# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **SHIRIN BAYATI** and **MOJAN KAMALVAND**, on behalf of themselves and all others similarly situated, | § § § § | |
| | § | |
| Plaintiffs, | § | |
| | § | CA 3-22-cv-0410-B |
| vs. | § | |
| | § | |
| **GWG HOLDINGS, INC.,** *et al.* | § | |
| | § | |
| Defendants | § | |

---

## MOTION TO INTERVENE

---

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................1

II.     RELEVANT FACTS .............................................................................................4

        A.      GWG's Relationship with Ben. ...................................................................4

        B.      The Class Action Lawsuit...........................................................................10

III.    ARGUMENTS AND AUTHORITIES................................................................15

        A.      The Court should grant the Intervenors' Motion as a matter of right or, in the
                alternative, on a permissive basis under Rule 24. .....................................15

                1.      Intervention is proper in this case. ................................................15

                2.      The Intervenors satisfy Rule 24(a)'s requirements. .....................17

                3.      Alternatively, the Intervenors satisfy Rule 24(b)'s requirements. .............22

## TABLE OF AUTHORITIES

**Cases**

*Adam Joseph Res. v. CNA Metals Ltd.*, 919 F.3d 856 (5th Cir. 2019) ......................................... 18

*Benjamin ex rel. Yock v. Dep't of Pub. Welfare of Pennsylvania*, 701 F.3d 938 (3rd Cir. 2012) ...................................................................................................................................... 15

*Brumfield v. Dodd*, 749 F.3d 339 (5th Cir. 2014)...................................................................... 17

*DeOtte v. Azar*, 332 F.R.D. 173 (N.D. Tex. 2019) ...................................................................... 21

*DeOtte v. State*, 20 F.4th 1055 (5th Cir. 2021) .......................................................................... 19

*Edwards v. City of Houston*, 78 F.3d 983 (5th Cir. 1996) ................................................ 20, 21, 22

*In re Charter Co.*, 50 B.R. 57 (Bankr. W.D. Tex. 1985)......................................................... 19, 20

*In re Discovery Zone Sec. Litig.*, 181 F.R.D. 582 (N.D. Ill. 1998)................................................ 16

*In re Enron Corp. Sec., Derivative & Erisa Litig.*, No. H-01-3624, 2004 WL 405886 (S.D. Tex. Feb. 25, 2004) ...................................................................................................... 16

*In re Estelle*, 516 F.2d 480 (5th Cir. 1975).................................................................................. 23

*In re Novatel Wireless Sec. Litig.*, No. 08CV1689 AJB RBB, 2014 WL 2858518 (S.D. Cal. June 23, 2014), *amended in part*, No. 08CV1689 AJB RBB, 2014 WL 3341049 (S.D. Cal. July 8, 2014) ...................................................................................................... 16

*In re Royal Alice Properties, LLC*, No. 19-12337, 2021 WL 150397 (Bankr. E.D. La. Jan. 15, 2021) ......................................................................................................................... 23, 24

*Kirkland v. New York State Dep't of Corr. Services*, 711 F.2d 1117 (2nd Cir. 1983).................. 15

*Miller v. Vilsack*, No. 21-11271, 2022 WL 851782 (5th Cir. Mar. 22, 2022) .............................. 17

*Moe v. Dinkins*, 533 F. Supp. 623 (S.D.N.Y. 1981), *aff'd*, 669 F.2d 67 (2nd Cir. 1982)............. 16

*Nat'l Horsemen's Benevolent and Protective Assoc. v. Black*, No. 5:21-CV-071-H, 2022 WL 974335 (N.D. Tex. Mar. 31, 2022)................................................................................. 18

*New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452 (5th Cir. 1984).......... 19

*Newby v. Enron Corp.*, 443 F.3d 416 (5th Cir. 2006)............................................................. 22, 23

*Obregon v. Melton*, No. No. 3:02-CV-1009D, 2002 WL 1792086 (N.D. Tex. Aug. 2, 2002) .......................................................................................................................... 22

*Piambino v. Bailey*, 610 F.2d 1306 (5th Cir. 1980), *cert. denied*, 449 U.S. 1011 (1980) ............ 19

*Sec. & Exch. Comm'n v. Stanford Int'l Bank, Ltd.*, No. 3:09-CV-298-N, 2010 WL 11492410 (N.D. Tex. Jan. 6, 2010) ..................................................................................... 23

*Sierra Club v. Espy,* 18 F.3d 1202 (5th Cir. 1994) ................................................................ 16, 18

*Stallworth v. Monsanto Co.*, 558 F.2d 257 (5th Cir. 1977) ......................................................... 17

*Texas v. United States*, 805 F.3d 653 (5th Cir. 2015)................................................................... 16

*Uniloc 2017 LLC v. AT&T Mobility LLC*, No. 2:18-CV-00514-JRG, 2019 WL 1773117 (E.D. Tex. Apr. 23, 2019) ...................................................................................................... 21

## Rules

Federal Rules of Civil Procedure 24 ........................................................................... 16, 17, 19, 22

L Bond Management LLC, the agent (the "Agent") for twenty-four holders (collectively the "Intervenors") holding over 22% of the total outstanding L Bonds issued by Defendant GWG Holdings, Inc. ("GWG"), files this Motion to Intervene ("Motion") in the above-captioned putative class action lawsuit (the "Lawsuit") and respectfully shows as follows[1]:

## I.      INTRODUCTION

Intervenors hold a substantial stake in this Lawsuit. Specifically, they currently hold $366.9 million of L Bonds.  *The Plaintiffs who filed this baseless Lawsuit, incorrectly alleging that the L Bonds were sold in a misleading manner, hold only $85,000 of L Bonds.*  The Lawsuit makes three principal allegations against GWG and various current and former GWG directors (the "Director Defendants"), and each of those allegations can be easily refuted based on the following key facts supported by GWG's SEC disclosures—disclosures that reflect the advice and counsel of outside legal firms and other advisers as to content, scope, and timeliness:

- GWG clearly disclosed in its public filings the use of L Bond proceeds, including any of the attendant risks associated with such use, and never represented that any specific amounts or percentages of L Bond proceeds would be invested in Ben.

    o   Neither GWG nor any of its directors ever misled investors as to the use of L Bond proceeds.

- GWG clearly disclosed Ben's business plan in its public filings, including any potential challenges Ben faced and its ability to achieve its objectives.

    o   Neither GWG nor its directors ever overstated Ben's business prospects.

- GWG's L Bond program was developed and engineered by GWG's original founder and a board of directors that pre-dated by over a half decade the management and directors named in the Lawsuit, every decision by GWG to invest in Ben was controlled by directors wholly independent of Ben, Ben's Founder, and Ben's management; GWG fully disclosed Ben's potential use of proceeds including with respect to any repayment to Ben's pre-existing related, associated or third-party lenders; and at the time the directors named in the Lawsuit stepped off the GWG board to focus on the opening of

---

[1] Intervenors support this Motion with the publicly-available information attached in the Appendix submitted with this Motion, which includes **Exhibits A** (and the documents attached thereto as Exhibits A-1 through A-10) and **Exhibit B**.

Ben's regulated business, GWG's investment in Ben had appreciated from its initial investment and GWG's assets significantly exceeded its liabilities as reported in GWG's filings that post-dated the directors' departure.

o  Ben's founder and CEO, Mr. Brad Heppner, and the other GWG board members, former and current, never engaged in a scheme to engineer the L Bond program to funnel money to Ben's senior lender; in fact, on a net cash basis, less than 9% of GWG's total L Bond proceeds were invested in Ben, much less applied by Ben for any particular purpose.

A chart included as **Exhibit B** in the Appendix to this Motion compares the Complaint's misleading allegations with the actual fulsome disclosures that GWG made and, therefore, demonstrates that the Complaint lacks merit.

As holders of L Bonds representing over 20% of the total L Bonds outstanding and representing the largest individual holders of L Bonds, the Intervenors have far more at stake in this Lawsuit than virtually any other party.  Moreover, certain of the Intervenors have a fiduciary obligation to protect the value of their assets for the ultimate beneficiaries, including a series of funds under one of the nation's top ten largest philanthropic grant-making foundations.  The Intervenors are compelled to intervene, through the Agent, because this baseless Lawsuit is causing substantial reputational harm to GWG, and thereby threatens to destroy the value of the L Bonds held by the very investors that the Plaintiffs purport to represent.  To assist in protecting the value of the L Bonds held by the Intervenors, the Agent has engaged the Honorable Richard S. Schmidt, Former Chief Judge for the United States Bankruptcy Court for the Southern District of Texas as a Restructuring Manager with full authority to act on behalf of the Intervenors in this Lawsuit.[2]

---

[2] "Judge Schmidt has a record of distinguished services as a judge advocate general, retiring from Air Force Reserves as a full colonel. During his military service he received the Meritorious Service Medal, the First Oak Leaf Cluster, the Commendation Medal, and the Air Force Achievement Medal. Upon retirement from the Air Force Reserves, Judge Schmidt received the Legion of Merit 'for exceptionally meritorious conduct in the performance of outstanding services.' On July 30, 2015, Judge Schmidt retired from the U.S. Bankruptcy Court bench after 28 years. During his tenure on the bench, Judge Schmidt served in many capacities, including chief bankruptcy judge for the Southern District of Texas, member of the Automation Committee for the Southern District of Texas, and board member and chair for the State Bar of Texas

**MOTION TO INTERVENE**                                                                    **Page 2**

In a series of transactions that began in 2018, GWG acquired almost all of the common units of a company called The Beneficient Company Group, L.P. ("Ben LP," and including all of the subsidiaries it may have from time to time, "Ben"). The equity GWG acquired in Ben is GWG's most valuable asset underpinning the repayment of GWG's L Bonds.  Thus, Ben's success correlates directly to the value of GWG's L Bonds. Due to recent regulatory approvals of a trust charter and other events, Ben's value, and the value of GWG's interests in Ben, is poised to grow substantially in the near future, as long as the unwarranted reputational harm caused by this Lawsuit is stopped in its tracks.  GWG's interests in Ben are also positioned to become substantially more liquid in the near future as Ben is pursuing transactions to make its equity publicly tradeable.

While the Lawsuit does not name Ben as a defendant, the specious allegations have caused, and continue to cause, reputational damage to Ben as it seeks to execute its business plan. Because the value of the L Bonds is inextricably intertwined with Ben's success, the Intervenors seek to join this suit to prevent this ill-conceived strike suit from decimating over approximately $1.15 billion in value to investors.

---

Bankruptcy Section. Judge Schmidt was a member of National Conference of Bankruptcy Judges. He is a frequent speaker and organizer of many CLE events, including Bench/Bar Conferences for the State Bar of Texas Bankruptcy Section, the Southern District of Texas, and the Fifth Circuit, as well as the State Bar of Texas Advanced Consumer and Advanced Business Bankruptcy conferences. He was selected one of the top 10 bankruptcy judges in America by Turnaround & Workout Magazine, received the Judicial Appreciation Award from the National Association of Chapter 13 Trustees, an Outstanding Service Award from the Bankruptcy Section of the State Bar of Texas in 2012, and the 'Banco Rotto' Award from that same section in 2015." Kay Walker, *Judicial Profile:  Hon. Richard S. Schmidt, Former Chief Judge for the U.S. Bankruptcy Court for the Southern District of Texas*, The Federal Lawyer, January/February 2016, at 31-32; available at https://www.fedbar.org/wp-content/uploads/2019/10/Schmidt-Hon-Richard-S-pdf-3.pdf.

---

## II.    RELEVANT FACTS

The Agent, acting through the Honorable Richard S. Schmidt, seeks to intervene in this matter on behalf of Intervenors holding $366.9 million in GWG's L Bonds. Certain of the Intervenors' ultimate beneficiaries include a series of charitable funds under the National Philanthropic Trust, one of the nation's top ten largest philanthropic grant making foundations (the "Charitable Beneficiaries").

Ben's financial condition and performance have a direct impact on the performance of GWG's L Bonds.  As more fully described below, through their recent business association, Ben, GWG, the Intervenors, and certain other parties engaged in a series of transactions whereby (a) the Intervenors obtained approximately $366.9 million in L Bonds, and (b) GWG acquired virtually all of the common units in Ben LP. *Id*. at App. 763 (as of September 30, 2021, GWG owned approximately 97% of outstanding Ben LP common units). Thus, the value of GWG's L Bonds ties directly both to (x) GWG's reputation and ability to raise capital and (y) the continued success and growth of not only GWG, but Ben as well. To understand the linkage, it is helpful to understand the recent relationship between GWG and Ben.

### A.    GWG's Relationship with Ben.

Before 2018, GWG's main business activity was to provide liquidity to holders of illiquid life insurance policies in exchange for interests in those policies. In 2017, GWG became interested in, among other things, diversifying its business through increased exposure to other types of illiquid "alternative" assets such as interests in private equity funds, hedge funds, etc. To accomplish this goal, beginning in 2018, GWG invested in and transacted with Ben, who provided exactly the type of liquidity and other services to investors of other classes of illiquid alternative assets to which GWG sought exposure, including private equity and hedge funds.  *See* GWG 2018

10-K, at App. 7 ("[GWG's] transactions with [Ben] provide us [GWG] with the opportunity for a diversified source of future earnings within the alternative asset industry. We believe the [Ben] transactions will transform GWG from a niche provider of liquidity to owners of life insurance to, as GWG and [Ben] expand their strategic relationship, a full-scale provider of trust and liquidity products and services to owners of a broad range of alternative assets."); *see also id.* at App. 6 ("In 2018 and early 2019 we [GWG] consummated a series of transactions (as more fully described below) with [Ben] that has resulted in a significant reorientation of our business and capital allocation strategy towards an expansive and diverse exposure to alternative assets."); *id.* at App. 7 ("While we [GWG] are continuing our work to maximize the value of our secondary life insurance business, we have made the strategic decision to begin reducing capital allocated to purchasing additional life insurance policies in the secondary market and to begin increasing capital allocated toward providing liquidity to a broader range of alternative assets, primarily through investments in [Ben].").

In particular, GWG explored investments in, and with, Ben. At the time, subject to obtaining certain regulatory charters, Ben provided, or planned to provide, a variety of products and services to mid-to-high net worth individuals (*i.e.*, individuals having a net worth of between $5 million and $30 million) and small to mid-sized institutional investors, with investments in illiquid alternative assets including, among other things, private equity funds and hedge funds. *Id.* at App. 6. The products and services included (i) loans and liquidity products, (ii) services for fund and trust administration, (iii) custody services, (iv) insurance services, and (v) an online portal for direct access to Ben's financial services and products. Prior to Ben's entry in the market, those types of products and services were typically cost- and time-prohibitive for investors, and GWG and Ben believed (and continue to believe) that there is a massive unmet market need for Ben's

products and services. *See, e.g., id.* at App. 14 (describing the market opportunity for "Alternative Asset Liquidity Products and Services); *id.* at App. 15 (describing the business strategies for "Liquidity for Alternative Assets).

In addition to seeing Ben's potential as a stand-alone company, GWG believed that a strategic partnership with Ben could provide other mutually advantageous opportunities to leverage GWG's knowledge, experience, and significant infrastructure in, and the marketing, sales, and servicing of, its independent broker dealer market and the related market for illiquid alternative investments. *See* App. 41. Accordingly, GWG and Ben engaged in a series of transactions from 2018 through 2021 whereby, among other things, they invested in each other, acquired equity in each other, acquired debt in each other, and shared the use of Ben's employees pursuant to a shared services agreement. *See, e.g.,* GWG 2019 10-K at App. 217-20 (detailing various transactions between GWG and Ben); GWG 2020 10-K at App. 397-401 (same). Certain of the Intervenors are a part of Ben's business plan to provide liquidity services to holders of alternative assets. In particular, those Intervenors are owned by a series of entities to which Ben loans money, and they use the funds to acquire interests in alternative assets that support the repayment of the loans and, ultimately, the payment of the Charitable Beneficiaries.

The L Bonds that the Intervenors hold are secured by the **same** collateral as Plaintiffs' L Bonds: GWG's assets and a guarantee and corresponding grant of security by its subsidiary, GWG Life, LLC. *See* June 2020 Registration Statement, at App. 871. GWG's assets consist primarily of its "investments in Beneficient, investments in [its] subsidiaries (including financing receivables from affiliates) and any cash proceeds [GWG] receives[s] from life insurance assets of [its] subsidiaries, and all other cash and investments [it] holds in various accounts." *Id.* The L Bonds are also secured by a pledge of 3,952,155 shares of GWG's common stock. *Id.* at App. 872. The

Intervenors L Bonds are *pari passu* in right of payment and in respect of collateral with the L Bonds held by Plaintiffs. *Id.* at App. 825.

Intervenors are GWG's two largest holders of L Bonds and among GWG's largest stakeholders of any class, and the value of the L Bonds that they hold directly links to Ben's success. More specifically, as of the period ending September 30, 2021, the total carrying value of all of GWG's holdings in Ben was reported at approximately $1.15 billion. *See* App. 825. That is the value at risk of being destroyed at GWG by this Lawsuit. Upon information and belief, GWG has net cash invested in Ben of $224 million with the first cash investments beginning in 2019. *See* App. 7-12 (detailing various transactions between GWG and Ben); *see* App. 217-23 (same). Since January 1, 2019, GWG has sold approximately $1.15 billion of L Bonds. Thus, the total percentage of cash GWG invested in Ben has been less than 20 percent of L Bonds raised by GWG over the same period. GWG's investment in Ben securities was made by GWG investing the net cash of $224 million and issuing common stock in-kind of $220 million and L Bonds in-kind of $367 million for a total cash and in-kind investment in Ben of $811 million. *See* App. 8-9. (describing the "Exchange Transaction" between, among others, GWG and Ben). The $811 million of net cash and in-kind investment now has an audited and reported value of $1.15 billion as September 30, 2021, or $340 million more than the consideration that GWG paid, and this figure does not reflect the growth that Ben is likely to achieve now given other recent events, such as obtaining a trust charter in Kansas. The single greatest asset GWG holds to make L Bond holders whole is Ben common units, and the specious allegations in the Complaint threaten the value of that asset.

Notably, as was disclosed to investors, GWG provided financing to Ben over the years in return for additional equity in Ben to support Ben's growth and achieve GWG's goal to grow its

investments in Ben and diversify GWG's exposure to illiquid alternative assets other than life settlements. *See* App. 717-23 (detailing various transactions with Ben).

As of GWG's filing of its 10-Q for the period ending on September 30, 2021, GWG's assets were worth more than its liabilities. *See* App. 825. However, the ability to raise capital, including through the issuance of L Bonds, was and remains a critical aspect of GWG's business. *See* App. 748 ("[GWG] critically rel[ies] on debt financing for [GWG's] business. Any inability to borrow could adversely affect [GWG's] business operations, [GWG's] ability to satisfy [its] debt-payment obligations and, ultimately, [GWG's] prospects and viability."). This Lawsuit has caused GWG to needlessly waste precious liquidity on legal fees and the resulting unwarranted reputational harm is hindering GWG's ability to raise the additional capital it needs to survive and service the L Bonds. It could even force GWG to liquidate its assets at a substantial discount to the detriment of L Bond holders, as GWG disclosed to its investors:

> The offer and sale of our [GWG's] L Bonds is the principal means by which we intend to raise funds needed to meet our business and financial goals. However, if we are unable to continue to do so for any reason we may be unable to meet our goals….[and] could be forced to sell our investments … in order to service or satisfy our debt-related obligations. …If we are forced to sell any material amount of these investments we may be unable to sell them at prices we believe are optimal, particularly if our sale of policies occurs at a time when we are (or are perceived to be) in distress. In any such event, our business **and the value of our securities would likely be materially and adversely impacted**.

*See* App. 33.

Further, the timing of this Lawsuit could not be worse, as it comes during a critical juncture for Ben. Mere months before Plaintiffs filed this putative class action, the Kansas Office of the State Bank Commissioner issued a Ben subsidiary an operating charter (the "<u>Charter</u>") under the recently enacted Kansas Technology-Enabled Fiduciary Financial Institutions ("<u>TEFFI</u>") Act. This Charter is a critical piece of Ben's business plan that allows Ben to substantially expand its operations and customer base. *See* App. 21 ("[Ben] has applied for trust charters from the Texas

---

**MOTION TO INTERVENE**                                                   **Page 8**

Department of Banking and intends to carry on much of its business through two subsidiary trust companies. Because [Ben's] current business plans are based in part on obtaining regulatory charters to operate as regulated trust companies, a failure to obtain such charters may materially and adversely impact its financial performance and prospects, which would likely diminish [GWG's] ability to affect parts of our business plan and growth strategies.").

The TEFFI Act was signed by the Governor on April 21, 2021, and it became effective on July 1, 2021. The final charter was issued on December 31, 2021. *See* GWG 8-K filed on Jan. 3, 2022, at App. 842; "The Beneficient Company Group Announces Initial $15 Million Community Reinvestment to Kansas as part of the TEFFI Act," Yahoo.com (https://finance.yahoo.com/news/beneficient-company-group-announces-initial-163800087.html) (Jan. 20, 2022), at App. 843-46, (discussing the charter that Ben received and Ben's corresponding "initial contribution of assets totaling approximately $15 million for the benefit of rural Kansas communities pursuant to the recently enacted Technology Enabled Fiduciary Financial Institutions (TEFFI) Act").  Upon information and belief, Ben is currently in the process of securing approval of additional legislation and regulatory approvals and is seeking to finalize various other transactions to raise capital, obtain additional assets, and improve the liquidity of its equity, all to further support its business plans. *See, e.g.,* "The Beneficient Company Group Appoints Emily Bowersock Hill to its Board of Directors," TrustBen.com (https://www.trustben.com/insights/the-beneficient-company-group-appoints-emily-bowersock-hill-to-its-board-of-directors/) (last visited April 12, 2022), at App. 847-51 ("Ben is at a critical inflection point as we work with Kansas regulators and legislators on the implementation of the Technology Enabled Fiduciary Financial Institutions (TEFFI) Act….").

---

**MOTION TO INTERVENE**                                                                    **Page 9**

Upon information and belief, the false and misleading allegations in the Complaint are hindering this process, which could hurt Ben's value (and thereby the value of GWG's equity in Ben, which is its most valuable asset available to generate proceeds to pay L Bonds). Indeed, while Ben was not named as a defendant in the Lawsuit, the spurious allegations were apparently distributed to the press (including in Kansas, where Ben is seeking critical legislative and regulatory approvals) before being served on the Defendants, in an apparent attempt to create leverage by harming Ben's reputation at this critical juncture.

With these critical pieces of its business plan falling into place, Ben's value is poised to grow substantially, which will increase the value of Ben common units. That increased value, in turn, will directly translate to value for GWG L Bond holders. The hollow allegations in this Lawsuit, however, threaten significant reputational damage to both GWG and Ben in the marketplace and public sphere. This threatens both GWG's and Ben's ability to execute their business plans fully and threatens the value of the L Bonds held by Intervenors and *all other bond holders*. Ironically, this Lawsuit could ultimately destroy the value it seeks to protect, threatening to wipe more than a billion dollars of value for L Bond investors.

**B.    The Class Action Lawsuit**

The Plaintiffs filed this baseless Lawsuit against GWG and certain former members of GWG's board who currently serve on Ben's board. The Lawsuit alleges violations of Sections 11, 12, and 15 of the Securities Act of 1933. The Lawsuit, however, advances misleading half-truths and outright false allegations, especially against certain of Ben's directors, including Mr. Heppner, the founder and key force behind Ben's business vision. Those allegations have harmed, and continue to harm, both GWG's and Ben's reputation and value, which, in turn, directly harms the L Bond holders by driving down the L Bonds' value.

---

The Lawsuit relates to a June 2020 Registration Statement and other filings incorporated therein that GWG issued as part of its ongoing program to issue L Bonds to fund operations. GWG issued approximately $476.7 million in L Bonds under the June 2020 program, only approximately 18.7% of the total approximately $2.5 billion in L Bonds that GWG issued. The Lawsuit makes three principal allegations, each of which the Intervenors believe would not survive a motion to dismiss. Indeed, the chart appended to this Motion as Exhibit B fully details the allegations in the Complaint, which claim a lack of disclosure, and then demonstrates the actual fulsome disclosures that refute the allegations. As more fully discussed in the chart, the Lawsuit falsely alleges that:

- GWG and its directors misled investors as to the use of L Bond proceeds;

- GWG and its directors overstated Ben's business prospects; and

- Ben's founder and CEO, Mr. Brad Heppner, and the other GWG board members, former and current, engaged in a scheme to engineer the L Bond program to funnel money to Ben's senior lender for Mr. Heppner's benefit.

To assert the first allegation, the Lawsuit selectively quotes only the first half of one sentence from the June 2020 Registration Statement relating to the use of L Bond proceeds. This artful quoting implies that GWG committed to using a certain portion of the proceeds to "grow [GWG]'s alternative asset exposure, including through investments in Ben LP in the form of equity investments and/or loans to Ben LP and related entities," which the Complaint alleges is misleading because "[o]nly a small percentage of the offering proceeds was being used for these purposes as of this time." *See* Compl. ¶ 70, ECF No. 1. But the second half of the sentence in the June 2020 Registration Statement and the following sentences —which Plaintiffs left out of the Complaint—explain that L Bond proceeds could be used for other purposes, including to pay Ben's senior lender, and that the amount spent for any particular purpose was dependent on many factors. In particular, the disclosure stated that:

---

We [GWG] intend to use the net proceeds from this offering to grow our alternative asset exposure, including through investments in Beneficient in the form of equity investments and/or loans to Beneficient or related entities, **and to meet our other obligations, including**:

- servicing our portfolio of life insurance assets (i.e., paying life insurance policy premiums);

- paying principal (at maturity or upon earlier prepayment or redemption), interest and fees to our lenders, including under DLP IV's second amended and restated senior credit facility, previously issued L Bonds, Seller Trust L Bonds and the L Bonds offered hereby;

- paying dividends on and, if applicable, redeeming our preferred stock;

- paying transaction expenses relating to interest rate hedging and similar derivative transactions (e.g., caps, collars, etc.); and

- general working capital purposes.

*See* App. 880 (emphasis added).

Moreover, the next two sentences about the potential uses of L Bond proceeds warned investors

that, among other things:

> **The extent to which we will use proceeds from this offering for any of these purposes, and the amounts and timing of such expenditures, will depend on, among other things**, how long the L Bonds are offered, the amount of net proceeds that we receive from the sale of L Bonds being offered, our cash flows and needs for liquidity, the existence and timing of opportunities to strategically increase our investment in Beneficient, the availability of funds from other sources, including realizations from policy benefits, distributions from investments in Beneficient, the issuance of common or preferred equity, borrowings from senior credit facilities, and other factors deemed relevant by our Board of Directors and management.
>
> Beneficient will have broad discretion to use the proceeds of any such investments and may use such proceeds to acquire alternative assets, **to repay indebtedness, including to related parties**, and for general working capital purposes, including operating expenses.

*Id*. (emphasis added).

In other words, the June 2020 Registration Statement stated explicitly that the L Bond

proceeds would not necessarily be used solely, or even mostly, to grow GWG's alternative asset

---

**MOTION TO INTERVENE**                                                                 **Page 12**

exposure, and that the proceeds could be used to repay Ben's senior debt. The June 2020 Registration Statement expressly disclaimed that any particular portion of L Bond proceeds would be used for any specific purpose. The second allegation—that GWG overstated Ben's business prospects, particularly with respect to the creation of a "unified platform uniquely positioned to provide an expanded suite of products," *see* Compl.¶ 70, ECF No.1—is also baseless and directly contradicted by GWG's public disclosures. For example, GWG's 2019 10-K, which Plaintiffs admit was incorporated by reference in the June 2020 Registration Statement, included 16 pages of "Risk Factors" relating to risks involving Ben. *See* App. 240-56. GWG expressly warned investors that:

- Ben had "experienced significant delays in obtaining trust company charters and may be unable to do so, which outcome would hinder Beneficient's ability to successfully pursue its current business plan and could adversely affect the value of Ben LP's common units;"

- "Ben's business faces substantial competition"; and

- "Beneficient may only be able to offer a limited number of products and solutions due to regulatory, capital or other restrictions."

App. 243, 250.

Finally, the allegation that Mr. Heppner and the other GWG directors engineered the L Bond program to enrich Mr. Heppner through, among other things, the use of L Bond proceeds to repay Ben's senior debt, *see* Compl. at. ¶¶ 2, 5-6, 78, does not make sense. As an initial matter, the Complaint does not explain why the other GWG directors would engage in a scheme to benefit Mr. Heppner. Furthermore, Mr. Heppner and the other Director Defendants did not serve on GWG's board during 2018, and therefore had no control over any transactions with Ben during that time. While Mr. Heppner and the other Director Defendants served on the GWG Board, each of the 2019 investments in Ben and all other material transactions were approved by a special committee of independent directors, who had independent legal counsel and independent financial

advisors. *See* App. 247. ("The Board of Directors of GWG has established a special committee of independent and disinterested directors to review and, if deemed appropriate, approve proposed transactions with or involving Beneficient."); *see id.* ("A special committee of the Board of Directors of the Company (the "Special Committee") composed solely of independent and disinterested directors of the Company, together with the assistance of its independent legal advisors, reviewed, negotiated and approved the terms of the [$65 million LiquidTrust] Loan."); *see id.* ("The Special Committee, together with the assistance of its independent legal advisors, reviewed, negotiated and approved the terms of the Intercreditor Agreements."); App. 915 ("The terms and conditions of [transaction whereby GWG transferred $79 million to Beneficient LP in return for 666,667 common units of Beneficient LP and a Preferred Series A Subclass 1 Unit Account of BCH] were negotiated and approved by the previously disclosed Special Committee of the Board of Directors of the Company with the assistance of independent legal and financial advisors."). *Simply put, based upon the robust corporate governance procedures in place, Mr. Heppner and the Director Defendants did not—and could not—control GWG's decisions to invest in or with Ben.*

These are just a sample of what the Intervenors believe to be many false and misleading allegations made in the Complaint.[3] GWG's own reputation, its ability to raise capital and the

---

[3] For example, the Complaint falsely alleges that GWG transferred "more than $359 million in cash to Ben LP and its subsidiaries" in 2018 and 2019, which included an "$80 million" loan to Ben. Compl. ¶ 5, ECF No. 1. But this is false. GWG did not transfer $359 million in cash to Ben in 2018 and 2019, and there was no $80 million loan. As clearly disclosed in financial statements, GWG did not transfer any cash to Ben in 2018 and only invested $144.03 million in cash in 2019. *See* App. at 236, ("On May 31, 2019, certain Liquid Trusts…executed a Promissory Note (the "Promissory Note") with GWG Life for a principal amount of $65.0 million…."); App. at 302 ("Pursuant to the Investment Agreement, [GWG] transferred $79 million to Ben LP in return for 666,667 common units of Ben LP and a Preferred Series A Subclass 1 Unit Account of BCH."). Notably, the Complaint fully admits that the 2019 10-K was incorporated by reference in the June 2020 Registration Statement. Compl. ¶ 72 n. 2, ECF No. 1. ("This statement was contained within the 2019 Annual Report, *which the June 2020 Registration Statement incorporated by reference*.") (emphasis added). Further, the loan referenced in the Complaint was for $65 million, not $80

---

value of its substantial equity stake in Ben—through which it owns approximately 46% of Ben LP common units on a fully-diluted basis—underpin the value of GWG's L Bonds and remains a key component of maintaining value for investors. Thus, the reputational harm to GWG and Ben that Plaintiffs have caused with their baseless allegations will, ironically, damage the very constituency Plaintiffs purport to represent. It is in all stakeholders' interests that the Court allow the Intervenors to intervene to ensure this suit does not damage GWG's and Ben's value and reputation so that, among other things, GWG and Ben can execute their respective business plans and continue to grow.

### III.   ARGUMENTS AND AUTHORITIES

**A.   The Court should grant the Intervenors' Motion as a matter of right or, in the alternative, on a permissive basis under Rule 24.**

**1.   Intervention is proper in this case.**

Under the current putative class definition, the Intervenors are not members of the proposed class. But their interest in this Lawsuit—preserving the value of the L Bonds for their beneficiaries—could be eliminated if this case continues on its current course. Intervenors may intervene given their interests even though they are not members of the putative class as currently defined. *See, e.g.*, *Benjamin ex rel. Yock v. Dep't of Pub. Welfare of Pennsylvania*, 701 F.3d 938, 942 (3rd Cir. 2012) (remanding with special instructions to the district court to grant intervention of non-class members to challenge settlement agreement and seek decertification of class); *Kirkland v. New York State Dep't of Corr. Services*, 711 F.2d 1117, 1128 (2nd Cir. 1983)

---

million. *See* App. at 236. ("On May 31, 2019, certain Liquid Trusts for which Ben…held investments in senior beneficial interests, executed a Promissory Note (the "Promissory Note") with GWG Life for a principal amount of $65.0 million…. An initial advance in the principal amount of $50.0 million was funded on June 3, 2019, and a second advance in the principal amount of $15.0 million was funded on November 27, 2019."). Thus, the Plaintiffs either intentionally or recklessly overstated the cash transferred to Ben by approximately **2.5 times** the amount actually invested in 2018 and 2019 and overstated the amount of the loan by almost **25%**.

---

(affirming grant of conditional intervention by non-class members); *In re Novatel Wireless Sec. Litig.*, No. 08CV1689 AJB RBB, 2014 WL 2858518, at *2 (S.D. Cal. June 23, 2014), *amended in part*, No. 08CV1689 AJB RBB, 2014 WL 3341049 (S.D. Cal. July 8, 2014) ("Indeed, while non-class members may not have standing to object to a proposed class action settlement, interjection of the opposing views of a non-class member may proceed via intervention under Rule 24."); *In re Discovery Zone Sec. Litig.*, 181 F.R.D. 582, 601–02 (N.D. Ill. 1998) (granting non-class member's motion to intervene, for the limited purpose of participating in settlement negotiations in securities fraud class action).

Generally, "[f]ederal courts should allow intervention where *no one would be hurt and the greater justice could be attained*." *Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015) (emphasis added) (quoting *Sierra Club v. Espy,* 18 F.3d 1202, 1205 (5th Cir. 1994)). Indeed, this approach harmonizes with the purpose of Rule 24:

> If an absentee would be *substantially affected in a practical sense* by the determination made in an action, he should, as a general rule, be entitled to intervene . . . Intervention of right is here seen to be a kind of counterpart to Rule 19(a)(2)(i) on joinder of persons needed for a just adjudication: where, upon motion of a party in an action, an absentee should be joined so that he may protect his interest which as a practical matter may be substantially impaired by the disposition of the action, he ought to have a right to intervene in the action on his own motion.

Fed. R. Civ. P. 24, comments to 1966 Amendment (emphasis added). In fact, intervention by the Intervenors, "would permit the rights of the class to be more broadly represented without delaying or prejudicing the orderly process of the litigation or the rights of the existing parties." *In re Enron Corp. Sec., Derivative & Erisa Litig.*, No. H-01-3624, 2004 WL 405886, at *3 (S.D. Tex. Feb. 25, 2004) (citing *Moe v. Dinkins*, 533 F. Supp. 623 (S.D.N.Y. 1981), *aff'd*, 669 F.2d 67 (2nd Cir. 1982)).

Here, Plaintiffs' Complaint makes numerous false allegations which have severely harmed GWG's value and ability to raise financing, to the detriment of all L Bond holders. Those allegations are harming GWG's reputation and forcing GWG to expend funds to defend against baseless litigation. Moreover, the Complaint is threatening to harm Ben's reputation and value, which is GWG's most valuable asset. Accordingly, the Intervenors' interests could be substantially impaired and greater justice can be obtained by correcting the record and allowing the Intervenors to safeguard the value of the L Bonds by intervening in this Lawsuit.

### 2.    The Intervenors satisfy Rule 24(a)'s requirements.

Federal Rule of Civil Procedure 24(a)(2) compels a court to permit a party to intervene who "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the [intervening party's] ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2); *Stallworth v. Monsanto Co.*, 558 F.2d 257, 268 (5th Cir. 1977) (reversing order denying motion to intervene). This rule requires the prospective intervenor to satisfy four requirements:

> (1) The application must be timely; (2) the applicant must have an interest relating to the property or transaction that is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede its ability to protect its interest; and (4) the applicant's interest must be inadequately represented by the existing parties to the suit.

*Brumfield v. Dodd*, 749 F.3d 339, 341 (5th Cir. 2014) (reversing denial of Rule 24(a) motion).

"Rule 24 is to be liberally construed, with doubts resolved in favor of the proposed intervenor." *Miller v. Vilsack*, No. 21-11271, 2022 WL 851782, at *2 (5th Cir. Mar. 22, 2022) (internal quotation marks and citation omitted) (reversing denial of intervention as a matter of

---

**MOTION TO INTERVENE**                                                                 **Page 17**

right). The Court should grant this timely motion to intervene because the Intervenors satisfy all those requirements.

### a.        This Motion is timely.

"Determining the timeliness of a motion to intervene is a four-factor analysis: '(1) the length of time during which the intervenor actually knew or reasonably should have known of his interest in the case; (2) the extent of prejudice to the existing parties to the litigation; (3) the extent of prejudice to the would-be intervenor; and (4) unusual circumstances.'" *Nat'l Horsemen's Benevolent and Protective Assoc. v. Black*, No. 5:21-CV-071-H, 2022 WL 974335, at *3 (N.D. Tex. Mar. 31, 2022) (granting a motion to intervene) (quoting *Adam Joseph Res. v. CNA Metals Ltd.*, 919 F.3d 856, 865 (5th Cir. 2019) (reversing order denying motion to intervene as a matter of right)). These factors are not meant to punish a movant seeking to participate in the litigation after it has begun, but to guard against prejudicing the original parties by the prospective intervenor not having moved earlier. *See Sierra Club*, 18 F.3d at 1205.

The Intervenors' Motion is timely as this Lawsuit was filed on February 18, 2022. Compl. 1, ECF No. 1. In that time, Plaintiffs have done little more than secure service, negotiate a preliminary scheduling order, and publish a notice to the members of the putative class who may wish to participate in the Lead Plaintiff process. Because the Intervenors have moved to intervene in less than two months' time, the first factor favors intervention. *See, e.g.*, *Black*, 2022 WL 974335, at *3 (granting a motion to intervene and holding the motion filed "a little over a month" after learning of the underlying lawsuit was timely); *Sierra Club*, 18 F.3d at 1204–05 (granting a motion to intervene and holding the motion was timely when it was filed within two months of the party becoming aware that its interest might be affected). The expediency with which the Intervenors moved to intervene and the fact that no substantive briefing, or other activities have occurred, show that Plaintiffs will suffer no prejudice. *Sierra Club*, 18 F.3d at 1206 ("[P]rejudice

---

**MOTION TO INTERVENE**                                                                                          **Page 18**

must be measured by the delay in seeking intervention, not the inconvenience to the existing parties of allowing the intervenor to participate in the litigation."). However, as discussed below, if the Court does not allow the Intervenors to intervene in this matter, they would suffer severe prejudice, as would all the other holders of approximately $1.6 billion in GWG L Bonds.

### b.     The Intervenors' interests in the L Bonds support intervention.

The Intervenors' interests in the L Bonds—which this Lawsuit currently and directly impacts—dwarf that of the Plaintiffs. The Intervenors currently hold approximately $367 million worth of L Bonds, while Plaintiffs hold just $85 thousand worth of L Bonds. Compl. ¶¶ 15, 16, ECF No. 1.  Rule 24(a)(2) requires the Intervenors to demonstrate only a direct, substantial, and legally protectable interest in the Lawsuit. *See Piambino v. Bailey*, 610 F.2d 1306, 1321 (5th Cir. 1980), *cert. denied*, 449 U.S. 1011 (1980). The dispositive question in this analysis is whether "the intervenor has a stake in the matter that goes beyond a generalized preference that the case come out a certain way," as opposed to seeking intervention "solely for ideological, economic, or precedential reasons." *DeOtte v. State*, 20 F.4th 1055, 1068 (5th Cir. 2021). Thus, the Court should grant this motion to intervene if the Intervenors possess a stake in protecting the value of L Bonds impacted by this Lawsuit. *See New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 466 (5th Cir. 1984) (concluding intervention is proper if the intervenor possesses the substantive legal right it seeks to assert); Fed. R. Civ. P. 24(a)(2). With approximately $367 million in L Bonds at risk, and the same collateral securing all L Bonds, the Intervenors possess a significant stake in protecting their value, and their intervention would serve to protect more than approximately $1.15 billion in value for other L Bond holders.

An intervenor satisfies Rule 24(a)(2)'s interest prong when the resolution of issues raised in a proceeding will impact the intervenor's interest in the property that is the subject of the litigation, here, the L Bonds. *See In re Charter Co.*, 50 B.R. 57, 62 (Bankr. W.D. Tex. 1985)

---

**MOTION TO INTERVENE**                                                                                   **Page 19**

("Resolution of the issues raised by the adversary proceedings . . . will most assuredly affect the interests of the [would-be intervenor]."). The Intervenors' interests are not general in the sense that they stem purely from unrelated tentative litigation. Rather, the Intervenors seek to curtail a baseless lawsuit that directly, and currently, harms their interests in their L Bonds and those of other investors. Therefore, the Intervenors' interests satisfy Rule 24(a)(2).

The outcome of this case threatens the value of all L Bonds, and the Intervenors seek to preserve that value. *See In re Charter Co.*, 50 B.R. 57, 62 (Bankr. W.D. Tex. 1985) (holding that an intervenor's interest in preserving the bankruptcy estate satisfied Rule 24(a)(2) where the outcome of a decision in the underlying case could deplete the estate, and ultimately granting Rule 24(b) motion to intervene on other grounds). Through a series of misleading allegations as outlined in Exhibit A, the Complaint alleges that Defendants' actions caused "the steep decline in the value of the L Bonds," issued under the June 2020 registration statement, thereby causing L Bond holders to suffer "significant losses and damages." *See* Compl. ¶¶ 11, 93. Indeed, the reckless accusations in the Complaint do not impact solely the value of the class's L Bonds but instead threaten to devalue ***all*** L Bonds. *See id.* ¶ 93 ("The ***value of the L Bonds*** has substantially declined ***as a result of*** Defendants' violations.") (emphasis added). This unwarranted cloud over the value of *all* L Bonds threatens to gut not only the value of the approximately $367 million of L Bonds held by the Intervenors but the $1.2 billion of L Bonds held by other investors. Thus, the Intervenors have significant interests in this Lawsuit to preserve the value of their investments (and the value of other's investments) and the Court should grant intervention.

<b>c.     Denying intervention would significantly impair the Intervenors'<br>ability to protect their interests in the L Bonds, and collaterally, the<br>value of the L Bonds held by other L Bond holders.</b>

Rule 24(a) requires that the Intervenors meet the liberal standard of practical impairment to intervene. *See Edwards v. City of Houston*, 78 F.3d 983, 1004–05 (5th Cir. 1996) (holding

---

movants were entitled to intervention as a matter of right). Rule 24(a)'s impairment factor focuses on whether denying intervention is tantamount to denying the movant the ability to safeguard its interests. *See Uniloc 2017 LLC v. AT&T Mobility LLC*, No. 2:18-CV-00514-JRG, 2019 WL 1773117, at *4 (E.D. Tex. Apr. 23, 2019). The Complaint's misleading allegations impugn the underlying economics of the L Bonds issued through the June 2020 registration statement. The reckless and unsubstantiated claims of misdeeds in June 2020 painted in broad strokes by this strike suit, now threaten to paint all L Bonds with an improper brush, potentially destroying approximately $1.15 billion in investor value, including the value of the class members they now claim to represent. By intervening, the Intervenors seek to prevent such destruction. Denying the request would deny the ability to protect the value of the L bonds.

> **d.   Existing parties do not, and cannot, adequately represent the Intervenors' interests in the L Bonds.**

The burden to demonstrate a party's interests are inadequately represented are "minimal," and an intervenor may meet this test solely by showing they "*may be*" inadequately represented by the existing parties. *DeOtte v. Azar*, 332 F.R.D. 173, 185 (N.D. Tex. 2019) (holding the movant satisfied the fourth Rule 24(a) prong where no party to the lawsuit shared the same ultimate objective as the movant) (quoting *Sierra Club*, 18 F.3d at 1207) (internal quotations omitted). As part of the analysis, courts in the Fifth Circuit must first assess whether a presumption of adequate representation exists. *DeOtte* 332 F.R.D. at 185 (quoting *Edwards*, 78 F.3d at 1005) (internal quotations and brackets omitted). These presumptions rest on whether (1) "the would-be intervenor has the same ultimate objective as a party to the lawsuit," or (2) if "the putative representative is a governmental body or officer charged by law with representing the interests of the intervenor." *Id.* (internal quotations and brackets omitted). Neither of these presumptions apply

in this case. First, neither Plaintiff is a government officer charged to represent the Intervenors. Second, the Intervenors do not have the same objective as any party to the lawsuit.

Here, the Intervenors seek to **preserve** the value of the L Bonds for the benefit of **all** L Bond holders. But the Plaintiffs seek only alleged damages solely tied to a discrete subset of L Bonds. Their Lawsuit, and the slipshod allegations within, show no regard for the possibility that it may vitiate the value of property held by other L Bond holders. As a result, the Intervenors need only meet a *de minimis* standard of proof to show the existing parties inadequately represent them. The Intervenors satisfy that low threshold. *See Edwards*, 78 F.3d at 1005–06 (5th Cir. 1996) (reversing order denying motions to intervene, concluding intervenors "may be" inadequately represented when they simply show they do not seek the same ultimate objective as the existing parties). Because the existing parties cannot adequately represent the Intervenors' interests, and the Intervenors otherwise satisfy the requirements of Rule 24(a), the Motion should be granted.

### 3.    Alternatively, the Intervenors satisfy Rule 24(b)'s requirements.

In addition to mandatory intervention, a movant may be permitted to intervene if it can satisfy the requirements of Rule 24(b)(2). Fed. R. Civ. P. 24(b)(2). The threshold determination is whether the movant's claim or defense in the main action has a common question of law or fact. *Newby v. Enron Corp.*, 443 F.3d 416, 421 (5th Cir. 2006) (affirming intervention). Additionally, the motion to intervene must be timely and the intervention must not unduly delay or prejudice the original parties to the suit. *See Obregon v. Melton*, No. No. 3:02-CV-1009D, 2002 WL 1792086, at *3 (N.D. Tex. Aug. 2, 2002). For the reasons discussed above, the Intervenors' intervention is timely and will not delay or prejudice either the proposed class or the defendants. Likewise, the fact that the Plaintiffs do not adequately represent the Intervenors' interests in the L Bonds weighs in favor of permitting intervention.

---

The Intervenors also satisfy the remaining part of the inquiry, common questions of law or fact with a claim or defense in the main action. This portion of Rule 24(b)(2) has been, and should be, construed liberally, and an applicant may be permitted to intervene under the rule even if they would not have been a proper party at the beginning of the suit. *In re Estelle*, 516 F.2d 480, 485 (5th Cir. 1975); *see also Newby*, 443 F.3d 422–23. Another court in the Northern District of Texas has found that holding an interest in property that was the subject of the underlying litigation satisfies Rule 24(b)(2). *See Sec. & Exch. Comm'n v. Stanford Int'l Bank, Ltd.*, No. 3:09-CV-298-N, 2010 WL 11492410, at *1 (N.D. Tex. Jan. 6, 2010). In *Stanford Int'l Bank*, a receiver was appointed over the defendant's assets in an SEC fraud action. *Id.* at *1. After filing for divorce, the defendant's wife moved to intervene in the receivership proceeding on the ground she had a community property interest in the defendant's personal assets. *Id.* The court found her property interest sufficient to permit intervention under Rule 24(b)(2), noting that her claims to property held in receivership "clearly share[d] common questions" with the underlying litigation. *See id.*

Similarly, here, the Intervenors' interests in the L Bonds clearly share common questions with Defendants in this this Lawsuit. The inflammatory and untruthful nature of the Complaint threatens the value of the Intervenors' property, which is secured *pari passu* by the same collateral as the L Bonds held by the Plaintiffs. Indeed, if permitted to intervene, the Intervenors would support defenses available to the Defendants. When common defenses exist between two entities, intervention should be allowed, especially where the intervening party would "significantly contribute to the full development of the underlying factual issues of the suit." *In re Royal Alice Properties, LLC*, No. 19-12337, 2021 WL 150397, at *5 (Bankr. E.D. La. Jan. 15, 2021) (quotations omitted). This is particularly true where the intervening party can "align" itself with the end goals of an existing party. *See id.* at *4.

In *In re. Royal Alice Properties, LLC,* following a petition for Chapter 11 bankruptcy, the LLC's member moved to intervene in the adversary proceeding against the LLC. *See id.* The court granted the motion for intervention because the member had demonstrated her interests in defending the debtor in the adversary action aligned with the interest of the Chapter 11 trustee— preservation of the bankruptcy estate—and she had offered what defenses she would raise if allowed to intervene. *See id.* at *2, *5. Here, the Intervenors can and will dispute many, if not all of Complaint's allegations to protect the value of their assets and will significantly contribute to the full development of the underlying factual issues of the Lawsuit. *See id.* at *5.

The Intervenors have demonstrated all these factors, and they should be permitted to intervene. Moreover, if the Intervenors are not granted their requested relief at this critical stage in the litigation, ***all holders of L Bonds stand to have their interest decimated***.

### <u>CONCLUSION</u>

For the reasons stated herein, this Court should grant L Bond Management LLC's Motion to Intervene as a matter of right under Federal Rule of Civil Procedure 24(a), or alternatively, allow permissive intervention under Rule 24(b).

DATED: April 19, 2022

Respectfully submitted,

/s/ Michael K. Hurst
Michael K. Hurst
Texas Bar No. 10316310
mhurst@lynnllp.com
Sara Hollan Chelette
Texas Bar No. 24046091
schelette@lynnllp.com
**LYNN PINKER HURST & SCHWEGMANN, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone:    214.981.3800
Facsimile:    214.981.3839

**ATTORNEYS FOR INTERVENORS**

## CERTIFICATE OF CONFERENCE

On April 29, 2022, Michael K. Hurst and Sara Hollan Chelette, attorneys for Intervenors, conferred with Adam Polk, one of the attorneys for Plaintiffs, regarding this Motion. Mr. Polk did not indicate whether he was opposed or unopposed as he wanted to confer with his co-counsel regarding the request.  At this time, Intervenors consider the Motion opposed, but if Plaintiffs' counsel informs Intervenors' counsel that they do not oppose the relief requested herein, Intervenors' counsel will promptly advise the Court.

/s/ Michael K. Hurst
Michael K. Hurst

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document has be served via ECF upon all counsel of record on April 19, 2022

/s/ Michael K. Hurst
Michael K. Hurst

---

**MOTION TO INTERVENE**                                                                                          **Page 25**