**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| SHIRIN BAYATI and MOJAN KAMALVAND, on behalf of themselves and all others similarly situated, | § § § § | |
| Plaintiffs, | § § § | CA 3-22-cv-0410-B |
| vs. | § § | |
| GWG HOLDINGS, INC., *et al.* | § § | |
| Defendants | § § | |

**APPENDIX TO MOTION TO INTERVENE**

| EX | Description | App Page(s) |
|---|---|---|
| A | Declaration of Sara Hollan Chelette | App. 3-5 |
| A-1 | GWG Holdings, Inc., 2018 10-K | App. 6-212 |
| A-2 | GWG Holdings, Inc., 2019 10-K | App. 213-378 |
| A-3 | GWG Holdings, Inc., 2020 10-K | App. 379-697 |
| A-4 | GWG Holdings, Inc., 10-Q for the period ending September 30, 2021 | App. 698-841 |
| A-5 | GWG Holdings, Inc., 2022 8-K | App. 842 -842.1 |
| A-6 | *The Beneficient Company Group Announces Initial $15 Million Community Reinvestment to Kansas as part of the TEFFI Act.* dated Jan 20, 2022 – Yahoo.com | App. 843-846 |
| A-7 | *The Beneficient Company Group Appoints Emily Bowersock Hill to its Board of Directors* dated April 12, 2022 | App. 847-851 |

APPENDIX TO MOTION TO INTERVENE                                        App. 1

| EX | Description | App Page(s) |
|----|-------------|-------------|
| A-8 | GWG Holdings, Inc.,  June 2020 Registration Statement | App. 852-910 |
| A-9 | GWG Holdings, Inc., 2020 8-K | App. 911-917 |
| A-10 | GWG Holdings, Inc, 2017 10-K | App. 918-1021 |
| B | Chart of Comparison of Misleading Allegations of the Complaint | App. 1022-1030 |

DATED:   April 19, 2022

Respectfully Submitted,

**LYNN PINKER HURST & SCHWEGMANN LLP**

*/s/ Sara Hollan Chelette*
Michael K. Hurst
State Bar No. 10316310
mhurst@lynnllp.com
Sara Hollan Chelette
State Bar No. 24046091
schelette@lynnllp.com
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone: (214) 981-3800
Facsimile: (214) 981-3839

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served *via electronic e-service* on all parties of record on April 19, 2022.

*/s/Sara Hollan Chelette*
Sara Hollan Chelette

APPENDIX TO MOTION TO INTERVENE                                                  App. 2

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SHIRIN BAYATI** and **MOJAN KAMALVAND**, on behalf of themselves and all others similarly situated, | § § § § | |
| Plaintiffs, | § § | |
| | § | CA 3-22-cv-0410-B |
| vs. | § § | |
| **GWG HOLDINGS, INC.,** *et al.* | § § | |
| Defendants | § § | |

---

## DECLARATION OF SARA HOLLAN CHELETTE

---

I, Sara Hollan Chelette, hereby declare and state as follows:

1.      My name is Sara Hollan Chelette.  I am over eighteen years of age.  My business address is 2100 Ross Avenue, Suite 2700, Dallas, TX 75201 I declare under penalty of perjury of the laws of the United States of America that the following is true and correct.

2.      I am an attorney in the law firm of LYNN PINKER HURST & SCHWEGMANN, LLP, attorneys for L Bond Management LLC, the agent (the "Agent").

3.      Attached to this Declaration as <u>Exhibit A-1</u> is a true and correct copy of GWG's 2018 10-K for the fiscal year ended December 31, 2018 filed with the United States Securities and Exchange Commission on July 9, 2019.

4.      Attached to this Declaration as <u>Exhibit A-2</u> is a true and correct copy of GWG's 2019 10-K for the fiscal year ended December 31, 2019 filed with the United States Securities and Exchange Commission on March 27, 2020.

DECLARATION OF SARA HOLLAN CHELETTE

5.    Attached to this Declaration as <u>Exhibit A-3</u> is a true and correct copy of GWG's 2020 10-K for the fiscal year ended December 31, 2020 filed with the United States Securities and Exchange Commission on November 5, 2021.

6.    Attached to this Declaration as <u>Exhibit A-4</u> is a true and correct copy of GWG's 10-Q for the period ending September 30, 2021 filed with the United State Securities and Exchange Commission on November 19, 2021.

7.    Attached to this Declaration as <u>Exhibit A-5</u> is a true and correct copy of GWG's 8-K filed with the United States Securities and Exchange Commission on January 3, 2022.

8.    Attached to this Declaration as <u>Exhibit A-6</u> is a January 20, 2022 article titled "The Beneficient Company Group Announces Initial $15 Million Community Reinvestment to Kansas as part of the TEFFI Act," obtained from Yahoo.com (https://finance.yahoo.com/news/beneficient-company-group-announces-initial-163800087.html).

9.    Attached to this Declaration as <u>Exhibit A-7</u> is a true and correct copy of a press release titled "The Beneficient Company Group Appoints Emily Bowersock Hill to its Board of Directors," printed from TrustBen.com.

10.    Attached to this Declaration as <u>Exhibit A-8</u> is a true and correct copy of GWG's June 3, 2020 Registration Statement.

11.    Attached to this Declaration as <u>Exhibit A-9</u> is a true and correct copy of GWG's 8-K filed with the United States Securities and Exchange Commission on January 7, 2020.

12.    Attached to this Declaration as <u>Exhibit A-10</u> is a true and correct copy of GWG's 10-K for the fiscal year ended December 31, 2017 filed with the United States Securities and Exchange Commission on March 29, 2018.

DECLARATION OF SARA HOLLAN CHELETTE

Executed in Dallas County, State of Texas on April 19, 2022.

_____

Sara Hollan Chelette

DECLARATION OF SARA HOLLAN CHELETTE

10-K 1 f10k2018_gwgholdings.htm ANNUAL REPORT

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

———————

**FORM 10-K**

———————

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2018

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES ACT OF 1934**

For the transition period from _____ to _____

**Commission File Number: 001-36615**

———————

# GWG HOLDINGS, INC.

(Exact name of registrant as specified in its charter)

———————

| Delaware | 26-2222607 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**220 South Sixth Street, Suite 1200**
**Minneapolis, MN 55402**

(Address of principal executive offices, including zip code)

**(612) 746-1944**

(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock | GWGH | NASDAQ Capital Market |

**Securities registered pursuant to Section 12(g) of the Act**
**None**

———————

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐ No ☒

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☐ | Accelerated filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | | Smaller reporting company | |

**Exhibit**

**A-1**

APP. 6

Emerging growth company                              ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The aggregate market value of the registrant's common stock held by non-affiliates was $11,692,802 as of June 29, 2018 (the last business day of the registrant's most recently completed second fiscal quarter), based on a total of 1,522,500 shares of common stock held by non-affiliates and a closing price of $7.68 as reported on the Nasdaq Capital Market on June 29, 2018. For purposes of this computation, all officers, directors, and 10% beneficial owners of the registrant are deemed to be affiliates. Such determination should not be deemed to be an admission that such officers, directors or 10% beneficial owners, are, in fact, affiliates of the registrant.

As of June 30, 2019, GWG Holdings, Inc. had 33,033,420 shares of common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE:**

None.

APP. 7

**GWG HOLDINGS, INC.**

**Index to Form 10-K**
**for the Fiscal Year Ended December 31, 2018**

| | | |
|---|---|---:|
| **PART I** | | 1 |
| | | |
| ITEM 1. | Business. | 1 |
| ITEM 1A. | Risk factors. | 12 |
| ITEM 1B. | Unresolved staff comments. | 40 |
| ITEM 2. | Properties. | 40 |
| ITEM 3. | Legal proceedings. | 40 |
| ITEM 4. | Mine safety disclosures. | 40 |
| | | |
| **PART II** | | 41 |
| | | |
| ITEM 5. | Market for the registrant's common equity, related shareholder matters and issuer purchases of equity securities. | 41 |
| ITEM 6. | Selected financial data. | 41 |
| ITEM 7. | Management's discussion and analysis of financial condition and results of operations. | 41 |
| ITEM 7A. | Quantitative and qualitative disclosures about market risk. | 61 |
| ITEM 8. | Consolidated financial statements and supplementary data. | F-1 |
| ITEM 9. | Changes in and disagreements with accountants on accounting and financial disclosure. | 62 |
| ITEM 9A. | Controls and procedures. | 62 |
| | | |
| **PART III** | | 65 |
| | | |
| ITEM 10. | Directors, executive officers and corporate governance. | 65 |
| ITEM 11. | Executive compensation. | 72 |
| ITEM 12. | Security ownership of certain beneficial owners and management and related shareholder matters. | 77 |
| ITEM 13. | Certain relationships and related transactions, and director independence. | 79 |
| ITEM 14. | Principal accounting fees and services. | 82 |
| | | |
| **PART IV** | | 83 |
| | | |
| ITEM 15. | Exhibits, financial statement schedules. | 83 |
| ITEM 16. | FORM 10-K SUMMARY | 85 |
| | | |
| **SIGNATURES** | | 86 |

i

PART I

## ITEM 1. BUSINESS.

### Organizational Structure

Our business was originally organized in February 2006. We added our current parent holding company, GWG Holdings, Inc., in March 2008, and in September 2014 we consummated an initial public offering of our common stock on The NASDAQ Capital Market where our stock trades under the ticker symbol "GWGH."

GWG Holdings conducts its life insurance secondary market business through a wholly owned subsidiary, GWG Life, LLC ("GWG Life"), and GWG Life's wholly owned subsidiaries, GWG Life Trust and GWG DLP Funding IV, LLC. GWG Holdings' indirect interests in other alternative assets are held and managed by The Beneficient Company Group, L.P. ("BEN LP," including all of the subsidiaries it may have from time to time — "Beneficient") and its general partner, Beneficient Management, L.L.C. All of these entities are legally organized in Delaware, other than GWG Life Trust, which is governed by the laws of the State of Utah. GWG Holdings' wholly owned subsidiary, Life Epigenetics Inc. (formerly named Actüa Life & Annuity Ltd.) ("Life Epigenetics"), was formed to engage in various life insurance related businesses and activities related to its development of epigenetic technology. Through its wholly owned subsidiary, youSurance General Agency, LLC ("youSurance"), GWG Holdings offers life insurance directly to customers from a variety of life insurance carriers. Unless the context otherwise requires or we specifically so indicate, all references in this report to "we," "us," "our," "our Company," "GWG," or the "Company" refer to these entities collectively. Our headquarters are currently based in Minneapolis, Minnesota.

Beneficient was formed in 2003 but began its alternative asset business in September 2017. Beneficient operates primarily through its subsidiaries, which provide Beneficient's products and services. These subsidiaries include: (i) Beneficient Capital Company, L.L.C. ("BCC"), through which Beneficient offers loans and liquidity products; (ii) Beneficient Administrative and Clearing Company, L.L.C. ("BACC"), through which Beneficient provides services for fund and trust administration and plans to provide custody services; (iii) PEN Indemnity Insurance Company, LTD ("PEN"), through which Beneficient plans to offer insurance services; and (iv) ACE Portal, L.L.C. ("ACE"), through which Beneficient plans to provide an online portal for direct access to Beneficient's financial services and products.

### Our Company

We are a financial services company committed to transforming the alternative asset industry with disruptive and innovative products and services. In 2018 and early 2019 we consummated a series of transactions (as more fully described below) with Beneficient that has resulted in a significant reorientation of our business and capital allocation strategy towards an expansive and diverse exposure to alternative assets. As part of this reorientation, we also changed our Board of Directors and executive management team.

Beneficient, through its subsidiaries, plans to operate three potentially high value, high margin lines of business:

- Private Trust Lending & Liquidity Products. Through BCC, Beneficient provides a unique suite of private trust, lending and liquidity products focused on bringing liquidity to owners of professionally managed alternative assets. Beneficient's innovative liquidity solutions are designed to serve mid-to-high net worth ("MHNW") individuals, small-to-mid sized ("STM") institutions, and asset managers who have historically possessed few attractive options to access early liquidity from their alternative assets. Beneficient targets MHNW clients with $5 million to $30 million in net worth and STM institutional clients typically holding up to $1 billion in assets.

- Trust and Custody Services. Through BACC and (subject to capitalization) through PEN, Beneficient plans, in the future, to market retirement funds, custody and clearing of alternative assets, and trustee and insurance services for covering risks attendant to owning or managing alternative assets.

- Financial Technology. Through ACE, Beneficient plans to provide online portals and financial technologies for the trading and financing of alternative assets.

Beneficient's existing and planned products and services are designed to support the tax and estate planning objectives of its MHNW clients, facilitate a diversification of assets or simply provide administrative management and reporting solutions tailored to the goals of the investor who owns alternative investments.

APP. 9

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 10 of 1031    PageID 182

APP. 10

While we are continuing our work to maximize the value of our secondary life insurance business, we have made the strategic decision to begin reducing capital allocated to purchasing additional life insurance policies in the secondary market and to begin increasing capital allocated toward providing liquidity to a broader range of alternative assets, primarily through investments in Beneficient. We believe Beneficient can finance investments in alternative assets that will produce higher risk-adjusted returns than those we can achieve from life insurance policies acquired in the secondary market. Furthermore, although we believe that our portfolio of life insurance policies is a meaningful component of a growing diversified alternative asset portfolio, we have begun to explore strategic alternatives for our life insurance portfolio aimed at maximizing its value, including a possible sale, refinancing or recapitalization of our life insurance portfolio.

We completed our transactions with Beneficient to provide us with a significant increase in assets and common shareholder equity. In addition, our transactions with Beneficient provide us with the opportunity for a diversified source of future earnings within the alternative asset industry. We believe the Beneficient transactions will transform GWG from a niche provider of liquidity to owners of life insurance to, as GWG and Beneficient expand their strategic relationship, a full-scale provider of trust and liquidity products and services to owners of a broad range of alternative assets.

**The Beneficient Transactions**

*The Exchange Transaction*

On January 12, 2018, GWG Holdings and GWG Life entered into a Master Exchange Agreement with Beneficient, MHT Financial SPV, LLC, a Delaware limited liability company ("MHT SPV"), and various related trusts (the "Seller Trusts"), as amended and restated on January 18, 2018 with effect from January 12, 2018, and as further amended by the First Amendment to Master Exchange Agreement, the Second Amendment to Master Exchange Agreement and the Third Amendment to the Master Exchange Agreement (as amended, the "Master Exchange Agreement"). The material terms and conditions of the initial Master Exchange Agreement were described in GWG Holdings' Current Report on Form 8-K (the "January 2018 Form 8-K") filed with the Securities and Exchange Commission ("SEC") on January 18, 2018.

On August 10, 2018, GWG Holdings, GWG Life, Beneficient, MHT SPV, and the Seller Trusts entered into a Third Amendment to Master Exchange Agreement (the "Third Amendment"). Pursuant to the Third Amendment, the parties agreed to consummate the transactions contemplated by the Master Exchange Agreement in two closings. The Third Amendment also generally deleted MHT SPV as a party to the Master Exchange Agreement. The material terms and conditions of the Third Amendment to Master Exchange Agreement were described in GWG Holdings' Current Report on Form 8-K (the "August 2018 Form 8-K") filed with the SEC on August 14, 2018. The transactions contemplated by the Master Exchange Agreement, as amended, are referred to throughout this Report as the "Exchange Transaction."

On the first closing date, which took place on August 10, 2018 (the "Initial Transfer Date"):

- in consideration for GWG and GWG Life entering into the Master Exchange Agreement and consummating the transactions contemplated thereby, BEN LP, as borrower, entered into a commercial loan agreement (the "Commercial Loan Agreement") with GWG Life, as lender, providing for a loan in a principal amount of $200,000,000 (the "Commercial Loan");

- BEN LP delivered to GWG a promissory note (the "Exchangeable Note") in the principal amount of $162,911,379;

- BEN LP purchased 5,000,000 shares of GWG's Series B Convertible Preferred Stock, par value $0.001 per share and having a stated value of $10 per share (the "Convertible Preferred Stock"), for cash consideration of $50,000,000, which shares were subsequently transferred to the Seller Trusts;

- the Seller Trusts delivered to GWG 4,032,349 common units of BEN LP at an assumed value of $10 per common unit;

- GWG issued to the Seller Trusts Seller Trust L Bonds due 2023 (the "Seller Trust L Bonds") in an aggregate principal amount of $403,234,866, as more fully described below;

- GWG and the Seller Trusts entered into a registration rights agreement with respect to the Seller Trust L Bonds received by the Seller Trusts; and

2

APP. 11

- GWG and Beneficient entered into a registration rights agreement with respect to the BEN LP common units received and to be received by GWG.

Under the Master Exchange Agreement, at the final closing (the "Final Closing" and the date on which the final closing occurred, the "Final Closing Date"), which occurred on December 28, 2018:

- in accordance with the Master Exchange Agreement, and based on the net asset value of alternative asset financings as of the Final Closing Date, effective as of the Initial Transfer Date, (i) the principal amount of the Commercial Loan was reduced to $181,974,314, (ii) the principal amount of the Exchangeable Note was reduced to $148,228,432, and (iii) the principal amount of the Seller Trust L Bonds was reduced to $366,891,940;

- the Seller Trusts refunded to GWG $840,430 in interest paid on the Seller Trust L Bonds related to the Seller Trust L Bonds that were issued as of the Initial Transfer Date but cancelled, effective as of the Initial Transfer Date, on the Final Closing Date;

- the accrued interest on the Commercial Loan and the Exchangeable Note was added to the principal amount of the Commercial Loan, as a result of which the principal amount of the Commercial Loan as of the Final Closing Date was $192,507,946;

- the Seller Trusts transferred to GWG an aggregate of 21,650,087 common units of BEN LP and GWG received 14,822,843 common units of BEN LP in exchange for the Exchangeable Note, upon completion of which GWG owned (including the 4,032,349 common units received by GWG on the Initial Transfer Date) 40,505,279 common units of BEN LP;

- BEN LP issued to GWG an option (the "Option Agreement") to acquire the number of common units of BEN LP, interests or other property that would be received by a holder of the NPC-A Prime limited partnership interests of Beneficient Company Holdings, L.P., an affiliate of BEN LP ("Beneficient Holdings"); and

- GWG issued to the Seller Trusts 27,013,516 shares of GWG common stock (including shares issued upon conversion of the Convertible Preferred Stock).

On the Final Closing Date, GWG and the Seller Trusts also entered into a registration rights agreement with respect to the shares of GWG common stock owned by the Seller Trusts, an orderly marketing agreement and a stockholders agreement. The material terms of these agreements were described in our Information Statement on Schedule 14C filed with the SEC on December 6, 2018 and in our Current Report on Form 8-K filed with the SEC on January 4, 2019.

*The Expanded Strategic Relationship*

In the second quarter of 2019, we completed an expansion of the strategic relationship with Beneficient, which was a transformational event for both organizations that creates a unified platform uniquely positioned to provide an expanded suite of products, services and resources for investors and the financial professionals who assist them. GWG and Beneficient intend to collaborate extensively and capitalize on one another's capabilities, relationships and services.

On April 15, 2019, Jon R. Sabes, the Company's former Chief Executive Officer and a former director, and Steven F. Sabes, the Company's former Executive Vice President and a former director, entered into a Purchase and Contribution Agreement (the "Purchase and Contribution Agreement") with, among others, Beneficient. The Purchase and Contribution Agreement was summarized in our Current Report on Form 8-K filed with the SEC on April 16, 2019.

The closing of the transactions contemplated by the Purchase and Contribution Agreement (the "Purchase and Contribution Transaction") occurred on April 26, 2019. Prior to or in connection with such closing:

- Messrs. Jon and Steven Sabes sold and transferred all of the shares of the Company's common stock held directly and indirectly by them and their immediate family members (approximately 12% of the Company's outstanding common stock in the aggregate); specifically, Messrs. Jon and Steven Sabes (i) sold an aggregate 2,500,000 shares of Company common stock to BCC for $25,000,000 in cash and (ii) contributed the remaining 1,452,155 shares of Company common stock to AltiVerse Capital Markets, L.L.C., a Delaware limited liability company ("AltiVerse") (which is a limited liability company owned by certain of Beneficient's

3

founders, including Brad K. Heppner (GWG's Chairman and Beneficient's Chief Executive Officer and Chairman) and Thomas O. Hicks (one of Beneficient's current directors and a director of GWG)), in exchange for certain equity interests in AltiVerse.

- Our bylaws were amended to increase the maximum number of directors of the Company from nine to 13, and the actual number of directors comprising the Board was increased from seven to 11.

- All seven members of the Company's Board of Directors prior to the closing resigned as directors of the Company, and 11 individuals designated by Beneficient were appointed as directors of the Company, leaving two board seats vacant after the closing.

- Jon R. Sabes resigned from all officer positions he held with the Company or any of its subsidiaries prior to the closing, other than his position as Chief Executive Officer of the Company's technology focused wholly owned subsidiaries, Life Epigenetics and youSurance.

- Steven F. Sabes resigned from all officer positions he held with the Company or any of its subsidiaries prior to the closing, except as Chief Operating Officer of Life Epigenetics.

- The resignations of Messrs. Jon and Steven Sabes included a full waiver and forfeit of (i) any severance that may be payable by the Company or any of its subsidiaries in connection with such resignations or the Transactions and (ii) all equity awards of the Company currently held by either of them.

- Murray Holland, a trust advisor of the Seller Trusts, was appointed as Chief Executive Officer of the Company.

- The Company entered into performance share unit agreements with certain employees of the Company pursuant to which such employees will receive a bonus under certain terms and conditions, including, among others, that such employees remain employed by the Company or one of its subsidiaries (or, if no longer employed, such employment was terminated by the Company other than for cause, as such term is defined in the performance share unit agreement) for a period of 120 days following the closing.

- The stockholders agreement that was entered into on the Final Closing Date was terminated by mutual consent of the parties thereto.

- BCC and AltiVerse executed and delivered a Consent and Joinder to the Amended and Restated Pledge and Security Agreement dated October 23, 2017 by and among the Company, GWG Life, LLC, Messrs. Jon and Steven Sabes and the Bank of Utah, which provides that the shares of the Company's common stock acquired by BCC and AltiVerse pursuant to the Purchase and Contribution Agreement will continue to be pledged as collateral security for the Company's obligations owing in respect of the L Bonds issued under our Amended and Restated Indenture, dated as of October 23, 2017, as amended and supplemented.

Among other things, the Purchase and Contribution Agreement contemplates that after the closing, the parties will seek to enter into an agreement pursuant to which the Company will have the right to appoint a majority of the board of directors of the general partner of Beneficient, resulting in the Company and Beneficient being under common control. The Company and Beneficient will also seek to enter into an agreement pursuant to which the Company will offer and distribute (through a FINRA registered managing broker-dealer) Beneficient's liquidity products and services. The Company intends to reduce capital allocated to life insurance assets while it works with Beneficient to build a larger diversified portfolio of alternative asset investment products.

A copy of the Purchase and Contribution Agreement is incorporated by reference as Exhibit 99.3 to this Report.

We refer to the Exchange Transaction and the Purchase and Contribution Transaction as the "Beneficient Transactions."

**Segment Financial Information**

We have two reportable segments: 1) Investment in Beneficient and 2) Secondary Life Insurance.

4

APP. 13

GWG segment information is included in Note 21, Segment Reporting, to the consolidated financial statements included in Item 8 of Part II of this 10-K.

**Market Opportunity**

*Alternative Asset Liquidity Products and Services*

The market demand for liquidity from owners of alternative assets is attributable to the outstanding net asset value of illiquid alternative assets ("NAV") held by U.S. investors. Using data from various published industry reports from 2017 and 2018, certain widely accepted commercial private-equity databases, and applying its own proprietary assumptions and calculations ("BEN Estimates"), Beneficient estimates that total outstanding NAV held by U.S. investors exceeded $3 trillion in 2018.

According to at least one industry report from 2018, total outstanding NAV in the hands of U.S. investors grew at a 12.1% compound annual growth rate (CAGR) for the ten years ended 2018 and is forecasted to grow at an 8% CAGR through 2023 as a result of continued increases in capital committed to the alternative asset class.

According to BEN Estimates, the large U.S. institutions representing approximately 54% of the NAV have consistently sought liquidity on approximately 1.85% to 2.25% of their outstanding NAV. Based on BEN Estimates, this has led to an annual demand for liquidity of nearly $40 billion in recent years.

A primary group not included in this demand is the MHNW investor who holds investments of $5 million to $30 million compared to a large institution's holdings in the hundreds of millions or billions of dollars. Intermediary brokers will often not represent the MHNW individuals (or STM institutional investors). According to BEN Estimates, MHNW investors hold over $700 billion in NAV, yet MHNW investors have only been able to access liquidity representing less than 0.5% of the NAV held by them each year, compared to the average 2% achieved by the large institutional owners, representing 54% of the market.

Based on these amounts, Beneficient estimates that MHNW investors would seek liquidity of 3% of their outstanding NAV, or a slightly greater percentage than that of large U.S. institutions, each year if liquidity was made available to them. As a result, and according to BEN Estimates, the estimated market demand for liquidity by MHNW individuals would have exceeded $20 billion in 2018.

*Secondary Life Insurance Market*

The market for life insurance is large. According to the American Council of Life Insurers Fact Book 2018 (ACLI), consumers owned approximately $12.0 trillion in face value of individual life insurance policy benefits in the United States in 2017. In that same year, the ACLI reports that individual consumers purchased an aggregate of $3.1 trillion of new individual life insurance policy benefits. This figure includes all types of individual life policies, including term insurance and permanent insurance known as whole life and universal life.

The life insurance secondary market primarily serves consumers, 65 years and older, and their families who own life insurance.

The secondary market for life insurance exists as a result of consumer lapse behaviors and surrender values far below economic value offered to consumers for their life insurance by the issuing insurance carriers. The ACLI reports that the annual lapse and surrender rate for individual life insurance policies is 5.7% of the in-force face value of benefits, amounting to over $680 billion in face value of policy benefits lapsed and surrendered in 2017 alone. According to Milliman (2004), a leading actuarial consulting firm, nearly 88% of all universal life insurance policies issued in the United States ultimately do not terminate with the payment of a death claim.

In 2017, the National Association of Insurance Commissioners ("NAIC") issued a policy bulletin in support of products we provide that the bulletin described as "innovative private market solutions for financing Americans' long-term care needs." The NAIC, citing the Company's August 25, 2016 presentation, discussed how consumers could exchange the market value of their life insurance policies for products designed to fund long-term care expenses.

<center>5</center>

*Primary Life Insurance Market and Technology ("Insurtech")*

The opportunity to apply technology to transform the insurance industry is significant. The application of technology to the insurance industry, commonly referred to as "insurtech", provides opportunities for new entrants into the traditional insurance marketplace that have the potential to significantly disrupt the insurance industry's historical approach to assessing and selecting acceptable underwriting risks.

As contemplated by the Purchase and Contribution Agreement described above, the Company intends to:

(a)     form a new technology subsidiary under the name of InsurTech Holdings, LLC ("InsurTech"), which will be wholly owned by a subsidiary of GWG other than GWG Life, LLC;

(b)     effect a reorganization so that InsurTech owns only two direct subsidiaries, Life Epigenetics Inc. and youSurance General Agency, LLC, both of which hold all insurtech assets, and one indirect subsidiary, Scientific Testing Partners, LLC, a wholly owned subsidiary of Life Epigenetics;

(c)     cause Life Epigenetics and youSurance to become independent of GWG on commercially reasonable terms as soon as practical; and

GWG anticipates funding a total of $20 million in capital to InsurTech over the next two years.

If we succeed in causing Life Epigenetics and youSurance to become independent of GWG, GWG may retain a significant ownership interest in the independent company.

**Business Strategies**

*1.    Liquidity For Alternative Assets*

As a result of the Beneficient Transactions, we are now uniquely positioned to provide liquidity and related services to investors holding a full range of illiquid alternative assets. We will continue to work closely with Beneficient to create the most value for holders of alternative assets, the financial professionals who advise them and for our shareholders.

Beneficient provides private trust solutions, including a unique suite of lending and liquidity products focused on bringing liquidity to owners of alternative assets. Beneficient's innovative liquidity solutions are designed to serve MHNW individuals, STM institutions, and asset managers who have historically possessed few attractive options to access early liquidity from their alternative assets. Beneficient targets MHNW individual clients with $5 million to $30 million in investments and institutional clients typically holding up to $1 billion in assets.

Beneficient's products can also support tax and estate planning objectives, facilitate a diversification of assets or simply provide administrative management and reporting solutions tailored to the goals of the investor. In the future, Beneficient plans to offer insurance services covering risks associated with owning or managing alternative assets.

Our life insurance secondary market business is designed to serve consumers 65 years or older owning life insurance. We seek to earn non-correlated yield from life insurance policies that we purchase in the secondary market. Since inception, we have purchased over $3.1 billion in face value of policy benefits from consumers for over $592 million, as compared to the $48 million in surrender value offered by insurance carriers on those same policies. Our products provide unique and valuable services to the senior consumers that we serve.

The goal of our secondary life insurance business has been to build a profitable, large and well-diversified portfolio of life insurance assets. We believe that scale and diversification are key factors and risk mitigation strategies to provide consistent cash flows and reliable investment returns. We believe that we have reached the goal in terms of portfolio size and diversification.

*2.    Developing a World Class Financial Services Distribution Platform*

GWG has developed a large and sophisticated financial services product distribution platform. Today, this platform consists of over one hundred independent broker dealers and several thousand independent financial advisors ("Retail Distribution") who sell the Company's investment products. Since inception, GWG has raised over $1.13 billion of debt and equity capital to support our secondary market of life insurance business and related expenditures.

<center>6</center>

We believe that we are well positioned to continue to grow our Retail Distribution for several reasons:

- We believe there is a trend towards financial professionals leaving large full-service broker-dealers to become "independent";

- Newly independent financial professionals and their clients demand a high level of customer service and access to innovative and value added products;

- The significant demand for liquidity from owners of alternative assets by US investors;

- We believe that our expanded relationship with Beneficient will attract more and larger broker dealers to our platform due to our increased size and market capitalization as well as the increase in products offered; and

- We believe that by using capital to provide liquidity products to our current customers, and as they begin to realize the benefit of these products, we will able to raise more capital and attract additional broker dealers into our selling group.

*3.  Commercializing Advanced Epigenetic Technology for Primary Life Insurance Markets*

We believe life insurance underwriting will be transformed due to advancements in science and technology. As part of that transformational change, we believe that the science of epigenetics will serve as a foundational science to this advancement for the life insurance industry. The life insurance industry is striving to achieve more automated underwriting and improve the overall customer experience.

As described above, the Company is working toward a separation of InsurTech as soon as practical and on commercially reasonable terms. We believe that as a separate entity (rather than as a small subsidiary of a large financial services holding company), the InsurTech businesses can reach their maximum potential in terms of marketing and branding, attraction of talent, appropriate peer group comparisons and, ultimately, return to its owners.

**Secondary Life Insurance Assets**

Our portfolio of life insurance policies, owned by our subsidiaries as of December 31, 2018, is summarized below:

**Life Insurance Portfolio Summary**

| | | |
|---|---|---|
| Total life insurance portfolio face value of policy benefits | $ | 2,047,992,000 |
| Average face value per policy | $ | 1,775,000 |
| Average face value per insured life | $ | 1,984,000 |
| Average age of insured (years)* | | 82.1 |
| Average life expectancy estimate (years)* | | 7.8 |
| Total number of policies | | 1,154 |
| Number of unique lives | | 1,032 |
| Demographics | | 77% Male; 23% Female |
| Number of smokers | | 52 |
| Largest policy as % of total portfolio face value | | 0.6% |
| Average policy as % of total portfolio | | 0.1% |
| Average annual premium as % of face value | | 2.9% |

_____

\*    Averages presented in the table are weighted averages.

7

Our portfolio of life insurance policies, owned by our subsidiaries as of December 31, 2018, organized by the insured's current age and the associated number of policies and policy benefits, is summarized below:

**Distribution of Policies and Policy Benefits by Current Age of Insured**

| Min Age | Max Age | Number of Policies | Policy Benefits | Percentage of Total | | Wtd. Avg. LE (yrs.) |
|---|---|---|---|---|---|---|
| | | | | Number of Policies | Policy Benefits | |
| 95 | 100 | 16 | $ 23,483,000 | 1.4% | 1.1% | 2.0 |
| 90 | 94 | 129 | 257,877,000 | 11.2% | 12.6% | 3.6 |
| 85 | 89 | 232 | 519,107,000 | 20.1% | 25.3% | 5.5 |
| 80 | 84 | 243 | 458,529,000 | 21.1% | 22.4% | 7.5 |
| 75 | 79 | 230 | 407,087,000 | 19.9% | 19.9% | 10.3 |
| 70 | 74 | 213 | 275,933,000 | 18.4% | 13.5% | 11.4 |
| 60 | 69 | 91 | 105,976,000 | 7.9% | 5.2% | 12.0 |
| **Total** | | **1,154** | **$2,047,992,000** | **100.0%** | **100.0%** | **7.8** |

Our portfolio of life insurance policies, owned by our subsidiaries as of December 31, 2018, organized by the insured's estimated life expectancy estimates and associated policy benefits, is summarized below:

**Distribution of Policies by Current Life Expectancies of Insured**

| Min LE (Months) | Max LE (Months) | Number of Policies | Policy Benefits | Percentage of Total | |
|---|---|---|---|---|---|
| | | | | Number of Policies | Policy Benefits |
| 1 | 47 | 231 | $ 336,205,000 | 20.0% | 16.4% |
| 48 | 71 | 217 | 408,826,000 | 18.8% | 20.0% |
| 72 | 95 | 226 | 429,535,000 | 19.6% | 21.0% |
| 96 | 119 | 176 | 294,803,000 | 15.3% | 14.4% |
| 120 | 143 | 139 | 256,526,000 | 12.0% | 12.5% |
| 144 | 179 | 129 | 227,752,000 | 11.2% | 11.1% |
| 180 | 228 | 36 | 94,345,000 | 3.1% | 4.6% |
| **Total** | | **1,154** | **$ 2,047,992,000** | **100.0%** | **100.0%** |

We rely on the payment of policy benefit claims by life insurance companies as a significant source of cash inflow. The life insurance assets we own represent obligations of third-party life insurance companies to pay the benefit amount under the policy upon the mortality of the insured. As a result, we manage this credit risk exposure by generally purchasing policies issued by insurance companies with investment-grade ratings from Standard & Poor's, and diversifying our life insurance portfolio among a number of insurance companies.

The yield to maturity on bonds issued by life insurance carriers reflects, among other things, the credit risk (risk of default) of such insurance carrier. We follow the yields on certain publicly traded life insurance company bonds because this information is part of the data we consider when valuing our portfolio of life insurance policies for our financial statements.

The average yield to maturity of publicly traded life insurance company bonds data we consider as inputs to our life insurance portfolio valuation process was 4.11% as of December 31, 2018. We believe that this average yield to maturity reflects, in part, the financial market's judgment that credit risk is low with regard to these carriers' financial obligations. The obligations of life insurance carriers to pay life insurance policy benefits ranks senior to all of their other financial obligations, including the senior bonds they issue. As of December 31, 2018, approximately 95.6% of the face value of policy benefits in our life insurance portfolio were issued by insurance companies with investment-grade credit ratings from Standard & Poor's.

8

As of December 31, 2018, our ten largest life insurance company credit exposures and the Standard & Poor's credit rating of their respective financial strength and claims-paying ability is set forth below:

**Distribution of Policy Benefits by Top 10 Insurance Companies**

| Rank | Policy Benefits | Percentage of Policy Benefit Amount | Insurance Company | Ins. Co. S&P Rating |
|------|-----------------|-------------------------------------|-------------------|---------------------|
| 1 | $ 280,851,000 | 13.7% | John Hancock Life Insurance Company | AA- |
| 2 | 231,959,000 | 11.3% | Lincoln National Life Insurance Company | AA- |
| 3 | 221,708,000 | 10.8% | AXA Equitable Life Insurance Company | A+ |
| 4 | 202,236,000 | 9.9% | Transamerica Life Insurance Company | AA- |
| 5 | 122,763,000 | 6.0% | Metropolitan Life Insurance Company | AA- |
| 6 | 97,498,000 | 4.8% | Pacific Life Insurance Company | AA- |
| 7 | 96,493,000 | 4.7% | American General Life Insurance Company | A+ |
| 8 | 61,695,000 | 3.0% | Massachusetts Mutual Life Insurance Company | AA+ |
| 9 | 61,152,000 | 3.0% | ReliaStar Life Insurance Company | A |
| 10 | 55,682,000 | 2.7% | Security Life of Denver Insurance Company | A |
| | **$1,432,037,000** | **69.9%** | | |

## Competitive and Regulatory Framework

*Competition*

We encounter significant competition from numerous companies in the products and services we provide and seek to develop in the alternative assets industry. Many of these competitors have greater financial and other resources than we do and may have significantly lower cost of funds than us because they have access to insured deposits or greater access to the capital markets, for example. They may also have greater market share in the markets in which we operate. These factors could adversely affect our business, results of operations and financial condition and our ability to implement our growth strategies.

In addition, as we enter new markets, we expect to experience significant competition from incumbent market participants. Our ability to compete in these markets will be dependent upon our ability to deliver value-added products and services to the customers we serve. Our competitors in these markets may have greater financial, market share and other resources than we do. These factors also could adversely affect our business, results of operations and financial condition and our ability to implement our growth strategies.

*Government Regulation*

Our life insurance secondary market business is highly regulated at the state level with respect to the life insurance industry, and at the federal level with respect to the issuance of our securities offerings. At the state level, states generally subject us to laws and regulations requiring us to obtain specific licenses or approvals to purchase life insurance policies in those states. State statutes typically provide state regulatory agencies with significant powers to interpret, administer and enforce the laws relating to the life insurance industry. Under this authority, state regulators have broad discretionary power and may impose new licensing and other requirements, and interpret or enforce existing regulatory requirements in new and different ways. Any of these new requirements, interpretations or enforcement directives could be materially adverse to our industry.

Beneficient has applied for trust company charters from the State of Texas and intends to carry on much of its business through two subsidiary trust companies. Because Beneficient's current business plans are based in part on obtaining regulatory approval to operate as regulated trust companies, a failure to do so may materially and adversely impact its financial performance and prospects, which would likely decrease the value of the BEN LP common units and commercial loan receivable we hold and adversely affect our ability to execute our growth strategies.

The state regulatory landscape for the use of genetic and epigenetic testing in life insurance underwriting is such that genetic and epigenetic testing is generally permitted. A few states require informed consent for use of

APP. 18

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 19 of 1031    PageID 191

genetic testing in life insurance underwriting. Epigenetic testing is distinguishable from genetic testing and we believe epigenetic

---

9

testing does not raise the ethical issue found with genetic testing of denying insurance coverage to applicants based on immutable inherited characteristics. While well-informed policymakers and regulators should have little reason to consider expanding current definitions of genetic testing to include epigenetic testing, or to increase restrictions on life insurance underwriting using epigenetic test results, we can provide no such assurances.

Other changes to the current genetic and epigenetic regulatory framework, including the imposition of additional or new regulations, could arise at any time during the development or marketing of our epigenetic based products. This may negatively affect our ability to obtain or maintain applicable regulatory clearance or approval of our products. In addition, regulatory authorities, such as the Food and Drug Administration (FDA), may introduce new requirements that may change the regulatory requirements for us or our customers, or both.

Although the federal securities laws and regulations do not directly affect life insurance, in some cases the purchase of a variable life insurance policy may constitute a transaction involving a "security" that is governed by federal securities laws. While we presently hold few variable life insurance policies, our holding of a significant amount of such policies in the future could cause our Company or one of our subsidiaries to be characterized as an "investment company" under the federal Investment Company Act of 1940. The application of that law to all or part of our businesses — whether due to our purchase of life insurance policies or to the expansion of the definition of "securities" under federal securities laws — could require us to comply with detailed and complex regulatory requirements, and cause us to fall out of compliance with certain covenants under our amended and restated senior credit facility with LNV Corporation. Such an outcome could negatively affect our business, results of operations and financial condition and our ability to implement our growth strategies.

We hold licenses to purchase life insurance policies in 39 states and can also purchase in the eight unregulated states. We also purchase life insurance policies from other secondary market participants.

*Health Insurance Portability and Accountability Act (HIPAA)*

HIPAA requires that holders of medical records maintain such records and implement procedures designed to assure the privacy of patient records. In order to carry out our business, we receive medical records and obtain a release to share such records with a defined group of persons, take on the responsibility for preserving the privacy of that information, and use the information only for purposes related to the life insurance policies we own.

*The Genetic Information Nondiscrimination Act of 2008 (GINA)*

GINA is a federal law that protects people from genetic discrimination in health insurance and employment. GINA prohibits health insurers from: (i) requesting, requiring, or using genetic information to make decisions about eligibility for health insurance; or (ii) making decisions on the health insurance premium, contribution amounts, or coverage terms they offer to consumers. In addition, GINA makes it against the law for health insurers to consider family history or a genetic test result, a pre-existing condition, require a genetic test, or use any genetic information, to discriminate coverage, even if the health insurance company did not mean to collect such genetic information.

GINA does not apply to the life insurance, long-term care or annuity industries. The life insurance, long-term care or annuity industries operate on medical-evidenced underwriting principles in which specific medical conditions are taken into account when assessing and pricing risk. The regulation of genomic data is relatively new, and we believe it is likely that regulation will increase and grow more complex in the foreseeable future. We cannot, however, predict what any new law or regulation would specifically involve or how it might affect our industry, our business, or our future plans.

**Patents, trademarks, licenses**

On April 26, 2017, our wholly owned subsidiary, Life Epigenetics, secured the exclusive license agreement for patent pending "DNA Methylation Based Predictor of Mortality" technology from The Regents of the University of California to commercialize advanced epigenetic technology for the life insurance industry.

On March 19, 2018, our wholly owned subsidiary, Life Epigenetics, filed provisional patents for the application of the use of epigenetic technology against the identification of tobacco and alcohol usage. We continue to advance our intellectual property protection of these alcohol and tobacco focused technologies.

10

APP. 20

On December 17, 2018, our wholly owned subsidiary, Life Epigenetics, secured the exclusive evaluation and option agreement for patent pending "Phenotypic Age and DNA Methylation Based Biomarkers for Life Expectancy and Morbidity" technology from The Regents of the University of California to commercialize advanced epigenetic technology for the life insurance industry.

We believe epigenetics holds promises to improve upon many traditional factors used in the life insurance underwriting process with greater accuracy, speed and convenience. To that end, we are engaged in several research and development efforts to further validate, refine and expand our epigenetic testing capabilities. In particular, we are working to conclude a research study comprised of approximately 1,300 participants in which biological samples, as well as medical records and prescription transaction history records, detailed health history, and DNA methylation analysis were conducted. During the second quarter of 2019, we expect to measure the results of each participant's diagnostic indicators against insurance risk classes, disease states, biomarker levels, and prescription medication statuses.

**Employees**

We employ approximately 75 employees.

**Properties**

Our principal executive offices are currently located at 220 South Sixth Street, Suite 1200, Minneapolis, Minnesota 55402. At that location, we lease 17,687 square feet of space for a lease term expiring in 2025. We believe these facilities are adequate for our current needs and that suitable additional space will be available as needed.

**Company Website Access and SEC Filings**

Our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and amendments to reports filed pursuant to Sections 13(a) and 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), are filed with the SEC. We are subject to the informational requirements of the Exchange Act and file or furnish reports, proxy statements and other information with the SEC.

Our general website address is *www.gwgh.com*. Our website has additional information about our Company, its mission, and our business. Our website also has tools that could be used by our clients and potential clients, financial advisors and investors alike. Beneficient's website address is *www.beneficient.com* and has additional information about Beneficient, its mission and its business. We maintain the website *www.gwglife.com* for consumers and life insurance professionals seeking our life insurance secondary market products and services. We also maintain the website *www.lifeegx.com* for our InsurTech initiative of commercializing epigenetic testing. The information contained on or accessible through the foregoing websites is not part of this Annual Report on Form 10-K.

11

APP. 21

**ITEM 1A. RISK FACTORS.**

Our business involves a number of challenges and risks. In addition to the other information in this report, you should consider carefully the following risk factors in evaluating us and our business. The risks described below are not the only ones that we face. Additional risks not presently known to us or that we currently deem immaterial may also affect our business, financial condition, operating results, or prospects.

**Risks Related to Our Life Insurance Secondary Business and Industry**

*Material changes in the life insurance secondary market, a relatively new and evolving market, may adversely affect our operating results, business prospects, the value of our common stock and our ability to repay our debt obligations.*

The success of our business and our ability to satisfy our debt obligations depends in large part on the continued development of the secondary market for life insurance, including the accuracy of actuarial forecasting and the solvency of life insurance companies to pay the face value of the life insurance benefits, both of which will critically impact our performance. The life insurance secondary market may be impacted by a variety of factors such as the interpretation of existing laws and regulations (including laws relating to insurable interests), the passage of new legislation and regulations, mortality improvement rates, updated actuarial methodologies, and mortality tables. Importantly, all of the factors that we believe could most significantly affect the life insurance secondary market are beyond our control. Any material and adverse change in the life insurance secondary market could adversely affect our operating results, our access to capital, the value of our common stock, our ability to repay our various debt and other obligations, and our business prospects and viability. Because of this, an investment in our securities involves greater risk as compared to investments offered by companies with more diversified business operations in more established or predictable markets.

*The valuation of our life insurance policy assets on our balance sheet requires us to make material assumptions that may ultimately prove to be incorrect. If our assumptions prove incorrect, we could suffer significant losses that materially and adversely affect our results of operations.*

One of our principal assets is a portfolio of life insurance policies purchased in the secondary market, comprising approximately 50% and 79% of our total assets as of December 31, 2018 and 2017, respectively. Those assets are considered "Level 3" fair value measurements under Accounting Standards Codification 820, *Fair Value Measurements and Disclosures* ("ASC 820"), as there is currently no active market where we are able to observe quoted prices for identical assets. As a result, our determination of "fair value" for those assets on our balance sheet incorporates significant inputs that are not observable. Fair value is defined as an exit price representing the amount that would be received if assets were sold or that would be paid to transfer a liability in an orderly transaction between market participants at the measurement date. As such, fair value is a market-based measurement determined based on the assumptions market participants would use in pricing an asset or liability.

A Level 3 fair value measurement is inherently uncertain and could create additional volatility in our financial statements that is not necessarily related to the performance of our underlying assets. As of December 31, 2018 and 2017, we estimated the fair value discount rate for our life insurance portfolio to be 8.25% and 10.45%, respectively. Life expectancy estimates are also a significant component within our fair value measurement. If in the future we determine that a higher discount rate is required to ascribe fair value to a similarly situated portfolio of life insurance policies or that life expectancy estimates materially differ from actuarial estimates and/or our projections, we could experience significant losses materially affecting our results of operations. In addition, significant losses of this nature would likely at some point cause our common stock to decline in value and cause us to be out of compliance with borrowing covenants contained in our various borrowing agreements. This could in turn result in acceleration of our amended and restated senior credit facility with LNV Corporation, L Bonds and Seller Trust L Bonds, which we may not be able to repay. As a result, we may be forced to seek additional debt or equity financing to repay such debt amounts, and additional financing may not be available on terms acceptable to us, if at all.

If we are unable to repay our debt when it comes due, then our senior lender or the holders of our L Bonds and Seller Trust L Bonds, or both, would have the right to foreclose on our assets. For further disclosure relating to the risks associated with the valuation of our assets, see the risk factors below "*If actuarial assumptions we obtain from third-party providers . . . .*" and "*Inaccuracies in the life expectancy estimates we use for small face policies . . . .*"

<div align="center">12</div>

APP. 22

*Actual results from our life insurance portfolio may not match our projected results, which could adversely affect our ability to service our existing portfolio and meet our debt obligations.*

Our business partially relies on achieving actual results that are in line with the results we expect to attain from our investments in life insurance policy assets. In this regard, we believe that the larger the portfolio of life insurance we own, the greater the likelihood that we will achieve our expected results. To our knowledge, rating agencies generally suggest that portfolios of life insurance policies contain enough policies on individual lives to achieve actuarial stability in receiving expected cash flows. For instance, in a life insurance securitization methodology published in 2016, A.M. Best concluded that at least 300 lives are necessary to achieve actuarial stability, while Standard & Poor's has indicated that stability is unlikely to be achieved with less than 1,000 lives. As of December 31, 2018, we owned $2.05 billion in face value of life insurance policies covering 1,032 lives.

However, even if our life insurance portfolio is actuarially stable, we still may experience differences between the projection models we use and actual mortalities. Differences between our expectations and actual mortality results could have a materially adverse effect on our operating results and cash flow. In such a case, we may face liquidity problems, including difficulties servicing our remaining portfolio of policies and servicing our outstanding debt obligations. Continued or material failures to meet our expected results could decrease the attractiveness of our securities in the eyes of potential investors, thereby making it even more difficult to obtain capital needed to service and grow the portfolio — to the extent we allocate capital to life insurance policy purchases, and service our existing debt.

*Our investments in life insurance policies have inherent risks, including fraud and legal challenges to the validity of the policies, which we will be unable to eliminate and which may adversely affect our results of operations.*

When we purchase a life insurance policy, we face certain risks associated with insurance fraud and other legal challenges to the validity of the policy. For example, to the extent the insured is not aware of the existence of the policy, the insured does not exist, or the insurance company does not recognize the policy, the insurance company may cancel or rescind the policy thereby causing the loss of an investment in that policy. In addition, if an insured's medical records have been altered in such a way as to shorten a life expectancy as reported, this may cause us to overpay for the related policy. Finally, we may experience legal challenges from insurance companies claiming that the insured failed to have an insurable interest at the time the policy was originally purchased or that the policy owner made fraudulent disclosures to the insurer at the time the policy was purchased (e.g., disclosures pertaining to the health status of the insured or the existence or sources of premium financing), or challenges from the beneficiaries of an insurance policy claiming that the sale of the policy to us was invalid.

To mitigate these risks, our origination practices and underwriting procedures include a current verification of coverage from the insurance company, a complete due-diligence investigation of the insured and accompanying medical records, a review of the life insurance policy application, and a requirement that the policy has been in force for at least two years. We also conduct a legal review of any premium financing associated with the policy to determine if an insurable interest existed at the time of its issuance. Nevertheless, these steps will not eliminate the risk of fraud or legal challenges to the life insurance policies we purchase. Furthermore, changes in laws or regulations or the interpretation of existing laws or regulations, may prove our due-diligence and risk-mitigation efforts inadequate. If a significant face amount of policies were invalidated for reasons of fraud or any other reason, our results of operations would be materially adversely affected.

*Our ownership of life insurance policies issued by insurers that are unable to pay claims presented to them could have a materially adverse effect on our results of operation, our financial condition, or even our overall prospects.*

We rely on the payment of policy claims by insurers as our most significant source of revenue collection. In essence, the life insurance assets we own represent the obligations of insurers to pay the benefit amount under the relevant policy upon the mortality of the insured. As a result, in our business, we face the "credit risk" that a particular insurer will be financially unable to pay claims when and as they become due. Depending on how many policies we own that are issued by insurers having financial difficulties at the time a claim is presented for payment, this risk could be significant enough to have a materially adverse effect on our results of operation, our financial condition, or even our overall prospects.

To mitigate this credit risk, we generally purchase policies issued only by insurers with an investment-grade credit rating from one or more of Standard & Poor's, Moody's, or A.M. Best Company. As of December 31,

APP. 23

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 24 of 1031    PageID 196

2018, 95.6% of the face value benefits of our life insurance policies were issued by insurers having an investment-grade rating (BBB or better) by Standard & Poor's. We also review our exposure to credit risk associated with our portfolio of life insurance

<div align="center">13</div>

policies when estimating its fair value. In evaluating the policies' credit risk we consider items such as insurance company solvency, credit risk indicators, and general economic conditions. Notwithstanding our efforts to mitigate credit risk exposure and to reflect this risk in our portfolio valuation, we cannot predict with any certainty whether a particular insurer will be in a financial position to satisfy amounts that it owes under life insurance policies it has issued when a claim for payment is presented.

*We have relied materially on information provided or obtained by third parties in the acquisition of life insurance policies. Any misinformation or negligence in the course of obtaining information could materially and adversely affect the value of the policies we own, our results of operation and the value of our securities.*

Our acquisition of each life insurance policy is negotiated based on variables and particular facts that are unique to the policy itself and the health of the insured. The facts we obtain about the policies and the insured at the time when the policy was applied for and obtained are based on the insured's factual representations to the insurance company, and the facts the insurance company independently obtains in the course of its own due-diligence examination, such as facts concerning the health of the insured and whether or not there is an insurable interest present when the policy was issued. Any misinformation or negligence in the course of obtaining information relating to a policy or insured could materially and adversely impact the value of the policies we own and could in turn adversely affect our results of operations and the value of our securities.

*Although we expect to reduce capital allocated to our life insurance business, such business is subject to state regulation and changes in those laws and regulations, or changes in their interpretation, could negatively affect our results of operation and financial condition.*

When we purchase a life insurance policy, we are subject to state insurance regulations. Over the past number of years, we have seen a dramatic increase in the number of states that have adopted legislation and regulations from model laws promulgated by either the NAIC or by the National Conference of Insurance Legislators (NCOIL). These laws are essentially consumer protection statutes responding to abuses that arose early in the development of our industry, some of which may persist. Today, almost every state has adopted some version of either the NAIC or NCOIL model laws, which generally require the licensing of purchasers of and brokers for life insurance policies, the filing and approval of purchase agreements, and the disclosure of transaction fees. These laws also require various periodic reporting requirements and prohibit certain business practices deemed to be abusive. State statutes typically provide state regulatory agencies with significant powers to interpret, administer, and enforce the laws relating to the purchase of life insurance policies. Under statutory authority, state regulators have broad discretionary power and may impose new licensing requirements, interpret or enforce existing regulatory requirements in different ways, or issue new administrative rules, any of which could be generally adverse to the industry and potentially the value of our life insurance policy assets.

*If federal regulators or courts conclude that the purchase of life insurance in the secondary market constitutes, in all cases, a transaction in securities, we could be in violation of existing covenants under our amended and restated senior credit facility with LNV Corporation, which could result in significantly diminished access to capital. We could also face increased operational expenses. The materialization of this risk could adversely affect our operating results and financial condition, our ability to repay our debt, and possibly threaten the viability of our business.*

On occasion, the SEC has attempted to regulate the purchase of non-variable universal life insurance policies as transactions in securities under federal securities laws. In July 2010, the SEC issued a Staff Report of its Life Settlement Task Force. In that report, the Staff recommended that certain types of purchased insurance policies be classified as securities. The SEC has not taken any position on the Staff Report, and there is no indication if the SEC will take any action to implement the recommendations of the Staff Report. In addition, there have been several federal court cases in which transactions involving the purchase and fractionalization of life insurance policies have been held to be transactions in securities under the federal Securities Act of 1933.

We believe that the matters discussed in the Staff Report and existing case law do not impact our current business model because our purchases of life insurance policies are distinguishable from those cases that have been held by courts, and advocated by the Staff Report, to be transactions in securities. For example, neither we nor any of our affiliates are involved in the fractionalization of life insurance policies, and we presently do not purchase significant amounts of variable life insurance policies. As a practical matter, if all or a majority of our life insurance policies were deemed to be "securities" under federal securities laws, either through an expansion of the definition of what constitutes a "security," the expansion of the types of transactions in life insurance policies that would constitute transactions in "securities," or the elimination or limitation of available exemptions and exceptions (whether by statutory change, regulatory change, or administrative or court interpretation), then we or one or more of our affiliated

APP. 25

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 26 of 1031    PageID 198

APP. 26

entities could become subject to the federal Investment Company Act of 1940. This outcome would likely have a material and negative effect on our Company by imposing additional regulations and rules to our governance structure, operations, and our capital structure. In particular, this outcome would likely cause us to be in violation of existing covenants under our amended and restated senior credit facility with LNV Corporation requiring us not to operate or be characterized as an "investment company" under the Investment Company Act of 1940. This breach would likely adversely affect our liquidity and increase our cost of capital and operational expenses, all of which would adversely affect our operating results. Such an outcome could also threaten our ability to satisfy our obligations as they come due and the viability of our business.

***If actuarial assumptions we obtain from third-party providers and rely on to calculate our expected returns on our investments in life insurance policies change, our operating results and cash flow could be adversely affected, as well as the value of our collateral and our ability to service our debt obligations.***

When we acquire a life insurance policy, the expected internal rate of return we calculate is based upon the probability of an insured's mortality over an actuarial life expectancy estimate. We presently obtain these estimates from third-party medical-actuarial underwriting companies. In addition to actuarial life expectancies, we rely on a pricing and premium forecasting software model developed by a third-party actuarial firm for the valuation of policies we purchase, future mortality revenues, and the calculation of anticipated internal rates of return. These pricing models forecast the estimated future premiums due as well the future mortalities of insureds.

All actuarial life expectancies (and related forecasting software) are subject to interpretation and change based on evolving medical technology, actuarial data, and analytical techniques. Additionally, we are required under the borrowing agreement for our amended and restated senior credit facility with LNV Corporation to update life expectancy estimates for life insurance policies with face amounts greater than $750,000 every two years beginning from the closing date of the amended facility. Our prior experience in updating life expectancies has generally resulted in longer life expectancies for most, but not all, of the insureds within our portfolio. Any increase in the actuarial life expectancy estimates of insureds within our life insurance portfolio could have a materially adverse effect on our operating results and cash flow, and our balance sheet. Adverse impacts on the value of our life insurance policy portfolio or our cash flow could in turn impair the value of the collateral we have pledged to our creditors and our ability to service our debt and obligations as they come due.

***Inaccuracies in the life expectancy estimates we use for small face policies could have a material and adverse effect on our results of operation and financial condition.***

As of December 31, 2018, we owned 684 "small face" life insurance policies (i.e., policies having $1 million in face value of benefits or less) having $382.0 million in aggregate face value of benefits.

The underwriting processes we use to evaluate, price and purchase small face policies are different from, and may not be as reliable as, the processes we use for life insurance policies with larger face values of benefits. In particular, the processes we use to develop or obtain life expectancy estimates and the related mortality curves for small face policies are less extensive than traditional methods. These processes include obtaining either a single fully underwritten or simplified report as opposed to two fully underwritten reports. A simplified third-party underwriting report is based on a self-reported medical interview and may be supplemented with additional information obtained from a pharmacy benefit manager database which is provided to one or more medical-actuarial underwriting firms to obtain a simplified life expectancy report. Although we obtain professional actuarial guidance regarding these processes, our simplified underwriting methodology may not be as reliable as the processes we use for policies with larger (i.e., greater than $1 million) face value of benefits.

Any shortcomings in the process we use to evaluate, price, purchase and value our small face policies, or significant inaccuracies in the life expectancy estimates relating to those policies, could have a material and adverse effect on our results of operations and financial condition. Any such outcomes could have a negative and possibly material effect on our ability to satisfy our debts.

***We rely on estimated rates of mortality when valuing life insurance policies and forecasting the performance of our life insurance portfolio, and we also rely on other estimates derived from statistical methodologies for projecting our future cash flows. If any of our estimates prove to be incorrect, it could materially and adversely affect our financial condition and ability to satisfy our debt service and repayment obligations.***

If we project we will receive cash inflows from policies sooner than we actually do, we may not be able to make payment on our debt obligations in a timely manner, or at all. Moreover, a significant medical discovery or advance that

15

APP. 27

results in mortality improvements among seniors, above historically predicted actuarial rates, could have a material adverse effect on the value of our life insurance investments.

We use a modeling practice for projecting cash flows known as the "probabilistic method." This is an actuarial method that uses the probability of an insured's mortality over time (a mortality curve) to project the flow of policy benefits to us and to project premiums that must be paid by us. This method requires the input of life expectancy assumptions. These inputs are then used to estimate the discounted cash flows from the life insurance portfolio using the ClariNet LS probabilistic and stochastic portfolio pricing model from ClearLife Limited, which estimates the expected cash flows using various mortality probabilities and scenarios.

Historically, the life expectancy inputs were based on the arithmetic average of two independent life expectancy reports ("Average Life Expectancy method"). Thus far, we have experienced fewer cash flows from policy benefits than projected using the Average Life Expectancy method. We had expected to receive approximately $453.8 million cumulative policy benefits as of December 31, 2018, and in fact received $262.1 million. This has resulted in greater than expected premium payments, increasing such expected payments from an expected $235.4 million to $248.3 million.

Using the Average Life Expectancy method, policy benefits actually received were approximately 58% of expected results. This resulted in a delay in policy benefit inflows from those anticipated and premium outflows being higher than anticipated due to the slower than anticipated maturities occurring within the life insurance portfolio.

Our enhanced longest life expectancy valuation methodology using the longest life expectancy report result at the time of purchase combined with a multiplier factor applied for variance in our portfolio actual to expected experience using the longest life expectancy results, attempts to address this issue by utilizing prior life insurance portfolio performance to establish life expectancy estimates. Given the methodology change, we anticipate the receipt of policy benefits and the payment of premiums to more closely track cash flow estimates in the future; however, this cannot be guaranteed.

We use the current future cash flow projection to generate our expected internal rate of return on the life insurance policy portfolio we own. Any change to these projections, pricing models, methodology, premium forecasting assumptions, cash flow projections, or mortality assumptions accompanied therewith that increase the projected cost-of-insurance premiums or decrease the probability of mortality could have a material and adverse impact on our cash flows and financial condition. Ultimately, this could adversely affect our ability to meet our debt service and repayment obligations and our viability.

***Cost-of-insurance (premium) increases could materially and adversely affect our profitability and financial condition.***

We are subject to the risk of increased cost-of-insurance ("COI") charges (i.e., premium charges) for the universal life insurance policies we own in our portfolio. As of December 31, 2018, approximately 29% of the policies in our life insurance portfolio have premium levels that are guaranteed under the terms of the policy to keep the policy's death benefit in force even in a situation where the policy's cash account has been wholly depleted. On the remaining approximately 71% of our policies, we pay "non-guaranteed COI charges" and are subject to the risk that the insurer could increase the COI charges for the policy. In all cases, the amount of increase is subject to any limits that may be set forth in the insurance policy. Because very few of the policies we own have significant cash account value balances, any COI increase will require us to use more cash to satisfy the minimum premium amount required to keep the related policy in force, and this could materially and adversely affect our profitability.

A COI increase can also be expected to impair the value of the affected policy because extra expense (i.e., additional premium amounts) will be required to keep the policy in force, and such extra expense will diminish the economic value, or return, of the policy realized upon the mortality of the insured. As a result, any widespread COI increases in policies we own would likely have a material and adverse effect on the value of our portfolio, which in turn would materially and adversely affect our profitability and financial condition.

***Our business and prospects may be adversely affected by changes, lack of growth, or increased competition in the life insurance secondary market.***

The growth of the life insurance policy secondary market may be negatively affected by a variety of factors beyond our control, including: negative publicity about the life insurance secondary market based on actual or perceived abuses; and the adoption of additional governmental regulation.

APP. 28

16

APP. 29

The relatively new and evolving nature of the market in which we operate makes the related risks difficult to identify and quantify. Nevertheless, contractions in the secondary market for life insurance policies, whether resulting from general economic conditions, regulatory or legal pressures, or otherwise (including regulatory pressures exerted on us or others involved in the secondary market for life insurance), could make participation in the market generally less desirable. This could in turn depress the prices at which life insurance policies on the secondary market are bought and sold and have a negative impact on the estimated value of the policies we own. If the value of the policies we own decreases, our results of operation and financial condition could suffer.

**Risks Unique to Our Company**

*We have a relatively limited history of operations, a history of net losses, and our future earnings, if any, and cash flows may be volatile, resulting in uncertainty about our ability to service and repay our debt when it comes due, redeem preferred stock when requested and uncertainty about our prospects generally.*

We are a company with a relatively limited operating history, which makes it difficult to accurately forecast our earnings and cash flows. We incurred a net loss attributable to common shareholders of $136.1 million and $33.3 million in the years ended December 31, 2018 and 2017, respectively. Our lack of a significant history and the evolving nature of the market in which we operate make it likely that there are risks inherent to our business that are yet to be recognized by us or others, or not fully appreciated, and that could result in us suffering further losses. As a result of the foregoing, an investment in our securities necessarily involves uncertainty about the stability of our operating results, cash flows and, ultimately, our ability to service and repay our debt and our prospects generally. In addition, any volatility in our operating results we experience may adversely affect the market price of our common stock.

*We may in the future rely, in part, on new and unproven technology as part of our life insurance policy underwriting processes. If the mortality predictions we obtain through use of this technology proves inaccurate, our results of operation and financial condition could be materially and adversely affected.*

In the future we may rely on new epigenetic-based technology that we believe may be applied to assist us with the mortality predictions in the course of underwriting and valuing life insurance policies. This technology, however, has not yet been commercially applied in the manner we envision, and it is possible that we will be unable to obtain more accurate mortality predictions through its use. It is also possible that the mortality predictions we obtain through use of epigenetic-based technology or other proprietary technology that we are developing will prove inaccurate, and perhaps materially so. In such a case, our failure to accurately forecast mortalities could have a material and adverse effect on our results of operation and financial condition, which could in turn materially and negatively affect the price of our common stock and our ability to satisfy our debts.

*Although we have entered into a written license agreement for the M-Panel technology, we may have difficulties preventing third parties from using that technology, and we may be required to obtain additional licenses from other parties prior to our commercial use of that technology. We are also developing our own proprietary processes, the success of which is uncertain. Difficulties we encounter in our efforts to use or develop, and protect, intellectual property may prove costly and affect our results of operation.*

The M-Panel technology rights we have licensed are the subject of a non-provisional patent application filed with the U.S. Patent and Trademark Office. If the patent for the M-Panel technology ultimately were to issue, we would be legally entitled to prevent third parties from using any part of the technology that is both covered by the claims of the patent and licensed to us. If, on the other hand, no patent is ultimately granted with respect to the M-Panel technology (or the scope of claims is too narrow to afford us with meaningful protection), then we may be unable to prevent third parties from using the M-Panel technology. This outcome may severely diminish any competitive advantage we hope to obtain through our use of the M-Panel technology.

We are aware that other patent applications pending in the U.S. Patent and Trademark Office may have scopes of claims that overlap with the claims contained in the pending patent application filed with respect to the M-Panel technology. If those other patents were to issue with scopes of claims that in fact overlap with the claims in any patent application for the M-Panel technology, we would likely be required to enter into a license agreement with other third parties before we could use processes that are covered by those overlapping claims. Nevertheless, we may be unable to procure such a license and, even if we are able to procure such a license, it may prove too costly for us. Alternatively, we would ourselves be required to develop other processes that would not overlap with other patent claims. Our own development of these processes could be costly and time consuming and may ultimately prove unsuccessful.

17

APP. 30

In sum, any difficulties we encounter in our efforts to use (through a license), or develop, and ultimately protect, intellectual property from which we hope to gain a competitive advantage and enter into new insurance-related and other markets could prove costly and time-consuming enough to materially and adversely affect our results of operation.

***The technology (including M-Panel technology) we own or license may subject us to claims of infringement or invalidity from third parties, and the magnitude of this risk to our business generally rises if and as we become more successful in employing and relying on the technology. Any such claims would be complex and costly, and adverse outcomes could undermine the competitive advantages we seek.***

Our reliance on technology (including M-Panel technology) that we own or license will subject us to the risk that other parties may assert, rightly or wrongly, that our intellectual property rights are invalid or violate the rights of those parties, as well as the risk that our intellectual property rights will be infringed upon by third parties. Any outcome invalidating our intellectual property rights or otherwise diminishing the competitive advantages obtained, at least in part, through the use of those rights could have a material and adverse effect on our competitive position and our prospects.

***Commercializing epigenetic or other technology may require significant expenses, may cause us to incur losses, and may ultimately prove ineffective or fail to create profitable business lines in the life insurance and other industries in which we may operate.***

We intend to pursue new business models and business strategies in the life insurance and other industries with epigenetic or similar technology. This epigenetic technology, however, has not yet been commercially applied in the manner we envision, and it is possible that we will incur losses as a result of these efforts. It is also possible that we will be unable to effectively commercialize epigenetic or similar technology, or be unsuccessful in disrupting the life insurance industry or other industries in which we may choose to operate. One or more competitors, however, may ultimately succeed in applying technology within the industries in which we operate in a manner that provides them with a significant competitive advantage or that disrupts the marketplace. Any such outcome could have a material and adverse effect on our prospects, which could in turn materially and negatively affect the price of our common stock and our ability to satisfy our debts.

Further, although we invest in the InsurTech business overall and in research and development specifically, these activities do not guarantee that we will develop or obtain intellectual property necessary for profitable operations. Costs involved in developing and protecting rights in intellectual property may have a negative impact on our business.

***Any failure to protect our intellectual property rights could impair our ability to protect our proprietary technology and our brand.***

If we fail to protect our intellectual property rights adequately, our competitors might gain access to our technology, and our business might be harmed. In addition, defending our intellectual property rights might entail significant expense. Any of our patents or other intellectual property rights may be challenged by others or invalidated through administrative process or litigation. Although we have U.S. patent applications pending, we may be unable to obtain patent protection for the technology covered in our patent applications. In addition, any patents issued in the future may not provide us with competitive advantages or may be successfully challenged by third parties. Furthermore, legal standards relating to the validity, enforceability and scope of protection of intellectual property rights are uncertain.

We might be required to spend significant resources to monitor and protect our intellectual property rights. We may initiate claims or litigation against third parties for infringement of our proprietary rights or to establish the validity of our proprietary rights. Any litigation, whether or not it is resolved in our favor, could result in significant expense to us and divert the efforts of our technical and management personnel.

***We critically rely on debt financing for our business. Any inability to borrow could adversely affect our business operations, our ability to satisfy our debt-payment obligations and, ultimately, our prospects and viability.***

To date, we have chosen to finance our business principally through the issuance of debt, including debt incurred by our subsidiary GWG DLP Funding IV, LLC ("DLP IV") under our amended and restated senior credit facility with LNV Corporation (see Note 8 to our consolidated financial statements), our L Bonds and Seller Trust L Bonds. Our amended and restated senior credit facility with LNV Corporation is secured by all of the assets of DLP IV, has a maximum amount of $300 million, and the outstanding balance at December 31,

APP. 31

Case 3:22-cv-00410-B   Document 32-1   Filed 04/19/22   Page 32 of 1031   PageID 204

2018 was $158.2 million. Obligations under the amended and restated senior credit facility with LNV Corporation have a maturity date of September 27, 2029. Our L Bonds and

---

18

APP. 32

Seller Trust L Bonds have scheduled maturities as indicated below in the risk factor "*If a significant number of holders . . . .*" Our debt facilities and offerings are the most important sources of financing on which our business continues to critically rely to grow and maintain our exposure to alternative assets — which include our portfolio of life insurance policies and our investments in Beneficient — as well as service existing debt.

Our business model relies on continued access to financing to enable us to grow our exposure to alternative assets. Our debt financing also provides funds to pay the attendant premiums and costs of maintaining the life insurance portfolio, all while satisfying our current interest and principal repayment obligations under our amended and restated senior credit facility with LNV Corporation, L Bonds and Seller Trust L Bonds and our dividend obligations on our preferred stock. Proceeds from life insurance policies that have been pledged to our amended and restated senior credit facility with LNV Corporation will first be applied, as determined by such agreement governing the amended and restated senior credit facility with LNV Corporation. Accordingly, until we achieve sufficient cash flows derived from our portfolio of life insurance policies, we expect to rely on advances from our amended and restated senior credit facility with LNV Corporation and proceeds from our L Bond offering to satisfy our ongoing financing and liquidity needs. Likewise, until interest and dividends from our investments in Beneficient reach a significant size to service our various debt obligations, we expect to rely on advances from our amended and restated senior credit facility with LNV Corporation and proceeds from our L Bond offering for these amounts.

Continued access to financing and liquidity under the amended and restated senior credit facility with LNV Corporation (other than premium payments on existing policies pledged thereto), the offering of our L Bonds, or otherwise is not guaranteed. For example, we have temporarily suspended the offering of our L Bonds as a result of our delay in filing certain periodic reports with the SEC, including this report. We anticipate recommencing our L Bond offering early in the third quarter of 2019, however there is no assurance that we will be able to do so within that timeframe. Additionally, due to our failure to deliver GWG Life audited financial statements for 2018 to LNV Corporation within 90 days after the end of the year and the failure to deliver GWG Life unaudited financial statements within 45 days after March 31, 2019, we are currently in violation of our debt covenants under our amended and restated senior credit facility with LNV Corporation. CLMG Corp., as administrative agent for LNV Corporation, has issued a forbearance extending the delivery of these reports to July 15, 2019; however, until we regain compliance with our debt covenants, we are not permitted to request, nor are we entitled to receive, advances under the amended and restated senior credit facility with LNV Corporation, and we will not be entitled to any excess amounts received from policies pledged under the amended and restated senior credit facility with LNV Corporation. See "*An inability to obtain accurate and timely financial information from Beneficient may prevent us from complying with reporting obligations under federal securities law ....*" In addition, general economic conditions could limit our access to financing, as could regulatory or legal pressures exerted on us, our financiers, or those involved in the procurement of financing such as brokers, dealers, and registered investment advisors. If we are unable to borrow under the amended and restated senior credit facility with LNV Corporation or otherwise for any reason, or to renew or replace the amended and restated senior credit facility with LNV Corporation when it comes due, or if we are forced to discontinue our L Bond offering for any significant length of time and for any reason, our business would be adversely impacted and our ability to service and repay our debt obligations would be compromised, thereby negatively affecting our business prospects, the value of our common stock and perhaps our viability.

*We may not be able to raise the capital that we are seeking from our securities offerings and may be unable to meet our overall business objective of growing and diversifying our alternative asset exposure.*

The offer and sale of our L Bonds is the principal means by which we intend to raise funds needed to meet our business and financial goals. However, if we are unable to continue to do so for any reason we may be unable to meet our goals. If actual cash flows from our portfolio of life insurance policies do not occur as we have forecasted, which has thus far been the case, we could be forced to sell our investments in life insurance policies in order to service or satisfy our debt-related obligations. Likewise, if our investments in Beneficient do not perform as we have projected, we could be forced to sell such investments in order to service or satisfy such debt-related obligations. Presently, none of our material investments (life insurance policies and investments in Beneficient) are supported by liquid secondary markets and our investments in Beneficient contain transfer restrictions. If we are forced to sell any material amount of these investments we may be unable to sell them at prices we believe are optimal, particularly if our sale of policies occurs at a time when we are (or are perceived to be) in distress. In any such event, our business and the value of our securities would likely be materially and adversely impacted.

19

APP. 33

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 34 of 1031    PageID 206

*We depend upon cash distributions from our subsidiaries, and contractual restrictions on distributions to us or adverse events at one of our operating subsidiaries could materially and adversely affect our ability to pay our debts, redeem preferred stock when requested and continue operating our business.*

GWG Holdings, Inc. is a holding company. As a holding company, we conduct our operations through operating subsidiaries, and as such our most significant assets are cash, our financing receivable from Beneficient and our ownership interests in our subsidiaries, controlled affiliates and equity investees, which includes our investment in Beneficient. Accordingly, our ability to meet our obligations, including our debt-related and dividend-payment obligations, materially depends upon the ability of our subsidiaries to distribute cash to us. In this regard, the ability of our subsidiaries to distribute cash to us is, and will continue to be, restricted by certain negative covenants in the agreement governing our senior credit facility. If any of these limitations were to materially impede the flow of cash to us, our ability to service and repay our debt, including obligations under the L Bonds and Seller Trust L Bonds, and make cash dividend payments to holders of our preferred stock would be materially and adversely affected. In addition, any adverse corporate event at the subsidiary level, such as a declaration of bankruptcy, liquidation or reorganization or an event of default under our senior credit facility, could adversely affect the ability of our subsidiaries to distribute cash to us, and thereby materially and adversely affect our ability to service and repay our debt and make cash dividend payments, and negatively impact our ability to continue operations.

*The collateral granted as security for our obligations under the L Bonds and Seller Trust L Bonds may be insufficient to repay the indebtedness upon an event of default.*

GWG Holdings (the issuer of the L Bonds and Seller Trust L Bonds) and GWG Life (the guarantor of obligations under the L Bonds and Seller Trust L Bonds, and the wholly owned subsidiary of GWG Holdings) have each granted a security interest in substantially all of their respective assets to serve as collateral security for obligations under the L Bonds and Seller Trust L Bonds. Importantly, DLP IV, a wholly owned subsidiary of GWG Life, owns a substantial number of our life insurance policies, 65% of the face value of our life insurance portfolio as of December 31, 2018, and is the borrower under our amended and restated senior credit facility with LNV Corporation. As the borrower under that amended and restated senior credit facility with LNV Corporation, all of its assets — including all of its life insurance policy assets — serve as collateral for our obligations under the facility.

Because of the fact that a substantial number of our life insurance assets are held in our DLP IV subsidiary (approximately 65% of face amount as of December 31, 2018), and all of those life insurance assets serve as collateral security first for our obligations under our amended and restated senior credit facility with LNV Corporation, then on a pari passu basis for our L Bonds and Seller Trust L Bonds, holders of L Bonds and Seller Trust L Bonds risk the possibility that the collateral security granted in our life insurance policies and our investments in Beneficient to secure our obligations under the L Bonds and Seller Trust L Bonds may be insufficient to repay holders upon an event of default. Furthermore, while the indenture governing the L Bonds and the Seller Trust L Bonds limits the amount of debt relative to a measure of asset coverage we and our subsidiaries can incur, the indenture permits us and our subsidiaries to incur additional secured debt (subject to the debt coverage ratio) that may be senior to the L Bonds and Seller Trust L Bonds.

*If a significant number of holders of our L Bonds and Seller Trust L Bonds demand repayment of those instruments upon maturity instead of renewing them, and at such time we do not have sufficient capital on hand to fund those repayments (and do not otherwise have access to sufficient capital), we may be forced to liquidate some of our life insurance policies or other assets, which could have a material and adverse impact on our results of operation and financial condition.*

As of December 31, 2018, we had approximately $662.2 million in principal amount of L Bonds outstanding (excluding Seller Trust L Bonds). Since we first issued our L Bonds, we have experienced $506.1 million in maturities, of which $297.5 million has renewed for an additional term, as of December 31, 2018. This has provided us with an historical renewal rate of approximately 58.8% for investments in our L Bonds. Future contractual maturities of L Bonds (excluding Seller Trust L Bonds) as of December 31, 2018 are as follows:

| Years Ending December 31, | L Bonds |
|---|---|
| 2019 | $ 144,627,000 |
| 2020 | 160,035,000 |
| 2021 | 117,230,000 |
| 2022 | 43,794,000 |
| 2023 | 73,646,000 |

APP. 34

| | |
|---|---:|
| 2024 | 33,782,000 |
| Thereafter | 89,038,000 |
| | $ 662,152,000 |

20

APP. 35

As of December 31, 2018, we had approximately $366.9 million in principal amount of Seller Trust L Bonds outstanding. The Seller Trust L Bonds have a contractual maturity in August 2023; however, the holders have the ability to exercise a put to require redemption beginning in 2021. Under the Supplemental Indenture for the Seller Trust L Bonds due 2023, in the event of a redemption request, including maturity, by the holders of the Seller Trust L Bonds, GWG in its sole discretion has the ability to satisfy the principal in the form of cash, a pro rata portion of (i) the outstanding principal amount and accrued and unpaid interest under the Commercial Loan Agreement and (ii) BEN LP common units, or a combination of cash and such property.

If investors holding existing indebtedness which matures do not elect to renew their investments and we do not at such time have or have access to sufficient capital to repay the indebtedness, then we may need to liquidate some of our life insurance policies or other assets earlier than anticipated. In such an event, we may be unable to sell those policies or other assets at prices we believe are fair or otherwise appropriate and such sales could have a material and adverse impact on our results of operations and financial condition. See also "*We may not be able to raise the capital that we are seeking . . . .*"

***Subordination provisions contained in the indenture will restrict the ability of the trustee or the L Bond or Seller Trust L Bond holders to enforce their rights against us under the indenture, including the right to payment on the L Bonds, if a default then exists under a senior credit facility.***

The L Bonds and Seller Trust L Bonds will be subordinate in right of payment to any claims of our senior lender under the amended and restated senior credit facility with LNV Corporation. In this regard, subordination provisions limiting the right of L Bond and Seller Trust L Bond holders to enforce their rights are contained in the indenture. These provisions include:

- a prohibition on challenging any enforcement action taken by a senior lender, or interfering with any legal action or suits undertaken by a senior lender, against us and our affiliates;

- a 180-day standstill period during which there may not be brought any action against us or our affiliates to enforce rights respecting collateral unless our amended and restated senior credit facility with LNV Corporation has been repaid in full, which period may be extended if the senior lender takes action during such standstill period; and

- a prohibition on filing a bankruptcy or insolvency case against us or our affiliates for at least one year plus one day after any senior lender has been paid in full.

In the event of a default on a senior credit facility, the indenture prohibits us from making any payment, direct or indirect (whether for interest, principal, as a result of any redemption or repayment at maturity, on default, or otherwise), on the L Bonds, Seller Trust L Bonds and any other indebtedness unless and until: (i) the default respecting the senior credit facility has been cured or waived or has ceased to exist; or (ii) in the case of a non-payment default that permits a senior lender to declare as due and payable all amounts owing under a senior credit facility (but where that senior lender has not yet so declared amounts as being due and payable), the end of the period commencing on the date the trustee receives written notice of default from the senior lender and ending on the earliest of (1) our discharge of the default (or other cure), (2) the trustee's receipt of a valid waiver of default from the senior lender, or (3) a written notice from the senior lender terminating the payment prohibition.

During any payment prohibition period, neither the holders of the L Bonds, the Seller Trust L Bonds, nor the trustee will have the right, directly or indirectly, to sue to enforce the indenture or the L Bonds or Seller Trust L Bonds. Other provisions of the indenture do permit the trustee to take action to enforce the payment rights of L Bond and Seller Trust L Bond holders after 179 days have passed since the trustee's receipt of notice of default from a senior lender, but in such case any funds paid as a result of any such suit or enforcement action shall be applied toward the senior credit facility until the facility is indefeasibly paid in full before being applied to the L Bonds and Seller Trust L Bonds.

These subordination provisions present the risk that, upon any default by us on obligations owed to our senior lender, the holders of the L Bonds and Seller Trust L Bonds will be unable to enforce their rights to payment.

If the 180-day standstill period noted above, or any other limitation on the rights of the trustee or L Bond and Seller Trust L Bond holders to assert their rights to payment of principal or interest under the indenture, is ultimately determined to conflict with provisions of the Trust Indenture Act of 1939 (most notably sections 316(b) and 317(a) of that Act),

21

APP. 36

then the trustee, as well as any holder who shall not have earlier consented to such subordination provisions, will (notwithstanding such provision contained in the indenture) be authorized to institute a lawsuit for the enforcement of any payment of principal or interest after their respective due dates.

***A failure to maintain compliance with the covenants under our amended and restated senior credit facility with LNV Corporation and the indenture governing the L Bonds and Seller Trust L Bonds may have a material adverse effect on our ability to continue our business operations.***

We are subject to various covenants under our amended and restated senior credit facility with LNV Corporation, including requirements to timely deliver financial statements to LNV Corporation (our senior lender). Due to our failure to deliver GWG Life audited financial statements for 2018 to LNV Corporation within 90 days after the end of the year and the failure to deliver GWG Life unaudited financial statements within 45 days after March 31, 2019, we are currently in violation or our debt covenants. CLMG Corp., as administrative agent for LNV Corporation, has issued a forbearance extending the delivery of these reports to July 15, 2019; however, until we regain compliance with our debt covenants, we are not permitted to request, nor are we entitled to receive, advances under the amended and restated senior credit facility with LNV Corporation, and we will not be entitled to any excess amounts received from policies pledged under amended and restated senior credit facility with LNV Corporation. A failure to deliver required financial statements to LNV Corporation within the forbearance period may result in termination of the credit facility absent an extension of such period. We may be unable to repay outstanding amounts under this credit facility unless we are able to replace it with another facility or otherwise obtain capital from other sources, in which case LNV Corporation could elect to foreclose on the life insurance assets held in our DLP IV subsidiary that serve collateral security.

Under the indenture governing the L Bonds and Seller Trust L Bonds, as amended on March 27, 2018, we are subject to various financial and non-financial covenants, including a maximum debt coverage ratio. As of December 31, 2018, we were in compliance with all of our covenants; however, there can be no assurance that we will be able to comply with all of our financial and non-financial covenants in the future. A failure to comply with these covenants could cause us to be in default of the indenture governing the L Bonds and Seller Trust L Bonds and indenture trustee, acting on behalf of the holders of our L Bonds and Seller Trust L Bonds, would be within its rights to accelerate the maturity dates of any amounts owed on our L Bonds and Seller Trust L Bonds. If we were unable to repay outstanding amounts, either using current cash reserves or another source of capital, the indenture trustee would have the right, subject to the subordination provisions in the indenture, to foreclose on our assets and the assets of GWG Life (including GWG Life's equity in DLP IV), which serve as collateral for our L Bonds and Seller Trust L Bonds. If we are required to seek other sources of financing in order to satisfy our obligations under our amended and restated senior credit facility with LNV Corporation, our L Bonds or Seller Trust L Bonds, such other sources of capital may be unavailable to us on terms acceptable to us or at all. As a result, failure to comply with the covenants under our debt arrangements would have a material and adverse impact on our ability to continue our business operations.

***The debt coverage ratio, designed to provide some assurance to the holders of the L Bonds and Seller Trust L Bonds that the value of our total assets exceeds our total interest-bearing obligations, values our life insurance policy assets, which represent 50% of our total assets as of December 31, 2018, in a manner that may not be representative of the amount we would actually receive upon a sale of those assets.***

Under the indenture governing the L Bonds and Seller Trust L Bonds, as amended on March 27, 2018, the maximum amount of L Bonds and Seller Trust L Bonds we may issue at any time is limited to an amount such that our debt coverage ratio does not exceed 90%. This limitation is designed to provide some basis to ensure that the net present value of policy benefits from our life insurance assets, plus the carrying value of our other assets (including our investments in Beneficient), will be sufficient to meet our obligations to our L Bond and Seller Trust L Bond holders. Expressed as a percentage, the debt coverage ratio is calculated as the ratio of (i) the total amounts outstanding on interest-bearing debt over (ii) the net present asset value of all life insurance assets we own, plus any cash and cash equivalents held in our accounts, policy benefit receivables and, without duplication, the value of all other assets of the Company, primarily our investments in Beneficient, as reflected on our most recently available balance sheet prepared in accordance with GAAP. For this purpose, the net present asset value of our life insurance assets is calculated as the present value of the life insurance portfolio's expected future cash flows discounted at the weighted-average interest rate of the interest-bearing indebtedness for the previous month.

22

APP. 37

Although the debt coverage ratio is designed to provide some basis to ensure that our assets will be sufficient to meet our obligations to the holders of L Bonds and Seller Trust L Bonds, the "net present value" of our life insurance assets used in the debt coverage ratio is not the same as the GAAP "fair value" of those assets on our balance sheet. Accordingly, the "net present value" and the "fair value" of our life insurance assets may be different and as a result the debt coverage ratio is not informative of the amount we and holders of L Bonds and Seller Trust L Bonds would actually receive if we were forced to sell or liquidate our life insurance related assets. Furthermore, any sale or liquidation of all or a significant portion of our life insurance policies or investments in Beneficient would include significant transactional costs. As a result, our mere compliance with the debt coverage ratio in the indenture will not guarantee that the value of our life insurance assets plus the value of our investments in Beneficient, if sold or liquidated, would in all cases exceed the amount of our obligations to the holders of L Bonds and Seller Trust L Bonds.

***The loss of the services of our key employees, or the failure to attract additional key individuals, would materially adversely affect our business operations and prospects.***

Our success and viability is dependent to a significant extent upon our ability to attract and retain qualified personnel in all areas of our business, especially our sales, policy acquisition, and financial management team. If we were to lose the members of these service teams, we would need to replace them with qualified individuals in a timely manner or our business operations and prospects could be adversely impacted.

***We have the discretion to purchase assets through different subsidiaries, and to transfer assets among our subsidiaries. Any decision to purchase or hold title to assets in one subsidiary, as opposed to a different subsidiary, may affect the value of collateral security for our debts.***

We may at our discretion direct the purchase of life insurance policies and other assets by, and the sale of life insurance policies and other assets amongst, different subsidiaries of GWG Holdings. Purchases of assets in, or movements of assets amongst, different subsidiaries could affect the value of the collateral security for obligations under the L Bonds and Seller Trust L Bonds. For example, purchases through, or transfers of life insurance policies to, DLP IV would cause the policies acquired or transferred to become collateral for our amended and restated senior credit facility with LNV Corporation, whereas purchases through, or transfers of life insurance policies to, GWG Life would cause the policies acquired by GWG Life to become collateral for the L Bonds and Seller Trust L Bonds. Accordingly, purchases of assets through, or transfers of assets to, different subsidiaries may affect the value of collateral security for different classes of holders of our debt.

***Being a public company is expensive and could adversely affect our ability to attract and retain qualified officers and directors.***

We have been a public reporting company since January 31, 2012. As such, we are subject to the reporting requirements of the Securities Exchange Act of 1934. These requirements generate significant accounting, legal, and financial compliance costs, and make some activities more difficult, time consuming or costly than they would otherwise be, and may place significant strain on our personnel and resources. These rules and regulations applicable to public companies, and the risks involved in serving as an officer or director of a public company, may also make it more difficult and expensive for us to obtain director and officer liability insurance, and to recruit and retain qualified officers and directors.

***Changes in general economic conditions could adversely impact our business.***

Changes in general economic conditions, including, for example, interest rates, investor sentiment, changes specifically affecting competition, technological developments, political and diplomatic events, tax laws, and other factors not known to us today, can substantially and adversely affect our business and prospects. For example, changes in interest rates may increase our cost of capital and ability to raise capital and have a corresponding adverse impact on our operating results. While we may engage in certain hedging activities in the future to mitigate the impact of rising interest rates, none of these risks are or will be within our control.

23

APP. 38

*We are dependent on our information systems for our financial reporting, policy-related databases, communications and other functions. If our information systems fail or experience major interruptions, including those relating to cybersecurity or arising from cyber-attacks, our business and our financial results could be adversely affected.*

We rely on our information systems to effectively manage our operational and financial functions. Our computer systems, Internet web sites, telecommunications, and data networks are also vulnerable to damage or interruption from power loss, natural disasters and attacks from viruses or hackers, including cybersecurity threats and incidents. Global cybersecurity threats and incidents can range from uncoordinated individual attempts to gain unauthorized access to information technology systems to targeted measures directed at us, our databases, policies, and/or the subjects of acquired policies. Although we utilize various procedures and controls to attempt to mitigate our exposure to these risks, attacks are evolving and unpredictable and we cannot guarantee that any risk prevention measures implemented will be successful. System failures or interruptions, including those relating to cybersecurity or arising from cyber-attacks, could breach the security of the personal information of the subjects of the acquired policies and could adversely affect our reputation, business, financial condition, and operating results.

**Risks Related to our Strategic Relationship with The Beneficient Company Group, L.P., including the Purchase and Contribution Transaction:**

On December 28, 2018, we held the Final Closing of the Exchange Transaction with Beneficient and the Seller Trusts. On April 15, 2019, Jon R. Sabes, the Company's former Chief Executive Officer and a former director, and Steven F. Sabes, the Company's former Executive Vice President and a former director, entered into a Purchase and Contribution Agreement (the "Purchase and Contribution Agreement") with, among others, Beneficient. The closing of the transactions contemplated by the Purchase and Contribution Agreement (the "Purchase and Contribution Transaction") occurred on April 26, 2019. You should consider carefully the following risk factors related to the Exchange Transaction and Purchase and Contribution Transaction in evaluating us and our business.

*We have limited or no ability to influence Beneficient's management's decisions regarding its business or its agreements or arrangements with its affiliates.*

The Purchase and Contribution Agreement contemplates that following the closing of the Purchase and Contribution Transaction, Beneficient will seek to negotiate and enter into an agreement with GWG pursuant to which GWG will have the authority to appoint a majority of the Board of Directors of the general partner of Beneficient upon terms and conditions as may be determined appropriate to ensure compliance with all regulatory and reporting requirements. Under the Purchase and Contribution Agreement, entry into such agreement is subject to the exercise of the respective fiduciary duties by each of our Board of Directors and the Board of Directors of the General Partner of Beneficient. If and when such agreement is effected, we expect a resulting financial consolidation of Beneficient and its subsidiaries and GWG.

Prior to this occurrence and although we own a significant percentage of BEN LP's outstanding common units (approximately 89.9% at December 31, 2018), BEN LP's general partner is authorized to perform all acts that it determines to be necessary or appropriate to carry out BEN LP's purposes and to conduct its business. As a result, we have only limited voting rights relating to certain matters and, as is contemplated by the terms of BEN LP's limited partnership agreement (to which we are a party to), any person or group that acquires beneficial ownership of 20% or more of BEN LP's common limited partnership units (including us) will lose voting rights associated with all of its common units and such common units may not be voted on any matter. Further, any person or group (other than BEN LP's general partner and its affiliates, or a direct or subsequently approved transferee of the general partner or its affiliates or such person or group approved by the board of directors of the general partner of BEN LP) who acquires, in the aggregate, beneficial ownership of 20% or more of BEN LP's common units (including us), will lose voting rights associated with all of its common units and such common units may not be voted on any matter and will not be considered to be outstanding when sending notices of a meeting of limited partners, calculating required votes, determining the presence of a quorum or for other similar purposes. In addition, prior to a listing, if any, of BEN LP's common units on a national stock exchange or, in lieu thereof, quotation of the common units in an automated quotation system, the executive committee of the board of directors of the general partner of BEN LP will be entitled to cast all of the votes that the limited partners would otherwise be entitled to cast, and no limited partner, in its capacity as such, will be permitted to vote in respect of its common units. As a result, we have limited or no ability to influence BEN LP's management's decisions regarding its business.

APP. 39

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 40 of 1031    PageID 212

24

APP. 40

Beneficient has business agreements and other arrangements with parties related to Beneficient and entities affiliated or associated with its founder(s). We cannot assure that these agreements and arrangements have been or will be negotiated and entered into under arms-length terms.

***Beneficient may be unable to operate its business successfully, which would negatively impact its ability to generate distributable cash flow and increase the value of BEN LP's common units.***

Beneficient plans to provide mid-to-high net worth individuals (i.e., individuals having a net worth of between $5 million and $30 million) with trust services and related liquidity products (collectively, "trust services and liquidity products") for the alternative assets and illiquid investment funds those individuals may own, and a variety of other financial services, including custody and clearing of alternative assets, fund and trust administration, retirement funds and insurance services for covering risks attendant to owning or managing alternative assets. The success of the Exchange Transaction and the Purchase and Contribution Transaction from our perspective will depend largely on Beneficient's ability to operate its business successfully, generate distributable cash flow, and increase the value of BEN LP's common units (of which we are a significant owner). If Beneficient is unable to do so, such inability will negatively impact the value of our investment in Beneficient and the Commercial Loan.

***We may be unable to capitalize on the anticipated benefits of the Exchange Transaction and the Purchase and Sale Transaction.***

We entered into the Exchange Transaction anticipating that such transaction would provide significant financial and strategic benefits, including, significantly increasing our common equity, significantly reducing our leverage ratio (as measured by total assets divided by total equity), the introduction of new opportunities to lower our cost of funds (an important driver of shareholder value), diversifying our revenue and cash flow sources resulting in more consistent earnings, and increasing our public float and the liquidity in our common stock, thereby increasing our common stockholder base and potentially attracting additional equity analyst coverage (both of which are important factors in maximizing share valuation). In addition, we believe that the Exchange Transaction has created opportunities for us and Beneficient to pursue strategies that are mutually advantageous, including the opportunity to leverage our knowledge, experience and significant infrastructure in, and the marketing, sales and servicing of, the independent broker dealer market and the related market for illiquid alternative investments — a prime target market for the origination of Beneficient's suite of liquidity products. We believe that the expansion of our strategic relationship with Beneficient pursuant to the Purchase and Contribution Transaction has created a unified platform uniquely positioned to provide an expanded suite of products, services and resources for investors and the financial professionals who assist them. We intend to collaborate extensively with Beneficient and capitalize on our respective capabilities, relationships and services. Specifically, the Purchase and Contribution Agreement contemplates that we will seek to enter into an agreement with Beneficient pursuant to which we would offer and distribute (through a FINRA registered managing broker-dealer) Beneficient's liquidity products and services. There is no assurance that we will realize the anticipated benefits from the Exchange Transaction and the Purchase and Contribution Transaction. Failure to realize these benefits will likely negatively impact the results of our operations, our business prospects, the ultimate success of our strategic relationship and the value of our common stock.

***Beneficient's operations will impact our financial performance.***

As contemplated by the Purchase and Contribution Agreement (as described above), if GWG is granted the authority to appoint a majority of the Board of Directors of the general partner of Beneficient, we believe that GWG will control Beneficient and that GWG would consolidate Beneficient for financial statement reporting purposes. If such authority is granted, our basis of accounting for and the presentation of our investment in Beneficient will be materially different from that described in this report. We cannot assure of when or if such authority will be granted and when or if such financial consolidation will become appropriate.

Pending the above anticipated financial consolidation, we account for our acquisition of common units of BEN LP using the equity method of accounting. As a result, from the closing of the Exchange Transaction, we will recognize a share of the profits and losses of Beneficient in the periods when such profits and losses are earned or incurred by Beneficient (subject to a quarter-lag accounting policy election that we have made). Because common units of BEN LP will represent a significant percent of our assets, the impact on our financial statements of Beneficient's financial performance may be material.

25

APP. 41

***Beneficient may be unable to obtain trust company charters, which would hinder Beneficient's ability to successfully pursue its current business plan and could adversely affect the value of BEN LP's common units.***

Beneficient has applied for trust company charters from the State of Texas and intends to carry on much of its business through two trust company subsidiaries. While it anticipates receiving the trust charters in the near future, there can be no assurance that Beneficient will be successful in obtaining trust company charters or the timing of the receipt of such trust charters. Because Beneficient's current business plans are based on obtaining regulatory approval to operate as regulated trust companies, a failure to do so may materially and adversely impact its financial performance and prospects, which would likely decrease the value of the BEN LP common units we hold.

***BEN LP's partnership agreement eliminates fiduciary duties that might otherwise be owed to us under Delaware law.***

BEN LP's business and affairs are managed by Beneficient Management, L.L.C., its general partner ("Beneficient Management"). BEN LP's partnership agreement eliminates the fiduciary duties that might otherwise be owed by Beneficient Management under Delaware law and replaces them with the duties expressly set forth in such agreement. BEN LP's partnership agreement provides that, when the general partner is permitted or required to make a decision in its "discretion" or pursuant to a provision not subject to an express standard of "good faith," in making such decision, the general partner has no duty to give any consideration to any interest of or factors affecting Beneficient or any other person. If a decision under BEN LP's partnership agreement is subject to an express standard of "good faith," such decision will not constitute a breach of the agreement if the decision is approved by (i) a majority of the members of the conflicts committee of the board of directors of the general partner of Beneficient, (ii) holders of a majority of the voting power of the BEN LP's common units entitled to vote (excluding voting common units owned by the general partner and its affiliates), or (iii) the general partner acting without a subjective belief that such decision was adverse to the interests of BEN LP. Potential conflicts of interest may arise among the general partner and its affiliates, on the one hand, and Beneficient, on the other hand, and the general partner may be able to favor its own interest to the detriment of Beneficient and the holders of the common units of BEN LP.

***Beneficient has significant debt obligations outstanding to us and has the ability to incur additional indebtedness.***

Subject to certain restrictions within our current Commercial Loan Agreement with Beneficient, Beneficient is permitted to incur additional indebtedness ranking senior to the Commercial Loan. If Beneficient is unable to execute its business plans, it may materially and adversely impact Beneficient's ability to repay its indebtedness, including indebtedness under the Commercial Loan Agreement in accordance with its terms. As a significant holder of Beneficient indebtedness, a payment default under any additional indebtedness Beneficient may incur, or under the Commercial Loan Agreement, would likely have a corresponding negative impact on the value of our assets (including the value of our BEN LP common units) and the price of our common stock.

***Our percentage ownership in BEN LP may be diluted significantly.***

If GWG is granted the authority to appoint a majority of the Board of Directors of Beneficient Management (as contemplated by the Purchase and Contribution Agreement (as described above)), we believe that GWG will control Beneficient and that GWG would consolidate Beneficient for financial statement reporting purposes. It is also possible that GWG and Beneficient will redeem all outstanding common units of BEN LP not owned by GWG such that GWG becomes the sole owner of such common units. In this scenario "dilution" refers to the potentially significant economic rights and privileges of the limited partner interests (described below) that are senior or preferred to our common interests that could result in substantial economic dilution to GWG.

Upon completion of the Exchange Transaction, we owned approximately 89.9% of the issued and outstanding common units in BEN LP. Our percentage ownership does not take into account (i) limited partner interests that may be issued upon the conversion of outstanding securities issued by Beneficient or its affiliates, or (ii) additional limited partner interests that may be issued after the closing of the Exchange Transaction. Importantly, Beneficient Management has discretion to cause BEN LP to issue additional limited partner interests from time to time, and BEN LP's partnership agreement contains no meaningful restrictions on this authority. Moreover, the Beneficient organizational structure permits the future issuance of additional securities that can, upon certain circumstances or at the discretion of their holders, be converted into additional limited

APP. 42

Case 3:22-cv-00410-B   Document 32-1   Filed 04/19/22   Page 43 of 1031   PageID 215

partner interests in BEN LP. Should any of these actions be taken, our percentage ownership in BEN LP will be diluted.

---

26

APP. 43

*The resale of our common stock issued in the Exchange Transaction could put downward pressure on the market price of our common stock and result in a destabilized trading market for our common stock.*

Upon the Final Closing, we issued approximately 27.0 million shares of our common stock, which in the aggregate represented approximately 83% of our outstanding common stock as of December 31, 2018. The shares issued in the Exchange Transaction are subject to resale restrictions applicable to "restricted securities" under applicable federal securities. The Master Exchange Agreement and related ancillary agreements require that we register the resale of the shares of common stock issued in the Final Closing to the Seller Trusts to the extent permitted by applicable SEC rules and regulations. Upon the effectiveness of such registration, or the lapse of applicable resale restrictions under applicable securities laws, the shares of our common stock issued in the Exchange Transaction will be available for resale in the public equity markets only through an Orderly Marketing Agreement among GWG, the Seller Trusts and Credit Suisse Securities (USA), LLC (the "Orderly Marketing Agreement") or in a widely dispersed registered public offering, unless the restrictions in the Orderly Marketing Agreement are waived by us or the Orderly Marketing Agreement expires. The Orderly Marketing Agreement expires upon the earlier of (i) December 27, 2019 and (ii) the date that all shares of stock subject to the Orderly Marketing Agreement have been sold. We cannot predict the effect, if any, that future sales of these shares or the availability of these shares for future sale could have on the market price of our common stock.

At the Final Closing, we entered into the Orderly Marketing Agreement for the orderly marketing and resale of the common stock issued to the Seller Trusts in the Exchange Transaction. The purpose of this Orderly Marketing Agreement is to manage the timing and amount of our common shares that are publicly resold in the market because the number of shares of our common stock to be issued in the Exchange Transaction substantially increased the total number of our issued and outstanding shares. However, there is no assurance that the Orderly Marketing Agreement will accomplish its purpose of maintaining a stable market for our common stock. The Orderly Marketing Agreement may be terminated upon written agreement among us and the other parties thereto, or by the trust advisors to the Seller Trusts in their sole discretion. The Orderly Marketing Agreement will terminate in accordance with its terms on December 27, 2019.

*The Seller Trusts, collectively, own a substantial majority of our outstanding common stock.*

According to their most recent Schedule 13D filing, the Seller Trusts own approximately 78.6% of our outstanding common stock. The Seller Trusts are a group of individual common law trusts that received shares of our common stock in the Exchange Transaction. The trustee of each of the Seller Trusts is Delaware Trust Company. The trust advisors of each trust are two individuals unrelated to each other, Jeffrey S. Hinkle and Murray T. Holland (our President and Chief Executive Officer), who have sole decision-making authority with respect to each Seller Trust. The beneficiary of each of the Seller Trusts is MHT Financial, LLC. The current members of MHT Financial, LLC include Murray T. Holland (our President and Chief Executive Officer) and an entity owned by Shawn T. Terry and Mike McGill. The Seller Trusts are entitled to full voting rights with respect to the shares of Common Stock they own. Because the Seller Trusts, collectively, own a substantial majority of our outstanding voting securities, the Seller Trusts are entitled to cast a majority of the votes on all matters requiring stockholder votes, including: the election of directors; mergers, consolidations, acquisitions and other strategic transactions; the sale of all or substantially all of our assets and other decisions affecting our capital structure; amendments to our Certificate of Incorporation or our bylaws; and our winding up and dissolution. This effectively transferred voting control over the Company to the Seller Trusts from Messrs. Jon and Steven Sabes, who held a majority of our outstanding common stock not held by the Seller Trusts prior to the closing of the Purchase and Contribution Transaction. This concentrated ownership enables the Seller Trusts to exert significant influence over all of our corporate activities and may delay, deter or prevent acts that would be favored by our other stockholders. The interests of the Seller Trusts may not always coincide with our interests or the interests of our other stockholders. This concentration of ownership may also have the effect of delaying, preventing or deterring a change in control of the Company. Also, the Seller Trusts may seek to cause us to take courses of action that, in their judgments, could enhance their investments in us, but which might involve risks to our other stockholders or adversely affect us or our other stockholders. As a result, the market price of our shares could decline or stockholders might not receive a premium over the then-current market price of our shares upon a change in control. In addition, this continued concentration of share ownership, albeit in new hands, may adversely affect the trading price of our shares because prospective investors may perceive disadvantages in owning shares in a company with such significant stockholders.

27

APP. 44

*We are currently relying on the "controlled company" exemption under Nasdaq Stock Market Listing Rules, pursuant to which "controlled companies" are exempt from certain corporate governance requirements otherwise applicable under Nasdaq listing rules.*

The Nasdaq Stock Market Listing Rules exempt "controlled companies," or companies of which more than 50% of the voting power is held by an individual, a group or another company, from certain corporate governance requirements, including those requirements that:

- A majority of the Board of Directors consist of independent directors;

- Compensation of officers be determined or recommended to the Board of Directors by a majority of its independent directors or by a compensation committee comprised solely of independent directors; and

- Director nominees be selected or recommended to the Board of Directors by a majority of its independent directors or by a nominating committee that is composed entirely of independent directors.

The Seller Trusts that acquired our shares in the Beneficient Transactions own approximately 78.6% of our common stock and are considered a group for purposes of the Nasdaq controlled company listing rule, based on the most recent Schedule 13D/A filed by the Seller Trusts and the trust advisors with the SEC. As a result, we are currently a "controlled company" and are relying on the controlled company exemption for certain of the above requirements, including those related to the determination or recommendation of officer compensation. Accordingly, should the interests of the Seller Trusts differ from those of other stockholders, the other our stockholders do not have the same protections generally as stockholders of other Nasdaq-listed companies with respect to corporate governance for so long as we rely on the controlled company exemption from the specified corporate governance requirements. Our status as a controlled company could make our common stock less attractive to some investors or otherwise harm our stock price.

*An inability to obtain accurate and timely financial information from Beneficient may prevent us from complying with reporting obligations under federal securities law and compromise our ability to finance our operations through the public equity or debt markets.*

We account for our investment in the common units of BEN LP using the equity method. Under this method, we record our share of the net earnings or losses attributable to BEN LP common unitholders, on a one quarter lag, as a separate line on our consolidated statements of operations. Therefore, we will continue to be heavily reliant on Beneficient to provide us with accurate and timely financial reporting that will allow us to timely prepare and file our own financial statements in accordance with GAAP and in compliance with SEC regulations and Nasdaq listing rules.

If we are unable to obtain accurate and timely financial information from Beneficient and are unable to timely prepare and file our financial statements as a result, we may fail to comply with reporting obligations under federal securities law, become subject to delisting from the Nasdaq Stock Market, and may be unable to utilize the public debt or equity markets to finance our operations. Because we have been heavily reliant on the public offer and sale of L Bonds, discontinuing our L Bond offers would have a material adverse impact on our ability to expand our alternative asset portfolio, service our existing portfolio of life insurance policies, satisfy payment requirements under our debt obligations, including our L Bonds and Seller Trust L Bonds, and otherwise fund our operations. In addition, our failure to deliver financial information and comply with disclosure requirements under applicable SEC regulations may result in covenant violations under our amended and restated senior credit facility with LNV Corporation and hurt our reputation and credibility with our stockholders and our debt holders.

On April 2, 2019, we filed with the SEC a Notification of Late Filing pursuant to Rule 12b-25 of the Securities Exchange Act of 1934 indicating that we were unable, without unreasonable effort and expense, to complete our financial statements as of and for the year ended December 31, 2018 within the time period required to timely file this Annual Report on Form 10-K for the year ended December 31, 2018. Our inability to timely file this Report was due, in part, to a delay in our obtaining financial information from Beneficient. We indicated at the time that we expected to file this Report no later than April 16, 2019, which is the fifteenth calendar day filing extension period afforded registrants under Rule 12b-25 of the Securities Exchange Act of 1934. As of April 16, 2019, however, we remained unable to file this Report. As a result, and in accordance with standard procedures related to the delayed filing of periodic reports with the SEC, we received a letter from NASDAQ stating that

APP. 45

we were not in compliance with its filing requirements for continued listing. For the same reasons, we were unable to timely file our Quarterly

28

APP. 46

Report on Form 10-Q for the quarter ended March 31, 2019 (the "Form 10-Q"), which was due on or before May 15, 2019. As a result, on May 17, 2019, we received a letter from NASDAQ stating that the Company continued not to be in compliance with the filing requirements for continued listing under NASDAQ Listing Rule 5250(c)(1). The NASDAQ letter provides that the Company has until June 17, 2019 (60 calendar days from after the date it received NASDAQ's initial notification letter) to submit a plan to regain compliance with NASDAQ's filing requirements for continued listing. The Company submitted its compliance plan to NASDAQ on June 12, 2019. NASDAQ accepted the Company's compliance plan on June 19, 2019 and granted an extension of 180 days from the Form 10-K's filing due date, or October 14, 2019, for the Company to regain compliance with NASDAQ's filing requirements for continued listing. If the Company is unable to regain compliance with NASDAQ's filing requirements for continued listing within the 180 extension period, we expect to be delisted, in which case our business and the value of our securities would likely be materially and adversely impacted. Our inability to timely file these reports also resulted in a temporary suspension of the offering of our L Bonds and in our management concluding that our internal control over financial reporting and our disclosure controls and procedures as of December 31, 2018 were not effective due to the existence of a material weakness in our internal control over financial reporting. See Item 9A — Controls and Procedures.

### *Our remedies for an "Event of Default" under our Commercial Loan Agreement with BEN LP are limited.*

As part of the Exchange Transaction, GWG Life, as lender, and BEN LP, as borrower, entered into the Commercial Loan Agreement under which $192,615,000 in principal and interest was outstanding at December 31, 2018. The principal amount under the Commercial Loan Agreement is due on August 9, 2023; provided that (a) in the event BEN LP completes at least one public offering of its common units raising at least $50 million which on its own or together with any other public offering of BEN LP's common units results in BEN LP raising at least $100 million, then the maturity date will be extended to August 9, 2028; and (b) in the event that BEN LP (i) completes at least one public offering of its common units raising at least $50 million which on its own or together with any other public offering of BEN LP's common units results in BEN LP raising at least $100 million and (ii) at least 75% of Beneficient Holding's total outstanding NPC-B limited partnership interests have been converted to shares of BEN LP's common units, then the maturity date will be extended to August 9, 2033.

BEN LP's obligations under the Commercial Loan Agreement are unsecured, and repayment of the balance under the Commercial Loan Agreement is subordinated in right of payment to any of Beneficient's commercial bank debt and to obligations which may arise in connection with its NPC-B Unit limited partnership interests. As a result, our remedies upon a default by BEN LP under the Commercial Loan Agreement that constitutes an "Event of Default" (as defined in the Commercial Loan Agreement) are limited to accelerating the loan and commencing a lawsuit for collection. We would not have the right to force BEN LP into bankruptcy or, since the Commercial Loan is unsecured, foreclose on any collateral. In addition, under the subordination provisions of the Commercial Loan Agreement, we would have the right to receive proceeds of any sale of BEN LP assets or any liquidation proceeding only after Beneficient's senior lender is paid in full.

### *Failure to effectively transition the management and oversight roles served by our former executives and our Board of Directors may materially disrupt our business operations.*

We have historically been heavily reliant upon the service of Jon R. Sabes as our Chief Executive Officer since our inception. On April 26, 2019, and in connection with the closing of the Purchase and Contribution Transaction, Mr. Jon R. Sabes resigned as our Chief Executive Officer and from all officer positions he held with the Company or any of its subsidiaries prior to the closing, other than his position as Chief Executive Officer of our technology focused wholly owned subsidiaries, Life Epigenetics Inc. and youSurance General Agency, LLC. Also at such closing, Murray T. Holland was appointed to serve as Chief Executive Officer. It will be vital to ensure a successful transition of Mr. Sabes' roles, responsibilities and leadership to Mr. Holland. A failure to effectively transition to Mr. Holland could be materially disruptive to our business operations and have a material adverse effect on such operations and our financial results. In addition, the reconstitution of our board of directors and management team that occurred upon the closing of the Purchase and Contribution Transaction will likely alter our operating priorities, allocation of capital and overall strategic direction, which may not ultimately prove to be successful.

*The Purchase and Contribution Agreement provides that GWG and Beneficient will use commercially reasonable efforts to enter into a joint venture agreement which may significantly alter the existing strategic relationship between GWG and Beneficient.*

The Purchase and Contribution Agreement provides that GWG and Beneficient will use commercially reasonable efforts to enter into a joint venture agreement. The terms of that agreement have not been determined and they may significantly alter the existing strategic relationship between GWG and Beneficient, including granting GWG the authority to designate a majority of the Board of Directors of Beneficient Management, providing for further integration of our respective businesses and establishing additional or alternative financing arrangements. The terms of the joint venture agreement are subject to approval of the Board of Directors of GWG and the Board of Directors of Beneficient Management and subject to the exercise of their respective fiduciary duties. The Board of Directors of GWG has established a special committee of independent and disinterested directors to review and, if deemed appropriate, approve proposed transactions with or involving Beneficient.

**Risks Related to Beneficient's operations:**

In addition to the risks set forth above related to our strategic relationship with Beneficient generally, the risk factors set forth below relate specifically to Beneficient's business operations. Because common units of BEN LP represent a significant percent of our assets, the impact on our financial results of Beneficient's current business operations may be material to the overall results of our business operations. Therefore, you should also consider carefully the following risk factors in evaluating us and our business.

*Beneficient does not have any operating history for its new business.*

Beneficient's management has a long track record of successfully organizing and operating businesses, including Beneficient's founder who organized Beneficient's predecessor in 2003, but Beneficient's business plan represents a new phase in its development and Beneficient does not have operating history under its current business plan. Additionally, Beneficient's proposed trust company subsidiaries have no operating history. In general, companies that seek to implement these kinds of business plans present substantial business and financial risks and uncertainties.

*Beneficient's business is dependent on obtaining the charters necessary to implement its business plan.*

Beneficient's proposed trust company subsidiaries may not commence trust company operations until those subsidiaries receive the necessary trust charters from the Texas Department of Banking. Beneficient filed charter applications for its proposed trust company subsidiaries with the Texas Department of Banking in September of 2018 and approval of those applications is not assured. Even if the charter applications are approved, Beneficient expects that the approvals will be subject to certain conditions including, among others, that the proposed trust company subsidiaries satisfy certain minimum restricted capital requirements. There is no assurance that Beneficient will be able to satisfy all the conditions imposed by the Texas Department of Banking in connection with its approvals. In addition, such conditions could delay the anticipated time for commencement of trust operations.

If Beneficient is ultimately unable to obtain satisfactory limited trust association charters, Beneficient's ability to implement its current business plan may be compromised. Without the trust company charters, federal regulations would substantially limit the amount of liquidity solutions or transactions with beneficial interests in underlying alternative assets ("Liquidity Transactions") or financing transactions Beneficient could undertake.

*A determination that Beneficient is an unregistered investment company would have serious adverse consequences.*

A determination that Beneficient or any of the proposed trust company subsidiaries is an unregistered investment company under the Investment Company Act of 1940 (the "1940 Act") would have serious adverse consequences. Beneficient does not believe it could operate its business effectively as a registered investment company. As a result, Beneficient would have to change its operations so as not to be an investment company. Changes could include refraining from raising capital, changing the types of products and services that Beneficient provides, and changing the nature of Beneficient's assets related to interests in private equity funds and other alternative assets that serve as collateral supporting Beneficient's Liquidity Transactions or financing transactions ("BEN Collateral"). Furthermore, if at any time it were established that Beneficient or any of the proposed trust company subsidiaries had been operating as an investment company in violation of the

APP. 48

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 49 of 1031    PageID 221

registration requirements of the 1940 Act, there would be a risk, among other material adverse consequences, that such company: (i) could become subject to SEC enforcement and investigation,

---

30

monetary penalties or injunctive relief, or both and (ii) would be unable to enforce contracts with third parties or that third parties could seek to obtain rescission of transactions with such company undertaken during the period in which it was established that such company was an unregistered investment company. Such developments would be likely to have material and adverse consequences for Beneficient. In addition, if Beneficient were treated as an investment company, it would not be eligible to be taxed as a partnership and instead would be taxable as a corporation for U.S. federal income tax purposes, which could result in a material and adverse impact on the returns of holders of BEN LP common units.

***Beneficient's success depends on certain key executives and the ability to attract, retain, and develop new professionals.***

Beneficient's success will depend in large part upon the skills, experience, personal reputations and network of business contacts of certain key executives. These individuals' reputations, business relationships and expertise are critical elements in the successful implementation of Beneficient's business strategy. Accordingly, the loss of any of the key executives could materially harm Beneficient's business and the value of Beneficient.

Beneficient's key executives are directly responsible for setting Beneficient's strategic direction, operating Beneficient's business, maintaining and expanding business and other critical relationships, customers and business partners and identifying expansion opportunities. Should Beneficient lose one of these key executives, it may have to search externally for a qualified replacement, which search may be prolonged, and Beneficient cannot provide assurance that it will be able to hire such a replacement on a timely basis or at all.

Competition for qualified personnel in the financial services industry is intense. Thus, the loss of any of these key personnel, by resignation, termination, death or disability, or Beneficient's inability to recruit and retain qualified replacements, could cause disruption in Beneficient's business and could prevent Beneficient from fully implementing Beneficient's business strategy, which could materially and adversely affect Beneficient's business, growth and profitability.

***Beneficient may not be able to grow, effectively manage its growth, or achieve profitability.***

A principal focus of Beneficient's strategy is to expand the number of Beneficient's product offerings, grow Beneficient's trust administration products and services and increase the number of clients Beneficient serves. Beneficient's future growth will depend upon a number of factors, many of which are beyond Beneficient's ability to control. These factors include Beneficient's ability to:

- accurately assess the demand for and sell the products and offerings that Beneficient expects to develop to meet demand;

- compete against other client solutions and other vendors;

- maintain the quality of Beneficient's trust administration products and services;

- effectively manage Beneficient's underwriting criteria, the acquisition of alternative assets and manage BEN Collateral, including with effective risk management discipline;

- update Beneficient's products and offerings and develop new products and offerings needed by clients; and

- hire, train and retain qualified personnel to manage and operate Beneficient's business as it is expected to grow.

A deficiency in any of these factors could adversely affect Beneficient's ability to achieve or manage growth or profitability.

***Beneficient's business faces substantial competition from a variety of financial solution companies and other liquidity providers.***

Beneficient will face substantial competition in all areas of its operations from a variety of competitors, many of which are larger, have an established track record and reputation, and may have more financial resources. Beneficient's business will compete with other providers of financial and trust administration such as bank holding companies, commercial and savings banks, savings and loan associations, credit unions, asset managers and their private equity

31

APP. 50

affiliates, insurance companies and a growing list of other local, regional and national institutions which offer financial and trust administration. Beneficient's business will also compete with other providers of liquidity for alternative assets, including secondary funds, which may hinder Beneficient's ability to offer Liquidity Transactions and financings to the market. If Beneficient is unable to compete effectively, Beneficient will lose market share and income generated from trust administration and other financial products will decline.

***Beneficient's liquidity, profitability and business may be adversely affected by an inability to access, or ability to access only on unfavorable terms, the capital markets.***

Liquidity is essential to Beneficient's business and will require Beneficient to continue to grow its capital. To the extent that working capital is insufficient to fund future operating costs and potential losses and loss adjustment expenses, Beneficient may need to raise additional funds through equity or debt financings, reduce expenses, or curtail Beneficient's growth. Many factors will affect Beneficient's capital needs and their amount and timing, including Beneficient's growth and profitability, as well as market disruptions and other unforeseeable developments.

Beneficient's liquidity may be impaired by an inability to access, or ability to access only on unfavorable terms, secured and/or unsecured debt markets or equity markets, an inability to access funds from its subsidiaries or otherwise allocate liquidity optimally, an inability to sell assets or redeem its interests in the BEN Collateral, or unforeseen outflows of cash or collateral. This situation may arise due to circumstances that Beneficient may be unable to control, such as a general market disruption or an operational problem that affects third parties or Beneficient, a disruption of the financial markets or negative views about the financial services industry generally, including concerns regarding fiscal matters in the U.S. and other geographic areas.

In addition, Beneficient's ability to raise funding could be impaired if investors or lenders develop a negative perception of Beneficient's long-term or short-term financial prospects. An increase in debt of Beneficient and/or its subsidiaries may increase Beneficient's leverage and reduce its interest coverage.

If Beneficient is unable to raise funding using the methods described above, Beneficient would likely need to consider financing or liquidating assets to meet maturing liabilities. Beneficient may be unable to sell some of its assets or Beneficient may have to sell assets at a discount to market value, either of which could adversely affect Beneficient's results of operations, cash flows and financial condition.

***Beneficient's results of operations may fluctuate from period to period.***

Beneficient expects that the results of its operations may vary significantly from period to period for a variety of reasons, many of which are outside of Beneficient's control and difficult to predict, including the number of alternative asset owners Beneficient can engage as clients, performance of the alternative assets comprising the BEN Collateral and concentration of risk in the portfolios. Because Beneficient's results of operations may vary significantly from quarter to quarter, the results of any one period should not be relied upon as an indication of future performance. Many but not all of the factors that may cause Beneficient's results of operations to fluctuate are presented in these risk factors.

***Beneficient may incur significant losses as a result of ineffective risk management processes and strategies.***

Beneficient seeks to monitor and control its risk exposure by developing an effective risk and control framework which will encompass a variety of separate but complementary financial, credit, operational, compliance, and legal reporting systems; internal controls; management review processes; and other mechanisms. While Beneficient employs and will continue to develop and deploy a broad and diversified set of risk monitoring and risk mitigation techniques, those techniques and the judgments that accompany their application may not be effective and may not anticipate every risk event in all market environments or the specific nature of the impact and timing of such outcomes.

***Beneficient's operations, products and services may be negatively impacted by changes in economic and market conditions.***

Beneficient's operations, products and services may be negatively impacted by changes in general economic and market conditions because the performance of Beneficient's private trust lending and liquidity products and trust and custody services is directly affected by conditions in the financial and securities markets. The financial markets and businesses operating in the securities industry are highly volatile (meaning that performance results can vary greatly from period to period) and are directly affected by, among other factors, domestic and foreign economic conditions,

APP. 51

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 52 of 1031     PageID 224

APP. 52

geopolitics and general trends in business and finance, all of which are beyond Beneficient's control. Declines in the financial markets or a lack of sustained growth may result in a corresponding decline in Beneficient's performance and may adversely affect the assets comprising the BEN Collateral.

***Fluctuations in interest rates may negatively impact the business of Beneficient.***

Fluctuations in interest rates may negatively impact the business of Beneficient. These rates are highly sensitive to many factors beyond Beneficient's control, including general economic conditions, both domestic and foreign, and the monetary and fiscal policies of various governmental and regulatory authorities. Beneficient's assets and liabilities can be affected significantly by changes in market interest rates. As a result, Beneficient may adopt asset and liability management policies to minimize the potential adverse effects of changes in interest rates, primarily by altering the mix and maturity of Liquidity Transactions, interests in the BEN Collateral, funding sources, and derivatives. However, even with these policies in place, a change in interest rates can impact Beneficient's financial condition. Beneficient's ability to successfully manage its interest rate risks is subject to factors beyond its control.

***Beneficient relies on other companies to provide key components of Beneficient's business infrastructure.***

Third-party vendors are expected to provide key components of Beneficient's business infrastructure. Any problems caused by these third parties, including as a result of their not providing Beneficient their services for any reason or their performing their services poorly, could adversely affect Beneficient's ability to deliver products and services to Beneficient's customers, impair Beneficient's ability to conduct its business efficiently and effectively, and/or result in regulatory action, financial loss, litigation, and loss of reputation. Replacing these third-party vendors could also entail significant delay and expense.

***Beneficient may only be able to offer a limited number of products.***

Beneficient may only be able to offer a limited number of products due to regulatory, capital or other restrictions. Accordingly, the prospects for Beneficient's success may be solely dependent upon the performance of a single product or solution, or dependent upon the development or market acceptance of a single or limited number of products or solutions. A lack of diversification in its offerings may make Beneficient susceptible to numerous economic, competitive and regulatory conditions, any or all of which may have a substantial adverse impact upon Beneficient's ability to operate its business and/or grow its business in the future. Further, Beneficient would not be able to diversify its operations or benefit from the possible spreading of risks or offsetting of losses that offering a comprehensive suite of solutions could provide.

***Beneficient depends on the accuracy and completeness of information from and about customers and counterparties.***

In deciding whether to enter into Liquidity Transactions with customers and counterparties, Beneficient may rely on information furnished to it by or on behalf of customers and counterparties, including financial statements and other financial information. Beneficient also may rely on representations of customers and counterparties as to the accuracy and completeness of that information and, with respect to financial statements, on reports of independent auditors. For example, under Beneficient's liquidity product offerings, Beneficient may rely on information provided by a customer such as net asset value of an underlying alternative asset. Beneficient will also rely on customer representations and certifications, or other audit or accountants' reports, with respect to the business and financial condition of the assets underlying the Liquidity Transaction. Reliance on customers and counterparties may not reveal or highlight all relevant facts (including bribery, fraud or other illegal activities) or risks that are necessary or helpful in evaluating such transaction opportunity. Instances of bribery, fraud, accounting irregularities and other improper, illegal or corrupt practices can be difficult to detect and may be more widespread in certain jurisdictions. Beneficient's financial condition, results of operations, financial reporting and reputation could be negatively affected if Beneficient relies on materially misleading, false, inaccurate or fraudulent information.

***Beneficient will be subject to comprehensive governmental regulation and supervision.***

Beneficient and its subsidiaries will operate in a highly regulated environment and will be subject to supervision and regulation by several governmental agencies, including the Texas Department of Banking. Beneficient and its subsidiaries are expected to be subject to changes in federal and state laws, regulations, governmental policies, tax laws and accounting principles. As Beneficient's business grows, Beneficient and its subsidiaries expect to become subject to additional regulatory agencies' regulation. Changes in regulations or the regulatory environment could adversely affect Beneficient's business.

APP. 53

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 54 of 1031     PageID 226

APP. 54

*Beneficient may incur fines, penalties and other negative consequences from regulatory violations.*

Beneficient may fail to comply with applicable laws and regulations and be held accountable for such violations, even if such violations are inadvertent. Some legal/regulatory frameworks provide for the imposition of fines or penalties for noncompliance even though the noncompliance was inadvertent or unintentional and even though there were systems and procedures designed to ensure compliance in place at the time. For example, Beneficient is subject to regulations issued by the Office of Foreign Assets Control, or "OFAC," that prohibit financial institutions from participating in the transfer of property belonging to the governments of certain foreign countries and designated nationals of those countries. OFAC may impose penalties for inadvertent or unintentional violations even if reasonable processes are in place to prevent the violations. There may be other negative consequences resulting from a finding of noncompliance, including restrictions on certain activities. Such a finding may also damage Beneficient's reputation and could restrict the ability of institutional investment managers to invest in Beneficient's securities.

*Beneficient faces a risk of noncompliance with and enforcement actions under the Bank Secrecy Act and other anti-money laundering statutes and regulations.*

The Bank Secrecy Act, the USA PATRIOT Act of 2001, and other laws and regulations require financial institutions, among other duties, to institute and maintain an effective anti-money laundering program and file suspicious activity and currency transaction reports as appropriate. The federal Financial Crimes Enforcement Network is authorized to impose significant civil money penalties for violations of those requirements and has recently engaged in coordinated enforcement efforts with the individual federal banking regulators, as well as the U.S. Department of Justice, Drug Enforcement Administration, and Internal Revenue Service (the "IRS"). Beneficient is also subject to increased scrutiny of compliance with the rules enforced by the OFAC and compliance with the Foreign Corrupt Practices Act. If Beneficient's policies, procedures and systems are deemed deficient, Beneficient will be subject to liability, including fines and regulatory actions, which may include restrictions on Beneficient's ability to make distributions to its unitholders and the necessity to obtain regulatory approvals to proceed with certain aspects of Beneficient's business plan. Failure to maintain and implement adequate programs to combat money laundering and terrorist financing could also have serious reputational consequences for Beneficient. Any of these results could materially and adversely affect Beneficient's business, financial condition and results of operations.

*Difficult market conditions can cause investors to reduce or suspend their investments in alternative assets or their desire to liquidate alternative assets they hold, which could adversely affect Beneficient's business.*

During economic downturns, alternative asset owners may suffer from decreasing returns (including negative returns and loss of principal investment), liquidity pressure, increased volatility and difficulty maintaining targeted asset allocations, and investors may decrease or suspend making new fund investments during and after such periods. As the economy begins to recover from these periods, investors may elect to reduce their exposure to alternative investments, resulting in a smaller overall pool of potential clients in the industry and customers for Beneficient's services and products in the future. In the event all or part of this analysis proves true, when trying to find new customers Beneficient will be competing for fewer available alternative assets to administer in an increasingly competitive environment, which could lead to terms less favorable to Beneficient as well as difficulty in reaching new customers. Such changes would adversely affect Beneficient's revenues and profitability.

*Beneficient is dependent on the continued success of the private equity industry and on the identification of suitable investment opportunities for Beneficient's clients.*

Beneficient's success depends, in part, on the continued success of private equity firms and the private equity industry that has enjoyed a prolonged period of expansion and profitability. There is no assurance that such success and profitability will continue. Beyond business and financial success, the private equity industry may also become subject to greater governmental regulation and investigation which could have a negative effect on Beneficient.

Beneficient's success depends, in part, on the identification and availability of suitable investment opportunities for its clients. The availability of investment opportunities is subject to market conditions and other factors outside of Beneficient's control and the control of the private markets fund managers with which BEN invests. There is no assurance that the private markets funds Beneficient selects will be able to identify sufficient attractive investment opportunities to meet its investment objectives.

34

APP. 55

*A failure of Beneficient to appropriately identify and address potential conflicts of interest could adversely affect Beneficient's business.*

Beneficient intends to develop robust procedures and controls designed to identify and address conflicts of interest. However, appropriately identifying and dealing with conflicts of interest is complex and difficult, and Beneficient's reputation could be damaged, and the willingness of clients to enter into transactions with Beneficient may be affected, if Beneficient fails, or appears to fail, to identify, disclose and deal appropriately with conflicts of interest. In addition, potential or perceived conflicts could give rise to litigation or regulatory enforcement actions.

*A failure in Beneficient's operational systems as well as human error or malfeasance, could impair Beneficient's liquidity, disrupt Beneficient's business, result in the disclosure of confidential information, damage Beneficient's reputation, and cause losses.*

Beneficient faces a variety of risks that are substantial and inherent in its business, including market, liquidity, credit, operational, legal, regulatory and reputational risks. The following are some of the more important factors that could affect Beneficient's business.

Beneficient's financial, accounting, data processing or other operational systems and facilities may fail to operate properly or become disabled as a result of events that are wholly or partially beyond Beneficient's control. Beneficient must continuously update systems to support its operations and growth and to respond to changes in regulations and markets, and invest heavily in systemic controls and training to ensure that such transactions do not violate applicable rules and regulations or, due to errors in processing such transactions, adversely affect markets, Beneficient's clients or Beneficient. Enhancements and updates to systems, as well as the requisite training, including in connection with the integration of new businesses, entail significant costs and create risks associated with implementing new systems and integrating them with existing ones.

The use of computing devices and phones is critical to the work done by Beneficient's employees and the operation of Beneficient's systems and business and those of Beneficient's clients and its third-party service providers and vendors. Additionally, computing devices may be vulnerable to cyber-attacks or have other inherent weaknesses.

Notwithstanding the proliferation of technology and technology-based risk and control systems, Beneficient's business ultimately relies on people as its greatest resource, and, from time-to-time, they may make mistakes or engage in violations of applicable policies, laws, rules or procedures that are not always identified immediately by Beneficient's technological processes or by Beneficient's controls and other procedures, which are intended to prevent and detect such errors or violations. These errors or violations can include calculation errors, mistakes in addressing emails, errors in software or model development or implementation, or simple errors in judgment, as well as intentional efforts to ignore or circumvent applicable policies, laws, rules or procedures. Human errors and malfeasance, even if promptly discovered and remediated, can result in material losses and liabilities for Beneficient.

*Any cybersecurity-attack or other security breach of Beneficient's technology systems, or those of third-party vendors Beneficient relies on, could subject Beneficient to significant liability and harm Beneficient's business operations and reputation.*

Cybersecurity attacks and security breaches of Beneficient's technology systems, including those of Beneficient's clients and third-party vendors, may subject Beneficient to liability and harm Beneficient's business operations and overall reputation. Beneficient's operations rely on the secure processing, storage and transmission of confidential and other information in its computer systems and networks. Threats to information technology systems associated with cybersecurity risks and cyber incidents continue to grow, and there have been a number of highly publicized cases involving financial services companies, consumer-based companies and other organizations reporting the unauthorized disclosure of client, customer or other confidential information in recent years. Beneficient is regularly the target of attempted cyber-attacks. Cybersecurity risks could disrupt Beneficient's operations, negatively impact Beneficient's ability to compete and result in injury to Beneficient's reputation, downtime, loss of revenue, and increased costs to prevent, respond to or mitigate cybersecurity events. Although Beneficient has developed, and continues to invest in, systems and processes that are designed to detect and prevent security breaches and cyber-attacks, and while Beneficient expects to periodically test this security, Beneficient's security measures, information technology and infrastructure may be vulnerable to attacks by hackers or breached due to employee error, malfeasance or other disruptions that could result in unauthorized disclosure or loss of sensitive information; damage to Beneficient's reputation; the incurrence of

APP. 56

additional expenses; additional regulatory scrutiny or penalties; or Beneficient's exposure to civil or criminal litigation and possible financial liability, any of which could have a material adverse effect on BEN's business, financial condition and results of operations.

Third parties upon whom Beneficient relies face similar threats, which could directly or indirectly impact Beneficient's business and operations. The occurrence of a cybersecurity-incident or attack on Beneficient's third-party vendors could have a material adverse effect on Beneficient's reputation and on Beneficient's business, financial condition and results of operations.

***Beneficient may not be able to attract a sufficient number of clients to achieve Beneficient's business goals.***

Many alternative assets contain stringent transfer restrictions imposed by the issuing entity, which may prevent Beneficient from providing trust administration and financing and liquidity with respect to such assets. Beneficient may not be able to attract a sufficient number of clients or alternative assets and, as a result, its revenues and profitability could be adversely affected.

***Beneficient's failure to correctly identify mergers, acquisitions, divestitures or other strategic transactions could have a material adverse effect on its business, financial condition and results of operations.***

Mergers, acquisitions, and other strategic transactions involve inherent risks that could compromise the success of the combined business and dilute the holdings of Beneficient's unitholders. If Beneficient is incorrect when assessing the value, strengths, weaknesses, liabilities and potential profitability of such transactions, or if Beneficient fails to adequately integrate the acquired businesses or individuals, the success of the combined business could be compromised. Business acquisitions are subject to the risks commonly associated with such transactions including, among others, potential exposure to unknown liabilities of acquired companies and to acquisition costs and expenses, the difficulty and expense of integrating the operations and personnel of the acquired companies, potential disruptions to the business of the combined company and potential diversion of management's time and attention, the impairment of relationships with and the possible loss of key employees and clients as a result of changes in management, potential litigation or other legal risks, potential write-downs related to goodwill impairments in connection with acquisitions and dilution to the unitholders of the combined company if the acquisition is made for equity of the combined company. In addition, investment strategies, technologies or businesses of acquired companies may not be effectively assimilated into Beneficient's business or may have a negative effect on the combined company's revenues or earnings. The combined company may also incur significant expenses to complete acquisitions and support acquired investment strategies and businesses. Further, any such acquisitions may be funded with cash, debt or equity, which could dilute the holdings or limit the rights of Beneficient's unitholders. Finally, Beneficient may not be successful in identifying attractive acquisition candidates or completing acquisitions on favorable terms.

Divestitures involve inherent risks that could compromise the success of Beneficient's business. Risks related to divestitures can include difficulties in the separation of the divested business, loss of clients, retention or obligation to indemnify certain liabilities, the failure of counterparties to satisfy payment obligations, unfavorable market conditions that may impact any earnout or contingency payment due to Beneficient and unexpected difficulties in losing employees of the divested business.

There is no assurance that Beneficient will be successful in overcoming these or other risks encountered with mergers, acquisitions, divestitures and other strategic transactions. These risks may prevent Beneficient from realizing the expected benefits from mergers, acquisitions, divestitures and other strategic transactions and could result in the failure to realize the full economic value of a strategic transaction.

***Beneficient faces risks associated with the ability of its information technology systems and its people and processes to support its operations and future growth effectively.***

In order to serve Beneficient's market effectively, Beneficient has developed, and is continually developing, a comprehensive array of products and services. In order to support these products and services and for Beneficient to operate effectively, Beneficient has developed, purchased and licensed information technology and other systems and processes. As Beneficient's business grows, Beneficient expects to continue to invest in and enhance these systems, and its people and processes.

36

APP. 58

These investments and enhancements may affect Beneficient's future profitability and overall effectiveness. From time to time, Beneficient may change, consolidate, replace, add or upgrade existing systems or processes, which if not implemented properly to allow for an effective transition, may have an adverse effect on Beneficient's operations, including business interruptions which may result in inefficiencies, revenue losses, client losses, exposure to fraudulent activities, regulatory enforcement actions, or damage to Beneficient's reputation. Beneficient also outsources certain operational and other functions to consultants or other third parties. If Beneficient does not implement its systems effectively or if its outsourcing business partners do not perform their functions properly, there could be an adverse effect on Beneficient. There can be no assurance that Beneficient will be able to effectively maintain or improve its systems and processes, or utilize outsourced talent, to meet its business needs efficiently. Any failure of such could adversely affect Beneficient's operations, financial condition, results of operations, future growth and reputation.

***Business disruptions and interruptions due to natural disasters and other external events beyond Beneficient's control can adversely affect Beneficient's business, financial condition and results of operations.***

Beneficient's operations can be subject to natural disasters and other external events beyond Beneficient's control, such as earthquakes, fires, severe weather, public health issues, power failures, telecommunication loss, major accidents, terrorist attacks, acts of war, and other natural and man-made events. Such events, whether natural or attributable to human beings, could cause severe destruction, disruption or interruption to Beneficient's operations or property. Financial institutions, such as Beneficient, generally must resume operations promptly following any interruption. If Beneficient were to suffer a disruption or interruption and was not able to resume normal operations within a period consistent with industry standards, Beneficient's business could suffer serious harm. In addition, depending on the nature and duration of the disruption or interruption, BEN might be vulnerable to fraud, additional expense or other losses, or to a loss of business and/or clients. Beneficient expects to implement a business continuity plan and continue to enhance it on an ongoing basis. There is no assurance that Beneficient's business continuity plan can adequately mitigate the risks of such business disruptions and interruptions.

***If Beneficient fails to establish and maintain effective internal controls over financial reporting, Beneficient's ability to accurately report its financial results could be adversely affected.***

Beneficient has been and is a private company with limited accounting personnel to execute its accounting processes and other supervisory resources with which to address Beneficient's internal controls over financial reporting. There is no certainty that Beneficient will be able to maintain effective internal controls over financial reporting.

Effective internal controls are necessary for Beneficient to provide reliable financial reports, prevent fraud and operate successfully. If Beneficient cannot provide reliable financial reports or prevent fraud, Beneficient's ability to accurately report its financial results could be adversely affected and its reputation and operating results would be harmed. Beneficient cannot be certain that its efforts to develop and maintain its internal controls will be successful or that Beneficient will be able to maintain adequate controls over its financial processes and reporting in the future. Any failure to develop or maintain effective internal controls, or difficulties encountered in implementing or improving Beneficient's internal controls, could harm Beneficient's operating results or cause GWG to fail to meet its reporting obligations. See the risk factor above "*An inability to obtain accurate and timely financial information from Beneficient may prevent us from complying with reporting obligations under federal securities law . . . .*" Ineffective internal controls could also cause investors to lose confidence in Beneficient's reported financial information.

***Beneficient faces risks from regulatory investigations and proceedings and from private actions brought against it.***

From time to time, Beneficient may be named as a defendant or otherwise become involved in various legal proceedings, including class actions and other litigation or disputes with third parties. Future actions against Beneficient may result in judgments, settlements, fines, penalties or other results adverse to Beneficient, which could materially adversely affect Beneficient's business, financial condition or results of operations, or cause serious reputational harm to Beneficient.

Beneficient's businesses and operations are also subject to increasing regulatory oversight and scrutiny, which may lead to additional regulatory investigations or enforcement actions. These and other initiatives from federal and state officials may subject Beneficient to judgments, settlements, fines or penalties, or cause Beneficient to

APP. 59

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 60 of 1031    PageID 232

be required to restructure its operations and activities, all of which could lead to reputational issues, or higher operational costs, thereby reducing Beneficient's profitability.

---

37

APP. 60

While Beneficient seeks to insure against potential risks, Beneficient may not be able to obtain insurance to cover certain risks, or obtain coverage on favorable terms, and the insurance that Beneficient has may be inadequate to cover certain civil or criminal proceedings or regulatory investigations and associated costs.

***Beneficient may be impacted adversely by claims or litigation, including claims or litigation relating to its fiduciary responsibilities.***

Beneficient's business involves the risk that clients or others may sue Beneficient, claiming that Beneficient has failed to perform under a contract or otherwise failed to carry out a duty perceived to be owed to them. This risk is heightened when Beneficient's trust company subsidiaries begin serving as fiduciaries for their clients following the issuance of state trust company charters. Specifically, Beneficient's trust company subsidiaries will be required to (i) adhere to the fiduciary standard of care required under the terms of the governing documents or applicable law and (ii) properly discharge their fiduciary duties. If Beneficient fails to comply with these fiduciary obligations, it could incur significant costs and possibly liability, which could materially and adversely affect Beneficient's business, financial condition or results of operations. Liability for breach of fiduciary duty may be difficult to assess or quantify and its existence and magnitude may remain unknown for a substantial period of time. Additionally, an alleged breach of fiduciary duty, regardless of the merits of such alleged breach, could significantly damage Beneficient's reputation and cause it to incur legal and other costs. Claims made or actions brought against Beneficient, whether founded or unfounded, may result in injunctions, settlements, damages, fines or penalties, which could have a material adverse effect on Beneficient's financial condition and results of operations, could adversely affect Beneficient's ability to raise additional funding or attract new clients, and could require changes to Beneficient's business. Even if Beneficient defends itself successfully, the cost of litigation is often substantial, and public reports regarding claims made against Beneficient may cause damage to its reputation among existing and prospective clients or negatively impact the confidence of counterparties, rating agencies, and equityholders, consequently affecting Beneficient's earnings negatively.

***A change in Beneficient's tax treatment could adversely affect Beneficient.***

Beneficient is subject to a variety of tax laws and tax regulations by national, regional and local governments. Beneficient, and most of its subsidiaries, are pass through entities that are generally not subject to taxation. Rather, Beneficient passes on the distributive share of income to its investors who bear the burden of any tax liability that may be generated by such income. These tax laws and regulations (including the applicable tax rates), and their interpretation and application, may change from time to time and those changes could have a material adverse effect on the results of operations or Beneficient's financial position.

In addition, without the consent of Beneficient's unitholders, Beneficient's general partner may elect to convert Beneficient into a corporation or be taxed as a corporation for U.S. federal income tax purposes if certain conditions have been met. Such a conversion could be a taxable event to Beneficient's unitholders where gain or loss is recognized. In addition, a conversion would subject all of Beneficient's future net income to a level of corporate tax, which may reduce the amount of cash available for distribution or reinvestment.

***Beneficient's business, profitability and liquidity may be adversely affected by deterioration in the credit quality of, or defaults by, third parties who owe Beneficient money, securities or other assets or whose securities or obligations Beneficient holds.***

Beneficient is exposed to the risk that third parties that owe Beneficient money, securities or other assets will not perform their obligations. These parties may default on their obligations to Beneficient due to bankruptcy, lack of liquidity, operational failure or other reasons. A failure of a significant market participant, or even concerns about a default by such an institution, could lead to significant liquidity problems, losses or defaults by other institutions, which in turn could adversely affect Beneficient.

***In the event Beneficient uses hedging transactions to manage certain market risks, Beneficient's business, profitability and liquidity may be adversely affected by unanticipated market conditions including interest rates, currency exchange rates, equity market behavior, and other relevant asset classes.***

When managing its exposure to market risks, Beneficient may make use of forward contracts, options, swaps, caps, collars and floors or pursue other strategies or use other forms of derivative instruments to limit its exposure to changes in the relative values of investments that may result from market developments, including changes in prevailing interest rates and currency exchange rates.

<div align="center">38</div>

APP. 61

The use of hedging transactions and other derivative instruments to reduce the effects of changes in the value of a position does not eliminate the possibility of fluctuations in the value of the position or prevent losses if the value of the position declines. However, such activities can establish other positions designed to gain from those same developments, thereby offsetting the decline in the value of the position. Such transactions may also limit the opportunity for gain if the value of a position increases. Moreover, it may not be possible to limit the exposure to a market development that is so generally anticipated that a hedging or other derivative transaction cannot be entered into at an acceptable price. Although Beneficient may enter into hedging transactions in order to reduce its exposure to market risks, unanticipated market changes may result in poorer overall investment performance than if the transaction had not been executed. In addition, the degree of correlation between price movements of the instruments used in connection with hedging activities and price movements in a position being hedged may vary. Moreover, for a variety of reasons, Beneficient may not be successful in establishing a sufficient correlation or a sufficient matching of cash flows between the instruments used in a hedging or other derivative transaction and the position being hedged. An insufficient correlation could prevent Beneficient from achieving the intended result and create new risks of loss. In addition, Beneficient will not be able to fully limit exposure against all changes in the values of the alternative assets underlying its Liquidity Transactions, because the values of such assets are likely to fluctuate as a result of a number of factors, some of which will be beyond Beneficient's control, and it may not be able to respond to such fluctuations in a timely manner or at all.

***Beneficient's fair value estimates of illiquid assets may not accurately estimate prices obtained at the time of sale and Beneficient cannot provide assurance that the values of the alternative assets underlying the Liquidity Transactions that it reports from time to time will be realized.***

Asset valuations for which there is no readily available market, such as the illiquid assets comprising the BEN Collateral, require estimates and assumptions about matters that are inherently uncertain. Given this uncertainty, the fair values of such assets as reflected in estimated net asset value may not reflect the prices that would actually be obtained if and when such assets are sold.

Under Beneficient's valuation policy, Beneficient bases its estimates of the fair value of its private equity fund investments on the fund reported net asset value reported to it by the underlying fund managers. Because private equity funds generally hold a high proportion of their investments in assets for which market prices are not readily available, fund reported net asset value will necessarily incorporate estimates of fair value made by the fund managers. As there is no single method for determining fair value, there may be significant variations in the valuation policies used by different fund managers in Beneficient's portfolio.

In addition, due to time lags in receiving valuation information from fund managers, Beneficient typically will not have up-to-date information from all underlying funds at the time it calculates the fair value of the alternative assets underlying the Liquidity Transactions. BEN typically will not be aware of all material developments at a fund or its underlying portfolio companies that could adversely affect the value of the funds in Beneficient's portfolio.

Even if market quotations are available for the alternative assets underlying the Liquidity Transactions, such quotations may not reflect the value that could actually be realized because of various factors, including the possible illiquidity associated with a large ownership position, subsequent illiquidity in the market for a company's securities, future market price volatility or the potential for a future loss in market value. Realizations at values significantly lower than the fair values recorded in Beneficient's financial statements could have a material adverse effect on the net asset value of the alternative asset, and therefore the value of the beneficial interests and the corresponding Liquidity Transactions.

***Beneficient's liquidity, profitability and business may be adversely affected by concentrations of assets comprising the BEN Collateral.***

The BEN Collateral may be concentrated in certain issuers, funds, sectors, geographic regions, countries, or asset types, which could negatively affect performance as well as Beneficient's financial results, including Beneficient's capital position, earnings, cashflows, and growth.

Similarly, Beneficient's balance sheet may have significant exposures to certain issuers, industries, or asset classes. As a result, Beneficient's net cashflows and asset valuations (e.g., net asset value) may exhibit greater volatility due to idiosyncratic factors specific to companies, industries, regions, and asset classes. Moreover, because of such concentrations, Beneficient may suffer losses even when economic and market conditions are generally favorable for Beneficient's competitors.

39

APP. 62

In the case of Beneficient's exposure to investments in publicly traded companies, its operating results would be impacted by volatility in the public markets generally and in the stock prices of such companies.

***The due diligence process that Beneficient undertakes in connection with Liquidity Transactions may or may not reveal all facts that may be relevant in connection with such Liquidity Transaction, and even if Beneficient receives complete and accurate information it may not translate to identifying the appropriate underwriting criteria.***

Before offering liquidity solutions to clients, Beneficient conducts due diligence that it deems reasonable and appropriate based on the facts and circumstances applicable to each transaction. When conducting due diligence, Beneficient may be required to evaluate important and complex business, financial, tax, accounting, technological, environmental, social, governance and legal and regulatory issues. In addition to Beneficient's own employees, outside consultants, legal advisors and accountants may be involved in the due diligence process in varying degrees depending on the type of investment and the parties involved. Nevertheless, when conducting due diligence and making an assessment regarding the alternative assets behind a potential Liquidity Transaction, Beneficient relies on the resources available to it, including information provided by the potential client of the Liquidity Transaction, the general partners and managers of the alternative assets the client holds, and, in some circumstances, third-party investigations, and such an investigation will not necessarily result in the investment ultimately being successful. Moreover, even in the event that Beneficient receives complete and accurate information in the due diligence process, it may not translate to identifying the appropriate underwriting criteria, which could result in negative reputational effects, and/or otherwise materially and adversely affect Beneficient's business, financial condition and results of operations.

***Restrictions on Beneficient's ability to collect and analyze data regarding its clients' alternative assets investments could adversely affect its business.***

The BEN Collateral includes interests in alternative assets. Beneficient depends on the continuation of its relationships with the general partners and sponsors of the underlying funds and investments in order to maintain current data on these alternative asset investments. The termination of such relationships or the imposition of restrictions on its ability to use the data it obtains for its reporting and monitoring services could adversely affect its business, financial condition and results of operations. Beneficient's monitoring is also dependent on the statements and conduct of personnel at investment managers of the general partners of these alternative asset firms. To the extent that the beliefs and expectations of these managers turn out to be inaccurate, Beneficient's expectations as part of its monitoring process may be materially impacted.

### ITEM 1B.  UNRESOLVED STAFF COMMENTS.

Not applicable.

### ITEM 2.  PROPERTIES.

Our principal executive offices are currently located at 220 South Sixth Street, Suite 1200, Minneapolis, Minnesota 55402. At that location, we lease 17,687 square feet of space for a lease term expiring in 2025. We believe that these facilities are adequate for our current needs and that suitable additional space will be available as needed.

### ITEM 3.  LEGAL PROCEEDINGS.

None.

### ITEM 4.  MINE SAFETY DISCLOSURES.

Not applicable.

40

# PART II

## ITEM 5. MARKET FOR THE REGISTRANT'S COMMON EQUITY, RELATED SHAREHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES.

Our common stock is listed on The NASDAQ Capital Market under the ticker symbol "GWGH."

As of June 30, 2019, there were 116 record holders of our common stock, one of which was Cede & Co., a nominee for Depository Trust Company, or DTC. Shares of common stock that are held by financial institutions as nominees for beneficial owners are deposited into participant accounts at DTC, and are considered to be held of record by Cede & Co. as one stockholder.

On August 10, 2018, the Company declared a special dividend of $4.30 per share of common stock payable to shareholders of record on August 27, 2018.

### *Purchases of Equity Securities by the Registrant*

On November 15, 2018, the Company's Board of Directors approved a stock repurchase program pursuant to which the Company was permitted, from time to time, to purchase shares of its common stock for an aggregate purchase price not to exceed $1,500,000. Stock repurchases were able to be executed through various means, including, without limitation, open market transactions, privately negotiated transactions or otherwise. The stock repurchase program did not obligate the Company to purchase any shares, and expired on April 30, 2019.

The following table includes information about the stock repurchase program for the year ended December 31, 2018:

| Monthly Period | Number of Shares Purchased | Average Price Paid per Share | Total Number of Shares Purchased as Part of the Program | Maximum Dollar Value of Shares that May Yet Be Purchased Under the Program |
|---|---|---|---|---|
| December 2018 | 10,035 | $ 6.82 | 10,035 | $ 1,432,000 |
| Total | 10,035 | $ 6.82 | 10,035 | $ 1,432,000[(1)] |

————————

(1)    The stock repurchase program expired on April 30, 2019.

## ITEM 6. SELECTED FINANCIAL DATA.

Not applicable.

## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.

You should read the following discussion in conjunction with the consolidated financial statements and accompanying notes and the information contained in other sections of this report. This discussion and analysis is based on the beliefs of our management, as well as assumptions made by, and information currently available to, our management.

### *Risk Relating to Forward-Looking Statements*

This report contains forward-looking statements that reflect our current expectations and projections about future events. Actual results could differ materially from those described in these forward-looking statements.

The words "believe," "could," "possibly," "probably," "anticipate," "estimate," "project," "expect," "may," "will," "should," "seek," "intend," "plan," "expect," or "consider" and similar expressions are intended to identify forward-looking statements but are not the exclusive means of identifying such statements. Forward-looking statements are subject to risks and uncertainties, which could cause actual results to differ materially from such statements. Many of the forward-looking statements contained in this report can be found in Item 1A — "Risk Factors" and in the following discussion and analysis.

Such risks and uncertainties include, but are not limited to:

- the valuation of assets reflected on our financial statements, including our equity method investment in Beneficient and our financing receivable from Beneficient;

APP. 64

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 65 of 1031    PageID 237

- the illiquidity of our life insurance and Beneficient-related investments and receivables;

41

APP. 65

- our ability to realize the anticipated benefits from our strategic relationship with Beneficient;

- Beneficient's financial performance and ability to execute on its business plan;

- our ability to obtain accurate and timely financial information from Beneficient;

- our ability to effectively transition the management and oversight roles served by our former executives and members of our Board of Directors.

- changes resulting from the evolution of our business model and strategy with respect to Beneficient and the life insurance secondary market;

- our reliance on debt financing and continued access to the capital markets;

- our significant and on-going financing requirements;

- our ability to make cash distributions in satisfaction of dividend obligations and redemption requests.

- our ability to satisfy our debt obligations if we were to sell our entire portfolio of life insurance policies and our Beneficient-related assets;

- our history of operating losses;

- general economic outlook, including prevailing interest rates;

- federal, state and FINRA regulatory matters;

- litigation risks;

- our ability to comply with financial and non-financial covenants contained in borrowing agreements;

- the reliability of assumptions underlying our actuarial models, including life expectancy estimates and our projections of mortality events and the realization of policy benefits;

- risks relating to the validity and enforceability of the life insurance policies we purchase;

- our reliance on information provided and obtained by third parties, including changes in underwriting tables and underwriting methodology;

- life insurance company credit exposure;

- cost-of-insurance (premium) increases on our life insurance policies;

- performance of our investments in life insurance policies;

- the various risks associated with our attempts to commercialize our epigenetic technology;

- risks associated with our ability to protect our intellectual property rights; and

- risks associated with causing Life Epigenetics and youSurance to become independent of GWG.

We caution you that the foregoing list of factors is not exhaustive. Forward-looking statements are only estimates and predictions, or statements of current intent. Actual results, outcomes or actions that we ultimately undertake could differ materially from those anticipated in the forward-looking statements due to risks, uncertainties or actual events differing from the assumptions underlying these statements.

### *JOBS Act*

On April 5, 2012, the Jumpstart Our Business Startups Act of 2012, or JOBS Act, was enacted. Section 107 of the JOBS Act provides that an "emerging growth company" can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act of 1933 for complying with new or revised accounting standards. This means that an "emerging growth company" can make an election to delay the adoption of certain accounting standards until those standards would apply to private companies. We have historically qualified as an emerging growth company and have elected to delay our adoption of new or revised accounting standards and, as a result, we may not have complied with new or revised accounting standards at the same time as other public reporting companies that are

42

APP. 66

not "emerging growth companies." Effective upon the Initial Transfer of the transactions contemplated by the Master Exchange Agreement (discussed below), we no longer qualify as an emerging growth company as a result of the aggregate amount of non-convertible debt that we have issued during the prior three year period.

## Overview

We are a financial services company committed to transforming the alternative asset industry with disruptive and innovative products and services. In 2018 and early 2019 we consummated a series of transactions (as more fully described below) with Beneficient that has resulted in a significant reorientation of our business and capital allocation strategy and a change in our Board of Directors and executive management team. Beneficient provides private trust solutions, including a unique suite of lending and liquidity products focused on bringing liquidity to owners of alternative assets. Beneficient's innovative liquidity solutions are designed to serve mid-to-high net worth ("MHNW") individuals, small-to-mid ("STM") sized institutions, and asset managers who have historically possessed few attractive options to access early liquidity from their alternative assets. Beneficient targets MHNW individual clients with $5 million to $30 million in investments and STM institutional clients typically holding up to $1 billion in assets.

Beneficient also plans to market custody and clearing of alternative assets, and trustee and insurance services for covering risks attendant to owning or managing alternative assets as well as online portals for the trading of alternative assets. Beneficient plans to offer these future services through Beneficient's U.S.-based subsidiaries, including trust companies Beneficient is in the process of applying to charter in Texas, and (subject to capitalization) through its Bermuda-regulated insurance companies, including PEN and its subsidiaries. The two anticipated trust companies will exist to provide loans and liquidity products to clients, to serve as custodian and trustee to certain trusts required for loan and liquidity product transactions, and to provide trustee services to Beneficient's clients.

Beneficient's existing and planned products and services can support tax and estate planning objectives, facilitate a diversification of assets or simply provide administrative management and reporting solutions tailored to the goals of the investor.

While we are continuing our work to maximize the value of our life insurance related business, we have made the strategic decision to begin reducing capital allocated to our traditional secondary market life insurance business and to begin increasing capital allocated toward providing liquidity to a broader range of alternative assets. We believe these investments will ultimately produce higher risk-adjusted returns than those we are projecting to receive from our portfolio of life insurance acquired in the secondary market. Furthermore, although we believe that our portfolio of life insurance policies is a meaningful component of a growing diversified alternative asset portfolio, we have begun to explore strategic alternatives for our life insurance portfolio aimed at maximizing its value, including a possible sale, refinancing or recapitalization of our life insurance portfolio.

Our transactions with Beneficient provided us with a significant increase in assets and common shareholder equity and provide the opportunity for a diversified source of future earnings within the alternative asset industry. We believe these transactions will complete the transformation of GWG from a niche provider of liquidity to owners of life insurance, to a full-scale provider of trust and liquidity products and services to owners of a broad range of alternative assets.

## Critical Accounting Policies

### *Critical Accounting Estimates*

The preparation of our consolidated financial statements in accordance with the Generally Accepted Accounting Principles in the United States of America (GAAP) requires us to make significant judgments, estimates, and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. We base our judgments, estimates, and assumptions on historical experience and on various other factors believed to be reasonable under the circumstances. Actual results could differ materially from these estimates. We evaluate our judgments, estimates, and assumptions on a regular basis and make changes accordingly. We believe that the judgments, estimates, and assumptions involved in valuing our investments in life insurance policies, assessing potential impairment of equity method investments and equity security investments, assessing the need for allowance for credit losses on financing receivables and evaluating deferred taxes have the greatest potential impact on our consolidated financial statements and accordingly believe these to be our critical accounting estimates. Below

APP. 67

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 68 of 1031     PageID 240

we discuss the critical accounting policies associated with these estimates as well as certain other critical accounting policies.

43

APP. 68

*Ownership of Life Insurance Policies — Fair Value Option*

We account for the purchase of life insurance policies in accordance with Accounting Standards Codification 325-30, *Investments in Insurance Contracts*, which requires us to use either the investment method or the fair value method. We have elected to account for all of our life insurance policies using the fair value method.

The fair value of our life insurance policies is determined as the net present value of the life insurance portfolio's future expected cash flows (policy benefits received and required premium payments) that incorporates current life expectancy estimates and discount rate assumptions.

We initially record our purchase of life insurance policies at the transaction price, which is the amount paid for the policy, inclusive of all external fees and costs associated with the acquisition. At each subsequent reporting period, we re-measure the investment at fair value in its entirety and recognize the change in fair value as unrealized gain (loss) in the current period, net of premiums paid. Changes in the fair value of our life insurance portfolio are based on periodic evaluations and are recorded in our consolidated statements of operations as changes in fair value of life insurance policies.

*Fair Value Components — Life Expectancies*

Unobservable inputs, as discussed below, are a critical component of our estimate for the fair value of our investments in life insurance policies. We currently use a probabilistic method of estimating and valuing the projected cash flows of our portfolio, which we believe to be the preferred and most prevalent valuation method in the industry. In this regard, the most significant assumptions we make are the life expectancy estimates of the insureds and the discount rate applied to the expected future cash flows to be derived from our life insurance portfolio.

The fair value of our portfolio of life insurance policies is determined as the net present value of the life insurance portfolio's future expected cash flows (net of policy benefits received and required premium payments). The net present value of the future expected cash flows incorporate life expectancy estimates and current discount rate assumptions. The life expectancy estimates we use for acquiring and valuing life insurance policies has in the past been typically based upon the average of two life expectancy reports received from independent third-party medical actuarial underwriting firms ("Life Expectancy Providers"). After the acquisition of a life insurance policy, we historically have sought to update these life expectancy reports on a periodic basis.

In October and November 2018, two of the primary Life Expectancy Providers used by the Company — ITM TwentyFirst, LLC ("TwentyFirst") and AVS, LLC ("AVS") — released updates to their respective mortality tables and medical underwriting methodologies. As disclosed in our Quarterly Report on Form 10-Q for the quarter ended September 30, 2018 filed with the SEC on November 19, 2018, and our amended Quarterly Report on Form 10-Q/A filed on April 22, 2019, the majority of our life insurance policies were valued using life expectancy reports provided by TwentyFirst and/or AVS. The updates from TwentyFirst and AVS suggest a lengthening of prior life expectancy estimates and relate to revised estimates of the originally issued life expectancy reports. These updates do not encompass any change to the insured's age and health condition since the report was originally issued.

We, along with other major secondary market participants, have noted the frequent changes in methodologies made by the Life Expectancy Providers over the years that, short of purchasing revised life expectancy reports at a substantial cost, have lacked detailed information about the impact of these changes on individual policy values. Moreover, our experience is these methodology changes have not resulted in a narrowing of consensus in the life expectancy estimates issued for individual insureds. Finally, as our life insurance portfolio has grown in size and diversity, our ability to model with greater certainty and predictability through the incorporation of historical portfolio experience in conjunction with the use of life expectancy reports has improved significantly.

*Performance Based Forecasting and Valuation Methodology ("Actual-to-Expected" or "A2E")*

As a result, we undertook a comprehensive study to determine a more accurate, transparent and cost-effective method of pricing, valuing, and modeling the performance of our portfolio of life insurance policies. Our goal was to incorporate life expectancy estimates from Life Expectancy Providers, the historical experience of the portfolio, the diversification and mortality factors of the portfolio, and relevant market-based observations and inputs.

44

APP. 69

We believe we have succeeded in creating and validating such an approach which is referred to as the "Longest Life Expectancy" methodology.

Our Longest Life Expectancy methodology is built from the following pillars:

- The utilization of life expectancy reports from independent Life Expectancy Providers for the pricing of all life insurance policies;

- The application of a stable valuation methodology driven by the experience of our life insurance portfolio which is re-evaluated if experience deviates by a specified margin; and

- The use of relevant market observations that can be validated and mapped to the discount rate used to value the life insurance portfolio.

We are committed to using the Longest Life Expectancy methodology going forward based upon using the longest life expectancy report received from the Life Expectancy Providers used for pricing at the time a life insurance policy is purchased (the "Longest Life Expectancy").

Our life insurance portfolio modeling and predicted future cash flows are based upon the central limit theorem, which establishes that, in certain situations, random events become normalized and predictable around the mean as the number of observations grow in size. We believe our portfolio of life insurance policies has grown sufficiently large in size and diversity to establish that while individual mortality experience is inherently unpredictable, the actual mortality experience of the portfolio should be expected to approach the mean modeled prediction. As of December 31, 2018, our life insurance portfolio, stratified by age of insured in the table below, stood at $2.047 billion in face value of policy benefits and 1,154 policies:

| | | | | Percentage of Total | |
| Min Age | Max Age | Number of Policies | Policy Benefits | Number of Policies | Policy Benefits |
|---|---|---|---|---|---|
| 95 | 100 | 16 | $ 23,483,000 | 1.4% | 1.1% |
| 90 | 94 | 129 | 257,877,000 | 11.2% | 12.6% |
| 85 | 89 | 232 | 519,107,000 | 20.1% | 25.3% |
| 80 | 84 | 243 | 458,529,000 | 21.1% | 22.4% |
| 75 | 79 | 230 | 407,087,000 | 19.9% | 19.9% |
| 70 | 74 | 213 | 275,933,000 | 18.4% | 13.5% |
| 60 | 69 | 91 | 105,976,000 | 7.9% | 5.2% |
| **Total** | | **1,154** | **$ 2,047,992,000** | **100.0**% | **100.0**% |

After extensive research and modeling, we determined that the Longest Life Expectancy methodology was highly predictive of the actual experience of our portfolio of life insurance policies as compared to our historical methodology using the Average Life Expectancy method.

We used the Least Squares statistical method, which can be used to determine a line of best fit by minimizing the sum of squares of the errors (actual vs expected) and can be used with either linear or non-linear data. In this case, we are fitting non-linear data to a non-linear curve. The Least Squares method was determined to be an efficient means of calculating the required portfolio multiplier (PMM) to maintain the overall shape of the projected curve while maximizing fit to the observed data.

45

The tables below compare the A2E mortality cash flow experience of our life insurance portfolio using Average Life Expectancy and Longest Life Expectancy. By using the Longest Life Expectancy methodology, we increased our actual- to-expected mortality cash flow experience accuracy from 78% to 95%.



We believe that a Longest Life Expectancy methodology, which incorporates the actual mortality experience of our portfolio and the use of third-party estimates, is superior to our historical methodology. We believe this methodology should minimize future fluctuations of valuation, decrease our reliance on Life Expectancy Providers for updated reports, and improve our ability to finance and forecast future revenues and earnings.

The implementation of the Longest Life Expectancy methodology required us to take a non-cash charge (net of the impact of a change in discount rate) to revenue of $87.1 million, reflecting a decrease in the fair value of its portfolio of life insurance policies at December 31, 2018. This non-cash charge represents approximately 10% of fair market value of the portfolio prior to adjustment.

*Updates to the Analysis*

Proper maintenance of an A2E based valuation methodology includes the continual tracking of actual results as well as comparisons to projections. An A2E based valuation methodology rests on the actuarial premise that mortality results for sufficiently large populations follow predictable mortality curves (see discussion above regarding the Central Limit Theorem). As such, through the A2E analysis and the use of the PMM, we are able to "fit" projections to actual results, which provides a basis to forecast future performance more accurately.

Should performance sufficiently deviate in the future from these projections, the A2E analysis would be re-examined to determine if the resultant PMM still results in the most accurate fitting of the projections to actual results. Adjustments to the PMM would then be made based on that analysis if warranted.

The analysis would utilize the same basic methodology as the initial analysis to ensure consistency in the process and would include:

Calculation of a static Portfolio PMM and;

- A cohort analysis of our life insurance portfolio combined with a durational analysis to determine if either static or vector cohort PMM's are warranted.

- Following this updated analysis, any necessary changes to the PMM would then be incorporated into the valuation methodology.

The basis for a re-examination of the A2E analysis could be based on either the passage of time or a pre-determined performance trigger. Following further analysis, we determined that a performance-based trigger approach that allows the portfolio to perform within statistical norms (+/- 1 standard deviation) without constant updates is most appropriate. We intend to re-examine the A2E analysis and recalculate the resultant PMM anytime the six-month moving average of the difference between actual portfolio performance and projected performance deviates by more than one standard deviation from the mean and such deviation persists for three consecutive months. This methodology allows for natural

46

periods of slow or excess maturities to occur without the necessity of changes to the PMM. At present, a one standard deviation move in the six month moving average of the difference between actual portfolio performance and projected performance would equate to a valuation change of approximately $8 million. The decision to update our valuation methodology was based in part on an analysis performed by an independent third party actuarial consulting firm, which indicated a very strong tendency toward mean reversion within the dataset.

The analysis above utilizes the Society of Actuaries 2015 Valuation Basic Table ("2015 VBT"). The 2015 VBT is the standard in the secondary market for life insurance and is based on a much larger dataset of insured lives, face amount of policies and more current information compared to the dataset underlying the 2008 Valuation Basic Table. The 2015 VBT dataset includes 266 million policies compared to the 2008 VBT dataset of 75 million. The experience data in the 2015 VBT dataset includes 2.6 million claims on policies from 51 insurance carriers. Life expectancies implied by the 2015 VBT are generally slightly longer for both male and female non-smokers between the ages of 65 and 80. However, insureds of both genders over the age of 80 have significantly longer life expectancies, approximately 8% to 42% longer, as compared to the 2008 VBT. We adopted the 2015 VBT in our valuation process in 2016.

*Periodic Updates to Life Expectancy (LE) Reports*

We anticipate some lenders will require regular updates to LE Reports. These lenders may also utilize an average LE for valuation, similar to our historical methodology.

We intend to continue obtaining LE Reports beyond our policy purchase process to the extent they are needed to comply with existing and future covenants within credit facilities. To the extent such LE Reports are available, we do not expect to immediately incorporate these life expectancy reports into our revised valuation methodology but will track this data to determine over time if there exists any additive predictive value in relation to the basis of its mortality projections.

As such, the policies and procedures surrounding the updating of LE Reports will reflect that LE Reports will only be updated when required by third parties.

*Portfolio Return Implications*

At any time, we calculate our returns from our life insurance assets based upon (i) our historical results; and (ii) the future cash flows we expect to realize from our statistical forecasts. To forecast our expected future cash flows and returns, we use the probabilistic method of analysis. The expected internal rate of return ("IRR") of our portfolio is based upon future cash flow forecasts derived from a probabilistic analysis of policy benefits received and policy premiums paid in relation to our non-GAAP investment cost basis which includes purchase price, total premiums paid, and total financing costs incurred to date. As of December 31, 2018, the expected internal rate of return on our portfolio of life insurance assets was 6.16% based on our portfolio benefits of $2.05 billion and our non-GAAP investment cost basis of $844.2 million. This calculation excludes returns realized from our matured policy benefits, which are substantial.

We seek to further enhance our understanding of our expected future cash flow and returns by using a stochastic analysis, sometimes referred to as a "Monte Carlo simulation," to provide us with a greater understanding of the variability of our projections. The stochastic analysis we perform, which excludes financing costs to isolate only those cash flows associated with the life insurance policies, provides IRR calculations for different statistical confidence intervals. The results of our stochastic analysis, in which we run 10,000 random mortality scenarios, demonstrates that the scenario ranking at the 50th percentile of all 10,000 results generates an IRR of 8.20%, which is very near to the discount rate of 8.25% that we used to calculate the fair value of our portfolio. Our Expected IRR is based upon future policy related cash flow forecasts derived from a probabilistic analysis of our policy benefits received and policy premiums paid. The stochastic analysis results also reveal that our portfolio is expected to generate an IRR of 7.75% or better in 75% of all generated scenarios; and an IRR of 7.36% or better in 90% of all generated scenarios. We believe the Company's portfolio of life insurance policies has grown sufficiently large in size and diversity to establish that, while individual mortality experience is inherently unpredictable, the actual mortality experience of the portfolio should be expected to approach the mean modeled prediction.

47

APP. 72

*Fair Value Components — Required Premium Payments*

We must pay the premiums on the life insurance policies within our portfolio in order to collect the policy benefit. The same probabilistic model and methodologies used to generate expected cash inflows from the life insurance policy benefits over the expected life of the insured are used to estimate cash outflows due to required premium payments. Premiums paid are offset against revenue in the applicable reporting period.

*Fair Value Components — Discount Rate*

A discount rate is used to calculate the net present value of the expected cash flows. The discount rate used to calculate fair value of our portfolio incorporates the guidance provided by Accounting Standards Codification ("ASC") 820, *Fair Value Measurements and Disclosures*.

The table below provides the discount rate used to estimate the fair value of our portfolio of life insurance policies for the period ending:

| December 31, 2018 | December 31, 2017 |
|---|---|
| 8.25% | 10.45% |

In adopting the Longest Life Expectancy methodology as described above, we preserved the general methodology that we have historically used to calculate the fair value discount rate and have made important enhancements. Most notably, we improved the reliability and relevancy of the competitive sales estimates we use to measure the discount rates (on a Longest Life Expectancy basis) observed in the life insurance secondary market. We continue to use market interest rates, credit exposure to the issuing insurance companies, and our estimate of the operational risk premium a purchaser would apply to the future cash flows derived from our portfolio of life insurance policies in our methodology.

Management has significant discretion regarding the combination of these and other factors when determining the discount rate. The discount rate we choose assumes an orderly and arms-length transaction (i.e., a non-distressed transaction in which neither seller nor buyer is compelled to engage in the transaction), which is consistent with related GAAP guidance. The carrying value of policies acquired during each quarterly reporting period are adjusted to their current fair value using the fair value discount rate applied to the entire portfolio as of that reporting date.

We engaged ClearLife Limited, owner of the ClariNet LS actuarial portfolio pricing software we use, to prepare a net present value calculation of our life insurance portfolio. ClearLife Limited processed policy data, future premium data, life expectancy estimate data, and other actuarial information to calculate a net present value for our portfolio using the specified discount rate of 8.25%. ClearLife Limited calculated the net present value of our portfolio of 1,154 policies to be $747.9 million and furnished us with a letter documenting its calculation. A copy of such letter is filed as Exhibit 99.1 to this report.

See Note 4 to the consolidated financial statements for additional discussion of the sensitivity of the valuation to different discount rates.

*Equity Method Investment, Equity Security Investment and Financing Receivable from Affiliate*

GWG has an investment in BEN LP, accounted for using the equity method, an equity security investment in Beneficient and a financing receivable for a loan it provided to Beneficient. When circumstances indicate that the carrying value of the equity method investment or equity security may not be recoverable, the fair value of the investment is evaluated by management. The fair value of these investments are not readily determinable as the BEN LP common units are not currently publicly traded on a stock exchange. Management will use other accepted valuation methods to determine fair value such as discounting estimated future cash flows for the business. If the fair value of the investment is determined to be less than its carrying value and the decline in value is considered to be other than temporary, an appropriate write down is recorded to net earnings based on the excess of the carrying value over the best estimate of fair value of the investment. In addition, if based on current information and events, it is probable that GWG will be unable to collect all amounts due according to the contractual terms of the financing receivable from affiliate and an amount can be reasonably estimated, GWG will write down the amounts to estimated realizable value. Information and events creating uncertainty about the realization of recorded amounts for financing receivables from affiliates include, but are not limited to, the estimated cash flows generated by the affiliate's business, the sufficiency of collateral securing the amounts, and the creditworthiness of the counterparties involved. Changes in facts, circumstances and

APP. 73

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 74 of 1031    PageID 246

management's estimates and judgment could result in a material charge to earnings. At December 31, 2018, we determined that no

---

48

---

APP. 74

indication of an impairment of the equity method investment or equity security investment existed, and no allowance for credit losses was recorded on the financing receivable from affiliate.

### Deferred Income Taxes

Under ASC 740, *Income Taxes*, deferred tax assets and liabilities are recognized for the future tax consequences attributable to temporary differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. A valuation allowance is established for deferred tax assets that are not considered "more likely than not" to be realized. Realization of deferred tax assets depends upon having sufficient past or future taxable income in periods to which the deductible temporary differences are expected to be recovered or within any applicable carryback or carryforward periods or sufficient tax planning strategies. After assessing the realization of the net deferred tax assets, we believe that there is substantial uncertainty that our net deferred tax asset will be realized during the applicable carryforward period. As such, a valuation allowance has been recorded against the total net deferred tax asset as of December 31, 2018 and December 31, 2017, respectively.

At December 31, 2018 and 2017, we had federal net operating loss ("NOL") carryforwards of $36,501,000 and $34,775,000, respectively, and aggregate state NOL carryforwards of approximately $36,475,000 and $34,749,000, respectively. The NOL carryforwards subject to expiration (i.e., those generated prior to 2018) will begin to expire in 2031. Future utilization of NOL carryforwards is subject to limitations under Section 382 of the Internal Revenue Code. This section generally relates to a more than 50 percent change in ownership over a three-year period. As a result of the Exchange Transaction, it is believed that a change in ownership for tax purposes only has occurred as of December 28, 2018. As such, the annual utilization of our net operating losses generated prior to the ownership change is limited. Based on the estimated value of the Company prior to the Exchange Transaction, utilization of pre-ownership change net operating losses are subject to an annual limitation of approximately $7,564,000.

### Principal Revenue and Expense Items

We earn revenues from the following primary sources.

- *Life Insurance Policy Benefits Realized*.   We recognize the difference between the face value of the policy benefits and carrying value when an insured event has occurred and determine that collection of the policy benefits is realizable and reasonably assured. Revenue from a transaction must meet both criteria in order to be recognized. We generally collect the face value of the life insurance policy from the insurance company within 45 days of our notification of the insured's mortality.

- *Change in Fair Value of Life Insurance Policies*.   We value our portfolio investments for each reporting period in accordance with the fair value principles discussed herein, which reflects the expected receipt of policy benefits in future periods, net of premium costs, as shown in our consolidated financial statements.

- *Interest on Financing Receivable from Affiliate.*   We recognize and record interest income on outstanding principal as earned.

- *Sale of a Life Insurance Policy*.   In the event of a sale of a policy, we recognize gain or loss as the difference between the sale price and the carrying value of the policy on the date of the receipt of payment on such sale.

Our main components of expense are summarized below.

- *Selling, General and Administrative Expenses*.   We recognize and record expenses incurred in our business operations, including operations related to the purchasing and servicing of life insurance policies. These expenses include salaries and benefits, sales, marketing, occupancy and other expenditures.

- *Interest Expense.*   We recognize, and record interest expenses associated with the costs of financing our life insurance portfolio and our investment in Beneficient for the current period. These expenses include interest paid to our senior lenders under our amended and restated senior credit facility with LNV Corporation, as well as interest paid on our L Bonds, Seller Trust L Bonds and other outstanding indebtedness. When we issue debt, we amortize the financing costs (commissions and other fees) associated with such indebtedness over the outstanding term of the financing and classify it as interest expense.

APP. 75

APP. 76

An additional component of our net earnings.

- *Earnings from Equity Method Investment.*   We account for our investment in the common units of BEN LP using the equity method. Under this method, we record our share of the net earnings or losses attributable to BEN LP common unitholders, on a one quarter lag, as a separate line on our consolidated statements of operations.

### Results of Operations — 2018 Compared to 2017

The following is our analysis of the results of operations for the periods indicated below. This analysis should be read in conjunction with our consolidated financial statements and related notes.

*Revenue*

|  | Years Ended December 31, | |
| --- | --- | --- |
|  | 2018 | 2017 |
| Revenue realized from maturities of life insurance policies | $ 50,326,000 | $ 48,649,000 |
| Revenue recognized from change in fair value of life insurance policies[1] | (10,344,000) | 66,761,000 |
| Premiums and other annual fees | (54,087,000) | (53,296,000) |
| Gain (loss) on life insurance policies, net | (14,105,000) | 62,114,000 |
| Interest and other income | 13,715,000 | 2,020,000 |
| Total revenue | $ (390,000) | $ 64,134,000 |
|  |  |  |
| Attribution of gain (loss) on life insurance policies, net: |  |  |
| Change in estimated probabilistic cash flows, net of premium and other annual fees paid | $ 21,357,000 | $ 9,945,000 |
| Net revenue recognized at matured policy event | 28,511,000 | 26,476,000 |
| Unrealized gain on acquisitions | 28,017,000 | 31,019,000 |
| Change in discount rates | — | 14,931,000 |
| Change in life expectancy evaluation | (4,890,000) | (20,257,000) |
| Change of life expectancy valuation methodology[2] | (87,100,000) | — |
| Gain (loss) on life insurance policies, net | $ (14,105,000) | $ 62,114,000 |
|  |  |  |
| Number of policies acquired | 318 | 255 |
| Face value of purchases | $440,445,000 | $ 378,948,000 |
| Purchases (initial cost basis) | $128,503,000 | $ 88,644,000 |
| Unrealized gain on acquisition (% of face value) | 6.4% | 8.2% |
|  |  |  |
| Number of policies matured | 62 | 47 |
| Face value of matured policies | $ 71,090,000 | $ 64,719,000 |
| Net revenue recognized at maturity event (% of face value matured) | 40.1% | 40.9% |

----

(1)   Includes a net pre-tax charge of $87.1 million related to the adoption of the Longest Life Expectancy methodology.

(2)    Represents the net impact of the lengthening of overall life expectancies as a result of the adoption of the Longest Life Expectancy methodology partially offset by the impact of a decrease in the discount rate associated thereto.

Revenue from changes in estimated probabilistic cash flows, net of premiums paid was $21.4 million and $9.9 million in 2018 and 2017, respectively. The decrease of $76.2 million on gain on life insurance policies for the twelve months ended December 31, 2018 over the comparable prior year period was driven by an $87.1 million charge resulted from the adoption of the Longest Life Expectancy methodology, offset by premium optimization actions coordinated with our external servicer, leveraging certain guarantee features and shadow accounts on certain life insurance policies in our portfolio, and growth of face value in our portfolio.

APP. 77

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 78 of 1031    PageID 250

50

APP. 78

The face value of policies purchased was $440.4 million and $378.9 million in 2018 and 2017, respectively, reflecting increase of face value purchased of $61.5 million. The resulting unrealized gain on acquisition was $28.0 million and $31.0 million in 2018 and 2017, respectively, reflecting a decrease of $3.0 million. Decreased unrealized gain on acquisition in the current period is the result of increased purchase competition driving down yields in the secondary market for life insurance, which we expect to continue for the foreseeable future.

The face value of matured policies was $71.1 million and $64.7 million in 2018 and 2017, respectively, reflecting an increase of face value of matured policies of $6.4 million. The resulting revenue recognized at matured policy event was $50.3 million and $48.6 million, respectively. Revenue changes from maturity events of $2.0 million primarily resulted from the changes of face value of policies matured during those same periods.

The discount rate of 8.25% as of December 31, 2018 reflected a decrease from the 10.45% rate used at December 31, 2017. The discount rate was decreased in connection with the implementation of our Longest Life Expectancy methodology. We believe this methodology should minimize future valuation fluctuations and improve our ability to finance and forecast future cash flows and revenues from our life insurance portfolio.

Net revenue charges from change in life expectancy evaluation were $4.9 million and $20.3 million in 2018 and 2017, respectively. The resulting net revenue increase of $15.4 million primarily resulted from a lower number of life insurance policy updates received during 2018 over 2017. The decreased number of life expectancy updates is primarily the result of our cycle update timing and concentrated efforts of our external servicer in the prior year to resolve a backlog of third party evaluations. The aforementioned excludes the impact of the adoption of the Longest Life Expectancy methodology, which had the overall effect of lengthening life expectancy estimates.

Interest and other income is comprised of interest from financing receivables, bank interest and other miscellaneous items. Increased revenue of $11.7 million in 2018 compared to 2017 was primarily driven by the interest income earned on the financing receivables from Beneficient, and to a lesser extent, interest income from higher bank account balances and the implementation of a sweep process to move balances to higher interest earning bank accounts.

*Expenses*

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | **2018** | **2017** | **Increase/ (Decrease)** |
| Interest expense (including amortization of deferred financing costs)[1] | $ 80,136,000 | $ 54,419,000 | $ 25,717,000 |
| Employee compensation and benefits[2] | 17,407,000 | 14,870,000 | 2,537,000 |
| Legal and professional expenses[3] | 5,541,000 | 5,096,000 | 445,000 |
| Other expenses[4] | 15,995,000 | 12,479,000 | 3,516,000 |
| Total expenses | $ 119,079,000 | $ 86,864,000 | $ 32,215,000 |

—————————

(1)    Increase is primarily due to the increase in the average debt outstanding from $597.5 million in 2017 to $771.0 million in 2018, contributing $14.9 million of interest expense. The average interest rate of the amended and restated senior credit facility with LNV Corporation increased from 7.95% to 10.12% in 2018 compared to 2017. Seller Trust L Bonds of $366.9 million were issued in the third quarter resulting in an additional $10.8 million of interest expense in 2018.

(2)    Increase is incentive cost resulting from certain stock-based compensation items in the third and fourth quarters of 2018.

(3)    Increase is the result of higher non-capitalizable professional service fees associated with the Exchange Transaction.

(4)    Increased contract labor costs, provision for uncollectible policy benefit receivable, and servicing and facility fees were offset by a reduction in charitable contributions and marketing costs, and lower provision for merchant cash advances. See Note 19 for the detailed breakdown of other expenses.

*Insurtech Initiatives*

During 2018 and 2017 we incurred $4.2 million and $1.6 million of expenses, respectively, in furtherance of our insurtech initiatives, which we believe are potentially transformational. These expenses are primarily related to

APP. 79

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 80 of 1031    PageID 252

the development of intellectual property surrounding advanced epigenetic testing technology and we expect these costs will increase over the foreseeable future.

---

51

APP. 80

*Deferred Income Taxes*

Under ASC 740, *Income Taxes,* deferred tax assets and liabilities are recognized for the future tax consequences attributable to temporary differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. A valuation allowance is established for deferred tax assets that are not considered "more likely than not" to be realized. Realization of deferred tax assets depends upon having sufficient past or future taxable income in periods to which the deductible temporary differences are expected to be recovered or within any applicable carryback or carryforward periods. After assessing the realization of the net deferred tax assets, we believe that there is substantial uncertainty that our net deferred tax asset will be realized during the applicable carryforward period. As such, a valuation allowance has been established against the total net deferred tax asset as of December 31, 2018 and December 31, 2017.

*Income Tax Expense*

We realized a net income tax benefit of $0 and $2.1 million for the years ended December 31, 2018 and 2017, respectively. The effective rate for the years ended December 31, 2018 and 2017 was 0% and 9.2%, respectively, compared to the statutory rate of 21% and 34%, respectively.

The following table provides a reconciliation of our income tax expense at the statutory federal tax rate to our actual income tax expense:

|  | Years Ended | | | |
|---|---|---|---|---|
|  | December 31, 2018 | | December 31, 2017 | |
| Statutory federal income tax (benefit) | $(25,085,000) | 21.0% | $ (7,728,000) | 34.0% |
| State income taxes (benefit), net of federal benefit | (9,243,000) | 7.7% | (1,433,000) | 6.3% |
| Impact of change in enacted rate | — | — | 2,605,000 | (11.4)% |
| Valuation allowance | 33,999,000 | (28.4)% | 4,222,000 | (18.6)% |
| Other permanent differences | 329,000 | (0.3)% | 237,000 | (1.1)% |
| **Total income tax expense (benefit)** | **$        —** | **0.0%** | **$ (2,097,000)** | **9.2%** |

The Tax Reform Bill enacted by U.S. Federal government in December 2017 changed existing tax law including a reduction of the U.S. Corporate tax rate. The Company re-measured deferred taxes as of the date of enactment, reflecting these changes within deferred tax assets as of December 31, 2017.

The most significant temporary differences between GAAP net income (loss) and taxable net income (loss) are the treatment of interest costs, policy premiums and servicing costs with respect to the acquisition and maintenance of the life insurance policies and revenue recognition with respect to the fair value of the life insurance portfolio.

**Revenue and Earnings before Tax by Reportable Segment — 2018 Compared to 2017**

**Comparison of revenue by reportable segment for the periods indicated:**

| | Years Ended December 31, | | |
|---|---|---|---|
| **Revenue:** | **2018** | **2017** | **Increase/ (Decrease)** |
| Secondary Life Insurance | $(11,633,000) | $  62,674,000 | $  (74,307,000) |
| Investment in Beneficient | 10,655,000 | — | 10,655,000 |
| Corporate & Other | 588,000 | 1,460,000 | (872,000) |
| Total | $    (390,000) | $  64,134,000 | $  (64,524,000) |

52

APP. 81

The primary drivers of the changes from 2017 to 2018 were:

- **Secondary Life Insurance revenue decreased by $74.3 million in 2018 primarily as a result of a $76.2 million decrease in the gain on life insurance policies, net as described in the discussion of consolidated results of operations. This decrease was driven by an $87.1 million charge resulting from the adoption of the Longest Life Expectancy methodology, offset by premium optimization actions coordinated with our external servicer, leveraging certain guarantee features and shadow accounts on certain life insurance policies in our portfolio, and growth of face value in our portfolio. The decrease was also partially offset by $1.9 million higher interest income as a result of higher bank balances and the implementation of a sweep process to earn higher yield on bank balances.**

- **Investment in Beneficient represents interest income on new financing receivables as a result of the transaction with Beneficient in 2018.**

Comparison of earnings before tax by reportable segment for the periods indicated:

| | Years Ended December 31, | | |
| Segment Earnings Before Tax: | 2018 | 2017 | Increase/ (Decrease) |
| --- | --- | --- | --- |
| Secondary Life Insurance | $ (96,578,000) | $ (3,433,000) | $ (93,145,000) |
| Investment in Beneficient | (106,000) | — | (106,000) |
| Corporate & Other | (22,767,000) | (19,296,000) | (3,471,000) |
| Total | $(119,451,000) | $(22,729,000) | $ (96,722,000) |

The primary drivers of the change from 2017 to 2018 were:

- **Secondary Life Insurance decreased by $93.1 million due to a $76.2 million decrease in the gain on life insurance policies, net as described above in the discussion of consolidated results of operations. The additional $16.9 million decrease is a result of the following:**

  - **Increase in interest expense of $14.9 million as a result of higher average debt outstanding and an interest rate increase of 2.17% on the amended and restated senior credit facility with LNV Corporation in 2018.**

  - **Partially offset by a $1.9 million increase in interest income as noted above in the segment revenue discussion.**

  - **An increase in operating expenses of $3.9 million, primarily resulting from a provision for an uncollectible policy benefit receivable of $4.3 million relating to an insurable interest challenge from an insurance carrier.**

- **Investment in Beneficient results in 2018 primarily consisted of interest income of $10.7 million from financing receivables, offset by $10.8 million of interest expense on the Seller Trust L Bonds issued to finance the Exchange Transaction.**

- **Corporate and Other operating loss increased primarily due to increased investments in its insurtech initiatives.**

### Liquidity and Capital Resources

We finance our businesses through a combination of life insurance policy benefit receipts, dividends and interest on investments, equity offerings, debt offerings and our amended and restated senior credit facility with LNV Corporation. We have used proceeds from our debt and equity offerings and our amended and restated senior credit facility with LNV Corporation for policy acquisition, policy premiums and servicing costs, working capital and financing expenditures including paying principal, interest and dividends.

As of December 31, 2018 and December 31, 2017, we had approximately $141.9 million and $159.4 million, respectively, in combined available cash, cash equivalents, restricted cash and policy benefits receivable for the purpose of financing our business.

53

APP. 82

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 83 of 1031    PageID 255

Additional future borrowing base capacity for premiums and servicing costs, created as the premiums and servicing costs of pledged life insurance policies become due and by additional policy pledges to the facility, if any, exists under our amended and restated senior credit facility with LNV Corporation. We may also obtain borrowing base capacity through the offering of our L Bonds, subject to recommencing offers and sales thereof. Due to the failure to issue GWG Life, LLC audited financial statements for 2018 to LNV Corporation within 90 days after the end of the year and the failure to deliver GWG Life, LLC unaudited financial statements within 45 days after March 31, 2019, we are in violation or our debt covenants. CLMG Corp., as administrative agent for LNV Corporation, has issued a forbearance extending the delivery of these reports to July 15, 2019; however, until we regain compliance with our debt covenants, we are not permitted to request, nor are we entitled to receive, advances under the amended and restated senior credit facility with LNV Corporation, and we will not be entitled to any excess amounts received from policies pledged under the amended and restated senior credit facility with LNV Corporation.

On August 10, 2018, we issued and sold $50 million of Series B in connection with the Initial Transfer of the Exchange Transaction. Approximately half of the proceeds from this sale were distributed to common shareholders pursuant to a special dividend paid on September 5, 2018 to shareholders of record on August 27, 2018. The remaining amount is expected to be utilized primarily for our insurtech initiatives, although these amounts are available for general corporate purposes. We do not expect to issue any additional Series B.

As of June 30, 2019, we had approximately $83.0 million in combined available cash, cash equivalents, restricted cash and policy benefits receivable. The decrease from approximately $141.9 million as of December 31, 2018 is due, in part, to our temporarily suspending the offering of our L Bonds, on which we heavily rely to fund our business operations. As described elsewhere in this report, the suspension resulted from our delinquency in filing certain periodic reports with the SEC, including this report. We anticipate recommencing our offering of L Bonds upon regaining compliance with our SEC reporting obligations. Although we expect to regain compliance with reporting obligations early in the third quarter of 2019, there is no assurance that we will be able to do so within that timeframe. If we are forced to discontinue our L Bond offering for any significant length of time, our business would be adversely impacted and our ability to service and repay our debt obligations would be compromised, thereby negatively affecting our business prospects and viability. See Item 1A — Risk Factors — "*We critically rely on debt financing for our business….*"

### *Financings Summary*

We had the following outstanding debt balances as of December 31, 2018 and December 31, 2017:

| | As of December 31, 2018 | | As of December 31, 2017 | |
|---|---|---|---|---|
| **Issuer/Borrower** | **Principal Amount Outstanding** | **Weighted Average Interest Rate** | **Principal Amount Outstanding** | **Weighted Average Interest Rate** |
| GWG DLP Funding IV, LLC – LNV senior credit facility (see Note 8) | $  158,209,000 | 10.45% | $  222,525,000 | 9.31% |
| GWG Holdings, Inc. – L Bonds (see Note 10) | 662,152,000 | 7.10% | 461,427,000 | 7.29% |
| GWG Holdings, Inc. – Seller Trust L Bonds (see Note 11) | 366,892,000 | 7.50% | — | — |
| **Total** | $1,187,253,000 | 7.67% | $  683,952,000 | 7.95% |

54

The table below reconciles the face amount of our outstanding debt to the carrying value shown on our balance sheets:

|  | As of December 31, 2018 | As of December 31, 2017 |
|---|---|---|
| **Senior credit facility with LNV Corporation** |  |  |
| Face amount outstanding | $ 158,209,000 | $ 222,525,000 |
| Unamortized selling costs | (9,231,000) | (10,287,000) |
| Carrying amount | $ 148,978,000 | $ 212,238,000 |
|  |  |  |
| **L Bonds and Seller Trust L Bonds:** |  |  |
| Face amount outstanding | $1,029,044,000 | $ 461,427,000 |
| Subscriptions in process | 13,467,000 | 1,560,000 |
| Unamortized selling costs | (24,216,000) | (15,593,000) |
| Carrying amount | $1,018,295,000 | $ 447,394,000 |

In November 2011, we began offering Series I Secured Notes, which were governed by an Intercreditor Agreement, a Third Amended and Restated Note Issuance and Security Agreement dated November 1, 2011, as amended, and a related Pledge Agreement. In September 2017, all of the Series I Secured Notes were paid in full and all obligations thereunder were terminated.

In June 2011, we concluded a private placement offering of Series A Preferred Stock for new investors, having received an aggregate $24.6 million in subscriptions for our Series A Preferred Stock. These subscriptions consisted of $14.0 million in conversions of outstanding Series I Secured Notes into Series A Preferred Stock and $10.6 million of new investments. In October 2017, we exercised our contractual right to call for the redemption of the Series A Preferred Stock and all related outstanding warrants and paid an aggregate of approximately $22.2 million.

In January 2012, we began publicly offering up to $250.0 million in debt securities (initially named "Renewable Secured Debentures" and subsequently renamed "L Bonds") that was completed in January 2015.

On September 24, 2014, we consummated an initial public offering of our common stock resulting in the sale of 800,000 shares of common stock at $12.50 per share and net proceeds of approximately $8.6 million after the deduction of underwriting commissions, discounts and expense reimbursements.

In January 2015, we began publicly offering up to $1.0 billion of L Bonds as a follow-on to our earlier $250.0 million public debt offering. In January 2018, we began publicly offering up to $1.0 billion L Bonds as a follow-on to our earlier L Bond offering. Through December 31, 2018, the total amount of these L Bonds sold, including renewals, was $1.1 billion. As of December 31, 2018 and December 31, 2017, respectively, we had approximately $662.1 million and $461.4 million in principal amount of L Bonds outstanding (exclusive of Seller Trust L Bonds).

In October 2015, we began publicly offering up to 100,000 shares of our Redeemable Preferred Stock ("RPS") at a per-share price of $1,000. As of December 31, 2017, we had issued approximately $99.1 million stated value of RPS and terminated that offering.

In February 2017, we began publicly offering up to 150,000 shares of our Series 2 Redeemable Preferred Stock ("RPS 2") at a per-share price of $1,000. As of December 31, 2018, we have issued approximately $150 million stated value of RPS 2 and terminated that offering.

On August 10, 2018, GWG Holdings, GWG Life and the Bank of Utah, as trustee, entered into the Supplemental Indenture to the Amended and Restated Indenture. GWG Holdings entered into the Supplemental Indenture to add and modify certain provisions of the Amended and Restated Indenture necessary to provide for the issuance of the Seller Trust L Bonds. We issued Seller Trust L Bonds in the amount of $366,892,000 to the Seller Trusts in connection with the Exchange Transaction. The maturity date of the Seller Trust L Bonds is August 9, 2023. The Seller Trust L Bonds bear interest at 7.5% per annum. Interest is payable monthly in cash (see Note 11).

APP. 84

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 85 of 1031    PageID 257

In August 2018, we offered and sold 5,000,000 shares of our Series B Convertible Preferred Stock ("Series B") in reliance upon the exemption from registration provided by Section 4(a)(2) under the Securities Act of 1933. The Series B shares were issued at $10 per share for cash consideration of $50 million.

---

55

APP. 85

On December 28, 2018, the Series B converted into 5,000,000 shares of our common stock at a conversion price of $10.00 per share immediately following the Final Closing of the Exchange Transaction.

The weighted-average interest rate of our outstanding L Bonds (excluding the Seller Trust L Bonds) as of December 31, 2018 and December 31, 2017 was 7.10% and 7.29%, respectively, and the weighted-average maturity at those dates was 2.83 and 2.38 years, respectively. Our L Bonds have renewal features. Since we first issued our L Bonds, we have experienced $506.1 million in maturities, of which $297.5 million has renewed through December 31, 2018 for an additional term. This has resulted in an aggregate renewal rate of approximately 58.8% for investments in these securities.

Future contractual maturities of L Bonds and Seller Trust L Bonds at December 31, 2018 are:

| Years Ending December 31, | L Bonds |
|---|---|
| 2019 | $ 144,627,000 |
| 2020 | 160,035,000 |
| 2021[1] | 484,122,000 |
| 2022 | 43,794,000 |
| 2023 | 73,646,000 |
| 2024 | 33,782,000 |
| Thereafter | 89,038,000 |
| | $ 1,029,044,000 |

_____

(1)    After the second anniversary of the Final Closing, the holders of the Seller Trust L Bonds will have the right to cause GWG to repurchase, in whole but not in part, the Seller Trust L Bonds held by such holder within 45 days. As such, while the maturity date of the $366,892,000 Seller Trust L Bonds is in August 2023, their contractual maturity is reflected in 2021, as that is the first period in which they could become payable. The repurchase may be paid, at GWG's option, in the form of cash, a pro rata portion of (i) the outstanding principal amount and accrued and unpaid interest under the Commercial Loan Agreement and (ii) BEN LP common units, or a combination of cash and such property.

The L Bonds and the Seller Trust L Bonds are secured by all of our assets and are subordinate to our amended and restated senior credit facility with LNV Corporation.

On September 27, 2017, we entered into a $300 million amended and restated senior credit facility with LNV Corporation in which DLP IV is the borrower. We intend to use the proceeds from this facility to maintain our portfolio of life insurance policies, for liquidity and for general corporate purposes. As of December 31, 2018, we had approximately $158.2 million outstanding under the amended and restated senior credit facility with LNV Corporation.

We expect to meet our ongoing operational capital needs for alternative asset investments, policy premiums and servicing costs, working capital and financing expenditures including paying principal, interest and dividends through a combination of the receipt of policy benefits from our portfolio of life insurance policies, net proceeds from our L Bond offering, dividends and interest from investments (primarily our investments in Beneficient), and funding available from our amended and restated senior credit facility with LNV Corporation. We estimate that our liquidity and capital resources are sufficient for our current and projected financial needs for at least the next twelve months given current assumptions. However, if we are unable to continue our L Bonds offering for any reason, and we are unable to obtain capital from other sources, our business will be materially and adversely affected. In addition, our business will be materially and adversely affected if we do not receive the policy benefits we forecast and if holders of our L Bonds fail to renew with the frequency we have historically experienced. In such a case, we could be forced to sell our investments in life insurance policies to service or satisfy our debt-related and other obligations. A sale under such circumstances may result in significant impairment of the recognized value of our portfolio.

Capital expenditures have historically not been material and we do not anticipate making material capital expenditures in 2018 or beyond.

***Alternative Assets and Secured Indebtedness***

APP. 86

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 87 of 1031     PageID 259

At December 31, 2018, the fair value of our investments in life insurance policies of $747.9 million plus our cash balance of $114.6 million, restricted cash balance of $10.8 million, policy benefits receivable of $16.5 million, and other assets (see definition below) of $591.0 million totaled $1,480.8 million, representing an excess of portfolio assets over secured indebtedness of $293.6 million. At December 31, 2017, the fair value of our investments in life insurance

<div align="center">56</div>

APP. 87

policies of $650.5 million plus our cash balance of $114.4 million, restricted cash balance of $28.3 million, and policy benefits receivable of $16.7 million, totaled $809.9 million, representing an excess of portfolio assets over secured indebtedness of $126.0 million.

The following forward-looking table seeks to illustrate the impact that a hypothetical sale of our portfolio of life insurance assets (at various discount rates), and the realization of the financing receivable from affiliate, equity method investment and equity security investment in the Option Agreement (at their carrying amounts) would have on our ability to satisfy our debt obligations as of December 31, 2018. In all cases, the sale of the life insurance assets owned by DLP IV will be used first to satisfy all amounts owing under our amended and restated senior credit facility with LNV Corporation. The net sale proceeds remaining after satisfying all obligations under our amended and restated senior credit facility with LNV Corporation would be applied to the L Bonds and Seller Trust L Bonds on a pari passu basis.

**Life Insurance**

| Portfolio Discount Rate | 12% | 14% | 16% | 18% | 19% |
|---|---|---|---|---|---|
| Value of life insurance portfolio | $ 611,519,000 | 555,428,000 | 507,870,000 | 467,171,000 | 448,981,000 |
| Cash, cash equivalents and policy benefits receivable | 141,897,000 | 141,897,000 | 141,897,000 | 141,897,000 | 141,897,000 |
| Other assets[2] | 591,048,000 | 591,048,000 | 591,048,000 | 591,048,000 | 591,048,000 |
| Total assets | 1,344,464,000 | 1,288,373,000 | 1,240,815,000 | 1,200,116,000 | 1,181,926,000 |
| Senior credit facility | 158,209,000 | 158,209,000 | 158,209,000 | 158,209,000 | 158,209,000 |
| Net after senior credit facility | 1,186,255,000 | 1,130,164,000 | 1,082,606,000 | 1,041,907,000 | 1,023,717,000 |
| L Bonds[1] | 1,029,044,000 | 1,029,044,000 | 1,029,044,000 | 1,029,044,000 | 1,029,044,000 |
| Net remaining | $ 157,211,000 | 101,120,000 | 53,562,000 | 12,863,000 | (5,327,000) |
| Impairment to L Bonds | No impairment | No impairment | No impairment | No Impairment | Impairment |

————————

(1)    Amount represents L Bonds and Seller Trust L Bonds

(2)    Other assets includes Equity method investment, Financing receivable from affiliate and the equity security investment in the Option Agreement. Beneficient issued to GWG an option (the "Option Agreement") to acquire the number of common units of BEN LP, interests or other property that would be received by a holder of the NPC-A Prime limited partnership interests of Beneficient Company Holdings, L.P., an affiliate of BEN LP.

The table illustrates that our ability to fully satisfy amounts owing under the L Bonds and Seller Trust L Bonds would likely be impaired upon the sale or realization of the financing receivable from affiliate, equity method investment and equity security investment in the Option Agreement at their respective carrying amounts, plus all our life insurance assets at a price equivalent to a discount rate of approximately 18.70% or higher. At December 31, 2017, the likely impairment occurred at a discount rate of approximately 15.04% or higher. The discount rate used to calculate the fair value of our life insurance portfolio was 8.25% as of December 31, 2018 and 10.45% as of December 31, 2017.

The table does not include any allowance for transactional fees and expenses associated with a portfolio sale or the realization of the financing receivable with affiliate, equity method investment and equity security investment in the Option Agreement (which expenses and fees could be substantial) and is provided to demonstrate how various discount rates used to value our portfolio could affect our ability to satisfy amounts owing under our debt obligations in light of our senior secured lender's right to priority payments under our amended and restated senior credit facility with LNV Corporation. This table also does not include the yield maintenance fee, which could be substantial, we are required to pay in certain circumstances under our amended and restated senior credit facility with LNV Corporation. You should read the above table in conjunction with the information contained in other sections of this report, including Critical Accounting Policies — Fair Value Components — Discount Rate and the notes to the consolidated financial statements.

***Amendment of Credit Facility***

Effective September 27, 2017, DLP IV entered into an amended and restated senior credit facility with LNV Corporation. The amended and restated senior credit facility makes available a total of up to $300,000,000 in

APP. 88

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 89 of 1031    PageID 261

credit to DLP IV with a maturity date of September 27, 2029. Additional advances are available under the amended and restated senior credit facility at the LIBOR rate described below. Advances are available as the result of additional borrowing base capacity, created as the premiums and servicing costs of pledged life insurance policies become due and by additional policy pledges to the amended and restated senior credit facility, if any. Interest will accrue on amounts borrowed under the amended and restated senior credit facility at an annual interest rate, determined as of each date of

<div align="center">57</div>

borrowing or quarterly if there is no borrowing, equal to (A) the greater of 12-month LIBOR or the federal funds rate (as defined in the agreement) plus one-half of one percent per annum, plus (B) 7.50% per annum. The effective rate at December 31, 2018 was 10.42%. Interest payments are made on a quarterly basis.

Under the amended and restated senior credit facility, DLP IV has granted the administrative agent, for the benefit of the lenders under the facility, a security interest in all of DLP IV's assets. As with prior collateral arrangements relating to the senior secured debt of GWG Holdings and its subsidiaries (on a consolidated basis), GWG Life's equity ownership in DLP IV continues to serve as collateral for the obligations of GWG Holdings under the L Bonds and Seller Trust L Bonds (although the life insurance assets owned by DLP IV will not themselves serve directly as collateral for those obligations).

We are subject to various financial and non-financial covenants under the amended and restated senior credit facility with LNV Corporation, including, but not limited to, compliance with laws, preservation of existence, financial reporting, keeping of proper books of record and account, payment of taxes, ensuring that neither DLP IV nor GWG Life become an investment company. As of December 31, 2018, we were in compliance with these covenants; however, due to our failure to deliver GWG Life audited financial statements for 2018 to LNV Corporation within 90 days after the end of the year and the failure to deliver GWG Life unaudited financial statements within 45 days after March 31, 2019, we are currently in violation of our debt covenants under our senior credit facility. CLMG Corp., as administrative agent for LNV Corporation, has issued a forbearance extending the delivery of these reports to July 15, 2019; however, until we regain compliance with our debt covenants, we are not permitted to request, nor are we entitled to receive, advances under the amended and restated senior credit facility with LNV Corporation, and we will not be entitled to any excess amounts received from policies pledged under the amended and restated senior credit facility with LNV Corporation.

**Cash Flows**

*Interest and Dividend Payments*

We finance our businesses through a combination of life insurance policy benefit receipts, dividends and interest on investments (primarily our investments in Beneficent), equity offerings, debt offerings and our amended and restated senior credit facility with LNV Corporation. We have historically relied on debt (L Bonds and our amended and restated senior credit facility with LNV Corporation) and equity (preferred stock) financing for the majority of our cash expenditures (for policy acquisition, policy premiums and servicing costs, working capital and financing expenditures including paying principal and interest on existing debt) as the amount of cash flows from the realization of life insurance policy benefits and cash flows from our other investments has been insufficient to meet all of our needs. This has resulted in the Company incurring substantial indebtedness and, to a lesser extent, obligations to make dividend payments on our classes of preferred stock.

Our total interest expense for the years ended December 31, 2018 and 2017 was $80.1 million and $54.4 million, respectively, and represent the largest single line item of expense in both periods. Preferred stock cash dividends paid for the years ended December 31, 2018 and 2017 were $16.7 million and $12.7 million, respectively. While reducing our cost of funds and increasing our common equity base (at valuations accretive to our book value) are primary goals of the Company, until we do so we will continue to expend significant amounts of cash for interest and dividend payments and will thus continue to rely heavily on our ability to raise cash from our L Bond offering, amended and restated senior credit facility with LNV Corporation and other means as they are developed and available.

*Life Insurance Policy Premium Payments*

The payment of premiums and servicing costs to maintain life insurance policies represents one of our most significant requirement for cash disbursement. When a policy is purchased, we are able to calculate the minimum premium payments required to maintain the policy in-force. Over time as the insured ages, premium payments will increase. Nevertheless, the probability we will actually be required to pay the premiums decreases as mortality becomes more likely. These scheduled premiums and associated probabilities are factored into our expected internal rate of return and cash-flow modeling. Beyond premiums, we incur policy servicing costs, including annual trustee, policy administration and tracking costs. Additionally, we incur significant financing costs, including principal, interest and dividends. Both policy servicing costs and financing costs are excluded from our internal rate of return calculations. We finance our businesses through a combination of life insurance policy benefit receipts, dividends and interest on other investments, equity offerings, debt offerings, and advances under our amended and restated senior credit facility with LNV Corporation.

APP. 90

The amount of payments for anticipated premiums, including the requirement under our amended and restated senior credit facility with LNV Corporation to maintain a two month cost-of-insurance threshold within each policy cash value account, and servicing costs that we will be required to make over the next five years to maintain our current portfolio, assuming no mortalities, is set forth in the table below.

| Years Ending December 31, | Premiums | Servicing | Premiums and Servicing Fees |
|---|---|---|---|
| 2019 | $ 65,536,000 | $ 1,413,000 | $ 66,949,000 |
| 2020 | 77,552,000 | 1,413,000 | 78,965,000 |
| 2021 | 90,290,000 | 1,413,000 | 91,703,000 |
| 2022 | 103,363,000 | 1,413,000 | 104,776,000 |
| 2023 | 115,597,000 | 1,413,000 | 117,010,000 |
| | $ 452,338,000 | $ 7,065,000 | $ 459,403,000 |

Our anticipated premium expenses are subject to the risk of increased cost-of-insurance charges (i.e., "COI" or premium charges) for the life insurance policies we own. During 2018, we received notice of, or support for, COI rate changes on 30 policies with combined face value of $84.6 million in our portfolio. These increased charges resulted in a $5.1 million reduction in the fair value of our portfolio. During 2017, we received notice of, or support for, COI rate changes on 8 policies with combined face value of $23.5 million in our portfolio. These increased charges resulted in a $1.9 million reduction in the fair value of our portfolio.

We have no known pending cost-of-insurance increases on any policies in our portfolio, but we are aware that cost-of-insurance increases have become more prevalent in the industry. Thus, we may see additional insurers implementing cost-of-insurance increases in the future.

### Life Insurance Policy Benefit Receipts

For the quarter-end dates set forth below, the following table illustrates the total amount of face value of policy benefits owned, and the trailing 12 months of life insurance policy benefits realized and premiums paid on our portfolio. The trailing 12-month benefits/premium coverage ratio indicates the ratio of policy benefits realized to premiums paid over the trailing 12-month period from our portfolio of life insurance policies.

| Quarter End Date | Portfolio Face Amount ($) | 12-Month Trailing Benefits Realized ($) | 12-Month Trailing Premiums Paid ($) | 12-Month Trailing Benefits/Premium Coverage Ratio |
|---|---|---|---|---|
| March 31, 2015 | 754,942,000 | 46,675,000 | 23,786,000 | 196.2% |
| June 30, 2015 | 806,274,000 | 47,125,000 | 24,348,000 | 193.5% |
| September 30, 2015 | 878,882,000 | 44,482,000 | 25,313,000 | 175.7% |
| December 31, 2015 | 944,844,000 | 31,232,000 | 26,650,000 | 117.2% |
| March 31, 2016 | 1,027,821,000 | 21,845,000 | 28,771,000 | 75.9% |
| June 30, 2016 | 1,154,798,000 | 30,924,000 | 31,891,000 | 97.0% |
| September 30, 2016 | 1,272,078,000 | 35,867,000 | 37,055,000 | 96.8% |
| December 31, 2016 | 1,361,675,000 | 48,452,000 | 40,239,000 | 120.4% |
| March 31, 2017 | 1,447,558,000 | 48,189,000 | 42,753,000 | 112.7% |
| June 30, 2017 | 1,525,363,000 | 49,295,000 | 45,414,000 | 108.5% |
| September 30, 2017 | 1,622,627,000 | 53,742,000 | 46,559,000 | 115.4% |
| December 31, 2017 | 1,676,148,000 | 64,719,000 | 52,263,000 | 123.8% |
| March 31, 2018 | 1,758,066,000 | 60,248,000 | 53,169,000 | 113.3% |
| June 30, 2018 | 1,849,079,000 | 76,936,000 | 53,886,000 | 142.8% |
| September 30, 2018 | 1,961,598,000 | 75,161,000 | 55,365,000 | 135.8% |
| December 31, 2018 | 2,047,992,000 | 71,090,000 | 52,675,000 | 135.0% |

59

We believe that the portfolio cash flow results set forth above are consistent with our general investment thesis: that the life insurance policy benefits we receive will continue to increase over time in relation to the premiums we are required to pay on the remaining polices in the portfolio. Nevertheless, we expect that our portfolio cash flow on a period-to-period basis will remain inconsistent as we begin to allocate substantially more capital to Beneficient and reduce capital allocated to acquiring a larger, more diversified portfolio of life insurance policies.

### Inflation

Changes in inflation do not necessarily correlate with changes in interest rates. We presently do not foresee any material impact of inflation on our results of operations in the periods presented in our consolidated financial statements.

### Off-Balance Sheet Arrangements

We are party to an office lease with U.S. Bank National Association as the landlord. On September 1, 2015, we entered into an amendment that expanded the leased space to 17,687 square feet and extended the term through October 2025 (see Note 22).

### Credit Risk

We review the credit risk associated with our portfolio of life insurance policies when estimating its fair value. In evaluating the policies' credit risk, we consider insurance company solvency, credit risk indicators, economic conditions, ongoing credit evaluations, and company positions. We attempt to manage our credit risk related to life insurance policies typically by purchasing policies issued only from companies with an investment-grade credit rating by either Standard & Poor's, Moody's, or A.M. Best Company. As of December 31, 2018, 95.6% of our life insurance policies, by face value benefits, were issued by companies that maintained an investment-grade rating (BBB or better) by Standard & Poor's.

The assets and liabilities exchanged in the Initial Transfer of the Exchange Transaction are excluded from this analysis.

### Interest Rate Risk

Our amended and restated senior credit facility with LNV Corporation is floating-rate financing. In addition, our ability to offer interest and dividend rates that attract capital (including in our continuous offering of L Bonds) is generally impacted by prevailing interest rates. Furthermore, while our L Bond offering provides us with fixed-rate debt financing, our Debt Coverage Ratio is calculated in relation to the interest rate on all of our debt financing, exclusive of our Seller Trust L Bonds. Therefore, fluctuations in interest rates impact our business by increasing our borrowing costs and reducing availability under our debt financing arrangements. We calculate our life insurance portfolio earnings based upon the spread generated between the return on our life insurance portfolio and the total cost of our financing, excluding cost of financing for the Seller Trust L Bonds. As a result, increases in interest rates will reduce the earnings we expect to achieve from our investments in life insurance policies.

### Non-GAAP Financial Measures — Discontinuation

The Company in the past has provided non-GAAP financial measures as additional information to investors in order to provide an alternative method for assessing our financial condition and operating results. These non-GAAP financial measures are not in accordance with GAAP and may be different from non-GAAP measures used by other companies, including other companies within our industry.

Historically we used non-GAAP financial measures for management's assessment of our financial condition and operating results without regard to GAAP fair value standards. The application of current GAAP fair value standards, especially during a period of significant growth of our life insurance portfolio may result in current period GAAP financial results that may not be reflective of our long-term earnings potential. Management believes our non-GAAP financial measures provided investors an alternative view of our long-term earnings potential without regard to the volatility in GAAP financial results that can occur during the growth stage of our life insurance portfolio and company.

Due primarily to the Beneficient Transactions and the Expanded Strategic Relationship with Beneficent, and to a lesser extent the size and actuarial diversity of our portfolio of life insurance policies, we believe that our

APP. 93

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 94 of 1031    PageID 266

historical non-GAAP financial measures are no longer relevant. Therefore, we no longer disclose non-GAAP financial measures.

---

60

---

**Debt Coverage Ratio**

Our L Bonds borrowing covenants require us to maintain a Debt Coverage Ratio of less than 90%. The Debt Coverage Ratio is calculated by dividing the sum of our total interest-bearing indebtedness by the sum of our cash, cash equivalents, and policy benefits receivable by the net present value of the life insurance portfolio, and, without duplication, the value of all of our other assets as reflected on our most recently available balance sheet prepared in accordance with GAAP.

|  | As of December 31, 2018 | As of December 31, 2017 |
|---|---|---|
| Life insurance portfolio policy benefits | $ 2,047,992,000 | $ 1,676,148,000 |
| Discount rate of future cash flows[1] | 7.75% | 7.95% |
| Net present value of life insurance portfolio policy benefits | $ 770,074,000 | $ 737,625,000 |
| Cash and cash equivalents | 125,436,000 | 142,771,000 |
| Life insurance policy benefits receivable | 16.461,000 | 16,659,000 |
| Other assets[2] | 591,048,000 | — |
| Total Coverage | $ 1,503,019,000 | $ 897,055,000 |
|  |  |  |
| Amended and Restated Senior credit facility with LNV Corporation | $ 158,209,000 | $ 222,525,000 |
| L Bonds and Seller Trust L Bonds | 1,029,044,000 | 461,427,000 |
| Total Indebtedness | $ 1,187,253,000 | $ 683,952,000 |
|  |  |  |
| Debt Coverage Ratio | 78.99% | 76.24% |

—————

(1)    Weighted-average interest rate paid on indebtedness, excluding that of Seller Trust L-Bonds.

(2)     The Total Coverage amount as of December 31, 2018 includes "other assets" of GWG Holdings as reflected on its most recently available balance sheet prepared in accordance with GAAP. This change in the definition of the Debt Coverage Ratio was defined in Amendment No. 1 to the Amended and Restated Indenture entered into as of March 27, 2018.

As of December 31, 2018 and 2017, we were in compliance with the Debt Coverage Ratio.

**ITEM 7A.  QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.**

Not applicable.

61

**ITEM 8.  CONSOLIDATED FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Shareholders and the Board of Directors of GWG Holdings, Inc. and Subsidiaries:

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of GWG Holdings, Inc. and Subsidiaries (the "Company") as of December 31, 2018 and 2017, the related consolidated statements of operations, changes in stockholders' equity, and cash flows, for each of the two years in the period ended December 31, 2018, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2018 and 2017, and the results of its operations and its cash flows for each of the two years in the period ended December 31, 2018, in conformity with accounting principles generally accepted in the United States of America.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2018, based on criteria established in *Internal Control – Integrated Framework: (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated July 9, 2019, expressed an adverse opinion.

**Emphasis of Matter**

As described in Note 3 to the consolidated financial statements, for the year ended December 31, 2018, the Company incurred a loss within its gain (loss) on life insurance policies, net, of $87,100,000, resulting from a change in accounting estimate related to the changes made to the life expectancy estimation methodology on life insurance policies in the Company's portfolio. Our opinion is not modified with respect to this matter.

**Basis for Opinions**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Baker Tilly Virchow Krause, LLP

We have served as the Company's auditor since 2013.

Minneapolis, Minnesota

July 9, 2019

F-1

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Shareholders and the Board of Directors of GWG Holdings, Inc. and Subsidiaries:

### Adverse Opinion on Internal Control over Financial Reporting

We have audited GWG Holdings, Inc. and Subsidiaries' (the Company's) internal control over financial reporting as of December 31, 2018, based on criteria established in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). In our opinion, because of the effect of the material weaknesses described in the following paragraph on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of December 31, 2018, based on criteria established in *Internal Control — Integrated Framework (2013)* issued by COSO.

A material weakness is a control deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim consolidated financial statements will not be prevented or detected on a timely basis. The following material weaknesses have been identified: 1) The Company did not maintain effective information and communication controls with external parties due to delays in the financial statement close and reporting process as evidenced by the untimely filing of the Annual Report on Form 10-K for the year ended December 31, 2018, and of the Quarterly Report on Form 10-Q for the quarter ended March 31, 2019, and 2) management did not have sufficient accounting resources and personnel to effectively design and execute process level controls around certain complex or non-recurring transactions to ensure proper application of U.S. GAAP, as described in the accompanying Management's Report on Internal Control over Financial Reporting ("Management's Report"). These material weaknesses were considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2018 consolidated financial statements, and this report does not affect our report dated July 9, 2019, on those consolidated financial statements.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets and the related statements of operations, changes in stockholders' equity, and cash flows of the Company, and our report dated July 9, 2019, expressed an unqualified opinion.

### Basis for Opinion

The Company's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Annual Report on Form 10-K. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

### Definition and Limitations of Internal Control Over Financial Reporting

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized

APP. 97

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 98 of 1031    PageID 270

acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

F-2

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Baker Tilly Virchow Krause, LLP

Minneapolis, Minnesota

July 9, 2019

<div align="center">F-3</div>

APP. 99

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**

|  | December 31, 2018 | December 31, 2017 |
|---|---|---|
| ASSETS | | |
| Cash and cash equivalents | $ 114,587,084 | $ 114,421,491 |
| Restricted cash | 10,849,126 | 28,349,685 |
| Investment in life insurance policies, at fair value | 747,922,465 | 650,527,353 |
| Life insurance policy benefits receivable | 16,460,687 | 16,658,761 |
| Financing receivable from affiliate | 184,768,874 | — |
| Equity method investment | 360,841,651 | — |
| Other assets | 45,437,164 | 8,898,884 |
| TOTAL ASSETS | $1,480,867,051 | $ 818,856,174 |
| | | |
| LIABILITIES & STOCKHOLDERS' EQUITY | | |
| LIABILITIES | | |
| Amended and Restated Senior credit facility with LNV Corporation | $ 148,977,596 | $ 212,238,192 |
| L Bonds | 651,402,663 | 447,393,568 |
| Seller Trust L Bonds | 366,891,940 | — |
| Accounts payable | 9,276,507 | 6,394,439 |
| Interest and dividends payable | 18,555,293 | 15,427,509 |
| Other accrued expenses | 4,705,170 | 3,730,723 |
| TOTAL LIABILITIES | 1,199,809,169 | 685,184,431 |
| | | |
| STOCKHOLDERS' EQUITY | | |
| | | |
| REDEEMABLE PREFERRED STOCK | | |
| (par value $0.001; shares authorized 100,000; shares outstanding 97,524 and 98,611; liquidation preference of $98,093,000 and $99,186,000 as of December 31, 2018 and December 31, 2017, respectively) | 86,910,335 | 92,840,243 |
| SERIES 2 REDEEMABLE PREFERRED STOCK | | |
| (par value $0.001; shares authorized 150,000; shares outstanding 148,359 and 88,709; liquidation preference of $149,225,000 and $89,208,000 as of December 31, 2018 and December 31, 2017, respectively) | 129,062,704 | 80,275,204 |
| COMMON STOCK | | |
| (par value $0.001; shares authorized 210,000,000; shares issued and outstanding 33,018,161 as of December 31, 2018 and 5,813,555 as of December 31, 2017) | 33,018 | 5,813 |
| Additional paid-in capital | 249,662,168 | — |
| Accumulated deficit | (184,610,343) | (39,449,517) |
| TOTAL STOCKHOLDERS' EQUITY | 281,057,882 | 133,671,743 |
| | | |
| TOTAL LIABILITIES & EQUITY | $1,480,867,051 | $ 818,856,174 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-4

APP. 100

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

|  | Years Ended | |
|  | December 31, 2018 | December 31, 2017 |
|---|---|---|
| REVENUE |  |  |
| Gain (loss) on life insurance policies, net | $ (14,104,572) | $ 62,114,403 |
| Interest and other income | 13,714,281 | 2,019,515 |
| TOTAL REVENUE | (390,291) | 64,133,918 |
|  |  |  |
| EXPENSES |  |  |
| Interest expense | 80,135,983 | 54,419,444 |
| Employee compensation and benefits | 17,406,982 | 14,869,749 |
| Legal and professional fees | 5,541,177 | 5,095,643 |
| Other expenses | 15,994,487 | 12,478,676 |
| TOTAL EXPENSES | 119,078,629 | 86,863,512 |
|  |  |  |
| INCOME (LOSS) BEFORE INCOME TAXES | (119,468,920) | (22,729,594) |
| INCOME TAX EXPENSE (BENEFIT) | — | (2,097,371) |
|  |  |  |
| NET INCOME (LOSS) BEFORE EARNINGS FROM EQUITY METHOD INVESTMENT | (119,468,920) | (20,632,223) |
|  |  |  |
| Earnings from equity method investment | 17,507 | — |
|  |  |  |
| NET INCOME (LOSS) | (119,451,413) | (20,632,223) |
|  |  |  |
| Preferred stock dividends | 16,662,731 | 12,702,341 |
| NET INCOME (LOSS) ATTRIBUTABLE TO COMMON SHAREHOLDERS | $(136,114,144) | $ (33,334,564) |
| NET INCOME (LOSS) PER SHARE |  |  |
| Basic | $ (22.32) | $ (5.72) |
| Diluted | $ (22.32) | $ (5.72) |
|  |  |  |
| WEIGHTED AVERAGE SHARES OUTSTANDING |  |  |
| Basic | 6,098,208 | 5,826,033 |
| Diluted | 6,098,208 | 5,826,033 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-5

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Years Ended | |
|---|---|---|
| | December 31, 2018 | December 31, 2017 |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net income (loss) | $(119,451,413) | $ (20,632,223) |
| Adjustments to reconcile net income (loss) to net cash flows used in operating activities: | | |
| Change in fair value of life insurance policies | 10,344,029 | (66,760,811) |
| Amortization of deferred financing and issuance costs | 10,036,955 | 8,780,847 |
| Amortization of premium and accretion of discount on financing receivables | (13,953) | — |
| Provision for uncollectible policy benefit receivable | 4,300,000 | — |
| Earnings from equity method investment | (17,507) | — |
| Stock-based compensation | 2,182,125 | 1,424,625 |
| Deferred income taxes | — | (2,097,371) |
| Preferred stock issued in lieu of cash dividends | — | 498,659 |
| (Increase) decrease in operating assets: | | |
| Life insurance policy benefits receivable | (4,101,926) | (11,313,761) |
| Interest receivable added to commercial loan principal | (10,533,632) | — |
| Other assets | 4,405,054 | 982,713 |
| Increase (decrease) in operating liabilities: | | |
| Accounts payable | 2,882,069 | 4,167,728 |
| Interest and dividends payable | 3,268,969 | 2,708,623 |
| Other accrued expenses | 1,220,176 | 1,198,197 |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (95,479,054) | (81,042,774) |
| | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Investment in life insurance policies | (128,502,654) | (88,643,819) |
| Carrying value of matured life insurance policies | 20,763,516 | 16,069,632 |
| Equity investment acquired | (3,204,016) | — |
| Other investments acquired | (3,037,234) | — |
| NET CASH FLOWS USED IN INVESTING ACTIVITIES | (113,980,388) | (72,574,187) |
| | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Net borrowings on (repayments of) senior debt | (64,315,618) | 59,799,649 |
| Payments for issuance of senior debt | — | (4,510,388) |
| Payments for redemption of Series I Secured Notes | — | (16,613,667) |
| Proceeds from issuance of L Bonds | 263,964,554 | 131,796,220 |
| Payments for issuance of L Bonds | (17,379,101) | (10,896,925) |
| Payments for redemption of L Bonds | (48,026,551) | (60,848,460) |
| Issuance (repurchase) of common stock | 614,193 | (1,603,560) |
| Proceeds from issuance of convertible preferred stock | 50,000,000 | — |
| Proceeds from issuance of redeemable preferred stock | 56,238,128 | 127,279,847 |
| Payments for issuance of redeemable preferred stock | (4,142,294) | (9,027,190) |

APP. 102

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 103 of 1031    PageID 275

| | | |
|---|---|---|
| Payments for redemption of redeemable preferred stock | (2,456,692) | (22,598,626) |
| Common stock dividends | (25,709,412) | — |
| Preferred stock dividends | (16,662,731) | (12,702,341) |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 192,124,476 | 180,074,559 |
| | | |
| NET INCREASE (DECREASE) IN CASH, CASH EQUIVALENTS AND RESTRICTED CASH | (17,334,966) | 26,457,598 |

**CASH, CASH EQUIVALENTS AND RESTRICTED CASH**

| | | |
|---|---|---|
| BEGINNING OF PERIOD | 142,771,176 | 116,313,578 |
| END OF PERIOD | $ 125,436,210 | $ 142,771,176 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-6

APP. 103

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS — CONTINUED**

| | Years Ended | |
| --- | --- | --- |
| | December 31, 2018 | December 31, 2017 |
| **SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION** | | |
| Interest paid | $ 67,058,000 | $ 45,990,000 |
| Premiums paid, including prepaid | $ 49,467,000 | $ 55,471,000 |
| Payments for exercised stock options | $ — | $ 346,000 |
| | | |
| **NON-CASH INVESTING AND FINANCING ACTIVITIES** | | |
| Financing receivable from affiliate: | | |
| Financing receivable from affiliate acquired | $ 173,485,000 | $ — |
| Conversion of interest receivable to commercial loan principal | $ 10,534,000 | $ — |
| Exchangeable note acquired and converted to equity method investment | $ 156,422,000 | $ — |
| Equity method investment acquired | $ 201,828,000 | $ — |
| Equity security acquired | $ 38,562,000 | $ — |
| Seller Trust L Bonds issued | $ 366,892,000 | $ — |
| Common stock issued | $ 203,405,000 | $ — |
| Common stock issued for vendor services | $ — | $ 321,000 |
| L Bonds: | | |
| Conversion of accrued interest and commissions payable to principal | $ 1,240,000 | $ 1,756,000 |
| Conversion of L Bonds to redeemable preferred stock | $ 4,546,000 | $ 2,666,000 |
| Preferred Stock: | | |
| Issuance of Series A preferred stock in lieu of cash dividends | $ — | $ 499,000 |
| Conversion of Series B convertible preferred stock to common stock | $ 50,000,000 | $ — |
| Options and stock appreciation rights issued | $ 614,000 | $ 534,000 |
| Investment in life insurance policies included in accounts payable | $ 6,377,000 | $ 3,913,000 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-7

APP. 104

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY**

| | Preferred Stock Shares | Preferred Stock | Common Shares | Common Stock (par) | Additional Paid-in Capital | Accumulated Deficit | Total Equity |
|---|---|---|---|---|---|---|---|
| **Balance, December 31, 2016** | **2,699,704** | **$ 78,726,297** | **5,980,190** | **$ 5,980** | **$ 7,383,515** | **$ (18,817,294)** | **$ 67,298,498** |
| Net income (loss) | — | — | — | — | — | (20,632,223) | (20,632,223) |
| Issuance of common stock | — | — | 33,810 | 33 | 320,970 | — | 321,003 |
| Redemption of common stock | — | — | (200,445) | (200) | (1,603,360) | — | (1,603,560) |
| Issuance of Series A preferred stock | 71,237 | 498,659 | — | — | — | — | 498,659 |
| Redemption of Series A preferred stock | (2,711,916) | (20,199,792) | — | — | — | — | (20,199,792) |
| Issuance of redeemable preferred stock | 129,622 | 122,933,106 | — | — | (2,338,457) | — | 120,594,649 |
| Redemption of redeemable preferred stock | (1,328) | (1,327,776) | — | — | — | — | (1,327,776) |
| Preferred stock dividends | — | (8,925,807) | — | — | (3,776,534) | — | (12,702,341) |
| Stock-based compensation | — | 1,410,760 | — | — | 13,866 | — | 1,424,626 |
| **Balance, December 31, 2017** | **187,319** | **$173,115,447** | **5,813,555** | **$ 5,813** | **$          —** | **$ (39,449,517)** | **$ 133,671,743** |
| Net income (loss) | — | — | — | — | — | (119,451,413) | (119,451,413) |
| Issuance of common stock | — | — | 22,214,641 | 22,215 | 204,771,249 | — | 204,793,464 |
| Repurchase of common stock | — | — | (10,035) | (10) | (68,751) | — | (68,761) |
| Issuance of redeemable preferred stock | 61,021 | 56,878,238 | — | — | — | — | 56,878,238 |
| Redemption of | (2,457) | (2,457,914) | — | — | — | — | (2,457,914) |

APP. 105

| | | | | | | |
|---|---|---|---|---|---|---|
| redeemable preferred stock | | | | | | |
| Common stock dividends | — | — | — | — | — | (25,709,413) | (25,709,413) |
| Issuance of Series B convertible preferred stock | 5,000,000 | 50,000,000 | — | — | — | — | 50,000,000 |
| Conversion of Series B convertible preferred stock to common stock | (5,000,000) | (50,000,000) | 5,000,000 | 5,000 | 49,995,000 | — | — |
| Preferred stock dividends | — | (11,562,732) | — | — | (5,099,999) | — | (16,662,731) |
| Stock-based compensation | — | — | — | — | 64,669 | — | 64,669 |
| **Balance, December 31, 2018** | **245,883** | **$215,973,039** | **33,018,161** | **$33,018** | **$249,662,168** | **$(184,610,343)** | **$ 281,057,882** |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-8

APP. 106

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(1) Nature of Business and Summary of Significant Accounting Policies**

**Nature of Business —** We are a leading provider of liquidity to consumers owning life insurance policies, an owner of a portfolio of alternative assets, and a developer of epigenetic technology for the life insurance industry and beyond. We built our business providing value to consumers owning illiquid life insurance products across America, delivering more than $593 million in value for their policies since 2006. As of December 31, 2018, we own an alternative asset portfolio of $2.05 billion in face value of life insurance policy benefits.

We have enhanced and extended our activities from our core competencies of providing liquidity to individuals owning illiquid assets and alternative asset ownership through our transaction with The Beneficient Company Group, L.P. ("BEN LP," including all of the subsidiaries it may have from time to time — "Beneficient").

In addition, we continue to innovate in the life insurance industry through our insurance technology initiative which, is based upon the use of step-change epigenetic technology. Our wholly owned insurtech subsidiary, Life Epigenetics Inc. ("Life Epigenetics") is focused on creating intellectual property and commercialized testing from supervised machine learning and advanced epigenetic technology. We believe our technology offers the life insurance industry a step-change opportunity for enhanced life insurance underwriting and risk assessment as well as creates opportunities within other industries, including health and wellness and nutraceuticals. Our wholly owned insurtech subsidiary, youSurance General Agency, LLC ("youSurance") is a digital life insurance agency that is working to offer life insurance directly to consumers in conjunction with our epigenetic testing. We believe that consumers who are interested in their health and wellness and in reducing the cost of their insurance will benefit from working with youSurance.

GWG Holdings, Inc. and all of its subsidiaries are incorporated and organized in Delaware, other than GWG Life Trust, which is governed by the laws of the State of Utah. Unless the context otherwise requires or we specifically so indicate, all references in these footnotes to "we," "us," "our," "our Company," "GWG," or the "Company" refer to GWG Holdings, Inc. and its subsidiaries collectively and on a consolidated basis. References to the full names of particular entities, such as "GWG Holdings, Inc." or "GWG Holdings," are meant to refer only to the particular entity referenced.

**The Exchange Transaction**

On August 10, 2018 (the "Initial Transfer Date"), we completed the first of two closings (the "Initial Transfer") contemplated by a Master Exchange Agreement with BEN LP and certain other parties (the "Seller Trusts"), which governs the strategic exchange of assets among the parties (the "Exchange Transaction"). On the Initial Transfer Date:

- GWG issued to the Seller Trust L Bonds due 2023 (the "Seller Trust L Bonds") in an aggregate principal amount of $403,234,866, as more fully described below;

- Beneficient purchased 5,000,000 shares of GWG's Series B Convertible Preferred Stock, par value $0.001 per share and having a stated value of $10 per share ("Series B"), for cash consideration of $50,000,000, which shares were subsequently transferred to the Seller Trusts, as more fully described below;

- in consideration for GWG and GWG Life entering into the Master Exchange Agreement and consummating the transactions contemplated thereby, BEN LP, as borrower, entered into a commercial loan agreement (the "Commercial Loan Agreement") with GWG Life, as lender, providing for a loan in a principal amount of $200,000,000 (the "Commercial Loan");

- BEN LP delivered to GWG a promissory note (the "Exchangeable Note") in the principal amount of $162,911,379; and

- the Seller Trusts delivered to GWG 4,032,349 common units of BEN LP at an assumed value of $10 per common unit.

On December 28, 2018, the final closing of the transaction occurred and the following actions took place (the "Final Closing" and the date upon which the Final Closing occurs, the "Final Closing Date"):

APP. 107

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 108 of 1031     PageID 280

- In accordance with the Master Exchange Agreement, and based on the net asset value of alternative asset financings as of the Final Closing Date, effective as of the Initial Transfer Date, (i) the principal amount of

---

F-9

APP. 108

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(1) Nature of Business and Summary of Significant Accounting Policies (cont.)**

the Commercial Loan was reduced to $181,974,314, (ii) the principal amount of the Exchangeable Note was reduced to $148,228,432, and (iii) the principal amount of the Seller Trust L Bonds was reduced to $366,892,000;

• the Seller Trusts refunded to GWG $840,430 in interest paid on the Seller Trust L Bonds related to the Seller Trust L Bonds that were issued as of the Initial Transfer Date but cancelled, effective as of the Initial Transfer Date, on the Final Closing Date;

• the accrued interest on the Commercial Loan and the Exchangeable Note was added to the principal amount of the Commercial Loan, as a result of which the principal amount of the Commercial Loan as of the Final Closing Date was $192,507,946;

• the Seller Trusts transferred to GWG an aggregate of 21,650,087 common units of BEN LP and GWG received 14,822,843 common units of BEN LP in exchange for the Exchangeable Note, upon completion of which GWG owned (including the 4,032,349 common units received by GWG on the Initial Transfer Date) 40,505,279 common units of BEN LP;

• BEN LP issued to GWG an option (the "Option Agreement") to acquire the number of common units of BEN LP, interests or other property that would be received by a holder of the NPC-A Prime limited partnership interests of Beneficient Company Holdings, L.P., an affiliate of BEN LP ("Beneficient Holdings"); and

• GWG issued to the Seller Trusts 27,013,516 shares of GWG common stock (including shares issued upon conversion of the Convertible Preferred Stock).

A summary of the Exchange Transaction is set forth in our Current Report on Form 8-K, filed with the Securities and Exchange Commission ("SEC") on August 14, 2018, and amended in our Current Report on Form 8-K/A filed with the SEC on November 9, 2018, as well as the Form 8-K filed with the SEC on January 4, 2019.

***Description of the Assets Exchanged at the Initial Transfer***

*Seller Trust L Bonds*

On August 10, 2018, in connection with the Initial Transfer, GWG Holdings, GWG Life and Bank of Utah, as trustee, entered into a Supplemental Indenture (the "Supplemental Indenture") to the Amended and Restated Indenture dated as of October 23, 2017 (the "Amended and Restated Indenture"). GWG Holdings entered into the Supplemental Indenture to add and modify certain provisions of the Amended and Restated Indenture necessary to provide for the issuance of the Seller Trust L Bonds. The maturity date of the Seller Trust L Bonds is August 9, 2023. The Seller Trust L Bonds bear interest at 7.5% per year. Interest is payable monthly in cash.

After the second anniversary of the Final Closing Date, the holders of the Seller Trust L Bonds will have the right to cause GWG to repurchase, in whole but not in part, the Seller Trust L Bonds held by such holder. The repurchase may be paid, at GWG's option, in the form of cash, a pro rata portion of (i) the outstanding principal amount and accrued and unpaid interest under the Commercial Loan and (ii) BEN LP common units, or a combination of cash and such property.

The Seller Trust L Bonds are senior secured obligations of GWG, ranking junior only to all senior debt of GWG (see Note 8), pari passu in right of payment and in respect of collateral with all "L Bonds" of GWG (see Note 10), and senior in right of payment to all subordinated indebtedness of GWG. Payments under the Seller Trust L Bonds are guaranteed by GWG Life (see Note 24).

*Series B Convertible Preferred Stock*

The Series B converted into 5,000,000 shares of our common stock at a conversion price of $10 per share upon the Final Closing.

F-10

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(1) Nature of Business and Summary of Significant Accounting Policies (cont.)**

*Commercial Loan*

The $192,508,000 principal amount under the Commercial Loan is due on August 9, 2023; however, is extendable for two five-year terms. See Note 5 for a full description of the terms of the loan. BEN LP's obligations under the Commercial Loan are unsecured.

The principal amount of the Commercial Loan bears interest at 5.0% per year. From and after the Final Closing Date, one-half of the interest, or 2.5% per year, is due and payable monthly in cash, and (ii) one-half of the interest, or 2.5% per year, accrues and compounds annually on each anniversary date of the Final Closing Date and become due and payable in full in cash on the maturity date.

In accordance with the Supplemental Indenture issuing the Seller Trust L Bonds, upon a redemption event or at the maturity date of the Seller Trust L Bonds, the Company, at its option, may use the outstanding principal amount of the Commercial Loan, and accrued and unpaid interest thereon, as repayment consideration of the Seller Trust L Bonds.

*Exchangeable Note*

The Exchangeable Note accrued interest at a rate of 12.4% per year, compounded annually. Interest was payable in cash on the earlier to occur of the maturity date or the Final Closing Date; provided that Beneficient had the option to add to the outstanding principal balance under the Commercial Loan the accrued interest in lieu of payment in cash of such accrued interest thereon at the Final Closing Date. At the Final Closing date, the principal amount of the Exchangeable Note was exchanged for 14,822,843 common units of BEN LP, and the accrued interest on the Exchangeable Note was added to the principal balance of the Commercial Loan.

*Option Agreement*

In connection with the Final Closing, the Company entered into the Option Agreement with BEN LP. The Option Agreement gives us the option to acquire the number of common units in BEN LP that would be received by the holder of NPC-A Prime limited partnership interests of Beneficient Company Holdings, L.P., an affiliate of BEN LP, if such holder were converting on that date. There is no exercise price and the Company may exercise the option at any time until the December 27, 2028, at which time the option will automatically settle.

*Common Units in BEN LP*

In connection with the Initial Transfer and Final Closing, the Seller Trusts and Beneficient delivered to us 40,505,279 common units of BEN LP. This represents an approximate 89.9% interest in the common units of BEN LP.

Beneficient operates in a sector of the alternative asset market that is complementary to ours by providing a suite of innovative liquidity and trust products to mid-to-high net worth individual investors and small-to-medium institutional owners of professionally managed illiquid alternative investment assets.

**Principles of Consolidation** — The consolidated financial statements include the accounts of GWG Holdings, Inc. and all its wholly owned subsidiaries. All material intercompany balances and transactions have been eliminated upon consolidation.

The Company has interests in various entities including corporations and limited partnerships. For each such entity, the Company evaluates its ownership interest to determine whether the entity is a variable interest entity ("VIE") and, if so, whether it is the primary beneficiary of the VIE. The Company would consolidate any entity for which it was the primary beneficiary, regardless of its ownership or voting interests. Upon inception of a variable interest or the occurrence of a reconsideration event, the Company makes judgments in determining whether entities in which it invests are VIEs. If so, the Company makes judgments to determine whether it is the primary beneficiary and is thus required to consolidate the entity.

F-11

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(1) Nature of Business and Summary of Significant Accounting Policies (cont.)**

If it is concluded that an entity is not a VIE, then the Company considers its proportional voting interests in the entity. The Company consolidates majority-owned subsidiaries in which a controlling financial interest is maintained. A controlling financial interest is determined by majority ownership and the absence of significant third-party participating rights. Ownership interests in entities for which the Company has significant influence that are not consolidated under the Company's consolidation policy are accounted for as equity method investments. SEC Staff Announcement: *Accounting for Limited Partnership Investments* (codified in Accounting Standards Codification ("ASC") 323-30-S99-1) guidance requires the use of the equity method unless the investor's interest "is so minor that the limited partner may have virtually no influence over partnership operating and financial policies." The SEC staff's position is that investments in limited partnerships of greater than 3% to 5% are considered more than minor and, therefore, should be accounted for using the equity method.

Related party transactions between the Company and its equity method investee have not been eliminated.

**Use of Estimates** — The preparation of our consolidated financial statements in conformity with the Generally Accepted Accounting Principles in the United States of America (GAAP) requires management to make significant estimates and assumptions affecting the reported amounts of assets and liabilities at the date of the consolidated financial statements, as well as the reported amounts of revenue during the reporting period. We regularly evaluate estimates and assumptions, which are based on current facts, historical experience, management's judgment, and various other factors that we believe to be reasonable under the circumstances. Our actual results may differ materially and adversely from our estimates. The most significant estimates with regard to these consolidated financial statements relate to (1) the determination of the assumptions used in estimating the fair value of our investments in life insurance policies, (2) the assessment of potential impairment of our equity method investment and our equity security investment and determination of the allowance for credit losses on our financing receivable, and (3) the value of our deferred tax assets and liabilities. Periodically, we make significant estimates in assessing the fair value of assets acquired and consideration given in return for those assets, which are used to establish the initial recorded values of such assets in accordance with ASC 805, *Business Combinations*. Under ASC 805, the consideration paid in an asset acquisition is allocated among the assets acquired based on their relative fair values at acquisition date. In relation to the Exchange Transaction, relative fair values were used to calculate the amounts recorded for the Commercial Loan, the Exchangeable Note, the equity method investment and the option agreement at their acquisition dates.

**Cash and Cash Equivalents** — We consider cash in demand deposit accounts and temporary investments purchased with an original maturity of three months or less to be cash equivalents. We maintain our cash and cash equivalents with highly rated financial institutions. The balances in our bank accounts may exceed Federal Deposit Insurance Corporation limits. We periodically evaluate the risk of exceeding insured levels and may transfer funds as we deem appropriate.

Cash, cash equivalents and restricted cash on our consolidated statements of cash flows include cash and cash equivalents of $114.6 million and restricted cash of $10.8 million as of December 31, 2018, and $114.4 million and $28.4 million, respectively, as of December 31, 2017.

**Life Insurance Policies** — ASC 325-30, *Investments in Insurance Contracts,* permits a reporting entity to account for its investments in life insurance policies using either the investment method or the fair value method. We elected to use the fair value method to account for our life insurance policies. We initially record our purchase of life insurance policies at the transaction price, which is the amount paid for the policy, inclusive of all external fees and costs associated with the acquisition. At each subsequent reporting period, we re-measure the investment at fair value in its entirety and recognize the change in fair value as unrealized gain or loss in the current period, net of premiums paid, within gain (loss) on life insurance policies, net in our consolidated statements of operations.

In a case where our acquisition of a policy is not complete as of a reporting date, but we have nonetheless advanced direct costs and deposits for the acquisition, those costs and deposits are recorded as other assets on our consolidated balance sheets until the acquisition is complete and we have secured title to the policy. On both December 31, 2018 and December 31, 2017, none of our other assets comprised direct costs and deposits that we had advanced for life insurance policy acquisitions.

APP. 111

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 112 of 1031    PageID 284

We also recognize realized gain (or loss) from a life insurance policy upon one of the two following events: (1) our receipt of notice or verified mortality of the insured; or (2) our sale of the policy (upon filing of change-of-ownership forms and receipt of payment). In the case of mortality, the gain (or loss) we recognize is the difference between the

F-12

APP. 112

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(1) Nature of Business and Summary of Significant Accounting Policies (cont.)**

policy benefits and the carrying value of the policy once we determine that collection of the policy benefits is realizable and reasonably assured. In the case of a policy sale, the gain (or loss) we recognize is the difference between the sale price and the carrying value of the policy on the date we receive sale proceeds.

**Life Insurance Policy Benefits Receivable** — Our policy benefit receivables represent amounts due from insurance carriers for claims submitted on matured life insurance policies. Policy benefit receivables are recorded at the policy benefit amounts less reserves for estimated uncollectible amounts. Uncollectible policy benefits can result from challenges by the insurance carrier to the legal validity of the policy, typically related to the concept of insurable interest, or from liquidity or solvency problems at the insurance carrier (although policy benefits are senior to any other obligations of a carrier).

We reserve for policy benefits when it becomes probable that we will not collect the full amount of the policy benefit. The reserve requirements are based on the best facts available to us and are reevaluated and adjusted as additional information becomes available. Uncollectible policy benefits are written off against the reserves when it is deemed that a policy amount is uncollectible. As of December 31, 2018, the balance of the allowance for uncollectible receivables was $4.3 million, relating to an insurable interest challenge from an insurance carrier.

**Other Assets —** Included in other assets at the current balance sheet date are $38.6 million of equity security acquired, $1.2 million of prepaid expenses, $1.5 million of net fixed assets, $0.6 million of security deposits with states for life settlement provider licenses, $0.5 million net secured merchant cash advances and $3.1 million of other miscellaneous assets — including Life Epigenetics' exclusive license for the "DNA Methylation Based Predictor of Mortality" technology for the life insurance industry. At December 31, 2017, other assets included $4.5 million of prepaid expenses, $1.9 million of net fixed assets, $0.6 million of security deposits with states for life settlement provider licenses, $1.7 million net secured merchant cash advances and $0.3 million of other miscellaneous assets.

In December 2018, in connection with the Final Closing of the Exchange Transaction, the Company entered into an Option Agreement with Beneficient. The agreement gives GWG the option to acquire the number of common units in BEN LP that would be received by the holder of NPC-A prime unit accounts in Beneficient Company Holdings, L.P., an affiliate of BEN LP. There is no exercise price and the Company may exercise the option at any time until the December 27, 2028, at which time the option will automatically settle. The Option Agreement is recorded in other assets at a value of $38.6 million at December 31, 2018. The Option Agreement is considered an equity security and the Company has elected the measurement alternative for equity securities without a readily determinable fair value. Under this measurement alternative, we record the Option Agreement at its cost, less any impairment, plus or minus changes resulting from observable price changes in orderly transactions for the identical or similar investments of Beneficient. As at December 31, 2018, there were no indications of impairment. The instrument is eligible for certain cash distributions that will be recorded in earnings when earned.

**Financing Receivable —** ASC 310, *Receivables,* provides guidance for receivables and notes that arise from credit sales, loans or other transactions. Financing receivable includes loans and notes receivable. Originated loans we hold for which we have the intent and ability to hold for the foreseeable future or to maturity (or payoff) are classified as held for investment. Financing receivables held for investment are reported in our consolidated balance sheets at the outstanding principal balance adjusted for any write-offs, allowance for loan losses, deferred fees or costs, and any unamortized premiums or discounts. Interest income is accrued on outstanding principal as earned. Unamortized discounts and premiums are amortized using the interest method with the amortization recognized as part of interest income in the consolidated statements of operations.

Losses on financing receivables are recognized when they are incurred, which requires us to make our best estimate of probable losses. Specific allowances are recorded for individually impaired loans to the extent we have determined that it is probable that we will be unable to collect all amounts due according to original contractual terms of the loan agreement. Certain loans classified as impaired may not require an allowance for loan loss because we believe that we will ultimately collect the unpaid balance (through collection or collateral repossession). The method for calculating the best estimate of losses depends on the type and risk characteristics of the related financing receivable. Such an estimate requires consideration of historical loss experience, adjusted for current conditions, and judgments about the probable effects of relevant observable

APP. 113

data, including present economic conditions such as delinquency rates, financial health of market sectors, and the present and expected future levels of interest rates. The underlying assumptions, estimates and

F-13

APP. 114

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(1) Nature of Business and Summary of Significant Accounting Policies (cont.)**

assessments we use to provide for losses are updated periodically to reflect our view of current conditions. Changes in such estimates can significantly affect the allowance and provision for losses. It is possible that we will experience credit losses that are different from our current estimates. We have no allowance for losses as of December 31, 2018. Write-offs are deducted from the allowance for losses when we judge the principal to be uncollectible and subsequent recoveries are added to the allowance at the time cash is received on a written-off account.

**Equity Method Investment** — We account for investments in common stock or in-substance common stock in which we have the ability to exercise significant influence, but do not own a controlling financial interest, under the equity method of accounting. Investments within the scope of the equity method of accounting are initially measured at cost, including the cost of the investment itself and direct transaction costs incurred to acquire the investment. After the initial recognition of the investment at cost, we recognize income and losses from our investment by adjusting upward or downward the balance of our equity method investment on our consolidated balance sheet with such adjustments, if any, flowing through earnings from equity method investment on our consolidated statement of operations, in all cases adjusted to reflect amortization of basis differences, if any, and the elimination of intercompany gains and losses, if any. Cash distributions received from equity method investees are recorded as reductions to the investment balance and classified on the statement of cash flows using the cumulative earnings approach.

Our equity method investment is reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of the investment might not be recoverable. These circumstances can include, but are not limited to: evidence that we do not have the ability to recover the carrying amount, the inability of the investee to sustain earnings, a current fair value of the investment that is less than the carrying amount, and other investors ceasing to provide support or reduce their financial commitment to the investee. If the fair value of the investment is less than the carrying amount, and the investment will not recover in the near term, then an other-than-temporary impairment may exist. We recognize a loss in value of an investment deemed other-than-temporary in the period the conclusion is made.

The Company reports its share of the income or loss of the equity method partner companies on a one-quarter lag where we do not expect financial information to be consistently available on a timely basis.

For more information on equity method investments, see Note 6.

**Stock-Based Compensation** — We measure and recognize compensation expense for all stock-based payments at fair value on the grant date over the requisite service period. We use the Black-Scholes option pricing model to determine the weighted-average fair value of stock options and stock appreciation rights. For restricted stock grants (including restricted stock units), fair value is determined as of the closing price of our common stock on the date of grant. Stock-based compensation expense is recorded in general and administrative expenses based on the classification of the employee or vendor. The determination of fair value of stock-based payment awards on the date of grant is affected by our stock price and a number of subjective variables. These variables include, but are not limited to, the expected stock price volatility over the term of the awards and the expected duration of the awards. We account for the effects of forfeitures as they occur.

The risk-free interest rate is based on the U.S. Treasury rates at the date of grant with maturity dates approximately equal to the expected life at grant date. Volatility is based on the standard deviation of the average continuously compounded rate of return of five selected companies.

**Deferred Financing and Issuance Costs** — Loans advanced to us under our amended and restated senior credit facility with LNV Corporation, as described in Note 8, are reported net of financing costs, including issuance costs, sales commissions and other direct expenses, which are amortized using the straight-line method over the term of the facility. We had no loans advanced to us under our senior credit facility with Autobahn Funding Company during the year ended December 31, 2017 and this credit facility was terminated in September 2017, as described in Note 7. The L Bonds, as described in Note 10, are reported net of financing costs, which are amortized using the interest method over the term of those borrowings. The Series I Secured Notes, as described in Note 9 have been redeemed, and were reported net of financing costs, all of which were fully amortized using the interest method as of December 31, 2017. The Series A Convertible Preferred Stock ("Series A"), as described in Note 12, were reported net of financing costs (including the fair value of warrants

APP. 115

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 116 of 1031     PageID 288

issued), all of which were fully amortized using the interest method as of December 31, 2017. All shares of Series A have been redeemed and the obligations thereunder satisfied. Selling and issuance costs of Redeemable

F-14

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(1) Nature of Business and Summary of Significant Accounting Policies (cont.)**

Preferred Stock ("RPS") and Series 2 Redeemable Preferred Stock ("RPS 2"), described in Notes 13 and 14, are netted against additional paid-in-capital, until depleted, and then against the outstanding balance of the preferred stock. The offerings of our RPS and RPS 2 closed in March 2017 and April 2018, respectively. There were no issuance costs associated with issuance of the Series B Convertible Preferred Stock ("Series B"), described in Note 15, in August 2018.

**Earnings (Loss) per Share** — Basic earnings (loss) per share attributable to common shareholders are calculated using the weighted-average number of shares outstanding during the reported period. Diluted earnings (loss) per share are calculated based on the potential dilutive impact of our Series A, RPS, RPS 2, Series B, warrants and stock options. Due to our net loss attributable to common shareholders for the years ended December 31, 2018 and 2017, there are no dilutive securities.

**Reclassification** — Certain prior year amounts have been reclassified for consistency with the current year presentation. These reclassifications had no effect on the reported results of operations.

**Recently Issued Accounting Pronouncements** — In February 2016, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update No. 2016-02, *Leases (Topic 842) ("*ASU 2016-02"). The new standard is effective for fiscal years, and interim periods within those years, beginning after December 15, 2018, with early adoption permitted. ASU 2016-02 requires lessees to recognize right-of-use assets and lease liabilities on the balance sheet for all leases with a term greater than twelve months, and provide enhanced disclosures. The Company plans to elect the practical expedient, which will allow for aggregation of non-lease components with the related lease components when evaluating accounting treatment. The Company has made an accounting policy election to exempt leases with an initial term of twelve months or less from balance sheet recognition. The Company adopted the standard on January 1, 2019, by applying the modified retrospective method, without restatement of comparative periods' financial information. The impact of the new standard will not be material to the financial statements.

In June 2016, the FASB issued ASU No. 2016-13, *Financial Instruments — Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments,* which changes the impairment model for most financial assets and certain other instruments, including trade and other receivables, held-to-maturity debt securities and loans. The standard requires entities to use a new, forward-looking "expected loss" model that is expected to generally result in the earlier recognition of allowances for losses. The guidance is effective for annual periods beginning after December 15, 2019, including interim periods within those years, but early adoption is permitted. The Company is evaluating the potential impact of this guidance on our consolidated financial statements.

In August 2016, the FASB issued ASU No. 2016-15, *Statement of Cash Flows (Topic 230): Classification of Certain Cash Receipts and Cash Payments*, which addresses eight specific cash flow issues with the objective of reducing the existing diversity in practice in how certain types of cash receipts and cash payments are presented in the statement of cash flows. We adopted ASU 2016-15 effective January 1, 2018. In connection with this standard, the Company elected to classify distributions received from equity method investees using the cumulative earnings approach. This election had no effect on our consolidated financial statements as we have not received any distributions from equity method investees to date.

In November 2016, the FASB issued ASU 2016-18, *Statement of Cash Flows (Topic 230): Restricted Cash,* which amends ASC 230 *Statement of Cash Flows,* to add or clarify guidance on the classification and presentation of restricted cash in the statement of cash flows. The guidance, to be applied retrospectively when adopted, requires entities to show the changes in the total of cash, cash equivalents, restricted cash and restricted cash equivalents in the statement of cash flows. The new guidance is effective for fiscal years beginning after December 15, 2017, and interim periods within those years. We adopted ASU 2016-18 as of March 31, 2018. The impact of the adoption was not material to the financial statements.

In August 2018, the FASB issued ASU No. 2018-13, *Fair Value Measurement (Topic 820): Disclosure Framework — Changes to the Disclosure Requirements for Fair Value Measurement*, which eliminates, adds and modifies certain disclosure requirements for fair value measurements. The guidance is effective for fiscal years and interim periods beginning after December 15, 2019. Certain of the amendments require prospective application, while the remainder require retrospective application. Early adoption is allowed either for the entire standard or only the provisions that eliminate or modify the requirements. The Company is currently evaluating the potential impact of this guidance on our consolidated financial statements.

APP. 117

APP. 118

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

### (2) Restrictions on Cash

Under the terms of our amended and restated senior credit facility with LNV Corporation (discussed in Note 8), we are required to maintain collection and payment accounts that are used to collect policy benefits from pledged policies, pay annual policy premiums, interest and other charges under the facility, and distribute funds to pay down the facility.

The agents for the lender authorize the disbursements from these accounts. At December 31, 2018 and December 31, 2017, there was a balance of $4,164,000 and $19,967,000, respectively, in these collection and payment accounts.

To fund the Company's acquisition of life insurance policies, we are required to maintain escrow accounts. Distributions from these accounts are made according to life insurance policy purchase contracts. At December 31, 2018 and December 31, 2017, there was a balance of $6,685,000 and $8,383,000, respectively, in the Company's escrow accounts.

### (3) Investment in Life Insurance Policies

Our investments in life insurance policies are valued based on unobservable inputs that are significant to their overall fair value. Changes in the fair value of these policies, net of premiums paid, are recorded in gain (loss) on life insurance policies, net in our consolidated statements of operations. Fair value is determined on a discounted cash flow basis that incorporates life expectancy assumptions generally derived from reports obtained from widely accepted life expectancy providers (other than insured lives covered under small face amount policies — those with $1 million in face value benefits or less — which utilize either a single fully underwritten, or simplified report based on self-reported medical interview data), assumptions relating to cost-of-insurance (premium) rates and other assumptions. The discount rate we apply incorporates current information about the discount rates observed in the life insurance secondary market, market interest rates, the estimated credit exposure to the insurance companies that issued the life insurance policies and management's estimate of the operational risk premium a purchaser would require to receive the future cash flows derived from our portfolio as a whole. Management has significant discretion regarding the combination of these and other factors when determining the discount rate. As a result of management's analysis, a discount rate of 8.25% and 10.45% were applied to our portfolio as of December 31, 2018 and 2017, respectively.

### Portfolio Information

Our portfolio of life insurance policies, owned by our subsidiaries as of December 31, 2018, is summarized below:

#### Life Insurance Portfolio Summary

| | |
|---|---:|
| Total life insurance portfolio face value of policy benefits | $ 2,047,992,000 |
| Average face value per policy | $ 1,775,000 |
| Average face value per insured life | $ 1,984,000 |
| Average age of insured (years)* | 82.1 |
| Average life expectancy estimate (years)* | 7.8 |
| Total number of policies | 1,154 |
| Number of unique lives | 1,032 |
| Demographics | 77% Males; 23% Females |
| Number of smokers | 52 |
| Largest policy as % of total portfolio face value | 0.6% |
| Average policy as % of total portfolio | 0.1% |
| Average annual premium as % of face value | 2.9% |

———————

\*    Averages presented in the table are weighted averages.

APP. 120

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(3) Investment in Life Insurance Policies (cont.)**

A summary of our policies, organized according to their estimated life expectancy dates as of the reporting date, is as follows:

| Years Ending December 31, | As of December 31, 2018 | | | As of December 31, 2017 | | |
|---|---|---|---|---|---|---|
| | Number of Policies | Estimated Fair Value | Face Value | Number of Policies | Estimated Fair Value | Face Value |
| 2018 | — | $ — | $ — | 8 | $ 4,398,000 | $ 4,689,000 |
| 2019 | 9 | 6,380,000 | 7,305,000 | 48 | 63,356,000 | 83,720,000 |
| 2020 | 41 | 46,338,000 | 59,939,000 | 87 | 79,342,000 | 127,373,000 |
| 2021 | 81 | 68,836,000 | 108,191,000 | 98 | 96,154,000 | 170,695,000 |
| 2022 | 104 | 97,231,000 | 177,980,000 | 90 | 85,877,000 | 181,120,000 |
| 2023 | 109 | 93,196,000 | 185,575,000 | 93 | 69,467,000 | 175,458,000 |
| 2024 | 107 | 84,150,000 | 211,241,000 | 100 | 77,638,000 | 228,188,000 |
| Thereafter | 703 | 351,791,000 | 1,297,761,000 | 374 | 174,295,000 | 704,905,000 |
| Totals | 1,154 | $747,922,000 | $2,047,992,000 | 898 | $650,527,000 | $ 1,676,148,000 |

We recognized life insurance benefits of $71,090,000 and $64,719,000 during 2018 and 2017, respectively, related to policies with a carrying value of $20,763,000 and $16,070,000, respectively, and as a result recorded realized gains of $50,327,000 and $48,649,000.

A reconciliation of gain on life insurance policies is a follows:

| | Years Ended December 31, | |
|---|---|---|
| | 2018 | 2017 |
| Change in estimated probabilistic cash flows[1] | $ 75,444,000 | $ 63,241,000 |
| Unrealized gain on acquisitions[2] | 28,017,000 | 31,019,000 |
| Premiums and other annual fees | (54,087,000) | (53,296,000) |
| Change in discount rates[3] | — | 14,931,000 |
| Change in life expectancy evaluation[4] | (4,890,000) | (20,257,000) |
| Change in life expectancy evaluation methodology[5] | (87,100,000) | — |
| Face value of matured policies | 71,090,000 | 64,719,000 |
| Fair value of matured policies | (42,579,000) | (38,243,000) |
| Gain (loss) on life insurance policies, net | $(14,105,000) | $ 62,114,000 |

———————

(1)   Change in fair value of expected future cash flows relating to our investment in life insurance policies that are not specifically attributable to changes in life expectancy, discount rate or policy maturity events.
(2)   Gain resulting from fair value in excess of the purchase price for life insurance policies acquired during the reporting period.
(3)   The discount rate applied to estimate the fair value of the portfolio of life insurance policies we own was 8.25% as of December 31, 2018, compared to 10.45% as of December 31, 2017.
(4)   The change in fair value due to updating life expectancy estimates on certain life insurance policies in our portfolio.
(5)   The change in fair value due to the adoption of the Longest Life Expectancy methodology on life insurance policies in our portfolio, partially offset by the impact of a decrease in the discount rate associated thereto.

We currently estimate that premium payments and servicing fees required to maintain our current portfolio of life insurance policies in force for the next five years, assuming no mortalities, are as follows:

| Years Ending December 31, | | Premiums | Servicing | Premiums and |
|---|---|---|---|---|

APP. 121

|      |                    |           | Servicing Fees |
|------|-------------------:|----------:|----------------:|
| 2019 | $  65,536,000 | $ 1,413,000 | $  66,949,000 |
| 2020 |     77,552,000 |   1,413,000 |     78,965,000 |
| 2021 |     90,290,000 |   1,413,000 |     91,703,000 |
| 2022 |    103,363,000 |   1,413,000 |    104,776,000 |
| 2023 |    115,597,000 |   1,413,000 |    117,010,000 |
|      | $ 452,338,000 | $ 7,065,000 | $ 459,403,000 |

F-17

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(3) Investment in Life Insurance Policies (cont.)**

Management anticipates funding the majority of the premium payments and servicing fees estimated above from cash flows realized from life insurance policy benefits, and to the extent necessary, with additional borrowing capacity created as the premiums and servicing costs of pledged life insurance policies become due, under the amended and restated senior credit facility with LNV Corporation as described in Note 8, and the net proceeds from our offering of L Bonds as described in Note 10. Management anticipates funding premiums and servicing costs of non-pledged life insurance policies with cash flows realized from life insurance policy benefits from our portfolio of life insurance policies and net proceeds from our offering of L Bonds. The proceeds of these capital sources may also be used for the purchase, policy premiums and servicing costs of additional life insurance policies, working capital and financing expenditures including paying principal, interest and dividends.

**(4) Fair Value Definition and Hierarchy**

ASC 820, *Fair Value Measurements and Disclosures,* establishes a hierarchical disclosure framework that prioritizes and ranks the level of market price observability used in measuring assets and liabilities at fair value. Market price observability is affected by a number of factors, including the type of investment, the characteristics specific to the investment and the state of the marketplace, including the existence and transparency of transactions between market participants. Assets and liabilities with readily available and actively quoted prices, or for which fair value can be measured from actively quoted prices in an orderly market, generally will have a higher degree of market price observability and a lesser degree of judgment used in measuring fair value.

ASC 820 maximizes the use of observable inputs and minimizes the use of unobservable inputs by requiring the use of observable inputs whenever available. Observable inputs are inputs that market participants would use in pricing the asset or liability developed based on market data obtained from independent sources. Unobservable inputs are inputs that reflect assumptions about how market participants price an asset or liability based on the best available information. Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability (i.e., the "exit price") in an orderly transaction between market participants at the measurement date.

The hierarchy is broken down into three levels based on the observability of inputs as follows:

Level 1 —   Valuations based on quoted prices in active markets for identical assets or liabilities that the Company has the ability to access. Valuations are based on quoted prices that are readily and regularly available in an active market.

Level 2 —   Valuations based on one or more quoted prices in markets that are not active or for which all significant inputs are observable, either directly or indirectly.

Level 3 —   Valuations based on inputs that are unobservable and significant to the overall fair value measurement.

The availability of observable inputs can vary by types of assets and liabilities and is affected by a wide variety of factors, including, for example, whether an instrument is established in the marketplace, the liquidity of markets and other characteristics particular to the transaction. To the extent that valuation is based on models or inputs that are less observable or unobservable in the market, the determination of fair value requires more judgment. Accordingly, the degree of judgment exercised by management in determining fair value is greatest for assets and liabilities categorized in Level 3.

*Level 3 Valuation Process*

The estimated fair value of our portfolio of life insurance policies is determined on a quarterly basis by management taking into consideration a number of factors, including changes in discount rate assumptions, estimated premium payments and life expectancy estimate assumptions, as well as any changes in economic and other relevant conditions. The discount rate incorporates current information about discount rates observed in the life insurance secondary market, market interest rates, the estimated credit exposure to the insurance company that issued the life insurance

APP. 123

F-18

APP. 124

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(4) Fair Value Definition and Hierarchy (cont.)**

policy and management's estimate of the operational risk premium a purchaser would require to receive the future cash flows derived from our portfolio as a whole. Management has significant discretion regarding the combination of these and other factors when determining the discount rate.

These inputs are then used to estimate the discounted cash flows from the portfolio using the ClariNet LS probabilistic and stochastic portfolio pricing model from ClearLife Limited, which estimates the expected cash flows using various mortality probabilities and scenarios. The valuation process includes a review by senior management as of each quarterly valuation date. We also engage ClearLife Limited to independently verify the accuracy of the valuations using the inputs we provide on a quarterly basis. A copy of a letter documenting the ClariNet LS calculation is filed as Exhibit 99.1 to this report.

The following table reconciles the beginning and ending fair value of our Level 3 investments in our portfolio of life insurance policies for the periods ended December 31, as follows:

|                                  | Years Ended December 31, | |
|----------------------------------|----------------|----------------|
|                                  | **2018**       | **2017**       |
| Beginning balance                | $650,527,000   | $ 511,192,000  |
| Purchases                        | 128,502,000    | 88,644,000     |
| Maturities (initial cost basis)  | (20,763,000)   | (16,070,000)   |
| Net change in fair value         | (10,344,000)   | 66,761,000     |
| Ending balance                   | $747,922,000   | $ 650,527,000  |

Historically, for life insurance policies with face amounts greater than $1 million and that are not pledged as collateral under our amended and restated senior credit facility with LNV Corporation (approximately 23.8% of our portfolio by face amount of policy benefits) we attempted to obtain updated life expectancy reports on a continuous rotating three year cycle. For life insurance policies that are pledged under our amended and restated senior credit facility with LNV Corporation (approximately 65.2% of our portfolio by face amount of policy benefits), we are presently required to update the life expectancy estimates every two years beginning from the closing date of the amended and restated senior credit facility with LNV Corporation. For the remaining small face insurance policies (i.e., a policy with $1 million in face value benefits or less), we historically employed other methods and timeframes to update life expectancy estimates.

With the adoption of the Longest Life Expectancy method (as described under "Fair Value Components — Life Expectancies"), we discontinued the practice of obtaining updated life expectancy reports (or updating specific life expectancies in any manner) except as may be required by lenders to comply with existing and future covenants within credit facilities. This change is being accounted for as a change in accounting estimate and affects current and future periods. To the extent such updated life expectancy reports are available, we do not expect to incorporate these life expectancy reports into our revised valuation methodology; however, we will monitor this data to determine over time if there exists any additive predictive value in relation to the basis of its mortality projections.

The following table summarizes the inputs utilized in estimating the fair value of our portfolio of life insurance policies:

|                                            | As of December 31, 2018 | As of December 31, 2017 |
|--------------------------------------------|-------------|-------------|
| Weighted-average age of insured, years*    | 82.1        | 81.7        |
| Weighted-average life expectancy, months*[1] | 93.2      | 82.4        |
| Average face amount per policy             | $  1,775,000 | $  1,867,000 |
| Discount rate                              | 8.25%       | 10.45%      |

_____

APP. 125

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 126 of 1031     PageID 298

\* Weighted-average by face amount of policy benefits

(1)    Increase primarily due to the adoption of the Longest Life Expectancy methodology.

---

F-19

APP. 126

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(4) Fair Value Definition and Hierarchy (cont.)**

Life expectancy estimates and market discount rates for a portfolio of life insurance policies are inherently uncertain and the effect of changes in estimates may be significant. For example, if the life expectancy estimates were increased or decreased by four and eight months on each outstanding policy, and the discount rates were increased or decreased by 1% and 2%, with all other variables held constant, the fair value of our investment in life insurance policies would increase or decrease as summarized below:

Change in Fair Value of the Investment in Life Insurance Policies

|  | Change in Life Expectancy Estimates | | | |
|---|---|---|---|---|
|  | minus 8 months | minus 4 months | plus 4 months | plus 8 months |
| December 31, 2018 | $ 113,410,000 | $ 57,611,000 | $(55,470,000) | $(110,473,000) |
| December 31, 2017 | $ 86,391,000 | $ 42,886,000 | $(42,481,000) | $ (84,238,000) |

|  | Change in Discount Rate | | | |
|---|---|---|---|---|
|  | minus 2% | minus 1% | plus 1% | plus 2% |
| December 31, 2018 | $ 95,747,000 | $ 45,440,000 | $(41,179,000) | $ (78,615,000) |
| December 31, 2017 | $ 68,117,000 | $ 32,587,000 | $(29,964,000) | $ (57,583,000) |

*Other Fair Value Considerations*

The carrying value of policy benefit receivables, prepaid expenses, accounts payable and accrued expenses approximate fair value due to their short-term maturities and low credit risk. Using the income-based valuation approach, the estimated fair value of our L Bonds, having an aggregate face value of $1,029,044,000 as of December 31, 2018, is approximately $1,034,729,000 based on a weighted-average market interest rate of 7.11%.

The Commercial Loan receivable from BEN LP has a below-market interest rate of 5.0% per year; provided that the accrued interest from the date of the Initial Transfer to the Final Closing Date of the Exchange Transaction was added to the principal balance of the Commercial Loan. From and after the Final Closing Date, one-half of the interest, or 2.5% per year, is due and payable monthly in cash, and (ii) one-half of the interest, or 2.5% per year, accrues and compounds annually on each anniversary date of the Final Closing Date and becomes due and payable in full in cash on the maturity date. Utilizing an implied yield of 6.75%, we estimate the fair value of the Commercial Loan to be approximately $183,119,000 based on a market yield analysis for similar instruments with similar credit profiles.

The carrying value of the amended and restated senior credit facility with LNV Corporation reflects interest charged at 12-month LIBOR plus an applicable margin. The margin represents our credit risk, and the strength of the portfolio of life insurance policies collateralizing the debt. The overall rate reflects the current interest rate market, and the carrying value of the facility approximates fair value.

GWG MCA Capital, Inc. ("GWG MCA") participates in the merchant cash advance industry by directly advancing sums to merchants and lending money, on a secured basis, to companies that advance sums to merchants. Each quarter, we review the carrying value of these cash advances, determine if an impairment exists and establish or adjust an allowance for loan loss as necessary. At December 31, 2018, one of our secured cash advances was impaired. Specifically, the secured loan to Nulook Capital LLC had an outstanding balance of $1,879,000 and an allowance for loan loss of $1,879,000 at December 31, 2018. We deem fair value to be the estimated collectible value on each loan or advance made from GWG MCA. Secured merchant cash advances, net of allowance for loan loss, of $547,000 and $1,662,000 are included within other assets on our consolidated balance sheets as of December 31, 2018 and December 31, 2017, respectively. Where we estimate the collectible amount to be less than the outstanding balance, we record an allowance for the difference. Provision for merchant cash advances are recorded within other expenses on the statement of operations (see Note 19).

Certain assets are subject to periodic impairment testing by comparing the respective carrying value of the asset to its estimated fair value. In the event we determine these assets to be impaired, we would recognize an impairment loss equal to the amount by which the carrying value of the impaired asset exceeds its estimated fair

APP. 127

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 128 of 1031     PageID 300

value. These periodic impairment tests utilize company-specific assumptions involving significant unobservable inputs, or Level 3, in the fair value hierarchy.

F-20

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(4) Fair Value Definition and Hierarchy (cont.)**

The following table summarizes outstanding common stock warrants (discussed in Note 17) as of December 31, 2018:

| Month issued | Warrants issued | Fair value per share | Risk free rate | Volatility | Term |
|---|---|---|---|---|---|
| September 2014 | 16,000 | $   1.26 | 1.85% | 17.03% | 5 years |
| | 16,000 | | | | |

**(5) Financing Receivable from Affiliate**

*Commercial Loan*

On August 10, 2018, in connection with the Initial Transfer of the Exchange Transaction, GWG Life, as lender, and BEN LP, as borrower, entered into the Commercial Loan Agreement. On December 28, 2018, the Final Closing Date of the Exchange Transaction, the Commercial Loan Agreement was amended to adjust the principal to $192,508,000. The principal amount under the Commercial Loan is due on August 9, 2023, but is extendable for two five-year terms under certain circumstances. The extensions are available to the borrower provided that (a) in the event BEN LP completes at least one public offering of its common units raising at least $50,000,000, which on its own or together with any other public offering of BEN LP's common units results in Beneficient raising at least $100,000,000, then the maturity date will be extended to August 9, 2028; and (b) in the event that BEN LP (i) completes at least one public offering of its common units raising at least $50,000,000, which on its own or together with any other public offering of BEN LP's common units results in Beneficient raising at least $100,000,000 and (ii) at least 75% of Beneficient Holding's total outstanding NPC-B limited partnership interests, if any, have been converted to shares of BEN LP's common units, then the maturity date will be extended to August 9, 2033.

Repayment of the Commercial Loan is subordinated in right of payment to other Beneficient obligations, including (i) Beneficient's exiting senior debt obligations, (ii) any of Beneficient's commercial bank debt and (iii) any Beneficient obligations that may arise in connection with the issuance of Preferred Series B Unit Accounts of Beneficient Company Holdings, L.P. Beneficient's obligations under the Commercial Loan Agreement are unsecured.

The Commercial Loan Agreement contains negative covenants that limit or restrict, subject to certain exceptions, the incurrence of liens and indebtedness by Beneficient, fundamental changes to its business and transactions with affiliates. The Commercial Loan Agreement also contains customary affirmative covenants, including, but not limited to, preservation of corporate existence, compliance with applicable law, payment of taxes, notice of material events, financial reporting and keeping of proper books of record and account.

The Commercial Loan Agreement includes customary events of default, including, but not limited to, non-payment of principal or interest, failure to comply with covenants, failure to pay other indebtedness when due, cross-acceleration to other debt, material adverse effects, events of bankruptcy and insolvency, and unsatisfied judgments. The borrower was in compliance with the covenants as of December 31, 2018. Subsequent to December 31, 2018, the borrower failed to comply with certain financial reporting covenants in the Commercial Loan Agreement. GWG Life has agreed to a forbearance of its rights and remedies under the Commercial Loan Agreement relating to such noncompliance until July 31, 2019.

The principal amount of the Commercial Loan bears interest at 5.00% per year from the Final Closing Date. One-half of the interest, or 2.50% per year, is due and payable monthly in cash, and (ii) one-half of the interest, or 2.50% per year, accrues and compounds annually on each anniversary date of the Final Closing Date and becomes due and payable in full in cash on the maturity date. The accrued interest from the Initial Transfer to the Final Closing date was added to the principal amount of the loan. The Commercial Loan was recorded at a discount as a result of the relative fair value allocations for the assets received in the Initial Transfer of the Exchange Transaction. Under ASC 805, *Business Combinations*, the consideration paid in an asset acquisition is allocated among the assets acquired based on their relative fair values at acquisition date. The discount is being amortized to interest income over the term of the loan.

APP. 129

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 130 of 1031    PageID 302

In accordance with the Supplemental Indenture issuing the Seller Trust L Bonds, upon a redemption event or at the maturity date of the Seller Trust L Bonds, the Company, at its option, may use the outstanding principal amount of the Commercial Loan, and accrued and unpaid interest thereon, as repayment consideration of the Seller Trust L Bonds (See Note 11).

F-21

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(5) Financing Receivable from Affiliate (cont.)**

*Exchangeable Note*

On August 10, 2018, in connection with the Initial Transfer of the Exchange Transaction, BEN LP issued to GWG the Exchangeable Note in the principal amount of $162,911,000. The Exchangeable Note was recorded at a premium as a result of the relative fair value allocations for the assets received in the Initial Transfer of the Exchange Transaction. The premium was amortized against interest income over the term of the loan until the Final Closing Date. The Exchangeable Note accrued interest at a rate of 12.40% per year. On December 28, 2018, in connection with the Final Closing of the Exchange Transaction, the principal balance was adjusted to $148,220,000, effective back to the Initial Transfer Date, the recorded premium on the note was adjusted pro rata to the change in principal, the accrued interest of $7.0 million was added to the principal balance of the Commercial Loan, and the Exchangeable Note was exchanged for 14.8 million common units of BEN LP. In connection with the exchange, the principal balance of the note and unamortized premium were reduced to zero and their balances became part of the equity method investment at the Final Closing Date.

The following table summarizes outstanding principal, discount and accrued interest balances of the Commercial Loan receivable:

|  | As of December 31, 2018 | As of December 31, 2017 |
|---|---|---|
| Commercial Loan receivable – principal | $192,508,000 | $ — |
| Discount on Commercial Loan receivable | (7,846,000) | — |
| Accrued interest receivable on Commercial Loan | 107,000 | — |
| Financing receivable from affiliate | $184,769,000 | $ — |

**(6) Equity Method Investment**

During 2018, in connection with the Initial Transfer and Final Closing of the Exchange Transaction, we acquired 40.5 million common units of BEN LP for a total limited partnership interest in the common units of BEN LP of approximately 89.9%. The common units of BEN LP are not publicly traded on a stock exchange.

In accordance with ASC 810, *Consolidation,* the Company assesses whether it has a variable interest in legal entities in which it has a financial relationship and, if so, whether or not those entities are variable interest entities ("VIEs"). For those entities that qualify as VIEs, ASC 810 requires the Company to determine if the Company is the primary beneficiary of the VIE, and if so, to consolidate the VIE.

We have determined that Beneficient is a VIE but that we are not the primary beneficiary of the investment. GWG does not have the power to direct any activities of Beneficient, or any of its related parties, that most significantly impact Beneficient's economic performance. GWG has no board representation at BEN LP or at its general partner. The general partner is exclusively assigned all management powers over the business and affairs of Beneficient, and the limited partners do not have the ability to remove the general partner. BEN LP's limited partnership agreement specifies that any person or group that acquires beneficial ownership of 20% or more of BEN LP's common limited partnership units (including us) forfeits all voting rights associated with all of its common units and such common units may not be voted on any matter. Therefore, we do not consolidate the results of Beneficient in our consolidated financial statements. The Company's exposure to risk of loss in Beneficient is generally limited to its investment in the common units of BEN LP, its financing receivable from Beneficient and its equity security investment in the Option Agreement to purchase additional common units of BEN LP.

The following table shows the classification, carrying value and maximum exposure to loss with respect to the Company's investments in Beneficient at December 31, 2018:

|  | Carrying Value | Maximum Exposure to Loss |
|---|---|---|
| Financing receivable from affiliate | $ 184,769,000 | $ 184,769,000 |
| Equity method investment | 360,842,000 | 360,842,000 |

| | | | | | |
|---|---|---|---:|---|---:|
| Other asset | | | 38,562,000 | | 38,562,000 |
| Total assets | | $ | 584,173,000 | $ | 584,173,000 |

F-22

APP. 132

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(6) Equity Method Investment (cont.)**

Our investment is presented in equity method investment on our consolidated balance sheets. Our proportionate share of earnings or losses from our investee is recognized in earnings from equity method investment in our consolidated statements of operations. We record our share of the income or loss of Beneficient on a one-quarter lag.

Financial information pertaining to Beneficient is summarized in the table below:

|  | August 10 to September 30, 2018 (unaudited) |
|---|---:|
| Total revenues | $ 18,409,000 |
| Net income | 8,291,000 |
| Net income attributable to Beneficient common unitholders | 129,000 |
| Net income attributable to GWG[1] | 18,000 |

_____

(1)    Represents our portion of net earnings from August 10, 2018 (Initial Transfer Date) to September 30, 2018.

Due to our accounting election to record the equity earnings of Beneficient on a one quarter-lag, for the year ended December 31, 2018, we recorded $18,000 for our share of the net earnings of Beneficient for the period from August 10, 2018 to September 30, 2018. From August 10, 2018 to September 30, 2018, we owned an average of 13.6% of the outstanding common units of BEN LP. For the period from October 1 to December 28, 2018, we owned 13.9% of the common units of BEN LP. Effective December 28, 2018, as a result of the Final Closing of the Exchange Transaction, our ownership of BEN LP common units increased to approximately 89.9%. As a result of the significance of our investment in Beneficient, we have attached the audited consolidated financial statements of The Beneficient Company Group, L.P. as of December 31, 2018 as Exhibit 99.4.

A substantial majority of the net assets of Beneficient are currently represented by intangible assets and goodwill. As such, we believe substantially all of our equity method investment is characterized as equity method goodwill as of December 31, 2018. We do not believe conditions exist indicating an other-than-temporary loss in value of our investment and no impairment has been recorded to our equity method investment as of December 31, 2018.

Beneficient has certain share classes outstanding other than and senior to BEN LP common units, namely Class S Ordinary units and Non-Participating Convertible Series A units issued by a subsidiary of BEN LP. These units are classified as noncontrolling interest and redeemable noncontrolling interest, respectively, on the consolidated statements of financial position of Beneficient and their share of the net income of Beneficient is classified as net income attributable to noncontrolling interests on the consolidated statements of operations of Beneficient. These units are exchangeable or convertible into common units of BEN LP.

**(7) Credit Facility — Autobahn Funding Company LLC**

On September 12, 2017, we terminated our $105 million senior credit facility with Autobahn Funding Company LLC, the Credit and Security Agreement governing the facility as well as the related pledge agreement, pursuant to which our obligations under the facility were secured. We paid off in full all obligations under the facility on September 14, 2016.

**(8) Credit Facility — LNV Corporation**

On September 27, 2017, we entered into an amended and restated senior credit facility with LNV Corporation as lender through our subsidiary GWG DLP Funding IV, LLC ("DLP IV"). The amended and restated senior credit facility with LNV Corporation makes available a total of up to $300,000,000 in credit with a maturity date of September 27, 2029. Additional advances are available under the amended and restated senior credit facility with LNV Corporation at the LIBOR rate as herein defined. Advances are available as the result of

APP. 133

Case 3:22-cv-00410-B   Document 32-1   Filed 04/19/22   Page 134 of 1031   PageID 306

additional borrowing base capacity, created as the premiums and servicing costs of pledged life insurance policies become due. Interest will accrue on amounts borrowed under the amended and restated senior credit facility with LNV Corporation at an annual interest rate, determined as of each date of borrowing

F-23

APP. 134

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(8) Credit Facility — LNV Corporation (cont.)**

or quarterly if there is no borrowing, equal to (a) the greater of 12-month LIBOR or the federal funds rate (as defined in the agreement) plus one-half of one percent per annum, plus (b) 7.50% per annum. The effective rate at December 31, 2018 was 10.42%. Interest payments are made on a quarterly basis.

As of December 31, 2018, approximately 65.2% of the total face value of our life insurance policies portfolio is pledged to LNV Corporation. The amount outstanding under this facility was $158,209,000 and $222,525,000 at December 31, 2018 and December 31, 2017, respectively. Obligations under the amended and restated senior credit facility are secured by a security interest in DLP IV's assets, for the benefit of the lenders, through an arrangement under which Wells Fargo Bank, N.A. serves as securities intermediary. The life insurance policies owned by DLP IV do not serve as direct collateral for the obligations of GWG Holdings under the L Bonds and Seller Trust L Bonds. The difference between the amount outstanding and the carrying amount on our consolidated balance sheets is due to netting of unamortized debt issuance costs.

The amended and restated senior credit facility with LNV Corporation has certain financial and nonfinancial covenants, and we were in compliance with these covenants at December 31, 2018 and December 31, 2017. Due to the failure to issue GWG Life, LLC audited financial statements for 2018 to LNV Corporation within 90 days after the end of the year and the failure to deliver GWG Life, LLC unaudited financial statements within 45 days after March 31, 2019, we are in violation or our financial reporting covenants under our amended and restated senior credit facility with LNV Corporation. CLMG Corp., as administrative agent for LNV Corporation, has issued a forbearance extending the delivery of these reports to July 15, 2019; however, until we regain compliance with our debt covenants, we are not permitted to request, nor are we entitled to receive, advances under the amended and restated senior credit facility with LNV Corporation, and we will not be entitled to any excess amounts received from policies pledged under the amended and restated senior credit facility with LNV Corporation.

**(9) Series I Secured Notes**

Series I Secured Notes were legal obligations of GWG Life and were privately offered and sold from August 2009 through June 2011. On September 8, 2017, we redeemed all outstanding Series I Secured Notes for an aggregate of $6,815,000, and terminated all related agreements.

**(10) L Bonds**

We began publicly offering and selling L Bonds in January 2012 under the name "Renewable Secured Debentures". These debt securities were re-named "L Bonds" in January 2015. L Bonds are publicly offered and sold on a continuous basis under a registration statement permitting us to sell up to $1.0 billion in principal amount of L Bonds through January 2018. On December 1, 2017, an additional public offering was declared effective permitting us to sell up to $1.0 billion in principal amount of L Bonds on a continuous basis until December 2020. The new offering is a follow-on to the previous L Bond offering and contains the same terms and features. We are party to an indenture governing the L Bonds dated October 19, 2011, as amended ("Indenture"), under which GWG Holdings is obligor, GWG Life is guarantor, and Bank of Utah serves as indenture trustee. On October 23, 2017, the parties entered into the Amended and Restated Indenture in connection with the new offering. On March 27, 2018, GWG L Bond holders approved Amendment No.1 to the Amended and Restated Indenture. This amendment expands the definition of Total Coverage to include, without duplication, the value of all of our other assets as reflected on our most recently available balance sheet prepared in accordance with GAAP. The Amended and Restated Indenture contains certain financial and non-financial covenants, and we were in compliance with these covenants at December 31, 2018 and December 31, 2017.

We publicly offer and sell L Bonds under a registration statement declared effective by the SEC and have issued Seller Trust L Bonds under a Supplemental Indenture, as described in Note 11. We have temporarily suspended the offering of our L Bonds as a result of our delay in filing certain periodic reports with the SEC, including this report. We anticipate recommencing our L Bond offering early in the third quarter of 2019, however there is no assurance that we will be able to do so within that timeframe. The L Bonds and Seller Trust L Bonds are secured by substantially all the assets of GWG Holdings, a pledge of all our common stock held by Beneficient Capital Company, L.L.C. ("BCC"), an indirect subsidiary of BEN LP and AltiVerse Capital Markets, L.L.C. ("AltiVerse") (which together

APP. 135

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 136 of 1031    PageID 308

F-24

APP. 136

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(10) L Bonds (cont.)**

represent approximately 12% of our outstanding common stock), and by a guarantee and corresponding grant of a security interest in substantially all the assets of GWG Life[1]. As a guarantor, GWG Life has fully and unconditionally guaranteed the payment of principal and interest on the L Bonds and Seller Trust L Bonds. GWG Life's equity in DLP IV[2] serves as collateral for our L Bond and Seller Trust L Bond obligations. Substantially all of our life insurance policies are held by DLP IV or GWG Life Trust ("the Trust"). The policies held by DLP IV are not direct collateral for the L Bonds as such policies are pledged to the amended and restated senior credit facility with LNV Corporation.

(1)   The Seller Trust L Bonds (see Note 11) are senior secured obligations of GWG, ranking junior to all senior debt of GWG (see Note 8) and pari passu in right of payment and in respect of collateral with all L Bonds of GWG. Payments under the Seller Trust L Bonds are guaranteed by GWG Life. The assets exchanged in the Exchange Transaction are available as collateral for all holders of the L Bonds and Seller Trust L Bonds. Specifically, the common units of BEN LP and the Option Agreement are held by GWG Holdings and the Commercial Loan is held by GWG Life.

(2)   The terms of our amended and restated senior credit facility with LNV Corporation require that we maintain a significant excess of pledged collateral value over the amount outstanding on the amended and restated senior credit facility at any given time. Any excess after satisfying all amounts owing under our amended and restated senior credit facility with LNV Corporation is available as collateral for the L Bonds (including the Seller Trust L Bonds).

The bonds have renewal features under which we may elect to permit their renewal, subject to the right of bondholders to elect to receive payment at maturity. Interest is payable monthly or annually depending on the election of the investor.

At December 31, 2018 and December 31, 2017, the weighted-average interest rate of our L Bonds was 7.10% and 7.29%, respectively. The principal amount of L Bonds outstanding was $662,152,000 and $461,427,000 at December 31, 2018 and 2017, respectively. The difference between the amount of outstanding L Bonds and the carrying amount on our consolidated balance sheets is due to netting of unamortized deferred issuance costs, cash receipts for new issuances and payments of redemptions in process. Amortization of deferred issuance costs was $8,982,000 and $6,940,000 in 2018 and 2017, respectively. Future expected amortization of deferred financing costs as of December 31, 2018 is $24,216,000 in total over the next seven years.

Future contractual maturities of L Bonds, and future amortization of their deferred financing costs, at December 31, 2018 are as follows:

| Years Ending December 31, | Contractual Maturities | Unamortized Deferred Financing Costs |
|---|---|---|
| 2019 | $ 144,627,000 | $     1,548,000 |
| 2020 | 160,035,000 | 4,741,000 |
| 2021 | 117,230,000 | 4,898,000 |
| 2022 | 43,794,000 | 1,885,000 |
| 2023 | 73,646,000 | 4,013,000 |
| 2024 | 33,782,000 | 1,765,000 |
| Thereafter | 89,038,000 | 5,366,000 |
| | $ 662,152,000 | $    24,216,000 |

**(11) Seller Trust L Bonds**

On August 10, 2018, in connection with the Initial Transfer of the Exchange Transaction, GWG Holdings, GWG Life and Bank of Utah, as trustee, entered into a Supplemental Indenture (the "Supplemental Indenture") to the Amended and Restated Indenture. GWG Holdings entered into the Supplemental Indenture to add and modify certain provisions of the Amended and Restated Indenture necessary to provide for the issuance of a

APP. 137

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 138 of 1031    PageID 310

new class of securities titled "Seller Trust L Bonds". The maturity date of the Seller Trust L Bonds is August 9, 2023. The Seller Trust L Bonds bear interest at 7.50% per year. Interest is payable monthly in cash.

---

F-25

---

APP. 138

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(11) Seller Trust L Bonds (cont.)**

GWG issued Seller Trust L Bonds in the amount of $366,892,000 to the various related trusts (the "Seller Trusts") in connection with the Exchange Transaction on August 10, 2018.

After the second anniversary of the Final Closing, the holders of the Seller Trust L Bonds will have the right to cause GWG to repurchase, in whole but not in part, the Seller Trust L Bonds held by such holder. The repurchase may be paid, at GWG's option, in the form of cash, a pro rata portion of (i) the outstanding principal amount and accrued and unpaid interest under the Commercial Loan Agreement and (ii) BEN LP common units, or a combination of cash and such property.

Our L Bonds are offered and sold under a registration statement declared effective by the SEC, as described in Note 10 and we have issued Seller Trust L Bonds under a Supplemental Indenture. We have temporarily suspended the offering of our L Bonds as a result of our delay in filing certain periodic reports with the SEC, including this report. We anticipate recommencing our L Bond offering early in the third quarter of 2019, however there is no assurance that we will be able to do so within that timeframe. The L Bonds and Seller Trust L Bonds are secured by substantially all the assets of GWG Holdings, a pledge of all our common stock held by BCC and AltiVerse (which together represent approximately 12% of our outstanding common stock), and by a guarantee and corresponding grant of a security interest in substantially all the assets of GWG Life[1]. As a guarantor, GWG Life has fully and unconditionally guaranteed the payment of principal and interest on the L Bonds and Seller Trust L Bonds. GWG Life's equity in DLP IV[2] serves as collateral for our L Bond and Seller Trust L Bond obligations. Substantially all of our life insurance policies are held by DLP IV or GWG Life Trust. The policies held by DLP IV are not direct collateral for the L Bonds as such policies are pledged to the amended and restated senior credit facility with LNV Corporation.

(1)   The Seller Trust L Bonds are senior secured obligations of GWG, ranking junior to all senior debt of GWG (see Note 8) and pari passu in right of payment and in respect of collateral with all L Bonds of GWG (see Note 10). Payments under the Seller Trust L Bonds are guaranteed by GWG Life. The assets exchanged in the Initial Transfer are available as collateral for all holders of the L Bonds and Seller Trust L Bonds. Specifically, the common units of BEN LP and the Option Agreement are held by GWG Holdings and the Commercial Loan is held by GWG Life.

(2)   The terms of our amended and restated senior credit facility with LNV Corporation require that we maintain a significant excess of pledged collateral value over the amount outstanding on the amended and restated senior credit facility at any given time. Any excess after satisfying all amounts owing under our amended and restated senior credit facility with LNV Corporation is available as collateral for the L Bonds (including the Seller Trust L Bonds).

The principal amount of Seller Trust L Bonds outstanding was $366,892,000 and $0 at December 31, 2018 and 2017, respectively.

**(12) Series A Convertible Preferred Stock**

From July 2011 through September 2012, we privately offered shares of Series A Convertible Preferred Stock of GWG Holdings at $7.50 per share (the "Series A"). In the offering, we sold an aggregate of 3,278,000 shares for gross consideration of $24,582,000. Holders of Series A were entitled to cumulative dividends at the rate of 10% per annum, paid quarterly. The Series A were only redeemable at our option.

On October 9, 2017, all shares of Series A were redeemed with a redemption payment equal to the sum of: (i) $8.25 per Series A share and (ii) all accrued but unpaid dividends.

**(13) Redeemable Preferred Stock**

On November 30, 2015, our public offering of up to 100,000 shares of RPS at $1,000 per share was declared effective. Holders of RPS are entitled to cumulative dividends at the rate of 7% per annum, paid monthly. Dividends on the RPS are recorded as a reduction to additional paid-in capital, if any, then to the outstanding balance of the preferred stock if additional paid-in-capital has been exhausted. Under certain circumstances described in the Certificate of Designation for the RPS, additional shares of RPS may be issued in lieu of cash dividends.

APP. 139

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 140 of 1031    PageID 312

APP. 140

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(13) Redeemable Preferred Stock (cont.)**

The RPS ranks senior to our common stock and pari passu with our RPS 2 and entitles its holders to a liquidation preference equal to the stated value per share (i.e., $1,000) plus accrued but unpaid dividends. Holders of RPS may presently convert their RPS into our common stock at a conversion price equal to the volume-weighted average price of our common stock for the 20 trading days immediately prior to the date of conversion, subject to a minimum conversion price of $15.00 and in an aggregate amount limited to 15% of the stated value of RPS originally purchased from us and still held by such purchaser.

Holders of RPS may request that we redeem their RPS at a price equal to their stated value plus accrued but unpaid dividends, less an applicable redemption fee, if any, as specified in the Certificate of Designation. Nevertheless, the Certificate of Designation for RPS permits us in our sole discretion to grant or decline redemption requests. Subject to certain restrictions and conditions, we may also redeem shares of RPS without a redemption fee upon a holder's death, total disability or bankruptcy. In addition, after one year from the date of original issuance, we may, at our option, call and redeem shares of RPS at a price equal to their liquidation preference.

In March 2017, we closed the RPS offering to additional investors having sold 99,127 shares of RPS for an aggregate gross consideration of $99,127,000 and incurred approximately $7,019,000 of related selling costs.

At the time of its issuance, we determined that the RPS contained two embedded features: (1) optional redemption by the holder, and (2) optional conversion by the holder. We determined that each of the embedded features met the definition of a derivative and that the RPS should be considered an equity host for the purposes of assessing the embedded derivatives for potential bifurcation. Based on our assessment under Accounting Standards Codification 470, "*Debt*" ("ASC 470") we do not believe bifurcation of either the holder's redemption or conversion feature is appropriate.

**(14) Series 2 Redeemable Preferred Stock**

On February 14, 2017, our public offering of up to 150,000 shares of RPS 2 at $1,000 per share was declared effective. Holders of RPS 2 are entitled to cumulative dividends at the rate of 7% per annum, paid monthly. Dividends on the RPS 2 are recorded as a reduction to additional paid-in capital, if any, then to the outstanding balance of the preferred stock if additional paid-in capital has been exhausted. Under certain circumstances described in the Certificate of Designation for the RPS 2, additional shares of RPS 2 may be issued in lieu of cash dividends.

The RPS 2 ranks senior to our common stock and pari passu with our RPS and entitles its holders to a liquidation preference equal to the stated value per share (i.e., $1,000) plus accrued but unpaid dividends. Holders of RPS 2 may, less an applicable conversion discount, if any, convert their RPS 2 into our common stock at a conversion price equal to the volume-weighted average price of our common stock for the 20 trading days immediately prior to the date of conversion, subject to a minimum conversion price of $12.75 and in an aggregate amount limited to 10% of the stated value of RPS 2 originally purchased from us and still held by such purchaser.

Holders of RPS 2 may request that we redeem their RPS 2 shares at a price equal to their liquidation preference, less an applicable redemption fee, if any, as specified in the Certificate of Designation. Nevertheless, the Certificate of Designation for RPS 2 permits us in our sole discretion to grant or decline requests for redemption. Subject to certain restrictions and conditions, we may also redeem shares of RPS 2 without a redemption fee upon a holder's death, total disability or bankruptcy. In addition, we may, at our option, call and redeem shares of RPS 2 at a price equal to their liquidation preference (subject to a minimum redemption price, in the event of redemptions occurring less than one year after issuance, of 107% of the stated value of the shares being redeemed).

In April 2018, we closed the RPS 2 offering to additional investors having sold 149,979 shares of RPS 2 for an aggregate gross consideration of $149,979,000 and incurred approximately $10,284,000 of related selling costs.

At the time of its issuance, we determined that the RPS 2 contained two embedded features: (1) optional redemption by the holder, and (2) optional conversion by the holder. We determined that each of the embedded features met the definition of a derivative and that the RPS 2 should be considered an equity host for the purposes of assessing the embedded derivatives for potential bifurcation. Based on our assessment under ASC 470, we do not believe bifurcation of either the holder's redemption or conversion feature is appropriate.

APP. 141

APP. 142

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(15) Series B Convertible Preferred Stock**

On August 10, 2018, GWG Holdings issued 5,000,000 shares of Series B, par value $0.001 per share and having a stated value of $10.00 per share, to BEN LP for cash consideration of $50,000,000 as part of the Initial Transfer.

On December 28, 2018, the Series B converted into 5,000,000 shares of our common stock at a conversion price of $10.00 per share immediately following the Final Closing of the Exchange Transaction.

**(16) Income Taxes**

We had a current income tax liability of $0 as of both December 31, 2018 and 2017. The components of our income tax expense (benefit) and the reconciliation at the statutory federal tax rate to our actual income tax expense (benefit) for the years ended December 31, 2018 and 2017 consisted of the following:

|  | Years Ended | |
|---|---|---|
|  | December 31, 2018 | December 31, 2017 |
| Statutory federal income tax (benefit) | $ (25,085,000) | $ (7,728,000) |
| State income taxes (benefit), net of federal benefit | (9,243,000) | (1,433,000) |
| Impact of change in enacted rate | — | 2,605,000 |
| Change in valuation allowance | 33,999,000 | 4,222,000 |
| Other permanent differences | 329,000 | 237,000 |
| Total income tax expense (benefit) | $          — | $ (2,097,000) |

The current and deferred components of tax expense (benefit) were as follows:

|  | Years Ended | |
|---|---|---|
|  | December 31, 2018 | December 31, 2017 |
| Current income tax expense (benefit) | $          — | $          — |
| Deferred income tax expense (benefit) | — | (2,097,000) |
| Total income tax expense (benefit) | $          — | (2,097,000) |

The tax effects of temporary differences that give rise to deferred income taxes were as follows:

|  | As of December 31, 2018 | As of December 31, 2017 |
|---|---|---|
| Deferred tax assets: |  |  |
| Note receivable from related party | $          — | $   1,437,000 |
| Net operating loss carryforwards | 10,491,000 | 9,995,000 |
| Other assets | 29,996,000 | 1,724,000 |
| Subtotal | 40,487,000 | 13,156,000 |
| Valuation allowance | (40,385,000) | (6,386,000) |
| Deferred tax assets | 102,000 | 6,770,000 |
|  |  |  |
| Deferred tax liabilities: |  |  |
| Investment in life insurance policies | — | (6,630,000) |
| Other liabilities | (102,000) | (140,000) |
| Net deferred tax asset (liability) | $          — | $          — |

APP. 143

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 144 of 1031    PageID 316

At December 31, 2018 and 2017, we had federal net operating loss ("NOL") carryforwards of $36,501,000 and $34,775,000, respectively, and aggregate state NOL carryforwards of approximately $36,475,000 and $34,749,000, respectively. The NOL carryforwards subject to expiration (i.e., those generated prior to 2018) will begin to expire in 2031. The NOL carryforward of $2,636,000 generated in 2018 is not subject to expiration. Future utilization of NOL carryforwards is subject to limitations under Section 382 of the Internal Revenue Code. This section generally relates to a more than 50 percent change in ownership over a three-year period. As a result of the Exchange Transaction, it

F-28

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

### (16) Income Taxes (cont.)

is believed that a change in ownership for income tax purposes only has occurred as of December 28, 2018. As such, the annual utilization of our net operating losses generated prior to the ownership change is limited. Based on the estimated value of the Company prior to the Exchange Transaction, utilization of pre-ownership change net operating losses are subject to an annual limitation of approximately $7,564,000.

We provide for a valuation allowance when it is not considered "more likely than not" that our deferred tax assets will be realized. As of December 31, 2018, based on all available evidence, we have provided a valuation allowance against our total net deferred tax asset of $40,385,000 due to uncertainty as to the realization of our deferred tax assets during the carryforward periods.

On December 22, 2017, the U.S. federal government enacted the Tax Cuts and Jobs Act ("Tax Reform Bill"). The Tax Reform Bill changed existing United States tax law, including a reduction of the U.S. corporate income tax rate. The Company re-measured deferred taxes as of the date of enactment, reflecting those changes within deferred tax assets as of December 31, 2017.

ASC 740 requires the reporting of certain tax positions that do not meet a threshold of "more-likely-than-not" to be recorded as uncertain tax benefits. It is management's responsibility to determine whether it is "more-likely-than-not" that a tax position will be sustained upon examination, including resolution of any related appeals or litigation, based upon the technical merits of the position. Management has reviewed all income tax positions taken or expected to be taken and has determined that the income tax positions are appropriately stated and supported. We do not anticipate that the total unrecognized tax benefits will significantly change prior to December 31, 2019.

Under our accounting policies, interest and penalties on unrecognized tax benefits, as well as interest received from favorable tax settlements are recognized as components of income tax expense. At December 31, 2018 and December 31, 2017, we recorded no accrued interest or penalties related to uncertain tax positions.

Our income tax returns for tax years ended December 31, 2014 through 2017, and 2018, when filed, remain open to examination by the Internal Revenue Service and various state taxing jurisdictions. Our income tax return for tax year ended December 31, 2013 also remains open to examination by various state taxing jurisdictions.

### (17) Common Stock

In September 2014, we consummated an initial public offering of our common stock resulting in the sale of 800,000 shares of common stock at $12.50 per share, and net proceeds of approximately $8.6 million after the payment of underwriting commissions, discounts and expense reimbursements. In connection with this offering, we listed our common stock on the Nasdaq Capital Market under the ticker symbol "GWGH."

In conjunction with the initial public offering, we issued warrants to purchase 16,000 shares of common stock at an exercise price of $15.63 per share. As of December 31, 2018, none of these warrants had been exercised. The remaining life of these warrants at December 31, 2018 was 0.75 years.

On August 10, 2018, the Company declared a special dividend of $4.30 per share of common stock payable to shareholders of record on August 27, 2018.

On December 28, 2018, the Series B converted into 5,000,000 shares of our common stock at a conversion price of $10.00 per share immediately following the Final Closing of the Exchange Transaction.

On December 28, 2018, in connection with the Exchange Transaction, we issued 22,013,516 shares of common stock to the Seller Trusts at a market value of approximately $203.4 million in exchange for BEN LP common units. The shares were offered and sold in reliance upon the exemption from registration provided by Section 4(a)(2) under the Securities Act of 1933, as amended.

The common shares issued to the Seller Trusts were initially subject to a Stockholders Agreement between GWG and the Seller Trusts, under which the Seller Trusts, as long as they own at least 10% of the voting shares of GWG, agree to vote their shares in proportion to the votes cast by all other voting securities of GWG. In addition, the Seller

APP. 145

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 146 of 1031    PageID 318

APP. 146

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(17) Common Stock** (cont.)

Trusts agree, for the period of one year after the Final Closing, not to seek or propose to influence or control the management, Board or policies of GWG. The Stockholders Agreement was terminated in connection with the closing of the Purchase and Contribution Transaction.

In addition, GWG and the Seller Trusts entered into a registration rights agreement and an orderly marketing agreement. Under these agreements, GWG and the Seller Trusts agreed to take steps to allow for the orderly marketing and resale of the common shares issued to Seller Trusts as part of the Exchange Transaction, and Seller Trusts agreed to sell their common share of GWG only as permitted under these agreements.

On November 15, 2018, the Company's Board of Directors approved a stock repurchase program pursuant to which the Company was permitted, from time to time, purchase shares of its common stock for an aggregate purchase price not to exceed $1,500,000. Stock repurchases were able to be executed through various means, including, without limitation, open market transactions, privately negotiated transactions or otherwise. The stock repurchase program did not obligate the Company to purchase any shares, and expired on April 30, 2019.

The following table includes information about the stock repurchase program for the year ended December 31, 2018:

| Monthly Period | Number of Shares Purchased | Average Price Paid per Share | Total Number of Shares Purchased as Part of the Program | Maximum Dollar Value of Shares that May Yet Be Purchased Under the Program |
|---|---|---|---|---|
| December 2018 | 10,035 | $ 6.82 | 10,035 | $ 1,432,000 |
| Total | 10,035 | $ 6.82 | 10,035 | $ 1,432,000[1] |

_____

(1)    The stock repurchase program expired on April 30, 2019.

**(18) Stock Incentive Plan**

We adopted our 2013 Stock Incentive Plan in March 2013, as amended on June 1, 2015, May 5, 2017 and May 8, 2018. The Compensation Committee of our Board of Directors is responsible for the administration of the plan. Participants under the plan may be granted incentive stock options and non-statutory stock options; stock appreciation rights; stock awards; restricted stock; restricted stock units; and performance shares. Eligible participants include officers and employees of GWG Holdings and its subsidiaries, members of our Board of Directors, and consultants. Option awards generally expire 10 years from the date of grant. As of December 31, 2018, 6,000,000 of our common stock options are authorized under the plan, of which 2,662,097 shares were reserved for issuance under outstanding incentive awards and 3,337,903 shares remain available for future grants.

*Stock Options*

As of December 31, 2018, we had outstanding stock options for 1,398,000 shares of common stock to employees, officers, and directors under the plan. Options for 833,000 shares have vested and the remaining options are scheduled to vest over three years. The options were issued with an exercise price between $6.35 and $10.38 for those beneficially owning more than 10% of our common stock, and between $4.83 and $11.56 for all others, which is equal to the market price of the shares on the date of grant. The expected annualized volatility used in the Black-Scholes model valuation of options issued during the period ranged from 20.45% to 25.83%. The annual volatility rate is based on the standard deviation of the average continuously compounded daily changes of stock price of five selected companies. The risk free rate used in the Black-Scholes calculation ranged from 2.36% to 2.77%, and the expected term was six years. As of December 31, 2018, stock options for 732,000 shares had been forfeited and stock options for 724,000 shares had been exercised. The total intrinsic value of stock options exercised during 2018 was $1,922,000. The aggregate intrinsic value of stock options outstanding and exercisable at December 31, 2018 was $805,000 and $481,000, respectively.

APP. 147

APP. 148

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(18) Stock Incentive Plan** (cont.)

Outstanding stock options:

|  | Vested | Unvested | Total |
|---|---|---|---|
| **Balance as of December 31, 2016** | 738,065 | 844,334 | 1,582,399 |
| Granted during the year | 61,099 | 367,500 | 428,599 |
| Vested during the year | 327,061 | (327,061) | — |
| Exercised during the year | (126,498) | — | (126,498) |
| Forfeited during the year | (142,535) | (105,017) | (247,552) |
| **Balance as of December 31, 2017** | 857,192 | 779,756 | 1,636,948 |
| Granted during the year | 63,950 | 314,000 | 377,950 |
| Vested during the year | 503,503 | (503,503) | — |
| Exercised during the year | (569,864) | — | (569,864) |
| Forfeited during the year | (21,582) | (25,501) | (47,083) |
| **Balance as of December 31, 2018** | 833,199 | 564,752 | 1,397,951 |

As of December 31, 2018, unrecognized compensation expense related to unvested options is $1,109,000. We expect to recognize this compensation expense over the next three years ($651,000 in 2019, $324,000 in 2020, and $134,000 in 2021).

*Stock Appreciation Rights (SARs)*

As of December 31, 2018, we had outstanding SARs for 272,000 shares of the common stock to employees. The strike price of the SARs was between $6.75 and $10.38, which was equal to the market price of the common stock at the date of issuance. SARs vest over varying terms of up to three years. As of December 31, 2018, 118,000 of the SARs were vested and 146,000 have been exercised. On December 31, 2018, the market price of GWG's common stock was $8.83.

Outstanding SARs:

|  | Vested | Unvested | Total |
|---|---|---|---|
| **Balance as of December 31, 2016** | 106,608 | 133,127 | 239,735 |
| Granted during the year | 13,001 | 91,986 | 104,987 |
| Vested during the year | 69,444 | (69,444) | — |
| Forfeited during the year | — | (1,750) | (1,750) |
| **Balance as of December 31, 2017** | 189,053 | 153,919 | 342,972 |
| Granted during the year | 2,625 | 111,025 | 113,650 |
| Vested during the year | 71,785 | (71,785) |  |
| Exercised during the year | (145,622) | — | (145,622) |
| Forfeited during the year | — | (39,235) | (39,235) |
| **Balance as of December 31, 2018** | 117,841 | 153,924 | 271,765 |

The liability for the SARs as of December 31, 2018 and December 31, 2017 was $349,000 and $551,000, respectively, and was recorded within other accrued expenses on the consolidated balance sheets. Remaining compensation expense is expected to be recognized over the next three years. Employee compensation and benefits expense for SARs of $264,000 and $547,000 was recorded for the years ended December 31, 2018 and 2017, respectively.

Upon the exercise of SARs, the Company is obligated to make cash payment equal to the positive difference between the fair market value of the Company's common stock on the date of exercise less the fair market value

APP. 149

of the common stock on the date of grant.

F-31

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(18) Stock Incentive Plan (cont.)**

The following summarizes information concerning outstanding options and SARs issued under the 2013 Stock Incentive Plan:

| | December 31, 2018 | | | |
| | Outstanding | Weighted-Average Exercise Price | Weighted-Average Remaining Life (years) | Fair Value at Grant Date |
|---|---|---|---|---|
| **Vested** | | | | |
| Stock Options | 833,199 $ | 8.88 | 5.95 $ | 2.02 |
| SARs | 117,841 $ | 8.88 | 5.02 $ | 2.02 |
| Total Vested | 951,040 $ | 8.88 | 5.83 $ | 2.02 |
| | | | | |
| **Unvested** | | | | |
| Stock Options | 564,752 $ | 9.15 | 7.88 $ | 2.35 |
| SARs | 153,924 $ | 8.37 | 5.98 $ | 2.09 |
| Total Unvested | 718,676 $ | 8.98 | 7.47 $ | 2.30 |

| | December 31, 2017 | | | |
| | Outstanding | Weighted-Average Exercise Price | Weighted-Average Remaining Life (years) | Fair Value at Grant Date |
|---|---|---|---|---|
| **Vested** | | | | |
| Stock Options | 857,192 $ | 8.05 | 6.17 $ | 1.76 |
| SARs | 189,053 $ | 8.54 | 5.86 $ | 1.90 |
| Total Vested | 1,046,245 $ | 8.14 | 6.11 $ | 1.78 |
| | | | | |
| **Unvested** | | | | |
| Stock Options | 779,756 $ | 9.21 | 7.50 $ | 2.17 |
| SARs | 153,919 $ | 9.16 | 6.24 $ | 2.02 |
| Total Unvested | 933,675 $ | 9.21 | 7.30 $ | 2.15 |

*Restricted Stock Units*

A restricted stock unit ("RSU") entitles the holder thereof to receive one share of our common stock upon vesting. As of December 31, 2018, we had outstanding RSUs for 53,403 shares of common stock held by employees under the plan, of which all have subsequently vested. In 2018, 34,496 shares of common stock were issued as a result of the vesting of 68,993 RSUs.

**(19) Other Expenses**

The components of other expenses in our consolidated statements of operations for the years ended December 31, 2018 and 2017 are as follows:

| | Years Ended December 31, | |
| | 2018 | 2017 |
|---|---|---|
| Contract Labor | $ 1,453,000 | $ 550,000 |
| Marketing | 1,856,000 | 2,226,000 |

APP. 151

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 152 of 1031    PageID 324

| | | |
|---|---:|---:|
| Information Technology | 1,378,000 | 1,555,000 |
| Servicing and Facility Fees | 1,782,000 | 1,226,000 |
| Travel and Entertainment | 892,000 | 1,047,000 |
| Insurance and Regulatory | 1,562,000 | 1,591,000 |
| Charitable Contributions | — | 462,000 |
| Bad Debt Expense | 4,300,000 | — |
| General and Administrative | 2,572,000 | 3,822,000 |
| Total Other Expenses | $ 15,995,000 | $ 12,479,000 |

F-32

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(20) Net Loss Attributable to Common Shareholders**

We have outstanding RPS and RPS 2 as described in Notes 13 and 14. RPS and RPS 2 are anti-dilutive to our net loss attributable to common shareholders calculation for the years ended December 31, 2018 and 2017. Our vested and unvested stock options and warrants are anti-dilutive for the years ended December 31, 2018 and 2017.

**(21) Segment Reporting**

GWG has two reportable segments consisting of Secondary Life Insurance and Investment in Beneficient. In addition, the Company reports certain of its results of operations in Corporate & Other. The Secondary Life Insurance segment seeks to earn non-correlated yield from our portfolio of life insurance policies. Our Investment in Beneficient segment consists of our investment in the common units of the BEN LP, which we account for using the equity method, and related assets and liabilities. BEN LP provides a variety of trust services, liquidity products and loans for alternative assets and illiquid investment funds, and other financial services to mid-to-high net worth individuals. The Corporate & Other category consists of unallocated corporate overhead and administrative costs and the operations of operating segments that do not meet the quantitative criteria to be separately reported.

These segments are differentiated by the products and services they offer as well as by the information used by the Company's chief operating decision maker to determine allocation of resources and assess performance.

Earnings before taxes ("EBT") is the measure of profitability used by management to assess performance of its segments and allocate resources. Segment EBT represents net income (loss) excluding income taxes and includes earnings from equity method investments. Equity method investments and related earnings are allocated to the Investment in Beneficient segment.

Summarized financial information for the Company's reportable segments is presented for the periods indicated:

| | Revenue: | | Segment EBT: | |
| --- | --- | --- | --- | --- |
| | **2018** | **2017** | **2018** | **2017** |
| Secondary Life Insurance | $(11,633,000) | $ 62,674,000 | $ (96,578,000) | $ (3,433,000) |
| Investment in Beneficient | 10,655,000 | — | (106,000) | — |
| Corporate & Other | 588,000 | 1,460,000 | (22,767,000) | (19,296,000) |
| Total | $ (390,000) | $ 64,134,000 | (119,451,000) | (22,729,000) |
| Income tax benefit | | | — | 2,097,000 |
| Net Loss | | | $(119,451,000) | $ (20,632,000) |

| | Interest Expense | | Interest Income | |
| --- | --- | --- | --- | --- |
| | **2018** | **2017** | **2018** | **2017** |
| Secondary Life Insurance | $ 69,357,000 | $ 54,409,000 | $ 2,182,000 | $ 432,000 |
| Investment in Beneficient | 10,778,000 | — | 10,655,000 | — |
| Corporate & Other | 1,000 | 10,000 | 189,000 | 554,000 |
| Total | $ 80,136,000 | $ 54,419,000 | $ 13,026,000 | $ 986,000 |

| | Total Assets | |
| --- | --- | --- |
| | **2018** | **2017** |
| Secondary Life Insurance | $ 889,665,000 | $ 814,231,000 |
| Investment in Beneficient | 584,173,000 | — |
| Corporate & Other | 7,029,000 | 4,625,000 |
| Total | $1,480,867,000 | $ 818,856,000 |

APP. 153

4/11/22, 12:18 PM                                                              https://sec.report/Document/0001213900-19-012331/f10k2018_gwgholdings.htm

F-33

APP. 154

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(22) Commitments**

We are party to an office lease with U.S. Bank National Association as the landlord. On September 1, 2015, we entered into an amendment to our original lease that expanded the leased space to 17,687 square feet and extended the term through October 2025. Under the amended lease we are obligated to pay base rent plus common area maintenance and a share of building operating costs. Rent expenses under this agreement were $435,000 and $442,000 for the years ended December 31, 2018 and 2017, respectively.

Minimum lease payments under the amended lease are as follows:

| | |
|---|---:|
| 2019 | 275,000 |
| 2020 | 284,000 |
| 2021 | 293,000 |
| 2022 | 302,000 |
| 2023 | 311,000 |
| Thereafter | 593,000 |
| | $  2,058,000 |

**(23) Contingencies**

*Litigation —* In the normal course of business, we are involved in various legal proceedings. In the opinion of management, any liability resulting from such proceedings would not have a material adverse effect on our financial position, results of operations or cash flows.

**(24) Guarantee of L Bonds and Seller Trust L Bonds**

Our L Bonds are offered and sold under a registration statement declared effective by the SEC, as described in Note 10, and we have issued Seller Trust L Bonds under a Supplemental Indenture, as described in Note 11. The L Bonds and Seller Trust L Bonds are secured by substantially all the assets of GWG Holdings, a pledge of all our common stock held by BCC and AltiVerse (which together represent approximately 12% of our outstanding common stock), and by a guarantee and corresponding grant of a security interest in substantially all the assets of GWG Life[1]. As a guarantor, GWG Life has fully and unconditionally guaranteed the payment of principal and interest on the L Bonds and Seller Trust L Bonds. GWG Life's equity in DLP IV[2] serves as collateral for our L Bond and Seller Trust L Bond obligations. Substantially all of our life insurance policies are held by DLP IV or GWG Life Trust ("the Trust"). The policies held by DLP IV are not direct collateral for the L Bonds as such policies are pledged to the amended and restated senior credit facility with LNV Corporation.

(1)   The Seller Trust L Bonds are senior secured obligations of GWG, ranking junior to all senior debt of GWG (see Note 8), and pari passu in right of payment and in respect of collateral with all L Bonds of GWG (see Note 10). Payments under the Seller Trust L Bonds are guaranteed by GWG Life. The assets exchanged in the in connection with the Beneficent transaction are available as collateral for all holders of the L Bonds and Seller Trust L Bonds. Specifically, the common units of BEN LP are held by GWG Holdings and the Commercial Loan is held by GWG Life.

(2)   The terms of our amended and restated senior credit facility with LNV Corporation require that we maintain a significant excess of pledged collateral value over the amount outstanding on the amended and restated senior credit facility at any given time. Any excess after satisfying all amounts owing under our amended and restated senior credit facility with LNV Corporation is available as collateral for the L Bonds (including the Seller Trust L Bonds).

The following represents consolidating financial information as of December 31, 2018 and December 31, 2017, with respect to the financial position, and as of December 31, 2018 and 2017, with respect to results of operations and cash flows of GWG Holdings and its subsidiaries. The parent column presents the financial information of GWG Holdings, the primary obligor for the L Bonds and Seller Trust L Bonds. The guarantor subsidiary column presents the financial information of GWG Life, the guarantor subsidiary of the L Bonds and Seller Trust L Bonds, presenting its investment in DLP IV and the Trust under the equity method. The non-

APP. 155

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 156 of 1031    PageID 328

guarantor subsidiaries column presents the financial information of all non-guarantor subsidiaries, including DLP IV and the Trust.

<div align="center">F-34</div>

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

### (24) Guarantee of L Bonds and Seller Trust L Bonds (cont.)

Consolidating Balance Sheets

| December 31, 2018 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash and cash equivalents | $ 113,293,682 | $ 232,387 | $ 1,061,015 | $ — | $ 114,587,084 |
| Restricted cash | — | 7,217,194 | 3,631,932 | — | 10,849,126 |
| Investment in life insurance policies, at fair value | — | 92,336,494 | 655,585,971 | — | 747,922,465 |
| Life insurance policy benefits receivable | — | 5,000,000 | 11,460,687 | — | 16,460,687 |
| Financing receivable from affiliate | — | 184,768,874 | — | — | 184,768,874 |
| Equity method investment | 360,841,651 | — | — | — | 360,841,651 |
| Other assets | 42,944,402 | 1,730,581 | 762,181 | — | 45,437,164 |
| Investment in subsidiaries | 799,182,251 | 510,865,003 | — | (1,310,047,254) | — |
| TOTAL ASSETS | $1,316,261,986 | $ 802,150,533 | $ 672,501,786 | $(1,310,047,254) | $ 1,480,867,051 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | | | | |
| LIABILITIES | | | | | |
| Senior credit facility with LNV Corporation | $ — | $ — | $ 148,977,596 | $ — | $ 148,977,596 |
| L Bonds | 651,402,663 | — | — | — | 651,402,663 |
| Seller Trust L Bonds | 366,891,940 | — | — | — | 366,891,940 |
| Accounts payable | 1,126,327 | 1,674,494 | 6,475,686 | — | 9,276,507 |
| Interest and dividends payable | 14,047,248 | — | 4,508,045 | — | 18,555,293 |
| Other accrued expenses | 1,735,926 | 1,593,108 | 1,376,136 | — | 4,705,170 |
| TOTAL LIABILITIES | 1,035,204,104 | 3,267,602 | 161,337,463 | — | 1,199,809,169 |
| STOCKHOLDERS' EQUITY | | | | | |
| Member capital | — | 798,882,931 | 511,164,323 | (1,310,047,254) | — |
| Redeemable preferred stock and Series 2 redeemable preferred stock | 215,973,039 | — | — | — | 215,973,039 |
| Common stock | 33,018 | — | — | — | 33,018 |
| Additional paid-in-capital | 249,662,168 | — | — | — | 249,662,168 |
| Accumulated deficit | (184,610,343) | — | — | — | (184,610,343) |
| TOTAL STOCKHOLDERS' EQUITY | 281,057,882 | 798,882,931 | 511,164,323 | (1,310,047,254) | 281,057,882 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $1,316,261,986 | $ 802,150,533 | $ 672,501,786 | $(1,310,047,254) | $ 1,480,867,051 |

F-35

APP. 157

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

### (24) Guarantee of L Bonds and Seller Trust L Bonds (cont.)

Consolidating Balance Sheets (continued)

| December 31, 2017 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash and cash equivalents | $ 111,952,829 | $ 1,486,623 | $ 982,039 | $ — | $ 114,421,491 |
| Restricted cash | — | 9,367,410 | 18,982,275 | — | 28,349,685 |
| Investment in life insurance policies, at fair value | — | 51,093,362 | 599,433,991 | — | 650,527,353 |
| Life insurance policy benefits receivable | — | 1,500,000 | 15,158,761 | — | 16,658,761 |
| Other assets | 1,912,203 | 1,986,312 | 5,000,369 | — | 8,898,884 |
| Investment in subsidiaries | 480,659,789 | 415,235,212 | — | (895,895,001) | — |
| TOTAL ASSETS | $ 594,524,821 | $ 480,668,919 | $ 639,557,435 | $ (895,895,001) | $ 818,856,174 |

**LIABILITIES & STOCKHOLDERS' EQUITY**

| | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| LIABILITIES | | | | | |
| Amended and Restated Senior credit facility with LNV Corporation | $ — | $ — | $ 212,238,192 | $ — | $ 212,238,192 |
| L Bonds | 447,393,568 | — | — | — | 447,393,568 |
| Accounts payable | 1,434,623 | 844,899 | 4,114,917 | — | 6,394,439 |
| Interest and dividends payable | 10,296,584 | — | 5,130,925 | — | 15,427,509 |
| Other accrued expenses | 1,728,303 | 1,610,773 | 391,647 | — | 3,730,723 |
| TOTAL LIABILITIES | 460,853,078 | 2,455,672 | 221,875,681 | — | 685,184,431 |
| STOCKHOLDERS' EQUITY | | | | | |
| Member capital | — | 478,213,247 | 417,681,754 | (895,895,001) | — |
| Redeemable preferred stock and Series 2 redeemable preferred stock | 173,115,447 | — | — | — | 173,115,447 |
| Common stock | 5,813 | — | — | — | 5,813 |
| Accumulated deficit | (39,449,517) | — | — | — | (39,449,517) |
| TOTAL STOCKHOLDERS' EQUITY | 133,671,743 | 478,213,247 | 417,681,754 | (895,895,001) | 133,671,743 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ 594,524,821 | $ 480,668,919 | $ 639,557,435 | $ (895,895,001) | $ 818,856,174 |

F-36

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

### (24) Guarantee of L Bonds and Seller Trust L Bonds (cont.)

Consolidating Statements of Operations

| For the year ended December 31, 2018 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUE | | | | | |
| Gain on life insurance policies, net | $ — | $ 8,341,206 | $ (22,445,778) | $ — | $ (14,104,572) |
| Interest and other income | 8,585,681 | 4,278,809 | 849,791 | — | 13,714,281 |
| TOTAL REVENUE | 8,585,681 | 12,620,015 | (21,595,987) | — | (390,291) |
| | | | | | |
| EXPENSES | | | | | |
| Interest expense | 59,111,989 | — | 21,023,994 | — | 80,135,983 |
| Employee compensation and benefits | 9,979,989 | 5,741,776 | 1,685,217 | — | 17,406,982 |
| Legal and professional fees | 1,795,094 | 863,851 | 2,882,232 | — | 5,541,177 |
| Other expenses | 6,907,502 | 1,994,807 | 7,092,178 | — | 15,994,487 |
| TOTAL EXPENSES | 77,794,574 | 8,600,434 | 32,683,621 | — | 119,078,629 |
| | | | | | |
| INCOME (LOSS) BEFORE EQUITY IN INCOME OF SUBSIDIARIES | (69,208,893) | 4,019,581 | (54,279,608) | — | (119,468,920) |
| EQUITY IN INCOME OF SUBSIDIARIES | (50,260,027) | (48,665,540) | — | 98,925,567 | — |
| NET INCOME (LOSS) BEFORE INCOME TAXES | (119,468,920) | (44,645,959) | (54,279,608) | 98,925,567 | (119,468,920) |
| INCOME TAX EXPENSE | — | — | — | — | — |
| NET INCOME (LOSS) BEFORE EARNINGS FROM EQUITY METHOD INVESTMENT | (119,468,920) | (44,645,959) | (54,279,608) | 98,925,567 | (119,468,920) |
| Earnings from equity method investment | 17,507 | — | — | — | 17,507 |
| NET INCOME (LOSS) | (119,451,413) | (44,645,959) | (54,279,608) | 98,925,567 | (119,451,413) |
| Preferred stock dividends | 16,662,731 | — | — | — | 16,662,731 |
| NET INCOME (LOSS) ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ (136,114,144) | $ (44,645,959) | $ (54,279,608) | $ 98,925,567 | $ (136,114,144) |

F-37

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

### (24) Guarantee of L Bonds and Seller Trust L Bonds (cont.)

Consolidating Statements of Operations (continued)

| For the year ended December 31, 2017 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **REVENUE** | | | | | |
| Gain on life insurance policies, net | $ — | $ 6,979,773 | $ 55,134,630 | $ — | $ 62,114,403 |
| Interest and other income | 244,202 | 496,886 | 1,753,798 | (475,371) | 2,019,515 |
| TOTAL REVENUE | 244,202 | 7,476,659 | 56,888,428 | (475,371) | 64,133,918 |
| **EXPENSES** | | | | | |
| Interest expense | 37,754,984 | 930,837 | 15,813,944 | (80,321) | 54,419,444 |
| Employee compensation and benefits | 9,043,509 | 5,310,498 | 515,742 | — | 14,869,749 |
| Legal and professional fees | 1,937,714 | 962,778 | 2,195,151 | — | 5,095,643 |
| Other expenses | 7,058,209 | 2,715,374 | 3,100,143 | (395,050) | 12,478,676 |
| TOTAL EXPENSES | 55,794,416 | 9,919,487 | 21,624,980 | (475,371) | 86,863,512 |
| INCOME (LOSS) BEFORE EQUITY IN INCOME OF SUBSIDIARIES | (55,550,214) | (2,442,828) | 35,263,448 | — | (22,729,594) |
| EQUITY IN INCOME OF SUBSIDIARIES | 32,820,620 | 38,392,230 | — | (71,212,850) | — |
| NET INCOME (LOSS) BEFORE INCOME TAXES | (22,729,594) | 35,949,402 | 35,263,448 | (71,212,850) | (22,729,594) |
| INCOME TAX BENEFIT | (2,097,371) | — | — | — | (2,097,371) |
| NET INCOME (LOSS) | (20,632,223) | 35,949,402 | 35,263,448 | (71,212,850) | (20,632,223) |
| Preferred stock dividends | 12,702,341 | — | — | — | 12,702,341 |
| NET INCOME (LOSS) ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ (33,334,564) | $ 35,949,402 | $ 35,263,448 | $ (71,212,850) | $ (33,334,564) |

F-38

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(24) Guarantee of L Bonds and Seller Trust L Bonds (cont.)**

Consolidating Statements of Cash Flows

| For the year ended December 31, 2018 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiary | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | |
| Net income (loss) | $(119,451,413) | $ (44,645,959) | $ (54,279,608) | $ 98,925,567 | $(119,451,413) |
| Adjustments to reconcile net income (loss) to net cash flows used in operating activities: | | | | | |
| Equity of subsidiaries | 50,260,028 | 48,665,539 | — | (98,925,567) | — |
| Change in fair value of life insurance policies | — | (4,262,774) | 14,606,803 | — | 10,344,029 |
| Amortization of deferred financing and issuance costs | 8,981,935 | — | 1,055,020 | — | 10,036,955 |
| Amortization of discount or premium on financing receivables | 628,528 | (642,481) | — | — | (13,953) |
| Provision for uncollectible policy benefit receivable | — | — | 4,300,000 | — | 4,300,000 |
| Earnings from equity method investment | (17,507) | | | | (17,507) |
| Stock-based compensation | 2,182,125 | — | — | — | 2,182,125 |
| (Increase) decrease in operating assets: | | | | | |
| Life insurance policy benefits receivable | — | (3,500,000) | (601,926) | — | (4,101,926) |
| Interest receivable added to loan principal | (7,045,791) | (3,487,841) | — | — | (10,533,632) |
| Other assets | (188,366,280) | (144,146,549) | 4,371,666 | 332,546,217 | 4,405,054 |
| Increase (decrease) in operating liabilities: | | | | | |
| Accounts payable | (308,295) | 829,595 | 2,360,769 | — | 2,882,069 |
| Interest and dividends payable | 4,025,326 | — | (756,357) | | 3,268,969 |
| Other accrued expenses | 253,353 | (17,665) | 984,488 | — | 1,220,176 |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (248,857,991) | (151,208,135) | (27,959,145) | 332,546,217 | (95,479,054) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | |
| Investment in life insurance policies | — | (41,404,136) | (87,098,518) | — | (128,502,654) |
| Carrying value of matured life insurance policies | — | 4,423,779 | 16,339,737 | — | 20,763,516 |
| Equity investment acquired | (3,204,016) | — | — | — | (3,204,016) |
| Other investments acquired | (3,037,234) | — | — | — | (3,037,234) |
| NET CASH FLOWS PROVIDED BY (USED IN) INVESTING ACTIVITIES | (6,241,250) | (36,980,357) | (70,758,781) | — | (113,980,388) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | | |
| Net borrowings on (repayments of) senior debt | — | — | (64,315,618) | — | (64,315,618) |
| Proceeds from issuance of L Bonds | 263,964,554 | — | — | — | 263,964,554 |
| Payments for issuance of L Bonds | (17,379,101) | — | — | — | (17,379,101) |
| Payments for redemption of L Bonds | (48,026,551) | — | — | — | (48,026,551) |
| Issuance of common stock | 614,193 | — | — | — | 614,193 |
| Proceeds from issuance of convertible preferred stock | 50,000,000 | — | — | — | 50,000,000 |
| Proceeds from issuance of redeemable preferred stock | 56,238,128 | — | — | — | 56,238,128 |
| Payments for issuance of redeemable preferred stock | (4,142,294) | — | — | — | (4,142,294) |

APP. 161

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 162 of 1031    PageID 334

| | | | | | |
|---|---|---|---|---|---|
| Payments for redemption of redeemable preferred stock | (2,456,692) | — | — | — | (2,456,692) |
| Common stock dividends | (25,709,412) | — | — | — | (25,709,412) |
| Preferred stock dividends | (16,662,731) | — | — | — | (16,662,731) |
| Issuance of member capital | — | 184,784,040 | 147,762,177 | (332,546,217) | — |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 256,440,094 | 184,784,040 | 83,446,559 | (332,546,217) | 192,124,476 |
| NET INCREASE (DECREASE) IN CASH, CASH EQUIVALENTS AND RESTRICTED CASH | 1,340,853 | (3,404,452) | (15,271,367) | — | (17,334,966) |
| **CASH, CASH EQUIVALENTS AND RESTRICTED CASH** | | | | | |
| BEGINNING OF THE PERIOD | 111,952,829 | 10,854,033 | 19,964,314 | — | 142,771,176 |
| END OF THE PERIOD | $ 113,293,682 | $ 7,449,581 | $ 4,692,947 | $ — | $ 125,436,210 |

F-39

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

### (24) Guarantee of L Bonds and Seller Trust L Bonds (cont.)

Consolidating Statements of Cash Flows (continued)

| For the year ended December 31, 2017 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiary | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | |
| Net income (loss) | $ (20,632,223) | $ 35,949,402 | $ 35,263,448 | $(71,212,850) | $ (20,632,223) |
| Adjustments to reconcile net income (loss) to net cash flows used in operating activities: | | | | | |
| Equity of subsidiaries | (32,820,620) | (38,392,230) | — | 71,212,850 | — |
| Change in fair value of life insurance policies | — | (7,746,744) | (59,014,067) | — | (66,760,811) |
| Amortization of deferred financing and issuance costs | 6,939,841 | 208,829 | 1,632,177 | — | 8,780,847 |
| Stock-based compensation | 1,424,625 | | | | 1,424,625 |
| Deferred income taxes | (2,097,371) | — | — | — | (2,097,371) |
| Preferred stock issued in lieu of cash dividends | 498,659 | | | | 498,659 |
| (Increase) decrease in operating assets: | | | | | |
| Life insurance policy benefits receivable | — | (1,500,000) | (9,813,761) | — | (11,313,761) |
| Other assets | (15,870,956) | (24,497,313) | (1,084,860) | 42,435,842 | 982,713 |
| Increase (decrease) in operating liabilities: | | | | | |
| Accounts payable | 581,153 | 113,202 | 3,473,373 | — | 4,167,728 |
| Interest and dividends payable | 3,771,709 | (3,743,277) | 2,680,191 | — | 2,708,623 |
| Other accrued expenses | 278,000 | 1,066,743 | (146,546) | — | 1,198,197 |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (57,927,183) | (38,541,388) | (27,010,045) | 42,435,842 | (81,042,774) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | |
| Investment in life insurance policies | — | (3,022,439) | (85,621,380) | — | (88,643,819) |
| Carrying value of matured life insurance policies | — | 2,091,713 | 13,977,919 | — | 16,069,632 |
| NET CASH FLOWS PROVIDED BY (USED IN) INVESTING ACTIVITIES | — | (930,726) | (71,643,461) | — | (72,574,187) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | | |
| Net borrowings on (repayments of) senior debt | — | — | 59,799,649 | — | 59,799,649 |
| Payments for issuance of senior debt | — | (1,076,118) | (3,434,270) | — | (4,510,388) |
| Payments for redemption of Series I Secured Notes | — | (16,613,667) | — | — | (16,613,667) |
| Proceeds from issuance of L Bonds | 131,796,220 | — | — | — | 131,796,220 |
| Payments for issuance of L Bonds | (10,896,925) | — | — | — | (10,896,925) |
| Payments for redemption of L Bonds | (60,848,460) | — | — | — | (60,848,460) |
| Redemption of common stock | (1,603,560) | — | — | — | (1,603,560) |
| Proceeds from issuance of redeemable preferred stock | 127,279,847 | — | — | — | 127,279,847 |
| Payments for issuance of redeemable preferred stock | (9,027,190) | — | — | — | (9,027,190) |
| Payments for redemption of redeemable preferred stock | (22,598,626) | — | — | — | (22,598,626) |
| Preferred stock dividends | (12,702,341) | — | — | — | (12,702,341) |
| Issuance of member capital | — | 16,537,331 | 25,898,511 | (42,435,842) | — |
| NET CASH FLOWS PROVIDED BY | 141,398,965 | (1,152,454) | 82,263,890 | (42,435,842) | 180,074,559 |

APP. 163

FINANCING ACTIVITIES

| | | | | | |
|---|---|---|---|---|---|
| NET INCREASE (DECREASE) IN CASH, CASH EQUIVALENTS AND RESTRICTED CASH | 83,471,782 | (40,624,568) | (16,389,616) | — | 26,457,598 |
| **CASH, CASH EQUIVALENTS AND RESTRICTED CASH** | | | | | |
| BEGINNING OF THE PERIOD | 28,481,047 | 51,478,601 | 36,353,930 | — | 116,313,578 |
| END OF THE PERIOD | $111,952,829 | $ 10,854,033 | $ 19,964,314 | $ — | $142,771,176 |

F-40

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(25) Concentration**

We mostly purchase life insurance policies written by life insurance companies having investment-grade ratings by independent rating agencies. As a result, there may be certain concentrations of policies with life insurance companies. The following summarizes the face value of insurance policies with specific life insurance companies exceeding 10% of the total face value held by our portfolio.

| Life Insurance Company | December 31, 2018 | December 31, 2017 |
|---|---|---|
| John Hancock | 13.71% | 15.57% |
| Lincoln National | 11.33% | 10.80% |
| AXA Equitable | 10.83% | 11.88% |

The following summarizes the number of insurance policies held in specific states exceeding 10% of the total face value held by us:

| State of Residence | December 31, 2018 | December 31, 2017 |
|---|---|---|
| California | 18.02% | 18.60% |
| Florida | 15.34% | 20.16% |

During 2018, in connection with the Exchange Transaction, the Company (i) acquired a limited partnership investment in the common units of BEN LP, (ii) entered into a Commercial Loan with BEN LP as borrower, and (iii) received an Option Agreement to acquire additional common units of BEN LP. The total carrying value of these investments at December 31, 2018 is $584,173,000, representing 39.4% of the Company's consolidated assets. Currently there is no liquid market for the common units of BEN LP and it is possible none will develop. Although we intend to hold the Commercial Loan to maturity, there is currently no liquid market for this loan and it is possible none will develop.

**(26) Subsequent Events**

Subsequent to December 31, 2018, policy benefits on 40 policies covering 30 individuals have been realized. The face value of insurance benefits of these policies was $53,957,000.

Subsequent to December 31, 2018, we have issued approximately $178,938,000 of L Bonds.

On April 15, 2019, Jon R. Sabes, the GWG's former Chief Executive Officer and a former director, and Steven F. Sabes, GWG's former Executive Vice President and a former director, entered into a Purchase and Contribution Agreement (the "Purchase and Contribution Agreement") with, among others, Beneficient. Under the Purchase and Contribution Agreement, Jon and Steven Sabes agreed to transfer all 3,952,155 of the shares of GWG's outstanding common stock held directly or indirectly by them to BCC (a subsidiary of BEN LP) and AltiVerse Capital Markets, L.L.C. ("AltiVerse"). GWG was not a party to the Purchase Agreement. However, the closing of the transactions contemplated by the Purchase and Contribution Agreement (the "Purchase and Contribution Transaction") were subject to certain conditions that were dependent upon GWG taking, or refraining from taking, certain actions.

The closing of the Purchase and Contribution Transaction occurred on April 26, 2019. Prior to or in connection with such closing:

- GWG's bylaws were amended to increase the maximum number of directors of GWG from nine to 13, and the actual number of directors comprising the Board of Director was increased from seven to 13.

- All seven members of GWG's Board of Directors prior to the closing resigned as directors of GWG, and 11 individuals designated by Beneficient were appointed as directors of GWG, leaving two board seats vacant after the closing.

APP. 165

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 166 of 1031    PageID 338

- Jon R. Sabes resigned from all officer positions he held with GWG or any of its subsidiaries prior to the closing, other than his position as Chief Executive Officer of GWG's technology focused wholly owned subsidiaries, Life Epigenetics and youSurance.

F-41

APP. 166

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(26) Subsequent Events** (cont.)

- Steven F. Sabes resigned from all officer positions he held with GWG or any of its subsidiaries prior to the closing, except as Chief Operating Officer of Life Epigenetics.

- The resignations of Messrs. Jon and Steven Sabes included a full waiver and forfeit of (i) any severance that may be payable by GWG or any of its subsidiaries in connection with such resignations or the Purchase and Contribution Transaction and (ii) all equity awards of GWG held by either of them.

- Murray T. Holland was appointed as Chief Executive Officer of GWG.

- GWG entered into performance share unit agreements with certain employees of GWG pursuant to which such employees will collectively receive up to $4.5 million in bonuses under certain terms and conditions, including, among others, that such employees remain employed by GWG or one of its subsidiaries (or, if no longer employed, such employment was terminated by GWG other than for cause, as such term is defined in the performance share unit agreement) for a period of 120 days following the closing.

- The stockholders agreement that was entered into on the Final Closing Date was terminated by mutual consent of the parties thereto.

- BCC, an indirect subsidiary of BEN LP that acquired a portion of the shares formerly held directly or indirectly by owned by Messrs. Jon and Steven Sabes, and AltiVerse executed and delivered a Consent and Joinder to the Amended and Restated Pledge and Security Agreement dated October 23, 2017 by and among the Company, GWG Life, LLC, Messrs. Jon and Steven Sabes and the Bank of Utah, which provides that the shares of GWG's common stock acquired by BCC and AltiVerse pursuant to the Purchase and Contribution Agreement will continue to be pledged as collateral security for GWG's obligations owing in respect of the L Bonds and Seller Trust L Bonds.

On April 26, 2019, GWG entered into Indemnification Agreements (the "Indemnification Agreements") with each of its executive officers and the directors appointed to the Board of Directors on such date. On May 13, 2019, GWG entered into Indemnification Agreement with the three additional directors appointed to the Board of Directors on such date (collectively with the executive officers and directors appointed on April 26, 2019, the "Indemnitees"). The Indemnification Agreements clarify and supplement indemnification provisions already contained in GWG's bylaws and generally provide that GWG shall indemnify the Indemnitees to the fullest extent permitted by applicable law, subject to certain exceptions, against expenses, judgments, fines and other amounts actually and reasonably incurred in connection with their service as a director or officer and also provide for rights to advancement of expenses and contribution.

*Employment Agreement with Murray T. Holland*

On April 26, 2019, Murray T. Holland was appointed as Chief Executive Officer of the Company. On May 31, 2019, GWG entered into an employment agreement with Mr. Holland pursuant to which he serves as GWG's President and Chief Executive Officer. The employment agreement has an initial three year term and is automatically renewed for additional one year periods unless either party gives notice of non-renewal at least 60 days prior to the expiration of the then current term.

Under the employment agreement, Mr. Holland is entitled to an annual base salary of $650,000, retroactive to April 26, 2019, and is eligible to receive an annual cash bonus the target amount of which will be 150% of his base salary (prorated for the partial first year of employment). Whether the bonus is granted for a particular year, and the amount thereof, will be determined by GWG's Compensation Committee in its discretion based upon Mr. Holland's performance. Mr. Holland is also entitled to participate in all employee benefit plans and programs made available by the Company to the Company's executive employees generally.

F-42

APP. 167

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(26) Subsequent Events (cont.)**

If Mr. Holland's employment is terminated by GWG without "Cause" or if he voluntarily resigns with "Good Reason," in each case as defined in the employment agreement, then (i) he will be entitled to severance pay in an amount equal to his annual base salary, payable in a lump sum within 30 days after the date of the termination, (ii) he will receive a pro-rated portion of the target amount of his annual cash bonus for the year in which termination occurs, and (iii) any performance share units ("PSUs") or other equity incentives held by Mr. Holland will fully vest on the date of termination.

*Performance Share Unit Agreement with Murray T. Holland*

On May 31, 2019, and as contemplated by the employment agreement, GWG entered into a performance share unit agreement ("PSU Agreement") with Mr. Holland which provides for a target award grant of 129,717 performance share units (the "PSUs")(the "Target Award"), and up to a maximum of 259,434 PSUs. Each PSU represents the right to receive one share of GWG common stock (or, following a Change-in-Control Transaction (as defined in the PSU Agreement, the cash value thereof), upon vesting, which is generally subject to (i) the satisfaction of performance goals over a three year performance period, as determined by GWG's Compensation Committee in its sole discretion, and (ii) Mr. Holland remaining continuously employed by the Company or one of its subsidiaries ("Continuous Service") from the date of grant through the date that the PSUs are vested and paid in shares of common stock (or cash). Promptly following the GWG's filing with the SEC of our Annual Report on Form 10-K for the year ended December 31, 2121 (the final year of the performance period), GWG's Compensation Committee will review and certify in writing (a) whether, and to what extent, the performance goals have been achieved, and (b) the number of PSUs that vested, if any. At such time, PSUs that are not vested will be forfeited.

The PSUs are subject to forfeiture until they vest. If Mr. Holland's Continuous Service terminates for any reason at any time before all PSUs have vested, all unvested PSUs will be automatically forfeited upon such termination of Continuous Service. However, if Mr. Holland's Continuous Service terminates as a result of his death or disability, or as a result of a termination by GWG without Cause or by Mr. Holland for Good Reason, Mr. Holland will retain, and will not forfeit, a pro rata portion of the Target Award based on the number of days that he remained employed during the performance period. This retained portion of the Target Award will not be subject to accelerated vesting and, instead, will vest (and be paid in shares of common stock) based on extent to which the performance goals are achieved during the entire performance period.

If a "Sale Transaction," as defined in the Company's 2013 Stock Incentive Plan, occurs during the performance period, Mr. Holland remains in Continuous Service up until the date of such Sale Transaction, and the acquiring entity or successor to GWG does not assume the obligations of the Company under the PSU Agreement or replace the grant with a substantially equivalent incentive award, then all outstanding PSUs shall vest at Target Award levels on the date of such Sale Transaction.

If a Change-in-Control Transaction occurs during the performance period, then all outstanding PSUs will automatically vest at Target Award levels on the 120th day following the closing of the Change-in-Control Transaction (the "Retention Date"), contingent upon Mr. Holland remaining in Continuous Service through the Retention Date. However, if Mr. Holland's Continuous Service terminates following the occurrence of a Change-in-Control Transaction and prior to the Retention Date for any reason other than as a result of a termination by the Company for Cause, then all outstanding PSUs will automatically vest at Target Award levels upon such termination. PSUs vesting upon a Change-in-Control will be paid in cash (not shares of common stock). The amount of cash to be paid to Mr. Holland in respect of each vested PSU will be equal to the greater of (y) $12.00 or (z) the Fair Market Value (as defined in the Plan) of a share of common stock as of the trading date immediately prior to the closing date of the Change-in-Control Transaction. The PSU Agreement includes a provision allowing the Company to reduce the payment to which Mr. Holland would be entitled upon a Change-in-Control Transaction to the extent needed for him to avoid paying an excise tax under Internal Revenue Code Section 280G, unless Mr. Holland would be better off, on an after-tax basis, receiving the full amount of such payments and paying the excise taxes due.

F-43

APP. 168

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(26) Subsequent Events (cont.)**

*LiquidTrust Promissory Note*

On May 31, 2019, our wholly-owned subsidiary GWG Life entered into a Promissory Note (the "Promissory Note"), made by Jeffrey S. Hinkle and Dr. John A. Stahl, not in their individual capacity but solely as trustees of The LT-1 LiquidTrust, The LT-2 LiquidTrust, The LT-5 LiquidTrust, The LT-7 LiquidTrust, The LT-8 LiquidTrust and The LT-9 LiquidTrust (collectively, the "Borrowers") in the principal amount of $65,000,000 and payable to the order of GWG Life. Pursuant to the terms of the Promissory Note, GWG Life will fund a term loan to the Borrowers in an aggregate principal amount of $65,000,000 (the "Loan"), which Loan is to be funded in two installments as described below.

The Borrowers are common law trusts established as part of alternative asset financings extended by a subsidiary of BEN LP, of which the Company owns approximately 90% of the issued and outstanding common units of BEN LP. Although each Borrower is allocated a portion of the Loan equal to approximately 16.7% of the aggregate outstanding principal of the Loan, the Loan constitutes the joint and several obligations of the Borrowers.

Proceeds of the Loan are to be used primarily to further Beneficient's diversification into alternative assets and ancillary businesses by positioning Beneficient's balance sheet, working capital and liquidity profile to satisfy audit and anticipated State of Texas regulatory requirements.

An initial advance in the principal amount of $50,000,000 was funded on June 3, 2019 and, subject to satisfaction of certain customary conditions, it is anticipated that the second advance, in the principal amount of $15,000,000, will be funded no sooner than September 15, 2019 and no later than December 31, 2019. The Loan bears interest at 7.0% per annum, with interest payable at maturity, and matures on June 30, 2023. Subject to the Intercreditor Agreements (as described below), the Loan can be prepaid at the Borrowers' election without premium or penalty.

The Loan is unsecured and is subject to certain covenants (including a restriction on the incurrence of any indebtedness senior to the Loan other than existing senior loan obligations to each of HCLP Nominees, L.L.C. ("HCLP") and Beneficient Holdings, Inc. ("BHI", and together with HCLP, the "Senior Lenders"), as lenders) and events of default. The Senior Lenders are directly or indirectly associated with Brad K. Heppner, who is Chairman of the Company's Board of Directors.

A special committee of the Board of Directors of the Company (the "Special Committee") composed solely of independent and disinterested directors of the Company, together with the assistance of its independent legal advisors, reviewed, negotiated and approved the terms of the Loan.

*LiquidTrust Loan Intercreditor Agreements*

In connection with the Promissory Note, the Company also entered into two intercreditor and subordination agreements: (1) an Intercreditor Agreement between the GWG Life and HCLP and (2) an Intercreditor Agreement between the GWG Life and BHI (the "Intercreditor Agreements"). Under the Intercreditor Agreements, GWG Life agrees to subordinate the Loan to the secured obligations of Beneficient and its affiliates outstanding to the Senior Lenders (the "Senior Loan Obligations"), agrees to not take any liens to secure the Loan (and to subordinate such liens, if any, to the liens of the Senior Lenders), and agrees not to take enforcement actions under the Promissory Note until such Senior Loan Obligations are paid in full. The Intercreditor Agreements establish various other inter-lender and subordination terms, including, without limitation, with respect to permitted actions by each party, permitted payments, waivers, voting arrangements in bankruptcy, application of certain proceeds and limitations on amendments of the respective loan obligations of the parties. The Senior Lenders have agreed not to extend the maturity of their respective loan obligations beyond June 30, 2023 or increase the outstanding principal of the loans made by the Senior Lenders without the written consent of GWG Life. GWG Life has agreed not to transfer the Promissory Note except with the written consent of the Senior Lenders (such consent not to be unreasonably withheld) or to the Company or direct or indirect wholly owned subsidiaries thereof. The Special Committee, together with the assistance of its independent legal advisors, reviewed, negotiated and approved the terms of the Intercreditor Agreements.

F-44

APP. 169

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(26) Subsequent Events (cont.)**

*Beneficient Adoption of Equity Incentive Plan*

The board of directors of Beneficient Management, L.L.C., Beneficient's general partner, adopted an equity incentive plan ("Beneficient's Equity Incentive Plan") in September 2018. Under the Beneficient Equity Incentive Plan, Beneficient is permitted to grant equity awards representing ownership interests in BEN LP common units. Vested awards under the Beneficient Equity Incentive Plan dilute BEN LP's common unitholders, including GWG. The total number of common units that may be issued under the Beneficient Equity Incentive Plan is equivalent to 15% of the number of fully diluted common units outstanding, subject to annual adjustment.

In April 2019, initial equity awards in the form of Beneficient restricted equity units ("Beneficient REUs") were granted under Beneficient's Equity Incentive Plan. These awards are generally subject to service-based vesting of a three year period from the date of grant, though some of the awards are fully vested upon grant date. All awards are subject to performance - conditions pertaining to entry into certain transactions with GWG Holdings or a change of control event prior to July 1, 2021. While providing services to Beneficient, if applicable, certain of these awards are subject to minimum retained ownership rules requiring the award recipient to continuously hold BEN LP common unit equivalents equal to at least 15% of their cumulatively vested awards that have the minimum retained ownership requirement.

For the Beneficient REUs awarded under the Beneficient Equity Incentive Plan, Beneficient will recognize expense associated with the vesting of these awards based on the fair value of the BEN LP common units on the date of grant, discounted for the lack of participation rights in the expected distributions on unvested units and discounted for the lack of marketability associated with the post-vesting transfer restrictions. Beneficient will recognize expense when it is probable that the performance condition will be met, which will be upon entering into certain transactions with GWG Holdings or upon a change of control. A cumulative catch up of expense will be recognized by Beneficient at the time of entering into certain transactions with GWG Holdings or a change of control for the portion of awards that are vested at the time the performance condition is met. The remaining unrecognized compensation cost for these awards would be recognized prospectively over the remaining requisite service period. The remaining unrecognized compensation expense will be recognized on a straight-line basis using the graded vesting method over the life of the award and forfeitures will be accounted for at the time that such forfeitures occur.

A total of 3.4 million Beneficient REUs have been approved for granting in 2019 that will vest upon the grant date, subject to the performance condition vesting described above. A total of 6.1 million Beneficient REUs have been approved for granting in 2019 that will vest over the completion of a 3-year service period beginning on the grant date, subject to the performance condition described above. All awards are anticipated to be classified in equity. Based on the grant date fair value, the estimated total Beneficient compensation expense attributable to these awards, assuming all vest, is approximately $90 to $100 million.

The expense, when recognized by Beneficient, will impact the earnings at BEN LP and GWG's equity earnings from our equity method investment in Beneficient. The Beneficient REUs, when settled – commencing July 1, 2021 over a three year period, will convert to BEN LP common units and will be dilutive to the existing BEN LP common unitholders, including GWG.

*Amendment of Beneficient Holdings Limited Partner Agreement Governing Beneficient Noncontrolling Interests*

BEN LP is a holding company of capital and financial services companies, the general partner of Beneficient Holdings, and owns 100% of the Class A Subclass 1 and Subclass 2 Units of Beneficient Holdings. Beneficient Holdings is a Delaware limited partnership formed on July 1, 2010. Beneficient Holdings is the holding company that directly or indirectly receives all active and passive income from its subsidiaries and allocates that income among its issued units.

As of December 31, 2018, Beneficient Holdings has issued general partnership Class A Units (Subclass 1 and Subclass 2) — the class of units owned by BEN LP — and Class S Ordinary Units, FLP Unit accounts (Subclass 1 and Subclass 2) and Preferred Series A Subclass 1 Unit accounts (formerly referred to as Non-Participating Convertible Series A Units), which are owned by entities associated with BEN LP's management and founders, including our Chairman, and certain of our directors, along with our Chief Executive Officer.

APP. 170

F-45

APP. 171

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(26) Subsequent Events (cont.)**

As shown on BEN LP's Consolidated Statements of Changes In Equity (Deficit), attached at page 6 of Exhibit 99.4, at December 31, 2018, there was $1,013,693,448 of Preferred Series A Subclass 1 Unit accounts (the "Preferred Series A") and $58,129,760 of Class S Ordinary Units issued. A description of each of these interests is included in footnote 12 — Equity of BEN LP's audited consolidated financial statements.

The rights of all partners of Beneficient Holdings are governed by a Limited Partnership Agreement ("BCH LPA"). On April 26, 2019, the BCH LPA was amended. Under the amendment, the preferred return to be paid to Preferred Series A holders is now limited by a quarterly rate cap that is based on the annualized revenues of Beneficient Holdings. Further, under the amendment, the Preferred Series A holders can convert up to 20% of the sub-capital balance in any calendar year into Class S Ordinary Units on or after January 1, 2021. Upon such an election, a holder of Preferred Series A will be issued Class S Ordinary Units necessary to provide the holder with a number of Class S Ordinary Units that, in the aggregate, equal (a) the balance of the holder's capital account associated with the Preferred Series A Subclass 1 Unit accounts being converted divided by (b) $8.50.

The amendment affects several areas that could impact the value of our ownership in BEN LP such as allocations or distributions of income to the various classes of units issued by Beneficient Holdings, including the Class A Units (Subclass 1 and Subclass 2) owned by BEN LP, preferred returns paid to the holders of Class S Preferred Units, FLP Units and Preferred Series A Units (collectively, "BCH Preferred Units"), distribution of proceeds from the sale of assets, and future issuance of dilutive securities and future debt issuances, among other changes. The impact of the BCH LPA amendment on our investment in BEN LP may vary depending on multiple factors, including, among other things, (1) the economic performance of BEN LP, (2) the value of BEN LP's common units, and (3) the timing, price and amount of any conversions of BCH Preferred Units or Class S Ordinary Units.

F-46

APP. 172

**ITEM 9.  CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE.**

There have been no changes in or disagreements with accountants on accounting and financial disclosure.

**ITEM 9A.  CONTROLS AND PROCEDURES.**

**Evaluation of Disclosure Controls and Procedures**

We maintain disclosure controls and procedures designed to provide reasonable assurance that information required to be disclosed in our reports filed pursuant to the Securities Exchange Act of 1934 is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance the objectives of the control system are met.

As of December 31, 2018, our Chief Executive Officer and Chief Financial Officer carried out an evaluation of the effectiveness of our disclosure controls and procedures as such term is defined in Rule 13a-15(e) under the Securities and Exchange Act of 1934, as of the end of the period covered by this report. Our Chief Executive Officer and Chief Financial Officer concluded that, as a result of the material weakness in internal control over financial reporting as described below, our disclosure controls and procedures were not effective as of December 31, 2018.

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rule 13a-15(f) under the Securities and Exchange Act of 1934.

The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that:

(i)     Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company;

(ii)    Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are in accordance with authorizations of management and directors of the company; and

(iii)   Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with policies or procedures may deteriorate.

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.

62

APP. 173

Under the supervision of the Audit Committee of the Board of Directors and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting using the criteria established in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on our assessment and those criteria, management concluded that our internal control over financial reporting as of December 31, 2018 was not effective due to the material weakness described below:

- *Failure to timely file*: the Company did not maintain effective information and communication controls with external parties due to delays in our financial statement close and reporting process as evidenced by the untimely filing of our Annual Report on Form 10-K for the year ended December 31, 2018 and our Quarterly Report on Form 10-Q for the quarter ended March 31, 2019. The delay in the finalization of our audit report and filings resulted from a delay in the completion of the audit report of our material equity method investee, Beneficient. The delay in receiving the audited financial statements of Beneficient prevented us from timely executing certain controls within our financial closing and reporting processes.

- *Complex non-routine transactions*: as previously disclosed in Item 4 of Part I of our amended Form 10-Q/A for the quarterly period ended September 30, 2018, management identified a material weakness in our internal controls over the application of generally accepted accounting principles to material complex non-routine transactions, related to the Exchange Transaction with Beneficient. Management has determined that we did not have sufficient accounting resources and personnel to effectively design and execute process level controls over complex non-recurring transactions.

**Remediation Plan for Material Weaknesses in Internal Control over Financial Reporting**

With respect to the material weakness related to *untimely filing*, Beneficient's primary operations commenced on September 1, 2017 with formative transactions to finance the economic rights to several portfolios of alternative assets. Through Beneficient's initial capitalization transactions with a third-party institutional investor, Beneficient's general partner had a change of control event on May 31, 2018, which ultimately resulted in Beneficient applying pushdown accounting as of that date. During 2018, the Company and Beneficient entered into the Exchange Transaction. Beneficient engaged a large international independent registered public accounting firm to complete its audits as of December 31, 2018 (Successor) and 2017 (Predecessor), and for the periods from June 1, 2018 to December 31, 2018 (Successor), January 1, 2018 to May 31, 2018 (Predecessor) and for the year ended December 31, 2017 (Predecessor).

Beneficient management has represented that the complexity of these transactions, combined with their initial year audit, resulted in their delays in successfully completing their financial reporting. Beneficient management believes that it will be able to provide timely financial reporting to the Company on a go-forward basis. The Company has elected to report its share of the equity earnings of Beneficient on a one quarter-lag and we expect the financial information of Beneficient to be consistently available for us to meet our financial reporting obligations.

With respect to the previously reported material weakness related to *complex, non-routine transactions*, management has begun to implement its remediation plan through the engagement of nationally recognized accounting experts to assist us in accounting and reporting analysis, guidance research and accounting memo documentation as required, and in particular, in our third quarter and year end reporting for the exchange transaction with Beneficient. The Company also sought "pre-clearance" from the staff of the SEC (the "Staff") to confirm certain accounting positions related to the Exchange Transaction for the year ended December 31, 2018. Based on management's review, we have determined that although progress has been made in remediating this material weakness, we do not believe that it has been fully remediated. Management, with the oversight of the Audit Committee, is assessing additional accounting resource and personnel requirements as we continue to develop our strategic relationship with Beneficient during 2019. Management, with the oversight of the Audit Committee, will continue to take steps to remedy the material weakness expeditiously to reinforce the overall design and capability of our control environment.

63

**Changes in Internal Control over Financial Reporting**

Other than the action described in *Remediation Plan for Material Weaknesses in Internal Control over Financial Reporting*, there were no other changes in the Company's internal control over financial reporting identified in connection with management's evaluation pursuant to Rules 13a-15(d) or 15d-15(d) of the Securities Exchange Act of 1934 during the quarter ended December 31, 2018 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

The Company's independent registered public accounting firm has audited the Company's internal control over financial reporting as of December 31, 2018, as stated in the Report of Independent Registered Public Accounting Firm, appearing under Item 8.

<p style="text-align:center">64</p>

## PART III

### ITEM 10.  DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE.

The following paragraphs provide information as of the date of this report about each of our current directors and executive officers.

Our bylaws permit a maximum of fifteen directors. The board of directors currently consists of fourteen members.

| Name | Age | Positions |
|---|---|---|
| Murray T. Holland | 65 | President and Chief Executive Officer |
| Brad K. Heppner[1] | 53 | Director, Chairman of the Board |
| William B. Acheson | 54 | Chief Financial Officer |
| Peter T. Cangany, Jr.[1] | 61 | Director |
| Michelle Caruso-Cabrera[1] | 50 | Director |
| David F. Chavenson[2] | 67 | Director |
| Richard W. Fisher[1] | 70 | Director |
| David H. Glaser[1] | 62 | Director |
| Thomas O. Hicks[1] | 73 | Director |
| Dennis P. Lockhart[2] | 72 | Director |
| Kathleen Mason[2] | 70 | Director |
| Bruce W. Schnitzer[1] | 74 | Director |
| Roger T. Staubach[1] | 77 | Director |
| Sheldon I. Stein[1] | 65 | Director |
| David H. de Weese[1] | 77 | Director |
| Bruce Zimmerman[1] | 61 | Director |

_____

(1)    Appointed to our Board of Directors upon the closing of the Purchase and Contribution Transaction, which occurred on April 26, 2019.

(2)    Appointed to our Board of Directors on May 13, 2019.

The biographies of the above-identified individuals are set forth below:

***Murray T. Holland*** has served as our President and Chief Executive Officer since April 26, 2019. In 2001, Mr. Holland became an original investor and consultant for MHT Partners, a boutique investment banking firm based in Dallas, Texas with a number of offices in the United States.  From 2013 until recently, he was Managing Director of MHT Partners. Mr. Holland resigned from this position in connection with the Transaction. Prior to MHT, he was CEO and principal shareholder of Convergent Media Systems (Atlanta), a $100 million custom network outsourcing firm with approximately 300 employees, CEO and principal shareholder of Convergent Group Corporation (Denver), a $200 million geographic information systems software and integration firm with approximately 450 employees, and CEO and principal shareholder of BTI Americas (Chicago), a $2.7 billion business travel agency with approximately 4,400 employees. EDS was his principal business partner in these ventures. Prior to that, Mr. Holland was a partner at the law firm of Akin, Gump, Strauss, Hauer & Feld (Dallas) in corporate finance and securities, a Senior Vice President of Credit Suisse First Boston (New York and Dallas) in Mergers and Acquisitions and a Managing Director of Kidder, Peabody & Co. (New York) in Mergers and Acquisitions. He graduated from Washington and Lee University with a B.S. in 1975, University of Virginia Graduate School of Business Administration with an M.B.A. in 1978, and Washington and Lee University School of Law with a J.D. in 1980. Mr. Holland is the author of "*A Nation in the Red*" (McGraw Hill- 2014), a book about the U.S. national debt and its implications.

***Brad K. Heppner*** is the Chief Executive Officer and Chairman of the Board of Directors of Beneficient. Mr. Heppner has acquired or founded ten operating companies principally in the financial services, investment and insurance sectors, each with a common business purpose of providing highly specialized solutions for alternative asset owners. Mr. Heppner founded Heritage Highland in 1996 as a family office to organize, acquire and own as controlling or sole shareholder these operating companies. In 2003, Mr. Heppner organized

APP. 176

Case 3:22-cv-00410-B   Document 32-1   Filed 04/19/22   Page 177 of 1031   PageID 349

Highland Consolidated Business Holdings, L.P. which is the predecessor-in-interest to Beneficient and reorganized into Beneficient in September 2017. He has successfully completed realizations from seven of the ten Heritage Highland companies through mergers and transactions with Fortune 50 companies or institutionally backed management teams. In 2003, Mr. Heppner merged The Crossroads

65

APP. 177

Group, a multi-billion dollar alternative asset manager, with Lehman Brothers, now Neuberger Berman. Among the companies Mr. Heppner founded and sold is Capital Analytics, the third oldest alternative asset administration company in the United States, which is now owned by Mitsubishi Union Financial Group. Currently, Mr. Heppner serves as chief executive officer and chairman for all Heritage Highland companies, positions he has held since its organization in 1996. Previously, he was a senior consultant at Bain & Company where he focused on private equity financed companies between 1994 and 1996. Mr. Heppner served as director of investments for John D. and Catherine T. MacArthur Foundation in Chicago from 1989 to 1993 after beginning his career in New York City at Goldman, Sachs & Co. as an analyst. Through companies held by Heritage Highland, Mr. Heppner has been a fiduciary for over 250 institutions and served on numerous corporate boards and advisory committees. Mr. Heppner earned his M.B.A. from the J.L. Kellogg Graduate School of Management at Northwestern University. He is a magna cum laude graduate and Most Distinguished Alumnus of Southern Methodist University, where he received a B.S., a B.B.A. and a B.A.

*William B. Acheson* became our Chief Financial Officer on May 30, 2014 and recently became a director of GWG MCA Capital, Inc., a subsidiary corporation of GWG Holdings, Inc., in the business of merchant cash advances. Prior to joining us, Mr. Acheson served as Chief Financial Officer and Senior Vice President of Strategic Development for The Homeownership Preservation Foundation from 2009 through 2013. Prior to that, Mr. Acheson served as Managing Director of Global Structured Finance and Investments at Merrill Lynch in London, England, from 2007 through 2008. From 1991 to 2007, Mr. Acheson spent his career at GMAC-RESCAP, where he served as Managing Director for a number of business units, concluding his career as Chief Financial Officer of the United Kingdom division from 2005 through 2007. Mr. Acheson's international experience includes structured finance, capital markets, and risk management experience in Canada, United Kingdom, Ireland, Eastern Europe, Western Europe, and Latin America. Mr. Acheson began his professional career working for Ernst & Young, LLP in Minneapolis, Minnesota. Mr. Acheson earned a Bachelor of Science degree in accounting from the College of St. Thomas in St. Paul, Minnesota.

*Peter T. Cangany, Jr.* joined Ernst & Young, LLP ("EY") in 1980 upon graduating college and retired from the firm in 2017. Mr. Cangany became an EY partner in 1993 and, during his tenure, worked in EY's Indianapolis office 1980 – 1987, Seattle office 1987 – 2004, San Antonio office 2004 – 2011, New York and Bermuda offices 2011 – 2017. At EY Mr. Cangany specialized in working with insurance entities, primarily property, casualty and reinsurance, and has as a strong working knowledge of the life settlement industry. He also worked closely with Beneficient during its early formation on various accounting and consolidation matters. During his 37 years with EY, Mr. Cangany served as the engagement partner on several large public and non-public nationally recognized companies. He held numerous leadership positions at EY, including area insurance practice leader for the Pacific Northwest, Southwest, and BBC (Bermuda, Bahamas, Caymans) and Office Managing Partner for EY's Seattle and Bermuda offices. Mr. Cangany serves on the Board of Trustees – Franklin College of Indiana (2009–present) and is the Finance Committee Chair (and previously Audit Committee Chair). Mr. Cangany earned a B.A. in Accounting from Franklin College and an M.B.A. from Texas A&M University.

*Michelle Caruso-Cabrera* is currently the Chief Executive Officer of MCC Productions, a media content and production company she founded in September 2018. Previously, Ms. Caruso-Cabrera spent more than 20 years at CNBC, most recently as a contributor, and prior to that as chief international correspondent and co-anchor of "Power Lunch." Throughout her career, Ms. Caruso-Cabrera has covered a wide range of stories from the 2008 financial crisis to U.S. elections to the debt crisis in Greece and the Brexit vote. She has traveled the world reporting live from Cuba, Iran, Ukraine, Iraq, Italy, Russia, Venezuela and Latin America, among many others. She joined CNBC from WTSP-TV in St. Petersburg, Fla., where she spent four years as a general assignment reporter covering crime and hurricanes. Prior to that, Ms. Caruso-Cabrera was a special projects producer for Univision where she gained experience covering Latin America. She began her career in 1990 while in college, as a stringer for The New York Times, reporting for the education section. Previously, she wrote a personal finance column for Shape en Español and People en Español. She has also been awarded Broadcaster of the Year from the National Association of Hispanic Journalists and was named one of the "100 Most Influential Hispanics" in the country by Hispanic Business magazine. She earned a bachelor's degree in economics from Wellesley College.

*David F. Chavenson* served as Treasurer of Alon USA Energy Company from 2007 until 2018. He served as Vice President and Treasurer of Flowserve Corp. from 2001 until 2005; Senior Vice President and Chief Financial Officer at Worldwide Flight Services, Inc. from 2000 to 2001; and Vice President of Finance, Chief Financial Officer and Corporate Secretary of Rutherford-Moran Oil Corporation since April 1996 to 1999. Previous to 1996, Mr. Chavenson spent 18 years at Oryx Energy Company, an oil and gas exploration and production company (previously Sun Exploration and Production Co.) ("Oryx"), and served as Treasurer there

APP. 178

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 179 of 1031     PageID  351

from 1995 to 1996. Prior to that, he served as Assistant Treasurer and Manager of Corporate Finance, Manager of Financial Analysis and Senior Financial Specialist at Oryx.

---

66

APP. 179

Mr. Chavenson has a B.A., Magna Cum Laude, Phi Beta Kappa from Dickinson College and holds an M.B.A. in finance with honors from the Harvard Business School. He is also a Certified Public Accountant.

**Richard W. Fisher** is the President and Chief Executive Officer of RWF Financial, Inc., a consulting and advisory services company he founded in 2016. From 2005 to 2015, Mr. Fisher was the President of the Federal Reserve Bank of Dallas and member of the Federal Open Market Committee. Mr. Fisher has served as the U.S. Trade Representative implementing NAFTA and negotiating bilateral trade agreements which admitted China and Taiwan to the World Trade Organization. Mr. Fisher founded Fisher Capital Management after leaving Brown Brothers Harriman & Co. in 1987. Mr. Fisher is presently Senior Adviser to Barclays PLC, and a Director of AT&T, PepsiCo and Tenet Health Care. Mr. Fisher has a B.S. from Harvard and M.B.A. from Stanford.

**David H. Glaser** retired from the position of Chief Operating Officer of Bank of America Merrill Lynch's Global Corporate and Investment Bank ("GCIB"), which encompasses investment banking, capital markets, large cap corporate lending, treasury services and leasing activities, a position he held from August 2010 to March 2019. His responsibilities included assisting in all aspects of the operations of GCIB, including working closely with finance, technology, human resources, legal, compliance, and marketing. Mr. Glaser was Chairman of the GCIB Fairness Opinion Committee and a member of the GCIB Operating Committee. Prior to being COO, he was Global Deputy Head of GCIB's Mergers & Acquisitions Group and Chairman of Bank of America Securities Mergers and Acquisitions Group. Prior to joining Bank of America Securities in June 2008, Mr. Glaser spent 23 years at Bear Stearns. During his tenure at Bear Stearns, he was at various times Co-Head of Investment Banking, Co-Head of Mergers and Acquisitions, a member of the Firm Management and Compensation Committee, Co-Chairman of the Firm Risk Committee, member of the Board of Directors of Bear Stearns & Co, Chairman of the Investment Banking Commitments Committee, a member of the Merchant Banking Investment Committee and Chairman of the Fairness Opinion Committee. Prior to joining Bear Stearns in 1985, Mr. Glaser spent three years as a mergers and acquisitions attorney at Skadden, Arps, Slate, Meagher & Flom. He was previously a member of the Board of Directors of Aeropostale Inc. Mr. Glaser has J.D. and M.B.A. degrees from the University of Chicago and an A.B. from Columbia.

**Thomas O. Hicks** is a pioneer in the private equity industry in the United States. From 1984 to 1988 he was Co-Founder and Co-Chairman of Hicks & Haas which compiled a highly successful track record of acquisitions, including Dr Pepper, Seven Up, A&W Root Beer, Sybron, and Thermadyne. He later founded numerous private equity funds for his firm, Hicks, Muse, Tate and Furst, which raised over $12 billion in funds. His funds have invested billions of dollars of equity in businesses in the United States, Europe, and Latin America. Mr. Hicks retired from Hicks Muse in 2004, and now manages his own family office private equity firm, Hicks Holdings, LLC. Mr. Hicks was a Director of Carpenter Technology Corporation until September 2014. Mr. Hicks has a B.B.A. from the University of Texas – Austin and an MBA from the University of Southern California. Mr. Hicks is also the manager and indirect, majority owner of HSG Sports Group Holdings LLC, which, through subsidiaries, including HSG Sports Group LLC and others, formerly owned interests in professional sports franchises, including the Texas Rangers major league professional baseball club and Dallas Stars professional ice hockey team. On May 24, 2010, the Texas Rangers filed a voluntary petition for Chapter 11 bankruptcy protection. On September 15, 2011, the Dallas Stars filed a voluntary petition for Chapter 11 bankruptcy protection. Additional proceedings were filed by or against other entities related to the Texas Rangers and the Dallas Stars, and Mr. Hicks in his individual capacity, in connection with the foregoing. Both the Texas Rangers and the Dallas Stars were sold to new owners in connection with their respective Chapter 11 bankruptcy cases.

**Dennis P. Lockhart** is currently a distinguished professor-of-the-practice in the Nunn School of International Affairs at Georgia Tech. Early in 2017, Mr. Lockhart retired from his position as president and Chief Executive Officer of the Federal Reserve Bank of Atlanta, a position he held since 2007. Earlier, he was a professor at Georgetown University, School of Foreign Service, from 2003 to 2007. Prior to this, he held senior positions at Heller Financial Inc. and Citicorp (now Citigroup), and served as an officer in the U.S. Marine Corps Reserve. Mr. Lockhart holds a Master of Arts from Johns Hopkins University, Bachelor of Arts from Stanford University, and an honorary doctorate from Georgia State University. Mr. Lockhart currently serves on the Board of Directors of Pensare Acquisition Corp. (WRLS) and Invesco Mortgage Capital.

**Kathleen J. Mason** currently serves as a consultant with Third Bridge, an international advisory firm based In London. Ms. Mason served as President and Chief Executive Officer of Tuesday Morning Corporation, an operator of first-quality discount and closeout home furnishing and gift stores, from 2000 until June 2012. She was president and chief merchandising officer of Filene's Basement, Inc. in 1999. She was president of the HomeGoods division of The TJX Companies, Inc., an apparel and home fashion retailer, from 1997 to 1999. She was employed by Cherry & Webb,

APP. 180

67

APP. 181

a women's apparel specialty chain, from 1987 until 1992, as executive vice president, then, until 1997, as chairman, president and chief executive officer. Her previous business experience includes senior management positions with retailers May Company, The Limited Inc. and the Mervyn's Stores division of Dayton-Hudson Corp. (now Target Corporation). Ms. Mason has also served as a director of other national retailers. Ms. Mason's senior executive and board experience with other national retail companies provide her with a valuable perspective on a number of issues directly relevant to the Company's business. Ms. Mason currently serves on the Board of Directors of Genesco Inc. (GCO) and formerly served on the Boards of Directors of Tuesday Morning Corporation (TUES), Office Depot, Inc. (ODP), The Men's Wearhouse, Inc. (now TLRD), Hot Topic, Inc. (HOTT) and Boston Restaurant Associates, Inc. (BRA).

*Bruce W. Schnitzer* has been a successful private equity investor since 1985 and Chairman of Wand Partners, a private equity firm specialized in insurance and other specialty financial services, since 1987. Wand has sponsored and invested in eighteen platform businesses, thirteen of which span the insurance industry and fifteen of which are now fully realized. From 1977 to 1985, Mr. Schnitzer was a senior executive with Marsh & McLennan, where he served as President and CEO of Marsh, Inc. (the world-wide insurance broker) and as Chief Financial Officer of Marsh & McLennan Companies, Inc. (NYSE-MMC). Prior to joining Marsh & McLennan, Mr. Schnitzer was a Vice President and head of Mergers & Acquisitions at Morgan Guaranty Trust Company (J.P. Morgan) — 1967-76. Mr. Schnitzer has served in numerous non-profit roles, including Chairman of The Institute of Human Origins, Director of The Litchfield Land Trust, and Director & Treasurer of Scherr-Thoss Foundation. Mr. Schnitzer graduated from the University of Texas, Austin in 1966 (B.B.A.) and received an M.B.A. from the University of Texas, Austin in 1967.

*Roger T. Staubach* retired in July 2018 from the role of Executive Chairman of JLL Americas, a professional services firm specializing in real estate. Mr. Staubach's role focused on client relationships and new business development. With 2017 global revenue of $7.9 billion, JLL serves clients in 80 countries from more than 1,000 locations worldwide, including 300 corporate offices and a global workforce of 82,000. Prior to joining forces with JLL, Mr. Staubach was Executive Chairman of The Staubach Company, a market leading global real estate advisory firm that delivered cost-effective solutions for office, industrial and retail clients. In July 2008, The Staubach Company merged with JLL. Prior to his career in real estate, Mr. Staubach was a member of the Dallas Cowboys professional football team and won numerous football awards including the Heisman Trophy in 1963. Among the many other honors bestowed upon Mr. Staubach are the 2018 Presidential Medal of Freedom, Commercial Property News' "Corporate Services Executive of the Year" (four times), the 2006 Congressional Medal of Honor "Patriot Award," the NCAA "Teddy Roosevelt Award" for being one of the "100 Most Influential NCAA Student-Athletes," the American Jewish Congress "Torch of Conscience Award," and the United States Naval Academy "Distinguished Graduate." Mr. Staubach served as the Chairman of the Host Committee for Super Bowl XLV which was held in North Texas in 2011, and he continues to be involved with The Children's Cancer Fund, the United States Naval Academy Foundation and numerous other civic, charitable, and professional organizations. Mr. Staubach earned a B.S. from the United States Naval Academy and served four years as a Navy officer.

*Sheldon I. Stein* is President of Southern Glazer's Wine and Spirits, the nation's largest distributor of wine and spirits. Previous to 2010, Mr. Stein was Vice Chairman and Head of Southwest Investment Banking for Bank of America, Merrill Lynch. Prior to joining Merrill Lynch, Mr. Stein was a Senior Managing Director and leader of Bear Stearns' Southwest Investment Banking Group for over 20 years. He was a member of Bear Stearns' President Advisory Council. Mr. Stein was also a partner with the Dallas law firm of Hughes & Luce. Mr. Stein serves on the Board of Directors of Tailored Brands, Inc. and is on the Advisory Board of Amegy Bank. Mr. Stein was a Director of ALON USA Partners, LP from September 2013 to February 2018. Mr. Stein received a Bachelors from Brandeis University and a J.D. from Harvard Law School.

*David H. de Weese* is a Partner of Paul Capital Advisors, a private equity firm. He was instrumental in developing Paul Capital's deal origination strategy and transaction sourcing network. He joined Paul Capital in 1995 and led global secondary transaction sourcing activities and the due diligence of life science and health care investments. Mr. de Weese has 14 years of management experience in Europe. He has an extensive entrepreneurial experience and in-depth scientific and business knowledge. He also founded Medical Innovations. In 1993, he co-founded and served as the President and Chief Executive Officer of M6 Pharmaceuticals. Mr. de Weese served as the President and Chief Executive Officer of Cygnus Therapeutic Systems, SigA Pharmaceuticals and a Silicon Valley software company. Prior to Cygnus, he served as the President and Chief Executive Officer of Machine Intelligence Corporation. Mr. de Weese served as Director of OSE Immunotherapeutics SA (also known as OSE Pharma SA) from June 2014 to June 2017. Mr. de Weese holds an M.B.A. from the Harvard Business School, a B.A. from Stanford University and attended law school at Stanford University.

APP. 182

68

***Bruce Zimmerman*** was the Chief Executive Officer and Chief Investment Officer of the University of Texas Investment Management Company ("UTIMCO") from 2007 until 2016. UTIMCO is the second largest investor of discretionary university assets worldwide. Before joining UTIMCO, Mr. Zimmerman was Chief Investment Officer and Global Head of Pension Investments at Citigroup. Mr. Zimmerman also served as Chief Financial Officer and Chief Administrative Officer of Citigroup Alternate Investments, which invests proprietary and client capital across a range of hedge fund, private equity, real estate and structured credit vehicles. Prior to his work at Citigroup, Mr. Zimmerman spent thirteen years at Texas Commerce Bank/JP Morgan Chase in a variety of capacities including Merger & Acquisition Investment Banking, Internet and ATM Retail Management, Consumer Marketing and Financial Planning, Strategy and Corporate Department. Mr. Zimmerman is Vice Chairman of the Board of Trustees for the CommonFund, a nonprofit asset management firm, and previously served on the Investment Committee for the Houston Endowment. Mr. Zimmerman also currently serves as lead independent director of Oaktree Specialty Lending Corporation and Oaktree Strategic Income Corporation. Mr. Zimmerman received an M.B.A. from Harvard Business School and graduated Magna Cum Laude from Duke University.

**Classification of Directors**

Our Board of Directors and stockholders recently approved an amendment to our bylaws that established a classified Board of Directors in which directors are divided into three classes, to be designated as Class I, Class II and Class III. Each class will serve staggered, three year terms. The terms of office of the initial Class I directors will expire at the upcoming annual meeting of stockholders to be held in 2019. The terms of office of the initial Class II directors will expire at the annual meeting of stockholders to be held in 2020. The terms of office of the initial Class III directors will expire at the annual meeting of stockholders to be held in 2021. Therefore, if elected at the annual meeting, each of our Class I directors will hold office for a term of three years or until his successor is elected and shall have qualified, or until his earlier death, resignation, removal or disqualification.

The following chart sets forth the three classes of directors.

| Director | Class | Expiration of Initial Term of Director |
|---|---|---|
| Brad K. Heppner | Class I | 2019 |
| Sheldon I. Stein | Class I | 2019 |
| Thomas O. Hicks | Class I | 2019 |
| Richard W. Fisher | Class I | 2019 |
| Kathleen J. Mason | Class I | 2019 |
| Michelle Caruso-Cabrera | Class II | 2020 |
| Bruce W. Schnitzer | Class II | 2020 |
| Roger T. Staubach | Class II | 2020 |
| Bruce E. Zimmerman | Class II | 2020 |
| Dennis P. Lockhart | Class II | 2020 |
| Peter T. Cangany, Jr. | Class III | 2021 |
| David H. de Weese | Class III | 2021 |
| David H. Glaser | Class III | 2021 |
| David F. Chavenson | Class III | 2021 |

**Director Qualifications**

When considering whether directors have the experience, qualifications, attributes and skills to enable the Board of Directors to satisfy its oversight responsibilities effectively in light of our business and structure, our Board of Directors focuses primarily on the information discussed in each of the directors' individual biographies set forth above.

In addition, we believe that all of our directors have experience in developing and overseeing businesses and implementing near term and long-range strategic plans. We also believe that all of our directors have a reputation for integrity, honesty and adherence to high ethical standards. Collectively, they have demonstrated

APP. 184

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 185 of 1031     PageID 357

business acumen and an ability to exercise sound judgment, as well as a commitment of service to our Company and our Board of Directors.

69

**Board Committees**

Our Board of Directors has an Audit Committee, Compensation Committee and Nomination and Corporate Governance Committee. Each of the foregoing Committees has a written charter, a copy of each of which is available at our website at www.gwgh.com. Our Audit Committee, Compensation Committee, and Nomination and Corporate Governance Committee each comply with the listing requirements of The NASDAQ Marketplace Rules taking into account our reliance on certain exceptions for "controlled companies" as described in Item 13 — Certain Relationships and Related Transactions, and Director Independence — Director Independence.

**Audit Committee**

The Audit Committee consists of three members: Peter T. Cangany, Jr. (Chair), Michelle Caruso-Cabrera and Bruce Zimmerman. All of the members are financially literate and are independent directors under the NASDAQ Marketplace Rules, and SEC audit committee structure and membership requirements. Further, the Board has determined that Mr. Cangany is an "audit committee financial expert" as defined by applicable regulations of the SEC and is "independent" under the NASDAQ Marketplace Rules.

**Compensation Committee**

Our Compensation Committee consists of two members: Sheldon I. Stein (Chair) and David H. Glaser. Our Compensation Committee is charged with oversight responsibility for the adequacy and effectiveness of our executive compensation and benefit plans and is primarily responsible for all matters relating to compensation of our executive officers and the directors, the adoption of all employee compensation and employee benefit plans and the administration of such plans including granting stock incentives or other benefits, and the review and approval of disclosures regarding executive compensation included in our SEC reports. Our Compensation Committee has the authority to obtain advice and assistance from external legal, accounting or other advisors, and has the authority to retain, terminate and approve the fees payable to any external compensation consultant to assist in the evaluation of director and senior executive compensation. However, any services to be rendered by our independent registered public accounting firm shall be pre-approved by the Audit Committee if required under our policy regarding pre-approval of such services.

**Corporate Governance and Nominating Committee**

Our Corporate Governance and Nominating Committee consists of two members: Michelle Caruso-Cabrera (Chair) and David H. Glaser. The primary role of our Corporate Governance and Nominating Committee is to consider and make recommendations to the full Board of Directors concerning the appropriate size, function and needs of the Board of Directors, including establishing criteria for Board membership and considering, recruiting and recommending candidates (including those recommended by stockholders) to fill new Board positions. The Corporate Governance and Nominating Committee also considers and advises the full Board of Directors on matters of corporate governance and monitors and recommends the functions of, and membership on, the various committees of the Board of Directors.

Our Corporate Governance and Nominating Committee (or a subcommittee thereof) recruits and considers director candidates and presents all qualified candidates to the full Board of Directors for consideration. Qualified candidates will be considered without regard to race, color, religion, sex, ancestry, national origin, disability, marital or veteran status, or any other legally protected status.

In identifying and evaluating potential candidates to be nominees for directors, our Corporate Governance and Nominating Committee has the flexibility to consider such factors as it deems appropriate under relevant circumstances. These factors may include education, general business and industry experience, ability to act on behalf of stockholders and build long-term stockholder value, potential concerns regarding independence or conflicts of interest and other factors relevant in evaluating Board nominees. Although our Corporate Governance and Nominating Committee does not have a policy with regard to the consideration of diversity in identifying director candidates, overall Board of Directors diversity of industry background and experience is generally among the factors considered. Our Corporate Governance and Nominating Committee believes that a Board of Directors comprised of directors with diverse skills and experiences relevant to our industry will result in efficient and competent oversight of our various core competencies.

70

Our Corporate Governance and Nominating Committee will consider recommendations by stockholders of candidates for election to the Board of Directors. Any stockholder who wishes that the Corporate Governance and Nominating Committee consider a candidate must follow the procedures set forth in our bylaws. Under our bylaws, if a stockholder plans to nominate a person as a director at a meeting, the stockholder is required to place a proposed director's name in nomination by written request delivered to or mailed and received at our principal executive offices not less than 90 nor more than 120 calendar days prior to the first anniversary of the date on which we first mailed proxy materials for the preceding year's annual meeting. However, in the event that the date of the annual meeting is more than 30 days before or more than 60 days after such anniversary date, notice by the stockholder must be so delivered not less than 90 nor more than 120 calendar days prior to the date of such annual meeting, or if the first public announcement of the date of such annual meeting is less than 100 days prior to the date of such annual meeting, the tenth day following the day on which public announcement is made.

**Ability of Stockholders to Communicate with our Board of Directors**

Our Board of Directors has established several means for stockholders and others to communicate with our Board of Directors. If a stockholder has a concern regarding our financial statements, accounting practices or internal controls, the concern should be submitted in writing to the Chair of our Audit Committee in care of our Secretary at the address of our principal executive offices. If the concern relates to our governance practices, business ethics or corporate conduct, the concern should be submitted in writing to the Chair of our Corporate Governance and Nominating Committee in care of our Secretary at the address of our principal executive offices. If a stockholder wishes to provide input with respect to our executive compensation policies and programs, input should be submitted in writing to the Chair of our Compensation Committee in care of our Secretary at the address of our principal executive offices. If a stockholder is unsure as to which category the concern relates, the stockholder may communicate it to any one of the independent directors in care of our Secretary at the address of our principal executive offices. All stockholder communications sent in care of our Company Secretary will be forwarded promptly to the applicable director(s).

**Delinquent Section 16(a) Reports**

Section 16(a) of the Securities Exchange Act of 1934, as amended, requires our officers and directors, and persons who own more than ten percent of a registered class of our equity securities, to file electronically reports of ownership and changes in ownership of such securities with the SEC. Based on review of the copies of Forms 3 and 4 and amendments thereto filed electronically with the SEC during the year ended December 31, 2018 and Forms 5 and amendments thereto filed electronically with the SEC with respect to such year, or written representations that no Forms 5 were required, we believe all required forms have been filed by our officers, directors and greater than ten percent beneficial owners; however, the following were reported late: option exercises and forfeitures due to taxes by William Acheson on August 16, 2018, by Steve Sabes and David Abramson on August 21, 2018 and by Jon Sabes on August 22, 2018 were reported on late Form 4s filed electronically with the SEC on September 5, 2018.

**Code of Ethics**

We have adopted a Code of Business Conduct and Ethics that applies to all of our employees and all of our officers (specifically including but not limited to the principal executive officer (CEO), principal financial officer (CFO), principal accounting officer, and other members of management). Our Code of Business Conduct and Ethics satisfies the requirements of Item 406(b) of Regulation S-K. Our Code of Business Conduct and Ethics is available, free of charge, upon written request to our Corporate Secretary at 220 South Sixth Street, Suite 1200, Minneapolis, MN 55402.

71

APP. 187

ITEM 11.  EXECUTIVE COMPENSATION.

### Summary Compensation Table

The following table sets forth the cash and non-cash compensation for the 2017 and 2018 years awarded to or earned by: (i) each individual who served as the principal executive officer of GWG Holdings during 2018; and (ii) the two most highly compensated executive officers of GWG Holdings who were serving as executive officers at the end of 2018 and who received more than $100,000 in the form of salary and bonus during such year. These individuals are referred to as our "named executives."

| Name and Principal Position | Year | Salary | Bonus | Stock Awards[1] | Option Awards[1] | Total |
|---|---|---|---|---|---|---|
| Jon R. Sabes | 2018 | $ 491,546 | $1,015,603 | $ — | $ — | $ 1,507,149 |
| Former Chief Executive Officer[2] | 2017 | $ 491,546 | $ 212,881 | $ — | $ — | $ 704,427 |
| William B. Acheson | 2018 | $ 320,000 | $ 693,353 | $ 757,702 | $ — | $ 1,771,055 |
| Chief Financial Officer | 2017 | $ 292,599 | $ 177,901 | $ — | $ 381,313 | $ 851,813 |
| Steven F. Sabes | 2018 | $ 208,246 | $ 54,343 | $ — | $ — | 262,589 |
| Former Chief Operating Officer – Life Epigenetics Inc. and Secretary[3] | 2017 | $ 216,255 | $ 98,275 | $ — | $ 11,050 | $ 325,580 |

_____

(1)     Amounts shown reflect the grant date fair value of stock awards and option awards granted for the respective year pursuant to the 2013 Stock Incentive Plan, computed in accordance with Financial Accounting Standards Board Accounting Standards Codification Topic 718. For a discussion of the assumptions used in calculating the grant date fair value of stock awards and option awards made in 2018, see footnote 18 to our consolidated financial statements.

(2)     On April 26, 2019, and in connection with the closing of the Purchase and Contribution Transaction, Jon R. Sabes resigned as the Company's Chief Executive Officer and from all officer positions he held with the Company or any of its subsidiaries prior to the Closing, other than his position as Chief Executive Officer of the Company's technology focused wholly owned subsidiaries, Life Epigenetics Inc. ("Life Epigenetics") and youSurance General Agency, LLC ("youSurance").

(3)     On April 26, 2019, and in connection with the closing of the Purchase and Contribution Transaction, Steven F. Sabes resigned from all officer positions he held with the Company or any of its subsidiaries prior to the Closing, except as Chief Operating Officer of Life Epigenetics.

In general, in connection with its decisions about executive compensation, the Compensation Committee intends to consider the results of the most recent stockholder advisory vote on executive compensation as well as the advisory vote on the frequency of future advisory votes on executive compensation in determining how frequently to hold its Say-on-Pay vote in the future.

### Employment Agreements and Change-in-Control Provisions

As of December 31, 2018, our named executives held the following positions: Mr. Jon R. Sabes, Chief Executive Officer and Chairman of the Board of Directors; Mr. William B. Acheson, Chief Financial Officer; and Mr. Steven F. Sabes, Chief Operating Officer - Life Epigenetics Inc., previously Executive Vice President of Originations and Servicing, President, and Chief Operating Officer.

In June 2011, we entered into employment agreements with each of Messrs. Jon R. Sabes and Steven F. Sabes. Each of these agreements has an initial one year term and is automatically renewed for additional one year periods unless terminated prior to such renewal. On June 28, 2017, we entered into an employment agreement with Mr. Acheson to replace his prior employment agreement dated May 30, 2014, which amendment increased his annual base salary from $225,000 to $320,000. Mr. Acheson's current agreement has an initial three year term and is automatically renewed for additional one year periods unless either party gives notice of non-renewal at least 60 days prior to the expiration of the then current term. All of these employment agreements establish key employment terms (including reporting responsibilities, base salary, discretionary and bonus opportunity and other benefits), provide for severance benefits in certain situations (including change in control), and contain non-competition, non-solicitation and confidentiality covenants.

APP. 188

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 189 of 1031     PageID 361

Under their respective employment agreements as of December 31, 2018, Mr. Jon R. Sabes received an annual base salary of $480,000 and Mr. Steven F. Sabes received an annual base salary of $200,000. Mr. William Acheson received an annual base salary of $225,000 until entering into his new employment agreement on June 28, 2017, at which

<div align="center">72</div>

<div align="right">APP. 189</div>

time his annual base salary was increased to $320,000. The employment agreements contain customary provisions prohibiting the executives from soliciting our employees for a period of 12–18 months after any termination of employment, and from competing with our Company for either two years (if the executive is terminated for good cause or if he resigns without good reason) or one year (if we terminate the executive's employment without good cause or if he resigns with good reason which includes a change in control). If an executive's employment is terminated by us without "good cause" or if the executive voluntarily resigns with "good reason", then the executive will be entitled to (i) severance pay for a period of 12 months and (ii) reimbursement for health insurance premiums for his family if he elects continued coverage under COBRA.

The employment agreements for Messrs. Jon R. Sabes and Steve F. Sabes also provided that we will reimburse them for any legal costs they incur in enforcing their rights under the employment agreement and, to the fullest extent permitted by applicable law, indemnify them for claims, costs and expenses arising in connection with their employment, regardless of the outcome of any such legal contest, as well as interest at the prime rate on any payments under the employment agreements that are determined to be past due, unless prohibited by law.

All of the foregoing executive employment agreements include a provision allowing us to reduce their severance payments and any other payments to which the executive becomes entitled as a result of our change in control to the extent needed for the executive to avoid paying an excise tax under Code Section 280G, unless the named executive officer is better off, on an after-tax basis, receiving the full amount of such payments and paying the excise taxes due.

On November 28, 2018, the Company entered into restricted stock unit agreement with Bill Acheson pursuant to which Mr. Acheson received a grant of 73,348 restricted stock units. The grant was intended to be effective as of August 10, 2018. Each restricted stock unit entitled Mr. Acheson to receive one share of the Company's common stock upon vesting, subject to remaining continuously employed by the Company or one of its subsidiaries through the applicable vesting date. The number of restricted stock units was increased by 14,336 as a result of dividend equivalent rights associated with the shares underlying the grant. One half of the restricted stock units vested on the grant date, with the remainder scheduled to vest in equal quarterly installments on each three month anniversary of the intended effective date of the grant. The vesting of all remaining unvested restricted stock units accelerated upon the closing of the Purchase and Contribution Transaction.

On April 26, 2019, and in connection with the closing of the Purchase and Contribution Transaction, (i) Jon R. Sabes resigned as the Company's Chief Executive Officer and from all officer positions he held with the Company or any of its subsidiaries prior to the closing, other than his position as Chief Executive Officer of the Company's technology focused wholly owned subsidiaries, Life Epigenetics Inc. ("Life Epigenetics") and youSurance General Agency, LLC ("youSurance"), and (ii) Steven F. Sabes resigned as the Company's Executive Vice President of Originations and Servicing and from all officer positions he held with the Company or any of its subsidiaries prior to the closing, except as Chief Operating Officer of Life Epigenetics. The resignations of Messrs. Jon and Steven Sabes included a full waiver and forfeit of (i) any severance that may be payable by the Company or any of its subsidiaries in connection with such resignations or the Purchase and Contribution Transactions and (ii) all equity awards of the Company currently held by either of them.

As contemplated by the Purchase and Contribution Agreement, the Company entered into performance share unit agreements (each a "PSU Agreement") with certain employees of the Company pursuant to which such employees will receive a bonus under certain terms and conditions, including, among others, that such employees remain employed by the Company or one of its subsidiaries (or, if no longer employed, such employment was terminated by the Company other than for cause, as such term is defined in the PSU Agreement) for a period of 120 days following the closing of the Purchase and Contribution Transaction. The Company's PSU Agreement with William B. Acheson, the Company's Chief Financial Officer, was entered into on April 22, 2019 and provides for a target award grant of 125,000 performance share units, which equates to a retention bonus amount of $1,500,000. The description of the form of PSU Agreement is not complete and is qualified in its entirety by reference to the full text of the form of PSU Agreement which is incorporated by reference as Exhibit 10.20 to this Report.

On April 26, 2019, and in connection with the closing of the Purchase and Contribution Transaction, Murray T. Holland was appointed as Chief Executive Officer of the Company. On May 31, 2019, we entered into an employment agreement with Mr. Holland pursuant to which he is currently serving as our President and Chief Executive Officer. The employment agreement has an initial three year term and is automatically renewed for additional one year periods unless either party gives notice of non-renewal at least 60 days prior to the expiration of the then current term.

73

Under the employment agreement, Mr. Holland is entitled to an annual base salary of $650,000, retroactive to April 26, 2019, and is eligible to receive an annual cash bonus the target amount of which will be 150% of his base salary (prorated for the partial first year of employment). Whether the bonus is granted for a particular year, and the amount thereof, will be determined by our Compensation Committee in its discretion based upon Mr. Holland's performance. Mr. Holland is also entitled to participate in all employee benefit plans and programs made available by the Company to the Company's executive employees generally.

If Mr. Holland's employment is terminated by us without "Cause" or if he voluntarily resigns with "Good Reason," in each case as defined in the employment agreement, then (i) he will be entitled to severance pay in an amount equal to his annual base salary, payable in a lump sum within 30 days after the date of the termination, (ii) he will receive a pro-rated portion of the target amount of his annual cash bonus for the year in which termination occurs, and (iii) any performance share units ("PSUs") or other equity incentives held by Mr. Holland will fully vest on the date of termination.

On May 31, 2019, and as contemplated by the employment agreement and discussed below, we entered into a PSU Agreement with Mr. Holland that provides for a target award grant of 129,717 PSUs (the "Target Award"), and up to a maximum of 259, 434 PSUs. Each PSU represents the right to receive one share of our common stock (or, following a Change-in-Control Transaction (as defined in the PSU Agreement, the cash value thereof), upon vesting, which is generally subject to (i) the satisfaction of performance goals over a three year performance period, as determined by our Compensation Committee in its sole discretion, and (ii) Mr. Holland remaining continuously employed by the Company or one of its subsidiaries ("Continuous Service") from the date of grant through the date that the PSUs are vested and paid in shares of common stock (or cash). Promptly following the Company's filing with the SEC of our Annual Report on Form 10-K for the year ended December 31, 2121 (the final year of the performance period), our Compensation Committee will review and certify in writing (a) whether, and to what extent, the performance goals have been achieved, and (b) the number of PSUs that vested, if any. At such time, PSUs that are not vested will be forfeited.

The PSUs are subject to forfeiture until they vest. If Mr. Holland's Continuous Service terminates for any reason at any time before all PSUs have vested, all unvested PSUs will be automatically forfeited upon such termination of Continuous Service. However, if Mr. Holland's Continuous Service terminates as a result of his death or disability, or as a result of a termination by the Company without Cause or by Mr. Holland for Good Reason, Mr. Holland will retain, and will not forfeit, a pro rata portion of the Target Award based on the number of days that he remained employed during the performance period. This retained portion of the Target Award will not be subject to accelerated vesting and, instead, will vest (and be paid in shares of common stock) based on extent to which the performance goals are achieved during the entire performance period.

If a "Sale Transaction," as defined in the Company's 2013 Stock Incentive Plan, occurs during the performance period, Mr. Holland remains in Continuous Service up until the date of such Sale Transaction, and the acquiring entity or successor to the Company does not assume the obligations of the Company under the PSU Agreement or replace the grant with a substantially equivalent incentive award, then all outstanding PSUs shall vest at Target Award levels on the date of such Sale Transaction.

If a Change-in-Control Transaction occurs during the performance period, then all outstanding PSUs will automatically vest at Target Award levels on the 120th day following the closing of the Change-in-Control Transaction (the "Retention Date"), contingent upon Mr. Holland remaining in Continuous Service through the Retention Date. However, if Mr. Holland's Continuous Service terminates following the occurrence of a Change-in-Control Transaction and prior to the Retention Date for any reason other than as a result of a termination by the Company for Cause, then all outstanding PSUs will automatically vest at Target Award levels upon such termination. PSUs vesting upon a Change-in-Control will be paid in cash (not shares of common stock). The amount of cash to be paid to Mr. Holland in respect of each vested PSU will be equal to the greater of (y) $12.00 or (z) the Fair Market Value (as defined in the Plan) of a share of common stock as of the trading date immediately prior to the closing date of the Change-in-Control Transaction. The PSU Agreement includes a provision allowing the Company to reduce the payment to which Mr. Holland would be entitled upon a Change-in-Control Transaction to the extent needed for him to avoid paying an excise tax under Internal Revenue Code Section 280G, unless Mr. Holland would be better off, on an after-tax basis, receiving the full amount of such payments and paying the excise taxes due.

The above descriptions of our employment agreement and PSU Agreement with Mr. Holland are not complete and are qualified in its entirety by reference to the full text of such agreements which are incorporated by reference as Exhibits 10.22 and 10.23, respectively, to this Report.

74

APP. 191

**2013 Stock Incentive Plan**

We maintain the GWG Holdings, Inc. 2013 Stock Incentive Plan, under which 6,000,000 shares of our common stock have previously been approved for issuance. The 2013 Stock Incentive Plan permits the grant of both incentive and non-statutory stock options. Through December 31, 2018, we had issued stock options, SARs and Restricted Stock Units (hereinafter, "options") for 2,662,097 shares of common stock to employees, officers, directors, and consultants under the plan. As of December 31, 2018, (i) 1,766,612 shares are reserved for issuance under outstanding options, of which 869,231 options have vested and the remaining outstanding are scheduled to vest over three years, (ii) 181,569 shares have been issued upon the exercise of options granted under the 2013 Stock Incentive Plan, and (iii) 3,337,903 shares remain available for issuance of future incentive grants. The Board of Directors adopted the 2013 Stock Incentive Plan to provide a means by which our employees, directors, officers and consultants may be granted an opportunity to purchase our common stock, to assist in retaining the services of such persons, to secure and retain the services of persons capable of filling such positions and to provide incentives for such persons to exert maximum efforts for our success.

**Outstanding Equity Awards at Year End**

As of December 31, 2018, our named executives had the following outstanding options to purchase common stock:

| | OPTION AWARDS | | | | STOCK AWARDS | |
|---|---|---|---|---|---|---|
| Name | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Option Exercise Price ($) | Option Expiration Date | Number of shares or units of stock that have not vested (#) | Market value of shares or units of stock that have not vested ($)[1] |
| Jon R. Sabes[2] | 5,000 | — | $ 8.20 | 4/7/2019 | | |
| | 5,000 | — | $ 8.71 | 9/2/2019 | | |
| | 5,000 | — | $ 9.01 | 11/24/2019 | | |
| | 5,000 | — | $ 10.18 | 6/12/2020 | | |
| | 5,000 | — | $ 8.55 | 8/18/2020 | | |
| | 5,000 | — | $ 6.60 | 12/29/2020 | | |
| | 3,333 | 1,667 | $ 6.35 | 4/29/2021 | | |
| | 3,333 | 1,667 | $ 6.41 | 5/13/2021 | | |
| | 232,917 | 81,250 | $ 9.47 | 11/10/2021 | | |
| | | | | | | |
| William B. Acheson | 1,667 | — | $ 6.00 | 12/29/2025 | | |
| | 1,667 | — | $ 6.35 | 4/29/2026 | | |
| | 1,667 | — | $ 6.41 | 5/13/2026 | | |
| | 6,250 | — | $ 10.38 | 4/18/2027 | | |
| | 145,000 | — | $ 10.20 | 6/29/2027 | | |
| | — | — | — | — | 38,259 | $ 337,827 |
| | | | | | | |
| Steven F. Sabes[2] | 1,667 | — | $ 6.60 | 12/29/2020 | | |
| | — | 1,667 | $ 6.35 | 4/29/2021 | | |
| | — | 1,667 | $ 6.41 | 5/13/2021 | | |
| | 1,666 | 1,667 | $ 9.64 | 9/19/2021 | | |
| | — | 3,333 | $ 10.38 | 4/18/2022 | | |

_____

(1)    Market value calculations based on the Company's closing stock price of $8.83 on December 31, 2018, the last trading day during the year ended December 31, 2018.

(2)    Messrs. Jon and Steven Sabes forfeited all equity awards of the Company held by without compensation in connection with the closing of the Purchase and Contribution Transaction.

APP. 192

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 193 of 1031     PageID 365

75

APP. 193

**Director Compensation**

The following table sets forth the cash and non-cash compensation awarded to or earned by each individual who served as a member of our Board of Directors during the year ended December 31, 2018.

| Director's Name | Fees Earned or Paid in Cash 2018 | Option Awards[1] | Total |
|---|---|---|---|
| Jon R. Sabes | $ — | $ —[2] | $ — |
| Steven F. Sabes | $ — | $ —[2] | $ — |
| David H. Abramson | $ 50,400 | $ — | $ 50,400 |
| Thomas J. Donohue, Jr. | $ 24,100 | $ 51,700 | $ 75,800 |
| Shawn R. Gensch | $ 33,600 | $ — | $ 33,600 |
| Charles H. Maguire[3] | $ 19,200 | $ — | $ 19,200 |
| Jeffrey L. McGregor | $ 40,800 | $ — | $ 40,800 |
| Mark E. Schwarzmann | $ 33,600 | $ 45,300 | $ 78,900 |

---

(1)     Amounts shown reflect the grant date fair value of stock option awards granted during 2018, computed in accordance with Financial Accounting Standards Board Accounting Standards Codification Topic 718. Values reflect (i) a 25,200 share stock option, exercisable at $8.00 per share, granted to Mr. Donohue upon his initial election to the Board on May 10, 2018, and (ii) stock options to purchase an aggregate of 18,900 shares, exercisable at $8.00 per share, granted to Mr. Schwarzmann on May 10, 2018.

(2)     Excludes stock option awards granted to employee directors as compensation for serving as employees of our Company.

(3)     Mr. Maguire served as a director until our May 8, 2018 annual stockholders' meeting, at which he elected not to stand for reelection.

During 2018, each independent board member received base compensation of $6,000 per quarter. In addition, the chairman of the audit committee received an additional $4,800 per quarter. The chairmen of the Compensation Committee and the Corporate Governance Committee each received an additional $2,400 per quarter. Also, each non-chair member of committees received an additional $1,200 per quarter.

On April 15, 2019, the Board approved changes to director compensation. In consideration for services provided and to be provided to the Company in their capacity as non-employee directors of the Company during the remainder of 2019, or until their earlier resignation in conjunction with the closing of the Purchase and Contribution Transaction, each individual serving as non-employee director of the Company prior to the closing of the Purchase and Contribution Transaction was entitled to receive cash compensation in the amount of $125,000. Such compensation was payable in three installments of $41,666, $41,666 and $41,667, respectively, on the last business day of June, September and December 2019, provided, however, that the entire unpaid portion of such compensation was accelerated and paid upon the closing of the Purchase and Contribution Transaction in accordance with the April 2019 changes to director compensation.

The Compensation Committee through consultation with its compensation advisors, approved a plan of compensation to be paid to the Company's non-employee directors for the period following the closing of the Purchase and Contribution Agreement. Under this plan, all non-employee directors receive annualized cash compensation of $100,000 paid in quarterly installments in arrears. The Chair and members of the Board's committees receive the additional annualized cash compensation set forth below:

| Committee | Position | Additional Fees |
|---|---|---|
| Audit Committee | Chair | $ 15,000 |
| | Member (other than Chair) | $ 10,000 |
| Compensation Committee | Chair | $ 12,000 |
| | Member (other than Chair) | $ 5,375 |
| Corporate Governance Committee | Chair | $ 10,000 |
| | Member (other than Chair) | $ 5,000 |
| Special Committee | Member | $ 25,000 |

APP. 194

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 195 of 1031    PageID 367

Further, each member of the Special Committee receives $1,000 for attending each in-person Special Committee meeting or $500 for participating telephonically. The Special Committee is a committee of the Board comprised solely of directors independent of Beneficient that was formed primarily for the purpose of considering and, if deemed appropriate, approving company transactions with or involving Beneficient.

76

APP. 195

On June 18, 2019, the Company entered into restriction stock unit agreements with each non-employee director of the Company pursuant to which each received a grant of 8,169 restricted stock units. Each restricted stock unit entitles the holder thereof to receive one share of the Company's common stock upon vesting on the one year anniversary of the grant date, subject remaining a member of the Board and/or employed by or engaged as a consultant to the Company or one of its subsidiaries through such date, and subject to accelerated vesting in certain circumstances. Holders of restricted stock units are also entitled to dividend equivalent rights with respect to the shares underlying the grants.

The Company has entered into Indemnification Agreements (the "Indemnification Agreements") with each of its current directors and executive officers (collectively, the "Indemnitees"). The Indemnification Agreements clarify and supplement indemnification provisions already contained in the Company's bylaws and generally provide that the Company shall indemnify the Indemnitees to the fullest extent permitted by applicable law, subject to certain exceptions, against expenses, judgments, fines and other amounts actually and reasonably incurred in connection with their service as a director or officer and also provide for rights to advancement of expenses and contribution.

The description of the form of Indemnification Agreement and the restricted stock unit agreements set forth above are not complete and is qualified in its entirety by reference to the full text of the form of Indemnification Agreement and the form of restricted stock unit agreement which are filed as Exhibit 10.21 and Exhibit 10.28 to this Annual Report on Form 10-K, respectively, and are incorporated herein by reference.

**ITEM 12.  SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED SHAREHOLDER MATTERS.**

**Securities Authorized for Issuance under Equity Compensation Plans**

We maintain our 2013 Stock Incentive Plan. The purpose of the 2013 Stock Incentive Plan is to provide a means by which our employees, directors, officers and consultants may be granted an opportunity to purchase our common stock, to assist in retaining the services of such persons, to secure and retain the services of persons capable of filling such positions and to provide incentives for such persons to exert maximum efforts for our success. 6,000,000 shares of our common stock have been approved for issuance under the 2013 Stock Incentive Plan, of which 3,337,903 shares remained available for issuance pursuant to future grants at December 31, 2018.

The 2013 Stock Incentive Plan was approved by our stockholders. The following table sets forth certain information as of December 31, 2018 with respect to securities authorized for issuance under compensation arrangements.

| Plan Category | Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants and Rights (a) | Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights (b) ($) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|
| Equity compensation plan approved by stockholders: | | | |
| Stock Options | 1,397,951 | $ 9.01 | N/A |
| Stock Appreciation Rights | 271,765 | $ 8.59 | N/A |
| Restricted Stock Units | 53,403 | N/A | N/A |
| 2013 Stock Incentive Plan Total | 1,723,119 | $ 8.92 | 3,337,903 |

77

APP. 196

**Beneficial Ownership**

The following table sets forth certain information regarding beneficial ownership of the our common stock as of June 21, 2019 for (i) each person known by us to be the beneficial owner of more than 5% of our common stock, (ii) each of our current directors and executive officers, (iii) all named executive officers and directors as a group, and (iv) each other named executive officer identified in the Summary Compensation Table. Unless otherwise indicated, the address of each of the following persons is 220 South Sixth Street, Suite 1200, Minneapolis, MN 55402, and each such person has sole voting and investment power with respect to the shares of common stock set forth opposite such person's name.

| Name | Shares Beneficially Owned | Percentage of Shares Beneficially Owned |
|---|---|---|
| *Executive Officers:* | | |
| Murray T. Holland[1] | 25,913,516 | 78.4% |
| William B. Acheson[2] | 289,397 | * |
| *Non-Employee Directors:* | | |
| Brad K. Heppner[3] | 2,500,000 | 7.6% |
| Peter T. Cangany, Jr. | — | — |
| Michelle Caruso-Cabrera | — | — |
| David F. Chavenson | — | — |
| Richard W. Fisher | — | — |
| David H. Glaser | — | — |
| Thomas O. Hicks[4] | 1,452,155 | 4.4% |
| Dennis P. Lockhart | — | — |
| Kathleen J. Mason | — | — |
| Bruce W. Schnitzer | — | — |
| Roger T. Staubach | — | — |
| Sheldon I. Stein | — | — |
| David H. de Weese | — | — |
| Bruce E. Zimmerman | — | — |
| All current directors and officers as a group | 30,155,068 | 90.8% |
| *Other Named Executive Officers:* | | |
| Jon R. Sabes[5] | — | — |
| Steven F. Sabes[6] | — | — |
| *Other 5% Beneficial Owners:* | | |
| Seller Trusts[7] | 25,913,516 | 78.46% |
| Beneficient Company Holdings, L.P.[8] | 2,500,000 | 7.6% |
| AltiVerse Capital Markets, L.L.C.[9] | 1,452,155 | 4.4% |

———————

\*     Less than one percent

(1)     Includes 25,913,516 shares of Common Stock held by the Seller Trusts. Murray T. Holland is one of the trust advisors to the Seller Trusts; the other trust advisor is an individual unrelated to Mr. Holland, Jeffrey S. Hinkle. Mr. Holland and Mr. Hinkle have shared decision-making authority with respect to each of the Seller Trusts, including shared voting power and shared dispositive power over the shares of Common Stock held by each of the Seller Trusts. Mr. Holland has an indirect pecuniary interest in the shares of Common Stock held by the Seller Trusts resulting from his ownership interest in 30% of the outstanding membership interests of MHT Financial, LLC ("MHT"), the sole beneficiary of each of the Seller Trusts. Consequently, to the extent that MHT, as beneficiary, receives proceeds from the sale of Common Stock and Seller Trust L Bonds, as contemplated by the Master Agreement, in excess of its contractual obligations, Mr. Holland would have a right to his pro rata share of any distribution of such proceeds if and when made by MHT to its members. There can be no assurance (i) that MHT will receive any proceeds in excess of its contractual obligations, (ii) as to the amount of any such excess, or (iii) that any distribution of such excess will

APP. 197

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 198 of 1031    PageID 370

be distributed to members of MHT, including Mr. Holland. Mr. Holland disclaims beneficial ownership of the shares of Common Stock held by the Seller Trusts except to the extent of the pecuniary interest therein described above.

(2)     Shares reflected in the table include 108,146 shares held individually. The number of shares also includes 181,251 of vested stock options currently exercisable or vesting within 60 days granted pursuant to our 2013 Stock Incentive Plan.

(3)     Includes 2,500,000 shares of Common Stock held by Beneficient Capital Company, L.L.C., a Delaware limited liability company ("BCC"). BCC is a wholly-owned subsidiary of Beneficient Company Holdings, L.P., a Delaware limited partnership ("BEN Holdings"). BEN Holdings is also the managing member of BCC. BEN Holdings is controlled by its general partner, The Beneficient Company Group, L.P, a Delaware limited partnership ("BEN LP"). BEN LP is controlled by its general

<div align="center">78</div>

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 199 of 1031    PageID 371

partner, Beneficient Management, L.L.C., a Delaware limited liability company ("BEN Management"). Brad K. Heppner serves as Director, Chairman and Chief Executive Officer of BEN Management. As a result, Mr. Heppner may be deemed to beneficially the shares of Common Stock owned by BCC. Mr. Heppner disclaims beneficial ownership of such shares except to the extent of his pecuniary interest therein.

(4)    Includes 1,452,155 shares of Common Stock held by AltiVerse Capital Markets, L.L.C. ("AltiVerse"). AltiVerse is a Delaware limited liability company for which Hicks Holdings Operating LLC, a Delaware limited liability company ("Hicks Holding"), serves as Manager. Thomas O. Hicks serves as sole manager of Hicks Holdings. As a result, Mr. Hicks may be deemed to beneficially own the shares of Common Stock owned by AltiVerse. Mr. Hicks disclaims beneficial ownership of such shares except to the extent of his pecuniary interest therein.

(5)    On April 26, 2019, and in connection with the closing of the Purchase and Contribution Transaction, Jon R. Sabes resigned as the Company's Chief Executive Officer and from all officer positions he held with the Company or any of its subsidiaries prior to the Closing, other than his position as Chief Executive Officer of the Company's technology focused wholly owned subsidiaries, Life Epigenetics and youSurance.

(6)    On April 26, 2019, and in connection with the closing of the Purchase and Contribution Transaction, Steven F. Sabes resigned from all officer positions he held with the Company or any of its subsidiaries prior to the Closing, except as Chief Operating Officer of Life Epigenetics.

(7)    The business address of the Seller Trusts is 325 North St. Paul Street, Ste. 4850, Dallas, Texas 75201. On January 12, 2018, we entered into a Master Exchange Agreement (the "Master Exchange Agreement") pursuant to which we agreed to engage in a strategic transaction (the "Exchange Transaction") with Beneficient and certain other parties (the "Seller Trusts"), in which the parties agreed to an exchange of certain assets. The Seller Trusts are a group of individual common law trusts that received shares of Common Stock in the Exchange Transaction. The trustee of each of the Seller Trusts is Delaware Trust Company. The trust advisors of each trust are two individuals unrelated to each other, Jeffrey S. Hinkle and Murray T. Holland, who have sole decision-making authority with respect to each trust. The beneficiary of each of the Seller Trusts is MHT Financial, LLC. The current members of MHT Financial, LLC are Shawn T. Terry and Mike McGill. The names of the various trusts comprising the Seller Trusts are as follows: The LT-1 Exchange Trust, The LT-2 Exchange Trust, The LT-3 Exchange Trust, The LT-4 Exchange Trust, The LT-5 Exchange Trust, The LT-6 Exchange Trust, The LT-7 Exchange Trust, The LT-8 Exchange Trust, The LT-9 Exchange Trust, The LT-12 Exchange Trust, The LT-14 Exchange Trust, The LT-15 Exchange Trust, The LT-16 Exchange Trust, The LT-17 Exchange Trust, The LT-18 Exchange Trust, The LT-19 Exchange Trust, The LT-20 Exchange Trust, The LT-21 Exchange Trust, The LT-22 Exchange Trust, The LT-23 Exchange Trust, The LT-24 Exchange Trust, The LT-25 Exchange Trust and The LT-26 Exchange Trust.

In connection with the Exchange Transaction, the Company and the Seller Trusts entered into a Stockholders Agreement that provides (among other standstill provisions) that until the Seller Trusts own, in the aggregate, voting securities representing less than 10% of the total voting power of all voting securities of the Company, all voting securities of the Company voted by the Seller Trusts will be voted solely in proportion with the votes cast by all other holders of voting securities of the Company on the matter. In connection with the Purchase and Contribution Transaction, the Stockholders Agreement was terminated and the Seller Trusts are now entitled to full voting rights with respect to the shares of Common Stock they own and are entitled to cast a majority of the votes on all matters requiring stockholder votes.

(8)    As a limited partnership, BEN LP is controlled by its general partner, Beneficient Management, LLC, which is currently governed by an 11 member board of directors. The business address of Beneficient is 325 North St. Paul Street, Ste. 4850, Dallas, Texas 75201.

(9)    AltiVerse is managed by its sole manager, Hicks Holdings Operating LLC, of which Thomas O. Hicks is the sole member and exercises voting and investment power with respect to the shares of Common Stock held by AltiVerse. The business address of AltiVerse is c/o Hicks Holdings Operating LLC, 2200 Ross Avenue, 50th Floor, Dallas, Texas 75201.

## ITEM 13.  CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE.

### Conflict-of-Interest and Related-Party Transaction Policy

We have a Conflict-of-Interest and Related-Party Transaction Policy, pursuant to which our Board of Directors (or an authorized committee thereof) is responsible for reviewing policies and procedures with respect to related party transactions required to be disclosed pursuant to Item 404 of the SEC's Regulation S-K (including transactions between the Company and its officers and directors, or affiliates of such officers or directors), and approving the terms and conditions of such related party transactions. Our Conflict-of-Interest and Related-Party Transaction Policy sets forth the processes and procedure to be taken in such review and approval, which includes obtaining approval by a majority of the disinterested members of the Board (or an authorized committee thereof) and otherwise in accordance with state law governing conflicts of interest, or if the transaction involves compensation payable to an executive, the Compensation Committee. The related party transactions in which we engaged during year 2018 and the interim 2019 year-to-date period, which are described below, were approved in accordance with Conflict-of-Interest and Related-Party Transaction Policy.

APP. 199

**Transactions with Related Persons**

Related party transactions that we have entered into during year 2018 and the interim 2019 year-to-date period are described below:

*Purchase and Contribution Transaction*

On April 15, 2019, Jon R. Sabes, the Company's former Chief Executive Officer and a director, and Steven F. Sabes, the Company's former Executive Vice President and a director, entered into the Purchase and Contribution Agreement with, among others, Beneficient. The Company was not a party to the Purchase and Contribution Agreement. However, the closing of the transactions contemplated by the Purchase and Contribution Agreement (the "Purchase and Contribution Transaction") were subject to certain conditions that were dependent upon the Company taking, or refraining from taking, certain actions. The closing of the Purchase and Contribution Transaction occurred on April 26, 2019. See "Item 1 — Business — The Beneficient Transactions — The Expanded Strategic Relationship" for a description of the Purchase and Contribution Agreement and the Purchase and Contribution Transaction are described.

Among other actions taken in connection with the with the closing of the Purchase and Contribution Transaction, on April 26, 2019, Beneficient Capital Company, L.L.C., a Delaware limited liability company ("BCC"), and AltiVerse Capital Markets, L.L.C., a Delaware limited liability company ("AltiVerse"), executed and delivered a Consent and Joinder (the "Consent and Joinder") to the Amended and Restated Pledge and Security Agreement dated October 23, 2017 by and among the Company, GWG Life, LLC, Messrs. Jon and Steven Sabes and the Bank of Utah (the "Security Agreement"). Pursuant to the Consent and Joinder, Messrs. Jon and Steven Sabes assigned their rights and delegated their obligations under the Security Agreement to BCC and AltiVerse, and BCC and AltiVerse became substitute grantors under the Security Agreement such that the shares of the Company's common stock acquired by BCC and AltiVerse pursuant to the Purchase Agreement (as defined below) will continue to be pledged as collateral security for the Company's obligations owing in respect of the L Bonds issued under the Amended and Restated Indenture governing our L Bonds. The description of the Consent and Joinder set forth above is not complete and is qualified in its entirety by reference to the full text of the Consent and Joinder which is incorporated by reference as Exhibit 10.19 to this Report.

In connection with the Exchange Transaction, the Company and the Seller Trusts entered into a Stockholders Agreement that provided (among other standstill provisions) that until the Seller Trusts own, in the aggregate, voting securities representing less than 10% of the total voting power of all voting securities of the Company, all voting securities of the Company voted by the Seller Trusts will be voted solely in proportion with the votes cast by all other holders of voting securities of the Company on the matter. On April 26, and in connection with the closing of the Purchase and Contribution Transaction, the Stockholders Agreement was amended and terminated, and the Seller Trusts are now entitled to full voting rights with respect to the shares of Common Stock they own and are entitled to cast a majority of the votes on all matters requiring stockholder votes.

*Promissory Note with Certain LiquidTrusts*

On May 31, 2019, our wholly-owned subsidiary GWG Life entered into a Promissory Note (the "Promissory Note"), made by Jeffrey S. Hinkle and Dr. John A. Stahl, not in their individual capacity but solely as trustees of The LT-1 LiquidTrust, The LT-2 LiquidTrust, The LT-5 LiquidTrust, The LT-7 LiquidTrust, The LT-8 LiquidTrust and The LT-9 LiquidTrust (collectively, the "Borrowers") in the principal amount of $65,000,000 and payable to the order of GWG Life. Pursuant to the terms of the Promissory Note, GWG Life will fund a term loan to the Borrowers in an aggregate principal amount of $65,000,000 (the "Loan"), which Loan is to be funded in two installments as described below.

The Borrowers are common law trusts established as part of alternative asset financings extended by a subsidiary of BEN LP, of which the Company owns approximately 90% of the issued and outstanding common units. Although each Borrower is allocated a portion of the Loan equal to approximately 16.7% of the aggregate outstanding principal of the Loan, the Loan constitutes the joint and several obligations of the Borrowers.

Proceeds of the Loan are to be used primarily to further Beneficient's diversification into alternative assets and ancillary businesses by positioning Beneficient's balance sheet, working capital and liquidity profile to satisfy audit and anticipated State of Texas regulatory requirements.

80

APP. 201

An initial advance in the principal amount of $50,000,000 was funded on June 3, 2019 and, subject to satisfaction of certain customary conditions, it is anticipated that the second advance, in the principal amount of $15,000,000, will be funded no sooner than September 15, 2019 and no later than December 31, 2019. The Loan bears interest at 7.0% per annum, with interest payable at maturity, and matures on June 30, 2023. Subject to the Intercreditor Agreements (as described below), the Loan can be prepaid at the Borrowers' election without premium or penalty.

The Loan is unsecured and is subject to certain covenants (including a restriction on the incurrence of any indebtedness senior to the Loan other than existing senior loan obligations to each of HCLP Nominees, L.L.C. ("HCLP") and Beneficient Holdings, Inc. ("BHI", and together with HCLP, the "Senior Lenders"), as lenders) and events of default. The Senior Lenders are directly or indirectly associated with Brad K. Heppner, who is Chairman of the Company's Board of Directors.

A special committee of the Board of Directors of the Company (the "Special Committee") composed solely of independent and disinterested directors of the Company, together with the assistance of its independent legal advisors, reviewed, negotiated and approved the terms of the Loan. The foregoing description of the Promissory Note is qualified in its entirety by reference to the full and complete terms of the Promissory Note, which is incorporated by reference as Exhibit 10.24 to this Report.

*Intercreditor Agreements*

In connection with the Promissory Note, the Company also entered into two intercreditor and subordination agreements: (1) an Intercreditor Agreement between the GWG Life and HCLP and (2) an Intercreditor Agreement between the GWG Life and BHI (the "Intercreditor Agreements"). Under the Intercreditor Agreements, GWG Life agrees to subordinate the Loan to the secured obligations of Beneficient and its affiliates outstanding to the Senior Lenders (the "Senior Loan Obligations"), agrees to not take any liens to secure the Loan (and to subordinate such liens, if any, to the liens of the Senior Lenders), and agrees not to take enforcement actions under the Promissory Note until such Senior Loan Obligations are paid in full. The Intercreditor Agreements establish various other inter-lender and subordination terms, including, without limitation, with respect to permitted actions by each party, permitted payments, waivers, voting arrangements in bankruptcy, application of certain proceeds and limitations on amendments of the respective loan obligations of the parties. The Senior Lenders have agreed not to extend the maturity of their respective loan obligations beyond June 30, 2023 or increase the outstanding principal of the loans made by the Senior Lenders without the written consent of GWG Life. GWG Life has agreed not to transfer the Promissory Note except with the written consent of the Senior Lenders (such consent not to be unreasonably withheld) or to the Company or direct or indirect wholly owned subsidiaries thereof. The Special Committee, together with the assistance of its independent legal advisors, reviewed, negotiated and approved the terms of the Intercreditor Agreements. The foregoing description of the Intercreditor Agreements are qualified in their entirety by reference to the full and complete terms of the Intercreditor Agreements, which are incorporated by reference as Exhibit 10.25 and Exhibit 10.26 to this Report.

*Purchase of Additional Common Unites of BEN LP*

On June 12, 2019, the Company acquired 1,000,000 BEN LP common units from unaffiliated holders of alternative assets that had sold the alternative assets to MHT Financial, LLC for contribution to various Exchange Trusts established by MHT Financial as part of the BEN LP liquidity products. The holders acquired the BEN LP common units from MHT Financial in satisfaction for a portion of the purchase price owed by MHT Financial for the alternative assets that MHT Financial contributed to the Exchange Trusts. Murray T. Holland, our Chief Executive Officer, was until recently a Managing Director of MHT Financial and continues to own a 30% interest in MHT Financial. Mr. Holland also serves as a trust advisor to the Exchange Trusts that hold the alternative assets. The purchase price for the BEN LP common units acquired by the Company was $10,000,000.

**Director Independence**

Our Board of Directors periodically reviews relationships that directors have with our Company to determine whether our directors are "independent directors" as such term is defined in Rule 5605(a)(2) of the NASDAQ Marketplace Rules. Our Board of Directors has determined that the following directors are independent directors: Peter T. Cangany, Jr., Michelle Caruso-Cabrera, David F. Chavenson, David H. Glaser, Dennis P. Lockhart, Kathleen Mason, Roger T. Staubach and Bruce Zimmerman.

81

APP. 202

Because the Seller Trusts currently own a majority of our outstanding Common Stock, we are a "controlled company" as that term is set forth in Rule 5615(c) of the NASDAQ Marketplace Rules. Under the NASDAQ rules, a company of which more than 50% of the voting power for the election of directors is held by an individual, a group or another company is a "controlled company" and may elect not to comply with certain NASDAQ corporate governance requirements, including the requirements that:

- a majority of our board of directors consist of independent directors;

- our nominating and corporate governance committee be composed entirely of independent directors; and

- our compensation committee be composed entirely of independent directors.

We are currently relying on the controlled company exemption for certain of the above requirements, including those related to the determination or recommendation of officer compensation.

## ITEM 14.    PRINCIPAL ACCOUNTING FEES AND SERVICES.

The following table presents fees for professional audit services and 401(k) audit services, tax services and other services rendered by Baker Tilly Virchow Krause, LLP during years 2017 and 2018:

|                          | 2018 | | 2017 | |
|--------------------------|---|----------|---|----------|
| Audit Fees[1]            | $ | 577,317  | $ | 345,526  |
| Audit-Related Fees[2]    | $ | 16,423   | $ | —        |
| Tax Fees[3]              | $ | 105,560  | $ | 87,075   |
| All Other Fees[4]        | $ | 11,913   | $ | 89,980   |
| Total Fees               | $ | 711,213  | $ | 522,581  |

_____

(1)    Audit Fees consist of fees for professional services rendered for the audit of our consolidated annual financial statements and review of the interim consolidated financial statements included in quarterly reports and services that are normally provided in connection with statutory and regulatory filings or engagements.

(2)    Audit-Related Fees consist principally of assurance and related services that are reasonably related to the performance of the audit or review of the Company's financial statements but not reported under the caption *Audit Fees* above.

(3)    Tax Fees consist of fees for tax compliance, tax advice, and tax planning.

(4)    All Other Fees typically consist of fees for permitted non-audit products and services provided. All Other Fees included expenses related to our continuous offering of L Bonds and redeemable preferred stock.

The Audit Committee of our Board of Directors has reviewed the services provided by Baker Tilly Virchow Krause, LLP during year 2018 and the fees billed for such services. After consideration, the Audit Committee has determined that the receipt of these fees by Baker Tilly Virchow Krause, LLP is compatible with the provision of independent audit services. The Audit Committee discussed these services and fees with Baker Tilly Virchow Krause, LLP and our management to determine that they are permitted under the rules and regulations concerning auditor independence promulgated by the SEC to implement the Sarbanes-Oxley Act of 2002, as well as the American Institute of Certified Public Accountants.

### Pre-Approval Policy

The written charter of the Audit Committee provides that all audit and non-audit accounting services permitted to be performed by the our independent registered public accounting firm under applicable rules and regulations must be pre-approved by the Audit Committee or by designated members of the Audit Committee, other than with respect to *de minimis* exceptions permitted under the Sarbanes-Oxley Act of 2002. All services performed by our independent registered public accounting firm during the years ended December 31, 2018 and 2017 were pre-approved in accordance with the written charter.

Prior to or as soon as practicable following the beginning of each year, a description of the audit, audit-related, tax, and other services expected to be performed by the independent registered public accounting firm in the following year will be presented to the Audit Committee for approval. Following such approval, any requests for audit, audit-related, tax, and other services not presented and pre-approved must be submitted to the Audit Committee for specific pre-approval and cannot commence until such approval has been granted. However, we have delegated the authority to grant specific pre-approval between meetings, as necessary, to the Chair of the

APP. 203

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 204 of 1031    PageID 376

Audit Committee. The Chair then updates the Audit Committee at the next regularly scheduled meeting of any services that were granted specific pre-approval.

---

82

---

APP. 204

PART IV

ITEM 15.  EXHIBITS, FINANCIAL STATEMENT SCHEDULES.

**Documents filed as part of this Form 10-K:**

Report of Independent Registered Public Accounting Firm                                                F-1

Consolidated Balance Sheets at December 31, 2018 and 2017                                               F-4

Consolidated Statements of Operations for the years ended December 31, 2018 and 2017                    F-5

Consolidated Statements of Cash Flows for the years ended December 31, 2018 and 2017                    F-6

Consolidated Statements of Changes in Stockholders' Equity for the years ended December 31, 2018
  and 2017                                                                                              F-8

Notes to Consolidated Financial Statements                                                             F-9

**Financial Statement Schedule:**

Not applicable.

**Exhibit Index**

| Exhibit | Description |
| --- | --- |
| 3.1 | Certificate of Incorporation[1] |
| 3.2 | Bylaws as amended (filed herewith) |
| 3.3 | Certificate of Amendment to Certificate of Incorporation[3] |
| 3.4 | Certificate of Amendment to Certificate of Incorporation[7] |
| 3.5 | Certificate of Designation for Redeemable Preferred Stock[8] |
| 3.6 | Certificate of Amendment to Certificate of Designation for Redeemable Preferred Stock[8] |
| 3.7 | Certificate of Designation for Series 2 Redeemable Preferred Stock[10] |
| 3.8 | Certificate Of Designations Of Series B Convertible Preferred Stock[18] |
| 4.1 | Amended and Restated Indenture with Bank of Utah, dated October 23, 2017[5] |
| 4.2 | Amended and Restated Pledge and Security Agreement by and among GWG Holdings, Inc., GWG Life, LLC, Jon R. Sabes, Steven F. Sabes, and Bank of Utah, dated October 23, 2017[5] |
| 4.3 | Form of Subscription Agreement for Redeemable Preferred Stock[11] |
| 4.4 | Form of Subscription Agreement for Series 2 Redeemable Preferred Stock[14] |
| 4.6 | Amendment No. 1 to Amended and Restated Indenture with Bank of Utah, dated March 27, 2018(23) |
| 4.7 | Supplemental Indenture dated as of August 10, 2018 To The Amended And Restated Indenture dated as of October 23, 2017, as amended[18] |
| 10.1 | Amended and Restated Loan and Security Agreement with GWG DLP Funding IV, LLC (as borrower), CLMG Corp. (as agent) and LNV Corporation (as lender), dated September 27, 2017(2) |
| 10.2* | Employment Agreement with William B. Acheson, dated June 30, 2017[9] |
| 10.3* | 2013 Stock Incentive Plan, as amended[16] |
| 10.4* | Form of Stock Option Agreement used with 2013 Stock Incentive Plan[13] |
| 10.5 | Master Exchange Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, MHT Financial SPV, LLC, a Delaware limited liability company, and various related trusts, as amended and restated on January 18, 2018 with effect from January 12, 2018[15] |
| 10.6 | First Amendment to Master Exchange Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, MHT Financial SPV, LLC, a Delaware limited liability company, and various related trusts, dated April 30, 2018[15] |
| 10.7 | Second Amendment to Master Exchange Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, MHT Financial SPV, LLC, a Delaware limited liability company, and various related trusts, dated June 29, 2018[17] |
| 10.8 | Third Amendment to Master Exchange Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, MHT Financial SPV, LLC, a Delaware limited liability company, and |

APP. 205

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 206 of 1031    PageID 378

various related trusts, dated August 10, 2018

---

83

---

| Exhibit | Description |
|---|---|
| 10.9 | Commercial Loan Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, dated August 10, 2018[18] |
| 10.10 | Amendment No. 1 dated December 27, 2018 to Commercial Loan Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership[19] |
| 10.11 | Exchangeable Note from The Beneficient Company Group, L.P., a Delaware limited partnership, dated August 10, 2018[18] |
| 10.12 | Registration Rights Agreement with certain trusts related to The Beneficient Company Group, L.P., a Delaware limited partnership, and as set forth in the Agreement, dated August 10, 2018[18] |
| 10.13 | Registration Rights Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, dated August 10, 2018[18] |
| 10.14 | Registration Rights Agreement with each of the Exchange Trusts, dated December 27, 2018[19] |
| 10.15 | Stockholders Agreement with each of the Exchange Trusts and the Trust Advisors, dated December 27, 2018[19] |
| 10.16 | Orderly Marketing Agreement with the Trust Advisors to the Seller Trusts, dated December 27, 2018[19] |
| 10.17 | Participating Option Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, dated December 27, 2018[19] |
| 10.18 | Amendment to and Termination of Stockholders Agreement with each of the Exchange Trusts and the Trust Advisors, dated April 26, 2019[21] |
| 10.19 | Consent and Joinder to Amended and Restated Pledge and Security Agreement dated April 26, 2019[21] |
| 10.20* | Form of PSU Agreement with William B. Acheson dated April 22, 2019[22] |
| 10.21* | Form of Indemnification Agreement with Directors and Officers[21] |
| 10.22* | Employment Agreement dated as of May 31, 2019 by and between GWG Holdings, Inc. and Murray T. Holland[24] |
| 10.23* | Performance Share Unit Agreement dated as of May 31, 2019 by and between GWG Holdings, Inc. and Murray T. Holland[24] |
| 10.24 | Promissory Note dated May 31, 2019 made by and on behalf of certain LiquidTrust Borrowers[25]† |
| 10.25 | Intercreditor Agreement dated May 31, 2019 between GWG Life and HCLP Nominees, L.L.C.[25] |
| 10.26 | Intercreditor Agreement dated May 31, 2019 between GWG Life and Beneficient Holdings, Inc.[25] |
| 10.27 | Forbearance Letter Agreement dated July 3, 2019 between GWG DLP Funding IV, LLC and CLMG Corp. (as agent) (filed herewith) |
| 10.28* | Form of Non-employee Director Restricted Stock Agreement (filed herewith) |
| 21 | List of Subsidiaries[23] |
| 23.1 | Consent of Independent Registered Public Accounting Firm (filed herewith) |
| 24.1 | Power of Attorney (incorporated by reference to the signature page of this Annual Report on Form 10-K) |
| 31.1 | Section 302 Certification of the Chief Executive Officer (filed herewith) |
| 31.2 | Section 302 Certification of the Chief Financial Officer (filed herewith) |
| 32.1 | Certification of Chief Executive Officer and Chief Financial Officer Pursuant to 18 U.S.C. §1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (filed herewith) |
| 99.1 | Letter from ClearLife Limited, dated June 12, 2019 (filed herewith) |
| 99.2 | Portfolio of Life Insurance Policies as of December 31, 2018 (filed herewith) |
| 99.3 | Purchase and Contribution Agreement dated as of April 15, 2018 by and among The Beneficient Company Group, L.P., Beneficient Company Holdings, L.P., AltiVerse Capital Markets, L.L.C., Sabes AV Holdings, LLC, Jon R. Sabes, Steven F. Sabes, Insurance Strategies Fund, LLC and SFS Holdings, LLC[20] |
| 99.4 | The Beneficient Company Group, L.P. and Subsidiaries Consolidated Financial Statements and Independent Auditor's Report (filed herewith) |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Schema Document |

APP. 207

Case 3:22-cv-00410-B  Document 32-1  Filed 04/19/22  Page 208 of 1031  PageID 380

101.CAL  XBRL Calculation Linkbase Document

101.DEF  XBRL Definition Linkbase Document

101.LAB  XBRL Label Linkbase Document

101.PRE  XBRL Presentation Linkbase Document

_____

*   Management contract or compensatory plan or arrangement.

(1)  Incorporated by reference to Form S-1 Registration Statement filed on June 14, 2011 (File No. 333-174887).

(2)  Incorporated by reference to Current Report on Form 8-K filed on September 29, 2017.

84

APP. 208

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 209 of 1031    PageID 381

(3)    Incorporated by reference to Form S-1/A Registration Statement filed on August 25, 2011 (File No. 333-174887).

(4)    Incorporated by reference to Form S-1/A Registration Statement filed on September 20, 2011 (File No. 333-174887).

(5)    Incorporated by reference to Current Report on Form 8-K filed on October 26, 2017.

(6)    Incorporated by reference to Annual Report on Form 10-K filed on March 15, 2017.

(7)    Incorporated by reference to Quarterly Report on Form 10-Q filed on August 8, 2014.

(8)    Incorporated by reference to Annual Report on Form 10-K filed on March 22, 2016.

(9)    Incorporated by reference to Current Report on Form 8-K filed on June 30, 2017.

(10)    Incorporated by reference to Current Report on Form 8-K filed on February 22, 2017.

(11)    Incorporated by reference to Form S-1/A Registration Statement filed on October 23, 2015 (File No. 333-206626).

(12)    Incorporated by reference to Current Report on Form 8-K filed on May 10, 2017.

(13)    Incorporated by reference to Form S-1/A Registration Statement filed on June 6, 2014 (File No. 333-195505).

(14)    Incorporated by reference to Form S-1/A Registration Statement filed on February 7, 2017 (File No. 333-214896).

(15)    Incorporated by reference to Quarterly Report on Form 10-Q filed on May 1, 2018.

(16)    Incorporated by reference to Current Report on Form 8-K filed on May 9, 2018.

(17)    Incorporated by reference to Quarterly Report on Form 10-Q filed on August 14, 2018.

(18)    Incorporated by reference to Current Report on Form 8-K filed on August 14, 2018.

(19)    Incorporated by reference to Current Report on Form 8-K filed on January 4, 2019.

(20)    Incorporated by reference to Exhibit 10.1 to Amendment No. 1 to the Schedule 13D jointly filed on April 16, 2019 by Jon R. Sabes and Steven F. Sabes, among others.

(21)    Incorporated by reference to Current Report on Form 8-K filed on April 30, 2019.

(22)    Incorporated by reference to Current Report on Form 8-K filed on April 26, 2019.

(23)    Incorporated by reference to Annual Report on Form 10-K filed on March 29, 2018.

(24)    Incorporated by reference to Current Report on Form 8-K filed on June 6, 2019.

(25)    Incorporated by reference to Current Report on Form 8-K filed on June 6, 2019.

†      Certain information has been excluded from this exhibit because it both is not material and would likely cause competitive harm to the registrant if publicly disclosed.

### ITEM 16.  FORM 10-K SUMMARY.

Not applicable.

---

85

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities and Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**GWG HOLDINGS, INC.**

Date: July 9, 2019                                    By:  /s/ Murray T. Holland
                                                           *President and Chief Executive Officer*

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Murray T. Holland and Craig Opp, jointly and severally, as his or her true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him or her, and in his or her name, place and stead, in any and all capacities, to sign any and all amendments to this report, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite or necessary to be done in and about the premises hereby ratifying and confirming all that said attorneys-in-fact and agents, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities and Exchange Act of 1934, this report has been signed below, as of July 9, 2019, by the following persons on behalf of the registrant and in the capacities indicated below.

| *Signature* | *Title* |
|---|---|
| /s/ Murray T. Holland<br>Murray T. Holland | President and Chief Executive Officer<br>(Principal Executive Officer) |
| /s/ William B. Acheson<br>William B. Acheson | Chief Financial Officer<br>(Principal Financial and Accounting Officer) |
| /s/ Brad K. Heppner<br>Brad K. Heppner | Director |
| /s/ Peter T. Cangany, Jr.<br>Peter T. Cangany, Jr. | Director |
| /s/ Michelle Caruso-Cabrera<br>Michelle Caruso-Cabrera | Director |
| /s/ David F. Chavenson<br>David F. Chavenson | Director |
| /s/ Richard W. Fisher<br>Richard W. Fisher | Director |
| /s/ David H. Glaser<br>David H. Glaser | Director |
| /s/ Thomas O. Hicks<br>Thomas O. Hicks | Director |
| /s/ Dennis P. Lockhart<br>Dennis P. Lockhart | Director |
| /s/ Kathleen J. Mason<br>Kathleen J. Mason | Director |
| /s/ Bruce W. Schnitzer | Director |

APP. 210

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 211 of 1031    PageID 383

Bruce W. Schnitzer

/s/ Roger T. Staubach        Director

Roger T. Staubach

---

86

---

| Signature | Title |
|---|---|
| /s/ Sheldon I. Stein<br>Sheldon I. Stein | Director |
| /s/ David H. de Weese<br>David H. de Weese | Director |
| /s/ Bruce E. Zimmerman<br>Bruce E. Zimmerman | Director |

<div align="center">87</div>

10-K 1 f10k2019_gwgholdings.htm ANNUAL REPORT

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

# FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2019

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES ACT OF 1934**

For the transition period from _____ to _____

**Commission File Number: 001-36615**

# GWG HOLDINGS, INC.
(Exact name of registrant as specified in its charter)

| **Delaware** | **26-2222607** |
|---|---|
| (State or other jurisdiction of | (I.R.S. Employer |
| incorporation or organization) | Identification No.) |

**325 North St. Paul Street, Suite 2650**
**Dallas, TX 75201**
(Address of principal executive offices, including zip code)

**(612) 746-1944**
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Trading Symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| Common Stock | GWGH | Nasdaq Capital Market |

**Securities registered pursuant to Section 12(g) of the Act**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐  No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☐ | Accelerated filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | ☐ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐  No ☒

The aggregate market value of the registrant's common stock held by non-affiliates was $21,845,565 as of June 28, 2019 (the last business day of the registrant's most recently completed second fiscal quarter), based on a total of 2,878,352 shares of common stock held by non-affiliates and a closing price of $7.14 as reported on the Nasdaq Capital Market on June 28, 2019. For purposes of this computation, all officers, directors, and 10% beneficial owners of the registrant are deemed to be affiliates. Such determination should not be deemed to be an admission that such officers, directors or 10% beneficial owners, are or were, in fact, affiliates of the registrant.

As of March 24, 2020, GWG Holdings, Inc. had 33,035,249 shares of common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE:**

> **Exhibit**
>
> **A-2**

APP. 213

APP. 214

**GWG HOLDINGS, INC.**

**Index to Form 10-K**
**for the Fiscal Year Ended December 31, 2019**

| | | |
|---|---|---|
| PART I | | 1 |
| | | |
| ITEM 1. | Business. | 1 |
| ITEM 1A. | Risk factors. | 13 |
| ITEM 1B. | Unresolved staff comments. | 42 |
| ITEM 2. | Properties. | 42 |
| ITEM 3. | Legal proceedings. | 42 |
| ITEM 4. | Mine safety disclosures. | 42 |
| | | |
| PART II | | 43 |
| | | |
| ITEM 5. | Market for the registrant's common equity, related shareholder matters and issuer purchases of equity securities. | 43 |
| ITEM 6. | Selected financial data. | 43 |
| ITEM 7. | Management's discussion and analysis of financial condition and results of operations. | 44 |
| ITEM 7A. | Quantitative and qualitative disclosures about market risk. | 70 |
| ITEM 8. | Consolidated financial statements and supplementary data. | F-1 |
| ITEM 9. | Changes in and disagreements with accountants on accounting and financial disclosure. | 71 |
| ITEM 9A. | Controls and procedures. | 71 |
| ITEM 9B. | Other Information. | 72 |
| | | |
| PART III | | 73 |
| | | |
| ITEM 10. | Directors, executive officers and corporate governance. | 73 |
| ITEM 11. | Executive compensation. | 80 |
| ITEM 12. | Security ownership of certain beneficial owners and management and related shareholder matters. | 86 |
| ITEM 13. | Certain relationships and related transactions, and director independence. | 88 |
| ITEM 14. | Principal accounting fees and services. | 92 |
| | | |
| PART IV | | 93 |
| | | |
| ITEM 15. | Exhibits, financial statement schedules. | 93 |
| ITEM 16. | FORM 10-K SUMMARY | 95 |
| | | |
| SIGNATURES | | 96 |

i

PART I

**ITEM 1. BUSINESS.**

**Organizational Structure**

Our business was originally organized in February 2006. We added our current parent holding company, GWG Holdings, Inc. ("GWG Holdings"), in March 2008, and in September 2014 we consummated an initial public offering of our common stock on The Nasdaq Capital Market where our stock trades under the ticker symbol "GWGH."

GWG Holdings conducts its life insurance secondary market business through a wholly owned subsidiary, GWG Life, LLC ("GWG Life"), and GWG Life's wholly owned subsidiaries, GWG Life Trust and GWG DLP Funding IV, LLC. GWG Holdings' indirect interests in loans collateralized by cash flows from alternative assets are held by The Beneficient Company Group, L.P. ("Ben LP," including all of the subsidiaries it may have from time to time — "Beneficient") and its general partner, Beneficient Management, L.L.C. ("Beneficient Management"). As a result of the Investment and Exchange Agreements described in the section below entitled "The Beneficient Transaction", GWG Holdings reported the results of Ben LP and its subsidiaries on a consolidated basis beginning on the transaction date of December 31, 2019. All of these entities are legally organized in the state of Delaware, other than GWG Life Trust, which is governed by the laws of the state of Utah. Unless the context otherwise requires or we specifically so indicate, all references in this report to "we," "us," "our," "our Company," "GWG," or the "Company" refer to these entities collectively. Our headquarters are located in Dallas, Texas.

On November 11, 2019, GWG Holdings contributed the common stock and membership interests of its previously-wholly owned subsidiaries Life Epigenetics Inc. ("Life Epigenetics") and youSurance General Agency, LLC ("youSurance") to a legal entity, InsurTech Holdings, LLC ("InsurTech Holdings") in exchange for a membership interest in InsurTech Holdings. On March 2, 2020, InsurTech Holdings changed its name to FOXO BioScience LLC. Although we currently own 100% of the equity of InsurTech Holdings, we do not have a controlling financial interest in InsurTech Holdings because the managing member has substantive participating rights. Therefore, we account for our ownership interest in InsurTech Holdings as an equity method investment. Life Epigenetics was formed to commercialize epigenetic technology for the longevity industry. youSurance seeks to offer life insurance directly to customers utilizing epigenetic technology.

Beneficient was formed in 2003 but began its alternative asset business in September 2017. Beneficient operates primarily through its subsidiaries, which provide Beneficient's products and services. These subsidiaries include: (i) Beneficient Capital Company, L.L.C. ("BCC"), through which Beneficient offers loans and liquidity products; (ii) Beneficient Administrative and Clearing Company, L.L.C. ("BACC"), through which Beneficient provides services for fund and trust administration and plans to provide custody services; (iii) Pen Indemnity Insurance Company, LTD ("Pen"), through which Beneficient plans to offer insurance services; and (iv) Ben Markets Management Holdings, L.P., formerly called ACE Portal, L.L.C. ("ACE"), through which Beneficient plans to provide an online portal for direct access to Beneficient's financial services and products.

**Our Company**

We are a financial services company committed to transforming the alternative asset industry with disruptive and innovative products and services. In 2018 and 2019 GWG consummated a series of transactions (as more fully described below) with Beneficient that has resulted in a significant reorientation of our business and capital allocation strategy towards an expansive and diverse exposure to alternative assets. As part of this reorientation, we also changed our Board of Directors and executive management team.

While we are continuing our work to maximize the value of our secondary life insurance business, we do not anticipate purchasing additional life insurance policies in the secondary market and have increased capital allocated toward providing liquidity to a broader range of alternative assets, primarily through investments in Beneficient. We believe Beneficient's operations will generally produce higher risk-adjusted returns than those we can achieve from life insurance policies acquired in the secondary market. Furthermore, although we believe that our portfolio of life insurance policies is a meaningful component of a growing diversified alternative asset portfolio, we continue to explore strategic alternatives for our life insurance portfolio aimed at maximizing its value, including a possible sale, refinancing or recapitalization of our life insurance portfolio.

Page 1

APP. 216

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 217 of 1031     PageID 389

We completed our transactions with Beneficient to provide us with a significant increase in assets and common shareholder equity. In addition, our transactions with Beneficient provide us with the opportunity for a diversified source of future earnings within the alternative asset industry. As GWG and Beneficient expand their strategic relationship, we believe the Beneficient transactions will transform GWG from a niche provider of liquidity to owners of life insurance to, as GWG and Beneficient expand their strategic relationship, a full-scale provider of trust and liquidity products and services to owners of a broad range of alternative assets.

Beneficient, through its subsidiaries, plans to operate three potentially high value, high margin lines of business:

- Private Trust Lending & Liquidity Products. Through BCC, Beneficient provides a unique suite of private trust, lending and liquidity products focused on bringing liquidity to owners of professionally managed alternative assets. Beneficient's innovative liquidity solutions are designed to serve mid-to-high net worth ("MHNW") individuals, small-to-mid sized ("STM") institutions, and asset managers who have historically possessed few attractive options to access early liquidity from their alternative assets. Beneficient targets MHNW clients with $5 million to $30 million in net worth and STM institutional clients typically holding less than $1 billion in assets.

- Trust and Custody Services. Through BACC and (subject to capitalization) through Pen, Beneficient plans, in the future, to market retirement funds, custody and clearing of alternative assets, and trustee and insurance services for covering risks attendant to owning or managing alternative assets.

- Financial Technology. Through ACE, Beneficient plans to provide online portals and financial technologies for the trading and financing of alternative assets.

Beneficient's existing and planned products and services are designed to support the tax and estate planning objectives of its MHNW clients, facilitate a diversification of assets or simply provide administrative management and reporting solutions tailored to the goals of the investor who owns alternative investments.

**The Beneficient Transactions**

*The Exchange Transaction*

On January 12, 2018, GWG Holdings and GWG Life entered into a Master Exchange Agreement (as amended, the "Master Exchange Agreement") with Beneficient, MHT Financial SPV, LLC, a Delaware limited liability company ("MHT SPV"), and various related trusts (the "Seller Trusts"). The material terms and conditions of the initial Master Exchange Agreement were described in GWG Holdings' Current Report on Form 8-K (the "January 2018 Form 8-K") filed with the Securities and Exchange Commission ("SEC") on January 18, 2018.

On August 10, 2018, GWG Holdings, GWG Life, Beneficient, MHT SPV, and the Seller Trusts entered into a Third Amendment to Master Exchange Agreement (the "Third Amendment"). Pursuant to the Third Amendment, the parties agreed to consummate the transactions contemplated by the Master Exchange Agreement in two closings. The Third Amendment also generally deleted MHT SPV as a party to the Master Exchange Agreement. The material terms and conditions of the Third Amendment to Master Exchange Agreement were described in GWG Holdings' Current Report on Form 8-K (the "August 2018 Form 8-K") filed with the SEC on August 14, 2018. The transactions contemplated by the Master Exchange Agreement, as amended, are referred to throughout this Report as the "Exchange Transaction."

On the first closing date, which took place on August 10, 2018 (the "Initial Transfer Date"):

- in consideration for GWG Holdings and GWG Life entering into the Master Exchange Agreement and consummating the transactions contemplated thereby, Ben LP, as borrower, entered into a commercial loan agreement (the "Commercial Loan Agreement") with GWG Life, as lender, providing for a loan in a principal amount of $200.0 million (the "Commercial Loan");

- Ben LP delivered to GWG a promissory note (the "Exchangeable Note") in the principal amount of $162.9 million;

- Ben LP purchased 5,000,000 shares of GWG's Series B Convertible Preferred Stock, par value $0.001 per share and having a stated value of $10 per share (the "Series B"), for cash consideration of $50.0 million, which shares were subsequently transferred to the Seller Trusts;

Page 2

- the Seller Trusts delivered to GWG 4,032,349 common units of Ben LP at an assumed value of $10 per common unit;

- GWG issued to the Seller Trusts Seller Trust L Bonds due 2023 (the "Seller Trust L Bonds") in an aggregate principal amount of $403.2 million, as more fully described below;

- GWG and the Seller Trusts entered into a registration rights agreement with respect to the Seller Trust L Bonds received by the Seller Trusts; and

- GWG and Beneficient entered into a registration rights agreement with respect to the Ben LP common units received and to be received by GWG.

Under the Master Exchange Agreement, at the final closing (the "Final Closing" and the date on which the final closing occurred, the "Final Closing Date"), which occurred on December 28, 2018:

- in accordance with the Master Exchange Agreement, and based on the net asset value of alternative asset financings as of the Final Closing Date, effective as of the Initial Transfer Date, (i) the principal amount of the Commercial Loan was reduced to $182.0 million, (ii) the principal amount of the Exchangeable Note was reduced to $148.2 million, and (iii) the principal amount of the Seller Trust L Bonds was reduced to $366.9 million;

- the Seller Trusts refunded to GWG $0.8 million in interest paid on the Seller Trust L Bonds related to the Seller Trust L Bonds that were issued as of the Initial Transfer Date but cancelled, effective as of the Initial Transfer Date, on the Final Closing Date;

- the accrued interest on the Commercial Loan and the Exchangeable Note was added to the principal amount of the Commercial Loan, as a result of which the principal amount of the Commercial Loan as of the Final Closing Date was $192.5 million;

- the Seller Trusts transferred to GWG an aggregate of 21,650,087 common units of Ben LP and GWG received 14,822,843 common units of Ben LP in exchange for the Exchangeable Note, upon completion of which GWG owned (including the 4,032,349 common units received by GWG on the Initial Transfer Date) 40,505,279 common units of Ben LP;

- Ben LP issued to GWG an option (the "Option Agreement") to acquire the number of common units of Ben LP, interests or other property that would be received by a holder of Preferred Series A Subclass 1 Unit Accounts of Beneficient Company Holdings, L.P. ("BCH"), an affiliate of Ben LP; and

- GWG issued to the Seller Trusts 27,013,516 shares of GWG common stock (including shares issued upon conversion of the Convertible Preferred Stock).

On the Final Closing Date, GWG and the Seller Trusts also entered into a registration rights agreement with respect to the shares of GWG common stock owned by the Seller Trusts, an orderly marketing agreement and a stockholders' agreement. The material terms of these agreements were described in our Information Statement on Schedule 14C filed with the SEC on December 6, 2018, and in our Current Report on Form 8-K filed with the SEC on January 4, 2019.

*The Expanded Strategic Relationship*

In the second quarter of 2019, we completed an expansion of the strategic relationship with Beneficient, which was a transformational event for both organizations that is expected to create a unified platform uniquely positioned to provide an expanded suite of products, services and resources for investors and the financial professionals who assist them. GWG and Beneficient intend to collaborate extensively and capitalize on one another's capabilities, relationships and services.

On April 15, 2019, Jon R. Sabes, the Company's former Chief Executive Officer and a former director, and Steven F. Sabes, the Company's former Executive Vice President and a former director, entered into a Purchase and Contribution Agreement (the "Purchase and Contribution Agreement") with, among others, Ben LP. The Purchase and Contribution Agreement was summarized in our Current Report on Form 8-K filed with the SEC on April 16, 2019.

Page 3

APP. 218

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 219 of 1031    PageID 391

The closing of the transactions contemplated by the Purchase and Contribution Agreement (the "Purchase and Contribution Transaction") occurred on April 26, 2019. Prior to or in connection with such closing:

- Messrs. Jon and Steven Sabes sold and transferred all of the shares of the Company's common stock held directly and indirectly by them and their immediate family members (approximately 12% of the Company's outstanding common stock in the aggregate); specifically, Messrs. Jon and Steven Sabes (i) sold an aggregate 2,500,000 shares of Company common stock to BCC for $25.0 million in cash and (ii) contributed the remaining 1,452,155 shares of Company common stock to AltiVerse Capital Markets, L.L.C., a Delaware limited liability company ("AltiVerse") (which is a limited liability company owned by an entity related to Beneficient's founders, including Brad K. Heppner (GWG's Chairman and Beneficient's Chief Executive Officer and Chairman) and an entity related to Thomas O. Hicks (one of Beneficient's current directors and a director of GWG)), in exchange for certain equity interests in AltiVerse.

- Our bylaws were amended to increase the maximum number of directors of the Company from nine to 13, and the actual number of directors comprising the Board was increased from seven to 11. The size of the Board has since been reduced and currently consists of nine directors.

- All seven members of the Company's Board of Directors prior to the closing resigned as directors of the Company, and 11 individuals designated by Beneficient were appointed as directors of the Company, leaving two board seats vacant after the closing.

- Jon R. Sabes resigned from all officer positions he held with the Company and all of its subsidiaries prior to the closing, other than his position as Chief Executive Officer of the Company's technology focused wholly owned subsidiaries, Life Epigenetics and youSurance.

- Steven F. Sabes resigned from all officer positions he held with the Company and all of its subsidiaries prior to the closing, except as Chief Operating Officer of Life Epigenetics.

- The resignations of Messrs. Jon and Steven Sabes included a full waiver and forfeit of (i) any severance that may be payable by the Company or any of its subsidiaries in connection with such resignations or the Purchase and Contribution Transaction and (ii) all equity awards of the Company currently held by either of them.

- Murray T. Holland, a trust advisor of the Seller Trusts, was appointed as Chief Executive Officer of the Company.

- The Company entered into performance share unit agreements with certain employees of the Company pursuant to which such employees would receive a bonus under certain terms and conditions, including, among others, that such employees remain employed by the Company or one of its subsidiaries (or, if no longer employed, such employment was terminated by the Company other than for cause, as such term is defined in the performance share unit agreement) for a period of 120 days following the closing.

- The stockholders' agreement that was entered into on the Final Closing Date was terminated by mutual consent of the parties thereto.

- BCC and AltiVerse executed and delivered a Consent and Joinder to the Amended and Restated Pledge and Security Agreement dated October 23, 2017 by and among the Company, GWG Life, LLC, Messrs. Jon and Steven Sabes and the Bank of Utah, which provides that the shares of the Company's common stock acquired by BCC and AltiVerse pursuant to the Purchase and Contribution Agreement will continue to be pledged as collateral security for the Company's obligations owing in respect of the L Bonds issued under our Amended and Restated Indenture, dated as of October 23, 2017, as amended and supplemented.

Among other things, the Purchase and Contribution Agreement contemplated that after the closing, the parties will seek to enter into an agreement pursuant to which the Company will, in certain circumstances, have the right to appoint a majority of the board of directors of the general partner of Beneficient, resulting in the Company and Beneficient being consolidated from a financial reporting perspective. The Company and Beneficient will also seek to enter into an agreement pursuant to which the Company will offer and distribute (through a FINRA registered managing broker-dealer) Beneficient's liquidity products and services. The Company intends to reduce capital allocated to life insurance assets while it works with Beneficient to build a larger diversified portfolio of alternative asset investment products.

A copy of the Purchase and Contribution Agreement is included in our Annual Report on Form 10-K filed with the SEC on July 9, 2019 as Exhibit 99.3.

<div align="center">Page 4</div>

*The Investment and Exchange Agreements*

On December 31, 2019, the Company, Ben LP, BCH, and Beneficient Management entered into a Preferred Series A Unit Account and Common Unit Investment Agreement (the "Investment Agreement").

Pursuant to the Investment Agreement, the Company transferred $79.0 million to Ben LP in return for 666,667 common units of Ben LP and a Preferred Series A Subclass 1 Unit Account of BCH.

In connection with the Investment Agreement, the Company obtained the right to appoint a majority of the board of directors of Beneficient Management, the general partner of Ben LP. As a result, the Company obtained control of Ben LP and began reporting the results of Ben LP and its subsidiaries on a consolidated basis beginning on the transaction date of December 31, 2019. The Company's right to appoint a majority of the board of directors of Beneficient Management will terminate in the event (i) the Company's ownership of the fully diluted equity of Ben LP (excluding equity issued upon the conversion or exchange of Preferred Series A Unit Accounts of BCH held as of December 31, 2019 by parties other than the Company) is less than 25%, (ii) the Continuing Directors of the Company cease to constitute a majority of the board of directors of the Company, or (iii) certain bankruptcy events occur with respect to the Company. The term "Continuing Directors" means, as of any date of determination, any member of the board of directors of the Company who: (1) was a member of the board of directors on December 31, 2019; or (2) was nominated for election or elected to the board of directors with the approval of a majority of the Continuing Directors who were members of the board of directors at the time of such nomination or election.

Following the transaction, and as agreed upon in the Investment Agreement, the Company was issued an initial capital account balance for the Preferred Series A Subclass 1 Unit Account of $319.0 million. The other holders of the Preferred Series A Subclass 1 Unit Accounts are an entity related to the founders of Ben LP and an entity related to one of GWG's and Beneficient's directors (the "Related Entities"), and the aggregate capital accounts of all holders of the Preferred Series A Subclass 1 Unit Accounts after giving effect to the investment by the Company is $1.6 billion. The Company's Preferred Series A Subclass 1 Unit Account is the same class of preferred security as held by the Related Entities. In the event the Related Entities exchange their Preferred Series A Subclass 1 Unit Account for securities of the Company, the Company's Preferred Series A Subclass 1 Unit Account would be converted into common units of Ben LP (so neither the Company nor the founders would hold Preferred Series A Subclass 1 Unit Accounts).

Also, on December 31, 2019, in a transaction related to the Investment Agreement, GWG Holdings transferred its interest in the Preferred Series A Subclass 1 Unit Account to its wholly owned subsidiary, GWG Life.

In addition, on December 31, 2019, the Company, Ben LP and the holders of common units of Ben LP (the "Common Units") entered into an Exchange Agreement (the "Exchange Agreement") pursuant to which the holders of Common Units from time to time have the right, on a quarterly basis, to exchange their Common Units for common stock of the Company. The exchange ratio in the Exchange Agreement is based on the ratio of the capital account associated with the Common Units to be exchanged to the market price of the Company's common stock based on the volume weighted average price of the Company's common stock for the five consecutive trading days prior to the quarterly exchange date. The Exchange Agreement is intended to facilitate the marketing of Ben LP's products to holders of alternative assets.

The Exchange Transaction, the Purchase and Contribution Transaction, and the Investment and Exchange Agreements are referred to collectively as the "Beneficient Transactions."

**Segment Financial Information**

We have two reportable segments: 1) Investment in Beneficient and 2) Secondary Life Insurance.

GWG segment information is included in Note 20, Segment Reporting, to the consolidated financial statements included in Item 8 of Part II of this Form 10-K.

**Market Opportunity**

*Alternative Asset Liquidity Products and Services*

The market demand for liquidity from owners of alternative assets is attributable to the outstanding net asset value of illiquid alternative assets ("NAV") held by U.S. investors. Using data from various published industry reports from 2017 to 2019, certain widely accepted commercial private-equity databases, and applying its own proprietary assumptions and calculations ("Ben Estimates"), Beneficient estimates that total outstanding NAV held by U.S. investors exceeded $4.0 trillion in 2019 (up from an estimated $3.0 trillion in 2018).

Page 5

APP. 220

According to at least one industry report from Preqin from 2018, total outstanding NAV in the hands of U.S. investors grew at a 12.1% compound annual growth rate (CAGR) for the ten years ended 2018 and was forecasted to grow at an 8% CAGR through 2023 as a result of continued increases in capital committed to the alternative asset class.

According to Ben Estimates, the large U.S. institutions representing approximately 54% of the NAV have consistently sought liquidity on approximately 1.85% to 2.25% of their outstanding NAV. Based on Ben Estimates, this has led to an annual demand for liquidity of nearly $50 billion in recent years.

A primary group not included in this demand is the MHNW investor who holds investments of $5 million to $30 million compared to a large institution's holdings in the hundreds of millions or billions of dollars. Intermediary brokers will often not represent the MHNW individuals (or STM institutional investors). According to Ben Estimates, MHNW investors hold over $700.0 billion in NAV, yet MHNW investors have only been able to access liquidity representing less than 0.5% of the NAV held by them each year, compared to the average 2% achieved by the large institutional owners, representing 54% of the market.

Based on these amounts, Beneficient estimates that MHNW investors would seek liquidity of 3% of their outstanding NAV each year if liquidity was made available to them, or a slightly greater percentage than that of large U.S. institutions. As a result, and according to Ben Estimates, the estimated market demand for liquidity by MHNW individuals would have exceeded $20.0 billion in 2019.

*Secondary Life Insurance Market*

The market for life insurance is large. According to the American Council of Life Insurers Fact Book 2018 (ACLI), consumers owned approximately $12.0 trillion in face value of individual life insurance policy benefits in the United States in 2017. In that same year, the ACLI reports that individual consumers purchased an aggregate of $3.1 trillion of new individual life insurance policy benefits. This figure includes all types of individual life policies, including term insurance and permanent insurance known as whole life and universal life.

The life insurance secondary market primarily serves consumers, 65 years and older, and their families who own life insurance.

The secondary market for life insurance exists as a result of consumer lapse behaviors and surrender values far below economic value offered to consumers for their life insurance by the issuing insurance carriers. The ACLI reports that the annual lapse and surrender rate for individual life insurance policies is 5.7% of the in-force face value of benefits, amounting to over $680 billion in face value of policy benefits lapsed and surrendered in 2017 alone.

In 2017, the National Association of Insurance Commissioners ("NAIC") issued a policy bulletin in support of products we provide. The bulletin described these products as "innovative private market solutions for financing Americans' long-term care needs." The NAIC, citing the Company's August 25, 2016 presentation, discussed how consumers could exchange the market value of their life insurance policies for products designed to fund long-term care expenses.

*Primary Life Insurance Market and Technology ("Insurtech")*

The opportunity to apply technology to transform the insurance industry is significant. The application of technology to the insurance industry, commonly referred to as "insurtech", provides opportunities for new entrants into the traditional insurance marketplace that have the potential to significantly disrupt the insurance industry's historical approach to assessing and selecting acceptable underwriting risks.

As discussed in the Organizational Structure section above, on November 11, 2019, GWG contributed the common stock and membership interests of its previously wholly-owned subsidiaries, Life Epigenetics and youSurance, to InsurTech Holdings. This transaction affected a reorganization such that InsurTech owns only two direct subsidiaries, Life Epigenetics and youSurance, which hold all insurtech assets, and one indirect subsidiary, Scientific Testing Partners, LLC, a wholly owned subsidiary of Life Epigenetics. In connection with the transaction, GWG Holdings contributed $2.1 million in cash to InsurTech Holdings during the fourth quarter of 2019 and is committed to contribute an additional $17.9 million to the entity over the next two years.

Page 6

APP. 221

**Business Strategies**

*1. Liquidity for Alternative Assets*

As a result of the Beneficient Transactions, we are now uniquely positioned to provide liquidity and related services to investors holding a full range of illiquid alternative assets. We will continue to work to create the most value for holders of alternative assets, the financial professionals who advise them and for our shareholders.

Beneficient provides private trust solutions, including a unique suite of lending and liquidity products focused on bringing liquidity to owners of alternative assets. Beneficient's innovative liquidity solutions are designed to serve MHNW individuals, STM institutions, and asset managers who have historically possessed few attractive options to access early liquidity from their alternative assets. Beneficient targets MHNW individual clients with $5 million to $30 million in investments and institutional clients typically holding less than $1 billion in assets.

Beneficient's products can also support tax and estate planning objectives, facilitate a diversification of assets or provide administrative management and reporting solutions tailored to the goals of the investor. In the future, Beneficient plans to offer insurance services covering risks associated with owning or managing alternative assets.

Our life insurance secondary market business is designed to serve consumers 65 years or older owning life insurance. We seek to earn non-correlated yield from life insurance policies that we purchased in the secondary market. Since inception, we have purchased over $3.2 billion in face value of policy benefits from consumers for over $620 million, as compared to the $52 million in surrender value offered by insurance carriers on those same policies. Our products provide unique and valuable services to the senior consumers that we serve.

The goal of our secondary life insurance business has been to build a profitable, large and well-diversified portfolio of life insurance assets. We believe that scale and diversification are key factors and risk mitigation strategies to provide consistent cash flows and reliable investment returns. We believe that we have reached the goal in terms of portfolio size and diversification. As described elsewhere, we do not anticipate making additional investments in the life settlements portfolio as we believe Beneficient's operations will generally produce higher risk-adjusted returns than those we can achieve from life insurance policies acquired in the secondary market.

*2. Developing a World Class Financial Services Distribution Platform*

GWG has developed a large and sophisticated financial services product distribution platform. Today, this platform consists of over one hundred independent broker-dealers and several thousand "independent" financial advisors ("Retail Distribution") who sell the Company's investment products. "Independent" in this context refers to broker-dealers that accommodate financial advisors who carry securities licenses and need back-office support for services, such as compliance and trade execution, but allow their advisors wide latitude in how they conduct business. Since inception, GWG has raised over $1.52 billion of debt and equity capital to support our secondary market of life insurance business and related expenditures.

We believe that we are well positioned to continue to grow our Retail Distribution for several reasons:

- There is a trend of financial professionals leaving large full-service broker-dealers to become "independent";

- Newly independent financial professionals and their clients demand a high level of customer service and access to innovative and value added products;

- The significant demand for liquidity from owners of alternative assets by US investors;

- Our expanded relationship with Beneficient will attract more and larger broker dealers to our platform due to our increased size and market capitalization as well as the increase in products offered; and

- By using capital to provide liquidity products to our current customers, and as they begin to realize the benefit of these products, we will able to raise more capital and attract additional broker dealers into our selling group.

*3. Commercializing Advanced Epigenetic Technology for Primary Life Insurance Markets*

We believe life insurance underwriting will be transformed due to advancements in science and technology. As part of that transformational change, we believe the science of epigenetics will serve as a foundational science to this advancement for the life insurance industry by achieving more accurate and automated underwriting.

Page 7

APP. 222

As discussed in the Organizational Structure section above, on November 11, 2019, GWG contributed the common stock and membership interests of its previously wholly-owned subsidiaries, Life Epigenetics and youSurance, to InsurTech Holdings. We believe that as a separate entity (rather than as a small subsidiary of a large financial services holding company), the InsurTech Holdings businesses can reach their maximum potential in terms of marketing and branding, attraction of talent, appropriate peer group comparisons and, ultimately, return to its owners. The Company will retain substantially all of the economics of InsurTech Holdings.

**Secondary Life Insurance Assets**

Our portfolio of life insurance policies, owned by our subsidiaries as of December 31, 2019, is summarized below:

**Life Insurance Portfolio Summary**

| | | |
|---|---|---|
| Total life insurance portfolio face value of policy benefits (in thousands) | $ | 2,020,973 |
| Average face value per policy (in thousands) | $ | 1,756 |
| Average face value per insured life (in thousands) | $ | 1,883 |
| Weighted average age of insured (years) | | 82.4 |
| Weighted average life expectancy (LE) estimate (years) | | 7.2 |
| Total number of policies | | 1,151 |
| Number of unique lives | | 1,073 |
| Demographics | | 74% Male; 26% Female |
| Number of smokers | | 48 |
| Largest policy as % of total portfolio face value | | 0.7% |
| Average policy as % of total portfolio | | 0.1% |
| Average annual premium as % of face value | | 3.3% |

Our portfolio of life insurance policies, owned by our subsidiaries as of December 31, 2019, organized by the insured's current age and the associated number of policies and policy benefits, is summarized below:

**Distribution of Policies and Policy Benefits by Current Age of Insured**

| Min Age | Max Age | Number of Policies | Policy Benefits (in thousands) | Number of Policies | Policy Benefits | Wtd. Avg. LE (years) |
|---|---|---|---|---|---|---|
| 95 | 101 | 17 | $ 34,402 | 1.5% | 1.7% | 2.2 |
| 90 | 94 | 145 | 283,442 | 12.6% | 14.0% | 3.3 |
| 85 | 89 | 238 | 556,090 | 20.7% | 27.5% | 5.0 |
| 80 | 84 | 251 | 463,047 | 21.8% | 22.9% | 7.7 |
| 75 | 79 | 224 | 347,952 | 19.4% | 17.2% | 9.8 |
| 70 | 74 | 205 | 264,496 | 17.8% | 13.1% | 11.0 |
| 60 | 69 | 71 | 71,544 | 6.2% | 3.6% | 11.4 |
| **Total** | | **1,151** | **$ 2,020,973** | **100.0%** | **100.0%** | **7.2** |

Page 8

Our portfolio of life insurance policies, owned by our subsidiaries as of December 31, 2019, organized by the insured's estimated life expectancy estimates and associated policy benefits, is summarized below:

**Distribution of Policies by Current Life Expectancies of Insured**

| LE (Months) | Max LE (Months) | Number of Policies | Policy Benefits (in thousands) | Percentage of Total | |
|---|---|---|---|---|---|
| | | | | Number of Policies | Policy Benefits |
| 0 | 47 | 281 | $ 447,313 | 24.4% | 22.1% |
| 48 | 71 | 223 | 389,264 | 19.4% | 19.3% |
| 72 | 95 | 214 | 408,932 | 18.6% | 20.2% |
| 96 | 119 | 191 | 334,356 | 16.6% | 16.6% |
| 120 | 143 | 121 | 187,760 | 10.5% | 9.3% |
| 144 | 179 | 97 | 180,742 | 8.4% | 8.9% |
| 180 | 240 | 24 | 72,606 | 2.1% | 3.6% |
| **Total** | | **1,151** | **$ 2,020,973** | **100.0%** | **100.0%** |

We rely on the payment of policy benefit claims by life insurance companies as a significant source of cash inflow. The life insurance assets we own represent obligations of third-party life insurance companies to pay the benefit amount under the policy upon the mortality of the insured. As a result, we manage this credit risk exposure by generally purchasing policies issued by insurance companies with investment-grade ratings from Standard & Poor's, and diversifying our life insurance portfolio among a number of insurance companies.

The yield to maturity on bonds issued by life insurance carriers reflects, among other things, the credit risk (risk of default) of such insurance carrier. We follow the yields on certain publicly traded life insurance company bonds because this information is part of the data we consider when valuing our portfolio of life insurance policies for our financial statements.

The average yield to maturity of publicly traded life insurance company bonds data we consider as inputs to our life insurance portfolio valuation process was 2.67% as of December 31, 2019. We believe that this average yield to maturity reflects, in part, the financial market's judgment that credit risk is low with regard to these carriers' financial obligations. The obligations of life insurance carriers to pay life insurance policy benefits ranks senior to all of their other financial obligations, including the senior bonds they issue. The portfolio is backed by over 80 high quality insurance carriers. As of December 31, 2019, 95.7% of the face value benefits of our life insurance policies were issued by insurers having an investment-grade rating (BBB or better) by Standard & Poor's.

As of December 31, 2019, our ten largest life insurance company credit exposures and the Standard & Poor's credit rating of their respective financial strength and claims-paying ability is set forth below:

**Distribution of Policy Benefits by Top 10 Insurance Companies**

| Rank | Policy Benefits (in thousands) | Percentage of Policy Benefit Amount | Insurance Company | Ins. Co. S&P Rating |
|---|---|---|---|---|
| 1 | $ 287,492 | 14.2% | John Hancock Life Insurance Company | AA- |
| 2 | 233,338 | 11.5% | Lincoln National Life Insurance Company | AA- |
| 3 | 214,799 | 10.6% | AXA Equitable Life Insurance Company | A+ |
| 4 | 196,164 | 9.7% | Transamerica Life Insurance Company | AA- |
| 5 | 112,503 | 5.6% | Metropolitan Life Insurance Company | AA- |
| 6 | 98,068 | 4.8% | American General Life Insurance Company | A+ |
| 7 | 85,998 | 4.3% | Pacific Life Insurance Company | AA- |
| 8 | 69,976 | 3.5% | ReliaStar Life Insurance Company | A |
| 9 | 64,095 | 3.2% | Massachusetts Mutual Life Insurance Company | AA+ |
| 10 | 60,953 | 3.0% | Protective Life Insurance Company | AA- |
| | **$ 1,423,386** | **70.4%** | | |

Page 9

**Beneficient Loans Receivable**

Beneficient's primary operations pertain to its liquidity products whereby Ben LP, through its subsidiaries, extends loans collateralized by cash flows from illiquid alternative assets and provides services to the trustees who administer the collateral. Beneficient's core business products are its Exchange Trust, LiquidTrust and the InterChange Trust (introduced in 2020). Beneficient's clients select one of these products and place their alternative assets into the custody trust that is a constituent member of a trust structure called the "ExAlt Plan$^{TM}$" (comprised of Exchange Trusts, LiquidTrusts, Custody Trusts, Collective Trusts, and Funding Trusts). The ExAlt Plan$^{TM}$ then delivers to Beneficient's clients the consideration required by the specific product selected by Beneficient's clients. At the same time, Beneficient, through a subsidiary, extends a loan to the ExAlt Plan$^{TM}$. The proceeds (cash or securities of Ben LP or its affiliates) of that loan to the ExAlt Plan$^{TM}$ are ultimately paid to the client. The cash flows from the client's alternative asset support the repayment of the loans plus any related interest and fees.

Beneficient held loans receivable of $232.3 million at December 31, 2019, representing the fair value of loans as a result of the purchase accounting applied in conjunction with the Investment and Exchange Agreements described above. Loans are carried at the principal amount outstanding, plus interest paid in kind. Loans are demand loans with a maturity date of 12 years. Loans bear contractual interest at the greater of 14% or 1-month LIBOR plus 10%, compounded daily. In the event an alternative reference rate is required, the secured overnight financing rate (SOFR) would replace LIBOR, as contemplated in our loan agreements. The primary source of repayment for the loans and related fees is cash flows from the alternative assets collateralizing the loans. Interest income on loans is accrued on the principal amount outstanding and interest compounds on a daily basis.

As of December 31, 2019, Beneficient's loan portfolio had exposure to 117 professionally managed alternative investment funds, comprised of 362 underlying investments, and approximately 96 percent of Beneficient's loan portfolio was backed by investments in private companies. Beneficient's loan portfolio diversification spans across these industry sectors, investment strategy types and geographic regions:



Assets in the collateral portfolio consist primarily of interests in alternative investment vehicles (also referred to as "funds") that are managed by a group of U.S. and non-U.S. based alternative asset management firms that invest in a variety of financial markets and utilize a variety of investment strategies. The vintages of the funds in the collateral portfolio as of December 31, 2019 ranged from 1998 to 2011.

As Beneficient grows its loan portfolio, Beneficient will monitor the diversity of its collateral portfolio through the use of concentration guidelines. These guidelines were established, and will be periodically updated, through a data driven approach based on asset type, fund manager, vintage of fund, industry segment and geography to manage portfolio risk. Beneficient will refer to these guidelines when making decisions about new financing opportunities; however, these guidelines will not restrict Beneficient from entering into financing opportunities that would result in Beneficient having exposure outside of its concentration guidelines. In addition, changes to Beneficient's collateral portfolio may lag changes to the concentration guidelines. As such, Beneficient's collateral portfolio may, at any given time, have exposures that are outside of its concentration guidelines to reflect, among other things, attractive financing opportunities, limited availability of assets, or other business reasons. Given Beneficient's limited operating history, the collateral portfolio, as of December 31, 2019, had exposure to certain alternative investment vehicles and investments in private companies that were outside of those guidelines.

Classifications by industry sector, investment strategy type and geography reflect classification of investments held in funds or companies held directly in the collateral portfolio. Investments reflect the assets listed by the general partner of a fund as held by the fund and have a positive or negative net asset value. Typical assets include portfolio companies, limited partnership interests in other funds, and net other assets, which are a fund's cash and other current assets minus liabilities.

Industry sector is based on Global Industry Classification Standard (GICS®) Level 2 classification (also known as "Industry Group") of companies held in the collateral portfolio by funds or directly, subject to certain adjustments by us. "Other" classification is not a GICS® classification. "Other" classification reflects companies in the GICS® classification categories of Automobiles & Components, Banks, Commercial & Professional Services, Consumer Durables & Apparel, Consumer Services, Energy, Food, Beverage & Tobacco, Household & Personal Products, Insurance, Materials, Media & Entertainment, Real Estate, Retailing, Semiconductors & Semiconductors Equipment, Tech Hardware & Equipment, and Transportation. N/A includes investments assets that we have determined do not have an applicable GICS Level 2 classification, such as Net Other Assets and investments that are not operating companies.

Investment strategy type reflects classifications based on each fund's current investment strategy stage as determined by us. "Other Strategy Types" include private debt strategies, natural resources strategies, and hedge funds.

APP. 225

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 226 of 1031    PageID 398

Geography reflects classifications determined by us based on each underlying investment. "Other" geography classification includes Israel, Australia, Eastern Europe.

---

Page 10

---

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 226 of 1031    PageID 398

Geography reflects classifications determined by us based on each underlying investment. "Other" geography classification includes Israel, Australia, Eastern Europe.

APP. 226

**Competitive and Regulatory Framework**

*Competition*

We encounter significant competition from numerous companies in the products and services we provide and seek to develop in the alternative assets industry. Many of these competitors have greater financial and other resources than we do and may have significantly lower cost of funds than us because they have access to insured deposits or greater access to the capital markets, for example. They may also have greater market share in the markets in which we operate. These factors could adversely affect our business, results of operations and financial condition and our ability to implement our growth strategies.

In addition, as we enter new markets, we expect to experience significant competition from incumbent market participants. Our ability to compete in these markets will be dependent upon our ability to deliver value-added products and services to the customers we serve. These factors also could adversely affect our business, results of operations and financial condition and our ability to implement our growth strategies.

*Government Regulation*

Our life insurance secondary market business is highly regulated at the state level with respect to the life insurance industry, and at the federal level with respect to the issuance of our securities offerings. At the state level, states generally subject us to laws and regulations requiring us to obtain specific licenses or approvals to purchase life insurance policies in those states. State statutes typically provide state regulatory agencies with significant powers to interpret, administer and enforce the laws relating to the life insurance industry. Under this authority, state regulators have broad discretionary power and may impose new licensing and other requirements, and interpret or enforce existing regulatory requirements in new and different ways. Any of these new requirements, interpretations or enforcement directives could be materially adverse to our industry.

Beneficient has applied for trust charters from the Texas Department of Banking and intends to carry on much of its business through two subsidiary trust companies. Because Beneficient's current business plans are based in part on obtaining regulatory charters to operate as regulated trust companies, a failure to obtain such charters may materially and adversely impact its financial performance and prospects, which would likely diminish our ability to affect parts of our business plan and growth strategies. Furthermore, a failure to obtain the trust charters may trigger an impairment assessment related to the assets of Beneficient, including goodwill recognized in connection with the Investment and Exchange Agreements (see Note 5 to our consolidated financial statements for further details of the accounting for the change in control).

The state regulatory landscape for the use of genetic and epigenetic testing in life insurance underwriting is such that genetic and epigenetic testing is generally permitted. A few states require informed consent for use of genetic testing in life insurance underwriting. Epigenetic testing is distinguishable from genetic testing and we believe epigenetic testing does not raise the ethical issue found with genetic testing of denying insurance coverage to applicants based on immutable inherited characteristics. While well-informed policymakers and regulators should have little reason to consider expanding current definitions of genetic testing to include epigenetic testing, or to increase restrictions on life insurance underwriting using epigenetic test results, we can provide no such assurances.

Other changes to the current genetic and epigenetic regulatory framework, including the imposition of additional or new regulations, could arise at any time during the development or marketing of InsurTech Holdings' epigenetic based products. This may negatively affect the ability of InsurTech Holdings to obtain or maintain applicable regulatory clearance or approval of its products. In addition, regulatory authorities, such as the Food and Drug Administration (FDA), may introduce new requirements that may change the regulatory requirements for InsurTech Holdings or its customers, or both.

Although the federal securities laws and regulations do not directly affect life insurance, in some cases the purchase of a variable life insurance policy may constitute a transaction involving a "security" that is governed by federal securities laws. While we presently hold few variable life insurance policies, our holding of a significant amount of such policies in the future could cause our Company or one of our subsidiaries to be characterized as an "investment company" under the federal Investment Company Act of 1940. The application of that law to all or part of our businesses — whether due to our purchase of life insurance policies or to the expansion of the definition of "securities" under federal securities laws — could require us to comply with detailed and complex regulatory requirements, and cause us to fall out of compliance with certain covenants under our second amended and restated senior credit facility with LNV Corporation. Such an outcome could negatively affect our business, results of operations and financial condition and our ability to implement our growth strategies.

We hold licenses to purchase life insurance policies in 38 states and can also purchase in seven unregulated states. We have also historically purchased life insurance policies from other secondary market participants.

*Health Insurance Portability and Accountability Act (HIPAA)*

HIPAA requires that holders of medical records maintain such records and implement procedures designed to assure the privacy of patient records. In order to carry out our business, we receive medical records and obtain a release to share such records with a defined group of persons, take on the responsibility for preserving the privacy of that information, and use the information only for purposes related to the life insurance policies we own.

<div align="center">Page 11</div>

APP. 227

*The Genetic Information Nondiscrimination Act of 2008 (GINA)*

GINA is a federal law that protects people from genetic discrimination in health insurance and employment. GINA prohibits health insurers from: (i) requesting, requiring, or using genetic information to make decisions about eligibility for health insurance; or (ii) making decisions on the health insurance premium, contribution amounts, or coverage terms they offer to consumers. In addition, GINA makes it against the law for health insurers to consider family history or a genetic test result, a preexisting condition, require a genetic test, or use any genetic information, to discriminate coverage, even if the health insurance company did not mean to collect such genetic information.

GINA does not apply to the life insurance, long-term care or annuity industries. The life insurance, long-term care or annuity industries operate on medical-evidenced underwriting principles in which specific medical conditions are taken into account when assessing and pricing risk. The regulation of genomic data is relatively new, and we believe it is likely that regulation will increase and grow more complex in the foreseeable future. We cannot, however, predict what any new law or regulation would specifically involve or how it might affect our industry, our business, or our future plans.

**Patents, trademarks, licenses**

On March 19, 2018, Life Epigenetics filed provisional patents for the application of the use of epigenetic technology against the identification of tobacco and alcohol usage. Life Epigenetics continues to advance its intellectual property protection of these alcohol and tobacco focused technologies.

On December 17, 2018, Life Epigenetics secured the exclusive evaluation and option agreement for patent pending "Phenotypic Age and DNA Methylation Based Biomarkers for Life Expectancy and Morbidity" technology from The Regents of the University of California to commercialize advanced epigenetic technology for the life insurance industry.

Life Epigenetics has filed additional patents for a machine learning model trained to classify risk using DNA epigenetic data, a machine learned epigenetic status estimator, and a machine learning model trained to determine biochemical stat and/or medical conditions using DNA epigenetic data.

We believe epigenetics will be commercialized to improve upon many traditional factors used in the life insurance underwriting process with greater accuracy, speed and convenience. To that end, Life Epigenetics is engaged in several research and development efforts to further validate, refine and expand its epigenetic testing capabilities. In particular, Life Epigenetics conducted a research study comprised of approximately 1,300 participants in which biological samples, as well as medical records and prescription transaction history records, detailed health history, and DNA methylation analysis were conducted. Life Epigenetics measured the results of each participant's diagnostic indicators against insurance risk classes, disease states, biomarker levels, and prescription medication statuses. The results demonstrate that epigenetics can be used to effectively estimate tobacco use, cardiovascular disease, hypertension, kidney disease, diabetes, obesity, and alcohol and drug abuse.

Beneficient has registered trademarks for its LiquidTrust product described in the "Beneficient Loans Receivable" section above and its ACE portal described in the "Organizational Structure" section above. Beneficient also has trademarks pending registration on a number of its other liquidity products and trust services, also described in the "Beneficient Loans Receivable" section above, including, its ExAlt Plan[TM], Exchange Trust and Interchange Trust.

**Employees**

We employed approximately 130 employees as of the date of the filing of this Form 10-K.

**Properties**

Our principal executive offices are currently located at 325 North St. Paul Street, Dallas, Texas 75201. GWG and Beneficient collectively lease 33,652 square feet of space for a lease term expiring on July 31, 2021. GWG also retains the lease of its legacy executive offices located at 220 South Sixth Street, Suite 1200, Minneapolis, Minnesota 55402. At that location, GWG leases 17,687 square feet of space for a lease term expiring in 2025. We believe these facilities are adequate for our current needs and that suitable additional space will be available as needed.

Page 12

**Company Website Access and SEC Filings**

Our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and amendments to reports filed pursuant to Sections 13(a) and 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), are filed with the SEC. We are subject to the informational requirements of the Exchange Act and file or furnish reports, proxy statements and other information with the SEC.

Our general website address is *www.gwgh.com*. Our website has additional information about our Company, its mission and our business. Our website also has tools that could be used by our clients and potential clients, financial advisors and investors. Beneficient's website address is *www.trustben.com* and has additional information about Beneficient, its mission and its business. We maintain the website *www.gwglife.com* for consumers and life insurance professionals seeking our life insurance secondary market products and services. InsurTech Holdings also maintains the websites *www.lifeegx.com* and *www.yousurance.com* for its initiatives of commercializing epigenetic testing and underwriting personalized life insurance policies based on this testing. The information contained on or accessible through the foregoing websites is not part of this Annual Report on Form 10-K.

**ITEM 1A. RISK FACTORS.**

Our business involves a number of challenges and risks. In addition to the other information in this report, you should consider carefully the following risk factors in evaluating us and our business. The risks described below are not the only ones that we face. Additional risks not presently known to us or that we currently deem immaterial may also affect our business, financial condition, operating results, or prospects.

**Risks Related to Our Secondary Life Insurance Business and Industry**

***Material changes in the secondary life insurance market, a relatively new and evolving market, may adversely affect our operating results, business prospects, the value of our common stock and our ability to repay our debt obligations.***

The success of our business and our ability to satisfy our debt obligations depends in part on the continued development of the secondary market for life insurance, including the accuracy of actuarial forecasting, the solvency of life insurance companies to pay the face value of the life insurance benefits and the demand for life insurance investments, all of which will critically impact our performance. The life insurance secondary market may be impacted by a variety of factors such as the interpretation of existing laws and regulations (including laws relating to insurable interests), the passage of new legislation and regulations, mortality improvement rates, updated actuarial methodologies, and mortality tables. Importantly, all of the factors that we believe could most significantly affect the life insurance secondary market are beyond our control. Any material and adverse change in the life insurance secondary market could adversely affect our operating results, our access to capital, the value of our common stock, our ability to repay our various debt and other obligations, and our business prospects and viability. Because of this, an investment in our securities involves greater risk as compared to investments offered by companies with more diversified business operations in more established or predictable markets.

***The valuation of our life insurance policy assets on our balance sheet requires us to make material assumptions that may ultimately prove to be incorrect. If our assumptions prove incorrect, we could suffer significant losses that materially and adversely affect our results of operations.***

One of our principal assets is a portfolio of life insurance policies purchased in the secondary market, comprising approximately 62% and 50% of our total assets, excluding goodwill, as of December 31, 2019 and 2018, respectively. Those assets are considered "Level 3" fair value measurements under Accounting Standards Codification 820, *Fair Value Measurements and Disclosures* ("ASC 820"), as there is currently no active market where we are able to observe quoted prices for identical assets. As a result, our determination of "fair value" for those assets on our balance sheet incorporates significant inputs that are not observable. Fair value is defined as an exit price representing the amount that would be received if assets were sold or that would be paid to transfer a liability in an orderly transaction between market participants at the measurement date. As such, fair value is a market-based measurement determined based on the assumptions market participants would use in pricing an asset or liability. A sale of the portfolio or a portion of the portfolio in an other than orderly transaction would likely occur at less than the fair value of the respective life insurance policies.

A Level 3 fair value measurement is inherently uncertain and could create additional volatility in our financial statements that is not necessarily related to the performance of our underlying assets. As of both December 31, 2019 and 2018, we estimated the fair value discount rate for our life insurance portfolio to be 8.25%. Life expectancy estimates are also a significant component within our fair value measurement. If in the future we determine that a higher discount rate is required to ascribe fair value to a similarly situated portfolio of life insurance policies or that life expectancy estimates materially differ from actuarial estimates and/or our projections, we could experience significant losses materially affecting our results of operations. In addition, significant losses of this nature would likely at some point cause our common stock to decline in value and cause us to be out of compliance with borrowing covenants contained in our various borrowing agreements. This could in turn result in acceleration of our second amended and restated senior credit facility with LNV Corporation, L Bonds and Seller Trust L Bonds, which we may not be able to repay. As a result, we may be forced to seek additional debt or equity financing to repay such debt amounts, and additional financing may not be available on terms acceptable to us, if at all.

If we are unable to repay our debt when it comes due, then our senior lender or the holders of our L Bonds and Seller Trust L Bonds, or both, would have the right to foreclose on our assets. For further disclosure relating to the risks associated with the valuation of our assets, see the risk factors below "*If actuarial assumptions we obtain from third-party providers . . . .*" and "*Inaccuracies in the life expectancy estimates we use for small face policies . . . .*"

Page 13

*Actual results from our life insurance portfolio may not match our projected results, which could adversely affect our ability to service our existing portfolio and meet our debt obligations.*

Our business partially relies on achieving actual results that are materially in line with the results we expect to attain from our investments in life insurance policy assets. In this regard, we believe that the larger the portfolio of life insurance we own, the greater the likelihood that we will achieve our expected results. To our knowledge, rating agencies generally suggest that portfolios of life insurance policies contain enough policies on individual lives to achieve actuarial stability in receiving expected cash flows. For instance, in a life insurance securitization methodology published in 2016, A.M. Best Company concluded that at least 300 lives are necessary to achieve actuarial stability, while Standard & Poor's has indicated that stability is unlikely to be achieved with less than 1,000 lives. As of December 31, 2019, we owned $2.0 billion in face value of life insurance policies covering 1,073 unique lives.

However, even if our life insurance portfolio is actuarially stable, we still may experience differences between the projection models we use and actual mortalities, which generally has been the case over the past several years. Differences between our expectations and actual mortality results could have a materially adverse effect on our operating results and cash flow. In such a case, we may face liquidity problems, including difficulties servicing our remaining portfolio of policies and servicing our outstanding debt obligations. Continued or material failures to meet our expected results could decrease the attractiveness of our securities in the eyes of potential investors, thereby making it even more difficult to obtain capital needed to service and grow the portfolio — to the extent we allocate capital to life insurance policy purchases, and service our existing debt.

*Our investments in life insurance policies have inherent risks, including fraud and legal challenges to the validity of the policies, which we will be unable to eliminate and which may adversely affect our results of operations.*

When we purchase a life insurance policy, we face certain risks associated with insurance fraud and other legal challenges to the validity of the policy. For example, to the extent the insured is not aware of the existence of the policy, the insured does not exist, or the insurance company does not recognize the policy, the insurance company may cancel or rescind the policy thereby causing the loss of an investment in that policy. In addition, if an insured's medical records have been altered in such a way as to shorten a life expectancy as reported, this may cause us to overpay for the related policy. Finally, we may experience legal challenges from insurance companies claiming that the insured failed to have an insurable interest at the time the policy was originally purchased or that the policy owner made fraudulent disclosures to the insurer at the time the policy was purchased (e.g., disclosures pertaining to the health status of the insured or the existence or sources of premium financing), or challenges from the beneficiaries of an insurance policy claiming that the sale of the policy to us was invalid.

To mitigate these risks, our origination practices and underwriting procedures include a current verification of coverage from the insurance company, a complete due-diligence investigation of the insured and accompanying medical records, a review of the life insurance policy application, and a requirement that the policy has been in force for at least two years. We also conduct a legal review of any premium financing associated with the policy to determine if an insurable interest existed at the time of its issuance. Nevertheless, these steps will not eliminate the risk of fraud or legal challenges to the life insurance policies we purchase. Furthermore, changes in laws or regulations or the interpretation of existing laws or regulations, may prove our due-diligence and risk-mitigation efforts inadequate. If a significant face amount of policies were invalidated for reasons of fraud or any other reason, our results of operations would be materially adversely affected.

*Our ownership of life insurance policies issued by insurers that are unable to pay claims presented to them could have a materially adverse effect on our results of operation, our financial condition, or even our overall prospects.*

We currently rely on the payment of policy claims by insurers as our most significant source of revenue collection. In essence, the life insurance assets we own represent the obligations of insurers to pay the benefit amount under the relevant policy upon the mortality of the insured. As a result, in our business, we face the "credit risk" that a particular insurer will be financially unable to pay claims when and as they become due. Depending on how many policies we own that are issued by insurers having financial difficulties at the time a claim is presented for payment, this risk could be significant enough to have a materially adverse effect on our results of operation, our financial condition, or even our overall prospects.

<div align="center">Page 14</div>

To mitigate this credit risk, we generally purchase policies issued only by insurers with an investment-grade credit rating from one or more of Standard & Poor's, Moody's, or A.M. Best Company. As of December 31, 2019, 95.7% of the face value benefits of our life insurance policies were issued by insurers having an investment-grade rating (BBB or better) by Standard & Poor's. We also review our exposure to credit risk associated with our portfolio of life insurance policies when estimating its fair value. In evaluating the policies' credit risk, we consider items such as insurance company solvency, credit risk indicators, and general economic conditions. Notwithstanding our efforts to mitigate credit risk exposure and to reflect this risk in our portfolio valuation, we cannot predict with any certainty whether a particular insurer will be in a financial position to satisfy amounts that it owes under life insurance policies it has issued when a claim for payment is presented.

***We have relied materially on information provided or obtained by third parties in the acquisition of life insurance policies. Any misinformation or negligence in the course of obtaining information could materially and adversely affect the value of the policies we own, our results of operation and the value of our securities.***

Our acquisition of each life insurance policy is negotiated based on variables and particular facts that are unique to the policy itself and the health of the insured. The facts we obtain about the policies and the insured at the time when the policy was applied for and obtained are based on the insured's factual representations to the insurance company, and the facts the insurance company separately obtains in the course of its own due-diligence examination, such as facts concerning the health of the insured and whether or not there is an insurable interest present when the policy was issued. Any misinformation or negligence in the course of obtaining information relating to a policy or insured could materially and adversely impact the value of the policies we own and could in turn adversely affect our results of operations and the value of our securities.

***Although we do not anticipate purchasing additional life insurance policies, our life insurance business continues to be subject to state regulation and changes in those laws and regulations, or changes in their interpretation, could negatively affect our results of operation and financial condition.***

When we purchase a life insurance policy, we are subject to state insurance regulations. Over the past number of years, we have seen a dramatic increase in the number of states that have adopted legislation and regulations from model laws promulgated by either the National Association of Insurance Commissioners ("NAIC") or by the National Conference of Insurance Legislators (NCOIL). These laws are essentially consumer protection statutes responding to abuses that arose early in the development of our industry, some of which may persist. Today, almost every state has adopted some version of either the NAIC or NCOIL model laws, which generally require the licensing of purchasers of and brokers for life insurance policies, the filing and approval of purchase agreements, and the disclosure of transaction fees. These laws also require various periodic reporting requirements and prohibit certain business practices deemed to be abusive. State statutes typically provide state regulatory agencies with significant powers to interpret, administer, and enforce the laws relating to the purchase of life insurance policies. Under statutory authority, state regulators have broad discretionary power and may impose new licensing requirements, interpret or enforce existing regulatory requirements in different ways, or issue new administrative rules, any of which could be generally adverse to the industry and potentially the value of our life insurance policy assets.

***If federal regulators or courts conclude that the purchase of life insurance in the secondary market constitutes, in all cases, a transaction in securities, we could be in violation of existing covenants under our second amended and restated senior credit facility with LNV Corporation, which could result in significantly diminished access to capital. We could also face increased operational expenses. The materialization of this risk could adversely affect our operating results and financial condition, our ability to repay our debt, and possibly threaten the viability of our business.***

On occasion, the SEC has attempted to regulate the purchase of non-variable universal life insurance policies as transactions in securities under federal securities laws. In July 2010, the SEC issued a Staff Report of its Life Settlement Task Force. In that report, the Staff recommended that certain types of purchased insurance policies be classified as securities. The SEC has not taken any position on the Staff Report, and there is no indication if the SEC will take any action to implement the recommendations of the Staff Report. In addition, there have been several federal court cases in which transactions involving the purchase and fractionalization of life insurance policies have been held to be transactions in securities under the federal Securities Act of 1933.

Page 15

We believe that the matters discussed in the Staff Report and existing case law do not impact our current business model because our purchases of life insurance policies are distinguishable from those cases that have been held by courts, and advocated by the Staff Report, to be transactions in securities. For example, neither we nor any of our affiliates are involved in the fractionalization of life insurance policies, and we presently do not purchase significant amounts of variable life insurance policies. As a practical matter, if all or a majority of our life insurance policies were deemed to be "securities" under federal securities laws, either through an expansion of the definition of what constitutes a "security," the expansion of the types of transactions in life insurance policies that would constitute transactions in "securities," or the elimination or limitation of available exemptions and exceptions (whether by statutory change, regulatory change, or administrative or court interpretation), then we or one or more of our affiliated entities could become subject to the federal Investment Company Act of 1940. This outcome would likely have a material and negative effect on our Company by imposing additional regulations and rules to our governance structure, operations, and our capital structure. In particular, this outcome would likely cause us to be in violation of existing covenants under our second amended and restated senior credit facility with LNV Corporation requiring us not to operate or be characterized as an "investment company" under the Investment Company Act of 1940. This breach would likely adversely affect our liquidity and increase our cost of capital and operational expenses, all of which would adversely affect our operating results. Such an outcome could also threaten our ability to satisfy our obligations as they come due and the viability of our business.

***If actuarial assumptions we obtain from third-party providers and rely on to calculate our expected returns on our investments in life insurance policies change, our operating results and cash flow could be adversely affected, as well as the value of our collateral and our ability to service our debt obligations.***

When we acquire a life insurance policy, the expected internal rate of return we calculate is based upon the probability of an insured's mortality over an actuarial life expectancy estimate. We presently obtain these estimates from third-party medical-actuarial underwriting companies. In addition to actuarial life expectancies, we rely on a pricing and premium forecasting software model developed by a third-party actuarial firm for the valuation of policies we purchase, future mortality revenues, and the calculation of anticipated internal rates of return. These pricing models forecast the estimated future premiums due as well the future mortalities of insureds.

All actuarial life expectancies (and related forecasting software) are subject to interpretation and change based on evolving medical technology, actuarial data, and analytical techniques. Additionally, we are required under our second amended and restated senior credit facility with LNV Corporation to update life expectancy estimates for pledged life insurance policies with face amounts greater than $750,000 by December 18, 2020, and obtain updated life expectancy updates no less frequently than once every five years. Previously, we were required to update life expectancy estimates for pledged life insurance policies with face amounts greater than $750,000 every two years beginning from the closing date of the first amended and restated senior credit facility with LNV Corporation (or approximately the end of 2019). Our prior experience in updating life expectancies has generally resulted in longer life expectancies for most, but not all, of the insureds within our portfolio. Adverse impacts on the value of our life insurance policy portfolio or our cash flow could in turn impair the value of the collateral we have pledged to our creditors and our ability to service our debt and obligations as they come due.

***Inaccuracies in the life expectancy estimates we use for small face policies could have a material and adverse effect on our results of operation and financial condition.***

As of December 31, 2019, we owned 697 "small face" life insurance policies (i.e., those policies with $1 million in face value of benefits or less) having $395.8 million in aggregate face value of benefits.

The underwriting processes we use to evaluate, price and purchase small face policies are different from, and may not be as reliable as, the processes we use for life insurance policies with larger face values of benefits. In particular, the processes we use to develop or obtain life expectancy estimates and the related mortality curves for small face policies are less extensive than traditional methods. These processes include obtaining either a single fully underwritten or simplified report as opposed to two fully underwritten reports. A simplified third-party underwriting report is based on a self-reported medical interview and may be supplemented with additional information obtained from a pharmacy benefit manager database that is provided to one or more medical-actuarial underwriting firms to obtain a simplified life expectancy report. Although we obtain professional actuarial guidance regarding these processes, our simplified underwriting methodology may not be as reliable as the processes we use for policies with larger (i.e., greater than $1 million) face value of benefits.

Any shortcomings in the process we use to evaluate, price, purchase and value our small face policies, or significant inaccuracies in the life expectancy estimates relating to those policies, could have a material and adverse effect on our results of operations and financial condition. Any such outcomes could have a negative and possibly material effect on our ability to satisfy our debts.

<div align="center">Page 16</div>

*We rely on estimated rates of mortality when valuing life insurance policies and forecasting the performance of our life insurance portfolio, and we also rely on other estimates derived from statistical methodologies for projecting our future cash flows. If any of our estimates prove to be incorrect, it could materially and adversely affect our financial condition and ability to satisfy our debt service and repayment obligations.*

If we project we will receive cash inflows from policies sooner than we actually do, we may not be able to make payment on our debt obligations in a timely manner, or at all. Moreover, a significant medical discovery or advance that results in mortality improvements among seniors could have a material adverse effect on the value of our life insurance investments.

We use a modeling practice for projecting cash flows known as the "probabilistic method." This is an actuarial method that uses the probability of an insured's mortality over time (a mortality curve) to project the flow of policy benefits to us and to project premiums that must be paid by us. This method requires the input of life expectancy assumptions. These inputs are then used to estimate the discounted cash flows from the life insurance portfolio using the ClariNet LS probabilistic and stochastic portfolio pricing model from ClearLife Limited, which estimates the expected cash flows using various mortality probabilities and scenarios.

Prior to December 2018, the life expectancy inputs were based on the arithmetic average of two separate life expectancy reports ("Average Life Expectancy method"). Under that methodology, we experienced fewer cash flows from policy benefits than projected. The lower-than-projected policy benefits received corresponded with higher-than-projected premium payments. Using the Average Life Expectancy method, policy benefits actually received were approximately 58% of expected results as of December 31, 2018. This resulted in a delay in policy benefit inflows from those anticipated and premium outflows being higher than anticipated due to the slower than anticipated maturities occurring within the life insurance portfolio.

As a result of the challenges we experienced using the Average Life Expectancy method, we revised our methodology using information that was derived from back-testing (the process of applying an analytical method to historical data to see how accurately the method would have predicted actual results) the mortality cash flow performance of our life insurance portfolio using the longest life expectancy report received from the Life Expectancy Providers used for pricing at the time the life insurance policies were acquired (the "Longest Life Expectancy"). This contrasts with our historical methodology of projecting mortality cash flows, used prior to the fourth quarter of 2018, which, as described above, typically used the average of two such life expectancy reports. Given the methodology change, we anticipate the receipt of policy benefits and the payment of premiums to more closely track cash flow estimates in the future; however, this cannot be guaranteed.

Our enhanced Longest Life Expectancy valuation methodology uses the Longest Life Expectancy report result at the time of purchase combined with a multiplier factor applied for variance in our portfolio of actual to expected experience using the Longest Life Expectancy results. Our revised methodology uses a static portfolio multiplier we must recalculate anytime the six-month moving average of the difference between actual portfolio performance and projected performance of cumulative face value maturities deviates by more than one standard deviation from the mean and such deviation persists for three consecutive months and continues as of the current quarter-end month. As of December 31, 2019, the six-month moving average of the difference between actual portfolio performance and projected performance of cumulative face value of maturities was within one standard deviation from the mean. As such, our valuation methodology did not require an update to our portfolio mortality multiplier (PMM) during the current quarter.

We use the current future cash flow projection to generate our expected internal rate of return on the life insurance policy portfolio we own. Any change to these projections, pricing models, methodology, premium forecasting assumptions, cash flow projections, or mortality assumptions accompanied therewith that increase the projected cost-of-insurance premiums or decrease the probability of mortality could have a material and adverse impact on our cash flows and financial condition. Ultimately, this could adversely affect our ability to meet our debt service and repayment obligations and our viability.

Page 17

*Cost-of-insurance (premium) increases could materially and adversely affect our profitability and financial condition.*

We are subject to the risk of increased cost-of-insurance ("COI") charges (i.e., premium charges) for the universal life insurance policies we own in our portfolio. As of December 31, 2019, approximately 33% of the policies in our life insurance portfolio have premium levels that are guaranteed under the terms of the policy to keep the policy's death benefit in force even in a situation where the policy's cash account has been wholly depleted. On the remaining approximately 67% of our policies, we pay "non-guaranteed COI charges" and are subject to the risk that the insurer could increase the COI charges for the policy. In all cases, the amount of increase is subject to any limits that may be set forth in the insurance policy. Because very few of the policies we own have significant cash account value balances, any COI increase will require us to use more cash to satisfy the minimum premium amount required to keep the related policy in force, and this could materially and adversely affect our profitability.

A COI increase can also be expected to impair the value of the affected policy because extra expense (i.e., additional premium amounts) will be required to keep the policy in force, and such extra expense will diminish the economic value, or return, of the policy realized upon the mortality of the insured. As a result, any widespread COI increases in policies we own would likely have a material and adverse effect on the value of our portfolio, which in turn would materially and adversely affect our profitability and financial condition.

*Our business and prospects may be adversely affected by changes, lack of growth, or increased competition in the life insurance secondary market.*

The growth of the secondary life insurance policy market may be negatively affected by a variety of factors beyond our control, including: negative publicity about the life insurance secondary market based on actual or perceived abuses; and the adoption of additional governmental regulation.

The relatively new and evolving nature of the market in which we operate makes the related risks difficult to identify and quantify. Nevertheless, contractions in the secondary market for life insurance policies, whether resulting from general economic conditions, regulatory or legal pressures, or otherwise (including regulatory pressures exerted on us or others involved in the secondary market for life insurance), could make participation in the market generally less desirable. This could in turn depress the prices at which life insurance policies on the secondary market are bought and sold and have a negative impact on the estimated value of the policies we own. If the value of the policies we own decreases, our results of operation and financial condition could suffer.

**Risks Relating to Our Company**

*We have a relatively limited history of operations, a history of net losses, and our future earnings, if any, and cash flows may be volatile, resulting in uncertainty about our ability to service and repay our debt when it comes due, redeem preferred stock when requested and uncertainty about our prospects generally.*

We are a company with a relatively limited operating history, which makes it difficult to accurately forecast our earnings and cash flows. We had net income attributable to common shareholders of $91.1 million in the year ended 2019. Net income attributable to common shareholders in 2019 includes a gain on the consolidation of Beneficient of $249.7 million. We incurred a net loss attributable to common shareholders of $136.1 million in the year ended December 31, 2018. Our lack of a significant history and the evolving nature of the market in which we operate make it likely that there are risks inherent to our business that are yet to be recognized by us or others, or not fully appreciated, and that could result in us suffering further losses. As a result of the foregoing, an investment in our securities necessarily involves uncertainty about the stability of our operating results, cash flows and, ultimately, our ability to service and repay our debt and our prospects generally. In addition, any volatility in our operating results we experience may adversely affect the market price of our common stock.

*Our indebtedness could adversely affect our financial condition and may otherwise adversely impact our business operations. We and our subsidiaries may incur additional indebtedness, including secured indebtedness.*

As of December 31, 2019, we had $1.6 billion of debt including our second amended and restated senior credit facility with LNV Corporation, our L Bonds and Seller Trust L Bonds, and Beneficient's other borrowings, which are due in June 2020. Our indebtedness could have significant effects on our business and the holders of our debt. For example, it could:

- require us to use a substantial portion of our cash flow from operations to service our indebtedness, which would reduce the available cash flow to fund acquisitions of alternative investments, working capital and other general corporate purposes;

Page 18

APP. 234

- require payments of principal and interest that may be greater than our cash flow from operations;

- force us to dispose of life insurance policies or other investments, possibly on disadvantageous terms, to make payments on our debt;

- increase our vulnerability to general adverse economic and industry conditions;

- limit our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate;

- restrict us from exploiting other business opportunities;

- make it more difficult for us to satisfy our obligations; and

- place us at a competitive disadvantage compared to our competitors that have less debt.

In addition, as of December 31, 2019, we had approximately $184.6 million of borrowings outstanding under our second amended and restated credit facility with LNV Corporation, which bore interest at variable rates. If interest rates increase significantly, our ability to borrow additional funds may be reduced and the risk related to our indebtedness would intensify.

In addition, most of our current debt is, and we anticipate that much of our future debt will be, non-amortizing and payable in balloon payments. Therefore, we will likely need to refinance at least a portion of that debt as it matures. There is a risk that we may not be able to refinance debt maturing in future years or that the terms of any refinancing will not be as favorable as the terms of the then-existing debt. If principal payments due at maturity cannot be refinanced, extended or repaid with proceeds from other sources, such as new equity capital or sales of facilities, our cash flow may not be sufficient to repay all maturing debt in years when significant balloon payments come due. Additionally, we may incur significant penalties if we choose to prepay the debt.

***We critically rely on debt financing for our business. Any inability to borrow could adversely affect our business operations, our ability to satisfy our debt-payment obligations and, ultimately, our prospects and viability.***

To date, we have chosen to finance our business principally through the issuance of debt, including debt incurred by our subsidiary GWG DLP Funding IV, LLC ("DLP IV") under our second amended and restated senior credit facility with LNV Corporation (see Note 11 to our consolidated financial statements), our L Bonds and Seller Trust L Bonds. Our second amended and restated senior credit facility with LNV Corporation is secured by all of the assets of DLP IV, has a maximum amount of $300.0 million, and the outstanding balance at December 31, 2019 was $184.6 million.

Obligations under the second amended and restated senior credit facility with LNV Corporation have a maturity date of September 27, 2029. Our L Bonds and Seller Trust L Bonds have scheduled maturities as set forth below in the risk factor "*If a significant number of holders . . . .*" Our debt facilities and offerings are the most important sources of financing on which our business continues to critically rely to grow and maintain our exposure to alternative assets — which include our portfolio of life insurance policies and our investments in Beneficient — as well as service existing debt.

Our business model is based on the acquisition of alternative assets financed primarily through debt financing. These alternative assets are typically long-term and may not produce cash flow for an extended period of time. For example, we do not receive cash in respect of acquired life insurance policies until the insured individual dies. The resulting asset/liability mismatch can result in a liquidity shortage if we are unable to renew maturing short-term debt or secure suitable additional financing. In such a situation, we could be forced to sell assets at less than optimal (distressed) prices. We thus rely on continued access to financing to enable us to grow our exposure to alternative assets and to pay the attendant premiums and costs of maintaining the life insurance portfolio, all while satisfying our current interest and principal repayment obligations under our second amended and restated senior credit facility with LNV Corporation, L Bonds and Seller Trust L Bonds and our dividend obligations on our preferred stock. Proceeds from life insurance policies that have been pledged under our second amended and restated senior credit facility with LNV Corporation will first be applied to the repayment of our obligations under the credit facility according to a waterfall amortization formula that is largely controlled by LNV Corporation. Therefore, we may not receive all of the proceeds from matured life insurance policies. Accordingly, until we achieve sufficient cash flows derived from our portfolio of life insurance policies, we expect to rely on advances from our second amended and restated senior credit facility with LNV Corporation and proceeds from our L Bond offering to satisfy our ongoing financing and liquidity needs. Likewise, until interest and dividends from our investments in Beneficient reach a significant size to service our various debt obligations, we expect to rely on advances from our second amended and restated senior credit facility with LNV Corporation and proceeds from our L Bond offering for these amounts.

<div align="center">Page 19</div>

APP. 235

Continued access to financing and liquidity under the second amended and restated senior credit facility with LNV Corporation (other than premium payments on existing policies pledged thereto), the offering of our L Bonds, or otherwise is not guaranteed. Due to our failure to deliver GWG Life audited financial statements for 2018 to LNV Corporation within 90 days after the end of the year and the failure to deliver GWG Life unaudited financial statements within 45 days after March 31, 2019, we were in violation of our debt covenants under our amended and restated senior credit facility with LNV Corporation. CLMG Corp., as administrative agent for LNV Corporation, issued a forbearance extending the delivery of these reports to July 22, 2019. Although the covenant violations were cured during the forbearance period, until we regained compliance with our debt covenants, we were prohibited from receiving advances under the amended and restated senior credit facility, and we were not entitled to any excess amounts received from policies pledged under the amended and restated senior credit facility. See "An inability to obtain accurate and timely financial information from Beneficient may prevent us from complying with reporting obligations under federal securities law …." In addition, general economic conditions could limit our access to financing, as could regulatory or legal pressures exerted on us, our financiers, or those involved in the procurement of financing such as brokers, dealers, and registered investment advisors. If we are unable to borrow under the second amended and restated senior credit facility with LNV Corporation or otherwise for any reason, or to renew or replace the second amended and restated senior credit facility with LNV Corporation when it comes due, or if we are forced to discontinue our L Bond offering for any significant length of time and for any reason, our business would be adversely impacted and our ability to service and repay our debt obligations would be compromised, thereby negatively affecting our business prospects, the value of our common stock and perhaps our viability.

As of March 24, 2020, we had remaining capacity of approximately $120 million under our current registered L Bond offering. We are in the process of preparing and filing a registration statement to offer additional L Bonds. If, for any reason, there is a delay in the filing or the effective date of this additional offering, our financial condition and ability to continue operations may be negatively affected.

***We may not be able to raise the capital that we are seeking from our securities offerings and may be unable to meet our overall business objective of growing and diversifying our alternative asset exposure.***

The offer and sale of our L Bonds is a principal means by which we intend to raise funds needed to meet our business and financial goals. However, if we are unable to continue to do so for any reason, we may be unable to meet our goals. If actual cash flows from our portfolio of life insurance policies do not occur as we have forecasted, which has thus far been the case, we could be forced to sell our investments in life insurance policies in order to service or satisfy our debt-related obligations. Likewise, if our investments in Beneficient do not perform as we have projected, we could be forced to sell such investments in order to service or satisfy such debt-related obligations. Presently, none of our material investments (life insurance policies and investments in Beneficient) are supported by liquid secondary markets and our investments in Beneficient contain transfer restrictions. If we are forced to sell any material amount of these investments, we may be unable to sell them at prices we believe are optimal or at or above the carrying value of such investments, particularly if our sale of assets occurs at a time when we are (or are perceived to be) in distress. In any such event, our business and the value of our securities would likely be materially and adversely impacted.

***We depend upon cash distributions from our subsidiaries, and contractual restrictions on distributions to us or adverse events at one of our operating subsidiaries could materially and adversely affect our ability to pay our debts, redeem preferred stock when requested and continue operating our business.***

GWG Holdings, Inc. is a holding company. As a holding company, we conduct our operations through operating subsidiaries, and as such our most significant assets are cash and our ownership interests in our subsidiaries, controlled affiliates and equity investees. Accordingly, our ability to meet our obligations, including our debt-related and dividend-payment obligations, materially depends upon the ability of our subsidiaries to distribute cash to us. In this regard, the ability of our subsidiaries to distribute cash to us is, and will continue to be, restricted by certain negative covenants in the agreement governing our second amended and restated senior credit facility with LNV Corporation. If any of these limitations were to materially impede the flow of cash to us, our ability to service and repay our debt, including obligations under the L Bonds and Seller Trust L Bonds, and make cash dividend payments to holders of our preferred stock would be materially and adversely affected. In addition, any adverse corporate event at the subsidiary level, such as a declaration of bankruptcy, liquidation or reorganization or an event of default under our second amended and restated senior credit facility with LNV Corporation, could adversely affect the ability of our subsidiaries to distribute cash to us, and thereby materially and adversely affect our ability to service and repay our debt and make cash dividend payments, and negatively impact our ability to continue operations.

<div align="center">Page 20</div>

***The collateral granted as security for our obligations under the L Bonds and Seller Trust L Bonds may be insufficient to repay the indebtedness upon an event of default.***

GWG Holdings (the issuer of the L Bonds and Seller Trust L Bonds) and GWG Life (the guarantor of obligations under the L Bonds and Seller Trust L Bonds, and a wholly owned subsidiary of GWG Holdings) have each granted a security interest in substantially all of their respective assets to serve as collateral security for obligations under the L Bonds and Seller Trust L Bonds. Importantly, DLP IV, a wholly owned subsidiary of GWG Life, owns a substantial number of our life insurance policies, 77.3% of the face value of our life insurance portfolio as of December 31, 2019, and is the borrower under our second amended and restated senior credit facility with LNV Corporation. As the borrower under that second amended and restated senior credit facility with LNV Corporation, all of its assets — including all of its life insurance policy assets — serve as collateral for our obligations under the facility.

Because of the fact that a substantial number of our life insurance assets are held in our DLP IV subsidiary, and all of those life insurance assets serve as collateral security for our obligations under our second amended and restated senior credit facility with LNV Corporation, holders of L Bonds and Seller Trust L Bonds risk the possibility that the collateral security to secure our obligations under the L Bonds and Seller Trust L Bonds may be insufficient to repay holders upon an event of default. Furthermore, while the indenture governing the L Bonds and the Seller Trust L Bonds limits the amount of debt relative to a measure of asset coverage we and our subsidiaries can incur, the indenture permits us and our subsidiaries to incur additional secured debt (subject to the debt coverage ratio) that may be senior to the L Bonds and Seller Trust L Bonds.

Furthermore, the assets that secure our obligations under the L Bonds and Seller Trust L Bonds are illiquid assets. As a result, the book value of those assets as reflected in our financial statements are based on numerous assumptions and may not necessarily reflect the current market price for those assets, especially in the event of a bulk or distressed sale. Furthermore, a substantial majority of the net assets of Beneficient are currently represented by goodwill as of December 31, 2019. Some or a substantial portion of the proceeds from L Bond sales may be used to make investments in Beneficient. Because these advances may be used by Beneficient for working capital purposes and to repay indebtedness, such investments may not increase the tangible assets securing the L Bonds. If the trustee for the L Bonds were forced to sell all or a portion of the collateral securing them, there can be no assurance that the trustee would be able to sell them for the prices at which we have recorded them, and the trustee might be forced to sell them at significantly lower prices.

***If a significant number of holders of our L Bonds and Seller Trust L Bonds demand repayment of those instruments upon maturity instead of renewing them, and at such time we do not have sufficient capital on hand to fund those repayments (and do not otherwise have access to sufficient capital), we may be forced to liquidate some of our life insurance policies, investments in Beneficient or other assets, which could have a material and adverse impact on our results of operation and financial condition.***

As of December 31, 2019, we had approximately $948.1 million in principal amount of L Bonds outstanding (excluding Seller Trust L Bonds). Since we first issued our L Bonds, we have experienced $646.3 million in maturities, of which $341.3 million has renewed for an additional term, as of December 31, 2019. This has provided us with a cumulative historical renewal rate of approximately 52.8% for investments in our L Bonds. Future contractual maturities of L Bonds (excluding Seller Trust L Bonds) as of December 31, 2019 are as follows:

| Years Ending December 31, | L Bonds (in thousands) |
|---|---:|
| 2020 | $ 152,118 |
| 2021 | 201,419 |
| 2022 | 163,741 |
| 2023 | 76,969 |
| 2024 | 118,848 |
| 2025 | 85,151 |
| Thereafter | 149,882 |
| | $ 948,128 |

Page 21

As of December 31, 2019, we had approximately $366.9 million in principal amount of Seller Trust L Bonds outstanding. The Seller Trust L Bonds have a contractual maturity in August 2023; however, the holders have the ability to exercise a put to require redemption beginning in 2021. Under the Supplemental Indenture for the Seller Trust L Bonds due 2023, in the event of a redemption request, including maturity, by the holders of the Seller Trust L Bonds, GWG in its sole discretion has the ability to satisfy the principal in the form of cash, a pro rata portion of (i) the outstanding principal amount and accrued and unpaid interest under the Commercial Loan Agreement and (ii) Ben LP common units, or a combination of cash and such property.

If investors holding existing indebtedness that matures do not elect to renew their investments and we do not at such time have or have access to sufficient capital to repay the indebtedness, then we may need to liquidate some of our life insurance policies or other assets earlier than anticipated. In such an event, we may be unable to sell those policies or other assets at prices we believe are fair or otherwise appropriate and such sales could have a material and adverse impact on our results of operations and financial condition. See also "*We may not be able to raise the capital that we are seeking . . . .*"

***Subordination provisions contained in the indenture will restrict the ability of the trustee or the L Bond or Seller Trust L Bond holders to enforce their rights against us under the indenture, including the right to payment on the L Bonds, if a default then exists under a senior credit facility.***

The L Bonds and Seller Trust L Bonds will be subordinate in right of payment to any claims of our senior lender under the second amended and restated senior credit facility with LNV Corporation. In this regard, subordination provisions limiting the right of L Bond and Seller Trust L Bond holders to enforce their rights are contained in the indenture. These provisions include:

- a prohibition on challenging any enforcement action taken by a senior lender, or interfering with any legal action or suits undertaken by a senior lender, against us and our affiliates;

- a 180-day standstill period during which there may not be brought any action against us or our affiliates to enforce rights respecting collateral unless our second amended and restated senior credit facility with LNV Corporation has been repaid in full, which period may be extended if the senior lender takes action during such standstill period; and

- a prohibition on filing a bankruptcy or insolvency case against us or our affiliates for at least one year plus one day after any senior lender has been paid in full.

In the event of a default on a senior credit facility, the indenture prohibits us from making any payment, direct or indirect (whether for interest, principal, as a result of any redemption or repayment at maturity, on default, or otherwise), on the L Bonds, Seller Trust L Bonds and any other indebtedness unless and until: (i) the default respecting the senior credit facility has been cured or waived or has ceased to exist; or (ii) in the case of a non-payment default that permits a senior lender to declare as due and payable all amounts owing under a senior credit facility (but where that senior lender has not yet so declared amounts as being due and payable), the end of the period commencing on the date the trustee receives written notice of default from the senior lender and ending on the earliest of (1) our discharge of the default (or other cure), (2) the trustee's receipt of a valid waiver of default from the senior lender, or (3) a written notice from the senior lender terminating the payment prohibition.

During any payment prohibition period, neither the holders of the L Bonds, the Seller Trust L Bonds, nor the trustee will have the right, directly or indirectly, to sue to enforce the indenture or the L Bonds or Seller Trust L Bonds. Other provisions of the indenture do permit the trustee to take action to enforce the payment rights of L Bond and Seller Trust L Bond holders after 179 days have passed since the trustee's receipt of notice of default from a senior lender, but in such case any funds paid as a result of any such suit or enforcement action shall be applied toward the senior credit facility until the facility is indefeasibly paid in full before being applied to the L Bonds and Seller Trust L Bonds.

These subordination provisions present the risk that, upon any default by us on obligations owed to our senior lender, the holders of the L Bonds and Seller Trust L Bonds will be unable to enforce their rights to payment.

<div align="center">Page 22</div>

If the 180-day standstill period noted above, or any other limitation on the rights of the trustee or L Bond and Seller Trust L Bond holders to assert their rights to payment of principal or interest under the indenture, is ultimately determined to conflict with provisions of the Trust Indenture Act of 1939 (most notably sections 316(b) and 317(a) of that Act), then the trustee, as well as any holder who shall not have earlier consented to such subordination provisions, will (notwithstanding such provision contained in the indenture) be authorized to institute a lawsuit for the enforcement of any payment of principal or interest after their respective due dates.

***A failure to maintain compliance with the covenants under our second amended and restated senior credit facility with LNV Corporation and the indenture governing the L Bonds and Seller Trust L Bonds may have a material adverse effect on our ability to continue our business operations.***

We are subject to various covenants under our second amended and restated senior credit facility with LNV Corporation, including requirements to timely deliver financial statements to LNV Corporation (our senior lender). Due to our failure to deliver GWG Life audited financial statements for 2018 to LNV Corporation within 90 days after the end of 2018 and the failure to deliver GWG Life unaudited financial statements within 45 days after March 31, 2019, we were in violation of our debt covenants during 2019. Although we regained compliance with our debt covenants in July 2019, if we fail to remain in compliance with our debt covenants, we may not be permitted to request, nor will we be entitled to receive, advances under the second amended and restated senior credit facility with LNV Corporation, and we will not be entitled to any excess amounts received from policies pledged under the second amended and restated senior credit facility with LNV Corporation. A failure to deliver required financial statements to LNV Corporation in the future may result in termination of the credit facility absent an extension of such period. We may be unable to repay outstanding amounts under this credit facility unless we are able to replace it with another facility or otherwise obtain capital from other sources, in which case LNV Corporation could elect to foreclose on the life insurance assets held in our DLP IV subsidiary that serve as collateral security.

Under the indenture governing the L Bonds and Seller Trust L Bonds, as amended, we are subject to various financial and non-financial covenants, including a maximum debt coverage ratio. As of December 31, 2019, we were in compliance with all of our covenants; however, there can be no assurance that we will be able to comply with all of our financial and non-financial covenants in the future. A failure to comply with these covenants could cause us to be in default of the indenture governing the L Bonds and Seller Trust L Bonds and the indenture trustee, acting on behalf of the holders of our L Bonds and Seller Trust L Bonds, would be within its rights to accelerate the maturity dates of any amounts owed on our L Bonds and Seller Trust L Bonds. If we were unable to repay outstanding amounts, either using current cash reserves or another source of capital, the indenture trustee would have the right, subject to the subordination provisions in the indenture, to foreclose on our assets and the assets of GWG Life (including GWG Life's equity in DLP IV), which serve as collateral for our L Bonds and Seller Trust L Bonds. If we are required to seek other sources of financing in order to satisfy our obligations under our second amended and restated senior credit facility with LNV Corporation, our L Bonds or Seller Trust L Bonds, such other sources of capital may be unavailable to us on terms acceptable to us or at all. As a result, failure to comply with the covenants under our debt arrangements would have a material and adverse impact on our ability to continue our business operations.

***The debt coverage ratio, designed to provide some assurance to the holders of the L Bonds and Seller Trust L Bonds that the value of our total assets exceeds our total interest-bearing obligations, values our life insurance policy assets, which represent 62% of our total assets (excluding goodwill) as of December 31, 2019, in a manner that may not be representative of the amount we would actually receive upon a sale of those assets.***

Under the indenture governing the L Bonds and Seller Trust L Bonds, as amended, the maximum amount of L Bonds and Seller Trust L Bonds we may issue at any time is limited to an amount such that our debt coverage ratio does not exceed 90%. This limitation is designed to provide some basis to ensure that the net present value of policy benefits from our life insurance assets, plus the carrying value of our other assets (including our investments in Beneficient), will be sufficient to meet our obligations to our L Bond and Seller Trust L Bond holders. Expressed as a percentage, the debt coverage ratio was previously defined as the ratio of (i) the total amounts outstanding on interest-bearing debt over (ii) the net present asset value of all life insurance assets we own, plus any cash and cash equivalents held in our accounts, policy benefit receivables and, without duplication, the value of all other assets of the Company, primarily our investments in Beneficient, as reflected on our most recently available balance sheet prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP"). For this purpose, the net present asset value of our life insurance assets is calculated as the present value of the life insurance portfolio's expected future cash flows discounted at the weighted-average interest rate of the interest-bearing indebtedness for the previous month.

<div align="center">Page 23</div>

However, effective December 31, 2019, we entered into an amendment to the indenture to define the debt coverage ratio as the ratio, expressed as percentage, of (A) the aggregate sum of all indebtedness (other than Excluded Indebtedness as described below) of GWG Holdings and its direct and indirect subsidiaries (including the securities issued under the indenture, but excluding any indebtedness of Ben LP and its direct and indirect subsidiaries) as reflected on GWG Holdings' most recent consolidated balance sheet prepared in accordance with GAAP over (B) the sum of (i) net present asset value of life insurance policies owned by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding life insurance policies held by Ben LP and its direct and indirect subsidiaries and controlled affiliates, plus (ii) all cash (and cash equivalents) held by GWG Holdings and its direct or indirect Subsidiaries or subsidiaries or affiliates, but excluding the cash (and cash equivalents) held by Ben LP and its direct and indirect subsidiaries, plus (iii) the original cost basis in GWG Holdings' investment in common units or other securities of Ben LP, plus (iv) the outstanding principal amount of any outstanding loans made under a commercial loan agreement with GWG Life, as lender, plus (v) the cost basis of assets contributed to GWG Holdings or any direct or indirect subsidiary of GWG Holdings in connection with a Repurchase Transaction, plus (vi) without duplication, the value of all other assets of GWG Holdings and its direct and indirect subsidiaries or affiliates (but excluding the value of assets of Ben LP and its direct and indirect subsidiaries) as reflected on its most recent consolidated balance sheet prepared in accordance with GAAP. For this purpose, "Excluded Indebtedness" is indebtedness that is payable at GWG Holdings' option in capital stock of GWG Holdings or securities mandatorily convertible into or exchangeable for such capital stock of the Company, or any indebtedness that is reasonably expected to be converted or exchanged, directly or indirectly, into such capital stock, provided that under the terms of such indebtedness in the event any such conversion or exchange does not occur in accordance with the terms of such transaction, such indebtedness would be cancelled and any assets received in exchange for such indebtedness would be returned.

Although the debt coverage ratio is designed to provide some basis to ensure that our assets will be sufficient to meet our obligations to the holders of L Bonds and Seller Trust L Bonds, the "net present value" of our life insurance assets used in the debt coverage ratio is not the same as the GAAP "fair value" of those assets on our balance sheet. Accordingly, the debt coverage ratio is not informative of the amount we and holders of L Bonds and Seller Trust L Bonds would actually receive if we were forced to sell or liquidate our life insurance related assets. Furthermore, any sale or liquidation of all or a significant portion of our life insurance policies or investments in Beneficient would include significant transactional costs. As a result, our mere compliance with the debt coverage ratio in the indenture will not guarantee that the value of our life insurance assets plus the value of our investments in Beneficient, if sold or liquidated, would in all cases exceed the amount of our obligations to the holders of L Bonds and Seller Trust L Bonds.

### We may not realize a return on our investment in InsurTech Holdings, LLC.

Under the Operating Agreement of InsurTech Holdings, LLC, we are obligated to invest $20.0 million in InsurTech Holdings over a two year period ending in November 2021, of which $2.1 million was funded in the fourth quarter of 2019. After this two-year period, we will be entitled to receive 100% of operating and capital distributions up to the amount of our cash contributions, and, thereafter 80% of cash flows from operations and capital proceeds. The success of InsurTech Holdings is dependent, in part, on new and unproven technology as part of its life insurance policy underwriting process. If the mortality predictions InsurTech Holdings obtains through use of this technology proves inaccurate, InsurTech Holdings may not generate sufficient cash flows to satisfy the terms of the distributions as provided in the Operating Agreement. Furthermore, any failure by InsurTech Holdings to protect its intellectual property rights could impair its ability to protect its proprietary technology and the value of our investment. As such, we may not realize the return contemplated in the Operating Agreement, and our results of operations and financial condition could be materially and adversely affected.

### The loss of the services of our key employees, or the failure to attract additional key individuals, would materially adversely affect our business operations and prospects.

Our success and viability are dependent to a significant extent upon our ability to attract and retain qualified personnel in all areas of our business, especially our sales, policy acquisition and financial management teams. If we were to lose the members of these service teams, we would need to replace them with qualified individuals in a timely manner or our business operations and prospects could be adversely impacted.

### We have the discretion to purchase assets through different subsidiaries, and to transfer assets among our subsidiaries. Any decision to purchase or hold title to assets in one subsidiary, as opposed to a different subsidiary, may affect the value of collateral security for our debts.

We may at our discretion direct the purchase of life insurance policies, investments in Beneficient and other assets by, and the sale of life insurance policies and other assets amongst, different subsidiaries of GWG Holdings. Purchases of assets in, or movements of assets amongst, different subsidiaries could affect the value of the collateral security for obligations under the L Bonds and Seller Trust L Bonds. For example, purchases through, or transfers of life insurance policies to, DLP IV would cause the policies acquired or transferred to become collateral for our second amended and restated senior credit facility with LNV Corporation, whereas purchases through, or transfers of life insurance policies to, GWG Life would cause the policies acquired by GWG Life to become collateral for the L Bonds and Seller Trust L Bonds. Similarly, the pledge of life insurance policies owned by GWG Life Trust, or the transfer of such policies to a subsidiary of GWG Life Trust, with a subsequent pledge of such policies could cause those policies to become collateral for a new loan facility. Accordingly, purchases of assets through, or transfers of assets to, different subsidiaries may affect the value of collateral security for different classes of holders of our debt.

### Being a public company is expensive and could adversely affect our ability to attract and retain qualified officers and directors.

We have been a public reporting company since January 31, 2012. As such, we are subject to the reporting requirements of the Securities Exchange Act of 1934. These requirements generate significant accounting, legal, and financial compliance costs, and make some activities more difficult, time consuming or costly than they would otherwise be, and may place significant strain on our personnel and resources. These rules and regulations applicable to public companies, and the risks involved in serving as an officer or director of a public company, may also make it more difficult and expensive for us to obtain director and officer liability insurance, and to recruit and retain qualified officers and directors.

Page 24

APP. 240

*Changes in general economic conditions could adversely impact our business.*

Changes in general economic conditions, including, for example, interest rates, short term funding markets, investor sentiment, changes specifically affecting competition, technological developments, political and diplomatic events, tax laws, and other factors not known to us today, can substantially and adversely affect our business and prospects. For example, an increase in interest rates would increase our cost of capital and may limit our ability to raise capital and have a corresponding adverse impact on our operating results. While we may engage in certain hedging activities in the future to mitigate the impact of rising interest rates, none of these risks are or will be within our control.

*Business disruptions and interruptions and adverse economic conditions due to natural disasters and other external events beyond our control can adversely affect our business, financial condition and results of operations.*

Our operations can be subject to natural disasters and other external events beyond our control, such as the effects of earthquakes, fires, floods, severe weather, public health issues such as the recent outbreak of the coronavirus or other pandemic diseases, power failures, telecommunication loss, major accidents, terrorist attacks, acts of war, and other natural and man-made events, some of which may be intensified by the effects of a government response to the event or climate change and changing weather patterns. For example, our corporate headquarters and critical business offices are located in north Texas, which is geographically located in "tornado alley", an area known for high instances of tornadoes, and which recently experienced catastrophic tornadic activity and blackouts. A tornado or other disaster could cause severe destruction, disruption or interruption to our operations or property and significantly impact our employees.

More recently, the COVID-19 coronavirus outbreak has impacted several countries around the world, including the United States. There have been numerous reports of the virus outbreak disrupting or restricting supply chains, facility closures, voluntary and mandatory quarantines, and federal, state and local governments requiring business to temporarily close or severely curtail commercial activity. It is also possible that the spread of the coronavirus may have direct effects on our operations, such as high levels of employee sickness and absences, limiting employee travel or increasing telecommuting arrangements. In addition, recent developments and reports indicate the coronavirus has coincided with heightened volatility in financial markets in the U.S. and worldwide. If the coronavirus adversely affects our business operations or leads to a significant or prolonged impact on global markets or economic growth, our financial conditions and results of operations could be adversely affected. We and other financial institutions generally must resume operations promptly following any interruption. If we were to suffer a disruption or interruption and were not able to resume normal operations within a period consistent with industry standards, our business, financial condition or results of operations could be adversely affected in a material manner. In addition, depending on the nature and duration of the disruption or interruption, we might become vulnerable to fraud, additional expense or other losses, or to a loss of business and clients.

Although we have implemented a business continuity management program that we continue to enhance on an ongoing basis, there can be no assurance that the program will adequately mitigate the risks of such business disruptions and interruptions. Additionally, natural disasters and external events, including those occurring in and around Texas, could affect the business and operations of our clients, which could impair their ability to satisfy obligations to us, impair the value of underlying collateral or otherwise adversely affect their business dealings with us, any of which could have a material adverse effect on our business, financial condition or results of operations.

*The interest rates under our credit agreement and other agreements may be impacted by the phase-out of the London Interbank Offered Rate ("LIBOR").*

LIBOR is the basic rate of interest used in lending between banks on the London interbank market and is widely used as a reference for setting the interest rates on loans globally. LIBOR is used as a reference rate to calculate interest under certain of our borrowings and receivables. In 2017, the United Kingdom's Financial Conduct Authority, which regulates LIBOR, announced that it intends to phase out LIBOR by the end of 2021. The U.S. Federal Reserve, in conjunction with the Alternative Reference Rates Committee, a steering committee comprised of large U.S. financial institutions, identified the Secured Overnight Financing Rate ("SOFR") as the preferred alternative reference rate to U.S. dollar LIBOR and recommended a paced transition plan that involves the creation of a reference rate based on SOFR by the end of 2021. SOFR is a more generic measure than LIBOR and considers the cost of borrowing cash overnight, collateralized by U.S. Treasury securities. Given the inherent differences between LIBOR and SOFR or any other alternative benchmark rate that may be established, there are many uncertainties regarding a transition from LIBOR. Certain of our borrowing and receivable agreements contain fallback provisions providing for alternative rate calculations in the event LIBOR is unavailable, prior to any LIBOR rate transition. As a result, our level of interest payments we incur or receive may change and the new rates we incur may not be as favorable to us as those in effect prior to any LIBOR phase-out.

*We are dependent on our information systems for our financial reporting, policy-related databases, communications and other functions. If our information systems fail or experience major interruptions, including those relating to cybersecurity or arising from cyber-attacks, our business and our financial results could be adversely affected.*

We rely on our information systems to effectively manage our operational and financial functions. Our computer systems, Internet web sites, telecommunications, and data networks are also vulnerable to damage or interruption from power loss, natural disasters and attacks from viruses or hackers, including cybersecurity threats and incidents. Global cybersecurity threats and incidents can range from uncoordinated individual attempts to gain unauthorized access to information technology systems to targeted measures directed at us, our databases, policies, and/or the subjects of acquired policies. Although we utilize various procedures and controls to attempt to mitigate our exposure to these risks, attacks are evolving and unpredictable and we cannot guarantee that any risk prevention measures implemented will be successful. System failures or interruptions, including those relating to cybersecurity or arising from cyber-attacks, could breach the security of the personal information of the subjects of the acquired policies and could adversely affect our reputation, business, financial condition, and operating results.

Page 25

APP. 241

**Risks Related to our Strategic Relationship with The Beneficient Company Group, L.P., including the Purchase and Contribution Transaction:**

On December 28, 2018, we held the Final Closing of the Exchange Transaction with Beneficient and the Seller Trusts. On April 15, 2019, Jon R. Sabes, the Company's former Chief Executive Officer and a former director, and Steven F. Sabes, the Company's former Executive Vice President and a former director, entered into the Purchase and Contribution with, among others, Ben LP. The closing of the Purchase and Contribution occurred on April 26, 2019. On December 31, 2019, we transferred approximately $79 million to Ben LP in return for 666,667 common units of Ben LP and a Preferred Series A Subclass 1 Unit Account of BCH and obtained the right to appoint a majority of the board of directors of Beneficient Management pursuant to the Investment Agreement and the Exchange Agreement. Also on December 31, 2019, in a transaction related to the Investment Agreement, GWG Holdings transferred its interest in the Preferred Series A Subclass 1 Unit Account to its wholly owned subsidiary, GWG Life. These transactions are collectively referred to as the "Beneficient Transactions." You should consider carefully the following risk factors related to the Beneficient Transactions in evaluating us and our business.

***Our loans to Beneficient are contractually and structurally subordinated to the debt and other liabilities of the Beneficient entities that are not obligors on such loans, which means that creditors of such entities will be paid from their assets before we would have any claims to those assets.***

As of December 31, 2019, GWG Life had loaned to Ben LP approximately $197.4 million, including accrued interest, pursuant to the Commercial Loan Agreement. The amounts owed to GWG Life under the Commercial Loan Agreement are contractually subordinated to Beneficient's obligations ("Senior Obligations") (i) to commercial banks pursuant to commercial term loan and/or revolving credit facilities, and (ii) to Beneficient's NPC-B limited partnership interest, if issued. As of December 31, 2019, Beneficient had outstanding approximately $153.1 million of Senior Obligations. Furthermore, because a substantial portion of Ben LP's assets are held by subsidiaries, the amounts owed to us under the Commercial Loan Agreement are structurally subordinated to all debt and other liabilities of those entities, which means that creditors of those entities will be paid from their assets before GWG Life would have any claims to those assets.

On May 31, 2019, GWG Life agreed to loan $65.0 million to six common law trusts established as part of alternative asset financings extended by a subsidiary of Beneficient. An initial advance in the principal amount of $50.0 million was funded on June 3, 2019 and the second advance of $15.0 million was made on November 22, 2019. These loans are contractually subordinated to the secured obligations of Beneficient and its affiliates outstanding to HCLP Nominees, L.L.C. and Beneficient Holdings, Inc.

***Beneficient may be unable to operate its business successfully, which would negatively impact its ability to generate distributable cash flow and increase the value of Ben LP's common units.***

Beneficient plans to provide mid-to-high net worth individuals (i.e., individuals having a net worth of between $5 million and $30 million) with trust services and related liquidity products (collectively, "trust services and liquidity products") for illiquid investment funds and other alternative assets those individuals may own, and a variety of other financial services, including custody and clearing of alternative assets, fund and trust administration, retirement funds and insurance services for covering risks attendant to owning or managing alternative assets. The success of the Beneficient Transactions from our perspective will depend largely on Beneficient's ability to operate its business successfully, generate distributable cash flow, and increase the value of Ben LP's common units (of which we are a significant owner) and our Preferred Series A Subclass 1 Unit Account of BCH. If Beneficient is unable to do so, such inability will negatively impact our operations and may result in an impairment of goodwill. Furthermore, to date, Ben LP's originations of liquidity products have been transacted with a limited number of family offices, fund-of-funds and institutions. These types of clients, specifically fund-of-funds and institutions, may not represent the target market of Ben's liquidity products in the future.

***We may be unable to capitalize on the anticipated benefits of the Beneficient Transactions.***

We entered into the Beneficient Transactions anticipating that such transactions would provide significant financial and strategic benefits, including, significantly increasing our common equity, significantly reducing our leverage ratio (as measured by total assets divided by total equity), the introduction of new opportunities to lower our cost of funds (an important driver of stockholder value), diversifying our revenue and cash flow sources resulting in more consistent earnings, and increasing our public float and the liquidity in our common stock, thereby increasing our common stockholder base and potentially attracting additional equity analyst coverage (both of which are important factors in maximizing share valuation). In addition, we believe that the Beneficient Transactions have created opportunities for us and Beneficient to pursue strategies that are mutually advantageous, including the opportunity to leverage our knowledge, experience and significant infrastructure in, and the marketing, sales and servicing of, the independent broker dealer market and the related market for illiquid alternative investments — a prime target market for the origination of Beneficient's suite of liquidity products. We believe that the expansion of our strategic relationship with Beneficient has created a unified platform uniquely positioned to provide an expanded suite of products, services and resources for investors and the financial professionals who assist them. We intend to collaborate extensively with Beneficient and capitalize on our respective capabilities, relationships and services. Specifically, the Purchase and Contribution Agreement contemplates that we will seek to enter into an agreement with Beneficient pursuant to which we would offer and distribute (through a FINRA registered managing broker-dealer) Beneficient's liquidity products and services. There is no assurance that we will realize the anticipated benefits from the Beneficient Transactions. Failure to realize these benefits will likely negatively impact the results of our operations, our business prospects, the ultimate success of our strategic relationship and the value of our common stock.

Page 26

APP. 242

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 243 of 1031     PageID 415

***We have and will continue to invest in Beneficient, and Beneficient's financial performance and results of operations will have a direct impact on our financial performance.***

As a result of the Investment Agreement and the Exchange Agreement (as described above), GWG was granted the authority to appoint a majority of the Board of Directors of the general partner of Beneficient. As a result, effective as of December 31, 2019, GWG controls Beneficient and consolidates Beneficient for financial statement reporting purposes. As such, our basis of accounting for and the presentation of our investment in Beneficient is materially different from that described in previous audited and unaudited financial statements. Because Beneficient will represent a significant percentage of our consolidated assets, the impact on our financial statements of Beneficient's financial performance may be material.

***Beneficient has experienced significant delays in obtaining trust company charters and may be ultimately unable to do so, which outcome would hinder Beneficient's ability to successfully pursue its current business plan and could adversely affect the value of Ben LP's common units.***

Beneficient has applied for trust charters from the Texas Department of Banking and intends to carry on much of its business through two trust company subsidiaries. While it anticipates receiving the trust charters in the near future, there have been significant delays and there can be no assurance that Beneficient will ultimately be successful in obtaining trust company charters. Because Beneficient's current business plans are based on obtaining regulatory approval to operate as regulated trust companies, a failure to do so may materially and adversely impact its financial performance and prospects, which would likely negatively impact our results of operations and may result in impairment of goodwill.

***Ben LP's partnership agreement eliminates fiduciary duties that might otherwise be owed to us under Delaware law.***

Ben LP's business and affairs are managed by Beneficient Management. Ben LP's partnership agreement eliminates the fiduciary duties that might otherwise be owed by Beneficient Management under Delaware law and replaces them with the duties expressly set forth in such agreement. Ben LP's partnership agreement provides that, when the general partner is permitted or required to make a decision in its "discretion" or pursuant to a provision not subject to an express standard of "good faith," in making such decision, the general partner has no duty to give any consideration to any interest of or factors affecting Beneficient or any other person. If a decision under Ben LP's partnership agreement is subject to an express standard of "good faith," such decision will not constitute a breach of the agreement if the decision is approved by (i) a majority of the members of the conflicts committee of the board of directors of the general partner of Beneficient, (ii) holders of a majority of the voting power of the Ben LP's common units entitled to vote (excluding voting common units owned by the general partner and its affiliates), or (iii) the general partner acting without a subjective belief that such decision was adverse to the interests of Ben LP. Potential conflicts of interest may arise among the general partner and its affiliates, on the one hand, and Beneficient, on the other hand, and the general partner may be able to favor its own interest to the detriment of Beneficient and the holders of the common units of Ben LP.

***Beneficient has significant debt obligations outstanding to us and has the ability to incur additional indebtedness.***

Subject to certain restrictions within our current Commercial Loan Agreement with Beneficient, Beneficient is permitted to incur additional indebtedness ranking senior to the Commercial Loan. If Beneficient is unable to execute its business plans, it may materially and adversely impact Beneficient's ability to repay its indebtedness, including indebtedness under the Commercial Loan Agreement in accordance with its terms. As a significant holder of Beneficient indebtedness, a payment default under any additional indebtedness Beneficient may incur, or under the Commercial Loan Agreement, would likely have a corresponding negative impact on the value of our assets (including the value of our Ben LP common units) and the price of our common stock.

<div align="center">Page 27</div>

*Our percentage ownership in Ben LP may be diluted significantly.*

On December 31, 2019, GWG was granted the authority to appoint a majority of the board of directors of the general partner of Ben LP (as contemplated by the Investment and Exchange Agreements). As such, GWG controls Beneficient and consolidates Beneficient for financial statement reporting purposes. It is possible that GWG and Beneficient will redeem all outstanding common units of Ben LP not owned by GWG such that GWG becomes the sole owner of such common units. In this scenario, "dilution" refers to the potentially significant economic rights and privileges of the limited partner interests (described below) that are senior or preferred to our common interests that could result in substantial economic dilution to GWG.

Upon completion of the Beneficient Transactions, we owned approximately 95.5% of the issued and outstanding common units in Ben LP. This percentage ownership does not take into account (i) limited partner interests that may be issued upon the conversion of outstanding securities issued by Beneficient or its affiliates, or (ii) additional limited partner interests that may be issued after the closing of the Beneficient Transactions. Taking these issuances into account, our ownership interest in common units of Ben LP could be reduced significantly below 50%. In addition, and importantly, Beneficient Management has discretion to cause Ben LP to issue additional limited partner interests from time to time, and Ben LP's partnership agreement contains no meaningful restrictions on this authority. Moreover, the Beneficient organizational structure permits the future issuance of additional securities that can, upon certain circumstances or at the discretion of their holders, be converted into additional limited partner interests in Ben LP. Should any of these actions be taken, our percentage ownership in Ben LP will be diluted.

*The resale of our common stock issued in the Exchange Transaction could put downward pressure on the market price of our common stock and result in a destabilized trading market for our common stock.*

Upon the Final Closing, we issued 27,013,516 shares of our common stock, which in the aggregate represented approximately 82% of our outstanding common stock as of December 31, 2019. The shares issued in the Exchange Transaction are subject to resale restrictions applicable to "restricted securities" under applicable federal securities laws. The Master Exchange Agreement and related ancillary agreements require that we register the resale of the shares of common stock issued in the Final Closing to the Seller Trusts to the extent permitted by applicable SEC rules and regulations. Upon the effectiveness of any such registration, or the lapse of applicable resale restrictions under applicable securities laws, the shares of our common stock issued in the Exchange Transaction will be available for resale in the public equity markets. We cannot predict the effect, if any, that future sales of these shares or the availability of these shares for future sale could have on the market price of our common stock.

*The Seller Trusts, collectively, own a substantial majority of our outstanding common stock, enabling them to exert significant influence over our operations, which may affect the trading price of our common stock.*

According to their most recent Schedule 13D/A filing, the Seller Trusts own approximately 78.4% of our outstanding common stock. The Seller Trusts are a group of individual common law trusts that received shares of our common stock in the Exchange Transaction. The trustee of each of the Seller Trusts is Delaware Trust Company. The trust advisors of each trust are two individuals unrelated to each other, Murray T. Holland (our President and Chief Executive Officer) and James E. Turvey, who have sole decision-making authority with respect to each Seller Trust. The beneficiary of each of the Seller Trusts is MHT Financial, LLC. The current members of MHT Financial, LLC include Murray T. Holland (our President and Chief Executive Officer) and an entity owned by Shawn T. Terry and Mike McGill. The Seller Trusts are entitled to full voting rights with respect to the shares of Common Stock they own. Because the Seller Trusts, collectively, own a substantial majority of our outstanding voting securities, the Seller Trusts are entitled to cast a majority of the votes on all matters requiring stockholder votes, including: the election of directors; mergers, consolidations, acquisitions and other strategic transactions; the sale of all or substantially all of our assets and other decisions affecting our capital structure; amendments to our Certificate of Incorporation or our bylaws; and our winding up and dissolution. This effectively transferred voting control over the Company to the Seller Trusts from Messrs. Jon and Steven Sabes, who held a majority of our outstanding common stock not held by the Seller Trusts prior to the closing of the Purchase and Contribution Transaction. This concentrated ownership enables the Seller Trusts to exert significant influence over all of our corporate activities, including the election of directors to our Board of Directors, and may delay, deter or prevent acts that would be favored by our other stockholders. The interests of the Seller Trusts may not always coincide with our interests or the interests of our other stockholders. This concentration of ownership may also have the effect of delaying, preventing or deterring a change in control of the Company. Also, the Seller Trusts may seek to cause us to take courses of action that, in their judgments, could enhance their investments in us, but which might involve risks to our other stockholders or adversely affect us or our other stockholders. As a result, the market price of our shares could decline or stockholders might not receive a premium over the then-current market price of our shares upon a change in control. In addition, this continued concentration of share ownership, albeit in new hands, may adversely affect the trading price of our shares because prospective investors may perceive disadvantages in owning shares in a company with such significant stockholders.

Page 28

*We are currently relying on the "controlled company" exemption under Nasdaq Stock Market Listing Rules, pursuant to which "controlled companies" are exempt from certain corporate governance requirements otherwise applicable under Nasdaq Stock Market Listing Rules.*

The Nasdaq Stock Market Listing Rules exempt "controlled companies," or companies of which more than 50% of the voting power is held by an individual, a group or another company, from certain corporate governance requirements, including those requirements that:

- A majority of the Board of Directors consist of independent directors;

- Compensation of officers be determined or recommended to the Board of Directors by a majority of its independent directors or by a compensation committee comprised solely of independent directors; and

- Director nominees be selected or recommended to the Board of Directors by a majority of its independent directors or by a nominating committee that is composed entirely of independent directors.

The Seller Trusts that acquired our shares in the Beneficient Transactions own approximately 78.4% of our common stock and are considered a group for purposes of the Nasdaq controlled company listing rule, based on the most recent Schedule 13D/A filed by the Seller Trusts and the trust advisors with the SEC. As a result, we are currently a "controlled company" and are relying on the controlled company exemption for certain of the above requirements, including those related to the determination or recommendation of officer compensation. Accordingly, should the interests of the Seller Trusts differ from those of other stockholders, the other stockholders do not have the same protections generally as stockholders of other Nasdaq-listed companies with respect to corporate governance for so long as we rely on the controlled company exemption from the specified corporate governance requirements. Our status as a controlled company could make our common stock less attractive to some investors or otherwise harm our stock price.

*An inability to obtain accurate and timely financial information from Beneficient may prevent us from complying with reporting obligations under federal securities law and compromise our ability to finance our operations through the public equity or debt markets.*

On December 31, 2019, Beneficient became a consolidated subsidiary of GWG Holdings. Until we can fully integrate our accounting and financial reporting systems with Beneficient, we will continue to be heavily reliant on Beneficient to provide us with accurate and timely financial reporting that will allow us to timely prepare and file our consolidated financial statements in accordance with GAAP and in compliance with SEC regulations and Nasdaq listing rules. Although we plan to integrate our accounting and financial reporting systems with Beneficient, this integration is not expected to be complete until the second half of 2020.

Beneficient's management and auditors identified several material weaknesses in Beneficient's internal controls as of December 31, 2018 relating to various Committee of Sponsoring Organizations of the Treadway Commission components including control environment, risk assessment, monitoring activities and control activities. More specifically, material weaknesses were identified relating to, among other matters, insufficient accounting resources to properly capture and accurately record all material transactions; insufficient controls surrounding certain key valuation models and surrounding data inputs into such key valuation models; and ineffective controls over the period end financial reporting process. Beneficient has implemented remedial measures and will perform testing over the operating effectiveness of these controls in mid-2020. While there can be no assurance that the operating effectiveness efforts will be completed without further remedial efforts, Beneficient believes that the remedial efforts put in place address the material weaknesses noted in the 2018 internal control findings. Until the integration of our accounting and financial reporting systems with Beneficient is complete, if Beneficient is unable to maintain its effective internal control over financial reporting, the financial information we receive from Beneficient necessary to produce our consolidated financial statements may not be prepared in sufficient time to allow for us to produce our consolidated financial statements within required time periods.

If we are unable to obtain accurate and timely financial information from Beneficient and are unable to timely prepare and file our financial statements as a result, we may fail to comply with reporting obligations under federal securities law, become subject to delisting from the Nasdaq Stock Market, and may be unable to utilize the public debt or equity markets to finance our operations. Because we have been heavily reliant on the public offer and sale of L Bonds, discontinuing our L Bond offers would have a material adverse impact on our ability to expand our alternative asset portfolio, service our existing portfolio of life insurance policies, satisfy payment requirements under our debt obligations, including our L Bonds and Seller Trust L Bonds, and otherwise fund our operations. In addition, our failure to deliver financial information and comply with disclosure requirements under applicable SEC regulations may result in covenant violations under our second amended and restated senior credit facility with LNV Corporation and hurt our reputation and credibility with our stockholders and our debt holders.

Page 29

We were unable, without unreasonable effort and expense, to complete our financial statements as of and for the year ended December 31, 2018 within the time period required for us to timely file our Annual Report on Form 10-K for the year ended December 31, 2018, which was due on or prior to April 1, 2019. Likewise, we were unable to timely file our Quarterly Reports on Form 10-Q for the quarters ended March 31, 2019 and June 30, 2019.

Our inability to timely file these Reports was due, in part, to a delay in our obtaining financial information from Beneficient. In each of these instances, and in accordance with standard procedures related to the delayed filing of periodic reports with the SEC, we received a letter from Nasdaq stating that we were not in compliance with our filing requirements for continued listing under Nasdaq Listing Rule 5250(c)(1). We ultimately regained compliance with Nasdaq's filing requirements within the grace periods provided by Nasdaq under its Marketplace Rules and delisting procedures. However, if we fail to maintain compliance in the future, we may be delisted, in which case our business and the value of our securities would likely be materially and adversely impacted. Our inability to timely file these reports also resulted in a temporary suspension of the offering of our L Bonds.

### *A failure to establish and maintain effective internal controls over financial reporting could adversely affect our financial results.*

Both GWG Holdings and Beneficient reported material weaknesses as part of their respective 2018 annual audits. GWG Holdings' material weaknesses included ineffective information and communication controls with external parties due to delays in the financial statement close and reporting process as evidenced by the untimely filing of the Annual Report on Form 10-K for the year ended December 31, 2018, and of the Quarterly Report on Form 10-Q for the quarter ended March 31, 2019. Also, management of GWG Holdings did not have sufficient accounting resources and personnel to effectively design and execute process level controls around certain complex or non-recurring transactions to ensure proper application of U.S. GAAP. Beneficient's material weaknesses included, among other matters, insufficient accounting resources to properly capture and accurately record all material transactions; insufficient controls surrounding certain key valuation models and surrounding data inputs into such key valuation models; and ineffective controls over the period end financial reporting process.

GWG is a smaller reporting company for SEC reporting purposes and has historically had limited accounting and financial reporting resources. Prior to the December 31, 2019 consolidation with GWG, Beneficient was not subject to the reporting obligations required under the Sarbanes-Oxley ("SOX") Act of 2002. The consolidation of Beneficient and GWG will result in increased accounting, reporting and internal controls complexity as the companies integrate systems and processes. Furthermore, Beneficient, as a consolidated subsidiary of GWG, is required to be SOX compliant as of December 31, 2020. While both GWG and Beneficient have implemented remedial measures to address their respective 2018 internal control findings, and the companies have plans to fully integrate information systems and processes and to share accounting and financial reporting resources, there is no certainty that GWG and Beneficient will be able to maintain effective internal controls over financial reporting.

Effective internal controls are necessary for GWG and Beneficient to provide reliable financial reports, prevent fraud and operate successfully. If either GWG or Beneficient, or both, cannot provide reliable financial reports or prevent fraud, the Company's ability to accurately report its financial results could be adversely affected and its reputation and operating results would be harmed. GWG and Beneficient cannot be certain that their efforts to further establish and maintain internal controls over financial reporting will be successful. Any failure to further develop, as necessary, or to maintain effective internal controls could harm the Company's operating results or cause the Company to fail to meet its reporting obligations. See the risk factor above *"An inability to obtain accurate and timely financial information from Beneficient may prevent us from complying with reporting obligations under federal securities law . . . ."* Ineffective internal controls could also cause investors to lose confidence in the Company's reported financial information.

### *Our remedies for an "Event of Default" under our Commercial Loan Agreement with Ben LP are limited.*

As part of the Exchange Transaction, GWG Life, as lender, and Ben LP, as borrower, entered into the Commercial Loan Agreement under which $197.4 million in principal and interest was outstanding at December 31, 2019. The principal amount under the Commercial Loan Agreement is due on August 9, 2023; provided that (a) in the event Ben LP completes at least one public offering of its common units raising at least $50 million, which on its own or together with any other public offering of Ben LP's common units results in Ben LP raising at least $100 million, then the maturity date will be extended to August 9, 2028; and (b) in the event that Ben LP (i) completes at least one public offering of its common units raising at least $50 million which on its own or together with any other public offering of Ben LP's common units results in Ben LP raising at least $100 million and (ii) at least 75% of Beneficient Holding's total outstanding NPC-B limited partnership interests have been converted to shares of Ben LP's common units, then the maturity date will be extended to August 9, 2033.

Ben LP's obligations under the Commercial Loan Agreement are unsecured, and repayment of the balance under the Commercial Loan Agreement is subordinated in right of payment to any of Beneficient's senior debt and to obligations that may arise in connection with its NPC-B Unit limited partnership interests. As a result, our remedies upon a default by Ben LP under the Commercial Loan Agreement that constitutes an "Event of Default" (as defined in the Commercial Loan Agreement) are limited to accelerating the loan and commencing a lawsuit for collection. We would not have the right to force Ben LP into bankruptcy or, since the Commercial Loan is unsecured, foreclose on any collateral until a judgment is secured. In addition, under the subordination provisions of the Commercial Loan Agreement, we would have the right to receive proceeds of any sale of Ben LP assets or any liquidation proceeding only after Beneficient's senior lender is paid in full.

### *Our evolving operating priorities, allocation of capital and overall strategic direction may prove to be unsuccessful.*

The consummation of the Purchase and Contribution Transaction resulted in the reconstitution of our board of directors and management team. Such reconstitution has altered and will likely continue to alter our operating priorities, allocation of capital and overall strategic direction from those in place prior to the consummation of the Purchase and Contribution Transaction. There is no assurance that our operating priorities, allocation of capital and overall strategic direction will ultimately prove to be successful.

Page 30

*The Purchase and Contribution Agreement provides that GWG and Beneficient will use commercially reasonable efforts to enter into a joint venture agreement, which may significantly alter the existing strategic relationship between GWG and Beneficient.*

The Purchase and Contribution Agreement provides that GWG and Beneficient will use commercially reasonable efforts to enter into a joint venture agreement. The terms of that agreement have not been determined and they may significantly alter the existing strategic relationship between GWG and Beneficient, including providing for further integration of our respective businesses and establishing additional or alternative financing arrangements. The terms of the joint venture agreement are subject to approval of the Board of Directors of GWG and the Board of Directors of Beneficient Management and subject to the exercise of their respective fiduciary duties. The Board of Directors of GWG has established a special committee of independent and disinterested directors to review and, if deemed appropriate, approve proposed transactions with or involving Beneficient.

**Risks Related to Beneficient's operations:**

In addition to the risks set forth above related to our controlling financial interest in Beneficient generally, the risk factors set forth below relate specifically to Beneficient's business operations. Because Ben LP is now our consolidated subsidiary as of December 31, 2019, the impact on our financial results of Beneficient's current business operations will be material to the overall results of our business operations. Therefore, you should also consider carefully the following risk factors in evaluating us and our business.

*Beneficient does not have any operating history for its new business.*

Beneficient's management has a long track record of successfully organizing and operating businesses, including Beneficient's founder who organized Beneficient's predecessor in 2003, but Beneficient's business plan represents a new phase in its development and Beneficient does not have significant operating history under its current business plan. Additionally, Beneficient's proposed trust company subsidiaries have little operating history. In general, companies that seek to implement these kinds of business plans present substantial business and financial risks and uncertainties.

*Beneficient's success depends on certain key executives and the ability to attract, retain, and develop new professionals.*

Beneficient's success depends in large part upon the skills, experience, personal reputations and network of business contacts of certain key executives. These individuals' reputations, business relationships and expertise are critical elements in the successful implementation of Beneficient's business strategy. Accordingly, the loss of any of the key executives could materially harm Beneficient's business and the value of Beneficient.

Beneficient's key executives are directly responsible for setting Beneficient's strategic direction, operating Beneficient's business, maintaining and expanding business and other critical relationships, clients and business partners and identifying expansion opportunities. Should Beneficient lose one of these key executives, it may have to search externally for a qualified replacement, which search may be prolonged, and Beneficient cannot provide assurance that it will be able to hire such a replacement on a timely basis or at all.

Competition for qualified personnel in the financial services industry is intense. Thus, the loss of any of these key personnel, by resignation, termination, death or disability, or Beneficient's inability to recruit and retain qualified replacements, could cause disruption in Beneficient's business and could prevent Beneficient from fully implementing Beneficient's business strategy, which could materially and adversely affect Beneficient's business, growth and profitability.

<div align="center">Page 31</div>

*Beneficient may not be able to grow, effectively manage its growth, or achieve profitability.*

A principal focus of Beneficient's strategy is to expand the number of Beneficient's product offerings and grow Beneficient's trust administration products and services. Beneficient's future growth depends upon a number of factors, many of which are beyond Beneficient's ability to control. These factors include Beneficient's ability to:

- accurately assess the demand for and sell the products and offerings that Beneficient expects to develop to meet demand;

- compete against other client solutions and other vendors;

- maintain the quality of Beneficient's trust administration products and services;

- effectively manage Beneficient's financing underwriting criteria and manage Ben Collateral, including with effective risk management discipline;

- update Beneficient's products and offerings and develop new products and offerings needed by clients; and

- hire, train and retain qualified personnel to manage and operate Beneficient's business as it is expected to grow.

A deficiency in any of these factors could adversely affect Beneficient's ability to achieve or manage growth or profitability.

*Beneficient's current business plan may be significantly compromised if it is unable to obtain its trust company charters.*

Beneficient's proposed trust company subsidiaries may not commence trust company operations until those subsidiaries receive the necessary trust charters from the Texas Department of Banking. Beneficient filed limited trust association charter applications for its proposed trust company subsidiaries with the Texas Department of Banking in September of 2018 and submitted revised charter applications on March 6, 2020. Approval of those applications is not assured. Even if the charter applications are approved, Beneficient expects that the approvals will be subject to certain conditions including, among others, that the proposed trust company subsidiaries satisfy certain minimum restricted capital requirements. There is no assurance that Beneficient will be able to satisfy all the conditions imposed by the Texas Department of Banking in connection with its approvals. In addition, such conditions could delay the anticipated time for commencement of trust operations.

If Beneficient is ultimately unable to obtain satisfactory limited trust association charters, Beneficient's ability to implement its current business plan may be significantly compromised. Without the trust company charters, federal regulations would significantly limit the amount of alternative asset liquidity financings ("Liquidity Transactions") Beneficient could undertake.

*Beneficient's business faces substantial competition from a variety of financial solution companies and other liquidity providers.*

Beneficient faces substantial competition in all areas of its operations from a variety of competitors, many of which are larger, have an established track record and reputation, and may have more financial resources. Beneficient's business competes with other providers of financial and trust administration such as bank holding companies, commercial and savings banks, savings and loan associations, credit unions, asset managers and their private equity affiliates, insurance companies and a growing list of other local, regional and national institutions which offer financial and trust administration services. Beneficient's business also competes with other providers of liquidity for alternative assets, which may hinder Beneficient's ability to offer Liquidity Transactions to the market. If Beneficient is unable to compete effectively, Beneficient will lose market share and income generated from trust administration services and other financial products will decline.

*Beneficient's liquidity, profitability and business may be adversely affected by an inability to access, or ability to access only on unfavorable terms, the capital markets.*

Liquidity is essential to Beneficient's business and Beneficient must continue to grow its capital to maintain liquidity. Future cash flows from Beneficient's financing arrangements and proceeds from borrowings may not be sufficient for Beneficient to satisfy Beneficient's working capital and liquidity needs. To the extent that working capital is insufficient to fund future operating costs, Beneficient may need to raise additional funds through equity or debt financings, including investments in the form of equity investments and debt advances from GWG, reduce expenses, or curtail its growth. Many factors will affect Beneficient's capital needs and their amount and timing, including Beneficient's growth and profitability, as well as market disruptions and other unforeseeable developments.

<div align="center">Page 32</div>

APP. 248

Beneficient's liquidity may be impaired by an inability to access, or ability to access only on unfavorable terms, secured and/or unsecured debt markets or equity markets, including access to capital markets indirectly through GWG, an inability to access funds from its subsidiaries or otherwise allocate liquidity optimally, an inability to sell assets or redeem its interests in the Ben Collateral, or unforeseen outflows of cash or collateral. This situation may arise due to circumstances that Beneficient may be unable to control, such as a general market disruption or an operational problem that affects third parties or Beneficient, a disruption of the financial markets or negative views about the financial services industry generally, including concerns regarding fiscal matters in the U.S. and other geographic areas.

In addition, Beneficient's ability to raise funding could be impaired if investors or lenders develop a negative perception of Beneficient's long-term or short-term financial prospects. An increase in debt of Beneficient and/or its subsidiaries may increase Beneficient's leverage and reduce its interest coverage. To the extent that Beneficient or its subsidiaries raise additional capital through the future sale of equity or debt, the ownership interest of our equity holders may be diluted.

If Beneficient is unable to raise funding using the methods described above, Beneficient would likely need to consider financing or liquidating assets to meet maturing liabilities. Beneficient may be unable to sell some of its assets or Beneficient may have to sell assets at a discount to market value, either of which could adversely affect Beneficient's results of operations, cash flows and financial condition.

If Beneficient is unable to repay or refinance its existing credit facilities, then Beneficient will be required to either liquidate assets to repay these loans or to raise additional capital through the sale of equity.

***Beneficient is subject to repayment risk in connection with its Liquidity Transactions.***

Beneficient's Liquidity Transactions are structured as loans from Beneficient's subsidiary to unaffiliated trusts that acquire ownership interests in the alternative assets comprising the collateral supporting Beneficient's Liquidity Transactions (the "Ben Collateral"). Loans extended by Beneficient do not require repayment prior to maturity and are subject to a risk of default. Unaffiliated trusts may default on a loan from Beneficient even if the cash flow from alternative assets in the Ben Collateral supporting such a loan is sufficient to otherwise repay interest and principal on the loan.

***A determination that Beneficient is an unregistered investment company would have serious adverse consequences.***

A determination that Beneficient or any of the proposed trust company subsidiaries is an unregistered investment company under the Investment Company Act of 1940 (the "1940 Act") would have serious adverse consequences. Beneficient does not believe it could operate its business effectively as a registered investment company. As a result, Beneficient would have to change its operations so as not to be an investment company. Changes could include refraining from raising capital, changing the types of products and services that Beneficient provides, and changing the nature of the Ben Collateral. Furthermore, if at any time it were established that Beneficient or any of the proposed trust company subsidiaries had been operating as an investment company in violation of the registration requirements of the 1940 Act, there would be a risk, among other material adverse consequences, that such company: (i) could become subject to SEC enforcement and investigation, monetary penalties or injunctive relief, or both, (ii) would be unable to enforce contracts with third parties or that third parties could seek to obtain rescission of transactions with such company undertaken during the period in which it was established that such company was an unregistered investment company, and (iii) would face adverse action from the Texas Department of Banking, either in relation to its pending application for trust company charters, or if such charters are granted, in connection with such charters. Such developments would be likely to have material and adverse consequences for Beneficient. In addition, if Beneficient were treated as an investment company, it would not be eligible to be taxed as a partnership and instead would be taxable as a corporation for U.S. federal income tax purposes, which could result in a material and adverse impact on the returns of holders of Ben LP common units. Upon completion of the Beneficient Transactions, GWG Holdings owned approximately 95.5% of Ben LP common units.

***Beneficient's results of operations may fluctuate from period to period.***

Beneficient expects that the results of its operations may vary significantly from period to period for a variety of reasons, many of which are outside of Beneficient's control and difficult to predict, including demand for Beneficient's liquidity products and trust administration services, performance of the loans against alternative assets comprising the Ben Collateral and concentration of risk in the loan portfolios. Because Beneficient's results of operations may vary significantly from quarter to quarter, the results of any one period should not be relied upon as an indication of future performance. Many but not all of the factors that may cause Beneficient's results of operations to fluctuate are presented in these risk factors.

Page 33

*Beneficient may incur significant losses as a result of ineffective risk management processes and strategies.*

Beneficient seeks to monitor and control its risk exposure by developing an effective risk and control framework, which encompasses a variety of separate but complementary financial, credit, operational, compliance, and legal reporting systems; internal controls; management review processes; and other mechanisms. While Beneficient employs and will continue to develop and deploy a broad and diversified set of risk monitoring and risk mitigation techniques, those techniques and the judgments that accompany their application may not be effective and may not anticipate every risk event in all market environments or the specific nature of the impact and timing of such outcomes.

*Beneficient's operations, products and services may be negatively impacted by changes in economic and market conditions.*

Beneficient's operations, products and services may be negatively impacted by changes in general economic and market conditions because the performance of Beneficient's liquidity products and trust administration services is directly affected by conditions in the financial and securities markets. The financial markets and businesses operating in the securities industry are highly volatile (meaning that performance results can vary greatly from period to period) and are directly affected by, among other factors, domestic and foreign economic conditions, geopolitics and general trends in business and finance, all of which are beyond Beneficient's control. Declines in the financial markets or a lack of sustained growth may result in a corresponding decline in Beneficient's performance and may adversely affect the assets comprising the Ben Collateral and the loans against the assets comprising the Ben Collateral.

*Fluctuations in interest rates and foreign exchange rates may negatively impact the business of Beneficient.*

Fluctuations in interest rates and foreign exchange rates may negatively impact the business of Beneficient. These rates are highly sensitive to many factors beyond Beneficient's control, including general economic conditions, both domestic and foreign, and the monetary and fiscal policies of various governmental and regulatory authorities. Beneficient's assets and liabilities can be affected significantly by changes in market interest rates. As a result, Beneficient may adopt asset and liability management policies to minimize the potential adverse effects of changes in interest rates and foreign exchange rates, primarily by altering the mix and maturity of Liquidity Transactions, interests in the Ben Collateral, funding sources, and derivatives. However, even with these policies in place, a change in interest rates and foreign exchange rates can impact Beneficient's financial condition. Beneficient's ability to successfully manage its interest rate and foreign exchange rate risks is subject to factors beyond its control.

*Beneficient relies on other companies to provide key components of Beneficient's business infrastructure.*

Third-party vendors provide and are expected to continue to provide key components of Beneficient's business infrastructure. Any problems caused by these third parties, including as a result of their not providing Beneficient their services for any reason or their performing their services poorly, could adversely affect Beneficient's ability to deliver products and services to Beneficient's clients, impair Beneficient's ability to conduct its business efficiently and effectively, and/or result in regulatory action, financial loss, litigation, and loss of reputation. Replacing these third-party vendors could also entail significant delay and expense.

*Beneficient may only be able to offer a limited number of products and solutions.*

Beneficient may only be able to offer a limited number of products and solutions due to regulatory, capital or other restrictions. Accordingly, the prospects for Beneficient's success may be solely dependent upon the performance of a single product or solution, or dependent upon the development or market acceptance of a single or limited number of products or solutions. A lack of diversification in its offerings may make Beneficient susceptible to numerous economic, competitive and regulatory conditions, any or all of which may have a substantial adverse impact upon Beneficient's ability to operate its business and/or grow its business in the future. Further, Beneficient would not be able to diversify its operations or benefit from the possible spreading of risks or offsetting of losses that offering a comprehensive suite of solutions could provide.

<div align="center">Page 34</div>

---

*Beneficient depends on the accuracy and completeness of information from and about clients.*

In deciding whether to enter into Liquidity Transactions with clients, Beneficient may rely on information furnished to it by or on behalf of clients, including financial statements and other financial information. Beneficient also may rely on representations of clients as to the accuracy and completeness of that information and, with respect to financial statements, on reports of independent auditors. For example, in connection with Liquidity Transactions, Beneficient may rely on information provided by a client such as net asset value of an underlying alternative asset. Beneficient also relies, and will continue to rely, on client representations and certifications, or other audit or accountants' reports, with respect to the business and financial condition of the assets underlying the Liquidity Transaction. Reliance on clients may not reveal or highlight all relevant facts (including bribery, fraud or other illegal activities) or risks that are necessary or helpful in evaluating such transaction opportunity. Instances of bribery, fraud, accounting irregularities and other improper, illegal or corrupt practices can be difficult to detect and may be more widespread in certain jurisdictions. Beneficient's financial condition, results of operations, financial reporting and reputation could be negatively affected if Beneficient relies on materially misleading, false, inaccurate or fraudulent information.

*Beneficient will be subject to comprehensive governmental regulation and supervision.*

Beneficient and its subsidiaries operate in a highly regulated environment and will be subject to supervision and regulation by several governmental agencies. Beneficient and its subsidiaries are subject to changes in federal and state laws, regulations, governmental policies, tax laws and accounting principles. As Beneficient's business grows, Beneficient and its subsidiaries expect to become subject to additional regulatory agencies' regulation. Changes in regulations or the regulatory environment could adversely affect Beneficient's business.

*Beneficient may incur fines, penalties and other negative consequences from regulatory violations.*

Beneficient may fail to comply with applicable laws and regulations and be held accountable for such violations, even if such violations are inadvertent. Some legal/regulatory frameworks provide for the imposition of fines or penalties for noncompliance even though the noncompliance was inadvertent or unintentional and even though there were systems and procedures designed to ensure compliance in place at the time. For example, Beneficient is subject to regulations issued by the Office of Foreign Assets Control, or "OFAC," that prohibit financial institutions from participating in the transfer of property belonging to the governments of certain foreign countries and designated nationals of those countries. OFAC may impose penalties for inadvertent or unintentional violations even if reasonable processes are in place to prevent the violations. There may be other negative consequences resulting from a finding of noncompliance, including restrictions on certain activities.

*Beneficient faces a risk of noncompliance with and enforcement actions under the Bank Secrecy Act and other anti-money laundering statutes and regulations.*

The Bank Secrecy Act, the USA PATRIOT Act of 2001, and other laws and regulations require financial institutions, among other duties, to institute and maintain an effective anti-money laundering program and file suspicious activity and currency transaction reports as appropriate. The federal Financial Crimes Enforcement Network is authorized to impose significant civil money penalties for violations of those requirements and has recently engaged in coordinated enforcement efforts with the individual federal banking regulators, as well as the U.S. Department of Justice, Drug Enforcement Administration, and Internal Revenue Service (the "IRS"). Beneficient is also subject to increased scrutiny of compliance with the rules enforced by the OFAC and compliance with the Foreign Corrupt Practices Act. If Beneficient's policies, procedures and systems are deemed deficient, Beneficient will be subject to liability, including fines and regulatory actions, which may include restrictions on Beneficient's ability to make distributions to its unitholders and the necessity to obtain regulatory approvals to proceed with certain aspects of Beneficient's business plan. Failure to maintain and implement adequate programs to combat money laundering and terrorist financing could also have serious reputational consequences for Beneficient. Any of these results could materially and adversely affect Beneficient's business, financial condition and results of operations.

*Difficult market conditions can cause investors to reduce or suspend their investments in alternative assets or their desire to liquidate alternative assets they hold, which could adversely affect Beneficient's business.*

During economic downturns, alternative asset owners may suffer from decreasing returns (including negative returns and loss of principal investment), liquidity pressure, increased volatility and difficulty maintaining targeted asset allocations, and investors may decrease or suspend making new fund investments during and after such periods. As the economy begins to recover from these periods, investors may elect to reduce their exposure to alternative investments, resulting in a smaller overall pool of potential clients in the industry and clients for Beneficient's services and products in the future. In the event all or part of this analysis proves true, when trying to find new clients Beneficient will be competing for fewer available alternative assets to administer in an increasingly competitive environment, which could lead to terms less favorable to Beneficient as well as difficulty in reaching new clients. Such changes would adversely affect Beneficient's revenues and profitability.

Page 35

APP. 251

*Beneficient is dependent on the continued success of the alternative asset industry.*

Beneficient's success depends, in part, on the continued success of alternative asset managers and the alternative asset industry that has enjoyed a prolonged period of expansion and profitability. Such expansion and profitability is subject to market conditions and other factors outside of Beneficient's control (and the control of managers of alternative assets). There is no assurance that such expansion and profitability will continue. Beyond business and financial success, the alternative asset industry may also become subject to greater governmental regulation and investigation, which could have a negative effect on Beneficient.

*A failure of Beneficient to appropriately identify and address potential conflicts of interest could adversely affect Beneficient's business.*

Beneficient has developed robust procedures and controls designed to identify and address conflicts of interest relevant to its business operations. However, appropriately identifying and dealing with conflicts of interest is complex and difficult, and Beneficient's reputation could be damaged, and the willingness of clients to enter into transactions with Beneficient may be affected, if Beneficient fails, or appears to fail, to identify, disclose and deal appropriately with conflicts of interest. In addition, potential or perceived conflicts could give rise to litigation or regulatory enforcement actions.

*A failure in Beneficient's operational systems as well as human error or malfeasance, could impair Beneficient's liquidity, disrupt Beneficient's business, result in the disclosure of confidential information, damage Beneficient's reputation, and cause losses.*

Beneficient faces a variety of risks that are substantial and inherent in its business, including market, liquidity, credit, operational, legal, regulatory and reputational risks. The following are some of the more important factors that could affect Beneficient's business.

Beneficient's financial, accounting, data processing or other operational systems and facilities may fail to operate properly or become disabled as a result of events that are wholly or partially beyond Beneficient's control. Beneficient must continuously update systems to support its operations and growth and to respond to changes in regulations and markets, and invest heavily in systemic controls and training to ensure that such transactions do not violate applicable rules and regulations or, due to errors in processing such transactions, adversely affect markets, Beneficient's clients or Beneficient. Enhancements and updates to systems, as well as the requisite training, including in connection with the integration of new businesses, entail significant costs and create risks associated with implementing new systems and integrating them with existing ones.

The use of computing devices and phones is critical to the work done by Beneficient's employees and the operation of Beneficient's systems and business and those of Beneficient's clients and its third-party service providers and vendors. Additionally, computing devices may be vulnerable to cyber-attacks or have other inherent weaknesses.

Notwithstanding the proliferation of technology and technology-based risk and control systems, Beneficient's business ultimately relies on people as its greatest resource, and, from time-to-time, they may make mistakes or engage in violations of applicable policies, laws, rules or procedures that are not always identified immediately by Beneficient's technological processes or by Beneficient's controls and other procedures, which are intended to prevent and detect such errors or violations. These errors or violations can include calculation errors, mistakes in addressing emails, errors in software or model development or implementation, or simple errors in judgment, as well as intentional efforts to ignore or circumvent applicable policies, laws, rules or procedures. Human errors and malfeasance, even if promptly discovered and remediated, can result in material losses and liabilities for Beneficient.

<div align="center">Page 36</div>

*Any cybersecurity-attack or other security breach of Beneficient's technology systems, or those of third-party vendors Beneficient relies on, could subject Beneficient to significant liability and harm Beneficient's business operations and reputation.*

Cybersecurity attacks and security breaches of Beneficient's technology systems, including those of Beneficient's clients and third-party vendors, may subject Beneficient to liability and harm Beneficient's business operations and overall reputation. Beneficient's operations rely on the secure processing, storage and transmission of confidential and other information in its computer systems and networks. Threats to information technology systems associated with cybersecurity risks and cyber incidents continue to grow, and there have been a number of highly publicized cases involving financial services companies, consumer-based companies and other organizations reporting the unauthorized disclosure of client, customer or other confidential information in recent years. Beneficient is regularly the target of attempted cyber-attacks. Cybersecurity risks could disrupt Beneficient's operations, negatively impact Beneficient's ability to compete and result in injury to Beneficient's reputation, downtime, loss of revenue, and increased costs to prevent, respond to or mitigate cybersecurity events. Although Beneficient has developed, and continues to invest in, systems and processes that are designed to detect and prevent security breaches and cyber-attacks, and while Beneficient expects to periodically test this security, Beneficient's security measures, information technology and infrastructure may be vulnerable to attacks by hackers or breached due to employee error, malfeasance or other disruptions that could result in unauthorized disclosure or loss of sensitive information; damage to Beneficient's reputation; the incurrence of additional expenses; additional regulatory scrutiny or penalties; or Beneficient's exposure to civil or criminal litigation and possible financial liability, any of which could have a material adverse effect on Ben's business, financial condition and results of operations.

Third parties upon whom Beneficient relies face similar threats, which could directly or indirectly impact Beneficient's business and operations. The occurrence of a cybersecurity-incident or attack on Beneficient's third-party vendors could have a material adverse effect on Beneficient's reputation and on Beneficient's business, financial condition and results of operations.

*Transfer restrictions applicable to alternative assets may prevent Beneficient from being able to attract a sufficient number of clients to achieve Beneficient's business goals.*

Many alternative assets contain stringent transfer restrictions imposed by the issuing entity, which may prevent Beneficient from entering into Liquidity Transactions or providing trust administration services with respect to such assets. Such restrictions may result in Beneficient not being able to attract a sufficient number of clients or Liquidity Transactions and, as a result, its revenues and profitability could be adversely affected.

*Beneficient's failure to correctly identify mergers, acquisitions, divestitures or other strategic transactions could have a material adverse effect on its business, financial condition and results of operations.*

Beneficient may seek to facilitate its growth through mergers, acquisitions or other strategic transactions. Mergers, acquisitions, and other strategic transactions involve inherent risks that could compromise the success of the combined business and dilute the holdings of Beneficient's unitholders. If Beneficient is incorrect when assessing the value, strengths, weaknesses, liabilities and potential profitability of such transactions, or if Beneficient fails to adequately integrate the acquired businesses or individuals, the success of the combined business could be compromised. Business acquisitions are subject to the risks commonly associated with such transactions including, among others, potential exposure to unknown liabilities of acquired companies and to acquisition costs and expenses, the difficulty and expense of integrating the operations and personnel of the acquired companies, potential disruptions to the business of the combined company and potential diversion of management's time and attention, the impairment of relationships with and the possible loss of key employees and clients as a result of changes in management, potential litigation or other legal risks, potential write-downs related to goodwill impairments in connection with acquisitions and dilution to the unitholders of the combined company if the acquisition is made for equity of the combined company. In addition, investment strategies, technologies or businesses of acquired companies may not be effectively assimilated into Beneficient's business or may have a negative effect on the combined company's revenues or earnings. The combined company may also incur significant expenses to complete acquisitions and support acquired investment strategies and businesses. Further, any such acquisitions may be funded with cash, debt or equity, which could dilute the holdings or limit the rights of Beneficient's unitholders. Finally, Beneficient may not be successful in identifying attractive acquisition candidates or completing acquisitions on favorable terms.

<div align="center">Page 37</div>

Divestitures involve inherent risks that could compromise the success of Beneficient's business. Risks related to divestitures can include difficulties in the separation of the divested business, loss of clients, retention or obligation to indemnify certain liabilities, the failure of counterparties to satisfy payment obligations, unfavorable market conditions that may impact any earnout or contingency payment due to Beneficient and unexpected difficulties in losing employees of the divested business.

There is no assurance that Beneficient will be successful in overcoming these or other risks encountered with mergers, acquisitions, divestitures and other strategic transactions. These risks may prevent Beneficient from realizing the expected benefits from mergers, acquisitions, divestitures and other strategic transactions and could result in the failure to realize the full economic value of a strategic transaction.

***Beneficient faces risks associated with the ability of its information technology systems and its people and processes to support its operations and future growth effectively.***

In order to serve Beneficient's market effectively, Beneficient has developed, and is continually developing, a comprehensive array of products and services. In order to support these products and services and for Beneficient to operate effectively, Beneficient has developed, purchased and licensed information technology and other systems and processes. As Beneficient's business grows, Beneficient expects to continue to invest in and enhance these systems, and its people and processes.

These investments and enhancements may affect Beneficient's future profitability and overall effectiveness. From time to time, Beneficient may change, consolidate, replace, add or upgrade existing systems or processes, which if not implemented properly to allow for an effective transition, may have an adverse effect on Beneficient's operations, including business interruptions, which may result in inefficiencies, revenue losses, client losses, exposure to fraudulent activities, regulatory enforcement actions, or damage to Beneficient's reputation. Beneficient also outsources certain operational and other functions to consultants or other third parties. If Beneficient does not implement its systems effectively or if its outsourcing business partners do not perform their functions properly, there could be an adverse effect on Beneficient. There can be no assurance that Beneficient will be able to effectively maintain or improve its systems and processes, or utilize outsourced talent, to meet its business needs efficiently. Any failure of such could adversely affect Beneficient's operations, financial condition, results of operations, future growth and reputation.

Page 38

*Beneficient faces risks from regulatory investigations and proceedings and from private actions brought against it.*

From time to time, Beneficient may be named as a defendant or otherwise become involved in various legal proceedings, including class actions and other litigation or disputes with third parties. Future actions against Beneficient may result in judgments, settlements, fines, penalties or other results adverse to Beneficient, which could materially adversely affect Beneficient's business, financial condition or results of operations, or cause serious reputational harm to Beneficient.

Beneficient's businesses and operations are also subject to increasing regulatory oversight and scrutiny, which may lead to additional regulatory investigations or enforcement actions. These and other initiatives from federal and state officials may subject Beneficient to judgments, settlements, fines or penalties, or cause Beneficient to be required to restructure its operations and activities, all of which could lead to reputational issues, or higher operational costs, thereby reducing Beneficient's profitability.

While Beneficient seeks to insure against potential risks, Beneficient may not be able to obtain insurance to cover certain risks, or obtain coverage on favorable terms, and the insurance that Beneficient has may be inadequate to cover certain civil or criminal proceedings or regulatory investigations and associated costs.

*Beneficient may be impacted adversely by claims or litigation, including claims or litigation relating to its fiduciary responsibilities.*

Beneficient's business involves the risk that clients or others may sue Beneficient, claiming that Beneficient has failed to perform under a contract or otherwise failed to carry out a duty perceived to be owed to them. This risk would be heightened when Beneficient's trust company subsidiaries begin serving as fiduciaries for their clients following the issuance of state trust company charters. Specifically, Beneficient's trust company subsidiaries would be required to (i) adhere to the fiduciary standard of care required under the terms of the governing documents or applicable law, and (ii) properly discharge their fiduciary duties. If Beneficient fails to comply with these fiduciary obligations, it could incur significant costs and possibly liability, which could materially and adversely affect Beneficient's business, financial condition or results of operations. Liability for breach of fiduciary duty may be difficult to assess or quantify and its existence and magnitude may remain unknown for a substantial period of time. Additionally, an alleged breach of fiduciary duty, regardless of the merits of such alleged breach, could significantly damage Beneficient's reputation and cause it to incur legal and other costs. Claims made or actions brought against Beneficient, whether founded or unfounded, may result in injunctions, settlements, damages, fines or penalties, which could have a material adverse effect on Beneficient's financial condition and results of operations, could adversely affect Beneficient's ability to raise additional funding or attract new clients, and could require changes to Beneficient's business. Even if Beneficient defends itself successfully, the cost of litigation is often substantial, and public reports regarding claims made against Beneficient may cause damage to its reputation among existing and prospective clients or negatively impact the confidence of counterparties, rating agencies, and equityholders, consequently affecting Beneficient's earnings negatively.

*A change in Beneficient's tax treatment could adversely affect Beneficient.*

Beneficient is subject to a variety of tax laws and tax regulations by national, regional and local governments. Beneficient, and most of its subsidiaries, are pass through entities that are generally not subject to taxation. Rather, Beneficient passes on the distributive share of income to its investors who bear the burden of any tax liability that may be generated by such income. These tax laws and regulations (including the applicable tax rates), and their interpretation and application, may change from time to time and those changes could have a material adverse effect on the results of operations or Beneficient's financial position.

<div align="center">Page 39</div>

In addition, without the consent of Beneficient's unitholders, Beneficient's general partner may elect to convert Beneficient into a corporation or be taxed as a corporation for U.S. federal income tax purposes if certain conditions have been met. Such a conversion could be a taxable event to Beneficient's unitholders where gain or loss is recognized. In addition, a conversion would subject all of Beneficient's future net income to a level of corporate tax, which may reduce the amount of cash available for distribution or reinvestment.

***Beneficient's business, profitability and liquidity may be adversely affected by deterioration in the credit quality of, or defaults by, third parties who owe Beneficient money, securities or other assets or whose securities or obligations Beneficient holds.***

Beneficient is exposed to the risk that third parties that owe Beneficient money, securities or other assets will not perform their obligations. These parties may default on their obligations to Beneficient due to bankruptcy, lack of liquidity, operational failure or other reasons. A failure of a significant market participant, or even concerns about a default by such an institution, could lead to significant liquidity problems, losses or defaults by other institutions, which in turn could adversely affect Beneficient.

***In the event Beneficient uses hedging transactions to manage certain market risks, Beneficient's business, profitability and liquidity may be adversely affected by unanticipated market conditions including interest rates, currency exchange rates, equity market behavior, and other relevant asset classes.***

When managing its exposure to market risks, Beneficient may make use of forward contracts, options, swaps, caps, collars and floors or pursue other strategies or use other forms of derivative instruments to limit its exposure to changes in the relative values of investments that may result from market developments, including changes in prevailing interest rates and currency exchange rates.

The use of hedging transactions and other derivative instruments to reduce the effects of changes in the value of a position does not eliminate the possibility of fluctuations in the value of the position or prevent losses if the value of the position declines. However, such activities can establish other positions designed to gain from those same developments, thereby offsetting the decline in the value of the position. Such transactions may also limit the opportunity for gain if the value of a position increases. Moreover, it may not be possible to limit the exposure to a market development that is so generally anticipated that a hedging or other derivative transaction cannot be entered into at an acceptable price. Although Beneficient may enter into hedging transactions in order to reduce its exposure to market risks, unanticipated market changes may result in poorer overall investment performance than if the transaction had not been executed. In addition, the degree of correlation between price movements of the instruments used in connection with hedging activities and price movements in a position being hedged may vary. Moreover, for a variety of reasons, Beneficient may not be successful in establishing a sufficient correlation or a sufficient matching of cash flows between the instruments used in a hedging or other derivative transaction and the position being hedged. An insufficient correlation could prevent Beneficient from achieving the intended result and create new risks of loss. In addition, Beneficient will not be able to fully limit exposure against all changes in the values of the alternative assets underlying its Liquidity Transactions, because the values of such assets are likely to fluctuate as a result of a number of factors, some of which will be beyond Beneficient's control, and it may not be able to respond to such fluctuations in a timely manner or at all.

***The interest rates under Beneficient's loan, credit and other agreements may be impacted by the phase-out of the London Interbank Offered Rate ("LIBOR").***

LIBOR is the basic rate of interest used in lending between banks on the London interbank market and is widely used as a reference for setting the interest rates on loans globally. LIBOR is used as a reference rate to calculate interest under certain of our borrowings and receivables. In 2017, the United Kingdom's Financial Conduct Authority, which regulates LIBOR, announced that it intends to phase out LIBOR by the end of 2021. The U.S. Federal Reserve, in conjunction with the Alternative Reference Rates Committee, a steering committee comprised of large U.S. financial institutions, identified the Secured Overnight Financing Rate ("SOFR") as the preferred alternative reference rate to U.S. dollar LIBOR and recommended a paced transition plan that involves the creation of a reference rate based on SOFR by the end of 2021. SOFR is a more generic measure than LIBOR and considers the cost of borrowing cash overnight, collateralized by U.S. Treasury securities. Given the inherent differences between LIBOR and SOFR or any other alternative benchmark rate that may be established, there are many uncertainties regarding a transition from LIBOR. Certain of Beneficient's borrowing and receivable agreements contain fallback provisions providing for alternative rate calculations in the event LIBOR is unavailable, prior to any LIBOR rate transition. As a result, our level of interest payments we incur or receive may change and the new rates we incur may not be as favorable to us as those in effect prior to any LIBOR phase-out.

***Beneficient's fair value estimates of illiquid assets may not accurately estimate prices obtained at the time of sale and Beneficient cannot provide assurance that the values of the alternative assets underlying the Liquidity Transactions that it reports from time to time will be realized.***

Asset valuations for which there is no readily available market, such as the illiquid assets comprising the Ben Collateral, require estimates and assumptions about matters that are inherently uncertain. Given this uncertainty, the fair values of such assets as reflected in estimated net asset value may not reflect the prices that would actually be obtained if and when such assets would be sold.

Under Beneficient's valuation policy, Beneficient bases its estimates of the fair value of the alternative assets in the Ben Collateral on the fund reported net asset value reported to it by the underlying fund managers. Because alternative asset managers generally hold a high proportion of their investments in assets for which market prices are not readily available, fund reported net asset value will necessarily incorporate estimates of fair value made by the fund managers. As there is no single method for determining fair value, there may be significant variations in the valuation policies used by different fund managers in the Ben Collateral.

Page 40

APP. 256

In addition, due to time lags in receiving valuation information from fund managers, Beneficient typically does not and will not have up-to-date information from all underlying funds at the time it calculates the fair value of the alternative assets underlying the Liquidity Transactions. Beneficient typically is not and will not be aware of all material developments at a fund or its underlying portfolio companies that could adversely affect the value of the funds in the Ben Collateral.

Even if market quotations are available for the alternative assets underlying the Liquidity Transactions, such quotations may not reflect the value that could actually be realized because of various factors, including the possible illiquidity associated with a large ownership position, subsequent illiquidity in the market for a company's securities, future market price volatility or the potential for a future loss in market value. Realizations at values significantly lower than the fair values recorded in Beneficient's financial statements could have a material adverse effect on the net asset value of the alternative asset, and therefore the value of the beneficial interests and the corresponding Liquidity Transactions.

Furthermore, a substantial majority of the net assets of Beneficient are currently represented by intangible assets and goodwill. Beneficient's management performs goodwill and intangible asset impairment testing annually, during the fourth quarter, or when events occur, or circumstances change that would more likely than not indicate impairment has occurred. Goodwill impairment exists when the carrying value of goodwill exceeds its implied fair value. If Beneficient's management concludes that a portion of its goodwill is impaired, and writes down the value of such goodwill, the value of our investment in Beneficient may also have to be written down.

***Beneficient's liquidity, profitability and business may be adversely affected by concentrations of assets comprising the Ben Collateral.***

The Ben Collateral may be concentrated in certain issuers, funds, sectors, geographic regions, countries, or asset types, which could negatively affect performance as well as Beneficient's financial results, including Beneficient's capital position, earnings, cash flows, and growth.

Similarly, Beneficient's balance sheet may have significant exposures to certain issuers, industries, or asset classes. As a result, Beneficient's net cash flows and asset valuations (e.g., net asset value) may exhibit greater volatility due to idiosyncratic factors specific to companies, industries, regions, and asset classes. Moreover, because of such concentrations, Beneficient may suffer losses even when economic and market conditions are generally favorable for Beneficient's competitors.

In the case of Beneficient's exposure to investments in publicly traded companies, its operating results would be impacted by volatility in the public markets generally and in the stock prices of such companies.

***The due diligence process that Beneficient undertakes in connection with Liquidity Transactions may or may not reveal all facts that may be relevant in connection with such Liquidity Transaction, and even if Beneficient receives complete and accurate information it may not translate to identifying the appropriate underwriting criteria.***

Before offering liquidity solutions to clients, Beneficient conducts due diligence that it deems reasonable and appropriate based on the facts and circumstances applicable to each transaction. When conducting due diligence, Beneficient may be required to evaluate important and complex business, financial, tax, accounting, technological, environmental, social, governance and legal and regulatory issues. In addition to Beneficient's own employees, outside consultants, legal advisors and accountants may be involved in the due diligence process in varying degrees depending on the type of investment and the parties involved. Nevertheless, when conducting due diligence and making an assessment regarding the alternative assets behind a potential Liquidity Transaction, Beneficient relies on the resources available to it, including information provided by the potential client of the Liquidity Transaction, the general partners and managers of the alternative assets the client holds, and, in some circumstances, third-party investigations, and such an investigation will not necessarily result in the investment ultimately being successful. Moreover, even in the event that Beneficient receives complete and accurate information in the due diligence process, it may not translate to identifying the appropriate underwriting criteria, which could result in negative reputational effects, and/or otherwise materially and adversely affect Beneficient's business, financial condition and results of operations.

Page 41

APP. 257

*Restrictions on Beneficient's ability to collect and analyze data regarding its clients' alternative assets investments could adversely affect its business.*

The Ben Collateral includes interests in alternative assets. Beneficient depends on the continuation of its relationships with the general partners and sponsors of the underlying funds and investments in order to maintain current data on these alternative assets. The termination of such relationships or the imposition of restrictions on its ability to use the data it obtains for its reporting and monitoring services could adversely affect its business, financial condition and results of operations. Beneficient's monitoring is also dependent on the statements and conduct of personnel at investment managers of the general partners of these alternative asset firms. To the extent that the beliefs and expectations of these managers turn out to be inaccurate, Beneficient's expectations as part of its monitoring process may be materially impacted.

## ITEM 1B. UNRESOLVED STAFF COMMENTS.

Not applicable.

## ITEM 2. PROPERTIES.

Our principal executive offices are currently located at 325 North St. Paul Street, Dallas, Texas 75201. GWG and Beneficient collectively lease 33,652 square feet of space for a lease term expiring on July 31, 2021. GWG also retains the lease of its legacy executive offices located at 220 South Sixth Street, Suite 1200, Minneapolis, Minnesota 55402. At that location, GWG leases 17,687 square feet of space for a lease term expiring in 2025. We believe these facilities are adequate for our current needs and that suitable additional space will be available as needed.

## ITEM 3. LEGAL PROCEEDINGS.

We are a party from time to time to what we believe are routine litigation and proceedings considered part of the ordinary course of our business. We believe that the outcome of such existing proceedings would not have a material adverse effect on our financial position, results of operations or cash flows.

## ITEM 4. MINE SAFETY DISCLOSURES.

Not applicable.

<div align="center">Page 42</div>

## PART II

### ITEM 5. MARKET FOR THE REGISTRANT'S COMMON EQUITY, RELATED SHAREHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES.

Our common stock is listed on The Nasdaq Capital Market under the ticker symbol "GWGH."

As of December 31, 2019, there were 111 record holders of our common stock, one of which was Cede & Co., a nominee for Depository Trust Company, or DTC. Shares of common stock that are held by financial institutions as nominees for beneficial owners are deposited into participant accounts at DTC, and are considered to be held of record by Cede & Co. as one stockholder.

#### *Purchases of Equity Securities by the Registrant*

On November 15, 2018, the Company's Board of Directors approved a stock repurchase program pursuant to which the Company was permitted, from time to time, to purchase shares of its common stock for an aggregate purchase price not to exceed $1.5 million. Stock repurchases were able to be executed through various means, including, without limitation, open market transactions, privately negotiated transactions or otherwise. The stock repurchase program did not obligate the Company to purchase any shares, and expired on April 30, 2019. As such, there were no repurchases of common stock under this stock repurchase program during the fourth quarter of 2019.

### ITEM 6. SELECTED FINANCIAL DATA.

Not applicable.

<div align="center">Page 43</div>

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

You should read the following discussion in conjunction with the consolidated financial statements and accompanying notes and the information contained in other sections of this report. This discussion and analysis is based on the beliefs of our management, as well as assumptions made by, and information currently available to, our management.

***Risk Relating to Forward-Looking Statements***

This report contains forward-looking statements that reflect our current expectations and projections about future events. Actual results could differ materially from those described in these forward-looking statements.

The words "believe," "could," "possibly," "probably," "anticipate," "estimate," "project," "expect," "may," "will," "should," "seek," "intend," "plan," "expect," or "consider" and similar expressions are intended to identify forward-looking statements but are not the exclusive means of identifying such statements. Forward-looking statements are subject to risks and uncertainties, which could cause actual results to differ materially from such statements. Many of the forward-looking statements contained in this report can be found in Item 1A — "Risk Factors" and in the following discussion and analysis.

Such risks and uncertainties include, but are not limited to:

- the valuation of assets reflected on our financial statements, including the fair value of Beneficient's assets, liabilities and equity, including noncontrolling interests, which were consolidated as a result of the Investment and Exchange Agreements on December 31, 2019 (as more fully described in the sections that follow);

- the illiquidity of our life insurance investments and receivables from affiliates;

- our ability to realize the anticipated benefits from our consolidation of Beneficient;

- Beneficient's financial performance and ability to execute on its business plan;

- Beneficient's ability to obtain the trust charters from the Texas Department of Banking necessary to implement its business plan;

- our ability to obtain accurate and timely financial information from Beneficient;

- our ability to effectively transition the management and oversight roles served by our former executives and members of our Board of Directors;

- changes resulting from the evolution of our business model and strategy with respect to Beneficient and the life insurance secondary market;

- our reliance on debt financing and continued access to the capital markets;

- our significant and on-going financing requirements;

- our predominant use of short term debt to fund a portfolio of long term assets could result in a liquidity shortage;

- our ability to make cash distributions in satisfaction of dividend obligations and redemption requests;

- our ability to satisfy our debt obligations if we were to sell our assets;

- our history of operating losses;

- general economic outlook, including prevailing interest rates;

- federal, state and FINRA regulatory matters;

- litigation risks;

Page 44

- our ability to comply with financial and non-financial covenants contained in borrowing agreements;

- the reliability of assumptions underlying our actuarial models, including life expectancy estimates and our projections of mortality events and the realization of policy benefits;

- risks relating to the validity and enforceability of the life insurance policies we purchase;

- our reliance on information provided and obtained by third parties, including changes in underwriting tables and underwriting methodology;

- life insurance company credit exposure;

- cost-of-insurance (premium) increases on our life insurance policies;

- performance of our investments in life insurance policies; and

- risks associated with causing Life Epigenetics and youSurance to become independent of GWG.

We caution you that the foregoing list of factors is not exhaustive. Forward-looking statements are only estimates and predictions, or statements of current intent. Actual results, outcomes or actions that we ultimately undertake could differ materially from those anticipated in the forward-looking statements due to risks, uncertainties or actual events differing from the assumptions underlying these statements.

### *JOBS Act*

On April 5, 2012, the Jumpstart Our Business Startups Act of 2012, or JOBS Act, was enacted. Section 107 of the JOBS Act provides that an "emerging growth company" can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act of 1933 for complying with new or revised accounting standards. This means that an "emerging growth company" can make an election to delay the adoption of certain accounting standards until those standards would apply to private companies. We historically qualified as an emerging growth company and elected to delay our adoption of new or revised accounting standards and, as a result, we may not have complied with new or revised accounting standards at the same time as other public reporting companies that are not "emerging growth companies." As discussed in our Annual Report on Form 10-K for the year ended December 31, 2018, we no longer qualify as an emerging growth company as a result of the aggregate amount of non-convertible debt that we have issued during the prior three year period.

### Overview

In 2018 and 2019, we consummated a series of transactions (as more fully described below) with The Beneficient Company Group, L.P. ("Ben LP," including all of the subsidiaries it may have from time to time — "Beneficient"). Beneficient is a financial services firm, based in Dallas, Texas, that provides liquidity solutions for professionally managed alternative assets for mid-to-high net worth ("MHNW") individuals and small-to-mid ("STM") size institutions, which previously had few options to obtain early liquidity for their alternative asset holdings. Beneficient has closed a limited number of these transactions to date, and intends to significantly expand its operations going forward. As part of GWG's reorientation, we also changed our Board of Directors and executive management team. Beneficient, through its subsidiaries, plans to operate three potentially high value, high margin lines of business:

- Private Trust Lending & Liquidity Products. Through Beneficient Capital Company, L.L.C. ("BCC"), Beneficient provides a unique suite of private trust, lending and liquidity products focused on bringing liquidity to owners of professionally managed alternative assets. Beneficient's innovative liquidity solutions are designed to serve mid-to-high net worth ("MHNW") individuals, small-to-mid sized ("STM") institutions, and asset managers who have historically possessed few attractive options to access early liquidity from their alternative assets. Beneficient targets MHNW clients with $5 million to $30 million in net worth and STM institutional clients typically holding less than $1 billion in assets.

Page 45

APP. 261

- Trust and Custody Services. Through Beneficient Administrative and Clearing Company, L.L.C. ("BACC"), and (subject to capitalization) through Pen Indemnity Insurance Company, LTD ("Pen"), Beneficient plans, in the future, to market retirement funds, custody and clearing of alternative assets, and trustee and insurance services for covering risks attendant to owning or managing alternative assets.

- Financial Technology. Through Ben Markets Management Holdings, L.P., formerly called ACE Portal, L.L.C. ("ACE"), Beneficient plans to provide online portals and financial technologies for the trading and financing of alternative assets. Beneficient's existing and planned products and services are designed to support the tax and estate planning objectives of its MHNW clients, facilitate a diversification of assets or simply provide administrative management and reporting solutions tailored to the goals of the investor who owns alternative investments.

While we are continuing our work to maximize the value of our secondary life insurance business, we do not anticipate purchasing additional life insurance policies in the secondary market and have increased capital allocated toward providing liquidity to a broader range of alternative assets, primarily through Beneficient. We believe Beneficient's operations will generally produce higher risk-adjusted returns than those we can generally achieve from life insurance policies acquired in the secondary market. Furthermore, although we believe that our portfolio of life insurance policies is a meaningful component of a diversified alternative asset portfolio, we continue to explore strategic alternatives for our life insurance portfolio aimed at maximizing its value, including a possible sale, refinancing or recapitalization of our life insurance portfolio.

We completed our transactions with Beneficient to provide us with a significant increase in assets and common shareholders' equity. In addition, our transactions with Beneficient may provide us with the opportunity for a diversified source of future earnings within the alternative asset industry. As GWG and Beneficient expand their strategic relationship, we believe the Beneficient transactions will transform GWG from a niche provider of liquidity to owners of life insurance to a full-scale provider of trust and liquidity products and trust services to owners of a broad range of alternative assets.

**The Beneficient Transactions**

*The Exchange Transaction*

On January 12, 2018, GWG Holdings and GWG Life entered into a Master Exchange Agreement (as amended, the "Master Exchange Agreement") with Beneficient, MHT Financial SPV, LLC, a Delaware limited liability company ("MHT SPV"), and various related trusts (the "Seller Trusts"). The material terms and conditions of the initial Master Exchange Agreement were described in GWG Holdings' Current Report on Form 8-K (the "January 2018 Form 8-K") filed with the Securities and Exchange Commission ("SEC") on January 18, 2018.

On August 10, 2018, GWG Holdings, GWG Life, Beneficient, MHT SPV, and the Seller Trusts entered into a Third Amendment to Master Exchange Agreement (the "Third Amendment"). Pursuant to the Third Amendment, the parties agreed to consummate the transactions contemplated by the Master Exchange Agreement in two closings. The Third Amendment also generally deleted MHT SPV as a party to the Master Exchange Agreement. The material terms and conditions of the Third Amendment to Master Exchange Agreement were described in GWG Holdings' Current Report on Form 8-K (the "August 2018 Form 8-K") filed with the SEC on August 14, 2018. The transactions contemplated by the Master Exchange Agreement, as amended, are referred to throughout this Report as the "Exchange Transaction."

<div align="center">Page 46</div>

On the first closing date, which took place on August 10, 2018 (the "Initial Transfer Date"):

- in consideration for GWG and GWG Life entering into the Master Exchange Agreement and consummating the transactions contemplated thereby, Ben LP, as borrower, entered into a commercial loan agreement (the "Commercial Loan Agreement") with GWG Life, as lender, providing for a loan in a principal amount of $200.0 million (the "Commercial Loan");

- Ben LP delivered to GWG a promissory note (the "Exchangeable Note") in the principal amount of $162.9 million;

- Ben LP purchased 5,000,000 shares of GWG's Series B Convertible Preferred Stock, par value $0.001 per share and having a stated value of $10 per share (the "Series B"), for cash consideration of $50.0 million, which shares were subsequently transferred to the Seller Trusts;

- the Seller Trusts delivered to GWG 4,032,349 common units of Ben LP at an assumed value of $10 per common unit;

- GWG issued to the Seller Trusts Seller Trust L Bonds due 2023 (the "Seller Trust L Bonds") in an aggregate principal amount of $403.2 million;

- GWG and the Seller Trusts entered into a registration rights agreement with respect to the Seller Trust L Bonds received by the Seller Trusts; and

- GWG and Beneficient entered into a registration rights agreement with respect to the Ben LP common units received and to be received by GWG.

Under the Master Exchange Agreement, at the final closing (the "Final Closing" and the date on which the final closing occurred, the "Final Closing Date"), which occurred on December 28, 2018:

- in accordance with the Master Exchange Agreement, and based on the net asset value of alternative asset financings as of the Final Closing Date, effective as of the Initial Transfer Date, (i) the principal amount of the Commercial Loan was reduced to $182.0 million, (ii) the principal amount of the Exchangeable Note was reduced to $148.2 million, and (iii) the principal amount of the Seller Trust L Bonds was reduced to $366,.9 million;

- the Seller Trusts refunded to GWG $0.8 million in interest paid on the Seller Trust L Bonds related to the Seller Trust L Bonds that were issued as of the Initial Transfer Date, but cancelled, effective as of the Initial Transfer Date, on the Final Closing Date;

- Ben LP issued to GWG an option (the "Option Agreement") to acquire the number of common units of Ben LP, interests or other property that would be received by a holder of Preferred Series A Subclass 1 Unit Accounts of Beneficient Company Holdings, L.P. ("BCH"), an affiliate of Ben LP; and

- GWG issued to the Seller Trusts 27,013,516 shares of GWG common stock (including shares issued upon conversion of the Series B).

On the Final Closing Date, GWG and the Seller Trusts also entered into a registration rights agreement with respect to the shares of GWG common stock owned by the Seller Trusts, an orderly marketing agreement and a stockholders' agreement. The material terms of these agreements are described in our Information Statement on Schedule 14C filed with the SEC on December 6, 2018 and in our Current Report on Form 8-K filed with the SEC on January 4, 2019.

*The Expanded Strategic Relationship*

In the second quarter of 2019, we completed an expansion of the strategic relationship with Beneficient, which was a transformational event for both organizations that is expected to create a unified platform uniquely positioned to provide an expanded suite of products, services and resources for investors and the financial professionals who assist them. GWG and Beneficient intend to collaborate extensively and capitalize on one another's capabilities, relationships and services. On April 15, 2019, Jon R. Sabes, the Company's former Chief Executive Officer and a former director, and Steven F. Sabes, the Company's former Executive Vice President and a former director, entered into a Purchase and Contribution Agreement (the "Purchase and Contribution Agreement") with, among others, Ben LP. The Purchase and Contribution Agreement was summarized in our Current Report on Form 8-K filed with the SEC on April 16, 2019.

<div align="center">Page 47</div>

APP. 263

The closing of the transactions contemplated by the Purchase and Contribution Agreement (the "Purchase and Contribution Transaction") occurred on April 26, 2019. Prior to or in connection with such closing:

- Messrs. Jon and Steven Sabes sold and transferred all of the shares of the Company's common stock held directly and indirectly by them and their immediate family members (approximately 12% of the Company's outstanding common stock in the aggregate); specifically, Messrs. Jon and Steven Sabes (i) sold an aggregate 2,500,000 shares of Company common stock to BCC for $25.0 million in cash and (ii) contributed the remaining 1,452,155 shares of Company common stock to AltiVerse Capital Markets, L.L.C., a Delaware limited liability company ("AltiVerse") (which is a limited liability company owned by an entity related to Beneficient's founders, including Brad K. Heppner (GWG's Chairman and Beneficient's Chief Executive Officer and Chairman) and an entity related to Thomas O. Hicks (one of Beneficient's current directors and a director of GWG)), in exchange for certain equity interests in AltiVerse.

- Our bylaws were amended to increase the maximum number of directors of the Company from nine to 13, and the actual number of directors comprising the Board was increased from seven to 11. The size of the Board has since been reduced and currently consists of nine directors.

- All seven members of the Company's Board of Directors prior to the closing resigned as directors of the Company, and 11 individuals designated by Beneficient were appointed as directors of the Company, leaving two board seats vacant after the closing.

- Jon R. Sabes resigned from all officer positions he held with the Company or any of its subsidiaries prior to the closing, other than his position as Chief Executive Officer of the Company's technology focused wholly owned subsidiaries, Life Epigenetics and youSurance.

- Steven F. Sabes resigned from all officer positions he held with the Company or any of its subsidiaries prior to the closing, except as Chief Operating Officer of Life Epigenetics.

- The resignations of Messrs. Jon and Steven Sabes included a full waiver and forfeit of (i) any severance that may be payable by the Company or any of its subsidiaries in connection with such resignations or the Purchase and Contribution Transaction and (ii) all equity awards of the Company currently held by either of them.

- Murray T. Holland, a trust advisor of the Seller Trusts, which in the aggregate own approximately 79 percent of GWG's outstanding common stock, was named Chief Executive Officer of the Company.

- The Company entered into performance share unit agreements with certain employees of the Company pursuant to which such employees would receive up to $4.5 million in bonuses under certain terms and conditions, including, among others, that such employees remain employed by the Company or one of its subsidiaries (or, if no longer employed, such employment was terminated by the Company other than for cause, as such term is defined in the performance share unit agreement) for a period of 120 days following the closing.

- The stockholders' agreement that was entered into on the Final Closing Date was terminated by mutual consent of the parties thereto.

- BCC and AltiVerse executed and delivered a Consent and Joinder to the Amended and Restated Pledge and Security Agreement dated October 23, 2017 by and among the Company, GWG Life, LLC, Messrs. Jon and Steven Sabes and the Bank of Utah, which provides that the shares of the Company's common stock acquired by BCC and AltiVerse pursuant to the Purchase and Contribution Agreement will continue to be pledged as collateral security for the Company's obligations owing in respect of the L Bonds issued under our Amended and Restated Indenture, dated as of October 23, 2017, as amended and supplemented.

Among other things, the Purchase and Contribution Agreement contemplated that after the closing, the parties will seek to enter into an agreement pursuant to which the Company in certain circumstances will have the right to appoint a majority of the board of directors of the general partner of Beneficient, resulting in the Company and Beneficient being consolidated from a financial reporting perspective. The Company and Beneficient will also seek to enter into an agreement pursuant to which the Company will offer and distribute (through a FINRA registered managing broker-dealer) Beneficient's liquidity products and services. The Company has reduced capital allocated to life insurance assets while it works with Beneficient to build a larger diversified portfolio of alternative asset investment products.

A copy of the Purchase and Contribution Agreement is included in our Annual Report on Form 10-K filed with the SEC on July 9, 2019 as Exhibit 99.3.

Page 48

*The Investment and Exchange Agreements*

On December 31, 2019, the Company, Ben LP, BCH, and Beneficient Management entered into a Preferred Series A Unit Account and Common Unit Investment Agreement (the "Investment Agreement").

Pursuant to the Investment Agreement, the Company transferred $79.0 million to Ben LP in return for 666,667 common units of Ben LP and a Preferred Series A Subclass 1 Unit Account of BCH.

In connection with the Investment Agreement, the Company obtained the right to appoint a majority of the board of directors of Beneficient Management, the general partner of Ben LP. As a result of this change-of-control event, we reported the results of Ben LP and its subsidiaries on a consolidated basis beginning on the transaction date of December 31, 2019. The Company's right to appoint a majority of the board of directors of Beneficient Management will terminate in the event (i) the Company's ownership of the fully diluted equity of Ben LP (excluding equity issued upon the conversion or exchange of Preferred Series A Unit Accounts of BCH held as of December 31, 2019 by parties other than the Company) is less than 25%, (ii) the Continuing Directors of the Company cease to constitute a majority of the board of directors of the Company, or (iii) certain bankruptcy events occur with respect to the Company. The term "Continuing Directors" means, as of any date of determination, any member of the board of directors of the Company who: (1) was a member of the board of directors on December 31, 2019; or (2) was nominated for election or elected to the board of directors with the approval of a majority of the Continuing Directors who were members of the board of directors at the time of such nomination or election.

Following the transaction, and as agreed upon in the Investment Agreement, the Company was issued an initial capital account balance for the Preferred Series A Subclass 1 Unit Account of $319.0 million. The other holders of the Preferred Series A Subclass 1 Unit Accounts are an entity related to the founders of Ben LP and an entity related to one of GWG's and Beneficient's directors (the "Related Unitholders"), and the aggregate capital accounts of all holders of the Preferred Series A Subclass 1 Unit Accounts after giving effect to the investment by the Company is $1.6 billion. The Company's Preferred Series A Subclass 1 Unit Account is the same class of preferred security as held by the Related Entities. If the Related Unitholders exchange their Preferred Series A Subclass 1 Unit Account for securities of the Company, the Company's Preferred Series A Subclass 1 Unit Account would be converted into common units of Ben LP (so neither the Company nor the founders would hold Preferred Series A Subclass 1 Unit Accounts).

Also on December 31, 2019, in a transaction related to the Investment Agreement, GWG Holdings transferred its interest in the Preferred Series A Subclass 1 Unit Account to its wholly owned subsidiary, GWG Life.

In addition, on December 31, 2019, the Company, Ben LP and the holders of common units of Ben LP (the "Common Units") entered into an Exchange Agreement (the "Exchange Agreement") pursuant to which the holders of Common Units from time to time have the right, on a quarterly basis, to exchange their Common Units for common stock of the Company. The exchange ratio in the Exchange Agreement is based on the ratio of the capital account associated with the Common Units to be exchanged to the market price of the Company's common stock based on the volume weighted average price of the Company's common stock for the five consecutive trading days prior to the quarterly exchange date. The Exchange Agreement is intended to facilitate the marketing of Ben LP's products to holders of alternative assets.

The Exchange Transaction, the Purchase and Contribution Transaction and the Investment and Exchange Agreements are referred to collectively as the "Beneficient Transactions."

**Critical Accounting Policies**

*Critical Accounting Estimates*

The preparation of our consolidated financial statements in accordance with the accounting principles generally accepted in the United States of America ("GAAP") requires us to make significant judgments, estimates, and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. We base our judgments, estimates, and assumptions on historical experience and on various other factors believed to be reasonable under the circumstances. Actual results could differ materially from these estimates. We evaluate our judgments, estimates, and assumptions on a regular basis and make changes accordingly. We believe that the judgments, estimates, and assumptions involved in accounting for business combinations, valuing our investments in life insurance policies, assessing potential impairment of equity method investments and equity security investments, assessing the need for allowance for credit losses on financing receivables and evaluating deferred taxes have the greatest potential impact on our consolidated financial statements and accordingly believe these to be our critical accounting estimates. Below we discuss the critical accounting policies associated with these estimates as well as certain other critical accounting policies.

<center>Page 49</center>

*Business Combinations*

We include the results of operations of acquired businesses from the acquisition date. In allocating the purchase price of a business combination, we record all assets acquired and liabilities assumed at fair value, with the excess of the purchase price over the aggregate fair values recorded as goodwill. Accounting Standards Codification ("ASC") Topic 820, *Fair Value Measurements*, defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. The purchase price of an acquisition is allocated to the underlying assets acquired and liabilities assumed based upon their estimated fair values as of the date of acquisition. To the extent the purchase price exceeds the fair value of the net identifiable tangible and intangible assets acquired and liabilities assumed, such excess is allocated to goodwill. The Company determines the estimated fair values after review and consideration of relevant information, including discounted cash flows, quoted market prices and estimates made by management. The fair value assigned to identifiable intangible assets acquired is based on estimates and assumptions made by management at the time of the acquisition. The Company adjusts the preliminary purchase price allocation, as necessary, during the measurement period of up to one year after the acquisition closing date as it obtains more information as to facts and circumstances existing as of the acquisition date. Acquisition-related costs are recognized separately from the business combination and are expensed as incurred.

As a result of the Investment and Exchange Agreements, we reported the results of Ben LP and its subsidiaries on a consolidated basis beginning on the transaction date of December 31, 2019. The business combination resulted in a gain of $249.7 million related to the remeasurement of our preexisting equity method investment and preliminary goodwill of $2.4 billion. The valuation of goodwill will be a critical accounting estimate beginning January 1, 2020. Refer to Note 5 to the consolidated financial statements for details on the accounting for the transaction.

*Ownership of Life Insurance Policies — Fair Value Option*

We account for the purchase of life insurance policies in accordance with ASC 325-30, *Investments in Insurance Contracts*, which requires us to use either the investment method or the fair value method. We have elected to account for all of our life insurance policies using the fair value method.

The fair value of our life insurance policies is determined as the net present value of the life insurance portfolio's future expected cash flows (policy benefits received and required premium payments) that incorporates current life expectancy estimates and discount rate assumptions.

We initially record our purchase of life insurance policies at the transaction price, which is the amount paid for the policy, inclusive of all external fees and costs associated with the acquisition. At each subsequent reporting period, we re-measure the investment at fair value in its entirety and recognize the change in fair value as unrealized gain (loss) in the current period, net of premiums paid. Changes in the fair value of our life insurance portfolio are based on periodic evaluations and are recorded in our consolidated statements of operations as changes in fair value of life insurance policies.

*Fair Value Components — Life Expectancies*

Unobservable inputs, as discussed below, are a critical component of our estimate for the fair value of our investments in life insurance policies. We currently use a probabilistic method of estimating and valuing the projected cash flows of our portfolio, which we believe to be the preferred and most prevalent valuation method in the industry. In this regard, the most significant assumptions we make are the life expectancy estimates of the insureds and the discount rate applied to the expected future cash flows to be derived from our life insurance portfolio.

The fair value of our portfolio of life insurance policies is determined as the net present value of the life insurance portfolio's future expected cash flows (the net of policy benefits received and required premium payments). The net present value of the future expected cash flows incorporate life expectancy estimates and current discount rate assumptions. The life expectancy estimates we use for acquiring and valuing life insurance policies has in the past been typically based upon the average of two life expectancy reports received from third-party medical actuarial underwriting firms ("Life Expectancy Providers"). After the acquisition of a life insurance policy, we historically have sought to update these life expectancy reports on a periodic basis.

Page 50

In October and November 2018, two of the primary Life Expectancy Providers used by the Company — ITM TwentyFirst, LLC ("TwentyFirst") and AVS, LLC ("AVS") — released updates to their respective mortality tables and medical underwriting methodologies. As disclosed in our Quarterly Report on Form 10-Q for the quarter ended September 30, 2018 filed with the SEC on November 19, 2018, and our amended Quarterly Report on Form 10-Q/A filed on April 22, 2019, the majority of our life insurance policies were valued using life expectancy reports provided by TwentyFirst and/or AVS. The updates from TwentyFirst and AVS suggest a lengthening of prior life expectancy estimates and relate to revised estimates of the originally issued life expectancy reports. These updates do not encompass any change to the insured's age and health condition since the report was originally issued.

We, along with other major secondary market participants, have noted the frequent changes in methodologies made by the Life Expectancy Providers over the years that, short of purchasing revised life expectancy reports at a substantial cost, have lacked detailed information about the impact of these changes on individual policy values. Moreover, our experience is these methodology changes have not resulted in a narrowing of consensus in the life expectancy estimates issued for individual insureds. In other words, the successive changes in the medical underwriting methodologies and mortality tables made by the Life Expectancy Providers have not, in retrospect, proven to be sufficiently accurate with respect to our life insurance portfolio as measured by the ratio of mortality cash flows realized to mortality cash flows predicted (or "expected). We believe, as further described below, that the method we have adopted is a more accurate way of projecting mortality cash flows. Finally, as our life insurance portfolio has grown in size and diversity, our ability to model with greater certainty and predictability through the incorporation of historical portfolio experience in conjunction with the use of life expectancy reports has improved significantly.

*Performance Based Forecasting and Valuation Methodology ("Actual-to-Expected" or "A2E")*

As a result, we undertook a comprehensive study to determine a more accurate, transparent and cost-effective method of pricing, valuing, and modeling the performance of our portfolio of life insurance policies. Our goal was to incorporate life expectancy estimates from Life Expectancy Providers, the historical experience of our portfolio, the diversification and mortality factors of our portfolio, and relevant market-based observations and inputs.

The revised methodology we have adopted was derived from back-testing (the process of applying an analytical method to historical data to see how accurately the method would have predicted actual results) the mortality cash flow performance of our life insurance portfolio using the *longest* life expectancy report received from the Life Expectancy Providers used for pricing at the time the life insurance policies were acquired (the "Longest Life Expectancy"). This contrasts with our historical methodology of projecting mortality cash flows, used prior to the fourth quarter of 2018, which typically used the *average* of two such life expectancy reports.

Our Longest Life Expectancy methodology is built from the following pillars:

- The utilization of life expectancy reports from Life Expectancy Providers for the pricing of all life insurance policies;

- The application of a stable valuation methodology driven by the experience of our life insurance portfolio, which is re-evaluated if experience deviates by a specified margin; and

- The use of relevant market-based observations that can be validated and mapped to the discount rate used to value the life insurance portfolio. See "*Fair Value Components — Discount Rate*" below for a further discussion.

Each of the aforementioned pillars of the Longest Life Expectancy methodology, and the associated assumptions, modeling and outcomes, was reviewed by a leading actuarial consulting firm whose longevity services are used worldwide.

Page 51

Our life insurance portfolio modeling and predicted future cash flows are based upon the central limit theorem, which establishes that, in certain situations, random events become normalized and predictable around the mean as the number of observations grow in size. We believe our portfolio of life insurance policies has grown sufficiently large in size and diversity to establish that while individual mortality experience is inherently unpredictable, the actual mortality experience of the portfolio should be expected to approach the mean modeled prediction. In other words, we believe that we have sufficient actual mortality experience from our life insurance portfolio to use as the basis for the Longest Life Expectancy methodology.

As of December 31, 2019, our life insurance portfolio, stratified by age of insured in the table below, stood at $2.0 billion in face value of policy benefits and 1,151 policies:

|  |  |  |  | Percentage of Total | | |
| --- | --- | --- | --- | --- | --- | --- |
| Min Age | Max Age | Number of Policies | Policy Benefits (in thousands) | Number of Policies | Policy Benefits | Wtd. Avg. LE (yrs.) |
| 95 | 101 | 17 | $ 34,402 | 1.5% | 1.7% | 2.2 |
| 90 | 94 | 145 | 283,442 | 12.6% | 14.0% | 3.3 |
| 85 | 89 | 238 | 556,090 | 20.7% | 27.5% | 5.0 |
| 80 | 84 | 251 | 463,047 | 21.8% | 22.9% | 7.7 |
| 75 | 79 | 224 | 347,952 | 19.4% | 17.2% | 9.8 |
| 70 | 74 | 205 | 264,496 | 17.8% | 13.1% | 11.0 |
| 60 | 69 | 71 | 71,544 | 6.2% | 3.6% | 11.4 |
| **Total** |  | **1,151** | **$ 2,020,973** | **100.0%** | **100.0%** | **7.2** |

As depicted in the graphs below and after extensive research and modeling, we determined that the Longest Life Expectancy methodology was highly predictive of the actual experience of our portfolio of life insurance policies as compared to our historical methodology using the Average Life Expectancy method.

We used the Least Squares statistical method, which can be used to determine a line of best fit by minimizing the sum of squares of the errors (actual vs. expected) and can be used with either linear or non-linear data. In this case, we are fitting non-linear data to a non-linear curve. The Least Squares method was determined to be an efficient means of calculating the required portfolio mortality multiplier (PMM) to maintain the overall shape of the projected curve while maximizing fit to the observed data.

<div style="text-align:center">Page 52</div>

The table below compares the actual to expected mortality cash flow experience of our life insurance portfolio using Longest Life Expectancy. We have increased our actual to expected mortality cash flow experience accuracy from 78% under the Average Life Expectancy through December 2018 to 98% using the Longest Life Expectancy through December 2019. The net effect on the life insurance portfolio of achieving a higher actual to expected ratio is a significant lengthening of its overall life expectancy.



We believe that a Longest Life Expectancy methodology, which incorporates the actual mortality experience of our portfolio and the use of third-party estimates, is superior to our historical methodology. We believe this methodology should minimize future fluctuations of valuation, decrease our reliance on Life Expectancy Providers for updated reports, and improve our ability to finance and forecast future revenues and cash flows.

The implementation of the Longest Life Expectancy methodology required us to take a non-cash charge (net of the impact of a change in discount rate) to revenue of $87.1 million in the fourth quarter of 2018, reflecting a decrease in the fair value of our portfolio of life insurance policies at December 31, 2018. This non-cash charge represented approximately 10% of fair value of the portfolio prior to adjustment.

*Updates to the Analysis*

Proper maintenance of an A2E based valuation methodology includes the continual tracking of actual results as well as comparisons to projections. An A2E based valuation methodology rests on the actuarial premise that mortality results for sufficiently large populations follow predictable mortality curves (see discussion above regarding the Central Limit Theorem). As such, through the A2E analysis and the use of the PMM, we are able to "fit" projections to actual results, which provides a basis to forecast future performance more accurately.

Should performance sufficiently deviate in the future from these projections, the A2E analysis will be re-examined to determine if the resultant PMM still results in the most accurate fitting of the projections to actual results. Adjustments to the PMM would then be made based on that analysis if warranted.

The analysis would utilize the same basic methodology as the initial analysis to ensure consistency in the process:

- Calculation of a static Portfolio PMM;

- A cohort analysis of our life insurance portfolio combined with a durational analysis to determine if either static or vector cohort PMM's are warranted; and

- Following this updated analysis, any necessary changes to the PMM would then be incorporated into the valuation methodology.

Page 53

The basis for a re-examination of the A2E analysis could be based on either the passage of time or a pre-determined performance trigger. Following further analysis, we determined that a performance-based trigger approach that allows the portfolio to perform within statistical norms (+/- 1 standard deviation) without constant updates is most appropriate. We intend to re-examine the A2E analysis and recalculate the resultant PMM anytime the six-month moving average of the difference between actual portfolio performance and projected performance deviates by more than one standard deviation from the mean and such deviation continues as of the end of any calendar quarter after persisting for three consecutive months. This methodology allows for natural periods of slow or excess maturities to occur without the necessity of changes to the PMM. At present, a one standard deviation move in the six-month moving average of the difference between actual portfolio performance and projected performance would equate to a valuation change of approximately $8 million. The decision to update our valuation methodology in the fourth quarter of 2018 was based in part on an analysis performed by a third-party actuarial consulting firm, which indicated a very strong tendency toward mean reversion within the dataset.

The analysis above utilizes the Society of Actuaries 2015 Valuation Basic Table ("2015 VBT"). The 2015 VBT is the standard in the secondary market for life insurance and is based on a much larger dataset of insured lives, face amount of policies and more current information compared to the dataset underlying the 2008 Valuation Basic Table. The 2015 VBT dataset includes 266 million policies compared to the 2008 VBT dataset of 75 million. The experience data in the 2015 VBT dataset includes 2.6 million claims on policies from 51 insurance carriers. Life expectancies implied by the 2015 VBT are generally slightly longer for both male and female non-smokers between the ages of 65 and 80. However, insureds of both genders over the age of 80 have significantly longer life expectancies, approximately 8% to 42% longer, as compared to the 2008 VBT. We adopted the 2015 VBT in our valuation process in 2016.

*Periodic Updates to Life Expectancy (LE) Reports*

Our senior lender requires, and other lenders we engage may require, regular updates to LE Reports. Additionally, should we choose to sell life insurance policies in the secondary market, investors may require updated LE Reports. These lenders and investors may utilize an average LE for valuation, similar to our historical methodology, which may result in significantly different valuations.

We intend to continue obtaining LE Reports beyond our policy purchase process to the extent they are needed to comply with existing and future covenants within credit facilities. To the extent such LE Reports are available, we do not expect to immediately incorporate these LE Reports into our revised valuation methodology, but will track this data to determine over time if there exists any additive predictive value in relation to the basis of its mortality projections. As such, our policies and procedures surrounding the updating of LE Reports reflect that LE Reports will only be updated when required by third parties.

*Current A2E Analysis and PMM Implications*

Our A2E based methodology and use of a static Portfolio PMM requires that we recalculate the PMM used in our valuation anytime the six-month moving average of the difference between actual portfolio performance and projected performance of cumulative face value maturities deviates by more than one standard deviation from the mean and such deviation persists for three consecutive months and continues as of the current quarter-end month. As of December 31, 2019, the six-month moving average of the difference between actual portfolio performance and projected performance of cumulative face value of maturities was within one standard deviation from the mean. As such, our valuation methodology did not require an update to our PMM during the current quarter.

*Portfolio Return Implications*

At any time, we calculate our returns from our life insurance assets based upon (i) our historical results, and (ii) the future cash flows we expect to realize from our statistical forecasts. To forecast our expected future cash flows and returns, we use the probabilistic method of analysis. The expected internal rate of return ("IRR") of our portfolio is based upon future cash flow forecasts derived from a probabilistic analysis of policy benefits received and policy premiums paid in relation to our non-GAAP investment cost basis, which includes purchase price, total premiums paid, and total financing costs incurred to date. As of December 31, 2019, the expected internal rate of return on our portfolio of life insurance assets was 5.17% based on our portfolio benefits of $2.0 billion and our non-GAAP investment cost basis of $941.7 million. This calculation excludes returns realized from our matured policy benefits, which are substantial.

Page 54

APP. 270

We seek to further enhance our understanding of our expected future cash flow and returns by using a stochastic analysis, sometimes referred to as a "Monte Carlo simulation," to provide us with a greater understanding of the variability of our projections. The stochastic analysis we perform, which excludes financing costs to isolate only those cash flows associated with the life insurance policies, provides IRR calculations for different statistical confidence intervals. The results of our stochastic analysis, in which we run 10,000 random mortality scenarios, demonstrates that the scenario ranking at the 50th percentile of all 10,000 results generates an IRR of 8.22%, which is very near to the discount rate of 8.25% that we used to calculate the fair value of our portfolio. Our expected IRR is based upon future policy related cash flow forecasts derived from a probabilistic analysis of our policy benefits received and policy premiums paid. The stochastic analysis results also reveal that our portfolio is expected to generate an IRR of 7.75% or better in 75% of all generated scenarios, and an IRR of 7.35% or better in 90% of all generated scenarios. We believe the Company's portfolio of life insurance policies has grown sufficiently large in size and diversity to establish that, while individual mortality experience is inherently unpredictable, the actual mortality experience of the portfolio should be expected to approach the mean modeled prediction.

### Fair Value Components — Required Premium Payments

We must pay the premiums on the life insurance policies within our portfolio in order to collect the policy benefit. The same probabilistic model and methodologies used to generate expected cash inflows from the life insurance policy benefits over the expected life of the insured are used to estimate cash outflows due to required premium payments. Premiums paid are offset against revenue in the applicable reporting period.

### Fair Value Components — Discount Rate

A discount rate is used to calculate the net present value of the expected cash flows. The discount rate used to calculate fair value of our portfolio incorporates the guidance provided by ASC 820, *Fair Value Measurements and Disclosures*.

We utilized an 8.25% discount rate to estimate the fair value of our portfolio of life insurance policies at both December 31, 2019 and 2018.

In adopting the Longest Life Expectancy methodology as described above, we preserved the general methodology historically used to calculate the fair value discount rate and have made important enhancements. We also improved the reliability and relevancy of the competitive sales estimates we use to measure the discount rates (on a Longest Life Expectancy basis) observed in the life insurance secondary market. We continue to use fixed income market interest rates, credit exposure to the issuing insurance companies, and our estimate of the operational risk yield premium a purchaser would apply to the future cash flows derived from our portfolio of life insurance policies in our methodology. To the extent we limit or cease acquiring insurance policies, we may not have reliable access to the market-based factors described above and will be required to find suitable alternative proxies.

Management has significant discretion regarding the combination of these and other factors when determining the discount rate. The discount rate we choose assumes an orderly and arms-length transaction (i.e., a non-distressed transaction in which neither seller nor buyer is compelled to engage in the transaction), which is consistent with related GAAP guidance. The carrying value of policies acquired during each quarterly reporting period are adjusted to their current fair value using the fair value discount rate applied to the entire portfolio as of that reporting date.

We engaged ClearLife Limited, owner of the ClariNet LS actuarial portfolio pricing software we use, to prepare a net present value calculation of our life insurance portfolio. ClearLife Limited processed policy data, future premium data, life expectancy estimate data, and other actuarial information to calculate a net present value for our portfolio using the specified discount rate of 8.25%. ClearLife Limited independently calculated the net present value of our portfolio of 1,151 policies to be $796.0 million and furnished us with a letter documenting its calculation. A copy of such letter is filed as Exhibit 99.1 to this report.

See Note 7 to the consolidated financial statements for additional discussion of the sensitivity of the valuation to different discount rates.

<div align="center">Page 55</div>

*Equity Method Investments, Equity Security Investment and Financing Receivable from Affiliate*

On November 11, 2019, GWG contributed the common stock and membership interests of its previously-wholly owned subsidiaries Life Epigenetics Inc. ("Life Epigenetics") and youSurance General Agency, LLC ("youSurance") to a legal entity, InsurTech Holdings, LLC ("InsurTech Holdings"), in exchange for a membership interest in InsurTech Holdings. Although we currently own 100% of the equity of InsurTech Holdings, we do not have a controlling financial interest in InsurTech Holdings because the managing member has substantive participating rights. Therefore, we account for our ownership interest in InsurTech Holdings as an equity method investment. Life Epigenetics was formed to commercialize epigenetic technology for the longevity industry. youSurance seeks to offer life insurance directly to customers utilizing epigenetic technology.

Prior to December 31, 2019, GWG's investment in Ben LP was accounted for using the equity method. As a result of the Investment and Exchange Agreements on December 31, 2019, GWG consolidated Beneficient and accounted for the consolidation under the Business Combinations Critical Accounting Policy described above.

GWG also has an equity security investment in Beneficient and financing receivables for loans it provided to Beneficient and the LiquidTrust Borrowers (see Notes 8 and 9 to the consolidated financial statements).

When circumstances indicate that the carrying value of the equity method investments or equity security may not be recoverable, the fair value of the investment is evaluated by management. The fair values of these investments are not readily determinable as they are not currently publicly traded on a stock exchange. As a result, management uses other accepted valuation methods to determine fair value such as discounting estimated future cash flows for the business. If the fair value of the investment is determined to be less than its carrying value and the decline in value is considered to be other than temporary, an appropriate write down is recorded to net earnings based on the excess of the carrying value over the best estimate of fair value of the investment. In addition, if based on current information and events it is probable that GWG will be unable to collect all amounts due according to the contractual terms of the financing receivables from affiliates and an amount can be reasonably estimated, GWG will write down the amounts to estimated realizable value. Information and events creating uncertainty about the realization of recorded amounts for financing receivables from affiliates include, but are not limited to, the estimated cash flows generated by the affiliate's business, the sufficiency of collateral securing the amounts, and the creditworthiness of the counterparties involved. Changes in facts, circumstances and management's estimates and judgment could result in a material charge to earnings. At December 31, 2019, we determined that no indication of an impairment of the aforementioned equity method investments or equity security investments existed, and no allowance for credit losses was recorded on the financing receivables from affiliates.

*Deferred Income Taxes*

Under ASC 740, *Income Taxes*, deferred tax assets and liabilities are recognized for the future tax consequences attributable to temporary differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. A valuation allowance is established for deferred tax assets that are not considered "more likely than not" to be realized. Realization of deferred tax assets depends upon having sufficient past or future taxable income in periods to which the deductible temporary differences are expected to be recovered or within any applicable carryback or carryforward periods or sufficient tax planning strategies. After assessing the realization of the net deferred tax assets, we believe that there is substantial uncertainty that our net deferred tax asset will be realized during the applicable carryforward period. As such, valuation allowances have been recorded against the applicable federal and state deferred tax assets of GWG Holdings as of December 31, 2019 and 2018. In 2019, valuation allowances were recorded against the total amount of non-permanent deferred tax assets. Permanent deferred tax assets of $10.8 million in 2019 were comprised of interest expense limitation under Section 163(j) and the tax-effected net operating loss ("NOL") created subsequent to 2018.

At December 31, 2019 and December 31, 2018, we had NOL carryforwards of $28.6 million and $36.5 million, respectively, for both federal and state taxes. The NOL carryforwards subject to expiration (i.e., those generated prior to 2018) will begin to expire in 2033. Future utilization of NOL carryforwards is subject to limitations under Section 382 of the Internal Revenue Code. This section generally relates to a more than 50 percent change in ownership over a three-year period. As a result of the Exchange Transaction, a change in ownership for tax purposes only has occurred as of December 28, 2018. As such, the annual utilization of our net operating losses generated prior to the ownership change is limited. However, net unrealized built-in gains on our life insurance policies result in an increase in the Section 382 limit over the five-year recognition period, which resulted in a nominal amount of current tax liability in 2019.

<div align="center">Page 56</div>

**Principal Revenue and Expense Items**

During the years ended December 31, 2019 and 2018, we earned revenues from the following primary sources:

- *Life Insurance Policy Benefits Realized*. We recognize the difference between the face value of the policy benefits and carrying value when an insured event has occurred and determine that collection of the policy benefits is realizable and reasonably assured. Revenue from a transaction must meet both criteria in order to be recognized. We generally collect the face value of the life insurance policy from the insurance company within 45 days of our notification of the insured's mortality.

- *Change in Fair Value of Life Insurance Policies*. We value our life insurance portfolio investments for each reporting period in accordance with the fair value principles discussed herein, which reflects the expected receipt of policy benefits in future periods, net of premium costs, as shown in our consolidated financial statements.

- *Interest on Financing Receivables from Affiliates*. We recognize and record interest income on outstanding principal as earned.

- *Sale of a Life Insurance Policy*. In the event of a sale of a policy, we recognize gain or loss as the difference between the sale price and the carrying value of the policy on the date of the receipt of payment on such sale.

During the years ended December 31, 2019 and 2018, our main components of expense are summarized below:

- *Interest Expense*. We recognize, and record interest expenses associated with the costs of financing our life insurance portfolio and our investment in Beneficient. These expenses include interest paid to our senior lenders under our second amended and restated senior credit facility with LNV Corporation, as well as interest paid on our L Bonds, Seller Trust L Bonds and other outstanding indebtedness. When we issue debt, we amortize the financing costs (commissions and other fees) associated with such indebtedness over the outstanding term of the financing and classify it as interest expense.

- *Selling, General and Administrative Expenses*. We recognize and record expenses incurred in our business operations, including operations related to the purchasing and servicing of life insurance policies. These expenses include salaries and benefits, sales, marketing, occupancy and other expenditures.

Additional components of our net earnings include:

- *Earnings (Loss) from Equity Method Investment*. Prior to the Investment and Exchange Agreements on December 31, 2019, we accounted for our investment in the common units of Ben LP using the equity method. Under this method, we recorded our share of the net earnings or losses attributable to Ben LP common unitholders, on a one quarter lag, as a separate line on our consolidated statements of operations. We also account for our investment in InsurTech as an equity method investment, which is also included in earnings (loss) from equity method investment in our consolidated statements of operations. We had a loss of $4.1 million from equity method investments during 2019, compared to nominal earnings in 2018.

- *Gain on Consolidation of Equity Method Investment:* In conjunction with the consolidation of Beneficient on December 31, 2019, we remeasured our preexisting equity method investment to fair value, resulting in a gain due to the increase in the estimated fair value compared to our existing book value. The gain on consolidation of Beneficient on December 31, 2019 was $249.7 million.

  In connection with the Investment Agreement, the Company obtained the right to appoint a majority of the board of directors of Beneficient Management, the general partner of Ben LP. As a result, the Company obtained control of Ben LP and consolidated Ben LP as of December 31, 2019, under the guidance in ASC 805, *Business Combinations*.

  As a result of the change-of-control, the Company was required to remeasure its existing equity investment at fair value prior to consolidation. At December 31, 2019, the Company's equity investment in the common units of Ben LP had a carrying value of $368.6 million, prior to the additional investment noted above. The Company estimated the fair value of its investment in Ben LP to be approximately $622.5 million, resulting in the recognition of a gain of $253.9 million during the fourth quarter of 2019. This gain is included in gain on consolidation of equity method investment on the Company's consolidated statement of operations for the year ended December 31, 2019. This gain was partially offset by the remeasurement to fair value of the Commercial Loan Agreement between GWG Life and Ben LP and the Option Agreement between GWG Holdings and Ben LP which resulted in a net loss of $4.2 million. The net gain on consolidation of equity method investment after remeasurement of these preexisting balances was $249.7 million. The Company's proportionate share of the earnings or losses from Ben LP was recognized in earnings (loss) from equity method investment in our consolidated statement of operations from August 10, 2018 until September 30, 2019 (see Note 9 to the consolidated financial statements for further information) and was previously recorded on a one-quarter lag basis. In connection with the consolidation of Beneficient, the Company was required to discontinue the one-quarter lag.

<div align="center">Page 57</div>

**Results of Operations — 2019 Compared to 2018**

The following is our analysis of the results of operations for the periods indicated below. This analysis should be read in conjunction with our consolidated financial statements and related notes (dollar values in thousands).

| | Years Ended December 31, | |
|---|---|---|
| | 2019 | 2018 |
| Revenue realized from maturities of life insurance policies | $      91,882 | $      50,326 |
| Revenue recognized from change in fair value of life insurance policies[1] | 49,015 | (10,344) |
| Premiums and other annual fees | (65,577) | (54,087) |
| Gain (loss) on life insurance policies, net | 75,320 | (14,105) |
| Interest and other income | 16,956 | 13,715 |
| Total revenue | $      92,276 | $        (390) |
| | | |
| Attribution of gain (loss) on life insurance policies, net: | | |
| Change in estimated probabilistic cash flows, net of premium and other annual fees paid | $        1,609 | $      21,357 |
| Net revenue recognized at maturity | 69,122 | 28,511 |
| Unrealized gain on acquisitions | 6,921 | 28,017 |
| Change in life expectancy evaluation | (2,332) | (4,890) |
| Change in life expectancy valuation methodology[1] | - | (87,100) |
| Gain (loss) on life insurance policies, net | $      75,320 | $      (14,105) |
| | | |
| Number of policies acquired | 83 | 318 |
| Face value of purchases | $      97,316 | $    440,445 |
| Purchases (initial cost basis) | $      32,356 | $    128,503 |
| Unrealized gain on acquisition (% of face value) | 7.1% | 6.4% |
| | | |
| Number of policies matured | 78 | 62 |
| Face value of matured policies | $    125,148 | $      71,090 |
| Net revenue recognized at maturity event (% of face value matured) | 55.2% | 40.1% |

---

(1)   In 2018, revenue recognized from change in fair value of life insurance policies includes a net pre-tax charge of $87.1 million related to the adoption of the Longest Life Expectancy methodology. The $87.1 million represented the net impact of the lengthening of overall life expectancies as a result of the adoption of the Longest Life Expectancy methodology partially offset by the impact of a decrease in the discount rate associated thereto.

Revenue from changes in estimated probabilistic cash flows, net of premiums paid was $1.6 million and $21.4 million in 2019 and 2018, respectively. The increase of $89.4 million in gain (loss) on life insurance policies for the year ended December 31, 2019 over the comparable prior year period was driven by a significant increase in maturities of life insurance policies and an $87.1 million charge resulting from the adoption of the Longest Life Expectancy methodology in 2018, offset by higher premiums paid in 2019.

The face value of policies purchased was $97.3 million and $440.4 million in 2019 and 2018, respectively, reflecting a decrease of face value purchased of $343.1 million. The resulting unrealized gain on acquisition was $6.9 million and $28.0 million in 2019 and 2018, respectively, reflecting a decrease of $21.1 million. Decreased unrealized gain on acquisition in the current period is the result of a strategic decision to significantly reduce capital allocated to purchasing additional life insurance policies in the secondary market and to increase capital allocated toward providing liquidity to a broader range of alternative assets, primarily through additional investments in Beneficient. On December 31, 2019, we obtained the right to appoint a majority of the board of directors of the general partner of Ben LP. As a result of this change-of-control event, we reported the results of Ben LP and its subsidiaries on a consolidated basis beginning on the transaction date of December 31, 2019. We believe Beneficient can finance investments in alternative assets that will generally produce higher risk-adjusted returns than those we can generally achieve from life insurance policies acquired in the secondary market. Furthermore, although we believe that our portfolio of life insurance policies is a meaningful component of a growing diversified alternative asset portfolio, we continue to explore strategic alternatives for our life insurance portfolio aimed at maximizing its value, including a possible sale, refinancing or recapitalization of our life insurance portfolio.

<div align="center">Page 58</div>

APP. 274

The face value of matured policies was $125.1 million and $71.1 million in 2019 and 2018, respectively, reflecting an increase of face value of matured policies of $54.0 million. The resulting net revenue recognized at maturity was $69.1 million and $28.5 million, respectively. Revenue changes from maturity events of $40.6 million primarily resulted from the changes of face value of policies matured during those same periods.

Net revenue charges from change in life expectancy evaluation were ($2.3) million and ($4.9) million in 2019 and 2018, respectively. The resulting net revenue increase of $2.6 million primarily resulted from a lower number of life expectancy updates received during 2019 over 2018.

Interest and other income is comprised of interest from financing receivables, bank interest and other miscellaneous items. Increased interest and other income of $3.2 million in 2019 compared to 2018 was primarily driven by the interest income earned on the financing receivables from Beneficient, and to a lesser extent, interest income from higher bank account balances and the implementation of a sweep process to move balances to higher interest earning bank accounts.

*Interest and Operating Expenses (in thousands)*

|  | **Years Ended December 31,** | | |
| | **2019** | **2018** | **Increase/ (Decrease)** |
|---|---|---|---|
| Interest expense (including amortization of deferred financing costs) | $ 114,844 | $ 80,136 | $ 34,708 |
| Employee compensation and benefits | 28,309 | 17,407 | 10,902 |
| Legal and professional fees | 12,824 | 5,541 | 7,283 |
| Other expenses | 15,896 | 15,995 | (99) |
| Total expenses | $ 171,873 | $ 119,079 | $ 52,794 |

The increase in interest expense was primarily due to the increase in the average outstanding L Bonds from $548.6 million in 2018 to $815.3 million in 2019, contributing $22.7 million of increased interest expense, including amortization of deferred financing costs. Seller Trust L Bonds of $366.9 million were issued in the third quarter of 2018 resulting in an additional $16.7 million of interest expense in 2019 compared to 2018. These increases were partially offset by $4.7 million of lower interest expense on the second amended and restated senior credit facility with LNV Corporation due to net paydowns of $19.8 million during the first ten months of 2019, prior to the amendment of the facility on November 1, 2019. A description of the agreement governing our second amended and restated senior credit facility is set forth below under the caption "Amendment of Credit Facility with LNV Corporation."

The increase in employee compensation and benefits in 2019 compared to 2018 was primarily related to management changes discussed under the caption "The Expanded Strategic Relationship" above, as well as incentive and severance costs associated with moving our principal executive offices from Minneapolis to Dallas during 2019. We also experienced higher costs in 2019 compared to 2018 resulting from certain stock-based compensation arrangements in the third and fourth quarters of 2019.

The increase in legal and professional fees in 2019 compared to 2018 is the result of higher non-capitalizable professional service fees, primarily legal and consulting fees, associated with the Investment and Exchange Agreements and the investment in InsurTech Holdings, in addition to legal, consulting and fees related to our move from Minneapolis to Dallas in 2019.

Page 59

APP. 275

*Insurtech Initiatives*

During 2019 and 2018, we incurred $5.5 million and $4.2 million of expenses, respectively, in furtherance of our insurtech initiatives. These expenses are primarily related to the development of intellectual property surrounding advanced epigenetic testing technology.

As previously discussed, on November 11, 2019, GWG contributed the common stock and membership interests of its previously wholly-owned subsidiaries Life Epigenetics and youSurance to InsurTech Holdings in exchange for a membership interest in InsurTech Holdings. We believe that as a separate entity (rather than as a small subsidiary of a large financial services holding company), the InsurTech Holdings businesses can reach their maximum potential in terms of marketing and branding, attraction of talent, appropriate peer group comparisons and, ultimately, return to its owners. We expect InsurTech Holdings' costs to increase in the future, which will affect our consolidated earnings through our earnings (loss) from equity method investment. Under the Operating Agreement of InsurTech Holdings, we are obligated to invest approximately $20.0 million in InsurTech Holdings over a two year period ending in November 2021, of which $2.1 million was funded during the fourth quarter of 2019.

*Income Tax Expense*

We realized $57.9 million in income tax expense in 2019, which resulted in an effective tax rate of 34.8%, compared to the statutory federal income tax rate of 21%. We realized no income tax expense in 2018.

The following table provides a reconciliation of our income tax expense (benefit) at the statutory federal income tax rate to our actual income tax expense (in thousands):

|  | Years Ended December 31, | | | |
|  | 2019 | | 2018 | |
| --- | ---: | ---: | ---: | ---: |
| Statutory federal income tax (benefit) | $ 34,869 | 21.0% | $ (25,085) | 21.0% |
| State income taxes (benefit), net of federal benefit | 13,486 | 8.1% | (9,243) | 7.7% |
| Change in valuation allowance | 9,671 | 5.8% | 33,999 | (28.4)% |
| Other permanent differences | (93) | (0.1)% | 329 | (0.3)% |
| **Total income tax expense (benefit)** | **$ 57,933** | **34.8%** | **$ —** | **0.0%** |

The most significant temporary differences between GAAP net income (loss) and taxable net income (loss) are the treatment of interest costs, policy premiums and servicing costs with respect to the acquisition and maintenance of the life insurance policies and revenue recognition with respect to the fair value of the life insurance portfolio.

**Revenue and Earnings before Tax by Reportable Segment — 2019 Compared to 2018**

We have two reportable segments: 1) Investment in Beneficient and 2) Secondary Life Insurance. Corporate & Other includes certain activities not allocated to specific business segments. These activities include holding company financing and investing activities, and management and administrative services to support the overall operations of the Company.

Page 60

APP. 276

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 277 of 1031    PageID 449

Comparison of revenue by reportable segment for the periods indicated (in thousands):

| | | Years Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| **Revenue:** | | **2019** | | **2018** | | **Increase/ (Decrease)** | |
| Secondary Life Insurance | $ | 78,002 | $ | (11,633) | $ | 89,635 | |
| Investment in Beneficient | | 13,738 | | 10,655 | | 3,083 | |
| Corporate & Other | | 536 | | 588 | | (52) | |
| Total | $ | 92,276 | $ | (390) | $ | 92,666 | |

The primary drivers of the changes from 2018 to 2019 were as follows:

- Secondary Life Insurance revenue increased by $89.6 million for the year ended December 31, 2019 over the comparable period in 2018 primarily as a result of an $89.4 million higher net gain on life insurance policies. We recognized a loss on life insurance policies in 2018 of $14.1 million due primarily an $87.1 million charge resulting from a change in our life expectancy evaluation methodology. The current year also benefited from $40.6 million higher revenue from life insurance policy maturities and $2.6 million lower charges on life expectancy evaluation updates, partially offset by $11.5 million increased premium costs, $21.1 million lower unrealized gain on acquisition and an $8.3 million lower change in estimated probabilistic cash flows.

- Investment in Beneficient revenue for the year ended December 31, 2019 represents a full year of interest income on approximately $192 million of financing receivables resulting from the Exchange Transaction with Beneficient in the third and fourth quarters of 2018. Also included is interest income from the loan executed with the LiquidTrust Borrowers in June 2019. The interest income from the Beneficient note will be eliminated beginning in January 2020 as a result of the consolidation of Beneficient on December 31, 2019. See Note 8 to the consolidated financial statements regarding our financing receivables with affiliates.

Comparison of earnings before tax by reportable segment for the periods indicated (in thousands):

| | | Years Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| **Segment Earnings Before Tax**[1] | | **2019** | | **2018** | | **Increase/ (Decrease)** | |
| Secondary Life Insurance | $ | (27,694) | $ | (96,578) | $ | 68,884 | |
| Investment in Beneficient | | 229,206 | | (106) | | 229,312 | |
| Corporate & Other | | (35,470) | | (22,767) | | (12,703) | |
| Total | $ | 166,042 | $ | (119,451) | $ | 285,493 | |

(1) Includes earnings (loss) from equity method investments and gain on consolidation of equity method investments as presented in our consolidated statements of operations.

Page 61

The primary drivers of the changes from 2018 to 2019 were as follows:

- Secondary Life Insurance increased by $68.9 million as a result of the following:

  - $89.4 million increase in the gain on life insurance policies, net as described above in the revenue discussion.

  - $13.7 million increase in interest expense as a result of higher average debt outstanding; and

  - An increase in operating expenses of $6.8 million, primarily resulting from higher employee compensation and benefits, professional fees and insurance costs, offset by $4.3 million lower bad debt expense.

- Investment in Beneficient segment earnings before tax increased by $229.3 in 2019 compared to 2018 primarily due to a fair value adjustment related to our preexisting investment as a result of obtaining control of Beneficient on December 31, 2019, resulting in a gain of $249.7 million. In addition, interest income was $3.1 million higher from financing receivables, offset by $21.0 million higher interest expense on the debt issued to finance the investments in Beneficient, and a $2.5 million loss from equity method earnings of Beneficient recognized during 2019 before the change-of-control.

- Corporate and Other operating loss increased primarily due to a $2.4 million increase in expenses related to insurtech initiatives, and a $10.3 million increase in other corporate costs, primarily employee compensation and benefits expenses associated with moving our principal executive offices from Minneapolis to Dallas and legal and professional fees associated with the Investment and Exchange Agreements.

**Liquidity and Capital Resources**

We finance our businesses through a combination of life insurance policy benefit receipts, dividends and interest on investments, equity offerings, debt offerings and our second amended and restated senior credit facility with LNV Corporation. We have traditionally used proceeds from these sources for policy acquisition, policy premiums and servicing costs, working capital and financing expenditures including paying principal, interest and dividends. We have also used proceeds to make additional investments in Beneficient. As of December 31, 2019 and 2018, we had approximately $151.5 million and $141.9 million, respectively, in combined available cash, cash equivalents, restricted cash, policy benefits receivable and fees receivable.

We currently fund our business primarily with debt that generally has a shorter duration than the duration of our long-term assets. The resulting asset/liability mismatch can result in a liquidity shortfall if we are unable to renew maturing short term debt or secure suitable additional financing. In such a situation, we could be forced to sell assets at less than optimal (distressed) prices. We were unable to offer our L Bonds, our primary source of debt capital, for the approximately three month period commencing May 1, 2019 due to delays in filing certain periodic reports with the SEC. We drew down our cash balances during that period as L Bonds matured but were unable to be renewed, and we were unable to offer new L Bonds. We recommenced our L Bond offering on August 8, 2019.

Additional future borrowing base capacity for premiums and servicing costs, created as the premiums and servicing costs of pledged life insurance policies become due and by additional policy pledges to the facility, if any, exists under our second amended and restated senior credit facility with LNV Corporation. The second amended and restated senior credit facility with LNV Corporation has certain financial and nonfinancial covenants. We were in compliance with the debt covenants as of December 31, 2019 and are in compliance as of the filing date of this report.

On August 10, 2018, we issued $50 million of Series B in connection with the Initial Transfer of the Exchange Transaction. Approximately half of the proceeds from this sale were distributed to common shareholders pursuant to a special dividend paid on September 5, 2018 to shareholders of record on August 27, 2018. The remaining amount was expected to be utilized primarily for our insurtech initiatives. As noted in the "Results of Operations" section above, on November 11, 2019, GWG contributed the common stock and membership interests of its wholly owned Life Epigenetics and youSurance subsidiaries to a legal entity, InsurTech Holdings, in exchange for a membership interest in the entity. In connection with the transaction, GWG contributed $2.1 million in cash to InsurTech Holdings during the fourth quarter of 2019 and is committed to contribute an additional $17.9 million to the entity over the next two years. We do not expect to issue any additional Series B.

We heavily rely on our L Bond offering to fund our business operations. As described elsewhere in this report, we suspended our offering on May 1, 2019 due to our delinquency in filing certain periodic reports with the SEC. After regaining compliance with our SEC reporting obligations, we recommenced our offering of L Bonds on August 8, 2019. If we are forced to suspend our L Bond offering in the future for any significant additional length of time and we are unable to obtain replacement financing, our business would be adversely impacted and our ability to service and repay our debt obligations, much of which is short term, would be compromised, thereby negatively affecting our business prospects and viability.

<div align="center">Page 62</div>

*Financings Summary*

We had the following outstanding debt balances as of December 31, 2019 and 2018:

| Issuer/Borrower | As of December 31, 2019 | | As of December 31, 2018 | |
|---|---|---|---|---|
| | Principal Amount Outstanding (in thousands) | Weighted Average Interest Rate | Principal Amount Outstanding (in thousands) | Weighted Average Interest Rate |
| GWG DLP Funding IV, LLC – LNV senior credit facility (see Note 11) | $ 184,586 | 9.57% | $ 158,209 | 10.45% |
| GWG Holdings, Inc. – L Bonds | 948,128 | 7.15% | 662,152 | 7.10% |
| GWG Holdings, Inc. – Seller Trust L Bonds | 366,892 | 7.50% | 366,892 | 7.50% |
| Beneficient – Other borrowings | 152,199 | 4.59% | — | —% |
| **Total** | $ 1,651,805 | 7.26% | $ 1,187,253 | 7.67% |

The table below reconciles the face amount of our outstanding debt to the carrying value shown on our balance sheets:

| | As of December 31, 2019 (in thousands) | As of December 31, 2018 (in thousands) |
|---|---|---|
| Senior credit facility with LNV Corporation | | |
| Face amount outstanding | $ 184,586 | $ 158,209 |
| Unamortized selling costs | (10,196) | (9,231) |
| Carrying amount | $ 174,390 | $ 148,978 |
| | | |
| L Bonds and Seller Trust L Bonds: | | |
| Face amount outstanding | $ 1,315,020 | $ 1,029,044 |
| Subscriptions in process | 15,839 | 13,467 |
| Unamortized selling costs | (37,329) | (24,216) |
| Carrying amount | $ 1,293,530 | $ 1,018,295 |

In January 2012, we began publicly offering up to $250.0 million in debt securities (initially named "Renewable Secured Debentures" and subsequently renamed "L Bonds") that was completed in January 2015.

On September 24, 2014, we consummated an initial public offering of our common stock resulting in the sale of 800,000 shares of common stock at $12.50 per share and net proceeds of approximately $8.6 million after the deduction of underwriting commissions, discounts and expense reimbursements.

In January 2015, we began publicly offering up to $1.0 billion of L Bonds as a follow-on to our earlier $250.0 million public debt offering. In January 2018, we began publicly offering up to $1.0 billion L Bonds as a follow-on to our earlier L Bond offering. Through December 31, 2019, the total amount of L Bonds sold under these two L Bond offerings, including renewals, was $1.5 billion. As of December 31, 2019 and 2018, respectively, we had approximately $948.1 million and $662.1 million in principal amount of L Bonds outstanding (exclusive of Seller Trust L Bonds).

Page 63

In February 2017, we began publicly offering up to 150,000 shares of our Series 2 Redeemable Preferred Stock ("RPS 2") at a per-share price of $1,000. As of December 31, 2018, we had issued approximately $150 million stated value of RPS 2 and terminated that offering.

On August 10, 2018, GWG Holdings, GWG Life and the Bank of Utah, as trustee, entered into the Supplemental Indenture to the Amended and Restated Indenture. The Amended and Restated Indenture was subsequently amended on December 31, 2019, primarily to modify the calculation of the Debt Coverage Ratio in the Indenture to provide the Company with the ability to incur indebtedness (directly or through a subsidiary of the Company) that is payable in capital stock of the Company or mandatorily convertible into or exchangeable for capital stock of the Company that would be excluded from the calculation of the Debt Coverage Ratio. GWG Holdings entered into the Supplemental Indenture to add and modify certain provisions of the Amended and Restated Indenture necessary to provide for the issuance of the Seller Trust L Bonds. We issued Seller Trust L Bonds in the amount of $366.9 million to the Seller Trusts in connection with the Exchange Transaction. The maturity date of the Seller Trust L Bonds is August 9, 2023. The Seller Trust L Bonds bear interest at 7.5% per annum. Interest is payable monthly in cash (see Note 13 to the consolidated financial statements).

In August 2018, we offered and sold 5,000,000 shares of our Series B Convertible Preferred Stock in reliance upon the exemption from registration provided by Section 4(a)(2) under the Securities Act of 1933. The Series B shares were issued at $10 per share for cash consideration of $50 million.

On December 28, 2018, the Series B converted into 5,000,000 shares of our common stock at a conversion price of $10.00 per share immediately following the Final Closing of the Exchange Transaction.

The weighted-average interest rate of our outstanding L Bonds (excluding the Seller Trust L Bonds) as of December 31, 2019 and 2018 was 7.15% and 7.10%, respectively, and the weighted-average maturity at those dates was 3.21 and 2.83 years, respectively. Our L Bonds have renewal features. Since we first issued our L Bonds, we have experienced $646.3 million in maturities, of which $341.3 million has renewed through December 31, 2019 for an additional term. This has provided us with an aggregate renewal rate of approximately 52.8% for investments in these securities.

Future contractual maturities of L Bonds and Seller Trust L Bonds at December 31, 2019 are as follows (in thousands):

| Years Ending December 31, | | |
| --- | --- | --- |
| 2020 | $ | 152,118 |
| 2021[1] | | 568,311 |
| 2022 | | 163,741 |
| 2023 | | 76,969 |
| 2024 | | 118,848 |
| Thereafter | | 235,033 |
| | $ | 1,315,020 |

(1) After the second anniversary of the Final Closing, the holders of the Seller Trust L Bonds will have the right to cause GWG to repurchase, in whole but not in part, the Seller Trust L Bonds held by such holder within 45 days. As such, while the maturity date of the $366.9 million of Seller Trust L Bonds is in August 2023, their contractual maturity is reflected in 2021, as that is the first period in which they could become payable. The repurchase may be paid, at GWG's option, in the form of cash, and/or a pro rata portion of (i) the outstanding principal amount and accrued and unpaid interest under the Commercial Loan Agreement, and (ii) Ben LP common units, or a combination of cash and such property.

The L Bonds and the Seller Trust L Bonds are secured by all of our assets and are subordinate to our second amended and restated senior credit facility with LNV Corporation.

Page 64

On September 27, 2017, we entered into a $300 million amended and restated senior credit facility with LNV Corporation in which DLP IV is the borrower. As of December 31, 2019, we had approximately $184.6 million outstanding under the senior credit facility. On November 1, 2019, we entered into a second amended and restated senior credit facility, which replaced the prior agreement governing the facility. A description of the agreement governing our second amended and restated senior credit facility is set forth below under the caption "Amendment of Credit Facility with LNV Corporation." We intend to use the proceeds from this facility to maintain our portfolio of life insurance policies, for liquidity and for general corporate purposes.

Beneficient had borrowings with an aggregate principal balance outstanding, including accrued interest, of $152.2 million as of December 31, 2019. This aggregate balance includes a senior credit agreement and a second lien credit agreement with respective balances, including accrued interest, of $77.5 million and $72.2 million at December 31, 2019. Both loans accrue interest at a rate of 1-month LIBOR plus 3.95%, compounded daily, with interest due by the 15th of each month. Ben LP intends to repay with cash or refinance with other third-party lenders the senior credit agreement and the second lien credit agreement prior to their maturities, both of which are on June 30, 2020. Ben LP may not be able to refinance or obtain additional financing on favorable terms, or at all. If Ben LP is unable to refinance the senior credit agreement or the second lien credit agreement, or defaults on either loan, then Ben LP will be required to either (i) sell assets to repay these loans or (ii) to raise additional capital through the sale of equity and the ownership interest of Ben LP's equity holders may be diluted. These loans are not guaranteed by GWG. Beneficient has additional borrowings maturing in 2023 and 2024 with an aggregate principal balance outstanding, including accrued interest, of $2.5 million as of December 31, 2019. Future contractual maturities of these borrowings are as follows (in thousands):

| Years Ending December 31, | | |
|---|---|---:|
| 2020 | $ | 149,661 |
| 2021 | | — |
| 2022 | | — |
| 2023 | | 750 |
| 2024 | | 1,579 |
| Thereafter | | — |
| | $ | 151,990 |

We expect to meet our ongoing operational capital needs for alternative asset investments, policy premiums and servicing costs, working capital and financing expenditures including paying principal, interest and dividends through a combination of the receipt of policy benefits from our portfolio of life insurance policies, net proceeds from our L Bond offering, dividends and interest from investments, including Beneficient's loans receivable, and funding available from our second amended and restated senior credit facility with LNV Corporation. We estimate that our liquidity and capital resources are sufficient for our current and projected financial needs for at least the next twelve months given current assumptions. However, if we are unable to continue our L Bond offering for any reason, and we are unable to obtain capital from other sources, our business will be materially and adversely affected. In addition, our business will be materially and adversely affected if we do not receive the policy benefits we forecast and if holders of our L Bonds fail to renew with the frequency we have historically experienced. In such a case, we could be forced to sell our investments in life insurance policies to service or satisfy our debt-related and other obligations. A sale under such circumstances may result in significant impairment of the recognized value of our portfolio.

Capital expenditures have historically not been material and we do not anticipate making material capital expenditures in 2020.

*Alternative Assets and Secured Indebtedness*

At December 31, 2019, the fair value of our investments in life insurance policies of $796.0 million plus our cash balance of $79.1 million, restricted cash balance of $20.3 million, life insurance policy benefits receivable of $23.0 million, loan receivables of $232.3 million, fees receivable of $29.2 million, and other assets of $99.2 million (which are mostly related to our financing receivables from affiliates) totaled $1.4 billion, representing an excess of portfolio assets over secured indebtedness of $155.0 million. At December 31, 2018, the fair value of our investments in life insurance policies of $747.9 million plus our cash balance of $114.6 million, restricted cash balance of $10.8 million, life insurance policy benefits receivable of $16.5 million, and other assets of $591.0 million totaled $1.5 billion, representing an excess of portfolio assets over secured indebtedness of $293.6 million.

<div align="center">Page 65</div>

The following forward-looking table seeks to illustrate the impact that a hypothetical sale of our portfolio of life insurance assets (at various discount rates), and the realization of the financing receivables from affiliates, investment in common units of Ben LP (a substantial majority of the net assets of which are currently represented by intangible assets and goodwill), investment in Preferred Series A Subclass 1 Unit Account of BCH, and equity security investment in the Option Agreement (in each case, at their respective carrying amounts and assuming no discount for lack of marketability or transaction costs, which could be substantial) would have on our ability to satisfy our debt obligations as of December 31, 2019. The amounts in the table below do not include the consolidation of the assets and liabilities of Beneficient and related eliminations as of December 31, 2019. In all cases, the sale of the life insurance assets owned by DLP IV will be used first to satisfy all amounts owing under our second amended and restated senior credit facility with LNV Corporation. The net sale proceeds remaining after satisfying all obligations under our second amended and restated senior credit facility with LNV Corporation would be applied to the L Bonds and Seller Trust L Bonds on a pari passu basis.

**Life Insurance**

| Portfolio Discount Rate | | 10% | 15% | 20% | 25% | 28% |
|---|---|---|---|---|---|---|
| Value of life insurance portfolio (in thousands) | $ | 728,702 | 583,888 | 485,256 | 414,614 | 381,300 |
| Investment in common units of Ben LP | | 632,473 | 632,473 | 632,473 | 632,473 | 632,473 |
| Cash, cash equivalents and policy benefits receivable | | 104,811 | 104,811 | 104,811 | 104,811 | 104,811 |
| Other assets | | 374,869 | 374,869 | 374,869 | 374,869 | 374,869 |
| Total assets | | 1,840,855 | 1,696,041 | 1,597,409 | 1,526,767 | 1,493,453 |
| Senior credit facility | | 184,587 | 184,587 | 184,587 | 184,587 | 184,587 |
| Net after senior credit facility | | 1,656,268 | 1,511,454 | 1,412,822 | 1,342,180 | 1,308,866 |
| L Bonds[1] | | 1,315,020 | 1,315,020 | 1,315,020 | 1,315,020 | 1,315,020 |
| Net remaining (in thousands) | $ | 341,248 | 196,434 | 97,802 | 27,160 | (6,154) |
| Impairment to L Bonds | | No impairment | No impairment | No impairment | No Impairment | Impairment |

(1)  Amount represents L Bonds and Seller Trust L Bonds

The above table illustrates that our ability to fully satisfy amounts owing under the L Bonds and Seller Trust L Bonds would likely be impaired upon the sale or the realization of the financing receivables from affiliates, investment in common units of Ben LP, investment in Preferred Series A Subclass 1 Unit Account of BCH, and equity security investment in the Option Agreement at their respective carrying amounts, plus all our life insurance assets at a price equivalent to a discount rate of approximately 27.41% or higher at December 31, 2019. At December 31, 2018, the likely impairment occurred at a discount rate of approximately 18.70% or higher. The discount rate used to calculate the fair value of our life insurance portfolio was 8.25% as of both December 31, 2019 and December 31, 2018.

The table does not include any allowance for transactional fees and expenses (which expenses and fees could be substantial) nor any discount for lack of marketability associated with a portfolio sale or the realization of the financing receivables with affiliates, investment in common units of Ben LP, investment in Preferred Series A Subclass 1 Unit Account of BCH, and equity security investment in the Option Agreement, respectively, and is provided to demonstrate how various discount rates used to value our portfolio of life insurance assets could affect our ability to satisfy amounts owing under our debt obligations in light of our senior secured lender's right to priority payments under our senior credit facility with LNV Corporation.

The table assumes we will realize the full amounts of financing receivables from affiliates, investment in common units of Ben LP, investment in Preferred Series A Subclass 1 Unit Account of BCH, and equity security investment in the Option Agreement. There is currently no market for the aforementioned assets, and a market may not develop. Our Commercial Loan receivable and a portion of our investment in the common units of Ben LP may be used as consideration for retiring the Seller Trust L Bonds upon a redemption event or at the maturity of the Seller Trust L Bonds (see Notes 12 and 13 to the consolidated financial statements). This table also does not include the yield maintenance fee we are required to pay in certain circumstances under our second amended and restated senior credit facility with LNV Corporation, which could be substantial. The above table should be read in conjunction with the information contained in other sections of this report, including Critical Accounting Policies — Fair Value Components — Discount Rate and the notes to the consolidated financial statements.

<div align="center">Page 66</div>

*Amendment of Credit Facility with LNV Corporation*

Effective November 1, 2019, DLP IV entered into a second amended and restated senior credit facility with LNV Corporation. The second amended and restated senior credit facility makes available a total of up to $300.0 million in credit to DLP IV with a maturity date of September 27, 2029. Subject to available borrowing base capacity, additional advances are available under the second amended and restated senior credit facility at the LIBOR rate described below. Such advances are available to pay premiums and servicing costs of pledged life insurance policies as such amounts become due. Interest will accrue on amounts borrowed under the second amended and restated senior credit facility at an annual interest rate, determined as of each date of borrowing or quarterly if there is no borrowing, equal to (a) 12-month LIBOR, plus (b) 7.50% per annum. The effective rate at December 31, 2019 was 9.54%. Interest payments are made on a quarterly basis.

Under the second amended and restated senior credit facility, DLP IV has granted the administrative agent, for the benefit of the lenders under the facility, a security interest in all of DLP IV's assets. As with prior collateral arrangements relating to the senior secured debt of GWG Holdings and its subsidiaries (on a consolidated basis), GWG Life's excess equity value of DLP IV after satisfying all amounts owing under our second amended and restated credit facility is available as collateral for the obligations of GWG Holdings under the L Bonds and Seller Trust L Bonds (although the life insurance assets owned by DLP IV do not themselves serve as direct collateral for those obligations).

We are subject to various financial and non-financial covenants under the second amended and restated senior credit facility with LNV Corporation, including, but not limited to, compliance with laws, preservation of existence, financial reporting, keeping of proper books of record and account, payment of taxes, and ensuring that neither DLP IV nor GWG Life become an investment company. As of December 31, 2019, we were in compliance with all financial and non-financial covenants.

**Cash Flows**

*Interest and Dividend Payments*

We finance our businesses through a combination of: life insurance policy benefit receipts; principal, dividends and interest receipts from investments, including Ben LP loan receivables; debt and equity offerings; and our senior credit facility with LNV Corporation. We have historically relied on debt (L Bonds and our senior credit facility with LNV Corporation) and equity (preferred stock) financing for the majority of our cash expenditures (for policy acquisition, policy premiums and servicing costs, working capital and financing expenditures including paying principal and interest on existing debt, and for making investments in Beneficient) as the amount of cash flows from the realization of life insurance policy benefits and cash flows from our other investments has been insufficient to meet all of our needs. This has resulted in the Company incurring substantial indebtedness (much of it being of a short term nature) and, to a lesser extent, obligations to make dividend payments on our classes of preferred stock.

Our total interest expense of $114.8 million and $80.1 million for years ended December 31, 2019 and 2018, respectively, represent the largest single line item of expense in each period. Preferred stock cash dividends were $16.9 and $16.7 million for the years ended December 31, 2019 and 2018, respectively. While reducing our cost of funds and increasing our common equity base (at valuations accretive to our book value) are primary goals of the Company, until we do so we will continue to expend significant amounts of cash for interest and dividend payments and will thus continue to rely heavily on our ability to raise cash from our L Bond offering, senior credit facility with LNV Corporation and other means as they are developed and available.

*Life Insurance Policy Premium Payments*

The payment of premiums and servicing costs to maintain life insurance policies represents one of our most significant requirements for cash disbursement. When a policy is purchased, we are able to calculate the minimum premium payments required to maintain the policy in-force. Over time as the insured ages, premium payments will increase. Nevertheless, the probability we will be required to pay the premiums decreases as mortality becomes more likely. These scheduled premiums and associated probabilities are factored into our expected internal rate of return and cash-flow modeling. Beyond premiums, we incur policy servicing costs, including annual trustee, policy administration and tracking costs. Additionally, we incur significant financing costs, including principal, interest and dividends. Both policy servicing costs and financing costs are excluded from our internal rate of return calculations. We finance our businesses through a combination of life insurance policy benefit receipts, dividends and interest on other investments, equity offerings, debt offerings, and advances under our senior credit facility with LNV Corporation.

<div align="center">Page 67</div>

The amount of payments for anticipated premiums, including the requirement under our second amended and restated senior credit facility with LNV Corporation to maintain a two month cost-of-insurance threshold within each policy cash value account, and servicing costs that we will be required to make over the next five years to maintain our current portfolio, assuming no mortalities, is set forth in the table below (in thousands).

| Years Ending December 31, | Premiums | Servicing | Premiums and Servicing Fees |
|---|---|---|---|
| 2020 | $ 67,455 | $ 1,674 | $ 69,129 |
| 2021 | 84,712 | 1,674 | 86,386 |
| 2022 | 97,757 | 1,674 | 99,431 |
| 2023 | 110,156 | 1,674 | 111,830 |
| 2024 | 120,077 | 1,674 | 121,751 |
| | $ 480,157 | $ 8,370 | $ 488,527 |

Our anticipated premium expenses are subject to the risk of increased cost-of-insurance charges (i.e., "COI" or premium charges) for the life insurance policies we own. During 2018, we received notice of, or support for, COI rate changes on 30 policies with combined face value of $84.6 million in our portfolio. These increased charges resulted in a $5.1 million reduction in the fair value of our life insurance portfolio in 2018. We did not receive any notices of COI rate changes in 2019.

We have no known pending cost-of-insurance increases on any policies in our portfolio, but we are aware that cost-of-insurance increases have become more prevalent in the industry. Thus, we may see additional insurers implementing cost-of-insurance increases in the future.

### Life Insurance Policy Benefit Receipts

For the quarter-end dates set forth below, the following table illustrates the total amount of face value of policy benefits owned, and the trailing 12 months of life insurance policy benefits realized and premiums paid on our portfolio. The trailing 12-month benefits/premium coverage ratio indicates the ratio of policy benefits realized to premiums paid over the trailing 12-month period from our portfolio of life insurance policies.

| Quarter End Date | Portfolio Face Amount (in thousands) | 12-Month Trailing Benefits Realized (in thousands) | 12-Month Trailing Premiums Paid (in thousands) | 12-Month Trailing Benefits/Premium Coverage Ratio |
|---|---|---|---|---|
| March 31, 2015 | $ 754,942 | $ 46,675 | $ 23,786 | 196.2% |
| June 30, 2015 | 806,274 | 47,125 | 24,348 | 193.5% |
| September 30, 2015 | 878,882 | 44,482 | 25,313 | 175.7% |
| December 31, 2015 | 944,844 | 31,232 | 26,650 | 117.2% |
| March 31, 2016 | 1,027,821 | 21,845 | 28,771 | 75.9% |
| June 30, 2016 | 1,154,798 | 30,924 | 31,891 | 97.0% |
| September 30, 2016 | 1,272,078 | 35,867 | 37,055 | 96.8% |
| December 31, 2016 | 1,361,675 | 48,452 | 40,239 | 120.4% |
| March 31, 2017 | 1,447,558 | 48,189 | 42,753 | 112.7% |
| June 30, 2017 | 1,525,363 | 49,295 | 45,414 | 108.5% |
| September 30, 2017 | 1,622,627 | 53,742 | 46,559 | 115.4% |
| December 31, 2017 | 1,676,148 | 64,719 | 52,263 | 123.8% |
| March 31, 2018 | 1,758,066 | 60,248 | 53,169 | 113.3% |
| June 30, 2018 | 1,849,079 | 76,936 | 53,886 | 142.8% |
| September 30, 2018 | 1,961,598 | 75,161 | 55,365 | 135.8% |
| December 31, 2018 | 2,047,992 | 71,090 | 52,675 | 135.0% |
| March 31, 2019 | 2,098,428 | 87,045 | 56,227 | 154.8% |
| June 30, 2019 | 2,088,445 | 82,421 | 59,454 | 138.6% |
| September 30, 2019 | 2,064,156 | 101,918 | 61,805 | 164.9% |
| December 31, 2019 | 2,020,973 | 125,148 | 63,851 | 196.0% |

We believe that the portfolio cash flow results set forth above are consistent with our general investment thesis that the life insurance policy benefits we receive will continue to increase over time in relation to the premiums we are required to pay on the remaining polices in the portfolio. Nevertheless, we expect that our portfolio cash flow on a period-to-period basis will remain inconsistent as we continue to allocate substantially more capital to Beneficient and have reduced capital allocated to acquiring a larger, more diversified portfolio of life insurance policies.

Page 68

**Inflation**

Changes in inflation do not necessarily correlate with changes in interest rates. We presently do not foresee any material impact of inflation on our results of operations in the periods presented in our consolidated financial statements.

**Off-Balance Sheet Arrangements**

*Unfunded Capital Commitments*

Beneficient had $73.8 million of gross potential capital commitments as of December 31, 2019 representing potential limited partner capital funding commitments on the alternative asset funds that serve as collateral to its loans. This is the amount above any existing cash reserves for such capital funding commitments. The trust holding the interest in the limited partnership for the alternative asset fund is required to fund these limited partner capital commitments per the terms of the limited partnership agreement. Capital funding commitment reserves are maintained by the associated trusts created at the origination of each trust for up to $0.1 million. To the extent that the associated trust cannot pay the capital funding commitment, Beneficient is obligated to lend sufficient funds to meet the commitment. Any amounts advanced by Beneficient for these limited partner capital funding commitments above the associated capital funding commitment reserves held by the associated trusts are added to the loan balance and are expected to be recouped through the cash distributions from the alternative asset fund collateral.

Capital commitments generally originate from limited partner agreements having fixed or expiring expiration dates. The total limited partner capital funding commitment amounts may not necessarily represent future cash requirements. Beneficient considers the creditworthiness on a case-by-case basis. At December 31, 2019, Beneficient had no reserves for losses on unused commitments to fund potential limited partner capital funding commitments.

**Credit Risk and Interest Rate Risk**

We review the credit risk associated with our portfolio of life insurance policies when estimating its fair value. In evaluating the policies' credit risk, we consider insurance company solvency, credit risk indicators, economic conditions, ongoing credit evaluations, and company positions. We attempt to manage our credit risk related to life insurance policies typically by purchasing policies issued only from companies with an investment-grade credit rating by either Standard & Poor's, Moody's, or A.M. Best Company. As of December 31, 2019, 95.7% of our life insurance policies, by face value benefits, were issued by companies that maintained an investment-grade rating (BBB or better) by Standard & Poor's.

The assets and liabilities exchanged in the Initial Transfer of the Exchange Transaction are excluded from this analysis.

Our second amended and restated senior credit facility with LNV Corporation and Beneficient's other borrowings are floating-rate financings. In addition, our ability to offer interest and dividend rates that attract capital (including in our continuous offering of L Bonds) is generally impacted by prevailing interest rates. Furthermore, while our L Bond offering provides us with fixed-rate debt financing, our Debt Coverage Ratio is calculated in relation to the interest rate on all of our debt financing, exclusive of our Seller Trust L Bonds. Therefore, increases in interest rates impact our business by increasing our borrowing costs and reducing availability under our debt financing arrangements. Earnings from our life insurance portfolio are based upon the spread, if any, generated between the return on the portfolio and the total cost of our financing (excluding cost of financing for the Seller Trust L Bonds). As a result, increases in interest rates will reduce the earnings we expect to achieve from our investments in life insurance policies.

<div align="center">Page 69</div>

APP. 285

Beneficient is subject to risks related to markets, credit, currency, and interest rates. Beneficient issues loans that are subject to credit risk, repayment risk and interest rate risk. Beneficient has underwriting procedures and utilizes market rates. As of December 31, 2019, all of Beneficient's loans are collateralized by the cash flows originating from alternative assets without recourse to the client. Currently, all of these alternative assets consist of private equity limited partnership interests which are primarily denominated in the U.S. dollar, Euro, and Canadian dollar. The underlying portfolio companies primarily operate in the United States, with the largest percentage, based on NAV, operating in healthcare technology, bio-technology, and diversified telecommunications services industries. The Company mitigates credit risk through the ExAlt Plan$^{TM}$ whereby excess cash flows from a collective pool of alternative assets can be utilized to repay the loans when cash flows from the client's original alternative assets are not sufficient to repay the outstanding principal, interest, and fees.

**Debt Coverage Ratio**

Our L Bond borrowing covenants require us to maintain a Debt Coverage Ratio of less than 90%. The Debt Coverage Ratio is calculated by dividing the sum of our total interest-bearing indebtedness (other than Excluded Indebtedness described in Note 2 to the table below) by the sum of our cash, cash equivalents, restricted cash, life insurance policy benefits receivable, the net present value of the life insurance portfolio, and, without duplication, the value of all of our other assets as reflected on our most recently available balance sheet prepared in accordance with GAAP. The discount rate we use for the net present value of our life insurance portfolio for this calculation may not be the same discount rate we use for our GAAP valuation and is not necessarily reflective of the amount we could realize upon a sale of the portfolio.

|  | December 31, 2019 | | December 31, 2018 | |
|---|---|---|---|---|
|  | (in thousands) | | (in thousands) | |
| Life insurance portfolio policy benefits | $ | 2,020,973 | $ | 2,047,992 |
| Discount rate of future cash flows[1] | | 7.55% | | 7.75% |
| Net present value of life insurance portfolio policy benefits | $ | 826,196 | $ | 770,074 |
| All cash and cash equivalents (including restricted cash) | | 81,780 | | 125,436 |
| Life insurance policy benefits receivable (net of allowance) | | 23,031 | | 16,461 |
| Other assets | | 945,240 | | 591,048 |
| Total Coverage[2] | $ | 1,876,247 | $ | 1,503,019 |
| | | | | |
| Senior credit facility with LNV Corporation | $ | 184,586 | $ | 158,209 |
| L Bonds | | 948,128 | | 1,029,044 |
| Total Indebtedness[2] | $ | 1,132,714 | $ | 1,187,253 |
| | | | | |
| Debt Coverage Ratio | | 60.40% | | 78.99% |

(1)  Weighted-average interest rate paid on indebtedness, excluding that of Seller Trust L-Bonds.
(2)  Total Coverage excludes the assets of Beneficient. Total Indebtedness is equal to the total liabilities balance of GWG Holdings (excluding the liabilities of Beneficient) as of December 31, 2019, other than Excluded Indebtedness. Excluded Indebtedness is Indebtedness that is payable at the Company's option in Capital Stock of the Company or securities mandatorily convertible into or exchangeable for Capital Stock of the Company, or any Indebtedness that is reasonably expected to be converted or exchanged, directly or indirectly, into Capital Stock of the Company. This change in the definition of the Debt Coverage Ratio was defined in Amendment No. 2 to the Amended and Restated Indenture entered into as of December 31, 2019 (see Note 12 to the consolidated financial statements).

As of December 31, 2019 and 2018, we were in compliance with the Debt Coverage Ratio.

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.**

Not applicable.

Page 70

**ITEM 8. CONSOLIDATED FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Stockholders of
GWG Holdings, Inc. and Subsidiaries

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheet of GWG Holdings, Inc. and Subsidiaries (the "Company") as of December 31, 2019, and the related consolidated statements of operations, changes in stockholders' equity, and cash flows for the year ended December 31, 2019, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2019, and the results of their operations and their cash flows for the year ended December 31, 2019, in conformity with accounting principles generally accepted in the United States of America.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of December 31, 2019, based on criteria established in *2013 Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated March 26, 2020, expressed an unqualified opinion.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. Our audit included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audit provides a reasonable basis for our opinion.

We have served as the Company's auditor since 2019.

/s/ WHITLEY PENN LLP

Dallas, Texas

March 27, 2020

F-1

APP. 287

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Stockholders of
GWG Holdings, Inc. and Subsidiaries

**Opinion on Internal Control Over Financial Reporting**

We have audited GWG Holdings, Inc. and Subsidiaries (the "Company") internal control over financial reporting as of December 31, 2019, based on criteria established in *2013 Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2019, based on criteria established in *2013 Internal Control—Integrated Framework* issued by COSO.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the consolidated balance sheet of the Company, as of December 31, 2019, and the related consolidated statements of operations, changes in stockholders' equity, and cash flows for the year ended December 31, 2019, and our report dated March 26, 2020 expressed an unqualified opinion on those consolidated financial statements.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying *Management's Report on Internal Control Over Financial Reporting.* Our responsibility is to express an opinion on the entity's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

An entity's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America. An entity's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the entity; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the entity are being made only in accordance with authorizations of management and directors of the entity; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the entity's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ WHITLEY PENN LLP

Dallas, Texas

March 27, 2020

F-2

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 289 of 1031     PageID 461

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Shareholders and the Board of Directors of GWG Holdings, Inc. and Subsidiaries:

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheet of GWG Holdings, Inc. and Subsidiaries (the "Company") as of December 31, 2018, the related consolidated statements of operations, changes in stockholders' equity, and cash flows, for the year ended December 31, 2018, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2018, and the results of its operations and its cash flows for the year ended December 31, 2018, in conformity with accounting principles generally accepted in the United States of America.

**Emphasis of Matter**

As described in Note 6 to the consolidated financial statements, for the year ended December 31, 2018, the Company incurred a loss within its gain (loss) on life insurance policies, net, of $87.1 million, resulting from a change in accounting estimate related to the changes made to the life expectancy estimation methodology on life insurance policies in the Company's portfolio. Our opinion is not modified with respect to this matter.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. Our audit included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audit provides a reasonable basis for our opinion.

/s/ Baker Tilly Virchow Krause, LLP

We served as the Company's auditor from 2013 to 2019.

Minneapolis, Minnesota

July 9, 2019

F-3

APP. 289

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
(in thousands, except per share data)

| | December 31, | |
| --- | --- | --- |
| | 2019 | 2018 |
| ASSETS | | |
| Cash and cash equivalents | $ 79,073 | $ 114,587 |
| Restricted cash | 20,258 | 10,849 |
| Investment in life insurance policies, at fair value | 796,039 | 747,922 |
| Life insurance policy benefits receivable, net | 23,031 | 16,461 |
| Loan receivables | 232,344 | — |
| Fees receivable | 29,168 | — |
| Financing receivables from affiliates | 67,153 | 184,769 |
| Equity method investments | 1,761 | 360,842 |
| Other assets | 28,374 | 45,437 |
| Goodwill | 2,358,005 | — |
| TOTAL ASSETS | $ 3,635,206 | $ 1,480,867 |
| | | |
| LIABILITIES & STOCKHOLDERS' EQUITY | | |
| LIABILITIES | | |
| Senior credit facility with LNV Corporation | $ 174,390 | $ 148,978 |
| L Bonds | 926,638 | 651,403 |
| Seller Trust L Bonds | 366,892 | 366,892 |
| Other borrowings | 153,086 | — |
| Interest and dividends payable | 16,516 | 18,555 |
| Deferred revenue | 41,444 | — |
| Accounts payable and accrued expenses | 27,836 | 13,981 |
| Deferred tax liability | 57,923 | — |
| TOTAL LIABILITIES | 1,764,725 | 1,199,809 |
| | | |
| Redeemable noncontrolling interests | 1,269,654 | — |
| | | |
| STOCKHOLDERS' EQUITY | | |
| | | |
| REDEEMABLE PREFERRED STOCK | | |
| (par value $0.001; shares authorized 100,000; shares outstanding 84,636 and 97,524; liquidation preference of $85,130 and $98,093 as of December 31, 2019 and 2018, respectively) | 74,023 | 86,910 |
| SERIES 2 REDEEMABLE PREFERRED STOCK | | |
| (par value $0.001; shares authorized 150,000; shares outstanding 147,164 and 148,359; liquidation preference of $148,023 and $149,225 as of December 31, 2019 and 2018, respectively) | 127,868 | 129,063 |
| COMMON STOCK | | |
| (par value $0.001; shares authorized 210,000,000; shares issued and outstanding 30,533,793 and 33,018,161 as of December 31, 2019 and 2018, respectively) | 33 | 33 |
| Common stock in treasury, at cost, 2,500,000 shares as of December 31, 2019 | (24,550) | — |
| Additional paid-in capital | 233,106 | 249,662 |
| Accumulated deficit | (76,501) | (184,610) |
| TOTAL GWG HOLDINGS STOCKHOLDERS' EQUITY | 333,979 | 281,058 |
| Noncontrolling interests | 266,848 | — |
| TOTAL STOCKHOLDERS' EQUITY | 600,827 | 281,058 |
| TOTAL LIABILITIES & STOCKHOLDERS' EQUITY | $ 3,635,206 | $ 1,480,867 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-4

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
(in thousands, except per share data)

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2019 | 2018 |
| REVENUE | | |
| Gain (loss) on life insurance policies, net | $ 75,320 | $ (14,105) |
| Interest and other income | 16,956 | 13,715 |
| TOTAL REVENUE | 92,276 | (390) |
| | | |
| EXPENSES | | |
| Interest expense | 114,844 | 80,136 |
| Employee compensation and benefits | 28,309 | 17,407 |
| Legal and professional fees | 12,824 | 5,541 |
| Other expenses | 15,896 | 15,995 |
| TOTAL EXPENSES | 171,873 | 119,079 |
| | | |
| LOSS BEFORE INCOME TAXES | (79,597) | (119,469) |
| INCOME TAX EXPENSE (BENEFIT) | 57,933 | — |
| | | |
| LOSS BEFORE EARNINGS FROM EQUITY METHOD INVESTMENTS | (137,530) | (119,469) |
| | | |
| Earnings (loss) from equity method investments | (4,077) | 18 |
| Gain on consolidation of equity method investment (see Note 5) | 249,716 | — |
| NET INCOME (LOSS) | 108,109 | (119,451) |
| | | |
| Preferred stock dividends | 16,943 | 16,663 |
| NET INCOME (LOSS) ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ 91,166 | $ (136,114) |
| | | |
| NET INCOME (LOSS) PER COMMON SHARE | | |
| Basic | $ 2.76 | $ (22.32) |
| Diluted | $ 2.65 | $ (22.32) |
| | | |
| WEIGHTED AVERAGE COMMON SHARES OUTSTANDING | | |
| Basic | 33,016,007 | 6,098,208 |
| Diluted | 35,219,442 | 6,098,208 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-5

APP. 291

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 292 of 1031     PageID 464

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
(in thousands)

|  | Years Ended December 31, | |
|  | 2019 | 2018 |
|---|---:|---:|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net income (loss) | $ 108,109 | $ (119,451) |
| Adjustments to reconcile net income (loss) to net cash flows used in operating activities: | | |
| Change in fair value of investment in life insurance policies | (49,015) | 10,344 |
| Amortization of deferred financing and issuance costs | 13,804 | 10,037 |
| Amortization of premium and accretion of discount on financing receivables | (1,720) | (14) |
| Provision for uncollectible policy benefit receivable | 153 | 4,300 |
| Loss (earnings) from equity method investments | 4,077 | (18) |
| Stock-based compensation | 1,732 | 2,182 |
| Gain on consolidation of equity method investment | (249,716) | — |
| Deferred income taxes | 57,923 | — |
| (Increase) decrease in operating assets: | | |
| Life insurance policy benefits receivable | (6,683) | (4,102) |
| Interest receivable added to commercial loan principal | — | (10,534) |
| Accrued interest on financing receivables | (6,913) | — |
| Other assets | (5,056) | 4,406 |
| Increase (decrease) in operating liabilities: | | |
| Accounts payable and other accrued expenses | (8,297) | 4,102 |
| Interest and dividends payable | (1,228) | 3,269 |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (142,830) | (95,479) |
| | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Investment in life insurance policies | (32,367) | (128,503) |
| Carrying value of matured life insurance policies | 33,265 | 20,764 |
| Equity method investments | (12,388) | (3,204) |
| Business combination consideration, net of cash acquired | (61,479) | — |
| Financing receivables from affiliate issued | (65,000) | (3,037) |
| NET CASH FLOWS USED IN INVESTING ACTIVITIES | (137,969) | (113,980) |
| | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Borrowings on senior debt | 50,133 | 12,903 |
| Repayments of senior debt | (23,756) | (77,219) |
| Payments for senior debt issuance costs | (2,042) | — |
| Proceeds from issuance of L Bonds | 403,397 | 263,965 |
| Payments for L Bonds issuance costs | (25,284) | (17,379) |
| Payments for redemption of L Bonds | (116,809) | (48,027) |
| Issuance of common stock | 59 | 614 |
| Proceeds from issuance of convertible preferred stock | — | 50,000 |
| Proceeds from issuance of redeemable preferred stock | — | 56,238 |
| Payments for redeemable preferred stock issuance costs | — | (4,142) |
| Payments for redemption of redeemable preferred stock | (14,061) | (2,457) |
| Common stock dividends | — | (25,709) |
| Preferred stock dividends | (16,943) | (16,663) |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 254,694 | 192,124 |
| | | |
| NET DECREASE IN CASH, CASH EQUIVALENTS AND RESTRICTED CASH | (26,105) | (17,335) |
| | | |
| **CASH, CASH EQUIVALENTS AND RESTRICTED CASH** | | |
| BEGINNING OF PERIOD | 125,436 | 142,771 |
| END OF PERIOD | $ 99,331 | $ 125,436 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-6

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS — CONTINUED**
(in thousands, except per share data)

| | Years Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2019** | | **2018** | |
| **SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION** | | | | |
| Interest paid | $ | 102,202 | $ | 67,058 |
| Premiums paid, including prepaid | $ | 68,467 | $ | 49,467 |
| **NON-CASH INVESTING AND FINANCING ACTIVITIES** | | | | |
| Financing receivable from affiliate: | | | | |
| Financing receivable from affiliate acquired | $ | — | $ | 173,485 |
| Conversion of interest receivable to commercial loan principal | $ | — | $ | 10,534 |
| Exchangeable note acquired and converted to equity method investment | $ | — | $ | 156,422 |
| Equity method investment acquired | $ | — | $ | 201,828 |
| Equity security acquired | $ | — | $ | 38,562 |
| Seller Trust L Bonds issued | $ | — | $ | 366,892 |
| Common stock issued | $ | — | $ | 203,405 |
| L Bonds: | | | | |
| Conversion of accrued interest and commissions payable to principal | $ | 1,760 | $ | 1,240 |
| Conversion of L Bonds to redeemable preferred stock | $ | — | $ | 4,546 |
| Preferred Stock: | | | | |
| Conversion of Series B convertible preferred stock to common stock | $ | — | $ | 50,000 |
| Options and stock appreciation rights issued | $ | 399 | $ | 614 |
| Investment in life insurance policies included in accounts payable | $ | — | $ | 6,377 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-7

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY**
(in thousands, except per share data)

| | Preferred Stock Shares | Preferred Stock | Common Shares | Common Stock (par) | Additional Paid-in Capital | Accumulated Deficit | Treasury Stock | Total GWG Holdings Stockholders' Equity | Noncontrolling Interests | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|---|
| **Balance, December 31, 2017** | 187,319 | $ 173,116 | 5,813,555 | $ 6 | $ — | $ (39,450) | $ — | $ 133,672 | $ — | $ 133,672 |
| Net loss | — | — | — | — | — | (119,451) | — | (119,451) | — | (119,451) |
| Issuance of common stock | — | — | 22,214,641 | 22 | 204,771 | — | — | 204,793 | — | 204,793 |
| Repurchase of common stock | — | — | (10,035) | — | (69) | — | — | (69) | — | (69) |
| Issuance of redeemable preferred stock | 61,021 | 56,878 | — | — | — | — | — | 56,878 | — | 56,878 |
| Redemption of redeemable preferred stock | (2,457) | (2,458) | — | — | — | — | — | (2,458) | — | (2,458) |
| Common stock dividends | — | — | — | — | — | (25,709) | — | (25,709) | — | (25,709) |
| Issuance of Series B convertible preferred stock | 5,000,000 | 50,000 | — | — | — | — | — | 50,000 | — | 50,000 |
| Conversion of Series B convertible preferred stock to common stock | (5,000,000) | (50,000) | 5,000,000 | 5 | 49,995 | — | — | — | — | — |
| Preferred stock dividends | — | (11,563) | — | — | (5,100) | — | — | (16,663) | — | (16,663) |
| Stock-based compensation | — | — | — | — | 65 | — | — | 65 | — | 65 |
| **Balance, December 31, 2018** | 245,883 | $ 215,973 | 33,018,161 | $ 33 | $ 249,662 | $ (184,610) | $ — | $ 281,058 | $ — | $ 281,058 |
| Net income | — | — | — | — | — | 108,109 | — | 108,109 | — | 108,109 |
| Issuance of common stock | — | — | 58,382 | — | 439 | — | — | 439 | — | 439 |
| Repurchase of common stock | — | — | (42,750) | — | (362) | — | — | (362) | — | (362) |
| Common stock | — | — | (2,500,000) | — | — | — | (24,550) | (24,550) | — | (24,550) |

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 295 of 1031    PageID 467

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Redemption of redeemable preferred stock | (14,083) | (14,082) | — | — | (1) | — | — | (14,083) | — | (14,083) |
| Preferred stock dividends | — | — | — | — | (16,943) | — | — | (16,943) | — | (16,943) |
| Stock-based compensation | — | — | — | — | 311 | — | — | 311 | — | 311 |
| Recognition of noncontrolling interests | — | — | — | — | — | — | — | — | 266,848 | 266,848 |
| **Balance, December 31, 2019** | **231,800** | **$ 201,891** | **30,533,793** | **$ 33** | **$ 233,106** | **$ (76,501)** | **$ (24,550)** | **$ 333,979** | **$ 266,848** | **$ 600,827** |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-8

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(1) Nature of Business**

**Organizational Structure**

GWG Holdings, Inc. ("GWG Holdings") conducts its life insurance secondary market business through a wholly owned subsidiary, GWG Life, LLC ("GWG Life"), and GWG Life's wholly owned subsidiaries, GWG Life Trust and GWG DLP Funding IV, LLC. GWG Holdings' previously wholly-owned subsidiary, Life Epigenetics Inc. ("Life Epigenetics") was formed to engage in various life insurance related businesses and activities related to its development of epigenetic technology. Through its previously wholly-owned subsidiary, youSurance General Agency, LLC ("youSurance"), GWG Holdings offered life insurance directly to customers from a variety of life insurance carriers. On November 11, 2019, GWG contributed the common stock of Life Epigenetics and membership interests in youSurance to a legal entity, InsurTech Holdings, LLC in exchange for a membership interest in the entity (see Note 9).

GWG Holdings' indirect interests in loans collateralized by cash flows from other alternative assets are held by The Beneficient Company Group, L.P. ("Ben LP," including all of the subsidiaries it may have from time to time — "Beneficient") and its general partner, Beneficient Management, L.L.C. ("Beneficient Management"). Prior to December 31, 2019, GWG Holdings' investment in Beneficient was accounted for as an equity method investment. On December 31, 2019, as more fully described below, Beneficient became a consolidated subsidiary of GWG Holdings.

Ben LP is the general partner to Beneficient Company Holdings, L.P. ("BCH") and owns 100% of the Class A Subclass A-1 and A-2 Units of BCH. BCH is the holding company that directly or indirectly receives all active and passive income of Beneficient and allocates that income among the units issued by BCH. As of December 31, 2019, BCH has issued general partnership Class A Units (Subclass A-1 and A-2), Class S Ordinary Units, Class S Preferred Units, FLP Units (Subclass 1 and Subclass 2), Preferred Series A Subclass 1 Unit Accounts, and Preferred Series A Subclass 2 Units. BCH issued to Ben LP Preferred Series A Subclass 2 Units as part of the transaction with GWG Holdings discussed below. Preferred Series A Subclass 2 Units hold the same rights and privileges as the Preferred Series A Subclass 1 Unit Accounts.

All of the aforementioned legal entities are organized in Delaware, other than GWG Life Trust, which is governed by the laws of the state of Utah. Unless the context otherwise requires or we specifically so indicate, all references in this report to "we," "us," "our," "our Company," "GWG," or the "Company" refer to these entities collectively. Our headquarters are located in Dallas, Texas.

**Nature of Business**

GWG Holdings, through its wholly-owned subsidiary GWG Life, has historically purchased life insurance policies in the secondary market and has built a large, actuarially diverse portfolio of life insurance policies backed by highly rated life insurance companies. These policy purchases were funded primarily through sales of L Bonds, as discussed in Note 12. In 2018 and 2019, GWG Holdings made strategic decisions to increase capital allocated toward providing liquidity products to a broader range of alternative assets, primarily through investments in Beneficient.

Beneficient is a financial services firm based in Dallas, Texas that provides liquidity solutions for mid-to-high net worth ("MHNW") individuals and small-to-mid ("STM") size institutions, which previously had few options to obtain early liquidity for their alternative assets holdings. On September 25, 2018, Beneficient's capital companies applied for trust charters from the Texas Department of Banking to merge into to-be organized limited trust associations. Beneficient's capital companies submitted revised charter applications on March 6, 2020. As of March 25, 2020, the trust charters had not been issued to Beneficient. As such, Beneficient has closed a limited number of transactions to date, but intends to significantly expand its operations if and when the trust charters are issued.

Beneficient was formed in 2003 but began its alternative asset business in September 2017. Beneficient operates primarily through its subsidiaries, which provide Beneficient's products and services. These subsidiaries include: (i) Beneficient Capital Company, L.L.C. ("BCC"), through which Beneficient offers loans and liquidity products; (ii) Beneficient Administrative and Clearing Company, L.L.C. ("BACC"), through which Beneficient provides services for fund and trust administration and plans to provide custody services; (iii) Pen Indemnity Insurance Company, LTD ("Pen"), through which Beneficient plans to offer insurance services; and (iv) Ben Markets Management Holdings, L.P., formerly called ACE Portal, L.L.C. ("ACE"), through which Beneficient plans to provide an online portal for direct access to Beneficient's financial services and products.

Beneficient's primary operations pertain to its liquidity products whereby Ben LP, through its subsidiaries, extends loans collateralized by cash flows from illiquid alternative assets and provides services to the trustees who administer the collateral. Beneficient's core business products are its Exchange Trust, LiquidTrust and the InterChange Trust (introduced in 2020). Beneficient's clients select one of these products and place their alternative assets into the custody trust that is a constituent member of a trust structure called the "ExAlt Plan$^{TM}$" (comprised of the Exchange Trusts, LiquidTrusts, Custody Trusts, Collective Trusts, and Funding Trusts). The ExAlt Plan$^{TM}$ then delivers to Beneficient's clients the consideration required by the specific product selected by Beneficient's clients. At the same time, Beneficient, through a subsidiary, extends a loan to the ExAlt Plan$^{TM}$. The proceeds (cash or common units in Ben LP) of that loan to the ExAlt Plan$^{TM}$ are ultimately paid to the client. The cash flows from the client's alternative asset support the repayment of the loans plus any related interest and fees.

In 2018 and 2019, GWG Holdings and GWG Life consummated a series of transactions (as more fully described below) with Beneficient that has resulted in a significant reorientation of our business and capital allocation strategy in addition to changes in our Board of Directors and executive management team.

**Liquidity**

As of December 31, 2019, we had cash and cash equivalents of approximately $79.1 million. We generated net losses from operations for the years ended December 31, 2019 and 2018 totaling $137.5 million and $119.5 million. As of February 29, 2020, we had cash and cash equivalents of $104.5 million, not including cash and cash equivalents of Beneficient. Besides funding operating expenditures and having sufficient cash to fund anticipated additional investments in Beneficient primarily for its lending products and working capital needs, we are obligated to pay other items such as interest payments and debt redemptions, and preferred stock dividends and redemptions. We expect to satisfy these obligations and fund our operations through anticipated operating cash flows, receipt of proceeds from our insurance policies, sales of additional L-Bonds, and, potentially, additional borrowings under existing debt facilities or new borrowings with other third-party lenders.

APP. 296

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 297 of 1031    PageID 469

GWG has a history of selling L-Bonds dating back to January 2012. GWG may not be able sell additional L-Bonds on terms as favorable to the Company as past transactions or in quantities sufficient to fund all of the Company's operating requirements. Additionally, the Company may not be able to obtain additional borrowing under existing debt facilities or new borrowings with other third-party lenders. To the extent that GWG or its subsidiaries raise additional capital through the future issuance of debt, the terms of those debt securities may include terms that adversely affect the rights of our existing debt and/or equity holders or involve negative covenants that restrict GWG's ability to take specific actions, such as incurring additional debt or making additional investments in growing the operations of the Company. If GWG is unable to fund its operations and other obligations, or defaults on its debt, then the Company will be required to either i) sell assets to provide sufficient funding or ii) to raise additional capital through the sale of equity and the ownership interest of our equity holders may be diluted.

Based on projections of anticipated operating cash flows, receipt of proceeds from our insurance policies, sales of additional L-Bonds, and, potentially, additional borrowings under existing debt facilities or new borrowings with other third-party lenders, we believe that we will have sufficient cash resources to finance our operations, satisfy our other obligations, and to fund anticipated additional investments in Beneficient through March 31, 2021.

<div align="center">F-9</div>

APP. 297

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**The Exchange Transaction**

On August 10, 2018 (the "Initial Transfer Date"), we completed the first of two closings (the "Initial Transfer") contemplated by a Master Exchange Agreement with Ben LP and certain other parties (the "Seller Trusts"), which governs the strategic exchange of assets among the parties (the "Exchange Transaction"). On the Initial Transfer Date:

- GWG issued to the Seller Trusts Seller Trust L Bonds due 2023 (the "Seller Trust L Bonds") in an aggregate principal amount of $403.2 million, as more fully described below;

- Beneficient purchased 5,000,000 shares of GWG's Series B Convertible Preferred Stock, par value $0.001 per share and having a stated value of $10 per share ("Series B"), for cash consideration of $50.0 million, which shares were subsequently transferred to the Seller Trusts;

- in consideration for GWG and GWG Life entering into the Master Exchange Agreement and consummating the transactions contemplated thereby, Ben LP, as borrower, entered into a commercial loan agreement (the "Commercial Loan Agreement") with GWG Life, as lender, providing for a loan in a principal amount of $200.0 million (the "Commercial Loan");

- Ben LP delivered to GWG a promissory note (the "Exchangeable Note") in the principal amount of $162.9 million; and

- the Seller Trusts delivered to GWG 4,032,349 common units of Ben LP at an assumed value of $10 per common unit.

On December 28, 2018, the final closing of the transaction occurred and the following actions took place (the "Final Closing" and the date upon which the Final Closing occurred, the "Final Closing Date"):

- in accordance with the Master Exchange Agreement, and based on the net asset value of alternative asset financings as of the Final Closing Date, effective as of the Initial Transfer Date, (i) the principal amount of the Commercial Loan was reduced to $182.0 million, (ii) the principal amount of the Exchangeable Note was reduced to $148.2 million, and (iii) the principal amount of the Seller Trust L Bonds was reduced to $366.9 million;

- the Seller Trusts refunded to GWG $0.8 million in interest paid on the Seller Trust L Bonds related to the Seller Trust L Bonds that were issued as of the Initial Transfer Date but cancelled, effective as of the Initial Transfer Date, on the Final Closing Date;

- the accrued interest on the Commercial Loan and the Exchangeable Note was added to the principal amount of the Commercial Loan, as a result of which the principal amount of the Commercial Loan as of the Final Closing Date was $192.5 million;

- the Seller Trusts transferred to GWG an aggregate of 21,650,087 common units of Ben LP and GWG received 14,822,843 common units of Ben LP in exchange for the Exchangeable Note, upon completion of which GWG owned (including the 4,032,349 common units received by GWG on the Initial Transfer Date) 40,505,279 common units of Ben LP;

- Ben LP issued to GWG an option (the "Option Agreement") to acquire the number of common units of Ben LP, interests or other property that would be received by a holder of Preferred Series A Subclass 1 Unit Accounts of BCH; and

- GWG issued to the Seller Trusts 27,013,516 shares of GWG common stock (including 5,000,000 shares issued upon conversion of the Series B).

***Description of the Assets Exchanged***

*Seller Trust L Bonds*

On August 10, 2018, in connection with the Initial Transfer, GWG Holdings, GWG Life and Bank of Utah, as trustee, entered into a Supplemental Indenture (the "Supplemental Indenture") to the Amended and Restated Indenture dated as of October 23, 2017 (the "Amended and Restated Indenture"). GWG Holdings entered into the Supplemental Indenture to add and modify certain provisions of the Amended and Restated Indenture necessary to provide for the issuance of the Seller Trust L Bonds. The maturity date of the Seller Trust L Bonds is August 9, 2023. The Seller Trust L Bonds bear interest at 7.5% per year. Interest is payable monthly in cash.

After the second anniversary of the Final Closing Date, the holders of the Seller Trust L Bonds will have the right to cause GWG to repurchase, in whole but not in part, the Seller Trust L Bonds held by such holder. The repurchase may be paid, at GWG's option, in the form of cash, a pro rata portion of (i) the outstanding principal amount and accrued and unpaid interest under the Commercial Loan, and (ii) Ben LP common units, or a combination of cash and such property.

F-10

APP. 298

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The Seller Trust L Bonds (see Note 13) are senior secured obligations of GWG, ranking junior only to all senior debt of GWG (see Note 11), pari passu in right of payment and in respect of collateral with all "L Bonds" of GWG (see Note 12), and senior in right of payment to all subordinated indebtedness of GWG. Payments under the Seller Trust L Bonds are guaranteed by GWG Life (see Note 23).

*Series B Convertible Preferred Stock*

The Series B converted into 5,000,000 shares of our common stock at a conversion price of $10 per share upon the Final Closing.

*Commercial Loan*

The $192.5 million principal amount under the Commercial Loan is due on August 9, 2023; however, it is extendable for two five-year terms. See Note 8 for a full description of the terms of the Commercial Loan. Ben LP's obligations under the Commercial Loan are unsecured.

The principal amount of the Commercial Loan bears interest at 5.0% per year. From and after the Final Closing Date, one-half of the interest, or 2.5% per year, is due and payable monthly in cash, and one-half of the interest, or 2.5% per year, accrues and compounds annually on each anniversary date of the Final Closing Date and becomes due and payable in full in cash on the maturity date.

In accordance with the Supplemental Indenture governing the issuance of the Seller Trust L Bonds, upon a redemption event or at the maturity date of the Seller Trust L Bonds, the Company, at its option, may use the outstanding principal amount of the Commercial Loan, and accrued and unpaid interest thereon, as repayment consideration of the Seller Trust L Bonds.

*Exchangeable Note*

The Exchangeable Note accrued interest at a rate of 12.4% per year, compounded annually. Interest was payable in cash on the earlier to occur of the maturity date or the Final Closing Date; provided that Beneficient had the option to add to the outstanding principal balance under the Commercial Loan the accrued interest in lieu of payment in cash of such accrued interest thereon at the Final Closing Date. At the Final Closing date, the principal amount of the Exchangeable Note was exchanged for 14,822,843 common units of Ben LP, and the accrued interest on the Exchangeable Note was added to the principal balance of the Commercial Loan.

*Option Agreement*

In connection with the Final Closing, GWG Holdings entered into the Option Agreement with Ben LP. The Option Agreement gives GWG Holdings the option to acquire the number of common units in Ben LP that would be received by the holder of Preferred Series A Subclass 1 Unit Accounts of BCH, if such holder were converting on that date. There is no exercise price and the Company may exercise the option at any time until December 27, 2028, at which time the option will automatically settle.

*Common Units of Ben LP*

In connection with the Initial Transfer and Final Closing, the Seller Trusts and Beneficient delivered to GWG Holdings 40,505,279 common units of Ben LP. These units represented an approximate 89.9% interest in the common units of Ben LP as of the Final Closing Date (although, on a fully diluted basis, our ownership interest in common units of Ben LP would be reduced significantly below a majority of those issued and outstanding).

F-11

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Purchase and Contribution Agreement**

On April 15, 2019, Jon R. Sabes, GWG's former Chief Executive Officer and a former director, and Steven F. Sabes, GWG's former Executive Vice President and a former director, entered into a Purchase and Contribution Agreement (the "Purchase and Contribution Agreement") with, among others, Ben LP. Under the Purchase and Contribution Agreement, Jon and Steven Sabes agreed to transfer all 3,952,155 of the shares of GWG's outstanding common stock held directly or indirectly by them to BCC (a subsidiary of Ben LP) and AltiVerse Capital Markets, L.L.C. ("AltiVerse"). AltiVerse is a limited liability company owned by an entity related to Beneficient's founders, including Brad K. Heppner (GWG's Chairman and Beneficient's Chief Executive Officer and Chairman) and an entity related to Thomas O. Hicks (one of Beneficient's current directors and a director of GWG). GWG was not a party to the Purchase Agreement; however, the closing of the transactions contemplated by the Purchase and Contribution Agreement (the "Purchase and Contribution Transaction") were subject to certain conditions that were dependent upon GWG taking, or refraining from taking, certain actions.

The closing of the Purchase and Contribution Transaction occurred on April 26, 2019. Prior to or in connection with such closing:

- GWG's bylaws were amended to increase the maximum number of directors of GWG from nine to 13, and the actual number of directors comprising the Board of Director was increased from seven to 11. The size of the Board has since been reduced and currently consists of nine directors.

- All seven members of GWG's Board of Directors prior to the closing resigned as directors of GWG, and 11 individuals designated by Beneficient were appointed as directors of GWG, leaving two board seats vacant after the closing.

- Jon R. Sabes resigned from all officer positions he held with GWG or any of its subsidiaries prior to the closing, other than his position as Chief Executive Officer of GWG's technology-focused then wholly-owned subsidiaries, Life Epigenetics and youSurance.

- Steven F. Sabes resigned from all officer positions he held with GWG or any of its subsidiaries prior to the closing, except as Chief Operating Officer of Life Epigenetics.

- The resignations of Messrs. Jon and Steven Sabes included a full waiver and forfeit of (i) any severance that may be payable by GWG or any of its subsidiaries in connection with such resignations or the Purchase and Contribution Transaction, and (ii) all equity awards of GWG held by either of them.

- Murray T. Holland was appointed as Chief Executive Officer of GWG.

- GWG entered into performance share unit agreements with certain employees of GWG pursuant to which such employees will collectively receive up to $4.5 million in cash compensation under certain terms and conditions, including, among others, that such employees remain employed by GWG or one of its subsidiaries (or, if no longer employed, such employment was terminated by GWG other than for cause, as such term is defined in the performance share unit agreement) for a period of 120 days following the closing.

- The stockholders agreement that was entered into on the Final Closing Date was terminated by mutual consent of the parties thereto.

- BCC and AltiVerse executed and delivered a Consent and Joinder to the Amended and Restated Pledge and Security Agreement dated October 23, 2017 by and among the Company, GWG Life, LLC, Messrs. Jon and Steven Sabes and the Bank of Utah, which provides that the shares of GWG's common stock acquired by BCC and AltiVerse pursuant to the Purchase and Contribution Agreement will continue to be pledged as collateral security for GWG's obligations owing in respect of the L Bonds and Seller Trust L Bonds.

*Indemnification Agreements*

On April 26, 2019, GWG entered into Indemnification Agreements (the "Indemnification Agreements") with each of its executive officers and the directors appointed to the Board of Directors on such date. On May 13, 2019, GWG entered into Indemnification Agreement with the three additional directors appointed to the Board of Directors on such date (collectively with the executive officers and directors appointed on April 26, 2019, the "Indemnitees"). The Indemnification Agreements clarify and supplement indemnification provisions already contained in GWG's bylaws and generally provide that GWG shall indemnify the indemnitees to the fullest extent permitted by applicable law, subject to certain exceptions, against expenses, judgments, fines and other amounts actually and reasonably incurred in connection with their service as a director or officer and also provide for rights to advancement of expenses and contribution.

F-12

APP. 300

**Case 3:22-cv-00410-B　　Document 32-1　　Filed 04/19/22　　Page 301 of 1031　　PageID 473**

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**The Investment and Exchange Agreements**

On December 31, 2019, the Company, Ben LP, BCH, and Beneficial Management entered into a Preferred Series A Unit Account and Common Unit Investment Agreement (the "Investment Agreement").

Pursuant to the Investment Agreement, the Company transferred $79.0 million to Ben LP in return for 666,667 common units of Ben LP and a Preferred Series A Subclass 1 Unit Account of BCH.

In connection with the Investment Agreement, the Company obtained the right to appoint a majority of the board of directors of Beneficial Management, the general partner of Ben LP. As a result, the Company obtained control of Ben LP and began reporting the results of Ben LP and its subsidiaries on a consolidated basis beginning on the transaction date of December 31, 2019. See Note 5 for more details on the accounting for the consolidation. The Company's right to appoint a majority of the board of directors of Beneficial Management will terminate in the event (i) the Company's ownership of the fully diluted equity of Ben LP (excluding equity issued upon the conversion or exchange of Preferred Series A Unit Accounts of BCH held as of December 31, 2019 by parties other than the Company) is less than 25%, (ii) the Continuing Directors of the Company cease to constitute a majority of the board of directors of the Company, or (iii) certain bankruptcy events occur with respect to the Company. The term "Continuing Directors" means, as of any date of determination, any member of the board of directors of the Company who: (1) was a member of the board of directors on December 31, 2019; or (2) was nominated for election or elected to the board of directors with the approval of a majority of the Continuing Directors who were members of the board of directors at the time of such nomination or election.

Following the transaction, and as agreed upon in the Investment Agreement, the Company was issued an initial capital account balance for the Preferred Series A Subclass 1 Unit Account of $319.0 million. The other holders of the Preferred Series A Subclass 1 Unit Accounts are an entity related to the founders of Ben LP and an entity related to one of GWG's and Beneficial's directors (the "Related Account Holders"), and the aggregate capital accounts of all holders of the Preferred Series A Subclass 1 Unit Accounts after giving effect to the investment by the Company is $1.6 billion. The Company's Preferred Series A Subclass 1 Unit Account is the same class of preferred security as held by the Related Account Holders. If the Related Account Holders exchange their Preferred Series A Subclass 1 Unit Accounts for securities of the Company, the Company's Preferred Series A Subclass 1 Unit Account would be converted into common units of Ben LP (so neither the Company nor the founders would hold Preferred Series A Subclass 1 Unit Accounts).

Also, on December 31, 2019, in a transaction related to the Investment Agreement, GWG Holdings transferred its interest in the Preferred Series A Subclass 1 Unit Account to its wholly owned subsidiary, GWG Life.

In addition, on December 31, 2019, the Company, Ben LP and the holders of common units of Ben LP (the "Common Units") entered into an Exchange Agreement (the "Exchange Agreement") pursuant to which the holders of Common Units from time to time have the right, on a quarterly basis, to exchange their Common Units for common stock of the Company. The exchange ratio in the Exchange Agreement is based on the ratio of the capital account associated with the Common Units to be exchanged to the market price of the Company's common stock based on the volume weighted average price of the Company's common stock for the five consecutive trading days prior to the quarterly exchange date. The Exchange Agreement is intended to facilitate the marketing of Ben LP's products to holders of alternative assets.

The Exchange Transaction, the Purchase and Contribution Transaction, and the Investment and Exchange Agreements are referred to collectively as the "Beneficial Transactions."

F-13

APP. 301

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 302 of 1031    PageID 474

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(2) Summary of Significant Accounting Policies**

**Basis of Presentation** — The consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP").

**Principles of Consolidation** — The consolidated financial statements include the accounts of GWG Holdings, Inc. and its subsidiaries. All material intercompany balances and transactions have been eliminated upon consolidation. Noncontrolling interests have been recorded for minority ownership in entities that are not wholly owned and are presented in compliance with the provisions of the *Noncontrolling Interest in Subsidiary* subsections of the Accounting Standards Codification ("ASC").

The Company has interests in various entities including corporations and limited partnerships. For each such entity, the Company evaluates its ownership interest to determine whether the entity is a variable interest entity ("VIE") and, if so, whether it is the primary beneficiary of the VIE. The Company would consolidate any entity for which it was the primary beneficiary, regardless of its ownership or voting interests. Upon inception of a variable interest or the occurrence of a reconsideration event, the Company makes judgments in determining whether entities in which it invests are VIEs. If so, the Company makes judgments to determine whether it is the primary beneficiary and is thus required to consolidate the entity.

If it is concluded that an entity is not a VIE, then the Company considers its proportional voting interests in the entity. The Company consolidates majority-owned subsidiaries in which a controlling financial interest is maintained. A controlling financial interest is determined by majority ownership and the absence of significant third-party participating rights. Ownership interests in entities for which the Company has significant influence that are not consolidated under the Company's consolidation policy are accounted for as equity method investments. SEC Staff Announcement: Accounting for Limited Partnership Investments (codified in ASC 323-30-S99-1) guidance requires the use of the equity method unless the investor's interest "is so minor that the limited partner may have virtually no influence over partnership operating and financial policies." The SEC staff's position is that investments in limited partnerships of greater than 3% to 5% are considered more than minor and, therefore, should be accounted for using the equity method.

Related party transactions between the Company and its equity method investees have not been eliminated.

**Use of Estimates** — The preparation of our consolidated financial statements in conformity with GAAP requires management to make significant estimates and assumptions affecting the reported amounts of assets and liabilities at the date of the consolidated financial statements, as well as the reported amounts of revenue during the reporting period. We regularly evaluate estimates and assumptions, which are based on current facts, historical experience, management's judgment, and various other factors that we believe to be reasonable under the circumstances. Our actual results may differ materially and adversely from our estimates. The most significant estimates with regard to these consolidated financial statements relate to (1) the determination of the assumptions used in estimating the fair value of our investments in life insurance policies, (2) the assessment of potential impairment of our equity method investments and our equity security investments and determination of the allowance for credit losses on our financing receivables, and (3) the value of our deferred tax assets and liabilities. Periodically, we make significant estimates in assessing the fair value of assets acquired and consideration given in return for those assets, which are used to establish the initial recorded values of such assets in accordance with ASC 805, *Business Combinations*. Under ASC 805, the consideration paid in an asset acquisition is allocated among the assets acquired based on their relative fair values at acquisition date. In relation to the Investment and Exchange Agreements, relative fair values obtained from a third-party valuation firm were used to calculate the amounts recorded for the assets acquired and liabilities assumed at their acquisition dates as more fully described in Note 5.

**Cash and Cash Equivalents** — We consider cash in demand deposit accounts and temporary investments purchased with an original maturity of three months or less to be cash equivalents. We maintain our cash and cash equivalents with highly rated financial institutions. The balances in our bank accounts may exceed Federal Deposit Insurance Corporation limits. We periodically evaluate the risk of exceeding insured levels and may transfer funds as we deem appropriate.

Cash, cash equivalents and restricted cash on our consolidated statements of cash flows include cash and cash equivalents and restricted cash of $79.1 million and $20.3 million and $114.6 million and $10.8 million as of December 31, 2019 and 2018, respectively. See Note 4 for a discussion of restrictions on cash.

F-14

APP. 302

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Investment in Life Insurance Policies, at Fair Value** — ASC 325-30, *Investments in Insurance Contracts*, permits a reporting entity to account for its investments in life insurance policies using either the investment method or the fair value method. We elected to use the fair value method to account for our life insurance policies. We initially record our purchase of life insurance policies at the purchase price, which is the amount paid for the policy, inclusive of all direct external fees and costs associated with the purchase. At each subsequent reporting period, we re-measure the investment at fair value in its entirety and recognize the change in fair value as unrealized gain or loss in the current period, net of premiums paid, within gain (loss) on life insurance policies, net in our consolidated statements of operations.

In a case where our acquisition of a policy is not complete as of a reporting date, but we have nonetheless advanced direct costs and deposits for the acquisition, those costs and deposits are recorded as other assets in our consolidated balance sheets until the acquisition is complete and we have secured title to the policy. At December 31, 2019 and 2018, none of our other assets comprised direct costs and deposits that we had advanced for life insurance policy acquisitions.

We also recognize realized gain (or loss) from a life insurance policy upon one of the two following events: (1) our receipt of notice or verified mortality of the insured; or (2) our sale of the policy (upon filing of change-of-ownership forms and receipt of payment). In the case of mortality, the gain (or loss) we recognize is the difference between the policy benefits and the carrying value of the policy once we determine that collection of the policy benefits is reasonably assured. In the case of a policy sale, the gain (or loss) we recognize is the difference between the sale price and the carrying value of the policy on the date we receive sale proceeds.

**Life Insurance Policy Benefits Receivable, Net** — Our policy benefit receivables represent amounts due from insurance carriers for claims submitted on matured life insurance policies. Policy benefit receivables are recorded at the policy benefit amounts less reserves for estimated uncollectible amounts. Uncollectible policy benefits can result from challenges by the insurance carrier to the legal validity of the policy, typically related to the concept of insurable interest, or from liquidity or solvency problems at the insurance carrier (although policy benefits are senior to any other obligations of a carrier).

We reserve for policy benefits when it becomes probable that we will not collect the full amount of the policy benefit. The reserve requirements are based on the best facts available to us and are re-evaluated and adjusted as additional information becomes available. Uncollectible policy benefits are written off against the reserves when it is deemed that a policy amount is uncollectible. As of December 31, 2018, the balance of the allowance for uncollectible receivables was $4.3 million, relating to a single life insurance policy claim where collection was doubtful. In 2019 we received a settlement on that policy recovering the amount of premiums paid during the period it was held by GWG. As of December 31, 2019, there was no allowance for uncollectible life insurance policy benefits receivable.

**Other Assets** — Other assets consist of fixed assets, intangible assets, prepaid expenses, operating lease right-of-use assets, and other receivables. At December 31, 2019, other assets also includes the fair values of Beneficient's other assets, net of intercompany eliminations.

In December 2018, in connection with the Final Closing of the Exchange Transaction, GWG Holdings entered into an Option Agreement with Beneficient. The agreement gives GWG Holdings the option to acquire the number of common units in Ben LP that would be received by the holder of Preferred Series A Subclass 1 Unit Accounts of BCH. There is no exercise price and the Company may exercise the option at any time until December 27, 2028, at which time the option will automatically exercise and settle. The Option Agreement was eliminated upon consolidation of Beneficient on December 31, 2019, and the balance of $38.6 million was recorded in other assets at December 31, 2018. The Option Agreement is considered an equity security investment and earns a preferred return that we accrued to the investment balance and recorded in interest and other income in the consolidated statement of operations up until December 31, 2019. Any future gains or losses on this investment will be eliminated in consolidation.

**Financing Receivables** — ASC 310, *Receivables*, provides guidance for receivables and notes that arise from credit sales, loans or other transactions. Financing receivables includes loans and notes receivable. Originated loans we hold for which we have the intent and ability to hold for the foreseeable future or to maturity (or payoff) are classified as held for investment. Financing receivables held for investment are reported in our consolidated balance sheets at the outstanding principal balance adjusted for any write-offs, allowance for loan losses, deferred fees or costs, and any unamortized premiums or discounts. Interest income is accrued on outstanding principal as earned. Unamortized discounts and premiums are amortized using the effective interest method with the amortization recognized as part of interest income in the consolidated statements of operations.

F-15

APP. 303

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Losses on financing receivables are recognized when they are incurred, which requires us to make our best estimate of probable losses. Specific allowances are recorded for individually impaired loans to the extent we determine it is probable we will be unable to collect all amounts due according to original contractual terms of the loan agreement. Certain loans classified as impaired may not require an allowance for loan loss because we believe we will ultimately collect the unpaid balance (through collection or collateral repossession). The method for calculating the best estimate of losses depends on the type and risk characteristics of the related financing receivables. Such an estimate requires consideration of historical loss experience, adjusted for current conditions, and judgments about the probable effects of relevant observable data, including present economic conditions such as delinquency rates, financial health of market sectors, and the present and expected future levels of interest rates. The underlying assumptions, estimates and assessments we use to provide for losses are updated periodically to reflect our view of current conditions. Changes in such estimates can significantly affect the allowance and provision for losses. It is possible we will experience credit losses that are different from our current estimates. We have no allowance for losses at December 31, 2019 or December 31, 2018. Write-offs are deducted from the allowance for losses when we judge the principal to be uncollectible and subsequent recoveries are added to the allowance at the time cash is received on a written-off account.

**Equity Method Investments** — The Company accounts for investments in common stock or in-substance common stock in which we have the ability to exercise significant influence, but do not own a controlling financial interest, under the equity method of accounting. Investments within the scope of the equity method of accounting are initially measured at cost, including the cost of the investment itself and direct transaction costs incurred to acquire the investment. After the initial recognition of the investment at cost, we recognize income and losses from our investment by adjusting upward or downward the balance of our equity method investment on our consolidated balance sheet with such adjustments, if any, flowing through earnings (loss) from equity method investment on our consolidated statement of operations, in all cases adjusted to reflect amortization of basis differences, if any, and the elimination of intercompany gains and losses, if any. Cash distributions received from equity method investees are recorded as reductions to the investment balance and classified in the statement of cash flows using the cumulative earnings approach.

Equity method investments are reviewed for impairment whenever events or changes in circumstances indicate the carrying amount of the investment might not be recoverable. These circumstances can include, but are not limited to evidence that we do not have the ability to recover the carrying amount, the inability of the investee to sustain earnings, a current fair value of the investment that is less than the carrying amount, and other investors ceasing to provide support or reducing their financial commitment to the investee. If the fair value of the investment is less than the carrying amount, and the investment will not recover in the near term, an other-than-temporary impairment may exist. We recognize a loss in value of an investment deemed other-than-temporary in the period the conclusion is made.

When we do not expect financial information of our equity method partner companies to be consistently available on a timely basis, the Company reports its share of the income or loss of the equity method investment on a one-quarter lag.

For more information on equity method investments, see Note 9.

**Leases** — The Company adopted ASC 842, *Leases*, on January 1, 2019. The Company leases certain real estate for its office premises that are classified as operating leases. We assess whether an arrangement is a lease at inception. Leases with an initial term of twelve months or less are not recorded in the balance sheet. We have elected the practical expedient to not separate lease and non-lease components for all assets. Operating lease assets and operating lease liabilities are calculated based on the present value of the future minimum lease payments over the lease term at the lease start date. As our leases do not provide an implicit rate, we use our incremental borrowing rate based on the information available at the lease start date in determining the present value of future payments. The operating lease asset is increased by any lease payments made at or before the lease start date and reduced by lease incentives and initial direct costs incurred. The lease term includes options to renew or terminate the lease when it is reasonably certain that we will exercise that option. The exercise of lease renewal options is at our sole discretion. The depreciable life of lease assets and leasehold improvements are limited by the lease term, unless there is a transfer of title or purchase option reasonably certain of exercise. Lease expense for operating leases is recognized on a straight-line basis over the lease term.

F-16

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Stock-Based Compensation** — The Company measures and recognizes compensation expense for all stock-based payments at fair value on the grant date over the requisite service period. We use the Black-Scholes option pricing model to determine the fair value of stock options and stock appreciation rights. For restricted stock grants (including restricted stock units), fair value is determined as of the closing price of our common stock on the date of grant. Stock-based compensation expense is recorded in general and administrative expenses based on the classification of the employee or vendor. The determination of fair value of stock-based payment awards on the date of grant is affected by our stock price and a number of subjective variables. These variables include, but are not limited to, the expected stock price volatility over the term of the awards and the expected duration of the awards. We account for the effects of forfeitures as they occur.

The risk-free interest rate is based on the U.S. Treasury rates at the date of grant with maturity dates approximately equal to the expected life at grant date. Volatility is based on the standard deviation of the average continuously compounded rate of return of five selected companies.

**Deferred Financing and Issuance Costs** — Loans advanced to us under our second amended and restated senior credit facility with LNV Corporation, as described in Note 11, are reported net of financing costs, including issuance costs, sales commissions and other direct expenses, which are amortized using the straight-line method over the term of the facility. The L Bonds, as described in Note 12, are reported net of financing costs, which are amortized using the effective interest method over the term of those borrowings. Selling and issuance costs of Redeemable Preferred Stock ("RPS") and Series 2 Redeemable Preferred Stock ("RPS 2"), described in Note 15, are netted against additional paid-in capital, until depleted, and then against the outstanding balance of the preferred stock. The offerings of our RPS and RPS 2 closed in March 2017 and April 2018, respectively. There were no issuance costs associated with the August 2018 issuance of the Series B Convertible Preferred Stock, described in Note 15.

**Business Combinations** — The Company includes the results of operations of the businesses that it acquires from the acquisition date. In allocating the purchase price of a business combination, in accordance with ASC 805, *Business Combinations*, the Company records all assets acquired and liabilities assumed at fair value, and the fair value of any noncontrolling interests, with the excess of the purchase price over the aggregate fair values recorded as goodwill. ASC Topic 820, *Fair Value Measurements*, defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. The purchase price of an acquisition is allocated to the underlying assets acquired and liabilities assumed based upon their estimated fair values as of the date of acquisition. To the extent the purchase price exceeds the fair value of the net identifiable tangible and intangible assets acquired and liabilities assumed, such excess is allocated to goodwill. The Company determines the estimated fair values after review and consideration of relevant information, including discounted cash flows, quoted market prices and estimates made by management. The fair value assigned to identifiable intangible assets acquired is based on estimates and assumptions made by management at the time of the acquisition. The Company adjusts the preliminary purchase price allocation, as necessary, during the measurement period of up to one year after the acquisition closing date as it obtains more information as to facts and circumstances existing as of the acquisition date. Acquisition-related costs are recognized separately from the business combination and are expensed as incurred.

**Goodwill and Other Intangibles** — Preliminary goodwill of $2.4 billion and intangible assets of $3.4 million were recognized as a result of the business combination related to the Investment and Exchange Agreements on December 31, 2019 (see Note 5). Intangible assets are included in other assets in the Company's consolidated balance sheet. The Company accounts for goodwill and intangible assets in accordance with ASC Topic 350, *Intangibles – Goodwill and Other*. The amount of goodwill initially recorded is based on the fair value of the acquired entity at the time of acquisition. Management performs goodwill and intangible asset impairment testing annually, during the fourth quarter, or when events occur, or circumstances change that would more likely than not indicate impairment has occurred. Goodwill impairment exists when the carrying value of goodwill exceeds its implied fair value. Intangible assets include an insurance license and a non-compete agreement. Finite-lived intangibles are stated at cost less accumulated amortization. Amortization is recorded using the straight-line method, which approximates the expected pattern of economic benefit, over the estimated lives of the assets. The insurance license intangible has an indefinite life and is evaluated for impairment annually. The non-compete agreement is amortized over its estimated useful life of four years and is evaluated for impairment when indicators of impairment are present as outlined in the subsequent paragraph.

F-17

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The Company reviews the carrying value of its finite-lived intangible assets whenever events or changes in circumstances indicate that the carrying amount of the asset group may not be recoverable. Factors that would require an impairment assessment include, among other things, a significant change in the extent or manner in which an asset is used, a continual decline in the Company's operating performance, or as a result of fundamental changes in a subsidiary's business condition.

**Income Taxes** — The Company is a corporation for tax purposes. Certain of the Company's subsidiaries operate in the U.S. as partnerships for U.S. federal income tax purposes. In addition, certain of the wholly-owned subsidiaries of the Company will be subject to federal, state, and local corporate income taxes at the entity level and the related tax provision attributable to the Company's share of this income tax is reflected in the consolidated financial statements. Income taxes are accounted for using the asset and liability method of accounting. Under this method, deferred tax assets and liabilities are recognized for the expected future tax consequences of differences between the carrying amounts of assets and liabilities and their respective tax basis, using tax rates in effect for the year in which the differences are expected to reverse. The effect on deferred assets and liabilities of a change in tax rates is recognized in income in the period when the change is enacted. Deferred tax assets are reduced by a valuation allowance when it is more likely than not that some portion or all of the deferred tax assets will not be realized. Current and deferred tax liabilities, if any, are recorded within accounts payable and accrued expenses and other liabilities in the consolidated balance sheets. The Company analyzes its tax filing positions in all of the U.S. federal, state, local and foreign tax jurisdictions where it is required to file income tax returns, as well as for all open tax years in these jurisdictions. The Company records uncertain tax positions on the basis of a two-step process: (a) determination is made whether it is more likely than not that the tax positions will be sustained based on the technical merits of the position, and (b) those tax positions that meet the more likely than not threshold are recognized as the largest amount of tax benefit that is greater than 50 percent likely to be realized upon ultimate settlement with the related tax authority. The Company recognizes accrued interest and penalties related to uncertain tax positions in other expenses within the consolidated statements of operations.

**Earnings (Loss) per Common Share** — Basic earnings (loss) per share attributable to common shareholders are calculated using the weighted-average number of shares outstanding during the reported period. Diluted earnings (loss) per share are calculated based on the potential dilutive impact of our RPS, RPS 2, restricted stock units, warrants (if applicable) and stock options.

Net earnings, less any preferred dividends accumulated for the period (whether or not declared), is allocated to common stock. Basic earnings per common share is computed by dividing net earnings available to common stockholders by the weighted average number of common shares outstanding during the period.

Diluted earnings per common share is computed in a similar manner, except that first the denominator is increased to include the number of additional common shares that would have been outstanding if potentially dilutive common shares were issued using the treasury stock method in the case of restricted stock units, warrants and options, or the if-converted method in the case of RPS and RPS 2. During 2019 and 2018, RPS, RPS2, restricted stock units and stock options were the potentially dilutive non-participating instruments issued by the Company.

**Accounting Policies of Recently Consolidated Subsidiaries** — As discussed in Note 5, as a result of the Company acquiring the right to appoint a majority of the board of directors of Beneficient Management, the general partner of Ben LP, on December 31, 2019, Beneficient became a consolidated subsidiary of GWG Holdings. The Company reviewed the accounting policies of Beneficient and conformed those of Beneficient with those of the Company. For those accounting policies utilized by Beneficient that were not applicable to GWG prior to the consolidation of Beneficient, the Company adopted those accounting policies as of December 31, 2019. Additionally, Beneficient's balance sheet was remeasured to fair value on that date in accordance with our business combination accounting policy described above. A description of each of the most pertinent accounting policies applicable to Beneficient is included below. This list is not exhaustive.

*Loan Receivables*

Loan receivables are carried at the principal amount outstanding, plus interest paid-in-kind. The loans do not have scheduled principal or interest payments due prior to their maturity date, which is generally 12 years from the date of origination. Prepayment of the loans, in whole or in part, is permitted without premium or penalty. Loans bear contractual interest at the greater of 14% or 1-month LIBOR plus 10% compounded daily. The primary source of repayment for the loans and related fees is cash flows from the alternative assets collateralizing the loans. Interest income on loans is accrued on the principal amount outstanding and interest compounds on a daily basis.

F-18

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Allowances for Loan Losses*

The allowance for loan losses is a valuation allowance for probable incurred credit losses in the portfolio. Management's determination of the allowance is based upon an evaluation of the loan portfolio, impaired loans, economic conditions, volume, growth and composition of the collateral to the loan portfolio, and other risks inherent in the portfolio. Management applies risk factors to categories of loans and individually reviews all impaired loans above a de minimis threshold. Management relies heavily on statistical analysis, current net asset value ("NAV") and distribution performance of the underlying alternative asset collateral and industry trends related to alternative asset investments to estimate losses. Management evaluates the adequacy of the allowance by reviewing relevant internal and external factors that affect credit quality. As the collateral is the sole source of repayment of the loans and related interest, these loans are considered to be collateral dependent. Any charge-offs are recognized in the period in which they arise for the collateral dependent loans (i.e., impaired collateral dependent loans are written down to their estimated net realizable value based on disposition value).

*Fees Receivable*

Fees receivable represent balances arising from services provided to clients and are recorded on an accrual basis. Fees receivable are written off when they are determined to be uncollectible. Any allowance for doubtful accounts is estimated based on our estimate of the ability of the collateral to satisfy the amounts due. Most of the fees receivable consist of unpaid upfront fees and trust service fees that will be paid from the cash flows from the client's alternative asset based on an allocation of those cash flows as prescribed in the associated trust agreement. Upfront fees and trust service fees are required to be paid first from the cash flows from the client's alternative asset and thus, we believe that the amounts are fully collectible. Accordingly, our consolidated financial statements do not include an allowance for bad debt nor any bad debt expense.

*Noncontrolling interests – Redeemable and Non-redeemable*

Noncontrolling interests represent the portion of certain consolidated subsidiaries' limited partnership interests that are held by third parties. Amounts are adjusted by the noncontrolling interest holder's proportionate share of the subsidiaries' or VIEs' earnings or losses each period and for any distributions that are paid.

Noncontrolling interests are reported as a component of equity unless the noncontrolling interest is considered redeemable, in which case the noncontrolling interest is recorded between liabilities and equity (mezzanine or temporary equity) in the Company's consolidated balance sheets. The redeemable noncontrolling interest is adjusted at each balance sheet date to its maximum redemption value if the amount is greater than the carrying value. Changes in the Company's redeemable noncontrolling interests are presented in the consolidated statements of changes in stockholders' equity.

Noncontrolling interests include holders, which consist of "Related Entities", an entity affiliated with a related party, and third parties, of Class S Ordinary Units issued by BCH. "Related Entities" are defined as certain trusts and those entities held by such trusts that are controlled by Beneficient's founder and in which Beneficient's founder and his family members are also among classes of economic beneficiaries whether or not Beneficient's founder is entitled to economic distributions from such trusts. Beneficient's founder is also chairman of the board of directors of GWG Holdings.

Redeemable noncontrolling interests are held by holders, which consist of a Related Entity, an entity affiliated with a related party, and a third-party entity, of Preferred Series A Subclass 1 Unit Accounts issued by BCH.

*Upfront Fees*

Non-refundable upfront fees are earned for setting up and providing the client access to the EXAlt Plan$^{TM}$. These activities do not transfer a separate promised service and therefore, represent advanced payments for trust administration services. Upfront fees are billed at the origination of the liquidity transaction and are based on a percentage of NAV plus any unfunded capital commitments. Payment of the fees occurs in the first step of the waterfall distribution per the LiquidTrust agreement. Upfront fees are deferred upon receipt and recognized ratably over the period of benefit which is generally consistent with estimated expected life of LiquidTrusts (typically 7 to 10 years). Upfront fees are recorded on the consolidated balance sheets as fees receivable with a corresponding amount recorded to deferred revenue. Deferred revenue is subsequently recognized as trust services revenues on the consolidated statements of comprehensive income (loss), ratably over the expected life of the LiquidTrust.

F-19

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Trust Administration Revenues*

Trust administration fees are earned for providing administrative services to trustees for existing liquidity solution clients. The performance obligation under these agreements is satisfied over time as the administration and management services are provided. Fees are recognized monthly based upon the beginning of quarter (in advance) net asset value plus any remaining unfunded loan commitments and the applicable fee rate of the account as outlined in the agreement. Payment frequency is defined in the individual contracts, which primarily stipulate billings on a quarterly basis in advance. Trust administration fee receivables are recorded in the consolidated balance sheets in the fees receivable line item and in trust services revenues on the consolidated statements of comprehensive income (loss).

**Reclassification** — Certain prior year amounts have been reclassified for consistency with the current year presentation. These reclassifications had no effect on the reported results of operations. See Note 3 for an explanation of certain reclassifications we recorded in comparative periods on the guarantor financial statements.

**Newly Adopted Accounting Pronouncements** — On January 1, 2019, we adopted Accounting Standards Update ("ASU") No. 2016-02, *Leases* (Topic 842). ASU 2016-02 requires lessees to recognize right-of-use assets and lease liabilities on the balance sheet for all leases with a term greater than twelve months. We elected to adopt the standard using the modified retrospective method, without restatement of prior periods' financial information. The impact to the balance sheet on January 1, 2019, was the addition of approximately $0.9 million in right-of-use assets, a reduction to deferred rent of $0.7 million, and a net increase to lease liabilities of $1.6 million for our operating lease. The adoption of the new standard did not materially affect our consolidated statements of operations, consolidated statements of cash flows or consolidated statements of changes in stockholders' equity. We have entered into additional leases and have consolidated Beneficient's right-of-use assets and lease liabilities since the adoption of ASU 2016-02 as discussed in Note 21.

ASU 2017-04, *Goodwill,* (Topic 350) was issued in January 2017. This standard simplifies how an entity is required to test goodwill for impairment by eliminating Step 2 from the goodwill impairment test. Step 2 measures a goodwill impairment loss by comparing the implied fair value of a reporting unit's goodwill with the carrying amount of that goodwill. Under the new guidance, goodwill impairment loss will be measured on the basis of the fair value of the reporting unit relative to the reporting unit's carrying amount rather than on the basis of the implied amount of goodwill relative to the goodwill balance of the reporting unit. ASU 2017-04 is effective for annual periods beginning after December 15, 2019, including interim periods within those periods, for public business entities. Early adoption is permitted for interim or annual goodwill impairment tests performed on testing dates after January 1, 2017. The Company adopted this ASU on January 1, 2020, and it did not have a material impact on its consolidated financial statements and related disclosures.

**Recently Issued Accounting Pronouncements** — In June 2016, the Financial Accounting Standards Board ("FASB") issued ASU No. 2016-13, *Financial Instruments — Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments*, which changes the impairment model for most financial assets and certain other instruments, including trade and other receivables, held-to-maturity debt securities and loans. There have been numerous codification improvements and technical corrections issued through subsequent ASUs snice the issuance of ASU No. 2016-13. The standard requires entities to use a new, forward-looking "expected loss" model that is expected to generally result in the earlier recognition of allowances for losses. The guidance is effective for annual periods beginning after December 15, 2022, including interim periods within those years, for smaller reporting companies, as defined by the SEC, but early adoption is permitted. The Company is evaluating the potential impact of this guidance on our consolidated financial statements.

In August 2018, the FASB issued ASU No. 2018-13, *Fair Value Measurement (Topic 820): Disclosure Framework — Changes to the Disclosure Requirements for Fair Value Measurement*, which eliminates, adds and modifies certain disclosure requirements for fair value measurements. The guidance is effective for fiscal years and interim periods beginning after December 15, 2019. Certain of the amendments require prospective application, while the remainder require retrospective application. Early adoption is allowed either for the entire standard or only the provisions that eliminate or modify the requirements. The Company believes that we are currently compliant with this pronouncement but continues to evaluate potential impact of this guidance on our consolidated financial statements.

F-20

APP. 308

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(3) Correction of an Immaterial Error**

In the consolidated statement of cash flows for the year ended December 31, 2018, we have separated the gross borrowings and repayments on our senior credit facility with LNV Corporation that were previously erroneously reported on a net basis in cash flows from financing activities.

For the year ended December 31, 2018, we previously reported net repayments of senior debt of $64.3 million. We revised the comparative information for the year ended December 31, 2018, to report gross borrowings on senior debt of $12.9 million, and gross repayments of senior debt of $77.2 million, in the consolidated statements of cash flows. This revision had no effect on the total cash flows from financing activities.

**(4) Restrictions on Cash**

Under the terms of our second amended and restated senior credit facility with LNV Corporation (discussed in Note 11), we are required to maintain collection and payment accounts that are used to collect policy benefits from pledged policies, pay annual policy premiums, interest and other charges under the facility, distribute funds to pay down the facility, and distribute excess funds to the borrower (GWG DLP Funding IV, LLC).

The agents for the lender authorize the disbursements from these accounts. At December 31, 2019 and 2018, there was a balance of $20.3 million and $4.2 million, respectively, in these collection and payment accounts.

To fund the Company's acquisition of life insurance policies, we are required to maintain escrow accounts. Distributions from these accounts are made according to life insurance policy purchase contracts. At December 31, 2019 and 2018, there was a balance of $0 and $6.6 million, respectively, in the Company's escrow accounts.

**(5) Business Combination**

Prior to December 31, 2019, the Company owned 41,505,279 common units of Ben LP, for a total limited partnership interest in the common units of Ben LP of approximately 90.2%. This investment was historically accounted for using the equity method (see Note 9). On December 31, 2019, the Company entered into the Investment Agreement and Exchange Agreements described in Note 1.

Pursuant to the Investment Agreement, the Company transferred $79.0 million to Ben LP in return for 666,667 additional common units of Ben LP and a Preferred Series A Subclass 1 Unit Account of BCH, which increased the Company's ownership in Ben LP common units to approximately 95.5%. Also on December 31, 2019, in a transaction related to the Investment Agreement, GWG Holdings transferred its interest in the Preferred Series A Subclass 1 Unit Account to its wholly owned subsidiary, GWG Life. In connection with the Investment Agreement, the Company obtained the right to appoint a majority of the board of directors of Beneficient Management, the general partner of Ben LP. As a result, the Company obtained control of Ben LP and consolidated Ben LP as of December 31, 2019, under the guidance in ASC 805, *Business Combinations*.

As a result of the change-of-control, the Company was required to remeasure its existing equity investment at fair value prior to consolidation. At December 31, 2019, the Company's equity investment in the common units of Ben LP had a carrying value of $368.6 million, prior to the additional investment noted above. The Company estimated the fair value of its investment in Ben LP to be approximately $622.5 million, resulting in the recognition of a gain of $253.9 million during the fourth quarter of 2019. This gain is included in gain on consolidation of equity method investment in the Company's consolidated statement of operations for the year ended December 31, 2019. This gain was partially offset by the remeasurement to fair value of the Commercial Loan Agreement between GWG Life and Ben and the Option Agreement between GWG Holdings and Ben which resulted in a net loss of $4.2 million. The net gain on consolidation of equity method investment after remeasurement of these preexisting balances was $249.7 million. The Company's proportionate share of the earnings or losses from Ben LP was recognized in earnings (loss) from equity method investment in our consolidated statement of operations from August 10, 2018 until December 31, 2019 (see Note 9 for further information) and was previously recorded on a one-quarter lag basis. In connection with the consolidation of Beneficient, the Company was required to discontinue the one-quarter lag.

F-21

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The following table summarizes the fair value measurement of the assets acquired and liabilities assumed as of December 31, 2019 (in thousands):

**ASSETS**

| | |
|---|---:|
| Loans receivable | $ 232,344 |
| Fees receivable | 29,168 |
| Investment in public equity securities | 24,550 |
| Other assets | 14,053 |
| Intangible assets | 3,449 |
|    Total identifiable assets acquired | 303,564 |

**LIABILITIES**

| | |
|---|---:|
| Other borrowings | 153,086 |
| Commercial loan agreement from parent | 168,420 |
| Other liabilities and deferred revenue | 105,866 |
| Accounts payable and accrued expenses | 13,713 |
|    Total liabilities assumed | 441,085 |
| Net liabilities assumed | (137,521) |

**NONCONTROLLING INTERESTS**

| | |
|---|---:|
| Common Units not owned by GWG Holdings[1] | 181,383 |
| Class S Ordinary Units | 85,448 |
| Class S Preferred Units | 17 |
| Preferred Series A Subclass 1 Unit Accounts | 1,269,654 |
|    Total noncontrolling interests | 1,536,502 |

**ACQUISITION CONSIDERATION**

| | |
|---|---:|
| Cash, less cash acquired | 61,479 |
| Fair value of preexisting investment in Common Units[2] | 622,503 |
| Fair value of noncontrolling interest | 1,536,502 |
|    Total estimated consideration | 2,220,484 |
| Less: Net liabilities assumed | (137,521) |
| Resulting preliminary goodwill | 2,358,005 |

(1) Calculated as 1,974,677 Common Units not owned by GWG Holdings at December 31, 2019, multiplied by the $15.00 per unit derived from the enterprise valuation of Beneficient. Also includes $151.8 million of share-based payment awards that were granted by Beneficient prior to the change in control but were not replaced by awards of GWG Holdings upon the change in control. These awards were treated as noncontrolling interests in accordance with ASC 805, *Business Combinations*.

(2) Calculated as 41,505,279 Common Units owned by GWG Holdings prior to the change in control multiplied by the $15.00 per unit derived from the enterprise valuation of Beneficient, with a nominal rounding adjustment.

*Methods Used to Determine Equity Value and to Fair Value Assets and Liabilities*

The following is a description of the valuation methodologies used to estimate the fair value of equity and the fair values of major categories of assets acquired and liabilities assumed. In many cases, determining the fair value of equity and the acquired assets and assumed liabilities required management to estimate cash flows expected from those assets and liabilities and to discount those cash flows at appropriate rates of interest. This required the utilization of significant estimates and management judgment in accounting for the 2019 change-of-control event.

**Loan receivables** — The loan portfolio was valued based on current guidance that defines fair value as the price that would be received to sell an asset or transfer a liability in an orderly transaction between market participants at the measurement date. Level 3 inputs were utilized to value the loan portfolio and included the use of present value techniques employing cash flow estimates and incorporated assumptions that marketplace participants would use in estimating fair values, specifically market interest rate and general credit fair value assumptions. In instances where reliable market information was not available, management used assumptions in an effort to determine reasonable fair value. There was no carryover related allowance for loan losses.

F-22

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Cash and cash equivalents and fees receivable** — Cash and cash equivalents and fees receivable were valued using their current carrying amounts which approximate fair value.

**Investment in public equity securities** — The fair value of the investments in public equity securities was determined using quoted market prices. As these were investments by Beneficient in the common stock of GWG, these amounts were eliminated in consolidation and treated as treasury stock as of December 31, 2019.

**Other assets** — Other assets include miscellaneous receivables that were valued using the current carrying amount as that amount approximates fair value due to the relatively short time between their origination date and the fair value date. Miscellaneous intercompany receivables were eliminated in consolidation.

**Intangible assets** — Intangible assets include an insurance license and a non-compete agreement. Both assets were valued using their current carrying amount which approximates fair value. The insurance license was valued at $3.1 million and the non-compete agreement was valued at $0.3 million.

**Other borrowings and commercial loan agreement from parent** — The measurement of the fair value of other borrowings and commercial loan agreement from parent was based on market prices that generally are observable for similar liabilities at commonly quoted intervals and is considered a Level 2 fair value measurement. The Commercial Loan Agreement between Beneficient and GWG Life was eliminated in consolidation as of December 31, 2019.

**Other liabilities and deferred revenue** — The carrying amounts of other liabilities and deferred revenue approximate their fair value. The Option Agreement between Beneficient and GWG was eliminated in consolidation as of December 31, 2019.

**Accounts payable and accrued expenses** — Due to their short-term nature, the carrying amounts of accounts payable and accrued expenses approximate the fair value. Miscellaneous intercompany payables were eliminated in consolidation as of December 31, 2019.

**Noncontrolling interests** — The values for each noncontrolling interest component were calculated after determination of an overall enterprise value for the Company. The enterprise value of the Company was determined using the Option Pricing Model ("OPM") Backsolve approach under the market method. The OPM Backsolve approach uses a Black-Scholes option pricing model to calculate the implied equity value of the firm. Once an overall equity value was determined, amounts were allocated to the various classes of equity based on the security class preferences. The inputs to the OPM Backsolve approach are the equity value for one component of the capital structure, expected time to exit, the risk-free interest rate and an assumed volatility based on the volatility of similar publicly traded companies. The OPM Backsolve inputs include Level 3 inputs.

The value of the noncontrolling interest includes an amount related to outstanding share-based payment awards that remain outstanding after the change-of-control. For these awards, the portion of the acquisition-date fair value of the share-based payment awards attributable to pre-combination service is recognized in noncontrolling interest as of December 31, 2019.

**Goodwill** — The resulting excess of the overall enterprise value after deducting the fair values of assets acquired and liabilities assumed is recognized as goodwill. The goodwill recognized is the result of the inherent value associated with the assembled business after all separately identifiable assets acquired and liabilities assumed are deducted from the enterprise value. None of the goodwill is expected to be deductible for income tax purposes. The goodwill is allocated to our Investment in Beneficient reporting unit.

As of December 31, 2019, the accounting for the estimates of equity values, which includes noncontrolling interests, the fair value of loan receivables, and any separately identifiable intangibles was based on the facts and circumstances that existed as of the acquisition date. Should management obtain new information about facts and circumstances that existed at the acquisition date, adjustments to the fair values assigned to these items could occur during the measurement period of one year from the acquisition date. Any such adjustment will result in corresponding adjustments to goodwill.

F-23

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The following unaudited pro forma financial information presents the combined results of operations of GWG Holdings as if the acquisition of Ben LP had occurred as of January 1, 2018:

| *(in thousands, except shares and per share data)* | **Years ended December 31,** | | | |
| --- | --- | --- | --- | --- |
| | **2019** | | **2018** | |
| **Total Revenue** | | | | |
| Pro forma | $ | 104,989 | $ | 89,949 |
| As reported | $ | 92,276 | $ | (390) |
| | | | | |
| **Net Income (Loss) Attributable to Common Shareholders** | | | | |
| Pro forma | $ | (218,572) | $ | (87,808) |
| As reported | $ | 91,166 | $ | (136,114) |
| | | | | |
| **Net Earnings (Loss) per Diluted Common Share** | | | | |
| Pro forma | $ | (6.15) | $ | (2.67) |
| As reported | $ | 2.65 | $ | (22.32) |

The unaudited pro forma financial information is presented for informational purposes only. It is not necessarily indicative of what our consolidated results of operations actually would have been had the acquisition occurred at the beginning of each year, nor does it attempt to project the future results of operations of the combined company.

The unaudited pro forma financial information above gives effect to the following:

- Deconsolidation of certain Beneficient trusts included in the EXAlt Plan$^{TM}$
- Exclusion of the $249.7 million nonrecurring gain on consolidation of equity method investment
- Reduction of Beneficient interest expense related to acquisition-date debt principal payments
- Elimination of intercompany transactions, including the Commercial Loan Agreement and Option Agreement
- Exclusion of nonrecurring acquisition-related transaction costs

**(6) Investment in Life Insurance Policies**

Our investments in life insurance policies are valued based on unobservable inputs that are significant to their overall fair value. Changes in the fair value of these policies, net of premiums paid, are recorded in gain (loss) on life insurance policies, net in our consolidated statements of operations. Fair value is determined on a discounted cash flow basis that incorporates life expectancy assumptions generally derived from reports obtained from widely accepted life expectancy providers (other than insured lives covered under small face amount policies — those with $1 million in face value benefits or less — which utilize either a single fully underwritten, or simplified report based on self-reported medical interview), assumptions relating to cost-of-insurance (premium) rates and other assumptions. The discount rate we apply incorporates current information about the discount rates observed in the life insurance secondary market through competitive bidding observations (which have recently declined for us as a result of our decreased purchase activity) and other means, fixed income market interest rates, the estimated credit exposure to the insurance companies that issued the life insurance policies and management's estimate of the operational risk yield premium a purchaser would require to receive the future cash flows derived from our portfolio as a whole. Management has significant discretion regarding the combination of these and other factors when determining the discount rate. As a result of management's analysis, a discount rate of 8.25% was applied to our portfolio as of both December 31, 2019 and 2018.

**Portfolio Information**

Our portfolio of life insurance policies, owned by our subsidiaries as of December 31, 2019 is summarized below:

**Life Insurance Portfolio Summary**

| | |
| --- | --- |
| Total life insurance portfolio face value of policy benefits (in thousands) | $ 2,020,973 |
| Average face value per policy (in thousands) | $ 1,756 |
| Average face value per insured life (in thousands) | $ 1,883 |
| Average age of insured (years)* | 82.4 |
| Average life expectancy estimate (years)* | 7.2 |
| Total number of policies | 1,151 |
| Number of unique lives | 1,073 |
| Demographics | 74% Male; 26% Female |
| Number of smokers | 48 |
| Largest policy as % of total portfolio face value | 0.7% |
| Average policy as % of total portfolio face value | 0.1% |
| Average annual premium as % of face value | 3.3% |

(*) Averages presented in the table are weighted averages by face amount of policy benefits.

APP. 312

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 314 of 1031     PageID 486

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

A summary of our policies organized according to their estimated life expectancy dates, grouped by year, as of the reporting date, is as follows:

| | As of December 31, 2019 | | | As of December 31, 2018 | | |
|---|---|---|---|---|---|---|
| Years Ending December 31, | Number of Policies | Estimated Fair Value (in thousands) | Face Value (in thousands) | Number of Policies | Estimated Fair Value (in thousands) | Face Value (in thousands) |
| 2019 | — | $ — | $ — | 9 | $ 6,380 | $ 7,305 |
| 2020 | 8 | 5,869 | 6,342 | 41 | 46,338 | 59,939 |
| 2021 | 55 | 62,061 | 79,879 | 81 | 68,836 | 108,191 |
| 2022 | 90 | 89,074 | 138,723 | 104 | 97,231 | 177,980 |
| 2023 | 128 | 123,352 | 222,369 | 109 | 93,196 | 185,575 |
| 2024 | 109 | 103,111 | 217,053 | 107 | 84,150 | 211,241 |
| 2025 | 113 | 74,223 | 171,961 | 124 | 77,718 | 210,781 |
| Thereafter | 648 | 338,349 | 1,184,646 | 579 | 274,074 | 1,086,980 |
| **Totals** | **1,151** | **$ 796,039** | **$ 2,020,973** | **1,154** | **$ 747,923** | **$ 2,047,992** |

We recognized life insurance benefits of $125.1 million and $71.1 million during the years ended December 31, 2019 and 2018, respectively, related to policies with a carrying value of $33.2 million and $20.8 million, respectively, and as a result recorded realized gains of $91.9 million and $50.3 million.

A reconciliation of gain (loss) on life insurance policies is as follows (in thousands):

| | Years Ended December 31, | |
|---|---|---|
| | 2019 | 2018 |
| Change in estimated probabilistic cash flows[1] | $ 67,186 | $ 75,444 |
| Unrealized gain on acquisitions[2] | 6,921 | 28,017 |
| Premiums and other annual fees | (65,577) | (54,087) |
| Change in discount rates[3] | — | — |
| Change in life expectancy evaluation[4] | (2,332) | (4,890) |
| Change in life expectancy evaluation methodology[5] | — | (87,100) |
| Face value of matured policies | 125,148 | 71,090 |
| Fair value of matured policies | (56,026) | (42,579) |
| Gain (loss) on life insurance policies, net | $ 75,320 | $ (14,105) |

(1) Change in fair value of expected future cash flows relating to our investment in life insurance policies that are not specifically attributable to changes in life expectancy, discount rate changes or policy maturity events.

(2) Gain resulting from fair value in excess of the purchase price for life insurance policies acquired during the reporting period.

(3) The discount rate applied to estimate the fair value of the portfolio of life insurance policies we own was 8.25% at December 31, 2019 and 2018.

(4) The change in fair value due to updating life expectancy estimates on certain life insurance policies in our portfolio.

(5) The change in fair value due to the adoption of the Longest Life Expectancy methodology on life policies in our portfolio, partially offset by the impact of a decrease in the discount rate associated thereto.

F-25

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Estimated premium payments and servicing fees required to maintain our current portfolio of life insurance policies in force for the next five years, assuming no mortalities (in thousands), are as follows:

| Years Ending December 31, | Premiums | | Servicing | | Total | |
|---|---|---|---|---|---|---|
| 2020 | $ | 67,455 | $ | 1,674 | $ | 69,129 |
| 2021 | | 84,712 | | 1,674 | | 86,386 |
| 2022 | | 97,757 | | 1,674 | | 99,431 |
| 2023 | | 110,156 | | 1,674 | | 111,830 |
| 2024 | | 120,077 | | 1,674 | | 121,751 |
| | $ | 480,157 | $ | 8,370 | $ | 488,527 |

Management anticipates funding the majority of the premium payments and servicing fees estimated above from cash flows realized from life insurance policy benefits, and to the extent necessary, with additional borrowing capacity created as the premiums and servicing costs of pledged life insurance policies become due, under the second amended and restated senior credit facility with LNV Corporation as described in Note 11. Management anticipates funding premiums and servicing costs of non-pledged life insurance policies with cash flows realized from life insurance policy benefits from our portfolio of life insurance policies and net proceeds from our offering of L Bonds. The proceeds of these capital sources may also be used for; additional investments in Beneficient; the purchase, policy premiums and servicing costs of additional life insurance policies; working capital; and financing expenditures including paying principal, interest and dividends.

**(7) Fair Value Definition and Hierarchy**

ASC 820, *Fair Value Measurements and Disclosures*, establishes a hierarchical disclosure framework that prioritizes and ranks the level of market price observability used in measuring assets and liabilities at fair value. Market price observability is affected by a number of factors, including the type of investment, the characteristics specific to the investment and the state of the marketplace, including the existence and transparency of transactions between market participants. Assets and liabilities with readily available and actively quoted prices, or for which fair value can be measured from actively quoted prices in an orderly market, generally will have a higher degree of market price observability and a lesser degree of judgment used in measuring fair value.

ASC 820 maximizes the use of observable inputs and minimizes the use of unobservable inputs by requiring the use of observable inputs whenever available. Observable inputs are inputs that market participants would use in pricing the asset or liability developed based on market data obtained from third-party sources. Unobservable inputs are inputs that reflect assumptions about how market participants price an asset or liability based on the best available information. Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability (i.e., the "exit price") in an orderly transaction between market participants at the measurement date (a non-distressed transaction in which neither seller nor buyer is compelled to engage in the transaction). A sale of the portfolio or a portion of the portfolio in an other than orderly transaction would likely occur at less than the fair value of the respective life insurance policies.

The hierarchy is broken down into three levels based on the observability of inputs as follows:

Level 1 —     Valuations based on quoted prices in active markets for identical assets or liabilities that the Company has the ability to access. Valuations are based on quoted prices that are readily and regularly available in an active market.

Level 2 —     Valuations based on one or more quoted prices in markets that are not active or for which all significant inputs are observable, either directly or indirectly.

Level 3 —     Valuations based on inputs that are unobservable and significant to the overall fair value measurement.

F-26

## GWG HOLDINGS, INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The availability of observable inputs can vary by types of assets and liabilities and is affected by a wide variety of factors, including, for example, whether an instrument is established in the marketplace, the liquidity of markets and other characteristics particular to the transaction. To the extent that valuation is based on models or inputs that are less observable or unobservable in the market, the determination of fair value requires more judgment. Accordingly, the degree of judgment exercised by management in determining fair value is greatest for assets and liabilities categorized in Level 3.

*Level 3 Valuation Process*

The estimated fair value of our portfolio of life insurance policies is determined on a quarterly basis by management taking into consideration a number of factors, including changes in discount rate assumptions, estimated premium payments and life expectancy estimate assumptions, as well as any changes in economic and other relevant conditions. The discount rate incorporates current information about discount rates observed in the life insurance secondary market through competitive bidding observations (which have declined recently as a result of our decreased purchase activity) and other means, fixed income market interest rates, the estimated credit exposure to the insurance company that issued the life insurance policy and management's estimate of the operational risk yield premium a purchaser would require to receive the future cash flows derived from our portfolio as a whole. Management has significant discretion regarding the combination of these and other factors when determining the discount rate.

These inputs are then used to estimate the discounted cash flows from the portfolio using the ClariNet LS probabilistic and stochastic portfolio pricing model from ClearLife Limited, which estimates the expected cash flows using various mortality probabilities and scenarios. The valuation process includes a review by senior management as of each quarterly valuation date. We also engage ClearLife Limited to prepare a net present value calculation of our life insurance portfolio using the inputs we provide on a quarterly basis.

The following table reconciles the beginning and ending fair value of our Level 3 investments in our portfolio of life insurance policies (in thousands):

| | Years Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2019** | | **2018** | |
| Beginning balance | $ | 747,922 | $ | 650,527 |
| Purchases | | 32,367 | | 128,502 |
| Maturities (initial cost basis) | | (33,265) | | (20,763) |
| Net change in fair value | | 49,015 | | (10,344) |
| Ending balance | $ | 796,039 | $ | 747,922 |

Historically, for life insurance policies with face amounts greater than $1 million and that are not pledged as collateral under our second amended and restated senior credit facility with LNV Corporation (approximately 14.6% of our portfolio by face amount of policy benefits), we attempted to obtain updated life expectancy reports on a continuous rotating three year cycle. For life insurance policies that are pledged under our second amended and restated senior credit facility with LNV Corporation (approximately 77.3% of our portfolio by face amount of policy benefits as of December 31, 2019), prior to entering into the second amended and restated senior credit facility with LNV Corporation on November 1, 2019, we were required to update the life expectancy estimates every two years beginning from the closing date of the second amended and restated senior credit facility with LNV Corporation. Under the second amended and restated senior credit facility with LNV Corporation, we are required to update the life expectancy estimates for all life insurance policies that are pledged no later than December 18, 2020, and obtain updated life expectancy updates no less frequently than once every five years. For the remaining small face insurance policies (i.e., a policy with $1 million in face value benefits or less), we employ other methods and timeframes to update life expectancy estimates.

F-27

APP. 316

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

In the fourth quarter of 2018, we adopted the Longest Life Expectancy portfolio valuation methodology. Under our Longest Life Expectancy methodology, we: i) utilize life expectancy reports from third-party life expectancy providers for the pricing of all life insurance policies; ii) apply a stable valuation methodology driven by the experience of our life insurance portfolio, which is re-evaluated if experience deviates by a specified margin; and iii) use relevant market observations that can be validated and mapped to the discount rate used to value the life insurance portfolio.

With the adoption of the Longest Life Expectancy method, we discontinued the practice of obtaining updated life expectancy reports (or updating specific life expectancies in any manner) except as required by lenders to comply with existing and future covenants within credit facilities. This change was accounted for as a change in accounting estimate and affected the year ended December 31, 2019 and will affect all periods thereafter. To the extent such updated life expectancy reports are available, we do not expect to incorporate these life expectancy reports into our revised valuation methodology; however, we will monitor this data to determine over time if there exists any additive predictive value in relation to the basis of its mortality projections.

The following table summarizes the inputs utilized in estimating the fair value of our portfolio of life insurance policies:

| | As of December 31, 2019 | As of December 31, 2018 |
|---|---|---|
| Weighted-average age of insured, years* | 82.4 | 82.1 |
| Age of insured range, years | 62-101 | 61-100 |
| Weighted-average life expectancy, months* | 86.2 | 93.2 |
| Life expectancy range, months | 0-240 | 1-251 |
| Average face amount per policy (in thousands) | $ 1,756 | $ 1,775 |
| Discount rate | 8.25% | 8.25% |

(*)  Weighted-average by face amount of policy benefits

Life expectancy estimates and market discount rates for a portfolio of life insurance policies are inherently uncertain and the effect of changes in estimates may be significant. For example, if the life expectancy estimates were increased or decreased by four and eight months on each outstanding policy, and the discount rates were increased or decreased by 1% and 2%, with all other variables held constant, the fair value of our investment in life insurance policies would increase or decrease as summarized below:

Change in Fair Value of the Investment in Life Insurance Policies (in thousands)

| | Change in Life Expectancy Estimates | | | |
|---|---|---|---|---|
| | minus 8 months | minus 4 months | plus 4 months | plus 8 months |
| December 31, 2019 | $ 113,812 | $ 57,753 | $ (55,905) | $ (111,340) |
| December 31, 2018 | $ 113,410 | $ 57,611 | $ (55,470) | $ (110,473) |

| | Change in Discount Rate | | | |
|---|---|---|---|---|
| | minus 2% | minus 1% | plus 1% | plus 2% |
| December 31, 2019 | $ 91,890 | $ 43,713 | $ (39,790) | $ (76,118) |
| December 31, 2018 | $ 95,747 | $ 45,440 | $ (41,179) | $ (78,615) |

*Other Fair Value Considerations*

The carrying value of policy benefit receivables, prepaid expenses, accounts payable and accrued expenses approximate fair value due to their short-term maturities and low credit risk. Using the income-based valuation approach, the estimated fair value of our L Bonds and Seller Trust L Bonds, largely containing the same terms, was approximately $1.4 billion and $1.0 billion as of December 31, 2019 and 2018, respectively, based on a weighted-average market interest rate of 6.34% and 7.11%, respectively.

The Commercial Loan receivable from Ben LP has a below-market interest rate of 5.0% per year; provided that the accrued interest from the date of the Initial Transfer to the Final Closing Date of the Exchange Transaction was added to the principal balance of the Commercial Loan. From and after the Final Closing Date, one-half of the interest, or 2.5% per year, is due and payable monthly in cash, and (ii) one-half of the interest, or 2.5% per year, accrues and compounds annually on each anniversary date of the Final Closing Date and becomes due and payable in full in cash on the maturity date. Utilizing an implied yield of 6.75%, we estimated the fair value of the Commercial Loan to be approximately $183.1 million as of December 31, 2018 based on a market yield analysis for similar instruments with similar credit profiles. As previously discussed, the Commercial Loan was eliminated in consolidation on December 31, 2019.

The Promissory Note receivable from the LiquidTrusts (see Note 8) earns interest at 7.0% per year, payable upon maturity in 2023. Utilizing an implied yield of 10.0%, we estimate the fair value of the Promissory Note to be approximately $59.6 million as of December 31, 2019 based on a market yield analysis for similar instruments with similar credit profiles. The Promissory Note had a carrying value of $67.2 million as of December 31, 2019.

Beneficient also has assets and liabilities measured at fair value on a non-recurring basis including loan receivables, fees receivable and other borrowings. As of December 31, 2019, all of the Beneficient's assets and liabilities were recorded at fair value in the consolidated balance sheet due to the application of pushdown accounting as described in Note 5.

APP. 317

F-28

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The carrying value of the second amended and restated senior credit facility with LNV Corporation reflects interest charged at 12-month LIBOR plus an applicable margin. The margin represents our credit risk, and the strength of the portfolio of life insurance policies collateralizing the debt. The overall rate reflects the current interest rate market, and the carrying value of the facility approximates fair value.

GWG MCA Capital, Inc. ("GWG MCA") participated in the merchant cash advance industry by directly advancing sums to merchants and lending money, on a secured basis, to companies that advance sums to merchants. Each quarter, we review the carrying value of these cash advances, determine if an impairment exists and establish or adjust an allowance for loan loss as necessary. At December 31, 2019, one of our secured cash advances was impaired. Specifically, the secured loan to Nulook Capital LLC had an outstanding balance of $1.9 million and an allowance for loan loss of $1.9 million at December 31, 2019. We deem fair value to be the estimated collectible value on each loan or advance made from GWG MCA. Secured merchant cash advances, net of allowance for loan loss, of $0.3 and $0.5 million are included within other assets in our consolidated balance sheets as of December 31, 2019 and December 31, 2018, respectively. Where we estimate the collectible amount to be less than the outstanding balance, we record an allowance for the difference. Provision for merchant cash advances are recorded within other expenses on our consolidated statements of operations (see Note 17). GWG MCA no longer participates in the merchant cash advance industry.

Certain assets are subject to periodic impairment testing by comparing the respective carrying value of the asset to its estimated fair value. In the event we determine these assets to be impaired, we would recognize an impairment loss equal to the amount by which the carrying value of the impaired asset exceeds its estimated fair value. These periodic impairment tests utilize company-specific assumptions involving significant unobservable inputs, or Level 3, in the fair value hierarchy.

GWG Holdings previously had outstanding common stock warrants; however, the warrants expired in the quarter ended September 30, 2019.

**(8) Financing Receivables from Affiliates**

*Commercial Loan-Ben LP*

On August 10, 2018, in connection with the Initial Transfer of the Exchange Transaction, GWG Life, as lender, and Ben LP, as borrower, entered into the Commercial Loan Agreement. On December 28, 2018, the Final Closing Date of the Exchange Transaction, the agreement was amended to adjust the principal to $192.5 million. The principal amount under the Commercial Loan is due on August 9, 2023, but is extendable for two five-year terms under certain circumstances. Repayment of the Commercial Loan is subordinated in right of payment to other Beneficient obligations. Ben LP's obligations under the Commercial Loan Agreement are unsecured.

In accordance with the Supplemental Indenture governing the issuance of the Seller Trust L Bonds, upon a redemption event or at the maturity date of the Seller Trust L Bonds, the Company, at its option, may use the outstanding principal amount of the Commercial Loan, and accrued and unpaid interest thereon, as repayment consideration of the Seller Trust L Bonds (see Note 13).

On December 31, 2019, the Commercial Loan was eliminated as an intercompany balance as a result of the consolidation of Beneficient.

F-29

APP. 319

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Promissory Note-LiquidTrusts*

On May 31, 2019, GWG Life entered into a Promissory Note (the "Promissory Note"), made by Jeffrey S. Hinkle and Dr. John A. Stahl, not in their individual capacity but solely as trustees of The LT-1 LiquidTrust, The LT-2 LiquidTrust, The LT-5 LiquidTrust, The LT-7 LiquidTrust, The LT-8 LiquidTrust and The LT-9 LiquidTrust (collectively, the "LiquidTrust Borrowers") in the principal amount of $65.0 million. Pursuant to the terms of the Promissory Note, GWG Life funded a term loan to the LiquidTrust Borrowers in an aggregate principal amount of $65.0 million (the "Loan"), which Loan was funded in two installments as described below. The Loan was made pursuant to GWG's strategy to further diversify into alternative assets (beyond life insurance) and ancillary businesses and was intended to better position Beneficient's balance sheet, working capital and liquidity profile to satisfy anticipated Texas Department of Banking regulatory requirements.

The LiquidTrust Borrowers are common law trusts established as part of alternative asset financings extended by a subsidiary of Ben LP, of which the Company owns approximately 95% of the issued and outstanding common units of Ben LP (although, on a fully diluted basis, our ownership interest in common units of Ben LP would be reduced significantly below a majority of those issued and outstanding). Although each Borrower is allocated a portion of the Loan equal to approximately 16.7% of the aggregate outstanding principal of the Loan, the Loan constitutes the joint and several obligations of the LiquidTrust Borrowers.

An initial advance in the principal amount of $50.0 million was funded on June 3, 2019 and, subsequent to satisfaction of certain customary conditions, the second advance in the principal amount of $15.0 million was funded on November 22, 2019. The Loan bears interest at 7.0% per annum, with interest payable at maturity, and matures on June 30, 2023. Subject to the Intercreditor Agreements (as defined below), the Loan can be prepaid at the LiquidTrust Borrowers' election without premium or penalty.

The Loan is unsecured and is subject to certain covenants (including a restriction on the incurrence of any indebtedness senior to the Loan other than existing senior loan obligations to each of HCLP Nominees, L.L.C. ("HCLP") and Beneficient Holdings, Inc. ("BHI", and together with HCLP, the "Senior Lenders"), as lenders) and events of default. At the time Beneficient was consolidated, all existing senior loan obligations were held by HCLP. The Senior Lenders are directly or indirectly associated with one of Beneficient's founders, who is also Chairman of the Company's Board of Directors. HCLP is not considered a related party of GWG Holdings or Beneficient.

*Intercreditor Agreements*

In connection with the Promissory Note, the Company also entered into two intercreditor and subordination agreements: (1) an Intercreditor Agreement between GWG Life and HCLP and (2) an Intercreditor Agreement between GWG Life and BHI (the "Intercreditor Agreements"). Under the Intercreditor Agreements, GWG Life agrees to subordinate the Loan to the secured obligations of Beneficient and its affiliates outstanding to the Senior Lenders (the "Senior Loan Obligations"), agrees to not take any liens to secure the Loan (and to subordinate such liens, if any, to the liens of the Senior Lenders), and agrees not to take enforcement actions under the Promissory Note until such Senior Loan Obligations are paid in full. The Intercreditor Agreements establish various other inter-lender and subordination terms, including, without limitation, with respect to permitted actions by each party, permitted payments, waivers, voting arrangements in bankruptcy, application of certain proceeds and limitations on amendments of the respective loan obligations of the parties. The Senior Lenders have agreed not to extend the maturity of their respective loan obligations beyond June 30, 2023 or increase the outstanding principal of the loans made by the Senior Lenders without the written consent of GWG Life. GWG Life has agreed not to transfer, assign, pledge, grant a security interest in or otherwise dispose of (including, without limitation, pursuant to a foreclosure) the Promissory Note except with the written consent of the Senior Lenders (such consent not to be unreasonably withheld) or to the Company or direct or indirect wholly owned subsidiaries thereof.

F-30

APP. 320

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The following table summarizes outstanding principal, discount and accrued interest balances of the financing receivables from affiliates (in thousands)**:**

|  | December 31, | |
| --- | --- | --- |
|  | **2019** | **2018** |
| **Commercial Loan** | | |
| Commercial Loan receivable – principal | $ — | $ 192,508 |
| Discount on Commercial Loan receivable | — | (7,846) |
| Accrued interest receivable on Commercial Loan | — | 107 |
| Balance outstanding on Commercial Loan [1] | — | 184,769 |
| **Promissory Note** | | |
| Promissory Note receivable – principal | 65,000 | — |
| Accrued interest receivable on Promissory Note | 2,153 | — |
| Balance outstanding on Promissory Note | $ 67,153 | $ — |

(1)  The Commercial Loan was eliminated upon consolidation of Beneficient at December 31, 2019. The outstanding principal and accrued interest at December 31, 2019 was $197.4 million.

**(9) Equity Method Investments**

The balances of our equity method investments are as follows (in thousands):

|  | December 31, | |
| --- | --- | --- |
|  | **2019** | **2018** |
| Beneficient Company Group, L.P. [1] | $ — | $ 360,842 |
| InsurTech Holdings, LLC [2] | 1,761 | — |
| Total | $ 1,761 | $ 360,842 |

(1)  The preexisting equity method investment in Ben was remeasured to fair value, and Ben and its subsidiaries were consolidated on December 31, 2019 (see Note 5).
(2)  On November 11, 2019, GWG Holdings contributed the common stock and membership interests of its previously-wholly owned subsidiaries Life Epigenetics and youSurance to InsurTech Holdings in exchange for a membership interest in InsurTech Holdings. Although GWG Holdings currently owns 100% of the equity of InsurTech Holdings, it does not have a controlling financial interest in InsurTech Holdings because the managing member has substantive participating rights. Therefore, GWG Holdings accounts for its ownership interest in InsurTech Holdings as an equity method investment.

*Beneficient Company Group, L.P.*

During 2018, we acquired 40.5 million common units of Ben LP for a total limited partnership interest in the common units of Ben LP of approximately 89.9% as of December 31, 2018. On June 12, 2019, we acquired an additional 1,000,000 common units of Ben LP from a third party for a cash investment of $10.0 million. On December 31, 2019, we acquired an additional 666,667 newly-issued common units of Ben LP for a cash investment of $10.0 million. The common units of Ben LP are not publicly traded on a stock exchange.

Prior to December 31, 2019, our investment in the common units of Ben LP was presented in equity method investment on our consolidated balance sheets. Our proportionate share of earnings or losses from our investee was recognized in earnings (loss) from equity method investments in our consolidated statements of operations. We recorded our share of the income or loss of Beneficient through September 30, 2019 on a one-quarter lag.

F-31

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

On December 31, 2019, we obtained control of Beneficient and consolidated Beneficient as of that date under the guidance in ASC 805, *Business Combinations*. See Note 5 for further information on the business combination. In connection with the consolidation, we discontinued the one-quarter reporting lag.

Financial information pertaining to Beneficient is summarized in the table below (in thousands):

|  | Twelve months ended September 30, 2019 (unaudited) | August 10 to September 30, 2018 (unaudited) |
|---|---|---|
| Total revenues | $ 93,921 | $ 18,409 |
| Net income (loss) | (32,133) | 8,291 |
| Net earnings (loss) attributable to Ben LP common unitholders | (13,754) | 129 |
| GWG portion of net earnings (loss) [1] | (2,460) | 18 |

[1]  Our portion of Beneficient's net earnings (loss) for the periods noted.

We eliminated the effects of any intercompany transactions in the summarized information presented above. Our historical ownership percentage of our investment in Ben LP common units is as follows:

| Date | Percentage of outstanding common units | Reason |
|---|---|---|
| August 10, 2018 | 13.9% | Purchase of units |
| December 28, 2018 | 89.9% | Purchase of units |
| March 31, 2019 | 88.1% | Change in investee outstanding units |
| June 12, 2019 | 90.2% | Purchase of units |
| December 31, 2019 | 95.5% | Purchase of units |

*Insurtech Holdings, LLC*

On November 11, 2019, GWG contributed the common stock and membership interests of its wholly owned Life Epigenetics and youSurance subsidiaries ("Insurtech Subsidiaries") to a legal entity, InsurTech Holdings, LLC ("InsurTech Holdings") in exchange for a membership interest in InsurTech Holdings. Although we currently own 100% of InsurTech Holdings' equity, we do not have a controlling financial interest in InsurTech Holdings because the managing member has substantive participating rights. Therefore, we account for our ownership interest in InsurTech Holdings as an equity method investment.

The transaction resulted in a loss of control of the Insurtech Subsidiaries and, as a result, we deconsolidated the subsidiaries and recorded an equity method investment balance during the fourth quarter of 2019. The loss of control required us to measure the equity investment at fair value. We determined the fair value of our investment in InsurTech approximated the carrying value of $3.4 million which was primarily comprised of cash and fixed assets contributed to the entity during the fourth quarter of 2019. We recognized a loss on equity method investment of $1.6 million during the fourth quarter of 2019, resulting in an ending balance of $1.8 million as of December 31, 2019.

In accordance with the operating agreement of InsurTech Holdings, GWG contributed $2.1 million in cash to InsurTech Holdings during the fourth quarter of 2019 and is committed to contribute an additional $17.9 million to the entity over the next two years.

Our investment in the membership interest of InsurTech Holdings is presented in equity method investment in our consolidated balance sheets. Our proportionate share of earnings or losses from our investee is recognized in earnings (loss) from equity method investments in our consolidated statements of operations.

F-32

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(10) Variable Interest Entities**

In accordance with ASC 810, *Consolidation*, the Company assesses whether it has a variable interest in legal entities in which it has a financial relationship and, if so, whether or not those entities are variable interest entities ("VIEs"). For those entities that qualify as VIEs, ASC 810 requires the Company to determine if the Company is the primary beneficiary of the VIE, and if so, to consolidate the VIE.

Prior to December 31, 2019, we determined that Beneficient is a VIE, but that we were not the primary beneficiary of the investment. GWG did not have the power to direct any activities of Beneficient, or any of its related parties, that most significantly impacted Beneficient's economic performance. GWG had no board representation at Ben LP or at its general partner. The general partner is exclusively assigned all management powers over the business and affairs of Beneficient, and the limited partners did not have the ability to remove the general partner. Therefore, we did not consolidate the results of Beneficient in our consolidated financial statements through September 30, 2019. The Company's exposure to risk of loss in Beneficient was generally limited to its investment in the common units of Ben LP, its financing receivable from Beneficient and its equity security investment in the Option Agreement to purchase additional common units of Ben LP. Effective December 31, 2019, GWG acquired the ability to appoint a majority of the board of directors of the general partner of Ben LP. As a result, we became the primary beneficiary of Ben LP on December 31, 2019 and consolidated the balance sheet of Beneficient on that date.

We determined that the LiquidTrust Borrowers are VIEs, but that we are not the primary beneficiary of the variable interests. We do not have the power to direct any activities of the LiquidTrust Borrowers that most significantly impact the Borrower's economic performance. The Company's exposure to risk of loss in the LiquidTrust Borrowers is limited to its financing receivable from the LiquidTrust Borrowers.

We determined that Insurtech is a VIE, but that we are not the primary beneficiary of the variable interests. We do not have the power to direct any activities of Insurtech that most significantly impact its economic performance. The Company's exposure to risk of loss in Insurtech is limited to its equity method investment in the limited partnership units of Insurtech Holdings, LLC and its remaining unfunded capital commitments.

The Company also determined that certain trusts included within the EXAlt$^{TM}$ Plans used in connection with Beneficient's operations are VIEs but that neither GWG nor Beneficient are the primary beneficiary of the trusts. The Company does not have both the power to direct the trust's most significant activities and the obligation to absorb losses or right to receive benefits that could potentially be significant to the trusts. The Company's investments in the trusts are carried in loans receivable in the consolidated balance sheet. The Company's exposure to risk of loss was determined as the amortized cost of the loans to the trusts, any earned but unpaid fees or expenses plus any remaining potential contributions for unfunded capital commitments and cash reserve commitments.

The following table shows the classification, carrying value and maximum exposure to loss with respect to the Company's unconsolidated VIEs (in thousands):

|  | December 31, 2019 | | December 31, 2018 | |
|  | Carrying Value | Maximum Exposure to Loss | Carrying Value | Maximum Exposure to Loss |
|---|---|---|---|---|
| Loan receivables | $ 232,344 | $ 335,255 | $ — | $ — |
| Financing receivables from affiliates | 67,153 | 67,153 | 184,769 | 184,769 |
| Equity method investments | 1,761 | 19,661 | 360,842 | 360,842 |
| Other asset | — | — | 38,562 | 38,562 |
| Accounts payable and accrued expenses | (2,515) | — | — | — |
| Total | $ 298,743 | $ 422,069 | $ 584,173 | $ 584,173 |

**(11) Senior Credit Facility with LNV Corporation**

On September 27, 2017, we entered into an amended and restated senior credit facility with LNV Corporation as lender through our subsidiary GWG DLP Funding IV, LLC ("DLP IV"). The amended and restated senior credit facility makes available a total of up to $300.0 million in credit with a maturity date of September 27, 2029. Additional advances are available under the second amended and restated senior credit facility at the LIBOR rate as herein defined. Advances are available as the result of additional borrowing base capacity, created as the premiums and servicing costs of pledged life insurance policies become due. Interest will accrue on amounts borrowed under the second amended and restated senior credit facility at an annual interest rate, determined as of each date of borrowing or quarterly if there is no borrowing, equal to (a) 12-month LIBOR plus (b) 7.50% per annum.

F-33

APP. 323

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

On November 1, 2019, DLP IV entered into a second amended and restated senior credit facility with LNV Corporation, as lender, and CLMG Corp., as the administrative agent on behalf of the lenders under the agreement (the "Second Amended and Restated Agreement"), which replaced the amended and restated senior credit facility dated September 27, 2017 that previously governed the DLP IV's senior credit facility. The second amended and restated senior credit facility with LV Corporation makes available a total of up to $300.0 million in credit to DLP IV with a maturity date of September 27, 2029. Subject to available borrowing base capacity, additional advances are available under the second amended and restated senior credit facility at the LIBOR rate described below. Such advances are available to pay the premiums and servicing costs of pledged life insurance policies as such amounts become due. Interest will accrue on amounts borrowed under the second amended and restated senior credit facility at an annual interest rate, determined as of each date of borrowing or quarterly if there is no borrowing, equal to (a) 12-month LIBOR, plus (b) 7.50% per annum. The effective rate at December 31, 2019 was 9.54%. Interest payments are made on a quarterly basis.

Under the second amended and restated senior credit facility, DLP IV has granted the administrative agent, for the benefit of the lenders under the agreement, a security interest in all of DLP IV's assets.

In conjunction with entering into the second amended and restated senior credit facility, DLP IV pledged life insurance policies having an aggregate face value of approximately $298.3 million as additional collateral and received an advance of approximately $37.1 million (inclusive of certain fees and expenses incurred in connection with the negotiation and entry into the second amended and restated senior credit facility). The second amended and restated senior credit facility has certain financial and nonfinancial covenants, and we were in compliance with these covenants at December 31, 2019 and as of the date of this filing.

As of December 31, 2019, approximately 77.3% of the total face value of our life insurance policies portfolio is pledged to LNV Corporation. The amount outstanding under this facility was $184.6 million and $158.2 million at December 31, 2019 and 2018, respectively. Obligations under the second amended and restated senior credit facility are secured by a security interest in DLP IV's assets, for the benefit of the lenders, through an arrangement under which Wells Fargo Bank, N.A. serves as securities intermediary. The life insurance policies owned by DLP IV do not serve as direct collateral for the obligations of GWG Holdings under the L Bonds and Seller Trust L Bonds. The difference between the amount outstanding and the carrying amount on our consolidated balance sheets is due to netting of unamortized debt issuance costs.

**(12) L Bonds**

We began publicly offering and selling L Bonds in January 2012 under the name "Renewable Secured Debentures". These debt securities were re-named "L Bonds" in January 2015. L Bonds were publicly offered and sold on a continuous basis under a registration statement permitting us to sell up to $1.0 billion in principal amount of L Bonds through January 2018. On December 1, 2017, an additional public offering was declared effective permitting us to sell up to $1.0 billion in principal amount of L Bonds on a continuous basis until December 2020. This offering is a follow-on to the previous L Bond offering and contains the same terms and features. We are party to an indenture governing the L Bonds dated October 19, 2011, as amended ("Indenture"), under which GWG Holdings is obligor, GWG Life is guarantor, and Bank of Utah serves as indenture trustee.

Effective December 31, 2019, we entered into Amendment No. 2 to the indenture to define the debt coverage ratio as the ratio, expressed as percentage, of (A) the aggregate sum of all indebtedness (other than Excluded Indebtedness as described below) of GWG Holdings and its direct and indirect subsidiaries (including the securities issued under the indenture, but excluding any indebtedness of Ben LP and its direct and indirect subsidiaries) as reflected on GWG Holdings' most recent consolidated balance sheet prepared in accordance with GAAP over (B) the sum of (i) net present asset value of life insurance policies owned by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding life insurance policies held by Ben LP and its direct and indirect subsidiaries and controlled affiliates, plus (ii) all cash (and cash equivalents) held by GWG Holdings and its direct or indirect Subsidiaries or subsidiaries or affiliates, but excluding the cash (and cash equivalents) held by Ben LP and its direct and indirect subsidiaries, plus (iii) the original cost basis in GWG Holdings' investment in common units or other securities of Ben LP, plus (iv) the outstanding principal amount of any outstanding loans made under a commercial loan agreement with GWG Life, as lender, plus (v) the cost basis of assets contributed to GWG Holdings or any direct or indirect subsidiary of GWG Holdings in connection with a Repurchase Transaction, plus (vi) without duplication, the value of all other assets of GWG Holdings and its direct and indirect subsidiaries or affiliates (but excluding the value of assets of Ben LP and its direct and indirect subsidiaries) as reflected on its most recent consolidated balance sheet prepared in accordance with GAAP. For this purpose, "Excluded Indebtedness" is indebtedness that is payable at GWG Holdings' option in capital stock of GWG Holdings or securities mandatorily convertible into or exchangeable for such capital stock of the Company, or any indebtedness that is reasonably expected to be converted or exchanged, directly or indirectly, into such capital stock, provided that under the terms of such indebtedness in the event any such conversion or exchange does not occur in accordance with the terms of such transaction, such indebtedness would be cancelled and any assets received in exchange for such indebtedness would be returned.

We were in compliance with all material covenants of the indenture at December 31, 2019 and as of the date of this filing, and no Events of Default (as defined in the Amended and Restated Indenture) existed as of such dates.

F-34

APP. 324

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

We publicly offer and sell L Bonds under a registration statement declared effective by the SEC and have issued Seller Trust L Bonds under a Supplemental Indenture, as described in Note 13. We temporarily suspended the offering of our L Bonds on May 1, 2019 as a result of our delay in filing certain periodic reports with the SEC. We recommenced our L Bond offering on August 8, 2019.

The collateral and guarantee provisions of the L Bonds and Seller Trust L Bonds are described in Note 23.

The bonds have renewal features under which we may elect to permit their renewal, subject to the right of bondholders to elect to receive payment at maturity. Interest is payable monthly or annually depending on the election of the investor.

At December 31, 2019 and 2018, the weighted-average interest rate of our L Bonds was 7.15% and 7.10%, respectively. The principal amount of L Bonds outstanding was $948.1 million and $662.2 million at December 31, 2019 and 2018, respectively. The difference between the amount of outstanding L Bonds and the carrying amount on our consolidated balance sheets is due to netting of unamortized deferred issuance costs, cash receipts for new issuances and payments of redemptions in process. Amortization of deferred issuance costs was $12.7 million and $9.0 million for the years ended December 31, 2019 and 2018, respectively. Future expected amortization of deferred financing costs as of December 31, 2019 is $37.2 million in total over the next seven years.

Future contractual maturities of L Bonds (other than Seller Trust L Bonds), and future amortization of their deferred financing costs, at December 31, 2019 (in thousands) are as follows:

| Years Ending December 31, | | Contractual Maturities | | Unamortized Deferred Financing Costs |
|---|---|---|---|---|
| 2020 | $ | 152,118 | $ | 1,632 |
| 2021 | | 201,419 | | 5,774 |
| 2022 | | 163,741 | | 6,812 |
| 2023 | | 76,969 | | 3,342 |
| 2024 | | 118,848 | | 6,328 |
| Thereafter | | 235,033 | | 13,312 |
| | $ | 948,128 | $ | 37,200 |

**(13) Seller Trust L Bonds**

On August 10, 2018, in connection with the Initial Transfer of the Exchange Transaction, GWG Holdings, GWG Life and Bank of Utah, as trustee, entered into a Supplemental Indenture (the "Supplemental Indenture") to the Amended and Restated Indenture. GWG Holdings entered into the Supplemental Indenture to add and modify certain provisions of the Amended and Restated Indenture necessary to provide for the issuance of a new class of securities titled "Seller Trust L Bonds". GWG issued Seller Trust L Bonds in the amount of $366.9 million to the various related trusts (the "Seller Trusts") in connection with the Exchange Transaction on August 10, 2018.

The maturity date of the Seller Trust L Bonds is August 9, 2023. The Seller Trust L Bonds bear interest at 7.50% per year. Interest is payable monthly in cash.

After the second anniversary of the Final Closing, the holders of the Seller Trust L Bonds will have the right to cause GWG to repurchase, in whole but not in part, the Seller Trust L Bonds held by such holder. The repurchase may be paid, at GWG's option, in the form of cash, and/or a pro rata portion of (i) the outstanding principal amount and accrued and unpaid interest under the Commercial Loan Agreement and (ii) Ben LP common units, or a combination of cash and such property.

Our L Bonds are offered and sold under a registration statement declared effective by the SEC, as described in Note 12, and we have issued Seller Trust L Bonds under a Supplemental Indenture. We temporarily suspended the offering of our L Bonds on May 1, 2019 as a result of our delay in filing certain periodic reports with the SEC. We recommenced our L Bond offering on August 8, 2019.

The collateral and guarantee provisions of the L Bonds and Seller Trust L Bonds are described in Note 23.

The principal amount of Seller Trust L Bonds outstanding was $366.9 million at both December 31, 2019 and 2018.

F-35

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(14) Other Borrowings**

Beneficient had borrowings with an aggregate fair value of $153.1 million upon consolidation as of December 31, 2019. This aggregate balance includes a senior credit agreement and a second lien credit agreement with respective balances, including accrued interest, of $77.5 million and $72.2 million at December 31, 2019. Both the senior credit agreement and the second lien credit agreement were held by HCLP as of December 31, 2019. Both loans accrue interest at a rate of 1-month LIBOR plus 3.95%, compounded daily, with interest due by the 15th of each month. Ben LP intends to repay with cash or refinance with other third-party lenders the senior credit agreement and the second lien credit agreement prior to their maturities, both of which are on June 30, 2020. Ben LP may not be able to refinance or obtain additional financing on favorable terms, or at all. If Ben LP is unable to refinance the senior credit agreement or the second lien credit agreement, or defaults on either loan, then Ben LP will be required to either (i) sell assets to repay these loans or (ii) to raise additional capital through the sale of equity and the ownership interest of Ben LP's equity holders may be diluted. These loans are not guaranteed by GWG.

The loans contain customary covenants and events of default and termination, including cross-default provisions. As of December 31, 2019, Beneficient was in compliance with all covenants except for certain covenants related to providing financial statements and information related to the eligible underlying investments by a specified date. Subsequent to December 31, 2019, but before these consolidated financial statements were issued, the covenants were amended whereby the Company is in compliance with all such covenants.

Beneficient has additional borrowings maturing in 2023 and 2024 with an aggregate principal balance outstanding, including accrued interest, of $2.5 million.

Future contractual maturities of Beneficient's borrowings are as follows (in thousands):

| Years Ending December 31, | | |
|---|---|---:|
| 2020 | $ | 149,661 |
| 2021 | | — |
| 2022 | | — |
| 2023 | | 750 |
| 2024 | | 1,579 |
| Thereafter | | — |
| | $ | 151,990 |

**(15) Stockholders' Equity**

*Common Stock*

In September 2014, GWG Holdings consummated an initial public offering of its common stock resulting in the sale of 800,000 shares of common stock at $12.50 per share, and net proceeds of approximately $8.6 million after the payment of underwriting commissions, discounts and expense reimbursements. In connection with this offering, the common stock of GWG Holdings was listed on the Nasdaq Capital Market under the ticker symbol "GWGH."

In conjunction with the initial public offering, GWG Holdings issued warrants to purchase 16,000 shares of common stock at an exercise price of $15.63 per share. As of December 31, 2019, all of these warrants have expired and none of them had been exercised.

On August 10, 2018, the Company declared a special dividend of $4.30 per share of common stock payable to shareholders of record on August 27, 2018.

On December 28, 2018, the Series B converted into 5,000,000 shares of GWG Holdings common stock at a conversion price of $10.00 per share immediately following the Final Closing of the Exchange Transaction.

On December 28, 2018, in connection with the Exchange Transaction, GWG Holdings issued 22,013,516 shares of common stock to the Seller Trusts at a market value of approximately $203.4 million in exchange for Ben LP common units. The shares were offered and sold in reliance upon the exemption from registration provided by Section 4(a)(2) under the Securities Act of 1933, as amended.

The common shares issued to the Seller Trusts were initially subject to a Stockholders Agreement between GWG and the Seller Trusts, under which the Seller Trusts, as long as they own at least 10% of the voting shares of GWG, agree to vote their shares in proportion to the votes cast by all other voting securities of GWG. In addition, the Seller Trusts agree, for the period of one year after the Final Closing, not to seek or propose to influence or control the management, Board of Directors or policies of GWG. The Stockholders Agreement was terminated in connection with the closing of the Purchase and Contribution Transaction on April 26, 2019.

F-36

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

In addition, GWG and the Seller Trusts entered into a registration rights agreement and an orderly marketing agreement. Under these agreements, GWG and the Seller Trusts agreed to take steps to allow for the orderly marketing and resale of the common shares issued to Seller Trusts as part of the Exchange Transaction, and Seller Trusts agreed to sell their common shares of GWG only as permitted under these agreements.

On November 15, 2018, the Board of Directors of GWG Holdings approved a stock repurchase program pursuant to which the Company was permitted, from time to time, to purchase shares of its common stock for an aggregate purchase price not to exceed $1.5 million. Stock repurchases were able to be executed through various means, including, without limitation, open market transactions, privately negotiated transactions or otherwise. The stock repurchase program did not obligate the Company to purchase any shares, and expired on April 30, 2019.

The following table includes information about the stock repurchase program for the years ended December 31, 2019 and 2018:

| 2018 Monthly Period | Number of Shares Purchased | Average Price Paid per Share | Total Number of Shares Purchased as Part of the Program | Maximum Dollar Value of Shares that May Yet Be Purchased Under the Program |
|---|---|---|---|---|
| December 2018 | 10,035 | $ 6.82 | 10,035 | $ 1,432 |
| **2019 Monthly Period[(1)]** | | | | |
| January 2019 | 42,488 | $ 8.47 | 52,523 | $ 1,072 |
| February 2019 | 202 | 8.88 | 52,725 | 1,070 |

(1) No stock was repurchased after February 2019, and the stock repurchase program expired on April 30, 2019.

The Exchange Agreement, discussed in Note 1, executed on December 31, 2019, allows holders of Ben LP common units to exchange their common units for common stock of the Company. The exchange ratio in the Exchange Agreement is based on the ratio of the capital account associated with the common units to be exchanged to the market price of the Company's common stock based on the volume weighted average price of the Company's common stock for the five consecutive trading days prior to the quarterly exchange date. No Ben LP common units have been exchanged for the Company's common stock through December 31, 2019.

***Redeemable Preferred Stock***

On November 30, 2015, our public offering of up to 100,000 shares of RPS at $1,000 per share was declared effective. Holders of RPS are entitled to cumulative dividends at the rate of 7% per annum, paid monthly. Dividends on the RPS are recorded as a reduction to additional paid-in capital, if any, then to the outstanding balance of the preferred stock if additional paid-in capital has been exhausted. Under certain circumstances described in the Certificate of Designation for the RPS, additional shares of RPS may be issued in lieu of cash dividends.

The RPS ranks senior to our common stock and pari passu with our RPS 2 and entitles its holders to a liquidation preference equal to the stated value per share (i.e., $1,000) plus accrued but unpaid dividends. Holders of RPS may presently convert their RPS into our common stock at a conversion price equal to the volume-weighted average price of our common stock for the 20 trading days immediately prior to the date of conversion, subject to a minimum conversion price of $15.00 and in an aggregate amount limited to 15% of the stated value of RPS originally purchased from us and still held by such purchaser.

Holders of RPS may request that we redeem their RPS at a price equal to their stated value plus accrued but unpaid dividends, less an applicable redemption fee, if any, as specified in the Certificate of Designation. Nevertheless, the Certificate of Designation for RPS permits us in our sole discretion to grant or decline redemption requests. Subject to certain restrictions and conditions, we may also redeem shares of RPS without a redemption fee upon a holder's death, total disability or bankruptcy. In addition, after one year from the date of original issuance, we may, at our option, call and redeem shares of RPS at a price equal to their liquidation preference.

F-37

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

In March 2017, we closed the RPS offering to additional investors having sold 99,127 shares of RPS for an aggregate gross consideration of $99.1 million and incurred approximately $7.0 million of related selling costs.

At the time of its issuance, we determined that the RPS contained two embedded features: (1) optional redemption by the holder, and (2) optional conversion by the holder. We determined that each of the embedded features met the definition of a derivative; however, based on our assessment under ASC 470, *Debt*, ("ASC 470") and ASC 815, *Derivatives and Hedging*, ("ASC 815"), we do not believe bifurcation of either the holder's redemption or conversion feature is appropriate.

*Series 2 Redeemable Preferred Stock*

On February 14, 2017, our public offering of up to 150,000 shares of RPS 2 at $1,000 per share was declared effective. Holders of RPS 2 are entitled to cumulative dividends at the rate of 7% per annum, paid monthly. Dividends on the RPS 2 are recorded as a reduction to additional paid-in capital, if any, then to the outstanding balance of the preferred stock if additional paid-in capital has been exhausted. Under certain circumstances described in the Certificate of Designation for the RPS 2, additional shares of RPS 2 may be issued in lieu of cash dividends.

The RPS 2 ranks senior to our common stock and pari passu with our RPS and entitles its holders to a liquidation preference equal to the stated value per share (i.e., $1,000) plus accrued but unpaid dividends. Holders of RPS 2 may, less an applicable conversion discount, if any, convert their RPS 2 into our common stock at a conversion price equal to the volume-weighted average price of our common stock for the 20 trading days immediately prior to the date of conversion, subject to a minimum conversion price of $12.75 and in an aggregate amount limited to 10% of the stated value of RPS 2 originally purchased from us and still held by such purchaser.

Holders of RPS 2 may request that we redeem their RPS 2 shares at a price equal to their liquidation preference, less an applicable redemption fee, if any, as specified in the Certificate of Designation. Nevertheless, the Certificate of Designation for RPS 2 permits us in our sole discretion to grant or decline requests for redemption. Subject to certain restrictions and conditions, we may also redeem shares of RPS 2 without a redemption fee upon a holder's death, total disability or bankruptcy. In addition, we may, at our option, call and redeem shares of RPS 2 at a price equal to their liquidation preference (subject to a minimum redemption price, in the event of redemptions occurring less than one year after issuance, of 107% of the stated value of the shares being redeemed).

In April 2018, we closed the RPS 2 offering to additional investors having sold 149,979 shares of RPS 2 for an aggregate gross consideration of $150.0 million and incurred approximately $10.3 million of related selling costs.

At the time of its issuance, we determined that the RPS 2 contained two embedded features: (1) optional redemption by the holder, and (2) optional conversion by the holder. We determined that each of the embedded features met the definition of a derivative; however, based on our assessment under ASC 470 and ASC 815, we do not believe bifurcation of either the holder's redemption or conversion feature is appropriate.

*Series B Convertible Preferred Stock*

On August 10, 2018, GWG Holdings issued 5,000,000 shares of Series B, par value $0.001 per share and having a stated value of $10.00 per share, to Ben LP for cash consideration of $50.0 million as part of the Initial Transfer.

On December 28, 2018, the Series B converted into 5,000,000 shares of our common stock at a conversion price of $10.00 per share immediately following the Final Closing of the Exchange Transaction.

F-38

APP. 328

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Preferred Series A Subclass 1 (Redeemable noncontrolling interest)*

BCH, a consolidated subsidiary of Ben LP, had non-unitized equity outstanding as of December 31, 2019. The Preferred Series A Subclass 1 Unit accounts are non-participating and convertible on a dollar basis. As of December 31, 2019, the 4th Amended and Restated Limited Partnership Agreement ("LPA") of BCH governs the terms of BCH's equity securities. Account holders are entitled to a compounded quarterly preferred return. The preferred return to be paid to Preferred Series A Unitholders is limited by a quarterly preferred return rate cap that is based on the annualized revenues of BCH. Annualized revenues are defined as four times the sum of total quarterly interest, fee and dividend income plus total noninterest revenues. This quarterly rate cap is defined as follows:

- 0.25% if annualized revenues are $80 million or less

- 0.50% if annualized revenues are greater than $80 million but equal to or less than $105 million

- 0.75% if annualized revenues are greater than $105 million but equal to or less than $125 million

- 1.00% if annualized revenues are greater than $125 million but equal to or less than $135 million

- 1.25% if annualized revenues are greater than $135 million but equal to or less than $140 million

- If over $140 million, the preferred return calculation is based on a fraction (i) the numerator of which is (A) the positive percentage rate change, if any, to the seasonally adjusted CPI-U covering the period from the date of the last allocation of profits to such holders, plus (B) (x) 2% prior to an Initial Public Offering (as defined in the BCH LPA) by Ben and (y) 3% thereafter, and (ii) the denominator of which is one minus the highest effective marginal combined U.S. federal, state and local income tax rate in effect as of the beginning of the fiscal quarter for which such determination is being made for an individual resident in New York City, New York, assuming (1) that the aggregate gross income allocable with respect to the quarterly preferred return for such fiscal year will consist of the same relative proportion of each type or character (e.g., long term or short term capital gain or ordinary or exempt income) of gross income item included in the aggregate gross income actually allocated in respect of the quarterly preferred return for the fiscal year reflected in the BCH's most recently filed Internal Revenue Service Form 1065 and (2) any state and local income taxes are not deductible against U.S. federal income tax.

The definition of Initial Public Offering includes an event, transaction or agreement pursuant to which Ben's Common Units are convertible or exchangeable into equity securities listed on a national securities exchange or quotation in an automated quotation system.

No amounts have been paid to the Preferred Series A Subclass 1 Unit Account holders related to the preferred return from issuance on September 1, 2017 through December 31, 2019. In connection with the issuance of Preferred Series A Subclass 2 Units as part of the Option Agreement, the preferred return of Preferred Series A Subclass 1 Unit Account holders is reduced by the preferred return allocated to the Preferred Series A Subclass 2 Units during the period the Option Agreement remains outstanding.

Upon election by a holder, the Preferred Series A Unit Accounts (other than Preferred Series A Subclass 2 Unit Accounts) are, at any time on or after January 1, 2021, convertible in an amount of Preferred Series A Unit Accounts (other than Preferred Series A Subclass 2 Unit Accounts), equal to 20% of their Sub-Capital Accounts into Class S Ordinary Units (with the right to convert any unconverted amount from previous years in any subsequent years). Upon an election, a holder of Preferred Series A Subclass 1 Unit Accounts will be issued Class S Ordinary Units necessary to provide the holder with a number of Class S Ordinary Units that, in the aggregate, equal (a) the balance of the holder's capital account associated with the Preferred Series A Subclass 1 Unit Accounts being converted divided by (b) either (x) prior to an initial public offering, the appraised per Class A Unit fair market value as determined by Beneficient or (y) following an initial public offering, the average price of a Common Unit for the thirty (30) day period ended immediately prior to the applicable conversion date. The holder of such newly issued Class S Ordinary Units may immediately convert them into Common Units. Additionally, effective December 31, 2030, if the Preferred Series A Subclass 1 Unit Accounts have not been converted, they will redeem for cash in an amount equal to the then outstanding capital account balance of the accounts. If available redeeming cash (as defined in the LPA) is insufficient to satisfy any such redemption requirements, BCH, on a quarterly basis, will redeem additional Preferred Series A Units until all such Preferred Series A Units have been redeemed. The Preferred Series A Subclass 1 Unit Accounts are subject to certain other conversion and redemption provisions.

F-39

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The current LPA of BCH also includes certain limitations of BCH, without the consent of a majority-in-interest of the Preferred Series A Unit Account holders, to (i) issue any new equity securities and (ii) except as otherwise provided, incur indebtedness that is senior to or pari passu with any right of distribution, redemption, repayment, repurchase or other payments relating to the Preferred Series A Unit accounts. Further, BCH cannot, prior to the conversion of all the Preferred Series A Unit accounts, incur any additional long-term debt unless (i) after giving effect to the incurrence of the new long-term debt on a pro forma basis, the sum of certain preferred stock, existing debt and any new long-term indebtedness would not exceed 55% of the BCH's NAV plus cash on hand, and (ii) at the time of incurrence of any new long-term indebtedness, the aggregate balance of the BCH's (including controlled subsidiaries) debt plus such new long-term debt does not exceed 40% of the sum of the NAV of the collateral underlying the loan portfolio of BCH and its subsidiaries plus cash on hand at Ben LP, BCH and its subsidiaries.

The Preferred Series A Subclass 1 Unit Accounts are recorded in the consolidated balance sheet in the redeemable noncontrolling interest line item.

*Class S Ordinary Units*

As of December 31, 2019, BCH, a subsidiary of Ben LP, had issued and outstanding 5.8 million Class S Ordinary Units, which were all outstanding on each of the respective dates. The Class S Ordinary Units participate on an as-converted basis pro-rata in the share of the profits or losses of BCH and subsidiaries following all other allocations made by BCH and its subsidiaries. As limited partner interests, these units have limited voting rights and do not entitle participation in the management of the Company's business and affairs. The Class S Ordinary Units are exchangeable for Common Units of Ben LP on a one-for-one basis, subject to customary conversion rate adjustments for splits, distributions and reclassifications, as well as compliance with any applicable vesting and transfer restrictions. Each conversion also results in the issuance to Ben LP of a Class A Unit of BCH for each Common Unit issued.

The Class S Ordinary Units are recorded in the consolidated balance sheet in the noncontrolling interests line item.

*Class S Preferred Units*

The limited partnership agreement of BCH allows it to issue Class S Preferred Units. The Class S Preferred Units are entitled to a quarterly preferred return that is limited by the quarterly preferred return rate cap described above for Preferred Series A Subclass 1 except for when annualized revenues exceed $140 million, the Class S Preferred return is based on a fraction (i) the numerator of which is (A) the positive percentage rate change, if any, to the seasonally adjusted CPI-U covering the period from the date of the last allocation of profits to such holders, plus (B) 0.75 percent, and (ii) the denominator of which is one minus the highest effective marginal combined U.S. federal, state and local income tax rate in effect as of the beginning of the fiscal quarter for which such determination is being made for an individual resident in New York City, New York, assuming (1) that the aggregate gross income allocable with respect to the quarterly preferred return for such fiscal year will consist of the same relative proportion of each type or character (e.g., long term or short term capital gain or ordinary or exempt income) of gross income item included in the aggregate gross income actually allocated in respect of the quarterly preferred return for the fiscal year reflected in the Ben Group Partnership's most recently filed IRS Form 1065 and (2) any state and local income taxes are not deductible against U.S. federal income tax. The Class S Preferred Units also participate on an as-converted basis pro-rata in the share of the profits or losses of BCH and subsidiaries following all other allocations made by BCH and its subsidiaries. As limited partner interests, these units are generally non-voting and do not entitle participation in the management of the Company's business and affairs. Generally, the Class S Preferred Units are exchangeable for Common Units in Ben LP on a 1.2-for-1 basis, subject to customary conversion rate adjustments for splits, distributions and reclassifications, as well as compliance with any applicable vesting and transfer restrictions. Each conversion also results in the issuance to Ben LP of a Class A Unit for each Common Unit issued. Holders of Class S Preferred Units may elect to convert into Class S Ordinary Units in connection with a sale or dissolution of BCH.

F-40

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

No amounts have been paid to the Class S Preferred Unit holders related to the preferred return from issuance through December 31, 2019. The Class S Preferred Units are recorded on the consolidated balance sheet in the noncontrolling interests line item.

**(16) Stock Incentive Plan**

We adopted our 2013 Stock Incentive Plan in March 2013, as amended on June 1, 2015, May 5, 2017 and May 8, 2018. The Stock Option Sub-Committee of our Compensation Committee of our Board of Directors is responsible for the administration of the plan. Participants under the plan may be granted incentive stock options and non-statutory stock options; stock appreciation rights; stock awards; restricted stock; restricted stock units; and performance shares. Eligible participants include officers and employees of GWG Holdings and its subsidiaries, members of our Board of Directors, and consultants. Option awards generally expire 10 years from the date of grant. As of December 31, 2019, 6,000,000 of our common stock options are authorized under the plan, of which 2,594,000 shares were reserved for issuance under outstanding incentive awards and 3,406,000 shares remain available for future grants.

*Stock Options*

As of December 31, 2019, we had outstanding stock options for 905,381 shares of common stock to employees, officers, and directors under the plan. Options for 673,341 shares have vested and the remaining options are scheduled to vest over three years. The options were issued with an exercise price between $4.83 and $11.56, which is equal to the market price of the shares on the date of grant. As of December 31, 2019, stock options for 1,195,705 shares had been forfeited and stock options for 777,364 shares had been exercised. The total intrinsic value of stock options exercised during 2019 was $0.3 million. The aggregate intrinsic value of stock options outstanding and exercisable at December 31, 2019 was $1.0 million and $0.8 million, respectively.

Outstanding stock options:

|  | Vested | Unvested | Total |
|---|---|---|---|
| **Balance as of December 31, 2017** | 857,192 | 779,756 | 1,636,948 |
| Granted during the year | 63,950 | 314,000 | 377,950 |
| Vested during the year | 503,503 | (503,503) | — |
| Exercised during the year | (569,864) | — | (569,864) |
| Forfeited during the year | (21,582) | (25,501) | (47,083) |
| **Balance as of December 31, 2018** | 833,199 | 564,752 | 1,397,951 |
| Granted during the year | — | 24,250 | 24,250 |
| Vested during the year | 197,859 | (197,859) | — |
| Exercised during the year | (53,001) | — | (53,001) |
| Forfeited during the year | (304,716) | (159,103) | (463,819) |
| **Balance as of December 31, 2019** | 673,341 | 232,040 | 905,381 |

F-41

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

We recognized $0.4 million and $1.3 million in expense related to stock options during 2019 and 2018, respectively. As of December 31, 2019, unrecognized compensation expense related to unvested options is $0.4 million. We expect to recognize this compensation expense over the next three years: $0.3 million in 2020, $0.1 million in 2021, and the remainder in 2022.

*Stock Appreciation Rights (SARs)*

As of December 31, 2019, we had outstanding SARs for 375,625 shares of common stock to employees. The strike price of the SARs was between $6.75 and $11.55, which was equal to the market price of the common stock at the date of issuance. SARs vest over varying terms of up to three years. As of December 31, 2019, 200,745 of the SARs were vested and 169,070 have been exercised. On December 31, 2019, the market price of GWG's common stock was $9.82.

Outstanding SARs:

|  | Vested | Unvested | Total |
|---|---|---|---|
| **Balance as of December 31, 2017** | 189,053 | 153,919 | 342,972 |
| Granted during the year | 2,625 | 111,025 | 113,650 |
| Vested during the year | 71,785 | (71,785) | — |
| Exercised during the year | (145,622) | — | (145,622) |
| Forfeited during the year | — | (39,235) | (39,235) |
| **Balance as of December 31, 2018** | 117,841 | 153,924 | 271,765 |
| Granted during the period | 4,250 | 130,650 | 134,900 |
| Vested during the period | 102,102 | (102,102) | — |
| Exercised during the period | (23,448) | — | (23,448) |
| Forfeited during the period | — | (7,592) | (7,592) |
| **Balance as of December 31, 2019** | 200,745 | 174,880 | 375,625 |

The liability for the SARs as of December 31, 2019 and 2018 was $0.6 million and $0.3 million, respectively, and was recorded within other accrued expenses in the consolidated balance sheets. Remaining compensation expense is expected to be recognized over the next three years. Employee compensation and benefits expense for SARs of $0.3 million was recorded for both years ended December 31, 2019 and 2018.

F-42

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Upon the exercise of SARs, the Company is obligated to make cash payment equal to the positive difference between the market value of the Company's common stock on the date of exercise less the market value of the common stock on the date of grant.

The following summarizes information concerning outstanding options and SARs issued under the 2013 Stock Incentive Plan:

| | December 31, 2019 | | | |
| --- | --- | --- | --- | --- |
| | Outstanding | Weighted-Average Exercise Price | Weighted-Average Remaining Life (years) | Fair Value at Grant Date |
| **Vested** | | | | |
| Stock Options | 673,341 | $ 8.88 | 6.83 | $ 2.21 |
| SARs | 200,745 | $ 8.81 | 4.49 | $ 2.09 |
| Total Vested | 874,086 | $ 8.87 | 6.29 | $ 2.18 |
| **Unvested** | | | | |
| Stock Options | 232,040 | $ 9.55 | 8.51 | $ 2.59 |
| SARs | 174,880 | $ 9.75 | 6.25 | $ 2.50 |
| Total Unvested | 406,920 | $ 9.64 | 7.54 | $ 2.55 |

| | December 31, 2018 | | | |
| --- | --- | --- | --- | --- |
| | Outstanding | Weighted-Average Exercise Price | Weighted-Average Remaining Life (years) | Fair Value at Grant Date |
| **Vested** | | | | |
| Stock Options | 833,199 | $ 8.88 | 5.95 | $ 2.02 |
| SARs | 117,841 | $ 8.88 | 5.02 | $ 2.02 |
| Total Vested | 951,040 | $ 8.88 | 5.83 | $ 2.02 |
| **Unvested** | | | | |
| Stock Options | 564,752 | $ 9.15 | 7.88 | $ 2.35 |
| SARs | 153,924 | $ 8.37 | 5.98 | $ 2.09 |
| Total Unvested | 718,676 | $ 8.98 | 7.47 | $ 2.30 |

*Restricted Stock Units*

A restricted stock unit ("RSU") entitles the holder thereof to receive one share of our common stock (or, in some circumstances, the cash value thereof) upon vesting. RSUs are subject to forfeiture until they vest. On June 18, 2019, we granted an aggregate of 114,366 RSUs to our directors, which RSUs are subject to time-based vesting and are scheduled to vest in their entirety on the one year anniversary of the grant date subject to the holder continuously remaining a director or employee of, or a consultant to, GWG or one of its subsidiaries through such date. On May 31, 2019, we granted RSUs to our Chief Executive Officer that are subject to performance-based vesting pursuant to a performance share unit agreement ("PSU Agreement"). The PSU Agreement provides for a target award grant of 129,717 RSUs, and up to a maximum of 259,434 RSUs, with each representing the right to receive one share of our common stock (or, following a Change-in-Control Transaction (as defined in the PSU Agreement), the cash value thereof) upon vesting, which is generally subject to the satisfaction of performance goals over a performance period commencing on April 26, 2019 and ending on December 31, 2021.

F-43

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

In the third quarter of 2019, a total of 375,000 RSUs held by employees vested entitling the holders thereof, collectively, to cash payments totaling $4.5 million, all of which were paid in the third and fourth quarters of 2019 and recognized in employee compensation and benefits in the consolidated statement of operations for the year ended December 31, 2019. Additionally during 2019, 53,403 RSUs vested and 26,701 shares of common stock were issued to employees, net of shares forfeited to satisfy tax withholding obligations.

Beneficient has various equity incentive plans. In 2019 and early 2020, Beneficient granted units to certain of its employees and directors under these plans. The Company expects the expense recognized related to these plans to be material. The holders of certain of these units, upon vesting, have the right to convert the units to shares GWG common stock per the Exchange Agreement discussed in Note 1. As such, units issued and vested under Beneficient's equity plans could result in dilution of GWG's common stock.

**(17) Other Expenses**

The components of other expenses in our consolidated statements of operations are as follows (in thousands):

|  | Years Ended December 31, | |
|  | 2019 | 2018 |
|---|---|---|
| Contract labor | $ 1,820 | $ 1,453 |
| Marketing | 1,612 | 1,856 |
| Information technology | 2,024 | 1,578 |
| Servicing and facility fees | 1,833 | 1,782 |
| Travel and entertainment | 1,218 | 892 |
| Insurance and regulatory | 5,032 | 1,562 |
| Bad debt expense | 153 | 4,300 |
| General and administrative | 2,204 | 2,572 |
| Total other expenses | $ 15,896 | $ 15,995 |

**(18) Income Taxes**

The components of our income tax expense (benefit) and the reconciliation at the statutory federal tax rate to our actual income tax expense (benefit) consisted of the following (in thousands):

|  | Years Ended December 31, | |
|  | 2019 | 2018 |
|---|---|---|
| Statutory federal income tax (benefit) | $ 34,869 | $ (25,085) |
| State income taxes (benefit), net of federal benefit | 13,486 | (9,243) |
| Change in valuation allowance | 9,671 | 33,999 |
| Other permanent differences | (93) | 329 |
| Total income tax expense (benefit) | $ 57,933 | $ — |

The current and deferred components of tax expense were as follows (in thousands):

|  | Years Ended December 31, | |
|  | 2019 | 2018 |
|---|---|---|
| Current income tax expense | $ 10 | $ — |
| Deferred income tax expense | 57,923 | — |
| Total income tax expense | $ 57,933 | $ — |

The Company's effective tax rate was 34.8% and 0.0% during 2019 and 2018, respectively. The 2019 effective tax rate was higher than the statutory rate primarily due to the deferred tax liability resulting from the gain on consolidation of equity method investment. The effective tax rate during 2018 was 0.0% as we did not generate taxable income.

F-44

APP. 334

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The effects of temporary differences that give rise to deferred income taxes were as follows (in thousands):

|  | December 31, | |
|---|---|---|
|  | **2019** | **2018** |
| Deferred tax assets: | | |
| Investment in life insurance policies | $ 37,649 | $ 23,132 |
| Net operating loss and business interest carryforwards | 18,935 | 10,491 |
| Other assets | 4,286 | 6,864 |
| Subtotal | 60,870 | 40,487 |
| Valuation allowance | (50,056) | (40,385) |
| Deferred tax assets | 10,814 | 102 |
| | | |
| Deferred tax liabilities: | | |
| Investment in partnership | (68,737) | — |
| Other liabilities | — | (102) |
| Net deferred tax asset (liability) | $ (57,923) | $ — |

At December 31, 2019 and 2018, we had federal and aggregate state net operating loss ("NOL") carryforwards of $28.6 million and $36.5 million, respectively. The NOL carryforwards will begin to expire in 2033. Future utilization of NOL carryforwards is subject to limitations under Section 382 of the Internal Revenue Code. This section generally relates to a more than 50 percent change in ownership over a three-year period. As a result of the Exchange Transaction, a change in ownership for income tax purposes occurred as of December 28, 2018. As such, the annual utilization of our net operating losses generated prior to the ownership change was limited. However, net unrealized built-in gains on our life insurance policies result in an increase in the Section 382 limit over the five-year recognition period, which resulted a nominal amount of current tax liability in 2019. Included in the deferred tax liability noted in the table above are our investments in Ben LP and InsurTech Holdings, which are partnerships for federal income tax purposes.

We provide for a valuation allowance when it is not considered "more likely than not" that our deferred tax assets will be realized. As of December 31, 2019, based on all available evidence, we have provided a valuation allowance of $50.1 million against our deferred tax assets due to the uncertainty as to the realization of our deferred tax assets during the carryforward periods. In 2019, valuation allowances were recorded against the total amount of non-permanent deferred tax assets. Permanent deferred tax assets of $10.8 million in 2019 were comprised of interest expense limitations under Section 163(j) and the tax-effected net operation loss ("NOL") created subsequent to 2018.

ASC 740, *Income Taxes*, requires the reporting of certain tax positions that do not meet a threshold of "more-likely-than-not" to be recorded as uncertain tax benefits. It is management's responsibility to determine whether it is "more-likely-than-not" that a tax position will be sustained upon examination, including resolution of any related appeals or litigation, based upon the technical merits of the position. Management has reviewed all income tax positions taken or expected to be taken and has determined that the income tax positions are appropriately stated and supported. We do not anticipate that the total unrecognized tax benefits will significantly change prior to December 31, 2020.

Under our accounting policies, interest and penalties on unrecognized tax benefits, as well as interest received from favorable tax settlements are recognized as components of income tax expense. At December 31, 2019 and 2018, we recorded no accrued interest or penalties related to uncertain tax positions.

Our income tax returns for tax years ended December 31, 2016 through 2018, and 2019, when filed, remain open to examination by the Internal Revenue Service and various state taxing jurisdictions. Our income tax return for tax year ended December 31, 2015 also remains open to examination by various state taxing jurisdictions.

**(19) Earnings (Loss) per Common Share**

The computations of basic and diluted income (loss) attributable to common shareholders per share for 2019 and 2018 are as follows (in thousands, except share data and per share data):

|  | Years Ended December 31, | |
|---|---|---|
|  | **2019** | **2018** |
| **Numerator:** | | |
| Basic – Net income (loss) attributable to common shareholders | $ 91,166 | $ (136,114) |
| Add: Preferred dividends upon conversion | 2,020 | — |
| Diluted – Net income (loss) attributable to common shareholders | 93,186 | (136,114) |
| | | |
| **Denominator:** | | |
| Basic – weighted average common shares outstanding | 33,016,007 | 6,098,208 |
| Effect of dilutive securities | 2,203,435 | — |
| Diluted – weighted average common shares outstanding | 35,219,442 | 6,098,208 |
| | | |
| Basic earnings (loss) per common share | $ 2.76 | $ (22.32) |

APP. 335

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 336 of 1031    PageID 508

Diluted earnings (loss) per common share | $ 2.65 | $ (22.32)

F-45

APP. 336

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

RPS and RPS 2 (as described in Note 15) and restricted stock units and stock options (as described in Note 16) were included in the calculation of diluted earnings per share for the year ended December 31, 2019. Options to purchase 437,266 shares of common stock were outstanding during 2019 but were excluded from the calculation of diluted earnings per share because their effects were anti-dilutive. RPS, RPS 2, restricted stock units and stock options were not included in the calculation of diluted earnings per share for the year ended December 31, 2018 because we recorded a net loss during that period and the effects were anti-dilutive.

**(20) Segment Reporting**

GWG has two reportable segments consisting of Secondary Life Insurance and Investment in Beneficient. Corporate & Other includes certain activities not allocated to specific business segments. These activities include holding company financing and investing activities, and management and administrative services to support the overall operations of the Company and from November 1, 2019, include our equity method investment in InsurTech Holdings.

The Secondary Life Insurance segment seeks to earn non-correlated yield from our portfolio of life insurance policies. Our Investment in Beneficient segment consists of our investment in the common units of Ben LP, which we accounted for using the equity method prior to December 31, 2019, and the Preferred Series A Subclass 1 Unit Account of BCH. Beneficient became a consolidated subsidiary of GWG as of December 31, 2019 as a result of the Investment and Exchange agreements described in Note 5. Ben LP provides a variety of trust services, liquidity products and loans for alternative assets and illiquid investment funds, and other financial services to mid-to-high net worth individuals. The Corporate & Other category consists of unallocated corporate overhead and administrative costs and the operations of operating segments that do not meet the quantitative criteria to be separately reported.

These segments are differentiated by the products and services they offer as well as by the information used by the Company's chief operating decision maker to determine allocation of resources and assess performance.

Earnings before taxes ("EBT") is the measure of profitability used by management to assess performance of its segments and allocate resources. Segment EBT represents net income (loss) excluding income taxes and includes earnings (loss) from equity method investments and gain on consolidation of equity method investment.

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| **Revenue:** | **2019** | | **2018** | |
| Secondary Life Insurance | $ | 78,002 | $ | (11,633) |
| Investment in Beneficient | | 13,738 | | 10,655 |
| Corporate & Other | | 536 | | 588 |
| Total | $ | 92,276 | $ | (390) |

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| **Interest Expense:** | **2019** | | **2018** | |
| Secondary Life Insurance | $ | 83,055 | $ | 69,357 |
| Investment in Beneficient | | 31,789 | | 10,778 |
| Corporate & Other | | — | | 1 |
| Total | $ | 114,844 | $ | 80,136 |

F-46

APP. 337

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

| | Years Ended December 31, | |
| --- | --- | --- |
| **Segment EBT:** | **2019** | **2018** |
| Secondary Life Insurance | $ (27,694) | $ (96,578) |
| Investment in Beneficient | 229,206 | (106) |
| Corporate & Other | (35,470) | (22,767) |
| Total | 166,042 | (119,451) |
| Income tax expense | 57,933 | - |
| Net income (loss) | $ 108,109 | $ (119,451) |

| | December 31, | |
| --- | --- | --- |
| **Total Assets:** | **2019** | **2018** |
| Secondary Life Insurance | $ 904,363 | $ 889,665 |
| Investment in Beneficient | 2,721,546 | 584,173 |
| Corporate & Other | 9,297 | 7,029 |
| Total | $ 3,635,206 | $ 1,480,867 |

The total assets of the Investment in Beneficient segment at December 31, 2019, includes goodwill of $2.4 billion which represents all of the goodwill on our consolidated balance sheet at December 31, 2019.

**(21) Leases**

The Company leases certain real estate for its office premises under operating lease agreements which expire in 2021 and 2025. Under these leases, we are obligated to pay base rent plus common area maintenance and a share of building operating costs. The lease agreements contain extension options which we have not included in our liability calculations. We lease various other facilities on a short-term basis.

The lease assets and liabilities are as follows (in thousands):

| Leases | Classification | December 31, 2019 |
| --- | --- | --- |
| Operating lease right-of-use assets | Other assets | $ 1,912 |
| Operating lease liabilities | Other accrued expenses | $ 2,540 |

Total lease costs recognized for the years ended December 31, 2019 and 2018 were $0.5 million and $0.4 million, respectively. These amounts included operating lease costs of $0.2 million, variable lease costs of $0.2 million, and short term lease costs of $0.1 million for the year ended December 31, 2019. The weighted average remaining lease term at December 31, 2019 was 4.2 years and the weighted average discount rate was 6.6%. For the year ended December 31, 2019 and 2018, cash paid for amounts included in the measurement of operating lease liabilities and included in operating cash flows totaled $0.3 million.

Maturities of operating lease liabilities as of December 31, 2019 are as follows (in thousands):

| | |
| --- | --- |
| 2020 | $ 998 |
| 2021 | 715 |
| 2022 | 302 |
| 2023 | 311 |
| 2024 | 320 |
| Thereafter | 273 |
| Total lease payments | 2,919 |
| Less: imputed interest | (379) |
| Present value of lease liabilities | $ 2,540 |

F-47

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The minimum aggregate operating lease commitments as of December 31, 2018 as reported under previous lease accounting standards were as follows (in thousands):

| | | |
|---|---|---:|
| 2019 | $ | 275 |
| 2020 | | 284 |
| 2021 | | 293 |
| 2022 | | 302 |
| 2023 | | 311 |
| Thereafter | | 593 |
| | $ | 2,058 |

**(22) Commitments and Contingencies**

*Litigation* — In the normal course of business, we are involved in various legal proceedings. In the opinion of management, any liability resulting from such proceedings would not have a material adverse effect on our financial position, results of operations or cash flows.

*Commitments* — GWG Holdings is committed to contribute an additional $17.9 million to InsurTech Holdings over the next two years, with $13.8 million in 2020 and $4.1 million in 2021. Beneficient had $73.8 million and $75.2 million of gross potential capital commitments as of December 31, 2019 and December 31, 2018, respectively, representing potential limited partner capital funding commitments on the alternative asset funds that serve as collateral to its loans. This is the amount above any existing cash reserves for such capital funding commitments.

**(23) Guarantee and Collateral Provisions of L Bonds and Seller Trust L Bonds**

Our L Bonds are offered and sold under a registration statement declared effective by the SEC, as described in Note 12, and we have issued Seller Trust L Bonds under a Supplemental Indenture, as described in Note 13. The L Bonds and Seller Trust L Bonds are secured by substantially all the assets of GWG Holdings, a pledge of all our common stock held by BCC and AltiVerse (which together represent approximately 12% of our outstanding common stock), and by a guarantee and corresponding grant of a security interest in substantially all the assets of GWG Life[1]. As a guarantor, GWG Life has fully and unconditionally guaranteed the payment of principal and interest on the L Bonds and Seller Trust L Bonds. GWG Life's equity in DLP IV[2] serves as collateral for our L Bond and Seller Trust L Bond obligations. Substantially all of our life insurance policies are held by DLP IV or GWG Life Trust ("the Trust"). The policies held by DLP IV are not direct collateral for the L Bonds as such policies are pledged to the second amended and restated senior credit facility with LNV Corporation.

[1] The Seller Trust L Bonds are senior secured obligations of GWG, ranking junior to all senior debt of GWG (see Note 11), and pari passu in right of payment and in respect of collateral with all L Bonds of GWG (see Note 12). Payments under the Seller Trust L Bonds are guaranteed by GWG Life. The assets exchanged in the in connection with the Beneficent transaction are available as collateral for all holders of the L Bonds and Seller Trust L Bonds. Specifically, the common units of Ben LP are held by GWG Holdings and the Commercial Loan is held by GWG Life.

[2] The terms of our second amended and restated senior credit facility with LNV Corporation require that we maintain a significant excess of pledged collateral value over the amount outstanding on the second amended and restated senior credit facility at any given time. Any excess after satisfying all amounts owing under our second amended and restated senior credit facility with LNV Corporation is available as collateral for the L Bonds (including the Seller Trust L Bonds).

The following represents consolidating financial information as of December 31, 2019 and 2018, with respect to the financial position, and as of December 31, 2019 and 2018, with respect to results of operations and cash flows of GWG Holdings and its subsidiaries. The parent column presents the financial information of GWG Holdings, the primary obligor for the L Bonds and Seller Trust L Bonds. The guarantor subsidiary column presents the financial information of GWG Life, the guarantor subsidiary of the L Bonds and Seller Trust L Bonds, presenting its investment in DLP IV and the Trust under the equity method. The non-guarantor subsidiaries column presents the financial information of all non-guarantor subsidiaries, including DLP IV and the Trust.

F-48

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(23) Guarantee of L Bonds and Seller Trust L Bonds** (continued)

Consolidating Balance Sheets (in thousands)

| December 31, 2019 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash and cash equivalents | $ 57,721 | $ 2,644 | $ 18,708 | $ — | $ 79,073 |
| Restricted cash | — | — | 20,258 | — | 20,258 |
| Investment in life insurance policies, at fair value | — | 340 | 795,699 | — | 796,039 |
| Life insurance policy benefits receivable, net | — | 200 | 22,831 | — | 23,031 |
| Investment in GWG stock | — | — | 24,550 | (24,550) | — |
| Loan receivables | — | — | 232,344 | — | 232,344 |
| Fees receivable | — | — | 29,168 | — | 29,168 |
| Financing receivable from affiliates | — | 235,573 | — | (168,420) | 67,153 |
| Equity method investment | 384,264 | — | — | (382,503) | 1,761 |
| Other assets | 62,354 | 320,490 | 22,163 | (376,633) | 28,374 |
| Goodwill | — | — | 2,358,005 | — | 2,358,005 |
| Investment in subsidiaries | 1,221,227 | 664,723 | — | (1,885,950) | — |
| TOTAL ASSETS | $ 1,725,566 | $ 1,223,970 | $ 3,523,726 | $ (2,838,056) | $ 3,635,206 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | | | | |
| LIABILITIES | | | | | |
| Senior credit facility with LNV Corporation | $ — | $ — | $ 174,390 | $ — | $ 174,390 |
| L Bonds | 926,638 | — | — | — | 926,638 |
| Seller Trust L Bonds | 366,892 | — | — | — | 366,892 |
| Other borrowings | — | — | 153,086 | — | 153,086 |
| Intercompany debt – commercial loan | — | — | 168,420 | (168,420) | — |
| Interest and dividends payable | 12,491 | — | 4,025 | — | 16,516 |
| Deferred revenue | — | — | 41,444 | — | 41,444 |
| Account payable and accrued expenses | 3,093 | 3,891 | 78,455 | (57,603) | 27,836 |
| Deferred tax liability | 57,923 | — | — | — | 57,923 |
| TOTAL LIABILITIES | 1,367,037 | 3,891 | 619,820 | (226,023) | 1,764,725 |
| Redeemable noncontrolling interests | — | — | 1,588,604 | (318,950) | 1,269,654 |
| STOCKHOLDERS' EQUITY | | | | | |
| Member capital | — | 1,220,079 | 665,871 | (1,885,950) | — |
| Common units | — | — | 563,966 | (563,966) | — |
| Redeemable preferred stock and Series 2 redeemable preferred stock | 201,891 | — | — | — | 201,891 |
| Common stock | 33 | — | — | — | 33 |
| Treasury stock | — | — | — | (24,550) | (24,550) |
| Additional paid-in capital | 233,106 | — | — | — | 233,106 |
| Accumulated deficit | (76,501) | — | — | — | (76,501) |
| Noncontrolling interests | — | — | 85,465 | 181,383 | 266,848 |
| TOTAL STOCKHOLDERS' EQUITY | 358,529 | 1,220,079 | 1,315,302 | (2,293,083) | 600,827 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ 1,725,566 | $ 1,223,970 | $ 3,523,726 | $ (2,838,056) | $ 3,635,206 |

F-49

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(23) Guarantee of L Bonds and Seller Trust L Bonds** (continued)

Consolidating Balance Sheets (continued)

| December 31, 2018 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash and cash equivalents | $ 113,294 | $ 232 | $ 1,061 | $ — | $ 114,587 |
| Restricted cash | — | 7,217 | 3,632 | — | 10,849 |
| Investment in life insurance policies, at fair value | — | 92,336 | 655,586 | — | 747,922 |
| Life insurance policy benefits receivable, net | — | 5,000 | 11,461 | — | 16,461 |
| Financing receivables from affiliates | — | 184,769 | — | — | 184,769 |
| Equity method investment | 360,842 | — | — | — | 360,842 |
| Other assets | 42,944 | 1,731 | 762 | — | 45,437 |
| Investment in subsidiaries | 799,182 | 510,865 | — | (1,310,047) | — |
| TOTAL ASSETS | $ 1,316,262 | $ 802,150 | $ 672,502 | $ (1,310,047) | $ 1,480,867 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | | | | |
| LIABILITIES | | | | | |
| Senior credit facility with LNV Corporation | $ — | $ — | $ 148,978 | $ — | $ 148,978 |
| L Bonds | 651,403 | — | — | — | 651,403 |
| Seller Trust L Bonds | 366,892 | — | — | — | 366,892 |
| Interest and dividends payable | 14,047 | — | 4,508 | — | 18,555 |
| Accounts payable and accrued expenses | 2,862 | 3,267 | 7,852 | — | 13,981 |
| TOTAL LIABILITIES | 1,035,204 | 3,267 | 161,338 | — | 1,199,809 |
| STOCKHOLDERS' EQUITY | | | | | |
| Member capital | — | 798,883 | 511,164 | (1,310,047) | — |
| Redeemable preferred stock and Series 2 redeemable preferred stock | 215,973 | — | — | — | 215,973 |
| Common stock | 33 | — | — | — | 33 |
| Additional paid-in capital | 249,662 | — | — | — | 249,662 |
| Accumulated deficit | (184,610) | — | — | — | (184,610) |
| TOTAL STOCKHOLDERS' EQUITY | 281,058 | 798,883 | 511,164 | (1,310,047) | 281,058 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ 1,316,262 | $ 802,150 | $ 672,502 | $ (1,310,047) | $ 1,480,867 |

F-50

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(23) Guarantee of L Bonds and Seller Trust L Bonds** (continued)

Consolidating Statements of Operations (in thousands)

| For the year ended December 31, 2019 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUE | | | | | |
| Gain on life insurance policies, net | $ — | $ 6,889 | $ 68,431 | $ — | $ 75,320 |
| Interest and other income | 2,090 | 13,738 | 1,128 | — | 16,956 |
| TOTAL REVENUE | 2,090 | 20,627 | 69,559 | — | 92,276 |
| | | | | | |
| EXPENSES | | | | | |
| Interest expense | 98,535 | — | 16,309 | — | 114,844 |
| Employee compensation and benefits | 17,699 | 9,103 | 1,507 | — | 28,309 |
| Legal and professional fees | 8,322 | 1,392 | 3,110 | — | 12,824 |
| Other expenses | 11,283 | 1,983 | 2,630 | — | 15,896 |
| TOTAL EXPENSES | 135,839 | 12,478 | 23,556 | — | 171,873 |
| | | | | | |
| INCOME (LOSS) BEFORE EQUITY IN INCOME OF SUBSIDIARIES | (133,749) | 8,149 | 46,003 | — | (79,597) |
| | | | | | |
| EQUITY IN INCOME OF SUBSIDIARIES | 31,322 | 51,362 | — | (82,684) | — |
| | | | | | |
| NET INCOME (LOSS) BEFORE INCOME TAXES | (102,427) | 59,511 | 46,003 | (82,684) | (79,597) |
| | | | | | |
| INCOME TAX EXPENSE | 57,933 | — | — | — | 57,933 |
| | | | | | |
| NET INCOME (LOSS) BEFORE EARNINGS FROM EQUITY METHOD INVESTMENT | (160,360) | 59,511 | 46,003 | (82,684) | (137,530) |
| | | | | | |
| Earnings (loss) from equity method investment | (4,077) | — | — | — | (4,077) |
| Gain on consolidation of equity method investment | 272,546 | (22,830) | — | — | 249,716 |
| NET INCOME (LOSS) | 108,109 | 36,681 | 46,003 | (82,684) | 108,109 |
| | | | | | |
| Preferred stock dividends | 16,943 | — | — | — | 16,943 |
| NET INCOME (LOSS) ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ 91,166 | $ 36,681 | $ 46,003 | $ (82,684) | $ 91,166 |

F-51

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(23) Guarantee of L Bonds and Seller Trust L Bonds** (continued)

Consolidating Statements of Operations (continued)

| For the year ended December 31, 2018 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUE | | | | | |
| Gain (loss) on life insurance policies, net | $ — | $ 8,340 | $ (22,445) | $ — | $ (14,105) |
| Interest and other income | 8,586 | 4,280 | 849 | — | 13,715 |
| TOTAL REVENUE | 8,586 | 12,620 | (21,596) | — | (390) |
| | | | | | |
| EXPENSES | | | | | |
| Interest expense | 59,112 | — | 21,024 | — | 80,136 |
| Employee compensation and benefits | 9,980 | 5,742 | 1,685 | — | 17,407 |
| Legal and professional fees | 1,795 | 864 | 2,882 | — | 5,541 |
| Other expenses | 6,908 | 1,995 | 7,092 | — | 15,995 |
| TOTAL EXPENSES | 77,795 | 8,601 | 32,683 | — | 119,079 |
| | | | | | |
| INCOME (LOSS) BEFORE EQUITY IN INCOME OF SUBSIDIARIES | (69,209) | 4,019 | (54,279) | — | (119,469) |
| | | | | | |
| EQUITY IN INCOME OF SUBSIDIARIES | (50,260) | (48,666) | — | 98,926 | — |
| | | | | | |
| NET INCOME (LOSS) BEFORE INCOME TAXES | (119,469) | (44,647) | (54,279) | 98,926 | (119,469) |
| | | | | | |
| INCOME TAX EXPENSE | — | — | — | — | — |
| | | | | | |
| NET INCOME (LOSS) BEFORE EARNINGS FROM EQUITY METHOD INVESTMENT | (119,469) | (44,647) | (54,279) | 98,926 | (119,469) |
| | | | | | |
| Earnings from equity method investment | 18 | — | — | — | 18 |
| NET INCOME (LOSS) | (119,451) | (44,647) | (54,279) | 98,926 | (119,451) |
| | | | | | |
| Preferred stock dividends | 16,663 | — | — | — | 16,663 |
| NET INCOME (LOSS) ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ (136,114) | $ (44,647) | $ (54,279) | $ 98,926 | $ (136,114) |

F-52

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(23) Guarantee of L Bonds and Seller Trust L Bonds** (continued)

Consolidating Statements of Cash Flows (in thousands)

| For the year ended December 31, 2019 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiary | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | |
| Net income (loss) | $ 108,109 | $ 36,681 | $ 46,003 | $ (82,684) | $ 108,109 |
| Adjustments to reconcile net income (loss) to net cash flows used in operating activities: | | | | | |
| Equity of subsidiaries | (31,322) | (51,362) | — | 82,684 | — |
| Change in fair value of investment in life insurance policies | — | (9,477) | (39,538) | — | (49,015) |
| Amortization of deferred financing and issuance costs | 12,727 | — | 1,077 | — | 13,804 |
| Amortization of discount or premium on financing receivables | — | (1,720) | — | — | (1,720) |
| Provision for uncollectible policy benefit receivable | — | — | 153 | — | 153 |
| Earnings from equity method investments | 4,077 | — | — | — | 4,077 |
| Stock-based compensation | 1,732 | — | — | — | 1,732 |
| Gain on consolidation of equity method investment | (272,546) | 22,830 | — | — | (249,716) |
| Deferred income taxes | 57,923 | — | — | — | 57,923 |
| (Increase) decrease in operating assets: | | | | | |
| Life insurance policy benefits receivable | — | 4,800 | (11,483) | — | (6,683) |
| Interest receivable added to commercial loan principal | — | (6,913) | — | — | (6,913) |
| Other assets | (1,079) | 194 | (4,171) | — | (5,056) |
| Increase (decrease) in operating liabilities: | | | | | |
| Accounts payable and other accrued expenses | (1,173) | (296) | (6,828) | — | (8,297) |
| Interest and dividends payable | (746) | — | (482) | — | (1,228) |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (122,298) | (5,263) | (15,269) | — | (142,830) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | |
| Investment in life insurance policies | — | (8,682) | (23,685) | — | (32,367) |
| Carrying value of matured life insurance policies | — | 3,403 | 29,862 | — | 33,265 |
| Equity investment acquired | (12,388) | — | — | — | (12,388) |
| Business combination consideration, net of cash acquired | (79,030) | — | 17,551 | — | (61,479) |
| Other investments acquired | — | (65,000) | — | — | (65,000) |
| Payment of capital contributions | (72,217) | 4,256 | — | 67,961 | — |
| NET CASH FLOWS PROVIDED BY (USED IN) INVESTING ACTIVITIES | (163,635) | (66,023) | 23,728 | 67,961 | (137,969) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | | |
| Borrowings on senior debt | — | — | 50,133 | — | 50,133 |
| Repayments of senior debt | — | — | (23,756) | — | (23,756) |
| Payments for senior debt issuance costs | — | — | (2,042) | — | (2,042) |
| Proceeds from issuance of L Bonds | 403,397 | — | — | — | 403,397 |
| Payments for L Bonds issuance costs | (25,284) | — | — | — | (25,284) |
| Payments for redemption of L Bonds | (116,809) | — | — | — | (116,809) |
| Issuance of common stock | 59 | — | — | — | 59 |
| Payments for redemption of redeemable preferred stock | (14,061) | — | — | — | (14,061) |
| Preferred stock dividends | (16,943) | — | — | — | (16,943) |
| Issuance of member capital | — | 66,481 | 1,480 | (67,961) | — |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 230,359 | 66,481 | 25,815 | (67,961) | 254,694 |
| NET INCREASE (DECREASE) IN CASH, CASH EQUIVALENTS AND RESTRICTED CASH | (55,574) | (4,805) | 34,274 | — | (26,105) |
| **CASH, CASH EQUIVALENTS AND RESTRICTED CASH** | | | | | |
| BEGINNING OF THE PERIOD | 113,294 | 7,449 | 4,693 | — | 125,436 |

APP. 344

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 345 of 1031    PageID 517

| END OF THE PERIOD | $ | 57,720 | $ | 2,644 | $ | 58,967 | $ | 99,331 |

F-53

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(23) Guarantee of L Bonds and Seller Trust L Bonds** (continued)

Consolidating Statements of Cash Flows (continued)

| For the year ended December 31, 2018 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiary | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | |
| Net income (loss) | $ (119,451) | $ (44,647) | $ (54,279) | $ 98,926 | $ (119,451) |
| Adjustments to reconcile net income (loss) to net cash flows used in operating activities: | | | | | |
| Equity of subsidiaries | 50,260 | 48,666 | — | (98,926) | — |
| Change in fair value of investment in life insurance policies | — | (4,263) | 14,607 | — | 10,344 |
| Amortization of deferred financing and issuance costs | 8,982 | — | 1,055 | — | 10,037 |
| Amortization of discount or premium on financing receivables | 628 | (642) | — | — | (14) |
| Provision for uncollectible policy benefit receivable | — | — | 4,300 | — | 4,300 |
| Earnings from equity method investment | (18) | — | — | — | (18) |
| Stock-based compensation | 2,182 | — | — | — | 2,182 |
| (Increase) decrease in operating assets: | | | | | |
| Life insurance policy benefits receivable | — | (3,500) | (602) | — | (4,102) |
| Interest receivable added to loan principal | (7,046) | (3,488) | — | — | (10,534) |
| Other assets | (188,365) | (144,147) | 4,372 | 332,546 | 4,406 |
| Increase (decrease) in operating liabilities: | | | | | |
| Accounts payable and other accrued expenses | (55) | 812 | 3,345 | — | 4,102 |
| Interest and dividends payable | 4,025 | — | (756) | | 3,269 |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (248,858) | (151,209) | (27,958) | 332,546 | (95,479) |
| | | | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | |
| Investment in life insurance policies | — | (41,404) | (87,099) | — | (128,503) |
| Carrying value of matured life insurance policies | — | 4,424 | 16,340 | — | 20,764 |
| Equity method investments | (3,204) | — | — | — | (3,204) |
| Other investments acquired | (3,037) | — | — | — | (3,037) |
| NET CASH FLOWS PROVIDED BY (USED IN) INVESTING ACTIVITIES | (6,241) | (36,980) | (70,759) | — | (113,980) |
| | | | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | | |
| Borrowings on senior debt | — | — | 12,903 | — | 12,903 |
| Repayments of senior debt | — | — | (77,219) | — | (77,219) |
| Proceeds from issuance of L Bonds | 263,965 | — | — | — | 263,965 |
| Payments for L Bonds issuance costs | (17,379) | — | — | — | (17,379) |
| Payments for redemption of L Bonds | (48,027) | — | — | — | (48,027) |
| Issuance of common stock | 614 | — | — | — | 614 |
| Proceeds from issuance of convertible preferred stock | 50,000 | — | — | — | 50,000 |
| Proceeds from issuance of redeemable preferred stock | 56,238 | — | — | — | 56,238 |
| Payments for redeemable preferred stock issuance costs | (4,142) | — | — | — | (4,142) |
| Payments for redemption of redeemable preferred stock | (2,457) | — | — | — | (2,457) |
| Common stock dividends | (25,709) | — | — | — | (25,709) |
| Preferred stock dividends | (16,663) | — | — | — | (16,663) |
| Issuance of member capital | — | 184,784 | 147,762 | (332,546) | — |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 256,440 | 184,784 | 83,446 | (332,546) | 192,124 |
| | | | | | |
| NET INCREASE (DECREASE) IN CASH, CASH EQUIVALENTS AND RESTRICTED CASH | 1,341 | (3,405) | (15,271) | — | (17,335) |
| | | | | | |
| **CASH, CASH EQUIVALENTS AND RESTRICTED CASH** | | | | | |
| BEGINNING OF THE PERIOD | 111,953 | 10,854 | 19,964 | — | 142,771 |
| | | | | | |
| END OF THE PERIOD | $ 113,294 | $ 7,449 | $ 4,693 | $ — | $ 125,436 |

APP. 346

APP. 347

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(24) Concentration**

We primarily purchase life insurance policies written by life insurance companies having investment-grade ratings by independent rating agencies. As a result, there may be certain concentrations of policies with life insurance companies. The following summarizes the face value of insurance policies with specific life insurance companies exceeding 10% of the total face value held by our portfolio.

| Life Insurance Company | December 31, 2019 | December 31, 2018 |
|---|---|---|
| John Hancock | 14.23% | 13.71% |
| Lincoln National | 11.55% | 11.33% |
| AXA Equitable | 10.63% | 10.83% |

The following summarizes the number of insurance policies held in specific states exceeding 10% of the total face value held by us:

| State of Residence | December 31, 2019 | December 31, 2018 |
|---|---|---|
| California | 17.46% | 18.02% |
| Florida | 14.86% | 15.34% |

Beneficient's underlying portfolio companies primarily operate in the United States, with the largest percentage, based on NAV, operating in healthcare technology, bio-technology, and diversified telecommunications services industries.

**(25) Related Parties**

*Relationship with Beneficient Management Counselors, L.L.C.*

Beneficient Management is the general partner of Ben LP and is governed by a board of directors. The governing document of BMLLC provides that Beneficient Management Counselors, L.L.C. ("BMC"), wholly owned by one of several Related Entities, determine the directors of Beneficient Management who fill 30% of the Board seats. BMC is also entitled to select (a) 50% of the membership of Beneficient Management's Nominating Committee and Executive Committee and appoint the chair of each of these committees, (b) 50% of the membership of the Community Reinvestment Committee (CRC), and (c) the CRC's chairperson, vice-chairperson, and lead committee member. Certain decisions with respect to Ben LP's charitable giving program are delegated to the CRC. Decisions regarding appointment and removal of Beneficient Management's directors, other than directors appointed by BMC, and GWG Holdings, are delegated, with certain exceptions, to the Nominating Committee of Beneficient Management, of which an executive of a Related Entity is a member and Chairman. In the event of a tie vote of the Nominating Committee on a vote for the removal of a director, the Chairman of the Nominating Committee may cast the tie-breaking vote.

F-55

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Services Agreement with Bradley Capital Company, L.L.C.*

Ben LP is the general partner of BCH and together they entered into an agreement with Bradley Capital Company, L.L.C. ("Bradley Capital") and BMC effective June 1, 2017 (the "Bradley Capital Agreement"). Bradley Capital is indirectly owned by a Related Entity. Under the Bradley Capital Agreement, Bradley Capital is entitled to a current base fee of $0.4 million per quarter for executive-level services provided by an executive of Bradley Capital, who is Beneficient's Chief Executive Officer and Chairman of GWG Holdings' and Beneficient Management's board of directors, together with a current supplemental fee of $0.2 million per quarter for administrative and financial analysis, subject to an annual inflation adjustment. The base fee may be increased up to two times the initial base fee per quarter if the scope of the services is expanded with the approval of the Executive Committee of the board of Beneficient Management, of which an executive of a Related Entity is a member and Chairman. An executive of a Related Entity receives an annual salary from the Company of $0.2 million and both an executive of a Related Entity and other employees of Bradley Capital can participate in equity incentive plans sponsored by the Company. The Bradley Capital Agreement also includes a payment from Ben LP of $0.2 million per year, paid quarterly, to cover ongoing employee costs for retired and/or departed employees of predecessor entities prior to September 1, 2017, which on-going costs were assumed by Bradley Capital, as well as a further payment to Bradley Capital in respect of the cost of health and retirement benefits for current employees of Bradley Capital all of which are reimbursed by Ben LP. Ben LP is also required to reimburse Bradley Capital for out-of-pocket expenses incurred by Bradley Capital employees, including reimbursement for private travel including the family members of a designated executive of a Related Entity for both business and personal use. The Bradley Capital Agreement requires Ben LP to reimburse Bradley Capital or its affiliates for taxes, fees, and expenses, including legal fees and related costs, relating to the contributions by affiliates of Bradley Capital of equity or debt interests in Ben LP to public charitable trusts in connection with the Exchange Trusts, as well as the contribution of beneficial interests in client trusts administered by Beneficient. Additionally, the Company provides office space and access to needed technology systems and telephony services. Payments by Ben LP to Bradley Capital and its affiliates are guaranteed and subject to enforcement by the state courts in Delaware in the event of default. The Bradley Capital Agreement extends through July 2021, with an annual one-year renewal provision thereafter. The Bradley Capital Agreement may be terminated by unanimous approval of the Executive Committee of the board of Beneficient Management of which an executive of a Related Entity is a member, or without such approval if the Related Entity no longer holds $10.0 million of Ben's securities.

*Relationship with Beneficient Holdings, Inc.*

The Beneficient Company Group (USA), L.L.C. ("Beneficient USA"), a subsidiary of BCH, entered into a Services Agreement with BHI effective July 1, 2017 (the "BHI Services Agreement"). BHI is indirectly owned by a Related Entity and is an affiliate of Beneficient. BHI pays an annual fee of $30 to Ben LP for the provision of trust administration services for a Related Entity and all trusts affiliated with its family trustee as that term is defined in the governing documents for a Related Entity. Beneficient USA also is required to provide any other services requested by BHI, subject to any restrictions in the operating agreement of BHI, at cost. The term of the BHI Services Agreement extends for the longer of (i) five years past the expiration or termination of the Bradley Capital Agreement, or (ii) seven years after the family trustee of the Related Entity is no longer a primary beneficiary of any trust affiliated with the family trustee.

BHI owns the majority of the Class S Ordinary Units, Preferred Series A Subclass 1 Unit Accounts, and FLP Subclass 1 Unit Accounts issued by BCH. Additionally, Ben LP, through its subsidiary, BCC, was the borrower of $72.0 million from BHI under the second lien credit agreement discussed in Note 14 that was subsequently assigned to HCLP.

*Administrative Services Agreement between Constitution Private Capital Company, L.L.C. ("Constitution") and Beneficient USA*

Constitution is an entity owned 50.5% by a Related Entity and 49.5% by an entity controlled by our board of directors. It was founded in 1986 and acquired by a Related Entity in 1996. Constitution currently manages three private equity fund-of-funds. Effective January 1, 2017, Constitution entered into an Administrative Services Agreement (the "ASA") with Beneficient USA, which is wholly owned by BACC and a subsidiary of BCH, whereby Beneficient USA provides personnel to administer the portfolio assets advised by Constitution. Under the ASA, Constitution pays to Beneficient USA a monthly fee equal to .01% of the month-end net assets of its portfolio. The ASA automatically renews on an annual basis and may be terminated at any time by Constitution. Beneficient USA may only terminate the ASA in the event of a breach by Constitution.

F-56

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Preferred Provider Liquidity Agreement with Constitution*

In May 2019, BCC entered into an agreement with Constitution (the "Preferred Liquidity Provider Agreement") under which at Constitution's option, BCC will provide liquidity to alternative asset funds sponsored by Constitution at an advance rate of not less than 82% of NAV, to the extent such funds meet certain specified qualifications. For a fund to qualify for the liquidity option, it must, among other things, hold investments that were approved or deemed approved by BCC at the time a fund makes such investments. BCC is required to provide liquidity in any combination, at its discretion, of cash, U.S. exchange traded funds registered under the Investment Company Act of 1940, or securities traded on a national securities exchange. BCC's obligation under the Preferred Liquidity Provider Agreement is guaranteed by Ben LP and BCH. The Preferred Provider Liquidity Agreement may be terminated solely by mutual consent of Ben and Constitution. Ben and Constitution have not contracted for any liquidity under this agreement through December 31, 2019.

*Relationship with The Heppner Endowment for Research Organizations, L.L.C. and Research Ranch Operating Company, L.L.C (collectively "HERO").*

HERO is owned indirectly by a Related Entity. Its purposes are (i) to serve as an advisor to National Philanthropic Trust ("NPT"), an unrelated third-party charitable organization, regarding the disbursement of research grants to qualifying organizations, (ii) to serve as an advisor to NPT regarding the administration of charitable contributions made for the benefit of multiple Texas universities and (iii) to provide funding and operational support for the research activities conducted by those Texas universities. Both HERO and the charitable organizations administered by NPT (the beneficiaries of which are multiple Texas universities) receive proceeds from trusts settled and funded by clients of Beneficient. The funding received by NPT is used to fund the research projects of the Texas universities. The funding received by HERO may be used, in HERO's discretion, to (i) provide appropriate facilities and properties for the Texas universities to utilize as part of their research endeavors (those properties and facilities being owned by a Related Entity), and (ii) provide fee revenue to HERO. HERO is granted such rights and authority pursuant to trust instruments entered into between a client and subsidiaries of Beneficient as well as an agreement between HERO and NPT. Beneficient's subsidiaries provide financing to the trusts established by the clients and Beneficient is paid as an agent of the trustees for administrative services it provides to the trusts.

*Relationship with Hicks Holdings L.L.C.*

Hicks Holdings L.L.C. ("Hicks Holdings"), an entity related to Thomas O. Hicks, who is a Beneficient Management and GWG Holdings director, owns a Preferred Series A Subclass 1 Unit Account and Class S Ordinary Units issued by BCH with a total initial balance of $60.4 million. Hicks Holdings was granted its Preferred Series A Subclass 1 Unit Account and Class S Ordinary Units as compensation for services provided under a previous advisory and consulting services agreement between Beneficient and Hicks Holdings which terminated on June 30, 2018.

*Services provided by representatives of Ben and the trusts associated with the loans*

An independent party currently serves as trustee for the LiquidTrusts and certain of the other trusts in the associated EXAlt Plan$^{TM}$ that are created at origination for each of our loans. Beneficient earns administration fees (for providing administrative serves to the trustee) and interest income from these trusts. Previously, an employee of Beneficient and another individual served as co-trustees for these trusts. The employee received no compensation for their services as co-trustee.

**(26) Subsequent Events**

In December 2019, a novel strain of coronavirus ("COVID-19") was first reported in Wuhan, China. Less than four months later, on March 11, 2020, the World Health Organization declared COVID-19 a pandemic. The extent of COVID-19's effect on the Company's operational and financial performance will depend on future developments, including the duration, spread and intensity of the pandemic, all of which are uncertain and difficult to predict considering the rapidly evolving landscape. As a result, it is not currently possible to ascertain the overall impact of COVID-19 on the Company's business. However, if the pandemic continues to evolve into a severe worldwide health crisis, the disease could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

Subsequent to December 31, 2019 through March 23, 2020, policy benefits on 18 policies covering 15 individuals have been realized. The face value of insurance benefits of these policies was $24.2 million.

Subsequent to December 31, 2019 through March 23, 2020, we have issued approximately $105.0 million of L Bonds.

F-57

**ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE.**

There have been no changes in or disagreements with accountants on accounting and financial disclosure.

**ITEM 9A. CONTROLS AND PROCEDURES.**

**Evaluation of Disclosure Controls and Procedures**

We maintain disclosure controls and procedures designed to provide reasonable assurance that information required to be disclosed in our reports filed pursuant to the Securities Exchange Act of 1934 is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance the objectives of the control system are met.

As of December 31, 2019, our Chief Executive Officer and Chief Financial Officer carried out an evaluation of the effectiveness of our disclosure controls and procedures as such term is defined in Rule 13a-15(e) under the Securities and Exchange Act of 1934, as of the end of the period covered by this report. Based on that evaluation, Our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective.

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting identified in connection with management's evaluation pursuant to Rules 13a-15(d) or 15d-15(d) of the Securities Exchange Act of 1934 during the fourth quarter of 2019 that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rule 13a-15(f) under the Securities and Exchange Act of 1934.

The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that:

(i) Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company;

(ii) Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are in accordance with authorizations of management and directors of the company; and

<div align="center">Page 71</div>

(iii) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with policies or procedures may deteriorate.

Under the supervision of the Audit Committee of the Board of Directors and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting using the criteria established in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on our assessment and those criteria, management concluded that our internal control over financial reporting as of December 31, 2019 was effective.

The Company's independent registered public accounting firm has audited the Company's internal control over financial reporting as of December 31, 2019, as stated in the Report of Independent Registered Public Accounting Firm, appearing under Item 8.

**ITEM 9B. OTHER INFORMATION.**

None.

Page 72

## PART III

### ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE.

The following paragraphs provide information as of the date of this report about each of our current directors and executive officers.

We currently have two "executive officers" as defined by the SEC. Our bylaws permit a maximum of fifteen directors, and our board of directors currently consists of nine members. The table below presents our executive officers and directors:

| Name | Age | Positions |
| --- | --- | --- |
| Murray T. Holland | 66 | President and Chief Executive Officer |
| Timothy L. Evans | 40 | Chief Financial Officer |
| Brad K. Heppner[1] | 54 | Director, Chairman of the Board |
| Roy W. Bailey[2] | 66 | Director |
| Peter T. Cangany, Jr.[1] | 62 | Director |
| David F. Chavenson[3] | 67 | Director |
| Thomas O. Hicks[1] | 74 | Director |
| Dennis P. Lockhart[3] | 73 | Director |
| Bruce W. Schnitzer[1] | 75 | Director |
| Roger T. Staubach[1] | 78 | Director |
| David H. de Weese[1] | 77 | Director |

(1) Appointed to our Board of Directors upon the closing of the Purchase and Contribution Transaction, which occurred on April 26, 2019.
(2) Appointed to our Board of Directors on March 16, 2020
(3) Appointed to our Board of Directors on May 13, 2019.

The biographies of the above-identified individuals are set forth below:

*Murray T. Holland* has served as our President and Chief Executive Officer since April 26, 2019. In 2001, Mr. Holland became an original investor and consultant for MHT Partners, a boutique investment banking firm based in Dallas, Texas with a number of offices in the United States. From 2013 until recently, he was Managing Director of MHT Partners. Mr. Holland resigned from this position in connection with the Transaction. Prior to MHT, he was CEO and principal shareholder of Convergent Media Systems (Atlanta), a $100 million custom network outsourcing firm with approximately 300 employees, CEO and principal shareholder of Convergent Group Corporation (Denver), a $200 million geographic information systems software and integration firm with approximately 450 employees, and CEO and principal shareholder of BTI Americas (Chicago), a $2.7 billion business travel agency with approximately 4,400 employees. EDS was his principal business partner in these ventures. Prior to that, Mr. Holland was a partner at the law firm of Akin, Gump, Strauss, Hauer & Feld (Dallas) in corporate finance and securities, a Senior Vice President of Credit Suisse First Boston (New York and Dallas) in Mergers and Acquisitions and a Managing Director of Kidder, Peabody & Co. (New York) in Mergers and Acquisitions. He graduated from Washington and Lee University with a B.S. in 1975, University of Virginia Graduate School of Business Administration with an M.B.A. in 1978, and Washington and Lee University School of Law with a J.D. in 1980. Mr. Holland is the author of "*A Nation in the Red*" (McGraw Hill- 2014), a book about the U.S. national debt and its implications.

Page 73

*Brad K. Heppner* is the Chief Executive Officer and Chairman of the Board of Directors of Beneficient. Mr. Heppner has acquired or founded ten operating companies principally in the financial services, investment and insurance sectors, each with a common business purpose of providing highly specialized solutions for alternative asset owners. Mr. Heppner founded Heritage Highland in 1996 as a family office to organize, acquire and own as controlling or sole shareholder these operating companies. In 2003, Mr. Heppner organized Highland Consolidated Business Holdings, L.P. which is the predecessor-in-interest to Beneficient and reorganized into Beneficient in September 2017. He has successfully completed realizations from seven of the ten Heritage Highland companies through mergers and transactions with Fortune 50 companies or institutionally backed management teams. In 2003, Mr. Heppner merged The Crossroads

Group, a multi-billion dollar alternative asset manager, with Lehman Brothers, now Neuberger Berman. Among the companies Mr. Heppner founded and sold is Capital Analytics, the third oldest alternative asset administration company in the United States, which is now owned by Mitsubishi Union Financial Group. Currently, Mr. Heppner serves as chief executive officer and chairman for all Heritage Highland companies, positions he has held since its organization in 1996. Previously, he was a senior consultant at Bain & Company where he focused on private equity financed companies between 1994 and 1996. Mr. Heppner served as director of investments for John D. and Catherine T. MacArthur Foundation in Chicago from 1989 to 1993 after beginning his career in New York City at Goldman, Sachs & Co. as an analyst. Through companies held by Heritage Highland, Mr. Heppner has been a fiduciary for over 250 institutions and served on numerous corporate boards and advisory committees. Mr. Heppner earned his M.B.A. from the J.L. Kellogg Graduate School of Management at Northwestern University. He is a magna cum laude graduate and Most Distinguished Alumnus of Southern Methodist University, where he received a B.S., a B.B.A. and a B.A.

*Timothy L. Evans* joined the Company as Chief Integration Officer on May 6, 2019, and was appointed Chief Financial Officer on August 15, 2019. Prior to joining GWG Holdings, Inc., Mr. Evans was Chief of Staff for Ben LP, where he had also served as Vice President and Deputy General Counsel since February 2018. Prior to joining Ben LP, Mr. Evans was an attorney for the United States Securities and Exchange Commission for six years, where he served as a trial attorney and a counsel to the Director of Enforcement. Mr. Evans was an associate in the Dallas office of Thompson & Knight LLP for four years before joining the Securities and Exchange Commission. He received his Juris Doctorate, summa cum laude, from the University of Arkansas School of Law in 2008. Prior to practicing as an attorney, Mr. Evans was an accountant for three years with SMG, a public facility management company. He previously held an Arkansas CPA license but is not currently licensed by the Arkansas State Board of Public Accountancy. He graduated from the University of Illinois at Urbana-Champaign with a Bachelor of Arts – Economics in 2001.

*Roy W. Bailey* has served as the CEO of Bailey Deason Capital Interests, LLC since 2012. Prior to serving as CEO of Bailey Deason Capital Interests, LLC, Mr. Bailey served in similar management roles with Giuliani Partners LLC and Hicks Holdings, LLC. He began his career in the insurance and the insurance finance industry. In addition to founding and owning Bailey Insurance Associates from 1983 – 1996, one of the largest single principal-owned agencies in Dallas at the time, he was also the co-founder and CEO of Premium Finance Holdings (PFH) from 1997 – 2001, which was later sold to Texas Capital Bank. Mr. Bailey received his BBA from Southern Methodist University in Dallas, Texas in 1976.

*Peter T. Cangany, Jr.* joined Ernst & Young, LLP ("EY") in 1980 upon graduating college and retired from the firm in 2017. Mr. Cangany became an EY partner in 1993 and, during his tenure, worked in EY's Indianapolis office 1980 – 1987, Seattle office 1987 – 2004, San Antonio office 2004 – 2011, and New York and Bermuda offices 2011 – 2017. At EY, Mr. Cangany specialized in working with insurance entities, primarily property, casualty and reinsurance, and has as a strong working knowledge of the life settlement industry. He also worked closely with Beneficient during its early formation on various accounting and consolidation matters. During his 37 years with EY, Mr. Cangany served as the engagement partner on several large public and non-public nationally recognized companies. He held numerous leadership positions at EY, including area insurance practice leader for the Pacific Northwest, Southwest, and BBC (Bermuda, Bahamas, Caymans) and Office Managing Partner for EY's Seattle and Bermuda offices. Mr. Cangany serves on the Board of Trustees – Franklin College of Indiana (2009–present) and is the Finance Committee Chair (and previously Audit Committee Chair). Mr. Cangany earned a B.A. in Accounting from Franklin College and an M.B.A. from Texas A&M University.

Page 74

*David F. Chavenson* served as Treasurer of Alon USA Energy Company from 2007 until 2018. He served as Vice President and Treasurer of Flowserve Corp. from 2001 until 2005; Senior Vice President and Chief Financial Officer at Worldwide Flight Services, Inc. from 2000 to 2001; and Vice President of Finance, Chief Financial Officer and Corporate Secretary of Rutherford-Moran Oil Corporation since April 1996 to 1999. Previous to 1996, Mr. Chavenson spent 18 years at Oryx Energy Company, an oil and gas exploration and production company (previously Sun Exploration and Production Co.) ("Oryx"), and served as Treasurer there from 1993 to 1996. Prior to that, he served as Assistant Treasurer and Manager of Corporate Finance, Manager of Financial Analysis and Senior Financial Specialist at Oryx.

Mr. Chavenson has a B.A., magna cum laude, Phi Beta Kappa from Dickinson College and holds an M.B.A. in finance with honors from the Harvard Business School. He is also a Certified Public Accountant.

*Thomas O. Hicks* is a pioneer in the private equity industry in the United States. From 1984 to 1988 he was Co-Founder and Co-Chairman of Hicks & Haas which compiled a highly successful track record of acquisitions, including Dr Pepper, Seven Up, A&W Root Beer, Sybron, and Thermadyne. He later founded numerous private equity funds for his firm, Hicks, Muse, Tate and Furst, which raised over $12 billion in funds. His funds have invested billions of dollars of equity in businesses in the United States, Europe, and Latin America. Mr. Hicks retired from Hicks Muse in 2004, and now manages his own family office private equity firm, Hicks Holdings, LLC. Mr. Hicks was a Director of Carpenter Technology Corporation until September 2014. Mr. Hicks has a B.B.A. from the University of Texas – Austin and an MBA from the University of Southern California. Mr. Hicks is also the manager and indirect, majority owner of HSG Sports Group Holdings LLC, which, through subsidiaries, including HSG Sports Group LLC and others, formerly owned interests in professional sports franchises, including the Texas Rangers major league professional baseball club and Dallas Stars professional ice hockey team. On May 24, 2010, the Texas Rangers filed a voluntary petition for Chapter 11 bankruptcy protection. On September 15, 2011, the Dallas Stars filed a voluntary petition for Chapter 11 bankruptcy protection. Additional proceedings were filed by or against other entities related to the Texas Rangers and the Dallas Stars, and Mr. Hicks in his individual capacity, in connection with the foregoing. Both the Texas Rangers and the Dallas Stars were sold to new owners in connection with their respective Chapter 11 bankruptcy cases.

---

Page 75

*Dennis P. Lockhart* is currently a distinguished professor-of-the-practice in the Nunn School of International Affairs at Georgia Tech. Early in 2017, Mr. Lockhart retired from his position as president and Chief Executive Officer of the Federal Reserve Bank of Atlanta, a position he held since 2007. Earlier, he was a professor at Georgetown University, School of Foreign Service, from 2003 to 2007. Prior to this, he held senior positions at Heller Financial Inc. and Citicorp (now Citigroup), and served as an officer in the U.S. Marine Corps Reserve. Mr. Lockhart holds a Master of Arts from Johns Hopkins University, Bachelor of Arts from Stanford University, and an honorary doctorate from Georgia State University. Mr. Lockhart currently serves on the Board of Directors of Pensare Acquisition Corp. (WRLS) and Invesco Mortgage Capital.

*Bruce W. Schnitzer* has been a successful private equity investor since 1985 and Chairman of Wand Partners, a private equity firm specialized in insurance and other specialty financial services, since 1987. Wand has sponsored and invested in eighteen platform businesses, thirteen of which span the insurance industry and fifteen of which are now fully realized. From 1977 to 1985, Mr. Schnitzer was a senior executive with Marsh & McLennan, where he served as President and CEO of Marsh, Inc. (the world-wide insurance broker) and as Chief Financial Officer of Marsh & McLennan Companies, Inc. (NYSE-MMC). Prior to joining Marsh & McLennan, Mr. Schnitzer was a Vice President and head of Mergers & Acquisitions at Morgan Guaranty Trust Company (J.P. Morgan) — 1967-76. Mr. Schnitzer has served in numerous non-profit roles, including Chairman of The Institute of Human Origins, Director of The Litchfield Land Trust, and Director & Treasurer of Scherr-Thoss Foundation. Mr. Schnitzer graduated from the University of Texas, Austin in 1966 (B.B.A.) and received an M.B.A. from the University of Texas, Austin in 1967.

*Roger T. Staubach* retired in July 2018 from the role of Executive Chairman of JLL Americas, a professional services firm specializing in real estate. Mr. Staubach's role focused on client relationships and new business development. With 2017 global revenue of $7.9 billion, JLL serves clients in 80 countries from more than 1,000 locations worldwide, including 300 corporate offices and a global workforce of 82,000. Prior to joining forces with JLL, Mr. Staubach was Executive Chairman of The Staubach Company, a market leading global real estate advisory firm that delivered cost-effective solutions for office, industrial and retail clients. In July 2008, The Staubach Company merged with JLL. Prior to his career in real estate, Mr. Staubach was a member of the Dallas Cowboys professional football team and won numerous football awards including the Heisman Trophy in 1963. Among the many other honors bestowed upon Mr. Staubach are the 2018 Presidential Medal of Freedom, Commercial Property News' "Corporate Services Executive of the Year" (four times), the 2006 Congressional Medal of Honor "Patriot Award," the NCAA "Teddy Roosevelt Award" for being one of the "100 Most Influential NCAA Student-Athletes," the American Jewish Congress "Torch of Conscience Award," and the United States Naval Academy "Distinguished Graduate." Mr. Staubach served as the Chairman of the Host Committee for Super Bowl XLV which was held in North Texas in 2011, and he continues to be involved with The Children's Cancer Fund, the United States Naval Academy Foundation and numerous other civic, charitable, and professional organizations. Mr. Staubach earned a B.S. from the United States Naval Academy and served four years as a Navy officer.

Page 76

*David H. de Weese* is a Partner of Paul Capital Advisors, a private equity firm. He was instrumental in developing Paul Capital's deal origination strategy and transaction sourcing network. He joined Paul Capital in 1995 and led global secondary transaction sourcing activities and the due diligence of life science and health care investments. Mr. de Weese has 14 years of management experience in Europe. He has an extensive entrepreneurial experience and in-depth scientific and business knowledge. He also founded Medical Innovations. In 1993, he co-founded and served as the President and Chief Executive Officer of M6 Pharmaceuticals. Mr. de Weese served as the President and Chief Executive Officer of Cygnus Therapeutic Systems, SigA Pharmaceuticals and a Silicon Valley software company. Prior to Cygnus, he served as the President and Chief Executive Officer of Machine Intelligence Corporation. Mr. de Weese served as Director of OSE Immunotherapeutics SA (also known as OSE Pharma SA) from June 2014 to June 2017. Mr. de Weese holds an M.B.A. from the Harvard Business School, a B.A. from Stanford University and attended law school at Stanford University.

**Classification of Directors**

In early 2019, our Board of Directors and stockholders approved an amendment to our bylaws that established a classified Board of Directors in which directors are divided into three classes, to be designated as Class I, Class II and Class III. Each class will serve staggered, three year terms. The terms of office of Class II directors will expire at the annual meeting of stockholders to be held in 2020. The terms of office of the Class III directors will expire at the annual meeting of stockholders to be held in 2021. The terms of office of the Class I directors will expire at the annual meeting of stockholders to be held in 2022.

The following chart sets forth the three classes of directors.

| Director | Class | Expiration of Initial Term of Director |
|---|---|---|
| Brad K. Heppner | Class I | 2022 |
| Thomas O. Hicks | Class I | 2022 |
| Roy W. Bailey | Class I | 2022 |
| Bruce W. Schnitzer | Class II | 2020 |
| Roger T. Staubach | Class II | 2020 |
| Dennis P. Lockhart | Class II | 2020 |
| Peter T. Cangany, Jr. | Class III | 2021 |
| David H. de Weese | Class III | 2021 |
| David F. Chavenson | Class III | 2021 |

Page 77

**Director Qualifications**

When considering whether directors have the experience, qualifications, attributes and skills to enable the Board of Directors to satisfy its oversight responsibilities effectively in light of our business and structure, our Board of Directors focuses primarily on the information discussed in each of the directors' individual biographies set forth above.

In addition, we believe that all of our directors have experience in developing and overseeing businesses and implementing near term and long-range strategic plans. We also believe that all of our directors have a reputation for integrity, honesty and adherence to high ethical standards. Collectively, they have demonstrated business acumen and an ability to exercise sound judgment, as well as a commitment of service to our Company and our Board of Directors.

**Board Committees**

Our Board of Directors has an Audit Committee, Compensation Committee and a Special Committee. The full board currently conducts the activities of the nominating committee. Each of the Audit Committee and the Compensation Committee has a written charter, a copy of each of which is available at our website at www.gwgh.com. Our Audit Committee and Compensation Committee each comply with the listing requirements of The NASDAQ Marketplace Rules taking into account our reliance on certain exceptions for "controlled companies" as described in Item 13 — Certain Relationships and Related Transactions, and Director Independence — Director Independence.

**Audit Committee**

The Audit Committee currently consists of three members: Peter T. Cangany, Jr. (Chair), David F. Chavenson and Roy W. Bailey. All members are financially literate and are independent directors under the NASDAQ Marketplace Rules, and SEC audit committee structure and membership requirements. Further, the Board has determined that Mr. Cangany is an "audit committee financial expert" as defined by applicable regulations of the SEC and is "independent" under the NASDAQ Marketplace Rules.

**Compensation Committee**

Our Compensation Committee consists of two members: Roy W. Bailey, Thomas O. Hicks and Dennis P. Lockhart. Our Compensation Committee is charged with oversight responsibility for the adequacy and effectiveness of our executive compensation and benefit plans and is primarily responsible for all matters relating to compensation of our executive officers and the directors, the adoption of all employee compensation and employee benefit plans and the administration of such plans including granting stock incentives or other benefits, and the review and approval of disclosures regarding executive compensation included in our SEC reports. Our Compensation Committee has the authority to obtain advice and assistance from external legal, accounting or other advisors, and has the authority to retain, terminate and approve the fees payable to any external compensation consultant to assist in the evaluation of director and senior executive compensation. However, any services to be rendered by our independent registered public accounting firm shall be pre-approved by the Audit Committee if required under our policy regarding pre-approval of such services.

**Special Committee**

Our Special Committee consists of three members: Roy W. Bailey, Peter T. Cangany, Jr. and David F. Chavenson. The Special Committee is a committee of the Board comprised solely of directors independent of Beneficient that was formed primarily for the purpose of considering and, if deemed appropriate, approving company transactions with or involving Beneficient.

Page 78

**Ability of Stockholders to Communicate with our Board of Directors**

Our Board of Directors has established several means for stockholders and others to communicate with our Board of Directors. If a stockholder has a concern regarding our financial statements, accounting practices or internal controls, the concern should be submitted in writing to the Chair of our Audit Committee in care of our Secretary at the address of our principal executive offices. If the concern relates to our governance practices, business ethics or corporate conduct, the concern should be submitted in writing in care of our Secretary at the address of our principal executive offices. If a stockholder wishes to provide input with respect to our executive compensation policies and programs, input should be submitted in writing to the Chair of our Compensation Committee in care of our Secretary at the address of our principal executive offices. If a stockholder is unsure as to which category the concern relates, the stockholder may communicate it to any one of the independent directors in care of our Secretary at the address of our principal executive offices. All stockholder communications sent in care of our Company Secretary will be forwarded promptly to the applicable director(s).

**Delinquent Section 16(a) Reports**

Section 16(a) of the Securities Exchange Act of 1934, as amended, requires our officers and directors, and persons who own more than ten percent of a registered class of our equity securities, to file electronically reports of ownership and changes in ownership of such securities with the SEC. Based on review of the copies of Forms 3 and 4 and amendments thereto filed electronically with the SEC during the year ended December 31, 2019 and Forms 5 and amendments thereto filed electronically with the SEC with respect to such year, or written representations that no Forms 5 were required, we believe all required forms have been filed by our officers, directors and greater than ten percent beneficial owners; however, Initial Statements of Beneficial Ownership on Form 3 required to be filed on or prior to May 6, 2019 were filed by on May 7, 2019 by Murray T. Holland; on May 8, 2019 by Michelle Caruso-Cabrera, David H. de Weese, David H. Glaser, Brad K. Heppner, Bruce W. Schnitzer, Roger T. Staubach, and Sheldon I. Stein; and on May 9, 2019 by Peter T. Cangany, Jr.

Page 79

**Code of Ethics**

We have adopted a Code of Business Conduct and Ethics that applies to all of our employees and all of our officers (specifically including but not limited to the principal executive officer (CEO), principal financial officer (CFO) and other members of management). Our Code of Business Conduct and Ethics satisfies the requirements of Item 406(b) of Regulation S-K. Our Code of Business Conduct and Ethics is available on our Internet website at www.gwgh.com.

**ITEM 11. EXECUTIVE COMPENSATION.**

**Summary Compensation Table**

The following table sets forth the cash and non-cash compensation for the 2018 and 2019 years awarded to or earned by: (i) each individual who served as the principal executive officer of GWG Holdings during 2019; (ii) the two most highly compensated executive officers of GWG Holdings who were serving as executive officers at the end of 2019 and who received more than $100,000 in the form of salary and bonus during such year; and (iii) up to two additional individuals for whom disclosure would have been required under (ii) above but for the fact that the individual was not serving as an executive office of GWG Holdings at the end of 2019. These individuals are referred to as our "named executives."

| Name and Principal Position | Year | Salary | Bonus[5] | Stock Awards[1] | Option Awards[1] | Total |
|---|---|---|---|---|---|---|
| Murray T. Holland | 2019 | $ 440,000 | $ 637,500 | $ — | $ — | $ 1,077,500 |
| Chief Executive Officer[2] | 2018 | $ — | $ — | $ — | $ — | $ — |
| Jon R. Sabes | 2019 | $ 387,692 | $ 751,350 | $ — | $ — | $ 1,139,042 |
| Former Chief Executive Officer[2] | 2018 | $ 491,546 | $ 1,015,603 | $ — | $ — | $ 1,507,149 |
| Timothy L. Evans | 2019 | $ 261,539 | $ 326,750 | $ — | $ — | $ 588,289 |
| Chief Financial Officer[3] | 2018 | $ — | $ — | $ — | $ — | $ — |
| William B. Acheson | 2019 | $ 320,000 | $ 2,123,400 | $ — | $ — | $ 2,443,400 |
| Former Chief Financial Officer[3] | 2018 | $ 320,000 | $ 693,353 | $ 757,702 | $ — | $ 1,771,055 |
| Steven F. Sabes | 2019 | $ 140,966 | $ 35,241 | $ — | $ — | $ 176,207 |
| Former Chief Operating Officer – Life Epigenetics Inc. and Secretary[4] | 2018 | $ 208,246 | $ 54,343 | $ — | $ — | $ 262,589 |

(1) Amounts shown reflect the grant date fair value of stock awards and option awards granted for the respective year pursuant to the 2013 Stock Incentive Plan, computed in accordance with Financial Accounting Standards Board Accounting Standards Codification Topic 718. For a discussion of the assumptions used in calculating the grant date fair value of stock awards and option awards made in 2019, see Note 16 to our consolidated financial statements.

(2) On April 26, 2019, and in connection with the closing of the Purchase and Contribution Transaction, Jon R. Sabes resigned as the Company's Chief Executive Officer and from all officer positions he held with the Company or any of its subsidiaries prior to the Closing, other than his position as Chief Executive Officer of the Company's technology focused previously wholly-owned subsidiaries, Life Epigenetics Inc. ("Life Epigenetics") and youSurance General Agency, LLC ("youSurance"). Murray T. Holland was appointed as Chief Executive Officer on April 26, 2019 with an annual base salary of $650,000.

(3) Mr. Acheson ceased serving as Chief Financial Officer on August 15, 2019, and Mr. Evans was appointed Chief Financial Officer on the same date with an annual base salary of $400,000.

(4) On April 26, 2019, and in connection with the closing of the Purchase and Contribution Transaction, Steven F. Sabes resigned from all officer positions he held with the Company or any of its subsidiaries prior to the Closing, except as Chief Operating Officer of Life Epigenetics.

(5) The bonus amount for Mr. William B. Acheson includes $1,500,000 in incentives paid pursuant to the Purchase and Contribution Agreement described below under "Employment Agreements and Change-in-Control Provisions".

In general, in connection with its decisions about executive compensation, the Compensation Committee intends to consider the results of the most recent stockholder advisory vote on executive compensation as well as the advisory vote on the frequency of future advisory votes on executive compensation in determining how frequently to hold its Say-on-Pay vote in the future.

Page 80

APP. 360

**Employment Agreements and Change-in-Control Provisions**

As of December 31, 2019, our named executives held the following positions: Mr. Murray T. Holland, Chief Executive Officer; and Mr. Timothy L. Evans, Chief Financial Officer. Mr. Jon R. Sabes, former Chief Executive Officer and Chairman of the Board of Directors, Mr. William B. Acheson, former Chief Financial Officer, and Mr. Steven F. Sabes, former Chief Operating Officer - Life Epigenetics Inc. Messrs. Jon R. Sabes, Steven F. Sabes and William B. Acheson were not serving as executive officers of the Company at December 31, 2019.

In June 2011, we entered into employment agreements with each of Messrs. Jon R. Sabes and Steven F. Sabes. Each of these agreements has an initial one year term and is automatically renewed for additional one year periods unless terminated prior to such renewal. On June 28, 2017, we entered into an employment agreement with Mr. Acheson to replace his prior employment agreement dated May 30, 2014, which amendment increased his annual base salary from $225,000 to $320,000. Mr. Acheson's current agreement has an initial three year term and is automatically renewed for additional one year periods unless either party gives notice of non-renewal at least 60 days prior to the expiration of the then current term. All of these employment agreements establish key employment terms (including reporting responsibilities, base salary, discretionary and bonus opportunity and other benefits), provide for severance benefits in certain situations (including change in control), and contain non-competition, non-solicitation and confidentiality covenants.

Under their respective employment agreements during 2019, Mr. Jon R. Sabes received an annual base salary of $480,000 and Mr. Steven F. Sabes received an annual base salary of $200,000. Mr. Acheson received an annual base salary of $320,000. The employment agreements contain customary provisions prohibiting the executives from soliciting our employees for a period of 12–18 months after any termination of employment, and from competing with our Company for either two years (if the executive is terminated for good cause or if he resigns without good reason) or one year (if we terminate the executive's employment without good cause or if he resigns with good reason which includes a change in control). If an executive's employment is terminated by us without "good cause" or if the executive voluntarily resigns with "good reason", then the executive will be entitled to (i) severance pay for a period of 12 months and (ii) reimbursement for health insurance premiums for his family if he elects continued coverage under COBRA.

The employment agreements for Messrs. Jon R. Sabes and Steve F. Sabes also provided that we will reimburse them for any legal costs they incur in enforcing their rights under the employment agreement and, to the fullest extent permitted by applicable law, indemnify them for claims, costs and expenses arising in connection with their employment, regardless of the outcome of any such legal contest, as well as interest at the prime rate on any payments under the employment agreements that are determined to be past due, unless prohibited by law.

All of the foregoing executive employment agreements include a provision allowing us to reduce their severance payments and any other payments to which the executive becomes entitled as a result of our change in control to the extent needed for the executive to avoid paying an excise tax under Code Section 280G, unless the named executive officer is better off, on an after-tax basis, receiving the full amount of such payments and paying the excise taxes due.

On November 28, 2018, the Company entered into restricted stock unit agreement with Mr. William B. Acheson pursuant to which Mr. Acheson received a grant of 73,348 restricted stock units. The grant was intended to be effective as of August 10, 2018. Each restricted stock unit entitled Mr. Acheson to receive one share of the Company's common stock upon vesting, subject to remaining continuously employed by the Company or one of its subsidiaries through the applicable vesting date. The number of restricted stock units was increased by 14,336 as a result of dividend equivalent rights associated with the shares underlying the grant. One half of the restricted stock units vested on the grant date, with the remainder scheduled to vest in equal quarterly installments on each three month anniversary of the intended effective date of the grant. The vesting of all remaining unvested restricted stock units accelerated upon the closing of the Purchase and Contribution Transaction.

On April 26, 2019, and in connection with the closing of the Purchase and Contribution Transaction, (i) Jon R. Sabes resigned as the Company's Chief Executive Officer and from all officer positions he held with the Company or any of its subsidiaries prior to the closing, other than his position as Chief Executive Officer of the Company's technology focused wholly owned subsidiaries, Life Epigenetics Inc. ("Life Epigenetics") and youSurance General Agency, LLC ("youSurance"), and (ii) Steven F. Sabes resigned as the Company's Executive Vice President of Originations and Servicing and from all officer positions he held with the Company or any of its subsidiaries prior to the closing, except as Chief Operating Officer of Life Epigenetics. The resignations of Messrs. Jon and Steven Sabes included a full waiver and forfeit of (i) any severance that may be payable by the Company or any of its subsidiaries in connection with such resignations or the Purchase and Contribution Transaction and (ii) all equity awards of the Company currently held by either of them.

<div align="center">Page 81</div>

As contemplated by the Purchase and Contribution Agreement, the Company entered into performance share unit agreements (each a "PSU Agreement") with certain employees of the Company pursuant to which such employees will receive a bonus under certain terms and conditions, including, among others, that such employees remain employed by the Company or one of its subsidiaries (or, if no longer employed, such employment was terminated by the Company other than for cause, as such term is defined in the PSU Agreement) for a period of 120 days following the closing of the Purchase and Contribution Transaction. The Company's PSU Agreement with William B. Acheson, the Company's Chief Financial Officer, was entered into on April 22, 2019 and provides for a target award grant of 125,000 performance share units, which equates to a retention bonus amount of $1,500,000. The description of the form of PSU Agreement is not complete and is qualified in its entirety by reference to the full text of the form of PSU Agreement which filed as Exhibit 10.1 to our Current Report on Form 8-K filed on April 26, 2019 and incorporated by reference herein.

On April 26, 2019, and in connection with the closing of the Purchase and Contribution Transaction, Murray T. Holland was appointed as Chief Executive Officer of the Company. On May 31, 2019, we entered into an employment agreement with Mr. Holland pursuant to which he is currently serving as our President and Chief Executive Officer. The employment agreement has an initial three year term and is automatically renewed for additional one year periods unless either party gives notice of non-renewal at least 60 days prior to the expiration of the then current term.

Under the employment agreement, Mr. Holland is entitled to an annual base salary of $650,000, retroactive to April 26, 2019, and is eligible to receive an annual cash bonus the target amount of which will be 150% of his base salary (prorated for the partial first year of employment). Whether the bonus is granted for a particular year, and the amount thereof, will be determined by our Compensation Committee in its discretion based upon Mr. Holland's performance. Mr. Holland is also entitled to participate in all employee benefit plans and programs made available by the Company to the Company's executive employees generally.

If Mr. Holland's employment is terminated by us without "Cause" or if he voluntarily resigns with "Good Reason," in each case as defined in the employment agreement, then (i) he will be entitled to severance pay in an amount equal to his annual base salary, payable in a lump sum within 30 days after the date of the termination, (ii) he will receive a pro-rated portion of the target amount of his annual cash bonus for the year in which termination occurs, and (iii) any performance share units ("PSUs") or other equity incentives held by Mr. Holland will fully vest on the date of termination.

On May 31, 2019, and as contemplated by the employment agreement and discussed below, we entered into a PSU Agreement with Mr. Holland that provides for a target award grant of 129,717 PSUs (the "Target Award"), and up to a maximum of 259, 434 PSUs. Each PSU represents the right to receive one share of our common stock (or, following a Change-in-Control Transaction (as defined in the PSU Agreement, the cash value thereof), upon vesting, which is generally subject to (i) the satisfaction of performance goals over a three year performance period, as determined by our Compensation Committee in its sole discretion, and (ii) Mr. Holland remaining continuously employed by the Company or one of its subsidiaries ("Continuous Service") from the date of grant through the date that the PSUs are vested and paid in shares of common stock (or cash). Promptly following the Company's filing with the SEC of our Annual Report on Form 10-K for the year ended December 31, 2121 (the final year of the performance period), our Compensation Committee will review and certify in writing (a) whether, and to what extent, the performance goals have been achieved, and (b) the number of PSUs that vested, if any. At such time, PSUs that are not vested will be forfeited.

The PSUs are subject to forfeiture until they vest. If Mr. Holland's Continuous Service terminates for any reason at any time before all PSUs have vested, all unvested PSUs will be automatically forfeited upon such termination of Continuous Service. However, if Mr. Holland's Continuous Service terminates as a result of his death or disability, or as a result of a termination by the Company without Cause or by Mr. Holland for Good Reason, Mr. Holland will retain, and will not forfeit, a pro rata portion of the Target Award based on the number of days that he remained employed during the performance period. This retained portion of the Target Award will not be subject to accelerated vesting and, instead, will vest (and be paid in shares of common stock) based on extent to which the performance goals are achieved during the entire performance period.

If a "Sale Transaction," as defined in the Company's 2013 Stock Incentive Plan, occurs during the performance period, Mr. Holland remains in Continuous Service up until the date of such Sale Transaction, and the acquiring entity or successor to the Company does not assume the obligations of the Company under the PSU Agreement or replace the grant with a substantially equivalent incentive award, then all outstanding PSUs shall vest at Target Award levels on the date of such Sale Transaction.

<div align="center">Page 82</div>

If a Change-in-Control Transaction occurs during the performance period, then all outstanding PSUs will automatically vest at Target Award levels on the 120th day following the closing of the Change-in-Control Transaction (the "Retention Date"), contingent upon Mr. Holland remaining in Continuous Service through the Retention Date. However, if Mr. Holland's Continuous Service terminates following the occurrence of a Change-in-Control Transaction and prior to the Retention Date for any reason other than as a result of a termination by the Company for Cause, then all outstanding PSUs will automatically vest at Target Award levels upon such termination. PSUs vesting upon a Change-in-Control will be paid in cash (not shares of common stock). The amount of cash to be paid to Mr. Holland in respect of each vested PSU will be equal to the greater of (y) $12.00 or (z) the Fair Market Value (as defined in the Plan) of a share of common stock as of the trading date immediately prior to the closing date of the Change-in-Control Transaction. The PSU Agreement includes a provision allowing the Company to reduce the payment to which Mr. Holland would be entitled upon a Change-in-Control Transaction to the extent needed for him to avoid paying an excise tax under Internal Revenue Code Section 280G, unless Mr. Holland would be better off, on an after-tax basis, receiving the full amount of such payments and paying the excise taxes due.

The above descriptions of our employment agreement and PSU Agreement with Mr. Holland are not complete and are qualified in its entirety by reference to the full text of such agreements which are incorporated by reference as Exhibits 10.18 and 10.19, respectively, to this Report.

On August 15, 2019, Timothy L. Evans was appointed as our Chief Financial Officer and Treasurer, replacing William B. Acheson. Mr. Acheson remained employed by the Company on an interim basis as an Executive Vice President, to assist in the transition of his prior duties and responsibilities to Mr. Evans. Mr. Evans is employed pursuant to an unwritten employment arrangement under which he receives a base salary of $400,000 per year. We are in the process of finalizing a written employment agreement with Mr. Evans.

On November 19, 2019, we entered into a Transition and Separation Agreement (the "Transition Agreement") with William B. Acheson that governed Mr. Acheson's continued employment with the Company on an at-will basis as Executive Vice President and Advisor to the Chief Executive Officer. Under the Transition Agreement, which replaced his prior employment agreement dated June 28, 2017, Mr. Acheson was entitled to an annual base salary of $320,000. If Mr. Acheson remained employed with the Company through December 31, 2019, he was entitled to receive his target incentive cash bonus for the second half of 2019 in the amount of $160,000. Mr. Acheson was also entitled to participate in all employee benefit plans and programs made available by the Company to the Company's executive employees generally. Upon termination of Mr. Acheson's employment with the Company for any reason, he was entitled to severance pay in an amount equal to his annual base salary, and was entitled to receive a pro-rated portion of the target amount of his annual cash bonus for the year in which termination occurs. The Transition Agreement provided for the payment of such amounts in a lump sum within 30 days after the date of the termination. In addition, the Company agreed to pay the full cost of health, dental and vision insurance coverage for 12 months following termination or, if earlier, until he is eligible to obtain replacement coverage. Mr. Acheson's employment with the Company terminated on December 31, 2019.

The Transition Agreement also acknowledged that outstanding and currently-vested stock options held by Mr. Acheson will not terminate as a result of the termination of Mr. Acheson's employment and, instead, will remain outstanding and exercisable through the full original term thereof. The post-termination exercise period of such options was previously extended in conjunction with the Purchase and Contribution Transaction.

**2013 Stock Incentive Plan**

We maintain the GWG Holdings, Inc. 2013 Stock Incentive Plan, under which 6,000,000 shares of our common stock have previously been approved for issuance. The 2013 Stock Incentive Plan permits the grant of both incentive and non-statutory stock options. Through December 31, 2019, we had issued stock options, SARs and Restricted Stock Units (hereinafter, "options") for 2,593,919 shares of common stock to employees, officers, directors, and consultants under the plan. As of December 31, 2019, (i) 1,647,485 shares are reserved for issuance under outstanding options, of which 874,086 options have vested and the remaining outstanding are scheduled to vest over three years, (ii) 261,681 shares have been issued upon the exercise of options granted under the 2013 Stock Incentive Plan, and (iii) 3,406,081 shares remain available for issuance of future incentive grants. The Board of Directors adopted the 2013 Stock Incentive Plan to provide a means by which our employees, directors, officers and consultants may be granted an opportunity to purchase our common stock, to assist in retaining the services of such persons, to secure and retain the services of persons capable of filling such positions and to provide incentives for such persons to exert maximum efforts for our success.

<div align="center">Page 83</div>

**Outstanding Equity Awards at Year End**

As of December 31, 2019, our named executives had the following outstanding options to purchase common stock:

| | OPTION AWARDS | | | | STOCK AWARDS | |
|---|---|---|---|---|---|---|
| Name | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Option Exercise Price ($) | Option Expiration Date | Number of shares or units of stock that have not vested (#) | Market value of shares or units of stock that have not vested ($) |
| William B. Acheson | 1,667 | — | $ 6.00 | 12/29/2025 | — | — |
| | 1,667 | — | $ 6.35 | 4/29/2026 | — | — |
| | 1,667 | — | $ 6.41 | 5/13/2026 | — | — |
| | 6,250 | — | $ 10.38 | 4/18/2027 | — | — |
| | 145,000 | — | $ 10.20 | 6/29/2027 | — | — |

Messrs. Jon and Steven Sabes forfeited all equity awards of the Company held by without compensation in connection with the closing of the Purchase and Contribution Transaction.

**Director Compensation**

The following table sets forth the cash and non-cash compensation awarded to or earned by each individual who served as a member of our Board of Directors during the year ended December 31, 2019.

| Director's Name | Fees Earned or Paid in Cash 2019 | Stock Awards[1] | Total |
|---|---|---|---|
| Murray T. Holland[2] | $ — | $ — | $ — |
| Brad K. Heppner[2] | 68,132 | 75,000 | 143,132 |
| Peter T. Cangany, Jr. [2] | 78,352 | 75,000 | 153,352 |
| David F. Chavenson [3] | 107,327 | 75,000 | 182,327 |
| Thomas O. Hicks [2] | 71,132 | 75,000 | 146,132 |
| Dennis P. Lockhart [3] | 64,805 | 75,000 | 139,805 |
| Bruce W. Schnitzer [2] | 68,132 | 75,000 | 143,132 |
| Roger T. Staubach [2] | 68,132 | 75,000 | 143,132 |
| Kathleen J. Mason [3][4] | 104,827 | 75,000 | 179,827 |
| Michelle Caruso-Cabrera [2][5] | 80,602 | 75,000 | 155,602 |
| Richard W. Fisher [2][6] | 47,021 | 75,000 | 122,021 |
| David H. Glaser [2][6] | 49,548 | 75,000 | 124,548 |
| Sheldon I. Stein [2][6] | 54,820 | 75,000 | 129,820 |
| Bruce E. Zimmerman [2][6] | 51,723 | 75,000 | 126,723 |
| David H. deWesse [2] | 75,000 | 75,000 | 150,000 |
| Jon R. Sabes [7] | — | — | — |
| Steven F. Sabes [7] | — | — | — |
| David H. Abramson [7] | 174,000 | — | 174,000 |
| Thomas J. Donohue, Jr. [7] | 181,800 | — | 181,800 |
| Shawn R. Gensch [7] | 166,800 | — | 166,800 |
| Jeffrey L. McGregor [7] | 169,200 | — | 169,200 |
| Mark E. Schwarzmann [7] | $ 166,800 | $ — | $ 166,800 |

(1)  Amounts shown reflect the grant date fair value of restricted stock awards granted during 2019, computed in accordance with Financial Accounting Standards Board Accounting Standards Codification Topic 718. The $75,000 noted in the table above for those specific directors reflects 8,169 awards granted on June 18, 2019 with a grant date value of $9.18 per share.

(2)  Such director commenced serving as a member of the Board of Directors at the April 16, 2019 closing of the Purchase and Contribution Transaction.

(3)  Such director commenced serving as a member of the Board of Directors on May 13, 2019.

(4)  Such director ceased serving as a member of the Board of Directors on March 2, 2020.

(5)  Such director ceased serving as a member of the Board of Directors on February 21, 2020.

(6)  Such director ceased serving as a member of the Board of Directors on October 15, 2019.

(7)  Such director ceased serving as a member of the Board of Directors at the April 16, 2019 closing of the Purchase and Contribution Transaction.

During 2019, prior to April 15, 2019, each independent board member received base compensation of $6,000 per quarter. In addition, the chairman of the audit committee received an additional $4,800 per quarter. The chairmen of the Compensation Committee and the Corporate Governance Committee, prior to its

APP. 364

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 365 of 1031    PageID 537

dissolution, each received an additional $2,400 per quarter. Also, each non-chair member of committees received an additional $1,200 per quarter.

Page 84

APP. 365

On April 15, 2019, the Board approved changes to director compensation. In consideration for services provided and to be provided to the Company in their capacity as non-employee directors of the Company during the remainder of 2019, or until their earlier resignation in conjunction with the closing of the Purchase and Contribution Transaction, each individual serving as non-employee director of the Company prior to the closing of the Purchase and Contribution Transaction was entitled to receive cash compensation in the amount of $125,000. Such compensation was payable in three installments of $41,666, $41,666 and $41,667, respectively, on the last business day of June, September and December 2019, provided, however, that the entire unpaid portion of such compensation was accelerated and paid upon the closing of the Purchase and Contribution Transaction in accordance with the April 2019 changes to director compensation.

The Compensation Committee through consultation with its compensation advisors, approved a plan of compensation to be paid to the Company's non-employee directors for the period following the closing of the Purchase and Contribution Agreement. Under this plan, all non-employee directors receive annualized cash compensation of $100,000 paid in quarterly installments in arrears. The Chair and members of the Board's committees receive the additional annualized cash compensation set forth below:

| Committee | Position | Additional Fees |
|---|---|---|
| Audit Committee | Chair | $ 15,000 |
| | Member (other than Chair) | $ 10,000 |
| Compensation Committee | Chair | $ 12,000 |
| | Member (other than Chair) | $ 5,375 |
| Special Committee | Member | $ 25,000 |

Further, each member of the Special Committee receives $1,000 for attending each in-person Special Committee meeting or $500 for participating telephonically. The Special Committee is a committee of the Board comprised solely of directors independent of Beneficient that was formed primarily for the purpose of considering and, if deemed appropriate, approving company transactions with or involving Beneficient.

On June 18, 2019, the Company entered into restricted stock unit agreements with each non-employee director of the Company pursuant to which each received a grant of 8,169 restricted stock units. Each restricted stock unit entitles the holder thereof to receive one share of the Company's common stock upon vesting on the one year anniversary of the grant date, subject remaining a member of the Board and/or employed by or engaged as a consultant to the Company or one of its subsidiaries through such date, and subject to accelerated vesting in certain circumstances. Holders of restricted stock units are also entitled to dividend equivalent rights with respect to the shares underlying the grants.

The Company has entered into Indemnification Agreements (the "Indemnification Agreements") with each of its current directors and executive officers (collectively, the "Indemnitees"). The Indemnification Agreements clarify and supplement indemnification provisions already contained in the Company's bylaws and generally provide that the Company shall indemnify the Indemnitees to the fullest extent permitted by applicable law, subject to certain exceptions, against expenses, judgments, fines and other amounts actually and reasonably incurred in connection with their service as a director or officer and also provide for rights to advancement of expenses and contribution.

The description of the form of Indemnification Agreement and the restricted stock unit agreements set forth above are not complete and is qualified in its entirety by reference to the full text of the form of Indemnification Agreement and the form of restricted stock unit agreement which are filed as Exhibit 10.17 and Exhibit 10.24 to this Annual Report on Form 10-K, respectively, and are incorporated herein by reference.

<div align="center">Page 85</div>

**ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED SHAREHOLDER MATTERS.**

**Securities Authorized for Issuance under Equity Compensation Plans**

We maintain our 2013 Stock Incentive Plan. The purpose of the 2013 Stock Incentive Plan is to provide a means by which our employees, directors, officers and consultants may be granted an opportunity to purchase our common stock, to assist in retaining the services of such persons, to secure and retain the services of persons capable of filling such positions and to provide incentives for such persons to exert maximum efforts for our success. 6,000,000 shares of our common stock have been approved for issuance under the 2013 Stock Incentive Plan, of which 3,406,081 shares remained available for issuance pursuant to future grants at December 31, 2019.

The 2013 Stock Incentive Plan was approved by our stockholders. The following table sets forth certain information as of December 31, 2019 with respect to securities authorized for issuance under compensation arrangements.

| Plan Category | Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants and Rights (a) | Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights (b) ($) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a) (c) |
|---|---|---|---|
| Equity compensation plan approved by stockholders: | | | |
| Stock Options | 905,381 | $ 9.05 | N/A |
| Stock Appreciation Rights | 375,625 | $ 9.25 | N/A |
| Restricted Stock Units | 244,083 | N/A | N/A |
| 2013 Stock Incentive Plan Total | 1,525,089 | $ 9.11 | 3,406,081 |

**Beneficial Ownership**

The following table sets forth certain information regarding beneficial ownership of the our common stock as of March 23, 2020 for (i) each person known by us to be the beneficial owner of more than 5% of our common stock, (ii) each of our current directors and executive officers, (iii) all named executive officers and directors as a group, and (iv) each other named executive officer identified in the Summary Compensation Table. Unless otherwise indicated, the address of each of the following persons is 325 North St. Paul Street, Suite 2650, Dallas, TX 75201, and each such person has sole voting and investment power with respect to the shares of common stock set forth opposite such person's name. Percentage ownership in the table below is based on 33,035,249 shares of the Company's common stock outstanding as of March 24, 2020.

<div align="center">Page 86</div>

Except as otherwise indicated in the table or its footnotes, the persons in the table below have sole voting and investment power with respect to all shares of common stock shown as beneficially owned by them, subject to community property laws where applicable.

| Name | Shares Beneficially Owned | Percentage of Shares Beneficially Owned |
|---|---|---|
| *Executive Officers:* | | |
| Murray T. Holland[1] | 25,913,516 | 78.4% |
| Timothy L. Evans | — | — |
| | | |
| *Non-Employee Directors:* | | |
| Brad K. Heppner[2] | 2,500,000 | 7.6% |
| Roy W. Bailey | — | — |
| Peter T. Cangany, Jr. | — | — |
| Michelle Caruso-Cabrera | — | — |
| David F. Chavenson | — | — |
| Thomas O. Hicks[3] | 1,452,155 | 4.4% |
| Dennis P. Lockhart | — | — |
| Kathleen J. Mason | — | — |
| Bruce W. Schnitzer | — | — |
| Roger T. Staubach | — | — |
| David H. de Weese | — | — |
| All current directors and officers as a group | 29,865,671 | 90.4% |
| | | |
| *Other Named Executive Officers:* | | |
| William B. Acheson[4] | 156,251 | * |
| Jon R. Sabes[5] | — | — |
| Steven F. Sabes[6] | — | — |
| | | |
| *Other 5% Beneficial Owners:* | | |
| Seller Trusts[7] | 25,913,516 | 78.4% |
| Beneficient Company Holdings, L.P.[8] | 2,500,000 | 7.6% |
| AltiVerse Capital Markets, L.L.C.[9] | 1,452,155 | 4.4% |

*     Less than one percent
(1)    Includes 25,913,516 shares of Common Stock held by the Seller Trusts. Murray T. Holland is one of the trust advisors to the Seller Trusts; the other trust advisor, James E. Turvey, is an individual unrelated to Mr. Holland. Mr. Holland and Mr. Turvey have shared decision-making authority with respect to each of the Seller Trusts, including shared voting power and shared dispositive power over the shares of Common Stock held by each of the Seller Trusts. Mr. Holland has an indirect pecuniary interest in the shares of Common Stock held by the Seller Trusts resulting from his ownership interest in 30% of the outstanding membership interests of MHT Financial, LLC ("MHT"), the sole beneficiary of each of the Seller Trusts. Consequently, to the extent that MHT, as beneficiary, receives proceeds from the sale of Common Stock and Seller Trust L Bonds, as contemplated by the Master Agreement, in excess of its contractual obligations, Mr. Holland would have a right to his pro rata share of any distribution of such proceeds if and when made by MHT to its members. There can be no assurance (i) that MHT will receive any proceeds in excess of its contractual obligations, (ii) as to the amount of any such excess, or (iii) that any distribution of such excess will be distributed to members of MHT, including Mr. Holland. Mr. Holland disclaims beneficial ownership of the shares of Common Stock held by the Seller Trusts except to the extent of the pecuniary interest therein described above.
(2)    Includes 2,500,000 shares of Common Stock held by Beneficient Capital Company, L.L.C., a Delaware limited liability company ("BCC"). BCC is a wholly-owned subsidiary of Beneficient Company Holdings, L.P., a Delaware limited partnership ("BEN Holdings"). BEN Holdings is also the managing member of BCC. BEN Holdings is controlled by its general partner, The Beneficient Company Group, L.P., a Delaware limited partnership ("BEN LP"). BEN LP is controlled by its general partner, Beneficient Management, L.L.C., a Delaware limited liability company ("BEN Management"). Brad K. Heppner serves as Director, Chairman and Chief Executive Officer of BEN Management. As a result, Mr. Heppner may be deemed to beneficially the shares of Common Stock owned by BCC. Mr. Heppner disclaims beneficial ownership of such shares except to the extent of his pecuniary interest therein.
(3)    Includes 1,452,155 shares of Common Stock held by AltiVerse Capital Markets, L.L.C. ("AltiVerse"). AltiVerse is a Delaware limited liability company for which Hicks Holdings Operating LLC, a Delaware limited liability company ("Hicks Holding"), serves as Manager. Thomas O. Hicks serves as sole manager of Hicks Holdings. As a result, Mr. Hicks may be deemed to beneficially own the shares of Common Stock owned by AltiVerse. Mr. Hicks disclaims beneficial ownership of such shares except to the extent of his pecuniary interest therein. All 1,452,155 shares held by AltiVerse have been pledged as collateral to secure our obligations under our L Bonds pursuant to the Amended and Restated Pledge and Security Agreement dated October 23, 2017.
(4)    Shares reflected in the table include 156,251 of vested stock options currently exercisable or vesting within 60 days granted pursuant to our 2013 Stock Incentive Plan.
(5)    On April 26, 2019, and in connection with the closing of the Purchase and Contribution Transaction, Jon R. Sabes resigned as the Company's Chief Executive Officer and from all officer positions he held with the Company or any of its subsidiaries prior to the Closing, other than his position as Chief Executive Officer of the Company's technology focused wholly owned subsidiaries, Life Epigenetics and youSurance.

APP. 368

Page 87

APP. 369

(6)  On April 26, 2019, and in connection with the closing of the Purchase and Contribution Transaction, Steven F. Sabes resigned from all officer positions he held with the Company or any of its subsidiaries prior to the Closing, except as Chief Operating Officer of Life Epigenetics.

(7)  The business address of the Seller Trusts is 325 North St. Paul Street, Suite 4850, Dallas, Texas 75201. On January 12, 2018, we entered into a Master Exchange Agreement (the "Master Exchange Agreement") pursuant to which we agreed to engage in a strategic transaction (the "Exchange Transaction") with Beneficient and certain other parties (the "Seller Trusts"), in which the parties agreed to an exchange of certain assets. The Seller Trusts are a group of individual common law trusts that received shares of Common Stock in the Exchange Transaction. The trustee of each of the Seller Trusts is Delaware Trust Company. The trust advisors of each trust are two individuals unrelated to each other, James E. Turvey and Murray T. Holland, who have sole decision-making authority with respect to each trust. The beneficiary of each of the Seller Trusts is MHT Financial, LLC. The current members of MHT Financial, LLC are Shawn T. Terry and Mike McGill. The names of the various trusts comprising the Seller Trusts are as follows: The LT-1 Exchange Trust, The LT-2 Exchange Trust, The LT-3 Exchange Trust, The LT-4 Exchange Trust, The LT-5 Exchange Trust, The LT-6 Exchange Trust, The LT-7 Exchange Trust, The LT-8 Exchange Trust, The LT-9 Exchange Trust, The LT-12 Exchange Trust, The LT-14 Exchange Trust, The LT-15 Exchange Trust, The LT-16 Exchange Trust, The LT-17 Exchange Trust, The LT-18 Exchange Trust, The LT-19 Exchange Trust, The LT-20 Exchange Trust, The LT-21 Exchange Trust, The LT-22 Exchange Trust, The LT-23 Exchange Trust, The LT-24 Exchange Trust, The LT-25 Exchange Trust and The LT-26 Exchange Trust.

In connection with the Exchange Transaction, the Company and the Seller Trusts entered into a Stockholders Agreement, which provides (among other standstill provisions) that until the Seller Trusts own, in the aggregate, voting securities representing less than 10% of the total voting power of all voting securities of the Company, all voting securities of the Company voted by the Seller Trusts will be voted solely in proportion with the votes cast by all other holders of voting securities of the Company on the matter. In connection with the Purchase and Contribution Transaction, the Stockholders Agreement was terminated and the Seller Trusts are now entitled to full voting rights with respect to the shares of Common Stock they own and are entitled to cast a majority of the votes on all matters requiring stockholder votes.

(8)  As a limited partnership, BEN LP is controlled by its general partner, Beneficient Management, LLC, which is currently governed by an 11 member board of directors. The business address of BEN LP is 325 North St. Paul Street, Suite 4850, Dallas, Texas 75201.

(9)  AltiVerse is managed by its sole manager, Hicks Holdings Operating LLC, of which Thomas O. Hicks is the sole member and exercises voting and investment power with respect to the shares of Common Stock held by AltiVerse. The business address of AltiVerse is c/o Hicks Holdings Operating LLC, 2200 Ross Avenue, 50th Floor, Dallas, Texas 75201. All 1,452,155 shares held by AltiVerse have been pledged as collateral to secure our obligations under our L Bonds pursuant to the Amended and Restated Pledge and Security Agreement dated October 23, 2017.

## ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE.

### Conflict-of-Interest and Related-Party Transaction Policy

We have a Conflict-of-Interest and Related-Party Transaction Policy, pursuant to which our Board of Directors (or an authorized committee thereof) is responsible for reviewing policies and procedures with respect to related party transactions required to be disclosed pursuant to Item 404 of the SEC's Regulation S-K (including transactions between the Company and its officers and directors, or affiliates of such officers or directors), and approving the terms and conditions of such related party transactions. Our Conflict-of-Interest and Related-Party Transaction Policy sets forth the processes and procedure to be taken in such review and approval, which includes obtaining approval by a majority of the disinterested members of the Board (or an authorized committee thereof) and otherwise in accordance with state law governing conflicts of interest, or if the transaction involves compensation payable to an executive, the Compensation Committee. The related party transactions in which we engaged during year 2019 and the interim 2020 year-to-date period, which are described below, were approved in accordance with Conflict-of-Interest and Related-Party Transaction Policy.

<div align="center">Page 88</div>

APP. 370

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 371 of 1031    PageID 543

**Transactions with Related Persons**

Related party transactions that we have entered into during year 2019 and the interim 2020 year-to-date period are described below:

*Purchase and Contribution Transaction*

On April 15, 2019, Jon R. Sabes, the Company's former Chief Executive Officer and a director, and Steven F. Sabes, the Company's former Executive Vice President and a director, entered into the Purchase and Contribution Agreement with, among others, Ben LP. The Company was not a party to the Purchase and Contribution Agreement. However, the closing of the transactions contemplated by the Purchase and Contribution Agreement (the "Purchase and Contribution Transaction") were subject to certain conditions that were dependent upon the Company taking, or refraining from taking, certain actions. The closing of the Purchase and Contribution Transaction occurred on April 26, 2019. See "Item 1 — Business — The Beneficient Transactions — The Expanded Strategic Relationship" for a description of the Purchase and Contribution Agreement and the Purchase and Contribution Transaction are described.

Among other actions taken in connection with the with the closing of the Purchase and Contribution Transaction, on April 26, 2019, Beneficient Capital Company, L.L.C., a Delaware limited liability company ("BCC"), and AltiVerse Capital Markets, L.L.C., a Delaware limited liability company ("AltiVerse"), executed and delivered a Consent and Joinder (the "Consent and Joinder") to the Amended and Restated Pledge and Security Agreement dated October 23, 2017 by and among the Company, GWG Life, LLC, Messrs. Jon and Steven Sabes and the Bank of Utah (the "Security Agreement"). Pursuant to the Consent and Joinder, Messrs. Jon and Steven Sabes assigned their rights and delegated their obligations under the Security Agreement to BCC and AltiVerse, and BCC and AltiVerse became substitute grantors under the Security Agreement such that the shares of the Company's common stock acquired by BCC and AltiVerse pursuant to the Purchase Agreement (as defined below) will continue to be pledged as collateral security for the Company's obligations owing in respect of the L Bonds issued under the Amended and Restated Indenture governing our L Bonds. The description of the Consent and Joinder set forth above is not complete and is qualified in its entirety by reference to the full text of the Consent and Joinder which is incorporated by reference as Exhibit 10.19 to this Report.

In connection with the Exchange Transaction, the Company and the Seller Trusts entered into a Stockholders Agreement that provided (among other standstill provisions) that until the Seller Trusts own, in the aggregate, voting securities representing less than 10% of the total voting power of all voting securities of the Company, all voting securities of the Company voted by the Seller Trusts will be voted solely in proportion with the votes cast by all other holders of voting securities of the Company on the matter. On April 26, and in connection with the closing of the Purchase and Contribution Transaction, the Stockholders Agreement was amended and terminated, and the Seller Trusts are now entitled to full voting rights with respect to the shares of Common Stock they own and are entitled to cast a majority of the votes on all matters requiring stockholder votes.

*Promissory Note with Certain LiquidTrusts*

On May 31, 2019, our wholly-owned subsidiary GWG Life entered into a Promissory Note (the "Promissory Note"), made by Jeffrey S. Hinkle and Dr. John A. Stahl, not in their individual capacity but solely as trustees of The LT-1 LiquidTrust, The LT-2 LiquidTrust, The LT-5 LiquidTrust, The LT-7 LiquidTrust, The LT-8 LiquidTrust and The LT-9 LiquidTrust (collectively, the "Borrowers") in the principal amount of $65.0 million and payable to the order of GWG Life. Pursuant to the terms of the Promissory Note, GWG Life funded a term loan to the Borrowers in an aggregate principal amount of $65.0 million (the "Loan"). The Loan was funded in two installments as described below.

The Borrowers are common law trusts established as part of alternative asset financings extended by a subsidiary of Ben LP, of which the Company owns approximately 90% of the issued and outstanding common units. Although each Borrower is allocated a portion of the Loan equal to approximately 16.7% of the aggregate outstanding principal of the Loan, the Loan constitutes the joint and several obligations of the Borrowers.

The Loan was made pursuant to GWG's strategy to further diversify into alternative assets (beyond life insurance) and ancillary businesses and was intended to better position Beneficient's balance sheet, working capital and liquidity profile to satisfy anticipated Texas Department of Banking regulatory requirements.

An initial advance in the principal amount of $50.0 million was funded on June 3, 2019 and, subject to satisfaction of certain customary conditions, it is anticipated that the second advance, in the principal amount of $15.0 million was funded on November 22, 2019. The Loan bears interest at 7.0% per annum, with interest payable at maturity, and matures on June 30, 2023. Subject to the Intercreditor Agreements (as described below), the Loan can be prepaid at the Borrowers' election without premium or penalty.

Page 89

The Loan is unsecured and is subject to certain covenants (including a restriction on the incurrence of any indebtedness senior to the Loan other than existing senior loan obligations to each of HCLP Nominees, L.L.C. ("HCLP") and Beneficient Holdings, Inc. ("BHI", and together with HCLP, the "Senior Lenders"), as lenders) and events of default. At the time Beneficient was consolidated, all existing senior loan obligations were held by HCLP. The Senior Lenders are directly or indirectly associated with Brad K. Heppner, who is Chairman of the Company's Board of Directors. HCLP is not considered a related party of GWG or Beneficient.

A special committee of the Board of Directors of the Company (the "Special Committee") composed solely of independent and disinterested directors of the Company, together with the assistance of its independent legal advisors, reviewed, negotiated and approved the terms of the Loan. The foregoing description of the Promissory Note is qualified in its entirety by reference to the full and complete terms of the Promissory Note, which is incorporated by reference as Exhibit 10.24 to this Report.

*Intercreditor Agreements*

In connection with the Promissory Note, the Company also entered into two intercreditor and subordination agreements: (1) an Intercreditor Agreement between GWG Life and HCLP and (2) an Intercreditor Agreement between GWG Life and BHI (the "Intercreditor Agreements"). Under the Intercreditor Agreements, GWG Life agrees to subordinate the Loan to the secured obligations of Beneficient and its affiliates outstanding to the Senior Lenders (the "Senior Loan Obligations"), agrees to not take any liens to secure the Loan (and to subordinate such liens, if any, to the liens of the Senior Lenders), and agrees not to take enforcement actions under the Promissory Note until such Senior Loan Obligations are paid in full. The Intercreditor Agreements establish various other inter-lender and subordination terms, including, without limitation, with respect to permitted actions by each party, permitted payments, waivers, voting arrangements in bankruptcy, application of certain proceeds and limitations on amendments of the respective loan obligations of the parties. The Senior Lenders have agreed not to extend the maturity of their respective loan obligations beyond June 30, 2023 or increase the outstanding principal of the loans made by the Senior Lenders without the written consent of GWG Life. GWG Life has agreed not to transfer the Promissory Note except with the written consent of the Senior Lenders (such consent not to be unreasonably withheld) or to the Company or direct or indirect wholly owned subsidiaries thereof. The Special Committee, together with the assistance of its independent legal advisors, reviewed, negotiated and approved the terms of the Intercreditor Agreements. The foregoing description of the Intercreditor Agreements are qualified in their entirety by reference to the full and complete terms of the Intercreditor Agreements, which are incorporated by reference as Exhibit 10.25 and Exhibit 10.26 to this Report.

*Purchase of Additional Common Units of Ben LP*

On June 12, 2019, the Company acquired 1,000,000 Ben LP common units from unaffiliated holders of alternative assets that had sold the alternative assets to MHT Financial, LLC for contribution to various Exchange Trusts established by MHT Financial as part of the Ben LP liquidity products. The holders acquired the Ben LP common units from MHT Financial in satisfaction for a portion of the purchase price owed by MHT Financial for the alternative assets that MHT Financial contributed to the Exchange Trusts. Murray T. Holland, our Chief Executive Officer, was until recently a Managing Director of MHT Financial and continues to own a 30% interest in MHT Financial. Mr. Holland also serves as a trust advisor to the Exchange Trusts that hold the alternative assets. The purchase price for the Ben LP common units acquired by the Company was $10,000,000.

*Preferred Series A Unit Account and Common Unit Investment Agreement; Exchange Agreement*

On December 31, 2019, the Company, Ben LP, Beneficient Company Holdings, L.P., a Delaware limited partnership of which Ben LP owns all of the outstanding common units and serves as its general partner ("BCH"), and Beneficient Management, L.L.C., a Delaware limited liability company and the general partner of Ben LP ("Beneficient Management"), entered into a Preferred Series A Unit Account and Common Unit Investment Agreement (the "Investment Agreement").

Pursuant to the Investment Agreement, the Company transferred $79 million to Ben LP in return for 666,667 common units of Ben LP and a Preferred Series A Subclass 1 Unit Account of BCH.

In connection with the Investment Agreement, the Company obtained the right to appoint a majority of the board of directors of Beneficient Management, the general partner of Ben LP. As a result, the Company obtained control of Ben LP and began reporting the results of Ben LP and its subsidiaries on a consolidated basis beginning on the transaction date of December 31, 2019. The Company's right to appoint a majority of the board of directors of Beneficient Management will terminate in the event (i) the Company's ownership of the fully diluted equity of Ben LP (excluding equity issued upon the conversion or exchange of Preferred Series A Unit Accounts of BCH held as of December 31, 2019 by parties other than the Company) is less than 25%, (ii) the Continuing Directors of the Company cease to constitute a majority of the board of directors of the Company, or (iii) certain bankruptcy events occur with respect to the Company. The term "Continuing Directors" means, as of any date of determination, any member of the board of directors of the Company who: (1) was a member of the board of directors on December 31, 2019; or (2) was nominated for election or elected to the board of directors with the approval of a majority of the Continuing Directors who were members of the board of directors at the time of such nomination or election.

Page 90

APP. 372

Beneficient Management has an executive committee, a nominating committee and a community reinvestment committee. The board of directors of Beneficient Management has the right to appoint two members of these committees, and an entity related to Brad K. Heppner, the Company's Chairman, has the right to appoint the other two members of these committees. The entity related to Mr. Heppner also has the right to appoint the Chairman of the Board and of each of the committees. The Beneficient Management executive committee has the right to approve certain transactions on behalf of Beneficient Management and Ben LP and its subsidiaries, including: (i) the incurrence of debt; (ii) the issuance of equity interests of Ben LP or any subsidiary equal to 5% or more of the fully diluted equity of such entity or that have preferred terms to the common equity of Ben LP, except in connection with any trust instrument or product offered by Ben LP or its affiliates; (iii) the adoption of a shareholder or unitholder rights plan by Ben LP or any subsidiary thereof; (iv) the amendment, supplement, waiver, or modification of Ben LP's limited partnership agreement, the BCH limited partnership agreement or the organizational documents of any subsidiary of the foregoing other than any common law or statutory trusts created to facilitate the financing, acquisition, contribution, assignment or holding of alternative assets; (v) the exchange or disposition of a majority or more of the assets, taken as a whole, of Ben LP or any subsidiary thereof in a single transaction or a series of related transactions; (vi) the exchange or disposition of a majority or more of the assets, taken as a whole, of Beneficient Management or any subsidiary thereof in a single transaction or a series of related transactions; (vii) the execution by Ben LP, Beneficient Management or any subsidiary thereof of any contracts or of any amendment, supplement, waiver or modification of any existing contract, which would materially change the nature of the business of Beneficient Management and its affiliates; (viii) materially or commercially substantive changes to or creation of an employee incentive or benefit plan of Beneficient Management, Ben LP or any subsidiary thereof; (ix) the merger, sale or other combination of Ben LP, Beneficient Management or any subsidiary thereof with or into any other person or entity; (x) the transfer, mortgage, pledge, hypothecation or grant of a security interest in all or substantially all of the assets of Ben LP or any subsidiary thereof; (xi) the transfer, mortgage, pledge, hypothecation or grant of a security interest in all or substantially all of the assets of Beneficient Management or any subsidiary thereof; (xii) the removal without cause of a chief executive officer or any other executive officer of Beneficient Management, Ben LP or any operating subsidiary thereof; (xiii) the termination of employment of any other officer of Beneficient Management, Ben LP or any operating subsidiary thereof or the termination of the association of a partner, member, manager or director of any subsidiary of Ben LP, in each case, without cause; (xiv) the liquidation or dissolution of Beneficient Management, Ben LP or any operating subsidiary thereof; (xv) the withdrawal or removal of Beneficient Management as the general partner of Ben LP or the direct or indirect transfer of beneficial ownership of all or any part of a general partner interest in Ben LP; (xvi) any determination by Beneficient Management, acting as general partner of Ben LP, related to the removal or replacement of the general partner under Ben LP's limited partnership agreement; (xvii) the entry into any material or commercially substantive agreement with a related party; (xviii) the creation of any new and materially or commercially substantively different trust instrument or product, or any materially or commercially substantive change, amendment, supplement, waiver or modification to the terms or provision of any existing trust product, offered by Ben LP or any of its affiliates to the extent regulated by the Texas Finance Commission or other state, federal or non-U.S. regulator with direct or indirect jurisdiction over Ben LP or such affiliate or such product, other than any change or modification to any exhibit or schedule to any trust instrument or product; or (xix) the bankruptcy of Ben LP.

Following the transaction, and as agreed in the Investment Agreement, the Company was issued an initial capital account balance for the Preferred Series A Subclass 1 Unit Account of $319 million. The other holders of the Preferred Series A Subclass 1 Unit Accounts are entities related to certain founders of Ben LP and an entity related to one of GWG's and Beneficient's directors (the "Related Account Holders"), and the aggregate capital accounts of all holders of the Preferred Series A Subclass 1 Unit Accounts after giving effect to the investment by the Company is $1.6 billion. The Company's Preferred Series A Subclass 1 Unit Account is the same class of preferred security as held by the Related Account Holders. If the Related Account Holders exchange their Preferred Series A Subclass 1 Unit Accounts for securities of the Company, the Company's Preferred Series A Subclass 1 Unit Account would be converted into common units of Ben LP (so neither the Company nor the Related Account Holders would hold Preferred Series A Subclass 1 Unit Accounts).

In addition, on December 31, 2019, the Company, Ben LP and certain holders of common units of Ben LP (the "Common Units") entered into an Exchange Agreement (the "Exchange Agreement") pursuant to which certain holders of Common Units from time to time have the right, on a quarterly basis, to exchange their Common Units for common stock of the Company. The exchange ratio in the Exchange Agreement is based on the ratio of the capital account associated with the Common Units to be exchanged to the market price of the Company's common stock based on the volume weighted average price of the Company's common stock for the five consecutive trading days prior to the quarterly exchange date. The Exchange Agreement is intended to facilitate the marketing of Ben LP's products to holders of alternative assets.

**Director Independence**

Our Board of Directors periodically reviews relationships that directors have with our Company to determine whether our directors are "independent directors" as such term is defined in Rule 5605(a)(2) of the NASDAQ Marketplace Rules. Our Board of Directors has determined that the following directors are independent directors: Roy W. Bailey, Peter T. Cangany, Jr., David F. Chavenson, Dennis P. Lockhart, and Roger T. Staubach.

Because the Seller Trusts currently own a majority of our outstanding Common Stock, we are a "controlled company" as that term is set forth in Rule 5615(c) of the NASDAQ Marketplace Rules. Under the NASDAQ rules, a company of which more than 50% of the voting power for the election of directors is held by an individual, a group or another company is a "controlled company" and may elect not to comply with certain NASDAQ corporate governance requirements, including the requirements that:

- a majority of our board of directors consist of independent directors;

- our nominating and corporate governance committee be composed entirely of independent directors; and

- our compensation committee be composed entirely of independent directors.

We are currently relying on the controlled company exemption for certain of the above requirements, including those related to the composition of our compensation and nominating our corporate governance committees.

Page 91

**ITEM 14. PRINCIPAL ACCOUNTING FEES AND SERVICES.**

|  | 2019[1] | 2018 |
|---|---|---|
| Audit Fees[2] | $ 1,559,082 | $ 577,317 |
| Audit-Related Fees[3] | 50,908 | 16,423 |
| Tax Fees[4] | 126,710 | 105,560 |
| All Other Fees[5] | 6,430 | 11,913 |
| Total Fees | $ 1,743,130 | $ 711,213 |

(1) Amounts for 2019 include principal accounting fees and services incurred by Ben LP and its subsidiaries as these services were necessary to complete the audited consolidated financial statements of GWG Holdings.

(2) Audit Fees consist of fees for professional services rendered for the audit of our consolidated annual financial statements and review of the interim consolidated financial statements included in quarterly reports and services that are normally provided in connection with statutory and regulatory filings or engagements.

(3) Audit-Related Fees consist principally of assurance and related services that are reasonably related to the performance of the audit or review of the Company's financial statements but not reported under the caption *Audit Fees* above.

(4) Tax Fees consist of fees for tax compliance, tax advice, and tax planning.

(5) All Other Fees typically consist of fees for permitted non-audit products and services provided. All Other Fees included expenses related to our continuous offering of L Bonds and redeemable preferred stock.

The Audit Committee of our Board of Directors has reviewed the services provided by Whitley Penn LLP during year 2019 and the fees billed for such services. After consideration, the Audit Committee has determined that the receipt of these fees by Whitley Penn LLP is compatible with the provision of independent audit services. The Audit Committee discussed these services and fees with Whitley Penn LLP and our management to determine that they are permitted under the rules and regulations concerning auditor independence promulgated by the SEC to implement the Sarbanes-Oxley Act of 2002, as well as the American Institute of Certified Public Accountants.

**Pre-Approval Policy**

The written charter of the Audit Committee provides that all audit and non-audit accounting services permitted to be performed by the our independent registered public accounting firm under applicable rules and regulations must be pre-approved by the Audit Committee or by designated members of the Audit Committee, other than with respect to *de minimis* exceptions permitted under the Sarbanes-Oxley Act of 2002. All services performed by our independent registered public accounting firm during the years ended December 31, 2019 and 2018 were pre-approved in accordance with the written charter.

Prior to or as soon as practicable following the beginning of each year, a description of the audit, audit-related, tax, and other services expected to be performed by the independent registered public accounting firm in the following year will be presented to the Audit Committee for approval. Following such approval, any requests for audit, audit-related, tax, and other services not presented and pre-approved must be submitted to the Audit Committee for specific pre-approval and cannot commence until such approval has been granted. However, we have delegated the authority to grant specific pre-approval between meetings, as necessary, to the Chair of the Audit Committee. The Chair then updates the Audit Committee at the next regularly scheduled meeting of any services that were granted specific pre-approval.

Page 92

APP. 374

PART IV

## ITEM 15. EXHIBITS, FINANCIAL STATEMENT SCHEDULES.

**Documents filed as part of this Form 10-K:**

| | |
|---|---|
| Reports of Independent Registered Public Accounting Firms | F-1 |
| Consolidated Balance Sheets at December 31, 2019 and 2018 | F-4 |
| Consolidated Statements of Operations for the years ended December 31, 2019 and 2018 | F-5 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2019 and 2018 | F-6 |
| Consolidated Statements of Changes in Stockholders' Equity for the years ended December 31, 2019 and 2018 | F-8 |
| Notes to Consolidated Financial Statements | F-9 |

**Financial Statement Schedule:**

Not applicable.

**Exhibit Index**

| Exhibit | Description |
|---|---|
| 3.1 | Certificate of Incorporation[1] |
| 3.2 | Bylaws as amended[27] |
| 3.3 | Certificate of Amendment to Certificate of Incorporation[3] |
| 3.4 | Certificate of Amendment to Certificate of Incorporation[7] |
| 3.5 | Certificate of Designation for Redeemable Preferred Stock[8] |
| 3.6 | Certificate of Amendment to Certificate of Designation for Redeemable Preferred Stock[8] |
| 3.7 | Certificate of Designation for Series 2 Redeemable Preferred Stock[10] |
| 3.8 | Certificate Of Designations Of Series B Convertible Preferred Stock[18] |
| 4.1 | Amended and Restated Indenture with Bank of Utah, dated October 23, 2017[5] |
| 4.2 | Amended and Restated Pledge and Security Agreement by and among GWG Holdings, Inc., GWG Life, LLC, Jon R. Sabes, Steven F. Sabes, and Bank of Utah, dated October 23, 2017[5] |
| 4.3 | Form of Subscription Agreement for Redeemable Preferred Stock[11] |
| 4.4 | Form of Subscription Agreement for Series 2 Redeemable Preferred Stock[14] |
| 4.6 | Amendment No. 1 to Amended and Restated Indenture with Bank of Utah, dated March 27, 2018[23] |
| 4.7 | Supplemental Indenture dated as of August 10, 2018 To The Amended And Restated Indenture dated as of October 23, 2017, as amended[18] |
| 4.8 | Amendment No. 2 to Amended and Restated Indenture with Bank of Utah, dated December 31, 2019[26] |
| 4.9 | Description of the Registrant's Securities Registered Pursuant to Section 12 of the Securities Exchange Act of 1934 (filed herewith) |
| 10.1 | Second Amended and Restated Loan and Security Agreement with GWG DLP Funding IV, LLC (as borrower), CLMG Corp. (as agent) and LNV Corporation (as lender), dated November 1, 2019[28] |
| 10.2* | Employment Agreement with William B. Acheson, dated June 30, 2017[9] |
| 10.3* | 2013 Stock Incentive Plan, as amended[16] |
| 10.4* | Form of Stock Option Agreement used with 2013 Stock Incentive Plan[13] |
| 10.5 | Master Exchange Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, MHT Financial SPV, LLC, a Delaware limited liability company, and various related trusts, as amended and restated on January 18, 2018 with effect from January 12, 2018[15] |
| 10.6 | First Amendment to Master Exchange Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, MHT Financial SPV, LLC, a Delaware limited liability company, and various related trusts, dated April 30, 2018[15] |
| 10.7 | Second Amendment to Master Exchange Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, MHT Financial SPV, LLC, a Delaware limited liability company, and various related trusts, dated June 29, 2018[17] |
| 10.8 | Third Amendment to Master Exchange Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, MHT Financial SPV, LLC, a Delaware limited liability company, and various related trusts, dated August 10, 2018[18] |

Page 93

| Exhibit | Description |
|---|---|
| 10.9 | Commercial Loan Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, dated August 10, 2018[18] |
| 10.10 | Amendment No. 1 dated December 27, 2018 to Commercial Loan Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership[19] |
| 10.11 | Exchangeable Note from The Beneficient Company Group, L.P., a Delaware limited partnership, dated August 10, 2018[18] |
| 10.12 | Registration Rights Agreement with certain trusts related to The Beneficient Company Group, L.P., a Delaware limited partnership, and as set forth in the Agreement, dated August 10, 2018[18] |
| 10.13 | Registration Rights Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, dated August 10, 2018[18] |
| 10.14 | Registration Rights Agreement with each of the Exchange Trusts, dated December 27, 2018[19] |
| 10.15 | Participating Option Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, dated December 27, 2018[19] |
| 10.16 | Consent and Joinder to Amended and Restated Pledge and Security Agreement dated April 26, 2019[21] |
| 10.17* | Form of Indemnification Agreement with Directors and Officers[21] |
| 10.18* | Employment Agreement dated as of May 31, 2019 by and between GWG Holdings, Inc. and Murray T. Holland[24] |
| 10.19* | Performance Share Unit Agreement dated as of May 31, 2019 by and between GWG Holdings, Inc. and Murray T. Holland[24] |
| 10.20 | Promissory Note dated May 31, 2019 made by and on behalf of certain LiquidTrust Borrowers[25]† |
| 10.21 | Intercreditor Agreement dated May 31, 2019 between GWG Life and HCLP Nominees, L.L.C.[25] |
| 10.22 | Intercreditor Agreement dated May 31, 2019 between GWG Life and Beneficient Holdings, Inc.[25] |
| 10.23 | Forbearance Letter Agreement dated July 3, 2019 between GWG DLP Funding IV, LLC and CLMG Corp. (as agent)[27] |
| 10.24* | Form of Non-employee Director Restricted Stock Agreement[27] |
| 21 | List of Subsidiaries (filed herewith) |
| 23.1 | Consent of Whitley Penn (filed herewith) |
| 23.2 | Consent of Baker Tilly Virchow Krause, LLP (filed herewith) |
| 24.1 | Power of Attorney (incorporated by reference to the signature page of this Annual Report on Form 10-K) |
| 31.1 | Section 302 Certification of the Chief Executive Officer (filed herewith) |
| 31.2 | Section 302 Certification of the Chief Financial Officer (filed herewith) |

Page 94

APP. 376

| Exhibit | Description |
|---|---|
| 32.1 | Certification of Chief Executive Officer and Chief Financial Officer Pursuant to 18 U.S.C. §1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (filed herewith) |
| 99.1 | Letter from ClearLife Limited, dated February 24, 2020 (filed herewith) |
| 99.2 | Portfolio of Life Insurance Policies as of December 31, 2019 (filed herewith) |
| 99.3 | Purchase and Contribution Agreement dated as of April 15, 2018 by and among The Beneficient Company Group, L.P., Beneficient Company Holdings, L.P., AltiVerse Capital Markets, L.L.C., Sabes AV Holdings, LLC, Jon R. Sabes, Steven F. Sabes, Insurance Strategies Fund, LLC and SFS Holdings, LLC[20] |
| 99.4 | The Beneficient Company Group, L.P. and Subsidiaries Consolidated Financial Statements and Independent Auditor's Report (filed herewith) |
| 99.5 | Fourth Amended and Restated Limited Partnership Agreement of Beneficient Company Holdings, L.P., dated as of April 26, 2019[29] †. |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Schema Document |
| 101.CAL | XBRL Calculation Linkbase Document |
| 101.DEF | XBRL Definition Linkbase Document |
| 101.LAB | XBRL Label Linkbase Document |
| 101.PRE | XBRL Presentation Linkbase Document |

\*    Management contract or compensatory plan or arrangement.

(1)  Incorporated by reference to Form S-1 Registration Statement filed on June 14, 2011 (File No. 333-174887).

(2)  Intentionally omitted.

(3)  Incorporated by reference to Form S-1/A Registration Statement filed on August 23, 2011 (File No. 333-174887).

(4)  Intentionally omitted.

(5)  Incorporated by reference to Current Report on Form 8-K filed on October 26, 2017.

(6)  Intentionally omitted.

(7)  Incorporated by reference to Quarterly Report on Form 10-Q filed on August 8, 2014.

(8)  Incorporated by reference to Annual Report on Form 10-K filed on March 22, 2016.

(9)  Incorporated by reference to Current Report on Form 8-K filed on June 30, 2017.

(10) Incorporated by reference to Current Report on Form 8-K filed on February 22, 2017.

(11) Incorporated by reference to Form S-1/A Registration Statement filed on October 23, 2015 (File No. 333-206626).

(12) Intentionally omitted.

(13) Incorporated by reference to Form S-1/A Registration Statement filed on June 6, 2014 (File No. 333-195505).

(14) Incorporated by reference to Form S-1/A Registration Statement filed on February 7, 2017 (File No. 333-214896).

(15) Incorporated by reference to Quarterly Report on Form 10-Q filed on May 11, 2018.

(16) Incorporated by reference to Current Report on Form 8-K filed on May 9, 2018.

(17) Incorporated by reference to Quarterly Report on Form 10-Q filed on August 14, 2018.

(18) Incorporated by reference to Current Report on Form 8-K filed on August 14, 2018.

(19) Incorporated by reference to Current Report on Form 8-K filed on January 4, 2019.

(20) Incorporated by reference to Exhibit 10.1 to Amendment No. 1 to the Schedule 13D jointly filed on April 16, 2019 by Jon R. Sabes and Steven F. Sabes, among others.

(21) Incorporated by reference to Current Report on Form 8-K filed on April 30, 2019.

(22) Intentionally omitted.

(23) Incorporated by reference to Annual Report on Form 10-K filed on March 29, 2018.

(24) Incorporated by reference to Current Report on Form 8-K filed on June 6, 2019.

(25) Incorporated by reference to Current Report on Form 8-K filed on June 6, 2019.

(26) Incorporated by reference to Current Report on Form 8-K filed on January 7, 2020.

(27) Incorporated by reference to Annual Report on Form 10-K filed on July 9, 2019.

(28) Incorporated by reference to Current Report on Form 8-K filed on November 7, 2019.

(29) Incorporated by reference to Quarterly Report on Form 10-Q filed on September 3, 2019.

†    Certain information has been excluded from this exhibit because it both is not material and would likely cause competitive harm to the registrant if publicly disclosed.

**ITEM 16. FORM 10-K SUMMARY.**

Not applicable.

Page 95

APP. 377

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 378 of 1031    PageID 550

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities and Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**GWG HOLDINGS, INC.**

Date: March 27, 2020

By:   /s/ Murray T. Holland
*President and Chief Executive Officer*

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Murray T. Holland and Lennie Nicholson, jointly and severally, as his or her true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him or her, and in his or her name, place and stead, in any and all capacities, to sign any and all amendments to this report, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite or necessary to be done in and about the premises hereby ratifying and confirming all that said attorneys-in-fact and agents, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities and Exchange Act of 1934, this report has been signed below, as of March 27, 2020, by the following persons on behalf of the registrant and in the capacities indicated below.

| *Signature* | *Title* |
|---|---|
| /s/ Murray T. Holland<br>Murray T. Holland | President and Chief Executive Officer<br>(Principal Executive Officer) |
| /s/ Timothy L. Evans<br>Timothy L. Evans | Chief Financial Officer<br>(Principal Financial and Accounting Officer) |
| /s/ Brad K. Heppner<br>Brad K. Heppner | Director |
| /s/ Roy W. Bailey<br>Roy W. Bailey | Director |
| /s/ Peter T. Cangany, Jr.<br>Peter T. Cangany, Jr. | Director |
| /s/ David F. Chavenson<br>David F. Chavenson | Director |
| /s/ Thomas O. Hicks<br>Thomas O. Hicks | Director |
| /s/ Dennis P. Lockhart<br>Dennis P. Lockhart | Director |
| /s/ Bruce W. Schnitzer<br>Bruce W. Schnitzer | Director |
| /s/ Roger T. Staubach<br>Roger T. Staubach | Director |
| /s/ David H. de Weese<br>David H. de Weese | Director |

Page 96

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

# FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended **December 31, 2020**

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES ACT OF 1934**

For the transition period from _____ to _____

**Commission File Number: 001-36615**

# GWG HOLDINGS, INC.

(Exact name of registrant as specified in its charter)

| **Delaware** | **26-2222607** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**325 North St. Paul Street, Suite 2650**
**Dallas, TX 75201**
(Address of principal executive offices, including zip code)

**(612) 746-1944**
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock | GWGH | Nasdaq Capital Market |

**Securities registered pursuant to Section 12(g) of the Act**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐  No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐  No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐  No ☒

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The aggregate market value of the registrant's common stock held by non-affiliates was $24,297,105 as of June 30, 2020 (the last business day of the registrant's most recently completed second fiscal quarter), based on a total of 3,167,810 shares of common stock held by non-affiliates and a closing price of $7.67 as reported on the Nasdaq Capital Market on June 30, 2020. For purposes of this computation, all officers, directors, and 10% beneficial owners of the registrant are deemed to be affiliates. Such determination should not be deemed to be an admission that such officers, directors or 10% beneficial owners, are or were, in fact, affiliates of the registrant.

As of September 30, 2021, GWG Holdings, Inc. had 33,097,118 shares of common stock outstanding.

### DOCUMENTS INCORPORATED BY REFERENCE:

None.

APP. 380

Table of Contents

# GWG HOLDINGS, INC.

### Index to Form 10-K
### for the Fiscal Year Ended December 31, 2020

**Explanatory Note**

**Forward-Looking Information; Risk Factor Summary**                                                      i

PART I                                                                                                     1

ITEM 1.      Business.                                                                                     1
ITEM 1A.     Risk factors.                                                                                12
ITEM 1B.     Unresolved staff comments.                                                                   41
ITEM 2.      Properties.                                                                                  41
ITEM 3.      Legal proceedings.                                                                           41
ITEM 4.      Mine safety disclosures.                                                                     41

PART II                                                                                                   42

ITEM 5.      Market for the registrant's common equity, related shareholder matters and issuer purchases of equity
             securities.                                                                                  42
ITEM 6.      Selected financial data.                                                                     42
ITEM 7.      Management's discussion and analysis of financial condition and results of operations.       42
ITEM 7A.     Quantitative and qualitative disclosures about market risk.                                  74
ITEM 8.      Consolidated financial statements and supplementary data.                                   F-1
ITEM 9.      Changes in and disagreements with accountants on accounting and financial disclosure.        73
ITEM 9A.     Controls and procedures.                                                                     73
ITEM 9B.     Other Information.                                                                            75

PART III                                                                                                  76

ITEM 10.     Directors, executive officers and corporate governance.                                      76
ITEM 11.     Executive compensation.                                                                       80
ITEM 12.     Security ownership of certain beneficial owners and management and related shareholder matters.  85
ITEM 13.     Certain relationships and related transactions, and director independence.                   88
ITEM 14.     Principal accounting fees and services.                                                       92

PART IV                                                                                                    94

ITEM 15.     Exhibits, financial statement schedules.                                                      94
ITEM 16.     FORM 10-K SUMMARY                                                                             98

SIGNATURES                                                                                                 99

Table of Contents

**Explanatory Note**

**Restatement Overview**

In this Annual Report on Form 10-K for the year ended December 31, 2020 (the "2020 Form 10-K"), GWG Holdings, Inc. is restating its previously issued (i) consolidated balance sheet as of December 31, 2019, (ii) the consolidated statement of operations, (iii) the consolidated statement of changes in stockholders' equity, and (iv) the consolidated statement of cash flows for the year ended December 31, 2019, included in its Annual Report on Form 10-K for the year ended December 31, 2019, (the "Restatement"). The Restatement also impacted each of the quarters for the periods beginning with GWG Holdings, Inc.'s consolidation with The Beneficient Company Group, L.P. ("Ben LP," including all of the subsidiaries it may have from time to time — "Beneficient") as of December 31, 2019 through the quarter ended September 30, 2020. We do not plan to file an amended version of any previously filed reports on Forms 10-K or 10-Q in connection with the Restatement, and, as such, the financial statements included in such previously filed periodic reports should not be relied upon.

In this 2020 Form 10-K, the annual and interim periods from GWG Holdings, Inc.'s consolidation with Beneficient as of December 31, 2019 through the quarter ended September 30, 2020 are collectively referred to as the "Restatement Period." References to the "Company," "we," "our" and "us" in this 2020 Form 10- K refer to GWG Holdings, Inc. together, in each case, with its subsidiaries unless the context suggests otherwise.

The impact of the Restatement is included in this 2020 Form 10-K, and is more specifically described below in this Explanatory Note and in Notes 21 and 22 of the notes to the accompanying audited consolidated financial statements and "Item 7 – Management's Discussion and Analysis of Financial Condition and Results of Operations". All references to prior periods included below in the Management's Discussion and Analysis of Financial Condition and Results of Operations have been revised to reflect the effects of the Restatement. Additionally, the impacts of the Restatement have been reflected throughout the financial statements, including the applicable footnotes.

As previously reported on Form 8-K filed with the Securities and Exchange Commission ("SEC") on July 7, 2021, and as discussed throughout this 2020 Form 10-K, as part of the preparation of its 2020 Form 10-K, the Company voluntarily submitted two questions to the SEC's Office of the Chief Accountant ("OCA") on February 15, 2021. The questions submitted by the Company to OCA were (1) whether a December 31, 2019 transaction resulted in GWG Holdings, Inc. obtaining control of Ben LP in a transaction that constituted a change-in-control of Beneficient by entities not under common control, and (2) whether Ben LP was required to consolidate any of the trusts created through Beneficient's ExAlt Plan$^{TM}$ (as defined in Item 1. Business) established in connection with its business of providing liquidity to holders of alternative assets. On July 26, 2021, the Company and OCA staff held a conference call in which OCA's staff notified the Company of its conclusions on the two accounting questions that were the subject of the consultation. During that call, OCA expressed that it would object to a conclusion that Ben LP not consolidate the Custody Trusts, Collective Trusts, LiquidTrusts and Funding Trusts, (collectively, the "ExAlt Trusts") as of December 31, 2019. Consistent with the conclusions communicated by OCA on July 26, 2021, the Company determined that it was necessary to restate the consolidated financial statements as of and for the year ended December 31, 2019 in response to the conclusion on question (2). Regarding question (1), OCA did not conclude on the common control aspect of the transaction in question. However, after further analysis, including, among other things, consulting with legal counsel to conclude that the common stock of GWG Holdings held by Beneficient were not voteable under Delaware law, the Company confirmed its original conclusion that the entities were not under common control.

Prior to December 31, 2019, only certain trusts created through Beneficient's ExAlt Plan$^{TM}$ were considered variable interest entities for which Ben LP had a variable interest and was considered the primary beneficiary. Thus, Ben LP was required to consolidate certain of such trusts. Due to changes to both the governance structure and the underlying economics of the trust and other agreements pertaining to certain of the ExAlt Trusts and the execution of new loan agreements between a subsidiary of Ben LP and certain of such trusts as of December 31, 2019, it was initially concluded that Ben LP no longer had the power to direct the activities that most significantly impact the economic performance of any of the ExAlt Trusts and therefore could no longer consolidate any of such trusts as of December 31, 2019, including those previously consolidated. However, we have since determined that such conclusion was incorrect, and that the proper application of generally accepted accounting principles is for Ben LP to consolidate the ExAlt Trusts. As a result of consolidating such trusts, Ben LP's primary tangible asset, which was acquired through loans a subsidiary of Ben LP made to certain of the ExAlt Trusts, was previously reported as a loan receivable as of December 31, 2019, but is now being reported as an investment in alternative assets held by certain of the ExAlt Trusts.

APP. 382

APP. 383

Table of Contents

**Impact of Restatement**

Notes 21 and 22 of the accompanying consolidated financial statements present the impact of the Restatement to our Consolidated Balance Sheets, Consolidated Statements of Operations, Consolidated Statements of Changes in Stockholders' Equity, and Consolidated Statements of Cash Flows for the annual and quarterly periods affected, each as compared with the amounts presented in the originally filed Annual Report on Form 10-K for the year ended December 31, 2019, and the original Quarterly Reports on Form 10-Q for the periods ended March 31, 2020, June 30, 2020, and September 30, 2020, previously filed with the SEC.

**Other Corrections**

In addition to the Restatement items, the Company has corrected other items, which had been previously identified and determined to be immaterial pursuant to Accounting Standards Codification ("ASC") Topic 250, *Accounting Changes and Error Corrections* and Staff Accounting Bulletin ("SAB") No. 99, *Materiality*. While these other adjustments are both quantitatively and qualitatively immaterial, individually and in the aggregate, because we are correcting for the Restatement items, we have decided to correct these other adjustments as well.

Specifically, the Company reassessed its valuation allowance against its deferred tax assets and determined it will no longer utilize the reversal of a temporary difference related to the Company's preferred equity ownership in Beneficient, until such time as the preferred equity is no longer constrained, as a source of income to realize existing deferred tax assets related to the net operating loss and Section 163(j) limitations. The net deferred tax liability presented in the Company's consolidated balance sheets is specifically related to GWG Life's investment in the Preferred Series A Subclass 1 Unit Accounts resulting from the Investment Agreement described in Note 1. The disposition of this investment is constrained by the Pledge and Security Agreement in favor of the holders of the L Bonds of GWG Holdings. As such, the timing of recognition of the necessary taxable income related to this investment and the future reversal of this temporary difference cannot be predicted. The changes in the valuation allowance are reflected in the restatement tables presented in Notes 21 and 22.

**Internal Control over Financial Reporting and Disclosure Controls and Procedures**

In connection with matters related to the Restatement, we have determined that a material weakness existed in our internal control over financial reporting for all periods from December 31, 2019 to December 31, 2020. As of December 31, 2020, the design and operating effectiveness of controls over the selection, application and review of the implementation of accounting policies were not sufficient to ensure amounts recorded and disclosed were fairly stated in accordance with GAAP. This material weakness resulted in the Restatement. In addition, not solely as a result of this material weakness, GWG Holdings, Inc.'s Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were not effective for the year ended December 31, 2020. Notwithstanding this material weakness and others identified, our management, based upon the substantial work performed during the Restatement process, has concluded that the Company's consolidated financial statements for the periods covered by and included in this 2020 Form 10-K are prepared in accordance with GAAP and fairly present, in all material respects, our financial position, results of operation and cash flows for each of the periods presented herein. For more information see "Part II – Item 9A – Controls and Procedures."

APP. 384

Table of Contents

## FORWARD-LOOKING INFORMATION; RISK FACTOR SUMMARY

This 2020 Form 10-K contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, which involve certain known and unknown risks and uncertainties. Forward-looking statements predict or describe our future operations, business plans, business and investment strategies and portfolio management and the performance of our investments. These forward-looking statements are generally identified by their use of such terms and phrases as "intend," "goal," "estimate," "expect," "project," "projections," "plans," "seeks," "anticipates," "will," "should," "could," "may," "designed to," "foreseeable future," "believe," "scheduled" and similar expressions. Our actual results or outcomes may differ materially from those anticipated. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date the statement was made. We assume no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law.

Our actual results may differ significantly from any results expressed or implied by these forward-looking statements. A summary of the principal risk factors that make investing in our securities risky and might cause our actual results to differ is set forth below. The following is only a summary of the principal risks that may materially adversely affect our business, financial condition, results of operations and cash flows. This summary should be read in conjunction with the more complete discussion of the risk factors we face, which are set forth in the section entitled "Risk Factors" in this report. Defined terms used below are defined elsewhere in this 2020 Form 10-K.

### Risks Related to Our Operations and Organizational Structure

- Our current inability to raise capital, recurring losses from operations, negative cash flows from operations, delays in executing our business plans, and potential negative implications of the ongoing SEC non-public, fact-finding investigation raise substantial doubt regarding our ability to continue as a going concern. The report from our independent registered public accounting firm for the year ended December 31, 2020, includes an explanatory paragraph stating that these factors raise substantial doubt about our ability to continue as a going concern.
- We have a relatively limited history of operations and a history of net losses.
- Our operations and financial results may be adversely affected by the ongoing COVID-19 pandemic.
- We may be unable to capitalize on the anticipated benefits of the Beneficient Transactions.
- GWG Holdings' ability to control the activities of Beneficient is subject to certain rights of others set forth in the limited liability company agreement for the general partner of Ben LP, and GWG Holdings has entered into a non-binding term sheet to relinquish certain rights with respect to Beneficient, including GWG Holdings' ability to appoint a majority of the board of directors of the general partner of Ben LP and control the activities of Beneficient.
- Ben LP's partnership agreement eliminates fiduciary duties that might otherwise be owed to GWG Holdings under Delaware law.
- If certain events occur, GWG Holdings will lose its right to appoint a majority of the board of directors of the general partner of Ben LP and therefore its ability to exercise control over Ben LP and consolidate its financial results.
- GWG Holdings' percentage ownership in Ben LP may be diluted significantly.
- A failure to establish and maintain effective internal controls over financial reporting, including our identified material weaknesses, could adversely affect our financial results.
- We may not realize a return on GWG Holdings' investment in FOXO Technologies Inc.
- The resale of GWG Holdings' common stock issued in the Exchange Transaction could result in a reduction to the market price of GWG Holdings' common stock and result in a destabilized trading market for GWG Holdings' common stock.
- The Seller Trusts, collectively, have the power to control the vote of a majority of GWG Holdings' outstanding common stock.
- We are currently relying on the "controlled company" exemption under Nasdaq Stock Market Listing Rules.

### Risks Related to Our Liquidity Products Business

- Beneficient may be unable to operate its business successfully.
- Beneficient has experienced significant delays in obtaining, and may not obtain, its TEFFI trust company charter.
- Beneficient may not be able to grow, effectively manage its growth, or achieve profitability.
- Beneficient is subject to repayment risk in connection with its liquidity transactions.
- Beneficient may incur significant losses as a result of ineffective risk management processes and strategies.
- Difficult market conditions can cause investors to reduce or suspend their investments in alternative assets or their desire to liquidate alternative assets they hold, which could adversely affect Beneficient's business.

APP. 385

i

Table of Contents

- Beneficient's business, profitability and liquidity may be adversely affected by deterioration in the credit quality of, or defaults by, the ExAlt Trusts that owe Beneficient money, securities or other assets or whose obligations collateralizes the loans made by certain of Beneficient's operating subsidiaries to certain of the ExAlt Trusts.
- Beneficient uses hedging transactions to manage certain market risks; Beneficient's business, profitability and liquidity may be adversely affected by unanticipated market conditions including interest rates, currency exchange rates, equity market behavior, and other relevant market factors that generate losses not covered or offset by a hedge.
- Beneficient's fair value estimates of illiquid assets may not accurately estimate prices obtained at the time of sale.
- Notwithstanding its diversification strategies, Beneficient's liquidity, profitability and business may be adversely affected by concentrations of assets.
- The due diligence process that Beneficient undertakes in connection with liquidity transactions may or may not reveal all facts that may be relevant in connection with such liquidity transaction.

**Risks Related to Our Secondary Life Insurance Business**

- The valuation of our life insurance policy assets requires us to make material assumptions that may ultimately prove to be incorrect.
- Actual results from our life insurance portfolio may not match our projected results.
- Our investments in life insurance policies have inherent risks, including fraud and legal challenges to the validity of the policies.
- If actuarial assumptions related to our investments in life insurance policies change, our operating results and cash flow could be adversely affected, as well as the value of our collateral and our ability to service our debt obligations.
- We rely on estimated rates of mortality when valuing life insurance policies and forecasting the performance of our life insurance portfolio.
- Cost-of-insurance (premium) increases could materially and adversely affect our profitability and financial condition.

**Risks Related to Our Proposed Insurance Business**

- We have no experience in operating an insurance business and our entry into the insurance market may not be successful.
- We may not be able to obtain or maintain approval of insurance regulators and other regulatory authorities.
- The operation of our proposed insurance business will subject us to additional costs and economic, political, currency, and other risks.

**Risks Related to Our Indebtedness and Financing Arrangements**

- Our indebtedness could adversely affect our financial condition and may otherwise adversely impact our business operations.
- We critically rely on debt financing for our business.
- We may not be able to raise the capital that we are seeking from our securities offerings.
- GWG Holdings depends upon cash distributions from its subsidiaries, and contractual restrictions on distributions to it or adverse events at one of its operating subsidiaries could materially and adversely affect its ability to pay its debts.
- The collateral granted as security for our obligations under our various debt obligations may be insufficient to repay all such debt obligations.
- If a significant number of holders of GWG Holdings' L Bonds demand repayment of those instruments upon maturity instead of renewing them, GWG Holdings may be forced to liquidate some of its life insurance policies, investments in Beneficient or other assets. Substantially all of our life insurance policies are pledged as collateral under the LNV Credit Facility and the NF Credit Facility and we would not be able to dispose of them without compliance with the terms of those credit facilities.
- Subordination provisions contained in the indenture governing the L Bonds, including any supplemental indentures, will place restrictions on the ability of the trustee or the L Bond holders to enforce certain rights against us under the indenture.
- A failure to maintain compliance with our debt covenants, including the indenture governing the L Bonds, may have a material adverse effect on our ability to continue our business operations.

**Legal and Regulatory Risks**

- A determination that we are an unregistered investment company would have material adverse consequences.
- We will be subject to comprehensive governmental regulation and supervision.
- Our life insurance business will be subject to state or foreign government regulation.

ii

Table of Contents

- We are currently subject to a non-public, fact-finding investigation into the Company by the SEC, and we are unable to predict the outcome of this matter.

**General Risk Factors**

- Our success depends on certain key executives and the ability to attract, retain, and develop new professionals.
- Business disruptions and interruptions and adverse economic conditions due to natural disasters and other external events beyond our control can adversely affect our business, financial condition and results of operations.
- Changes in general economic conditions could adversely impact our business.
- A failure in our operational systems as well as human error or malfeasance could impair our liquidity, disrupt our business, result in the disclosure of confidential information, damage our reputation, and cause losses.
- We rely on other companies to provide key components of our business infrastructure.

iii

# PART I

## ITEM 1. BUSINESS.

### Organizational Structure

Our business was originally organized in February 2006. We added our parent holding company, GWG Holdings, Inc. ("GWG Holdings"), in March 2008, and in September 2014 we consummated an initial public offering of GWG Holdings' common stock on The Nasdaq Capital Market where the stock trades under the ticker symbol "GWGH."

GWG Holdings conducts its life insurance secondary market business through a wholly-owned subsidiary, GWG Life, LLC ("GWG Life"), and GWG Life's wholly-owned subsidiaries, GWG Life Trust, GWG DLP Funding IV, LLC ("DLP IV"), GWG DLP Funding V Holdings, LLC ("DLP V Holdings"), and GWG DLP Funding Holdings VI, LLC ("DLP VI Holdings"). DLP V Holdings is the sole member of GWG DLP Funding V, LLC ("DLP V"). DLP VI Holdings is the sole member of GWG DLP Funding VI, LLC ("DLP VI").

In addition, GWG Holdings has exposure to indirect interests in loans collateralized by cash flows from alternative assets. Such loans are made and held by certain of the operating subsidiaries of Ben LP. These loans are made to certain of the ExAlt Trusts, which are consolidated subsidiaries of Ben LP and thus, such loans are eliminated upon consolidation for financial reporting purposes. Ben LP's general partner is Beneficient Management, L.L.C. ("Beneficient Management"). Prior to December 31, 2019, GWG Holdings' investment in Beneficient was accounted for as an equity method investment. On December 31, 2019, as more fully described below, Beneficient became a consolidated subsidiary of GWG Holdings. As also described below, on August 13, 2021, GWG Holdings entered into a non-binding term sheet with Ben LP and Beneficient Company Holdings, L.P. ("BCH"), that outlines a series of transactions which, if completed, will result in, among other things, (i) GWG Holdings receiving certain proposed enhancements to its investments in Beneficient; (ii) GWG Holdings no longer having the right to appoint directors of the Board of Directors of Beneficient Management; and (iii) Beneficient no longer being a consolidated subsidiary of GWG Holdings. The term sheet is part of ongoing efforts by management and the Board of Directors of the Company to maximize the value of GWG Holdings' and GWG Life's investment in Beneficient.

GWG Holdings also has a financial interest in FOXO Technologies Inc. ("FOXO", formerly FOXO BioScience LLC), which, through its wholly-owned subsidiaries FOXO Labs Inc. ("FOXO Labs", formerly, Life Epigenetics Inc.) and FOXO Life LLC ("FOXO Life", formerly, youSurance General Agency, LLC), seeks to commercialize epigenetic technology for the longevity industry and offer life insurance directly to customers utilizing epigenetic technology. Although we have a financial interest in FOXO, we do not have a controlling financial interest because another party is the majority shareholder of the voting class of securities. Therefore, we account for our ownership interest in FOXO as an equity method investment. FOXO Labs was formed to commercialize epigenetic technology for the longevity industry. FOXO Life seeks to offer life insurance directly to customers utilizing epigenetic technology.

All of the aforementioned entities are legally organized in the state of Delaware, other than GWG Life Trust, which was formed under the laws of the state of Utah, and certain of the ExAlt Trusts, which were formed under the laws of the State of Texas. Unless the context otherwise requires or we specifically so indicate, all references in this report to "we," "us," "our," "our Company," "GWG," or the "Company" refer to GWG Holdings together, in each case, with its subsidiaries. Our headquarters are located at 325 N. St. Paul Street, Suite 2560, Dallas, Texas 75201.

### Our Company

We are an innovative financial services company that is a leader in providing unique liquidity solutions and services for the owners of illiquid investments. In 2018 and 2019, GWG Holdings consummated a series of transactions (as more fully described below) with Beneficient that has resulted in a significant reorientation of our business and capital allocation strategy towards an expansive and diverse exposure to alternative assets. As part of this reorientation, GWG Holdings also changed its Board of Directors and executive management team.

While we are continuing our work to maximize the value of our secondary life insurance business, based on recent developments in the capital markets, including the availability of financing on favorable terms, we have begun exploring the feasibility of purchasing additional life insurance policies through the secondary market and establishing a life insurance subsidiary to operate in the life insurance industry. These operations are in addition to allocating capital to provide liquidity to holders of a broader range of alternative assets, which GWG Holdings currently provides through investments in Beneficient.

APP. 389

Page 1

APP. 390

Table of Contents

We completed the transactions with Beneficient to provide the Company with a significant increase in assets and common stockholders' equity as well as with the opportunity for a diversified source of future earnings from our exposure to the alternative asset industry. We believe the Beneficient transactions and the other strategies we are pursuing, including continuing to pursue opportunities in the life insurance industry, will transform GWG Holdings from a niche provider of liquidity to owners of life insurance to a diversified provider of financial products and services with exposure to a broad range of alternative assets.

Beneficient is a financial services company based in Dallas, Texas, that markets an array of liquidity and trust administration products to alternative asset investors primarily comprised of mid-to-high-net-worth individuals having a net worth between $5 million and $30 million ("MHNW") and small-to-midsize institutional investors and family offices with less than $1 billion in investable assets ("STMIs"). One of Beneficient's founders, Brad K. Heppner ("Ben Founder"), serves as Chairman and Chief Executive Officer of Beneficient and previously served as Chairman of GWG Holdings from April 26, 2019 to June 14, 2021. Ben LP plans to offer its products and services through its five operating subsidiaries, which include (i) Ben Liquidity, (ii) Ben Custody Admin, (iii) Ben Insurance, (iv) Ben Markets and (v) Beneficient USA (each operating subsidiary is further defined below). Ben Liquidity plans to operate a trust company that is a Kansas Technology Enabled Fiduciary Financial Institutions ("TEFFI") authorized to serve as an alternative asset custodian, trustee and lender with statutory powers granted for each of these activities and permitting Ben Liquidity to provide fiduciary financing for certain of its customer liquidity transactions. Ben Custody Admin plans to operate a Texas trust company that is being organized to provide its customers with certain administrative, custodial and trustee products and specialized services focused on alternative asset investors. Ben Insurance has been chartered as a Bermuda based insurance company that plans to offer certain customized insurance products and services covering risks relating to owning, managing and transferring alternative assets. Ben Markets is in the regulatory process for acquiring a captive registered broker-dealer that would conduct certain of its activities attendant to offering a suite of products and services from the Beneficient family of companies. Certain of Ben LP's operating subsidiary products and services involve or are offered to certain of the ExAlt Trusts (defined below), which are consolidated subsidiaries of Ben LP for financial reporting purposes (such trusts are and may individually be referred to as Custody Trusts, Collective Trusts, LiquidTrusts, and Funding Trusts). Beneficient USA employs a substantial majority of the executives and staff for Beneficient's operating subsidiaries to which Beneficient USA provides administrative and technical services.

Beneficient's primary operations, which commenced on September 1, 2017, consist of offering its liquidity and trust administration services to its customers, primarily through certain of Ben LP's operating subsidiaries, Ben Liquidity, L.L.C. ("Ben Liquidity") and Ben Custody, L.L.C. ("Ben Custody Admin"), respectively. Ben Liquidity offers simple, rapid and cost-effective liquidity products to its customers through the use of customized trust vehicles, (such trusts, the "ExAlt Trusts"), that facilitate the exchange of a customer's alternative assets for consideration using a unique financing structure (such structure and process, the "ExAlt Plan™"). The ExAlt Plan trademark was developed by Beneficient as a brand of liquidity and trust administration services designed for alternative asset investors, specifically MHNW and STMIs to "Ex"it "Alt"ernatives. A subsidiary of Ben Liquidity makes loans (each, an "ExAlt Loan") to certain of the ExAlt Trusts which employ the loan proceeds to acquire agreed upon consideration, which certain of the ExAlt Trusts deliver to customers in exchange for their alternative assets. Ben Liquidity generates interest and fee income earned in connection with the ExAlt Loans, which are collateralized by a portion of the cash flows from the exchanged alternative assets (the "Collateral"). Ben Custody Admin currently provides trust administration services to the trustees of certain of the ExAlt Trusts that own the exchanged alternative asset following liquidity transactions for fees payable quarterly. The Collateral supports the repayment of the ExAlt Loans plus any related interest and fees and trust administration service fees. Under the applicable trust and other agreements, certain charities are the ultimate beneficiaries of the ExAlt Trusts (the "Non-Controlling Interest Holders"). As ultimate beneficiaries of prior transactions, for every $0.95 paid to the lender (e.g., subsidiaries of Ben LP) on the ExAlt Loans, $0.05 is also paid to certain of the Non-Controlling Interest Holders. For periods following 2020, future Non-Controlling Interest Holders are structured to be paid $0.025 for every $0.975 paid to the fiduciary financial lender (e.g., subsidiaries of Ben LP) of the ExAlt Loans. Since Ben LP consolidates the ExAlt Trusts, Ben LP's operating subsidiary's ExAlt Loans and related interest and fee income are eliminated in the presentation of our consolidated financial statements.

Prior to January 1, 2021, Ben LP operated primarily through certain of its subsidiaries that included, (i) Beneficient Capital Company, L.L.C. ("BCC"), which offered liquidity products; (ii) Beneficient Administration and Clearing Company, L.L.C. ("BACC"), which provided services for private fund and trust administration; and (iii) other entities, including the ExAlt Trusts.

On December 31, 2020, a series of restructuring transactions occurred to better position certain of Ben LP's subsidiaries for ongoing operations and future products and services, to capitalize Pen and to meet certain requirements of the Texas

Page 2

APP. 392

Table of Contents

Department of Banking. In connection with these transactions, BCC transferred all of its assets, which included, among other assets, its ExAlt Loans receivable, liabilities, which included, among other liabilities, loans payable with respect to secured loans with HCLP Nominees, L.L.C., held as of December 31, 2020, to BCH. In order to capitalize Pen and enable it to offer insurance products and services to cover risks attendant to owning and managing alternative assets following approval from the Bermuda Monetary Authority (the "BMA"), BCH contributed to Pen certain of such ExAlt Loans receivable with an aggregate carrying value equal to $129.2 million. Likewise, BACC transferred all of its assets, which included its rights to perform fund trust administration services under certain trust and other agreements, and liabilities to BCH, which will perform such services until a Texas trust company charter is issued or the Kansas TEFFI trust company becomes operational.

Subsequent to December 31, 2020, Ben LP operates primarily through its business line operating subsidiaries, which provide, or will provide, Beneficient's existing and planned products and services. These subsidiaries include (i) Ben Liquidity, which offers liquidity products; (ii) Ben Custody Admin, which provides services for fund and trust administration; (iii) Ben Insurance L.L.C., including its subsidiaries ("Ben Insurance"), which intends to offer insurance products and services covering risks attendant to owning, managing and transferring alternative assets; (iv) Ben Markets, L.L.C., including its subsidiaries ("Ben Markets"), which intends to provide broker-dealer services in connection with offering Beneficient's liquidity products and services; and (vi) other entities, including the ExAlt Trusts, which operate for the benefit of the Non-Controlling Interest Holder. Beneficient's financial products and services are presently offered through Ben Liquidity and Ben Custody Admin, and Beneficient plans to expand its capabilities under Ben Custody Admin and provide products and services through Ben Insurance and Ben Markets in the future.

Beneficient's existing and planned products and services are designed to provide liquidity and trust solutions, support the tax and estate planning objectives of its MHNW customers, facilitate asset diversification or provide administrative management and reporting solutions tailored to the goals of investors of alternative investments.

Following several enhancements to its business practices, on March 6, 2020, Beneficient submitted updated trust company charter applications for two trust companies (one for liquidity products and the other for custodian and trustee services) to the Texas Department of Banking. On November 25, 2020, Beneficient withdrew one of its Texas charter applications.

In April 2021, the Kansas Legislature adopted, and the governor of Kansas signed into law, a bill that would allow for the chartering and creation of Kansas trust companies, known as TEFFIs, that provide fiduciary financing (e.g., lending to the Exalt Trusts), custodian and trustee services in all capacities pursuant to statutory fiduciary powers, to investors and other participants in the alternative assets market, as well as the establishment of alternative asset trusts. The legislation became effective on July 1, 2021, and designates an operating subsidiary of Ben LP, Beneficient Fiduciary Financial, L.L.C. ("BFF"), as the pilot trust company under the TEFFI legislation. A conditional trust charter was issued by the Kansas Bank Commissioner to BFF on July 1, 2021. Under the pilot program, Beneficient will not be authorized to exercise its fiduciary powers as a TEFFI until the earlier of the date the Kansas Bank Commissioner promulgates applicable rules and regulations or December 31, 2021. The bill also permits the Kansas Bank Commissioner to request a six-month extension of the pilot program period, which could delay Beneficient's permission to exercise fiduciary powers under the charter until July 1, 2022. In order to devote their time to serving as directors of the Beneficient TEFFI trust company, the directors of GWG Holdings who serve on the new TEFFI trust company Board of Directors resigned their membership, effective June 14, 2021, on GWG Holdings' Board of Directors, which the Company believes is the highest and best use of their available time and skills and will support the development of the Beneficient TEFFI trust company and the successful execution of Beneficient's business plan.

Additionally, Beneficient's charter application for custodian and trustee services remains in process at the Texas Department of Banking. If the charter is issued, the trust company would serve as custodian and trustee to one or more of the ExAlt Trusts. Similar or the same services may also be provided by Beneficient's Kansas trust company TEFFI. Also, a subsidiary of Ben Insurance, PEN Indemnity Insurance Company, Ltd. ("Pen"), has applied for regulatory approval from the BMA to write fiduciary liability policies for managers and investors in alternative asset funds to cover losses from contractual indemnification and exculpation provisions arising under the governing documents of such funds. Further, on March 26, 2021, a Ben LP subsidiary, Beneficient Capital Markets, L.L.C ("Beneficient Capital Markets") filed a Form BD with the Securities and Exchange Commission ("SEC") to commence its application for broker-dealer registration. Upon registration and admittance as a Financial Industry Regulatory Authority ("FINRA") member, Beneficient Capital Markets will conduct its activities attendant to offering Beneficient's products and services.

When the Kansas TEFFI trust company is authorized to exercise its fiduciary powers, Beneficient expects to be able to expand its operations and close an increased number of liquidity transactions. Additionally, once BMA regulatory approval is

APP. 393

APP. 394

Table of Contents

obtained and Beneficient Capital Markets is admitted as a FINRA member, Beneficient anticipates being able to offer its full suite of Beneficient's Current and Future Products and Services.

**The Beneficient Transactions**

*The Exchange Transaction*

On December 28, 2018 (the "Final Closing Date"), we completed a series of strategic exchanges of assets among GWG Holdings, GWG Life, Ben LP and certain trusts, each identified as an Exchange Trust formed during 2017 and 2018 (such trusts collectively, the "Seller Trusts", which are a related party but not among Ben LP's consolidated trusts), pursuant to a Master Exchange Agreement among the parties (the "Exchange Transaction"). As a result of the Exchange Transaction, a number of securities were exchanged between the parties, including the following securities as of the Final Closing Date: the Seller Trusts acquired GWG L Bonds due 2023 (the "Seller Trust L Bonds") in the aggregate principal amount of $366.9 million; the Seller Trusts acquired 27,013,516 shares of GWG Holdings' common stock; GWG Holdings acquired 40,505,279 common units of Ben LP (the "Common Units"); and GWG Holdings acquired the right to obtain additional Common Units or other property that would be received by a holder of Preferred Series A Subclass 1 Unit Accounts of BCH pursuant to an option issued by Ben LP (the "Option Agreement"). In addition, in connection with the Exchange Transaction, Ben LP, as borrower, entered into a commercial loan agreement (the "Commercial Loan Agreement") with GWG Life, as lender, providing for a loan in a principal amount of $192.5 million as of the Final Closing Date (the "Commercial Loan").

*The Investment and Exchange Agreements*

On December 31, 2019, GWG Holdings obtained control over Ben LP pursuant to a Preferred Series A Unit Account and Common Unit Investment Agreement by and among GWG Holdings, Ben LP, BCH, and Beneficient Management (the "Investment Agreement"), which resulted in the consolidation of GWG Holdings and Ben LP for accounting and financial reporting purposes.

Pursuant to the Investment Agreement, GWG Holdings transferred $79.0 million to Ben LP in return for 666,667 Common Units and a Preferred Series A Subclass 1 Unit Account of BCH.

In connection with the Investment Agreement, GWG Holdings obtained the right to appoint a majority of the board of directors of Beneficient Management, the general partner of Ben LP. As a result, GWG Holdings obtained control of Ben LP and began reporting the results of Ben LP and its subsidiaries on a consolidated basis beginning on the transaction date of December 31, 2019. GWG Holdings' right to appoint a majority of the Board of Directors of Beneficient Management will terminate in the event (i) GWG Holdings' ownership of the fully diluted equity of Ben LP (excluding equity issued upon the conversion or exchange of Preferred Series A Unit Accounts of BCH held as of December 31, 2019 by parties other than GWG Holdings) is less than 25%, (ii) the Continuing Directors of GWG Holdings cease to constitute a majority of the Board of Directors of GWG Holdings, or (iii) certain bankruptcy events occur with respect to GWG Holdings. The term "Continuing Directors" means, as of any date of determination, any member of the Board of Directors of GWG Holdings who: (1) was a member of the Board of Directors of GWG Holdings on December 31, 2019; or (2) was nominated for election or elected to the Board of Directors of GWG Holdings with the approval of a majority of the Continuing Directors who were members of the Board of Directors of GWG Holdings at the time of such nomination or election.

Following the transaction, and as agreed upon in the Investment Agreement, GWG Holdings was issued an initial capital account balance for the Preferred Series A Subclass 1 Unit Account of $319.0 million. The other holders of the Preferred Series A Subclass 1 Unit Accounts are an entity related to Beneficient's initial investors (the "Ben Initial Investors") and an entity related to one of Beneficient's directors who is also a former director of GWG Holdings (the "Related Account Holders"). The parties to the Investment Agreement agreed that the aggregate capital accounts of all holders of the Preferred Series A Subclass 1 Unit Accounts after giving effect to the investment by GWG Holdings is $1.6 billion. GWG Holdings' Preferred Series A Subclass 1 Unit Account is the same class of preferred security as held by the Related Account Holders. In the event the Related Account Holders exchange their Preferred Series A Subclass 1 Unit Account for securities of GWG Holdings, the Preferred Series A Subclass 1 Unit Account of GWG Holdings would be converted into Common Units (so neither GWG Holdings nor the founders would hold Preferred Series A Subclass 1 Unit Accounts).

Also, on December 31, 2019, in a transaction related to the Investment Agreement, GWG Holdings transferred its interest in the Preferred Series A Subclass 1 Unit Account to its wholly owned subsidiary, GWG Life.

APP. 395

Table of Contents

In addition, on December 31, 2019, GWG Holdings, Ben LP and the holders of Common Units entered into an Exchange Agreement (the "Exchange Agreement") pursuant to which the holders of Common Units from time to time have the right, on a quarterly basis, to exchange their Common Units for common stock of GWG Holdings. The exchange ratio in the Exchange Agreement is based on the ratio of the capital account associated with the Common Units to be exchanged to the market price of GWG Holdings' common stock based on the volume weighted average price of GWG Holdings' common stock for the five consecutive trading days prior to the quarterly exchange date. The Exchange Agreement is intended to facilitate the marketing of Ben LP's products to holders of alternative assets.

*Preferred Series C Unit Purchase Agreement*

On July 15, 2020, GWG Holdings entered into a Preferred Series C Unit Purchase Agreement ("UPA") with Ben LP and BCH. The UPA was reviewed and approved by the then constituted Special Committee of the Board of Directors of GWG Holdings.

Pursuant to the UPA, and provided it has adequate liquidity, GWG Holdings has agreed to make capital contributions from time to time to BCH in exchange for Preferred Series C Unit Accounts of BCH during a purchasing period commencing on the date of the UPA and continuing until the earlier of (i) the occurrence of a Change of Control Event (as defined below) and (ii) the mutual agreement of the parties (the "Purchasing Period"). A "Change of Control Event" shall mean (A) the occurrence of an event that results in GWG Holdings' ownership of the fully diluted equity of Ben LP is less than 25%, the Continuing Directors (as defined below) of GWG Holdings cease to constitute a majority of the board of directors of GWG Holdings, or certain bankruptcy events occur with respect to GWG Holdings, and (B) the listing of Common Units on a national securities exchange (a "Public Listing"). The term "Continuing Directors" means, as of any date of determination, any member of the board of directors of GWG Holdings who: (1) was a member of the Board of Directors of GWG Holdings on December 31, 2019; or (2) was nominated for election or elected to the Board of Directors of GWG Holdings with the approval of a majority of the Continuing Directors who were members of the Board of Directors of GWG Holdings at the time of such nomination or election.

If, on or prior to the end of the Purchasing Period, a Public Listing occurs, the BCH Purchased Units shall be automatically exchanged for Common Units, or another unit of Ben LP, as the parties may mutually agree (the "Beneficient Units"), at the lower of (i) the volume-weighted average of the Beneficient Units for the 20 trading days following the Public Listing, and (ii) $12.75.

In addition, at any time following the Effective Date, all or some of the Preferred Series C Unit Accounts purchased under the UPA may be exchanged for Beneficient Units at the option of GWG Holdings (exercised by a special committee of the Board of Directors or, if such committee is no longer in place, the appropriate governing body of the Company); provided that, if GWG Holdings exchanges less than all of the Preferred Series C Unit Accounts purchased under the UPA, then, immediately after giving effect to such exchange, GWG Holdings shall be required to continue to hold Preferred Series C Unit Accounts with a capital account that is at least $10.0 million. The exchange price for such Beneficient Units shall be determined by third-party valuation agents selected by GWG Holdings and Beneficient.

*Contribution and Exchange Agreement*

On September 30, 2020, certain of the ExAlt Trusts (collectively, the "Participating ExAlt Trusts") at the sole direction of John A. Stahl, independent trustee of each such trust, with the intention of protecting the value of certain assets of the Participating ExAlt Trusts underlying part of the Collateral portfolio, the Participating ExAlt Trusts entered into that certain Contribution and Exchange Agreement with certain of the Seller Trusts, (collectively, the "Participating Exchange Trusts"), each of which entered into such agreement at the direction of its applicable trust advisor and by and through its applicable corporate trustee (the "Contribution and Exchange Agreement). Under the Contribution and Exchange Agreement, the Participating Exchange Trusts agreed to exchange 9,837,264 shares of GWG Holdings' common stock valued at $84.6 million, 543,874 shares of Common Units valued at $6.8 million, and GWG Holdings' L Bonds due 2023 in the aggregate principal amount of $94.8 million to the Participating ExAlt Trusts for $94.3 million in net asset value of the alternative asset investments held by the Participating ExAlt Trusts. This transaction (the "Collateral Swap") resulted in GWG Holdings, after the effects of eliminations upon consolidation, recognizing an additional $42.9 million of treasury stock, $3.4 million of additional noncontrolling interest, and $46.8 million of a deemed capital contribution from a related party.

The Exchange Transaction, the Investment and Exchange Agreements, the UPA, and the Collateral Swap are referred to collectively as the "Beneficient Transactions."

APP. 397

*Term Sheet*

On August 13, 2021, GWG Holdings entered into a non-binding term sheet (the "Term Sheet") with its non-wholly owned subsidiaries Ben LP and BCH that outlines a series of transactions which, if completed, will result in, among other things, (i) GWG Holdings receiving certain proposed enhancements to its investments in Beneficient; (ii) GWG Holdings no longer having the right to appoint directors of the Board of Directors of Beneficient Management; and (iii) Ben LP no longer being a consolidated subsidiary of GWG Holdings. The Term Sheet is a part of ongoing efforts by management and the Board of Directors of GWG Holdings to maximize the value of its investments in Beneficient.

GWG Holdings believes that returning control of Beneficient is a necessary step for Ben LP to establish one of its operating subsidiaries as a TEFFI under the Kansas Technology-Enabled Fiduciary Financial Institutions Act (the "TEFFI Act"), which is important to Beneficient's long-term business objective of providing liquidity and other services to holders of alternative assets.

Until the definitive documentation is finalized and executed, each of the provisions of the Term Sheet is non-binding and is subject to change in all respects, including as a result of additional diligence, the further discharge of fiduciary duties, and the negotiation of definitive documentation. GWG Holdings has begun working on definitive documentation to implement the Term Sheet with Ben LP and is working to complete such definitive documentation during the fourth quarter of 2021, although there can be no assurance definitive documentation will be completed by then, or at all.

If Ben LP becomes an independent company pursuant to the terms of the Term Sheet, GWG Holdings expects that Ben LP would reduce its reliance on GWG Holdings to fund its operations and would raise future capital from other sources. Beneficient's capital raising efforts may include the issuance of equity or debt of Ben LP or one of its subsidiaries, and the newly issued securities are expected to be dilutive to GWG Holdings' and GWG Life's percentage ownership in Ben LP and BCH and may include preferential terms relative to GWG Holdings' and GWG Life's investments in Ben LP and BCH, as applicable. GWG Holdings would still retain a substantial investment in Beneficient.

**Segment Financial Information**

We have two reportable segments: 1) Secondary Life Insurance and 2) Beneficient.

GWG Holdings' segment information is included in Note 16, Segment Reporting, to the consolidated financial statements included in Item 8 of Part II of this 2020 Form 10-K.

**Market Opportunity**

*Alternative Asset Liquidity Products and Services*

The market demand for liquidity from owners of alternative assets is generally correlated to the outstanding net asset value of illiquid alternative assets ("NAV") held by U.S. investors. Using data from various published industry reports from 2017 to 2020, certain widely accepted commercial private-equity databases, and applying its own proprietary assumptions and calculations ("Ben Estimates"), Beneficient estimates that total outstanding NAV held by U.S. investors exceeded $5.8 trillion in 2019 (up from an estimated $5.3 trillion in 2018).

According to at least one industry report from Preqin, the leading provider of data on alternative assets, from 2020, total outstanding NAV in the hands of U.S. investors grew at a 17.4% compound annual growth rate (CAGR) from 2017-2020, the highest CAGR of all investment classes.

According to Ben Estimates, the large U.S. institutions representing approximately 62% of the NAV have consistently sought liquidity on approximately 1.85% to 2.25% of their outstanding NAV on an annual basis. Based on Ben Estimates, this has led to an annual demand for liquidity of nearly $55.0 billion in recent years.

A primary group not included in this demand is the MHNW investor who holds investments of $5 million to $30 million compared to a large institution's holdings in the hundreds of millions or billions of dollars. Intermediary brokers will often not represent the MHNW individuals (or STM institutional investors). Of the $5.8 trillion of investments in alternative assets, approximately $785.0 billion were held by MHNW investors, and over $890.0 billion were held in the portfolios of STM investors, both segments of investors who we believe have little to no access to the highly competitive large institutional

APP. 399

Page 6

Table of Contents

market for alternative asset liquidity, as reported by Preqin, Setter Capital and Ben Estimates. According to Ben Estimates, MHNW investors have only been able to access liquidity representing less than 0.5% of the NAV held by them each year, compared to the average 2% annually achieved by the large institutional owners, representing 62% of the market.

Based on these amounts, Beneficient estimates that MHNW investors would seek liquidity of at least 3% of their outstanding NAV each year if liquidity was made available to them, or a slightly greater percentage than that of large U.S. institutions. As a result, and according to Ben Estimates, the estimated market demand for liquidity by MHNW individuals would have exceeded $23.0 billion in 2020.

In addition to providing liquidity to owners of alternative assets, Beneficient, through Ben Custody Admin, seeks to address the administrative and regulatory burden of holding alternative assets by offering bespoke administrative support services to trustees and custodians. While Beneficient's conditional Kansas TEFFI charter, once operational, would allow Beneficient to provide custodial and trustee services, Beneficient has also submitted a trust company charter to the Texas Department of Banking to conduct custodial and trustee services in the future. Upon issuance of a trust company charter from Kansas or Texas, Beneficient intends to expand its services to provide its customers and others with comprehensive qualified custodial, trustee, accounting, tax, compliance, reporting and other back-office administrative services for their alternative assets. Ben Custody Admin's trust administrative support services to trustees and custodians are currently only offered to certain of the ExAlt Trusts, which are consolidated subsidiaries of Beneficient.

*Primary Life Insurance Market and Technology ("insurtech")*

The opportunity to apply technology to transform the insurance industry is significant. The application of technology to the insurance industry, commonly referred to as "insurtech", provides opportunities for new entrants into the traditional insurance marketplace that have the potential to significantly disrupt the insurance industry's historical approach to assessing and selecting acceptable underwriting risks. GWG Holdings' involvement in the insurtech space is limited to its investments in FOXO, as discussed in the Organizational Structure section above. GWG Holdings has contributed $16.2 million in cash to FOXO to date through December 31, 2020, and is committed to contribute an additional $3.8 million to the entity through October 2021, all of which was contributed by such date.

**Business Strategies**

*1. Liquidity for Alternative Assets*

As a result of the Beneficient Transactions, we are now uniquely positioned to provide liquidity and related services to investors holding a full range of illiquid alternative assets. We will continue to work to create the most value for holders of alternative assets, the financial professionals who advise them, and for our shareholders.

Beneficient provides private trust solutions, including a unique suite of lending and liquidity products focused on bringing liquidity to owners of alternative assets. Beneficient's innovative liquidity solutions are designed to serve MHNW individuals, STM institutions, and asset managers who have historically possessed few attractive options to access early liquidity from their alternative assets. Beneficient targets MHNW individual customers with $5 million to $30 million in investments and institutional customers typically holding less than $1 billion in assets.

Beneficient's products can also support tax and estate planning objectives, facilitate a diversification of assets or provide administrative management and reporting solutions tailored to the goals of the investor.

Our life insurance secondary market business is designed to serve consumers 65 years or older who own life insurance policies. We seek to earn non-correlated yield from life insurance policies that we purchased and may purchase in the secondary market. Since inception, we have purchased over $3.2 billion in face value of policy benefits from consumers for over $620 million, as compared to the $52 million in surrender value offered by insurance carriers on those same policies. Our products provide unique and valuable services to the senior consumers whom we serve.

The goal of our secondary life insurance business has been to build a profitable, large and well-diversified portfolio of life insurance assets. We have not made additional investments in the life settlements portfolio since 2018. However, because of the changes in the capital markets landscape, including the availability of favorable financing terms, we have begun exploring the feasibility of additional future investments in the life settlement portfolio as well as the form such investments might take.

APP. 401

Page 7

APP. 402

Table of Contents

*2. Insurance Products and Services*

Through Ben Insurance, Beneficient intends to offer customized insurance services covering risks attendant to owning, managing, and transferring alternative assets. These services would provide tailored solutions to customers that enable them to mitigate many of the risks associated with alternative asset ownership, management and divestment. We are also exploring opportunities to provide life insurance products related to our life insurance business.

*3. Developing a World Class Financial Services Distribution Platform*

GWG Holdings has developed a large and sophisticated financial services product distribution platform. Today, this platform consists of approximately 145 independent broker-dealers and almost five thousand independent financial advisors ("Retail Distribution") who sell the Company's investment products. "Independent" in this context refers to broker-dealers that accommodate financial advisors who carry securities licenses and need back-office support for services, such as compliance and trade execution, but allow their advisors wide latitude in how they conduct business. Since inception, GWG Holdings has raised approximately $2.6 billion of debt and equity capital, including renewals but excluding Seller Trust L Bonds, to support our business activities.

We believe that we are well positioned to continue to grow our Retail Distribution for several reasons:

- Newly independent financial professionals and their clients demand a high level of customer service and access to innovative and value added products;

- The significant demand for liquidity from owners of alternative assets by US investors;

- GWG Holdings' relationship with Beneficient will attract more and larger broker dealers to our platform due to our increased size and market capitalization as well as the increase in products offered; and

- By using capital to provide liquidity products to our current customers, and as they begin to realize the benefit of these products, we will able to raise more capital and attract additional broker dealers into our selling group.

**Competitive and Regulatory Framework**

*Competition*

We encounter significant competition from numerous companies in the products and services we provide and seek to develop in the alternative assets industry. Many of these competitors may have greater resources and significantly lower cost of funds than we do because, for example, they have access to insured deposits or greater access to the capital markets. They may also have greater market share in the markets in which we operate. These factors could adversely affect our business, results of operations and financial condition and our ability to implement our growth strategies.

In addition, as we enter new markets, we expect to experience significant competition from incumbent market participants. Our ability to compete in these markets will depend on our ability to deliver value-added products and services to the customers we serve. These factors could also adversely affect our business, results of operations and financial condition and our ability to implement our growth strategies.

*Government Regulation*

Our life insurance secondary market business is highly regulated at the state level. We hold a license to purchase life insurance policies in one state and can also purchase in seven unregulated states. We have also historically purchased life insurance policies from other secondary market participants. States generally subject us to laws and regulations requiring us to obtain specific licenses or approvals to purchase life insurance policies in those states. State statutes typically provide state regulatory agencies with significant powers to interpret, administer and enforce the laws relating to the life insurance industry. Under this authority, state regulators have broad discretionary power and may impose new licensing and other requirements, and interpret or enforce existing regulatory requirements in new and different ways. Any of these new requirements, interpretations or enforcement directives could be materially adverse to our industry.

Although the federal securities laws and regulations do not directly affect life insurance, in some cases the purchase of a variable life insurance policy may constitute a transaction involving a "security" that is governed by federal securities laws. While we presently

APP. 403

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 404 of 1031    PageID 576

hold few variable life insurance policies, our holding of a significant amount of such policies in the future could cause our Company or one of our subsidiaries to be characterized as an "investment company" under the federal

Page 8

APP. 404

Table of Contents

Investment Company Act of 1940. The application of that law to all or part of our businesses — whether due to our purchase of life insurance policies, GWG Holdings' and GWG Life's investments in Beneficient, or to the expansion of the definition of "securities" under federal securities laws — could require us to comply with detailed and complex regulatory requirements, and cause us to fall out of compliance with certain covenants under the second amended and restated senior credit facility with LNV Corporation (as amended from time to time, "LNV Credit Facility"), the credit facility (the "NF Credit Facility") with National Founders, L.P. ("National Founders"), the credit agreements governing Beneficient's secured loans from HCLP Nominees, L.L.C., and the Pledge and Security Agreement in favor of the holders of the L Bonds of GWG Holdings. Such an outcome could negatively affect our business, results of operations and financial condition and our ability to implement our growth strategies.

Beneficient has applied for a trust company charter from the Texas Department of Banking, received a conditional Kansas TEFFI charter from the Kansas Office of the State Bank Commissioner, and intends to carry on a significant portion its business through its subsidiary, BFF, as a Kansas TEFFI. Because Beneficient's current business plans are based in part on obtaining the unconditional Kansas TEFFI charter to operate as regulated Kansas TEFFI, a failure to obtain such unconditional Kansas TEFFI charter may materially and adversely impact its financial performance and prospects, which would likely diminish our ability to effect certain parts of our business plan and growth strategies. Furthermore, a failure to obtain the unconditional Kansas TEFFI charter may trigger an impairment assessment related to the assets of Beneficient, including goodwill recognized in connection with the Investment and Exchange Agreements (see Note 4 to our accompanying audited consolidated financial statements for further details of the accounting for the change in control). Additionally, in connection with the receipt of a Kansas TEFFI charter, BFF will become subject to further regulation by the Kansas Office of the State Bank Commissioner, including new rules and regulations that it will be expected to adopt as a part of and following the TEFFI pilot program. Such regulations could prove to be burdensome on Beneficient's business and could adversely impact its financial condition and results of operations.

In addition, Beneficient has applied for regulatory approval to commence offering insurance policies through its Ben Insurance subsidiary, Pen, in Bermuda as a Class 3 insurer. Bermuda insurance statutes and regulations, and the policies of the BMA, require that Pen, among other things, maintain a minimum level of capital and surplus, satisfy solvency standards, restrict dividends and distributions, obtain prior approval or provide notification to the BMA of certain transactions, maintain a head office in Bermuda, have a representative, secretary or a director resident in Bermuda, appoint and maintain a principal representative in Bermuda and provide for the performance of certain periodic examinations of itself and its financial conditions. A failure to meet these conditions may result in the failure to obtain the required regulatory approvals or, if obtained, a suspension or revocation of Pen's authority to do business as an insurance company in Bermuda, which would mean that Pen would not be able to provide the planned insurance products until the approvals are obtained or any suspension or revocation of the required approvals is resolved.

The state regulatory landscape for the use of genetic and epigenetic testing in life insurance underwriting is such that genetic and epigenetic testing is generally permitted. A few states require informed consent for use of genetic testing in life insurance underwriting. Epigenetic testing is distinguishable from genetic testing and we believe epigenetic testing does not raise the ethical issue found with genetic testing of denying insurance coverage to applicants based on immutable inherited characteristics. While well-informed policymakers and regulators should have little reason to consider expanding current definitions of genetic testing to include epigenetic testing, or to increase restrictions on life insurance underwriting using epigenetic test results, we can provide no such assurances.

Other changes to the current genetic and epigenetic regulatory framework, including the imposition of additional or new regulations, could arise at any time during the development or marketing of FOXO's epigenetic based products. This may negatively affect the ability of FOXO to obtain or maintain applicable regulatory clearance or approval of its products. In addition, regulatory authorities, such as the Food and Drug Administration ("FDA"), may introduce new requirements that may change the regulatory requirements for FOXO or its customers, or both.

On March 26, 2021, Beneficient Capital Markets filed a Form BD with the SEC to commence its application for broker-dealer registration. If and when Beneficient Capital Markets is registered and admitted as a FINRA member, it will become subject to the various rules and regulations governing broker-dealers.

Much of the regulation of broker-dealers has been delegated by the SEC to self-regulatory organizations such as FINRA. FINRA adopts rules (which are subject to approval by the SEC) for governing its members and the industry. Broker-dealers are also subject to federal securities laws and SEC rules, as well as the laws and rules of the states in which a broker-dealer conducts business. The laws and regulations to which broker-dealers are subject cover all aspects of its securities business, including, but not limited to, sales and trading practices, net capital requirements, record keeping and reporting procedures,

APP. 405

APP. 406

Table of Contents

relationships and conflicts with customers, restrictions on new business lines without regulatory approval, restrictions on cash withdrawals and distributions, investment banking activities, experience and training requirements for certain employees, and the conduct and supervision of registered persons, officers and employees. Broker-dealers are also subject to privacy, disaster recovery and anti-money laundering laws and regulations.

The principal purpose of regulation, oversight and discipline of broker-dealers is the protection of customers and the securities markets rather than protection of creditors and stockholders of broker-dealers. Additional legislation, changes in rules promulgated by the SEC, securities exchanges, self-regulatory organizations such as FINRA or states, or changes in the interpretation or enforcement of existing laws and rules, often directly affect the method of operation and profitability of broker-dealers. These governmental and self-regulatory organizations may conduct routine examinations, for-cause examinations, investigations and administrative and enforcement proceedings that can result in censure, fine, profit disgorgement, monetary penalties, suspension, revocation of registration or expulsion of broker-dealers, their registered persons, officers or employees.

*Health Insurance Portability and Accountability Act (HIPAA)*

HIPAA requires that holders of medical records maintain such records and implement procedures designed to assure the privacy of patient records. In order to carry out our secondary life insurance business, we receive medical records and obtain a release to share such records with a defined group of persons, take on the responsibility for preserving the privacy of that information, and use the information only for purposes related to the life insurance policies we own.

*The Genetic Information Nondiscrimination Act of 2008 (GINA)*

GINA is a federal law that protects people from genetic discrimination in health insurance and employment. GINA prohibits health insurers from: (i) requesting, requiring, or using genetic information to make decisions about eligibility for health insurance; or (ii) making decisions on the health insurance premiums, contribution amounts, or coverage terms they offer to consumers. In addition, GINA makes it against the law for health insurers to consider family history or a genetic test result, a preexisting condition, require a genetic test, or use any genetic information, to discriminate coverage, even if the health insurance company did not mean to collect such genetic information.

GINA does not apply to the life insurance, long-term care or annuity industries. The life insurance, long-term care or annuity industries operate on medical-evidenced underwriting principles in which specific medical conditions are taken into account when assessing and pricing risk. The regulation of genomic data is relatively new, and we believe it is likely that regulation will increase and grow more complex in the foreseeable future. We cannot, however, predict what any new law or regulation would specifically involve or how it might affect our industry, our business, or our future plans.

**Patents, trademarks, licenses**

Beneficient has registered trademarks for its liquidity products and its Ben Markets portal described in the "Our Company" section above. Beneficient also has trademarks pending registration on a number of its other liquidity products and trust services and other operating subsidiaries.

Beneficient filed provisional patent applications pending on certain of its systems and processes underlying its liquidity products and trust services. These patent applications cover the liquidity structure, underwriting, and risk assessment and reduction aspects of Beneficient's business.

**Employees**

We, primarily through Beneficient, employed approximately 160 employees as of the date of the filing of this Form 10-K. These employees are aligned to our vision and values – Trust, Trailblazing and Teamwork. The values inform our behaviors, how we pursue performance excellence and engage a thriving culture focused on collegiality. Our exceptional culture, career progression opportunities, and training and development have been instrumental in the retention of our talented employees. Our most important asset are the talented employees we are fortunate to have on our team. We will continue to grow our business leveraging their capabilities within an exceptional culture.

Our success depends upon the contributions of our employees, and our ability to provide employees with the resources they need to perform their roles and to develop and excel in their careers. Our senior management provides oversight for benefits and compensation

APP. 407

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 408 of 1031    PageID 580
of our workforce in a variety of ways, including periodic compensation benchmarking, implementation

Page 10

APP. 408

Table of Contents

and adaptation of various employee benefit programs, primarily health and other related benefits, review of certain employee post-retirement benefits and accessibility of employee assistance programs. Our human resources department oversees these programs to ensure our benefits and compensation are competitive.

**Company Website Access and SEC Filings**

Our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and amendments to reports filed pursuant to Sections 13(a) and 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), are filed with the SEC. We are subject to the informational requirements of the Exchange Act and file or furnish reports, proxy statements and other information with the SEC.

GWG Holdings general website address is *www.gwgh.com*. GWG Holdings website has additional information about our Company, its mission and our business. Our website also has tools that could be used by our customers and potential customers, financial advisors and investors. Beneficient's website address is *www.trustben.com* and has additional information about Beneficient, its mission and its business. We maintain the website *www.gwglife.com* for consumers and life insurance professionals seeking our life insurance secondary market products and services. The information contained on or accessible through the foregoing websites is not part of this 2020 Form 10-K.

Page 11

Table of Contents

## ITEM 1A. RISK FACTORS.

Our business involves a number of challenges and risks. In addition to the other information in this report, you should consider carefully the following risk factors in evaluating us and our business. The risks described below are not the only ones that we face. Additional risks not presently known to us or that we currently deem immaterial may also affect our business, financial condition, operating results, or prospects.

### Risks Related to Our Operations and Organizational Structure

***Our current inability to raise capital, recurring losses from operations, negative cash flows from operations, delays in executing our business plans, and potential negative implications of the ongoing SEC non-public, fact-finding investigation raise substantial doubt regarding our ability to continue as a going concern. The report from our independent registered public accounting firm for the year ended December 31, 2020, includes an explanatory paragraph stating that these factors raise substantial doubt about our ability to continue as a going concern.***

We heavily rely on debt financing through our L Bonds to raise sufficient capital to meet our obligations. We temporarily suspended the offering of GWG Holdings' L Bonds, commencing April 16, 2021, as a result of our delay in filing certain periodic reports with the SEC, including this 2020 Form 10-K. Our inability to meet the applicable NASDAQ listing requirements in a timely manner may result in the delisting of our common stock and our L Bonds no longer being "covered securities" for federal securities law purposes, which would subject the offer and sale of L Bonds to potentially extensive state "blue sky" securities law requirements.

The potential NASDAQ delisting, in combination with significant recurring losses from operations, negative cash flows from operations, delays in executing our business plans, and any potential negative outcome from the ongoing SEC investigation discussed elsewhere in this Form 10-K, raise substantial doubt about our ability to continue as a going concern. In that regard, the audit report issued by our independent registered public accounting firm for the audit of our 2020 consolidated financial statements includes an explanatory paragraph describing the existence of conditions that raise substantial doubt about our ability to continue as a going concern.

If we are unable to continue as a going concern, we may have to liquidate our assets and may receive less than the value at which those assets are carried on our audited financial statements, and it is likely that investors would lose part or all of their investment. Future reports from our independent registered public accounting firm may also contain statements expressing substantial doubt about our ability to continue as a going concern. If there remains substantial doubt about our ability to continue as a going concern, investors or other financing sources may be unwilling to provide additional funding to us on commercially reasonable terms, or at all, and our business may be harmed.

***We have a relatively limited history of operations, a history of net losses, and our future earnings, if any, and cash flows may be volatile, resulting in uncertainty about our ability to service and repay our debt when it comes due, redeem preferred stock when requested and uncertainty about our prospects generally.***

We are a company with a relatively limited operating history, which makes it difficult to accurately forecast our earnings and cash flows. We incurred a net loss attributable to common shareholders of $168.5 million in the year ended December 31, 2020. We had net income attributable to common shareholders of $70.5 million in the year ended December 31, 2019. Net income attributable to common shareholders in 2019 includes a gain on the consolidation of Beneficient of $243.0 million. We incurred a net loss attributable to common shareholders of $136.1 million in the year ended December 31, 2018. Our lack of a significant history and the evolving nature of the markets in which we operate make it likely that there are risks inherent to our business that are yet to be recognized by us or others, or not fully appreciated, and that could result in us suffering further losses. As a result of the foregoing, an investment in our securities necessarily involves uncertainty about the stability of our operating results, cash flows and, ultimately, our ability to service and repay our debt and our prospects generally. If we are unable to pay our debt when it becomes due, the trustee for the L Bonds or our other secured lenders may foreclose on the collateral securing such debt, which collateral may be worth less than the debt it secures, and investors in our securities could lose all or a portion of their investment. In addition, any volatility in our operating results we experience may adversely affect the market price of GWG Holdings' common stock.

***Our operations and financial results may be adversely affected by the ongoing COVID-19 pandemic.***

The COVID-19 coronavirus outbreak has impacted many countries around the world, including the United States. There have been numerous reports of the virus outbreak disrupting or restricting supply chains, facility closures, voluntary and mandatory quarantines, and federal, state and local governments and foreign governments requiring business to temporarily close or severely curtail commercial activity. It is also possible that the spread of the coronavirus may have direct effects on

APP. 410

Page 12

Table of Contents

our operations, such as high levels of employee sickness and absences, limiting employee travel or increasing telecommuting arrangements. In addition, recent developments and reports indicate the coronavirus has coincided with heightened volatility in financial markets in the U.S. and worldwide. If the coronavirus adversely affects our business operations or leads to a significant or prolonged impact on global markets or economic growth, our financial conditions and results of operations could be adversely affected. We and other financial institutions generally must resume operations promptly following any interruption. If we were to suffer a disruption or interruption and were not able to resume normal operations within a period consistent with industry standards, our business, financial condition or results of operations could be adversely affected in a material manner. In addition, depending on the nature and duration of the disruption or interruption, we might become vulnerable to fraud, additional expense or other losses, or to a loss of business and customers.

*We may be unable to capitalize on the anticipated benefits of the Beneficient Transactions.*

We entered into the Beneficient Transactions anticipating that such transactions would provide significant financial and strategic benefits, including, significantly increasing our common equity, significantly reducing our leverage ratio, the introduction of new opportunities to lower our cost of funds (an important driver of stockholder value), diversifying our revenue and cash flow sources resulting in more consistent earnings, and increasing GWG Holdings' public float and the liquidity in its common stock, thereby increasing GWG Holdings' common stockholder base and potentially attracting additional equity analyst coverage (both of which are important factors in maximizing share valuation). In addition, certain terms of the Beneficient Transactions may be required to be revised to satisfy the requirements of the regulatory authorities from which Beneficient is seeking approvals or authorizations. There is no assurance that we will realize the anticipated benefits from the Beneficient Transactions. Failure to realize these benefits will likely have a material negative impact the results of our operations, our business prospects, the ultimate success of our strategic relationship and the value of GWG Holdings' common stock.

*GWG Holdings' ability to control the activities of Beneficient is subject to certain rights of others set forth in the limited liability company agreement for the general partner of Ben LP and GWG Holdings has entered into the Term Sheet that provides for it to relinquish certain rights with respect to Beneficient, including GWG Holdings' ability to appoint a majority of the board of directs of the general partner of Ben LP and control the activities of Beneficient.*

Beneficient Management, the general partner of Ben LP, has an executive committee, a nominating committee and a community reinvestment committee. The board of directors of Beneficient Management has the right to appoint two members of these committees, and an entity affiliated with Brad K. Heppner, former Chairman of GWG Holdings from April 26, 2019 to June 14, 2021, has the right to appoint the other two members of these committees. The entity affiliated with Mr. Heppner also has the right to appoint the chairman of the board of each of the committees. The Beneficient Management executive committee has the right to approve certain transactions on behalf of Beneficient Management and Ben LP and its subsidiaries, including the incurrence of debt, the issuance of equity interests of Ben LP or any subsidiary of Ben LP except in connection with any trust instrument or product offered by Ben LP or its affiliates, changes to or creation of employee incentive or benefit plans of Ben LP or its subsidiaries, certain changes to management of Beneficient Management or Ben LP or its subsidiaries, approval of mergers or acquisitions of Ben LP or liens on all or substantially all of its assets, and any change in the general partner of Ben LP. These rights may have the effect of limiting the power of GWG Holdings' board of directors to exercise control over certain business activities of Beneficient. In addition, GWG Holdings has entered into the Term Sheet which, if completed, will result in, among other things, (i) GWG Holdings receiving certain proposed enhancements to its investments in Beneficient; (ii) GWG Holdings no longer having the right to appoint directors of the board of directors of Beneficient Management; and (iii) Beneficient no longer being a consolidated subsidiary of GWG Holdings. Until the definitive documentation regarding the proposed transactions is finalized and executed, each of the provisions contemplated in the Term Sheet is non-binding and is subject to change in all respects, including as a result of additional diligence, the further discharge of fiduciary duties, and the negotiation of definitive documentation. The parties have begun working on definitive documentation to implement the Term Sheet and are working to complete such definitive documentation during the fourth quarter of 2021, but there can be no assurance definitive documentation will be completed by then, or at all.

*Ben LP's partnership agreement eliminates fiduciary duties that might otherwise be owed to GWG Holdings under Delaware law.*

Ben LP's partnership agreement eliminates the fiduciary duties that might otherwise be owed by Beneficient Management under Delaware law and replaces them with the duties expressly set forth in such agreement. Ben LP's partnership agreement provides that, when the general partner is permitted or required to make a decision in its "discretion" or pursuant to a provision not subject to an express standard of "good faith," in making such decision, the general partner has no duty to give any consideration to any interest of or factors affecting Beneficient or any other person. If a decision under Ben LP's partnership agreement is subject to an express standard of "good faith," such decision will not constitute a breach of the

APP. 412

Page 13

APP. 413

Table of Contents

agreement if the decision is approved by (i) a majority of the members of the conflicts committee of the board of directors of the general partner of Ben LP, (ii) holders of a majority of the voting power of the Ben LP's Common Units entitled to vote (excluding voting Common Units owned by the general partner and its affiliates), or (iii) the general partner acting without a subjective belief that such decision was adverse to the interests of Ben LP. Potential conflicts of interest may arise among the general partner and its affiliates, on the one hand, and Beneficient, on the other hand, and the general partner may be able to favor its own interest to the detriment of Beneficient and the holders of the Ben LP common units.

***If certain events occur, GWG Holdings will lose its right to appoint a majority of the board of directors of the general partner of Ben LP and therefore its ability to exercise control over Ben LP and consolidate its financial results. In addition, GWG Holdings has entered into the Term Sheet that provides for it to relinquish certain rights with respect to Beneficient, including GWG Holdings' ability to appoint a majority of the board of directors of the general partner of Ben LP and control the activities of Beneficient.***

In connection with the Investment Agreement, GWG Holdings acquired the right to appoint a majority of the board of directors of Beneficient Management. As a result, GWG Holdings reports the results of Ben LP and its subsidiaries on a consolidated basis beginning on the transaction date of December 31, 2019. GWG Holdings' right to appoint a majority of the board of directors of Beneficient Management will terminate in the event (i) GWG Holdings' ownership of the fully diluted equity of Ben LP (excluding equity issued upon the conversion or exchange of Preferred Series A Unit Accounts of BCH held as of December 31, 2019 by parties other than GWG Holdings) is less than 25%, (ii) the Continuing Directors of GWG Holdings cease to constitute a majority of the board of directors of GWG Holdings, or (iii) certain bankruptcy events occur with respect to GWG Holdings. The term "Continuing Directors" means, as of any date of determination, any member of the board of directors of GWG Holdings who: (1) was a member of the Board of Directors of GWG Holdings on December 31, 2019; or (2) was nominated for election or elected to the Board of Directors of GWG Holdings with the approval of a majority of the Continuing Directors who were members of the Board of Directors of GWG Holdings at the time of such nomination or election. In addition, GWG Holdings entered into the Term Sheet that provides for GWG Holdings no longer having the right to appoint directors of the board of directors of Beneficient Management and Beneficient no longer being a consolidated subsidiary of GWG Holdings. If any such events occur, GWG Holdings may no longer have the right to control Ben LP and consolidate its financial results, which could have a material negative effect on our financial condition.

***GWG Holdings' percentage ownership in Ben LP may be diluted significantly.***

GWG Holdings currently owns approximately 96% of the issued and outstanding common units in Ben LP. This percentage ownership does not take into account (i) limited partner interests that may be issued upon the conversion of outstanding securities issued by Ben LP or its affiliates, or (ii) additional limited partner interests that may be issued, and Ben LP is currently seeking to raise capital through the issuance of limited partner interests. Taking these issuances into account, as well as potential payments in Ben LP common units under the Seller Trust L Bonds, GWG Holdings' ownership interest in Ben LP common units could be reduced significantly below 25%. In addition, Beneficient Management has discretion to cause Ben LP to issue additional limited partner interests from time to time, and Ben LP's partnership agreement contains no meaningful restrictions on this authority. Moreover, the Beneficient organizational structure permits the future issuance of additional securities that can, upon certain circumstances or at the discretion of their holders, be converted into additional limited partner interests in Ben LP. Should any of these actions be taken, GWG Holdings' percentage ownership in Ben LP will be diluted.

***A failure to establish and maintain effective internal controls over financial reporting could adversely affect our financial results.***

A material weakness is defined as a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. GWG Holdings identified a material weakness in internal controls over financial reporting in the quarterly income tax provision process, which included the measurement of the valuation allowance against our deferred tax assets, which was reported in GWG Holdings' Quarterly Report on Form 10-Q for the quarter ended September 30, 2020. In addition, in connection with matters related to the Restatement, we have determined that a material weakness existed in our internal control over financial reporting for all periods from December 31, 2019 to December 31, 2020. As of December 31, 2020, the design and operating effectiveness of controls over the selection, application and review of the implementation of accounting policies were not sufficient to ensure amounts recorded and disclosed were fairly stated in accordance with GAAP. This material weakness resulted in the Restatement. As a result of these material weaknesses, GWG Holdings' Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were not effective for the year ended December 31, 2020.

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 415 of 1031     PageID 587

APP. 415

Table of Contents

We continue to evaluate, design and implement controls and procedures under a remediation plan designed to address these material weaknesses. If our remedial measures are insufficient to address the material weaknesses, or if additional material weaknesses or significant deficiencies in our internal control are discovered or occur in the future, our financial results could be adversely affected.

GWG Holdings is a smaller reporting company for SEC reporting purposes and has historically had limited accounting and financial reporting resources. Prior to the December 31, 2019 consolidation with GWG Holdings, Beneficient was not subject to the reporting obligations required under the Sarbanes-Oxley ("SOX") Act of 2002. The consolidation of Beneficient and GWG Holdings resulted in increased accounting, reporting and internal controls complexity as the companies integrate systems and processes.

Effective internal controls are necessary for GWG Holdings and Beneficient to provide reliable financial reports, prevent fraud and operate successfully. If either GWG Holdings or Beneficient, or both, cannot provide reliable financial reports or prevent fraud, our ability to accurately report financial results could be adversely affected and our reputation and operating results would be harmed. While GWG Holdings and Beneficient believe they have increased their accounting and financial reporting resources, GWG Holdings and Beneficient cannot be certain that their efforts to further establish and maintain internal controls over financial reporting will be successful. Any failure to further develop, as necessary, or to maintain effective internal controls could harm our operating results or cause us to fail to meet our reporting obligations. Ineffective internal controls could also cause investors to lose confidence in our reported financial information. Refer to *Item 9A. Control and Procedures* for additional information regarding the material weaknesses identified.

### *We may not realize a return on GWG Holdings' investment in FOXO Technologies Inc.*

Under the FOXO subscription agreement, GWG Holdings is obligated to invest $20.0 million in FOXO over a two-year period ending in October 2021, of which $16.2 million was funded as of December 31, 2020. The success of FOXO is dependent, in part, on new and unproven technology as part of its life insurance policy underwriting process. If the mortality predictions FOXO obtains through use of this technology proves inaccurate, FOXO may not generate sufficient cash flows to satisfy the terms of the distributions to us as provided in its operating agreement. Furthermore, any failure by FOXO to protect its intellectual property rights could impair its ability to protect its proprietary technology and the value of GWG Holdings' investment. As such, GWG Holdings may not realize the return contemplated in the FOXO subscription agreement, and our results of operations and financial condition could be materially and adversely affected.

### *The resale of GWG Holdings' common stock issued in the Exchange Transaction could result in a reduction in the market price of GWG Holdings' common stock and result in a destabilized trading market for GWG Holdings' common stock.*

Upon the Final Closing Date, GWG Holdings issued 27,013,516 shares of its common stock to the Seller Trusts, which in the aggregate represented approximately 83% of the outstanding common stock on that date. On September 30, 2020, the ownership of 9,837,264 shares transferred to certain of the ExAlt Trusts in connection with the Collateral Swap, as discussed in *Item 1. Business*. The remaining shares issued in the Exchange Transaction are subject to resale restrictions applicable to "restricted securities" under applicable federal securities laws. The Master Exchange Agreement and related ancillary agreements require that GWG Holdings register the resale of the shares of common stock issued in the Exchange Transaction to the Seller Trusts to the extent permitted by applicable SEC rules and regulations. Upon the effectiveness of any such registration, or the lapse of applicable resale restrictions under applicable securities laws, the shares of GWG Holdings' common stock issued in the Exchange Transaction will be available for resale in the public equity markets. We cannot predict the effect, if any, that future sales of these shares or the availability of these shares for future sale could have on the market price of GWG Holdings' common stock.

### *The Seller Trusts, collectively, have the power to control the vote of a majority of GWG Holdings' outstanding common stock, enabling them to exert significant influence over our operations, which may affect the trading price of GWG Holdings' common stock.*

According to their most recent Schedule 13D/A filing, the Seller Trusts own approximately 48.6% of GWG Holdings' outstanding common stock. The Seller Trusts are a group of individual common law trusts that received shares of such common stock in the Exchange Transaction. The trustee of each of the Seller Trusts is Delaware Trust Company. The trust advisors of each trust are two individuals unrelated to each other, Murray T. Holland (GWG Holdings' President and Chief Executive Officer) and James E. Turvey, a Beneficient employee, who have sole decision-making authority with respect to each Seller Trust. The beneficiary of each of the Seller Trusts is MHT Financial, LLC. The current members of MHT Financial, LLC include Murray T. Holland and an entity owned by Shawn T. Terry and Mike McGill. The Seller Trusts are entitled to full voting rights with respect to the shares of Common Stock they own. Because the Seller Trusts, collectively,

APP. 416

APP. 417

Table of Contents

own a substantial portion of GWG Holdings' outstanding voting securities and certain ExAlt Trusts, holding approximately 29.7% of GWG Holdings' outstanding common stock according to their latest Schedule 13D/A filing have agreed to vote their shares in proportion to the votes cast by all other holders of GWG Holdings' voting securities, the Seller Trusts are entitled to cast a majority of the votes on all matters requiring stockholder votes, including, if a stockholder vote is required: the election of directors; mergers, consolidations, acquisitions and other strategic transactions; the sale of all or substantially all of our assets and other decisions affecting our capital structure; amendments to GWG Holdings' Certificate of Incorporation or bylaws; and our winding up and dissolution. This concentrated ownership enables the Seller Trusts to exert significant influence over all of our corporate activities, including the election of directors to GWG Holdings' Board of Directors, and may delay, deter or prevent acts that would be favored by our other stockholders. The interests of the Seller Trusts may not always coincide with our interests or the interests of our other stockholders. This concentration of ownership may also have the effect of delaying, preventing or deterring a change in control of the Company. Also, the Seller Trusts may seek to cause us to take courses of action that, in their judgments, could enhance their investments in us, but which might involve risks to our other stockholders or adversely affect us or our other stockholders. As a result, the market price of GWG Holdings' shares could decline or stockholders might not receive a premium over the then-current market price of GWG Holdings' shares upon a change in control. In addition, this continued concentration of share ownership may adversely affect the trading price of GWG Holdings' shares because prospective investors may perceive disadvantages in owning shares in a company with such significant stockholders.

***We are currently relying on the "controlled company" exemption under Nasdaq Stock Market Listing Rules, pursuant to which "controlled companies" are exempt from certain corporate governance requirements otherwise applicable under Nasdaq Stock Market Listing Rules.***

The Nasdaq Stock Market Listing Rules exempt "controlled companies," or companies of which more than 50% of the voting power is held by an individual, a group or another company, from certain corporate governance requirements, including those requirements that:

- A majority of the board of directors consist of independent directors;
- Compensation of officers be determined or recommended to the board of directors by a majority of its independent directors or by a compensation committee comprised solely of independent directors; and
- Director nominees be selected or recommended to the board of directors by a majority of its independent directors or by a nominating committee that is composed entirely of independent directors.

The Seller Trusts that acquired GWG Holdings' shares in the Beneficient Transactions own approximately 48.6% of our common stock and are considered a group for purposes of the Nasdaq controlled company listing rule, based on the most recent Schedule 13D/A filed by the Seller Trusts and its trust advisors with the SEC, and certain of the ExAlt Trusts, holding approximately 29.7% of GWG Holdings' outstanding common stock according to their latest Schedule 13D/A filing have agreed to vote their shares in proportion to the votes cast by all other holders of GWG Holdings' voting securities. As a result, we are currently a "controlled company" and are relying on the controlled company exemption for certain of the above requirements, including those related to director nomination. Accordingly, should the interests of the Seller Trusts differ from those of other stockholders, the other stockholders do not have the same protections generally as stockholders of other Nasdaq-listed companies with respect to corporate governance for so long as we rely on the controlled company exemption from the specified corporate governance requirements. GWG Holdings' status as a controlled company could make GWG Holdings' common stock less attractive to some investors or otherwise harm GWG Holdings' stock price.

**Risks Related to Our Liquidity Products Business**

***Beneficient may be unable to operate its business successfully, which would negatively impact its ability to generate distributable cash flow and increase the value of GWG Holdings' and GWG Life's investments in Beneficient.***

We operate our liquidity products business through our consolidated subsidiary Ben LP and its subsidiaries. The success of our liquidity products business will depend primarily on Beneficient's ability to operate its business successfully, generate distributable cash flow, and increase the value of GWG Holdings' and GWG Life's investments in Beneficient. If Beneficient is unable to do so, such inability will negatively impact our operations and liquidity and may result in an impairment of goodwill. Beneficient does not have significant operating history under its current business plan. Additionally, Ben LP's proposed trust company subsidiary has no operating history. In general, companies that seek to implement these kinds of business plans present substantial business and financial risks and uncertainties. Furthermore, to date, Ben LP's originations of liquidity products have been transacted primarily with a limited number of family offices, fund-of-funds and institutions. These types of customers, specifically fund-of-funds and institutions, may not represent the target market of Beneficient's liquidity products in the future, and Beneficient has only recently begun transactions with individual investors.

APP. 418

Page 16

Because Beneficient represents a significant percentage of our consolidated assets, the impact on our consolidated financial statements of Beneficient's financial performance is likely to be material.

***Beneficient may not obtain an unconditional Kansas TEFFI charter and has experienced significant delays in obtaining a trust company charter, which outcome would hinder Beneficient's ability to successfully pursue its current business plan and could adversely affect the value of GWG Holdings' and GWG Life's investments in Beneficient.***

Beneficient's liquidity products are designed to facilitate the delivery, at a customer's election, of cash, equity securities or debt securities, or a combination of cash and equity or debt securities for their alternative assets. In order to further grow these businesses, BFF is seeking to obtain an unconditional TEFFI charter in Kansas and a non-depository trust company charter in Texas. Each of those proposed institutions may not commence operations until it receives its respective unconditional charter.

In April 2021, the Kansas Legislature adopted, and the governor of Kansas signed into law, a bill that would allow for the chartering and creation of Kansas TEFFI trust companies that provide fiduciary financing, custodian and trustee services to participants in the alternative assets market known as TEFFIs, as well as the establishment of alternative asset trusts. The legislation, which names BFF as the pilot TEFFI, became effective on July 1, 2021. As part of the pilot program, BFF received a conditional charter on July 1, 2021, and has applied for a final operational charter. Upon issuance of a final operational charter, Beneficient expects to conduct its liquidity business through BFF as a Kansas TEFFI. While Beneficient expects that it will establish an operational Kansas TEFFI trust company with a permanent unconditional charter, its ability to do so is not assured, in part because BFF's initial charter will be a part of a pilot program that could last until July 1, 2022 during which it will not be authorized to conduct operations. Until that time, BFF will not be authorized to conduct operations as a TEFFI. There can be no assurance that BFF will receive an unconditional TEFFI charter following the pilot program. Further, in connection with the expected receipt of a Kansas TEFFI charter, BFF is anticipated to become subject to regulation by the Kansas Office of the State Bank Commissioner and new rules and regulations that it would be expected to promulgate throughout and following the pilot program. Such regulations could prove to be burdensome on Beneficient's business and could adversely impact its financial condition and results of operations. Beneficient filed limited trust association charter applications for two proposed trust companies (one to offer liquidity products and the other to offer custodial and trustee services) with the Texas Department of Banking in September of 2018 and submitted revised charter applications on March 6, 2020. During the fourth quarter of 2020, the Texas Department of Banking delivered guidance to Beneficient that it does not require a trust company charter for Beneficient to offer its liquidity products to customers, and, as a result, on November 25, 2020, Beneficient withdrew its charter application with respect to the liquidity products. However, Beneficient is exploring whether it would be advantageous to continue pursuing a trust company charter to provide its liquidity products. Beneficient's charter application with respect to offering custodial and trustee services remains under review by Texas Department of Banking. Approval of this application is not assured.

Because Beneficient's current business plans are based in part on obtaining regulatory approval to operate a regulated trust company, a failure to do so may materially and adversely impact its financial performance and prospects, which would likely negatively impact our results of operations and may result in impairment of goodwill.

Even if the Kansas TEFFI is established or the Texas charter application is approved, Beneficient expects that the approval will be subject to certain conditions including, among others, that each proposed entity satisfies certain minimum restricted capital requirements. There is no assurance that Beneficient will be able to satisfy all the conditions imposed by the Kansas Office of the State Bank Commissioner or the Texas Department of Banking in connection with its approval. In addition, such conditions could delay the anticipated time for commencement of fiduciary operations.

***Beneficient may not be able to grow, effectively manage its growth, or achieve profitability.***

A principal focus of Beneficient's liquidity products strategy is to expand the number of Beneficient's product offerings and grow Beneficient's trust administration products and services. Beneficient's future growth depends upon a number of factors, many of which are beyond Beneficient's ability to control. These factors include Beneficient's ability to:

- accurately assess the demand for and sell the products and offerings that Beneficient has developed and expects to develop to meet demand;
- compete against other customer solutions and vendors;
- maintain the quality of Beneficient's trust administration products and services;
- effectively manage Beneficient's financing underwriting and risk criteria and manage diversification, including with effective risk management discipline;

APP. 421

Table of Contents

- update Beneficient's products and offerings and develop new products and offerings for which its customers will be willing to exchange their alternative assets;
- properly scale its internal organization and infrastructure to accommodate the development and commercialization of its existing products and products in development; and
- hire, train and retain qualified personnel to manage and operate Beneficient's business as it is expected to grow.

A deficiency in any of these factors could adversely affect Beneficient's ability to achieve or manage growth or profitability.

### Beneficient is subject to repayment risk in connection with its liquidity transactions.

Beneficient's liquidity transactions include making ExAlt Loans, which are collateralized by the Collateral. ExAlt Loans do not require repayment prior to maturity and are subject to a risk of default. Because the trusts that borrow from the lending operating subsidiary of Ben Liquidity under such ExAlt Loans are controlled by an unaffiliated third-party trust advisor with investment discretion over the Collateral, any such borrower trusts may default on an ExAlt Loan even if the cash flow from alternative assets comprising the Collateral supporting any such ExAlt Loan is sufficient to otherwise repay interest and principal.

### Beneficient may incur significant losses as a result of ineffective risk management processes and strategies.

Beneficient seeks to monitor and control its risk exposure by developing an effective risk and control framework, which encompasses a variety of separate but complementary financial, credit, operational, compliance, and legal reporting systems; internal controls; management review processes; and other mechanisms. While Beneficient employs and will continue to develop and deploy risk monitoring and risk mitigation techniques, those techniques and the judgments that accompany their application may not be effective and may not anticipate every risk event in all market environments or the specific nature of the impact and timing of such outcomes. Beneficient's failure to manage risk effectively could have an adverse effect on its business and results of operations.

### Beneficient may be able to offer only a limited number of products and solutions.

Beneficient may be able to offer only a limited number of products and solutions due to regulatory, capital or other restrictions. Accordingly, the prospects for Beneficient's success may be solely dependent upon the performance of a single or limited products or solutions, or dependent upon the development or market acceptance of a single or limited number of products or solutions. A lack of diversification in its offerings may make Beneficient's results of operations susceptible to numerous economic, competitive and regulatory conditions, any or all of which may have a substantial adverse impact upon Beneficient's ability to operate its business and/or grow its business in the future. Further, Beneficient would not be able to diversify its operations or benefit from the possible spreading of risks or offsetting of losses that offering a comprehensive suite of solutions could provide.

### Beneficient depends on the accuracy and completeness of information from and about customers.

In making an assessment regarding the alternative assets underlying a potential liquidity transaction, Beneficient may rely on information furnished to it by or on behalf of customers, including financial statements and other financial information. Beneficient also may rely on representations of customers as to the accuracy and completeness of that information and, with respect to financial statements, on reports of independent auditors. For example, in connection with liquidity transactions, Beneficient may rely on information provided by a customer such as net asset value of an underlying alternative asset. Beneficient also relies, and will continue to rely, on customer representations and certifications, or other audit or accountants' reports, with respect to the business and financial condition of the assets underlying the liquidity transaction. While Beneficient believes that its underwriting process is thorough and robust, its necessary reliance on customers may not reveal or highlight all relevant facts (including bribery, fraud or other illegal activities) or risks that are necessary or helpful in evaluating such transaction opportunity. Instances of bribery, fraud, accounting irregularities and other improper, illegal or corrupt practices can be difficult to detect and may be more widespread in certain jurisdictions. Beneficient's financial condition, results of operations, financial reporting and reputation could be negatively affected if Beneficient relies on materially misleading, false, inaccurate or fraudulent information.

### Difficult market conditions can cause investors to reduce or suspend their investments in alternative assets or their desire to liquidate alternative assets they hold, which could adversely affect Beneficient's business.

Beneficient's business depends upon the health of the market for investments in alternative assets. During economic downturns, alternative asset owners may suffer from decreasing returns (including negative returns and loss of principal investment), liquidity pressure, increased volatility and difficulty maintaining targeted asset allocations, and investors may

Page 18

APP. 423

Table of Contents

decrease or suspend making new fund investments during and after such periods. As the economy begins to recover from these periods, investors may elect to reduce their exposure to alternative investments, resulting in a smaller overall pool of potential customers in the industry and customers for Beneficient's products and services in the future. In the event all or part of this occurs, when trying to find new customers Beneficient will be competing for fewer available alternative assets to administer in an increasingly competitive environment, which could lead to terms less favorable to Beneficient as well as difficulty in reaching new customers. Such changes would adversely affect Beneficient's revenues and profitability.

### *Beneficient is dependent on the continued success of the alternative asset industry.*

Beneficient's success depends, in part, on the continued success of alternative asset managers and the alternative asset industry that has enjoyed a prolonged period of expansion and profitability. Such expansion and profitability is subject to market conditions and other factors outside of Beneficient's control (and the control of managers of alternative assets). There is no assurance that such expansion and profitability will continue. Beyond business and financial success, the alternative asset industry may also become subject to greater governmental regulation and investigation, which could have a negative effect on Beneficient.

### *A failure of Beneficient to appropriately identify and address potential conflicts of interest could adversely affect Beneficient's business.*

Beneficient has developed procedures and controls designed to identify and address conflicts of interest relevant to its business operations. However, appropriately identifying and dealing with conflicts of interest is complex and difficult, and Beneficient's reputation could be damaged, and the willingness of customers to enter into transactions with Beneficient may be affected, if Beneficient fails, or appears to fail, to identify, disclose and deal appropriately with conflicts of interest. In addition, potential or perceived conflicts could give rise to litigation or regulatory enforcement actions.

### *Transfer restrictions applicable to alternative assets may prevent Beneficient from being able to attract a sufficient number of customers to achieve Beneficient's business goals.*

Many alternative assets contain stringent transfer restrictions imposed by the issuing entity, which may prevent Beneficient from entering into liquidity transactions or providing trust administration services with respect to such assets. Such restrictions may result in Beneficient not being able to attract a sufficient number of customers or liquidity transactions and, as a result, its revenues and profitability could be adversely affected.

### *Beneficient's business, profitability and liquidity may be adversely affected by deterioration in the credit quality of, or defaults by, the ExAlt Trusts that owe Ben Liquidity money, securities or other assets or obligations collateralizing the ExAlt Loans held by Ben Liquidity.*

Beneficient is exposed to the risk that the ExAlt Trusts that owe Ben Liquidity money, securities or other assets will not perform their obligations. These parties may default on their obligations to Ben Liquidity due to bankruptcy, lack of liquidity, operational failure or other reasons. A failure of a significant market participant, or even concerns about a default by such an institution, could lead to significant liquidity problems, losses or defaults by other institutions, which in turn could adversely affect Ben Liquidity.

### *Beneficient uses hedging transactions to manage certain market risks; Beneficient's business, profitability and liquidity may be adversely affected by unanticipated market conditions including interest rates, currency exchange rates, equity market behavior, and other relevant market factors that generate losses not covered or offset by a hedge.*

When managing its exposure to market risks, Beneficient may make use of forward contracts, options, swaps, caps, collars and floors and may pursue other strategies or use other forms of derivative instruments to limit its exposure to changes in the relative values of investments that may result from market developments, including changes in prevailing interest rates and currency exchange rates. On July 17, 2020, Ben LP, through its subsidiary CT Risk Management, L.L.C., made aggregate payments of $14.8 million to purchase put options against a decrease in the S&P 500 Index. The options have an aggregate notional amount of $300.0 million and are designed to protect the net asset value of the interests in alternative assets that generate the collateral to Beneficient's loan portfolio against market risk. One-half of the put options expire in July 2022 with the remaining put options expiring in July 2023.

The use of hedging transactions and other derivative instruments to reduce the effects of changes in the value of a position does not eliminate the possibility of fluctuations in the value of the position or prevent losses if the value of the position declines. However, such activities can establish other positions designed to gain from those same developments, thereby offsetting the decline in the value of the position. Such transactions may also limit the opportunity for gain if the value of a position increases. Moreover, it may not be possible to limit the exposure to a market development that is so generally

APP. 424

APP. 425

Table of Contents

anticipated that a hedging or other derivative transaction cannot be entered into at an acceptable price. Although Beneficient has entered into and may continue to enter into hedging transactions in order to reduce its exposure to market risks, unanticipated market changes may result in poorer overall investment performance than if the transaction had not been executed. In addition, the degree of correlation between price movements of the instruments used in connection with hedging activities and price movements in a position being hedged may vary. Moreover, for a variety of reasons, Beneficient may not be successful in establishing a sufficient correlation or a sufficient matching of cash flows between the instruments used in a hedging or other derivative transaction and the position being hedged. An insufficient correlation could prevent Beneficient from achieving the intended result and create new risks of loss. In addition, Beneficient will not be able to fully limit exposure against all changes in the values of the alternative assets underlying its liquidity transactions, because the values of such assets are likely to fluctuate as a result of a number of factors, some of which will be beyond Beneficient's control, and it may not be able to respond to such fluctuations in a timely manner or at all.

***Beneficient's fair value estimates of illiquid assets may not accurately estimate prices obtained at the time of sale and Beneficient cannot provide assurance that the values of the alternative assets underlying the liquidity transactions that it reports from time to time will be realized.***

Asset valuations for which there is no readily available market, such as the illiquid assets comprising the Collateral, require estimates and assumptions about matters that are inherently uncertain. Given this uncertainty, the fair values of such assets as reflected in estimated net asset value may not reflect the prices that would actually be obtained if and when such assets were sold.

Under Beneficient's valuation policy, Beneficient bases its estimates of the fair value of the alternative assets in the Collateral on the fund reported net asset value provided to it by the underlying fund managers. Because alternative asset managers generally hold a high proportion of their investments in assets for which market prices are not readily available, fund reported net asset value will necessarily incorporate estimates of fair value made by the fund managers. As there is no single method for determining fair value, there may be significant variations in the valuation policies used by different fund managers in the Collateral.

In addition, due to time lags in receiving valuation information from fund managers, Beneficient typically does not and will not have up-to-date information from all underlying funds at the time it calculates the fair value of the alternative assets underlying the liquidity transactions. Beneficient typically is not and will not be aware of all material developments at a fund or its underlying portfolio companies that could adversely affect the value of the funds in the Collateral.

Even if market quotations are available for the alternative assets underlying the liquidity transactions, such quotations may not reflect the value that could actually be realized because of various factors, including the possible illiquidity associated with a large ownership position, subsequent illiquidity in the market for a company's securities, future market price volatility or the potential for a future loss in market value. Realizations at values significantly lower than the fair values recorded in Beneficient's financial statements could have a material adverse effect on the net asset value of the alternative asset, and therefore the value of the beneficial interests and the corresponding liquidity transactions.

Furthermore, a substantial majority of the net assets of Beneficient, and a significant portion of the net assets of GWG Holdings on a consolidated basis, are currently represented by intangible assets and goodwill. Management performs goodwill and intangible asset impairment testing annually, during the fourth quarter, or when events occur, or circumstances change that would more likely than not indicate impairment has occurred. For 2020, the annual goodwill impairment analysis did not result in any impairment charges. Our evaluation utilized multiple assumptions, including estimated discounted cash flows and other estimates that may change over time. While our assumption reflects management's best estimates of future performance, the estimates assume Beneficient capturing a significant market share of liquidity transactions during the next five years leading to a substantial rate of growth of new service offerings and products, revenues and assets over the next five years ending December 31, 2025. These estimations are uncertain to occur, and to the extent the Company falls short of achieving our expected growth in revenues and assets over the next four years, material impairments of our goodwill may occur in the near term. Moreover, in light of Beneficient's significant recurring losses from operations, negative cash flows from operations, and delays in executing its business plans, there could be potential triggering events identified and resulting impairment of goodwill recorded during the annual impairment test during the fourth quarter of 2021. While management can and has implemented strategies to address these events, changes in operating plans or adverse changes in the future could reduce the underlying cash flows used to estimate fair values and could result in a decline in fair value that would trigger future impairment charges of the reporting unit's goodwill balance. Goodwill impairment exists when the carrying value of goodwill exceeds its implied fair value. If management concludes that a portion of goodwill is impaired, we would be required to write down the value of such goodwill, which may adversely affect our results of operations.

APP. 426

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 427 of 1031    PageID 599

APP. 427

Table of Contents

***Notwithstanding its diversification strategies, Beneficient's liquidity, profitability and business may be adversely affected by concentrations of assets comprising the Collateral.***

Although Beneficient monitors the diversity of its collateral portfolio through the use of concentration guidelines, the Collateral may be concentrated in certain issuers, funds, sectors, geographic regions, countries, or asset types, which could negatively affect performance as well as Beneficient's financial results, including Beneficient's capital position, earnings, cash flows, and growth.

Similarly, Beneficient may have significant exposures to certain issuers, industries, or asset classes. As a result, Beneficient's net cash flows and asset valuations (e.g., net asset value) may exhibit greater volatility due to idiosyncratic factors specific to companies, industries, regions, and asset classes. Moreover, because of such concentrations, Beneficient may suffer losses even when economic and market conditions are generally favorable for Beneficient's competitors.

In the case of Beneficient's exposure to investments in publicly traded companies, its operating results would be impacted by volatility in the public markets generally and in the stock prices of such companies.

***The due diligence process that Beneficient undertakes in connection with liquidity transactions may or may not reveal all facts that may be relevant in connection with such liquidity transaction, and even if Beneficient receives complete and accurate information it may not translate to identifying the appropriate underwriting criteria.***

Before offering liquidity solutions to customers, Beneficient conducts due diligence that it deems reasonable and appropriate based on the facts and circumstances applicable to each transaction. When conducting due diligence, Beneficient may be required to evaluate important and complex business, financial, tax, accounting, technological, environmental, social, governance and legal and regulatory issues. In addition to Beneficient's own employees, outside consultants, legal advisors and accountants may be involved in the due diligence process in varying degrees depending on the type of investment and the parties involved. Nevertheless, when conducting due diligence and making an assessment regarding the alternative assets behind a potential liquidity transaction, Beneficient relies on the resources available to it, including information provided by the potential customer of the liquidity transaction, the general partners and managers of the alternative assets the customer holds, and, in some circumstances, third-party investigations, and such an investigation will not necessarily result in the investment ultimately being successful. Moreover, even in the event that Beneficient receives complete and accurate information in the due diligence process, it may not translate to identifying the appropriate underwriting criteria, which could result in negative reputational effects, and/or otherwise materially and adversely affect our business, financial condition and results of operations.

***Restrictions on Beneficient's ability to collect and analyze data regarding its customers' alternative assets investments could adversely affect its business.***

The Collateral is generated by interests in alternative assets. Beneficient depends on the continuation of its relationships with the general partners and sponsors of the underlying funds and investments in order to maintain current data on these alternative assets. The termination of such relationships or the imposition of restrictions on its ability to use the data it obtains for its reporting and monitoring services could adversely affect our business, financial condition and results of operations. Beneficient's monitoring is also dependent on the statements and conduct of personnel at investment managers of the general partners of these alternative asset firms. To the extent that the beliefs and expectations of these managers turn out to be inaccurate, Beneficient's expectations as part of its monitoring process may be materially impacted.

**Risks Related to Our Secondary Life Insurance Business**

***The valuation of our life insurance policy assets on our balance sheet requires us to make material assumptions that may ultimately prove to be incorrect. If our assumptions prove incorrect, we could suffer significant losses that materially and adversely affect our results of operations.***

One of our principal assets is a portfolio of life insurance policies purchased in the secondary market, comprising approximately 64% and 62% of our total assets, excluding goodwill, as of December 31, 2020 and 2019, respectively. Those assets are considered "Level 3" fair value measurements under Accounting Standards Codification 820, *Fair Value Measurements and Disclosures* ("ASC 820"), as there is currently no active market where we are able to observe quoted prices for identical assets. As a result, our determination of fair value for those assets on our balance sheet incorporates significant inputs that are not observable. A sale of the portfolio or a portion of the portfolio in an other than orderly transaction would likely occur at less than the fair value of the respective life insurance policies.

A Level 3 fair value measurement is inherently uncertain and could create additional volatility in our financial statements that is not necessarily related to the performance of our underlying assets. As of both December 31, 2020 and 2019, we estimated

APP. 428

Table of Contents

the fair value discount rate for our life insurance portfolio to be 8.25%. Life expectancy estimates are also a significant component within our fair value measurement. If in the future we determine that a higher discount rate is required to ascribe fair value to a similarly situated portfolio of life insurance policies or that life expectancy estimates materially differ from actuarial estimates and/or our projections, we could experience significant losses materially affecting our results of operations. In addition, significant losses of this nature would likely at some point cause us to be out of compliance with borrowing covenants contained in our various borrowing agreements as well as cause our common stock to decline in value. This could in turn result in acceleration of the LNV Credit Facility, the NF Credit Facility, and GWG Holdings' L Bonds (including the Seller Trust L Bonds and Liquidity Bonds issued in connection with Beneficient liquidity transactions), which we may not be able to repay. As a result, we may be forced to seek additional debt or equity financing to repay such debt amounts, and additional financing may not be available on terms acceptable to us, if at all.

If we are unable to repay our debt when it comes due, then our senior lender or the holders of GWG Holdings' L Bonds, or both, would have the right to foreclose on our assets, and investors in our securities could lose all or a portion of their investment.

***Actual results from our life insurance portfolio may not match our projected results, which could adversely affect our ability to service our existing portfolio and meet our debt obligations.***

Our business partially relies on achieving actual results that are materially in line with the results we expect to attain from our investments in life insurance policy assets. In this regard, we believe that the larger the portfolio of life insurance we own, the greater the likelihood that we will achieve our expected results. To our knowledge, rating agencies generally suggest that portfolios of life insurance policies contain enough policies on individual lives to achieve actuarial stability in receiving expected cash flows. For instance, in a life insurance securitization methodology published in 2016, A.M. Best Company concluded that at least 300 lives are necessary to achieve actuarial stability, while Standard & Poor's has indicated that stability is unlikely to be achieved with less than 1,000 lives. As of December 31, 2020, we owned $1.9 billion in face value of life insurance policies covering 978 unique lives. Based on recent changes in the capital markets, specifically the availability of financing on favorable terms, we have begun exploring the feasibility of additional future purchases of life insurance policies through the secondary market. These operations are in addition to allocating capital to provide liquidity to a broader range of alternative assets, which GWG Holdings currently provides through investments in Beneficient. In the absence of purchasing additional life insurance policies, the number of life insurance policies that comprise our portfolio will decrease over time as policies mature, which may negatively impact the actuarial stability of our portfolio.

However, even if our life insurance portfolio is actuarially stable, we still may experience differences between the projection models we use and actual mortalities. Differences between our expectations and actual mortality results could have a materially adverse effect on our operating results and cash flows. In such a case, we may face liquidity problems, including difficulties servicing our remaining portfolio of policies and servicing our outstanding debt obligations. Continued or material failures to meet our expected results could decrease the attractiveness of our securities in the eyes of potential investors, thereby making it even more difficult to obtain capital needed meet our capital needs. Failure to meet our capital needs could materially and adversely affect the Company's financial position and may lead to our security holders losing all or a portion of their investment in the Company.

***Our investments in life insurance policies have inherent risks, including fraud and legal challenges to the validity of the policies, which we will be unable to eliminate and which may adversely affect our results of operations.***

We face certain risks associated with insurance fraud and other legal challenges to the validity of the policy. For example, to the extent the insured is not aware of the existence of the policy, the insured does not exist, or the insurance company does not recognize the policy, the insurance company may cancel or rescind the policy thereby causing the loss of an investment in that policy. In addition, if an insured's medical records have been altered in such a way as to shorten a life expectancy as reported, this may cause us to overpay for the related policy. Finally, we may experience legal challenges from insurance companies claiming that the insured failed to have an insurable interest at the time the policy was originally purchased or that the policy owner made fraudulent disclosures to the insurer at the time the policy was purchased (e.g., disclosures pertaining to the health status of the insured or the existence or sources of premium financing), or challenges from the beneficiaries of an insurance policy claiming that the sale of the policy to us was invalid.

To mitigate these risks, our origination practices and underwriting procedures, when we were purchasing policies, included a current verification of coverage from the insurance company, a complete due-diligence investigation of the insured and accompanying medical records, a review of the life insurance policy application, and a requirement that the policy has been in force for at least two years. We also conducted a legal review of any premium financing associated with the policy to determine if an insurable interest existed at the time of its issuance. Nevertheless, these steps will not eliminate the risk of fraud or legal challenges to the life insurance policies we own. Furthermore, changes in laws or regulations or the

APP. 431

Table of Contents

interpretation of existing laws or regulations, may prove our due-diligence and risk-mitigation efforts inadequate. If a significant face amount of policies were invalidated for reasons of fraud or any other reason, our results of operations would be materially adversely affected.

***Our ownership of life insurance policies issued by insurers that are unable to pay claims presented to them could have a materially adverse effect on our results of operation and our financial condition.***

We currently rely on the payment of policy claims by insurers as our most significant source of revenue collection. In essence, the life insurance assets we own represent the obligations of insurers to pay the benefit amount under the relevant policy upon the mortality of the insured. As a result, in our business, we face the "credit risk" that a particular insurer will be financially unable to pay claims when and as they become due. Depending on how many policies we own that are issued by insurers having financial difficulties at the time a claim is presented for payment, this risk could be significant enough to have a materially adverse effect on our results of operation, our financial condition, or even our overall prospects.

To mitigate this credit risk, we generally purchased policies issued only by insurers with an investment-grade credit rating from one or more of Standard & Poor's, Moody's, or A.M. Best Company. As of December 31, 2020, 96.3% of the face value benefits of our life insurance policies were issued by insurers having an investment-grade credit rating (BBB or better) by Standard & Poor's. We also review our exposure to credit risk associated with our portfolio of life insurance policies when estimating its fair value. In evaluating the policies' credit risk, we consider items such as insurance company solvency, credit risk indicators, and general economic conditions. Notwithstanding our efforts to mitigate credit risk exposure and to reflect this risk in our portfolio valuation, we cannot predict with any certainty whether a particular insurer will be in a financial position to satisfy amounts that it owes under life insurance policies it has issued when a claim for payment is presented or whether a particular credit rating accurately reflects the risks associated with such life insurance policies.

***We have relied materially on information provided or obtained by third parties in the acquisition of life insurance policies. Any misinformation or negligence in the course of obtaining information could materially and adversely affect the value of the policies we own, our results of operation and the value of our securities.***

Our acquisition of each life insurance policy was negotiated based on variables and particular facts unique to the policy itself and the health of the insured. The facts we obtained about the policies and the insured at the time when the policy was applied for and obtained were based on the insured's factual representations to the insurance company, and the facts the insurance company separately obtained in the course of its own due-diligence examination, such as facts concerning the health of the insured and whether or not there is an insurable interest present when the policy was issued. Any misinformation or negligence in the course of obtaining information relating to a policy or insured could materially and adversely impact the value of the policies we own and could in turn adversely affect our results of operations and the value of our securities.

***If actuarial assumptions related to our investments in life insurance policies change, our operating results and cash flow could be adversely affected, as well as the value of our collateral and our ability to service our debt obligations.***

When we were acquiring life insurance policies, the expected internal rates of return we calculated were based upon the probability of an insured's mortality over an actuarial life expectancy estimate. We obtained these estimates from third-party medical-actuarial underwriting companies. In addition to actuarial life expectancies, we relied on a pricing and premium forecasting software model developed by a third-party actuarial firm for the valuation of policies we purchased, future mortality revenues, and the calculation of anticipated internal rates of return. These pricing models forecast the estimated future premiums due as well the future mortalities of insureds.

All actuarial life expectancies (and related forecasting software) are subject to interpretation and change based on evolving medical technology, actuarial data, and analytical techniques. Additionally, we were required under the LNV Credit Facility to update life expectancy estimates for pledged life insurance policies with face amounts greater than $750,000 by December 18, 2020, and obtain updated life expectancy updates no less frequently than once every five years. Additionally, we are required, under the NF Credit Facility, to use commercially reasonable efforts to update life expectancies on a biannual basis. Our prior experience in updating life expectancies has generally resulted in longer life expectancies for most, but not all, of the insureds within our portfolio. Adverse impacts on the value of our life insurance policy portfolio or our cash flow could in turn impair the value of the collateral we have pledged to our creditors and our ability to service our debt and obligations as they come due.

***Inaccuracies in the life expectancy estimates we used for small face policies at the time of purchase could have a material and adverse effect on our results of operation and financial condition.***

As of December 31, 2020, we owned 633 "small face" life insurance policies (i.e., those policies with $1 million in face value of benefits or less) having $364.6 million in aggregate face value of benefits.

APP. 432

Page 23

Table of Contents

The underwriting processes we used to evaluate, price and purchase small face policies were different from, and may not have been as reliable as, the processes we used for life insurance policies with larger face values of benefits. In particular, the processes we used to develop or obtain life expectancy estimates and the related mortality curves for small face policies were less extensive than traditional methods. These processes included obtaining either a single fully underwritten or simplified report as opposed to two fully underwritten reports. A simplified third-party underwriting report is based on a self-reported medical interview and may be supplemented with additional information obtained from a pharmacy benefit manager database that is provided to one or more medical-actuarial underwriting firms to obtain a simplified life expectancy report. Although we obtained professional actuarial guidance regarding these processes, our simplified underwriting methodology may not have been as reliable as the processes we use for policies with larger (i.e., greater than $1 million) face value of benefits.

Any shortcomings in the process we used to evaluate, price, purchase and value our small face policies, or significant inaccuracies in the life expectancy estimates relating to those policies, could have a material and adverse effect on our results of operations and financial condition. Any such outcomes could have a negative and possibly material effect on our ability to satisfy our debts.

***We rely on estimated rates of mortality when valuing life insurance policies and forecasting the performance of our life insurance portfolio, and we also rely on other estimates derived from statistical methodologies for projecting our future cash flows. If any of our estimates prove to be incorrect, it could materially and adversely affect our financial condition and ability to satisfy our capital needs including debt service and repayment obligations.***

If we project we will receive cash inflows from policies sooner than we actually do, we may not be able to make payment on our debt obligations in a timely manner, or at all. Moreover, a significant medical discovery or advance that results in mortality improvements among seniors could have a material adverse effect on the value of our life insurance investments.

We use a modeling practice for projecting cash flows known as the "probabilistic method". This is an actuarial method that uses the probability of an insured's mortality over time (a mortality curve) to project the flow of policy benefits to us and to project premiums that must be paid by us. This method requires the input of life expectancy assumptions. These inputs are then used to estimate the discounted cash flows from the life insurance portfolio using the ClariNet LS probabilistic and stochastic portfolio pricing model from ClearLife Limited, which estimates the expected cash flows using various mortality probabilities and scenarios.

Our Longest Life Expectancy valuation methodology uses the Longest Life Expectancy report result at the time of purchase combined with a multiplier factor applied for variance in our portfolio of actual to expected experience using the Longest Life Expectancy results. Our methodology uses a static portfolio multiplier we must recalculate anytime the six-month moving average of the difference between actual portfolio performance and projected performance of cumulative face value maturities deviates by more than one standard deviation from the mean and such deviation persists for three consecutive months and continues as of the current quarter-end month. As of December 31, 2020, the six-month moving average of the difference between actual portfolio performance and projected performance of cumulative face value of maturities was within one standard deviation from the mean. As such, our valuation methodology did not require an update to our portfolio mortality multiplier ("PMM").

We use the current future cash flow projection to generate our expected internal rate of return on the life insurance policy portfolio we own. Any change to these projections, pricing models, methodology, premium forecasting assumptions, cash flow projections, or mortality assumptions accompanied therewith that increase the projected cost-of-insurance premiums or decrease the probability of mortality could have a material and adverse impact on our cash flows and financial condition. Ultimately, this could adversely affect our ability to meet our debt service and repayment obligations and could materially and adversely affect our profitability.

***Cost-of-insurance (premium) increases could materially and adversely affect our profitability and financial condition.***

We are subject to the risk of increased cost-of-insurance ("COI") charges (i.e., premium charges) for the universal life insurance policies we own in our portfolio. As of December 31, 2020, approximately 31% of the policies in our life insurance portfolio have premium levels that are guaranteed under the terms of the policy to keep the policy's death benefit in force even in a situation where the policy's cash account has been wholly depleted. On the remaining approximately 69% of our policies, we pay "non-guaranteed COI charges" and are subject to the risk that the insurer could increase the COI charges for the policy. In all cases, the amount of increase is subject to any limits that may be set forth in the insurance policy and must be approved by the applicable state regulator. Because very few of the policies we own have significant cash account value balances, any COI increase will require us to use more cash to satisfy the minimum premium amount required to keep the related policy in force, and this could materially and adversely affect our profitability.

Page 24

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 435 of 1031    PageID 607

APP. 435

Table of Contents

A COI increase can also be expected to impair the value of the affected policy because extra expense (i.e., additional premium amounts) will be required to keep the policy in force, and such extra expense will diminish the economic value, or return, of the policy realized upon the mortality of the insured. As a result, any widespread COI increases in policies we own would likely have a material and adverse effect on the value of our life insurance portfolio, which in turn would materially and adversely affect our profitability and financial condition.

*Our business and prospects may be adversely affected by changes, lack of growth, or increased competition in the life insurance secondary market.*

The growth of the secondary life insurance policy market may be negatively affected by a variety of factors beyond our control, including: negative publicity about the life insurance secondary market based on actual or perceived abuses; and the adoption of additional governmental regulation.

The relatively new and evolving nature of the market in which we operate makes the related risks difficult to identify and quantify. Nevertheless, contractions in the secondary market for life insurance policies, whether resulting from general economic conditions, regulatory or legal pressures, or otherwise (including regulatory pressures exerted on us or others involved in the secondary market for life insurance), could make participation in the market generally less desirable. This could in turn depress the prices at which life insurance policies on the secondary market are bought and sold and have a negative impact on the estimated value of the policies we own. If the value of the policies we own decreases, our results of operation and financial condition could suffer.

**Risks Related to Our Proposed Insurance Business**

*We have no experience in operating an insurance business and our entry into the insurance market may not be successful.*

Beneficient's business plan involves, through Ben Insurance, entering into the business of providing insurance policies to managers of, and investors in, alternative asset funds, such as private equity funds, for specified losses arising from indemnification and related obligations to the funds. GWG Holdings is also exploring opportunities to provide life insurance products related to its life insurance business. Entering the insurance business will subject us to additional laws and regulations and involve additional risks, including risks relating to regulatory oversight and examinations, risks related to compliance with capital maintenance requirements, and increased risks of litigation. Although certain of our directors and management have experience operating insurance businesses, we have no experience in operating an insurance business, which will enhance these risks. Attempts to expand our business involve a number of risks, including the required investment of capital and other resources, increasing demands on operational and management systems and controls, the diversion of management's attention from our core business, and the ability to implement an effective marketing strategy to promote awareness of our insurance products. The insurance industry is highly competitive and there can be no assurance that our plans to enter the insurance market will be successful. If our proposed insurance business does not generate sufficient revenue or if we are unable to efficiently manage our expanded operations, our results of operations will be adversely affected.

*Beneficient's failure to obtain or maintain approval of insurance regulators and other regulatory authorities as required for the operations of an insurance subsidiary may have a material adverse effect on our future business, financial condition, results of operations and prospects.*

As a part of Beneficient's business plan, through Ben Insurance, Beneficient may seek to obtain a license to offer insurance products from the Kansas Insurance Department. If and when Beneficient receives the necessary regulatory approvals, Beneficient intends to offer certain insurance products, including, but not limited to, insurance policies to managers of, and investors in, alternative asset funds, such as private equity funds, for specified losses arising from indemnification and related obligations related to the funds and transfer and assignment policies to buyers and sellers of interests in funds to cover risks attendant transfers pursuant to transactions such as the liquidity transactions. Kansas insurance statutes and regulations and the policies of the Kansas Insurance Department may require Beneficient to, among other things, maintain a minimum level of capital and surplus, satisfy solvency standards, restrict dividends and distributions, obtain prior approval or provide notification of certain transactions, have at least one director or manager be a resident of Kansas, maintain a principal place of business in Kansas and hold at least one meeting in Kansas annually, and provide for the performance of certain periodic examinations of our insurance subsidiary and its financial conditions.

In addition, Beneficient has applied for regulatory approval to commence offering insurance policies through Pen, as a Bermuda Class 3 insurer. Subject to receiving the necessary regulatory approvals, Beneficient would intend to offer the same insurance policies noted above through Pen. Bermuda insurance statutes and regulations, and the policies of the BMA require that Pen, among other things, maintain a minimum level of capital and surplus, satisfy solvency standards, restrict dividends

APP. 436

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 437 of 1031    PageID 609

APP. 437

Table of Contents

and distributions, obtain prior approval or provide notification to the BMA of certain transactions, maintain a head office in Bermuda, have a representative, secretary or director resident in Bermuda, appoint and maintain a principal representative in Bermuda and provide for the performance of certain periodic examinations of itself and its financial conditions.

A failure to meet these conditions may result in the failure to obtain the required regulatory approvals or, if obtained, a suspension or revocation of Ben Insurance's authority to do business as an insurance company, which would mean that Beneficient would not be able to provide the planned insurance products until the approvals are obtained or any suspension or revocation of the required approvals is resolved. If obtained, any suspension or revocation of regulatory approvals would negatively impact Beneficient's reputation in the marketplace and could have a material adverse effect on our ability to grow our exposure to alternative assets.

***The operation of Beneficient's proposed international insurance business, for which it has no prior experience, will subject Beneficient to additional costs and economic, political, currency and other risks that could adversely affect its revenues or financial position.***

Beneficient has no experience in operating its business internationally, which increases the risk that its proposed insurance business and any potential future expansion efforts that it may undertake may not be successful. Beneficient's operation of its proposed insurance business may face adverse financial consequences and operational problems due to political or economic changes, such as changes in political or economic conditions in Bermuda and the surrounding region, laws and regulations that restrict repatriation of earnings or other funds or that could subject repatriated earnings or other funds to additional taxes, or changes in foreign currency exchange rates. If Beneficient invests substantial time and resources to grow its proposed insurance business and is unable to manage these risks effectively, its business, results of operations and financial condition could be adversely affected. In addition, international expansion may increase its risks in complying with various laws and standards in Bermuda, including with respect to anti-corruption, anti-bribery, anti-money laundering, export controls, and trade and economic sanctions. Expansion into new markets abroad will require additional investments by Beneficient in both regulatory approvals and marketing. These incremental costs may include hiring additional personnel, as well as engaging third-party service providers and other research and development costs. If Beneficient fails to grow its international insurance business or if growth occurs at a slower rate than expected, its business, its results of operations and financial condition could be adversely affected.

**Risks Related to Beneficient's Proposed Broker-Dealer Business**

***Beneficient has no experience in operating a broker-dealer business, and its entry into this market may not be successful.***

Beneficient's proposed business plan involves offering broker-dealer services to its subsidiaries and affiliates through Ben Markets and its subsidiaries, including Beneficient Capital Markets and through Ben Market's acquisition of MHT Securities, L.P. ("MHT"). MHT is an SEC-registered broker dealer and FINRA member that is authorized to engage in private placements of securities. On July 14, 2021, an operating subsidiary of Ben LP, Ben Markets Management Holdings, L.P. ("Buyer") entered into a Transaction Agreement (the "Transaction Agreement") with MHT, MHT GP Securities, LLC, a Texas limited liability company (the "MHT GP"), and MHT Partners, L.P., a Texas limited partnership ("MHT LP" and, together with MHT GP, the "Sellers" and, together with Buyer, the "Transaction Parties"). Pursuant to the terms and conditions of the Transaction Agreement, the Buyer (i) purchased 20% of the limited partnership interests of MHT from MHT LP for an amount equal to $10,000, and (ii) agreed to (a) purchase the remaining 80% limited partnership interests of MHT from MHT LP, and (b) purchase 100% of the general partnership interests in MHT from MHT GP, in both cases for an aggregate amount equal to $40,000 (the "Subsequent Closing"). In addition to customary closing conditions applicable to transactions such as the ones contemplated by the Transaction Agreement, the Subsequent Closing is conditioned upon receipt from FINRA of approval of the Sellers' application for Continuing Membership Application under FINRA Rule 1017 for the remaining change in ownership (the "FINRA Application") (provided that such condition is waivable by the Transaction Parties if, on the date which is forty-five (45) days after the application was submitted, the Transaction Parties have not received a material objection from FINRA to the FINRA Application or in regard to FINRA approval which is disagreeable to the Transaction Parties). Until the Subsequent Closing, MHT is not controlled by or under common control with Beneficient and is not an affiliate of Beneficient.

Beneficient expects that operational efficiencies created by having an in-house broker-dealer will allow it to streamline its ExAlt Plan$^{TM}$ liquidity transactions, increase control of product distribution and reduce transaction costs. Entering into the broker-dealer business will subject Beneficient to additional laws and regulations and involve additional risks, including risks relating to regulatory oversight and examinations and increased risks of litigation. Although certain of Beneficient's directors and management have experience operating and advising broker-dealer businesses, Beneficient has no experience in operating a broker-dealer business, which will enhance these risks. Attempts to expand Beneficient's business involve a

APP. 438

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 439 of 1031    PageID 611

APP. 439

number of risks, including the required investment of capital and other resources, increasing demands on its operational and management systems and controls, the diversion of management's attention from its core business, and our ability to implement an effective marketing strategy to promote awareness of our broker-dealer products. The broker-dealer industry is highly competitive and there can be no assurance that Beneficient's plans to enter the broker-dealer market will be successful. If Beneficient's proposed broker-dealer business does not generate sufficient revenue, provide expected efficiencies or if Beneficient is unable to efficiently manage its expanded operations, Beneficient's results of operations will be adversely affected.

***Beneficient's failure to obtain or maintain approval of regulatory authorities as required for the operations of its broker-dealer subsidiaries may have a material adverse effect on its future business, financial condition, results of operations and prospects.***

As a part of Beneficient's business plan, a subsidiary of Ben Markets, Beneficient Capital Markets, may seek to register as a broker-dealer with the SEC and in all 50 states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands, and become a member of FINRA, and on July 14, 2021, a subsidiary of Ben Markets acquired a 20% interest in MHT pursuant to the Transaction Agreement and, following FINRA approval, will acquire the remaining 80% upon the Subsequent Closing (and following, MHT shall be renamed "Ben Securities Company, L.L.C."). If and when Beneficient receives the necessary regulatory approvals, Beneficient Capital Markets and MHT will be subject to regulations that cover all aspects of its business, including sales methods, trade practices, use and safekeeping of customers' funds and securities, the capital structure of Beneficient Capital Markets and MHT, recordkeeping, the financing of customers' purchases and the conduct of directors, officers and employees. Beneficient Capital Markets and MHT will also be subject to routine periodic examination by the staff of FINRA. In addition, as a registered broker-dealer and member of a self-regulatory organization, Beneficient Capital Markets and MHT will be subject to the SEC's uniform net capital rule. Rule 15c3-1 of the Exchange Act specifies the minimum level of net capital a broker-dealer must maintain and also requires that a significant part of a broker-dealer's assets be kept in relatively liquid form. The SEC and FINRA impose rules that require notification when net capital falls below certain predefined criteria, limit the ratio of subordinated debt to equity in the regulatory capital composition of a broker-dealer and constrain the ability of a broker-dealer to expand its business under certain circumstances. Additionally, the SEC's uniform net capital rule imposes certain requirements that may have the effect of prohibiting a broker-dealer from distributing or withdrawing capital and requiring prior notice to the SEC for certain withdrawals of capital. MHT is already subject to such requirements. Any failure to meet these conditions may result in the failure to obtain the required regulatory approvals or, if obtained, a suspension or revocation of Beneficient Capital Markets' or MHT's broker-dealer license, which would mean that Beneficient would not be able to provide the planned broker-dealer products until the approvals are obtained or any suspension or revocation of the required approvals is resolved. If obtained, any suspension or revocation of regulatory approvals would negatively impact Beneficient's reputation in the marketplace and could have a material adverse effect on its ability to grow its exposure to alternative assets.

**Risks Related to Our Indebtedness and Financing Arrangements**

***Our indebtedness could adversely affect our financial condition and may otherwise adversely impact our business operations. We may incur additional indebtedness, including secured indebtedness.***

As of December 31, 2020, we had $1.8 billion of debt including the LNV Credit Facility, GWG Holdings' L Bonds (including its Seller Trust L Bonds and Liquidity Bonds issued in connection with Beneficient's liquidity transactions), and Beneficient's debt due to related parties. Beneficient's debt to HCLP Nominees, L.L.C. is due in 2022. In 2021, GWG Holdings also incurred indebtedness under the NF Credit Facility, which is due in 2031. Our indebtedness could have significant effects on our business and the holders of our debt.

For example, it could:

- require us to use a substantial portion of our cash flow from operations to service our indebtedness, which would reduce the available cash flow to fund acquisitions of alternative assets, working capital and other general corporate purposes;
- require payments of principal and interest that may be greater than our cash flow from operations;
- force us to dispose of life insurance policies or other investments, possibly on disadvantageous terms, to make payments on our debt;
- increase our vulnerability to general adverse economic and industry conditions;
- limit our flexibility in planning for, or reacting to, changes in our business and the industries in which we operate;
- restrict us from exploiting other business opportunities;

Page 27

Table of Contents

- make it more difficult for us to satisfy our obligations; and
- place us at a competitive disadvantage compared to our competitors that have less debt.

In addition, the LNV Credit Facility, NF Credit Facility, and Beneficient's secured loans with HCLP Nominees L.L.C. bear interest at variable rates. If interest rates increase significantly, our ability to borrow additional funds may be reduced and the risk related to our indebtedness would intensify.

In addition, most of our current debt is, and we anticipate that much of our future debt will be, non-amortizing and payable in balloon payments. Therefore, we will likely need to refinance most of that debt as it matures. There is a risk that we may not be able to refinance debt as it matures or that the terms of any refinancing will not be as favorable as the terms of the then-existing debt. If principal payments due at maturity cannot be refinanced, extended or repaid with proceeds from other sources, such as new debt, equity capital or sales of assets, our cash flow may not be sufficient to repay all maturing debt in years when significant balloon payments come due. In the event we are unable to refinance debt as it becomes due, this could force us to liquidate and/or file for bankruptcy, and the collateral securing such debt may be worth less than the debt it secures, which would lead to material losses for our security holders as it relates to their investments in the Company. Additionally, we may incur significant penalties if we choose to prepay the debt.

***We critically rely on debt financing for our business. Any inability to borrow could adversely affect our business operations, our ability to satisfy our debt-payment obligations and, ultimately, our prospects and viability.***

To date, we have chosen to finance our business principally through the issuance of debt, including debt incurred by our subsidiary DLP IV under the LNV Credit Facility (see Note 10 to our accompanying audited consolidated financial statements), DLP VI under the NF Credit Facility, GWG Holdings' L Bonds and Beneficient's secured loans. The LNV Credit Facility is secured by all of the assets of DLP IV, has a maximum amount of $300.0 million, and the outstanding balance at December 31, 2020 was $193.7 million. The NF Credit Facility is secured by all assets of DLP VI and is fully drawn with $107.6 million outstanding as of August 31, 2021.

Obligations under the LNV Credit Facility and NF Credit Facility have maturity dates of September 27, 2029 and August 11, 2031, respectively. GWG Holdings' L Bonds have scheduled maturities as set forth below in the risk factor "*If a significant number of holders of GWG Holdings' L Bonds demand repayment of those instruments upon maturity instead of renewing them, and at such time we do not have sufficient capital on hand to fund those repayments (and do not otherwise have access to sufficient capital), we may be forced to liquidate some of our life insurance policies, investments in Beneficient or other assets, which could have a material and adverse impact on our results of operations and financial condition.*" Our debt facilities and offerings have been the most important sources of financing on which our business continues to critically rely to grow and maintain our exposure to alternative assets — which include our portfolio of life insurance policies and GWG Holdings' and GWG Life's investments in Beneficient — as well as service existing debt and preferred stock obligations, maintaining premium payments on our life settlements portfolio and paying for operations.

Our business model is based on increasing our exposure to alternative assets financed primarily through debt and preferred stock financing. These alternative assets are typically long-term and may not produce cash flows for an extended period of time. For example, we do not receive cash in respect of acquired life insurance policies until the insured individual dies, and Ben Liquidity may not receive payments on its ExAlt Loans until the assets underlying the Collateral have been sold by the asset manager and the unaffiliated third-party trust advisor that controls such borrower trusts elects to make a loan payment to Ben Liquidity prior to term, which is generally 12 years after the origination of any such ExAlt Loan. The resulting asset/liability mismatch can result in a liquidity shortage if we are unable to renew maturing short-term debt or secure suitable additional financing. In such a situation, we could be forced to sell assets at less than optimal (distressed) prices, or, in the event additional debt or other financings are not available, we could have to liquidate or file for bankruptcy, which would lead to material losses for our security holders as it relates to their investments in the Company. We thus rely on continued access to financing to enable us to grow our exposure to alternative assets and to pay the premiums and costs of maintaining our life insurance portfolio, all while satisfying our current interest, principal and dividend payment obligations under our debt and equity arrangements. Proceeds from life insurance policies that have been pledged under both the LNV Credit Facility and NF Credit Facility will first be applied to the repayment of our obligations under each respective credit facility according to a waterfall amortization formula that is largely controlled by each lender, respectively. Therefore, we may not receive all of the proceeds from matured life insurance policies. Accordingly, until we achieve sufficient cash flows derived from our portfolio of life insurance policies and investments in Beneficient, we expect to rely on proceeds from GWG Holdings' L Bond and preferred stock offerings to satisfy our ongoing financing and liquidity needs. Continued access to financing and liquidity under the LNV Credit Facility (other than premium payments on existing policies pledged pursuant thereto), from the offering of GWG Holdings' L Bonds, or otherwise is not guaranteed.

APP. 441

APP. 442

Table of Contents

As part of the preparation of its 2020 10-K, the Company voluntarily submitted two questions to the SEC's Office of the Chief Accountant ("OCA") on February 15, 2021. OCA is responsible for accounting and auditing matters arising in the SEC's administration of the federal securities laws, particularly with respect to accounting policy determinations. In this role, OCA consults with registrants on the application of accounting standards and financial disclosure requirements. Its website indicates that registrants can expect consultations to take approximately three weeks, although that time may vary depending on various factors. The questions submitted by the Company to OCA were (1) whether the December 31, 2019 transaction resulted in GWG Holdings obtaining control of Ben LP in a transaction by entities not under common control, and (2) whether Ben LP was required to consolidate any of the ExAlt Trusts. On July 26, 2021, the Company and OCA staff held a conference call in which OCA's staff notified the Company of its conclusions on the two accounting questions that were the subject of the consultation. During that call, OCA expressed that it would object to a conclusion that Beneficient not consolidate the ExAlt Trusts as of December 31, 2019. Consistent with the conclusions communicated by OCA, on August 1, 2021, the Board of Directors of GWG Holdings determined that it is necessary to restate prior period financial statements for the year ended December 31, 2019, and quarterly financial statements for the first three quarters of the year ended December 31, 2020, to consolidate all of the ExAlt Trusts into Beneficient's financial statements beginning on December 31, 2019, and consequently into the Company's consolidated financial statements on that same date.

We temporarily suspended the offering of GWG Holdings' L Bonds, commencing April 16, 2021, as a result of our delay in filing certain periodic reports with the SEC, including this 2020 Form 10-K. We anticipate recommencing the offering of GWG Holdings' L Bonds when we regain compliance with SEC filing requirements. Additionally, due to our failure to deliver GWG Life audited financial statements for 2020 to LNV Corporation within 90 days after the end of the year, we were in violation of our reporting obligations under the LNV Credit Facility. CLMG Corp., as administrative agent for LNV Corporation, issued a limited deferral extending the delivery of these reports to May 17, 2021. We regained compliance on May 17, 2021, when the audited annual financial statements of GWG Life were delivered to LNV Corporation.

During the time period between April 16, 2021 and when we re-commence GWG Holdings' L Bond offering, we have financed, and will continue to finance, our business using cash on hand and additional financings from creditors to meet our cash needs, including cash needs for premiums on our life settlements portfolio, interest expense on outstanding bonds, bond maturities, preferred stock redemptions, preferred stock dividends, operating costs, professional fees and miscellaneous expenses. In the event that L Bond sales and/or preferred stock sales do no recover to expected levels, we may have to sell assets or find additional financing options. In such event, the terms of such sale or financings may be on less favorable terms than we have sold assets or borrowed in the past

In addition, general economic conditions could limit our access to financing, as could regulatory or legal pressures exerted on us, our financiers, or those involved in the procurement of financing such as brokers, dealers, and registered investment advisors. If we are unable to borrow under either the LNV Credit Facility or the NF Credit Facility or otherwise for any reason, or to renew or replace the LNV Credit Facility or NF Credit Facility when it comes due, or if we are forced to discontinue GWG Holdings' L Bond offering for any significant length of time and for any reason, our business would be adversely impacted and our ability to service and repay our debt obligations would be compromised, thereby negatively affecting our business prospects, the value of our common stock and perhaps our viability. As such, investors in our securities could lose all or a portion of their investment.

***We may not be able to raise the capital that we are seeking from our securities offerings and may be unable to meet our overall business objective of growing and diversifying our alternative asset exposure.***

The offer and sale of GWG Holdings' L Bonds and preferred stock are a principal means by which we intend to raise funds needed to meet our business and financial goals. However, if we are unable to continue to do so for any reason, we may be unable to meet our goals. If actual cash flows from our portfolio of life insurance policies do not occur as we have forecasted we could be forced to sell our investments in life insurance policies in order to service or satisfy our debt-related obligations. Likewise, if GWG Holdings' and GWG Life's investments in Beneficient do not perform as we have projected, we could be forced to sell such investments in order to service or satisfy such debt-related obligations. Presently, none of GWG Holdings' material investments (life insurance policies and investments in Beneficient) are supported by liquid secondary markets and GWG Holdings' and GWG Life's investments in Beneficient contain transfer restrictions. If we are forced to sell any material amount of these investments, we may be unable to sell them at prices we believe are optimal or at or above the carrying value of such investments, particularly if our sale of assets occurs at a time when we are (or are perceived to be) in distress. In any such event, our business and the value of our securities would likely be materially and adversely impacted.

Page 29

APP. 443

Table of Contents

***GWG Holdings depends upon cash distributions from its subsidiaries, and contractual restrictions on distributions to GWG Holdings or adverse events at one of its operating subsidiaries could materially and adversely affect its ability to pay its debts, redeem preferred stock when requested and continue operating our business.***

GWG Holdings, Inc. is a holding company. As a holding company, GWG Holdings conducts its operations through operating subsidiaries, and as such its most significant assets are cash and its ownership interests in its subsidiaries, controlled affiliates and equity investees. Accordingly, GWG Holdings' ability to meet its obligations, including its debt-related and dividend-payment obligations, materially depends upon the ability of its subsidiaries to distribute cash to it. In this regard, the ability of GWG Holdings' subsidiaries to distribute cash to it is, and will continue to be, restricted by certain negative covenants in the agreement governing the LNV Credit Facility, the NF Credit Facility, and the credit agreements governing Beneficient's secured loans from HCLP Nominees, L.L.C. If any of these limitations were to materially impede the flow of cash to GWG Holdings, its ability to service and repay its debt, including obligations under the L Bonds, and make cash dividend payments to holders of GWG Holdings' preferred stock would be materially and adversely affected. In addition, any adverse corporate event at the subsidiary level, such as a declaration of bankruptcy, liquidation or reorganization or an event of default under the LNV Credit Facility, the NF Credit Facility, or the credit agreements governing Beneficient's secured loans from HCLP Nominees, L.L.C., could adversely affect the ability of GWG Holdings' subsidiaries to distribute cash to it, and thereby materially and adversely affect its ability to service and repay its debt and make cash dividend payments, and negatively impact GWG Holdings ability to continue operations.

***The collateral granted as security for our obligations under our various debt obligations may be insufficient to repay all such debt obligations upon an event of default.***

GWG Holdings and GWG Life have each granted a security interest in substantially all of their respective assets, which include GWG Holdings' and GWG Life's investments in Beneficient and GWG Life's investments in DLP IV Holdings and DLP VI Holdings, to serve as collateral security for obligations under the L Bonds. Importantly, DLP IV, a wholly owned subsidiary of GWG Life, owns approximately 78% of the face value of our life insurance portfolio as of December 31, 2020, and is the borrower under the LNV Credit Facility. As the borrower under the LNV Credit Facility, all of the assets of DLP IV — including all of its life insurance policy assets — serve as collateral for our obligations under the facility. DLP VI, a wholly owned subsidiary of DLP Holdings VI, which itself is a wholly owned subsidiary of GWG Life, owns the remainder of our life insurance portfolio, approximately 22% of the face value of our life insurance portfolio, as of August 31, 2021, and is the borrower under the NF Credit Facility. As the borrower under the NF Credit Facility, all of the assets of DLP VI — including all of its life insurance policy assets — serve as collateral for our obligations under the facility.

Because of the fact that substantially all of our life insurance policies are held in our DLP IV and DLP VI subsidiaries, and all of those life insurance assets serve as collateral security for our obligations under the LNV Credit Facility and NF Credit Facility, respectively, holders of L Bonds risk the possibility that the collateral security to secure our obligations under the L Bonds may be insufficient to repay holders upon an event of default. Furthermore, while the indenture governing the L Bonds limits the amount of debt relative to a measure of asset coverage we can incur, the indenture permits us to incur additional secured debt (subject to a debt coverage ratio) that may be senior to the L Bonds.

Furthermore, most of the assets that secure our obligations under the L Bonds, including GWG Holdings' and GWG Life's investments in Beneficient and GWG Life's ownership interests in the holding companies that own DLP IV and DLP VI, which own substantially all of the life insurance portfolio, are illiquid assets. Although GWG Holdings and GWG Life own debt and equity securities of Beneficient, a substantial majority of the net assets of Beneficient are currently represented by goodwill, an intangible asset. The calculation of Beneficient's goodwill required the utilization of significant estimates and management judgment, as discussed elsewhere in this 2020 Form 10-K. As a result, the carrying value of those assets as reflected in our consolidated financial statements may not necessarily reflect the current market price for those assets, especially in the event of a bulk or distressed sale. Proceeds from L Bond sales will be primarily used for the repayment of L Bond maturities, interest payments and other operating expenses of GWG Holdings, and as otherwise specified in the prospectus for the L Bonds. GWG Holdings may also continue to use a portion of proceeds from L Bond sales to make investments in Beneficient. Because advances from GWG Holdings to Beneficient may be used by Beneficient for working capital purposes, such investments may not increase the tangible assets securing the L Bonds. If the trustee for the L Bonds were forced to sell all or a portion of the collateral securing them, there can be no assurance that the trustee would be able to sell them for the prices at which we have recorded them in our consolidated financial statements, and the trustee might be forced to sell them at significantly lower prices.

***If a significant number of holders of GWG Holdings' L Bonds demand repayment of those instruments upon maturity instead of renewing them, and at such time we do not have sufficient capital on hand to fund those repayments (and do not otherwise have access to sufficient capital), we may be forced to liquidate some of GWG Holdings' life insurance***

APP. 444

Page 30

Table of Contents

*policies, GWG Holdings' or GWG Life's investments in Beneficient or other assets, which could have a material and adverse impact on our results of operations and financial condition. In addition, substantially all of our life insurance policies are pledged as collateral under the LNV Credit Facility and the NF Credit Facility and we would not be able to dispose of them without compliance with the terms of those credit facilities.*

As of December 31, 2020, we had approximately $1.3 billion in principal amount of L Bonds outstanding (including Liquidity Bonds issued in connection with Beneficient's liquidity transactions, but excluding Seller Trust L Bonds). Since we first issued GWG Holdings' L Bonds, we have experienced $768.7 million in maturities, of which $406.3 million has renewed for an additional term, as of December 31, 2020. This has provided us with a cumulative historical renewal rate of approximately 53% for investments in GWG Holdings' L Bonds.

Future contractual maturities of L Bonds (including Liquidity Bonds issued in connection with Beneficient's liquidity transactions, but excluding Seller Trust L Bonds) as of December 31, 2020 are as follows:

| Years Ending December 31, | L Bonds (in thousands) |
|---|---|
| 2021 | $ 191,582 |
| 2022 | 293,038 |
| 2023 | 191,446 |
| 2024 | 121,105 |
| 2025 | 167,433 |
| Thereafter | 313,277 |
| | $ 1,277,881 |

As of December 31, 2020, we had approximately $366.9 million in principal amount of Seller Trust L Bonds outstanding, of which $94.8 million are held by the ExAlt Trusts and are eliminated in consolidation. The Seller Trust L Bonds have a contractual maturity in August 2023; however, the holders have the ability to exercise a put to require redemption beginning in 2021. This option has not been exercised as of the date of the filing of this 2020 Form 10-K. Under that certain Supplemental Indenture ("L Bond Supplemental Indenture") to the Amended and Restated Indenture dated as of October 23, 2017 (the "Amended and Restated Indenture"), by and among GWG Holdings, GWG Life and Bank of Utah, as trustee, in the event of a redemption request, including maturity, by the holders of the Seller Trust L Bonds, GWG Holdings in its sole discretion has the ability to satisfy the principal in the form of cash, a pro rata portion of (i) the outstanding principal amount and accrued and unpaid interest under the Commercial Loan Agreement and (ii) Common Units, or a combination of cash and such property.

The terms of the Liquidity Bonds issued in connection with Beneficient's liquidity transactions also require payment of principal and interest in cash subject to certain exceptions, and we expect to substantially increase the principal amount of Liquidity Bonds we issue as we seek to grow our exposure to alternative assets.

If investors holding existing indebtedness that matures do not elect to renew their investments and we do not at such time have or have access to sufficient capital to repay the indebtedness, then we may need to liquidate some of our life insurance policies or other assets earlier than anticipated. In such an event, we may be unable to sell those policies or other assets at prices we believe are fair or otherwise appropriate and such sales could have a material and adverse impact on our results of operations and financial condition. In addition, substantially all of our life insurance policies are pledged as collateral under the LNV Credit Facility and the NF Credit Facility and we would not be able to dispose of them without compliance with the terms of those credit facilities.

*Subordination provisions contained in the indenture governing the L Bonds, including any supplemental indentures, will restrict the ability of the trustee or the L Bond holders to enforce their rights against us under the indenture, including the right to payment on the L Bonds, if a default then exists under a senior credit facility.*

The L Bonds are subordinate in right of payment to any claims of our senior lender under the LNV Credit Facility and NF Credit Facility. In this regard, subordination provisions limiting the right of L Bond holders to enforce their rights are contained in the indenture. These provisions include:

- a prohibition on challenging any enforcement action taken by a senior lender, or interfering with any legal action or suits undertaken by a senior lender, against us and our affiliates;

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 447 of 1031     PageID 619

APP. 447

Table of Contents

- a 180-day standstill period during which there may not be brought any action against us or our affiliates to enforce rights respecting collateral unless the LNV Credit Facility and the NF Credit Facility has been repaid in full, which period may be extended if the senior lender takes action during such standstill period; and
- a prohibition on filing a bankruptcy or insolvency case against us or our affiliates for at least one year plus one day after any senior lender has been paid in full.

In the event of a default on a senior credit facility, the indenture prohibits us from making any payment, direct or indirect (whether for interest, principal, as a result of any redemption or repayment at maturity, on default, or otherwise), on the L Bonds and any other indebtedness unless and until: (i) the default respecting the senior credit facility has been cured or waived or has ceased to exist; or (ii) in the case of a non-payment default that permits a senior lender to declare as due and payable all amounts owing under a senior credit facility (but where that senior lender has not yet so declared amounts as being due and payable), until the end of the period commencing on the date the trustee receives written notice of default from the senior lender and ending on the earliest of (1) our discharge of the default (or other cure), (2) the trustee's receipt of a valid waiver of default from the senior lender, or (3) a written notice from the senior lender terminating the payment prohibition.

During any payment prohibition period, neither the holders of the L Bonds nor the trustee will have the right, directly or indirectly, to sue to enforce the indenture or the L Bonds. Other provisions of the indenture do permit the trustee to take action to enforce the payment rights of L Bond holders after 179 days have passed since the trustee's receipt of notice of default from a senior lender, but in such case any funds paid as a result of any such suit or enforcement action shall be applied toward the senior credit facility until the facility is indefeasibly paid in full before being applied to the L Bonds.

These subordination provisions present the risk that, upon any default by us on obligations owed to our senior lender, the holders of the L Bonds will be unable to enforce their rights to payment.

If the 180-day standstill period noted above, or any other limitation on the rights of the trustee or L Bond holders to assert their rights to payment of principal or interest under the indenture, is ultimately determined to conflict with provisions of the Trust Indenture Act of 1939 (most notably sections 316(b) and 317(a) of that Act), then the trustee, as well as any holder who shall not have earlier consented to such subordination provisions, will (notwithstanding such provision contained in the indenture) be authorized to institute a lawsuit for the enforcement of any payment of principal or interest after their respective due dates.

*A failure to maintain compliance with the covenants under the LNV Credit Facility and the NF Credit Facility and the indenture governing the L Bonds may have a material adverse effect on our ability to continue our business operations.*

We are subject to various covenants under both the LNV Credit Facility and NF Credit Facility, including requirements to timely deliver financial statements to LNV Corporation (our senior lender under the LNV Credit Facility) and National Founders (the administrative agent under the NF Credit Facility). Due to our failure to deliver GWG Life audited financial statements for 2020 to LNV Corporation within 90 days after the end of the year, we were in violation of our reporting obligations. CLMG Corp., as administrative agent for LNV Corporation, issued a limited deferral extending the delivery of this report to May 17, 2021. We regained compliance on May 17, 2021, when the audited annual financial statements of GWG Life were delivered to LNV Corporation. If we fail to remain in compliance with our debt covenants, we may not be permitted to request, nor will we be entitled to receive, advances under the LNV Credit Facility, and we will not be entitled to any excess amounts received from policies pledged under the LNV Credit Facility. A failure to deliver required financial statements to LNV Corporation or National Founders in the future may result in termination of the applicable credit facility absent an extension of such period. We may be unable to repay outstanding amounts under our credit facilities unless we are able to replace it with another facility or otherwise obtain capital from other sources, in which case LNV Corporation or National Founders could elect to foreclose on the life insurance assets held in DLP IV or DLP VI, respectively, that serve as collateral security.

Under the indenture, including any supplemental indentures, governing the L Bonds, we are subject to various financial and non-financial covenants, including a maximum debt coverage ratio. As of December 31, 2020, we were in compliance with all of our covenants; however, there can be no assurance that we will be able to comply with all of our financial and non-financial covenants in the future. A failure to comply with these covenants could cause us to be in default of the indenture governing the L Bonds and the indenture trustee, acting on behalf of the holders of GWG Holdings' L Bonds, would be within its rights to accelerate the maturity dates of any amounts owed on GWG Holdings' L Bonds. If we were unable to repay outstanding amounts, either using current cash reserves or another source of capital, the indenture trustee would have the right, subject to the subordination provisions in the indenture, to foreclose on our assets and the assets of GWG Life (including GWG Life's equity in DLP IV and DLP Holdings VI), which serve as collateral for GWG Holdings' L Bonds. If

APP. 448

APP. 449

we are required to seek other sources of financing in order to satisfy our obligations under the LNV Credit Facility, the NF Credit Facility or GWG Holdings' L Bonds, such other sources of capital may be unavailable to us on terms acceptable to us or at all. As a result, failure to comply with the covenants under our debt arrangements would have a material and adverse impact on our ability to continue our business operations and may result in our investors losing all or a portion of their investment.

***The debt coverage ratio in our indenture, designed to provide some assurance to the holders of the L Bonds that the value of our total assets exceeds our total interest-bearing obligations, values our life insurance policy assets, which represent 66% of our total assets (excluding goodwill) as of December 31, 2020, in a manner that may not be representative of the amount we would actually receive upon a sale of those assets.***

Under the indenture governing the L Bonds, the maximum amount of L Bonds we may issue at any time, and certain other debt, is limited to an amount such that our debt coverage ratio does not exceed 90%. This limitation is designed to provide a limit on the aggregate amount of certain debt of the Company. The "net present value" of our life insurance assets used in the debt coverage ratio is not the same as the GAAP "fair value" of those assets on our balance sheet. Accordingly, the debt coverage ratio is not necessarily indicative of the amount we and holders of L Bonds would actually receive if we were forced to sell or liquidate our life insurance related assets. Furthermore, any sale or liquidation of all or a significant portion of GWG Holdings' life insurance policies or investments in Beneficient would include significant transactional costs. As a result, our mere compliance with the debt coverage ratio in the indenture will not guarantee that the value of GWG Holdings' life insurance assets plus the value of GWG Holdings' and GWG Life's investments in Beneficient, if sold or liquidated, would in all cases exceed the amount of GWG Holdings' obligations to the holders of L Bonds and other creditors.

***The interest rates under our credit agreements and other agreements may be impacted by the phase-out of the London Interbank Offered Rate ("LIBOR").***

LIBOR is the basic rate of interest used in lending between banks on the London interbank market and is widely used as a reference for setting the interest rates on loans globally. LIBOR is used as a reference rate to calculate interest under certain of our borrowings and receivables. In 2017, the United Kingdom's Financial Conduct Authority, which regulates LIBOR, announced that it intends to phase out LIBOR by the end of 2021. The U.S. Federal Reserve, in conjunction with the Alternative Reference Rates Committee, a steering committee comprised of large U.S. financial institutions, identified the Secured Overnight Financing Rate ("SOFR") as the preferred alternative reference rate to U.S. dollar LIBOR and recommended a paced transition plan that involves the creation of a reference rate based on SOFR by the end of 2021. SOFR is a more generic measure than LIBOR and considers the cost of borrowing cash overnight, collateralized by U.S. Treasury securities. Given the inherent differences between LIBOR and SOFR or any other alternative benchmark rate that may be established, there are many uncertainties regarding a transition from LIBOR. Certain of our borrowing and receivable agreements contain fallback provisions providing for alternative rate calculations in the event LIBOR is unavailable, prior to any LIBOR rate transition. As a result, our level of interest payments we incur or receive may change and the new rates we incur may not be as favorable to us as those in effect prior to any LIBOR phase-out.

***We have the discretion to purchase assets through different subsidiaries, and to transfer assets among GWG Holdings' subsidiaries. Any decision to purchase or hold title to assets in one subsidiary, as opposed to a different subsidiary, may affect the value of collateral security for our debts.***

We may at our discretion direct GWG Holdings' and GWG Life's investments in Beneficient, purchases of additional life insurance policies, if any, and other assets by, and the sale of life insurance policies and other assets among, different subsidiaries of GWG Holdings. Purchases of assets in, or movements of assets amongst, different subsidiaries could affect the value of the collateral security for obligations under the L Bonds. For example, purchases through, or transfers of life insurance policies to, DLP IV would cause the policies acquired or transferred to become collateral for the LNV Credit Facility, and purchases through, or transfers of life insurance policies to, DLP VI would cause the policies acquired or transferred to become collateral for the NF Credit Facility, whereas purchases through, or transfers of life insurance policies to, GWG Life would cause the policies acquired by GWG Life to become collateral for the L Bonds. Accordingly, purchases of assets through, or transfers of assets to, different subsidiaries may affect the value of collateral security for different classes of holders of our debt.

**Legal and Regulatory Risks**

***A determination that we are an unregistered investment company would have material adverse consequences.***

A determination that we are an unregistered investment company under the Investment Company Act of 1940 (the "1940 Act") would have serious adverse consequences. We do not believe we could operate our business effectively as a registered

APP. 450

APP. 451

Table of Contents

investment company. As a result, we would have to change our operations so as not to be an investment company. Changes could include refraining from raising capital, changing the types of products and services that Beneficient provides, and changing the nature of the Collateral. Furthermore, if at any time it were established that we had been operating as an investment company in violation of the registration requirements of the 1940 Act, there would be a risk, among other material adverse consequences, that such company: (i) could become subject to SEC investigation and enforcement actions, including monetary penalties and injunctive relief, (ii) would be unable to enforce contracts with third parties or that third parties could seek to obtain rescission of transactions with such company undertaken during the period in which it was established that such company was an unregistered investment company, and (iii) would face adverse action from the Texas Department of Banking, either in relation to Beneficient's pending application for a trust company charter, or if such charter is granted, in connection with such charter, the Kansas Office of the State Bank Commissioner, in relation to the Kansas TEFFI trust company charter. Such developments would be likely to have material and adverse consequences for us and the value of GWG Holdings' and GWG Life's investments in Beneficient and result in a breach under our credit facilities and GWG Holdings' L Bonds, which would likely adversely affect our liquidity and increase our cost of capital and operational expenses. In addition, if Ben LP were treated as an investment company, it would not be eligible to be taxed as a partnership and instead would be taxable as a corporation for U.S. federal income tax purposes, which could result in a material and adverse impact on the value of GWG Holdings' and GWG Life's investments in Beneficient.

On occasion, the SEC has attempted to regulate the purchase of non-variable universal life insurance policies as transactions in securities under federal securities laws. In July 2010, the SEC issued a Staff Report of its Life Settlement Task Force. In that report, the Staff recommended that certain types of purchased insurance policies be classified as securities. The SEC has not taken any position on the Staff Report, and there is no indication if the SEC will take any action to implement the recommendations of the Staff Report. In addition, there have been several federal court cases in which transactions involving the purchase and fractionalization of life insurance policies have been held to be transactions in securities under the federal Securities Act of 1933.

We believe that the matters discussed in the Staff Report and existing case law do not impact our current business model because our life insurance policies are distinguishable from those cases that have been held by courts, and advocated by the Staff Report, to be transactions in securities. For example, neither we nor any of our affiliates are involved in the fractionalization of life insurance policies, and we presently do not purchase variable life insurance policies. As a practical matter, if all or a majority of our life insurance policies were deemed to be "securities" under federal securities laws, either through an expansion of the definition of what constitutes a "security," the expansion of the types of transactions in life insurance policies that would constitute transactions in "securities," or the elimination or limitation of available exemptions and exceptions (whether by statutory change, regulatory change, or administrative or court interpretation), then we or one or more of our affiliated entities could become subject to the 1940 Act.

***Beneficient will be subject to comprehensive governmental regulation and supervision.***

Ben LP and its subsidiaries operate in a highly regulated environment and will be subject to supervision and regulation by several governmental agencies. Ben LP and its subsidiaries are subject to changes in federal and state laws, regulations, governmental policies, tax laws and accounting principles. As Beneficient's business grows, Ben LP and its subsidiaries expect to become subject to additional regulatory agencies' regulation, including offshore insurance regulatory requirements in Bermuda and broker-dealer regulatory requirements in the United States. Changes in regulations or the regulatory environment could adversely affect Beneficient's business and the value of GWG Holdings' and GWG Life's investments in Beneficient.

***Beneficient faces a risk of noncompliance with and enforcement actions under the Bank Secrecy Act and other anti-money laundering statutes and regulations.***

The Bank Secrecy Act, the USA PATRIOT Act of 2001, and other laws and regulations require financial institutions, among other duties, to institute and maintain an effective anti-money laundering program and file suspicious activity and currency transaction reports as appropriate. The federal Financial Crimes Enforcement Network is authorized to impose significant civil money penalties for violations of those requirements and has recently engaged in coordinated enforcement efforts with the individual federal banking regulators, as well as the U.S. Department of Justice, Drug Enforcement Administration, and Internal Revenue Service (the "IRS"). Beneficient is also subject to increased scrutiny of compliance with the rules enforced by the OFAC and compliance with the Foreign Corrupt Practices Act. If Beneficient's policies, procedures and systems are deemed deficient, Beneficient will be subject to liability, including fines and regulatory actions, which may include restrictions on Beneficient's ability to make distributions to its unitholders, including GWG, and the necessity to obtain regulatory approvals to proceed with certain aspects of Beneficient's business plan. Failure to maintain and implement adequate programs to combat money laundering and terrorist financing could also have serious reputational consequences for

APP. 453

Table of Contents

Beneficient. Any of these results could materially and adversely affect Beneficient's business, financial condition and results of operations and the value of GWG Holdings' and GWG Life's investments in Beneficient.

***The failure of our trust subsidiaries to maintain certain minimum amounts of capital may result in regulatory sanctions or restrictions, limitations on their respective activities and operations, or require them to raise additional capital.***

As regulated entities, Beneficient's Kansas TEFFI and Texas trust company would be required to maintain minimum levels of capital under a framework determined by the Kansas State Banking Commissioner or Texas Banking Commissioner, as applicable. Except under certain specific and limited circumstances, in the event that Beneficient's Texas trust company failed to maintain at least such minimum capital amount, it would be unable to pay dividends to Beneficient or engage in capital repurchases, which could impair its ability to provide liquidity to Beneficient. In addition, the failure of Beneficient's trust companies to maintain minimum required levels of capital could subject them to administrative action, which could include restrictive constraints on operations, management, and activities, monetary sanctions, orders to raise additional capital, or, under certain limited circumstances, in the commencement of receivership or conservatorship proceedings. Any of these actions could have a material adverse effect on Beneficient's financial condition, results of operations or prospects, which could affect the value of GWG Holdings' and GWG Life's investments in Beneficient.

***If a subsidiary of Ben LP receives a trust company charter in Texas or an unconditional TEFFI charter in Kansas, the Texas Banking Commissioner or the Kansas State Banking Commissioner, as applicable, would have the authority to increase the minimum amount of capital required to be maintained by such subsidiaries under certain circumstances, which may result in lower returns on equity.***

The Texas Banking Commissioner has the authority to increase the minimum amount of capital required to be maintained by a Texas trust company, under a framework set forth in the Texas Finance Code, if the Commissioner finds that the condition and operations of the Company require additional capital to promote the safety and soundness of the trust company. Factors to be considered include the nature and type of business in which the trust company engages, the nature and decree of liquidity in trust company assets, the amount and type of fiduciary assets managed by the trust company, the complexity of the business, the adequacy of insurance held by the trust company and the extent and adequacy of its internal controls, among other things.

The Kansas State Banking Commissioner does not have the same discretionary authority under the TEFFI Act to increase a TEFFI's minimum capital so long as: (i) the TEFFI does not accept deposits, other than alternative asset custody accounts; (ii) the TEFFI maintains no third-party debt except debts owed to its members or its affiliates; and (iii) the TEFFI has secured an agreement from its members whereby such members agree to contribute additional capital to the TEFFI on if needed to ensure the safety and soundness of the fiduciary financial institution. However, if those requirements are not satisfied, the Kansas State Banking Commissioner may have the authority to require the TEFFI to maintain additional capital.

Any increase in the minimum amount of capital required for Beneficient's Kansas TEFFI or Texas trust company will further limit its ability to direct the allocation of those capital resources in the most optimal manner, including through cash distributions to Beneficient. In addition, a requirement to maintain higher minimum levels of capital at those entities may result in lower returns on equity, which could affect the value of GWG Holdings' and GWG Life's investments in Beneficient.

***Beneficient may be impacted adversely by claims or litigation, including claims or litigation relating to its fiduciary responsibilities.***

Beneficient's business involves the risk that customers or others may sue Beneficient, claiming that Beneficient has failed to perform under a contract or otherwise failed to carry out a duty perceived to be owed to them. This risk would be heightened when Beneficient's trust company begins serving as a fiduciary for its customers if the Texas state trust company charter is issued or when the Kansas TEFFI charter becomes unconditional. Specifically, Beneficient's trust company would be required to (i) adhere to the fiduciary standard of care required under the terms of the governing documents or applicable law, and (ii) properly discharge its fiduciary duties. If Beneficient fails to comply with these fiduciary obligations, it could incur significant costs and possibly liability, which could materially and adversely affect Beneficient's business, financial condition or results of operations. Liability for breach of fiduciary duty may be difficult to assess or quantify and its existence and magnitude may remain unknown for a substantial period of time. Additionally, an alleged breach of fiduciary duty, regardless of the merits of such alleged breach, could significantly damage Beneficient's reputation and cause it to incur legal and other costs. Claims made or actions brought against Beneficient, whether founded or unfounded, may result in injunctions, settlements, damages, fines or penalties, which could have a material adverse effect on Beneficient's financial condition and results of operations, could adversely affect Beneficient's ability to raise additional funding or attract new customers, and could require changes to Beneficient's business. Even if Beneficient defends itself successfully, the cost of litigation is often

APP. 454

APP. 455

substantial, and public reports regarding claims made against Beneficient may cause damage to its reputation among existing and prospective customers or negatively impact the confidence of counterparties, rating agencies, and equity holders, consequently affecting Beneficient's earnings negatively.

### *A change in Beneficient's tax treatment could adversely affect Beneficient.*

Beneficient is subject to a variety of tax laws and tax regulations by national, regional and local governments and its Ben Insurance subsidiary, Pen, will be subject to foreign tax laws and tax regulations. Ben LP, and most of its subsidiaries, are pass through entities that are generally not subject to taxation. Rather, Beneficient passes on the distributive share of income to its investors who bear the burden of any tax liability that may be generated by such income. These tax laws and regulations (including the applicable tax rates), and their interpretation and application, may change from time to time and those changes could have a material adverse effect on the results of operations or Beneficient's financial position.

In addition, without the consent of Ben LP's unitholders, Ben LP's general partner may elect to convert Ben LP into a corporation or be taxed as a corporation for U.S. federal income tax purposes if certain conditions have been met. Such a conversion could be a taxable event to Ben LP's unitholders where gain or loss is recognized. In addition, a conversion would subject all of Ben LP's future net income to a level of corporate tax, which may reduce the amount of cash available for distribution or reinvestment.

### *Our life insurance business is subject to state regulation and changes in those laws and regulations, or changes in their interpretation, could negatively affect our results of operation and financial condition.*

When we purchase a life insurance policy, we are subject to state insurance regulations. Over the past number of years, we have seen a dramatic increase in the number of states that have adopted legislation and regulations from model laws promulgated by either the National Association of Insurance Commissioners ("NAIC") or by the National Conference of Insurance Legislators (NCOIL). These laws are essentially consumer protection statutes responding to abuses that arose early in the development of the industry, some of which may persist. Today, almost every state has adopted some version of either the NAIC or NCOIL model laws, which generally require the licensing of purchasers of and brokers for life insurance policies, the filing and approval of purchase agreements, and the disclosure of transaction fees. These laws also require various periodic reporting requirements and prohibit certain business practices deemed to be abusive. State statutes typically provide state regulatory agencies with significant powers to interpret, administer, and enforce the laws relating to the purchase of life insurance policies. Under statutory authority, state regulators have broad discretionary power and may impose new licensing requirements, interpret or enforce existing regulatory requirements in different ways, or issue new administrative rules, any of which could be generally adverse to the industry and potentially the value of our life insurance policy assets.

### *We may incur fines, penalties and other negative consequences from regulatory violations.*

We may fail to comply with applicable laws and regulations and be held accountable for such violations, even if such violations are inadvertent. Some legal/regulatory frameworks provide for the imposition of fines or penalties for noncompliance even though the noncompliance was inadvertent or unintentional and even though there were systems and procedures designed to ensure compliance in place at the time. For example, Beneficient is subject to regulations issued by the Office of Foreign Assets Control, or "OFAC," that prohibit financial institutions from participating in the transfer of property belonging to the governments of certain foreign countries and designated nationals of those countries. OFAC may impose penalties for inadvertent or unintentional violations even if reasonable processes are in place to prevent the violations. There may be other negative consequences resulting from a finding of noncompliance, including restrictions on certain activities.

On April 1, 2021, we filed with the SEC a Notification of Late Filing pursuant to Rule 12b-25 of the Securities Exchange Act of 1934 indicating that we were unable to complete our financial statements as of and for the year ended December 31, 2020 within the time period required to timely file this 2020 Form 10-K for the year ended December 31, 2020. We indicated at the time that we expected to file this Report no later than April 15, 2021, which is the fifteenth calendar day filing extension period afforded registrants under Rule 12b-25 of the Securities Exchange Act of 1934. As of April 15, 2020, however, we remained unable to file this Report. As such, we temporarily suspended the offering of GWG Holdings' L Bonds, commencing April 16, 2021, as a result of our delay in filing this annual report with the SEC. Additionally, we were unable to timely file our Quarterly Report on Form 10-Q for the quarter ended March 31, 2021, which was due on or before May 17, 2021, and our Quarterly Report on Form 10-Q for the quarter ended June 30, 2021, which was due on or before August 17, 2021.

APP. 456

Table of Contents

As part of the preparation of this 2020 Form 10-K, the Company voluntarily submitted two questions to the SEC's OCA on February 15, 2021. OCA is responsible for accounting and auditing matters arising in the SEC's administration of the federal securities laws, particularly with respect to accounting policy determinations. The questions submitted by the Company to OCA were (1) whether the December 31, 2019 transaction resulted in GWG Holdings obtaining control of Ben LP in a transaction by entities not under common control, and (2) whether Ben LP was required to consolidate any of the ExAlt Trusts. On July 26, 2021, the Company and OCA staff held a conference call in which OCA's staff notified the Company of its conclusions on the two accounting questions that were the subject of the consultation. During that call, OCA expressed that it would object to a conclusion that Ben LP not consolidate the ExAlt Trusts as of December 31, 2019. Consistent with the conclusions communicated by OCA, on August 1, 2021, the Board of Directors of GWG Holdings determined that it is necessary to restate prior period financial statements for the year ended December 31, 2019, and quarterly financial statements for the first three quarters of the year ended December 31, 2020, to consolidate the ExAlt Trusts into Beneficient's financial statements beginning on December 31, 2019, and consequently into the Company's consolidated financial statements on that same date.

We anticipate recommencing the offering of GWG Holdings' L Bonds when we regain compliance with SEC filing requirements. To regain compliance, we must (i) prepare and file all applicable late filings, including this 2020 Form 10-K and the Quarterly Reports on Form 10-Q for the first and second quarters of 2021, by October 31, 2021, and (ii) hold an annual shareholder meeting by December 31, 2021. If GWG Holdings is unable to regain compliance with Nasdaq's filing requirements for continued listing, we expect GWG Holdings to be delisted, in which case our business and the value of our securities would likely be materially and adversely impacted. While we have not filed the filings required by October 31, 2021, as of the date of this filings, we have communicated with Nasdaq regarding the status of the filings and have not yet received notice from Nasdaq regarding delisting.

### *We face risks from regulatory investigations and proceedings and from private actions.*

From time to time, we may be named as a defendant or otherwise become involved in various legal proceedings, including class actions and other litigation or disputes with third parties. Future actions against us may result in judgments, settlements, fines, penalties or other results adverse to us, which could materially adversely affect our business, financial condition or results of operations, or cause serious reputational harm to us.

Beneficient's businesses and operations are also subject to increasing regulatory oversight and scrutiny, which may lead to additional regulatory investigations or enforcement actions. These and other initiatives from federal and state officials may subject Beneficient to judgments, settlements, fines or penalties, or cause Beneficient to be required to restructure its operations and activities, all of which could lead to reputational issues, or higher operational costs, thereby reducing Beneficient's profitability.

While we seek to insure against potential risks, we may not be able to obtain insurance to cover certain risks, or obtain coverage on favorable terms, and the insurance that we have may be inadequate to cover certain civil or criminal proceedings or regulatory investigations and associated costs.

### *We are currently subject to a non-public, fact-finding investigation into GWG Holdings by the SEC, and we are unable to predict the outcome of this matter.*

On October 6, 2020, GWG Holdings received a subpoena to produce documents from the Chicago office of the SEC's Division of Enforcement, informing the Company of the existence of a non-public, fact-finding investigation into GWG Holdings. Since the initial subpoena, the Company has received subsequent subpoenas from the SEC for additional information. The requested information from the SEC has primarily related to GWG Holdings' investment products, including its L Bonds, as well as various accounting matters, among them, the consolidation for financial reporting purposes of Beneficient by GWG Holdings, goodwill valuation, and the accounting related to the ExAlt Trusts, related party transactions, life insurance policies, and the calculation of the debt-coverage ratio. We are cooperating fully with the SEC in connection with its investigation. Investigations of this nature are inherently uncertain, and their results cannot be predicted. Regardless of the outcome, the SEC investigation may have an adverse impact on us because of fines, legal costs, other expenses, diversion of management resources, and other factors. The investigation could also result in reputational harm to the Company and may have a material adverse effect on the Company's current and future business activities and its ability to

Page 37

Table of Contents

raise capital through the sale of L Bonds and equity securities. As a result, the failure to raise enough capital to meet our cash needs could have a material adverse effect on our operations and the value of our securities.

**General Risk Factors**

***Our success depends on certain key executives and the ability to attract, retain, and develop new professionals.***

Our success depends in large part upon the skills, experience, personal reputations and network of business contacts of certain key executives. These individuals' reputations, business relationships and expertise are critical elements in the successful implementation of our business strategy. Accordingly, the loss of any of the key executives could materially harm our business.

Our key executives are directly responsible for setting our strategic direction, operating our business, maintaining and expanding business and other critical relationships, clients and business partners and identifying expansion opportunities. Should we lose one of these key executives, we may have to search externally for a qualified replacement, which search may be prolonged, and we cannot provide assurance that we will be able to hire such a replacement on a timely basis or at all.

Most of our employees are employed by Beneficient, who provide services to GWG Holdings pursuant to the terms and conditions of an administrative shared services agreement, by and between GWG Holdings and Ben LP (the "Shared Services Agreement"). GWG Holdings and Ben LP have entered into a non-binding term sheet under which GWG Holdings would lose its ability to appoint a majority of the board of directors of the general partner of Ben LP and control the activities of Beneficient. If GWG Holdings is no longer able to control the activities of Beneficient, GWG Holdings will be relying on contractual obligations, including those under the Shared Services Agreement, to meet its human capital needs.

Additionally, competition for qualified personnel in the financial services industry is intense. Thus, the loss of any of these key personnel, by resignation, termination, death or disability, or our inability to recruit and retain qualified replacements, could cause disruption in our business and could prevent us from fully implementing our business strategy, which could materially and adversely affect our business, growth and profitability.

***Our business faces substantial competition from a variety of financial solution companies and other liquidity providers to owners of alternative assets.***

We face substantial competition in all areas of its operations from a variety of competitors, many of which are larger, have an established track record and reputation, and may have more financial resources. Our business competes with other providers of financial and trust administration such as bank holding companies, commercial and savings banks, savings and loan associations, credit unions, asset managers and their private equity affiliates, insurance companies and a growing list of other local, regional and national institutions that offer financial and trust administration services. Our business also competes with other providers of liquidity for alternative assets, which may hinder our ability to offer liquidity transactions to the market. If we are unable to compete effectively, we will not be able to grow our exposure to alternative assets and our operating results and financial condition will be adversely affected. While we believe regulatory approval to operate certain of our subsidiaries as a Texas trust company, Kansas TEFFI trust company and Bermuda Class 3 insurer will give us competitive advantages, any such advantages are not certain and we may never receive such approvals.

***Our results of operations likely will fluctuate from period to period, which may adversely affect the market price of our securities.***

We expect that the results of our operations will vary significantly from period to period for a variety of reasons, many of which are outside of our control and difficult to predict, including demand for Beneficient's liquidity products and trust administration services, changes in the fair value of the alternative assets held by certain of the ExAlt Trusts, performance of the ExAlt Loans against alternative assets interests underlying the Collateral and concentration of risk in the loan portfolios, and the performance of our life insurance portfolio. Because our results of operations may vary significantly from quarter to quarter, the results of any one period should not be relied upon as an indication of future performance and such fluctuations may make it harder for us to market and sell our securities or otherwise obtain necessary financing to maintain and grow our business.

***Business disruptions and interruptions and adverse economic conditions due to natural disasters and other external events beyond our control can adversely affect our business, financial condition and results of operations.***

Our operations can be subject to natural disasters and other external events beyond our control, such as the effects of earthquakes, fires, floods, severe weather, public health issues such as the outbreak of the coronavirus or other pandemic diseases, power failures, telecommunication loss, major accidents, terrorist attacks, acts of war, and other natural and man-made events, some of which may be intensified by the effects of a government response to the event or climate change and

APP. 458

gwgh-20201231

Page 38

APP. 459

Table of Contents

changing weather patterns. For example, our corporate headquarters and critical business offices are located in north Texas, which is geographically located in "tornado alley", an area known for high instances of tornadoes, and which recently experienced catastrophic tornadic activity and blackouts. A tornado or other disaster could cause severe destruction, disruption or interruption to our operations or property and significantly impact our employees.

Although we have implemented a business continuity management program that we continue to enhance on an ongoing basis, there can be no assurance that the program will adequately mitigate the risks of such business disruptions and interruptions. Additionally, natural disasters and external events, including those occurring in and around Texas, could affect the business and operations of our clients, which could impair their ability to satisfy obligations to us, impair the value of underlying collateral or otherwise adversely affect their business dealings with us, any of which could have a material adverse effect on our business, financial condition or results of operations.

### *Changes in general economic conditions could adversely impact our business.*

Changes in general economic conditions, including, for example, interest rates, foreign exchange rates, short term funding markets, investor sentiment, changes specifically affecting competition, technological developments, political and diplomatic events, tax laws, and other factors, can substantially and adversely affect our business and prospects. For example, an increase in interest rates would increase our cost of capital and may limit our ability to raise capital and have a corresponding adverse impact on our operating results. The financial markets and businesses operating in the securities industry are highly volatile and are affected by, among other factors, domestic and foreign economic conditions, geopolitics and general trends in business and finance, all of which are beyond our control. While we have engaged and may continue to engage in certain hedging activities to mitigate the impact of fluctuating interest rates and foreign exchange rates, none of these risks are or will be within our control. Declines in the financial markets or a lack of sustained growth may result in a corresponding decline in Beneficient's performance and may adversely affect the assets comprising the Collateral and the ExAlt Loans against the assets comprising the Collateral.

### *A failure in our operational systems as well as human error or malfeasance, including cyber-attacks, could impair our liquidity, disrupt our business, result in the disclosure of confidential information, damage our reputation, and cause losses.*

Our financial, accounting, data processing or other operational systems and facilities may fail to operate properly or become disabled as a result of events that are wholly or partially beyond our control. We must continuously update systems to support our operations and growth and to respond to changes in regulations and markets, and invest in systemic controls and training to ensure that such transactions do not violate applicable rules and regulations or, due to errors in processing such transactions, adversely affect markets, our clients or us. Enhancements and updates to systems, as well as the requisite training, including in connection with the integration of new businesses, entail significant costs and create risks associated with implementing new systems and integrating them with existing ones.

The use of computing devices and phones is critical to the work done by our employees and the operation of our systems and business and those of our clients and its third-party service providers and vendors. Additionally, computing devices may be vulnerable to cyber-attacks or have other inherent weaknesses.

Cybersecurity attacks and security breaches of our technology systems, and those of our clients and third-party vendors, may subject us to liability and harm our business operations and overall reputation. Our operations rely on the secure processing, storage and transmission of confidential and other information in our computer systems and networks. Threats to information technology systems associated with cybersecurity risks and cyber incidents continue to grow, and there have been a number of highly publicized cases involving financial services companies, consumer-based companies and other organizations reporting the unauthorized disclosure of client, customer or other confidential information in recent years. Cybersecurity risks could disrupt our operations, negatively impact our ability to compete and result in injury to our reputation, result in system downtime and loss of revenue, and increase costs to prevent, respond to or mitigate cybersecurity events. Our security measures, information technology and infrastructure may be vulnerable to attacks by hackers or breached due to employee error, malfeasance or other disruptions that could result in unauthorized disclosure or loss of sensitive information; damage to our reputation; the incurrence of additional expenses; additional regulatory scrutiny or penalties; or our exposure to civil or criminal litigation and possible financial liability, any of which could have a material adverse effect on our business, financial condition and results of operations.

Third parties upon whom we rely face similar threats, which could directly or indirectly impact our business and operations. The occurrence of a cybersecurity-incident or attack on our third-party vendors could have a material adverse effect on our reputation and on our business, financial condition and results of operations.

APP. 461

Table of Contents

Notwithstanding the proliferation of technology and technology-based risk and control systems, our business relies on individuals that may make mistakes or engage in violations of applicable policies, laws, rules or procedures that are not always identified immediately by our technological processes or by our controls and other procedures. These errors or violations can include calculation errors, mistakes in addressing emails, errors in software or model development or implementation, or errors in judgment, as well as intentional efforts to ignore or circumvent applicable policies, laws, rules or procedures. Human errors and malfeasance, even if promptly discovered and remediated, can result in material losses and liabilities for us.

### *We rely on other companies to provide key components of our business infrastructure.*

Third-party vendors provide and are expected to continue to provide key components of our business infrastructure. Any problems caused by these third parties, including as a result of their not providing us their services for any reason or their performing their services poorly, could adversely affect our ability to deliver products and services to our clients, impair our ability to conduct our business efficiently and effectively, and/or result in regulatory action, financial loss, litigation, and loss of reputation. Replacing these third-party vendors could also entail significant delay and expense.

Page 40

Table of Contents

## ITEM 1B. UNRESOLVED STAFF COMMENTS.

Not applicable.

## ITEM 2. PROPERTIES.

Our principal executive offices are currently located at 325 North St. Paul Street, Dallas, Texas 75201. GWG Holdings and Beneficient collectively lease 33,652 square feet of space for a lease term which expired on July 31, 2021. GWG Holdings also retains the lease of its legacy executive offices located at 220 South Sixth Street, Suite 1200, Minneapolis, Minnesota 55402. At that location, GWG Holdings is the primary lessee for 17,687 square feet of space for a lease term expiring in 2025. GWG Holdings no longer occupies the Minneapolis office space, but the lease of the space has been retained for use by FOXO. We believe these facilities are adequate for our current needs and that suitable additional space will be available as needed.

## ITEM 3. LEGAL PROCEEDINGS

We are a party from time to time to what we believe are routine litigation and proceedings considered part of the ordinary course of our business. We believe that the outcome of such existing proceedings would not have a material adverse effect on our financial position, results of operations or cash flows.

*U.S. Securities and Exchange Commission Subpoena*

On October 6, 2020, GWG Holdings received a subpoena to produce documents from the Chicago office of the SEC's Division of Enforcement, informing the Company of the existence of a non-public, fact-finding investigation into GWG Holdings. Since the initial subpoena, the Company has received subsequent subpoenas from the SEC for additional information. The requested information from the SEC has primarily related to GWG Holdings' investment products, including its L Bonds, as well as various accounting matters, among them, the consolidation for financial reporting purposes of Beneficient by GWG Holdings, goodwill valuation, and the accounting related to the ExAlt Trusts, related party transactions, life insurance policies, and the calculation of the debt-coverage ratio.

Until receipt of the initial subpoena on October 6, 2020, the Company had no previous communication with the SEC related to these issues and was unaware of this investigation. The Company is fully cooperating with the SEC in this investigation. The Company is unable to predict when this matter will be resolved or what further action, if any, the SEC may take in connection with it.

## ITEM 4. MINE SAFETY DISCLOSURES.

Not applicable.

Page 41

Table of Contents

PART II

**ITEM 5. MARKET FOR THE REGISTRANT'S COMMON EQUITY, RELATED SHAREHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES.**

GWG Holdings common stock is listed on The Nasdaq Capital Market under the ticker symbol "GWGH."

As of December 31, 2020, there were 112 record holders of GWG Holdings' common stock, one of which was Cede & Co., a nominee for The Depository Trust Company, or DTC. Shares of common stock that are held by financial institutions as nominees for beneficial owners are deposited into participant accounts at DTC, and are considered to be held of record by Cede & Co. as one stockholder.

**ITEM 6. SELECTED FINANCIAL DATA.**

Not applicable.

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

*The following discussion should be read in conjunction with the consolidated financial statements and accompanying notes and the information contained in other sections of this report. This discussion and analysis is based on the beliefs of our management, as well as assumptions made by, and information currently available to, our management.*

*Unless the context otherwise indicates, all references in this Management's Discussion and Analysis of Financial Condition and Results of Operations, or MD&A, to the "Company," "we," "us," "our" or "ours" or similar words are to GWG Holdings Inc. and its direct and indirect wholly-owned and consolidated subsidiaries, references to "GWG Holdings" refer to GWG Holdings Inc., references to "GWG Life" refer to GWG Life, LLC (a wholly-owned subsidiary of GWG Holdings), references to "DLP IV" refer to GWG DLP Funding IV, LLC (a wholly-owned subsidiary of GWG Life), references to "DLP V Holdings" refer to GWG DLP Funding V Holdings, LLC (a wholly-owned subsidiary of GWG Life), references to "DLP V" refer to GWG DLP Funding V, LLC (a wholly-owned subsidiary of DLP V Holdings), references to "DLP VI Holdings" refer to GWG DLP Funding Holdings VI, LLC (a wholly-owned subsidiary of GWG Life), references to "DLP VI" refer to GWG DLP Funding VI, LLC (a wholly-owned subsidiary of DLP VI Holdings), references to "Ben LP" refer to The Beneficient Company Group, L.P. (a consolidated subsidiary of GWG Holdings), references to "Beneficient" refer to Ben LP and all of its consolidated subsidiaries, references to "BCH" refer to Beneficient Company Holdings, L.P. (of which Ben LP is the general partner), references to "Beneficient Management" refer to Beneficient Management, L.L.C. (the general partner of Ben LP), references to "BCC" refer to Beneficient Capital Company, L.L.C. (a subsidiary of Ben LP), references to "BACC" refer to Beneficient Administrative and Clearing Company, L.L.C. (a subsidiary of Ben LP), references to "Pen" refer to Pen Indemnity Insurance Company, LTD (a subsidiary of Ben LP), references to "Ben Markets" refer to Ben Markets L.L.C. (a subsidiary of Ben LP), references to "FOXO" refer to FOXO Technologies Inc. (formerly, FOXO BioScience LLC, an equity investee of GWG Holdings), references to "FOXO Labs" refer to FOXO Labs Inc. (formerly, Life Epigenetics Inc., a wholly-owned subsidiary of FOXO), references to "FOXO Life" refer to FOXO Life LLC (formerly, youSurance General Agency, LLC, a wholly-owned subsidiary of FOXO); references to the "ExAlt Plan™ ", refer to a trust structure comprising customized trust vehicles (the "ExAlt Trusts", and each, an "ExAlt Trust").*

**Overview**

We are an innovative financial services firm based in Dallas, Texas, that is a leader in providing unique liquidity solutions and services for the owners of illiquid investments. In 2018 and 2019, GWG Holdings and GWG Life consummated a series of transactions (as more fully described in Item 1. *Business*) with The Beneficient Company Group, L.P. ("Ben LP," including all of the subsidiaries it may have from time to time — "Beneficient"). On December 31, 2019, GWG Holdings obtained the right to appoint a majority of the board of directors of Beneficient Management. As a result of this change-of-control event, GWG Holdings reported the results of Beneficient on a consolidated basis beginning on the transaction date of December 31, 2019. As further described in Note 23 to the consolidated financial statements, on August 13, 2021, GWG Holdings and Ben LP, and BCH (as defined below) entered into a non-binding term sheet (the "Term Sheet") which, if completed, is expected to result in, among other things, the deconsolidation of Beneficient from GWG Holdings.

Beneficient is a financial services company, based in Dallas, Texas, that markets an array of liquidity and trust administration products to alternative asset investors primarily comprised of mid-to-high-net-worth individuals having a net worth between

APP. 464

Page 42

Table of Contents

$5 million and $30 million ("MHNW") and small-to-midsize institutional investors and family offices with less than $1 billion in investable assets ("STMIs"). Ben LP plans to offer its products and services through its five operating subsidiaries, which include (i) Ben Liquidity, L.L.C. and its subsidiaries (collectively, "Ben Liquidity"), (ii) Ben Custody, L.L.C. and its subsidiaries (collectively, "Ben Custody Admin"), (iii) Ben Insurance, L.L.C. and its subsidiaries (collectively, "Ben Insurance"), (iv) Ben Markets, L.L.C., and its subsidiaries (collectively, "Ben Markets") and (v) The Beneficient Company Group (USA), L.L.C ("Beneficient USA"). Ben Liquidity plans to operate a trust company that is a Kansas Technology Enabled Fiduciary Financial Institutions ("TEFFI") authorized to serve as an alternative asset custodian, trustee and lender with statutory powers granted for each of these activities and permitting Ben Liquidity to provide fiduciary financing for certain of its customer liquidity transactions. Ben Custody Admin plans to operate a Texas trust company that is being organized to provide its customers with certain administrative, custodial and trustee products and specialized services focused on alternative asset investors. Ben Insurance has been chartered as a Bermuda based insurance company that plans to offer certain customized insurance products and services covering risks relating to owning, managing and transferring alternative assets. Ben Markets is in the regulatory process for acquiring a captive registered broker-dealer that would conduct certain of its activities attendant to offering a suite of products and services from the Beneficient family of companies. Certain of Ben LP's operating subsidiary products and services involve or are offered to certain of the ExAlt Trusts, which operate for the benefit of the Non-Controlling Interest Holders, and are consolidated subsidiaries of Ben LP for financial reporting purposes (such trusts are and may individually be referred to as Custody Trusts, Collective Trusts, LiquidTrusts, and Funding Trusts). Beneficient USA employs a substantial majority of the executives and staff for Beneficient's operating subsidiaries to which Beneficient USA provides administrative and technical services.

We believe that Beneficient's operations will generally produce higher risk-adjusted returns than those we can achieve from life insurance policies acquired in the secondary market; however, returns on equity in life settlements, especially with the current availability of financings on favorable terms, appear to be an attractive option to diversify our exposure to alternative assets, and we have begun exploring the feasibility of acquiring such policies. Furthermore, although we believe that our portfolio of life insurance policies is a meaningful component of a growing diversified alternative asset portfolio, we continue to explore strategic alternatives for our life insurance portfolio aimed at maximizing its value, including a possible sale, refinancing, recapitalization, partnership, reinsurance guarantees, life insurance operations or other transactions involving of our life insurance portfolio, as well as pursuing other alternatives to increase our exposure to alternative assets. These operations are in addition to allocating capital to provide liquidity to holders of a broader range of alternative assets, which we currently provide through GWG Holdings' and GWG Life's investments in Beneficient.

GWG Holdings completed the transactions with Beneficient, in part, to provide the Company with a significant increase in assets and common stockholders' equity. In addition, the transactions with Beneficient may provide us with the opportunity for a diversified source of future earnings within the alternative asset industry. We believe the Beneficient transactions and the other strategies we are pursuing will transform GWG Holdings from a niche provider of liquidity to owners of life insurance to a diversified provider of financial products and services with exposure to a broad range of alternative assets.

**Critical Accounting Policies**

*Critical Accounting Estimates*

The preparation of our consolidated financial statements in accordance with the accounting principles generally accepted in the United States of America ("GAAP") requires us to make significant judgments, estimates, and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. We base our judgments, estimates, and assumptions on historical experience and on various other factors believed to be reasonable under the circumstances. Actual results could differ materially from these estimates. We evaluate our judgments, estimates, and assumptions on a regular basis and make changes accordingly.

Material estimates that are particularly susceptible to change, in the near term, relate to: determining the assumptions used in estimating the fair value of our investments in life insurance policies; determining the grant date fair value for equity-based compensation awards; determining the allowance for loan losses as an input to the allocation of income (loss) to Beneficient's equity holders; and evaluation of potential impairment of goodwill and other intangibles. We believe these estimates are likely to have the greatest potential impact on our consolidated financial statements and accordingly believe these to be our critical accounting estimates. Below we discuss the critical accounting policies associated with these estimates.

APP. 466

APP. 467

Table of Contents

*Valuation of Life Insurance Policies*

We account for the purchase of life insurance policies in accordance with ASC 325-30, *Investments in Insurance Contracts*, which requires us to use either the investment method or the fair value method. We have elected to account for all of our life insurance policies using the fair value method.

We initially record our purchase of life insurance policies at the transaction price, which is the amount paid for the policy, inclusive of all external fees and costs associated with the acquisition. At each subsequent reporting period, we remeasure the investment at fair value in its entirety and recognize the change in fair value as unrealized gain (loss) in the current period, net of premiums paid. Changes in the fair value of our life insurance portfolio are based on periodic evaluations and are recorded in our consolidated statements of operations as changes in fair value of life insurance policies.

The fair value of our life insurance policies is determined as the net present value of the life insurance portfolio's future expected cash flows (policy benefits received and required premium payments) that incorporates life expectancy estimates obtained when the policy was purchased and current discount rate assumptions. We refer to our valuation methodology as the Longest Life Expectancy methodology. This methodology utilizes a portfolio mortality multiplier ("PMM") that allows us to "fit" projections to actual results, which provides a basis to forecast future performance more accurately. The table below compares the actual-to-expected ("A2E") mortality cash flow experience of our life insurance portfolio using this methodology. We have achieved expected mortality cash flow experience accuracy of 96% under the Longest Life Expectancy methodology through December 31, 2020.



Should performance sufficiently deviate in the future from these projections, the A2E analysis will be re-examined to determine if the resultant PMM still results in the most accurate fitting of the projections to actual results. Adjustments to the PMM would then be made based on that analysis if warranted.

A discount rate is used to calculate the net present value of the expected cash flows. The discount rate used to calculate fair value of our portfolio incorporates the guidance provided by ASC 820, *Fair Value Measurements and Disclosures*. We utilized an 8.25% discount rate to estimate the fair value of our portfolio of life insurance policies at both December 31, 2020 and 2019.

As we have ceased acquiring insurance policies, we no longer have direct access market-based factors that previously served as a key input to our discount rate. However, we engaged a third-party firm to provide recent market data on comparable assets to support our discount rate as of December 31, 2020. We also continue to use fixed income market interest rates, credit exposure to the issuing insurance companies and our estimate of the operational risk yield premium a purchaser would apply to the future cash flows derived from our portfolio of life insurance policies as inputs to our discount rate.

The determination of the discount rate used in the valuation of the Company's life insurance policies requires management judgment and incorporates information that is reasonably available to management as of the date of the valuation. The discount rate we utilize assumes an orderly and arms-length transaction (i.e., a non-distressed transaction in which neither seller nor buyer is compelled to engage in the transaction), which is consistent with related GAAP guidance. The carrying

APP. 468

Page 44

Table of Contents

value of policies held at the end of each quarterly reporting period is adjusted to current fair value using the fair value discount rate applied to the entire portfolio as of that reporting date.

We engaged ClearLife Limited, owner of the ClariNet LS actuarial portfolio pricing software we use, to prepare a net present value calculation of our life insurance portfolio as of December 31, 2020. ClearLife Limited processed policy data, future premium data, life expectancy estimate data, and other actuarial information to calculate a net present value for our portfolio using the specified discount rate of 8.25%. ClearLife Limited independently calculated the net present value of our portfolio of 1,058 policies to be $791.9 million and furnished us with a letter documenting its calculation. A copy of such letter is filed as Exhibit 99.1 to this report.

Life expectancy estimates and market discount rates for a portfolio of life insurance policies are inherently uncertain and the effect of changes in estimates may be significant. For example, if the life expectancy estimates were increased or decreased by four and eight months on each outstanding policy, and the discount rates were increased or decreased by 1% and 2%, with all other variables held constant, the fair value of our investment in life insurance policies would increase or decrease as summarized below (in thousands):

| | Change in Life Expectancy Estimates | | | |
| | Minus 8 Months | Minus 4 Months | Plus 4 Months | Plus 8 Months |
|---|---|---|---|---|
| December 31, 2020 | $ 97,837 | $ 45,536 | $ (61,713) | $ (114,099) |
| December 31, 2019 | $ 113,812 | $ 57,753 | $ (55,905) | $ (111,340) |

| | Change in Discount Rate | | | |
| | Minus 2% | Minus 1% | Plus 1% | Plus 2% |
|---|---|---|---|---|
| December 31, 2020 | $ 82,983 | $ 39,560 | $ (36,151) | $ (69,284) |
| December 31, 2019 | $ 91,890 | $ 43,713 | $ (39,790) | $ (76,118) |

See Note 5 - Investment in Life Insurance Policies and Note 7 - Fair Value Measurements in the notes to the accompanying audited consolidated financial statements for additional information related to our valuation of life insurance policies.

### *Equity-Based Compensation*

The Company measures and recognizes compensation expense for all equity-based payments at fair value on the grant date over the requisite service period. GWG Holdings uses the Black-Scholes option pricing model to determine the fair value of stock options and stock appreciation rights. For restricted stock grants (including restricted stock units), if any, fair value is determined as of the closing price of GWG Holdings' common stock on the date of grant. As it is not publicly traded, Beneficient uses various methods to determine the grant date fair value of its equity-based compensation awards.

The fair value of the Beneficient Management Partners, L.P. ("BMP") Equity Units is determined on the grant date using a probability-weighted discounted cash flow analysis. This fair value measurement is based on significant inputs not observable in the market and thus represents a Level 3 measurement within the fair value hierarchy. The resultant probability-weighted cash flows are then discounted using a rate that reflects the uncertainty surrounding the expected outcomes, which the Company believes is appropriate and representative of a market participant assumption.

The fair value of Ben LP's restricted equity units ("REUs") was determined for substantially all of the awards granted in 2020, by using the valuation techniques consistent with those utilized to determine the acquisition date equity values arising from GWG Holdings obtaining a controlling financial interest in Beneficient. These valuation techniques relied upon the OPM Backsolve approach under the market method as more fully described in Note 4 to the consolidated financial statements. For the REUs granted in the latter portion of 2020, which is a *de minimis* amount of the total 2020 REUs, we utilized valuation techniques consisting of the income approach and market approach. For awards granted in 2019, the fair value of the REUs was estimated using recent equity transactions involving third parties, which provided the Company with observable fair value information sufficient for estimating the grant date fair value.

### *Beneficient's Income Allocation*

Net income (loss) attributable to noncontrolling interest holders is subject to Beneficient's income allocation in accordance with the governing limited partnership agreement of BCH as more fully described in Note 11.

APP. 470

Page 45

APP. 471

Table of Contents

The consolidated financial statements of Beneficient reflect the assets, liabilities, revenues, expenses, investment income and cash flows of Beneficient, including, after December 31, 2019, all of the trusts in the ExAlt Plan™ on a gross basis, and a portion of the economic interests certain of the ExAlt Trusts, held by the residual beneficiaries, are attributed to noncontrolling interests in the accompanying consolidated financial statements. Interest income earned by Beneficient from the ExAlt Trusts is eliminated in its consolidation. However, because the eliminated amounts are earned from, and funded by, its noncontrolling interests, Beneficient's attributable share of the net income from the ExAlt Trusts is increased by the amounts eliminated. Accordingly, the elimination in consolidation of interest income and, for periods after December 31, 2019, certain fee revenue has no effect on net income (loss) attributable to Beneficient or holders of Common Units.

For purposes of income allocation to Beneficient's equity holders, interest income is generally comprised of contractual interest, which is computed at a variable rate compounding monthly, interest recognized on certain of the ExAlt Loans through the effective yield method, and an amortized discount that is recognized ratably over the life of the ExAlt Loan.

As a result of the change-of-control event discussed in Note 9 to the accompanying audited consolidated financial statements on December 31, 2019 and the resulting valuation performed under ASC 805, the existing loan portfolio between Ben and the ExAlt Trusts was evaluated as of December 31, 2019, for credit deterioration based on the intentions of all parties that the income allocations provisions of Ben operate under US GAAP as if the ExAlt Trusts were not consolidated for financial reporting purposes. Further, as required under ASC 805, each ExAlt Loans between Beneficient and the ExAlt Trusts was evaluated and classified as either purchased credit impaired ("PCI") or non purchased credit impaired ("non-PCI"). For PCI loans, expected cash flows as of the date of valuation in excess of the fair value of loans are recorded as interest income over the life of the loans using a level yield method if the timing and amount of the future cash flows is reasonably estimable. Subsequently, increases in cash flows over those expected at the acquisition date are recognized prospectively as interest income. Decreases in expected cash flows due to credit deterioration are recognized by recording an allowance for loan loss. For non-PCI loans, the difference between the fair value and unpaid principal balance of the loan as of the date of valuation is amortized or accreted to interest income over the contractual life of the loans using the effective interest method. In the event of prepayment, the remaining unamortized amount is recognized in interest income, which is eliminated upon the consolidation of the ExAlt Trusts for financial reporting purposes.

Allowance for Loan Losses

The allowance for loan losses, which is eliminated in consolidation, is an input to Beneficient's allocation of income to equity holders of Ben LP. The allowance for loan losses is a valuation allowance for probable incurred credit losses in the portfolio. Management's determination of the allowance is based upon an evaluation of the loan portfolio, impaired loans, economic conditions, volume, growth and composition of the collateral to the loan portfolio, and other risks inherent in the portfolio. Currently, management individually reviews all ExAlt Loans due to the low volume and non-homogenous nature of the current portfolio. Management relies heavily on statistical analysis, current NAV and distribution performance of the underlying alternative asset interests and industry trends related to alternative asset investments to estimate losses. Management evaluates the adequacy of the allowance by reviewing relevant internal and external factors that affect credit quality. The cash flows from the underlying alternative assets interests are the sole source of repayment for the ExAlt Loans and related interest. Beneficient recognizes any charge-off in the period in which it is confirmed. Therefore, impaired ExAlt Loans are written down to their estimated net present value.

Interest income, for purposes of determining income allocations to Beneficient's equity holders, is adjusted for any allowance for loan losses, which was approximately $5.4 million for the year ended December 31, 2020.

***Goodwill and Identifiable Intangible Assets***

Goodwill and other identifiable intangible assets are initially recorded at their estimated fair values at the date of acquisition. Goodwill and other intangible assets having an indefinite useful life are not amortized for financial statement purposes. In the event that facts and circumstances indicate that the goodwill or other identifiable intangible assets may be impaired, an interim impairment test would be required. Intangible assets with finite lives are amortized over their useful lives. We perform required annual impairment tests of our goodwill and other intangible assets as of October 1 for our reporting units.

The goodwill impairment test requires us to make judgments and assumptions. The test consists of estimating the fair value of each reporting unit based on valuation techniques, including a discounted cash flow model using revenue and profit forecasts and recent industry transaction and trading multiples of our peers. We then compare those estimated fair values with the carrying values of the assets and liabilities of each reporting unit, which includes the allocated goodwill. If the estimated fair value is less than the carrying value, we will recognize an impairment charge for the amount by which the carrying amount

APP. 472

APP. 473

Table of Contents

exceeds the reporting unit's fair value; however, any loss recognized will not exceed the total amount of goodwill allocated to that reporting unit.

For 2020, the annual goodwill impairment analysis did not result in any impairment charges. Our impairment evaluation included a qualitative assessment, which considered whether there were indicators of potential impairment following the recent completion of the business combination accounting. In addition, our evaluation included a quantitative analysis, which included multiple assumptions, including estimated discounted cash flows and other estimates that may change over time. For example, a key assumption in determining the fair value of our reporting units is forecasting free cash flow generated by our business over the next five years and includes assumptions regarding expected growth of new service offerings and products. While our assumption reflects management's best estimates of future performance, the estimates assume Beneficient capturing a significant market share of liquidity transactions during the next five years leading to a substantial rate of growth of new service offerings and products, revenues and assets over the next five years ending December 31, 2025. These estimations are uncertain to occur, and to the extent the Company falls short of achieving our expected growth in revenues and assets over the next four years, material impairments of our goodwill may occur in the near term. For example, a 15% decline in our annual projected volume of liquidity transactions reflected in the Company's forecasts would require impairments to begin to be recorded assuming all other assumptions on which the forecasts are built remain constant. Because the Company's forecasts are predicated on estimating future volume for new service offerings and products, the Company's actual future volume of liquidity transactions reflected in the Company's forecasts may fall short of management's forecasts by 15% or greater and may result in a partial or full write down of our goodwill balance, which totaled $2.4 billion at December 31, 2020. In light of Beneficient's significant recurring losses from operations, negative cash flows from operations, and delays in executing its business plans, there could be potential triggering events identified and resulting impairment of goodwill recorded during the annual impairment test during the fourth quarter of 2021. While management can and has implemented strategies to address these events, changes in operating plans or adverse changes in the future could reduce the underlying cash flows used to estimate fair values and could result in a decline in fair value that would trigger future impairment charges of the reporting unit's goodwill balance.

In addition, as reflected in Note 23 to the accompanying audited consolidated financial statements, the Company is evaluating potential strategic transactions that, if consummated, may result in the deconsolidation of Beneficient as GWG Holdings will no longer own a controlling financial interest in Beneficient. As we evaluate various strategic changes for the investment in Beneficient, we may make further changes to the Company's forecasted cash flows and such changes could result in losses upon deconsolidation of our subsidiary or may result in increased risk of future goodwill impairment charges. If future discounted cash flows become less than those projected by us, future impairment charges may become necessary that could have a materially adverse impact on our results of operations and financial condition in the period in which the write-off occurs.

**Recent Developments**

We define "recent developments" as material transactions or matters that occurred in the most recent fiscal quarter or in the period between the end of the fiscal quarter and the filing of the quarterly or annual financial statements with the SEC. The following recent developments are described in more detail in the notes to the accompanying audited consolidated financial statements. A reference to the corresponding note is included below:

- The amendment of Beneficient's Credit Agreements (Note 23).

- On December 31, 2020, GWG Holdings, GWG Life and Bank of Utah entered into a supplemental indenture (the "Liquidity Bond Supplemental Indenture") providing for the issuance of up to $1.0 billion in aggregate principal amount of two new series of L Bonds known as "Liquidity Bonds" (Note 10).

- During the fourth quarter of 2020, Beneficient executed 9 liquidity transactions pursuant to which customers sold interests in private equity funds with an aggregate net asset value of $15.1 million to certain of the ExAlt Trusts in exchange for agreed upon consideration. In connection with these transactions, GWG Life issued $0.5 million of principal in Liquidity Bonds on December 31, 2020.

- Subsequent to December 31, 2020 and through the date of this filing, Beneficient executed 10 liquidity transactions pursuant to which customers sold interests in private equity funds with an aggregate net asset value of $5.6 million to certain of the ExAlt Trusts in exchange for agreed upon consideration. In connection with certain of these transactions, GWG Life issued an aggregate of $0.3 million of principal in Liquidity Bonds on January 8, 2021 and January 15, 2021.

APP. 475

Table of Contents

- In addition, on March 25, 2021, Beneficient filed provisional patent applications pending on certain of its systems and processes underlying its liquidity products and trust services. These patent applications cover the following aspects of Beneficient's business:

  - *Ben ExAlt Plan<sup>TM</sup> Patent Application*.

    - **ExAlt Plan**. System and process for providing liquidity to customers for their alternative assets.

  - *Underwriting Systems Patent Applications*.

    - **AltScore**. Alternative asset quality scoring system.
    - **ValueAlt**. Method to value interests in alternative asset funds.
    - **AltRating**. Method to assign credit ratings to structured debt that is backed by alternative assets.

  - *Risk Assessment and Risk Reduction Patent Applications*.

    - **AltC**. Tool to measure portfolio concentration relative to an established limit or target.
    - **OptimumAlt**. Portfolio optimization and allocation tool specifically designed for alternative asset funds.
    - **AlphaAlt**. Proprietary forecast of expected returns and cash flows for alternative asset fund types.
    - **AltQuote**. Real-time indicator of liquidity solutions for holders of alternative assets.

- In April 2021, the Kansas Legislature adopted, and the governor of Kansas signed into law, a bill that would allow for the chartering and creation of Kansas trust companies, known as Technology Enabled Fiduciary Financial Institutions ("TEFFIs"), that provide fiduciary financing (e.g., lending to ExAlt Trusts), custodian and trustee services in all capacities pursuant to statutory fiduciary powers, to investors and other participants in the alternative assets market, as well as the establishment of alternative asset trusts. The legislation became effective on July 1, 2021 and designates an operating subsidiary of Ben LP, Beneficient Fiduciary Financial, L.L.C. ("BFF") as the pilot trust company under the TEFFI legislation. A conditional trust charter was issued by the Kansas Bank Commissioner to a subsidiary of Ben LP on July 1, 2021. Under the pilot program, BFF will not be authorized to exercise its fiduciary powers as a TEFFI until the earlier of the date the Kansas Bank Commissioner promulgates applicable rules and regulations or December 31, 2021. The bill also permits the Kansas Bank Commissioner to request a six-month extension of the pilot program period, which could delay Beneficient's permission to exercise its fiduciary powers under the charter until July 1, 2022. As a result, the directors of GWG Holdings who serve on the new TEFFI trust company Board of Directors resigned their membership, effective June 14, 2021, on GWG Holdings' Board of Directors to devote their time to serving as directors of the Beneficient TEFFI trust company, which the Company believes is the highest and best use of their available time and skills and will support the development of the Beneficient TEFFI trust company and the successful execution of Beneficient's business plan (Note 23).

- On June 28, 2021, DLP IV entered into a Third Amended and Restated Loan and Security Agreement with LNV Corporation (the "Third Amended Facility") that resulted in a $52.5 million advance from LNV Corporation, or $51.2 million including certain fees and expenses incurred in connection with the entry into the Third Amended Facility (Note 23).

- On August 11, 2021, GWG DLP Funding VI, LLC, a Delaware limited liability company ("DLP VI"), entered into a Credit Agreement (the "NF Credit Agreement") with each lender from time to time party thereto and National Founders LP, a Delaware limited partnership, as the administrative agent (the credit facility evidenced by such NF Credit Agreement, the "NF Credit Facility") that resulted in a one-time $107.6 million advance with a scheduled maturity date of August 11, 2031 (Note 23). Approximately $56.7 million of such advanced amount was used to pay off the remaining amount due under the Third Amended Facility.

- On August 13, 2021, GWG Holdings, Ben LP, and BCH entered into a Term Sheet that contemplates a series of transactions which, if completed, will result in, among other things, (i) GWG Holdings receiving certain proposed enhancements to its investments in Beneficient; (ii) GWG Holdings no longer having the right to appoint directors of the board of directors of Beneficient Management; and (iii) Beneficient no longer being a consolidated subsidiary of GWG Holdings (Note 23).

<div align="center">Page 48</div>

Table of Contents

- On September 7, 2021, DLP IV entered into a Fourth Amended and Restated Loan and Security Agreement with LNV Corporation, as lender, and CLMG Corp., as the administrative agent on behalf of the lenders under the agreement (the "Fourth Amended Facility") that resulted in a $30.3 million advance from LNV Corporation, with such advance including amounts to cover certain fees and expenses incurred in connection with the entry into the Fourth Amended Facility (Note 23).

- An update on the current state of the Company and potential impact of the COVID-19 pandemic (Note 23).

**Asset Diversification**

As of December 31, 2020, we held a combined portfolio of assets consisting of 78% of fair value secondary life insurance policies and 22% of indirect interests in alternative assets held by certain of the ExAlt Trusts. The table presented below reflects classifications based on GWG Holdings' and Beneficient's current exposure types as of December 31, 2020 (dollar amounts in thousands). Additional information regarding the Collateral portfolio is available on its website at *www.trustben.com*. The information on Beneficient's website is not part of, or incorporated by reference in, this report.

| Exposure Type | | Value | Percent of Total |
|---|---|---|---|
| Near-Duration Life Insurance Policies [1] | $ | 329,277 | 32.5 % |
| Intermediate-Duration Life Insurance Policies [1] | | 299,812 | 29.6 % |
| Long-Duration Life Insurance Policies [1] | | 162,823 | 16.1 % |
| Growth Stage Private [2] | | 72,887 | 7.2 % |
| Late Stage Venture Backed [2] | | 54,144 | 5.3 % |
| Corporate Buyouts [2] | | 34,235 | 3.4 % |
| Early Stage Venture Backed [2] | | 31,483 | 3.1 % |
| Other [2] | | 29,145 | 2.8 % |
| **Total** | $ | 1,013,806 | 100.0 % |

(1) Represents fair value of life insurance policies.
(2) Represents the net asset value ("NAV") of the interests in alternative assets that provide cash flows, which comprise the Collateral of the ExAlt Loans, excluding the collateral exchanged in the Collateral Swap, which is eliminated in consolidation. These ExAlt Loans eliminate upon consolidation in the presentation of our consolidated financial statements NAV calculation reflects the most current report of NAV and other data received from firm/fund sponsors. If no such report has been received, Beneficient estimates NAV based upon the last NAV calculation reported by the investment manager and adjusts it for capital calls and distributions made in the intervening time frame.

The underlying exposure data represents GWG Holdings' exposure to life insurance policies included in its portfolio and its exposure to the underlying Collateral of Beneficient's loan portfolio to the ExAlt Trusts. Exposure type reflects classifications based on each company's portfolio as determined by management. Figures are based on third-party information and other relevant information as determined by management. "Other" includes private debt strategies, natural resources strategies, and hedge funds. "Near-Term", "Intermediate-Term", and "Long-Term" life insurance policies represent policies with life expectancies between 0 – 47 months, 48 – 95 months, and 96 – 240 months, respectively.

The following sections contain information on each of the secondary life insurance assets and the interests in alternative assets held by certain of the ExAlt Trusts separately.

Page 49

Table of Contents

*Secondary Life Insurance Assets*

Our portfolio of life insurance policies, owned by GWG Holdings' subsidiaries as of December 31, 2020, is summarized below:

### Life Insurance Portfolio Summary

| | | |
|---|---|---:|
| Total life insurance portfolio face value of policy benefits (in thousands) | $ | 1,900,715 |
| Average face value per policy (in thousands) | $ | 1,797 |
| Average face value per insured life (in thousands) | $ | 1,943 |
| Weighted average age of insured (years) | | 83.1 |
| Weighted average life expectancy (LE) estimate (years) | | 6.9 |
| Total number of policies | | 1,058 |
| Number of unique lives | | 978 |
| Demographics | | 74% Male; 26% Female |
| Number of smokers | | 40 |
| Largest policy as % of total portfolio face value | | 0.7 % |
| Average policy as % of total portfolio | | 0.1 % |
| Average annual premium as % of face value | | 3.8 % |

Our portfolio of life insurance policies, owned by GWG Holdings' subsidiaries as of December 31, 2020, organized by the insured's current age and the associated number of policies and policy benefits, is summarized below:

### Distribution of Policies and Policy Benefits by Current Age of Insured

| Min Age | Max Age | Number of Policies | Policy Benefits (in thousands) | Percentage of Total | | Weighted Average LE (Years) |
|---|---|---|---|---|---|---|
| | | | | Number of Policies | Policy Benefits | |
| 63 | 69 | 42 | $ 49,535 | 4.0 % | 2.6 % | 10.21 |
| 70 | 74 | 191 | 222,761 | 18.1 % | 11.7 % | 10.6 |
| 75 | 79 | 206 | 349,467 | 19.5 % | 18.4 % | 9.44 |
| 80 | 84 | 213 | 375,926 | 20.0 % | 19.7 % | 7.54 |
| 85 | 89 | 229 | 556,339 | 21.6 % | 29.3 % | 4.84 |
| 90 | 94 | 153 | 296,310 | 14.5 % | 15.6 % | 2.99 |
| 95 | 100 | 24 | 50,377 | 2.3 % | 2.7 % | 2.09 |
| **Total** | | 1,058 | $ 1,900,715 | 100.0 % | 100.0 % | 6.92 |

Page 50

Table of Contents

Our portfolio of life insurance policies, owned by GWG Holdings' subsidiaries as of December 31, 2020, organized by the insured's estimated life expectancy estimates and associated policy benefits, is summarized below:

**Distribution of Policies by Current Life Expectancies of Insured**

| Min LE (Months) | Max LE (Months) | Number of Policies | Policy Benefits (in thousands) | Percentage of Total | |
|---|---|---|---|---|---|
| | | | | Number of Policies | Policy Benefits |
| 0 | 47 | 300 | $ 518,044 | 28.4 % | 27.3 % |
| 48 | 71 | 225 | 421,774 | 21.3 % | 22.2 % |
| 72 | 95 | 192 | 318,497 | 18.1 % | 16.8 % |
| 96 | 119 | 150 | 283,899 | 14.2 % | 14.9 % |
| 120 | 143 | 109 | 167,195 | 10.3 % | 8.8 % |
| 144 | 179 | 71 | 145,581 | 6.7 % | 7.7 % |
| 180 | 240 | 11 | 45,725 | 1.0 % | 2.3 % |
| **Total** | | 1,058 | $ 1,900,715 | 100.0 % | 100.0 % |

We rely on the payment of policy benefit claims by life insurance companies as a significant source of cash inflow. The life insurance assets we own represent obligations of third-party life insurance companies to pay the benefit amount under the policy upon the mortality of the insured. As a result, we manage this credit risk exposure by generally purchasing policies issued by insurance companies with investment-grade credit ratings from Standard & Poor's, and diversifying our life insurance portfolio among a number of insurance companies.

The yield to maturity on bonds issued by life insurance carriers reflects, among other things, the credit risk (risk of default) of such insurance carrier. We follow the yields on certain publicly traded life insurance company bonds because this information is part of the data we consider when valuing our portfolio of life insurance policies for our financial statements.

The average yield to maturity of publicly traded life insurance company bonds data we consider as inputs to our life insurance portfolio valuation process was 1.15% as of December 31, 2020. We believe this average yield to maturity reflects, in part, the financial market's judgment that credit risk is low with regard to these carriers' financial obligations. The obligations of life insurance carriers to pay life insurance policy benefits ranks senior to all of their other financial obligations, including the senior bonds they issue. As of December 31, 2020, 96.3% of the face value benefits of our life insurance policies were issued by insurers having an investment-grade credit rating (BBB or better) by Standard & Poor's.

As of December 31, 2020, our ten largest life insurance company credit exposures and the Standard & Poor's credit rating of their respective financial strength and claims-paying ability is set forth below:

**Distribution of Policy Benefits by Top 10 Insurance Companies**

| Rank | Policy Benefits (in thousands) | Percentage of Policy Benefit Amount | Insurance Company | Ins. Co. S&P Rating |
|---|---|---|---|---|
| 1 | $ 279,792 | 14.7 % | John Hancock Life Insurance Company | AA- |
| 2 | 212,879 | 11.2 % | Lincoln National Life Insurance Company | AA- |
| 3 | 200,936 | 10.6 % | Equitable Life Insurance Company | A+ |
| 4 | 164,391 | 8.6 % | Transamerica Life Insurance Company | A+ |
| 5 | 157,755 | 8.3 % | Brighthouse Life Insurance Company | AA- |
| 6 | 87,339 | 4.6 % | American General Life Insurance Company | A+ |
| 7 | 84,998 | 4.5 % | Pacific Life Insurance Company | AA- |
| 8 | 67,376 | 3.5 % | ReliaStar Life Insurance Company | A+ |
| 9 | 59,808 | 3.1 % | Security Life of Denver Insurance Company | A+ |
| 10 | 57,153 | 3.0 % | Protective Life Insurance Company | AA- |
| | $ 1,372,427 | 72.1 % | | |

APP. 479

Page 51

Table of Contents

***ExAlt Trusts' Investment in Alternative Assets***

Beneficient's primary operations, which commenced on September 1, 2017, consist of offering its liquidity and trust administration services to its customers, primarily through certain of Ben LP's operating subsidiaries, Ben Liquidity (as defined below) and Ben Custody Admin (as defined below), respectively. Ben Liquidity offers simple, rapid and cost-effective liquidity products to its customers through the use of customized trust vehicles, the ExAlt Trusts, that facilitate the exchange of a customer's alternative assets for consideration using a unique financing structure. A subsidiary of Ben Liquidity makes ExAlt Loans to certain of the ExAlt Trusts. Ben Liquidity generates interest and fee income earned in connection with such ExAlt Loans to certain of the ExAlt Trusts, which are collateralized by the cash flows from the exchanged alternative assets (the "Collateral"). Ben Custody Admin provides trust administration services to the trustees of certain of the ExAlt Trusts that own the exchanged alternative asset following a liquidity transaction for fees payable quarterly. The Collateral supports the repayment of the loans plus any related interest and fees. Since the ExAlt Trusts are consolidated, Ben LP's operating subsidiary ExAlt Loans and interest and fee income are eliminated in the presentation of our consolidated financial statements.

The ExAlt Trusts' investments in alternative assets are the source of the Collateral supporting the ExAlt Loans. These assets consist primarily of limited partnership interests in various alternative investments, including private equity funds. These alternative investments are valued using NAV as a practical expedient. Changes in the NAV of these investments are recorded in investment income, net in our consolidated statements of operations. The ExAlt Trusts' investments in alternative assets provide the economic value creating the Collateral to the ExAlt Loans made in connection with each liquidity transaction.

The ExAlt Trusts held interests in alternative assets with a net asset value of $221.9 million and $342.0 million at December 31, 2020 and December 31, 2019, respectively. As of December 31, 2020, the ExAlt Trusts' portfolio had exposure to 117 professionally managed alternative investment funds, comprised of 327 underlying investments, 91 percent of which are investments in private companies.

The portfolio of alternative assets, excluding the collateral exchanged in the Collateral Swap, which is eliminated in consolidation, covers the following industry sectors and geographic regions as of the dates shown below (dollar amounts in thousands):

| | December 31, 2020 | | (As Restated) December 31, 2019 | |
| Industry Sector | Value | Percent of Total | Value | Percent of Total |
|---|---|---|---|---|
| Diversified Financials | $ 28,462 | 12.8 % | $ 27,418 | 8.0 % |
| Telecommunication Services | 27,401 | 12.3 % | 27,059 | 7.9 % |
| Food and Staples Retailing | 24,450 | 11.0 % | 20,507 | 6.0 % |
| Software and Services | 23,310 | 10.5 % | 22,573 | 6.6 % |
| Utilities | 21,740 | 9.8 % | 15,733 | 4.6 % |
| Semiconductors and Semiconductor Equipment | 21,271 | 9.6 % | 14,658 | 4.3 % |
| Not Applicable (e.g., Escrow, Earnouts) | 18,138 | 8.2 % | 26,569 | 7.7 % |
| Health Care Equipment and Services | 14,682 | 6.6 % | 92,418 | 27.0 % |
| Pharmaceuticals, Biotechnology and Life Sciences[1] | 3,415 | 1.5 % | 52,202 | 15.3 % |
| Other[1] | 39,025 | 17.7 % | 42,875 | 12.6 % |
| **Total** | $ 221,894 | 100.0 % | $ 342,012 | 100.0 % |

Page 52

Table of Contents

| | | | | *(As Restated)* | |
| | December 31, 2020 | | December 31, 2019 | |
| **Geography** | **Value** | **Percent of Total** | **Value** | **Percent of Total** |
|---|---|---|---|---|
| North America | $ 95,569 | 43.1 % | $ 211,722 | 61.9 % |
| Western Europe | 50,219 | 22.6 % | 46,719 | 13.7 % |
| Asia | 36,436 | 16.4 % | 29,144 | 8.5 % |
| Latin & South America | 25,255 | 11.4 % | 22,377 | 6.5 % |
| Other[2] | 14,415 | 6.5 % | 32,050 | 9.4 % |
| **Total** | $ 221,894 | 100.0 % | $ 342,012 | 100.0 % |

---

[1]   Industries in this category each comprise less than 5 percent as of December 31, 2020. Pharmaceuticals, Biotechnology and Life Sciences is shown separately as it comprised greater than 5 percent as of December 31, 2019.

[2]   Locations in this category each comprise less than 5 percent.

Assets in the portfolio consist primarily of interests in alternative investment vehicles (also referred to as "funds") that are managed by a group of U.S. and non-U.S. based alternative asset management firms that invest in a variety of financial markets and utilize a variety of investment strategies. The vintages of the funds in the portfolio as of December 31, 2020 ranged from 1993 to 2018.

As the ExAlt Trusts grow its portfolio, it will monitor the diversity of the portfolio through the use of concentration guidelines. These guidelines were established, and will be periodically updated, through a data driven approach based on asset type, fund manager, vintage of fund, industry segment and geography to manage portfolio risk. Beneficient will refer to these guidelines when making decisions about new financing opportunities; however, these guidelines will not restrict Beneficient from entering into financing opportunities that would result in Beneficient having exposure outside of its concentration guidelines. In addition, changes to the ExAlt Trusts' portfolio may lag changes to the concentration guidelines. As such, the ExAlt Trusts' portfolio may, at any given time, have exposures that are outside of its concentration guidelines to reflect, among other things, attractive financing opportunities, limited availability of assets, or other business reasons. Given the ExAlt Trusts' limited operating history, the portfolio as of December 31, 2020 had exposure to certain alternative investment vehicles and investments in private companies that were outside of those guidelines.

Classifications by industry sector, exposure type and geography reflect classification of investments held in funds or companies held directly in the portfolio. Investments reflect the assets listed by the general partner of a fund as held by the fund and have a positive or negative net asset value. Typical assets include portfolio companies, limited partnership interests in other funds, and net other assets, which are a fund's cash and other current assets minus liabilities. The underlying interests in alternative assets are primarily limited partnership interests, and the limited partnership agreements governing those interests generally include restrictions on disclosure of fund-level information, including fund names and company names in the funds.

Industry sector is based on Global Industry Classification Standard (GICS®) Level 2 classification (also known as "Industry Group") of companies held in the portfolio by funds or directly, subject to certain adjustments by us. "Other" classification is not a GICS® classification. "Other" classification reflects companies in the GICS® classification categories of Automobiles & Components, Banks, Capital Goods, Commercial & Professional Services, Consumer Durables & Apparel, Consumer Services, Energy, Food, Beverage & Tobacco, Household & Personal Products, Insurance, Materials, Media & Entertainment, Real Estate, Retailing, Tech Hardware & Equipment, and Transportation. N/A includes investments assets that we have determined do not have an applicable GICS® Level 2 classification, such as Net Other Assets and investments that are not operating companies.

Investment exposure type reflects classifications based on each fund's current investment strategy stage as determined by us. "Other" includes private debt strategies, natural resources strategies and hedge funds.

Geography reflects classifications determined by us based on each underlying investment. "Other" geography classification includes Israel, Australia, Northern Europe, and Eastern Europe.

Case 3:22-cv-00410-B Document 32-1 Filed 04/19/22 Page 483 of 1031 PageID 655

APP. 483

**Principal Revenue and Expense Items**

During the years ended December 31, 2020 and 2019, we earned revenues from the following primary sources:

- *Revenue Realized from Maturities of Life Insurance Policies.* We recognize the difference between the face value of the policy benefits and carrying value when an insured event has occurred and determine that collection of the policy benefits is realizable and reasonably assured. Revenue from a transaction must meet both criteria in order to be recognized. We generally collect the face value of the life insurance policy from the insurance company within 45 days of our notification of the insured's mortality, but this collection time varies depending on the insurance company and individual policy.

- *Change in Fair Value of Life Insurance Policies.* We value our life insurance portfolio investments for each reporting period in accordance with the fair value principles discussed herein, which reflects the expected receipt of policy benefits in future periods, net of premium costs, as shown in our consolidated financial statements.

- *Investment Income.* Includes the change in net asset value of the alternative assets held by certain of the ExAlt Trusts as well as the change in fair value of repurchase options issued by certain of the ExAlt Trusts.

- *Interest Income.* During the year ended December 31, 2019, and thus prior to the consolidation of Beneficient. interest income primarily included interest income on the Promissory Note and Commercial Loan Agreement. Interest earned on the Promissory Note and the Commercial Loan Agreement was eliminated in consolidation with Beneficient beginning January 1, 2020. As such, interest income during the year ended December 31, 2020 only includes interest earned from policy benefits receivable and cash held in banks.

- *Other Income.* Includes changes in the fair value of Beneficient's investment in put options, L Bond redemption fees, and other miscellaneous income. Additionally, includes income totaling $36.3 million recognized during the second quarter of 2020 by Beneficient as a result of the forfeiture of vested equity-based compensation related to one former director of Beneficient.

During the years ended December 31, 2020 and 2019, our main components of expense are summarized below:

- *Interest Expense.* Includes interest incurred under the second amended and restated senior credit facility with LNV Corporation (as amended from time to time, "LNV Credit Facility"), as well as interest on GWG Holdings' L Bonds, Seller Trust L Bonds and other outstanding indebtedness, including Beneficient's debt due to related parties. When we issue debt, we amortize the financing costs (commissions and other fees) associated with such indebtedness over the outstanding term of the financing and classify it as interest expense.

- *Employee Compensation and Benefits.* Employee compensation and benefits includes salaries, bonuses and other incentives and costs of employee benefits. Also included are significant non-cash compensation expenses totaling $110.7 million related to Beneficient's equity incentive plans for the year ended December 31, 2020.

- *Selling, General and Administrative Expenses.* We recognize and record expenses incurred in our business operations, including operations related to the purchasing and servicing of life insurance policies, the origination and servicing of ExAlt Loans and costs associated with trust administration. These expenses include legal and professional fees, sales, marketing, occupancy and other expenditures.

Additional components of our net earnings include:

- *Earnings (Loss) from Equity Method Investment.* Prior to the Investment and Exchange Agreements on December 31, 2019, we accounted for GWG Holdings' investment in the common units of Ben LP ("Common Units") using the equity method. Under this method, we recorded our share of the net earnings or losses attributable to holders of Common Units, on a one quarter lag, as a separate line on our consolidated statements of operations. We also account for GWG Holdings' investment in FOXO as an equity method investment, which is also included in earnings (loss) from equity method investment in our consolidated statements of operations. We had losses of $7.3 million and $4.1 million from equity method investments during the years ended December 31, 2020 and 2019, respectively.

- *Gain on Consolidation of Equity Method Investment.* In conjunction with the consolidation of Beneficient on December 31, 2019, we remeasured our preexisting equity method investment to fair value, resulting in a gain due to

APP. 484

Page 54

the increase in the estimated fair value compared to our existing book value. The gain on consolidation of Beneficient on December 31, 2019 was $243.0 million. Refer to Note 4 to the consolidated financial statements for further information.

**Results of Operations — 2020 Compared to 2019**

The following is our analysis of the results of operations for the periods indicated below. This analysis should be read in conjunction with our consolidated financial statements and related notes (dollar values in thousands).

*Net Income (Loss) Attributable to Common Shareholders*

Net loss attributable to common shareholders was $168.5 million for 2020 compared to net income attributable to common shareholders of $70.5 million for 2019. The results of operations for 2020 reflect the consolidation of Beneficient compared to an equity method investment in 2019. The year ended December 31, 2020 includes significant non-cash equity based compensation expense of $110.7 million related to Beneficient's equity incentive plans. The net income for 2019 was primarily driven by the net gain of $243.0 million realized upon consolidation of Beneficient. More details regarding revenue and expenses in 2020 compared to 2019 are included in the discussion below.

*Revenue from Secondary Life Insurance*

|  | | Year Ended December 31, | | |
|---|---|---|---|---|
|  | | **2020** | | **2019** |
| Revenue realized from maturities of life insurance policies | $ | 86,923 | $ | 91,882 |
| Revenue recognized from change in fair value of life insurance policies | | 34,114 | | 49,015 |
| Premiums and other annual fees | | (71,439) | | (65,577) |
| Gain on life insurance policies, net | $ | 49,598 | $ | 75,320 |
| | | | | |
| Attribution of gain on life insurance policies, net: | | | | |
| Change in estimated probabilistic cash flows, net of premium and other annual fees paid | $ | (7,976) | $ | 1,609 |
| Net revenue recognized at maturity | | 57,574 | | 69,122 |
| Unrealized gain on acquisitions | | — | | 6,921 |
| Change in life expectancy evaluation | | — | | (2,332) |
| Gain on life insurance policies, net | $ | 49,598 | $ | 75,320 |
| | | | | |
| Number of policies acquired | | — | | 83 |
| Face value of purchases | $ | — | $ | 97,316 |
| Purchases (initial cost basis) | $ | — | $ | 32,356 |
| Unrealized gain on acquisition (% of face value) | | — % | | 7.1 % |
| | | | | |
| Number of policies matured | | 92 | | 78 |
| Face value of matured policies | $ | 125,109 | $ | 125,148 |
| Net revenue recognized at maturity event (% of face value matured) | | 46.0 % | | 55.2 % |

Revenue from changes in estimated probabilistic cash flows, net of premiums paid, was a charge of $8.0 million in 2020 compared to a credit of $1.6 million in 2019. The decrease of $25.7 million in gain on life insurance policies for the year ended December 31, 2020, over the comparable prior year period, was driven by a combination of no gain on policy acquisitions, maturities of life insurance policies with a higher cumulative cost basis, and higher premiums paid.

The Company did not purchase any life insurance policies during 2020. The face value of policies purchased in 2019 was $97.3 million. The resulting unrealized gain on acquisition was $6.9 million in 2019. The absence of an unrealized gain on acquisition in the current period is the result of a strategic decision to significantly reduce capital allocated to purchasing additional life insurance policies through the secondary market and to increase capital allocated toward providing liquidity to a broader range of alternative assets, primarily through additional investments in Beneficient. On December 31, 2019, GWG

APP. 486

Page 55

Table of Contents

Holdings obtained the right to appoint a majority of the board of directors of the general partner of Ben LP. As a result of this change-of-control event, we reported the results of Ben LP and its subsidiaries on a consolidated basis beginning on the transaction date of December 31, 2019. We believe that Beneficient's operations will generally produce higher risk-adjusted returns than those we can achieve from life insurance policies acquired in the secondary market; however, returns on equity in life settlements, especially with the current availability of financings on favorable terms, appear to be an attractive option to diversify our exposure to alternative assets, and we have begun exploring the feasibility of acquiring such policies. Furthermore, although we believe that our portfolio of life insurance policies is a meaningful component of a growing diversified alternative asset portfolio, we continue to explore strategic alternatives for our life insurance portfolio aimed at maximizing its value, including a possible sale, refinancing, recapitalization, partnership, reinsurance guarantees, life insurance operations or other transactions involving of our life insurance portfolio, as well as pursuing other alternatives to increase our exposure to alternative assets.

The face value of matured policies was $125.1 million for each period presented. The net revenue recognized at maturity was $57.6 million and $69.1 million, respectively, reflecting a decrease in revenue attributable to maturity events of $11.5 million primarily from maturities of policies with a higher cumulative cost basis in 2020 compared to 2019.

There were no net revenue charges from change in life expectancy evaluation in 2020 compared to a charge of $2.3 million in 2019. The resulting net revenue increase of $2.3 million primarily resulted from refinement of life expectancy data that occurred during 2019 that were nonrecurring in 2020.

*Investment Income, Interest Income and Other Income (in thousands)*

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2020** | **2019** | **Increase/(Decrease)** |
| Investment income | $ 44,106 | $ — | $ 44,106 |
| Interest income | 1,594 | 15,646 | (14,052) |
| Other income | 29,073 | 1,310 | 27,763 |
| Total | $ 74,773 | $ 16,956 | $ 57,817 |

Investment income was added as result of the consolidation of Beneficient on December 31, 2019. Investment income was $44.1 million during the year ended December 31, 2020, and is comprised of $17.6 million decrease in net asset value of the alternative assets held by certain of the ExAlt Trusts and $61.7 million increase in fair value of repurchase options issued by certain of the ExAlt Trusts.

Interest income decreased $14.1 million during the year ended December 31, 2020, compared to the same period in 2019, primarily due to the consolidation of Beneficient, which eliminated interest earned on the Promissory Note and Commercial Loan Agreement beginning January 1, 2020. Interest income on the Promissory Note entered into on May 31, 2019, was $2.2 million during 2019. Interest income earned on the commercial loan between GWG Life and Beneficient was $11.3 million during the year ended December 31, 2019. Interest income recognized during the year ended December 31, 2020 and 2019, also includes interest earned from policy benefits receivable and cash held in banks, which in the aggregate was $1.3 million and $2.1 million, respectively. The decrease was driven by lower average cash balances and slightly lower interest rates in 2020 compared to 2019.

Other income increased during the year ended December 31, 2020 compared to the same period in 2019. Other income for the year ended 2020 includes $36.3 million of income recognized during the second quarter of 2020 by Beneficient as a result of the forfeiture of vested equity-based compensation related to one former director of Beneficient. A substantial majority of the former director's equity-based compensation units were fully vested, and the related expense was recorded in prior periods. This income was offset by a $7.8 million decrease to the fair value of Beneficient's put options during 2020. Other income during the year ended December 31, 2019, includes L Bond early redemption fees and other miscellaneous income from legacy initiatives of GWG Holdings.

Table of Contents

*Interest and Operating Expenses (in thousands)*

|  | Year Ended December 31, | | |
|  | **2020** | **2019** | **Increase/ (Decrease)** |
|---|---|---|---|
| Interest expense (including amortization of deferred financing costs) | $    154,616 | $    114,844 | $    39,772 |
| Employee compensation and benefits | 146,363 | 28,309 | 118,054 |
| Legal and professional fees | 30,075 | 12,824 | 17,251 |
| Other expenses | 18,227 | 15,896 | 2,331 |
| Total expenses | $    349,281 | $    171,873 | $    177,408 |

Interest expense, including amortization of deferred financing costs, increased $39.8 million during the year ended December 31, 2020 compared to the same period in 2019. The increase in interest expense was primarily due to the increase in the average outstanding L Bonds in 2020 compared to 2019, contributing $26.5 million of increased interest expense, including amortization of deferred financing costs. Also, the consolidation of Beneficient beginning December 31, 2019, increased interest expense by $11.3 million for the year ended December 31, 2020 compared to the same period in 2019, related to Beneficient's debt due to related parties. Additionally, $3.8 million of increased interest expense, including amortization of deferred financing costs, during the year ended December 31, 2020, compared to the same period in 2019, was due to increased interest paid on the LNV Credit Facility associated with a higher average principal balance outstanding. Finally, these increases were partially offset by a $1.8 million decrease in interest expense on Seller Trusts L Bonds related to the portion of Seller Trust L Bonds eliminated as of September 30, 2020 as a result of the Collateral Swap discussed in Note 1 to the consolidated financial statements.

The increase in employee compensation and benefits in 2020 compared to 2019 was primarily related to the consolidation of Beneficient on December 31, 2019. Specifically, the Company recognized $110.7 million of equity-based compensation expense during the year ended December 31, 2020, related to Beneficient's equity incentive plans. Beneficient's Board of Directors adopted the equity incentive plans in 2018 and 2019 and approved the granting of equity incentive awards during the second quarter of 2019 to certain directors and in the first quarter of 2020 to certain employees. Awards are generally subject to service-based vesting over a multi-year period from the recipient's date of hire, though some awards fully vested upon the grant date. As of December 31, 2020, over 78% of the awards granted under Beneficient's equity incentive plans had vested.

Expense associated with these awards is based on the fair value of the equity on the date of grant. As Ben LP's equity is not publicly traded, the fair value of the equity awards is estimated on the grant date using the most recent valuation received from a reputable third-party valuation firm, which provides the Company with observable fair value information sufficient for estimating the grant date fair value.

In addition to Beneficient's equity-based compensation expense, we recognized additional retention, severance and other costs in the first quarter of 2020 related to the relocation of GWG Holdings' principal offices from Minneapolis to Dallas in late 2019.

The increase in legal and professional fees in 2020 compared to 2019 is primarily the result of the consolidation of Beneficient on December 31, 2019, which added $19.0 million of legal and professional fees during the year ended December 31, 2020. The increase attributable to the consolidation of Beneficient was partially offset by lower consulting fees during 2020, compared to 2019.

The increase in other expenses during the year ended December 31, 2020 compared to the same period of 2019, is primarily the result of the consolidation of Beneficient on December 31, 2019, which added $7.6 million of other expenses during 2020. These increases were partially offset by lower business insurance, contract labor and other operating expenses of GWG Holdings and subsidiaries during the comparable periods.

*FOXO Initiatives*

During 2019, we incurred $5.5 million of expenses related to the development of intellectual property surrounding advanced epigenetic testing technology. These expenses were included in the loss from our equity method investment in FOXO during 2020.

Page 57

APP. 489

On November 13, 2020, FOXO BioScience LLC converted to a corporation and is now known as FOXO Technologies Inc. GWG's previous membership interest in the LLC converted to preferred equity in FOXO. We believe that as a separate entity (rather than as a small subsidiary of a large financial services holding company), the FOXO businesses can reach their maximum potential in terms of marketing and branding, attraction of talent, appropriate peer group comparisons and, ultimately, return to its owners. We expect FOXO's costs to increase in the future, which will affect our consolidated earnings through our earnings (loss) from equity method investment. Under GWG Holdings' subscription agreement with FOXO, we are obligated to invest approximately $20.0 million in FOXO over a two year period ending in October 2021, of which $16.2 million has been funded through December 31, 2020.

*Income Taxes*

We realized $16.4 million in income tax benefit and $71.9 million in income tax expense for the years ended December 31, 2020 and 2019, respectively, which resulted in effective tax rates of 7.9% and 34.8%, compared to the statutory federal income tax rate of 21.0% for both periods.

The following table provides a reconciliation of our income tax expense (benefit) at the statutory federal income tax rate to our actual income tax expense (in thousands):

| | Year Ended December 31, | | | |
| | 2020 | | 2019 | |
| | | | *(As Restated)* | |
| Statutory federal income tax (benefit) | $ (43,339) | 21.0 % | $ 33,449 | 21.0 % |
| State income taxes (benefit), net of federal benefit | (2,995) | 1.5 % | 12,962 | 8.1 % |
| Change in valuation allowance | 20,688 | (10.0) % | 25,547 | 5.8 % |
| Noncontrolling interest | 7,718 | (3.7) % | — | — % |
| Other permanent differences, net | 1,538 | (0.9) % | (93) | (0.1) % |
| **Total income tax expense (benefit)** | **$ (16,390)** | **7.9 %** | **$ 71,865** | **34.8 %** |

The most significant temporary differences between GAAP net income (loss) and taxable net income (loss) are the treatment of interest costs, policy premiums and servicing costs with respect to the acquisition and maintenance of the life insurance policies and revenue recognition with respect to the fair value of the life insurance portfolio.

As of both December 31, 2020 and 2019, valuation allowances were recorded against the total amount of non-permanent deferred tax assets. Indefinite-lived deferred tax assets of $2.8 million in 2020 were comprised of an interest expense limitation under Internal Revenue Code Section 163(j) and the tax-effected net operating loss ("NOL") created beginning in 2019.

At December 31, 2020, we had federal NOL carryforwards of $58.0 million resulting in related deferred tax assets of $12.2 million, and state NOL carryforwards of $24.3 million resulting in related deferred tax assets of $1.9 million. At December 31, 2019, we had federal NOL carryforwards of $29.7 million resulting in related deferred tax assets of $6.2 million, and state NOL carryforwards of $29.6 million resulting in related deferred tax assets of $2.3 million. The NOL carryforwards subject to expiration (i.e., those generated prior to 2018) will begin to expire in 2031. Future utilization of NOL carryforwards is subject to limitations under Section 382 of the Internal Revenue Code. This section generally relates to a more than 50 percent change in ownership over a three-year period. As a result of the Exchange Transaction, a change in ownership for tax purposes only has occurred as of December 28, 2018. As such, the annual utilization of our net operating losses generated prior to the ownership change is limited. However, net unrealized built-in gains on our life insurance policies result in an increase in the Section 382 limit over the five-year recognition period, which resulted in $0.5 million of current tax liability in 2020 and a nominal amount in 2019.

After the change-of-control transaction with Ben LP on December 31, 2019, GWG Holdings moved its headquarters from Minnesota to Texas. This move resulted in a change in the state deferred tax rate from 9.8% to 0%. In the third quarter 2020, GWG Holdings was allocated a gain from its investment in Ben LP. The tax effects of these items were recorded as discrete items.

The Company currently records a valuation allowance against its deferred tax assets that cannot be realized by the future reversal of existing temporary differences. Due to the uncertain timing of the reversal of certain of these temporary differences associated with the constraint described below, they cannot be considered as a source of future taxable income for

APP. 491

Table of Contents

purposes of determining a valuation allowance; therefore, the vast majority of the deferred tax liability cannot be utilized in determining the realizability of the deferred tax assets. Due to a prior deemed ownership change, net operating loss carryforwards are subject to Section 382 of the Internal Revenue Code.

The Company reassessed its valuation allowance during the third quarter of 2020 and determined it will no longer utilize the reversal of a temporary difference related to GWG Holdings' preferred equity ownership in Ben LP, until such time as the preferred equity is no longer constrained, as a source of income to realize existing deferred tax assets related to the net operating loss and Internal Revenue Code Section 163(j) limitations. As a result, we recorded a large net deferred tax liability as of December 31, 2020. The effects of the reassessment of the valuation allowance on the deferred tax liability as of December 31, 2019 are reflected in Note 21 to the consolidated financial statements. The net deferred tax liability as of December 31, 2020 is specifically related to GWG Life's investment in the Preferred Series A Subclass 1 Unit Accounts described in Note 1 to the consolidated financial statements. The disposition of this investment is constrained by the Pledge and Security Agreement in favor of the holders of the L Bonds of GWG Holdings. As such, the timing of recognition of the necessary taxable income related to this investment and the future reversal of this temporary difference cannot be predicted.

We continue to monitor and evaluate the rationale for recording a full valuation allowance for the net amount of the deferred tax assets in excess of the deferred tax liabilities that are not constrained. We intend to continue maintaining a full valuation allowance on these net deferred tax assets until there is sufficient evidence to support the reversal of all or some portion of these allowances. Release of the valuation allowance would result in the recognition of certain deferred tax assets and a decrease to income tax expense for the period the release is recorded. However, the exact timing and amount of the valuation allowance release are subject to change on the basis of the level of profitability that we are able to actually achieve.

On March 27, 2020, Congress passed and the President signed into law the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), which included significant changes to U.S. Federal income tax law. However, the only change that is expected to affect the Company is the modification to Section 163(j), which increased the allowable business interest deduction from 30% of adjusted taxable income to 50% of adjusted taxable income.

**Revenue and Earnings before Tax by Reportable Segment — 2020 Compared to 2019**

We have two reportable segments: 1) Beneficient and 2) Secondary Life Insurance. Corporate & Other includes certain activities not allocated to specific business segments. These activities include holding company financing and investing activities, and management and administrative services to support the overall operations of the Company and GWG Holdings' equity method investment in FOXO.

Comparison of revenue by reportable segment for the periods indicated (in thousands):

|  | Year Ended December 31, | | |
|---|---|---|---|
| **Revenue:** | **2020** | **2019** | **Increase/ (Decrease)** |
| Secondary Life Insurance | $    51,359 | $    78,002 | $    (26,643) |
| Beneficient | 72,950 | 13,738 | 59,212 |
| Corporate & Other | 62 | 536 | (474) |
| Total | $    124,371 | $    92,276 | $    32,095 |

The primary drivers of the changes from 2019 to 2020 were as follows:

- Secondary Life Insurance revenue decreased by $26.6 million for the year ended December 31, 2020, over the comparable period in 2019 primarily as a result of a $25.7 million decrease in gain on life insurance policies driven by a combination of no gain on policy acquisitions, maturities of life insurance policies with a higher cumulative cost basis, and higher premiums paid. Also contributing to the decrease in the Secondary Life Insurance segment revenues was a decrease of $0.9 million in interest and other miscellaneous income during 2020 compared to 2019.

- Beneficient segment revenue for the year ended December 31, 2020, represents the consolidated operations of Beneficient, compared to an equity method investment in Beneficient during the same period in 2019. As such, the year ended 2020 includes $61.7 million of investment income recognized related to repurchase options issued by certain of the ExAlt Trusts and a $17.6 million downward adjustment to NAV of alternative assets held by certain of the ExAlt Trusts, which are consolidated subsidiaries of Ben LP, whereas the year ended 2019 primarily includes

APP. 492

Page 59

Table of Contents

$11.3 million of interest income on the Commercial Loan between GWG Life and Ben LP and $2.2 million of interest income on the Promissory Note between GWG Life and the ExAlt Trusts, both of which were eliminated in consolidation beginning December 31, 2019. Additionally, there was $36.3 million of income recognized during the second quarter by Beneficient as a result of the forfeiture of vested equity-based compensation related to one former director of Beneficient. A substantial majority of the former director's equity-based compensation units were fully vested, and the related expense was recorded in prior periods. Finally, this was offset by a $7.8 million decrease to the fair value of Beneficient's put options during 2020.

- Corporate & Other revenue was *de minimis* during the year ended December 31, 2020. The year ended 2019 includes minimal revenue related to a legacy merchant cash advance subsidiary of GWG Holdings. GWG Holdings no longer participates in the merchant cash advance industry.

Comparison of earnings (loss) before tax by reportable segment for the periods indicated (in thousands):

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| **Segment Earnings (Loss) Before Tax**[1] | | **2020** | | **2019** | | **Increase/ (Decrease)** |
| | | | | *(As Restated)* | | |
| Secondary Life Insurance | $ | (59,684) | $ | (27,694) | $ | (31,990) |
| Beneficient[1] | | (139,575) | | 222,443 | | (362,018) |
| Corporate & Other[2] | | (32,970) | | (35,470) | | 2,500 |
| Total | $ | (232,229) | $ | 159,279 | $ | (391,508) |

_____

[1] Includes earnings from equity method investments and gain on consolidation of equity method investments for the year ended December 31, 2019, as presented in our consolidated statements of operations, related to GWG Holdings' equity method investment in Beneficient prior to December 31, 2019.

[2] Includes loss from equity method investments for the year ended December 31, 2020, as presented in our consolidated statements of operations, related to GWG Holdings' investment in FOXO.

The primary drivers of the changes in earnings (loss) before tax for the year ended December 31, 2020, compared to the same period of 2019 were as follows:

- Secondary Life Insurance loss before tax increased by $32.0 million as a result of the following:

  - $25.7 million decrease in the gain on life insurance policies, net as described above in the revenue discussion; and

  - $14.2 million increase in interest expense as a result of higher average debt outstanding; partially offset by

  - A decrease in operating expenses of $8.9 million, primarily resulting from lower employee compensation and benefits, lower business insurance costs, and lower legal fees.

- Beneficient segment experienced a net loss of $139.6 million in 2020 compared to earnings of $222.4 million in 2019, primarily due to the consolidation of Beneficient on December 31, 2019. During 2019, we accounted for Beneficient using the equity method on a one-quarter lag, and the amount reported represents our proportionate share of the losses of Beneficient for the period presented. The one-quarter lag was discontinued with the consolidation of Beneficient on December 31, 2019. The consolidation of Beneficient resulted in a net gain of $243.0 million related to the remeasurement to fair value of GWG Holdings' preexisting equity method investment in Beneficient. The loss of Beneficient for the year ended December 31, 2020, was primarily driven by $107.8 million of non-cash charges for equity incentive compensation. During the year ended December 31, 2020, Beneficient's losses were partially offset by $36.3 million of income recognized as a result of the forfeiture of vested equity-based compensation related to one former director of Beneficient as described in the revenue comparison discussion above.

- Corporate and Other operating loss was lower during December 31, 2020, compared to 2019, primarily due to lower legal and consulting fees as we incurred higher fees in 2019 as a result of the Beneficient transactions.

APP. 495

Table of Contents

**Liquidity and Capital Resources**

As of December 31, 2020 and 2019, we had approximately $124.2 million and $115.8 million, respectively, in combined available cash, cash equivalents, and restricted cash. We generated net losses from operations for the years ended December 31, 2020 and 2019 totaling $208.5 million and $151.5 million. As of October 15, 2021, we had approximately $54.3 million in combined available cash, cash equivalents, and restricted cash. Besides funding operating expenditures, we are obligated to pay other items such as interest payments and debt maturities, and preferred stock dividends and redemptions.

We have historically financed our businesses primarily through a combination of L Bond sales, preferred stock sales, the LNV Credit Facility, and the NF Credit Facility. We have also financed our business through proceeds from life insurance policy benefit receipts, cash distributions from the ExAlt Trusts' alternative asset portfolio, dividends and interest on investments, and Beneficient's debt due to related parties. We have traditionally used proceeds from these sources for policy acquisition, policy premiums and servicing costs, working capital and financing expenditures including paying principal, interest and dividends. We have also used proceeds to allocate capital to Beneficient; however, if Ben LP becomes an independent company per the Term Sheet discussed in the "Recent Developments" section above, the Company expects that Ben LP would reduce its reliance on GWG Holdings to fund its operations and would raise future capital from other sources. Ben LP's capital raising efforts and participation in liquidity transactions may include the issuance of equity or debt of Ben LP or one of its subsidiaries, and the newly issued securities may be dilutive to GWG Holdings' and GWG Life's investments in Ben LP and BCH and may include preferential terms relative to GWG Holdings' and GWG Life's investments in Ben LP and BCH, as applicable.

We currently fund our business primarily with debt that generally has a shorter duration than the duration of our long-term assets. The resulting asset/liability mismatch can result in a liquidity shortfall if we are unable to renew maturing short term debt or secure suitable additional financing. In such a situation, we could be forced to sell assets at less than optimal (distressed) prices. Substantially all of our life insurance policies are pledged as collateral under the LNV Credit Facility and the NF Credit Facility and we would not be able to dispose of them without compliance with the terms of those credit facilities. We heavily rely on GWG Holdings' L Bond offering to fund our business operations, including, among other things, interest and principal payments on the existing L Bonds and capital allocations to Beneficient. We temporarily suspended the offering of GWG Holdings' L Bonds, commencing April 16, 2021, as a result of our delay in filing certain periodic reports with the SEC, including this 2020 Form 10-K, and were required to seek alternative sources of capital.

As a result of the suspension of GWG Holdings' L Bond offering, on June 28, 2021 (as described in more detail above), we pledged additional life insurance policies as collateral and received an additional advance of $51.2 million under the Third Amended Facility. Subsequently, on August 11 2021, we entered into the NF Credit Agreement (as described in more detail above and in Note 23 to the accompanying audited consolidated financial statements) and received a one-time advance of $107.6 million. Approximately $56.7 million of such advanced amount was used to pay off the remaining amount due, including interest and penalties, under the Third Amended Facility and the additional pledged life insurance policies used as collateral for the Third Amended Facility were released and pledged under the NF Credit Facility. Further, on September 7, 2021, DLP IV entered into the Fourth Amended Facility, that replaced the aforementioned Third Amended Facility. The Fourth Amended Facility resulted in an additional advance of $30.3 million from LNV Corporation, with no additional pledged collateral.

Primarily due to the current suspension of GWG Holdings' L Bond offering, the Company may require additional capital to continue its operations over the next twelve months if our ability to sell L Bonds dissipates, or if we are forced to suspend the L Bond offering. However, the Company may not be able to obtain additional borrowings under existing debt facilities or new borrowings with other third-party lenders. To the extent that GWG Holdings or its subsidiaries raise additional capital through the future issuance of debt, the terms of those debt securities may include terms that adversely affect the rights of our existing debt and/or equity holders or involve negative covenants that restrict GWG Holdings' ability to take specific actions, such as incurring additional debt or making additional investments in growing the operations of the Company. If GWG Holdings is unable to fund its operations and other obligations, or defaults on its debt, then the Company will be required to either i) sell assets to provide sufficient funding, ii) exercise our right to decline requests for early L Bond redemptions or redemptions of preferred stock, or iii) to raise additional capital through the sale of equity and the ownership interest of our equity holders may be diluted. Substantially all of our life insurance policies are pledged as collateral under the LNV Credit Facility and the NF Credit Facility and we would not be able to dispose of them without compliance with the terms of those credit facilities.

APP. 497

Table of Contents

We anticipate recommencing the offering of GWG Holdings' L Bonds once we become current with our filing obligations and satisfy applicable NASDAQ listing requirements. Once we become current with our filing obligations with respect to the L Bonds, we may be limited in the origination channels in which we sell our L Bonds in the event that we are unable to meet the applicable NASDAQ listing requirements in a timely manner, which could result in the L Bonds no longer being "covered securities" for federal securities law purposes which would subject the offer and sale of L Bonds to potentially extensive state "blue sky" securities law requirements. If for any reason we are forced to suspend GWG Holdings' L Bond offering, are limited in our origination channels in which we sell our L Bonds, or demand for GWG Holdings' L bonds dissipates, our business would be adversely impacted and our ability to service and repay our debt obligations, much of which is short term, would be compromised, thereby negatively affecting our business prospects and viability.

We had $97.4 million borrowing base capacity, excluding any potential capacity for premiums and servicing costs, under the LNV Credit Facility as of December 31, 2020. Additional future borrowing base capacity for premiums and servicing costs, created as the premiums and servicing costs of pledged life insurance policies become due and by additional policy pledges to the facility, if any, exists under the LNV Credit Facility at the sole discretion of the lender. The LNV Credit Facility has certain financial and nonfinancial covenants, and we were in compliance with these debt covenants as of December 31, 2020, and December 31, 2019, and continue to be so as of the filing date of this report. Subsequent to December 31, 2020, we received additional advances through amendments to the LNV Credit Facility and entered in to the NF Credit Facility (as described in more detail above and in Note 23 to the accompanying audited consolidated financial statements).

Beneficient is obligated to make debt payments totaling $74.5 million on certain outstanding borrowings through May 30, 2022 under the terms of the Amendment No. 1 to the Second Amended and Restated Credit Agreements as discussed further in Note 23 to the accompanying audited consolidated financial statements. Primarily due to both the forthcoming debt payments under the Credit Agreement and Second Lien Credit Agreement and the anticipated deconsolidation of Beneficient from GWG Holdings, as discussed previously and in Note 23 to the accompanying audited consolidated financial statements, which is expected to result in reduced reliance by Beneficient on GWG Holdings to fund its operations, Beneficient will require additional liquidity to continue its operations over the next twelve months. We expect Beneficient to satisfy these obligations and fund its operations through anticipated operating cash flows, proceeds from distributions on the alternative assets portfolio, additional investments into Beneficient by GWG Holdings and/or other parties and, potentially refinancing with other third-party lenders some or all of the existing borrowings due prior to their maturity. Beneficient is currently in the process of raising additional equity, which is anticipated to close during the fourth quarter of 2021 and/or the first quarter of 2022.

Beneficient may not be able to refinance or obtain additional financing on terms favorable to the Company, or at all. To the extent that Beneficient raises additional capital through the future sale of equity or debt, the ownership interest of its existing equity holders may be diluted. The terms of these future equity or debt securities may include liquidation or other preferences that adversely affect the rights of its existing equity unitholders or involve negative covenants that restrict Beneficient's ability to take specific actions, such as incurring additional debt or making additional investments in growing its operations. If Beneficient defaults on these borrowings, then it will be required to either i) sell assets to repay these loans or ii) to raise additional capital through the sale of equity and the ownership interest of our equity holders may be diluted. Moreover, if Beneficient were to sell assets to avoid a default of these borrowings, then the price at which Beneficient sold such assets may not reflect the carrying value of those assets as reflected in our consolidated financial statements, especially in the event of a bulk or distressed sale.

As noted in the "Results of Operations" section above, on November 11, 2019, GWG Holdings contributed the common stock and membership interests of its then wholly-owned FOXO Labs and FOXO Life subsidiaries to FOXO in exchange for a membership interest in the entity. On November 13, 2020, FOXO BioScience LLC converted to a corporation and is now known as FOXO Technologies Inc. With the corporate conversion, GWG Holdings' previous membership interest in the LLC converted to preferred equity. GWG Holdings has contributed $16.2 million in cash to FOXO through December 31, 2020, and is committed to contribute an additional $3.8 million to the entity through October 2021, all of which was contributed by such date.

The potential NASDAQ delisting and our current inability to sell L Bonds as discussed above, in combination with significant recurring losses from operations, negative cash flows from operations, delays in executing our business plans, and any potential negative outcome from the ongoing SEC investigation discussed elsewhere in this Form 10-K, raise substantial doubt about our ability to continue as a going concern for the next 12 months following the filing of this Form 10-K.

APP. 499

*Financings Summary*

We had the following outstanding debt balances as of December 31, 2020 and 2019, with the following weighted average interest rate as calculated for the years ended December 31, 2020 and 2019 (dollars in thousands):

| Issuer/Borrower | December 31, 2020 | | December 31, 2019 | |
| --- | --- | --- | --- | --- |
| | Principal Amount Outstanding | Weighted Average Interest Rate | Principal Amount Outstanding | Weighted Average Interest Rate |
| GWG DLP Funding IV, LLC – LNV senior credit facility | $ 202,611 | 9.12 % | $ 184,586 | 9.57 % |
| GWG Holdings, Inc. – L Bonds | 1,277,881 | 7.21 % | 948,128 | 7.15 % |
| GWG Holdings, Inc. – Seller Trust L Bonds | 272,104 | 7.50 % | 366,892 | 7.50 % |
| Beneficient – Debt due to related parties | 77,176 | 6.50 % | 152,199 | 4.59 % |
| **Total** | $ 1,829,772 | 7.43 % | $ 1,651,805 | 7.26 % |

The table below reconciles the face amount of our outstanding debt to the carrying value shown on our balance sheets (dollars in thousands):

| | December 31, 2020 | December 31, 2019 |
| --- | --- | --- |
| **Senior credit facility with LNV Corporation** | | |
| Face amount outstanding | $ 202,611 | $ 184,586 |
| Unamortized deferred financing costs | (8,881) | (10,196) |
| Carrying amount | $ 193,730 | $ 174,390 |
| | | |
| **L Bonds and Seller Trust L Bonds:** | | |
| Face amount outstanding | $ 1,549,985 | $ 1,315,020 |
| Subscriptions in process | 17,978 | 15,839 |
| Unamortized selling costs | (48,957) | (37,329) |
| Carrying amount | $ 1,519,006 | $ 1,293,530 |
| | | |
| **Debt due to related parties:** | | |
| Face amount outstanding | $ 77,176 | $ 152,199 |
| Unamortized premium (discount) | (916) | 887 |
| Carrying amount | $ 76,260 | $ 153,086 |

In January 2015, GWG Holdings began publicly offering up to $1.0 billion of L Bonds as a follow-on to our earlier $250.0 million public debt offering. In January 2018, GWG Holdings began publicly offering up to $1.0 billion L Bonds as a follow-on to GWG Holdings' earlier L Bond offering.

On June 3, 2020, a registration statement relating to an additional public offering was declared effective permitting us to sell up to $2.0 billion in principal amount of L Bonds on a continuous basis through June 2023. These bonds contain the same terms and features as our previous offerings. We have raised $231.2 million under this offering since it was declared effective.

Through December 31, 2020, the total amount of L Bonds sold under all offerings, including renewals, was $2.1 billion. As of December 31, 2020 and 2019, we had approximately $1.3 billion and $0.9 billion, respectively, in principal amount of L Bonds outstanding (exclusive of Seller Trust L Bonds).

On August 10, 2018, GWG Holdings, GWG Life and the Bank of Utah, as trustee, entered into the L Bond Supplemental Indenture to the Amended and Restated Indenture. GWG Holdings entered into the L Bond Supplemental Indenture to add and modify certain provisions of the Amended and Restated Indenture necessary to provide for the issuance of the Seller Trust L Bonds. GWG Holdings issued Seller Trust L Bonds in the amount of $366.9 million to the Seller Trusts in connection with the Exchange Transaction. As a result of the Collateral Swap discussed in Note 1 to the consolidated financial statements, $94.8 million of the Seller Trust L Bonds are eliminated upon consolidation. The maturity date of the Seller Trust

APP. 500

Page 63

Table of Contents

L Bonds is August 9, 2023. The Seller Trust L Bonds bear interest at 7.5% per annum. Interest is payable monthly in cash (see Note 10 to the accompanying audited consolidated financial statements). The Amended and Restated Indenture was subsequently amended on December 31, 2019, primarily to modify the calculation of the Debt Coverage Ratio in the Indenture to provide GWG Holdings with the ability to incur indebtedness (directly or through a subsidiary of GWG Holdings) that is payable in capital stock of GWG Holdings or mandatorily convertible into or exchangeable for capital stock of GWG Holdings that would be excluded from the calculation of the Debt Coverage Ratio. On December 31, 2020, we entered into the Liquidity Bond Supplemental Indenture to add and modify certain provisions of the Amended and Restated Indenture necessary to provide for the issuance of the Liquidity Bonds in a principal amount of up to $1.0 billion.

The weighted-average interest rate of GWG Holdings' outstanding L Bonds (excluding the Seller Trust L Bonds) as of December 31, 2020 and 2019, was 7.21% and 7.15%, respectively, and the weighted-average maturity at those dates was 3.19 and 3.21 years, respectively. GWG Holdings' L Bonds (other than the Seller Trust L Bonds and the Liquidity Bonds) have renewal features. Since we first issued GWG Holdings' L Bonds, we have experienced $768.7 million in maturities, of which $406.3 million has renewed through December 31, 2020, for an additional term. This renewal activity has provided us with an aggregate renewal rate of approximately 52.9% for investments in these securities.

Future contractual maturities of L Bonds (including the Seller Trust L Bonds and Liquidity Bonds) at December 31, 2020 are as follows (in thousands):

| Years Ending December 31, | | |
|---|---|---:|
| 2021[1] | $ | 463,686 |
| 2022 | | 293,038 |
| 2023 | | 191,446 |
| 2024 | | 121,105 |
| 2025 | | 167,433 |
| Thereafter | | 313,277 |
| | $ | 1,549,985 |

[1] As of December 31, 2020, we had approximately $366.9 million in principal amount of Seller Trust L Bonds outstanding, of which $94.8 million are held by the ExAlt Trusts and are eliminated in consolidation. Accordingly, the net of these amounts, $272.1 million, is presented in the table above. As the second anniversary of the Final Closing Date has passed, the holders of the Seller Trust L Bonds now have the right to cause GWG Holdings to repurchase, in whole but not in part, the Seller Trust L Bonds held by such holder within 45 days. As such, while the maturity date of the Seller Trust L Bonds is in August 2023, their contractual maturity is reflected in 2021, as that is the period in which they could become payable. The repurchase may be paid, at GWG Holdings' option, in the form of cash, and/or a pro rata portion of (i) the outstanding principal amount and accrued and unpaid interest under the Commercial Loan Agreement, and (ii) Common Units, or a combination of cash and such property.

The L Bonds (including the Seller Trust L Bonds and Liquidity Bonds) are secured by all of our assets and are subordinate to the LNV Credit Facility and the NF Credit Facility.

On September 27, 2017, we entered into a $300 million amended and restated senior credit facility with LNV Corporation in which DLP IV is the borrower. As of December 31, 2020, we had approximately $202.6 million outstanding under the senior credit facility. On November 1, 2019, we entered into the LNV Credit Facility, which replaced the prior agreement governing the facility. A description of the agreement governing the LNV Credit Facility is set forth below under the caption "Amendment of Credit Facility with LNV Corporation." We intend to use the proceeds from this facility to maintain our portfolio of life insurance policies, for liquidity and for general corporate purposes.

Beneficient had borrowings with an aggregate carrying value of $76.3 million and $153.1 million as of December 31, 2020, and December 31, 2019, respectively. This aggregate outstanding balance includes a first lien credit agreement and a second lien credit agreement with respective balances, including accrued interest, of $2.3 million and $72.3 million at December 31, 2020, and $77.5 million and $72.2 million as of December 31, 2019, respectively. These amounts exclude an unamortized discount of $0.9 million as of December 31, 2020, and an unamortized premium of $0.9 million as of December 31, 2019. Both credit agreements were amended and restated on August 13, 2020, which extended the maturity for both to April 10,

Page 64

Table of Contents

2021, as discussed in detail in Note 10 to the consolidated financial statements. In accordance with the terms of the Second Amendments, both loans accrue interest at a rate of 1-month LIBOR plus 8.0%, with a maximum rate of 9.5%. Prior to the Second Amendments, both loans accrued interest at a rate of 1-month LIBOR plus 3.95%, compounded daily. On March 10, 2021, and again on June 28, 2021, Beneficient executed amendments to both credit agreements that, among other items, extended the maturity for both agreements to May 30, 2022, as discussed in more detail in Note 23 to the consolidated financial statements. These loans are not currently guaranteed by GWG Holdings or GWG Life.

Beneficient has additional borrowings maturing in 2023 and 2024 with an aggregate principal balance outstanding, including accrued interest, of $2.6 million and $2.5 million as of December 31, 2020 and December 31, 2019, respectively.

Future contractual maturities of Beneficient's debt due to related parties as of December 31, 2020 are as follows (in thousands):

**Years Ending December 31,**

| | | |
|---|---|---|
| 2021 | $ | 74,548 |
| 2022 | | — |
| 2023 | | 750 |
| 2024 | | 1,856 |
| 2025 | | — |
| Thereafter | | — |
| | $ | 77,154 |

We expect to meet our ongoing operational capital needs for, among other things, GWG Holdings' and GWG Life's investments in Beneficient, alternative asset investments, policy premiums and servicing costs, exploring opportunities to establish a life insurance company, working capital and financing expenditures including paying principal, interest and dividends through a combination of the receipt of policy benefits from our portfolio of life insurance policies, net proceeds from GWG Holdings' L Bond offering, dividends and interest from investments, distributions from the alternative assets held by certain of the ExAlt Trusts, future preferred and common equity offerings, and funding available from the LNV Credit Facility. We estimate that our liquidity and capital resources are sufficient for our current and projected financial needs for at least the next twelve months given current assumptions. However, if we are unable to continue GWG Holdings' L Bond offering for any reason, and we are unable to obtain capital from other sources, our business will be materially and adversely affected. In addition, our business will be materially and adversely affected if we do not receive the policy benefits we forecast and if holders of GWG Holdings' L Bonds fail to renew with the frequency we have historically experienced. In such a case, we could be forced to sell our investments in life insurance policies to service or satisfy our debt-related and other obligations. A sale under such circumstances may result in significant impairment of the recognized value of our portfolio.

Capital expenditures have historically not been material and we do not anticipate making material capital expenditures in 2021.

***Alternative Assets and Secured Indebtedness***

The following information is specifically related to GWG Holdings, Inc. and its subsidiaries (not including the assets and liabilities held by Beneficient or any eliminations in consolidation).

The following table seeks to illustrate the impact that a hypothetical sale of our portfolio of life insurance assets (at various discount rates, including the discount rate used to value our portfolio at December 31, 2020), and the realization of the investment in Common Units, investment in Preferred Series A Subclass 1 Unit Account of BCH, investment in Preferred Series C Unit Account of BCH (a substantial majority of the net assets of which are currently represented by intangible assets and goodwill), and the Commercial Loan Agreement (in each case, at their respective carrying amounts and assuming no discount for lack of marketability or transaction costs, which could be substantial) would have on our ability to satisfy our debt obligations as of December 31, 2020. The investment in Common Units, investment in Preferred Series A Subclass 1 Unit Account of BCH, investment in Preferred Series C Unit Account of BCH, and Commercial Loan Agreement are discussed in detail in Note 1 and other applicable notes to the accompanying audited consolidated financial statements. The amounts in the table below do not include the consolidation of the assets and liabilities of Beneficient and related eliminations as of December 31, 2020. In all cases, the sale of the life insurance assets owned by DLP IV will be used first to satisfy all amounts owing under the LNV Credit Facility. The net sale proceeds remaining after satisfying all obligations

https://sec.report/Document/0001522690-21-000008/gwgh-20201231.htm

APP. 505

Table of Contents

under the LNV Credit Facility would be applied to the L Bonds and Seller Trust L Bonds on a pari passu basis. All dollar amounts in the table below are in thousands.

| Life Insurance Portfolio Discount Rate | 8.25%[1] | 10.00% | 12.00% | 14.00% | 16.12% |
|---|---|---|---|---|---|
| Value of life insurance portfolio | $ 791,911 | $ 730,648 | $ 670,923 | $ 620,023 | $ 573,799 |
| Common Units | 438,194 | 438,194 | 438,194 | 438,194 | 438,194 |
| Preferred Series A Subclass 1 Unit Account of BCH | 319,030 | 319,030 | 319,030 | 319,030 | 319,030 |
| Preferred Series C Unit Account of BCH | 195,578 | 195,578 | 195,578 | 195,578 | 195,578 |
| Commercial Loan Agreement | 180,080 | 180,080 | 180,080 | 180,080 | 180,080 |
| Cash, cash equivalents and policy benefits receivable | 120,616 | 120,616 | 120,616 | 120,616 | 120,616 |
| Other assets | 20,082 | 20,082 | 20,082 | 20,082 | 20,082 |
| Total assets | 2,065,491 | 2,004,228 | 1,944,503 | 1,893,603 | 1,847,379 |
| Less: Senior credit facility[2] | 202,611 | 202,611 | 202,611 | 202,611 | 202,611 |
| Net after senior credit facility | 1,862,880 | 1,801,617 | 1,741,892 | 1,690,992 | 1,644,768 |
| Less: L Bonds[3] | 1,644,773 | 1,644,773 | 1,644,773 | 1,644,773 | 1,644,773 |
| Net remaining | $ 218,107 | $ 156,844 | $ 97,119 | $ 46,219 | $ (5) |
| Impairment to L Bonds | No impairment | No impairment | No impairment | No Impairment | Impairment |

(1)   The discount rate used to calculate the fair value of our life insurance portfolio as of December 31, 2020.
(2)   This amount excludes unamortized deferred financing costs.
(3)   Amount represents aggregate outstanding principal balance of L Bonds and Seller Trust L Bonds prior to eliminations as of December 31, 2020.

The above table illustrates that our ability to fully satisfy amounts owing under the L Bonds and Seller Trust L Bonds would likely be impaired upon the sale or the realization of the investment in Common Units, investment in Preferred Series A Subclass 1 Unit Account of BCH, investment in Preferred Series C Unit Account of BCH and Commercial Loan Agreement at their respective carrying amounts, plus all our life insurance assets at a price equivalent to a discount rate of approximately 16.12% or higher at December 31, 2020. At December 31, 2019, the likely impairment occurred at a discount rate of approximately 26.78% or higher. Based on a preliminary analysis, at September 30, 2021, management expects the likely impairment, as calculated in accordance with the table above, to occur at a discount rate of approximately 8.50% or higher. The above hypothetical analysis is included for informational purposes only, and the results of such analysis have no bearing on the current ability of GWG Holdings to market and sell L Bonds or to satisfy amounts owing under the L Bonds and Seller Trust L Bonds.

The table does not include any allowance for transactional fees and expenses (which expenses and fees could be substantial) nor any discount for lack of marketability associated with a portfolio sale or the realization of the investment in Common Units, investment in Preferred Series A Subclass 1 Unit Account of BCH, investment in Preferred Series C Unit Account of BCH and Commercial Loan Agreement, respectively, and is provided to demonstrate how various discount rates used to value our portfolio of life insurance assets could affect our ability to satisfy amounts owing under our debt obligations in light of our senior secured lender's right to priority payments under our senior credit facility with LNV Corporation.

The table also assumes GWG Holdings will realize the full amounts of the investment in Common Units, investment in Preferred Series A Subclass 1 Unit Account of BCH, investment in Preferred Series C Unit Account of BCH, and Commercial Loan Agreement. However, the ultimate value of GWG Holdings' and GWG Life's investments in Beneficient depends on multiple factors, including the expected growth of new service offerings and products. Since predicting the rate of growth attributable to newly launched products is inherently uncertain, there is no assurance that GWG Holdings will recover the full book basis of its investments in Beneficient. Additionally, there is currently no market for the aforementioned assets, and a market may not develop. Our Commercial Loan receivable and a portion of GWG Holdings' and GWG Life's investment in the Common Units may be used as consideration for retiring the Seller Trust L Bonds upon a redemption event or at the maturity of the Seller Trust L Bonds (see Note 10 to the accompanying audited consolidated financial statements). This table also does not include the yield maintenance fee we are required to pay in certain circumstances under the LNV Credit Facility, which could be substantial. The above table should be read in conjunction with the information contained in other sections of this report, including Critical Accounting Policies — Valuation of Life Insurance Policies and the notes to the accompanying audited consolidated financial statements.

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 507 of 1031    PageID 679

APP. 507

Table of Contents

### *Amendment of Credit Facility with LNV Corporation*

Effective November 1, 2019, DLP IV entered into the LNV Credit Facility. The LNV Credit Facility makes available a total of up to $300.0 million in credit to DLP IV with a maturity date of September 27, 2029. Subject to available borrowing base capacity, additional advances are available under the LNV Credit Facility at the LIBOR rate described below. Such advances are available to pay premiums and servicing costs of pledged life insurance policies as such amounts become due. Interest will accrue on amounts borrowed under the LNV Credit Facility at an annual interest rate, determined as of each date of borrowing or quarterly if there is no borrowing, equal to (a) the greater of 1.50% or 12-month LIBOR, plus (b) 7.50% per annum. The effective rate at December 31, 2020 was 9.00%. Interest payments are made on a quarterly basis.

Under the LNV Credit Facility, DLP IV has granted the administrative agent, for the benefit of the lenders under the facility, a security interest in all of DLP IV's assets. As with prior collateral arrangements relating to the senior secured debt of GWG Holdings and its subsidiaries (on a consolidated basis), GWG Life's excess equity value of DLP IV after satisfying all amounts owing under the LNV Credit Facility is available as collateral for the obligations of GWG Holdings under the L Bonds and Seller Trust L Bonds (although the life insurance assets owned by DLP IV do not themselves serve as direct collateral for those obligations).

We are subject to various financial and non-financial covenants under the LNV Credit Facility, including, but not limited to, compliance with laws, preservation of existence, financial reporting, keeping of proper books of record and account, payment of taxes, and ensuring that neither DLP IV nor GWG Life become an investment company. As of December 31, 2020, we were in compliance with all financial and non-financial covenants.

In addition, the LNV Credit Facility has certain reporting obligations that require DLP IV to deliver audited annual financial statements no later than ninety days after the end of each fiscal year. Due to the failure to issue GWG Life, LLC audited financial statements for 2020 to LNV Corporation within 90 days after the end of the year, we were in violation of our financial reporting obligations under the LNV Credit Facility. CLMG Corp., as administrative agent for LNV Corporation, has issued a limited deferral extending the delivery of these reports to May 17, 2021. We regained compliance on May 17, 2021, when the audited annual financial statements of GWG Life were delivered to LNV Corporation.

On June 28, 2021, DLP IV entered into the Third Amended Facility with LNV Corporation, as lender, and CLMG Corp., as the administrative agent on behalf of the lenders under the agreement, that replaced the aforementioned LNV Credit Facility. The Third Amended Facility resulted in an additional advance of $52.5 million from LNV Corporation.

In conjunction with entering into the Third Amended Facility, DLP V transferred life insurance policies having an aggregate face value of approximately $440.6 million to DLP IV which were pledged as additional collateral to the Third Amended Facility, and DLP IV received proceeds of approximately $51.2 million (net of certain fees and expenses incurred in connection with the negotiation and entry into the Third Amended Facility). The Third Amended Facility sets forth interest and other terms and covenants similar those included in the previous LNV Credit Facility. The Third Amended Facility was paid off on August 11, 2021, with a portion of the proceeds from the NF Credit Facility described below.

On September 7, 2021, DLP IV entered into the Fourth Amended Facility with LNV Corporation, as lender, and CLMG Corp., as the administrative agent on behalf of the lenders under the agreement, that replaced the aforementioned Third Amended Facility. The Fourth Amended Facility resulted in an additional advance of $30.3 million from LNV Corporation. The Fourth Amended Facility sets forth interest and other terms and covenants similar those included in the previous LNV Credit Facility.

### *Credit Facility with National Founders LP*

On August 11, 2021, DLP VI, entered into the NF Credit Agreement with each lender from time to time party thereto and National Founders LP, as the administrative agent. On August 11, 2021, a one-time advance of approximately $107.6 million was made to the DLP VI under the NF Credit Facility with a scheduled maturity date of August 11, 2031. Approximately $56.7 million of such advanced amount was used to pay off the remaining amount due, including interest and penalties, under the Third Amended Facility. Amounts borrowed under the NF Credit Facility bear interest on each day on the outstanding principal amount on such day at a per annum rate, determined on a daily basis, generally equal to 5.5% up to a 65% of the loan to value percent as calculated in accordance with the NF Credit Agreement, and 7.0% on anything above that loan to value percent.

APP. 508

Page 67

APP. 509

Table of Contents

A portion of the proceeds from the funding under the NF Credit Facility was used to purchase life insurance policies that were owned by DLP IV, which used the funds to repay the most recent advance of $52.5 million plus interest and penalties under the LNV Credit Facility described above. At August 11, 2021, the aggregate face value of life insurance policies owned by DLP VI, was approximately $433.1 million. As of such date, the aggregate face value of life insurance policies owned by DLP IV was approximately $1.42 billion.

We are subject to various financial and non-financial covenants under the NF Credit Facility, including, but not limited to, compliance with laws, preservation of existence, financial reporting, keeping of proper books of record and account, payment of taxes, and ensuring that neither DLP VI nor GWG Life become an investment company. Additionally, we are required to maintain a Debt Coverage Ratio not to exceed 90%. As of August 31, 2021, we were in compliance with all financial and non-financial covenants in the NF Credit Facility.

**Cash Flows**

*Interest and Dividend Payments*

We finance our businesses through a combination of: life insurance policy benefit receipts; principal, dividends and interest receipts from investments; distributions from the alternative assets held by the ExAlt Trusts; debt and equity offerings; and the LNV Credit Facility and the NF Credit Facility. We have historically relied on debt (L Bonds and the LNV Credit Facility) and equity (preferred stock) financing for the majority of our cash expenditures (for policy acquisition, policy premiums and servicing costs, working capital and financing expenditures including paying principal and interest on existing debt, and for GWG Holdings and GWG Life making investments in Beneficient) as the amount of cash flows from the realization of life insurance policy benefits and cash flows from our other investments has been insufficient to meet all of our needs. This has resulted in the Company incurring substantial indebtedness and, to a lesser extent, obligations to make dividend payments on our classes of preferred stock.

Beneficient primarily finances its business through repayments on ExAlt Loans. Such repayments are funded from a portion of the cash distributions the ExAlt Trusts receive from their alternative assets and additional investments in Beneficient by GWG Holdings and/or other parties. See Note 10 to the accompanying audited consolidated financial statements for details on the amendments of Beneficient's credit agreements. Beneficient uses proceeds from these sources to fund liquidity transactions and potential unfunded capital commitments, working capital, debt service payments, and costs associated with potential future products. Beneficient also anticipates the need to establish sufficient regulatory capital if and when its Texas trust company charter is issued or the Kansas TEFFI trust company becomes operational. Additionally, Bermuda insurance statutes and regulations, and the policies of the BMA, require that Pen, among other things, maintain a minimum level of capital and surplus, satisfy solvency standards, and restrict dividends and distributions. Beneficient Capital Markets will also be subject to regulations of the SEC and FINRA that require, among other things, Beneficient Capital Markets to maintain a minimum level of capital.

Our total interest expense of $154.6 million and $114.8 million for the years ended December 31, 2020 and 2019, respectively, represent the largest cash expense in each period. Preferred stock cash dividends were $14.6 million and $16.9 million for the years ended December 31, 2020 and 2019, respectively. While reducing our cost of funds and increasing our common equity base are primary goals of the Company, until we do so we will continue to expend significant amounts of cash for interest and dividend payments and will thus continue to rely heavily on our ability to raise cash from GWG Holdings' L Bond offering, LNV Credit Facility and other means as they are developed and available.

*Life Insurance Policy Premium Payments*

The payment of premiums and servicing costs to maintain life insurance policies represents one of our most significant requirements for cash disbursement. When a policy is purchased, we are able to calculate the minimum premium payments required to maintain the policy in-force. Over time as the insured ages, premium payments will increase. Nevertheless, the probability we will be required to pay the premiums decreases as mortality becomes more likely. These scheduled premiums and associated probabilities are factored into our expected internal rate of return and cash-flow modeling. Beyond premiums, we incur policy servicing costs, including annual trustee, policy administration and tracking costs. Additionally, we incur significant financing costs, including principal, interest and dividends. Both policy servicing costs and financing costs are excluded from our internal rate of return calculations. We finance our businesses through a combination of life insurance policy benefit receipts, dividends and interest on other investments, equity offerings, debt offerings, and advances under the LNV Credit Facility and NF Credit Facility.

APP. 510

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 511 of 1031    PageID 683

APP. 511

Table of Contents

The amount of payments for anticipated premiums, including the requirement under the LNV Credit Facility and NF Credit Facility to maintain a two month cost-of-insurance threshold within each policy cash value account, and servicing costs that we will be required to make over the next five years to maintain our current portfolio, assuming no mortalities, is set forth in the table below (in thousands):

| Years Ending December 31, | Premiums | Servicing | Total |
|---|---|---|---|
| 2021 | $ 72,445 | $ 1,655 | $ 74,100 |
| 2022 | 89,436 | 1,655 | 91,091 |
| 2023 | 100,953 | 1,655 | 102,608 |
| 2024 | 110,044 | 1,655 | 111,699 |
| 2025 | 122,438 | 1,655 | 124,093 |
| | $ 495,316 | $ 8,275 | $ 503,591 |

Our anticipated premium expenses are subject to the risk of increased cost-of-insurance charges (i.e., "COI" or premium charges) for the life insurance policies we own. We did not receive any notices of COI rate changes in 2019. We have received COI increases on six policies during the year ended December 31, 2020.

We have no known pending cost-of-insurance increases on any policies in our portfolio, but we are aware that cost-of-insurance increases have become more prevalent in the industry. Thus, we may see additional insurers implementing cost-of-insurance increases in the future.

### *Life Insurance Policy Benefit Receipts*

For the quarter-end dates set forth below, the following table illustrates the total amount of face value of policy benefits owned, and the trailing 12 months of life insurance policy benefits realized and premiums paid on our portfolio. The trailing 12-month benefits/premium coverage ratio indicates the ratio of policy benefits realized to premiums paid over the trailing 12-month period from our portfolio of life insurance policies.

| Quarter End Date | Portfolio Face Amount (in thousands) | 12-Month Trailing Benefits Realized (in thousands) | 12-Month Trailing Premiums Paid (in thousands) | 12-Month Trailing Benefits/Premiums Coverage Ratio |
|---|---|---|---|---|
| March 31, 2016 | $ 1,027,821 | $ 21,845 | $ 28,771 | 75.9 % |
| June 30, 2016 | 1,154,798 | 30,924 | 31,891 | 97.0 % |
| September 30, 2016 | 1,272,078 | 35,867 | 37,055 | 96.8 % |
| December 31, 2016 | 1,361,675 | 48,452 | 40,239 | 120.4 % |
| March 31, 2017 | 1,447,558 | 48,189 | 42,753 | 112.7 % |
| June 30, 2017 | 1,525,363 | 49,295 | 45,414 | 108.5 % |
| September 30, 2017 | 1,622,627 | 53,742 | 46,559 | 115.4 % |
| December 31, 2017 | 1,676,148 | 64,719 | 52,263 | 123.8 % |
| March 31, 2018 | 1,758,066 | 60,248 | 53,169 | 113.3 % |
| June 30, 2018 | 1,849,079 | 76,936 | 53,886 | 142.8 % |
| September 30, 2018 | 1,961,598 | 75,161 | 55,365 | 135.8 % |
| December 31, 2018 | 2,047,992 | 71,090 | 52,675 | 135.0 % |
| March 31, 2019 | 2,098,428 | 87,045 | 56,227 | 154.8 % |
| June 30, 2019 | 2,088,445 | 82,421 | 59,454 | 138.6 % |
| September 30, 2019 | 2,064,156 | 101,918 | 61,805 | 164.9 % |
| December 31, 2019 | 2,020,973 | 125,148 | 63,851 | 196.0 % |
| March 31, 2020 | 2,000,680 | 120,191 | 65,224 | 184.3 % |
| June 30, 2020 | 1,960,826 | 137,082 | 66,846 | 205.1 % |
| September 30, 2020 | 1,921,067 | 149,415 | 67,931 | 220.0 % |
| December 31, 2020 | 1,900,715 | 125,109 | 69,734 | 179.4 % |

APP. 513

Table of Contents

We believe that the portfolio cash flow results set forth above are consistent with our general investment thesis that the life insurance policy benefits we receive will continue to increase over time in relation to the premiums we are required to pay on the remaining polices in the portfolio. Nevertheless, we expect that our portfolio cash flow on a period-to-period basis will remain inconsistent as we have reduced capital allocated to acquiring a larger, more diversified portfolio of life insurance policies.

**Inflation**

Changes in inflation do not necessarily correlate with changes in interest rates. We presently do not foresee any material impact of inflation on our results of operations in the periods presented in our consolidated financial statements.

**Off-Balance Sheet Arrangements**

*Unfunded Capital Commitments*

The ExAlt Trusts had $35.6 million and $34.9 million of potential gross capital commitments as of December 31, 2020 and December 31, 2019, respectively, representing potential limited partner capital funding commitments on the interests in alternative asset funds. The trust holding the interest in the limited partnership for the alternative asset fund is required to fund these limited partner capital commitments per the terms of the limited partnership agreement. Capital funding commitment reserves are maintained by the associated trusts within the ExAlt Plan™ created at the origination of each trust for up to $0.1 million. To the extent that the associated ExAlt Trust cannot pay the capital funding commitment, Beneficient is obligated to lend sufficient funds to meet the commitment. Any amounts advanced by Beneficient to the ExAlt Trusts for these limited partner capital funding commitments above the associated capital funding commitment reserves held by the associated ExAlt Trusts are added to the ExAlt Loan balance between Beneficient and the ExAlt Trusts and are expected to be recouped through the cash distributions from the interests in alternative asset fund that collateralizes such ExAlt Loan.

Capital commitments generally originate from limited partner agreements having fixed or expiring expiration dates. The total limited partner capital funding commitment amounts may not necessarily represent future cash requirements. Beneficient considers the creditworthiness of the investment on a case-by-case basis. At both December 31, 2020 and December 31, 2019, Beneficient had no reserves for losses on unused commitments to fund potential limited partner capital funding commitments.

*Unfunded Commitments*

Beneficient had $1.1 million of unfunded commitments on liquidity solution transactions as of December 31, 2020, related to liquidity transactions in process as of that date. There were no reserves for unfunded commitments as of December 31, 2020, and all amounts in process were fully funded in the first quarter of 2021.

*Equity Method Investee Commitments*

GWG Holdings has contributed $16.2 million in cash to FOXO to date through December 31, 2020, and is committed to contribute an additional $3.8 million to the entity through October 2021, all of which was contributed by such date.

**Credit Risk and Interest Rate Risk**

We review the credit risk associated with our portfolio of life insurance policies when estimating its fair value. In evaluating the policies' credit risk, we consider insurance company solvency, credit risk indicators, economic conditions, ongoing credit evaluations, and company positions. We attempt to manage our credit risk related to life insurance policies typically by purchasing policies issued only from companies with an investment-grade credit rating by either Standard & Poor's, Moody's, or A.M. Best Company. As of December 31, 2020, 96.3% of our life insurance policies, by face value benefits, were issued by companies that maintained an investment-grade credit rating (BBB or better) by Standard & Poor's.

The LNV Credit Facility, NF Credit Facility, and Beneficient's debt due to related parties are floating-rate financings. In addition, our ability to offer interest and dividend rates that attract capital (including in our continuous offering of L Bonds) is generally impacted by prevailing interest rates. Furthermore, while GWG Holdings' L Bond offering provides us with fixed-rate debt financing, our Debt Coverage Ratio is calculated in relation to the interest rate on all of our debt financing, exclusive of our Seller Trust L Bonds. Therefore, increases in interest rates impact our business by increasing our borrowing costs and reducing availability under our debt financing arrangements. Earnings from our life insurance portfolio are based upon the spread, if any, generated between the return on the portfolio and the total cost of our financing (excluding cost of

APP. 514

Page 70

financing for the Seller Trust L Bonds). As a result, increases in interest rates will reduce the earnings we expect to achieve from our investments in life insurance policies.

The ExAlt Trusts hold investments in alternative assets, which are exposed to risks related to markets, credit, currency, and interest rates. Currently, all of these alternative assets consist of private equity limited partnership interests, which are primarily denominated in the U.S. dollar, Euro, and Canadian dollar. The underlying portfolio companies primarily operate in the United States and Western Europe, with the largest percentage, based on NAV, operating in diversified financials, telecommunications services, food and staples retailing, and software and services industries.

As of December 31, 2020, and 2019, all of the ExAlt Loans, which are eliminated upon consolidation, are collateralized by the cash flows originating from the ExAlt Trusts' investments in alternative assets. These ExAlt Loans are a key determinant in income (loss) allocable to Beneficient's equity holders, and thus GWG Holdings. Beneficient has underwriting procedures and utilizes market rates. Additionally, Beneficient has purchased put options to protect the net asset value of the interests in alternative assets held by certain of the ExAlt Trusts from impacts associated with a broad market downturn. Finally, the ExAlt Trusts applicable trust agreements allow for excess cash flows from a collective pool of alternative assets to be utilized to repay the ExAlt Loans they have with Beneficient when cash flows from the customer's originally alternative assets are not sufficient to repay the outstanding principal, interest, and fees.

**Guarantee and Collateral Provisions of L Bonds**

GWG Holdings' L Bonds are offered and sold under a registration statement declared effective by the SEC, and GWG Holdings has issued Seller Trust L Bonds under the L Bond Supplemental Indenture, as described in Note 10 to the consolidated financial statements. The L Bonds and Seller Trust L Bonds are secured by substantially all the assets of GWG Holdings and a pledge of all of GWG Holdings' common stock held by BCC and AltiVerse Capital Markets, L.L.C., a limited liability company owned by an entity related to the Ben Initial Investors, including Brad K. Heppner (GWG Holdings' former Chairman, who served in such capacity from April 26, 2019 to June 14, 2021, and Beneficient's current Chief Executive Officer and Chairman), and an entity related to Thomas O. Hicks (one of Beneficient's current directors and a former director of GWG Holdings) ("AltiVerse"). Together, BCC and AltiVerse represent approximately 12% of our outstanding common stock, and are guaranteed by GWG Life and a corresponding grant of a security interest in substantially all the assets of GWG Life. As a guarantor, GWG Life has fully and unconditionally guaranteed the payment of principal and interest on the L Bonds and Seller Trust L Bonds. GWG Life's equity in GWG Life Trust, DLP IV, and DLP V Holdings serves as collateral for GWG Holdings' L Bond and Seller Trust L Bond obligations. As of December 31, 2020, substantially all of our life insurance policies were held by DLP IV, DLP V, or GWG Life Trust. The policies held by DLP IV are not direct collateral for the L Bonds as such policies are pledged under the LNV Credit Facility.

On December 31, 2020, GWG Holdings, GWG Life and Bank of Utah, as trustee, entered into the Liquidity Bond Supplemental Indenture that provides for the issuance of two series of Liquidity Bonds, as described in Note 10 to the consolidated financial statements. The Liquidity Bonds are issued by GWG Life and guaranteed by GWG Holdings. The Liquidity Bonds are secured by the same collateral as the other L Bonds.

Furthermore, regarding the obligations of GWG Holdings and its subsidiaries as of December 31, 2020:

(1) The Seller Trust L Bonds are secured obligations of GWG Holdings, ranking junior to all senior debt of GWG Holdings and pari passu in right of payment and in respect of collateral with all L Bonds of GWG Holdings (see Note 10 to the accompanying audited consolidated financial statements). Payments under the Seller Trust L Bonds are guaranteed by GWG Life. The assets exchanged in connection with the Beneficent transaction are available as collateral for all holders of the L Bonds and Seller Trust L Bonds. Specifically, the Common Units are held by GWG Holdings and the Commercial Loan is held by GWG Life.

(2) The Liquidity Bonds are secured obligations of GWG Life, ranking junior to all senior debt of GWG Holdings or GWG Life and pari passu in right of payment and in respect of collateral with all L Bonds of GWG Holdings. Payments under the Liquidity Bonds are guaranteed by GWG Holdings.

(3) The terms of the LNV Credit Facility require that we maintain a significant excess of pledged collateral value over the amount outstanding on the LNV Credit Facility at any given time. Any excess after satisfying all amounts owing under the LNV Credit Facility is available as collateral for the L Bonds (including the Seller Trust L Bonds and Liquidity Bonds).

APP. 516

APP. 517

Table of Contents

The following represents summarized financial information as of December 31, 2020 and December 31, 2019, with respect to the financial position, and for the year ended December 31, 2020, with respect to results of operations. The tables present summarized financial information of GWG Holdings and GWG Life on a combined basis after elimination of (i) intercompany transactions and balances among such entities, including GWG Holdings' interest in GWG Life, and (ii) equity in earnings from and investments in any subsidiary that is a non-guarantor (including DLP IV, DLP V, GWG Life Trust and Beneficient). The summarized financial information has been prepared in accordance with Rule 13-01 of Regulation S-X.

Summarized Balance Sheet Information (in thousands, not intended to balance):

| | December 31, 2020 | | (As Restated) December 31, 2019 | |
|---|---|---|---|---|
| **Assets**[1] | | | | |
| Cash, cash equivalents and restricted cash | $ | 65,556 | $ | 60,365 |
| Financing receivables from affiliates | | — | | 67,153 |
| Other assets | | 6,366 | | 8,659 |
| Total assets | $ | 71,922 | $ | 136,177 |
| **Liabilities** | | | | |
| L Bonds | $ | 1,246,902 | $ | 926,638 |
| Seller Trust L Bonds | | 366,892 | | 366,892 |
| Interest and dividends payable | | 12,086 | | 12,491 |
| Accounts payable and accrued expenses | | 7,347 | | 3,093 |
| Deferred tax liabilities | | 51,469 | | 71,855 |
| Total liabilities | $ | 1,684,696 | $ | 1,380,969 |
| **Equity** | | | | |
| Redeemable preferred stock and Series 2 redeemable preferred stock | $ | 156,833 | $ | 201,891 |

_____

[1] Assets exclude: i) GWG Holdings' investment in GWG Life of $1.2 billion as of both December 31, 2020 and December 31, 2019; ii) GWG Holdings' aggregate investments in non-obligor subsidiaries of $643.1 million and $439.4 million as of December 31, 2020 and December 31, 2019, respectively; and iii) GWG Life's aggregate investments in and loans to non-obligor subsidiaries of $1.2 billion as of both December 31, 2020 and December 31, 2019.

Summarized Statement of Operations Information (in thousands):

| | Year Ended December 31, 2020 | |
|---|---|---|
| **Total revenues** | $ | 100,518 |
| | | |
| Interest expense | | 125,012 |
| Other expenses | | 38,155 |
| **Total expenses** | | 163,167 |
| **Loss before income taxes and preferred dividends** | | (62,649) |
| Income tax expense (benefit) | | (19,849) |
| Preferred dividends | | 14,630 |
| **Net loss** | $ | (57,430) |

Table of Contents

**Debt Coverage Ratio**

GWG Holdings' L Bond borrowing covenants require us to maintain a Debt Coverage Ratio not to exceed 90%. The Debt Coverage Ratio is calculated by dividing the sum of our total interest-bearing indebtedness (other than Excluded Indebtedness defined and described in note 5 to the table below) by the sum of our cash, cash equivalents, restricted cash, life insurance policy benefits receivable, the net present value of the life insurance portfolio, and, without duplication, the value of all of our other assets as reflected on our most recently available balance sheet prepared in accordance with GAAP.

GWG Holdings' and GWG Life's investments in Beneficient and GWG Life's ownership interests in the holding companies that own DLP IV and DLP VI, which own substantially all of the life insurance portfolio, secure our obligations under the L Bonds, and are illiquid assets. Although GWG Holdings and GWG Life own debt and equity securities of Beneficient, a substantial majority of the net assets of Beneficient are currently represented by goodwill, an intangible asset. The calculation of Beneficient's goodwill required the utilization of significant estimates and management judgment, as discussed elsewhere in this 2020 Form 10-K. As a result, the carrying value of those assets as reflected in our consolidated financial statements may not necessarily reflect the current market price for those assets, especially in the event of a bulk or distressed sale. Proceeds from L Bond sales will be primarily used for the repayment of L Bond maturities, interest payments and other operating expenses of GWG Holdings, and as otherwise specified in the prospectus for the L Bonds. GWG Holdings may also continue to use a portion of the proceeds from L Bond sales to make investments in Beneficient. Because advances may be used by Beneficient for working capital purposes, such investments may not increase the tangible assets securing the L Bonds. If the trustee for the L Bonds were forced to sell all or a portion of the collateral securing them, there can be no assurance that the trustee would be able to sell them for the prices at which we have recorded them in our consolidated financial statements, and the trustee might be forced to sell them at significantly lower prices.

The discount rate we use for the net present value of our life insurance portfolio for this calculation may not be the same discount rate we use for our GAAP valuation and is not necessarily reflective of the amount we could realize upon a sale of the portfolio (dollars in thousands):

|  | December 31, 2020 | (As Restated) December 31, 2019 |
|---|---|---|
| Life insurance portfolio policy benefits | $ 1,900,715 | $ 2,020,973 |
| Discount rate of future cash flows[1] | 7.46 % | 7.55 % |
| Net present value of life insurance portfolio policy benefits | $ 822,859 | $ 826,196 |
| All cash and cash equivalents (including restricted cash) | 106,282 | 81,780 |
| Life insurance policy benefits receivable, net | 14,334 | 23,031 |
| Financing receivables from affiliates[2] | 180,080 | 258,402 |
| Investments in Common Units[2][3][4] | 438,194 | 313,443 |
| Investment in Preferred Series A Subclass 1 Unit Account[4] | 319,030 | 319,030 |
| Investment in Preferred Series C Unit Account[4] | 195,578 | — |
| Option Agreement and other assets [3] | 20,082 | 54,365 |
| Total Coverage [5] | $ 2,096,439 | $ 1,876,247 |
| Total Indebtedness [5] | $ 1,519,107 | $ 1,146,646 |
| Debt Coverage Ratio | 72.46 % | 61.10 % |

---

(1) Weighted-average interest rate paid on indebtedness, excluding that of Seller Trust L-Bonds, as required under the indenture governing the L Bonds.

(2) The Promissory Note, previously included in financing receivables from affiliates, was converted to Preferred Series C on September 30, 2020.

(3) The Option Agreement was exercised and converted to Common Units effective August 11, 2020.

(4) Generally represents the value of the investment in Beneficient as of December 31, 2019 for investments that existed at the time of the change-in-control transaction, or the value at the time of purchase for investments that were made subsequent to December 31, 2019. As noted above, these are illiquid investments that are carried at book basis and not market value.

(5) Total Coverage excludes the assets of Beneficient. Total Indebtedness is equal to the total liabilities balance of GWG Holdings (excluding the liabilities of Beneficient) as of December 31, 2020, other than Excluded Indebtedness. "Excluded Indebtedness" means

APP. 520

Table of Contents

indebtedness that is payable at GWG Holdings' option in capital stock of GWG Holdings or securities mandatorily convertible into or exchangeable for capital stock of GWG Holdings, or any indebtedness that is reasonably expected to be converted or exchanged, directly or indirectly, into capital stock of GWG Holdings. This change in the definition of the Debt Coverage Ratio was defined in Amendment No. 2 to the Amended and Restated Indenture entered into as of December 31, 2019 (see Note 10 to the accompanying audited consolidated financial statements).

As of December 31, 2020 and 2019, we were in compliance with the Debt Coverage Ratio. Based on a preliminary analysis, the Company expects the Debt Coverage Ratio to be approximately 82% as of September 30, 2021.

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.**

Not applicable.

Page 74

Table of Contents

**ITEM 8. CONSOLIDATED FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Stockholders
GWG Holdings, Inc. and Subsidiaries

## Opinion on the financial statements

We have audited the accompanying consolidated balance sheet of GWG Holdings, Inc. (a Delaware corporation) and subsidiaries (the "Company") as of December 31, 2020 and the related consolidated statements of operations, cash flows and changes in stockholders' equity for the year ended December 31, 2020, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2020, and the results of its operations and its cash flows for the year ended December 31, 2020, in conformity with accounting principles generally accepted in the United States of America.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of December 31, 2020, based on criteria established in the 2013 *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), and our report dated November 5, 2021 expressed an adverse opinion.

## Going concern

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the financial statements, the Company has incurred significant losses from operations, experienced negative cash flows from operations and experienced delays in executing its business plans. The Company expects to be dependent on raising equity or other financing to fund ongoing operations and to execute its business plans. These conditions, along with other matters as set forth in Note 1, raise substantial doubt about the Company's ability to continue as a going concern.

Management's plans in regard to these matters are also described in Note 1. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

## Basis for opinion

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audit included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audit provides a reasonable basis for our opinion.

## Critical audit matters

The critical audit matter communicated below arises from the current period audit of the financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which they relate.

*Fair value of investments in life insurance policies*

As described further in Note 5 and Note 7 to the financial statements, the fair value of the Company's investments in life insurance policies is determined as the net present value of the life insurance portfolio's future expected cash flows (policy

APP. 522

F-1

Table of Contents

benefits to be received and required future premium payments) that incorporates life expectancy estimates obtained when the policy was purchased and current discount rate assumptions. We identified fair value of investments in life insurance policies as a critical audit matter.

The principal considerations for our determination that fair value of investments in life insurance policies is a critical audit matter are that this asset is valued using unobservable inputs that require a high level of management judgment and fluctuations to such inputs could have a material impact on the financial statements. As a result, obtaining sufficient appropriate audit evidence related to the fair value measurement required significant auditor judgement to evaluate the reasonableness of unobservable inputs used in the valuation.

Our audit procedures related to the fair value of investments in life insurance policies included the following, among others:

- We tested the design and operating effectiveness of relevant controls over management's process relating to the fair value measurement of investments in life insurance policies.
- With the assistance of external valuation specialists, we considered results of the Company's actual-to-expected ("A2E") mortality cash flow experience, available third-party service provider reports for future premium streams, available market information, other available information to further corroborate overall valuation and sampled life insurance policy information in order to evaluate the following key fair value inputs:
  - Life expectancy, utilizing portfolio mortality multiplier methodology which is updated based on the A2E analysis
  - Estimated premium payments
  - Age of insured
  - Face amount of policies
  - Discount rate

/s/ GRANT THORNTON LLP

We have served as the Company's auditor since 2020.

Dallas, Texas
November 5, 2021

F-2

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholders
GWG Holdings, Inc. and Subsidiaries

### Opinion on internal control over financial reporting

We have audited the internal control over financial reporting of GWG Holdings, Inc. (a Delaware corporation) and subsidiaries (the "Company") as of December 31, 2020, based on criteria established in the 2013 *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). In our opinion, because of the effect of the material weaknesses described in the following paragraphs on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of December 31, 2020, based on criteria established in the 2013 *Internal Control— Integrated Framework* issued by COSO.

A material weakness is a deficiency, or combination of control deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. The following material weaknesses have been identified and included in management's assessment.

As of December 31, 2020, the design and operating effectiveness of controls over the selection, application and review of the implementation of accounting policies were not sufficient to ensure amounts recorded and disclosed were fairly stated in accordance with GAAP. This material weakness resulted in the Restatement.

During the year ended December 31, 2020, the Company identified a material weakness in internal controls over the quarterly income tax provision process, which included the measurement of the valuation allowance against the Company's deferred tax assets.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the consolidated financial statements of the Company as of and for the year ended December 31, 2020. The material weaknesses identified above were considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2020 consolidated financial statements, and this report does not affect our report dated November 5, 2021 which expressed a qualified opinion on those financial statements.

### Basis for opinion

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

### Definition and limitations of internal control over financial reporting

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

APP. 525

F-3

Table of Contents

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ GRANT THORNTON LLP

Dallas, Texas
November 5, 2021

F-4

# REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholders of
GWG Holdings, Inc. and Subsidiaries

## Opinion on the Financial Statements

We have audited the accompanying consolidated balance sheet of GWG Holdings, Inc. and Subsidiaries (the "Company") as of December 31, 2019, and the related consolidated statements of operations, changes in stockholders' equity, and cash flows for the year ended December 31, 2019, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2019, and the results of their operations and their cash flows for the year ended December 31, 2019, in conformity with accounting principles generally accepted in the United States of America.

## Restatement and Other Corrections

As discussed in Notes 2 and 21 to the consolidated financial statements, the 2019 consolidated financial statements have been restated to correct misstatements.

## Basis for Opinion

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. Our audit included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audit provides a reasonable basis for our opinion.

/s/ WHITLEY PENN LLP

We served as the Company's auditor from 2019 to 2020.

Dallas, Texas

March 27, 2020, except for Notes 2, 6, and 21, as to which the date is November 5, 2021.

F-5

4/11/22, 12:17 PM        gwgh-20201231

Case 3:22-cv-00410-B  Document 32-1  Filed 04/19/22  Page 529 of 1031  PageID 701

Table of Contents

## GWG HOLDINGS, INC. AND SUBSIDIARIES
## CONSOLIDATED BALANCE SHEETS
(in thousands, except share and per share data)

|  | | December 31, | |
|---|---|---|---|
|  | | **2020** | **2019** |
| ASSETS | | | *(As Restated)* |
| Cash and cash equivalents | $ | 85,249 | $ 82,284 |
| Restricted cash | | 38,911 | 33,506 |
| Investment in life insurance policies, at fair value | | 791,911 | 796,039 |
| Life insurance policy benefits receivable, net | | 14,334 | 23,031 |
| Investment in alternative assets, at fair value | | 221,894 | 342,012 |
| Equity method investments | | 8,582 | 1,761 |
| Other assets | | 36,326 | 29,398 |
| Goodwill | | 2,367,750 | 2,367,750 |
| TOTAL ASSETS | $ | 3,564,957 | $ 3,675,781 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | | |
| LIABILITIES | | | |
| Senior credit facility with LNV Corporation | $ | 193,730 | $ 174,390 |
| L Bonds | | 1,246,902 | 926,638 |
| Seller Trust L Bonds | | 272,104 | 366,892 |
| Debt due to related parties | | 76,260 | 153,086 |
| Interest and dividends payable | | 24,080 | 16,516 |
| Repurchase option | | — | 61,664 |
| Accounts payable and accrued expenses | | 26,505 | 27,892 |
| Deferred tax liability, net | | 51,469 | 71,855 |
| TOTAL LIABILITIES | | 1,891,050 | 1,798,933 |
| Redeemable noncontrolling interests | | 1,233,093 | 1,269,654 |
| STOCKHOLDERS' EQUITY | | | |
| REDEEMABLE PREFERRED STOCK | | | |
| (par value $0.001; shares authorized 100,000; shares outstanding 56,855 and 84,636; liquidation preference of $57,187 and $85,130 as of December 31, 2020 and 2019, respectively) | | 46,241 | 74,023 |
| SERIES 2 REDEEMABLE PREFERRED STOCK | | | |
| (par value $0.001; shares authorized 150,000; shares outstanding 129,887 and 147,164; liquidation preference of $130,645 and $148,023 as of December 31, 2020 and 2019, respectively) | | 110,592 | 127,868 |
| COMMON STOCK | | | |
| (par value $0.001; shares authorized 210,000,000; shares issued and outstanding, 33,094,664 and 33,033,793 as of December 31, 2020 and 2019, respectively) | | 33 | 33 |
| Common stock in treasury, at cost, 12,337,264 shares as of December 31, 2020 and 2,500,000 shares as of December 31, 2019 | | (67,406) | (24,550) |
| Additional paid-in capital | | 274,023 | 233,106 |
| Accumulated deficit | | (251,111) | (97,196) |
| TOTAL GWG HOLDINGS STOCKHOLDERS' EQUITY | | 112,372 | 313,284 |
| Noncontrolling interests | | 328,442 | 293,910 |
| TOTAL STOCKHOLDERS' EQUITY | | 440,814 | 607,194 |
| TOTAL LIABILITIES & STOCKHOLDERS' EQUITY | $ | 3,564,957 | $ 3,675,781 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-6

APP. 529

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
(in thousands, except per share data)

| | Year Ended December 31, | |
| --- | ---: | ---: |
| | **2020** | **2019** |
| REVENUE | | *(As Restated)* |
| Gain on life insurance policies, net | $ 49,598 | $ 75,320 |
| Investment income, net | 44,106 | — |
| Interest income | 1,594 | 15,646 |
| Other income | 29,073 | 1,310 |
| TOTAL REVENUE | 124,371 | 92,276 |
| EXPENSES | | |
| Interest expense | 154,616 | 114,844 |
| Employee compensation and benefits | 146,363 | 28,309 |
| Legal and professional fees | 30,075 | 12,824 |
| Other expenses | 18,227 | 15,896 |
| TOTAL EXPENSES | 349,281 | 171,873 |
| LOSS BEFORE INCOME TAXES | (224,910) | (79,597) |
| INCOME TAX EXPENSE (BENEFIT) | (16,390) | 71,865 |
| LOSS BEFORE LOSS FROM EQUITY METHOD INVESTMENTS | (208,520) | (151,462) |
| Loss from equity method investments | (7,319) | (4,077) |
| Gain on consolidation of equity method investment (see Note 4) | — | 242,953 |
| NET INCOME (LOSS) | (215,839) | 87,414 |
| Net loss attributable to noncontrolling interests | 61,924 | — |
| Less: Preferred stock dividends | 14,630 | 16,943 |
| NET INCOME (LOSS) ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ (168,545) | $ 70,471 |
| NET INCOME (LOSS) PER COMMON SHARE | | |
| Basic | $ (6.01) | $ 2.13 |
| Diluted | $ (6.01) | $ 2.06 |
| WEIGHTED AVERAGE COMMON SHARES OUTSTANDING | | |
| Basic | 28,063,268 | 33,016,007 |
| Diluted | 28,063,268 | 35,219,442 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-7

Table of Contents

## GWG HOLDINGS, INC. AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF CASH FLOWS (in thousands)

| | Year Ended December 31, | |
| --- | ---: | ---: |
| | **2020** | **2019** |
| | | *(As Restated)* |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net income (loss) | $ (215,839) | $ 87,414 |
| Adjustments to reconcile net income (loss) to net cash flows used in operating activities: | | |
| Change in fair value of investment in life insurance policies | (34,114) | (49,015) |
| Investment income, net | (44,106) | — |
| Amortization of deferred financing and issuance costs | 19,760 | 13,804 |
| Amortization and depreciation of long-lived assets | 1,171 | — |
| Accretion of discount on financing receivables from affiliate | — | (1,720) |
| Provision for uncollectible policy benefit receivable | — | 153 |
| Return on investments in alternative assets | 3,683 | — |
| Non-cash interest income, including interest paid-in-kind and accretion of purchase discount | (283) | — |
| Non-cash interest expense | 2,343 | — |
| Loss from equity method investments | 7,319 | 4,077 |
| Loss on fair value of put options | 7,757 | — |
| Equity-based compensation | 110,840 | 1,732 |
| Forfeiture of vested equity-based compensation | (36,267) | — |
| Gain on consolidation of equity method investment | — | (242,953) |
| Deferred income taxes | (16,927) | 71,855 |
| Change in operating assets and liabilities: | | |
| Life insurance policy benefits receivable | 8,697 | (6,683) |
| Accrued interest on financing receivables | — | (6,913) |
| Other assets | (599) | (5,056) |
| Accounts payable and accrued expenses | 3,123 | (8,297) |
| Interest and dividends payable | 1,042 | (1,228) |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (182,400) | (142,830) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Investment in life insurance policies | — | (32,367) |
| Return of investment for matured life insurance policies | 38,186 | 33,265 |
| Purchases of fixed assets | (3,281) | — |
| Contributions to equity method investments | (14,140) | (12,388) |
| Business combination consideration, net of cash and restricted cash acquired | — | (45,020) |
| Return of investments in alternative assets | 20,394 | — |
| Investments in alternative assets | (8,378) | — |
| Financing receivables from affiliate issued | — | (65,000) |
| Investment in put options | (14,775) | — |
| NET CASH FLOWS PROVIDED BY (USED IN) INVESTING ACTIVITIES | 18,006 | (121,510) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Borrowings on senior debt | 28,530 | 50,133 |
| Repayments of senior debt and debt due to related parties | (85,505) | (23,756) |
| Payments for deferred financing and issuance costs for senior debt and debt due to related parties | (3,207) | (2,042) |
| Proceeds from issuance of L Bonds | 440,195 | 403,397 |
| Payments for L Bonds issuance costs | (27,904) | (25,284) |
| Payments for redemption of L Bonds | (110,691) | (116,809) |
| Payment of employee taxes on stock awards | (1,554) | — |
| Purchase of noncontrolling interest | (1,195) | — |
| Issuance of common stock | 8 | 59 |
| Payments for redemption of redeemable preferred stock | (45,058) | (14,061) |
| Payments for equity issuance costs | (633) | — |
| Preferred stock dividends | (14,630) | (16,943) |
| Tax distribution to noncontrolling interest | (5,592) | — |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 172,764 | 254,694 |
| NET INCREASE (DECREASE) IN CASH, CASH EQUIVALENTS AND RESTRICTED CASH | 8,370 | (9,646) |
| **CASH, CASH EQUIVALENTS AND RESTRICTED CASH** | | |
| BEGINNING OF PERIOD | 115,790 | 125,436 |
| END OF PERIOD | $ 124,160 | $ 115,790 |

F-8

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS — CONTINUED**
(in thousands)

| | Year Ended December 31, | |
|---|---|---|
| | **2020** | **2019** |
| **SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION** | | |
| Interest paid | $ 131,516 | $ 102,202 |
| Premiums paid, including prepaid | $ 70,243 | $ 68,467 |
| **NON-CASH INVESTING AND FINANCING ACTIVITIES** | | |
| L Bonds: Conversion of accrued interest and commissions payable to principal | $ 1,911 | $ 1,760 |
| Distribution payable to noncontrolling interest (see Note 12) | 738 | — |
| Noncash issuance of noncontrolling interest (see Note 12) | 5,978 | — |
| Liquidity Bonds, net of financing costs (see Note 10) | 392 | — |
| Collateral Swap (See Note 1): | | |
| Exchange of alternative assets for GWG Holdings' Seller Trust L Bonds | 94,788 | — |
| Exchange of alternative assets for GWG Holdings' common stock | 42,856 | — |
| Deemed capital contribution from related party | 46,770 | — |
| Adjustment to noncontrolling interest | 3,444 | — |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-9

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY (As Restated)**
(in thousands, except per share data)

APP. 533

gwgh-20201231

| | Redeemable Preferred Stock Shares | Redeemable Preferred Stock | Common Shares | Common Stock (par) | Additional Paid-in Capital | Accumulated Deficit | Treasury Stock | Total GWG Holdings Stockholders' Equity | Noncontrolling Interests | Total Stockholders' Equity | Redeemable Noncontrolling Interests |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Balance, December 31, 2018** | 245,883 | $ 215,973 | 33,018,161 | $ 33 | $ 249,662 | $ (184,610) | $ — | $ 281,058 | $ — | $ 281,058 | $ — |
| Net income (As Restated) | — | — | — | — | — | 87,414 | — | 87,414 | — | 87,414 | — |
| Issuance of common stock | — | — | 58,382 | — | 439 | — | — | 439 | — | 439 | — |
| Repurchase of common stock | — | — | (42,750) | — | (362) | — | — | (362) | — | (362) | — |
| Common stock in treasury | — | — | (2,500,000) | — | — | — | (24,550) | (24,550) | — | (24,550) | — |
| Redemption of redeemable preferred stock | (14,083) | (14,082) | — | — | (1) | — | — | (14,083) | — | (14,083) | — |
| Preferred stock dividends | — | — | — | — | (16,943) | — | — | (16,943) | — | (16,943) | — |
| Stock-based compensation | — | — | — | — | 311 | — | — | 311 | — | 311 | — |
| Recognition of noncontrolling interests (As Restated) | — | — | — | — | — | — | — | — | 293,910 | 293,910 | 1,269,654 |
| **Balance, December 31, 2019 (As Restated)** | 231,800 | $ 201,891 | 30,533,793 | $ 33 | $ 233,106 | $ (97,196) | $ (24,550) | $ 313,284 | $ 293,910 | $ 607,194 | $ 1,269,654 |
| Net loss | — | — | — | — | — | (153,915) | — | (153,915) | (30,955) | (184,870) | (30,969) |
| Issuance of common stock | — | — | 60,871 | — | 533 | — | — | 533 | — | 533 | — |
| Common stock in treasury (Note 1) | — | — | (9,837,264) | — | — | — | (42,856) | (42,856) | — | (42,856) | — |
| Redemption of redeemable preferred stock | (45,058) | (45,058) | — | — | — | — | — | (45,058) | — | (45,058) | — |
| Preferred stock dividends | — | — | — | — | (14,630) | — | — | (14,630) | — | (14,630) | — |
| Deemed capital contribution from related party (Note 1) | — | — | — | — | 46,770 | — | — | 46,770 | — | 46,770 | — |
| Tax distribution to noncontrolling interest | — | — | — | — | — | — | — | — | — | — | (5,592) |
| Equity-based compensation | — | — | — | — | 180 | — | — | 180 | 110,738 | 110,918 | — |
| Forfeiture of vested equity-based compensation | — | — | — | — | — | — | — | — | (36,267) | (36,267) | — |
| Tax withholding for employee restricted equity units | — | — | — | — | — | — | — | — | (1,521) | (1,521) | — |
| Distributions payable to noncontrolling interest | — | — | — | — | — | — | — | — | (738) | (738) | — |
| Noncash issuance of noncontrolling interest | — | — | — | — | — | — | — | — | 5,978 | 5,978 | — |
| Adjustment to noncontrolling interest for change in ownership of Common Units (Note 1) | — | — | — | — | 8,064 | — | — | 8,064 | (8,064) | — | — |
| Reduction to noncontrolling interest for Beneficient treasury (Note 1) | — | — | — | — | — | — | — | — | (3,444) | (3,444) | — |
| Purchase of noncontrolling interest | — | — | — | — | — | — | — | — | (1,195) | (1,195) | — |
| **Balance, December 31, 2020** | 186,742 | $ 156,833 | 20,757,400 | $ 33 | $ 274,023 | $ (251,111) | $ (67,406) | $ 112,372 | $ 328,442 | $ 440,814 | $ 1,233,093 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-10

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## (1) Nature of Business

### Organizational Structure

GWG Holdings, Inc. ("GWG Holdings") conducts its life insurance secondary market business through a wholly-owned subsidiary, GWG Life, LLC ("GWG Life"), and GWG Life's wholly-owned subsidiaries, GWG Life Trust, GWG DLP Funding IV, LLC ("DLP IV"), GWG DLP Funding V Holdings, LLC ("DLP V Holdings"), and GWG DLP Funding Holdings VI, LLC ("DLP VI Holdings"). DLP V Holdings is the sole member of GWG DLP Funding V, LLC ("DLP V"). DLP VI Holdings is the sole member of GWG DLP Funding VI, LLC ("DLP VI").

In addition, GWG Holdings has exposure to indirect interests in loans collateralized by cash flows from alternative assets. Such loans are made and held by certain of the operating subsidiaries of The Beneficient Company Group, L.P. ("Ben LP," including all of the subsidiaries it may have from time to time — "Beneficient"). These loans are made to certain of the ExAlt Trusts (defined below), which are consolidated subsidiaries of Ben LP and thus, such loans are eliminated in consolidation for financial reporting purposes. The ExAlt Trusts are comprised of the Custody Trusts, Collective Trusts, LiquidTrusts and Funding Trusts, (collectively, the "ExAlt Trusts"). Ben LP's general partner is Beneficient Management, L.L.C. ("Beneficient Management"). Prior to December 31, 2019, GWG Holdings' investment in Beneficient was accounted for as an equity method investment. On December 31, 2019, as more fully described below, Beneficient became a consolidated subsidiary of GWG Holdings. As also further described in Note 23, on August 13, 2021, GWG Holdings and Ben LP, and Beneficient Company Holdings, L.P. ("BCH") entered into a non-binding term sheet (the "Term Sheet") that outlines a series of transactions that, if completed, will result in, among other things, (i) GWG Holdings receiving certain proposed enhancements to its investments in Beneficient; (ii) GWG Holdings no longer having the right to appoint directors of the Board of Directors of Beneficient Management; and (iii) Beneficient no longer being a consolidated subsidiary of GWG Holdings. The Term Sheet is part of ongoing efforts by management and the Board of Directors of GWG Holdings to maximize the value of GWG Holdings' and GWG Life's investment in Beneficient.

Ben LP is the general partner of BCH and owns 100% of the Class A Subclass A-1 and A-2 Units of BCH. BCH is the holding company that directly or indirectly receives all active and passive income of Beneficient and allocates that income among the partnership interests issued by BCH. As of December 31, 2020, BCH has issued general partnership Class A Units (Subclass A-1 and A-2), Class S Ordinary Units, Class S Preferred Units, FLP Units (Subclass 1 and Subclass 2), Preferred Series A Subclass 1 Unit Accounts, and Preferred Series C Unit Accounts. On July 15, 2020, BCH amended its limited partnership agreement by executing that certain 5th Amended and Restated Limited Partnership Agreement ("LPA") of BCH to allow for the issuance of Preferred Series A Subclass 0 Unit Accounts ("Preferred A.0"), which are expected to be issued once certain conditions are met (as discussed in more detail below).

GWG Holdings also has a financial interest in FOXO Technologies Inc. ("FOXO", formerly FOXO BioScience LLC), which, through its wholly-owned subsidiaries FOXO Labs Inc. ("FOXO Labs", formerly, Life Epigenetics Inc.) and FOXO Life LLC ("FOXO Life", formerly, youSurance General Agency, LLC), seeks to commercialize epigenetic technology for the longevity industry and offer life insurance directly to customers utilizing epigenetic technology. Although we have a financial interest in FOXO, we do not have a controlling financial interest because another party is the majority shareholder of the voting class of securities. Therefore, we account for GWG Holdings' ownership interest in FOXO as an equity method investment.

All of the aforementioned entities are legally organized in the state of Delaware, other than GWG Life Trust, which was formed under the laws of the state of Utah, and certain of the ExAlt Trusts, which were formed under the laws of the state of Texas. Unless the context otherwise requires or we specifically so indicate, all references in this report to "we," "us," "our," "our Company," "GWG," or the "Company" refer to GWG Holdings together, in each case, with its subsidiaries. Our headquarters are located at 325 N. St. Paul Street, Suite 2650, Dallas, Texas 75201.

### Nature of Business

GWG Holdings, through its wholly-owned subsidiary GWG Life, purchased life insurance policies in the secondary market and has built a large, actuarially diverse portfolio of life insurance policies backed by highly rated life insurance companies. These policies were purchased between April 2006 and November 2019 and were funded primarily through sales of L Bonds, as discussed in Note 10. Beginning in 2018, GWG Holdings consummated a series of transactions with Beneficient as part of

APP. 535

F-11

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

a strategic decision to reorient its business and increase capital allocated toward providing liquidity products to a broader range of alternative assets through investments in Beneficient. GWG Holdings completed the transactions with Beneficient to provide the Company with a significant increase in assets and common stockholders' equity as well as the opportunity for a diversified source of future earnings from our exposure to the alternative asset industry. We believe that GWG Holdings' and GWG Life's investments in Beneficient and the other strategies we are pursuing, including continuing to pursue opportunities in the life insurance industry, will transform GWG Holdings from a niche provider of liquidity to owners of life insurance policies to a diversified provider of financial products and services with exposure to a broad range of alternative assets.

We believe that Beneficient's operations will generally produce higher risk-adjusted returns than those we can achieve from life insurance policies acquired in the secondary market; however, returns on equity in life settlements, especially with the current availability of financings on favorable terms, appear to be an attractive option to diversify our exposure to alternative assets, and we have begun exploring the feasibility of acquiring such policies. Furthermore, although we believe that our portfolio of life insurance policies is a meaningful component of a growing diversified alternative asset portfolio, we continue to explore strategic alternatives for our life insurance portfolio aimed at maximizing its value, including a possible sale, refinancing, recapitalization, partnership, reinsurance guarantees, life insurance operations or other transactions involving of our life insurance portfolio, as well as pursuing other alternatives to increase our exposure to alternative assets. These operations are in addition to allocating capital to provide liquidity to holders of a broader range of alternative assets, which we currently provide through GWG Holdings' and GWG Life's investments in Beneficient.

Beneficient is a financial services company based in Dallas, Texas that markets an array of liquidity and trust administration products to alternative asset investors primarily comprised of mid-to-high-net-worth individuals having a net worth between $5 million and $30 million ("MHNW") and small-to-midsize institutional investors and family offices with less than $1 billion in investable assets ("STMIs"). One of Beneficient's founders, Brad K. Heppner ("Ben Founder") serves as Chairman and Chief Executive Officer of Beneficient and previously served from April 26, 2019 to June 14, 2021 as Chairman of GWG Holdings. Ben LP plans to offer its products and services through its five operating subsidiaries, which include (i) Ben Liquidity, (ii) Ben Custody Admin, (iii) Ben Insurance, (iv) Ben Markets and (v) Beneficient USA (each operating subsidiary is further defined below). Ben Liquidity plans to operate a trust company that is a Kansas Technology Enabled Fiduciary Financial Institutions ("TEFFI") authorized to serve as an alternative asset custodian, trustee and lender with statutory powers granted for each of these activities and permitting Ben Liquidity to provide fiduciary financing for certain of its customer liquidity transactions. Ben Custody Admin plans to operate a Texas trust company that is being organized to provide its customers with certain administrative, custodial and trustee products and specialized services focused on alternative asset investors. Ben Insurance has been chartered as a Bermuda based insurance company that plans to offer certain customized insurance products and services covering risks relating to owning, managing and transferring alternative assets. Ben Markets is in the regulatory process for acquiring a captive registered broker-dealer that would conduct certain of its activities attendant to offering a suite of products and services from the Beneficient family of companies. Certain of Ben LP's operating subsidiary products and services involve or are offered to certain of the ExAlt Trusts (defined below), which are consolidated subsidiaries of Ben LP for financial reporting purposes (such trusts are and may individually be referred to as Custody Trusts, Collective Trusts, LiquidTrusts, and Funding Trusts). Beneficient USA employs a substantial majority of the executives and staff for Beneficient's operating subsidiaries to which Beneficient USA provides administrative and technical services.

Beneficient's primary operations, which commenced on September 1, 2017, consist of offering its liquidity and trust administration services to its customers, primarily through certain of Ben LP's operating subsidiaries, Ben Liquidity, L.L.C and its subsidiaries (collectively, "Ben Liquidity") and Ben Custody Admin, L.L.C. and its subsidiaries (collectively, "Ben Custody Admin"), respectively. Ben Liquidity offers simple, rapid and cost-effective liquidity products to its customers through the use of customized trust vehicles, (such trusts, the ExAlt Trusts), that facilitate the exchange of a customer's alternative assets for consideration using a unique financing structure (such structure and process, the "ExAlt Plan™"). The ExAlt Plan trademark was developed by Beneficient as a brand of liquidity and trust administration services designed for alternative asset investors, specifically MHNW and STMIs to "Ex"it "Alt"ernatives. A subsidiary of Ben Liquidity makes loans (each, an "ExAlt Loan") to certain of the ExAlt Trusts, which employ the loan proceeds to acquire agreed upon consideration, which certain of the ExAlt Trusts deliver to customers in exchange for their alternative assets. Ben Liquidity generates interest and fee income earned in connection with the ExAlt Loans, which are collateralized by a portion of the cash flows from the exchanged alternative assets (the "Collateral"). Ben Custody Admin currently provides trust administration services to the trustees of certain of the ExAlt Trusts that own the exchanged alternative asset following liquidity transactions for fees payable quarterly. The Collateral supports the repayment of the ExAlt Loans plus any related interest and fees and trust administration service fees. Under the applicable trust and other agreements, certain charities are

APP. 537

F-12

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

the ultimate beneficiaries of the ExAlt Trusts (the "Non-Controlling Interest Holders"). As ultimate beneficiaries of prior transactions, for every $0.95 paid to the lender (e.g., subsidiaries of Ben LP) on the ExAlt Loans, $0.05 is also paid to certain of the Non-Controlling Interest Holders. For periods following 2020, future Non-Controlling Interest Holders are structured to be paid $0.025 for every $0.975 paid to the fiduciary financial lender (e.g., subsidiaries of Ben LP) of the ExAlt Loans. Since Ben LP consolidates the ExAlt Trusts, Ben LP's operating subsidiary's ExAlt Loans and related interest and fee income are eliminated in the presentation of our consolidated financial statements but are recognized for purposes of the allocation of income (loss) to Beneficient's equity holders.

Prior to January 1, 2021, Ben LP operated primarily through certain of its subsidiaries, that included (i) Beneficient Capital Company, L.L.C. ("BCC"), which offered liquidity products; (ii) Beneficient Administration and Clearing Company, L.L.C. ("BACC"), which provided services for private fund and trust administration; and (iii) other entities, including the ExAlt Trusts.

On December 31, 2020, a series of restructuring transactions occurred to better position certain of Ben LP's subsidiaries for ongoing operations and future products and services, to capitalize PEN Indemnity Insurance Company, Ltd. ("Pen") and to meet certain requirements of the Texas Department of Banking. These transactions had no impact to the consolidated financial statements. In connection with these transactions, BCC transferred all of its assets, which included, among other assets, its ExAlt Loans receivable, and liabilities, which included, among other liabilities, loans payable with respect to secured loans with HCLP Nominees, L.L.C., held as of December 31, 2020, to BCH. In order to capitalize Pen and enable it to offer insurance products and services to cover risks attendant to owning and managing alternative assets following approval from the Bermuda Monetary Authority (the "BMA"), BCH contributed to Pen certain of such ExAlt Loans receivable with an aggregate carrying value equal to $129.2 million. Likewise, BACC transferred all of its assets, which included its rights to perform fund trust administration services under certain trust and other agreements, and liabilities to BCH, which will perform such services until a Texas trust company charter is issued or the Kansas TEFFI trust company becomes operational.

Subsequent to December 31, 2020, Ben LP operates primarily through its business line operating subsidiaries, which provide, or will provide, Beneficient's existing and planned products and services. These subsidiaries include (i) Ben Liquidity, which offers liquidity products; (ii) Ben Custody Admin, which provides services for fund and trust administration; (iii) Ben Insurance L.L.C., including its subsidiaries (collectively, "Ben Insurance"), which intends to offer insurance products and services covering risks attendant to owning, managing and transferring alternative assets; (iv) Ben Markets, L.L.C., including its subsidiaries (collectively, "Ben Markets"), which intends to provide broker-dealer services in connection with offering Beneficient's liquidity products and services; and (vi) other entities, including the ExAlt Trusts, which operate for the benefit of the Non-Controlling Interest Holders. Beneficient's financial products and services are presently offered through Ben Liquidity and Ben Custody Admin, and Beneficient plans to expand its capabilities under Ben Custody Admin and provide products and services through Ben Insurance and Ben Markets in the future.

Beneficient's existing and planned products and services are designed to provide liquidity and trust solutions, support the tax and estate planning objectives of its MHNW customers, facilitate asset diversification or provide administrative management and reporting solutions tailored to the goals of investors of alternative investments.

*Beneficient's Regulatory Developments*

In April 2021, the Kansas Legislature adopted, and the governor of Kansas signed into law, a bill that would allow for the chartering and creation of Kansas trust companies, known as TEFFIs, that provide fiduciary financing (e.g., lending to ExAlt Trusts), custodian and trustee services in all capacities pursuant to statutory fiduciary powers, to investors and other participants in the alternative assets market, as well as the establishment of alternative asset trusts. The legislation became effective on July 1, 2021, and designates an operating subsidiary of Ben LP, Beneficient Fiduciary Financial ("BFF"), as the pilot trust company under the TEFFI legislation. A conditional trust charter was issued by the Kansas Bank Commissioner to Beneficient on July 1, 2021 as discussed further in Note 23. Under the pilot program, Beneficient will not be authorized to exercise its fiduciary powers as a TEFFI until the earlier of the date the Kansas Bank Commissioner promulgates applicable rules and regulations or December 31, 2021. The bill also permits the Kansas Bank Commissioner to request a six-month extension of the pilot program period, which could delay Beneficient's permission to exercise its fiduciary powers under the charter until July 1, 2022. In order to devote their time to serving as directors of the Beneficient TEFFI trust company, the directors of GWG Holdings who serve on the new TEFFI trust company Board of Directors resigned their membership, effective June 14, 2021, on GWG Holdings' Board of Directors, which the Company believes is the highest and best use of

APP. 539

F-13

APP. 540

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

their available time and skills and will support the development of the Beneficient TEFFI trust company and the successful execution of Beneficient's business plan.

Also, Beneficient's charter application for custodian and trustee services remains in process at the Texas Department of Banking. If the charter is issued, the trust company would serve as custodian and trustee to one or more ExAlt Trusts. Similar or the same services may also be provided by Beneficient's Kansas trust company TEFFI. Also, a subsidiary of Ben Insurance, Pen has applied for regulatory approval from the BMA to write fiduciary liability policies for managers and investors in alternative asset funds to cover losses from contractual indemnification and exculpation provisions arising under the governing documents of such funds. Further, on March 26, 2021, a Ben LP subsidiary, Beneficient Capital Markets, L.L.C ("Beneficient Capital Markets") filed a Form BD with the Securities and Exchange Commission ("SEC") to commence its application for broker-dealer registration. Upon registration and admittance as a Financial Industry Regulatory Authority ("FINRA") member, Beneficient Capital Markets will conduct activities attendant to offering Beneficient's products and services.

When the Kansas TEFFI trust company is authorized to exercise its fiduciary powers, Beneficient expects to be able to expand its operations and close an increased number of liquidity transactions. Additionally, once BMA regulatory approval is obtained and Beneficient Capital Markets is admitted as a FINRA member, Beneficient anticipates being able to offer its full suite of products and services.

**The Exchange Transaction**

On December 28, 2018 (the "Final Closing Date"), we completed a series of strategic exchanges of assets among GWG Holdings, GWG Life, Ben LP and certain trusts, each identified as an Exchange Trust formed during 2017 and 2018 (such trusts collectively, the "Seller Trusts", which are a related party but are not among Ben LP's consolidated trusts), pursuant to a Master Exchange Agreement among the parties (the "Exchange Transaction"). As a result of the Exchange Transaction, a number of securities were exchanged between the parties, including the following securities as of the Final Closing Date: the Seller Trusts acquired GWG Holdings' L Bonds due 2023 (the "Seller Trust L Bonds") in the aggregate principal amount of $366.9 million; the Seller Trusts acquired 27,013,516 shares of GWG Holdings' common stock; GWG Holdings acquired 40,505,279 common units of Ben LP (the "Common Units"); and GWG Holdings acquired the right to obtain additional Common Units or other property that would be received by a holder of Preferred Series A Subclass 1 Unit Accounts of BCH pursuant to an option issued by Ben LP (the "Option Agreement"). In addition, in connection with the Exchange Transaction, Ben LP, as borrower, entered into a commercial loan agreement (the "Commercial Loan Agreement") with GWG Life, as lender, providing for a loan in a principal amount of $192.5 million as of the Final Closing Date (the "Commercial Loan").

*Description of the Assets Exchanged*

*Seller Trust L Bonds*

On August 10, 2018, in connection with the initial transfer of the Exchange Transaction, GWG Holdings, GWG Life and Bank of Utah, as trustee, entered into a Supplemental Indenture (the "L Bond Supplemental Indenture") to the Amended and Restated Indenture dated as of October 23, 2017 (the "Amended and Restated Indenture"). GWG Holdings entered into the L Bond Supplemental Indenture to add and modify certain provisions of the Amended and Restated Indenture necessary to provide for the issuance of the Seller Trust L Bonds. The maturity date of the Seller Trust L Bonds is August 9, 2023. The Seller Trust L Bonds bear interest at 7.5% per year. Interest is payable monthly in cash.

As the second anniversary of the Final Closing Date has passed, the holders of the Seller Trust L Bonds now have the right to cause GWG Holdings to repurchase, in whole but not in part, the Seller Trust L Bonds held by such holder. The repurchase may be paid, at GWG Holdings' option, in the form of cash, a pro rata portion of (i) the outstanding principal amount and accrued and unpaid interest under the Commercial Loan, and (ii) Common Units, or a combination of cash and such property.

The Seller Trust L Bonds are senior secured obligations of GWG Holdings, ranking junior only to all senior debt of GWG Holdings, pari passu in right of payment and in respect of collateral with all "L Bonds" of GWG Holdings, and senior in right of payment to all subordinated indebtedness of GWG Holdings. See Note 10 for additional discussion of the outstanding debt of GWG Holdings. Payments under the Seller Trust L Bonds are guaranteed by GWG Life (see Item 7. *Management's Discussion and Analysis of Financial Condition and Results of Operations*).

APP. 541

F-14

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

As result of the Collateral Swap (discussed and defined below) on September 30, 2020, $94.8 million of Seller Trusts L Bonds are eliminated upon consolidation.

*Commercial Loan*

The $192.5 million principal amount under the Commercial Loan is due on August 9, 2023; however, it is extendable for two five-year terms. Ben LP's obligations under the Commercial Loan are unsecured.

The principal amount of the Commercial Loan bears interest at 5.0% per year. From and after the Final Closing Date, one-half of the interest, or 2.5% per year, is due and payable monthly in cash, and one-half of the interest, or 2.5% per year, accrues and compounds annually on each anniversary date of the Final Closing Date and becomes due and payable in full in cash on the maturity date.

In accordance with the L Bond Supplemental Indenture governing the issuance of the Seller Trust L Bonds, upon a redemption event or at the maturity date of the Seller Trust L Bonds, GWG Holdings, at its option, may use the outstanding principal amount of the Commercial Loan, and accrued and unpaid interest thereon, as repayment consideration of the Seller Trust L Bonds.

The Commercial Loan and its related interest are eliminated upon consolidation.

*Option Agreement*

In connection with the Exchange Transaction, GWG Holdings entered into the Option Agreement with Ben LP. The Option Agreement gave GWG Holdings the option to acquire the number of Common Units or other property that would be received by the holder of Preferred Series A Subclass 1 Unit Accounts of BCH pursuant to an option issued by Ben LP, if such holder were converting on that date. There was no exercise price and GWG Holdings could exercise the option at any time until December 27, 2028, at which time the option automatically settled.

Effective August 11, 2020, as a result of the Exchange Agreement entered into by the parties on December 31, 2019 (discussed below), and the mutual agreement of the parties, the Option Agreement was exercised under the provisions of the Option Agreement. As such, GWG Holdings received $57.5 million of Common Units at a price per unit equal to $12.50 per unit. The exercise of the Option Agreement had no impact on the Company's consolidated financial statements as it is eliminated in consolidation.

*Common Units of Ben LP*

In connection with the Exchange Transaction, the Seller Trusts and Beneficient delivered to GWG Holdings 40,505,279 Common Units. These units represented an approximate 89.9% interest in the Common Units as of the Final Closing Date (although, on a fully diluted basis, GWG Holdings' ownership interest in Common Units would be reduced significantly below a majority of those issued and outstanding). These amounts eliminate upon consolidation.

**Purchase and Contribution Agreement**

On April 15, 2019, Jon R. Sabes, the former Chief Executive Officer and a former director of GWG Holdings, and Steven F. Sabes, the former Executive Vice President and a former director of GWG Holdings, entered into a Purchase and Contribution Agreement (the "Purchase and Contribution Agreement") with, among others, Ben LP. Under the Purchase and Contribution Agreement, Jon and Steven Sabes agreed to transfer all 3,952,155 of the shares of GWG Holdings' outstanding common stock held directly or indirectly by them to BCC (a subsidiary of Ben LP) and AltiVerse Capital Markets, L.L.C. ("AltiVerse"). AltiVerse is a limited liability company owned by an entity related to Beneficient's initial investors (the "Ben Initial Investors"), including Brad K. Heppner (GWG Holdings' former Chairman, who served in such capacity from April 26, 2019 to June 14, 2021, and Beneficient's current Chief Executive Officer and Chairman), and an entity related to Thomas O. Hicks (one of Beneficient's current directors and a former director of GWG Holdings). GWG Holdings was not a party to the Purchase Agreement; however, the closing of the transactions contemplated by the Purchase and Contribution Agreement (the "Purchase and Contribution Transaction") were subject to certain conditions that were dependent upon GWG Holdings taking, or refraining from taking, certain actions. The closing of the Purchase and Contribution Transaction occurred on April 26, 2019.

APP. 543

APP. 544

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

In connection with such closing, BCC and AltiVerse executed and delivered a Consent and Joinder to the Amended and Restated Pledge and Security Agreement dated October 23, 2017 by and among GWG Holdings, GWG Life, Messrs. Jon and Steven Sabes and the Bank of Utah, which provides that the shares of GWG Holdings' common stock acquired by BCC and AltiVerse pursuant to the Purchase and Contribution Agreement will continue to be pledged as collateral security for GWG Holdings' obligations owing in respect of the L Bonds and Seller Trust L Bonds.

**Promissory Note - ExAlt Trusts**

On May 31, 2019, GWG Life entered into a Promissory Note (the "Promissory Note"), made by Jeffrey S. Hinkle and Dr. John A. Stahl, not in their individual capacity but solely as trustees of certain of The LT-1 LiquidTrust, The LT-2 LiquidTrust, The LT-5 LiquidTrust, The LT-7 LiquidTrust, The LT-8 LiquidTrust, and The LT-9 LiquidTrust, (collectively, the "Borrowers"). Pursuant to the terms of the Promissory Note, GWG Life funded a term loan to the Borrowers in an aggregate principal amount of $65.0 million (the "Loan"). The Loan was made pursuant to GWG's strategy to further diversify into alternative assets (beyond life insurance) and ancillary businesses and was intended to better position Beneficient's balance sheet, working capital and liquidity profile to satisfy anticipated Texas Department of Banking regulatory requirements. The Loan bears interest at 7.0% per annum, with interest payable at maturity, and matures on June 30, 2023. As of December 31, 2019, the Borrowers became consolidated subsidiaries of GWG Holdings as a result of the Investment Agreement (described below). Accordingly, the Promissory Note and related accrued interest, are eliminated upon consolidation as of that date.

On September 30, 2020, GWG Holdings, GWG Life, BCH, Ben LP, BCC, and the Borrowers entered into an agreement (the "Promissory Note Repayment") by which the parties agreed to repay the Promissory Note and any related accrued interest for a $75.0 million Preferred Series C Unit Account (the "Preferred C") of BCH that Ben LP issued to the Borrowers. The $75.0 million of Preferred C received by GWG Life was transferred to GWG Holdings upon execution of the Promissory Note conversion, which increased GWG Holdings' ownership percentage in Ben LP. As part of the agreement, if Beneficient has not received a trust company charter as of the one-year anniversary of the Promissory Note conversion, or if no trust company charter filing is still pending or in the process of being refiled, GWG Holdings would receive an additional $5.0 million of Preferred C. The carrying value of the Promissory Note on September 30, 2020, immediately prior to the transaction, net of a fair value adjustment and with accrued and unpaid interest thereon, was $65.1 million.

Other than the $8.1 million decrease to noncontrolling interest, which represents the required rebalancing of equity driven from the change in GWG Holdings' ownership percentage, any impacts of the Promissory Note conversion are eliminated upon consolidation.

**The Investment and Exchange Agreements**

On December 31, 2019, GWG Holdings obtained control over Ben LP pursuant to a Preferred Series A Unit Account and Common Unit Investment Agreement, by and among GWG Holdings, Ben LP, BCH, and Beneficient Management (the "Investment Agreement"), which resulted in the consolidation of GWG Holdings and Ben LP for accounting and financial reporting purposes.

Pursuant to the Investment Agreement, GWG Holdings transferred $79.0 million to Ben LP in return for 666,667 Common Units and a Preferred Series A Subclass 1 Unit Account of BCH.

In connection with the Investment Agreement, GWG Holdings obtained the right to appoint a majority of the board of directors of Beneficient Management, the general partner of Ben LP. As a result, GWG Holdings obtained control of Ben LP and began reporting the results of Ben LP and its subsidiaries on a consolidated basis beginning on the transaction date of December 31, 2019. See Note 4 for more details on the accounting for the consolidation. GWG Holdings' right to appoint a majority of the board of directors of Beneficient Management will terminate in the event (i) GWG Holdings' ownership of the fully diluted equity of Ben LP (excluding equity issued upon the conversion or exchange of Preferred Series A Unit Accounts of BCH held as of December 31, 2019 by parties other than GWG Holdings) is less than 25%, (ii) the Continuing Directors of GWG Holdings cease to constitute a majority of the board of directors of GWG Holdings, or (iii) certain bankruptcy events occur with respect to GWG Holdings. The term "Continuing Directors" means, as of any date of determination, any member of the board of directors of GWG Holdings who: (1) was a member of the board of directors of GWG Holdings on December 31, 2019; or (2) was nominated for election or elected to the board of directors of GWG

APP. 545

F-16

APP. 546

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Holdings with the approval of a majority of the Continuing Directors who were members of the board of directors of GWG Holdings at the time of such nomination or election.

Following the transaction, and as agreed upon in the Investment Agreement, GWG Holdings was issued an initial capital account balance for the Preferred Series A Subclass 1 Unit Account of $319.0 million. The other holders of the Preferred Series A Subclass 1 Unit Accounts are an entity related to the Ben Initial Investors and an entity related to one of Beneficient's directors who is also a former director of GWG Holdings (the "Related Account Holders"). The parties to the Investment Agreement agreed that the aggregate capital accounts of all holders of the Preferred Series A Subclass 1 Unit Accounts after giving effect to the investment by GWG Holdings was $1.6 billion. GWG Holdings' Preferred Series A Subclass 1 Unit Account is the same class of preferred security as held by the Related Account Holders. If the Related Account Holders exchange their Preferred Series A Subclass 1 Unit Accounts for securities of GWG Holdings, the Preferred Series A Subclass 1 Unit Account of GWG Holdings would be converted into Common Units (so neither GWG Holdings nor the founders would hold Preferred Series A Subclass 1 Unit Accounts).

Also, on December 31, 2019, in a transaction related to the Investment Agreement, GWG Holdings transferred its interest in the Preferred Series A Subclass 1 Unit Account to its wholly owned subsidiary, GWG Life.

In addition, on December 31, 2019, GWG Holdings, Ben LP and the holders of Common Units entered into an Exchange Agreement (the "Exchange Agreement") pursuant to which the holders of Common Units from time to time have the right, on a quarterly basis, to exchange their Common Units for common stock of GWG Holdings. The exchange ratio in the Exchange Agreement is based on the ratio of the capital account associated with the Common Units to be exchanged to the market price of GWG Holdings' common stock based on the volume weighted average price of GWG Holdings' common stock for the five consecutive trading days prior to the quarterly exchange date. The Exchange Agreement is intended to facilitate the marketing of Ben LP's products to holders of alternative assets.

**Preferred Series C Unit Purchase Agreement**

On July 15, 2020, GWG Holdings entered into a Preferred Series C Unit Purchase Agreement ("UPA") with Ben LP and BCH. The UPA was reviewed and approved by the then constituted independent Special Committee of the Board of Directors of GWG Holdings.

Pursuant to the UPA, and provided it has adequate liquidity, GWG Holdings has agreed to make capital contributions from time to time to BCH in exchange for Preferred Series C Unit Accounts of BCH during a purchasing period commencing on the date of the UPA and continuing until the earlier of (i) the occurrence of a Change of Control Event (as defined below) and (ii) the mutual agreement of the parties (the "Purchasing Period"). A "Change of Control Event" shall mean (A) the occurrence of an event that results in GWG Holdings' ownership of the fully diluted equity of Ben LP is less than 25%, the Continuing Directors (as defined below) of GWG Holdings cease to constitute a majority of the board of directors of GWG Holdings, or certain bankruptcy events occur with respect to GWG Holdings, and (B) the listing of Common Units on a national securities exchange (a "Public Listing"). The term "Continuing Directors" means, as of any date of determination, any member of the board of directors of GWG Holdings who: (1) was a member of the board of directors of GWG Holdings on December 31, 2019; or (2) was nominated for election or elected to the board of directors of GWG Holdings with the approval of a majority of the Continuing Directors who were members of the board of directors of GWG Holdings at the time of such nomination or election.

If, on or prior to the end of the Purchasing Period, a Public Listing occurs, the BCH Purchased Units shall be automatically exchanged for Common Units, or another unit of Ben LP, as the parties may mutually agree (the "Beneficient Units"), at the lower of (i) the volume-weighted average of the Beneficient Units for the 20 trading days following the Public Listing, and (ii) $12.75.

In addition, at any time following the Effective Date, all or some of the Preferred Series C Unit Accounts purchased under the UPA may be exchanged for Beneficient Units at the option of GWG Holdings (exercised by a special committee of the Board of Directors or, if such committee is no longer in place, the appropriate governing body of GWG Holdings); provided that, if GWG Holdings exchanges less than all of the Preferred Series C Unit Accounts purchased under the UPA, then, immediately after giving effect to such exchange, GWG Holdings shall be required to continue to hold Preferred Series C Unit Accounts with a capital account that is at least $10.0 million. The exchange price for such Beneficient Units shall be determined by third-party valuation agents selected by GWG Holdings and Beneficient.

APP. 547

APP. 548

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Contribution and Exchange Agreement**

On September 30, 2020, certain of the ExAlt Trusts (collectively, the "Participating ExAlt Trusts"), at the sole direction of John A. Stahl, independent trustee of each such trust, with the intention of protecting the value of certain assets of the Participating ExAlt Trusts underlying part of the Collateral portfolio, the Participating ExAlt Trusts entered into that certain Contribution and Exchange Agreement with certain of the Seller Trusts, (collectively, the Participating Exchange Trusts), each of which entered into such agreement at the direction of its applicable trust advisor and by and through its applicable corporate trustee (the "Contribution and Exchange Agreement). Under the Contribution and Exchange Agreement, the Participating Exchange Trusts agreed to exchange 9,837,264 shares of GWG Holdings' common stock valued at $84.6 million, 543,874 shares of Common Units valued at $6.8 million, and GWG Holdings' L Bonds due 2023 in the aggregate principal amount of $94.8 million to the Participating ExAlt Trusts for $94.3 million in net asset value of the alternative asset investments held by the Participating ExAlt Trusts. This transaction (the "Collateral Swap") resulted in GWG Holdings, after the effects of eliminations upon consolidation, recognizing an additional $42.9 million of treasury stock, $3.4 million of additional noncontrolling interest, and $46.8 million of a deemed capital contribution from a related party.

The Exchange Transaction, the Purchase and Contribution Transaction, the Promissory Note, the Investment and Exchange Agreements, the UPA, and the Collateral Swap, are referred to collectively as the "Beneficient Transactions."

**Going Concern**

To meet the Company's future capital needs, the Company may need to raise additional debt or equity financing. While the Company has historically been able to raise additional capital through issuance of debt and/or equity, the Company cannot guarantee that it will be able to secure additional financing or will otherwise be able to meet is ongoing obligations. These factors, in combination with the potential NASDAQ delisting and our current inability to sell L Bonds as discussed below under the heading "Liquidity and Capital Resources", our significant recurring losses from operations, negative cash flows from operations, delays in executing our business plans, and any potential negative outcome from the ongoing SEC investigation discussed elsewhere in this Form 10-K and in Note 18 to these consolidated financial statements, raise substantial doubt about the Company's ability to continue as a going concern within one year after these financial statements are issued.

The accompanying consolidated financial statements have been prepared on a going concern basis, which contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

**Liquidity and Capital Resources**

As of December 31, 2020, we had cash, cash equivalents, and restricted cash of $124.2 million. We generated net losses from operations for the years ended December 31, 2020 and 2019 totaling $208.5 million and $151.5 million. As of October 15, 2021, we had combined cash, cash equivalents, and restricted cash of $54.3 million. Besides funding operating expenditures, we are obligated to pay other items such as interest payments and debt maturities, and preferred stock dividends and redemptions.

We have historically financed our businesses primarily through a combination of L Bond sales, preferred stock sales, the LNV Credit Facility (as discussed further in Note 10) , and the NF Credit Facility (as discussed further in Note 23). We have also financed our business through proceeds from life insurance policy benefit receipts, cash distributions from the ExAlt Trusts' alternative asset portfolio, dividends and interest on investments, and Beneficient's debt due to related parties. We have traditionally used proceeds from these sources for policy acquisition, policy premiums and servicing costs, working capital and financing expenditures including paying principal, interest and dividends. We have also used proceeds to allocate capital to Beneficient; however, if Ben LP becomes an independent company pursuant to the terms of the Term Sheet discussed above and in Note 23, the Company expects that Ben LP would reduce its reliance on GWG Holdings to fund its operations and would raise future capital from other sources. Ben LP's capital raising efforts and participation in liquidity transactions may include the issuance of equity or debt of Ben LP or one of its subsidiaries, and the newly issued securities may be dilutive to GWG Holdings' and GWG Life's investments in Ben LP and BCH and may include preferential terms relative to GWG Holdings' and GWG Life's investments in Ben LP and BCH, as applicable.

F-18

APP. 549

Case 3:22-cv-00410-B Document 32-1 Filed 04/19/22 Page 550 of 1031 PageID 722

APP. 550

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

We currently fund our business primarily with debt that generally has a shorter duration than the duration of our long-term assets. The resulting asset/liability mismatch can result in a liquidity shortfall if we are unable to renew maturing short term debt or secure suitable additional financing. In such a situation, we could be forced to sell assets at less than optimal (distressed) prices. Substantially all of our life insurance policies are pledged as collateral under the LNV Credit Facility and the NF Credit Facility and we would not be able to dispose of them without compliance with the terms of those credit facilities. We heavily rely on GWG Holdings' L Bond offering to fund our business operations, including, among other things, interest and principal payments on the existing L Bonds and capital allocations to Beneficient. We temporarily suspended the offering of GWG Holdings' L Bonds, commencing April 16, 2021, as a result of our delay in filing certain periodic reports with the SEC, including this 2020 Form 10-K, and were required to seek alternative sources of capital.

As a result of the suspension of GWG Holdings' L Bond offering, on June 28, 2021, we pledged additional life insurance policies as collateral and received an additional advance of $51.2 million under the Third Amended Facility. Subsequently, on August 11 2021, we entered into the NF Credit Agreement and received a one-time advance of $107.6 million. Approximately $56.7 million of such advanced amount was used to pay off the remaining amount due, including interest and penalties, under the Third Amended Facility and the additional pledged life insurance policies used as collateral for the Third Amended Facility were released and pledged under the NF Credit Facility. Further, on September 7, 2021, DLP IV entered into the Fourth Amended Facility, that replaced the aforementioned Third Amended Facility. The Fourth Amended Facility resulted in an additional advance of $30.3 million from LNV Corporation, with no additional pledged collateral. All of the aforementioned transactions that occurred subsequent to December 31, 2020, are described in more detail in Note 23.

Primarily due to the current suspension of GWG Holdings' L Bond offering, the Company may require additional capital to continue its operations over the next twelve months if our ability to sell L Bonds dissipates, or if we are forced to suspend the L Bond offering. However, the Company may not be able to obtain additional borrowings under existing debt facilities or new borrowings with other third-party lenders. To the extent that GWG Holdings or its subsidiaries raise additional capital through the future issuance of debt, the terms of those debt securities may include terms that adversely affect the rights of our existing debt and/or equity holders or involve negative covenants that restrict GWG Holdings' ability to take specific actions, such as incurring additional debt or making additional investments in growing the operations of the Company. If GWG Holdings is unable to fund its operations and other obligations, or defaults on its debt, then the Company will be required to either i) sell assets to provide sufficient funding, ii) exercise our right to decline requests for early L Bond redemptions or redemptions of preferred stock, or iii) to raise additional capital through the sale of equity and the ownership interest of our equity holders may be diluted. Substantially all of our life insurance policies are pledged as collateral under the LNV Credit Facility and the NF Credit Facility and we would not be able to dispose of them without compliance with the terms of those credit facilities.

We anticipate recommencing the offering of GWG Holdings' L Bonds once we become current with our filing obligations and satisfy applicable NASDAQ listing requirements. Once we become current with our filing obligations with respect to the L Bonds, we may be limited in the origination channels in which we sell our L Bonds in the event that we are unable to meet the applicable NASDAQ listing requirements in a timely manner, which could result in the L Bonds no longer being "covered securities" for federal securities law purposes which would subject the offer and sale of L Bonds to potentially extensive state "blue sky" securities law requirements. If for any reason we are forced to suspend GWG Holdings' L Bond offering, are limited in our origination channels in which we sell our L Bonds, or demand for GWG Holdings' L bonds dissipates, our business would be adversely impacted and our ability to service and repay our debt obligations, much of which is short term, would be compromised, thereby negatively affecting our business prospects and viability.

We had $97.4 million borrowing base capacity, excluding any potential capacity for premiums and servicing costs, under the LNV Credit Facility as of December 31, 2020. Additional future borrowing base capacity for premiums and servicing costs, created as the premiums and servicing costs of pledged life insurance policies become due and by additional policy pledges to the facility, if any, exists under the LNV Credit Facility at the sole discretion of the lender. The LNV Credit Facility has certain financial and nonfinancial covenants, and we were in compliance with these debt covenants as of December 31, 2020, and December 31, 2019, and continue to be so as of the filing date of this report. Subsequent to December 31, 2020, we received additional advances through amendments to the LNV Credit Facility and entered in to the NF Credit Facility (as described in more detail above and in Note 23).

Beneficient is obligated to make debt payments totaling $74.5 million on certain outstanding borrowings through May 30, 2022 under the terms of the Amendment No. 1 to the Second Amended and Restated Credit Agreements as discussed further in Note 23. Primarily due to both the forthcoming debt payments under the Credit Agreement and Second Lien Credit

APP. 551

F-19

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Agreement and the anticipated deconsolidation of Beneficient from GWG Holdings, as discussed in Note 23, which is expected to result in reduced reliance by Beneficient on GWG Holdings to fund its operations, Beneficient will require additional liquidity to continue its operations over the next twelve months. We expect Beneficient to satisfy these obligations and fund its operations through anticipated operating cash flows, proceeds from distributions on the alternative assets portfolio, additional investments into Beneficient by GWG Holdings and/or other parties and, potentially refinancing with other third-party lenders some or all of the existing borrowings due prior to their maturity. Beneficient is currently in the process of raising additional equity, which is anticipated to close during the fourth quarter of 2021 and/or the first quarter of 2022.

Beneficient may not be able to refinance or obtain additional financing on terms favorable to the Company, or at all. To the extent that Beneficient raises additional capital through the future sale of equity or debt, the ownership interest of its existing equity holders may be diluted. The terms of these future equity or debt securities may include liquidation or other preferences that adversely affect the rights of its existing equity unitholders or involve negative covenants that restrict Beneficient's ability to take specific actions, such as incurring additional debt or making additional investments in growing its operations. If Beneficient defaults on these borrowings, then it will be required to either i) sell assets to repay these loans or ii) to raise additional capital through the sale of equity and the ownership interest of our equity holders may be diluted. Moreover, if Beneficient were to sell assets to avoid a default of these borrowings, then the price at which Beneficient sold such assets may not reflect the carrying value of those assets as reflected in our consolidated financial statements, especially in the event of a bulk or distressed sale.

On November 11, 2019, GWG Holdings contributed the common stock and membership interests of its then wholly-owned FOXO Labs and FOXO Life subsidiaries to FOXO in exchange for a membership interest in the entity. On November 13, 2020, FOXO BioScience LLC converted to a corporation and is now known as FOXO Technologies Inc. With the corporate conversion, GWG Holdings' previous membership interest in the LLC converted to preferred equity. GWG Holdings has contributed $16.2 million in cash to FOXO through December 31, 2020, and is committed to contribute an additional $3.8 million to the entity through October 2021, all of which was contributed by such date.

**(2) Summary of Significant Accounting Policies**

**Restatement** — The Company is restating its previously issued (i) consolidated balance sheet as of December 31, 2019, (ii) the consolidated statement of operations, (iii) the consolidated statement of changes in stockholders' equity, and (iv) the consolidated statement of cash flows for the year ended December 31, 2019, included in its Annual Report on Form 10-K for the year ended December 31, 2019, (the "Restatement"). The Restatement also impacted each of the quarters for the periods beginning with GWG Holdings, Inc.'s consolidation with The Beneficient Company Group, L.P. ("Ben LP," including all of the subsidiaries it may have from time to time — "Beneficient") as of December 31, 2019 through the quarter ended September 30, 2020.

The impact of the Restatement is included in this 2020 Form 10-K, and is more specifically described in Notes 21 and 22. Additionally, the impacts of the Restatement have been reflected throughout the financial statements, including the applicable footnotes.

**Other Corrections** — In addition to the Restatement items, the Company has corrected other items, which had been previously identified and determined to be immaterial pursuant to Accounting Standards Codification ("ASC") Topic 250, *Accounting Changes and Error Corrections* and Staff Accounting Bulletin ("SAB") No. 99, *Materiality*. While these other adjustments are both quantitatively and qualitatively immaterial, individually and in the aggregate, because we are correcting for the Restatement items, we have decided to correct these other adjustments as well.

Specifically, the Company reassessed its valuation allowance against its deferred tax assets and determined it will no longer utilize the reversal of a temporary difference related to the Company's preferred equity ownership in Beneficient, until such time as the preferred equity is no longer constrained, as a source of income to realize existing deferred tax assets related to the net operating loss and Section 163(j) limitations. The net deferred tax liability presented in the Company's consolidated balance sheets is specifically related to GWG Life's investment in the Preferred Series A Subclass 1 Unit Accounts resulting from the Investment Agreement described in Note 1. The disposition of this investment is constrained by the Pledge and Security Agreement in favor of the holders of the L Bonds of GWG Holdings. As such, the timing of recognition of the necessary taxable income related to this investment and the future reversal of this temporary difference cannot be predicted. The changes in the valuation allowance are reflected in the restatement tables presented in Notes 21 and 22.

APP. 553

APP. 554

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Basis of Presentation** — The consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP").

**Principles of Consolidation** — The consolidated financial statements include the accounts of GWG Holdings, Inc. and its subsidiaries. All material intercompany balances and transactions have been eliminated upon consolidation. Noncontrolling interests have been recorded for minority ownership in entities that are not wholly owned and are presented in compliance with the provisions of the *Noncontrolling Interest in Subsidiary* subsections of the Accounting Standards Codification ("ASC").

The Company has interests in various entities including, but not limited to, corporations and limited partnerships. For each such entity, the Company evaluates its ownership interest to determine whether the entity is a variable interest entity ("VIE") and, if so, whether it is the primary beneficiary of the VIE. The Company would consolidate any entity for which it was the primary beneficiary, regardless of its ownership or voting interests. Upon inception of a variable interest or the occurrence of a reconsideration event, the Company makes judgments in determining whether entities in which it invests are VIEs. If so, the Company makes judgments to determine whether it is the primary beneficiary and is thus required to consolidate the entity. Ownership interests in entities for which the Company has significant influence that are not consolidated under the Company's consolidation policy are accounted for as equity method investments.

The entities for which the ExAlt Plan Trusts hold an ownership interest are investment companies (i.e., funds) under ASC 946. Thus, the investments in non-investment companies made by these funds are accounted for in accordance with ASC 946 and are not subject to consolidation or the disclosure requirements of ASC 810. Moreover, further consolidation provisions of ASC 946 are not applicable to Beneficient since these investment companies do not have an investment in an operating entity that provides services to the investment company or to Beneficient.

Related party transactions between the Company and its equity method investees have not been eliminated.

**Use of Estimates** — The preparation of our consolidated financial statements in conformity with GAAP requires management to make significant estimates and assumptions affecting the reported amounts of assets and liabilities at the date of the consolidated financial statements, as well as the reported amounts of revenue during the reporting period. Management regularly evaluates estimates and assumptions, which are based on current facts, historical experience, management's judgment, and various other factors that we believe to be reasonable under the circumstances. Our actual results may differ materially and adversely from our estimates. Material estimates that are particularly susceptible to change, in the near term, relate to: (1) determining the assumptions used in estimating the fair value of our investments in life insurance policies, (2) determining the grant date fair value for equity-based compensation awards, (3) determination of the allowance for loan losses as an input to the allocation of income (loss) to Beneficient's equity holders, and (4) evaluation of potential impairment of goodwill and other intangibles. Periodically, we make significant estimates in assessing the fair value of assets acquired and consideration given in return for those assets, which are used to establish the initial recorded values of such assets in accordance with ASC 805, *Business Combinations*. Under ASC 805, the consideration paid in an asset acquisition is allocated among the assets acquired based on their relative fair values at acquisition date. In relation to the Investment and Exchange Agreements, relative fair values obtained from a third-party valuation firm were used to calculate the amounts recorded for the assets acquired and liabilities assumed at their acquisition dates as more fully described in Note 4.

**Cash and Cash Equivalents** — We consider cash in demand deposit accounts and temporary investments purchased with an original maturity of three months or less to be cash equivalents. We maintain our cash and cash equivalents with highly rated financial institutions. The balances in our bank accounts may exceed Federal Deposit Insurance Corporation limits. We periodically evaluate the risk of exceeding insured levels and may transfer funds as we deem appropriate.

Cash, cash equivalents and restricted cash on our consolidated statements of cash flows include cash and cash equivalents and restricted cash of $85.2 million and $38.9 million and $82.3 million and $33.5 million as of December 31, 2020 and 2019, respectively. See Note 3 for a discussion of restrictions on cash.

**Investment in Life Insurance Policies, at Fair Value** — ASC 325-30, *Investments in Insurance Contracts*, permits a reporting entity to account for its investments in life insurance policies using either the investment method or the fair value method. We elected to use the fair value method to account for our life insurance policies. We initially record our purchase of life insurance policies at the purchase price, which is the amount paid for the policy, inclusive of all direct external fees and costs associated with the purchase. At each subsequent reporting period, we re-measure the investment at fair value in its

APP. 555

F-21

*Table of Contents*

## GWG HOLDINGS, INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

entirety and recognize the change in fair value as unrealized gain or loss in the current period, net of premiums paid, within gain (loss) on life insurance policies, net in our consolidated statements of operations.

We also recognize realized gain (or loss) from a life insurance policy upon one of the two following events: (1) our receipt of notice or verified mortality of the insured; or (2) our sale of the policy (upon filing of change-of-ownership forms and receipt of payment). In the case of mortality, the gain (or loss) we recognize is the difference between the policy benefits and the carrying value of the policy once we determine that collection of the policy benefits is reasonably assured. In the case of a policy sale, the gain (or loss) we recognize is the difference between the sale price and the carrying value of the policy on the date we receive sale proceeds.

Life insurance premium payments are considered operating cash flows and are included in the net income (loss) line item in the consolidated statements of cash flows. The portion of proceeds received from policy maturities that represents the carrying value of the policy is reported in return of investment for matured life insurance policies in the consolidated statements of cash flows.

**Life Insurance Policy Benefits Receivable, Net** — Our policy benefit receivables represent amounts due from insurance carriers for claims submitted on matured life insurance policies. Policy benefit receivables are recorded at the policy benefit amounts less reserves for estimated uncollectible amounts. Uncollectible policy benefits can result from challenges by the insurance carrier to the legal validity of the policy, typically related to the concept of insurable interest, or from liquidity or solvency problems at the insurance carrier (although policy benefits are senior to any other obligations of a carrier).

We reserve for policy benefits when it becomes probable that we will not collect the full amount of the policy benefit. The reserve requirements are based on the best facts available to us and are re-evaluated and adjusted as additional information becomes available. Uncollectible policy benefits are written off against the reserves when it is deemed that a policy amount is uncollectible. As of December 31, 2020 and 2019, there was no allowance for uncollectible life insurance policy benefits receivable.

**Other Assets** — Other assets consist of investment in put options, fixed assets, intangible assets, prepaid expenses, operating lease right-of-use assets, and other receivables.

**Investment in Alternative Assets, at Fair Value** — Investments in alternative assets represent the ownership interests in alternative assets, predominately private equity funds, held by certain of the ExAlt Trusts, either through direct ownership or a beneficial interest. ASC Topic 820, *Fair Value Measurement,* permits, as a practical expedient, to estimate the fair value of these types of investments based on the net asset value ("NAV") per share, or its equivalent, if the NAV of such investments is calculated in a manner consistent with the measurement principles of ASC 946, *Financial Services – Investment Companies*. The Company has elected to use NAV as a practical expedient to measure the fair value of these investments. These investments are valued based on the most recent available information, which typically has a delay due to the timing of financial information received from the individual investments. Accordingly, in determining the value of the investment, we may consider whether adjustments to the NAV are necessary in certain circumstances in which management is aware of material events that affect the value of the investments during the intervening period. Changes in NAV are recorded within investment income (loss) on our consolidated statements of operations.

**Equity Method Investments** — Other than the investments in alternative assets, which use NAV as a practical expedient, the Company accounts for investments in common stock or in-substance common stock in which we have the ability to exercise significant influence, but do not own a controlling financial interest, under the equity method of accounting. Investments within the scope of the equity method of accounting are initially measured at cost, including the cost of the investment itself and direct transaction costs incurred to acquire the investment. After the initial recognition of the investment at cost, we recognize income and losses from our investment by adjusting upward or downward the balance of our equity method investment on our consolidated balance sheet with such adjustments, if any, flowing through earnings (loss) from equity method investment on our consolidated statement of operations, in all cases adjusted to reflect amortization of basis differences, if any, and the elimination of intercompany gains and losses, if any. Cash distributions received from equity method investees are recorded as reductions to the investment balance and classified in the statement of cash flows using the cumulative earnings approach.

Equity method investments are reviewed for impairment whenever events or changes in circumstances indicate the carrying amount of the investment might not be recoverable. These circumstances can include, but are not limited to evidence that we

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 558 of 1031     PageID 730

APP. 558

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

do not have the ability to recover the carrying amount, the inability of the investee to sustain earnings, a current fair value of the investment that is less than the carrying amount, and other investors ceasing to provide support or reducing their financial commitment to the investee. If the fair value of the investment is less than the carrying amount, and the investment will not recover in the near term, an other-than-temporary impairment may exist. We recognize a loss in value of an investment deemed other-than-temporary in the period the conclusion is made.

When we do not expect financial information of our equity method partner companies to be consistently available on a timely basis, the Company reports its share of the income or loss of the equity method investment on a one-quarter lag.

For more information on equity method investments, see Note 8.

**Leases** — The Company adopted ASC 842, *Leases*, on January 1, 2019. The Company leases certain real estate for its office premises that are classified as operating leases. We assess whether an arrangement is a lease at inception. Leases with an initial term of twelve months or less are not recorded in the balance sheet. We have elected the practical expedient to not separate lease and non-lease components for all assets. Operating lease assets and operating lease liabilities are calculated based on the present value of the future minimum lease payments over the lease term at the lease start date. As our leases do not provide an implicit rate, we use our incremental borrowing rate based on the information available at the lease start date in determining the present value of future payments. The operating lease asset is increased by any lease payments made at or before the lease start date and reduced by lease incentives and initial direct costs incurred. The lease term includes options to renew or terminate the lease when it is reasonably certain that we will exercise that option. The exercise of lease renewal options is at our sole discretion. The depreciable life of lease assets and leasehold improvements are limited by the lease term, unless there is a transfer of title or purchase option reasonably certain of exercise. Lease expense for operating leases is recognized on a straight-line basis over the lease term.

**Equity-based Compensation** — The Company measures and recognizes compensation expense for all equity-based payments at fair value on the grant date over the requisite service period. New shares of common are issued for stock option exercises. GWG Holdings uses the Black-Scholes option pricing model to determine the fair value of stock options and stock appreciation rights. For restricted stock grants (including restricted stock units), fair value is determined as of the closing price of GWG Holdings' common stock on the date of grant.

The determination of fair value of equity-based payment awards on the date of grant is affected by our stock price and a number of subjective variables. These variables include, but are not limited to, the expected stock price volatility over the term of the awards, the expected duration of the awards, the results of a probability-weighted discounted cash flow analysis and observable transactions. We account for the effects of forfeitures as they occur. The risk-free interest rate is based on the U.S. Treasury rates at the date of grant with maturity dates approximately equal to the expected life at grant date. Volatility is based on the standard deviation of the average continuously compounded rate of return of five selected companies.

As it is not publicly traded, Beneficient uses various methods to determine the grant date fair value of its equity-based compensation awards, as more fully described in Note 12.

Equity-based compensation expense is recorded in employee compensation and benefits in the consolidated statements of operations.

**Deferred Financing and Issuance Costs** — Loans advanced to us under the second amended and restated senior credit facility with LNV Corporation (as amended from time to time, "LNV Credit Facility"), as described in Note 10, are reported net of financing costs, including issuance costs, sales commissions and other direct expenses, which are amortized using the straight-line method over the term of the facility. The L Bonds, as described in Note 10, are reported net of financing costs, which are amortized using the effective interest method over the term of those borrowings. Beneficient's first and second lien credit agreements, as described in Note 10, are reported net of financing costs, which are amortized using the effective interest method over the term of those borrowings.

Selling and issuance costs of Redeemable Preferred Stock ("RPS") and Series 2 Redeemable Preferred Stock ("RPS 2"), described in Note 11, are netted against additional paid-in capital, until depleted, and then against the outstanding balance of the preferred stock. The offerings of GWG Holdings' RPS and RPS 2 closed in March 2017 and April 2018, respectively. There were no issuance costs associated with the August 2018 issuance of the Series B Convertible Preferred Stock.

APP. 560

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Business Combinations** — The Company includes the results of operations of the businesses that it acquires from the acquisition date. In allocating the purchase price of a business combination, in accordance with ASC 805, *Business Combinations*, the Company records all assets acquired and liabilities assumed at fair value, and the fair value of any noncontrolling interests, with the excess of the purchase price over the aggregate fair values recorded as goodwill. ASC Topic 820, *Fair Value Measurements*, defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. The Company determines the estimated fair values after review and consideration of relevant information, including discounted cash flows, quoted market prices and estimates made by management. The fair value assigned to identifiable intangible assets acquired is based on estimates and assumptions made by management at the time of the acquisition. The Company adjusts the preliminary purchase price allocation, as necessary, during the measurement period of up to one year after the acquisition closing date as it obtains more information as to facts and circumstances existing as of the acquisition date. Acquisition-related costs are recognized separately from the business combination and are expensed as incurred.

**Goodwill and Other Intangibles** — Goodwill of $2.4 billion and intangible assets of $3.4 million were recognized as a result of the business combination related to the Investment and Exchange Agreements on December 31, 2019 (see Note 4). Intangible assets are included in other assets in the Company's consolidated balance sheets. The Company accounts for goodwill and intangible assets in accordance with ASC Topic 350, *Intangibles – Goodwill and Other*. The amount of goodwill recorded is based on the fair value of the acquired entity at the time of acquisition. Management performs goodwill and intangible asset impairment testing annually, as of October 1, or when events occur, or circumstances change that would more likely than not indicate impairment has occurred. Goodwill impairment exists when the carrying value of goodwill exceeds its implied fair value.

For 2020, the annual goodwill impairment analysis did not result in any impairment charges. Our impairment evaluation included a qualitative assessment, which considered whether there were indicators of potential impairment following the recent completion of the business combination accounting. In addition, our evaluation included a quantitative analysis, which included multiple assumptions, including estimated discounted cash flows and other estimates that may change over time. For example, a key assumption in determining the fair value of our reporting units is forecasting free cash flow generated by our business over the next five years and includes assumptions regarding expected growth of new service offerings and products. While our assumption reflects management's best estimates of future performance, the estimates assume Beneficient capturing a significant market share of liquidity transactions during the next five years leading to a substantial rate of growth of new service offerings and products, revenues and assets over the next five years ending December 31, 2025. These estimations are uncertain to occur, and to the extent the Company falls short of achieving our expected growth in revenues and assets over the next four years, material impairments of our goodwill may occur in the near term. For example, a 15% decline in our annual projected volume of liquidity transactions reflected in the Company's forecasts would require impairments to begin to be recorded assuming all other assumptions on which the forecasts are built remain constant. Because the Company's forecasts are predicated on estimating future volume for new service offerings and products, the Company's actual future volume of liquidity transactions reflected in the Company's forecasts may fall short of management's forecasts by 15% or greater and may result in a partial or full write down of our goodwill balance, which totaled $2.4 billion at December 31, 2020. In light of Beneficient's significant recurring losses from operations, negative cash flows from operations, and delays in executing its business plans, there could be potential triggering events identified and resulting impairment of goodwill recorded during the annual impairment test during the fourth quarter of 2021. While management can and has implemented strategies to address these events, changes in operating plans or adverse changes in the future could reduce the underlying cash flows used to estimate fair values and could result in a decline in fair value that would trigger future impairment charges of the reporting unit's goodwill balance.

Intangible assets include an insurance license and a non-compete agreement. Finite-lived intangibles are stated at cost less accumulated amortization. Amortization is recorded using the straight-line method, which approximates the expected pattern of economic benefit, over the estimated lives of the assets. The insurance license intangible has an indefinite life and is evaluated for impairment annually. The non-compete agreement is amortized over its estimated useful life of two years and is evaluated for impairment when indicators of impairment are present as outlined in the subsequent paragraph.

The Company reviews the carrying value of its finite-lived intangible assets whenever events or changes in circumstances indicate that the carrying amount of the asset group may not be recoverable. Factors that would require an impairment assessment include, among other things, a significant change in the extent or manner in which an asset is used, a continual decline in the Company's operating performance, or as a result of fundamental changes in a subsidiary's business condition.

F-24

APP. 562

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Repurchase Option** — Beneficient determined that a provision of the Exchange Trust agreements, of which such trust is not among the consolidated trusts of Ben LP, executed as part of its initial capitalization whereby the holder of the beneficial interest can repurchase the senior beneficial interest in a certain ExAlt Trust from its holder, at any time up to 3 years from the initial transaction date, represents an equity contract liability that it has elected to account for utilizing the fair value option in accordance with accounting standards applicable to financial instruments. The repurchase options were provided to each Exchange Trust for no consideration. As of the date of establishment of these ExAlt Trusts in 2017 and 2018, Beneficient measured the fair value of the repurchase options and recorded the amount of repurchase options in the consolidated balance sheets with the recognition of transaction expense of a corresponding amount. The repurchase options are recorded at fair value with changes in fair value recorded in net income (loss) in the consolidated statements of operations. Adjustments to the fair value of the repurchase options are recognized within investment income in the consolidated statements of operations. ExAlt Plan™ transactions, other than those executed in the initial capitalization, do not include a repurchase provision.

The primary reasons that management elected to record the repurchase options at fair value included reflecting the economic events in earnings on a timely basis and mitigating volatility in earnings from using different measurement attributes. Refer to Note 7 for additional information.

**Income Taxes** — GWG Holdings is a corporation for tax purposes. Certain of GWG Holdings' subsidiaries operate in the U.S. as partnerships for U.S. federal income tax purposes. In addition, certain of the wholly-owned subsidiaries of GWG Holdings will be subject to federal, state, and local corporate income taxes at the entity level and the related tax provision attributable to the Company's share of this income tax is reflected in the consolidated financial statements. Income taxes are accounted for using the asset and liability method of accounting. Under this method, deferred tax assets and liabilities are recognized for the expected future tax consequences of differences between the carrying amounts of assets and liabilities and their respective tax basis, using tax rates in effect for the year in which the differences are expected to reverse. The effect on deferred assets and liabilities of a change in tax rates is recognized in income in the period when the change is enacted. Deferred tax assets are reduced by a valuation allowance when it is more likely than not that some portion or all of the deferred tax assets will not be realized. Current and deferred tax liabilities, if any, are recorded within accounts payable and accrued expenses and other liabilities in the consolidated balance sheets. The Company analyzes its tax filing positions in all of the U.S. federal, state, local and foreign tax jurisdictions where it is required to file income tax returns, as well as for all open tax years in these jurisdictions. The Company records uncertain tax positions on the basis of a two-step process: (a) determination is made whether it is more likely than not that the tax positions will be sustained based on the technical merits of the position, and (b) those tax positions that meet the more likely than not threshold are recognized as the largest amount of tax benefit that is greater than 50 percent likely to be realized upon ultimate settlement with the related tax authority. The Company recognizes accrued interest and penalties related to uncertain tax positions in income tax expense (benefit) within the consolidated statements of operations.

**Noncontrolling Interests – Redeemable and Non-redeemable** — Noncontrolling interests represent the portion of certain consolidated subsidiaries' limited partnership interests or the ExAlt Trusts that are held by third parties. Amounts are adjusted by the noncontrolling interest holder's proportionate share of the subsidiaries' or VIEs' earnings or losses each period and for any distributions that are paid.

Noncontrolling interests are reported as a component of equity unless the noncontrolling interest is considered redeemable, in which case the noncontrolling interest is recorded between liabilities and equity (mezzanine or temporary equity) in the Company's consolidated balance sheets. The redeemable noncontrolling interest is adjusted at each balance sheet date to its maximum redemption value if the amount is greater than the carrying value. Changes in the Company's redeemable noncontrolling interests are presented in the consolidated statements of changes in stockholders' equity.

Noncontrolling interests include (i) holders of Class S Ordinary Units issued by BCH, which consist of Ben Founder Affiliates (as defined below), an entity affiliated with a related party, and third parties, and (ii) holders, which consists of unrelated charity organizations, of residual beneficial interests issued by the ExAlt Trusts. "Ben Founder Affiliates" are defined as certain trusts and those entities held by such trusts that are controlled by Ben Founder or in which Ben Founder and his family members are also among classes of economic beneficiaries whether or not our founder is entitled to economic distributions from such trusts. Ben Founder is also the former Chairman of the board of directors of GWG Holdings, serving is such capacity from April 26, 2019 to June 14, 2021.

Redeemable noncontrolling interests are held by holders, which consist of a Ben Founder Affiliate, entities affiliated with a related party, and certain former directors, of Preferred Series A Subclass 1 Unit Accounts issued by BCH.

APP. 563

F-25

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Beneficient's Income Allocation*

Net income (loss) attributable to noncontrolling interest holders is subject to Beneficient's income allocation in accordance with the governing limited partnership agreement of BCH as more fully described in Note 11.

The consolidated financial statements of Beneficient reflect the assets, liabilities, revenues, expenses, investment income and cash flows of Beneficient, including, after December 31, 2019, all of the trusts in the ExAlt Plan$^{TM}$ on a gross basis, and a portion of the economic interests of certain of the ExAlt Trusts, held by the residual beneficiaries, are attributed to noncontrolling interests in the accompanying consolidated financial statements. Interest income earned by Beneficient from the ExAlt Trusts is eliminated in its consolidation. However, because the eliminated amounts are earned from, and funded by, its noncontrolling interests, Beneficient's attributable share of the net income from the ExAlt Trusts is increased by the amounts eliminated. Accordingly, the elimination in consolidation of interest income and, for periods after December 31, 2019, certain fee revenue has no effect on net income (loss) attributable to Beneficient or to holders of Common Units.

For purposes of income allocation to Beneficient's equity holders, interest income is generally comprised of contractual interest, which is computed at a variable rate compounding monthly, interest recognized on certain of the ExAlt Loans through the effective yield method, and an amortized discount that is recognized ratably over the life of the ExAlt Loan.

As a result of the change-of-control event discussed in Note 9 on December 31, 2019 and the resulting valuation performed under ASC 805, the existing loan portfolio between Ben and the ExAlt Trusts was evaluated as of December 31, 2019, for credit deterioration based on the intentions of all parties that the income allocations provisions of Ben operate under US GAAP as if the ExAlt Trusts were not consolidated for financial reporting purposes. Further, as required under ASC 805, each ExAlt Loan between Beneficient and the ExAlt Trusts was evaluated and classified as either purchased credit impaired ("PCI") or non purchased credit impaired ("non-PCI"). For PCI loans, expected cash flows as of the date of valuation in excess of the fair value of loans are recorded as interest income over the life of the loans using a level yield method if the timing and amount of the future cash flows is reasonably estimable. Subsequently, increases in cash flows over those expected at the acquisition date are recognized prospectively as interest income. Decreases in expected cash flows due to credit deterioration are recognized by recording an allowance for loan loss. For non-PCI loans, the difference between the fair value and unpaid principal balance of the loan as of the date of valuation is amortized or accreted to interest income over the contractual life of the loans using the effective interest method. In the event of prepayment, the remaining unamortized amount is recognized in interest income, which is eliminated upon the consolidation of the ExAlt Trusts for financial reporting purposes.

Allowance for Loan Losses

The allowance for loan losses is an input to Beneficient's allocation of income. The allowance for loan losses is a valuation allowance for probable incurred credit losses in the portfolio. Management's determination of the allowance is based upon an evaluation of the loan portfolio, impaired loans, economic conditions, volume, growth and composition of the collateral to the loan portfolio, and other risks inherent in the portfolio. Currently, management individually reviews all ExAlt Loans due to the low volume and non-homogenous nature of the current portfolio. Management relies heavily on statistical analysis, current NAV and distribution performance of the underlying alternative asset interests and industry trends related to alternative asset investments to estimate losses. Management evaluates the adequacy of the allowance by reviewing relevant internal and external factors that affect credit quality. The cash flows from the underlying alternative assets interests are the sole source of repayment for the loans and related interest. Beneficient recognizes any charge-off in the period in which it is confirmed. Therefore, impaired ExAlt Loans are written down to their estimated net present value.

Interest income, for purposes of determining income allocations to Beneficient's equity holders, is adjusted for any allowance for loan losses, which was approximately $5.4 million for the year ended December 31, 2020.

**Earnings (Loss) per Common Share** — Basic earnings (loss) per share is computed by dividing net income (loss) attributable to common shareholders by the weighted-average number of common shares outstanding during the reported period.

Diluted earnings (loss) per share in net income periods is calculated by dividing net income attributable to common shareholders by the weighted-average number of common shares outstanding adjusted to include the number of additional common shares that would have been outstanding if the potential dilutive common shares resulting from GWG Holdings' RPS, RPS 2, restricted stock units, warrants (if applicable) and stock options were issued. The Company uses the treasury stock method to calculate if potentially dilutive common shares were issued in the case of restricted stock units, warrants and

APP. 565

APP. 566

*Table of Contents*

## GWG HOLDINGS, INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

options, and the if-converted method in the case of RPS and RPS 2. During 2020 and 2019, RPS, RPS2, restricted stock units and stock options were the potentially dilutive non-participating instruments issued by GWG Holdings.

Additionally, pursuant to the Exchange Agreement, as discussed in Note 1, holders of Common Units have the right to exchange their Common Units for common stock of GWG. The Company uses the if-converted method for these potentially dilutive instruments issued by Ben LP that are ultimately exchangeable into GWG Holdings' common stock.

Diluted earnings (loss) per share does not reflect an adjustment for potentially dilutive shares in periods in which a net loss attributable to common shareholders exists.

**Newly Adopted Accounting Pronouncements** — On January 1, 2020, we adopted Accounting Standards Update ("ASU") 2017-04, *Goodwill*, (Topic 350). This standard simplifies how an entity is required to test goodwill for impairment by eliminating Step 2 from the goodwill impairment test. Step 2 measures a goodwill impairment loss by comparing the implied fair value of a reporting unit's goodwill with the carrying amount of that goodwill. Under the new guidance, goodwill impairment loss will be measured on the basis of the fair value of the reporting unit relative to the reporting unit's carrying amount rather than on the basis of the implied amount of goodwill relative to the goodwill balance of the reporting unit. The adoption of this standard did not have a material impact on the consolidated financial statements and related disclosures.

On January 1, 2020, we adopted ASU No. 2018-13, *Fair Value Measurement (Topic 820): Disclosure Framework — Changes to the Disclosure Requirements for Fair Value Measurement*, which eliminates, adds and modifies certain disclosure requirements for fair value measurements. The adoption did not have a material impact on the consolidated financial statements and related disclosures.

In March 2020, the SEC amended Regulation S-X to create Rules 13-01 and 13-02. These new rules reduce and simplify financial disclosure requirements for issuers and guarantors of registered debt offerings. Previously, with limited exceptions, a parent entity was required to provide detailed disclosures with regard to guarantors of registered debt offerings within the footnotes to the consolidated financial statements. Under the new regulations, disclosure exceptions have been expanded and required disclosures may be provided within Item 7. *Management's Discussion and Analysis of Financial Condition and Results of Operations* rather than in the notes to the financial statements. Further, summarized financial information covering guarantor balance sheets and income statements are permitted, replacing the previously required condensed consolidating financial statements. Summarized financial information only needs be disclosed for the current fiscal year rather than all years presented in the financial statements as was previously required. The amendments were subsequently included in the FASB codification through the issuance of ASU No. 2020-09, *Debt, (Topic 470)* in October 2020. The guidance will become effective for filings on or after January 4, 2021, with early adoption permitted. The Company elected to early adopt the new regulations during the second quarter of 2020. Our summarized guarantor financial information is now presented in Item 7. *Management's Discussion and Analysis of Financial Condition and Results of Operations.*

**Accounting Pronouncements Issued But Not Yet Adopted** — In June 2016, the Financial Accounting Standards Board ("FASB") issued ASU No. 2016-13, *Financial Instruments — Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments*, which changes the impairment model for most financial assets and certain other instruments, including trade and other receivables, held-to-maturity debt securities and loans. There have been numerous codification improvements and technical corrections issued through subsequent ASUs since the issuance of ASU No. 2016-13. The standard requires entities to use a new, forward-looking "expected loss" model that is expected to generally result in the earlier recognition of allowances for losses. The guidance is effective for annual periods beginning after December 15, 2022, including interim periods within those years, for smaller reporting companies, as defined by the SEC, but early adoption is permitted. The Company is evaluating the potential impact of this guidance on our consolidated financial statements.

ASU 2019-12, *Income Taxes: Simplifying the Accounting for Income Taxes, (Topic 740)* was issued in December 2019. The amendments in Topic 740 eliminate certain exceptions related to the approach for intraperiod tax allocation, the methodology for calculating income taxes in an interim period and the recognition of deferred tax liabilities for outside basis differences. Topic 740 also clarifies and simplifies other aspects of the accounting for income taxes. The standard is effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2020, for public business entities. Early adoption is permitted, including adoption in any interim period. The adoption of this standard is not expected to have a material impact on the consolidated financial statements and disclosures.

APP. 567

APP. 568

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

ASU 2020-04, *Reference Rate Reform, (Topic 848)* was issued in March 2020. The amendments in Topic 848 provide optional expedients and exceptions for applying GAAP to contracts, hedging relationships, and other transactions affected by reference rate reform if certain criteria are met. Topic 848 can be applied by all entities as of the beginning of the interim period that includes March 12, 2020, or any date thereafter, and entities may elect to apply the amendments prospectively through December 31, 2022. The Company did not utilize the optional expedients and exceptions provided by this standard during the year ended December 31, 2020. The Company is evaluating the impact of this standard on its consolidated financial statements and disclosures.

ASU 2020-06, *Debt—Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging—Contracts in Entity's Own Equity (Subtopic 815-40): Accounting for Convertible Instruments and Contracts in an Entity's Own Equity (ASU 2020-06)* was issued in August 2020. The amendments in ASU 2020-06 simplify the accounting for convertible instruments by removing major separation models and removing certain settlement condition qualifiers for the derivatives scope exception for contracts in an entity's own equity, and simplify the related diluted net income per share calculation for both Subtopics. ASU 2020-06 is effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2023, for smaller reporting companies, as defined by the SEC. Early adoption is permitted, but no earlier than fiscal years beginning after December 15, 2020, including interim periods within those fiscal years. The Company is evaluating the impact of this ASU on its consolidated financial statements and disclosures.

**(3) Restrictions on Cash**

Under the terms of the LNV Credit Facility, discussed further in Note 10, we are required to maintain collection and payment accounts that are used to collect policy benefits from pledged policies, pay annual policy premiums, interest and other charges under the facility, distribute funds to pay down the facility, and distribute excess funds to the borrower (GWG DLP Funding IV, LLC).

The agents for the lender authorize the disbursements from these accounts. At December 31, 2020 and 2019, there was a balance of $33.5 million and $20.3 million, respectively, in these collection and payment accounts.

Under the terms of the ExAlt Plan™ trust agreements, the trusts are required to maintain capital call reserves and administration reserves. These reserves are used to satisfy capital call obligations and pay fees and expenses for the trusts as required. The fees and expenses are primarily paid to Ben Custody Admin for serving as the administrative agent to the current trustees of the ExAlt Trusts. These reserves represent cash held in banks. At December 31, 2020 and 2019, there was a combined balance of $5.4 million and $13.2 million, respectively, in these reserves.

**(4) Business Combination**

Prior to December 31, 2019, GWG Holdings owned 41,505,279 Common Units, for a total limited partnership interest in the Common Units of approximately 90.2%. This investment was historically accounted for using the equity method (see Note 8). On December 31, 2019, GWG Holdings entered into the Investment Agreement and Exchange Agreements described in Note 1.

Pursuant to the Investment Agreement, GWG Holdings transferred $79.0 million to Ben LP in return for 666,667 additional Common Units and a Preferred Series A Subclass 1 Unit Account of BCH, which increased GWG Holdings' ownership of Common Units to approximately 95.5%. Also, on December 31, 2019, in a transaction related to the Investment Agreement, GWG Holdings transferred its interest in the Preferred Series A Subclass 1 Unit Account to its wholly-owned subsidiary, GWG Life. In connection with the Investment Agreement, GWG Holdings obtained the right to appoint a majority of the board of directors of Beneficient Management, the general partner of Ben LP. As a result, GWG Holdings obtained control of Ben LP and consolidated Ben LP as of December 31, 2019, under the guidance in ASC 805, *Business Combinations.*

As a result of the change-of-control, GWG Holdings was required to remeasure its existing equity investment at fair value prior to consolidation. At December 31, 2019, GWG Holdings' equity investment in Common Units had a carrying value of $368.6 million, prior to the additional investment noted above. GWG Holdings estimated the fair value of its investment in Ben LP to be approximately $622.5 million, resulting in the recognition of a gain of $253.9 million during the fourth quarter of 2019. This gain is included in gain on consolidation of equity method investment in the Company's consolidated statement of operations for the year ended December 31, 2019. This gain was partially offset by the remeasurement to fair value of the Commercial Loan Agreement between GWG Life and Ben LP, the Promissory Note between GWG Life and the Borrowers,

APP. 569

F-28

APP. 570

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

and the Option Agreement between GWG Holdings and Ben LP which resulted in a net loss of $10.9 million. The net gain on consolidation of equity method investment after remeasurement of these preexisting balances was $243.0 million. GWG Holdings' proportionate share of the earnings or losses from Ben LP was recognized in earnings (loss) from equity method investment in our consolidated statement of operations from August 10, 2018 until December 31, 2019 (see Note 8 for further information) and was previously recorded on a one-quarter lag basis. In connection with the consolidation of Beneficient, the one-quarter lag was discontinued.

The following table summarizes the fair value measurement of the assets acquired and liabilities assumed as of December 31, 2019 (in thousands):

|  | As Restated |
|---|---|
|  | Fair Value at Acquisition Date |
| **ASSETS** |  |
| Investments in alternative assets, at net asset value | $ 342,012 |
| Investment in public equity securities | 24,550 |
| Other assets | 15,077 |
| Intangible assets[1] | 3,449 |
| Total identifiable assets acquired | 385,088 |
| **LIABILITIES** |  |
| Debt due to related parties | 153,086 |
| Promissory note with related party | 60,390 |
| Commercial loan agreement from parent | 168,420 |
| Other liabilities and option agreement | 64,421 |
| Repurchase option | 61,664 |
| Accounts payable and accrued expenses | 13,770 |
| Total liabilities assumed | 521,751 |
| Net liabilities assumed | (136,663) |
| **NONCONTROLLING INTERESTS** |  |
| Common Units not owned by GWG Holdings[2] | 181,383 |
| Class S Ordinary Units | 85,448 |
| Class S Preferred Units | 17 |
| Trusts' Deficit | 27,062 |
| Preferred Series A Subclass 1 Unit Accounts | 1,269,654 |
| Total noncontrolling interests | 1,563,564 |
| **ACQUISITION CONSIDERATION** |  |
| Cash, less cash acquired | 45,020 |
| Fair value of preexisting investment in Common Units[3] | 622,503 |
| Fair value of noncontrolling interest | 1,563,564 |
| Total estimated consideration | 2,231,087 |
| Less: Net liabilities assumed | (136,663) |
| Resulting goodwill | $ 2,367,750 |

---

(1) Includes an insurance license valued at $3.1 million and a non-compete agreement valued at $0.3 million.

(2) Calculated as 1,974,677 Common Units not owned by GWG Holdings at December 31, 2019, multiplied by the $15 per unit derived from the enterprise valuation of Beneficient. Also includes $151.8 million of share-based payment awards that were granted by Beneficient prior to the change in control but were not replaced by awards of GWG Holdings upon the change in control. These awards were treated as noncontrolling interests in accordance with ASC 805, *Business Combinations*.

APP. 572

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

(3) Calculated as 41,505,279 Common Units owned by GWG Holdings prior to the change in control multiplied by the $15 per unit derived from the enterprise valuation of Beneficient, with a nominal rounding adjustment.

*Methods Used to Determine Equity Value and to Fair Value Assets and Liabilities*

The following is a description of the valuation methodologies used to estimate the fair value of equity and the fair values of major categories of assets acquired and liabilities assumed. In many cases, determining the fair value of equity and the acquired assets and assumed liabilities required management to estimate cash flows expected from those assets and liabilities and to discount those cash flows at appropriate rates of interest. This required the utilization of significant estimates and management judgment in accounting for the change-of-control event.

**Investments in alternative assets** — The investment in alternative assets was valued at fair value using the net asset value of each underlying investment as a practical expedient.

**Cash and cash equivalents and restricted cash** — Cash and cash equivalents and restricted cash were valued using their current carrying amounts which approximate fair value.

**Investment in public equity securities** — The fair value of the investments in public equity securities was determined using quoted market prices. As these were investments by Beneficient in the common stock of GWG Holdings, these amounts were eliminated in consolidation and treated as treasury stock.

**Other assets** — Other assets include miscellaneous receivables that were valued using the current carrying amount as that amount approximates fair value due to the relatively short time between their origination date and the fair value date. Miscellaneous intercompany receivables were eliminated in consolidation.

**Intangible assets** — Intangible assets include an insurance license and a non-compete agreement. Both assets were valued using their current carrying amount which approximates fair value.

**Debt due to related parties, promissory note with related party, and commercial loan agreement from parent** — The measurement of the fair value of debt due to related parties, promissory note with related party, and commercial loan agreement from parent was based on market prices that generally are observable for similar liabilities at commonly quoted intervals and is considered a Level 2 fair value measurement. The Promissory Note between certain of the ExAlt Trusts and GWG Life and the Commercial Loan Agreement between Ben LP and GWG Life were eliminated in consolidation.

**Other liabilities** — The carrying amount of other liabilities approximates the fair value. The Option Agreement between Ben LP and GWG Holdings was eliminated in consolidation.

**Repurchase options:** Repurchase options were fair valued using a Black-Scholes option pricing model with a time-dependent strike for the repurchase price. Other model assumptions include i) a period of restricted exercise, ii) the dividend yield, iii) underlying NAVs, iv) alternative asset growth rates, v) volatilities, and vi) market discount rate.

**Accounts payable and accrued expenses** — Due to their short-term nature, the carrying amounts of accounts payable and accrued expenses approximate the fair value. Miscellaneous intercompany payables were eliminated in consolidation.

**Noncontrolling interests** — The values for each noncontrolling interest component were calculated after determination of an overall enterprise value for the Company. The enterprise value of the Company was determined using the Option Pricing Model ("OPM") Backsolve approach under the market method. The OPM Backsolve approach uses a Black-Scholes option pricing model to calculate the implied equity value of the firm. Once an overall equity value was determined, amounts were allocated to the various classes of equity based on the security class preferences. The inputs to the OPM Backsolve approach are the equity value for one component of the capital structure, expected time to exit, the risk-free interest rate and an assumed volatility based on the volatility of similar publicly traded companies. The OPM Backsolve inputs include Level 3 inputs.

**Goodwill** — The resulting excess of the overall enterprise value after deducting the fair values of assets acquired and liabilities assumed is recognized as goodwill. The goodwill recognized is the result of the inherent value associated with the assembled business after all separately identifiable assets acquired and liabilities assumed are deducted from the enterprise value. The excess estimated enterprise value of Beneficient over the fair value of its net assets is primarily attributable to

APP. 573

F-30

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

management's expectation of the potentially large and underserved market that Beneficient is seeking to address, including the estimated demand from MHNW individuals and STM size institutions seeking liquidity for their professionally managed alternative assets. None of the goodwill is expected to be deductible for income tax purposes. The goodwill is allocated to our Beneficient reporting unit.

The following unaudited pro forma financial information presents the combined results of operations of GWG Holdings as if the acquisition of Ben LP had occurred as of January 1, 2019:

| *(in thousands, except shares and per share data)* | | *(As Restated)* |
| --- | --- | --- |
| | | **December 31, 2019** |
| **Total Revenue** | | |
| Pro forma | $ | 62,636 |
| As reported | $ | 92,276 |
| | | |
| **Net Income (Loss) Attributable to Common Shareholders** | | |
| Pro forma | $ | (220,726) |
| As reported | $ | 70,471 |
| | | |
| **Net Earnings (Loss) per Diluted Common Share** | | |
| Pro forma | $ | (6.21) |
| As reported | $ | 2.06 |

The unaudited pro forma financial information is presented for informational purposes only. It is not necessarily indicative of what our consolidated results of operations actually would have been had the acquisition occurred at the beginning of the year, nor does it attempt to project the future results of operations of the combined company.

The unaudited pro forma financial information above gives effect to the following:

•   Consolidation of all ExAlt Trusts (only certain of the trusts were consolidated until December 31, 2019)

•   Exclusion of the $243.0 million nonrecurring gain on consolidation of equity method investment

•   Reduction of Beneficient interest expense related to acquisition-date debt principal payments

•   Elimination of intercompany transactions, including the Promissory Note, Commercial Loan Agreement and Option Agreement

•   Exclusion of nonrecurring acquisition-related transaction costs

**(5) Investment in Life Insurance Policies**

The Company's investments in life insurance policies are valued based on unobservable inputs that are significant to their overall fair value. Changes in the fair value of these policies, net of premiums paid, are recorded in gain (loss) on life insurance policies, net in our consolidated statements of operations.

The fair value of our life insurance policies is determined as the net present value of the life insurance portfolio's future expected cash flows (policy benefits received and required premium payments) that incorporates life expectancy estimates obtained when the policy was purchased and current discount rate assumptions. We refer to our valuation methodology as the Longest Life Expectancy methodology. This methodology utilizes a portfolio mortality multiplier ("PMM") that allows us to "fit" projections to actual results, which provides a basis to forecast future performance more accurately.

The life expectancies used in our valuation were obtained at the time of policy purchase and are generally derived from reports obtained from widely accepted life expectancy providers (other than insured lives covered under small face amount policies — those with $1.0 million in face value benefits or less — which utilize either a single fully underwritten, or simplified report based on self-reported medical interview). Our valuation methodology also incorporates assumptions relating to cost-of-insurance (premium) rates and other assumptions, including a discount rate.

APP. 575

F-31

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The discount rate we apply is primarily based on information about the discount rates observed in recent portfolio purchase transactions in the life insurance tertiary market. The discount rate also incorporates fixed income market interest rates, the estimated credit exposure to the insurance companies that issued the life insurance policies and management's estimate of the operational risk yield premium a purchaser would require to receive the future cash flows derived from our portfolio as a whole. In prior periods, the discount rate also incorporated information about the discount rates observed in the life insurance secondary market through the Company's internal competitive bidding to purchase policies. However, the Company discontinued the use of this input as of December 31, 2020, as it is no longer actively purchasing policies in the life insurance secondary market. The determination of the discount rate used in the valuation of the Company's life insurance policies requires management judgment and incorporates information that is reasonably available to management as of the date of the valuation. As a result of management's analysis, a discount rate of 8.25% was applied to our portfolio as of both December 31, 2020 and 2019.

**Portfolio Information**

Our portfolio of life insurance policies, owned by GWG Holdings' subsidiaries as of December 31, 2020 is summarized below:

**Life Insurance Portfolio Summary**

| | |
|---|---:|
| Total life insurance portfolio face value of policy benefits (in thousands) | $ 1,900,715 |
| Average face value per insured life (in thousands) | $ 1,943 |
| Average life expectancy estimate (years)* | 6.9 |
| Total number of policies | 1,058 |
| Number of unique lives | 978 |
| Demographics | 74% Male; 26% Female |
| Number of smokers | 40 |
| Largest policy as % of total portfolio face value | 0.7 % |
| Average policy as % of total portfolio face value | 0.1 % |
| Average annual premium as % of face value | 3.8 % |

(*) Averages presented in the table are weighted averages by face amount of policy benefits.

A summary of our policies organized according to their estimated life expectancy dates, grouped by year, as of the reporting date, is as follows (dollars in thousands):

| Years Ending December 31, | As of December 31, 2020 | | | As of December 31, 2019 | | |
|---|---:|---:|---:|---:|---:|---:|
| | Number of Policies | Estimated Fair Value | Face Value | Number of Policies | Estimated Fair Value | Face Value |
| 2020 | — | $ — | $ — | 8 | $ 5,869 | $ 6,342 |
| 2021 | 15 | 19,429 | 22,298 | 55 | 62,061 | 79,879 |
| 2022 | 62 | 66,657 | 88,698 | 90 | 89,074 | 138,723 |
| 2023 | 106 | 113,926 | 178,983 | 128 | 123,352 | 222,369 |
| 2024 | 119 | 130,280 | 229,815 | 109 | 103,111 | 217,053 |
| 2025 | 111 | 85,842 | 187,042 | 113 | 74,223 | 171,961 |
| 2026 | 115 | 100,280 | 237,632 | 123 | 92,337 | 250,239 |
| Thereafter | 530 | 275,497 | 956,247 | 525 | 246,012 | 934,407 |
| **Totals** | 1,058 | $ 791,911 | $ 1,900,715 | 1,151 | $ 796,039 | $ 2,020,973 |

We recognized life insurance benefits of $125.1 million for each of the years ended December 31, 2020 and 2019, respectively, related to policies with a carrying value of $38.2 million and $33.2 million, respectively, and as a result recorded realized gains of $86.9 million and $91.9 million. The aforementioned carrying value, which represents the aggregate cost basis in the policies that matured during the period, is considered a return of investment within the investing section of the consolidated statements of cash flows. Changes in fair value of policies and the other components of the net

APP. 577

F-32

APP. 578

*Table of Contents*

## GWG HOLDINGS, INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

gain on life insurance policies, as detailed below, are included in the operating section of the consolidated statements of cash flows.

A reconciliation of gain (loss) on life insurance policies is as follows (in thousands):

| | Year Ended December 31, | |
|---|---|---|
| | 2020 | 2019 |
| Change in estimated probabilistic cash flows[1] | $ 63,463 | $ 67,186 |
| Unrealized gain on acquisitions[2] | — | 6,921 |
| Premiums and other annual fees | (71,439) | (65,577) |
| Change in life expectancy evaluation[3] | — | (2,332) |
| Face value of matured policies | 125,109 | 125,148 |
| Fair value of matured policies | (67,535) | (56,026) |
| Gain on life insurance policies, net | $ 49,598 | $ 75,320 |

(1)  Change in fair value of expected future cash flows relating to our investment in life insurance policies that are not specifically attributable to changes in life expectancy, discount rate changes or policy maturity events.

(2)  Gain resulting from fair value in excess of the purchase price for life insurance policies acquired during the reporting period.

(3)  The change in fair value due to updating life expectancy estimates on certain life insurance policies in our portfolio.

Estimated premium payments and servicing fees required to maintain our current portfolio of life insurance policies in force for the next five years, assuming no mortalities, are as follows (in thousands):

| Years Ending December 31, | Premiums | Servicing | Total |
|---|---|---|---|
| 2021 | $ 72,445 | $ 1,655 | $ 74,100 |
| 2022 | 89,436 | 1,655 | 91,091 |
| 2023 | 100,953 | 1,655 | 102,608 |
| 2024 | 110,044 | 1,655 | 111,699 |
| 2025 | 122,438 | 1,655 | 124,093 |
| | $ 495,316 | $ 8,275 | $ 503,591 |

Management anticipates funding the majority of the premium payments and servicing fees estimated above from cash flows realized from life insurance policy benefits, and to the extent necessary, with additional borrowing capacity created as the premiums and servicing costs of pledged life insurance policies become due, under the LNV Credit Facility and the net proceeds from our offering of L Bonds as described in Note 10. Management anticipates funding premiums and servicing costs of non-pledged life insurance policies with cash flows realized from life insurance policy benefits from our portfolio of life insurance policies and net proceeds from GWG Holdings' offering of L Bonds. The proceeds of these capital sources may also be used for; the purchase, policy premiums and servicing costs of additional life insurance policies; working capital; and financing expenditures including paying principal, interest and dividends.

### (6) Investments in Alternative Assets

The investments held, either through direct ownership or through a beneficial interest, by certain of the ExAlt Trusts consist primarily of limited partnership interests in various alternative assets, including private equity funds. These alternative investments are valued using NAV as a practical expedient. Changes in the NAV of these investments are recorded in investment income, net in our consolidated statements of operations. The investments in alternative assets provide the economic value that ultimately collateralizes the loan that Beneficient originates with the ExAlt Trusts in a liquidity transaction.

F-33

Case 3:22-cv-00410-B Document 32-1 Filed 04/19/22 Page 580 of 1031 PageID 752

APP. 580

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The NAV calculation reflects the most current report of NAV and other data received from firm/fund sponsors. If no such report has been received, Beneficient estimates NAV based upon the last NAV calculation reported by the investment manager and adjusts it for capital calls and distributions made in the intervening time frame. Beneficient also considers whether adjustments to the NAV are necessary in certain circumstances in which management is aware of specific material events, changes in market conditions, and other relevant factors that have affected the value of an investment during the period between the date of the most recent NAV calculation reported by the investment manager or sponsor and the measurement date. Public equity securities known to be owned within an alternative investment fund, based on the most recent information reported by the general partners, are marked to market using quoted market prices on the reporting date.

The underlying interests in alternative assets are primarily limited partnership interests, and the limited partnership agreements governing those interests generally include restrictions on disclosure of fund-level information, including fund names and company names in the funds. The transfer of the investments in private equity funds generally requires the consent of the corresponding private equity fund manager, and the transfer of certain fund investments is subject to rights of first refusal or other preemptive rights, potentially further limiting the ExAlt Plan™ from transferring an investment in a private equity fund. These investments can never be redeemed with the funds. Distributions from each fund will be received as the underlying investments are liquidated. Timing of liquidation is currently unknown.

**Portfolio Information**

Our portfolio of alternative investments, held by certain of the ExAlt Trust subsidiaries by asset class of each fund as of December 31, 2020 and 2019, is summarized below:

**Alternative Investments Portfolio Summary[1]**

|  | December 31, 2020 | | December 31, 2019 | |
|---|---|---|---|---|
| **Asset Class** | **Value** | **Unfunded Commitments** | **Value** | **Unfunded Commitments** |
| Venture Capital | $ 123,021 | $ 1,659 | $ 267,662 | $ 8,915 |
| Private Equity | 92,316 | 33,387 | 34,614 | 22,187 |
| Private Real Estate | 2,118 | 269 | 27,151 | 3,584 |
| Other[2] | 4,439 | 294 | 12,585 | 260 |
| **Total** | $ 221,894 | $ 35,609 | $ 342,012 | $ 34,946 |

[1]   Amounts presented in the table exclude the collateral resulting from the Collateral Swap, including GWG Holdings' common stock valued at $84.6 million, 543,874 shares of Ben Common Units valued at $6.8 million, and GWG L Bonds due 2023 in the aggregate principal amount of $94.8 million, all of which are eliminated in consolidation

[2]   "Other" includes private debt strategies, natural resources strategies, and hedge funds.

As of December 31, 2020, ExAlt Trusts' portfolio had exposure to 117 professionally managed alternative investment funds, comprised of 327 underlying investments, 91 percent of which are investments in private companies.

**(7) Fair Value Measurements**

ASC 820, *Fair Value Measurements and Disclosures* ("ASC 820"), establishes a hierarchical disclosure framework that prioritizes and ranks the level of market price observability used in measuring assets and liabilities at fair value. Market price observability is affected by a number of factors, including the type of investment, the characteristics specific to the investment and the state of the marketplace, including the existence and transparency of transactions between market participants. Assets and liabilities with readily available and actively quoted prices, or for which fair value can be measured from actively quoted prices in an orderly market, generally will have a higher degree of market price observability and a lesser degree of judgment used in measuring fair value.

ASC 820 maximizes the use of observable inputs and minimizes the use of unobservable inputs by requiring the use of observable inputs whenever available. Observable inputs are inputs that market participants would use in pricing the asset or liability developed based on market data obtained from third-party sources. Unobservable inputs are inputs that reflect assumptions about how market participants price an asset or liability based on the best available information. Fair value is

F-34

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

defined as the price that would be received to sell an asset or paid to transfer a liability (i.e., the "exit price") in an orderly transaction between market participants at the measurement date (a non-distressed transaction in which neither seller nor buyer is compelled to engage in the transaction).

The fair value hierarchy is broken down into three levels based on the observability of inputs as follows:

Level 1 — Valuations based on quoted prices in active markets for identical assets or liabilities that the Company has the ability to access as of the measurement date. Valuations are based on quoted prices that are readily and regularly available in an active market.

Level 2 — Valuations based quoted prices for similar instruments in active markets; quoted prices for identical or similar instruments in markets that are not active; and model-derived valuations whose inputs are observable or whose significant value drivers are observable market data.

Level 3 — Valuations based on inputs that are unobservable, are derived from other valuation methodologies, including option pricing models, discounted cash flow models and similar techniques, and are not based on market exchange, dealer, or broker traded transactions. Level 3 valuations incorporate certain assumptions and projections in determining the fair value assigned to such instruments.

A financial instrument's categorization within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement. Investments valued using NAV as a practical expedient are excluded from this hierarchy. At December 31, 2020 and December 31, 2019, the fair value of these investments using the NAV per share practical expedient was $221.9 million and $342.0 million, respectively. During the year ended December 31, 2020, $17.6 million of loss was recognized from changes in NAV, which is recorded within investment income (loss) on our consolidated statements of operations.

The availability of observable inputs can vary by types of assets and liabilities and is affected by a wide variety of factors, including, for example, whether an instrument is established in the marketplace, the liquidity of markets and other characteristics particular to the transaction. To the extent that valuation is based on models or inputs that are less observable or unobservable in the market, the determination of fair value requires more judgment. Accordingly, the degree of judgment exercised by management in determining fair value is greatest for assets and liabilities categorized in Level 3.

F-35

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Financial instruments measured at fair value on a recurring basis*

The Company's financial assets and liabilities carried at fair value on a recurring basis, including the level in the fair value hierarchy, on December 31, 2020 and December 31, 2019 are presented below (in thousands).

| | As of December 31, 2020 | | | |
| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Assets: | | | | |
| Investments in put options | $ 7,017 | $ — | $ — | $ 7,017 |
| Investments in life insurance policies | — | — | 791,911 | 791,911 |

| | As of December 31, 2019 (As Restated) | | | |
| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Assets: | | | | |
| Investments in life insurance policies | $ — | $ — | $ 796,039 | $ 796,039 |
| | | | | |
| Liabilities: | | | | |
| Repurchase options | $ — | $ — | $ 61,664 | $ 61,664 |

The following is a description of the valuation methodologies used for financial instruments measured at fair value on a recurring basis:

*Investments in put options*

On July 17, 2020, Ben LP, through its subsidiary CT Risk Management, L.L.C., made aggregate payments of $14.8 million to purchase put options against a decrease in the S&P 500 Index. The options have an aggregate notional amount of $300.0 million and are designed to protect the net asset value of the interests in alternative assets that support the Collateral to Beneficient's loan portfolio against market risk. One-half of the put options expire in July 2022 with the remaining put options expiring in July 2023. Changes in the fair value of the options are recognized directly in earnings. The fair value of the options is recorded in the other assets line item of the consolidated balance sheets, and changes in the fair value of the options are recognized directly in earnings in the other income (loss) line item of the consolidated statements of operations.

*Repurchase options*

Repurchase options were fair valued using a Black-Scholes option pricing model with a time-dependent strike price for the repurchase price. The option pricing model has assumptions related to a period of restricted exercise price, dividend yield, underlying NAVs, alternative asset growth rates, volatilities, and market discount rate. The Company uses Level 3 inputs for its fair value estimates. The unrealized impact of this Level 3 measurement on earnings is reflected in investment income (loss).

The following table reconciles the beginning and ending fair value of our Level 3 repurchase options (in thousands). The year ended December 31, 2019, is not presented as the consolidation of Beneficient occurred on December 31, 2019.

| | Year Ended |
| | December 31, 2020 |
|---|---|
| Beginning balance | $ 61,664 |
| Total gain in earnings[1] | (61,664) |
| Purchases | — |
| Settlements | — |
| Other | — |
| Ending balance | $ — |

[1] Net change in fair value.

F-36

APP. 585

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The repurchase options, all of which were unexercised, expired during the third and fourth quarters of 2020, which is recognized in the investment income (loss) line item of the consolidated statements of operations. Additionally, during the year ended December 31, 2020, $17.6 million of loss on the investments in alternative assets was recognized from changes in NAV, which is recorded within investment income (loss) on our consolidated statements of operations.

The following table provides quantitative information about the significant unobservable inputs used in the fair value measurement of the Level 3 repurchase options as of December 31, 2019 (dollars in thousands):

| Valuation Date | Fair Value | Valuation Methodology | Unobservable Inputs | Range of Targets |
|---|---|---|---|---|
| December 31, 2019 | $ 61,664 | Option Pricing Model | Alternative asset market discount rate | 0.085 |
| | | | Dividend yield | .22 - .56 |
| | | | Net asset value growth rates | 0.085 |
| | | | Net asset value volatilities | 0.24 - 0.45 |
| | | | Restricted exercise period | 1 year |

*Investments in life insurance policies*

The estimated fair value of our portfolio of life insurance policies is determined on a quarterly basis by management taking into consideration a number of factors, including changes in discount rate assumptions, estimated premium payments and life expectancy estimate assumptions, as well as any changes in economic and other relevant conditions. The discount rate incorporates information about discount rates observed in the life insurance secondary market through competitive bidding observations (which have declined recently as a result of our decreased purchase activity) and other means, fixed income market interest rates, the estimated credit exposure to the insurance companies that issued the life insurance policies and management's estimate of the operational risk yield premium a purchaser would require to receive the future cash flows derived from our portfolio as a whole. The determination of the discount rate used in the valuation of the Company's life insurance policies requires management judgment and incorporates information that is reasonably available to management as of the date of the valuation.

Under our Longest Life Expectancy portfolio valuation methodology, we: i) utilize life expectancy reports from third-party life expectancy providers for the pricing of all life insurance policies at the time of purchase; ii) apply a stable valuation methodology driven by the experience of our life insurance portfolio, which is re-evaluated if experience deviates by a specified margin; and iii) use relevant market observations that can be validated and mapped to the discount rate used to value the life insurance portfolio.

These inputs are then used to estimate the discounted cash flows from the portfolio using the ClariNet LS probabilistic and stochastic portfolio pricing model from ClearLife Limited, which estimates the expected cash flows using various mortality probabilities and scenarios. The valuation process includes a review by senior management as of each quarterly valuation date. We also engage ClearLife Limited to prepare a net present value calculation of our life insurance portfolio using the inputs we provide on a quarterly basis.

The following table reconciles the beginning and ending fair value of our Level 3 investments in our portfolio of life insurance policies (in thousands):

| | Year Ended December 31, | |
|---|---|---|
| | **2020** | **2019** |
| Beginning balance | $ 796,039 | $ 747,922 |
| Total gain in earnings[1] | 34,114 | 49,015 |
| Purchases | — | 32,367 |
| Settlements[2] | (38,185) | (33,265) |
| Lapsed policy[3] | (57) | — |
| Ending balance | $ 791,911 | $ 796,039 |

APP. 587

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

(1)  Net change in fair value
(2)  Policy maturities at initial cost basis
(3)  Represents the cost basis of one policy with a face value of $0.5 million.

The net activity in the table above is reported in gain on life insurance policies, net, in the consolidated statements of operations.

There have been no transfers between levels in the fair value hierarchy for any assets or liabilities recorded at fair value on a recurring basis or any changes in the valuation techniques used for measuring the fair value as of December 31, 2020 and December 31, 2019.

The following table summarizes the inputs utilized in estimating the fair value of our portfolio of life insurance policies:

|  | As of December 31, 2020 | As of December 31, 2019 |
|---|---|---|
| Weighted-average age of insured, years* | 83.1 | 82.4 |
| Age of insured range, years | 63-100 | 62-101 |
| Weighted-average life expectancy, months* | 83.0 | 86.2 |
| Life expectancy range, months | 0-240 | 0-240 |
| Average face amount per policy (in thousands) | $ 1,797 | $ 1,756 |
| Discount rate | 8.25 % | 8.25 % |

(*) Weighted-average by face amount of policy benefits

Life expectancy estimates and market discount rates for a portfolio of life insurance policies are inherently uncertain and the effect of changes in estimates may be significant. For example, if the life expectancy estimates were increased or decreased by four and eight months on each outstanding policy, and the discount rates were increased or decreased by 1% and 2%, with all other variables held constant, the fair value of our investment in life insurance policies would increase or decrease as summarized below (in thousands):

|  | Change in Life Expectancy Estimates | | | |
|---|---|---|---|---|
|  | Minus 8 Months | Minus 4 Months | Plus 4 Months | Plus 8 Months |
| December 31, 2020 | $ 97,837 | $ 45,536 | $ (61,713) | $ (114,099) |
| December 31, 2019 | $ 113,812 | $ 57,753 | $ (55,905) | $ (111,340) |

|  | Change in Discount Rate | | | |
|---|---|---|---|---|
|  | Minus 2% | Minus 1% | Plus 1% | Plus 2% |
| December 31, 2020 | $ 82,983 | $ 39,560 | $ (36,151) | $ (69,284) |
| December 31, 2019 | $ 91,890 | $ 43,713 | $ (39,790) | $ (76,118) |

*Financial instruments measured at fair value on a non-recurring basis*

There were no assets or liabilities measured at fair value on a non-recurring basis as of December 31, 2020. As of December 31, 2019, Beneficient's assets and liabilities were recorded at fair value in the consolidated balance sheet due to the application of purchase accounting in accordance with ASC 805 as described in Note 4.

*Carrying amounts and estimated fair values*

The Company is required to disclose the estimated fair value of financial instruments, whether or not recognized in the condensed consolidated balance sheets, for which it is practicable to estimate those values. These fair value estimates are determined based on relevant market information and information about the financial instruments. Fair value estimates are intended to represent the price at which an asset could be sold or the price at which a liability could be settled. However,

APP. 589

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

given there is no active market or observable market transactions for many of the Company's financial instruments, estimates of fair values are subjective in nature, involve uncertainties and matters of significant judgment and therefore cannot be determined with precision. Changes in assumptions could significantly affect the estimated values. Nonfinancial instruments are excluded from disclosure requirements.

The carrying amounts and estimated fair values of the Company's financial instruments not recorded at fair value were as noted in the tables below (in thousands).

| | As of December 31, 2020 | | |
| --- | --- | --- | --- |
| | Level in Fair Value Hierarchy | Carrying Amount | Estimated Fair Value |
| Financial assets: | | | |
| Cash, cash equivalents and restricted cash | 1 | $ 124,160 | $ 124,160 |
| Life insurance policy benefits receivable, net | 1 | 14,334 | 14,334 |
| Financial liabilities: | | | |
| Senior credit facility | 2 | $ 193,730 | $ 202,611 |
| L Bonds and Seller Trust L bonds | 1 | 1,519,006 | 1,519,006 |
| Debt due to related parties | 2 | 76,260 | 78,081 |
| Other liabilities | 1 | 50,585 | 50,585 |

| | As of December 31, 2019 (As Restated) | | |
| --- | --- | --- | --- |
| | Level in Fair Value Hierarchy | Carrying Amount | Estimated Fair Value |
| Financial assets: | | | |
| Cash, cash equivalents and restricted cash | 1 | $ 115,790 | $ 115,790 |
| Life insurance policy benefits receivable, net | 1 | 23,031 | 23,031 |
| Financial liabilities: | | | |
| Senior credit facility with LNV Corporation | 2 | $ 174,390 | $ 184,587 |
| L Bonds and Seller Trust L Bonds | 1 | 1,293,530 | 1,293,530 |
| Debt due to related parties | 2 | 153,086 | 153,086 |
| Other liabilities | 1 | 44,408 | 44,408 |

Other liabilities is comprised of the interest and dividends payable and accounts payable and accrued expenses line items on the consolidated balance sheets as of December 31, 2020 and December 31, 2019.

Certain assets are subject to periodic impairment testing by comparing the respective carrying value of the asset to its estimated fair value. In the event we determine these assets to be impaired, we would recognize an impairment loss equal to the amount by which the carrying value of the impaired asset exceeds its estimated fair value. These periodic impairment tests utilize company-specific assumptions involving significant unobservable inputs, or Level 3, in the fair value hierarchy.

**(8) Equity Method Investments**

*FOXO Technologies Inc. (formerly, FOXO BioScience LLC)*

On November 11, 2019, GWG Holdings contributed the common stock and membership interests of its wholly-owned subsidiaries, FOXO Labs and FOXO Life ("Insurtech Subsidiaries") to a legal entity, then known as FOXO BioScience LLC, in exchange for a membership interest in FOXO. On November 13, 2020, FOXO BioScience LLC converted to a corporation and is now known as FOXO Technologies Inc. With the conversion to a corporation, GWG Holdings' previous membership interest in the LLC converted to preferred equity in FOXO. Although GWG Holdings has a financial interest in FOXO, GWG

APP. 590

F-39

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Holdings does not have a controlling financial interest because another party is the majority shareholder of the voting class of securities. Therefore, we account for GWG Holdings' ownership interest in FOXO as an equity method investment.

The 2019 transaction resulted in a loss of control of the Insurtech Subsidiaries and, as a result, we deconsolidated the subsidiaries and recorded an equity method investment balance during the fourth quarter of 2019. The loss of control required us to measure the equity investment at fair value. We determined the fair value of our investment in FOXO approximated the carrying value of $3.4 million which was primarily comprised of cash and fixed assets contributed to the entity during the fourth quarter of 2019.

The following table includes a rollforward of the equity method investment in FOXO (in thousands):

|  | Year Ended December 31, 2020 | Year Ended December 31, 2019 |
|---|---|---|
| Beginning balance | $ 1,761 | $ — |
| Contributions | 14,436 | 3,378 |
| Loss on equity method investment | (7,319) | (1,617) |
| Other | (296) | — |
| Ending balance | $ 8,582 | $ 1,761 |

In accordance with the subscription agreement of FOXO, as of December 31, 2020, GWG Holdings was committed to contribute an additional $3.8 million to the entity through October 2021, all of which was contributed by such date. GWG Holdings' investment in FOXO is presented in other assets in our consolidated balance sheets. Our proportionate share of earnings or losses from our investee is recognized in earnings (loss) from equity method investments in our consolidated statements of operations.

*The Beneficient Company Group, L.P.*

During 2018, GWG Holdings acquired 40,505,279 Common Units for a total limited partnership interest in the Common Units of approximately 89.9% as of December 31, 2018. On June 12, 2019, GWG Holdings acquired an additional 1,000,000 Common Units from a third party for a cash investment of $10.0 million.

Prior to December 31, 2019, GWG Holdings' investment in Common Units was presented in equity method investment on our consolidated balance sheets. Our proportionate share of earnings or losses from our investee was recognized in earnings (loss) from equity method investments in our consolidated statements of operations. We recorded GWG Holdings' share of the income or loss of Beneficient through September 30, 2019 on a one-quarter lag.

On December 31, 2019, GWG Holdings obtained control of Beneficient and consolidated Beneficient as of that date under the guidance in ASC 805, *Business Combinations*. See Note 4 for further information on the business combination. In connection with the consolidation, we discontinued the one-quarter reporting lag.

Preconsolidation financial information after the elimination of any intercompany transactions pertaining to Beneficient is summarized in the table below (in thousands):

|  | Twelve months ended September 30, 2019 (unaudited) |
|---|---|
| Total revenues | $ 93,921 |
| Net loss | (32,133) |
| Net loss attributable to holders of Common Units | (13,754) |
| **GWG Holdings'** portion of net loss [1] | (2,460) |

---

(1)  GWG Holdings portion of Beneficient's net loss for October 1, 2018 to September 31, 2019. This amount was recognized during the year ended December 31, 2019, prior to the consolidation of Beneficient.

F-40

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(9) Variable Interest Entities**

In accordance with ASC 810, *Consolidation*, the Company assesses whether it has a variable interest in legal entities in which it has a financial relationship and, if so, whether or not those entities are variable interest entities ("VIEs"). For those entities that qualify as VIEs, ASC 810 requires the Company to determine if the Company is the primary beneficiary of the VIE, and if so, to consolidate the VIE.

*VIEs for Which the Company is the Primary Beneficiary*

ExAlt Trusts

The Company determined that the ExAlt Trusts used in connection with Beneficient's operations are VIEs of which Beneficient is the primary beneficiary. The Company concluded that Beneficient is the primary beneficiary of the trusts as it has the power to direct the most significant activities and has an obligation to absorb potential losses of the trusts. Accordingly, the results of the trusts are included in the Company's consolidated financial statements. The assets of the trusts may only be used to settle obligations of the trusts. Other than potentially funding capital calls above the related reserve (refer to Note 18), there is no recourse to the Company for the trusts' liabilities.

The cash flows generated by these VIEs subsequent to December 31, 2019 are included within the Company's consolidated statements of cash flows. The consolidated balance sheets include the following amounts from these consolidated VIEs as of the dates presented (in thousands):

|  | December 31, 2020 | December 31, 2019 |
|---|---|---|
| **Assets:** | | |
| Cash and cash equivalents | $ 5,965 | $ 3,211 |
| Restricted cash | 5,386 | 13,248 |
| Investments in alternative assets, at NAV | 221,894 | 342,012 |
| Other assets | 1,273 | 1,335 |
| Total Assets of VIE | $ 234,518 | $ 359,806 |
| | | |
| **Liabilities:** | | |
| Repurchase obligation | $ — | $ 61,664 |
| Accounts payable and accrued expense | 2,029 | 17 |
| Total Liabilities of VIE | $ 2,029 | $ 61,681 |
| | | |
| **Equity:** | | |
| Noncontrolling interest | $ 7,208 | $ 27,062 |
| Total Equity of VIE | $ 7,208 | $ 27,062 |

The consolidated statement of operations for the year ended December 31, 2020 includes the following amounts from these consolidated VIEs (in thousands). The results of operations for year ended December 31, 2019 are not inclusive of these consolidated VIEs as Beneficient was not a consolidated subsidiary of GWG Holdings until December 31, 2019.

APP. 594

|                                                                  |   | Year Ended December 31, 2020 |
|------------------------------------------------------------------|---|-----------------------------:|
| REVENUE                                                          |   |                              |
| Investment income, net                                          | $ |                       44,106 |
| Interest income                                                 |   |                           21 |
| TOTAL REVENUE                                                    |   |                       44,127 |
| EXPENSES                                                        |   |                              |
| Other expenses                                                  |   |                          501 |
| TOTAL EXPENSES                                                  |   |                          501 |
| NET INCOME                                                      |   |                       43,626 |
| Net loss attributable to noncontrolling interests              |   |                       25,094 |
| NET INCOME ATTRIBUTABLE TO COMMON SHAREHOLDERS                 | $ |                       68,720 |

F-41

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

CT Risk Management, L.L.C.

On March 20, 2020, CT Risk Management, L.L.C. ("CT") was created as a Delaware limited liability company to reduce the impact of a potential market downturn on the interests in alternative assets that support the Collateral for receivables held by Beneficient by distributing any potential profits to the certain of the ExAlt Trusts thereby offsetting any reduction in the value of the alternative assets. The LLC agreement was amended and restated on April 16, 2020. There was no activity of CT until July 2020 when Beneficient made a capital contribution of $14.8 million, which was used to purchase the put options reflected in the consolidated balance sheet as of December 31, 2020.

CT is considered a VIE as the at-risk equity holder, Ben LP, does not have all of the characteristics of a controlling financial interest due to Ben LP's receipt of returns being limited to its initial investment in CT. The Company concluded that Beneficient is the primary beneficiary of CT as it has the power to direct the most significant activities and has an obligation to absorb potential losses of CT. Accordingly, the results of CT are included in the Company's consolidated financial statements.

As of December 31, 2020, the consolidated balance sheets include assets of this consolidated VIE with a carrying value of $7.0 million, which is recorded in the other assets line item. Additionally, the Company recorded a $7.8 million loss on investment for the year ended December 31, 2020, which is reported in the other income (loss) line item of the consolidated statements of operations.

*VIEs for Which the Company is Not the Primary Beneficiary*

Prior to December 31, 2019, we determined that the Borrowers are VIEs, but that we are not the primary beneficiary of the variable interests. We do not have the power to direct any activities of the Borrowers that most significantly impact the Borrower's economic performance. The Company's exposure to risk of loss in the Borrowers is limited to its financing receivable from the Borrowers, which is eliminated upon consolidation with Beneficient on December 31, 2019.

We determined that FOXO is a VIE, but that we are not the primary beneficiary of the variable interests. We do not have the power to direct any activities of FOXO that most significantly impact its economic performance. The Company's exposure to risk of loss in FOXO is limited to its equity method investment in the preferred equity of FOXO and its remaining unfunded capital commitments.

The following table shows the classification, carrying value and maximum exposure to loss with respect to the Company's unconsolidated VIE (in thousands):

|  | December 31, 2020 | | December 31, 2019 | |
| --- | --- | --- | --- | --- |
|  | Carrying Value | Maximum Exposure to Loss | Carrying Value | Maximum Exposure to Loss |
| Total equity method investment | $ 8,582 | $ 12,332 | $ 1,761 | $ 19,661 |

**(10) Debt**

***Senior Credit Facility with LNV Corporation***

On November 1, 2019, DLP IV entered into a second amended and restated senior credit facility with LNV Corporation (as amended and restated by the Fourth Amended Facility (defined in Note 23) on September 7, 2021, the ("LNV Credit Facility")), as lender, and CLMG Corp., as the administrative agent on behalf of the lenders under the agreement, which replaced the amended and restated senior credit facility dated September 27, 2017 that previously governed DLP IV's senior credit facility. The LNV Credit Facility makes available a total of up to $300.0 million in credit to DLP IV with a maturity date of September 27, 2029. Subject to available borrowing base capacity, additional advances are available under the LNV Credit Facility at the LIBOR rate described below. Such advances are available to pay the premiums and servicing costs of pledged life insurance policies as such amounts become due. Interest will accrue on amounts borrowed under the LNV Credit Facility at an annual interest rate, determined as of each date of borrowing or quarterly if there is no borrowing, equal to (a) the greater of 1.5% or 12-month LIBOR, plus (b) 7.50% per annum. The effective rate at December 31, 2020 was 9.00%. Interest payments are made on a quarterly basis.

F-42

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Under the LNV Credit Facility, DLP IV has granted the administrative agent, for the benefit of the lenders under the agreement, a security interest in all of DLP IV's assets.

In conjunction with entering into the LNV Credit Facility, DLP IV pledged life insurance policies having an aggregate face value of approximately $298.3 million as additional collateral and received an advance of approximately $37.1 million (inclusive of certain fees and expenses incurred in connection with the negotiation and entry into the LNV Credit Facility). The LNV Credit Facility has certain financial and nonfinancial covenants, and we were in compliance with these covenants at December 31, 2020 and continue to be as of the date of this filing.

In addition, the LNV Credit Facility has certain reporting obligations that require DLP IV to deliver audited annual financial statements no later than ninety days after the end of each fiscal year. Due to the failure to issue GWG Life, LLC audited financial statements for 2020 to LNV Corporation within 90 days after the end of the year, we were in violation of our financial reporting obligations under the LNV Credit Facility. CLMG Corp., as administrative agent for LNV Corporation, issued a limited deferral extending the delivery of these reports to May 17, 2021. We regained compliance on May 17, 2021, when the audited annual financial statements of GWG Life were delivered to LNV Corporation.

As of December 31, 2020, approximately 77.1% of the total face value of our life insurance policies portfolio is pledged to LNV Corporation. The amount outstanding under this facility was $202.6 million and $184.6 million at December 31, 2020 and 2019, respectively. There were unamortized deferred financing costs of $8.9 million and $10.2 million as of December 31, 2020 and 2019, respectively. Obligations under the LNV Credit Facility are secured by a security interest in DLP IV's assets, for the benefit of the lenders, through an arrangement under which Wells Fargo Bank, N.A. serves as securities intermediary. The life insurance policies owned by DLP IV do not serve as direct collateral for the obligations of GWG Holdings under the L Bonds and Seller Trust L Bonds. The difference between the amount outstanding and the carrying amount on our consolidated balance sheets is due to netting of unamortized debt issuance costs.

***L Bonds***

GWG Holdings began publicly offering and selling L Bonds in January 2012, which have been sold under various registration statements since that time. On December 1, 2017, an additional public offering was declared effective permitting us to sell up to $1.0 billion in principal amount of L Bonds on a continuous basis until December 2020. We reached the maximum capacity on this offering during the third quarter of 2020.

On June 3, 2020, a registration statement relating to an additional public offering was declared effective permitting us to sell up to $2.0 billion in principal amount of L Bonds on a continuous basis through June 2023. These bonds contain the same terms and features as our previous offerings.

We are party to an indenture governing the L Bonds dated October 19, 2011, as amended ("Indenture"), under which GWG Holdings is obligor, GWG Life is guarantor, and Bank of Utah serves as indenture trustee. Effective December 31, 2019, we entered into Amendment No. 2 to the indenture, which primarily modified the calculation of the debt coverage ratio to allow the Company greater flexibility to finance and to anticipate the potential impacts of GWG Holdings' relationship with Beneficient.

We were in compliance with the covenants of the indenture at December 31, 2020 and as of the date of this filing, and no Events of Default (as defined in the Amended and Restated Indenture) existed as of such dates.

GWG Holdings publicly offers and sells L Bonds under a registration statement declared effective by the SEC and have issued Seller Trust L Bonds under the L Bond Supplemental Indenture, as described below. We temporarily suspended the offering of GWG Holdings' L Bonds, commencing April 16, 2021, as a result of our delay in filing certain periodic reports with the SEC, including this 2020 Form 10-K. We anticipate recommencing the offering of GWG Holdings' L Bonds when we regain compliance with SEC filing requirements.

The bonds have renewal features under which we may elect to permit their renewal, subject to the right of bondholders to elect to receive payment at maturity. Interest is payable monthly or annually depending on the election of the investor.

At December 31, 2020 and 2019, the weighted-average interest rate of GWG Holdings' L Bonds was 7.21% and 7.15%, respectively. The principal amount of L Bonds outstanding, including Liquidity Bonds discussed below, was $1.3 billion and

APP. 597

gwgh-20201231

F-43

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

$0.9 billion at December 31, 2020 and 2019, respectively. The difference between the amount of outstanding L Bonds and the carrying amount on our consolidated balance sheets is due to netting of unamortized deferred issuance costs, cash receipts for new issuances, and payments of redemptions in process. There were $18.0 million and $15.8 million of subscriptions in process as of December 31, 2020 and 2019, respectively. Amortization of deferred issuance costs was $17.0 million and $12.7 million for the years ended December 31, 2020 and 2019, respectively. Future expected amortization of deferred financing costs as of December 31, 2020 is $49.0 million in total over the next seven years.

Future contractual maturities of L Bonds, including Liquidity Bonds discussed below, but excluding Seller Trust L Bonds, and future amortization of their deferred financing costs, at December 31, 2020 (in thousands) are as follows:

| Years Ending December 31, | Contractual Maturities | | Unamortized Deferred Financing Costs | |
|---|---|---|---|---|
| 2021 | $ | 191,582 | $ | 2,116 |
| 2022 | | 293,038 | | 8,522 |
| 2023 | | 191,446 | | 7,616 |
| 2024 | | 121,105 | | 5,220 |
| 2025 | | 167,433 | | 8,251 |
| Thereafter | | 313,277 | | 17,232 |
| | $ | 1,277,881 | $ | 48,957 |

### Seller Trust L Bonds

On August 10, 2018, in connection with the initial transfer of the Exchange Transaction described in Note 1, GWG Holdings, issued Seller Trust L Bonds in the amount of $366.9 million to the Seller Trusts. The maturity date of the Seller Trust L Bonds is August 9, 2023. The Seller Trust L Bonds bear interest at 7.50% per year. Interest is payable monthly in cash.

After December 28, 2020, the holders of the Seller Trust L Bonds have the right to cause GWG Holdings to repurchase, in whole but not in part, the Seller Trust L Bonds held by such holder. The repurchase may be paid, at GWG Holdings' option, in the form of cash, and/or a pro rata portion of (i) the outstanding principal amount and accrued and unpaid interest under the Commercial Loan Agreement and (ii) Common Units, or a combination of cash and such property.

GWG Holdings' L Bonds are offered and sold under a registration statement declared effective by the SEC, as described above, and GWG Holdings has issued Seller Trust L Bonds under the L Bond Supplemental Indenture.

As a result of the Collateral Swap on September 30, 2020, as discussed in Note 1, $94.8 million of Seller Trust L Bonds are now held by certain trusts within the ExAlt Trusts, and are eliminated in consolidation as of December 31, 2020.

The principal amount of Seller Trust L Bonds outstanding reflected on the consolidated balance sheets was $272.1 million and $366.9 million as of December 31, 2020 and 2019, respectively.

### Liquidity Bonds

On December 31, 2020, GWG Holdings, GWG Life, and Bank of Utah, as trustee (the "Trustee"), entered into a supplemental indenture, dated as of December 31, 2020 (the "Liquidity Bond Supplemental Indenture"), to that certain Amended and Restated Indenture, dated as of October 23, 2017 (as amended, the "Indenture"), among GWG Holdings, GWG Life and the Trustee, providing for the issuance from time to time of up to $1.0 billion in aggregate principal amount of two new series of L Bonds (the "Liquidity Bonds"). The Liquidity Bonds will be offered and sold to accredited investors in transactions that are exempt from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act"), pursuant to Regulation D under the Securities Act.

The Liquidity Bonds were issued as part of the Company's strategy to expand its exposure to a portfolio of loans collateralized by cash flows from illiquid alternative assets. Holders of alternative assets will be able to contribute their alternative assets to trusts that are part of the ExAlt Plan™ established by GWG Holdings' subsidiary, Ben LP, in exchange for Liquidity Bonds. The Liquidity Bonds will be

APP. 599

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 600 of 1031     PageID 772

issued by GWG Life, as issuer, and guaranteed by GWG Holdings, will bear interest rates determined by the Company and the holders of the alternative assets being contributed and will generally

F-44

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

have a maturity of four years from issuance. The Liquidity Bonds will be issued under the Indenture, and will rank pari passu with respect to payment on and collateral securing all of the Company's other L Bonds issued under the Indenture.

The Liquidity Bond Supplemental Indenture provides for the issuance of two series of Liquidity Bonds: Series A Liquidity Bonds and Series B Liquidity Bonds. The Company expects an exchange of alternative assets for Series A Liquidity Bonds will be treated as a non-taxable exchange for U.S. federal and state income tax purposes, and that an exchange of alternative assets for Series B Liquidity Bonds will be treated as a taxable exchange for U.S. federal and state income tax purposes. In addition to interest payments, holders of Series A Liquidity Bonds will be entitled to an annual, cash participation payment of up to 1.5% of the principal amount of their Series A Liquidity Bonds subject to GWG Life having net taxable income in a given year, prorated for the portion of such year that the holder owned the Series A Liquidity Bond. To the extent that the net taxable income of GWG Life is insufficient to provide holders of Series A Liquidity Bonds with the full participation payment for any given year, such shortfall shall carry forward and be payable from net taxable income earned by GWG Life in subsequent years.

Six months after the issuance date of a Liquidity Bond, the holder may elect to exchange the Liquidity Bond, at the beginning of each month and upon 30 days' prior written notice to GWG Holdings, for that number of shares of GWG Holdings' common stock (the "GWG Common Stock") as determined by dividing the entire outstanding principal balance and accrued but unpaid interest of the Liquidity Bond by the Exchange Price (as defined below) or, at GWG Holdings' election, common securities of a subsidiary of GWG Holdings (the "Subsidiary Common Securities") if they are publicly traded on a national securities exchange, by dividing the entire outstanding principal balance and accrued but unpaid interest of the Liquidity Bond by the Subsidiary Common Securities Exchange Price (as defined below). For purposes of the Liquidity Bond Supplemental Indenture, (i) the Exchange Price will be set at a premium to the closing price of GWG Holdings' Common Stock on the Nasdaq Stock Market on the last trading day prior to the execution and delivery of the binding agreement for issuance of the Liquidity Bond, and (ii) the Subsidiary Common Securities Exchange Price will be based on the Exchange Price multiplied by the exchange ratio of GWG Common Stock to the Subsidiary Common Securities issued in connection with any transaction in which GWG Common Stock is converted into, or exchanged for, Subsidiary Common Securities, or if there is no conversion or exchange, the Subsidiary Common Securities Exchange Price will be determined by GWG Holdings' board of directors in good faith taking into account differences in capital structure and related matters between GWG Holdings and the issuer of such Subsidiary Common Securities.

The Liquidity Bonds are payable in cash at maturity; provided that the Liquidity Bonds may be paid at maturity (in GWG Life's sole discretion) in GWG Common Stock (at the Exchange Price) or Subsidiary Common Securities if they are publicly traded on a national securities exchange (at the Subsidiary Common Security Exchange Price), or a combination of cash and GWG Common Stock or Subsidiary Common Securities.

GWG Life may call and redeem the entire outstanding principal balance and accrued but unpaid interest of any or all of the Liquidity Bonds for cash at any time without penalty or premium. Liquidity Bond holders have no rights to require GWG Life to redeem any Liquidity Bond prior to maturity.

As of December 31, 2020, there was $0.5 million in principal and $0.2 million of unamortized financing costs of Liquidity Bonds. The net of these amounts, $0.3 million, is presented on the consolidated balance sheets in the L Bonds line item.

*Debt Due to Related Parties*

As of December 31, 2020 and December 31, 2019, Beneficient had borrowings that consisted of the following (in thousands):

|  | December 31, 2020 | December 31, 2019 |
|---|---|---|
| First Lien Credit Agreement | $ 2,288 | $ 77,477 |
| Second Lien Credit Agreement | 72,260 | 72,184 |
| Other borrowings | 2,628 | 2,538 |
| Unamortized debt premiums (discounts) | (916) | 887 |
| Total debt due to related parties | $ 76,260 | $ 153,086 |

F-45

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Beneficient First and Second Lien Credit Agreement*

On May 15, 2020, Beneficient executed a Term Sheet with HCLP Nominees, L.L.C ("HCLP" or the "lender") to amend its then senior credit agreement and subordinated credit agreement. The resulting Second Amended and Restated First Lien Credit Agreement and Second Amended and Restated Second Lien Credit Agreement (collectively, the "Second Amendments") was executed on August 13, 2020, with terms and conditions substantially consistent with the Term Sheet, as further described below. Prior to the execution of the Second Amendments, other amendments extended the June 30, 2020 maturity dates of both loans to August 13, 2020, while Beneficient and the lender finalized the amended and restated credit agreements. Additional agreements were entered into on June 10, 2020, and on June 19, 2020, consistent with the Term Sheet, whereby Beneficient agreed to repay $25.0 million of the then outstanding principal balance and pay an extension fee of 2.5% of the outstanding aggregate principal balance of the loans, calculated after the $25.0 million repayment, on July 15, 2020. A total of $28.6 million was paid on July 15, 2020, which included the $25.0 million principal payment, related accrued interest thereon, and the extension fee described above.

GWG Holdings, GWG Life, and a newly formed entity, DLP V, also entered into the credit agreements with respect to provisions related to the potential future assumption of the loans by DLP V as described below. The amendments extended the maturity date of both loans to April 10, 2021, and increased the interest rate on each loan to 1-month LIBOR plus 8.0%, with a maximum interest rate of 9.5%. The loans are payable in three installments of $25.0 million on each of September 10, 2020, December 10, 2020, and March 10, 2021, with the remaining balance payable on April 10, 2021. On March 10, 2021, and again on June 28, 2021, Beneficient executed subsequent amendments, among other items, to further extend the maturity date to May 30, 2022, as more fully described below and in Note 23. Through December 31, 2020, all principal and interest due under the Second Amendments have been paid.

The Second Amendments provided for the assumption of the loans by DLP V pursuant to a Third Amended and Restated First Lien Credit Agreement, upon satisfaction of certain conditions precedent, including the issuance of Beneficient's trust company charter by the Texas Department of Banking. The amendments provide that DLP V will receive Preferred C interests in exchange for assuming Beneficient's amended loans in an amount equal to 110% of the then outstanding loan balance. Upon assumption of the loans, the lender will receive a fee of 2.0% of the then outstanding balance of the loans. Furthermore, upon assumption of the loans, the Commercial Loan Agreement between GWG Life and Ben LP will be assumed by GWG Life USA, LLC, a wholly owned subsidiary of GWG Holdings, in exchange for Class A Subclass A-2 Units of BCH equivalent to the outstanding principal balance of the debt evidenced by the Commercial Loan Agreement. In connection with the assumption of the loans by DLP V, the lender will be granted a security interest in the Preferred Series A Subclass 1 Unit Accounts of BCH held by GWG Life and the life insurance policies held by DLP V, which are to be contributed to DLP V from GWG Life Trust. The assumption of the loans by DLP V has not occurred and, as described below, further amendments to the Second Amended and Restated Credit Agreement and the Second Amended and Restated Subordinate Credit Agreement removed the assumption of the loans by DLP V.

In connection with the Ben Credit Agreements (as defined in Note 23), (i) the lender will be permitted to make capital contributions of up to $152.0 million in exchange for a Preferred Series A Subclass 1 Unit Account of BCH for an equal amount of cash for two years after the assumption of the loans; should the lender elect to make such a capital contribution, GWG Holdings or one of its subsidiaries will be allowed to exchange an amount of Preferred C into Preferred Series A Subclass 1 Unit Accounts or contribute cash for Preferred Series A Subclass 1 Unit Accounts, in certain circumstances, in order to maintain its relative ownership percentage of the Preferred Series A Subclass 1 Unit Accounts; (ii) Beneficient Holdings, Inc. ("BHI"), which owns a majority of the Class S Ordinary Units, Preferred Series A Subclass 1 Unit Accounts, and FLP Subclass 1 Unit Accounts issued by BCH, will grant certain tax-related concessions related to the transaction to the lender as may be mutually agreed upon between the parties, and (iii) in exchange for the tax-related concessions to be agreed between the parties, (a) 5% of BHI's Preferred Series A Sub Class 1 Unit Account, which will be held by the lender, may convert, upon delivery of notice by BHI or its designee, to a Preferred A.0 Unit Account of BCH, and (b) recipients of a grant of Preferred Series A Subclass 1 Unit Accounts from BHI will have the right to put an amount of Preferred Series A Subclass 1 Unit Accounts to Ben LP equal to any associated tax liability stemming from any such grant; provided that the aggregated associated tax liability shall not relate to more than $30 million of grants of Preferred Series A Subclass 1 Unit Accounts from BHI; and provided, further, that such a put cannot be exercised prior to July 1, 2021. There has been no liability recorded for the put right as of December 31, 2020, as the transfer of Preferred Series A Subclass Unit Accounts has not occurred.

F-46

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The amended loan terms and ancillary documents contain covenants that (i) prevent Beneficient from issuing any securities senior to the Preferred Series A Subclass 1 or Preferred A.0 Unit Accounts; (ii) prevent Beneficient from incurring additional debt or borrowings greater than $10.0 million, other than trade payables, while the loans are outstanding; (iii) prevent, without the written consent of the lender, GWG Life Trust or DLP V from selling, transferring or otherwise disposing any of the life insurance policies held by GWG Life Trust as of May 15, 2020, except that life insurance policies may be sold, transferred, or otherwise disposed of, provided that concurrent with the assumption of the loans by DLP V, a prepayment of the loans would be required, if necessary, to maintain certain loan-to-value percentages, after giving effect to such sale, transfer or disposal; and (iv) prevent, without the written consent of the lender, GWG Holdings from selling, transferring, or otherwise disposing of any Preferred Series A Subclass 1 Unit Accounts held as of May 15, 2020, other than to DLP V. These covenants are materially similar to the terms under the Third Amended and Restated First Lien Credit Agreement once assumed by DLP V. As of December 31, 2020, Beneficient was in compliance with all covenants.

The assumption set forth in the amendments are subject to, among other things, the satisfaction of certain closing conditions, some of which may be outside of the parties' control. These loans are not currently guaranteed by GWG.

As more fully described in Note 23, on March 10, 2021, Beneficient executed the Amendment No.1 to the Second Amended and Restated Credit Agreement and Amendment No. 1 to the Second Amended and Restated Subordinate Credit Agreement with its lender. The amendments extend the maturity date of both loans to May 30, 2022. The loans are payable in three installments of $5.0 million on each of September 10, 2021 (subsequently deferred as discussed below), December 10, 2021, and March 10, 2022, with the remaining balance payable on May 30, 2022. The amendments also provide for an extension fee equal to 1.5% of the amount outstanding under the Credit Agreements, which was added to the outstanding amount under the Credit Agreements as provided for in the amendments. Further, as more fully described in Note 23, on June 28, 2021, Beneficient executed the Amendment No. 2 to the Second Amended and Restated Credit Agreement and Amendment No. 2 to the Second Amended and Restated Subordinate Credit Agreement with its lender. The amendments eliminate the obligation of DLP V to assume the Ben Credit Agreements as provided for in the Second Amendments and waive the daily fee payable upon the Trigger as provided for in the Amendment No. 1 to the Ben Credit Agreements. Finally, as also discussed in Note 23, effective July 15, 2021, Beneficient executed Consent and Amendment No. 3 to the Second Amended and Restated Credit Agreement and Amendment No. 2 to the Second Amended and Restated Subordinate Credit Agreement with its lender, which (i) deferred the payment of all accrued and unpaid interest until December 10, 2021, and (ii) deferred the installment payment of $5.0 million due on September 10, 2021, to December 10, 2021. Beneficient agreed to pay an amendment fee to the lender in an amount equal to 3% of the then outstanding principal and interest on December 10, 2021.

Beneficient's Second Lien Credit Agreement was originally issued to BHI, a Ben Founder Affiliate. During 2019, the Second Lien Credit Agreement was contributed to HCLP and thus, all existing senior loan obligations are held by HCLP as of December 31, 2020 and 2019. Future transactions between these parties are more fully described in Note 20.

HCLP is indirectly associated with Ben Founder. Further, an indirect parent entity of HCLP had loans outstanding to Ben Founder Affiliates as of December 31, 2020. Neither GWG Holdings nor Beneficient are a party to these loans, nor have they secured or guaranteed the loans. See Note 20 for further discussion of the relationship between HCLP and Ben Founder.

Beneficient's additional borrowings as detailed in the table below mature in 2023 and 2024.

Future contractual maturities of Beneficient's debt due to related parties as of December 31, 2020 are as follows (in thousands):

| Years Ending December 31, | | |
|---|---|---:|
| 2021 | $ | 74,548 |
| 2022 | | — |
| 2023 | | 750 |
| 2024 | | 1,856 |
| 2025 | | — |
| Thereafter | | — |
| | $ | 77,154 |

APP. 604

APP. 605

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(11) Stockholders' Equity**

***GWG Holdings Equity***

*Common Stock*

In September 2014, GWG Holdings consummated an initial public offering of its common stock resulting in the sale of 800,000 shares of common stock at $12.50 per share, and net proceeds of approximately $8.6 million after the payment of underwriting commissions, discounts and expense reimbursements. In connection with this offering, the common stock of GWG Holdings was listed on the Nasdaq Capital Market under the ticker symbol "GWGH."

The 2018 transactions between GWG Holdings, GWG Life, Beneficient and the Seller Trusts described in Note 1 ultimately resulted in the issuance of 27,013,516 shares of GWG Holdings' common stock to the Seller Trusts in exchange for Common Units. The shares were offered and sold in reliance upon the exemption from registration provided by Section 4(a)(2) under the Securities Act of 1933, as amended. Also, the Purchase and Contribution Agreement described in Note 1 ultimately resulted in the sale of 2,500,000 shares of GWG Holdings common stock to BCC, and the contribution of 1,452,155 shares of GWG Holdings common stock to AltiVerse.

Pursuant to the Exchange Agreement described in Note 1, commencing on December 31, 2019, holders of Common Units have the right to exchange their Common Units for common stock of GWG Holdings. The exchange ratio in the Exchange Agreement is based on the ratio of the capital account associated with the Common Units to be exchanged to the market price of the common stock of GWG Holdings based on the volume weighted average price of GWG Holdings' common stock for the five consecutive trading days prior to the quarterly exchange date. No Common Units have been exchanged for common stock of GWG Holdings through December 31, 2020.

On November 15, 2018, the Board of Directors of GWG Holdings approved a stock repurchase program pursuant to which GWG Holdings was permitted, from time to time, to purchase shares of its common stock for an aggregate purchase price not to exceed $1.5 million. Stock repurchases were able to be executed through various means, including, without limitation, open market transactions, privately negotiated transactions or otherwise. The Company repurchased 42,750 shares under this program in the first quarter of 2019 at an average per share price of $8.43. The stock repurchase program did not obligate the Company to purchase any shares and expired on April 30, 2019.

*Redeemable Preferred Stock*

On November 30, 2015, GWG Holdings' public offering of up to 100,000 shares of RPS at $1,000 per share was declared effective. Holders of RPS are entitled to cumulative dividends at the rate of 7% per annum, paid monthly. Dividends on the RPS are recorded as a reduction to additional paid-in capital, if any, then to the outstanding balance of the preferred stock if additional paid-in capital has been exhausted. Under certain circumstances described in the Certificate of Designation for the RPS, additional shares of RPS may be issued in lieu of cash dividends.

The RPS ranks senior to GWG Holdings' common stock and pari passu with GWG Holdings' RPS 2 (see further details in the section below) and entitles its holders to a liquidation preference equal to the stated value per share (i.e., $1,000) plus accrued but unpaid dividends. Holders of RPS may presently convert their RPS into GWG Holdings' common stock at a conversion price equal to the volume-weighted average price of GWG Holdings' common stock for the 20 trading days immediately prior to the date of conversion, subject to a minimum conversion price of $15.00 and in an aggregate amount limited to 15% of the stated value of RPS originally purchased from us and still held by such purchaser.

Holders of RPS may request that we redeem their RPS at a price equal to their stated value plus accrued but unpaid dividends, less an applicable redemption fee, if any, as specified in the Certificate of Designation. Nevertheless, the Certificate of Designation for RPS permits us in our sole discretion to grant or decline redemption requests. Subject to certain restrictions and conditions, we may also redeem shares of RPS without a redemption fee upon a holder's death, total disability or bankruptcy. In addition, after one year from the date of original issuance, we may, at our option, call and redeem shares of RPS at a price equal to their liquidation preference.

In March 2017, we closed the RPS offering to additional investors having sold 99,127 shares of RPS for an aggregate gross consideration of $99.1 million and incurred approximately $7.0 million of related selling costs.

APP. 606

F-48

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

At the time of its issuance, we determined that the RPS contained two embedded features: (1) optional redemption by the holder, and (2) optional conversion by the holder. We determined that each of the embedded features met the definition of a derivative; however, based on our assessment under ASC 470, *Debt*, ("ASC 470") and ASC 815, *Derivatives and Hedging*, ("ASC 815"), we do not believe bifurcation of either the holder's redemption or conversion feature is appropriate.

*Series 2 Redeemable Preferred Stock*

On February 14, 2017, GWG Holdings' public offering of up to 150,000 shares of RPS 2 at $1,000 per share was declared effective. The terms of the RPS 2 are largely consistent with those of the RPS, other than the conversion and redemption features discussed below.

Holders of RPS 2 may, less an applicable conversion discount, if any, convert their RPS 2 into GWG Holdings' common stock at a conversion price equal to the volume-weighted average price of GWG Holdings' common stock for the 20 trading days immediately prior to the date of conversion, subject to a minimum conversion price of $12.75 and in an aggregate amount limited to 10% of the stated value of RPS 2 originally purchased from us and still held by such purchaser. We may, at our option, call and redeem shares of RPS 2 at a price equal to their liquidation preference (subject to a minimum redemption price, in the event of redemptions occurring less than one year after issuance, of 107% of the stated value of the shares being redeemed).

In April 2018, we closed the RPS 2 offering to additional investors having sold 149,979 shares of RPS 2 for an aggregate gross consideration of $150.0 million and incurred approximately $10.3 million of related selling costs.

The RPS 2 was determined to have the same two embedded features discussed in the RPS section above (optional redemption by the holder and optional conversion by the holder). We do not believe bifurcation of either the holder's redemption or conversion feature is appropriate.

**Beneficient Equity**

As of December 31, 2020, Ben LP has issued Common Units and BCH, a consolidated subsidiary of Ben LP, has issued general partnership Class A Units (Subclass A-1 and A-2), Class S Ordinary Units, Class S Preferred Units, FLP Units (Subclass 1 and Subclass 2), Preferred Series A Subclass 1 Unit Accounts, Preferred Series A Subclass 2 Unit Accounts, and Preferred Series C Unit Accounts. The Preferred Series A Subclass 0 Unit Accounts were created under the 5th Amended and Restated LPA; however, none have been issued as of December 31, 2020. The 5th Amended and Restated LPA of BCH governs the terms of these equity securities.

*Common Units*

As of December 31, 2020 and December 31, 2019, Ben LP has a total of 48,205,756 and 44,146,623 Common Units issued and outstanding, respectively. As of December 31, 2020 and December 31, 2019, GWG Holdings owns 46,887,915 and 42,171,946, Common Units, respectively, which are eliminated in consolidation. The remaining issued and outstanding Common Units are recorded in the consolidated balance sheets in the noncontrolling interests line item.

*Preferred Series A Subclass 0 (Noncontrolling Interests)*

On July 15, 2020, BCH amended its limited partnership agreement in a 5th Amended and Restated LPA, which created a new subclass of Preferred Series A Unit Accounts, the Preferred A.0.

As a subclass of the Preferred Series A Unit Accounts, the Preferred A.0 receives the same preferred return on a quarterly basis as the other Preferred Series A subclasses. However, the Preferred A.0 is senior to all other classes of preferred equity, including the other subclasses of Preferred Series A in terms of allocations of profits, distributions, and liquidation. The Preferred A.0 can be converted into Class S Units at the election of the holder, at a price equal to (x) prior to the initial public listing, the per Common Unit fair market value as determined by the general Partner and (y) following the initial public listing, the lesser of (i) $10 and (ii) if the Common Units are listed on a national securities exchange, the volume-weighted average closing price of a Common Unit as reported on the exchange on which the Common Units are traded for the twenty (20) days immediately prior to the applicable exchange date, or if the Common Units are not listed on a national securities exchange, then the volume-weighted average closing price of a security traded on a national securities exchange or quoted in

APP. 608

F-49

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

an automated quotation system into which the Common Units are convertible or exchangeable for the twenty (20) days immediately prior to the applicable exchange date.

The Preferred A.0 Unit Accounts have not been issued as of December 31, 2020.

*Preferred Series A Subclass 1 (Redeemable Noncontrolling Interest)*

BCH, a consolidated subsidiary of Ben LP, has non-unitized equity outstanding. The Preferred Series A Subclass 1 Unit Accounts are non-participating and convertible on a dollar basis.

In 2019, Preferred Series A Subclass 1 Unit Account holders signed an agreement to forbear the right to receive an annualized preferred return in excess of a rate determined materially consistent with the methodology below until, initially, the earlier of December 31, 2019 or three months following the issuance of the limited trust association charter by the Texas Department of Banking. The charter from the Texas Department of Banking was not issued as of December 31, 2019. In 2020, this forbearance agreement was extended through December 31, 2020.

The income allocation methodology under this forbearance agreement was as follows:

- First, Ben, as the sole holder of Class A Units issued by BCH is allocated income from BCH to cover the expenses incurred solely by Ben;

- Second, the remaining income at BCH is allocated 50% to the aggregate of Class A Units and Class S Ordinary Units and 50% to Preferred Series A Subclass 1 Unit Accounts, until the Common Units issued by Ben LP receive a 1% annualized return on the Common Unit account balance;

- Third, after the 1% annualized return to the Common Unit issued by Ben LP is achieved, additional income is allocated to the Preferred Series A until the Preferred Series A is allocated the amount required under the LPA, (as amended); and

- Finally, any remaining income is allocated under the terms of the current LPA (pro-rata between the Class A Units and Class S Ordinary Units).

If and when the forbearance agreement expires, account holders will be entitled to a compounded quarterly preferred return. The preferred return to be paid to Preferred Series A Unitholders is limited by a quarterly preferred return rate cap that is based on the annualized revenues of BCH. Annualized revenues are defined as four times the sum of total quarterly interest, fee and dividend income plus total noninterest revenues. This quarterly rate cap is defined as follows:

- 0.25% if annualized revenues are $80 million or less

- 0.50% if annualized revenues are greater than $80 million but equal to or less than $105 million

- 0.75% if annualized revenues are greater than $105 million but equal to or less than $125 million

- 1.00% if annualized revenues are greater than $125 million but equal to or less than $135 million

- 1.25% if annualized revenues are greater than $135 million but equal to or less than $140 million

- If over $140 million, the preferred return calculation is based on a fraction (i) the numerator of which is (A) the positive percentage rate change, if any, to the seasonally adjusted CPI-U covering the period from the date of the last allocation of profits to such holders, plus (B) (x) 2% prior to an Initial Public Offering (as defined in the BCH LPA) by Ben LP and (y) 3% thereafter, and (ii) the denominator of which is one minus the highest effective marginal combined U.S. federal, state and local income tax rate in effect as of the beginning of the fiscal quarter for which such determination is being made for an individual resident in New York City, New York, assuming (1)that the aggregate gross income allocable with respect to the quarterly preferred return for such fiscal year will consist of the same relative proportion of each type or character (e.g., long term or short term capital gain or ordinary or exempt income) of gross income item included in the aggregate gross income actually allocated in respect of the quarterly preferred return for the fiscal year reflected in the BCH's most recently filed Internal Revenue Service Form 1065 and (2) any state and local income taxes are not deductible against U.S. federal income tax.

F-59

APP. 610

APP. 611

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The definition of Initial Public Offering includes an event, transaction or agreement pursuant to which the Common Units are convertible or exchangeable into equity securities listed on a national securities exchange or quotation in an automated quotation system.

No amounts have been paid to the Preferred Series A Subclass 1 Unit Account holders related to the preferred return from inception through December 31, 2020, and any amounts earned have been accrued and are included in the balance of redeemable noncontrolling interests line item of the consolidated balance sheets. Certain Preferred Series A Subclass 1 Unit Account holders agreed to be specially allocated any income or losses associated with the Beneficient Management Partners, L.P. Equity Incentive Plan and certain other costs.

Upon election by a holder, the Preferred Series A Unit Accounts (other than Preferred Series A Subclass 2 Unit Accounts) are, at any time on or after January 1, 2021, convertible in an amount of Preferred Series A Unit Accounts (other than Preferred Series A Subclass 2 Unit Accounts), equal to 20% of their Sub-Capital Accounts into Class S Ordinary Units (with the right to convert any unconverted amount from previous years in any subsequent years). Upon an election, a holder of Preferred Series A Subclass 1 Unit Accounts will be issued Class S Ordinary Units necessary to provide the holder with a number of Class S Ordinary Units that, in the aggregate, equal (a) the balance of the holder's capital account associated with the Preferred Series A Subclass 1 Unit Accounts being converted divided by (b) either (x) prior to an initial public offering, the appraised per Class A Unit fair market value as determined by Beneficient or (y) following an initial public offering, the average price of a Common Unit for the thirty (30) day period ended immediately prior to the applicable conversion date. The holder of such newly issued Class S Ordinary Units may immediately convert them into Common Units. Additionally, effective December 31, 2030, if the Preferred Series A Subclass 1 Unit Accounts have not been converted, they will redeem for cash in an amount equal to the then outstanding capital account balance of the accounts. If available redeeming cash (as defined in the LPA) is insufficient to satisfy any such redemption requirements, BCH, on a quarterly basis, will redeem additional Preferred Series A Units until all such Preferred Series A Units have been redeemed. The Preferred Series A Subclass 1 Unit Accounts are subject to certain other conversion and redemption provisions.

The current LPA of BCH also includes certain limitations of BCH, without the consent of a majority-in-interest of the Preferred Series A Unit Account holders, to (i) issue any new equity securities and (ii) except as otherwise provided, incur indebtedness that is senior to or pari passu with any right of distribution, redemption, repayment, repurchase or other payments relating to the Preferred Series A Unit accounts. Further, BCH cannot, prior to the conversion of all the Preferred Series A Unit accounts, incur any additional long-term debt unless (i) after giving effect to the incurrence of the new long-term debt on a pro forma basis, the sum of certain preferred stock, existing debt and any new long-term indebtedness would not exceed 55% of BCH's net asset value ("NAV") plus cash on hand, and (ii) at the time of incurrence of any new long-term indebtedness, the aggregate balance of BCH's (including controlled subsidiaries) debt plus such new long-term debt does not exceed 40% of the sum of the NAV of the interests in alternative assets supporting the Collateral underlying the loan portfolio of BCH and its subsidiaries plus cash on hand at Ben LP, BCH and its subsidiaries.

The Preferred Series A Subclass 1 Unit Accounts are recorded in the consolidated balance sheet in the redeemable noncontrolling interest line item.

*Preferred Series C Unit Accounts*

The 5th Amended and Restated LPA also created a new class of preferred equity, the Preferred Series C Unit Accounts. The Preferred Series C Unit Accounts are non-participating and convertible on a basis consistent with the UPA discussed in Note 1. Account holders are entitled to a compounded quarterly preferred return based on a fraction, the numerator of which is (a) the sum of an inflation adjustment amount, plus (1) 0.5% prior to the initial public listing and (2) 0.75% following the initial public listing, and the denominator of which is (b) 1 minus the means of the highest effective marginal combined U.S. federal, state and local income tax rate (including the rate of taxes under Section 1411 of the Code) for a Fiscal Year prescribed for an individual resident in New York, New York (taking into account (a) the nondeductibility of expenses subject to the limitations described in Sections 67 and 68 of the Code and (b) the character (e.g., long-term or short-term capital gain or ordinary or exempt income) of the applicable income, but not taking into account the deductibility of state and local income taxes for U.S. federal income tax purposes), based on the Partnership's most recently filed IRS form 1065.

BCH calculates two Preferred Series C Unit Accounts capital accounts: the Liquidation Capital Account and the Conversion Capital Account. In calculating the Conversion Capital Account, the Preferred Series C Unit Accounts are allocated profits

APP. 612

F-51

APP. 613

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

and losses junior to the Preferred Series A Unit Accounts. In calculating the Liquidation Capital Account, the Preferred Series C Unit Accounts are allocated profits and losses pari passu with the Preferred Series A Unit Accounts.

Following the exchange of any Preferred Series C Unit Accounts into Common Units under the UPA described in Note 1, the excess of the profits and losses allocated to the Preferred Series C Unit Accounts under the Liquidation Capital Account will be deemed the "Excess Amount." This Excess Amount will be specially allocated at each tax period in accordance with the principals of Treasury Regulation Section 1.704-1(b)(4)(x), to the Preferred Series A Subclass 1 Units Accounts, prior to any amount of profit, income or gain being allocated to any other class of units (other than the Preferred A.0) or limited partners until such special allocations equal, in the aggregate, such Excess Amount.

The only conversion, redemption, or exchange rights available to the Preferred Series C Unit Accounts are those rights afforded in accordance with the UPA, described in Note 1, or such similar agreement.

While any amount of Preferred Series C Unit Accounts is outstanding, BCH cannot make any distributions, other than tax distributions and redemptions, distributions upon a liquidation of BCH, and distributions of net consideration received from a sale of BCH, without the prior consent of a majority in interest of the holders of the Preferred Series C Unit Accounts.

As of December 31, 2020, the carrying value of GWG Holdings' investments in Preferred Series C Unit Accounts was $195.6 million. The Preferred Series C Unit Accounts are eliminated upon consolidation.

*Class S Ordinary Units*

As of December 31, 2020 and 2019, BCH, a subsidiary of Ben LP, had issued and outstanding 5.8 million and 5.7 million Class S Ordinary Units, respectively. The Class S Ordinary Units participate on an as-converted basis pro-rata in the share of the profits or losses of BCH and subsidiaries following all other allocations made by BCH and its subsidiaries. As limited partner interests, these units have limited voting rights and do not entitle participation in the management of BCH's business and affairs. The Class S Ordinary Units are exchangeable for Common Units on a one-for-one basis, subject to customary conversion rate adjustments for splits, distributions and reclassifications, as well as compliance with any applicable vesting and transfer restrictions. Each conversion also results in the issuance to Ben LP of a Class A Unit of BCH for each Common Unit issued.

The Class S Ordinary Units are recorded in the consolidated balance sheet in the noncontrolling interests line item.

*Class S Preferred Units*

The limited partnership agreement of BCH allows it to issue Class S Preferred Units. The Class S Preferred Units are entitled to a quarterly preferred return that is limited by the quarterly preferred return rate cap described above for Preferred Series A Subclass 1 except for when annualized revenues exceed $140 million, the Class S Preferred return is based on a fraction (i) the numerator of which is (A) the positive percentage rate change, if any, to the seasonally adjusted CPI-U covering the period from the date of the last allocation of profits to such holders, plus (B) 0.75 percent, and (ii) the denominator of which is one minus the highest effective marginal combined U.S. federal, state and local income tax rate in effect as of the beginning of the fiscal quarter for which such determination is being made for an individual resident in New York City, New York, assuming (1) that the aggregate gross income allocable with respect to the quarterly preferred return for such fiscal year will consist of the same relative proportion of each type or character (e.g., long term or short term capital gain or ordinary or exempt income) of gross income item included in the aggregate gross income actually allocated in respect of the quarterly preferred return for the fiscal year reflected in the Ben Group Partnership's most recently filed IRS Form 1065 and (2) any state and local income taxes are not deductible against U.S. federal income tax. The Class S Preferred Units also participate on an as-converted basis pro-rata in the share of the profits or losses of BCH and subsidiaries following all other allocations made by BCH and its subsidiaries. As limited partner interests, these units are generally non-voting and do not entitle participation in the management of the BCH's business and affairs. Generally, the Class S Preferred Units are exchangeable for Common Units in Ben LP on a 1.2-for-1 basis, subject to customary conversion rate adjustments for splits, distributions and reclassifications, as well as compliance with any applicable vesting and transfer restrictions. Each conversion also results in the issuance to Ben LP of a Class A Unit for each Common Unit issued. Holders of Class S Preferred Units may elect to convert into Class S Ordinary Units in connection with a sale or dissolution of BCH.

APP. 614

F-52

APP. 615

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

As of December 31, 2020, a nominal number of shares of Class S Preferred Units have been issued. No amounts have been paid to the Class S Preferred Unit holders related to the preferred return from issuance through December 31, 2020, and any amounts earned have been accrued and are included in the balance of Class S Preferred Units presented on the consolidated balance sheet in the noncontrolling interests line item.

*Beneficiaries of the ExAlt Trusts*

The ultimate beneficiary of the ExAlt Trusts is an unrelated third party charity (the "Charitable Beneficiary") that is entitled to i) approximately 5% of any amounts paid to Beneficient as payment on amounts due under each ExAlt Loan, ii) approximately 10% of the amount of excess cash Collateral, if any, following the full repayment of an ExAlt Loan; and (iii) all amounts accrued and held at the ExAlt Trusts once all amounts due to Beneficient under the ExAlt Loans and any fees related to Beneficient's services to the ExAlt Trusts are repaid. The Charitable Beneficiary's account balances with respect to its interest in such ExAlt Trusts cannot be reduced to below zero. Any losses allocable to the Charitable Beneficiary in excess of its account balances are reclassified at each period end to the trusts deficit account which is included as part of noncontrolling interest. During 2020, additional ExAlt Trusts were created arising from new liquidity transactions with customers. These new ExAlt Trusts, which are consolidated by Beneficient, resulted in the recognition of additional noncontrolling interest of $6.0 million representing the interests in these new ExAlt Trusts held by the Charitable Beneficiary.

The interest of the Charitable Beneficiary, including the associated trust deficit (as applicable), in the ExAlt Trusts is recorded on the consolidated balance sheets in the noncontrolling interests line item.

**(12) Equity-Based Compensation**

As of December 31, 2020 and 2019, the Company has outstanding equity-based awards under the GWG Holdings 2013 Stock Incentive Plan, the Beneficient Management Partners, L.P. ("BMP") Equity Incentive Plan (the "BMP Equity Incentive Plan"), the Ben Equity Incentive Plan (as defined below), and Preferred Series A Subclass 1 Unit Accounts, as more fully described in the sections below.

*2013 Stock Incentive Plan*

GWG Holdings adopted the 2013 Stock Incentive Plan in March 2013, as amended on June 1, 2015, May 5, 2017 and May 8, 2018. Participants under the plan may be granted incentive stock options and non-statutory stock options; stock appreciation rights; stock awards; restricted stock; restricted stock units; and performance shares. Eligible participants include officers and employees of GWG Holdings and its subsidiaries, members of GWG Holdings' Board of Directors, and consultants. Option awards generally expire 10 years from the date of grant. As of December 31, 2020, the Company has granted stock options, stock appreciation rights ("SAR"), and restricted stock units ("RSU") under this plan. As of December 31, 2020, 6,000,000 awards are authorized under the plan, of which 2,507,924 shares were reserved for issuance under outstanding incentive awards and 3,492,076 shares remain available for future grants.

*Stock Options*

As of December 31, 2020, GWG Holdings had outstanding stock options for 695,117 shares of common stock to employees, officers, and directors under the plan. The options were issued with an exercise price between $4.83 and $11.56, which is equal to the market price of the shares on the date of grant. Options vest over varying terms of up to three years. There were no options granted during the year ended December 31, 2020. The weighted average grant date fair value of options granted during the year ended December 31, 2019, was $2.73. The total intrinsic value of stock options exercised during the year ended December 31, 2020 and 2019 was $31.6 thousand and $0.3 million, respectively. The aggregate intrinsic value of stock options outstanding and exercisable at December 31, 2020 was $41.7 thousand and $40.1 thousand, respectively. Additionally, as a result of stock option exercises, 3,688 shares of common stock were issued to employees, net of shares forfeited to satisfy tax withholding obligations. During the years ended December 31, 2020 and 2019, a total of 97,996 and 197,859 stock options held by employees vested for a total fair value of $0.3 million and $0.5 million, respectively.

APP. 616

APP. 617

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Stock Appreciation Rights (SARs)*

As of December 31, 2020, GWG Holdings had 535,657 SARs outstanding. The strike price of the SARs was between $6.75 and $11.55, which was equal to the market price of the common stock at the date of issuance. SARs vest over varying terms of up to three years. On December 31, 2020, the market price of GWG's common stock was $6.99. The weighted average grant date fair value of SARs granted during the years ended December 31, 2020 and 2019, was $2.51 and $2.66, respectively. During the years ended December 31, 2020 and 2019, a total of 98,536 and 102,102 SARs held by employees vested for a total fair value of $0.2 million and $0.2 million, respectively.

Upon the exercise of SARs, the Company is obligated to make cash payments equal to the positive difference between the market value of GWG Holdings' common stock on the date of exercise less the market value of the common stock on the date of grant. The liability for the SARs as of December 31, 2020 and 2019 was $0.5 million and $0.6 million, respectively, and was recorded within other accrued expenses in the consolidated balance sheets.

The following summarizes information concerning outstanding options and SARs issued under the 2013 Stock Incentive Plan:

|  | Outstanding | | Weighted Average Exercise Price | |
| --- | --- | --- | --- | --- |
|  | Stock Options | SARs | Stock Options | SARs |
| December 31, 2019 | 905,381 | 375,625 $ | 9.05 $ | 9.25 |
| Granted | — | 192,925 | — | 7.82 |
| Exercised | (20,136) | (1,284) | 8.27 | 7.24 |
| Forfeited and expired | (190,128) | (31,609) | 9.23 | 9.05 |
| December 31, 2020 | 695,117 | 535,657 | 9.03 | 8.75 |

The following table provides information regarding outstanding stock options and SARs which were fully vested and exercisable:

|  | December 31, 2020 | | December 31, 2019 | |
| --- | --- | --- | --- | --- |
|  | Stock Options | SARs | Stock Options | SARs |
| Number outstanding and exercisable | 629,530 | 293,455 | 673,341 | 200,745 |
| Weighted-Average Remaining Life (years) | 5.88 | 4.17 | 6.83 | 4.49 |
| Weighted Average Exercise Price | $ 8.91 $ | 8.93 $ | 8.88 $ | 8.81 |

*Restricted Stock Units*

A restricted stock unit ("RSU") entitles the holder thereof to receive one share of GWG Holdings' common stock (or, in some circumstances, the cash value thereof) upon vesting. RSUs are subject to forfeiture until they vest. On June 18, 2019, GWG Holdings granted an aggregate of 114,366 RSUs to its directors, which vested in their entirety on the one year anniversary of the grant date. On May 31, 2019, GWG Holdings granted RSUs to its Chief Executive Officer that are subject to performance-based vesting pursuant to a performance share unit agreement ("PSU Agreement"). The PSU Agreement provides for a target award grant of 129,717 RSUs, and up to a maximum of 259,434 RSUs, with each representing the right to receive one share of GWG Holdings' common stock (or, following a Change-in-Control Transaction (as defined in the PSU Agreement), the cash value thereof) upon vesting, which is generally subject to the satisfaction of performance goals over a performance period commencing on April 26, 2019 and ending on December 31, 2021. The weighted average grant date fair value of awards granted during 2019 was $10.15.

In the third quarter of 2019, a total of 375,000 RSUs held by employees vested entitling the holders thereof, collectively, to cash payments totaling $4.5 million, all of which were paid in the third and fourth quarters of 2019 and recognized in employee compensation and benefits in the consolidated statement of operations for the year ended December 31, 2019. Additionally during 2019, 53,403 RSUs vested and 26,701 shares of common stock were issued to employees, net of shares forfeited to satisfy tax withholding obligations.

APP. 618

APP. 619

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

During the year ended December 31, 2020, 57,183 of the RSUs held by directors vested for the same number of shares of common stock for a total fair value of $0.5 million. The weighted-average grant date fair value for the unvested activity presented in the table below was $9.18 for the year ended December 31, 2020.

*BMP Equity Incentive Plan*

The Board of Directors of Beneficient Management, Ben LP's general partner, adopted the BMP Equity Incentive Plan in 2019. Under the BMP Equity Incentive Plan, certain directors and employees of Beneficient are eligible to receive equity units in BMP, an entity affiliated with the board of directors of Beneficient Management, in return for their services to Ben. The BMP equity units eligible to be awarded to employees are comprised of BMP's Class A Units and/or BMP's Class B Units (collectively, the "BMP Equity Units"). As of December 31, 2020 and 2019, the Board of Directors of Beneficient Management has authorized the issuance of up to 19,000,000 units each of the BMP Equity Units. All awards are classified in equity upon issuance.

While providing services to Beneficient, if applicable, certain of these awards are subject to minimum retained ownership rules requiring the award recipient to continuously hold BMP Equity Units equivalents equal to at least 25% of their cumulatively granted awards that have the minimum retained ownership requirement. The awards are generally non-transferable. Awards under the BMP Equity Incentive Plan that vest ultimately dilute holders of Common Units.

The BMP Equity Units awarded beginning in second quarter 2019 and through December 31, 2020, included awards that were fully vested upon grant date, and some awards that are subject to service-based vesting over a four-year period from the date of hire. Expense associated with the vesting of these awards is based on the fair value of the BMP Equity Units on the date of grant. As of December 31, 2020 and 2019, compensation cost has been recognized for the granted awards using the straight-line method over the requisite service period. The remaining unrecognized compensation cost for granted awards will be recognized prospectively over the remaining requisite service period, on a straight-line basis using the graded vesting method and forfeitures will be accounted for at the time that such forfeitures occur. Expense recognized for these awards is specially allocated to certain holders of redeemable noncontrolling interests.

As BMP's equity is not publicly traded, the fair value of the BMP Equity Units is determined on each grant date using a probability-weighted discounted cash flow analysis. This fair value measurement is based on significant inputs not observable in the market and thus represents a Level 3 measurement within the fair value hierarchy. The resultant probability-weighted cash flows are then discounted using a rate that reflects the uncertainty surrounding the expected outcomes, which the Company believes is appropriate and representative of a market participant assumption.

During the second quarter of 2020, 1,963,969 vested units were forfeited and returned as a result of an agreement allowing Beneficient to recover the aforementioned units held by one former director of Beneficient (see further discussion below).

The weighted-average grant date fair value was $9.61 per unit as of December 31, 2020. The weighted-average grant date fair value for the unvested activity presented in the table below was $9.61 per unit for the year ended December 31, 2020. The total fair value of shares vested during the year ended December 31, 2020, was $49.6 million.

*Ben Equity Incentive Plan*

The Board of Directors of Beneficient Management adopted the Ben Equity Incentive Plan in September 2018 (the "Ben Equity Incentive Plan"). Under the Ben Equity Incentive Plan, Ben LP is permitted to grant equity awards, in the form of restricted equity units ("REUs") up to a maximum of 12,811,258, representing ownership interests in Common Units. Settled awards under the Ben Equity Incentive Plan dilute holders of Common Units. The total number of Common Units that may be issued under the Ben Equity Incentive Plan is equivalent to 15% of the number of fully diluted Common Units outstanding, subject to annual adjustment. All awards are classified in equity upon issuance.

All REUs are subject to two performance conditions, both of which were met during 2019. Additionally, if a change-of-control event occurs prior to July 1, 2021, then all units, vested and unvested, will settle within 60 days. Any transaction whereby GWG Holdings obtains the right to appoint a majority of the members of Beneficient Management's Board of Directors is expressly excluded from the definition of change-of-control for the REUs.

APP. 620

APP. 621

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Awards will generally be subject to service-based vesting over a multi-year period from the recipient's date of hire, though some awards fully vest upon grant date. While providing services to Beneficient, if applicable, certain of these awards are subject to minimum retained ownership rules requiring the award recipient to continuously hold Common Unit equivalents equal to at least 15% of their cumulatively granted awards that have the minimum retained ownership requirement.

The holders of certain of the units issued under the BMP Equity Incentive Plan and the Ben Equity Incentive Plan, upon vesting, have the right to convert the units to shares of GWG Holdings common stock per the Exchange Agreement discussed in Note 1. As such, units vested and issued under Beneficient's equity incentive plans may result in dilution of the common stock of GWG Holdings.

REUs were awarded under the Ben Equity Incentive Plan beginning in the second quarter of 2019. For the REUs awarded under the Ben Equity Incentive Plan, pre-combination expense associated with the vesting of these awards is based on the fair value of the Common Units on the date of grant while post-combination expense is based on the fair value of the Common Units on the change-in-control date. The remaining unrecognized compensation cost for granted awards will be recognized prospectively over the remaining requisite service period, on a straight-line basis using the graded vesting method and forfeitures will be accounted for at the time that such forfeitures occur.

As Ben LP's equity is not publicly traded, the fair value for substantially all of the REUs granted in 2020 was estimated by using the valuation techniques consistent with those utilized to determine the acquisition date equity values arising from GWG Holdings obtaining a controlling financial interest in Beneficient. These valuation techniques relied upon the OPM Backsolve approach under the market method as more fully described in Note 4. For the REUs granted in the latter portion of 2020, which is a *de minimis* amount of the total 2020 REUs, we utilized valuation techniques consisting of the income approach and market approach. For awards granted during 2019, the fair value of the REUs was estimated using recent equity transactions involving third parties, which provided the Company with observable fair value information sufficient for estimating the grant date fair value.

During the second quarter of 2020, 507,500 vested units were forfeited as a result of an agreement allowing Beneficient to recover the aforementioned units held by one former director of Beneficient. Beneficient recognized $36.3 million of other income as a result of this recovery of equity-based compensation, including both BMP Equity Units and REUs. A substantial majority of the former director's equity-based compensation units were fully vested, and the majority of the related expense was allocated to certain holders of noncontrolling interests and recorded in prior periods. The provisions of the award agreements related to the forfeiture of vested units resulted in the previous expense being recorded to other income in the year-to-date period, accordingly.

During the third quarter of 2020, 515,000 units were granted to a senior partner director subject to a performance condition. The performance condition has not been met as of December 31, 2020. As the performance condition of the grant is based on a liquidity event, recognition of the related compensation cost is deferred until the condition has been met. Total unrecognized compensation cost related to this award is approximately $6.4 million as of December 31, 2020.

The estimated weighted-average grant date fair value date was $12.50 as of December 31, 2020. The weighted-average grant date fair value for the unvested activity presented in the table below was $12.50 for the year ended December 31, 2020. The total fair value of shares vested during the year ended December 31, 2020, was $42.9 million.

*Preferred Equity*

On April 25, 2019, Preferred Series A Subclass 1 Unit Accounts in BCH, a subsidiary of Ben LP, were assigned to three directors, with each having a capital account balance of $4.0 million, subject to a performance condition, in return for each of the directors providing to BCH their knowledge and abilities in helping with the formation of and capital raising for the Company. BHI, a Ben Founder Affiliate, assigned the Preferred Series A Subclass 1 Unit Accounts it holds in BCH to the directors for those individuals providing services to BCH. Accounting for services provided to the Company but paid by a principal shareholder follows the substance of the transaction and is therefore accounted for similar to a share-based payment in exchange for services rendered. The awards vest upon grant, subject to a performance condition whereby each of the directors must be a board member at the time that a certain level of additional capital is raised. The fair value of the awards at the grant date was estimated at $12.0 million in aggregate.

During the fourth quarter of 2019, $4.0 million of the capital account balance was forfeited back to the Company and reverted to BHI upon the departure of a certain director. The performance condition was met during the fourth quarter of 2020 and

APP. 622

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

expense of $11.4 million was recognized and specially allocated to certain Preferred Series A Subclass 1 Unit Account holders on a pro-rata basis based on their capital account balance. The expense recognized upon vesting is reflective of the value calculated after the determination of overall enterprise value in connection with the change of control event discussed in Note 4.

The following table summarizes the award activity, in number of units, during the year ended December 31, 2020:

| | Balance at December 31, 2019 | Granted | Vested | Exercised | Forfeited | Recovery of Vested Awards | Balance at December 31, 2020 |
|---|---|---|---|---|---|---|---|
| **Vested** | | | | | | | |
| RSU | — | — | 57,183 | (57,183) | — | — | — |
| BMP Equity Units | 7,980,037 | 4,580,888 | 578,678 | — | (31,618) | (1,963,969) | **11,144,016** |
| REUs | 2,164,742 | 3,033,956 | 401,598 | — | (14,000) | (507,500) | **5,078,796** |
| **Unvested** | | | | | | | |
| RSU | 244,083 | — | (57,183) | — | (57,183) | — | **129,717** |
| BMP Equity Units | 180,000 | 3,008,800 | (578,678) | — | (380,025) | — | **2,230,097** |
| REUs | 246,500 | 2,727,072 | (401,598) | — | (303,400) | — | **2,268,574** |
| **Total** | | | | | | | |
| RSU | 244,083 | — | — | (57,183) | (57,183) | — | **129,717** |
| BMP Equity Units | 8,160,037 | 7,589,688 | — | — | (411,643) | (1,963,969) | **13,374,113** |
| REUs | 2,411,242 | 5,761,028 | — | — | (317,400) | (507,500) | **7,347,370** |

The following table presents the components of equity-based compensation expense recognized in the consolidated statement of operations (in thousands):

| | Year Ended December 31, | |
|---|---|---|
| | **2020** | **2019** |
| Stock options | $ 180 | $ 408 |
| Stock appreciation rights | (40) | 338 |
| Restricted stock units | (38) | 986 |
| BMP equity units | 53,523 | — |
| REUs | 45,772 | — |
| Preferred equity | 11,443 | — |
| **Total equity-based compensation** | $ 110,840 | $ 1,732 |

Unrecognized equity-based compensation expense, excluding the expense related to the performance award discussed above, totaled approximately $34.8 million as of December 31, 2020.

F-57

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The following table presents the equity-based compensation expense expected to be recognized over the next five years based on scheduled vesting of awards outstanding, excluding the award subject to the performance condition discussed above, as of December 31, 2020 (in thousands):

|  | Stock Options | SAR | REU | BMP Equity Units | Total |
|---|---|---|---|---|---|
| 2021 | $ 107 | $ 287 | $ 7,805 | $ 7,965 | $ 16,164 |
| 2022 | 19 | 192 | 5,754 | 5,834 | 11,799 |
| 2023 | — | 91 | 2,993 | 2,555 | 5,639 |
| 2024 | — | — | 674 | 518 | 1,192 |
| 2025 | — | — | — | — | — |
| **Total** | $ 126 | $ 570 | $ 17,226 | $ 16,872 | $ 34,794 |
| **Weighted-average period over which to be recognized** | 0.57 years | 1.12 years | 2.52 years | 1.61 years | |

**(13) Other Expenses**

The components of other expenses in our consolidated statements of operations are as follows (in thousands):

|  | Year Ended December 31, | |
|---|---|---|
|  | 2020 | 2019 |
| Insurance and regulatory | $ 4,459 | $ 5,032 |
| Information technology | 3,596 | 2,024 |
| Servicing and facility fees | 2,423 | 1,833 |
| Marketing | 1,251 | 1,612 |
| Premises and equipment | 1,215 | 692 |
| Depreciation and amortization | 1,170 | 436 |
| Contract labor | 906 | 1,820 |
| Travel and entertainment | 2,004 | 1,218 |
| General and administrative | 1,203 | 1,076 |
| Bad debt expense | — | 153 |
| Total other expenses | $ 18,227 | $ 15,896 |

**(14) Income Taxes**

The Company's income tax provision reflects the activity of GWG Holdings and its subsidiaries and Beneficient Corporate Holdings, LLC, currently the sole entity in the Beneficient consolidated group that is taxed as a corporation. GWG Holdings and its subsidiaries files a separate tax return from Beneficient Corporate Holdings, LLC, but the tax provision information below as of and for the year ended December 31, 2020 is presented on a consolidated basis for financial reporting purposes under applicable GAAP.

As the statements of operations of GWG Holdings and Ben LP were presented on a consolidated basis beginning on January 1, 2020, the information below as of and for the year ended December 31, 2019 does not include the tax provision information of Beneficient Corporate Holdings, LLC.

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The current and deferred components of our income tax expense (benefit) and the reconciliation at the statutory federal tax rate to our actual income tax expense (benefit) consisted of the following (in thousands):

|  | Year Ended December 31, | |
|  | 2020 | 2019 |
|  |  | *(As Restated)* |
| Current income tax expense | $ 537 | $ 10 |
| Deferred income tax expense (benefit) | (16,927) | 71,855 |
| Total income tax expense (benefit) | $ (16,390) | $ 71,865 |

|  | Year Ended December 31, | |
|  | 2020 | 2019 |
|  |  | *(As Restated)* |
| Statutory federal income tax (benefit) | $ (43,339) | $ 33,449 |
| State income taxes (benefit), net of federal benefit | (2,995) | 12,962 |
| Change in valuation allowance | 20,688 | 25,547 |
| Noncontrolling interest | 7,718 | — |
| Other permanent differences, net | 1,538 | (93) |
| Total income tax expense (benefit) | $ (16,390) | $ 71,865 |

The Company's effective tax rate was 7.9% and 45.1% for the years ended December 31, 2020 and 2019, respectively. The effective tax rate for the year ended December 31, 2020 primarily reflects the effects of the remeasurement of deferred tax liabilities due to a change in state deferred tax rate, offset by current state taxes and an increase in valuation allowance. The effective tax rate for the year ended December 31, 2019 was higher than the statutory rate primarily due to the deferred tax liability resulting from the gain on consolidation of equity method investment.

After the change-of-control transaction with Ben LP on December 31, 2019, GWG Holdings moved its headquarters from Minnesota to Texas. This move resulted in a change in the state deferred tax rate from 9.8% to 0%.

The effects of temporary differences that give rise to deferred income taxes were as follows (in thousands):

|  | December 31 | |
|  | 2020 | 2019 |
|  |  | *(As Restated)* |
| Deferred tax assets: |  |  |
| Investment in life insurance policies | $ 42,836 | $ 37,649 |
| Net operating loss and business interest carryforwards | 43,188 | 18,935 |
| Other assets | 4,940 | 9,348 |
| Subtotal | 90,964 | 65,932 |
| Valuation allowance | (88,157) | (65,932) |
| Deferred tax assets | 2,807 | — |
|  |  |  |
| Deferred tax liabilities: |  |  |
| Investment in partnership | (54,077) | (71,855) |
| Other liabilities | (199) | — |
| Net deferred tax liability | $ (51,469) | $ (71,855) |

APP. 626

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 627 of 1031    PageID 799

At December 31, 2020, we had federal net operating loss ("NOL") carryforwards of $58.0 million resulting in related deferred tax assets of $12.2 million, and state NOL carryforwards of $24.3 million resulting in related deferred tax assets of $1.9 million. At December 31, 2019, we had federal NOL carryforwards of $29.7 million resulting in related deferred tax

F-59

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

assets of $6.2 million, and state NOL carryforwards of $29.6 million resulting in related deferred tax assets of $2.3 million. The NOL carryforwards will begin to expire in 2031.

Future utilization of NOL carryforwards is subject to limitations under Section 382 of the Internal Revenue Code. This section generally relates to a more than 50 percent change in ownership over a three-year period. As a result of the Exchange Transaction, a change in ownership for income tax purposes occurred as of December 28, 2018. As such, the annual utilization of our net operating losses generated prior to the ownership change was limited. However, net unrealized built-in gains on our life insurance policies result in an increase in the Section 382 limit over the five-year recognition period, which resulted in $0.5 million of current tax liability in 2020 and a nominal amount in 2019. Included in the deferred tax liability noted in the table above are our investments in various classes of equity in Beneficient, which are partnerships for federal income tax purposes.

Also, as of December 31, 2020, we had a capital loss carryforward of $14.2 million that, if unused, will expire in 2025.

We provide for a valuation allowance when it is not considered "more likely than not" that our deferred tax assets will be realized. As of December 31, 2020, based on all available evidence, we have provided a valuation allowance of $88.2 million against our deferred tax assets due to the uncertainty as to the realization of our deferred tax assets during the carryforward periods. In 2020, valuation allowances were recorded against the total amount of non-permanent deferred tax assets.

The Company currently records a valuation allowance against its deferred tax assets that cannot be realized by the future reversal of existing temporary differences. Due to the uncertain timing of the reversal of certain of these temporary differences due to the constraint described below, they cannot be considered as a source of future taxable income for purposes of determining a valuation allowance; therefore, the vast majority of the deferred tax liability cannot be utilized in determining the realizability of the deferred tax assets. As previously discussed, due to a prior deemed ownership change, net operating loss carryforwards are subject to Section 382 of the Internal Revenue Code.

The Company reassessed its valuation allowance during the third quarter of 2020 and determined it would no longer utilize the reversal of a temporary difference related to GWG Holdings' preferred equity ownership in Beneficient, until such time as the preferred equity is no longer constrained, as a source of income to realize existing deferred tax assets related to the net operating loss and Section 163(j) limitations. As a result, the Company recorded a large net deferred tax liability as of December 31, 2020. The effects of the reassessment of the valuation allowance on the deferred tax liability as of December 31, 2019 are reflected in Note 21 to these consolidated financial statements. The net deferred tax liability as of December 31, 2020 is specifically related to GWG Life's investment in the Preferred Series A Subclass 1 Unit Accounts described in Note 1. The disposition of this investment is constrained by the Pledge and Security Agreement in favor of the holders of the L Bonds of GWG Holdings. As such, the timing of recognition of the necessary taxable income related to this investment and the future reversal of this temporary difference cannot be predicted.

ASC 740, *Income Taxes*, requires the reporting of certain tax positions that do not meet a threshold of "more-likely-than-not" to be recorded as uncertain tax benefits. It is management's responsibility to determine whether it is "more-likely-than-not" that a tax position will be sustained upon examination, including resolution of any related appeals or litigation, based upon the technical merits of the position. Management has reviewed all income tax positions taken or expected to be taken and has determined that the income tax positions are appropriately stated and supported. We do not anticipate that the total unrecognized tax benefits will significantly change prior to December 31, 2021.

Under our accounting policies, interest and penalties on unrecognized tax benefits, as well as interest received from favorable tax settlements are recognized as components of income tax expense. At December 31, 2020 and 2019, we recorded no accrued interest or penalties related to uncertain tax positions.

Our income tax returns for tax years ended December 31, 2017 through 2019, and 2020, when filed, remain open to examination by the Internal Revenue Service and various state taxing jurisdictions. Our income tax return for tax year ended December 31, 2016 also remains open to examination by various state taxing jurisdictions.

F-60

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(15) Earnings (Loss) per Common Share**

The computations of basic and diluted income (loss) attributable to common shareholders per share for 2020 and 2019 are as follows (in thousands, except share data and per share data):

|  | Year Ended December 31, | |
|---|---|---|
|  | **2020** | **2019** |
| **Numerator:** |  | *(As Restated)* |
| Basic – Net income (loss) attributable to common shareholders | $ (168,545) | $ 70,471 |
| Add: Preferred dividends upon conversion | — | 2,020 |
| Diluted – Net income (loss) attributable to common shareholders | (168,545) | 72,491 |
|  |  |  |
| **Denominator:** |  |  |
| Basic – weighted average common shares outstanding | 28,063,268 | 33,016,007 |
| Effect of dilutive securities | — | 2,203,435 |
| Diluted – weighted average common shares outstanding | 28,063,268 | 35,219,442 |
| Basic earnings (loss) per common share | $ (6.01) | $ 2.13 |
| Diluted earnings (loss) per common share | $ (6.01) | $ 2.06 |

For the year ended December 31, 2020, RPS, RPS 2, restricted stock units, and stock options for a potential 2,313,748 shares were not included in the calculation of diluted earnings per share because we recorded a net loss during this period and the effects were anti-dilutive. Potentially dilutive instruments issued by Ben LP that are ultimately exchangeable into GWG Holdings' common stock were also excluded from the calculation of diluted earnings per share for the year ended December 31, 2020 because we recorded a net loss during this period and the effects were anti-dilutive.

RPS and RPS 2 (as described in Note 11) and restricted stock units and stock options (as described in Note 12) were included in the calculation of diluted earnings per share for the year ended December 31, 2019. Options to purchase 437,266 shares of common stock were outstanding during 2019 but were excluded from the calculation of diluted earnings per share because their effects were anti-dilutive.

**(16) Segment Reporting**

The Company has two reportable segments consisting of Secondary Life Insurance and Beneficient. Corporate & Other includes certain activities not allocated to specific business segments. These activities include holding company financing and investing activities, and management and administrative services to support the overall operations of the Company, and from November 1, 2019, include GWG Holdings' equity method investment in FOXO.

The Secondary Life Insurance segment seeks to earn non-correlated yield from our portfolio of life insurance policies. Our Beneficient segment consists of the assets and operations of Ben LP and its subsidiaries. Beneficient became a consolidated subsidiary of GWG Holdings as of December 31, 2019 as described in Note 4. Ben LP provides a variety of trust services, liquidity products for owners of alternative assets and illiquid investment funds, and other financial services to MHNW individuals. The Corporate & Other category consists of unallocated corporate overhead and administrative costs and the operations of operating segments that do not meet the quantitative criteria to be separately reported.

These segments are differentiated by the products and services they offer as well as by the information used by the Company's chief operating decision maker to determine allocation of resources and assess performance.

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Earnings before taxes ("EBT") is the measure of profitability used by management to assess performance of its segments and allocate resources. Segment EBT represents net income (loss) excluding income taxes and includes earnings (loss) from equity method investments and for the year ended December 31, 2019, the gain on consolidation of equity method investment. Information on reportable segments is as follows (in thousands):

| | Year Ended December 31, | |
| --- | --- | --- |
| **Revenue:** | **2020** | **2019** |
| Secondary Life Insurance | $ 51,359 | $ 78,002 |
| Beneficient | 72,950 | 13,738 |
| Corporate & Other | 62 | 536 |
| Total | $ 124,371 | $ 92,276 |

| | Year Ended December 31, | |
| --- | --- | --- |
| **Interest Expense:** | **2020** | **2019** |
| Secondary Life Insurance | $ 97,279 | $ 83,055 |
| Beneficient | 57,337 | 31,789 |
| Corporate & Other | — | — |
| Total | $ 154,616 | $ 114,844 |

| | Year Ended December 31, | |
| --- | --- | --- |
| **Segment EBT:** | **2020** | **2019** |
| | | *(As Restated)* |
| Secondary Life Insurance | $ (59,684) | $ (27,694) |
| Beneficient | (139,575) | 222,443 |
| Corporate & Other | (32,970) | (35,470) |
| Total Segment EBT | (232,229) | 159,279 |
| Income tax expense (benefit) | (16,390) | 71,865 |
| Net income (loss) | $ (215,839) | $ 87,414 |

| | December 31, | |
| --- | --- | --- |
| **Total Assets:** | **2020** | **2019** |
| | | *(As Restated)* |
| Secondary Life Insurance | $ 886,739 | $ 904,363 |
| Beneficient | 2,662,630 | 2,762,121 |
| Corporate & Other | 15,588 | 9,297 |
| Total | $ 3,564,957 | $ 3,675,781 |

The total assets of the Beneficient segment at both December 31, 2020 and 2019, includes goodwill of $2.4 billion which represents all of the goodwill on our consolidated balance sheet as of the end of each reporting period.

**(17) Leases**

The Company leases certain real estate for its office premises under operating lease agreements, which expire in 2021 and 2025. Under these leases, we are obligated to pay base rent plus common area maintenance and a share of building operating costs. The lease

APP. 630

agreements contain extension options which we have not included in our liability calculations. We lease various other facilities on a short-term basis. The lease assets and liabilities are as follows (in thousands):

F-62

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

| Leases | Classification | December 31, 2020 |
|---|---|---|
| Operating lease right-of-use assets | Other assets | $  1,126 |
| Operating lease liabilities | Accounts payable and accrued expenses | $  1,672 |

Total lease costs recognized for the years ended December 31, 2020 and 2019 were as follows (in thousands):

| | Year Ended December 31, | |
|---|---|---|
| | 2020 | 2019 |
| Operating lease costs | $  910 | $  233 |
| Variable lease costs | 332 | 225 |
| Short-term lease costs | 87 | 60 |
| Total lease costs | $  1,329 | $  518 |

The weighted average remaining lease term at December 31, 2020 and 2019 was 3.9 years and 4.2 years, respectively, and the weighted average discount rate was 6.8% and 6.6%, respectively. For the years ended December 31, 2020 and 2019, cash paid for amounts included in the measurement of operating lease liabilities and included in operating cash flows totaled $1.0 million and $0.3 million respectively.

Maturities of operating lease liabilities as of December 31, 2020 are as follows (in thousands):

| | |
|---|---|
| 2021 | $  716 |
| 2022 | 302 |
| 2023 | 311 |
| 2024 | 320 |
| 2025 | 273 |
| Thereafter | — |
| Total lease payments | 1,922 |
| Less: imputed interest | (250) |
| Present value of lease liabilities | $  1,672 |

**(18) Commitments and Contingencies**

*Litigation* — In the normal course of business, we are involved in various legal proceedings. In the opinion of management, any liability resulting from such proceedings would not have a material adverse effect on our financial position, results of operations or cash flows.

*Commitments* — GWG Holdings is committed to contribute an additional $3.8 million to FOXO through 2021. The ExAlt Trusts had $35.6 million and $34.9 million of potential gross capital commitments as of December 31, 2020 and December 31, 2019, respectively, representing potential limited partner capital funding commitments on the interests in alternative asset funds. This is the amount above any existing cash reserves for such capital funding commitments. The ExAlt Trusts holding the interest in the limited partnership for the alternative asset fund is required to fund these limited partner capital commitments per the terms of the limited partnership agreement. Capital funding commitment reserves are maintained by the associated trusts within the ExAlt Plan™ created at the origination of each trust for up to $0.1 million. To the extent that the associated ExAlt Trusts cannot pay the capital funding commitment, Beneficient is obligated to lend the associated ExAlt Trust sufficient funds to meet the commitment pursuant to the terms of the respective ExAlt Loan. Any amounts advanced by Beneficient to the ExAlt Trusts for these limited partner capital funding commitments pursuant to the terms of the respective ExAlt Loan above the associated capital funding commitment reserves held by the associated ExAlt Trusts are added to the ExAlt Loan balance between Beneficient and the ExAlt Trusts and are expected to be recouped through the cash distributions from the alternative asset fund that collateralizes such ExAlt Loan.

APP. 632

F-63

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Capital commitments generally originate from limited partner agreements having fixed or expiring expiration dates. The total limited partner capital funding commitment amounts may not necessarily represent future cash requirements. Beneficient considers the creditworthiness of the investments on a case-by-case basis. At both December 31, 2020 and December 31, 2019, Beneficient had no reserves for losses on unused commitments to fund potential limited partner capital funding commitments.

*Unfunded Commitments* — Beneficient had $1.1 million of unfunded commitments on liquidity solution transactions as of December 31, 2020 related to liquidity transactions in process as of that date. There were no reserves for unfunded commitments as of December 31, 2020, and all amount in process were fully funded in the first quarter of 2021.

*Investigation* — On October 6, 2020, GWG Holdings received a subpoena to produce documents from the Chicago office of the SEC's Division of Enforcement, informing the Company of the existence of a non-public, fact-finding investigation into GWG Holdings. Since the initial subpoena, GWG Holdings has received subsequent subpoenas from the SEC for additional information. The requested information from the SEC has primarily related to GWG Holdings' investment products, including its L Bonds, as well as various accounting matters, among them, the consolidation for financial reporting purposes of Beneficient by GWG Holdings, goodwill valuation, and the accounting related to the ExAlt Trusts, related party transactions, life insurance policies, and the calculation of the debt-coverage ratio.

Until receipt of the initial subpoena on October 6, 2020, GWG Holdings had no previous communication with the SEC related to these issues and was unaware of this investigation. The Company is fully cooperating with the SEC in this investigation. The Company is currently unable to predict when this matter will be resolved or what further action, if any, the SEC may take in connection with it. As such, the Company cannot predict with certainty the outcome or effect of any such investigation or whether it will lead to any claim or litigation.

## (19) Concentration

*Life Insurance Carriers*

Our portfolio consists of purchased life insurance policies written by life insurance companies rated investment-grade by third-party rating agencies, including A.M. Best Company, Standard & Poor's, and Moody's. As a result, there may be concentrations of policies with certain life insurance companies. The following summarizes the face value of insurance policies with specific life insurance companies exceeding 10% of the total face value of our portfolio.

| Life Insurance Company | December 31, 2020 | December 31, 2019 |
|---|---|---|
| John Hancock | 14.72 % | 14.23 % |
| Lincoln National | 11.20 % | 11.55 % |
| Equitable Financial | 10.57 % | 10.63 % |

The following summarizes the number of insurance policies held in specific states exceeding 10% of the total face value held by us:

| State of Residence | December 31, 2020 | December 31, 2019 |
|---|---|---|
| California | 18.05 % | 17.46 % |
| Florida | 14.93 % | 14.86 % |

*Alternative Assets Industries*

Beneficient's underlying portfolio companies primarily operate in the United States and Western Europe, with the largest percentage, based on NAV, operating in diversified financials, telecommunications services, food and staples retailing, and software and services industries.

F-64

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(20) Related Parties**

*Relationship with Beneficient Management Counselors, L.L.C.*

Beneficient Management is the general partner of Ben LP and is governed by a board of directors. The governing document of Beneficient Management provides that Beneficient Management Counselors, L.L.C. ("BMC"), wholly owned by one of several Ben Founder Affiliates, determines the directors of Beneficient Management who fill 30% of the seats on the Board of Directors of Beneficient Management. BMC is also entitled to select (a) 50% of the membership of Beneficient Management's Nominating Committee and Executive Committee and appoint the chair of each of these committees, and (b) 50% of the membership of the Community Reinvestment Committee (CRC) and the CRC's chairperson, vice-chairperson, and lead committee member. Certain decisions with respect to Ben LP's charitable giving program are delegated to the CRC. Decisions regarding appointment and removal of Beneficient Management's directors, other than directors appointed by BMC, and GWG Holdings, are delegated, with certain exceptions, to the Nominating Committee of Beneficient Management, of which an executive of a Ben Founder Affiliate is a member and Chairman. In the event of a tie vote of the Nominating Committee on a vote for the removal of a director, the Chairman of the Nominating Committee may cast the tie-breaking vote.

*Services Agreement with Bradley Capital Company, L.L.C.*

Ben LP is the general partner of BCH and together they entered into an agreement with Bradley Capital Company, L.L.C. ("Bradley Capital") and BMC effective July 1, 2017 (the "Bradley Capital Agreement"). Bradley Capital is indirectly owned by a Ben Founder Affiliate. Under the Bradley Capital Agreement, Bradley Capital is entitled to a current base fee of $0.4 million per quarter for executive-level services provided by an executive of Bradley Capital, who is Beneficient's Chief Executive Officer, former Chairman of GWG Holdings' board of directors (serving from April 26, 2019 to June 14, 2021), and Chairman of Beneficient Management's board of directors, together with a current supplemental fee of $0.2 million per quarter for administrative and financial analysis, subject to an annual inflation adjustment. The base fee may be increased up to two times the initial base fee per quarter if the scope of the services is expanded with the approval of the Executive Committee of the board of Beneficient Management, of which an executive of a Ben Founder Affiliate is a member and Chairman. An executive of a Ben Founder Affiliate receives an annual salary from the Company of $0.2 million and both an executive of a Ben Founder Affiliate and other employees of Bradley Capital can participate in equity incentive plans sponsored by the Company. The Bradley Capital Agreement also includes a payment from Ben LP of $0.2 million per year, paid quarterly, to cover ongoing employee costs for retired and/or departed employees of predecessor entities prior to September 1, 2017, which on-going costs were assumed by Bradley Capital, as well as a further payment to Bradley Capital in respect of the cost of health and retirement benefits for current employees of Bradley Capital all of which are reimbursed by Ben LP. Ben LP is also required to reimburse Bradley Capital for out-of-pocket expenses incurred by Bradley Capital employees, including reimbursement for private travel including the family members of a designated executive of a Ben Founder Affiliate for both business and personal use. The Bradley Capital Agreement requires Ben LP to reimburse Bradley Capital or its affiliates for taxes, fees, and expenses, including legal fees and related costs, relating to the contributions by affiliates of Bradley Capital of equity or debt interests in Ben LP to public charitable trusts in connection with the Exchange Trusts, as well as the contribution of beneficial interests in customer trusts administered by Beneficient. Additionally, the Company provides office space and access to needed technology systems and telephony services. Payments by Ben LP to Bradley Capital and its affiliates are guaranteed and subject to enforcement by the state courts in Delaware in the event of default. The Bradley Capital Agreement extends through December 31, 2021, with an automatic annual one-year renewal provision thereafter. The Bradley Capital Agreement may be terminated by unanimous approval of the Executive Committee of the board of Beneficient Management of which an executive of a Ben Founder Affiliate is a member, or without such approval if the Ben Founder Affiliate no longer holds $10.0 million of Ben LP's securities. During the year ended December 31, 2020, the Company recognized expenses totaling $3.8 million related to this services agreement.

*Relationship with Beneficient Holdings, Inc.*

The Beneficient Company Group (USA), L.L.C. ("Beneficient USA"), a subsidiary of BCH, entered into a Services Agreement with BHI effective July 1, 2017 (the "BHI Services Agreement"). BHI is indirectly owned by a Ben Founder Affiliate and is an affiliate of Beneficient. BHI pays an annual fee of $30 thousand to Ben LP for the provision of trust administration services for a Ben Founder Affiliate and all trusts affiliated with its family trustee as that term is defined in the governing documents for a Ben Founder Affiliate. Beneficient USA also is required to provide any other services requested by BHI, subject to any restrictions in the operating agreement of BHI, at cost. The term of the BHI Services Agreement

APP. 635

F-65

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

extends for the longer of (i) five years past the expiration or termination of the Bradley Capital Agreement, or (ii) seven years after the family trustee of the Ben Founder Affiliate is no longer a primary beneficiary of any trust affiliated with the family trustee. During the year ended December 31, 2020, the Company recognized income in accordance with the agreement.

BHI owns the majority of the Class S Ordinary Units, Class S Preferred Units, Preferred Series A Subclass 1 Unit Accounts, and FLP Subclass 1 Unit Accounts issued by BCH.

BHI expects to receive tax distributions from HCLP arising from the repayment of the Second Lien Credit Agreement to cover any tax liability associated with the contribution of the Second Lien Credit Agreement to HCLP (Note 10). Additionally, if HCLP is liquidated while the Second Lien Credit Agreement is still outstanding, the Second Lien Credit Agreement will transfer back to BHI.

*HCLP Nominees, LLC*

During the years ended December 31, 2020 and 2019, GWG Holdings invested $130.2 million and $79.0 million, respectively, of cash into equity investments in Beneficient. During this same period, Beneficient made payments to HCLP, its Senior Lender, totaling $144.6 million in principal and interest on the First and Second Lien Credit Agreements. The First Credit Agreement was issued in 2017, while the Second Lien Credit Agreement was issued in 2018. HCLP is an indirect subsidiary of Highland Consolidated, L.L.C. ("Highland").

A long-standing lending and investment relationship of 25 years exists between Highland (and its affiliates or related parties), on the one hand, and certain trusts and entities held by such trusts that are controlled by Ben Founder ("Ben Founder Affiliates"), on the other. From time to time, Highland or its affiliates have advanced funds under various lending and investing arrangements to the Ben Founder Affiliates, and such Ben Founder Affiliates have made repayments to Highland or its affiliates, as applicable, both in cash and in kind.

Such loans to and investments with or in the Ben Founder Affiliates have been and may be made by Highland, or its affiliates, as applicable, using proceeds from loan repayments made by Beneficient to HCLP in its capacity as Senior Lender to Beneficient, with such loan repayments made potentially using cash from GWG Holdings' and GWG Life's investments in Beneficient. Such loans and investments have ranged between no outstanding balance and $104.0 million.

As of June 30, 2021, Highland and the applicable Ben Founder Affiliates mutually agreed to satisfy all obligations under all outstanding loans among Highland and the Ben Founder Affiliates via full payment and satisfaction of the existing loan balances (the "Loan Balances") by in-kind real property transfers (the "In-Kind Property Payment") from certain of the Ben Founder Affiliates to Highland. The terms of the In-Kind Property Payment grants Highland the right to transfer the real property that was transferred pursuant to the In-Kind Property Payment back to certain of the Ben Founder Affiliates, in exchange for a Preferred Series A Subclass 1 capital account balance in BCH in an amount equal to the Loan Balances, with such exchange to be satisfied from existing Preferred Series A Subclass 1 Unit Accounts that are held by such Ben Founder Affiliates. As of June 30, 2021, neither Highland nor any of its affiliates has any outstanding loans or investments with or in any Ben Founder Affiliates.

*Administrative Services Agreement between Constitution Private Capital Company, L.L.C. ("Constitution") and Beneficient USA*

Constitution is an entity owned 50.5% by a Ben Founder Affiliate and 49.5% by an entity controlled by the board of directors of Beneficient Management. It was founded in 1986 and acquired by a Ben Founder Affiliate in 1996. Constitution currently manages three private equity fund-of-funds. Effective January 1, 2017, Constitution entered into an Administrative Services Agreement (the "ASA") with Beneficient USA, which is wholly owned by BACC and a subsidiary of BCH, whereby Beneficient USA provides personnel to administer the portfolio assets advised by Constitution. Under the ASA, Constitution pays to Beneficient USA a monthly fee equal to .01% of the month-end net assets of its portfolio. The ASA automatically renews on an annual basis and may be terminated at any time by Constitution. Beneficient USA may only terminate the ASA in the event of a breach by Constitution. The income recognized by the Company related to this services agreement was immaterial for the years ended December 31, 2020.

F-66

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Preferred Liquidity Provider Agreement with Constitution*

In May 2019, BCC entered into an agreement with Constitution (the "Preferred Liquidity Provider Agreement") under which at Constitution's option, BCC will provide liquidity to alternative asset funds sponsored by Constitution at an advance rate of not less than 82% of NAV, to the extent such funds meet certain specified qualifications. For a fund to qualify for the liquidity option, it must, among other things, hold investments that were approved or deemed approved by BCC at the time a fund makes such investments. BCC is required to provide liquidity in any combination, at its discretion, of cash, U.S. exchange traded funds registered under the Investment Company Act of 1940, or securities traded on a national securities exchange. BCC's obligation under the Preferred Liquidity Provider Agreement is guaranteed by Ben LP and BCH. The Preferred Liquidity Provider Agreement may be terminated solely by mutual consent of Beneficient and Constitution. Beneficient and Constitution have not contracted for any liquidity under this agreement through December 31, 2020.

*Relationship with The Heppner Endowment for Research Organizations, L.L.C. ("HERO") and Research Ranch Operating Company, L.L.C ("RROC").*

HERO and RROC are owned indirectly by a Ben Founder Affiliate. HERO's purposes are (i) to serve as an advisor to National Philanthropic Trust ("NPT"), an unrelated third-party charitable organization, regarding the disbursement of research grants to qualifying organizations, and (ii) to serve as an advisor to NPT regarding the administration of charitable contributions made for the benefit of such qualifying organizations. Although HERO can advise on these matters, NPT has all final decision-making authority on the charitable contributions and complete control over the proceeds received by the charitable organizations. The charitable organizations administered by NPT (the beneficiaries of which have historically been multiple Texas universities) receive proceeds from trusts settled and funded by customers of Beneficient, in support of their charitable initiatives. HERO does not receive any proceeds from trusts settled and funded by customers of Beneficient.

RROC's purpose is to provide funding and operational support for the research activities conducted by the qualified charities. The funding received by RROC, from proceeds of trusts settled and funded by customers of Beneficient, may be used, in RROC's discretion, to (i) provide appropriate facilities and properties for the charitable organizations to utilize as part of their charitable initiatives (those properties and facilities being owned by a Ben Founder Affiliate), and (ii) provide fee revenue to RROC. RROC is granted such rights and authority pursuant to trust instruments entered into between a customer and subsidiaries of Ben LP as well as an agreement with NPT. Ben LP's subsidiaries provide financing to the ExAlt Trusts and Beneficient is paid as an agent of the trustees for administrative services it provides to the trusts. The Company has certain outstanding payables, including accrued interest, of approximately $2.6 million and $2.5 million as of December 31, 2020 and 2019, respectively, to RROC and NPT (for the benefit of the Texas universities). There were no payments made during the year ended December 31, 2020.

*Relationship with Hicks Holdings L.L.C.*

Hicks Holdings L.L.C. ("Hicks Holdings"), an entity related to Thomas O. Hicks, who is a Beneficient Management director and a former GWG Holdings director, owns a Preferred Series A Subclass 1 Unit Account and Class S Ordinary Units issued by BCH with a total initial balance of $60.4 million. Hicks Holdings was granted its Preferred Series A Subclass 1 Unit Account and Class S Ordinary Units as compensation for services provided under a previous advisory and consulting services agreement between Beneficient and Hicks Holdings, which terminated on June 30, 2018. The total balance as of December 31, 2020 was $78.2 million.

*Relationship with MHT Financial, L.L.C.*

MHT Financial, L.L.C ("MHT") is the sole beneficiary of each of the Seller Trusts. MHT is an entity affiliated with the Chairman, President and Chief Executive Officer of GWG Holdings (the "GWG Chairman") and became a related party to Beneficient as a result of the December 31, 2019 transactions between GWG Holdings and Ben LP. The GWG Chairman may be deemed to have an indirect interest in the assets held by the Seller Trusts as a result of his ownership of 30% of the outstanding membership interests of MHT. The assets of the Seller Trusts currently include shares of GWG Holdings' common stock and Seller Trust L Bonds. Consequently, to the extent that MHT, as sole beneficiary of each of the Seller Trusts, receives any proceeds from distributions on the GWG Holdings' common stock, interest and principal payments on the Seller Trust L Bonds or the sale or other disposition of GWG Holdings' common stock and Seller Trust L Bonds in excess of MHT's contractual obligations to the former owners of alternative assets that were contributed to the Seller Trusts, the GWG Chairman would have a right to receive his pro rata share of any distribution of such excess proceeds if made by

APP. 638

F-67

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

MHT to its members. The GWG Chairman does not have unilateral authority to effect the sale or other disposition of the assets of the Seller Trusts or cause MHT to make distributions to its members. Following the satisfaction of MHT's contractual obligations upon the sale or other disposition of the assets of the Seller Trusts, (i) there may not be excess proceeds to distribute to MHT or (ii) even if there are excess proceeds, MHT may not distribute such excess proceeds to its members.

Beneficient has amounts due under two promissory note agreements with MHT for funds advanced outside of its normal liquidity arrangements. Aggregate principal and interest due for both promissory notes as of December 31, 2020 and 2019, was $4.2 million and $3.9 million, respectively, which is recorded in other assets in the consolidated balance sheets.

MHT also owns a Preferred Series A Subclass 1 Unit Account with a total account balance of $23.9 million and $24.5 million as of December 31, 2020 and 2019, respectively.

*Promissory Note*

On May 31, 2019, the Borrowers executed the Promissory Note with GWG Life for a principal amount of $65.0 million that matures on June 30, 2023. An initial advance in the principal amount of $50.0 million was funded on June 3, 2019, and a second advance in the principal amount of $15.0 million was funded on November 27, 2019.

The proceeds from the Promissory Note were used by the Borrowers to purchase senior beneficial interests held by these certain other trusts of the ExAlt Plan™. The aforementioned trusts utilized the proceeds to repay loan amounts owed by certain of the trusts included within the ExAlt Plan™ to BCC, a subsidiary of Ben LP.

As of December 31, 2019, the Borrowers became consolidated subsidiaries of GWG Holdings as a result of the Investment Agreement (described in Note 1). Accordingly, the Promissory Note and related accrued interest, are eliminated upon consolidation as of that date. Prior to any purchase accounting adjustments, the outstanding principal balance was $65.0 million and accrued interest expense was $2.2 million as of December 31, 2019. The Promissory Note was settled on September 30, 2020, as discussed further in Note 1.

F-68

*Table of Contents*



**(21) Restatement**

As previously reported on Form 8-K filed with the SEC on July 7, 2021, and as discussed throughout this 2020 Form 10-K, as part of the preparation of its 2020 Form 10-K, the Company voluntarily submitted two questions to the OCA on February 15, 2021. The questions submitted by the Company to OCA were (1) whether a December 31, 2019 transaction resulted in GWG Holdings, Inc. obtaining control of Ben LP in a transaction that constituted a change-in-control of Beneficient by entities not under common control, and (2) whether Ben LP was required to consolidate any of the trusts created through Beneficient's ExAlt Plan™ established in connection with its business of providing liquidity to holders of alternative assets. On July 26, 2021, the Company and OCA staff held a conference call in which OCA's staff notified the Company of its conclusions on the two accounting questions that were the subject of the consultation. During that call, OCA expressed that it would object to a conclusion that Ben LP not consolidate the ExAlt Trusts as of December 31, 2019. Regarding question (1), OCA did not conclude on the common control aspect of the transaction in question. However, after further analysis, including, among other things, consulting with legal counsel to conclude that the common stock of GWG Holdings held by Beneficient were not voteable under Delaware law, the Company confirmed its original conclusion that the entities were not under common control.

Prior to December 31, 2019, only certain trusts created through Beneficient's ExAlt Plan™ were considered variable interest entities for which Ben LP had a variable interest and was considered the primary beneficiary. Thus, Ben LP was required to consolidate certain of such trusts. Due to changes to both the governance structure and the underlying economics of the trust and other agreements pertaining to certain of the ExAlt Trusts and the execution of new loan agreements between a subsidiary of Ben LP and certain of such trusts as of December 31, 2019, it was initially concluded that Ben LP no longer had the power to direct the activities that most significantly impact the economic performance of any of the ExAlt Trusts and therefore could no longer consolidate any of such trusts as of December 31, 2019, including those previously consolidated. However, we have since determined that such conclusion was incorrect, and that the proper application of generally accepted accounting principles is for Ben LP to consolidate all of the ExAlt Trusts. As a result of consolidating such trusts, Ben LP's primary tangible asset, which was acquired through loans a subsidiary of Ben LP made to certain of the ExAlt Trusts, was previously reported as a loan receivable as of December 31, 2019, but is now being reported as an investment in alternative assets held by certain of the ExAlt Trusts.

The tables below illustrate the impact of the Restatement, as well as other corrections as discussed in Note 2, on our historical Consolidated Balance Sheet, Consolidated Statement of Operations, Consolidated Statement of Cash Flows, and Consolidated Statement of Changes in Stockholder's Equity as of December 31, 2019, each as compared with the amounts presented in the original Form 10-K previously filed with the SEC.

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Effects of the Restatement - Annual Results**

All adjustments presented in the tables below reflect the impact of the consolidation of the ExAlt Trusts, unless otherwise specifically indicated in the footnotes to each table.

The following table sets forth the effects of the Restatement on the affected line items within the Company's previously reported Consolidated Balance Sheet as of December 31, 2019 (dollars in thousands).

| | December 31, 2019 | | |
|---|---|---|---|
| | As Previously Reported | Adjustments | As Restated |
| ASSETS | | | |
| Cash and cash equivalents | $ 79,073 | $ 3,211 | $ 82,284 |
| Restricted cash | 20,258 | 13,248 | 33,506 |
| Investment in alternative assets, at net asset value | — | 342,012 | 342,012 |
| Loan receivables, net of discount | 232,344 | (232,344) | — |
| Fees receivable | 29,168 | (29,168) | — |
| Financing receivables from affiliates | 67,153 | (67,153) | — |
| Other assets | 28,374 | 1,024 | 29,398 |
| Goodwill | 2,358,005 | 9,745 | 2,367,750 |
| TOTAL ASSETS | 3,635,206 | 40,575 | 3,675,781 |
| LIABILITIES & STOCKHOLDERS' EQUITY | | | |
| LIABILITIES | | | |
| Deferred revenue | 41,444 | (41,444) | — |
| Repurchase option | — | 61,664 | 61,664 |
| Accounts payable and accrued expenses | 27,836 | 56 | 27,892 |
| Deferred tax liability, net[1] | 57,923 | 13,932 | 71,855 |
| TOTAL LIABILITIES | 1,764,725 | 34,208 | 1,798,933 |
| STOCKHOLDERS' EQUITY | | | |
| Accumulated deficit | (76,501) | (20,695) | (97,196) |
| TOTAL GWG HOLDINGS STOCKHOLDERS' EQUITY | 333,979 | (20,695) | 313,284 |
| Noncontrolling interests | 266,848 | 27,062 | 293,910 |
| TOTAL STOCKHOLDERS' EQUITY | 600,827 | 6,367 | 607,194 |
| TOTAL LIABILITIES & STOCKHOLDERS' EQUITY | $ 3,635,206 | $ 40,575 | $ 3,675,781 |

[1] Adjustment specifically reflects the impact of an immaterial out-of-period adjustment to correct the valuation allowance against the Company's deferred tax assets. See Note 2 to the consolidated financial statements for more details.

F-70

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The following table sets forth the effects of the Restatement on the affected line items within the Company's previously reported Consolidated Statement of Operations for the year ended December 31, 2019 (dollars in thousands).

|  | As Previously Reported | Adjustments | As Restated |
|---|---|---|---|
| INCOME TAX EXPENSE[1] | $ 57,933 | $ 13,932 | $ 71,865 |
| LOSS BEFORE EARNINGS FROM EQUITY METHOD INVESTMENTS | (137,530) | (13,932) | (151,462) |
| Gain on consolidation of equity method investment (see Note 4) [2] | 249,716 | (6,763) | 242,953 |
| NET INCOME (LOSS) | 108,109 | (20,695) | 87,414 |
| NET INCOME (LOSS) ATTRIBUTABLE TO COMMON SHAREHOLDERS | 91,166 | (20,695) | 70,471 |
| NET INCOME (LOSS) PER COMMON SHARE |  |  |  |
| Basic | $ 2.76 | $ (0.63) | $ 2.13 |
| Diluted | $ 2.65 | $ (0.59) | $ 2.06 |

[1] Adjustment reflects the impact of an immaterial out-of-period adjustment to correct the valuation allowance against the Company's deferred tax assets. See Note 2 to the consolidated financial statements for more details.
[2] Adjustment is due to the fair value adjustment of the Promissory Note, which was required as of December 31, 2019 upon consolidation of the ExAlt Trusts.

The following table sets forth the effects of the Restatement on the affected line items within the Company's previously reported Consolidated Statement of Cash Flows for the year ended December 31, 2019 (dollars in thousands).

|  | As Previously Reported | Adjustments | As Restated |
|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** |  |  |  |
| Net income (loss) [1] [2] | $ 108,109 | $ (20,695) | $ 87,414 |
| Gain on consolidation of equity method investment | (249,716) | 6,763 | (242,953) |
| Deferred income taxes[1] | 57,923 | 13,932 | 71,855 |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (142,830) | — | (142,830) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** |  |  |  |
| Business combination consideration, net of cash and restricted cash acquired | (61,479) | 16,459 | (45,020) |
| NET CASH FLOWS PROVIDED BY (USED IN) INVESTING ACTIVITIES | (137,969) | 16,459 | (121,510) |
| NET INCREASE (DECREASE) IN CASH, CASH EQUIVALENTS AND RESTRICTED CASH | (26,105) | 16,459 | (9,646) |
| **CASH, CASH EQUIVALENTS AND RESTRICTED CASH** |  |  |  |
| END OF PERIOD | 99,331 | 16,459 | 115,790 |

[1] Adjustment reflects the impact of an immaterial out-of-period adjustment to correct the valuation allowance against the Company's deferred tax assets. See Note 2 to the consolidated financial statements for more details.
[2] Adjustment is due to the fair value adjustment of the Promissory Note, which was required as of December 31, 2019 upon consolidation of the ExAlt Trusts.

The following table sets forth the effects of the Restatement on the affected line items and classes of stockholders' equity within the Company's previously reported Consolidated Statement of Changes in Stockholder's Equity as of December 31, 2019 (dollars in thousands).

|  | Accumulated Deficit | Total GWG Holdings Stockholders' Equity | Noncontrolling Interests | Total Stockholders' Equity |
|---|---|---|---|---|
| **Balance, December 31, 2019 (As Previously Reported)** | $ (76,501) | $ 333,979 | $ 266,848 | $ 600,827 |
| Adjustment to recognition of noncontrolling interest | — | — | 27,062 | 27,062 |
| Adjustments to net income | (20,695) | (20,695) | — | (20,695) |
| **Balance, December 31, 2019 (As Restated)** | $ (97,196) | $ 313,284 | $ 293,910 | $ 607,194 |

F-71

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

### (22) Effects of the Restatement - Quarterly Results (Unaudited)

The tables below illustrate the impact of the Restatement, as well as other adjustments, on our historical Condensed Consolidated Balance Sheets, Condensed Consolidated Statements of Operations, Condensed Consolidated Statements of Cash Flows, and Condensed Consolidated Statements of Changes in Stockholder's Equity for the interim quarters impacted, each as compared with the amounts presented in the original Form 10-Q previously filed with the SEC. All adjustments presented in the tables below reflect the impact of the consolidation of the ExAlt Trusts, unless otherwise specifically indicated in the footnotes to each table.

The following table sets forth the effects of the Restatement on the affected line items within the Company's previously reported Condensed Consolidated Balance Sheets as of September 30, 2020, June 30, 2020, and March 31, 2020 (dollars in thousands).

| | September 30, 2020 | | | June 30, 2020 | | | March 31, 2020 | | |
|---|---|---|---|---|---|---|---|---|---|
| | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated |
| ASSETS | | | | | | | | | |
| Cash and cash equivalents | $ 93,766 | $ 588 | $ 94,354 | $ 149,233 | $ 454 | $ 149,687 | $ 116,432 | $ 776 | $ 117,208 |
| Restricted cash | 15,990 | 5,324 | 21,314 | 19,059 | 6,686 | 25,745 | 26,446 | 7,613 | 34,059 |
| Investment in alternative assets, at net asset value | — | 221,245 | 221,245 | — | 315,713 | 315,713 | — | 335,487 | 335,487 |
| Loan receivables, net of discount | 229,961 | (229,961) | — | 218,448 | (218,448) | — | 219,296 | (219,296) | — |
| Allowance for loan losses | (2,914) | 2,914 | — | (7,900) | 7,900 | — | (700) | 700 | — |
| Loans receivable, net | 227,047 | (227,047) | — | 210,548 | (210,548) | — | 218,596 | (218,596) | — |
| Fees receivable | 31,571 | (31,571) | — | 31,611 | (31,611) | — | 30,453 | (30,453) | — |
| Financing receivables from affiliates | — | — | — | 69,428 | (69,428) | — | 68,290 | (68,290) | — |
| Other assets | 53,501 | 838 | 54,339 | 40,142 | 1,399 | 41,541 | 33,906 | 1,035 | 34,941 |
| Goodwill | 2,384,121 | (16,371) | 2,367,750 | 2,384,121 | (16,371) | 2,367,750 | 2,372,595 | (4,845) | 2,367,750 |
| TOTAL ASSETS | 3,629,674 | (46,994) | 3,582,680 | 3,718,637 | (3,706) | 3,714,931 | 3,684,229 | 22,727 | 3,706,956 |
| LIABILITIES & STOCKHOLDERS' EQUITY | | | | | | | | | |
| LIABILITIES | | | | | | | | | |
| Seller Trust L Bonds [1] | $ 366,892 | $ (94,788) | $ 272,104 | $ 366,892 | $ — | $ 366,892 | $ 366,892 | $ — | $ 366,892 |
| Deferred revenue | 35,848 | (35,848) | — | 37,858 | (37,858) | — | 39,651 | (39,651) | — |
| Repurchase option | — | 730 | 730 | — | 56,660 | 56,660 | — | 52,052 | 52,052 |
| Accounts payable and accrued expenses | 33,235 | 277 | 33,512 | 23,457 | 242 | 23,699 | 21,139 | 208 | 21,347 |
| Deferred tax liability, net [2] | 52,500 | — | 52,500 | 33,674 | 18,826 | 52,500 | 40,206 | 12,294 | 52,500 |
| TOTAL LIABILITIES | 1,970,900 | (129,629) | 1,841,271 | 1,913,834 | 37,870 | 1,951,704 | 1,841,462 | 24,903 | 1,866,365 |
| STOCKHOLDERS' EQUITY | | | | | | | | | |
| Common stock in treasury, at cost, 12,337,264 shares December 31, 2020 and 2,500,000 shares as of December 31, 2019 [1] | (24,550) | (42,856) | (67,406) | (24,550) | — | (24,550) | (24,550) | — | (24,550) |
| Additional paid-in capital [1] | 178,969 | 98,385 | 277,354 | 225,537 | — | 225,537 | 229,207 | — | 229,207 |
| Accumulated deficit [2] | (200,935) | (5,501) | (206,436) | (136,355) | (24,752) | (161,107) | (121,933) | (18,634) | (140,567) |
| TOTAL GWG HOLDINGS STOCKHOLDERS' EQUITY | 120,630 | 50,028 | 170,658 | 242,067 | (24,752) | 217,315 | 269,415 | (18,634) | 250,781 |
| Noncontrolling interests [1] | 291,391 | 32,607 | 323,998 | 298,705 | (16,824) | 281,881 | 331,711 | 16,458 | 348,169 |
| TOTAL STOCKHOLDERS' EQUITY | 412,021 | 82,635 | 494,656 | 540,772 | (41,576) | 499,196 | 601,126 | (2,176) | 598,950 |
| TOTAL LIABILITIES & STOCKHOLDERS' EQUITY | 3,629,674 | (46,994) | 3,582,680 | 3,718,637 | (3,706) | 3,714,931 | 3,684,229 | 22,727 | 3,706,956 |

[1] For September 30, 2020, adjustments reflect the impact of the Collateral Swap discussed in Note 1.

[2] Adjustments reflect the impact of an immaterial out-of-period adjustment to correct the valuation allowance against the Company's deferred tax assets. See Note 2 to the consolidated financial statements for more details.

F-72

*Table of Contents*

# GWG HOLDINGS, INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The following tables set forth the effects of the Restatement on the affected line items within the Company's previously reported Condensed Consolidated Statements of Operations for the quarterly periods ended September 30, 2020, June 30, 2020, and March 31, 2020 (dollars in thousands).

| | Three Months Ended September 30, 2020 | | | Three Months Ended June 30, 2020 | | | Three Months Ended March 31, 2020 | | |
|---|---|---|---|---|---|---|---|---|---|
| | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated |
| REVENUE | | | | | | | | | |
| Investment income (loss), net | $ — $ | 56,705 $ | 56,705 | $ — $ | (22,671) $ | (22,671) | $ — $ | 7,556 $ | 7,556 |
| Interest income | 12,928 | (12,650) | 278 | 12,671 | (12,371) | 300 | 13,989 | (13,274) | 715 |
| Trust services revenues | 4,556 | (4,556) | — | 4,829 | (4,829) | — | 5,027 | (5,027) | — |
| TOTAL REVENUE | 28,513 | 39,499 | 68,012 | 68,789 | (39,871) | 28,918 | 33,557 | (10,745) | 22,812 |
| EXPENSES | | | | | | | | | |
| Provision for loan losses | (4,986) | 4,986 | — | 7,200 | (7,200) | — | 700 | (700) | — |
| Other expenses | 4,550 | 162 | 4,712 | 4,895 | 168 | 5,063 | 3,612 | — | 3,612 |
| TOTAL EXPENSES | 81,963 | 5,148 | 87,111 | 68,720 | (7,032) | 61,688 | 124,050 | (700) | 123,350 |
| LOSS BEFORE INCOME TAXES | (53,450) | 34,351 | (19,099) | 69 | (32,839) | (32,770) | (90,493) | (10,045) | (100,538) |
| INCOME TAX EXPENSE (BENEFIT) [1] | 22,444 | (18,826) | 3,618 | (8,550) | 6,532 | (2,018) | (14,507) | (1,638) | (16,145) |
| LOSS BEFORE LOSS FROM EQUITY METHOD INVESTMENTS | (75,894) | 53,177 | (22,717) | 8,619 | (39,371) | (30,752) | (75,986) | (8,407) | (84,393) |
| NET INCOME (LOSS) | (77,325) | 53,177 | (24,148) | 7,301 | (39,371) | (32,070) | (77,516) | (8,407) | (85,923) |
| Net (income) loss attributable to noncontrolling interests | 12,745 | (33,926) | (21,181) | (21,723) | 33,253 | 11,530 | 32,084 | 10,468 | 42,552 |
| NET INCOME (LOSS) ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ (68,149) $ | 19,251 $ | (48,898) | $ (18,136) $ | (6,118) $ | (24,254) | $ (49,384) $ | 2,061 $ | (47,323) |
| NET INCOME (LOSS) PER COMMON SHARE | | | | | | | | | |
| Basic | $ (2.23) $ | 0.63 $ | (1.60) | $ (0.59) $ | (0.20) $ | (0.79) | $ (1.62) $ | 0.07 $ | (1.55) |
| Diluted | $ (2.23) $ | 0.63 $ | (1.60) | $ (0.59) $ | (0.20) $ | (0.79) | $ (1.62) $ | 0.07 $ | (1.55) |
| WEIGHTED AVERAGE COMMON SHARES OUTSTANDING [2] | | | | | | | | | |
| Basic | 30,584,719 | (106,927) | 30,477,792 | 30,536,830 | — | 30,536,830 | 30,534,977 | — | 30,534,977 |
| Diluted | 30,584,719 | (106,927) | 30,477,792 | 30,536,830 | — | 30,536,830 | 30,534,977 | — | 30,534,977 |

[1] Adjustments reflect the impact of an immaterial out-of-period adjustment to correct the valuation allowance against the Company's deferred tax assets. See Note 2 to the consolidated financial statements for more details.

[2] For September 30, 2020, adjustments reflect the impact of the Collateral Swap discussed in Note 1.

F-73

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The following tables set forth the effects of the Restatement on the affected line items within the Company's previously reported Condensed Consolidated Statements of Operations for the year-to-date periods ended September 30, 2020 and June 30, 2020 (dollars in thousands).

| | Nine Months Ended September 30, 2020 | | | Six Months Ended June 30, 2020 | | |
|---|---|---|---|---|---|---|
| | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated |
| REVENUE | | | | | | |
| Investment income (loss), net | $ — $ | 41,590 $ | 41,590 | $ — $ | (15,115) $ | (15,115) |
| Interest income | 39,588 | (38,295) | 1,293 | 26,660 | (25,645) | 1,015 |
| Trust services revenues | 14,412 | (14,412) | — | 9,856 | (9,856) | — |
| TOTAL REVENUE | 130,859 | (11,117) | 119,742 | 102,346 | (50,616) | 51,730 |
| EXPENSES | | | | | | |
| Provision for loan losses | 2,914 | (2,914) | — | 7,900 | (7,900) | — |
| Other expenses | 13,057 | 330 | 13,387 | 8,507 | 168 | 8,675 |
| TOTAL EXPENSES | 274,733 | (2,584) | 272,149 | 192,770 | (7,732) | 185,038 |
| LOSS BEFORE INCOME TAXES | (143,874) | (8,533) | (152,407) | (90,424) | (42,884) | (133,308) |
| INCOME TAX EXPENSE (BENEFIT)[1] | (613) | (13,932) | (14,545) | (23,057) | 4,894 | (18,163) |
| LOSS BEFORE LOSS FROM EQUITY METHOD INVESTMENTS | (143,261) | 5,399 | (137,862) | (67,367) | (47,778) | (115,145) |
| NET INCOME (LOSS) | (147,540) | 5,399 | (142,141) | (70,215) | (47,778) | (117,993) |
| Net loss attributable to noncontrolling interests | 23,106 | 9,795 | 32,901 | 10,361 | 43,721 | 54,082 |
| NET INCOME (LOSS) ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ (135,669) $ | 15,194 $ | (120,475) | $ (67,520) $ | (4,057) $ | (71,577) |
| NET INCOME (LOSS) PER COMMON SHARE | | | | | | |
| Basic | $ (4.44) $ | 0.49 $ | (3.95) | $ (2.21) $ | (0.13) $ | (2.34) |
| Diluted | $ (4.44) $ | 0.49 $ | (3.95) | $ (2.21) $ | (0.13) $ | (2.34) |
| WEIGHTED AVERAGE COMMON SHARES OUTSTANDING [2] | | | | | | |
| Basic | 30,552,233 | (35,902) | 30,516,331 | 30,535,811 | — | 30,535,811 |
| Diluted | 30,552,233 | (35,902) | 30,516,331 | 30,535,811 | — | 30,535,811 |

[1] Adjustments reflect the impact of an immaterial out-of-period adjustment to correct the valuation allowance against the Company's deferred tax assets. See Note 2 to the consolidated financial statements for more details.
[2] For September 30, 2020, adjustments reflect the impact of the Collateral Swap discussed in Note 1.

F-74

*Table of Contents*

## GWG HOLDINGS, INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The following tables set forth the effects of the Restatement on the affected line items within the Company's previously reported Condensed Consolidated Statements of Cash Flows for the year-to-date periods ended September 30, 2020, June 30, 2020, and March 31, 2020 (dollars in thousands).

| | Nine Months Ended September 30, 2020 | | | Six Months Ended June 30, 2020 | | | Three Months Ended March 31, 2020 | | |
|---|---|---|---|---|---|---|---|---|---|
| | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | | | | | |
| Net loss | $ (147,540) $ | 5,399 $ | (142,141) $ | (70,215) $ | (47,778) $ | (117,993) $ | (77,516) $ | (8,407) $ | (85,923) |
| Adjustments to reconcile net income (loss) to net cash flows used in operating activities: | | | | | | | | | |
| Investment income (loss), net | — | (41,590) | (41,590) | — | 15,115 | 15,115 | — | (7,556) | (7,556) |
| Amortization of upfront fees | (5,356) | 5,356 | — | (3,586) | 3,586 | — | (1,793) | 1,793 | — |
| Return on investments in alternative assets | — | 1,577 | 1,577 | — | 1,180 | 1,180 | — | 374 | 374 |
| Non-cash interest income, including interest paid-in-kind and accretion of purchase discount | (38,530) | 38,315 | (215) | (25,811) | 25,665 | (146) | (13,374) | 13,295 | (79) |
| Provision for loan losses | 2,914 | (2,914) | — | 7,900 | (7,900) | — | 700 | (700) | — |
| Deferred income taxes [1] | (4,621) | (13,932) | (18,553) | (24,250) | 4,894 | (19,356) | (17,717) | (1,638) | (19,355) |
| Change in operating assets and liabilities: | | | | | | | | | |
| Fees receivable | (2,643) | 2,643 | — | (2,443) | 2,443 | — | (1,285) | 1,285 | — |
| Other assets | (2,634) | 184 | (2,450) | (2,869) | (377) | (3,246) | 368 | (12) | 356 |
| Accounts payable and accrued expenses | 8,306 | 58 | 8,364 | 2,592 | 21 | 2,613 | (1,103) | 15 | (1,088) |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (142,905) | (4,904) | (147,809) | (83,669) | (3,151) | (86,820) | (40,632) | (1,551) | (42,183) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | | | | | |
| Net change in loans receivable | 11,169 | (11,169) | — | 11,169 | (11,169) | — | 10,614 | (10,614) | — |
| Investments in alternative assets | — | (226) | (226) | — | (169) | (169) | — | (78) | (78) |
| Return of investments in alternative assets | — | 5,752 | 5,752 | — | 5,169 | 5,169 | — | 4,173 | 4,173 |
| NET CASH FLOWS PROVIDED BY (USED IN) INVESTING ACTIVITIES | 16,007 | (5,643) | 10,364 | 19,049 | (6,169) | 12,880 | 10,751 | (6,519) | 4,232 |
| NET INCREASE (DECREASE) IN CASH, CASH EQUIVALENTS AND RESTRICTED CASH | 10,425 | (10,547) | (122) | 68,962 | (9,320) | 59,642 | 43,547 | (8,070) | 35,477 |
| **CASH, CASH EQUIVALENTS AND RESTRICTED CASH** | | | | | | | | | |
| BEGINNING OF PERIOD | 99,331 | 16,459 | 115,790 | 99,331 | 16,459 | 115,790 | 99,331 | 16,459 | 115,790 |
| END OF PERIOD | $ 109,756 $ | 5,912 $ | 115,668 $ | 168,293 $ | 7,139 $ | 175,432 $ | 142,878 $ | 8,389 $ | 151,267 |

[1] Adjustment reflects the impact of an immaterial out-of-period adjustment to correct the valuation allowance against the Company's deferred tax assets. See Note 2 to the consolidated financial statements for more details.

F-75

Table of Contents

## GWG HOLDINGS, INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

| | Nine Months Ended September 30, 2020 | | | Six Months Ended June 30, 2020 | | | Three Months Ended March 31, 2020 | | |
|---|---|---|---|---|---|---|---|---|---|
| | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated |
| **NON-CASH INVESTING AND FINANCING ACTIVITIES** | | | | | | | | | |
| Conversion of Promissory Note | 70,565 | (70,565) | — | — | — | — | — | — | — |
| Collateral Swap (see Note 1): | | | | | | | | | |
| Exchange of alternative assets for Seller Trust L Bonds [1] | — | 94,788 | 94,788 | — | — | — | — | — | — |
| Exchange of alternative assets for common stock [1] | — | 42,856 | 42,856 | — | — | — | — | — | — |
| Deemed capital contribution from related party [1] | — | 46,770 | 46,770 | — | — | — | — | — | — |
| Adjustment to noncontrolling interest as a result of Collateral Swap [1] | — | 3,444 | 3,444 | — | — | — | — | — | — |
| Distribution payable to noncontrolling interest | — | 165 | 165 | — | 165 | 165 | — | 136 | 136 |
| Business combination measurement period adjustments: | | | | | | | | | |
| Reduction in loans receivable | 26,116 | (26,116) | — | 26,116 | (26,116) | — | 14,590 | (14,590) | — |

[1] For September 30, 2020, adjustments reflect the impact of the Collateral Swap discussed in Note 1.

The following table sets forth the effects of the Restatement on the affected line items and classes of stockholders' equity within the Company's previously reported Condensed Consolidated Statements of Changes in Stockholder's Equity for the quarters ended March 31, 2020 through September 30, 2020 (dollars in thousands). There was no impact to the redeemable noncontrolling interest.

| | Common Shares | Additional Paid-in Capital | Accumulated Deficit | Treasury Stock | Total GWG Holdings Stockholders' Equity | Noncontrolling Interests | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|
| **Balance, December 31, 2019 (As Previously Reported)** | 30,533,793 $ | 233,106 $ | (76,501) $ | (24,550) $ | 333,979 $ | 266,848 $ | 600,827 |
| Adjustments to recognition of noncontrolling interest | — | — | — | — | — | 27,062 | 27,062 |
| Adjustments to net income | — | — | (20,695) | — | (20,695) | — | (20,695) |
| **Balance, December 31, 2019 (As Restated)** | 30,533,793 | 233,106 | (97,196) | (24,550) | 313,284 | 293,910 | 607,194 |
| Adjustments to noncontrolling interest | — | — | — | — | — | (10,604) | (10,604) |
| Adjustments to net loss | — | — | 2,061 | — | 2,061 | — | 2,061 |
| Total other activity as previously reported | 1,456 | (3,899) | (45,432) | — | (64,564) | 64,863 | 299 |
| **Balance, March 31, 2020 (As Restated)** | 30,535,249 | 229,207 | (140,567) | (24,550) | 250,781 | 348,169 | 598,950 |
| Adjustments to noncontrolling interest | — | — | — | — | — | (33,282) | (33,282) |
| Adjustments to net loss | — | — | (6,118) | — | (6,118) | — | (6,118) |
| Total other activity as previously reported | 2,232 | (3,670) | (14,422) | — | (27,348) | (33,006) | (60,354) |
| **Balance, June 30, 2020 (As Restated)** | 30,537,481 | 225,537 | (161,107) | (24,550) | 217,315 | 281,881 | 499,196 |
| Adjustments to noncontrolling interest | — | — | — | — | — | 33,926 | 33,926 |
| Adjustments to net loss | — | — | 19,251 | — | 19,251 | — | 19,251 |
| Deemed capital contribution from related party | — | 46,770 | — | — | 46,770 | — | 46,770 |
| Recognition of shares in treasury | (9,837,264) | — | — | (42,856) | (42,856) | — | (42,856) |
| Adjustment for change in ownership | — | 8,039 | — | — | 8,039 | (8,039) | — |
| Reduction to noncontrolling interest for Beneficient treasury | — | — | — | — | — | (3,444) | (3,444) |
| Total other activity as previously reported | 57,183 | (2,992) | (64,580) | — | (77,861) | 19,674 | (58,187) |
| **Balance, September 30, 2020 (As Restated)** | 20,757,400 $ | 277,354 $ | (206,436) $ | (67,406) $ | 170,658 $ | 323,998 $ | 494,656 |

F-76

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(23) Subsequent Events and Other Matters**

*Amendment of Beneficient Credit Agreements*

On March 10, 2021, Beneficient Capital Company II, L.L.C. (formerly known as Beneficient Capital Company, L.L.C.) and Beneficient Company Holdings, L.P. (the "New Borrower"), both of which are subsidiaries of Ben LP, entered into Amendment No. 1 to the Second Amended and Restated Credit Agreement (the "First Lien Amendment") and Amendment No. 1 to the Second Amended and Restated Second Lien Credit Agreement (the "Second Lien Amendment" and, together with the First Lien Amendment, the "Amendments") with HCLP Nominees, L.L.C. (the "Lender"). The Second Amended and Restated Credit Agreement is referred to herein as the "First Lien Credit Agreement" and the Second Amended and Restated Second Lien Credit Agreement is referred to herein as the "Second Lien Credit Agreement" and, together with the First Lien Credit Agreement, the "Ben Credit Agreements." As of March 10, 2021, the principal amount outstanding under the First Lien Credit Agreement was $2.3 million and the principal amount outstanding under the Second Lien Credit Agreement was $72.0 million.

The Amendments extend the scheduled maturity date under the Ben Credit Agreements from April 10, 2021 to May 30, 2022. The Amendments also provide that the New Borrower shall repay $5.0 million of the outstanding principal amount under the Ben Credit Agreements on each of September 10, 2021, December 10, 2021 and March 10, 2022. The Amendments also provide for the payment by the New Borrower to the Lender of an extension fee equal to 1.5% of the outstanding principal amounts under the Ben Credit Agreements, which was added to the outstanding amount under the Ben Credit Agreements as provided for in the amendments.

On June 28, 2021, the New Borrower and the Lender entered into Amendment No. 2 to the Ben Credit Agreements. The amendments eliminate the obligation of DLP V to assume the Ben Credit Agreements as provided for in the Second Amendments and waive the daily fee payable upon the Trigger as defined and provided for in the Amendment No. 1 to the Ben Credit Agreements. The eliminated provisions are discussed in further detail in Note 10.

Effective July 15, 2021, Beneficient executed Consent and Amendment No. 3 to the Second Amended and Restated Credit Agreement and Amendment No. 2 to the Second Amended and Restated Subordinate Credit Agreement with its lender, which (i) deferred the payment of all accrued and unpaid interest until December 10, 2021, and (ii) deferred the installment payment of $5.0 million due on September 10, 2021, to December 10, 2021. Beneficient agreed to pay an amendment fee to the lender in an amount equal to 3% of the then outstanding principal and interest on December 10, 2021.

*Third Amended and Restated Senior Credit Facility with LNV Corporation*

On June 28, 2021, DLP IV entered into the Third Amended and Restated Credit Facility with LNV Corporation, as lender, and CLMG Corp., as the administrative agent on behalf of the lenders under the agreement (the "Third Amended Facility"), which replaced the LNV Credit Facility described in Note 10 to the consolidated financial statements. The Third Amended Facility resulted in an additional advance of $52.5 million from LNV Corporation.

In conjunction with entering into the Third Amended Facility, DLP V transferred life insurance policies having an aggregate face value of approximately $440.6 million to DLP IV, which were pledged as additional collateral to the Third Amended Facility, and DLP IV received proceeds of approximately $51.2 million (net of certain fees and expenses incurred in connection with the negotiation and entry into the Third Amended Facility). The Third Amended Facility sets forth interest and other terms and covenants similar those included in the previous LNV Credit Facility.

*Beneficient's Conditional Kansas Charter*

In April 2021, the Kansas Legislature adopted, and the governor of Kansas signed into law, a bill that would allow for the chartering and creation of Kansas trust companies, known as TEFFIs, that provide fiduciary financing (e.g., lending to ExAlt Trusts), custodian and trustee services, in all capacities pursuant to statutory fiduciary powers, to investors and other participants in the alternative assets market, as well as the establishment of alternative asset trusts. The legislation became effective on July 1, 2021 and designates BFF as the pilot trust company under the TEFFI legislation. A conditional trust charter was issued by the Kansas Bank Commissioner to a subsidiary of Ben LP on July 1, 2021. Under the pilot program, BFF will not be authorized to exercise its fiduciary powers as a TEFFI until the earlier of the date the Kansas Bank Commissioner promulgates applicable rules and regulations or December 31, 2021 or. The bill also permits the Kansas Bank

APP. 649

F-77

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Commissioner to request a six-month extension of the pilot program period, which could delay Beneficient's permission to exercise of fiduciary powers under the charter until July 1, 2022.

*National Founders LP Credit Agreement*

On August 11, 2021, GWG DLP Funding VI, LLC, a Delaware limited liability company ("DLP VI"), entered into a Credit Agreement (the "NF Credit Agreement") with each lender from time to time party thereto and National Founders LP, a Delaware limited partnership, as the administrative agent (the credit facility evidenced by such NF Credit Agreement, the "NF Credit Facility"). DLP VI is a wholly owned subsidiary of GWG DLP Funding Holdings VI, LLC, a Delaware limited liability company (the "DLP Holdings VI"). DLP Holdings VI is a wholly owned subsidiary of GWG Life.

On August 11, 2021, a one-time advance of approximately $107.6 million was made to the DLP VI under the NF Credit Facility with a scheduled maturity date of August 11, 2031. Amounts borrowed under the NF Credit Facility bear interest on each day on the outstanding principal amount on such day at a per annum rate, determined on a daily basis, generally equal to 5.5% up to 65% of the loan to value percent as calculated in accordance with the NF Credit Agreement, and 7.0% on anything above that loan to value percent. In particular, amounts borrowed under the NF Credit Facility bear interest on each day on the outstanding principal amount on such day at a per annum rate equal to the Interest Rate as of such day, or the Default Rate as of such day if an event of default has occurred and is continuing. The "Interest Rate" as of such day is equal to the sum of: (a) the percentage equal to (i) the Non-Higher Rate Factor as of such date of determination multiplied by (ii) 5.50%; and (b) the percentage equal to (i) the Higher Rate Factor as of such date of determination multiplied by (ii) 7.00%. "Non-Higher Rate Factor" means, as of any date of determination, the percentage equal to (i) 100% minus (ii) the Higher Rate Factor as of such date of determination, and "Higher Rate Factor" means, as of any date of determination, the percentage equal to (i) the greater of (a) the amount equal to (1) the LTV Percentage (as defined in the NF Credit Agreement) as of such date of determination minus (2) 65% and (b) zero percent divided by (ii) the LTV Percentage as of such date of determination. The "Default Rate" as of such day is equal to the sum of: (a) the Interest Rate as of such day and (b) 2.00%. Interest payments are made on a monthly basis.

Under the NF Credit Facility, each of DLP VI and DLP Holdings VI has granted the administrative agent, for the benefit of the lenders under the agreement, a security interest in substantially all of GWG Holdings' remaining life insurance policy assets not pledged by DLP IV under its LNV Credit Facility. In addition, amounts owing under the NF Credit Facility have been guaranteed by GWG Holdings upon the occurrence of a Guarantee Trigger Event (as defined in the guarantee), including certain bankruptcy events related to the DLP VI or DLP Holdings VI or a Change in Control (as defined in the NF Credit Agreement).

A portion of the proceeds from the funding under the NF Credit Facility was used to purchase life insurance policies that were owned by DLP IV, which used the funds to repay the most recent advance of $52.5 million plus interest and penalties under the LNV Credit Facility described above. At August 11, 2021, the aggregate face value of life insurance policies owned by DLP VI, was approximately $433.1 million. As of such date, the aggregate face value of life insurance policies owned by DLP IV was approximately $1.42 billion.

With the exception of assets pledged by DLP IV under the LNV Credit Facility, and the assets pledged under the NF Credit Facility, GWG Holdings secures L Bonds with a pledge of collateral security in its ownership interests in GWG Life and GWG Holdings' other direct subsidiaries; GWG Life's ownership in its direct subsidiaries that own directly or indirectly a large actuarially diverse portfolio of life insurance policies of highly rated insurance companies; and investments in Beneficient. Furthermore, L Bonds are secured by a pledge of approximately 4.0 million shares of GWG Holdings' common stock. GWG Holdings' most significant assets are cash and its investments in subsidiaries. These assets were not pledged under the NF Credit Facility.

The NF Credit Facility has certain financial and nonfinancial covenants, and we were in compliance with these covenants as of the date of this filing. In addition, the NF Credit Facility has certain reporting obligations that require DLP VI to deliver audited annual consolidated financial statements of DLP Holdings VI no later than 150 days after the end of each fiscal year (beginning with the fiscal year ending December 31, 2021) and unaudited quarterly consolidated financial statements of DLP Holdings VI no later than 90 days after the end of each of DLP VI's first three fiscal quarters (beginning with the fiscal quarter ending September 30, 2021). The NF Credit Facility also has customary events of default for a facility of this type.

F-78

APP. 652

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

DLP VI may voluntarily prepay amounts owing under the NF Credit Facility upon payment of all accrued and unpaid interest on such prepaid amounts and payment of the applicable Prepayment Premium (as defined in the NF Credit Agreement).

The NF Credit Facility permits DLP VI to pay dividends and distributions from the proceeds of the one-time advance. As a result, the funding under the NF Credit Facility, less amounts used to purchase the life insurance policies from DLP IV, will be available to GWG Holdings and will improve GWG Holdings' cash position while it works to complete this 2020 Form 10-K, and its Current Reports on Form 10-Q for the quarters ended March 31, 2021 and June 30, 2021, which GWG Holdings expects will permit it to resume the issuance of its L Bonds.

*Non-Binding Term Sheet with Beneficient*

On August 13, 2021, GWG Holdings, Ben LP, and BCH entered into a non-binding term sheet (the "Term Sheet") that contemplates a series of transactions which, if completed, will result in, among other things, (i) GWG Holdings receiving certain proposed enhancements to its investments in Beneficient; (ii) GWG Holdings no longer having the right to appoint directors of the board of directors of Beneficient Management; and (iii) Beneficient no longer being a consolidated subsidiary of GWG Holdings. The Term Sheet and related negotiations are a part of ongoing efforts by management and the Board of Directors of GWG Holdings to maximize the value of GWG Holdings' and GWG Life's investment in Beneficient.

The Company believes that returning control of Beneficient is a necessary step for Ben LP to establish one of its operating subsidiaries as a TEFFI under the Kansas Technology-Enabled Fiduciary Financial Institutions Act (the "TEFFI Act"), which is important to Beneficient's long-term business objective of providing liquidity and other services to holders of alternative assets.

Until the definitive documentation is finalized and executed, each of these provisions is non-binding and is subject to change in all respects, including as a result of additional diligence, the further discharge of fiduciary duties, and the negotiation of definitive documentation. The Company has begun working on definitive documentation to implement the Term Sheet with Ben LP and is working to complete such definitive documentation within the fourth quarter of 2021, although there can be no assurance definitive documentation will be completed by then, or at all.

If Ben LP becomes an independent company pursuant to the terms of the Term Sheet, the Company expects that Ben LP would reduce its reliance on GWG Holdings to fund its operations and would raise future capital from other sources. Beneficient's capital raising efforts may include the issuance of equity or debt of Ben LP or one of its subsidiaries, and the newly issued securities may be dilutive to GWG Holdings' and GWG Life's investment in Ben LP and BCH and may include preferential terms relative to GWG Holdings' and GWG Life's investments in Ben LP and BCH. GWG Holdings and GWG Life would still retain a substantial investment in Beneficient.

*Fourth Amended and Restated Senior Credit Facility with LNV Corporation*

On September 7, 2021, DLP IV entered into a Fourth Amended and Restated Loan and Security Agreement with LNV Corporation, as lender, and CLMG Corp., as the administrative agent on behalf of the lenders under the agreement (the "Fourth Amended Facility"). The Fourth Amended Facility replaced the Third Amended Facility, that previously governed the Company's senior credit facility. The Fourth Amended Facility resulted in an additional advance of $30.3 million from LNV Corporation, paid on September 7, 2021.

Under the Fourth Amended Facility, all advances bear interest at a rate of the Benchmark Rate plus the Applicable Margin, or the Default Rate if an event of default has occurred and is continuing. For purposes of the Fourth Amended Facility, (i) the Benchmark Rate is the greater of (a) the sum of (i) the Federal Funds Rate plus (ii) one-half of one percent (0.50%) and (b) one and one half of one percent (1.50%); (ii) the Applicable Margin is seven and one half percent (7.50%); and (iii) the Default Rate is the Benchmark Rate plus nine and one half percent (9.50%).

F-79

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*COVID-19*

In December 2019, a novel strain of coronavirus and the associated respiratory disease ("COVID-19") was first reported in Wuhan, China. Less than four months later, on March 11, 2020, the World Health Organization declared COVID-19 a pandemic. The extent of COVID-19's effect on the Company's operational and financial performance will depend on continuing developments, including the duration, spread and intensity of the pandemic, all of which are uncertain and difficult to predict considering the rapidly evolving landscape. Although a substantial majority of our employees continue to work remotely, we have maintained our operations at or near normal levels. We have not experienced any significant disruptions due to operational issues, loss of communication capabilities, technology failure or cyber-attacks. The Company continues to raise capital, receive distributions from alternative assets and insurance policy benefits, pay interest and dividends and otherwise meet its ongoing obligations. However, depending on the extent of the ongoing economic crisis resulting from the pandemic and its impact on the Company's business, the pandemic could have a material adverse effect on our results of operations, financial condition and cash flows.

*Policy Benefits and L Bonds*

Subsequent to December 31, 2020 through October 15, 2021, policy benefits on 81 policies covering 74 individuals have been realized. The face value of insurance benefits of these policies was $106.2 million.

Subsequent to December 31, 2020 through April 16, 2021, the date we temporarily suspended GWG Holdings' L Bond offering, GWG Holdings issued approximately $191.6 million of L Bonds. No L Bonds have been sold since April 16, 2021.

*Beneficient's Liquidity Transactions*

Subsequent to December 31, 2020 through the date of this filing, we executed 10 transactions pursuant to which customers sold interests in private equity funds with an aggregate net asset value of $5.6 million to certain of the ExAlt Trusts in exchange for agreed upon consideration.

F-80

Table of Contents

**ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE.**

There have been no changes in or disagreements with accountants on accounting and financial disclosure.

**ITEM 9A. CONTROLS AND PROCEDURES.**

**Evaluation of Disclosure Controls and Procedures**

We maintain disclosure controls and procedures designed to provide reasonable assurance that information required to be disclosed in our reports filed pursuant to the Securities Exchange Act of 1934 is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including GWG Holdings' Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance the objectives of the control system are met.

GWG Holdings' Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of our disclosure controls and procedures as such term is defined in Rule 13a-15(e) and 15d-15(e) under the Securities and Exchange Act of 1934, as of December 31, 2020 (the end of the period covered by this report). Based on that evaluation, GWG Holdings' Chief Executive Officer and Chief Financial Officer concluded that due to the material weaknesses described below, our disclosure controls and procedures were ineffective.

*Material Weaknesses*

*Restatement*

In connection with matters related to the Restatement, we have determined that a material weakness existed in our internal control over financial reporting for all periods from December 31, 2019 to December 31, 2020. As of December 31, 2020, the design and operating effectiveness of controls over the selection, application and review of the implementation of accounting policies were not sufficient to ensure amounts recorded and disclosed were fairly stated in accordance with GAAP. This material weakness resulted in the Restatement.

In response to this material weakness, our management has expended, and will continue to expend, a substantial amount of effort and resources for the remediation and improvement of our internal control over financial reporting. While we have processes to identify and evaluate the appropriate accounting for technical pronouncements and other literature for all significant or unusual transactions, we are improving these processes to ensure that the nuances and complexities of such transactions are effectively evaluated in the context of the increasingly complex accounting standards. Our remediation plan at this time includes continuing to enhance our internal and external technical accounting resources by hiring additional personnel and increasing communication with third-party professionals with whom we consult regarding the application of complex accounting transactions.

Our remediation plan can only be accomplished over time and will be continually reviewed to determine that it is achieving its objectives. We can offer no assurance that these initiatives will ultimately have the intended effects.

*Quarterly Valuation Allowance*

In connection with the preparation and review of our quarterly condensed consolidated financial statements as of and for the period ended September 30, 2020, we also identified a material weakness in internal controls over the quarterly income tax provision process, which included the measurement of the valuation allowance against the Company's deferred tax assets.

We have implemented a suite of enhanced internal controls and have involved additional external resources in the quarterly income tax provision process, including the assessment of the valuation allowance. We believe these measures will enable us to remediate this material weakness in internal controls over the income tax provision process, including the valuation allowance against the Company's deferred tax assets.

We have completed certain of such remediation activities as of the date of this filing and believe that we have strengthened our internal controls to address the identified material weakness in internal controls over the quarter income tax provision process. However,

APP. 655

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 656 of 1031     PageID 828

control weaknesses are not considered remediated until new internal controls have been operational for a

Page 73

Table of Contents

period of time, are tested, and management concludes that these controls are operating effectively. We will continue to monitor the effectiveness of these remediation measures, and we will make any changes to the design of this plan and take such other actions that we deem appropriate given the circumstances.

Notwithstanding these material weaknesses, the Company has concluded that no material misstatements exist in the consolidated financial statements, and such financial statements present fairly, in all material respects, the financial position, results of operations and cash flows of the Company as of and for the years ended December 31, 2020 and December 31, 2019, in conformity with accounting principles generally accepted in the United States of America.

**Changes in Internal Control over Financial Reporting**

As a result of the consolidation of Beneficient on December 31, 2019, we have evaluated the processes and procedures of Beneficient's internal control over financial reporting, and have incorporated Beneficient's internal control over financial reporting into our internal control over financial reporting framework. In addition, as a result of the consolidation of Beneficient, we have implemented new processes and controls over accounting for goodwill and other intangible assets, primarily related to assessing these assets for impairment.

Additionally, we implemented a suite of enhanced internal controls in response to the identified material weakness in the quarterly income tax provision process. Specifically, we implemented a more robust process for evaluating the potential impact of significant and unusual transactions on the tax provision. We have also involved additional internal and external resources with a heightened understanding of ASC Topic 740, *Income Taxes*, in the quarterly income tax provision process.

Other than the aforementioned items, there were no changes in our internal control over financial reporting identified in connection with management's evaluation pursuant to Rules 13a-15(d) or 15d-15(d) of the Securities Exchange Act of 1934 during the fourth quarter of 2020 that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rule 13a-15(f) under the Securities and Exchange Act of 1934.

The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that:

(i)    Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company;

(ii)   Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are in accordance with authorizations of management and directors of the company; and

(iii)  Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with policies or procedures may deteriorate.

Under the supervision of the Audit Committee of the Board of Directors of GWG Holdings and with the participation of our management, including GWG Holdings' Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting using the criteria established in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on our assessment and those criteria, management concluded that due to the material weaknesses described above, our internal control over financial reporting as of December 31, 2020 was ineffective.

APP. 657

Page 74

Table of Contents

The Company's independent registered public accounting firm has audited the Company's internal control over financial reporting as of December 31, 2020, as stated in the Report of Independent Registered Public Accounting Firm, appearing under Item 8.

**ITEM 9B. OTHER INFORMATION.**

None.

Page 75

# PART III

## ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE.

The following paragraphs provide information as of the date of this report about each of GWG Holdings' current directors and executive officers.

### Directors

GWG Holdings' bylaws permit a maximum of fifteen directors. The board of directors of GWG Holdings currently consists of five members. GWG Holdings' Board of Directors is divided into three classes, designated as Class I, Class II and Class III. Each class serves staggered, three year terms except as described below. The terms of office of GWG Holdings' Class II directors will expire at the Combined 2020/2021 Annual Meeting, and their successors shall be elected for a term expiring at the 2023 annual meeting of stockholders. The terms of office of GWG Holdings' Class III directors will expire at the Combined 2020/2021 Annual Meeting, and their successors shall be elected for a three year term expiring at the 2024 annual meeting of stockholders. We expect that Peter T. Cangany, Jr. will become a Class I director and David F. Chavenson and David H. de Weese will become Class II directors following the Combined 2020/2021 Annual Meeting.

Each director serves until his or her successor is elected and shall have qualified, or until his or her earlier death, resignation, removal or disqualification.

The following chart sets forth the three classes of directors as of the date of this report.

| Director | Class | Expiration of Current Term of Director |
|---|---|---|
| Murray T. Holland | Class I | 2022 Annual Meeting |
| Peter T. Cangany, Jr. | Class III | 2020/2021 Annual Meeting |
| David F. Chavenson | Class III | 2020/2021 Annual Meeting |
| David H. de Weese | Class III | 2020/2021 Annual Meeting |
| Timothy L. Evans | Class III | 2020/2021 Annual Meeting |

| Name and Age of Director | Principal Occupation, Business Experience For the Past Five Years and Directorships of Public Companies | Director Since |
|---|---|---|
| | **CLASS I DIRECTORS** | |
| Murray T. Holland<br>Age 67 | Murray T. Holland has served as GWG Holdings' President and Chief Executive Officer since April 26, 2019 and a director and Chairman of the Board of GWG Holdings since June 2021. In 2001, Mr. Holland became an original investor and consultant for MHT Partners, a boutique investment banking firm based in Dallas, Texas with a number of offices in the United States. From 2013 until recently, he was Managing Director of MHT Partners. Mr. Holland resigned from this position in connection with the transaction contemplated by the Purchase and Contribution Agreement, dated April 15, 2019, among Jon R. Sabes, Steven F. Sabes and Ben LP, among others. Prior to MHT Partners, he was CEO and principal shareholder of Convergent Media Systems (Atlanta), a $100 million custom network outsourcing firm with approximately 300 employees, CEO and principal shareholder of Convergent Group Corporation (Denver), a $200 million geographic information systems software and integration firm with approximately 450 employees, and CEO and principal shareholder of BTI Americas (Chicago), a $2.7 billion business travel agency with approximately 4,400 employees. EDS was his principal business partner in these ventures. Prior to that, Mr. Holland was a partner at the law firm of Akin, Gump, Strauss, Hauer & Feld (Dallas) in corporate finance and securities, a Senior Vice President of Credit Suisse First Boston (New York and Dallas) in Mergers and Acquisitions and a Managing Director of Kidder, Peabody & Co. (New York) in Mergers and Acquisitions. He graduated from Washington and Lee University with a B.S. in 1975, University of Virginia Graduate School of Business Administration with an M.B.A. in 1978, and Washington and Lee University School of Law with a J.D. in 1980. Mr. Holland is the author of "A Nation in the Red" (McGraw Hill - 2014), a book about the U.S. national debt and its implications. | 2021 |

APP. 660

Page 76

Table of Contents

## CLASS III DIRECTORS

| | | |
|---|---|---|
| Peter T. Cangany, Jr.<br>Age 64 | Peter T. Cangany, Jr. retired as a partner with Ernst & Young LLP ("EY") in 2017, having served in such capacity since 1993. Mr. Cangany specialized in the audits of companies involved in several sectors of the financial services industry, including insurance companies and investment management firms with a focus on public companies. He held senior positions with the leadership of EY throughout his years as a partner, including location and sector leadership responsibilities. Mr. Cangany also currently serves as Chair of the Board of Trustees of Franklin College of Indiana. Mr. Cangany brings extensive knowledge of financial reporting and accounting issues faced by companies in the financial services industry, as well as experience with early-stage growth businesses, strategic planning, and corporate governance from nearly 40 years of serving clients. Mr. Cangany earned a B.A. in Accounting from Franklin College and an M.B.A. from Texas A&M University. He is also a Certified Public Accountant. | 2019 |
| David F. Chavenson<br>Age 69 | David F. Chavenson served as Treasurer of Alon USA Energy Company from 2007 until 2018. He served as Vice President and Treasurer of Flowserve Corp. from 2001 until 2005; Senior Vice President and Chief Financial Officer at Worldwide Flight Services, Inc. from 2000 to 2001; and Vice President of Finance, Chief Financial Officer and Corporate Secretary of Rutherford-Moran Oil Corporation since April 1996 to 1999. Previous to 1996, Mr. Chavenson spent 18 years at Oryx Energy Company, an oil and gas exploration and production company (previously Sun Exploration and Production Co.) ("Oryx"), and served as Treasurer there from 1993 to 1996. Prior to that, he served as Assistant Treasurer and Manager of Corporate Finance, Manager of Financial Analysis and Senior Financial Specialist at Oryx. Mr. Chavenson has a B.A., magna cum laude, Phi Beta Kappa from Dickinson College and holds an M.B.A. in finance with honors from the Harvard Business School. He is also a Certified Public Accountant. | 2019 |
| David H. de Weese<br>Age 79 | David H. de Weese is a Partner of Paul Capital Advisors, a private equity firm. He was instrumental in developing Paul Capital's deal origination strategy and transaction sourcing network. He joined Paul Capital in 1995 and led global secondary transaction sourcing activities and the due diligence of life science and health care investments. Mr. de Weese has 14 years of management experience in Europe. He has an extensive entrepreneurial experience and in-depth scientific and business knowledge. He is the co-founder and a member of the board of directors of NISTA Diagnostics, Inc. He also founded Medical Innovations. In 1993, he co-founded and served as the President and Chief Executive Officer of M6 Pharmaceuticals. Mr. de Weese served as the President and Chief Executive Officer of Cygnus Therapeutic Systems, SIGA Technologies, Inc. and a Silicon Valley software company. Prior to Cygnus, he served as the President and Chief Executive Officer of Machine Intelligence Corporation. Mr. de Weese previously served as a member of the board of directors of OSE Immunotherapeutics SA (also known as OSE Pharma SA) and as the chairman of Capacitor Sciences, Inc. Mr. de Weese holds an M.B.A. from the Harvard Business School, a B.A. from Stanford University and attended law school at Stanford University. | 2019 |
| Timothy L. Evans<br>Age 42 | Timothy L. Evans joined GWG Holdings as Chief Integration Officer on May 6, 2019, and was appointed Chief Financial Officer on August 15, 2019 and a director in June 2021. Prior to joining GWG Holdings, Inc., Mr. Evans was Chief of Staff for Ben L.P. where he had also served as Vice President and Deputy General Counsel since February 2018. Prior to joining Ben LP, Mr. Evans was an attorney for the United States Securities and Exchange Commission for six years, where he served as a trial attorney and a counsel to the Director of Enforcement. Mr. Evans was an associate in the Dallas office of Thompson & Knight LLP for four years before joining the Securities and Exchange Commission. He received his Juris Doctorate, summa cum laude, from the University of Arkansas School of Law in 2008. Prior to practicing as an attorney, Mr. Evans was an accountant for three years with SMG, a public facility management company. He previously held an Arkansas CPA license but is not currently licensed by the Arkansas State Board of Public Accountancy. He graduated from the University of Illinois at Urbana-Champaign with a Bachelor of Arts in Economics in 2001. | 2021 |

Page 77

APP. 662

**Executive Officers**

| Name and Title | Age | Principal Occupation, Business Experience for the Past Five Years and Directorships of Public Companies |
| --- | --- | --- |
| Murray T. Holland<br>President and Chief Executive Officer | 67 | See description above. |
| Timothy L. Evans<br>Chief Financial Officer and Treasurer | 42 | See description above. |

**Board Leadership Structure and Risk Oversight**

Murray T. Holland serves as GWG Holdings' Chairman of our Board of Directors.

Management and our outside counsel discuss risks, both during Board meetings and in direct discussions with members of our Board of Directors. These discussions identify Company risks that are prioritized and assigned to the appropriate Board committee, as discussed below, or the full Board for oversight. Our risk management program as a whole is reviewed periodically as needed or as requested by GWG Holdings' Board or a Board committee.

**Board Committees and Board Meetings**

GWG Holdings' Board of Directors has an Audit Committee, a Compensation Committee and an Executive Committee. GWG Holdings' Board of Directors has also had a Nomination and Corporate Governance Committee; however, the activities conducted by such committee are currently being conducted by the full Board of Directors. Each of the foregoing Committees has a written charter, a copy of each of which is available at GWG Holdings' website at www.gwgh.com. GWG Holdings' Board committees comply with the listing requirements of The Nasdaq Marketplace Rules taking into account its reliance on exceptions for "controlled companies" as described under the caption "Director Independence" below.

**Audit Committee**

The Audit Committee consists of three members: Peter T. Cangany, Jr. (Chair), David F. Chavenson, and David H. de Weese. All of the members are financially literate and are independent directors under the Nasdaq Marketplace Rules, and SEC audit committee structure and membership requirements. Further, GWG Holdings' Board has determined that Mr. Cangany is an "audit committee financial expert" as defined by applicable regulations of the SEC and is "independent" under the Nasdaq Marketplace Rules.

The Audit Committee's job is one of oversight as set forth in its charter. It is not the duty of the Audit Committee to prepare our consolidated financial statements, to plan or conduct audits or investigations, or to determine that our financial statements are complete and accurate and are in accordance with generally accepted accounting principles. Our management is responsible for preparing our consolidated financial statements and for establishing and maintaining effective internal control over financial reporting. The independent registered public accountants are responsible for the audit of our consolidated financial statements and the review of the effectiveness of our internal control over financial reporting.

The Audit Committee is responsible primarily for assisting the Board in fulfilling its oversight and monitoring responsibility of reviewing the financial information that will be provided to stockholders and others, appointing the independent registered public accounting firm, reviewing the services performed by our independent registered public accounting firm, reviewing our accounting policies and the internal controls established by management and the Board, reviewing significant financial transactions, the integrity of the financial statements and our enterprise risk management framework. The Audit Committee also reviews the Anonymous Complaint Program, which allows for confidential, anonymous submissions by Company employees regarding questionable accounting or auditing matters, including reviewing if any such complaints were received and the disposition of those complaints.

In fulfilling its oversight over our independent registered public accounting firm, the Audit Committee carefully reviews the engagement of the independent registered public accounting firm, which includes among other things: the scope of the audit; fees; the assigned partner(s) and other personnel and their industry experience; auditor independence; peer and Public Company Accounting Oversight Board ("PCAOB") reviews; any significant legal proceedings; previous experience with the firm's performance; and any non-audit services performed. The Audit Committee engaged Grant Thornton LLP as our independent registered public accounting firm for the year ended December 31, 2020.

APP. 663

Page 78

Table of Contents

We maintain an auditor independence policy that, among other things, prohibits our independent registered public accounting firm from performing non-financial consulting services, such as information technology consulting and internal audit services. This policy mandates that the Audit Committee approve in advance any non-audit services to be performed by the independent registered public accounting firm and the related costs associated therewith. Therefore, we may not enter into engagements with our independent registered public accounting firm for non-audit services without the express pre-approval of the Audit Committee.

**Compensation Committee**

GWG Holdings' Compensation Committee consists of one member: David H. de Weese. As described in our Current Report on Form 8-K filed with the SEC on June 17, 2021, Thomas O. Hicks, a former member of GWG Holdings' Compensation Committee, resigned from the Board and the Compensation Committee to join the board of directors of the Beneficient TEFFI trust company, and the Board has yet to appoint a successor to Mr. Hicks on the Compensation Committee. GWG Holdings' Compensation Committee is charged with oversight responsibility for the adequacy and effectiveness of our executive compensation and benefit plans and is primarily responsible for all matters relating to compensation of our executive officers and the directors, the adoption of all employee compensation and employee benefit plans and the administration of such plans including granting stock incentives or other benefits, and the review and approval of disclosures regarding executive compensation included in our SEC reports. GWG Holdings' Compensation Committee has the authority to obtain advice and assistance from external legal, accounting or other advisors, and has the authority to retain, terminate and approve the fees payable to any external compensation consultant to assist in the evaluation of director and senior executive compensation. However, any services to be rendered by our independent registered public accounting firm shall be pre-approved by the Audit Committee if required under our policy regarding pre-approval of such services.

**Executive Committee**

GWG Holdings' Executive Committee currently consists of one member: David H. de Weese. As described in our Current Report on Form 8-K filed with the SEC on June 17, 2021, Brad K. Heppner, Thomas O. Hicks, and Bruce W. Schnitzer, former members of the Executive Committee, resigned from the Board and the Executive Committee to join the board of directors of the Beneficient TEFFI trust company, and the Board has yet to appoint successors to Messrs. Heppner, Hicks, or Schnitzer on the Executive Committee. GWG Holdings' Executive Committee has authority to act on behalf of the full Board of Directors between regular meetings of the Board of Directors, consistent with the requirements of Delaware law.

**Corporate Governance and Nominating Committee**

GWG Holdings' Corporate Governance and Nominating Committee was dissolved in 2019. We are a controlled company and are currently relying on the Nasdaq controlled company exemption from the requirement to have nominations for director be selected, or recommended for selection, solely by independent directors. The activities conducted by GWG Holdings' Corporate Governance and Nominating Committee are currently being conducted by the full Board of Directors. The primary role of GWG Holdings' Corporate Governance and Nominating Committee was to consider and make recommendations to the full Board of Directors concerning the appropriate size, function and needs of the Board of Directors, including establishing criteria for Board membership and considering, recruiting and recommending candidates (including those recommended by stockholders) to fill new Board positions. The Corporate Governance and Nominating Committee also considered and advised the full Board of Directors on matters of corporate governance and monitored and recommended the functions of, and membership on, the various committees of the Board of Directors.

GWG Holdings' Corporate Governance and Nominating Committee (or a subcommittee thereof) recruited and considered director candidates and presented all qualified candidates to the full Board of Directors for consideration. In identifying and evaluating potential candidates to be nominees for directors, GWG Holdings' Corporate Governance and Nominating Committee had the flexibility to consider such factors as it deemed appropriate under relevant circumstances. These factors may include education, general business and industry experience, ability to act on behalf of stockholders and build long-term stockholder value, potential concerns regarding independence or conflicts of interest and other factors relevant in evaluating Board nominees. Qualified candidates will be considered without regard to race, color, religion, sex, ancestry, national origin, disability, marital or veteran status, or any other legally protected status. Although our Corporate Governance and Nominating Committee did not have a policy with regard to the consideration of diversity in identifying director candidates, the overall Board of Directors' diversity of industry background and experience is generally among the factors considered. GWG Holdings' Corporate Governance and Nominating Committee believed that a Board of Directors comprised of directors with diverse skills and experiences relevant to our industry will result in efficient and competent oversight of our various core competencies.

APP. 665

APP. 666

Table of Contents

GWG Holdings' Corporate Governance and Nominating Committee considered recommendations by stockholders of candidates for election to the Board of Directors. Any stockholder who wishes that the Board consider a candidate must follow the procedures set forth in our bylaws. Under our bylaws, if a stockholder plans to nominate a person as a director at a meeting, the stockholder is required to place a proposed director's name in nomination by written request delivered to or mailed and received at our principal executive offices not less than 90 nor more than 120 calendar days prior to the first anniversary of the date on which we first mailed proxy materials for the preceding year's annual meeting. However, in the event that the date of the annual meeting is more than 30 days before or more than 60 days after such anniversary date, notice by the stockholder must be so delivered not less than 90 nor more than 120 calendar days prior to the date of such annual meeting, or if the first public announcement of the date of such annual meeting is less than 100 days prior to the date of such annual meeting, the tenth day following the day on which public announcement is made.

**Ability of Stockholders to Communicate with GWG Holdings' Board of Directors**

GWG Holdings' Board of Directors has established several means for stockholders and others to communicate with the Board of Directors. If a stockholder has a concern regarding our financial statements, accounting practices or internal controls, the concern should be submitted in writing to the Chair of our Audit Committee in care of our Secretary at the address of our principal executive offices. If the concern relates to our governance practices, business ethics or corporate conduct, the concern should be submitted in writing to the Chairman of the Board of Directors in care of our Secretary at the address of our principal executive offices. If a stockholder wishes to provide input with respect to our executive compensation policies and programs, input should be submitted in writing to the Chair of our Compensation Committee in care of our Secretary at the address of our principal executive offices. If a stockholder is unsure as to which category the concern relates, the stockholder may communicate it to any one of the independent directors in care of our Secretary at the address of our principal executive offices. All stockholder communications sent in care of our Company Secretary will be forwarded promptly to the applicable director(s).

**Delinquent Section 16(a) Reports**

Section 16(a) of the Securities Exchange Act of 1934, as amended, requires our officers and directors, and persons who own more than ten percent of a registered class of our equity securities, to file electronically reports of ownership and changes in ownership of such securities with the SEC. Based on review of the copies of Forms 3 and 4 and amendments thereto filed electronically with the SEC during the year ended December 31, 2020 and Forms 5 and amendments thereto filed electronically with the SEC with respect to such year, or written representations that no Forms 5 were required, we believe all required forms have been filed by our officers, directors and greater than ten percent beneficial owners.

**Code of Ethics**

We have adopted a Code of Business Conduct and Ethics that applies to all of our employees and all of our officers (specifically including but not limited to the principal executive officer (CEO), principal financial officer (CFO) and other members of management). Our Code of Business Conduct and Ethics satisfies the requirements of Item 406(b) of Regulation S-K. Our Code of Business Conduct and Ethics is available on our Internet website at www.gwgh.com.

**ITEM 11. EXECUTIVE COMPENSATION AND RELATED-PARTY TRANSACTION DISCLOSURES.**

**Summary Compensation Table**

The following table sets forth the cash and non-cash compensation for the 2019 and 2020 fiscal years awarded to or earned by: (i) each individual who served as the principal executive officer of GWG Holdings during 2020; (ii) the two most highly compensated executive officers of GWG Holdings who were serving as executive officers at the end of 2020 and who received more than $100,000 in the form of salary and bonus during such year; and (iii) up to two additional individuals for whom disclosure would have been required under (ii) above but for the fact that the individual was not serving as an executive officer of GWG Holdings at the end of 2020. These individuals are referred to as GWG Holdings' "named executives."

Page 80

APP. 667

Table of Contents

| Name and Principal Position | Year | Salary | Bonus | All Other Compensation | Total |
|---|---|---|---|---|---|
| Murray T. Holland President and Chief Executive Officer | 2020 | $ 650,000 | $ 975,000 | $ 17,819 | $ 1,642,819 |
| | 2019[1] | $ 440,000 | $ 637,500 | $ — | $ 1,077,500 |
| Timothy L. Evans Chief Financial Officer | 2020 | $ 400,000 | $ 500,000 | $3,427,411[2] | $ 4,327,411 |
| | 2019[3] | $ 261,539 | $ 326,750 | $ — | $ 588,289 |
| Lennie Nicholson Former General Counsel[4] | 2020 | $ 211,538 | $ 105,769 | $ — | $ 317,308 |

_____

(1)  Mr. Holland was appointed as Chief Executive Officer on April 26, 2019 with an annual base salary of $650,000.
(2)  Includes REUs (defined below) with an estimated grant date fair value of $1,562,500 issued by Ben LP and BMP Equity Units (defined below) with an estimated grant date fair value of $1,854,834 issued by Beneficient Management Partners, L.P. to Mr. Evans. Awards of REUs and BMP Equity Units are included because, beginning on December 31, 2019, GWG Holdings reports the results of Beneficient on a consolidated basis.
(3)  Mr. Evans was appointed Chief Financial Officer on August 15, 2019 with an annual base salary of $400,000.
(4)  Mr. Nicholson was appointed as General Counsel of GWG Holdings on March 3, 2020 and resigned on January 29, 2021.

In general, in connection with its decisions about executive compensation, the Compensation Committee intends to consider the results of the most recent stockholder advisory vote on executive compensation as well as the advisory vote on the frequency of future advisory votes on executive compensation in determining how frequently to hold its Say-on-Pay vote in the future. The Company currently seeks a stockholder advisory vote on executive compensation every three years and expects to hold the next stockholder advisory vote on executive compensation at the Company's 2022 annual meeting of stockholders.

**Employment Agreements and Change-in-Control Provisions**

As of the date of this filing, GWG Holdings' named executives held the following positions: Mr. Murray T. Holland, President and Chief Executive Officer; and Mr. Timothy L. Evans, Chief Financial Officer.

On April 26, 2019, and in connection with the closing of the Purchase and Contribution Transaction, Murray T. Holland was appointed as Chief Executive Officer of GWG Holdings. On May 31, 2019, GWG Holdings entered into an employment agreement with Mr. Holland pursuant to which he is currently serving as GWG Holdings' President and Chief Executive Officer. The employment agreement has an initial three-year term and is automatically renewed for additional one-year periods unless either party gives notice of non-renewal at least 60 days prior to the expiration of the then current term.

Under the employment agreement, Mr. Holland is entitled to an annual base salary of $650,000, retroactive to April 26, 2019, and is eligible to receive an annual cash bonus the target amount of which will be 150% of his base salary (prorated for the partial first year of employment). Whether the bonus is granted for a particular year, and the amount thereof, will be determined by GWG Holdings' Compensation Committee in its discretion based upon Mr. Holland's performance. Mr. Holland is also entitled to participate in all employee benefit plans and programs made available by GWG Holdings to the Company's executive employees generally.

If Mr. Holland's employment is terminated by us without "Cause" or if he voluntarily resigns with "Good Reason," in each case as defined in the employment agreement, then (i) he will be entitled to severance pay in an amount equal to his annual base salary, payable in a lump sum within 30 days after the date of the termination, (ii) he will receive a pro-rated portion of the target amount of his annual cash bonus for the year in which termination occurs, and (iii) any performance share units ("PSUs") or other equity incentives held by Mr. Holland will fully vest on the date of termination.

On May 31, 2019, and as contemplated by the employment agreement and discussed below, GWG Holdings entered into a Performance Share Unit Agreement (the "PSU Agreement") with Mr. Holland that provides for a target award grant of 129,717 PSUs (the "Target Award"), and up to a maximum of 259,434 PSUs. Each PSU represents the right to receive one share of GWG Holdings' common stock (or, following a Change-in-Control Transaction (as defined in the PSU Agreement), the cash value thereof), upon vesting, which is generally subject to (i) the satisfaction of performance goals over a three year

APP. 668

APP. 669

performance period, as determined by GWG Holdings' Compensation Committee in its sole discretion, and (ii) Mr. Holland remaining continuously employed by GWG Holdings or one of its subsidiaries ("Continuous Service") from the date of grant through the date that the PSUs are vested and paid in shares of common stock (or cash). Promptly following the Company's filing with the SEC of our Annual Report on Form 10-K for the fiscal year ended December 31, 2021 (the final year of the performance period), GWG Holdings' Compensation Committee will review and certify in writing (a) whether, and to what extent, the performance goals have been achieved, and (b) the number of PSUs that vested, if any. At such time, PSUs that are not vested will be forfeited.

The PSUs are subject to forfeiture until they vest. If Mr. Holland's Continuous Service terminates for any reason at any time before all PSUs have vested, all unvested PSUs will be automatically forfeited upon such termination of Continuous Service. However, if Mr. Holland's Continuous Service terminates as a result of his death or disability, or as a result of a termination by the Company without Cause or by Mr. Holland for Good Reason, Mr. Holland will retain, and will not forfeit, a pro rata portion of the Target Award based on the number of days that he remained employed during the performance period. This retained portion of the Target Award will not be subject to accelerated vesting and, instead, will vest (and be paid in shares of common stock) based on extent to which the performance goals are achieved during the entire performance period.

If a "Sale Transaction," as defined in GWG Holdings' 2013 Stock Incentive Plan, occurs during the performance period, Mr. Holland remains in Continuous Service up until the date of such Sale Transaction, and the acquiring entity or successor to GWG Holdings does not assume the obligations of GWG Holdings under the PSU Agreement or replace the grant with a substantially equivalent incentive award, then all outstanding PSUs shall vest at Target Award levels on the date of such Sale Transaction.

If a Change-in-Control Transaction occurs during the performance period, then all outstanding PSUs will automatically vest at Target Award levels on the 120th day following the closing of the Change-in-Control Transaction (the "Retention Date"), contingent upon Mr. Holland remaining in Continuous Service through the Retention Date. However, if Mr. Holland's Continuous Service terminates following the occurrence of a Change-in-Control Transaction and prior to the Retention Date for any reason other than as a result of a termination by GWG Holdings for Cause, then all outstanding PSUs will automatically vest at Target Award levels upon such termination. PSUs vesting upon a Change-in-Control will be paid in cash (not shares of common stock). The amount of cash to be paid to Mr. Holland in respect of each vested PSU will be equal to the greater of (y) $12.00 or (z) the Fair Market Value (as defined in the Plan) of a share of common stock as of the trading date immediately prior to the closing date of the Change-in-Control Transaction. The PSU Agreement includes a provision allowing GWG Holdings to reduce the payment to which Mr. Holland would be entitled upon a Change-in-Control Transaction to the extent needed for him to avoid paying an excise tax under Internal Revenue Code Section 280G, unless Mr. Holland would be better off, on an after-tax basis, receiving the full amount of such payments and paying the excise taxes due.

On August 15, 2019, Timothy L. Evans was appointed as GWG Holdings' Chief Financial Officer and Treasurer, replacing William B. Acheson. Mr. Acheson remained employed by GWG Holdings on an interim basis as an Executive Vice President, to assist in the transition of his prior duties and responsibilities to Mr. Evans, but is no longer in that capacity.

**2013 Stock Incentive Plan**

We maintain the GWG Holdings, Inc. 2013 Stock Incentive Plan, under which 6,000,000 shares of GWG Holdings' common stock have previously been approved for issuance. The 2013 Stock Incentive Plan permits the grant of both incentive and non-statutory stock options. Through December 31, 2020, we had issued stock options, SARs and Restricted Stock Units (hereinafter, "options") for 2,507,904 shares of common stock to employees, officers, directors, and consultants under the plan. As of December 31, 2020, (i) 1,360,491 shares are reserved for issuance under outstanding options, of which 922,985 options have vested and the remaining outstanding are scheduled to vest over three years, (ii) 322,552 shares have been issued upon the exercise of options granted under the 2013 Stock Incentive Plan, and (iii) 3,492,096 shares remain available for issuance of future incentive grants. The Board of Directors adopted the 2013 Stock Incentive Plan to provide a means by which our employees, directors, officers and consultants may be granted an opportunity to purchase GWG Holdings' common stock, to assist in retaining the services of such persons, to secure and retain the services of persons capable of filling such positions and to provide incentives for such persons to exert maximum efforts for our success.

**BMP Equity Incentive Plan**

The board of directors of Beneficient Management, Ben LP's general partner, maintains the BMP Equity Incentive Plan under which participants are eligible to receive equity units in Beneficient Management Partners, L.P. ("BMP"), an entity

APP. 670

Page 82

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 671 of 1031     PageID 843

APP. 671

Table of Contents

affiliated with the board of directors of Beneficient Management. The BMP equity units eligible to be awarded to participants are comprised of BMP's Class A Units and/or BMP's Class B Units (collectively, the "BMP Equity Units"). The weighted-average grant date fair value of BMP Equity Units was $9.61 per unit as of December 31, 2020.

On January 1, 2020, Mr. Evans was awarded 193,011 BMP Equity Units for his prior service at Ben LP that vested 20% on the date of grant and vest 20% on each anniversary of Mr. Evan's hire date with Ben LP of February 15, 2018.

### Ben Equity Incentive Plan

The Board of Directors of Beneficient Management maintains the Ben Equity Incentive Plan under which Ben LP is permitted to grant equity awards, in the form of restricted equity units ("REUs") up to a maximum of 12,811,258, representing ownership interests in common units of Ben LP. The holders of certain of the units issued under the BMP Equity Incentive Plan and the Ben Equity Incentive Plan, upon vesting, have the right to convert the units to shares of GWG Holdings common stock per the Exchange Agreement discussed below.

The estimated weighted-average grant date fair value date of REUs was $12.50 as of December 31, 2020.

On January 1, 2020, Mr. Evans was awarded 125,000 REUs for his prior service at Ben LP that vested 20% on the date of grant and vest 20% on each anniversary of Mr. Evan's hire date with Ben LP of February 15, 2018.

### Outstanding Equity Awards at Year End

The following table sets forth the total outstanding equity awards as of December 31, 2020 for each named executive officer.

| | | Stock Awards | | | |
| | | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
| Name | Grant Date | | | | |
|---|---|---|---|---|---|
| Murray T. Holland[1] | 05/31/2019 | — | $ — | 129,717 | $ 906,721 |
| Timothy L. Evans[2] | 01/01/2020 | 50,000 | 625,000 | — | — |
| | 01/01/2020 | 77,204 | 741,931 | — | — |

(1) Represents the target award of PSUs awards that will vest on December 31, 2021, subject to the satisfaction of certain performance goals over a three-year performance period and Mr. Holland's Continuous Service (as defined in the PSU Agreement), through such vesting date, with a market value based on GWG Holdings' closing stock price of $6.99 on December 31, 2020.
(2) Includes 50,000 unvested REUs, of which 25,000 vested on February 15, 2021 and 25,000 vest February 15, 2022, and 77,204 unvested BMP Equity Units of which 38,602 vested on February 15, 2021 and 38,602 vest February 15, 2022.

### Director Compensation

The following table sets forth the cash compensation awarded to or earned by each individual who served as a member of GWG Holdings' Board of Directors during the year ended December 31, 2020. There was no non-cash compensation paid to members of GWG Holdings' Board of Directors during 2020 except as noted below for Mr. Lockhart and Mr. Bailey.

Page 83

| Director's Name | Fees Earned or Paid in Cash 2020[1] | Stock Awards | Total |
|---|---|---|---|
| Peter T. Cangany, Jr.[2] | $ 371,225 | $ — | $ 371,225 |
| David F Chavenson | 156,255 | — | 156,255 |
| Brad K. Heppner | 100,000 | — | 100,000 |
| Thomas O. Hicks | 412,000 | — | 412,000 |
| Dennis P. Lockhart[3] | 295,375 | 1,105,500 | 1,400,875 |
| Bruce W. Schnitzer[4] | 400,000 | — | 400,000 |
| David H. de Weese | 100,000 | — | 100,000 |
| Roy W. Bailey[5] | 155,537 | 55,187 | 210,724 |
| Daniel P. Fine[6] | 62,413 | — | 62,413 |
| Michelle Caruso-Cabrera[7] | 43,625 | — | 43,625 |
| David S. Gruber[8] | 29,897 | — | 29,897 |
| Kathleen J. Mason[9] | 22,291 | — | 22,291 |
| Roger T. Staubach[10] | 133,379 | — | 133,379 |

_____

(1) Includes cash compensation for service as a director on the board of directors of Beneficient Management, L.L.C., a Delaware limited liability company ("Beneficient Management"), the general partner of Ben LP (the "Ben Board") of $300,000 for Mr. Schnitzer, $190,000 for Mr. Lockhart, $27,143 or Ms. Caruso-Cabrera, $210,000 for Mr. Cangany, $87,500 for Mr. Staubach, and $300,000 for Mr. Hicks.

(2) At fiscal year-end, Mr. Cangany had outstanding 25,000 REUs, of which 12,500 vested on April 1, 2021, and 12,500 vest on April 1, 2022, and 30,000 BMP Equity Units, of which 10,000 vested on April 1, 2021, 10,000 vest on April 1, 2022, and 10,000 vest on April 1, 2023.

(3) Stock awards include 50,000 REUs with an estimated grant date fair value of $625,000 and 50,000 BMP Equity Units with an estimated grant date fair value $480,500 that Mr. Lockhart was granted on May 1, 2020 for service as a director on the Ben Board. The REUs vest 25% on the date of grant and 25% on each anniversary of Mr. Lockhart's service start date with the Ben Board of May 10, 2019 and BMP Equity Units vest 20% on the date of grant and 20% on each anniversary of Mr. Lockhart's service start date with the Ben Board of May 10, 2019. At fiscal year-end, Mr. Lockhart had outstanding 25,000 REUs, of which 12,500 vest on May 10, 2021, and 12,500 vest on May 10, 2022, and 30,000 BMP Equity Units, of which 10,000 vest on May 10, 2021, 10,000 vest on May 10, 2022, and 10,000 vest on May 10, 2023.

(4) At fiscal year-end, Mr. Schnitzer held 3,750 REUs which vested on January 1, 2021.

(5) Mr. Bailey commenced serving as a member of GWG Holdings' Board of Directors on March 16, 2020 and ceased serving as a member of GWG Holdings' Board of Directors on March 6, 2021. The amount in the Stock Awards column represents the grant date fair value computed in accordance with FASB ASC Topic 718 for a grant of 7,895 restricted stock units. Such units did not vest due to Mr. Bailey's resignation from GWG Holdings' Board of Directors on March 6, 2021.

(6) Mr. Fine commenced serving as a member of GWG Holdings' Board of Directors on September 3, 2020 and ceased serving as a member of GWG Holdings' Board of Directors on March 6, 2021.

(7) Ms. Caruso-Cabrera ceased serving as a member of GWG Holdings' Board of Directors on February 21, 2020.

(8) Mr. Gruber commenced serving as a member of GWG Holdings' Board of Directors on September 3, 2020 and ceased serving as a member of GWG Holdings' Board of Directors on October 27, 2020.

(9) Ms. Mason ceased serving as a member of GWG Holdings' Board of Directors on March 2, 2020.

(10) Mr. Staubach ceased serving as a member of GWG Holdings' Board of Directors on June 15, 2020.

During 2020, all directors received annualized cash compensation of $100,000 paid in quarterly installments in arrears. The Chair and members of the Board's committees received the additional annualized cash compensation set forth below:

| Committee | Position | Additional Fees |
|---|---|---|
| Audit Committee | Chair | $ 15,000 |
| | Member (other than Chair) | $ 10,000 |
| Compensation Committee | Chair | $ 12,000 |
| | Member (other than Chair) | $ 5,375 |
| Special Committee | Chair | $ 30,000 |
| | Member (other than Chair) | $ 25,000 |

APP. 673

https://sec.report/Document/0001522690-21-000008/gwgh-20201231.htm    295/319

Table of Contents

Further, each member of the former Special Committee, which was dissolved in March 2021, received $1,000 for attending each Special Committee meeting, whether participating in-person or telephonically. The former Special Committee was a committee of the Board comprised solely of directors independent of Beneficient that was formed primarily for the purpose of considering and, if deemed appropriate, approving company transactions with or involving Beneficient.

In addition, upon approval by the board of directors of Beneficient Management ("Ben Board") following the recommendation of its compensation committee, members of the Board of Directors that serve as a member of the board of directors of Ben Management may receive board and committee retainers, meeting fees, equity-based compensation or other form of compensation for their service on the Ben Board.

On March 16, 2020, GWG Holdings entered into a restricted stock unit agreement with Mr. Bailey pursuant to which he received a grant of 7,895 restricted stock units. Each restricted stock unit entitled him to receive one share of GWG Holdings' common stock upon vesting on the one-year anniversary of the grant date, subject to remaining a member of the Board through such date, and subject to accelerated vesting in certain circumstances. Such units did not vest due to his resignation from the Board of Directors on March 6, 2021.

GWG Holdings has entered into Indemnification Agreements (the "Indemnification Agreements") with each of its current directors and executive officers (collectively, the "Indemnitees"). The Indemnification Agreements clarify and supplement indemnification provisions already contained in GWG Holdings' bylaws and generally provide that GWG Holdings shall indemnify the Indemnitees to the fullest extent permitted by applicable law, subject to certain exceptions, against expenses, judgments, fines and other amounts actually and reasonably incurred in connection with their service as a director or officer and also provide for rights to advancement of expenses and contribution.

The description of the Indemnification Agreements and the restricted stock unit agreement set forth above is not complete and is qualified in its entirety by reference to the full text of the form of Indemnification Agreement and the form of restricted stock unit agreement which are filed as Exhibit 10.17 and Exhibit 10.24, respectively, to this 2020 Form 10-K.

## ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED SHAREHOLDER MATTERS.

### In General

The tables below set forth information known to us regarding the beneficial ownership of GWG Holdings' common stock as of September 30, 2021 for:

- each person we believe beneficially holds more than 5% of GWG Holdings' outstanding common shares (based solely on our review of SEC filings), other than consolidated subsidiaries of the Company;
- each of GWG Holdings' named executive officers;
- each of GWG Holdings' directors; and
- all of GWG Holdings' directors and executive officers as a group.

The number of shares beneficially owned by a person includes shares issuable under options held by that person and that are currently exercisable or that become exercisable within 60 days of September 30, 2021. Percentage calculations assume, for each person and group, that all shares that may be acquired by such person or group pursuant to options currently exercisable or that become exercisable within 60 days of September 30, 2021 are outstanding for the purpose of computing the "Percentage of Common Stock Owned" by such person or group. Nevertheless, shares of common stock that are issuable upon exercise of presently unexercised options are not deemed to be outstanding for purposes of calculating the "Percentage of Common Stock Owned" by any other person or any other group.

Except as otherwise indicated in the table or its footnotes, the persons in the table below have sole voting and investment power with respect to all shares of common stock shown as beneficially owned by them, subject to community property laws where applicable.

As of the close of business on September 30, 2021, 33,097,118 shares of common stock, $0.001 par value, were issued and outstanding.

APP. 674

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 675 of 1031    PageID 847

APP. 675

**Beneficial Ownership**

| Name | Shares Beneficially Owned | Percentage of Shares Beneficially Owned |
|---|---|---|
| *5% Beneficial Owners:* | | |
| Seller Trusts[1] | 16,076,252 | 48.6 % |
| Custody Trusts[2] | 9,837,264 | 29.7 % |
| Beneficient Company Holdings, L.P. [3] | 2,500,000 | 7.6 % |
| *Named Executive Officers:* | | |
| Murray T. Holland (solely in his capacity as Trust Advisor to the Seller Trusts)[4] | 16,076,252 | 48.6 % |
| Timothy L. Evans | — | — % |
| Lennie Nicholson | 1,000 | * |
| *Non-Employee Directors:* | | |
| Peter T. Cangany, Jr. | 8,169 | * |
| David F. Chavenson | 8,169 | * |
| David H. de Weese | 8,169 | * |
| *All current directors and executive officers as a group* | 16,100,759 | 48.6 % |

* less than one percent.

(1) The business address of the Seller Trusts is 251 Little Falls Drive, Wilmington, DE 19808. On January 12, 2018, GWG Holdings entered into a Master Exchange Agreement (the "Master Exchange Agreement") pursuant to which we agreed to engage in a strategic transaction (the "Exchange Transaction") with Beneficient and the Seller Trusts, in which the parties agreed to an exchange of certain assets. The Seller Trusts are a group of individual common law trusts that received shares of common stock in the Exchange Transaction. The trustee of each of the Seller Trusts is Delaware Trust Company. The trust advisors of each trust are two individuals unrelated to each other, James E. Turvey, who is a Beneficient employee, and Murray T. Holland, who have sole decision-making authority with respect to each trust. The beneficiary of each of the Seller Trusts is MHT Financial, L.L.C. ("MHT"). The current members of MHT are Shawn T. Terry and Mike McGill. The names of the various trusts comprising the Seller Trusts that own the shares in the table above are as follows: The LT-1 Exchange Trust, The LT-2 Exchange Trust, The LT-3 Exchange Trust, The LT-4 Exchange Trust, The LT-5 Exchange Trust, The LT-6 Exchange Trust, The LT-7 Exchange Trust, The LT-8 Exchange Trust, The LT-9 Exchange Trust, The LT-12 Exchange Trust, The LT-14 Exchange Trust, The LT-15 Exchange Trust, The LT-16 Exchange Trust, The LT-17 Exchange Trust, The LT-18 Exchange Trust, The LT-19 Exchange Trust, and The LT-20 Exchange Trust.

(2) The business address of the Custody Trusts is 251 Little Falls Drive, Wilmington, DE 19808. The Custody Trusts, which are variable interest entities, are a group of individual common law trusts that received shares of common stock from certain Seller Trusts that the Seller Trusts had received in connection with the Exchange Transaction. The names of the various trusts comprising the Custody Trusts and certain other custody trusts (collectively, the "Custody Trusts") are as follows: LT-21A Custody Trust, LT-22A Custody Trust, LT-23A Custody Trust, LT-24A Custody Trust, LT-25A Custody Trust, and LT-26A Custody Trust. The certificate holders of the Custody Trusts are as follows: The LT-21 LiquidTrust, The LT-22 LiquidTrust, The LT-23 LiquidTrust, The LT-24 LiquidTrust, The LT-25 LiquidTrust, and The LT-26 LiquidTrust (the "Liquid Trusts"). The trustee of each of the Liquid Trusts is John A. Stahl who has sole decision-making authority with respect to such Custody Trust, and therefore, may be deemed to have voting power and dispositive power with respect to the shares held by the Custody Trusts, subject to the provisions of the stockholders agreement described below.

In connection with the transfer of the shares to the Custody Trusts, on November 3, 2020, the Company and the LiquidTrusts entered into a Stockholders Agreement (the "Stockholders Agreement"), and concurrently, each of the Custody Trusts entered into a joinder to the Stockholders Agreement with respect to the shares held by the Custody Trusts (the LiquidTrusts and the Custody Trusts collectively, the "Subject Trusts"). The purpose of the Stockholders Agreement is to limit the voting power of the Subject Trusts and the control they would otherwise be entitled to exercise over the Company. The Stockholders Agreement contains, among others, the following provisions, all of which bind the Subject Trusts and their respective transferees:

- Until the Seller Trusts beneficially own less than 20% of the total voting power of GWG Holdings' common stock, the shares and any other voting securities of GWG Holdings over which the Subject Trusts have voting control, with respect to all matters including without limitation the election and removal of directors, regardless of whether voted at a regular or special meeting or pursuant to a written consent, will be voted solely in proportion with the votes cast by all other holders of voting securities of GWG Holdings on any matter put before them; and

- No Subject Trust nor its assignees and transferees (other than pursuant to a registered public offering) or their respective affiliates will, without the prior written consent of GWG Holdings' Board of Directors, directly or indirectly:

  ◦ acquire, offer to acquire, or agree to acquire, directly or indirectly, by purchase or otherwise, any securities or direct or indirect rights to acquire any voting securities of the Company or any of its subsidiaries;

APP. 676

Table of Contents

◦ seek or propose to influence or control the management, Board of Directors, or policies of GWG Holdings, make or participate, directly or indirectly, in any "solicitation" of "proxies" (as such terms are used in applicable SEC rules) to vote any voting securities of GWG Holdings or any of its subsidiaries, or seek to advise or influence any other person with respect to the voting of any voting securities of GWG Holdings or any of its subsidiaries;

◦ submit a proposal for or offer of (with or without conditions) any merger, recapitalization, reorganization, business combination, or other extraordinary transaction involving GWG Holdings, any of its subsidiaries, or any of their respective securities or assets or, except as required by law, make any public announcement with respect to the foregoing;

◦ enter into any discussions, negotiations, arrangements, or understandings with any other person with respect to any of the foregoing, or otherwise form, join, engage in discussions relating to the formation of, or participate in a "group," within the meaning of Section 13(d)(3) of the Securities Exchange Act of 1934, as amended, in connection with any of the foregoing; or

◦ advise, assist, or encourage any other person in connection with any of the foregoing.

Each of the Subject Trusts has appointed as its proxy and attorney-in-fact an officer of GWG Holdings to be designated by GWG Holdings, with full power of substitution, to vote or execute written consents with respect to all of the shares owned by the Custody Trusts, provided that such proxy may only be exercised with respect to a Subject Trust if such Subject Trust fails to comply with its voting obligations under the Stockholders Agreement.

The Stockholders Agreement shall remain in effect until the Seller Trusts beneficially own less than 20% of GWG Holdings' common stock.

(3) Represents 2,500,000 shares of common stock held by Beneficient Company Holdings, L.P., a Delaware limited partnership ("BCH"). BCH is controlled by its general partner, Ben LP. Ben LP is controlled by its general partner, Beneficient Management. All 2,500,000 shares held by BCH have been pledged as collateral to secure our obligations under our debt securities pursuant to the Amended and Restated Pledge and Security Agreement dated October 23, 2017. While BCH has sole dispositive power with respect to the shares it holds, unless such shares are transferred to an unaffiliated third party, such shares are not entitled to vote nor to be counted for quorum purposes.

(4) Consists solely of 16,076,252 shares of common stock held by the Seller Trusts. Murray T. Holland, acting in a capacity other than as CEO of GWG, is one of the trust advisors to the Seller Trusts and James E Turvey, an individual unrelated to Mr. Holland and an employee of Ben LP, acting in a capacity other than as an employee of Ben LP, is the other trust advisor. Mr. Holland and Mr. Turvey have shared decision-making authority with respect to each of the Seller Trusts, including shared voting power and shared dispositive power over the shares of common stock held by each of the Seller Trusts. Mr. Holland has an indirect pecuniary interest in the shares of common stock held by the Seller Trusts resulting from his ownership interest in 30% of the outstanding membership interests of MHT, the sole beneficiary of each of the Seller Trusts. Consequently, to the extent that MHT, as beneficiary, receives proceeds from the sale of common stock and, GWG Holdings' Seller Trust L Bonds due 2023, as contemplated by the Master Exchange Agreement, in excess of MHT's contractual obligations, Mr. Holland would have a right to his pro rata share of any distribution of such proceeds if and when made by MHT to its members. There can be no assurance (i) that MHT will receive any proceeds in excess of its contractual obligations, (ii) as to the amount of any such excess, or (iii) that any distribution of such excess will be distributed to members of MHT, including Mr. Holland. Mr. Holland disclaims beneficial ownership of the shares of common stock held by the Seller Trusts except to the extent of the pecuniary interest therein described above.

## Securities Authorized for Issuance under Equity Compensation Plans

We maintain GWG Holdings' 2013 Stock Incentive Plan. The purpose of the 2013 Stock Incentive Plan is to provide a means by which our employees, directors, officers and consultants may be granted an opportunity to purchase GWG Holdings common stock, to assist in retaining the services of such persons, to secure and retain the services of persons capable of filling such positions and to provide incentives for such persons to exert maximum efforts for our success. At December 31, 2020, 6,000,000 shares of GWG Holdings' common stock have been approved for issuance under the 2013 Stock Incentive Plan, of which 3,492,096 shares remained available for issuance pursuant to future grants.

The 2013 Stock Incentive Plan was approved by GWG Holdings' stockholders. The following table sets forth certain information as of December 31, 2020 with respect to securities authorized for issuance under compensation arrangements.

Page 87

| Plan Category | Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants and Rights | Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights ($) |
|---|---|---|
| Equity compensation plan approved by stockholders: | | |
| Stock Options | 695,117 | $ 9.03 |
| Stock Appreciation Rights | 535,657 | $ 8.75 |
| Restricted Stock Units | 129,717 | N/A |
| 2013 Stock Incentive Plan Total | 1,360,491 | $ 8.91 |

Additional information in response to this Item is incorporated herein by reference to our definitive proxy statement to be filed pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this Form 10-K.

### ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE.

**Conflict-of-Interest and Related-Party Transaction Policy**

We have a Conflict-of-Interest and Related-Party Transaction Policy, pursuant to which GWG Holdings' Board of Directors (or an authorized committee thereof) is responsible for reviewing policies and procedures with respect to related party transactions required to be disclosed pursuant to Item 404 of the SEC's Regulation S-K (including transactions between the Company and its officers and directors, or affiliates of such officers or directors), and approving the terms and conditions of such related party transactions. Our Conflict-of-Interest and Related-Party Transaction Policy sets forth the processes and procedure to be taken in such review and approval, which includes obtaining approval by a majority of the disinterested members of the Board (or an authorized committee thereof) and otherwise in accordance with state law governing conflicts of interest, or if the transaction involves compensation payable to an executive, the Compensation Committee. The related party transactions in which we engaged during 2020 and 2019, which are described below, were approved in accordance with Conflict-of-Interest and Related-Party Transaction Policy.

**Transactions with Related Persons**

*Purchase and Contribution Transaction*

On April 15, 2019, Jon R. Sabes, the former Chief Executive Officer and a former director of GWG Holdings, and Steven F. Sabes, the former Executive Vice President and a former director of GWG Holdings, entered into the Purchase and Contribution Agreement ("the Purchase and Contribution Agreement") with, among others, Ben LP. GWG Holdings was not a party to the Purchase and Contribution Agreement. However, the closing of the transactions contemplated by the Purchase and Contribution Agreement (the "Purchase and Contribution Transaction") were subject to certain conditions that were dependent upon the Company taking, or refraining from taking, certain actions. The closing of the Purchase and Contribution Transaction occurred on April 26, 2019.

Among other actions taken in connection with the closing of the Purchase and Contribution Transaction, on April 26, 2019, Beneficient Capital Company, L.L.C., a Delaware limited liability company ("BCC"), and AltiVerse Capital Markets, L.L.C., a Delaware limited liability company ("AltiVerse"), executed and delivered a Consent and Joinder (the "Consent and Joinder") to the Amended and Restated Pledge and Security Agreement dated October 23, 2017 by and among GWG Holdings, GWG Life, LLC, Messrs. Jon and Steven Sabes and the Bank of Utah (the "Security Agreement"). Pursuant to the Consent and Joinder, Messrs. Jon and Steven Sabes assigned their rights and delegated their obligations under the Security Agreement to BCC and AltiVerse, and BCC and AltiVerse became substitute grantors under the Security Agreement such that the shares of GWG Holdings' common stock acquired by BCC and AltiVerse pursuant to the Purchase Agreement (as defined below) will continue to be pledged as collateral security for the Company's obligations owing in respect of the debt securities issued under the Amended and Restated Indenture, dated as of October 23, 2017, as amended and supplemented.

In connection with the Exchange Transaction, GWG Holdings and the Seller Trusts entered into a stockholders agreement that provided (among other standstill provisions) that until the Seller Trusts own, in the aggregate, voting securities representing less than 10% of the total voting power of all voting securities of GWG Holdings, all voting securities of GWG Holdings voted by the Seller Trusts will be voted solely in proportion with the votes cast by all other holders of voting securities of GWG Holdings on the matter. On April 26, 2019, and in connection with the closing of the Purchase and

Page 88

APP. 680

Table of Contents

Contribution Transaction, the stockholders agreement was amended and terminated, and the Seller Trusts are now entitled to full voting rights with respect to the shares of common stock they own.

*Promissory Note with Certain ExAlt Trusts*

On May 31, 2019, GWG Holdings' wholly-owned subsidiary GWG Life entered into a Promissory Note (the "Promissory Note"), made by Jeffrey S. Hinkle and Dr. John A. Stahl, not in their individual capacity but solely as trustees of The LT-1 LiquidTrust, The LT-2 LiquidTrust, The LT-5 LiquidTrust, The LT-7 LiquidTrust, The LT-8 LiquidTrust and The LT-9 LiquidTrust (collectively, the "Borrowers"). Pursuant to the terms of the Promissory Note, GWG Life funded a term loan to the Borrowers in an aggregate principal amount of $65.0 million (the "Loan"). The Loan was funded in two installments as described below.

The Borrowers are common law trusts established as part of alternative asset financings extended by a subsidiary of Ben LP, of which GWG Holdings owns approximately 96.2% of the issued and outstanding common units. Although each Borrower is allocated a portion of the Loan equal to approximately 16.7% of the aggregate outstanding principal of the Loan, the Loan constituted the joint and several obligations of the Borrowers.

The Loan was made pursuant to GWG Holdings' strategy to further diversify into alternative assets (beyond life insurance) and ancillary businesses and was intended to better position Beneficient's balance sheet, working capital and liquidity profile to satisfy anticipated Texas Department of Banking regulatory requirements.

An initial advance in the principal amount of $50.0 million was funded on June 3, 2019 and the second advance, in the principal amount of $15.0 million, was funded on November 22, 2019. The Loan bore interest at 7.0% per annum, with interest payable at maturity, and matured on June 30, 2023. On September 30, 2020, the Promissory Note was repaid by the Borrowers utilizing Preferred Series C Unit Accounts of BCH, a Delaware limited partnership of which Ben LP owns all of the outstanding Class A units and serves as its general partner.

The Loan was unsecured and was subject to certain covenants (including a restriction on the incurrence of any indebtedness senior to the Loan other than existing senior loan obligations to each of HCLP Nominees, L.L.C. ("HCLP") and Beneficient Holdings, Inc. ("BHI", and together with HCLP, the "Senior Lenders"), as lenders) and events of default. At the time Beneficient was consolidated, all existing senior loan obligations were held by HCLP.

A then constituted special committee of the Board of Directors of GWG Holdings composed solely of independent and disinterested directors of GWG Holdings, together with the assistance of its independent legal advisors, reviewed, negotiated and approved the terms of the Loan as well as the terms of the repayment.

*HCLP Nominees, LLC*

During the years ended December 31, 2019 and 2020, GWG Holdings invested $79.0 million and $130.2 million, respectively, of cash into equity investments in Beneficient. During this same period, Beneficient made payments to HCLP, its Senior Lender, totaling $144.6 million in principal and interest on the First and Second Lien Credit Agreements. The First Credit Agreement was issued in 2017, while the Second Lien Credit Agreement was issued in 2018. HCLP is an indirect subsidiary of Highland Consolidated, L.L.C. ("Highland").

A long-standing lending and investment relationship of 25 years exists between Highland (and its affiliates or related parties), on the one hand, and certain trusts and entities held by such trusts that are controlled by Ben Founder ("Ben Founder Affiliates"), on the other. From time to time, Highland or its affiliates have advanced funds under various lending and investing arrangements to the Ben Founder Affiliates, and such Ben Founder Affiliates have made repayments to Highland or its affiliates, as applicable, both in cash and in kind.

Such loans to and investments with or in the Ben Founder Affiliates have been and may be made by Highland, or its affiliates, as applicable, using proceeds from loan repayments made by Beneficient to HCLP in its capacity as Senior Lender to Beneficient, with such loan repayments made potentially using cash from GWG Holdings' and GWG Life's investments in Beneficient. Such loans and investments have ranged between no outstanding balance and $104.0 million.

As of June 30, 2021, Highland and the applicable Ben Founder Affiliates mutually agreed to satisfy all obligations under all outstanding loans among Highland and the Ben Founder Affiliates via full payment and satisfaction of the existing loan balances (the "Loan Balances") by in-kind real property transfers (the "In-Kind Property Payment") from certain of the Ben Founder Affiliates to Highland. The terms of the In-Kind Property Payment grants Highland the right to transfer the real

APP. 681

Page 89

APP. 682

Table of Contents

property that was transferred pursuant to the In-Kind Property Payment back to certain of the Ben Founder Affiliates, in exchange for a Preferred Series A Subclass 1 capital account balance in BCH in an amount equal to the Loan Balances, with such exchange to be satisfied from existing Preferred Series A Subclass 1 Unit Accounts that are held by such Ben Founder Affiliates. As of June 30, 2021, neither Highland nor any of its affiliates has any outstanding loans or investments with or in any Ben Founder Affiliates.

*Intercreditor Agreements*

In connection with the Promissory Note, GWG Holdings also entered into two intercreditor and subordination agreements: (1) an Intercreditor Agreement between GWG Life and HCLP and (2) an Intercreditor Agreement between GWG Life and BHI (the "Intercreditor Agreements"). Under the Intercreditor Agreements, GWG Life agreed to subordinate the Loan to the secured obligations of Beneficient and its affiliates outstanding to the Senior Lenders (the "Senior Loan Obligations"), agreed to not take any liens to secure the Loan (and to subordinate such liens, if any, to the liens of the Senior Lenders), and agreed not to take enforcement actions under the Promissory Note until such Senior Loan Obligations were paid in full. The Intercreditor Agreements established various other inter-lender and subordination terms, including, without limitation, with respect to permitted actions by each party, permitted payments, waivers, voting arrangements in bankruptcy, application of certain proceeds and limitations on amendments of the respective loan obligations of the parties. The Senior Lenders agreed not to extend the maturity of their respective loan obligations beyond June 30, 2023 or increase the outstanding principal of the loans made by the Senior Lenders without the written consent of GWG Life. GWG Life agreed not to transfer the Promissory Note except with the written consent of the Senior Lenders (such consent not to be unreasonably withheld) or to the Company or direct or indirect wholly owned subsidiaries thereof. The special committee, together with the assistance of its independent legal advisors, reviewed, negotiated and approved the terms of the Intercreditor Agreements.

*Purchase of Additional Common Units of Ben LP*

On June 12, 2019, GWG Holdings acquired 1,000,000 Ben LP common units from unaffiliated holders of alternative assets that had sold the alternative assets to MHT for contribution to various Exchange Trusts established by MHT as part of the Ben LP liquidity products. The holders acquired the Ben LP common units from MHT in satisfaction for a portion of the purchase price owed by MHT for the alternative assets that MHT contributed to the Exchange Trusts. Murray T. Holland, GWG Holdings' Chairman and Chief Executive Officer, was a Managing Director of MHT and continues to own a 30% interest in MHT. Mr. Holland also serves as a trust advisor to the Exchange Trusts that hold the alternative assets. The purchase price for the Ben LP common units acquired by GWG Holdings was $10,000,000.

*Preferred Series A Unit Account and Common Unit Investment Agreement; Exchange Agreement*

On December 31, 2019, GWG Holdings, Ben LP, BCH and Beneficient Management, the general partner of Ben LP, entered into a Preferred Series A Unit Account and Common Unit Investment Agreement (the "Investment Agreement").

Pursuant to the Investment Agreement, GWG Holdings transferred $79 million to Ben LP in return for 666,667 common units of Ben LP and a Preferred Series A Subclass 1 Unit Account of BCH.

In connection with the Investment Agreement, GWG Holdings obtained the right to appoint a majority of the board of directors of Beneficient Management, the general partner of Ben LP. As a result, GWG Holdings obtained control of Ben LP and began reporting the results of Ben LP and its subsidiaries on a consolidated basis beginning on the transaction date of December 31, 2019. GWG Holdings' right to appoint a majority of the board of directors of Beneficient Management will terminate in the event (i) GWG Holdings' ownership of the fully diluted equity of Ben LP (excluding equity issued upon the conversion or exchange of Preferred Series A Unit Accounts of BCH held as of December 31, 2019 by parties other than the Company) is less than 25%, (ii) the Continuing Directors of GWG Holdings cease to constitute a majority of the board of directors of GWG Holdings, or (iii) certain bankruptcy events occur with respect to GWG Holdings. The term "Continuing Directors" means, as of any date of determination, any member of the board of directors of the Company who: (1) was a member of the board of directors of GWG Holdings on December 31, 2019; or (2) was nominated for election or elected to the board of directors of GWG Holdings with the approval of a majority of the Continuing Directors who were members of the board of directors of GWG Holdings at the time of such nomination or election.

Beneficient Management has an executive committee, a nominating committee and a community reinvestment committee. The board of directors of Beneficient Management has the right to appoint two members of these committees, and an entity related to Brad K. Heppner, GWG Holdings' former Chairman, who served in such capacity from April 26, 2019 to June 14, 2021, has the right to appoint the other two members of these committees. The entity related to Mr. Heppner also has the

APP. 683

Page 90

APP. 684

Table of Contents

right to appoint the Chairman of the Board and of each of the committees. The Beneficient Management executive committee has the right to approve certain transactions on behalf of Beneficient Management and Ben LP and its subsidiaries, including: (i) the incurrence of debt; (ii) the issuance of equity interests of Ben LP or any subsidiary equal to 5% or more of the fully diluted equity of such entity or that have preferred terms to the common equity of Ben LP, except in connection with any trust instrument or product offered by Ben LP or its affiliates; (iii) the adoption of a shareholder or unitholder rights plan by Ben LP or any subsidiary thereof; (iv) the amendment, supplement, waiver, or modification of Ben LP's limited partnership agreement, the BCH limited partnership agreement or the organizational documents of any subsidiary of the foregoing other than any common law or statutory trusts created to facilitate the financing, acquisition, contribution, assignment or holding of alternative assets; (v) the exchange or disposition of a majority or more of the assets, taken as a whole, of Ben LP or any subsidiary thereof in a single transaction or a series of related transactions; (vi) the exchange or disposition of a majority or more of the assets, taken as a whole, of Beneficient Management or any subsidiary thereof in a single transaction or a series of related transactions; (vii) the execution by Ben LP, Beneficient Management or any subsidiary thereof of any contracts or of any amendment, supplement, waiver or modification of any existing contract, which would materially change the nature of the business of Beneficient Management and its affiliates; (viii) materially or commercially substantive changes to or creation of an employee incentive or benefit plan of Beneficient Management, Ben LP or any subsidiary thereof; (ix) the merger, sale or other combination of Ben LP, Beneficient Management or any subsidiary thereof with or into any other person or entity; (x) the transfer, mortgage, pledge, hypothecation or grant of a security interest in all or substantially all of the assets of Ben LP or any subsidiary thereof; (xi) the transfer, mortgage, pledge, hypothecation or grant of a security interest in all or substantially all of the assets of Beneficient Management or any subsidiary thereof; (xii) the removal without cause of a chief executive officer or any other executive officer of Beneficient Management, Ben LP or any operating subsidiary thereof; (xiii) the termination of employment of any other officer of Beneficient Management, Ben LP or any operating subsidiary thereof or the termination of the association of a partner, member, manager or director of any subsidiary of Ben LP, in each case, without cause; (xiv) the liquidation or dissolution of Beneficient Management, Ben LP or any operating subsidiary thereof; (xv) the withdrawal or removal of Beneficient Management as the general partner of Ben LP or the direct or indirect transfer of beneficial ownership of all or any part of a general partner interest in Ben LP; (xvi) any determination by Beneficient Management, acting as general partner of Ben LP, related to the removal or replacement of the general partner under Ben LP's limited partnership agreement; (xvii) the entry into any material or commercially substantive agreement with a related party; (xviii) the creation of any new and materially or commercially substantively different trust instrument or product, or any materially or commercially substantive change, amendment, supplement, waiver or modification to the terms or provision of any existing trust product, offered by Ben LP or any of its affiliates to the extent regulated by the Texas Finance Commission or other state, federal or non-U.S. regulator with direct or indirect jurisdiction over Ben LP or such affiliate or such product, other than any change or modification to any exhibit or schedule to any trust instrument or product; or (xix) the bankruptcy of Ben LP.

Following the transaction, and as agreed in the Investment Agreement, GWG Holdings was issued an initial capital account balance for the Preferred Series A Subclass 1 Unit Account of $319 million. The other holders of the Preferred Series A Subclass 1 Unit Accounts are entities related to certain Ben Initial Investors and an entity related to one of GWG Holdings' former directors and Beneficient's current directors (the "Related Account Holders"), and the aggregate capital accounts of all holders of the Preferred Series A Subclass 1 Unit Accounts after giving effect to the investment by GWG Holdings was $1.6 billion. GWG Holdings' Preferred Series A Subclass 1 Unit Account is the same class of preferred security as held by the Related Account Holders. If the Related Account Holders exchange their Preferred Series A Subclass 1 Unit Accounts for securities of GWG Holdings, GWG Holdings' Preferred Series A Subclass 1 Unit Account would be converted into Common Units (so neither GWG Holdings nor the Related Account Holders would hold Preferred Series A Subclass 1 Unit Accounts).

In addition, on December 31, 2019, GWG Holdings, Ben LP and certain holders of common units of Ben LP (the "Common Units") entered into an Exchange Agreement (the "Exchange Agreement") pursuant to which certain holders of Common Units from time to time have the right, on a quarterly basis, to exchange their Common Units for common stock of GWG Holdings. The exchange ratio in the Exchange Agreement is based on the ratio of the capital account associated with the Common Units to be exchanged to the market price of GWG Holdings' common stock based on the volume weighted average price of GWG Holdings' common stock for the five consecutive trading days prior to the quarterly exchange date. The Exchange Agreement is intended to facilitate the marketing of Ben LP's products to holders of alternative assets.

*Preferred Series C Unit Purchase Agreement*

On July 15, 2020, GWG Holdings entered into a Preferred Series C Unit Purchase Agreement ("UPA") with Ben LP and BCH. The UPA was reviewed and approved by the then constituted Special Committee of the Board of Directors of GWG Holdings.

APP. 685

Page 91

APP. 686

Table of Contents

Pursuant to the UPA, and provided that GWG Holdings determines that it has excess liquidity, GWG Holdings has agreed to make capital contributions from time to time to BCH in exchange for Preferred Series C Unit accounts of BCH during a purchasing period commencing on the date of the UPA and continuing until the earlier of (i) the occurrence of a Change of Control Event (as defined below) and (ii) the mutual agreement of the parties (the "Purchasing Period"). A "Change of Control Event" shall mean (A) the occurrence of an event that results in GWG Holdings' ownership of the fully diluted equity of Beneficient is less than 25%, the Continuing Directors (as defined below) of GWG Holdings cease to constitute a majority of the board of directors of GWG Holdings, or certain bankruptcy events occur with respect to GWG Holdings, and (B) the listing of Common Units on a national securities exchange (a "Public Listing"). The term "Continuing Directors" means, as of any date of determination, any member of the board of directors of GWG Holdings who: (1) was a member of the board of directors of GWG Holdings on December 31, 2019; or (2) was nominated for election or elected to the board of directors of GWG Holdings with the approval of a majority of the Continuing Directors who were members of the board of directors of GWG Holdings at the time of such nomination or election.

If, on or prior to the end of the Purchasing Period, a Public Listing occurs, the BCH Purchased Units shall be automatically exchanged for Common Units, or another unit of Beneficient, as the parties may mutually agree (the "Beneficient Units"), at the lower of (i) the volume-weighted average of the Beneficient Units for the 20 trading days following the Public Listing, and (ii) $12.75.

In addition, at any time following the date of the UPA, all or some of the Preferred Series C Unit Accounts purchased under the UPA may be exchanged for Beneficient Units at the option of GWG Holdings (exercised by a special committee of the Board of Directors or, if such committee is not in place, the appropriate governing body of GWG Holdings); provided that, if GWG Holdings exchanges less than all of the Preferred Series C Unit Accounts purchased under the UPA, then, immediately after giving effect to such exchange, GWG Holdings shall be required to continue to hold Preferred Series C Unit Accounts with a capital account that is at least $10.0 million. The exchange price for such Beneficient Units shall be determined by third-party valuation agents selected by GWG Holdings and Beneficient.

**Director Independence**

GWG Holdings' Board of Directors periodically reviews relationships that directors have with our Company to determine whether our directors are "independent directors" as such term is defined in Rule 5605(a)(2) of the Nasdaq Marketplace Rules. GWG Holdings' Board of Directors has determined that the following directors are independent directors: Peter T. Cangany, Jr., David F. Chavenson and David H. de Weese.

Because various trusts (the "Seller Trusts"), collectively, own approximately 48.6% of GWG Holdings' outstanding voting securities and certain ExAlt Trusts holding approximately 29.7% of GWG Holdings' outstanding common stock (according to their latest Schedule 13D/A filing) have agreed to vote their shares in proportion to the votes cast by all other holders of GWG Holdings' voting securities, the Seller Trusts are entitled to cast a majority of the votes on all matters requiring stockholder votes, including, if a stockholder vote is required: the election of directors; mergers, consolidations, acquisitions and other strategic transactions; the sale of all or substantially all of our assets and other decisions affecting our capital structure; amendments to GWG Holdings' Certificate of Incorporation or bylaws; and our winding up and dissolution. As such, we are a "controlled company" as that term is set forth in Rule 5615(c) of the Nasdaq Marketplace Rules. Under the Nasdaq rules, a company of which more than 50% of the voting power for the election of directors is held by an individual, a group or another company is a "controlled company" and may elect not to comply with certain Nasdaq corporate governance requirements, including the requirements that:

- a majority of its board of directors consist of independent directors;
- nominations for director be selected, or recommended for selection, solely by independent directors; and
- its Compensation Committee be composed entirely of independent directors.

We are currently relying on the controlled company exemption for the above requirements related to director nominations.

**ITEM 14. PRINCIPAL ACCOUNTING FEES AND SERVICES.**

**Fees Billed to Company by Its Independent Registered Public Accounting Firm**

The following table presents fees for professional audit services and 401(k) audit services, tax services and other services rendered by Grant Thornton in 2020 and Whitley Penn in 2019:

APP. 687

Page 92

APP. 688

|  | **2020** | **2019** |
|---|---:|---:|
| Audit Fees[1] | $ 1,704,000 | $ 1,559,082 |
| Audit-Related Fees[2] | — | 50,908 |
| Tax Fees[3] | — | 126,710 |
| All Other Fees[4] | 124,200 | 6,430 |
| Total Fees | $ 1,828,200 | $ 1,743,130 |

---

(1)   Audit Fees consist of fees for professional services rendered for the audit of our consolidated annual financial statements and review of the interim consolidated financial statements included in quarterly reports and services that are normally provided in connection with statutory and regulatory filings or engagements.

(2)   Audit-Related Fees consist principally of assurance and related services that are reasonably related to the performance of the audit or review of the Company's financial statements but not reported under the caption Audit Fees above.

(3)   Tax Fees consist of fees for tax compliance, tax advice, and tax planning.

(4)   All Other Fees typically consist of fees for permitted non-audit products and services provided. All Other Fees included expenses related to employee compensation consulting services performed by Grant Thornton during 2020.

(5)   Due to the change in auditors noted above, fees for 2020 include only those fees paid to Grant Thornton, the accountant who rendered the audit opinion for the 2020 financial statements. Whitley Penn, the predecessor auditor, performed reviews of the Company's Forms 10-Q for the first and second quarters of 2020, as well as certain other services related to SEC filings during 2020. Whitley Penn was paid fees totaling $315,884 for these services in 2020 that are not included in the table above.

The Audit Committee of GWG Holdings' Board of Directors reviewed the services provided by Grant Thornton during the 2020 fiscal year and Whitley Penn during the 2019 fiscal year and the fees billed for such services. After consideration, the Audit Committee determined that the receipt of these fees by Whitley Penn and Grant Thornton, respectively, was compatible with the provision of independent audit services. The Audit Committee discussed these services and fees with the relevant auditor and our management to determine that they are permitted under the rules and regulations concerning auditor independence promulgated by the Securities and Exchange Commission ("SEC") to implement the Sarbanes-Oxley Act of 2002, as well as the American Institute of Certified Public Accountants.

**Pre-Approval Policy**

The written charter of the Audit Committee provides that all audit and non-audit accounting services permitted to be performed by our independent registered public accounting firm under applicable rules and regulations must be pre-approved by the Audit Committee or by designated members of the Audit Committee, other than with respect to *de minimis* exceptions permitted under the Sarbanes-Oxley Act of 2002. All services performed by our independent registered public accounting firms during the years ended December 31, 2020 and 2019 were pre-approved in accordance with the written charter.

Prior to or as soon as practicable following the beginning of each year, a description of the audit, audit-related, tax, and other services expected to be performed by the independent registered public accounting firm in the following year will be presented to the Audit Committee for approval. Following such approval, any requests for audit, audit-related, tax, and other services not presented and pre-approved must be submitted to the Audit Committee for specific pre-approval and cannot commence until such approval has been granted. However, we have delegated the authority to grant specific pre-approval between meetings, as necessary, to the Chair of the Audit Committee. The Chair then updates the Audit Committee at the next regularly scheduled meeting of any services that were granted specific pre-approval.

Table of Contents

<div align="center">

**PART IV**

</div>


**ITEM 15. EXHIBITS, FINANCIAL STATEMENT SCHEDULES.**

**Documents filed as part of this Form 10-K:**

| | |
|---|---|
| Reports of Independent Registered Public Accounting Firms | F-1 |
| Consolidated Balance Sheets at December 31, 2020 and 2019[1] | F-6 |
| Consolidated Statements of Operations for the years ended December 31, 2020 and 2019[1] | F-7 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2020 and 2019[1] | F-8 |
| Consolidated Statements of Changes in Stockholders' Equity for the years ended December 31, 2020 and 2019[1] | F-10 |
| Notes to Consolidated Financial Statements | F-9 |

[1] Financial statements as of and for the year ended December 31, 2019 reflect restatements as discussed in Notes 21 and 22.

**Financial Statement Schedule:**

Not applicable.


<div align="center">

Page 94

</div>

---

Table of Contents

Exhibit Index

| Exhibit | Description |
| --- | --- |
| 3.1 | Certificate of Incorporation[1] |
| 3.2 | Bylaws as amended[2] |
| 3.3 | Certificate of Amendment to Certificate of Incorporation[3] |
| 3.4 | Certificate of Amendment to Certificate of Incorporation[7] |
| 3.5 | Certificate of Designation for Redeemable Preferred Stock[8] |
| 3.6 | Certificate of Amendment to Certificate of Designation for Redeemable Preferred Stock[8] |
| 3.7 | Certificate of Designation for Series 2 Redeemable Preferred Stock[10] |
| 3.8 | Certificate Of Designations Of Series B Convertible Preferred Stock[18] |
| 3.9 | Certificate of Correction for Redeemable Preferred Stock[30] |
| 3.10 | Certificate of Correction for Series 2 Redeemable Preferred Stock[30] |
| 4.1 | Amended and Restated Indenture with Bank of Utah, dated October 23, 2017[5] |
| 4.2 | Amended and Restated Pledge and Security Agreement by and among GWG Holdings, Inc., GWG Life, LLC, Jon R. Sabes, Steven F. Sabes, and Bank of Utah, dated October 23, 2017[5] |
| 4.3 | Form of Subscription Agreement for Redeemable Preferred Stock[11] |
| 4.4 | Form of Subscription Agreement for Series 2 Redeemable Preferred Stock[14] |
| 4.6 | Amendment No. 1 to Amended and Restated Indenture with Bank of Utah, dated March 27, 2018[23] |
| 4.7 | Supplemental Indenture dated as of August 10, 2018 to the Amended And Restated Indenture dated as of October 23, 2017, as amended[18] |
| 4.8 | Amendment No. 2 to Amended and Restated Indenture with Bank of Utah, dated December 31, 2019 [26] |
| 4.9 | Supplemental Indenture dated as of December 31, 2020 to the Amended and Restated Indenture dated as of October 23, 2017, as amended[31] |
| 4.10 | Description of the Registrant's Securities Registered Pursuant to Section 12 of the Securities Exchange Act of 1934 (filed herewith) |
| 10.1 | Third Amended and Restated Loan and Security Agreement with GWG DLP Funding IV, LLC (as borrower), CLMG Corp. (as agent) and LNV Corporation (as lender), dated June 28, 2021[34] |
| 10.2 | Fourth Amended and Restated Loan and Security Agreement with GWG DLP Funding IV, LLC (as borrower), CLMG Corp. (as agent) and LNV Corporation (as lender), dated September 7, 2021 (filed herewith)† |
| 10.3* | 2013 Stock Incentive Plan, as amended[16] |
| 10.4* | Form of Stock Option Agreement used with 2013 Stock Incentive Plan[13] |
| 10.5 | Master Exchange Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, MHT Financial SPV, LLC, a Delaware limited liability company, and various related trusts, as amended and restated on January 18, 2018 with effect from January 12, 2018[15] |
| 10.6 | First Amendment to Master Exchange Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, MHT Financial SPV, LLC, a Delaware limited liability company, and various related trusts, dated April 30, 2018[15] |
| 10.7 | Second Amendment to Master Exchange Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, MHT Financial SPV, LLC, a Delaware limited liability company, and various related trusts, dated June 29, 2018[17] |
| 10.8 | Third Amendment to Master Exchange Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, MHT Financial SPV, LLC, a Delaware limited liability company, and various related trusts, dated August 10, 2018[18] |
| 10.9 | Commercial Loan Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, dated August 10, 2018[18] |
| 10.10 | Amendment No. 1 dated December 27, 2018 to Commercial Loan Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership[19] |
| 10.12 | Registration Rights Agreement with certain trusts related to The Beneficient Company Group, L.P., a Delaware limited partnership, and as set forth in the Agreement, dated August 10, 2018[18] |
| 10.13 | Registration Rights Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, dated August 10, 2018[18] |
| 10.14 | Registration Rights Agreement with each of the Exchange Trusts, dated December 27, 2018[19] |

APP. 691

Table of Contents

| Exhibit | Description |
|---------|-------------|
| 10.15 | Participating Option Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, dated December 27, 2018[19] |
| 10.16 | Consent and Joinder to Amended and Restated Pledge and Security Agreement dated April 26, 2019[21] |
| 10.17* | Form of Indemnification Agreement with Directors and Officers[21] |
| 10.18* | Employment Agreement dated as of May 31, 2019 by and between GWG Holdings, Inc. and Murray T. Holland[24] |
| 10.19* | Performance Share Unit Agreement dated as of May 31, 2019 by and between GWG Holdings, Inc. and Murray T. Holland[24] |
| 10.20 | Promissory Note dated May 31, 2019 made by and on behalf of certain Borrowers[25]† |
| 10.21 | Intercreditor Agreement dated May 31, 2019 between GWG Life and HCLP Nominees, L.L.C.[25] |
| 10.22 | Intercreditor Agreement dated May 31, 2019 between GWG Life and Beneficient Holdings, Inc.[25] |
| 10.23 | Forbearance Letter Agreement dated July 3, 2019 between GWG DLP Funding IV, LLC and CLMG Corp. (as agent)[27] |
| 10.24* | Form of Non-employee Director Restricted Stock Agreement[27] |
| 10.25 | Second Amended and Restated Credit Agreement among Beneficient Capital Company, L.LC., HCLP Nominees L.L.C., and other persons party thereto[32]† |
| 10.26 | Second Amended and Restated Second Lien Credit Agreement among Beneficient Capital Company, L.LC., HCLP Nominees L.L.C., and other persons party thereto[32]† |
| 10.27 | Amendment No. 1 to the Second Amended and Restated Credit Agreement among Beneficient Capital Company II, L.L,C., Beneficient Company Holdings, L.P. and HCLP Nominees, L.L.C. dated March 10, 2021[33] |
| 10.28 | Amendment No. 1 to the Second Amended and Restated Second Lien Credit Agreement among Beneficient Capital Company II, L.L,C., Beneficient Company Holdings, L.P. and HCLP Nominees, L.L.C. dated March 10, 2021 [33] |
| 10.29 | Amendment No. 2 to the Second Amended and Restated Credit Agreement among Beneficient Capital Company II, L.L,C., Beneficient Company Holdings, L.P. and HCLP Nominees, L.L.C. dated June 28, 2021[34] |
| 10.30 | Amendment No. 2 to the Second Amended and Restated Second Lien Credit Agreement among Beneficient Capital Company II, L.L,C., Beneficient Company Holdings, L.P. and HCLP Nominees, L.L.C. dated June 28, 2021 [34] |
| 10.31 | Credit Agreement, dated as of August 11, 2021, among GWG DLP Funding VI, LLC, as borrower, each lender from time to time party hereto and National Founders LP, as the administrative agent (filed herewith)† |
| 10.32 | Security Agreement, dated as of August 11, 2021, by GWG DLP Funding Holdings VI, LLC, as the pledgor, and National Founders LP, as administrative agent on behalf of the secured parties (filed herewith) |
| 10.33 | Security Agreement, dated as of August 11, 2021, by GWG DLP Funding VI, LLC, as the pledgor, and National Founders LP, as administrative agent on behalf of the secured parties (filed herewith) |
| 10.34 | Guarantee, dated as of August 11, 2021, by GWG Holdings, Inc., as guarantor, in favor of National Founders LP, as administrative agent for the benefit of the secured parties (filed herewith) |
| 21 | List of Subsidiaries (filed herewith) |
| 22 | List of Guarantor Subsidiaries (filed herewith) |
| 23.1 | Consent of Grant Thornton LLP (filed herewith) |
| 23.2 | Consent of Whitley Penn LLP (filed herewith) |
| 24.1 | Power of Attorney (incorporated by reference to the signature page of this 2020 Form 10-K) |
| 31.1 | Section 302 Certification of the Chief Executive Officer (filed herewith) |
| 31.2 | Section 302 Certification of the Chief Financial Officer (filed herewith) |
| 32.1 | Certification of Chief Executive Officer and Chief Financial Officer Pursuant to 18 U.S.C. §1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (filed herewith) |
| 99.1 | Letter from ClearLife Limited, dated January 25, 2021 (filed herewith) |
| 99.2 | Portfolio of Life Insurance Policies as of December 31, 2020 (filed herewith) |
| 99.3 | Purchase and Contribution Agreement dated as of April 15, 2018 by and among The Beneficient Company Group, L.P., Beneficient Company Holdings, L.P., AltiVerse Capital Markets, L.L.C., Sabes AV Holdings, LLC, Jon R. Sabes, Steven F. Sabes, Insurance Strategies Fund, LLC and SFS Holdings, LLC[20] |
| 99.5 | Fifth Amended and Restated Limited Partnership Agreement of Beneficient Company Holdings, L.P.[29] †. |

Page 96

Table of Contents

| Exhibit | Description |
|---------|-------------|
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Schema Document |
| 101.CAL | XBRL Calculation Linkbase Document |
| 101.DEF | XBRL Definition Linkbase Document |
| 101.LAB | XBRL Label Linkbase Document |
| 101.PRE | XBRL Presentation Linkbase Document |

_____

\*    Management contract or compensatory plan or arrangement.

(1)   Incorporated by reference to Form S-1 Registration Statement filed on June 14, 2011 (File No. 333-174887).

(2)   Incorporated by reference to Current Report on Form 8-K filed on March 31, 2021.

(3)   Incorporated by reference to Form S-1/A Registration Statement filed on August 23, 2011 (File No. 333-174887).

(4)   Intentionally omitted.

(5)   Incorporated by reference to Current Report on Form 8-K filed on October 26, 2017.

(6)   Intentionally omitted.

(7)   Incorporated by reference to Quarterly Report on Form 10-Q filed on August 8, 2014.

(8)   Incorporated by reference to Annual Report on Form 10-K filed on March 22, 2016.

(9)   Intentionally omitted

(10) Incorporated by reference to Current Report on Form 8-K filed on February 22, 2017.

(11) Incorporated by reference to Form S-1/A Registration Statement filed on October 23, 2015 (File No. 333-206626).

(12) Intentionally omitted.

(13) Incorporated by reference to Form S-1/A Registration Statement filed on June 6, 2014 (File No. 333-195505).

(14) Incorporated by reference to Form S-1/A Registration Statement filed on February 7, 2017 (File No. 333-214896).

(15) Incorporated by reference to Quarterly Report on Form 10-Q filed on May 11, 2018.

(16) Incorporated by reference to Current Report on Form 8-K filed on May 9, 2018.

(17) Incorporated by reference to Quarterly Report on Form 10-Q filed on August 14, 2018.

(18) Incorporated by reference to Current Report on Form 8-K filed on August 14, 2018.

(19) Incorporated by reference to Current Report on Form 8-K filed on January 4, 2019.

(20) Incorporated by reference to Exhibit 10.1 to Amendment No. 1 to the Schedule 13D jointly filed on April 16, 2019 by Jon R. Sabes and Steven F. Sabes, among others.

(21) Incorporated by reference to Current Report on Form 8-K filed on April 30, 2019.

(22) Intentionally omitted.

(23) Incorporated by reference to Annual Report on Form 10-K filed on March 29, 2018.

(24) Incorporated by reference to Current Report on Form 8-K filed on June 6, 2019.

(25) Incorporated by reference to Current Report on Form 8-K filed on June 6, 2019.

(26) Incorporated by reference to Current Report on Form 8-K filed on January 7, 2020.

(27) Incorporated by reference to Annual Report on Form 10-K filed on July 9, 2019.

(28) Intentionally omitted.

(29) Incorporated by reference to Quarterly Report on Form 10-Q filed on August 14, 2020.

(30) Incorporated by reference to Quarterly Report on Form 10-Q filed November 14, 2019.

(31) Incorporated by reference to Current Report on Form 8-K filed January 7, 2021.

(32) Incorporated by reference to Form 10-Q filed on November 19, 2020.

(33) Incorporated by reference to Current Report on Form 8-K filed on March 16, 2021.

(34) Incorporated by reference to Current Report on Form 8-K filed on July 2, 2021.

†   Certain confidential information has been excluded from this exhibit.

Page 97

Table of Contents

APP. 696

## ITEM 16. FORM 10-K SUMMARY.

Not applicable.

Page 98

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities and Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

GWG HOLDINGS, INC.

Date: November 5, 2021                              By:   /s/ Murray T. Holland
                                                         _____
                                                         *President and Chief Executive Officer*

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Murray T. Holland and Timothy L. Evans, jointly and severally, as his or her true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him or her, and in his or her name, place and stead, in any and all capacities, to sign any and all amendments to this report, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite or necessary to be done in and about the premises hereby ratifying and confirming all that said attorneys-in-fact and agents, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities and Exchange Act of 1934, this report has been signed below, as of November 5, 2021, by the following persons on behalf of the registrant and in the capacities indicated below.

| *Signature* | *Title* |
|---|---|
| /s/ Murray T. Holland<br>Murray T. Holland | Chairman, President and Chief Executive Officer<br>(Principal Executive Officer) |
| /s/ Timothy L. Evans<br>Timothy L. Evans | Director and Chief Financial Officer<br>(Principal Financial and Accounting Officer) |
| /s/ Peter T. Cangany, Jr.<br>Peter T. Cangany, Jr. | Director |
| /s/ David F. Chavenson<br>David F. Chavenson | Director |
| /s/ David H. de Weese<br>David H. de Weese | Director |

Page 99

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

**FORM 10-Q**

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended September 30, 2021

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES ACT OF 1934**

For the transition period from _____ to _____

Commission File Number: 001-36615

# GWG HOLDINGS, INC.

(Exact name of registrant as specified in its charter)

| **Delaware** | **26-2222607** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**325 North St. Paul Street, Suite 2650**
**Dallas, TX 75201**
(Address of principal executive offices, including zip code)

**(612) 746-1944**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock | GWGH | NASDAQ Capital Market |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☒ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). ☒ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☐ | Accelerated filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). ☐ Yes ☒ No

As of November 9, 2021, GWG Holdings, Inc. had 33,098,631 shares of common stock outstanding.

| Exhibit | APP. 698 |
|---|---|
| A-4 | |

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 699 of 1031    PageID 871

APP. 699

**GWG HOLDINGS, INC.**

**Index to Form 10-Q**
**for the Quarter Ended September 30, 2021**

|  |  | Page No. |
|---|---|---|
| PART I. FINANCIAL INFORMATION | | |
| Item 1. | Financial Statements | 1 |
| | Condensed Consolidated Balance Sheets as of September 30, 2021, and December 31, 2020 | 1 |
| | Condensed Consolidated Statements of Operations for the three and nine months ended September 30, 2021 and 2020 | 2 |
| | Condensed Consolidated Statements of Cash Flows for the nine months ended September 30, 2021 and 2020 | 3 |
| | Condensed Consolidated Statements of Changes in Stockholders' (Deficit) Equity for the three and nine months ended September 30, 2021 and 2020 | 5 |
| | Notes to Condensed Consolidated Financial Statements | 8 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 51 |
| Item 4. | Controls and Procedures | 80 |
| | | |
| PART II. OTHER INFORMATION | | 82 |
| Item 6. | Exhibits | 82 |
| | | |
| SIGNATURES | | 82 |

i

## PART I — FINANCIAL INFORMATION

## ITEM 1. FINANCIAL STATEMENTS

GWG HOLDINGS, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED BALANCE SHEETS
(in thousands, except share and per share data)

| | September 30, 2021 (Unaudited) | December 31, 2020 |
|---|---|---|
| **ASSETS** | | |
| Cash and cash equivalents | $ 42,207 | $ 85,249 |
| Restricted cash | 25,516 | 38,911 |
| Investment in life insurance policies, at fair value | 761,560 | 791,911 |
| Life insurance policy benefits receivable, net | 33,105 | 14,334 |
| Investment in alternative assets, at fair value | 226,138 | 221,894 |
| Equity method investments | 664 | 8,582 |
| Other assets | 33,256 | 36,326 |
| Goodwill | 2,367,750 | 2,367,750 |
| TOTAL ASSETS | $ 3,490,196 | $ 3,564,957 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | |
| **LIABILITIES** | | |
| Senior credit facilities with LNV Corporation and National Founders LP | $ 327,702 | $ 193,730 |
| L Bonds | 1,279,808 | 1,246,902 |
| Seller Trust L Bonds | 272,104 | 272,104 |
| Debt due to related parties | 77,362 | 76,260 |
| Interest and dividends payable | 24,440 | 24,080 |
| Accounts payable and accrued expenses | 30,448 | 26,505 |
| Deferred tax liability, net | 51,328 | 51,469 |
| TOTAL LIABILITIES | 2,063,192 | 1,891,050 |
| | | |
| Redeemable noncontrolling interests | 1,226,020 | 1,233,093 |
| | | |
| **STOCKHOLDERS' EQUITY** | | |
| Redeemable preferred stock | | |
| (par value $0.001; shares authorized 100,000; shares outstanding 41,681 and 56,855; liquidation preference of $41,925 and $57,187 as of September 30, 2021 and December 31, 2020, respectively) | 31,069 | 46,241 |
| Series 2 redeemable preferred stock | | |
| (par value $0.001; shares authorized 150,000; shares outstanding 86,707 and 129,887; liquidation preference of $87,212 and $130,645 as of September 30, 2021 and December 31, 2020, respectively) | 67,410 | 110,592 |
| Common stock | | |
| (par value $0.001; shares authorized 210,000,000; shares issued and outstanding, 33,097,118 and 33,094,664 as of September 30, 2021 and December 31, 2020, respectively) | 33 | 33 |
| Common stock in treasury, at cost (12,337,264 shares as of both September 30, 2021 and December 31, 2020) | (67,406) | (67,406) |
| Additional paid-in capital | 265,812 | 274,023 |
| Accumulated deficit | (412,621) | (251,111) |
| TOTAL GWG HOLDINGS STOCKHOLDERS' (DEFICIT) EQUITY | (115,703) | 112,372 |
| Noncontrolling interests | 316,687 | 328,442 |
| TOTAL STOCKHOLDERS' EQUITY | 200,984 | 440,814 |
| TOTAL LIABILITIES & STOCKHOLDERS' EQUITY | $ 3,490,196 | $ 3,564,957 |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements.

APP. 701

APP. 702

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 703 of 1031    PageID 875

# GWG HOLDINGS, INC. AND SUBSIDIARIES
## CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(in thousands, except share and per share data)
(unaudited)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| REVENUE | | | | |
| Gain on life insurance policies, net | $ 15,484 | $ 14,122 | $ 17,923 | $ 43,355 |
| Investment income, net | 17,554 | 56,705 | 21,417 | 41,590 |
| Interest income | 213 | 278 | 835 | 1,293 |
| Other income (loss) | 535 | (3,093) | (2,916) | 33,504 |
| TOTAL REVENUE | 33,786 | 68,012 | 37,259 | 119,742 |
| EXPENSES | | | | |
| Interest expense | 45,096 | 40,792 | 128,605 | 113,805 |
| Employee compensation and benefits | 14,871 | 33,777 | 43,977 | 123,321 |
| Legal and professional fees | 6,650 | 7,830 | 20,832 | 21,636 |
| Other expenses | 9,652 | 4,712 | 23,050 | 13,387 |
| TOTAL EXPENSES | 76,269 | 87,111 | 216,464 | 272,149 |
| LOSS BEFORE INCOME TAXES | (42,483) | (19,099) | (179,205) | (152,407) |
| INCOME TAX EXPENSE (BENEFIT) | 655 | 3,618 | 173 | (14,545) |
| NET LOSS BEFORE LOSS FROM EQUITY METHOD INVESTMENT | (43,138) | (22,717) | (179,378) | (137,862) |
| Loss from equity method investment | (4,949) | (1,431) | (11,898) | (4,279) |
| NET LOSS | (48,087) | (24,148) | (191,276) | (142,141) |
| Net (income) loss attributable to noncontrolling interests | (87) | (21,181) | 29,766 | 32,901 |
| Less: Preferred stock dividends | 2,404 | 3,569 | 8,371 | 11,235 |
| NET LOSS ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ (50,578) | $ (48,898) | $ (169,881) | $ (120,475) |
| NET LOSS PER COMMON SHARE | | | | |
| Basic | $ (2.44) | $ (1.60) | $ (8.18) | $ (3.95) |
| Diluted | $ (2.44) | $ (1.60) | $ (8.18) | $ (3.95) |
| WEIGHTED AVERAGE COMMON SHARES OUTSTANDING | | | | |
| Basic | 20,759,854 | 30,477,792 | 20,758,910 | 30,516,331 |
| Diluted | 20,759,854 | 30,477,792 | 20,758,910 | 30,516,331 |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements.

Page 2

APP. 703

GWG HOLDINGS, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
(in thousands)
(unaudited)

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2021 | 2020 |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net loss | $ (191,276) | $ (142,141) |
| Adjustments to reconcile net loss to net cash flows used in operating activities: | | |
| Change in fair value of life insurance policies | (623) | (23,476) |
| Investment income, net | (21,417) | (41,590) |
| Amortization of deferred financing and issuance costs | 19,594 | 13,619 |
| Amortization and depreciation on long-lived assets | 1,552 | 827 |
| Return on investments in alternative assets | 3,043 | 1,577 |
| Non-cash interest income | (214) | (215) |
| Non-cash interest expense | 3,149 | 1,795 |
| Loss from equity method investment | 11,898 | 4,279 |
| Loss on change in fair value of put options | 4,022 | 3,191 |
| Deferred income tax | (141) | (18,553) |
| Write-off of other equity investment | 2,037 | — |
| Equity-based compensation | 14,252 | 96,618 |
| Forfeiture of vested equity-based compensation | — | (36,267) |
| Change in operating assets and liabilities | | |
| Life insurance policy benefits receivable | (18,771) | (13,387) |
| Other assets | (1,369) | (2,450) |
| Accounts payable and other accrued expenses | (2,022) | 8,364 |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (176,286) | (147,809) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Return of investment for matured life insurance policies | 30,974 | 32,255 |
| Purchases of fixed assets | (2,477) | (2,498) |
| Equity method investments | (3,750) | (10,144) |
| Investments in alternative assets | (4,470) | (226) |
| Return of investments in alternative assets | 19,692 | 5,752 |
| Investment in put options | — | (14,775) |
| NET CASH FLOWS PROVIDED BY INVESTING ACTIVITIES | 39,969 | 10,364 |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Borrowings on senior debt | 215,959 | 28,530 |
| Repayments of senior debt and debt due to related parties | (81,105) | (50,000) |
| Payments for deferred financing costs for senior debt and debt due to related parties | (3,285) | (3,307) |
| Purchase of noncontrolling interest | — | (1,195) |
| Proceeds from issuance of L Bonds | 155,170 | 317,302 |
| Payments for issuance costs of L Bonds | (10,007) | (20,203) |
| Payments for redemption of L Bonds | (127,961) | (82,206) |
| Issuance of common stock | — | 8 |
| Payments for redemption of preferred stock | (58,354) | (34,779) |
| Payment for equity issuance costs | (778) | — |
| Preferred stock dividends | (8,371) | (11,235) |
| Payment of employee taxes on equity based awards | (1,388) | — |
| Tax distribution to noncontrolling interest | — | (5,592) |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 79,880 | 137,323 |
| NET DECREASE IN CASH, CASH EQUIVALENTS AND RESTRICTED CASH | (56,437) | (122) |
| **CASH, CASH EQUIVALENTS AND RESTRICTED CASH** | | |
| BEGINNING OF PERIOD | 124,160 | 115,790 |
| END OF PERIOD | $ 67,723 | $ 115,668 |

Page 3

GWG HOLDINGS, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
(in thousands)
(unaudited)

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2021 | 2020 |
| **SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION** | | |
| Interest paid | $ 105,464 | $ 97,098 |
| Premiums paid, including prepaid | 54,885 | 52,136 |
| **NON-CASH INVESTING AND FINANCING ACTIVITIES** | | |
| L Bonds: Conversion of accrued interest and commissions payable to principal | $ 436 | $ 1,296 |
| Liquidity Bonds, net of financing costs (see Note 9) | 246 | — |
| Employee payroll tax liability on restricted equity units | — | 1,555 |
| Debt due to related parties: Capitalization of deferred financing costs to principal | 1,014 | — |
| Debt due to related parties: Deferred financing costs payable (see Note 9) | 2,334 | — |
| Noncash issuance of noncontrolling interest (Note 10) | 374 | — |
| Distribution payable to noncontrolling interest (Note 10) | 1,120 | 165 |
| Collateral Swap (see Note 1): | | |
| Exchange of alternative assets for GWG Holdings' Seller Trust L Bonds | — | 94,788 |
| Exchange of alternative assets for GWG Holdings' common stock | — | 42,856 |
| Deemed capital contribution from related party | — | 46,770 |
| Adjustment to noncontrolling interest | — | 3,444 |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements.

Page 4

GWG HOLDINGS, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY
(in thousands, except share data)
(unaudited)

For the three and nine months ended September 30, 2021:

| | Redeemable Preferred Stock Shares | Redeemable Preferred Stock | Common Shares | Common Stock (par) | Additional Paid-in Capital | Accumulated Deficit | Treasury Stock | Total GWG Holdings Stockholders' Equity (Deficit) | Noncontrolling Interests | Total Stockholders' Equity | Redeemable noncontrolling interests |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance, June 30, 2021 (unaudited) | 151,094 | $ 121,184 | 20,759,854 | $ 33 | $ 268,190 | $ (364,447) | $ (67,406) | $ (42,446) | $ 310,177 | $ 267,731 | $ 1,228,599 |
| Net loss | — | — | — | — | — | (48,174) | — | (48,174) | 2,666 | (45,508) | (2,579) |
| Redemption of redeemable preferred stock | (22,706) | (22,705) | — | — | — | — | — | (22,705) | — | (22,705) | — |
| Preferred stock dividends | — | — | — | — | (2,404) | — | — | (2,404) | — | (2,404) | — |
| Equity-based compensation | — | — | — | — | 26 | — | — | 26 | 4,091 | 4,117 | — |
| Tax withholding on employee restricted equity units | — | — | — | — | — | — | — | — | (86) | (86) | — |
| Distributions payable to noncontrolling interest | — | — | — | — | — | — | — | — | (161) | (161) | — |
| Balance, September 30, 2021 (unaudited) | 128,388 | $ 98,479 | 20,759,854 | $ 33 | $ 265,812 | $ (412,621) | $ (67,406) | $ (115,703) | $ 316,687 | $ 200,984 | $ 1,226,020 |

| | Redeemable Preferred Stock Shares | Redeemable Preferred Stock | Common Shares | Common Stock (par) | Additional Paid-in Capital | Accumulated Deficit | Treasury Stock | Total GWG Holdings Stockholders' Equity (Deficit) | Noncontrolling Interests | Total Stockholders' Equity | Redeemable noncontrolling interests |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance, December 31, 2020 (audited) | 186,742 | $ 156,833 | 20,757,400 | $ 33 | $ 274,023 | $ (251,111) | $ (67,406) | $ 112,372 | $ 328,442 | $ 440,814 | $ 1,233,093 |
| Net loss | — | — | — | — | — | (161,510) | — | (161,510) | (22,693) | (184,203) | (7,073) |
| Issuance of common stock | — | — | 2,454 | — | — | — | — | — | — | — | — |
| Redemption of redeemable preferred stock | (58,354) | (58,354) | — | — | 27 | — | — | (58,327) | — | (58,327) | — |
| Preferred stock dividends | — | — | — | — | (8,371) | — | — | (8,371) | — | (8,371) | — |
| Equity-based compensation | — | — | — | — | 133 | — | — | 133 | 13,072 | 13,205 | — |
| Tax withholding on employee restricted equity units | — | — | — | — | — | — | — | — | (1,388) | (1,388) | — |
| Distributions payable to noncontrolling interest | — | — | — | — | — | — | — | — | (1,120) | (1,120) | — |
| Noncash issuance of noncontrolling interest | — | — | — | — | — | — | — | — | 374 | 374 | — |
| Balance, September 30, 2021 (unaudited) | 128,388 | $ 98,479 | 20,759,854 | $ 33 | $ 265,812 | $ (412,621) | $ (67,406) | $ (115,703) | $ 316,687 | $ 200,984 | $ 1,226,020 |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements.

APP. 706

APP. 707

GWG HOLDINGS, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY
(in thousands, except share data)
(unaudited)

For the three months ended September 30, 2020:

| | Redeemable Preferred Stock Shares | Redeemable Preferred Stock | Common Shares | Common Stock (par) | Additional Paid-in Capital | Accumulated Deficit | Treasury Stock | Total GWG Holdings Stockholders' Equity | Noncontrolling Interests | Total Stockholders' Equity | Redeemable noncontrolling interests |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Balance, June 30, 2020 (unaudited)** | 207,311 | $ 177,402 | 30,537,481 | $ 33 | $ 225,537 | $ (161,107) | $ (24,550) | $ 217,315 | $ 281,881 | $ 499,196 | $ 1,264,031 |
| Net loss | — | — | — | — | — | (45,329) | — | (45,329) | 32,867 | (12,462) | (11,686) |
| Issuance of common stock | — | — | 57,183 | — | 524 | — | — | 524 | — | 524 | — |
| Common stock in treasury (Note 1) | — | — | (9,837,264) | — | — | — | (42,856) | (42,856) | — | (42,856) | — |
| Redemption of redeemable preferred stock | (10,289) | (10,289) | — | — | — | — | — | (10,289) | — | (10,289) | — |
| Preferred stock dividends | — | — | — | — | (3,569) | — | — | (3,569) | — | (3,569) | — |
| Equity-based compensation | — | — | — | — | 53 | — | — | 53 | 23,222 | 23,275 | — |
| Tax withholding for employee restricted equity units | — | — | — | — | — | — | — | — | (1,554) | (1,554) | — |
| Tax distribution to noncontrolling interest | — | — | — | — | — | — | — | — | — | — | (5,592) |
| Purchase of noncontrolling interest | — | — | — | — | — | — | — | — | (935) | (935) | — |
| Deemed capital contribution from related party (Note 1) | — | — | — | — | 46,770 | — | — | 46,770 | — | 46,770 | — |
| Adjustment to noncontrolling interest for change in ownership of Common Units (Note 1) | — | — | — | — | 8,039 | — | — | 8,039 | (8,039) | — | — |
| Reduction to noncontrolling interest for Beneficient treasury (Note 1) | — | — | — | — | — | — | — | — | (3,444) | (3,444) | — |
| **Balance, September 30, 2020 (unaudited)** | 197,022 | $ 167,113 | 20,757,400 | $ 33 | $ 277,354 | $ (206,436) | $ (67,406) | $ 170,658 | $ 323,998 | $ 494,656 | $ 1,246,753 |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements.

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 709 of 1031    PageID 881

APP. 709

GWG HOLDINGS, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY
(in thousands, except share data)
(unaudited)

For the nine months ended September 30, 2020:

| | Redeemable Preferred Stock Shares | Redeemable Preferred Stock | Common Shares | Common Stock (par) | Additional Paid-in Capital | Accumulated Deficit | Treasury Stock | Total GWG Holdings Stockholders' Equity | Noncontrolling Interests | Total Stockholders' Equity | Redeemable noncontrolling interests |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance, December 31, 2019 (audited) | 231,800 | $ 201,891 | 30,533,793 | $ 33 | $ 233,106 | $ (97,196) | $ (24,550) | $ 313,284 | $ 293,910 | $ 607,194 | $ 1,269,654 |
| Net loss | — | — | — | — | — | (109,240) | — | (109,240) | (15,593) | (124,833) | (17,309) |
| Issuance of common stock | — | — | 60,871 | — | 534 | — | — | 534 | — | 534 | — |
| Common stock in treasury (Note 1) | — | — | (9,837,264) | — | — | — | (42,856) | (42,856) | — | (42,856) | — |
| Redemption of redeemable preferred stock | (34,778) | (34,778) | — | — | — | — | — | (34,778) | — | (34,778) | — |
| Preferred stock dividends | — | — | — | — | (11,235) | — | — | (11,235) | — | (11,235) | — |
| Equity-based compensation | — | — | — | — | 140 | — | — | 140 | 96,345 | 96,485 | — |
| Forfeiture of equity-based compensation | — | — | — | — | — | — | — | — | (36,267) | (36,267) | — |
| Tax withholding for employee restricted equity units | — | — | — | — | — | — | — | — | (1,554) | (1,554) | — |
| Tax distribution to noncontrolling interest | — | — | — | — | — | — | — | — | — | — | (5,592) |
| Purchase of noncontrolling interest | — | — | — | — | — | — | — | — | (1,195) | (1,195) | — |
| Distributions payable to noncontrolling interest | — | — | — | — | — | — | — | — | (165) | (165) | — |
| Deemed capital contribution from related party (Note 1) | — | — | — | — | 46,770 | — | — | 46,770 | — | 46,770 | — |
| Adjustment to noncontrolling interest for change in ownership of Common Units (Note 1) | — | — | — | — | 8,039 | — | — | 8,039 | (8,039) | — | — |
| Reduction to noncontrolling interest for Beneficient treasury (Note 1) | — | — | — | — | — | — | — | — | (3,444) | (3,444) | — |
| Balance, September 30, 2020 (unaudited) | 197,022 | $ 167,113 | 20,757,400 | $ 33 | $ 277,354 | $ (206,436) | $ (67,406) | $ 170,658 | $ 323,998 | $ 494,656 | $ 1,246,753 |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements.

Page 7

APP. 710

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

## (1) Nature of Business

### Organizational Structure

GWG Holdings, Inc. ("GWG Holdings") conducts its life insurance secondary market business through a wholly-owned subsidiary, GWG Life, LLC ("GWG Life"), and GWG Life's wholly-owned subsidiaries, GWG Life Trust, GWG DLP Funding IV, LLC ("DLP IV"), GWG DLP Funding V Holdings, LLC ("DLP V Holdings"), and GWG DLP Funding Holdings VI, LLC ("DLP VI Holdings"). DLP V Holdings is the sole member of GWG DLP Funding V, LLC ("DLP V"). DLP VI Holdings is the sole member of GWG DLP Funding VI, LLC ("DLP VI").

In addition, GWG Holdings has exposure to indirect interests in loans collateralized by cash flows from alternative assets. Such loans are made and held by certain of the operating subsidiaries of The Beneficient Company Group, L.P. ("Ben LP," including all of the subsidiaries it may have from time to time — "Beneficient"). These loans are made to certain of the ExAlt Trusts (as defined below), which are consolidated subsidiaries of Ben LP and thus, such loans are eliminated in consolidation for financial reporting purposes. The ExAlt Trusts are comprised of the Custody Trusts, Collective Trusts, LiquidTrusts and Funding Trusts (collectively, the "ExAlt Trusts"). Ben LP's general partner is Beneficient Management, L.L.C. ("Beneficient Management"). Prior to December 31, 2019, GWG Holdings' investment in Beneficient was accounted for as an equity method investment. On December 31, 2019, as more fully described below, Beneficient became a consolidated subsidiary of GWG Holdings. As also further described in Note 17, on August 13, 2021, GWG Holdings and Ben LP, and Beneficient Company Holdings, L.P. ("BCH") entered into a non-binding term sheet (the "Term Sheet") that outlines a series of transactions that, once completed, is expected to result in, among other things, (i) GWG Holdings receiving certain proposed enhancements to its investments in Beneficient; (ii) GWG Holdings no longer having the right to appoint directors of the Board of Directors of Beneficient Management; and (iii) Beneficient no longer being a consolidated subsidiary of GWG Holdings. The Term Sheet is part of ongoing efforts by management and the Board of Directors of GWG Holdings to maximize the value of GWG Holdings' and GWG Life's investment in Beneficient.

Ben LP is the general partner of BCH and owns 100% of the Class A Subclass A-1 and A-2 Units of BCH. BCH is the holding company that directly or indirectly receives all active and passive income of Beneficient and allocates that income among the partnership interests issued by BCH. As of September 30, 2021, BCH has issued general partnership Class A Units (Subclass A-1 and A-2), Class S Ordinary Units, Class S Preferred Units, FLP Units (Subclass 1 and Subclass 2), Preferred Series A Subclass 1 Unit Accounts, and Preferred Series C Unit Accounts. On July 15, 2020, BCH amended its limited partnership agreement by executing that certain 5th Amended and Restated Limited Partnership Agreement ("LPA") of BCH to allow for the issuance of Preferred Series A Subclass 0 Unit Accounts ("Preferred A.0"), which are expected to be issued once certain conditions are met (as discussed in more detail below). Effective March 31, 2021, BCH amended its limited partnership agreement by executing that certain 6th Amended and Restated LPA of BCH to allow for the issuance of Preferred Series C Subclass 0 Unit Accounts ("Preferred C.0"), which are wholly owned by GWG Holdings.

GWG Holdings also has a financial interest in FOXO Technologies Inc. ("FOXO", formerly FOXO BioScience LLC), which through its wholly-owned subsidiaries FOXO Labs Inc. ("FOXO Labs", formerly, Life Epigenetics Inc.) and FOXO Life LLC ("FOXO Life", formerly, youSurance General Agency, LLC), seeks to commercialize epigenetic technology for the longevity industry and offer life insurance directly to customers utilizing epigenetic technology. Although we have a financial interest in FOXO, we do not have a controlling financial interest because another party is the majority shareholder of the voting class of securities. Therefore, we account for GWG Holdings' ownership interest in FOXO as an equity method investment.

All of the aforementioned entities are legally organized in the state of Delaware, other than GWG Life Trust, which was formed under the laws of the state of Utah, and certain of the ExAlt Trusts, which were formed under the laws of the state of Texas. Unless the context otherwise requires or we specifically so indicate, all references in this report to "we," "us," "our," "our Company," "GWG," or the "Company" refer to GWG Holdings together, in each case, with its subsidiaries. Our headquarters are located at 325 N. St. Paul Street, Suite 2650, Dallas, Texas 75201.

### Nature of Business

GWG Holdings, through its wholly-owned subsidiary GWG Life, purchased life insurance policies in the secondary market and has built a large, actuarially diverse portfolio of life insurance policies backed by highly rated life insurance companies. These policies

APP. 711

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 712 of 1031    PageID 884

were purchased between April 2006 and November 2019 and were funded primarily through sales of L Bonds, as discussed in Note 9. Beginning in 2018, GWG Holdings consummated a series of transactions with Beneficient as part of a

Page 8

APP. 712

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

strategic decision to reorient its business and increase capital allocated toward providing liquidity products to a broader range of alternative assets through investments in Beneficient. GWG Holdings completed the transactions with Beneficient to provide the Company with a significant increase in assets and common stockholders' equity as well as the opportunity for a diversified source of future earnings from our exposure to the alternative asset industry. We believe that GWG Holdings' and GWG Life's investments in Beneficient and the other strategies we are pursuing, including continuing to pursue opportunities in the life insurance industry, will transform GWG Holdings from a niche provider of liquidity to owners of life insurance policies to a diversified provider of financial products and services with exposure to a broad range of alternative assets.

We believe that Beneficient's operations will generally produce higher risk adjusted returns than those we can achieve from life insurance policies acquired in the secondary market; however, returns on equity in life settlements, especially with the current availability of financings on favorable terms, appear to be an attractive option to diversify our exposure to alternative assets, and we have begun exploring the feasibility of acquiring such policies. Furthermore, although we believe that our portfolio of life insurance policies is a meaningful component of a growing diversified alternative asset portfolio, we continue to explore strategic alternatives for our life insurance portfolio aimed at maximizing its value, including a possible sale, refinancing, recapitalization, partnership, reinsurance guarantees, life insurance operations or other transactions involving our life insurance portfolio, as well as pursuing other alternatives to increase our exposure to alternative assets. These operations are in addition to allocating capital to provide liquidity to holders of a broader range of alternative assets, which we currently provide through GWG Holdings' and GWG Life's investments in Beneficient.

Beneficient is a financial services company based in Dallas, Texas that markets an array of liquidity and trust administration products to alternative asset investors primarily comprised of mid-to-high-net-worth individuals having a net worth between $5 million and $30 million ("MHNW") and small-to-midsize institutional investors and family offices with less than $1 billion in investable assets ("STMIs"). One of Beneficient's founders, Brad K. Heppner ("Ben Founder"), serves as Chairman and Chief Executive Officer of Beneficient and previously served from April 26, 2019 to June 14, 2021 as Chairman of GWG Holdings. Ben LP plans to offer its products and services through its five operating subsidiaries, which include (i) Ben Liquidity, (ii) Ben Custody Admin, (iii) Ben Insurance, (iv) Ben Markets and (v) Beneficient USA (each operating subsidiary is further defined below). Ben Liquidity plans to operate a trust company that is a Kansas Technology Enabled Fiduciary Financial Institutions ("TEFFI") authorized to serve as an alternative asset custodian, trustee and lender with statutory powers granted for each of these activities and permitting Ben Liquidity to provide fiduciary financing for certain of its customer liquidity transactions. Ben Custody Admin plans to operate a Texas trust company that is being organized to provide its customers with certain administrative, custodial and trustee products and specialized services focused on alternative asset investors. Ben Insurance has been chartered as a Bermuda based insurance company that plans to offer certain customized insurance products and services covering risks relating to owning, managing and transferring alternative assets. Ben Markets is in the regulatory process for acquiring a captive registered broker-dealer that would conduct certain of its activities attendant to offering a suite of products and services from the Beneficient family of companies. Certain of Ben LP's operating subsidiary products and services involve or are offered to certain of the ExAlt Trusts (defined below), which are consolidated subsidiaries of Ben LP for financial reporting purposes (such trusts are and may individually be referred to as Custody Trusts, Collective Trusts, LiquidTrusts, and Funding Trusts). Beneficient USA employs a substantial majority of the executives and staff for Beneficient's operating subsidiaries to which Beneficient USA provides administrative and technical services.

Beneficient's primary operations, which commenced on September 1, 2017, consist of offering its liquidity and trust administration services to its customers, primarily through certain of Ben LP's operating subsidiaries, Ben Liquidity, L.L.C and its subsidiaries (collectively, "Ben Liquidity") and Ben Custody Admin, L.L.C. and its subsidiaries (collectively, "Ben Custody Admin"), respectively. Ben Liquidity offers simple, rapid and cost-effective liquidity products to its customers through the use of customized trust vehicles, (such trusts, the ExAlt Trusts), that facilitate the exchange of a customer's alternative assets for consideration using a unique financing structure (such structure and process, the "ExAlt Plan™"). The ExAlt trademark was developed by Beneficient as a brand of liquidity and trust administration services designed for alternative asset investors, specifically MHNW and STMIs to "Ex"it "Alt"ernatives. A subsidiary of Ben Liquidity makes loans (each, an "ExAlt Loan") to certain of the ExAlt Trusts, which employ the loan proceeds to acquire agreed upon consideration, upon which certain of the ExAlt Trusts deliver to customers in exchange for their alternative assets. Ben Liquidity generates interest and fee income earned in connection with the ExAlt Loans, which are collateralized by a portion of the cash flows from the exchanged alternative assets (the "Collateral"). Ben Custody Admin currently provides trust administration services to the trustees of certain of the ExAlt Trusts that own the exchanged alternative asset following liquidity transactions for fees payable quarterly. The Collateral supports the repayment of the ExAlt Loans plus any related interest and fees and trust administration service fees. Under the applicable trust and other agreements, certain charities are the ultimate beneficiaries of the ExAlt Trusts (the "Non-Controlling Interest Holders"). As ultimate beneficiaries of prior transactions, for every $0.95 paid to the lender (e.g.,

APP. 713

Page 9

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 715 of 1031     PageID 887

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

subsidiaries of Ben LP) on the ExAlt Loans, $0.05 is also paid to certain of the Non-Controlling Interest Holders. For periods following 2020, future Non-Controlling Interest Holders are structured to be paid $0.025 for every $0.975 paid to the fiduciary financial lender (e.g., subsidiaries of Ben LP) of the ExAlt Loans. Since Ben LP consolidates the ExAlt Trusts,` Ben LP's operating subsidiary's ExAlt Loans and related interest and fee income are eliminated in the presentation of our condensed consolidated financial statements but are recognized for purposes of the allocation of income (loss) to Beneficient's equity holders.

Prior to January 1, 2021, Ben LP operated primarily through certain of its subsidiaries, that included (i) Beneficient Capital Company, L.L.C. ("BCC"), which offered liquidity products; (ii) Beneficient Administration and Clearing Company, L.L.C. ("BACC"), which provided services for private fund and trust administration; and (iii) other entities, including the ExAlt Trusts.

On December 31, 2020, a series of restructuring transactions occurred to better position certain of Ben LP's subsidiaries for ongoing operations and future products and services, to capitalize PEN Indemnity Insurance Company, Ltd. ("Pen") and to meet certain requirements of the Texas Department of Banking. These transactions had no impact on the consolidated financial statements. In connection with these transactions, BCC transferred all of its assets, which included, among other assets, its ExAlt Loans receivable, and liabilities, which included, among other liabilities, loans payable with respect to secured loans with HCLP Nominees, L.L.C., held as of December 31, 2020, to BCH. In order to capitalize Pen and enable it to offer insurance products and services to cover risks attendant to owning and managing alternative assets following approval from the Bermuda Monetary Authority (the "BMA"), BCH contributed to Pen certain of such ExAlt Loans receivable with an aggregate carrying value equal to $129.2 million. Likewise, BACC transferred all of its assets, which included its rights to perform fund trust administration services under certain trust and other agreements, and liabilities to BCH, which will perform such services until a Texas trust company charter is issued or the Kansas TEFFI trust company becomes operational.

Subsequent to December 31, 2020, Ben LP operates primarily through its business line operating subsidiaries, which provide, or will provide, Beneficient's existing and planned products and services. These subsidiaries include (i) Ben Liquidity, which offers liquidity products; (ii) Ben Custody Admin, which provides services for fund and trust administration; (iii) Ben Insurance, L.L.C., including its subsidiaries (collectively, "Ben Insurance"), which intends to offer insurance products and services covering risks attendant to owning, managing, and transferring alternative assets; (iv) Ben Markets, L.L.C., including its subsidiaries (collectively, "Ben Markets"), which intends to provide broker-dealer services in connection with offering Beneficient's liquidity products and services; and (vi) other entities, including the ExAlt Trusts, which operate for the benefit of the Non-Controlling Interest Holders. Beneficient's financial products and services are presently offered through Ben Liquidity and Ben Custody Admin, and Beneficient plans to expand its capabilities under Ben Custody Admin and provide products and services through Ben Insurance and Ben Markets in the future.

Beneficient's existing and planned products and services are designed to provide liquidity and trust solutions, support the tax and estate planning objectives of its MHNW customers, facilitate asset diversification or provide administrative management and reporting solutions tailored to the goals of investors of alternative investments.

*Beneficient's Regulatory Developments*

In April 2021, the Kansas Legislature adopted, and the governor of Kansas signed into law, a bill that would allow for the chartering and creation of Kansas trust companies, known as TEFFIs, that provide fiduciary financing (e.g., lending to ExAlt Trusts), custodian and trustee services in all capacities pursuant to statutory fiduciary powers, to investors and other participants in the alternative assets market, as well as the establishment of alternative asset trusts. The legislation became effective on July 1, 2021, and designates an operating subsidiary of Ben LP, Beneficient Fiduciary Financial ("BFF"), as the pilot trust company under the TEFFI legislation. A conditional trust charter was issued by the Kansas Bank Commissioner to Beneficient on July 1, 2021. Under the pilot program, Beneficient will not be authorized to exercise its fiduciary powers as a TEFFI until the earlier of the date the Kansas Bank Commissioner promulgates applicable rules and regulations or December 31, 2021. The bill also permits the Kansas Bank Commissioner to request a six-month extension of the pilot program period, which could delay Beneficient's permission to exercise its fiduciary powers under the charter until July 1, 2022. In order to devote their time to serving as directors of the Beneficient TEFFI trust company, the directors of GWG Holdings who serve on the new TEFFI trust company Board of Directors resigned their membership, effective June 14, 2021, on GWG Holdings' Board of Directors, which the Company believes is the highest and best use of their available time and skills and will support the development of the Beneficient TEFFI trust company and the successful execution of Beneficient's business plan.

Additionally, Beneficient's charter application for custodian and trustee services remains in process at the Texas Department of Banking. If the charter is issued, the trust company would serve as custodian and trustee to one or more ExAlt Trusts. Similar or

APP. 715

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 716 of 1031     PageID 888

Page 10

APP. 716

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

the same services may also be provided by Beneficient's Kansas trust company TEFFI. Also, a subsidiary of Ben Insurance, Pen has applied for regulatory approval from the BMA to write fiduciary liability policies for managers and investors in alternative asset funds to cover losses from contractual indemnification and exculpation provisions arising under the governing documents of such funds. Further, on March 26, 2021, a Ben LP subsidiary, Beneficient Capital Markets, L.L.C ("Beneficient Capital Markets") filed a Form BD with the Securities and Exchange Commission ("SEC") to commence its application for broker-dealer registration. Upon registration and admittance as a Financial Industry Regulatory Authority ("FINRA") member, Beneficient Capital Markets will conduct activities attendant to offering Beneficient's products and services.

When the Kansas TEFFI trust company is authorized to exercise its fiduciary powers, Beneficient expects to be able to expand its operations and close an increased number of liquidity transactions. Additionally, once BMA regulatory approval is obtained and Beneficient Capital Markets is admitted as a FINRA member, Beneficient anticipates being able to offer its full suite of products and services.

**The Exchange Transaction**

On December 28, 2018 (the "Final Closing Date"), we completed a series of strategic exchanges of assets among GWG Holdings, GWG Life, Ben LP and certain trusts, each identified as an Exchange Trust formed during 2017 and 2018 (such trusts collectively, the "Seller Trusts", which are a related party but are not among Ben LP's consolidated trusts), pursuant to a Master Exchange Agreement among the parties (the "Exchange Transaction"). As a result of the Exchange Transaction, a number of securities were exchanged between the parties, including the following securities as of the Final Closing Date: the Seller Trusts acquired GWG Holdings' L Bonds due 2023 (the "Seller Trust L Bonds") in the aggregate principal amount of $366.9 million; the Seller Trusts acquired 27,013,516 shares of GWG Holdings' common stock; GWG Holdings acquired 40,505,279 common units of Ben LP (the "Common Units"); and GWG Holdings acquired the right to obtain additional Common Units or other property that would be received by a holder of Preferred Series A Subclass 1 Unit Accounts of BCH pursuant to an option issued by Ben LP (the "Option Agreement"). In addition, in connection with the Exchange Transaction, Ben LP, as borrower, entered into a commercial loan agreement (the "Commercial Loan Agreement") with GWG Life, as lender, providing for a loan in a principal amount of $192.5 million as of the Final Closing Date (the "Commercial Loan").

*Description of the Assets Exchanged*

*Seller Trust L Bonds*

On August 10, 2018, in connection with the initial transfer of the Exchange Transaction, GWG Holdings, GWG Life and Bank of Utah, as trustee, entered into a Supplemental Indenture (the "L Bond Supplemental Indenture") to the Amended and Restated Indenture dated as of October 23, 2017 (the "Amended and Restated Indenture"). GWG Holdings entered into the L Bond Supplemental Indenture to add and modify certain provisions of the Amended and Restated Indenture necessary to provide for the issuance of the Seller Trust L Bonds. The maturity date of the Seller Trust L Bonds is August 9, 2023. The Seller Trust L Bonds bear interest at 7.5% per year. Interest is payable monthly in cash.

As the second anniversary of the Final Closing Date has passed, the holders of the Seller Trust L Bonds now have the right to cause GWG Holdings to repurchase, in whole but not in part, the Seller Trust L Bonds held by such holder. The repurchase may be paid, at GWG Holdings' option, in the form of cash, a pro rata portion of (i) the outstanding principal amount and accrued and unpaid interest under the Commercial Loan, and (ii) Common Units, or a combination of cash and such property.

The Seller Trust L Bonds are senior secured obligations of GWG Holdings, ranking junior only to all senior debt of GWG Holdings, pari passu in right of payment and in respect of collateral with all "L Bonds" of GWG Holdings, and senior in right of payment to all subordinated indebtedness of GWG Holdings. See Note 9 for additional discussion of the outstanding debt of GWG Holdings. Payments under the Seller Trust L Bonds are guaranteed by GWG Life (see Item 2. *Management's Discussion and Analysis of Financial Condition and Results of Operations*).

As result of the Collateral Swap (discussed and defined below) on September 30, 2020, $94.8 million of Seller Trusts L Bonds are eliminated upon consolidation.

APP. 717

APP. 718

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

*Commercial Loan*

The $192.5 million principal amount under the Commercial Loan is due on August 9, 2023; however, it is extendable for two five-year terms. Ben LP's obligations under the Commercial Loan are unsecured.

The principal amount of the Commercial Loan bears interest at 5.0% per year. From and after the Final Closing Date, one-half of the interest, or 2.5% per year, is due and payable monthly in cash, and one-half of the interest, or 2.5% per year, accrues and compounds annually on each anniversary date of the Final Closing Date and becomes due and payable in full in cash on the maturity date.

In accordance with the L Bond Supplemental Indenture governing the issuance of the Seller Trust L Bonds, upon a redemption event or at the maturity date of the Seller Trust L Bonds, GWG Holdings, at its option, may use the outstanding principal amount of the Commercial Loan, and accrued and unpaid interest thereon, as repayment consideration of the Seller Trust L Bonds.

The Commercial Loan and its related interest are eliminated upon consolidation.

*Option Agreement*

In connection with the Exchange Transaction, GWG Holdings entered into the Option Agreement with Ben LP. The Option Agreement gave GWG Holdings the option to acquire the number of Common Units or other property that would be received by the holder of Preferred Series A Subclass 1 Unit Accounts of BCH pursuant to an option issued by Ben LP, if such holder were converting on that date. There was no exercise price and GWG Holdings could exercise the option at any time until December 27, 2028, at which time the option automatically settled.

Effective August 11, 2020, as a result of the Exchange Agreement entered into by the parties on December 31, 2019 (discussed below), and the mutual agreement of the parties, the Option Agreement was exercised under the provisions of the Option Agreement. As such, GWG Holdings received $57.5 million of Common Units at a price per unit equal to $12.50 per unit. The exercise of the Option Agreement had no impact on the Company's condensed consolidated financial statements as it is eliminated in consolidation.

*Common Units of Ben LP*

In connection with the Exchange Transaction, the Seller Trusts and Beneficient delivered to GWG Holdings 40,505,279 Common Units. These units represented an approximate 89.9% interest in the Common Units as of the Final Closing Date (although, on a fully diluted basis, GWG Holdings' ownership interest in Common Units would be reduced significantly below a majority of those issued and outstanding). These amounts eliminate upon consolidation.

**Purchase and Contribution Agreement**

On April 15, 2019, Jon R. Sabes, the former Chief Executive Officer and a former director of GWG Holdings, and Steven F. Sabes, the former Executive Vice President and a former director of GWG Holdings, entered into a Purchase and Contribution Agreement (the "Purchase and Contribution Agreement") with, among others, Ben LP. Under the Purchase and Contribution Agreement, Jon and Steven Sabes agreed to transfer all 3,952,155 of the shares of GWG Holdings' outstanding common stock held directly or indirectly by them to BCC (a subsidiary of Ben LP) and AltiVerse Capital Markets, L.L.C. ("AltiVerse"). AltiVerse is a limited liability company owned by an entity related to Beneficient's initial investors (the "Ben Initial Investors"), including Brad K. Heppner (GWG Holdings' former Chairman, who served in such capacity from April 26, 2019 to June 14, 2021, and Beneficient's current Chief Executive Officer and Chairman), and an entity related to Thomas O. Hicks (one of Beneficient's current directors and a former director of GWG Holdings). GWG Holdings was not a party to the Purchase Agreement; however, the closing of the transactions contemplated by the Purchase and Contribution Agreement (the "Purchase and Contribution Transaction") were subject to certain conditions that were dependent upon GWG Holdings taking, or refraining from taking, certain actions. The closing of the Purchase and Contribution Transaction occurred on April 26, 2019.

In connection with such closing, BCC and AltiVerse executed and delivered a Consent and Joinder to the Amended and Restated Pledge and Security Agreement dated October 23, 2017 by and among GWG Holdings, GWG Life, Messrs. Jon and Steven Sabes and the Bank of Utah, which provides that the shares of GWG Holdings' common stock acquired by BCC and

APP. 719

Page 12

Table Of Contents

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

AltiVerse pursuant to the Purchase and Contribution Agreement will continue to be pledged as collateral security for GWG Holdings' obligations owing in respect of the L Bonds and Seller Trust L Bonds.

**Promissory Note - ExAlt Trusts**

On May 31, 2019, GWG Life entered into a Promissory Note (the "Promissory Note"), made by Jeffrey S. Hinkle and Dr. John A. Stahl, not in their individual capacity but solely as trustees of certain of The LT-1 LiquidTrust, The LT-2 LiquidTrust, The LT-5 LiquidTrust, The LT-7 LiquidTrust, The LT-8 LiquidTrust, and The LT-9 LiquidTrust, (collectively, the "Borrowers"). Pursuant to the terms of the Promissory Note, GWG Life funded a term loan to the Borrowers in an aggregate principal amount of $65.0 million (the "Loan"). The Loan was made pursuant to GWG's strategy to further diversify into alternative assets (beyond life insurance) and ancillary businesses and was intended to better position Beneficient's balance sheet, working capital and liquidity profile to satisfy anticipated Texas Department of Banking regulatory requirements. The Loan bears interest at 7.0% per annum, with interest payable at maturity, and matures on June 30, 2023. As of December 31, 2019, the Borrowers became consolidated subsidiaries of GWG Holdings as a result of the Investment Agreement (described below). Accordingly, the Promissory Note and related accrued interest, are eliminated upon consolidation as of that date.

On September 30, 2020, GWG Holdings, GWG Life, BCH, Ben LP, BCC, and the Borrowers entered into an agreement (the "Promissory Note Repayment") by which the parties agreed to repay the Promissory Note and any related accrued interest for a $75.0 million Preferred Series C Unit Account (the "Preferred C") of BCH that Ben LP issued to the Borrowers. The $75.0 million of Preferred C received by GWG Life was transferred to GWG Holdings upon execution of the Promissory Note conversion, which increased GWG Holdings' ownership percentage in Ben LP. As part of the agreement, if Beneficient has not received a trust company charter as of the one-year anniversary of the Promissory Note conversion, or if no trust company charter filing is still pending or in the process of being refiled, GWG Holdings would receive an additional $5.0 million of Preferred C. The carrying value of the Promissory Note on September 30, 2020, immediately prior to the transaction, net of a fair value adjustment and with accrued and unpaid interest thereon, was $65.1 million.

Other than the required rebalancing of equity driven from the change in GWG Holding's ownership percentage, any impacts of the Promissory Note conversion are eliminated upon consolidation.

**The Investment and Exchange Agreements**

On December 31, 2019, GWG Holdings obtained control over Ben LP pursuant to a Preferred Series A Unit Account and Common Unit Investment Agreement, by and among GWG Holdings, Ben LP, BCH, and Beneficient Management (the "Investment Agreement"), which resulted in the consolidation of GWG Holdings and Ben LP for accounting and financial reporting purposes.

Pursuant to the Investment Agreement, GWG Holdings transferred $79.0 million to Ben LP in return for 666,667 Common Units and a Preferred Series A Subclass 1 Unit Account of BCH.

In connection with the Investment Agreement, GWG Holdings obtained the right to appoint a majority of the board of directors of Beneficient Management, the general partner of Ben LP. As a result, GWG Holdings obtained control of Ben LP and began reporting the results of Ben LP and its subsidiaries on a consolidated basis beginning on the transaction date of December 31, 2019. For more details on the accounting for the consolidation, refer to the Company's Annual Report on Form 10-K for the year ended December 31, 2020, filed with the SEC on November 5, 2021 ("2020 Form 10-K"). GWG Holdings' right to appoint a majority of the board of directors of Beneficient Management will terminate in the event (i) GWG Holdings' ownership of the fully diluted equity of Ben LP (excluding equity issued upon the conversion or exchange of Preferred Series A Unit Accounts of BCH held as of December 31, 2019 by parties other than GWG Holdings) is less than 25%, (ii) the Continuing Directors of GWG Holdings cease to constitute a majority of the board of directors of GWG Holdings, or (iii) certain bankruptcy events occur with respect to GWG Holdings. The term "Continuing Directors" means, as of any date of determination, any member of the board of directors of GWG Holdings who: (1) was a member of the board of directors of GWG Holdings on December 31, 2019; or (2) was nominated for election or elected to the board of directors of GWG Holdings with the approval of a majority of the Continuing Directors who were members of the board of directors of GWG Holdings at the time of such nomination or election.

Following the transaction, and as agreed upon in the Investment Agreement, GWG Holdings was issued an initial capital account balance for the Preferred Series A Subclass 1 Unit Account of $319.0 million. The other holders of the Preferred Series

APP. 721

Page 13

---

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 723 of 1031     PageID 895

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

A Subclass 1 Unit Accounts are an entity related to the Ben Initial Investors and an entity related to one of Beneficient's directors who is also a former director of GWG Holdings (the "Related Account Holders"). The parties to the Investment Agreement agreed that the aggregate capital accounts of all holders of the Preferred Series A Subclass 1 Unit Accounts after giving effect to the investment by GWG Holdings was $1.6 billion. GWG Holdings' Preferred Series A Subclass 1 Unit Account is the same class of preferred security as held by the Related Account Holders. If the Related Account Holders exchange their Preferred Series A Subclass 1 Unit Accounts for securities of GWG Holdings, the Preferred Series A Subclass 1 Unit Account of GWG Holdings would be converted into Common Units (so neither GWG Holdings nor the founders would hold Preferred Series A Subclass 1 Unit Accounts).

Also, on December 31, 2019, in a transaction related to the Investment Agreement, GWG Holdings transferred its interest in the Preferred Series A Subclass 1 Unit Account to its wholly owned subsidiary, GWG Life.

In addition, on December 31, 2019, GWG Holdings, Ben LP and the holders of Common Units entered into an Exchange Agreement (the "Exchange Agreement") pursuant to which the holders of Common Units from time to time have the right, on a quarterly basis, to exchange their Common Units for common stock of GWG Holdings. The exchange ratio in the Exchange Agreement is based on the ratio of the capital account associated with the Common Units to be exchanged to the market price of GWG Holdings' common stock based on the volume weighted average price of GWG Holdings' common stock for the five consecutive trading days prior to the quarterly exchange date. The Exchange Agreement is intended to facilitate the marketing of Ben LP's products to holders of alternative assets.

**Preferred Series C Unit Purchase Agreement**

On July 15, 2020, GWG Holdings entered into a Preferred Series C Unit Purchase Agreement ("UPA") with Ben LP and BCH. The UPA was reviewed and approved by the then constituted independent Special Committee of the Board of Directors of GWG Holdings.

Pursuant to the UPA, and provided it has adequate liquidity, GWG Holdings has agreed to make capital contributions from time to time to BCH in exchange for Preferred Series C Unit Accounts of BCH during a purchasing period commencing on the date of the UPA and continuing until the earlier of (i) the occurrence of a Change of Control Event (as defined below) and (ii) the mutual agreement of the parties (the "Purchasing Period"). A "Change of Control Event" shall mean (A) the occurrence of an event that results in GWG Holdings' ownership of the fully diluted equity of Ben LP is less than 25%, the Continuing Directors (as defined below) of GWG Holdings cease to constitute a majority of the board of directors of GWG Holdings, or certain bankruptcy events occur with respect to GWG Holdings, and (B) the listing of Common Units on a national securities exchange (a "Public Listing"). The term "Continuing Directors" means, as of any date of determination, any member of the board of directors of GWG Holdings who: (1) was a member of the board of directors of GWG Holdings on December 31, 2019; or (2) was nominated for election or elected to the board of directors of GWG Holdings with the approval of a majority of the Continuing Directors who were members of the board of directors of GWG Holdings at the time of such nomination or election.

If, on or prior to the end of the Purchasing Period, a Public Listing occurs, the BCH Purchased Units shall be automatically exchanged for Common Units, or another unit of Ben LP, as the parties may mutually agree (the "Beneficient Units"), at the lower of (i) the volume-weighted average of the Beneficient Units for the 20 trading days following the Public Listing, and (ii) $12.75.

In addition, at any time following the Effective Date, all or some of the Preferred Series C Unit Accounts purchased under the UPA may be exchanged for Beneficient Units at the option of GWG Holdings (exercised by a special committee of the Board of Directors or, if such committee is no longer in place, the appropriate governing body of GWG Holdings); provided that, if GWG Holdings exchanges less than all of the Preferred Series C Unit Accounts purchased under the UPA, then, immediately after giving effect to such exchange, GWG Holdings shall be required to continue to hold Preferred Series C Unit Accounts with a capital account that is at least $10.0 million. The exchange price for such Beneficient Units shall be determined by third-party valuation agents selected by GWG Holdings and Beneficient.

**Contribution and Exchange Agreement**

On September 30, 2020, certain of the ExAlt Trusts (collectively, the "Participating ExAlt Trusts") at the sole direction of John A. Stahl, independent trustee of each such trust, with the intention of protecting the value of certain assets of the Participating ExAlt Trusts underlying part of the Collateral portfolio, the Participating ExAlt Trusts entered into that certain Contribution and

APP. 723

APP. 724

Case 3:22-cv-00410-B　　Document 32-1　　Filed 04/19/22　　Page 725 of 1031　　PageID 897

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

Exchange Agreement with certain of the Seller Trusts, (collectively, the "Participating Exchange Trusts"), each of which entered into such agreement at the direction of its applicable trust advisor and by and through its applicable corporate trustee (the "Contribution and Exchange Agreement). Under the Contribution and Exchange Agreement, the Participating Exchange Trusts agreed to exchange 9,837,264 shares of GWG Holdings' common stock valued at $84.6 million, 543,874 shares of Common Units valued at $6.8 million, and GWG Holdings' L Bonds due 2023 in the aggregate principal amount of $94.8 million to the Participating ExAlt Trusts for $94.3 million in net asset value of the alternative asset investments held by the Participating ExAlt Trusts. This transaction (the "Collateral Swap") resulted in GWG Holdings, after the effects of eliminations upon consolidation, recognizing an additional $42.9 million of treasury stock, $3.4 million of additional noncontrolling interest, and $46.8 million of a capital contribution from a related party.

The Exchange Transaction, the Purchase and Contribution Transaction, the Promissory Note, the Investment and Exchange Agreements, the UPA, and the Collateral Swap, are referred to collectively as the "Beneficient Transactions."

**Going Concern**

To meet the Company's future capital needs, the Company may need to raise additional debt or equity financing. While the Company has historically been able to raise additional capital through issuance of debt and/or equity, the Company cannot guarantee that it will be able to secure additional financing or will otherwise be able to meet is ongoing obligations. These factors, in combination with the potential NASDAQ delisting and our current inability to sell L Bonds as discussed below under the heading "Liquidity and Capital Resources", our significant recurring losses from operations, negative cash flows from operations, delays in executing our business plans, and any potential negative outcome from the ongoing SEC investigation discussed in Note 15 to these condensed consolidated financial statements, raise substantial doubt about the Company's ability to continue as a going concern within one year after these financial statements are issued.

The accompanying condensed consolidated financial statements have been prepared on a going concern basis, which contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. The condensed consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

**Liquidity and Capital Resources**

As of September 30, 2021, we had cash, cash equivalents and restricted cash of $67.7 million. We generated net losses attributable to common shareholders of $169.9 million and $120.5 million for the nine months ended September 30, 2021 and 2020, respectively. As of November 10, 2021, we had cash, cash equivalents, and restricted cash of approximately $29.8 million. Besides funding operating expenditures, we are obligated to pay other items such as interest payments and debt maturities, and preferred stock dividends and redemptions.

We have historically financed our businesses primarily through a combination of L Bond sales, preferred stock sales, the LNV Credit Facility, and the NF Credit Facility. We have also financed our business through proceeds from life insurance policy benefit receipts, cash distributions from the ExAlt Trusts' alternative asset portfolio, dividends and interest on investments, and Beneficient's debt due to related parties. We have traditionally used proceeds from these sources for policy acquisition, policy premiums and servicing costs, working capital and financing expenditures including paying principal, interest and dividends. We have also used proceeds to allocate capital to Beneficient; however, if Ben LP becomes an independent company per the Term Sheet discussed above and in Note 17, the Company expects that Ben LP would reduce its reliance on GWG Holdings to fund its operations and would raise future capital from other sources. Ben LP's capital raising efforts and participation in liquidity transactions may include the issuance of equity or debt of Ben LP or one of its subsidiaries, and the newly issued securities may be dilutive to GWG Holdings' and GWG Life's investments in Ben LP and BCH and may include preferential terms relative to GWG Holdings' and GWG Life's investments in Ben LP and BCH, as applicable.

We currently fund our business primarily with debt that generally has a shorter duration than the duration of our long-term assets. The resulting asset/liability mismatch can result in a liquidity shortfall if we are unable to renew maturing short term debt or secure suitable additional financing. In such a situation, we could be forced to sell assets at less than optimal (distressed) prices. Substantially all of our life insurance policies are pledged as collateral under the LNV Credit Facility and the NF Credit Facility and we would not be able to dispose of them without compliance with the terms of those credit facilities. We heavily rely on GWG Holdings' L Bond offering to fund our business operations, including, among other things, interest and principal payments on the existing L Bonds and capital allocations to Beneficient. We temporarily suspended the offering of GWG

APP. 725

Page 15

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

Holdings' L Bonds, commencing April 16, 2021, as a result of our delay in filing certain periodic reports with the SEC, and were required to seek alternative sources of capital.

As a result of the suspension of GWG Holdings' L Bond offering, on June 28, 2021, we pledged additional life insurance policies as collateral and received an additional advance of $51.2 million under the Third LNV Credit Facility (as defined below). Subsequently, on August 11, 2021, we received a one-time advance of $107.6 million under the NF Credit Facility as described above. Approximately $56.7 million of such advanced amount was used to pay off the remaining amount due, including interest and penalties, under the Third LNV Credit Facility and the pledged life insurance policies used as collateral for the Third LNV Credit Facility were released and pledged under the NF Credit Facility. Further, on September 7, 2021, DLP IV entered into the Fourth LNV Credit Facility (as defined below), that replaced the aforementioned Third LNV Credit Facility. The Fourth LNV Credit Facility resulted in an additional advance of $30.3 million from LNV Corporation, with no additional pledged collateral. All of the aforementioned transactions are described in more detail in Note 9. Finally, as more fully described in Note 17, on November 15, 2021, DLP IV modified the terms the Fourth LNV Credit Facility and entered into a letter agreement which released $17.0 million from a collection account used to collect policy benefits from pledged policies.

Primarily due to the current suspension of GWG Holdings' L Bond offering, the Company may require additional capital to continue its operations over the next twelve months if our ability to sell L Bonds dissipates, or if we are forced to suspend the L Bond offering. However, the Company may not be able to obtain additional borrowings under existing debt facilities or new borrowings with other third-party lenders. To the extent that GWG Holdings or its subsidiaries raise additional capital through the future issuance of debt, the terms of those debt securities may include terms that adversely affect the rights of our existing debt and/or equity holders or involve negative covenants that restrict GWG Holdings' ability to take specific actions, such as incurring additional debt or making additional investments in growing the operations of the Company. If GWG Holdings is unable to fund its operations and other obligations, or defaults on its debt, then the Company will be required to either i) sell assets to provide sufficient funding, ii) exercise our right to decline requests for early L Bond redemptions or redemptions of preferred stock, or iii) to raise additional capital through the sale of equity and the ownership interest of our equity holders may be diluted. Substantially all of our life insurance policies are pledged as collateral under the LNV Credit Facility and the NF Credit Facility and we would not be able to dispose of them without compliance with the terms of those credit facilities.

We anticipate recommencing the offering of GWG Holdings' L Bonds once we become current with our filing obligations and satisfy applicable NASDAQ listing requirements. Once we become current with our filing obligations with respect to the L Bonds, we may be limited in the origination channels in which we sell our L Bonds in the event that we are unable to meet the applicable NASDAQ listing requirements in a timely manner, which could result in the L Bonds no longer being "covered securities" for federal securities law purposes which would subject the offer and sale of L Bonds to potentially extensive state "blue sky" securities law requirements. If for any reason we are forced to suspend GWG Holdings' L Bond offering, are limited in our origination channels in which we sell our L Bonds, or demand for GWG Holdings' L bonds dissipates, our business would be adversely impacted and our ability to service and repay our debt obligations, much of which is short term, would be compromised, thereby negatively affecting our business prospects and viability.

Beneficient is obligated to make debt payments totaling $77.1 million on certain outstanding borrowings through May 30, 2022 under the terms of the Amendment No. 1 to the Second Amended and Restated Credit Agreements as discussed in more detail in Note 9. Primarily due to both the forthcoming debt payments under the Credit Agreement and Second Lien Credit Agreement and the anticipated deconsolidation of Beneficient from GWG Holdings as discussed above and in Note 17, which is expected to result in reduced reliance by Beneficient on GWG Holdings to fund its operations, Beneficient will require additional liquidity to continue its operations over the next twelve months. We expect Beneficient to satisfy these obligations and fund its operations through anticipated operating cash flows, proceeds from distributions on the alternative assets portfolio, additional investments into Beneficient by GWG Holdings and/or other parties and, potentially refinancing with other third-party lenders some or all of the existing borrowings due prior to their maturity. Beneficient is currently in the process of raising additional equity, which is anticipated to close during the fourth quarter of 2021 and/or the first quarter of 2022.

Beneficient may not be able to refinance or obtain additional financing on terms favorable to the Company, or at all. To the extent that Beneficient raises additional capital through the future sale of equity or debt, the ownership interest of its existing equity holders may be diluted. The terms of these future equity or debt securities may include liquidation or other preferences that adversely affect the rights of its existing equity unitholders or involve negative covenants that restrict Beneficient's ability to take specific actions, such as incurring additional debt or making additional investments in growing its operations. If Beneficient defaults on these borrowings, then it will be required to either i) sell assets to repay these loans or ii) to raise additional capital through the sale of equity and the

APP.727

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 728 of 1031    PageID 900

ownership interest of our equity holders may be diluted. Moreover, if Beneficient were to sell assets to avoid a default of these borrowings, then the price at which Beneficient sold such assets may

Page 16

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

not reflect the carrying value of those assets as reflected in our condensed consolidated financial statements, especially in the event of a bulk or distressed sale.

**(2) Summary of Significant Accounting Policies**

**Restatement** — The Company restated its previously issued (i) consolidated balance sheet as of December 31, 2019, included in its Annual Report on Form 10-K for the year ended December 31, 2019 and (ii) the consolidated statement of operations, (iii) the consolidated statement of changes in stockholders' equity, and (iv) the consolidated statement of cash flows for the year ended December 31, 2019, included in its Annual Report on Form 10-K for the year ended December 31, 2019, (the "Restatement") as part of its 2020 Form 10-K. The Restatement also impacted each of the quarters for the periods beginning with GWG Holdings, Inc.'s consolidation with The Beneficient Company Group, L.P. ("Ben LP," including all of the subsidiaries it may have from time to time — "Beneficient") as of December 31, 2019 through the quarter ended September 30, 2020.

The historical interim periods included in this Form 10-Q have been restated to reflect the Restatement.

**Basis of Presentation** — The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with the U.S. Securities and Exchange Commission ("SEC") requirements for interim reporting, which allows certain footnotes and other financial information normally required by Generally Accepted Accounting Principles in the United States of America ("GAAP") to be condensed or omitted. In our opinion, the condensed consolidated financial statements contain all adjustments (consisting of only normal recurring adjustments) necessary for the fair presentation of the Company's financial position and results of operations. These statements should be read in conjunction with the consolidated financial statements and notes included in our 2020 Form 10-K. The results of operations for interim periods are not necessarily indicative of the results to be expected for the full year.

Significant accounting policies are detailed in Note 2 to the consolidated financial statements included in the Company's 2020 Form 10-K. There are no new or revised significant accounting policies as of September 30, 2021.

**Use of Estimates** — The preparation of our condensed consolidated financial statements in conformity with GAAP requires management to make significant estimates and assumptions affecting the reported amounts of assets and liabilities at the date of the condensed consolidated financial statements, as well as the reported amounts of revenue during the reporting period. Management regularly evaluates estimates and assumptions, which are based on current facts, historical experience, management's judgment, and various other factors that we believe to be reasonable under the circumstances. Our actual results may differ materially and adversely from our estimates. Material estimates that are particularly susceptible to change, in the near term, relate to: (1) determining the assumptions used in estimating the fair value of our investments in life insurance policies, (2) determining the grant date fair value for equity-based compensation awards, (3) determining the allocation of income (loss) to Beneficient's equity holders, and (4) evaluation of potential impairment of goodwill and other intangibles.

As it relates to the goodwill intangible asset, in light of Beneficient's significant recurring losses from operations, negative cash flows from operations, and delays in executing its business plans, management plans to engage a third-party valuation firm to assist in performing a quantitative goodwill impairment test in the fourth quarter of 2021. The valuation work related to the goodwill intangible is not complete, and we expect the work to be completed before the filing of our 2021 annual financial statements. While management has implemented strategies to execute its business plans, a failure to execute our business plans or adverse market changes in the future could result in changes in management's forecasts, which could result in a decline in estimated fair value of the Beneficient reporting unit and would result in an impairment of our goodwill intangible. Key assumptions in our quantitative goodwill impairment test include assumptions regarding Ben LP's ability to raise substantial amounts of capital as disclosed in the 2020 Form 10-K. Beneficient is actively engaged in capital raising efforts that may include the issuance of equity or debt of Ben LP or one of its subsidiaries and has received non-binding indications of interest from potential investors. The outcome of Ben LP's capital raising efforts will have a direct impact on management's forecasts and consequently, have a direct impact on the magnitude of future goodwill intangible impairment losses, if any. The outcome of Ben LP's capital raising efforts is uncertain, and it is not certain that the potential investors that have submitted non-binding indications of interest ultimately will invest in Ben LP, or the amount of any such investments. As a result, our quantitative goodwill intangible impairment analysis, once complete, could result in material goodwill intangible impairment in the near future.

Page 17

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 730 of 1031     PageID 902

APP. 730

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 731 of 1031     PageID 903

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

**Reclassification** — Certain prior year amounts have been reclassified for consistency with the current year presentation. Specifically, amortization of debt discounts and premiums were previously presented separately. This is now combined with amortization of deferred financing and issuance costs. This change had no effect on the reported net cash flows used by operating activities.

**Newly Adopted Accounting Pronouncements** — On January 1, 2021, we adopted Accounting Standards Update ("ASU") No 2019-12, *Income Taxes: Simplifying the Accounting for Income Taxes (Topic 740)*. The amendments in ASU 2019-12 eliminate certain exceptions related to the approach for intraperiod tax allocation, the methodology for calculating income taxes in an interim period and the recognition of deferred tax liabilities for outside basis differences. ASU 2019-12 also clarifies and simplifies other aspects of the accounting for income taxes. The adoption of this standard did not have a material impact on the consolidated financial statements and disclosures.

**Accounting Pronouncements Issued But Not Yet Adopted** — In June 2016, the Financial Accounting Standards Board ("FASB") issued ASU No. 2016-13, *Financial Instruments—Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments*, which changes the impairment model for most financial assets and certain other instruments, including trade and other receivables, held-to-maturity debt securities and loans. There have been numerous codification improvements and technical corrections issued through subsequent ASUs since the issuance of ASU No. 2016-13. The standard requires entities to use a new, forward-looking "expected loss" model that is expected to generally result in the earlier recognition of allowances for losses. The guidance is effective for annual periods beginning after December 15, 2022, including interim periods within those years, for smaller reporting companies, as defined by the SEC, but early adoption is permitted. The Company is evaluating the potential impact of this guidance on our consolidated financial statements.

ASU 2020-04, *Reference Rate Reform (Topic 848)* was issued in March 2020. The amendments in Topic 848 provide optional expedients and exceptions for applying GAAP to contracts, hedging relationships, and other transactions affected by reference rate reform if certain criteria are met. Topic 848 can be applied by all entities as of the beginning of the interim period that includes March 12, 2020, or any date thereafter, and entities may elect to apply the amendments prospectively through December 31, 2022. The Company did not utilize the optional expedients and exceptions provided by this standard during the nine months ended September 30, 2021. The Company is evaluating the impact of this standard on its consolidated financial statements and disclosures.

ASU 2020-06, *Debt—Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging—Contracts in Entity's Own Equity (Subtopic 815-40): Accounting for Convertible Instruments and Contracts in an Entity's Own Equity (ASU 2020-06)* was issued in August 2020. The amendments in ASU 2020-06 simplify the accounting for convertible instruments by removing major separation models and removing certain settlement condition qualifiers for the derivatives scope exception for contracts in an entity's own equity, and simplify the related diluted net income per share calculation for both Subtopics. ASU 2020-06 is effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2023, for smaller reporting companies, as defined by the SEC. The Company is evaluating the impact of this ASU on its consolidated financial statements and disclosures.

## (3) Restrictions on Cash

Under the terms of the third amended and restated senior credit facility with LNV Corporation (as amended from time to time, "LNV Credit Facility") and the NF Credit Agreement (as defined below) (both discussed further in Note 9), we are required to maintain collection and payment accounts that are used to collect policy benefits from pledged policies, pay annual policy premiums, interest and other charges under the facility, distribute funds to pay down the facility, and distribute excess funds to the borrowers (GWG DLP Funding IV, LLC and GWG DLP Funding VI, LLC, respectively).

The agents for the lender authorize the disbursements from these accounts. At September 30, 2021 and December 31, 2020, there was a combined balance of $21.0 million and $33.5 million, respectively, in these collection and payment accounts.

Under the terms of the ExAlt Plan™ trust agreements, the trusts are required to maintain capital call reserves and administration reserves. These reserves are used to satisfy capital call obligations and pay fees and expenses for the trusts as required. The fees and expenses are primarily paid to Ben Custody Admin for serving as the administrative agent to the current trustees of the ExAlt Trusts. These reserves represent cash held in banks. At September 30, 2021 and December 31, 2020, there was a combined balance of $4.5 million and $5.4 million, respectively, in these reserves.

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 732 of 1031    PageID 904

APP. 732

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 732 of 1031    PageID 904

APP. 732

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 733 of 1031     PageID 905

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

**(4) Investment in Life Insurance Policies**

The Company's investments in life insurance policies are valued based on unobservable inputs that are significant to their overall fair value. Changes in the fair value of these policies, net of premiums paid, are recorded in gain (loss) on life insurance policies, net in our condensed consolidated statements of operations.

The fair value of our life insurance policies is determined as the net present value of the life insurance portfolio's future expected cash flows (policy benefits received and required premium payments) that incorporates life expectancy estimates obtained when the policy was purchased and current discount rate assumptions. We refer to our valuation methodology as the Longest Life Expectancy methodology. This methodology utilizes a portfolio mortality multiplier ("PMM") that allows us to "fit" projections to actual results, which provides a basis to forecast future performance more accurately. During the second quarter of 2021, we recalculated the PMM in accordance with our valuation methodology, which requires an analysis any time (1) the six-month moving average of the difference between the actual portfolio performance and projected performance deviates by more than one standard deviation from the mean, and (2) such deviation continues as of the end of any calendar quarter after persisting for three consecutive months. The PMM recalculation resulted in a $16.4 million downward adjustment to the value of the life insurance portfolio during the quarter ended June 30, 2021, as reflected in the year-to-date reconciliation of gain (loss) on life insurance policies table below.

The life expectancies used in our valuation were obtained at the time of policy purchase and are generally derived from reports obtained from widely accepted life expectancy providers (other than insured lives covered under small face amount policies — those with $1.0 million in face value benefits or less — which utilize either a single fully underwritten, or simplified report based on self-reported medical interview). Our valuation methodology also incorporates assumptions relating to cost-of-insurance (premium) rates and other assumptions, including a discount rate.

The discount rate we apply is primarily based on information about the discount rates observed in recent portfolio purchase transactions in the life insurance tertiary market. The discount rate also incorporates fixed income market interest rates, the estimated credit exposure to the insurance companies that issued the life insurance policies and management's estimate of the operational risk yield premium a purchaser would require to receive the future cash flows derived from our portfolio as a whole. In prior periods, the discount rate also incorporated information about the discount rates observed in the life insurance secondary market through the Company's internal competitive bidding to purchase policies. However, the Company discontinued the use of this input as of December 31, 2020, as it is no longer actively purchasing policies in the life insurance secondary market. The determination of the discount rate used in the valuation of the Company's life insurance policies requires management judgment and incorporates information that is reasonably available to management as of the date of the valuation. As a result of management's analysis, a discount rate of 8.25% was applied to our portfolio as of both September 30, 2021 and December 31, 2020.

**Portfolio Information**

Our portfolio of life insurance policies, owned by GWG Holdings' subsidiaries as of September 30, 2021, is summarized below:

**Life Insurance Portfolio Summary**

| | | |
|---|---|---|
| Total life insurance portfolio face value of policy benefits (in thousands) | $ | 1,801,306 |
| Average face value per insured life (in thousands) | $ | 1,984 |
| Average life expectancy estimate (years)* | | 6.4 |
| Total number of policies | | 984 |
| Number of unique lives | | 908 |
| Demographics | | 74% Male; 26% Female |
| Number of smokers | | 36 |
| Largest policy as % of total portfolio face value | | 0.7 % |
| Average policy as % of total portfolio face value | | 0.1 % |
| Average annual premium as % of face value | | 4.1 % |

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 735 of 1031    PageID 907

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

(*) Averages presented in the table are weighted averages by face amount of policy benefits.

A summary of our policies organized according to their estimated life expectancy dates, grouped by year, as of the reporting date, is as follows (dollars in thousands):

| Years Ending December 31, | As of September 30, 2021 | | | As of December 31, 2020 | | |
|---|---|---|---|---|---|---|
| | Number of Policies | Estimated Fair Value | Face Value | Number of Policies | Estimated Fair Value | Face Value |
| Three months ending December 31, 2021 | 2 | $ 3,226 | $ 3,250 | 15 | $ 19,429 | $ 22,298 |
| 2022 | 21 | 23,530 | 27,611 | 62 | 66,657 | 88,698 |
| 2023 | 79 | 100,355 | 141,376 | 106 | 113,926 | 178,983 |
| 2024 | 112 | 127,746 | 207,890 | 119 | 130,280 | 229,815 |
| 2025 | 113 | 110,159 | 217,082 | 111 | 85,842 | 187,042 |
| 2026 | 105 | 80,135 | 171,025 | 115 | 100,280 | 237,632 |
| Thereafter | 552 | 316,409 | 1,033,072 | 530 | 275,497 | 956,247 |
| **Totals** | 984 | $ 761,560 | $ 1,801,306 | 1,058 | $ 791,911 | $ 1,900,715 |

We recognized life insurance benefits of $43.2 million and $39.8 million during the three months ended September 30, 2021 and 2020, respectively, related to policies with a carrying value of $12.3 million and $13.5 million, respectively, and as a result recorded realized gains of $30.9 million and $26.3 million, respectively. We recognized life insurance benefits of $104.7 million and $105.2 million during the nine months ended September 30, 2021 and 2020, respectively, related to policies with a carrying value of $31.0 million and $32.3 million, respectively, and as a result recorded realized gains of $73.7 million and $72.9 million, respectively. The aforementioned carrying value, which represents the aggregate cost basis in the policies that matured during the period, is considered a return of investment within the investing section of the condensed consolidated statements of cash flows. Changes in fair value of policies and the other components of the net gain on life insurance policies, as detailed below, are included in the operating section of the condensed consolidated statements of cash flows.

A reconciliation of gain (loss) on life insurance policies is as follows (in thousands):

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 736 of 1031    PageID 908

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2021 | 2020 | 2021 | 2020 |
| Change in estimated probabilistic cash flows[1] | $ 13,120 | $ 14,723 | $ 40,230 | $ 47,923 |
| Premiums and other annual fees | (19,267) | (18,235) | (56,388) | (53,060) |
| Change in life expectancy evaluation | — | — | 2,337 | — |
| Change in PMM | — | — | (16,386) | — |
| Face value of matured policies | 43,217 | 39,803 | 104,662 | 105,194 |
| Fair value of matured policies | (21,586) | (22,169) | (56,532) | (56,702) |
| Gain on life insurance policies, net | $ 15,484 | $ 14,122 | $ 17,923 | $ 43,355 |

(1) Change in fair value of expected future cash flows relating to our investment in life insurance policies that are not specifically attributable to changes in life expectancy, discount rate changes or policy maturity events.

Estimated premium payments and servicing fees required to maintain our current portfolio of life insurance policies in force for the next five years, assuming no mortalities, are as follows (in thousands):

| Years Ending December 31, | Premiums | Servicing | Total |
| --- | --- | --- | --- |
| Three months ending December 31, 2021 | $ 13,847 | $ 457 | $ 14,304 |
| 2022 | 81,839 | 1,828 | 83,667 |
| 2023 | 93,037 | 1,828 | 94,865 |
| 2024 | 101,998 | 1,828 | 103,826 |
| 2025 | 113,722 | 1,828 | 115,550 |
| 2026 | 125,911 | 1,828 | 127,739 |
| | $ 530,354 | $ 9,597 | $ 539,951 |

Management anticipates funding the majority of the premium payments and servicing fees estimated above from cash flows realized from life insurance policy benefits, and to the extent necessary, with additional borrowing capacity created as the premiums and servicing costs of pledged life insurance policies become due, under the LNV Credit Facility and the net proceeds from our offering of L Bonds as described in Note 9. Management anticipates funding premiums and servicing costs of non-pledged life insurance policies with cash flows realized from life insurance policy benefits from our portfolio of life insurance policies and net proceeds from GWG Holdings' offering of L Bonds. The proceeds of these capital sources may also be used for: the purchase, policy premiums and servicing costs of additional life insurance policies; working capital; and financing expenditures including paying principal, interest and dividends.

**(5) Investments in Alternative Assets**

The investments held, either through direct ownership or through a beneficial interest, by certain of the ExAlt Trusts consist primarily of limited partnership interests in various alternative assets, including private equity funds. These alternative investments are valued using NAV as a practical expedient. Changes in the NAV of these investments are recorded in investment income, net in our consolidated statements of operations. The investments in alternative assets provide the economic value that ultimately collateralizes the loan that Beneficient originates with the ExAlt Trusts in a liquidity transaction.

The NAV calculation reflects the most current report of NAV and other data received from firm/fund sponsors. If no such report has been received, Beneficient estimates NAV based upon the last NAV calculation reported by the investment manager and adjusts it for capital calls and distributions made in the intervening time frame. In some instances, current available valuation information may indicate that the valuations that are available from third-party sources are not reliable. In these instances, Beneficient may perform model-based analytical valuations that could be used as an input to value these investments. Public equity securities known to be owned within an alternative investment fund, based on the most recent information reported by the general partners, are marked to market using quoted market prices on the reporting date.

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 737 of 1031    PageID 909

The underlying interests in alternative assets are primarily limited partnership interests, and the limited partnership agreements governing those interests generally include restrictions on disclosure of fund-level information, including fund names and

Page 21

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

company names in the funds. The transfer of the investments in private equity funds generally requires the consent of the corresponding private equity fund manager, and the transfer of certain fund investments is subject to rights of first refusal or other preemptive rights, potentially further limiting the ExAlt Plan™ from transferring an investment in a private equity fund. These investments can never be redeemed with the funds. Distributions from each fund will be received as the underlying investments are liquidated. Timing of liquidation is currently unknown.

**Portfolio Information**

Our portfolio of alternative investments, held by certain of the ExAlt Trust subsidiaries by asset class of each fund as of September 30, 2021 and December 31, 2020, is summarized below:

**Alternative Investments Portfolio Summary[1]**

| Asset Class | September 30, 2021 | | December 31, 2020 | |
| --- | --- | --- | --- | --- |
| | Value | Unfunded Commitments | Value | Unfunded Commitments |
| Venture Capital | $ 123,694 | $ 1,519 | $ 123,021 | $ 1,659 |
| Private Equity | 97,616 | 33,386 | 92,316 | 33,387 |
| Private Real Estate | 1,960 | 269 | 2,118 | 269 |
| Other[2] | 2,868 | 289 | 4,439 | 294 |
| **Total** | $ 226,138 | $ 35,463 | $ 221,894 | $ 35,609 |

[1] Amounts presented in the table exclude the collateral resulting from the Collateral Swap, including GWG Holdings' common stock valued at $84.6 million, 543,874 shares of Ben Common Units valued at $6.8 million, and GWG L Bonds due 2023 in the aggregate principal amount of $94.8 million, all of which are eliminated in consolidation.

[2] "Other" includes private debt strategies, natural resources strategies, and hedge funds.

As of September 30, 2021, ExAlt Trusts' portfolio had exposure to 111 professionally managed alternative investment funds, comprised of 301 underlying investments, 99 percent of which are investments in private companies.

**(6) Fair Value Measurements**

ASC 820, *Fair Value Measurements and Disclosures* ("ASC 820"), establishes a hierarchical disclosure framework that prioritizes and ranks the level of market price observability used in measuring assets and liabilities at fair value. Market price observability is affected by a number of factors, including the type of investment, the characteristics specific to the investment and the state of the marketplace, including the existence and transparency of transactions between market participants. Assets and liabilities with readily available and actively quoted prices, or for which fair value can be measured from actively quoted prices in an orderly market, generally will have a higher degree of market price observability and a lesser degree of judgment used in measuring fair value.

ASC 820 maximizes the use of observable inputs and minimizes the use of unobservable inputs by requiring the use of observable inputs whenever available. Observable inputs are inputs that market participants would use in pricing the asset or liability developed based on market data obtained from third-party sources. Unobservable inputs are inputs that reflect assumptions about how market participants price an asset or liability based on the best available information. Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability (i.e., the "exit price") in an orderly transaction between market participants at the measurement date (a non-distressed transaction in which neither seller nor buyer is compelled to engage in the transaction).

The fair value hierarchy is broken down into three levels based on the observability of inputs as follows:

Level 1 —    Valuations based on quoted prices in active markets for identical assets or liabilities that the Company has the ability to access as of the measurement date. Valuations are based on quoted prices that are readily and regularly available in an active market.

https://sec.report/Document/0001522690-21-000017/gwgh-20210930.htm

41/144

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 739 of 1031    PageID 911

APP. 739

Table Of Contents

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

Level 2 —     Valuations based quoted prices for similar instruments in active markets; quoted prices for identical or similar instruments in markets that are not active; and model-derived valuations whose inputs are observable or whose significant value drivers are observable market data.

Level 3 —     Valuations based on inputs that are unobservable, are derived from other valuation methodologies, including option pricing models, discounted cash flow models and similar techniques, and are not based on market exchange, dealer, or broker traded transactions. Level 3 valuations incorporate certain assumptions and projections in determining the fair value assigned to such instruments.

A financial instrument's categorization within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement. Investments valued using NAV as a practical expedient are excluded from this hierarchy. At September 30, 2021 and December 31, 2020, the fair value of these investments using the NAV per share practical expedient was $226.1 million and $221.9 million, respectively. During the three and nine months ended September 30, 2021, $17.6 million and $21.4 million of gain, respectively, was recognized from changes in NAV, compared to $0.8 million of gain and $19.3 million of loss for the three and nine months ended September 30, 2020, respectively. These changes in NAV are recorded within the investment income (loss) on our condensed consolidated statements of operations.

The availability of observable inputs can vary by types of assets and liabilities and is affected by a wide variety of factors, including, for example, whether an instrument is established in the marketplace, the liquidity of markets and other characteristics particular to the transaction. To the extent that valuation is based on models or inputs that are less observable or unobservable in the market, the determination of fair value requires more judgment. Accordingly, the degree of judgment exercised by management in determining fair value is greatest for assets and liabilities categorized in Level 3.

*Financial instruments measured at fair value on a recurring basis*

The Company's financial assets and liabilities carried at fair value on a recurring basis, including the level in the fair value hierarchy, on September 30, 2021 and December 31, 2020 are presented below (in thousands).

| | As of September 30, 2021 | | | |
| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Assets: | | | | |
| Investments in put options | $ 2,995 | $ — | $ — | $ 2,995 |
| Investments in life insurance policies | — | — | 761,560 | 761,560 |

| | As of December 31, 2020 | | | |
| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Assets: | | | | |
| Investments in put options | $ 7,017 | $ — | $ — | $ 7,017 |
| Investments in life insurance policies | — | — | 791,911 | 791,911 |

The following is a description of the valuation methodologies used for financial instruments measured at fair value on a recurring basis:

*Investments in put options*

On July 17, 2020, Ben LP, through its subsidiary CT Risk Management, L.L.C., made aggregate payments of $14.8 million to purchase put options against a decrease in the S&P 500 Index. The options have an aggregate notional amount of $300.0 million and are designed to protect the net asset value of the interests in alternative assets that support the Collateral to Beneficient's loan portfolio against market risk. One-half of the put options expire in July 2022 with the remaining put options expiring in July 2023. Changes in the fair value of the options are recognized directly in earnings. The fair value of the options is recorded in the other assets line item of the condensed consolidated balance sheets, and changes in the fair value of the options are recognized directly in earnings in the other income (loss) line item of the condensed consolidated statements of operations.

APP. 740

Page 23

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

*Repurchase options*

Repurchase options were fair valued using a Black-Scholes option pricing model with a time-dependent strike price for the repurchase price. The option pricing model has assumptions related to a period of restricted exercise price, dividend yield, underlying NAVs, alternative asset growth rates, volatilities, and market discount rate. The Company uses Level 3 inputs for its fair value estimates. The unrealized impact of this Level 3 measurement on earnings is reflected in investment income (loss).

The following table reconciles the beginning and ending fair value of our Level 3 repurchase options (in thousands). The three months ended September 30, 2021, is not presented as the repurchase options, all of which were unexercised, expired during the third and fourth quarters of 2020, which is recognized in the investment income (loss) line item of the condensed consolidated statement of operations. Additionally, during the three and nine months ended September 30, 2020, $0.8 million of gain and $19.3 million of loss, respectively, was recognized from changes in NAV, which is recorded within investment income (loss) on our consolidated statements of operations.

| | Three Months Ended September 30, 2020 | | Nine Months Ended September 30, 2020 | |
|---|---:|---|---:|---|
| Beginning balance | $ | 56,660 | $ | 61,664 |
| Total gain in earnings[1] | | (55,930) | | (60,934) |
| Purchases | | — | | — |
| Settlements | | — | | — |
| Ending balance | $ | 730 | $ | 730 |

_____

[1]    Net change in fair value.

The following table provides quantitative information about the significant unobservable inputs used in the fair value measurement of the Level 3 repurchase options as of September 30, 2020 (dollars in thousands):

| Valuation Date | Fair Value | Valuation Methodology | Unobservable Inputs | Range of Targets |
|---|---|---|---|---|
| September 30, 2020 | $    730 | Option Pricing Model | Alternative asset market discount rate | 0.085 |
| | | | Dividend yield | .10 - .53 |
| | | | Net asset value growth rates | 0.085 |
| | | | Net asset value volatilities | 0.24 - 0.45 |
| | | | Restricted exercise period | 1 year |

*Investments in life insurance policies*

The estimated fair value of our portfolio of life insurance policies is determined on a quarterly basis by management taking into consideration a number of factors, including changes in discount rate assumptions, estimated premium payments and life expectancy estimate assumptions, as well as any changes in economic and other relevant conditions. The discount rate incorporates information about discount rates observed in the life insurance secondary market through competitive bidding observations (which have declined recently as a result of our decreased purchase activity) and other means, fixed income market interest rates, the estimated credit exposure to the insurance companies that issued the life insurance policies and management's estimate of the operational risk yield premium a purchaser would require to receive the future cash flows derived from our portfolio as a whole. The determination of the discount rate used in the valuation of the Company's life insurance policies requires management judgment and incorporates information that is reasonably available to management as of the date of the valuation.

Under our Longest Life Expectancy portfolio valuation methodology, we: i) utilize life expectancy reports from third-party life expectancy providers for the pricing of all life insurance policies at the time of purchase; ii) apply a stable valuation methodology driven by the experience of our life insurance portfolio, which is re-evaluated if experience deviates by a specified margin; and iii) use relevant market observations that can be validated and mapped to the discount rate used to value the life insurance portfolio.

APP. 743

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

These inputs are then used to estimate the discounted cash flows from the portfolio using the ClariNet LS probabilistic and stochastic portfolio pricing model from ClearLife Limited, which estimates the expected cash flows using various mortality probabilities and scenarios. The valuation process includes a review by senior management as of each quarterly valuation date. We also engage ClearLife Limited to prepare a net present value calculation of our life insurance portfolio using the inputs we provide on a quarterly basis.

As discussed in further detail in Note 4 above, during the second quarter of 2021, we recalculated the PMM in accordance with our valuation methodology, which resulted in a $16.4 million downward adjustment to the value of the life insurance portfolio during the quarter ended June 30, 2021.

The following table reconciles the beginning and ending fair value of our Level 3 investments in our portfolio of life insurance policies (in thousands):

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|  | 2021 | 2020 | 2021 | 2020 |
|---|---|---|---|---|
| Beginning balance | $ 770,026 | $ 794,706 | $ 791,911 | $ 796,039 |
| Total gain in earnings[1] | 3,860 | 6,021 | 623 | 23,476 |
| Settlements[2] | (12,326) | (13,467) | (30,974) | (32,255) |
| Ending balance | $ 761,560 | $ 787,260 | $ 761,560 | $ 787,260 |

(1)   Net change in fair value
(2)   Policy maturities at initial cost basis

The net activity in the table above is reported in gain on life insurance policies, net, in the condensed consolidated statements of operations. There have been no transfers between levels in the fair value hierarchy for any assets or liabilities recorded at fair value on a recurring basis or any changes in the valuation techniques used for measuring the fair value as of September 30, 2021 and December 31, 2020.

The following table summarizes the inputs utilized in estimating the fair value of our portfolio of life insurance policies:

|  | As of September 30, 2021 | As of December 31, 2020 |
|---|---|---|
| Weighted-average age of insured, years* | 83.6 | 83.1 |
| Age of insured range, years | 64-101 | 63-100 |
| Weighted-average life expectancy, months* | 77.3 | 83.0 |
| Life expectancy range, months | 0-240 | 0-240 |
| Average face amount per policy (in thousands) | $ 1,831 | $ 1,797 |
| Discount rate | 8.25 % | 8.25 % |

(*)   Weighted-average by face amount of policy benefits

Life expectancy estimates and market discount rates for a portfolio of life insurance policies are inherently uncertain and the effect of changes in estimates may be significant. For example, if the life expectancy estimates were increased or decreased by four and eight months on each outstanding policy, and the discount rates were increased or decreased by 1% and 2%, with all other variables held constant, the fair value of our investment in life insurance policies would increase or decrease as summarized below (in thousands):

Page 25

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

| | Change in Life Expectancy Estimates | | | |
| | Minus 8 Months | Minus 4 Months | Plus 4 Months | Plus 8 Months |
|---|---|---|---|---|
| September 30, 2021 | $ 101,300 | $ 50,567 | $ (50,412) | $ (100,637) |
| December 31, 2020 | $ 97,837 | $ 45,536 | $ (61,713) | $ (114,099) |
| | Change in Discount Rate | | | |
| | Minus 2% | Minus 1% | Plus 1% | Plus 2% |
| September 30, 2021 | $ 76,055 | $ 36,295 | $ (33,232) | $ (63,747) |
| December 31, 2020 | $ 82,983 | $ 39,560 | $ (36,151) | $ (69,284) |

*Financial instruments measured at fair value on a non-recurring basis*

There were no assets or liabilities measured at fair value on a non-recurring basis as of September 30, 2021 and December 31, 2020, respectively.

*Carrying amounts and estimated fair values*

The Company is required to disclose the estimated fair value of financial instruments, whether or not recognized in the condensed consolidated balance sheets, for which it is practicable to estimate those values. These fair value estimates are determined based on relevant market information and information about the financial instruments. Fair value estimates are intended to represent the price at which an asset could be sold or the price at which a liability could be settled. However, given there is no active market or observable market transactions for many of the Company's financial instruments, estimates of fair values are subjective in nature, involve uncertainties and matters of significant judgment and therefore cannot be determined with precision. Changes in assumptions could significantly affect the estimated values. Nonfinancial instruments are excluded from disclosure requirements.

The carrying amounts and estimated fair values of the Company's financial instruments not recorded at fair value were as noted in the tables below (in thousands).

| | As of September 30, 2021 | | |
| | Level in Fair Value Hierarchy | Carrying Amount | Estimated Fair Value |
|---|---|---|---|
| Financial assets: | | | |
| Cash, cash equivalents and restricted cash | 1 | $ 67,723 | $ 67,723 |
| Life insurance policy benefits receivable, net | 1 | 33,105 | 33,105 |
| Financial liabilities: | | | |
| Senior credit facility with LNV Corporation | 2 | $ 327,702 | $ 229,862 |
| L Bonds and Seller Trust L Bonds | 1 | 1,551,912 | 1,551,912 |
| Debt due to related parties | 2 | 77,362 | 76,519 |
| Other liabilities | 1 | 54,888 | 54,888 |

Page 26

APP. 745

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

| | As of December 31, 2020 | | |
| --- | --- | --- | --- |
| | Level in Fair Value Hierarchy | Carrying Amount | Estimated Fair Value |
| Financial assets: | | | |
| Cash, cash equivalents and restricted cash | 1 | $ 124,160 | $ 124,160 |
| Life insurance policy benefits receivable, net | 1 | 14,334 | 14,334 |
| Financial liabilities: | | | |
| Senior credit facility with LNV Corporation | 2 | $ 193,730 | $ 202,611 |
| L Bonds and Seller Trust L Bonds | 1 | 1,519,006 | 1,519,006 |
| Debt due to related parties | 2 | 76,260 | 78,081 |
| Other liabilities | 1 | 50,585 | 50,585 |

Other liabilities are comprised of the interest and dividends payable and accounts payable and accrued expenses line items on the condensed consolidated balance sheets as of September 30, 2021 and December 31, 2020.

Certain assets are subject to periodic impairment testing by comparing the respective carrying value of the asset to its estimated fair value. In the event we determine these assets to be impaired, we would recognize an impairment loss equal to the amount by which the carrying value of the impaired asset exceeds its estimated fair value. These periodic impairment tests utilize company-specific assumptions involving significant unobservable inputs, or Level 3, in the fair value hierarchy.

**(7) Equity Method Investments**

*FOXO Technologies Inc. (formerly, FOXO BioScience LLC)*

On November 11, 2019, GWG Holdings contributed the common stock and membership interests of its wholly-owned subsidiaries, FOXO Labs and FOXO Life ("Insurtech Subsidiaries"), to a legal entity then known as FOXO BioScience LLC, in exchange for a membership interest in FOXO. On November 13, 2020, FOXO BioScience LLC converted to a corporation and is now known as FOXO Technologies Inc. With the conversion to a corporation, GWG Holdings' previous membership interest in the LLC converted to preferred equity in FOXO. Although GWG Holdings has a financial interest in FOXO, GWG Holdings does not have a controlling financial interest because another party is the majority shareholder of the voting class of securities. Therefore, we account for GWG Holdings' ownership interest in FOXO as an equity method investment.

The following table includes a rollforward of the equity method investment in FOXO (in thousands):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2021 | 2020 | 2021 | 2020 |
| Beginning balance | $ 4,363 | $ 7,773 | $ 8,582 | $ 1,761 |
| Contributions | 1,250 | 3,884 | 3,750 | 13,051 |
| Loss on equity method investment | (4,949) | (1,431) | (11,898) | (4,279) |
| Other | — | 10 | 230 | (297) |
| Ending balance | $ 664 | $ 10,236 | $ 664 | $ 10,236 |

As of September 30, 2021, GWG Holdings has fully contributed its commitment to FOXO in accordance with the related subscription agreement and has no other outstanding capital commitments to FOXO. GWG Holdings' investment in FOXO is presented in other assets in our condensed consolidated balance sheets. Our proportionate share of earnings or losses from our investee is recognized in earnings (loss) from equity method investments in our condensed consolidated statements of operations.

**(8) Variable Interest Entities**

In accordance with ASC 810, *Consolidation*, the Company assesses whether it has a variable interest in legal entities in which it has a financial relationship and, if so, whether or not those entities are variable interest entities ("VIEs"). For those entities that

APP. 746

APP. 747

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

qualify as VIEs, ASC 810 requires the Company to determine if the Company is the primary beneficiary of the VIE, and if so, to consolidate the VIE.

*VIEs for Which the Company is the Primary Beneficiary*

ExAlt Trusts

The Company determined that the ExAlt Trusts used in connection with Beneficient's operations are VIEs of which Beneficient is the primary beneficiary. The Company concluded that Beneficient is the primary beneficiary of the trusts as it has the power to direct the most significant activities and has an obligation to absorb potential losses of the trusts. Accordingly, the results of the trusts are included in the Company's condensed consolidated financial statements. The assets of the trusts may only be used to settle obligations of the trusts. Other than potentially funding capital calls above the related reserve (refer to Note 15), there is no recourse to the Company for the trusts' liabilities.

The cash flows generated by these VIEs are included within the Company's consolidated statements of cash flows. The consolidated balance sheets include the following amounts from these consolidated VIEs as of the dates presented (in thousands):

|  | September 30, 2021 | December 31, 2020 |
|---|---|---|
| **Assets:** | | |
| Cash and cash equivalents | $ 2,240 | $ 5,965 |
| Restricted cash | 4,469 | 5,386 |
| Investments in alternative assets, at NAV | 226,138 | 221,894 |
| Other assets | 1,278 | 1,273 |
| Total Assets of VIE | $ 234,125 | $ 234,518 |
| | | |
| **Liabilities:** | | |
| Accounts payable and accrued expense | $ 2,065 | $ 2,029 |
| Total Liabilities of VIE | $ 2,065 | $ 2,029 |
| | | |
| **Equity (Deficit):** | | |
| Noncontrolling interest | $ (14,469) | $ 7,208 |
| Total Equity of VIE | $ (14,469) | $ 7,208 |

The consolidated statement of operations for the three and nine months ended September 30, 2021 and 2020, includes the following amounts from these consolidated VIEs (in thousands):

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | **2021** | **2020** | **2021** | **2020** |
| REVENUE | | | | |
| Investment income, net | $ 17,554 | $ 56,705 | $ 21,417 | $ 41,590 |
| Interest income | — | — | — | 20 |
| TOTAL REVENUE | 17,554 | 56,705 | 21,417 | 41,610 |
| EXPENSES | | | | |
| Other expenses | 215 | 162 | 572 | 330 |
| TOTAL EXPENSES | 215 | 162 | 572 | 330 |
| NET INCOME | 17,339 | 56,543 | 20,845 | 41,280 |
| Net (income) loss attributable to noncontrolling interests | (2,936) | (33,926) | (20,931) | 9,795 |
| NET INCOME (LOSS) ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ 14,403 | $ 22,617 | $ (86) | $ 51,075 |

CT Risk Management L.L.C.

On March 20, 2020, CT Risk Management, L.L.C. ("CT") was created as a Delaware limited liability company to reduce the impact of a potential market downturn on the interests in alternative assets that support the Collateral for receivables held by Beneficient by distributing any potential profits to certain of the ExAlt Trusts thereby offsetting any reduction in the value of the alternative assets. The LLC agreement was amended and restated on April 16, 2020. There was no activity of CT until July

APP. 748

Page 28

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

2020 when Beneficient made a capital contribution of $14.8 million, which was used to purchase the put options reflected in the condensed consolidated balance sheets as of September 30, 2021 and December 31, 2020.

CT is considered a VIE as the at-risk equity holder, Ben LP, does not have all of the characteristics of a controlling financial interest due to Ben LP's receipt of returns being limited to its initial investment in CT. The Company concluded that Beneficient is the primary beneficiary of CT as it has the power to direct the most significant activities and has an obligation to absorb potential losses of CT. Accordingly, the results of CT are included in the Company's condensed consolidated financial statements.

As of September 30, 2021 and December 31, 2020, the condensed consolidated balance sheets include assets of this consolidated VIE with a carrying value of $3.0 million and $7.0 million, respectively, which is recorded in the other assets line item. Additionally, the Company recorded a $0.2 million gain and $4.0 million loss on investment for the three and nine months ended September 30, 2021, respectively, compared to a $3.2 million loss on investment for both of the same periods of 2020. The gain (loss) on investment is reported in the other income (loss) line item of the condensed consolidated statements of operations.

*VIEs for Which the Company is Not the Primary Beneficiary*

We determined that FOXO is a VIE, but that we are not the primary beneficiary of the variable interests. We do not have the power to direct any activities of FOXO that most significantly impact its economic performance. The Company's exposure to risk of loss in FOXO is limited to its equity method investment in the preferred equity of FOXO and its remaining unfunded capital commitments.

The following table shows the classification, carrying value and maximum exposure to loss with respect to the Company's unconsolidated VIEs (in thousands):

|  | September 30, 2021 | | December 31, 2020 | |
| --- | --- | --- | --- | --- |
|  | Carrying Value | Maximum Exposure to Loss | Carrying Value | Maximum Exposure to Loss |
| Total equity method investment | $ 664 | $ 664 | $ 8,582 | $ 12,332 |

**(9) Debt**

***Senior Credit Facility with LNV Corporation***

On September 7, 2021, DLP IV entered into a Fourth Amended and Restated Loan and Security Agreement with LNV Corporation, as lender, and CLMG Corp., as the administrative agent on behalf of the lenders under the agreement (the "Fourth LNV Credit Facility"). The Fourth LNV Credit Facility replaced the Third LNV Credit Facility (as defined below), that previously governed the Company's senior credit facility. The Fourth LNV Credit Facility resulted in an additional advance of $30.3 million from LNV Corporation, paid on September 7, 2021.

Subject to available borrowing base capacity, additional advances are available under the Fourth LNV Credit Facility at the LIBOR rate described below. Such advances are available to pay the premiums and servicing costs of pledged life insurance policies as such amounts become due. Interest accrued on amounts borrowed under the Third LNV Credit Facility at an annual interest rate, determined as of each date of borrowing or quarterly if there is no borrowing, equal to (a) the greater of 1.50% or 12-month LIBOR, plus (b) 7.50% per annum. Under the Fourth LNV Credit Facility, all advances bear interest at a rate of the Benchmark Rate plus the Applicable Margin (as defined below), or the Default Rate (as defined below) if an event of default has occurred and is continuing. For purposes of the Fourth LNV Credit Facility, (i) the "Benchmark Rate" is the greater of (a) the sum of (i) the Federal Funds Rate plus (ii) one-half of one percent (0.50%) and (b) one and one half of one percent (1.50%); (ii) the "Applicable Margin" is seven and one half percent (7.50%); and (iii) the "Default Rate" is the Benchmark Rate plus nine and one half percent (9.50%). The effective rate at September 30, 2021 was 9.00%. Interest payments are made on a quarterly basis.

Under the Fourth LNV Credit Facility, DLP IV has granted the administrative agent, for the benefit of the lenders under the agreement, a security interest in all of DLP IV's assets. Obligations under the Fourth LNV Credit Facility are secured by a security interest in DLP IV's assets, for the benefit of the lenders, through an arrangement under which Wells Fargo Bank, N.A.

Page 29                                                                                                                APP. 750

APP. 751

Table Of Contents

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

serves as securities intermediary. The life insurance policies owned by DLP IV do not serve as direct collateral for the obligations of GWG Holdings under the L Bonds and Seller Trust L Bonds.

Prior to the Fourth LNV Credit Facility, on June 28, 2021, DLP IV entered into the third amended and restated senior credit facility with LNV Corporation, the ("Third LNV Credit Facility")), as lender, and CLMG Corp., as the administrative agent on behalf of the lenders under the agreement, which replaced the second amended and restated senior credit facility with LNV Corporation ("Second LNV Credit Facility") dated November 1, 2019 that previously governed DLP IV's senior credit facility. The Third LNV Credit Facility resulted in an additional advance of $52.5 million from LNV Corporation, which was subsequently repaid on August 11, 2021, using a portion of the advance received from the NF Credit Facility (as defined and discussed below).

In conjunction with entering into the Second LNV Credit Facility, DLP IV pledged life insurance policies having an aggregate face value of approximately $298.3 million as additional collateral and received an advance of approximately $37.1 million (inclusive of certain fees and expenses incurred in connection with the negotiation and entry into the Second LNV Credit Facility). In conjunction with entering into the Third LNV Credit Facility, DLP V transferred life insurance policies having an aggregate face value of approximately $440.6 million to DLP IV, which were pledged as additional collateral to the Third LNV Credit Facility, and DLP IV received proceeds of approximately $51.2 million (net of certain fees and expenses incurred in connection with the negotiation and entry into the Third LNV Credit Facility). As of September 30, 2021, 77.0% of the total face value of the life insurance policies portfolio is pledged to LNV Corporation.

The LNV Credit Facility has certain financial and nonfinancial covenants. In addition, the LNV Credit Facility has certain reporting obligations that require DLP IV to deliver unaudited quarterly financial statements no later than forty-five days after the end of each of the first three fiscal quarters, and audited annual financial statements no later than ninety days after the end of each fiscal year. We were in compliance with these covenants at September 30, 2021, and continue to be as of the date of this filing.

The Fourth LNV Credit Facility makes available a total of up to $300.0 million in credit to DLP IV with a maturity date of September 27, 2029. The principal amount outstanding under this facility was $229.9 million and $202.6 million at September 30, 2021 and December 31, 2020, respectively. There were unamortized deferred financing costs of $7.9 million and $8.9 million as of September 30, 2021 and December 31, 2020, respectively. The difference between the amount outstanding and the carrying amount on our condensed consolidated balance sheets is due to netting of unamortized debt issuance costs.

### National Founders LP Credit Agreement

On August 11, 2021, GWG DLP Funding VI, LLC, a Delaware limited liability company ("DLP VI"), entered into a Credit Agreement (the "NF Credit Agreement") with each lender from time to time party thereto and National Founders LP, a Delaware limited partnership, as the administrative agent (the credit facility evidenced by such NF Credit Agreement, the "NF Credit Facility"). DLP VI is a wholly owned subsidiary of GWG DLP Funding Holdings VI, LLC, a Delaware limited liability company (the "DLP Holdings VI"). DLP Holdings VI is a wholly owned subsidiary of GWG Life.

On August 11, 2021, a one-time advance of approximately $107.6 million was made to the DLP VI under the NF Credit Facility with a scheduled maturity date of August 11, 2031. Amounts borrowed under the NF Credit Facility bear interest on each day on the outstanding principal amount on such day at a per annum rate, determined on a daily basis, generally equal to 5.5% up to a 65% of the loan to value percent as calculated in accordance with the NF Credit Agreement, and 7.0% on anything above that loan to value percent. In particular, amounts borrowed under the NF Credit Facility bear interest on each day on the outstanding principal amount on such day at a per annum rate equal to the Interest Rate as of such day, or the Default Rate as of such day if an event of default has occurred and is continuing. The "Interest Rate" as of such day is equal to the sum of: (a) the percentage equal to (i) the Non-Higher Rate Factor as of such date of determination multiplied by (ii) 5.50%; and (b) the percentage equal to (i) the Higher Rate Factor as of such date of determination multiplied by (ii) 7.00%. "Non-Higher Rate Factor" means, as of any date of determination, the percentage equal to (i) 100% minus (ii) the Higher Rate Factor as of such date of determination, and "Higher Rate Factor" means, as of any date of determination, the percentage equal to (i) the greater of (a) the amount equal to (1) the LTV Percentage (as defined in the NF Credit Agreement) as of such date of determination minus (2) 65% and (b) zero percent divided by (ii) the LTV Percentage as of such date of determination. The "Default Rate" as of such day is equal to the sum of: (a) the Interest Rate as of such day and (b) 2.00%. Interest payments are made on a monthly basis. The effective rate at September 30, 2021 was 5.61%.

APP. 752

APP. 753

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 754 of 1031    PageID 926

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

Under the NF Credit Facility, each of DLP VI and DLP Holdings VI has granted the administrative agent, for the benefit of the lenders under the agreement, a security interest in substantially all of GWG Holdings' remaining life insurance policy assets not pledged by DLP IV under its LNV Credit Facility. In addition, amounts owing under the NF Credit Facility have been guaranteed by GWG Holdings upon the occurrence of a Guarantee Trigger Event (as defined in the guarantee), including certain bankruptcy events related to the DLP VI or DLP Holdings VI or a Change in Control (as defined in the NF Credit Agreement).

A portion of the proceeds from the funding under the NF Credit Facility was used to purchase life insurance policies that were owned by DLP IV, which used the funds to repay the most recent advance of $52.5 million plus interest and penalties under the LNV Credit Facility described above. At August 11, 2021, the aggregate face value of life insurance policies owned by DLP VI, was approximately $433.1 million. As of such date, the aggregate face value of life insurance policies owned by DLP IV was approximately $1.42 billion. As of September 30, 2021, 23.0% of the total face value of the life insurance policies portfolio is pledged to National Founders LP.

GWG Holdings secures L Bonds with (1) a pledge of collateral security in its ownership interests in GWG Life and GWG Holdings' other direct subsidiaries; (2) GWG Life's ownership in its direct subsidiaries that own directly or indirectly a large actuarially diverse portfolio of life insurance policies of highly rated insurance companies; and (3) investments in Beneficient. Subsequent to entering into the NF Credit Facility, substantially all of our life insurance policies are held by DLP IV or DLP VI. The policies held by DLP IV and DLP VI are not direct collateral for the L Bonds as such policies are pledged under the LNV Credit Facility and NF Credit Facility, respectively. Furthermore, L Bonds are secured by a pledge of approximately 4.0 million shares of GWG Holdings' common stock. GWG Holdings' most significant assets are cash and its investments in subsidiaries. These assets were not pledged under the NF Credit Facility.

The NF Credit Facility has certain financial and nonfinancial covenants, and we were in compliance with these covenants as of the date of this filing. In addition, the NF Credit Facility has certain reporting obligations that require DLP VI to deliver audited annual consolidated financial statements of DLP Holdings VI no later than 150 days after the end of each fiscal year (beginning with the fiscal year ending December 31, 2021) and unaudited quarterly consolidated financial statements of DLP Holdings VI no later than 90 days after the end of each of DLP VI's first three fiscal quarters (beginning with the fiscal quarter ending September 30, 2021). The NF Credit Facility also has customary events of default for a facility of this type. We were in compliance with these covenants at September 30, 2021, and continue to be as of the date of this filing.

DLP VI may voluntarily prepay amounts owing under the NF Credit Facility upon payment of all accrued and unpaid interest on such prepaid amounts and payment of the applicable Prepayment Premium (as defined in the NF Credit Agreement).

The principal amount outstanding under this facility was $107.6 million as of September 30, 2021. There were unamortized deferred financing costs of $1.9 million as of September 30, 2021. The difference between the amount outstanding and the carrying amount on our condensed consolidated balance sheets is due to netting of unamortized debt issuance costs.

***L Bonds***

GWG Holdings began publicly offering and selling L Bonds in January 2012, which have been sold under various registration statements since that time. On December 1, 2017, an additional public offering was declared effective permitting us to sell up to $1.0 billion in principal amount of L Bonds on a continuous basis until December 2020. We reached the maximum capacity on this offering during the third quarter of 2020.

On June 3, 2020, a registration statement relating to an additional public offering was declared effective permitting us to sell up to $2.0 billion in principal amount of L Bonds on a continuous basis through June 2023. These bonds contain the same terms and features as our previous offerings.

We are party to an indenture governing the L Bonds dated October 19, 2011, as amended ("Indenture"), under which GWG Holdings is obligor, GWG Life is guarantor, and Bank of Utah serves as indenture trustee. Effective December 31, 2019, we entered into Amendment No. 2 to the indenture, which primarily modified the calculation of the debt coverage ratio to allow the Company greater flexibility to finance and to anticipate the potential impacts of GWG Holdings' relationship with Beneficient.

We were in compliance with the covenants of the indenture at September 30, 2021, and as of the date of this filing, and no Events of Default (as defined in the Amended and Restated Indenture) existed as of such dates.

APP. 754

Page 31

APP. 755

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

GWG Holdings publicly offers and sells L Bonds under a registration statement declared effective by the SEC and have issued Seller Trust L Bonds under the L Bond Supplemental Indenture, as described below. We temporarily suspended the offering of GWG Holdings' L Bonds, commencing April 16, 2021, as a result of our delay in filing certain periodic reports with the SEC, including this Quarterly Report on Form 10-Q. We anticipate recommencing the offering of GWG Holdings' L Bonds when we regain compliance with SEC filing requirements.

The bonds have renewal features under which we may elect to permit their renewal, subject to the right of bondholders to elect to receive payment at maturity. Interest is payable monthly or annually depending on the election of the investor.

At September 30, 2021 and December 31, 2020, the weighted-average interest rate of GWG Holdings' L Bonds was 7.25% and 7.21%, respectively. The principal amount of L Bonds outstanding, including Liquidity Bonds discussed below, was $1.3 billion as of both September 30, 2021 and December 31, 2020, respectively. The difference between the amount of outstanding L Bonds and the carrying amount on our condensed consolidated balance sheets is due to netting of unamortized deferred issuance costs, cash receipts for new issuances, and payments of redemptions in process. There were $12.7 million of redemptions in process and $18.0 million of subscriptions in process as of September 30, 2021 and December 31, 2020, respectively. Amortization of deferred issuance costs was $5.1 million and $4.3 million for the three months ended September 30, 2021 and 2020, respectively. Amortization of deferred issuance costs was $15.4 million and $12.4 million for the nine months ended September 30, 2021 and 2020, respectively. Future expected amortization of deferred financing costs as of September 30, 2021 is $44.0 million in total over the next seven years.

### Seller Trust L Bonds

On August 10, 2018, in connection with the initial transfer of the Exchange Transaction described in Note 1, GWG Holdings issued Seller Trust L Bonds in the amount of $366.9 million to the Seller Trusts. The maturity date of the Seller Trust L Bonds is August 9, 2023. The Seller Trust L Bonds bear interest at 7.50% per year. Interest is payable monthly in cash.

After December 28, 2020, the holders of the Seller Trust L Bonds have the right to cause GWG Holdings to repurchase, in whole but not in part, the Seller Trust L Bonds held by such holder. The repurchase may be paid, at the option of GWG Holdings, in the form of cash, and/or a pro rata portion of (i) the outstanding principal amount and accrued and unpaid interest under the Commercial Loan Agreement and (ii) Common Units, or a combination of cash and such property.

GWG Holdings' L Bonds are offered and sold under a registration statement declared effective by the SEC, as described above, and GWG Holdings has issued Seller Trust L Bonds under the L Bond Supplemental Indenture.

As a result of the Collateral Swap on September 30, 2020, as discussed in Note 1, $94.8 million of Seller Trust L Bonds are now held by certain trusts within the ExAlt Trusts, and are eliminated in consolidation.

The principal amount of Seller Trust L Bonds outstanding reflected on the condensed consolidated balance sheets was $272.1 million at both September 30, 2021 and December 31, 2020.

### Liquidity Bonds

On December 31, 2020, GWG Holdings, GWG Life, and Bank of Utah, as trustee (the "Trustee"), entered into a supplemental indenture, dated as of December 31, 2020 (the "Liquidity Bond Supplemental Indenture"), to that certain Amended and Restated Indenture, dated as of October 23, 2017 (as amended, the "Indenture"), among GWG Holdings, GWG Life and the Trustee, providing for the issuance from time to time of up to $1.0 billion in aggregate principal amount of two new series of L Bonds (the "Liquidity Bonds"). The Liquidity Bonds were offered and sold to accredited investors in transactions that are exempt from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act"), pursuant to Regulation D under the Securities Act.

The Liquidity Bonds were issued as part of the Company's strategy to expand its exposure to a portfolio of loans collateralized by cash flows from illiquid alternative assets; however, the Company has decided during the second quarter 2021 to cease the offering of these Liquidity Bonds at this time, but will consider replacing with other similar securities as needed to execute the Company's strategy. Ben LP is now in the process of reevaluating its strategy and does not believe the decision to cease offering the Liquidity Bonds will have a significant impact on our future operating performance

APP. 756

Page 32

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 758 of 1031    PageID 930

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

As of September 30, 2021 and December 31, 2020, there was $0.8 million and $0.5 million in principal and, as of both dates, $0.2 million of unamortized financing costs of Liquidity Bonds, respectively. The net of these amounts is presented on the condensed consolidated balance sheets in the L Bonds line item.

**Debt Due to Related Parties**

As of September 30, 2021 and December 31, 2020, Beneficient had borrowings that consisted of the following (in thousands):

|  | September 30, 2021 | December 31, 2020 |
| --- | ---: | ---: |
| First Lien Credit Agreement | $ 2,366 | $ 2,288 |
| Second Lien Credit Agreement | 74,738 | 72,260 |
| Other borrowings | 2,699 | 2,628 |
| Unamortized debt discounts | (2,441) | (916) |
| Total debt due to related parties | $ 77,362 | $ 76,260 |

*Beneficient First and Second Lien Credit Agreement*

On May 15, 2020, Beneficient executed a Term Sheet with HCLP Nominees, L.L.C. ("HCLP" or the "Lender") to amend its then senior credit agreement and subordinated credit agreement. The resulting Second Amended and Restated First Lien Credit Agreement and Second Amended and Restated Second Lien Credit Agreement (collectively, the "Ben Credit Agreements") was executed on August 13, 2020, with terms and conditions substantially consistent with the Term Sheet, as further described below. The Ben Credit Agreements extended the maturity date of both loans to April 10, 2021, and increased the interest rate on each loan to 1-month LIBOR plus 8.0%, with a maximum interest rate of 9.5%. Through September 30, 2021, all principal and interest due under the Ben Credit Agreements have been paid.

On March 10, 2021, Beneficient Capital Company II, L.L.C. (formerly known as Beneficient Capital Company, L.L.C.) and Beneficient Company Holdings, L.P. (the "New Borrower"), both of which are subsidiaries of the Company, entered into Amendment No. 1 to the Second Amended and Restated Credit Agreement (the "First Lien Amendment") and Amendment No. 1 to the Second Amended and Restated Second Lien Credit Agreement (the "Second Lien Amendment" and, together with the First Lien Amendment, the "Amendments") with the Lender. The Amendments extend the scheduled maturity date under the Ben Credit Agreements from April 10, 2021 to May 30, 2022. The Amendments also provide that the New Borrower shall repay $5.0 million of the outstanding principal amount under the Ben Credit Agreements on each of September 10, 2021 (subsequently deferred as discussed below), December 10, 2021, and March 10, 2022. The Amendments also provide for an extension fee equal to 1.5% of the outstanding principal under the Ben Credit Agreements, which was added to the outstanding amount under the Ben Credit Agreements as provided for in the amendments. Effective July 15, 2021, Beneficient executed Consent and Amendment No. 3 to the Second Amended and Restated Credit Agreement and Amendment No. 2 to the Second Amended and Restated Subordinate Credit Agreement with its lender, which (i) deferred the payment of all accrued and unpaid interest until December 10, 2021, and (ii) deferred the installment payment of $5.0 million due on September 10, 2021, to December 10, 2021. Beneficient agreed to pay an amendment fee to the lender in an amount equal to 3% of the then outstanding principal and interest on December 10, 2021.

On June 28, 2021, Beneficient executed the Amendment No. 2 to the Second Amended and Restated Credit Agreement and Amendment No. 2 to the Second Amended and Restated Subordinate Credit Agreement with its lender. The amendments, among other things, eliminated the obligation of DLP V to assume the Ben Credit Agreements as provided for in the Ben Credit Agreements and waive the daily fee payable upon the Trigger as provided for in the Amendments.

In connection with the Ben Credit Agreements, (i) the Lender will be permitted to make capital contributions of up to $152.0 million in exchange for a Preferred Series A Subclass 1 Unit Account of BCH for an equal amount of cash for two years after the assumption of the loans; should the Lender elect to make such a capital contribution, GWG Holdings or one of its subsidiaries will be allowed to exchange an amount of Preferred C into Preferred Series A Subclass 1 Unit Accounts or contribute cash for Preferred Series A Subclass 1 Unit Accounts, in certain circumstances, in order to maintain its relative ownership percentage of the Preferred Series A Subclass 1 Unit Accounts; (ii) Beneficient Holdings, Inc. ("BHI"), which owns a majority of the Class S Ordinary Units, Preferred Series A Subclass 1 Unit Accounts, and FLP Subclass 1 Unit Accounts issued by BCH, will grant certain tax-related concessions related to the transaction to the Lender as may be mutually agreed upon between the parties, and (iii) in exchange for the tax-related concessions to be agreed between the parties, (a) 5% of BHI's

APP. 758

Page 33

---

Page 33

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

Preferred Series A Sub Class 1 Unit Account, which will be held by the Lender, may convert, upon delivery of notice by BHI or its designee, to a Preferred A.0 Unit Account of BCH, and (b) recipients of a grant of Preferred Series A Subclass 1 Unit Accounts from BHI will have the right to put an amount of Preferred Series A Subclass 1 Unit Accounts to Ben LP equal to any associated tax liability stemming from any such grant; provided that the aggregated associated tax liability shall not relate to more than $30 million of grants of Preferred Series A Subclass 1 Unit Accounts from BHI; and provided, further, that such a put cannot be exercised prior to July 1, 2021. There has been no liability recorded for the put right as of September 30, 2021, as the transfer of Preferred Series A Subclass Unit Accounts has not occurred.

The Ben Credit Agreements and ancillary documents contain covenants that (i) prevent Beneficient from issuing any securities senior to the Preferred Series A Subclass 1 or Preferred A.0 Unit Accounts; (ii) prevent Beneficient from incurring additional debt or borrowings greater than $10.0 million, other than trade payables, while the loans are outstanding; (iii) prevent, without the written consent of the Lender, GWG Life Trust or DLP V from selling, transferring or otherwise disposing any of the life insurance policies held by GWG Life Trust as of May 15, 2020, except that life insurance policies may be sold, transferred, or otherwise disposed of, provided that concurrent with the assumption of the loans by DLP V, a prepayment of the loans would be required, if necessary, to maintain certain loan-to-value percentages, after giving effect to such sale, transfer or disposal; and (iv) prevent, without the written consent of the Lender, GWG Holdings from selling, transferring, or otherwise disposing of any Preferred Series A Subclass 1 Unit Accounts held as of May 15, 2020, other than to DLP V. These covenants are materially similar to the terms under the Third Amended and Restated First Lien Credit Agreement once assumed by DLP V. As of September 30, 2021, Beneficient was in compliance with all covenants.

These loans are not currently guaranteed by GWG.

Beneficient's Second Lien Credit Agreement was originally issued to BHI, a Ben Founder Affiliate. "Ben Founder Affiliates" are defined as certain trusts and those entities held by such trusts that are controlled by Ben Founder. During 2019, the Second Lien Credit Agreement was contributed to HCLP and thus, all existing senior loan obligations are held by HCLP as of September 30, 2021 and December 31, 2020. HCLP is indirectly associated with Ben Founder. Further, an indirect parent entity of HCLP had loans outstanding to Ben Founder Affiliates as of December 31, 2020.

Beneficient's other borrowings as detailed in the table above mature in 2024 and 2025.

**(10) Stockholders' Equity**

***GWG Holdings Equity***

*Common Stock*

In September 2014, GWG Holdings consummated an initial public offering of its common stock resulting in the sale of 800,000 shares of common stock at $12.50 per share, and net proceeds of approximately $8.6 million after the payment of underwriting commissions, discounts and expense reimbursements. In connection with this offering, the common stock of GWG Holdings was listed on the Nasdaq Capital Market under the ticker symbol "GWGH."

The 2018 transactions between GWG Holdings, GWG Life, Beneficient and the Seller Trusts described in Note 1 ultimately resulted in the issuance of 27,013,516 shares of GWG Holdings' common stock to the Seller Trusts in exchange for Common Units. The shares were offered and sold in reliance upon the exemption from registration provided by Section 4(a)(2) under the Securities Act of 1933, as amended. Also, the Purchase and Contribution Agreement described in Note 1 ultimately resulted in the sale of 2,500,000 shares of GWG Holdings common stock to BCC, and the contribution of 1,452,155 shares of GWG Holdings common stock to AltiVerse.

Pursuant to the Exchange Agreement described in Note 1, commencing on December 31, 2019, holders of Common Units have the right to exchange their Common Units for common stock of GWG Holdings. The exchange ratio in the Exchange Agreement is based on the ratio of the capital account associated with the Common Units to be exchanged to the market price of the common stock of GWG Holdings based on the volume weighted average price of GWG Holdings' common stock for the five consecutive trading days prior to the quarterly exchange date. No Common Units have been exchanged for common stock of GWG Holdings through September 30, 2021.

Page 34

APP. 760

APP. 761

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 762 of 1031     PageID 934

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

*Redeemable Preferred Stock*

On November 30, 2015, GWG Holdings' public offering of up to 100,000 shares of RPS at $1,000 per share was declared effective. Holders of RPS are entitled to cumulative dividends at the rate of 7% per annum, paid monthly. Dividends on the RPS are recorded as a reduction to additional paid-in capital, if any, then to the outstanding balance of the preferred stock if additional paid-in capital has been exhausted. Under certain circumstances described in the Certificate of Designation for the RPS, additional shares of RPS may be issued in lieu of cash dividends.

The RPS ranks senior to GWG Holdings' common stock and pari passu with GWG Holdings' RPS 2 (see further details in the section below) and entitles its holders to a liquidation preference equal to the stated value per share (i.e., $1,000) plus accrued but unpaid dividends. Holders of RPS may presently convert their RPS into GWG Holdings' common stock at a conversion price equal to the volume-weighted average price of GWG Holdings' common stock for the 20 trading days immediately prior to the date of conversion, subject to a minimum conversion price of $15.00 and in an aggregate amount limited to 15% of the stated value of RPS originally purchased from us and still held by such purchaser.

Holders of RPS may request that we redeem their RPS at a price equal to their stated value plus accrued but unpaid dividends, less an applicable redemption fee, if any, as specified in the Certificate of Designation. Nevertheless, the Certificate of Designation for RPS permits us in our sole discretion to grant or decline redemption requests. Subject to certain restrictions and conditions, we may also redeem shares of RPS without a redemption fee upon a holder's death, total disability or bankruptcy. In addition, after one year from the date of original issuance, we may, at our option, call and redeem shares of RPS at a price equal to their liquidation preference.

In March 2017, we closed the RPS offering to additional investors having sold 99,127 shares of RPS for an aggregate gross consideration of $99.1 million and incurred approximately $7.0 million of related selling costs.

At the time of its issuance, we determined that the RPS contained two embedded features: (1) optional redemption by the holder, and (2) optional conversion by the holder. We determined that each of the embedded features met the definition of a derivative; however, based on our assessment under ASC 470, *Debt*, ("ASC 470") and ASC 815, *Derivatives and Hedging*, ("ASC 815"), we do not believe bifurcation of either the holder's redemption or conversion feature is appropriate.

*Series 2 Redeemable Preferred Stock*

On February 14, 2017, GWG Holdings' public offering of up to 150,000 shares of RPS 2 at $1,000 per share was declared effective. The terms of the RPS 2 are largely consistent with those of the RPS, other than the conversion and redemption features discussed below.

Holders of RPS 2 may, less an applicable conversion discount, if any, convert their RPS 2 into GWG Holdings' common stock at a conversion price equal to the volume-weighted average price of GWG Holdings' common stock for the 20 trading days immediately prior to the date of conversion, subject to a minimum conversion price of $12.75 and in an aggregate amount limited to 10% of the stated value of RPS 2 originally purchased from us and still held by such purchaser. We may, at our option, call and redeem shares of RPS 2 at a price equal to their liquidation preference (subject to a minimum redemption price, in the event of redemptions occurring less than one year after issuance, of 107% of the stated value of the shares being redeemed).

In April 2018, we closed the RPS 2 offering to additional investors having sold 149,979 shares of RPS 2 for an aggregate gross consideration of $150.0 million and incurred approximately $10.3 million of related selling costs.

The RPS 2 was determined to have the same two embedded features discussed in the RPS section above (optional redemption by the holder and optional conversion by the holder). We do not believe bifurcation of either the holder's redemption or conversion feature is appropriate.

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 763 of 1031    PageID 935

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

### Beneficient Equity

As of September 30, 2021, Ben LP has issued Common Units and BCH, a consolidated subsidiary of Ben LP, has issued general partnership Class A Units (Subclass A-1 and A-2), Class S Ordinary Units, Class S Preferred Units, FLP Units (Subclass 1 and Subclass 2), Preferred Series A Subclass 1 Unit Accounts, Preferred Series A Subclass 2 Unit Accounts, and Preferred Series C Subclass 1 Unit Accounts. The Preferred Series A Subclass 0 Unit Accounts were created under the 5th Amended and Restated LPA while the Preferred Series C Subclass 0 Unit Accounts were created under the 6th Amended and Restated LPA; however, neither security has been issued as of September 30, 2021. The 6th Amended and Restated LPA of BCH governs the terms of these equity securities.

### Common Units

As of both September 30, 2021 and December 31, 2020, Ben LP has a total of 48,205,756 Common Units issued and outstanding, respectively. As of both September 30, 2021 and December 31, 2020, GWG Holdings owns 46,887,915 Common Units, respectively, which are eliminated in consolidation. The remaining issued and outstanding Common Units are recorded in the condensed consolidated balance sheet in the noncontrolling interests line item.

### Preferred Series A Subclass 0 (Noncontrolling Interests)

On July 15, 2020, BCH amended its limited partnership agreement in a 5th Amended and Restated LPA, which created a new subclass of Preferred Series A Unit Accounts, the Preferred A.0.

As a subclass of the Preferred Series A Unit Accounts, the Preferred A.0 receives the same preferred return on a quarterly basis as the other Preferred Series A subclasses. However, the Preferred A.0 is senior to all other classes of preferred equity, including the other subclasses of Preferred Series A in terms of allocations of profits, distributions, and liquidation. The Preferred A.0 can be converted into Class S Units at the election of the holder, at a price equal to (x) prior to the initial public listing, the per Common Unit fair market value as determined by the general Partner and (y) following the initial public listing, the lesser of (i) $10 and (ii) if the Common Units are listed on a national securities exchange, the volume-weighted average closing price of a Common Unit as reported on the exchange on which the Common Units are traded for the twenty (20) days immediately prior to the applicable exchange date, or if the Common Units are not listed on a national securities exchange, then the volume-weighted average closing price of a security traded on a national securities exchange or quoted in an automated quotation system into which the Common Units are convertible or exchangeable for the twenty (20) days immediately prior to the applicable exchange date.

The Preferred A.0 Unit Accounts have not been issued as of September 30, 2021.

### Preferred Series A Subclass 1 (Redeemable Noncontrolling Interest)

BCH, a consolidated subsidiary of Ben LP, has non-unitized equity outstanding. The Preferred Series A Subclass 1 Unit Accounts are non-participating and convertible on a dollar basis.

In 2019, Preferred Series A Subclass 1 Unit Account holders signed an agreement to forbear the right to receive an annualized preferred return in excess of a rate determined materially consistent with the methodology below until, initially, the earlier of December 31, 2019 or three months following the issuance of the limited trust association charter by the Texas Department of Banking. The charter from the Texas Department of Banking was not issued as of December 31, 2019. The forbearance agreement was extended through September 30, 2021.

The income allocation methodology under this forbearance agreement was as follows:

- First, Ben, as the sole holder of Class A Units issued by BCH is allocated income from BCH to cover the expenses incurred solely by Ben;
- Second, the remaining income at BCH is allocated 50% to the aggregate of Class A Units and Class S Ordinary Units and 50% to Preferred Series A Subclass 1 Unit Accounts, until the Common Units issued by Ben LP receive a 1% annualized return on the Common Unit account balance;
- Third, after the 1% annualized return to the Common Unit issued by Ben LP is achieved, additional income is allocated to the Preferred Series A until the Preferred Series A is allocated the amount required under the LPA, (as amended); and

APP. 763

Page 36

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 765 of 1031     PageID 937

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

- Finally, any remaining income is allocated under the terms of the current LPA (pro-rata between the Class A Units and Class S Ordinary Units).

If and when the forbearance agreement expires, account holders will be entitled to a compounded quarterly preferred return. The preferred return to be paid to Preferred Series A Unitholders is limited by a quarterly preferred return rate cap that is based on the annualized revenues of BCH. Annualized revenues are defined as four times the sum of total quarterly interest, fee and dividend income plus total noninterest revenues. This quarterly rate cap is defined as follows:

- 0.25% if annualized revenues are $80 million or less;
- 0.50% if annualized revenues are greater than $80 million but equal to or less than $105 million;
- 0.75% if annualized revenues are greater than $105 million but equal to or less than $125 million;
- 1.00% if annualized revenues are greater than $125 million but equal to or less than $135 million;
- 1.25% if annualized revenues are greater than $135 million but equal to or less than $140 million; and
- If over $140 million, the preferred return calculation is based on a fraction (i) the numerator of which is (A) the positive percentage rate change, if any, to the seasonally adjusted CPI-U covering the period from the date of the last allocation of profits to such holders, plus (B) (x) 2% prior to an Initial Public Offering (as defined in the BCH LPA) by Ben LP and (y) 3% thereafter, and (ii) the denominator of which is one minus the highest effective marginal combined U.S. federal, state and local income tax rate in effect as of the beginning of the fiscal quarter for which such determination is being made for an individual resident in New York City, New York, assuming (1) that the aggregate gross income allocable with respect to the quarterly preferred return for such fiscal year will consist of the same relative proportion of each type or character (e.g., long term or short term capital gain or ordinary or exempt income) of gross income item included in the aggregate gross income actually allocated in respect of the quarterly preferred return for the fiscal year reflected in the BCH's most recently filed Internal Revenue Service Form 1065 and (2) any state and local income taxes are not deductible against U.S. federal income tax.

The definition of Initial Public Offering includes an event, transaction or agreement pursuant to which the Common Units are convertible or exchangeable into equity securities listed on a national securities exchange or quotation in an automated quotation system.

No amounts have been paid to the Preferred Series A Subclass 1 Unit Account holders related to the preferred return from inception through September 30, 2021, and any amounts earned have been accrued and are included in the balance of redeemable noncontrolling interests line item of the condensed consolidated balance sheets. Certain Preferred Series A Subclass 1 Unit Account holders agreed to be specially allocated any income or losses associated with the Beneficient Management Partners, L.P. Equity Incentive Plan and certain other costs.

Upon election by a holder, the Preferred Series A Unit Accounts (other than Preferred Series A Subclass 2 Unit Accounts) are, at any time on or after January 1, 2021, convertible in an amount of Preferred Series A Unit Accounts (other than Preferred Series A Subclass 2 Unit Accounts), equal to 20% of their Sub-Capital Accounts into Class S Ordinary Units (with the right to convert any unconverted amount from previous years in any subsequent years). Upon an election, a holder of Preferred Series A Subclass 1 Unit Accounts will be issued Class S Ordinary Units necessary to provide the holder with a number of Class S Ordinary Units that, in the aggregate, equal (a) the balance of the holder's capital account associated with the Preferred Series A Subclass 1 Unit Accounts being converted divided by (b) either (x) prior to an initial public offering, the appraised per Class A Unit fair market value as determined by Beneficient or (y) following an initial public offering, the average price of a Common Unit for the thirty (30) day period ended immediately prior to the applicable conversion date. The holder of such newly issued Class S Ordinary Units may immediately convert them into Common Units. Additionally, effective December 31, 2030, if the Preferred Series A Subclass 1 Unit Accounts have not been converted, they will redeem for cash in an amount equal to the then outstanding capital account balance of the accounts. If available redeeming cash (as defined in the LPA) is insufficient to satisfy any such redemption requirements, BCH, on a quarterly basis, will redeem additional Preferred Series A Units until all such Preferred Series A Units have been redeemed. The Preferred Series A Subclass 1 Unit Accounts are subject to certain other conversion and redemption provisions.

The current LPA of BCH also includes certain limitations of BCH, without the consent of a majority-in-interest of the Preferred Series A Unit Account holders, to (i) issue any new equity securities and (ii) except as otherwise provided, incur indebtedness that is senior to or pari passu with any right of distribution, redemption, repayment, repurchase or other payments relating to the

APP. 765

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 767 of 1031     PageID 939

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

Preferred Series A Unit accounts. Further, BCH cannot, prior to the conversion of all the Preferred Series A Unit accounts, incur any additional long-term debt unless (i) after giving effect to the incurrence of the new long-term debt on a pro forma basis, the sum of certain preferred stock, existing debt and any new long-term indebtedness would not exceed 55% of BCH's net asset value ("NAV") plus cash on hand, and (ii) at the time of incurrence of any new long-term indebtedness, the aggregate balance of BCH's (including controlled subsidiaries) debt plus such new long-term debt does not exceed 40% of the sum of the NAV of the interests in alternative assets supporting the Collateral underlying the loan portfolio of BCH and its subsidiaries plus cash on hand at Ben LP, BCH and its subsidiaries.

The Preferred Series A Subclass 1 Unit Accounts are recorded in the condensed consolidated balance sheet in the redeemable noncontrolling interest line item.

*Preferred Series C Subclass 0 Unit Accounts*

The 6th Amended and Restated LPA allowed for the issuance of Preferred Series C Subclass 0 Unit Accounts. The Preferred Series C Subclass 0 Unit Accounts are non-participating and convertible on a basis consistent with the UPA discussed in Note 1. Account holders are entitled to a compounded quarterly preferred return based on a fraction, the numerator of which is (a) the sum of an inflation adjustment amount, plus (1) 0.5% prior to the initial public listing and (2) 0.75% following the initial public listing, and the denominator of which is (b) 1 minus the means of the highest effective marginal combined U.S. federal, state and local income tax rate (including the rate of taxes under Section 1411 of the Code) for a Fiscal Year prescribed for an individual resident in New York, New York (taking into account (a) the nondeductibility of expenses subject to the limitations described in Sections 67 and 68 of the Code, (b) the character (e.g., long-term or short-term capital gain or ordinary or exempt income) of the applicable income, but not taking into account the deductibility of state and local income taxes for U.S. federal income tax purposes), based on the Partnership's most recently filed IRS form 1065, and (c) multiplied by 80%.

The Preferred Series C Subclass 0 Unit Accounts are senior to all other classes of preferred equity other than the Preferred Series A Subclass 0 Unit Accounts in terms of allocations of profits, distributions, and liquidation.

The only conversion, redemption, or exchange rights available to the Preferred Series C Subclass 0 Unit Accounts are those rights afforded in accordance with the UPA, described in Note 1, or such similar agreement.

While any amount of Preferred Series C (Subclass 0 or 1) Unit Accounts is outstanding, BCH cannot make any distributions, other than tax distributions and redemptions, distributions upon a liquidation of BCH, and distributions of net consideration received from a sale of BCH, without the prior consent of a majority in interest of the holders of the Preferred Series C (Subclass 0 or 1) Unit Accounts.

The Preferred Series C Subclass 0 Unit Accounts have not been issued as of September 30, 2021.

*Preferred Series C Subclass 1 Unit Accounts*

The 5th Amended and Restated LPA also created a new class of preferred equity, the Preferred Series C Subclass 1 Unit Accounts. The Preferred Series C Subclass 1 Unit Accounts are non-participating and convertible on a basis consistent with the UPA discussed in Note 1. Account holders are entitled to a compounded quarterly preferred return based on a fraction, the numerator of which is (a) the sum of an inflation adjustment amount, plus (1) 0.5% prior to the initial public listing and (2) 0.75% following the initial public listing, and the denominator of which is (b) 1 minus the means of the highest effective marginal combined U.S. federal, state and local income tax rate (including the rate of taxes under Section 1411 of the Code) for a Fiscal Year prescribed for an individual resident in New York, New York (taking into account (a) the nondeductibility of expenses subject to the limitations described in Sections 67 and 68 of the Code and (b) the character (e.g., long-term or short-term capital gain or ordinary or exempt income) of the applicable income, but not taking into account the deductibility of state and local income taxes for U.S. federal income tax purposes), based on the Partnership's most recently filed IRS form 1065.

BCH calculates two Preferred Series C Subclass 1 Unit Accounts capital accounts: the Liquidation Capital Account and the Conversion Capital Account. In calculating the Conversion Capital Account, the Preferred Series C Subclass 1 Unit Accounts are allocated profits and losses junior to the Preferred Series A Unit Accounts. In calculating the Liquidation Capital Account, the Preferred Series C Subclass 1 Unit Accounts are allocated profits and losses pari passu with the Preferred Series A Unit Accounts.

APP. 767

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

Following the exchange of any Preferred Series C Subclass 1 Unit Accounts into Common Units under the UPA described in Note 1, the excess of the profits and losses allocated to the Preferred Series C Subclass 1 Unit Accounts under the Liquidation Capital Account will be deemed the "Excess Amount." This Excess Amount will be specially allocated at each tax period in accordance with the principals of Treasury Regulation Section 1.704-1(b)(4)(x), to the Preferred Series A Subclass 1 Units Accounts, prior to any amount of profit, income or gain being allocated to any other class of units (other than the Preferred A.0) or limited partners until such special allocations equal, in the aggregate, such Excess Amount.

The only conversion, redemption, or exchange rights available to the Preferred Series C Subclass 1 Unit Accounts are those rights afforded in accordance with the UPA, described in Note 1, or such similar agreement.

While any amount of Preferred Series C (Subclass 0 or 1) Unit Accounts is outstanding, BCH cannot make any distributions, other than tax distributions and redemptions, distributions upon a liquidation of BCH, and distributions of net consideration received from a sale of BCH, without the prior consent of a majority in interest of the holders of the Preferred Series C (Subclass 0 or 1) Unit Accounts.

As of September 30, 2021 and December 31, 2020, the aggregate carrying value of GWG Holdings' investments in Preferred Series C Subclass 1 Unit Accounts was $210.6 million and $195.6 million, respectively. The Preferred Series C Subclass 1 Unit Accounts are eliminated upon consolidation.

*Class S Ordinary Units*

As of both September 30, 2021 and December 31, 2020, BCH, a consolidated subsidiary of Ben LP, had issued and outstanding 5.8 million Class S Ordinary Units, respectively. The Class S Ordinary Units participate on an as-converted basis pro-rata in the share of the profits or losses of BCH and subsidiaries following all other allocations made by BCH and its subsidiaries. As limited partner interests, these units have limited voting rights and do not entitle participation in the management of BCH's business and affairs. The Class S Ordinary Units are exchangeable for Common Units on a one-for-one basis, subject to customary conversion rate adjustments for splits, distributions and reclassifications, as well as compliance with any applicable vesting and transfer restrictions. Each conversion also results in the issuance to Ben LP of a Class A Unit of BCH for each Common Unit issued.

The Class S Ordinary Units are recorded in the condensed consolidated balance sheet in the noncontrolling interests line item.

*Class S Preferred Units*

The limited partnership agreement of BCH allows it to issue Class S Preferred Units. The Class S Preferred Units are entitled to a quarterly preferred return that is limited by the quarterly preferred return rate cap described above for Preferred Series A Subclass 1 except for when annualized revenues exceed $140 million, the Class S Preferred return is based on a fraction (i) the numerator of which is (A) the positive percentage rate change, if any, to the seasonally adjusted CPI-U covering the period from the date of the last allocation of profits to such holders, plus (B) 0.75 percent, and (ii) the denominator of which is one minus the highest effective marginal combined U.S. federal, state and local income tax rate in effect as of the beginning of the fiscal quarter for which such determination is being made for an individual resident in New York City, New York, assuming (1) that the aggregate gross income allocable with respect to the quarterly preferred return for such fiscal year will consist of the same relative proportion of each type or character (e.g., long term or short term capital gain or ordinary or exempt income) of gross income item included in the aggregate gross income actually allocated in respect of the quarterly preferred return for the fiscal year reflected in the Ben Group Partnership's most recently filed IRS Form 1065 and (2) any state and local income taxes are not deductible against U.S. federal income tax. The Class S Preferred Units also participate on an as-converted basis pro-rata in the share of the profits or losses of BCH and subsidiaries following all other allocations made by BCH and its subsidiaries. As limited partner interests, these units are generally non-voting and do not entitle participation in the management of BCH's business and affairs. Generally, the Class S Preferred Units are exchangeable for Common Units in Ben LP on a 1.2-for-1 basis, subject to customary conversion rate adjustments for splits, distributions and reclassifications, as well as compliance with any applicable vesting and transfer restrictions. Each conversion also results in the issuance to Ben LP of a Class A Unit for each Common Unit issued. Holders of Class S Preferred Units may elect to convert into Class S Ordinary Units in connection with a sale or dissolution of BCH.

As of September 30, 2021, a nominal number of shares of Class S Preferred Units have been issued. No amounts have been paid to the Class S Preferred Unit holders related to the preferred return from issuance through September 30, 2021, and any

APP. 769

Page 39

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

amounts earned have been accrued and are included in the balance of Class S Preferred Units presented on the condensed consolidated balance sheet in the noncontrolling interests line item.

*Beneficiaries of the ExAlt Trusts*

The ultimate beneficiary of the ExAlt Trusts is an unrelated third party charity (the "Charitable Beneficiary") that is entitled to i) approximately 5% of any amounts paid to Beneficient as payment on amounts due under each ExAlt Loan, ii) approximately 10% of the amount of excess cash Collateral, if any, following the full repayment of an ExAlt Loan; and (iii) all amounts accrued and held at the ExAlt Trusts once all amounts due to Beneficient under the ExAlt Loans and any fees related to Beneficient's services to the ExAlt Trusts are repaid. The Charitable Beneficiary's account balances with respect to its interest in such ExAlt Trusts cannot be reduced to below zero. Any losses allocable to the Charitable Beneficiary in excess of its account balances are reclassified at each period end to the trusts deficit account, which is included as part of noncontrolling interest. Additional ExAlt Trusts are created with each new liquidity transaction with customers. These new ExAlt Trusts, which are consolidated by Beneficient, result in the recognition of additional noncontrolling interest representing the interests in these new ExAlt Trusts held by the Charitable Beneficiary. For the three and nine months ended September 30, 2021, nil and $0.4 million, respectively, of such noncontrolling interest was created, compared to nil for both the three and nine months ended September 30, 2020.

The interest of the Charitable Beneficiary, including the associated trust deficit (as applicable), in the ExAlt Trusts is recorded on the consolidated balance sheets in the noncontrolling interests line item.

**(11) Equity-Based Compensation**

As of September 30, 2021 and December 31, 2020, the Company has outstanding equity-based awards under the GWG Holdings 2013 Stock Incentive Plan, the Beneficient Management Partners, L.P. ("BMP") Equity Incentive Plan (the "BMP Equity Incentive Plan", the Ben Equity Incentive Plan (as defined below), and Preferred Series A Subclass 1 Unit Accounts, as more fully described in the sections below. The holders of certain of the units issued under the BMP Equity Incentive Plan and the Ben Equity Incentive Plan, upon vesting, have the right to convert the units to shares of GWG Holdings common stock per the Exchange Agreement discussed in Note 1. As such, units vested and issued under Beneficient's equity incentive plans may result in dilution of the common stock of GWG Holdings.

*2013 Stock Incentive Plan*

GWG Holdings adopted the 2013 Stock Incentive Plan in March 2013, as amended on June 1, 2015, May 5, 2017 and May 8, 2018. Participants under the plan may be granted incentive stock options and non-statutory stock options; stock appreciation rights; stock awards; restricted stock; restricted stock units; and performance shares. Eligible participants include officers and employees of GWG Holdings and its subsidiaries, members of GWG Holdings' Board of Directors, and consultants. Option awards generally expire 10 years from the date of grant. As of September 30, 2021, the Company has granted stock options, stock appreciation rights ("SAR"), and restricted stock units ("RSU") under this plan.

Upon the exercise of SARs, the Company is obligated to make cash payments equal to the positive difference between the market value of GWG Holdings' common stock on the date of exercise less the market value of the common stock on the date of grant. The liability for the SARs as of both September 30, 2021 and December 31, 2020 was $1.6 million, and was recorded within accounts payable and accrued expenses in the condensed consolidated balance sheets.

A RSU entitles the holder thereof to receive one share of GWG Holdings' common stock (or, in some circumstances, the cash value thereof) upon vesting. RSUs are subject to forfeiture until they vest. During the nine months ended September 30, 2021, none of the RSUs held by employees and directors vested.

Page 40

Table Of Contents

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

*BMP Equity Incentive Plan*

The Board of Directors of Beneficient Management, Ben LP's general partner, adopted the BMP Equity Incentive Plan in 2019. Under the BMP Equity Incentive Plan, certain directors and employees of Beneficient are eligible to receive equity units in BMP, an entity affiliated with the board of directors of Beneficient Management, in return for their services to Ben. The BMP equity units eligible to be awarded to employees are comprised of BMP's Class A Units and/or BMP's Class B Units (collectively, the "BMP Equity Units"). All awards are classified in equity upon issuance.

Awards will generally be subject to service-based vesting over a four-year period from the recipient's date of hire, though some awards fully vest upon grant date. Expense associated with the vesting of these awards is based on the fair value of the BMP Equity Units on the date of grant. Expense recognized for these awards is specially allocated to certain holders of redeemable noncontrolling interests. While providing services to Beneficient, if applicable, certain of these awards are subject to minimum retained ownership rules requiring the award recipient to continuously hold BMP Equity Units equivalents equal to at least 25% of their cumulatively granted awards that have the minimum retained ownership requirement. The awards are generally non-transferable. Awards under the BMP Equity Incentive Plan that vest ultimately dilute holders of Common Units.

As BMP's equity is not publicly traded, the fair value of the BMP Equity Units is determined on each grant date using a probability-weighted discounted cash flow analysis. This fair value measurement is based on significant inputs not observable in the market and thus represents a Level 3 measurement within the fair value hierarchy. The resultant probability-weighted cash flows are then discounted using a rate that reflects the uncertainty surrounding the expected outcomes, which the Company believes is appropriate and representative of a market participant assumption.

*Ben Equity Incentive Plan*

The Board of Directors of Beneficient Management adopted the Ben Equity Incentive Plan in September 2018 (the "Ben Equity Incentive Plan"). Under the Ben Equity Incentive Plan, Ben LP is permitted to grant equity awards, in the form of restricted equity units ("REUs"), among others, representing ownership interests in Common Units. Settled awards under the Ben Equity Incentive Plan dilute holders of Common Units. The total number of Common Units that may be issued under the Ben Equity Incentive Plan is equivalent to 15% of the number of fully diluted Common Units outstanding, subject to annual adjustment. All awards are classified in equity upon issuance.

All REUs are subject to two performance conditions, both of which were met during 2019. Additionally, if a change-of-control event occurs prior to July 1, 2021, then all units, vested and unvested, will settle within 60 days. Any transaction whereby GWG Holdings obtains the right to appoint a majority of the members of Beneficient Management's Board of Directors is expressly excluded from the definition of change-of-control for the REUs.

Awards will generally be subject to service-based vesting over a multi-year period from the recipient's date of hire, though some awards fully vest upon grant date. While providing services to Beneficient, if applicable, certain of these awards are subject to minimum retained ownership rules requiring the award recipient to continuously hold Common Unit equivalents equal to at least 15% of their cumulatively granted awards that have the minimum retained ownership requirement.

The holders of certain of the units issued under the BMP Equity Incentive Plan and the Ben Equity Incentive Plan, upon vesting, have the right to convert the units to shares of GWG Holdings common stock per the Exchange Agreement discussed in Note 1. As such, units vested and issued under Beneficient's equity incentive plans may result in dilution of the common stock of GWG Holdings.

As Ben LP's equity is not publicly traded, the fair value for substantially all of the REUs granted in 2020 was estimated by using the valuation techniques consistent with those utilized to determine the acquisition date equity values arising from GWG Holdings obtaining a controlling financial interest in Beneficient. These valuation techniques relied upon the OPM Backsolve approach under the market method as more fully described in the 2020 Form 10-K. For the REUs granted in the latter portion of 2020 and through September 30, 2021, we utilized valuation techniques consisting of the income approach and market approach.

During third quarter 2020, 515,000 units were granted to a senior partner director subject to a performance condition. The performance condition has not been met as of September 30, 2021. As the performance condition of the grant is based on a

APP. 772

APP. 773

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 774 of 1031    PageID 946

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

liquidity event, recognition of the related compensation cost is deferred until the condition has been met. Total unrecognized compensation cost related to this award is approximately $6.4 million as of September 30, 2021.

*Preferred Equity*

On April 25, 2019, Preferred Series A Subclass 1 Unit Accounts in BCH, a subsidiary of Ben LP, were assigned to three directors, with each having a capital account balance of $4.0 million, subject to a performance condition, in return for each of the directors providing to BCH their knowledge and abilities in helping with the formation of and capital raising for the Company. BHI, a Ben Founder Affiliate, assigned the Preferred Series A Subclass 1 Unit Accounts it holds in BCH to the directors for those individuals providing services to BCH. Accounting for services provided to the Company but paid by a principal shareholder follows the substance of the transaction and is therefore accounted for similar to a share-based payment in exchange for services rendered. The awards vest upon grant, subject to a performance condition whereby each of the directors must be a board member at the time that a certain level of additional capital is raised. The fair value of the awards at the grant date was estimated at $12.0 million in aggregate.

During the fourth quarter of 2019, $4.0 million of the capital account balance was forfeited back to the Company and reverted to BHI upon the departure of a certain director. The performance condition was met during the fourth quarter of 2020 and expense of $11.4 million was recognized and specially allocated to certain Preferred Series A Subclass 1 Unit Account holders on a pro-rata basis based on their capital account balance. The expense recognized upon vesting is reflective of the value calculated after the determination of overall enterprise value in connection with the change of control event discussed in the 2020 Form 10-K.

The following table summarizes the award activity, in number of units, for each plan during the nine months ended September 30, 2021:

| | Balance at December 31, 2020 | Granted | Vested | Exercised | Forfeited/Cancelled | Balance at September 30, 2021 |
|---|---|---|---|---|---|---|
| **Vested** | | | | | | |
| Stock Options | 629,530 | — | 50,169 | (20,082) | (2,334) | **657,283** |
| SAR | 293,455 | 19,837 | 63,167 | — | — | **376,459** |
| RSU | — | — | — | — | — | **—** |
| BMP Equity Units | 11,144,016 | 40,776 | 746,238 | — | (321,986) | **11,609,044** |
| REUs | 5,078,796 | 40,776 | 576,031 | — | (208,816) | **5,486,787** |
| **Unvested** | | | | | | |
| Stock Options | 65,587 | — | (50,169) | 250 | — | **15,668** |
| SAR | 242,202 | 140,163 | (63,167) | — | — | **319,198** |
| RSU | 129,717 | 3,189 | — | — | (3,189) | **129,717** |
| BMP Equity Units | 2,230,097 | 163,104 | (746,238) | — | (167,837) | **1,479,126** |
| REUs | 2,268,574 | 163,104 | (576,031) | — | (127,574) | **1,728,073** |
| **Total** | | | | | | |
| Stock Options | 695,117 | — | — | (19,832) | (2,334) | **672,951** |
| SAR | 535,657 | 160,000 | — | — | — | **695,657** |
| RSU | 129,717 | 3,189 | — | — | (3,189) | **129,717** |
| BMP Equity Units | 13,374,113 | 203,880 | — | — | (489,823) | **13,088,170** |
| REUs | 7,347,370 | 203,880 | — | — | (336,390) | **7,214,860** |

Page 42

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 775 of 1031     PageID 947

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

The following table presents the components of equity-based compensation expense recognized in the condensed consolidated statement of operations (in thousands):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | **2021** | **2020** | **2021** | **2020** |
| Stock options | $ 26 | $ 53 | $ 102 | $ 140 |
| Stock appreciation rights | 889 | 282 | 1,047 | 171 |
| Restricted stock units | — | — | 31 | (38) |
| BMP equity units | 2,033 | 12,392 | 6,002 | 51,515 |
| REUs | 2,058 | 10,831 | 7,070 | 44,830 |
| **Total equity-based compensation** | $ 5,006 | $ 23,558 | $ 14,252 | $ 96,618 |

Unrecognized equity-based compensation expense, excluding the expense related to the performance award discussed above, totaled approximately $24.3 million as of September 30, 2021. We currently expect to recognize equity-based compensation expense of $4.0 million during the remainder of 2021, and the remainder thereafter based on scheduled vesting of awards outstanding as of September 30, 2021.

The following table presents the equity-based compensation expense expected to be recognized over the next five years based on scheduled vesting of awards outstanding, excluding the award subject to the performance condition discussed above, as of September 30, 2021 (in thousands):

| | **Stock Options** | **SAR** | **REUs** | **BMP Equity Units** | **Total** |
| --- | --- | --- | --- | --- | --- |
| Three months ending 2021 | $ 6 | $ 148 | $ 1,895 | $ 1,937 | $ 3,986 |
| 2022 | 19 | 299 | 5,685 | 5,819 | 11,822 |
| 2023 | — | 199 | 3,275 | 2,620 | 6,094 |
| 2024 | — | 37 | 1,096 | 883 | 2,016 |
| 2025 | — | — | 191 | 163 | 354 |
| 2026 | — | — | — | — | — |
| **Total** | $ 25 | $ 683 | $ 12,142 | $ 11,422 | $ 24,272 |

**(12) Income Taxes**

The Company's income tax provision reflects the activity of GWG Holdings and its subsidiaries, Beneficient Corporate Holdings, LLC and Ben Markets Corporate Holdings, LLC. GWG Holdings and its subsidiaries files a separate tax return from the aforementioned Beneficient entities, but the tax provision information below as of and for the nine months ended September 30, 2021 is disclosed on a consolidated basis for financial reporting purposes under applicable GAAP.

The Company applies an estimated annual effective rate to interim period pre-tax income to calculate the income tax provision for the quarter in accordance with the principal method prescribed by the accounting guidance established for computing income taxes in interim periods.

The Company's effective tax rate was (0.09)% for the nine months ended September 30, 2021. The income tax expense for the three and nine months ended September 30, 2021 was $0.7 million and $0.2 million, respectively, compared to income tax expense of $3.6 million and income tax benefit of $14.5 million for the three and nine months ended September 30, 2020, respectively. The effective tax rate differs from the statutory U.S. federal income tax rate of 21% primarily due to valuation allowances recorded on the current year losses, offset by a current state tax expense. The income tax expense for the three and nine months ended September 30, 2021 reflects current state tax expense of GWG Holdings and adjustments to deferred federal income taxes related to Beneficient's losses, partially offset by adjustments to the deferred tax liability of GWG Holdings for specific expense allocations to the holders of the Preferred Series A Subclass 1 Unit Accounts.

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 776 of 1031     PageID 948

The Company currently records a valuation allowance against its deferred tax assets that cannot be realized solely by the future reversal of existing temporary differences. Due to the uncertain timing of the reversal of certain of these taxable temporary

Page 43

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 777 of 1031    PageID 949

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

differences due to the constraint described below, they cannot be considered as a source of future taxable income for purposes of determining a valuation allowance; therefore, the vast majority of the existing deferred tax liability cannot be utilized in determining the realizability of the deferred tax assets. Due to a prior deemed ownership change, net operating loss carryforwards are subject to Section 382 of the Internal Revenue Code.

The Company determined it cannot utilize the reversal of a taxable temporary difference related to GWG Life's ownership in the Preferred Series A Subclass 1 Unit Accounts described in Note 1, until such time as the preferred equity is no longer constrained, as a source of income to realize existing deferred tax assets related to the net operating loss and Internal Revenue Code Section 163(j) limitations. As a result, the Company recorded a large net deferred tax liability on December 31, 2019, the majority of which remained as of September 30, 2021 and December 31, 2020. The disposition of this investment is constrained by the Pledge and Security Agreement in favor of the holders of the L Bonds of GWG Holdings. As such, the timing of recognition of the necessary taxable income related to this investment and the future reversal of this taxable temporary difference cannot be predicted.

### (13) Loss per Common Share

The computations of basic and diluted income (loss) attributable to common shareholders per share for the three and nine months ended September 30, 2021 and 2020 are as follows (in thousands, except share data and per share data):

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
|  | 2021 | 2020 | 2021 | 2020 |
| **Numerator:** | | | | |
| Net loss attributable to common shareholders | $ (50,578) | $ (48,898) | $ (169,881) | $ (120,475) |
| **Denominator:** | | | | |
| Basic – weighted average common shares outstanding | 20,759,854 | 30,477,792 | 20,758,910 | 30,516,331 |
| Effect of dilutive securities | — | — | — | — |
| Diluted – weighted average common shares outstanding | 20,759,854 | 30,477,792 | 20,758,910 | 30,516,331 |
| | | | | |
| Basic loss per common share | $ (2.44) | $ (1.60) | $ (8.18) | $ (3.95) |
| Diluted loss per common share | $ (2.44) | $ (1.60) | $ (8.18) | $ (3.95) |

For the three months ended September 30, 2021 and 2020, RPS, RPS 2, restricted stock units, and stock options for a potential 1,678,946 and 2,222,118 shares, respectively, were not included in the calculation of diluted earnings per share because we recorded a net loss during these periods and the effects were anti-dilutive. For the nine months ended September 30, 2021 and 2020, RPS, RPS 2, restricted stock units, and stock options for a potential 1,980,473 and 2,377,628 shares, respectively, were not included in the calculation of diluted earnings per share because we recorded a net loss during these periods and the effects were anti-dilutive. Potentially dilutive instruments issued by Ben LP that are ultimately exchangeable into GWG common stock were also excluded from the calculation of diluted earnings per share for the three and nine months ended September 30, 2021 and 2020 because we recorded a net loss during these periods and the effects were anti-dilutive.

### (14) Segment Reporting

The Company has two reportable segments consisting of Secondary Life Insurance and Beneficient. Corporate & Other includes certain activities not allocated to specific business segments. These activities include holding company financing and investing activities, management and administrative services to support the overall operations of the Company, and GWG Holdings' equity method investment in FOXO.

The Secondary Life Insurance segment seeks to earn non-correlated yield from our portfolio of life insurance policies. Our Beneficient segment consists of the assets and operations of Ben LP and its subsidiaries. Ben LP provides a variety of trust services, liquidity products for owners of alternative assets and illiquid investment funds, and other financial services to MHNW individuals. The Corporate & Other category consists of unallocated corporate overhead and administrative costs and the operations of operating segments that do not meet the quantitative criteria to be separately reported.

APP. 777

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 778 of 1031    PageID 950

Page 44

APP. 778

Table Of Contents

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

These segments are differentiated by the products and services they offer as well as by the information used by the Company's chief operating decision maker to determine allocation of resources and assess performance.

Earnings before taxes ("EBT") is the measure of profitability used by management to assess performance of its segments and allocate resources. Segment EBT represents net income (loss) excluding income taxes and includes earnings (loss) from equity method investments. Information on reportable segments is as follows (in thousands):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| **Revenue:** | **2021** | **2020** | **2021** | **2020** |
| Secondary Life Insurance | $ 15,856 | $ 14,422 | $ 18,955 | $ 44,800 |
| Beneficient | 17,867 | 53,589 | 18,235 | 74,925 |
| Corporate & Other | 63 | 1 | 69 | 17 |
| Total | $ 33,786 | $ 68,012 | $ 37,259 | $ 119,742 |

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| **Interest Expense:** | **2021** | **2020** | **2021** | **2020** |
| Secondary Life Insurance | $ 37,635 | $ 24,983 | $ 95,713 | $ 72,022 |
| Beneficient | 7,461 | 15,809 | 32,892 | 41,783 |
| Total | $ 45,096 | $ 40,792 | $ 128,605 | $ 113,805 |

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| **Segment EBT:** | **2021** | **2020** | **2021** | **2020** |
| Secondary Life Insurance | $ (28,142) | $ (12,147) | $ (86,730) | $ (39,314) |
| Beneficient | (6,576) | 532 | (67,450) | (94,880) |
| Corporate & Other | (12,714) | (8,915) | (36,923) | (22,492) |
| Total Segment EBT | (47,432) | (20,530) | (191,103) | (156,686) |
| Income tax expense (benefit) | 655 | 3,618 | 173 | (14,545) |
| Net loss | $ (48,087) | $ (24,148) | $ (191,276) | $ (142,141) |

| **Total Assets:** | September 30, 2021 | December 31, 2020 |
|---|---|---|
| Secondary Life Insurance | $ 857,166 | $ 886,739 |
| Beneficient | 2,627,976 | 2,662,630 |
| Corporate & Other | 5,054 | 15,588 |
| Total | $ 3,490,196 | $ 3,564,957 |

The total assets of the Beneficient segment at both September 30, 2021 and December 31, 2020 includes goodwill of $2.4 billion, which represents all of the goodwill on the Company's condensed consolidated balance sheet as of the end of each reporting period.

## (15) Commitments and Contingencies

*Litigation* — In the normal course of business, we are involved in various legal proceedings. In the opinion of management, any liability resulting from such proceedings would not have a material adverse effect on our financial position, results of operations or cash flows.

*Commitments* — The ExAlt Trusts had $35.5 million and $35.6 million of potential gross capital commitments as of September 30, 2021 and December 31, 2020, respectively, representing potential limited partner capital funding commitments on the interests in alternative asset funds. This is the amount above any existing cash reserves for such capital funding commitments. The ExAlt Trusts holding the interest in the limited partnership for the alternative asset fund is required to fund

APP. 779

Page 45

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 781 of 1031     PageID 953

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

these limited partner capital commitments per the terms of the limited partnership agreement. Capital funding commitment reserves are maintained by the associated trusts within the ExAlt Plan™ created at the origination of each trust for up to $0.1 million. To the extent that the associated ExAlt Trusts cannot pay the capital funding commitment, Beneficient is obligated to lend the associated ExAlt Trust sufficient funds to meet the commitment, pursuant to the terms of the respective ExAlt Loan. Any amounts advanced by Beneficient to the ExAlt Trusts for these limited partner capital funding commitments, pursuant to the terms of the respective ExAlt Loan, above the associated capital funding commitment reserves held by the associated ExAlt Trusts are added to the ExAlt Loan balance between Beneficient and the ExAlt Trusts and are expected to be recouped through the cash distributions from the alternative asset fund that collateralizes such ExAlt Loan.

Capital commitments generally originate from limited partner agreements having fixed or expiring expiration dates. The total limited partner capital funding commitment amounts may not necessarily represent future cash requirements. Beneficient considers the creditworthiness of the investments on a case-by-case basis. At both September 30, 2021 and December 31, 2020, Beneficient had no reserves for losses on unused commitments to fund potential limited partner capital funding commitments.

*Investigation* — On October 6, 2020, GWG Holdings received a subpoena to produce documents from the Chicago office of the SEC's Division of Enforcement, informing the Company of the existence of a non-public, fact-finding investigation into GWG Holdings. Since the initial subpoena, GWG Holdings has received subsequent subpoenas from the SEC for additional information. The requested information from the SEC has primarily related to GWG Holdings' investment products, including its L Bonds, as well as various accounting matters. among them, the consolidation for financial reporting purposes of Beneficient by GWG Holdings, goodwill valuation, and the accounting related to the ExAlt Trusts, related party transactions, life insurance policies, and the calculation of the debt-coverage ratio.

Until receipt of the initial subpoena on October 6, 2020, GWG Holdings had no previous communication with the SEC related to these issues and was unaware of this investigation. The Company is fully cooperating with the SEC in this investigation. The Company is currently unable to predict when this matter will be resolved or what further action, if any, the SEC may take in connection with it. As such, the Company cannot predict with certainty the outcome or effect of any such investigation or whether it will lead to any claim or litigation.

**(16) Concentration**

*Life Insurance Carriers*

Our portfolio consists of purchased life insurance policies written by life insurance companies rated investment-grade by third-party rating agencies, including A.M. Best Company, Standard & Poor's, and Moody's. As a result, there may be concentrations of policies with certain life insurance companies. The following summarizes the aggregate face value of insurance policies with specific life insurance companies exceeding 10% of the total face value of our portfolio.

| Life Insurance Company | September 30, 2021 | December 31, 2020 |
|---|---|---|
| John Hancock Life Insurance Company | 13.33 % | 14.72 % |
| The Lincoln National Life Insurance Company | 11.54 % | 11.20 % |
| Equitable Financial Life Insurance Company | 11.00 % | 10.57 % |

The following summarizes the number of insurance policies held in specific states exceeding 10% of the total face value held by our portfolio:

| State of Residence | September 30, 2021 | December 31, 2020 |
|---|---|---|
| California | 18.09 % | 18.05 % |
| Florida | 15.24 % | 14.93 % |

*Alternative Assets Industries*

Beneficient's underlying portfolio companies primarily operate in the United States and Asia, with the largest percentage, based on NAV, operating in software and services, semiconductors and semiconductor equipment, diversified financials, food and staples

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 782 of 1031    PageID 954

retailing, telecommunications services, and utilities.

Page 46

APP. 782

Table Of Contents

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

## (17) Subsequent Events and Other Matters

*L Bond suspension*

We temporarily suspended the offering of GWG Holdings' L Bonds, commencing April 16, 2021, as a result of our delay in filing certain periodic reports with the SEC. We anticipate recommencing the offering of GWG Holdings' L Bonds when we regain compliance with SEC filing requirements.

*Decoupling Transactions with Beneficient*

Amendments to the organizational documents of Ben LP, BCH, and Beneficient Management (the "Amendments") were approved by the Boards of Directors of GWG Holdings and Ben Management and executed on November 12, 2021, as part of, and effectuating, the series of transactions (the "Decoupling Transactions") contemplated by the August 13, 2021 Term Sheet. The Amendments will take effect no later than November 29, 2021. The Decoupling Transactions, once completed, are expected to result in, among other things, (i) GWG Holdings receiving certain proposed enhancements to its investments in Beneficient; (ii) GWG Holdings no longer having the right to appoint members of the board of directors of Beneficient Management; and (iii) Beneficient no longer being a consolidated subsidiary of GWG Holdings.

The Amendments primarily reflect the creation of securities, the Preferred Series B-1 Unit Accounts of Ben LP (with a corresponding security to be issued by BCH to Ben LP), Preferred Series B-2 Unit Accounts of Ben LP (with a corresponding security to be issued by BCH to Ben LP), that Ben LP intends to issue in connection with its recent capital raising activities and product offerings (as described in more detail below). The Amendments to the BCH limited partnership agreement reflect certain of the agreements contemplated by the Term Sheet, including, among other things, (1) eliminating the mandatory redemption rights of the holders of Preferred Series A Subclass 1 Unit Accounts following a public listing and (2) modifying the terms of the Preferred Series A Subclass 0 Unit Accounts to provide for a quarterly guaranteed payment and certain conversion and redemption rights. As the Amendments are not yet effective, (i) the Preferred Series B-1 Unit Accounts of Ben LP (with a corresponding security to be issued by BCH to Ben LP), Preferred Series B-2 Unit Accounts of Ben LP (with a corresponding security to be issued by BCH to Ben LP), and Subclass 3 FLP Unit Accounts of BCH have not been issued or granted and (ii) the modifications to the Preferred Series A Subclass 1 Unit Accounts and the Preferred A.0 are not yet effective.

Upon the effectiveness of the amendments to the Beneficient Management limited liability company agreement, Ben LP and its subsidiaries are expected to cease to be consolidated subsidiaries of GWG Holdings for financial reporting purposes. The Company is currently evaluating the accounting impact and conclusions of the Decoupling Transactions. We expect that if the Decoupling Transactions result in deconsolidation of Beneficient, then GWG Holdings' and GWG Life's investments in Beneficient will be recorded at fair value as of the closing of the transaction with a gain or loss reflected in the 2021 annual consolidated financial statements of GWG Holdings. Subsequent to the expected deconsolidation, GWG Holdings expects to account for its investment in Common Units as an equity method investment with either (i) its pro-rata portion of income or losses reported in earnings on a quarterly basis or (ii) if the fair value option under ASC 825-10 is elected, subsequent changes in the fair value of the Common Units recorded in earnings, though our preliminary conclusions continue to be evaluated. Management further expects GWG Holdings' and GWG Life's investments in various preferred securities of Beneficient that do not qualify for equity method accounting to be accounted for under applicable debt and equity security or other applicable accounting standards, which may include an election by the Company to account for these investments at fair value with subsequent changes in their fair value recorded in earnings, if such election is made under ASC 825-10.

In addition, GWG Holdings and Ben LP agreed to enter into a payoff letter for the Commercial Loan Agreement pursuant to which Ben LP would repay the entire outstanding principal balance of the Commercial Loan Agreement of approximately $202 million, plus accrued interest to the date of the payoff, by issuing to GWG Life or GWG Holdings 19,250,795 of Common Units.

GWG Holdings also agreed to convert its capital account balance in Preferred Series A Subclass 1 Unit Accounts of BCH to a preferential class of equity of BCH with enhanced conversion rights.

*Beneficient Equity*

The Amendments, among other things, provide for the creation of the Preferred Series B-1 Unit Accounts of Ben LP (with a corresponding security to be issued by BCH to Ben LP), Preferred Series B-2 Unit Accounts of Ben LP (with a corresponding

APP. 783

Page 47

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 785 of 1031     PageID 957

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

security to be issued by BCH to Ben LP), and Subclass 3 FLP Unit Accounts of BCH (the "FLP 3 Unit Accounts") and modify the terms of the Preferred A.0. Once effective, the 7th Amended and Restated LPA of BCH ("BCH LPA") and 3rd Amended and Restated LPA of Ben LP ("Ben LP LPA"), as applicable, will govern the terms of these equity securities.

Preferred Series B-1 Unit Accounts

The Preferred Series B-1 Unit Accounts of Ben LP ("Ben LP Preferred B-1 Unit Accounts") will be created pursuant to the Ben LP LPA. The Preferred Series B Subclass 1 Unit Accounts of BCH ("BCH Preferred B-1 Unit Accounts") will be created pursuant to the BCH LPA. The Ben LP Preferred B-1 Unit Accounts will correspond to the BCH Preferred B-1 Unit Accounts to be issued by BCH to Ben LP, as the sole holder of the BCH Preferred B-1 Unit Accounts. The BCH Preferred B-1 Unit Accounts will be entitled to certain distributions and income allocations. Upon Ben LP's receipt of any allocation, distribution, or return of capital on the BCH Preferred B-1 Unit Accounts, Ben LP will make a corresponding allocation, distribution, or return of capital to the holders of the Ben LP Preferred B-1 Unit Accounts in accordance with the Ben LP LPA.

Upon a listing of Ben LP's Common Units on a national securities exchange or such similar event (an "Initial Listing Event"), each Ben LP Preferred B-1 Unit Account shall be cancelled and converted into a certain number of Ben LP's Common Units, dependent on certain other conditions being met. Similarly, upon an Initial Listing Event, the BCH Preferred B-1 Unit Accounts will be cancelled and converted into a certain number of BCH Class A Units, dependent on certain other conditions being met.

Other allocations, distributions or returns of capital may be made subject to the provisions of the BCH LPA and Ben LPA. Additionally, holders of Ben LP Preferred B-2 Unit Accounts may be entitled to a return of capital, pending certain conditions, on December 31, 2025.

With respect to Ben LP, upon its sale, liquidation, dissolution or winding up, the Ben LP Preferred B-1 Unit Accounts will rank senior to all other currently issued and outstanding classes and series of Ben LP's preferred units and common units (i.e., the Ben LP Preferred B-2 Unit Accounts (as defined below) and Ben LP's Common Units), but because Ben LP has a holding company structure, the Ben LP Preferred B-1 Units will be structurally subordinated to interests in BCH, including creditors and certain equity interests. With respect to BCH, upon its sale, liquidation, dissolution or winding up, the BCH Preferred B-1 Unit Accounts will be entitled to distributions pursuant to an effective ranking of (i) junior to certain guaranteed payments to the holders of the Preferred A.0 and any required distributions to the holders of the FLP 3 Unit Accounts, (ii) junior to the Preferred A.0, and (iii) senior to all other currently issued and outstanding classes and series of BCH's preferred units and common units. Upon payment to Ben LP as the holder of the BCH Preferred B-1 Unit Accounts in an amount equal to the positive amount of the capital account balance attributable to the BCH Preferred B-1 Unit Accounts, the BCH Preferred B-1 Unit Accounts will be canceled.

Preferred Series B-2 Unit Accounts

The Preferred Series B-2 Unit Accounts of Ben LP ("Ben LP Preferred B-2 Unit Accounts") will be created pursuant to the Ben LP LPA. The Preferred Series B Subclass 2 Unit Accounts of BCH ("BCH Preferred B-2 Unit Accounts") will be created pursuant to the BCH LPA. The Ben LP Preferred B-2 Unit Accounts will correspond to the BCH Preferred B-2 Unit Accounts to be issued by BCH to Ben LP, as the sole holder of the BCH Preferred B-2 Unit Accounts. The BCH LP Preferred B-2 Unit Accounts will be entitled to certain distributions and income allocations. Upon Ben LP's receipt of any allocation, distribution, or return of capital on the BCH Preferred B-2 Unit Accounts, Ben LP will make a corresponding allocation, distribution, or return of capital to the holders of the Ben LP Preferred B-2 Unit Accounts in accordance with the Ben LP LPA.

Upon an Initial Listing Event, each Ben LP Preferred B-2 Unit Account shall be cancelled and converted into a certain number of Ben LP's Common Units, dependent on certain other conditions being met. Similarly, upon an Initial Listing Event, the BCH Preferred B-2 Unit Accounts held by Ben LP will be cancelled and converted into a certain number of BCH Class A Units, dependent on certain other conditions being met.

Other allocations, distributions or returns of capital may be made subject to the provisions of the BCH LPA and Ben LPA. Additionally, holders of Ben LP Preferred B-2 Unit Accounts may be entitled to a return of capital, pending certain conditions, on December 31, 2025.

With respect to Ben LP, upon its sale, liquidation, dissolution or winding up, the Ben LP Preferred B-2 Unit Accounts will rank (a) junior to the Ben LP Preferred B-1 Unit Accounts and (b) senior to all other currently issued and outstanding classes and series of Ben

APP. 785

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 786 of 1031    PageID 958

LP's preferred units and common units (i.e., Ben LP's Common Units), but, because Ben LP has a holding company structure, the Ben LP Preferred B-2 Unit Accounts will be structurally subordinated to interests in BCH. With respect

Page 48

APP. 786

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 787 of 1031     PageID 959

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

to BCH, upon its sale, liquidation, dissolution or winding up, the BCH Preferred B-2 Unit Accounts held by Ben LP will be entitled to distributions pursuant to an effective ranking of (a) junior to certain guaranteed payments to the holders of the Preferred A.0, any required distributions to the holders of the FLP 3 Unit Accounts, (b) junior to the Preferred A.0, (c) junior to the BCH Preferred B-1 Unit Accounts, (d) junior to the BCH Preferred C-0 Unit Accounts; (e) pari passu and pro rata with the BCH Preferred A-1 Unit Accounts, and (f) senior to all other currently issued and outstanding classes and series of BCH's preferred units and common units. Upon payment to Ben LP as the holder of the BCH Preferred B-2 Unit Accounts in an amount equal to the positive amount of the capital account balance attributable to the BCH Preferred B-2 Unit Accounts, the BCH Preferred B-2 Unit Accounts will be cancelled.

*The disclosure in this Note 17 concerning Ben LP securities offerings shall not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of Ben LP securities in any state or jurisdiction in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such state or jurisdiction. The securities offered by Ben LP will not be registered under the Securities Act of 1933, as amended, and may not be offered or sold in the United States absent registration or an applicable exemption from registration.*

Subclass 3 FLP Unit Accounts

The Subclass 3 FLP Unit Accounts (the "FLP 3 Unit Accounts") will be created pursuant to the BCH LPA. All FLP 3 Unit Accounts will be granted to, and held by, BHI. The FLP 3 Unit Accounts will be allocated profits from net financing revenues on a quarterly basis equal to the lesser of (i) 5% of the quarterly net financing revenues, or (ii) 10% of the average annualized stated interest (to the extent constituting net financing revenue) of the quarterly average of new loans issued by any subsidiaries of Ben LP during the previous twelve fiscal quarters.

The FLP 3 Unit Accounts will also be entitled to tax and other distributions equal to 100% of the amount of profits allocated to the FLP 3 Unit Accounts, and such distributions will not be subject to available cash. The FLP 3 Unit Accounts do not have any conversion features or rights.

Modifications to Preferred Series A Subclass 0 Unit Accounts

As a subclass of the Preferred Series A Unit Accounts, the Preferred A.0 will be modified pursuant to the BCH LPA. As part of the BCH LPA taking effect, 20% of the current outstanding capital accounts of Preferred Series A Subclass 1 Unit Accounts of BCH, with the exception of the capital accounts held by GWG Holdings, shall be automatically converted into Preferred A.0. This will result in the issuance of $252.8 million of the Preferred A.0. Currently, the Preferred A.0 receives the same preferred return on a quarterly basis as the other Preferred Series A subclasses of BCH. Under the BCH LPA, the Preferred A.0 will cease to receive any form of preferred return. Instead, the Preferred A.0 shall receive a quarterly guaranteed payment calculated as 6% of the Preferred A.0's initial capital account balance on an annual basis, or 1.50% per fiscal quarter. The Preferred A.0 will no longer receive any allocations of profits. The guaranteed payment to Preferred A.0 is not subject to available cash and has priority over all other distributions made by BCH.

Additionally, the Preferred A.0 will have the ability under the BCH LPA to elect, by a majority of holders of Preferred A.0, to receive a full return of capital senior to any other security in the event of an event causing mandatory returns of capital. There will be no change to the conversion abilities of the Preferred A.0

Finally, a holder of Pref A.0, subsequent to January 1, 2023, may elect to force a redemption of up to 12.5% of his or her respective Preferred A.0 Capital Account by BCH on an annual basis. If a holder of Preferred A.0 has elected to have a portion of his or her Preferred A.0 redeemed and also continues to hold Preferred Series A Subclass 1 Unit Accounts, such holder may elect on an annual basis to convert additional Preferred Series A Subclass 1 Unit Accounts held by such holder to Preferred A.0 up to an amount equal to 12.5% of such holder's initial Preferred A.0 capital account.

*Amendments to LNV Credit Facility*

Pursuant to a letter agreement, dated as of November 15, 2021 (the "Letter Agreement"), by and among DLP IV, as borrower, LNV Corporation, as lender, and CLMG Corp., as the administrative agent on behalf of the lenders under the LNV Credit Facility, the parties thereto modified the terms of the Fourth LNV Credit Facility. In order to collect policy benefits from pledged policies, DLP IV maintains a collection account (the "Collection Account") with Wells Fargo Bank, N.A., as securities intermediary, for the benefit of the lenders under the LNV Credit Facility. Pursuant to the Letter Agreement, LNV Corporation and CLMG Corp. agreed to release $17.0 million from the Collection Account, which represented the entire balance of the

APP. 787

Page 49

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 789 of 1031    PageID 961

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

Collection Account as of November 15, 2021, to DLP IV in exchange for an irrevocable beneficial interest in three percent (3.0%) of the U.S. dollar death benefit payable under each life insurance policy pledged as collateral under the LNV Credit Facility (the "Pledged Policies"). As of November 15, 2021, the aggregate face value of policies pledged under the LNV Credit Facility was approximately $1.4 billion.

On and after the date of the Letter Agreement, three percent (3.0%) of any amount received by DLP IV with respect to any death benefit under any Pledged Policy will be payable directly to CLMG Corp. for the benefit of the lenders. Such death benefit amounts payable to CLMG Corp. will not serve to reduce the outstanding obligations owed by DLP IV under the LNV Credit Facility. The Company expects that this three percent (3.0%) beneficial interest will result in a significant downward adjustment to the fair value of the policies pledged under the LNV Credit Facility as of December 31, 2021, in addition to other potential accounting implications that are currently being evaluated.

*COVID-19*

In December 2019, a novel strain of coronavirus and the associated respiratory disease ("COVID-19") was first reported in Wuhan, China. Less than four months later, on March 11, 2020, the World Health Organization declared COVID-19 a pandemic. The extent of COVID-19's effect on the Company's operational and financial performance will depend on continuing developments, including the duration, spread and intensity of the pandemic, all of which are uncertain and difficult to predict considering the rapidly evolving landscape. Although a substantial majority of our employees continue to work remotely, we have maintained our operations at or near normal levels. We have not experienced any significant disruptions due to operational issues, loss of communication capabilities, technology failure or cyber-attacks. The Company continues to raise capital, receive distributions from alternative assets and insurance policy benefits, pay interest and dividends and otherwise meet its ongoing obligations. However, depending on the extent of the ongoing economic crisis resulting from the pandemic and its impact on the Company's business, the pandemic could have a material adverse effect on our results of operations, financial condition and cash flows.

*Policy Benefits and L Bonds*

Subsequent to September 30, 2021 through November 10, 2021, policy benefits on 12 policies covering 9 individuals have been realized. The face value of insurance benefits of these policies was $16.3 million.

GWG Holdings issued approximately $191.6 million L Bonds in the current year through April 16, 2021, the date we temporarily suspended GWG Holdings' L Bond offering. No L Bonds have been sold since April 16, 2021.

Page 50

## ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.

*The following discussion should be read in conjunction with the accompanying condensed consolidated financial statements and accompanying notes and the information contained in other sections of this report. This discussion and analysis is based on the beliefs of our management, as well as assumptions made by, and information currently available to, our management.*

*Unless the context otherwise indicates, all references in this Management's Discussion and Analysis of Financial Condition and Results of Operations, or MD&A, to the "Company," "we," "us," "our" or "ours" or similar words are to GWG Holdings Inc. and its direct and indirect wholly-owned and consolidated subsidiaries, references to "GWG Holdings" refer to GWG Holdings Inc., references to "GWG Life" refer to GWG Life, LLC (a wholly-owned subsidiary of GWG Holdings), references to "DLP IV" refer to GWG DLP Funding IV, LLC (a wholly-owned subsidiary of GWG Life), references to "DLP V Holdings" refer to GWG DLP Funding V Holdings, LLC (a wholly-owned subsidiary of GWG Life), references to "DLP V" refer to GWG DLP Funding V, LLC (a wholly-owned subsidiary of DLP V Holdings), references to "DLP VI Holdings" refer to GWG DLP Funding Holdings VI, LLC (a wholly-owned subsidiary of GWG Life), references to "DLP VI" refer to GWG DLP Funding VI, LLC (a wholly-owned subsidiary of DLP VI Holdings), references to "Ben LP" refer to The Beneficient Company Group, L.P. (a consolidated subsidiary of GWG Holdings), references to "Beneficient" refer to Ben LP and all of its consolidated subsidiaries, references to "BCH" refer to Beneficient Company Holdings, L.P. (of which Ben LP is the general partner), references to "Beneficient Management" refer to Beneficient Management, L.L.C. (the general partner of Ben LP), references to "BCC" refer to Beneficient Capital Company, L.L.C. (a subsidiary of Ben LP), references to "BACC" refer to Beneficient Administrative and Clearing Company, L.L.C. (a subsidiary of Ben LP), references to "Pen" refer to Pen Indemnity Insurance Company, LTD (a subsidiary of Ben LP), references to "Ben Markets" refer to Ben Markets L.L.C. (a subsidiary of Ben LP), references to "FOXO" refer to FOXO Technologies Inc. (formerly, FOXO BioScience LLC, an equity investee of GWG Holdings), references to "FOXO Labs" refer to FOXO Labs Inc. (formerly, Life Epigenetics Inc., a wholly-owned subsidiary of FOXO), references to "FOXO Life" refer to FOXO Life LLC (formerly, youSurance General Agency, LLC, a wholly-owned subsidiary of FOXO), and references to the "ExAlt Plan™" refer to a trust structure comprising customized trust vehicles (the "ExAlt Trusts" and each, an "ExAlt Trust") .*

### *Risk Relating to Forward-Looking Statements*

This report contains forward-looking statements that reflect our current expectations and projections about future events. Actual results could differ materially from those described in these forward-looking statements.

The words "believe," "could," "possibly," "probably," "anticipate," "estimate," "project," "expect," "may," "will," "should," "seek," "intend," "plan," "expect," or "consider" and similar expressions are intended to identify forward-looking statements but are not the exclusive means of identifying such statements. Forward-looking statements are subject to risks and uncertainties, which could cause actual results to differ materially from such statements. Many of the forward-looking statements contained in this report can be found in the following discussion and analysis.

Such risks and uncertainties include, but are not limited to:

- substantial doubt about our ability to continue as a going concern;
- the valuation of assets reflected on our financial statements;
- the illiquidity of our life insurance investments and receivables from affiliates;
- the continued success of the alternative assets industry;
- our ability to realize the anticipated benefits from our consolidation of Beneficient;
- Beneficient's financial performance and ability to execute on its business plan;
- Beneficient's ability to obtain the trust company charter from the Texas Department of Banking and its trust bank charter from the Kansas State Bank Commissioner necessary to implement its business plan;
- changes resulting from the evolution of our business model and strategy with respect to Beneficient and the life insurance secondary market;
- our reliance on debt financing and continued access to the capital markets;
- our significant and ongoing financing requirements;

APP. 790

Case 3:22-cv-00410-B   Document 32-1   Filed 04/19/22   Page 791 of 1031   PageID 963

- our predominant use of short-term debt to fund a portfolio of long-term assets could result in a liquidity shortage;

Page 51

- our ability to make cash distributions in satisfaction of dividend obligations and redemption requests;
- our ability to satisfy our debt obligations if we were to sell our assets;
- general economic outlook, including prevailing interest rates;
- the novel coronavirus pandemic, the ongoing economic downturn and its impact on our business;
- federal, state, FINRA and other regulatory matters;
- litigation risks;
- our ability to comply with financial and non-financial covenants contained in borrowing agreements;
- the reliability of assumptions underlying our actuarial models, including life expectancy ("LE") estimates and our projections of mortality events and the realization of policy benefits;
- risks relating to the validity and enforceability of the life insurance policies we purchase;
- our reliance on information provided and obtained by third parties, including changes in underwriting tables and underwriting methodology;
- life insurance company credit exposure;
- cost-of-insurance (premium) increases on our life insurance policies;
- performance of our investments in life insurance policies; and
- risks associated with our investment in FOXO Technologies Inc. (formerly FOXO BioScience LLC).

We caution you that the foregoing list of factors is not exhaustive. Forward-looking statements are only estimates and predictions, or statements of current intent. Actual results, outcomes or actions that we ultimately undertake could differ materially from those anticipated in the forward-looking statements due to risks, uncertainties or actual events differing from the assumptions underlying these statements. We assume no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events, or otherwise, except as required by law.

## Overview

We are an innovative financial services firm based in Dallas, Texas that is a leader in providing unique liquidity solutions and services for the owners of illiquid investments. In 2018 and 2019, GWG Holdings and GWG Life consummated a series of transactions with The Beneficient Company Group, L.P. ("Ben LP" including all of the subsidiaries it may have from time to time — "Beneficient"), as more fully described in Note 1 to our accompanying condensed consolidated financial statements in this Form 10-Q. On December 31, 2019, GWG Holdings obtained the right to appoint a majority of the board of directors of Beneficient Management. As a result of this change-of-control event, GWG Holdings reported the results of Beneficient on a consolidated basis beginning on the transaction date of December 31, 2019. As further described in Note 17 to the accompanying condensed consolidated financial statements, on August 13, 2021, GWG Holdings, Ben LP, and BCH entered into a non-binding term sheet (the "Term Sheet") that contemplates a series of transactions, which, once completed, is expected to result in, among other things, the deconsolidation of Beneficient from GWG Holdings.

Beneficient is a financial services company, based in Dallas, Texas, that markets an array of liquidity and trust administration products to alternative asset investors primarily comprised of mid-to-high-net-worth individuals having a net worth between $5 million and $30 million ("MHNW") and small-to-midsize institutional investors and family offices with less than $1 billion in investable assets ("STMIs"). Ben LP plans to offer its products and services through its five operating subsidiaries, which include (i) Ben Liquidity, L.L.C. and its subsidiaries (collectively, "Ben Liquidity"), (ii) Ben Custody, L.L.C. and its subsidiaries (collectively, "Ben Custody Admin"), (iii) Ben Insurance, L.L.C. and its subsidiaries (collectively, "Ben Insurance"), (iv) Ben Markets, L.L.C., and its subsidiaries (collectively, "Ben Markets") and (v) The Beneficient Company Group (USA), L.L.C ("Beneficient USA"). Ben Liquidity plans to operate a trust company that is a Kansas Technology Enabled Fiduciary Financial Institutions ("TEFFI") authorized to serve as an alternative asset custodian, trustee and lender with statutory powers granted for each of these activities and permitting Ben Liquidity to provide fiduciary financing for certain of its customer liquidity transactions. Ben Custody Admin plans to operate a Texas trust company that is being organized to provide its customers with certain administrative, custodial and trustee products and specialized services focused on alternative asset investors. Ben Insurance has been chartered as a Bermuda based insurance company that plans to offer certain customized insurance products and services covering risks relating to owning, managing and transferring alternative assets. Ben Markets is in the regulatory process for acquiring a captive registered broker-dealer that would conduct certain of its activities attendant to offering a suite of products and services from the Beneficient family of companies. Certain of Ben LP's operating

APP. 792

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 793 of 1031     PageID 965

subsidiary products and services involve or are offered to certain of the ExAlt Trusts, which operate for the benefit of the Non-Controlling Interest Holders, and are consolidated subsidiaries of Ben LP for financial reporting purposes (such trusts are and may

Page 52

APP. 793

individually be referred to as Custody Trusts, Collective Trusts, LiquidTrusts, and Funding Trusts). Beneficient USA employs a substantial majority of the executives and staff for Beneficient's operating subsidiaries to which Beneficient USA provides administrative and technical services.

We believe that Beneficient's operations will generally produce higher risk adjusted returns than those we can achieve from life insurance policies acquired in the secondary market; however, returns on equity in life settlements, especially with the current availability of financings on favorable terms, appear to be an attractive option to diversify our exposure to alternative assets, and we have begun exploring the feasibility of acquiring such policies. Furthermore, although we believe that our portfolio of life insurance policies is a meaningful component of a growing diversified alternative asset portfolio, we continue to explore strategic alternatives for our life insurance portfolio aimed at maximizing its value, including a possible sale, refinancing, recapitalization, partnership, reinsurance guarantees, life insurance operations or other transactions involving our life insurance portfolio, as well as pursuing other alternatives to increase our exposure to alternative assets. These operations are in addition to allocating capital to provide liquidity to holders of a broader range of alternative assets, which we currently provide through GWG Holdings' and GWG Life's investments in Beneficient.

GWG Holdings completed the transactions with Beneficient, in part, to provide the Company with a significant increase in assets and common stockholders' equity. In addition, the transactions with Beneficient may provide us with the opportunity for a diversified source of future earnings within the alternative asset industry. We believe the Beneficient transactions and the other strategies we are pursuing will transform GWG Holdings from a niche provider of liquidity to owners of life insurance to a diversified provider of financial products and services with exposure to a broad range of alternative assets.

**Restatement**

The Company restated its previously issued (i) consolidated balance sheet as of December 31, 2019, included in its Annual Report on Form 10-K for the year ended December 31, 2019 and (ii) the consolidated statement of operations, (iii) the consolidated statement of changes in stockholders' equity, and (iv) the consolidated statement of cash flows for the year ended December 31, 2019, included in its Annual Report on Form 10-K for the year ended December 31, 2019, (the "Restatement") as part of its 2020 Form 10-K. The Restatement also impacted each of the quarters for the periods beginning with GWG Holdings, Inc.'s consolidation with The Beneficient Company Group, L.P. ("Ben LP," including all of the subsidiaries it may have from time to time — "Beneficient") as of December 31, 2019 through the quarter ended September 30, 2020.

The historical interim periods included in this Form 10-Q have been restated to reflect the Restatement.

**Critical Accounting Policies and Estimates**

*Critical Accounting Estimates*

The preparation of our accompanying condensed consolidated financial statements in accordance with accounting principles generally accepted in the United States of America ("GAAP") requires us to make significant judgments, estimates, and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. We base our judgments, estimates, and assumptions on historical experience and on various other factors believed to be reasonable under the circumstances. Actual results could differ materially from these estimates. We evaluate our judgments, estimates, and assumptions on a regular basis and make changes accordingly.

Material estimates that are particularly susceptible to change, in the near term, relate to: determining the assumptions used in estimating the fair value of our investments in life insurance policies; determining the grant date fair value for equity-based compensation awards; determining the allocation of income (loss) to Beneficient's equity holders; and evaluation of potential impairment of goodwill and other intangibles. We believe these estimates are likely to have the greatest potential impact on our accompanying condensed consolidated financial statements and accordingly believe these to be our critical accounting estimates.

As it relates to the goodwill intangible asset, in light of Beneficient's significant recurring losses from operations, negative cash flows from operations, and delays in executing its business plans, management plans to engage a third-party valuation firm to assist in performing a quantitative goodwill impairment test in the fourth quarter of 2021. The valuation work related to the goodwill intangible is not complete, and we expect the work to be completed before the filing of our 2021 annual financial

APP. 794

Page 53

statements. While management has implemented strategies to execute its business plans, a failure to execute our business plans or adverse market changes in the future could result in changes in management's forecasts, which could result in a decline in estimated fair value of the Beneficient reporting unit and would result in an impairment of our goodwill intangible. Key assumptions in our quantitative goodwill impairment test include assumptions regarding Ben LP's ability to raise substantial amounts of capital as disclosed in the 2020 Form 10-K (as defined below). Beneficient is actively engaged in capital raising efforts that may include the issuance of equity or debt of Ben LP or one of its subsidiaries and has received non-binding indications of interest from potential investors. The outcome of Ben LP's capital raising efforts will have a direct impact on management's forecasts and consequently, have a direct impact on the magnitude of future goodwill intangible impairment losses, if any. The outcome of Ben LP's capital raising efforts is uncertain, and it is not certain that the potential investors that have submitted non-binding indications of interest ultimately will invest in Ben LP, or the amount of any such investments. As a result, our quantitative goodwill intangible impairment analysis, once complete, could result in material goodwill intangible impairment in the near future.

_Update on the Investments in Life Insurance Policies_

We maintain an actual-to-expected analysis-based valuation methodology ("A2E Methodology") to ensure more accurate pricing and valuation of our life insurance policies. Proper maintenance of an A2E Methodology includes the continual tracking of actual results as well as comparisons to projections. An A2E Methodology rests on the actuarial premise that mortality results for sufficiently large populations follow predictable mortality curves. As such, through the A2E Methodology and the use of the portfolio mortality multiplier ("PMM"), we are able to "fit" projections to actual results, which provides a basis to forecast future performance more accurately.

When performance sufficiently deviates from these projections, the A2E Methodology is re-examined to determine if the resultant PMM still results in the most accurate fitting of the projections to actual results. Adjustments to the PMM are made based on that analysis if warranted. The basis for a re-examination is based on a performance-based trigger approach that allows the portfolio to perform within statistical norms (+/- 1 standard deviation). We re-examine the A2E Methodology and recalculate the resultant PMM anytime the six-month moving average of the difference between actual portfolio performance and projected performance deviates by more than one standard deviation from the mean and such deviation continues as of the end of any calendar quarter after persisting for three consecutive months.

A re-examination occurred during second quarter of 2021, which resulted in an update to the PMM and a downward adjustment of $16.4 million to the fair value of the investments in life insurance policies.

**Critical Accounting Policies**

Refer to our Annual Report on Form 10-K for the year ended December 31, 2020 filed with the SEC on November 5, 2021 ("2020 Form 10-K") for a discussion of our critical accounting policies and estimates. There have been no significant changes to our critical accounting policies during the nine months ended September 30, 2021.

**Recent Developments**

We define "recent developments" as material transactions or matters that occurred in the most recent fiscal quarter or in the period between the end of the fiscal quarter and the filing of the quarterly or annual financial statements with the SEC. The following recent developments are described in more detail in the notes to the accompanying condensed consolidated financial statements. A reference to the corresponding note is included below:

- Effective July 15, 2021, Beneficient executed Consent and Amendment No. 3 to the Second Amended and Restated Credit Agreement and Amendment No. 2 to the Second Amended and Restated Subordinate Credit Agreement with its lender, which (i) deferred the payment of all accrued and unpaid interest until December 10, 2021, and (ii) deferred the installment payment of $5.0 million due on September 10, 2021, to December 10, 2021. Beneficient agreed to pay an amendment fee to the lender in an amount equal to 3% of the then outstanding principal and interest on December 10, 2021 (Note 9).

Page 54                                                                                          APP. 796

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 797 of 1031     PageID 969

APP. 797

- On August 11, 2021, GWG DLP Funding VI, LLC, a Delaware limited liability company ("DLP VI"), entered into a Credit Agreement (the "NF Credit Agreement") with each lender from time to time party thereto and National Founders LP, a Delaware limited partnership, as the administrative agent (the credit facility evidenced by such NF Credit Agreement, the "NF Credit Facility") that resulted in a one-time $107.6 million advance with a scheduled maturity date of August 11, 2031 (Note 9). Approximately $56.7 million of such advanced amount was used to pay off the remaining amount due under the Third LNV Credit Facility.

- On August 13, 2021, GWG Holdings, Ben LP, and BCH entered into a Term Sheet that contemplates a series of transactions, which, once completed, is expected to result in, among other things, (i) GWG Holdings receiving certain proposed enhancements to its investments in Beneficient; (ii) GWG Holdings no longer having the right to appoint directors of the board of directors of Beneficient Management; and (iii) Beneficient no longer being a consolidated subsidiary of GWG Holdings (Note 17).

- On September 7, 2021, DLP IV entered into a Fourth Amended and Restated Loan and Security Agreement with LNV Corporation, as lender, and CLMG Corp., as the administrative agent on behalf of the lenders under the agreement (the "Fourth LNV Credit Facility") that resulted in a $30.3 million advance from LNV Corporation, with such advance including amounts to cover certain fees and expenses incurred in connection with the entry into the Fourth LNV Credit Facility (Note 9).

- Pursuant to a letter agreement, dated as of November 15, 2021 (the "Letter Agreement"), DLP IV, as borrower, LNV Corporation, as lender, and CLMG Corp., as the administrative agent on behalf of the lenders under the LNV Credit Facility, the parties thereto modified the terms of the Fourth LNV Credit Facility. Pursuant to the Letter Agreement, LNV Corporation and CLMG Corp. agreed to release $17.0 million from the collection account, which is maintained by DLP to collect policy benefits from pledged policies, to DLP IV in exchange for an irrevocable beneficial interest in three percent (3.0%) of the U.S. dollar death benefit payable under each life insurance policy pledged as collateral under the LNV Credit Facility.

- An update on the current state of the Company and potential impact of the COVID-19 pandemic (Note 17).

Page 55

APP. 798

**Asset Diversification**

As of September 30, 2021, we held a combined portfolio of assets consisting of 77% of fair value secondary life insurance policies and 23% of indirect interests in alternative assets held by certain of the ExAlt Trusts. The table presented below reflects classifications based on GWG Holdings' and Beneficient's current exposure types as of September 30, 2021 (dollar amounts in thousands). Additional information regarding the Collateral portfolio is available on its website at *www.trustben.com*. The information on Beneficient's website is not part of, or incorporated by reference in, this report.

| Exposure Type | Value | Percent of Total |
|---|---:|---:|
| Near-Duration Life Insurance Policies [1] | $ 334,450 | 33.7 % |
| Intermediate-Duration Life Insurance Policies [1] | 288,996 | 29.3 % |
| Long-Duration Life Insurance Policies [1] | 138,114 | 14.0 % |
| Growth Stage Private [2] | 84,039 | 8.5 % |
| Late Stage Venture Backed [2] | 72,316 | 7.3 % |
| Early Stage Venture Backed [2] | 30,141 | 3.1 % |
| Other [2] | 24,317 | 2.5 % |
| Corporate Buyouts [2] | 15,325 | 1.6 % |
| **Total** | $ 987,698 | 100.0 % |

(1)   Represents fair value of life insurance policies.
(2)   Represents the net asset value ("NAV") of the interests in alternative assets that provide cash flows, which comprise the Collateral of the ExAlt Loans (defined in section below entitled *ExAlt Trusts' Investment in Alternative Assets)*. Excludes collateral exchanged in the Collateral Swap, which are eliminated in consolidation. These ExAlt Loans eliminate upon consolidation in the presentation of our accompanying condensed consolidated financial statements. The Net Asset Value ("NAV") calculation reflects the most current report of NAV and other data received from firm/fund sponsors. If no such report has been received, Beneficient estimates NAV based upon the last NAV calculation reported by the investment manager and adjusts it for capital calls and distributions made in the intervening time frame.

The underlying exposure data represents GWG Holdings' exposure to life insurance policies included in its portfolio and its exposure to the underlying Collateral of Beneficient's loan portfolio to the ExAlt Trusts. Exposure type reflects classifications based on each company's portfolio as determined by management. Figures are based on third-party information and other relevant information as determined by management. "Other" includes private debt strategies, natural resources strategies, and hedge funds. "Near-Term", "Intermediate-Term", and "Long-Term" life insurance policies represent policies with life expectancies between 0 – 47 months, 48 – 95 months, and 96 – 240 months, respectively.

The following sections contain information on each of the secondary life insurance assets and the interests in alternative assets held by certain of the ExAlt Trusts separately.

<div align="center">Page 56</div>

*Secondary Life Insurance Assets*

Our portfolio of life insurance policies, owned by GWG Holdings' subsidiaries as of September 30, 2021, is summarized below:

**Life Insurance Portfolio Summary**

| | | |
|---|---|---:|
| Total life insurance portfolio face value of policy benefits (in thousands) | $ | 1,801,306 |
| Average face value per policy (in thousands) | $ | 1,831 |
| Average face value per insured life (in thousands) | $ | 1,984 |
| Weighted average age of insured (years) | | 83.6 |
| Weighted average life expectancy estimate (years) | | 6.4 |
| Total number of policies | | 984 |
| Number of unique lives | | 908 |
| Demographics | | 74% Male; 26% Female |
| Number of smokers | | 36 |
| Largest policy as % of total portfolio face value | | 0.7 % |
| Average policy as % of total portfolio | | 0.1 % |
| Average annual premium as % of face value | | 4.1 % |

Our portfolio of life insurance policies, owned by GWG Holdings' subsidiaries as of September 30, 2021, organized by the insured's current age and the associated number of policies and policy benefits, is summarized below:

**Distribution of Policies and Policy Benefits by Current Age of Insured**

| Min Age | Max Age | Number of Policies | Policy Benefits (in thousands) | Percentage of Total Number of Policies | Policy Benefits | Weighted Average LE (Years) |
|---|---|---:|---:|---:|---:|---:|
| 64 | 69 | 23 | $ 22,735 | 2.3 % | 1.2 % | 11.4 |
| 70 | 74 | 168 | 198,473 | 17.1 % | 11.0 % | 10.1 |
| 75 | 79 | 197 | 340,040 | 20.0 % | 18.9 % | 9.3 |
| 80 | 84 | 197 | 350,391 | 20.0 % | 19.5 % | 7.5 |
| 85 | 89 | 210 | 489,899 | 21.3 % | 27.2 % | 4.8 |
| 90 | 94 | 155 | 334,534 | 15.8 % | 18.6 % | 3.1 |
| 95 | 101 | 34 | 65,234 | 3.5 % | 3.6 % | 2.2 |
| **Total** | | 984 | $ 1,801,306 | 100.0 % | 100.0 % | 6.4 |

Page 57

Our portfolio of life insurance policies, owned by GWG Holdings' subsidiaries as of September 30, 2021, organized by the insured's estimated life expectancy estimates and associated policy benefits, is summarized below:

**Distribution of Policies by Current Life Expectancies of Insured**

| Min LE (Months) | Max LE (Months) | Number of Policies | Policy Benefits (in Thousands) | Percentage of Total | |
|---|---|---|---|---|---|
| | | | | Number of Policies | Policy Benefits |
| 0 | 47 | 295 | $ 531,585 | 30.1 % | 29.6 % |
| 48 | 71 | 213 | 380,621 | 21.6 % | 21.1 % |
| 72 | 95 | 178 | 334,664 | 18.1 % | 18.6 % |
| 96 | 119 | 140 | 248,971 | 14.2 % | 13.8 % |
| 120 | 143 | 92 | 133,992 | 9.3 % | 7.4 % |
| 144 | 179 | 58 | 149,198 | 5.9 % | 8.3 % |
| 180 | 240 | 8 | 22,275 | 0.8 % | 1.2 % |
| **Total** | | 984 | $ 1,801,306 | 100.0 % | 100.0 % |

We rely on the payment of policy benefit claims by life insurance companies as a significant source of cash inflow. The life insurance assets we own represent obligations of third-party life insurance companies to pay the benefit amount under the policy upon the mortality of the insured. As a result, we manage this credit risk exposure by generally purchasing policies issued by insurance companies with investment-grade credit ratings from Standard & Poor's, and diversifying our life insurance portfolio among a number of insurance companies.

The yield to maturity on bonds issued by life insurance carriers reflects, among other things, the credit risk (risk of default) of such insurance carrier. We follow the yields on certain publicly traded life insurance company bonds because this information is part of the data we consider when valuing our portfolio of life insurance policies for our financial statements.

The average yield to maturity of publicly traded life insurance company bonds data we consider as inputs to our life insurance portfolio valuation process was 1.64% as of September 30, 2021. We believe this average yield to maturity reflects, in part, the financial market's judgment that credit risk is low with regard to these carriers' financial obligations. The obligations of life insurance carriers to pay life insurance policy benefits ranks senior to all of their other financial obligations, including the senior bonds they issue. As of September 30, 2021, 94.7% of the face value benefits of our life insurance policies were issued by insurers having an investment-grade credit rating (BBB or better) by Standard & Poor's.

As of September 30, 2021, our ten largest life insurance company credit exposures and the Standard & Poor's credit rating of their respective financial strength and claims-paying ability is set forth below:

**Distribution of Policy Benefits by Top 10 Insurance Companies**

| Rank | Policy Benefits (in Thousands) | Percentage of Policy Benefit Amount | Insurance Company | S&P Insurer Financial Strength Rating |
|------|-------------------------------|-------------------------------------|-------------------|---------------------------------------|
| 1 | $ 240,132 | 13.3 % | John Hancock Life Insurance Company | AA- |
| 2 | 207,917 | 11.5 % | Lincoln National Life Insurance Company | AA- |
| 3 | 198,091 | 11.0 % | Equitable Financial Life Insurance Company | A+ |
| 4 | 156,976 | 8.7 % | Transamerica Life Insurance Company | A+ |
| 5 | 150,789 | 8.4 % | Brighthouse Life Insurance Company | AA- |
| 6 | 84,081 | 4.7 % | Pacific Life Insurance Company | AA- |
| 7 | 81,389 | 4.5 % | American General Life Insurance Company | A+ |
| 8 | 63,876 | 3.5 % | ReliaStar Life Insurance Company | A+ |
| 9 | 56,732 | 3.1 % | Security Life of Denver Insurance Company | A- |
| 10 | 53,419 | 3.0 % | Protective Life Insurance Company | AA- |
| | $ 1,293,402 | 71.7 % | | |

### *ExAlt Trusts' Investment in Alternative Assets*

Beneficient's primary operations, which commenced on September 1, 2017, consist of offering its liquidity and trust administration services to its customers, primarily through certain of Ben LP's operating subsidiaries, Ben Liquidity (as defined below) and Ben Custody Admin (as defined below), respectively. Ben Liquidity offers simple, rapid and cost-effective liquidity products to its customers through the use of customized trust vehicles, the ExAlt Trusts, that facilitate the exchange of a customer's alternative assets for consideration using a unique financing structure. A subsidiary of Ben Liquidity makes ExAlt Loans to certain of the ExAlt Trusts. Ben Liquidity generates interest and fee income earned in connection with such ExAlt Loans to certain of the ExAlt Trusts, which are collateralized by the cash flows from the exchanged alternative assets (the "Collateral"). Ben Custody Admin provides trust administration services to the trustees of certain of the ExAlt Trusts that own the exchanged alternative asset following a liquidity transaction for fees payable quarterly. The Collateral supports the repayment of the loans plus any related interest and fees. Since the ExAlt Trusts are consolidated, Ben LP's operating subsidiary ExAlt Loans and interest and fee income are eliminated in the presentation of our accompanying condensed consolidated financial statements.

The ExAlt Trusts' investments in alternative assets are the source of the Collateral supporting the ExAlt Loans. These assets consist primarily of limited partnership interests in various alternative investments, including private equity funds. These alternative investments are valued using NAV as a practical expedient. Changes in the NAV of these investments are recorded in investment income, net in our consolidated statements of operations. The ExAlt Trusts' investments in alternative assets provide the economic value creating the Collateral to the ExAlt Loans made in connection with each liquidity transaction.

The ExAlt Trusts held interests in alternative assets with a net asset value of $226.1 million and $221.9 million at September 30, 2021 and December 31, 2020, respectively. As of September 30, 2021, the ExAlt Trusts' portfolio had exposure to 111 professionally managed alternative investment funds, comprised of 301 underlying investments, 99 percent of which are investments in private companies.

Page 59

The portfolio of alternative assets, excluding the collateral exchanged in the Collateral Swap, which is eliminated in consolidation, covers the following industry sectors and geographic regions as of the dates shown below (dollar amounts in thousands):

| Industry Sector | September 30, 2021 Value | Percent of Total | December 31, 2020 Value | Percent of Total |
|---|---|---|---|---|
| Software and Services | $ 30,700 | 13.6 % | $ 23,310 | 10.5 % |
| Semiconductors and Semiconductor Equipment | 29,656 | 13.1 % | 21,271 | 9.6 % |
| Diversified Financials | 29,051 | 12.8 % | 28,462 | 12.8 % |
| Food and Staples Retailing | 26,986 | 11.9 % | 24,450 | 11.0 % |
| Telecommunication Services | 24,859 | 11.0 % | 27,401 | 12.3 % |
| Utilities | 23,208 | 10.3 % | 21,740 | 9.8 % |
| Not Applicable (e.g., Escrow, Earnouts)[1] | 15,524 | 6.9 % | 18,138 | 8.2 % |
| Health Care Equipment and Services | 12,056 | 5.3 % | 14,682 | 6.6 % |
| Other[1] | 34,098 | 15.1 % | 42,440 | 19.2 % |
| **Total** | $ 226,138 | 100.0 % | $ 221,894 | 100.0 % |

| Geography | September 30, 2021 Value | Percent of Total | December 31, 2020 Value | Percent of Total |
|---|---|---|---|---|
| North America | $ 97,182 | 43.0 % | $ 96,056 | 43.3 % |
| Asia | 48,421 | 21.4 % | 42,475 | 19.1 % |
| Southern Europe | 30,912 | 13.7 % | 36,229 | 16.3 % |
| South America | 27,248 | 12.0 % | 24,767 | 11.2 % |
| Western Europe | 20,773 | 9.2 % | 21,064 | 9.5 % |
| Other[2] | 1,602 | 0.7 % | 1,303 | 0.6 % |
| **Total** | $ 226,138 | 100.0 % | $ 221,894 | 100.0 % |

Certain previously reported amounts have been reclassified to agree with current presentation.

(1) Industries in this category each comprise less than 5 percent as of September 30, 2021.

(2) Locations in this category each comprise less than 5 percent.

Assets in the portfolio consist primarily of interests in alternative investment vehicles (also referred to as "funds") that are managed by a group of U.S. and non-U.S. based alternative asset management firms that invest in a variety of financial markets and utilize a variety of investment strategies. The vintages of the funds in the portfolio as of September 30, 2021 ranged from 1993 to 2021.

As the ExAlt Trusts grow their portfolio, they will monitor the diversity of the portfolio through the use of concentration guidelines. These guidelines were established, and will be periodically updated, through a data driven approach based on asset type, fund manager, vintage of fund, industry segment and geography to manage portfolio risk. Beneficient will refer to these guidelines when making decisions about new financing opportunities; however, these guidelines will not restrict Beneficient from entering into financing opportunities that would result in Beneficient having exposure outside of its concentration guidelines. In addition, changes to the ExAlt Trusts' portfolio may lag changes to the concentration guidelines. As such, the ExAlt Trusts' portfolio may, at any given time, have exposures that are outside of its concentration guidelines to reflect, among other things, attractive financing opportunities, limited availability of assets, or other business reasons. Given the ExAlt Trusts' limited operating history, the portfolio as of September 30, 2021 had exposure to certain alternative investment vehicles and investments in private companies that were outside of those guidelines.

Classifications by industry sector, exposure type and geography reflect classification of investments held in funds or companies held directly in the portfolio. Investments reflect the assets listed by the general partner of a fund as held by the fund and have a positive or negative net asset value. Typical assets include portfolio companies, limited partnership interests in other funds, and

APP. 803

Page 60

net other assets, which are a fund's cash and other current assets minus liabilities. The underlying interests in alternative assets are primarily limited partnership interests, and the limited partnership agreements governing those interests generally include restrictions on disclosure of fund-level information, including fund names and company names in the funds.

Industry sector is based on Global Industry Classification Standard (GICS®) Level 2 classification (also known as "Industry Group") of companies held in the portfolio by funds or directly, subject to certain adjustments by us. "Other" classification is not a GICS® classification. "Other" classification reflects companies in the GICS® classification categories of Automobiles & Components, Capital Goods, Commercial & Professional Services, Consumer Durables & Apparel, Consumer Services, Energy, Food, Beverage & Tobacco, Household & Personal Products, Insurance, Materials, Media & Entertainment, Pharmaceutical, Biotechnology & Life Sciences, Real Estate, Retailing, Tech Hardware & Equipment, and Transportation. N/A includes investments assets that we have determined do not have an applicable GICS® Level 2 classification, such as Net Other Assets and investments that are not operating companies.

Investment exposure type reflects classifications based on each fund's current investment strategy stage as determined by us. "Other" includes private debt strategies, natural resources strategies and hedge funds.

Geography reflects classifications determined by us based on each underlying investment. "Other" geography classification includes Australia, Northern Europe, and Eastern Europe.

**Principal Revenue and Expense Items**

During the three and nine months ended September 30, 2021 and 2020, we earned revenues from the following primary sources:

- *Revenue Realized from Maturities of Life Insurance Policies*. We recognize the difference between the face value of the policy benefits and carrying value when an insured event has occurred and determine that collection of the policy benefits is realizable and reasonably assured. Revenue from a transaction must meet both criteria in order to be recognized. We generally collect the face value of the life insurance policy from the insurance company within 45 days of our notification of the insured's mortality, but this collection time varies depending on the insurance company and individual policy.

- *Change in Fair Value of Life Insurance Policies*. We value our life insurance portfolio investments for each reporting period in accordance with the fair value principles discussed herein, which reflects the expected receipt of policy benefits in future periods, net of premium costs, as shown in our accompanying condensed consolidated financial statements.

- *Investment Income*. Includes the change in NAV of the alternative assets held by certain of the ExAlt Trusts.

- *Interest Income.* Primarily includes interest earned from policy benefits receivable and cash held in banks.

- *Other Income.* Includes changes in the fair value of Beneficient's investment in put options, L Bond redemption fees, and other miscellaneous income. Additionally, includes $36.3 million recognized during the second quarter of 2020 by Beneficient as a result of the forfeiture of vested equity-based compensation related to one former director of Beneficient.

During the three and nine months ended September 30, 2021 and 2020, our main components of expense are summarized below:

- *Interest Expense.* Includes interest incurred under the LNV Credit Facility and the NF Credit Facility, as well as interest paid on GWG Holdings' L Bonds, Seller Trust L Bonds and other outstanding indebtedness, including Beneficient's debt due to related parties. When we issue debt, we amortize the financing costs (commissions and other fees) associated with such indebtedness over the outstanding term of the financing and classify it as interest expense.

- *Employee Compensation and Benefits*. Employee compensation and benefits includes salaries, bonuses and other incentives and costs of employee benefits. Also included are significant non-cash compensation expenses totaling $13.1 million and $96.3 million for the nine months ended September 30, 2021 and 2020, respectively, related to Beneficient's equity incentive plans.

Page 61

APP. 805

- *Selling, General and Administrative Expenses.* We recognize and record expenses incurred in our business operations, including operations related to the servicing of life insurance policies, the origination and servicing of ExAlt Loans and costs associated with trust administration. These expenses include legal and professional fees, sales, marketing, occupancy and other expenditures.

Additional components of our net earnings include:

- *Earnings (Loss) from Equity Method Investment.* We account for GWG Holdings' investment in FOXO as an equity method investment, which is included in earnings (loss) from equity method investment in our accompanying condensed consolidated statements of operations. We had losses from equity method investments of $4.9 million and $1.4 million during the three months ended September 30, 2021 and 2020, respectively. We had losses from equity method investments of $11.9 million and $4.3 million during the nine months ended September 30, 2021 and 2020, respectively.

**Results of Operations —Three and Nine Months Ended September 30, 2021 Compared to the Same Periods in 2020**

The following is our analysis of the results of operations for the periods indicated below. This analysis should be read in conjunction with our accompanying condensed consolidated financial statements and related notes (dollar values in thousands).

*Net Loss Attributable to Common Shareholders*

Net loss attributable to common shareholders was $50.6 million and $48.9 million for the three months ended September 30, 2021 and 2020, respectively. Net loss attributable to common shareholders was $169.9 million and $120.5 million for the nine months ended September 30, 2021 and 2020, respectively. The results of operations for the three and nine months ended September 30, 2021 reflect higher interest expense as result of increased average debt balances and interest rates, combined with a lower gain on life insurance policies as a result of the adjustment to the PMM and lower revenue recognized from the change in fair value of life insurance policies. More details regarding revenue and expenses for the three and nine months ended September 30, 2021 and 2020 are included in the discussion below.

*Revenue from Secondary Life Insurance*

| | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2021 | | 2020 | | 2021 | | 2020 | |
| Revenue realized from maturities of life insurance policies | $ | 30,891 | $ | 26,336 | $ | 73,688 | $ | 72,939 |
| Revenue recognized from change in fair value of life insurance policies | | 3,860 | | 6,021 | | 623 | | 23,476 |
| Premiums and other annual fees paid | | (19,267) | | (18,235) | | (56,388) | | (53,060) |
| Gain on life insurance policies, net | $ | 15,484 | $ | 14,122 | $ | 17,923 | $ | 43,355 |
| **Attribution of gain on life insurance policies, net:** | | | | | | | | |
| Change in estimated probabilistic cash flows, net of premium and other annual fees paid | $ | (6,147) | $ | (3,512) | $ | (16,158) | $ | (5,137) |
| Change in life expectancy evaluation | | — | | — | | 2,337 | | — |
| Change in PMM | | — | | — | | (16,386) | | — |
| Net revenue recognized at maturity | | 21,631 | | 17,634 | | 48,130 | | 48,492 |
| Gain on life insurance policies, net | $ | 15,484 | $ | 14,122 | $ | 17,923 | $ | 43,355 |
| | | | | | | | | |
| Number of policies matured | | 26 | | 21 | | 74 | | 70 |
| Face value of matured policies | $ | 43,217 | $ | 39,803 | $ | 104,662 | $ | 105,194 |
| Net revenue recognized at maturity event (% of face value matured) | | 50.1 % | | 44.3 % | | 46.0 % | | 46.1 % |

Revenue from changes in estimated probabilistic cash flows, net of premiums paid was a charge of $6.1 million compared to $3.5 million during the three months ended September 30, 2021 and 2020, respectively. Revenue from changes in estimated probabilistic cash flows, net of premiums paid was a charge of $16.2 million and $5.1 million for the nine months ended September 30, 2021 and 2020, respectively. The increase of $1.4 million in gain on life insurance policies for the three months ended September 30, 2021 compared to the same period of 2020, was driven by higher revenue realized from maturities of life

APP. 806

Page 62

insurance policies, partially offset by a decreases in revenue recognized from the change in fair value of life insurance policies and higher premium costs due to the aging of the portfolio. The decrease of $25.4 million in gain on life insurance policies for the nine months ended September 30, 2021, respectively, over the comparable prior year period, was driven by higher premium costs due to the aging of the portfolio and lower amount of revenue recognized from changes in fair value of the policies still in force at September 30, 2021, partially offset by higher revenue realized from maturities of life insurance policies (see more details in the following paragraph). The lower amount of revenue recognized from changes in fair value of the policies is largely driven by the $16.4 million downward adjustment to fair value recorded as a result of an update to the PMM as discussed in the "Critical Accounting Policies and Estimates" section above.

The face value of matured policies was $43.2 million and $39.8 million for the three months ended September 30, 2021 and 2020, respectively, reflecting an increase in face value of matured policies of $3.4 million. The resulting revenue realized at maturity was $30.9 million and $26.3 million during the three months ended September 30, 2021 and 2020, respectively. The increased revenue realized at maturity during the comparable periods was primarily due to a higher number and face value of matured policies during the third quarter of 2021 compared to the third quarter of 2020.

The face value of matured policies was $104.7 million and $105.2 million for the nine months ended September 30, 2021 and 2020, respectively, reflecting a decrease in face value of matured policies of $0.5 million, respectively, during those periods. The resulting revenue recognized at maturity was $73.7 million and $72.9 million during the nine months ended September 30, 2021 and 2020, respectively. The revenue recognized at maturity was comparable between periods due to the relatively comparable face value of and average carrying value of policies that matured.

*Investment Income, Interest Income, and Other Income (in thousands)*

|  | Three Months Ended September 30, | | | Nine Months Ended September 30, | | |
|---|---|---|---|---|---|---|
|  | 2021 | 2020 | Variance | 2021 | 2020 | Variance |
| Investment income (loss) | $ 17,554 | $ 56,705 | $ (39,151) | $ 21,417 | $ 41,590 | $ (20,173) |
| Interest income | 213 | 278 | (65) | 835 | 1,293 | (458) |
| Other (loss) income | 535 | (3,093) | 3,628 | (2,916) | 33,504 | (36,420) |
| Total | $ 18,302 | $ 53,890 | $ (35,588) | $ 19,336 | $ 76,387 | $ (57,051) |

Investment income was $17.6 million and $21.4 million during the three and nine months ended September 30, 2021, respectively, driven by an increase in the NAV of the alternative assets held by certain of the ExAlt Trusts. Investment income was $56.7 million during the three months ended September 30, 2020 primarily due to a decrease to the repurchase option liability combined with an increase in NAV of the alternative assets held by certain of the ExAlt Trusts. Investment income was $41.6 million during the nine months ended September 30, 2020, due to decrease to the repurchase option liability, partially offset by an increase in the NAV of the alternative assets held by certain of the ExAlt Trusts.

Interest income decreased during the nine months ended September 30, 2021, compared to the same period in 2020, primarily due to a decrease in average cash balances and corresponding bank interest earned.

Other income (loss) during the three and nine months ended September 30, 2021, includes a $0.2 million increase and a $4.0 million decrease, respectively, to the fair value of Beneficient's investment in put options, compared to a $3.2 million decrease for both of the comparable periods of 2020. Other income for the nine months ended September 30, 2020, includes $36.3 million of income recognized during the second quarter of 2020 by Beneficient as a result of the forfeiture of vested equity-based compensation related to one former director of Beneficient. A substantial majority of the former director's equity-based compensation units were fully vested, and the related expense was recorded in prior periods. The three and nine months ended September 30, 2021 also includes higher L Bond early redemption fees and other miscellaneous income items recorded than in the comparable periods of 2020.

Page 63

*Interest and Operating Expenses (in thousands)*

| | Three Months Ended September 30, | | | Nine Months Ended September 30, | | |
|---|---|---|---|---|---|---|
| | **2021** | **2020** | **Variance** | **2021** | **2020** | **Variance** |
| Interest expense (including amortization of deferred financing costs) | $ 45,096 | $ 40,792 | $ 4,304 | $ 128,605 | $ 113,805 | $ 14,800 |
| Employee compensation and benefits | 14,871 | 33,777 | (18,906) | 43,977 | 123,321 | (79,344) |
| Legal and professional fees | 6,650 | 7,830 | (1,180) | 20,832 | 21,636 | (804) |
| Other expenses | 9,652 | 4,712 | 4,940 | 23,050 | 13,387 | 9,663 |
| Total expenses | $ 76,269 | $ 87,111 | $ (10,842) | $ 216,464 | $ 272,149 | $ (55,685) |

Interest expense, including amortization of deferred financing costs, increased $4.3 million and $14.8 million during the three and nine months ended September 30, 2021, respectively, compared to the same periods in 2020, primarily due to the increase in the average balance of outstanding L Bonds and increased deferred financing cost amortization as a result of the LNV credit facility amendments. The increase in interest expense was partially offset by the elimination of a portion of the interest expense on the Seller Trust L Bonds as a result of the Collateral Swap transaction that occurred on September 30, 2020. Additionally, interest expense on debt due to related parties for the three months ended September 30, 2021 compared to the same period in 2020 was lower due to a decrease in the average balance outstanding. Interest expense on debt due to related parties for the nine months ended September 30, 2021 compared to the same period in 2020 increased slightly due to an increase in in the interest rate and additional deferred financing cost amortization as a result of the amendments of Beneficient's credit agreements partially offset by a decrease in interest expense attributable to a lower average balance outstanding was offset by an increase

The decrease in employee compensation and benefits in the three and nine months ended September 30, 2021, compared to the same periods of 2020, was primarily related to Beneficient's equity incentive plans. Specifically, the Company recognized $4.1 million and $13.1 million during the three and nine months ended September 30, 2021, respectively, compared to $23.2 million and $96.3 million during the comparable periods of 2020, respectively, of equity-based compensation expense related to Beneficient's equity incentive plans. The decrease is due to the full vesting of some awards upon grant during the first quarter of 2020 compared to predominately service-based vesting during 2021. In addition to Beneficient's equity-based compensation expense, we recognized additional retention, severance and other costs in the first quarter of 2020 related to the relocation of GWG Holdings' principal offices from Minneapolis to Dallas in late 2019. Finally, these decreases were partially offset by higher salary and benefit costs recognized as a result of higher headcount for the comparable periods.

The decreases in legal and professional fees in the three and nine months ended September 30, 2021, compared to the same period of 2020, is primarily the result of lower consulting fees during 2021 combined with higher costs of life expectancy reports and higher legal costs during 2020 related to debt amendments and other transactions that occurred during that time.

The increase in other expenses during the three months ended September 30, 2021, compared to the same period of 2020, is primarily due to a $3.7 million prepayment premium related to the repayment of the Third LNV Credit Facility. In addition to the prepayment premium, the increase in other expenses during the nine months ended September 30, 2021, compared to the same period of 2020, is primarily due to: the $1.0 million TEFFI application fee incurred by Beneficient during the second quarter of 2021; the $2.0 million write-off of an investment related to legacy business initiatives of GWG Holdings during the first quarter of 2021; and a $1.3 million partial expense reversal of a service provider accrual by Beneficient during the first quarter of 2020.

*Income Taxes*

The Company applies an estimated annual effective rate to interim period pre-tax income to calculate the income tax provision for the quarter in accordance with the principal method prescribed by the accounting guidance established for computing income taxes in interim periods.

The Company's effective tax rate was (0.09)% for the nine months ended September 30, 2021. The income tax expense for the three and nine months ended September 30, 2021 was $0.7 million and $0.2 million, respectively, compared to income tax expense of $3.6 million and income tax benefit of $14.5 million for the three and nine months ended September 30, 2020, respectively. The effective

APP. 809

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 810 of 1031    PageID 982

tax rate differs from the statutory U.S. federal income tax rate of 21% primarily due to valuation allowances recorded on the current year losses, offset by a current state tax expense. The income tax expense for the three and

Page 64

APP. 810

nine months ended September 30, 2021 reflects current state tax expense of GWG Holdings and adjustments to deferred federal income taxes related to Beneficient's losses, partially offset by adjustments to the deferred tax liability of GWG Holdings for specific expense allocations to the holders of the Preferred Series A Subclass 1 Unit Accounts.

The Company currently records a valuation allowance against its deferred tax assets that cannot be realized solely by the future reversal of existing temporary differences. Due to the uncertain timing of the reversal of certain of these taxable temporary differences due to the constraint described below, they cannot be considered as a source of future taxable income for purposes of determining a valuation allowance; therefore, the vast majority of the existing deferred tax liability cannot be utilized in determining the realizability of the deferred tax assets. Due to a prior deemed ownership change, net operating loss carryforwards are subject to Section 382 of the Internal Revenue Code.

The Company determined it cannot utilize the reversal of a taxable temporary difference related to GWG Life's ownership in the Preferred Series A Subclass 1 Unit Accounts described in Note 1, until such time as the preferred equity is no longer constrained, as a source of income to realize existing deferred tax assets related to the net operating loss and Internal Revenue Code Section 163(j) limitations. As a result, the Company recorded a large net deferred tax liability on December 31, 2019, the majority of which remained as of September 30, 2021 and December 31, 2020. The disposition of this investment is constrained by the Pledge and Security Agreement in favor of the holders of the L Bonds of GWG Holdings. As such, the timing of recognition of the necessary taxable income related to this investment and the future reversal of this taxable temporary difference cannot be predicted.

**Revenue and Earnings before Tax by Reportable Segment — Three and Nine Months Ended September 30, 2021 Compared to the Same Periods in 2020**

We have two reportable segments: 1) Secondary Life Insurance and 2) Beneficient. Corporate & Other includes certain activities not allocated to specific business segments. These activities include holding company financing and investing activities, management and administrative services to support the overall operations of the Company, and GWG Holdings' equity method investment in FOXO.

Comparison of revenue by reportable segment for the periods indicated (in thousands):

| Revenue: | Three Months Ended September 30, | | | Nine Months Ended September 30, | | |
|---|---|---|---|---|---|---|
| | 2021 | 2020 | Variance | 2021 | 2020 | Variance |
| Secondary Life Insurance | $ 15,856 | $ 14,422 | $ 1,434 | 18,955 | $ 44,800 | $ (25,845) |
| Beneficient | 17,867 | 53,589 | (35,722) | 18,235 | 74,925 | (56,690) |
| Corporate & Other | 63 | 1 | 62 | 69 | 17 | 52 |
| Total | $ 33,786 | $ 68,012 | $ (34,226) | $ 37,259 | $ 119,742 | $ (82,483) |

The primary components of the changes in revenue during the three and nine months ended September 30, 2021 compared to the same periods in 2020 were as follows:

- Secondary Life Insurance revenue increased by $1.4 million during the three months ended September 30, 2021 compared to the same period in 2020, primarily due to higher revenue realized from maturities of life insurance policies, partially offset by a decreases in revenue recognized from the change in fair value of life insurance policies and higher premium costs due to the aging of the portfolio. Secondary Life Insurance revenue decreased by $25.8 million during the nine months ended September 30, 2021, compared to the comparable periods in 2020, primarily as a result of an adjustment to the PMM during the second quarter of 2021 that resulted in a $16.4 million downward adjustment to the fair value of the portfolio, combined with higher premiums and lower revenue recognized from changes in fair value of the policies still in force at September 30, 2021, notwithstanding the PMM adjustment.

- Beneficient segment revenue decreased for the three and nine months ended September 30, 2021, compared to the same periods in 2020, primarily due income recognized from the decrease to fair value of the repurchase option liability in both periods of 2020 combined with $36.3 million of non-recurring income recognized in the year to date period of 2020 by Beneficient as a result of the forfeiture of vested equity-based compensation related to one former director of Beneficient. A substantial majority of the former director's equity-based compensation units

APP. 811

APP. 812

were fully vested, and the related expense was recorded in prior periods. This decrease was partially offset by an increase in investment income driven by changes in the NAV of the alternative assets held by certain of the ExAlt Trusts during the three and nine months ended September 30, 2021, compared to the same periods in 2020.

Comparison of loss before tax by reportable segment for the periods indicated (in thousands):

| Segment Loss Before Tax | Three Months Ended September 30, | | | Nine Months Ended September 30, | | |
| | 2021 | 2020 | Variance | 2021 | 2020 | Variance |
| --- | --- | --- | --- | --- | --- | --- |
| Secondary Life Insurance | $ (28,142) | $ (12,147) | $ (15,995) | $ (86,730) | $ (39,314) | $ (47,416) |
| Beneficient | (6,576) | 532 | (7,108) | (67,450) | (94,880) | 27,430 |
| Corporate & Other[1] | (12,714) | (8,915) | (3,799) | (36,923) | (22,492) | (14,431) |
| Total | $ (47,432) | $ (20,530) | $ (26,902) | $ (191,103) | $ (156,686) | $ (34,417) |

(1)  Includes loss from equity method investments as presented in our accompanying condensed consolidated statements of operations, related to GWG Holdings' investment in FOXO.

The primary drivers of the changes in loss before tax during the three and nine months ended September 30, 2021, compared to the same periods in 2020 were as follows:

- Secondary Life Insurance loss before tax increased by $16.0 million and $47.4 million, respectively, for the three and nine months ended September 30, 2021, compared to the same periods in 2020, primarily as a result of the following:

  - $1.4 million increase and $25.4 million decrease, respectively, in gain on life insurance policies, net for the comparative periods as described above in the revenue comparison discussion;

  - $12.7 million and $23.7 million respective increases in interest expense during the comparative periods as a result of higher average debt outstanding; and

  - $4.8 million increase and $2.1 million decrease, respectively, in operating expenses during the comparative periods, primarily resulting from the $3.8 million prepayment premium as described above for the third quarter of 2021, partially offset by a lower percentage of employee compensation and benefits allocated to the Secondary Life Insurance segment for the current year periods.

- Beneficient segment recognized a loss before tax of $6.6 million for the three months ended September 30, 2021 compared to earnings before tax of $0.5 million during same period in 2020, primarily due to:

  - a decrease of $20.6 million in non-cash charges for equity incentive compensation;

  - an decrease in investment income of $39.2 million as described above in the revenue comparison discussion; and

  - net decreases in interest and other operating expenses of approximately $8.0 million.

- Beneficient segment loss before tax decreased by $27.4 million for the nine months ended September 30, 2021, primarily due to:

  - a decrease of $81.2 million in non-cash charges for equity compensation;

  - a decrease in investment income of $20.2 million combined with $36.3 million of non-recurring income in second quarter of 2020 as described above in the revenue comparison discussion; and

  - net decreases in interest and other operating expenses of approximately $2.9 million.

- Corporate & Other operating loss was higher during the three and nine months ended September 30, 2021 compared to the same periods in 2020, primarily due:

  - $3.5 million and $7.6 million respective increases in loss from equity method investments due to higher costs incurred by FOXO as it continues to strive to bring its products to market;

APP. 814

- $0.3 million and $4.8 million respective increases in operating expenses due to a higher percentage of salaries and benefits, legal fees and other operating expenses allocated to Corporate & Other; and

- the write-off of a $2.0 million investment related to legacy business initiatives of GWG Holdings during the nine months ended September 30, 2021.

**Liquidity and Capital Resources**

As of September 30, 2021 and December 31, 2020, we had approximately $67.7 million and $124.2 million, respectively, in combined available cash, cash equivalents, and restricted cash. We generated net losses attributable to common shareholders of $169.9 million and $120.5 million for the nine months ended September 30, 2021 and 2020, respectively. As of November 10, 2021, we had cash, cash equivalents, and restricted cash of approximately $29.8 million. Besides funding operating expenditures, we are obligated to pay other items such as interest payments and debt maturities, and preferred stock dividends and redemptions.

We have historically financed our businesses primarily through a combination of L Bond sales, preferred stock sales, the LNV Credit Facility, and the NF Credit Facility. We have also financed our business through proceeds from life insurance policy benefit receipts, cash distributions from the ExAlt Trusts' alternative asset portfolio, dividends and interest on investments, and Beneficient's debt due to related parties. We have traditionally used proceeds from these sources for policy acquisition, policy premiums and servicing costs, working capital and financing expenditures including paying principal, interest and dividends. We have also used proceeds to allocate capital to Beneficient; however, if Ben LP becomes an independent company pursuant to the terms of the Term Sheet discussed in Note 17, the Company expects that Ben LP would reduce its reliance on GWG Holdings to fund its operations and would raise future capital from other sources. Ben LP's capital raising efforts and participation in liquidity transactions may include the issuance of equity or debt of Ben LP or one of its subsidiaries, and the newly issued securities may be dilutive to GWG Holdings' and GWG Life's investments in Ben LP and BCH and may include preferential terms relative to GWG Holdings' and GWG Life's investments in Ben LP and BCH, as applicable.

We currently fund our business primarily with debt that generally has a shorter duration than the duration of our long-term assets. The resulting asset/liability mismatch can result in a liquidity shortfall if we are unable to renew maturing short-term debt or secure suitable additional financing. In such a situation, we could be forced to sell assets at less than optimal (distressed) prices. Substantially all of our life insurance policies are pledged as collateral under the LNV Credit Facility and the NF Credit Facility and we would not be able to dispose of them without compliance with the terms of those credit facilities. We heavily rely on GWG Holdings' L Bond offering to fund our business operations, including, among other things, interest and principal payments on the existing L Bonds and capital allocations to Beneficient. We temporarily suspended the offering of GWG Holdings' L Bonds, commencing April 16, 2021, as a result of our delay in filing certain periodic reports with the SEC, and were required to seek alternative sources of capital.

As a result of the suspension of GWG Holdings' L Bond offering, on June 28, 2021, we pledged additional life insurance policies as collateral and received an additional advance of $51.2 million under the Third LNV Credit Facility. Subsequently, on August 11, 2021, we received a one-time advance of $107.6 million under the NF Credit Facility as described above. Approximately $56.7 million of such advanced amount was used to pay off the remaining amount due, including interest and penalties, under the Third LNV Credit Facility and the pledged life insurance policies used as collateral for the Third LNV Credit Facility were released and pledged under the NF Credit Facility. Further, on September 7, 2021, DLP IV entered into the Fourth LNV Credit Facility, that replaced the aforementioned Third LNV Credit Facility. The Fourth LNV Credit Facility resulted in an additional advance of $30.3 million from LNV Corporation, with no additional pledged collateral. All of the aforementioned transactions are described in more detail in Note 9.

Page 67

Primarily due to the current suspension of GWG Holdings' L Bond offering, the Company may require additional capital to continue its operations over the next twelve months if our ability to sell L Bonds dissipates, or if we are forced to suspend the L Bond offering. However, the Company may not be able to obtain additional borrowings under existing debt facilities or new borrowings with other third-party lenders. To the extent that GWG Holdings or its subsidiaries raise additional capital through the future issuance of debt, the terms of those debt securities may include terms that adversely affect the rights of our existing debt and/or equity holders or involve negative covenants that restrict GWG Holdings' ability to take specific actions, such as incurring additional debt or making additional investments in growing the operations of the Company. If GWG Holdings is unable to fund its operations and other obligations, or defaults on its debt, then the Company will be required to either i) sell assets to provide sufficient funding, ii) exercise our right to decline requests for early L Bond redemptions or redemptions of preferred stock, or iii) to raise additional capital through the sale of equity and the ownership interest of our equity holders may be diluted. Substantially all of our life insurance policies are pledged as collateral under the LNV Credit Facility and the NF Credit Facility and we would not be able to dispose of them without compliance with the terms of those credit facilities.

We anticipate recommencing the offering of GWG Holdings' L Bonds once we become current with our filing obligations and satisfy applicable NASDAQ listing requirements. Once we become current with our filing obligations with respect to the L Bonds, we may be limited in the origination channels in which we sell our L Bonds in the event that we are unable to meet the applicable NASDAQ listing requirements in a timely manner, which could result in the L Bonds no longer being "covered securities" for federal securities law purposes which would subject the offer and sale of L Bonds to potentially extensive state "blue sky" securities law requirements. If for any reason we are forced to suspend GWG Holdings' L Bond offering, are limited in our origination channels in which we sell our L Bonds, or demand for GWG Holdings' L bonds dissipates, our business would be adversely impacted and our ability to service and repay our debt obligations, much of which is short term, would be compromised, thereby negatively affecting our business prospects and viability.

We had $70.1 million of borrowing base capacity, excluding any potential capacity for premiums and servicing costs, under the LNV Credit Facility as of September 30, 2021. Additional future borrowing base capacity for premiums and servicing costs, created as the premiums and servicing costs of pledged life insurance policies become due and by additional policy pledges to the facility, if any, exists under the LNV Credit Facility at the sole discretion of the lender. The LNV Credit Facility has certain financial and nonfinancial covenants, and we were in compliance with these debt covenants as of September 30, 2021 and continue to be so as of the filing date of this report.

Beneficient is obligated to make debt payments totaling $77.1 million on certain outstanding borrowings through May 30, 2022 under the terms of the Amendment No. 1 to the Second Amended and Restated Credit Agreements as discussed in more detail in Note 9. Primarily due to both the forthcoming debt payments under the Credit Agreement and Second Lien Credit Agreement and the anticipated deconsolidation of Beneficient from GWG Holdings as discussed in Note 17, which is expected to result in reduced reliance by Beneficient on GWG Holdings to fund its operations, Beneficient will require additional liquidity to continue its operations over the next twelve months. We expect Beneficient to satisfy these obligations and fund its operations through anticipated operating cash flows, proceeds from distributions on the alternative assets portfolio, additional investments into Beneficient by GWG Holdings and/or other parties and, potentially refinancing with other third-party lenders some or all of the existing borrowings due prior to their maturity. Beneficient is currently in the process of raising additional equity, which is anticipated to close during the fourth quarter of 2021 and/or the first quarter of 2022.

Beneficient may not be able to refinance or obtain additional financing on terms favorable to the Company, or at all. To the extent that Beneficient raises additional capital through the future sale of equity or debt, the ownership interest of its existing equity holders may be diluted. The terms of these future equity or debt securities may include liquidation or other preferences that adversely affect the rights of its existing equity unitholders or involve negative covenants that restrict Beneficient's ability to take specific actions, such as incurring additional debt or making additional investments in growing its operations. If Beneficient defaults on these borrowings, then it will be required to either i) sell assets to repay these loans or ii) to raise additional capital through the sale of equity and the ownership interest of our equity holders may be diluted. Moreover, if Beneficient were to sell assets to avoid a default of these borrowings, then the price at which Beneficient sold such assets may not reflect the carrying value of those assets as reflected in our consolidated financial statements, especially in the event of a bulk or distressed sale.

As noted in the "Results of Operations" section above, on November 11, 2019, GWG Holdings contributed the common stock and membership interests of its then wholly-owned FOXO Labs and FOXO Life subsidiaries to FOXO in exchange for a membership interest in the entity. On November 13, 2020, FOXO BioScience LLC converted to a corporation and is now known as FOXO

APP. 816

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 817 of 1031    PageID 989

Technologies Inc. With the corporate conversion, GWG Holdings' previous membership interest in the LLC converted to preferred equity. GWG Holdings has contributed $3.8 million in cash to FOXO during the nine months ended

Page 68

APP. 817

September 30, 2021, and has fully contributed its commitment to FOXO in accordance with the related subscription agreement. GWG has no other outstanding capital commitments to FOXO.

The potential NASDAQ delisting and our current inability to sell L Bonds as discussed above, in combination with significant recurring losses from operations, negative cash flows from operations, delays in executing our business plans, and any potential negative outcome from the ongoing SEC investigation discussed elsewhere in this Form 10-Q, raise substantial doubt about our ability to continue as a going concern for the next 12 months following the filing of this Form 10-Q.

*Financings Summary*

We had the following outstanding debt balances as of September 30, 2021 and December 31, 2020, with the following weighted average interest rates as calculated for the nine months ended September 30, 2021, and the year ended December 31, 2020 (dollars in thousands):

| | September 30, 2021 | | December 31, 2020 | |
| --- | --- | --- | --- | --- |
| Issuer/Borrower | Principal Amount Outstanding | Weighted Average Interest Rate | Principal Amount Outstanding | Weighted Average Interest Rate |
| GWG DLP Funding IV, LLC – LNV senior credit facility | $ 229,862 | 9.00 % | $ 202,611 | 9.12 % |
| GWG DLP Funding VI, LLC - NF senior credit facility | 107,604 | 5.61 % | — | — % |
| GWG Holdings, Inc. – L Bonds | 1,311,104 | 7.25 % | 1,277,881 | 7.21 % |
| GWG Holdings, Inc. – Seller Trust L Bonds | 272,104 | 7.50 % | 272,104 | 7.50 % |
| Beneficient – Debt due to related parties | 79,803 | 7.91 % | 77,176 | 6.50 % |
| **Total** | $ 2,000,477 | 7.42 % | $ 1,829,772 | 7.43 % |

The table below reconciles the face amount of our outstanding debt to the carrying value shown on our balance sheets (dollars in thousands):

| | September 30, 2021 | December 31, 2020 |
| --- | --- | --- |
| **Senior credit facility with LNV Corporation:** | | |
| Face amount outstanding | $ 229,862 | $ 202,611 |
| Unamortized deferred financing costs | (7,894) | (8,881) |
| Carrying amount | $ 221,968 | $ 193,730 |
| **Senior credit facility with National Founders LP:** | | |
| Face amount outstanding | $ 107,604 | $ — |
| Unamortized deferred financing costs | (1,870) | — |
| Carrying amount | $ 105,734 | $ — |
| **L Bonds and Seller Trust L Bonds:** | | |
| Face amount outstanding | $ 1,583,208 | $ 1,549,985 |
| Redemptions and subscriptions in process[1] | 12,726 | 17,978 |
| Unamortized selling costs | (44,022) | (48,957) |
| Carrying amount | $ 1,551,912 | $ 1,519,006 |
| **Debt due to related parties:** | | |
| Face amount outstanding | $ 79,803 | $ 77,176 |
| Unamortized discount | (2,441) | (916) |
| Carrying amount | $ 77,362 | $ 76,260 |

---

[1]     Amount as of September 30, 2021 only includes redemptions in process.

APP. 819

*Amendments of Senior Credit Facility with LNV Corporation*

Effective September 7, 2021, DLP IV entered into the Fourth LNV Credit Facility, which replaced the Third LNV Credit Facility, dated June 28, 2021. The Fourth LNV Credit Facility makes available a total of up to $300.0 million in credit to DLP IV with a maturity date of September 27, 2029. Subject to available borrowing base capacity, additional advances are available under the Fourth LNV Credit Facility at the LIBOR rate described below. Such advances are available to pay premiums and servicing costs of pledged life insurance policies as such amounts become due. Under the Fourth LNV Credit Facility, all advances bear interest at a rate of the Benchmark Rate plus the Applicable Margin, or the Default Rate if an event of default has occurred and is continuing. For purposes of the Fourth LNV Credit Facility, (i) the "Benchmark Rate" is the greater of (a) the sum of (i) the Federal Funds Rate plus (ii) one-half of one percent (0.50%) and (b) one and one half of one percent (1.50%); (ii) the "Applicable Margin" is seven and one half percent (7.50%); and (iii) the "Default Rate" is the Benchmark Rate plus nine and one half percent (9.50%). The effective rate at September 30, 2021 was 9.00%. Interest payments are made on a quarterly basis. As of September 30, 2021, we had approximately $229.9 million outstanding under the LNV Credit facility. The Fourth LNV Credit Facility resulted in an additional advance of $30.3 million from LNV Corporation.

Under the Fourth LNV Credit Facility, DLP IV has granted the administrative agent, for the benefit of the lenders under the facility, a security interest in all of DLP IV's assets. As with prior collateral arrangements relating to the senior secured debt of GWG Holdings and its subsidiaries (on a consolidated basis), GWG Life's excess equity value of DLP IV after satisfying all amounts owing under the LNV Credit Facility is available as collateral for the obligations of GWG Holdings under the L Bonds and Seller Trust L Bonds (although the life insurance assets owned by DLP IV do not themselves serve as direct collateral for those obligations).

We are subject to various financial and non-financial covenants under the Fourth LNV Credit Facility, including, but not limited to, compliance with laws, preservation of existence, financial reporting, keeping of proper books of record and account, payment of taxes, and ensuring that neither DLP IV nor GWG Life become an investment company. In addition, the Fourth LNV Credit Facility has certain reporting obligations that require DLP IV to deliver unaudited quarterly financial statements no later than forty-five days after the end of each of the first three fiscal quarters, and audited annual financial statements no later than ninety days after the end of each fiscal year. As of September 30, 2021, we were in compliance with all financial and non-financial covenants.

*Credit Facility with National Founders LP*

On August 11, 2021, DLP VI, entered into the NF Credit Agreement with each lender from time to time party thereto and National Founders LP, as the administrative agent. On August 11, 2021, a one-time advance of approximately $107.6 million was made to the DLP VI under the NF Credit Facility with a scheduled maturity date of August 11, 2031. Approximately $56.7 million of such advanced amount was used to pay off the remaining amount due under the Third LNV Credit Facility. Amounts borrowed under the NF Credit Facility bear interest on each day on the outstanding principal amount on such day at a per annum rate, determined on a daily basis, generally equal to 5.5% up to a 65% of the loan to value percent as calculated in accordance with the NF Credit Agreement, and 7.0% on anything above that loan to value percent. The principal amount outstanding under this facility was $107.6 million as of September 30, 2021.

We are subject to various financial and non-financial covenants under the NF Credit Facility, including, but not limited to, compliance with laws, preservation of existence, financial reporting, keeping of proper books of record and account, payment of taxes, and ensuring that neither DLP VI nor GWG Life become an investment company. Additionally, we are required to maintain a Debt Coverage Ratio not to exceed 90%. As of September 30, 2021, we were in compliance with all financial and non-financial covenants in the NF Credit Facility.

*L Bonds (including Liquidity Bonds) and Seller Trust L Bonds*

In January 2015, GWG Holdings began publicly offering up to $1.0 billion of L Bonds as a follow-on to our earlier $250.0 million public debt offering. In January 2018, GWG Holdings began publicly offering up to $1.0 billion L Bonds as a follow-on to its earlier offering.

On June 3, 2020, a registration statement relating to an additional public offering was declared effective permitting us to sell up to $2.0 billion in principal amount of L Bonds on a continuous basis through June 2023. These bonds contain the same terms and features as our previous offerings. Through September 30, 2021, we have raised $453.2 million under this offering, including renewals, since it was declared effective.

APP. 820

Page 70

Through September 30, 2021, the total amount of L Bonds sold under all offerings, including renewals, was $2.3 billion. As of both September 30, 2021 and December 31, 2020, respectively, we had approximately $1.3 billion in principal amount of L Bonds outstanding (exclusive of Seller Trust L Bonds).

On August 10, 2018, GWG Holdings, GWG Life and the Bank of Utah, as trustee, entered into the L Bond Supplemental Indenture to the Amended and Restated Indenture. GWG Holdings entered into the L Bond Supplemental Indenture to add and modify certain provisions of the Amended and Restated Indenture necessary to provide for the issuance of the Seller Trust L Bonds. GWG Holdings issued Seller Trust L Bonds in the amount of $366.9 million to the Seller Trusts in connection with the Exchange Transaction. As a result of the Collateral Swap discussed in Note 1 to the accompanying condensed consolidated financial statements, $94.8 million of the Seller Trust L Bonds are eliminated upon consolidation. The maturity date of the Seller Trust L Bonds is August 9, 2023. The Seller Trust L Bonds bear interest at 7.5% per annum. Interest is payable monthly in cash (see Note 9 to the accompanying condensed consolidated financial statements). The Amended and Restated Indenture was subsequently amended on December 31, 2019, primarily to modify the calculation of the Debt Coverage Ratio in the Indenture to provide GWG Holdings with the ability to incur indebtedness (directly or through a subsidiary of GWG Holdings) that is payable in capital stock of GWG Holdings or mandatorily convertible into or exchangeable for capital stock of GWG Holdings that would be excluded from the calculation of the Debt Coverage Ratio. On December 31, 2020, we entered into the Liquidity Bond Supplemental Indenture to add and modify certain provisions of the Amended and Restated Indenture necessary to provide for the issuance of the Liquidity Bonds in a principal amount of up to $1.0 billion.

The weighted-average interest rate of GWG Holdings' outstanding L Bonds (excluding the Seller Trust L Bonds) as of both September 30, 2021 and December 31, 2020 was 7.25%, and the weighted-average maturity at those dates was 2.89 years and 3.19 years, respectively. GWG Holdings' L Bonds (other than the Seller Trust L Bonds and Liquidity Bonds) have renewal features. Since we first issued GWG Holdings' L Bonds, we have experienced $873.1 million in maturities, of which $429.5 million has renewed through September 30, 2021, for an additional term. This renewal activity has provided us with an aggregate renewal rate of approximately 49.2% for investments in these securities.

Future contractual maturities of L Bonds (including the Seller Trust L Bonds and Liquidity Bonds) at September 30, 2021 are as follows (in thousands):

| Years Ending December 31, | | |
| --- | --- | --- |
| Three months ending 2021[1] | $ | 320,919 |
| 2022 | | 288,968 |
| 2023 | | 248,168 |
| 2024 | | 171,306 |
| 2025 | | 164,645 |
| Thereafter | | 389,202 |
| | $ | 1,583,208 |

[1]  As of September 30, 2021, we had approximately $366.9 million in principal amount of Seller Trust L Bonds outstanding, of which $94.8 million are held by the ExAlt Trusts and are eliminated in consolidation. Accordingly, the net of these amounts, $272.1 million, is presented in the table above. As the second anniversary of the Final Closing Date has passed, the holders of the Seller Trust L Bonds now have the right to cause GWG Holdings to repurchase, in whole but not in part, the Seller Trust L Bonds held by such holder within 45 days. As such, while the maturity date of the Seller Trust L Bonds is in August 2023, their contractual maturity is reflected in 2021, as that is the first period in which they could become payable. The repurchase may be paid, at the option of GWG Holdings, in the form of cash, and/or a pro rata portion of (i) the outstanding principal amount and accrued and unpaid interest under the Commercial Loan Agreement, and (ii) Common Units, or a combination of cash and such property.

The L Bonds (including the Seller Trust L Bonds and Liquidity Bonds) are secured by all of our assets and are subordinate to the LNV Credit Facility and the NF Credit Facility.

*Debt Due to Related Parties*

Beneficient had borrowings with an aggregate carrying value of $77.4 million and $76.3 million as of September 30, 2021 and December 31, 2020, respectively. This aggregate outstanding balance includes a first lien credit agreement and a second lien credit agreement with respective balances, including accrued interest, of $2.4 million and $74.7 million as of September 30, 2021 and $2.3 million and $72.3 million as of December 31, 2020, respectively. These amounts exclude an unamortized

APP. 822

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 823 of 1031    PageID 995

Page 71

discount of $2.4 million and $0.9 million as of September 30, 2021 and December 31, 2020, respectively. In accordance with the terms of the Ben Credit Agreements, dated August 13, 2020, both loans accrue interest at a rate of 1-month LIBOR plus 8.0%, with a maximum rate of 9.5%. Prior to the Ben Credit Agreements, both loans accrued interest at a rate of 1-month LIBOR plus 3.95%, compounded daily. On March 10, 2021, the Ben Credit Agreements were amended to extend the maturity for both agreements to May 30, 2022, as discussed in detail in Note 17 to the accompanying condensed consolidated financial statements. These loans are not currently guaranteed by GWG Holdings as of September 30, 2021.

Beneficient has additional borrowings maturing in 2023 and 2024 with an aggregate principal balance of $2.7 million and $2.6 million as of September 30, 2021 and December 31, 2020, respectively.

We expect to meet our ongoing operational capital needs for, among other things, GWG Holdings' investments in Beneficient, alternative asset investments, policy premiums and servicing costs, new policy acquisitions, exploring opportunities to establish a life insurance company, working capital and financing expenditures including paying principal, interest and dividends through a combination of the receipt of policy benefits from our portfolio of life insurance policies, net proceeds from GWG Holdings' L Bond offering, dividends and interest from investments, distributions from the alternative assets held by certain of the ExAlt Trusts, future preferred and common equity offerings, and funding available from the LNV Credit Facility. We estimate that our liquidity and capital resources are sufficient for our current and projected financial needs for at least the next twelve months given current assumptions. However, if we are unable to continue GWG Holdings' L Bond or preferred stock offerings for any reason, and we are unable to obtain capital from other sources, our business will be materially and adversely affected. In addition, our business will be materially and adversely affected if we do not receive the policy benefits we forecast and if holders of GWG Holdings' L Bonds fail to renew with the frequency we have historically experienced. In such a case, we could be forced to sell our investments in life insurance policies to service or satisfy our debt-related and other obligations. A sale under such circumstances may result in significant impairment of the recognized value of our portfolio.

Capital expenditures have historically not been material and we do not anticipate making material capital expenditures through the remainder of 2021.

***Alternative Assets and Secured Indebtedness***

The following information is specifically related to GWG Holdings, Inc. and its subsidiaries (not including the assets and liabilities held by Beneficient or any eliminations in consolidation).

The following table seeks to illustrate the impact that a hypothetical sale of our portfolio of life insurance assets (at various discount rates, including the discount rate used to value our portfolio at September 30, 2021), and the realization of the investment in Common Units, investment in Preferred Series A Subclass 1 Unit Account of BCH, investment in Preferred Series C Unit Account of BCH (a substantial majority of the net assets of which are currently represented by intangible assets and goodwill), and the Commercial Loan Agreement (in each case, at their respective carrying amounts and assuming no discount for lack of marketability or transaction costs, which could be substantial) would have on our ability to satisfy our debt obligations as of September 30, 2021. The investment in Common Units, investment in Preferred Series A Subclass 1 Unit Account of BCH, investment in Preferred Series C Unit Account of BCH, and Commercial Loan Agreement are discussed in detail in Note 1 and other applicable notes to the accompanying condensed consolidated financial statements. The amounts in the table below do not include the consolidation of the assets and liabilities of Beneficient and related eliminations as of September 30, 2021. In all cases, the sale of the life insurance assets owned by DLP IV will be used first to satisfy all amounts owing under the LNV Credit Facility. The net sale proceeds remaining after satisfying all obligations under the LNV Credit Facility would be applied to the L Bonds and Seller Trust L Bonds on a pari passu basis. All dollar amounts in the table below are in thousands.

Page 72

| Life Insurance Portfolio Discount Rate | 8.25%[1] | | 8.49% |
|---|---|---|---|
| Value of life insurance portfolio | $ 761,560 | $ | 753,160 |
| Common Units | 437,573 | | 437,573 |
| Preferred Series A Subclass 1 Unit Account of BCH | 319,030 | | 319,030 |
| Preferred Series C Unit Account of BCH | 210,624 | | 210,624 |
| Commercial Loan Agreement | 189,957 | | 189,957 |
| Cash, cash equivalents and policy benefits receivable | 91,080 | | 91,080 |
| Other assets | 14,037 | | 14,037 |
| Total assets | 2,023,861 | | 2,015,461 |
| Less: Senior credit facilities[2] | 337,466 | | 337,466 |
| Net after senior credit facilities | 1,686,395 | | 1,677,995 |
| Less: L Bonds[3] | 1,677,996 | | 1,677,996 |
| Net remaining | $ 8,399 | $ | (1) |
| Impairment to L Bonds | No impairment | | Impairment |

(1)  The discount rate used to calculate the fair value of our life insurance portfolio as of September 30, 2021.

(2)  This amount excludes unamortized deferred financing costs.

(3)  Amount represents aggregate outstanding principal balance of L Bonds and Seller Trust L Bonds prior to eliminations as of September 30, 2021.

The above table illustrates that our ability to fully satisfy amounts owing under the L Bonds and Seller Trust L Bonds would likely be impaired upon the sale or the realization of the investment in Common Units, investment in Preferred Series A Subclass 1 Unit Account of BCH, investment in Preferred Series C Unit Account of BCH and Commercial Loan Agreement at their respective carrying amounts, plus all our life insurance assets at a price equivalent to a discount rate of approximately 8.49% or higher at September 30, 2021. At December 31, 2020, the likely impairment occurred at a discount rate of approximately 16.12% or higher. The above hypothetical analysis is included for informational purposes only, and the results of such analysis have no bearing on the current ability of GWG Holdings to market and sell L Bonds or to satisfy amounts owing under the L Bonds and Seller Trust L Bonds.

The table does not include any allowance for transactional fees and expenses (which expenses and fees could be substantial) nor any discount for lack of marketability associated with a portfolio sale or the realization of the investment in Common Units, investment in Preferred Series A Subclass 1 Unit Account of BCH, investment in Preferred Series C Unit Account of BCH, and Commercial Loan Agreement, respectively, and is provided to demonstrate how various discount rates used to value our portfolio of life insurance assets could affect our ability to satisfy amounts owing under our debt obligations in light of our senior secured lenders' right to priority payments under the LNV Credit Facility and the NF Credit Facility.

The table also assumes GWG Holdings will realize the full amounts of investment in Common Units, investment in Preferred Series A Subclass 1 Unit Account of BCH, investment in Preferred Series C Unit Account of BCH, and Commercial Loan Agreement. However, the ultimate value of these investments in Beneficient depends on multiple factors, including the expected growth of new service offerings and products. Since predicting the rate of growth attributable to newly launched products is inherently uncertain, there is no assurance that GWG Holdings will recover the full book basis of its investments in Beneficient. Additionally, there is currently no market for the aforementioned assets, and a market may not develop. Our Commercial Loan receivable and a portion of GWG Holdings' investment in the Common Units may be used as consideration for retiring the Seller Trust L Bonds upon a redemption event or at the maturity of the Seller Trust L Bonds (see Note 9 to the accompanying condensed consolidated financial statements). This table also does not include the yield maintenance fee we are required to pay in certain circumstances under the LNV Credit Facility, which could be substantial. The above table should be read in conjunction with the information contained in other sections of this report, including the notes to the accompanying condensed consolidated financial statements in this Form 10-Q and our 2020 Form 10-K.

As a result of the Letter Agreement dated November 15, 2021, by and among DLP IV, LNV Corporation, and CLMG Corp., discussed in detail in Note 17 to these accompanying condensed consolidated financial statements, three percent (3.0%) of any amount received by DLP IV with respect to any death benefit under any policies pledged under the LNV Credit Facility will be payable directly to CLMG Corp. for the benefit of the lenders. The Company expects that the three percent (3.0%) beneficial interest obtained by LNV Corporation will result in a significant downward adjustment to the fair value of the policies pledged under the LNV Credit Facility and will likely have an unfavorable impact on the above sensitivity analysis as of December 31, 2021, absent any other changes to the values of other assets and liabilities reported at that date.

APP. 825

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 826 of 1031     PageID 998

Page 73

APP. 826

**Cash Flows**

*Interest and Dividend Payments*

We finance our businesses through a combination of: life insurance policy benefit receipts; principal, dividends and interest receipts from investments; distributions from the alternative assets held by the ExAlt Trusts; debt and equity offerings; and the LNV Credit Facility and the NF Credit Facility. We have historically relied on debt (L Bonds and the LNV Credit Facility) and equity (preferred stock) financing for the majority of our cash expenditures (for policy acquisition, policy premiums and servicing costs, working capital and financing expenditures including paying principal and interest on existing debt, and for GWG Holdings and GWG Life making investments in Beneficient) as the amount of cash flows from the realization of life insurance policy benefits and cash flows from our other investments has been insufficient to meet all of our needs. This has resulted in the Company incurring substantial indebtedness and, to a lesser extent, obligations to make dividend payments on our classes of preferred stock.

Beneficient primarily finances its business through repayments on ExAlt Loans. Such repayments are funded from a portion of the cash distributions the ExAlt Trusts receive from their alternative assets and additional investments in Beneficient by GWG Holdings and/or other parties. See Note 9 to the accompanying condensed consolidated financial statements for details on the amendments of Beneficient's credit agreements. Beneficient uses proceeds from these sources to fund liquidity transactions and potential unfunded capital commitments, working capital, debt service payments, and costs associated with potential future products. Beneficient also anticipates the need to establish sufficient regulatory capital if and when its Texas trust company charter is issued or the Kansas TEFFI trust company becomes operational. Additionally, Bermuda insurance statutes and regulations, and the policies of the BMA, require that Pen, among other things, maintain a minimum level of capital and surplus, satisfy solvency standards, and restrict dividends and distributions. Beneficient Capital Markets will also be subject to regulations of the SEC and FINRA that require, among other things, Beneficient Capital Markets to maintain a minimum level of capital.

Our total interest expense of $45.1 million and $40.8 million for the three months ended September 30, 2021 and 2020, respectively, and $128.6 million and $113.8 million for the nine months ended September 30, 2021 and 2020, respectively, represents the largest cash expense item in each period. Preferred stock cash dividends were $2.4 million and $3.6 million for the three months ended September 30, 2021 and 2020, respectively. and $8.4 million and $11.2 million for the nine months ended September 30, 2021 and 2020, respectively. While reducing our cost of funds and increasing our common equity base are primary goals of the Company, until we do so we will continue to expend significant amounts of cash for interest and dividend payments and will thus continue to rely heavily on our ability to raise cash from GWG Holdings' L Bond offering, LNV Credit Facility and other means as they are developed and available.

*Life Insurance Policy Premium Payments*

The payment of premiums and servicing costs to maintain life insurance policies represents one of our most significant requirements for cash disbursement. When a policy is purchased, we are able to calculate the minimum premium payments required to maintain the policy in-force. Over time as the insured ages, premium payments will increase. Nevertheless, the probability we will be required to pay the premiums decreases as mortality becomes more likely. These scheduled premiums and associated probabilities are factored into our expected internal rate of return and cash-flow modeling. Beyond premiums, we incur policy servicing costs, including annual trustee, policy administration and tracking costs. Additionally, we incur significant financing costs, including principal, interest and dividends. Both policy servicing costs and financing costs are excluded from our internal rate of return calculations. We finance our businesses through a combination of life insurance policy benefit receipts, dividends and interest on other investments, equity offerings, debt offerings, and advances under the LNV Credit Facility and NF Credit Facility.

Page 74

APP. 827

The amount of payments for anticipated premiums, including the requirement under the LNV Credit Facility and NF Credit Facility to maintain a two month cost-of-insurance threshold within each policy cash value account, and servicing costs that we will be required to make over the next five years to maintain our current portfolio, assuming no mortalities, is set forth in the table below (in thousands):

| Years Ending December 31, | Premiums | Servicing | Total |
|---|---|---|---|
| Three months ending 2021 | $ 13,847 | $ 457 | $ 14,304 |
| 2022 | 81,839 | 1,828 | 83,667 |
| 2023 | 93,037 | 1,828 | 94,865 |
| 2024 | 101,998 | 1,828 | 103,826 |
| 2025 | 113,722 | 1,828 | 115,550 |
| 2026 | 125,911 | 1,828 | 127,739 |
| | $ 530,354 | $ 9,597 | $ 539,951 |

Our anticipated premium expenses are subject to the risk of increased cost-of-insurance charges (i.e., "COI" or premium charges) for the life insurance policies we own. We have received notices of COI increases on one policy in the first nine months of 2021 compared to six in the first nine months of 2020.

We have no known pending cost-of-insurance increases on any policies in our portfolio, but we are aware that cost-of-insurance increases have become more prevalent in the industry. Thus, we may see additional insurers implementing cost-of-insurance increases in the future.

*Life Insurance Policy Benefit Receipts*

For the quarter-end dates set forth below, the following table illustrates the total amount of face value of policy benefits owned, and the trailing 12 months of life insurance policy benefits realized and premiums paid on our portfolio. The trailing 12-month benefits/premium coverage ratio indicates the ratio of policy benefits realized to premiums paid over the trailing 12-month period from our portfolio of life insurance policies.

| Quarter End Date | Portfolio Face Amount (in thousands) | 12-Month Trailing Benefits Realized (in thousands) | 12-Month Trailing Premiums Paid (in thousands) | 12-Month Trailing Benefits/Premiums Coverage Ratio |
|---|---|---|---|---|
| September 30, 2017 | 1,622,627 | 53,742 | 46,559 | 115.4 % |
| December 31, 2017 | 1,676,148 | 64,719 | 52,263 | 123.8 % |
| March 31, 2018 | 1,758,066 | 60,248 | 53,169 | 113.3 % |
| June 30, 2018 | 1,849,079 | 76,936 | 53,886 | 142.8 % |
| September 30, 2018 | 1,961,598 | 75,161 | 55,365 | 135.8 % |
| December 31, 2018 | 2,047,992 | 71,090 | 52,675 | 135.0 % |
| March 31, 2019 | 2,098,428 | 87,045 | 56,227 | 154.8 % |
| June 30, 2019 | 2,088,445 | 82,421 | 59,454 | 138.6 % |
| September 30, 2019 | 2,064,156 | 101,918 | 61,805 | 164.9 % |
| December 31, 2019 | 2,020,973 | 125,148 | 63,851 | 196.0 % |
| March 31, 2020 | 2,000,680 | 120,191 | 65,224 | 184.3 % |
| June 30, 2020 | 1,960,826 | 137,082 | 66,846 | 205.1 % |
| September 30, 2020 | 1,921,067 | 149,415 | 67,931 | 220.0 % |
| December 31, 2020 | 1,900,715 | 125,109 | 69,734 | 179.4 % |
| March 31, 2021 | 1,879,895 | 125,566 | 71,206 | 176.3 % |
| June 30, 2021 | 1,844,466 | 121,163 | 61,301 | 197.7 % |
| September 30, 2021 | 1,801,306 | 124,577 | 72,846 | 171.0 % |

We believe that the portfolio cash flow results set forth above are consistent with our general investment thesis that the life insurance policy benefits we receive will continue to increase over time in relation to the premiums we are required to pay on

APP. 828

APP. 829

the remaining polices in the portfolio. Nevertheless, we expect that our portfolio cash flow on a period-to-period basis will remain inconsistent as we have reduced capital allocated to acquiring a larger, more diversified portfolio of life insurance policies.

**Inflation**

Changes in inflation do not necessarily correlate with changes in interest rates. We presently do not foresee any material impact of inflation on our results of operations in the periods presented in our accompanying condensed consolidated financial statements.

**Off-Balance Sheet Arrangements**

*Unfunded Capital Commitments*

The ExAlt Trusts had $35.5 million and $35.6 million of gross potential capital commitments as of September 30, 2021 and December 31, 2020, respectively, representing potential limited partner capital funding commitments on the interests in alternative asset funds. The trust holding the interest in the limited partnership for the alternative asset fund is required to fund these limited partner capital commitments per the terms of the limited partnership agreement. Capital funding commitment reserves are maintained by the associated trusts within the ExAlt Plan™ created at the origination of each trust for up to $0.1 million. To the extent that the associated ExAlt Trust cannot pay the capital funding commitment, Beneficient is obligated to lend sufficient funds to meet the commitment. Any amounts advanced by Beneficient to the ExAlt Trusts for these limited partner capital funding commitments above the associated capital funding commitment reserves held by the associated ExAlt Trusts are added to the ExAlt Loan balance between Beneficient and the ExAlt Trusts and are expected to be recouped through the cash distributions from the interests in alternative asset fund that collateralizes such ExAlt Loan.

Capital commitments generally originate from limited partner agreements having fixed or expiring expiration dates. The total limited partner capital funding commitment amounts may not necessarily represent future cash requirements. Beneficient considers the creditworthiness of the investment on a case-by-case basis. At both September 30, 2021 and December 31, 2020, Beneficient had no reserves for losses on unused commitments to fund potential limited partner capital funding commitments.

*Equity Method Investee Commitments*

GWG Holdings contributed $3.8 million in cash to FOXO during the nine months ended September 30, 2021, and has fully contributed its commitment to FOXO in accordance with the related subscription agreement. GWG has no other outstanding capital commitments to FOXO.

**Credit Risk and Interest Rate Risk**

We review the credit risk associated with our portfolio of life insurance policies when estimating its fair value. In evaluating the policies' credit risk, we consider insurance company solvency, credit risk indicators, economic conditions, ongoing credit evaluations, and company positions. We attempt to manage our credit risk related to life insurance policies typically by purchasing policies issued only from companies with an investment-grade credit rating by either Standard & Poor's, Moody's, or A.M. Best Company. As of September 30, 2021, 94.7% of our life insurance policies, by face value benefits, were issued by companies that maintained an investment-grade credit rating (BBB or better) by Standard & Poor's.

The LNV Credit Facility, NF Credit Facility, and Beneficient's debt due to related parties are floating-rate financings. In addition, our ability to offer interest and dividend rates that attract capital (including in our continuous offering of L Bonds) is generally impacted by prevailing interest rates. Furthermore, while GWG Holdings' L Bond offering provides us with fixed-rate debt financing, our Debt Coverage Ratio is calculated in relation to the interest rate on all of our debt financing, exclusive of GWG Holdings' Seller Trust L Bonds. Therefore, increases in interest rates impact our business by increasing our borrowing costs and reducing availability under our debt financing arrangements. Earnings from our life insurance portfolio are based upon the spread, if any, generated between the return on the portfolio and the total cost of our financing (excluding cost of financing for the Seller Trust L Bonds). As a result, increases in interest rates will reduce the earnings we expect to achieve from our investments in life insurance policies.

The ExAlt Trusts hold investments in alternative assets, which are exposed to risks related to markets, credit, currency, and interest rates. Currently, all of these alternative assets consist of private equity limited partnership interests, which are primarily

APP. 830

Page 76

APP. 831

denominated in the U.S. dollar, Euro, and Canadian dollar. The underlying portfolio companies primarily operate in the United States and Asia, with the largest percentage, based on NAV, operating in software and services, semiconductors and semiconductor equipment, diversified financials, food and staples retailing, telecommunications services, and utilities industries. The financial statements risk, stemming from such investments, are those associated with the determination of estimated fair values, the diminished ability to monetize certain investments in times of strained market conditions, the recognition of income and recognition of impairments on certain investments.

As of September 30, 2021, and December 31, 2020, all of the ExAlt Loans, which are eliminated upon consolidation, are collateralized by the cash flows originating from the ExAlt Trusts' investments in alternative assets. These ExAlt Loans are a key determinant in income (loss) allocable to Beneficient's equity holders, and thus GWG Holdings. Beneficient has underwriting procedures and utilizes market rates. Additionally, Beneficient has purchased put options to protect the net asset value of the interests in alternative assets held by certain of the ExAlt Trusts from impacts associated with a broad market downturn. Finally, the ExAlt Trusts applicable trust agreements allow for excess cash flows from a collective pool of alternative assets to be utilized to repay the ExAlt Loans they have with Beneficient when cash flows from the customer's originally alternative assets are not sufficient to repay the outstanding principal, interest, and fees.

**Guarantee and Collateral Provisions of L Bonds**

GWG Holdings' L Bonds are offered and sold under a registration statement declared effective by the SEC, and GWG Holdings has issued Seller Trust L Bonds under the L Bond Supplemental Indenture, as described in Note 9 to the accompanying condensed consolidated financial statements. The L Bonds and Seller Trust L Bonds are secured by substantially all the assets of GWG Holdings and a pledge of all of GWG Holdings' common stock held by BCC and AltiVerse Capital Markets, L.L.C., a limited liability company owned by an entity related to the Ben Initial Investors, including Brad K. Heppner (GWG Holdings' former Chairman, who served in such capacity from April 26, 2019 to June 14, 2021, and Beneficient's current Chief Executive Officer and Chairman) and an entity related to Thomas O. Hicks (one of Beneficient's current directors and a former director of GWG Holdings) ("AltiVerse"). Together, BCC and AltiVerse represent approximately 12% of our outstanding common stock, and are guaranteed by GWG Life and a corresponding grant of a security interest in substantially all the assets of GWG Life. As a guarantor, GWG Life has fully and unconditionally guaranteed the payment of principal and interest on the L Bonds and Seller Trust L Bonds. GWG Life's equity in GWG Life Trust, DLP IV, and DLP V Holdings serves as collateral for GWG Holdings' L Bond and Seller Trust L Bond obligations. As of September 30, 2021, substantially all of our life insurance policies were held by DLP IV, DLP V, or GWG Life Trust. The policies held by DLP IV are not direct collateral for the L Bonds as such policies are pledged under the LNV Credit Facility.

On December 31, 2020, GWG Holdings, GWG Life and Bank of Utah, as trustee, entered into the Liquidity Bond Supplemental Indenture that provides for the issuance of two series of Liquidity Bonds, as described in Note 9 to the accompanying condensed consolidated financial statements. The Liquidity Bonds are issued by GWG Life and guaranteed by GWG Holdings. The Liquidity Bonds are secured by the same collateral as the other L Bonds.

Furthermore, regarding the obligations of GWG Holdings and its subsidiaries as of September 30, 2021:

(1)   The Seller Trust L Bonds are secured obligations of GWG Holdings, ranking junior to all senior debt of GWG Holdings and pari passu in right of payment and in respect of collateral with all L Bonds of GWG Holdings (see Note 9). Payments under the Seller Trust L Bonds are guaranteed by GWG Life. The assets exchanged in connection with the Beneficent transaction are available as collateral for all holders of the L Bonds and Seller Trust L Bonds. Specifically, the Common Units are held by GWG Holdings and the Commercial Loan is held by GWG Life.

(2)   The Liquidity Bonds are secured obligations of GWG Life, ranking junior to all senior debt of GWG Holdings or GWG Life and pari passu in right of payment and in respect of collateral with all L Bonds of GWG Holdings. Payments under the Liquidity Bonds are guaranteed by GWG Holdings.

(3) The terms of the LNV Credit Facility require that we maintain a significant excess of pledged collateral value over the amount outstanding on the LNV Credit Facility at any given time. Any excess after satisfying all amounts owing under the LNV Credit Facility is available as collateral for the L Bonds (including the Seller Trust L Bonds and Liquidity Bonds).

APP. 832

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 833 of 1031    PageID 1005

The following represents summarized financial information as of September 30, 2021 and December 31, 2020, with respect to the financial position, and for the nine months ended September 30, 2021, with respect to results of operations. The tables

Page 77

present summarized financial information of GWG Holdings and GWG Life on a combined basis after elimination of (i) intercompany transactions and balances among such entities, including GWG Holdings' interest in GWG Life, and (ii) equity in earnings from and investments in any subsidiary that is a non-guarantor (including DLP IV, DLP V, GWG Life Trust and Beneficient). The summarized financial information has been prepared in accordance with Rule 13-01 of Regulation S-X.

Summarized Balance Sheet Information (in thousands, not intended to balance):

| | September 30, 2021 | December 31, 2020 |
|---|---|---|
| **Assets[1]** | | |
| Cash, cash equivalents and restricted cash | $ 36,720 | $ 65,556 |
| Other assets | 4,130 | 6,366 |
| Total assets | $ 40,850 | $ 71,922 |
| **Liabilities** | | |
| L Bonds | $ 1,279,808 | $ 1,246,902 |
| Seller Trust L Bonds | 366,892 | 366,892 |
| Interest and dividends payable | 11,402 | 12,086 |
| Accounts payable and accrued expenses | 7,067 | 7,347 |
| Deferred tax liabilities | 51,328 | 51,469 |
| Total liabilities | $ 1,716,497 | $ 1,684,696 |
| **Equity** | | |
| Redeemable preferred stock and Series 2 redeemable preferred stock | $ 98,478 | $ 156,833 |

_____

(1) Assets exclude: i) GWG Holdings' investment in GWG Life of $1.0 billion and $1.2 billion as of September 30, 2021 and December 31, 2020, respectively; ii) GWG Holdings' aggregate investments in non-obligor subsidiaries of $654.0 million and $643.1 million as of September 30, 2021 and December 31, 2020, respectively; and iii) GWG Life's aggregate investments in and loans to non-obligor subsidiaries of $1.0 billion and $1.2 billion as of September 30, 2021 and December 31, 2020, respectively.

Summarized Statement of Operations Information (in thousands):

| | Nine Months Ended September 30, 2021 |
|---|---|
| **Total revenues** | $ 19,928 |
| Interest expense | 109,535 |
| Other expenses | 27,020 |
| **Total expenses** | 136,555 |
| **Loss before income taxes and preferred dividends** | (116,627) |
| Income tax benefit | 173 |
| Preferred dividends | 8,371 |
| **Net loss** | $ (125,171) |

**Debt Coverage Ratio**

The L Bond borrowing covenants of GWG Holdings require it to maintain a Debt Coverage Ratio not to exceed 90%. The Debt Coverage Ratio is calculated by dividing the sum of our total interest-bearing indebtedness (other than Excluded Indebtedness defined and described in note 2 to the table below) by the sum of our cash, cash equivalents, restricted cash, life insurance policy benefits receivable, the net present value of the life insurance portfolio, and, without duplication, the value of all of our other assets as reflected on our most recently available balance sheet prepared in accordance with GAAP.

GWG Holdings' and GWG Life's investments in Beneficient and GWG Life's ownership interests in the holding companies that own DLP IV and DLP VI, which own substantially all of the life insurance portfolio, secure our obligations under the L Bonds, and are

APP. 834

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 835 of 1031    PageID 1007

illiquid assets. Although GWG Holdings and GWG Life own debt and equity securities of Beneficient, a substantial majority of the net assets of Beneficient are currently represented by goodwill, an intangible asset. The calculation

Page 78

APP. 835

of Beneficient's goodwill required the utilization of significant estimates and management judgment, as discussed elsewhere in this Quarterly Report on Form 10-Q. As a result, the carrying value of those assets as reflected in our accompanying condensed consolidated financial statements may not necessarily reflect the current market price for those assets, especially in the event of a bulk or distressed sale. Proceeds from L Bond sales will be primarily used for the repayment of L Bond maturities, interest payments and other operating expenses of GWG Holdings, and as otherwise specified in the prospectus for the L Bonds. GWG Holdings may also continue to use a portion of the proceeds from L Bond sales to make investments in Beneficient. Because advances may be used by Beneficient for working capital purposes, such investments may not increase the tangible assets securing the L Bonds. If the trustee for the L Bonds were forced to sell all or a portion of the collateral securing them, there can be no assurance that the trustee would be able to sell them for the prices at which we have recorded them in our accompanying condensed consolidated financial statements, and the trustee might be forced to sell them at significantly lower prices.

The discount rate we use for the net present value of our life insurance portfolio for this calculation may not be the same discount rate we use for our GAAP valuation and is not necessarily reflective of the amount we could realize upon a sale of the portfolio (dollars in thousands):

| | September 30, 2021 | December 31, 2020 |
|---|---|---|
| Life insurance portfolio policy benefits | $ 1,801,306 | $ 1,900,715 |
| Discount rate of future cash flows[1] | 7.39 % | 7.46 % |
| Net present value of life insurance portfolio policy benefits | $ 792,575 | $ 822,859 |
| All cash and cash equivalents (including restricted cash) | 57,975 | 106,282 |
| Life insurance policy benefits receivable, net | 33,105 | 14,334 |
| Financing receivables from affiliates | 189,957 | 180,080 |
| Investments in Common Units[3] | 437,573 | 438,194 |
| Investments in Preferred Series A Subclass 1 Unit Account[3] | 319,030 | 319,030 |
| Investments in Preferred Series C Unit Account[3] | 210,624 | 195,578 |
| Other Assets | 14,037 | 20,082 |
| Total Coverage[2] | $ 2,054,876 | $ 2,096,439 |
| Total Indebtedness[2] | $ 1,684,698 | $ 1,519,107 |
| Debt Coverage Ratio | 81.99 % | 72.46 % |

(1) Weighted-average interest rate paid on indebtedness, excluding that of Seller Trust L-Bonds, as required under the indenture governing the L Bonds.

(2) Total Coverage excludes the assets of Beneficient. Total Indebtedness is equal to the total liabilities balance of GWG Holdings (excluding the liabilities of Beneficient) as of September 30, 2021, other than Excluded Indebtedness. "Excluded Indebtedness" means indebtedness that is payable at GWG Holdings' option in capital stock of GWG Holdings or securities mandatorily convertible into or exchangeable for capital stock of GWG Holdings, or any Indebtedness that is reasonably expected to be converted or exchanged, directly or indirectly, into capital stock of GWG Holdings. This change in the definition of the Debt Coverage Ratio was defined in Amendment No. 2 to the Amended and Restated Indenture entered into as of December 31, 2019 (see Note 9 to the accompanying condensed consolidated financial statements).

(3) Generally represents the value of the investment in Beneficient as of December 31, 2019, for investments that existed at the time of the change-in-control transaction, or the value at the time of purchase for investments that were made subsequent to December 31, 2019. As noted above, these are illiquid investments that are carried at book basis and not market value. In the future, the book basis of these investments is subject to change pending the finalization of the accounting impact and conclusions of the Decoupling Transactions discussed in Note 17 to the accompanying condensed consolidated financial statements.

As of September 30, 2021 and December 31, 2020, we were in compliance with the Debt Coverage Ratio. As a result of the Letter Agreement dated November 15, 2021, by and among DLP IV, LNV Corporation, and CLMG Corp., discussed in detail in Note 17 to these accompanying condensed consolidated financial statements, three percent (3.0%) of any amount received by DLP IV with respect to any death benefit under any policies pledged under the LNV Credit Facility will be payable directly to CLMG Corp. for the benefit of the lenders. The Company expects that the three percent (3.0%) beneficial interest obtained by LNV Corporation will result in a significant downward adjustment to the fair value of the policies pledged under the LNV Credit Facility and will likely have an unfavorable impact on the debt coverage ratio as of December 31, 2021, absent any other changes to the values of other assets and liabilities reported at that date.

APP. 836

APP. 837

**ITEM 4. CONTROLS AND PROCEDURES.**

**Evaluation of Disclosure Controls and Procedures**

We maintain disclosure controls and procedures designed to provide reasonable assurance that information required to be disclosed in our reports filed pursuant to the Securities Exchange Act of 1934 is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including GWG Holdings' Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance the objectives of the control system are met.

GWG Holdings' Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities and Exchange Act of 1934) as of September 30, 2021 (the end of the period covered by this report). Based on that evaluation, GWG Holdings' Chief Executive Officer and Chief Financial Officer have concluded that due to the material weaknesses described below, our disclosure controls and procedures were not effective as of September 30, 2021.

*Material Weaknesses*

*Restatement*

In connection with matters related to the Restatement, we have determined that a material weakness existed in our internal control over financial reporting for all periods from December 31, 2019 to December 31, 2020. As of December 31, 2020, the design and operating effectiveness of controls over the selection, application and review of the implementation of accounting policies were not sufficient to ensure amounts recorded and disclosed were fairly stated in accordance with GAAP. This material weakness resulted in the Restatement.

In response to this material weakness, our management has expended, and will continue to expend, a substantial amount of effort and resources for the remediation and improvement of our internal control over financial reporting. While we have processes to properly identify and evaluate the appropriate accounting technical pronouncements and other literature for all significant or unusual transactions, we are improving these processes to ensure that the nuances of such transactions are effectively evaluated in the context of the increasingly complex accounting standards. Our remediation plan at this time includes continuing to enhance our internal and external technical accounting resources by hiring additional personnel and increasing communication with third-party professionals with whom we consult regarding the application of complex accounting transactions.

Our remediation plan can only be accomplished over time and will be continually reviewed to determine that it is achieving its objectives. We can offer no assurance that these initiatives will ultimately have the intended effects.

*Quarterly Valuation Allowance*

In connection with the preparation and review of our quarterly condensed consolidated financial statements as of and for the period ended September 30, 2020, we also identified a material weakness in internal controls over the quarterly income tax provision process, which included the measurement of the valuation allowance against the Company's deferred tax assets.

We have implemented a suite of enhanced internal controls and have involved additional external resources in the quarterly income tax provision process, including the assessment of the valuation allowance. We believe these measures will enable us to quickly remediate this material weakness in internal controls over the income tax provision process, including the valuation allowance against the Company's deferred tax assets.

We have completed certain of such remediation activities as of the date of this filing and believe that we have strengthened our internal controls to address the identified material weakness. However, control weaknesses are not considered remediated until new internal controls have been operational for a period of time, are tested, and management concludes that these controls are operating effectively. We will continue to monitor the effectiveness of these remediation measures, and we will make any changes to the design of this plan and take such other actions that we deem appropriate given the circumstances.

APP. 838

Page 80

Notwithstanding these material weaknesses, the Company has concluded that no material misstatements exist in the accompanying condensed consolidated financial statements, and such financial statements present fairly, in all material respects, the financial position, results of operations and cash flows of the Company as of and for the nine months ended September 30, 2021 and 2020, in conformity with accounting principles generally accepted in the United States of America.

**Changes in Internal Control over Financial Reporting**

Other than the aforementioned material weaknesses, there were no changes in our internal control over financial reporting during the period covered by this report that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

Page 81

APP. 840

## PART II — OTHER INFORMATION

**ITEM 6.   EXHIBITS**

| Exhibit | |
|---|---|
| 22 | List of Guarantor Subsidiaries *(filed herewith)* |
| 31.1 | Section 302 Certification of the Chief Executive Officer *(filed herewith)* |
| 31.2 | Section 302 Certification of the Chief Financial Officer *(filed herewith)* |
| 32.1 | Certification of Chief Executive Officer and Chief Financial Officer Pursuant to 18 U.S.C. §1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 *(filed herewith)* |
| 99.1 | Letter from ClearLife Limited, dated October 29, 2021 *(filed herewith)* |
| 99.2 | Portfolio of Life Insurance Policies as of September 30, 2021 *(filed herewith)* |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document |

## SIGNATURES

Pursuant to the requirements of the Securities and Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

GWG HOLDINGS, INC.

Date: November 19, 2021        By:    /s/ Murray T. Holland
                                                 *President and Chief Executive Officer*

Date: November 19, 2021        By:    /s/ Timothy L. Evans
                                                 *Chief Financial Officer*

<div align="center">Page 82</div>

APP. 841

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, DC 20549

---

**FORM 8-K**

CURRENT REPORT
Pursuant to Section 13 or 15(d) of
the Securities Exchange Act of 1934

Date of Report (date of earliest event reported): **December 31, 2021**

**GWG Holdings, Inc.**
(Exact name of registrant as specified in its charter)

Commission File Number:  **001-36615**

| **Delaware** | **26-2222607** |
|---|---|
| (State or other jurisdiction of incorporation) | (IRS Employer Identification No.) |

**325 North St. Paul Street, Suite 2650, Dallas, TX 75201**
(Address of principal executive offices, including zip code)

**(612) 746-1944**
(Registrant's telephone number, including area code)

**Not Applicable**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Shares | GWGH | Nasdaq Capital Market |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.    ☐

**Exhibit**

**A-5**

**Item 8.01 Other Events.**

Effective December 31, 2021, the Kansas Office of the State Bank Commissioner issued Beneficient Fiduciary Financial, L.L.C. ("Ben Financial"), a subsidiary of The Beneficient Company Group, L.P. ("Ben"), an operating charter (the "Charter") under the recently enacted Kansas Technology-Enabled Fiduciary Financial Institutions Act. Ben's Kansas regulated technology-enabled fiduciary financial institution trust company, Ben Financial, is now authorized to exercise fiduciary powers, including as custodian and trustee of, and lender with respect to, alternative assets. The Charter enables Ben Financial to provide fiduciary financing for Ben's customer liquidity transactions, allowing Ben to expand its operations and customer base. The Charter provides Ben with regulatory authorization to advance Ben's business strategy of providing liquidity and other services to holders of alternative assets, primarily comprised of mid-to-high-net-worth individuals and small-to-midsize institutional investors and family offices. The anticipated receipt of the Charter was a primary consideration of the board of directors of GWG Holdings, Inc. ("GWGH") when it approved the series of transactions by which Ben would no longer be a consolidated subsidiary of GWGH, as the board of directors believed the Charter would enhance the value of GWGH's investments in Ben.

**Cautionary Statement Regarding Forward-Looking Statements**

This report contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, which involve certain known and unknown risks and uncertainties. Forward-looking statements predict or describe our future operations, business plans, business and investment strategies and portfolio management and the performance of GWGH's investments. These forward-looking statements are generally identified by their use of such terms and phrases as "intend," "goal," "estimate," "expect," "project," "projections," "plans," "seeks," "anticipates," "will," "should," "could," "may," "designed to," "foreseeable future," "believe," "scheduled" and similar expressions. GWGH's actual results or outcomes may differ materially from those anticipated. Investors are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date the statement was made. GWGH assumes no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law.

GWGH's actual results may differ significantly from any results expressed or implied by these forward-looking statements. A summary of the principal risk factors that make investing in GWGH's securities risky and might cause GWGH's actual results to differ is set forth in the section entitled "Risk Factors" in GWGH's Annual Report on Form 10-K for the year ended December 31, 2020, filed with the SEC on November 5, 2021.

1

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**GWG HOLDINGS, INC.**

Date: January 3, 2022

By:    /s/ Timothy L. Evans
Name: Timothy L. Evans
Title:  Chief Financial Officer

2

APP. 842.1

HOME    MAIL    NEWS    FINANCE    SPORTS    ENTERTAINMENT    LIFE    SEARCH    SHOPPING    YAHOO PLUS    MORE...    Try it free

yahoo/finance

Search for news, symbols or companies

Sign in         Mail

Finance    Watchlists    My Portfolio    Cryptocurrencies    Yahoo Finance Plus    Screeners    Markets    News    Personal Finance    Videos    Yal

# The Beneficient Company Group Announces Initial $15 Million Community Reinvestment to Kansas as part of the TEFFI Act

**The Beneficient Company, LP.**

January 20, 2022  ·  6 min read

*Initial contribution made for the benefit of rural communities throughout Kansas as part of legislation aimed at attracting out-of-state alternative assets to the state*

DALLAS, Jan. 20, 2022 (GLOBE NEWSWIRE) -- The Beneficient Company Group, L.P. (Ben), a leading technology-enabled fiduciary financial institution serving the new emerging market demand from investors seeking regulated fiduciaries that provide liquidity, custody and trustee management services for their alternative assets, today announced that it has facilitated an initial contribution of assets totaling approximately $15 million for the benefit of rural Kansas communities pursuant to the recently enacted Technology Enabled Fiduciary Financial Institutions (TEFFI) Act.

The TEFFI Act, which received unanimous support in the Kansas Senate and strong bipartisan support in the House, is designed to expand the state's banking and financial services industry through the chartering of regulated fiduciaries that provide financing, custody and trustee management services to investors and managers of alternative investments principally located in wealth centers outside of Kansas. Ben recently received a charter from the Kansas State Bank

Exhibit

A-6

APP. 843

yahoo/finance

Search for news, symbols or companies                                    Sign in        Mail

Finance    Watchlists    My Portfolio    Cryptocurrencies    Y!● Yahoo Finance Plus    Screeners    Markets    News    Personal Finance    Videos    Yal

"A critical component of the TEFFI legislation was that it provided a novel mechanism that permits the state's banking industry to collectively expand into newly emerging markets and bring out of state commerce into Kansas while simultaneously generating community reinvestment in the state," said Kansas Lieutenant Governor David Toland. "We are thrilled to see the benefits to Kansans from our work with Ben, and we look forward to future contributions as Ben continues its operations and as more alternative assets are attracted to the state under this new innovative framework."

When alternative assets are placed into new Kansas trusts, the regulated fiduciary serving as trustee under the TEFFI Act facilitates a contribution to rural Kansas communities, colleges, and universities with a value equal to 2.5% of the total amount of the financing provided. The issuance of the charter assisted Ben in expanding its operations, and, as a result, Ben was able to increase the initial community reinvestment amount from $9 million to $15 million. Ben will continue to facilitate additional contributions as Ben engages as a regulated fiduciary in future financing and liquidity transactions.

Kansas State Representative Stephen Owens added, "Our efforts working with Ben to expand the Kansas banking industry are already coming to fruition through this tremendous $15 million community reinvestment coming much more quickly than forecasted. As legislators, we seek to make Kansas a top state in economic segments, and we see this new emerging demand from alternative asset investors for financing, custodial and trustee management by regulated fiduciaries as an area where Kansas can lead, much like South Dakota saw the need for credit card banking and Utah saw the need for industrial loan banking many years ago. The focus of the TEFFI Act is to address this new market demand principally from out of state investors while generating funding for our rural economies by providing a home for alternative asset investors from across the nation in the form of Kansas based trusts. We are pleased to see the first pilot work as intended. Everyone involved with this initiative always ensured that local Kansas communities were the main beneficiaries throughout the legislative process, and this reinvestment is a testament to the many benefits the TEFFI Act will have for our state."

A core objective of the legislation is to encourage investors, most of whom are not Kansas residents, to bring their alternative assets from outside of the state into Kansas-based trusts for which regulated

economic growth opportunities for our rural communities such as my hometown of Hesston and Harvey County," said Ben CEO and Chairman Brad Heppner. "I'm proud of Ben's critical work during our opening days with generating over 99% of its new business from out-of-state investors seeking fiduciary financing from Ben, and for making sure the people of Kansas directly benefit from the new home for alternative assets that they've helped us create. I look forward to future contributions in addition to seeing contributions of other organizations as the TEFFI Act is more widely adopted by the alternative asset investment industry, which faces a new and emerging market demand for financing and services provided by fiduciaries such as TEFFIs chartered by state bank regulators."

The TEFFI Act has been subject to extensive review and input from various parties throughout the legislative process, all to ensure the promulgation of effective rules and regulations and that benefits will ultimately flow to rural Kansas communities. In addition to Rep. Stephen Owens' and Lieutenant Governor David Toland's work related to the TEFFI Act, the legislation – Senate Substitute for House Bill No. 2074 – was introduced into and worked by the Kansas Senate Committee on Financial Institutions and Insurance, chaired by Sen. Jeff Longbine (R-Kansas, representing the Emporia area) and by the Kansas House Committee on Financial Institutions and Rural Development, chaired by Rep. Jim Kelly (R-Kansas, representing the Independence area).

Pursuant to the TEFFI Act, the statutory $9 million community reinvestment along with the additional $6 million generated earlier than expected will be distributed to the Kansas Department of Commerce and to charitable foundations designed to benefit Kansas Economic Growth Zones, including the city of Hesston, KS – an economic growth zone designated by Ben as a funding recipient. Beneficient has established the Beneficient Heartland Foundation in Hesston, Kansas, to receive funds. It's designed to be governed by a 14-member board of local community leaders and Ben representatives having a mission to support Hometown Economic Area Reinvestment for Tomorrow, or "**HEART**". The Foundation's first objective is to support the community's long-time goal of rebuilding by opening a new hometown grocery store and market in Hesston.

For more information on the TEFFI program, please visit
http://trustben.com/teffi.

HOME    MAIL    NEWS    FINANCE    SPORTS    ENTERTAINMENT    LIFE    SEARCH    SHOPPING    YAHOO PLUS    MORE...    Try it free

yahoo/finance

Search for news, symbols or companies

Sign in

Mail

Finance    Watchlists    My Portfolio    Cryptocurrencies    Yahoo Finance Plus    Screeners    Markets    News    Personal Finance    Videos    Yal

solutions are available for most types of professionally managed alternative asset investments and can be customized to suit individual circumstances. Serving as a principal by using its own balance sheet, Ben operates as a permanent financial institution that helps to remove many of the traditional barriers to liquidity faced by mid-to-high-net-worth individuals and small-to-mid-sized institutions. For more information, visit www.trustben.com.

**Media Contact**

Brunswick Group

BenMedia@brunswickgroup.com

+1 312-206-8010

**Comments**

Commenting on this article has ended                    Log in    Sign up

Powered by OpenWeb

 The Beneficient
Company Group



# The Beneficient Company Group Appoints Emily Bowersock Hill to its Board of Directors



Ben announced that Emily Bowersock Hill has been appointed to serve on Ben's Board of Directors, effective March 30. The addition of Ms. Bowersock Hill further strengthens Ben's deeply experienced Board of Directors, which includes former Dallas Federal Reserve Chair Richard Fisher, former Atlanta Federal Reserve Chair Dennis Lockhart, and private equity investor Tom Hicks, among others.

"Emily's depth and breadth of industry experience makes her a perfect addition to Ben's Board of Directors," said Brad Heppner, CEO and Chairman of Ben. "Ben is at a critical inflection point as we work with Kansas regulators and legislators on the implementation of the Technology Enabled Fiduciary Financial Institutions (TEFFI) Act, and Emily's wealth management, capital markets, and alternative investments expertise and leadership will be pivotal to driving Ben's future ambition as we continue to develop innovative ways to serve the growing number of alternative asset investors with liquidity solutions and other services."

As a Kansas native and experienced industry professional, Ms. Hill's expertise will be critical to Ben's continued work in Kansas related to the recently passed TEFFI Act. The TEFFI Act is landmark legislation designed to expand the state's banking and financial services industry through the chartering of regulated fiduciaries that provide financing, custody, and trustee management services to investors and managers of alternative investments principally located in wealth centers outside of Kansas.

Exhibit

A-7

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 849 of 1031    PageID 1021

"I am incredibly excited to join Ben's Board and to be part of their unique mission to truly democratize the alternative assets industry," said Ms. Bowersock Hill. "After discussions with Brad and his team, their ability to see around corners and passion for serving investors was apparent, and I look forward to contributing to Ben's continued success."

Ms. Hill currently serves as CEO and Founding Partner of Bowersock Capital Partners – a comprehensive financial management firm working with a select number of successful professionals, business owners, and high-net-worth families – which she launched in July 2020. Prior, she spent eighteen years at Morgan Stanley, where she was Executive Director, Senior Portfolio Manager, and Family Wealth Director providing comprehensive wealth management across a range of disciplines important to high-net-worth families, using both traditional and alternative investment strategies. Prior to Morgan Stanley, she was an associate and project manager at McKinsey Company. Ms. Hill has earned a BA from Dartmouth, an M.A. from The London School of Economics, and a Ph.D. and Master of Philosophy from Yale University.



**Emily Bowersock Hill**

## More About Emily Bowersock Hill

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 850 of 1031    PageID 1022

in 2022, Mrs. Hill was ranked by *Barron's* as the #1 Wealth Advisor in Kansas and on the Forbes inaugural list of America's "Top 200 Women Wealth Advisors." She was named by *Forbes* as one of America's Top Women Wealth Advisors from 2018-2020 and a Best-in-State Wealth Advisor from 2017-2022. She was named by *Working Mother* magazine as a Top Wealth Advisor from 2018-2020. In 2019, Kansas Governor Laura Kelly appointed her to the board of the Kansas Public Employees Retirement System (KPERS), a $25 billion pension fund. In 2021, she was appointed chair of the KPERS Investment Committee.



← **Return to Insights**



**What We Do**

Liquidity Solutions

Custody Administration

Markets

Insurance

**Who We Serve**

Individual Investors

Institutions

Wealth Managers

APP. 849

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 851 of 1031     PageID 1023

General Partners

**About Ben**

Our Team

Careers

Contact Us

**Corporate Social Responsibility**

**Insights**

**Terms of Use**

**Privacy Policy**

**Cookie Settings**

© 2011-2022 The Beneficient Company Group, L.P.

Securities Products are offered through Emerson Equity LLC. Member FINRA SIPC. The Beneficient Company Group, L.P. and Emerson Equity LLC are separate, unaffiliated entities.

**For informational and educational purposes only.**
These materials do not constitute an offer to sell or the solicitation of an offer to buy securities. Any offer or sale of securities shall be made solely to accredited investors and solely pursuant to a definitive confidential private placement memorandum and related documents, including definitive subscription materials.

Ben does not provide investment advisory services or tax, accounting or legal advice. The products and services described on this website may not be suitable for all users and you should consult with your legal, tax or other advisors prior to taking any action relating to the subject matter contained on this website. The contents hereof do not constitute an offer or solicitation to buy or sell any securities, financial instruments, products or services.

APP. 850

Case 3:22-cv-00410-B   Document 32-1   Filed 04/19/22   Page 852 of 1031   PageID 1024

Ben's products and services are not insured by the FDIC or any other government agency, are not guaranteed by Ben or its subsidiaries or affiliates, may lose value, and are not a Bank deposit.

**Important Information About Procedures for Establishing a Relationship with Ben**

To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person who establishes a relationship or carries out a transaction with the financial institution.

What this means for you: When you establish a relationship or carry out a transaction with us, we will ask for your name, address, date of birth and other information that will allow us to identify you (or similar identifying information for entities). We may also ask to see or that you provide us with copies of your driver's license or other identifying documents.

If you are unable or unwilling to provide this information, we may not be able to establish a relationship or carry out a transaction with you. We thank you for your patience and hope that you will support the financial industry's efforts to deny terrorists and money launderers access to America's financial system.

Ben's products and services are not insured by the FDIC or any other government agency, are not guaranteed by Ben or its

APP. 851

Filed pursuant to Rule 424(b)(1)
**Registration No. 333-237458**

# GWG HOLDINGS, INC.



2,000,000 Units of L Bonds
($2,000,000,000)

We are a financial services company committed to transforming the alternative asset industry with disruptive and innovative products and services. In 2018 and 2019 we consummated a series of transactions (as more fully described in this prospectus) with Beneficient (as defined below) that has resulted in a significant reorientation of our business and capital allocation strategy towards an expansive and diverse exposure to alternative assets.

We are offering up to 2,000,000 Units of L Bonds (the "L Bonds") at $1,000 principal amount per whole Unit, representing $2,000,000,000 in aggregate principal amount of L Bonds. This is a continuous offering and there is no minimum amount of L Bonds that must be sold before we can use any of the proceeds. The proceeds from the sale of the L Bonds will be paid directly to us following each sale and will not be placed in an escrow account. We intend to use the net proceeds from the offering of the L Bonds to grow our alternative asset exposure, primarily through investments in Beneficient in the form of equity investments or loans, and to meet our other obligations, including debt obligations. The minimum investment in L Bonds is 25 Units, or $25,000. Investments in excess of the minimum amount may be made in any number of whole Units. The L Bonds will be sold with varying maturity terms, interest rates and frequency of interest payments, all as set forth in this prospectus and in further supplements we publish from time to time. Depending on our capital needs and the amount of your investment, L Bonds with certain maturity terms may not always be available. Although we will periodically establish and change interest rates on unsold L Bonds offered under this prospectus, once an L Bond is sold, its interest rate will not change during its term (subject, however, to the extension and renewal provisions of the L Bond). Upon maturity, and subject to the terms and conditions described in this prospectus, the L Bonds will be automatically renewed for the same or lesser term at the interest rate we are offering at that time to other investors with similar aggregate L Bond portfolios for L Bonds of the same maturity, unless redeemed upon maturity at our or your election.

Obligations under the L Bonds are secured by substantially all the assets of GWG Holdings (the most significant components of which are cash and investments in subsidiaries), and by a guarantee and corresponding grant of a security interest in substantially all the assets of our subsidiary, GWG Life, LLC ("GWG Life"). As a guarantor, GWG Life has fully and unconditionally guaranteed the payment of principal and interest on the L Bonds. A substantial majority of our life insurance assets are held by GWG DLP Funding IV, LLC ("DLP IV") and GWG Life Trust ("Life Trust"), which are wholly owned subsidiaries of GWG Life. Although GWG Life's assets, including its equity in DLP IV and its beneficial interest in Life Trust, serve as collateral for our L Bonds, the life insurance policies held by DLP IV and Life Trust, which comprise a substantial majority of our life insurance policies, do not serve as direct collateral for the L Bonds. Further, the life insurance policies held by DLP IV are pledged as direct collateral securing the obligations under our amended and restated senior credit facility. These facts present the risk to investors that the collateral security that we and GWG Life have granted for our obligations under the L Bonds may be insufficient to repay the L Bonds when they become due.

**Neither the SEC nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

*Cover continued on next page*

The date of this prospectus is June 3, 2020

**Exhibit**

**A-8**

exhibitsticker.com

We may call and redeem the entire outstanding principal and accrued but unpaid interest of any or all of the L Bonds at any time, and from time to time, without penalty or premium. L Bond holders will have no right to put (that is, require us to redeem) any L Bond prior to its due date unless in the case of a holder's death, bankruptcy or total permanent disability. In the event we agree to redeem L Bond upon the request of an L Bond holder — other than after death, bankruptcy or total permanent disability— we will impose a redemption fee of 6% against the outstanding principal balance of the redeemed L Bond. This redemption fee will be subtracted from the amount paid.

We do not intend to list our L Bonds on any securities exchange during the offering period, and we do not expect a secondary market in the L Bonds to develop. As a result, you should not expect to be able to resell your L Bonds regardless of how we perform. Accordingly, an investment in our L Bonds is not suitable for investors that require liquidity in advance of their L Bond's maturity date.

We maintain senior borrowing arrangements that subordinate to our senior lenders the right to payment on, and the collateral securing, the L Bonds. In addition, these borrowing arrangements restrict our receipt of distributions from certain of our operating subsidiaries, subject to certain exceptions. These provisions will restrict cash flows available for payment of principal and interest on the L Bonds. From time to time we may add or replace senior lenders and the particular arrangements under which we borrow from them.

**Investing in our L Bonds may be considered speculative and involves a high degree of risk, including the risk of losing your entire investment. See "Risk Factors" beginning on page 11 of this prospectus and the risks discussed in the documents we file with the SEC to read about the risks you should consider before buying our L Bonds. The L Bonds are only suitable for persons with substantial financial resources and with no need for liquidity in this investment.**

Please read this prospectus before investing and keep it for future reference. We file annual, quarterly and current reports with the SEC. This information will be available free of charge by contacting us at 325 N. Saint Paul Street, Suite 2650, Dallas, TX 75201, or by phone at (612) 746-1944. This information may also be accessed on our website at *www.gwgh.com*, and the SEC maintains a website at *www.sec.gov* that contains this information.

The L Bonds will be offered and sold on a best-efforts basis by Emerson Equity LLC, a registered broker-dealer and member of the Financial Industry Regulatory Authority ("FINRA"). Emerson Equity will be our dealer manager for the L Bonds in this offering for purposes of the Securities Act of 1933, as amended. Our dealer manager will enter into participating dealer agreements with certain other broker-dealers that are members of FINRA, referred to as "selling group members," to authorize those broker-dealers to sell our L Bonds. We will pay Emerson Equity a selling commission ranging from 0.75% to 5.00% of the principal amount of L Bonds sold, depending on the L Bonds' maturity date. We will also pay Emerson Equity additional compensation consisting of those items set forth in footnote (1) to the table below. The dealer manager will share its commissions and additional compensation, other than its dealer manager fee, with selling group members pursuant to the terms of each participating dealer agreement. The total amount of the selling commissions and additional compensation (including reimbursements, non-transaction-based and non-cash compensation) paid to Emerson Equity and any other FINRA member in the course of offering and selling L Bonds will not exceed 8.00% of the aggregate gross offering proceeds we receive from the sale of L Bonds. We also may sell L Bonds at a discount from the public offering price through appropriate and designated distribution channels. See "Plan of Distribution" and "Use of Proceeds" for further information.

| | Units | Price to Investors | Aggregate Commission, Fees, and Expense Allowances(1)(2) | Net Proceeds to Company |
|---|---|---|---|---|
| Minimum Investment | 25 | $ 25,000 | $ 2,000 | $ 23,000(3) |
| Maximum Investment | 2,000,000 | $2,000,000,000 | $ 160,000,000 | $1,840,000,000(4) |

(1)  Assumes an average sales commission of 5.00%. As explained above, actual commissions will vary based on the term of the L Bonds sold. Nevertheless, the total amount of selling commissions and additional compensation (consisting of (i) a dealer-manager fee payable to the dealer manager in an amount equal to 0.40% of the principal amount of all L Bonds sold; (ii) an accountable expense allowance payable to the selling group members as described in the "Plan of Distribution," which may include due-diligence expenses of the dealer manager and selling group members set forth in a detailed and itemized invoice; (iii) wholesaling fees, which may consist of commissions and non-transaction-based compensation of the wholesalers; (iv) non-cash compensation; and (v) up to a 1.00% reallowance to selling group members) will not exceed 8.00% of the aggregate gross offering proceeds we receive from the sale of L Bonds. Accordingly, and assuming the sale of all $2,000,000,000 in principal amount of bonds offered hereby, the maximum amount of selling commissions we can pay is 5.00% of the gross offering proceeds we receive from the sale of the L Bonds (or $100,000,000), and the maximum amount of additional compensation we can pay will not exceed 3.00% of the aggregate gross offering proceeds we receive from the sale of the L Bonds (or $60,000,000). See "Plan of Distribution" for further information.

(2)  Emerson Equity has agreed to offer the L Bonds on a "best efforts" basis.
(3)  Net Proceeds to Company based on the minimum investment are calculated after deducting (i) selling commissions and (ii) additional compensation (consisting of the dealer-manager fee, a wholesaling fee, an accountable expense allowance and non-transaction-based and non-cash selling compensation). We expect that our own offering expenses, consisting of legal, accounting, printing, mailing, registration, qualification and associated securities offering filing costs and expenses, will, through the course of the offering, aggregate to approximately $2,400,000, but for purposes of illustrating the Net Proceeds to Company based on the minimum investment, those offering expenses of $2,400,000 are not reflected.
(4)  Net Proceeds to Company based on the Maximum Offering of 2,000,000 L Bond Units (representing $2,000,000,000 in aggregate principal amount) are calculated as described in footnote (3) above, but also before deducting our estimated offering-related expenses of $2,400,000.

L Bonds will be sold as "Units," with each whole Unit representing $1,000 in principal amount of L Bonds. We will issue the L Bonds in book-entry form, certificated form, or in the form of a global certificate deposited with a depositary. Depending on the manner in which you purchase L Bonds, you may not receive a physical certificate representing your L Bonds. In all cases, however, we will deliver written confirmation to purchasers of L Bonds. Bank of Utah will act as trustee for the L Bonds.

The current interest rates for the L Bonds based on their applicable maturity is set forth in the table below.

| Maturity Term | Interest Rate (%) |
|---|---|
| 2 years | 5.50 |
| 3 years | 6.25 |
| 5 years | 7.50 |
| 7 years | 8.50 |

We may change the interest rates applicable to unsold L Bonds from time to time during this offering, in which case the applicable interest rates will be set forth in a supplement to this prospectus. Once an L Bond is sold, the interest rate will not change during its term (subject, however, to the extension and renewal provisions contained in that L Bond).

**TABLE OF CONTENTS**

|  | **Page** |
|---|---|
| ABOUT THIS PROSPECTUS | ii |
| INDUSTRY AND MARKET DATA | ii |
| HOW TO PURCHASE L BONDS | iii |
| PROSPECTUS SUMMARY | 1 |
| RISK RELATING TO FORWARD-LOOKING STATEMENTS | 10 |
| RISK FACTORS | 11 |
| USE OF PROCEEDS | 14 |
| DESCRIPTION OF THE L BONDS | 15 |
| PLAN OF DISTRIBUTION | 30 |
| MATERIAL FEDERAL INCOME TAX CONSIDERATIONS | 34 |
| STATE, LOCAL AND FOREIGN TAXES | 37 |
| ERISA CONSIDERATIONS | 38 |
| LEGAL MATTERS | 40 |
| EXPERTS | 40 |
| WHERE YOU CAN FIND MORE INFORMATION | 40 |
| INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE | 40 |



GWG Holdings, Inc.
325 N. Saint Paul Street, Suite 2650
Dallas, TX 75201
Tel: (612) 746-1944
Fax: (612) 746-0445

i

APP. 855

**ABOUT THIS PROSPECTUS**

We have prepared this prospectus as part of a registration statement that we filed with the SEC for our continuous offering of L Bonds.

The registration statement we filed with the SEC includes exhibits that provide more detailed descriptions of the matters discussed in this prospectus and certain information that is incorporated by reference. You should read this prospectus, the related exhibits filed with the SEC, and any prospectus supplement(s), together with additional information described below under "Where You Can Find More Information," and the documents that are incorporated by reference into this prospectus. Any statement that we make in this prospectus will be modified or superseded by any inconsistent statement made by us in a prospectus supplement (or other disclosure incorporated into this prospectus by reference). This prospectus contains summaries of certain other documents, which summaries contain all material terms of the relevant documents and are believed to be accurate, but reference is hereby made to the full text of the actual documents for full and complete information concerning those documents. All documents relating to this offering, if readily available to us, will be made available to a prospective investor or its representatives upon request.

The L Bonds will be issued under an amended and restated indenture, as may be amended or supplemented from time to time (referred to herein as the "indenture"). This prospectus is qualified in its entirety by the terms of that indenture filed with SEC as an exhibit to the registration statement of which this prospectus is a part. All material terms of the indenture are summarized in this prospectus. You may obtain a copy of the indenture upon written request to us or online at *www.sec.gov*.

The indenture trustee did not participate in the preparation of this prospectus and makes no representations concerning the L Bonds, the collateral, or any other matter stated in this prospectus. The indenture trustee has no duty or obligation to pay the L Bonds from its funds, assets or capital or to make inquiry regarding, or investigate the use of, amounts disbursed from any account.

You should rely only on the information contained in this prospectus, as the same may be supplemented by prospectus supplements or other public disclosure incorporated into this prospectus by reference. Neither we nor the dealer manager have authorized any other person to provide you with any information different from that contained in this prospectus, a supplement, information incorporated into this prospectus by reference, or information furnished by us upon request as described herein. The information contained in this prospectus is complete and accurate only as of the date of this prospectus, regardless of the time of delivery of this prospectus or sale of our securities.

**N o information contained herein, nor in any prior, contemporaneous or subsequent communication should be construed by a prospective investor as legal or tax advice. Each prospective investor should consult its, his or her own legal, tax and financial advisors to ascertain the merits and risks of the transactions described herein prior to purchasing the L Bonds. This written communication is not intended to be written advice as defined in Circular 230 published by the U.S. Treasury Department.**

In this prospectus, we use the term "day" to refer to a calendar day, and we use the term "business day" to refer to any day other than Saturday, Sunday, a legal holiday or a day on which banks in New York City are authorized or required to close.

**INDUSTRY AND MARKET DATA**

The industry and market data used throughout this prospectus have been obtained from our own research, surveys or studies conducted by third parties and industry or general publications. Industry publications and surveys generally state that they have obtained information from sources believed to be reliable, but do not guarantee the accuracy and completeness of such information. We believe that each of these studies and publications is reliable.

ii

**HOW TO PURCHASE L BONDS**

If, after carefully reading this entire prospectus, obtaining any other information requested and available, and being fully satisfied with the results of pre-investment due-diligence activities, you would like to purchase L Bonds, you will have two different ways in which to consummate a purchase: (1) DTC settlement, or (2) direct settlement with the Company.

1. *Depositary Trust Company Settlement (DTC settlement).*    You can place an order for the purchase of L Bonds using DTC Settlement through your selling group member (i.e., your broker-dealer). A selling group member using this service will have an account with a DTC participant in which your funds will be placed to facilitate a closing on our periodic DTC closing cycle (typically, closings will occur on a bi-monthly cycle). Orders may be placed until the cyclical order due date. Orders will be executed by your selling group member electronically and you must coordinate with your selling group member's registered representative to pay the full purchase price for the L Bonds by the trade date. You will be credited with ownership of an L Bond on the second business day following the periodic DTC closing cycle in which the purchase is made. Nevertheless, interest will accrue for a period of 15 or 30 days for the month in which your purchase is made, depending on when during the DTC closing cycle your purchase is made. Your purchase price for L Bonds purchased in this way will not be held in escrow. This process is different if you purchase L Bonds through direct settlement with the Company as described below.

2. *Direct Settlement with the Company.*    If you wish to purchase L Bonds through direct settlement with the Company, then you must complete, execute and return the Subscription Agreement to us together with a certified check or personal check payable to the order of "GWG Holdings, Inc. — Subscription Account" (or wire sent to the Subscription Account) equal to the principal amount of L Bonds you wish to purchase. You will be credited with ownership of an L Bond, and interest will begin to accrue, from the date on which your fully paid subscription is accepted. If you are working with a selling group member, your subscription materials and the wire transfer, certified check or personal check should be delivered to your selling group member, who will deliver it to us at the following address:

<div align="center">

**GWG Holdings, Inc.**
**325 North St. Paul Street, Suite 2650**
**Dallas, TX, 75201**

**<u>Wire Instructions</u>**
GWG Holdings, Inc. — Subscription Account
Account: 500023916
Routing: 091310521
Bank Name: Bell Bank

</div>

Your purchase is subject to our acceptance. All information provided is confidential and will be disclosed only to our directors, officers and employees who need to know, affiliates, the managing broker-dealer, legal counsel and, if required, to governmental authorities and self-regulatory organizations or as otherwise required by law. For your purchase to be effective as of the first business day of a calendar month, your completed and executed Subscription Agreement, together with your related funds, must be received and accepted by us on or prior to the final settlement date (settlement dates normally occur on a bi-monthly basis).

Upon our receipt of the signed Subscription Agreement and acceptance of your purchase, we will notify you of such acceptance. In our sole discretion, we may accept or reject any purchase, in whole or in part. In the event we do not accept your purchase of L Bonds for any reason, we will promptly return your payment. We may terminate or suspend this offering at any time, for any reason or no reason, in our sole discretion. You may obtain a copy of the Subscription Agreement from our website at *www.gwgh.com*, from your selling group member (if you are working with one), or by contacting us at 1-877-494-2388.

<div align="center">iii</div>

**COVERED SECURITY**

Our L Bonds are a "covered security." The term "covered security" applies to securities exempt from state registration pursuant to Section 18 of the Securities Act of 1933. Generally, securities listed on national exchanges are the most common type of covered security exempt from state registration. A non-traded security also can be a covered security if it has a seniority greater than or equal to other securities from the same issuer that are listed on a national exchange. Our L Bonds are a covered security because they will be senior to our common stock, which is listed on The Nasdaq Capital Market, and therefore our offering of L Bonds is exempt from state registration.

**Although the status of our L Bonds as a "covered security" will facilitate their purchase and sale to a broader range of investors than would otherwise be available to us, and although the offer and sale of a "covered security" generally involves fewer issuance costs to the issuer of such securities, our L Bonds are not a suitable purchase for all investors. Investors are urged to read carefully the risk factors relating to our business and our Company contained in the Risk Factors section of this prospectus beginning on page 11 and under Item 1A, entitled "Risk Factors," of our Annual Report on Form 10-K for the year ended December 31, 2019, which is incorporated by reference herein. In addition, investors should understand that because our L Bonds are a "covered security" exempt from state securities regulations, neither our Company, the L Bonds, or any other aspects of this offering have been the subject of any merit-based review by state securities regulators.**

## QUESTIONS AND ANSWERS ABOUT THIS OFFERING

*The following questions and answers about this offering highlight material information regarding us and this offering that you may wish to review. Nevertheless, you should read this entire prospectus, including the section entitled "Risk Factors," and the documents incorporated by reference into this prospectus, before deciding to purchase our L Bonds.*

**Can you explain and clarify the interplay between GWG Holdings, Inc. and GWG Life, LLC and its subsidiaries in relation to the L Bonds and the registration statement?**

GWG Holdings, Inc. will be issuing the L Bonds, receiving all proceeds from the sale of L Bonds, and will be the only entity making regular payments on the L Bonds. Nevertheless, because a significant amount of our consolidated assets is held in our subsidiary GWG Life, LLC (and its own subsidiaries), GWG Life is a guarantor of our obligations under the L Bonds. As guarantor of the L Bonds, SEC rules require that GWG Life be included as a co-registrant under this registration statement. GWG Life will not, however, be otherwise involved in the offering of L Bonds.

**It seems as though you are offering several L Bonds with different interest rates and maturities but calling them all L Bonds. Is this the case?**

All bonds we issue in this offering will have identical terms, except (1) the interest rate and (2) the maturity length or "term." In this regard, we have essentially created multiple classes of L Bonds, similar to how companies may have different classes of stocks with slightly different economic rights. Currently, we are offering four classes of L Bonds, as follows:

- "Class 2-3" L Bonds will mature two years from their issuance and accrue interest at 5.50% *per annum.*

- "Class 3-3" L Bonds will mature three years from their issuance and accrue interest at 6.25% *per annum.*

- "Class 5-3" L Bonds will mature five years from their issuance and accrue interest at 7.50% *per annum.*

- "Class 7-3" L Bonds will mature seven years from their issuance and accrue interest at 8.50% *per annum.*

The economic terms for each L Bond in any particular class will be identical to all other L Bonds in the same class (other than the date of maturity). In the event we adjust the interest rate for any class of bonds we offer, we will create a new class of L Bonds. Upon the renewal of any L Bonds we have sold, any new interest rate applied to an L Bond will be applied to all L Bonds in the same class.

**Your prospectus states that the interest rate for the L Bonds may be adjusted from time to time during the course of the offering. Will any such adjustment apply retroactively to L Bonds already issued?**

No. Once you purchase an L Bond, the interest rate on that L Bond will not change during the entirety of its original term. The interest rate on an issued L Bond may, however, be adjusted upon renewal of that L Bond. In any such case, we will advise you of any different interest rate that may apply to your L Bond upon renewal. In sum, any new interest rates for the L Bonds will apply only to newly issued L Bonds sold or renewed after the date of any interest rate change. Our decision to change interest rates depends on numerous factors, including but not limited to things such as market interest rates, our capitalization, the demand for our L Bonds, the life settlement market in general, our capital requirements, and other factors. Please see "Description of the L Bonds — Interest Rate."

**How do I subscribe for L Bonds, and what is the settlement process?**

L Bonds may be purchased either directly from the Company or through your broker-dealer (also referred to in this prospectus as a selling group member), who utilizes a participant in the DTC system and offers "DTC settlement."

*Direct Settlement*

I f you purchase directly from the Company, you will send your completed and executed Subscription Agreement, together with your subscription amount to us at the address listed in "How to Purchase L Bonds." Your subscription amount is the principal amount of L Bonds you wish to purchase, and should be paid through a certified check or personal check payable to the order of "GWG Holdings, Inc. — Subscription Account." In lieu of paying by check, you may wire your subscription amount to the account referenced in "How to Purchase L Bonds." If you are working with a broker-dealer or other investment professional, your broker-dealer or professional will gather and send in the required information on your behalf, and may facilitate your payment of the subscription amount.

APP. 859

Once we have received your subscription amount and required documentation, we will either reject or accept your subscription. If accepted, you will be credited with ownership of the L Bond, we will have immediate access to your subscription amount and you will start to accrue interest on your investment at the rate applicable to the L Bond you have purchased. If you purchase directly from the Company, your L Bond will ordinarily be issued in book-entry (or, if requested, certificated) form and payments will be made directly into the account you indicate in your Subscription Agreement.

### *DTC Settlement*

Purchasing through a DTC participant is a slightly different process. In this case, you will provide your order for the purchase of L Bonds to your broker-dealer, together with such other information as your broker-dealer may require. Your broker-dealer will ensure your order is electronically placed with the Company and that the Company timely receives your subscription amount. There is no need to furnish the Company with a Subscription Agreement when you purchase through a broker-dealer that utilizes a participant in the DTC system and offers "DTC settlement." However, your broker-dealer may require additional documents.

Once we have received your subscription amount, we will either reject or accept your subscription. Once accepted based on our DTC closing cycle, we will have immediate access to your subscription amount and you will start to accrue interest on your investment at the rate applicable to the L Bond you have purchased. Nevertheless, you will be credited with ownership of an L Bond on the second business day after the end of the closing cycle in which your subscription is accepted. Interest will accrue for a period of 15 or 30 days for the month in which your purchase is made, depending on when during the DTC closing cycle your purchase is made. If you purchase through a broker-dealer who utilizes a participant in the DTC system and offers "DTC settlement," your L Bond will be issued to DTC in the name of Cede & Co., as its nominee. In this sense, DTC will be the legal owner of the L Bond and you will be the beneficial owner. Your ownership of the L Bond should then appear on the brokerage or other investment statements you receive from your broker-dealer or custodian.

For so long as DTC settlement is approved, we intend to issue each class of L Bonds a unique identifying number (CUSIP) each month to facilitate the settlement of L Bonds. Thus, Class 2-2 L Bonds issued in May 2020 (and maturing May 2022) will all have the same CUSIP, which will be different from the CUSIP applicable to Class 2-2 L Bonds issued in September 2020 (and maturing September 2022). In this way, all L Bonds belonging to a single CUSIP will be completely fungible, meaning that they will all mature on the same date and have identical terms so that one L Bond with a particular CUSIP is interchangeable with any other L Bond having the same CUSIP. This process creates a tracking system for the L Bonds to be issued to and transferred through DTC.

### What is the role of the trustee?

The Bank of Utah is the trustee for the L Bonds. The role of the trustee is essentially to enforce the terms of the L Bonds on behalf of bondholders, including direct and beneficial holders, and facilitate the relationship between our Company and the bondholders. We must notify the trustee of certain events as required under the indenture, and the trustee will in turn notify bondholders. The trustee has also been granted a security interest in all of the assets of GWG Holdings and GWG Life for the benefit of the bondholders. The trustee has no duty to pay any obligations under L Bonds or to make inquiry regarding, or investigate the use of, amounts disbursed from any account. Upon an event of default under the indenture, and subject to those limitations in the indenture designed to benefit our senior creditors, the trustee may take action against us to enforce the rights of holders of the L Bonds.

### What is the role of the paying agent?

The paying agent is the term ascribed to whomever it is that is making the payment to the holders of L Bonds. Presently, the Company has designated Computershare Trust Company, N.A. ("Computershare") to serve as the paying agent with respect to L Bonds settled through DTC, and the Company itself is the paying agent with respect to L Bonds settled directly with the Company. Please see "How to Purchase L Bonds," below. Computershare and the Company are therefore responsible for tracking investors' respective payment dates and ensuring timely payment of principal and interest under the L Bonds. The role of the paying agent is essentially mechanical, and does not ordinarily involve the exercise of discretion and judgment in the way that is typical for an indenture trustee.

APP. 860

**Do I need to sign any paperwork in connection with the renewal of my L Bond?**

No. The terms of the L Bond allow for the automatic renewal into a new L Bond of an identical (or lesser) maturity, unless we receive notice from you. Upon maturity, the L Bonds will be automatically renewed for the same term at the interest rate we are offering at that time to other investors with similar aggregate L Bond portfolios for L Bonds.

**Can I resell or transfer my L Bond after it has been purchased?**

Yes. Since these L Bonds are being offered and sold pursuant to an effective registration statement, the L Bonds may be transferred so long as the transfer is documented in a form approved by us. We do not, however, expect a public trading market to develop for the L Bonds in the foreseeable future, if ever. Because of the lack of a trading market for L Bonds, it is unlikely that holders will be able to sell their L Bonds easily. If you wish to transfer your L Bond held in book-entry (or certificated) form, you should contact us. If you wish to transfer your L Bond held through DTC, you should contact your broker-dealer (i.e., your selling group member).

**How will I receive interest and principal payments on my L Bonds?**

This will depend on how you purchased your L Bond. If you purchased your L Bond directly from us, we will directly deposit our payments of interest and principal into the account indicated in your Subscription Agreement. If you purchased through DTC, all payments of principal and interest will be made to DTC, who will forward such payment to the DTC participant you hold your L Bonds through, which will then arrange to transfer the payment to your brokerage account. In this case, all accountings of what you have contributed and what you are owed will be the responsibility of your broker-dealer.

**What is GWG Holdings, Inc.?**

We are a financial services company committed to transforming the alternative asset industry with disruptive and innovative products and services. In 2018 and 2019, we consummated a series of transactions (as more fully described below) with Beneficient that has resulted in a significant reorientation of our business and capital allocation strategy towards an expansive and diverse exposure to alternative assets. Beneficient, through its subsidiaries, plans to operate three potentially high value, high margin lines of business: (i) private trust lending and liquidity products; (ii) trust and custody services; and (iii) financial technology.

While we are continuing our work to maximize the value of our secondary life insurance business, we do not anticipate purchasing additional life insurance policies in the secondary market and have increased capital allocated toward providing liquidity to a broader range of alternative assets, primarily through Beneficient. We believe Beneficient can finance investments in alternative assets that will generally produce higher risk-adjusted returns than those we generally can achieve from life insurance policies acquired in the secondary market. Furthermore, although we believe that our portfolio of life insurance policies is a meaningful component of a growing diversified alternative asset portfolio, we continue to explore various strategic alternatives for our life insurance portfolio aimed at maximizing its value, including a possible sale, refinancing or recapitalization of our life insurance portfolio.

Our common stock is listed on The NASDAQ Capital Market under the ticker symbol "GWGH." We are based in Dallas, Texas.

**What is your business strategy?**

We are a financial services company committed to transforming the alternative asset industry with disruptive and innovative products and services. In 2018 and 2019 we consummated a series of transactions with Beneficient that has resulted in a significant reorientation of our business and capital allocation strategy towards an expansive and diverse exposure to alternative assets.

**Are there any risks involved in investing in this offering?**

Yes. Investing in our L Bonds involves a high degree of risk. You should carefully review the "Risk Factors" section of this prospectus and Item 1A, entitled "Risk Factors," of our Annual Report on Form 10-K for the year ended December 31, 2019, which is incorporated by reference herein, which contain a detailed discussion of the material risks that you should consider before investing in our L Bonds.

**How long will this offering last?**

The offering is a continuous offering. The offering expires under SEC rules after three years from the effective date of the registration statement of which this prospectus forms a part. We may, however, conduct similar or identical offerings of L Bonds or other securities during this same time or afterwards. We may also decide to terminate this offering at any time.

**Will I be notified of how my investment is doing?**

We will provide you with periodic updates on our performance through periodic filings we make with the SEC. Such filings will include: (i) three quarterly financial reports; (ii) one annual report; (iii) supplements to this prospectus, as appropriate; and (iv) such other reports as required under Section 13 of the Securities Exchange Act of 1934. Such information is also available on our website at *www.gwgh.com*.

**Will I receive annual tax information regarding interest payments from you?**

You will receive a Form 1099-INT, which will be mailed by January 31 of each year.

**Who can help answer my questions about the offering?**

If you have more questions about our offering, you should contact a registered representative of your broker-dealer (i.e., your selling group member) or other investment professional, or else contact:

GWG Holdings, Inc.
325 N. Saint Paul Street, Suite 2650
Dallas, TX 75201
(612) 746-1944
Attention: General Counsel

<div align="center">viii</div>

**PROSPECTUS SUMMARY**

*This summary highlights some of the information in this prospectus. It is not complete and may not contain all of the information that you may want to consider. To understand this offering fully, you should carefully read the entire prospectus, including the section entitled "Risk Factors," and the documents that are incorporated by reference into this prospectus, including Item 1A, entitled "Risk Factors," of our Annual Report on Form 10-K for the year ended December 31, 2019, before making a decision to invest in our L Bonds. Unless otherwise noted or unless the context otherwise requires, the terms "we," "us," "our," the "Company" and "GWG" refer to GWG Holdings, Inc. together with its direct or indirect subsidiaries. In instances where we refer specifically to "GWG Holdings" or "GWG Holdings, Inc.," or where we refer to a specific subsidiary of ours by name, we are referring only to that specific legal entity.*

**Our Company**

We are a financial services company committed to transforming the alternative asset industry with disruptive and innovative products and services. In 2018 and 2019 we consummated a series of transactions with The Beneficient Company Group, L.P. ("Ben LP," and, including all of the subsidiaries it may have from time to time, "Beneficient") that has resulted in a significant reorientation of our business and capital allocation strategy towards an expansive and diverse exposure to alternative assets. As part of this reorientation, we also changed our Board of Directors and executive management team.

Beneficient, through its subsidiaries, plans to operate three potentially high value, high margin lines of business:

- <u>Private Trust Lending & Liquidity Products.</u> Through Beneficient Capital Company, L.L.C. ("BCC"), Beneficient provides a unique suite of private trust, lending and liquidity products focused on bringing liquidity to owners of professionally managed alternative assets. Beneficient's innovative liquidity solutions are designed to serve mid-to-high net worth ("MHNW") individuals, small-to-mid sized ("STM") institutions, and asset managers who have historically possessed few attractive options to access early liquidity from their alternative assets. Beneficient targets MHNW clients with $5 million to $30 million in net worth and STM institutional clients typically holding less than $1 billion in assets.

- <u>Trust and Custody Services.</u> Through Beneficient Administrative and Clearing Company, L.L.C. ("BACC") and (subject to capitalization) through PEN Indemnity Insurance Company, LTD ("PEN"), Beneficient plans, in the future, to market retirement funds, custody and clearing of alternative assets, and trustee and insurance services for covering risks attendant to owning or managing alternative assets.

- <u>Financial Technology.</u> Through Ben Markets Management Holdings, L.P., formerly called ACE Portal, L.L.C. ("ACE"), Beneficient plans in the future to provide online portals and financial technologies for the trading and financing of alternative assets.

Beneficient's existing and planned products and services are designed to support the tax and estate planning objectives of its MHNW clients, facilitate a diversification of assets or simply provide administrative management and reporting solutions tailored to the goals of the investor who owns alternative investments.

While we are continuing our work to maximize the value of our secondary life insurance business, we do not anticipate purchasing additional life insurance policies in the secondary market and have increased capital allocated toward providing liquidity to a broader range of alternative assets, primarily through investments in Beneficient. We believe Beneficient's operations will generally produce higher risk-adjusted returns than those we can achieve from life insurance policies acquired in the secondary market. Furthermore, although we believe that our portfolio of life insurance policies is a meaningful component of a growing diversified alternative asset portfolio, we continue to explore strategic alternatives for our life insurance portfolio aimed at maximizing its value, including a possible sale, refinancing or recapitalization of our life insurance portfolio.

We completed our transactions with Beneficient to provide us with a significant increase in assets and common shareholder equity. In addition, our transactions with Beneficient provide us with the opportunity for a diversified source of future earnings within the alternative asset industry. As GWG and Beneficient expand their strategic relationship, we believe the Beneficient transactions will transform GWG from a niche provider of liquidity to owners of life insurance to, as GWG and Beneficient expand their strategic relationship, a full-scale provider of trust and liquidity products and services to owners of a broad range of alternative assets.

1

**Organizational Structure**

GWG Holdings conducts its life insurance secondary market business through a wholly owned subsidiary, GWG Life, and GWG Life's wholly owned subsidiaries, Life Trust and DLP IV. GWG Holdings' indirect interests in loans collateralized by cash flows from other alternative assets are held by Ben LP and its general partner, Beneficient Management, L.L.C. ("Beneficient Management"). All of these entities are legally organized in the state of Delaware, other than GWG Life Trust, which is governed by the laws of the state of Utah. GWG Holdings' wholly owned subsidiary, Life Epigenetics Inc. (formerly named Actua Life & Annuity Ltd.) ("Life Epigenetics"), was formed to commercialize epigenetic technology for the longevity industry. Through its wholly owned subsidiary, youSurance General Agency, LLC ("youSurance"), GWG Holdings sought to offer life insurance directly to customers utilizing epigenetic technology. On November 11, 2019, GWG Holdings contributed the common stock of Life Epigenetics and membership interests in youSurance to a legal entity, InsurTech Holdings, LLC ("InsurTech Holdings"), in exchange for 100% of the membership interest in InsurTech Holdings (on March 2, 2020, InsurTech Holdings changed its name to FOXO BioScience LLC). Although we currently own 100% of the equity of InsurTech Holdings, we do not have a controlling financial interest in InsurTech Holdings because InsurTech Holdings' managing member has substantive participating rights. Therefore, we account for our ownership interest in InsurTech Holdings as an equity method investment. Our headquarters are currently located in Dallas, Texas.

Beneficient was formed in 2003 but began its alternative asset business in September 2017. Beneficient operates primarily through its subsidiaries, which provide Beneficient's products and services. These subsidiaries include: (i) BCC, through which Beneficient offers loans and liquidity products; (ii) BACC, through which Beneficient provides services for fund and trust administration and plans to provide custody services; (iii) PEN, through which Beneficient plans to offer insurance services; and (iv) ACE, through which Beneficient plans to provide an online portal for direct access to Beneficient's financial services and products.

In the second quarter of 2019, in connection with the expansion of our strategic relationship with Beneficient, (i) our former chief executive officer resigned and was replaced with Murray T. Holland, a trust advisor of various related trusts (the "Seller Trusts"), which control a majority of our outstanding common stock, and (ii) all then current members of our Board of Directors resigned as directors of the Company, and 11 individuals designated by Beneficient were appointed as directors of the Company. Shortly thereafter, three additional directors were appointed to our Board of Directors. On October 11, 2019, four members of the Board of Directors resigned as directors of the Company, and the size of the Board of Directors was reduced from 14 to ten directors in order to facilitate the Board of Directors' ability to oversee the Company's operations in an efficient and effective manner. Under our current conflicts of interest policy, all transactions between the Company and its wholly owned subsidiaries, on the one hand, and related parties (including Beneficient and its controlled affiliates), on the other hand, must be approved by disinterested directors. On December 31, 2019, we entered into a Preferred Series A Unit Account and Common Unit Investment Agreement (the "Investment Agreement") with Ben LP, Beneficient Company Holdings, L.P. and Beneficient Management pursuant to which, among other things, we obtained the right to appoint a majority of the board of directors of Beneficient Management. As a result, the Company obtained control of Ben LP and began reporting the results of Ben LP and its subsidiaries on a consolidated basis beginning on the transaction date of December 31, 2019.

**Market Opportunity**

*Alternative Asset Liquidity Products and Services*

The market demand for liquidity from owners of alternative assets is attributable to the outstanding net asset value of illiquid alternative assets ("NAV") held by U.S. investors. Using data from various published industry reports from 2017 to 2019, certain widely accepted commercial private-equity databases, and applying its own proprietary assumptions and calculations ("Ben Estimates"), Beneficient estimates that total outstanding NAV held by U.S. investors exceeded $4.0 trillion in 2019 (up from an estimated $3.0 trillion in 2018).

According to at least one industry report from Prequin from 2018, total outstanding NAV in the hands of U.S. investors grew at a 12.1% compound annual growth rate ("CAGR") for the ten years ended 2018 and was forecasted to grow at an 8% CAGR through 2023 as a result of continued increases in capital committed to the alternative asset class.

According to Ben Estimates, the large U.S. institutions representing approximately 54% of the NAV have consistently sought liquidity on approximately 1.85% to 2.25% of their outstanding NAV. Based on Ben Estimates, this has led to an annual demand for liquidity of nearly $50 billion in recent years.

A primary group not included in this demand is the MHNW investor who holds investments of $5 million to $30 million compared to a large institution's holdings in the hundreds of millions or billions of dollars. Intermediary brokers will often not represent the MHNW individuals (or STM institutional investors). According to Ben Estimates, MHNW investors hold over $700.0 billion in NAV, yet MHNW investors have only been able to access liquidity representing less than 0.5% of the NAV held by them each year, compared to the average 2% achieved by the large institutional owners, representing 54% of the market.

Based on these amounts, Beneficient estimates that MHNW investors would seek liquidity of 3% of their outstanding NAV each year if

liquidity was made available to them, or a slightly greater percentage than that of large U.S. institutions. As a result, and according to Ben Estimates, the estimated market demand for liquidity by MHNW individuals would have exceeded $20.0 billion in 2019.

2

*Secondary Life Insurance Market*

The market for life insurance is large. According to the American Council of Life Insurers Fact Book 2018 (ACLI), consumers owned approximately $12.0 trillion in face value of individual life insurance policy benefits in the United States in 2017. In that same year, the ACLI reports that individual consumers purchased an aggregate of $3.1 trillion of new individual life insurance policy benefits. This figure includes all types of individual life policies, including term insurance and permanent insurance known as whole life and universal life.

The life insurance secondary market primarily serves consumers, 65 years and older, and their families who own life insurance.

The secondary market for life insurance exists as a result of consumer lapse behaviors and surrender values far below economic value offered to consumers for their life insurance by the issuing insurance carriers. The ACLI reports that the annual lapse and surrender rate for individual life insurance policies is 5.7% of the in-force face value of benefits, amounting to over $680 billion in face value of policy benefits lapsed and surrendered in 2017 alone.

In 2017, the National Association of Insurance Commissioners ("NAIC") issued a policy bulletin in support of products we provide. The bulletin described these products as "innovative private market solutions for financing Americans' long-term care needs." The NAIC, citing the Company's August 25, 2016 presentation, discussed how consumers could exchange the market value of their life insurance policies for products designed to fund long-term care expenses.

*Primary Life Insurance Market and Technology ("Insurtech")*

The opportunity to apply technology to transform the insurance industry is significant. The application of technology to the insurance industry, commonly referred to as "insurtech", provides opportunities for new entrants into the traditional insurance marketplace that have the potential to significantly disrupt the insurance industry's historical approach to assessing and selecting acceptable underwriting risks.

As discussed in the Organizational Structure section above, on November 11, 2019, GWG contributed the common stock and membership interests of its previously-wholly owned subsidiaries, Life Epigenetics and youSurance, to InsurTech Holdings. This transaction affected a reorganization such that InsurTech owns only two direct subsidiaries, Life Epigenetics and youSurance, which hold all insurtech assets, and one indirect subsidiary, Scientific Testing Partners, LLC, a wholly owned subsidiary of Life Epigenetics. In connection with the transaction, GWG Holdings contributed $2.1 million in cash to InsurTech Holdings during the fourth quarter of 2019 and is committed to contribute an additional $17.9 million to the entity over the next two years.

**Business Strategies**

*1. Liquidity for Alternative Assets*

We believe we are now uniquely positioned to provide liquidity and related services to investors holding a full range of illiquid alternative assets. We will continue to work to create the most value for holders of alternative assets, the financial professionals who advise them and for our shareholders.

Beneficient provides private trust solutions, including a unique suite of lending and liquidity products focused on bringing liquidity to owners of alternative assets. Beneficient's innovative liquidity solutions are designed to serve MHNW individuals, STM institutions, and asset managers who have historically possessed few attractive options to access early liquidity from their alternative assets. Beneficient targets MHNW individual clients with $5 million to $30 million in investments and institutional clients typically holding less than $1 billion in assets.

Beneficient's products can also support tax and estate planning objectives, facilitate a diversification of assets or provide administrative management and reporting solutions tailored to the goals of the investor. In the future, Beneficient plans to offer insurance services covering risks associated with owning or managing alternative assets.

Our life insurance secondary market business is designed to serve consumers 65 years or older owning life insurance. We seek to earn non-correlated yield from life insurance policies that we purchased in the secondary market. Since inception, we have purchased over $3.2 billion in face value of policy benefits from consumers for over $620 million, as compared to the $52 million in surrender value offered by insurance carriers on those same policies. Our products provide unique and valuable services to the senior consumers that we serve.

APP. 867

The goal of our secondary life insurance business has been to build a profitable, large and well-diversified portfolio of life insurance assets. We believe that scale and diversification are key factors and risk mitigation strategies to provide consistent cash flows and reliable investment returns. We believe that we have reached the goal in terms of portfolio size and diversification. We do not anticipate making additional investments in the life settlements portfolio as we believe Beneficient's operations will generally produce higher risk-adjusted returns than those we can achieve from life insurance policies acquired in the secondary market.

*2. Developing a World Class Financial Services Distribution Platform*

GWG has developed a large and sophisticated financial services product distribution platform. Today, this platform consists of over one hundred independent broker dealers and several thousand "independent" financial advisors ("Retail Distribution") who sell the Company's investment products. "Independent" in this context refers to broker-dealers that accommodate financial advisors who carry securities licenses and need back-office support for services, such as compliance and trade execution, but allow their advisors wide latitude in how they conduct business. Since inception, GWG has raised over $1.52 billion of debt and equity capital to support our secondary market of life insurance business and related expenditures.

We believe that we are well positioned to continue to grow our Retail Distribution for several reasons:

- We believe there is a trend towards financial professionals leaving large full-service broker-dealers to become "independent";

- Newly independent financial professionals and their clients demand a high level of customer service and access to innovative and value added products;

- The significant demand for liquidity from owners of alternative assets by US investors;

- We believe that our expanded relationship with Beneficient will attract more and larger broker dealers to our platform due to our increased size and market capitalization as well as the increase in products offered; and

- We believe that by using capital to provide liquidity products to our current customers, and as they begin to realize the benefit of these products, we will able to raise more capital and attract additional broker dealers into our selling group.

*3. Commercializing Advanced Epigenetic Technology for Primary Life Insurance Markets*

We believe life insurance underwriting will be transformed due to advancements in science and technology. As part of that transformational change, we believe the science of epigenetics will serve as a foundational science to this advancement for the life insurance industry by achieving more accurate and automated underwriting.

As described above, on November 11, 2019, the Company contributed the common stock and membership interests of its previously wholly-owned subsidiaries, Life Epigenetics and youSurance to InsurTech Holdings. We believe that as a separate entity (rather than as a small subsidiary of a large financial services holding company), the InsurTech Holdings businesses can reach their maximum potential in terms of marketing and branding, attraction of talent, appropriate peer group comparisons and, ultimately, return to its owners. The Company will retain substantially all of the economics of InsurTech Holdings.

4

**The Offering**

| | |
|---|---|
| **Issuer** | GWG Holdings, Inc. |
| **Indenture Trustee** | Bank of Utah |
| **Paying Agent** | GWG Holdings, Inc. |
| **Securities Offered** | We are offering up to 2,000,000 Units of L Bonds ("L Bonds"), with each whole Unit representing $1,000 in principal amount of L Bonds. The L Bonds are being sold on a continuous basis. |
| **Method of Purchase** | We will sell L Bonds using two different closing or "settlement" services, whenever available. The first service is DTC settlement, and the second is direct settlement with the Company. For more information, see "Plan of Distribution." The registration statement of which this prospectus is a part also registers the renewal of L Bonds that are outstanding from time to time. |
| **Denomination** | The minimum purchase amount is 25 L Bond Units, or $25,000 in principal amount. Additional L Bonds in excess of 25 Units may be purchased in any number of whole or fractional Units. |
| **Offering Price** | $1,000 per whole Unit, representing 100% of the principal amount of the L Bond represented by a whole Unit. Throughout this prospectus, we refer to L Bond Units simply as "L Bonds." |
| **Limited Rescission Right** | If you are purchasing L Bonds through direct settlement with the Company and your Subscription Agreement is accepted at a time when we have determined that a post-effective amendment to the registration statement of which this prospectus is a part must be filed with the SEC, but such post-effective amendment has not yet been declared effective, you will have a limited time within which to rescind your investment subject to the conditions set forth in this prospectus. See "Description of the L Bonds — Limited Rescission Right" for additional information. |
| **Maturity** | You may generally choose maturities for your L Bonds of two, three, five or seven years. Nevertheless, depending on our capital requirements, we may not offer and sell L Bonds of all maturities at all times during this offering. |
| **Interest Rates** | The interest rate of the L Bonds will be established at the time of your purchase, or at the time of renewal, based upon the rates we are offering in this prospectus or our latest interest rate supplement to this prospectus (i.e., any prospectus supplement containing interest rate information for L Bonds of different maturities), and will remain fixed throughout the term of the L Bond. We may offer higher rates of interest to investors with larger aggregate L Bond portfolios, but only as set forth in the then-current interest rate supplement. |
| **Interest Payments** | We will pay interest in cash on the L Bonds based on the terms you choose, which may be monthly or annually. Interest will accrue from the effective date of the L Bond's issuance. If you purchase your L Bond directly from the Company, the effective date of your L Bond will be the date on which we accept your fully paid subscription. If you purchase your L Bond through DTC settlement, interest will begin accruing on the trade date. Based on our anticipated bi-monthly closing cycle, this means that interest will accrue for a period of 15 or 30 days for the month in which your purchase is made, depending on when during the DTC closing cycle your purchase is made. Interest payments will generally be made on the 15th day immediately following the last day of the month to the L Bond holder of record as of the last day of that interest-payment period. Interest will be paid without any compounding. |

5

| | |
|---|---|
| **Principal Payments** | The maturity date for the L Bonds will be the last day of the month during which the L Bond matures. We are obligated to pay the principal on the L Bond in cash by the fifth day of the month next following its maturity (or the first business day following such date). |
| **Payment Method** | Principal and interest payments will be made in cash by direct deposit to the account you designate in your Subscription Agreement if you purchase L Bonds through direct settlement with the Company. If you purchase L Bonds through DTC settlement, principal and interest payments will be made to your brokerage or custodial account through DTC. |
| **Renewal or Redemption at Maturity** | Upon maturity, the L Bonds will be automatically renewed for the same term at the interest rate we are offering at that time to other investors with similar aggregate L Bond portfolios for L Bonds of the same maturity, unless repaid upon maturity at our or your election. In this regard, we will notify you at least 30 days prior to the maturity date of your L Bonds. In the notice, we will advise you if we intend to repay the L Bonds or else remind you that your L Bonds will be automatically renewed unless you exercise your option, at least 15 days prior to the maturity date, to elect to have your L Bonds repaid. If applicable, a new certificate will be issued. |
| | If we determine that a post-effective amendment to the registration statement covering the offer and sale of L Bonds must be filed during your 15-day repayment election period, we will extend your election period until ten days following the postmark date of our notice to you that the amendment has become effective. |
| | For any L Bonds offered hereby that mature after the three-year anniversary of the commencement of this offering, we expect that the renewal of such L Bonds may require us to file a new registration statement. In such a case, the new registration statement must be declared effective before we will be able to renew your L Bond. In this event, if the new registration statement has not yet been filed or become effective, we will extend your election period until ten days following the date of our notice to you that the new registration statement has become effective, which notice will include a new prospectus. |
| | If L Bonds with similar terms are not being offered at the time of renewal, then (i) the interest rate upon renewal will be (a) the rate specified by us in writing on or before the maturity date or (b) if no such rate is specified, the rate of your existing L Bonds, and (ii) the maturity will the same if L Bonds of the same maturity are then being offered at the time of renewal. If L Bonds of the same maturity are not then being offered at the time of renewal, then the maturity will be the next earliest maturity. Accordingly, you should understand that the interest rate offered upon renewal may differ from the interest rate applicable to your L Bonds prior to maturity. See "Description of the L Bonds — Renewal or Redemption on Maturity." |
| **Call and Redemption Prior to Maturity** | We may call and redeem the entire outstanding principal balance and accrued but unpaid interest of any or all of the L Bonds at any time without penalty or premium. L Bond holders will have no right to require us to redeem any L Bond prior to maturity unless the request is due to death, bankruptcy or total permanent disability. The indenture defines "total permanent disability" as the determination by a physician, approved by us, that a holder of an L Bond who is a natural person, and who was gainfully employed at the time of issuance of the L Bond (or its renewal date), is unable to work on a full-time basis during a period of 24 consecutive months. |
| | In our sole discretion, we may accommodate other requests to redeem any L Bond prior to maturity. If we agree to redeem an L Bond upon the request of an L Bond holder (other than in connection with death, bankruptcy or total permanent disability of a holder), we will impose a redemption fee of 6% against the outstanding principal balance of the L Bond redeemed, which fee will be subtracted from the amount paid. |

6

| | |
|---|---|
| **Ranking** | The L Bonds will constitute secured debt of GWG Holdings. The payment of principal and interest on the L Bonds will be: |

- pari passu with respect to payment on and collateral securing all L Bonds (including those issued under our prior L Bond offering) and the previously issued Seller Trust L Bonds due 2023 (the "Seller Trust L Bonds"), of which approximately $948.1 million and $366.9 million in principal amount was outstanding, respectively, as of December 31, 2019 (see the caption "— Collateral Security" below);

- structurally junior to the present and future obligations owed by DLP IV under a second amended and restated senior credit facility with LNV Corporation, and structurally or contractually junior to any future obligations that DLP IV or other primary obligors or guarantors may have under future senior secured borrowing facilities; and

- structurally junior to the present and future claims of other creditors of our subsidiaries other than GWG Life, including Beneficient's senior credit agreement and second lien credit agreement with HCLP Nominees, L.L.C., of which approximately $152.2 million in principal amount was outstanding as of December 31, 2019, and trade creditors.

The indenture will permit us to issue other forms of debt, including senior and secured debt, in the future. Any such secured senior debt will have priority over L Bonds with respect to claims for payment and claims for any collateral that is shared as between the holders of L Bonds and such senior secured debt.

To fully understand the foregoing summary, you should understand that "pari passu" means that claims for payment and entitlement to security among the holders of L Bonds (including the holders of previously issued L Bonds) and the holders of any later-created class of "pari passu debt" of ours, will generally be treated equally and without preference. Debt issued on a pari passu basis in the future would be treated equally and without preference in respect of the L Bonds. Thus, in the event of any default on the L Bonds (or any other debt securities of ours that is pari passu with the L Bonds) resulting in claims for payment or claims on collateral security, the holders of the L Bonds and all such other debt securities that are pari passu with the L Bonds would share in payment or collateral in proportion to the amount of principal and interest owed on each such debt instrument. See "Description of the L Bonds — Ranking" for further information.

| | |
|---|---|
| **Guarantee** | The payment of principal and interest on the L Bonds (including those issued under our prior L Bond offering) and Seller Trust L Bonds is fully and unconditionally guaranteed by GWG Life. On December 31, 2019, there was approximately $948.1 million and $366.9 million, respectively, in outstanding principal amount of previously issued L Bonds and Seller Trust L Bonds. |
| **Collateral Security** | The L Bonds are secured by the assets of GWG Holdings, Inc. and by a guarantee and corresponding grant of a security interest in the assets of GWG Life. Our assets consist primarily of our investments in Beneficient, investments in our subsidiaries (including financing receivables from affiliates) and any cash proceeds we receive from life insurance assets of our subsidiaries, and all other cash and investments we hold in various accounts. |

7

GWG Life's assets, including its equity in our subsidiary DLP IV and its beneficial interest in Life Trust, serve as collateral for our L Bonds. However the life insurance policies held by DLP IV and Life Trust, which comprise a substantial majority of our life insurance policies, do not serve as collateral for the L Bonds. Further, the life insurance policies held by DLP IV are pledged as collateral securing the obligations under DLP IV's second amended and restated senior credit facility with LNV Corporation. The L Bonds' security interest will be structurally subordinate to the security interest in favor of our senior secured lender, together with any future senior secured lenders of ours. The assets of GWG Life, including proceeds it receives as distributions from DLP IV and derived from the insurance policies owned by DLP IV, are collateral for GWG Life's guarantee of the repayment of principal and interest on the L Bonds.

The L Bonds are also secured by a pledge of 3,952,155 shares of our common stock. For more information please see "Description of the L Bonds — Collateral Security."

**Indenture Covenants**

The indenture governing the L Bonds places restrictive covenants and affirmative obligations on us. For example, our debt coverage ratio may not exceed 90%.

The indenture defines the debt coverage ratio as the ratio, expressed as percentage, of (A) the aggregate sum of all Indebtedness (as defined in the indenture, other than Excluded Indebtedness, as described below) of GWG Holdings and its direct and indirect subsidiaries (including the Securities issued under the indenture, but excluding any Indebtedness of Ben LP and its direct and indirect subsidiaries) as reflected on GWG Holdings' most recent consolidated balance sheet prepared in accordance with GAAP over (B) the sum of (i) Net Present Asset Value (as defined in the amended indenture) of Life Insurance Policies (as defined in the amended indenture) owned by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding Life Insurance Policies held by Ben LP and its direct and indirect subsidiaries and controlled affiliates, plus (ii) all cash (and cash equivalents) held by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding the cash (and cash equivalents) held by Ben LP and its direct and indirect subsidiaries, plus (iii) the original cost basis in GWG Holdings' investment in common units or other securities of Ben LP, plus (iv) the outstanding principal amount of any outstanding loans made under a commercial loan agreement with GWG Life, as lender, plus (v) the cost basis of assets contributed to GWG Holdings or any direct or indirect subsidiary of GWG Holdings in connection with a Repurchase Transaction (as defined below), plus (vi) without duplication, the value of all other assets of GWG Holdings and its direct and indirect subsidiaries or affiliates (but excluding the value of assets of Ben LP and its direct and indirect subsidiaries) as reflected on its most recent consolidated balance sheet prepared in accordance with GAAP.

The indenture defines "Excluded Indebtedness" as Indebtedness or any portion thereof (A) the principal and accrued but unpaid interest of which is payable at GWG Holdings' option, pursuant to the terms of such Indebtedness or otherwise, in Capital Stock (as defined in the amended indenture) of GWG Holdings or securities mandatorily convertible into or exchangeable for Capital Stock of GWG Holdings, or (B) any Indebtedness that is reasonably expected to be converted or exchanged, directly or indirectly, into Capital Stock of GWG Holdings, provided that under the terms of such Indebtedness in the event any such conversion or exchange does not occur in accordance with the terms of such transaction, such Indebtedness would be cancelled and any assets received in exchange for such Indebtedness would be returned (a "Repurchase Transaction").

For this purpose, the net present asset value of our life insurance assets is equal to the present value of the cash flows derived from the face value of policy benefit assets we own, discounted at a rate equal to the weighted-average interest rate paid on indebtedness, excluding that of Seller Trust L Bonds.

The net present asset value of our life insurance assets for purposes of this covenant is not necessarily the same as the fair value of our life insurance assets as reflected on our most recently available balance sheet prepared in accordance with U.S. generally accepted accounting principles ("GAAP") and does not necessarily reflect the saleable or market value of those assets.

We are required to notify the indenture trustee in the event we violate this restrictive covenant

for a period of 30 consecutive days. An "event of default" will exist under the indenture if a violation of this covenant persists for a period of 60 calendar days after the trustee's notice to us of a breach, or such a notice received from the holders of at least 25% in principal amount of outstanding L Bonds.

The indenture also places limitations on our ability to engage in a merger or sale of all of our assets. See "Description of the Indentures — Events of Default" and "— Consolidation Mergers or Sales" for more information.

8

| | |
|---|---|
| **Use of Proceeds** | If all the L Bonds are sold, we would expect to receive up to approximately $1,837.6 million of net proceeds from this offering after paying our estimated average selling commissions, dealer-manager fees, accountable expense allowance, wholesale commissions and our own offering-related expenses. There is no minimum amount of L Bonds that must be sold before we access investor funds. The exact amount of proceeds we receive may vary considerably depending on a variety of factors, including how long the L Bonds are offered.<br><br>We intend to use the net proceeds from this offering to grow our alternative asset exposure, including through investments in Beneficient in the form of equity investments or loans, and to meet our other obligations, including debt obligations. Beneficient will have broad discretion to use the proceeds of any such investments and may use such proceeds to fund alternative asset financings, to repay indebtedness, including to related parties, and for general working capital purposes, including operating expenses. We may also use some of the proceeds from this offering to pay interest and principal amounts owing under previously issued L Bonds, Seller Trust L Bonds, and L Bonds offered hereby and for the payment of dividends on and redemption of our preferred stock. See "Use of Proceeds" for additional information. |
| **No Market for L Bonds Units; Transferability** | There is no existing market for the L Bonds and we do not anticipate that a secondary market for the L Bonds will develop. We do not intend to apply for listing of the L Bonds on any securities exchange or for quotation of the L Bonds in any automated dealer quotation system. Nevertheless, you will be able to freely transfer or pledge L Bonds. See "Description of the L Bonds — Transfers." |
| **Book Entry** | The L Bonds may be issued in book-entry form, certificated form, or in the form of a global certificate deposited with a depositary. See "Description of the L Bonds — Registration and Exchange." |
| **Covered Security** | Our L Bonds are a "covered security." The term "covered security" applies to securities exempt from state registration because of their oversight by federal authorities and national-level regulatory bodies pursuant to Section 18 of the Securities Act of 1933. Generally, securities listed on national exchanges are the most common type of covered security exempt from state registration. A non-traded security also can be a covered security if it has a seniority greater than or equal to other securities from the same issuer that are listed on a national exchange. Our L Bonds are a covered security because they are senior to our common stock, which is listed on The Nasdaq Capital Market, and therefore our offering of L Bonds is exempt from state registration.<br><br>Although the status of our L Bonds as a "covered security" will facilitate their purchase and sale to a broader range of investors than would otherwise be available to us, and although the offer and sale of a "covered security" generally involves fewer issuance costs to the issuer of such securities, our L Bonds are not a suitable purchase for all investors. |
| **Risk Factors** | An investment in the L Bonds involves significant risks, including the risk of losing your entire investment, and may be considered speculative. Importantly, we maintain a senior borrowing arrangement that subordinates the right to payment on, and shared collateral securing, the L Bonds to our senior secured lender. From time to time we may add or replace senior lenders and the particular arrangements under which we borrow from them. In addition, these borrowing arrangements with senior lenders restrict, and are expected to continue to restrict, our cash flows and, subject to certain exceptions, distributions from our operating subsidiaries. These provisions will restrict cash flows available for payment of principal and interest on the L Bonds. For a summary of risks relating to this offering and our Company and business, please see "Risk Factors" beginning on page 11 of this prospectus and Item 1A, entitled "Risk Factors," of our Annual Report on Form 10-K for the year ended December 31, 2019, which is incorporated by reference herein. |

**RISK RELATING TO FORWARD-LOOKING STATEMENTS**

Certain matters discussed in this prospectus and the documents incorporated by reference contain forward-looking statements. These forward-looking statements reflect our current expectations and projections about future events and are subject to risks, uncertainties and assumptions about our operations and the investments we make, including, among other things, factors discussed under the heading "Risk Factors" below.

The words "believe," "could," "possibly," "probably," "anticipate," "estimate," "project," "expect," "may," "will," "should," "seek," "intend," "plan," "expect," or "consider" and similar expressions are intended to identify forward-looking statements but are not the exclusive means of identifying such statements. Forward-looking statements are subject to risks and uncertainties, which could cause actual results to differ materially from such statements. Such risks and uncertainties include, but are not limited to:

- the valuation of assets reflected on our financial statements, including the fair value of Beneficient's assets and liabilities, including noncontrolling interests, which were consolidated as a result of the transactions with Beneficient on December 31, 2019;

- the illiquidity of our life insurance and Beneficient-related investments and receivables from affiliates;

- our ability to realize the anticipated benefits from our consolidation of Beneficient;

- Beneficient's financial performance and ability to execute on its business plan;

- Beneficient's ability to obtain the trust charters from the Texas Department of Banking necessary to implement its business plan;

- our ability to obtain accurate and timely financial information from Beneficient;

- our ability to effectively transition the management and oversight roles served by our former executives and members of our Board of Directors;

- changes resulting from the evolution of our business model and strategy with respect to Beneficient and the life insurance secondary market;

- our reliance on debt financing and continued access to the capital markets;

- our significant and ongoing financing requirements;

- our predominant use of short term debt to fund a portfolio of long term assets could result in a liquidity shortage;

- our ability to make cash distributions in satisfaction of dividend obligations and redemption requests;

- our ability to satisfy our debt obligations if we were to sell our assets;

- our history of operating losses;

- general economic outlook, including prevailing interest rates and credit market conditions

- federal, state and FINRA regulatory matters;

- litigation risks;

- our ability to comply with financial and non-financial covenants contained in borrowing agreements;

- the reliability of assumptions underlying our actuarial models, including life expectancy estimates and our projections of mortality events and the realization of policy benefits;

- risks relating to the validity and enforceability of the life insurance policies we have purchased;

- our reliance on information provided and obtained by third parties, including changes in underwriting tables and underwriting methodology;

- life insurance company credit exposure;

- cost-of-insurance (premiums) increases on our life insurance policies;

- performance of our investments in life insurance policies; and

- risks associated with causing Life Epigenetics and youSurance to become independent of GWG.

We caution you that the foregoing list of factors is not exhaustive. Forward-looking statements are only estimates and predictions, or statements of current intent. Actual results, outcomes or actions that we ultimately undertake could differ materially from those anticipated in the forward-looking statements due to risks, uncertainties or actual events differing from the assumptions underlying these statements.

---

10

**RISK FACTORS**

*An investment in our securities involves a high degree of risk. Before purchasing the securities offered by this prospectus, you should carefully consider the risks, uncertainties and additional information (i) set forth in our most recent Annual Report on Form 10-K filed with the SEC which is incorporated by reference into this prospectus, and (ii) contained herein or in any applicable prospectus supplement. The information incorporated by reference into this prospectus specifically includes the risk factors contained in our Annual Report on Form 10-K filed with the SEC on March 27, 2020.*

*For a description of these reports and documents, and information about where you can find them, see "Where You Can Find More Information" and "Incorporation of Certain Documents by Reference." The risks and uncertainties in this prospectus and in the documents incorporated by reference in this prospectus are those that we currently believe may materially impact the Company and could result in the loss of all or a portion of your investment in the L Bonds. Additional risks not presently known or are currently deemed immaterial could also materially and adversely affect our financial condition, results of operations, business and prospects.*

**Risks Related to the Offering and the L Bonds**

***There is no established trading market for the L Bonds. If an actual trading market does not develop for the L Bonds, you may not be able to resell them quickly, for the price that you paid or at all.***

There is currently no existing market for the L Bonds and the L Bonds will not be listed for trading on any exchange. We cannot assure you as to the liquidity of any market that may develop for the L Bonds, the ability of holders of the L Bonds to sell them or the price at which the holders of the L Bonds may be able to sell them. The liquidity of any market for the L Bonds will depend on numerous factors, including prevailing interest rates, the market for similar securities and other factors, including general economic conditions and our own financial condition, performance and prospects. Historically, the market for debt securities, such as the L Bonds, has been subject to disruptions that have caused substantial price volatility. We cannot assure you that if a market for the L Bonds were to develop, such a market would not be subject to similar disruptions.

We also cannot assure you that you will be able to sell your L Bonds at a particular time or at all, or that the prices that you receive when you sell them will be favorable. If no active trading market develops, you may not be able to resell your L Bonds at their fair market value, or at all.

11

***The collateral granted as security for our obligations under the L Bonds and Seller Trust L Bonds may be insufficient to repay the indebtedness upon an event of default.***

GWG Holdings (the issuer of the L Bonds and Seller Trust L Bonds) and GWG Life (the guarantor of obligations under the L Bonds and Seller Trust L Bonds, and a wholly owned subsidiary of GWG Holdings) have each granted a security interest in substantially all of their respective assets to serve as collateral security for obligations under the L Bonds and Seller Trust L Bonds. Importantly, DLP IV, a wholly owned subsidiary of GWG Life, owns a substantial number of our life insurance policies, 77% of the face value of our life insurance portfolio as of December 31, 2019, and is the borrower under our second amended and restated senior credit facility with LNV Corporation. As the borrower under that second amended and restated senior credit facility with LNV Corporation, all of its assets — including all of its life insurance policy assets — serve as collateral for our obligations under the facility.

Because of the fact that a substantial number of our life insurance assets are held in our DLP IV subsidiary, and all of those life insurance assets serve as collateral security for our obligations under our second amended and restated senior credit facility with LNV Corporation, holders of L Bonds and Seller Trust L Bonds risk the possibility that the collateral security granted in our life insurance policies and our investments in Beneficient to secure our obligations under the L Bonds and Seller Trust L Bonds may be insufficient to repay holders upon an event of default. Furthermore, while the indenture governing the L Bonds and the Seller Trust L Bonds limits the amount of debt relative to a measure of asset coverage we and our subsidiaries can incur, the indenture permits us and our subsidiaries to incur additional secured debt (subject to the debt coverage ratio) that may be senior to the L Bonds and Seller Trust L Bonds.

Furthermore, the life insurance policies and our investments in Beneficient that secure our obligations under the L Bonds and Seller Trust L Bonds are illiquid assets. As a result, the book value of those assets as reflected on our financial statements are based on numerous assumptions and may not necessarily reflect the current market price for those assets, especially in the event of a bulk or distressed sale. Furthermore, a substantial majority of the net assets of Beneficient are currently represented by goodwill as of December 31, 2019. Some or a substantial portion of the proceeds from L Bond sales may be used to make investments in Beneficient. Because these advances may be used by Beneficient for working capital purposes and to repay indebtedness, such investments may not increase the tangible assets securing the L Bonds. If the trustee for the L Bonds were forced to sell all or a portion of the collateral securing them, there can be no assurance that the trustee would be able to sell them for the prices at which we have recorded them, and the trustee might be forced to sell them at significantly lower prices.

***Subordination provisions contained in the indenture will restrict the ability of the trustee or the L Bond or Seller Trust L Bond holders to enforce their rights against us under the indenture, including the right to payment on the L Bonds, if a default then exists under a senior credit facility.***

The L Bonds and Seller Trust L Bonds will be subordinate in right of payment to any claims of our senior lender under the second amended and restated senior credit facility with LNV Corporation. In this regard, subordination provisions limiting the right of L Bond and Seller Trust L Bond holders to enforce their rights are contained in the indenture. These provisions include:

- a prohibition on challenging any enforcement action taken by a senior lender, or interfering with any legal action or suits undertaken by a senior lender, against us and our affiliates;

- a 180-day standstill period during which there may not be brought any action against us or our affiliates to enforce rights respecting collateral unless our second amended and restated senior credit facility with LNV Corporation has been repaid in full, which period may be extended if the senior lender takes action during such standstill period; and

- a prohibition on filing a bankruptcy or insolvency case against us or our affiliates for at least one year plus one day after any senior lender has been paid in full.

In the event of a default on a senior credit facility, the indenture prohibits us from making any payment, direct or indirect (whether for interest, principal, as a result of any redemption or repayment at maturity, on default, or otherwise), on the L Bonds, Seller Trust L Bonds and any other indebtedness unless and until: (i) the default respecting the senior credit facility has been cured or waived or has ceased to exist; or (ii) in the case of a non-payment default that permits a senior lender to declare as due and payable all amounts owing under a senior credit facility (but where that senior lender has not yet so declared amounts as being due and payable), the end of the period commencing on the date the trustee receives written notice of default from the senior lender and ending on the earliest of (1) our discharge of the default (or other cure), (2) the trustee's receipt of a valid waiver of default from the senior lender, or (3) a written notice from the senior lender terminating the payment prohibition.

12

During any payment prohibition period, neither the holders of the L Bonds, the Seller Trust L Bonds, nor the trustee will have the right, directly or indirectly, to sue to enforce the indenture or the L Bonds or Seller Trust L Bonds. Other provisions of the indenture do permit the trustee to take action to enforce the payment rights of L Bond and Seller Trust L Bond holders after 179 days have passed since the trustee's receipt of notice of default from a senior lender, but in such case any funds paid as a result of any such suit or enforcement action shall be applied toward the senior credit facility until the facility is indefeasibly paid in full before being applied to the L Bonds and Seller Trust L Bonds.

These subordination provisions present the risk that, upon any default by us on obligations owed to our senior lender, the holders of the L Bonds and Seller Trust L Bonds will be unable to enforce their rights to payment.

If the 180-day standstill period noted above, or any other limitation on the rights of the trustee or L Bond and Seller Trust L Bond holders to assert their rights to payment of principal or interest under the indenture, is ultimately determined to conflict with provisions of the Trust Indenture Act of 1939 (most notably sections 316(b) and 317(a) of that Act), then the trustee, as well as any holder who shall not have earlier consented to such subordination provisions, will (notwithstanding such provision contained in the indenture) be authorized to institute a lawsuit for the enforcement of any payment of principal or interest after their respective due dates.

***The debt coverage ratio, designed to provide some assurance to the holders of the L Bonds and Seller Trust L Bonds that the value of our total assets exceeds our total interest-bearing obligations, values our life insurance policy assets, which represent 56% of our total assets (excluding goodwill) as of December 31, 2019, in a manner that may not be representative of the amount we would actually receive upon a sale of those assets.***

Under the indenture governing the L Bonds and Seller Trust L Bonds, as amended, the maximum amount of L Bonds and Seller Trust L Bonds we may issue at any time is limited to an amount such that our debt coverage ratio does not exceed 90%. This limitation is designed to provide some basis that the net present value of policy benefits from our life insurance assets, plus the carrying value of our other assets (including our investments in Beneficient), will be sufficient to meet our obligations to our L Bond and Seller Trust L Bond holders. Expressed as a percentage, the debt coverage ratio is the ratio of (A) the aggregate sum of all Indebtedness (other than Excluded Indebtedness) of GWG Holdings and its direct and indirect subsidiaries (including the Securities issued under the indenture, but excluding any Indebtedness of Ben LP and its direct and indirect subsidiaries) as reflected on GWG Holdings' most recent consolidated balance sheet prepared in accordance with GAAP over (B) the sum of (i) Net Present Asset Value of Life Insurance Policies owned by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding Life Insurance Policies held by Ben LP and its direct and indirect subsidiaries and controlled affiliates, plus (ii) all cash (and cash equivalents) held by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding the cash (and cash equivalents) held by Ben LP and its direct and indirect subsidiaries, plus (iii) the original cost basis in GWG Holdings' investment in common units or other securities of Ben LP, plus (iv) the outstanding principal amount of any outstanding loans made under a commercial loan agreement with GWG Life, as lender, plus (v) the cost basis of assets contributed to GWG Holdings or any direct or indirect subsidiary of GWG Holdings in connection with a Repurchase Transaction, plus (vi) without duplication, the value of all other assets of GWG Holdings and its direct and indirect subsidiaries or affiliates (but excluding the value of assets of Ben LP and its direct and indirect subsidiaries) as reflected on its most recent consolidated balance sheet prepared in accordance with GAAP. For this purpose, Excluded Indebtedness" is Indebtedness which is payable at GWG Holdings' option in capital stock of GWG Holdings or securities mandatorily convertible into or exchangeable for such capital stock of GWG Holdings, or any Indebtedness that is reasonably expected to be converted or exchanged, directly or indirectly, into such capital stock, provided that under the terms of such Indebtedness in the event any such conversion or exchange does not occur in accordance with the terms of such transaction, such Indebtedness would be cancelled and any assets received in exchange for such Indebtedness would be returned.

Although the debt coverage ratio is designed to provide some basis that our assets will be sufficient to meet our obligations to the holders of L Bonds and Seller Trust L Bonds, the "net present value" of our life insurance assets used in the debt coverage ratio is not the same as the GAAP "fair value" of those assets on our balance sheet. Accordingly, the debt coverage ratio is not informative of the amount we and holders of L Bonds and Seller Trust L Bonds would actually receive if we were forced to sell or liquidate our life insurance related assets. Furthermore, any sale or liquidation of all or a significant portion of our life insurance policies or investments in Beneficient would include significant transactional costs. See "— The collateral granted as security for our obligations under the L Bonds and Seller Trust L Bonds may be insufficient to repay the indebtedness upon an event of default." As a result, our compliance with the debt coverage ratio in the indenture will not guarantee that the value of our life insurance assets plus the value of our investments in Beneficient, if sold or liquidated, would in all cases exceed the amount of our obligations to the holders of L Bonds and Seller Trust L Bonds.

13

**USE OF PROCEEDS**

If all of the L Bonds are sold, we expect to receive up to approximately $1,837.6 million of net proceeds from this offering after paying our estimated offering and related expenses and the estimated selling commissions and additional compensation (consisting of (i) dealer-manager fees, (ii) wholesaling fees and non-transaction based compensation of the wholesalers, who are our employees and associated with the dealer manager, (iii) accountable expense allowance (iv) non-cash compensation, and (v) up to a 1.00% reallowance to selling group members). We expect the selling commissions and additional compensation to aggregate approximately $160.0 million based on expected average selling commissions of $100.0 million (5.00%), dealer-manager fees of $8.0 million (0.4%), and additional expenses aggregating to $52.0 million (2.60%), assuming the sale of all of the L Bonds. In addition, we expect that our offering expenses, consisting of legal, accounting, printing, mailing, registration, qualification and associated securities offering filing costs and expenses, will aggregate to approximately $2,400,000 through the course of this offering.

As explained elsewhere in this prospectus, the maximum amount of commissions, dealer manager fees and additional compensation payable to the dealer manager and selling group members is 8.0% of the aggregate principal amount of L Bonds sold. Therefore, if all of the L Bonds were sold and the maximum commissions, dealer manager fees and additional compensation were paid, we estimate that the net proceeds to us, after paying our own estimated offering and related expenses, would be approximately $1,837.6 million. Nevertheless, because we do not know the total principal amount of L Bonds that will be ultimately sold, we are unable to accurately forecast the total net proceeds that will be generated by this offering.

There is no minimum amount of L Bonds that must be sold before we access investor funds. The exact amount of proceeds we receive may vary considerably depending on a variety of factors, including how long the L Bonds are offered.

We intend to use the net proceeds from this offering to grow our alternative asset exposure, including through investments in Beneficient in the form of equity investments and/or loans to Beneficient or related entities, and to meet our other obligations, including:

- servicing our portfolio of life insurance assets (i.e., paying life insurance policy premiums);

- paying principal (at maturity or upon earlier prepayment or redemption), interest and fees to our lenders, including under DLP IV's second amended and restated senior credit facility, previously issued L Bonds, Seller Trust L Bonds and the L Bonds offered hereby;

- paying dividends on and, if applicable, redeeming our preferred stock;

- paying transaction expenses relating to interest rate hedging and similar derivative transactions (e.g., caps, collars, etc.); and

- general working capital purposes.

The extent to which we will use proceeds from this offering for any of these purposes, and the amounts and timing of such expenditures, will depend on, among other things, how long the L Bonds are offered, the amount of net proceeds that we receive from the sale of L Bonds being offered, our cash flows and needs for liquidity, the existence and timing of opportunities to strategically increase our investment in Beneficient, the availability of funds from other sources, including realizations from policy benefits, distributions from investments in Beneficient, the issuance of common or preferred equity, borrowings from senior credit facilities, and other factors deemed relevant by our Board of Directors and management.

Beneficient will have broad discretion to use the proceeds of any such investments and may use such proceeds to acquire alternative assets, to repay indebtedness, including to related parties, and for general working capital purposes, including operating expenses.

Net offering proceeds not immediately applied to the uses summarized above will be invested, at our sole discretion, in bank deposits or short-term investments such as money market funds, commercial paper, U.S. Treasury Bills and similar securities investments pending their use.

The maximum amount of L Bonds we may issue and have outstanding is limited by our debt coverage ratio discussed below.

14

**DESCRIPTION OF THE L BONDS**

**General**

The L Bonds are secured obligations of GWG Holdings. The L Bonds will be issued under the amended and restated indenture between us and Bank of Utah as the indenture trustee, dated October 23, 2017, which amends and restates the original indenture dated October 19, 2011 and as may be amended or supplemented from time to time (referred to herein as the "indenture"). The terms and conditions of the L Bonds include those stated in the indenture and those made part of the indenture by reference to the Trust Indenture Act of 1939. The following is a summary of the material provisions of the indenture. For a complete understanding of the L Bonds, you should review the definitive terms and conditions contained in the indenture, which include definitions of certain terms used below. A copy of the indenture has been filed with the SEC as an exhibit to the registration statement of which this prospectus is a part, and is available from us at no charge upon request.

The following is a summary of the material terms of the L Bonds:

- The L Bonds are general secured obligations of GWG Holdings. The obligations are secured by a grant of a security interest in all of the assets of GWG Holdings, which assets will serve as collateral for our obligations under the L Bonds. This grant of a security interest is effected pursuant to an amended and restated pledge and security that has been filed as an exhibit to the registration statement of which this prospectus forms a part.

- The L Bonds are fully and unconditionally guaranteed by our wholly owned direct subsidiary, GWG Life, but otherwise are not guaranteed by any other person or entity. The guarantee is backed by a grant of a security interest in all of the assets of GWG Life, which assets will serve as additional collateral for our obligations under the L Bonds. Chief among these assets is GWG Life's ownership interest in DLP IV. This guarantee is effected pursuant to provisions contained in the indenture.

- The L Bonds are also secured by a pledge of the equity ownership interests in GWG Holdings beneficially owned by BCC and AltiVerse Capital Markets, L.L.C., a Delaware limited liability company ("AltiVerse") (which is a limited liability company owned by an entity related to Beneficient's founders)— which pledge is effected pursuant to an amended and restated pledge and security agreement that has been filed as an exhibit to the registration statement of which this prospectus forms a part.

- Through DLP IV, we are party to a $300.0 million second amended and restated senior credit facility with LNV Corporation. The amount outstanding under this facility was $184.6 million at December 31, 2019.

- The L Bonds are not savings accounts, certificates of deposit (CDs) or other forms of "deposits," and are not insured by the FDIC or any other governmental agency.

- The L Bonds are not directly secured by any life insurance assets not owned by GWG Life. A substantial majority of our life insurance assets are held by DLP IV. Although GWG Life's equity ownership interest in DLP IV is an asset in which GWG Life has, pursuant to its guarantee, granted a security interest to serve as collateral for obligations under the L Bonds, the payment on such equity interest will be subordinate to the interests of creditors of DLP IV, including our senior creditor LNV Corporation.

- The L Bonds do not have the benefit of a "sinking fund" for the retirement of principal.

- The L Bonds are not convertible into our capital stock or other securities.

- We have the option to call and redeem the entire outstanding principal balance and accrued but unpaid interest of any L Bonds at any time and without premium or penalty. If we elect to call and redeem your L Bonds, those redeemed L Bonds will cease to accrue interest after the redemption date under the terms and subject to the conditions of the indenture.

- Except in limited circumstances (death, bankruptcy or total permanent disability) L Bond holders will have no right to require us to redeem any L Bond prior to its maturity date. Any early redemption will be for the total outstanding principal balance and accrued but unpaid interest. If we in our sole discretion nonetheless elect to accommodate a redemption request, we will redeem the entire (but not less than the entire) outstanding principal balance and accrued but unpaid interest of the L Bonds and may impose a redemption fee of 6% against the outstanding principal balance of the L Bond redeemed. This fee will be subtracted from the amount paid to you.

15

The L Bonds will be represented by "Units," with each whole Unit representing $1,000 in principal amount (USD) of L Bonds. Accordingly, L Bond Units will be sold at 100% of their principal face amount. Throughout this prospectus, we refer to L Bond Units simply as "L Bonds." The minimum investment amount in the L Bonds will be 25 Units, or $25,000. Above that minimum amount, L Bonds may be purchased in whole Units. Subject to the minimum investment amount, you may select the principal amount and term of the L Bonds (ranging from two to seven years) you would like to purchase when you subscribe. The interest rate of your L Bonds will remain fixed until maturity. Depending on our capital requirements, we may not, however, always offer L Bonds with the particular terms you seek. See "Description of the L Bonds — Interest Rate and Maturity" below.

Upon acceptance of your subscription, we will create an account in a book-entry registration and transfer system for you, and credit the principal amount of your subscription to your account. We will also send you a purchase confirmation that will indicate our acceptance of your subscription. If your subscription is rejected, all funds deposited will be promptly returned to you without any interest. See "— Registration and Exchange" below. Alternatively, you may subscribe for L Bonds as a direct participant with Depository Trust Company (DTC settlement). See "Plan of Distribution — Settlement Procedures" for more information.

Investors whose subscriptions for L Bonds have been accepted and anyone who subsequently acquires L Bonds in a qualified transfer are referred to as "holders" or "registered holders" in this prospectus. We may modify or supplement the terms of the L Bonds described in this prospectus from time to time in a supplement to the indenture and a further supplement to this prospectus. Except as set forth under "— Amendment, Supplement and Waiver" below, any modification or amendment will not affect L Bonds outstanding at the time of such modification or amendment.

The L Bonds are transferable pursuant to the terms of the indenture. The L Bonds may be transferred or exchanged for other L Bonds of the same series and class of a like aggregate principal amount (i.e., the same number of Units) subject to limitations contained in the indenture. We will not charge a fee for any registration, transfer or exchange of L Bonds. However, we may require the holder to pay any tax, assessment fee, or other governmental charge required in connection with any registration, transfer or exchange of L Bonds. The registered holder of any L Bonds will be treated as the owner of such L Bond Units for all purposes.

### Denomination

You may purchase L Bonds in the minimum amount of 25 Units, representing a minimum principal amount of $25,000, and in any whole Unit amounts in excess thereof. You will determine the exact number of L Bond Units you purchase when you subscribe. You may not cumulate multiple purchases L Bond Units in amounts less than 25 Units to satisfy the 25 Unit minimum requirement. In our discretion, however, we may waive the 25 Unit minimum purchase requirement for any investor.

### Term

We may offer L Bonds with the following terms to maturity: two years, three years, five years, and seven years.

You will select the term of the L Bonds you purchase when you subscribe. You may purchase multiple L Bonds with different terms by filling in investment amounts for more than one term on your Subscription Agreement. Nevertheless, during this offering we may not always offer L Bonds with each of the maturity terms outlined above.

The actual maturity date will be on the last day of the month in which the L Bond matures (i.e., the month in which the L Bond's term ends) For example, if you select a two-year term and your L Bond becomes effective on June 1, 2020, then the actual maturity date will be June 30, 2022. After actual maturity, we will pay all outstanding principal and accrued but unpaid interest on the L Bond no later than the fifth day of the calendar month next following its maturity (or the first business day following the fifth day of such month). So, in the case of an L Bond with a maturity date of June 30, 2022, actual payment will be made on or prior to July 5, 2022 (unless such date is not a business day, in which case actual payment will be made on the next business day). The L Bonds do not earn interest after the maturity date or any date set for prepayment.

Should the original L Bond holder (x) no longer be the holder of the L Bond or (y) be unavailable, or a change in payee be necessary, such as in the case of a surviving estate, we may require a copy of the executed assignment to any transferee, or an order from a court or probate commission, as the case may be, in order that we know the principal is returned to the rightful party.

16

**Interest Rate**

The rate of interest we will offer to pay on L Bonds at any particular time will vary based upon market conditions, and will be determined by the term to maturity of the L Bonds, our capital requirements and other factors described below. The interest rate on particular L Bonds will be determined at the time of subscription or renewal and then remain fixed for the original or renewal term of the L Bond. We will establish and may change the interest rates payable for L Bonds of various terms and at various investment levels in an interest rate supplement to this prospectus.

We may offer L Bonds that earn incrementally higher interest rates when, at the time they are purchased or renewed, the aggregate principal amount of the L Bond portfolio of the holder increases. If applicable, the interest rates payable at each level of investment will be set forth in an interest rate supplement to this prospectus. We may change the interest rate for any or all maturities to reflect market conditions at any time by supplementing this prospectus. If we change the interest rates, the interest rate on L Bonds issued before the date of the change will not be affected.

**Payments on the L Bonds; Paying Agent and Registrar**

Investors will have the opportunity to select whether interest on their L Bonds will be paid monthly or annually. For investors using direct settlement with the Company, this selection opportunity will be presented in the Subscription Agreement.

Interest will accrue on the L Bonds at the stated rate from and including the effective date of the L Bond until maturity. The effective date of an L Bond will be as follows:

- If you purchase an L Bond through DTC settlement, the effective date of your L Bond purchase will be the date your subscription is accepted by the Company.

- If you purchase an L Bond through direct settlement with the Company, the effective date of your L Bond purchase will be the following, as applicable: (i) in cases where you pay for your bond via wire transfer directly to us, the first business day of the next calendar month after which we receive the wire; (ii) in cases where you pay for your bond by bank draft directly to us, the first business day of the next calendar month after which we receive the draft; or (iii) in cases where you pay for your bond by personal check, the first business day of the calendar month that is at least five full business days after which we receive the check. In all cases involving direct settlement with the Company, we must also have received and accepted your completed and executed Subscription Agreement.

Interest payments on L Bonds will be paid on the 15th day immediately following the last day of the applicable interest payment period. Interest will be paid without any compounding. The first payment of interest will include interest for the partial period in which the purchase occurred. The indenture provides that all interest will be calculated based on a year with twelve 30-day months.

If you purchase your L Bond Units through direct settlement, we will pay the principal of, and interest on, L Bonds by direct deposit to the account you specify in your Subscription Agreement. We will not accept subscriptions from investors who are not willing to receive their interest payments via direct deposit. If the foregoing payment method is not available, principal and interest payments on the L Bonds will be payable at our principal executive office or at such other place as we may designate for payment purposes. If you purchase your L Bond Units through DTC settlement, our payments of principal and interest will be paid to the depositary (DTC) and then be credited to your brokerage or custodial account through the DTC procedures followed by your brokerage firm or custodian. For more information, please see "Registration and Exchange — Global Certificates Deposited with DTC" below.

We will withhold 28% of any interest payable to any investor who has not provided us with a social security number, employer identification number, or other satisfactory equivalent in the Subscription Agreement (or another document) or where the IRS has notified us that backup withholding is otherwise required. Please see "Material Federal Income Tax Considerations — Backup Withholding and Information Reporting."

**Registration and Exchange**

The L Bonds that we settle directly will generally be issued in book-entry form, which means that no physical L Bond is created, subject, however, to limited exceptions described in the indenture. The L Bonds settled through DTC settlement will be represented by global certificates deposited with the depositary as described below.

*Book-Entry Registration*

Evidence of your ownership will be provided by written confirmation. As described below, holders may, under certain circumstance described below, opt to receive physical delivery of a certificated security that evidences their L Bonds. Otherwise, the issuance and transfer of L Bonds will be accomplished exclusively through the crediting and debiting of the appropriate accounts in our book-entry registration and transfer system.

The holders of the accounts established upon the purchase or transfer of L Bonds will be deemed to be the owners of the L Bonds under the indenture. The holder of the L Bonds must rely upon the procedures established by the trustee to exercise any rights of a holder of L Bonds under the indenture. We will regularly provide the trustee with information regarding the establishment of new accounts and the transfer of existing accounts.

On or prior to any interest payment date or upon redemption, we will also provide the trustee with information regarding the total amount of any principal and interest due to holders of L Bonds. On each interest payment date, we will credit interest due on each account and direct payments to the holders. We will determine the interest payments to be made to the book-entry accounts and maintain, supervise and review any records relating to book-entry accounts for the L Bonds.

Book-entry notations in the accounts evidencing ownership of the L Bonds are exchangeable for certificated L Bonds only: (i) at the request of the holder, at the end of the Company's next fiscal quarter; or (ii) after the occurrence of an event of default under the indenture, if holders of more than 50% of the aggregate outstanding principal amount of the L Bonds advise the trustee in writing that the continuation of a book-entry system is no longer in the best interests of the holders of L Bonds. In its discretion, the Company may elect to terminate the book-entry system and replace book-entry notations with physical certificates.

*Global Certificates Deposited with DTC*

L Bonds may be issued in the form fully registered global certificates deposited with, or on behalf of, The Depository Trust Company ("DTC"), New York, NY, and registered in the name of Cede & Co., as nominee of DTC. Unless and until exchanged, in whole or in part, for L Bonds in definitive registered form, a global certificate may not be transferred except as a whole by the depositary to a nominee of such depositary, by a nominee of such depositary to such depositary or another nominee of such depositary, or by such depositary or any nominee of such depositary to a successor of such depositary or a nominee of such successor.

DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act. DTC was created to hold securities of its participants and to facilitate the clearance and settlement of securities transactions, such as transfers and pledges, among its participants in such securities through electronic computerized book-entry changes in accounts of the participants, thereby eliminating the need for physical movement of securities certificates. DTC's participants include securities brokers and dealers (including the managing broker-dealer), banks, trust companies, clearing corporations and certain other organizations, some of whom own DTC. Access to DTC's book-entry system is also available to others, such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a participant, either directly or indirectly. The rules applicable to DTC and its participants are on file with the SEC.

If available, purchases of L Bonds within the DTC system must be made by or through direct participants, which will receive a credit for the L Bonds on DTC's records. The ownership interest of each beneficial owner of the L Bonds will be recorded on the direct and indirect participants' records. Beneficial owners will not receive written confirmation from DTC of their purchases, but beneficial owners are expected to receive written confirmations providing details of the transactions, as well as periodic statements of their holdings, from the direct or indirect participants through which the beneficial owners entered into the transaction. Transfers of ownership interests in the L Bonds are to be accomplished by entries made on the books of participants acting on behalf of beneficial owners.

To facilitate subsequent transfers, all L Bonds deposited by participants with DTC will be registered in the name of DTC's nominee, Cede & Co. The deposit of L Bonds with DTC and their registration in the name of Cede & Co. will effect no change in beneficial ownership. DTC will have no knowledge of the actual beneficial owners of the L Bonds. DTC's records will reflect only the identity of the direct participants to whose accounts such notes are credited, which may or may not be the beneficial owners. The participants will remain responsible for keeping account of their holdings on behalf of their customers.

18

Conveyance of notices and other communications by DTC to direct participants, by direct participants to indirect participants and by direct and indirect participants to beneficial owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

We will make payments due on the notes to Cede & Co., as nominee of DTC, in immediately available funds. DTC's practice is to credit direct participants' accounts, upon DTC's receipt of funds and corresponding detailed information, on the relevant payment date in accordance with their respective holdings shown on DTC's records. Payments by participants to beneficial owners will be governed by standing instructions and customary practices, as is the case with securities held for the account of customers in bearer form or registered in "street name," and will be the responsibility of such participant and not our responsibility or that of DTC, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment to Cede & Co. is our responsibility. Disbursement of such payments to direct participants is the responsibility of Cede & Co. Thereafter, disbursement of such payments to the beneficial owners is the responsibility of direct and indirect participants (i.e., brokers, dealers and custodians).

Except as provided herein, a beneficial owner of an interest in a global certificate will not be entitled to receive physical delivery of the L Bonds. Accordingly, each beneficial owner must rely on the procedures of DTC to exercise any rights under the L Bonds. The laws of some jurisdictions require that certain purchasers of securities take physical delivery of securities in definitive form. Such laws may impair the ability to transfer beneficial interests in a global certificate.

As long as the depositary, or its nominee, is the registered holder of a global certificate, the depositary or such nominee will be considered the sole owner and holder of the L Bonds represented thereby for all purposes under the L bonds and the indenture. Except in the limited circumstances referred to below, owners of beneficial interests in a global certificate will not be entitled to have such global certificate or any L Bonds represented thereby registered in their names, will not receive or be entitled to receive physical delivery of certificated L Bonds in exchange for the global certificate and will not be considered to be the owners or holders of such global certificate or any certificates represented thereby for any purpose under the L Bonds or the indenture. Accordingly, each person owning a beneficial interest in such global certificate must rely on the procedures of the depositary and, if such person is not a participant, on the procedures of the participant through which such person owns its interest to exercise any rights of a holder under the indenture.

If the depositary for a global certificate representing L Bonds is at any time unwilling or unable to continue as depositary and a successor depositary is not appointed by us within 90 days, we will issue L Bonds in definitive form in exchange for such global certificate. In addition, we may at any time and in our sole discretion determine not to have the L Bonds represented by one or more global certificates and, in such event, we will issue the notes in definitive form in exchange for all of the global certificates representing the L Bonds. Finally, if an event of default, or an event which with the giving of notice or lapse of time or both would constitute an event of default, with respect to the L Bonds represented by a global certificate has occurred and is continuing, then we will issue L Bonds in definitive form in exchange for all of the global certificates representing the notes.

Although DTC has agreed to the procedures provided above in order to facilitate transfers, it is under no obligation to perform these procedures, and these procedures may be modified or discontinued at any time.

**Limited Rescission Right**

If you are purchasing L Bonds through direct settlement with the Company and your Subscription Agreement is accepted at a time when we have determined that a post-effective amendment to the registration statement of which this prospectus is a part must be filed with the SEC, but such post-effective amendment has not yet been declared effective, we will send to you at your registered address a notice and a copy of the related prospectus once it has been declared effective. You will thereupon have the right to rescind your investment upon written request within ten business days from the postmark date of the notice we send to you that the post-effective amendment has been declared effective (and containing the related prospectus). We will promptly return any funds sent with a Subscription Agreement that is properly rescinded without penalty, although any interest previously paid on a rescinded L Bond will be deducted from the funds returned to you upon rescission. A written request for rescission, except in the case of a mailed rescission, must be postmarked on or before the tenth business day after our notice to you (described above). If you notify us other than by mail, we must actually receive your rescission request on or before the tenth business day after our notice to you.

We will not accept purchases of L Bonds through DTC settlement if, as of the end of the monthly closing for DTC settlement, we have determined that a post-effective amendment to the registration statement of which this prospectus is a part must be filed with the SEC, but such post-effective amendment has not yet been declared effective. In any such case, settlement of your L Bond purchase must occur in the following month.

APP. 885

**Renewal or Repayment on Maturity**

At least 30 days prior to the maturity of your L Bond, we will provide you with a notice indicating that your L Bond is about to mature and whether we will allow automatic renewal of your L Bond. If we allow you to renew your L Bond, we will also provide to you the then-current form of prospectus, which may include an interest rate or prospectus supplement and any other updates to the information contained in this prospectus. The prospectus, or the interest rate or prospectus supplement, will set forth the interest rates then in effect. The notice will recommend that you review the then-current prospectus, including any interest rate or prospectus supplement, prior to exercising one of the below options. If we do not provide you a new prospectus because the prospectus has not changed since the delivery of this prospectus in connection with your original investment or any prior renewal, we will nonetheless send you a new copy of the prospectus upon your request. Unless the election period is extended as described below, you will have until 15 days prior to the maturity date to exercise one of the following options:

- You can do nothing, in which case (subject to applicable law) your L Bond will automatically renew for a new term equal to the original term but at the interest rate in effect at the time of renewal. Interest on renewed L Bonds will be paid on the same schedule (i.e., monthly or annually) as the original L Bond. If applicable, a new certificate will be issued.

- You can elect repayment of your L Bond, in which case the principal amount will be repaid in full along with any accrued but unpaid interest. If you choose this option, your L Bond will not earn interest on or after the maturity date.

- You can elect repayment of your L Bond and use all or part of the proceeds to purchase a new L Bond with a different term or principal amount. To exercise this option, you will need to complete a new Subscription Agreement for the new L Bond and mail it along with your request, or else work with your broker if you wish to purchase your new L Bond through DTC settlement. Any proceeds from the old L Bond that are not applied to the new L Bond will be sent to you.

The foregoing options will be available to holders unless and until terminated under the indenture. Interest will accrue from the first day of each renewed term. Each renewed L Bond will retain all its original provisions, including provisions relating to payment, except that the interest rate payable during any renewal term will be the interest rate that is being offered at that time to other holders with similar aggregate L Bond portfolios for L Bonds of the same term as set forth in the interest rate supplement delivered with the maturity notice. If similar L Bonds are not then being offered, the (i) interest rate upon renewal will be the rate specified by us on or before the maturity date, or the rate of the existing L Bond if no such rate is specified, and (ii) the maturity will, if L Bonds of the same maturity are being offered at the time of renewal, be the same or, if not, the next earliest maturity.

If we notify the holder of our intention to repay an L Bond at maturity, or if the holder timely requests repayment, we will pay the principal and all accrued but unpaid interest on the L Bond on or prior to the fifth day of the calendar month after the maturity date (or the first business day following the fifth day of such month). Thus, in the case of an L Bond with a maturity date of January 31, 2020, actual payment will be made on or prior to February 5, 2020 (unless such date is not a business day, in which case actual payment will be made on the next business day). No interest will accrue after the maturity date. You should be aware that because payment is made by ACH transfer, funds may not be received in the holder's account for two to three business days.

We will be required from time to time to file post-effective amendments to the registration statement of which this prospectus is a part to update the information it contains. If you would otherwise be entitled to renew your L Bonds upon their stated maturity at a time when we have determined that a post-effective amendment must be filed with the SEC, but such post-effective amendment has not yet been declared effective, then the period during which you can elect renewal (or repayment) will be automatically extended until ten days following the postmark date of our notice to you that the post-effective amendment has been declared effective, which notice shall contain a copy of the related prospectus. All other provisions relating to the renewal or redemption of L Bonds upon their stated maturity described above shall remain unchanged.

For any L Bonds offered hereby that mature on or after the three-year anniversary of the date on which the registration statement of which this prospectus is a part shall have been declared effective, we expect that the renewal of such L Bonds may require us to file a new registration statement. In such a case, the new registration statement must be declared effective before we can renew your L Bond. In this event, if the new registration statement has not yet been filed or become effective, we will extend your election period until ten days following the date of our notice to you that the new registration statement has become effective, which notice will include a new prospectus.

20

**Call and Redemption Prior to Stated Maturity**

We may call and redeem, in whole or in part, principal amount and accrued but unpaid interest on any L Bonds prior to their stated maturity only as set forth in the indenture and described below. The holder has no right to put or otherwise require us to redeem any L Bond prior to its maturity date (as originally stated or as it may be extended), except as indicated in the indenture and described below.

*Our Voluntary Redemption*

We have the right to redeem any L Bond, in whole or in part, at any time prior to its stated maturity upon at least 30 days written notice to the holder of the L Bond. The holder of the L Bond being redeemed will be paid a redemption price equal to the outstanding principal amount thereof plus accrued but unpaid interest up to but not including the date of redemption without any penalty or premium. We may use any criteria we choose to determine which L Bonds we will redeem if we choose to do so. We are not required to redeem L Bonds on a pro rata basis.

*Holder's Put Election Upon Death*

L Bonds may be redeemed prior to maturity at the election of a holder who is a natural person (including L Bonds held in an individual retirement account and the holders of a beneficial interest in a global certificate held by a depositary or its nominee), by giving us written notice within 45 days following the holder's total permanent disability or bankruptcy, as established to our satisfaction, or at the election of the holder's estate, by giving written notice within 45 days following the death of the holder. Subject to the limitations described below, we will redeem the L Bonds not later than the 15th day of the month next following the month in which we establish to our satisfaction the holder's death, bankruptcy or total permanent disability. In the event that the 15th day of the month next following the month in which we so establish such facts is not a business day, we will redeem the L Bonds on the next business day. The redemption price, in the event of such a death, bankruptcy or total permanent disability, will be the entire principal amount of the L Bonds, plus accrued but unpaid interest thereon up to and through the last day of the calendar month preceding the redemption date. The indenture defines "total permanent disability" as the determination by a physician, approved by us, that a holder of an L Bond who is a natural person, and who was gainfully employed at the time of issuance of the L Bond (or its renewal date), is unable to work on a full-time basis during a period of 24 consecutive months.

If spouses are joint registered holders of an L Bond, the right to elect to have us redeem L Bonds will apply when either registered holder dies, files bankruptcy or suffers a total permanent disability. If the L Bond is held jointly by two or more persons who are not legally married, none of these persons will have the right to request that we redeem the L Bonds unless all joint holders have died, filed bankruptcy or suffered a total permanent disability. If the L Bond is held by a trust, partnership, corporation or other similar entity, the right to request redemption upon death or total permanent disability does not apply.

*Redemption at Request of Holder*

We have no obligation to redeem any L Bonds other than upon maturity, or upon the death, bankruptcy or total permanent disability of a natural person holder. Nevertheless, at our sole discretion we may agree from time to time, at the written request of a holder (including the holder of a beneficial interest in a global certificate held by a depositary or its nominee), to redeem an L Bond, subject, however, to a redemption fee of 6.0% of the principal amount of such L Bond. If we so redeem any L Bond prior to maturity, we will redeem the entire principal amount of such L Bond together with accrued but unpaid interest thereon, The redemption fee will be subtracted from the amount paid to you.

**Transfers**

The L Bonds will be transferable in accordance with the indenture. For L Bonds that are issued solely in book-entry form, transfers will be effective only upon the delivery to us of an executed assignment or other conveyance instrument in customary form. For L Bonds that are represented by a global certificate held by a depositary or its nominee, transfers of beneficial interests in such certificate must be effected in accordance with the procedures and rules of the depositary.

Upon transfer of an L Bond, we will provide the new holder of the L Bond with a purchase confirmation that will evidence the transfer of the account on our records. If applicable (e.g., if transferred to a custodial account), a new certificate will be issued. No written confirmations will be provided with respect to transfers of beneficial interests in a global certificate held by a depositary or its nominee.

21

**Quarterly Statements**

We will provide holders of the L Bonds with quarterly statements, which will indicate, among other things, the account balance at the end of the quarter, interest credited, redemptions made, if any, and the interest rate paid during the quarter. These statements will be sent electronically on or prior to the 10th business day after the end of each calendar quarter. If a holder is unwilling or unable to receive quarterly statements electronically, we will mail the statements to the address of record on or prior to the 10th business day after the end of each calendar quarter. In such a case, we may charge such holders a reasonable fee to cover our expenses incurred in mailing the statements.

**Ranking**

The L Bonds will constitute secured debt of GWG Holdings. The payment of principal and interest on the L Bonds will be:

- pari passu with respect to payment and collateral securing all L Bonds and Seller Trust L Bonds previously issued by GWG Holdings, Inc., of which approximately $1,315.0 million in principal amount is outstanding as of December 31, 2019 (see the caption "— Collateral Security" below);

- structurally and contractually junior to the present and future obligations owed by our subsidiary DLP IV under our second amended and restated senior credit facility with LNV Corporation, and structurally or contractually junior to any future obligations that DLP IV or other primary obligors or guarantors may have under future senior secured borrowing facilities; and

- structurally junior to the present and future claims of creditors of our subsidiaries, other than GWG Life, including Beneficient's senior credit agreement and second lien credit agreement with HCLP Nominees, L.L.C., of which approximately $152.2 million in principal amount was outstanding as of December 31, 2019, and trade creditors.

The indenture will permit us to issue other forms of debt, including secured and senior debt, in the future.

"Pari passu" means that claims for payment and entitlement to security among the holders of L Bonds, including the holders of previously issued L Bonds and Seller Trust L Bonds, and the holders of any later-created class of "pari passu debt," will be treated equally and without preference. Although we have no present intention of causing GWG Life to issue additional secured debt in the future, any such debt issued on a pari passu basis in the future (including renewals of outstanding L Bonds or other renewable pari passu debt) would also be treated equally and without preference in respect of all outstanding L Bonds and Seller Trust L Bonds. Thus, in the event of any default on the L Bonds (or any other debt securities of ours that are pari passu with the L Bonds) resulting in claims for payment or claims on collateral security, the holders of the L Bonds and all such other debt securities pari passu with the L Bonds (such as the Seller Trust L Bonds) would share in payment or collateral in proportion to the amount of principal and interest owed on each such debt instrument.

**Guarantee by GWG Life Subsidiary**

The payment of principal and interest on the L Bonds and Seller Trust L Bonds, including previously issued L Bonds, is fully and unconditionally guaranteed by GWG Life. There were approximately $1,315.0 million in principal amount of previously issued L Bonds and Seller Trust L Bonds outstanding as of December 31, 2019.

**Collateral Security**

The L Bonds are secured by the assets of GWG Holdings. We will grant a security interest in all of the assets of GWG Holdings to the indenture trustee for the benefit of the L Bond holders. The assets of GWG Holdings consist, and are expected to consist, primarily of (i) any cash proceeds received from its subsidiaries as distributions derived from life insurance assets of subsidiaries, (ii) all other cash and investments held in various accounts, (iii) the equity ownership interests in subsidiaries of GWG Holdings, including the equity ownership interest in GWG Life, together with (iv) all proceeds from the foregoing. This collateral security granted by us is referred to as the "GWG Holdings Assets Collateral."

As indicated above, our direct and wholly owned subsidiary, GWG Life, will fully and unconditionally guarantee our obligations under the L Bonds. This guarantee will be supported by GWG Life's grant of a security interest in all of its assets. The assets of GWG Life consist, and are expected to consist, primarily of (i) certain life insurance assets, (ii) any cash proceeds received from life insurance assets owned by GWG Life or received from DLP IV, as distributions derived from life insurance policies owned by that subsidiary, (iii) all other cash and investments held by GWG Life in its various accounts, (iv) GWG Life's equity ownership interest in its direct subsidiaries, including DLP IV, together with (v) all proceeds from the foregoing. The collateral security granted by GWG Life pursuant to its guarantee of our obligations under the L Bonds is referred to as the "GWG Life Assets Collateral."

22

In addition, BCC and AltiVerse, collectively, have pledged 3,952,155 shares of our common stock to further secure our obligations under the L Bonds. This collateral security granted by BCC and Altiverse is referred to as the "GWG Holdings Equity Collateral."

Together, the GWG Holdings Assets Collateral, GWG Life Assets Collateral and GWG Holdings Equity Collateral comprise all of the collateral security for our obligations under the L Bonds. To the extent that we subsequently establish one or more wholly owned subsidiaries of GWG Holdings or GWG Life, the L Bonds will have a security interest in the equity ownership interests of those subsidiaries if and to the extent owned by GWG Holdings or GWG Life.

The guarantee by GWG Life is contained in the indenture, and the grant of security interests in the GWG Holdings Assets Collateral, GWG Life Assets Collateral and GWG Holdings Equity Collateral is effected through an "Amended and Restated Pledge and Security Agreement" that is an exhibit to the registration statement of which this prospectus forms a part. Neither the indenture nor the pledge and security agreement contain any provision preventing a pledging party from disposing of any collateral in the ordinary course of business. In this regard, the pledge and security agreement permits the disposition of GWG Holdings Equity Collateral to the extent the number of shares continuing to constitute such collateral represents at least 10% of the number of shares beneficially held by each individual grantor as of the date of the original pledge and security agreement.

Substantially all of our life insurance assets are held in our subsidiaries. The L Bonds will not be directly secured by any security interest in the assets of those subsidiaries, including DLP IV. Instead, the L Bonds will be secured by a pledge of the equity ownership interests in those subsidiaries, including DLP IV, owned by GWG Life by virtue of the guarantee provisions in the indenture and the pledge and security agreement referenced above. An equity ownership interest is, by its very nature, subordinate to the interests of creditors. **Therefore, although investors in the L Bonds will have a security interest in the ownership of DLP IV (and other direct subsidiaries of GWG Life) any claim they may have to the assets owned by such entity will be subordinate to the interests of creditors of that entity, including LNV Corporation, which is the lender to DLP IV under our second amended and restated senior credit facility, and all other creditors of DLP IV, including trade creditors. In addition, there is the risk that the collateral security granted for our obligations under the L Bonds may be insufficient to repay the L Bonds upon an event of default. See "Risk Factors — The collateral granted as security for our obligations under the L Bonds and Seller Trust L Bonds may be insufficient to repay the indebtedness upon an event of default**."

**Subordination; Other Indebtedness**

Our obligations under the L Bonds will be subordinate to all our senior debt. For this purpose, "our senior debt" presently includes all indebtedness owed or that may in the future become owing under our second amended and restated senior credit facility with LNV Corporation. As of December 31, 2019, DLP IV had approximately $184.6 million of debt outstanding under the second amended and restated credit facility with LNV Corporation. In addition, as of December 31, 2019, we had approximately $1,315.0 million in principal amount of debt outstanding under previously issued L Bonds and Seller Trust L Bonds.

The maximum amount of debt, including the L Bonds, we may issue is limited by the indenture. In particular, the indenture prohibits us from issuing debt in an amount such that our "debt coverage ratio" would exceed 90%. The indenture defines the debt coverage ratio as the ratio, expressed as percentage, of (A) the aggregate sum of all Indebtedness (other than Excluded Indebtedness) of GWG Holdings and its direct and indirect subsidiaries (including the Securities issued under the indenture, but excluding any Indebtedness of Ben LP and its direct and indirect subsidiaries) as reflected on GWG Holdings' most recent consolidated balance sheet prepared in accordance with GAAP over (B) the sum of (i) Net Present Asset Value of Life Insurance Policies owned by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding Life Insurance Policies held by Ben LP and its direct and indirect subsidiaries and controlled affiliates, plus (ii) all cash (and cash equivalents) held by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding the cash (and cash equivalents) held by Ben LP and its direct and indirect subsidiaries, plus (iii) the original cost basis in GWG Holdings' investment in common units or other securities of Ben LP, plus (iv) the outstanding principal amount of any outstanding loans made under a commercial loan agreement with GWG Life, as lender, plus (v) the cost basis of assets contributed to GWG Holdings or any direct or indirect subsidiary of GWG Holdings in connection with a Repurchase Transaction, plus (vi) without duplication, the value of all other assets of GWG Holdings and its direct and indirect subsidiaries or affiliates (but excluding the value of assets of Ben LP and its direct and indirect subsidiaries) as reflected on its most recent consolidated balance sheet prepared in accordance with GAAP.

APP. 889

We are required to notify the indenture trustee in the event we violate this restrictive covenant. An "event of default" will exist under the indenture if a violation of this covenant persists for a period of 30 calendar days after our initial notice to the trustee. The L Bonds are guaranteed by GWG Life but otherwise are not guaranteed by any of our subsidiaries, affiliates or control persons. Neither indenture nor the pledge and security agreement prevent holders of debt issued by our subsidiaries from disposing of, or exercising any other rights with respect to, any or all of the collateral securing that debt. Accordingly, in the event of a liquidation or dissolution of one of our subsidiaries (other than GWG Life), creditors of that subsidiary that are senior in rank will be paid in full, or provision for such payment will be made, from the assets of that subsidiary prior to distributing any remaining assets to us as an equity owner of that subsidiary.

The indenture also contains specific subordination provisions, benefitting lenders under any senior credit facility, restricting the right of L Bond holders to enforce certain of their rights in certain circumstances, including:

- a prohibition on challenging any enforcement action taken by a senior lender or interfering with any legal action or suits undertaken by our senior lenders against us and our affiliates;

- a 180-day standstill period during which there may not be brought any action against us or our affiliates to enforce rights respecting collateral unless our senior credit facilities have been repaid in full, which period may be extended if the senior lender takes action during such standstill period; and

- a prohibition on filing a bankruptcy or insolvency case against us or our affiliates for at least one year plus one day after the senior credit facility lenders have been paid in full.

We will not make any payment, direct or indirect (whether for interest, principal, as a result of any redemption or repayment at maturity, on default, or otherwise), on the L Bonds and any other indebtedness, and neither the holders of the L Bonds nor the trustee will have the right, directly or indirectly, to sue to enforce the indenture or the L Bonds, if a default or event of default under any senior credit facility has occurred and is continuing, or if any default or event of default under any senior credit facility would result from such payment, in each case unless and until:

- the default and event of default has been cured or waived or has ceased to exist; or

- in the case of a non-payment default that permits a senior lender to declare as due and payable all amounts owing under a senior credit facility (but where that senior lender has not yet so declared amounts as being due and payable), the end of the period commencing on the date the trustee receives written notice of default from the senior lender and ending on the earliest of (1) our discharge of the default (or other cure), (2) the trustee's receipt of a valid waiver of default from the senior lender, or (3) a written notice from the senior lender terminating the payment prohibition.

During any payment prohibition period, neither the holders of the L Bonds nor the trustee will have the right, directly or indirectly, to sue to enforce the indenture or the L Bonds. Other provisions of the indenture do permit the trustee to take action to enforce the payment rights of L Bond holders after 179 days have passed since the trustee's receipt of notice of default from a senior lender, but in such case any funds paid as a result of any such suit or enforcement action shall be applied toward the senior credit facility until the facility is indefeasibly paid in full before being applied to the L Bonds. The indenture contains provisions whereby each investor in the L Bonds consents to the subordination provisions contained in the indenture and related agreements governing collateral security.

If the 180-day standstill period noted above or any other limitation on the rights of the trustee or L Bond holders to assert their rights to payment of principal or interest under the indenture or L Bonds is ultimately determined to conflict with provisions of the Trust Indenture Act of 1939 (most notably sections 316(b) and 317(a) of that Act), then the trustee, as well as any holder who shall not have earlier consented to such subordination provisions, shall (notwithstanding such provision contained in the indenture) be authorized to institute a lawsuit for the enforcement of any payment of principal or interest after their respective due dates.

24

**No Sinking Fund**

The L Bonds are not associated with any sinking fund. A sinking fund is generally any account to which contributions will be made, from which payments of principal or interest owed on the L Bonds will be made. See "Risk Factors," page 11.

**Restrictive Covenants**

The indenture contains covenants that restrict us from certain actions as described below. In particular, the indenture provides that:

- we will not declare or pay any dividends or other payments of cash or other property solely in respect of our capital stock to our stockholders (other than a dividend paid in shares of our capital stock on a pro rata basis to all our stockholders) unless no default and no event of default with respect to the L Bonds exists or would exist immediately following the declaration or payment of the dividend or other payment;

- to the extent legally permissible, we will not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or the performance of the indenture;

- our Board of Directors will not adopt a plan of liquidation that provides for, contemplates or the effectuation of which is preceded by (a) the sale, lease, conveyance or other disposition of all or substantially all of our assets, otherwise than (i) substantially as an entirety, or (ii) in a qualified sales and financing transaction, and (b) the distribution of all or substantially all of the proceeds of such sale, lease, conveyance or other disposition and of our remaining assets to the holders of our capital stock, unless, prior to making any liquidating distribution pursuant to such plan, we make provision for the satisfaction of our obligations under the renewable unsecured subordinated notes; and

- our debt coverage ratio may not exceed 90%.

The indenture defines the debt coverage ratio as the ratio, expressed as percentage, of (A) the aggregate sum of all Indebtedness (other than Excluded Indebtedness) of GWG Holdings and its direct and indirect subsidiaries (including the Securities issued under the indenture, but excluding any Indebtedness of Ben LP and its direct and indirect subsidiaries) as reflected on GWG Holdings' most recent consolidated balance sheet prepared in accordance with GAAP over (B) the sum of (i) Net Present Asset Value of Life Insurance Policies owned by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding Life Insurance Policies held by Ben LP and its direct and indirect subsidiaries and controlled affiliates, plus (ii) all cash (and cash equivalents) held by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding the cash (and cash equivalents) held by Ben LP and its direct and indirect subsidiaries, plus (iii) the original cost basis in GWG Holdings' investment in common units or other securities of Ben LP, plus (iv) the outstanding principal amount of any outstanding loans made under a commercial loan agreement with GWG Life, as lender, plus (v) the cost basis of assets contributed to GWG Holdings or any direct or indirect subsidiary of GWG Holdings in connection with a Repurchase Transaction, plus (vi) without duplication, the value of all other assets of GWG Holdings and its direct and indirect subsidiaries or affiliates (but excluding the value of assets of Ben LP and its direct and indirect subsidiaries) as reflected on its most recent consolidated balance sheet prepared in accordance with GAAP.

The indenture defines "Excluded Indebtedness" as Indebtedness or any portion thereof (A) the principal and accrued but unpaid interest of which is payable at GWG Holdings' option, pursuant to the terms of such Indebtedness or otherwise, in Capital Stock (as defined in the amended indenture) of GWG Holdings or securities mandatorily convertible into or exchangeable for Capital Stock of GWG Holdings, or (B) any Indebtedness that is reasonably expected to be converted or exchanged, directly or indirectly, into Capital Stock of GWG Holdings, provided that under the terms of such Indebtedness in the event any such conversion or exchange does not occur in accordance with the terms of such transaction, such Indebtedness would be cancelled and any assets received in exchange for such Indebtedness would be returned (a "Repurchase Transaction").

For this purpose, the net present asset value of our life insurance assets is equal to the present value of the face value of policy benefit assets we own, discounted at a rate equal to the weighted-average interest rate paid on indebtedness, excluding that of Seller Trust L Bonds. The net present asset value of our life insurance assets for purposes of this covenant is not necessarily the same as the net present asset value of our life insurance assets as reflected on our most recently available balance sheet prepared in accordance with GAAP and does not necessarily reflect the saleable or fair market value of those assets.

25

Importantly, we are not restricted from entering into "qualified sale and financing transactions" as defined in the indenture, or incurring additional indebtedness, including additional senior debt.

**Consolidation, Mergers or Sales**

The indenture generally permits a consolidation or merger between us and another entity. It also permits the sale or transfer by us of all or substantially all of our property and assets. These transactions are permitted if:

- the resulting or acquiring entity, if other than us, is a United States corporation, limited liability company or limited partnership and assumes all of our responsibilities and liabilities under the indenture, including the payment of all amounts due on the notes and performance of the covenants in the indenture; and

- immediately after the transaction, and after giving effect to the transaction, no event of default shall exist under the indenture.

If we consolidate or merge with or into any other entity or sell or lease all or substantially all of our assets, according to the terms and conditions of the indenture, the resulting or acquiring entity will be substituted for us in the indenture with the same effect as if it had been an original party to the indenture. As a result, the successor entity may exercise our rights and powers under the indenture in our name, and we (as an entity) will be released from all our liabilities and obligations under the indenture and under the L Bonds. Nevertheless, no such transaction will by itself eliminate or modify the collateral that we have provided as security for our obligations under the indenture.

**Events of Default and Remedies**

The indenture provides that each of the following constitutes an event of default:

- the failure to pay interest or principal on any L Bond for a period of 30 days after it becomes due and payable;

- a failure to observe or perform any material covenant, condition or agreement in the indenture, but only after notice of failure from the indenture trustee and such failure is not cured within 60 days;

- our debt coverage ratio exceeds 90% for a period of 30 consecutive calendar days, but only after notice of such breach from the indenture trustee and such breach is not cured within 60 days;

- certain events of bankruptcy, insolvency or reorganization with respect to us; or

- the cessation of our business.

In addition, a default under the indenture will create a default under our second amended and restated senior credit facility.

Through DLP IV, we are party to a second amended and restated senior credit facility with LNV Corporation, as the lender. CLMG Corp (referred to in this prospectus as CLMG) acts as the administrative agent for the lender under the second amended and restated senior credit facility.

Effective November 1, 2019, DLP IV entered into the second amended and restated senior credit facility with LNV Corporation, as lender, and CLMG Corp., as the administrative agent on behalf of the lenders under the agreement. The second amended and restated senior credit facility makes available a total of up to $300,000,000 in credit to DLP IV with a maturity date of September 27, 2029. Additional advances are available under the second amended and restated credit facility at the LIBOR rate as defined in the second amended and restated credit facility. Advances are available as the result of additional borrowing base capacity, created as the premiums and servicing costs of pledged life insurance policies become due. Interest will accrue on amounts borrowed under the second amended and restated credit facility at an annual interest rate, determined as of each date of borrowing or quarterly if there is no borrowing, equal to (A) the greater of 12-month LIBOR or the federal funds rate (as defined in the agreement) plus one-half of one percent per annum, plus (B) 7.50% per annum. The effective rate at December 31, 2019 was 9.54%. Interest payments are made on a quarterly basis. We may use proceeds of the line of credit to repay short-term debt, acquire additional life insurance assets and make additional investments in Beneficient.

Under the second amended and restated senior credit facility, DLP IV has granted the administrative agent, for the benefit of the lenders under the agreement, a security interest in all of its assets. As with prior collateral arrangements relating to the senior secured debt of GWG Holdings and its subsidiaries (on a consolidated basis), GWG Holdings' equity ownership in DLP IV will serve as collateral for the obligations of GWG Holdings under its L Bonds (although the life insurance assets owned by DLP IV will not themselves serve directly as collateral for those obligations).

26

The second amended and restated senior credit facility does not require DLP IV to maintain a reserve account for future premiums.

In addition, the second amended and restated senior credit facility contains certain customary negative covenants restricting the ability of the borrower to directly or indirectly engage in a merger or exchange transaction, sell substantially all of its assets, or permit the amendment of the contracts governing the outstanding debt securities of GWG Holdings and its subsidiaries, without the prior consent of the lender.

The second amended and restated senior credit facility contains customary events of default (e.g., payment defaults, covenant defaults, cross-defaults, defaults arising by virtue of a change in control, and defaults arising from breaches of representations and warranties), as well as defaults for amendments to the organizational documents of the borrower, defaults from pledged policies falling out of good standing, the occurrence of an event that could terminate the arrangement by which GWG Life services the pledged life insurance policies, and the entry of a judgment against the borrower in an amount exceeding $50,000 without payment or discharge, or a stay of execution obtained, within 30 days thereafter.

The indenture requires that we give notice to the indenture trustee upon the occurrence of an event of default under the indenture, unless it has been cured or waived. The indenture trustee may then provide notice to the L Bond holders or withhold the notice if the indenture trustee determines in good faith that withholding the notice is in your best interest, unless the default is a failure to pay principal or interest on any L Bond.

If an event of default occurs, the indenture trustee or the holders of at least 25% in principal amount of the outstanding L Bonds, may by written notice to us declare the unpaid principal and all accrued but unpaid interest on the L Bonds to be immediately due and payable. Notwithstanding the foregoing, the indenture limits the ability of the L Bond holders to enforce certain rights under the indenture in certain circumstances. These limitations are required subordination provisions under our second amended and restated senior credit facility and are summarized above under "— Subordination; Other Indebtedness." The pledge and security agreement permits the trustee to exercise on behalf of the holders of L Bonds all rights and remedies as are available to a secured creditor under applicable law, subject to any limitations therein or in the indenture. In this regard, the trustee is not authorized under the pledge and security agreement to distribute in kind any collateral in its possession to the holders of L Bonds.

**Amendment, Supplement and Waiver**

Except as provided in this prospectus or the indenture, the terms of the indenture or the L Bonds then outstanding may be amended, supplemented or waived with the consent of the holders of at least a majority in principal amount of the L Bonds then outstanding (which consent will be presumed if a holder does not object within 30 days of a request for consent), and any existing default or compliance with any provision of the indenture or the L Bonds may be waived with the affirmative consent of the holders of a majority in principal amount of the then outstanding L Bonds.

Notwithstanding the foregoing, an amendment or waiver will not be effective with respect to the L Bonds held by a holder who him, her or itself has not consented if such amendment or waiver:

- reduces the principal of, or changes the fixed maturity of, any L Bond;

- reduces the rate of or changes the time for payment of interest, including default interest, on any L Bond;

- waives a default or event of default in the payment of principal or interest on the L Bonds, except for a rescission or withdrawal of acceleration of the L Bonds made by the holders of at least a majority in aggregate principal amount of the then-outstanding L Bonds and a waiver of the payment default that resulted from such acceleration;

- makes any change in the provisions of the indenture relating to waivers of past defaults or the rights of holders of L Bonds to receive payments of principal of or interest on the L Bonds; or

- makes any change to the subordination provisions of the indenture that has a material adverse effect on holders of L Bonds.

27

Notwithstanding the foregoing, the following kinds of amendments or supplements to the indenture may be effected by us and the trustee without any consent of any holder of the L Bonds:

- to cure any ambiguity, defect or inconsistency;

- to provide for assumption of our obligations to holders of the L Bonds in the case of a merger, consolidation or sale of all or substantially all of our assets;

- to provide for additional uncertificated or certificated L Bonds;

- to make any change that does not materially and adversely affect the legal rights under the indenture of any holder of L Bonds, including but not limited to an increase in the aggregate dollar amount of L Bonds which may be outstanding under the indenture and limited in amount thereunder;

- to modify or eliminate our policy regarding redemptions elected by a holder of L Bonds prior to maturity, including our obligation to redeem L Bonds upon the death, bankruptcy or total permanent disability of any holder of the L Bonds, but only so long as such modifications do not materially and adversely affect any then-existing obligations under pending repurchase commitments for L Bonds;

- to comply with requirements of the SEC in order to effect or maintain the qualification of the indenture under the Trust Indenture Act of 1939, or to comply with other applicable federal or state laws or regulations;

- to comply with the rules or policies of a depositary of the L Bonds; or

- in connection with an amendment, extension, replacement, renewal or substitution of any senior debt, to amend the subordination provisions of the indenture to conform to the reasonable requirements of the holder or holders of such senior debt.

**Rights of L Bond Holders**

As an L Bond holder, you have limited rights to vote on our actions as set forth in the indenture. In general, you will have the right to vote on whether or not to approve some amendments to the indenture. For a description of these rights, see "— Amendment, Supplement and Waiver" above. You will also have the right to direct some actions that the trustee takes if there is an event of default with respect to the L Bonds. For a description of these rights, see above under the caption "— Events of Default." For a complete description of your rights as an L Bond holder, we encourage you to read a copy of the indenture, which is filed as an exhibit to the registration statement of which this prospectus is a part. We will also provide you with a copy of the indenture upon your request.

The trustee and the L Bond holders will have the right to direct the time, method and place of conducting any proceeding for some of the remedies available, except as otherwise provided in the indenture. The trustee may require reasonable indemnity, satisfactory to the trustee, from L Bond holders before acting at their direction. You will not have any right to pursue any remedy with respect to the indenture or the L Bonds unless you satisfy the conditions contained in the indenture.

**The Indenture Trustee**

*General*

Bank of Utah has agreed to be the trustee under the indenture. The indenture contains certain limitations on the rights of the trustee, should it become one of our creditors, to obtain payment of claims in certain cases, or to realize on certain property received in respect of any claim as security or otherwise. The trustee will be permitted to engage in other transactions with us.

Subject to certain exceptions, the holders of a majority in principal amount of the then-outstanding L Bonds will have the right to direct the time, method and place of conducting any proceeding for exercising any remedy available to the trustee. The indenture provides that if an event of default specified in the indenture shall occur and not be cured, the trustee will be required, in the exercise of its power, to use the degree of care of a reasonable person in the conduct of his own affairs. Subject to such provisions, the trustee will be under no obligation to exercise any of its rights or powers under the indenture at the request of any holder of L Bonds, unless the holder shall have offered to the trustee security and indemnity satisfactory to it against any loss, liability or expense.

*Resignation or Removal of the Trustee*

The trustee may resign at any time, or may be removed by the holders of a majority of the aggregate principal amount of the outstanding L Bonds. In addition, we may remove the trustee for certain failures in its duties, including the insolvency of the trustee or the trustee's ineligibility to serve as trustee under the Trust Indenture Act of 1939. However, no resignation or removal of the trustee may become

effective until a successor trustee has accepted the appointment as provided in the indenture.

28

APP. 895

*Reports to Trustee*

We will provide the trustee with (i) a calculation date report within 45 days after the end of each fiscal quarter containing a calculation of the debt coverage ratio that includes a summary of all cash, life insurance policy investments serving as collateral, as well as our total outstanding indebtedness including outstanding principal balances, interest credited and paid, transfers made, any redemption or repayment and interest rate paid; (ii) copies of our audited annual financials, no earlier than when the same become a matter of public record; and (iii) any additional information reasonably requested by the trustee.

**Certain Charges**

We and our servicing agents, if any, may assess service charges for changing the registration of any L Bond to reflect a change in name of the holder, multiple changes in interest payment dates or transfers (whether by operation of law or otherwise) of an L Bond by the holder to another person. The indenture permits us to set off, against amounts otherwise payable to you under the L Bonds, the amount of these charges.

**Variations in Terms and Conditions**

We may from time to time vary the terms and conditions of the L Bonds offered, including but not limited to minimum initial principal investment amount requirements, maximum aggregate principal amount limits, interest rates, minimum denominations, service and other fees and charges, and redemption provisions. Terms and conditions may be varied by state, locality, principal amount, type of investor (for example, new or current investor) or as otherwise permitted under the indenture governing the securities offered by this prospectus. No change in terms, however, will apply to any L Bonds already issued and outstanding at the time of such change.

**Satisfaction and Discharge of Indenture**

The indenture shall cease to be of further effect upon the payment in full of all of the outstanding L Bonds and the delivery of an officer's certificate to the trustee stating that we do not intend to issue additional L Bonds under the indenture or, with certain limitations, upon deposit with the trustee of funds sufficient for the payment in full of all of the outstanding L Bonds.

**Reports**

We will publish annual reports containing financial statements and quarterly reports containing financial information for the first three quarters of each fiscal year. We will send copies of these reports, at no charge, to any holder of L Bonds who sends us a written request.

29

**PLAN OF DISTRIBUTION**

**General**

We are offering up to 2,000,000 Units, representing $2,000,000,000 in aggregate principal amount, of L Bonds (referred to throughout this prospectus simply as "L Bonds") on a continuous basis. The L Bonds will be sold at $1,000 per Unit, and in minimum amounts of 25 Units, or $25,000 or more in principal. There is no minimum amount of L Bonds that must be sold before we access and use the proceeds. The proceeds of new sales of L Bonds will be paid directly to us promptly following each sale and will not be placed in an escrow account. Even if we sell less than the entire $2,000,000,000 in aggregate principal amount of L Bonds Units being offered, the L Bonds that we sell will be issued, and the proceeds of those L Bond sales will be used by us, as described in this prospectus.

The L Bonds will be offered and sold on a best efforts basis by Emerson Equity LLC (our "dealer manager"). Our dealer manager will enter into participating dealer agreements with certain other broker-dealers that are members of FINRA, referred to as "selling group members," to authorize those broker-dealers to sell our L Bonds. The L Bonds will be offered to the public on the terms set forth in this prospectus and any prospectus supplements we may file from time to time. Neither our dealer manager nor any selling group members will have any obligation to take or purchase any L Bonds. In addition to forming the selling group, our dealer manager provides services to us, which include conducting broker-dealer seminars, holding informational meetings and providing information and answering any questions investors or selling group members may have concerning this offering.

Members of the selling group will receive sales commissions of up to 5.00% of the gross offering proceeds depending upon the maturity of the L Bonds sold. In addition, our dealer manager and selling group members may receive up to 3.00% of the gross offering proceeds as additional compensation consisting of the following:

- a dealer-manager fee payable to the dealer manager in an amount equal to 0.40% of the principal amount of all L Bonds sold;

- an accountable expense allowance to be paid to the selling group members, which may include due diligence expenses of the dealer manager and selling group members set forth in a detailed and itemized invoice and as further described below;

- wholesaling fees, which may consist of commissions and non-transaction-based compensation of the wholesalers;

- non-cash compensation, which may consist of an occasional meal, a ticket to a sporting event or the theater, or comparable entertainment that is neither so frequent nor so extensive as to raise any question of propriety and is not preconditioned on achievement of a sales target, the national and regional sales conferences of our selling group members, training and education meetings for registered representatives of our selling group members, and permissible forms of non-cash compensation to registered representatives of our selling group members, such as gifts that do not exceed an aggregate value of $100 per annum per registered representative and that are not pre-conditioned on achievement of a sales target, including but not limited to seasonal gifts; and

- up to a 1.00% reallowance to selling group members.

A s part of the accountable expense allowance, the dealer manager and selling group members are expected to be reimbursed for accountable out-of-pocket expenses incurred by them during the course of the offering. Expenses eligible for reimbursement may include:

- travel, lodging, and meals for the wholesalers who are our employees and associated with the dealer manager;

- reasonable out-of-pocket expenses incurred by selling group members and their associated persons, including reimbursement of actual costs of third-party professionals retained by them; and

- due diligence expenses of the dealer manager and selling group members set forth in a detailed and itemized invoice.

Upon the sale of L Bonds by a selling group member, the selling group member effecting the sale will receive selling commissions and additional compensation in connection therewith pursuant to the terms of the soliciting dealer agreement between the dealer manager and the selling group member.

30

In no event will the total selling commissions and additional compensation, including accountable due diligence expenses and reimbursements, exceed 8.00% of the aggregate gross offering proceeds we receive from the sale of L Bonds.

We may also sell our L Bonds at a discount through the following distribution channels in the event that the investor:

- purchases L Bonds through fee-based programs, also known as wrap accounts;

- purchases L Bonds through a selling group member that has an alternative fee arrangement with its clients;

- purchases L Bonds through certain registered investment advisers;

- purchases L Bonds through bank trust departments or any other organization or person authorized to act in a fiduciary capacity for its clients or customers; or

- is an endowment, foundation, pension fund or other institutional investor.

If an investor purchases shares through one of the above distribution channels in our offering, we will sell the L Bonds at a discount, reflecting that selling commissions are not being paid in connection with such purchase. The public offering price will be decreased by an amount equal to such reduction; however, the net proceeds to us will not be affected by any such reduction in selling commissions.

Our officers and directors and their family members may purchase the L Bonds offered hereby for investment and not for distribution at a discount from the public offering price. For purposes of this discount, we consider a family member to be a spouse, parent, child, sibling, mother- or father-in-law, son- or daughter-in-law or brother- or sister-in-law. In addition, if approved by our Board of Directors, certain of our joint venture partners, consultants and other service providers may purchase the L Bonds offered hereby at a discount from the public offering price. We will sell such L Bonds reflecting that selling commissions will not be paid in connection with such sales. The public offering price will be decreased by an amount equal to such reduction; however, the net proceeds to us from such sales made net of commissions will be the same as the net proceeds we receive from other sales of L Bonds.

Also, we may sell L Bonds to the dealer manager, selling group members, their retirement plans, their representatives and the family members as described above, IRAs and qualified plans of their representatives at a purchase price reflecting that selling commissions will not be payable in consideration of the services rendered by such dealer manager, selling group members, and their representatives in the offering. Such sales, however, may not be made for the period of time from the effective date through 90 days after the effective date. The public offering price will be decreased by an amount equal to such reduction; however, the net proceeds to us from the sales of these L Bonds will be the same as the net proceeds we receive from other sales of L Bonds.

Neither our dealer manager nor its affiliates will directly or indirectly compensate any person engaged as an investment advisor or a bank trust department by a potential investor as an inducement for such investment advisor or bank trust department to advise favorably for an investment in the L Bonds offered hereby. Also, we will not pay referral or similar fees to any accountants, attorneys or other persons in connection with the distribution of the L Bonds.

In addition to the sales commissions, fees, allowances, reimbursements and expenses described above, we expect to pay approximately $2,400,000 in offering and related costs and expenses in connection with this offering. These kinds of expenses include all expenses to be paid by us in connection with the offering (other than sales commissions, additional compensation, and expense allowances and reimbursement to our selling group members), including but not limited to legal, accounting, printing and mailing expenses, registration, qualification and associated securities filing fees and other costs and expenses.

31

The table below sets forth the maximum amount of sales commissions and additional compensation, as described in footnote (1) to the table below, we may pay in connection with this offering.

| L Bond Term | Sales Commission | Additional Compensation(1) | Total(2) |
|---|---|---|---|
| 2 years | 3.25% | 4.75% | 8.00% |
| 3 years | 4.25% | 3.75% | 8.00% |
| 5 years | 4.90% | 3.10% | 8.00% |
| 7 years | 5.00% | 3.00% | 8.00% |

(1)  As described above, additional compensation includes: (i) a dealer-manager fee payable to the dealer manager in an amount equal to 0.40% of the principal amount of all L Bonds sold; (ii) an accountable expense allowance to the selling group members as described above, which may include due-diligence expenses of the dealer manager and selling group members set forth in a detailed and itemized invoice; (iii) wholesaling fees, which may consist of commissions and non-transaction-based compensation of the wholesalers; (iv) non-cash compensation, which may consist of an occasional meal, a ticket to a sporting event or the theater, or comparable entertainment that is neither so frequent nor so extensive as to raise any question of propriety and is not preconditioned on achievement of a sales target, the national and regional sales conferences of our selling group members, training and education meetings for registered representatives of our selling group members, and permissible forms of non-cash compensation to registered representatives of our selling group members, such as gifts that do not exceed an aggregate value of $100 per annum per registered representative and that are not pre-conditioned on achievement of a sales target, including but not limited to seasonal gifts; and (v) up to a 1.00% reallowance to selling group members.

(2)  The combined selling commissions and additional compensation for this offering will not exceed 8.00% of the aggregate gross proceeds of this offering.

The line items reflected in the table below are our current estimates of average sales commissions and additional compensation (including accountable expenses) that we will pay. Specifically, we estimate that the average sales commission will be 5.00%, or $100,000,000 based on $2,000,000,000 in principal amount of L Bonds sold, and the average additional compensation will be 3.00%, or $60,000,000 based on $2,000,000,000 in principal amount of L Bonds sold. The components of "additional compensation" are detailed in footnote (1) to the table above. Actual costs may differ from the percentages and amounts shown in the table below, subject, however, to the limitations noted above.

| L Bonds Sold | Sales Commission | Additional Compensation | Total |
|---|---|---|---|
| $  500,000,000 | $ 25,000,000 | $  15,000,000 | 8.00% |
| $  750,000,000 | $ 37,500,000 | $  22,500,000 | 8.00% |
| $2,000,000,000 | $100,000,000 | $  60,000,000 | 8.00% |

The wholesalers employed by us are registered with and associated persons of our dealer manager. The wholesalers will:

- attend local, regional and national conferences of the selling group members; and

- contact selling group members and their registered representatives to make presentations concerning us and this offering.

The wholesalers will receive a portion of their non-transaction based compensation as compensation for their selling efforts. We host training and education meetings for selling group members and their representatives. The costs of the training and education meetings will be borne by us, but counted toward the 8.00% underwriting compensation limit.

Certain of our employees who are also registered representatives and supervisory principals of the dealer manager have been granted certain share appreciation rights ("SARs") as part of their compensation. The SARs give such individual the contractual right to receive from us additional cash compensation at any point before the SAR's expiration, but only if the price of our common stock has increased between the grant date and the date when we receive notice of such individual's intention to exercise the SAR. At the termination of this offering, the aggregate of the appreciation amount, as defined in the SAR agreement, will be calculated and added to the other items of value (e.g., selling commissions and additional forms of compensation) to ensure that aggregate compensation paid in connection with this offering does not exceed 8.00% of the gross offering proceeds.

In accordance with FINRA rules, in no event will our total compensation to FINRA members, including but not limited to sales commissions, the dealer-manager fee and accountable expense and other reimbursements to our dealer manager and selling group members, including non-transaction-based compensation of the wholesalers and non-cash compensation, exceed 8.00% of our gross offering proceeds, in the aggregate.

We will indemnify the selling group members and our dealer manager against some civil liabilities, including certain liabilities under the Securities Act of 1933, as amended, and liabilities arising from breaches of our representations and warranties contained in the Dealer Manager Agreement.

32

The foregoing is a summary of the material terms relating to the plan of distribution of the L Bonds contained in the Dealer Manager Agreement. Any amendment to the Dealer Manager Agreement will be filed as an exhibit to an amendment to the registration statement of which this prospectus is a part.

## Settlement Procedures

You can place an order for the purchase of L Bonds using DTC Settlement through your selling group member. A selling group member using DTC settlement will have an account with a DTC participant in which your funds will be placed to facilitate settlement. Orders may be placed until the cyclical order due date. Orders will be executed by such selling group member electronically and you must coordinate with your selling group member's registered representative to pay the full purchase price of the L Bonds by the trade date. If you purchase your L Bonds using DTC settlement, you will be credited with ownership of an L Bond on the second business day after the end of the DTC closing cycle in which the subscription is made (typically, closings will occur on a bi-monthly cycle). If you purchase your L Bonds in this manner, your purchase price will not be held in escrow.

You also have the option to elect to settle your purchase directly with us, the Company. If you elect to use direct settlement with us, you should complete and sign a Subscription Agreement similar to the one filed as an exhibit to the registration statement of which this prospectus is a part. A form of Subscription Agreement is available from your selling group member's registered representative. Once completed and signed, your Subscription Agreement should be provided to your selling group member who will deliver it to us to be held, together with your related subscription funds, until our acceptance of your subscription. In connection with a direct settlement subscription, you should pay the full purchase price of the L Bonds to us as set forth in the Subscription Agreement. Subscribers may not withdraw funds from the subscription account. Subscriptions will be effective upon our acceptance of your Subscription Agreement and related funds, and we reserve the right to reject any subscription in whole or in part.

## Covered Security

Our L Bonds are a "covered security." The term "covered security" applies to securities exempt from state registration because of their oversight by federal authorities and national-level regulatory bodies pursuant to Section 18 of the Securities Act of 1933. Generally, securities listed on national exchanges are the most common type of covered security exempt from state registration. A non-traded security also can be a covered security if it has a seniority greater than or equal to other securities from the same issuer that are listed on a national exchange. Our L Bonds are a covered security because they are senior to our common stock, which is listed on The Nasdaq Capital Market, and therefore our offering of L Bonds will be exempt from state registration.

**Although the status of our L Bonds as a "covered security" will facilitate their purchase and sale to a broader range of investors than would otherwise be available to us, and although the offer and sale of a "covered security" generally involves fewer issuance costs to the issuer of such securities, our L Bonds are not a suitable purchase for all investors. Investors are urged to read carefully the risk factors relating to our business and our Company contained in the Risk Factors section of this prospectus beginning on page 11 and under Item 1A, entitled "Risk Factors," of our Annual Report on Form 10-K for the year ended December 31, 2019, which is incorporated by reference herein. In addition, investors should understand that because our L Bonds are a "covered security" exempt from state securities regulations, neither our Company, the L Bonds, or any other aspects of this offering have been the subject of any merit-based review by state securities regulators.**

**MATERIAL FEDERAL INCOME TAX CONSIDERATIONS**

The following is a general discussion of the material United States ("U.S.") federal income tax considerations relating to the initial purchase, ownership and disposition of the L Bonds by U.S. and non-U.S. holders. This discussion is a summary only and is not a complete analysis of all the potential tax considerations relating to the purchase, ownership and disposition of the L Bonds. We have based this summary on current provisions of the Code of 1986, as amended (the "Code"), applicable U.S. Treasury Regulations promulgated thereunder, judicial opinions, and published rulings of the Internal Revenue Service (the "IRS"), all as in effect on the date of this prospectus. However, these laws and other guidance are subject to differing interpretations or change, possibly with retroactive effect. In addition, we have not sought, and will not seek, a ruling from the IRS or an opinion of counsel with respect to any tax consequences of purchasing, owning or disposing of L Bonds. Thus, the IRS could take a different position regarding one or more of the tax consequences or matters described in this prospectus; and there can be no assurance that any position taken by the IRS would not be sustained.

This discussion is limited to purchasers of L Bonds who acquire the L Bonds from us in this offering and hold the L Bonds as capital assets for federal income tax purposes. This discussion does not address all possible tax consequences that may be applicable to you in light of your specific circumstances. For instance, this discussion does not address the alternative minimum tax provisions of the Code, or special rules applicable to some categories of investors such as financial institutions, insurance companies, tax-exempt organizations, dealers in securities, real estate investment trusts, regulated investment companies, or persons who hold L Bonds as part of a hedge, conversion or constructive sale transaction, straddle or other risk reduction transaction that may be subject to special rules. This discussion also does not address the tax consequences arising under the laws of any foreign, state or local jurisdiction; or any U.S. estate or gift tax laws.

If you are considering the purchase of an L Bond, you should consult your own tax advisors as to the particular tax consequences to you of acquiring, holding or otherwise disposing of the L Bonds, including the effect and applicability of state, local or foreign tax laws, or any U.S. estate and gift tax laws.

As used in this discussion, the term "U.S. holder" means a holder of an L Bond that is:

(i)   for United States federal income tax purposes, a citizen or resident of the United States;

(ii)  a corporation, partnership or other entity created or organized in or under the laws of the United States or of any political subdivision thereof or other entity characterized as a corporation or partnership for federal income tax purposes;

(iii) an estate, the income of which is subject to United States federal income taxation regardless of its source; or

(iv)  a trust, the administration of which is subject to the primary supervision of a court within the United States and which has one or more United States persons with authority to control all substantial decisions, or if the trust was in existence on August 20, 1996, and has elected to continue to be treated as a United States trust.

For the purposes of this discussion, a "non-U.S. holder" means any holder of L Bonds other than a U.S. holder. Any L Bond purchaser who is not a U.S. citizen will be required to furnish documentation, on IRS Form W-8BEN, that clearly states whether it is subject to U.S. withholding taxes, in accordance with applicable requirements of the United States taxing authority.

**Characterization of the L Bonds**

The federal income tax consequences of owning L Bonds depend on characterization of the L Bonds as debt for federal income tax purposes, rather than as equity interests or a partnership among the holders of the L Bonds. We believe that the L Bonds have been structured in a manner that will allow the L Bonds to be characterized as debt for federal income tax purposes. However, this is only our belief; and no ruling from the IRS or an opinion of counsel has been sought in this regard. Thus, the IRS could successfully challenge this characterization.

If the L Bonds were treated as equity interests, there could be adverse effects on some holders. For example, payments on the L Bonds could (1) if paid to non-U.S. holders, be subject to federal income tax withholding; (2) constitute unrelated business taxable income to some tax-exempt entities, including pension funds and some retirement accounts (if the relationship were characterized as a partnership for tax purposes); and (3) cause the timing and amount of income that accrues to holders of L Bonds to be different from that described below.

Because of these potential adverse effects, you are urged to consult your own tax advisors as to the tax consequences that may apply to your particular situation in the event the L Bonds are re-characterized as equity interests; and as to the likelihood that the L Bonds could be so re-characterized. The remainder of this discussion assumes that the L Bonds are characterized as debt.

**Taxation of U.S. Holders**

*Stated Interest*

Under general federal income tax principles, you must include stated interest in income in accordance with the method of accounting you use for federal income tax purposes. Accordingly, if you are using the accrual method of tax accounting, you must include stated interest in income as it accrues. If you are using the cash method of tax accounting, you must include stated interest in income as it is actually or constructively received. Payments of interest to taxable holders of L Bonds will constitute portfolio income, and not passive activity income, for the purposes of the passive loss limitations of the Code. Accordingly, income arising from payments on the L Bonds will not be subject to reduction by losses from passive activities of a holder.

If a partnership (or other entity or arrangement treated as a partnership for U.S. federal income tax purposes) holds L Bonds, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership. If you are a partner in a partnership purchasing L Bonds, we urge you to consult your tax advisor.

*Disposition of L Bonds*

In general, a U.S. holder will recognize gain or loss upon the sale, exchange or other taxable disposition of an L Bond measured by the difference between (1) the sum of the cash and the fair market value of all other property received on such disposition, excluding any portion of the payment that is attributable to accrued interest on the L Bonds; and (2) your adjusted tax basis in the L Bond. A U.S. holder's adjusted tax basis in an L Bond generally will be equal to the price the U.S. holder paid for the L Bond. Any of this gain or loss generally will be long-term capital gain or loss if, at the time of any such taxable disposition, the L Bond was a capital asset in the hands of the holder and was held for more than one year. Net long-term capital gain recognized by individual U.S. holders is eligible for a reduced rate of taxation. The deductibility of capital losses is subject to annual limitations.

The terms of the L Bonds may be modified upon the consent of a specified percentage of holders and, in some cases, without consent of the holders. In addition, the L Bonds may be assumed upon the occurrence of specific transactions. The modification or assumption of an L Bond could, in some instances, give rise to a deemed exchange of an L Bond for a new debt instrument for federal income tax purposes. If an exchange is deemed to occur by reason of a modification or assumption, you could realize gain or loss without receiving any cash.

*Additional Tax on Net Investment Income*

If you are a U.S. holder other than a corporation, you generally will be subject to a 3.8% additional tax on the lesser of (1) your "net investment income" for the taxable year, and (2) the excess of your modified adjusted gross income for the taxable year over a certain threshold. Your net investment income generally will include any income or gain recognized by you with respect to our L Bonds, unless such income or gain is derived in the ordinary course of the conduct of your trade or business (other than a trade or business that consists of certain passive or trading activities).

**Considerations for Tax-Exempt Holders of L Bonds**

Tax-exempt entities, including charitable corporations, pension plans, profit sharing or stock bonus plans, individual retirement accounts and some other employee benefit plans are subject to federal income tax on unrelated business taxable income. For example, net income derived from the conduct of a trade or business regularly carried on by a tax-exempt entity or by a partnership in which it is a partner is treated as unrelated business taxable income.

A $1,000 special deduction is allowed in determining the amount of unrelated business taxable income subject to tax. Tax-exempt entities taxed on their unrelated business taxable income are also subject to the alternative minimum tax for items of tax preference which enter into the computation of unrelated business taxable income.

35

In general, interest income does not constitute unrelated business taxable income. However, under the debt-financed property rules, if tax-exempt holders of L Bonds finance the acquisition or holding of L Bonds with debt, interest on the L Bonds will be taxable as unrelated business taxable income. The L Bonds will be treated as debt-financed property if the debt was incurred to acquire the L Bonds or was incurred after the acquisition of the L Bonds, so long as the debt would not have been incurred but for the acquisition and, at the time of the acquisition, the incurrence of the debt has already occurred or was foreseeable.

**Non-U.S. Holders**

The following discussion is a summary of the principal U.S. federal income consequences resulting from the ownership of the L Bonds by non-U.S. holders. However, application of the U.S. federal income tax rules associated with non-U.S. holders is complex and factually sensitive. Thus, if you could be considered to be a non-U.S. holder, you are urged to consult your own tax advisors with respect to the application of the federal income tax rules for your particular situation.

*Payments of Interest to Non-U.S. Holders*

Subject to the discussion below under "Backup Withholding and Information Reporting," payments of interest received by a non-U.S. holder generally will not be subject to U.S. federal withholding tax, provided (1) that (a) the non-U.S. holder does not own, actually or constructively, 10% or more of the total combined voting power of all classes of our stock entitled to vote; (b) the non-U.S. holder is not a controlled foreign corporation, actually or constructively, through stock ownership; and (c) the beneficial owner of the L Bond complies with the certification requirements, including delivery of a statement, signed by the holder under penalties of perjury, certifying that the holder is a foreign person and provides its name and address; or (2) that the non-U.S. holder is entitled to the benefits of an income tax treaty under which the interest is exempt from U.S. withholding tax and the non-U.S. holder complies with the reporting requirements. If an L Bond is held through a securities clearing organization or other specified financial institutions (an "Intermediary"), the Intermediary may provide the relevant signed statement and, unless the Intermediary is a "qualified" intermediary as defined under the Code, the signed statement provided by the Intermediary must be accompanied by a copy of a valid Form W-8BEN provided by the non-U.S. beneficial holder of the L Bond.

Payments of interest not exempt from United States federal withholding tax as described above will be subject to a withholding tax at the rate of 30%, subject to reduction under an applicable income tax treaty.

Payments of interest on an L Bond to a non-U.S. holder generally will not be subject to U.S. federal income tax, as opposed to withholding tax, unless the income is effectively connected with the conduct by the non-U.S. holder of a trade or business in the United States. To claim the benefit of a lower treaty withholding rate, a non-U.S. holder must provide a properly executed IRS Form W-8BEN to us or our paying agent before the payment of stated interest; and may be required to obtain a U.S. taxpayer identification number and provide documentary evidence issued by foreign governmental authorities to prove residence in the foreign country. You should consult your own tax advisor to determine the effects of the application of the U.S. federal withholding tax to your particular situation.

*Disposition of the L Bonds by Non-U.S. Holders*

Subject to the discussion below under "Backup Withholding and Information Reporting," a non-U.S. holder generally will not be subject to United States federal income tax, and generally no tax will be withheld with respect to gains realized on the disposition of an L Bond, unless (a) the gain is effectively connected with a United States trade or business conducted by the non-U.S. holder or (b) the non-U.S. holder is an individual who is present in the United States for 183 or more days during the taxable year of the disposition and other requirements are satisfied.

*Non-U.S. Holders Subject to U.S. Income Taxation*

If interest and other payments received by a non-U.S. holder with respect to the L Bonds, including proceeds from the disposition of the L Bonds, are effectively connected with the conduct by the non-U.S. holder of a trade or business within the United States, or the non-U.S. holder is otherwise subject to United States federal income taxation on a net basis with respect to the holder's ownership of the L Bonds, or are individuals that have by operation of law become residents in the United States for federal income tax purposes, the non-U.S. holder generally will be subject to the rules described above applicable to U.S. holders of L Bonds, subject to any modification provided under an applicable income tax treaty. If any of these non-U.S. holders is a corporation, it may also be subject to a U.S. "branch profits tax" at a 30% rate.

36

**Backup Withholding and Information Reporting**

Non-corporate U.S. holders may be subject to backup withholding at a rate of 28% on payments of principal, premium, and interest on, and the proceeds of the disposition of, the L Bonds. In general, backup withholding will be imposed only if the U.S. holder (1) fails to furnish its taxpayer identification number ("TIN"), which for an individual would be his or her Social Security number; (2) furnishes an incorrect TIN; (3) is notified by the IRS that it has failed to report payments of interest or dividends; or (4) under some circumstances, fails to certify under penalty of perjury that it has furnished a correct TIN and has been notified by the IRS that it is subject to backup withholding tax for failure to report interest or dividend payments. In addition, the payments of principal and interest to U.S. holders generally will be subject to information reporting. You should consult your tax advisors regarding your qualification for exemption from backup withholding and the procedure for obtaining an exemption, if applicable.

Backup withholding generally will not apply to payments made to a non-U.S. holder of an L Bond who provides the certification that it is a non-U.S. holder, and the payor does not have actual knowledge that a certificate is false, or otherwise establishes an exemption from backup withholding. Payments by United States office of a broker of the proceeds of a disposition of the L Bonds generally will be subject to backup withholding at a rate of 28% unless the non-U.S. holder certifies it is a non-U.S. holder under penalties of perjury or otherwise establishes an exemption. In addition, if a foreign office of a foreign custodian, foreign nominee or other foreign agent of the beneficial owner, or if a foreign office of a foreign "broker" pays the proceeds of the sale of an L Bond to the seller, backup withholding and information reporting will not apply; provided that the nominee, custodian, agent or broker is not a "United States related person," or a person which derives more than 50% of its gross income for some periods from the conduct of a trade or business in the United States or is a controlled foreign corporation. The payment by a foreign office of a broker that is a United States person or a United States related person of the proceeds of the sale of L Bonds will not be subject to backup withholding, but will be subject to information reporting unless the broker has documentary evidence in its records that the beneficial owner is not a United States person for purposes of the backup withholding and information reporting requirements and other conditions are met, or the beneficial owner otherwise establishes an exemption.

The amount of any backup withholding imposed on a payment to a holder of an L Bond will be allowed as a credit against the holder's United States federal income tax liability and may entitle the holder to a refund; provided that the required information is furnished to the IRS.

**STATE, LOCAL AND FOREIGN TAXES**

We make no representations regarding the tax consequences of the purchase, ownership or disposition of the L Bonds under the tax laws of any state, locality or foreign country. You should consult your own tax advisors regarding these state and foreign tax consequences.

<div align="center">37</div>

APP. 905

## ERISA CONSIDERATIONS

### General

Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and Section 4975 of the Code impose restrictions on employee benefit plans that are subject to ERISA, or plans or arrangements that are subject to Code Section 4975, and on persons who are parties in interest or disqualified persons with respect to those plans or arrangements. Some employee benefit plans, like governmental plans and church plans (if no election has been made under Section 410(d) of the Code), are not subject to the restrictions of Title I of ERISA or Code Section 4975, and assets of these plans may be invested in the L Bonds without regard to the ERISA considerations described below, subject to the Code and other applicable federal and state laws affecting tax-exempt organizations generally. Any plan fiduciary that proposes to cause a plan to acquire any of the L Bonds should consult with its counsel with respect to the potential consequences under ERISA and the Code of the plan's acquisition and ownership of the L Bonds. Investments by plans are also subject to ERISA's and the Code's general fiduciary requirements, including the requirement of investment prudence and diversification and the requirement that a plan's investments be made in accordance with the documents governing the plan.

### Prohibited Transactions

*General*

Section 406 of ERISA and Section 4975 of the Code prohibits certain "parties in interest" and "disqualified persons" with respect to a plan from engaging in select transactions involving a plan and its assets unless a statutory, regulatory or administrative exemption applies to the transaction. Section 4975 of the Code imposes excise taxes on parties in interest that engage in non-exempt "prohibited transactions." Section 502(i) of ERISA requires the Secretary of the U.S. Department of Labor ("Labor") to assess a civil penalty against a fiduciary who breaches any fiduciary responsibility under, or commits any other violation of, part 4 of Title I of ERISA, or any other person who knowingly participates in a breach or violation.

*Plan Asset Regulations*

Labor has issued regulations concerning the definition of what constitutes the assets of a plan for purposes of ERISA and the prohibited transaction provisions of the Code. The plan asset regulations describe the circumstances where the assets of an entity in which a plan invests will be considered to be "plan assets," so that any person who exercises control over the assets would be subject to ERISA's fiduciary standards. Generally, under the plan asset regulation, when a plan invests in another entity, the plan's assets do not include, solely by reason of the investment, any of the underlying assets of the entity. However, the plan asset regulation provides that, if a plan acquires an "equity interest" in an entity that is neither a "publicly-offered security" nor a security issued by an investment company registered under the Investment Company Act of 1940 the assets of the entity will be treated as assets of the plan investor unless exceptions apply.

Under the plan asset regulations the term "equity interest" is defined as any interest in an entity other than an instrument that is treated as indebtedness under "applicable local law" and that has no "substantial equity features." Although the plan asset regulation is silent with respect to the question of which law constitutes "applicable local law" for this purpose, Labor has stated that these determinations should be made under the state law governing interpretation of the instrument in question. In the preamble to the plan asset regulation, Labor declined to provide a precise definition of what features are equity features or the circumstances under which the features would be considered "substantial," noting that the question of whether a plan's interest has substantial equity features is an inherently factual one, but that in making that determination it would be appropriate to take into account whether the equity features are such that a plan's investment would be a practical vehicle for the indirect provision of investment management services. We believe that the L Bonds will be classified as indebtedness without substantial equity features for ERISA purposes.

Under the plan asset regulations the term "publicly-offered security" is defined as a security that is (i) freely transferable, (ii) part of a class of securities that is widely held, and (iii) either (A) part of a class of securities registered under section 12(b) or 12(g) of the Securities Exchange Act of 1934 or (B) sold to the plan as part of an offering of securities to the public pursuant to an effective registration statement under the Securities Act of 1933 and the class of securities of which such security is a part is registered under the Securities Exchange Act of 1934 within 120 days after the end of the fiscal year of the issuer during which the offering of such securities to the public occurred. For purposes of the above, a class of securities is considered to be "widely held" if it is owned by 100 or more investors independent of the issuer and of one another. In the case of this offering, while the offer and sale of the L Bonds have been registered under the Securities Act of 1933, the L Bonds themselves have not been registered under the Securities Exchange Act of 1934. For this reason, we believe that the L Bonds will not likely meet the definition for "publicly-offered security" under the plan asset regulations.

38

In light of the foregoing, if the L Bonds were deemed to be equity interests for this purpose and no statutory, regulatory, or administrative exception applies, we could be considered to hold plan assets by reason of a plan's investment in the L Bonds. These plan assets would include an undivided interest in all of our assets. In this case, we may be considered a fiduciary with respect to the investing plans. We would be subject to the fiduciary responsibility provisions of Title I of ERISA, including the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code, and to Section 4975 of the Code with respect to transactions involving any of our assets. The ERISA fiduciary standards could affect the way we conduct the business, which would have consequences for all investors, not just those that are employee benefit plans.

Depending on the relevant facts and circumstances, prohibited transaction exemptions may apply to the purchase or holding of the L Bonds. See, for example, Prohibited Transaction Class Exemption ("PTE") 96-23, which exempts some transactions effected on behalf of a plan or by an "in-house asset manager;" PTE 95-60, which exempts some transactions between insurance company general accounts and parties in interest; PTE 91-38, which exempts some transactions between bank collective investment funds and parties in interest; PTE 90-1, which exempts some transactions between insurance company pooled separate accounts and parties in interest; or PTE 84-14, which exempts some transactions effected on behalf of a plan by a "qualified professional asset manager." However, there can be no assurance that any of these exemptions will apply with respect to any plan's investment in the L Bonds, or that the exemption, if it did apply, would apply to all prohibited transactions that may occur in connection with the investment.

Any plan fiduciary considering whether to purchase L Bonds on behalf of a plan should consult with its counsel regarding the applicability of the fiduciary responsibility and prohibited transaction provisions of ERISA and the Code. Before purchasing any L Bonds, a fiduciary of a plan should make its own determination as to (1) whether GWG Holdings, as issuer of and borrower under the L Bonds, is a "party in interest" under ERISA or a "disqualified person" under the Code with respect to the plan; (2) the availability of the relief provided in the plan asset regulation and (3) the availability of any other prohibited transaction exemptions. In addition, purchasers that are insurance companies should consult their own ERISA counsel with respect to their fiduciary responsibilities associated with their purchase and ownership of the L Bonds, including any responsibility under the Supreme Court case *John Hancock Mutual Life Insurance Co. v. Harris Trust and Savings Bank*.

39

**LEGAL MATTERS**

Certain legal matters in connection with the L Bonds will be passed upon for us by Mayer Brown LLP, Chicago, Illinois.

**EXPERTS**

The consolidated financial statements of GWG Holdings, Inc. and its subsidiaries for the year ended December 31, 2019 incorporated by reference in this prospectus from GWG Holdings, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2019 and the effectiveness of GWG Holdings, Inc.'s internal control over financial reporting as of December 31, 2019, have been audited by Whitley Penn LLP, independent registered public accounting firm, as set forth in their reports thereon, which are incorporated herein by reference. Such financial statements have been so incorporated in reliance upon the report of Whitley Penn LLP pertaining to such financial statements and the effectiveness of our internal control over financial reporting on the authority of such firm as experts in accounting and auditing.

The consolidated financial statements of GWG Holdings, Inc. and its subsidiaries for the year ended December 31, 2018 incorporated by reference in this prospectus from GWG Holdings, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2019 have been audited by Baker Tilly Virchow Krause, LLP, independent registered public accounting firm, as set forth in their report thereon. Such financial statements have been so incorporated in reliance upon the report of Baker Tilly Virchow Krause, LLP on the authority of such firm as experts in accounting and auditing.

The consolidated financial statements of The Beneficient Company Group, L.P. and its subsidiaries for the year ended December 31, 2019 incorporated by reference in this prospectus from GWG Holdings, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2019 have been audited by Whitley Penn LLP, independent registered public accounting firm, as set forth in their report thereon, which is incorporated herein by reference. Such financial statements have been so incorporated in reliance upon the report of Whitley Penn LLP pertaining to such financial statements on the authority of such firm as experts in accounting and auditing.

**WHERE YOU CAN FIND MORE INFORMATION**

We have filed with the SEC a registration statement on Form S-1 under the Securities Act with respect to the L Bonds to be offered and sold pursuant to this prospectus which is a part of that registration statement. This prospectus does not contain all the information contained in the registration statement. For further information with respect to us and the L Bonds to be sold in this offering, we refer you to the registration statement, including the agreements, other documents and schedules filed as exhibits to the registration statement.

We file annual, quarterly and current reports, and other information with the SEC. We intend to make these filings available on our website at *www.gwgh.com*. Information on our website is not incorporated by reference in this prospectus. We maintain an office at 325 N. Saint Paul Street, Suite 2650, Dallas, TX 75201 where all records concerning the L Bonds are to be retained. L Bond holders and their representatives can request information regarding the L Bonds by contacting our office by mail at our address or by telephone at (612) 746-1944 or by fax at (612) 746-0445. Upon request, we will provide copies of our filings with the SEC free of charge to our investors. Our SEC filings, including the registration statement of which this prospectus is a part, will also be available on the SEC's Internet site at *http://www.sec.gov*.

**INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE**

We are incorporating certain information about us that we have filed with the SEC by reference in this prospectus, which means that we are disclosing important information to you by referring you to those documents. The information we incorporate by reference is an important part of this prospectus.

We incorporate by reference the documents listed below:

- Our Annual Report on Form 10-K for the year ended http://www.sec.gov/Archives/edgar/data/1522690/000121390020007722/f10k2019_gwgholdings.htm">December 31, 2019, filed with the SEC on March 27, 2020;

- Our Quarterly Report on Form 10-Q for the quarter ended http://www.sec.gov/Archives/edgar/data/1522690/000121390020012627/f10q0320_gwgholdingsinc.htm">March 31, 2020, filed with the SEC on May 15, 2020; and

- Our Current Reports on Form 8-K filed with the SEC

APP. 908

o   n http://www.sec.gov/Archives/edgar/data/1522690/000121390020000406/f8k123119_gwgholdingsinc.htm">January 7, 2020,   http://www.sec.gov/Archives/edgar/data/1522690/000121390020004936/f8k022120_gwgholdingsinc.htm">February 27, 2020,   http://www.sec.gov/Archives/edgar/data/1522690/000121390020005634/ea119391-8k_gwgholdings.htm">March 6, 2020, http://www.sec.gov/Archives/edgar/data/1522690/000121390020006795/ea119760-8k_gwgholdings.htm">March 18, 2020 and http://www.sec.gov/Archives/edgar/data/1522690/000121390020006966/ea119781-8k_gwgholdings.htm">March 20, 2020.

All documents filed by us pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, as amended, after the date of this prospectus and before the termination of the offering also are incorporated herein by reference. We are not, however, incorporating by reference any documents or portions thereof that are not deemed "filed" with the SEC or any information furnished pursuant to Items 2.02 or 7.01 of Form 8-K or certain exhibits furnished pursuant to Item 9.01 of Form 8-K.

The section entitled "Where You Can Find More Information" above describes how you can obtain or access any documents or information that we have incorporated by reference herein. The information relating to us contained in this prospectus does not purport to be comprehensive and should be read together with the information contained in the documents incorporated by reference in this prospectus.

Upon written or oral request, we will provide, free of charge, to each person, including any beneficial owner, to whom a prospectus is delivered, a copy of any or all of the reports or documents that are incorporated by reference into this prospectus. Such written or oral requests should be made to:

<div align="center">

Timothy Evans, Chief Financial Officer
325 N. Saint Paul Street, Suite 2650
Dallas, TX 75201
Telephone Number: (612) 746-1935

</div>

In addition, such reports and documents may be found on our website at *www.gwgh.com*.

<div align="center">40</div>

2,000,000 Units

($2,000,000,000)

**GWG HOLDINGS, INC.**

**L Bonds**

**PROSPECTUS**

**June 3, 2020**

8-K 1 f8k123119_gwgholdingsinc.htm CURRENT REPORT

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, DC 20549

## FORM 8-K

CURRENT REPORT
Pursuant to Section 13 or 15(d) of
the Securities Exchange Act of 1934

Date of Report (date of earliest event reported): **December 31, 2019**

**GWG Holdings, Inc.**
(Exact name of registrant as specified in its charter)

Commission File Number:   **001-36615**

| **Delaware** | **26-2222607** |
|:---:|:---:|
| (State or other jurisdiction of incorporation) | (IRS Employer Identification No.) |

**325 North St. Paul Street, Suite 2650, Dallas, TX 75201**
(Address of principal executive offices, including zip code)

**(612) 746-1944**
(Registrant's telephone number, including area code)

**220 South Sixth Street, Suite 1200, Minneapolis, MN 55402**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|:---:|:---:|:---:|
| Common Shares | GWGH | Nasdaq Capital Markets |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company  ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.   ☐

APP. 911

Exhibit
A-9

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 913 of 1031     PageID 1085

APP. 912

**Item 1.01 Entry into a Material Definitive Agreement.**

*Amendment No. 2 to Amended and Restated Indenture*

On December 31, 2019, GWG Holdings, Inc. ("GWG" or the "Company"), GWG Life, LLC, a wholly owned subsidiary of the Company ("GWG Life"), and Bank of Utah, as trustee (the "Trustee"), entered into Amendment No. 2 (the "Amendment") to that certain Amended and Restated Indenture, dated as of October 23, 2017, among the Company, GWG Life and the Trustee (as amended, the "Indenture").

The Amendment amended the Debt Coverage Ratio in the Indenture (and added or revised associated definitions) to provide the Company with the ability to incur indebtedness (directly or through a subsidiary of the Company) that is payable in capital stock of the Company or mandatorily convertible into or exchangeable for capital stock of the Company that would be excluded from the calculation of the Debt Coverage Ratio (which would constitute "Excluded Indebtedness" under the Debt Coverage Ratio). Also included in the definition of Excluded Indebtedness (and thus also excluded from the calculation of the Debt Coverage Ratio) is indebtedness that is reasonably expected to be converted or exchanged, directly or indirectly, into capital stock of the Company. This category of Excluded Indebtedness only includes indebtedness where the transaction agreements provide that in the event the indebtedness does not convert into, or is exchanged for, capital stock of the Company as provided in the transaction agreements, the indebtedness would be cancelled and any assets received in exchange for the issuance of the indebtedness would be returned.

The Amendment excludes from the calculation of the Debt Coverage Ratio any indebtedness of The Beneficient Company Group, L.P., a Delaware limited partnership ("Beneficient LP"), and its direct and indirect subsidiaries, as well as the value of the assets of Beneficient LP and its direct and indirect subsidiaries. To avoid lengthy and costly quarterly valuation studies, the Amendment provides that the Company's investment in Beneficient is valued at its original cost basis and any commercial loans made by the Company to Beneficient is included at their outstanding principal amount. The Amendment also provides that the Debt Coverage Ratio is measured on a quarterly basis.

The Amendment is intended to provide the Company with greater flexibility to finance and to anticipate the potential impacts of its expanding relationship with Beneficient LP. Management expects that the Amendment will strengthen its compliance with the Debt Coverage Ratio.

Finally, the Amendment amends the definition of "Pricing Model" to reflect the fact that the Company now uses the life insurance pricing model owned by ClariNet LS rather than the pricing model owned by Modeling Actuarial Pricing Systems, Inc.

*Preferred Series A Unit Account and Common Unit Investment Agreement; Exchange Agreement*

On December 31, 2019, the Company, Beneficient LP, Beneficient Company Holdings, L.P., a Delaware limited partnership of which Beneficient LP owns all of the outstanding common units and serves as its general partner ("BCH"), and Beneficient Management, L.L.C., a Delaware limited liability company and the general partner of Beneficient LP ("Beneficient Management"), entered into a Preferred Series A Unit Account and Common Unit Investment Agreement (the "Investment Agreement").

Pursuant to the Investment Agreement, the Company transferred $79 million to Beneficient LP in return for 666,667 common units of Beneficient LP and a Preferred Series A Subclass 1 Unit Account of BCH.

1

APP. 913

In connection with the Investment Agreement, the Company acquired the right to appoint a majority of the board of directors of Beneficient Management, the general partner of Beneficient LP. As a result, the Company expects to report the results of Beneficient LP and its subsidiaries on a consolidated basis beginning with the Company's audited consolidated financial statements for the year ended December 31, 2019. The Company's right to appoint a majority of the board of directors of Beneficient Management will terminate in the event (i) the Company's ownership of the fully diluted equity of Beneficient LP (excluding equity issued upon the conversion or exchange of Preferred Series A Unit Accounts of BCH held as of December 31, 2019 by parties other than the Company) is less than 25%, (ii) the Continuing Directors of the Company cease to constitute a majority of the board of directors of the Company, or (iii) certain bankruptcy events occur with respect to the Company. The term "Continuing Directors" means, as of any date of determination, any member of the board of directors of the Company who: (1) was a member of the board of directors on December 31, 2019; or (2) was nominated for election or elected to the board of directors with the approval of a majority of the Continuing Directors who were members of the board of directors at the time of such nomination or election.

Beneficient Management has an executive committee, a nominating committee and a community reinvestment committee. The board of directors of Beneficient Management has the right to appoint two members of these committees, and an entity affiliated with Brad K. Heppner, the Company's Chairman, has the right to appoint the other two members of these committees. The entity affiliated with Mr. Heppner also has the right to appoint the Chairman of the Board and of each of the committees. The Beneficient Management executive committee has the right to approve certain transactions on behalf of Beneficient Management and Beneficient LP and its subsidiaries, including: (i) the incurrence of debt; (ii) the issuance of equity interests of Beneficient LP or any subsidiary equal to 5% or more of the fully diluted equity of such entity or that have preferred terms to the common equity of Beneficient LP, except in connection with any trust instrument or product offered by Beneficient LP or its affiliates; (iii) the adoption of a shareholder or unitholder rights plan by Beneficient LP or any subsidiary thereof; (iv) the amendment, supplement, waiver, or modification of Beneficient LP's limited partnership agreement, the BCH limited partnership agreement or the organizational documents of any subsidiary of the foregoing other than any common law or statutory trusts created to facilitate the financing, acquisition, contribution, assignment or holding of alternative assets; (v) the exchange or disposition of a majority or more of the assets, taken as a whole, of Beneficient LP or any subsidiary thereof in a single transaction or a series of related transactions; (vi) the exchange or disposition of a majority or more of the assets, taken as a whole, of Beneficient Management or any subsidiary thereof in a single transaction or a series of related transactions; (vii) the execution by Beneficient LP, Beneficient Management or any subsidiary thereof of any contracts or of any amendment, supplement, waiver or modification of any existing contract, which would materially change the nature of the business of Beneficient Management and its affiliates; (viii) materially or commercially substantive changes to or creation of an employee incentive or benefit plan of Beneficient Management, Beneficient LP or any subsidiary thereof; (ix) the merger, sale or other combination of Beneficient LP, Beneficient Management or any subsidiary thereof with or into any other person or entity; (x) the transfer, mortgage, pledge, hypothecation or grant of a security interest in all or substantially all of the assets of Beneficient LP or any subsidiary thereof; (xi) the transfer, mortgage, pledge, hypothecation or grant of a security interest in all or substantially all of the assets of Beneficient Management or any subsidiary thereof; (xii) the removal without cause of a chief executive officer or any other executive officer of Beneficient Management, Beneficient LP or any operating subsidiary thereof; (xiii) the termination of employment of any other officer of Beneficient Management, Beneficient LP or any operating subsidiary thereof or the termination of the association of a partner, member, manager or director of any subsidiary of Beneficient LP, in each case, without cause; (xiv) the liquidation or dissolution of Beneficient Management, Beneficient LP or any operating subsidiary thereof; (xv) the withdrawal or removal of Beneficient Management as the general partner of Beneficient LP or the direct or indirect transfer of beneficial ownership of all or any part of a general partner interest in Beneficient LP; (xvi) any determination by Beneficient Management, acting as general partner of Beneficient LP, related to the removal or replacement of the general partner under Beneficient LP's limited partnership agreement; (xvii) the entry into any material or commercially substantive agreement with a related party; (xviii) the creation of any new and materially or commercially substantively different trust instrument or product, or any materially or commercially substantive change, amendment, supplement, waiver or modification to the terms or provision of any existing trust product, offered by Beneficient LP or any of its affiliates to the extent regulated by the Texas Finance Commission or other state, federal or non-U.S. regulator with direct or indirect jurisdiction over Beneficient LP or such affiliate or such product, other than any change or modification to any exhibit or schedule to any trust instrument or product; or (xix) the bankruptcy of Beneficient LP.

2

APP. 914

Following the transaction, and as agreed in the Investment Agreement, the Company had an initial capital account balance for the Preferred Series A Subclass 1 Unit Account of $319 million. The other holders of the Preferred Series A Subclass 1 Unit Accounts are certain founders of Beneficient LP, and the aggregate capital accounts of all holders of the Preferred Series A Subclass 1 Unit Accounts after giving effect to the investment by the Company is $1.569 billion. The Company's Preferred Series A Subclass 1 Unit Account is the same class of preferred security as held by the founders. If the founders exchange their Preferred Series A Subclass 1 Unit Accounts for securities of the Company, the Company's Preferred Series A Subclass 1 Unit Account would be converted into common units of Beneficient LP (so neither the Company nor the founders would hold Preferred Series A Subclass 1 Unit Accounts).

In addition, on December 31, 2019, the Company, Beneficient LP and certain holders of common units of Beneficient LP (the "Common Units") entered into an Exchange Agreement (the "Exchange Agreement") pursuant to which certain holders of Common Units from time to time have the right, on a quarterly basis, to exchange their Common Units for common stock of the Company. The exchange ratio in the Exchange Agreement is based on the ratio of the capital account associated with the Common Units to be exchanged to the market price of the Company's common stock based on the volume weighted average price of the Company's common stock for the five consecutive trading days prior to the quarterly exchange date. The Exchange Agreement is intended to facilitate the marketing of Beneficient LP's products to holders of alternative assets.

The terms and conditions of the transactions described under this "Item 1.01 Entry into a Material Definitive Agreement -- Preferred Series A Unit Account and Common Unit Investment Agreement; Exchange Agreement" were negotiated and approved by the previously disclosed Special Committee of the Board of Directors of the Company with the assistance of independent legal and financial advisors.

**Item 9.01. Financial Statements and Exhibits.**

(d) Exhibits.

| Exhibit No. | Description |
| --- | --- |
| 4.1 | Amendment No. 2 to the Indenture |

3

APP. 915

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**GWG HOLDINGS, INC.**

Date: January 7, 2020

By:     /s/ Timothy Evans
Name:   Timothy Evans
Title:   Chief Financial Officer

4

APP. 916

**Exhibit Index**

| Exhibit No. | Description |
| --- | --- |
| 4.1 | Amendment No. 2 to the Indenture |

5

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 919 of 1031    PageID 1091

10-K 1 f10k2017_gwgholdings.htm ANNUAL REPORT

**Exhibit**

**A-10**

exhibitsticker.com

APP. 918

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 920 of 1031    PageID 1092

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

—————————

**FORM 10-K**

—————————

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2017

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES ACT OF 1934**

For the transition period from _____ to _____

**Commission File Number: 001-36615**

—————————

# GWG HOLDINGS, INC.

(Exact name of registrant as specified in its charter)

—————————

| **Delaware** | **26-2222607** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**220 South Sixth Street, Suite 1200**
**Minneapolis, MN 55402**
(Address of principal executive offices, including zip code)

**(612) 746-1944**
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**
**Common Stock**

**Securities registered pursuant to Section 12(g) of the Act**
**None**

—————————

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ (Do not check if a smaller reporting company) | Smaller reporting company | ☒ |
| | | Emerging growth company | ☒ |

APP. 919

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 921 of 1031    PageID 1093

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). ☐ Yes ☒ No

The aggregate market value of the registrant's common stock held by non-affiliates was $16,531,000 as of June 30, 2017 (the last business day of the registrant's most recently completed second fiscal quarter), based on a total of 1,562,500 shares of common stock held by non-affiliates and a closing price of $10.58 as reported on the Nasdaq Capital Market on June 30, 2017. For purposes of this computation, all officers, directors, and 10% beneficial owners of the registrant are deemed to be affiliates. Such determination should not be deemed to be an admission that such officers, directors or 10% beneficial owners, are, in fact, affiliates of the registrant.

As of March 29, 2018, GWG Holdings, Inc. had 5,813,555 shares of common stock outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE:

Portions of the definitive Proxy Statement for our 2018 Annual Meeting of Stockholders, to be filed within 120 days after the end of the fiscal year ended December 31, 2017, are incorporated by reference into Part III of this Form 10-K.

APP. 920

**GWG HOLDINGS, INC.**

**Index to Form 10-K**
**for the Fiscal Year Ended December 31, 2017**

| | | |
|---|---|---|
| PART I | | 1 |
| | | |
| ITEM 1. | Business. | 1 |
| ITEM 1A. | Risk factors. | 15 |
| ITEM 1B. | Unresolved staff comments. | 30 |
| ITEM 2. | Properties. | 30 |
| ITEM 3. | Legal proceedings. | 30 |
| ITEM 4. | Mine safety disclosures. | 30 |
| | | |
| PART II | | 31 |
| | | |
| ITEM 5. | Market for the registrant's common equity, related shareholder matters and issuer purchases of equity securities. | 31 |
| ITEM 6. | Selected Financial Data. | 31 |
| ITEM 7. | Management's discussion and analysis of financial condition and results of operations. | 31 |
| ITEM 7A. | Quantitative and qualitative disclosures about market risk. | 45 |
| ITEM 8. | Consolidated financial statements and supplementary data. | F-1 |
| ITEM 9. | Changes in and disagreements with accountants on accounting and financial disclosure. | 46 |
| ITEM 9A. | Controls and procedures. | 46 |
| ITEM 9B. | Other information | 47 |
| | | |
| PART III | | 48 |
| | | |
| ITEM 10. | Directors, executive officers and corporate governance. | 48 |
| ITEM 11. | Executive compensation and related-party transaction disclosures. | 48 |
| ITEM 12. | Security ownership of certain beneficial owners and management and related shareholder matters. | 48 |
| ITEM 13. | Certain relationships and related transactions, and director independence. | 48 |
| ITEM 14. | Principal accounting fees and services. | 48 |
| | | |
| PART IV | | 49 |
| | | |
| ITEM 15. | Exhibits, financial statement schedules. | 49 |
| ITEM 16. | FORM 10-K SUMMARY | 51 |
| | | |
| SIGNATURES | | 52 |

i

**PART I**

### ITEM 1. BUSINESS.

### Overview

We are a financial services company committed to transforming the life insurance industry with disruptive and innovative products and services. We built our business by creating opportunities for consumers to obtain significantly more value for their life insurance policies in a secondary market as compared to the traditional options offered by the insurance industry. We are working to enhance and extend our business in the life insurance industry through continued innovation in our products and services, including the application of advanced technology. Finally, we entered into a strategic relationship with The Beneficient Company Group, L.P. that we expect to provide a significant increase in assets, common shareholder equity and earnings.

Our core life insurance secondary market business is designed to serve consumers 65 years or older owning life insurance. We seek to earn non-correlated yield from life insurance policies that we purchase in the secondary market. We purchase these policies at a discount to the face value of the policy's benefit and continue to pay the premiums in order to collect the policy benefits. The secondary market opportunity exists because the incumbent life insurance industry offers consumers inadequate surrender values for the policies they sell. Since inception, we have purchased over $2.7 billion in face value of policy benefits from consumers for over $477 million, as compared to the $35 million in surrender value offered by insurance carriers on those same policies. Our products provide unique and valuable services to the senior consumers that we serve.

The opportunity to earn non-correlated yield generated from a portfolio of life insurance is potentially generated from the difference between the (i) purchase price of the life insurance assets over time, plus the premiums and financing costs to maintain those assets; and (ii) the face value of the policy benefits received. As of December 31, 2017, the total face value of the life insurance policy benefits that we own was $1.68 billion, and the total investment in our portfolio of life insurance assets, including the purchase price, attendant premiums and financing costs was $644 million.

The goal of our secondary life insurance business has been to build a profitable, large and well-diversified portfolio of life insurance assets. We believe that scale and diversification are key factors and risk mitigation strategies to provide consistent cash flows and reliable investment returns. We believe that we are reaching this goal in terms of acquiring portfolio size and diversification. Our other key goal has been to build an operational platform to work with financial advisors and insurance professionals to assist consumers in accessing our products and services. We believe originating life insurance policies for the secondary market is a key source of value for our business.

More recently, we have been working to further innovate in the primary life insurance market with products and services built using our advanced epigenetic technology. On April 26, 2017 we exclusively licensed the patent pending "DNA Methylation Based Predictor of Mortality" discovered by Dr. Steve Horvath from the University of California, Los Angeles (UCLA). We refer to the technology developed by Dr. Horvath as M-Panel technology because it measures methylation patterns along the human epigenome. The "DNA Methylation Based Predictor of Mortality" established an all-cause mortality hazard ratio estimate based upon a pattern of methylation along the human epigenome. The science, known as epigenetics, is a facet of biology that reflects certain aspects of one's interactions with environmental and physiological conditions at a molecular level. We believe epigenetics provides a foundational science for improving the traditional factors measured by the life insurance industry in underwriting, as well as providing new insights into health and wellness. To that end, we recently filed patents for our proprietary M-Panel Smoking and Alcohol consumption Tests. We are in the process of applying this advanced epigenetic technology into commercial applications that will permit us to reimagine the way in which risk is assessed, selected and priced in the life insurance, long-term care insurance and annuity industries.

On January 12, 2018, we entered into a strategic relationship through a Master Exchange Agreement (as it may be amended from time to time, the "Master Agreement"), among GWG Holdings, GWG Life, The Beneficient Company Group, L.P., a Delaware limited partnership ("Beneficient"), MHT Financial SPV, L.L.C., a Delaware limited liability company ("MHT SPV"), and certain related trusts (the "Seller Trusts"). The transactions contemplated by the Master Agreement are collectively referred to in this report as the "Exchange Transaction." Information regarding Beneficient and the Exchange Transaction is set forth below and in Item 1A (Risk Factors) of this report under the caption "Risks Related to the Pending Exchange Transaction."

1

APP. 922

Our business was originally organized in February 2006. We added our current parent holding company, GWG Holdings Inc., in March 2008, and in September 2014 we consummated an initial public offering of our common stock on The NASDAQ Capital Market where our stock trades under the ticker symbol "GWGH."

GWG Holdings, Inc. ("GWG Holdings") conducts its life insurance secondary market business through a wholly owned subsidiary, GWG Life, LLC ("GWG Life"), and GWG Life's wholly owned subsidiaries, GWG Life Trust and GWG DLP Funding IV, LLC. All of these entities are legally organized in Delaware, other than GWG Life Trust, which is governed by the laws of the State of Utah. GWG Holdings' wholly owned subsidiary, Life Epigenetics Inc. (formerly named Actüa Life & Annuity Ltd.), was formed to engage in various life insurance related businesses and activities related to its exclusive license for "DNA Methylation Based Predictor of Mortality" technology. Unless the context otherwise requires or we specifically so indicate, all references in this report to "we," "us," "our," "our Company," "GWG," or the "Company" refer to these entities collectively. Our headquarters are based in Minneapolis, Minnesota.

On December 7, 2015, GWG Holdings formed a wholly owned subsidiary, GWG MCA, LLC. On January 13, 2016, GWG MCA, LLC was converted to a corporation and became GWG MCA Capital, Inc. GWG MCA Capital, Inc. was formed to provide cash advances to small businesses.

**Markets**

*Secondary Life Insurance Market*

The market for life insurance is large. According to the American Council of Life Insurers Fact Book 2017 (ACLI), consumers owned approximately $12 trillion in face value of individual life insurance policy benefits in the United States in 2016. In that same year, the ACLI reports that individual consumers purchased an aggregate of $1.7 trillion of new individual life insurance policy benefits. This figure includes all types of individual life policies, including term insurance and permanent insurance known as whole life and universal life.

The secondary market for life insurance exists as a result of consumer lapse behaviors and surrender values far below economic value offered to consumers for their life insurance by the issuing insurance carriers. The ACLI reports that the annual lapse and surrender rate for individual life insurance policies is 5.2% of the in-force face value of benefits, amounting to over $624 billion in face value of policy benefits lapsed and surrendered in 2016 alone. According to Milliman (2004), a leading actuarial consulting firm, nearly 88% of all universal life insurance policies issued in the United States ultimately do not terminate with the payment of a death claim.

The life insurance secondary market primarily serves consumers, 65 years and older, and their families who own life insurance. These consumers represent the fastest growing demographic segment in the United States, estimated to be over 49 million in 2016, according to the U.S. Census Bureau in its 2015 report "*Projections and the Size and Composition of the U.S. Population: 2014 to 2060*". As these consumers age, they and their families will be faced with a variety of financial needs that can be met from the value-added products and services we offer. Our life insurance secondary market products and services address the convergence of major trends that include: increased lifetime estate tax exemptions, changing needs for life insurance protection, the disappearance of traditional long-term care insurance protection, under-saving for retirement, and increasing medical expenses. Our approach to the life insurance secondary market allows consumers to efficiently access the value of an illiquid life insurance asset, which may otherwise lapse or be surrendered, to offset the costs associated with retirement and aging.

This year we experienced a noticeable increase in activity and interest in the life insurance secondary market across the entire spectrum of market constituents. This increased activity and interest was marked by the National Association of Insurance Commissioners ("NAIC") policy bulletin issued July 19, 2017 in support of products we provide that the bulletin described as "innovative private market solutions for financing Americans' long-term care needs." The NAIC, citing the Company's August 25, 2016 presentation, discussing how consumers could exchange the market value of their life insurance policies for products designed to fund long-term care expenses. The use of a life insurance policy to generate resources to fund long-term care was pioneered by our Executive Vice President, Chris Orestis. Today, we are the only company in the life insurance industry that provides this innovative product to pay for long-term care expenses.

2

APP. 923

*Primary Life Insurance Market and Technology ("Insurtech")*

The opportunity to apply technology to transform the insurance industry is significant. According to leading industry consultancy firms such as KPMG, Accenture, and Ernst & Young, there is a major movement afoot to transform the insurance industry through the use and application of advanced technology. This movement, commonly referred to as "insurtech," suggests a new era of disruptive entrants into the traditional insurance marketplace that have the potential to upend the insurance industry's historical approach to assessing and selecting acceptable underwriting risks.

We have identified advanced epigenetic technology as a means to improve underwriting systems in the primary life insurance market. Our M-Panel technology provides innovative insights into individual all-cause mortality and may have market-wide application to traditional life insurance underwriting. In addition, we have filed patent applications for our Smoking and Alcohol Tests. We believe these tests will provide more accuracy and precision in assessing the key factors used in the traditional life insurance underwriting process. We intend to commercialize and apply our tests to the primary market of life insurance and believe that our initial tests, and additional testing we plan to develop, may have applications outside of the insurance industry.

**Our Business**

Our business was founded to acquire life insurance policies in the secondary market and earn a profit from those assets. We believe that we are uniquely positioned in the life insurance secondary market, particularly as the need for our products and services grows. Over the past year we have been expanding our business with products and services built from intellectual property based on epigenetic science. In addition, we recently announced our pending transaction with The Beneficient Company Group, L.P. that will serve to expand our business to include a greater, more diversified portfolio of assets.

To participate in our industry and deliver our products and services in the markets we serve, we intend to spend significant resources: (i) recruiting and developing professional management; (ii) establishing strategic relationships for delivering the services we provide; (iii) creating opportunities for investors to participate in the yield and capital appreciation from the life insurance assets and intellectual property we own; (iv) developing innovative products from epigenetic technology; and (v) developing an operational platform and systems for originating life insurance.

**Secondary Life Insurance**

*Secondary Life Insurance — Origination*

We generally purchase life insurance assets in the secondary market directly from policy owners who purchased their life insurance in the primary market. Historically, we have purchased these life insurance policies through a network of specialized life settlement brokers who assist consumers and financial professionals in accessing the secondary market. One of our key strategic initiatives has been to expand our ability to originate and purchase life insurance policies directly from consumers by working with their financial or insurance advisor. We refer to this strategy as our "D100" initiative because we seek to acquire 100% of the life insurance policies that we purchase directly from consumers without the aid of a broker. Our D100 initiative is focused on bringing our products and services to consumers through partnerships with independent life insurance distribution organizations, which we believe is critical to achieve the growth potential of the life insurance secondary market.

*Secondary Life Insurance Underwriting*

We focus on purchasing high quality life insurance assets through our origination practices and underwriting procedures. These practices and procedures strive to meet guidelines and methodologies published by rating agency A.M. Best. At the same time, we seek innovative value-added tools, services, and methodologies to improve both the accuracy and efficiency with which we acquire life insurance assets.

Our secondary market underwriting procedures consist of a careful review and analysis of available materials and information related to a life insurance policy and the insured. The goal of our underwriting procedures is to make an informed purchasing decision. We typically purchase life insurance policies from insureds who are 65 years or older and whose life expectancies are less than 144 months (twelve years). The life expectancies we use are estimates, stated in months, which indicate the 50% probability of an individual's mortality (meaning actuarial analysis predicts half of

APP. 924

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 926 of 1031    PageID 1098

the individuals with similar age, sex, and medical conditions will experience mortality before that number of months, and half will experience mortality after that number of months). Life expectancies are based on actuarial tables that predict statistical probability of individual mortality.

We obtain life expectancies from independent third-party medical-actuarial underwriting firms, unless the life insurance policy benefit has a face value of $1,000,000 or less (which we generally refer to as a "small face policy").

*Secondary Life Insurance – Value Proposition*

The value proposition of owning a life insurance asset purchased in the secondary market is the opportunity to earn a spread between the investment cost of the life insurance assets and the face value of the policy benefits. Accordingly, if we purchase life insurance assets in the secondary market, and make all the attendant premium payments to maintain those assets in order to receive the policy benefits, the most significant risk factors (among others that we discuss in the "Risk Factors" section of this report) in the performance of those assets are: (i) the predictability of mortality, or longevity risk; and (ii) the creditworthiness of the issuing life insurance company, or credit risk. We believe the value proposition of our investments in the life insurance assets is our ability to obtain superior risk-adjusted returns.

We believe actuarial mortality is the single largest variable affecting the returns on our investments in life insurance assets over time. Accurately predicting an individual's mortality date is impossible, and the best an actuary can do is provide a set of probabilities of survival over time. Nevertheless, predicting mortality among a group of similarly situated individuals is less difficult — in fact, the larger the group, the more accurate actuarial predictions tend to become. The statistical mathematical concept stating that the results of random events tend to become very predictable as the number of events becomes large is the "Central Limit Theorem" (or more commonly known as the "Law of Large Numbers"). This statistical mathematical concept is the basis for many business models, ranging from insurance to the lottery. Insurance carriers, for example, can be very certain of the number of insurance claims they can expect when they have spread their risk over a large pool of diversified policies. In this way, insurance carriers can price a large number of insurance policies of any type to collect premiums slightly above the level of expected claims, and thereby expect to earn a surplus or profit. Similarly, a lottery can depend on an expected amount of earnings equal to the small advantage built into the odds of the games.

The implications for our business model are two-fold: first, as we accumulate larger numbers of life insurance policies, we should expect our results to increasingly correlate with our expectations; second, over the long run, we should expect that the actual cash flows will converge with the forecasted cash flows from our portfolio of life insurance assets, and the actual return on our portfolio of life insurance assets will converge with our expected return. Although medical advances and life expectancy changes may significantly impact the longevity risk we face and our understanding of that risk, these concepts nevertheless serve as guiding principles as we seek to build, manage, and forecast the performance of our portfolio of life insurance assets.

These expectations are affirmed in research published by A.M. Best and others, illustrating that as the number of insured lives increase within a portfolio of life insurance policies, there is a corresponding decrease in the standard deviation of the mortality events within the portfolio — i.e., longevity risk decreases as the number of insureds increases. Standard & Poor's indicates that 1,000 insured lives are required to reach statistical "significance" (where the relationship, in this context, between mortality projections and actual mortality events is not random). A.M. Best concludes that a portfolio of at least 300 insured lives is statistically significant. Our current portfolio covers 804 insured lives and we believe that both the predictability and actual performance will continue to improve with additional size and diversification. Accordingly, we continue to seek to grow the size and diversification of the portfolio in order to mitigate risk and improve our profitability.

We rely on the payment of policy benefit claims by life insurance companies as a significant source of cash inflow. The life insurance assets we own represent obligations of third-party life insurance companies to pay the benefit amount under the policy upon the mortality of the insured. As a result, we manage this credit risk exposure by generally purchasing policies issued by insurance companies with investment-grade ratings from Standard & Poor's, and diversifying our portfolio among a number of insurance companies.

The yield to maturity on bonds issued by life insurance carriers reflects, among other things, the credit risk (risk of default) of such insurance carrier. We follow the yields on certain publicly traded life insurance company bonds because this information is part of the data we consider when valuing our portfolio of life insurance policies for our financial statements.

4

APP. 926

The average yield to maturity of publicly traded life insurance company bonds data we consider when valuing our portfolio of life insurance policies was 2.71% as of December 31, 2017. We believe that this reflects, in part, the financial market's judgment that credit risk is low with regard to these carriers' financial obligations. It should be noted that the obligations of life insurance carriers to pay life insurance policy benefits ranks senior to all of their other financial obligations, such as the aforementioned senior bonds they issue. As of December 31, 2017, approximately 96.7% of the face value of policy benefits in our life insurance portfolio were issued by insurance companies with investment-grade credit ratings from Standard & Poor's.

*Secondary Life Insurance Assets*

Our portfolio of life insurance policies, owned by our subsidiaries as of December 31, 2017, is summarized below:

### Life Insurance Portfolio Summary

| | |
|---|---|
| Total portfolio face value of policy benefits | $1,676,148,000 |
| Average face value per policy | $    1,867,000 |
| Average face value per insured life | $    2,085,000 |
| Average age of insured (yrs.)* | 81.7 |
| Average life expectancy estimate (yrs.)* | 6.9 |
| Total number of policies | 898 |
| Number of unique lives | 804 |
| Demographics | 75% Males; 25% Females |
| Number of smokers | 36 |
| Largest policy as % of total portfolio | 0.79% |
| Average policy as % of total portfolio | 0.11% |
| Average annual premium as % of face value | 2.92% |

_____

\*    Averages presented in the table are weighted averages.

Our portfolio of life insurance policies, owned by our wholly owned subsidiaries as of December 31, 2017, organized by the insured's current age and the associated number of policies and policy benefits, is summarized below:

### Distribution of Policies and Policy Benefits by Current Age of Insured

| Min Age | Max Age | Policy Benefits | Weighted Average Life Expectancy (years) | Number of Policies | Percentage of Total Policy Benefits |
|---|---|---|---|---|---|
| 95 | 100 | $     11,139,000 | 1.2 | 6 | 0.7% |
| 90 | 94 | $   166,518,000 | 2.8 | 94 | 9.9% |
| 85 | 89 | $   440,672,000 | 4.8 | 202 | 26.3% |
| 80 | 84 | $   425,070,000 | 6.5 | 192 | 25.4% |
| 75 | 79 | $   311,667,000 | 8.8 | 170 | 18.6% |
| 70 | 74 | $   240,709,000 | 10.8 | 160 | 14.3% |
| 60 | 69 | $     80,373,000 | 9.7 | 74 | 4.8% |
| **Total** | | **$1,676,148,000** | **6.9** | **898** | **100.00%** |

5

APP. 927

Our portfolio of life insurance policies, owned by our subsidiaries as of December 31, 2017, organized by the insured's estimated life expectancy estimates and associated policy benefits, is summarized below:

**Distribution of Policies by Current Life Expectancies of Insured**

| Minimum Life Expectancy (Months) | Maximum Life Expectancy (Months) | Policies | Policy Benefits | Percentage of Total Policy Benefits |
|---|---|---|---|---|
| 1 | 47 | 225 | $ 367,529,000 | 21.9% |
| 48 | 71 | 195 | 367,908,000 | 21.9% |
| 72 | 95 | 180 | 357,059,000 | 21.3% |
| 96 | 119 | 136 | 262,733,000 | 15.7% |
| 120 | 143 | 90 | 163,732,000 | 9.8% |
| 144 | 179 | 59 | 109,340,000 | 6.5% |
| 180 | 206 | 13 | 47,847,000 | 2.9% |
| **Total** | | **898** | **$ 1,676,148,000** | **100.0%** |

We track concentrations of pre-existing medical conditions among insured individuals within our portfolio based on information contained in life expectancy reports including the underwriter's designation of primary impairment. We track these medical conditions within the following ten primary categories: (1) cancer, (2) cardiovascular, (3) cerebrovascular, (4) dementia, (5) diabetes, (6) multiple, (7) neurological disorders, (8) respiratory disease, (9) other, and (10) no diseases. Currently, the primary disease categories within our portfolio that represent a concentration of over 10% are multiple, cardiovascular, and other which constitute 26.2%, 20.5%, and 13.2%, respectively, of the face amount of insured benefits of our portfolio as of December 31, 2017.

As of December 31, 2017, approximately 96.7% of the face value of policy benefits in our life insurance portfolio were issued by insurance companies with investment-grade credit ratings from Standard & Poor's. Our ten largest life insurance company credit exposures and the Standard & Poor's credit rating of their respective financial strength and claims-paying ability is set forth below:

**Distribution of Policy Benefits by Top 10 Insurance Companies**

| Rank | Policy Benefits | Percentage of Policy Benefit Amount | Insurance Company | Insurance Company S&P Rating |
|---|---|---|---|---|
| 1 | $ 260,928,000 | 15.6% | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 2 | $ 199,202,000 | 11.9% | AXA Equitable Life Insurance Company | A+ |
| 3 | $ 181,003,000 | 10.8% | Lincoln National Life Insurance Company | AA- |
| 4 | $ 167,254,000 | 10.0% | Transamerica Life Insurance Company | AA- |
| 5 | $ 118,472,000 | 7.1% | Metropolitan Life Insurance Company | AA- |
| 6 | $ 65,089,000 | 3.9% | American General Life Insurance Company | A+ |
| 7 | $ 62,457,000 | 3.7% | Pacific Life Insurance Company | AA- |
| 8 | $ 57,293,000 | 3.4% | Massachusetts Mutual Life Insurance Company | AA+ |
| 9 | $ 53,106,000 | 3.1% | Security Life of Denver Insurance Company | A |
| 10 | $ 50,140,000 | 3.0% | West Coast Life Insurance Company | AA- |
| **Total** | **1,214,944,000** | **72.5%** | | |

### Secondary Life Insurance — Portfolio Return Modeling

Our portfolio of life insurance assets is to earn superior risk-adjusted returns. At any time, we calculate our returns from our life insurance assets based upon (i) our historical results; and (ii) the future cash flows we expect to realize from our statistical forecasts. To forecast our expected future cash flows and returns, we use the probabilistic method of analysis. The expected internal rate of return of our portfolio is based upon future cash flow forecasts derived from a probabilistic analysis of policy benefits received and policy premiums paid in relation to our non-GAAP (Generally Accepted Accounting Principles in the United States of America, or

APP. 928

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 930 of 1031     PageID 1102

"GAAP") investment cost basis. As of December 31, 2017, the expected internal rate of return on our portfolio of life insurance assets was 10.48% based

---

6

APP. 929

on our portfolio benefits of $1.68 billion and our non-GAAP investment cost basis of $644.2 million (including purchase price, premiums paid, and financing costs incurred to date). This calculation excludes returns realized from our matured policy benefits which are substantial.

We seek to further enhance our understanding of our expected future cash flow and returns by using a stochastic analysis, sometimes referred to as a "Monte Carlo simulation," to provide us with a greater understanding of the variability of our projections. The stochastic analysis we perform provides internal rates of return calculations for different statistical confidence intervals. The results of our stochastic analysis, in which we run 10,000 random mortality scenarios, demonstrates that the scenario ranking at the 50th percentile of all 10,000 results generates an internal rate of return ("IRR") of 10.46%, which is very near to our expected IRR ("Expected IRR") of our portfolio of 10.48%. Our Expected IRR is based upon future cash flow forecasts derived from a probabilistic analysis of our policy benefits received and policy premiums paid in relation to our non-GAAP investment cost basis. The stochastic analysis results also reveal that our portfolio is expected to generate an internal rate of return of 9.98% or better in 75% of all generated scenarios; and an internal rate of return of 9.56% or better in 90% of all generated scenarios. As the portfolio continues to grow in size and diversity, all else equal, the scenario results cluster closer to each other around our median, or 50th percentile, internal rate of return expectation, thereby lowering future cash flow volatility and potentially justifying our use of lower discount rates to value our portfolio.

In sum, we believe our statistical analyses show that, if we can continue to grow and maintain our investments in life insurance assets, then, in the absence of material negative events affecting our most significant risks, including but not limited to longevity, credit risk, interest rate and financing risk, those investments will potentially provide superior risk-adjusted returns for our Company.

The complete detail of our portfolio of life insurance policies, owned by our wholly owned subsidiaries as of December 31, 2017, organized by the current age of the insured and the associated policy benefits, sex, estimated life expectancy, issuing insurance carrier, and the credit rating of the issuing insurance carrier, is set in Exhibit 99.2 to this report.

**Primary Life Insurance and Technology ("Insurtech")**

We believe life insurance underwriting will transform due to advancements in science and technology. As part of that transformational change, we believe that the science of epigenetics will serve as a foundational science to this advancement for the life insurance industry. The life insurance industry is striving to achieve more automated underwriting and improve the overall customer experience. However, for a large number of life insurance policies issued today, the industry requires the collection of blood and urine to measure traditional health underwriting factors. Epigenetics not only offers a less invasive saliva-based solution, but promises to provide greater accuracy and precision to these traditional underwriting factors.

*Science Overview — Genetics vs. Epigenetics*

The science of epigenetics differs materially from genetics. Genetic science is the study of human DNA, or genes, that consist of over three billion base pairs consisting of Adenine (A), Guanine (G), Thymine (T) and Cytosine(C). The Human Genome Project reports that the first human genomes were fully mapped and sequenced in 2003 at a cost of $2.7 billion. Since then, the cost of genetic sequencing has decreased exponentially where "next-generation sequencing" has brought this cost down even faster than Moore's Law would have predicted. Several companies, such as Helix, now measure targeted sections of the genome as a service directly to consumers for under $100.

Epigenetic science is the study of how gene expression changes through the addition or removal of biochemical markers rather than alterations in the genetic DNA code itself. Unlike the genome, which basically stays the same throughout a person's lifetime, studies show that the epigenome changes dramatically over a person's lifetime based on age, behaviors and other environmental factors. This means that the epigenome is reacting to an individual's behavior or environment, such as smoking, alcohol consumption, or running marathons. Among the most studied epigenetic processes is DNA methylation, wherein chemical molecules called methyl groups attach or detach to cytosines along the genome, thereby affecting gene expression. By measuring unique methylation signatures along the genome, we believe we can identify health conditions or disease states that are traditionally used to underwrite life insurance with greater accuracy and precision.

7

APP. 930

While our technology is scientifically verified, the science of epigenetics is still nascent. As a result, we anticipate our technology to evolve rapidly in a way that adds to its core benefits over time. In particular, we believe that once our technology is commercialized for use and more lives are underwritten, we will have more data to further refine our technology and enhance its underwriting benefit. We also expect that the costs and the time required to process our tests will continue to fall due to technological advances, economies of scale and process improvements. The anticipated strengthening of these core benefits gives us confidence that epigenetic testing will become an integral part of life insurance underwriting and a driving force of the industry's transformation.

*Epigenetic Testing — All-Cause M-Panel Mortality Test*

We believe epigenetics not only promises to improve upon many traditional factors used in underwriting with greater accuracy and precision, but also opens up new factors in underwriting itself. In 2013, Dr. Steve Horvath published his landmark paper on the "Epigenetic Clock," which demonstrated that epigenetic data can be used to estimate human age. In late 2016, an international effort led by Dr. Horvath and Dr. Brian Chen, our Chief Science Officer, established that a new epigenetic clock could be used to "predict all-cause mortality above and beyond chronological age and traditional risk factors." The meta-analysis study completed by Dr. Horvath and Dr. Chen on DNA methylation and mortality prediction, involved more than 13,000 people from multiple countries that were followed for a number of years. In April of 2017, we secured an exclusive global license from UCLA to use Dr. Horvath's patent pending all-cause mortality predictive technology for the life insurance and related industries. We call the technology to conduct our all-cause M-Panel Mortality Test technology after the methylation signatures used in the analysis to identify individual risk of all-cause mortality.

The research behind our all-cause M-Panel Mortality Test suggests that the information it provides about an individual's risk of mortality is a new important independent factor that should be considered in life insurance underwriting. With the help of actuarial consultants, we have translated the all-cause mortality hazard ratios reported in Dr. Horvath's research into individual actuarial mortality factors. The actuarial consultants reported that the process we developed was "acceptable and consistent with established actuarial principles," an important confirmation of the proposed application of an all-cause M-Panel Mortality Test. We are in process of conducting our first large scale pilot test to analyze the independent and significance of our all-case M-Panel Mortality Test.

*Epigenetic Testing — M-Panel Smoking Test*

We recently filed for patent protection for our proprietary M-Panel Smoking Test. Environmental factors, such as smoking tobacco, impact the epigenome and can be measured through distinct epigenetic patterns. Given the large difference in life insurance premiums between smokers and non-smokers, and the shortcomings of current testing methodologies for testing smoking status, we have developed our proprietary M-Panel Smoking Test. The current gold-standard for measuring smoking status used by the life insurance industry measures cotinine collected from saliva, blood or urine. The half-life of cotinine in the human body is 16-19 hours, which means that >95% of cotinine is eliminated from the human body after about 3 days, making it easy for smokers to appear as non-smokers.

In contrast, our patent pending M-Panel Smoking Test analyzes methylation patterns in saliva to assess a variety of smoking patterns, including short-term and long-term effects of smoking on the epigenome. The test is based on a rich body of scientific evidence that identified specific epigenetic signatures for different smoking patterns. Several studies have reported individual epigenetic markers that may be used to estimate: (i) the amounts of cigarettes smoked, (ii) whether someone has regularly smoked within the past decade, and (iii) whether someone is a currently smoking or not. Building upon these findings, we developed a proprietary algorithm that selects the optimal combination of epigenetic markers to determine an individual's smoking habits. Using a single biological sample (e.g., saliva), the M-Panel Smoking Test identifies four categories of smokers: current smokers, recent quitters, long-term quitters, and never smokers. In addition to these four classifications, the M-Panel Smoking Test can also estimate the amount of cigarettes a current smoker likely smokes. Both amount and duration of smoking in one's lifetime plays a dramatic role in determining one's risk for morbidity and mortality. We believe our M-Panel Smoking Test will provide new features and details of individual smoking behavior that are not currently on the market. For a discussion of risks attendant to our M-Panel Smoking Test, see Risk Factors ("Commercializing the M-Panel or other technology…").

8

APP. 931

*Epigenetic Testing — M-Panel Alcohol Test*

We recently filed for patent protection for our proprietary M-Panel Alcohol Test. Similar to smoking tobacco, alcohol consumption leads to changes in the epigenome which may be useful in life insurance underwriting decisions. Today, quantification of alcohol intake is currently limited to self-reporting, as well as a limited number of biomarkers that have their own strengths and limitations. Current biomarkers to detect alcohol consumption are able to measure recent alcohol use (e.g., ethyl glucuronide), moderate use (e.g., PeTH), longer term use (e.g., carbohydrate-deficient transferrin), and chronic alcohol intake (e.g., severe liver damage, alanine aminotransferase). However, each of these biomarkers have limitations that include their cost and accuracy, particularly for the biomarkers that detect moderate and longer term use. We believe there is a great need for a single test that integrates information across self-report and multiple biomarkers and epigenetics may offer such a test. Our patent pending M-Panel Alcohol Test is based on scientific research that identifies specific methylation signatures for different drinking patterns. Building upon these findings, the proprietary algorithm underlying our M-Panel Alcohol Test identifies three types of alcohol consumption patterns with a single biological sample (e.g., from saliva): heavy drinkers, moderate drinkers, and light/non-drinkers. For a discussion of risks attendant to our M-Panel Alcohol Test, see Risk Factors ("Commercializing the M-Panel or other technology…").

*Epigenetics — Research and Development*

We are engaged in several research and development efforts to further validate, refine and expand our epigenetic M-Panel testing capabilities. In particular, we are working with leading researchers in smoking and alcohol consumption to enhance and further validate our technology. We expect our research and development will support and enhance the efficacy of our M-Panel testing technology. We are in the final stages of readying our first scaled research pilot that will run concurrent M-Panel testing and life insurance underwriting analysis on up to 10,000 unique insurance applicants. We will compare and analyze the standard underwriting information against a detailed epigenetic scan of methylation patterns on each insurance applicant.

One of the first analyses that we conduct will be to compare the standard overall underwriting conclusion for each applicant to our all-cause M-Panel Mortality Test. This analysis will determine the relationship between our all-cause M-Panel Mortality Test and traditional underwriting conclusions. We seek to discover the correlation between our all-cause M-Panel Mortality Test results and traditional underwriting conclusions and risk classifications. A strong correlation will indicate that the all-cause M-Panel Mortality Test can be used to capture some or all of the current underwriting process, and a non-correlation will indicate that the all-cause M-Panel Mortality Test captures a new underwriting factor to be considered. This is critical for understanding the value proposition of our all-cause M-Panel Mortality Test to life insurance underwriting.

We also expect to finalize our M-Panel Smoking and Alcohol Tests for commercialization with the pilot. The pilot will allow us to compare the standard smoking test laboratory results currently used by the life insurance industry with a "ground truth" smoking measure based on a panel of biomarkers. With this information, we seek to demonstrate the accuracy of the current practice of measuring smoking in life insurance against "gold standard" biomarkers and the results of our M-Panel Smoking Test. We plan to run a similar process with respect to testing alcohol consumption using "gold standard" measurements. We expect we will emerge from the pilot with a quantitative understanding of the accuracy of our M-Panel Smoking and Alcohol Tests that will be critical in understanding the value proposition and commercialization of these tests for the life insurance industry.

**The Beneficient Company Group, L.P. Strategic Transaction**

On January 12, 2018, we entered into a strategic transaction through a Master Exchange Agreement (as it may be amended from time to time, the "Master Agreement"), among GWG Holdings, GWG Life, The Beneficient Company Group, L.P., a Delaware limited partnership ("Beneficient"), MHT Financial SPV, L.L.C., a Delaware limited liability company ("MHT SPV"), and certain related trusts (the "Seller Trusts"). Information regarding Beneficient and the Exchange Transaction is set forth below and in Item 1A (Risk Factors) of this report under the caption "Risks Related to the Pending Exchange Transaction." We expect that this transaction will increase our common shareholder equity, diversify our balance sheet, income statement and cash flow sources while creating opportunities to leverage existing infrastructure and capabilities.

9

*Description of The Beneficient Company Group, L.P.*

Beneficient is a privately-held company organized as a Delaware master limited partnership, the general partner of which is Beneficient Management, a Delaware limited liability company. Subject to receipt of its regulatory trust charters from the State of Texas, Beneficient intends to register its common units with the SEC in the future and to apply for listing on a national stock exchange. If so registered and listed, Beneficient would be considered a publicly traded partnership for Internal Revenue Service purposes. There can be no assurance as to the timing or effectiveness, if any, of the proposed SEC registration and stock exchange listing of the common units.

Subject to receipt of its regulatory charters, Beneficient plans to provide to mid-to-high net worth individuals (i.e., individuals having a net worth of between $5 million and $30 million) trust services and related liquidity products and loans for the alternative assets and illiquid investment funds those individuals may own, as well as a variety of other financial services, including custody and clearing of alternative assets, fund and trust administration, and insurance services for covering risks attendant to owning or managing alternative assets.

In addition, Beneficient is developing a third business segment, referred to as financial technologies and online platforms, designed to offer clients online financial technologies and platforms for direct access to Beneficient's liquidity products and services as well as specialized reporting tools. To expand this segment, Beneficient has acquired assets of ACE Portal Inc. ("ACE"), which was previously financed in part by the New York Stock Exchange in order to develop and operate a centralized platform for accredited and qualified investors to access the private markets for private placements of equity, debt and fund interests marketed by SEC-registered broker-dealers. Beneficient's acquisition of the ACE closed in the first quarter of 2018.

*Description of the Overall Exchange Transaction*

The Seller Trusts are expected to own up to 82% of Beneficient's issued and outstanding common units in the limited partnership. Pursuant to the Master Agreement, we will acquire the Beneficient common units held by the Seller Trusts in exchange for consideration valued at up to $800 million, which will be comprised of a combination of our common stock and five-year L Bonds valued, collectively, at up to $650 million, and $150 million in cash. The exact number of outstanding common units of Beneficient that we will purchase from the Seller Trusts, and the exact number of shares of our common stock and L Bonds that we will issue to the Seller Trusts as consideration therefor, will be determined approximately five business days prior to the closing of the Exchange Transaction. The Master Agreement provides, however, that the aggregate value of the consideration (consisting of our common stock, L Bonds and cash) provided to the Seller Trusts will not be less than $550 million nor more than $800 million.

As part of the Exchange Transaction, we may elect, in our sole discretion, to issue and sell to MHT SPV a combination of additional shares of common stock (at a purchase price of $10.00 per share) and additional L Bonds for aggregate cash proceeds of $150 million. We would use the proceeds from the sale of these additional securities to facilitate our payment of the cash consideration to the Seller Trusts.

Also as part of the Exchange Transaction, GWG Life will make a commercial loan to Beneficient in a principal amount between $275 million and $400 million. The expected terms of the commercial loan are described below under "— Other Agreements — Commercial Loan Agreement."

Below is a diagram of the Exchange Transaction:



10

APP. 933

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 935 of 1031    PageID 1107

We have ascribed a minimum value of $10.00 per unit to the common units of Beneficient that we will acquire in the Exchange Transaction. If valuation opinions are secured from nationally recognized valuation firms stating that the common units of Beneficient will have, as of the closing date of the Exchange Transaction, a fair value of less than $9.00 per common unit, and such opinion is subsequently confirmed by a separate valuation opinion, Beneficient will cause its existing security holders to transfer additional common units to us at the closing as shall be necessary to provide an aggregate value to us equal to $10.00 per unit.

The Exchange Transaction is expected to close in the second quarter of 2018, subject to the satisfaction of various closing conditions set forth in the Master Agreement.

*Proposed Listing of Beneficient Common Units; Redemption*

In the Master Agreement, Beneficient has agreed to use its commercial best efforts to pursue and obtain a listing of its common units on a nationally recognized stock exchange (a "listing") on or prior to the 40-month anniversary of the closing of the Exchange Transaction. If Beneficient does not (i) file a registration statement with the SEC in connection with a listing within 24 months after the closing of the Exchange Transaction, or (ii) secure a listing on or prior to the 40-month anniversary of the closing of the Exchange Transaction, then the Master Agreement provides that we may, at our election, cause Beneficient to adopt a strategy to redeem all of the common units of Beneficient held by us. If we were to make such an election, Beneficient would be obligated to repurchase our common units at a redemption price equal to the greater of $11.00 per unit or the book value per unit as of the date of redemption.

In adopting its redemption strategy, Beneficient will be obligated to use no less than 75% of its distributable cash flow (calculated quarterly as cash flows derived from operations, plus cash inflows from financings, less mandatory tax distributions) to satisfy our redemption election and any redemption elections that may be made by the holders of other interests in Beneficient that have redemption rights. If we were to elect redemption, then Beneficient will be obligated under the Master Agreement to use a percentage of its distributable cash flow (as defined above), each quarter, equal to the percentage that the common units held by us on the date of our election bears to the total number of outstanding common units (on an undiluted basis) as of the date of our election, until such time as all of our common units shall have been redeemed.

*Other Agreements*

The Master Agreement contemplates a number of other agreements that will be executed and delivered between the date of the Master Agreement and closing, or at the closing, in furtherance of the Exchange Transaction. None of these other agreements have been fully negotiated, reduced to writing, executed and delivered. Generally, the Master Agreement requires the proposed parties to these other agreements to use some level of effort to arrive at terms reasonably acceptable to the parties, or to enter into these other agreements in customary but negotiated form or substance reasonably acceptable to the parties. In all cases, however, the Master Agreement itself provides some of the material terms and conditions that will be included in these other agreements. Descriptions under the captions below summarize certain of the material terms and conditions that the Master Agreement specifies for these other agreements.

*Commercial Loan Agreement*

As required by the Master Agreement, at the closing of the Exchange Transaction, GWG Life, as the lender, will enter into a commercial loan agreement (the "Commercial Loan Agreement") with Beneficient, as the borrower. The proceeds of the loan are intended to be used by Beneficient for working capital and to facilitate the delivery of trust products and services of Beneficient. The principal amount of the loan is expected to be $275 million, but may be increased by agreement of the parties up to an aggregate maximum amount of $400 million. Simple interest will accrue on the principal amount at the rate of 5% per annum, one-half of which will be due and payable in cash on a monthly basis, and one-half of which will accrue and become due on the maturity date. The loan will have a four-year term, and the maturity date will be the 48-month anniversary of the Commercial Loan Agreement. The outstanding principal amount of the commercial loan, together with interest thereon, may be prepaid in cash at any time or from time to time without penalty. The amounts owing in connection with the Commercial Loan Agreement will rank junior only to Beneficient's bank debt and the NPC-B Unit Accounts of Beneficient Company Holdings, L.P., the subsidiary limited partnership of Beneficient. We expect that, in addition to the above, the Commercial Loan Agreement will contain certain financial covenants and other terms and conditions that are customary for commercial agreements of this type.

11

APP. 934

*Registration Rights Agreements; Lock-Up Provisions*

In connection with the closing of the Exchange Transaction, and as contemplated in the Master Agreement, we will enter into two different registration rights agreements, one of which will grant resale registration rights to us with respect to the common units of Beneficient we will receive at the closing, and the other of which will involve our grant of resale registration rights to the Seller Trusts with respect to the shares of common stock and L Bonds we issue to the Seller Trusts at the closing. These registration rights agreements are intended to provide the parties with the legal right to resell the securities they receive in the Exchange Transaction in compliance with the Securities Act of 1933. Notwithstanding the registration rights to be granted to the Seller Trusts, the ability of the Seller Trusts to resell the shares of our common stock they receive in the Exchange Transaction will be limited by the contractual provisions of the Orderly Marketing Agreement discussed below.

MHT SPV has agreed that, until the earlier of (i) the listing of the common units of Beneficient on a nationally recognized stock exchange and (ii) 40 months from the date of closing, it will not directly or indirectly sell, transfer, distribute, pledge or otherwise dispose of any shares it receives in the Exchange Transaction without our prior written consent.

*Orderly Marketing Agreement*

The Master Agreement obligates us and the Seller Trusts to negotiate in good faith the terms of an agreement (the "Orderly Marketing Agreement") with one or more nationally recognized investment banks for the orderly marketing and resale of the shares of our common stock that we issue to the Seller Trusts under the Master Agreement. The purpose of the Orderly Marketing Agreement is to manage the timing and amount of our common shares that are publicly resold in the market since the number of shares of our common stock to be issued under the Master Agreement will substantially increase the total number of our issued and outstanding shares. However, the terms of that Orderly Marketing Agreement have not yet been determined. There is no assurance that the Orderly Marketing Agreement will accomplish its purpose of maintaining a stable market for our common stock.

*Shareholders' Agreement*

The Master Agreement contemplates and requires the delivery at closing of a shareholders' agreement (the "Shareholders' Agreement") among the Seller Trusts, MHT SPV and GWG. The purpose of the Shareholders' Agreement is to limit the voting power of the Seller Trusts and MHT SPV and the control they would otherwise be entitled to exercise over GWG. To that end, the Shareholders' Agreement will provide that all voting securities of GWG over which the Seller Trusts and MHT SPV (and their respective transferees) have voting control will be voted solely in proportion with the votes cast by all other holders of voting securities of GWG on any matter put before them. In addition, until the earlier of (i) one year from the closing of the Exchange Transaction and (ii) the termination of the Orderly Marketing Agreement, the Seller Trusts (including their assignees and transferees, and their respective affiliates) will be subject to certain standstill restrictions. These restrictions will prohibit the Seller Trusts from, among other things, acquiring any voting securities of GWG or any of its subsidiaries, seeking or proposing to influence or control our management, Board of Directors, or policies, and submitting a proposal for any merger, recapitalization, reorganization, business combination, or other extraordinary transaction involving GWG.

*No Control of the Business and Affairs of Beneficient*

Beneficient is a limited partnership organized in the State of Delaware and its business and affairs are managed by its general partner. Although we will become the owner of up to 82% of the issued and outstanding common units in Beneficient upon consummation of the Exchange Transaction, owners of common units of Beneficient have only limited voting rights relating to certain matters under applicable state law and Beneficient's partnership agreement Therefore, we will have limited or no ability to influence Beneficient's management's decisions regarding its business.

**Competitive and Regulatory Framework**

*Competition*

We encounter significant competition from numerous companies in the products and services we provide and seek to develop in the life insurance industry. Many of these competitors have greater financial and other resources than we do and may have significantly lower cost of funds than us because they have access to insured deposits or greater access

APP. 935

APP. 936

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 938 of 1031    PageID 1110

to the capital markets, for example. Moreover, some of these competitors have significant cash reserves and can better fund shortfalls in collections that might have a more pronounced impact on companies such as ours. They may also have greater market share. In the event that these or other competitors make a significant effort to compete against our businesses, we would experience significant challenges with our business model.

Competition can take many forms, including the pricing, technology, financing resources, transaction structuring, timeliness and customer service. Some competitors may outperform us in these areas. These factors could adversely affect our profitability by reducing our return on investment or increasing our risk.

As we enter new markets, we expect to experience significant competition from incumbent market participants. Our ability to compete in these markets will be dependent upon our ability to deliver value-added products and services to the customers we serve. Even still, our competitors in these markets may have greater financial, market share and other resources than we do. These factors could adversely affect our profitability by reducing our return on investment or increasing our risk as we enter these markets.

*Government Regulation*

Our business is highly regulated at the state level with respect to the life insurance industry, and at the federal level with respect to the issuance of our securities offerings. At the state level, states generally subject us to laws and regulations requiring us to obtain specific licenses or approvals to purchase life insurance policies in those states. State statutes typically provide state regulatory agencies with significant powers to interpret, administer and enforce the laws relating to the life insurance industry. Under this authority, state regulators have broad discretionary power and may impose new licensing and other requirements, and interpret or enforce existing regulatory requirements in new and different ways. Any of these new requirements, interpretations or enforcement directives could be materially adverse to our industry. Furthermore, because the areas of business in which we participate are relatively new, we believe it is likely that state regulation will increase and grow more complex in the foreseeable future. We cannot, however, predict what any new regulation would specifically involve or how it might affect our industry or our business.

The state regulatory landscape for the use of genetic and epigenetic testing in life insurance underwriting is such that genetic and epigenetic testing is generally permitted. A few states require informed consent for use of genetic testing in life insurance underwriting. Epigenetic testing is distinguishable from genetic testing and we believe epigenetic testing does not raise the ethical issue found with genetic testing of denying insurance coverage to applicants based on immutable inherited characteristics. While well-informed policymakers and regulators should have little reason to consider expanding current definitions of genetic testing to include epigenetic testing, or to increase restrictions on life insurance underwriting using epigenetic test results, we can provide no such assurances.

Although the federal securities laws and regulations do not directly affect life insurance, in some cases the purchase of a variable life insurance policy may constitute a transaction involving a "security" that is governed by federal securities laws. While we presently hold few variable life insurance policies, our holding of a significant amount of such policies in the future could cause our Company or one of our subsidiaries to be characterized as an "investment company" under the federal Investment Company Act of 1940. The application of that law to all or part of our businesses — whether due to our purchase of life insurance policies or to the expansion of the definition of "securities" under federal securities laws — could require us to comply with detailed and complex regulatory requirements, and cause us to fall out of compliance with certain covenants under our senior credit facility with LNV Corporation. Such an outcome could negatively affect our liquidity and increase our cost of capital and operational expenses, all of which would adversely affect our operating results. It is possible that such an outcome could even threaten the viability of our business and our ability to satisfy our obligations as they come due.

We hold licenses to purchase life insurance policies in 38 states and can also purchase in the eight unregulated states. At times, we may work with licensed entities to purchase a policy in a state where we are not licensed.

*Health Insurance Portability and Accountability Act (HIPAA)*

HIPAA requires that holders of medical records maintain such records and implement procedures designed to assure the privacy of patient records. In order to carry out our business, we receive medical records and obtain a release to share such records with a defined group of persons, take on the responsibility for preserving the privacy of that information, and use the information only for purposes related to the life insurance policies we own.

13

APP. 937

*The Genetic Information Nondiscrimination Act of 2008 (GINA)*

GINA is a federal law that protects people from genetic discrimination in health insurance and employment. GINA prohibits health insurers from: (i) requesting, requiring, or using genetic information to make decisions about eligibility for health insurance; or (ii) making decisions on the health insurance premium, contribution amounts, or coverage terms they offer to consumers. In addition, GINA makes it against the law for health insurers to consider family history or a genetic test result, a pre-existing condition, require a genetic test, or use any genetic information, to discriminate coverage, even if the health insurance company did not mean to collect such genetic information.

GINA does not apply to the life insurance, long-term care or annuity industries. The life insurance, long-term care or annuity industries operate on medical-evidenced underwriting principles in which specific medical conditions are taken into account when assessing and pricing risk. The regulation of genomic data is relatively new, and we believe it is likely that regulation will increase and grow more complex in the foreseeable future. We cannot, however, predict what any new law or regulation would specifically involve or how it might affect our industry, our business, or our future plans.

### The Tax Cuts and Jobs Act

On December 22, 2017, the U.S. federal government enacted the Tax Cuts and Jobs Act ("Tax Reform Bill"). The Tax Reform Bill changed existing United States tax law and includes provisions that will affect our results of operations, financial position and cash flows. The Tax Reform Bill reduced the U.S. corporate income tax rate and changed business-related exclusions, deductions and credits.

### Employees

We employ approximately 65 employees.

### Properties

Our principal executive offices are located at 220 South Sixth Street, Suite 1200, Minneapolis, Minnesota 55402. At that location, we lease 17,687 square feet of space for a lease term expiring in 2025. We believe that these facilities are adequate for our current needs and that suitable additional space will be available as needed.

### Company Website Access and SEC Filings

Our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and amendments to reports filed pursuant to Sections 13(a) and 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), are filed with the SEC. We are subject to the informational requirements of the Exchange Act and file or furnish reports, proxy statements and other information with the SEC.

Our general website address is www.gwgh.com. Our website has a wealth of information about our Company, its mission, and our specialty finance business. Our website also has tools that could be used by our potential clients, financial advisors and investors alike. We maintain the website www.gwglife.com for consumers and life insurance professionals seeking our life insurance secondary market products and services. We also maintain the website www.lifeegx.com for our insurtech initiative of bringing commercialized epigenetic testing to the life insurance industry.

14

**ITEM 1A.  RISK FACTORS.**

Our business involves a number of challenges and risks. In addition to the other information in this report, you should consider carefully the following risk factors in evaluating us and our business. The risks described below are not the only ones that we face. Additional risks not presently known to us or that we currently deem immaterial may also affect our business, financial condition, operating results, or prospects.

**Risks Related to Our Business and Industry**

***Material changes in the life insurance secondary market, a relatively new and evolving market, may adversely affect our operating results, business prospects and our ability to repay our debt obligations.***

Our primary business, the purchase and ownership of life insurance policies acquired in the secondary market, is a relatively new and evolving market. The success of our business and our ability to satisfy our debt obligations depends in large part on the continued development of the secondary market for life insurance, including the accuracy of actuarial forecasting and the solvency of life insurance companies to pay the face value of the life insurance benefits, both of which will critically impact our performance. We expect that the development of the secondary market will be impacted by a variety of factors such as the interpretation of existing laws and regulations (including laws relating to insurable interests), the passage of new legislation and regulations, mortality improvement rates, updated actuarial methodologies, and mortality tables. Importantly, all of the factors that we believe will most significantly affect the development of the life insurance secondary market are beyond our control. Any material and adverse development in the life insurance secondary market could adversely affect our operating results, our access to capital, our ability to repay our various debt and other obligations, and our business prospects and viability. Because of this, an investment in our securities involves greater risk as compared to investments offered by companies with more diversified business operations in more established markets.

***The valuation of our principal assets on our balance sheet requires us to make material assumptions that may ultimately prove to be incorrect. If our assumptions prove incorrect, we could suffer significant losses that materially and adversely affect our results of operations.***

Our principal asset is a portfolio of life insurance policies purchased in the secondary and tertiary markets, comprising approximately 79% of our total assets as of both December 31, 2017 and 2016. Those assets are considered "Level 3" fair value measurements under ASC 820, *Fair Value Measurements and Disclosures* ("ASC 820"), as there is currently no active market where we are able to observe quoted prices for identical assets. As a result, our determination of "fair value" for those assets on our balance sheet incorporates significant inputs that are not observable. Fair value is defined as an exit price representing the amount that would be received if assets were sold or that would be paid to transfer a liability in an orderly transaction between market participants at the measurement date. As such, fair value is a market-based measurement determined based on the assumptions market participants would use in pricing an asset or liability.

A Level 3 fair value measurement is inherently uncertain and could create additional volatility in our financial statements that is not necessarily related to the performance of our underlying assets. As of December 31, 2017 and 2016, we estimated the fair value discount rate for our portfolio to be 10.45% and 10.96%, respectively. Life expectancy estimates are also a significant component within our fair value measurement. If in the future we determine that a higher discount rate is required to ascribe fair value to a similarly situated portfolio of life insurance policies or that life expectancy estimates materially differ from actuarial estimates, we could experience significant losses materially affecting our results of operations. It is also possible that significant losses of this nature could at some point cause us to be out of compliance with borrowing covenants contained in our various borrowing agreements. This could in turn result in acceleration of our L Bonds, which we may not be able to repay. As a result, we may be forced to seek additional debt or equity financing to repay such debt amounts, and additional financing may not be available on terms acceptable to us, if at all.

If we are unable to repay our debt when it comes due, then our senior lender or the holders of our L Bonds, or both, would have the right to foreclose on our assets. For further disclosure relating to the risks associated with the valuation of our assets, see the risk factors below "*If actuarial assumptions we obtain from third-party providers . . . .*" and "*Inaccuracies in the life expectancy estimates we use for small face policies . . . .*"

15

*Actual results from our life insurance portfolio may not match our expected results, which could adversely affect our ability to service and grow our portfolio to achieve actuarial stability.*

Our business model relies on achieving actual results that are in line with the results we expect to attain from our investments in life insurance policy assets. In this regard, we believe that the larger the portfolio we own, the greater the likelihood that we will achieve our expected results. To our knowledge, rating agencies generally suggest that portfolios of life insurance policies contain enough policies on individual lives to achieve actuarial stability in receiving expected cash flows. For instance, in a life insurance securitization methodology published in 2016, A.M. Best concluded that at least 300 lives are necessary to achieve actuarial stability, while Standard & Poor's has indicated that stability is unlikely to be achieved with less than 1,000 lives. As of December 31, 2017, we owned $1.68 billion in face value of life insurance policies covering 804 lives.

Although we plan to expand the number of life insurance policies we own using proceeds raised from our securities offerings, we may change our strategy or be unable to do so if sufficient financing is unavailable or is available only on unfavorable or unacceptable terms. Furthermore, even if our portfolio reaches a size that is actuarially stable, we still may experience differences between the actuarial models we use and actual mortalities. Differences between our expectations and actuarial models, and actual mortality results, could have a materially adverse effect on our operating results and cash flow. In such a case, we may face liquidity problems, including difficulties servicing our remaining portfolio of policies and servicing our outstanding debt obligations. Continued or material failures to meet our expected results could decrease the attractiveness of our securities in the eyes of potential investors, thereby making it even more difficult to obtain capital needed to service our portfolio, grow the portfolio to obtain desired diversification, and service our existing debt.

*We critically rely on debt financing for our business. Any inability to borrow could adversely affect our business operations, our ability to satisfy our debt-payment obligations and, ultimately, our prospects and viability.*

To date, we have chosen to finance our business principally through the issuance of debt, including debt incurred by our subsidiary GWG DLP Funding IV, LLC ("DLP IV") under a senior secured term loan with LNV Corporation (see Note 6) (referred to as our "senior credit facility") and our L Bonds. Our senior credit facility with LNV Corporation is secured by all of the assets of DLP IV, has a maximum amount of $300 million, and the outstanding balance at December 31, 2017 was $222.5 million. Obligations under the senior credit facility with LNV Corporation have a maturity date of September 27, 2029. Our L Bonds have scheduled maturities as indicated below in the risk factor "*If a significant number of holders . . . .*" To date, our debt arrangements are the most important sources of financing on which our business has critically relied to grow and maintain our portfolio of life insurance policies as well as service existing debt.

Our business model relies on continued access to financing to enable us to purchase a large and diversified portfolio of life insurance policies and pay the attendant premiums and costs of maintaining the portfolio, all while satisfying our current interest and principal repayment obligations under our senior credit facility and other indebtedness. We expect that proceeds from our life insurance policies will first be used to satisfy our obligations, as determined by the agreement governing the senior credit facility. Accordingly, until we achieve sufficient cash flows derived from our portfolio of life insurance policies, we expect to rely on the proceeds from our ongoing to satisfy our ongoing financing and liquidity needs. Nevertheless, continued access to financing and liquidity under the senior credit facility (other than premium payments on existing policies pledged) or otherwise is not guaranteed. For example, general economic conditions could limit our access to financing, as could regulatory or legal pressures exerted on us, our financiers, or those involved in the procurement of financing such as brokers, dealers, and registered investment advisors. If we are unable to borrow under the senior credit facility with LNV Corporation or otherwise for any reason, or to renew or replace the senior credit facility when it comes due, our business would be adversely impacted and our ability to service and repay our debt obligations would be compromised, thereby negatively affecting our business prospects and perhaps our viability.

*Our investments in life insurance policies have inherent risks, including fraud and legal challenges to the validity of the policies, which we will be unable to eliminate and which may adversely affect our results of operations.*

When we purchase a life insurance policy, we face certain risks associated with insurance fraud and other legal challenges to the validity of the policy. For example, to the extent the insured is not aware of the existence of the policy, the insured does not exist, or the insurance company does not recognize the policy, the insurance company may

APP. 940

APP. 941

cancel or rescind the policy thereby causing the loss of an investment in that policy. In addition, if an insured's medical records have been altered in such a way as to shorten a life expectancy as reported, this may cause us to overpay for the related policy. Finally, we may experience legal challenges from insurance companies claiming that the insured failed to have an insurable interest at the time the policy was originally purchased or that the policy owner made fraudulent disclosures to the insurer at the time the policy was purchased (e.g., disclosures pertaining to the health status of the insured or the existence or sources of premium financing), or challenges from the beneficiaries of an insurance policy claiming that the sale of the policy to us was invalid.

To mitigate these risks, our origination practices and underwriting procedures include a current verification of coverage from the insurance company, a complete due-diligence investigation of the insured and accompanying medical records, a review of the life insurance policy application, and a requirement that the policy has been in force for at least two years. We also conduct a legal review of any premium financing associated with the policy to determine if an insurable interest existed at the time of its issuance. Nevertheless, these steps will not eliminate the risk of fraud or legal challenges to the life insurance policies we purchase. Furthermore, changes in laws or regulations or the interpretation of existing laws or regulations, may prove our due-diligence and risk-mitigation efforts inadequate. If a significant face amount of policies were invalidated for reasons of fraud or any other reason, our results of operations would be materially adversely affected.

***Our ownership of life insurance policies issued by insurers that are unable to pay claims presented to them could have a materially adverse effect on our results of operation, our financial condition, or even our overall prospects.***

We rely on the payment of policy claims by insurers as our most significant source of revenue collection. In essence, the life insurance assets we own represent the obligations of insurers to pay the benefit amount under the relevant policy upon the mortality of the insured. As a result, in our business, we face the "credit risk" that a particular insurer will be financially unable to pay claims when and as they become due. Depending on how many policies we own that are issued by insurers having financial difficulties at the time a claim is presented for payment, this risk could be significant enough to have a materially adverse effect on our results of operation, our financial condition, or even our overall prospects.

To mitigate this credit risk, we generally purchase policies issued only by insurers with an investment-grade credit rating from one or more of Standard & Poor's, Moody's, or A.M. Best Company. As of December 31, 2017, 96.7% of the face value benefits of our life insurance policies were issued by insurers having an investment-grade rating (BBB or better) by Standard & Poor's. We also review our exposure to credit risk associated with our portfolio of life insurance policies when estimating its fair value. In evaluating the policies' credit risk we consider items such as insurance company solvency, credit risk indicators, and general economic conditions. Notwithstanding our efforts to mitigate credit risk exposure and to reflect this risk in our portfolio valuation, we cannot predict with any certainty whether a particular insurer will be in a financial position to satisfy amounts that it owes under life insurance policies it has issued when a claim for payment is presented.

***Every acquisition of a life insurance policy necessarily requires us to materially rely on information provided or obtained by third parties. Any misinformation or negligence in the course of obtaining information could materially and adversely affect the value of the policies we own, our results of operation and the value of our securities.***

Our acquisition of each life insurance policy is negotiated based on variables and particular facts that are unique to the policy itself and the health of the insured. The facts we obtain about the policies and the insured at the time when the policy was applied for and obtained are based on the insured's factual representations to the insurance company, and the facts the insurance company independently obtains in the course of its own due-diligence examination, such as facts concerning the health of the insured and whether or not there is an insurable interest present when the policy was issued. Any misinformation or negligence in the course of obtaining information relating to a policy or insured could materially and adversely impact the value of the policies we own and could in turn adversely affect our results of operations and the value of our securities.

***Our business is subject to state regulation and changes in those laws and regulations, or changes in their interpretation, could negatively affect our results of operation, financial condition and our business prospects.***

When we purchase a life insurance policy, we are subject to state insurance regulations. Over the past years, we have seen a dramatic increase in the number of states that have adopted legislation and regulations from model laws

APP. 942

APP. 943

promulgated by either the National Association of Insurance Commissioners (NAIC) or by the National Conference of Insurance Legislators (NCOIL). These laws are essentially consumer protection statutes responding to abuses that arose early in the development of our industry, some of which may persist. Today, almost every state has adopted some version of either the NAIC or NCOIL model laws, which generally require the licensing of purchasers of and brokers for life insurance policies, the filing and approval of purchase agreements, and the disclosure of transaction fees. These laws also require various periodic reporting requirements and prohibit certain business practices deemed to be abusive. State statutes typically provide state regulatory agencies with significant powers to interpret, administer, and enforce the laws relating to the purchase of life insurance policies. Under statutory authority, state regulators have broad discretionary power and may impose new licensing requirements, interpret or enforce existing regulatory requirements in different ways, or issue new administrative rules, any of which could be generally adverse to our industry. Because the life insurance secondary market is relatively new and because of the history of certain abuses in the industry, we believe it is likely that state regulation will increase and grow more complex in the foreseeable future. We cannot, however, predict what any new regulation would specifically involve.

Any adverse change in laws or regulations, or their interpretation, in one or more states in which we operate could result in our curtailment or termination of operations in such jurisdictions, or cause us to modify our operations in a way that adversely affects our results of operation. Any such action could have a corresponding material and negative impact on our financial condition and could also negatively affect our general business prospects.

*If federal regulators or courts conclude that the purchase of life insurance in the secondary market constitutes, in all cases, a transaction in securities, we could be in violation of existing covenants under our senior credit facility with LNV Corporation, which could result in significantly diminished access to capital. We could also face increased operational expenses. The materialization of this risk could adversely affect our operating results and financial condition, our ability to repay our debt, and possibly threaten the viability of our business.*

On occasion, the SEC has attempted to regulate the purchase of non-variable universal life insurance policies as transactions in securities under federal securities laws. In July 2010, the SEC issued a Staff Report of its Life Settlement Task Force. In that report, the Staff recommended that certain types of purchased insurance policies be classified as securities. The SEC has not taken any position on the Staff Report, and there is no indication if the SEC will take any action to implement the recommendations of the Staff Report. In addition, there have been several federal court cases in which transactions involving the purchase and fractionalization of life insurance policies have been held to be transactions in securities under the federal Securities Act of 1933.

We believe that the matters discussed in the Staff Report and existing case law do not impact our current business model because our purchases of life insurance policies are distinguishable from those cases that have been held by courts, and advocated by the Staff Report, to be transactions in securities. For example, neither we nor any of our affiliates are involved in the fractionalization of life insurance policies, and we presently do not purchase significant amounts of variable life insurance policies. As a practical matter, if all or a majority of our life insurance policies were deemed to be "securities" under federal securities laws, either through an expansion of the definition of what constitutes a "security," the expansion of the types of transactions in life insurance policies that would constitute transactions in "securities," or the elimination or limitation of available exemptions and exceptions (whether by statutory change, regulatory change, or administrative or court interpretation), then we or one or more of our affiliated entities could become subject to the federal Investment Company Act of 1940. This outcome would likely have a material and negative effect on our Company by imposing additional regulations and rules to our governance structure, operations, and our capital structure. In particular, this outcome would likely cause us to be in violation of existing covenants under our senior credit facility with LNV Corporation requiring us not to operate or be characterized as an "investment company" under the Investment Company Act of 1940. This breach would likely adversely affect our liquidity and increase our cost of capital and operational expenses, all of which would adversely affect our operating results. Such an outcome could also threaten our ability to satisfy our obligations as they come due and the viability of our business.

*If actuarial assumptions we obtain from third-party providers and rely on to calculate our expected returns on our investments in life insurance policies change, our operating results and cash flow could be adversely affected, as well as the value of our collateral and our ability to service our debt obligations.*

The expected internal rate of return we calculate is based upon the probability of an insured's mortality over an actuarial life expectancy estimate. We presently obtain these estimates from third-party medical-actuarial

APP. 944

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 946 of 1031    PageID 1118

underwriting companies. In the case of small face policies (i.e., policies having $1.0 million or less in face value of policy benefits),

18

we may choose not to obtain any third party estimates, and instead use proprietary mortality tables or other techniques to develop our own life expectancy for an insured. In addition to actuarial life expectancies, we rely on a pricing and premium forecasting software model developed by a third-party actuarial firm for the valuation of policies we purchase, future mortality revenues, and the calculation of anticipated internal rates of return. These pricing models forecast the estimated future premiums due as well the future mortalities of insureds.

All actuarial life expectancies (and related forecasting software) are subject to interpretation and change based on evolving medical technology, actuarial data, and analytical techniques. Additionally, we are required under the borrowing agreement for our senior credit facility with LNV Corporation to update life expectancy estimates for life insurance policies with face amounts greater than $750,000 every two years. Our prior experience in updating life expectancies has generally resulted in longer life expectancies for most, but not all, of the insureds within our portfolio. Any increase in the actuarial life expectancy estimates of insureds within our portfolio could have a materially adverse effect on our operating results and cash flow, and our balance sheet. Adverse impacts on the value of our life insurance policy portfolio or our cash flow could in turn impair the value of the collateral we have pledged to our creditors and our ability to service our debt and obligations as they come due.

***We rely on estimated rates of mortality when valuing life insurance policies and forecasting the performance of our portfolio, and we also rely on other estimates derived from statistical methodologies for projecting our future cash flows. If any of our estimates prove to be incorrect, it could materially and adversely affect our financial condition and ability to satisfy our debt service and repayment obligations.***

If we project we will receive cash inflows from policies sooner than we actually do, we may not be able to make payment on our debt obligations in a timely manner, or at all. Moreover, a significant medical discovery or advance that results in mortality improvements among seniors, above historically predicted actuarial rates, could have a material adverse effect on the value of our life insurance investments.

For example, we use a modeling method for projecting cash flows known as the "probabilistic method." This is an actuarial method that uses the probability of an insured's mortality over time (a mortality curve) to project the flow of policy benefits to us and to project premiums that must be paid. Thus far, we have in fact experienced fewer cash flows from policy benefits than projected in the early stages of ownership of our current life insurance policy portfolio using this method. We had expected to receive approximately $339.7 million cumulative policy benefits as of December 31, 2017, and in fact received $191.2 million. This has resulted in greater than expected premium payments, increasing such expected payments from an expected $172.1 million to $203.5 million. Barring significant mortality improvements (i.e., medical discoveries or advancements relating to the medical conditions of insureds), however, the fact that actual results have differed from the expectations derived from the probabilistic method of projecting policy benefits should ordinarily result in greater policy benefits in later stages of ownership.

We update our projected future cash flows each month using the probabilistic method to reflect the actual experience within our life insurance policy portfolio to date. We use the current future cash flow projection to generate our expected internal rate of return on the life insurance policy portfolio we own. We would expect to change our method of calculating our future cash flows only if leading actuarial firms determined that such a methodology was no longer the most appropriate means of projecting cash flows from a life insurance policy portfolio. Any change to the pricing model, methodology, premium forecasting assumptions, cash flow projections, or the mortality assumptions accompanied therewith that increase the projected cost-of-insurance premiums or decrease the probability of mortality could have a material and adverse impact on our cash flows and financial condition. Ultimately, this could adversely affect our ability to meet our debt service and repayment obligations and our viability.

***Cost-of-insurance (premium) increases could materially and adversely affect our profitability and financial condition.***

We are subject to the risk of increased cost-of-insurance ("COI") charges (i.e., premium charges) for the universal life insurance policies we own in our portfolio. As of December 31, 2017, approximately 24% of the policies in our portfolio have premium levels that are guaranteed under the terms of the policy to keep the policy's death benefit in force even in a situation where the policy's cash account has been wholly depleted. On the remaining approximately 76% of our policies, we pay "non-guaranteed COI charges" and are subject to the risk that the insurer could increase the COI charges for the policy. In all cases, the amount of increase is subject to any limits that may be set forth in the insurance policy. Because very few of the policies we own have significant cash account value balances, any COI

19

APP. 946

increase will require us to use more cash to satisfy the minimum premium amount required to keep the related policy in force, and this could materially and adversely affect our profitability.

A COI increase can also be expected to impair the value of the affected policy because extra expense (i.e., additional premium amounts) will be required to keep the policy in force, and such extra expense will diminish the economic value, or return, of the policy realized upon the mortality of the insured. As a result, any widespread COI increases in policies we own would likely have a material and adverse effect on the value of our portfolio, which in turn would materially and adversely affect our profitability and financial condition.

***Our business and prospects may be adversely affected by changes, lack of growth, or increased competition in the life insurance secondary market.***

The growth of the life insurance policy secondary market and our expansion within the market may be negatively affected by a variety of factors beyond our control, including: our inability to locate sufficient numbers of life insurance policy sellers or agents to source those sellers; our inability to convince life insurance policy owners of the benefits of selling their policy; competition from other companies in the life insurance secondary market; negative publicity about the life insurance secondary market based on actual or perceived abuses; and the adoption of additional governmental regulation.

The relatively new and evolving nature of the market in which we operate makes the related risks difficult to identify and quantify. Nevertheless, contractions in the secondary market for life insurance policies, whether resulting from general economic conditions, regulatory or legal pressures, or otherwise (including regulatory pressures exerted on us or others involved in the secondary market for life insurance), could make participation in the market generally less desirable. This could in turn depress the prices at which life insurance policies on the secondary market are bought and sold and have a negative impact on the estimated value of the policies we own. If the value of the policies we own decreases, our results of operation and financial condition could suffer.

***Changes in general economic conditions could adversely impact our business.***

Changes in general economic conditions, including, for example, interest rates, investor sentiment, changes specifically affecting the insurance industry, competition, technological developments, political and diplomatic events, tax laws, and other factors not known to us today, can substantially and adversely affect our business and prospects. For example, changes in interest rates may increase our cost of capital and ability to raise capital and have a corresponding adverse impact on our operating results. While we may engage in certain hedging activities to mitigate the impact of rising interest rates, none of these risks are or will be within our control.

***We are dependent on our information systems for our financial reporting, policy-related databases, communications and other functions. If our information systems fail or experience major interruptions, including those relating to cybersecurity or arising from cyber-attacks, our business and our financial results could be adversely affected.***

We rely on our information systems to effectively manage our operational and financial functions. Our computer systems, Internet web sites, telecommunications, and data networks are also vulnerable to damage or interruption from power loss, natural disasters and attacks from viruses or hackers, including cybersecurity threats and incidents. Global cybersecurity threats and incidents can range from uncoordinated individual attempts to gain unauthorized access to information technology systems to targeted measures directed at us, our databases, policies, and/or the subjects of acquired policies. Although we utilize various procedures and controls to attempt to mitigate our exposure to these risks, attacks are evolving and unpredictable and we cannot guarantee that any risk prevention measures implemented will be successful. System failures or interruptions, including those relating to cybersecurity or arising from cyber-attacks, could breach the security of the personal information of the subjects of the acquired policies and could adversely affect our reputation, business, financial condition, and operating results.

20

APP. 947

**Risks Unique to Our Company**

*We have a relatively limited history of operations and our earnings and cash flows may be volatile, resulting in uncertainty about our ability to service and repay our debt when it comes due, redeem preferred stock when requested and uncertainty about our prospects generally.*

We are a company with a limited history, which makes it difficult to accurately forecast our earnings and cash flows. We incurred a net loss attributable to common shareholders of $33.3 million and $3.1 million in the years ended December 31, 2017 and 2016, respectively. Our lack of a significant history and the evolving nature of the market in which we operate make it likely that there are risks inherent to our business that are yet to be recognized by us or others, or not fully appreciated, and that could result in us earning less than we anticipate or even suffering further losses. As a result of the foregoing, an investment in our securities necessarily involves uncertainty about the stability of our earnings, cash flows and, ultimately, our ability to service and repay our debt and our prospects generally. In addition, any earnings volatility we experience may adversely affect the market price of our common stock.

*We may in the future rely, in part, on new and unproven technology as part of our underwriting processes. If the mortality predictions we obtain through use of this technology proves inaccurate, our results of operation and financial condition could be materially and adversely affected.*

We recently exercised our option to license, on an exclusive basis for use in the life insurance industry, new technology (which we call "M-Panel" technology) that we believe may be applied to assist us with the mortality predictions in the course of underwriting and valuing life insurance policies. This M-Panel technology, however, has not yet been commercially applied in the manner we envision, and it is possible that we will be unable to obtain more accurate mortality predictions through its use. It is also possible that the mortality predictions we obtain through use of the M-Panel technology will prove inaccurate, and perhaps materially so. In such a case, our failure to accurately forecast mortalities could have a material and adverse effect on our results of operation and financial condition, which could in turn materially and negatively affect the price of our common stock and our ability to satisfy our debts.

*Although we have entered into a written license agreement for the M-Panel technology, we may have difficulties preventing third parties from using that technology, and we may be required to obtain additional licenses from other parties prior to our commercial use of that technology. We may be forced to develop our own proprietary processes, the success of which would be uncertain. Difficulties we encounter in our efforts to use or develop, and protect, intellectual property may prove costly and affect our results of operation.*

The M-Panel technology rights we have licensed are the subject of a provisional patent application, but no patent protection will be afforded those rights unless and until a non-provisional patent application is filed with the U.S. Patent and Trademark Office, which filing is beyond our control. If the patent for the M-Panel technology ultimately were to issue, we would be legally entitled to prevent third parties from using any part of the technology that is both covered by the claims of the patent and licensed to us. If, on the other hand, no patent is ultimately granted with respect to the M-Panel technology (or the scope of claims is too narrow to afford us with meaningful protection), then we may be unable to prevent third parties from using the M-Panel technology. This outcome may severely diminish any competitive advantage we hope to obtain through our use of the M-Panel technology.

We are aware that other patent applications pending in the U.S. Patent and Trademark Office may have scopes of claims that overlap with the claims contained in the provisional patent application filed with respect to the M-Panel technology. If those other patents were to issue with scopes of claims that in fact overlap with the claims in any patent application for the M-Panel technology, we would likely be required to enter into a license agreement with other third parties before we could use processes that are covered by those overlapping claims. Nevertheless, we may be unable to procure such a license, and even if we are able to procure such a license it may prove too costly for us. Alternatively, we would ourselves be required to develop other processes that would not overlap with other patent claims. Our own development of these processes could be costly and time consuming and may ultimately prove unsuccessful.

In sum, any difficulties we encounter in our efforts to use (through a license), or develop, and ultimately protect, intellectual property from which we hope to gain a competitive advantage and enter into new insurance-related markets could prove costly and time-consuming enough to materially and adversely affect our results of operation.

21

APP. 948

*The M-Panel technology we license may subject us to claims of infringement or invalidity from third parties, and the magnitude of this risk to our business generally rises if and as we become more successful in employing and relying on the technology. Any such claims would be complex and costly, and adverse outcomes could undermine the competitive advantages we seek.*

Our reliance on M-Panel technology (or any other technology we own or license) will subject us to the risk that other parties may assert, rightly or wrongly, that our intellectual property rights are invalid or violate the rights of those parties, as well as the risk that our intellectual property rights will be infringed upon by third parties. Any outcome invalidating our intellectual property rights or otherwise diminishing the competitive advantages obtained, at least in part, through the use of those rights could have a material and adverse effect on our competitive position and our prospects.

*Commercializing the M-Panel or other technology may require significant expenses, may cause us to incur losses, and may ultimately prove ineffective or fail to create profitable business lines in the life insurance and related industries in which we operate.*

We intend to pursue new business models and business strategies in the insurance industry with M-Panel or similar technology. This M-Panel technology, however, has not yet been commercially applied in the manner we envision, and it is possible that we will incur losses as a result of these efforts. It is also possible that we will be unable to effectively commercialize M-Panel or similar technology, or unsuccessful in disrupting the life insurance industry. One or more competitors, however, may ultimately succeed in applying technology to the life insurance industry in a manner that provides them with a significant competitive advantage or that disrupts the marketplace. Any such outcome could have a material and adverse effect on our prospects, which could in turn materially and negatively affect the price of our common stock and our ability to satisfy our debts.

We are in the final stages of readying our first scaled research pilot that will run concurrent M-Panel testing and life insurance underwriting analysis on insurance applicants. On each insurance applicant, we will compare and analyze the standard underwriting protocol against a detailed epigenetic scan of methylation patterns. Although we expect we will emerge from the pilot with a quantitative understanding of the accuracy of our M-Panel Smoking Test and Alcohol Test that will be critical in commercializing our tests for the life insurance industry, we have not yet validated the claims that we believe to be true in a large-scale study. Further, although we invest in the insurtech business overall and in research and development specifically, these activities do not guarantee that we will develop or obtain intellectual property necessary for profitable operations. Costs involved in developing and protecting rights in intellectual property may have a negative impact on our business.

*Any failure to protect our intellectual property rights could impair our ability to protect our proprietary technology and our brand.*

If we fail to protect our intellectual property rights adequately, our competitors might gain access to our technology, and our business might be harmed. In addition, defending our intellectual property rights might entail significant expense. Any of our patents or other intellectual property rights may be challenged by others or invalidated through administrative process or litigation. Although we have U.S. patent applications pending, we may be unable to obtain patent protection for the technology covered in our patent applications. In addition, any patents issued in the future may not provide us with competitive advantages or may be successfully challenged by third parties. Furthermore, legal standards relating to the validity, enforceability and scope of protection of intellectual property rights are uncertain.

We might be required to spend significant resources to monitor and protect our intellectual property rights. We may initiate claims or litigation against third parties for infringement of our proprietary rights or to establish the validity of our proprietary rights. Any litigation, whether or not it is resolved in our favor, could result in significant expense to us and divert the efforts of our technical and management personnel.

*We may not be able to raise the capital that we are seeking from our securities offerings and may be unable to meet our overall business objective of growing a larger, actuarially diverse portfolio of life insurance.*

Our offer and sale of our Series 2 Redeemable Preferred Stock and our L Bond offerings are the principal means by which we intend to raise funds needed to meet our goal of growing a larger and more statistically diverse portfolio. While we plan to continue financing our business, if we are unable to continue to do so for any reason we may be unable to meet our goal. In addition, if actual cash flows from our portfolio of life insurance policies do not occur as

<div align="center">22</div>

APP. 949

our actuarial projections have forecasted, which has thus far been the case, we could be forced to sell our investments in life insurance policies in order to service or satisfy our debt-related obligations. If we are forced to sell some or all of our investments in life insurance policies, or our entire portfolio, we may be unable to sell them at prices we believe are optimal or that approximate the discount rate we have applied to value our portfolio, particularly if our sale of policies occurs at a time when we are (or are perceived to be) in distress. In any such event, our business and the value of our securities would likely be materially and adversely impacted.

***Inaccuracies in the life expectancy estimates we use for small face policies could have a material and adverse effect on our results of operation and financial condition.***

As of December 31, 2017, we owned 502 "small face" life insurance policies (i.e., policies having $1 million in face value of benefits or less) having $279.9 million in aggregate face value of benefits. We expect that the proportion of our total portfolio of life insurance policies consisting of small face policies will continue to increase in the future.

The underwriting processes we use to evaluate, price and purchase small face policies are different from, and may not be as reliable as, the processes we use for life insurance policies with larger face values of benefits. In particular, the processes we use to develop or obtain life expectancy estimates and the related mortality curves for small face policies are less extensive than traditional methods. These processes include obtaining either a single fully underwritten or simplified report as opposed to two fully underwritten reports. A simplified third-party underwriting report is based on a self-reported medical interview and may be supplemented with additional information obtained from a pharmacy benefit manager database which is provided to one or more medical-actuarial underwriting firms to obtain a simplified life expectancy report. Although we obtain professional actuarial guidance regarding these processes, our simplified underwriting methodology may not be as reliable as the processes we use for policies with larger (i.e., greater than $1 million) face value of benefits where two fully underwritten life expectancy reports are obtained.

As the face value attributable to our small face policies increases relative to the total face value of our portfolio, the accuracy with which we have estimated life expectancies for these policies will become increasingly material to our business. Any shortcomings in the processes we use to evaluate, price, purchase and value our small face policies, or significant inaccuracies in the life expectancy estimates relating to those policies, could have a material and adverse effect on our results of operation and financial condition. Any such outcomes could have a negative and possibly material effect on our ability to satisfy our debts.

***We depend upon cash distributions from our subsidiaries, and contractual restrictions on distributions to us or adverse events at one of our operating subsidiaries could materially and adversely affect our ability to pay our debts, redeem preferred stock when requested and continue operating our business.***

GWG Holdings, Inc. is a holding company. As a holding company, we conduct our operations through operating subsidiaries, and as such our most significant assets are cash and our ownership interests in our subsidiaries. Accordingly, our ability to meet our obligations, including our debt-related and dividend-payment obligations, materially depends upon the ability of our subsidiaries to distribute cash to us. In this regard, the ability of our subsidiaries to distribute cash to us is, and will continue to be, restricted by certain negative covenants in the agreement governing our senior credit facility. If any of these limitations were to materially impede the flow of cash to us, our ability to service and repay our debt, including obligations under the L Bonds, and make cash dividend payments to holders of our preferred stock offerings would be materially and adversely affected. In addition, any adverse corporate event at the subsidiary level, such as a declaration of bankruptcy, liquidation or reorganization or an event of default under our senior credit facility, could adversely affect the ability of our subsidiaries to distribute cash to us, and thereby materially and adversely affect our ability to service and repay our debt and make cash dividend payments, and negatively impact our ability to continue operations.

***The collateral granted as security for our obligations under the L Bonds may be insufficient to repay the indebtedness upon an event of default.***

GWG Holdings (the issuer of the L Bonds) and GWG Life (the guarantor of obligations under the L Bonds, and the wholly owned subsidiary of GWG Holdings) have each granted a security interest in substantially all of their respective assets to serve as collateral security for obligations under the L Bonds. Importantly, DLP IV owns substantially all of our life insurance policies and is the borrower under our senior credit facility with LNV Corporation. As the borrower

23

APP. 950

under that senior credit facility, all of its assets — including all of its life insurance policy assets — serve as collateral for our obligations under the facility.

The most significant assets of each of GWG Holdings and GWG Life are their cash and investments in their respective subsidiaries. At December 31, 2017, GWG Holdings' total assets were approximately $594.5 million, of which approximately $112.0 million was cash and approximately $480.7 million was its investment in subsidiaries. On that same date, GWG Life's total assets were approximately $480.7 million, of which approximately $1.5 million was cash and approximately $415.2 million was its investment in subsidiaries. Approximately $51.1 million in fair value of life insurance policies was directly owned by GWG Life at December 31, 2017.

Because of the fact that substantially all of our life insurance assets are held in our DLP IV subsidiary, and all of those assets serve as collateral security for our obligations under our senior credit facility, L Bond holders risk the possibility that the collateral security that has been granted for our obligations under the L Bonds may be insufficient to repay holders upon an event of default. Furthermore, while the indenture governing the L Bonds limits the amount of debt we and our subsidiaries can incur, the indenture permits us and our subsidiaries to incur additional secured debt (subject to the debt coverage ratio) that may be senior to the L Bonds.

***If a significant number of holders of our L Bonds demand repayment of those instruments upon maturity instead of renewing them, and at such time we do not have sufficient capital on hand to fund those repayments (and do not otherwise have access to sufficient capital), we may be forced to liquidate some of our life insurance policy assets, which could have a material and adverse impact on our results of operation and financial condition.***

As of December 31, 2017, we had approximately $461.4 million in principal amount of L Bonds outstanding. Since we first issued our L Bonds, we have experienced $394.9 million in maturities, of which $234.7 million has renewed for an additional term, as of December 31, 2017. This has provided us with an historical renewal rate of approximately 59.4% for investments in our L Bonds. Future contractual maturities of L Bonds as of December 31, 2017 are as follows:

| Years Ending December 31, | L Bonds |
|---|---|
| 2018 | $ 105,916,000 |
| 2019 | 151,689,000 |
| 2020 | 78,402,000 |
| 2021 | 30,759,000 |
| 2022 | 40,018,000 |
| Thereafter | 54,643,000 |
| | $ 461,427,000 |

If investors holding existing indebtedness which matures do not elect to renew their investments and we do not at such time have or have access to sufficient capital, then we may need to liquidate some of our investments in life insurance policies earlier than anticipated. In such an event, we may be unable to sell those policies at prices we believe are fair or otherwise appropriate and such sales could have a material and adverse impact on our results of operations and financial condition. See also "*We may not be able to raise the capital that we are seeking . . . .*"

***Subordination provisions contained in the indenture will restrict the ability of the trustee or the L Bond holders to enforce their rights against us under the indenture, including the right to payment on the L Bonds, if a default then exists under a senior credit facility.***

The L Bonds will be subordinate in right of payment to any claims of our senior lender under the senior credit facility. In this regard, subordination provisions limiting the right of L Bond holders to enforce their rights are contained in the indenture. These provisions include:

- a prohibition on challenging any enforcement action taken by a senior lender, or interfering with any legal action or suits undertaken by a senior lender, against us and our affiliates;

- a 180-day standstill period during which there may not be brought any action against us or our affiliates to enforce rights respecting collateral unless our senior credit facility with LNV Corporation has been repaid in full, which period may be extended if the senior lender takes action during such standstill period; and

APP. 951

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 953 of 1031    PageID 1125

24

APP. 952

- a prohibition on filing a bankruptcy or insolvency case against us or our affiliates for at least one year plus one day after any senior lender has been paid in full.

In the event of a default on a senior credit facility, the indenture prohibits us from making any payment, direct or indirect (whether for interest, principal, as a result of any redemption or repayment at maturity, on default, or otherwise), on the L Bonds and any other indebtedness unless and until: (i) the default respecting the senior credit facility has been cured or waived or has ceased to exist; or (ii) in the case of a non-payment default that permits a senior lender to declare as due and payable all amounts owing under a senior credit facility (but where that senior lender has not yet so declared amounts as being due and payable), the end of the period commencing on the date the trustee receives written notice of default from the senior lender and ending on the earliest of (1) our discharge of the default (or other cure), (2) the trustee's receipt of a valid waiver of default from the senior lender, or (3) a written notice from the senior lender terminating the payment prohibition.

During any payment prohibition period, neither the holders of the L Bonds nor the trustee will have the right, directly or indirectly, to sue to enforce the indenture or the L Bonds. Other provisions of the indenture do permit the trustee to take action to enforce the payment rights of L Bond holders after 179 days have passed since the trustee's receipt of notice of default from a senior lender, but in such case any funds paid as a result of any such suit or enforcement action shall be applied toward the senior credit facility until the facility is indefeasibly paid in full before being applied to the L Bonds.

These subordination provisions present the risk that, upon any default by us on obligations owed to our senior lender, the holders of the L Bonds will be unable to enforce their rights to payment.

If the 180-day standstill period noted above, or any other limitation on the rights of the trustee or L Bond holders to assert their rights to payment of principal or interest under the indenture, is ultimately determined to conflict with provisions of the Trust Indenture Act of 1939 (most notably sections 316(b) and 317(a) of that Act), then the trustee, as well as any holder who shall not have earlier consented to such subordination provisions, will (notwithstanding such provision contained in the indenture) be authorized to institute a lawsuit for the enforcement of any payment of principal or interest after their respective due dates.

***The debt coverage ratio, designed to provide some assurance that the value of our assets exceeds our obligations to the holders of L Bonds, values our life insurance policy assets in a manner that may not be representative of the amount we would actually receive upon a sale of those assets.***

Under the indenture governing the L Bonds, as amended on March 27, 2018 (see Item 9B), the maximum amount of L Bonds we may issue at any time is limited to an amount such that our debt coverage ratio does not exceed 90%. This limitation is designed to provide a basis to ensure that the net present value of policy benefits from our life insurance assets, along with the value of our other asset, are able to cover the obligations to our L Bond holders. Conceptually, and because we intend to hold our life insurance policies until we receive the related policy benefits, the debt coverage ratio is based on the future receipt of our portfolio's gross expected yield (i.e., our expected gains) as measured against the future interest cost of our total debt obligations to finance the portfolio to maturity. Expressed as a percentage, the debt coverage ratio is calculated as the ratio of (i) the total amounts outstanding on interest-bearing debt over (ii) the net present asset value of all life insurance assets we own, plus any cash and cash equivalents held in our accounts, policy benefit receivables and, without duplication, the value of all other assets of the Company as reflected on our most recently available balance sheet prepared in accordance with GAAP. For this purpose, the net present asset value of our life insurance assets is calculated as the present value of the life insurance portfolio's expected future cash flows discounted at the weighted-average interest rate of the interest-bearing indebtedness for the previous month.

Although the debt coverage ratio is designed to provide a basis to ensure that our assets will be sufficient to meet our obligations to the holders of L Bonds, the "net present value" of our life insurance assets used in the debt coverage ratio is not the same as the "fair value" of those assets on our balance sheet. Accordingly, the "net present value" and the "fair value" of our life insurance assets may be different — greater or less — and as a result the debt coverage ratio is not informative of the amount we and holders of L Bonds would actually receive if we were forced to sell or liquidate our life insurance assets. Furthermore, any sale or liquidation of all or a significant portion of our life insurance assets would incur significant transactional costs. As a result, our mere compliance with the debt coverage ratio in the indenture will not guarantee that the value of our life insurance assets, if sold or liquidated, would in all cases exceed the amount of our obligations to the holders of L Bonds.

<div align="center">25</div>

APP. 953

*Our controlling stockholders and principal executives are involved in litigation "clawback" claims, and it is possible that adverse outcomes from these claims could negatively affect us.*

Our Chief Executive Officer, Jon R. Sabes, and our corporate secretary and Chief Operating Officer — Life Epigenetics Inc., Steven F. Sabes, who together beneficially own or control approximately 72% of our common stock, are subject to clawback litigation relating to loan payments made to Opportunity Finance, LLC. The litigation stems from loan payments received by Opportunity Finance, LLC (owned by Jon R. Sabes and Steve F. Sabes) from a borrower who filed for bankruptcy in 2008. The bankruptcy trustee alleges that loan repayments to Opportunity Finance were voidable transfers under preference or other legal theories and seeks to recover amounts for other creditors of the bankruptcy estate Case No. 08-45257 (U.S. Bankruptcy Court District of Minnesota). Such loan repayments may ultimately be deemed to be voidable transfers under preference or other legal theories. To date, no claim has been made against us.

While we believe there are numerous meritorious defenses to the claims made by the bankruptcy trustee, and we are advised that the defendants in that action will vigorously defend against the trustee's claims, the defendants may not prevail. If the bankruptcy trustee were to succeed in any effort to sell or transfer the equity interests of Jon R. Sabes or Steven F. Sabes in our Company as a result of the litigation, there could be a change in control of our Company. Such an event could adversely affect holders of our L Bonds by reducing the number of shares of common stock of GWG Holdings that have been pledged as collateral security for our obligations under those securities. Finally, regardless of the outcome of this litigation, these matters may distract management and reduce the time and attention that they are able to devote to our business.

*The loss of the services of our current executives or other key employees, or the failure to attract additional key individuals, would materially adversely affect our business operations and prospects.*

Our financial success is significantly dependent upon the efforts of our current executive officers and other key employees. We have entered into employment agreements with Messrs. Jon R. Sabes and William B. Acheson. Nevertheless, there can be no assurance that these individuals will continue to provide services to us. A voluntary or involuntary termination of employment could have a materially adverse effect on our business operations if we were not able to attract qualified replacements in a timely manner. At present, we do not maintain key-man life insurance policies for any of these individuals. In addition, our success and viability is also dependent to a significant extent upon our ability to attract and retain qualified personnel in all areas of our business, especially our sales, policy acquisition, and financial management team. If we were to lose the members of these service teams, we would need to replace them with qualified individuals in a timely manner or our business operations and prospects could be adversely impacted.

*We have the discretion to purchase assets, including life insurance assets, through different subsidiaries, and to transfer assets among our subsidiaries. Any decision to purchase or hold title to assets in one subsidiary, as opposed to a different subsidiary, may affect the value of collateral security for our debts.*

We may at our discretion direct the purchase of policies by, and the sale of policies and other assets amongst, different subsidiaries of GWG Holdings. Purchases of assets in, or movements of assets amongst, different subsidiaries could affect the value of the collateral security for obligations under the L Bonds. For example, purchases through, or transfers of life insurance policies to, DLP IV would cause the policies acquired or transferred to become collateral for our senior credit facility with LNV Corporation, whereas purchases through, or transfers of life insurance policies to, GWG Life would cause the policies acquired by GWG Life to become collateral for the L Bonds. Accordingly, purchases of assets through, or transfers of assets to, different subsidiaries may affect the value of collateral security for different classes of holders of our debt.

*Being a public company is expensive and could adversely affect our ability to attract and retain qualified officers and directors.*

We have been a public reporting company since January 31, 2012. As such, we are subject to the reporting requirements of the Securities Exchange Act of 1934. These requirements generate significant accounting, legal, and financial compliance costs, and make some activities more difficult, time consuming or costly than they would otherwise be, and may place significant strain on our personnel and resources. These rules and regulations applicable to public companies, and the risks involved in serving as an officer or director of a public company, may also make it more difficult and expensive for us to obtain director and officer liability insurance, and to recruit and retain qualified officers and directors.

26

APP. 954

*We are an "emerging growth company" under federal securities laws, and the reduced reporting requirements applicable to emerging growth companies may make it more difficult to compare our financial statements to those of other issuers that are not emerging growth companies.*

We are an "emerging growth company," as defined in the Jumpstart Our Business Startups Act, or JOBS Act. For as long as we continue to be an emerging growth company, we may take advantage of exemptions from various reporting requirements normally applicable to public companies, including reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, exemptions from the requirements of holding a non-binding advisory vote on executive compensation, and delayed adoption of new or revised financial accounting standards. We could be an emerging growth company through 2019, although certain circumstances could cause us to lose that status earlier. It is possible that these reduced reporting requirements could make it more difficult for investors to compare our results of operations and financial condition with those of other companies that are not emerging growth companies.

*We have a merchant cash advance business that presents a number of unique risks.*

In February 2016, we acquired certain loan and advance assets from a lender to merchant cash advance funders. A merchant cash advance funder provides small businesses with one or more cash advances structured as the purchase of a portion of a small business's future receipts. This type of transaction is not characterized or structured as a loan. Small businesses typically seek these advances for working capital purposes to finance their purchase of inventory, equipment, or to otherwise address immediate business needs.

Our activities in this space are currently not significant to our Company as a whole and do we intend to originate any additional cash advances. Nevertheless, this business presents a number of unique risks, including the illiquidity of the cash advances; our critical reliance on certain individuals to operate the business; collection and cash advance repayment issues and challenges given that the merchant cash advances are typically unsecured; and sensitivity to general economic conditions.

**Risks Related to the Pending Exchange Transaction**

*We may not complete the Exchange Transaction within our anticipated timeframe or at all, or on the terms and conditions presently set forth in the Master Exchange Agreement.*

We have entered into a Master Exchange Agreement (the "Master Agreement") to govern our contemplated securities exchange transaction with The Beneficient Company Group, L.P. ("Beneficient") and certain other parties (the "Exchange Transaction"). Completion of the Exchange Transaction is subject to various conditions. These conditions include, among other things, the negotiation and entry into various ancillary agreements, obtaining requisite third party consents, receipt by our Board of Directors of a reasonably acceptable valuation opinion and a fairness opinion, and the expiration or termination of the applicable waiting period under the Hart-Scott-Rodino Antitrust Improvement Acts of 1976. Although we anticipate consummating the Exchange Transaction during the second quarter of 2018, there is no guarantee that it will be completed on this timeframe or at all. If the Exchange Transaction is not completed for any reason, we will not realize the anticipated benefits of the Exchange Transaction described elsewhere in this report. Further, the price of our common stock may decline to the extent that the current market price reflects an assumption that the Exchange Transaction will be completed. In addition, significant costs related to the Exchange Transaction, such as legal, accounting, financial valuation and filing fees, must be paid and expended even if the Exchange Transaction is not completed. Many of these costs, which we expect to capitalize upon consummation of the Exchange Transaction, must be expensed by us if the Exchange Transaction is not completed. Such expenses will have a negative impact on our consolidated financial results, which may further depress the market price of our common stock.

*Beneficient may be unable to operate its business successfully, which would negatively impact its ability to generate distributable cash flow and increase the value of its common units.*

Beneficient plans to provide to mid-to-high net worth individuals (i.e., individuals having a net worth of between $5 million and $30 million) with trust services and related liquidity products and loans (collectively, "trust services and liquidity products") for the alternative assets and illiquid investment funds those individuals may own, and a variety of other financial services, including custody and clearing of alternative assets, fund and trust administration, retirement funds and insurance services for covering risks attendant to owning or managing alternative assets. The

27                                                                          APP. 955

success of the Exchange Transaction from our perspective will depend, in part, on Beneficient's ability to operate its business successfully, generate distributable cash flow and increase the value of its common units. If Beneficient is unable to do so, such inability will negatively impact the value of our investment in Beneficient.

***Beneficient's operations will impact our financial performance.***

We expect to account for our acquisition of common units of Beneficient using the equity method of accounting. As a result, following the closing of the Exchange Transaction, we will recognize a share of the profits and losses of Beneficient in the periods when such profits and losses are earned or incurred by Beneficient. Because common units of Beneficient will represent a significant percent of our assets, the impact on our financial statements of Beneficient's financial performance may be material.

***Beneficient may be unable to obtain a listing of its common units on a nationally recognized stock exchange, which would hinder Beneficient's ability to successfully pursue its current business plans.***

Beneficient is a privately-held company organized as a Delaware master limited partnership. Subject to receipt of regulatory trust charters from the State of Texas, which is not a certainty, Beneficient intends to register its common units with the Securities and Exchange Commission and to apply for listing on a national stock exchange (a "listing"), after which it would be considered a publicly traded partnership for IRS purposes. There can be no assurance as to the timing or effectiveness, if any, of the proposed listing. Because Beneficient's current business plans are based in part on obtaining a listing, failure to do so may materially and adversely impact its financial performance and prospects, which would likely decrease the value of Beneficient's common units. As a potential significant holder of Beneficient common units, such a decrease would have a corresponding negative impact on the value of our assets and the price of our common stock.

Under the Master Agreement, Beneficient has agreed to use its commercial best efforts to pursue and obtain a listing following the closing of the Exchange Transaction. If Beneficient fails to file a registration statement with the SEC in connection with a listing within 24 months after such closing, or secure a listing on or prior to the 40-month anniversary of such closing, then the Master Agreement provides that we may, at our election, cause Beneficient to adopt a strategy to redeem all of the common units of Beneficient then held by us at a redemption price equal to the greater of $11.00 per unit or the book value per unit as of the redemption date. Under this strategy, Beneficient would be required to use a portion of its distributable cash flow to satisfy our redemption election (together with all other redemption elections that may be made by the holders of other interests in Beneficient or interests convertible into interests of Beneficient). However, there is no assurance that Beneficient's distributable cash flow will be sufficient to affect a redemption within a particular period of time or at all. If Beneficient is ultimately unable to satisfy its redemption obligation, we may not be able to recoup our investment in Beneficient common units.

***We will have limited or no ability to influence Beneficient's management's decisions regarding its business.***

Although we will own a significant percentage of Beneficient's outstanding common units upon consummation of the Exchange Transaction, Beneficient's general partner is authorized to perform all acts that it determines to be necessary or appropriate to carry out Beneficient's purposes and to conduct its business. As a result, we will have only limited voting rights relating to certain matters and, as is contemplated by the terms of Beneficient's limited partnership agreement (which we will be required to become a party to upon consummation of the Exchange Transaction), any person or group that acquires beneficial ownership of 20% or more of Beneficient's common limited partnership units (including GWG) will lose voting rights associated with all of its common units and such common units may not be voted on any matter. Further, any person or group (other than Beneficient's general partner and its affiliates, or a direct or subsequently approved transferee of the general partner or its affiliates or such person or group has the prior approval of the board of directors of the general partner of Beneficient) who acquires, in the aggregate, beneficial ownership of 20% or more of Beneficient's common units (including GWG), will lose voting rights associated with all of its common units and such common units may not be voted on any matter and will not be considered to be outstanding when sending notices of a meeting of limited partners, calculating required votes, determining the presence of a quorum or for other similar purposes. In addition, prior to a listing, if any, of Beneficient's common units on a national stock exchange or, in lieu thereof, quotation of the common units in an automated quotation system, the executive committee of the board of directors of the general partner of Beneficient will be entitled to cast all of the votes that the limited partners would otherwise be entitled to cast, and no limited partner, in its capacity as such, will be permitted

28

Case 3:22-cv-00410-B   Document 32-1   Filed 04/19/22   Page 958 of 1031   PageID 1130

to vote in respect of its common units. As a result, we will have limited or no ability to influence Beneficient's management's decisions regarding its business.

***Beneficient's partnership agreement eliminates fiduciary duties that might otherwise be owed to us under Delaware law.***

Beneficient's business and affairs are managed by Beneficient Management, LLC, its general partner ("Beneficient Management"). Beneficient's partnership agreement eliminates the fiduciary duties that might otherwise be owed by the Beneficient Management under Delaware law and replaces them with the duties expressly set forth in such agreement. Beneficient's partnership agreement provides that, when the general partner is permitted or required to make a decision in its "discretion" or pursuant to a provision not subject to an express standard of "good faith," in making such decision, the general partner has no duty to give any consideration to any interest of or factors affecting Beneficient or any other person. If a decision under Beneficient's partnership agreement is subject to an express standard of "good faith," such decision will not constitute a breach of the agreement if the decision is approved by (i) a majority of the members of the conflicts committee of the board of directors of the general partner of Beneficient, (ii) holders of a majority of the voting power of the Beneficient's common units entitled to vote (excluding voting common units owned by the general partner and its affiliates), or (iii) the general partner acting without a subjective belief that such decision was adverse to the interests of Beneficient. Potential conflicts of interest may arise among the general partner and its affiliates, on the one hand, and Beneficient, on the other hand, and the general partner may be able to favor its own interest to the detriment of Beneficient and the holders of the common units.

***Our percentage ownership in Beneficient may be diluted.***

Upon consummation of the Exchange Transaction, we will become the owner of up to 82% of the issued and outstanding common units in Beneficient. Our percentage ownership does not take into account (i) approximately 125,657,883 limited partner interests that may be issued upon the conversion of outstanding securities issued by Beneficient or its affiliates, or (ii) additional limited partner interests that may be issued after the closing of the Exchange Transaction. Importantly, the general partner of Beneficient has discretion to cause Beneficient to issue additional limited partner interests from time to time, and Beneficient's partnership agreement contains no meaningful restrictions on this authority. Moreover, the Beneficient organizational structure permits the future issuance of additional securities that can, upon certain circumstances or at the discretion of their holders, be converted into additional limited partner interests in Beneficient. As a result, our percentage ownership in Beneficient may be diluted in the future.

***The resale of our common stock issued in the Exchange Transaction could put downward pressure on the market price of our common stock and result in a destabilized trading market for our common stock.***

We may issue up to 40 million shares of our common stock upon closing of the Exchange Transaction, which would represent approximately 688% of the 5,813,555 shares of our common stock outstanding as of March 29, 2018. Upon issuance, the shares of common stock we issue in the Exchange Transaction will be subject to resale restrictions applicable to "restricted securities" under applicable federal securities. The Master Agreement and related ancillary agreements require that we register the resale of the shares issued to the Seller Trusts (up to 29.1 million shares) to the extent permitted by applicable SEC rules and regulations. The shares of our common stock that we may issue in the Exchange Transaction to MHT SPV are not contemplated to be included among the securities to be registered for resale, and such shares will subject to a lock-up provision that will prohibit MHT SPV from reselling them until 40 months following the closing of the Exchange Transaction or, if earlier, the listing of the common units of Beneficient on a nationally recognized stock exchange. Upon the effectiveness of such registration, or the lapse of applicable resale restrictions under applicable securities laws or applicable lock-up restrictions, the shares of our common stock issued in the Exchange Transaction will be available for resale in the public equity markets. We cannot predict the effect, if any, that future sales of these shares or the availability of these shares for future sale will have on the market price of our common stock.

The Master Agreement obligates us and the Seller Trusts to negotiate in good faith the terms of an Orderly Marketing Agreement with one or more nationally recognized investment banks, and enter into that agreement at the closing, for the orderly marketing and resale of the shares of our common stock that we issue to the Seller Trusts in the Exchange Transaction. The purpose of this Orderly Marketing Agreement is to manage the timing and amount of our common shares that are publicly resold in the market because the number of shares of our common stock to be issued in the Exchange Transaction will substantially increase the total number of our issued and outstanding shares. However,

<div align="center">29</div>

APP. 957

the terms of that Orderly Marketing Agreement have not yet been determined. There is no assurance that the Orderly Marketing Agreement will accomplish its purpose of maintaining a stable market for our common stock.

***Upon consummation of the Exchange Transaction, the Seller Trusts and MHT SPV, collectively, will own a substantial majority of our outstanding common stock.***

At the closing of the Exchange Transaction, we may issue up to 29.1 million shares of our common stock to the Seller Trusts and up to 12.5 million additional shares of our common stock to MHT SPV. Upon issuance, such shares will represent a substantial majority of our outstanding common stock. The Master Agreement contemplates and requires the delivery at closing of a shareholders' agreement (the "Shareholders' Agreement") among the Seller Trusts, MHT SPV and GWG Holdings. The purpose of the Shareholders' Agreement is to limit the voting power of the Seller Trusts and MHT SPV and the control they would otherwise be entitled to exercise over our Company. To that end, the Shareholders' Agreement will provide that all voting securities of GWG Holdings over which the Seller Trusts and MHT SPV (and their respective transferees) have voting control will be voted solely in proportion with the votes cast by all other holders of voting securities of GWG on any matter put before them. In addition, until the earlier of (i) one year from the closing of the Exchange Transaction and (ii) the termination of the Orderly Marketing Agreement, the Seller Trusts (including their assignees and transferees, and their respective affiliates) will be subject to certain standstill restrictions that will prohibit the Seller Trusts from, among other things, acquiring any of our voting securities, seeking or proposing to influence or control our management, Board of Directors, or policies, and submitting a proposal for any merger, recapitalization, reorganization, business combination, or other extraordinary transaction involving our Company. Following expiration of the standstill period, however, the Seller Trusts, to the extent they continue to hold shares of our common stock, may engage in such activities.

### ITEM 1B. UNRESOLVED STAFF COMMENTS.

Not applicable.

### ITEM 2. PROPERTIES.

Our principal executive offices are located at 220 South Sixth Street, Suite 1200, Minneapolis, Minnesota 55402. At that location, we lease 17,687 square feet of space for a lease term expiring in 2025. We believe that these facilities are adequate for our current needs and that suitable additional space will be available as needed.

### ITEM 3. LEGAL PROCEEDINGS.

None.

### ITEM 4. MINE SAFETY DISCLOSURES.

Not applicable.

30

APP. 958

PART II

### ITEM 5. MARKET FOR THE REGISTRANT'S COMMON EQUITY, RELATED SHAREHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES.

Our common stock is listed on The NASDAQ Capital Market under the ticker symbol "GWGH."

The following table shows the high and low sales for our common stock for the periods indicated, as reported by NASDAQ:

| Three Months Ended | High | | Low | |
|---|---|---|---|---|
| March 31, 2016 | $ | 7.19 | $ | 4.21 |
| June 30, 2016 | $ | 8.75 | $ | 5.96 |
| September 30, 2016 | $ | 11.56 | $ | 6.22 |
| December 31, 2016 | $ | 9.65 | $ | 7.32 |
| March 31, 2017 | $ | 11.24 | $ | 10.80 |
| June 30, 2017 | $ | 10.58 | $ | 10.45 |
| September 30, 2017 | $ | 10.20 | $ | 9.90 |
| December 31, 2017 | $ | 10.42 | $ | 8.24 |

As of March 29, 2018, there were 90 record holders of our common stock, one of which was Cede & Co., a nominee for Depository Trust Company, or DTC. Shares of common stock that are held by financial institutions as nominees for beneficial owners are deposited into participant accounts at DTC, and are considered to be held of record by Cede & Co. as one stockholder. As of March 29, 2018, we had -two beneficial holders of our common stock.

We have not historically issued any common stock dividends and do not expect to do so in the foreseeable future.

### ITEM 6. SELECTED FINANCIAL DATA.

Not applicable.

### ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.

You should read the following discussion in conjunction with the consolidated financial statements and accompanying notes and the information contained in other sections of this report. This discussion and analysis is based on the beliefs of our management, as well as assumptions made by, and information currently available to, our management. Subject to completion of the pending Exchange Transaction contemplated by the Master Exchange Agreement with Beneficient, among others, we intend to account for our acquisition of common units of Beneficient under the equity method of accounting. However, this discussion and analysis does not take into account the potential impact that such pending Exchange Transaction may have on our future financial condition and the results of our future obligations.

#### *Risk Relating to Forward-Looking Statements*

This report contains forward-looking statements that reflect our current expectations and projections about future events. Actual results could differ materially from those described in these forward-looking statements.

The words "believe," "could," "possibly," "probably," "anticipate," "estimate," "project," "expect," "may," "will," "should," "seek," "intend," "plan," "expect," or "consider" and similar expressions are intended to identify forward-looking statements but are not the exclusive means of identifying such statements. Forward-looking statements are subject to risks and uncertainties, which could cause actual results to differ materially from such statements.

Such risks and uncertainties include, but are not limited to:

- changes in the secondary market for life insurance;

- changes resulting from the evolution of our business model and strategy with respect to the life insurance industry;

APP. 959

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 961 of 1031    PageID 1133

- our limited operating history;

---

31

APP. 960

- the valuation of assets reflected on our financial statements;

- the reliability of assumptions underlying our actuarial models, including our life expectancy estimates;

- our reliance on debt financing and continued access to the capital markets;

- our history of operating losses;

- risks relating to the validity and enforceability of the life insurance policies we purchase;

- risks relating to our ability to license and effectively apply technologies to improve and expand the scope of our business;

- our reliance on information provided and obtained by third parties;

- federal, state and FINRA regulatory matters;

- competition in the secondary market of life insurance;

- the relative illiquidity of life insurance policies;

- our ability to satisfy our debt obligations if we were to sell our entire portfolio of life insurance policies;

- life insurance company credit exposure;

- cost-of-insurance (premium) increases on our life insurance policies;

- general economic outlook, including prevailing interest rates;

- performance of our investments in life insurance policies;

- financing requirements;

- risks associated with the merchant cash advance business;

- risks associated with our attempts to commercialize our M-Panel technology;

- risks associated with our ability to protect our intellectual property rights;

- litigation risks;

- restrictive covenants contained in borrowing agreements; and

- our ability to make cash distributions in satisfaction of dividend obligations and redemption requests.

We caution you that the foregoing list of factors is not exhaustive. Forward-looking statements are only estimates and predictions, or statements of current intent. Actual results, outcomes or actions that we ultimately undertake, could differ materially from those anticipated in the forward-looking statements due to risks, uncertainties or actual events differing from the assumptions underlying these statements.

### JOBS Act

On April 5, 2012, the Jumpstart Our Business Startups Act of 2012, or JOBS Act, was enacted. Section 107 of the JOBS Act provides that an "emerging growth company" can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act of 1933 for complying with new or revised accounting standards. This means that an "emerging growth company" can make an election to delay the adoption of certain accounting standards until those standards would apply to private companies. We are an emerging growth company and have elected to delay our adoption of new or revised accounting standards and, as a result, we may not comply with new or revised accounting standards at the same time as other public reporting companies that are not "emerging growth companies." This exemption will apply for a period of five years following our first sale of common equity securities under an effective registration statement (which will occur in September 2019) or until we no longer qualify as an "emerging growth company" as defined under the JOBS Act, whichever is earlier.

32

APP. 961

**Overview**

We are a financial services company committed to disrupting and transforming the life insurance industry and related industries. We built our business by creating opportunities for consumers to obtain significantly more value for their life insurance policies in a secondary market as compared to the traditional options offered by the insurance industry. We are enhancing and extending these activities through innovation in our products and services, business processes, financing strategies, and advanced epigenetic technologies. At the same time, we are creating opportunities for investors to receive income and capital appreciation from our investment activities in the life insurance and related industries.

**Critical Accounting Policies**

*Critical Accounting Estimates*

The preparation of our consolidated financial statements in accordance with the GAAP requires us to make judgments, estimates, and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. We base our judgments, estimates, and assumptions on historical experience and on various other factors believed to be reasonable under the circumstances. Actual results could differ materially from these estimates. We evaluate our judgments, estimates, and assumptions on a regular basis and make changes accordingly. We believe that the judgments, estimates, and assumptions involved in valuing our investments in life insurance policies and evaluating deferred taxes have the greatest potential impact on our consolidated financial statements and accordingly believe these to be our critical accounting estimates. Below we discuss the critical accounting policies associated with these estimates as well as certain other critical accounting policies.

*Ownership of Life Insurance Policies — Fair Value Option*

We account for the purchase of life insurance policies in accordance with Accounting Standards Codification 325-30, *Investments in Insurance Contracts*, which requires us to use either the investment method or the fair value method. We have elected to account for all of our life insurance policies using the fair value method.

The fair value of our life insurance policies is determined as the net present value of the life insurance portfolio's future expected cash flows (policy benefits received and required premium payments) that incorporates current life expectancy estimates and discount rate assumptions.

We initially record our purchase of life insurance policies at the transaction price, which is the amount paid for the policy, inclusive of all external fees and costs associated with the acquisition. At each subsequent reporting period, we re-measure the investment at fair value in its entirety and recognize the change in fair value as unrealized gain (revenue) in the current period, net of premiums paid. Changes in the fair value of our portfolio are based on periodic evaluations and are recorded in our consolidated statements of operations as changes in fair value of life insurance policies.

*Fair Value Components — Medical Underwriting*

Unobservable inputs, as discussed below, are a critical component of our estimate for the fair value of our investments in life insurance policies. We currently use a probabilistic method of estimating and valuing the projected cash flows of our portfolio, which we believe to be the preferred and most prevalent valuation method in the industry. In this regard, the most significant assumptions we make are the life expectancy estimates of the insureds and the discount rate applied to the expected future cash flows to be derived from our portfolio.

The 2015 Valuation Basic Table ("2015 VBT") finalized by the Society of Actuaries is based on a much larger dataset of insured lives, face amount of policies and more current information compared to the dataset underlying the 2008 Valuation Basic Table. The 2015 VBT dataset includes 266 million policies compared to the 2008 VBT dataset of 75 million. The experience data in the 2015 VBT dataset includes 2.55 million claims on policies from 51 insurance carriers. Life expectancies implied by the 2015 VBT are generally longer for male and female nonsmokers between the ages of 65 and 80, while smokers and insureds of both genders over the age of 85 have significantly lower life expectancies. We adopted the 2015 VBT in our valuation process in June 2016.

33

APP. 962

For life insurance policies with face amounts greater than $1 million and that are not pledged under any senior credit facility (approximately 11% of our portfolio by face amount of policy benefits) we attempt to update the independent life expectancy estimates on a continuous rotating three year cycle. For life insurance policies with face amounts greater than $750,000 that are pledged under the senior credit facility with LNV Corporation (approximately 82.6% of our portfolio by face amount of policy benefits) we are presently required to update the independent life expectancy estimates every two years beginning from the date of the amended facility.

We conduct medical underwriting on the life insurance policies we own with life expectancy reports produced by independent third-party medical-actuarial underwriting firms. Each life expectancy report summarizes the underlying insured person's medical history based on the underwriter's review of recent and historical medical records. We obtain two such life expectancy reports for almost all policies, except for small face value insurance policies (i.e., a policy with $1 million in face value benefits or less) for which we have obtained at least one fully underwritten or simplified third-party report. A simplified third-party underwriting report is based on a medical interview, which may be supplemented with additional information obtained from a pharmacy benefit manager database. For valuation purposes, we use the life expectancy estimate, using the average in the case of multiple reports, expressed as the number of months at which the individual will have a 50% probability of mortality.

Our prior experience in updating independent life expectancy estimates has generally resulted in shorter life expectancies of the updated insureds within our portfolio, but often not as short as we had projected. As our life insurance portfolio continues to grow, we may experience additional and material adjustments to the fair value of our portfolio due to updating independent life expectancy estimates. For more information about life expectancy estimates and their impact upon our business and financial statements, please see Risk Factors ("*If actuarial assumptions we obtain from third-party providers . . . .*"), and Note 4 to our consolidated financial statements.

During 2017 we received notice of, or support for, COI rate changes on 8 policies with combined face value of $23.5 million in our portfolio. These increased charges resulted in a $1.9 million reduction in the fair value of our portfolio.

We are aware of additional pending COI increases affecting three policies in our portfolio for which we are in receipt of notice and expect to quantify and recognize in the following months. We have requested additional information and policy illustrations reflecting the increased rates from the insurers which will enable us to revise our projections and valuations on the affected policies.

### *Fair Value Components — Required Premium Payments*

We must pay the premiums on the life insurance policies within our portfolio in order to collect the policy benefit. The same probabilistic model and methodologies used to generate expected cash inflows from the life insurance policy benefits over the expected life of the insured are used to estimate cash outflows due to required premium payments. Premiums paid are offset against revenue in the applicable reporting period.

### *Fair Value Components — Discount Rate*

A discount rate is used to calculate the net present value of the expected cash flows. The discount rate used to calculate fair value of our portfolio incorporates the guidance provided by ASC 820, *Fair Value Measurements and Disclosures*.

The table below provides the discount rate used to estimate the fair value of our portfolio of life insurance policies for the period ending:

| December 31, 2017 | December 31, 2016 |
|---|---|
| 10.45% | 10.96% |

The change in the discount rate incorporates current information about discount rates applied by other reporting companies owning portfolios of life insurance policies, discount rates observed by us in the life insurance secondary market, market interest rates, credit exposure to the issuing insurance companies, and our estimate of the operational risk premium a purchaser would require to receive the future cash flows derived from our portfolio of life insurance policies. Management has discretion regarding the combination of these and other factors when determining the

34

APP. 963

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 965 of 1031    PageID 1137

discount rate. The discount rate we choose assumes an orderly and arms-length transaction (i.e., a non-distressed transaction in which neither seller nor buyer is compelled to engage in the transaction), which is consistent with related GAAP guidance. The carrying value of policies acquired during each quarterly reporting period are adjusted to their current fair value using the fair value discount rate applied to the entire portfolio as of that reporting date.

We engaged Model Actuarial Pricing Systems, LP ("MAPS"), owner of the actuarial portfolio pricing software we use, to prepare a calculation of our life insurance portfolio. MAPS processed policy data, future premium data, life expectancy estimate data, and other actuarial information to calculate a net present value for our portfolio using the specified discount rate of 10.45%. MAPS independently calculated the net present value of our portfolio of 898 policies to be $650.5 million and furnished us with a letter documenting its calculation. A copy of such letter is filed as Exhibit 99.1 to this report.

### Deferred Income Taxes

Under Accounting Standards Codification 740, *Income Taxes*, deferred tax assets and liabilities are recognized for the future tax consequences attributable to temporary differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. A valuation allowance is established for deferred tax assets that are not considered "more likely than not" to be realized. Realization of deferred tax assets depends upon having sufficient past or future taxable income in periods to which the deductible temporary differences are expected to be recovered or within any applicable carryback or carryforward periods or sufficient tax planning strategies. After assessing the realization of the net deferred tax assets, we believe that there is substantial uncertainty that our net deferred tax asset will be realized during the applicable carryover period. As such, a valuation allowance has been established against the total net deferred tax asset as of December 31, 2017.

### Principal Revenue and Expense Items

We earn revenues from the following three primary sources.

- *Life Insurance Policy Benefits Realized*.   We recognize the difference between the face value of the policy benefits and carrying value when an insured event has occurred and determine that settlement and collection of the policy benefits is realizable and reasonably assured. Revenue from a transaction must meet both criteria in order to be recognized. We generally collect the face value of the life insurance policy from the insurance company within 45 days of our notification of the insured's mortality.

- *Change in Fair Value of Life Insurance Policies*.   We value our portfolio investments for each reporting period in accordance with the fair value principles discussed herein, which reflects the expected receipt of policy benefits in future periods, net of premium costs, as shown in our consolidated financial statements.

- *Sale of a Life Insurance Policy*.   In the event of a sale of a policy, we recognize gain or loss as the difference between the sale price and the carrying value of the policy on the date of the receipt of payment on such sale.

Our main components of expense are summarized below.

- *Selling, General and Administrative Expenses*.   We recognize, and record expenses incurred in our business operations, including operations related to the purchasing and servicing of life insurance policies. These expenses include salaries and benefits, sales, marketing, occupancy and other expenditures.

- *Interest Expense*.   We recognize, and record interest expenses associated with the costs of financing our life insurance portfolio for the current period. These expenses include interest paid to our senior lender under our senior credit facility with LNV Corporation, interest paid on our L Bonds and other outstanding indebtedness. When we issue debt, we amortize the financing costs (commissions and other fees) associated with such indebtedness over the outstanding term of the financing and classify it as interest expense.

35

APP. 964

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 966 of 1031    PageID 1138

**Results of Operations — 2017 Compared to 2016**

The following is our analysis of the results of operations for the periods indicated below. This analysis should be read in conjunction with our consolidated financial statements and related notes.

| *Revenue* | Years Ended December 31, | |
| --- | --- | --- |
| | **2017** | **2016** |
| Revenue recognized from maturities of life insurance contracts | $ 48,649,000 | $ 37,459,000 |
| Revenue recognized from change in fair value of life insurance contracts | 66,761,000 | 70,582,000 |
| Premiums and other annual fees | (53,296,000) | (40,239,000) |
| Gain on life insurance policies, net | 62,114,000 | 67,802,000 |
| Other income | 2,020,000 | 1,675,000 |
| Total revenue | $ 64,134,000 | $ 69,477,000 |
| | | |
| Number of policies matured | 47 | 23 |
| Face value of matured policies | $ 64,719,000 | $ 48,452,000 |
| The change in fair value related to new policies acquired during the year | $ 31,019,000 | $ 38,205,000 |

The discount rate applied to estimate the fair value of the portfolio of life insurance policies we own was 10.45% and 10.96% as of December 31, 2017 and 2016, respectively.

*Expenses*

| | **2017** | **2016** | **Increase** |
| --- | --- | --- | --- |
| Interest expense (including amortization of deferred financing costs) | $ 54,419,000 | $ 42,343,000 | $ 12,076,000[1] |
| Employee compensation and benefits | 14,870,000 | 11,784,000 | 3,086,000[2] |
| Legal and professional expenses | 5,096,000 | 3,948,000 | 1,148,000[3] |
| Provision for MCA advances | 1,308,000 | 600,000 | 708,000[4] |
| Other expenses | 11,171,000 | 10,077,000 | 1,094,000[5] |
| Total expenses | $ 86,864,000 | $ 68,752,000 | $ 18,112,000 |

_____

(1)    Increase is primarily due to the increase in the average debt outstanding from $471.4 million in 2016 to $597.5 million in 2017, contributing $11.4 million of interest expense.

(2)    Increase is primarily due to increases of $2.1 million for expense attributable to stock options and SARs and $0.8 million in severance payments made to several former executives.

(3)    Increase is due to legal fees associated with MCA collections as well as increased costs related to securities offerings and on-going compliance.

(4)    Increase is due to continued impairment of the Nulook loan due to decreased recovery estimates.

(5)    Increase is primarily due to increases of $0.5 million for sales and marketing costs associated with growing and servicing our network of independent financial advisors and appointed agents and $0.8 million in technology costs.

*Deferred Income Taxes*

Under ASC 740, Income Taxes ("ASC 740"), deferred tax assets and liabilities are recognized for the future tax consequences attributable to temporary differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. A valuation allowance is established for deferred tax assets that are not considered "more likely than not" to be realized. Realization of deferred tax assets depends upon having sufficient past or future taxable income in periods to which the deductible temporary differences are expected to be recovered or within any applicable carryback or carryforward periods. After assessing the realization of the net deferred tax assets, we believe that there is substantial uncertainty that our net deferred tax asset will be realized during the applicable carryover period. As such, a valuation allowance has been established against the total net deferred tax asset as of December 31, 2017.

36

APP. 965

*Income Tax Expense*

We realized a net income tax benefit of $2.1 million for the year ended December 31, 2017 and a net income tax expense of $0.3 million for the year ended December 31, 2016. The effective rate for the years ended December 31, 2017 and 2016 was 9.2% and 46.0%, respectively, compared to an expected statutory rate of 34%.

The following table provides a reconciliation of our income tax expense at the statutory federal tax rate to our actual income tax expense:

|  | 2017 | | 2016 | |
|---|---|---|---|---|
| Statutory federal income tax (benefit) | $ (7,728,000) | 34.0% | $ 247,000 | 34.0% |
| State income taxes (benefit), net of federal benefit | (1,433,000) | 6.3% | 56,000 | 7.8% |
| Impact of change in enacted rate | 2,605,000 | (11.4)% | — | — |
| Change in valuation allowance | 4,222,000 | (18.6)% | — | — |
| Other permanent differences | 237,000 | (1.1)% | 30,000 | 4.2% |
| Total income tax expense (benefit) | $ (2,097,000) | 9.2% | $ 333,000 | 46.0% |

The Tax Reform Bill enacted by the U.S. federal government in December 2017 changed existing tax law including a reduction of the U.S. corporate income tax rate. The Company re-measured deferred taxes as of the date of enactment, resulting in a $2,605,000 reduction of net deferred income tax assets and a corresponding decrease to earnings in 2017. With the Tax Reform Bill, we expect our effective tax rate in 2018 will be approximately 28.7%.

The most significant temporary differences between GAAP net income (loss) and taxable net income (loss) are the treatment of interest costs with respect to the acquisition of the life insurance policies and revenue recognition with respect to the mark-to-market of our life insurance portfolio.

**Liquidity and Capital Resources**

We finance our business through a combination of life insurance policy benefit receipts, equity offerings, debt offerings, and our senior credit facility. We have used our debt offerings and our senior credit facility primarily for policy acquisition, policy servicing, and portfolio-related financing expenditures including paying principal and interest.

As of December 31, 2017 and December 31, 2016, we had approximately $159.4 million and $121.7 million, respectively, in combined available cash, cash equivalents, and policy benefits receivable for the purpose of purchasing additional life insurance policies, paying premiums on existing policies, paying portfolio servicing expenses, and paying principal and interest on our outstanding financing obligations. Additional future borrowing base capacity for premiums and servicing costs, created as the premiums and servicing costs of pledged life insurance policies become due and by additional policy pledges to the facility or not, exists under the amended and restated senior credit facility with LNV Corporation.

*Financings Summary*

We had the following outstanding debt balances as of December 31, 2017 and December 31, 2016:

| Issuer/Borrower | As of December 31, 2017 | | As of December 31, 2016 | |
|---|---|---|---|---|
|  | Principal Amount Outstanding | Weighted Average Interest Rate | Principal Amount Outstanding | Weighted Average Interest Rate |
| GWG Holdings, Inc. – L Bonds (see Note 8) | $ 461,427,000 | 7.29% | $ 387,067,000 | 7.23% |
| GWG Life, LLC – Series I Secured Notes | — | N/A | 16,614,000 | 8.68% |
| GWG DLP Funding IV, LLC – senior credit facility with LNV Corporation (see Note 6) | 222,525,000 | 9.31% | 162,725,000 | 7.34% |
| **Total** | $ 683,952,000 | 7.95% | $ 566,406,000 | 7.30% |

APP. 966

Case 3:22-cv-00410-B   Document 32-1    Filed 04/19/22    Page 968 of 1031    PageID 1140

As of September 8, 2017, all of the Series I Secured Notes had been paid in full and all obligations thereunder had been terminated.

---

37

APP. 967

The Series I Secured Notes were governed by an Intercreditor Agreement, a Third Amended and Restated Note Issuance and Security Agreement dated November 1, 2011, as amended, and a related Pledge Agreement. Upon the redemption of the Series I Secured Notes and the termination of all obligations outstanding thereunder, those agreements were terminated effective as of September 8, 2017.

In June 2011, we concluded a private placement offering of Series A Preferred Stock for new investors, having received an aggregate $24.6 million in subscriptions for our Series A Preferred Stock. These subscriptions consisted of $14.0 million in conversions of outstanding Series I Secured Notes into Series A Preferred Stock and $10.6 million of new investments.

On October 9, 2017, we exercised our contractual right to call for the redemption of the Series A Preferred Stock and all related outstanding warrants and paid an aggregate of approximately $22.2 million.

In January 2012, we began publicly offering up to $250.0 million in debt securities (initially named "Renewable Secured Debentures" and subsequently renamed "L Bonds") that was completed in January 2015.

On September 24, 2014, we consummated an initial public offering of our common stock resulting in the sale of 800,000 shares of common stock at $12.50 per share and net proceeds of approximately $8.6 million after the deduction of underwriting commissions, discounts and expense reimbursements.

In January 2015, we began publicly offering up to $1.0 billion of L Bonds as a follow-on to our earlier $250.0 million public debt offering. Through December 31, 2017, the total amount of these L Bonds sold, including renewals, was $856.3 million. As of December 31, 2017 and December 31, 2016, respectively, we had approximately $461.4 million and $387.1 million in principal amount of L Bonds outstanding.

In October 2015, we began publicly offering up to 100,000 shares of our Redeemable Preferred Stock (RPS) at a per-share price of $1,000. As of December 31, 2017, we had issued approximately $99.1 million stated value of RPS and have terminated that offering.

On February 14, 2017, we began publicly offering up to 150,000 shares of Series 2 Redeemable Preferred Stock (RPS 2) at a per-share price of $1,000. As of December 31, 2017, we have issued approximately $88.7 million stated value of RPS 2.

On January 2, 2018, we began publicly offering up to $1.0 billion L Bonds as a follow-on to our earlier $1.0 billion L Bond offering. As of December 31, 2017, we have not issued any L Bonds in our follow-on offering.

The weighted-average interest rate of our outstanding L Bonds as of December 31, 2017 and December 31, 2016 was 7.29% and 7.23%, respectively, and the weighted-average maturity at those dates was 2.38 and 2.13 years, respectively. Our L Bonds have renewal features. Since we first issued our L Bonds, we have experienced $394.9 million in maturities, of which $234.7 million has renewed through December 31, 2017 for an additional term. This has provided us with an aggregate renewal rate of approximately 59.4% for investments in these securities.

Future contractual maturities of L Bonds at December 31, 2017 are:

| Years Ending December 31, | L Bonds |
|---|---|
| 2018 | $ 105,916,000 |
| 2019 | 151,689,000 |
| 2020 | 78,402,000 |
| 2021 | 30,759,000 |
| 2022 | 40,018,000 |
| Thereafter | 54,643,000 |
| | $ 461,427,000 |

The L Bonds are secured by all of our assets and are subordinate to our senior credit facility with LNV Corporation.

On September 27, 2017, we entered into a $300 million amended and restated senior credit facility with LNV Corporation in which DLP IV is the borrower. We intend to use the proceeds from this facility to grow and maintain our portfolio of life insurance policies, for liquidity and for general corporate purposes. As of December 31, 2017 we had approximately $222.5 million outstanding under the senior credit facility with LNV Corporation.

APP. 968

Case 3:22-cv-00410-B   Document 32-1   Filed 04/19/22   Page 970 of 1031   PageID 1142

38

APP. 969

We expect to meet our ongoing operational capital needs through a combination of the receipt of policy benefits from our portfolio of life insurance policies and net proceeds from our L Bonds and RPS 2 offerings. We expect to meet our policy acquisition, servicing, and financing capital needs principally from the receipt of policy benefits from our portfolio of life insurance policies, net proceeds from our offering of L Bonds and RPS 2, and from our senior credit facility with LNV Corporation. We estimate that our liquidity and capital resources are sufficient for our current and projected financial needs for at least the next twelve months given current assumptions. However, if we are unable to continue our offerings for any reason (or if we become unsuccessful in selling our securities), and we are unable to obtain capital from other sources, our business will be materially and adversely affected. In addition, our business will be materially and adversely affected if we do not receive the policy benefits we forecast and if holders of our L Bonds fail to renew with the frequency we have historically experienced. In such a case, we could be forced to sell our investments in life insurance policies to service or satisfy our debt-related and other obligations. A sale under such circumstances may result in significant impairment of the recognized value of our portfolio.

Capital expenditures have historically not been material and we do not anticipate making material capital expenditures in 2018 or beyond.

### Debt Financings Summary

The table below reconciles the face amount of our outstanding debt to the carrying value shown on our balance sheet:

|  | As of December 31, 2017 | As of December 31, 2016 |
|---|---|---|
| **Total senior facilities and other indebtedness:** |  |  |
| Face amount outstanding | $ 222,525,000 | $ 162,725,000 |
| Unamortized selling costs | (10,287,000) | (6,660,000) |
| Carrying amount | $ 212,238,000 | $ 156,065,000 |
|  |  |  |
| **Series I Secured Notes:** |  |  |
| Face amount outstanding | $ — | $ 16,614,000 |
| Unamortized selling costs | — | (209,000) |
| Carrying amount | $ — | $ 16,405,000 |
|  |  |  |
| **L Bonds:** |  |  |
| Face amount outstanding | $ 461,427,000 | $ 387,067,000 |
| Subscriptions in process | 1,560,000 | 5,882,000 |
| Unamortized selling costs | (15,593,000) | (11,636,000) |
| Carrying amount | $ 447,394,000 | $ 381,313,000 |

### Portfolio Assets and Secured Indebtedness

At December 31, 2017, the fair value of our investments in life insurance policies of $650.5 million plus our cash balance of $114.4 million and our restricted cash balance of $28.3 million, plus matured policy benefits receivable of $16.7 million, totaled $809.9 million, representing an excess of portfolio assets over secured indebtedness of $126.0 million. At December 31, 2016, the fair value of our investments in life insurance policies of $511.2 million plus our cash balance of $78.5 million and our restricted cash balance of $37.8 million, plus matured policy benefits receivable of $5.3 million, totaled $632.9 million representing an excess of portfolio assets over secured indebtedness of $66.4 million.

The following forward-looking table seeks to illustrate the impact that a hypothetical sale of our portfolio of life insurance assets at various discount rates would have on our ability to satisfy our debt obligations as of December 31, 2017. In all cases, the sale of the life insurance assets owned by DLP IV will be used first to satisfy all amounts owing under the respective senior credit facility with LNV Corporation. The net sale proceeds remaining after satisfying all obligations under the senior credit facility with LNV Corporation would be applied to L Bonds on a pari passu basis.

39

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 972 of 1031    PageID 1144

| Portfolio Discount Rate | 10% | 11% | 12% | 13% | 14% | 15.04% | 16% |
|---|---|---|---|---|---|---|---|
| Value of portfolio | $664,849,000 | $633,741,000 | $605,099,000 | $578,666,000 | $554,216,000 | $531,554,000 | $510,506,000 |
| Cash, cash equivalents and policy benefits receivable | 159,430,000 | 159,430,000 | 159,430,000 | 159,430,000 | 159,430,000 | 159,430,000 | 159,430,000 |
| Total assets | 824,279,000 | 793,171,000 | 764,529,000 | 738,096,000 | 713,646,000 | 690,984,000 | 669,936,000 |
| Senior credit facility | 222,525,000 | 222,525,000 | 222,525,000 | 222,525,000 | 222,525,000 | 222,525,000 | 222,525,000 |
| Net after senior credit facility | 601,754,000 | 570,646,000 | 542,004,000 | 515,571,000 | 491,121,000 | 468,459,000 | 447,411,000 |
| L Bonds | 461,427,000 | 461,427,000 | 461,427,000 | 461,427,000 | 461,427,000 | 461,427,000 | 461,427,000 |
| Net after L Bonds | 140,327,000 | 109,219,000 | 80,577,000 | 54,144,000 | 29,694,000 | 7,032,000 | (14,016,000) |
| Impairment to L Bonds | No impairment | No impairment | No impairment | No impairment | No impairment | No impairment | Impairment |

The table illustrates that our ability to fully satisfy amounts owing under the L Bonds would likely be impaired upon the sale of all our life insurance assets at a price equivalent to a discount rate of approximately 15.04% or higher. At December 31, 2016, the likely impairment occurred at a discount rate of approximately 13.94% or higher. The discount rates used to calculate the fair value of our portfolio were 10.45% and 10.96% as of December 31, 2017 and December 31, 2016, respectively.

The table does not include any allowance for transactional fees and expenses associated with a portfolio sale (which expenses and fees could be substantial) and is provided to demonstrate how various discount rates used to value our portfolio could affect our ability to satisfy amounts owing under our debt obligations in light of our senior secured lender's right to priority payments. This table also does not include the yield maintenance fee, which could be substantial, we are required to pay in certain circumstances under our senior credit facility with LNV Corporation. You should read the above table in conjunction with the information contained in other sections of this report, including our discussion of discount rates included under the "Critical Accounting Policies — Fair Value Components — Discount Rate" caption above.

### *Amendment of Credit Facility*

Effective September 27, 2017, DLP IV entered into an Amended and Restated Loan and Security Agreement with LNV Corporation, as lender, and CLMG Corp., as the administrative agent on behalf of the lenders under the agreement. The Loan and Security Agreement makes available a total of up to $300,000,000 in credit to DLP IV with a maturity date of September 27, 2029. Additional advances are available under the Amended and Restated Loan Agreement at the LIBOR rate as defined in the Amended and Restated Loan Agreement. Advances are available as the result of additional borrowing base capacity, created as the premiums and servicing costs of pledged life insurance policies become due and by additional policy pledges to the facility or not. Interest will accrue on amounts borrowed under the Amended and Restated Loan Agreement at an annual interest rate, determined as of each date of borrowing or quarterly if there is no borrowing, equal to (A) the greater of 12-month LIBOR or the federal funds rate (as defined in the agreement) plus one-half of one percent per annum, plus (B) 7.50% per annum. The effective rate at December 31, 2017 was 9.31%. Interest payments are made on a quarterly basis.

Under the Amended and Restated Loan and Security Agreement, DLP IV has granted the administrative agent, for the benefit of the lenders under the agreement, a security interest in all of DLP IV's assets. As with prior collateral arrangements relating to the senior secured debt of GWG Holdings and its subsidiaries (on a consolidated basis), GWG Holdings' equity ownership in DLP IV continues to serve as collateral for the obligations of GWG Holdings under the L Bonds (although the life insurance assets owned by DLP IV will not themselves serve directly as collateral for those obligations).

### Cash Flows

The payment of premiums and servicing costs to maintain life insurance policies represents our most significant requirement for cash disbursement. When a policy is purchased, we are able to calculate the minimum premium payments required to maintain the policy in-force. Over time as the insured ages, premium payments will increase. Nevertheless, the probability we will actually be required to pay the premiums decreases as mortality becomes more likely. These scheduled premiums and associated probabilities are factored into our expected internal rate of return and cash-flow modeling. Beyond premiums, we incur policy servicing costs, including annual trustee, tracking costs,

APP. 971

and debt servicing costs, including principal and interest payments all of which are excluded from our internal rate of return calculations. Until we receive a sufficient amount of proceeds from the policy benefits, we intend to pay these costs from our senior credit facility with LNV Corporation, when permitted, and through the issuance of debt securities, including the L Bonds, and equity securities including our preferred stock offerings.

The amount of payments for anticipated premiums and servicing costs that we will be required to make over the next five years to maintain our current portfolio, assuming no mortalities, is set forth in the table below.

| Years Ending December 31, | Premiums | Servicing | Premiums and Servicing Fees |
|---|---|---|---|
| 2018 | $ 53,548,000 | $ 1,102,000 | $ 54,650,000 |
| 2019 | 61,125,000 | 1,102,000 | 62,227,000 |
| 2020 | 69,886,000 | 1,102,000 | 70,988,000 |
| 2021 | 79,081,000 | 1,102,000 | 80,183,000 |
| 2022 | 89,102,000 | 1,102,000 | 90,204,000 |
| | $ 352,742,000 | $ 5,510,000 | $ 358,252,000 |

Our anticipated premium expenses are subject to the risk of increased cost-of-insurance charges (i.e., premium charges) for the universal life insurance policies we own. We are aware of additional pending COI increases affecting three policies in our portfolio that we have received notice on and expect to quantify and recognize in the following months. As a result, we expect that our premium expense will increase and the fair value of the affected policies and our portfolio will be negatively impacted once we receive additional information and policy illustrations reflecting the increased rates from the insurers to revise our projections and valuations. Except as noted above, we are not aware of COI increases by other insurers, but we are aware that COI increases have become more prevalent in the industry. Thus, we may see additional insurers implementing COI increases in the future. See also the Risk Factor section of this report *("Cost-of-insurance (premium) increases could materially and adversely affect our profitability and financial condition.")*.

For the quarter-end dates set forth below, the following table illustrates the total amount of face value of policy benefits owned, and the trailing 12 months of life insurance policy benefits realized and premiums paid on our portfolio. The trailing 12-month benefits/premium coverage ratio indicates the ratio of policy benefits realized to premiums paid over the trailing 12-month period from our portfolio of life insurance policies.

| Quarter End Date | Portfolio Face Amount ($) | 12-Month Trailing Benefits Realized | 12-Month Trailing Premiums Paid | 12-Month Trailing Benefits/Premium Coverage Ratio |
|---|---|---|---|---|
| March 31, 2015 | 754,942,000 | 46,675,000 | 23,786,000 | 196.2% |
| June 30, 2015 | 806,274,000 | 47,125,000 | 24,348,000 | 193.5% |
| September 30, 2015 | 878,882,000 | 44,482,000 | 25,313,000 | 175.7% |
| December 31, 2015 | 944,844,000 | 31,232,000 | 26,650,000 | 117.2% |
| March 31, 2016 | 1,027,821,000 | 21,845,000 | 28,771,000 | 75.9% |
| June 30, 2016 | 1,154,798,000 | 30,924,000 | 31,891,000 | 97.0% |
| September 30, 2016 | 1,272,078,000 | 35,867,000 | 37,055,000 | 96.8% |
| December 31, 2016 | 1,361,675,000 | 48,452,000 | 40,239,000 | 120.4% |
| March 31, 2017 | 1,447,558,000 | 48,189,000 | 42,753,000 | 112.7% |
| June 30, 2017 | 1,525,363,000 | 49,295,000 | 45,414,000 | 108.5% |
| September 30, 2017 | 1,622,627,000 | 53,742,000 | 46,559,000 | 115.4% |
| December 31, 2017 | 1,676,148,000 | 64,719,000 | 52,263,000 | 123.8% |

We believe that the portfolio cash flow results set forth above are consistent with our general investment thesis: that the life insurance policy benefits we receive will continue to increase over time in relation to the premiums we are required to pay on the remaining polices in the portfolio. Nevertheless, we expect that our portfolio cash flow on a period-to-period basis will remain inconsistent until such time as we achieve our goal of acquiring a larger, more diversified portfolio of life insurance policies.

41

**Inflation**

Changes in inflation do not necessarily correlate with changes in interest rates. We presently do not foresee any material impact of inflation on our results of operations in the periods presented in our consolidated financial statements.

**Off-Balance Sheet Arrangements**

We are party to an office lease with U.S. Bank National Association as the landlord. On September 1, 2015, we entered into an amendment that expanded the leased space to 17,687 square feet and extended the term through October 2025 (see Note 17 to the Consolidated Financial Statements).

**Credit Risk**

We review the credit risk associated with our portfolio of life insurance policies when estimating its fair value. In evaluating the policies' credit risk, we consider insurance company solvency, credit risk indicators, economic conditions, ongoing credit evaluations, and company positions. We attempt to manage our credit risk related to life insurance policies typically by purchasing policies issued only from companies with an investment-grade credit rating by either Standard & Poor's, Moody's, or A.M. Best Company. As of December 31, 2017, 96.7% of our life insurance policies, by face value benefits, were issued by companies that maintained an investment-grade rating (BBB or better) by Standard & Poor's.

**Interest Rate Risk**

Our senior credit facility with LNV Corporation is floating-rate financing. In addition, our ability to offer interest and dividend rates that attract capital (including in our continuous offering of L Bonds and RPS 2) is generally impacted by prevailing interest rates. Furthermore, while our L Bond and RPS 2 offerings provide us with fixed-rate debt and equity financing, respectively, our debt coverage ratio is calculated in relation to the interest rate on all of our debt financing. Therefore, fluctuations in interest rates impact our business by increasing our borrowing costs and reducing availability under our debt financing arrangements. We calculate our portfolio earnings based upon the spread generated between the return on our life insurance portfolio and the total cost of our financing. As a result, increases in interest rates will reduce the earnings we expect to achieve from our investments in life insurance policies.

**Non-GAAP Financial Measures**

Non-GAAP financial measures disclosed by our management are provided as additional information to investors in order to provide an alternative method for assessing our financial condition and operating results. These non-GAAP financial measures are not in accordance with GAAP and may be different from non-GAAP measures used by other companies, including other companies within our industry. This presentation of non-GAAP financial information is not meant to be considered in isolation or as a substitute for comparable amounts prepared in accordance with GAAP. See our consolidated financial statements and our financial statements contained herein.

We use non-GAAP financial measures for management's assessment of our financial condition and operating results without regard to GAAP fair value standards. The application of current GAAP fair value standards, especially during a period of significant growth of our portfolio and our Company may result in current period GAAP financial results that may not be reflective of our long-term earnings potential or overall financial condition. Management believes that our non-GAAP financial measures permit investors to understand long-term earnings performance without regard to the volatility in GAAP financial results that can, and does, occur during this stage of our portfolio and company growth.

Therefore, in contrast to a GAAP fair valuation, we seek to measure the accrual of the actuarial gain occurring within the portfolio of life insurance policies at our expected internal rate of return (exclusive of future interest costs) based on statistical mortality probabilities for the insureds (using primarily the insured's age, sex, health and smoking status). The expected internal rate of return tracks actuarial gain occurring within the policies according to a mortality table as the insureds' age increases. By comparing the actuarial gain accruing within our portfolio of life insurance policies against our adjusted operating costs during the same period, we can estimate, manage and evaluate the overall financial performance of our business without regard to fair value volatility. We use this information to balance our life insurance policy purchasing and manage our capital structure, including the issuance of debt and utilization of our other sources of capital, and to monitor our compliance with borrowing covenants. We believe that these non-GAAP

APP. 973

APP. 974

financial measures provide information that is useful for investors to understand period-over-period operating results separate and apart from fair value items that can have a disproportionately positive or negative impact on GAAP results in any particular reporting period.

Our senior credit facility with Autobahn/DZ Bank, which we terminated effective as of September 12, 2017, required us to maintain a "positive net income" and "tangible net worth," each of which were calculated on an adjusted non-GAAP basis using the method described below, without regard to GAAP-based fair value measures. In addition, our senior credit facility with Autobahn/DZ Bank required us to maintain an "excess spread," which is the difference between (i) the weighted average of our expected internal rate of return of our portfolio of life insurance policies; and (ii) the weighted average of the senior credit facility with Autobahn/DZ Bank's interest rate.

In addition, the note issuance and security agreement governing our Series I Secured Notes, which we terminated effective as of September 8, 2017, and the Indenture governing our L Bonds requires us to maintain a "debt coverage ratio" designed to provide reasonable assurance that the buy and hold value of our portfolio plus certain short-term assets exceed our total outstanding indebtedness. This ratio is calculated using non-GAAP measures in the method described below, again without regard to GAAP-based fair value measures.

| Non-GAAP Investment Cost Basis | As of December 31, 2017 | As of December 31, 2016 |
|---|---|---|
| GAAP fair value | $ 650,527,000 | $ 511,192,000 |
| Unrealized fair value gain[1] | (331,386,000) | (264,625,000) |
| Adjusted cost basis increase[2] | 325,100,000 | 248,377,000 |
| Investment cost basis[3] | $ 644,241,000 | $ 494,944,000 |

_____

(1)  This represents the reversal of cumulative unrealized GAAP fair value gain of life insurance policies.
(2)  Adjusted cost basis is increased to interest, premiums and servicing fees that are expensed under GAAP.
(3)  This is the non-GAAP cost basis in life insurance policies from which our expected internal rate of return is calculated.

*Excess Spread*.   Management uses the "total excess spread" to gauge expected profitability of our investments. The Expected IRR of our portfolio is based upon future cash flow forecasts derived from a probabilistic analysis of our policy benefits received and policy premiums paid in relation to our non-GAAP investment cost basis.

| | As of December 31, 2017 | As of December 31, 2016 |
|---|---|---|
| Expected IRR[1] | 10.48% | 11.34% |
| Total weighted-average interest rate on indebtedness for borrowed money[2] | 7.95% | 7.30% |
| Total excess spread[3] | 2.53% | 4.04% |

_____

(1)  Excludes IRR realized on matured life insurance policies – which are substantial.
(2)  Represents the weighted-average interest rate paid on all interest-bearing indebtedness as of the measurement date, determined as follows:

| Indebtedness | As of December 31, 2017 | As of December 31, 2016 |
|---|---|---|
| Senior credit facility with LNV Corporation | $ 222,525,000 | $ 162,725,000 |
| Series I Secured Notes | — | 16,614,000 |
| L Bonds | 461,427,000 | 387,067,000 |
| Total | $ 683,952,000 | $ 566,406,000 |

| Interest Rates on Indebtedness | | |
|---|---|---|
| Senior credit facility with LNV Corporation | 9.31% | 7.34% |
| Series I Secured Notes | — | 8.68% |

APP. 975

Case 3:22-cv-00410-B   Document 32-1   Filed 04/19/22   Page 977 of 1031   PageID 1149

| | | |
|---|---|---|
| L Bonds | 7.29% | 7.23% |
| Weighted-average interest rates on indebtedness | 7.95% | 7.30% |

(3)    Calculated as the Expected IRR minus the weighted-average interest rate on interest-bearing indebtedness[2].

43

APP. 976

*Adjusted Non-GAAP Net Income.* We calculate our adjusted non-GAAP net income by recognizing the actuarial gain accruing within our life insurance portfolio at the Expected IRR against our adjusted cost basis without regard to fair value. We net this actuarial gain against our adjusted operating costs during the same period to calculate our net income on a non-GAAP basis.

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2017 | 2016 |
| GAAP net (loss) attributable to common shareholders | $ (33,335,000) | $ (3,145,000) |
| Unrealized fair value gain[1] | (66,761,000) | (70,582,000) |
| Adjusted cost basis increase[2] | 99,320,000 | 72,818,000 |
| Accrual of unrealized actuarial gain[3] | 25,434,000 | 31,873,000 |
| Total adjusted non-GAAP net income attributable to common shareholders | $ 24,658,000 | $ 30,964,000 |

_____

(1)   Reversal of unrealized GAAP fair value gain on life insurance policies for current period.
(2)   Adjusted cost basis is increased to include interest, premiums and servicing fees that are expensed under GAAP.
(3)   Accrual of actuarial gain at Expected IRR.

*Adjusted Non-GAAP Tangible Net Worth.*   We calculate our adjusted non-GAAP tangible net worth by recognizing the actuarial gain accruing within our life insurance policies at the Expected IRR of the policies we own without regard to fair value. We net this actuarial gain against our costs during the same period to calculate our adjusted tangible net worth on a non-GAAP basis.

| | As of December 31, 2017 | As of December 31, 2016 |
| --- | --- | --- |
| GAAP net worth | $ 133,672,000 | $ 67,298,000 |
| Less intangible assets[1] | (30,354,000) | (19,442,000) |
| GAAP tangible net worth | 103,318,000 | 47,856,000 |
| Unrealized fair value gain[2] | (331,386,000) | (264,625,000) |
| Adjusted cost basis increase[3] | 325,100,000 | 248,377,000 |
| Accrual of unrealized actuarial gain[4] | 158,241,000 | 132,808,000 |
| Total adjusted non-GAAP tangible net worth | $ 255,273,000 | $ 164,416,000 |

_____

(1)   Unamortized portion of deferred financing costs and pre-paid insurance.
(2)   Reversal of cumulative unrealized GAAP fair value gain or loss of life insurance policies.
(3)   Adjusted cost basis is increased to include interest, premiums and servicing fees that are expensed under GAAP.
(4)   Accrual of cumulative actuarial gain at Expected IRR.

*Debt Coverage Ratio.*   Our L Bonds borrowing covenants require us to maintain a debt coverage ratio of less than 90%. The debt coverage ratio is calculated by dividing the sum of our total interest-bearing indebtedness by the sum of our cash, cash equivalents, and policy benefits receivable by the net present value of the life insurance portfolio, and, without duplication, the value of all of our other assets as reflected on our most recently available balance sheet prepared in accordance with GAAP (see Item 9B).

| | As of December 31, 2017 | As of December 31, 2016 |
| --- | --- | --- |
| Life insurance portfolio policy benefits | $ 1,676,148,000 | $ 1,361,675,000 |
| Discount rate of future cash flows[1] | 7.95%[1] | 7.30%[1] |
| Net present value of life insurance portfolio policy benefits | $ 737,625,000 | $ 614,908,000 |
| Cash, cash equivalents | 142,771,000 | 116,314,000 |
| Life insurance policy benefits receivable | 16,659,000 | 5,345,000 |
| Total Coverage | $ 897,055,000 | $ 736,567,000 |
| | | |
| Senior credit facilities | $ 222,525,000 | $ 162,725,000 |
| Series I Secured Notes | — | 16,614,000 |
| L Bonds | 461,427,000 | 387,067,000 |

APP. 977

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 979 of 1031    PageID 1151

| | | | |
|---|---|---|---|
| Total Indebtedness | $ | 683,992,000 | $ | 566,406,000 |
| Debt Coverage Ratio | | 76.24% | 76.90% |

44

APP. 978

(1)     Weighted average-interest rate paid on indebtedness.

As of December 31, 2017, we were in compliance with the debt coverage ratio.

*Expected Portfolio Internal Rate of Return at Purchase*.   Expected portfolio IRR at purchase is calculated as the weighted average (by face amount of policy benefits) derived from a probabilistic analysis of policy benefits received and policy premiums paid relative to our purchase price for all life insurance policies in the portfolio. This non-GAAP measure isolates our IRR expectation at purchase utilizing our underwriting life expectancy assumptions at the time of purchase. This measure does not change with the passage of time as compared to our non-GAAP investment cost basis that increases with the payment of premiums, financing costs, and the effective life expectancy which changes over time, both of which are used to calculate our Expected IRR.

| | **2017** | **2016** |
|---|---|---|
| Life insurance portfolio policy benefits | $ 1,676,148,000 | $ 1,361,675,000 |
| Total number of polices | 898 | 690 |
| Non-GAAP Expected Portfolio Internal Rate of Return at Purchase | 15.32% | 15.64% |

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.**

Not applicable.

45

APP. 979

ITEM 8. CONSOLIDATED FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Shareholders and the Board of Directors of GWG Holdings, Inc. and Subsidiaries:

### Opinions on the Financial Statements and Internal Control over Financial Reporting

We have audited the accompanying consolidated balance sheets of GWG Holdings, Inc. and Subsidiaries (the "Company") as of December 31, 2017 and 2016, the related consolidated statements of operations, changes in stockholders' equity, and cash flows, for each of the two years in the period ended December 31, 2017, and the related notes (collectively referred to as the "consolidated financial statements"). We also have audited the Company's internal control over financial reporting as of December 31, 2017, based on criteria established in *Internal Control — Integrated Framework: (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2017 and 2016, and the results of their operations and their cash flows for each of the two years in the period ended December 31, 2017, in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2017, based on criteria established in *Internal Control — Integrated Framework: (2013)* issued by COSO.

### Basis for Opinion

The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's consolidated financial statements and an opinion on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinion.

### Definition and Limitations of Internal Control Over Financial Reporting

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations

F-1

APP. 980

of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Baker Tilly Virchow Krause, LLP
Minneapolis, Minnesota

We have served as the Company's auditor since 2013.

March 29, 2018

<div align="center">F-2</div>

APP. 981

GWG HOLDINGS, INC. AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEETS

| | December 31, 2017 | December 31, 2016 |
|---|---|---|
| **ASSETS** | | |
| Cash and cash equivalents | $ 114,421,491 | $ 78,486,982 |
| Restricted cash | 28,349,685 | 37,826,596 |
| Investment in life insurance policies, at fair value | 650,527,353 | 511,192,354 |
| Secured MCA advances | 1,661,774 | 5,703,147 |
| Life insurance policy benefits receivable | 16,658,761 | 5,345,000 |
| Other assets | 7,237,110 | 4,688,103 |
| TOTAL ASSETS | $ 818,856,174 | $ 643,242,182 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | |
| **LIABILITIES** | | |
| Senior Credit Facilities | $ 212,238,192 | $ 156,064,818 |
| Series I Secured Notes | — | 16,404,836 |
| L Bonds | 447,393,568 | 381,312,587 |
| Accounts payable | 6,394,439 | 2,226,712 |
| Interest and dividends payable | 15,427,509 | 16,160,599 |
| Other accrued expenses | 3,730,723 | 1,676,761 |
| Deferred taxes, net | — | 2,097,371 |
| TOTAL LIABILITIES | $ 685,184,431 | $ 575,943,684 |
| **STOCKHOLDERS' EQUITY** | | |
| CONVERTIBLE PREFERRED STOCK – SERIES A | | |
| (par value $0.001; shares authorized 40,000,000; shares outstanding 0 and 2,640,521; liquidation preference of $0 and $19,804,000 as of December 31, 2017 and 2016, respectively) | — | 19,701,133 |
| REDEEMABLE PREFERRED STOCK | | |
| (par value $0.001; shares authorized 100,000; shares outstanding 98,611 and 59,183; liquidation preference of $99,186,000 and $59,183,000 as of December 31, 2017 and 2016, respectively) | 92,840,243 | 59,025,164 |
| SERIES 2 REDEEMABLE PREFERRED STOCK | | |
| (par value $0.001; shares authorized 150,000; shares outstanding 88,709 and 0; liquidation preference of $89,208,000 and $0 as of December 31, 2017 and 2016, respectively) | 80,275,204 | — |
| COMMON STOCK | | |
| (par value $0.001: shares authorized 210,000,000; shares issued and outstanding 5,813,555 and 5,980,190 as of December 31, 2017 and 2016, respectively) | 5,813 | 5,980 |
| Additional paid-in capital | — | 7,383,515 |
| Accumulated deficit | (39,449,517) | (18,817,294) |
| TOTAL STOCKHOLDERS' EQUITY | 133,671,743 | 67,298,498 |
| TOTAL LIABILITIES & EQUITY | $ 818,856,174 | $ 643,242,182 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

APP. 982

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 984 of 1031     PageID 1156

F-3

APP. 983

GWG HOLDINGS, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF OPERATIONS

|  | Year Ended | |
|---|---|---|
|  | December 31, 2017 | December 31, 2016 |
| REVENUE | | |
| Gain on life insurance policies, net | $ 62,114,403 | $ 67,801,565 |
| MCA income | 554,341 | 929,303 |
| Interest and other income | 1,465,174 | 746,466 |
| TOTAL REVENUE | 64,133,918 | 69,477,334 |
|  | | |
| EXPENSES | | |
| Interest expense | 54,419,444 | 42,343,374 |
| Employee compensation and benefits | 14,869,749 | 11,784,296 |
| Legal and professional fees | 5,095,643 | 3,947,376 |
| Provision for MCA advances | 1,308,000 | 600,000 |
| Other expenses | 11,170,676 | 10,076,976 |
| TOTAL EXPENSES | 86,863,512 | 68,752,022 |
|  | | |
| INCOME (LOSS) BEFORE INCOME TAXES | (22,729,594) | 725,312 |
| INCOME TAX EXPENSE (BENEFIT) | (2,097,371) | 333,403 |
|  | | |
| NET INCOME (LOSS) | (20,632,223) | 391,909 |
|  | | |
| Preferred stock dividends | 12,702,341 | 3,537,287 |
| NET LOSS ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ (33,334,564) | $ (3,145,378) |
|  | | |
| NET LOSS PER SHARE | | |
| Basic | $ (5.72) | $ (0.53) |
| Diluted | $ (5.72) | $ (0.53) |
|  | | |
| WEIGHTED AVERAGE SHARES OUTSTANDING | | |
| Basic | 5,826,033 | 5,967,274 |
| Diluted | 5,826,033 | 5,967,274 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-4

APP. 984

GWG HOLDINGS, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY

| | Preferred Stock Shares | Preferred Stock | Common Shares | Common Stock (par) | Additional Paid-in Capital | Accumulated Deficit | Total Equity |
|---|---|---|---|---|---|---|---|
| **Balance, December 31, 2015** | **2,781,735** | **$ 20,784,841** | **5,941,790** | **$ 5,942** | **$14,563,834** | **$ (19,209,203)** | **$ 16,145,414** |
| Net income | — | — | — | — | — | 391,909 | 391,909 |
| Issuance of common stock | — | — | 36,450 | 36 | 244,149 | — | 244,185 |
| Redemption of Series A Preferred Stock | (239,749) | (1,788,451) | 1,950 | 2 | 19,498 | — | (1,768,951) |
| Issuance of Series A Preferred Stock | 98,535 | 704,743 | — | — | — | — | 704,743 |
| Issuance of Redeemable Preferred Stock | 59,183 | 59,025,164 | — | — | (4,133,526) | — | 54,891,638 |
| Preferred stock dividends | — | — | — | — | (3,537,287) | — | (3,537,287) |
| Stock-based compensation | — | — | — | — | 226,847 | — | 226,847 |
| **Balance, December 31, 2016** | **2,699,704** | **$ 78,726,297** | **5,980,190** | **$ 5,980** | **$ 7,383,515** | **$ (18,817,294)** | **$ 67,298,498** |
| Net loss | — | — | — | — | — | (20,632,223) | (20,632,223) |
| Issuance of common stock | — | — | 33,810 | 33 | 320,970 | — | 321,003 |
| Redemption of common stock | — | — | (200,445) | (200) | (1,603,360) | — | (1,603,560) |
| Issuance of Series A preferred stock | 71,237 | 498,659 | — | — | — | — | 498,659 |
| Redemption of Series A preferred stock | (2,711,916) | (20,199,792) | — | — | — | — | (20,199,792) |
| Issuance of redeemable preferred stock | 129,622 | 122,933,106 | — | — | (2,338,457) | — | 120,594,649 |
| Redemption of redeemable preferred stock | (1,328) | (1,327,776) | — | — | — | — | (1,327,776) |
| Preferred stock dividends | — | (8,925,807) | — | — | (3,776,534) | — | (12,702,341) |
| Stock-based compensation | — | 1,410,760 | — | — | 13,866 | — | 1,424,626 |
| **Balance, December 31, 2017** | **187,319** | **$ 173,115,447** | **5,813,555** | **$ 5,813** | **$ —** | **$ (39,449,517)** | **$ 133,671,743** |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-5

APP. 985

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 987 of 1031    PageID 1159

GWG HOLDINGS, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Year Ended | |
| --- | --- | --- |
| | December 31, 2017 | December 31, 2016 |
| CASH FLOWS FROM OPERATING ACTIVITIES | | |
| Net income (loss) | $ (20,632,223) | $ 391,909 |
| Adjustments to reconcile net income (loss) to net cash flows from operating activities: | | |
| Change in fair value of life insurance policies | (66,760,811) | (70,582,383) |
| Amortization of deferred financing and issuance costs | 8,780,847 | 8,445,252 |
| Provision for MCA advances | 1,308,000 | 600,000 |
| Deferred income taxes | (2,097,371) | 333,402 |
| Preferred stock issued in lieu of cash dividends | 498,659 | 689,742 |
| (Increase) decrease in operating assets: | | |
| Life insurance policy benefits receivable | (11,313,761) | (5,345,000) |
| Other assets | (3,088,071) | (1,427,816) |
| Increase (decrease) in operating liabilities: | | |
| Accounts payable | 4,167,728 | 709,272 |
| Interest and dividends payable | 2,708,623 | 5,171,168 |
| Other accrued expenses | 2,622,822 | (4,999,443) |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (83,805,558) | (66,013,897) |
| | | |
| CASH FLOWS FROM INVESTING ACTIVITIES | | |
| Investment in life insurance policies | (88,643,819) | (94,952,879) |
| Carrying value of matured life insurance policies | 16,069,632 | 10,992,624 |
| Investment in Secured MCA advances | — | (8,727,924) |
| Proceeds from Secured MCA advances | 2,762,784 | 2,553,466 |
| NET CASH FLOWS USED IN INVESTING ACTIVITIES | (69,811,403) | (90,134,713) |
| | | |
| CASH FLOWS FROM FINANCING ACTIVITIES | | |
| Net borrowings on Senior Credit Facilities | 59,799,649 | 104,825,508 |
| Payments for issuance costs of senior debt | (4,510,388) | (7,111,556) |
| Payments for redemption of Series I Secured Notes | (16,613,667) | (7,469,462) |
| Proceeds from issuance of L Bonds | 131,796,220 | 153,874,402 |
| Payments for issuance costs of L Bonds | (10,896,925) | (10,149,316) |
| Payments for redemption of L Bonds | (60,848,460) | (45,754,691) |
| Proceeds from (increase in) restricted cash | 9,476,911 | (35,484,697) |
| (Redemption) issuance of common stock | (1,603,560) | 244,185 |
| Proceeds from issuance of preferred stock | 127,279,847 | 57,112,501 |
| Payments for issuance costs of preferred stock | (9,027,190) | (4,140,867) |
| Payments for redemption of preferred stock | (22,598,626) | (2,198,233) |
| Preferred stock dividends | (12,702,341) | (3,537,287) |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 189,551,470 | 200,210,487 |
| | | |
| NET INCREASE IN CASH AND CASH EQUIVALENTS | 35,934,509 | 44,061,877 |
| | | |
| CASH AND CASH EQUIVALENTS | | |
| BEGINNING OF YEAR | 78,486,982 | 34,425,105 |
| END OF YEAR | $ 114,421,491 | $ 78,486,982 |

APP 986

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 988 of 1031    PageID 1160

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-6

APP. 987

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 989 of 1031    PageID 1161

GWG HOLDINGS, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS — CONTINUED

| | | Year Ended December 31, | | |
|---|---|---|---|---|
| | | **2017** | | **2016** |
| **SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION** | | | | |
| Interest paid | $ | 45,990,000 | $ | 34,607,000 |
| Premiums paid, including prepaid | $ | 55,471,000 | $ | 40,239,000 |
| Stock-based compensation | $ | 1,425,000 | $ | 227,000 |
| Payments for exercised stock options | $ | 346,000 | $ | — |
| | | | | |
| **NON-CASH INVESTING AND FINANCING ACTIVITIES** | | | | |
| Options and stock appreciation rights issued | | 534,000 | | 638,000 |
| Series I Secured Notes: | | | | |
|    Conversion of accrued interest and commission payable to principal | $ | — | $ | 234,000 |
| L Bonds: | | | | |
|    Conversion of accrued interest and commission payable to principal | $ | 1,756,000 | $ | 1,988,000 |
| Series A Preferred Stock: | | | | |
|    Conversion to common stock | $ | — | $ | 39,000 |
| Common stock issued for vendor services | $ | 321,003 | $ | — |
| Investment in life insurance policies included in accounts payable | $ | 3,913,000 | $ | 605,000 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-7

APP. 988

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**(1) Nature of Business and Summary of Significant Accounting Policies**

**Nature of Business** — We are a financial services company committed to disrupting and transforming the life insurance industry and related industries. We built our business by creating opportunities for consumers to obtain significantly more value for their life insurance policies in a secondary market as compared to the traditional options offered by the insurance industry. We are enhancing and extending these activities through innovation in our products and services, business processes, financing strategies, and advanced epigenetic technologies. At the same time, we are creating opportunities for investors to receive income and capital appreciation from our investment activities in the life insurance and related industries.

GWG Holdings, Inc. and all of its subsidiaries are incorporated and organized in Delaware. Unless the context otherwise requires or we specifically so indicate, all references in these footnotes to "we," "us," "our," "our Company," "GWG," or the "Company" refer to GWG Holdings, Inc. and its subsidiaries collectively and on a consolidated basis. References to the full names of particular entities, such as "GWG Holdings, Inc." or "GWG Holdings," are meant to refer only to the particular entity referenced.

On December 7, 2015, GWG Holdings formed a wholly owned subsidiary, GWG MCA, LLC. On January 13, 2016, GWG MCA, LLC was converted to a corporation and became GWG MCA Capital, Inc. GWG MCA Capital, Inc. was formed to provide cash advances to small businesses.

On August 25, 2016, GWG Holdings formed a wholly owned subsidiary, Actüa Life & Annuity Ltd., renamed to Life Epigenetics Inc. ("Life Epigenetics") in August 2017, to engage in various life insurance related businesses and activities related to its exclusive license for "DNA Methylation Based Predictor of Mortality" technology.

**Use of Estimates** — The preparation of our consolidated financial statements in conformity with the Generally Accepted Accounting Principles in the United States of America (GAAP) requires management to make significant estimates and assumptions affecting the reported amounts of assets and liabilities at the date of the consolidated financial statements, as well as the reported amounts of revenue during the reporting period. We regularly evaluate estimates and assumptions, which are based on current facts, historical experience, management's judgment, and various other factors that we believe to be reasonable under the circumstances. Our actual results may differ materially and adversely from our estimates. The most significant estimates with regard to these consolidated financial statements relate to (1) the determination of the assumptions used in estimating the fair value of our investments in life insurance policies and (2) the value of our deferred tax assets and liabilities.

**Cash and Cash Equivalents** — We consider cash in demand deposit accounts and temporary investments purchased with an original maturity of three months or less to be cash equivalents. We maintain our cash and cash equivalents with highly rated financial institutions. The balances in our bank accounts may exceed Federal Deposit Insurance Corporation limits. We periodically evaluate the risk of exceeding insured levels and may transfer funds as we deem appropriate.

**Life Insurance Policies** — Accounting Standards Codification 325-30, *Investments in Insurance Contracts* permits a reporting entity to account for its investments in life insurance policies using either the investment method or the fair value method. We elected to use the fair value method to account for our life insurance policies. We initially record our purchase of life insurance policies at the transaction price, which is the amount paid for the policy, inclusive of all external fees and costs associated with the acquisition. At each subsequent reporting period, we re-measure the investment at fair value in its entirety and recognize the change in fair value as unrealized gain or loss in the current period, net of premiums paid, within Gain on life insurance policies, net in our consolidated statements of operations.

In a case where our acquisition of a policy is not complete as of a reporting date, but we have nonetheless advanced direct costs and deposits for the acquisition, those costs and deposits are recorded as "other assets" on our balance sheet until the acquisition is complete and we have secured title to the policy. On December 31, 2017 and December 31, 2016, a total of $0 and $42,000, respectively, of our "other assets" comprised direct costs and deposits that we had advanced for life insurance policy acquisitions.

We also recognize realized gain (or loss) from a life insurance policy upon one of the two following events: (1) our receipt of notice or verified mortality of the insured; or (2) our sale of the policy (upon filing of change-of-ownership

APP. 989

APP. 990

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**(1) Nature of Business and Summary of Significant Accounting Policies** (cont.)

forms and receipt of payment). In the case of mortality, the gain (or loss) we recognize is the difference between the policy benefits and the carrying values of the policy once we determine that collection of the policy benefits is realizable and reasonably assured. In the case of a policy sale, the gain (or loss) we recognize is the difference between the sale price and the carrying value of the policy on the date we receive sale proceeds.

**Other Assets** — Life Epigenetics is engaged in various life insurance related businesses and activities related to its exclusive license for the "DNA Methylation Based Predictor of Mortality" technology for the life insurance industry. The cost of entering into this license agreement is included in "other assets."

**Stock-Based Compensation** — We measure and recognize compensation expense for all stock-based payments at fair value over the requisite service period. We use the Black-Scholes option pricing model to determine the weighted-average fair value of options. For restricted stock grants, fair value is determined as of the closing price of our common stock on the date of grant. Stock-based compensation expense is recorded in general and administrative expenses based on the classification of the employee or vendor. The determination of fair value of stock-based payment awards on the date of grant using an option-pricing model is affected by our stock price as well as by assumptions regarding a number of subjective variables. These variables include, but are not limited to, the expected stock price volatility over the term of the awards.

The risk-free interest rate is based on the U.S. Treasury rates at the date of grant with maturity dates approximately equal to the expected life at grant date. Volatility is based on the standard deviation of the average continuously compounded rate of return of five selected comparable companies. We have not historically issued any common stock dividends and do not expect to do so in the foreseeable future.

**Deferred Financing and Issuance Costs** — Loans advanced to us under our senior credit facility with LNV Corporation, as described in Note 6, are reported net of financing costs, including issuance costs, sales commissions and other direct expenses, which are amortized using the straight-line method over the term of the facility. We had no loans advanced to us under our senior credit facility with Autobahn Funding Company during the year ended December 31, 2017, as described in Note 5. The Series I and L Bonds, as respectively described in Notes 7 and 8, are reported net of financing costs, which are amortized using the interest method over the term of those borrowings. The Series A Convertible Preferred Stock ("Series A"), as described in Note 9, is reported net of financing costs (including the fair value of warrants issued), all of which were fully amortized using the interest method as of December 31, 2017. Selling and issuance costs of Redeemable Preferred Stock ("RPS") and Series 2 Redeemable Preferred Stock ("RPS 2"), described in Notes 10 and 11, are netted against additional paid-in-capital, if any, and then against the outstanding balance of the preferred stock.

**Earnings (loss) per Share** — Basic earnings (loss) per share attributable to common shareholders are calculated using the weighted-average number of shares outstanding during the reported period. Diluted earnings (loss) per share are calculated based on the potential dilutive impact of our Series A, RPS, RPS 2, warrants and stock options. Due to our net loss attributable to common shareholders for the years ended December 31, 2017 and 2016, there are no dilutive securities.

**Recently Issued Accounting Pronouncements** — On April 7, 2015, the FASB issued Accounting Standards Update No. 2015-03, *Simplifying the Presentation of Debt Issuance Costs* ("ASU 2015-03"), as part of its simplification initiative. ASU 2015-03 changes the presentation of debt issuance costs by presenting those costs in the balance sheet as a direct deduction from the related debt liability. Amortization of the costs is reported as interest expense. We adopted ASU 2015-03 effective January 1, 2016, as required for public reporting entities.

On February 25, 2016, the FASB issued Accounting Standards Update 2016-02 *Leases* ("ASU 2016-02"). The new guidance is effective for fiscal years beginning after December 15, 2018. ASU 2016-02 provides more transparency and comparability in the financial statements of lessees by recognizing all leases with a term greater than twelve months on the balance sheet. Lessees will also be required to disclose key information about their leases. Early adoption is permitted. We are currently evaluating the impact of the adoption of this pronouncement and have not yet adopted ASU 2016-02 as of December 31, 2017.

F-9

APP. 991

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**(1) Nature of Business and Summary of Significant Accounting Policies** (cont.)

In March 2016, the FASB issued Accounting Standards Update 2016-09 ("ASU 2016-09") to simplify the accounting for stock compensation related to the following items: income tax accounting, award classification, estimation of forfeitures, and cash flow presentation. The new guidance is effective for fiscal years beginning after December 15, 2016. We adopted ASU 2016-09 effective January 1, 2017. The impact of the adoption was not material to the financial statements.

In November 2016, the FASB issued Accounting Standards Update 2016-18 ("ASU 2016-18"), which amends ASC 230 *Statement of Cash Flows* to add or clarify guidance on the classification and presentation of restricted cash in the statement of cash flows. The guidance, to be applied retrospectively when adopted, requires entities to show the changes in the total of cash, cash equivalents, restricted cash and restricted cash equivalents in the statement of cash flows. The new guidance is effective for fiscal years beginning after December 15, 2017, and interim periods within those years. We will adopt ASU 2016-18 in the first quarter of 2018. The impact of the adoption is not expected to be material to the financial statements.

**(2) Restrictions on Cash**

Under the terms of our senior credit facility with LNV Corporation (discussed in Note 6), we are required to maintain collection account that is used to collect policy benefits from pledged policies, pay interest and other charges under the facility, and distribute funds to pay down the facility. The agents for the lenders authorize the disbursements from these accounts. At December 31, 2017 and December 31, 2016, there was a balance of $28,350,000 and $37,827,000, respectively, in these restricted cash accounts.

**(3) Investment in Life Insurance Policies**

Life insurance policies are valued based on unobservable inputs that are significant to their overall fair value. Changes in the fair value of these policies are recorded as gain or loss on life insurance policies, net of premiums paid on those policies, in our consolidated statements of operations. Fair value is determined on a discounted cash flow basis that incorporates life expectancy assumptions generally derived from reports obtained from widely accepted life expectancy providers, other than insured lives covered under small face amount policies (i.e., $1 million in face value benefits or less), assumptions relating to cost-of-insurance (premium) rates and other assumptions. The discount rate we apply incorporates current information about discount rates applied by other public reporting companies owning portfolios of life insurance policies, the discount rates observed in the life insurance secondary market, market interest rates, the estimated credit exposure to the insurance companies that issued the life insurance policies and management's estimate of the operational risk premium a purchaser would require to receive the future cash flows derived from our portfolio as a whole. Management has discretion regarding the combination of these and other factors when determining the discount rate. As a result of management's analysis, discount rates of 10.45% and 10.96% were applied to our portfolio as of December 31, 2017 and December 31, 2016, respectively.

A summary of our policies, organized according to their estimated life expectancy dates as of the reporting date, is as follows:

| Years Ending December 31, | As of December 31, 2017 | | | As of December 31, 2016 | | |
|---|---|---|---|---|---|---|
| | Number of Policies | Estimated Fair Value | Face Value | Number of Policies | Estimated Fair Value | Face Value |
| 2017 | — | $ — | $ — | 11 | $ 14,837,000 | $ 16,939,000 |
| 2018 | 8 | 4,398,000 | 4,689,000 | 23 | 30,830,000 | 42,564,000 |
| 2019 | 48 | 63,356,000 | 83,720,000 | 55 | 57,556,000 | 88,858,000 |
| 2020 | 87 | 79,342,000 | 127,373,000 | 93 | 85,414,000 | 159,814,000 |
| 2021 | 98 | 96,154,000 | 170,695,000 | 86 | 73,825,000 | 158,744,000 |
| 2022 | 90 | 85,877,000 | 181,120,000 | 66 | 56,909,000 | 147,222,000 |
| 2023 | 93 | 69,467,000 | 175,458,000 | 64 | 44,953,000 | 128,581,000 |
| Thereafter | 474 | 251,933,000 | 933,093,000 | 292 | 146,868,000 | 618,953,000 |
| Totals | 898 | $ 650,527,000 | $1,676,148,000 | 690 | $ 511,192,000 | $1,361,675,000 |

APP. 992

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 994 of 1031    PageID 1166

F-10

APP. 993

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### (3) Investment in Life Insurance Policies (cont.)

We recognized life insurance benefits of $64,719,000 and $48,452,000 during 2017 and 2016, respectively, related to policies with a carrying value of $16,070,000 and $10,993,000, respectively, and as a result recorded realized gains of $48,649,000 and $37,459,000.

Reconciliation of gain on life insurance policies:

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2017 | 2016 |
| Change in estimated probabilistic cash flows | $ 63,241,000 | $ 46,515,000 |
| Unrealized gain on acquisitions | 31,019,000 | 38,205,000 |
| Premiums and other annual fees | (53,296,000) | (40,239,000) |
| Change in discount rates[1] | 14,931,000 | 3,188,000 |
| Change in life expectancy evaluation[2] | (20,257,000) | (6,029,000) |
| Face value of matured policies | 64,719,000 | 48,452,000 |
| Fair value of matured policies | (38,243,000) | (22,290,000) |
| Gain on life insurance policies, net | $ 62,114,000 | $ 67,802,000 |

_____

[1]    The discount rate applied to estimate the fair value of the portfolio of life insurance policies we own was 10.45% as of December 31, 2017, compared to 10.96% as of December 31, 2016. The carrying value of policies acquired during each quarterly reporting period is adjusted to current fair value using the fair value discount rate applied to the entire portfolio as of that reporting date.

[2]    The change in fair value due to updating independent life expectancy estimates on certain life insurance policies in our portfolio.

We currently estimate that premium payments and servicing fees required to maintain our current portfolio of life insurance policies in force for the next five years, assuming no mortalities, are as follows:

| Years Ending December 31, | Premiums | Servicing | Premiums and Servicing Fees |
| --- | --- | --- | --- |
| 2018 | $ 53,548,000 | $ 1,102,000 | $ 54,650,000 |
| 2019 | 61,125,000 | 1,102,000 | 62,227,000 |
| 2020 | 69,886,000 | 1,102,000 | 70,988,000 |
| 2021 | 79,081,000 | 1,102,000 | 80,183,000 |
| 2022 | 89,102,000 | 1,102,000 | 90,204,000 |
| | $ 352,742,000 | $ 5,510,000 | $ 358,252,000 |

Management anticipates funding the majority of the premium payments estimated above with additional borrowing capacity, created as the premiums and servicing costs of pledged life insurance policies become due, under the amended and restated senior credit facility with LNV Corporation as described in Note 6. Management anticipates funding premiums and servicing costs of non-pledged life insurance policies from proceeds from the receipt of policy benefits from our portfolio of life insurance policies and net proceeds from our offering of L Bonds and RPS 2. The proceeds of these capital sources may also be used for the purchase, financing, and maintenance of additional life insurance policies as well as servicing the interest, dividends and principal on existing and future capital.

### (4) Fair Value Definition and Hierarchy

Accounting Standards Codification 820, *Fair Value Measurements and Disclosures* ("ASC 820") establishes a hierarchical disclosure framework that prioritizes and ranks the level of market price observability used in measuring assets and liabilities at fair value. Market price observability is affected by a number of factors, including the type of investment, the characteristics specific to the investment and the state of the marketplace, including the existence and transparency of transactions between market participants. Assets and liabilities with readily available and actively

APP. 994

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 996 of 1031    PageID 1168

F-11

APP. 995

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**(4) Fair Value Definition and Hierarchy** (cont.)

quoted prices, or for which fair value can be measured from actively quoted prices in an orderly market, generally will have a higher degree of market price observability and a lesser degree of judgment used in measuring fair value.

ASC 820 maximizes the use of observable inputs and minimizes the use of unobservable inputs by requiring the use of observable inputs whenever available. Observable inputs are inputs that market participants would use in pricing the asset or liability developed based on market data obtained from independent sources. Unobservable inputs are inputs that reflect assumptions about how market participants price an asset or liability based on the best available information. Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability (i.e., the "exit price") in an orderly transaction between market participants at the measurement date.

The hierarchy is broken down into three levels based on the observability of inputs as follows:

- Level 1 — Valuations based on quoted prices in active markets for identical assets or liabilities that the Company has the ability to access. Because valuations are based on quoted prices that are readily and regularly available in an active market, valuation of these products does not entail a significant degree of judgment.

- Level 2 — Valuations based on one or more quoted prices in markets that are not active or for which all significant inputs are observable, either directly or indirectly.

- Level 3 — Valuations based on inputs that are unobservable and significant to the overall fair value measurement.

The availability of observable inputs can vary by types of assets and liabilities and is affected by a wide variety of factors, including, for example, whether an instrument is established in the marketplace, the liquidity of markets and other characteristics particular to the transaction. To the extent that valuation is based on models or inputs that are less observable or unobservable in the market, the determination of fair value requires more judgment. Accordingly, the degree of judgment exercised by management in determining fair value is greatest for assets and liabilities categorized in Level 3.

*Level 3 Valuation Process*

The estimated fair value of our portfolio of life insurance policies is determined on a quarterly basis by our portfolio management committee, taking into consideration changes in discount rate assumptions, estimated premium payments and life expectancy estimate assumptions, as well as any changes in economic and other relevant conditions. The discount rate incorporates current information about discount rates applied by other reporting companies owning portfolios of life insurance policies, the discount rates observed in the life insurance secondary market, market interest rates, the estimated credit exposure to the insurance company that issued the life insurance policy and management's estimate of the operational risk premium a purchaser would require to receive the future cash flows derived from our portfolio as a whole. Management has discretion regarding the combination of these and other factors when determining the discount rate.

These inputs are then used to estimate the discounted cash flows from the portfolio using the MAPS probabilistic portfolio price model, which estimates the cash flows using various mortality probabilities and scenarios. The valuation process includes a review by senior management as of each valuation date. We also engage MAPS to independently test the accuracy of the valuations using the inputs we provide on a quarterly basis. See Exhibit 99.1 filed herewith.

F-12

APP. 996

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**(4) Fair Value Definition and Hierarchy** (cont.)

The following table reconciles the beginning and ending fair value of our Level 3 investments in our portfolio of life insurance policies for the periods ended December 31, as follows:

|  | Years Ended December 31, | |
| --- | --- | --- |
|  | **2017** | **2016** |
| Beginning balance | $ 511,192,000 | $ 356,650,000 |
| Purchases | 88,644,000 | 94,953,000 |
| Maturities (initial cost basis) | (16,070,000) | (10,993,000) |
| Net change in fair value | 66,761,000 | 70,582,000 |
| Ending balance | $ 650,527,000 | $ 511,192,000 |

In the past, we periodically updated the independent life expectancy estimates on the insured lives in our portfolio, other than insured lives covered under small face amount policies (i.e., $1 million in face value benefits or less), on a continuous rotating three-year cycle, and through that effort attempted to update life expectancies for approximately one-twelfth of our portfolio each quarter. Currently, however, the terms of our senior credit facility with LNV Corporation require us update the independent life expectancy estimates every two years beginning from the date of the amended facility.

The following table summarizes the inputs utilized in estimating the fair value of our portfolio of life insurance policies:

|  | As of December 31, 2017 | As of December 31, 2016 |
| --- | --- | --- |
| Weighted-average age of insured, years* | 81.7 | 81.6 |
| Weighted-average life expectancy, months* | 82.4 | 83.2 |
| Average face amount per policy | $ 1,867,000 | $ 1,973,000 |
| Discount rate | 10.45% | 10.96% |

_____

(*)    Weighted-average by face amount of policy benefits

Life expectancy estimates and market discount rates for a portfolio of life insurance policies are inherently uncertain and the effect of changes in estimates may be significant. For example, if the life expectancy estimates were increased or decreased by four and eight months on each outstanding policy, and the discount rates were increased or decreased by 1% and 2%, while all other variables were held constant, the fair value of our investment in life insurance policies would increase or decrease as summarized below:

<u>Change in Fair Value of the Investment in Life Insurance Policies</u>

|  | Change in life expectancy estimates | | | |
| --- | --- | --- | --- | --- |
|  | **minus 8 months** | **minus 4 months** | **plus 4 months** | **plus 8 months** |
| December 31, 2017 | $ 86,391,000 | $ 42,886,000 | $ (42,481,000) | $ (84,238,000) |
| December 31, 2016 | $ 69,253,000 | $ 34,601,000 | $ (33,846,000) | $ (67,028,000) |

|  | Change in discount rate | | | |
| --- | --- | --- | --- | --- |
|  | **minus 2%** | **minus 1%** | **plus 1%** | **plus 2%** |
| December 31, 2017 | $ 68,117,000 | $ 32,587,000 | $ (29,964,000) | $ (57,583,000) |
| December 31, 2016 | $ 53,764,000 | $ 25,728,000 | $ (23,668,000) | $ (45,491,000) |

F-13

APP. 997

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**(4) Fair Value Definition and Hierarchy** (cont.)

*Other Fair Value Considerations*

The carrying value of receivables, prepaid expenses, accounts payable and accrued expenses approximate fair value due to their short-term maturities and low credit risk. Using the income-based valuation approach, the estimated fair value of our L Bonds, having an aggregate face value of $461,427,000 as of December 31, 2017, is approximately $470,672,000 based on a weighted-average market interest rate of 6.70%. The carrying value of the senior credit facility with LNV Corporation reflects interest charged at 12-month LIBOR plus an applicable margin. The margin represents our credit risk, and the strength of the portfolio of life insurance policies collateralizing the debt. The overall rate reflects market, and the carrying value of the facility approximates fair value.

GWG MCA participates in the merchant cash advance industry by directly advancing sums to merchants and lending money, on a secured basis, to companies that advance sums to merchants. Each quarter, we review the carrying value of these cash advances, and determine if an impairment reserve is necessary. At December 31, 2017 one of our secured cash advances was impaired. Specifically, the secured loan to Nulook Capital LLC had an outstanding balance of $1,954,000 and a loan loss reserve of $1,908,000 at December 31, 2017. We deem fair value to be the estimated collectible value on each loan or advance made from GWG MCA. Where we estimate the collectible amount to be less than the outstanding balance, we record a reserve for the difference, referred to as an impairment charge. We recorded an impairment charge of $1,308,000 and $600,000 for the years ended December 31, 2017 and 2016, respectively.

The following table summarizes outstanding warrants as of December 31, 2017:

| Month issued | Warrants issued | Fair value per share | Risk free rate | Volatility | Term |
|---|---|---|---|---|---|
| September 2014 | 16,000 | $ 1.26 | 1.85% | 17.03% | 5 years |
| | 16,000 | | | | |

**(5) Credit Facility — Autobahn Funding Company LLC**

On September 12, 2017, we terminated our $105 million senior credit facility with Autobahn Funding Company LLC, the Credit and Security Agreement governing the facility as well as the related pledge agreement, pursuant to which our obligations under the facility were secured. We had paid off in full all obligations under the facility on September 14, 2016, and since that date, we have had no amounts outstanding under the facility.

The Credit and Security Agreement contained certain financial and non-financial covenants, and we were in compliance with these covenants during the year ended December 31, 2017 until the date of termination.

**(6) Credit Facility — LNV Corporation**

On September 27, 2017, we entered into an amended and restated senior credit facility with LNV Corporation as lender through our subsidiary GWG DLP Funding IV, LLC ("DLP IV"). The Amended and Restated Loan Agreement governing the facility makes available a total of up to $300,000,000 in credit with a maturity date of September 27, 2029. Additional advances are available under the Amended and Restated Loan Agreement at the LIBOR rate as defined in the Amended and Restated Loan Agreement. Advances are available as the result of additional borrowing base capacity, created as the premiums and servicing costs of pledged life insurance policies become due. Interest will accrue on amounts borrowed under the Amended and Restated Loan Agreement at an annual interest rate, determined as of each date of borrowing or quarterly if there is no borrowing, equal to (A) the greater of 12-month LIBOR or the federal funds rate (as defined in the agreement) plus one-half of one percent per annum, plus (B) 7.50% per annum. The effective rate at December 31, 2017 was 9.31%. Interest payments are made on a quarterly basis.

F-14

APP. 998

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**(6) Credit Facility — LNV Corporation** (cont.)

As of December 31, 2017, approximately 82.6% of the total face value of our portfolio is pledged to LNV Corporation. The amount outstanding under this facility was $222,525,000 and $162,725,000 at December 31, 2017 and 2016, respectively. Obligations under the facility are secured by a security interest in DLP IV's assets, for the benefit of the lenders under the Amended and Restated Loan Agreement, through an arrangement under which Wells Fargo serves as securities intermediary. The life insurance policies owned by DLP IV do not serve as direct collateral for the obligations of GWG Holdings under the L Bonds. The difference between the amount outstanding and the carrying amount on our balance sheet is due to netting of unamortized debt issuance costs.

The Amended and Restated Loan Agreement does not require DLP IV to maintain a reserve account for future premiums.

The Amended and Restated Loan Agreement has certain financial and nonfinancial covenants, and we were in compliance with these covenants at December 31, 2017, and with the covenants in the original Loan Agreement at December 31, 2016.

**(7) Series I Secured Notes**

Series I Secured Notes were legal obligations of GWG Life and were privately offered and sold from August 2009 through June 2011. On September 8, 2017, we redeemed all outstanding Series I Secured Notes for an aggregate of $6,815,000.

The Series I Secured Notes were governed by an Intercreditor Agreement, a Third Amended and Restated Note Issuance and Security Agreement dated November 1, 2011, as amended, and a related Pledge Agreement. Upon the redemption of the Series I Secured Notes and the termination of all obligations outstanding thereunder, those agreements were terminated effective as of September 8, 2017.

**(8) L Bonds**

Our L Bonds are legal obligations of GWG Holdings. Obligations under the L Bonds are secured by the assets of GWG Holdings and by GWG Life, as a guarantor, and are subordinate to the obligations under our senior credit facility (see Note 6). We began publicly offering and selling L Bonds in January 2012 under the name "Renewable Secured Debentures". These debt securities were re-named "L Bonds" in January 2015. L Bonds are publicly offered and sold on a continuous basis under a registration statement permitting us to sell up to $1.0 billion in principal amount of L Bonds. We are party to an indenture governing the L Bonds dated October 19, 2011, as amended ("Indenture"), under which GWG Holdings is obligor, GWG Life is guarantor, and Bank of Utah serves as indenture trustee. The Indenture contains certain financial and non-financial covenants, and we were in compliance with these covenants at December 31, 2017 and 2016.

On December 1, 2017, an additional public offering sold on a continuous basis of L Bonds permitting us to sell up to $1.0 billion in principal amount of L Bonds was declared effective. The new offering is a follow-on to the previous L Bond offering and contains the same terms and features.

The bonds have renewal features under which we may elect to permit their renewal, subject to the right of bondholders to elect to receive payment at maturity. Interest is payable monthly or annually depending on the election of the investor.

At December 31, 2017 and 2016, the weighted-average interest rate of our L Bonds was 7.29% and 7.23%, respectively. The principal amount of L Bonds outstanding was $461,427,000 and $387,067,000 at December 31, 2017 and 2016, respectively. The difference between the amount of outstanding L Bonds and the carrying amount on our balance sheets is due to netting of unamortized deferred issuance costs, cash receipts for new issuances and payments of redemptions in process. Amortization of deferred issuance costs was $6,940,000 and $7,099,000 in 2017 and 2016, respectively. Future expected amortization of deferred financing costs as of December 31, 2017 is $15,593,000 in total over the next seven years.

F-15

APP. 999

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**(8) L Bonds** (cont.)

Future contractual maturities of L Bonds, and future amortization of their deferred financing costs, at December 31, 2017 are as follows:

| Years Ending December 31, | Contractual Maturities | | Amortization of Deferred Financing Costs | |
|---|---|---|---|---|
| 2018 | $ | 105,916,000 | $ | 1,182,000 |
| 2019 | | 151,689,000 | | 4,485,000 |
| 2020 | | 78,402,000 | | 3,297,000 |
| 2021 | | 30,759,000 | | 1,331,000 |
| 2022 | | 40,018,000 | | 2,137,000 |
| Thereafter | | 54,643,000 | | 3,161,000 |
| | $ | 461,427,000 | $ | 15,593,000 |

**(9) Series A Convertible Preferred Stock**

From July 2011 through September 2012, we privately offered shares of Series A of GWG Holdings at $7.50 per share. In the offering, we sold an aggregate of 3,278,000 shares for gross consideration of $24,582,000. Holders of Series A were entitled to cumulative dividends at the rate of 10% per annum, paid quarterly. The Series A Convertible Preferred Stock were only redeemable at our option.

Purchasers of Series A in our offering received warrants to purchase an aggregate of 416,000 shares of our common stock at an exercise price of $12.50 per share. As of December 31, 2017, all of these warrants have expired and none of them had been exercised.

On October 9, 2017 all shares of Series A were redeemed with a redemption payment equal to the sum of: (i) $8.25 per Series A share and (ii) all accrued but unpaid dividends.

**(10) Redeemable Preferred Stock**

On November 30, 2015, our public offering of up to 100,000 shares of Redeemable Preferred Stock ("RPS") at $1,000 per share was declared effective. Holders of RPS are entitled to cumulative dividends at the rate of 7% per annum, paid monthly. Dividends on the RPS are recorded as a reduction to additional paid-in capital, if any, then to the outstanding balance of the preferred stock if additional paid-in-capital has been exhausted. Under certain circumstances described in the Certificate of Designation for the RPS, additional shares of RPS may be issued in lieu of cash dividends.

The RPS ranks senior to our common stock and pari passu with our RPS 2 and entitles its holders to a liquidation preference equal to the stated value per share (i.e., $1,000) plus accrued but unpaid dividends. Holders of RPS may presently convert their RPS into our common stock at a conversion price equal to the volume-weighted average price of our common stock for the 20 trading days immediately prior to the date of conversion, subject to a minimum conversion price of $15.00 and in an aggregate amount limited to 15% of the stated value of RPS originally purchased by such holder from us and still held by such holder.

Holders of RPS may request that we redeem their RPS at a price equal to their stated value plus accrued but unpaid dividends, less an applicable redemption fee, if any. Nevertheless, the Certificate of Designation for RPS permits us sole discretion to grant or decline redemption requests. Subject to certain restrictions and conditions, we may also redeem shares of RPS without a redemption fee upon a holder's death, total disability or bankruptcy. In addition, after one year from the date of original issuance, we may, at our option, call and redeem shares of RPS at a price equal to their liquidation preference.

F-16

APP. 1000

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**(10) Redeemable Preferred Stock** (cont.)

As of March 31, 2017, we closed the RPS offering to investors having sold 99,127 shares of RPS for an aggregate gross consideration of $99,127,000 and incurred approximately $7,019,000 of related selling costs.

At the time of its issuance, we determined that the RPS contained two embedded features: (1) optional redemption by the holder and (2) optional conversion by the holder. We determined that each of the embedded features met the definition of a derivative and that the RPS should be considered an equity host for the purposes of assessing the embedded derivatives for potential bifurcation. Based on our assessment under Accounting Standards Codification 470 "*Debt*" ("ASC 470") we do not believe bifurcation of either the holder's redemption or conversion feature is appropriate.

**(11) Series 2 Redeemable Preferred Stock**

On February 14, 2017, our public offering up to 150,000 shares of Series 2 Redeemable Preferred Stock ("RPS 2") at $1,000 per share was declared effective. Holders of RPS 2 are entitled to cumulative dividends at the rate of 7% per annum, paid monthly. Dividends on the RPS 2 are recorded as a reduction to additional paid-in capital, if any, then to the outstanding balance of the preferred stock if additional paid-in capital has been exhausted. Under certain circumstances described in the Certificate of Designation for the RPS 2, additional shares of RPS 2 may be issued in lieu of cash dividends.

The RPS 2 ranks senior to our common stock and pari passu with our RPS and entitles its holders to a liquidation preference equal to the stated value per share (i.e., $1,000) plus accrued but unpaid dividends. Holders of RPS 2 may, less an applicable conversion discount, if any, convert their RPS 2 into our common stock at a conversion price equal to the volume-weighted average price of our common stock for the 20 trading days immediately prior to the date of conversion, subject to a minimum conversion price of $12.75 and in an aggregate amount limited to 10% of the stated value of RPS 2 originally purchased by such holder from us and still held by such holder.

Holders of RPS 2 may request that we redeem their RPS 2 shares at a price equal to their liquidation preference, less an applicable redemption fee, if any. Nevertheless, the Certificate of Designation for RPS 2 permits us sole discretion to grant or decline requests for redemption. Subject to certain restrictions and conditions, we may also redeem shares of RPS 2 without a redemption fee upon a holder's death, total disability or bankruptcy. In addition, we may, at our option, call and redeem shares of RPS 2 at a price equal to their liquidation preference (subject to a minimum redemption price, in the event of redemptions occurring less than one year after issuance, of 107% of the stated value of the shares being redeemed).

The selling broker dealer has agreed to sell the RPS 2 shares to qualified accounts with a selling commission of 6.0% of the gross proceeds from the RPS 2 shares sold by the selling broker dealer which will result in a sales price of $940 per RPS 2 share. The net proceeds to the Company from the sales to qualified accounts will not be affected by the reduction in the selling broker dealer's commissions.

As of December 31, 2017, we had sold 88,709 shares of RPS 2 for aggregate gross consideration of $88,709,000 and incurred approximately $6,142,000 of selling costs related to the sale of those shares.

At the time of its issuance, we determined that the RPS 2 contained two embedded features: (1) optional redemption by the holder; and (2) optional conversion by the holder. We determined that each of the embedded features met the definition of a derivative and that the RPS 2 should be considered an equity host for the purposes of assessing the embedded derivatives for potential bifurcation. Based on our assessment under ASC 470 we do not believe bifurcation of either the holder's redemption or conversion feature is appropriate.

F-17

APP. 1001

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 1003 of 1031    PageID 1175

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### (12) Income Taxes

We had a current income tax liability of $0 as of both December 31, 2017 and 2016. The components of our income tax expense (benefit) and the reconciliation at the statutory federal tax rate to our actual income tax expense (benefit) for the years ended December 31, 2017 and 2016 consisted of the following:

| | 2017 | | 2016 | |
|---|---|---|---|---|
| Statutory federal income tax (benefit) | $ (7,728,000) | 34.0% | $ 247,000 | 34.0% |
| State income taxes (benefit), net of federal benefit | (1,433,000) | 6.3% | 56,000 | 7.8% |
| Impact of change in enacted rate | 2,605,000 | (11.4)% | — | — |
| Change in valuation allowance | 4,222,000 | (18.6)% | — | — |
| Other permanent differences | 237,000 | (1.1)% | 30,000 | 4.2% |
| Total income tax expense (benefit) | $ (2,097,000) | 9.2% | $ 333,000 | 46.0% |

The tax effects of temporary differences that give rise to deferred income taxes were as follows:

| | As of December 31, 2017 | As of December 31, 2016 |
|---|---|---|
| Deferred tax assets: | | |
| Note Receivable from related party | $ 1,437,000 | $ 2,023,000 |
| Net operating loss carryforwards | 9,995,000 | 10,781,000 |
| Other assets | 1,724,000 | 1,130,000 |
| Subtotal | $ 13,156,000 | $ 13,934,000 |
| Valuation allowance | (6,386,000) | (2,164,000) |
| Deferred tax assets | $ 6,770,000 | $ 11,770,000 |
| | | |
| Deferred tax liabilities: | | |
| Investment in life insurance policies | $ (6,630,000) | $ (13,867,000) |
| Other liabilities | (140,000) | — |
| Net deferred tax asset/(liability) | $ — | $ (2,097,000) |

At December 31, 2017 and 2016, we had federal net operating loss ("NOL") carryforwards of $34,775,000 and $26,642,000, respectively, and aggregate state NOL carryforwards of approximately $34,749,000 and $26,616,000, respectively. The NOL carryforwards will begin to expire in 2031. Future utilization of NOL carryforwards is subject to limitations under Section 382 of the Internal Revenue Code. This section generally relates to a more than 50 percent change in ownership over a three-year period. We currently do not believe that any prior issuance of common stock has resulted in an ownership change under Section 382 through December 31, 2017.

We provide for a valuation allowance when it is not considered "more likely than not" that our deferred tax assets will be realized. As of December 31, 2017, based on all available evidence, we have provided a valuation allowance against our total net deferred tax asset of $6,386,000 due to uncertainty as to the realization of our deferred tax assets during the carryover periods. As of December 31, 2016, we had provided a valuation allowance of $2,164,000 against deferred tax assets related to the likelihood of recovering the tax benefit of a capital loss on a note receivable from a related entity and other capital losses.

On December 22, 2017, the U.S. federal government enacted the Tax Cuts and Jobs Act ("Tax Reform Bill"). The Tax Reform Bill changed existing United States tax law, including a reduction of the U.S. corporate income tax rate. The Company re-measured deferred taxes as of the date of enactment, resulting in a $2,605,000 reduction of net deferred income tax assets. The Company's measurement of the income tax effects of the Tax Reform Bill for the year ended December 31, 2017 is reasonably estimated and, therefore, included in these financial statements in accordance with SEC Staff Accounting Bulletin No. 118.

APP. 1002

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 1004 of 1031     PageID 1176

F-18

APP. 1003

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**(12) Income Taxes** (cont.)

ASC 740 requires the reporting of certain tax positions that do not meet a threshold of "more-likely-than-not" to be recorded as uncertain tax benefits. It is management's responsibility to determine whether it is "more-likely-than-not" that a tax position will be sustained upon examination, including resolution of any related appeals or litigation, based upon the technical merits of the position. Management has reviewed all income tax positions taken or expected to be taken for all open years and has determined that the income tax positions are appropriately stated and supported. We do not anticipate that the total unrecognized tax benefits will significantly change prior to December 31, 2018.

Under our accounting policies, interest and penalties on unrecognized tax benefits, as well as interest received from favorable tax settlements are recognized as components of income tax expense. At December 31, 2017 and 2016, we recorded no accrued interest or penalties related to uncertain tax positions.

Our income tax returns for tax years ended December 31, 2014, 2015, 2016 and 2017, when filed, remain open to examination by the Internal Revenue Service and various state taxing jurisdictions. Our income tax return for tax year ended December 31, 2013 also remains open to examination by various state taxing jurisdictions.

**(13) Common Stock**

In September 2014, we consummated an initial public offering of our common stock resulting in the sale of 800,000 shares of common stock at $12.50 per share, and net proceeds of approximately $8.6 million after the payment of underwriting commissions, discounts and expense reimbursements. In connection with this offering, we listed our common stock on the Nasdaq Capital Market under the ticker symbol "GWGH."

In conjunction with the initial public offering our Company issued warrants to purchase 16,000 shares of common stock at an exercise price of $15.63 per share. As of December 31, 2017, none of these warrants had been exercised. The remaining life of these warrants at December 31, 2017 was 1.8 years.

**(14) Stock Incentive Plan**

We adopted our 2013 Stock Incentive Plan in March 2013, as amended on June 1, 2015 and May 5, 2017. The Compensation Committee of our Board of Directors is responsible for the administration of the plan. Participants under the plan may be granted incentive stock options and non-statutory stock options; stock appreciation rights; stock awards; restricted stock; restricted stock units; and performance shares. Eligible participants include officers and employees of GWG Holdings and its subsidiaries, members of our Board of Directors, and consultants. Awards generally expire 10 years from the date of grant. As of December 31, 2017, 3,000,000 common stock options are authorized under the plan, of which 866,000 remain available for issuance.

*Stock Options*

Through December 31, 2017, we had outstanding stock options for 1,637,000 shares of common stock to employees, officers, and directors under the plan. Options for 857,000 shares have vested, and the remaining options are scheduled to vest over three years. The options were issued with an exercise price between $6.35 and $10.38 for those beneficially owning more than 10% of our common stock, and between $4.83 and $11.00 for all others, which is equal to the market price of the shares on the date of grant. The expected annualized volatility used in the Black-Scholes model valuation of options issued during the period ranged from 19.7% to 29.0%. The annual volatility rate is based on the standard deviation of the average continuously compounded rate of return of five selected comparable companies. As of December 31, 2017, stock options for 685,000 shares had been forfeited and stock options for 154,000 shares had been exercised.

F-19

APP. 1004

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**(14) Stock Incentive Plan** (cont.)

Outstanding stock options:

| | Vested | Un-vested | Total |
|---|---|---|---|
| **Balance as of December 31, 2015** | 483,703 | 569,912 | 1,053,615 |
| Granted during the year | 22,500 | 608,350 | 630,850 |
| Vested during the year | 251,788 | (251,788) | — |
| Forfeited during the year | (19,926) | (82,140) | (102,066) |
| **Balance as of December 31, 2016** | 738,065 | 844,334 | 1,582,399 |
| Granted during the year | 61,099 | 367,500 | 428,599 |
| Vested during the year | 327,061 | (327,061) | — |
| Exercised during the year | (126,498) | — | (126,498) |
| Forfeited during the year | (142,535) | (105,017) | (247,552) |
| **Balance as of December 31, 2017** | 857,192 | 779,756 | 1,636,948 |

As of December 31, 2017, unrecognized compensation expense related to un-vested options is $1,096,000. We expect to recognize this compensation expense over the next three years ($577,000 in 2018, $397,000 in 2019, and $122,000 in 2020).

*Stock Appreciation Rights (SARs)*

As of December 31, 2017, we have issued SARs for 343,000 shares of the common stock to employees. The strike price of the SARs was between $7.84 and $10.38, which was equal to the market price of the common stock at the date of issuance. As of December 31, 2017, 189,000 of the SARs were vested. On December 31, 2017, the market price of GWG's common stock was $8.32.

Outstanding SARs:

| | Vested | Un-vested | Total |
|---|---|---|---|
| **Balance as of December 31, 2015** | — | — | — |
| Granted during the year | 106,608 | 133,127 | 239,735 |
| **Balance as of December 31, 2016** | 106,608 | 133,127 | 239,735 |
| Granted during the year | 13,001 | 91,986 | 104,987 |
| Vested during the year | 69,444 | (69,444) | — |
| Forfeited during the year | — | (1,750) | (1,750) |
| **Balance as of December 31, 2017** | 189,053 | 153,919 | 342,972 |

The liability for the SARs as of December 31, 2017, recorded within other accrued expenses, was $551,000. Employee compensation and benefits expense for SARs of $547,000 and $4,000 was recorded for the years ending December 31, 2017 and 2016, respectively.

Upon the exercise of SARs, the Company is obligated to make cash payment equal to the positive difference between the fair market value of the Company's common stock on the date of exercise less the fair market value of the common stock on the date of grant.

F-20

APP. 1005

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**(14) Stock Incentive Plan** (cont.)

The following summarizes information concerning outstanding shares issuable under the 2013 Stock Incentive Plan:

| | December 31, 2017 | | | |
| | Outstanding | Weighted-Average Exercise Price | Weighted-Average Remaining Life (years) | Weighted-Average Fair Value at Grant Date |
|---|---|---|---|---|
| Vested | | | | |
| Stock Options | 857,192 $ | 8.05 | 6.17 $ | 1.76 |
| SARs | 189,053 $ | 8.54 | 5.86 $ | 1.90 |
| Total Vested | 1,046,245 $ | 8.14 | 6.11 $ | 1.78 |
| | | | | |
| Unvested | | | | |
| Stock Options | 779,756 $ | 9.21 | 7.50 $ | 2.17 |
| SARs | 153,919 $ | 9.16 | 6.24 $ | 2.02 |
| Total Unvested | 933,675 $ | 9.21 | 7.30 $ | 2.15 |

| | December 31, 2016 | | | |
| | Outstanding | Weighted-Average Exercise Price | Weighted-Average Remaining Life (years) | Weighted-Average Fair Value at Grant Date |
|---|---|---|---|---|
| Vested | | | | |
| Stock Options | 745,565 $ | 8.41 | 7.00 $ | 1.64 |
| SARs | 106,608 $ | 8.35 | 6.81 $ | 1.83 |
| Total Vested | 852,173 $ | 8.40 | 6.98 $ | 1.66 |
| | | | | |
| Unvested | | | | |
| Stock Options | 844,334 $ | 8.72 | 7.04 $ | 1.82 |
| SARs | 133,127 $ | 8.41 | 6.82 $ | 2.00 |
| Total Unvested | 977,461 $ | 8.68 | 7.01 $ | 1.84 |

**(15) Other Expenses**

The components of "Other expenses" in our consolidated statements of operations for the years ended December 31, 2017 and 2016 are as follows:

| | 2017 | 2016 |
|---|---|---|
| Contract labor | $ 550,000 | $ 913,000 |
| Marketing | 2,226,000 | 1,702,000 |
| Information technology | 1,555,000 | 739,000 |
| Servicing and facility fees | 1,226,000 | 1,159,000 |
| Travel and entertainment | 1,047,000 | 1,092,000 |
| Insurance and regulatory | 1,591,000 | 1,729,000 |
| Charitable contributions | 462,000 | 280,000 |
| General and administrative | 2,514,000 | 2,463,000 |
| Total other expenses | $ 11,171,000 | $ 10,077,000 |

APP. 1006

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 1008 of 1031     PageID 1180

F-21

APP. 1007

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**(16) Net Loss Attributable to Common Shareholders**

We have outstanding RPS and RPS 2, as described in Notes 10 and 11. RPS and RPS 2 are anti-dilutive to our net loss attributable to common shareholders calculation for the years ended December 31, 2017 and December 31, 2016. Our vested and un-vested stock options are anti-dilutive at both December 31, 2017 and 2016.

**(17) Commitments**

We are party to an office lease with U.S. Bank National Association as the landlord. On September 1, 2015, we entered into an amendment to our original lease that expanded the leased space to 17,687 square feet and extended the term through October 2025. Under the amended lease we are obligated to pay base rent plus common area maintenance and a share of building operating costs. Rent expenses under this agreement were $442,000 and $415,000 for the years ended December 31, 2017 and 2016, respectively.

Minimum lease payments under the amended lease are as follows:

| | | |
|---|---|---|
| 2018 | $ | 266,000 |
| 2019 | | 275,000 |
| 2020 | | 284,000 |
| 2021 | | 293,000 |
| 2022 | | 302,000 |
| Thereafter | | 904,000 |
| | $ | 2,324,000 |

**(18) Contingencies**

*Litigation* — In the normal course of business, we are involved in various legal proceedings. In the opinion of management, any liability resulting from such proceedings would not have a material adverse effect on our financial position, results of operations or cash flows.

**(19) Guarantee of L Bonds**

We are publicly offering and selling L Bonds under a registration statement declared effective by the SEC, as described in Note 8. Our obligations under the L Bonds are secured by substantially all the assets of GWG Holdings, a pledge of all our common stock held individually by our largest stockholders, and by a guarantee and corresponding grant of a security interest in substantially all the assets of GWG Life. As a guarantor, GWG Life has fully and unconditionally guaranteed the payment of principal and interest on the L Bonds. GWG Life's equity in DLP IV serve as collateral for our L Bond obligations. Substantially all of our life insurance policies are held by DLP IV and the Trust. The policies held by DLP IV are not collateral for the L Bond obligations as such policies are pledged to the senior credit facility with LNV Corporation.

The consolidating financial statements are presented in lieu of separate financial statements and other related disclosures of the subsidiary guarantor and issuer, because management does not believe that separate financial statements and related disclosures would be material to investors. There are currently no significant restrictions on the ability of GWG Holdings or GWG Life, the guarantor subsidiary, to obtain funds from its subsidiaries by dividend or loan, except as described in these notes. A substantial majority of insurance policies we currently own are subject to a collateral arrangement with LNV Corporation described in Note 6. Under this arrangement, we are required to maintain a collection account that is used to collect policy benefits from pledged policies, pay interest and other charges under the facility, and distribute funds to pay down the facility.

The following represents consolidating financial information as of December 31, 2017 and December 31, 2016, with respect to the financial position, and for the years ended December 31, 2017 and 2016, with respect to results of operations and cash flows of GWG Holdings and its subsidiaries. The parent column presents the financial information of GWG Holdings, the primary obligor for the L Bonds. The guarantor subsidiary column presents the financial information of GWG Life, the guarantor subsidiary of the L Bonds, presenting its investment in DLP IV and the Trust under the equity method. The non-guarantor subsidiaries column presents the financial information of all non-guarantor subsidiaries, including DLP IV and the Trust.

F-22

APP. 1008

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**(19) Guarantee of L Bonds** (cont.)

Consolidating Balance Sheets

| December 31, 2017 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash and cash equivalents | $ 111,952,829 | $ 1,486,623 | $ 982,039 | $ — | $ 114,421,491 |
| Restricted cash | — | 9,367,410 | 18,982,275 | — | 28,349,685 |
| Investment in life insurance policies, at fair value | — | 51,093,362 | 599,433,991 | — | 650,527,353 |
| Secured MCA advances | — | — | 1,661,774 | — | 1,661,774 |
| Life insurance policy benefits receivable | — | 1,500,000 | 15,158,761 | — | 16,658,761 |
| Other assets | 1,912,203 | 1,986,312 | 3,338,595 | — | 7,237,110 |
| Investment in subsidiaries | 480,659,789 | 415,235,212 | — | (895,895,001) | — |
| TOTAL ASSETS | $ 594,524,821 | $ 480,668,919 | $ 639,557,435 | $ (895,895,001) | $ 818,856,174 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | | | | |
| LIABILITIES | | | | | |
| Senior Credit Facilities | $ — | $ — | $ 212,238,192 | $ — | $ 212,238,192 |
| L Bonds | 447,393,568 | — | — | — | 447,393,568 |
| Accounts payable | 1,434,623 | 844,899 | 4,114,917 | — | 6,394,439 |
| Interest and dividends payable | 10,296,584 | — | 5,130,925 | — | 15,427,509 |
| Other accrued expenses | 1,728,303 | 1,610,773 | 391,647 | — | 3,730,723 |
| TOTAL LIABILITIES | 460,853,078 | 2,455,672 | 221,875,681 | — | 685,184,431 |
| STOCKHOLDERS' EQUITY | | | | | |
| Member capital | — | 478,213,247 | 417,681,754 | (895,895,001) | — |
| Redeemable preferred stock and Series 2 redeemable preferred stock | 173,115,447 | — | — | — | 173,115,447 |
| Common stock | 5,813 | — | — | — | 5,813 |
| Accumulated deficit | (39,449,517) | — | — | — | (39,449,517) |
| TOTAL STOCKHOLDERS' EQUITY | 133,671,743 | 478,213,247 | 417,681,754 | (895,895,001) | 133,671,743 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ 594,524,821 | $ 480,668,919 | $ 639,557,435 | $ (895,895,001) | $ 818,856,174 |

F-23

APP. 1009

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**(19) Guarantee of L Bonds** (cont.)

Consolidating Balance Sheets (continued)

| December 31, 2016 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash and cash equivalents | $ 28,481,047 | $ 49,360,952 | $ 644,983 | $ — | $ 78,486,982 |
| Restricted cash | — | 2,117,649 | 35,708,947 | — | 37,826,596 |
| Investment in life insurance policies, at fair value | — | 41,277,896 | 469,914,458 | — | 511,192,354 |
| Secured MCA advances | — | — | 5,703,147 | — | 5,703,147 |
| Life insurance policy benefits receivable | — | — | 5,345,000 | — | 5,345,000 |
| Other assets | 3,854,233 | 2,056,822 | 810,640 | (2,033,592) | 4,688,103 |
| Investment in subsidiaries | 429,971,148 | 352,337,037 | — | (782,308,185) | — |
| TOTAL ASSETS | $ 462,306,428 | $ 447,150,356 | $ 518,127,175 | $ (784,341,777) | $ 643,242,182 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | | | | |
| LIABILITIES | | | | | |
| Senior Credit Facilities | $ — | $ — | $ 156,064,818 | $ — | $ 156,064,818 |
| Series I Secured Notes | — | 16,404,836 | — | — | 16,404,836 |
| L Bonds | 381,312,587 | — | — | — | 381,312,587 |
| Accounts payable | 853,470 | 731,697 | 641,545 | — | 2,226,712 |
| Interest and dividends payable | 9,882,133 | 3,743,277 | 2,535,189 | — | 16,160,599 |
| Other accrued expenses | 862,369 | 544,032 | 2,303,952 | (2,033,592) | 1,676,761 |
| Deferred taxes, net | 2,097,371 | — | — | — | 2,097,371 |
| TOTAL LIABILITIES | 395,007,930 | 21,423,842 | 161,545,504 | (2,033,592) | 575,943,684 |
| STOCKHOLDERS' EQUITY (DEFICIT) | | | | | |
| Member capital | — | 425,726,514 | 356,581,671 | (782,308,185) | — |
| Convertible preferred stock | 19,701,133 | — | — | — | 19,701,133 |
| Redeemable preferred stock | 59,025,164 | — | — | — | 59,025,164 |
| Common stock | 5,980 | — | — | — | 5,980 |
| Additional paid-in capital | 7,383,515 | — | — | — | 7,383,515 |
| Accumulated deficit | (18,817,294) | — | — | — | (18,817,294) |
| TOTAL STOCKHOLDERS' EQUITY | 67,298,498 | 425,726,514 | 356,581,671 | (782,308,185) | 67,298,498 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ 462,306,428 | $ 447,150,356 | $ 518,127,175 | $ (784,341,777) | $ 643,242,182 |

F-24

APP. 1010

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**(19) Guarantee of L Bonds** (cont.)

Consolidating Statements of Operations

| For the year ended December 31, 2017 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUE | | | | | |
| Gain on life insurance policies, net | $ — | $ 6,979,773 | $ 55,134,630 | $ — | $ 62,114,403 |
| MCA income | — | — | 554,341 | — | 554,341 |
| Interest and other income | 244,202 | 496,886 | 1,199,457 | (475,371) | 1,465,174 |
| TOTAL REVENUE | 244,202 | 7,476,659 | 56,888,428 | (475,371) | 64,133,918 |
| EXPENSES | | | | | |
| Interest expense | 37,754,984 | 930,837 | 15,813,944 | (80,321) | 54,419,444 |
| Employee compensation and benefits | 9,043,509 | 5,310,498 | 515,742 | — | 14,869,749 |
| Legal and professional fees | 1,937,714 | 962,778 | 2,195,151 | — | 5,095,643 |
| Provision for MCA advances | — | — | 1,308,000 | — | 1,308,000 |
| Other expenses | 7,058,209 | 2,715,374 | 1,792,143 | (395,050) | 11,170,676 |
| TOTAL EXPENSES | 55,794,416 | 9,919,487 | 21,624,980 | (475,371) | 86,863,512 |
| INCOME (LOSS) BEFORE EQUITY IN INCOME OF SUBSIDIARIES | (55,550,214) | (2,442,828) | 35,263,448 | — | (22,729,594) |
| EQUITY IN INCOME OF SUBSIDIARIES | 32,820,620 | 38,392,230 | — | (71,212,850) | — |
| INCOME (LOSS) BEFORE INCOME TAXES | (22,729,594) | 35,949,402 | 35,263,448 | (71,212,850) | (22,729,594) |
| INCOME TAX BENEFIT | (2,097,371) | — | — | — | (2,097,371) |
| NET INCOME (LOSS) | (20,632,223) | 35,949,402 | 35,263,448 | (71,212,850) | (20,632,223) |
| Preferred stock dividends | 12,702,341 | — | — | — | 12,702,341 |
| NET INCOME (LOSS) ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ (33,334,564) | $ 35,949,402 | $ 35,263,448 | $ (71,212,850) | $ (33,334,564) |

| For the year ended December 31, 2016 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUE | | | | | |
| Gain on life insurance policies, net | $ — | $ 379,405 | $ 67,422,160 | $ — | $ 67,801,565 |
| MCA income | — | — | 929,303 | — | 929,303 |
| Interest and other income | 260,087 | 72,757 | 639,414 | (225,792) | 746,466 |
| TOTAL REVENUE | 260,087 | 452,162 | 68,990,877 | (225,792) | 69,477,334 |
| EXPENSES | | | | | |
| Interest expense | 32,149,577 | 2,311,819 | 8,094,353 | (212,375) | 42,343,374 |
| Employee compensation and benefits | 6,874,368 | 4,358,406 | 551,522 | — | 11,784,296 |
| Legal and professional fees | 2,107,053 | 1,628,408 | 211,915 | — | 3,947,376 |
| Provision for MCA advances | — | — | 600,000 | — | 600,000 |
| Other expenses | 5,822,621 | 2,871,318 | 1,396,454 | (13,417) | 10,076,976 |
| TOTAL EXPENSES | 46,953,619 | 11,169,951 | 10,854,244 | (225,792) | 68,752,022 |
| INCOME (LOSS) BEFORE EQUITY IN INCOME OF SUBSIDIARIES | (46,693,532) | (10,717,789) | 58,136,633 | — | 725,312 |
| EQUITY IN INCOME OF SUBSIDIARIES | 47,418,844 | 58,822,543 | — | (106,241,387) | — |
| INCOME (LOSS) BEFORE INCOME TAXES | 725,312 | 48,104,754 | 58,136,633 | (106,241,387) | 725,312 |
| INCOME TAX EXPENSE | 333,403 | — | — | — | 333,403 |
| NET INCOME (LOSS) | 391,909 | 48,104,754 | 58,136,633 | (106,241,387) | 391,909 |
| Preferred stock dividends | 3,537,287 | — | — | — | 3,537,287 |
| NET INCOME (LOSS) ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ (3,145,378) | $ 48,104,754 | $ 58,136,633 | $ (106,241,387) | $ (3,145,378) |

F-25

APP. 1011

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**(19) Guarantee of L Bonds** (cont.)

Consolidating Statements of Cash Flows

| For the year ended December 31, 2017 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | |
| Net income (loss) | $ (20,632,223) | $ 35,949,402 | $ 35,263,448 | $ (71,212,850) | $ (20,632,223) |
| Adjustments to reconcile net income (loss) to net cash flows from operating activities: | | | | | |
| Equity of subsidiaries | (32,820,620) | (38,392,230) | — | 71,212,850 | — |
| Change in fair value of life insurance policies | — | (7,746,744) | (59,014,067) | — | (66,760,811) |
| Amortization of deferred financing and issuance costs | 6,939,841 | 208,829 | 1,632,177 | — | 8,780,847 |
| Provision for MCA advances | — | — | 1,308,000 | — | 1,308,000 |
| Deferred income taxes | (2,097,371) | — | — | — | (2,097,371) |
| Preferred stock issued in lieu of cash dividends | 498,659 | — | — | — | 498,659 |
| (Increase) decrease in operating assets: | | | | | |
| Life insurance policy benefits receivable | — | (1,500,000) | (9,813,761) | — | (11,313,761) |
| Other assets | (15,870,956) | (24,497,313) | (5,155,644) | 42,435,842 | (3,088,071) |
| Increase (decrease) in operating liabilities: | | | | | |
| Accounts payable | 581,153 | 113,202 | 3,473,373 | — | 4,167,728 |
| Interest and dividends payable | 3,771,709 | (3,743,277) | 2,680,191 | — | 2,708,623 |
| Other accrued expenses | 1,702,625 | 1,066,743 | (146,546) | — | 2,622,822 |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (57,927,183) | (38,541,388) | (29,772,829) | 42,435,842 | (83,805,558) |
| | | | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | |
| Investment in life insurance policies | — | (3,022,439) | (85,621,380) | — | (88,643,819) |
| Carrying value of matured life insurance policies | — | 2,091,713 | 13,977,919 | — | 16,069,632 |
| Proceeds from Secured MCA advances | — | — | 2,762,784 | — | 2,762,784 |
| NET CASH FLOWS USED IN INVESTING ACTIVITIES | — | (930,726) | (68,880,677) | — | (69,811,403) |
| | | | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | | |
| Net borrowings on Senior Credit Facilities | — | — | 59,799,649 | — | 59,799,649 |
| Payments for issuance costs of senior debt | — | (1,076,118) | (3,434,270) | — | (4,510,388) |
| Payments for redemption of Series I Secured Notes | — | (16,613,667) | — | — | (16,613,667) |
| Proceeds from issuance of L Bonds | 131,796,220 | — | — | — | 131,796,220 |
| Payments for issuance costs of L Bonds | (10,896,925) | — | — | — | (10,896,925) |
| Payments for redemption of L Bonds | (60,848,460) | — | — | — | (60,848,460) |
| Proceeds from (increase in) restricted cash | — | (7,249,761) | 16,726,672 | — | 9,476,911 |
| Issuance of member capital | — | 16,537,331 | 25,898,511 | (42,435,842) | — |
| Redemption of common stock | (1,603,560) | — | — | — | (1,603,560) |
| Proceeds from issuance of preferred stock | 127,279,847 | — | — | — | 127,279,847 |
| Payments for issuance costs of preferred stock | (9,027,190) | — | — | — | (9,027,190) |
| Payments for redemption of preferred stock | (22,598,626) | — | — | — | (22,598,626) |
| Preferred stock dividends | (12,702,341) | — | — | — | (12,702,341) |
| NET CASH FLOWS PROVIDED BY (USED IN) FINANCING ACTIVITIES | 141,398,965 | (8,402,215) | 98,990,562 | (42,435,842) | 189,551,470 |
| | | | | | |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | 83,471,782 | (47,874,329) | 337,056 | — | 35,934,509 |
| | | | | | |
| **CASH AND CASH EQUIVALENTS** | | | | | |
| BEGINNING OF THE PERIOD | 28,481,047 | 49,360,952 | 644,983 | — | 78,486,982 |
| | | | | | |
| END OF THE PERIOD | $ 111,952,829 | $ 1,486,623 | $ 982,039 | $ — | $ 114,421,491 |

F-26

APP. 1012

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 1014 of 1031    PageID 1186

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## (19) Guarantee of L Bonds (cont.)

Consolidating Statements of Cash Flows (continued)

| For the year ended December 31, 2016 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | |
| Net income (loss) | $ 391,909 | $ 48,104,754 | $ 58,136,633 | $ (106,241,387) | $ 391,909 |
| Adjustments to reconcile net income (loss) to net cash flows from operating activities: | | | | | |
| Equity of subsidiaries | (47,418,844) | (58,822,543) | — | 106,241,387 | — |
| Change in fair value of life insurance policies | — | (900,808) | (69,681,575) | — | (70,582,383) |
| Amortization of deferred financing and issuance costs | 7,720,065 | (1,307,640) | 2,032,827 | — | 8,445,252 |
| Provision for MCA advances | — | — | 600,000 | — | 600,000 |
| Deferred income taxes | 333,402 | — | — | — | 333,402 |
| Preferred stock issued in lieu of cash dividends | 689,742 | — | — | — | 689,742 |
| (Increase) decrease in operating assets: | | | | | |
| Life insurance policy benefits receivable | — | — | (5,345,000) | — | (5,345,000) |
| Other assets | (114,758,710) | (43,964,379) | 42,410,680 | 114,884,593 | (1,427,816) |
| Increase (decrease) in operating liabilities: | | | | | |
| Accounts payable | 572,483 | 574,481 | (437,692) | — | 709,272 |
| Interest and dividends payable | 2,494,085 | 420,259 | 2,256,824 | — | 5,171,168 |
| Other accrued expenses | 706,719 | 2,873,233 | (8,579,395) | — | (4,999,443) |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (149,269,149) | (53,022,643) | 21,393,302 | 114,884,593 | (66,013,897) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | |
| Investment in life insurance policies | — | — | (94,952,879) | — | (94,952,879) |
| Carrying value of matured life insurance policies | — | — | 10,992,624 | — | 10,992,624 |
| Investment in Secured MCA advances | — | — | (8,727,924) | — | (8,727,924) |
| Proceeds from Secured MCA advances | — | — | 2,553,466 | — | 2,553,466 |
| NET CASH FLOWS USED IN INVESTING ACTIVITIES | — | — | (90,134,713) | — | (90,134,713) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | | |
| Net borrowings on Senior Credit Facilities | — | — | 104,825,508 | — | 104,825,508 |
| Payments for issuance costs of senior debt | — | — | (7,111,556) | — | (7,111,556) |
| Payments for redemption of Series I Secured Notes | — | (7,469,462) | — | — | (7,469,462) |
| Proceeds from issuance of L Bonds | 153,874,402 | — | — | — | 153,874,402 |
| Payments for issuance costs of L Bonds | (10,149,316) | — | — | — | (10,149,316) |
| Payments for redemption of L Bonds | (45,754,691) | — | — | — | (45,754,691) |
| Issuance of member capital | — | 107,885,727 | 6,998,866 | (114,884,593) | — |
| Increase in restricted cash | — | (15,392) | (35,469,305) | — | (35,484,697) |
| Issuance of common stock | 244,185 | — | — | — | 244,185 |
| Proceeds from issuance of preferred stock | 57,040,946 | — | 71,555 | — | 57,112,501 |
| Payments for issuance costs of preferred stock | (4,133,527) | — | (7,340) | — | (4,140,867) |
| Payments for redemption of preferred stock | (2,126,678) | — | (71,555) | — | (2,198,233) |
| Preferred stock dividends | (3,537,287) | — | — | — | (3,537,287) |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 145,458,034 | 100,400,873 | 69,236,173 | (114,884,593) | 200,210,487 |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | (3,811,115) | 47,378,230 | 494,762 | — | 44,061,877 |
| **CASH AND CASH EQUIVALENTS** | | | | | |
| BEGINNING OF THE PERIOD | 32,292,162 | 1,982,722 | 150,221 | — | 34,425,105 |
| END OF THE PERIOD | $ 28,481,047 | $ 49,360,952 | $ 644,983 | $ — | $ 78,486,982 |

F-27

APP. 1013

Case 3:22-cv-00410-B     Document 32-1     Filed 04/19/22     Page 1015 of 1031     PageID 1187

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**(20) Concentration**

We mostly purchase life insurance policies written by life insurance companies having investment-grade ratings by independent rating agencies. As a result, there may be certain concentrations of policies with life insurance companies. The following summarizes the face value of insurance policies with specific life insurance companies exceeding 10% of the total face value held by our portfolio.

|  | As of December 31, | |
| --- | --- | --- |
| **Life insurance company** | **2017** | **2016** |
| John Hancock | 15.57% | 14.36% |
| AXA Equitable | 11.88% | 13.42% |
| Lincoln National | 10.80% | 11.22% |

The following summarizes the number of insurance policies held in specific states exceeding 10% of the total face value held by us:

|  | As of December 31, | |
| --- | --- | --- |
| **State of residence** | **2017** | **2016** |
| Florida | 20.16% | 19.42% |
| California | 18.60% | 20.72% |

**(21) Subsequent Events**

Subsequent to December 31, 2017, thirteen policies covering thirteen individuals have matured. The combined insurance benefits of these policies were $10,704,000.

Subsequent to December 31, 2017, we have issued approximately $34,493,000 of L Bonds.

Subsequent to December 31, 2017, we have issued approximately $46,260,000 of RPS 2.

On January 12, 2018, we entered into a Master Exchange Agreement, pursuant to which we have agreed to issue an aggregate of up to 29.1 million shares of GWG common stock as partial consideration in exchange for our receipt of outstanding common units of The Beneficient Company Group, L.P., a Delaware limited partnership, we will receive from certain related trusts ("Seller Trusts"). Our common stock will be issued in the exchange to the Seller Trusts at a deemed purchase price of $10.00 per share. In addition to shares of our common stock, the aggregate consideration to the Seller Trusts will consist of up to $359 million of our L Bonds and payment of $150 million in cash. We may also issue and sell, in our sole discretion, a combination of common stock (at a purchase price of $10.00 per share) and L Bonds to MHT Financial SPV, L.L.C., a Delaware limited liability company, for an aggregate purchase price of $150 million in cash. Such combination will represent at least 10.9 million additional shares of common stock (including $41 million in L Bonds) but no more than 12.5 million additional shares of our common stock (including $25 million in L Bonds). The Exchange Transaction is expected to close in the second quarter of 2018, subject to the satisfaction of various closing conditions set forth in the Master Agreement.

F-28

APP. 1014

**ITEM 9.  CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE.**

There have been no changes in or disagreements with accountants on accounting and financial disclosure.

**ITEM 9A. CONTROLS AND PROCEDURES.**

**Evaluation of Disclosure Controls and Procedures**

We maintain disclosure controls and procedures designed to provide reasonable assurance that information required to be disclosed in our reports filed pursuant to the Securities Exchange Act of 1934 is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance the objectives of the control system are met.

As of December 31, 2017, our Chief Executive Officer and Chief Financial Officer carried out an evaluation of the effectiveness of our disclosure controls and procedures as such term is defined in Rule 13a-15(e) under the Securities and Exchange Act of 1934, as of the end of the period covered by this report. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded our disclosure controls and procedures were effective.

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting identified in connection with management's evaluation pursuant to Rules 13a-15(d) or 15d-15(d) of the Securities Exchange Act of 1934 during the fourth quarter of 2017 that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of the financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures are being made only with proper authorizations; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of our assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Our management, under the supervision of and with the participation of the Chief Executive Officer and Chief Financial Officer, assessed the effectiveness of our internal control over financial reporting as of December 31, 2017 based on criteria for effective control over financial reporting set forth by the Committee of Sponsoring Organizations of the Treadway Commission, 2013 framework in "*Internal Control — Integrated Framework*." Based on this assessment, our management concluded that, as of the evaluation date, we maintained effective internal control over financial reporting.

The Company's independent registered public accounting firm has audited the Company's internal control over financial reporting as of December 31, 2017, as stated in the Report of Independent Registered Public Accounting Firm, appearing under Item 8.

**ITEM 9B. OTHER INFORMATION.**

On March 27, 2018, with the approval of a majority in interest of the holders of our L Bonds as of February 9, 2018, we amended the Amended and Restated Indenture as of October 23, 2017 by and among GWG Holdings, Inc., as obligor, GWG Life, as guarantor, and Bank of Utah, as trustee (the "Indenture"). The Indenture requires that we maintain a "Debt Coverage Ratio" that does not exceed 90%. The Debt Coverage Ratio is designed to provide comfort to the holders of our L Bond that the value of our assets exceeds the value of our obligations under those L Bonds. Under the Indenture, the Debt Coverage Ratio is calculated as (i) the total amount outstanding on our interest-bearing debt (including that of our subsidiaries), over (ii) the net present asset value of all of our life insurance assets (including those of our subsidiaries), plus all of our cash and cash equivalents (including those of our subsidiaries). For this purpose, the net present asset value of life insurance assets is calculated as the present value of the life insurance portfolio's expected future cash flows, discounted at the weighted-average interest rate of the interest bearing indebtedness for the previous month.

Because the Indenture only took into account the net present asset value of our life insurance assets and the amount of our cash and equivalents when calculating the Debt Coverage Ratio, the value of our other assets was not taken into account in calculating the Debt Coverage Ratio. In order to provide a more accurate reflection of our assets that support the obligations owed to holders of securities issued under the Indenture, the amendment to the Indenture amends the definition of Debt Coverage Ratio to take into account all other assets reflected on our most recently available consolidated balance sheet prepared in the accordance with GAAP when calculating the Debt Coverage Ratio.

The description the Indenture and the amendment thereto set forth above is only a summary and is qualified in its entirety by the compete terms and conditions of the of the actual Indenture and amendment, copies of which are incorporated by reference filed as Exhibits 4.1 and 4.9 to this report, respectively.

47

**PART III**

**ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE.**

Information in response to this Item is incorporated herein by reference to our definitive proxy statement to be filed pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this Form 10-K.

**ITEM 11. EXECUTIVE COMPENSATION AND RELATED-PARTY TRANSACTION DISCLOSURES.**

Information in response to this Item is incorporated herein by reference to our definitive proxy statement to be filed pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this Form 10-K.

**ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED SHAREHOLDER MATTERS.**

**Securities Authorized for Issuance under Equity Compensation Plans**

We maintain our 2013 Stock Incentive Plan. The purpose of the 2013 Stock Incentive Plan is to provide a means by which our employees, directors, officers and consultants may be granted an opportunity to purchase our common stock, to assist in retaining the services of such persons, to secure and retain the services of persons capable of filling such positions and to provide incentives for such persons to exert maximum efforts for our success. 3,000,000 shares of our common stock have been approved for issuance under the 2013 Stock Incentive Plan, of which 866,000 shares remained available for issuance pursuant to future grants at December 31, 2017.

The 2013 Stock Incentive Plan was approved by our stockholders. The following table sets forth certain information as of December 31, 2017 with respect to securities authorized for issuance under compensation arrangements.

| Plan Category | Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants and Rights | Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights | |
|---|---|---|---|
| Equity compensation plan approved by stockholders: | | | |
| Stock Options | 1,637,000 | $ | 8.60 |
| Stock Appreciation Rights | 343,000 | $ | 8.82 |
| 2013 Stock Incentive Plan Total | 1,980,000 | $ | 8.64 |

Additional information in response to this Item is incorporated herein by reference to our definitive proxy statement to be filed pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this Form 10-K.

**ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE.**

Information in response to this Item is incorporated herein by reference to our definitive proxy statement to be filed pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this Form 10-K.

**ITEM 14. PRINCIPAL ACCOUNTING FEES AND SERVICES.**

Information in response to this Item is incorporated herein by reference to our definitive proxy statement to be filed pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this Form 10-K.

48

APP. 1017

**PART IV**

### ITEM 15. EXHIBITS, FINANCIAL STATEMENT SCHEDULES.

**Documents filed as part of this Form 10-K:**

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-1 |
| Consolidated Balance Sheets at December 31, 2017 and 2016 | F-3 |
| Consolidated Statements of Operations for the years ended December 31, 2017 and 2016 | F-4 |
| Consolidated Statements of Changes in Stockholders' Equity for the years ended December 31, 2017 and 2016 | F-5 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2017 and 2016 | F-6 |
| Notes to Consolidated Financial Statements | F-8 |

**Financial Statement Schedule:**

Not applicable.

<div align="center">49</div>

Exhibit Index

| Exhibit | Description |
|---|---|
| 3.1 | Certificate of Incorporation[1] |
| 3.2 | Bylaws as amended[6] |
| 3.3 | Certificate of Amendment to Certificate of Incorporation[3] |
| 3.4 | Certificate of Amendment to Certificate of Incorporation[7] |
| 3.5 | Certificate of Designation for Redeemable Preferred Stock[8] |
| 3.6 | Certificate of Amendment to Certificate of Designation for Redeemable Preferred Stock[8] |
| 3.7 | Certificate of Designation for Series 2 Redeemable Preferred Stock[10] |
| 4.1 | Amended and Restated Indenture with Bank of Utah, dated October 23, 2017[5] |
| 4.2 | Amended and Restated Pledge and Security Agreement by and among GWG Holdings, Inc., GWG Life, LLC, Jon R. Sabes, Steven F. Sabes, and Bank of Utah, dated October 23, 2017[5] |
| 4.3 | Form of Subscription Agreement for Redeemable Preferred Stock[11] |
| 4.4 | Form of Subscription Agreement for Series 2 Redeemable Preferred Stock[14] |
| 4.5 | Pledge Agreement dated November 15, 2010, among Jon R. Sabes, Steven F. Sabes, Opportunity Finance, LLC, SFS Trust 1976, SFS Trust 1992 Esther, SFS Trust 1982, Mokeson, LLC (collectively as pledgors), and Lord Securities Corporation (as trustee and pledgee)[3] |
| 4.6 | Amendment No. 1 to Amended and Restated Indenture with Bank of Utah, dated March 27, 2018 (filed herewith) |
| 10.1 | Amended and Restated Loan and Security Agreement with GWG DLP Funding IV, LLC (as borrower), CLMG Corp. (as agent) and LNV Corporation (as lender), dated September 27, 2017[2] |
| 10.2 | Employment Agreement with Jon R. Sabes, dated June 14, 2011[4] |
| 10.3 | Employment Agreement with Steven F. Sabes, dated June 14, 2011[4] |
| 10.4 | Employment Agreement with William B. Acheson, dated June 30, 2017[9] |
| 10.5 | 2013 Stock Incentive Plan[12] |
| 10.6 | Form of Stock Option Agreement used with 2013 Stock Incentive Plan[13] |
| 21 | List of Subsidiaries (filed herewith) |
| 23.1 | Consent of Independent Registered Public Accounting Firm (filed herewith) |
| 24.1 | Power of Attorney (incorporated by reference to the signature page of this Annual Report on Form 10-K) |
| 31.1 | Section 302 Certification of the Chief Executive Officer (filed herewith) |
| 31.2 | Section 302 Certification of the Chief Financial Officer (filed herewith) |
| 32.1 | Certification of Chief Executive Officer and Chief Financial Officer Pursuant to 18 U.S.C. §1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (filed herewith) |
| 99.1 | Letter from Model Actuarial Pricing Systems, LP, dated March 7, 2018 (filed herewith) |
| 99.2 | Portfolio of Life Insurance Policies as of December 31, 2017 (filed herewith) |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Schema Document |
| 101.CAL | XBRL Calculation Linkbase Document |
| 101.DEF | XBRL Definition Linkbase Document |
| 101.LAB | XBRL Label Linkbase Document |
| 101.PRE | XBRL Presentation Linkbase Document |

_____

(1)    Incorporated by reference to Form S-1 Registration Statement filed on June 14, 2011 (File No. 333-174887).
(2)    Incorporated by reference to Current Report on Form 8-K filed on September 29, 2017.
(3)    Incorporated by reference to Form S-1/A Registration Statement filed on August 23, 2011 (File No. 333-174887).
(4)    Incorporated by reference to Form S-1/A Registration Statement filed on September 20, 2011 (File No. 333-174887).
(5)    Incorporated by reference to Current Report on Form 8-K filed on October 26, 2017.
(6)    Incorporated by reference to Annual Report on Form 10-K filed on March 15, 2017.
(7)    Incorporated by reference to Quarterly Report on Form 10-Q filed on August 8, 2014.
(8)    Incorporated by reference to Annual Report on Form 10-K filed on March 22, 2016.
(9)    Incorporated by reference to Current Report on Form 8-K filed on June 30, 2017.
(10)   Incorporated by reference to Current Report on Form 8-K filed on February 22, 2017.
(11)   Incorporated by reference to Form S-1/A Registration Statement filed on October 23, 2015 (File No. 333-206626).
(12)   Incorporated by reference to Current Report on Form 8-K filed on May 10, 2017.

50

APP. 1019

Case 3:22-cv-00410-B    Document 32-1    Filed 04/19/22    Page 1021 of 1031    PageID 1193

(13)    Incorporated by reference to Form S-1/A Registration Statement filed on June 6, 2014 (File No. 333-195505).

(14)    Incorporated by reference to Form S-1/A Registration Statement filed on February 7, 2017 (File No. 333-214896).

**ITEM 16. FORM 10-K SUMMARY.**

Not applicable.

51

APP. 1020

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities and Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**GWG HOLDINGS, INC.**

Date: March 29, 2018                                        By:  /s/ Jon R. Sabes
                                                                *Chief Executive Officer*

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Jon R. Sabes and William B. Acheson, jointly and severally, as his or her true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him or her, and in his or her name, place and stead, in any and all capacities, to sign any and all amendments to this report, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite or necessary to be done in and about the premises hereby ratifying and confirming all that said attorneys-in-fact and agents, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities and Exchange Act of 1934, this report has been signed below, as of March 29, 2018, by the following persons on behalf of the registrant and in the capacities indicated below.

| *Signature* | *Title* |
| --- | --- |
| /s/ Jon R. Sabes<br>Jon R. Sabes | Chief Executive Officer, Director and Executive Chairman<br>(Principal Executive Officer) |
| /s/ William B. Acheson<br>William B. Acheson | Chief Financial Officer<br>(Principal Financial and Accounting Officer) |
| /s/ Steven F. Sabes<br>Steven F. Sabes | Chief Operating Officer — Life Epigenetics Inc., Director and Secretary |
| /s/ Mark Schwarzmann<br>Mark Schwarzmann | Director |
| /s/ David H. Abramson<br>David H. Abramson | Director |
| /s/ Shawn R. Gensch<br>Shawn R. Gensch | Director |
| /s/ Charles H. Maguire III<br>Charles H. Maguire III | Director |
| /s/ Jeffrey L. McGregor<br>Jeffrey L. McGregor | Director |

52

| Complaint Allegation | Response from Publicly Available Documents |
|---|---|
| **Unsupported allegation #1** – The Complaint incorrectly alleges that GWG transferred more than "$359 million in cash to Ben LP and its subsidiaries" in 2018 and 2019.  Compl. ¶¶ 5, 39. | The allegation overstates the amount by almost 2.5 times the actual amount of cash GWG invested in Ben in 2018 and 2019.  As disclosed in the SEC filings:<br><br>• GWG did not invest any cash in Ben in 2018;<br><br>• GWG only invested $144.03 million in cash in 2019; *see* GWG 2019 10-K, at App. 242. ("On May 31, 2019, certain LiquidTrusts…executed a Promissory Note (the "Promissory Note") with GWG Life for a principal amount of $65.0 million…."); *id.* at App. 301 ("Pursuant to the Investment Agreement, [GWG] transferred $79 million to Ben LP in return for 666,667 common units of Ben LP and a Preferred Series A Subclass 1 Unit Account of BCH."); and<br><br>• Ben invested approximately $55 million in cash in GWG during this period, for a net cash investment by GWG in Ben of only approximately $89 million. *See id.* at App. 298 (on August 10, 2018, "Beneficient purchased 5,000,000 shares of GWG's Series B Convertible Preferred Stock…for cash consideration of $50.0 million").[1] |
| **Unsupported allegation #2** – The Complaint incorrectly alleges that GWG loaned "$80 million" to a Ben subsidiary in 2019.  Compl. ¶¶ 5, 49, 51, 72. | As disclosed in public filings and outlined in the above response to unsupported allegation #1, GWG only loaned $65 million in 2019, not $80 million as alleged in the Complaint, which overstates the amount of the loan by almost 25%.  *See* GWG 2019 10-K at App. 242 ("On May 31, 2019, certain LiquidTrusts for which Ben…held investments in senior beneficial interests, executed a Promissory Note (the "Promissory Note") with GWG Life for a principal amount of $65.0 million…. An initial advance in the principal amount of $50.0 million was funded on June 3, 2019, and a second advance in the principal amount of $15.0 million was funded on November 27, 2019."). |
| **Unsupported allegation #3** – GWG disclosed that the "expansion of the strategic relationship with [Ben LP] . . . is expected to create a unified platform uniquely positioned to provide an | Beyond the fact that the allegedly misleading quoted statement was expressly qualified by the word "expected," GWG included 16 pages of "Risk Factors" relating to risks involving Ben in its 2019 10-K,[2] including warnings that: |

---

[1] During this time, Ben also made approximately $4,867,607 in interest payments pursuant to the Commercial Loan Agreement referenced in the 2019 10-K at page F-10.  *See* App. 298.

[2] App. 240-56.

**Exhibit**

**B**

| Complaint Allegation | Response from Publicly Available Documents |
|---|---|
| expanded suite of products, service [SIC] and resources for investors." The Complaint incorrectly alleges that this statement "materially misrepresented Ben LP's business prospects and ability to achieve those objectives." Compl. ¶ 70. | • Ben had "experienced significant delays in obtaining trust company charters and may be unable to do so, which outcome would hinder Beneficient's ability to successfully pursue its current business plan and could adversely affect the value of Ben LP's common units," *see* App. 243; and<br><br>• "Beneficient may only be able to offer a limited number of products and solutions due to regulatory, capital or other restrictions." *See* App. 250. |
| **Unsupported allegation #4** – GWG disclosed that it intended to use the proceeds from L Bond offerings "to grow [GWG]'s alternative asset exposure, including through investments in Ben LP in the form of equity investments and/or loans to Ben LP and related entities." The Complaint incorrectly alleges that this statement was false and misleading because "[o]nly a small percentage of the offering proceeds was being used for these purposes as of this time." Compl. ¶ 70. | The Complaint only quotes the first part of the relevant sentence, and ignores the following two sentences, which expressly disclaim that any particular percentage of L Bond proceeds would be used for any specific purpose. GWG's full disclosure stated that:<br><br>[GWG] intend[s] to use the net proceeds from this offering to grow our alternative asset exposure, including through investments in Beneficient in the form of equity investments and/or loans to Beneficient or related entities, **and to meet our other obligations, including**:<br><br>• servicing our portfolio of life insurance assets (i.e., paying life insurance policy premiums);<br><br>• paying principal (at maturity or upon earlier prepayment or redemption), interest and fees to our lenders, including under DLP IV's second amended and restated senior credit facility, previously issued L Bonds, Seller Trust L Bonds and the L Bonds offered hereby;<br><br>• paying dividends on and, if applicable, redeeming our preferred stock;<br><br>• paying transaction expenses relating to interest rate hedging and similar derivative transactions (e.g., caps, collars, etc.); and<br><br>• general working capital purposes. |

2

#156656089_v3

| Complaint Allegation | Response from Publicly Available Documents |
|---|---|
| | **The extent to which we will use proceeds from this offering for any of these purposes, and the amounts and timing of such expenditures, will depend on, among other things**, how long the L Bonds are offered, the amount of net proceeds that we receive from the sale of L Bonds being offered, our cash flows and needs for liquidity, the existence and timing of opportunities to strategically increase our investment in Beneficient, the availability of funds from other sources, including realizations from policy benefits, distributions from investments in Beneficient, the issuance of common or preferred equity, borrowings from senior credit facilities, and other factors deemed relevant by our Board of Directors and management.<br><br>Beneficient will have broad discretion to use the proceeds of any such investments and may use such proceeds to acquire alternative assets, **to repay indebtedness, including to related parties**, and for general working capital purposes, including operating expenses.<br><br>App. 880 (emphasis added). |
| **Unsupported allegation #5** – The Complaint incorrectly alleges that "Mr. Heppner defrauded GWGH and investors in the L Bonds by engineering GWGH's capital-raising platform to enrich himself and his affiliated entities, in a scheme that would inevitably collapse," by using L Bond proceeds to repay Ben's "debt to a Heppner-controlled entity..." Compl. ¶¶ 6, 78. The Complaint also incorrectly alleges that the other GWG director defendants (the "GWG Director Defendants") "aided and abetted, encouraged, and | The allegation that Mr. Heppner and the other GWG Director Defendants engaged in a scheme to engineer the L Bond program to enrich Mr. Heppner through use of L Bond proceeds to repay a portion of Ben's debt to its senior lenders (the "Senior Lenders") is contradicted by publicly available documents and the Complaint itself. Notably, though the Complaint says that Mr. Heppner and the other GWG Director Defendants engaged in a scheme to "defraud" GWG investors, the Complaint does not actually plead the elements of common law fraud or breach of fiduciary duty, therefore contradicting this unsupported allegation on its face.<br><br>The Complaint also fails to explain why the other GWG Director Defendants, who are not beneficiaries of, and do not own interests in, the Senior Lenders, would aid and abet a scheme to benefit Mr. Heppner through the use of L Bond proceeds to repay such Senior Lenders.<br><br>Additionally, Mr. Heppner did not control GWG's transactions with, or investments in, Ben. As publicly disclosed, Mr. Heppner began serving on GWG's board of directors on April 26, 2019, and |

| Complaint Allegation | Response from Publicly Available Documents |
|---|---|
| rendered substantial assistance" to such scheme.  Compl. ¶ 34. | his service ended on June 14, 2021.  *See* App. 719. Accordingly, as publicly disclosed, **all** of the GWG-Ben transactions referenced in the Complaint either (a) pre- or post-dated Mr. Heppner's service on GWG's board or (b) were negotiated, reviewed, and approved by a special committee of independent directors who had independent legal counsel and independent financial advisors (the "Special Committee"),[3] including:<br><br>• App. 301 ("A special committee of the Board of Directors of the Company (the "Special Committee") composed solely of independent and disinterested directors of the Company, together with the assistance of its independent legal advisors, reviewed, negotiated and approved the terms of the [$65 million LiquidTrust] Loan.")<br><br>• *Id.* ("The Special Committee, together with the assistance of its independent legal advisors, reviewed, negotiated and approved the terms of the Intercreditor Agreements.");<br><br>• *Id.* ("The terms and conditions of [the transaction whereby GWG transferred $79 million to Beneficient LP in return for 666,667 common units of Beneficient LP and a Preferred Series A Subclass 1 Unit Account of BCH] were negotiated and approved by the previously disclosed Special Committee of the Board of Directors of the Company with the assistance of independent legal and financial advisors."); and<br><br>• 10-Q for Period Ending September 30, 2021, at App. 723 ("On July 15, 2020, GWG Holdings entered into a Preferred Series C Unit Purchase Agreement ("UPA") with Ben LP and BCH. The UPA was reviewed and approved by the then constituted independent Special Committee of the Board of Directors of GWG Holdings.").<br><br>Furthermore, Mr. Heppner did not 'engineer' the L Bond program, which began over half a decade before he began serving as a GWG board member.  *See* App. 279 ("In January 2012, we began publicly offering up to $250.0 million in debt securities (initially named 'Renewable Secured Debentures' and subsequently renamed 'L Bonds')"). |
| **Unsupported allegation #6** – The Complaint incorrectly alleges that the | As noted above, GWG expressly disclosed that L Bond proceeds could be used to repay Ben's debt, and expressly disclosed Mr. Heppner's connection to Ben's lender (the "Senior Lenders"). *See* App. |

---

[3] *See* 2019 10-K at pp. 31 ("The Board of Directors of GWG has established a special committee of independent and disinterested directors to review and, if deemed appropriate, approve proposed transactions with or involving Beneficient.").

4

| Complaint Allegation | Response from Publicly Available Documents |
|---|---|
| debt Ben owes to the Senior Lenders is a "debt to a Heppner-controlled entity, which…appears not to have been a *bona fide* debt."  Compl. ¶¶ 6, 50, 78. | 880 ("Beneficient will have broad discretion to use the proceeds of any such investments and may use such proceeds to acquire alternative assets, **to repay indebtedness, including to related parties**, and for general working capital purposes, including operating expenses.") (emphasis added); App. 320 ("The Senior Lenders are directly or indirectly associated with one of Beneficient's founders, who is also Chairman of the Company's Board of Directors.").[4]<br><br>The use of the L Bond proceeds to repay Ben's debt was not only disclosed, it was an appropriate use of such funds that benefited L Bond holders.  The debt owed by Ben to the Senior Lenders is a *bona fide* debt that represents cash and property received by Ben, which Ben used to launch and operate its business, and for legitimate business expenses such as payroll, systems programming, office and equipment leases, and general administrative expenses.  Notably, the debt has been audited by **three different third-party auditing firms** (Deloitte & Touche LLP,[5] Whitley Penn LLP,[6] and Grant Thornton LLP[7]), which have all found the debt to be a valid, *bona fide* liability of Ben.<br><br>The loan is fully documented and secured by the alternative assets held by various trusts. The documentation is over 600 pages, and was attached as exhibits to GWG's public filings.  *See* GWG 2020 10-K, Exhibits 10.25-10.30, at App. 693. The Senior Lenders publicly filed security interests relating to the loan. The loan bears interest and requires periodic principal payments to the Senior Lender.  *See* GWG 2019 10-K at p. F-36, at App. at 301 ("Both loans accrue interest at a rate of 1-month LIBOR plus 3.95%, compounded daily, with interest due by the 15th of each month.").<br><br>The arrangement between Ben and the Senior Lenders is very common in founder start-up businesses like Ben.  Ben payments to the Senior Lenders were necessary to preserve the value of its business enterprise for the benefit of its investors, of which GWG continues to be one of the largest.  *See* App. 719 (disclosing that GWG owned approximately 89.9% of the common units of Ben LP). Not only did Ben never favor the Senior Lender, Ben has not made a principal payment on the loan since December 2020 and has not paid interest on the loan in over a year. |

---

[4] The Senior Lenders are also not a "Heppner-controlled entity" as alleged in the Complaint.  Mr. Heppner does not legally control the Senior Lenders and did not legally control them at the time of the transactions detailed in the Complaint.

[5] App. 207.

[6] App. 287.

[7] App. 288.

5

| Complaint Allegation | Response from Publicly Available Documents |
|---|---|
| | Further, Ben negotiated numerous extensions of the maturity date. In fact, under the original terms of the Senior Lenders' loans, the Senior Lenders were to be repaid in full by December 31, 2018. *See* App. 248 ("The Loan Agreement had a scheduled maturity of December 31, 2018."). Ben was able to negotiate a series of extensions of the maturity dates for the loans from the Senior Lender: first to March 31, 2019, then to June 30, 2020, then to August 13, 2020, then to April 10, 2021, then to May 30, 2022, and, most recently, to August 31, 2023. *See id*. ("On December 31, 2018, [the Senior Lenders] approved the extension of the maturity date to March 31, 2019, and then in March 2019, the maturity was extended to June 30, 2020 and allows for further extensions through March 31, 2022, at the request by Ben and the discretion of [the Senior Lenders]."); *see* App. 504 ("On March 10, 2021, and again on June 28, 2021, Beneficient executed amendments to both credit agreements that, among other items, extended the maturity for both agreements to May 30, 2022….").<br><br>As of March 23, 2022, approximately $109 million dollars is still owed by Ben to the Senior Lenders, more than three years after the date that such amount originally was required to be paid in full. Because the Senior Lenders have deferred payment and restructured the loan multiple times over the last three years, Ben had more flexibility in executing its business plan and required less capital from GWG. This allowed GWG to pay its creditors, including the L Bond Holders. This also preserved Ben's value for GWG's benefit, which in turn benefited the L Bond holders. *See* GWG 10-Q for the Period Ending September 30, 2021, at App. 725 ("We [GWG] have also financed our [GWG's] business through proceeds from life insurance policy benefit receipts, cash distributions from the ExAlt Trusts' alternative asset portfolio, dividends and interest on investments, **and Beneficient's debt due to related parties**. **We have traditionally used proceeds from these sources for** policy acquisition, policy premiums and servicing costs, working capital and **financing expenditures including paying principal, interest and dividends**.") (emphasis added). |
| **Unsupported allegation #7** – GWG disclosed that the purpose of the $65 million loan referenced above (the "LiquidTrust Loan") was to "further diversify into alternative assets (beyond life insurance) and ancillary businesses and was intended to better position [Ben LP's] balance sheet, working capital and liquidity profile to satisfy anticipated | Contrary to the allegations, the LiquidTrust loan was intended to do each of the things referenced in the quoted language, and was actually used for such purposes. *See*, *e.g.*, GWG 2019 10-K at Ex. 99.4, at App. 693 (disclosing $56.856 million "Payments on other borrowings and related parties", which reduced Ben's debt and better positioned its balance sheet). Based on conversations with the Texas Banking Department during the chartering process, Ben anticipated that it would have a better chance at obtaining a trust charter if Ben reduced the amount of its debt. Accordingly, Ben used the LiquidTrust Loan, among other things, to better position its balance sheet by paying down debt and increasing its liquidity profile, as well for working capital. *Id.* While Ben's efforts to obtain a trust charter in Texas remain ongoing, it was able to obtain a trust charter in Kansas. *See* GWG 8-K filed |

6

| Complaint Allegation | Response from Publicly Available Documents |
|---|---|
| Texas department of banking regulatory requirements." The Complaint incorrectly alleges that this statement was false and misleading because "the funds were not actually used to position Ben LP's 'balance sheet, working capital and liquidity profile to satisfy anticipated Texas department of banking regulatory requirements.'" Compl. ¶ 72. | Jan. 3, 2022, at App. 842. Accordingly, it accomplished the objective that was the stated purpose of the loan: to help it obtain a trust charter. Notably, GWG expressly disclosed the potential to use L Bond proceeds to pay the Senior Lenders in support of the goal to obtain a trust charter, and expressly disclosed Ben's payments to the Senior Lenders. *See* June 2020 Registration Statement, at App. 693, ("Beneficient will have broad discretion to use the proceeds of any such investments and may use such proceeds to acquire alternative assets, **to repay indebtedness, including to related parties**, and for general working capital purposes, including operating expenses.") (emphasis added); 2019 10-K at Ex. 99.4, at App. 693 (disclosing $56.856 million "Payments on other borrowings and related parties"); 2020 10-K, at App. 603 ("A total of $28.6 million was paid [by Ben to the Senior Lenders] on July 15, 2020, which included the $25.0 million principal payment, related accrued interest thereon, and the extension fee described above….The loans are payable in three installments of $25.0 million on each of September 10, 2020, December 10, 2020, and March 10, 2021, with the remaining balance payable on April 10, 2021."). |
| **Unsupported allegation #8** – The Complaint incorrectly alleges that GWG "issued $366 million in L Bonds to a Ben LP subsidiary." Compl. ¶ 5. | As disclosed in public filings and acknowledged in the Complaint, GWG issued $366 million in L Bonds to the "Seller Trusts," which are not subsidiaries of Ben LP. *See* 2019 10-K, at App. 474 ("GWG issued to the Seller Trusts Seller Trust L Bonds due 2023 (the "Seller Trust L Bonds") in an aggregate principal amount of $403.2 million….the principal amount of the Seller Trust L Bonds was reduced to $366.9 million…."); Compl. ¶¶ 40–41 (admitting that "GWGH issued L Bonds *to the Seller Trusts* in the aggregate principal amount of $403.2 million ("Seller Trust L Bonds")….the principal amount of the Seller Trust L Bonds was reduced to $366.9 million….") (emphasis added). The Seller Trusts are not subsidiaries of Ben LP. *See* App. 676, ("The Seller Trusts are a group of individual common law trusts that received shares of Common Stock in the Exchange Transaction. The trustee of each of the Seller Trusts is Delaware Trust Company. The trust advisors of each trust are two individuals unrelated to each other, James E. Turvey and Murray T. Holland, who have sole decision-making authority with respect to each trust. The beneficiary of each of the Seller Trusts is MHT Financial, LLC. The current members of MHT Financial, LLC are Shawn T. Terry and Mike McGill."). |
| **Unsupported allegation #9** – While not made in the Complaint itself, Plaintiffs' counsel have incorrectly alleged in quotes to the press that the L Bonds were sold to investors as 'safe' investments. | Fulsome information regarding GWG's business and the risks relating to same was easily available from government sources and GWG's web site www.gwgh.com. Information available to L Bond investors included the following: |

7

| Complaint Allegation | Response from Publicly Available Documents |
|---|---|
|  | • GWG Annual Report for year-end December 31, 2017;[8]<br><br>• GWG Annual Report for year-end December 31, 2018;<br><br>• GWG Annual Report for year-end December 31, 2019;<br><br>• GWG Annual Report for year-end December 31, 2020;<br><br>• Twelve (12) 10-Qs filed during the relevant time period;<br><br>• L Bond Registration Statement (3.30.20) and its two amendments;<br><br>• L Bond Registration Statement (08.31.17) and its six amendments;<br><br>• L Bond Prospectus 06.03.2020 and its supplements;<br><br>• L Bond Prospectus 08.17.17 and its supplements; and<br><br>• Fifty-three (53) 8-Ks filed during the relevant time period disclosing a variety of material events.<br><br>These reports are collectively referred to as the "GWG Disclosures."  In particular, the registration statements and 10-Ks included fulsome discussions of the risks to L Bond holders.  For example, L Bond investors were warned upfront that "[i]nvesting in [GWG's] L Bonds may be considered ***speculative and involves a high degree of risk, including the risk of losing your entire investment*** . . . . The L Bonds are only suitable for persons with substantial financial resources and with no need for liquidity in this investment." L Bond Registration Statement dated June 3, 2020, at App. 474 (emphasis added). Further, potential investors were "urged to read carefully the risk factors relating to [GWG's] business and [GWG's] Company contained in the Risk Factors section of [the] prospectus beginning on page 11 and under Item 1A, entitled 'Risk Factors,' of [GWG's] Annual Report on Form 10-K for |

[8] Each Annual Report contains multiple exhibits, which include the material contracts relevant to the allegations in the Complaint.

8

| Complaint Allegation | Response from Publicly Available Documents |
|---|---|
| | the year ended December 31, 2019, which is incorporated by reference [in the Prospectus]." *See* App. 877. The "Risk Factors" section of the GWG's 2019 10-K alone spanned almost 30 pages. *See* App. 229-58. |
| **Unsupported allegation #10** – The Complaint incorrectly alleges that the transactions with Ben left GWG "insolvent and the L Bonds virtually worthless." Compl. ¶ 2. | As publicly disclosed, GWG is not 'insolvent' and the L Bonds are not 'virtually worthless.' As disclosed in its most recent publicly-filed financial reports, GWG has substantial assets that have a book value of approximately $3.49 billion, with total liabilities of approximately $2.06 billion. *See* App. 701. Among GWG's assets are its equity investments in Ben. With the recent approval of a trust charter in Kansas, the value of such equity interests continues to grow and is poised to increase substantially. Ben estimates that its equity is worth in excess of $3 billion. GWG has substantial assets that can be used to satisfy the payment of L Bonds. |
| **Unsupported allegation #11** – The Complaint incorrectly alleges that GWG did not timely disclose the existence of the "SEC's non-public investigation." Compl. ¶¶ 74-75. | As the Complaint admits, the SEC investigation was "<u>non-public</u>." Compl. ¶ 74 (emphasis added). Because the investigation was non-public, GWG, as would any public company, sought, obtained, and acted upon the advice of its counsel regarding the need to disclose the non-public SEC investigation, and the timing of any such disclosure. |

9