**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| | § | |
| IN RE GWG HOLDINGS, INC. | § | |
| SECURITIES LITIGATION | § | Case No. 3:22-cv-00410-B |
| | § | |
| | § | |
| | § | |

**DEFENDANTS BRAD K. HEPPNER, PETER T. CANGANY, JR, THOMAS O. HICKS, DENNIS P. LOCKHART, BRUCE W. SCHNITZER, AND THE BENEFI-CIENT COMPANY GROUP'S MOTION TO DISMISS AND BRIEF IN SUPPORT**

Defendants Brad K. Heppner, Peter T. Cangany, Jr., Thomas O. Hicks, Dennis P. Lockhart, and Bruce W. Schnitzer (collectively, the "Individual Defendants") and Beneficient Company Group, L.P. ("Ben," and together with the Individual Defendants, the "Ben Defendants"), submit this motion to dismiss Plaintiffs' claims for alleged violation of Section 11, Section 12, and Section 15 of the Securities Act of 1933 against the Ben Defendants (Counts I, III, and IV).

**Table of Contents**

**Page**

I.   INTRODUCTION ........................................................................................................... 2

II.  NATURE AND STAGE OF PROCEEDING ...................................................................... 3

III. BACKGROUND ........................................................................................................... 3

IV. LEGAL STANDARD..................................................................................................... 5

V.   ARGUMENTS AND AUTHORITIES ............................................................................. 7

     A.   Plaintiffs lack standing to assert Section 11 or 12(a)(2) claims...................................... 7

          1.   Plaintiffs lack standing to assert a Section 11 claim (Count I). .............................. 7

          2.   Plaintiffs lack standing to assert a Section 12(a)(2) claim (Count III).................... 8

     B.   Plaintiffs fail to adequately allege that a statement in the Registration Statement was a
          false or misleading statement of material fact (Counts I and III). ................................ 10

          1.   The Registration Statement did not misstate Ben's business and operations......... 12

          2.   The Registration Statement did not misstate Ben's financial performance
              and assets. ................................................................................................. 15

          3.   The Registration Statement did not misstate the goodwill value. ......................... 16

          4.   The Registration Statement did not misstate Ben's internal controls. ................... 19

          5.   The Registration Statement did not misstate the nature of the related party
              payments.................................................................................................... 21

          6.   The Registration Statement did not misstate the resignations of certain
              directors. ................................................................................................... 21

7.    The Registration Statement is not false or misleading in light of the cautionary language. ................................................................................................................. 23

C.   Plaintiffs' Section 11 claim is subject to an absolute negative causation defense and must be dismissed. ............................................................................................................... 28

D.   Plaintiffs' control-person claims (Count IV) fail because Plaintiffs cannot plead a primary violation or control. ........................................................................................... 28

VI.   CONCLUSION...................................................................................................................... 31

# Table of Authorities

**Cases**                                                               **Page(s)**

*Ahders v. SEI Private Tr. Co.*,
   982 F.3d 312 (5th Cir. 2020) ..................................................................................29, 30

*In re Alamosa Holdings, Inc. Sec. Litig.*,
   382 F. Supp. 2d 832 (N.D. Tex. 2005) ...................................................................28

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
   572 F.3d 221 (5th Cir. 2009) ..................................................................................10

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)................................................................................................10

*Amorosa v. AOL Time Warner, Inc.*,
   409 Fed. App'x. 412 (2d Cir. Feb. 2, 2011)...........................................................28

*In re Anadarko Petrol. Corp. Class Action Litig.*,
   957 F. Supp. 2d 806 (S.D. Tex. 2013) ...................................................................20

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..................................................................................................5

*In re Azurix Corp. Sec. Litig.*,
   198 F. Supp. 2d 862 (S.D. Tex. 2002) ...................................................................10

*Barnes v. Osofsky*,
   373 F.2d 269 (2d Cir. 1967).....................................................................................8

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)................................................................................................11

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)..................................................................................................5

*In re Boston Sci. Corp. Sec. Litig.*,
   686 F.3d 21 (1st Cir. 2012).....................................................................................22

*Braun v. Eagle Rock Energy Partners, L.P.*,
   223 F. Supp. 3d 644 (S.D. Tex. 2016) ...................................................................28

*In re Century Aluminum Co. Sec. Litig.*,
   729 F.3d 1104 (9th Cir. 2013) ..............................................................................7, 8

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017) ..................................................................................18

*Craftmatic Sec. Litigation v. Kraftsow*,
    890 F.2d 628 (3d Cir. 1989)............................................................................10

*Cutsforth v. Renschler*,
    235 F. Supp. 2d 1216 (M.D. Fla. 2002)..........................................................23

*Cuvillier v. Taylor*,
    503 F.3d 397 (5th Cir. 2007) ............................................................................5

*Dartley v. ErgoBilt Inc*.,
    No. 98- cv-1442-M, 2001 WL 313964 (N.D. Tex. Mar. 29, 2001)....................30

*Dennis v. Gen. Imaging, Inc.*,
    918 F.2d 496 (5th Cir. 1990) ..........................................................................30

*In re Donald J. Trump Casino Sec. Litig.–Taj Mahal Litig.*,
    7 F.3d 357 (3d Cir. 1993).........................................................................24, 28

*In re Dynegy*,
    339 F. Supp. 2d 804 (S.D. Tex. 2004) ............................................................28

*Edgar v. Anadarko Petroleum Corp.*,
    No. 17-1372, 2018 WL 3032573 (S.D. Tex. June 19, 2018)..............................19

*Einhorn v. Axogen, Inc.*,
    42 F.4th 1218 (11th Cir. 2022) .......................................................................18

*Fait v. Regions Fin. Corp.*,
    655 F.3d 105 (2d Cir. 2011)............................................................................18

*Firefighters Pension & Relief Fund v. Bulmahn*,
    53 F. Supp. 3d 882 (E.D. La. 2014)..........................................................16, 20

*Fitzer v. Sec. Dynamic Techs., Inc.*,
    119 F. Supp. 2d 12 (D. Mass. 2000) ...............................................................23

*In re Franklin Bank Corp. Sec. Litig.*,
    782 F. Supp. 2d 364 (S.D. Tex. 2011), *aff'd sub nom. Harold Roucher Tr. U/A
    DTD 9/21/72 v. Nocella*, 464 Fed. Appx. 334 (5th Cir. 2012) ................................30

*Harris v. AmTrust Fin. Servs., Inc.*,
    135 F.Supp.3d 155 (S.D. N.Y. 2015).................................................................19

*HCB Fin. Corp. v. McPherson*,
    8 F.4th 335 (5th Cir. 2021) ..............................................................................5

*Heck v Triche*,
    775 F.3d 265 (5th Cir. 2014) .....................................................................29, 30

iv

*Kapps v. Torch Offshore, Inc.*,
  379 F.3d 207 (5th Cir. 2004) ...........................................................................28

*In re Kosmos Energy Ltd. Sec. Litig.*,
  299 F.R.D. 133 (N.D. Tex. 2014) .....................................................................10

*In re Kosmos Energy Ltd. Sec. Litig.*,
  955 F. Supp. 2d 658 (N.D. Tex. 2013) ........................................................30, 31

*Krim v. BancTexas Grp.*,
  989 F.2d 1435 (5th Cir. 1993) .......................................................................16, 20

*Krim v. PcOrder.com, Inc.*,
  402 F.3d 489 (5th Cir. 2005) ..........................................................................7, 8

*Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*,
  810 F.3d 951 (5th Cir. 2016) ..............................................................................6

*Lormand v. U.S. Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ............................................................................24

*Melder v. Morris*,
  27 F.3d 1097 (5th Cir 1994) ...............................................................................6

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000).............................................................................20

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus.*,
  575 U.S. 175 (2015)......................................................................................12, 18

*Ortiz v. Canopy Growth Corp.*,
  537 F. Supp. 3d 621 (D. N.J. 2021) ...................................................................18

*In re Pilgrim's Pride Corp. Sec. Litig.*,
  No. 2:08-CV-419-TJW, 2010 WL 3257369 (E.D. Tex. Aug. 17, 2010).................30

*Pinter v. Dahl*,
  486 U.S. 622 (1988).............................................................................................9

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
  245 F. Supp. 3d 870 (S.D. Tex. 2017), *aff'd*, 777 Fed. App'x 726 (5th Cir.
  2019) .........................................................................................10, 11, 14, 21

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
  307 F. Supp. 3d 583, 618 (S.D. Tex. 2018) .......................................................29

*Plotkin v. IP Axess Inc.*,
  407 F.3d 690 (5th Cir. 2005) ...............................................................................6

*Randall D. Wolcott, M.D., P.A. v. Sebelius,*
    635 F.3d 757 (5th Cir. 2011) ...................................................................5

*Ret. Fund v. Tile Shop Holdings, Inc.,*
    No. 14-cv-786, 2015 WL 927456 (D. Minn. Mar. 4, 2015) ......................8

*Rombach v. Chang,*
    355 F.3d 164 (2d Cir. 2004)....................................................................28

*Rosenzweig v. Azurix Corp.,*
    332 F.3d 854 (5th Cir. 2003) ......................................................... *passim*

*Rubinstein v. Collins,*
    20 F.3d 160 (5th Cir. 1994) ....................................................................24

*Santa Fe Indus., Inc. v. Green,*
    430 U.S. 462 (1977)................................................................................23

*Scott v. ZST Digital Networks, Inc.,*
    896 F. Supp. 2d 877 (C.D. Cal. 2012) .....................................................8

*In re Segue Software, Inc.,*
    106 F. Supp. 2d 161 (D. Mass. 2000) .....................................................20

*Slack Techs., LLC v. Pirani,*
    143 S. Ct. 1433 (2023)...........................................................................7, 8

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.,*
    365 F.3d 353 (5th Cir. 2004) ............................................................11, 29

*In re State Street Bank & Trust Co. Fixed Income Funds Invs. Litig.,*
    774 F. Supp. 2d 584 (S.D. N.Y. 2011)....................................................28

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007)..................................................................................3

*In re Venator Materials PLC Sec. Litig.,*
    547 F. Supp. 3d 624 (S.D. Tex. 2021) ...............................................14, 21

*Yaroni v. Pintec Tech. Holdings Ltd.,*
    600 F. Supp. 3d 385 (S.D. N.Y. 2022).....................................................20

*Zishka v. Am. Pad & Paper Co.,*
    No. 3:98–cv–0660–M, 2001 WL 1748741 (N.D.Tex. Sept. 28, 2001), *aff'd,* 72
    Fed. App'x. 130 (5th Cir. 2003) ..............................................................31

**Statutes**

15 U.S.C. § 77*l*(a)(2).......................................................................8, 9, 11

15 U.S.C. § 77k(a) ............................................................................................................7, 10

15 U.S.C. § 77k(e) ...............................................................................................................28

15 U.S.C. § 77o ....................................................................................................................29

PSLRA ....................................................................................................................................6

Securities Act of 1933 Section 11 .............................................................................. *passim*

Securities Act of 1933 Section 12 .............................................................................. *passim*

Securities Act of 1933 Section 15 .............................................................................. *passim*

**Other Authorities**

17 C.F.R §§ 240.13a-11, 249.308 (2012) ...........................................................................22

Rule 9(b) ................................................................................................................................6

Rule 10b-5 ............................................................................................................................28

Rule 12(b)(1) .........................................................................................................................5

Rule 12(b)(6) ....................................................................................................................5, 28

Rule 23(b)(3) .......................................................................................................................10

## I.    INTRODUCTION

This is a Complaint that should never have been filed. In thousands of pages of public documents, GWG fully disclosed the details of its business—including the opportunity to grow a new industry in Ben—and it disclosed the myriad risks of investing in GWG L Bonds. GWG specifically, and repeatedly, warned that no investor should invest unless he read and understood those materials and could accept the high-risk of investing in GWG along with the possibility of losing his entire investment. Investors, who chose to shoulder that risk cannot now ignore those extensive disclosures and ask this Court to rewrite history in an effort to recoup their losses. Investing has risks, and the federal securities laws are not an insurance scheme to remove those risks.

Further, even accepting the allegations as true, the Complaint fails a matter of law.  Plaintiffs fail to adequately allege that any of the challenged statements were materially false or misleading when made.  Plaintiffs also fail to allege properly that the Ben Defendants are "sellers" for purposes of Section 12, or that any of the Ben Defendants are a "control person" under Section 15. Thus, the Court should dismiss all of Plaintiffs' claims against the Ben Defendants.

Separately, but equally compellingly, the Complaint fails on plausibility grounds, making it a prime candidate for dismissal on Twombly grounds.  It rests on conclusory statements and attempts to infer liability despite the failure to plead facts to support such inferences. For example, Plaintiffs allege that Ben Defendants hid from investors the truth about the risks associated with investing in bonds ("L Bonds") issued by GWG Holdings, Inc. ("GWG"), the nature of Ben's business and its value, and the use of proceeds from the sale of L Bonds. Those allegations lack detail, especially individualized facts concerning each Ben Defendant.  Instead, the Complaint hurls serious (and baseless) accusations indiscriminately at all Ben Defendants.  The law requires

more particularity.  The Complaint also falls under its own weight because its allegations contradict themselves, its legal thesis, and the documents filed with the Securities and Exchange Commission by GWG that are incorporated by reference into the Complaint which can be considered at this stage of the litigation.  GWG, through thousands of detailed pages of public filings fully disclosed the facts surrounding alleged misrepresentations or omissions and included meaningful cautionary language with the statements. Public filings and the prospectus provided to every prospective L Bond investor repeatedly and expansively disclosed the risks of investing in L Bonds. A complaint premised on the unsupportable contention that the Ben Defendants hid the truth in plain sight fails as a matter of law.

## II.     NATURE AND STAGE OF PROCEEDING

Plaintiffs seek to bring this putative class action on behalf of all persons who acquired L Bonds pursuant to the Registration Statement from June 3, 2020 through April 16, 2021. Aside from a claim against Defendant Whitley Penn (Count II), the Complaint asserts claims under:

- Section 11, based on statements in the Registration Statement, against the Individual Defendants (Counts I );

- Section 12(a)(2) against the Individual Defendants (Count III); and

- Section 15 against Ben and the Individual Defendants (Count IV).

## III.     BACKGROUND[1]

GWG, whose common stock traded on the NASDAQ, was founded in 2006. Prior to its association with Ben, GWG's primary business was the buying of life insurance policies in the life

---

[1] The facts stated in this section are taken from the Complaint and any documents referenced therein. In deciding a motion to dismiss, the Court may consider the Complaint's factual allegations, documents "incorporated in the [Complaint] by reference," and GWG's SEC filings. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Because Plaintiffs expressly referenced these public SEC filings, Defendants may therefore rely on such filings in their arguments in this motion.

insurance secondary market, called "Life Settlements," which allow owners of life insurance to obtain liquidity for an illiquid asset. However, in 2017, GWG became interested in diversifying its business through increased exposure to other types of illiquid "alternative" assets such as interests in private equity funds. Ben began its current operations in September 2017, positioning itself to offer liquidity to mid-to-high net worth individuals and small to mid-sized institutional investors with investments in illiquid alternative assets.[2] Thus, to accomplish its goals, GWG began to invest in and transact business with Ben.[3]

In addition to seeing Ben's potential as a stand-alone company, GWG believed that a strategic partnership with Ben could provide other mutually advantageous opportunities to leverage GWG's knowledge, experience, and significant infrastructure in, and the marketing, sales, and servicing of, its independent broker dealer market and the related market for illiquid alternative investments. GWG increased its ownership and control of Ben in December of 2019, and Ben became a consolidated operating subsidiary of GWG in December 2019. Thus, as fully disclosed to L Bond Holders, in the last half of 2018 and early 2019 (and continuing through 2021), GWG consummated a series of transactions with Ben that significantly reoriented GWG's business and capital allocation strategy away from Life Settlements towards a diverse exposure to the business of providing liquidity to investors who hold other types of alternative assets. A detailed explanation of the market opportunities and business strategy appeared in GWG's annual filings with the SEC and the L Bond prospectus provided to all investors.[4]

In June 2020, GWG commenced a new offering of L Bonds (the "Offering"), pursuant to a registration statement and prospectus declared effective June 3, 2020. Those offering materials

---

[2] GWG Annual Report (Form 10-K) (2018), at p. 6. All of GWG's public SEC filings can be found here: https://www.sec.gov/edgar/browse/?CIK=1522690&owner=exclude.
[3] *Id.* at pp. 6–7.
[4] GWG Annual Report (Form 10-K) (2018) at pp. 2–7.

expressly incorporated GWG's 2019 annual report, GWG's first quarter 2020 report, and other GWG reports filed with the SEC:

> The registration statement was filed March 30, 2020, amended May 15, 2020, and declared effective June 3, 2020. The registration statement included a prospectus dated June 3, 2020, filed June 5, 2020, and supplemented August 17, 2020, and November 23, 2020 (as amended, the "Prospectus"). The registration statement incorporates by reference GWG's Annual Report on Form 10-K for the year ended December 31, 2019, filed with the SEC March 27, 2020 ("2019 10-K"); GWG's Quarterly Report on Form 10-Q for the quarter ended March 31, 2020, filed with the SEC May 15, 2020 ("March 2020 10-Q"); and GWG's Current Reports on Form 8-K filed with the SEC January 7, 2020, February 27, 2020, March 6, 2020, March 18, 2020, and March 20, 2020. The registration statement as amended, the Prospectus, and the materials incorporated therein are referred to as the "Registration Statement."

Dkt. #63 at p. 2. n. 2.

## IV.  LEGAL STANDARD

Rule 12(b)(6) authorizes dismissal when the plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).[5] To survive a Rule 12(b)(6) motion to dismiss, the complaint "must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007). A complaint must contain enough facts to state a claim to relief that is plausible on its face. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

---

[5] This includes when a plaintiff fails to plead facts sufficient to demonstrate statutory standing. The Fifth Circuit has treated a plaintiff's failure to demonstrate that the defendant qualifies as a statutory seller under Section 12(a)(2) of the Securities Act is a statutory standing issue that can be disposed of under Rule 12(b)(6). *See Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003) (affirming dismissal of Section 12(a)(2) claim against non-sellers under Rule 12(b)(6)); *see generally, HCB Fin. Corp. v. McPherson*, 8 F.4th 335, 339 (5th Cir. 2021) (distinguishing statutory standing and Article III standing, and explaining that "statutory standing is analyzed under Rule 12(b)(6), not Rule 12(b)(1)"). In the alternative, to the extent this Court determines that the issue is one of Article III standing, Defendants respectfully request that the Court consider the standing issue first and dispose of it under Rule 12(b)(1). *See, e.g., Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 762 (5th Cir. 2011) ("When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." (quoting Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001))).

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"When 1933 Securities Act claims are grounded in fraud rather than negligence . . . Rule 9(b) applies." *Melder v. Morris*, 27 F.3d 1097, 1100 n.6 (5th Cir 1994) (collecting cases). The Complaint shows their Securities Act claims sound in fraud and are subject to Rule 9(b)'s heightened pleading standard. Not only do Plaintiffs repeatedly use the terms "false and misleading" throughout the Complaint, *see, e.g.*, Dkt. #63, ¶¶ 59, 114, 155, 176–77 and pp. 16–17, 23, 26, 28, 31, 35, but Plaintiffs also allege a year's long scheme to defraud L Bond holders that the Restatement ultimately uncovered. *See* Dkt. #63 ¶¶ 10, 13, 15, 18, 51-54, 44-50, 67, 69, 71, 74. Plaintiffs also insist the Ben Defendants "knew or should have known" of the alleged fraud on investors. *Id.* ¶¶ 1555, 177.

"Where, as here, the complaint involves an allegation of fraud," Rule 9(b) "imposes a higher standard on the complainant, requiring that he plead with 'particularity the circumstances constituting fraud.'" *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 956 (5th Cir. 2016). A complaint must contain "specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation why they are fraudulent." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005).

Additionally, the PSLRA "enhances Rule 9(b)'s particularity requirement for pleading fraud in two ways": (1) the plaintiff must "'specify each statement alleged to have been misleading, and the reason or reasons why the statement is misleading,'" and (2) "for 'each act or omission alleged' to be false or misleading, plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind,'" i.e., with scienter. *Diodes*, 810 F.3d at 956.

## V.     ARGUMENTS AND AUTHORITIES

Plaintiffs' claims fail for multiple reasons. *First*, Plaintiffs lack standing to bring a claim under either Section 11 or Section 12(a)(2) of the Securities Act. *Second*, Plaintiffs fail to plausibly allege a material false or misleading statement, a required element under the Securities Act. *Third*, Plaintiffs' control-person claims fail as a matter of law because the Complaint does not allege a primary violation of the securities laws, or facts which would establish any of the Ben Defendants constitute "control persons."

### A.     Plaintiffs lack standing to assert Section 11 or 12(a)(2) claims.

#### 1.     Plaintiffs lack standing to assert a Section 11 claim (Count I).

Plaintiffs allege violations of Section 11 of the Securities Act. However, Plaintiffs lack standing to assert such a claim. Section 11's scope is narrowed to "any person acquiring such security," 15 U.S.C. § 77k(a), thereby limiting the universe of proper plaintiffs to "anyone who can 'trace' his shares to the challenged registration statement," *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 873 (5th Cir. 2003); *see also Slack Techs., LLC v. Pirani*, 143 S. Ct. 1433, 1440–41 (2023). Plaintiffs' Section 11 claim therefore must be dismissed unless they adequately allege that each member of the class purchased new L Bonds, and do not hold renewed L Bonds, as of June 2020. *Krim v. PcOrder.com, Inc.*, 402 F.3d 489, 494–502 (5th Cir. 2005). The Complaint must go beyond conclusory allegations and provide factual specificity supporting a reasonable inference on this point. *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107–08 (9th Cir. 2013).

Plaintiffs fail to plausibly allege traceability here. Prior to June 2020, L-Bonds existed and automatically renewed when they come due, even if during an open registration statement later in time.[6] For example, L Bonds issued in 2018 renewed automatically on their maturity date in 2020,

---

[6] Prospectus at p. 5.

but are treated in the Complaint as if they had been purchased pursuant to the June 2020 registration even though the purchase decision took place back in 2018, well before the June 2020 registration. Plaintiffs fail to allege facts to trace which L Bonds within the proposed class were new L Bond purchases as opposed to automatic renewals, and fail to allege facts that show that class certification is appropriate notwithstanding this important distinction. The Complaint does not address this issue at all. *See* Dkt. #63. In fact, the Complaint does not even use the terms "trace," "traced," "tracing," or "traceable." *Id.* Simply put, there are no factual allegations in the Complaint that plausibly show Plaintiffs to have performed the "often impossible" task of "trac[ing] the lineage of [their] shares to the new offering." *Barnes v. Osofsky*, 373 F.2d 269, 271–72 (2d Cir. 1967) (Friendly, J.); *see also Krim*, 402 F.3d at 498 (noting that "the fungible nature of stocks" makes tracing "virtually impossible"); *Century Aluminum*, 729 F.3d at 1106 (noting that tracing "is easier said than done"). Because Plaintiffs cannot satisfy the tracing requirement, Plaintiffs' Section 11 claim should be dismissed. *See Krim,* 402 F.3d at 491; *see also Slack*, 143 S. Ct. 1441–42; *Century Aluminum*, 729 F.3d at 1107–08 (affirming dismissal of complaint where plaintiffs "allege[d], without more, that they 'purchased Century Aluminum common stock directly traceable to the Company's Secondary Offering'"); *Beaver Cnty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*, No. 14-cv-786, 2015 WL 927456, at *15–*17 (D. Minn. Mar. 4, 2015) (dismissing claim where plaintiffs "simply plead[ed] that the shares were purchased 'pursuant and/or traceable to' the misleading registration statement"); *Scott v. ZST Digital Networks, Inc.*, 896 F. Supp. 2d 877, 883 (C.D. Cal. 2012) (holding that "mere boilerplate allegations of traceability are insufficient").

### 2.      Plaintiffs lack standing to assert a Section 12(a)(2) claim (Count III).

Plaintiffs assert a claim under Section 12(a)(2) of the Securities Act of 1933. Dkt. 63 at ¶¶ 172–7915; *see* U.S.C. § 77*l*(a)(2). Plaintiffs, however, lack standing to assert a Section 12 claim.

Section 12(a)(2) creates a cause of action only against a "statutory seller" from which the plaintiff directly purchased a security. *Id.* at § 77l(a)(2); *Pinter v. Dahl*, 486 U.S. 622, 641–42 (1988). To be a statutory seller under Section 12(a)(2), a defendant must have either (1) actually passed title to plaintiffs, or (2) have been "'the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner,' e.g., a *broker*." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003) (quoting *Pinter*, 486 U.S. at 647 ). Even accepting Plaintiffs' allegations as true, none of the Individual Defendants are statutory sellers. To the contrary, Plaintiffs allege that they purchased L Bonds in GWG's offering, such that GWG passed title to the Plaintiffs, not any Ben Defendant. Dkt. 63 at ¶ 169. And Plaintiffs allege that the L Bonds sales were solicited by "a network of independent broker-dealers," not any Ben Defendant. *Id.* at ¶ 40. Plaintiffs' pleadings thus negate the facts necessary to establish that the Individual Defendants (or any Ben Defendant) constitutes a statutory seller.

Instead, Plaintiffs allege that the Individual Defendants' involvement in the preparation and circulation of the prospectus is sufficient to show solicitation. Dkt. #63 at ¶ 176. The Fifth Circuit rejected precisely this kind of argument in *Rosenzweig*:

> [P]laintiffs argue that, with respect to the individual defendants, signing the registration statement suffices for solicitation. They assert a "complex entanglement" with Azurix and Enron, from which it could be inferred that the companies participated in a "concerted course of action to market Azurix." In any event, plaintiffs argue that the issue of whether or not defendants actively participated in the solicitation is best left for a later stage in the litigation. We disagree.

332 F.3d at 871.

The *Rosenzweig* Court held that, to constitute a statutory seller on the basis of "solicitation," the defendant "must, at a minimum, directly communicate with the buyer" and must have "actively solicited" the sale, so that it "became the vendor's agent." *Id.* (citing *Craftmatic Sec. Litigation v. Kraftsow*, 890 F.2d 628, 636 (3d Cir. 1989) and *Lone Star Ladies Inv. Club v.*

*Schlotzsky's, Inc.*, 238 F.3d 363 (5th Cir. 2001)). The Court concluded that the *Rosenzweig* plaintiffs' pleadings about the defendants' involvement in signing the registration statement and acting in concert with the vendor did not adequately establish standing under Section 12(a). *Id.*

Here too, Plaintiffs failed to allege that any Individual Defendant took on the role of the vendor's agent, and do not identify a single direct communication between any Plaintiffs and any Individual Defendant.[7] *See* Dkt. 63 at ¶¶ 172–79. Instead, Plaintiffs rely exclusively on statements in the prospectus. *Id.* at ¶ 176. Under *Rosenzweig* and its progeny, Plaintiffs' Section 12(a) claim thus must be dismissed for lack of standing. *Id.*; *see also Craftmatic*, 890 F.2d at 636 (holding defendant could not be liable "on the basis of its involvement in preparing the prospectus"); *In re Azurix Corp. Sec. Litig.*, 198 F. Supp. 2d 862, 892 (S.D. Tex. 2002).

### B.   Plaintiffs fail to adequately allege that a statement in the Registration Statement was a false or misleading statement of material fact (Counts I and III).

Plaintiffs' Section 11 claim fails because they have not adequately alleged (nor can they) a false or misleading statement or omission of material fact. To state a claim under Section 11 of the Securities Act, Plaintiffs must adequately allege, among other things, that the L Bonds' registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a); *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 245 F. Supp. 3d 870, 894 (S.D.

---

[7] Moreover, this is a plaintiff-by-plaintiff issue that renders class certification inappropriate. Rule 23(b)(3) requires a proposed class representative to establish that common questions of law or fact predominate over any questions affecting only individual members, and that a class action is superior to other available means of adjudication. *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 228 (5th Cir. 2009); *see also* FED. R. CIV. P. 23(b)(3). The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Here, Plaintiffs have failed to plead facts to show that *any* putative class members interacted directly with any Individual Defendant, much less plead facts to support that common questions of fact predominate on this issue amongst the proposed class members. Similarly, "[c]laims brought pursuant to § 11 of the 1933 Act will not succeed where a defendant shows that the plaintiff knew of the untruth or omission at the time of his or her acquisition of the security." *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 152 (N.D. Tex. 2014) (internal citations omitted). Pleading each Plaintiff's specific knowledge—or lack thereof—is not only impossible for Plaintiffs to do here (and has not been pleaded here), but also precludes class certification.

Tex. 2017), *aff'd*, 777 Fed. App'x 726 (5th Cir. 2019). Similarly, to state a claim under Section 12(a)(2), which, as stated above the Plaintiffs do not have standing to assert, the Plaintiffs must adequately allege, among other things, that Ben Defendants sold L Bonds to the Plaintiffs "by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading the purchaser not knowing of such untruth or omission." 15 U.S.C. §77*l*(a)(2); *In re Plains*, 245 F. Supp. 3d at 894. Thus, to adequately plead a claim under either Section 11 (Count I) or Section 12 (Count III), Plaintiffs must adequately allege a false or misleading statement or omission of material fact.

A misstatement or omission is actionable only if it is material—meaning "there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision." *In re Plains*, 245 F. Supp. 3d at 890. "[T]o fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (internal citations omitted). As such, "generalized, positive statements . . . are not actionable because they are immaterial." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004).

Plaintiffs allege that Ben Defendants "made materials misstatements and omissions by failing to disclose in the Registration Statement that: (1) GWG materially misrepresented the nature of Ben's business and its true financial condition; (2) GWG's financial statements were not prepared in accordance with GAAP; (3) GWG's valuation of Ben was materially overstated; (4) GWG lacked adequate internal and financial controls; (5) GWG's representations about the use of proceeds to repay Ben indebtedness were materially incomplete, misleading, and concealed related

party transactions; and (6) GWG's representations about the reasons for the resignation of several GWG directors before the effective date of the Registration Statement were materially misleading and false." Dkt. #63 at ¶ 154. However, these items were either fully disclosed in the Registration Statement, or the information complained of did not exist at the time GWG filed the Registration Statement. Further, some of the alleged misrepresentations are not actionable under the standard the Supreme Court set in *Omnicare, Inc. v. Laborers Dist. Council Const. Indus.*, 575 U.S. 175 (2015).

### 1. The Registration Statement did not misstate Ben's business and operations.

Plaintiffs allege the Registration Statement falsely portrayed Ben's business model as being a lender, when Ben was "actually an investor" because Ben's "primary tangible assets were the alternative assets themselves, not loans receivable." Dkt. #63 at ¶ 69. According to Plaintiffs, GWG "conceded" in the Restatement that the Registration Statement contained false representations regarding Ben's core business. Dkt. #63 ¶ 76. The Restatement did no such thing. Rather, the Restatement merely clarified the change in accounting presentations under GAAP.[8] While GWG's financial statements were restated to consolidate certain trusts (the "ExAlt Trusts")—following a consultation with the Office of the Chief Accountant of the SEC that GWG *proactively* sought regarding a complex and novel accounting question—this was an immaterial change in presentation; Ben was and remains a lender, and the exact mechanics of Ben's business model were described fully and accurately in GWG's SEC filings. Specifically, as described in detail in GWG's SEC filings, Ben makes loans to the ExAlt Trusts, the ExAlt Trusts contemporaneously use the

---

[8] GWG, Annual Report (Form 10-K) (2020), at F-69 ("As a result of consolidating such trusts, Ben LP's primary tangible asset, which was acquired through loans a subsidiary of Ben LP made to certain of the ExAlt Trusts, was previously reported as a loan receivable as of December 31, 2019, but is now being reported as an investment in alterative assets held by certain of the ExAlt Trusts.").

proceeds to acquire interests in alternative assets from customers that own alternative assets, and then the ExAlt Trusts repay the loans to Ben with the cash flows from the alternative assets as collateral.[9] Upon consolidation of the ExAlt Trusts, the loans receivable and fees receivable no longer appeared on the face of the financial statements, but the effect of such presentation was to *increase*, rather than decrease, total assets and stockholder equity, making such reclassification immaterial.[10]

Moreover, the form of presentation of the Ben assets on GWG's financial statements was immaterial to investors.  Notably, before both the Restatement and the Registration Statement, the alternative assets held in the ExAlt Trusts appeared on the face of Ben's financial statements.  Yet, it expressly disclosed to investors that it was changing the presentation to instead present the loans receivable and explained its reasoning for doing so *before* the plaintiffs invested under the Registration Statement, when it disclosed:

> Due to the deconsolidation of the trusts included in the ExAlt Plan[TM] as of December 31, 2019, the loans receivable between BCC and certain trusts included in the ExAlt PlanTM became Ben's primary reported asset…. In addition, the comparative period on the statement of financial condition of December 31, 2018, is not comparable as the loans were not presented on that statement due to the consolidation of certain trusts included within the ExAlt PlanTM. As a result, Ben's statement of financial condition as of December 31, 2018 presented investments in senior beneficial interests instead of loans receivable. Refer to Note 10 for further discussion of the investments in senior beneficial interests…. As of December 31, 2019, due to the deconsolidation of these trusts, Ben's consolidated financial statements no longer report the investments in senior beneficial interests held by the Collective Trusts. Prior to the deconsolidation, the Company held investments in senior beneficial interests in each LiquidTrust that has been established.[11]

Had it been important to investors that GWG present the investments rather than loan receivables, investors would not have invested because GWG expressly told investors that it would no longer

---

[9] GWG Annual Statement (Form 10-K) (2019) at pp. 10, 70, F-9, and F-18; *see also* Notes to Ben's Consolidated Financial Statements (attached to the 2019 10-K) at pp. 7, 20, 26.
[10] GWG Annual Report (Form 10-K) (2020) at F-70.
[11] Notes to Ben's Consolidated Financial Statements (attached to the 2019 10-K) at p. 26.

present it that way.  Put differently, GWG made investors aware of the alternative way in which Ben's assets could have been (and previously were) presented on the balance sheet, such that no investor could be misled prior to the Restatement, especially considering that the effect of the Restatement was to increase, rather than decrease, total assets and stockholder equity.

Moreover, the Registration Statement provided numerous details regarding the business operations and organizational structure:[12]

- "GWG Holdings conducts its life insurance secondary market business **through a wholly owned subsidiary,** GWG Life, and GWG Life's wholly owned subsidiaries, Life Trust and DLP IV. GWG Holdings' indirect interests **in loans collateralized by cash flows from other alternative assets are held by Ben LP**[.]"
- "[Ben] **operates primarily through its subsidiaries**."
- Ben "began its **alternative asset business** in September 2017."
- "In 2018 and 2019 we consummated a series of transactions with [Ben] that has resulted in a **significant reorientation of our business and capital allocation strategy towards an expansive and diverse exposure to alternative assets**."

Accordingly, Ben's business was described in detail such that an investor could, and should, have known prior to the Restatement that Ben's business was predicated on the cash flows from alternative assets. Thus, this alleged misstatement regarding the nature of Ben's business is not actionable. *Basic Inc.*, 485 U.S. at 231–32; *Flaherty*, 565 F.3d at 207; *In re Plains*, 245 F. Supp. 3d at 894; *see also In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 669 (S.D. Tex. 2021) (dismissing Section 11 claim for failure to adequately plead material misrepresentation).

Plaintiffs also allege that "GWG did not disclose that substantially all of Ben's portfolio was acquired through the deal with Paul Capital, and not as a result of Ben's deployment of 'innovative liquidity solutions . . . designed to serve mid-to-high net worth ('MHNW') individuals,

---

[12] GWG Annual Report (Form 10-K) (2019), at p. 2 (emphases added); Prospectus at pp. 1.

small-to-mid sized ('STM') institutions, and asset managers" to "access early liquidity from their alternative assets.' The Paul Capital transaction came to light in February 2022 when Paul Capital sued Ben…"  Dkt. #63 at ¶ 71.  However, the 2019 10-K does expressly disclose this when it says that Ben "plans" (future tense) to "provide mid-to-high net worth individuals with trust services and related liquidity products," but that, "to date, Ben LP's originations of liquidity products have been transacted with a limited number of family offices, fund-of-funds and institutions. These types of clients, specifically fund-of-funds and institutions, may not represent the target market of Ben's liquidity products in the future."[13]

### 2.    The Registration Statement did not misstate Ben's financial performance and assets.

Plaintiffs allege that the change in presentation of the ExAlt loans in the Restatement materially misstated Ben's financial performance and assets. Dkt. #63 at ¶ 83. Not so. The accounting presentation GWG adopted before the Restatement was based on the advice of multiple accounting firms, and audited by multiple accounting firms.[14] Indeed, CPA firm Whitley Penn provided the following certification:

> We have audited the accompanying consolidated balance sheet of [GWG] as of December 31, 2019, and the related consolidated statements of operations, changes in stockholders' equity, and cash flows for the year ended December 31, 2019, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, ***the consolidated financial statements present fairly, in all material respects, the financial position of [GWG]*** as of December 31, 2019, and the results of their operations and their cash flows for the year ended December 31, 2019, in conformity with accounting principles generally accepted in the United States of America.[15]

An essential element of a Section 11 claim is "that the information allegedly omitted from

---

[13] GWG Annual Report (Form 10-K) (2019) at p. 26; *see also* Notes to Ben's Consolidated Financial Statements (attached to the 2019 10-K) at pp. 17-18; 31; 45; 48.
[14] GWG Annual Report (Form 10-K) (2019), at F-1–F-3; GWG Current Report (Form 8-K) (Sept. 17, 2020) at p. 1.
[15] GWG, Annual Report (Form 10-K) (2019), at F-1.

the prospectus was known to the issuer at the time the prospectus was distributed." *Krim v. Banc-Texas Grp.*, 989 F.2d 1435, 1445 (5th Cir. 1993); *see also Firefighters Pension & Relief Fund v. Bulmahn*, 53 F. Supp. 3d 882, 909 (E.D. La. 2014) (granting motion to dismiss where alleged misstatements were "reasonable when made" and finding "defendants had no obligation to provide updated figures until the issuance of" the next Form 10-K). As such, statements "made by management in a prospectus, even if in hindsight it is shown to have been incorrect" are protected "as long it was made or reaffirmed with a reasonable basis in fact and in good faith." *BancTexas*, 989 F.2d at 1446. The certification from Whitley Penn provided Ben Defendants with a reasonable basis for their statements, and Plaintiffs have failed to plausibly allege facts which would show the Registration Statement's representations were false when made. *See id.* at 1445–46. Therefore, Plaintiffs' claim for Section 11 violations based on alleged misrepresentations regarding financials cannot carry the day. *Firefighters Pension & Relief Fund*, 53 F. Supp. 3d at 909.

### 3.    The Registration Statement did not misstate the goodwill value.

According to Plaintiffs, "Ben's business and prospects did not justify these [goodwill] valuations. . . If Ben had any value at all, its value was only fraction of the inflated value ascribed to it." Dkt. #63 at ¶ 91. Such allegation is false. Plaintiffs' bare assertion that the goodwill value was not justified does not satisfy Plaintiffs' pleading burden.

To start, the Restatement—which used a different auditor—did not show that goodwill was inflated; rather, the restated goodwill (as of December 31, 2019) was actually *higher*, not lower, than originally reported.[16] Thus, the Restatement did not reveal any material misstatement, misrepresentation, or omission regarding goodwill.

---

[16] *Compare* GWG Annual Report (Form 10-K) (2019) at F-4 (showing goodwill valued at $2,358,005,000), *with* GWG, Annual Report (Form 10-K) (2020) at F-6 (showing goodwill valued at $$2,367,750,000).

Plaintiffs acknowledge that Ben's goodwill value is largely driven by Ben's fair value—indeed, the two values are directly correlated. Dkt. #63 ¶ 87. Under the relevant accounting standards, there are multiple different methods that can be used to calculate the fair value of a reporting unit. *See* Fin. Accounting Standards Board, *Accounting Standards Codification 820 - Fair Value Measurement*. Any discrepancy in enterprise valuation (and thereby goodwill valuation) here is merely the result of the use of different permissible methods. And, even if the Registration Statement's goodwill valuation could amount to a misrepresentation, it is not a ***material*** misrepresentation because it is an estimate.

Estimates of Ben's fair value, and thereby goodwill, are statements of opinion. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc*., 856 F.3d 605, 613 (9th Cir. 2017) (affirming grant of motion to dismiss securities fraud claim because plaintiff failed to allege the actual assumptions defendants relied on in conducting their goodwill valuation analysis); *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011) ("Estimates of goodwill depend on management's determination of the 'fair value' of the assets acquired and liabilities assumed, which are not matters of objective fact."); *Ortiz v. Canopy Growth Corp*., 537 F. Supp. 3d 621, 666–68 (D. N.J. 2021) (noting that multiple courts have found that determining the "fair value" of a company's assets, including its goodwill, is an "inherently subjective" process). The Supreme Court has held that an opinion statement is actionable if: (1) the speaker did not hold the belief professed, (2) the supporting facts supplied were untrue, or (3) the stated opinion, though sincerely held and otherwise true as a matter of fact, omitted information whose omission made the stated opinion misleading to a reasonable investor. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus*., 575 U.S. 175, 186 (2015). "Meeting the standard under *Omnicare* 'is no small task for an investor,'" since reasonable investors "'understand that opinions sometimes rest on a weighing of competing

facts,'" and "'do[] not expect that every fact known to an issuer supports its opinion statement,'" "'read[ ] each statement within [an SEC filing] ... in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information,'" and " 'take[ ] into account the customs and practices of the relevant industry.'" *Omnicare*, 575 U.S. at 189–91). Plaintiffs cannot satisfy this standard.

***First***, Plaintiffs do not allege Ben Defendants did not believe their fair value and goodwill opinions at the time those opinions were made. *See Omnicare*, 75 U.S. at 186; *Einhorn v. Axogen, Inc.*, 42 F.4th 1218, 1224–25 (11th Cir. 2022) ("Aside from cursorily alleging that [Defendant] knew the statements were materially false or misleading, [Plaintiff] failed to allege any facts suggesting [Defendant's] actual knowledge of the statements' falsity."); *see also Edgar v. Anadarko Petroleum Corp.*, No. 17-1372, 2018 WL 3032573, at 13 (S.D. Tex. June 19, 2018). ***Second***, Plaintiffs do not plead facts showing the supporting facts underlying the fair value of Ben and the goodwill calculation were untrue. Rather, Plaintiffs point to the Restatement to show the falsity of the underlying facts. Dkt. #63 at ¶ 91. However, the Restatement merely reflects the change in presentation under GAAP principles, and did not negatively impact the underlying goodwill calculation. *Harris v. AmTrust Fin. Servs., Inc.*, 135 F.Supp.3d 155, 172 (S.D. N.Y. 2015) ("In the absence of a restatement or allegations pointing to objective facts that [d]efendants' accounting methods violated GAAP, carping about [d]efendants' application of GAAP amounts ... d[id] not permit the [c]ourt to infer that the [d]efendants committed accounting fraud."). Thus, Plaintiffs have not pleaded facts showing the Registration Statement contained material misrepresentations regarding Ben's goodwill valuation. ***Third***, GWG expressly described how it calculated its fair vale and goodwill, warned investors that those valuations were "based on estimates and assumptions," and

disclosed various risks that could require future goodwill impairment.[17]

Moreover, and contrary to Plaintiffs' unsubstantiated accusations, the Registration State-ment made clear that the goodwill valuation was subject to change based on any number of fac-tors.[18]  For instance, the Prospectus disclosed that, should facts and circumstances change, the goodwill or other identifiable intangible assets may be impaired, "**an interim impairment test would be required**."[19]  Further, the Prospectus detailed that a goodwill evaluation "**includes mul-tiple assumptions, including estimated discounted cash flows and other estimates that may change over time**."[20]  GWG's (and Ben's) goodwill was subject to regular impairment testing, supported by third party valuations, and was never impaired.[21]  Ben Defendants therefore dis-closed that the valuation provided was not fixed, and was subject to routine impairment testing.

### 4.    The Registration Statement did not misstate Ben's internal controls.

Plaintiffs' contend that the Registration Statement "materially misrepresented GWG's in-ternal control over financial reporting as effective." Dkt. #63 at ¶ 99. However, Whitley Penn audited the effectiveness of GWG's internal controls over financial reporting as of December 31, 2019, and did not identify any issues. Plaintiffs do not allege any facts showing the Ben Defendants had reason to doubt such audit conclusions. And, as soon as the material weaknesses in the internal controls were discovered, the public was made aware.[22] Plaintiffs now try to spin Ben Defendants' voluntary disclosure into a material misrepresentation. Dkt. #63 at ¶¶ 97, 99–100.

For Plaintiffs to adequately plead a Section 11 claim, they must plausibly allege facts which

---

[17] *See* GWG Annual Report (Form 10-K) (2019) at pp. 11, 26, 40, 50, F-20, F-22, F-23; *see also* Notes to Ben's Consolidated Financial Statements (attached to the 2019 10-K) at pp. 11, 23.
[18] *Id.* at p. 5
[19] *Id.* (emphasis added).
[20] *Id.* (emphasis added).
[21] GWG Annual Report (Form 10-K) (2019), Exhibit 99.4 at p. 27.
[22] GWG Annual Report (Form 10-K) (2020).

would tend to show the statements were false ***when made***. *See BancTexas*, 989 F.2d at 1445; *Fire-fighters Pension & Relief Fund*, 53 F. Supp. 3d at 909. This is true for alleged misstatements related to internal control failures. *See Yaroni v. Pintec Tech. Holdings Ltd*., 600 F. Supp. 3d 385, 397 (S.D. N.Y. 2022) (dismissing Section 11 claims based on alleged omission of internal controls weaknesses in registration statement because "[p]laintiff allege[d] no facts suggesting that [de-fendant] knew or should have known about the internal control weaknesses at the time of the IPO"). The Complaint does not plausibly allege that Ben Defendants knew or should have known of these material weaknesses prior to engaging qualified personnel familiar with U.S. GAAP and SEC reporting requirements to complete a thorough assessment of its internal controls over finan-cial reporting. *See id.*; *see also Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts rea-sonably available to them").

Further, it would violate securities law policy favoring fulsome disclosures to "reflexively punish a company for correcting its earning statements when subsequent events disclose errors in the originals would create a perverse incentive for management to conceal mistakes[.]" *In re Segue Software, Inc.*, 106 F. Supp. 2d 161, 170 (D. Mass. 2000). A voluntary "restatement of earnings, without more, does not support a strong inference of fraud, or for that matter, a weak one." *Id.* at 169; *see also In re Anadarko Petrol. Corp. Class Action Litig.,* 957 F. Supp. 2d 806, 824 (S.D. Tex. 2013) (holding that the presence of an isolated control breakdown does not create an inference that broader company statements about its overall controls were misleading).

Ben Defendants' voluntary and fulsome disclosure of the material weaknesses in its inter-nal controls over financial reporting upon discovery does not amount to a material misrepresenta-tion that could support Plaintiffs' Section 11 claim.

5.    **The Registration Statement did not misstate the nature of the related party payments.**

The Complaint wrongly alleges that GWG "failed to disclose that a portion of the funds that Ben paid to its lender was subsequently transferred to entities affiliated with Heppner," Dkt. #63 at ¶ 15. GWG fully disclosed prior payments to parties associated with certain Individual Defendants and the potential use of L Bond proceeds to pay obligations owed to such parties:

> [GWG] intend[s] to use the net proceeds from this offering to grow [GWG's] alternative asset exposure, including through investments in [Ben] . . . **[Ben] will have broad discretion to use the proceeds of any such investments and may use such proceeds to** fund alternative asset financings, to **repay indebtedness,** *including to related parties*, and for general working capital purposes, including operating expenses."[23] Thus, GWG expressly disclosed Mr. Heppner's associations with various entities, prior payments to such entities, and that L Bond proceeds could be used to repay Ben's senior lenders and/or other parties associated with Mr. Heppner.[24]

The Registration Statement plainly disclosed the facts Plaintiffs claim were omitted. *See Basic Inc.*, 485 U.S. at 231–32; *Flaherty*, 565 F.3d at 207; *In re Plains*, 245 F. Supp. 3d at 894; *see also In re Venator*, 547 F. Supp. 3d at 669.

6.    **The Registration Statement did not misstate the resignations of certain directors.**

Plaintiffs claim that the Registration Statement's position that "four members of the Board of Directors resigned as directors of the Company, and the size of the Board of Directors was reduced from 14 to ten directors in order to facilitate the Board of Directors' ability to oversee the

---

[23] Prospectus, at Cover Page (emphasis added); *see also id.* at p. 9.

[24] For example, GWG disclosed, among other things, the amounts paid to the Senior Lenders, 2019 10-K at p. 32 of the notes to Ben's consolidated financial statements (attached to the 2019 10-K), that "[t]he Senior Lenders are directly or indirectly associated with Brad K. Heppner, who is Chairman of the Company's Board of Director;" GWG Annual Report (Form 10-K) (2019) at p. 90 and F-30, and that "'Related Entities' are defined as certain trusts and those entities held by such trusts that are controlled by Beneficient's founder and in which Beneficient's founder and his family members are also among classes of economic beneficiaries whether or not Beneficient's founder is entitled to economic distributions from such trusts. Beneficient's founder is also chairman of the board of directors of GWG Holdings." GWG Annual Report (Form 10-K) (2019) at F-19.

Company's operations in an efficient and effective manner" is false and misleading. Dkt. #63 at

¶ 114. Plaintiffs would rather that the Registration Statement disclose that the four directors re-

signed due to "disagreements with GWG management." *Id.* at ¶ 120. However, that is simply not

the case.[25] Indeed, these allegations run directly in the face of sworn statements made by the former

directors in GWG's bankruptcy case.

     ***First***, none of the directors at issue disagreed with the characterization of their departure

in GWG's filings. The SEC requires disclosure of specified material changes and other events

"that the registrant deems of importance to security holders" whenever they occur via a Form 8-

K. Form 8-K, item 8.01 https://www.sec.gov/files/form8-k.pdf [as of Nov. 5, 2023]; *see also* 17

C.F.R §§ 240.13a-11, 249.308 (2012); *In re Boston Sci. Corp. Sec. Litig.*, 686 F.3d 21, 28, n.2 (1st

Cir. 2012). Item 5.02(a) of Form 8-K requires registrants to describe the circumstances of a direc-

tor's resignation when he or she resigned "because of a disagreement with the registrant… on any

matter related to the registrant's operations, policies or practices." *See* Form 8-K, item 5.02. After

four directors resigned in October of 2019, GWG disclosed:

> As a result of discussions among members of the Board of Directors (the "Board")
> of [GWG] and based in part on a determination that a Board comprised of fewer
> directors would facilitate that Board's ability to oversee future [GWG] activities in
> an efficient and effective manner, Messrs. Richard W. Fisher, David H. Glaser,
> Sheldon I. Stein and Bruce E. Zimmerman resigned from the Board and the size of
> the Board was reduced from 14 to ten directors.[26]

Thus, GWG disclosed the directors' resignations. Further, item 5.02 requires the director furnish

---

[25] Even from the face of the Complaint, Plaintiffs have failed to adequately plead that there were any disagreements to begin with at all. Plaintiffs allege that the resigning directors had concerns about related party payments, the company's cash flows and ability to service its debts, and the amount and growth of tangible assets (or lack thereof). See Dkt. #63 at ¶¶ 115–18. Yet each of these issues were disclosed as risk factors in GWG's financial statements (i.e. the other directors did not disagree that there were risks relating to each of these issues, and expressly disclosed such risks to investors). *See* GWG Annual Report (Form 10-K) (2019) at pp. 18 (disclosing risks relating to cash flows and service of L Bond debt), 19 (same), 21 (disclosing risks relating to potential inability to increase tangible assets), 32 (disclosing risks relating to Ben's cash flows), 40 (disclosing risks relating to amount of tangible assets); *see also supra* n. 23, 24 (disclosing related party payments).

[26] GWG Current Report (Form 8-K) (Oct. 21, 2019).

a letter "stating whether he or she agrees with the statements made by the registrant in response to this item 5.02, and, if not, stating the respects in which he or she does not agree." Item 5.02(a)(3)(ii). GWG would then be required to file such letter from the director. Item 5.02(a)(3)(iii). None of the directors who resigned provided a letter disagreeing with the characterization of their resignations, and certainly did not clarify that their resignations were attributable to "disagreements with GWG management," as Plaintiffs allege.

*Second*, the failure to disclose possible corporate mismanagement is not actionable under federal securities laws. *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977); *see also Cutsforth v. Renschler*, 235 F. Supp. 2d 1216, 1242 (M.D. Fla. 2002) ("[C]ourts generally hold that the failure to disclose possible corporate mismanagement does not state a federal securities law claim."); *see also Fitzer v. Sec. Dynamic Techs., Inc.*, 119 F. Supp. 2d 12, 31 (D. Mass. 2000) ("[P]oor management is a risk that every investor takes. Damages flowing therefrom are not actionable under the securities laws."). So, the alleged misrepresentations or omissions about certain directors' resignation from GWG's board are not actionable for purposes of Section 11.

### 7.    The Registration Statement is not false or misleading in light of the cautionary language.

Plaintiffs have failed to adequately plead material false or misleading statements or omissions with respect to the forward-looking prospectus statements, when viewed in light of the cautionary language that accompanied them.   The "bespeaks caution" doctrine precludes liability when (1) forward-looking statements, such as financial projections, are (2) accompanied by meaningful cautionary language, which would alert the reasonable investor to consider those statements with healthy skepticism. *See In re Donald J. Trump Casino Sec. Litig.–Taj Mahal Litig.*, 7 F.3d 357, 371 (3d Cir. 1993). Although the Fifth Circuit has rejected the "bespeaks caution" doctrine as a *per se* bar to liability, it agrees that forward-looking statements must be analyzed in context

of any accompanying cautionary language, under the "total mix" test. *See Rubinstein v. Collins*, 20 F.3d 160, 167 & n.25 (5th Cir. 1994). Meaningful cautionary statements should include "specific, concrete explanations that clearly identif[y] and quantif[y] . . . clearly present financial dangers." *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 247 (5th Cir. 2009).

GWG's filings extensively disclosed the high degree of risk associated with investing in L Bonds. Indeed, the Prospectus warned L Bond investors that "[i]nvesting in [GWG's] L Bonds may be considered speculative and involves a high degree of risk, including the risk of losing your entire investment . . . . The L Bonds are only suitable for persons with substantial financial resources and with no need for liquidity in this investment."[27] Potential investors were "urged to read carefully the risk factors" relating to GWG's business, including all risk factors from the GWG's recent Form 10-K, which spanned approximately thirty pages.[28] GWG disclosed numerous additional risks relating to investment in L Bonds:

- "The valuation of our life insurance policy assets on our balance sheet requires us to make material assumptions that may ultimately prove to be incorrect. If our assumptions prove incorrect, we could suffer significant losses that materially and adversely affect our results of operations."[29]
- "Actual results from our life insurance portfolio may not match our projected results, which could adversely affect our ability to service our existing portfolio and meet our debt obligations."[30]
- "We have a relatively limited history of operations, a history of net losses, and our future earnings, if any, and cash flows may be volatile, resulting in uncertainty about our ability to service and repay our debt when it comes due[.]"[31]

GWG also emphasized the risks if GWG lost its ability raise capital, which is what has actually caused the alleged loss to the L Bond Holders:[32]

- "We critically rely on debt financing for our business…. To date, we have chosen to finance

---

[27] Prospectus, at Cover Page.
[28] *Id.* at p. 33.
[29] GWG Current Report (Form 8-K) (Aug. 8, 2019) at p. 9.
[30] *Id.* at p. 10.
[31] *Id.* at p. 1.
[32] GWG Annual Report (Form 10-K) (2020) at pp. 19–20.

our business principally through the issuance of debt, including . . . our L Bonds . . . . Continued access to financing and liquidity under . . . the offering of our L Bonds, or otherwise is not guaranteed. For example, we have temporarily suspended the offering of our L Bonds as a result of our delay in filing certain periodic reports with the SEC, including this report. We anticipate recommencing our L Bond offering early in the third quarter of 2019, however there is no assurance that we will be able to do so within that timeframe. [I]f we . . . are forced to discontinue our L Bond offering for any significant length of time and for any reason, our business would be adversely impacted…."

- "The offer and sale of our L Bonds is the principal means by which we intend to raise funds needed to meet our business and financial goals. However, if we are unable to continue to do so for any reason we may be unable to meet our goals…."

In addition to generally disclosing the risks associated with the purchase of L Bonds, GWG

disclosed risks associated with the various misrepresentations and omissions Plaintiffs allege:

| Alleged Misrepresentation: | Clear Disclosure to the Contrary: |
|---|---|
| "The trusts that had acquired the alternative assets collateralizing Ben's loans were Ben subsidiaries—meaning that Ben's primary tangible assets were the alternative assets themselves, not loans receivable. The Registration Statement portrayed Ben as a lender, when it was actually an investor." Dkt. #63 at ¶ 69. | "[GWG] conducts its life insurance secondary market business *through a wholly owned subsidiary,* GWG Life, and GWG Life's wholly owned subsidiaries, Life Trust and DLP IV. [GWG's] indirect interests *in loans collateralized by cash flows from other alternative assets are held by [Ben]*."[33] <br> "[Ben] *operates primarily through its subsidiaries*, which provide [Ben's] products and services."[34] <br> Ben "began its *alternative asset business* in September 2017."[35] <br> "In 2018 and 2019 we consummated a series of transactions with [Ben] that has resulted in a *significant reorientation of our business and capital allocation strategy towards an expansive and diverse exposure to alternative assets*."[36] |
| "[T]he Registration Statement did not disclose that substantially all of Ben's portfolio was acquired through the deal with Paul Capital, and not as a result of Ben's deployment of 'innovative liquidity solutions ... designed to serve mid-to-high net worth individuals, small-to- | Ben "*plans*" to "*provide mid-to-high net worth individuals with trust services and related liquidity products*," but that, "to date, [Ben's] originations of liquidity products have been transacted with a limited number of family offices, fund-of-funds and institutions. These types of clients, specifically fund-of-funds and institu- |

---

[33] GWG, Annual Report (Form 10-K) (2020), at p. 2 (emphases added).
[34] Prospectus, at F-9 (emphasis added).
[35] *Id.*, at p. 2 (emphasis added).
[36] *Id.*, at p. 1 (emphasis added).

| | |
|---|---|
| mid sized institutions, and asset managers' to 'access early liquidity from their alternative assets.'" *Id.* at ¶ 71. | tions, may not represent the target market of Ben's liquidity products in the future."[37] |
| "The Restatement materially reduced Ben's revenue, and materially increased its reported net loss before income taxes, for the period ended March 31, 2020, as compared to the figures reported in the financial statements incorporated into the Registration Statement." *Id. a*t ¶ 83.<br><br>"The corrected, significantly reduced revenue and increased net loss disclosed in the Restatement show that GWG's prior disclosures in the Registration Statement were materially false and inaccurate." *Id.* at ¶ 85. | Whitley Penn certified: "We have audited the accompanying consolidated balance sheet of GWG Holdings, Inc. and Subsidiaries (the "Company") as of December 31, 2019, and the related consolidated statements of operations, changes in stockholders' equity, and cash flows for the year ended December 31, 2019, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, ***the consolidated financial statements present fairly, in all material respects, the financial position of the Company*** as of December 31, 2019, and the results of their operations and their cash flows for the year ended December 31, 2019, in conformity with accounting principles generally accepted in the United States of America."[38] |
| "There was no bona fide arm's-length transaction of any Ben securities supporting the aforementioned valuations ascribed to Ben. Further, Ben's business and prospects did not justify these [goodwill] valuations. . . If Ben had any value at all, its value was only fraction of the inflated value ascribed to it." *Id.* at ¶ 91. | "In the event that facts and circumstances indicate that the goodwill or other identifiable intangible assets may be impaired, ***an interim impairment test would be required***. Intangible assets with finite lives are amortized over their useful lives. ***We perform required annual impairment tests of our goodwill*** and other intangible assets ... The goodwill impairment test ***requires us to make judgments and assumptions***. The test consists of ***estimating*** the fair value of each reporting unit based on valuation techniques, including a discounted cash flow model using revenue and profit forecasts and recent industry transaction and trading multiples of our peers, and comparing those estimated fair values with the carrying values of the assets and liabilities of each reporting unit, which includes the allocated goodwill. If the estimated fair value is less than the carrying value, we will recognize an impairment charge for the amount by which the carrying amount exceeds the reporting unit's fair value; however, any loss recognized will not exceed the total amount of goodwill allocated to that reporting unit. ***This evaluation includes multiple assumptions, including estimated discounted cash flows and other estimates that may change over time***. If future discounted cash flows become less than those projected by us, ***future impairment charges may become necessary that could have a materially adverse impact*** |

---

[37] GWG Annual Report (Form 10-K) (2019) at p. 26 (emphases added).
[38] GWG, Annual Report (Form 10-K) (2020), at p. 1.

| | |
|---|---|
| | *on our results of operations and financial condition in the period in which the write-off occur*."[39] |
| "The 2019 10-K does not disclose Ben's $49.8 million loan payment to HCLP as a related party transaction, stating instead that 'HCLP is not considered a related party of [GWG] or [Ben].'" *Id.* at ¶ 105. | "The Senior Lenders are directly or indirectly associated with one of Beneficient's founders, who is also Chairman of the Company's Board of Directors."[40] "[Ben] has significant debt obligations to [GWG] and has the ability to incur additional indebtedness."[41] "[Ben] does not have any operating history for its new business."[42] "Some or a substantial portion of the proceeds from L Bond sales may be used to make investments in [Ben]."[43] "We intend to use the net proceeds from this offering to grow our alternative asset exposure, including through investments in [Ben] in the form of equity investments and/or loans to [Ben] or related entities[.]"[44] "[Ben] will have broad discretion to use the proceeds of any such investments and may use such proceeds to acquire alternative assets, to repay indebtedness, including to related parties, and for general working capital purposes, including operating expenses."[45] |

The cautionary language in the prospectus was neither vague nor boilerplate. The cautionary statements were tailored to address the risks and uncertainties associated with the purchase of L Bonds. *See Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 216 (5th Cir. 2004); *see also Rombach v. Chang*, 355 F.3d 164, 175–76 (2d Cir. 2004) (holding "bespeaks caution" doctrine barred claims where cautionary statements provided a sobering picture of issuer's financial condition and future plans); *In re Trump*, 7 F.3d at 371–72 (finding prospectus bespoke caution where it conveyed the riskiness of investment and directly addressed the substance of challenged statements). Because Plaintiffs rely on statements "accompanied by meaningful cautionary language, which would alert

---

[39] Prospectus, at p. 5 (emphases added).
[40] *Id.* at F-31.
[41] *Id.*, at p. 27.
[42] *Id.*, at p. 37.
[43] *Id.*, at p. 20.
[44] *Id.*, at Cover Page.
[45] *Id.*, at p. 9.

the reasonable investor to consider those statements with healthy skepticism," the statements Plaintiffs rely on are not materially misleading. *Braun v. Eagle Rock Energy Partners, L.P.*, 223 F. Supp. 3d 644, 653 (S.D. Tex. 2016).

### C.   Plaintiffs' Section 11 claim is subject to an absolute negative causation defense and must be dismissed.

It is an affirmative defense to Plaintiffs' Section 11 claim that their losses are not attributable to the Ben Defendants' alleged misrepresentation or omission. 15 U.S.C. § 77k(e); *In re Dynegy*, 339 F. Supp. 2d 804, 867 (S.D. Tex. 2004).[46] This defense is known as the "negative causation defense." *See In re Dynegy*, 339 F. Supp. 2d at 867. "If the negative causation defense is apparent on the face of a complaint, dismissal under Rule 12(b)(6) of the Section 11 claim is proper." *In re Alamosa Holdings, Inc. Sec. Litig.*, 382 F. Supp. 2d 832, 865 (N.D. Tex. 2005).

GWG lost its ability to raise capital, which is what has actually caused the alleged loss to the L Bond Holders. Dkt. 63 ¶ 128. GWG's loss of ability to raise capital, including through the sale of L Bonds, has nothing to do with the Ben Defendants. The inability to raise further capital flows from GWG's delay in filing its financial statements and SEC subpoenas that shut down GWG's distribution network, making additional L Bond sales impossible. *Id.* Because these are circumstances other than the allegedly untrue Registration Statement, Plaintiffs' Section 11 claim is subject to the absolute negative causation defense, and must, therefore, be dismissed. *Id.* at 866.

### D.   Plaintiffs' control-person claims (Count IV) fail because Plaintiffs cannot plead a primary violation or control.

Section 15 provides that "anyone who controls persons liable under § 11 or § 12 of the

---

[46] The negative causation defense in Section 11 mirrors the loss causation requirement in Section 10(b), and courts apply the case law addressing loss causation under Section 10(b) and Rule 10b-5 to Section 11 claims. *See, e.g.*, *Amorosa v. AOL Time Warner, Inc.*, 409 Fed. App'x. 412, 415–16 (2d Cir. Feb. 2, 2011); *In re State Street Bank & Trust Co. Fixed Income Funds Invs. Litig.*, 774 F. Supp. 2d 584, 590 & n.4 (S.D. N.Y. 2011).

Securities Act can be held jointly and severally liable to the same extent as the persons they control." 15 U.S.C. § 77o. To allege control-person liability under the Securities Act, Plaintiffs must allege both a primary violation of § 11 or § 12 and the defendant's control over the primary violator. *Southland*, 365 F.3d at 383 ("Control person liability is secondary only and cannot exist in the absence of a primary violation."). Control-person liability under section 15 is thus "secondary or derivative, dependent on the plaintiff demonstrating an underlying 'primary' violation." *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 618 (S.D. Tex. 2018). Because Plaintiffs fail to allege a primary violation, their secondary-liability claims should be dismissed as well. *Southland*, 365 F.3d at 383–84. However, in the event the Court disagrees and finds Plaintiffs have stated a primary claim, Plaintiffs' Section 15 claim nevertheless fails.

The Fifth Circuit has held that, to support control-person liability, a plaintiff "must at least show that the defendant had an ability to control the specific transaction or activity upon which the primary violation is based." *Heck v Triche*, 775 F.3d 265, 283 (5th Cir. 2014) (internal citations omitted). The Fifth Circuit has also held that, "[w]hile some courts have required proof of control over day-to-day operations *in addition* to proof of control over the primary violations, control over day-to-day operations is not facial evidence of control over a primary violation." *Ahders v. SEI Private Tr. Co.*, 982 F.3d 312, 317 (5th Cir. 2020) (emphasis in original). Plaintiffs' complaint does not allege facts that could satisfy this standard for control.

Plaintiffs allege that the Individual Defendants were controlling persons of GWG merely "by virtue of their officer positions as Directors or senior officers of GWG." Dkt. #63 at ¶ 183. This is not sufficient to satisfy the standard for pleading control-person liability and fails to show that any Individual Defendant controlled the specific activity that Plaintiffs allege constituted a violation of Sections 11 or 12. *See Heck*, 775 F.3d at 283. To adequately plead a claim for control-

person liability, "a plaintiff must allege some facts beyond a defendant's position or title that show the defendant had actual power or control over the controlled person." *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 380 (S.D. Tex. 2011), *aff'd sub nom. Harold Roucher Tr. U/A DTD 9/21/72 v. Nocella*, 464 Fed. Appx. 334 (5th Cir. 2012); *see also Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1990) (holding that defendant's status as a director was not sufficient to make him a controlling person); *In re Pilgrim's Pride Corp. Sec. Litig.*, No. 2:08-CV-419-TJW, 2010 WL 3257369, at *33 (E.D. Tex. Aug. 17, 2010) ("[A] plaintiff needs to allege some facts beyond a defendant's position or title that show the defendant had actual power or control over the controlled person."). Plaintiffs failed to do so here.

Plaintiffs allege that Ben is a controlling person of GWG "by virtue of its direct power to designate the members of GWG's Board." Dkt. #63 ¶¶ 184. In addition to not being true, this too falls short of the level of control required under Section 15 and fails to show that GWG controlled the specific activity that Plaintiffs allege constituted a violation of Sections 11 or 12. *See Heck*, 775 F.3d at 283; *see also Dartley v. ErgoBilt Inc*., No. 98- cv-1442-M, 2001 WL 313964 at *1 (N.D. Tex. Mar. 29, 2001) ("[S]tatus as a major shareholder and a party to the voting agreement at issue does not, without more, create control person liability[.]"). The Complaint admits that the Seller Trusts, not Ben or the Individual Defendants, controlled GWG. Dkt. #63 at ¶ 184 ("[T]he Seller Trusts—which owned approximately 79% of GWG's common shares—became controlling stockholders of GWG… ."). While the Complaint further alleges that the Seller Trusts conferred upon Ben the authority to designate members of GWG's board in April 2019, *id.*, this falls short of adequately pleading control-person liability for two reasons.

*First*, allegations that a defendant had the right to appoint board members are not sufficient to plead control-person liability. *See, e.g.*, *In re Kosmos Energy Ltd. Sec. Litig.*, 955 F. Supp. 2d

658, 675–76 (N.D. Tex. 2013) (dismissing Section 15 claim where allegations of control were "based almost entirely on the Shareholder Defendants' stock ownership and the fact that they each designated two of their employees as directors of Kosmos"); *Zishka v. Am. Pad & Paper Co.*, No. 3:98–cv–0660–M, 2001 WL 1748741, *1 (N.D.Tex. Sept. 28, 2001), *aff'd*, 72 Fed. App'x. 130 (5th Cir. 2003) (holding pleadings alleging defendants "owned 38%-50% of the stock of Ampad, and thus had the power to, and did, place three persons on the Ampad Board" inadequate).

*Second*, even if the right to appoint directors were sufficient to establish control, Plaintiffs failed to plead control *during the relevant time period*. At the time of the Registration Statement and after, the Seller Trusts regained the ability to appoint and remove directors.[47]  Moreover, special committees comprised of independent directors who received advice from independent counsel and advisors, controlled the transactions upon which the allegations rest as the special committees had full authority to review, negotiate and approve transactions between GWG and Ben.[48]

## VI.    CONCLUSION

Ben Defendants respectfully request the Court **GRANT** this Motion and **DISMISS** Plaintiffs' claims against them **with prejudice.**

---

[47] GWG Annual Report (Form 10-K) (2019) ("Because the Seller Trusts, collectively, own a substantial majority of our outstanding voting securities, the Seller Trusts are entitled to cast a majority of the votes on all matters requiring stockholder votes, including: the election of directors; mergers, consolidations, acquisitions and other strategic transactions; the sale of all or substantially all of our assets and other decisions affecting our capital structure; amendments to our Certificate of Incorporation or our bylaws; and our winding up and dissolution. This effectively transferred voting control over the Company to the Seller Trusts…").
[48] GWG Annual Report (Form 10-K) (2019), at p. 78.

DATED: November 7, 2023                                Respectfully submitted,


                                                        s/ Michael W. Stockham

                                                       Michael W. Stockham B
                                                       Michael.Stockham@hklaw.com

                                                       Sara Babineaux
                                                       Sara.Babineaux@hklaw.com

                                                       HOLLAND & KNIGHT LLP
                                                       1722 Routh Street, Suite 1500
                                                       Dallas, Texas 75201-2533
                                                       Telephone: 214.969.1700
                                                       Facsimile: 214.969.1750

                                                       ATTORNEYS FOR PETER T. CANGANY, BRAD
                                                       K. HEPPNER, THOMAS O. HICKS, DENNIS P.
                                                       LOCKHART, AND BRUCE W. SCHNITZER