**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| | § | |
| | § | |
| IN RE GWG HOLDINGS, INC. | § | Case No. 3:22-cv-00410-B |
| SECURITIES LITIGATION | § | |
| | § | |
| | § | |
| | § | |

**DEFENDANT TIMOTHY L. EVANS' MOTION TO DISMISS AND BRIEF IN
SUPPORT**

Defendant Timothy L. Evans submits this motion to dismiss Plaintiffs' claims against him for alleged violations of Section 11, Section 12, and Section 15 of the Securities Act of 1933 (Counts I, III, and IV). In support of this Motion, Mr. Evans relies on and incorporates by reference the Brief in Support of the Motion to Dismiss filed by The Beneficient Company Group L.P. and other associated individuals (Dkt. No. 68, filed November 7, 2023), and the accompanying Brief.

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES..................................................................................................ii

PRELIMINARY STATEMENT .........................................................................................1

BACKGROUND..................................................................................................................3

      A.    Mr. Evans' Roles at Ben and GWG ....................................................................3

      B.    The 2020 L Bond Offering.................................................................................4

      C.    GWG's 2021 Restatement....................................................................................6

LEGAL STANDARD .........................................................................................................7

ARGUMENT.......................................................................................................................9

I.     Plaintiffs' Section 12 Claim (Count III) Against Mr. Evans Fails Because He Was Not A "Statutory Seller"......................................................................................9

II.    Plaintiffs' Section 15 Claim (Count IV) Against Mr. Evans Fails For Lack Of Control Person Liability..........................................................................................11

III.   Plaintiffs Fail To Allege Any Material False Or Misleading Statement In Support Of Their Section 11 and 12 Claims (Counts I and III) ......................................13

      A.    The Cautionary Language In GWG's Financial Reports Disclosed The Precise Risks On Which Plaintiffs Now Base Their Claims........................14

      B.    Plaintiffs' Allegations Regarding The 2021 Restatement Fail To Substantiate Any Plausibly Material Misstatement...........................................15

      C.    Plaintiffs Fail to Allege a Material Misstatement Regarding Related Party Transactions...............................................................................21

      D.    Plaintiffs Fail to Allege a Material Misstatement in Connection with the Director Resignations...........................................................................22

CONCLUSION..................................................................................................................23

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).................................................................................................. 7

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988).................................................................................................. 14

*Blue Chip Stamps v. Manor Drug Stores*,
  421 U.S. 723 (1975).................................................................................................. 2

*Brooks v. United Dev. Funding III, L.P.*,
  No. 4:20-cv-00150-O, 2020 WL 6132230 (N.D. Tex. Apr. 15, 2020) ............................... 23

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017)....................................................................................... 19

*Dennis v. Gen. Imaging, Inc.*,
  918 F.2d 496 (5th Cir. 1990)....................................................................................... 12

*ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)........................................................................................ 17

*Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*,
  53 F. Supp. 3d 882 (E.D. La. 2014) .............................................................................8-10

*Geinko v. Padda*,
  No. 00 C 5070, 2002 WL 276236 (N.D. Ill. Feb. 26, 2002) .............................................. 23

*Heck v. Triche*,
  775 F.3d 265 (5th Cir. 2014)....................................................................................... 12

*In re Amtrust Fin. Servs., Inc. Sec. Litig.*,
  No. 17-cv-1545 LAK, 2019 WL 4257110 (S.D.N.Y. Sep. 9, 2019).................................... 20

*In re Franklin Bank Corp. Sec. Litig.*,
  782 F. Supp. 2d 364 (S.D. Tex. 2011), *aff'd sub nom. Harold Roucher Tr. U/A DTD
  9/21/72 v. Nocella*, 464 F. App'x 334 (5th Cir. 2012)................................................. 12, 16

*In re JPMorgan Chase Sec. Litig.*,
  363 F. Supp. 2d 595 (S.D.N.Y. 2005)............................................................................ 16

*In re Kosmos Energy Ltd. Sec. Litig.*,
   955 F. Supp. 2d 658 (N.D. Tex. 2013)................................................................*passim*

*In re Venator Materials*,
   547 F. Supp. 3d 624 (S.D. Tex. 2021)...................................................8-9, 11, 13

*Kapps v. Torch Offshore, Inc.*,
   379 F.3d 207 (5th Cir. 2004)......................................................................17-18

*Krim v. BancTexas Grp., Inc.*,
   989 F.2d 1435 (5th Cir. 1993) ................................................................... 14, 22

*Labib Janbay v. Canadian Solar, Inc.*,
   No. 10 Civ. 4430(RWS), 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012)............................ 23

*Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*,
   810 F.3d 951 (5th Cir. 2016)........................................................................ 8

*Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*,
   238 F.3d 363 (5th Cir. 2001)........................................................................ 8

*Melder v. Morris*,
   27 F.3d 1097 (5th Cir. 1994)........................................................................ 8

*N. Port Firefighters' Pension-Loc. Option Plan v. Temple-Inland, Inc.*,
   936 F. Supp. 2d 722 (N.D. Tex. 2013)...................................................... 7, 9, 18

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)................................................................................20-21

*Pinter v. Dahl*,
   486 U.S. 622 (1988)............................................................................... 9, 11

*Rosenzweig v. Azurix Corp.*,
   332 F.3d 854 (5th Cir. 2003)................................................................10-11, 17

*SEPTA v. Orrstown Fin. Servs.*,
   No. 1:12-cv-00993, 2022 WL 3572474 (M.D. Pa. Aug. 18, 2022) ..................................... 20

*Tellabs, Inc. v. Makor Issues & Rts, Ltd.*,
   551 U.S. 308 (2007).................................................................................. 3

*Walker v. Beaumont Indep. Sch. Dist.*,
    938 F.3d 724 (5th Cir. 2019) ............................................................................ 7

**Statutes**

15 U.S.C. § 77k ..................................................................................................*passim*

15 U.S.C. § 77l(a)(2) ..........................................................................................*passim*

15 U.S.C. § 77o .............................................................................................2, 11-13

**Rules**

Fed. R. Civ. P. 9(b) ............................................................................................. 8-9

Fed. R. Civ. P. 11 ................................................................................................. 23

Fed. R. Civ. P. 12(b)(6) ......................................................................................... 7

**PRELIMINARY STATEMENT**

As the Brief in support of the Motion to Dismiss (the "Ben Motion") filed by The Beneficient Company Group L.P. ("Ben") (Dkt. No. 68, filed November 7, 2023) makes clear, this putative securities class action is brought on behalf of a group of investors in L Bonds issued by GWG Holdings Inc. ("GWG") in June 2020. The L Bonds were expressly described to investors as "speculative" and involving "a high degree of risk" on account of GWG's limited operating history, untested business model, and then-ongoing integration of Ben's operations with its own. Among the specific risk factors described to investors was that "[w]e critically rely on debt financing for our business" and that "[c]ontinued access to financing and liquidity . . . is not guaranteed." Plaintiffs' claims in this case arise not from any misrepresentation in the L Bond offering documents, but rather from the opposite: *realization* of the specifically-disclosed risk factor of material adverse consequences if GWG were to lose the ability to raise sufficient capital.

Plaintiffs' claims against Timothy Evans simply bootstrap their allegations about GWG and Ben. Mr. Evans is an accomplished former securities enforcement lawyer with a sterling reputation. Formerly in private practice and a prosecutor in the Dallas County prosecutor's office, he joined the Securities and Exchange Commission's Enforcement Division in 2012, where he held several roles of increasing responsibility, before leaving in February 2018 to become Ben's Deputy General Counsel. As discussed below, Mr. Evans later moved to GWG, where he became its Chief Integration Officer ("CIO") and later Chief Financial Officer ("CFO"). The Complaint ("Compl") includes not a single specific allegation about Mr. Evans besides his title, Compl. ¶ 32, and includes no allegation that he did anything improper, knowingly or otherwise.

The crux of Plaintiffs' allegations is that they purchased L Bonds issued by GWG in purported reliance on a June 2020 registration statement (the "Registration Statement"), that the Registration Statement contained material misstatements, and that Mr. Evans and others who were

required to sign the Registration Statement by virtue of their role at the company are liable for those supposed misstatements. The problem with Plaintiffs' allegations, however, is that they fail to identify any material information that was omitted from the Registration Statement or any statement in the Registration Statement that was false when made. All Plaintiffs manage to cobble together are a series of negative risk factors about L Bonds, all of which were disclosed in excruciating detail, and the unremarkable fact that in 2021 GWG restated its financial statements for a period of time based on a changed understanding of the proper accounting treatment for certain assets, the material features of which were all *always* fully disclosed.

As a former securities enforcement lawyer himself, Mr. Evans had absolutely no incentive to expose himself to personal liability by signing off on a misleading Registration Statement. In deciding this Motion the Court is under no obligation to permit "a plaintiff with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741 (1975). The three claims asserted against Mr. Evans—under Sections 11, 12(a)(2), and 15 of the Securities Act—fail on their face and should be dismissed for at least the following reasons:

- Mr. Evans did not sell the L Bonds to Plaintiffs, and is not alleged to have done so. He is not a "statutory seller" and is therefore not part of the class of potential defendants who can be liable under Section 12(a)(2);

- Plaintiffs' generic allegations of "control" against Mr. Evans fail to satisfy the requirements under controlling law; and

- Plaintiffs fail to identify any material statement in the Registration Statement that was false or misleading when made. That forecloses liability under Sections 11 and 12 of the Securities Act, for which Plaintiffs also seek to hold Mr. Evans liable under Section 15.

Further, because Plaintiffs have already had the opportunity to replead once, and because the insufficiency of their allegations against Mr. Evans are incapable of being cured, the Court should dismiss the claims against him with prejudice.

## BACKGROUND

The action relates to GWG's offering of L Bonds in June 2020, pursuant to a registration statement and prospectus declared effective June 3, 2020 ("Prospectus"). The Registration Statement incorporated GWG's 2019 annual report ("2019 10-K"), GWG's first quarter 2020 report ("2020 10-Q"), and other GWG reports filed with the SEC.[1]

### A. Mr. Evans' Roles at Ben and GWG

Founded in 2006, GWG participated in the market for life settlements. Its business centered on purchasing life insurance policies on the secondary market at a discount to the death benefit thereby providing policy holders with cash to use within their lifetimes, in exchange for assignment of the policy's death benefits. Compl. ¶¶ 2, 39. GWG financed its operations by selling bonds—known as "L Bonds"—to raise capital. *Id*. These bonds were sold through a network of independent SEC-regulated securities brokers throughout the country. Compl. ¶ 40.

Mr. Evans first became involved with GWG in May 2019. Before that time, after leaving service at the SEC, Mr. Evans had been associated with a different company—Ben—as its Deputy General counsel. Ben's business plan was similar to GWG's insofar as it focused on helping holders of illiquid assets obtain liquidity. Rather than life insurance policies, however, Ben was focused on providing liquidity to holders of private equity interests and other similar illiquid assets. Compl. ¶¶ 45–46.

---

[1] These filings can be considered by the Court since the Complaint incorporates them by reference. *See Tellabs, Inc. v. Makor Issues & Rts, Ltd.*, 551 U.S. 308, 322 (2007).

The two companies had been separately founded and each developed their own business plans and operations independently. In January 2018, GWG announced in its SEC Form 8-K filing that it had entered into a strategic partnership with Ben, and between August and December 2018 GWG began investing in Ben. Compl. ¶¶ 44–49. GWG and Ben also entered into a transaction in August 2018 that involved the exchange of GWG common shares and L Bonds for Ben LP interests. Compl. ¶ 49. Subsequent cash investments were made between 2019 and 2021. *Id.* ¶ 50. The objective of these transactions was to ultimately combine GWG and Ben.

In May 2019, Mr. Evans moved from his role at Ben to GWG, serving first as its CIO and later becoming its CFO in August 2019—a role he held until November 2022. Compl. ¶ 32.

By December of 2019, GWG had acquired a controlling interest in Ben and began reporting the results of Ben and its subsidiaries on a consolidated basis. Compl. ¶ 54.

**B. The 2020 L Bond Offering**

In July 2020—nearly two years after GWG first invested in Ben and more than 7 months after Ben's financial results were fully consolidated with GWG's—GWG announced the L Bond offering that is the subject of this lawsuit. The offering, which was registered with the SEC, was to consist of up to $2 billion of new L Bond sales. Compl. ¶¶ 55–56. Mr. Evans—as CFO of GWG—was one of several executives who signed the SEC Registration Statement for this offering. Compl. ¶ 56.

The 2020 Registration Statement and the documents it incorporated included extensive and specific disclosures regarding all of the material risks of investing in L Bonds. These are discussed at length in the Ben Motion, and not fully reproduced here. But the disclosures in the Registration Statement clearly and directly disclose *precisely* the risk factors and other information that Plaintiffs complain in this lawsuit were concealed from them. For example, the Registration Statement said expressly:

4

- "Investing in our L Bonds may be considered speculative and involves a high degree of risk, including the risk of losing your entire investment . . . . The L Bonds are only suitable for persons with substantial financial resources and with no need for liquidity in this investment." Prospectus at Cover.

- "We have a relatively limited history of operations, a history of net losses, and our future earnings, if any, and cash flows may be volatile, resulting in uncertainty about our ability to service and repay our debt when it comes due." 2019 10-K at 18.

- "We critically rely on debt financing for our business . . . . To date, we have chosen to finance our business principally through the issuance of debt, including . . . our L Bonds . . . . Continued access to financing and liquidity under . . . the offering of our L Bonds, or otherwise is not guaranteed." *Id.* at 19.

The Registration Statement likewise made clear that there was a reorientation of GWG's business strategy associated with the 2018 and 2019 investments in Ben, and that it remained to be seen whether and to what extent that would be successful:

- "In 2018 and 2019 we consummated a series of transactions with [Ben] that has resulted in a significant reorientation of our business and capital allocation strategy towards an expansive and diverse exposure to alternative assets." *Id.* at 45.

- Ben "plans" to "provide mid-to-high net worth individuals with trust services and related liquidity products," but that, "to date, [Ben's] originations of liquidity products have been transacted with a limited number of family offices, fund-of-funds and institutions. These types of clients, specifically fund-of-funds and institutions, may not represent the target market of Ben's liquidity products in the future." *Id.* at 26.

Additionally, the Registration Statement and incorporated documents included disclosures about specific things about which Plaintiffs say they were misled. For example, the Registration Statement discloses GWG's intended use of the L Bond proceeds:

- "We intend to use the net proceeds from this offering to grow our alternative asset exposure, including through investments in Beneficient in the form of equity investments or loans, and to meet our other obligations, including debt obligations." Prospectus at Cover.

- "Beneficient will have broad discretion to use the proceeds of any such investments and may use such proceeds to fund alternative asset financings, to repay indebtedness, including to related parties, and for general working capital purposes,

including operating expenses. We may also use some of the proceeds from this offering to pay interest and principal amounts owing under previously issued L Bonds, Seller Trust L Bonds, and L Bonds offered hereby and for the payment of dividends on and redemption of our preferred stock." *Id*. at 9.

The Prospectus made clear that goodwill valuations are dependent on "judgments," "multiple assumptions," and "estimates that may change over time." 2020 10-Q for the quarterly period ended March 31, 2020, at 54; *see also* Prospectus at 40 (explicitly incorporating 2020 10-Q by reference). And the 2019 10-K, which was incorporated in the Registration Statement, warned that "GWG and Beneficient cannot be certain that their efforts to further establish and maintain internal controls over financial reporting will be successful. Any failure to further develop, as necessary, or to maintain effective internal controls could harm the Company's operating results or cause the Company to fail to meet its reporting obligations." 2019 10-K at 30.

### C. GWG's 2021 Restatement

In February 2021, while GWG was preparing to file its 2020 annual report, it initiated a consultation with the Office of the Chief Accountant of the SEC ("OCA") regarding two complex accounting questions. 2020 10-K at Explanatory Note. GWG did so with the concurrence of its prior auditor and in order to ensure it could accurately file its financial statements. *See id*. That consultation concluded with a final response from OCA in July 2021. *Id*. On November 5, 2021, GWG then filed its 2020 annual report on Form 10-K which included a restatement of certain of GWG's prior financial statements, consistent with OCA's conclusion. *Id*.. These restated financial statements changed the accounting presentation of certain items in its financial statements (the "Restatement"). *Id*.

The Restatement related to a specific and highly-nuanced question of how Ben accounted for the economics of certain trusts, referred to as ExAlt Trusts, through which Ben's alternative asset business was conducted. Compl. ¶¶ 9, 62–63. The structure of these trusts, and Ben's

financial relationship with them, was described in detail in GWG's 2019 10-K, which was incorporated in the Registration Statement. Compl. ¶ 61. By 2021, however, Ben determined that the subjective accounting guidance did not require that the Trusts be consolidated in its financial statements; instead it reflected its loans with the Trusts as loan receivables on the face of its financial statements. By November 2021, in accordance with OCA's conclusion, the company determined that the Trusts should instead be consolidated, collapsing the relationship between Ben and the Trusts, and resulting in its reporting an investment in the underlying Trust assets, rather than a loan receivable. Compl. ¶ 75. Nothing about this Restatement in any way altered the risk factors set out in the Registration Statement, nor did the revision materially alter GWG's reporting of assets and liabilities—as the Complaint sets out in detail, the Restatement changed how assets were accounted for, not what they were. *See* Compl. ¶ 80.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 734 (5th Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Factual allegations in a complaint that are "merely consistent" with liability are insufficient. *Ashcroft*, 556 U.S. at 678. Rather, facial plausibility exists only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Additionally, allegations that are merely "labels and conclusions" need not be accepted as true. *N. Port Firefighters' Pension-Loc. Option Plan v. Temple-Inland, Inc*., 936 F. Supp. 2d 722, 736 (N.D. Tex. 2013) (Boyle, J.) (quoting *Ashcroft*, 556 U.S. at 678).

Where a securities claim "sounds in fraud," even if nominally pled under Section 11 or 12 of the Securities Act, the Fifth Circuit has recognized that Rule 9(b)'s heightened pleading standard

applies. *Melder v. Morris*, 27 F.3d 1097, 1100 n.6 (5th Cir. 1994) (Rule 9(b) applies to Securities Act claims that are "grounded in fraud rather than negligence"); *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th Cir. 2001); *Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*, 53 F. Supp. 3d 882, 897 (E.D. La. 2014) (applying Rule 9(b) to Section 11 claim based on, among other things, allegation that "defendants *knew* ATP would ultimately go bankrupt and purposefully withheld that information"); *In re Venator Materials*, 547 F. Supp. 3d 624, 669 (S.D. Tex. 2021) (applying Rule 9(b) to Section 11 claim).

Here, while Plaintiffs include no specific allegations against Mr. Evans personally, they seek to hold him liable for the conduct of others that they specifically allege was fraudulent. Their Complaint accordingly sounds in fraud. For instance, Plaintiffs allege that defendants knowingly omitted in the Registration Statement that L Bond proceeds were being used to "personally enrich" Mr. Heppner by "servic[ing] debt connected to [his] ranch, instead of being used to fund Ben's business." Compl. ¶¶ 11, 108–111. As another example, Plaintiffs allege that the Registration Statement covered up that resignations of three directors were based on concerns about "GWG's investments in Ben and Ben's payment to related parties," instead claiming these resignations were for purposes of efficiency. Compl. ¶¶ 115–122. And Plaintiffs assert that multiple statements of opinion were false and misleading, which requires them to show that the defendants made those statements with scienter—*i.e.*, while believing them to be false. *Infra* Section III; *see also* Compl. ¶¶ 56, 59 (alleging the Registration Statement contained various "false and misleading representations and omissions" and was "replete with falsehoods").

Accordingly, under Rule 9(b) plaintiffs must "plead with particularity the circumstances constituting fraud." *Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 956 (5th Cir. 2016). To do so, plaintiffs must "identify the 'time, place, and contents

of the false representations, as well as the identity of the person making the misrepresentation and what that person obtained thereby.'" *N. Port Firefighters' Pension-Loc. Option Plan*, 936 F. Supp. 2d at 736 (quoting *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)); *In re Venator Materials*, 547 F. Supp. 3d at 647 (quoting *Dorsey v. Portfolio Equities Inc.*, 540 F.3d 333, 339 (5th Cir. 2008) ("Rule 9(b) requires the complaint to set forth the 'who, what, when, where, and how' of the events at issue."). For claims based on omissions, Rule 9(b) "typically requires the claimant to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the misrepresentations misleading." *Firefighters Pension & Relief Fund of the City of New Orleans*, 53 F. Supp. 3d at 897 (quoting *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006)).

## ARGUMENT

Mr. Evans joins in and incorporates by reference the arguments in the Ben Motion as if fully set forth herein. In addition, the Complaint's allegations against Mr. Evans should be dismissed on the following grounds.

### I. Plaintiffs' Section 12 Claim (Count III) Against Mr. Evans Fails Because He Was Not A "Statutory Seller"

As the Ben Motion explains, only "statutory sellers" can be liable for a violation of Section 12(a)(2). Ben Mot. at 8–10; *Pinter v. Dahl*, 486 U.S. 622, 647–50 (1988); *see* 15 U.S.C. § 77l(a)(2). Because Mr. Evans was not a statutory seller of L Bonds, the claims against him related to those sales under Section 12 of the Securities Act must be dismissed.

Under Section 12, an individual is a "statutory seller" only if he (i) "actually passes the title [of the security] to the buyer" or (ii) "successfully solicits the purchase [of the security], motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *In re Kosmos Energy Ltd. Sec. Litig.*, 955 F. Supp. 2d 658, 670 (N.D. Tex. 2013) (Boyle, J.) (quoting

9

*Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003)).  Plaintiffs fail to allege that either basis applies to Mr. Evans.

*First*, Plaintiffs do not and cannot allege that Mr. Evans passed title of the L Bonds to them. Plaintiffs allege that the L Bonds were issued by GWG, Compl. ¶ 1, and sold through a "network of independent broker-dealers."  Compl. ¶¶ 40, 55.  This allegation belies any inference that Mr. Evans, an individual who did not sell or issue anything, passed title to Plaintiffs.  *See, e.g.*, *In re Kosmos Energy*, 955 F. Supp. 2d at 670 (holding that issuer did not pass title when it did not directly sell any stock, but rather sold "through a firm commitment underwriting").

*Second,* Plaintiffs also do not and cannot allege that Mr. Evans "successfully solicited" their purchases.  "To count as 'solicitation,' the seller must, *at a minimum*, directly communicate with the buyer."  *Rosenzweig*, 332 F.3d at 871 (emphasis added).  There are no allegations regarding *any* statements made by Mr. Evans, much less any direct communications between him and Plaintiffs.  Under *Rosenzweig*, that alone is fatal to any solicitation theory.

The fact that Mr. Evans signed the Registration Statement—which is the only specific relevant fact pled as to Mr. Evans—does not save Plaintiffs' claim.  Signing a registration statement certainly does not constitute direct passage of title.  Nor is it the same as directly communicating with a buyer, as required for a solicitation.  *See Rosenzweig*, 332 F.3d at 871 (rejecting argument that "signing the registration statement suffices for solicitation"); *Firefighters Pension & Relief Fund of the City of New Orleans*, 53 F. Supp. 3d at 917 ("[P]laintiff's failure to allege that defendants did anything other than sign the Registration Statement and cause it to become effective forecloses their Section 12 claim."); *see also In re Kosmos Energy*, 955 F. Supp. 2d at 670 ("In *Rosenzweig*, the Fifth Circuit explained that merely signing the registration statement does not suffice for solicitation . . . .").

Without referring to Mr. Evans specifically, or seeking to describe any particular act by him, Plaintiffs vaguely assert that "participating in the preparation, dissemination, and promotion of the false and misleading Prospectus" qualifies as solicitation by "Defendants." Compl. ¶ 176. But another court in this Circuit has rejected a near-identical contention. *See In re Venator Materials*, 547 F. Supp. 3d at 669 (allegation that defendants "participat[ed] in the preparation of the untrue and misleading IPO Materials and SPO Materials" did not prevent dismissal of Section 12 claim). Here, as in *Venator Materials*, Plaintiffs' allegation is not supported by any facts suggesting Mr. Evans did any of those things or explaining what his role, if any, was in the offering. *See id.* ("nonspecific allegations" of solicitation are "insufficient under section 12"). Without such facts, Plaintiffs cannot show that Mr. Evans was an active solicitor rather than a "collateral participant[]," which is fatal to their claim. *See Rosenzweig*, 332 F.3d at 871 (Section 12 liability does not extend to "collateral participants"); *see also Pinter*, 486 U.S. at 650 ("mere participation in unlawful sales transactions" insufficient to impose Section 12 liability).

## II. Plaintiffs' Section 15 Claim (Count IV) Against Mr. Evans Fails For Lack Of Control Person Liability

Nor can Plaintiffs bootstrap their Section 11 allegations about GWG into allegations for which Mr. Evans would be personally liable. As a threshold matter, Plaintiffs' claims under Section 15 are derivative of their claims under Sections 11 and 12, and should be dismissed insofar as those claims are dismissed. *See In re Venator Materials*, 547 F. Supp. at 670 (dismissing control-person claim because primary violation was not adequately pled).

As the Ben Motion outlines, moreover, under Section 15, "anyone who controls persons liable under § 11 or § 12 of the Securities Act can be held jointly and severally liable to the same extent as the persons they control." Ben Mot. at 28–29; *In re Kosmos Energy*, 955 F. Supp. 2d at 674 (citing 15 U.S.C. § 77o). However, "[t]o allege control person liability under § 15, the plaintiff

11

must allege both a primary violation of § 11 or § 12 and the defendant's control over the primary violator." *In re Kosmos Energy*, 955 F. Supp. 2d at 674.

It is well settled that mere allegations of a corporate officer's role at the company are insufficient to state a claim under Section 15. *See In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 380 (S.D. Tex. 2011), *aff'd sub nom. Harold Roucher Tr. U/A DTD 9/21/72 v. Nocella*, 464 F. App'x 334 (5th Cir. 2012) ("[A] plaintiff must allege some facts beyond a defendant's position or title that show the defendant had actual power or control over the controlled person."); *see also Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 509–10 (5th Cir. 1990) ("While Robinson was a director of New South, this status alone will not automatically cause him to be deemed a Section 15 or 20 controlling person. He must be found to have influence over at least the direction of the firm."). Rather, under controlling precedent in this Circuit, a plaintiff "must at least show that the defendant had an ability to control the specific transaction or activity upon which the primary violation is based." *Heck v. Triche*, 775 F.3d 265, 283 (5th Cir. 2014).

Plaintiffs' claims against Mr. Evans should be dismissed because they fail to allege his actual control over the transactions at issue in this case. Indeed, the only "control person" allegation related to Mr. Evans in the Complaint is that he was a control person over GWG. Compl. ¶ 183 ("The Individual Defendants were controlling persons of GWG by virtue of their positions as Directors or senior officers of GWG."). But Plaintiffs plead no specific facts showing Mr. Evans controlled GWG. Plaintiffs' allegation that Mr. Evans was a control person of GWG "by virtue of" his position as CFO and director, Compl. ¶ 183, is plainly insufficient under the decisions cited above.

Plaintiffs otherwise vaguely assert that the "Individual Defendants" "participated in" and "conducted" GWG's business, also pointing to the fact that they signed the Registration Statement.

12

Compl. ¶¶ 183–185. But these allegations say nothing about whether Mr. Evans was "involved in [GWG's] operations (day-to-day or long term), decisionmaking, or planning." *In re Kosmos Energy*, 955 F. Supp. 2d at 676 (dismissing Section 15 claim given absence of allegations of day-to-day control); *In re Venator Materials*, 547 F. Supp. 3d at 666 ("The question under Fifth Circuit precedent, then, is whether the alleged control-person had 'effective day-to-day control' of the corporation, or had 'the requisite power to directly or indirectly control or influence corporate policy,' or had 'actual power or influence over the controlled person.'"). Plaintiffs' allegations likewise do not "show that [Mr. Evans] had an ability to control the specific transaction or activity upon which the primary violation is based." *In re Venator Materials*, 547 F. Supp. 3d at 666 (quoting *Heck*, 775 F.3d at 283).[2]

Insofar as Plaintiffs seek to impose on Mr. Evans *personal* liability for alleged *corporate* misstatements, something more than generic, rote allegations are required. Allegations that Mr. Evans himself had a role in the alleged wrongful activity are required, but there are none.

### III. Plaintiffs Fail To Allege Any Material False Or Misleading Statement In Support Of Their Section 11 and 12 Claims (Counts I and III)

The Ben Motion outlines, in detail, how Plaintiffs have failed to make out the substantive elements of their Section 11 and 12 claims by pleading that the Registration Statement contained material statements that, when made, were misleading. Mr. Evans will not repeat those arguments in full, but rather adopts and incorporates them by reference. *See* Ben Mot. at 10–28. We do, however, briefly address the insufficiency of Plaintiffs' allegations of misstatements and

---

[2] For instance, Plaintiffs' Section 12(a)(2) claim is based on the sale and solicitation of L Bonds to them through allegedly untrue statements in the Registration Statement. But without more, signing the Registration Statement does not show how Mr. Evans could control the subsequent sales by independent broker-dealers to Plaintiffs or any alleged solicitations (*i.e.*, direct communications to Plaintiffs).

materiality insofar as they concern Mr. Evans' understanding of the Registration Statement for which Plaintiffs seek to hold him *personally* liable.

### A. The Cautionary Language In GWG's Financial Reports Disclosed The Precise Risks On Which Plaintiffs Now Base Their Claims

Plaintiffs' cherry-picked allegations must be read in the context of how a "reasonable investor" would have viewed the Registration Statement "as a whole," and whether further disclosures would have "*significantly* altered the total mix of information made available." *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1445-48 (5th Cir. 1993) (emphasis added) (holding the misrepresentations were not material "because a reasonable investor viewing the information in context would not have considered the investment significantly more risky as a result"); *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) ("[T]o fulfill the materiality requirement 'there must be a *substantial* likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having *significantly* altered the 'total mix' of information made available.'") (emphases added).

Here, the L Bonds were sold to investors on the *express* representation—right on the cover of the Prospectus—that "[i]nvesting in our L Bonds may be considered speculative and involves a high degree of risk, including the risk of losing your entire investment." Prospectus at Cover. The cautionary language goes on to explain not only that future performance may be materially negatively impacted by a variety of events, but also *expressly* discloses that the financial information presented in GWG's 2019 10-K may not be entirely reliable because of GWG's internal controls, limited operating history, and limited resources:

- "GWG Holdings did not have sufficient accounting resources and personnel to effectively design and execute process level controls around certain complex or non-recurring transactions to ensure proper application of U.S. GAAP . . . . GWG is a smaller reporting company for SEC reporting purposes and has historically had limited accounting and financial reporting resources." 2019 10-K at 30.

- "A failure to establish and maintain effective internal controls over financial reporting could adversely affect [GWG's] financial results." *Id*.

- "Beneficient's material weaknesses included, among other matters, insufficient accounting resources to properly capture and accurately record all material transactions; insufficient controls surrounding certain key valuation models and surrounding data inputs into such key valuation models; and ineffective controls over the period end financial reporting process." *Id*.

- "The consolidation of Beneficient and GWG will result in increased accounting, reporting and internal controls complexity as the companies integrate systems and processes," meaning "there is no certainty that GWG and Ben[] will be able to maintain effective internal controls over financial reporting" as is "necessary . . . to provide reliable financial reports, prevent fraud and operate successfully." *Id*.

- More generally, GWG explained that "we are a company with a relatively limited operating history, which makes it difficult to accurately forecast our earnings and cash flows." *Id*. at 18.

- GWG further emphasized that Ben had little to no "operating history," that such companies "present substantial business and financial risks and uncertainties," and that "results of operations may fluctuate from period to period" and "the results of any one period should not be relied upon as an indication of future performance." *Id*. at 30.

From Mr. Evans' standpoint, as well as the standpoint of any reasonable investor, the Registration Statement and documents incorporated in it, including the 2019 10-K, make abundantly clear that an investor in L Bonds should appreciate the high degree of risk associated with that investment, and should not assume that the financial results presented are free from error, including *in particular* errors arising from the exercise of accounting judgment and from the increased complexity resulting from the integration of Ben with GWG. Yet Plaintiffs' entire case rests on the core allegation that these very risk factors were somehow concealed from them. As the Ben Motion outlines, these risk factors were not concealed at all.

## B. Plaintiffs' Allegations Regarding The 2021 Restatement Fail To Substantiate Any Plausibly Material Misstatement

Plaintiffs allegations further seize on the 2021 Restatement of GWG's financial reports following consultation with OCA, and in particular on selected changes to figures on GWG's

balance sheet resulting from revised accounting treatment relating to the ExAlt Trusts. As described in GWG's filings, Ben makes loans to the ExAlt Trusts, the ExAlt Trusts use the proceeds to acquire interests in alternative assets from customers that own alternative assets, and then the ExAlt Trusts repay the loans to Ben with the cash flows from the alternative assets as collateral. 2019 10-K at 10, 70, F-9, and F-18.[3] In the Restatement, the ExAlt Trusts were consolidated into Ben which affected certain line items in GWG's financial statements.

Plaintiffs allege that the change in accounting presentation regarding the ExAlt Trusts rendered GWG's financial statements materially false and misleading with respect to (i) Ben's financial results, (ii) Ben's business and operations; (iii) the value of goodwill; and (iv) the adequacy of internal controls. Compl. ¶¶ 60–93. But the bare fact of a restatement does not itself establish materiality. *See In re Franklin Bank*, 782 F. Supp. 2d at 408 (finding no materiality in spite of restatement). The Complaint otherwise fails to establish that the consolidation of the ExAlt Trusts significantly altered the total mix of information available to investors on any of these points, rendering each immaterial as a matter of law.

*First*, Plaintiffs have not adequately alleged that the revised understanding of the GAAP treatment of the ExAlt Trusts resulted in false and misleading GWG financial statements. *See* Compl. ¶¶ 77–85. In light of the change in treatment of the ExAlt Trusts, certain of GWG's loan, fee, and financing receivables were reclassified as investments in alternative assets. All of these line items, however, are assets—the reclassification is merely from one type of asset to another. *See In re JPMorgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 630 (S.D.N.Y. 2005) (in holding that an alleged misclassification of assets as trades rather than loans was immaterial, explaining that proper classification "would not have involved diminishing the [defendant's] total assets, but

---

[3] *See also* Notes to Ben's Consolidated Financial Statements, attached to 2019 10-K, at 7, 20, 26.

rather would have involved shifting a minute fraction of assets from one line—trading assets—to another—loan assets—in the asset column of [the defendant's] balance sheet."); *see also ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 205 (2d Cir. 2009) ("[G]iven that assets in either category carry [similar] risk, we cannot reasonably infer that there was a substantial likelihood that [the defendant's alleged misclassifications of various transactions] as loans rather than as trades would have been viewed by a reasonable investor as having significantly altered the total mix of information made available.").

In addition, Plaintiffs cherry-pick line items corresponding to the ExAlt Trusts' loans receivable, ignoring all of the other ExAlt Trust line items that were also consolidated into Ben. Viewing the consolidation of the ExAlt Trusts comprehensively, the Restatement resulted in an *increase* of GWG's total assets by over $40 million, and an *increase* in GWG's total stockholders' equity of over $6 million. *See* 2020 10-K at F-70; *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 214 (5th Cir. 2004) (courts "must determine whether the information allegedly omitted or misrepresented in the [relevant document] was material, in the sense that it would have altered the way a reasonable investor would have perceived the total mix of information available in [that document] *as a whole*." (internal quotes omitted) (emphasis added)). Accordingly, Plaintiffs have failed to adequately allege that this change would negatively affect a reasonable investor's investment decision, particularly taken together with the fact that the nature of Ben's business and operations remained unchanged. *See Rosenzweig*, 332 F.3d at 866 ("Materiality is not judged in the abstract, but in light of the surrounding circumstances." (internal quotes omitted)).

*Second*, contrary to Plaintiffs' assertions, Compl. ¶¶ 60–76, the consolidation of the ExAlt Trusts does not contravene GWG's statements about the nature of Ben's business and operations. Whether the ExAlt trusts are consolidated or not, it remains the case that Ben's business plan is to

17

assist its clients in turning illiquid assets into liquid assets, through its subsidiaries, as Ben correctly stated. Compl. ¶ 61 (quoting 2019 10-K, which describes Ben's "primary operations" as "pertain[ing] to its liquidity products" and explaining that Ben carries out these operations "through its subsidiaries" by "extend[ing] loans collateralized by cash flows from illiquid, alternative assets" and by "provid[ing] services to the trustees who administer the collateral"); *see also Kapps*, 379 F.3d at 217 (affirming dismissal of Section 11 claim when challenged statements were neither material nor false when made).

Moreover, and critically, Plaintiffs fail to plead with particularity that this purported misstatement regarding Ben's business and operations was material to investors. Plaintiffs make a sole, conclusory allegation that "[t]he Restatement materially affected several of GWG's previous financial statements, as well as information furnished in its MD&A." *See* Compl. ¶ 74. This allegation does not save Plaintiffs' claim. As an initial matter, it is a legal conclusion that should not be accepted as true. *See N. Port Firefighters' Pension-Loc. Option Plan*, 936 F. Supp. 2d at 736 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"). In any event, this paragraph says nothing about materiality of a purported misrepresentation regarding the nature of Ben's business and operations. It only alleges a purportedly material change to Ben's *financial statements* (which is also not material for the reasons above). There are no allegations from which materiality of the alleged misrepresentation actually at issue in this section can be inferred. Compl. ¶ 74 (explaining the nature of the change made in the Restatement); *id.* ¶ 76 (concluding the section by claiming that the above facts demonstrate falsity).

*Third*, Plaintiffs' allegations regarding goodwill cannot sustain their claim. Compl. ¶¶ 86–93. Plaintiffs have not pled—let alone with particularity—that Ben's enterprise value was inflated.

Plaintiffs base their conclusory assertion that "Ben's business and prospects did not justify [its goodwill valuations]" on the restatement of the loans, fees, and services receivable and the restatement regarding the net value of Ben's alternative asset portfolio. *Id.* ¶ 91. But these are just two of the many inputs into the complex valuation technique used to calculate Ben's goodwill. *See id.* ¶ 89 (identifying the OPM Backsolve approach as the valuation technique employed). The consolidation of the ExAlt Trusts would have resulted in changes to many of the inputs into the goodwill valuation. It does not follow from Plaintiffs' identification of changes related to these two inputs that the overall goodwill number must be incorrect. Plaintiffs speculate that the change in accounting presentation of these isolated line items necessarily must have lowered Ben's goodwill. But goodwill valuations are complex, and Plaintiffs do not allege *how* the reclassification must have lowered goodwill. Indeed, Plaintiffs' contention that the reported goodwill was impossibly high, *id.* ¶ 91, is at odds with the fact that in recalculating goodwill for the Restatement, it emerged that Ben's goodwill was actually *higher* than first stated. *Compare* 2019 10-K at F-4 (showing goodwill valued at $2,358,005,000), *with* 2020 10-K at F-6 (showing goodwill valued at $2,367,750,000).

Moreover, statements regarding goodwill are statements of opinion. *See, e.g., City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616-18 (9th Cir. 2017) (holding that goodwill statements are governed by *Omnicare* and affirming dismissal where plaintiffs failed to "establish that defendants must have known there was a likelihood of goodwill impairment"). The Supreme Court has held that statements of opinion are only actionable under the securities laws under three limited circumstances: if (i) the speaker did not in fact hold the stated belief; (ii) the statement of opinion itself contained "embedded statements of fact"; or (iii) there were material omissions regarding the speaker's "inquiry into or knowledge concerning"

the statement. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185–89, 194 (2015) (meeting these criteria is "no small task"). None of these circumstances apply here. Regarding the first and third, there are no allegations—much less particularized allegations—that GWG reported Ben's goodwill based on views that it did not reasonably hold. Certainly the Complaint does not allege that Mr. Evans had any different view than was presented to investors. As to the second, Plaintiffs merely cite simple, declarative statements regarding GWG's belief about the numerical value of Ben's goodwill. *See* Compl. ¶ 86 (taking issue with the fact that "GWG's 2019 10-K says that Ben had goodwill of approximately $1.5 billion as of December 31, 2018" and "[t]he 2019 10-K says that GWG had goodwill of approximately $2.4 billion attributable to Ben as of December 31, 2019."). There are no further facts embedded into these statements beyond GWG's belief regarding what the numerical value was. Accordingly, Plaintiffs' allegations regarding goodwill fail.

*Finally*, statements regarding internal controls, Compl. ¶¶ 94–100, are likewise treated as statements of opinion and analyzed under *Omnicare*. *See In re Amtrust Fin. Servs., Inc. Sec. Litig.*, No. 17-cv-1545 LAK, 2019 WL 4257110, at *24-25 (S.D.N.Y. Sep. 9, 2019) (granting motion to dismiss Section 11 and 12(a)(2) claims because statements "regarding the company's controls" are "statements of opinion" so plaintiffs "must allege adequately that [the defendants] reached a conclusion different from the one stated, or that defendants reached no conclusion at all"); *SEPTA v. Orrstown Fin. Servs.*, No. 1:12-cv-00993, 2022 WL 3572474, at *48-49 (M.D. Pa. Aug. 18, 2022) (granting motion to dismiss Section 11 claim because "representations and certifications" regarding internal controls "are statements of opinion under *Omnicare*," so plaintiffs "must allege sufficiently that defendants knew that the financial statements were inaccurate").

Plaintiffs thus fail to state a claim on this theory for the same reason that their goodwill allegations fail—none of the three bases set forth in *Omnicare* apply. Plaintiffs cite a statement by GWG's outside auditors that "[i]n [their] opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2019, based on criteria established in 2013 Internal Control—Integrated Framework issued by COSO." Compl. ¶ 95 (emphasis removed). There are no allegations that Mr. Evans did not reasonably believe that the outside auditors held this belief at the time the statement was made (nor are there allegations that GWG or the auditors did not believe this statement at the time). *See Omnicare*, 575 U.S. at 185–86. The statement does not contain any embedded statements of fact. *See id.* And there are no allegations regarding any lack of inquiry or knowledge of Mr. Evans regarding this statement. *See id.* at 188–89.

### C. Plaintiffs Fail to Allege a Material Misstatement Regarding Related Party Transactions

Plaintiffs assert that GWG's $79 million investment in Ben and Ben's subsequent $49.8 million repayment to an entity called HCLP constituted a related party transaction, and was labelled as such in the Restatement but not in the 2019 10-K. Compl. ¶¶ 101–110. Plaintiffs do not allege Mr. Evans had any involvement with, or knowledge of, any purported misuse of L Bond proceeds. And Plaintiffs ignore that the Prospectus itself fully and prominently disclosed the potential for use of the L Bond proceeds in related party transactions. Under the "Use of Proceeds" heading in the "Prospectus Summary" at the beginning of the registration statement, it is clearly stated that GWG "intend[s] to use the net proceeds from this offering to grow [GWG's] alternative asset exposure, including through investments in [Ben]" and in turn that Ben "will have broad discretion to use the proceeds of any such investments" and "may use such proceeds" *inter alia* "to repay indebtedness, including to related parties." Prospectus at 9. This unambiguous

disclosure defeats the suggestion of any misstatement, much less any inference of materiality. Investors were well-aware that L Bond proceeds would be used to "repay indebtedness, including to related parties," *id.,* and no further specificity is required. Accordingly, the purported revelation about servicing "debt connected to Heppner's ranch," Compl. ¶ 111, was not a revelation at all, and as a matter of law did not "*significantly* alter[] the total mix of information" available to investors. *Krim*, 989 F.2d at 1448 (emphasis added).

### D. Plaintiffs Fail to Allege a Material Misstatement in Connection with the Director Resignations

Finally, Plaintiffs dispute GWG's statement that four of its directors resigned "in order to facilitate the Board of Directors' ability to oversee the Company's operations in an efficient and effective manner." Compl. ¶ 114 (citing Prospectus at 2). For this assertion, Plaintiffs rely solely on secondhand information taken from a separate complaint, including heavily excerpted snippets from emails between three of these directors and GWG's management team. *Id.* ¶¶ 115–118. According to Plaintiffs, these emails show purported disagreements between these three directors and the management team. *Id.* Plaintiffs then assert that these directors must have resigned *because* of their purported unresolved disagreements with management. *Id.* ¶¶ 119–120. Plaintiffs do not allege that Mr. Evans ever saw or had any knowledge of these emails. And nothing in the emails—which depict a healthy exchange of ideas between directors and management in the normal course of business—supports that causal leap. There is simply no basis to conclude that the directors resigned based on any disagreement with management, rather than for the reasons stated by GWG.[4]

---

[4] The Form 8-K's filed in connection with the resignations of these directors accurately reflect that they did not resign based on disagreements with management. *See* Form 8-K, Item 502.

---

22

In addition, all of the email snippets at issue are cited from a complaint by a group of bondholders in a separate litigation. Compl. ¶¶ 115–118 (describing this as the "OBC Complaint"). The OBC Complaint is the only source provided for these allegations—Plaintiffs do not appear to have done any further independent verification beyond crediting the OBC Complaint. *See id; Brooks v. United Dev. Funding III, L.P.*, No. 4:20-cv-00150-O, 2020 WL 6132230, at *13 (N.D. Tex. Apr. 15, 2020) (striking complaint paragraphs that were "taken from" another complaint, where "[p]laintiffs and their attorneys have not provided the Court with any certification that they independently investigated the allegations prior to their wholesale incorporation"); *Labib Janbay v. Canadian Solar, Inc.*, No. 10 Civ. 4430(RWS), 2012 WL 1080306, at *7 (S.D.N.Y. Mar. 30, 2012) ("Plaintiffs here neither identify the sources they consulted as part of their investigation nor allege that they contacted the attorneys who filed the [copied] Complaint."); *Geinko v. Padda*, No. 00 C 5070, 2002 WL 276236, at *6 n.8 (N.D. Ill. Feb. 26, 2002) ("Plaintiffs do not attest to independently examining the materials underlying these third-party allegations; they did not contact the attorneys for the plaintiffs in these actions or the witnesses quoted . . . . [I]f this Court were to accept Plaintiffs' view of pleading fraud, two plaintiffs could file separate actions each relying on the allegations in the other's complaint and both would state a claim for fraud. Clearly, Rule 11's requirements do not allow this type of pleading loophole.").

## CONCLUSION

Accordingly, the claims against Mr. Evans should be dismissed in full with prejudice.

23

DATED: January 4, 2024

Respectfully Submitted,

/s/ Nowell D. Bamberger

Matthew C. Solomon (*pro hac vice*)
Nowell D. Bamberger (*pro hac vice*)
**CLEARY GOTTLIEB STEEN &
HAMILTON LLP**
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 974-1500
Fax: (202) 974-1999
msolomon@cgsh.com
nbamberger@cgsh.com

Roger B. Cowie (Texas Bar No. 00783886)
Chase T. Cobb (Texas Bar No. 24116208)
**LOCKE LORD LLP**
2200 Ross Avenue
Suite 2800
Dallas, TX 75201
Telephone: (214) 740-8614
Fax: (214) 740-8800
rcowie@lockelord.com
chase.cobb@lockelord.com

*Attorneys for Timothy L. Evans*

**CERTIFICATE OF SERVICE**

This is to certify that on January 4, 2024, I have filed the above and foregoing on the Court's CM/ECF electronic filing system, and that by virtue of this filing, all attorneys of record will be served electronically with true and exact copies of this filing.

*/s/ Nowell D. Bamberger*
Nowell D. Bamberger