**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE GWG HOLDINGS, INC.** | § | **Civil Action No. 3:22-cv-00410-B** |
| **SECURITIES LITIGATION** | § | |
| | § | |
| | § | **CLASS ACTION** |
| | § | |
| | § | |
| | § | |
| | § | |
| **This Document Relates To: All Actions** | § | |
| | § | |
| | § | |

**LEAD PLAINTIFFS' CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................. 1

II.     STATEMENT OF FACTS ................................................................................... 2

III.    LEGAL STANDARD........................................................................................... 7

IV.     ARGUMENT ....................................................................................................... 8

        A.    Plaintiffs Have Standing and the L Bond Acquisitions Are Traceable to the
              Offering. .................................................................................................... 8

        B.    Plaintiffs' Claims Are Not Subject to a Heightened Pleading Standard............... 13

        C.    The Registration Statement Contains Materially False Statements and
              Omissions. ............................................................................................... 15

              1.    Misrepresentations related to Ben's assets and financial
                    performance. ............................................................................... 15

              2.    Misleading representations and omissions concerning Ben's
                    business and operations.................................................................. 24

              3.    Misrepresentations and omissions related to Ben's goodwill
                    valuations. .................................................................................. 28

              4.    Misleading representations and omissions as to accounting
                    controls....................................................................................... 31

              5.    Misleading representations and omissions concerning Ben's
                    related-party transactions. ............................................................. 33

              6.    Misleading representations and omissions regarding director
                    resignations. ............................................................................... 36

        D.    Defendants' Generalized Risk Disclosures Do Not Immunize Their
              Misleading Representations and Omissions of Material Fact.............................. 39

        E.    A Negative Causation Defense Does Not Justify Dismissal on the
              Pleadings. ............................................................................................... 45

        F.    Ben and the Individual Defendants Are Controlling Persons. ............................. 47

        G.    Plaintiffs Should Be Permitted to Replead Their Section 12(a)(2) Claims
              and Amend as to Any Claim the Court Finds Defective. .................................... 50

V.      CONCLUSION.................................................................................................. 50

## TABLE OF AUTHORITIES

**Cases**

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
    572 F.3d 221 (5th Cir. 2009) ........................................................................................ 45, 46

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002) .................................................................................................. 23

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
    663 F. Supp. 3d 334 (S.D.N.Y. 2023) ................................................................................ 31

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .............................................................................................................. 7

*Barnes v. Osofsky*,
    373 F.2d 269 (2d Cir. 1967) ................................................................................................ 12

*Brown v. China Integrated Energy, Inc.*,
    875 F. Supp. 2d 1096 (C.D. Cal. 2012) .............................................................................. 35

*Casella v. Webb*,
    883 F.2d 805 (9th Cir. 1989) ............................................................................................... 46

*CFTC v. Cassidy*,
    2009 WL 5454918 (S.D.N.Y. Nov. 5, 2009) ...................................................................... 29

*Chen v. Missfresh Ltd.*,
    — F. Supp. 3d —, 2023 WL 7289750 (S.D.N.Y. Nov. 6, 2023) ..................... 16, 19, 40, 41, 44

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012) ................................................................................. 42

*Coates v. Heartland Wireless Commnc'ns, Inc.*,
    26 F. Supp. 2d 910 (N.D. Tex. 1998) .................................................................................. 24

*Collmer v. U.S. Liquids, Inc.*,
    268 F. Supp. 2d 718 (S.D. Tex. 2001) .................................................................................. 8

*Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.*,
    2001 WL 300733 (S.D.N.Y. 2001) ................................................................................. 41, 44

*Dartley v. ErgoBilt Inc.*,
    2001 WL 313964 (N.D. Tex. Mar. 29, 2001) ..................................................................... 49

*De Vito v. Liquid Holdings Grp., Inc.*,
    2018 WL 6891832 (D.N.J. Dec. 31, 2018) ......................................................................... 16

*Dillon v. Berg*,
    326 F. Supp. 1214 (D. Del. 1971), *aff'd*, 453 F.2d 876 (3d Cir. 1971) ............................. 37

*ECA & Local 134 IBEW Joint Pension TR. of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ................................................................................................ 19

*EP Medsystems, Inc. v. EchoCath, Inc.*,
 235 F.3d 865 (3d Cir. 2000) ................................................................. 46

*EPCO Carbon Dioxide Prods., Inc. v. JP Morgan Chase Bank, NA*,
 467 F.3d 466 (5th Cir. 2006) ................................................................. 22

*Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Assoc. v. Nomura Holding Am., Inc.*,
 873 F.3d 85 (2d Cir. 2017) ............................................................. 16, 46

*Fed. Hous. Fin. Agency v. UBS Ams., Inc.*,
 858 F. Supp. 2d 306 (S.D.N.Y. 2012), *aff'd*, 712 F.3d 136 (2d Cir. 2013) ............................. 22

*Fener v. Belo Corp.*,
 425 F. Supp. 2d 788 (N.D. Tex. 2006) ............................................. 14, 24

*Fin. Acquisition P'ners LP v. Blackwell*,
 440 F.3d 278 (5th Cir. 2006) ................................................................. 24

*Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*,
 53 F. Supp. 3d 882 (E.D. La. 2014) ................................................. 14, 23

*Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*,
 565 F.3d 200 (5th Cir. 2009) ........................................................... 13, 28

*Fresno Cty. Emps. Ret. Assoc. v. comScore, Inc.*,
 268 F. Supp. 3d 526 (S.D.N.Y. 2017) .................................................. 16

*Ganino v. Citizens Util. Co.*,
 228 F.3d 154 (2d Cir. 2000) ........................................................... 16, 28

*Gebhardt v. ConAgra Foods, Inc.*,
 335 F.3d 824 (8th Cir. 2003) ................................................................. 17

*Hedick v. Kraft Heinz Co.*,
 2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) ........................................ 16

*Heinze v. Tesco Corp.*,
 971 F.3d 475 (5th Cir. 2020) ................................................................. 39

*Hemmer Grp. v. SouthWest Water Co.*,
 527 F. App'x 623 (9th Cir. 2013) .......................................................... 21

*Herman & MacLean v. Huddleston*,
 459 U.S. 375 (1983) ................................................................................. 8

*Hildes v. Arthur Andersen LLP*,
 734 F.3d 854 (9th Cir. 2013) ................................................................. 46

*Huddleston v. Herman & MacLean*,
 640 F.2d 534 (5th Cir. 1981) ................................................................. 46

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
 741 F. Supp. 2d 511 (S.D.N.Y. 2010) ..................................................... 9

*In re Apache Corp.*,
 2022 WL 4277350 (S.D. Tex. Sept. 15, 2022), *R&R adopted*, 2022 WL 17324439
 (S.D. Tex. Nov. 29, 2022) ...................................................................... 31

*In re ArthroCare Corp. Sec. Litig.*,
726 F. Supp. 2d 696 (W.D. Tex. 2010) ................................................................ 16, 21

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004) .................................................................. 16, 21

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
851 F. Supp. 2d 746 (S.D.N.Y. 2012) ........................................................................ 38

*In re Century Aluminum Co. Sec. Litig.*,
729 F.3d 1104 (9th Cir. 2013) ................................................................................... 12

*In re Chambers Dev. Sec. Litig.*,
848 F. Supp. 602 (W.D. Pa. 1994) ............................................................................... 4

*In re Charles Schwab Corp. Sec. Litig.*,
257 F.R.D. 534 (N.D. Cal. 2009) ............................................................................... 47

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
2021 WL 3727095 (S.D.N.Y. Aug. 23, 2021) ........................................................... 31

*In re Cobalt Int'l Energy, Inc.*,
2016 WL 215476 (S.D. Tex. Jan. 19, 2016) ...................................... 8, 44, 46, 47, 48

*In re Constar Int'l Inc. Sec. Litig.*,
585 F.3d 774 (3d Cir. 2009) ...................................................................................... 45

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ....................................................................... 9

*In re Donald J. Trump Casino Sec. Litig.–Taj Mahal Litig.*,
7 F.3d 357 (3d Cir. 1993) .......................................................................................... 40

*In re Dynegy, Inc. Sec. Litig.*,
226 F.R.D. 263 (S.D. Tex. 2005) ................................................................................. 9

*In re Dynegy, Inc. Sec. Litig.*,
339 F. Supp. 2d 804 (S.D. Tex. 2004) ................................................... 13, 15, 46, 48

*In re Enron Corp. Sec., Deriv. & "Erisa" Litig.*,
2003 WL 230688 (S.D. Tex. Jan. 28, 2003) .............................................................. 13

*In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*,
238 F. Supp. 3d 799 (S.D. Tex. 2017), *aff'd sub nom. Lampkin v. UBS Fin. Servs., Inc.*,
925 F.3d 727 (5th Cir. 2019) ..................................................................................... 37

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
258 F. Supp. 2d 576 (S.D. Tex. 2003) ........................................................... 14, 48, 49

*In re Franklin Bank Corp. Sec. Litig.*,
782 F. Supp. 2d 364 (S.D. Tex. 2011), *aff'd sub nom. Harold Roucher Tr. U/A DTD 9/21/72 v. Nocella*, 464 F. App'x 334 (5th Cir. 2012) ................................. 14, 50

*In re Hamilton Bankcorp., Inc. Sec. Litig.*,
194 F. Supp. 2d 1353 (S.D. Fla. 2002) ...................................................................... 32

iv

*In re Home Health Corp. of Am., Inc. Sec. Litig.*,
1999 WL 79057 (E.D. Pa. Jan. 20, 1999) .................................................................................... 17

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005) ........................................................................................ 41

*In re IPO Sec. Litig.*,
358 F. Supp. 2d 189 (S.D.N.Y. 2004) ........................................................................................ 43

*In re JDN Realty Corp. Sec. Litig.*,
182 F. Supp. 2d 1230 (N.D. Ga. 2002) ...................................................................................... 35

*In re JP Morgan Chase Sec. Litig.*,
363 F. Supp. 2d 595 (S.D.N.Y. 2005) ........................................................................................ 19

*In re Kosmos Energy Ltd. Sec. Litig.*,
955 F. Supp. 2d 658 (N.D. Tex. 2013) ................................................................... 7, 24, 45, 50

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
982 F. Supp. 2d 277 (S.D.N.Y. 2013) .................................................................................. 43, 45

*In re Nielsen Holdings PLC Sec. Litig.*,
510 F. Supp. 3d 217 (S.D.N.Y. 2021) ........................................................................................ 30

*In re OSG Sec. Litig.*,
12 F. Supp. 3d 619 (S.D.N.Y. 2014) .......................................................................................... 38

*In re Pilgrim's Pride Corp. Sec. Litig.*,
2010 WL 3257369 (E.D. Tex. Aug. 17, 2010) ......................................................................... 49

*In re Primera Energy, LLC*,
579 B.R. 75 (Bankr. W.D. Tex. 2017) ........................................................................................ 39

*In re Regeneron Pharms., Inc. Sec. Litig.*,
2005 WL 225288 (S.D.N.Y. Feb. 1, 2005) ................................................................................ 43

*In re Sunpoint Sec., Inc.*,
377 B.R. 513 (Bankr. E.D. Tex. 2007) ...................................................................................... 23

*In re TETRA Techs., Inc. Sec. Litig.*,
2009 WL 6325540 (S.D. Tex. July 9, 2009), *order clarified*, 2009 WL 6326865
(S.D. Tex. Aug. 10, 2009) ........................................................................................................... 42

*In re Teva Sec. Litig.*,
2023 WL 3186407 (D. Conn. May 1, 2023) ........................................................................ 30, 31

*In re Venator Materials PLC Sec. Litig.*,
547 F. Supp. 3d 624 (S.D. Tex. 2021) ................................................. 8, 13, 14, 19, 28, 49, 50

*In re WorldCom, Inc. Sec. Litig.*,
2005 WL 517331 (S.D.N.Y. Mar. 4, 2005) ............................................................................... 46

*In re WorldCom, Inc. Sec. Litig.*,
2005 WL 638268 (S.D.N.Y. Mar. 21, 2005) ............................................................................. 22

*In re WorldCom, Inc. Sec. Litig.*,
346 F. Supp. 2d 628 (S.D.N.Y. 2004) ........................................................................................ 23

*In re Worlds of Wonder Sec. Litig.*,
  35 F.3d 1407 (9th Cir. 1994) ................................................................................. 46

*In re Xcel Energy, Inc.*,
  364 F. Supp. 2d 980 (D. Minn. 2005) ...................................................................... 7

*Indiana Elec. Workers Pension Trust Fund IBEW v. Shaw Grp., Inc.*,
  537 F.3d 527 (5th Cir. 2008) ................................................................................. 14

*Iowa Pub. Emps. Ret. Sys. v. MF Glob., Ltd.*,
  620 F.3d 137 (2d Cir. 2010) .................................................................................. 40

*Johnson v. CBD Energy Ltd.*,
  2016 WL 3654657 (S.D. Tex. Jul. 6, 2016) ............................................................ 12

*Kapps v. Torch Offshore, Inc.*,
  379 F.3d 207 (5th Cir. 2004) ............................................................... 16, 26, 27, 45

*Krim v. BancTexas Grp.*,
  989 F.2d 1435 (5th Cir. 1993) ......................................................................... 18, 23

*Krim v. pcOrder.com*,
  2002 WL 1185913 (W.D. Tex. Apr. 12, 2002) ....................................................... 35

*Krim v. pcOrder.com, Inc.*,
  402 F.3d 489 (5th Cir. 2005) ............................................................................. 8, 12

*Kurtzman v. Compaq Computer Corp.*,
  2000 WL 34292632 (S.D. Tex. Dec. 12, 2000) ..................................... 39, 40, 41, 42

*Langhamer v. Johnson*,
  2023 WL 6691017 (S.D.N.Y. Oct. 12, 2023) ......................................................... 11

*Lenartz v. Am. Superconductor Corp.*,
  879 F. Supp. 2d 167 (D. Mass. 2012) .................................................................... 14

*Lewy v. SkyPeople Fruit Juice, Inc.*,
  2012 WL 3957916 (S.D.N.Y. Sept. 10, 2012) ........................................................ 35

*Litwin v. Blackstone Group, L.P.*,
  634 F.3d 706 (2d Cir. 2011) ............................................................................. 17, 21

*Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*,
  810 F.3d 951 (5th Cir. 2016) ........................................................................... 13, 14

*Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*,
  238 F.3d 363 (5th Cir. 2001) ..................................................... 13, 14, 22, 38, 50

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ................................................................................. 40

*Marcus v. J.C. Penney Co., Inc.*,
  2015 WL 5766870 (E.D. Tex. Sept. 29, 2015) ....................................................... 44

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ........................................................................................... 8, 19

*McLin v. Ard*,
  866 F.3d 682 (5th Cir. 2017) ....................................................................... 8, 32

*Nat'l Credit Union Admin. Bd. v. UBS Sec., LLC*,
  2017 WL 411338 (D. Kan. Jan. 31, 2017)........................................................ 22

*New England Carpenters Guar. Annuity & Pension Funds v. DeCarlo*,
  80 F.4th 158 (2d Cir. 2023) ...................................................................... 29, 30

*Nguyen v. MaxPoint Interactive, Inc.*,
  234 F. Supp. 3d 540 (S.D.N.Y. 2017) ............................................................. 14

*Nykredit Portefølje Admin. A/S v. Propetro Holding Corp.*,
  2021 WL 9037758 (W.D. Tex. Sept. 13, 2021)........................................ 32, 33, 36

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)................................................................................ 29, 31

*One Longhorn Land I, L.P. v. FF Arabian, LLC*,
  2015 WL 7432360 (E.D. Tex. Nov. 23, 2015) .............................................. 47, 48

*P. Stolz Family P'ship L.P. v. Daum*,
  355 F.3d 92 (2d Cir. 2004) ......................................................................... 40

*Plotkin v. IP Axess Inc.*,
  407 F.3d 690 (5th Cir. 2005) ...................................................................... 13

*Pollack v. Laidlaw Holdings, Inc.*
  1995 WL 261518 (S.D.N.Y. May 3, 1995) ....................................................... 11

*Prause v. TechnipFMC, PLC*,
  2019 WL 1211428 (S.D. Tex. Jan. 18, 2019)................................................ 16, 20

*Rosenzweig v. Azurix Corp.*,
  332 F.3d 854 (5th Cir. 2003) .................................................................. 12, 24

*Rubinstein v. Collins*,
  20 F.3d 160 (5th Cir. 1994) ........................................................................ 39

*Schering-Plough Corp. v. United States*,
  651 F. Supp. 2d 219 (D.N.J. 2009)................................................................ 27

*SEC v. China Ne. Petroleum Holdings Ltd.*,
  27 F. Supp. 3d 379 (S.D.N.Y. 2014) .............................................................. 34

*SEC v. Collector's Coffee*,
  2023 WL 6453709 (S.D.N.Y. Oct. 4, 2023)...................................................... 40

*SEC v. Morgan Keegan & Co.*,
  678 F.3d 1233 (11th Cir. 2012) ................................................................... 41

*SEC v. RPM Int'l, Inc.*,
  282 F. Supp. 3d 1 (D.D.C. 2017)................................................................... 16

*SEC v. SBM Inv. Certificates, Inc.*,
  2007 WL 609888 (D. Md. Feb. 23, 2007) ........................................................ 12

*SEC v. World Tree Fin., L.L.C.*,
   43 F.4th 448 (5th Cir. 2022) .......................................................................... 8

*Slack Techs., LLC v. Pirani*,
   598 U.S. 759 (2023) ....................................................................................... 12

*St. Denis J. Villere & Co. v. Caprock Commc'ns Corp.*,
   2003 WL 21339286 (N.D. Tex. June 4, 2003) ......................................... 24

*Takara Tr. v. Molex Inc.*,
   429 F. Supp. 2d 960 (N.D. Ill. 2006) ........................................................ 16

*Touchtone Grp., LLC v. Rink*,
   913 F. Supp. 2d 1063 (D. Colo. 2012) ...................................................... 28

*Turner Ins. Agency, Inc. v. Farmland P'nrs Inc.*,
   2019 WL 2521834 (D. Colo. June 18, 2019) ...................................... 17, 18

*United Food & Commercial Workers Union v. Chesapeake Energy Corp.*,
   281 F.R.D. 641 (W.D. Okla. 2012) .............................................................. 9

*United States v. Peterson*,
   101 F.3d 375 (5th Cir. 1996) ...................................................................... 35

*Zagami v. Nat. Health Trends Corp.*,
   540 F. Supp. 2d 705 (N.D. Tex. 2008) ......................................... 33, 35, 36

*Zishka v. Am. Pad & Paper Co.*,
   2001 WL 1748741 (N.D. Tex. Sept. 28, 2001), *amended on reconsideration*, 2001 WL
   1645500 (N.D. Tex. Dec. 20, 2001), *and aff'd*, 72 F. App'x 130 (5th Cir. 2003) .................. 50

*Zwick P'nrs, LP v. Quorum Health Corp.*,
   2018 WL 2933406 (M.D. Tenn. Apr. 19, 2018) ................................. 29, 30

**Statutes**

15 U.S.C. § 77e(a) ................................................................................................ 11

15 U.S.C. § 77o .................................................................................................... 47

15 U.S.C. § 80a-3(a)(1) ....................................................................................... 28

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) ......................................................... 12

Financial Accounting Standards Board, Accounting Standards Codification 250-10-20 ...... 18, 21

Financial Accounting Standards Board, Accounting Standards Codification 820-10-50 ............ 30

Securities Act of 1933, Section 10(b) .............................................................. 28

Securities Act of 1933, Section 11 ........................................................... *passim*

Securities Act of 1933, Section 11(e) .............................................................. 46

Securities Act of 1933, Section 12(a)(2) .......................................................... 50

Securities Act of 1933, Section 15 ............................................................... 2, 47

**Rules**

Fed. R. Civ. P. 12(b)(6)..................................................................................................... 46

Fed. R. Civ. P. 8................................................................................................................. 7

Fed. R. Civ. P. 9(b) ................................................................................................... 13, 14

**Regulations**

17 C.F.R. § 229.404(a) ("Item 404") ..................................................................... 33, 34, 35

50 Fed. Reg. 49,529–02, 1985 WL 125398 (Dec. 3, 1985)............................................. 36

64 Fed. Reg. 45 (1999) ("SAB No. 99") ................................................... 15, 16, 17, 18

**CONTENTS OF APPENDIX**

In accordance with Local Civil Rule 7.1(i), Lead Plaintiffs submit an Appendix, organized chronologically, with materials that they rely on in opposing Defendants' motions. When citing these materials in their brief, Lead Plaintiffs use the original pagination. For ease of reference, the table below also shows the beginning "App." page number as stamped on each document.

| Document | Page |
|---|---|
| GWG Holdings, Inc., Amendment No. 6 to Registration Statement (Form S-1/A) (Jan. 7, 2015) | **App. 0002** |
| GWG Holdings, Inc., Post-Effective Amendment No. 5 to Registration Statement (Form POS AM) (Apr. 8, 2016) | **App. 0144** |
| GWG Holdings, Inc., Amendment No. 2 to Registration Statement (Form S-1/A) (Nov. 28, 2017) | **App. 0301** |
| GWG Holdings, Inc., Annual Report (Form 10-K) (Mar. 27, 2020) | **App. 0506** |
| GWG Holdings, Inc., Annual Report, Ex. 99.4 (Form 10-K) (Mar. 27, 2020) | **App. 0672** |
| GWG Holdings, Inc., Registration Statement (Form S-1) (Mar. 30, 2020) | **App. 0755** |
| GWG Holdings, Inc., Amendment No. 1 to Registration Statement (Form S-1/A) (May 15, 2020) | **App. 0844** |
| GWG Holdings, Inc., Quarterly Report (Form 10-Q) (May 15, 2020) | **App. 0927** |
| GWG Holdings, Inc., Notice of Effectiveness (June 3, 2020) | **App. 1004** |
| GWG Holdings, Inc., Prospectus (Form 424B1) (June 5, 2020) | **App. 1005** |
| GWG Holdings, Inc., Current Report (Form 8-K) (Aug. 3, 2021) | **App. 1074** |
| GWG Holdings, Inc., Annual Report (Form 10-K) (Nov. 5, 2021) | **App. 1079** |
| *Paul Capital Advisors, L.L.C. v. Holland*, No. 2022-0167-SG (Del. Ch. May 13, 2022), Verified Second Amended Complaint | **App. 1397** |
| GWG Holdings, Inc., Amendment to Current Report (Form 8-K/A) (Nov. 14, 2022) | **App. 1523** |
| *Paul Capital Advisors, L.L.C. v. Holland*, No. 2022-0167-SG (Del. Ch. Aug. 29, 2023), Order Granting in Part and Denying in Part Defendants' Motions to Dismiss | **App. 1527** |
| Effective Date Good Faith Valuation of Trust Assets, *In re GWG Holdings, Inc.*, No. 22-90032 (MI) (Bankr. S.D. Tex.), *available at* https://gwgholdingstrust.com/asset-values/. | **App. 1542** |

x

**GLOSSARY OF CITATIONS TO DEFENDANTS' BRIEFS**

Lead Plaintiffs cite to the Defendants' various briefs as follows, with page citations corresponding to the ECF pagination stamped in blue at the top of each page.

| Title of brief | Docket entry number | Abbreviation used in Lead Plaintiffs' citations |
|---|---|---|
| Defendants Brad K. Heppner, Peter T. Cangany, Jr, Thomas O. Hicks, Dennis P. Lockhart, Bruce W. Schnitzer, and The Beneficient Company Group's Motion to Dismiss and Brief in Support | **Doc. 68** | Ben Br. |
| Individual Defendants David F. Chavenson and David H. de Weese's Joinder and Motion to Dismiss | **Doc. 90** | Chavenson & de Weese Br. |
| Defendant Timothy L. Evans' Motion to Dismiss and Brief in Support | **Doc. 94** | Evans Br. |
| Defendant Murray Holland's Motion to Dismiss | **Doc. 95** | Holland Br. |

## I.       **INTRODUCTION**

This case arises out of the sale by GWG Holdings, Inc. ("GWG") of over $350 million in bonds pursuant to a registration statement (the "Registration Statement") effective June 2020 (the "Offering").  The bonds were sold to retail investors on a best-efforts basis through a network of independent broker-dealers.  GWG suspended the Offering in April 2021 when it missed the March 31st deadline to file its 2020 Annual Report.  GWG filed its Annual Report in November 2021, restating the financials (the "Restatement") that were incorporated into the Registration Statement.  GWG also disclosed an ongoing SEC investigation.  GWG announced in February 2022 it would default on the L Bonds.  In April 2022, GWG filed for bankruptcy.[1]  Lead Plaintiffs acquired bonds in the Offering.  They sue under the Securities Act of 1933 ("'33 Act" or "Securities Act") to recover their losses and those of the other bondholders.

The Restatement corrected material errors in the Registration Statement.  GWG's revenue for the first quarter of 2020 alone was overstated by 47 percent.  The Registration Statement said that the business of GWG's subsidiary, The Beneficient Company Group, L.P. ("Ben"), was secured lending to unaffiliated trusts.  The Restatement conceded that instead of making secured loans, Ben had acquired beneficial ownership of a portfolio of alternative assets and bore the associated investment risk.  Consequently, the Restatement eliminated Ben's previously reported interest and fee income, loans receivable, and fees receivable.  And the assets Ben acquired were declining in value, even as bondholder money was being diverted to the CEO's affiliates to pay down debt connected to his personal property.  GWG's Registration Statement also failed to disclose material facts surrounding its goodwill valuations of Ben that would have showed that Ben's goodwill was greatly overstated.

---

[1] In the bankruptcy, L Bondholders stand to recover only a minimal portion of their investment. *See* Effective Date Good Faith Valuation of Trust Assets, *In re GWG Holdings, Inc.*, No. 22-90032 (MI) (Bankr. S.D. Tex.), *available at* https://gwgholdingstrust.com/asset-values/.

1

Defendants' traceability arguments are premature and destined to fail.  Each L Bond sale, whether by original purchase, renewal, or reissue, took place pursuant to the Registration Statement.  Defendants argue, also prematurely, that they conducted adequate due diligence and reasonably relied upon GWG's auditor.[2]  These affirmative defenses cannot be decided on the pleadings.  Even if they were considered, they lack merit.  A year before the Registration Statement, Ben's auditor found that its failure to treat purportedly "unaffiliated" trusts as consolidated was erroneous, the same error corrected by the Restatement.  Defendants point to their risk disclosures, but they are too generalized to shield their misstatements as a matter of law.  And no warnings about future possibilities can immunize Defendants for signing a registration statement that contained inaccurate financial statements, mischaracterized Ben's core business, omitted facts that would have exposed its goodwill valuation as grossly inflated, and misrepresented other historical or existing facts.  Defendants also argue loss causation, but they will bear the burden of showing that the decline in value of Lead Plaintiffs' L Bonds is attributable to factors other than their false statements.  They cannot make that showing on the pleadings.

Defendants' motions to dismiss Plaintiffs' claims under Sections 11 and 15 of the Securities Act should be denied, for the reasons set forth in greater detail below.

## II.     <u>STATEMENT OF FACTS</u>

**GWG's business.**  From its founding in 2006 until January 2018, GWG's business focused on buying life insurance policies on secondary markets.  ¶ 2.[3]  GWG raised money through the sale of "L Bonds" (with "L" standing for "life insurance").  *Id.*  GWG proposed to earn a profit by purchasing the policies at a discount to the expected mortality benefit payable

---

[2] Whitley Penn LLP ("Whitley Penn").

[3] Unless otherwise noted, "¶" references are to paragraphs of the Consolidated Class Action Complaint for Violation of the Federal Securities Laws, Doc. 63 ("CCAC").

upon the insured's death.  ¶ 39.  But the policies never produced the income GWG needed to be profitable.  ¶¶ 39–41.  By the end of 2018, the value of GWG's insurance portfolio was about $400 million less than its total debt obligations, and it faced increasingly negative cash flow. ¶ 43.

**The GWG-Ben transaction.**  Approaching insolvency, GWG entered into a complex set of transactions under which its founders cashed out and control shifted to Defendant Brad Heppner.  ¶¶ 2–3, 44.  As a first step, GWG announced in January 2018 that it had entered into a strategic relationship with Ben, which claimed to have developed "the first financial services platform designed to provide a comprehensive suite of innovative lending and liquidity products offered to meet the rapidly growing liquidity demand from the nearly one million underserved mid-to-high net worth . . . individual investors and small-to-medium institutional owners of alternative assets."  ¶ 44.  Beginning in September 2017, Ben had acquired beneficial ownership of an alternative asset portfolio valued at approximately $500 million, through a series of complex transactions involving Ben, GWG, and investment funds managed by Paul Capital, a private equity firm.  ¶ 70.  After announcing its new relationship with Ben, GWG shifted from investing in life insurance policies to making passive investments in Ben, while continuing to raise new money by selling L Bonds.  ¶ 45.  Under the Heppner-controlled GWG Board, GWG invested $289 million of L Bond sale proceeds in Ben between 2019 and 2021, receiving Ben equity and promissory notes in return.  ¶ 50.

**After investing in Ben, GWG portrayed Ben as a lending enterprise.**  GWG told investors that its investments in Ben would offer "a diversified source of future earnings[.]" ¶ 112.  According to GWG, "[Ben's] primary operations pertain to its liquidity products whereby Ben LP, through its subsidiaries, extends loans collateralized by cash flows from illiquid alternative assets and provides services to the trustees who administer the collateral."  ¶ 61; *see*

3

¶ 6. The borrowers were "unaffiliated trusts" that used the proceeds of Ben's loans to purchase alternative assets from Ben's customers. ¶ 64. GWG investors were told that Ben had begun to successfully execute this lending-and-service-based business model, resulting in substantial interest income and trust administration fees. ¶¶ 67–68.

**The Offering.** On July 1, 2020, GWG began the Offering, seeking to sell up to $2 billion in new L Bonds. ¶ 55. The GWG directors who signed the Registration Statement were Ben designees, several of whom also sat on Ben's board. ¶¶ 26–30, 32–33, 53. After missing the deadline to file its 2020 annual report, GWG suspended the Offering in April 2021 and missed its quarterly reporting deadlines for the first three quarters of 2021. ¶ 7.

**The Restatement.** In its 2020 annual report, belatedly filed November 5, 2021, GWG restated its financial statements for the year ending December 31, 2019, and for the quarterly periods ending March 31, 2020, June 30, 2020, and September 30, 2020. ¶ 8. The financial statements for 2019 and for the first quarter of 2020 were incorporated by reference into the Registration Statement, forming a part of it. ¶ 57.[4] The Restatement affected, for each restatement period, GWG's consolidated (1) balance sheet, (2) statement of operations, (3) statement of changes in stockholders' equity, and (4) statement of cash flows. ¶ 8. GWG admitted in the Restatement that its financial statements in the Registration Statement were inaccurate, should not be relied on, and that material weaknesses in its internal controls over financial reporting existed as of December 31, 2019. *Id*.

**Inaccurate reporting of Ben's financial performance, assets, and operations.** The Restatement revealed that the Registration Statement had inaccurately described Ben's business

---

[4] *See, e.g.*, *In re Chambers Dev. Sec. Litig.*, 848 F. Supp. 602, 611 (W.D. Pa. 1994) (noting that "various 10-Q and 10-K Forms and annual reports [were] incorporated into [defendant's] Registration Statement").

4

as secured lending.  Instead of making loans to third parties secured by alternative assets, Ben had invested in unsecured alternative assets through its subsidiaries.  ¶¶ 9–10.  GWG thus "determined that the Trusts should instead be consolidated, collapsing the relationship between Ben and the Trusts, and resulting in its reporting an investment in the underlying Trust assets, rather than a loan receivable."  Evans Br. at p. 12 of 30 (citing ¶ 75).  In short, because loans and services that Ben provided were to its own subsidiaries, accounting principles required eliminating about $18 million of previously reported interest income and trust-services revenue for the first quarter of 2020 alone.  ¶¶ 12, 80–83.

The Restatement reduced Ben's revenue for the period ended March 31, 2020, by about 32 percent and eliminated loan receivables of around $232 million and $219 million as of December 31, 2019, and March 31, 2020, respectively.  ¶¶ 77, 80, 83–85.  The Registration Statement, therefore, fundamentally mischaracterized Ben's financial performance and business activity, much like a bank that claimed to originate and service secured loans but acquired and held real estate assets through subsidiaries.  Ben was not a secured lender, and any suggestion it had begun to successfully execute its lending-based business model was misleading.  Contrary to the picture created by the Registration Statement, Ben's business model was not getting traction.

**Misrepresentation of goodwill.**  Despite the fact that materially all of Ben's alternative asset portfolio came from a single, convoluted deal with Paul Capital to acquire secondary private equity interests originally valued at approximately $500 million (¶¶ 70–71), with Ben lacking any other meaningful source of revenue, the Registration Statement reported goodwill valuations for Ben of approximately $1.5 billion and $2.4 billion as of the end of 2018 and 2019, implying enterprise valuations of approximately $1.4 billion and $2.3 billion, respectively.  ¶ 88.  While the Registration Statement said these valuations were calculated by reference to an arm's length transaction in Ben securities, investors were given no information about the valuation of

5

Ben securities used in the calculation. ¶¶ 89–90. In fact, there *was* no arm's length transaction in Ben securities sufficient to support Ben's goodwill valuation. ¶ 91. And the value of Ben's alternative asset portfolio at the end of 2019 was $342 million and declining, even as Ben owed debt of approximately $153 million and other liabilities. *Id.*

**Related-party payments.** On a single day (December 31, 2019), GWG invested $79 million in Ben using cash from GWG's L Bond accounts, and Ben in turn made a $49.8 million loan payment to an entity affiliated with trusts under Heppner's control. ¶¶ 15, 104–07. The funds received from GWG were applied to satisfy part of Heppner's debt incurred in connection with a $57 million Texas ranch and—as the Restatement belatedly admitted—were transferred outright to Heppner affiliates. ¶¶ 15–16, 106–10. The Registration Statement did not fairly disclose these related-party transactions and falsely stated that the Heppner affiliate that received the $49.8 million in bondholder sale proceeds was "not considered a related party of GWG Holdings or Beneficient[.]" ¶ 105.

**Inadequate controls.** The Restatement further conceded that the Registration Statement's representations of effective financial controls at GWG were false:

> [A] material weakness existed in our internal control over financial reporting for all periods from December 31, 2019 to December 31, 2020. . . . [T]he design and operating effectiveness of controls over the selection, application and review of the implementation of accounting policies were not sufficient to ensure amounts recorded and disclosed were fairly stated in accordance with GAAP.

¶¶ 14, 97, 99.

**Director resignations.** The Registration Statement also mischaracterized the circumstances surrounding a reduction in the number of GWG directors. According to the Registration Statement, GWG reduced the Board from 14 to 10 directors to "facilitate the Board of Directors' ability to oversee the Company's operations in an efficient and effective manner." ¶¶ 18, 114. What happened was that three GWG (and Ben) directors, Bruce Zimmerman, David

6

Glaser, and Sheldon Stein, resigned in 2019.  ¶¶ 18, 113–22.  Contemporaneous emails show these directors resigned because Heppner ignored concerns they expressed about GWG's investments in Ben and Ben's "unacceptable" payments to "related parties."  ¶¶ 115–18.  GWG's attempt to spin the reduction in board size as a corporate governance improvement was at best a half-truth; GWG simply elected not to replace the resigning directors.

**Collapse of GWG.**  The market reacted definitively when the truth became known.  On the same day that GWG issued its corrective Restatement, it disclosed it was under SEC investigation. ¶ 128.[5]  GWG found few buyers for L Bonds once the truth emerged.  ¶¶ 7, 123.  By the end of November 2021, GWG had spun off Ben.  ¶ 129.  GWG announced in January 2022 that it had suspended L Bond sales and, in April 2022, filed for chapter 11 bankruptcy.  ¶¶ 131–32.

**Plaintiffs' relevant L Bond purchases.**  Plaintiffs filed this class action on February 18, 2022.  Doc. 1.  Pursuant to the Registration Statement, on September 1, 2020, Plaintiff Moore acquired $225,000 of L Bonds, and on January 1, 2021, he acquired $58,000 of L Bonds.  ¶ 25; CCAC at pp. 58–59.  On July 22, 2020, in connection with the Offering, also pursuant to the Registration Statement, GWG "reissued" $5,600,000 of L Bonds to Plaintiff Horton to replace previously acquired L Bonds that had not yet matured.  ¶ 24; CCAC at pp. 56–57.

## III.    LEGAL STANDARD

Section 11 of the Securities Act "requires only notice pleading under Federal Rule of Civil Procedure 8," *In re Kosmos Energy Ltd. Sec. Litig.*, 955 F. Supp. 2d 658, 664 (N.D. Tex. 2013) (Boyle, J.), under which a complaint must raise "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court draws all inferences in favor of Plaintiffs and views all facts and inferences in the light most favorable

---

[5] *See In re Xcel Energy, Inc.*, 364 F. Supp. 2d 980, 995 (D. Minn. 2005) (noting that "investigation by the SEC" is one of the "usual indicia" of securities law violations).

to Plaintiffs.  *McLin v. Ard*, 866 F.3d 682, 688 (5th Cir. 2017).

Section 11 "impos[es] a stringent standard of liability on the parties who play a direct role in a registered offering" while placing "a relatively minimal burden on a plaintiff."  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381–82 (1983) (footnotes omitted).  Plaintiffs "need only show a material misstatement or omission to establish [their] *prima facie* case" and liability is "virtually absolute."  *Id*. at 382; *see also Collmer v. U.S. Liquids, Inc.*, 268 F. Supp. 2d 718, 756 (S.D. Tex. 2001).  A representation or omission is material if "disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011). Materiality is a "fact-specific" inquiry—determining "the significance of the inferences a reasonable investor would draw . . . is peculiarly within the competence of the trier of fact."  *SEC v. World Tree Fin., L.L.C.*, 43 F.4th 448, 465 (5th Cir. 2022) (internal quotation marks and citations omitted); *see also In re Venator Materials PLC Sec. Litig*., 547 F. Supp. 3d 624, 649 (S.D. Tex. 2021) ("There is no bright-line rule" and materiality "requires a fact-intensive inquiry into 'the source, content, and context'") (citation omitted).

## IV.    ARGUMENT

### A.    Plaintiffs Have Standing and the L Bond Acquisitions Are Traceable to the Offering.

"Section 11 of the Securities Act, imposing civil liability for public offering of securities pursuant to a false registration statement, permits 'any person acquiring such security' to sue."  *In re Cobalt Int'l Energy, Inc.*, 2016 WL 215476, at *8 (S.D. Tex. Jan. 19, 2016) (quoting *Krim v. pcOrder.com, Inc*., 402 F.3d 489, 495 (5th Cir. 2005)).  The Registration Statement at issue in this case went into effect on June 3, 2020.  *See* GWG Holdings, Inc., Notice of Effectiveness (June 3, 2020).  Lead Plaintiffs allege they acquired L Bonds pursuant to the Registration

Statement after its effective date and during the continuous offering period. *See* ¶¶ 24–25 (Mr. Horton "acquired $5,600,000 of L Bonds *pursuant to the Registration Statement* on or about July 22, 2020" and Mr. Moore "acquired $225,000 of L Bonds *pursuant to the Registration Statement* on or about September 1, 2020, and acquired $58,000 of L Bonds *pursuant to the Registration Statement* on or about January 1, 2021") (italics added); CCAC at pp. 56–59; GWG Holdings, Inc., Prospectus at p. viii (Form 424B1) (June 5, 2020) (stating that "[t]he offering is a continuous offering" and "expires under SEC rules after three years from the effective date of the registration statement of which this prospectus forms a part.").

Lead Plaintiffs thus adequately allege standing as to acquisition of their own L Bonds. *See In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 538 (S.D.N.Y. 2010) (plaintiff has standing to bring Section 11 claims for all offerings made pursuant to the same registration statement); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1165 (C.D. Cal. 2008) (similar). Whether *other* class members will be able to trace their L Bond acquisitions is not before the Court at the motion to dismiss stage. *See In re Dynegy, Inc. Sec. Litig.*, 226 F.R.D. 263, 282 (S.D. Tex. 2005) (that certain "purchasers will be unable to trace . . . is an argument best addressed after a factual record has been developed"); *United Food & Commercial Workers Union v. Chesapeake Energy Corp.*, 281 F.R.D. 641, 656–67 (W.D. Okla. 2012) (finding that "consideration of the tracing difficulties . . . is not properly addressed" absent a complete evidentiary record). GWG, moreover, was tracking L Bond renewals and paying interest on these bonds, which necessitates records showing when L Bonds were issued and to whom. *See* GWG Holdings, Inc., Amend. No. 1 to Registration Statement at p. 6 (Form S-1/A) (May 15, 2020) ("Upon maturity, the L Bonds will be automatically renewed . . . unless repaid upon maturity at our or your election."); *id.* at p. 5 ("We will pay interest in cash on the L Bonds").

Contrary to Defendants' assertions, tracing is not an issue in this case. The bonds were

9

issued directly to investors during a set time period: from June 3, 2020 until GWG suspended the Offering on April 16, 2021. *See* CCAC at p. 5 n.2 of 59. There were two ways for an investor to purchase an L Bond during this offering period: (1) Depository Trust Company Settlement ("DTC Settlement"), and (2) Direct Settlement with GWG. *See* GWG Holdings, Inc., Amend. No. 1 to Registration Statement at p. iii (Form S-1/A) (May 15, 2020). For a DTC Settlement, a broker-dealer, acting as an investor's agent, would purchase an L Bond from GWG on a periodic DTC closing cycle, after which *the investor* would be "credited with ownership of an L Bond." *Id*. With a Direct Settlement, the investor purchased an L Bond *directly* from GWG. *Id*. Importantly, there were no secondary markets for aftermarket purchasers to acquire L Bonds. *Id.* at Cover (stating "we do not expect a secondary market . . . to develop" and "you should not expect to be able to resell your L Bonds"). There are accordingly records of who purchased an L Bond and when—whether through renewal, reissue, or initial purchase.

Defendants assert that "[p]rior to June 2020, L-Bonds existed and automatically renewed when they c[a]me due" and Lead Plaintiffs cannot "adequately allege that each member of the class purchased new L Bonds, and do not hold renewed L Bonds, as of June 2020." Ben Br. at p. 14 of 39; *see* Holland Br. at p. 17 of 37. The reason Defendants are mistaken is that, as the Offering Materials demonstrate, the "renewal" of a maturing L Bond involved the issuance of a new security, necessitating a separate investment decision. *See* GWG Holdings, Inc., Prospectus at p. 6 (Form 424B1) (June 5, 2020) ("Upon maturity, the L Bonds will be automatically renewed . . . unless repaid upon maturity at our or *your election*.") (italics added); GWG Holdings, Inc., Amend. No. 1 to Registration Statement at pp. 6, 20 (Form S-1/A) (May 15, 2020) (with respect to the automatic renewal, "a new certificate will be issued"). The issuance of that new security required an effective registration statement, without which the sale of the security to the public would violate the registration requirement of the Securities Act. *See* 15 U.S.C. § 77e(a) ("Unless

10

a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly . . . to sell such security through the use or medium of any prospectus or otherwise"). For this reason, GWG's Registration Statement, like those that preceded it, makes clear that the renewal of an L Bond can only take place pursuant to an effective registration statement.[6] Accordingly, Defendants' records showing when and to whom L Bonds were issued will trace the class members' purchases to the Registration Statement.

That a new investment decision was implicated in a renewal is apparent from the stark change in risk that a bondholder faced just before renewal, as compared to after.  Prior to renewal, "the risk of Plaintiffs' . . . investment turned solely on [the company's] ability to pay back the principal and accrued interest"—but "[a]fter rolling over their investments for another lock-up period, Plaintiffs' risk now depended on [the company's] financial solvency over the [security's *new* term]." *Langhamer v. Johnson*, 2023 WL 6691017, at *11 (S.D.N.Y. Oct. 12, 2023) (finding that a new "purchase" occurred for securities that were renewed or extended upon maturity) (citing *Pollack v. Laidlaw Holdings, Inc.* 1995 WL 261518, at *7–8 (S.D.N.Y. May 3, 1995)).  Hence these "renewals" were investment decisions, as the "investor . . . [wa]s faced with a new interest rate term determined by the issuing company at the time of the investor's rollover decision." *SEC v. SBM Inv. Certificates, Inc.*, 2007 WL 609888, at *10 (D. Md. Feb. 23, 2007); *see* GWG

---

[6] *See* GWG Holdings, Inc., Amend. No. 1 to Registration Statement at p. 5 (Form S-1/A) (May 15, 2020) ("The registration statement . . . registers the renewal of L Bonds that are outstanding from time to time."); *id.* at p. 20 ("If . . . allow[ed] . . . to renew your L Bond, we will also provide to you the then-current form of prospectus"); *id.* at p. 6 ("[A]fter the three-year anniversary of the commencement of this offering, we expect that the renewal of such L Bonds may require us to file a new registration statement. . . . [which] *must be declared effective before we will be able to renew your L Bond*.") (italics added); GWG Holdings, Inc., Amend. No. 2 to Registration Statement at p. 6 (Form S-1/A) (Nov. 28, 2017) (same); GWG Holdings, Inc., Post-Effective Amend. No. 5 to Registration Statement at p. 14 (Form POS AM) (Apr. 8, 2016) (same); GWG Holdings, Inc., Amend. No. 6 to Registration Statement at p. 12 (Form S-1/A) (Jan. 7, 2015) (same).

11

Holdings, Inc., Amend. No. 1 to Registration Statement at p. 20 (Form S-1/A) (May 15, 2020) (advising that "your L Bond will automatically renew for a new term equal to the original term but at the interest rate in effect at the time of renewal."); *id*. at p. 6 ("Upon maturity, the L Bonds will be automatically renewed . . . at the interest rate we are offering at that time").

Defendants' cases—*Krim*, 402 F.3d at 492, *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 862-83 (5th Cir. 2003), *Barnes v. Osofsky*, 373 F.2d 269, 270–71 (2d Cir. 1967), *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106–07 (9th Cir. 2013), and *Johnson v. CBD Energy Ltd.*, 2016 WL 3654657, at *5–6 (S.D. Tex. Jul. 6, 2016)[7]—all involved "aftermarket" purchasers who could not trace their purchases to the relevant public offering of stock. The question presented in those cases was therefore whether certain investors acquired stock in a "secondary market," in which "previously issued securities are traded among investors." *Market*, Black's Law Dictionary (11th ed. 2019). Here, in contrast, there was no secondary market[8] and Lead Plaintiffs acquired L Bonds directly from GWG, "pursuant to the Registration Statement" and during the offering period. *See* ¶¶ 24–25; CCAC at pp. 56–59 (Lead Plaintiffs certifying their "transactions during the Class Period in the securities that are the subject of this action").

Several Defendants also cite *Slack Technologies, LLC v. Pirani*, 598 U.S. 759 (2023).[9] In *Slack*, the defendant filed a registration statement that registered the sale of a certain number of shares after it had employed a direct listing that offered both registered and unregistered shares. *Id.* at 764. In this case, *all* L Bonds within the class definition were issued after the Registration Statement's effective date and sold pursuant to the Registration Statement. As a result, transaction

---

[7] Cited at Ben Br. at pp. 14–15 of 39; Chavenson & de Weese Br. at pp. 3–6 of 10; Holland Br. at pp. 17–18 of 37.

[8] GWG Holdings, Inc., Amend. No. 1 to Registration Statement at Cover (Form S-1/A) (May 15, 2020).

[9] Ben Br. at pp. 14–15 of 39; Chavenson & de Weese Br. at p. 4 n.3 of 10; Holland Br. at pp. 17–18 of 37.

12

records will identify the bonds acquired pursuant to the Registration Statement.

Thus, because Lead Plaintiffs allege they acquired L Bonds pursuant to the Registration Statement, they have standing to maintain Securities Act claims. In any event, tracing is not an issue because there was no secondary market.

**B.      Plaintiffs' Claims Are Not Subject to a Heightened Pleading Standard.**

Contrary to Defendants' contention that Lead Plaintiffs "allege a year's long scheme to defraud L Bond holders" (Ben Br. at p. 13 of 39; *see* Holland Br. at pp. 13–14 of 37; Evans Br. at p. 13 of 30), the CCAC makes no mention of "fraud" or a "scheme."[10] While Defendants invoke heightened pleading under Rule 9(b) (*e.g.*, Ben Br. at p. 13 of 39; Evans Br. at pp. 12–14 of 30; Holland Br. at pp. 13–14 of 37), "where a complaint does not allege that the defendants are liable for fraudulent or intentional conduct under Section 11, . . . the claims do *not* 'sound in fraud' and they cannot be dismissed for failure to satisfy Rule 9(b)[.]" *In re Enron Corp. Sec., Deriv. & "Erisa" Litig.*, 2003 WL 230688, at *12 (S.D. Tex. Jan. 28, 2003) (italics added) (citing *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th Cir. 2001)). The CCAC in this case "sounds in strict liability" rather than fraud, alleging that Defendants should be held "strictly liable" under the '33 Act.  ¶¶ 151, 155, 163, 174, 182. Thus, because "the § 11 claims asserted in this action sound only in strict liability . . . they are only subject to the notice pleading standard[.]" *In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 827 (S.D. Tex. 2004).

Allegations that the Defendants "knew or should have known that the statements were

---

[10] Unlike the complaints in cases cited by Defendants, the CCAC does not assert any violations of the Securities Exchange Act of 1934. *See* Ben Br. at p. 13 of 39, Evans Br. at p. 13 of 30, Holland Br. at pp. 13–14 of 37 (Defendants citing cases that applied Rule 9(b) where plaintiffs alleged Exchange Act violations or fraud, such as *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951 (5th Cir. 2016); *Plotkin v. IP Axess Inc.*, 407 F.3d 690 (5th Cir. 2005); *Venator Materials*, 547 F. Supp. 3d 624; *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200 (5th Cir. 2009)).

untrue d[o] not transpose the Section 11 claim into one sounding in fraud." *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 403 (S.D. Tex. 2011), *aff'd sub nom. Harold Roucher Tr. U/A DTD 9/21/72 v. Nocella*, 464 F. App'x 334 (5th Cir. 2012). *Cf.* CCAC ¶¶ 155, 177. Nor is Rule 9(b) triggered by Plaintiffs' use of the adjectives "false" and "misleading" to support their '33 Act claims. *See Lenartz v. Am. Superconductor Corp.*, 879 F. Supp. 2d 167, 190 (D. Mass. 2012) ("Thus, the words used by the Lead Plaintiff . . . such as 'materially misleading' and 'inaccurate' by themselves do not transform a negligence-based claim into a fraud-based claim."); *Nguyen v. MaxPoint Interactive, Inc.*, 234 F. Supp. 3d 540, 545 (S.D.N.Y. 2017).[11]

Because Plaintiffs' allegations do not "sound in fraud," Rule 9(b) has no application. For the same reason, the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), also invoked by the Defendants (*e.g.*, Ben Br. at p. 13 of 39; Holland Br. at pp. 14–15 of 37), do not apply. *See In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 258 F. Supp. 2d 576, 639 (S.D. Tex. 2003) ("[B]ecause the claims can be viewed as grounded in strict liability . . . heightened pleading standards and scienter are not applicable.") (citing *Lone Star Ladies*, 238 F.3d at 368).[12] As Lead Plaintiffs "allege[] that the § 11 claims asserted in this

---

[11] Defendants' cases are inapposite. *See* Evans Br. at p. 13 of 30. The court in one case found it "[s]ignificant[]" that the complaint was "devoid of allegations that [issuer's] affirmative disclosures misrepresented any aspect of the company's financial condition." *Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*, 53 F. Supp. 3d 882, 897–98 (E.D. La. 2014). The CCAC, by contrast, sets forth many affirmative disclosures that misrepresented aspects of GWG's financial condition. *See* CCAC, §§ IV.D.1–5. In another case, the court held that "[w]here the Securities Act and Exchange Act allegations are substantively identical, Rule 9(b) applies, and the Securities Act claims must be pleaded with particularity." *Venator Materials*, 547 F. Supp. 3d at 669 (internal quotations omitted). Lead Plaintiffs do not allege any violations of the Exchange Act. ¶¶ 149–86.

[12] Defendants' reliance on *Diodes*, 810 F.3d at 955, *Indiana Elec. Workers Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 532 (5th Cir. 2008), and *Fener v. Belo Corp.*, 425 F. Supp. 2d 788, 793 (N.D. Tex. 2006) is misplaced because the plaintiffs in those cases were required to plead scienter to state Exchange Act claims. *Compare* Holland Br. at p. 15 of 37, *and* Ben Br. at p. 13 of 39; *with* ¶¶ 149–86 (Plaintiffs do not allege violations of the Exchange Act).

14

action sound only in strict liability . . . they are only subject to the notice pleading standard[.]" *In re Dynegy*, 339 F. Supp. 2d at 827.

> **C.      The Registration Statement Contains Materially False Statements and Omissions.**

> **1.      Misrepresentations related to Ben's assets and financial performance.**

The Restatement's admission that tens of millions of dollars in GWG's reported revenue required erasure, due to admitted errors in the Registration Statement's financial reporting, gives rise to '33 Act liability.  The Restatement eliminated *all* of Ben's previously reported interest income (approximately $13.4 million) and fees (approximately $5.0 million) for the period ended March 31, 2020, revealing that the Registration Statement had materially misrepresented Ben's financial performance.  ¶¶ 77–78, 82–83.  GWG's restated financials reflect a decrease in revenue of approximately 32% for this period, showing that the Registration Statement had overstated revenue by approximately 47%; in addition, the restated financials reflect an increase in loss of approximately 11%, showing that the Registration Statement had understated loss by approximately 10%.[13]  ¶ 84.

The inaccuracies in GWG's stated financials vastly exceed the 5% threshold that the SEC and courts use as a starting point in evaluating materiality.  The SEC's guidance on materiality, set forth in Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45,150 (1999) ("SAB No. 99"), is "thoroughly reasoned and consistent with existing law" and "persuasive guidance for evaluating the materiality of an alleged misrepresentation."  *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 163 (2d Cir. 2000); *accord Takara Tr. v. Molex Inc.*, 429 F. Supp. 2d 960, 969 n.12 (N.D. Ill. 2006).

---

[13] Specifically, for the period ended March 31, 2020, GWG's restated financial statements report a downward adjustment in revenue from approximately $33.6 million to approximately $22.8 million (32.0%), reflecting that revenue had been overstated by approximately 47.4%.  GWG Holdings, Inc., Annual Report at p. F-73 (Form 10-K) (Nov. 5, 2021).  The restated financial statements also report an upward adjustment in loss for this period, from approximately $90.5 million to approximately $100.5 million (11.1%), reflecting that loss had been understated by approximately 10.0%.  *Id.*

As relevant here, SAB No. 99 "counsels that 5% falsity for statements in offering documents may provide a preliminary assumption of materiality." *Prause v. TechnipFMC, PLC*, 2019 WL 1211428, at *4 (S.D. Tex. Jan. 18, 2019) (citing *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Assoc. v. Nomura Holding Am., Inc.*, 873 F.3d 85, 147 (2d Cir. 2017)).

GWG's misstatements were not "so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality." *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 216 (5th Cir. 2004) (citation omitted).[14] Errors of such magnitude, moreover, raise questions as to materiality that cannot be resolved at the pleading stage. *See Chen v. Missfresh Ltd.*, — F. Supp. 3d —, 2023 WL 7289750, at *6 (S.D.N.Y. Nov. 6, 2023) (declining to dismiss where financial statements overstated net revenue by 11.4%); *SEC v. RPM Int'l, Inc.*, 282 F. Supp. 3d 1, 24 (D.D.C. 2017) (declining to dismiss when net income was overstated by 30%); *see also Hedick v. Kraft Heinz Co.*, 2021 WL 3566602, at *8 (N.D. Ill. Aug. 11, 2021) (finding materiality of financial restatement "ill-suited for resolution at the motion to dismiss stage.").

Courts evaluating materiality also consider the qualitative factors outlined in SAB No. 99, which can "establish materiality as a matter of law." *Fresno Cty. Emps. Ret. Assoc. v. comScore, Inc.*, 268 F. Supp. 3d 526, 549 (S.D.N.Y. 2017) (citing *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 717 (2d Cir. 2011)). Among these qualitative factors is "whether the misstatement concerns a segment or other portion of the registrant's business that has been

---

[14] That GWG's financial statements required restatement itself evidences materiality: "[U]nder Generally Accepted Accounting Principles ('GAAP'), restatements are required only to correct accounting errors that are material." *De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL 6891832, at *32 (D.N.J. Dec. 31, 2018). An accounting restatement "operates as an admission [that the] public filings [requiring the restatement] were false in many material respects." *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 709-10 (W.D. Tex. 2010); *see also In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004) (under GAAP, "previously issued financial statements should be restated only to correct material accounting errors that existed at the time the statements were originally issued"; hence, "that financial results were restated is sufficient basis for pleading that those statements were false when made.").

16

identified as playing a significant role in the registrant's operations or profitability." *Turner Ins. Agency, Inc. v. Farmland P'nrs Inc.*, 2019 WL 2521834, at \*5 (D. Colo. June 18, 2019) (quoting SAB No. 99); *see also Litwin*, 634 F.3d at 720 (reversing in part because "the District Court failed to consider another relevant qualitative factor—that the omissions 'mask[] a change in earnings or other trends.'") (quoting SAB No. 99). Thus, even if a misrepresentation appears quantitatively small, a qualitative factor may render it material. For example, in *In re Home Health Corporation of America, Inc. Securities Litigation*, the court declined to hold a failure to report loss of a *de minimis* percentage of revenue immaterial as a matter of law, when qualitative factors may have rendered the loss significant. 1999 WL 79057 at \*5–7 (E.D. Pa. Jan. 20, 1999). Similarly, in *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824 (8th Cir. 2003), the court reversed a decision that had deemed a 0.4% overstatement of revenue immaterial as a matter of law. The court held that the "total mix of data available to investors" when placed in context made the "quantity of [the] revenue overstatement, in and of itself," non-dispositive. *Id*. at 830.

GWG's misrepresentations of Ben's financial performance went to its core business. By representing that Ben generated approximately $13.4 million in interest and $5.0 million in fees during the quarter ended March 31, 2020, the Registration Statement led investors to believe that Ben was successfully executing a lending-and-service-based business model when, in reality, Ben was the beneficial owner of alternative assets held by its subsidiaries. ¶¶ 68–69. The Restatement eliminated the income that Ben supposedly generated and struck Ben's loan assets from the balance sheet, thereby revealing as false and misleading the pretense in the Registration Statement that Ben was generating income from secured lending. The misrepresentations of Ben's revenue, therefore, misled investors not just about financial performance but also about the qualitative nature of the business Ben had conducted. The misrepresentations thus "altered the

17

way a reasonable investor would have perceived the total mix of information available . . . as a whole." *Krim v. BancTexas Grp.*, 989 F.2d 1435, 1445 (5th Cir. 1993); *see Turner Ins. Agency*, 2019 WL 2521834, at *5 (noting that a qualitative factor for assessing materiality under SAB No. 99 is whether the misstatement concerns a business segment "that has been identified as playing a significant role in . . . operations or profitability.").

Ignoring the misrepresentations of Ben's financial performance, Defendants focus on changes to GWG's balance sheet, describing the Restatement as an immaterial reclassification of assets and change in accounting presentation. Ben Br. at pp. 19–20 of 39; Evans Br. at pp. 21–22 of 30; Holland Br. at p. 29 of 37. First, GWG's restatement was not a reclassification. *See* Financial Accounting Standards Board ("FASB"), Accounting Standards Codification ("ASC") 250-10-20 (a change in accounting principle, *i.e.*, a reclassification, is "[a] change from one generally accepted accounting principle to another generally accepted accounting principle[,]" whereas "[a] change from an accounting principle that is not generally accepted to one that is generally accepted is a correction of an error [in prior financial statements]."). More problematically, by representing that Ben had loans receivable of $232.3 million and $218.6 million, and fees receivable of $29.2 million and $30.5 million, as of December 31, 2019 and March 31, 2020, respectively, GWG led prospective investors to believe that Ben was acting as a lender and service provider. ¶¶ 77, 79. And, by representing that Ben's loans were secured by alternative assets worth $350.7 million as of March 31, 2020, the Registration Statement gave the false appearance that Ben's loans were secured, when, in truth, Ben beneficially owned the assets, and their value was eroding. ¶¶ 68–69, 77. The Restatement *eliminated* Ben's loans to third parties, with reported values that exceeded $200 million, from GWG's December 31, 2019 balance sheet. ¶¶ 77, 80 (citing GWG Holdings, Inc., Annual Report at pp. F-69–F-76 (Form 10-K) (Nov. 5, 2021)). And Ben's fees receivable—over $30.5 million as of March 31, 2020—also

18

were eliminated.  ¶¶ 79–80 (citing GWG Holdings, Inc., Annual Report at pp. F-69–F-76 (Form 10-K) (Nov. 5, 2021)).  Following the Restatement, the bonds were unsaleable.

Given that GWG's liabilities exceeded its tangible assets (¶ 88), the return of principal and interest to bondholders depended on Ben successfully executing its business model.  Because the Restatement erased the revenue that Ben's business supposedly generated, while also erasing its loan assets from the balance sheet, the impact was to reveal that Ben was not generating income from lending—it was acquiring investment assets and assuming investment risk.  This was not the business Ben claimed to be developing.  As such, the Restatement was not an immaterial reclassification that merely "shift[ed] a minute fraction of assets from one line . . . to another."  *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 630 (S.D.N.Y. 2005).  Rather, the Restatement "impacted the company's core businesses, which is 'the exact type of information that would be important to a reasonable investor.'"  *Chen*, 2023 WL 7289750, at *6 (citation omitted).  Defendant Evans's reliance on *ECA & Local 134 IBEW Joint Pension TR. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009)[15] is likewise self-defeating: the Second Circuit's opinion holds that "misclassification of assets *does* matter" but concludes that the "relatively small size of the allegedly misstated transactions"—unlike the large shifts in income and debt at issue here—could not support liability.  *ECA*, 553 F.3d at 205 (italics added).

Because materiality analysis "requires a fact-intensive inquiry into 'the source, content, and context' of the allegedly misleading" disclosures, *Venator Materials*, 547 F. Supp. 3d at 649 (quoting *Matrixx*, 563 U.S. at 43), the context of the misrepresentations of items on GWG's balance sheet matters.  Defendants seek to downplay the misrepresentations of Ben's financial performance by arguing that non-controlling stockholder equity, cash, and assets increased once

---

[15] Evans Br. at p. 22 of 30.

19

GWG's consolidated balance sheet included the alternative equity portfolio held by Ben's subsidiaries.  Ben Br. at p. 20 of 39; Evans Br. at p. 22 of 30; Holland Br. at pp. 29–30 of 37.  But increases to GWG's non-controlling stockholder equity, cash, and assets were no reason for comfort.  These shifts simply resulted from GWG's recognition that it was the effective owner of the trusts holding the private equity secondaries acquired in the Paul Capital deal, rather than being a secured lender.  Moreover, by describing Ben as already deploying its innovative lending-based liquidity products, and by representing that Ben had business goodwill of approximately $2.4 billion as of December 31, 2019, the Registration Statement implied Ben's business was gaining momentum and GWG's investment in Ben was beginning to pay off.  ¶¶ 68, 88.  Under these circumstances, a reasonable investor would have found it important that Ben actually had no loan portfolio and had done no significant lending, and would have given more weight to these facts than to the modest increase in GWG's tangible assets, which its liabilities still exceeded.  ¶ 88.[16]  More to the point: these fact issues are not capable of determination on the pleadings.  *See Prause*, 2019 WL 1211428, at *5.

Defendants maintain that the Registration Statement communicated to investors different ways that Ben's financial statements could be prepared.[17]  *See* Ben Br. at pp. 20–21 of 39;

---

[16] The materiality of Defendants' false statements and omissions is confirmed by "GWG's swift collapse when the falsehoods in the Registration Statement concerning Ben's true business . . . were revealed . . . . In the wake of the Restatement, GWG found few buyers for its L Bonds . . . . So too would these misrepresented facts have mattered to investors when deciding whether to acquire GWG L Bonds in the Offering." ¶ 123.

[17] Defendants also claim that the alternative assets appeared in Ben's financial statements before and after the Restatement.  Ben Br. at pp. 20–21 of 39; Holland Br. at pp. 29–30 of 37.  This is sophistry: the alternative asset portfolio did *not* appear in GWG's financial statements incorporated by the Registration Statement.  Instead, the Registration Statement said that these alternative assets were owned by Ben's "unaffiliated" borrowers and collateralized Ben's loans.  ¶ 64; GWG Holdings, Inc., Annual Report at p. 33 (Form 10-K) (Mar. 27, 2020).  In contrast, GWG's restated balance sheets showed that Ben itself owned the alternative asset portfolio, and its restated statements of operations reflect that the portfolio had declined in value.  *See* ¶¶ 68–69; GWG Holdings, Inc., Annual Report at Explanatory Note (Form 10-K) (Nov. 5, 2021); *id.* at

20

Holland Br. at p. 30 of 37. Yet GWG admitted that Ben's original financial statements, treating

Ben's "borrowers" as third parties, "should not be relied upon" and, by restating them, admitted

they were materially incorrect. ¶¶ 153–54; GWG Holdings, Inc., Annual Report at Explanatory

Note (Form 10-K) (Nov. 5, 2021). *See Hemmer Grp. v. SouthWest Water Co.*, 527 F. App'x

623, 626 (9th Cir. 2013) ("By definition, a restatement corrects financial data that was false

when made."); *In re ArthroCare*, 726 F. Supp. 2d at 709–10; *In re Atlas Air*, 324 F. Supp. 2d at

486–87. GAAP required GWG to restate its financials on account of "mistakes in the application

of . . . accounting principles . . . or oversight or misuse of facts that existed at the time the

financial statements were prepared" (FASB, ASC 250-10-20), not because of subsequent

changes in facts or circumstances. Moreover, despite Defendants' suggestion (*e.g.*, Ben Br. at

pp. 20–21 of 39; Holland Br. at p. 30 of 37), GWG lacked discretion under GAAP to choose

among different accounting treatments of its borrower trusts. GWG in fact restated its financial

reports after the SEC's Chief Accountant "expressed that it would object to a conclusion that

Ben not consolidate" the trusts. GWG Holdings, Inc., Current Report at p. 1 (Form 8-K) (Aug.

3, 2021); *see* Ben Br. at p. 19 of 39. Nor did the Registration Statement's arcane discussion of

deconsolidation of the ExAlt Trusts as of December 31, 2019, put reasonable investors on notice

that Ben was not operating its lending-and-service-based business or generating revenue from

interest and fees as represented. *See* GWG Holdings, Inc., Annual Report, Ex. 99.4 at p. 26

(Form 10-K) (Mar. 27, 2020). On the contrary, GWG's disclosures in the Offering "mask[ed]

. . . trend[s]" imperiling its business. *Litwin*, 634 F.3d at 720.

Various Defendants raise due diligence and reliance defenses, arguing in part that the

"certification from Whitley Penn provided Ben Defendants with a reasonable basis for their

---

p. F-6 (value of alternative asset portfolio declined from $342 to $221 million from December
31, 2019 to December 31, 2020).

statements." Ben Br. at p. 23 of 39; *see* Holland Br. at pp. 23–25 of 37. But these are "affirmative defense[s] that must be pleaded and proved." *Lone Star Ladies*, 238 F.3d at 369. Furthermore, because these defenses do not appear on the face of the CCAC, they cannot be considered. *EPCO Carbon Dioxide Prods., Inc. v. JP Morgan Chase Bank, NA*, 467 F.3d 466, 470 (5th Cir. 2006); *see also Fed. Hous. Fin. Agency v. UBS Ams., Inc.*, 858 F. Supp. 2d 306, 329 (S.D.N.Y. 2012) ("[D]ue diligence cannot be asserted as a basis for dismissal pursuant to Rule 12(b)(6)."), *aff'd*, 712 F.3d 136 (2d Cir. 2013). Reliance and due diligence defenses require "the application of a standard of reasonable care [which] ordinarily presents a question of fact for the jury." *Nat'l Credit Union Admin. Bd. v. UBS Sec., LLC*, 2017 WL 411338, at *5 (D. Kan. Jan. 31, 2017). Whether the directors and signatories of the Registration Statement knew or should have known of its materially flawed accounting cannot be resolved at the pleading stage.

Defendants in this regard ignore factual circumstances that make their due diligence and reliance defenses especially weak. That Ben was in the business of purchasing alternative assets, and that its "borrowers" were actually subsidiaries (¶¶ 68–69), were facts already determined in connection with the restatement of Ben's *earlier*, 2017 financials (also prepared by Whitley Penn), which *also* eliminated all of Ben's previously reported interest and fee revenue. ¶ 19. *See In re WorldCom, Inc. Sec. Litig.*, 2005 WL 638268, at *8 (S.D.N.Y. Mar. 21, 2005) (directors "may not fend off liability by claiming reliance where 'red flags' regarding the reliability of an audited financial statement, or any other expertised statement, emerge."). Three GWG directors resigned out of discomfort with the trajectory of Ben's business prior to the Offering. ¶¶ 113–22. It was or should have been apparent to the individual Defendants that Ben had done no meaningful business based on lending and providing services to "unaffiliated" trusts and that, as a result, there was no basis to claim that Ben was generating interest or fees as GWG's financial

22

statements represented.  ¶¶ 19, 64–68; GWG Holdings, Inc., Annual Report at p. 33 (Form 10-K) (Mar. 27, 2020); GWG Holdings, Inc., Quarterly Report at pp. 40, 60–61, 71 (Form 10-Q) (May 15, 2020).

Even as the Individual Defendants seek refuge in Whitley Penn's accounting judgment, Whitley Penn (like the Restatement) notes that GWG's own "internal controls failed to detect th[e] issue." Doc. 91 at p. 22 of 33; ¶¶ 97–99.  Defendants' efforts to shift the blame ignore that GWG's management was responsible for preparing its financial statements and that the directors and officers who signed the Registration Statement are strictly liable for its material misrepresentations.  *See In re Sunpoint Sec., Inc.*, 377 B.R. 513, 529 (Bankr. E.D. Tex. 2007) ("management is responsible for accurately preparing financial statements in accordance with [GAAP]"); *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 664 (S.D.N.Y. 2004) (financial statements "are prepared by the management of a company").  An audit by an independent accounting firm does not extinguish the responsibilities of corporate officers and directors under the securities laws because "[t]o hold otherwise would shift to accountants the responsibility that belongs to the courts" and "allow officers and directors of corporations to exercise an unwarranted degree of control over whether they are sued[.]"  *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002).[18]

Despite Defendant Holland's argument (Holland Br. at p. 15 of 37), the CCAC does not "group plead," as it alleges that each Defendant either signed or caused to be issued the Offering

---

[18] For the proposition that Whitley Penn's clean audit opinion affords them immunity, the Ben Defendants cite off-point cases that do not even address audit opinions.  The court in *Firefighters Pension & Relief Fund*, 53 F. Supp. 3d at 909, held that plaintiff's claims based on hydrocarbon projections fell within a safe harbor for forward-looking statements.  And in *Krim*, 989 F.2d at 1445–46, the Fifth Circuit affirmed dismissal at summary judgment of a 10(b) claim on the grounds that the defendant's statement of opinion that the company's finances would stabilize upon restructuring was non-material and that the plaintiff had failed to sufficiently allege scienter.

Materials.  *E.g.*, ¶¶ 1, 56, 155, 175, 185 (the Individual Defendants signed the Registration Statement); *see* GWG Holdings, Inc., Registration Statement at p. II-7 (Form S-1) (Mar. 30, 2020); GWG Holdings, Inc., Amend. No. 1 to Registration Statement at p. II-7 (Form S-1/A) (May 15, 2020).[19]  "Section 11 . . . 'permits a securities purchaser to recover damages against . . . *signatories to a registration statement and directors of the issuer*, if the registration statement contained an untrue statement of material fact or omitted to state a material fact . . . necessary to make the statements . . . not misleading.'"  *In re Kosmos Energy*, 955 F. Supp. 2d at 663–64 (italics added) (quoting *Rosenzweig*, 332 F.3d at 861); *see St. Denis J. Villere & Co. v. Caprock Commc'ns Corp.*, 2003 WL 21339286, at *1 (N.D. Tex. June 4, 2003) (even "the use of a defined term for a group of individuals . . . does not constitute improper 'group pleading'" where the complaint "alleges that each and every, one and all of the 'Individual Defendants' did whatever is alleged.").

### 2.   Misleading representations and omissions concerning Ben's business and operations.

The Registration Statement described Ben's operations inaccurately.  According to the Registration Statement, through its "primary operations," Ben "*provides* a unique suite of private trust, lending and liquidity products" to "clients" holding alternative assets.  ¶¶ 60–61 (italics added); GWG Holdings, Inc., Annual Report at pp. 2, 10, 45 (Form 10-K) (Mar. 27, 2020); GWG Holdings, Inc., Quarterly Report at p. 52 (Form 10-Q) (May 15, 2020).  "Beneficient's clients *select* one of [its liquidity] products[,]" after which Ben makes a loan to an unaffiliated trust, and then the borrower uses the proceeds of Ben's loan to purchase alternative assets, which collateralize Ben's loan.  GWG Holdings, Inc., Annual Report at p. 10 (Form 10-K) (Mar. 27,

---

[19] Plaintiffs in this case, unlike in the cases cited by Holland, need not plead scienter.  *See Fin. Acquisition P'ners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006), *Belo*, 425 F. Supp. 2d at 793; *Coates v. Heartland Wireless Commnc'ns, Inc.*, 26 F. Supp. 2d 910, 915-16 (N.D. Tex. 1998).

2020) (italics added).  Through lending-based "liquidity products" Ben generates revenue in the form of interest.  ¶ 66; GWG Holdings, Inc., Quarterly Report at pp. 60, 71 (Form 10-Q) (May 15, 2020).  The Registration Statement further said that Ben had begun to implement this business plan—Ben had "originat[ed] . . . liquidity products" and completed certain "of th[o]se transactions[.]"  ¶ 67; GWG Holdings, Inc., Annual Report, Ex. 99.4 at p. 18 (Form 10-K) (Mar. 27, 2020); GWG Holdings, Inc., Quarterly Report at pp. 7, 52 (Form 10-Q) (May 15, 2020).  During the quarter ended March 31, 2020, Ben purportedly generated interest from a secured loan portfolio worth more than $200 million.  ¶ 77; GWG Holdings, Inc., Quarterly Report at pp. 40, 63 (Form 10-Q) (May 15, 2020).  The Registration Statement also said that Ben provided trust administration services to "unaffiliated trusts" that were paying Ben fees.  ¶¶ 78–79; GWG Holdings, Inc., Annual Report at p. F-20 (Form 10-K) (Mar. 27, 2020); GWG Holdings, Inc., Quarterly Report at pp. 61, 63 (Form 10-Q) (May 15, 2020).

All of these statements, including the italicized portions, portray Ben as successfully executing a business centered on making secured loans.  But, contrary to this description of Ben as a secured lender, the Restatement revealed these statements were in error and instead revealed something quite different: Ben had acquired beneficial ownership of alternative assets through affiliated trusts, and the value of those assets was declining.  ¶¶ 68–69; GWG Holdings, Inc., Annual Report at F-6 (Form 10-K) (Nov. 5, 2021) (value of alternative asset portfolio declined from $342 to $221 million from December 31, 2019 to December 31, 2020).

In addition, Ben's alternative asset portfolio had not been acquired through deployment of the "liquidity products" described in the Registration Statement.  *See id.* at Explanatory Note.  Ben itself, through its subsidiaries, had acquired beneficial ownership of the securities in the alternative asset portfolio.  ¶¶ 68–69.  As the Restatement conceded, Ben's "primary tangible asset . . . acquired through loans a subsidiary of [Ben] made to certain of the ExAlt Trusts, was

25

previously reported as a loan receivable as of December 31, 2019, but is now being reported as an investment in alternative assets held by certain of the ExAlt Trusts." GWG Holdings, Inc., Annual Report at Explanatory Note (Form 10-K) (Nov. 5, 2021). And Ben further admitted that it acquired hundreds of millions of dollars in illiquid securities from funds managed by Paul Capital. ¶¶ 70–71. The Registration Statement said nothing of this significant transaction.[20]

The Registration Statement portrayed Ben as executing its business model of offering "innovative liquidity solutions," with the value of the collateral securing Ben's loans greatly exceeding the loan outlays, and as generating substantial interest and fee income of approximately $13 million and $5 million, respectively, leading up to the Offering. ¶¶ 68, 77; GWG Holdings, Inc., Quarterly Report at p. 58 (Form 10-Q) (May 15, 2020) (stating that Ben's loan portfolio had an approximate net carrying value of $218.6 million as of March 31, 2020, and that Ben's loans were collateralized by alternative assets with an estimated net asset value of approximately $350.7 million). The Registration Statement thereby created the appearance that Ben was successfully implementing a lending-and-service-based business and that its business prospects were far better than they actually were. These favorable representations "altered the way a reasonable investor would have perceived the total mix of information." *Kapps*, 379 F.3d at 214. A lending business is fundamentally different than an investment business; Defendants cannot demonstrate that the

---

[20] Nearly all of Ben's alternative asset portfolio during the Offering Period consisted of securities acquired through this transaction. ¶ 70. Paul Capital is now pursuing claims that Ben failed to pay it promised cash consideration of at least $550 million. *See Paul Capital Advisors, L.L.C. v. Holland*, No. 2022-0167-SG (Del. Ch. May 13, 2022), Verified 2d Amend. Compl. That litigation, which Vice Chancellor Glasscock described as a "Gordian Knot" of financial transactions and contracts, has proceeded past a motion to dismiss. *See id.* (Del. Ch. Aug. 29, 2023), Order Granting in Part and Denying in Part Defs.' Mtns. to Dismiss at pp. 1, 14–15. Until Paul Capital initiated suit in February 2022, the fact that Paul Capital, and funds that it sponsors, were counterparties to transactions with Ben was not a matter of public record. In its SEC filings, GWG never revealed the identities of any of Ben's counterparties. GWG also held out Defendant de Weese, a GWG director since April 2019, as an "Independent Director" even though he is a Paul Capital partner.

Registration Statement's misleading statements are so "obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality." *Id*. at 216.

Defendants insist that Ben "remains a lender" (Ben Br. at p. 19 of 39; *see* Holland Br. at p. 29 of 37) yet ignore that when a company lends to its own subsidiary, there is no economic effect to the enterprise, a fact reflected in how the Restatement wiped out revenue, loans receivable, and fees receivable. *See Schering-Plough Corp. v. United States*, 651 F. Supp. 2d 219, 272 (D.N.J. 2009) (finding in a taxpayer refund action that loans extended to subsidiaries "had no appreciable economic effect on the parties"). Defendants' briefing ignores the elimination of this previously reported revenue. They also fail to address Plaintiffs' allegation that Ben's business of providing services to third parties—one of Ben's two business lines described in the Registration Statement—did not actually exist, or to explain why this fact would not be material.

It is undisputed that, at the time of the Registration Statement, Ben had not actually originated any liquidity products and was not successfully implementing its supposed lending-based business model. *See* Ben Br. at p. 20 of 39 ("Upon consolidation of the ExAlt Trusts, the loans receivable and fees receivable no longer appeared"); Holland Br. at p. 29 of 37; Evans Br. at pp. 22–23 of 30. Defendants incorrectly state, however, that the Registration Statement only spoke of Ben's plans (future tense) to offer liquidity products. *See* Ben Br. at p. 22 of 39; Holland Br. at p. 31 n.22 of 37. In fact, the Registration Statement said that "Ben's originations of liquidity products have primarily been" (present perfect tense), Ben had "originated a limited number of loans to date" (past tense), and Ben had "closed a limited number of . . . transactions" (past tense), statements that communicated that Ben's nascent business was consistent with the lending-based model described. GWG Holdings, Inc., Annual Report at pp. 45, F-9 (Form 10-K) (Mar. 27, 2020); *id.*, Ex. 99.4 at p. 18; GWG Holdings, Inc., Quarterly Report at pp. 7, 52, 71 (Form 10-Q) (May 15, 2020). The Restatement confirms that these claims were at best materially misleading.

According to the Ben Defendants, an investor should have known that cash flows from alternative assets propped up Ben's business, rendering nonactionable the qualitative misrepresentations as to the nature of Ben's business.  Yet the Registration Statement said that "[Ben's] . . . loans [were] *collateralized* by cash flows from illiquid alternative assets."  ¶ 61; GWG Holdings, Inc., Annual Report at p. 10 (Form 10-K) (Mar. 27, 2020) (italics added).  This representation was inaccurate: the Restatement acknowledged there was no collateral and no loans. Ben was operating more like an unregistered investment company by making risky investments in alternative assets, where the investments themselves were its primary tangible assets.[21]  ¶ 10; *see Touchtone Grp., LLC v. Rink*, 913 F. Supp. 2d 1063, 1077 (D. Colo. 2012) (company's false suggestion that its profits derived from home site sales, rather than money from new investors, was material); *Ganino*, 228 F.3d at 164–66 (reversing dismissal where the complaint alleged misrepresentation of fees in one year as income in the next).[22]

> **3.    Misrepresentations and omissions related to Ben's goodwill valuations.**

Overlooking Plaintiffs' allegations of material omissions regarding the basis for Ben's inflated goodwill valuations, Defendants contend that a goodwill valuation is a non-actionable opinion statement.  Even so, Defendants failed to disclose critical facts bearing on their purported opinions: there was no genuine arm's length transaction of any Ben securities underpinning the goodwill valuation, which consequently lacked support under the stated valuation methodology.

---

[21] *See* Investment Company Act of 1940, 15 U.S.C. § 80a-3(a)(1) (defining an "investment company" to include any issuer "engage[d] primarily, in the business of investing, reinvesting, or trading in securities").

[22] Defendants' cases are distinguishable.  *See, e.g.*, *Flaherty*, 565 F.3d at 207 (because the defendants "did disclose that the dividend policy was 'under review' during the tender offer period, the inference of non-fraudulent intent" favored defendants); *Venator Materials*, 547 F. Supp. 3d at 669 (Section 11 claims were based on the same insufficient allegations of fraud as Section 10(b) claims).

28

As the Supreme Court recognized in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015), an omission of material fact may render a statement of opinion presented in a registration statement materially misleading even if the issuer sincerely believed the opinion was correct. *Id.* at 186–95 ("[I]f a registration statement omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself, then §11's omissions clause creates liability."). The Court "explained that a reasonable investor expects not just that the company believes the opinion, but that 'it fairly aligns with the information in the company's possession at the time.'" *Zwick P'nrs, LP v. Quorum Health Corp.*, 2018 WL 2933406, at *5 (M.D. Tenn. Apr. 19, 2018) (quoting *Omnicare*, 575 U.S. at 188–89). As such, "opinions are actionable under Section 11 of the Securities Act not only when the speaker did not hold the belief she professed, but also if . . . the statement omits information whose omission conveys false facts about the speaker's basis for holding that view and makes the opinion statement misleading to a reasonable investor." *New England Carpenters Guar. Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 171 (2d Cir. 2023) (citing *Omnicare*, 575 U.S. at 185–88) (internal quotation marks and citations omitted).

GWG's Registration Statement stated that Ben's goodwill valuations—approximately $1.5 billion and $2.4 billion as of December 31, 2018, and December 31, 2019, respectively—were determining using the "Option Pricing Model ('OPM') Backsolve approach under the market method" ("OPM Backsolve Approach"). That method relies on, among other inputs, the fair value for at least one component of the entity's capital structure, based upon an arm's length transaction. ¶ 89; GWG Holdings, Inc., Annual Report at p. F-23 (Form 10-K) (Mar. 27, 2020); GWG Holdings, Inc., Annual Report at p. F-56 (Form 10-K) (Nov. 5, 2021). *See, e.g.*, *CFTC v. Cassidy*, 2009 WL 5454918, at *3 (S.D.N.Y. Nov. 5, 2009) (defendant placed "inaccurate implied

29

volatility values into his options pricing model" to hide losses).

Plaintiffs allege that the Registration Statement omitted the facts that formed the basis for the goodwill valuation. ¶¶ 90–91. *See, e.g.*, *In re Nielsen Holdings PLC Sec. Litig.*, 510 F. Supp. 3d 217, 234 (S.D.N.Y. 2021) ("Plaintiffs adequately allege that Defendants' rosy valuation of . . . goodwill was based on baseless cash flow growth rates that they failed to disclose in their 2017 and 2018 Form 10-Ks."); *Zwick*, 2018 WL 2933406, at *4–7 (finding representations related to delayed goodwill impairment actionable). Contrary to GAAP (*see* FASB, ASC 820-10-50), GWG's Registration Statement failed to provide necessary disclosures about the inputs used to determine the enterprise valuation of Ben and related acquisition consideration fair values used to calculate Ben's reported goodwill. ¶ 90. As of year-end 2019, Ben's goodwill was valued at $2.4 billion. Its primary assets were securities valued at only $342 million; goodwill was determined by extrapolating an implied enterprise value from a transaction in Ben securities. ¶¶ 87–93. The flaw in this was the absence of a reliable arm's length transaction in Ben securities supporting the goodwill valuation that investors saw.

Any reasonable investor would have expected that Ben's goodwill valuation was calculated on the basis of a good-faith valuation of Ben securities determined in an arm's length transaction. *See, e.g.*, *In re Teva Sec. Litig.*, 2023 WL 3186407, at *11, *49-50 (D. Conn. May 1, 2023) (upholding investor claims asserting the misleading use of "bogus inputs for the discounted cash flow ('DCF') model used to calculate the fair value and goodwill" and explaining that "a reasonable investor would want to know"). The omission of relevant facts underlying the inputs used in the calculation of goodwill—including the fact that the valuation of Ben securities used in the calculation was not determined in an arm's length transaction— conflicted with reasonable investor expectations. *DeCarlo*, 80 F.4th at 171; *see also In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2021 WL 3727095, at *6 (S.D.N.Y. Aug. 23, 2021)

30

(finding that "[a] reasonable jury evaluating this evidence could conclude that the Goodwill Statements were misleading."); *In re Teva Sec. Litig.*, 2023 WL 3186407, at *50.

Moreover, because these grounds for liability stem from omission, Plaintiffs need not establish that Defendants knew the goodwill valuations were inflated. *Omnicare*, 575 U.S. at 186–95; *see In re Apache Corp.*, 2022 WL 4277350, at *6 (S.D. Tex. Sept. 15, 2022) ("Lead Plaintiffs have sufficiently alleged that Defendants omitted material factual information that would render their statements misleading to a reasonable investor under the *Omnicare* rubric."), *R&R adopted*, 2022 WL 17324439 (S.D. Tex. Nov. 29, 2022); *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 663 F. Supp. 3d 334, 359 (S.D.N.Y. 2023) (whether defendant "[i]n fact believed the Merger was not fair" was "not the only route to liability under *Omnicare*"); *In re Teva*, 2023 WL 3186407, at *49 (alleged material omissions made goodwill statements actionable).

Defendants incorrectly argue that "Plaintiffs point to the Restatement to show the falsity of the underlying facts" related to Ben's goodwill. Ben Br. at p. 25 of 39; *see* Holland Br. at p. 28 of 37. Plaintiffs allege that goodwill was "not addressed by the Restatement" (¶ 13) and that the transaction in Ben equity securities upon which goodwill was based was not an arm's length transaction, resulting in GWG reporting grossly inflated goodwill valuations in the Registration Statement (¶¶ 91–93). Thus, Defendants' factual argument that the Ben goodwill reflected in GWG's restated financials was "higher, not lower" is not relevant.[23]

### 4.    Misleading representations and omissions as to accounting controls.

Incorporating Whitley Penn's opinion, the Registration Statement represented that "the Company maintained, in all material respects, effective internal control over financial reporting as

---

[23] The Registration Statement disclosed that goodwill represents the difference between (i) Ben's overall enterprise value and (ii) the net value of the assets and liabilities attributable to Ben. ¶ 87. It does not appear that the Restatement affected in any way the calculation of Ben's enterprise valuation. Rather, the adjustments to goodwill in the Restatement resulted from adjustments to the Restatement-induced change in the net value of the assets and liabilities attributable to Ben.

of December 31, 2019." GWG later admitted this statement was incorrect—"a material weakness existed in [GWG's] internal control over financial reporting for all periods from December 31, 2019 to December 31, 2020." ¶¶ 14, 97. The CCAC's factual allegations create an inference that Defendants either knew that GWG lacked effective financial controls (and accordingly knew Whitley Penn's opinion was incorrect) or acted in reckless disregard for the truth. *See Nykredit Portefølje Admin. A/S v. Propetro Holding Corp.*, 2021 WL 9037758, at \*16 (W.D. Tex. Sept. 13, 2021) (noting that courts have found statements regarding internal controls actionable).

Contrary to the Ben Defendants' argument, they had every "reason to doubt such audit conclusions." Ben Br. at p. 26 of 39. Ben's 2017 financial statements, also certified by Whitley Penn, were incorrectly prepared on account of Ben's failure to consolidate the trusts to which Ben purportedly made loans; Ben's next auditor determined that those 2017 financials required restatement. ¶ 19. The majority of GWG directors who signed the Registration Statement were Ben directors at all relevant times. ¶¶ 26–30, 33. GWG hired Whitley Penn to audit its 2019 financials, which treated Ben as a consolidated subsidiary, and which—like Ben's 2017 financials—erroneously failed to consolidate the trusts. ¶ 19. The Individual Defendants nevertheless signed the Registration Statement containing Whitley Penn's opinion that GWG had effective financial controls.

Drawing reasonable inferences in Plaintiffs' favor, *see McLin*, 866 F.3d at 688, Plaintiffs sufficiently allege it was apparent to Defendants that GWG lacked effective controls over financial reporting. *See, e.g.*, *Nykredit*, 2021 WL 9037758, at \*31-32 (upholding Section 11 claims based on the defendant's statements that its internal controls were adequate); *In re Hamilton Bankcorp., Inc. Sec. Litig.*, 194 F. Supp. 2d 1353, 1356 (S.D. Fla. 2002) (upholding Section 11 claims against signatories of registration statement based on materially misleading statements and omissions concerning the company's internal controls).

32

### 5.    Misleading representations and omissions concerning Ben's related-party transactions.

Plaintiffs allege, and GWG's Restatement concedes, that its Registration Statement failed to disclose that $49.8 million in L Bond sales was paid to a Heppner-affiliated entity and used to pay down debt on Heppner's personal property.  ¶¶ 15, 105–107.  Furthermore, instead of disclosing this entity as a related party, the Registration Statement falsely represented that the entity was "not considered a related party of GWG Holdings or Beneficient[.]"  ¶ 105. Defendants nonetheless claim that "GWG fully disclosed prior payments to parties associated with certain Individual Defendants," citing a statement in GWG's 2019 10-K that "[Ben] will have broad discretion to use the proceeds of any such investments and may use such proceeds to fund alternative asset financings, to repay indebtedness, including to related parties[.]"  Ben Br. at p. 28 of 39; Evans Br. at pp. 26–27 of 30; Holland Br. at pp. 31–32 of 37.  But this language falls short of the candor required under the securities laws, considering the scope and nature of Defendants' alleged related-party payments.

"[S]tatements regarding related-party transactions in quarterly and annual filings after such related-party transactions occurred are actionable at the pleading stage." *Nykredit*, 2021 WL 9037758, at *19 (citation omitted).  "'[D]isclosure is the overriding principle' governing related-party transactions," which "have proven to be an easy and effective way . . . to misstate the economic substance and reality of financial transactions . . . [and] are difficult to measure economically because they may not be comparable[.]'" *Zagami v. Nat. Health Trends Corp.*, 540 F. Supp. 2d 705, 711 (N.D. Tex. 2008) (citation omitted).  SEC Regulation S-X Item 404, 17 C.F.R. § 229.404(a) ("Item 404"), which governs disclosures under the Securities Act and the Exchange Act, "requires disclosures of related-party transactions when 'the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material

33

interest.'" *SEC v. China Ne. Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 393 (S.D.N.Y. 2014) (quoting 17 C.F.R. § 229.404(a)).[24]  The regulation defines "related party" to include "[a]ny director or executive officer of the registrant."  Item 404, Instructions to Item 404(a) at 1(a)(i).

GWG's 2019 10-K states that, during the fourth quarter of 2019, Ben made a loan payment of approximately $49.8 million to its lender, HCLP Nominees, LLC ("HCLP").  The Restatement revealed that proceeds from this payment "advanced funds under various lending and investing arrangements" to Heppner-controlled trusts.  ¶ 106.  Although Defendants suggest GWG disclosed HCLP as a related party (*see* Ben Br. at p. 28 n.24 of 39; Holland Br. at p. 32 of 37), the 2019 10-K in fact said that "HCLP is *not* considered a related party" and failed to identify Ben's $49.8 million loan payment to HCLP as a related-party transaction.  ¶ 105 (italics added).  The money to fund this loan payment[25] came from GWG's $79 million cash investment in Ben— using funds from GWG's L Bond-specific bank accounts—on December 31, 2019.  ¶ 107.  On that same day, Ben made the $49.8 million loan payment to HCLP, at which point HCLP affiliates transferred a portion of those funds to Heppner affiliates.  *Id.*

---

[24] The registrant must specifically disclose: "(1) The name of the related person and the basis on which the person is a related person. (2) The related person's interest in the transaction with the registrant, including the related person's position(s) or relationship(s) with, or ownership in, a firm, corporation, or other entity that is a party to, or has an interest in, the transaction. (3) The approximate dollar value of the amount involved in the transaction. (4) The approximate dollar value of the amount of the related person's interest in the transaction, which shall be computed without regard to the amount of profit or loss. (5) In the case of indebtedness, disclosure of the amount involved in the transaction shall include the largest aggregate amount of principal outstanding during the period for which disclosure is provided, the amount thereof outstanding as of the latest practicable date, the amount of principal paid during the periods for which disclosure is provided, the amount of interest paid during the period for which disclosure is provided, and the rate or amount of interest payable on the indebtedness. (6) Any other information regarding the transaction or the related person in the context of the transaction that is material to investors in light of the circumstances of the particular transaction."  17 C.F.R. § 229.404(a)(1)–(6).

[25] HCLP required this payment as a condition to a waiver for HCLP's consent to the change-in-control of Ben.  *See* GWG Holdings, Inc., Annual Report, Ex. 99.4 at p. 32 (Form 10-K) (Mar. 27, 2020).  The payment was to reduce the outstanding principal of Ben's existing loan by $48.7 million and pay $0.1 million of outstanding interest and a $1.0 million prepayment penalty.  *Id.*

Admitting its disclosure error, in the Restatement, GWG identified Ben's $49.8 million loan payment to HCLP as one of a series of related-party transactions in which Defendant Heppner was an interested party and his affiliates received funds indirectly from GWG.  ¶ 106.  Contrary to Item 404, GWG's 2019 10-K (incorporated into the Registration Statement) did *not* disclose Heppner's interest in these transactions, the approximate dollar value of his interest in the transactions, or that Ben's payment was made in partial satisfaction of debt that Heppner incurred for the purchase and development of his ranch.  ¶ 110; 17 C.F.R. § 229.404(a)(1)–(6).

Notably, the last sentence of the Ben Defendants' block quote appears nowhere in the Registration Statement or any other SEC filing.  Ben Br. at p. 28 of 39.  And Defendants' contention that Heppner's *affiliation* with the lenders was disclosed (*id.* at p. 28 n.24 of 39; Holland Br. at p. 32 of 37) only highlights the concealment of the *related-party transactions* and the fact that Ben's loan payments to HCLP benefited Heppner.  *See In re JDN Realty Corp. Sec. Litig.*, 182 F. Supp. 2d 1230, 1251 (N.D. Ga. 2002) (upholding Section 11 claims based on alleged related-party transactions); *Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096, 1117–20 (C.D. Cal. 2012); *Lewy v. SkyPeople Fruit Juice, Inc.*, 2012 WL 3957916, at *10 (S.D.N.Y. Sept. 10, 2012); *Krim v. pcOrder.com*, 2002 WL 1185913, at *4 (W.D. Tex. Apr. 12, 2002) (registration statement did not disclose that company was controlled by competitor that diverted business away from it).

Defendants' failure to adequately disclose these related-party transactions was material to prospective investors.  "The court's role at [the pleading stage] is limited to determining whether, as plaintiffs have pleaded their complaint, the court can conclude that the [related-party] transactions were immaterial *as a matter of law*."  *Zagami*, 540 F. Supp. 2d at 711 (N.D. Tex. 2008) (italics in original) (citing *United States v. Peterson*, 101 F.3d 375, 380 (5th Cir. 1996)); *see Nykredit*, 2021 WL 9037758, at *19 (omissions concerning related-party transactions are

35

actionable if the court cannot conclude "as a matter of law that these omissions 'are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance,' particularly in light of the alleged related-party nature of the transaction under Item 404(a)") (citation omitted).  Of additional relevance, "in some cases[,] the significance of an item may be independent of the amount involved" such as the "amounts due to and from officers and directors, because of their special nature and origin[.]" *Zagami*, 540 F. Supp. 2d at 710 (quoting Financial Statements and Regulation S–X, 50 Fed. Reg. 49,529–02, at 49,530 n.3, 1985 WL 125398 (Dec. 3, 1985)).

Defendants' failure to disclose as a related-party transaction Ben's $49.8 million loan payment to HCLP—a portion of which HCLP's affiliates immediately transferred to Heppner's own affiliates, and which was used to retire debt on Heppner's property—both omitted material facts and rendered GWG's disclosures materially misleading.  ¶¶ 104–10.  These omissions obfuscated the reality that L Bond proceeds were used to benefit the CEO and the payments had no connection to Ben or its business.  *Id.*  These facts would have been important to a reasonable investor assessing GWG's strategic focus on investing in Ben, the independence and competence of GWG's Board, and the candor and motivations of management.  ¶ 111.  At the very least, "reasonable minds" could "differ" as to "the[] importance" of these facts when considering the "related-party nature of the transaction[.]" *Nykredit*, 2021 WL 9037758, at *19.

### 6.      Misleading representations and omissions regarding director resignations.

Plaintiffs also sufficiently allege that the Offering Materials' representation that the number of GWG directors had been reduced "to facilitate the Board of Directors' ability to oversee the Company's operations in an efficient and effective manner" is materially misleading. GWG Holdings, Inc., Prospectus at p. 2 (Form 424B1) (June 5, 2020).  GWG's characterization

implied that the reduction in board size was a corporate governance enhancement. The truth about the reduction in the number of directors is something "a reasonable investor would consider significant in the decision whether to invest[.]" *In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, 238 F. Supp. 3d 799, 829 (S.D. Tex. 2017) (citation omitted), *aff'd sub nom. Lampkin v. UBS Fin. Servs., Inc.*, 925 F.3d 727 (5th Cir. 2019).

Plaintiffs allege that in 2019, directors Bruce E. Zimmerman, Sheldon I. Stein, and David H. Glaser—each of whom was also a Ben director at the time—questioned CEO Heppner about GWG's investments in Ben and Ben's payments to related parties. ¶¶ 115–17. After GWG's management failed to address their concerns—they were "totally kept in the dark," Stein wrote— each resigned from the Company's Board in October 2019. ¶¶ 118–19. The Registration Statement did not disclose that the resignations of directors Zimmerman, Stein, and Glaser resulted from their concerns with the direction of GWG's business and the investments in Ben. ¶ 120.

Faced with this straightforward omission, coupled with the misleading characterization of the reason for the reduction in board size, Defendants erroneously argue that liability also requires an affirmative letter from the resigning directors disagreeing with the misleading description of why they resigned. Ben Br. at pp. 29–30 of 39; Holland Br. at pp. 33–34 of 37. Whether the resigning directors ever formally "provided a letter," however, has no bearing on whether GWG's characterization of the reduction in board size as a corporate governance enhancement in light of the circumstances would have mattered to a reasonable investor. Investors certainly would have found it significant that the number of directors was reduced, not to facilitate the Board's "ability to oversee . . . operations in an efficient and effective manner," but after directors resigned following concerns about GWG's investments in Ben and Ben's related-party transactions. ¶ 121. *See, e.g.*, *Dillon v. Berg*, 326 F. Supp. 1214, 1233–34 (D. Del. 1971) (false statement that director had resigned from board when in fact director had withdrawn undated void resignation was

37

material within rule relating to misleading disclosures to solicit proxies), *aff'd*, 453 F.2d 876 (3d

Cir. 1971).  Glaser, Stein, and Zimmerman's reasons for giving up their Board seats were

especially important given GWG's concurrent shift in business focus to investment in Ben.

The Registration Statement created the false impression that GWG had reduced its board size for

reasons of efficient governance and nothing more.[26]

Defendants also claim there was no disagreement among the directors since Zimmerman,

Stein, and Glaser's "concerns" were disclosed as risk factors (they were not), so "other directors

did not disagree that there were risks relating to each of these issues[.]"  Ben Br. at p. 29 n.25 of

39.  In addition to being unintelligible, this argument ignores documentary evidence that

Zimmerman, Stein, and Glaser were "totally opposed" to payments from GWG to Ben and

demanded that "no money should be sent from GWG to Ben" until an asset and liability analysis

was completed.  ¶ 115.[27]  Changing tack, Defendants mischaracterize Plaintiffs' allegation as

---

[26] Defendants' effort to whitewash the Registration Statement's benign characterization of the resignations and change in board size is even less persuasive in light of GWG's concession that it misstated why other GWG directors—Roy W. Bailey, Daniel P. Fine, and Jeffrey N. MacDowell—resigned in March 2021.  On November 14, 2022, GWG filed an amended disclosure admitting that "[t]he Original 8-K incorrectly stated that the resignations were not due to any disagreement with the Company."  GWG Holdings, Inc., Amend. to Current Report (Form 8-K/A) (Nov. 14, 2022).  In truth, Bailey, Fine, and MacDowell resigned over "disagreements with [GWG] relating to certain operations, policies and practices"—in particular, they "objected to certain terms and parameters of a proposed investment [GWG] was considering in . . . Ben[.]"  *Id.*

[27] Defendant Evans faults Plaintiffs for relying in part on facts alleged in the complaint filed by the Official Bondholder Committee following its investigation in the bankruptcy.  Evans Br. at p. 28 of 30.  But "[w]hile allegations from another lawsuit are not evidence . . . plaintiffs need not provide admissible proof at this stage."  *In re OSG Sec. Litig.*, 12 F. Supp. 3d 619, 622 (S.D.N.Y. 2014) (quotation marks and citation omitted); *see In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 768 n.24 (S.D.N.Y. 2012) ("Defendants also argue that the sections . . . that rely on allegations put forth in other litigants' complaints should be disregarded or stricken. The Court disagrees. . . . It makes little sense to say that information" taken from another complaint—"which the TAC could unquestionably rely on if it were mentioned in a news clipping or public testimony—is immaterial simply because it is conveyed in an unadjudicated complaint.").  To the extent this Court finds that the allegations relating to the resigning directors require further independent investigation to state a claim, Plaintiffs respectfully request leave to amend.  *See Lone Star Ladies*, 238 F.3d at 367–68.

being about GWG's "failure to disclose possible corporate mismanagement[.]" Ben Br. at p. 30 of 39; *see* Holland Br. at p. 34 of 37 (arguing that "corporate mismanagement has been held not actionable under the federal securities laws").  In fact, Plaintiffs allege that the Registration Statement's representations regarding the reduction in board size were false and misleading given the directors' actual reasons for resigning.  CCAC, § IV.D.6.

Lead Plaintiffs adequately allege that the Offering Materials contain materially false and misleading representations regarding the resignations of certain directors.

**D.     Defendants' Generalized Risk Disclosures Do Not Immunize Their Misleading Representations and Omissions of Material Fact.**

The cautionary statements in the Offering Materials were insufficient to alert a reasonable investor of the real nature of the risks associated with purchasing L Bonds.  The general risk statements that Defendants cite (Ben Br. at pp. 30–35 of 39; Evans Br. at pp. 19–20 of 30; Holland Br. at p. 16 of 37) are undermined by other relevant information that they failed to disclose and were themselves misleading because they described the "risks" as only potentialities, rather than material conditions that already existed.

Defendants invoke the bespeaks caution doctrine, which "addresses situations in which optimistic projections are coupled with cautionary language, which in turn affects the reasonableness of the reliance on and the materiality of those projections." *In re Primera Energy, LLC*, 579 B.R. 75, 150 (Bankr. W.D. Tex. 2017).  The bespeaks caution doctrine "merely reflects the unremarkable proposition that statements must be analyzed in context"; "cautionary language is not necessarily sufficient, in and of itself, to render predictive statements immaterial as a matter of law." *Kurtzman v. Compaq Computer Corp.*, 2000 WL 34292632, at *38 (S.D. Tex. Dec. 12, 2000) (quoting *Rubinstein v. Collins*, 20 F.3d 160, 167 (5th Cir. 1994), *abrogation on other grounds recognized by Heinze v. Tesco Corp.*, 971 F.3d 475 (5th Cir. 2020)); *see also* Ben Br. at

p. 30 of 39 (acknowledging that the doctrine is not "a *per se* bar to liability").

Moreover, the "bespeaks-caution doctrine applies only to statements that are forward-looking." *Iowa Pub. Emps. Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 142 (2d Cir. 2010); *see also SEC v. Collector's Coffee*, 2023 WL 6453709, at *18 (S.D.N.Y. Oct. 4, 2023). Plaintiffs' claims arise from incorrectly prepared financial statements, misrepresentations of past events, transactions, and the nature and status of operations, and omissions regarding the basis for Ben's goodwill valuation. The claims are not based on forward-looking statements—the "bespeaks caution doctrine only applies to forward-looking statements, not historical financial results such as these." *Chen*, 2023 WL 7289750, at *7. "It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language." *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004).

Further, cautionary language in offering materials "must 'relate directly to that by which plaintiffs claim to have been misled.'" *Kurtzman*, 2000 WL 34292632, at *25 (citation omitted). "Even then, including general cautionary language about a prediction does not excuse an alleged failure to reveal known material and adverse facts. There must be sufficient cautionary language or disclosure of risk that *reasonable minds could not disagree* that the challenged statements were not misleading." *Id.* (italics added) (internal citations omitted). Even the cases cited by Defendants recognize that "a vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation." *In re Donald J. Trump Casino Sec. Litig.–Taj Mahal Litig.*, 7 F.3d 357, 371–72 (3d Cir. 1993); *see also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 244 (5th Cir. 2009). To warrant dismissal, cautionary language must be "precise" and "meaningful"—*i.e.*, specific enough to "discredit the alleged misrepresentations to such an extent that 'the risk of real deception drops to nil.'" *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1033 (S.D. Cal. 2005) (citation omitted).

40

Thus, even "warnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described." *Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.*, 2001 WL 300733, at *8 (S.D.N.Y. 2001).

Defendants' general statements that GWG's financial statements might not be entirely reliable (*see* Evans Br. at pp. 19–20 of 30) do not justify dismissal. *See Chen*, 2023 WL 7289750, at *8 ("Defendants cannot avoid that affirmative duty by warning that the information they were providing may be inaccurate."); *SEC v. Morgan Keegan & Co.*, 678 F.3d 1233, 1253 (11th Cir. 2012) (reversing dismissal and holding general cautionary language insufficient to render misrepresentations immaterial as a matter of law). The cautionary statements that Defendants identify were neither "precise" nor "meaningful" such that their misleading statements posed no practical risk of deceiving reasonable investors. For instance, a warning that valuations of life insurance policies "may ultimately prove to be incorrect" (Ben Br. at p. 31 of 39) does not "relate directly to that by which plaintiffs claim to have been misled." *Kurtzman*, 2000 WL 34292632, at *25 (citation omitted); *see also, e.g.*, Evans Br. at p. 19 of 30 (arguing that the cover of the Prospectus states that L Bonds are considered speculative); *id.* at pp. 19–20 of 30 (relying on disclaimers focusing on GWG's limited operating history and the uncertainties of future performance); Ben Br. at pp. 31–32 of 39 (pointing out statements regarding the possibility of incorrect assumptions and projections about the life insurance portfolio). Nothing in these statements informed investors that the trusts acquiring assets were Ben subsidiaries, or that Ben had acted as an investor rather than as a lender and had acquired beneficial ownership of unsecured alternative assets that were declining in value. ¶¶ 68–69.

Evans and the Ben Defendants quote certain statements in the Offering Materials to contend that they "disclosed risks associated with the various misrepresentations and omissions" including that financial information may not be reliable due to "GWG's internal controls, limited

41

operating history, and limited resources[.]" Ben Br. at pp. 32–33 of 39; Evans Br. at pp. 19–20 of 30. Reading these excerpts in context, however, makes clear that GWG never informed investors (a) that Ben's business was not based on lending or providing services to unaffiliated trust borrowers as the Registration Statement described, or (b) that Ben did not actually receive revenue from interest income and trust administration fees, as represented. *Kurtzman*, 2000 WL 34292632, at *38 (cautionary statements must be assessed in the context of available information to determine whether they rendered alleged misstatements immaterial as a matter of law).[28]

**Loss of fundraising ability.** The Ben Defendants argue that GWG warned investors of the risk that GWG might lose its fundraising ability. Ben Br. at pp. 31–32 of 39. But this risk disclosure stands apart from GWG's specific misrepresentations and omissions regarding Ben's historical financial performance, assets, goodwill, and related-party transactions. *See In re TETRA Techs., Inc. Sec. Litig.*, 2009 WL 6325540, at *24 n.14 (S.D. Tex. July 9, 2009), *order clarified*, 2009 WL 6326865 (S.D. Tex. Aug. 10, 2009) ("[T]he language cautions against uncertainties in reserve estimates, but does not warn against the behavior alleged by Plaintiffs"); *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.,* 875 F. Supp. 2d 359, 365 (S.D.N.Y. 2012) (finding cautionary language insufficient where it did not "speak[] to the substantive information that plaintiff alleges the defendants misrepresented."). As discussed above, GWG was unable to successfully resume its L Bond offering after GWG admitted in November 2021 that its previously filed financial statements were unreliable and that the SEC was investigating GWG's valuation of Ben's goodwill, Ben's accounting treatment of the borrower trusts, and related-party transactions, among other matters. ¶ 128. None of this was

---

[28] The Ben Defendants' argument further errs by relying on certain statements of historical fact—*e.g.*, that Ben began reorientating towards alternative assets between 2017 and 2019. *See* Ben Br. at p. 32 of 39. These statements are themselves misleading because they falsely represented that Ben had successfully implemented a business model based on making secured loans to unaffiliated entities.

disclosed in the Offering.  *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 304, 315 (S.D.N.Y. 2013) ("Vague disclosures of general risks will not protect defendants . . . .").

**Ben's business model.**  The Ben Defendants and Evans assert that certain statements— Ben "operates primarily through its subsidiaries" and had limited operating history; GWG was reorienting towards "an expansive and diverse exposure to alternative assets"—adequately disclosed the risks associated with Ben's business model.  Ben Br. at p. 32 of 39; Evans Br. at pp. 10, 20 of 30.  But none of the statements suggested that because Ben had closed only one major transaction, Ben was effectively acting as an investor in the alternative assets rather than a lender, or that Ben's primary sources of revenue were not interest income or trust administration fees. ¶¶ 68–70.  In fact, the rest of the cited paragraph states that the subsidiaries are the ones through which Ben supposedly "offers loans and liquidity products," "services for fund and trust administration," and "insurance services" to third parties.  GWG Holdings, Inc., Prospectus at p. 2 (Form 424B1) (June 5, 2020).  Nothing in Registration Statement suggested that Ben's borrowers were its own subsidiaries.  *See In re Regeneron Pharms., Inc. Sec. Litig.*, 2005 WL 225288, at *18 (S.D.N.Y. Feb. 1, 2005) ("A warning that fails to disclose specific known facts is insufficiently precise and will not insulate Defendants' statements") (citation omitted).

Similarly, the fact that GWG's 2019 10-K said that Ben "plans" to provide "mid-to-high net worth individuals with trust services and related liquidity products" (Ben Br. at p. 22 of 39) is irrelevant when, contrary to the accompanying disclosure that Ben had already begun implementing its business plan (¶ 67), it had not actually implemented the represented business model and could not feasibly do so.  *See In re IPO Sec. Litig.*, 358 F. Supp. 2d 189, 212 (S.D.N.Y. 2004) (finding the existence of some cautionary statements about problems with email system insufficient where they did not cover the "specific omissions" underlying the plaintiffs' claims).

**Accounting statements and goodwill valuation.**  Seeking to avoid responsibility for false

43

and misleading statements about Ben's financial performance and goodwill, the Ben Defendants and Evans further claim that the Registration Statement informed investors that they should not assume GWG's financial results were free from errors derived from accounting judgment or from the integration of Ben with GWG.  Evans Br. at pp. 19–20 of 30; Ben Br. at p. 33 of 39 (citing Whitley Penn certification).  But, "[w]hen cautionary language is glossed over as a future risk rather than the certain dangers that had already begun to materialize then the warnings are no longer meaningful."  *In re Cobalt Int'l Energy*, 2016 WL 215476, at *6 (citing *Marcus v. J.C. Penney Co., Inc.*, 2015 WL 5766870, at *3 (E.D. Tex. Sept. 29, 2015)).

GWG's cautionary language that Ben's financial statements might contain errors omitted the fact that the "loans" Ben was making to its own subsidiaries were really intra-company transfers, that Ben had no income at the time from interest or trust administration, or that accounting for these facts would drive up GWG's net losses by tens of millions of dollars. ¶¶ 77–85.  Nor do GWG's references to the possibility of an interim impairment test, or that a goodwill impairment test "requires us to make judgments and assumptions," insulate these Defendants for failing to disclose that the valuation of Ben securities supposedly justifying Ben's goodwill valuation was not supported by any reliable arm's length transaction.  ¶¶ 86–93.  *See Credit Suisse First Boston Corp.*, 2001 WL 300733, at *8.

**Internal controls.**  Evans also highlights GWG's statement "that the financial information presented in GWG's 2019 10-K *may* not be entirely reliable because of GWG's internal controls, limited operating history, and limited resources."  Evans Br. at p. 19 of 30 (italics added).  Again, however, the "bespeaks caution doctrine only applies to forward-looking statements" and not to "historical financial results."  *Chen*, 2023 WL 7289750, at *8.  Therefore, a warning that a company's historical financial statements might not be accurate does not shield a defendant from claims of inaccuracies in those very statements.  *Id.*  Regardless, the

44

Registration Statement elsewhere represented that GWG *did* maintain effective controls, a statement the Restatement retracted, and which contrasts with the cautionary language Evans cites.  ¶¶ 96–97, 99.  Prioritizing an equivocal warning over their definitive statement would be particularly unrealistic when, as discussed, Defendants had reason to believe GWG's internal controls were not effective.  *See In re MF Glob. Holdings*, 982 F. Supp. 2d at 315.

**Related-party transactions.**  Even though the Registration Statement said HCLP is "not considered a related party of" GWG or Ben (¶ 105), the Ben Defendants insist that GWG sufficiently disclosed Ben's $49.8 million loan payment to HCLP because the Registration Statement advised that senior lenders were "directly or indirectly associated" with one of Ben's founders.  Ben Br. at p. 34 of 39.  Yet, this vague statement corrected neither the inaccurate description of HCLP as an *un*related party nor the omission of the fact that Ben's payments to HCLP were related-party transactions.  The statement provides no helpful information about Ben's relationship to, or transactions with, HCLP.  Defendants do not dispute that it would have been material to investors to know their money would be applied for Heppner's personal benefit.

**E.    A Negative Causation Defense Does Not Justify Dismissal on the Pleadings.**

The Ben Defendants also ask the Court to accept, without an evidentiary record, that the L Bondholders' losses have nothing to do with the misrepresented facts.  Yet these attempts to litigate the causal chain on the pleadings conflict with settled law recognizing this defense as fact-dependent.  Under the Securities Act, Plaintiffs "do not bear the burden of proving causation," as instead "any decline in value is presumed to be caused by the misrepresentation." *In re Kosmos Energy*, 955 F. Supp. 2d at 664 (citing *Kapps*, 379 F.3d at 210).  Hence, Section 11 "does not require a showing of individualized loss causation, because injury and loss are presumed." *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 785 (3d Cir. 2009); *see Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 234 (5th Cir. 2009); *see also In re Cobalt*

*Int'l Energy*, 2016 WL 215476, at *3; *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989) ("The buyer need not show any causal connection between the misrepresentation and his damage."). While Section 11 allows a defendant to raise a negative causation defense to potentially reduce some portion of the statutorily presumed damages, the evidentiary burden required to carry the defense is "heavy." *Nomura Holding Am.*, 873 F.3d at 153. A defendant must prove as to each decline that it was *wholly* caused by something other than the misrepresentations and omissions. *Id*. To overcome a negative defense, by contrast, Plaintiffs need only show that the "misrepresentation *touches* upon the reasons for an investment's decline in value." *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 861 (9th Cir. 2013) (emphasis modified) (quoting *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1422 (9th Cir. 1994), cited in *Alaska Elec. Pension Fund*, 572 F.3d at 230). Therefore, dismissal on a 12(b)(6) motion is inappropriate unless the face of the complaint makes clear that the investor's loss is wholly unrelated to the alleged misrepresentation or omission. *See, e.g.*, *In re Dynegy*, 339 F. Supp. 2d at 868 (plaintiff sold the securities at issue before the alleged misrepresentation became publicly known).

Defendants consequently would need to prove that GWG's insolvency resulted from wholly extraneous factors as opposed to facts misrepresented in or omitted from the Registration Statement. And causation and damages are fact questions reserved for the jury. *See Huddleston v. Herman & MacLean*, 640 F.2d 534, 553 (5th Cir. 1981) (under Section 11(e), "[t]he amount of damages is a jury issue"); *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000) ("Whether the plaintiff has proven causation is usually reserved for the trier of fact."); *In re WorldCom, Inc. Sec. Litig.*, 2005 WL 517331, at *3 (S.D.N.Y. Mar. 4, 2005).

Plaintiffs' allegations refute the Ben Defendants' claim that negative causation "is apparent on the face of [the] complaint." Ben Br. at p. 35 of 39 (citation omitted). In addition to removing millions of dollars in income from GWG's income statement and striking over $200

million in loan assets from GWG's balance sheet, the Restatement revealed that GWG's Registration Statement fundamentally mischaracterized Ben's business. ¶¶ 12, 60–85. Further, the Registration Statement's massively inflated goodwill valuations gave Ben the appearance of having already built a successful and growing business, conveying to investors that GWG's investment in Ben was valuable and the prospects for repayment of the L Bonds were materially greater than justified by the aspirational character of Ben's business. ¶¶ 86–93. The diversion of cash to Heppner's affiliates, concealed by the Registration Statement, also directly contributed to the investors' losses because this misuse of L Bond proceeds caused GWG to fall deeper into insolvency. ¶¶ 101–12. In sum, the facts that the Defendants deceptively presented and omitted directly contributed to the bondholders' losses. ¶¶ 149–60, 172–86. So if the jury finds materially misleading representations or omissions, the only reasonable causation finding will be that "it was the very facts about which the defendant[s] lied which caused [] injuries" to Plaintiffs. *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 547 (N.D. Cal. 2009) (citations omitted).

### F.    Ben and the Individual Defendants Are Controlling Persons.

Under Section 15 of the Securities Act, a person who controls any person liable under Section 11 "shall also be liable jointly and severally . . . ." 15 U.S.C. § 77o. Because determination of control person liability is "highly fact intensive," there is "a 'relaxed' and 'lenient' pleading standard for evaluating whether a plaintiff has sufficiently alleged a claim for control person liability." *In re Cobalt Int'l Energy*, 2016 WL 215476, at *11–12 (quoting *One Longhorn Land I, L.P. v. FF Arabian, LLC*, 2015 WL 7432360, at *2 (E.D. Tex. Nov. 23, 2015)). Control may "be established by 'business relationships, interlocking directors, family relations, or the power to influence and control the activities of another.'" *In re Cobalt Int'l Energy*, 2016 WL 215476, at *11 (quoting *In re Dynegy*, 339 F. Supp. 2d at 828). In addition, "a plaintiff may assert controlling person liability by alleging . . . power to control the controlled person or to influence

corporate policy, but . . . actual exercise of that control need not be alleged." *In re Enron*, 258 F. Supp. 2d at 642 (citation omitted); *see also One Longhorn Land I*, 2015 WL 7432360, at *3 ("plaintiff need only allege that [defendant] possessed the power to control the primary violator, not that control was exercised"); *In re Cobalt Int'l Energy*, 2016 WL 215476, at *11.

Applying this standard, given the primary violations established in the CCAC, Ben's appointment of GWG's entire board of directors makes Ben a controlling person subject to Section 15 liability. ¶¶ 53, 184. Defendants insist that "the Seller Trusts, not Ben or the Individual Defendants, controlled GWG." Ben Br. at p. 37 of 39. But, for one thing, Defendant Holland was the trust advisor to the Seller Trusts, rebutting any suggestion by Defendants that the Seller Trusts were unaffiliated with them. *See* GWG Holdings, Inc., Annual Report at p. 4 (Form 10-K) (Mar. 27, 2020); *see also* ¶ 49. Moreover, Plaintiffs allege, and the Offering Materials demonstrate, that Ben held the "power to designate GWG's Directors, and with it, the power to control GWG." ¶¶ 52–53, 184. For example, on the same day that the Seller Trusts became GWG's controlling stockholders, "11 individuals *designated by Beneficient* were appointed as directors of the Company[.]" GWG Holdings, Inc., Annual Report at p. 4 (Form 10-K) (Mar. 27, 2020) (italics added); *see* ¶ 53 (in addition to the eleven Ben board designees, "Heppner became the Chair of the Board, and Holland was appointed as CEO. Three additional Directors designated by Ben were appointed"). Ben separately qualifies as a control person of GWG because its directors were simultaneously serving on GWG's board. ¶¶ 26–30, 32–33 (seven of the eleven signatories of the Registration Statement are current or former Ben directors or officers). *See In re Cobalt Int'l Energy*, 2016 WL 215476, at *11 (finding control person liability against companies whose directors also served on controlled company's board).

Ben's control over many of the transactions relating to GWG's liability, its flawed financial reporting, and its repayment of HCLP debt independently make it a controlling person.

48

*See* Ben Br. at p. 36 of 39 (Ben conceding that control person liability may attach if it "had an ability to control the specific transaction or activity upon which the primary violation is based.") (citation omitted); *e.g.*, ¶ 15 ("The Registration Statement . . . failed to disclose that . . . *funds that Ben paid to its lender* w[ere] subsequently transferred to entities affiliated with Heppner") (italics added); ¶ 17 ("*Ben was responsible* for debt incurred to purchase a ranch owned by Heppner") (italics added); ¶ 9 ("GWG acknowledged its failure to properly account for certain trusts . . . *Ben had created* after entering the alternative asset business.") (italics added).

Individual Defendants also are liable under Section 15 because, as Plaintiffs allege (¶ 183), their role as GWG directors and officers gave them the "power to control the controlled person or to influence corporate policy" during the relevant time period. *In re Enron*, 258 F. Supp. 2d at 642. The CCAC alleges facts demonstrating the Individual Defendants' power to influence and control the activities of GWG, including its investments in and relations with Ben. *E.g.*, ¶ 3 ("Heppner and his associates acquired control of GWG"); ¶ 11 (noting "the use of L Bond proceeds that GWG invested in Ben to personally enrich Heppner"); ¶ 49 (Holland was the trust advisor of the Seller Trusts); ¶ 117 (former directors Stein and Glaser became aware that "*Brad's plan* was to also use future cash flows to pay related parties.") (italics added).[29]

---

[29] Defendants' control person cases support their control person liability here or are factually distinguishable. *See* Ben Br. at pp. 36–38 of 39; Evans Br. at pp. 16–18 of 30; Holland Br. at p. 35 of 37. In *Pilgrim's Pride*, the court found "controlling person liability under Section 15 . . . *properly* alleged" because "the Officer Defendants had the power and influence . . . to cause the Defendants to engage in the alleged violations of Section 11[.]" *In re Pilgrim's Pride Corp. Sec. Litig.*, 2010 WL 3257369, at *32–33 (E.D. Tex. Aug. 17, 2010) (italics added). In *Venator Materials* the court analyzed *Triche* and other Fifth Circuit decisions construing control person liability and found "no controlling decisions that establish precise pleading requirements for such a claim." 547 F. Supp. 3d at 654. The defendant in *Dartley* only "had the right to appoint one of eight directors" and "was *obligated* to vote for those particular directors specified in the voting agreement." *Dartley v. ErgoBilt Inc.*, 2001 WL 313964, at *1 (N.D. Tex. Mar. 29, 2001) (italics added). In *Kosmos*, only four employees of the alleged controlling persons were appointed to the company's board, which contrasts with the situation here: GWG's entire board of directors was designated by Ben, and of those eleven directors, six were simultaneously serving as directors of

49

Thus, Lead Plaintiffs sufficiently allege control person liability on the part of Ben and the Individual Defendants.

### G.    Plaintiffs Should Be Permitted to Replead Their Section 12(a)(2) Claims and Amend as to Any Claim the Court Finds Defective.

Lead Plaintiffs respectfully seek leave to amend their Section 12(a)(2) claims to allege that certain of the Individual Defendants "passed title to Plaintiffs or solicited their purchases through direct communications." *Venator Materials*, 547 F. Supp. 3d at 669–70 (granting leave to replead Section 12(a)(2) claims). Plaintiffs further request leave to amend to reflect the results of their continuing investigation as to any claim the Court finds insufficiently pleaded. *See Lone Star Ladies*, 238 F.3d at 367–68.

## V.    CONCLUSION

For all the foregoing reasons, Lead Plaintiffs respectfully request that the Court deny the motions to dismiss, other than dismissing without prejudice the claims under Section 12(a)(2).

Dated: February 20, 2024                     Respectfully submitted,


                                             /s/ *Daniel C. Girard*
                                             Daniel C. Girard (admitted *pro hac vice*)
                                             Jordan Elias (admitted *pro hac vice*)
                                             Adam E. Polk (admitted *pro hac vice*)
                                             Sean Greene (admitted *pro hac vice*)
                                             **GIRARD SHARP LLP**

---

Ben, including GWG's chairman of the board, who was Ben's founder. ¶¶ 26–30, 33, 53. Further, Plaintiffs allege these interlocking directors were "involved in [GWG's] operations (day-to-day or long-term), decisionmaking, or planning." *In re Kosmos Energy*, 955 F. Supp. 2d at 675–76. Likewise, the alleged control person in *Zishka* designated only three directors to the company's board. *Zishka v. Am. Pad & Paper Co.*, 2001 WL 1748741, at *1 (N.D. Tex. Sept. 28, 2001), *amended on reconsideration*, 2001 WL 1645500 (N.D. Tex. Dec. 20, 2001), *and aff'd*, 72 F. App'x 130 (5th Cir. 2003). And in *Franklin*, the plaintiffs "fail[ed] to allege any specific misstatement or omission or untrue statement appearing in the financial statements for the relevant time frame[,]" so there was no primary violation under Section 11. 782 F. Supp. 2d at 412, 414–17.

601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
dgirard@girardsharp.com
jelias@girardsharp.com
apolk@girardsharp.com
sgreene@girardsharp.com

Paul D. Malmfeldt (admitted *pro hac vice*)
**MALMFELDT LAW GROUP P.C.**
120 N. LaSalle Street, Suite 2000
Chicago, IL 60602
Tel: (312) 606-8625
pdm@malmfeldt.com

Warren T. Burns (TXBN 24053119)
Spencer Cox (TXBN 24097540)
**BURNS CHAREST LLP**
900 Jackson Street, Suite 500
Dallas, TX 75202
Tel: (469) 904-4550

*Attorneys for Lead Plaintiffs Thomas Horton and Frank Moore*

51

## CERTIFICATE OF SERVICE

This is to certify that on February 20, 2024, I filed the foregoing Opposition on the

Court's CM/ECF electronic filing system, and that by virtue of this filing, all attorneys of record

will be served electronically with true and correct copies of the filing.


/s/ Daniel C. Girard
Daniel C. Girard

52