# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE GWG HOLDINGS, INC. SECURITIES LITIGATION** | § § § § § § § § § § § § | **Civil Action No. 3:22-cv-00410-B** |
| _____ | | **CLASS ACTION** |
| **This Document Relates To: All Actions** | | |

## APPENDIX TO LEAD PLAINTIFFS' CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS

| Document | Page |
|---|---|
| GWG Holdings, Inc., Amendment No. 6 to Registration Statement (Form S-1/A) (Jan. 7, 2015) | **App. 0002** |
| GWG Holdings, Inc., Post-Effective Amendment No. 5 to Registration Statement (Form POS AM) (Apr. 8, 2016) | **App. 0144** |
| GWG Holdings, Inc., Amendment No. 2 to Registration Statement (Form S-1/A) (Nov. 28, 2017) | **App. 0301** |
| GWG Holdings, Inc., Annual Report (Form 10-K) (Mar. 27, 2020) | **App. 0506** |
| GWG Holdings, Inc., Annual Report, Ex. 99.4 (Form 10-K) (Mar. 27, 2020) | **App. 0672** |
| GWG Holdings, Inc., Registration Statement (Form S-1) (Mar. 30, 2020) | **App. 0755** |
| GWG Holdings, Inc., Amendment No. 1 to Registration Statement (Form S-1/A) (May 15, 2020) | **App. 0844** |
| GWG Holdings, Inc., Quarterly Report (Form 10-Q) (May 15, 2020) | **App. 0927** |
| GWG Holdings, Inc., Notice of Effectiveness (June 3, 2020) | **App. 1004** |
| GWG Holdings, Inc., Prospectus (Form 424B1) (June 5, 2020) | **App. 1005** |
| GWG Holdings, Inc., Current Report (Form 8-K) (Aug. 3, 2021) | **App. 1074** |
| GWG Holdings, Inc., Annual Report (Form 10-K) (Nov. 5, 2021) | **App. 1079** |
| *Paul Capital Advisors, L.L.C. v. Holland*, No. 2022-0167-SG (Del. Ch. May 13, 2022), Verified Second Amended Complaint | **App. 1397** |
| GWG Holdings, Inc., Amendment to Current Report (Form 8-K/A) (Nov. 14, 2022) | **App. 1523** |
| *Paul Capital Advisors, L.L.C. v. Holland*, No. 2022-0167-SG (Del. Ch. Aug. 29, 2023), Order Granting in Part and Denying in Part Defendants' Motions to Dismiss | **App. 1527** |

1

| Effective Date Good Faith Valuation of Trust Assets, *In re GWG Holdings, Inc.*, No. 22-90032 (MI) (Bankr. S.D. Tex.), *available at* https://gwgholdingstrust.com/asset-values/. | **App. 1542** |
| --- | --- |

Dated: February 20, 2024

Respectfully submitted,

/s/ *Daniel C. Girard*
Daniel C. Girard (admitted *pro hac vice*)
Jordan Elias (admitted *pro hac vice*)
Adam E. Polk (admitted *pro hac vice*)
Sean Greene (admitted *pro hac vice*)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
dgirard@girardsharp.com
jelias@girardsharp.com
apolk@girardsharp.com
sgreene@girardsharp.com

Paul D. Malmfeldt (admitted *pro hac vice*)
**MALMFELDT LAW GROUP P.C.**
120 N. LaSalle Street, Suite 2000
Chicago, IL 60602
Tel: (312) 606-8625
pdm@malmfeldt.com

Warren T. Burns (TXBN 24053119)
Spencer Cox (TXBN 24097540)
**BURNS CHAREST LLP**
900 Jackson Street, Suite 500
Dallas, TX 75202
Tel: (469) 904-4550

*Attorneys for Lead Plaintiffs Thomas Horton and Frank Moore*

2

## CERTIFICATE OF SERVICE

This is to certify that on February 20, 2024, I filed the foregoing document on the Court's

CM/ECF electronic filing system, and that by virtue of this filing, all attorneys of record will be

served electronically with true and correct copies of this filing.


*/s/ Daniel C. Girard*
Daniel C. Girard

# APPENDIX

S-1/A 1 d31958.htm S-1/A

Table of Contents

**As filed with the Securities and Exchange Commission on January 7, 2015**

Registration Nos. 333-197227 and
333-197227-01

# SECURITIES AND EXCHANGE COMMISSION

**WASHINGTON, D.C. 20549**

**AMENDMENT NO. 6 TO**

# FORM S-1

**REGISTRATION STATEMENT**
*Under the Securities Act of 1933*

# GWG HOLDINGS, INC.
# GWG LIFE, LLC

(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware**<br>**Delaware** | **26-2222607**<br>**20-4356955** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

220 South Sixth Street, Suite 1200
Minneapolis, Minnesota 55402
Tel: (612) 746-1944
Fax: (612) 746-0445

(Address, including zip code, and telephone number, including area code, of Registrant's principal executive offices)

| | |
|---|---|
| **Jon R. Sabes**<br>**Chief Executive Officer**<br>**220 South Sixth Street, Suite 1200**<br>**Minneapolis, Minnesota 55402**<br>**Tel: (612) 746-1944**<br>**(Name, address, including zip code, and telephone number, including area code, of agent for service)** | *Copies to*:<br>**Paul D. Chestovich, Esq.**<br>**Maslon Edelman Borman & Brand, LLP**<br>**3300 Wells Fargo Center**<br>**90 South Seventh Street**<br>**Minneapolis, Minnesota 55402**<br>**Tel: (612) 672-8200** |

Approximate date of commencement of proposed sale to the public: from time to time after the effective date of this registration statement.

If the only securities being registered on this Form are being offered pursuant to dividend or interest reinvestment plans, please check the following box. ☐

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, other than securities offered only in connection with dividend or interest reinvestment plans, check the following box. ☒

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐    Accelerated filer ☐    Non-accelerated filer ☐    Smaller reporting company ☒

App. 0002

**CALCULATION OF REGISTRATION FEE**

| Title of Each Class of Securities to Be Registered | Amount to be Registered | Proposed Maximum Offering Price Per Unit | Proposed Maximum Aggregate Offering Price | Amount of Registration Fee[2] |
|---|---|---|---|---|
| L Bonds | $1,000,000,000 | (1) | $1,000,000,000 | $128,800.00 |

(1)   The L Bonds will be issued in minimum denominations of $25,000 and in $1,000 increments in excess of such minimum amount.

(2)   Previously paid.

The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the registration statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.

Table of Contents

The information in this prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any state where the offer or sale is not permitted

**Subject to Completion, dated January 7, 2015**

# GWG HOLDINGS, INC.



### $1,000,000,000 of L Bonds

GWG Holdings, Inc., through its subsidiaries, invests in life insurance assets in the secondary marketplace. Our objective is to earn returns from our investments in life insurance assets that are greater than the costs necessary to purchase, finance and service those policies to their maturity.

We are offering up to $1,000,000,000 in L Bonds (the "L Bonds") in this offering. This is a continuous offering and there is no minimum amount of L Bonds that must be sold before we can use any of the proceeds. The proceeds from the sale of the L Bonds will be paid directly to us following each sale and will not be placed in an escrow account. We will use the net proceeds from the offering of the L Bonds primarily to purchase and finance additional life insurance assets, and to service and retire other outstanding debt obligations. The minimum investment in L Bonds is $25,000. Investments in excess of such minimum amount may be made in $1,000 increments. The L Bonds will be sold with varying maturity terms, interest rates and frequency of interest payments, all as set forth in this prospectus and in supplements we publish from time to time. Depending on our capital needs and the amount of your investment, L Bonds with certain terms may not always be available. Although we will periodically establish and change interest rates on unsold L Bonds offered pursuant to this prospectus, once an L Bond is sold, its interest rate will not change during its term (subject, however, to the extension and renewal provisions contained in such L Bond). Upon maturity, subject to the terms and conditions described in this prospectus, the L Bonds will be automatically renewed for the same term at the interest rate we are offering at that time to other investors with similar aggregate L Bond portfolios for L Bonds of the same maturity, unless redeemed upon maturity at our or your election.

The L Bonds are secured by the assets of GWG Holdings, Inc. and a pledge of all of the common stock by our largest stockholders. Importantly, GWG Holdings' most significant assets are cash and its investment in subsidiaries. Obligations under the L Bonds will be guaranteed by our subsidiary GWG Life, LLC, which guarantee will involve the grant of a security interest in all of the assets of such subsidiary. The majority of our life insurance assets are held in our subsidiary GWG DLP Funding II, LLC, which is a direct subsidiary of GWG Life. The life insurance assets held by GWG DLP Funding II will not be collateral for obligations under the L Bonds although the guarantee and collateral provided by GWG Life will include its ownership interest in GWG DLP Funding II. These facts present the risk to investors that the collateral security we and our subsidiary have granted for our obligations under the L Bonds may be insufficient to repay the L Bonds upon an event of default. The security offered for the L Bonds will provide rights as to collateral that are pari passu with the holders of other secured debt previously issued by GWG Life and GWG Holdings. This generally means that claims for payment and entitlement to security among the holders of L Bonds and such other secured debt previously issued by GWG Life and GWG Holdings will be treated equally and without preference.

We may call and redeem the entire outstanding principal and accrued but unpaid interest of any or all of the L Bonds at any time without penalty or premium. L Bond holders will have no right to put (that is, require us to redeem) any L Bond prior to the due date unless in the case of death, bankruptcy or total disability. In

the event we agree to redeem an L Bond upon the request of an L Bond holder — other than after death, bankruptcy or total disability of such holder — we will impose a redemption fee of 6% against the outstanding principal balance of the redeemed L Bond. This redemption fee will be subtracted from the amount paid.

We do not intend to list our L Bonds on any securities exchange during the offering period, and we do not expect a secondary market in the L Bonds to develop. As a result, you should not expect to be able to resell your L Bonds regardless of how we perform. Accordingly, an investment in our L Bonds is not suitable for investors that require liquidity in advance of their L Bond's maturity date.

We maintain a senior borrowing arrangement that subordinates the right to payment on, and shared collateral securing, the L Bonds to our senior secured lender. From time to time we may add or replace senior lenders and the particular arrangements under which we borrow from them. In addition, these borrowing arrangements with senior lenders restrict, and are expected to continue to restrict, our cash flows and, subject to certain exceptions, distributions from our operating subsidiaries. These provisions will restrict cash flows available for payment of principal and interest on the L Bonds.

We are an "emerging growth company" under applicable law and are subject to reduced public company reporting requirements. Please read the disclosures on page 8 of this prospectus for more information. Investing in our L Bonds may be considered speculative and involves a high degree of risk, including the risk of losing your entire investment. See "Risk Factors" beginning on page 19 to read about the risks you should consider before buying our L Bonds. You should carefully consider the risk factors set forth in this prospectus. The L Bonds are only suitable for persons with substantial financial resources and with no need for liquidity in this investment.

Please read this prospectus before investing and keep it for future reference. We file annual, quarterly and current reports with the SEC. This information will be available free of charge by contacting us at 220 South Sixth Street, Suite 1200, Minneapolis, Minnesota 55402 or by phone at (612) 746-1944 or on our website at www.gwglife.com. The SEC also maintains a website at www.sec.gov that contains such information.

**Neither the SEC nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

**The date of this prospectus is                    , 2015**

---

Table of Contents

The L Bonds will be offered and sold on a best-efforts basis by Emerson Equity LLC, a registered broker-dealer and member of the Financial Industry Regulatory Authority ("FINRA"). Emerson Equity will be our placement agent for the L Bonds in this offering for purposes of the Securities Act of 1933. Emerson Equity may retain other dealers to act as an agent on its behalf in the course of offering and selling L Bonds in this offering. We will pay Emerson Equity a selling commission ranging from 0.75% to 6.00% of the principal amount of L Bonds sold, depending on the L Bonds' maturity date. We will also pay Emerson Equity additional compensation consisting of a dealer-manager fee, a wholesaling fee (payable only to wholesaling dealers), and an accountable expense allowance. Emerson Equity will share its commissions and accountable expense allowance with other dealers who may participate in the offering. We have also agreed to reimburse Emerson Equity for certain pre-offering expenses that we anticipate will aggregate to no more than $30,000. The total amount of the selling commissions and additional compensation (including reimbursements, non-transaction-based and non-cash selling compensation) paid to Emerson Equity and any other FINRA member in the course of offering and selling L Bonds will not exceed 8.00% of the aggregate L Bonds. See "Plan of Distribution" and "Use of Proceeds" for further information.

| | Price to Investor | Aggregate Commissions, Fees, and Expense Allowances (1) (2) | Net Proceeds to Company |
|---|---|---|---|
| **Minimum Investment** | $      25,000 | $       1,812 | $       23,188(3) |
| **Offering** | $1,000,000,000 | $80,000,000 | $920,000,000(4) |

---

(1)  Assumes an average sales commission of 5.00%, average dealer-manager fee of 0.50%, average wholesaling fees of 1.30%, and average accountable expense allowance of 1.20%. As explained above, actual commissions will vary based on the term of the L Bonds sold. Nevertheless, the total amount of selling commissions and additional compensation (consisting of dealer-manager fees, wholesaling fees and accountable expense allowance, together with non-transaction-based and non-cash selling compensation, if any) paid to the placement agent will not exceed 8.00% of the aggregate gross offering proceeds we receive from the sale of the L Bonds sold. Accordingly, and assuming our sale of all $1,000,000,000 in principal amount of bonds offered hereby, the maximum amount of selling commissions we can pay is 6.00% of the gross offering proceeds we receive from the sale of the L Bonds (or $60,000,000), the maximum dealer-manager fee we can pay is 0.50% of the gross offering proceeds we receive from the sale of the L Bonds (or $5,000,000), and the maximum amount of aggregated accountable expenses, wholesaling fees, non-transaction-based and non-cash selling compensation we can pay will not exceed 2.50% of the aggregate gross offering proceeds we receive from the sale of the L Bonds. If all L Bonds sold have seven-year maturities resulting in sales commissions of 6.00%, then the maximum amounts of aggregate accountable expenses, wholesaling fees, non-transaction-based and non-cash selling compensation will not exceed 1.5%.

(2)  Emerson Equity has agreed to offer the L Bonds on a "best efforts" basis.

(3)  Net Proceeds to Company based on the Minimum Investment are calculated after deducting (i) selling commissions and (ii) additional compensation (consisting of a dealer-manager fee, wholesaling fee, an accountable expense allowance and non-transaction-based and non-cash selling compensation). We expect that our own offering expenses, consisting of legal, accounting, printing, mailing, registration, qualification and associated securities offering filing costs and expenses, will through the course of the offering aggregate to approximately $1,500,500, but for purposes of illustrating the Net Proceeds to Company based on the Minimum Investment, those offering expenses of $1,500,500 are not reflected.

(4)  Net Proceeds to Company based on the offering of $1,000,000,000 in principal amount of L Bonds are calculated as described in fn. 3 above, but also after deducting our own expected offering expenses of $1,500,500.

We will issue the L Bonds in book-entry form, certificated form, or in the form of a global certificate deposited with a depositary. Depending on the manner in which you purchase L Bonds, you may not receive a physical certificate representing your L Bonds. In all cases, however, we will deliver written confirmation to purchasers of L Bonds. Bank of Utah will act as trustee for the L Bonds.

The initial interest rates for the L Bonds based on the applicable maturity thereof is set forth in the table below.

| Maturity Term | Interest Rate (%) |
| --- | --- |
| 6 months | 4.25 |
| 1 year | 5.00 |
| 2 years | 6.50 |
| 3 years | 7.50 |
| 5 years | 8.50 |
| 7 years | 9.00 |

We may change the interest rates applicable to unsold L Bonds from time to time during this offering, in which case the applicable interest rates will be set forth in an interest rate supplement to this prospectus. Once an L Bond is sold, the interest rate will not change during its term (subject, however, to the extension and renewal provisions contained in such L Bond).

Table of Contents

## TABLE OF CONTENTS

| | Page |
| --- | --- |
| INDUSTRY AND MARKET DATA | 2 |
| HOW TO PURCHASE L BONDS | 2 |
| PROSPECTUS SUMMARY | 4 |
| RISK RELATING TO FORWARD-LOOKING STATEMENTS | 18 |
| RISK FACTORS | 19 |
| USE OF PROCEEDS | 35 |
| CAPITALIZATION | 37 |
| SELECTED FINANCIAL INFORMATION | 38 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATION | 39 |
| BUSINESS | 55 |
| MANAGEMENT AND DIRECTORS | 79 |
| EXECUTIVE COMPENSATION AND RELATED-PARTY TRANSACTION DISCLOSURES | 85 |
| DIRECTOR COMPENSATION | 89 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 90 |
| DESCRIPTION OF THE L BONDS | 92 |
| PLAN OF DISTRIBUTION | 109 |
| MATERIAL FEDERAL INCOME TAX CONSIDERATIONS | 113 |
| STATE, LOCAL AND FOREIGN TAXES | 118 |
| ERISA CONSIDERATIONS | 118 |
| LEGAL MATTERS | 120 |
| EXPERTS | 120 |
| WHERE YOU CAN FIND MORE INFORMATION | 120 |
| FINANCIAL STATEMENTS | F-1 |



GWG Holdings, Inc.
220 South Sixth Street, Suite 1200
Minneapolis, MN 55402

Tel: (612) 746-0444
Fax: (612) 746-0445

**Table of Contents**

## ABOUT THIS PROSPECTUS

We have prepared this prospectus as part of a registration statement that we filed with the SEC for our continuous offering of L Bonds. Periodically, as we make material investments or have other material developments, we will provide a prospectus supplement that may add to, update or change information contained in this prospectus. We will endeavor to avoid interruptions in the continuous offering of our L Bonds. Nonetheless, our continuous offering may be suspended while the SEC or FINRA reviews certain amendments to our registration statement, until ultimately declared effective by the SEC.

Any statement that we make in this prospectus will be modified or superseded by any inconsistent statement made by us in a subsequent prospectus supplement. The registration statement we filed with the SEC includes exhibits that provide more detailed descriptions of the matters discussed in this prospectus. You should read this prospectus, the related exhibits filed with the SEC, and any prospectus supplement, together with additional information described below under "Where You Can Find More Information." In this prospectus, we use the term "day" to refer to a calendar day, and we use the term "business day" to refer to any day other than Saturday, Sunday, a legal holiday or a day on which banks in New York City are authorized or required to close.

You should rely only on the information contained in this prospectus. Neither we nor the dealer-manager have authorized any other person to provide you with any information different from that contained in this prospectus or information furnished by us upon request as described herein. The information contained in this prospectus is complete and accurate only as of the date of this prospectus, regardless of the time of delivery of this prospectus or sale of our L Bonds. This prospectus contains summaries of certain other documents, which summaries contain all material terms of the relevant documents and are believed to be accurate, but reference is hereby made to the full text of the actual documents for complete information concerning the rights and obligations of the parties thereto. Such information necessarily incorporates significant assumptions, as well as factual matters. All documents relating to this offering and related documents and agreements, if readily available to us, will be made available to a prospective investor or its representatives upon request. During the course of this offering and prior to sale, each prospective L Bond holder is invited to ask questions of and obtain additional information from us concerning the terms and conditions of this offering, our company, the L Bonds and any other relevant matters, including but not limited to additional information necessary or desirable to verify the accuracy of the information set forth in this prospectus. We will provide the information to the extent it possesses such information or can obtain it without unreasonable effort or expense. If there is a material change in the affairs of our company, we will supplement this prospectus or amend the registration statement of which this prospectus is a part.

No information contained herein, nor in any prior, contemporaneous or subsequent communication should be construed by a prospective investor as legal or tax advice. Each prospective investor should consult its, his or her own legal, tax and financial advisors to ascertain the merits and risks of the transactions described herein prior to purchasing the L Bonds. This written communication is not intended to be written advice as defined in Circular 230 published by the U.S. Treasury Department.

The L Bonds will be issued under an indenture, as amended or supplemented from time to time (referred to herein collectively as the "indenture"). This prospectus is qualified in its entirety by the terms of that indenture filed with SEC as an exhibit to the registration statement of which this prospectus is a part. All material terms of the indenture are summarized in this prospectus. You may obtain a copy of the indenture upon written request to us or online at www.sec.gov.

The indenture trustee did not participate in the preparation of this prospectus and makes no representations concerning the L Bonds, the collateral, or any other matter stated in this prospectus. The indenture trustee has no duty or obligation to pay the L Bonds from their funds, assets or capital or to make inquiry regarding, or investigate the use of, amounts disbursed from any account.

1

**Table of Contents**

## INDUSTRY AND MARKET DATA

The industry and market data used throughout this prospectus have been obtained from our own research, surveys or studies conducted by third parties and industry or general publications. Industry publications and surveys generally state that they have obtained information from sources believed to be reliable, but do not guarantee the accuracy and completeness of such information. We believe that each of these studies and publications is reliable.

## HOW TO PURCHASE L BONDS

If, after carefully reading this entire prospectus, obtaining any other information requested and available, and being fully satisfied with the results of pre-investment due-diligence activities, you would like to purchase L Bonds, you will have two different ways in which to consummate a purchase: (1) DTC settlement, and (2) direct settlement with the Company.

1. *Depositary Trust Company Settlement (DTC settlement)*. If your broker-dealer is a participant in the DTC system and makes DTC settlement available to you, then you can place an order for the purchase of L Bonds through your broker-dealer. A broker-dealer using this service will have an account with DTC in which your funds will be placed to facilitate the monthly closing cycle. Orders will be executed by your broker-dealer electronically and you must coordinate with your broker-dealer's registered representative to pay the full purchase price for the L Bonds by the final settlement date. Orders may be placed at any time, and the final settlement date will be the date on which your subscription agreement is accepted. You will be credited with ownership of an L Bond on the first business day

App. 0006

following the month in which the subscription is made. However, interest will begin to accrue from the final settlement date. Your purchase price for L Bonds purchased in this way will not be held in escrow.

2. *Direct Settlement with the Company*. If you wish to purchase L Bonds through direct settlement with the Company, then you must complete, execute and return the Subscription Agreement to us together with a certified check or personal check payable to the order of "GWG Holdings, Inc.—Subscription Account" (or wire sent to the Subscription Account) equal to the principal amount of L Bonds you wish to purchase. If you are working with a broker-dealer, your subscription materials and the certified check or personal check should be delivered to your broker-dealer, who will deliver it to us at the following address:

**GWG Holdings, Inc.**
**220 South Sixth Street, Suite 1200**
**Minneapolis, MN 55402**

**Wire Instructions**
GWG Holdings, Inc. — Subscription Account
Account: 500023916
Routing: 091310521
Bank Name: Bell State Bank & Trust

Your purchase is subject to our acceptance. All information provided is confidential and will be disclosed only to our officers, affiliates, managing broker-dealer, legal counsel and, if required, to governmental authorities and self-regulatory organizations or as otherwise required by law. For your purchase to be effective as of the first business day of a calendar month, your completed and executed Subscription Agreement, together with your related funds, must be received by the final settlement date (i.e., the last business day of the prior calendar month).

Upon our receipt of the signed Subscription Agreement and acceptance of your purchase, we will notify you of such acceptance. We may, in our sole discretion, accept or reject any purchase, in whole or in part. In the event we do not accept your purchase of L Bonds for any reason, we will promptly return your payment. We may terminate or suspend this offering at any time, for any reason or no reason, in our sole discretion. You may obtain a copy of the Subscription Agreement from our website at <u>www.gwglife.com</u>, your broker-dealer (if you are working with one), or from us by contacting us at 1-877-494-2388.

2

---

Table of Contents

## COVERED SECURITY

Our L Bonds are a "covered security." The term "covered security" applies to securities exempt from state registration pursuant to Section 18 of the Securities Act of 1933. Generally, securities listed on national exchanges are the most common type of covered security exempt from state registration. A non-traded security also can be a covered security if it has a seniority greater than or equal to other securities from the same issuer that are listed on a national exchange. Our L Bonds are a covered security because they will be senior to our common stock, which is listed on The Nasdaq Capital Market.

**Although the status of our L Bonds as a "covered security" will facilitate their purchase and sale to a broader range of investors than would otherwise be available to us, and although the offer and sale of a "covered security" generally involves fewer issuance costs to the issuer of such securities, our L Bonds are not a suitable purchase for all investors. Investors are urged to read carefully the risk factors relating to our business and our Company contained in the Risk Factors section of this prospectus beginning on page 19. In addition, investors should understand that because our L Bonds are a "covered security" exempt from state securities regulations, neither our Company, the L Bonds, or any other aspects of this offering have been the subject of any merit-based review by state securities regulators.**

3

---

Table of Contents

## PROSPECTUS SUMMARY

*This summary highlights some of the information in this prospectus. It is not complete and may not contain all of the information that you may want to consider. To understand this offering fully, you should carefully read the entire prospectus, including the section entitled "Risk Factors," before making a decision to invest in our L Bonds. Unless otherwise noted or unless the context otherwise requires, the terms "we," "us," "our," the "Company" and "GWG" refers to GWG Holdings, Inc. together with its wholly owned subsidiaries. In instances where we refer emphatically to "GWG Holdings" or "GWG Holdings, Inc.," or where we refer to a specific subsidiary of ours by name, we are referring only to that specific legal entity.*

### Our Company

We provide financial services to consumers in the emerging secondary market for life insurance settlements. We target our financial service offerings toward consumers owning life insurance who can benefit from realizing the actuarial value of their life insurance policy. We believe the value proposition of our services to the consumers we serve is very high, and these consumers represent the fastest growing demographic in the United States according to the U.S. Census Bureau. To

App. 0007

address this growing need, we recently have expanded our services by offering consumers a range of options to access the actuarial value of their life insurance, including purchasing (i) all or a portion of their life insurance policy for cash, (ii) all or a portion of their life insurance policy in exchange for a different asset, and (iii) all or a portion of their life insurance policy in an installment sale that provides the selling consumer with a stream of cash flow. All of our services involve our purchase or financing of life insurance assets from consumers in the secondary market at a discount to the face value of the life insurance asset we obtain. In cases where we purchase a life insurance policy, we continue paying the policy premiums until maturity, in order to collect the policy benefit upon the insured's mortality. In this way, we hope to profit from the difference between our cost of obtaining and financing a life insurance asset, and the policy benefit we ultimately receive upon the mortality of the insured.

In addition to our goal of providing consumers with value-added services based upon the actuarial value of their life insurance policies, we seek to build a profitable and large portfolio of life insurance assets that are well diversified in terms of insurance carriers, mortality profiles and the medical conditions of insureds. We believe that successfully diversifying our assets will lower our overall risk exposure and provide our portfolio of life insurance assets with greater actuarial stability and more reliable returns. To obtain the growth and diversification we seek, we have raised capital through a variety of financing efforts that have included the public offering of our common stock, private and public offerings of structured debt securities, private offerings of preferred stock, and the use of a senior secured revolving credit facility. This offering of L Bonds is an extension of that strategy, and presents investors with an opportunity to participate in our business and the opportunity presented by the secondary market for life insurance. We believe that this investment opportunity is unique and attractive in that potential investment returns from life insurance assets are not correlated to general economic or financial market conditions.

According to the American Council of Life Insurers Fact Book 2013 (ACLI), individuals owned over $11.22 trillion of face value of life insurance policies in the United States in 2012. This figure includes all types of policies, including term and permanent insurance known as whole life, universal life, variable life, and variable universal life. The ACLI reports that the lapse and surrender rate of individual life insurance policies for 2012 was 5.9%, over $649 billion in face value of policy benefits in 2012 alone. These figures do not include group-owned life insurance, such as employer-provided life insurance, the market for which totaled over $8.01 trillion of face value of life insurance policies in the United States in 2012, and the policies of which exhibit similar lapse and surrender rates, according to the ACLI. Consumers owning life insurance generally allow policies to lapse or surrender the policies for a variety of reasons, including: (i) the life insurance is no longer needed; (ii) unrealistic original earnings assumptions made when the policy was purchased; (iii) increasing premium payment obligations as the insured ages; (iv) changes in financial status or outlook which cause the insured to no longer require life insurance; (v) other financial needs that make the insurance unaffordable; or (vi) a desire to maximize the policy's investment value.

4

Table of Contents

The secondary market for life insurance has developed in response to the large volume of policy lapses and surrenders. Rather than allowing a policy to lapse as worthless, or surrendering a life insurance policy at a fraction of its inherent value, the secondary market can be a source of significant value to consumers. The inherent actuarial value of a policy in the life insurance secondary market often exceeds the cash surrender value offered by the insurance carrier. Without the development of the secondary market, insurance carriers would maintain monopsony power over the options offered to consumers who no longer want, need or can afford their life insurance.

Although still relatively new and still emerging, Conning Research & Consulting (Conning) reports that the secondary market for life insurance policies grew from $2 billion in face value of benefits purchased in 2002, to over $12 billion in face value of benefits purchased in 2008. During and after the 2009 credit crisis, the secondary market for life insurance contracted significantly, evidenced by Conning's report that investors purchased approximately $2 billion in face value of life insurance benefits in 2012. Nevertheless, Conning reports that consumer demand for continued development of the secondary market remains strong, and there are indications of strengthening interest among investors. Conning maintains that, given the current economic condition and investor sentiment, the secondary market will likely increase, and the market's largest growth will likely come from companies that attract capital to purchase the assets. We believe that socio-economic and demographic trends further support the long-term development and growth of the secondary market for life insurance, and that the secondary market for life insurance represents a significant and expanding market opportunity. In support of this belief, Conning reports that the net market potential for policies sold in the secondary market exceeded $109 billion in 2012, and is expected to grow to $151 billion by 2019.

We believe that we are uniquely positioned to capitalize on this opportunity by providing value-added services to the consumers we serve, and new investment opportunities for investors, where both participants can profit. To participate and compete in our growing market, we have spent and intend to continue to spend significant resources: (i) developing a robust operational platform and systems for originating, purchasing, and servicing life insurance policies; (ii) obtaining requisite licensure to participate in the life insurance secondary market; (iii) developing financing resources, strategies, and capabilities for servicing a large portfolio of life insurance policies; (iv) recruiting and developing a professional management team; and (v) establishing strategic relationships for delivering our services.

Since our formation in 2006, we have evaluated over 36,000 policies and acquired over $1.7 billion in face value of life insurance policy benefits in the secondary market. In 2008, after selling approximately $1 billion in face value of life insurance policy benefits, we adopted our current buy-and-hold strategy of investing in a portfolio life insurance assets and offering investors the opportunity to finance our ownership of the portfolio. As of September 30, 2014, we owned approximately $788 million in face value of life insurance policy benefits with an aggregate cost basis (i.e., acquisition and ongoing premiums and financing costs) of approximately $270 million.

A summary of our portfolio of life insurance assets as of September 30, 2014, is set forth in the table below:

**Life Insurance Portfolio Summary**

| | |
|---|---|
| Total portfolio face value of policy benefits | $ 787,964,000 |
| Average face value per policy | $ 2,727,000 |
| Average face value per insured life | $ 2,996,000 |
| Average age of insured (yrs.) * | 82.6 |
| Average life expectancy estimate (yrs.) * | 6.69 |
| Total number of policies | 289 |
| Number of unique lives | 263 |
| Demographics | 68% Males; 32% Females |
| Number of smokers | 3 insureds are smokers |
| Largest policy as % of total portfolio | 1.27% |
| Average policy as % of total portfolio | 0.35% |
| Average Annual Premium as % of face value | 3.31% |

5

**Table of Contents**

All of our services are premised on financial and actuarial modeling that assigns a present value to the face value of an insurance policy benefit. In this regard, the value we assign to a life insurance asset in the secondary market is primarily a function of: (i) the face value of the life insurance policy or portion thereof we may wish to acquire; (ii) the estimated life expectancy of the individual insured under the policy; (iii) the premiums expected to be paid over the life of the insured; (iv) market competition from other purchasers in the secondary market; and (v) the particular underwriting characteristics of the policy, relative to the characteristics of our portfolio of life insurance assets as a whole.

The types of policies for which we provide services are typically, but not always, universal life insurance policies. Universal life insurance is a type of permanent life insurance in which premium payments above the cost of insurance are credited to the "cash value" of the policy. The cash value is credited each month with interest based on the terms of the insurance policy agreement. If a universal life insurance policy were to lapse, the insured or other owner of the policy would nonetheless have a right to receive the "cash surrender value" of the policy. The cash surrender value is the cash value of the policy, less any surrender charges imposed by the insurance company for removing the cash value. Our services provide greatest value to a consumer when the actuarial value of the life insurance policy benefit exceeds the cash surrender value of the policy—which is often the case. We also provide services to consumers who own term life insurance. Unlike permanent universal life insurance, term life insurance does not have a cash value associated with it. Nevertheless, most term insurance policies permit the policy to be converted into permanent universal life insurance. In the future, we may consider offering services in conjunction with variable universal life insurance, which differs from universal insurance in that the "variable" component of the policy involves the ownership of securities inside the policy. Regardless of the type of policy, we generally seek to purchase life insurance policies issued by rated life insurance carriers with investment grade credit ratings by Standard & Poor's (AAA through BBB), Moody's (Aaa through Baa3), or A.M. Best Company (aaa through bbb). As of December 31, 2013 and September 30, 2014, over 93.5% and 95.2%, respectively, of life insurance policies within our portfolio were issued by companies rated "A-" or better under Standard & Poor's rating system.

Before acquiring a life insurance asset, we value the related life insurance policy by conducting an underwriting review. Our present underwriting review process generally involves obtaining two life expectancy estimates on each insured from third-party medical-actuarial firms, and then averaging these two estimates. On occasion, we may obtain more than two life expectancy estimates, in which case we average the two life expectancy estimates that we believe are the most reliable, based on our own analyses and conclusions. In this regard, the two life expectancy estimates we ultimately choose to average may not always be the most conservative estimates we obtain. From time to time and as permitted by applicable borrowing covenants, we may modify our underwriting review process. For example, in anticipation of our planned marketing efforts, we recently changed our definition of a "small face policy" from $250,000 in policy benefits to $1,000,000 in policy benefits. For small face policies, rather than obtaining life expectancy estimates from third-party medical-actuarial firms, we may employ a modified underwriting review process involving the use of a combination of standard mortality tables, actuarial or medical consultants, and our own analysis to develop a life expectancy estimate for an insured.

We generally transact directly with the policy owner who originally purchased the life insurance in the primary market. Historically, we have purchased policies in the secondary market through a network of life insurance agents, life insurance brokers, and licensed providers who assist policy owners in accessing the secondary market. We expect to expand our origination practice by marketing directly to consumers through various marketing initiatives.

We have built our business with what we believe to be the following competitive strengths:

- *Industry Experience*: We have actively participated in the development of the secondary market of life insurance as a principal purchaser and financier within the asset class since 2006. Our position within the marketplace has allowed us to gain a deep understanding of the life insurance secondary market. We have participated in the leadership of various industry associations and forums, including the Life Insurance Settlement Association (LISA) and the Insurance Studies Institute (ISI). Our experience gives

6

App. 0009

Table of Contents

us confidence in building a company to compete in the industry and acquire a portfolio of life insurance policies that will perform to our expectations.

- *Operational Platform*: We have built and continue to refine and develop an operational platform and systems for efficiently tracking, processing, and servicing life insurance policies that we believe provide competitive advantages when participating in the life insurance secondary marketplace.

- *Origination and Underwriting Practices*: We seek to use underwriting review processes and file documentation standards that generally meet published guidelines for rated securitizations of life insurance portfolios. We purchase life insurance policies we consider to be non-contestable and that meet our underwriting criteria and reviews. We consider a life insurance policy to be "non-contestable" once applicable state law prohibits the insurer from challenging the validity of the policy due to fraud. In this regard, state non-contestability laws generally require a period of one to two years to elapse after the initial issuance of the policy before that policy is considered non-contestable under state law. Non-contestability laws do not, however, prevent an insurer from challenging the validity of a policy procured by fraud for lack of an insurable interest at the time at which the policy was purchased, such as is the case with so-called "stranger-originated" life insurance policies. To the extent we use modified methodologies for estimating life expectancies for small face policies, those modified methodologies may not meet published guidelines for rated securitizations of life insurance portfolios.

- *Origination Relationships and Strategies*: We have established origination relationships with life insurance policy brokers and insurance agents who submit policies for our purchase or financing. Our referral base knows our underwriting standards for purchasing life insurance policies in the secondary market, which provides confidence in our bidding and closing processes and streamlines our own due-diligence process. We expect to expand our origination methodology and channels with the proceeds of this offering (e.g., the addition of consumer marketing).

- *Life Expectancy Methodology*: We generally rely on two life expectancy estimates obtained from independent third-party medical-actuarial underwriting firms to arrive at a life expectancy estimate we use for valuing a life insurance asset. For a majority of our life insurance asset purchases, we rely on estimates obtained from 21st Services and AVS Underwriting to develop our life expectancy estimate. We may, however, also obtain and use life expectancy estimates from other medical-actuarial underwriting firms. As explained above, we may from time to time modify our underwriting review processes, including our methodology for arriving at life expectancy estimates we use in ascribing value to a life insurance asset.

- *Pricing Software and Methodology*: To calculate our expected returns on the investments we make in life insurance assets, we use actuarial pricing methodologies and software tools built by a leading independent actuarial service firm and currently supported by Modeling Actuarial Pricing Systems, Inc. ("MAPS").

- *Financing Strategy*: We have actively developed diversified financing strategy for accessing capital markets in support of our buy-and-hold strategy for our portfolio of life insurance policies, ranging from institutional bank financing to a network of broker-dealers registered with the Financial Industry Regulatory Authority ("FINRA"), many of whom have participated in one or more of our Series I Secured note financing, our Series A preferred stock financing, or our earlier L Bond financing (such L Bonds originally issued under the name "Renewable Secured Debentures" and to be renamed "L Bonds" upon the effectiveness of the registration statement of which this prospectus is a part) (referred to in this prospectus as the "previously issued L Bonds" or the "Renewable Secured Debentures"). If in the future we determine to offer different kinds of investment products, we expect to leverage the network of broker-dealers that we have built over time.

7

Table of Contents

On the other hand, our business involves a number of challenges and risks described in more detail elsewhere in this prospectus, including the following:

- *Relatively New Market*: Investing in life insurance assets in the secondary market is a relatively new and evolving market. Our ability to source and invest in life insurance assets at attractive prices materially depends on the continued growth of the secondary market for life insurance and the continued solvency of the life insurance companies that pay the face value of life insurance policy benefits.

- *Asset Valuation Assumptions:* The valuation of our portfolio life insurance assets—the principal asset on our balance sheet—requires us to make material assumptions that may ultimately prove to be incorrect. These assumptions include appropriate discount rates, cash flow projections, and the life expectancy estimates we use for these purposes, any of which may ultimately prove to be inaccurate.

- *Ability to Expand Our Portfolio:* Our business model requires us to achieve actual results that are in line with those we expect to attain from our investments in life insurance assets. In this regard, we believe that the larger the portfolio of life insurance assets we own, the greater likelihood there is that we will achieve results matching our expectations. Although we plan to expand the number of investments in life insurance assets using proceeds from the sale of our

L Bonds, we may be unable to meet this goal. Furthermore, even if we successfully grow our portfolio of life insurance assets, we nevertheless may not achieve the results we expect.

- *Reliance on Financing*: We have chosen to finance our business almost entirely through the issuance of debt, including the sale of L Bonds, previously issued L Bonds, Series I Secured notes, and our use of a senior secured revolving credit facility. Our business model expects that we will have continued access to financing (including financing to expand or replace our existing financing) in order to purchase and finance a large and diversified portfolio of life insurance assets, and thereafter pay the attendant premiums and financing costs of maintaining that portfolio. We will be required to rely on our access to financing to pay premiums and interest until such time as we experience a significant amount of mortality within our portfolio and begin receiving significant revenues from the receipt of life insurance policy benefits. Even if we obtain the financing we require, we may not receive life insurance policy benefits that match our cash flow projections or meet them in time to earn profits after the payment of financing costs.

- *Risk of Investment in Life Insurance Assets*: Our investments in life insurance assets have inherent risks, including fraud and legal challenges to the validity of the life insurance policies. Examples of fraud include the possibility that the seller of a policy may have provided us with inaccurate or misleading information during the underwriting review process.

- *Effects of Regulation*: Our business is subject to complex state and federal regulation. Changes in state or federal laws and regulations governing our business, or changes in the interpretation of such laws and regulations, could materially and negatively affect our business.

Our business also involves certain other challenges and risks described in the "Risk Factors" section of this prospectus.

**Implications of Being an "Emerging Growth Company"**

As a public reporting company with less than $1 billion in revenue during our last fiscal year, we qualify as an "emerging growth company" under the Jumpstart our Business Startups Act of 2012, or the JOBS Act. An emerging growth company may take advantage of certain reduced reporting requirements and is relieved of certain other significant requirements that are otherwise generally applicable to public companies. In particular, as an emerging growth company we:

- are not required to obtain an attestation and report from our auditors on our management's assessment of our internal control over financial reporting pursuant to the Sarbanes-Oxley Act of 2002;

8

[Table of Contents](#)

- are not required to provide a detailed narrative disclosure discussing our compensation principles, objectives and elements and analyzing how those elements fit with our principles and objectives (commonly referred to as "compensation discussion and analysis");

- are not required to obtain a non-binding advisory vote from our stockholders on executive compensation or golden parachute arrangements (commonly referred to as the "say-on-pay," "say-on-frequency" and "say-on-golden-parachute" votes);

- are exempt from certain executive compensation disclosure provisions requiring a pay-for-performance graph and CEO pay ratio disclosure;

- may present only two years of audited financial statements and only two years of related Management's Discussion & Analysis of Financial Condition and Results of Operations, or MD&A; and

- are eligible to claim longer phase-in periods for the adoption of new or revised financial accounting standards under §107 of the JOBS Act.

We intend to take advantage of all of these reduced reporting requirements and exemptions, including the longer phase-in periods for the adoption of new or revised financial accounting standards under §107 of the JOBS Act. Our election to use the phase-in periods may make it difficult to compare our financial statements to those of non-emerging growth companies and other emerging growth companies that have opted out of the phase-in periods under §107 of the JOBS Act. Please see "Risk Factors," page 32 ("*We are an 'emerging growth company'. . . .*").

Certain of these reduced reporting requirements and exemptions were already available to us due to the fact that we also qualify as a "smaller reporting company" under SEC rules. For instance, smaller reporting companies are not required to obtain an auditor attestation and report regarding management's assessment of internal control over financial reporting; are not required to provide a compensation discussion and analysis; are not required to provide a pay-for-performance graph or CEO pay ratio disclosure; and may present only two years of audited financial statements and related MD&A disclosure.

Under the JOBS Act, we may take advantage of the above-described reduced reporting requirements and exemptions for up to five years after our initial sale of common equity pursuant to a registration statement declared effective under the Securities Act of 1933, or such earlier time that we no longer meet the definition of an emerging growth company. In this regard, the JOBS Act provides that we would cease to be an "emerging growth company" if we have more than $1 billion in annual revenues, have more than $700 million in market value of our common stock held by non-affiliates, or issue more than $1 billion in principal amount of non-

convertible debt over a three-year period. Furthermore, under current SEC rules we will continue to qualify as a "smaller reporting company" for so long as we have a public float (i.e., the market value of common equity held by non-affiliates) of less than $75 million as of the last business day of our most recently completed second fiscal quarter.

9

Table of Contents

## Corporate Organization

Our business was organized in February 2006. As a parent holding company, GWG Holdings was incorporated on March 19, 2008 as a limited liability company. On June 10, 2011, GWG Holdings converted from a Delaware limited liability company to a Delaware corporation through the filing of statutory articles of conversion. In connection with the conversion, each class of limited liability company membership interests in GWG Holdings, LLC was converted into shares of common stock of GWG Holdings, Inc. Our corporate structure, including our principal subsidiaries, is as follows:

GWG Life, LLC (a Delaware limited liability company formerly known as GWG Life Settlements, LLC), is a licensed life/viatical settlement provider and the guarantor of the obligations of GWG Holdings under our previously issued L Bonds. GWG DLP Funding II, LLC (a Delaware limited liability company), or DLP Funding II, is a wholly owned special-purpose subsidiary owning life insurance policies and is the borrower under our revolving line of credit from Autobahn/DZ Bank. The life insurance assets owned by DLP Funding II are held in the GWG DLP Master Trust II (a Delaware statutory trust). The trust exists solely to hold the collateral security (i.e., life insurance policies) granted to Autobahn/DZ Bank under our revolving line of credit. DLP Funding II is the beneficiary under that trust.

On June 24, 2014, we effected a 1-for-2 share combination (reverse stock split) of our issued and outstanding common stock. Unless otherwise expressly indicated herein, all common share figures contained in this prospectus have been adjusted to reflect the effectiveness of this share combination.

On September 24, 2014, we consummated an initial public offering of our common stock that involved the listing of our common stock on The Nasdaq Capital Market effective September 25, 2014.

Our principal executive offices are located at 220 South Sixth Street, Suite 1200, Minneapolis, Minnesota 55402 and our telephone number is (612) 746-1944. Our website address is www.gwglife.com. The information on or accessible through our website is not part of this prospectus.

10

Table of Contents

## The Offering

| | |
|---|---|
| **Issuer** | GWG Holdings, Inc. |
| **Indenture Trustee** | Bank of Utah |
| **Paying Agent** | GWG Holdings, Inc. |

App. 0012

| | |
|---|---|
| **Securities Offered** | We are offering up to $1,000,000,000 in principal amount of our "L Bonds." The L Bonds are being sold on a continuous basis. |
| **Method of Purchase** | We will sell L Bonds using two different closing or "settlement" services, whenever available. The first service is DTC settlement, and the second is direct settlement with the Company. For more information, see "Plan of Distribution." |
| **Denomination** | The minimum purchase of L Bonds is $25,000 in principal amount. Additional L Bonds in excess of $25,000 may be purchased in increments of $1,000. |
| **Offering Price** | 100% of the principal of the L Bond. |
| **Limited Rescission Right** | If you are purchasing L Bonds through direct settlement with the Company and your Subscription Agreement is accepted at a time when we have determined that a post-effective amendment to the registration statement of which this prospectus is a part must be filed with the SEC, but such post-effective amendment has not yet been declared effective, you will have a limited time within which to rescind your investment subject to the conditions set forth in this prospectus. See "Description of the L Bonds—Limited Rescission Right" for additional information. |
| **Maturity** | You may generally choose maturities for your L Bonds of six months or 1, 2, 3, 5, or 7 years. Nevertheless, depending on our capital requirements, we may not offer and sell L Bonds of all maturities at all times during this offering. |
| **Interest Rates** | The interest rate of the L Bonds will be established at the time of your purchase, or at the time of renewal, based upon the rates we are offering in this prospectus or our latest interest rate supplement to this prospectus (i.e., any prospectus supplement containing interest rate information for L Bonds of different maturities), and will remain fixed throughout the term of the L Bond. We may offer higher rates of interest to investors with larger aggregate L Bond portfolios, but only as set forth in the then-current interest rate supplement. |
| **Interest Payments** | We will pay interest on the L Bonds based on the terms you choose, which may be monthly or annually. Interest will accrue from the effective date of the L Bond. Interest payments will generally be made on the 15th day immediately following the last day of the month to the |

11

**Table of Contents**

| | |
|---|---|
| | L Bond holder of record as of the last day of that interest-payment period. Interest will be paid without any compounding. |
| **Principal Payments** | The maturity date for the L Bonds will be the last day of the month during which the L Bond matures. We are obligated to pay the principal on the L Bond by the fifth day of the month next following its maturity (or the first business day following such date). |
| **Payment Method** | Principal and interest payments will be made by direct deposit to the account you designate in your Subscription Agreement if you purchase L Bonds through direct settlement with the Company. If you purchase L Bonds through DTC settlement, principal and interest payments will be made to your brokerage or custodial account through DTC. |
| **Renewal or Redemption at Maturity** | Upon maturity, the L Bonds will be automatically renewed for the same term at the interest rate we are offering at that time to other investors with similar aggregate L Bond portfolios for L Bonds of the same maturity, unless repaid upon maturity at our or your election. In this regard, we will notify you at least 30 days prior to the maturity date of your L Bonds. In the notice, we will advise you if we intend to repay the L Bonds or else remind you that your L Bonds will be automatically |

App. 0013

renewed unless you exercise your option, at least 15 days prior to the maturity date, to elect to have your L Bonds repaid. If applicable, a new certificate will be issued.

If we determine that a post-effective amendment to the registration statement covering the offer and sale of L Bonds must be filed during your 15-day repayment election period, we will extend your election period until ten days following the postmark date of our notice to you that the amendment has become effective.

For any L Bonds offered hereby that mature after the three-year anniversary of the commencement of this offering, we expect that the renewal of such L Bonds may require us to file a new registration statement. In such a case, the new registration statement must be declared effective before we will be able to renew your L Bond. In this event, if the new registration statement has not yet been filed or become effective, we will extend your election period until ten days following the date of our notice to you that the new registration statement has become effective, which notice will include a new prospectus.

If L Bonds with similar terms are not being offered at the time of renewal, (i) the interest rate upon renewal will be

12

Table of Contents

(a) the rate specified by us in writing on or before the maturity date or (b) if no such rate is specified, the rate of your existing L Bonds, and (ii) the maturity will, if L Bonds of the same maturity are being offered at the time of renewal, be the same or, if not, the next earliest maturity. Accordingly, you should understand that the interest rate offered upon renewal may differ from the interest rate applicable to your L Bonds prior to maturity. See "Description of the L Bonds—Renewal or Redemption on Maturity."

**Call and Redemption Prior to Maturity**

We may call and redeem the entire outstanding principal balance and accrued but unpaid interest of any or all of the L Bonds at any time without penalty or premium. L Bond holders will have no right to require us to redeem any L Bond prior to maturity unless the request is due to death, bankruptcy or total disability. In our sole discretion, we may accommodate other requests to redeem any L Bond prior to maturity. If we agree to redeem an L Bond upon the request of an L Bond holder, we will impose a redemption fee of 6% against the outstanding principal balance of the L Bond redeemed, which fee will be subtracted from the amount paid.

**Ranking**

The L Bonds will constitute secured debt of GWG Holdings. The payment of principal and interest on the L Bonds will be:

• pari passu with respect to payment on and collateral securing the approximately $28.2 million in outstanding principal amount of Series I Secured notes previously issued by our subsidiary GWG Life, and the previously issued L Bonds, of which approximately $173.2 million in principal amount is outstanding as of September 30, 2014 (see the caption "—Collateral Security" below);

• structurally junior to the present and future obligations owed by our subsidiary DLP Funding II under our current revolving credit facility with Autobahn/DZ Bank (including the approximately $79 million presently outstanding under such facility), and structurally or contractually junior to any future obligations that DLP Funding II or other primary obligors or guarantors may have under future senior secured borrowing facilities; and

• structurally junior to the present and future claims of other creditors of DLP Funding II, including trade creditors.

App. 0014

The indenture will permit us to issue other forms of debt, including senior and secured debt, in the future. Any such secured senior debt will have priority over L Bonds with respect to claims for payment and claims for any

13

Table of Contents

collateral that is shared as between the holders of L Bonds and such senior secured debt.

To fully understand the foregoing summary, you should understand that "pari passu" means that claims for payment and entitlement to security among the holders of L Bonds, the holders of previously issued L Bonds, and the holders of Series I Secured notes previously issued by GWG Life, together with the holders of any later-created class of "pari passu debt" of ours, will generally be treated equally and without preference. We expect to continue our offering of Series I Secured notes and previously issued L Bonds for purposes of processing renewals only, and any such debt issued on a pari passu basis in the future would also be treated equally and without preference in respect of the L Bonds and any secured debt issued by GWG Life. Thus, in the event of any default on the L Bonds (or any other debt securities of ours that is pari passu with the L Bonds) resulting in claims for payment or claims on collateral security, the holders of the L Bonds and all such other debt securities that are pari passu with the L Bonds would share in payment or collateral in proportion to the amount of principal and interest owed on each such debt instrument. See "Description of the L Bonds—Ranking" for further information.

| | |
|---|---|
| **Guarantee** | The payment of principal and interest on the L Bonds is fully and unconditionally guaranteed by GWG Life. This guarantee, together with the accompanying grant of a security interest in all of the assets of GWG Life and the terms and conditions of an intercreditor agreement, makes the L Bonds pari passu, with respect to payment and collateral, with the Series I Secured notes issued by GWG Life and the previously issued L Bonds issued by GWG Holdings. On September 30, 2014, there was approximately $28.2 million in outstanding principal amount owed on the Series I Secured notes and approximately $173.2 million in outstanding principal amount of previously issued L Bonds. |
| **Collateral Security** | The L Bonds are secured by the assets of GWG Holdings, Inc. We have granted a security interest in all of our assets to the indenture trustee for the benefit of the L Bond holders. Our assets consist primarily of our investments in our subsidiaries and any cash proceeds we receive from life insurance assets of our subsidiaries, and all other cash and investments we hold in various accounts. |
| | The majority of our life insurance assets are held in our subsidiary DLP Funding II, LLC and its associated master trust. The L Bonds' security interest will be structurally subordinate to the security interest in favor |

14

Table of Contents

of our senior secured lender under the revolving credit facility, together with any future senior secured lenders of ours. The assets of GWG Life, including proceeds

it receives as distributions from DLP Funding II and derived from the insurance policies owned by DLP Funding II, are collateral for GWG Life's guarantee of the repayment of principal and interest on the L Bonds. As indicated above under "Collateral," this security interest will be pari passu to other issued and outstanding debt of GWG Life and GWG Holdings, including our Series I Secured notes and previously issued L Bonds, respectively. The L Bonds are also secured by a pledge of a majority of our outstanding common stock from our largest stockholders, which pledge is pari passu with the pledge of such common stock to the holders of Series I Secured notes issued by GWG Life and to the holders of previously issued L Bonds. For a description of the meaning of the term "pari passu," please refer to the caption "Ranking" above.

**Indenture Covenants**

The indenture governing the L Bonds places restrictive covenants and affirmative obligations on us. For example, our debt coverage ratio may not exceed 90%.

The indenture defines the debt coverage ratio as a percentage calculated by the ratio of (A) obligations owing by us and our subsidiaries on all outstanding debt for borrowed money (including the L Bonds), over (B) the net present asset value of all life insurance assets we own, directly or indirectly, plus any cash held in our accounts. For this purpose, the net present asset value of our life insurance assets is equal to the present value of the cash flows derived from the face value of policy benefit assets we own, discounted at a rate equal to the weighted-average cost of capital for all our indebtedness for the prior month.

We are required to notify the indenture trustee in the event that we violate this restrictive covenant for a period of 30 consecutive days. An "event of default" will exist under the indenture if a violation of this covenant persists for a period of 60 calendar days after the trustee's notice to us of a breach, or such a notice received from the holders of at least 25% in principal amount of outstanding L Bonds.

The indenture also places limitations on our ability to engage in a merger or sale of all of our assets. See "Description of the Indentures—Events of Default" and "—Consolidation Mergers or Sales" for more information.

**Use of Proceeds**

If all the L Bonds are sold, we would expect to receive up to approximately $918.5 million of net proceeds from this offering after paying estimated offering and related expenses and after paying our estimated average

15

Table of Contents

selling commissions, dealer-manager fees, accountable expense allowance, wholesale commissions and our offering expenses. There is no minimum amount of L Bonds that must be sold before we access investor funds. The exact amount of proceeds we receive may vary considerably depending on a variety of factors, including how long the L Bonds are offered.

We intend to use a substantial majority of the net proceeds from this offering to invest in life insurance policies assets. We intend to use the remaining balance of the net proceeds from this offering for certain other expenditures we anticipate incurring in connection with this offering and in connection with our business. See "Use of Proceeds" for additional information.

**No Market for L Bonds;**
**Transferability**

There is no existing market for the L Bonds and we do not anticipate that a secondary market for the L Bonds will develop. We do not intend to apply for listing of the L Bonds on any securities exchange or for quotation of the L Bonds in any automated dealer quotation system. Neverless, you will be able to freely transfer or pledge L Bonds. See "Description of the L Bonds—Transfers."

**Book Entry**

The L Bonds may be issued in book-entry form, certificated form, or in the form of a global certificate deposited with a depositary. See "Description of the L Bonds—

App. 0016

| | |
|---|---|
| **Covered Security** | Our L Bonds are a "covered security." The term "covered security" applies to securities exempt from state registration because of their oversight by federal authorities and national-level regulatory bodies pursuant to Section 18 of the Securities Act of 1933. Generally, securities listed on national exchanges are the most common type of covered security exempt from state registration. A non-traded security also can be a covered security if it has a seniority greater than or equal to other securities from the same issuer that are listed on a national exchange. Our L Bonds are a covered security because they are senior to our common stock, which is listed on The Nasdaq Capital Market, and therefore our offering of L Bonds is exempt from state registration.<br><br>**Although the status of our L Bonds as a "covered security" will facilitate their purchase and sale to a broader range of investors than would otherwise be available to us, and although the offer and sale of a "covered security" generally involves fewer issuance costs to the issuer of such securities, our L Bonds are not a suitable purchase for all investors. In this regard, please carefully review the "Risk Factors" contained in this prospectus, as well as the disclosures on page 3 under the heading "Covered Security."** |

16

Table of Contents

| | |
|---|---|
| **Risk Factors** | An investment in the L Bonds involves significant risks, including the risk of losing your entire investment, and may be considered speculative. Importantly, we maintain a senior borrowing arrangement that subordinates the right to payment on, and shared collateral securing, the L Bonds to our senior secured lender. From time to time we may add or replace senior lenders and the particular arrangements under which we borrow from them. In addition, these borrowing arrangements with senior lenders restrict, and are expected to continue to restrict, our cash flows and, subject to certain exceptions, distributions from our operating subsidiaries. These provisions will restrict cash flows available for payment of principal and interest on the L Bonds. For a summary of risks relating to this offering and our Company and business, please see "Risk Factors," page 19. |

17

Table of Contents

## RISK RELATING TO FORWARD-LOOKING STATEMENTS

Certain matters discussed in this prospectus contain forward-looking statements. These forward-looking statements are subject to risks, uncertainties and assumptions about our operations and the investments we make, including, among other things, factors discussed under the heading "Risk Factors" in this prospectus and the following:

- changes in the secondary market for life insurance;

- our limited operating history;

- the valuation of assets reflected on our financial statements;

- the reliability of assumptions underlying our actuarial models;

- the reliability of assumptions underlying our life expectancy estimates;

App. 0017

- our reliance on debt financing;

- risks relating to the validity and enforceability of the life insurance policies we purchase;

- our reliance on information provided and obtained by third parties;

- federal and state regulatory matters;

- additional expenses, not reflected in our operating history, related to being a public reporting company;

- competition in the secondary life insurance market;

- the relative illiquidity of life insurance policies;

- life insurance company credit exposure;

- economic outlook;

- performance of our investments in life insurance policies;

- financing requirements;

- litigation risks; and

- restrictive covenants contained in borrowing agreements.

Forward-looking statements can be identified by the use of words like "believes," "could," "possibly," "probably," "anticipates," "estimates," "projects," "expects," "may," "will," "should," "seek," "intend," "plan," "expect," or "consider" or the negative of these expressions or other variations, or by discussions of strategy that involve risks and uncertainties. All forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause our actual transactions, results, performance or achievements to be materially different from any future transactions, results, performance or achievements expressed or implied by such forward-looking statements. We base these forward-looking statements on current expectations and projections about future events and the information currently available to us. Although we believe that the assumptions for these forward-looking statements are reasonable, any of the assumptions could prove to be inaccurate. Consequently, no representation or warranty can be given that the estimates, opinions, or assumptions made in or referenced by this prospectus will prove to be accurate. Some of the risks, uncertainties and assumptions are identified in the discussion entitled "Risk Factors" in this prospectus. We caution you that the forward-looking statements in this prospectus are only estimates and predictions, or statements or current intent. Actual results or outcomes, or actions that we ultimately undertake, could differ materially from those anticipated in the forward-looking statements due to risks, uncertainties or actual events differing from the assumptions underlying these statements. These risks, uncertainties and assumptions include, but are not limited to, those discussed in this prospectus.

<center>18</center>

Table of Contents

<center>

**RISK FACTORS**

</center>

*An investment in the L Bonds involves a high degree of risk. Before purchasing L Bonds, you should carefully consider the following risk factors in conjunction with the other information contained in this prospectus. The risks discussed in this prospectus can materially harm our operations, operating results, financial condition or future results. If any of these risks materialize or occur, the value of our L Bonds could decline and could cause you to lose part or all of your investment. You should review the risks of this investment with your legal and financial advisors prior to purchasing L Bonds.*

<center>**Risks Related to Our Company and Our Industry**</center>

***Material changes in the life insurance secondary market, a relatively new and evolving market, may adversely affect our operating results, business prospects and our ability to repay our obligations under the L Bonds.***

Our sole business is currently the purchase and ownership of life insurance policies acquired in the secondary market, which is a relatively new and evolving market. The success of our business and our ability to repay the principal and interest on our obligations, including our L Bonds, depends in large part on the continued development of the secondary market for life insurance, including the solvency of life insurance companies to pay the face value of the life insurance benefits, both of which will critically impact the performance of the life insurance assets we own. We expect that the development of the secondary market will primarily be impacted by a variety of factors such as the interpretation of existing laws and regulations (including laws relating to insurable interests), the passage of new legislation and regulations, mortality improvement rates, and actuarial understandings and methodologies. Importantly, all of the factors that we believe will most significantly affect the development of the life insurance secondary market are beyond our control. Any material and adverse development in the life insurance secondary market could adversely affect our operating results, our access to capital, our ability to repay our various obligations, including our L Bonds, and our

<div align="right">App. 0018</div>

business prospects and viability. Because of this, an investment in the L Bonds generally involves greater risks as compared to investments offered by companies with more diversified business operations in more established markets.

***We have a relatively limited history of operations and our earnings and cash flows may be volatile, resulting in future losses and uncertainty about our ability to service and repay our debt when and as it comes due.***

We are a company with a limited history, which makes it difficult to accurately forecast our earnings and cash flows. During the year ended December 31, 2013, we incurred a net loss of $195,000, and for the nine months ended September 30, 2014, we incurred a net loss of $7,888,058. Our lack of a significant history and the evolving nature of our market make it likely that there are risks inherent in our business that are yet to be recognized by us or others, or not fully appreciated, and that could result in us earning less than we anticipate or even suffering further losses. As a result of the foregoing, an investment in the L Bonds necessarily involves uncertainty about the stability of our earnings, cash flows and, ultimately, our ability to service and repay our debt. Accordingly, there is a risk that you could lose your entire investment.

***The valuation of our principal assets on our balance sheet requires us to make material assumptions that may ultimately prove to be incorrect. In such an event, we could suffer significant losses that could materially and adversely affect our results of operations and eventually cause us to be in default of restrictive covenants contained in our borrowing agreements.***

Our principal asset is a portfolio of life insurance policies purchased in the secondary market, comprising approximately 85% of our total assets at December 31, 2013 and 89% of our total assets at September 30, 2014. Those assets are considered "Level 3" fair value measurements under ASC 820, *Fair Value Measurements and Disclosures*, as there is currently no active market where we are able to observe quoted prices for identical assets. As a result, our valuation of those assets incorporates significant inputs that are not observable. Fair value is defined as an exit price representing the amount that would be received if assets

19

Table of Contents

were sold or that would be paid to transfer a liability in an orderly transaction between market participants at the measurement date. As such, fair value is a market-based measurement that should be determined based on assumptions that market participants would use in pricing an asset or liability.

A Level 3 fair value measurement is inherently uncertain and creates additional volatility in our financial statements that are not necessarily related to the performance of the underlying assets. As of December 31, 2013 and September 30, 2014, we estimated the fair value discount rate for our portfolio to be 11.69% and 11.56%, respectively. If in the future we determine that a higher discount rate is required to ascribe fair value to a similarly situated portfolio of life insurance policies, we could experience significant losses materially affecting our results of operations. It is also possible that significant losses of this nature could at some point cause us to fall out of compliance with certain borrowing covenants contained in our various borrowing agreements. This could result in acceleration of our loan balances under the revolving credit facility or our Series I Secured notes and the L Bonds, which we may not be able to repay. We may be forced to seek additional debt or equity financing to repay such debt amounts, which may not be available on terms acceptable to us, if at all. If we are unable to repay when debt comes due, then our senior lender or the holders of our Series I Secured notes and the L Bonds, or both, would have the right to foreclose on our assets.

In an effort to present operating results not subject to the valuation volatility associated with the discount rate we choose, we intend to provide additional non-GAAP financial disclosures, on a consistent basis, presenting the actuarial economic gain we expect within our portfolio of life insurance policies at the expected internal rate of return against the costs we incur over the same period. We report these very same non-GAAP financial measures to the lender under our revolving credit facility pursuant to financial covenants in the related borrowing documents. Nevertheless, our reported GAAP earnings may in the future be volatile for reasons that do not bear an immediate relationship to the cash flows we experience.

For further disclosure relating to the risks associated with the valuation of our assets, see the risk factor below "*If actuarial assumptions we obtain from third-party providers . . . .*" on page 24.

***Our expected results from our life insurance portfolio will not match actual results, which could adversely affect our ability to service and grow our portfolio for diversification.***

Our business model relies on achieving actual results that are in line with the results we expect to attain from our investments in life insurance assets. In this regard, we believe that the larger portfolio we own, the greater the likelihood that we will achieve our expected results. To our knowledge, rating agencies generally suggest that portfolios of life insurance policies be diversified enough to achieve actuarial stability in receiving expected cash flows from underlying mortality. For instance, in a study published in 2012, A.M. Best concluded that at least 300 lives are necessary to narrow the band of cash flow volatility and achieve actuarial stability, while Standard & Poor's has indicated that stability is unlikely to be achieved with a pool of less than 1,000 lives. As of December 31, 2013, we owned $741 million in face value of life insurance policies covering 239 lives. As of September 30, 2014, we owned approximately $788 million in face value of life insurance policies covering 263 lives. Accordingly, while there is risk with a portfolio of any size that our actual yield may be less than expected, we believe that the risk we face is presently more significant given the relative lack of diversification in our current portfolio as compared to rating agency recommendations.

Although we plan to expand the number of life insurance policies we own using proceeds raised from our offering of the L Bonds, we may be unable to meet this goal if sufficient financing from capital sources is not available or is available only on unfavorable or unacceptable terms. Furthermore, even if our portfolio reaches the size we desire, we still may experience material differences between the actuarial models we use and actual mortalities.

Differences between our expectations and actuarial models (which include life expectancy estimates) on the one hand, and actual mortality results on the other hand, could have a materially adverse effect on our operating results and cash flow. In such a case, we may face liquidity problems, including difficulties servicing our remaining portfolio of policies and servicing our outstanding debt obligations. Continued or material failures to meet our expected results could decrease the attractiveness of our securities in the eyes of

Table of Contents

potential investors, making it even more difficult to obtain capital needed to service our portfolio, grow the portfolio to obtain desired diversification, and service our existing debt.

***We critically rely on debt financing for our business. Any inability to borrow could adversely affect our business operations, our ability to satisfy our obligations under the L Bonds, and ultimately our viability.***

To date, we have chosen to finance our business principally through the issuance of debt, including debt incurred by DLP Funding II under a senior revolving credit facility provided by Autobahn/DZ Bank (which we refer to throughout this prospectus as our "revolving credit facility"), our Series I Secured notes and the L Bonds. Our revolving credit facility is secured by all of the assets of DLP Funding II, has a maximum amount of $100 million, and the outstanding balance at both December 31, 2013 and September 30, 2014 was approximately $79 million. Obligations under the revolving credit facility have a scheduled maturity date of December 31, 2016, and obligations under our Series I Secured notes and the L Bonds have scheduled maturities as indicated below in the risk factor "*If a significant number of holders . . . .,*" on page 29. Our debt arrangements comprise the most important sources of financing on which our business critically relies to grow our portfolio of life insurance policies and maintain those policies.

Our business model expects that we will have continued access to financing in order to purchase and finance a large and diversified portfolio of life insurance policies and pay the attendant premiums and costs of maintaining the portfolio, all while satisfying our current interest and principal repayment obligations under our revolving credit facility and other indebtedness. We expect to refinance our revolving credit facility, either through renewal or replacement, when it comes due on December 31, 2016. Pending the due date or refinancing of our revolving credit facility, we expect that proceeds from our life insurance policies will first be used to satisfy our obligations under that facility, as required by the agreement governing the revolving credit facility. Accordingly, until we achieve cash flows derived from our portfolio of life insurance policies, we expect to rely primarily on the proceeds from this offering of L Bonds to satisfy our ongoing financing and liquidity needs. Nevertheless, continued access to financing and liquidity is not guaranteed. For example, general economic conditions could limit our access to financing, as could regulatory or legal pressures exerted on us, our financiers or those involved in our general plan of financing such as brokers, dealers and registered investment advisors. If we are unable to borrow under the revolving credit facility or otherwise for any reason, or to renew or replace the revolving credit facility when it comes due in December 2016, our business would be adversely impacted and our ability to service and repay our obligations would be compromised.

***Our investments in life insurance policies have inherent risks, including fraud and legal challenges to the validity of the policies, which we will be unable to eliminate and which may adversely affect our results of operations.***

When we purchase a life insurance policy, we underwrite the purchase of the policy to mitigate certain risks associated with insurance fraud and other legal challenges to the validity of the life insurance policy. For example, to the extent that the insured is not aware of the existence of the policy, the insured him or herself does not exist, or the insurance company does not recognize the policy, the insurance company may cancel or rescind the policy thereby causing the loss of an investment in that policy. In addition, if medical records have been altered in such a way as to shorten a life expectancy report, this may cause us to overpay for the related policy. Finally, we may experience legal challenges from insurance companies claiming that the insured failed to have an insurable interest at the time the policy was originally purchased or that the policy owner made fraudulent disclosures to the insurer at the time the policy was purchased (e.g., disclosures pertaining to the health status of the insured or the existence or sources of premium financing), or challenges from the beneficiaries of an insurance policy claiming, upon mortality of the insured that the sale of the policy to us was invalid.

To mitigate these risks, we require a current verification of coverage from the insurance company, complete a due-diligence investigation of the insured and accompanying medical records, review the life insurance policy application, require a policy to have been in force for at least two years before purchasing, and require a legal review of any premium financing associated with the life insurance policy to determine whether an insurable interest existed at the time the policy was originally purchased in the primary market.

21

Table of Contents

Nevertheless, we do not expect that these steps will eliminate the risk of fraud or legal challenges to the life insurance policies we purchase. Furthermore, changes in laws or regulations, or the interpretation of existing laws or regulations, may prove our current due-diligence and risk-mitigation efforts inadequate for us to have confidence that our portfolio of life insurance policies are unlikely to be successfully challenged or to purchase new policies with such confidence. If a significant face amount of policies were invalidated for reasons of fraud or any other reason, our results of operations would be adversely affected, perhaps materially.

***Every acquisition of a life insurance policy necessarily requires us to materially rely on information provided or obtained by third parties. Any misinformation or negligence in the course of obtaining information could materially and adversely affect the value of the policies we own.***

The acquisition of each life insurance policy is negotiated based on variables and particular facts that are unique to the life insurance policy itself and the health of the insured. The facts we obtain about the policies and the insured at the time at which the policy is applied for and obtained are based on factual representations made to the insurance company by the insured, and the facts the insurance company independently obtains in the course of its own due-diligence examination, such as facts concerning the health of the insured and whether or not there is an insurable interest present when the policy was issued. Any misinformation or negligence in the course of obtaining or supplying information relating to an insurance policy or insured could materially and adversely impact the value of the life insurance policies we own and could, in turn, adversely affect our financial condition, results of operations, and the value of any investment in our company.

App. 0020

*Our business is subject to state regulation, and changes in state laws and regulations governing our business, or changes in the interpretation of such laws and regulations, could negatively affect our business.*

When we purchase a life insurance policy, we are subject to state insurance regulations. Over the past years, we have seen a dramatic increase in the number of states that have adopted legislation and regulations from a model law promulgated by either the National Association of Insurance Commissioners (NAIC) or by the National Conference of Insurance Legislators (NCOIL). These laws are essentially consumer protection statutes responding to abuses that arose early in the development of our industry, some of which may persist. Today, almost every state has adopted some version of either the NAIC or NCOIL model laws, which generally require the licensing of purchasers of and brokers for life insurance policies, the filing and approval of purchase agreements, and the disclosure of transaction fees. These laws also require various periodic reporting requirements and prohibit certain business practices deemed to be abusive.

State statutes typically provide state regulatory agencies with significant powers to interpret, administer and enforce the laws relating to the purchase of life insurance policies. Under statutory authority, state regulators have broad discretionary power and may impose new licensing requirements, interpret or enforce existing regulatory requirements in different ways or issue new administrative rules, even if not contained in state statutes. State regulators may also impose rules that are generally adverse to our industry. Because the life insurance secondary market is relatively new and because of the history of certain abuses in the industry, we believe it is likely that state regulation will increase and grow more complex during the foreseeable future. We cannot, however, predict what any new regulation would specifically involve.

Any adverse change in present laws or regulations, or their interpretation, in one or more states in which we operate (or an aggregation of states in which we conduct a significant amount of business) could result in our curtailment or termination of operations in such jurisdictions, or cause us to modify our operations in a way that adversely affects our profitability. Any such action could have a corresponding material and negative impact on our results of operations and financial condition, primarily through a material decrease in revenues, and could also negatively affect our general business prospects.

22

---

Table of Contents

*If federal or state regulators or courts conclude that the purchase of life insurance in the secondary market constitutes, in all cases, a transaction in securities, we could be in violation of existing covenants under our revolving credit facility, which could result in significantly diminished access to capital. We could also face increased operational expenses. The materialization of any of these risks could adversely affect our operating results and possibly threaten the viability of our business.*

Some states and the SEC have, on occasion, attempted to regulate the purchase of non-variable universal life insurance policies as transactions in securities under federal or state securities laws. In July 2010, the SEC issued a Staff Report of its Life Settlement Task Force. In that report, the Staff recommended that certain types of purchased life insurance policies be classified as securities. The SEC has not taken any position on the Staff Report, and there is no indication if the SEC will take or advocate for any action to implement the recommendations of the Staff Report. In addition, there have been several federal court cases in which transactions involving the purchase and fractionalization of life insurance contracts have been held to be transactions in securities under the federal Securities Act of 1933. We believe that the matters discussed in the Staff Report, and existing case law, do not presently impact our current business model since our purchases of life settlements are currently distinguishable from those cases that have been held by courts, and advocated by the Staff Report, to be transactions in securities. For example, presently neither we nor any of our affiliates are involved in the fractionalization of any life insurance policies, and we do not presently purchase variable life insurance policies.

With respect to state securities laws, almost all states currently treat the sale of a life insurance policy as a securities transaction under state laws, although some states exclude from the definition of security the original sale from the insured or the policy owner to the life settlement provider. To date, due to the manner in which we conduct and structure our activities and the availability, in certain instances, of exceptions and exemptions under those state laws, such laws have not adversely impacted our business model.

As a practical matter, the widespread application of federal securities laws to our purchases of life insurance policies, either through the expansion of the definition of what constitutes a "security," the expansion of the types of transactions in life insurance policies that would constitute transactions in "securities," or the elimination or limitation of available exemptions and exceptions (whether by statutory change, regulatory change, or administrative or court interpretation) could burden us and other companies operating in the life insurance secondary market through the imposition of additional processes in the purchase of life insurance policies or the imposition of additional corporate governance and operational requirements through the application of the federal Investment Company Act of 1940. Any such burdens could be material. Among the particular repercussions for us would be a violation of existing covenants under our revolving credit facility requiring us to not be an "investment company" under the Investment Company Act of 1940, which could in the short or long term affect our liquidity and increase our cost of capital and operational expenses, all of which would adversely affect our operating results. It is possible that such an outcome could threaten the viability of our business and our ability to satisfy our obligations as they come due, including obligations under our L Bonds.

*Being a public company results in additional expenses and diverts management's attention, and could also adversely affect our ability to attract and retain qualified directors.*

We have been a public reporting company since January 31, 2012. As a public reporting company, we are subject to the reporting requirements of the Securities Exchange Act of 1934. These requirements generate significant accounting, legal and financial compliance costs, and make some activities more difficult, time consuming or costly, and may place significant strain on our personnel and resources. The Securities Exchange Act of 1934 requires, among other things, that we maintain effective disclosure controls and procedures and internal control over financial reporting. In order to establish the requisite disclosure controls and procedures and internal control over financial reporting, significant resources and management oversight are required.

As a result, management's attention may be diverted from other business concerns, which could have an adverse and even material effect on our business, financial condition and results of operations. These rules and regulations may also make it more difficult and expensive for us to obtain director and officer liability

23

Table of Contents

insurance. If we are unable to obtain appropriate director and officer insurance, our ability to recruit and retain qualified officers and directors, especially those directors who may be deemed independent, could be adversely impacted.

***Our business and prospects may be adversely affected by changes, lack of growth or increased competition in the life insurance secondary market.***

The growth of the life insurance policy secondary market and our expansion within the market may be negatively affected by a variety of factors beyond our control, including:

- the inability to locate sufficient numbers of life insurance policy sellers and agents to source such sellers;

- the inability to convince life insurance policy owners of the benefits of selling their life insurance policy;

- competition from other companies in the life insurance secondary market;

- negative publicity about the market based on actual or perceived abuses; and

- the adoption of additional governmental regulation.

The relatively new and evolving nature of the market in which we operate makes these risks unique and difficult to quantify. Nevertheless, contractions in the secondary market for life insurance policies, whether resulting from general economic conditions, regulatory or legal pressures or otherwise (including regulatory pressures exerted on us or others involved in the secondary market for life insurance or involved with participants in that market), could make participation in that market generally less desirable. This could, in turn, depress the prices at which life insurance policies on the secondary market are bought and sold. As indicated elsewhere in this prospectus, decreases in the value of life insurance policies on the secondary market could negatively affect our results of operations and our financial condition since the value of our policy portfolio is marked to market on a quarterly basis.

***Changes in general economic conditions could adversely impact our business.***

Changes in general economic conditions, including, for example, interest rates, investor sentiment, changes specifically affecting the insurance industry, competition, technological developments, political and diplomatic events, tax laws, and other factors not known to us today, can substantially and adversely affect our business and prospects. For example, changes in interest rates may increase our cost of capital and ability to raise capital, and have a corresponding adverse impact on our operating results. While we may engage in certain hedging activities to mitigate the impact of these changes, none of these conditions are or will be within our control.

***If actuarial assumptions we obtain from third-party providers and rely on to model our expected returns on our investments in life insurance policies change, our operating results and cash flow could be adversely affected, as well as the value of our collateral and our ability to service our debt obligations, including obligations owed to the holders of L Bonds.***

The expected internal rate of return we calculate we will earn when purchasing a life insurance policy is based upon a probability curve estimate of how long the insured will live—an actuarial life expectancy estimate. We presently obtain actuarial life expectancy estimates from third-party medical-actuarial underwriting companies. In the case of small face policies, which we currently define as life insurance policies with less than $1,000,000 in face value of policy benefits, we may choose not to obtain life expectancies from third-party medical-actuarial firms, but rather use standard mortality tables to develop our own life expectancy of an insured. These actuarial life expectancies are subject to interpretation and change based on evolving medical technology, actuarial data and analytical techniques. Any increase in the actuarial life expectancy estimates of insureds within our portfolio could have a materially adverse effect on our operating results and cash flow. Adverse impacts on the value of our life insurance policy portfolio or our cash flow could in turn

24

Table of Contents

impair the value of the collateral we have pledged to our creditors, including the holders of our L Bonds, and our ability to service our debt and obligations as they come due.

For example, on January 22, 2013, 21st Services, an independent provider of life expectancy analysis and related services for the life settlement industry in general, announced advancements in its underwriting methodology, resulting in revised life expectancy mortality tables for life settlement transactions. Based on information publicly released by 21st Services, the revised tables incorporate significantly more older-age mortality data than earlier versions commonly used by the life insurance industry, resulting in a far greater ability to:

- assess the magnitude of impact that hundreds of different types of health impairments have on senior mortality on a case-by-case basis;

App. 0022

- apply credits and debits during the underwriting process in a manner that accounts for the different impacts of the same impairments for males and females; and

- reflect the difference in mortality between insureds who have sold policies and the group of 90,000 insureds underwritten by 21st Services, most of whom did not ultimately sell their policies in the life settlement market (such difference is frequently referred to in the life-settlement industry as "anti-selection").

21st Services reported that the revised mortality tables reflected an average 19% increase in the life expectancy of insureds. Nevertheless, 21st Services representatives have also advised us that generalizations could not be gleaned from their report as the changes that were made were very granular and dependent upon the specific medical conditions of an insured, as well as other factors. More specifically, mortality tables increased the general life expectancies most significantly for people leading an active lifestyle. The revised tables also generally reflect increased life expectancies for non-smoking men and women. 21st Services representatives have further advised us that (i) certain medial conditions have resulted in increased life expectancies (e.g., cardiovascular disease) and some conditions resulted in decreased life expectancies, and (ii) the revised tables also have greater impact on the life expectancies of insureds who are younger.

For a majority of our life insurance policy purchases, we use 21st Services life expectancy estimates as one of two such estimates we generally obtain prior to purchasing life insurance policies on the secondary market and average those estimates for our life expectancy estimate. The life expectancy of an insured has an inverse relationship to the expected internal rate of return to be generated from life insurance policies purchased in the secondary market. A reduced internal rate of return may reduce the value of a life insurance policy available for purchase on the secondary market, and the value of life insurance policies already purchased by us and being serviced in our portfolio.

As of December 31, 2012, we increased all life expectancy reports provided by 21st Services by an average of 8.67%. The impact of this adjustment to the fair value of our portfolio was a decrease of $12.4 million as of December 31, 2012, and the impact on our expected internal rate of return was a decrease from 14.27% to 12.84%. In February 2013, we began the process of evaluating the impact of 21st Services' revised mortality tables upon our portfolio. We concluded that the adjustments we made a year ago were reasonable based upon the updated life expectancy estimates we have received as of December 31, 2013.

We generally rely on two life expectancy estimates from independent third-party medical-actuarial underwriting firms to develop our own life expectancy estimate. In some cases, we may obtain more than two life expectancy estimates. In those cases, we average the two life expectancy estimates that we believe are the most reliable of those we have received, based on our own analyses and conclusions. In this regard, the two life expectancy estimates we ultimately choose to average may not always be the most conservative ones we obtain.

In addition to actuarial life expectancies, we rely on pricing and premium forecasting software models developed by third-party actuarial companies for the valuation of policies we purchase, future mortality revenues, and the calculation of anticipated internal rates of return. These pricing models forecast the estimated future premiums due, as well as the future mortalities based on the survival probabilities of the

<div align="center">25</div>

Table of Contents

insureds over their life expectancies. It is possible that the actuarial tables we presently use will again change in the future or that the mortality assumptions will fail substantially to meet actuarial estimates, and that any such failure could have a materially adverse effect on our business.

On September 15, 2014, 21st Services announced changes to its mortality tables primarily for insureds age 90 and older, as well as updated adjustment factors designed to better underwrite seniors with multiple impairments. These changes represent small portions of 21st Services' historical underwritings and were not material to the company's portfolio of life insurance policies. We expect medical-actuarial underwriting firms to continue improving and refining their underwriting methodology. We will continue to monitor developments in medical-actuarial methodologies. We generally expect to incorporate such changes to our portfolio when we update our life expectancy reports.

*We rely on estimated rates of mortality for the actuarial assumptions we use when valuing life insurance policies and forecasting the performance of our portfolio, and we also rely on other estimates derived from statistical methodologies for projecting our future cash flows, among other things. If our estimates prove to be incorrect, it could materially and adversely affect our ability to satisfy our debt service and repayment obligations, including our obligations under the L Bonds.*

If we assume we will receive cash inflows from policies sooner than we actually do, we may not be able to make payment on our debt obligations, including our L Bonds, in a timely manner, or at all. Moreover, a significant discovery that results in mortality improvements among seniors, above historically predicted rates by medical actuaries providing life expectancies, could have a material adverse effect on our life insurance policy investments.

For example, we use a modeling method for projecting cash flows known as the "probabilistic method." This is an actuarial method that uses a mortality curve to project the likely flow of policy benefits to us, and attempts to reflect the probability that each premium must be paid. We have in fact experienced fewer cash flows from policy benefits than projected in the early stages of ownership of our current life insurance policy portfolio using this method. We had expected to receive approximately $65.7 million in cumulative policy benefits as of December 31, 2013, and in fact received $28.6 million. This has resulted in greater than expected premium payments, increasing from an expected $58.6 million to $61.0 million. Barring significant mortality improvements (i.e., medical advancements relating to the medical conditions of insureds), however, the fact that actual results have differed from the expectations derived from the probabilistic method of projecting cash flows should ordinarily result in greater cash flows later in the portfolio's servicing period.

We update and revise our projected future cash flows each month using the probabilistic method to reflect the actual experience within our life insurance policy portfolio to date. We use the current future cash flow projection to generate our expected internal rate of return on the life insurance policy portfolio we own. We would expect to change our method of calculating our future cash flows only if leading actuarial firms no longer believed such methodology was the most

<div align="right">App. 0023</div>

appropriate means of generating projected cash flows from a life insurance policy portfolio. Any change to the pricing model, methodology, premium forecasting assumptions, cash flow projections, or the mortality assumptions accompanied therewith that increase the projected cost of insurance premiums or decrease the probability of mortality could have a material and adverse impact on our results of operations and cash flows. Ultimately, this could adversely affect our ability to meet our debt service and repayment obligations, including our obligations under the L Bonds.

<div align="center">

**Risks Related to This Offering and Our Company**

</div>

***We may not be able to raise the capital that we are seeking in this offering or in our offering of previously issued L Bonds, and may be unable to meet our overall business objectives of growing a larger, more statistically diverse portfolio of life insurance policies without the proceeds from the sale of such securities.***

Emerson Equity LLC serves as our placement agent and managing broker-dealer in this offering of L Bonds on a best-efforts basis. Although Emerson Equity, LLC has agreed to use its best efforts in the offer and sale of the L Bonds, there is no minimum aggregate principal amount of L Bonds that we must sell prior

<div align="center">

26

</div>

---

Table of Contents

to accessing investor funds, and we may not be able to sell the L Bonds that we are seeking to sell in this offering. Consequently, the additional capital we are seeking may not ultimately be obtained.

Our offering of previously issued L Bonds has been the principal means by which we have raised the funds needed to meet our goal of growing a larger and more statistically diverse portfolio that is more likely to meet our cash flow projections. While we plan to continue financing our business and meet this goal through this offering of L Bonds, if we are unable to continue this offering for any reason we may be unable to meet our goal. In addition, if holders of our Series I Secured notes or previously issued L Bonds were to fail to renew those securities with the frequency we have historically experienced, and actual cash flows from our portfolio of life insurance policies do not occur as our actuarial projections have forecasted, we could be forced to sell our investments in life insurance policies in order to service or satisfy our debt-related obligations. If we are forced to sell investments in life insurance policies or our entire portfolio, we may be unable to sell them at prices we believe are appropriate, and may not be able to sell them at prices that approximate the discount rate we have applied to value our portfolio, particularly if our sale of policies occurs at a time when we are (or are perceived to be) in distress. In any such event, our business and the value of our securities, including our debt securities and common stock, may be materially and adversely impacted. Accordingly, there is a risk that you could lose your entire investment.

***We depend upon cash distributions from our subsidiaries, and contractual restrictions on distributions to us or adverse events at one of our operating subsidiaries could materially and adversely affect our ability to pay our debts, including our obligations under the L Bonds, and to continue to operate our business.***

GWG Holdings, Inc. is a holding company. As a holding company, we conduct our operations through our operating subsidiaries, and our only significant assets are the capital stock of our subsidiaries. Accordingly, our ability to meet our cash obligations, including our obligations under the L Bonds, depends in material part upon the ability of our subsidiaries to make cash distributions to us. In this regard, the ability of our subsidiaries to make distributions to us is, and will continue to be, restricted by certain negative covenants in the agreement governing our revolving credit facility. DLP Funding II is the borrower under our revolving credit facility (see note 6 to our consolidated financial statements). The significant majority of the insurance policies we own are subject to a collateral arrangement with the agent for our revolving credit lender, as described in note 2 to our consolidated financial statements. Under this arrangement, collection and escrow accounts are used to fund purchases of and premiums for the insurance policies and to pay interest and other charges under the revolving credit facility. The lender and its agent must authorize all disbursements from these accounts, including any distributions to GWG Life. Distributions are limited to an amount that would result in the borrowers (us) realizing an annualized rate of return on the equity funded amount for such assets of not more than 18%, as determined by the agent. After such amount is reached, the credit agreement requires that excess funds be used to fund repayments or a reserve account in certain amount, before any additional distributions may be made.

If any of the above limitations were to materially impede the flow of cash to us, such fact would materially and adversely affect our ability to service and repay our debt, including obligations under the L Bonds and Series I Secured notes. In addition, any adverse event at the subsidiary level, such as a declaration of bankruptcy, liquidation or reorganization or an event of default under our revolving credit facility, could materially and adversely affect the ability of our subsidiaries to make cash distributions to us. Just as with a material contractual impediment to cash flow, any such subsidiary corporate event would materially and adversely affect our ability to service and repay our debt, including obligations under the L Bonds, and negatively impact our ability to continue operations.

<div align="center">

27

</div>

---

Table of Contents

***Subordination provisions contained in the indenture will restrict the ability of the trustee or the L Bond holders to enforce their rights against us under the indenture, including the right to payment on the L Bonds, if a default then exists under our revolving credit facility.***

The L Bonds will be subordinate in right of payment to any claims of the senior lender under our revolving credit facility. In this regard, subordination provisions limiting the right of L Bond holders to enforce their rights are contained in the indenture. These provisions include:

- a prohibition on challenging any enforcement action taken by a senior lender or interfering with any legal action or suits undertaken by a senior lender against us and our affiliates;

<div align="right">

App. 0024

</div>

- a 180-day standstill period during which there may not be brought any action to enforce an event of default against us or our affiliates unless our revolving credit facility has been repaid in full, which period may be extended if the credit facility provider takes action during such standstill period; and

- a prohibition on filing a bankruptcy or insolvency case against us or our affiliates for at least one year plus one day after the revolving credit facility lender has been paid in full.

Furthermore, in the event of a default, we will be prohibited from making any payment, direct or indirect (whether for interest, principal, as a result of any redemption or repayment at maturity, on default, or otherwise), on the L Bonds and any other indebtedness, and neither the holders of the L Bonds nor the trustee will have the right, directly or indirectly, to sue to enforce the indenture or the L Bonds, if a default or event of default under any senior credit facility has occurred and is continuing, or if any default or event of default under any senior credit facility would result from such payment. This payment restriction will generally remain in effect unless and until: (i) the default and event of default respecting the senior credit facility has been cured or waived or has ceased to exist; and (ii) the end of the period commencing on the date the indenture trustee receives written notice of default from a holder of such credit facility and ending on the earlier of the indenture trustee's receipt of (1) a valid waiver of default from the holder of a credit facility, or (2) a written notice from the holder of a credit facility terminating the payment blockage period.

Other provisions of the indenture permit the trustee to take action to enforce the right of L Bond holders to payment after 179 days have passed since the trustee's receipt of notice of default from the senior lender, but in such case any funds paid as a result of any such suit or enforcement action shall be applied toward the senior credit facility until the facility is indefeasibly paid in full before being applied to the L Bonds. These subordination provisions present the risk that, upon any default by us on obligations owed under our senior debt, the holders of the L Bonds will be unable to enforce their right to payment.

If the 180-day standstill period noted above or any other limitation on the rights of the trustee or L Bond holders to assert their rights to payment of principal or interest under the indenture or L Bonds is ultimately determined to conflict with provisions of the Trust Indenture Act of 1939 (most notably sections 316(b) and 317(a) of that Act), then the trustee, as well as any holder who shall not have earlier consented to such subordination provisions, shall (notwithstanding such provision contained in the indenture) be authorized to institute a lawsuit for the enforcement of any payment of principal or interest after their respective due dates.

**The collateral granted as security for our obligations under the L Bonds and Series I Secured notes may be insufficient to repay the indebtedness upon an event of default.**

Our L Bonds and Series I Secured notes are structurally subordinate to all obligations of our wholly owned subsidiary DLP Funding II. Importantly in this regard, DLP Funding II owns most of our life insurance policies and is the borrower under the credit facility. This means that holders of the L Bonds and Series I Secured notes will have a junior position to the claims of our senior credit facility provider.

Thus, L Bonds and Series I Secured notes are subordinate to all senior secured debt we have or may incur, to the extent of the value of the assets securing that debt. Importantly, as the issuers of the L Bonds and Series I Secured notes which have granted a general security interest in its assets as collateral security for those obligations, GWG Holdings' and GWG Life's most significant assets are cash and their investments in subsidiaries. GWG Holdings' total assets at September 30, 2014 were approximately $311 million, of which

28

Table of Contents

approximately $172 million was its investment in subsidiaries. While the indenture agreements governing the L Bonds limits the amount of debt we and our subsidiaries can incur (through the debt coverage ratio covenant contained in Section 6.1 of such indenture), the indenture permits us and our subsidiaries to incur secured debt (subject to the debt coverage ratio) that may be senior to the L Bonds. For more information relating to the debt coverage ratio, please refer to the risk factor below captioned "*Because we intend to hold our life insurance policies to their maturity*," page 30.

As indicated above, as of September 30, 2014, we had approximately $79 million of outstanding secured indebtedness under our revolving credit facility that is senior to the L Bonds. For a description of the ranking of the L Bonds, see "*Description of the L Bonds — Ranking*" in this prospectus. In addition, the guarantee and associated grant of collateral security by GWG Life for our obligations under the L Bonds may offer security that is insufficient to fully satisfy obligations under the L Bonds. Like GWG Holdings, GWG Life's most significant asset is its investment in its subsidiaries (in this case, DLP Funding II). GWG Life's total assets at September 30, 2014 were approximately $203 million, of which approximately $199 million was its investment in subsidiaries.

Because of the foregoing, and because of the fact that 75.8% of our life insurance policies representing approximately 78.6% of the face value of our life insurance policy benefits as of September 30, 2014 are held in our DLP Funding II subsidiary or its associated master trust (and all of those assets serve as collateral security for our obligations under the revolving credit facility), L Bond holders risk the possibility that the collateral security we have granted for our obligations under such securities may be insufficient to repay those securities upon an event of default.

**If a significant number of holders of our Series I Secured notes and previously issued L Bonds demand repayment of those instruments instead of renewing them, and at such time we do not have sufficient capital on hand to fund such repayment (and do not otherwise have access to sufficient capital), we may be forced to liquidate some of our life insurance assets, which could have a material and adverse impact on our results of operations.**

Our direct and wholly owned subsidiary, GWG Life, had issued and outstanding approximately $29.7 million and $28.2 million in Series I Secured notes as of December 31, 2013 and September 30, 2014, respectively. By virtue of GWG Life's full and unconditional guarantee of obligations under the L Bonds, and other agreements contained in or made in connection with the indenture, the L Bonds are pari passu in right of payment and collateral with the Series I Secured notes. The indenture governing the L Bonds, and the note issuance and security agreement governing the Series I Secured notes, each provide for cross defaults upon an event

of default under the provisions of the other agreement (i.e., an event of default under the note issuance and security agreement will constitute an event of default under the indenture for the L Bonds, and vice versa).

The terms of the Series I Secured notes have renewal features. Since we first issued our Series I Secured notes, we have experienced $131,774,000 in maturities, of which $102,260,000 has renewed for an additional term as of September 30, 2014. This has provided us with an aggregate renewal rate of approximately 78% for investments in our Series I Secured notes. Future contractual maturities of Series I Secured notes payable at September 30, 2014 are as follows:

**Years Ending December 31,**

| | |
|---|---:|
| Three months ending December 31, 2014 | $ 1,925,000 |
| 2015 | 12,729,000 |
| 2016 | 8,217,000 |
| 2017 | 4,427,000 |
| 2018 | 754,000 |
| Thereafter | 141,000 |
| | $28,193,000 |

## Table of Contents

The terms of the previously issued L Bonds also have renewal features. Since we first issued our previously issued L Bonds, we have experienced $51,493,000 in maturities, of which $34,105,000 has renewed for an additional term as of September 30, 2014. This has provided us with an aggregate renewal rate of approximately 66% for investments in the previously issued L Bonds. Future contractual maturities of previously issued L Bonds at September 30, 2014 are as follows:

**Years Ending December 31,**

| | |
|---|---:|
| Three months ending December 31, 2014 | $ 16,086,000 |
| 2015 | 55,676,000 |
| 2016 | 43,434,000 |
| 2017 | 21,950,000 |
| 2018 | 10,730,000 |
| Thereafter | 25,369,000 |
| | $173,245,000 |

If investors holding existing indebtedness with short-term maturities do not elect to renew and we do not, at such time, have access to sufficient capital or have not raised sufficient capital by other financing efforts, we may need to liquidate some of our investments in life insurance policies earlier than anticipated. In such an event, we may be unable to sell those life insurance policies at prices we believe are fair or otherwise appropriate and such sales could have a material and adverse impact on our results of operations.

***Because we intend to hold our life insurance policies to their maturity, we therefore measure our debt coverage ratio against our current cost of financing, which may not reflect the sale price of our life insurance policies if we were to liquidate them.***

We intend and expect to hold the life insurance policy investments until they are paid out at the mortality of the insured. As a result, we measure our debt coverage ratio based on the portfolio's gross expected yield against the interest cost of our total debt obligations to finance the portfolio. The debt coverage ratio, expressed as a percentage, is defined as the ratio of (i) total amounts outstanding on any indebtedness for borrowed money, over (ii) the net present asset value of all life insurance assets we own, plus any cash held in our accounts. For this purpose, the net present asset value is calculated as the present value of the life insurance portfolio's expected future cash flows discounted at the weighted-average interest rate of the indebtedness for the previous month. Under the indenture, the maximum amount of such securities we may issue at any time is limited to an amount such that our debt coverage ratio does not exceed 90%. This limitation is designed to provide some comfort to holders of our debt that the value of our assets exceeds our obligations to those holders. Nevertheless, the debt coverage ratio (as calculated) is not based on the fair value of our life insurance assets, which may be different — greater or less—than the amount we would receive if we were forced to sell those assets in the marketplace. Furthermore, mere compliance with the debt coverage ratio does not contemplate or account for the significant transactional costs that could be associated with a sale of all or any significant portion of our portfolio. Please see "Management's Discussion and Analysis of Financial Condition and Results of Operations — Liquidity and Capital Resources — Debt Financings Summary" for more information.

***We have no obligation to redeem L Bonds prior to their maturity date except in narrowly limited circumstances.***

We will have no obligation, and L Bond holders will have no right to require us, to redeem any L Bond prior to its maturity date. The only exceptions exist for situations in which an individual natural person investor suffers a total permanent disability or a bankruptcy, or dies. In any such event, we will be required to redeem the L Bond of such person so long as certain procedural requirements are met. Outside these narrow exceptions, we may nonetheless agree, in our sole and absolute discretion, to accommodate requests to redeem an L Bond prior to its maturity in other cases. If we do agree to redeem an L Bond, we will assess a 6% redemption fee for such transaction. For more information, see "Description of the L Bonds—Call and

Table of Contents

Redemption Prior to Stated Maturity." As a result, any investment in an L Bond should be considered illiquid and unable to be redeemed until its stated maturity.

***Fraudulent transfer statutes may limit your rights under the guarantee of the L Bonds.***

Our obligations under the L Bonds will be fully and unconditionally guaranteed by our direct wholly owned subsidiary, GWG Life. The guarantee may be subject to review under various laws for the protection of creditors. It is possible that other creditors of GWG Life may challenge the guarantee as a fraudulent transfer under relevant federal and state laws. Under certain circumstances, including a finding that GWG Life was insolvent at the time its guarantee was issued, a court could hold that the obligations of GWG Life under the guarantee may be voided or are subordinate to other obligations of GWG Life, or that the amount for which GWG Life is liable under its guarantee of the L Bonds may be limited. Different jurisdictions define "insolvency" differently, and we cannot assure you as to what standard a court would apply to determine whether GWG Life was insolvent. If a court were to determine that GWG Life was insolvent on the date on which it guaranteed the L Bonds, or that the guarantee constituted a fraudulent transfer on other legal grounds, the claims of creditors of GWG Life would effectively have priority with respect to GWG Life's assets and earnings over the claims of the holders of the L Bonds.

***Our controlling stockholders and principal executives are involved in a litigation "clawback" claim made by a bankruptcy trustee to an affiliate, and it is possible that the trustee may assert claims against our company.***

Our Chief Executive Officer, Jon R. Sabes, and our Executive Vice President of Originations and Servicing and Secretary, Steven F. Sabes, who together beneficially own or control approximately 74.81% of our common stock, are subject to litigation relating to claims by a bankruptcy trustee for loan payments made to an affiliate, Opportunity Finance, LLC. The litigation stems from the 2010 conviction of an individual operating a fraudulent business scheme which filed for bankruptcy in 2008. The bankruptcy trustee alleges that loan repayments to Opportunity Finance were avoidable transfers under preference or other legal theories and seeks to recover amounts for other creditors of the bankruptcy estate. Such payments may ultimately be deemed to be avoidable transfers under preference or other legal theories. Case No. 08-45257 (U.S. Bankruptcy Court District of Minnesota). In addition, GWG holdings invested $1.0 million in Opportunity Finance, LLC in 2006 and was repaid and received $176,948 of interest income from that investment in 2007. To date, no claim has been made against GWG Holdings.

Although we believe there are numerous meritorious defenses to the claims made by the bankruptcy trustee, and we are advised that the defendants in that action will vigorously defend against the trustee's claims, such defendants may not prevail in the litigation with the bankruptcy trustee. If the bankruptcy trustee sought to sell or transfer the equity interests of Jon R. Sabes or Steven F. Sabes as a result of the litigation, there could be a change in control of the Company, and our business together with all of our investors, including investors in our common stock, could be materially and adversely impacted. Such adverse results would likely arise in connection with negative change-in-control covenants contained in our revolving credit facility agreements, the breach of those covenants and an ensuing event of default under such facility. Finally, regardless of the outcome of this litigation, these matters are likely to distract management and reduce the time and attention that they are able to devote to our business.

***We have no obligation to contribute to a sinking fund to retire the L Bonds, nor are the L Bonds guaranteed by any governmental agency.***

We have no obligation to contribute funds to a sinking fund to repay principal or interest on the L Bonds upon maturity or default. The L Bonds are not certificates of deposit or similar obligations of, or guaranteed by, any depository institution. Further, no governmental entity insures or guarantees payment on the L Bonds if we do not have enough funds to make principal or interest payments.

<div align="center">31</div>

Table of Contents

***The loss of the services of our current executives or other key employees, or the failure to attract additional key individuals, would materially and adversely affect our business operations and prospects.***

Our financial success is dependent to a significant degree upon the efforts of our current executive officers and other key employees. In addition, our revolving credit facility requires Messrs. Jon R. Sabes and Steven F. Sabes to generally remain active within the business. We have entered into employment agreements with Messrs. Jon R. Sabes, Steven F. Sabes, Paul A. Siegert, William Acheson and Jon Gangelhoff. Nevertheless, there can be no assurance that these individuals will continue to provide services to us. A voluntary or involuntary termination of employment could have materially adverse effect on our business operations if we were not able to attract qualified replacements in a timely manner. At present, we do not maintain key-man life insurance policies for any of these individuals. In addition, our success and viability is also dependent to a significant extent upon our ability to attract and retain qualified personnel in all areas of our business, especially our sales, policy acquisition, and financial management team. If we were to lose the members of these service teams, we would need to replace them with qualified individuals in a timely manner or our business operations and prospects could be adversely impacted.

***We have the discretion to purchase assets, including life insurance policies, through different subsidiaries, and to transfer assets among our subsidiaries. Any decision to purchase or hold title to assets in one subsidiary, as opposed to a different subsidiary, may affect the value of collateral security for our obligation under the L Bonds.***

We may at our discretion direct the purchase of policies by, and the sale of policies and other assets amongst, different subsidiaries of GWG Holdings as a method of asset and liability management and to attempt to maintain diversification and certain ratios in our investment portfolio. Purchases of assets in, or movements of assets amongst, different subsidiaries could affect the value of the collateral security for obligations under the L Bonds. For example, purchases through, or transfers of life insurance policies to, DLP Funding II would cause the policies acquired by DLP Funding II to become collateral for our revolving credit facility, whereas purchases through, or transfers of life insurance policies to, GWG Life would cause the policies acquired by GWG Life to become collateral for the

L Bonds. Accordingly, purchases of assets such as life insurance policies through, or transfers of such assets to, different subsidiaries may affect the value of collateral security for different classes of holders of our debt, including the L Bonds. In the case of a liquidation, any of these discretionary decisions may affect the value of and amount you may ultimately be entitled to receive with respect to your L Bonds.

***We are an "emerging growth company" and our election to delay adoption of new or revised accounting standards applicable to public companies may result in our financial statements not being comparable to those of some other public companies. As a result of this and other reduced disclosure requirements applicable to emerging growth companies, our securities may be less attractive to investors.***

As a public reporting company with less than $1.0 billion in revenue during our last fiscal year, we qualify as an "emerging growth company" under the Jumpstart our Business Startups Act of 2012, or the JOBS Act. An emerging growth company may take advantage of certain reduced reporting requirements and is relieved of certain other significant requirements that are otherwise generally applicable to public companies. In particular, as an emerging growth company we:

- are not required to obtain an attestation and report from our auditors on our management's assessment of our internal control over financial reporting pursuant to the Sarbanes-Oxley Act of 2002;

- are not required to provide a detailed narrative disclosure discussing our compensation principles, objectives and elements and analyzing how those elements fit with our principles and objectives (commonly referred to as "compensation discussion and analysis");

- are not required to obtain a non-binding advisory vote from our stockholders on executive compensation or golden parachute arrangements (commonly referred to as the "say-on-pay," "say-on-frequency" and "say-on-golden-parachute" votes);

<div align="center">32</div>

Table of Contents

- are exempt from certain executive compensation disclosure provisions requiring a pay-for-performance graph and CEO pay ratio disclosure;

- may present only two years of audited financial statements and only two years of related Management's Discussion & Analysis of Financial Condition and Results of Operations, or MD&A; and

- are eligible to claim longer phase-in periods for the adoption of new or revised financial accounting standards under §107 of the JOBS Act.

We intend to take advantage of all of these reduced reporting requirements and exemptions, including the longer phase-in periods for the adoption of new or revised financial accounting standards under §107 of the JOBS Act. Our election to use the phase-in periods may make it difficult to compare our financial statements to those of non-emerging growth companies and other emerging growth companies that have opted out of the phase-in periods under §107 of the JOBS Act.

Certain of these reduced reporting requirements and exemptions were already available to us due to the fact that we also qualify as a "smaller reporting company" under SEC rules. For instance, smaller reporting companies are not required to obtain an auditor attestation and report regarding management's assessment of internal control over financial reporting; are not required to provide a compensation discussion and analysis; are not required to provide a pay-for-performance graph or CEO pay ratio disclosure; and may present only two years of audited financial statements and related MD&A disclosure.

Under the JOBS Act, we may take advantage of the above-described reduced reporting requirements and exemptions for up to five years after our initial sale of common equity pursuant to a registration statement declared effective under the Securities Act of 1933, or such earlier time that we no longer meet the definition of an emerging growth company. In this regard, the JOBS Act provides that we would cease to be an "emerging growth company" if we have more than $1.0 billion in annual revenues, have more than $700 million in market value of our common stock held by non-affiliates, or issue more than $1.0 billion in principal amount of non-convertible debt over a three-year period. Furthermore, under current SEC rules we will continue to qualify as a "smaller reporting company" for so long as we have a public float (i.e., the market value of common equity held by non-affiliates) of less than $75 million as of the last business day of our most recently completed second fiscal quarter.

We cannot predict if investors will find our securities less attractive due to our reliance on these exemptions. If investors were to find our securities less attractive as a result of our election, we may have difficulty raising all of the proceeds we seek in this offering.

***We do not expect a market to exist that will enable you to sell your L Bonds.***

Although we are a public reporting company that files information with the SEC, the L Bonds will not be readily resalable or transferable. No public market for the L Bonds exists and none is expected to develop. As a result, the transferability of the L Bonds will be limited. Accordingly, the purchase of L Bonds is not suitable for investors desiring liquidity at any time prior to the maturity of the L Bonds.

***We cannot know the tax implications of an investment in the L Bonds for the L Bond holder.***

The section of this prospectus entitled "Material Federal Income Tax Considerations" sets forth a summary of federal income tax consequences to the purchasers of the L Bonds. No information is provided concerning tax consequences under any other federal, state, local or foreign laws that may apply to the purchasers of the L Bonds. Prospective investors or their representatives should read that section very carefully in order to properly evaluate the federal income tax risks of an investment in the L Bonds. Each prospective investor should consult his personal counsel, accountant and other business advisors as to the federal, state, local and foreign tax consequences of an investment in the L Bonds. L Bond holders will receive an IRS Form 1099-INT in connection with their receipt of interest payments.

Table of Contents

*Advances previously made to members of our executive management and outstanding at the time that we initially filed the registration statement for our offering of previously issued L Bonds may be deemed violations of Section 402 of the Sarbanes-Oxley Act of 2002. That law prohibits public reporting companies from extending or maintaining credit to directors or executive officers in the form of a personal loan. Any such violations could have a material and adverse effect upon our reputation and business.*

Prior to our conversion from a limited liability company to a corporation and the filing of the registration statement for our offering of previously issued L Bonds, we made certain advances to our executive management personnel, Messrs. Jon R. Sabes, Steven F. Sabes and Paul A. Siegert, that were to be repaid by such individuals upon or in connection with operating distributions to be paid by us when the Company had cash flow sufficient to make distributions on account of their ownership interests in the Company. For further information, please refer to the "Executive Compensation" section of this prospectus the "—Summary Compensation Table," "—Employment Agreements and Change-in-Control Provisions," and "—Related-Party Transactions" captions thereunder.

Each of Messrs. Jon R. Sabes, Steven F. Sabes and Paul A. Siegert have repaid all outstanding advances, including all interest accrued thereon. Nevertheless, because such loan advances remained outstanding at the time that we initially filed such registration statement with the SEC, we may be deemed to have inadvertently violated Section 402 of the Sarbanes-Oxley Act of 2002, which prohibits "issuers" from extending or maintaining credit to directors or executive officers in the form of a personal loan. As defined under the Sarbanes-Oxley Act of 2002, the term "issuer" includes, in addition to public companies, a company that has filed a registration statement that has not yet become effective under the Securities Act of 1933 and that has not been withdrawn. Although we believe that the loan advances constitute business loans, as opposed to personal loans, regulatory authorities may not agree with this assessment if the matter is investigated and claims alleging a violation are pursued. On July 27, 2011, Messrs. Jon R. Sabes, Steven F. Sabes and Paul A. Siegert repaid their loan balances.

Violations of the Sarbanes-Oxley Act of 2002 could result in significant penalties, including censure, cease and desist orders, revocation of registration and fines. It is also possible that the criminal penalties could exist, although criminal penalties require a related violation to have been willful, and not the result of an innocent mistake, negligence or inadvertence. In the end, it is possible that we could face any of these potential penalties or results, and any action by administrative authorities, whether or not ultimately successful, could have a material and adverse effect upon our reputation and business.

<div align="center">34</div>

Table of Contents

<div align="center">**USE OF PROCEEDS**</div>

If all of the L Bonds are sold, we expect to receive up to approximately $918.5 million of net proceeds from this offering after paying estimated offering and related expenses and after paying our estimated average selling and wholesale commissions, dealer-manager fees, and accountable expense allowance. The estimated commissions, dealer-manager fees, accountable expense allowance and wholesale commissions of our selling group members aggregate to approximately $80 million based on expected average selling commissions of $50 million (5.00%), dealer-manager fees of $5 million (0.50%), and accountable expenses, wholesale commissions, and any non-transaction-based and non-cash selling compensation aggregating to $25 million (2.50%), assuming the sale of all of the L Bonds. We have also agreed to reimburse Emerson Equity for certain pre-offering expenses that we expect will aggregate to no more than $180,500. In addition, we expect that our offering expenses, consisting of legal, accounting, printing, mailing, registration, qualification and associated securities offering filing costs and expenses, will aggregate to approximately $1,350,000 through the course of this offering.

As explained elsewhere in this prospectus, the maximum amount of commissions, fees and allowances (including non-transaction-based and non-cash selling compensation, if any) payable to FINRA selling members is 8.00% of the aggregate principal amount of L Bonds sold. Therefore, if all of the L Bonds were sold and the maximum commissions, fees and allowances and reimbursements were paid, we estimate that the net proceeds to us, after paying our own estimated offering and related expenses, would be approximately $918.5 million. Nevertheless, because we do not know the total principal amount of L Bonds that will be ultimately sold, we are unable to accurately forecast the total net proceeds that will be generated by this offering. For more information about dealer-manager fees, selling commissions, and accountable expenses payable to our selling group in connection with the sale of L Bonds, as well as our own offering and related expenses, please see "Plan of Distribution."

There is no minimum amount of L Bonds that must be sold before we access investor funds. The exact amount of proceeds we receive may vary considerably depending on a variety of factors, including how long the L Bonds are offered.

Our goal is to use a majority of the net proceeds from the sale of L Bonds to purchase additional life insurance policy assets in the secondary market. The amount of proceeds we apply towards purchasing additional life insurance policy assets will depend, among other things, on how long the L Bonds are offered, the amount of net proceeds that we receive from the sale of L Bonds being offered, the existence and timing of opportunities to expand our portfolio of insurance policy assets, our cash needs for certain other expenditures (summarized below) we anticipate incurring in connection with this offering and in connection with our business, and the availability of other sources of cash (e.g., our revolving credit facility). These certain other expenditures, listed in order of priority, include:

- paying premiums on life insurance assets we own;

- paying principal at maturity, interest and fees to our lenders, including under our revolving credit facility, the Series I Secured notes, the previously issued L Bonds and the L Bonds offered hereby; and paying fees and expenses of the trustees of certain trusts associated with our Series I Secured notes, the previously issued L Bonds and the L Bonds offered hereby; and

<div align="right">App. 0029</div>

• providing funds for portfolio operations and working capital purposes.

Our use of funds for portfolio operations is expected to include, but not be limited to, expenditures such as (i) obtaining life expectancy reports, (ii) mortality tracking and (iii) legal and collections expenses; and our use of funds for working capital purposes is expected to include, but not be limited to, (iv) sales and marketing expenses, (v) general and administrative expenses, as well as (vi) tax liabilities, and (vii) interest rate caps, swaps or hedging instruments for our life insurance policy portfolio or our indebtedness.

As indicated above, the extent to which we will use proceeds from this offering for these other purposes, and the amounts and timing of such expenditures will depend on, among other things, how long the L Bonds are offered, the amount of net proceeds that we receive from the sale of L Bonds being offered, the existence

35

**Table of Contents**

and timing of opportunities to expand our portfolio of insurance policy assets, the availability of funds from other sources, including borrowings from our revolving credit facility and cash generated from our operations, and certain other factors. We currently expect to allocate net offering proceeds (assuming the maximum amount of commissions, fees, allowances and any other items of selling compensation equal to 8.00% of the aggregate principal amount of L Bonds sold) as follows, based upon various assumed amounts of gross proceeds that we receive from the sale of L Bonds:

| | Gross Offering Proceeds | | | | | |
|---|---|---|---|---|---|---|
| | $1,000,000,000 | | $500,000,000 | | $250,000,000 | |
| Net Offering Proceeds | 918,500,000 | 100% | 458,500,000 | 100% | 228,500,000 | 100% |
| Purchase Policies | 661,320,000 | 72% | 330,120,000 | 72% | 141,670,000 | 62% |
| Payment of Premiums | 91,850,000 | 10% | 45,850,000 | 10% | 34,275,000 | 15% |
| Payment of Principal and Interest | 119,405,000 | 13% | 59,605,000 | 13% | 41,130,000 | 18% |
| Other Expenditures | 45,925,000 | 5% | 22,925,000 | 5% | 11,425,000 | 5% |

Net offering proceeds not immediately applied to the uses summarized above will be invested in short-term investments such as money market funds, commercial paper, U.S. Treasury Bills and similar securities investments pending their use. We may also purchase interest rate hedges to lock in our cost of capital, or longevity hedges to lock in our expected return from our portfolio.

As indicated above, we may use some of the net proceeds from this offering to pay premiums on life insurance assets we own. Our aggregate premium obligations over the next five years for life insurance assets that we own as of September 30, 2014 are set forth in the table below. These premium obligations do not take into account the expectation of mortality over the periods presented.

| Year | Premiums |
|---|---|
| Three months ending December 31, 2014 | $  6,364,000 |
| 2015 | 26,728,000 |
| 2016 | 29,354,000 |
| 2017 | 32,829,000 |
| 2018 | 35,753,000 |
| Total | $131,028,000 |

Also as indicated above, we may use some of the net proceeds from this offering to pay principal amounts owing under our Series I Secured notes or previously issued L Bonds when such amounts become due and payable. The amount of such securities that we would repay with proceeds of this offering will depend on whether the holders of such notes elect repayment rather than renewal of such securities, as well as whether we elect to use other sources of repayment. We believe it is most likely that such payments, if any, would relate to securities that mature within the first three years after the initial effective date of the registration statement of which this prospectus is a part (i.e., the maximum period of time during which we may offer securities under the registration statement). Of the Series I Secured notes presently scheduled to mature on or prior to December 31, 2017, such notes have an aggregate outstanding principal amount of approximately $27.3 million and a weighted-average interest rate of 8.33% as of September 30, 2014. Of the previously issued L Bonds presently scheduled to mature on or prior to December 31, 2017, such securities have an aggregate outstanding principal amount of approximately $137.1 million and a weighted-average interest rate of 7.07% as of September 30, 2014. We do not intend to use any net proceeds from this offering to repurchase Series I Secured notes or previously issued L Bonds prior to their maturity.

Some of the outstanding previously issued L Bonds due to mature within the next year may have been issued within the prior year (i.e., less than one year ago). In such a case, we used the proceeds of such debt to purchase life insurance policies or finance the servicing of such policies.

36

Table of Contents

## CAPITALIZATION

The following table sets forth, as of September 30, 2014, our consolidated debt and stockholders' equity on an actual basis and as adjusted to give effect to the sale of the maximum amount of L Bonds offered hereby. You should read this table in conjunction with our consolidated financial statements and the notes thereto which are incorporated herein by this reference.

| | At September 30, 2014 | |
| --- | --- | --- |
| | Actual | As Adjusted |
| | (Dollars in thousands, except per-share amounts) (Unaudited) | |
| **Debt:** | | |
| L Bonds offered hereby | $ 0 | $1,000,000 |
| L Bonds previously issued (1) | 169,187 | 169,187 |
| Series I Secured notes (2) | 27,702 | 27,702 |
| Revolving credit facility (3) | 79,000 | 79,000 |
| Total debt | $275,889 | $1,275,889 |
| **Stockholders' equity (accumulated deficit):** | | |
| Series A Convertible Redeemable Preferred (par value $0.001; shares authorized 40,000,000; shares issued and outstanding 2,710,214; liquidation preference of $20,327,000 on September 30, 2014) | $ 20,218 | $ 20,218 |
| Common stock (par value $0.001 per share; shares authorized 210,000,000; 5,871,798 shares issued and 5,870,193 shares outstanding on September 30, 2014) | $ 6 | $ 6 |
| Additional paid-in capital | 16,324 | 16,324 |
| Accumulated Deficit | (16,327) | (16,327) |
| Total stockholders' equity (Deficit) | $ 20,221 | $ 20,221 |
| Total debt, preferred stock and common stockholders' equity | $296,110 | $1,296,110 |

(1)    The total outstanding face amount of L Bonds previously issued by GWG Holdings, Inc. (originally under the name Renewable Secured Debentures) outstanding at September 30, 2014 was $173,245,000 plus $1,679,000 of subscriptions in process, less unamortized selling costs of $5,737,000. The weighted average interest rate of our outstanding L Bonds at September 30, 2014 was approximately 7.49%, and the weighted average maturity was approximately 3.50 years. Upon effectiveness of the registration statement of which this prospectus is a part, all securities originally issued as "Renewable Secured Debentures" will be renamed "L Bonds."

(2)    The total outstanding face amount of Series I Secured notes outstanding at September 30, 2014 was $28,193,000, less unamortized selling costs of $491,000. The weighted-average interest rate of our outstanding Series I Secured notes at September 30, 2014 was approximately 8.37%, and the weighted-average maturity was approximately 1.92 years.

(3)    The interest rate of our revolving credit line floats in conjunction with advances made thereunder. The weighted-average interest rate payable under our revolving credit line at September 30, 2014 was approximately 6.22%. Amounts owing under our revolving credit line come due on December 31, 2016.

(4)    As of September 30, 2014, we had 2,710,000 preferred shares outstanding with a gross consideration of $20,327,000 (including cash proceeds, conversion of Series I Secured notes and accrued interest on Series I notes, conversion of preferred dividends payable and conversion of preferred stock to common stock) net of redemptions. We incurred Series A preferred stock issuance costs of $2,838,000, of which $2,729,000 was amortized to additional paid in capital as of September 30, 2014, resulting in a carrying amount of $20,218,000.

For more discussion and information relating to the retirement of Series I Secured notes, please refer to the "Use of Proceeds" section of this prospectus.

37

Table of Contents

## SELECTED FINANCIAL INFORMATION

The following tables set forth our summary consolidated financial information. The summary statement of operations data for fiscal years 2013 and 2012 and the selected balance sheet data as of December 31, 2013 and 2012 are derived from our audited consolidated financial statements contained elsewhere in this prospectus. This selected consolidated financial information should be read in conjunction with, and is qualified by reference to, our consolidated financial statements and related notes contained herein and the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of this prospectus.

**Balance Sheet Data:**

App. 0031

|  | September 30, 2014 | December 31, 2013 | December 31, 2012 |
|---|---|---|---|
| Total Assets | $311,492,676 | $275,380,476 | $197,948,035 |
| Investment in Portfolio | 276,381,979 | 234,672,794 | 164,317,183 |
| Cash and Cash Equivalents | 29,511,989 | 33,449,793 | 27,497,044 |
| Restricted Cash | 2,144,734 | 5,832,970 | 2,093,092 |
| Total Liabilities | 291,271,867 | 256,149,798 | 175,303,946 |
| Revolving Credit Facility | 79,000,000 | 79,000,000 | 71,000,000 |
| Series I Secured notes (1) | 27,701,842 | 29,275,202 | 37,844,711 |
| L Bonds previously issued (2) | 169,186,917 | 131,646,062 | 55,718,950 |
| Stockholder Preferred and Common Equity | 20,220,809 | 19,530,678 | 22,644,089 |

(1)    The total outstanding face amount of Series I Secured notes outstanding at September 30, 2014 was $28,193,000, less unamortized selling costs of $491,000.

(2)    The total outstanding face amount of L Bonds previously issued by GWG Holdings, Inc. (originally under the name Renewable Secured Debentures) outstanding at September 30, 2014 was $173,245,000 plus $1,679,000 of subscriptions in process, less unamortized selling costs of $5,737,000. Upon effectiveness of the registration statement of which this prospectus is a part, all securities originally issued as "Renewable Secured Debentures" will be renamed "L Bonds."

**Income Statement Data:**

|  | Nine Months Ended September 30, 2014 | Year Ended December 31, 2013 | Year Ended December 31, 2012 |
|---|---|---|---|
| Total Revenue | $16,143,492 | $33,064,774 | $17,525,798 |
| Gain on Life Insurance Contracts | 16,119,517 | 29,513,642 | 17,436,743 |
| Interest Expense | 19,731,327 | 20,762,644 | 10,878,627 |
| Net Loss | (7,888,000) | (194,955) | (1,012,899) |

38

Table of Contents

### MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATION

You should read the following discussion in conjunction with the consolidated financial statements and accompanying notes and the information contained in other sections of this prospectus, particularly under the headings "Risk Factors" and "Business." This discussion and analysis is based on the beliefs of our management, as well as assumptions made by, and information currently available to, our management. The statements in this discussion and analysis concerning expectations regarding our future performance, liquidity and capital resources, as well as other non-historical statements, are forward-looking statements. These forward-looking statements are subject to numerous risks and uncertainties. Our actual results could differ materially from those suggested or implied by any forward-looking statements. Please see the "Risk Relating to Forward-Looking Statements" section of this prospectus.

**Overview**

We are engaged in the emerging secondary market for life insurance policies. We acquire life insurance policies in the secondary market from policy owners desiring to sell their policies at a discount to the face value of the insurance benefit. Once we purchase a policy, we continue paying the policy premiums in order to ultimately collect the face value of the insurance benefit. We generally seek to hold the individual policies to maturity, in order to ultimately collect the policy's face value upon the insured's mortality. Our strategy is to build a profitable and large (greater than 300 lives) portfolio of policies that is diversified in terms of insurance carriers and the medical conditions of insureds. We believe that diversification among insureds, insurers and medical conditions will lower our overall risk exposure, and that a larger number of individual policies (diversification in overall number) will provide our portfolio with greater actuarial stability.

In 2013, we recognized $12,036,000 of revenue from the receipt of $16,600,000 in policy benefits. In addition, we recognized revenue from the change in fair value of our life insurance policies, net of premiums and carrying costs, of $17,478,000. In 2013, interest expense, including amortization of the deferred financing costs and preferred stock dividends, was $20,763,000, and selling, general and administrative expenses were $10,323,000. Income tax expense in 2013 was $2,174,000. Our net loss in 2013 was $195,000.

In the first nine months of 2014, we recognized revenue from the change in fair value of our life insurance policies, net of premiums and carrying costs, of $16,119,000. Interest expense, including amortization of the deferred financing costs and preferred stock dividends, was $19,731,000, and selling, general and administrative expenses were $8,430,000. Income tax benefit for the nine months ended September 30, 2014 was $4,130,000. Our net loss for the first nine months of 2014 was $7,888,000.

App. 0032

To date, we have financed our business principally through the issuance of debt, including debt incurred by our subsidiary DLP Funding II under a senior revolving credit facility provided by Autobahn/DZ Bank, Series I Secured notes issued by our subsidiary GWG Life and our registered public offering of Renewable Secured Debentures (to be renamed L Bonds upon the effectiveness of the registration statement of which this prospectus is a part). See the "Liquidity and Capital Resources" caption below. As of September 30, 2014, the outstanding shares of our preferred stock (equaling 2,710,214 preferred shares), may be converted at the election of the holders of preferred stock into an aggregate of approximately 2,032,661 shares of our common stock.

**Critical Accounting Policies**

*Critical Accounting Estimates*

The preparation of our consolidated financial statements in accordance with the Generally Accepted Accounting Principles (GAAP) requires us to make judgments, estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. We base our judgments, estimates and assumptions on historical experience and on various other factors believed to be reasonable under the circumstances. Actual results could differ materially from these estimates. We evaluate our judgments, estimates and assumptions on

39

[Table of Contents](#)

a regular basis and make changes accordingly. We believe that the judgments, estimates and assumptions involved in the accounting for the valuation of investments in life insurance policies have the greatest potential impact on our consolidated financial statements and accordingly believe these to be our critical accounting estimates. Below we discuss the critical accounting policies associated with these estimates as well as certain other critical accounting policies.

*Ownership of Life Insurance Policies — Fair Value Option*

Our primary business involves the purchasing and financing of life insurance policies. As such, we account for the purchase of life insurance policies in accordance with Financial Accounting Standards Board's Accounting Standards Codification (FASB ASC) 325-30, *Investments in Insurance Contracts*, which requires us to use either the investment method or the fair value method. We have elected to account for these life insurance policies as investments using the fair value method.

We initially record our purchase of life insurance policies at the transaction price, which is the amount paid for the policy, inclusive of all fees and costs associated with the acquisition. The fair value of our investment in the portfolio of insurance policies is evaluated at the end of each reporting period. Changes in the fair value of the portfolio of life insurance policies are based on periodic evaluations and are recorded as changes in fair value of life insurance policies in our consolidated and combined statement of operations. The fair value is determined as the net present value of the life insurance portfolio's future expected cash flows that incorporates current life expectancy estimates and discount rate assumptions.

In addition to reporting our results of operations and financial condition based on the fair value of our life insurance policies as required by GAAP, management also makes calculations based on the weighted average expected internal rate of return of the policies. See "Non-GAAP Financial Measures" below.

*Valuation of Life Insurance Policies*

Unobservable inputs, as discussed below, are a critical component of our estimate for the fair value of our investments in life insurance policies. We currently use a probabilistic method of estimating and valuing the projected cash flows of our portfolio of life insurance policies, which we believe to be the preferred and most prevalent valuation method in the industry. In this regard, the most significant assumptions we make are the life expectancy estimates of the insureds and the discount rate applied to the projected cash flows to be derived from our portfolio.

In determining life expectancy estimates, we generally use actuarial medical reviews from independent medical underwriters. These medical underwriters summarize the health of the insured by reviewing historical and current medical records. The medical underwriters evaluate the health condition of the insured in order to produce an estimate of the insured's mortality — a life expectancy report. In the case of a small face policy ($1,000,000 face value or less), we may use one life expectancy report or estimate life expectancy based on a modified methodology which does not use actuarial medical reviews from independent medical underwriters. The life expectancy estimate represents a range of probabilities for the insured's mortality against a group of cohorts with the same age, sex and smoking status. These mortality probabilities represent a mathematical curve known as a mortality curve, which is then used to generate a series of expected cash flows from the life insurance policy over the expected lifespan of the insured. A discount rate is used to calculate the net present value of the expected cash flows. The discount rate represents the internal rate of return we expect to earn on investments in a policy or in the portfolio as a whole at the stated fair value. The discount rate used to calculate fair value of our portfolio incorporates the guidance provided by ASC 820, *Fair Value Measurements and Disclosures*. Many of our current underwriting review processes, including our policy of obtaining actuarial medical reviews from independent medical underwriters as described above, are undertaken in satisfaction of obligations under our revolving credit facility. As a result, we may in the future modify our underwriting review processes if permitted under our borrowing arrangements.

40

[Table of Contents](#)

The table below provides the discount rate used to estimate the fair value of our portfolio of life insurance policies for the period ending:

| September 30, 2014 | December 31, 2013 |
|---|---|
| 11.56% | 11.69% |

The change in the discount rate incorporates current information about discount rates applied by other reporting companies owning portfolios of life insurance policies, discount rates observed in the life insurance secondary market, market interest rates, the credit exposure to the issuing insurance companies and our estimate of the risk premium a purchaser would require to receive the future cash flows derived from our portfolio of life insurance policies. Because we use the discount rate to arrive at the fair value of our portfolio, the rate we choose necessarily assumes an orderly and arms-length transaction (i.e., a non-distressed transaction in which neither seller nor buyer is compelled to engage in the transaction).

We engaged a third party, Model Actuarial Pricing Systems (MAPS), to prepare a third-party valuation of our life settlement portfolio. MAPS owns and maintains the portfolio pricing software we use. MAPS processed policy data, future premium data, life expectancy estimate data, and other actuarial information we supply to calculate a net present value for our portfolio using the specified discount rate of 11.56%. MAPS independently calculated the net present value of our portfolio of 289 policies to be $276,381,979, which is the same fair value estimate we used on the balance sheet as of September 30, 2014, and furnished us with a letter documenting its calculation. A copy of such letter is filed as Exhibit 99.1 to the registration statement of which this prospectus is a part.

### JOBS Act

On April 5, 2012, the Jumpstart Our Business Startups Act of 2012, or JOBS Act, was enacted. Section 107 of the JOBS Act provides that an "emerging growth company" can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act of 1933 for complying with new or revised accounting standards. This means that an "emerging growth company" can make an election to delay the adoption of certain accounting standards until those standards would apply to private companies. We have elected to delay such adoption of new or revised accounting standards and, as a result, we may not comply with new or revised accounting standards at the same time as other public reporting companies that are not "emerging growth companies." This exemption will apply for a period of five years following our first sale of common equity securities under an effective registration statement or until we no longer qualify as an "emerging growth company" as defined under the JOBS Act, whichever is earlier.

### Deferred Income Taxes

FASB ASC 740, Income Taxes, requires us to recognize deferred tax assets and liabilities for the future tax consequences attributable to temporary differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. A valuation allowance is established for any portion of deferred tax assets that is not considered more likely than not to be realized.

We have provided a valuation allowance against the deferred tax asset related to a note receivable because we believe that, when realized for tax purposes, it will result in a capital loss that will not be utilized because we have no expectation of generating a capital gain within the applicable carryforward period. Therefore, we do not believe that it is more likely than not that the deferred tax asset will be realized.

We have also provided a valuation allowance against the deferred tax asset related to a tax basis capital loss generated with respect to its settlement and subsequent disposal of our investment in Athena Structured Funds PLC (see "Notes to Consolidated Financial Statements" Note 10). As we have no expectation of generating capital gains within the applicable carry-forward period, we do not believe that it is more likely than not that the deferred asset will be realized.

A valuation allowance is required to be recognized to reduce deferred tax assets to an amount that is more likely than not to be realized. Realization of deferred tax assets depends upon having sufficient past or future taxable income in periods to which the deductible temporary differences are expected to be recovered

41

Table of Contents

or within any applicable carryback or carryforward periods. We believe that it is more likely than not that we will be able to realize all of our deferred tax assets other than that which is expected to result in a capital loss.

### Deferred Financing and Issuance Costs

Financing costs incurred to obtain financing under the revolving credit facility have been capitalized and are amortized using the straight-line method over the term of the revolving credit facility. The Series I Secured note obligations are reported net of issuance costs, sales commissions and other direct expenses, which are amortized using the interest method over the term of each respective borrowing. The Renewable Secured Debentures are reported net of issuance costs, sales commissions and other direct expenses, which are amortized using the interest method over the term of each respective borrowing. The Series A preferred stock is reported net of issuance costs, sales commissions, including the fair value of warrants issued, and other direct expenses, which are amortized using the interest method as interest expense over the three-year redemption period.

### Principal Revenue and Expense Items

We earn revenues from three primary sources as described below.

- *Policy Benefits Realized.* We recognize the difference between the death benefits and carrying values of the policy when an insured event has occurred and we determine that settlement and ultimate collection of the death benefits is realizable and reasonably assured. Revenue from a transaction must meet both criteria in order to be recognized. We generally collect the face value of the life insurance policy from the insurance company within 45 days of the insured's mortality.

App. 0034

- *Change in Fair Value of Life Insurance Policies*. We have elected to carry our investments in life insurance policies at fair value in accordance with ASC 325-30, *Investments in Life Insurance Contracts*. Accordingly, we value our investments in our portfolio of life insurance policies each reporting period in accordance with the fair value principles discussed herein, which includes the expected payment of premiums for future periods.

- *Sale of a Life Insurance Policy or a Portfolio of Life Insurance Policies*. In an event of a sale of a policy, we recognize gain or loss as the difference between the sale price and the carrying value of the policy on the date of the receipt of payment on such sale.

Our main components of expense are summarized below.

- *Selling, General and Administrative Expenses*. We recognize and record expenses incurred in the operations of the purchasing and servicing of life insurance policies. These expenses include professional fees, salaries, and sales and marketing expenditures.

- *Interest Expense*. We recognize and record interest expenses associated with the costs of financing our life insurance portfolio for the current period. These expenses include interest paid to our senior lender under our revolving credit facility, as well as all interest paid on our debentures and other outstanding indebtedness such as our subsidiary secured notes and dividends on convertible, redeemable preferred stock. When we issue long-term indebtedness, we amortize the issuance costs associated with such indebtedness over the outstanding term of the financing, and classify it as interest expense.

**Results of Operations — 2013 Compared to 2012**

The following is our analysis of the results of operations for the periods indicated below. This analysis should be read in conjunction with our consolidated financial statements and related notes.

*Revenue*. Revenue recognized from the receipt of policy benefits was $12,036,000 and $6,283,000 in 2013 and 2012, respectively. Revenue recognized from the change in fair value of our life insurance policies, net of premiums and carrying costs, was $17,478,000 in 2013 and $11,154,000 in 2012. That portion of the change in fair value related to new policies acquired during 2013 and 2012 was $27,475,000 and $12,242,000,

42

Table of Contents

respectively. In each case, the increases in fair value were due to changes in the discount rates we applied to calculate the net present value of cash flows expected from our portfolio of life insurance policies, change in fair value of policies acquired during the period, and aging of the policies. The discount rate incorporates current information about market interest rates, credit exposure to the insurance companies that issued the life insurance policies in our portfolio and our estimate of the risk premium an investor would require to receive the future cash flows from our portfolio of life insurance policies. The discount rate applied to estimate the fair value of the portfolio of life insurance policies we own was 11.69% as of December 31, 2013, compared to 12.08% for the same date in 2012. The decrease in discount rate was due to an increase in the size of the portfolio and the diversity of policies held in our portfolio of life insurance policies that resulted in a lower anticipated risk premium to a potential buyer. The carrying value of policies acquired during each quarterly reporting period are adjusted to their current fair value using the fair value discount rate applied to the entire portfolio as of that reporting date.

*Gain Upon Termination of Agreement with Athena Securities Ltd*. In June 2013, we entered into a "Purchase and Sale Agreement" with Athena Securities Ltd. and Athena Securities Group Ltd. This agreement effected the termination of an earlier agreement that the parties had entered into in 2011. That 2011 agreement had contemplated cooperative efforts by the parties aimed at developing a security and related offering in Europe or Ireland, the proceeds of which would be used to finance the acquisition of life-insurance related assets in the United States. We sought to terminate the 2011 agreement due to a changing regulatory environment in Europe that negatively affected the likelihood of consummating the contemplated offering of securities, and due to our dissatisfaction with Athena's performance under the 2011 agreement. Accordingly, the June 2013 agreement contained mutual general releases of claims and substantially unwound certain capital stock transactions that had been effected under the earlier agreement. In particular, Athena returned to us for redemption 865,000 shares of our common stock, and retained 124,000 common shares in recognition of their earlier efforts under the 2011 agreement. For our part, we sold back to Athena Securities Group Ltd. all of our ownership in Athena Structured Funds, PLC that we had originally acquired under the 2011 agreement. As a result of the termination effected by our June 2013 agreement with Athena and our re-acquisition of 865,000 shares of our common stock, we recorded a non-cash gain on the transaction of $3,252,000. Presently, we have no ongoing business relationship with Athena.

*Expenses*. Interest expense, including amortization of the deferred financing costs and preferred stock dividends, was $20,763,000 during 2013 compared to $10,879,000 during 2012, an increase of $9,884,000. The increase was due to increased average debt outstanding and increased issuance costs being amortized during 2013. Selling, general and administrative expenses were $10,323,000, and $6,467,000 for 2013 and 2012, respectively, representing an increase of $3,856,000. Employee compensation and benefits increased by $2,140,000. This increase partially resulted from $825,000 in bonuses paid to the original members of the Company (prior to its conversion to a corporation) equal to the tax effect of the conversion from an LLC to a corporation, and a $449,000 increase related to the implementation of a new incentive compensation plan. Legal expenses increased by $745,000 due in part to increased compliance work. Sales and marketing expenses increased by $971,000 due to increased activity related to our public offering of Renewable Secured Debentures and increased effort at procuring life insurance policies for our investment portfolio.

*Income Tax Expense*. Income tax expense was $2,174,000 and $1,193,000 in 2013 and 2012, respectively. The effective tax rate for the 12 months ended December 31, 2013 and 2012, was 109.8% and 661.8%, respectively, compared to a statutory rate of 40.5%. In 2013 and 2012, there were significant permanent differences between income before income taxes and taxable income. The primary permanent differences between our effective tax rate and the statutory federal rate result from the accrual of preferred stock dividend expense, state taxes, and other non-deductible expenses. The dividends charged to interest expense were

$2,528,000 and $2,227,000 in 2013 and 2012, respectively. Excluding the impact of the dividends and other permanent differences, the effective tax rate for 2013 and 2012 would have been 40.5%.

The most significant temporary differences between GAAP net income and taxable net income are the treatment of interest costs with respect to the acquisition of the life insurance policies and revenue recognition with respect to the mark-to-market of life insurance portfolio.

43

Table of Contents

**Results of Operations — Three and Nine Months Ended September 30, 2014 Compared to the Same Period in 2013**

The following is our analysis of the results of operations for the periods indicated below. This analysis should be read in conjunction with our consolidated financial statements and related notes.

*Revenue.* Revenue recognized from the receipt of policy benefits was $2,070,000 and $2,301,000 during the three and nine months ended September 30, 2014, respectively. Revenue recognized from the receipt of policy benefits was $3,668,000 and $11,396,000 during the three and nine months ended September 30, 2013, respectively. Revenue recognized from the change in fair value of our life insurance policies, net of premiums and carrying costs, was $3,049,000 and $13,819,000 for the three and nine months ended September 30, 2014, respectively and $1,769,000 and $10,115,000 for the three and nine months ended September 30, 2013, respectively. During the nine-month period ended September 30, 2013, we purchased a higher volume of life insurance policies than we did during the same period in 2014. The change in fair value related to new policies acquired during the three and nine month periods ended September 30, 2014 was $964,000 and $7,523,000 respectively, and $6,732,000 and $19,762,000 for those acquired during the three-month and nine-month periods ended September 30, 2013, respectively. In each case, the increases in fair value were due to changes in the discount rates we use to calculate the net present value of cash flows expected from our portfolio of life insurance policies, change in fair value of policies acquired during the period, and aging of the policies. The discount rate incorporates current information about discount rates applied by other reporting companies owning portfolios of life insurance policies, discount rates observed in the life insurance secondary market, market interest rates, the credit exposure to the insurance company that issued the life insurance policy and management's estimate of the risk premium a purchaser would require to receive the future cash flows derived from our portfolio of life insurance policies. The discount rate used to estimate the fair value of the life insurance policies we own was 11.56% as of September 30, 2014, compared to 11.77% as of September 30, 2013. The decrease in discount rate was due to changes in a variety of factors in our fair value methodology. The carrying value of policies acquired during each quarterly reporting period are adjusted to their current fair value using the fair value discount rate applied to the portfolio as of that reporting date.

*Expenses.* Interest expense, including amortization of the deferred financing costs as well as preferred stock dividends, were $6,797,000 and $19,731,000 during the three and nine months ended September 30, 2014, compared to $5,537,000 and $14,946,000 during the same periods of 2013, increases of $1,260,000 and $4,785,000, respectively. The increase was due to the increased debt outstanding that increased from $225,362,000 at September 30, 2013 to $280,438,000 at September 30, 2014, principally to fund acquisition of policies, make premium payments, pay interest and principal on the outstanding debt, and fund operating expenses. Selling, general, and administrative expenses were $3,590,000 and $8,430,000 during the three and nine months ended September 30, 2014, compared to $2,276,000 and $8,191,000 during the same periods of 2013, an increase of $1,314,000 and $239,000, respectively. The third quarter of 2014 over the same quarter of 2013 selling, general and administrative expenses increase was due to $277,000 increase of employee expenses, $339,000 increase in legal and professional fees, and $698,000 increase in marketing, recruiting and other fees.

*Income Tax Expense.* For the three and nine months ended September 30, 2014, we had a loss of $3,400,000 and $7,888,000 before income taxes and recorded income tax benefit of $1,858,000 and $4,130,000, respectively, or 35.3% and 34.4%, respectively. In the same periods of 2013, we recorded income tax benefit of $657,000 (or 28.7% of income before taxes) and income tax expense of $1,711,000 (or 89.8% of income before taxes). The primary differences between our effective tax rate and the statutory federal rate are the accrual of preferred stock dividend expense, state taxes, and other non-deductible expenses. Excluding the impact of the dividends and other permanent differences, the effective tax rate for the three and nine months ended September 30, 2014 and 2013 would have been 43.8% and 40.5%, respectively.

The following table provides a reconciliation of our income tax expense at the statutory federal tax rate to our actual income tax expense:

44

Table of Contents

| | Three Months Ended September 30, 2014 | | Nine Months Ended September 30, 2014 | | Three Months Ended September 30, 2013 | | Nine Months Ended September 30, 2014 | |
|---|---|---|---|---|---|---|---|---|
| Statutory federal income tax | $(1,788,000) | 34.0% | $(4,086,000) | 34.0% | $ 777,000 | 34.0% | $ (648,000) | 34.0% |
| State income taxes, net of federal benefit | (297,000) | 5.6% | (649,000) | 5.4% | 105,000 | 4.6% | (251,000) | 13.2% |
| Series A preferred stock dividends | 216,000 | (4.1)% | 650,000 | (5.4)% | (215,000) | (9.4)% | (645,000) | 33.9% |
| Other permanent differences | 11,000 | (0.2)% | (45,000) | 0.4% | (10,000) | (0.5)% | (167,000) | 8.7% |
| Total income tax expense | $(1,858,000) | 35.3% | $(4,130,000) | 34.4% | $ 657,000 | 28.7% | $(1,711,000) | 89.8% |

The most significant temporary differences between GAAP net income and taxable net income are the treatment of interest costs with respect to the acquisition of the life insurance policies and revenue recognition with respect to the mark-to-market of life insurance portfolio.

**Liquidity and Capital Resources**

We finance our business through a combination of policy benefit revenues, origination fees, equity offerings, debt offerings, and a credit facility. We have used our debt offerings and credit facility primarily for policy acquisition, policy servicing and portfolio related financing expenditures. We charge an intercompany origination fee in the amount of one to four percent of the face value of a life insurance policy's benefit when we acquire the related life insurance policy. The origination fee we charge is included in the total purchase price we pay for a life insurance policy for purposes of our valuation and expected internal rate of return calculations, but is not netted against the purchase price we pay to a seller of an insurance policy. We generated cash flows of $153,000 and $1,462,000 from origination fees during the three and nine months ended September 30, 2014, and $1,004,000 and $2,818,000 during the same periods in 2013. Profit from intra-company origination fees for life insurance policies retained by the Company are eliminated from our consolidated statements of operations. As such, the origination fees collected under our life insurance policy financing arrangements are reflected in our consolidated statements of cash flows as cash flows from financing activities as they are received from borrowings used to finance the acquisition of life insurance policies. Our revolving bank line allows DLP II to borrow the funds necessary to pay origination fees to GWG Life. Our borrowing agreements allow us to use net proceeds of the Renewable Secured Debentures for policy acquisition, which includes origination fees. If the policy acquisition is not financed, no fees are included in the consolidated cash flows. See "Cash Flows" below for further information. We determine the purchase price of life insurance policies in accordance with ASC 325-30, *Investments in Insurance Contracts*, using the fair value method. Under the fair value method, the initial investment is recorded at the transaction price. Because the origination fees are paid from a wholly owned subsidiary to the parent company, these fees are not included in the transaction price as reflected in our consolidated financial statements. For further discussion on our accounting policies for life settlements, please refer to note 1 to our consolidated financial statements.

As of September 30, 2014, we had approximately $41.1 million in combined available cash and available borrowing base surplus capacity under our revolving credit facility for the purpose of purchasing additional life insurance policies, paying premiums on existing policies, paying portfolio servicing expenses, and paying principal and interest on our outstanding financing obligations.

As of December 31, 2013, we had approximately $43.2 million in combined available cash and available borrowing base surplus capacity under our revolving credit facility for the purpose of purchasing additional life insurance policies, paying premiums on existing policies, paying portfolio servicing expenses, and paying principal and interest on our outstanding financing obligations.

In September 2012, we concluded a Series A preferred stock offering, receiving an aggregate $24.6 million in subscriptions for our Series A preferred stock. These subscriptions consisted of $14.0 million in

45

Table of Contents

conversions of outstanding Series I Secured notes and $10.6 million of new investments. We have used the proceeds from the sale of our Series A preferred stock, together with the origination fees we received to purchase and finance life insurance policies to fund our operational expenditures.

In June 2011, we registered a $250.0 million debt offering of our Renewable Secured Debentures with the SEC. The registration became effective on January 31, 2012. Through September 30, 2014, the total amount of Renewable Secured Debentures sold, including renewals, is $225.0 million. As of September 30, 2014, we had approximately $173.2 million in principal amount of Renewable Secured Debentures outstanding.

On September 24, 2014, GWG consummated an initial public offering of its common stock which resulted in the sale of 800,000 shares of common stock at $12.50 per share. The sale resulted in net proceeds of approximately $9.03 million after the deduction of underwriting commissions, discounts and expense reimbursements. The company intends to use the net proceeds from the offering to promote and advertise the opportunities for consumers owning life insurance and investors to profit from participating in the secondary market for life insurance policies, purchase additional life insurance policies in the secondary market, pay premiums on the company's life insurance policy assets, fund its portfolio operations, and for working capital purposes.

Additionally, our wholly owned subsidiary GWG Life issued Series I Secured notes beginning in November 2009 on a private placement basis to accredited investors only. As of September 30, 2014, we had approximately $28.2 million in principal amount of Series I Secured notes outstanding. This offering was closed in November 2011.

The weighted-average interest rate of our outstanding Series I Secured notes as of September 30, 2014 and December 31, 2013 was 8.37% and 8.35%, respectively, and the weighted average maturity at those dates was 1.92 and 2.49 years, respectively. The Series I Secured notes have renewal features. Since we first issued our Series I Secured notes, we have experienced $131,774,000 in maturities, of which as of September 30, 2014, $102,260,000 has renewed for an additional term. This has provided us with an aggregate renewal rate of approximately 78% for investments in our subsidiary secured notes. Future contractual maturities of Series I Secured notes payable at September 30, 2014 are:

| Years Ending December 31, | |
| --- | --- |
| Three months ending December 31, 2014 | $ 1,925,000 |
| 2015 | 12,729,000 |
| 2016 | 8,217,000 |
| 2017 | 4,427,000 |
| 2018 | 754,000 |
| Thereafter | 141,000 |
| | $28,193,000 |

The weighted-average interest rate of our outstanding Renewable Secured Debentures as of September 30, 2014 and December 31, 2013 was 7.49% and 7.53%, respectively, and the weighted average maturity at those dates was 3.50 and 3.69 years, respectively. Our Renewable Secured Debentures have renewal features.

App. 0037

Since we first issued our Renewable Secured Debentures, we have experienced $53,493,000 in maturities, of which as of September 30, 2014 $35,403,000 has renewed for an additional term. This has provided us with an aggregate renewal rate of approximately 66% for investments in our Renewable Secured Debentures. Future contractual maturities of Renewable Secured Debentures at September 30, 2014 are:

| Years Ending December 31, | |
| --- | --- |
| Three months ending December 31, 2014 | $ 16,086,000 |
| 2015 | 55,676,000 |
| 2016 | 43,434,000 |
| 2017 | 21,950,000 |
| 2018 | 10,730,000 |
| Thereafter | 25,369,000 |
| | $173,245,000 |

Table of Contents

The Renewable Secured Debentures and Series I Secured notes are secured by all our assets, and are subordinate to our revolving credit facility with Autobahn/DZ Bank. The Renewable Secured Debentures and Series I Secured notes are pari passu with respect to our assets pursuant to an intercreditor agreement (see notes 7 and 8 to our consolidated financial statements).

We maintain a $100 million revolving credit facility with Autobahn/DZ Bank through GWG Life's wholly owned subsidiary DLP II. As of September 30, 2014 and December 31, 2013 we had $79.0 million outstanding under the revolving credit facility and maintained an available borrowing base surplus of $11.6 and $3.9 million, respectively (see note 6 to our consolidated financial statements).

We expect to meet our ongoing operational capital needs through a combination of policy benefit revenues, origination fees, and proceeds from financing transactions. We expect to meet our policy acquisition, servicing, and financing capital needs principally from the receipt of policy benefit revenues from our portfolio of life insurance policies, net proceeds from our offering of Renewable Secured Debentures, and from our revolving credit facility. Because we only receive origination fees when we purchase a policy, our receipt of those fees is contingent upon our consummation of policy purchases, which is, in turn, contingent upon our receipt of external funding. Despite recent adverse capital market conditions, including a prolonged credit crisis, we have demonstrated continued access to credit and financing markets. Furthermore, we expect that the insurance benefit payments, to be received on our portfolio of life insurance policies, to increase as the average age of the insureds increase and mortality events occur over time which we expect to begin more significantly in 2015 and steadily increasing until 2018. As a result of the foregoing, we estimate that our liquidity and capital resources are sufficient for our current and projected financial needs. Nevertheless, if we are unable to continue our offering of Renewable Secured Debentures for any reason (or if we become unsuccessful in selling debentures), and we are unable to obtain capital from other sources, we expect that our business would be materially and adversely affected. In addition, our business would be materially and adversely affected if we did not receive the policy benefits we forecast and if holders of our Renewable Secured Debentures or Series I Secured notes failed to renew with the frequency we have historically experienced. In such a case, we could be forced to sell our investments in life insurance policies to service or satisfy our debt-related obligations and continue to pay policy premiums.

Capital expenditures have historically not been material and we do not anticipate making material capital expenditures in 2014 or beyond.

*Debt Financings Summary*

We had the following outstanding debt balances as of September 30, 2014:

| Issuer/Borrower | Principal Amount Outstanding | Weighted Average Interest Rate |
| --- | --- | --- |
| GWG Holdings, Inc. — Renewable Secured Debentures | $173,245,000 | 7.49% |
| GWG Life Settlements, LLC — Series I Secured notes | 28,193,000 | 8.37% |
| GWG DLP Funding II, LLC — Revolving credit facility | 79,000,000 | 6.22% |
| **Total** | $280,438,000 | 7.22% |

Our total credit facility and other indebtedness balance as of September 30, 2014 and December 31, 2013 was $280,438,000 and $243,635,000, respectively. At September 30, 2014, the total outstanding face amount under our Series I Secured notes outstanding was $28,193,000, less unamortized selling costs of $491,000, resulting in a carrying amount of $27,702,000. At December 31, 2013, the total outstanding face amount under our Series I Secured notes outstanding was $29,744,000, less unamortized selling costs of $469,000, resulting in a carrying amount of $29,275,000. At September 30, 2014, the total outstanding face amount of Renewable Secured Debentures was $173,245,000 plus $1,679,000 of subscriptions in process, less unamortized selling costs of $5,737,000, resulting in a carrying amount of $169,187,000. At December 31, 2013, the total outstanding face amount of Renewable Secured Debentures outstanding was $134,891,000 plus $1,902,000 of subscriptions in process, less unamortized selling costs of $5,147,000, resulting in a carrying

App. 0038

amount of $131,646,000. At September 30, 2014, the fair value of our investments in life insurance policies of $276,382,000 plus our cash balance of $29,512,000 and our restricted cash balance of $2,145,000, totaled $308,039,000, representing an excess of portfolio assets over secured indebtedness of $27,601,000. At December 31, 2013, the fair value of our investments in life insurance policies of $234,673,000 plus our cash balance of $33,450,000 and our restricted cash balance of $5,833,000, totaled $273,956,000, representing an excess of portfolio assets over secured indebtedness of $30,321,000. The Renewable Secured Debentures and Series I Secured notes are secured by all our assets and are subordinate to our revolving credit facility with Autobahn/DZ Bank. The Renewable Secured Debentures and Series I Secured notes are pari passu with respect to shared collateral pursuant to an intercreditor agreement.

The following forward-looking table seeks to illustrate the impact of the sale of our portfolio of life insurance assets at various discount rates in order to satisfy our debt obligations as of September 30, 2014. In all cases, the sale of the life insurance assets owned by DLP II will be used first to satisfy all amounts owing under the revolving credit facility with Autobahn/ DZ Bank. The net sale proceeds remaining after satisfying all obligations under the revolving credit facility would be applied to Renewable Secured Debentures and Series I Secured notes on a pari passu basis.

| Portfolio Discount Rate | 10% | 11% | 12% | 13% | 14% |
|---|---|---|---|---|---|
| Value of portfolio | $298,167,000 | $283,889,000 | $270,713,000 | $258,529,000 | $247,240,000 |
| Cash and cash equivalents | 31,657,000 | 31,657,000 | 31,657,000 | 31,657,000 | 31,657,000 |
| Total assets | 329,824,000 | 315,546,000 | 302,370,000 | 290,186,000 | 278,897,000 |
| Revolving credit facility Autobahn/DZ Bank | 79,000,000 | 79,000,000 | 79,000,000 | 79,000,000 | 79,000,000 |
| Net after revolving credit facility | 250,824,000 | 236,546,000 | 223,370,000 | 211,186,000 | 199,897,000 |
| Series I Secured notes and Renewable Secured Debentures | 201,438,000 | 201,438,000 | 201,438,000 | 201,438,000 | 201,438,000 |
| Net after Series I Secured notes and Renewable Secured Debentures | $ 49,386,000 | $ 35,108,000 | $ 21,932,000 | $ 9,748,000 | $ (1,541,000) |
| Impairment to Series I Secured notes and Renewable Secured Debentures | No impairment | No impairment | No impairment | No impairment | Impairment |

The table illustrates that our ability to fully satisfy amounts owing under the Renewable Secured Debentures and Series I Secured notes would likely be impaired upon the sale of all our life insurance assets at a price equivalent to a discount rate of approximately 13.86% or higher. The discount rates used to calculate the fair value of our portfolio for mark-to-market accounting were 11.56% and 11.69% as of September 30, 2014 and December 31, 2013, respectively. The table does not include any allowance for transactional fees and expenses associated with a portfolio sale (which expenses and fees could be substantial), and is provided to demonstrate how various discount rates used to value our portfolio could affect our ability to satisfy amounts owing under our debt obligations, in light of our senior secured lender's right to priority payments. You should read the above table in conjunction with the information contained in other sections of this report, including our discussion of discount rates included under the "— Critical Accounting Policies — Valuation of Insurance Policies" caption above. This discussion and analysis is based on the beliefs of our management, as well as assumptions made by, and information currently available to, our management. The forward-looking presentation above is subject to numerous risks and uncertainties. Our actual results could differ materially from those suggested or implied by the above table. Please see the caption "Risk Relating to Forward-Looking Statements" above. Bond offering, a pending amendment to the indenture will rename our outstanding "Renewable Secured Debentures" as "L Bonds."

## Cash Flows

The payment of premiums and servicing costs to maintain life insurance policies represents our most significant requirement for cash disbursement. When a policy is purchased, we are able to calculate the minimum premium payments required to maintain the policy in-force. Over time as the insured ages, premium payments will increase; however, the probability of actually needing to pay the premiums decreases since mortality becomes more likely. These scheduled premiums and associated probabilities are factored into our

expected internal rate of return and cash-flow modeling described herein. Beyond premiums, we incur policy servicing costs, including annual trustee and tracking costs, and debt servicing costs, including principal and interest payments. Until we receive a stable amount of proceeds from the policy benefits, we intend to pay these costs from our credit facility, when permitted, and through the issuance of debt securities, including the L Bonds.

For the quarter end dates set forth below, the following table illustrates the total amount of face value of policy benefits owned, and the trailing 12 months of life insurance policy benefits collected and premiums paid on our portfolio. The trailing 12-month benefits/premium coverage ratio indicates the ratio of policy benefits received to premiums paid over the trailing 12-month period from our portfolio of life insurance policies.

| Quarter End Date | Portfolio Face Amount | 12-Month Trailing Benefits Collected | 12-Month Trailing Premiums Paid | 12-Month Trailing Benefits/ Premium Coverage Ratio |
|---|---|---|---|---|
| March 31, 2012 | $482,455,000 | $ 4,203,000 | $14,977,000 | 28.06% |
| June 30, 2012 | 489,255,000 | 8,703,000 | 15,412,000 | 56.47% |
| September 30, 2012 | 515,661,000 | 7,833,000 | 15,837,000 | 49.46% |
| December 31, 2012 | 572,245,000 | 7,350,000 | 16,597,000 | 44.28% |

App. 0039

| | | | | |
|---|---|---|---|---|
| March 31, 2013 | 639,755,000 | 11,350,000 | 18,084,000 | 62.90% |
| June 30, 2013 | 650,655,000 | 13,450,000 | 19,182,000 | 70.11% |
| September 30, 2013 | 705,069,000 | 18,450,000 | 20,279,000 | 90.98% |
| December 31, 2013 | 740,648,000 | 16,600,000 | 21,733,000 | 76.38% |
| March 31, 2014 | 771,940,000 | 12,600,000 | 21,930,000 | 57.46% |
| June 30, 2014 | 784,652,000 | 6,300,000 | 22,598,000 | 27.88% |
| September 30, 2014 | 787,964,000 | 4,300,000 | 23,121,000 | 18.60% |

We believe that the portfolio cash flow results set forth above represent our general investment thesis: that the life insurance policy benefits we receive will continue to increase over time in relation to the premiums we are required to pay on the remaining polices in the portfolio. Nevertheless, we expect that our portfolio cash flow results will remain inconsistent until such time we achieve our goal of acquiring a larger, more diversified portfolio of life insurance policies in order to obtain more normalized actuarial results. For example, we had expected to receive a greater amount of insurance benefits for the periods ended December 31, 2013 and September 30, 2014 than we actually experienced. As our receipt of life insurance policy benefits increase, we expect to begin servicing and paying down our outstanding indebtedness, or alternatively purchasing additional life insurance policies, from these cash flows. As indicated above under "Liquidity and Capital Resources," we presently expect that in 2015, the cash inflows from the receipt of policy benefits will exceed the 2015 premium obligations on the remaining life insurance policies held within the portfolio as of September 30, 2014.

The amount of payments for anticipated premiums and servicing costs that we will be required to make over the next five years to maintain our current portfolio, assuming no mortalities, is set forth in the table below.

| Year | Premiums and Servicing |
|---|---|
| Three months ending December 31, 2014 | $ 6,711,000 |
| 2015 | 27,075,000 |
| 2016 | 29,701,000 |
| 2017 | 33,176,000 |
| 2018 | 36,100,000 |
| Total | $132,763,000 |

Table of Contents

The life insurance policies owned by DLP II are subject to a collateral arrangement with the agent to our revolving credit lender, as described in note 6 to the consolidated financial statements. Under this arrangement, collection and escrow accounts are used to fund purchases and premiums of the insurance policies and to pay interest and other charges under our revolving credit facility. The lender and its agent must authorize all disbursements from these accounts, including any distributions to GWG Life or GWG Holdings. Distributions are limited to an amount that would result in the borrowers (DLP II, GWG Life, and GWG Holdings) realizing an annualized rate of return on the equity funded amount for such assets of not more than 18%, as determined by the agent. After such amount is reached, the credit agreement requires that excess funds be used to fund repayments or a reserve account in a certain amount before any additional distributions may be made. In the future, these arrangements may restrict the cash flows available for payment of principal and interest on our debt obligations.

**Inflation**

Changes in inflation do not necessarily correlate with changes in interest rates. We presently do not foresee any material impact of inflation on our results of operations in the periods presented in our consolidated financial statements.

**Off-Balance Sheet Arrangements**

*Operating Lease*—We entered into an office lease with U.S. Bank National Association as the landlord. The lease was effective April 22, 2012 with a term through August 31, 2015. The lease is for 11,695 square feet of office space located at 220 South Sixth Street, Minneapolis, Minnesota. We are obligated to pay base rent plus common area maintenance and a share of the building operating costs. Minimum lease payments under the lease are as follows:

| | |
|---|---|
| Three months ending December 31, 2014 | $26,000 |
| 2015 | 70,000 |
| **Total** | $96,000 |

**Credit Risk**

We review the credit risk associated with our portfolio of life insurance policies when estimating its fair value. In evaluating the policies' credit risk we consider insurance company solvency, credit risk indicators, economic conditions, ongoing credit evaluations, and company positions. We attempt to manage our credit risk related to life insurance policies typically by purchasing policies issued only from companies with an investment grade credit rating by either Standard & Poor's, Moody's, or A.M. Best Company. As of September 30, 2014, 99.08% of our life insurance policies, by face value benefits, were issued by companies that maintained an investment grade rating (BBB or better) by Standard & Poor's.

App. 0040

Our credit facility is floating-rate financing. In addition, our ability to offer interest rates that attract capital (including in the offer and sale of Renewable Secured Debentures) is generally impacted by prevailing interest rates. Furthermore, while our other indebtedness provides us with fixed-rate financing, our debt coverage ratio is calculated in relation to our total cost of financing. Therefore, fluctuations in interest rates impact our business by increasing our borrowing costs, and reducing availability under our debt financing arrangements. Furthermore, we calculate our portfolio earnings based upon the spread generated between the return on our life insurance portfolio and the cost of our financing. As a result, increases in interest rates will reduce the earnings we expect to achieve from our investments in life insurance policies.

50

Table of Contents

**Non-GAAP Financial Measures**

We use non-GAAP financial measures when evaluating our financial results, for planning and forecasting purposes, and for maintaining compliance with covenants contained in our borrowing agreements. Non-GAAP financial measures disclosed by management are provided as additional information to investors in order to provide them with an alternative method for assessing our financial condition and operating results. These non-GAAP financial measures are not in accordance with GAAP and may be different from non-GAAP measures used by other companies, including other companies within our industry. This presentation of non-GAAP financial information is not meant to be considered in isolation or as a substitute for comparable amounts prepared in accordance with GAAP. See the notes to our consolidated financial statements and our audited financial statements contained herein.

We have elected to carry our investments in life insurance policies at fair value in accordance with ASC 325-30, *Investments in Life Insurance Contracts*. Accordingly, we value our investments in life insurance policies at the conclusion of each reporting period in accordance with GAAP fair value accounting principles. In addition to GAAP, we are required to report non-GAAP financial measures to Autobahn/DZ Bank under certain financial covenants made to that lender under our revolving credit facility. As indicated above, we also use non-GAAP financial reporting to manage and evaluate the financial performance of our business.

The election to record our investments in life insurance policies at fair value, which by its nature, is based upon Level 3 measurements that are unobservable. As a result, this accounting treatment imports financial market volatility and subjective inputs into our financial reporting. We believe this type of accounting reporting is at odds with one of the key attractions for purchasing and owning a portfolio life insurance policies: the non-correlated nature of the returns to be derived from such policies. Therefore, in contrast to a GAAP-based fair valuation, we seek to measure the accrual of the actuarial gain occurring within the portfolio of life insurance policies at their expected internal rate of return based on statistical mortality probabilities for the insureds (using primarily the insured's age, sex and smoking status). The expected internal rate of return tracks actuarial gain occurring within the policies according to a mortality table as the insureds' age increases. By comparing the actuarial gain accruing within our portfolio of life insurance policies against our costs during the same period, we can estimate, manage and evaluate the overall financial profitability of our business without regard to mark-to-market volatility. We use this information to balance our life insurance policy purchasing and manage our capital structure, including the issuance of debt and utilization of our other sources of capital, and to monitor our compliance with borrowing covenants. We believe that these non-GAAP financial measures provide information that is useful for investors to understand period-over-period operating results separate and apart from fair value items that may, or could, have a disproportionately positive or negative impact on results in any particular period.

Our credit facility requires us to maintain a "positive net income" and "tangible net worth" each of which are calculated on an adjusted non-GAAP basis on the method described above, without regard to GAAP-based fair value measures. In addition, our revolving credit facility requires us to maintain an "excess spread," which is the difference between (i) the weighted average of our expected internal rate of return of our portfolio of life insurance policies and (ii) the weighted average of our credit facility's interest rate. These calculations are made using non-GAAP measures in the method described below, without regard to GAAP-based fair value measures.

In addition, our Renewable Secured Debentures and Series I Secured notes require us to maintain a "debt coverage ratio" designed to ensure that the expected cash flows from our portfolio of life insurance policies is able to adequately service our total outstanding indebtedness. In addition, our Renewable Secured Debentures requires us to maintain a "subordination ratio" which limits the total amount of indebtedness that can be issued senior in rank to the Renewable Secured Debentures and Series I Secured notes. These ratios are calculated using non-GAAP measures in the method described below, without regard to GAAP-based fair value measures.

*Adjusted Non-GAAP Net Income*. Our credit facility requires us to maintain a positive net income calculated on an adjusted non-GAAP basis. We calculate the adjusted net income by recognizing the actuarial gain accruing within our life insurance policies at the expected internal rate of return of the policies we own

51

Table of Contents

without regard to fair value. We net this actuarial gain against our costs during the same period to calculate our net income on a non-GAAP basis.

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| GAAP net income (loss) | $ (3,400,000) | $(1,629,000) | $ (7,888,000) | $ 195,000 |

App. 0041

| | | | | |
|---|---|---|---|---|
| Unrealized fair value gain (1) | (6,762,000) | (6,960,000) | (30,973,000) | (25,904,000) |
| Adjusted cost basis increase (2) | 10,982,000 | 9,360,000 | 33,156,000 | 28,256,000 |
| Accrual of unrealized actuarial gain (3) | 8,082,000 | 5,208,000 | 23,209,000 | 15,406,000 |
| Total adjusted non-GAAP income (4) | $ 6,902,000 | $ 5,979,000 | $ 17,504,000 | $ 17,953,000 |

(1)     Reversal of unrealized fair value gain of life insurance policies for current period.

(2)     Adjusted cost basis is increased to include those acquisition and servicing expenses which are not capitalized by GAAP.

(3)     Accrual of actuarial gain at expected internal rate of return based on investment cost basis for the period.

(4)     We must maintain an annual positive consolidated net income, calculated on a non-GAAP basis, to maintain compliance with our revolving credit facility with DZ Bank/Autobahn.

*Adjusted Non-GAAP Tangible Net Worth*. Our revolving credit facility requires us to maintain a tangible net worth in excess of $15 million calculated on an adjusted non-GAAP basis. We calculate the adjusted tangible net worth by recognizing the actuarial gain accruing within our life insurance policies at the expected internal rate of return of the policies we own without regard to fair value. We net this actuarial gain against our costs during the same period to calculate our tangible net worth on a non-GAAP basis.

| | As of September 30, 2014 | As of December 31, 2013 |
|---|---|---|
| GAAP net worth (1) | $ 20,221,000 | $ 19,231,000 |
| Less intangible assets (2) | (8,237,000) | (6,068,000) |
| GAAP tangible net worth | 11,984,000 | 13,163,000 |
| Unrealized fair value gain (3) | (145,717,000) | (114,744,000) |
| Adjusted cost basis increase (4) | 139,094,000 | 106,201,000 |
| Accrual of unrealized actuarial gain (5) | 72,875,000 | 49,666,000 |
| Total adjusted non-GAAP tangible net worth (6) | $ 78,236,000 | $ 54,286,000 |

(1)     Includes termination of redeemable member's interest prior to corporate conversion and preferred stock classified as temporary equity.

(2)     Unamortized portion of deferred financing costs and pre-paid insurance.

(3)     Reversal of cumulative unrealized fair value gain or loss of life insurance policies.

(4)     Adjusted cost basis is increased by acquisition and servicing expenses which are not capitalized under GAAP.

(5)     Accrual of cumulative actuarial gain at expected internal rate of return based on investment cost basis.

(6)     We must maintain a total adjusted non-GAAP tangible net worth of $15 million to maintain compliance with our revolving credit facility with DZ Bank/Autobahn.

*Excess Spread*. Our revolving credit facility requires us to maintain a 2.00% "excess spread" between our weighted-average expected internal rate of return of our portfolio of life insurance policies and the credit facility's interest rate. A presentation of our excess spread and our total excess spread is set forth below. Management uses the "total excess spread" to gauge expected profitability of our investments, and uses the "excess spread" to monitor compliance with our borrowing.

**Table of Contents**

| | As of September 30, 2014 | As of December 31, 2013 |
|---|---|---|
| Weighted-average expected IRR (1) | 11.88% | 12.21% |
| Weighted-average revolving credit facility interest rate (2) | 6.22% | 6.19% |
| Excess spread (3) | 5.66% | 6.02% |
| Total weighted-average interest rate on indebtedness for borrowed money (4) | 7.22% | 7.20% |

App. 0042

Total excess spread ... 4.66% ... 5.01%

(1) This represents the weighted-average expected internal rate of return of the life insurance policies as of the measurement date based upon our investment cost basis of the insurance policies and the expected cash flows from the life insurance portfolio. Our investment cost basis is calculated as our cash investment in the life insurance policies, without regard to GAAP-based fair value measurements, and is set forth below:

| | As of September 30, 2014 | As of December 31, 2013 |
|---|---|---|
| *Investment Cost Basis* | | |
| GAAP fair value | $ 276,382,000 | $ 234,673,000 |
| Unrealized fair value gain (A) | (145,717,000) | (114,744,000) |
| Adjusted cost basis increase (B) | 139,094,000 | 106,201,000 |
| Investment cost basis (C) | $ 269,759,000 | $ 226,130,000 |

(A) This represents the reversal of cumulative unrealized GAAP fair value gain of life insurance policies.

(B) Adjusted cost basis is increased to include those acquisition and servicing expenses that are not capitalized by GAAP.

(C) This is the full cash investment cost basis in life insurance policies from which our expected internal rate of return is calculated.

(2) This is the weighted-average revolving credit relating to our revolving credit facility interest rate as of the measurement date.

(3) We must maintain an excess spread of 2.00% relating to our revolving credit facility to maintain compliance under such facility.

(4) Represents the weighted-average interest rate paid on all outstanding indebtedness as of the measurement date, determined as follows:

| | As of September 30, 2014 | As of December 31, 2013 |
|---|---|---|
| *Outstanding Indebtedness* | | |
| Revolving credit facility | $ 79,000,000 | $ 79,000,000 |
| Series I Secured notes | 28,193,000 | 29,744,000 |
| Renewable Secured Debentures (1) | 173,245,000 | 134,891,000 |
| **Total** | $280,438,000 | $243,635,000 |

(1) Upon effectiveness of the registration statement of which this prospectus is a part, all securities originally issued as "Renewable Secured Debentures" will be renamed "L Bonds."

| | As of September 30, 2014 | As of December 31, 2014 |
|---|---|---|
| *Interest Rates on Indebtedness* | | |
| Revolving credit facility | 6.22% | 6.19% |
| Series I Secured notes | 8.37% | 8.35% |
| Renewable Secured Debentures | 7.49% | 7.53% |
| Weighted-average interest rates on indebtedness | 7.22% | 7.20% |

Table of Contents

*Debt Coverage Ratio and Subordination Ratio.* Our Renewable Secured Debentures and Series I Secured notes require us to maintain a "debt coverage ratio" of less than 90%. The "debt coverage ratio" is calculated by dividing the sum of our total indebtedness by the sum of our cash and cash equivalents and the net present value of the life insurance portfolio. The "subordination ratio" for our Renewable Secured Debentures is calculated by dividing the total indebtedness that is senior to Renewable Secured Debentures and Series I Secured notes by the sum of the company's cash and cash equivalents and the net present value of the life insurance portfolio. The "subordination ratio" must be less than 50%. For purposes of both ratio calculations, the net present value of the life insurance portfolio is calculated using a discount rate equal to the weighted average interest rate of all indebtedness.

App. 0043

| | As of September 30, 2014 | As of December 31, 2013 |
|---|---|---|
| Life insurance portfolio policy benefits | $787,964,000 | $740,648,000 |
| Discount rate of future cash flows | 7.22% | 7.20% |
| Net present value of Life insurance portfolio policy benefits | $344,774,000 | $302,761,000 |
| Cash and cash equivalents | 31,657,000 | 39,283,000 |
| Total Coverage | 376,431,000 | 342,044,000 |
| Revolving credit facility | 79,000,000 | 79,000,000 |
| Series I Secured notes | 28,193,000 | 29,744,000 |
| Renewable Secured Debentures | 173,245,000 | 134,891,000 |
| Total Indebtedness | $280,438,000 | $243,635,000 |
| Debt Coverage Ratio | 74.50% | 71.23% |
| Subordination Ratio | 20.99% | 23.10% |

As of September 30, 2014, we were in compliance with both the debt coverage ratio and the subordination ratio as required under our related financing agreements for Renewable Secured Debentures and Series I Secured notes.

<center>54</center>

Table of Contents

<center>**BUSINESS**</center>

**Overview**

We provide financial solutions to consumers in the emerging secondary market for life insurance settlements. We target our financial solution offerings toward consumers owning life insurance who can benefit from realizing the actuarial value of their life insurance policy. We believe the value proposition of our services to the consumers we serve is compelling and these consumers represent the fastest growing demographic in the United States according to the U.S. Census Bureau. To address this growing need, we recently have expanded our services by offering consumers a range of options to access the actuarial value of their life insurance, including purchasing (i) all or a portion of their life insurance policy for cash, (ii) all or a portion of their life insurance policy in exchange for a different asset, and (iii) all or a portion of their life insurance policy in an installment sale that provides the selling consumer with a stream of cash flow. All of our services involve our purchase or financing of life insurance assets from consumers in the secondary market at a discount to the face value of the life insurance asset we obtain. In cases where we purchase a life insurance policy, we continue paying the policy premiums until maturity, in order to collect the policy benefit upon the insured's mortality. In this way, we hope to profit from the difference between our cost of obtaining and financing a life insurance asset, and the policy benefit we ultimately receive upon the mortality of the insured.

In addition to our goal of providing consumers with value-added services based upon the actuarial value of their life insurance policies, we seek to build a profitable and large portfolio of life insurance assets that are well diversified in terms of insurance carriers, mortality profiles and the medical conditions of insureds. We believe that successfully diversifying our assets will lower our overall risk exposure and provide our portfolio of life insurance assets with greater actuarial stability and more reliable returns. To obtain the growth and diversification we seek, we have raised capital through a variety of financing efforts that have included the private and public offerings of structured debt securities, private offerings of preferred stock, and the use of a senior secured revolving credit facility. This offering of common stock is an extension of that strategy.

As of September 30, 2014, we owned approximately $788 million in face value of life insurance policy benefits covering 263 lives with an aggregate non-GAAP cost basis of approximately $270 million. Aggregate cost basis includes our acquisition costs and ongoing maintenance and financing costs. We have acquired this portfolio through a combination of the issuance of debt—in particular, the sale of previously issued L Bonds by GWG Holdings, the sale of Series I Secured notes by GWG Life, and the use of a senior secured revolving credit facility provided to our subsidiary GWG DLP Funding II, as borrower. Our objective is to earn returns from our life insurance assets that are greater than the costs necessary to purchase and finance those policy assets to their maturity. We expect to accomplish our objective by:

- purchasing life insurance policy assets which generate expected internal rates of returns in excess of our cost of capital;

- paying the life insurance asset's premiums and costs until the insured's mortality;

- obtaining a large and diverse portfolio of insurance policy assets to mitigate actuarial risk;

- maintaining diversified funding sources to reduce our overall cost of financing;

- maintaining rigorous portfolio monitoring and servicing practices; and

- if appropriate, engaging in hedging strategies that reduce potential volatility to our cost of financing.

We intend to apply the majority of proceeds of this offering, along with amounts we receive under arrangements with senior lenders, to expand the portfolio of insurance assets we own, and finance those assets until their maturity. See also "Use of Proceeds."

In the future, we may determine to create other kinds of investment products that may relate to or be based upon, or otherwise be offered and sold for the purpose of permitting us to become involved in, industries and financing opportunities other than life insurance. Although we presently have no definitive plans

55

Table of Contents

%

to do this, we have begun the effort of identifying other industries that present potentially viable financing opportunities. Any decision to become involved in other industries would likely involve a separate financing effort on our part, and we would expect to leverage the network of broker-dealers that have participated in our earlier financing efforts and with whom we have developed relationships.

**Market**

According to the American Council of Life Insurers Fact Book 2013 (ACLI), individuals owned over $11.22 trillion of face value of life insurance policies in the United States in 2012. This figure includes all types of policies, including term and permanent insurance known as whole life, universal life, variable life, and variable universal life. The ACLI reports that the lapse and surrender rate of individual life insurance policies for 2012 was 5.9%, over $649 billion in face value of policy benefits in 2012 alone. These figures do not include group-owned life insurance, such as employer-provided life insurance, the market for which totaled over $8.01 trillion of face value of life insurance policies in the United States in 2012, and the policies of which exhibit similar lapse and surrender rates, according to the ACLI. Consumers owning life insurance generally allow policies to lapse or surrender the policies for a variety of reasons, including: (i) the life insurance is no longer needed; (ii) unrealistic original earnings assumptions made when the policy was purchased; (iii) increasing premium payment obligations as the insured ages; (iv) changes in financial status or outlook which cause the insured to no longer require life insurance; (v) other financial needs that make the insurance unaffordable; or (vi) a desire to maximize the policy's investment value.

The secondary market for life insurance has developed in response to the large volume of policy lapses and surrenders. Rather than allowing a policy to lapse as worthless, or surrendering a life insurance policy at a fraction of its inherent value, the secondary market can be a source of significant value to consumers. The inherent actuarial value of a policy in the life insurance secondary market often exceeds the cash surrender value offered by the insurance carrier. Life insurance companies earn substantial revenue windfalls due to the lapse and surrender of many insurance policies. These revenue windfalls have enabled life insurance companies to issue policies with reduced premiums. The profit opportunity for a purchaser of a life insurance asset in the secondary market is the difference, or "spread," between (i) the cost of obtaining and maintaining a life insurance policy over the insured's lifetime, and (ii) the face value of the policy's benefit that will be paid upon the insured's mortality. The secondary market for life insurance policies has also been driven by the creation of life insurance policy pricing tools and actuarial modeling techniques developed by investors. Without the development of the secondary market, insurance carriers would maintain monopsony power over the options offered to consumers who no longer want, need or can afford their life insurance.

Although still relatively new and still emerging, Conning Research & Consulting (Conning) reports that the secondary market for life insurance policies grew from $2 billion in face value of benefits purchased in 2002, to over $12 billion in face value of benefits purchased in 2007. During and after the 2009 credit crisis, the secondary market for life insurance contracted significantly, evidenced by Conning's report that investors purchased approximately $2 billion in face value of life insurance benefits in 2012. Nevertheless, Conning reports that consumer demand for continued development of the secondary market remains strong, and there are indications of strengthening interest among investors. Conning maintains that, given the current economic environment and investor sentiment, the secondary market will likely increase. We believe that the market's largest growth will likely come from companies that attract capital to purchase the assets. Conning reports that the net market potential for policies sold in the secondary market exceeded $109 billion in 2012, and is expected to grow to $151 billion by 2019.

We believe that socio-economic and demographic trends further support the long-term development and growth of the secondary market for life insurance, and that the secondary market for life insurance represents a significant and expanding market opportunity. According to the United States Census Bureau (Bureau) the population age 65 and older is expected to more than double between 2012 and 2060, from 43.1 million to 92.0 million. The Bureau projects that the increase in the number of the "oldest old" will be even more dramatic—those 85 and older are projected to more than triple from 5.9 million to 18.2 million, reaching 4.3 percent of the total population. We believe that this older demographic, 85 years and older, may be particularly well served by the services we offer.

56

Table of Contents

In addition to changing demographics, we believe there is a growing need for services that address the post-retirement financial needs of consumers in general. Research published by Natixis Global Asset Management (NGAM) reports that retirees will likely be required to finance a larger portion of their retirement as the government's ability to support them fades. In response to this growing need, the States of Texas and Kentucky adopted legislation enabling individuals to help finance their long-term care needs through the value of their life insurance by allowing individuals to enter the Medicaid program so long as they use the proceeds from the sale of their life insurance policy in the secondary market for long-term care needs. Additional states are considering similar legislation to deal with the increasing costs of providing long-term care to the growing population of seniors.

As the life insurance secondary market has grown, a regulatory framework has been established to oversee the industry participants and protect consumers. Since 2007, there has been a dramatic increase in the number of states that have adopted legislation and regulations. Today, almost every state has adopted some version of model laws prohibiting business practices deemed to be abusive and generally requiring the licensing of life insurance purchasers and brokers, the filing

App. 0045

and approval of purchase agreements, disclosure of transaction fees and periodic reporting requirements. The widespread adoption of this regulatory framework by states has brought about standardized practices and procedures for industry participants in the secondary market. In addition, several states have modified their laws to adopt notice requirements for the benefit of consumers owning life insurance, alerting them to the existence of the secondary market before they surrender their life insurance policy or allow it to lapse.

We believe the strengthened regulatory framework, along with the emergence of best practices adopted by industry participants within the life insurance secondary market, will lead to a growing awareness of the secondary market among life insurance agents and financial advisors serving the financial needs of consumers. We expect this growing awareness, along with the demographic factors described above, will lead to the continued growth of services related to the secondary market for life insurance policies.

We believe that the secondary market for life insurance policies has also attracted global investor interest because investments in life insurance policy assets can provide non-correlated investment diversification. The ability for investors to invest in the life insurance asset class comes as a result of the development of life insurance policy pricing tools and actuarial modeling techniques for valuing portfolios of life insurance policies. Standardized life insurance pricing tools and actuarial modeling software, including life expectancies, have provided foundational support for the development of services related to the life insurance secondary market. The appeal for investors to achieve non-correlated diversification appears strong, particularly after the global recession of 2008. The appeal of non-correlation is that the underlying investment return is independent of the factors contributing to economic downturns such as real estate values, commodity prices, and stock market indices. In addition, many life insurance policies represent payment obligations from highly rated life insurance companies. As a result, investors can evaluate the expected risk premium they receive for investing in the asset class as compared to the credit profile of the underlying insurance company. The risk premium offered by the asset class, along with the non-correlated return profile has attracted a large number of investors seeking investment opportunities in the life insurance secondary market. As innovation and investor awareness of the secondary market for life insurance increases, we expect continued investor interest in the asset class.

We believe that we are well positioned to capitalize on this opportunity by providing value-added services to the consumers we serve and by leveraging our retail alternative investment distribution network. To participate and compete in our growing market, we have spent and intend to continue to spend significant resources: (i) developing a robust operational platform and systems for originating, purchasing, and servicing life insurance policies; (ii) obtaining requisite licensure to participate in the life insurance secondary market; (iii) developing financing resources, strategies, and capabilities for servicing a large portfolio of life insurance policies; (iv) recruiting and developing a professional management team; and (v) establishing strategic relationships for delivering our services.

<center>57</center>

Table of Contents

**Company History**

We were founded in 2006 to develop a platform to evaluate, purchase, service, and track life insurance policies purchased in the secondary market. Our original model was to operate as a joint venture with WestLB, AG, a large German commercial bank, with the goal of having the bank securitize and sell investments in the life insurance portfolio we purchased. During 2006 and 2007, we built an institutional platform to underwrite, purchase, service, and track life insurance policies purchased in the secondary market in conjunction with a $250 million revolving credit facility provided by WestLB. In 2008, however, WestLB informed us that they were abandoning their effort to securitize and sell investments backed by our life insurance portfolio in light of the global economic and financial crisis. This resulted in a material change to our business plan, as we had earlier purchased the portfolio of life insurance policies with the expectation these policies would be sold through a securitization organized by WestLB. Subsequently, in 2010 we sold the original portfolio that had been financed entirely by WestLB.

Since 2008, we have focused on establishing diversified funding sources whose investment expectation is based on the purchase and finance of life insurance policies to their maturity—a buy-and-hold strategy—as opposed to the securitized sale of those assets prior to maturity. In 2009, our subsidiary GWG Life, LLC, or "GWG Life," began selling Series I Secured notes to further finance our buy-and-hold strategy. In January 2012, we registered a public offering of our previously issued L Bonds in order to continue to grow and diversify the portfolio we started acquiring with the sale of Series I Secured notes. In addition to the Series I Secured notes and previously issued L Bonds, we have utilized a $100 million senior secured revolving credit facility provided by Autobahn Funding Company, LLC, a bank-sponsored commercial paper conduit administered by DZ Bank AG Deutsche Zentral-Genossenschaftsbank, or "DZ Bank." This credit facility is provided to our wholly owned subsidiary GWG DLP Funding II, LLC, or "DLP Funding II," as borrower. DLP Funding II holds title to substantially all of our life insurance assets. We expect to maintain and expand our access to credit in conjunction with the stated goal of growing and expanding our portfolio of life insurance policies through the proceeds of our common stock offering. On September 24, 2014, we consummated an initial public offering of our common stock that involved the listing of our common stock on The Nasdaq Capital Market effective September 25, 2014.

**Our Business Model**

All of our services are premised on financial and actuarial modeling that assigns a present value to the face value of an insurance policy benefit. In this regard, the value we assign to a life insurance asset in the secondary market is primarily a function of: (i) the face value of the life insurance policy or portion thereof we may wish to acquire; (ii) the estimated life expectancy of the individual insured under the policy; (iii) the premiums expected to be paid over the life of the insured; (iv) market competition from other purchasers in the secondary market; and (v) the particular underwriting characteristics of the policy, relative to the characteristics of our portfolio of life insurance assets as a whole.

The types of policies for which we provide services are typically, but not always, universal life insurance policies. Universal life insurance is a type of permanent life insurance in which premium payments above the cost of insurance are credited to the "cash value" of the policy. The cash value is credited each month with interest based on the terms of the insurance policy agreement. If a universal life insurance policy were to lapse, the insured or other owner of the policy would nonetheless have a right to receive the "cash surrender value" of the policy. The cash surrender value is the cash value of the policy, less any surrender charges imposed by the insurance company for removing the cash value. Our services provide greatest value to a consumer when the actuarial value of the life insurance policy benefit exceeds the cash surrender value of the policy—which is often the case. We also provide services to consumers who own term life insurance. Unlike permanent universal life insurance, term life insurance does not have a cash value associated with it. Nevertheless, most term insurance policies permit the policy to be converted into permanent universal life insurance. In the future, we may consider offering services in conjunction with variable universal life

insurance which differs from universal insurance in that the variable component of the policy involves the ownership of securities inside the policy. Regardless of the type of policy, we generally seek to purchase life insurance policies issued by rated life insurance carriers with investment grade credit ratings by Standard &

58

Table of Contents

Poor's (AAA through BBB), Moody's (Aaa through Baa3), or A.M. Best Company (aaa through bbb). As of December 31, 2013 and September 30, 2014, over 93.5% and 95.2%, respectively, of life insurance policies within our portfolio were issued by companies rated "A-" or better under Standard & Poor's rating system.

Before acquiring a life insurance asset, we value the related life insurance policy by conducting an underwriting review. Our present underwriting review process generally involves obtaining two life expectancy estimates on each insured from third-party medical-actuarial firms, and then averaging these two estimates. On occasion, we may obtain more than two life expectancy estimates, in which case we average the two life expectancy estimates that we believe are the most reliable, based on our own analyses and conclusions. In this regard, the two life expectancy estimates we ultimately choose to average may not always be the most conservative estimates we obtain. From time to time and as permitted by applicable borrowing covenants, we may modify our underwriting review process. For example, in anticipation of our planned marketing efforts, we recently changed our definition of a "small face policy" from $250,000 in policy benefits to $1,000,000 in policy benefits. For small face policies, rather than obtaining life expectancy estimates from third-party medical-actuarial firms, we may employ a modified underwriting review process involving the use of a combination of standard mortality tables, actuarial or medical consultants, and our own analysis to develop a life expectancy estimate for an insured.

We generally transact directly with the policy owner who originally purchased the life insurance in the primary market. Historically, we have purchased policies in the secondary market through a network of life insurance agents, life insurance brokers, and licensed providers who assist policy owners in accessing the secondary market. We expect to expand our origination practice by marketing directly to consumers through various marketing initiatives.

We have built our business with what we believe to be the following competitive strengths:

- *Industry Experience*: We have actively participated in the development of the secondary market of life insurance as a principal purchaser and financier within the asset class since 2006. Our position within the marketplace has allowed us to gain a deep understanding of the life insurance secondary market. We have participated in the leadership of various industry associations and forums, including the Life Insurance Settlement Association (LISA) and the Insurance Studies Institute (ISI). Our experience gives us confidence in building a company to compete in the industry and acquire a portfolio of life insurance policies that will perform to our expectations.

- *Operational Platform*: We have built and continue to refine and develop an operational platform and systems for efficiently tracking, processing, and servicing life insurance policies that we believe provide competitive advantages when participating in the life insurance secondary marketplace.

- *Origination and Underwriting Practices*: We seek to use underwriting review processes and file documentation standards that generally meet published guidelines for rated securitizations of life insurance portfolios. We purchase life insurance policies we consider to be non-contestable and that meet our underwriting criteria and reviews. We consider a life insurance policy to be "non-contestable" once applicable state law prohibits the insurer from challenging the validity of the policy due to fraud. In this regard, state non-contestability laws generally require a period of one to two years to elapse after the initial issuance of the policy before that policy is considered non-contestable under state law. Non-contestability laws do not, however, prevent an insurer from challenging the validity of a policy procured by fraud for lack of an insurable interest at the time at which the policy was purchased, such as is the case with so-called "stranger-originated" life insurance policies. To the extent we use modified methodologies for estimating life expectancies for small face policies, those modified methodologies may not meet published guidelines for rated securitizations of life insurance portfolios.

- *Origination Relationships and Strategies*: We have established origination relationships with life insurance policy brokers and insurance agents who submit policies for our purchase or financing. Our referral base knows our underwriting standards for purchasing life insurance policies in the secondary market, which provides confidence in our bidding and closing processes and streamlines our own

59

Table of Contents

due-diligence process. We expect to expand our origination methodology and channels with the proceeds of this offering (e.g., the addition of consumer marketing).

- *Life Expectancy Methodology*: We generally rely on two life expectancy estimates obtained from independent third-party medical-actuarial underwriting firms to arrive at a life expectancy estimate we use for valuing a life insurance asset. For a majority of our life insurance asset purchases, we rely on estimates obtained from 21st Services and AVS Underwriting to develop our life expectancy estimate. We may, however, also obtain and use life expectancy estimates from other medical-actuarial underwriting firms. As explained above, we may from time to time modify our underwriting review processes, including our methodology for arriving at life expectancy estimates we use in ascribing value to a life insurance asset.

- *Pricing Software and Methodology*: To calculate our expected returns on the investments we make in life insurance assets, we use actuarial pricing methodologies and software tools built by a leading independent actuarial service firm and currently supported by Modeling Actuarial Pricing Systems, Inc. ("MAPS").

- *Financing Strategy*: We have actively developed diversified financing strategy for accessing capital markets in support of our buy-and-hold strategy for our portfolio of life insurance policies, ranging from institutional bank financing to a network of broker-dealers registered with the Financial Industry Regulatory Authority ("FINRA"), many of whom have participated in one or more of our Series I Secured note financing, our Series A preferred stock financing, or our Renewable Secured Debenture (previously issued L Bonds) financing. If in the future we determine to offer different kinds of investment products, we expect to leverage the network of broker-dealers that we have built over time.

On the other hand, our business involves a number of challenges and risks described in more detail elsewhere in this prospectus, including the following:

- *Relatively New Market*: Investing in life insurance assets in the secondary market is a relatively new and evolving market. Our ability to source and invest in life insurance assets at attractive prices materially depends on the continued growth of the secondary market for life insurance and the continued solvency of the life insurance companies that pay the face value of life insurance policy benefits.

- *Asset Valuation Assumptions:* The valuation of our portfolio life insurance assets—the principal asset on our balance sheet—requires us to make material assumptions that may ultimately prove to be incorrect. These assumptions include appropriate discount rates, cash flow projections, and the life expectancy estimates we use for these purposes, any of which may ultimately prove to be inaccurate.

- *Ability to Expand Our Portfolio:* Our business model requires us to achieve actual results that are in line with those we expect to attain from our investments in life insurance assets. In this regard, we believe that the larger the portfolio of life insurance assets we own, the greater likelihood there is that we will achieve results matching our expectations. Although we plan to expand the number of investments in life insurance assets using proceeds from the sale of our common stock, we may be unable to meet this goal. Furthermore, even if we successfully grow our portfolio of life insurance assets, we nevertheless may not achieve the results we expect.

- *Reliance on Financing*: We have chosen to finance our business almost entirely through the issuance of debt, including the sale of previously issued L Bonds, Series I Secured notes, and our use of a senior secured revolving credit facility. Our business model expects that we will have continued access to financing (including financing to expand or replace our existing financing) in order to purchase and finance a large and diversified portfolio of life insurance assets, and thereafter pay the attendant premiums and financing costs of maintaining that portfolio. We will be required to rely on our access to financing to pay premiums and interest until such time as we experience a significant amount of mortality within our portfolio and begin receiving significant revenues from the receipt of life insurance policy benefits. Even if we obtain the financing we require, we may not receive life insurance policy benefits that match our cash flow projections or meet them in time to earn profits after the payment of financing costs.

<div align="center">60</div>

Table of Contents

- *Risk of Investment in Life Insurance Assets*: Our investments in life insurance assets have inherent risks, including fraud and legal challenges to the validity of the life insurance policies. Examples of fraud include the possibility that the seller of a policy may have provided us with inaccurate or misleading information during the underwriting review process.

- *Effects of Regulation*: Our business is subject to complex state and federal regulation. Changes in state or federal laws and regulations governing our business, or changes in the interpretation of such laws and regulations, could materially and negatively affect our business.

Our business also involves certain other challenges and risks described in the "Risk Factors" section of this prospectus.

**Our Portfolio**

Our portfolio of life insurance policies, owned by our subsidiaries as of September 30, 2014, is summarized below:

<div align="center">

**Life Insurance Portfolio Summary**

</div>

| | | |
|---|---|---|
| Total portfolio face value of policy benefits | $ | 787,964,000 |
| Average face value per policy | $ | 2,727,000 |
| Average face value per insured life | $ | 2,996,000 |
| Average age of insured (yrs.) * | | 82.6 |
| Average life expectancy estimate (yrs.) * | | 6.69 |
| Total number of policies | | 289 |
| Number of unique lives | | 263 |
| Demographics | | 68% Males; 32% Females |
| Number of smokers | | 3 insureds are smokers |
| Largest policy as % of total portfolio | | 1.27% |
| Average policy as % of total portfolio | | 0.35% |
| Average Annual Premium as % of face value | | 3.31% |

App. 0048

\*      Averages presented in the table are weighted averages.

Our portfolio of life insurance policies, owned by our subsidiaries as of September 30, 2014, organized by the insured's current age and the associated policy benefits, is summarized below:

**Distribution of Policy Benefits by Current Age of Insured**

| Min Age | Max Age | Policy Benefits | Weighted Average Life Expectancy (yrs.) | Distribution |
|---|---|---|---|---|
| 65 | 69 | $ 9,157,000 | 7.66 | 1.16% |
| 70 | 74 | 47,767,000 | 8.72 | 6.06% |
| 75 | 79 | 172,048,000 | 8.38 | 21.83% |
| 80 | 84 | 289,260,000 | 7.20 | 36.71% |
| 85 | 89 | 237,464,000 | 4.82 | 30.14% |
| 90 | 95 | 32,268,000 | 3.59 | 4.10% |
| **Total** | | **$ 787,964,000** | 6.69 | **100.00%** |

61

Table of Contents

Our portfolio of life insurance policies, owned by our subsidiaries as of September 30, 2014, organized by the insured's current age and number of policies owned, is summarized below:

**Distribution of Policies by Current Age of Insured**

| Min Age | Max Age | Policies | Weighted Average Life Expectancy (yrs.) | Distribution |
|---|---|---|---|---|
| 65 | 69 | 8 | 7.66 | 2.77% |
| 70 | 74 | 20 | 8.72 | 6.92% |
| 75 | 79 | 57 | 8.38 | 19.72% |
| 80 | 84 | 99 | 7.20 | 34.26% |
| 85 | 89 | 90 | 4.82 | 31.14% |
| 90 | 95 | 15 | 3.59 | 5.19% |
| **Total** | | **289** | 6.69 | **100.00%** |

Our portfolio of life insurance policies, owned by our subsidiaries as of September 30, 2014, organized by the insured's estimated life expectancy estimates and associated policy benefits, is summarized below:

**Distribution of Policy Benefits by Current Life Expectancies of Insured**

| Min LE (Months) | Max LE (Months) | Policy Benefits | Distribution |
|---|---|---|---|
| 144 | 167 | $ 9,000,000 | 1.14% |
| 120 | 143 | 69,656,000 | 8.84% |
| 96 | 119 | 175,024,000 | 22.21% |
| 72 | 95 | 203,081,000 | 25.77% |
| 48 | 71 | 209,573,000 | 26.60% |
| 16 | 47 | 121,630,000 | 15.44% |
| **Total** | | **$ 787,964,000** | **100.00%** |

We track concentrations of pre-existing medical conditions among insured individuals within our portfolio based on information contained in life expectancy reports. We track these medical conditions with ten primary disease categories: (1) cardiovascular, (2) cerebrovascular, (3) dementia, (4) cancer, (5) diabetes, (6) respiratory disease, (7) neurological disorders, (8) other, no disease, or multiple. Our primary disease categories are summary generalizations based on the ICD-9 codes we track on each insured individuals within our portfolio. ICD-9 codes, published by the World Health Organization, are used worldwide for medical diagnoses and treatment systems, as well as morbidity and mortality statistics. Currently, cardiovascular is the only primary disease category within our portfolio that represents a concentration over 10%.

Table of Contents

Our portfolio of life insurance policies, owned by our subsidiaries as of September 30, 2014, organized by the primary disease categories of the insured and associated policy benefits, is summarized below:

**Distribution of Policy Benefits by Primary Disease Category**

| Primary Disease Category | Policy Benefits | Distribution |
|---|---|---|
| Cancer | $ 57,450,000 | 7.29% |
| Cardiovascular | 141,874,000 | 18.00% |
| Cerebrovascular | 21,960,000 | 2.79% |
| Dementia | 62,699,000 | 7.96% |
| Diabetes | 63,617,000 | 8.07% |
| Multiple | 202,109,000 | 25.65% |
| Neurological Disorders | 16,104,000 | 2.04% |
| No Disease | 94,468,000 | 11.99% |
| Other | 86,483,000 | 10.98% |
| Respiratory Diseases | 41,200,000 | 5.23% |
| Total Policy Benefits | $787,964,000 | 100.00% |

The primary disease category represents a general category of impairment. Within the primary disease category, there are a multitude of sub-categorizations defined more specifically by ICD-9 codes. For example, a primary disease category of cardiovascular includes subcategorizations such as atrial fibrillation, heart valve replacement, coronary atherosclerosis, etc. In addition, individuals may have more than one ICD-9 code describing multiple medical conditions within one or more primary disease categories. Where an individual's ICD-9 codes indicate medical conditions in more than one primary disease categories, we categorize the individual as having multiple primary disease categories. We expect to continue to develop and refine our identification and tracking on the insured individuals medical conditions as we manage our portfolio of life insurance policies.

63

Table of Contents

The complete detail of the portfolio of all life insurance policies, owned by our subsidiaries as of September 30, 2014, organized by the current age of the insured and the associated policy benefits, sex, estimated life expectancy, issuing insurance carrier, and the credit rating of the issuing insurance carrier is set forth below.

**Life Insurance Portfolio Detail**
**(as of September 30, 2014)**

| | Face Amount | Gender | Age (ALB) | LE (mo.) | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 1 | $ 1,100,000 | M | 94 | 31.7 | ING Life Insurance and Annuity Company | A- |
| 2 | $ 4,000,000 | M | 93 | 37.5 | MetLife Investors USA Insurance Company | AA- |
| 3 | $ 1,770,726 | F | 93 | 35.7 | Aviva Life Insurance Company | A- |
| 4 | $ 3,200,000 | M | 93 | 61.0 | West Coast Life Insurance Company | AA- |
| 5 | $ 1,000,000 | F | 92 | 41.9 | Transamerica Life Insurance Company | AA- |
| 6 | $ 264,000 | F | 92 | 27.5 | Lincoln Benefit Life Company | BBB+ |
| 7 | $ 2,500,000 | M | 91 | 25.4 | Columbus Life Insurance Company | AA |
| 8 | $ 500,000 | M | 91 | 20.6 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 9 | $ 2,000,000 | F | 91 | 19.3 | Pruco Life Insurance Company | AA- |
| 10 | $ 250,000 | M | 91 | 24.9 | Transamerica Life Insurance Company | AA- |
| 11 | $ 1,682,773 | F | 90 | 56.9 | Hartford Life and Annuity Insurance Company | BBB+ |
| 12 | $ 3,000,000 | M | 90 | 53.4 | West Coast Life Insurance Company | AA- |
| 13 | $ 5,000,000 | F | 90 | 58.7 | American General Life Insurance Company | A+ |
| 14 | $ 5,000,000 | F | 90 | 38.5 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 15 | $ 1,000,000 | F | 90 | 35.7 | Protective Life Insurance Company | AA- |
| 16 | $ 5,000,000 | M | 89 | 37.9 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 17 | $ 3,500,000 | F | 89 | 62.7 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 18 | $ 3,100,000 | F | 89 | 39.6 | Lincoln Benefit Life Company | BBB+ |

App. 0050

| | Face Amount | Gender | Age (ALB) | LE (mo.) | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 19 | $ 1,500,000 | F | 89 | 72.9 | Jefferson-Pilot Life Insurance Company | AA- |
| 20 | $ 1,000,000 | M | 89 | 31.9 | State Farm Life Insurance Company | AA- |
| 21 | $ 3,000,000 | F | 89 | 39.2 | Jefferson-Pilot Life Insurance Company | AA- |
| 22 | $ 5,000,000 | F | 89 | 46.1 | ING Life Insurance and Annuity Company | A- |
| 23 | $ 5,000,000 | F | 89 | 23.4 | Lincoln National Life Insurance Company | AA- |
| 24 | $ 1,000,000 | M | 89 | 13.1 | ING Life Insurance and Annuity Company | A- |
| 25 | $ 1,203,520 | M | 89 | 49.9 | Columbus Life Insurance Company | AA |
| 26 | $ 1,350,000 | F | 89 | 41.6 | Jefferson-Pilot Life Insurance Company | AA- |
| 27 | $ 600,000 | F | 89 | 26.9 | Columbus Life Insurance Company | AA |
| 28 | $ 5,000,000 | F | 88 | 54.6 | Massachusetts Mutual Life Insurance Company | AA+ |
| 29 | $ 2,500,000 | F | 88 | 54.3 | American General Life Insurance Company | A+ |
| 30 | $ 2,500,000 | M | 88 | 45.7 | Pacific Life Insurance Company | A+ |
| 31 | $ 1,000,000 | F | 88 | 56.9 | United of Omaha Life Insurance Company | A+ |
| 32 | $ 1,000,000 | F | 88 | 72.4 | Transamerica Life Insurance Company | AA- |
| 33 | $ 250,000 | F | 88 | 72.4 | Transamerica Life Insurance Company | AA- |
| 34 | $ 1,750,000 | M | 88 | 27.4 | Transamerica Life Insurance Company | AA- |
| 35 | $ 2,500,000 | F | 88 | 13.1 | AXA Equitable Life Insurance Company | A+ |
| 36 | $ 2,500,000 | F | 88 | 13.1 | AXA Equitable Life Insurance Company | A+ |
| 37 | $ 8,985,000 | M | 88 | 37.6 | Massachusetts Mutual Life Insurance Company | AA+ |
| 38 | $ 715,000 | F | 88 | 66.7 | Jefferson-Pilot Life Insurance Company | AA- |
| 39 | $ 2,225,000 | F | 88 | 91.3 | Transamerica Life Insurance Company | AA- |
| 40 | $ 2,000,000 | F | 88 | 34.8 | American General Life Insurance Company | A+ |
| 41 | $ 3,500,000 | F | 88 | 47.2 | Lincoln National Life Insurance Company | AA- |
| 42 | $ 500,000 | F | 87 | 75.0 | Sun Life Assurance Company of Canada (U.S.) | AA- |
| 43 | $ 250,000 | M | 87 | 79.0 | Metropolitan Life Insurance Company | AA- |
| 44 | $ 4,000,000 | F | 87 | 79.0 | Transamerica Life Insurance Company | AA- |

64

**Table of Contents**

| | Face Amount | Gender | Age (ALB) | LE (mo.) | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 45 | $ 5,000,000 | M | 87 | 59.7 | AXA Equitable Life Insurance Company | A+ |
| 46 | $ 1,500,000 | M | 87 | 47.5 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 47 | $ 1,500,000 | M | 87 | 47.5 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 48 | $ 1,050,000 | M | 87 | 49.9 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 49 | $ 5,000,000 | F | 87 | 37.9 | Penn Mutual Life Insurance Company | A+ |
| 50 | $ 1,000,000 | M | 87 | 61.5 | AXA Equitable Life Insurance Company | A+ |
| 51 | $ 500,000 | M | 87 | 68.1 | Lincoln National Life Insurance Company | AA- |
| 52 | $ 4,785,380 | F | 87 | 49.2 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 53 | $ 1,803,455 | F | 87 | 55.5 | Metropolitan Life Insurance Company | AA- |
| 54 | $ 1,529,270 | F | 87 | 55.5 | Metropolitan Life Insurance Company | AA- |
| 55 | $ 800,000 | M | 87 | 77.0 | Lincoln National Life Insurance Company | AA- |
| 56 | $ 5,000,000 | M | 87 | 58.4 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 57 | $ 3,000,000 | F | 87 | 88.7 | Massachusetts Mutual Life Insurance Company | AA+ |
| 58 | $ 200,000 | M | 87 | 54.9 | Lincoln Benefit Life Company | BBB+ |
| 59 | $ 4,445,467 | M | 87 | 65.2 | Penn Mutual Life Insurance Company | A+ |
| 60 | $ 1,500,000 | M | 87 | 52.3 | Union Central Life Insurance Company | A+ |
| 61 | $ 7,500,000 | M | 87 | 57.1 | Jefferson-Pilot Life Insurance Company | AA- |
| 62 | $ 3,600,000 | F | 87 | 64.4 | AXA Equitable Life Insurance Company | A+ |
| 63 | $ 3,000,000 | M | 87 | 50.4 | Jefferson-Pilot Life Insurance Company | AA- |
| 64 | $ 2,000,000 | M | 87 | 45.6 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 65 | $ 3,000,000 | M | 87 | 39.3 | American General Life Insurance Company | A+ |
| 66 | $ 1,000,000 | M | 86 | 67.7 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 67 | $ 2,000,000 | M | 86 | 67.7 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 68 | $ 5,000,000 | M | 86 | 55.6 | Jefferson-Pilot Life Insurance Company | AA- |
| 69 | $ 5,000,000 | F | 86 | 40.8 | Transamerica Life Insurance Company | AA- |
| 70 | $ 3,000,000 | M | 86 | 58.8 | Transamerica Life Insurance Company | AA- |
| 71 | $ 1,200,000 | M | 86 | 67.0 | Transamerica Life Insurance Company | AA- |
| 72 | $ 6,000,000 | F | 86 | 63.0 | Sun Life Assurance Company of Canada (U.S.) | AA- |

| | Face Amount | Gender | Age (ALB) | LE (mo.) | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 73 | $ 4,000,000 | M | 86 | 90.5 | AXA Equitable Life Insurance Company | A+ |
| 74 | $ 5,570,000 | F | 86 | 53.8 | ING Life Insurance and Annuity Company | A- |
| 75 | $ 5,570,000 | F | 86 | 53.8 | ING Life Insurance and Annuity Company | A- |
| 76 | $ 1,000,000 | F | 86 | 42.0 | New York Life Insurance Company | AA+ |
| 77 | $10,000,000 | F | 86 | 79.1 | West Coast Life Insurance Company | AA- |
| 78 | $ 2,500,000 | M | 86 | 54.4 | Transamerica Life Insurance Company | AA- |
| 79 | $ 1,000,000 | F | 86 | 57.6 | West Coast Life Insurance Company | AA- |
| 80 | $ 2,000,000 | F | 86 | 57.6 | West Coast Life Insurance Company | AA- |
| 81 | $ 500,000 | F | 86 | 62.1 | Beneficial Life Insurance Company | N/A |
| 82 | $ 800,000 | M | 86 | 61.9 | National Western Life Insurance Company | A |
| 83 | $ 5,000,000 | M | 86 | 88.1 | Lincoln National Life Insurance Company | AA- |
| 84 | $ 1,000,000 | F | 86 | 33.7 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 85 | $ 4,513,823 | F | 86 | 29.3 | Aviva Life Insurance Company | A- |
| 86 | $ 2,000,000 | M | 86 | 105.6 | ING Life Insurance and Annuity Company | A- |
| 87 | $ 2,000,000 | M | 86 | 105.6 | ING Life Insurance and Annuity Company | A- |
| 88 | $ 2,000,000 | M | 86 | 105.6 | ING Life Insurance and Annuity Company | A- |
| 89 | $ 2,000,000 | F | 86 | 82.2 | U.S. Financial Life Insurance Company | A+ |
| 90 | $ 1,365,000 | F | 85 | 92.1 | Transamerica Life Insurance Company | AA- |
| 91 | $ 1,000,000 | F | 85 | 91.6 | ING Life Insurance and Annuity Company | A- |
| 92 | $ 1,000,000 | M | 85 | 46.2 | Massachusetts Mutual Life Insurance Company | AA+ |
| 93 | $ 2,000,000 | M | 85 | 91.8 | Transamerica Life Insurance Company | AA- |
| 94 | $ 8,500,000 | M | 85 | 88.1 | Massachusetts Mutual Life Insurance Company | AA+ |
| 95 | $ 2,328,547 | M | 85 | 50.8 | Metropolitan Life Insurance Company | AA- |

65

Table of Contents

| | Face Amount | Gender | Age (ALB) | LE (mo.) | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 96 | $ 2,000,000 | M | 85 | 50.8 | Metropolitan Life Insurance Company | AA- |
| 97 | $ 1,000,000 | M | 85 | 31.5 | Transamerica Life Insurance Company | AA- |
| 98 | $ 500,000 | M | 85 | 88.9 | Metropolitan Life Insurance Company | AA- |
| 99 | $ 2,000,000 | M | 85 | 68.6 | Jefferson-Pilot Life Insurance Company | AA- |
| 100 | $ 3,000,000 | F | 85 | 78.1 | Transamerica Life Insurance Company | AA- |
| 101 | $ 1,800,000 | M | 85 | 58.7 | John Hancock Variable Life Insurance Company | AA- |
| 102 | $ 2,000,000 | M | 85 | 71.2 | AXA Equitable Life Insurance Company | A+ |
| 103 | $ 1,750,000 | M | 85 | 71.2 | AXA Equitable Life Insurance Company | A+ |
| 104 | $ 2,000,000 | M | 85 | 40.9 | Transamerica Life Insurance Company | AA- |
| 105 | $ 1,425,000 | M | 85 | 89.1 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 106 | $ 1,500,000 | M | 84 | 55.9 | Transamerica Life Insurance Company | AA- |
| 107 | $ 1,500,000 | F | 84 | 116.2 | Lincoln Benefit Life Company | BBB+ |
| 108 | $ 3,750,000 | M | 84 | 82.8 | AXA Equitable Life Insurance Company | A+ |
| 109 | $ 1,000,000 | M | 84 | 66.8 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 110 | $ 2,000,000 | F | 84 | 92.1 | AXA Equitable Life Insurance Company | A+ |
| 111 | $ 1,000,000 | M | 84 | 60.9 | ING Life Insurance and Annuity Company | A- |
| 112 | $ 3,000,000 | F | 84 | 90.6 | Sun Life Assurance Company of Canada (U.S.) | AA- |
| 113 | $ 829,022 | F | 84 | 31.1 | Hartford Life and Annuity Insurance Company | BBB+ |
| 114 | $ 1,500,000 | M | 84 | 86.3 | AXA Equitable Life Insurance Company | A+ |
| 115 | $ 5,000,000 | M | 84 | 96.2 | ING Life Insurance and Annuity Company | A- |
| 116 | $ 1,500,000 | M | 84 | 55.7 | ING Life Insurance and Annuity Company | A- |
| 117 | $ 1,500,000 | M | 84 | 55.7 | ING Life Insurance and Annuity Company | A- |
| 118 | $ 5,000,000 | M | 84 | 80.1 | ING Life Insurance and Annuity Company | A- |
| 119 | $ 500,000 | M | 84 | 47.6 | Genworth Life Insurance Company | A- |
| 120 | $ 1,000,000 | M | 84 | 53.8 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 121 | $ 4,000,000 | F | 84 | 56.2 | ING Life Insurance and Annuity Company | A- |
| 122 | $ 5,000,000 | F | 84 | 99.7 | American General Life Insurance Company | A+ |
| 123 | $ 3,500,000 | F | 84 | 115.0 | Lincoln Benefit Life Company | BBB+ |
| 124 | $ 5,000,000 | F | 83 | 104.2 | AXA Equitable Life Insurance Company | A+ |
| 125 | $ 1,000,000 | F | 83 | 90.6 | John Hancock Life Insurance Company (U.S.A) | AA- |

| | Face Amount | Gender | Age (ALB) | LE (mo.) | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 126 | $ 6,000,000 | F | 83 | | American General Life Insurance Company | A+ |
| 127 | $ 5,000,000 | M | 83 | 72.6 | AXA Equitable Life Insurance Company | A+ |
| 128 | $ 2,000,000 | M | 83 | 46.1 | National Life Insurance Company | A |
| 129 | $ 4,200,000 | F | 83 | 126.5 | Transamerica Life Insurance Company | AA- |
| 130 | $ 750,000 | M | 83 | 96.1 | West Coast Life Insurance Company | AA- |
| 131 | $ 4,000,000 | M | 83 | 43.3 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 132 | $ 1,000,000 | M | 83 | 89.0 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 133 | $ 2,000,000 | F | 83 | 105.8 | Lincoln Benefit Life Company | BBB+ |
| 134 | $ 5,000,000 | M | 83 | 81.8 | Jefferson-Pilot Life Insurance Company | AA- |
| 135 | $ 2,700,000 | M | 83 | 68.6 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 136 | $ 7,600,000 | F | 83 | 105.3 | Transamerica Life Insurance Company | AA- |
| 137 | $ 2,500,000 | F | 83 | 70.5 | American General Life Insurance Company | A+ |
| 138 | $ 2,500,000 | M | 83 | 66.3 | AXA Equitable Life Insurance Company | A+ |
| 139 | $ 3,000,000 | M | 83 | 66.3 | Lincoln National Life Insurance Company | AA- |
| 140 | $ 2,000,000 | M | 83 | 93.2 | Pacific Life Insurance Company | A+ |
| 141 | $ 3,000,000 | F | 83 | 50.3 | AXA Equitable Life Insurance Company | A+ |
| 142 | $ 1,703,959 | M | 83 | 74.5 | Jefferson-Pilot Life Insurance Company | AA- |
| 143 | $ 3,000,000 | M | 83 | 68.2 | Metropolitan Life Insurance Company | AA- |
| 144 | $ 500,000 | M | 83 | 23.9 | Great Southern Life Insurance Company | N/A |
| 145 | $ 1,000,000 | M | 83 | 64.8 | Hartford Life and Annuity Insurance Company | BBB+ |
| 146 | $10,000,000 | F | 83 | 64.6 | American National Insurance Company | A |

66

**Table of Contents**

| | Face Amount | Gender | Age (ALB) | LE (mo.) | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 147 | $ 500,000 | M | 83 | 30.8 | West Coast Life Insurance Company | AA- |
| 148 | $ 3,500,000 | F | 82 | 100.1 | Jefferson-Pilot Life Insurance Company | AA- |
| 149 | $ 500,000 | M | 82 | 108.1 | Metropolitan Life Insurance Company | AA- |
| 150 | $ 1,000,000 | M | 82 | 76.1 | Lincoln National Life Insurance Company | AA- |
| 151 | $ 3,000,000 | M | 82 | 46.9 | U.S. Financial Life Insurance Company | A+ |
| 152 | $ 1,900,000 | M | 82 | 73.4 | American National Insurance Company | A |
| 153 | $ 500,000 | M | 82 | 52.5 | New York Life Insurance Company | AA+ |
| 154 | $ 500,000 | M | 82 | 52.5 | New York Life Insurance Company | AA+ |
| 155 | $ 5,000,000 | M | 82 | 80.7 | AXA Equitable Life Insurance Company | A+ |
| 156 | $ 250,000 | M | 82 | 38.5 | Jackson National Life Insurance Company | AA |
| 157 | $ 1,500,000 | M | 82 | 83.0 | Jefferson-Pilot Life Insurance Company | AA- |
| 158 | $ 3,500,000 | F | 82 | 96.2 | AXA Equitable Life Insurance Company | A+ |
| 159 | $ 5,000,000 | F | 82 | 83.1 | Sun Life Assurance Company of Canada (U.S.) | AA- |
| 160 | $ 3,000,000 | F | 82 | 101.5 | MetLife Investors USA Insurance Company | AA- |
| 161 | $ 750,000 | M | 82 | 89.4 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 162 | $ 4,500,000 | M | 82 | 81.3 | AXA Equitable Life Insurance Company | A+ |
| 163 | $ 1,250,000 | F | 82 | 68.4 | Columbus Life Insurance Company | AA |
| 164 | $ 2,275,000 | M | 82 | 98.7 | ING Life Insurance and Annuity Company | A- |
| 165 | $10,000,000 | M | 82 | 86.7 | AXA Equitable Life Insurance Company | A+ |
| 166 | $ 2,300,000 | M | 82 | 26.8 | American General Life Insurance Company | A+ |
| 167 | $ 3,500,000 | M | 82 | 79.7 | AXA Equitable Life Insurance Company | A+ |
| 168 | $ 6,217,200 | F | 82 | 113.9 | Phoenix Life Insurance Company | B+ |
| 169 | $ 2,500,000 | F | 82 | 79.6 | ING Life Insurance and Annuity Company | A- |
| 170 | $ 5,000,000 | F | 82 | 64.4 | Massachusetts Mutual Life Insurance Company | AA+ |
| 171 | $ 1,500,000 | M | 82 | 31.1 | Pacific Life Insurance Company | A+ |
| 172 | $ 2,000,000 | F | 82 | 105.6 | Jefferson-Pilot Life Insurance Company | AA- |
| 173 | $ 5,000,000 | M | 82 | 91.5 | Jefferson-Pilot Life Insurance Company | AA- |
| 174 | $ 3,000,000 | M | 81 | 75.7 | Protective Life Insurance Company | AA- |
| 175 | $ 1,500,000 | M | 81 | 75.7 | American General Life Insurance Company | A+ |
| 176 | $ 2,000,000 | F | 81 | 124.9 | Transamerica Life Insurance Company | AA- |
| 177 | $ 1,500,000 | M | 81 | 63.6 | Pacific Life Insurance Company | A+ |
| 178 | $ 5,000,000 | M | 81 | 118.4 | American General Life Insurance Company | A+ |

| # | Face Amount | Gender | Age (ALB) | LE (mo.) | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 179 | $ 1,995,000 | F | 81 | 88.2 | Transamerica Life Insurance Company | AA- |
| 180 | $ 4,000,000 | M | 81 | 63.8 | Jefferson-Pilot Life Insurance Company | AA- |
| 181 | $10,000,000 | M | 81 | 88.8 | New York Life Insurance Company | AA+ |
| 182 | $ 5,000,000 | M | 81 | 83.4 | Transamerica Life Insurance Company | AA- |
| 183 | $ 2,000,000 | M | 81 | 78.9 | Ohio National Life Assurance Corporation | AA- |
| 184 | $ 1,000,000 | M | 81 | 78.9 | Ohio National Life Assurance Corporation | AA- |
| 185 | $ 350,000 | M | 81 | 42.5 | Reassure America Life Insurance Company | AA |
| 186 | $ 5,000,000 | M | 80 | 101.2 | AXA Equitable Life Insurance Company | A+ |
| 187 | $ 8,000,000 | M | 80 | 92.6 | AXA Equitable Life Insurance Company | A+ |
| 188 | $ 550,000 | M | 80 | 113.1 | Genworth Life Insurance Company | A- |
| 189 | $ 1,680,000 | F | 80 | 77.0 | AXA Equitable Life Insurance Company | A+ |
| 190 | $ 1,000,000 | F | 80 | 106.5 | Jefferson-Pilot Life Insurance Company | AA- |
| 191 | $ 1,250,000 | M | 80 | 110.3 | Metropolitan Life Insurance Company | AA- |
| 192 | $ 1,000,000 | M | 80 | 74.7 | AXA Equitable Life Insurance Company | A+ |
| 193 | $ 1,250,000 | F | 80 | 84.1 | Principal Life Insurance Company | A+ |
| 194 | $ 1,000,000 | M | 80 | 65.2 | AXA Equitable Life Insurance Company | A+ |
| 195 | $ 3,000,000 | M | 80 | 108.6 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 196 | $ 2,000,000 | M | 80 | 48.1 | Jefferson-Pilot Life Insurance Company | AA- |
| 197 | $ 1,750,000 | M | 80 | 92.6 | AXA Equitable Life Insurance Company | A+ |

67

Table of Contents

| # | Face Amount | Gender | Age (ALB) | LE (mo.) | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 198 | $ 5,000,000 | M | 80 | 82.0 | AXA Equitable Life Insurance Company | A+ |
| 199 | $ 250,000 | M | 80 | 89.6 | American General Life Insurance Company | A+ |
| 200 | $10,000,000 | M | 80 | 124.0 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 201 | $ 3,000,000 | M | 80 | 121.4 | Principal Life Insurance Company | A+ |
| 202 | $ 1,210,000 | M | 80 | 73.2 | Lincoln National Life Insurance Company | AA- |
| 203 | $ 3,000,000 | F | 80 | 116.7 | West Coast Life Insurance Company | AA- |
| 204 | $ 7,000,000 | M | 80 | 96.6 | Genworth Life Insurance Company | A- |
| 205 | $ 3,000,000 | M | 79 | 101.6 | ING Life Insurance and Annuity Company | A- |
| 206 | $ 4,000,000 | M | 79 | 91.0 | Jefferson-Pilot Life Insurance Company | AA- |
| 207 | $ 5,000,000 | M | 79 | 101.8 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 208 | $ 2,000,000 | M | 79 | 35.0 | Metropolitan Life Insurance Company | AA- |
| 209 | $ 6,000,000 | M | 79 | 134.7 | AXA Equitable Life Insurance Company | A+ |
| 210 | $ 130,000 | M | 79 | 59.2 | Genworth Life Insurance Company | A- |
| 211 | $ 1,000,000 | M | 79 | 135.7 | Empire General Life Assurance Corporation | AA- |
| 212 | $ 2,000,000 | F | 79 | 99.9 | Pacific Life Insurance Company | A+ |
| 213 | $ 4,300,000 | F | 79 | 121.9 | American National Insurance Company | A |
| 214 | $ 2,000,000 | F | 79 | 98.4 | Transamerica Life Insurance Company | AA- |
| 215 | $ 5,000,000 | M | 79 | 104.0 | AXA Equitable Life Insurance Company | A+ |
| 216 | $ 5,000,000 | M | 79 | 104.0 | AXA Equitable Life Insurance Company | A+ |
| 217 | $ 500,000 | M | 79 | 56.8 | Transamerica Life Insurance Company | AA- |
| 218 | $ 3,000,000 | M | 78 | 51.4 | Pacific Life Insurance Company | A+ |
| 219 | $ 3,000,000 | M | 78 | 51.4 | Minnesota Life Insurance Company | A+ |
| 220 | $ 3,000,000 | M | 78 | 51.4 | Prudential Life Insurance Company | AA- |
| 221 | $ 5,000,000 | M | 78 | 89.4 | Pacific Life Insurance Company | A+ |
| 222 | $ 5,000,000 | M | 78 | 89.4 | Pacific Life Insurance Company | A+ |
| 223 | $ 3,601,500 | M | 78 | 105.6 | Transamerica Life Insurance Company | AA- |
| 224 | $ 1,000,000 | M | 78 | 102.3 | Sun Life Assurance Company of Canada (U.S.) | AA- |
| 225 | $ 5,000,000 | M | 78 | 100.4 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 226 | $ 5,000,000 | M | 78 | 125.2 | Principal Life Insurance Company | A+ |
| 227 | $ 1,009,467 | M | 78 | 58.7 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 228 | $ 7,000,000 | M | 78 | 97.4 | Lincoln Benefit Life Company | BBB+ |
| 229 | $ 5,000,000 | M | 78 | 66.8 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 230 | $ 476,574 | M | 78 | 83.2 | Transamerica Life Insurance Company | AA- |
| 231 | $ 2,250,000 | M | 78 | 105.9 | Massachusetts Mutual Life Insurance Company | AA+ |

| | Face Amount | Gender | Age (ALB) | LE (mo.) | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 232 | $ 4,000,000 | M | 78 | 122.6 | Metropolitan Life Insurance Company | A+ |
| 233 | $ 6,000,000 | M | 78 | 119.1 | AXA Equitable Life Insurance Company | A+ |
| 234 | $ 5,000,000 | F | 78 | 129.0 | ING Life Insurance and Annuity Company | A- |
| 235 | $ 750,000 | M | 78 | 80.6 | Lincoln National Life Insurance Company | AA- |
| 236 | $ 3,000,000 | M | 78 | 107.4 | Principal Life Insurance Company | A+ |
| 237 | $ 5,000,000 | M | 77 | 131.0 | Jefferson-Pilot Life Insurance Company | AA- |
| 238 | $ 5,000,000 | M | 77 | 89.3 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 239 | $ 500,000 | M | 77 | 77.7 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 240 | $ 1,000,000 | M | 77 | 121.3 | Metropolitan Life Insurance Company | AA- |
| 241 | $ 4,000,000 | M | 77 | 59.8 | MetLife Investors USA Insurance Company | AA- |
| 242 | $ 2,500,000 | M | 77 | 99.5 | Massachusetts Mutual Life Insurance Company | AA+ |
| 243 | $ 2,500,000 | M | 77 | 99.5 | Massachusetts Mutual Life Insurance Company | AA+ |
| 244 | $ 500,000 | F | 77 | 128.9 | Columbus Life Insurance Company | AA |
| 245 | $ 1,750,000 | M | 77 | 73.6 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 246 | $ 5,000,000 | M | 77 | 116.1 | Transamerica Life Insurance Company | AA- |
| 247 | $ 3,750,000 | M | 77 | 68.8 | AXA Equitable Life Insurance Company | A+ |
| 248 | $ 2,000,000 | F | 77 | 67.4 | Transamerica Life Insurance Company | AA- |

68

Table of Contents

| | Face Amount | Gender | Age (ALB) | LE (mo.) | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 249 | $ 2,840,000 | M | 76 | 111.0 | Transamerica Life Insurance Company | AA- |
| 250 | $ 4,000,000 | M | 76 | 79.4 | Massachusetts Mutual Life Insurance Company | AA+ |
| 251 | $ 750,000 | M | 76 | 16.5 | U.S. Financial Life Insurance Company | A+ |
| 252 | $ 1,000,000 | F | 76 | 87.2 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 253 | $ 490,620 | M | 76 | 99.6 | Ameritas Life Insurance Corporation | A+ |
| 254 | $ 600,000 | M | 76 | 96.6 | Protective Life Insurance Company | AA- |
| 255 | $ 5,000,000 | M | 75 | 163.8 | Prudential Life Insurance Company | AA- |
| 256 | $ 3,000,000 | M | 75 | 117.7 | Protective Life Insurance Company | AA- |
| 257 | $ 2,000,000 | F | 75 | 133.9 | Aviva Life Insurance Company | A- |
| 258 | $ 7,000,000 | F | 75 | 137.0 | Pacific Life Insurance Company | A+ |
| 259 | $ 850,000 | M | 75 | 79.4 | New York Life Insurance Company | AA+ |
| 260 | $ 1,000,000 | M | 75 | 96.3 | Pacific Life Insurance Company | A+ |
| 261 | $ 5,000,000 | M | 75 | 71.4 | West Coast Life Insurance Company | AA- |
| 262 | $ 3,000,000 | M | 74 | 67.6 | Aviva Life Insurance Company | A- |
| 263 | $ 200,000 | M | 74 | 83.0 | ING Life Insurance and Annuity Company | A- |
| 264 | $ 8,000,000 | M | 74 | 117.6 | Metropolitan Life Insurance Company | AA- |
| 265 | $ 4,000,000 | F | 74 | 159.5 | American General Life Insurance Company | A+ |
| 266 | $ 5,000,000 | M | 74 | 42.8 | Lincoln Benefit Life Company | BBB+ |
| 267 | $ 3,000,000 | F | 74 | 131.0 | General American Life Insurance Company | AA- |
| 268 | $ 300,000 | M | 73 | 25.3 | Lincoln National Life Insurance Company | AA- |
| 269 | $ 2,000,000 | M | 73 | 113.5 | American General Life Insurance Company | A+ |
| 270 | $ 500,000 | M | 72 | 47.1 | Midland National Life Insurance Company | A+ |
| 271 | $ 3,000,000 | M | 72 | 89.0 | AXA Equitable Life Insurance Company | A+ |
| 272 | $ 1,000,000 | M | 72 | 82.5 | United of Omaha Life Insurance Company | A+ |
| 273 | $ 2,500,000 | M | 71 | 113.2 | American General Life Insurance Company | A+ |
| 274 | $ 1,167,000 | M | 71 | 38.7 | Transamerica Life Insurance Company | AA- |
| 275 | $ 1,500,000 | M | 71 | 128.3 | Metropolitan Life Insurance Company | AA- |
| 276 | $ 3,000,000 | M | 70 | 91.5 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 277 | $ 2,000,000 | M | 70 | 118.8 | New York Life Insurance Company | AA+ |
| 278 | $ 2,000,000 | M | 70 | 118.8 | New York Life Insurance Company | AA+ |
| 279 | $ 2,500,000 | M | 70 | 130.2 | Lincoln National Life Insurance Company | AA- |
| 280 | $ 2,500,000 | M | 70 | 130.2 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 281 | $ 600,000 | M | 70 | 101.9 | AXA Equitable Life Insurance Company | A+ |
| 282 | $ 500,000 | M | 69 | 109.6 | Transamerica Life Insurance Company | AA- |
| 283 | $ 500,000 | M | 69 | 109.6 | North American Company for Life And Health Insurance | A+ |
| 284 | $ 2,000,000 | M | 67 | 131.7 | Transamerica Life Insurance Company | AA- |

App. 0055

| 285 | $ 1,000,000 | M | 67 | 131.7 | Genworth Life Insurance Company | A+ |
| 286 | $ 156,538 | F | 67 | 123.9 | New York Life Insurance Company | AA+ |
| 287 | $ 2,000,000 | M | 67 | 64.0 | MetLife Investors USA Insurance Company | AA- |
| 288 | $ 2,000,000 | M | 67 | 64.0 | MetLife Investors USA Insurance Company | AA- |
| 289 | $ 1,000,000 | M | 65 | 61.5 | Lincoln National Life Insurance Company | AA- |
| | $787,963,841 | | | | | |

(1)    The insured's age is current as of the measurement date.

(2)    The insured's life expectancy estimate, other than for a small face value insurance policy benefit, is the average of two life expectancy estimates provided by independent third-party medical-actuarial underwriting firms at the time of purchase, actuarially adjusted through the measurement date. Numbers in this column represent months. For more information, see disclosure under the caption "*Pricing Life Insurance Policies*."

69

Table of Contents

**Obtaining Life Insurance Assets**

We seek to offer our services nationwide. In general, we work directly with consumers in states where we hold proper licensure, and in states where we are not licensed we work through other licensed providers. Historically, sourcing policy assets typically begins with life insurance agents and financial advisors ("agents") that identify consumers owning life insurance who could benefit from the extraction of value from their life insurance in the secondary market. The agents typically work with professional life insurance policy brokers specializing in packaging the policies for presentation to participants in the secondary market. Their packaging includes obtaining medical records on the insured, life expectancy estimates from medical-actuarial firms, current insurance policy illustrations, and other information needed to properly evaluate the policy. The only parties able to evaluate the policies are regulated licensed "providers." Once the providers have evaluated the policy, offers are made to the owner through a competitive auction process whereby brokers facilitate competing offers from providers, concurrently negotiating fees.

We maintain membership affiliations and representation within key industry groups, such as the Life Insurance Settlement Association. Our Executive Chairman, Paul Siegert, currently serves on the board of the Life Insurance Settlement Association. We typically sponsor events and/or maintain a trade booth at events where we are able to maintain contacts with existing life settlement brokers and meet new brokers to submit policies for purchase.

In the future, we expect to develop new channels for obtaining life insurance assets by soliciting consumers directly, which may eliminate fees we pay brokers and competition we experience when a policy is auctioned through a broker. While these new channels are unproven, we believe that consumer awareness of the life insurance secondary market is relatively low while the consumer value proposition is very high and, as a result, provides a significant growth opportunity for our business.

**Life Insurance Policy Underwriting and Investment Process**

The process used to value and underwrite life insurance policies is relatively new and continues to be refined. We underwrite and service all the life insurance policies that we purchase. When we identify a life insurance policy that meets our criteria, we seek to invest in the policy at a discount sufficient to provide us with an expected internal rate of return that meets our internal guidelines. Once our offer to invest in a policy is accepted, we enter into a purchase agreement with the seller. This agreement gives us the right to, among other things, pay premiums, collect policy benefits, file collateral assignments, change the ownership, and obtain medical records. The general terms and conditions of the agreement are standardized and regulated by most states.

We maintain an underwriting department with experience in underwriting life insurance policies for investment. The underwriting due diligence process consists of a careful review and analysis of available materials related to a life insurance policy and the covered individual. The goal of the underwriting process is to make an informed investment decision with respect to the life insurance policy. While we believe that our underwriting policies and practices are consistent with industry best practices, it is possible that the processes may change or may not accurately reflect actual mortality experience or catch fraud or deception by sellers. To the extent the underwriting is not accurate or we are subject to fraud or deception by sellers, the performance of policies may be different from the expected results, which could adversely affect profitability.

**Life Insurance Policy Characteristics**

We typically invest in universal life insurance policies whose insureds are 65 years or older and whose actuarial life expectancies are estimated to be less than 168 months. In some cases, however, we invest in term life insurance policies that are convertible into universal life insurance policies, depending on the analysis of the life insurance policy and the insured's life expectancy estimate. The life expectancy estimate is the number of months the insured is expected to live based upon 50% mortality (meaning roughly half of the individuals with similar age, sex, smoking and medical statuses will have died within that number of months), which is in turn based upon actuarial tables.

70

App. 0056

We invest only in life insurance assets that have been in force for more than two years from the policy issuance date and meet our other underwriting guidelines. We reserve the right to disqualify some life insurance companies or categories of life insurance policies for purchasing in our sole discretion.

**Pricing Life Insurance Policies**

Pricing involves an analysis of both the policy and the insured. An analysis of the insurance policy starts with an illustration obtained from the insurance company providing a schedule of level premium payments until the insured reaches age 125. Then, utilizing pricing software now owned by Modeling Actuarial Pricing Systems, Inc. ("MAPS"), we reverse engineer the premium schedule of the policy to determine a premium schedule that provides for the minimum payments required to keep the policy in effect. An analysis of the insured involves an actuarial evaluation of the insured's probable mortality at different points in the future—the mortality curve. This analysis covers the insured's entire projected lifespan using life expectancy estimates generated by third-party medical-actuarial underwriting firms or generated from base actuarial tables in the case of small face policies.

In determining the life expectancy estimate, we presently require two life expectancy estimates from independent third-party medical-actuarial underwriting firms, unless the life insurance policy is a small face policy (defined as a policy with $1,000,000 in face value benefits or less), in which case we may use a life expectancy estimate derived from base actuarial mortality table assumptions. When a life expectancy estimate is obtained from a medical-actuarial firm, the health of the insured is summarized by the underwriters in a written health assessment based on the review of the insured's historical and current medical records. Underwriting assesses the characteristics and health risks of the insured in order to quantify the health into a mortality rating that represents their life expectancy estimate. We currently average the life expectancy estimates provided by two independent medical-actuarial underwriting firms to form our life expectancy estimate for life insurance policies other than small face policies. In some cases, we may obtain more than two life expectancy estimates. In those cases, we average the two life expectancy estimates that we believe are the most reliable of those we have received, based on our own analyses and conclusions. In this regard, the two life expectancy estimates we ultimately choose to average may not always be the most conservative. If in the future our we believe our business model will benefit from changes in our underwriting process and are permitted under our borrowing covenants, we may change our underwriting processes and policies, including our present policy under which we generally obtain two life expectancy estimates from independent third-party medical-actuarial firms (other than for small face policies).

By combining the optimized premiums and the insured's life expectancy estimate within the MAPS software, we generate detailed information, including the expected mortality curve over the insured's total projected lifespan; the expected premiums and related costs over the insured's total projected lifespan; the expected policy benefit paid over the insured's total projected lifespan; the account values within the policy; and the expected internal rate of return we will achieve at various investment amounts. From this information, we are able to calculate the present value of the life insurance policy by discounting the anticipated cash flows at the targeted internal rate of return using the probabilistic pricing methodology employed by the MAPS program. The actuarial value of the life insurance policy asset is the present value of the policy's cash flows discounted at an expected internal rate of return. We expect that our investments in life insurance assets will generate yields in excess of our borrowing and operating costs.

On January 22, 2013, one of the independent medical-actuarial underwriting firms we utilize, 21st Services, announced advancements in its underwriting methodology, resulting in revised estimated life expectancy mortality tables for life settlement transactions. We were advised by 21st Services that the changes are very granular and relate to both specific medical conditions and lifestyles of insureds. These changes resulted from the application of additional medical information gathered by 21st Services over a period of time. While we do not believe these revised methodologies indicate the previous estimated life expectancies were inaccurate, we believe the revised methodologies provide additional information that should be considered in updating our estimate of the life expectancies of the insureds within our portfolio. Based upon our evaluation and analysis of data made available by 21st Services, as well as information regarding the insureds within our portfolio, we have estimated the impact of the changes in 21st Services' methodologies for

71

Table of Contents

determining life expectancies on a policy-by-policy basis within our portfolio as of December 31, 2012 and applied such changes to the life expectancy inputs used to estimate fair value. We have adjusted the original life expectancies provided by 21st Services based on four factors, the impact of each analyzed individually for each insured in the GWG portfolio. The four factors are gender, anti-selection, age, and primary impairment. GWG applied this set of adjustments to all 21st Services life expectancy reports used in valuation of the portfolio as of December 31, 2012. At that time, the portfolio contained 211 policies on 194 insured lives. Of those 211 policies, 199 were valued using a 21st Services life expectancy report as part of the pricing life expectancy estimate calculation. While the analysis and adjustments were applied on an individual policy basis, the result was an average overall increase in the original life expectancy estimates of 8.67%. We have a standard practice of obtaining two third-party life expectancy estimates for each policy in our portfolio. As a result, the effective change in life expectancy on the portfolio as of December 31, 2012 was an average of approximately 4.33%, which resulted in an aggregate decrease in the fair value of our life settlements portfolio of $12.4 million as of December 31, 2012. Life expectancy reports by their very nature are estimates.

During 2013, we sought to update our life expectancy estimates from all four of the major independent third-party medical-actuarial underwriting firms (including 21st Services) with updated medical records on all of the 211 policies we originally used a life expectancy report from 21st Services. As of December 31, 2013, we had successfully procured new life expectancy reports on 176 of the 211 policies owned as of December 31, 2012. We experienced ten mortalities in 2013 for which no updated life expectancy reports were necessary. We also had two small face policies in our portfolio for which we did not update life expectancy reports. Accordingly, as of December 31, 2013 we had updated our life expectancy estimates based on updated life expectancy reports on all but 22 policies (covering 21 people) in our portfolio that we are still seeking to update.

In order to assess the reasonableness of our adjustments made effective December 31, 2012, we compared the life expectancy estimates including any adjustments used on December 31, 2012 to the updated life expectancy estimates used on December 31, 2013. Because an additional year has elapsed since the December 31, 2012 date, the older set of adjusted life expectancy estimates were "rolled down" to shorter numbers based on an actuarial calculation to make them comparable to the updated life expectancy estimates used on December 31, 2013. The average amount of roll down to account for the 12-month passage of time was

eight and one-half months. We concluded that our the adjustments we made a year ago were reasonable when we compared the rolled down life expectancy estimates from December 31, 2012 to the updated life expectancy estimates on December 31, 2013. The average rolled down life expectancy estimate from December 31, 2012 is 80.9 months. The average updated life expectancy estimate obtained from updated life expectancy reports as of December 31, 2013 is 79.4 months, shorter by one and one-half months. We see no need to make any further adjustments to our life expectancy estimates at this time.

On September 15, 2014, 21st Services announced changes to its mortality tables primarily for insureds age 90 and older, as well as updated adjustment factors designed to better underwrite seniors with multiple impairments. These changes represent small portions of 21st Services' historical underwritings. We expect medical-actuarial underwriting firms to continue improving and refining their underwriting methodology. We generally expect to incorporate such changes to our portfolio when we update our life expectancy reports.

**Portfolio Administration**

We have developed a comprehensive administration and servicing platform to manage the life insurance assets we own. This allows us to safeguard our life insurance assets and to process and report on the assets in our portfolio. We regularly contact each insurance company on every policy we own to verify policy account values, confirm the correct application of premium payments made, and the resulting account values inside the life insurance policy after application of the premium payment and the deduction of the cost of insurance. We typically maintain little account value inside the policy and seek to make only minimum premium payments necessary to keep the life insurance policy in force until the next scheduled premium payment.

72

Table of Contents

In addition to policy servicing, we monitor insureds by periodically contacting them directly, or their appointed representatives, to confirm their location and health status. We monitor the social security database for mortalities as well as online obituary databases. When we are notified of an insured's mortality, we are required to obtain a copy of the death certificate and present it to the life insurance company for payment of the face value of the policy benefit.

**Portfolio Management**

We realize profits by earning a spread between our investment cost in our life insurance assets and the face value of the policy benefits that will be paid upon the insured's mortality. We believe that building and managing a profitable portfolio of life insurance policies is complex, requires considerable technical knowledge and resources, and is subject to numerous regulations. We have developed extensive experience and disciplines to work toward a stable and profitable portfolio. We update our actuarial projections each month for the portfolio based on the life expectancy estimates, premium payments made, and mortalities experienced. These data points combine to provide us with future forecasted cash flows with respect to our portfolio of life insurance assets. These forecasted future cash flows, along with our current financial position, are combined in a comprehensive model that includes detailed assumptions as to interest rates, financing costs, life insurance asset acquisitions, and capital markets activities. This comprehensive financial model enables us to closely monitor and manage our necessary capital reserves and attempt to project our future profitability.

While we believe our portfolio of life insurance assets represents a balanced and stable portfolio of life insurance assets, we seek to grow the size of the portfolio in order to further mitigate risk and improve our profitability. In order to assess the stability of our portfolio, we analyze longevity risk, which is the risk of the insured living longer than his/her life expectancy estimate. Longevity risk is the single largest variable affecting the returns on an investment in life insurance assets and the ability to predict the portfolio's value over time. Research by A.M. Best and others indicates that, as the number of insured lives increase within a portfolio of life insurance policies, there is a decrease in the standard deviation of the value of the portfolio—i.e., the stability of longevity risk increases with an increase in the number of insured lives. While Standard & Poor's has indicated that statistical credibility is unlikely to be achieved with a pool of less than 1,000 lives, a study published in 2014 by A.M. Best concluded that at least 300 lives are necessary to narrow the band of expected cash flow volatility using the Monte Carlo simulations, which is the same methodology we use to evaluate our portfolios. Our internal analysis of our portfolio, which as of September 30, 2014 consisted of 263 lives, resulted in a standard deviation that is comparable with the A.M. Best measurement for a portfolio of 200 lives. We believe this result is due to the specific portfolio make up of our portfolio relative to the variation in underlying life expectancy estimates. Further, A.M. Best suggests that no one life should comprise more than 3.33% of the face value of an entire portfolio or collateral pool. As of September 30, 2014, the largest face value policy on one life in our portfolio represented approximately 1.27% of the total portfolio. We intend to maintain a well-diversified portfolio as we continue to expand our investments in life insurance assets.

We also believe our portfolio represents a profitable portfolio. In order to assess the profitability, we analyze the future cash flows expected from our portfolio of life insurance assets. The standard practice within the insurance industry is to analyze the timing of uncertain future cash flows through stochastic modeling, or Monte Carlo simulations. We continue to analyze the expected internal rates of return and spread against borrowing costs represented by our portfolio. As of December 31, 2013, the expected internal rate of return on our portfolio of life insurance assets was 12.21% and our weighted-average borrowing costs to finance our portfolio was 7.20%.

**Portfolio Credit Risk Management**

The life insurance assets that we invest in represent obligations of third-party life insurance companies to pay the benefits under the relevant policy. Because we finance life insurance policies, we rely on the payments from the face value of policy benefits from life insurance companies for revenue collections. We rely on the face value of the life insurance policy benefit at maturity as the exclusive form of payment.

73

Table of Contents

The possible insolvency or loss by a life insurance company is a significant risk to our business. To manage this risk, we seek to invest in life insurance assets that are issued by insurance companies with investment-grade ratings from either A.M. Best, Moody's or Standard & Poor's. To further mitigate risk, we seek to limit the face value of policy benefits issued by any one life insurance company within the total portfolio to 20%. State guaranty funds generally guaranty policy benefits up to $200,000. In addition, to assure diversity and stability in our portfolio, we regularly review the various metrics of our portfolio relating to credit risk. We track industry rating agency reports and industry journals and articles in order to gain insight into possible financial problems of life insurance companies. Recently, some of the credit ratings on insurance companies were downgraded and we will no longer consider purchasing policies issued by these insurance companies. Finally, we will only invest in those life insurance policies that meet the underwriting standards established in the indenture governing our debt securities, as applicable.

As of September 30, 2014, 99.87% of insurance companies in our portfolio hold an investment-grade rating by Standard & Poor's (BBB- or better), and the face value of policy benefits issued by one life insurance company within the portfolio was 15.66%. Of the 44 insurance companies that insure the policies we own, ten companies insure approximately 72.80% of total face value of insurance benefits and the remaining 34 insurance companies insure the remaining approximately 27.20% of total face value of insurance benefits. The concentration risk of our ten largest insurance company holdings as of September 30, 2014 is set forth in the table below.

| Rank | Policy Benefits | Percentage of Policy Benefit Amt. | Insurance Company | Ins. Co. S&P Rating |
|------|-----------------|-----------------------------------|-------------------|---------------------|
| 1 | $123,380,000 | 15.66% | AXA Equitable Life Insurance Company | A+ |
| 2 | $ 89,470,000 | 10.35% | John Hancock Life Insurance Company (U.S.A) | AA- |
| 3 | $ 73,920,000 | 9.38% | Transamerica Life Insurance Company | AA- |
| 4 | $ 58,769,000 | 7.46% | Jefferson-Pilot Life Insurance Company | AA- |
| 5 | $ 56,215,000 | 7.13% | ING Life Insurance and Annuity Company | A- |
| 6 | $ 43,550,000 | 5.53% | American General Life Insurance Company | A+ |
| 7 | $ 42,735,000 | 5.42% | Massachusetts Mutual Life Insurance Company | AA+ |
| 8 | $ 30,500,000 | 3.87% | Pacific Life Insurance Company | A+ |
| 9 | $ 28,450,000 | 3.61% | West Coast Life Insurance Company | AA- |
| 10 | $ 26,661,000 | 3.38% | Metropolitan Life Insurance Company | AA- |

**Servicing Agents**

We have contracted with Wells Fargo Bank to provide servicing, collateral agent, and trustee services with respect to certain life insurance policies owned by DLP Funding II. We have contracted with Bank of Utah to provide servicing, collateral agent, and trustee services with respect to all other life insurance policies we own. Wells Fargo Bank and Bank of Utah provide services for certain life insurance policies in connection with ownership and tracking of life insurance policies we own, including paying premiums, posting of payments (receipts) of the life insurance policies, certain monitoring, enforcement of rights and payer notifications, and related services. We reserve the right to service and provide collateral agent services for certain life insurance policies directly, or appoint additional third-party servicers in the future.

**Competition**

We encounter significant competition in the life insurance purchasing and financing business from numerous companies, including hedge funds, investment banks, secured lenders, specialty life insurance finance companies and life insurance companies themselves. Many of these competitors have greater financial and other resources than we do and may have significantly lower cost of funds because they have greater access to insured deposits or the capital markets. Moreover, some of these competitors have significant cash reserves and can better fund shortfalls in collections that might have a more pronounced impact on companies such as ours. They also have greater market share. In the event that the life insurance companies make a significant effort to compete against the business, we would experience significant challenges with our business model.

<div align="center">74</div>

Table of Contents

Competition can take many forms, including the pricing of the financing, transaction structuring, timeliness and responsiveness in processing a seller's application and customer service. Some of the competitors may outperform us in these areas. Some competitors target the same type of life insurance clients as we do and generally have operated in the markets we service for a longer period of time. Increased competition may result in increased costs of purchasing policies, or it may affect the availability and quality of policies that are available for our purchase. These factors could adversely affect our profitability by reducing our return on investment or increasing our risk.

**Government Regulation**

The life insurance sector is highly regulated at both the federal and state levels. We are subject to federal and state regulation and supervision in the life insurance purchasing and finance business. There are significant regulations in many states that require us to obtain specific licenses or approvals to be able to purchase life insurance policies in those states. We continually research and monitor regulations and apply for the appropriate licenses in the required states.

Governments at both the federal and state levels have continued to review the impact of the business on the life insurance industry. Moreover, recent federal government actions with respect to insurance companies have increased the federal government's role in regulating the insurance industry. Recently we have seen legislative efforts by state governments to mandate the sale or liquidation of a life insurance policy as part of the Patient Protection and Affordable Care Act in order

<div align="right">App. 0059</div>

to increase the number of Americans covered by health insurance and decrease the cost of health care. The legislative effort is designed to provide all classes of the insured prior to eligibility under the health care provided under the Patient Protection and Affordable Care Act. These efforts may affect the number of life insurance policies available for purchase and their attractiveness.

State statutes typically provide state regulatory agencies with significant powers to interpret, administer and enforce the laws relating to the purchase of life insurance policies in those states. Under statutory authority, state regulators have broad discretionary power and may impose new licensing requirements, interpret or enforce existing regulatory requirements in different ways or issue new administrative rules, even if not contained in state statutes. State regulators may also impose rules that are generally adverse to our industry. Because the life insurance secondary market is relatively new and because of the history of certain abuses in the industry, we believe it is likely that state regulation will increase and grow more complex in the foreseeable future. We cannot, however, predict what any new regulation would specifically involve.

Any adverse change in present laws or regulations, or their interpretation, in one or more states in which we operate (or an aggregation of states in which we conduct a significant amount of business) could result in our curtailment or termination of operations in such jurisdictions, or cause us to modify our operations in a way that adversely affects our ultimate profitability. Any such action could have a corresponding material and negative impact on our results of operations and financial condition, primarily through a material decrease in revenues, and could also negatively affect our general business prospects.

Some states and the SEC have, on occasion, attempted to regulate the purchase of non-variable life insurance policies as transactions in securities under federal or state securities laws. In July 2010, the SEC issued a Staff Report of its Life Settlement Task Force. In that report, the Staff recommended that certain types of purchased life insurance policies be classified as securities. The SEC has not taken any position on the Staff Report, and there is no indication if the SEC will take or advocate for any action to implement the recommendations of the Staff Report. In addition, there have been several federal court cases in which transactions involving the purchase and fractionalization of life insurance contracts have been held to be transactions in securities under the federal Securities Act of 1933. We believe that the matters discussed in the Staff Report, and existing case law, do not impact our current business model since our purchases of life settlements are distinguishable from those cases that have been held by courts, and advocated by the Staff Report, to be transactions in securities. For example, we are not involved in fractionalization of any life insurance policies, and we do not purchase variable life insurance policies.

<center>75</center>

Table of Contents

If federal law were to change, whether by action of the Congress or through the courts, with the result that purchases of non-fractionalized and non-variable life insurance policies would be considered transactions in "securities," we would be in violation of existing covenants under our revolving credit facility requiring us to not be an "investment company" under the Investment Company Act of 1940. This could in the short-term or long-term affect our liquidity and increase our cost of capital and operational expenses, all of which would adversely affect our operating results. It is possible that such an outcome could threaten the viability of our business and our ability to satisfy our obligations as they come due.

With respect to state securities laws, almost all states currently treat the sale of a life insurance policy as a securities transaction under state laws, although some states exclude from the definition of a security the original sale from the insured or the policy owner to the life settlement provider. To date, due to the manner in which we conduct and structure our activities and the availability, in certain instances, of exceptions and exemptions under securities laws, such laws have not adversely impacted our business model.

*State Life Settlement License Requirements*

State laws differ as to the extent to which purchasers of life insurance policies are required to be licensed by a state regulatory agency. We may elect to conduct life insurance policy purchasing only in those states in which we are licensed or where no licensure is required. The licensing requirements differ from state to state, but where they exist, they typically require the payment of licensing fees, periodic reporting, and submission to audit by state regulators. We do not intend to purchase any life insurance policies in any states that require a license or similar qualification without first obtaining such license or qualification or purchasing through a licensed provider in that state.

The table below identifies all states (and the District of Columbia) in which we can conduct business directly with the seller of a life insurance policy or through a licensed provider. An asterisk (*) indicates that the state does not require licensing. In those states identified in the right-hand column, we can purchase policies through our provider relationships with Magna Administrative Services, Inc. Abacus Settlements, LLC, and Lotus Life, LLC. If our relationships with either Magna Administrative Services, Abacus Settlements or Lotus Life were to end, for any reason, we believe we would be able to replace that relationship quickly.

| States Where We Conduct Business Directly | States Where We Conduct Business Through Other Licensed Providers |
|---|---|
| Alabama* | Colorado |
| Arizona | Georgia |
| Arkansas | Indiana |
| California | Nevada |
| Connecticut | New Jersey |
| Delaware | Utah |
| District of Columbia* | |
| Florida | |
| Illinois | |
| Iowa | |
| Kansas | |
| Kentucky | |

App. 0060

Louisiana
Maine
Maryland
Massachusetts
Michigan*
Minnesota
Mississippi
Missouri*

76

| States Where<br>We Conduct Business Directly | States Where<br>We Conduct Business Through<br>Other Licensed Providers |
|---|---|
| Nebraska | |
| New Mexico* | |
| New York | |
| North Carolina | |
| Ohio | |
| Oklahoma | |
| Oregon | |
| Pennsylvania | |
| Rhode Island | |
| South Carolina* | |
| South Dakota* | |
| Tennessee | |
| Texas | |
| Virginia | |
| Washington | |
| Wisconsin | |
| Wyoming* | |

We are not presently able to conduct business in the following states due to the fact that we neither have a license to operate in that state nor do we have a relationship with another licensed provider in that state: Alaska, Hawaii, Idaho, Montana, New Hampshire, North Dakota, Vermont, and West Virginia.

### Health Insurance Portability and Accountability Act (HIPAA)

HIPAA requires that holders of medical records maintain such records and implement procedures in ways designed to assure the privacy of patient records. HIPAA has precipitated widespread changes in record keeping, including patient consent forms and access restrictions in data processing software. In order to carry out the business, we receive medical records and obtain a release to share such records with a defined group of persons. We are entitled to have access to patient information, take on the responsibility for preserving the privacy of that information, and use the information only for purposes related to the life insurance policies.

### Regulatory Matters

As previously disclosed in a Quarterly Report on Form 10-Q filed on October 30, 2013, the SEC conducted a private investigation of the Company and its offering of previously issued L Bonds. On November 5, 2014, the staff of the SEC, Division of Enforcement, advised us in writing that its investigation has been closed and that the staff does not intend to recommend any enforcement action by the SEC against the Company.

### Employees

We employ approximately 40 employees.

### Properties

Our principal executive offices are located at 220 South Sixth Street, Suite 1200, Minneapolis, Minnesota 55402. At that location, we lease 11,695 square feet of space for a lease term expiring in August 2015. We believe that these facilities are adequate for our current needs and that suitable additional space will be available as needed.

77

App. 0061

**Legal Proceedings**

Our Chief Executive Officer, Jon R. Sabes, and Executive Vice President of Originations and Servicing and Secretary, Steven F. Sabes, who together beneficially own approximately 74.81% of our common stock, are subject to litigation relating to claims by a bankruptcy trustee for loan payments made to an affiliate, Opportunity Finance, LLC. The litigation stems from the 2010 conviction of an individual operating a fraudulent business scheme which filed for bankruptcy in 2008. The bankruptcy trustee alleges that loan repayments to Opportunity Finance were avoidable transfers under preference or other legal theories and seeks to recover amounts for other creditors of the bankruptcy estate. Such payments may ultimately be deemed to be avoidable transfers under preference or other legal theories. Case No. 08-45257 (U.S. Bankruptcy Court District of Minnesota). In addition, GWG Holdings invested $1.0 million in Opportunity Finance, LLC in 2006 and was repaid and received $176,948 of interest income from that investment in 2007. To date, no claim has been made against us.

While we believe there are numerous meritorious defenses to the claims made by the bankruptcy trustee, and we are advised that the defendants in that action will vigorously defend against the trustee's claims, such defendants may not prevail in the litigation with the bankruptcy trustee. If the bankruptcy trustee sought to sell or transfer the equity interests of Jon R. Sabes or Steven F. Sabes as a result of the litigation, there could be a change in control of the Company and our business together with all of our investors, including investors in our debentures, could be materially and adversely impacted. Such adverse results would likely arise in connection with negative change-in-control covenants contained in our revolving credit facility agreements, the breach of those covenants and an ensuing event of default under such facility. In addition, if the bankruptcy trustee sought to sell or transfer the equity interests of Jon R. Sabes or Steven F. Sabes as a result of the litigation, such transfers would adversely affect holders of our previously issued L Bonds by reducing the number of shares of common stock of GWG Holdings that have been pledged as collateral security for our obligations under the debentures. Finally, regardless of the outcome of this litigation, these matters are likely to distract management and reduce the time and attention that they are able to devote to our business.

<div align="center">78</div>

Table of Contents

<div align="center">

**MANAGEMENT AND DIRECTORS**

</div>

**Directors and Executive Officers**

The name, age and positions of our current executive officers and directors are as follows:

| Name | Age | Positions |
| --- | --- | --- |
| Jon R. Sabes | 47 | Chief Executive Officer and Director |
| Paul A. Siegert | 75 | Director (Executive Chairman) |
| Steven F. Sabes | 45 | Executive Vice President of Originations and Servicing, Secretary and Director |
| William Acheson | 49 | Chief Financial Officer |
| Jon Gangelhoff | 56 | Chief Operating Officer |
| Michael D. Freedman | 51 | President |
| Jeffrey L. McGregor | 61 | Director |
| Charles H. Maguire III | 71 | Director |
| David H. Abramson | 73 | Director |
| Shawn R. Gensch | 45 | Director |

**Jon R. Sabes**, co-founder and Chief Executive Officer of our company, is a financial professional with over 20 years of experience in the fields of finance, venture capital, business development, managerial operations, and federal taxation. Since 1999, Mr. Sabes has served as Chief Executive Officer of Opportunity Finance, LLC, a family investment company specializing in structured finance. Over his career, Mr. Sabes has been active in receivable financing, life insurance financing, and casualty insurance financing, structuring over $900 million in financing commitments for his related businesses. Mr. Sabes' experience includes co-founding and leading the development of two leading insurance-related finance companies: GWG Life, a company in the life insurance finance industry founded in 2006, and MedFinance, an innovator in casualty insurance and healthcare finance founded in 2005. Through these companies, Mr. Sabes has developed and applied financial structuring techniques, underwriting algorithms, and business modeling aspects to the insurance industry. Mr. Sabes' education includes a Juris Doctor degree cum laude from the University of Minnesota Law School; and a Bachelor of Arts degree in Economics, from the University of Colorado. Over his career, Mr. Sabes has held several licenses and professional association memberships including FINRA Series 7, Series 63, Minnesota State Bar Association, and American Bar Association. In addition to being an active father of three, Mr. Sabes serves on the boards of Saving Children and Building Families, and the Insurance Studies Institute. Mr. Sabes is the brother of Steven F. Sabes. Mr. Sabes has served as our Chief Executive Officer, and a director, since 2006.

**Paul A. Siegert**, co-founder of our company, has over 50 years of experience in national and international business with focus on general business, financial and investment strategies, management practices, fiscal controls, profit incentives, systems and corporate structuring and governance. Over his career, Mr. Siegert has consulted to Fortune 500 corporations, regional firms, emerging businesses, government and education, and has served as director, general partner and advisor to partnerships and corporations, including restructuring of economically troubled businesses. Mr. Siegert has provided written testimony to the Senate Finance Committee regarding SEC practices and created two companies registered under the Investment Advisors Act of 1940. Mr. Siegert was an active participant in the formation and direction of the Colorado Institute for Artificial Intelligence at the University of Colorado. Mr. Siegert's education includes studies toward a Master of Business Administration, University of Chicago; and Bachelor of Science and Industrial Management, Purdue University. His insurance-related experiences include the creation of one of the nation's first employer self-funded life, medical and disability insurance programs; designing medical, life insurance and social security opt-out programs for educational institutions; incorporation of financial analysis disciplines in life insurance and estate planning; and strategizing of key-man insurance plans and life insurance in business continuation planning for corporations and senior executives. From 1979 to 1986, Mr. Siegert was nationally

recognized as a tax and estate planning expert. In 1996, Mr. Siegert retired from active business to engage in various personal financial and investment endeavors. In 2004, he founded Great West Growth, LLC, a Nevada limited liability company and a predecessor to GWG Life, to purchase life insurance policies. In his

79

Table of Contents

capacities with GWG Life, he created an insurance policy valuation and pricing model, created life insurance policy purchase documentation, undertook state licensing and compliance and developed operating and

marketing systems. Mr. Siegert currently serves as the President and Chief Executive Officer of the Insurance Studies Institute, which he founded in 2007, and also serves on the Board of Directors of the Life Insurance Settlement Association. Mr. Siegert currently serves as Director and Executive Chairman of the Board of GWG Holdings, Inc., and served as its President until May 30, 2014. He has been active in a variety of charities and foundations, including Rotary International.

**Steven F. Sabes**, co-founder, Executive Vice President of Originations and Servicing and Secretary of our company, is responsible for various managerial aspects of our business, with a specific focus on treasury and financial operations, life insurance policy purchasing, and specialty finance operations. Since 1998, Mr. Sabes has served as a Managing Director of Opportunity Finance, LLC, a family investment company specializing in structured finance. Mr. Sabes holds a Master of Science and Doctor of Philosophy in organic chemistry from the University of Minnesota, as well as a Bachelor of Arts degree from The Colorado College. Mr. Sabes is the brother of Jon Sabes. Mr. Sabes has served as our Secretary, and a director, since 2006. He also served as our Chief Operating Officer from 2006 until May 30, 2014, when he was appointed as our President. On November 13, 2014, Mr. Sabes resigned from the position of President and was appointed Executive Vice President of Originations and Servicing.

**William Acheson** became our Chief Financial Officer on May 30, 2014. Prior to joining us, Mr. Acheson served as Chief Financial Officer and Senior Vice President of Strategic Development for The Homeownership Preservation Foundation, a residential real estate foreclosure prevention organization seeded by GMAC, from 2009 through 2013. Prior to that, Mr. Acheson served as Managing Director of Global Structured Finance and Investments at Merrill Lynch in London, England, from 2007 through 2008. From 1991 to 2007, Mr. Acheson spent his career at GMAC-RESCAP, where he served as Managing Director for a number of business units, concluding his career as Chief Financial Officer of the United Kingdom division from 2005 through 2007. Mr. Acheson earned a Bachelor of Science degree in accounting from the College of St. Thomas in St. Paul, Minnesota, and earned his Certified Public Accountant certificate in 1991 while working for Ernst & Young in Minneapolis, Minnesota.

**Jon Gangelhoff**, our Chief Operating Officer, served rapidly growing businesses in several industries as chief financial officer with a strong focus on business operations since 1986. Prior to joining our company as Chief Financial Officer in March 2009, he served as chief financial officer for Northern Metal Recycling, a metal recycling firm the sales of which exceeded $500 million annually, from 2006 to 2008. Mr. Gangelhoff's responsibilities at Northern Metal Recycling included acquisition and related integration operations focused on finance, information systems, and human resources functions. Prior to that, from 2003 to 2006, Mr. Gangelhoff served as the chief financial officer of Kuhlman Company, formerly a public reporting company, where he established corporate infrastructure, developed financial reporting and internal control systems, and managed the SEC reporting process. During his 25-year career, Mr. Gangelhoff has used an integrated hands-on and financial management approach to improve the performance of the companies he served in a variety of industries. Mr. Gangelhoff holds a Bachelor of Arts degree from Mankato State University. Mr. Gangelhoff was appointed as our Chief Operating Officer on May 30, 2014.

**Michael Freedman**, our President, joined GWG in September 2014 and was appointed President in November. For over a decade, he has been the life settlement industry's chief advocate for laws promoting life settlements as a way for seniors to fund their retirement and long-term care needs. Mr. Freedman was a driving force behind the development of life settlement laws in 42 states and more than 60 different pieces of legislation, including several Federal laws. Also in 2014, Mr. Freedman was elected to the Board of Directors of the Life Insurance Settlement Association for a three-year term, and he founded Sentinel Solutions, LLC, a provider of strategic services to clients in the life settlement and related industries, including insurance and financial services. Previously he served as the Senior Vice President of Government Affairs at Coventry First, LLC, a participant in the life settlement industry, from June 2002 to December 2013. Mr. Freedman received his Juris Doctor from the University at Buffalo School of Law in 1993, for which he served for two years as the Graduate Fellow in Public Interest/Public Service. Mr. Freedman was appointed as our President on November 13, 2014.

80

Table of Contents

**Jeffrey L. McGregor** has had an extensive career in the insurance and financial services industry, serving as President for three major financial sales and distribution companies. Mr. McGregor has 34 years of experience in sales, distribution strategies and leadership with a proven track record in sales and growth of annuity, life insurance, and mutual fund products. Mr. McGregor has been a quoted industry source for Ignites, Foxfire, Dalbar, Mutual Fund Forum and Investment News, and has served on numerous industry boards and associations, including the Life and Annuity Advisory Board, the Mutual Fund Forum, and the International Association for Financial Planning. Mr. McGregor has written, published and presented a number of papers focused on the insurance and financial industry. Throughout his career, Mr. McGregor's primary focus has been to promote successful collaboration with employees, clients and colleagues to create respectful, profitable, and long-term relationships.

Mr. McGregor has lead teams that represented all traditional life insurance products — term, whole life, universal life, disability insurance, long-term care, along with high-net worth and estate planning strategies that maximize the protection and tax advantages that life insurance products provide. Mr. McGregor has worked closely with product development teams in determining the risk and required sales results necessary to meet profitability targets. Mr. McGregor professional career encompasses the oversight and creation of marketing, sales presentations and advisor/only materials, seeking a balanced approached to the risks and rewards of the insurance, annuity and asset management products offered.

From 2005 to 2010, Mr. McGregor served as the President of RiverSource Distributors and Senior Vice President of Ameriprise Financial, Inc. During his tenure as the President of RiverSource Distributors, he was responsible for the sales and distribution of all insurance, annuity and asset management product lines of Ameriprise through existing and new channels. In this position, Mr. McGregor identified and greatly influenced strategy, compliance, profitability and the success of multiple insurance and investment products offered by Ameriprise.

From 2001 to 2004, Mr. McGregor was President of AXA Distributors, where he was responsible for the sales and distribution of insurance and annuity products manufactured by AXA Financial. In 2003, Mr. McGregor's sales team achieved annuity sales of $7.0 billion. This record sales year resulted in AXA Distributors' market share position going from number six in 2002 to number two in 2003.

From 1988 to 1998, Mr. McGregor served in a variety of senior leadership positions for Colonial Investment Services. Mr. McGregor was named President of Colonial Investment Services in 1990 and joined Colonial's Board of Directors. During his tenure, assets under management grew from $9.0 billion to $24.0 billion. During Mr. McGregor's leadership, Colonial earned a number one rating in wholesaler and marketing support three times, according to Dalbar Survey.

Over his career, Mr. McGregor has also worked with American Capital, Prudential-Bache Securities, Planco and IDS, where he began his career as a financial advisor in 1978. Mr. McGregor has earned numerous industry degrees and certifications, including LUTC CFP, CLU, and NASD licenses Series 7 and 24. Mr. McGregor received his B.S. and M.B.A. from California Coast University. In 2012, Mr. McGregor authored a life experience and motivational book — A Spirit Never Tires — which echoes his results driven style to inspire others through passion, energy, courage and a positive attitude.

**Charles H. Maguire III**, a registered FINRA Arbitrator, has over 35 years of experience in the financial services industry. The core of Mr. Maguire's career has been with Merrill Lynch and Company from 1969 to 2004. In one of his last positions with Merrill Lynch, Mr. Maguire served as Director of Financial Institutions Services Group, where he had complete responsibility for the Merrill Lynch's institutional client services within its domestic branch office system. In addition, Mr. Maguire oversaw the professional teams responsible for product creation and had oversight of an institutional trading desk in New York City. Mr. Maguire's most notable contribution to Merrill Lynch was the creation of the Consults Product, which to this day is one of the most profitable products at Merrill Lynch. In addition to serving as Director of Financial Institutions Services Group, Mr. Maguire held a variety of sales and management roles at Merrill Lynch, including Sales Manager, Resident Vice President, Regional Sales Manager, Senior Resident Vice President, and Managing Director.

<div align="center">81</div>

Table of Contents

From 2009 to 2011, Mr. Maguire served as a leadership consultant for the University of Cincinnati School of Medicine and the Economic Center, University of Cincinnati. From 2005 to 2007, Mr. Maguire also served as the Senior Advisor on Staff to the Governor of the State of South Carolina, the Director of Cabinet Affairs, and the Chief of Staff of the Department of Commerce for the State of South Carolina. During his tenure as Director of Cabinet Affairs for the Governor of the State of Carolina, Mr. Maguire was fully responsible for overseeing the operations of all agencies that reported to the Governor of South Carolina. In his role as Chief of Staff of the South Carolina Department of Commerce, Mr. Maguire was responsible for the daily operations of the Department of Commerce. During his tenure with the Department of Commerce, Mr. Maguire led the restructuring of the Department of Commerce, which led to South Carolina becoming one of the top three states for job creation and corporate relocations.

Mr. Maguire has served on the boards (or similar functions) of over 25 nonprofit organizations, including services as a trustee for Centre College, trustee for The Seven Hills School, member of the Charter Review Committee of Cincinnati, trustee for the Queen City Foundation, trustee and executive committee member for St. Elizabeth Medical Center, and President for the Joy Outdoor Education Center. Mr. Maguire holds a B.A. from Centre College.

**David H. Abramson,** a certified public accountant, is presently the Chairman and Chief Executive Officer of David Abramson & Associates, LLC, an executive search and leadership development and financial consulting firm that he founded in 2002. The firm provides retained executive search services at the senior leadership levels as well as senior leadership mentoring and coaching. In addition, the firm provides financial and other consulting services to clients.

In 2001, Mr. Abramson was a Senior Vice President of AXA Financial/Equitable Life Insurance based in New York City, and served as Chairman and Chief Executive Officer of Grant Thornton Advisors, a joint venture of AXA Financial and Grant Thornton. Required by his responsibility, Mr. Abramson held NASD series 7, 24 and 66 licenses during his tenure at Grant Thornton Advisors. From 1999 to 2001 Mr. Abramson was Grant Thornton's National Managing Partner of Financial Advisory Services where he led the design of the vision, strategy, governance and operational planning for Grant Thornton Advisors. Grant Thornton Advisors was designed to offer personal financial and estate planning, and investment and insurance products and services to middle-market companies, their owners and officers and other high net worth individuals.

The core of Mr. Abramson's career was as a Partner in Grant Thornton from 1972 until 2001. In 1972, Mr. Abramson became an Audit Partner and the Minneapolis Office Managing Partner, and he continued serving in those roles throughout most of his time at Grant Thornton. Mr. Abramson also became a member of Grant Thornton's National Senior Leadership Team in 1982 and continued in that role until 2001. In this regard, his primary responsibility was Regional Managing Partner with direct line responsibility over assigned operating offices throughout the country. From 1988 to 1990, Mr. Abramson was Grant Thornton's National Managing Director of Client Services directly responsible for Accounting, Tax, Management Consulting, Human Resources, Marketing and Strategic Planning. During the 1990s, Mr. Abramson also led the development and implementation of the Manufacturing/Distribution Services practice. Mr. Abramson's partners at Grant Thornton elected him to serve on Grant Thornton's 11-person Partnership Board for three terms from 1982 to 1990. This board provided oversight and direction related to governance, partner admission and compensation, financial and strategic issues.

Mr. Abramson previously served on the Board of Directors of Southwest Casino Corporation, and served as Chairman of that board's Audit Committee and a member of its Governance and Nominating Committee from 2006 to 2009. Mr. Abramson has also served as a board member, Chairman or President of a number of nonprofit organizations, including President of the Minnesota Society of CPAs, Chairman of The Greater Minneapolis Chamber of Commerce, and President of Temple Israel. He currently is a Member of the University of Minnesota Carlson School Of Management Alumni Board, and an Advisory Board Member of the University of Minnesota Carlson Consulting Enterprise.

Mr. Abramson received his B.S. degree (Accounting) from the University of Minnesota and his M.B.A. from the University of Michigan.

Table of Contents

**Shawn R. Gensch** is a financial and marketing executive with over 20 years of professional experience. Previously, Mr. Gensch was the Senior Vice President, Marketing, at Target Corporation, a role he held from 2012 through 2013, and in which he led, among other things, that corporation's media strategy, public relations, events and lifestyle marketing efforts. In previous marketing roles with Target, beginning in 2008, Mr. Gensch led brand marketing, storewide and seasonal campaigns, agency management, and marketing finance, production and technology teams. Prior to 2008, Marketing, Mr. Gensch served as the initial President of Target Bank (2003-2007), served as Vice President, Financial Product Design & Development, at Target Financial Services (2005-2008), and served as Director of New Business Development (2003-2005). Prior to joining Target Corporation in 2003, Mr. Gensch worked in various roles in the structured finance, insurance, banking and related consulting industries, including work as Vice President and Assistant Treasurer of Green Tree Financial Corporation (Conseco Finance), in which role he led that corporation's commercial paper program and asset-based funding conduits, syndicated banking lines and structured-finance securitization efforts across a variety of asset classes. Mr. Gensch began his career with KPMG as an Assurance Accountant in 1992.

Mr. Gensch presently serves as a director of Anser Innovation, a technology company developing Internet-based software and hardware to enhance remote interaction, and is currently also Vice-Chair of the Board of Directors of Avenues for Homeless Youth based in Minneapolis, Minnesota. He previously served on the Board of Directors of the Walker Art Center, Minneapolis, Minnesota. Mr. Gensch graduated from the University of Wisconsin-Eau Claire with a B.S. degree in accounting.

**Director Qualifications, Independence and Board Committees**

When considering whether directors have the experience, qualifications, attributes and skills to enable the Board of Directors to satisfy its oversight responsibilities effectively in light of the Company's business and structure, the Board of Directors focuses primarily on the information discussed in each of the directors' individual biographies set forth above. With regard to Mr. Jon R. Sabes, the board considered his significant experience, expertise and background with regard to financial matters, and his demonstrated experience and skills in managing the Company's business. With respect to Mr. Siegert, the board considered his significant experience in securities and finance, and his background in secondary life insurance market. With regard to Mr. Steven F. Sabes, the board considered his background and experience with the Company and its business. With regard to Mr. McGregor, the board considered his experience in the financial and insurance industries, and in particular his sales, marketing and leadership experience relative to those industries. In the case of Mr. Maguire, the board considered his extensive background in the financial services industry and service in various leadership positions for multiple organizations. With regard to Mr. Abramson, the board considered his extensive background and knowledge of accounting and finance, his focus on wealth management, and prior leadership positions. With regard to Mr. Gensch, the board considered his finance background as well as his marketing expertise.

The Board of Directors periodically reviews relationships that directors have with the Company to determine whether the directors are independent. Directors are considered "independent" as long as they do not accept any consulting, advisory or other compensatory fee (other than director fees) from the Company, are not an affiliated person of the Company or its subsidiaries (e.g., an officer or a greater-than-ten-percent stockholder) and are independent within the meaning of applicable laws, regulations and the NASDAQ listing rules. In this latter regard, the Board of Directors uses the NASDAQ listing rules (specifically, Section 5605(a)(2) of such rules) as a benchmark for determining which, if any, of its directors are independent, solely in order to comply with applicable SEC disclosure rules.

The Board of Directors has determined that, of its current directors, Messrs. Abramson, McGregor, Maguire III and Gensch are independent within the meaning of the NASDAQ listing rule cited above. In the case of Mr. Siegert, his position as an executive officer of the Company precludes him from being considered independent. In the case of both Messrs. Jon R. and Steven F. Sabes, their positions as executive officers of the Company, together with their beneficial ownership of more than ten percent of the common stock of the Company, similarly precludes them from being considered independent within the meaning of the cited NASDAQ listing rule.

<center>83</center>

Table of Contents

Our Board of Directors has an Audit Committee, Compensation Committee and Nomination and Corporate Governance Committee. The Audit Committee is composed of Messrs. Abramson (Chair), McGregor, Maguire and Gensch. The Compensation Committee is composed of Messrs. Maguire (Chair), Abramson and Gensch. The Nomination and Corporate Governance Committee is composed of Messrs. McGregor (Chair) and Abramson.

Our Audit Committee, Compensation Committee, and Nomination and Corporate Governance Committee each comply with the listing requirements of The NASDAQ Marketplace rules. At least one member of the Audit Committee, Mr. Abramson, is an "audit committee financial expert," as that term is defined in Item 401(h)(2) of Regulation S-K, and is "independent" as that term is defined in Rule 5605(a) of the NASDAQ Marketplace Rules.

**Indemnification of Directors and Executive Officers**

Section 145 of the Delaware General Corporation Law provides for, under certain circumstances, the indemnification of our officers, directors, employees and agents against liabilities that they may incur in such capacities. A summary of the circumstances in which such indemnification provided for is contained herein, but that description is qualified in its entirety by reference to the relevant Section of the Delaware General Corporation Law.

In general, the statute provides that any director, officer, employee or agent of a corporation may be indemnified against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement, actually and reasonably incurred in a proceeding (including any civil, criminal, administrative or investigative proceeding) to which the individual was a party by reason of such status. Such indemnity may be provided if the indemnified person's actions resulting in the

liabilities (i) were taken in good faith, (ii) were reasonably believed to have been in or not opposed to our best interest; and (iii) with respect to any criminal action, such person had no reasonable cause to believe the actions were unlawful. Unless ordered by a court, indemnification generally may be awarded only after a determination of independent members of the Board of Directors or a committee thereof, by independent legal counsel or by vote of the stockholders that the applicable standard of conduct was met by the individual to be indemnified.

The statutory provisions further provide that to the extent a director, officer, employee or agent is wholly successful on the merits or otherwise in defense of any proceeding to which he was a party, he is entitled to receive indemnification against expenses, including attorneys' fees, actually and reasonably incurred in connection with the proceeding.

Indemnification in connection with a proceeding by or in the right of GWG Holdings, Inc. in which the director, officer, employee or agent is successful is permitted only with respect to expenses, including attorneys' fees actually and reasonably incurred in connection with the defense. In such actions, the person to be indemnified must have acted in good faith, in a manner believed to have been in our best interest and must not have been adjudged liable to us unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability, in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expense which the Court of Chancery or such other court shall deem proper. Indemnification is otherwise prohibited in connection with a proceeding brought on behalf of GWG Holdings, Inc. in which a director is adjudged liable to us, or in connection with any proceeding charging improper personal benefit to the director in which the director is adjudged liable for receipt of an improper personal benefit.

Delaware law authorizes us to reimburse or pay reasonable expenses incurred by a director, officer, employee or agent in connection with a proceeding in advance of a final disposition of the matter. Such advances of expenses are permitted if the person furnishes to us a written agreement to repay such advances if it is determined that he is not entitled to be indemnified by us.

The statutory section cited above further specifies that any provisions for indemnification of or advances for expenses does not exclude other rights under our Certificate of Incorporation, corporate bylaws, resolutions of our stockholders or disinterested directors, or otherwise. These indemnification provisions continue for a

84

Table of Contents

person who has ceased to be a director, officer, employee or agent of the corporation and inure to the benefit of the heirs, executors and administrators of such persons.

The statutory provision cited above also grants the power to GWG Holdings, Inc. to purchase and maintain insurance policies that protect any director, officer, employee or agent against any liability asserted against or incurred by him in such capacity arising out of his status as such. Such policies may provide for indemnification whether or not the corporation would otherwise have the power to provide for it.

Article 6 of our corporate bylaws provides that we shall indemnify our directors, officers, employees and agents to the fullest extent permitted by the Delaware General Corporation Law. Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers or persons controlling GWG Holdings, Inc. pursuant to the foregoing provisions, we understand that in the opinion of the SEC such indemnification is against public policy as expressed in that Act and is therefore unenforceable.

We have purchased directors' and officers' liability insurance in order to limit the exposure to liability for indemnification of directors and officers, including liabilities under the Securities Act of 1933.

<div align="center">

**EXECUTIVE COMPENSATION**
**AND RELATED-PARTY TRANSACTION DISCLOSURES**

</div>

**Summary Compensation Table**

The following table sets forth the cash and non-cash compensation awarded to or earned by: (i) each individual who served as the principal executive officer and principal financial officer of GWG Holdings during the years ended December 31, 2014 and 2013; and (ii) each other individual that served as an executive officer of either GWG Holdings or GWG Life, Inc. at the conclusion of the years ended December 31, 2014 and 2013 and who received more than $100,000 in the form of salary and bonus during such fiscal year. For purposes of this document, these individuals are collectively the "named executives" of the Company.

In the table below, the amounts listed for 2014 bonuses include only the amounts awarded and paid in 2014 under the Company's incentive compensation plan through September 30, 2014 (with the exception of Michael D. Freedman's bonus, which was awarded outside such plan). Any additional bonus amounts to be awarded for the fourth quarter of 2014 will be determined in March 2015.

| Name and Principal Position | | Salary | Bonus (1) | All Other Compensation (2) | Total |
|---|---|---|---|---|---|
| Jon R. Sabes | 2014 | 372,602 | 38,980 | 14,690 | 426,272 |
| Chief Executive Officer | 2013 | $350,000 | $544,581 | $ 16,905 | $911,486 |
| | | | | | |
| Jon Gangelhoff | 2014 | 223,629 | 24,155 | 9,852 | 257,636 |
| Chief Operating Officer (3) | 2013 | $120,000 | $ 57,276 | $ 13,244 | $190,520 |

App. 0066

| | Year | Salary | Bonus | All Other Compensation | Total |
|---|---|---|---|---|---|
| Paul A. Siegert<br>Executive Chairman (4) | 2014 | 183,529 | 20,199 | 20,317 | 228,045 |
| | 2013 | $150,000 | $ 54,236 | $ 2,631 | $206,867 |
| Steven F. Sabes<br>Executive Vice President of Originations and Servicing and Secretary (5) | 2014 | 195,774 | 20,199 | 17,240 | 233,213 |
| | 2013 | $150,000 | $426,836 | $ 11,063 | $587,899 |
| Michael D. Freedman<br>President (6) | 2014 | 87,564 | 102,921 | 4,934 | 195,419 |
| William B. Acheson<br>Chief Financial Officer (7) | 2014 | 115,953 | 5,491 | 3,395 | 124,839 |

---

(1)  In 2013, Messrs. Jon R. Sabes, Steven F. Sabes, and Paul A. Siegert each received a discretionary bonus related to the tax impact of the conversion of the Company from a limited liability company to

85

Table of Contents

a corporation. In this regard, Mr. Jon R. Sabes received a discretionary tax-related bonus of $436,700, Mr. Steven F. Sabes received a discretionary tax-related bonus of $380,600, and Mr. Paul A. Siegert received a discretionary tax-related bonus of $8,000. In addition, each named executive received a cash bonus under the Company's incentive compensation plan. Mr. Jon R. Sabes received a $107,881 cash bonus, Mr. Gangelhoff received a $57,276 cash bonus, Mr. Siegert received a $46,236 cash bonus, and Mr. Steven F. Sabes received a $46,236 cash bonus, under that incentive compensation plan. In 2014, there were no discretionary tax-related bonuses paid by the Company to any of the named executives. All amounts listed for 2014 relate to bonuses paid under the Company's incentive compensation plan (with the exception of Michael D. Freedman's bonus, which was awarded outside such plan).

(2)  All Other Compensation includes payment of unused and accrued vacation, and premiums paid by the Company that are reported on the named executives' W-2 forms as a component of gross income.

(3)  Mr. Gangelhoff previously served as our Chief Financial Officer from March 2009 until May 30, 2014.

(4)  Mr. Siegert previously served as our President until May 30, 2014.

(5)  Mr. Steven F. Sabes previously served as our Chief Operating Officer from 2006 until May 30, 2014, and as our President from May 30, 2014 until November 13, 2014.

(6)  Mr. Freedman joined the Company in September 2014 and became our President in November 2014.

(7)  Mr. Acheson became our Chief Financial Officer on May 30, 2014.

**Employment Agreements and Change-in-Control Provisions**

In June 2011, we entered into employment agreements with each of Messrs. Jon R. Sabes, Steven F. Sabes, Paul A. Siegert and Jon Gangelhoff. Mr. Jon R. Sabes is our Chief Executive Officer; Mr. Steven F. Sabes is our Executive Vice President of Originations and Servicing and Secretary and previously served as our President and our Chief Operating Officer; Mr. Siegert previously served as our President and Chairman of the Board and is currently the Executive Chairman of the Board; and Mr. Gangelhoff previously served as our Chief Financial Officer and is currently our Chief Operating Officer. On May 30, 2014, we entered into an employment agreement with William Acheson coincident with his appointment as our new Chief Financial Officer. These employment agreements establish key employment terms (including reporting responsibilities, base salary, discretionary and bonus opportunity and other benefits), provide for severance benefits in certain situations, and contain non-competition, non-solicitation and confidentiality covenants.

Under their respective employment agreements, Mr. Jon R. Sabes receives an annual base salary of $480,000 (effective December 1, 2014), Messrs. Steven F. Sabes, William Acheson and Paul A. Siegert receive an annual base salary of $200,000, and Mr. Gangelhoff receives an annual base salary of $250,000. The employment agreements contain customary provisions prohibiting the executives from soliciting our employees for a period of 12–18 months after any termination of employment, and from competing with the Company for either two years (if the executive is terminated for good cause or if he resigns without good reason) or one year (if we terminate the executive's employment without good cause or if he resigns with good reason). In the case of Mr. Acheson, his employment agreement prohibits him from competing against the Company for a one-year period after his termination of employment, regardless of the circumstances relating to that termination. If an executive's employment is terminated by us without "good cause" or if the executive voluntarily resigns with "good reason," then the executive will be entitled to (i) severance pay for a period of 12 months and (ii) reimbursement for health insurance premiums for his family if he elects continued coverage under COBRA.

App. 0067

The employment agreements for Messrs. Jon R. Sabes, Steve F. Sabes and Paul A. Siegert also provide that we will reimburse them for any legal costs they incur in enforcing their rights under the employment agreement and, to the fullest extent permitted by applicable law, indemnify them for claims, costs and expenses arising in connection with their employment, regardless of the outcome of any such legal contest, as well as interest at the prime rate on any payments under the employment agreements that are determined to be past due, unless prohibited by law.

All of the foregoing executive employment agreements include a provision allowing us to reduce their severance payments and any other payments to which the executive becomes entitled as a result of our change

86

Table of Contents

in control to the extent needed for the executive to avoid paying an excise tax under Code Section 280G, unless the named executive officer is better off, on an after-tax basis, receiving the full amount of such payments and paying the excise taxes due.

In September 2014, we entered into an employment agreement with Michael D. Freedman, who was appointed as our President in November 2014. Under his employment agreement, Mr. Freedman receives an annual base salary of $350,000 and a signing bonus of $200,000. His employment agreement contains customary provisions prohibiting him from soliciting our employees or customers for a one-year period after his termination of employment, regardless of the circumstances relating to that termination. If Mr. Freedman's employment is terminated without "cause" or if he voluntarily resigns with "good reason," then he will be entitled to (i) severance pay equal to one-half of his annual salary then in effect (if such termination or resignation occurs one year or less from the date he was first employed by the Company) or his annual salary then in effect (if such termination or resignation occurs more than one year from the date he was first employed by the Company) 12 months and (ii) reimbursement for health insurance premiums for his family if he elects continued coverage under COBRA for 6 months (if such termination or resignation occurs one year or less from the date he was first employed by the Company) or for 12 months (if such termination or resignation occurs more than one year from the date he was first employed by the Company).

**Outstanding Equity Awards at Fiscal Year End**

As of December 31, 2014, our named executives had the following outstanding options to purchase common stock:

|  | Vested Shares | Un-Vested Shares | Total Shares |
| --- | --- | --- | --- |
| Jon R. Sabes | 2,000 | 19,000 | 21,000 |
| Steven F. Sabes | 25,833 | 16,667 | 42,500 |
| Paul Siegert | 25,834 | 11,666 | 37,500 |
| Jon Gangelhoff | 59,000 | 33,000 | 92,000 |
| Michael D. Freedman | — | 318,000 | 318,000 |
| William B. Acheson | 2,500 | 40,000 | 42,500 |
|  | 115,167 | 438,333 | 553,500 |

**2013 Stock Incentive Plan**

In April 2013, our Board of Directors and our stockholders adopted the 2013 Stock Incentive Plan and reserved 1,000,000 shares of common stock for issuance under that plan. The 2013 Stock Incentive Plan permits the grant of both incentive and non-statutory stock options. As of the date of this prospectus, there are 649,851 common shares issuable upon exercise of outstanding incentives granted under the plan. The Board of Directors adopted the 2013 Stock Incentive Plan to provide a means by which our employees, directors, officers and consultants may be granted an opportunity to purchase our common stock, to assist in retaining the services of such persons, to secure and retain the services of persons capable of filling such positions and to provide incentives for such persons to exert maximum efforts for our success.

In September 2014, we granted an option outside the 2013 Stock Incentive Plan, exercisable into an aggregate of 318,000 shares of common stock, to Michael D. Freedman, who was then a new management employee as an inducement grant.

**Related-Party Transactions**

As explained above under "—Employment Agreements and Change-in-Control Provisions," we were party to an arrangement with each of Jon R. Sabes, Paul A. Siegert and Steven F. Sabes whereby those individuals received loan advances that accrued interest at rates ranging from 4.2% to 5.0% per annum. Under this arrangement, made during the time when GWG Holdings was a limited liability company, these advance amounts were to be repaid upon or in connection with operating distributions made by us. From inception through June 13, 2011, advances aggregating approximately $981,167 were made to Jon R. Sabes with

87

Table of Contents

App. 0068

cumulative interest owed of $114,496, $287,500 to Paul A. Siegert with cumulative interest owed of $22,708, and $861,976 were made to Steven F. Sabes with cumulative interest owed of $94,438. On July 27, 2011, Messrs. Jon R. Sabes, Steven F. Sabes and Paul A. Siegert repaid their loan balances.

In May 2008, our affiliate, Insurance Strategies Fund, LLC, a Delaware limited liability company beneficially owned by Mr. Jon R. Sabes, our Chief Executive Officer, agreed to make discretionary unsecured

general working capital loans to GWG Holdings for short-term working capital needs. As of December 31, 2013 and 2012, we owed no amounts to Insurance Strategies Fund. Nevertheless, an Amended and Restated Investment Agreement with Insurance Strategies Fund, dated as of September 3, 2009, remains in place. That agreement permits Insurance Strategies Fund to make additional discretionary unsecured short-term work capital loans in the future.

Effective July 14, 2008, we entered into an Addendum No. 1 to Sub-Sublease Agreement with Opportunity Finance, LLC, a limited liability company of which Jon R. Sabes, our Chief Executive Officer, also serves as Chief Executive Officer. Pursuant to the Addendum, Opportunity Finance, LLC assigned to us, and we assumed, all of Opportunity Finance's rights and obligations under a Sub-Sublease Agreement between Opportunity Finance and an unrelated third party. The Sub-Sublease Agreement relates to the facilities in which we conduct our business operations. Under the Sub-Sublease Agreement, as assigned, we assumed the obligation to make monthly payments of base rent that range from $7,310 (from the commencement date through July 31, 2009) to $8,770 (for the period from August 1, 2011 through the April 20, 2012 expiration of the Sub-Sublease Agreement). In addition, the Sub-Sublease Agreement, as assigned, requires that we pay additional monthly amounts in respect of operating costs as additional rent. We made aggregate payments under the Sub-Sublease Agreement of $0 and $50,000 for the calendar years ended December 31, 2013 and 2012, respectively.

On July 11, 2011, we entered into a Purchase and Sale Agreement with Athena Securities Group, Ltd. and Athena Structured Funds PLC. Under this agreement, we issued to Athena Securities Group, Ltd. ("Athena") 494,500 shares of common stock, which was equal to 9.9% of our then-outstanding shares, in exchange for shares equal to 9.9% of the outstanding shares in Athena Structured Funds, PLC and cash of $5,000. This 2011 agreement had contemplated cooperative efforts by the parties aimed at developing a security and related offering in Europe or Ireland, the proceeds of which would be used to finance the acquisition of life-insurance related assets in the United States. In 2013, we sought to terminate the 2011 agreement due to a changing regulatory environment in Europe that negatively affected the likelihood of consummating the contemplated offering of securities, and our dissatisfaction with Athena's performance under the 2011 agreement. As a result, in June 2013 we entered into a second Purchase and Sale Agreement with Athena Securities Ltd. and Athena. This agreement effected the termination of the 2011 agreement. The June 2013 agreement contained mutual general releases of claims and substantially unwound certain capital stock transactions that had been effected under the 2011 agreement. In particular, Athena returned to us for redemption 432,500 shares of our common stock, and retained 62,000 common shares in recognition of their earlier efforts under the 2011 agreement. For our part, we sold back to Athena all of our ownership in Athena Structured Funds, PLC that we had originally acquired under the 2011 agreement. Presently, we have no ongoing business relationship with Athena.

**Related-Party Transaction Policy**

In all cases, we abide by applicable state corporate law when approving all transactions, including transactions involving officers, directors or affiliates. More particularly, our policy is to have any related-party transactions (i.e., transactions involving a director, an officer or an affiliate of the Company) be approved solely by a majority of the disinterested and independent directors serving on our Board of Directors. Presently, we have four independent directors on the board, and intend to maintain a board on which independent directors comprise a majority of directors serving on the board.

88

Table of Contents

## DIRECTOR COMPENSATION

The following table sets forth the cash and non-cash compensation awarded to or earned by each individual who served as a member of the board of directors of GWG Holdings during the year ended December 31, 2014.

| Director's Name | Fees Earned or Paid in Cash 2014 |
| --- | --- |
| Paul A. Siegert (Chairman) | $20,000 |
| Jon R. Sabes | $20,000 |
| Steven F. Sabes | $20,000 |
| David H. Abramson | $44,000 |
| Shawn R. Gensch | $ 14,000 |
| Charles H. Maguire III | $32,000 |
| Jeffrey L. McGregor | $32,000 |

On June 23, 2014, Mr. Shawn R. Gensch was appointed to the board. Each independent board member receives base compensation of $5,000 and an option to purchase 1,000 shares of the Company's common stock per quarter. In addition, the chairman of the audit committee receives $4,000 and an option to purchase up to 1,000 shares of the Company's common stock per quarter. The chairmen of the compensation committee and the corporate governance committee each receive $2,000 and an option to purchase up to 500 shares of the Company's common stock per quarter. Also each non-chair member of committees receive $1,000 and an option to purchase up to 250 shares of the Company's common stock per quarter.

89

Table of Contents

## SECURITY OWNERSHIP OF
## CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth the number and percentage of outstanding common shares beneficially owned as of January 7, 2015, by:

- each person known by us to be the beneficial owner of more than five percent of our outstanding common stock

- each of our current directors

- each our current executive officers and any other persons identified as a "named executive" in the Summary Compensation Table above, and

- all current executive officers and directors as a group.

Shares beneficially owned and percentage ownership is based on 5,870,193 shares of common stock outstanding. Beneficial ownership is determined in accordance with the rules of the SEC, and includes general voting power and/or investment power with respect to securities. Shares of common stock issuable upon exercise of options or warrants that are currently exercisable or exercisable within 60 days of the record rate, and shares of common stock issuable upon conversion of other securities currently convertible or convertible within 60 days, are deemed outstanding for computing the beneficial ownership percentage of the person holding such securities but are not deemed outstanding for computing the beneficial ownership percentage of any other person. Under the applicable SEC rules, each person's beneficial ownership is calculated by dividing the total number of shares with respect to which they possess beneficial ownership by the total number of outstanding shares of the Company. In any case where an individual has beneficial ownership over securities that are not outstanding, but are issuable upon the exercise of options or warrants or similar rights within the next 60 days, that same number of shares is added to the denominator in the calculation described above. Because the calculation of each person's beneficial ownership set forth in the "Percentage of Common Shares" column of the table may include shares that are not presently outstanding, the sum total of the percentages set forth in such column may exceed 100%. Unless otherwise indicated, the address of each of the following persons is 220 South Sixth Street, Suite 1200, Minneapolis, Minnesota 55402, and each such person has sole voting and investment power with respect to the shares set forth opposite his, her or its name.

| Name and Address | Shares Beneficially Owned | Percentage of Shares Beneficially Owned |
|---|---|---|
| Jon R. Sabes (1) | 2,514,395 | 42.82% |
| Steven S. Sabes (2) | 2,487,081 | 42.18% |
| Paul A. Siegert (3) | 226,279 | 3.84% |
| Jon Gangelhoff (4) | 59,000 | * |
| William B. Acheson (5) | 2,500 | * |
| Michael D. Freedman (6) | 2,700 | * |
| David H. Abramson (7) | 15,000 | * |
| Jeffrey L. McGregor (8) | 10,500 | * |
| Charles H. Maguire III (9) | 10,500 | * |
| Shawn R. Gensch (10) | 3,000 | * |
| All current directors and officers as a group | 4,741,869 | 78.71% |

---

* less than one percent.

(1)  Mr. Sabes is our Chief Executive Officer and a director of the Company. Shares reflected in the table include 1,077,276 shares held individually, 489,086 shares held by Opportunity Finance, LLC, a Minnesota limited liability company of which Mr. Sabes is a manager and member, 169,671 shares held by Jon Sabes 1992 Trust No.1, a trust of which Mr. Sabes is the beneficiary, 168,801 shares held by Esther Sabes 1992 Trust FBO Jon Sabes, a trust of which Mr. Sabes is a beneficiary, 241,632 shares held by Moe Sabes 1982 Trust FBO Jon Sabes, a trust of which Mr. Sabes is a beneficiary, and 163,738

90

Table of Contents

shares held by Moe Sabes 1976 Trust FBO Jon Sabes, a trust of which Mr. Sabes is a beneficiary. Also includes 102,191 shares held by Mr. Sabes' immediate family members. The trustees of each of the trusts are Robert W. Sabes, Steve F. Sabes and Ross A. Sabes. The number of shares also includes 2,000 stock options currently exerciseable or exercisable within 60 days granted pursuant to stock option agreements for 21,000 shares at a per-share exercise price ranging from $8.28 to $9.01. Figures also include 100,000 shares held by Insurance Strategies Fund, LLC, a Delaware limited liability

App. 0070

company over whose securities each of Jon R. and Steven F. Sabes exercise voting and dispositive control. Jon R. and Steve F. Sabes disclaim beneficial ownership over the shares held by Insurance Strategies Fund, LLC except to the extent of their pecuniary interest in such shares.

(2)    Mr. Sabes is our Executive Vice President of Originations and Servicing, Secretary and a director of the Company. Shares reflected in the table include 799,779 shares held individually, 489,086 shares held by Opportunity Finance, LLC, a Minnesota limited liability company of which Mr. Sabes is a manager and member, 521,158 shares held by Moe Sabes 1982 Trust FBO Steven Sabes, a trust of which Mr. Sabes is the beneficiary, 350,779 shares held by Esther Sabes 1992 Trust FBO Steven Sabes, a trust of which Mr. Sabes is a beneficiary, and 200,445 shares held by Moe Sabes 1976 Trust FBO Steven Sabes, a trust of which Mr. Sabes is a beneficiary. The trustees of each of the trusts are Robert W. Sabes, Jon R. Sabes and Ross A. Sabes. The number of shares also includes 25,834 stock options currently exercisable or exercisable within 60 days granted pursuant to stock option agreements for 42,500 shares at a per-share exercise price ranging from $8.28 to $9.01 vesting over a three-year period. Figures also includes 100,000 shares held by Insurance Strategies Fund, LLC, a Delaware limited liability company over whose securities each of Jon R. and Steven F. Sabes exercise voting and dispositive control. Jon R. and Steve F. Sabes disclaim beneficial ownership over the shares held by Insurance Strategies Fund except to the extent of their pecuniary interest in such shares.

(3)    Mr. Siegert is a director of the Company (Executive Chairman). Shares reflected in the table include 200,445 shares held individually and 25,834 stock options currently exercisable or exercisable within 60 days granted pursuant to stock option agreements for 27,500 shares at a per-share exercise price ranging from $7.52 to $9.01 vesting over a three-year period.

(4)    Mr. Gangelhoff is our Chief Operating Officer. Shares reflected in the table include 59,000 stock options currently exercisable or exercisable within 60 days granted pursuant to stock option agreements for 92,000 shares at a per-share exercise price ranging from $7.52 to $9.01 vesting over a three-year period.

(5)    Mr. Acheson is our Chief Financial Officer. Shares reflected in the table include 2,500 of stock options currently exercisable or exercisable within 60 days granted pursuant to stock option agreements for 42,500 shares at a per-share exercise price ranging from $7.52 to $9.01 and vesting over a three-year period.

(6)    Mr. Freedman is our President. Mr. Freedman owns 2,700 shares directly. He was granted an option outside the 2013 Stock Option Plan, for an aggregate of 318,000 shares vesting over three years, none of which are currently exercisable or exercisable in the next 60 days.

(7)    Mr. Abramson is a director of the Company. Shares reflected in the table include 15,000 stock options currently exercisable or exercisable within 60 days granted pursuant to a stock option agreement dated October 28, 2013 for 30,000 shares at a per-share exercise price of $7.52 and vesting quarterly over a three-year period.

(8)    Mr. McGregor is a director of the Company. Shares reflected in the table include 10,500 stock options currently exercisable or exercisable within 60 days granted pursuant to a stock option agreement dated November 12, 2013 for 21,000 shares at a per-share exercise price of $7.52 and vesting quarterly over a three-year period.

(9)    Mr. Maguire is a director of the Company. Shares reflected in the table include 10,500 stock options currently exercisable or exercisable within 60 days granted pursuant to a stock option agreement dated November 12, 2013 for 21,000 shares at a per-share exercise price of $7.52 and vesting quarterly over a three-year period.

(10)   Mr. Gensch is a director of the Company. Shares reflected in the table include 3,000 stock options currently exercisable or exercisable within 60 days granted pursuant to a stock option agreement dated July 1, 2014 for 18,000 shares at a per-share exercise price of $7.52 and vesting quarterly over a three-year period.

91

Table of Contents

## DESCRIPTION OF THE L BONDS

**General**

The L Bonds will be secured obligations of GWG Holdings. The L Bonds will be issued under the indenture between us and Bank of Utah as the indenture trustee, dated October 19, 2011, as amended or supplemented from time to time, including by that certain Amendment No. 2 to Indenture to be entered into in connection with this offering of L Bonds (referred to collectively herein as the "indenture"). The terms and conditions of the L Bonds include those stated in the indenture and those made part of the indenture by reference to the Trust Indenture Act of 1939. The following is a summary of the material provisions of the indenture. For a complete understanding of the L Bonds, you should review the definitive terms and conditions contained in the indenture, which include definitions of certain terms used below. A copy of the indenture has been filed with the SEC as an exhibit to the registration statement of which this prospectus is a part, and is available from us at no charge upon request.

The following is a summary of the material terms associated with the L Bonds:

•   The L Bonds are general secured obligations of GWG Holdings. The obligations are secured by a grant of a security interest in all of the assets of GWG Holdings, which assets will serve as collateral for our obligations under the L Bonds. This grant of a security interest is effected pursuant to a pledge and security agreement attached to the indenture.

•   The L Bonds are fully and unconditionally guaranteed by our wholly owned direct subsidiary, GWG Life, but otherwise are not guaranteed by any other person or entity. The guarantee is backed by a grant of a security interest in all of the assets of GWG Life, which assets will serve as additional collateral for

App. 0071

our obligations under the L Bonds. Chief among these assets is GWG Life's ownership interest in DLP Funding II. This guarantee is effected pursuant to provisions contained in the indenture.

- The L Bonds are also secured by a pledge of the equity ownership interests in GWG Holdings by its principal stockholders — Jon R. Sabes and Steven F. Sabes — which pledge is effected pursuant to a pledge and security agreement attached to the indenture.

- The collateral granted for our obligations under the L Bonds (i.e., the security interest in all of the assets of GWG Holdings, and the guarantee by GWG Life and corresponding security interest in all of its assets including a pledge of the equity ownership interests in DLP Funding II), together with (i) certain covenants contained in the documents relating to our earlier issued Series I Secured notes (of which approximately $28.2 million was outstanding as of September 30, 2014), and (ii) an intercreditor agreement, as amended, between Bank of Utah (on behalf of the L Bond holders, and on behalf of the previously issued L Bonds) and Lord Securities Corporation (the collateral trustee for the Series I Secured notes), make the L Bonds pari passu with the Series I Secured notes and the previously issued L Bonds (of which approximately $173.2 million was outstanding as of September 30, 2014) with respect to payment, security and collateral. The intercreditor agreement is attached to the indenture.

- The L Bonds will be junior to the $100 million revolving credit facility of DLP Funding II with Autobahn/DZ Bank, which currently has an outstanding balance of approximately $79 million. The L Bonds will also be junior to any other senior lending facility we may later obtain.

- The L Bonds are not savings accounts, certificates of deposit (CDs) or other forms of "deposits," and are not insured by the FDIC or any other governmental agency.

- The L Bonds are not directly secured by any life insurance assets not owned by GWG Life. A significant amount of our life insurance assets (75.8% of our policies, representing approximately 78.6% of the face value of policy benefits as of September 30, 2014) are held by our DLP Funding II subsidiary. Although GWG Life's equity ownership interests in DLP Funding II is an asset in which GWG Life has pursuant to its guarantee granted a security interest to serve as collateral for

92

**Table of Contents**

obligations under the L Bonds, the payment on such equity interests will be subordinate to the interests of creditors of DLP Funding II, including our senior creditor Autobahn/DZ Bank.

- The L Bonds do not have the benefit of a "sinking fund" for the retirement of principal.

- The L Bonds are not convertible into our capital stock or other securities.

- We have the option to call and redeem the entire outstanding principal balance and accrued but unpaid interest of any L Bonds at any time and without premium or penalty. If we elect to call and redeem your L Bonds, those redeemed L Bonds will cease to accrue interest after the redemption date under the terms and subject to the conditions of the indenture.

- Except in limited circumstances (death, bankruptcy or total disability), L Bond holders will have no right to require us to redeem any L Bond prior to its maturity date. Any early redemption will be for the total outstanding principal balance and accrued but unpaid interest. If we in our sole discretion nonetheless elect to accommodate a redemption request, we will redeem the entire (but not less than the entire) outstanding principal balance and accrued but unpaid interest of the L Bonds and impose a redemption fee of 6% against the outstanding principal balance of the L Bond redeemed. This fee will be subtracted from the amount paid to you.

The L Bonds will be denominated in U.S. dollars and we intend to sell the L Bonds at 100% of their principal face amount. The minimum investment amount in the L Bonds will be $25,000. Above that minimum amount, L Bonds may be purchased in $1,000 increments. Subject to the minimum investment amount, you may select the principal amount and term of the L Bonds (ranging from six months to seven years) you would like to purchase when you subscribe. The interest rate of your L Bond will remain fixed until maturity. Depending on our capital requirements, we may not, however, always offer L Bonds with the particular terms you seek. See "Description of the L Bonds — Interest Rate and Maturity" below.

Upon acceptance of your subscription, we will create an account in a book-entry registration and transfer system for you, and credit the principal amount of your subscription to your account. We will also send you a purchase confirmation that will indicate our acceptance of your subscription. If your subscription is rejected, all funds deposited will be promptly returned to you without any interest. See "—Registration and Exchange" below. Alternatively, you may subscribe for L Bonds as a direct participant with Depository Trust Company (DTC settlement). See "Plan of Distribution — Settlement Procedures" for more information.

Investors whose subscriptions for L Bonds have been accepted and anyone who subsequently acquires L Bonds in a qualified transfer are referred to as "holders" or "registered holders" in this prospectus. We may modify or supplement the terms of the L Bonds described in this prospectus from time to time in a supplement to the indenture and a supplement to this prospectus. Except as set forth under "—Amendment, Supplement and Waiver" below, any modification or amendment will not affect L Bonds outstanding at the time of such modification or amendment.

The L Bonds are transferable pursuant to the terms of the indenture. The L Bonds may be transferred or exchanged for other L Bonds of the same series and class of a like aggregate principal amount subject to limitations contained in the indenture. We will not charge a fee for any registration, transfer or exchange of L

Bonds. However, we may require the holder to pay any tax, assessment fee, or other governmental charge required in connection with any registration, transfer or exchange of L Bonds. The registered holder of an L Bond will be treated as its owner for all purposes.

**Denomination**

You may purchase L Bonds in the minimum principal amount of $25,000, and in whole increments of $1,000 above $25,000. You will determine the original principal amount of each L Bond you purchase when you subscribe. You may not cumulate purchases of multiple L Bonds with principal amounts less than $25,000 to satisfy the minimum requirement. In our discretion, we may waive the $25,000 minimum purchase requirement for any investor.

93

Table of Contents

**Term**

We may offer L Bonds with the following terms to maturity:

- six months
- one year
- two years

- three years
- five years
- seven years

You will select the term of each L Bond you purchase when you subscribe. You may purchase multiple L Bonds with different terms by filling in investment amounts for more than one term on your Subscription Agreement. Nevertheless, during this offering we may not always offer L Bonds with each of the maturity terms outlined above.

The actual maturity date will be on the last day of the month in which the L Bond matures (i.e., the month in which the L Bond's term ends). For example, if you select a one-year term and your L Bond becomes effective on January 1, 2015, the actual maturity date will be January 31, 2016. After actual maturity, we will pay all outstanding principal and accrued but unpaid interest on the L Bond no later than the fifth day of the calendar month next following its maturity (or the first business day following the fifth day of such month). So, in the case of an L Bond with a maturity date of January 31, 2016, actual payment will be made on or prior to February 5, 2016 (unless such date is not a business day, in which case actual payment will be made on the next business day). The L Bonds do not earn interest after the maturity date or any date set for prepayment.

Should the original L Bond holder (x) no longer be the holder of the L Bond or (y) be unavailable, or a change in payee be necessary, such as in the case of a surviving estate, we may require a copy of the executed assignment to any transferee, or an order from a court or probate commission, as the case may be, in order that we know the principal is returned to the rightful party.

**Interest Rate**

The rate of interest we will offer to pay on L Bonds at any particular time will vary based upon market conditions, and will be determined by the term to maturity of the L Bonds, our capital requirements and other factors described below. The interest rate on a particular L Bond will be determined at the time of subscription or renewal and then remain fixed for the original or renewal term of the L Bond. We will establish and may change the interest rates payable for L Bonds of various terms and at various investment levels in an interest rate supplement to this prospectus.

We may offer L Bonds that earn incrementally higher interest rates when, at the time they are purchased or renewed, the aggregate principal amount of the L Bond portfolio of the holder increases. If applicable, the interest rates payable at each level of investment will be set forth in an interest rate supplement to this prospectus. We may change the interest rate for any or all maturities to reflect market conditions at any time by supplementing this prospectus. If we change the interest rates, the interest rate on L Bonds issued before the date of the change will not be affected.

**Payments on the L Bonds; Paying Agent and Registrar**

Investors will have the opportunity to select whether interest on their L Bonds will be paid monthly or annually. For investors using direct settlement with the Company, this selection opportunity will be presented in the Subscription Agreement.

Interest will accrue on the L Bonds at the stated rate from and including the effective date of the L Bond until maturity. The effective date of an L Bond will be as follows:

- If you purchase an L Bond through DTC settlement, the first business day after the monthly closing cycle with DTC. In this regard, you should be aware that the final settlement date for participating in a closing cycle will generally require you to have paid your subscription no later than the last business day of the prior calendar month. So for example, to participate in a closing cycle on which L Bonds will be issued on May 1, your DTC settlement subscription must be effected and paid for no later than April 30 (if April 30 is a business day, and if not then the last business day prior to April 30).

94

Table of Contents

App. 0073

- If you purchase an L Bond through direct settlement with the Company, the effective date of your bond will be the following, as applicable: (i) in cases where you pay for your bond via wire transfer directly to us, the first business day of the next calendar month after which we receive the wire; (ii) in cases where you pay for your bond by bank draft directly to us, the first business day of the next calendar month after which we receive the draft; or (iii) in cases where you pay for your bond by personal check, the first business day of the calendar month that is at least five full business days after which we receive the check. In all cases involving direct settlement with the Company, we must also have received your completed and executed Subscription Agreement.

Interest payments on L Bonds will be paid on the 15th day immediately following the last day of the applicable interest payment period. Interest will be paid without any compounding. The first payment of interest will include interest for the partial period in which the purchase occurred. The indenture provides that all interest will be calculated based on a year with twelve 30-day months.

If you purchase your L Bond through direct settlement, we will pay the principal of, and interest on, L Bonds by direct deposit to the account you specify in your Subscription Agreement. We will not accept subscriptions from investors who are not willing to receive their interest payments via direct deposit. If the foregoing payment method is not available, principal and interest payments on the L Bonds will be payable at our principal executive office or at such other place as we may designate for payment purposes. If you purchase your L Bond through DTC settlement, our payments of principal and interest will be paid to the depositary (DTC) and then be credited to your brokerage or custodial account through the DTC procedures followed by your brokerage firm or custodian. For more information, please see "Registration and Exchange—Global Certificates Deposited with DTC " below.

We will withhold 28% of any interest payable to any investor who has not provided us with a social security number, employer identification number, or other satisfactory equivalent in the Subscription Agreement (or another document) or where the IRS has notified us that backup withholding is otherwise required. Please see "Material Federal Income Tax Considerations — Backup Withholding and Information Reporting."

**Registration and Exchange**

The L Bonds that we settle directly will generally be issued in book-entry form, which means that no physical L Bond is created, subject, however, to limited exceptions described in the indenture. The L Bonds settled through DTC settlement will be represented by global certificates deposited with the depositary as described below.

*Book-Entry Registration*

Evidence of your ownership will be provided by written confirmation. As described below, holders may, under certain circumstance described below, opt to receive physical delivery of a certificated security that evidences their L Bonds. Otherwise, the issuance and transfer of L Bonds will be accomplished exclusively through the crediting and debiting of the appropriate accounts in our book-entry registration and transfer system.

The holders of the accounts established upon the purchase or transfer of L Bonds will be deemed to be the owners of the L Bonds under the indenture. The holder of the L Bonds must rely upon the procedures established by the trustee to exercise any rights of a holder of L Bonds under the indenture. We will regularly provide the trustee with information regarding the establishment of new accounts and the transfer of existing accounts.

On or prior to any interest payment date or upon redemption, we will also provide the trustee with information regarding the total amount of any principal and interest due to holders of L Bonds. On each interest payment date, we will credit interest due on each account and direct payments to the holders. We will determine the interest payments to be made to the book-entry accounts and maintain, supervise and review any records relating to book-entry accounts for the L Bonds.

95

Table of Contents

Book-entry notations in the accounts evidencing ownership of the L Bonds are exchangeable for certificated L Bonds only: (i) at the request of the holder, at the end of the Company's next fiscal quarter; or (ii) after the occurrence of an event of default under the indenture, if holders of more than 50% of the aggregate outstanding principal amount of the L Bonds advise the trustee in writing that the continuation of a book-entry system is no longer in the best interests of the holders of L Bonds. In its discretion, the Company may elect to terminate the book-entry system and replace book-entry notations with physical certificates.

*Global Certificates Deposited with DTC*

L Bonds may be issued in the form fully registered global certificates deposited with, or on behalf of, The Depository Trust Company ("DTC"), New York, NY, and registered in the name of Cede & Co., as nominee of DTC. Unless and until exchanged, in whole or in part, for L Bonds in definitive registered form, a global certificate may not be transferred except as a whole by the depositary to a nominee of such depositary, by a nominee of such depositary to such depositary or another nominee of such depositary, or by such depositary or any nominee of such depositary to a successor of such depositary or a nominee of such successor.

DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act. DTC was created to hold securities of its participants and to facilitate the clearance and settlement of securities transactions, such as transfers and pledges, among its participants in such securities through electronic computerized book-entry changes in accounts of the participants, thereby eliminating the need for physical movement of securities certificates. DTC's participants include securities brokers and dealers (including the managing broker-dealer), banks, trust companies, clearing corporations and certain other organizations, some of whom own DTC. Access to DTC's book-entry system is also available to others, such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a participant, either directly or indirectly. The rules applicable to DTC and its participants are on file with the SEC.

If available, purchases of the L Bonds within the DTC system must be made by or through direct participants, which will receive a credit for the L Bonds on DTC's records. The ownership interest of each beneficial owner of the L Bonds will be recorded on the direct and indirect participants' records. Beneficial owners

will not receive written confirmation from DTC of their purchases, but beneficial owners are expected to receive written confirmations providing details of the transactions, as well as periodic statements of their holdings, from the direct or indirect participants through which the beneficial owners entered into the transaction. Transfers of ownership interests in the L Bonds are to be accomplished by entries made on the books of participants acting on behalf of beneficial owners.

To facilitate subsequent transfers, all L Bonds deposited by participants with DTC will be registered in the name of DTC's nominee, Cede & Co. The deposit of the L Bonds with DTC and their registration in the name of Cede & Co. will effect no change in beneficial ownership. DTC will have no knowledge of the actual beneficial owners of the L Bonds. DTC's records will reflect only the identity of the direct participants to whose accounts such notes are credited, which may or may not be the beneficial owners. The participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to direct participants, by direct participants to indirect participants and by direct and indirect participants to beneficial owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

We will make payments due on the notes to Cede & Co., as nominee of DTC, in immediately available funds. DTC's practice is to credit direct participants' accounts, upon DTC's receipt of funds and corresponding detailed information, on the relevant payment date in accordance with their respective holdings shown on DTC's records. Payments by participants to beneficial owners will be governed by standing instructions and customary practices, as is the case with securities held for the account of customers in bearer form or

96

Table of Contents

registered in "street name," and will be the responsibility of such participant and not our responsibility or DTC, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment to Cede & Co. is our responsibility. Disbursement of such payments to direct participants is the responsibility of Cede & Co. Disbursement of such payments to the beneficial owners is the responsibility of direct and indirect participants.

Except as provided herein, a beneficial owner of an interest in a global certificate will not be entitled to receive physical delivery of the L Bonds. Accordingly, each beneficial owner must rely on the procedures of DTC to exercise any rights under the L Bonds. The laws of some jurisdictions require that certain purchasers of securities take physical delivery of securities in definitive form. Such laws may impair the ability to transfer beneficial interests in a global certificate.

As long as the depositary, or its nominee, is the registered holder of a global certificate, the depositary or such nominee will be considered the sole owner and holder of the L Bonds represented thereby for all purposes under the L bonds and the indenture. Except in the limited circumstances referred to below, owners of beneficial interests in a global certificate will not be entitled to have such global certificate or any L Bonds represented thereby registered in their names, will not receive or be entitled to receive physical delivery of certificated L Bonds in exchange for the global certificate and will not be considered to be the owners or holders of such global certificate or any certificates represented thereby for any purpose under the L Bonds or the indenture. Accordingly, each person owning a beneficial interest in such global certificate must rely on the procedures of the depositary and, if such person is not a participant, on the procedures of the participant through which such person owns its interest to exercise any rights of a holder under the indenture.

If the depositary for a global certificate representing L Bonds is at any time unwilling or unable to continue as depositary and a successor depositary is not appointed by us within 90 days, we will issue L Bonds in definitive form in exchange for such global certificate. In addition, we may at any time and in our sole discretion determine not to have the L Bonds represented by one or more global certificates and, in such event, we will issue the notes in definitive form in exchange for all of the global certificates representing the L Bonds. Finally, if an event of default, or an event which with the giving of notice or lapse of time or both would constitute an event of default, with respect to the L Bonds represented by a global certificate has occurred and is continuing, then we will issue L Bonds in definitive form in exchange for all of the global certificates representing the notes.

Although DTC has agreed to the procedures provided above in order to facilitate transfers, it is under no obligation to perform these procedures, and these procedures may be modified or discontinued at any time.

**Limited Rescission Right**

If you are purchasing L Bonds through direct settlement with the Company and your Subscription Agreement is accepted at a time when we have determined that a post-effective amendment to the registration statement of which this prospectus is a part must be filed with the SEC, but such post-effective amendment has not yet been declared effective, we will send to you at your registered address a notice and a copy of the related prospectus once it has been declared effective. You will thereupon have the right to rescind your investment upon written request within ten business days from the postmark date of the notice we send to you that the post-effective amendment has been declared effective (and containing the related prospectus). We will promptly return any funds sent with a Subscription Agreement that is properly rescinded without penalty, although any interest previously paid on a rescinded L Bond will be deducted from the funds returned to you upon rescission. A written request for rescission, except in the case of a mailed rescission, must be postmarked on or before the tenth business day after our notice to you (described above). If you notify us other than by mail, we must actually receive your rescission request on or before the tenth business day after our notice to you.

We will not accept purchases of L Bonds through DTC settlement if, as of the end of the monthly closing for DTC settlement, we have determined that a post-effective amendment to the registration statement of which this prospectus is a part must be filed with the SEC, but such post-effective amendment has not yet

97

App. 0075

been declared effective. In any such case, settlement of your L Bond purchase must occur in the following month.

**Renewal or Repayment on Maturity**

At least 30 days prior to the maturity of your L Bond, we will provide you with a notice indicating that your L Bond is about to mature and whether we will allow automatic renewal of your L Bond. If we allow you to renew your L Bond, we will also provide to you the then-current form of prospectus, which may include an interest rate or prospectus supplement and any other updates to the information contained in this prospectus. The prospectus, or the interest rate or prospectus supplement, will set forth the interest rates then in effect. The notice will recommend that you review the then-current prospectus, including any interest rate or prospectus supplement, prior to exercising one of the below options. If we do not provide you a new prospectus because the prospectus has not changed since the delivery of this prospectus in connection with your original investment or any prior renewal, we will nonetheless send you a new copy of the prospectus upon your request. Unless the election period is extended as described below, you will have until 15 days prior to the maturity date to exercise one of the following options:

- You can do nothing, in which case (subject to applicable law) your L Bond will automatically renew for a new term equal to the original term but at the interest rate in effect at the time of renewal. Interest on renewed L Bonds will be paid on the same schedule (i.e., monthly or annually) as the original L Bond. If applicable, a new certificate will be issued.

- You can elect repayment of your L Bond, in which case the principal amount will be repaid in full along with any accrued but unpaid interest. If you choose this option, your L Bond will not earn interest on or after the maturity date.

- You can elect repayment of your L Bond and use all or part of the proceeds to purchase a new L Bond with a different term or principal amount. To exercise this option, you will need to complete a new Subscription Agreement for the new L Bond and mail it along with your request, or else work with your broker if you wish to purchase your new L Bond through DTC settlement. Any proceeds from the old L Bond that are not applied to the new L Bond will be sent to you.

The foregoing options will be available to holders unless and until terminated under the indenture. Interest will accrue from the first day of each renewed term. Each renewed L Bond will retain all its original provisions, including provisions relating to payment, except that the interest rate payable during any renewal term will be the interest rate that is being offered at that time to other holders with similar aggregate L Bond portfolios for L Bonds of the same term as set forth in the interest rate supplement delivered with the maturity notice. If similar L Bonds are not then being offered, the (i) interest rate upon renewal will be the rate specified by us on or before the maturity date, or the rate of the existing L Bond if no such rate is specified, and (ii) the maturity will, if L Bonds of the same maturity are being offered at the time of renewal, be the same or, if not, the next earliest maturity.

If we notify the holder of our intention to repay an L Bond at maturity, or if the holder timely requests repayment, we will pay the principal and all accrued but unpaid interest on the L Bond on or prior to the fifth day of the calendar month after the maturity date (or the first business day following the fifth day of such month). Thus, in the case of an L Bond with a maturity date of January 31, 2015, actual payment will be made on or prior to February 5, 2015 (unless such date is not a business day, in which case actual payment will be made on the next business day). No interest will accrue after the maturity date. You should be aware that because payment is made by ACH transfer, funds may not be received in the holder's account for two to three business days.

We will be required from time to time to file post-effective amendments to the registration statement of which this prospectus is a part to update the information it contains. If you would otherwise be entitled to renew your L Bonds upon their stated maturity at a time when we have determined that a post-effective amendment must be filed with the SEC, but such post-effective amendment has not yet been declared effective, then the period during which you can elect renewal (or repayment) will be automatically extended

<div align="center">98</div>

Table of Contents

until ten days following the postmark date of our notice to you that the post-effective amendment has been declared effective, which notice shall contain a copy of the related prospectus. All other provisions relating to the renewal or redemption of L Bonds upon their stated maturity described above shall remain unchanged.

For any L Bonds offered hereby that mature on or after the three-year anniversary of the date on which the registration statement of which this prospectus is a part shall have been declared effective, we expect that the renewal of such L Bonds may require us to file a new registration statement. In such a case, the new registration statement must be declared effective before we can renew your L Bond. In this event, if the new registration statement has not yet been filed or become effective, we will extend your election period until ten days following the date of our notice to you that the new registration statement has become effective, which notice will include a new prospectus.

**Call and Redemption Prior to Stated Maturity**

We may call and redeem, in whole or in part, principal amount and accrued but unpaid interest on any L Bonds prior to their stated maturity only as set forth in the indenture and described below. The holder has no right to put or otherwise require us to redeem any L Bond prior to its maturity date (as originally stated or as it may be extended), except as indicated in the indenture and described below.

*Our Voluntary Redemption*

We have the right to redeem any L Bond, in whole or in part, at any time prior to its stated maturity upon at least 30 days written notice to the holder of the L Bond. The holder of the L Bond being redeemed will be paid a redemption price equal to the outstanding principal amount thereof plus accrued but unpaid interest up to but not including the date of redemption without any penalty or premium. We may use any criteria we choose to determine which L Bonds we will redeem if we choose to do so. We are not required to redeem L Bonds on a pro rata basis.

### *Holder's Put Election Upon Death, Bankruptcy or Total Permanent Disability*

L Bonds may be redeemed prior to maturity at the election of a holder who is a natural person (including L Bonds held in an individual retirement account and the holders of a beneficial interest in a global certificate held by a depositary or its nominee), by giving us written notice within 45 days following the holder's total permanent disability or bankruptcy, as established to our satisfaction, or at the election of the holder's estate, by giving written notice within 45 days following the death of the holder. Subject to the limitations described below, we will redeem the L Bonds not later than the 15th day of the month next following the month in which we establish to our satisfaction the holder's death, bankruptcy or total permanent disability. In the event that the 15th day of the month next following the month in which we so establish such facts is not a business day, we will redeem the L Bonds on the next business day. The redemption price, in the event of such a death, bankruptcy or total permanent disability, will be the entire principal amount of the L Bonds, plus accrued but unpaid interest thereon up to and through the last day of the calendar month preceding the redemption date.

If spouses are joint registered holders of an L Bond, the right to elect to have us redeem L Bonds will apply when either registered holder dies, files bankruptcy or suffers a total permanent disability. If the L Bond is held jointly by two or more persons who are not legally married, none of these persons will have the right to request that we redeem the L Bonds unless all joint holders have died, filed bankruptcy or suffered a total permanent disability. If the L Bond is held by a trust, partnership, corporation or other similar entity, the right to request redemption upon death or total permanent disability does not apply.

### *Redemption at Request of Holder*

We have no obligation to redeem any L Bonds other than upon maturity, or upon the death, bankruptcy or total permanent disability of a natural person holder. Nevertheless, at our sole discretion we may agree from time to time, at the written request of a holder (including the holder of a beneficial interest in a global certificate held by a depositary or its nominee), to redeem an L Bond, subject, however, to a redemption fee

<div align="center">99</div>

Table of Contents

of 6.0% of the principal amount of such L Bond. If we so redeem any L Bond prior to maturity, we will redeem the entire principal amount of such L Bond together with accrued but unpaid interest thereon, The redemption fee will be subtracted from the amount paid to you.

### Transfers

The L Bonds will be transferable in accordance with the indenture. For L Bonds that are issued solely in book-entry form, transfers will be effective only upon the delivery to us of an executed assignment or other conveyance instrument in customary form. For L Bonds that are represented by a global certificate held by a depositary or its nominee, transfers of beneficial interests in such certificate must be effected in accordance with the procedures and rules of the depositary.

Upon transfer of an L Bond, we will provide the new holder of the L Bond with a purchase confirmation that will evidence the transfer of the account on our records. If applicable (e.g., if transferred to a custodial account), a new certificate will be issued. No written confirmations will be provided with respect to transfers of beneficial interests in a global certificate held by a depositary or its nominee.

### Quarterly Statements

We will provide holders of the L Bonds with quarterly statements, which will indicate, among other things, the account balance at the end of the quarter, interest credited, redemptions made, if any, and the interest rate paid during the quarter. These statements will be sent electronically on or prior to the 10th business day after the end of each calendar quarter. If a holder is unwilling or unable to receive quarterly statements electronically, we will mail the statements to the address of record on or prior to the 10th business day after the end of each calendar quarter. In such a case, we may charge such holders a reasonable fee to cover our expenses incurred in mailing the statements.

### Ranking

The L Bonds will constitute secured debt of GWG Holdings. The payment of principal and interest on the L Bonds will be:

- pari passu with respect to payment and collateral securing the approximately $28.2 million in outstanding principal amount of Series I Secured notes previously issued by our subsidiary GWG Life, and the L Bonds previously issued by GWG Holdings, Inc. (originally under the name Renewable Secured Debentures and to be renamed L Bonds upon the effectiveness of the registration statement of which this prospectus is a part) (referred to in this prospectus as the "previously issued L Bonds" or the "Renewable Secured Debentures"), of which approximately $173.2 million in principal amount is outstanding as of September 30, 2014 (see the caption "—Collateral Security" below);

- structurally junior to the present and future obligations owed by our subsidiary DLP Funding II under the senior secured revolving credit facility with Autobahn/DZ Bank (including the approximately $79 million outstanding under such facility as of September 30, 2014), and structurally or contractually junior to any future obligations that DLP Funding II or other primary obligors or guarantors may have under future senior secured borrowing facilities; and

- structurally junior to the present and future claims of creditors of our subsidiaries, other than GWG Life, including trade creditors, including trade creditors.

The indenture will permit us to issue other forms of debt, including secured and senior debt, in the future.

"Pari passu" means that claims for payment and entitlement to security among the holders of L Bonds, the holders of previously issued L Bonds, and the holders of Series I Secured notes previously issued by GWG Life, together with the holders of any later-created class of "pari passu debt," will be treated equally and without preference. Although we have no present intention of causing GWG Life to issue additional

100

Table of Contents

secured debt in the future, any such debt issued on a pari passu basis in the future would also be treated equally and without preference in respect of the L Bonds, the previously issued L Bonds and Series I Secured notes. We may continue our offering of Series I Secured Notes and previously issued L Bonds for renewals only, and any such debt issued on a pari passu basis in the future would also be treated equally and without preference in respect of the L Bonds and any secured debt issued by GWG Life. Thus, in the event of any default on the L Bonds (or any other debt securities of ours that is pari passu with the L Bonds) resulting in claims for payment or claims on collateral security, the holders of the L Bonds and all such other debt securities pari passu with the L Bonds would share in payment or collateral in proportion to the amount of principal and interest owed on each such debt instrument.

**Guarantee by GWG Life Subsidiary**

The payment of principal and interest on the L Bonds is fully and unconditionally guaranteed by GWG Life. This guarantee, together with (i) the accompanying grant of a security interest in all of the assets of GWG Life, including GWG Life's entire ownership interest in DLP Funding II, (ii) the pledge of ownership interests in GWG Holdings, Inc. by our principal stockholders, and (iii) an intercreditor agreement, as amended, between Bank of Utah (on behalf of the L Bond holders and on behalf of the holders of previously issued L Bonds) and Lord Securities Corporation (the collateral trustee for the Series I Secured notes), make the L Bonds pari passu with the Series I Secured notes and the previously issued L Bonds with respect to payment, security and collateral. For an explanation of the term "pari passu," see "—Ranking" above. There were approximately $28.2 million in principal amount of Series I Secured notes and approximately $173.2 million in principal amount of previously issued L Bonds outstanding as of September 30, 2014.

**Collateral Security**

The L Bonds are secured by the assets of GWG Holdings, Inc. We will grant a security interest in all of the assets of GWG Holdings to the indenture trustee for the benefit of the L Bond holders. The assets of GWG Holdings consist, and are expected to consist, primarily of (i) any cash proceeds received from its subsidiaries as distributions derived from life insurance assets of subsidiaries, (ii) all other cash and investments held in various accounts, (iii) the equity ownership interests in subsidiaries of GWG Holdings, including the equity ownership interest in GWG Life, together with (iv) all proceeds from the foregoing. This collateral security granted by us is referred to as the "GWG Holdings Assets Collateral."

As indicated above, our direct and wholly owned subsidiary, GWG Life, will fully and unconditionally guarantee our obligations under the L Bonds. This guarantee will be supported by GWG Life's grant of a security interest in all of its assets. The assets of GWG Life consist, and are expected to consist, primarily of (i) certain life insurance assets, (ii) any cash proceeds received from life insurance assets owned by GWG Life or received from its direct subsidiary DLP Funding II as distributions derived from life insurance policies owned by that subsidiary, (iii) all other cash and investments held by GWG Life in its various accounts, (iv) GWG Life's equity ownership interest in its direct subsidiary DLP Funding II, together with (v) all proceeds from the foregoing. The collateral security granted by GWG Life pursuant to its guarantee of our obligations under the L Bonds is referred to as the "GWG Life Assets Collateral."

In addition, Messrs. Jon R. Sabes and Steven F. Sabes, our principal stockholders beneficially holding approximately 74.81% of the outstanding shares of our common stock, have pledged all of the shares they own in GWG Holdings to further secure our obligations under the L Bonds. This collateral security granted by Messrs. Jon R. Sabes and Steven F. Sabes is referred to as the "GWG Holdings Equity Collateral."

Together, the GWG Holdings Assets Collateral, GWG Life Assets Collateral and GWG Holdings Equity Collateral comprise all of the collateral security for our obligations under the L Bonds. To the extent that we subsequently establish one or more wholly owned subsidiaries of GWG Holdings or GWG Life, the L Bonds will have a security interest in the equity ownership interests of those subsidiaries if and to the extent owned by GWG Holdings or GWG Life.

The guarantee by GWG Life is contained in the indenture, and the grant of security interests in the GWG Holdings Assets Collateral, GWG Life Assets Collateral and GWG Holdings Equity Collateral is effected

101

Table of Contents

through a "Pledge and Security Agreement" that is an exhibit to the indenture and has been amended in connection with this offering of L Bonds. The grant of collateral security comprising the GWG Life Assets Collateral and GWG Holdings Equity Collateral is designed to afford the holders of L Bonds with rights to the same payment and collateral as that granted to holders of our Series I Secured notes and the holders of our previously issued L Bonds on a pari passu basis. To effect this arrangement, the trustee under the indenture, Bank of Utah (to whom the security grant for L Bonds and the previously issued L Bonds are made under the Pledge and Security Agreement, as amended), has entered into an "Intercreditor Agreement" with Lord Securities Corporation (the trustee for our Series I Secured

App. 0078

notes). This intercreditor agreement is an exhibit to the indenture and has been amended in connection with the offering of L Bonds. Neither the indenture nor the Pledge and Security Agreement contain any provision preventing a pledging party from disposing of any collateral in the ordinary course of business. In this regard, the Pledge and Security Agreement permits the disposition of GWG Holdings Equity Collateral to the extent the number of shares continuing to constitute such collateral represents at least 10% of the number of shares held by each individual grantor as of the date of the Pledge and Security Agreement.

A significant amount of our life insurance assets (75.8% of our policies, representing approximately 78.6% of the face value of policy benefits as of September 30, 2014) are held in our subsidiary GWG DLP Funding II, LLC, which we refer to throughout this prospectus as "DLP Funding II." The L Bonds will not be directly secured by any security interest in the assets of DLP Funding II. Instead, the L Bonds will be secured by a pledge of the equity ownership interests in DLP Funding II owned by GWG Life by virtue of the guarantee provisions in the indenture and the Pledge and Security Agreement referenced above. An equity ownership interest is, by its very nature, subordinate to the interests of creditors. **Therefore, although investors in the L Bonds will have a security interest in the ownership of DLP Funding II, any claim they may have to the assets owned by such entity will be subordinate to the interests of creditors of that entity, including (i) Autobahn/DZ Bank which is the lender to DLP Funding II under our revolving credit facility, and (ii) all other creditors of DLP Funding II, including trade creditors. In addition, there is the risk that the collateral security granted for our obligations under the L Bonds may be insufficient to repay the L Bonds upon an event of default. See "Risk Factors," page 28** *("The collateral granted as security...").*

**Subordination; Other Indebtedness**

Our obligations under the L Bonds will be subordinate to all our senior debt. For this purpose, "our senior debt" presently includes all indebtedness of our subsidiaries with respect to which the L Bonds are not pari passu with respect to payment and collateral (i.e., other than our Series I Secured notes and previously issued L Bonds). In this regard, our subsidiary DLP Funding II has, as of September 30, 2014, approximately $79 million of debt outstanding under our revolving credit facility. With respect to pari passu indebtedness, as of September 30, 2014 our subsidiary GWG Life has approximately $28.2 million of debt outstanding under our Series I Secured notes, and we had approximately $173.2 million of debt outstanding under our previously issued L Bonds.

The maximum amount of debt, including the L Bonds, we may issue is limited by the indenture. In particular, the indenture prohibits us from issuing debt in an amount such that our "debt coverage ratio" would exceed 90%. The indenture defines the debt coverage ratio as a percentage calculated by the ratio of (A) obligations owing by us and our subsidiaries on all outstanding debt for borrowed money (including the L Bonds), over (B) the net present asset value of all life insurance assets we own, directly or indirectly, plus any cash held in our accounts. For this purpose, the net present asset value of our life insurance assets is equal to the present value of the cash flows derived from the face value of policy benefit assets we own, discounted at a rate equal to the weighted average cost of capital for all our indebtedness for the prior month.

We are required to notify the indenture trustee in the event that we violate this restrictive covenant. An "event of default" will exist under the indenture if a violation of this covenant persists for a period of 30 calendar days after our initial notice to the trustee.

Table of Contents

The L Bonds are guaranteed by GWG Life but otherwise are not guaranteed by any of our subsidiaries, affiliates or control persons. Neither indenture nor the Pledge and Security Agreement prevent holders of debt issued by our subsidiaries from disposing of, or exercising any other rights with respect to, any or all of the collateral securing that debt. Accordingly, in the event of a liquidation or dissolution of one of our subsidiaries (other than GWG Life), creditors of that subsidiary that are senior in rank will be paid in full, or provision for such payment will be made, from the assets of that subsidiary prior to distributing any remaining assets to us as an equity owner of that subsidiary.

The indenture also contains specific subordination provisions, benefitting lenders under senior credit facilities to our operating subsidiaries, restricting the right of L Bond holders to enforce certain of their rights in certain circumstances, including:

- a prohibition on challenging any enforcement action taken by a senior lender or interfering with any legal action or suits undertaken by the senior lender against us and our affiliates;

- a 180-day standstill period during which there may not be brought any action to enforce an event of default against us or our affiliates unless our revolving credit facility has been repaid in full, which period may be extended if the credit facility provider takes action during such standstill period; and

- a prohibition on filing a bankruptcy or insolvency case against us or our affiliates for at least one year plus one day after the revolving credit facility lender has been paid in full.

We will not make any payment, direct or indirect (whether for interest, principal, as a result of any redemption or repayment at maturity, on default, or otherwise), on the L Bonds and any other indebtedness, and neither the holders of the L Bonds nor the trustee will have the right, directly or indirectly, to sue to enforce the indenture or the L Bonds, if a default or event of default under any senior credit facility has occurred and is continuing, or if any default or event of default under any senior credit facility would result from such payment, in each case unless and until:

- the default and event of default has been cured or waived or has ceased to exist; and

- the end of the period commencing on the date the indenture trustee receives written notice of default from a holder of such credit facility and ending on the earlier of the indenture trustee's receipt of (i) a valid waiver of default from the holder of a credit facility, or (ii) a written notice from the holder of a credit facility terminating the payment blockage period.

App. 0079

Notwithstanding the foregoing, if any of the blockage events described above have occurred and 179 days have passed since the indenture trustee's receipt of the notice of default without the occurrence of the cure, waiver, termination, or extension of all blockage periods described above, the trustee may thereafter sue on and enforce the indenture and our obligations thereunder and under the L Bonds as long as any funds paid as a result of any such suit or enforcement action shall be paid toward the senior credit facility until it is indefeasibly paid in full before being applied to the L Bonds. The indenture contains provisions whereby each investor in the L Bonds consents to the subordination provisions contained in the indenture and related agreements governing collateral security.

If the 180-day standstill period noted above or any other limitation on the rights of the trustee or L Bond holders to assert their rights to payment of principal or interest under the indenture or L Bonds is ultimately determined to conflict with provisions of the Trust Indenture Act of 1939 (most notably sections 316(b) and 317(a) of that Act), then the trustee, as well as any holder who shall not have earlier consented to such subordination provisions, shall (notwithstanding such provision contained in the indenture) be authorized to institute a lawsuit for the enforcement of any payment of principal or interest after their respective due dates.

**No Sinking Fund**

The L Bonds are not associated with any sinking fund. A sinking fund is generally any account to which contributions will be made, from which payments of principal or interest owed on the L Bonds will be made. See "Risk Factors," page 19.

<div align="center">103</div>

Table of Contents

**Restrictive Covenants**

The indenture contains covenants that restrict us from certain actions as described below. In particular, the indenture provides that:

- we will not declare or pay any dividends or other payments of cash or other property solely in respect of our capital stock to our stockholders (other than a dividend paid in shares of our capital stock on a pro rata basis to all our stockholders) unless no default and no event of default with respect to the L Bonds exists or would exist immediately following the declaration or payment of the dividend or other payment;

- to the extent legally permissible, we will not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or the performance of the indenture;

- our Board of Directors will not adopt a plan of liquidation that provides for, contemplates or the effectuation of which is preceded by (a) the sale, lease, conveyance or other disposition of all or substantially all of our assets, otherwise than (i) substantially as an entirety, or (ii) in a qualified sales and financing transaction, and (b) the distribution of all or substantially all of the proceeds of such sale, lease, conveyance or other disposition and of our remaining assets to the holders of our capital stock, unless, prior to making any liquidating distribution pursuant to such plan, we make provision for the satisfaction of our obligations under the renewable unsecured subordinated notes; and

- our debt coverage ratio may not exceed 90%.

The indenture defines the debt coverage ratio as a percentage calculated by the ratio of (A) obligations owing on all outstanding debt for borrowed money (including the L Bonds), over (B) the net present asset value of all life insurance assets we own, plus any cash held in our accounts. For this purpose, the net present asset value of our life insurance assets is equal to the present value of the face value of policy benefit assets we own, discounted at a rate equal to the weighted-average cost of capital for all our indebtedness for the prior month.

Importantly, we are not restricted from entering into "qualified sale and financing transactions" as defined — in the indenture, or incurring additional indebtedness, including additional senior debt.

**Consolidation, Mergers or Sales**

The indenture generally permits a consolidation or merger between us and another entity. It also permits the sale or transfer by us of all or substantially all of our property and assets. These transactions are permitted if:

- the resulting or acquiring entity, if other than us, is a United States corporation, limited liability company or limited partnership and assumes all of our responsibilities and liabilities under the indenture, including the payment of all amounts due on the notes and performance of the covenants in the indenture; and

- immediately after the transaction, and after giving effect to the transaction, no event of default shall exist under the indenture.

If we consolidate or merge with or into any other entity or sell or lease all or substantially all of our assets, according to the terms and conditions of the indenture, the resulting or acquiring entity will be substituted for us in the indenture with the same effect as if it had been an original party to the indenture. As a result, the successor entity may exercise our rights and powers under the indenture in our name, and we (as an entity) will be released from all our liabilities and obligations under the indenture and under the L Bonds. Nevertheless, no such transaction will by itself eliminate or modify the collateral that we have provided as security for our obligations under the indenture.

<div align="center">104</div>

Table of Contents

**Events of Default and Remedies**

The indenture provides that each of the following constitutes an event of default:

- the failure to pay interest or principal on any L Bond for a period of 30 days after it becomes due and payable;

- a failure to observe or perform any material covenant, condition or agreement in the indenture, but only after notice of failure from the indenture trustee and such failure is not cured within 60 days;

- our debt coverage ratio exceeds 90% for a period of 30 consecutive calendar days, but only after notice of such breach from the indenture trustee and such breach is not cured within 60 days;

- certain events of bankruptcy, insolvency or reorganization with respect to us; or

- the cessation of our business.

In addition, the indenture provides that for so long as any Series I Secured notes or previously issued L Bonds remain outstanding, an event of default under the borrowing agreements relating to the Series I Secured notes or the previously issued L Bonds (as the same may from time to time be amended) will constitute an event of default under the indenture. In this regard, a default under the Series I Secured note or previously issued L Bonds borrowing agreements includes a default under our revolving credit facility. As explained in other parts of this prospectus, our revolving credit facility is currently provided by Autobahn Funding Company, LLC, as lender, and DZ Bank AG Deutsche Zentral-Genossenschaftsbank, as agent, pursuant to a Credit and Security Agreement dated July 15, 2008, which was amended and restated effective as of January 29, 2013. DLP Funding II is the borrower under the line of credit, and GWG Holdings is a party to the facility as performance guarantor (primarily for the obligations of GWG Life, as the servicer of policy assets).

The maximum line of credit is $100 million subject to a borrowing base, which permits us to borrow up to 70% of the amount of eligible policies purchased and held in our portfolio. As of September 30, 2014, approximately $79 million was outstanding under the line of credit. Proceeds of the line of credit may be used to purchase policies and loans. The credit facility matures in December 31, 2016. Advances under the line of credit bear interest based either at the commercial paper rates available to the lender at the time of funding or at the lender's cost of borrowing plus an applicable margin.

The line of credit is secured by a pledge of substantially all of each borrower's assets and requires GWG Holdings to provide certain indemnities to the lender. In addition, the borrowers are required to maintain a reserve account for the benefit of the lenders. If at any time the ratio of outstanding borrowings under the line of credit, together with accrued and unpaid interest and fees, exceeds 50% of the borrower's net eligible receivables balance (as defined in the loan agreement), collections from the maturity of life insurance policies are required to be deposited in the reserve account.

The line of credit is subject to customary affirmative and negative covenants. In addition, we must maintain certain financial covenants, including a positive consolidated net income measured annually and, at all times, a tangible net worth in excess of $15,000,000 (calculated on a prescribed non-GAAP basis). In addition, the line of credit requires us to maintain a reserve equal to 12 months of certain projected expenditures, including anticipated premium payments required to service our life insurance portfolio.

Finally, the line of credit is subject to certain customary events of default (e.g., payment defaults, covenant defaults, cross-defaults, material adverse change, changes in control and changes in management) and certain events of default specifically relating to our business, including but not limited to (i) portfolio defaults in excess of 10% on an annualized basis, (ii) failure to obtain an unqualified opinion on our annual consolidated financial statements, (iii) failure to maintain certain hedge transactions or replace hedge counterparties under any certain hedging transactions required under the credit agreement, (iv) any governmental authority directs that the purchase and/or servicing of loans be terminated or any law, rule or regulation makes it unlawful to originate, purchase and/or service loans, (v) the performance guaranty of GWG Holdings shall cease to be in full force and effect (vi) a deficiency in the borrowing base, as calculated

Table of Contents

under the credit agreement, or (vii) any default in the payment when due of other indebtedness in excess of $100,000.

The indenture requires that we give immediate notice to the indenture trustee upon the occurrence of an event of default, unless it has been cured or waived. The indenture trustee may then provide notice to the L Bond holders or withhold the notice if the indenture trustee determines in good faith that withholding the notice is in your best interest, unless the default is a failure to pay principal or interest on any L Bond.

If an event of default occurs, the indenture trustee or the holders of at least 25% in principal amount of the outstanding L Bonds, may by written notice to us declare the unpaid principal and all accrued but unpaid interest on the L Bonds to be immediately due and payable. Notwithstanding the foregoing, the indenture limits the ability of the L Bond holders to enforce certain rights under the indenture in certain circumstances. These limitations are required subordination provisions under our revolving credit facility and are summarized above under "—Subordination; Other Indebtedness." The Pledge and Security Agreement permits the trustee to exercise on behalf of the holders of L Bonds all rights and remedies as are available to a secured creditor under applicable law, subject to any limitations in the

indenture, note agreement or the intercreditor agreement. In this regard, the trustee is not authorized under the Pledge and Security Agreement to distribute in kind any collateral in its possession to the holders of L Bonds.

**Amendment, Supplement and Waiver**

Except as provided in this prospectus or the indenture, the terms of the indenture or the L Bonds then outstanding may be amended, supplemented or waived with the consent of the holders of at least a majority in principal amount of the L Bonds then outstanding (which consent will be presumed if a holder does not object within 30 days of a request for consent), and any existing default or compliance with any provision of the indenture or the L Bonds may be waived with the affirmative consent of the holders of a majority in principal amount of the then outstanding L Bonds.

Notwithstanding the foregoing, an amendment or waiver will not be effective with respect to the L Bonds held by a holder who him, her or itself has not consented if such amendment or waiver:

- reduces the principal of, or changes the fixed maturity of, any L Bond;

- reduces the rate of or changes the time for payment of interest, including default interest, on any L Bond;

- waives a default or event of default in the payment of principal or interest on the L Bonds, except for a rescission or withdrawal of acceleration of the L Bonds made by the holders of at least a majority in aggregate principal amount of the then-outstanding L Bonds and a waiver of the payment default that resulted from such acceleration;

- makes any change in the provisions of the indenture relating to waivers of past defaults or the rights of holders of L Bonds to receive payments of principal of or interest on the L Bonds; or

- makes any change to the subordination provisions of the indenture that has a material adverse effect on holders of L Bonds.

Notwithstanding the foregoing, the following kinds of amendments or supplements to the indenture may be effected by us and the trustee without any consent of any holder of the L Bonds:

- to cure any ambiguity, defect or inconsistency;

- to provide for assumption of our obligations to holders of the L Bonds in the case of a merger, consolidation or sale of all or substantially all of our assets;

- to provide for additional uncertificated or certificated L Bonds;

- to make any change that does not materially and adversely affect the legal rights under the indenture of any holder of L Bonds, including but not limited to an increase in the aggregate dollar amount of L Bonds which may be outstanding under the indenture and limited in amount thereunder;

106

Table of Contents

- to modify or eliminate our policy regarding redemptions elected by a holder of L Bonds prior to maturity, including our obligation to redeem L Bonds upon the death, bankruptcy or total permanent disability of any holder of the L Bonds, but only so long as such modifications do not materially and adversely affect any then-existing obligations under pending repurchase commitments for L Bonds;

- to comply with requirements of the SEC in order to effect or maintain the qualification of the indenture under the Trust Indenture Act of 1939, or to comply with other applicable federal or state laws or regulations;

- to comply with the rules or policies of a depositary of the L Bonds; or

- in connection with an amendment, extension, replacement, renewal or substitution of any senior debt, to amend the subordination provisions of the indenture to conform to the reasonable requirements of the holder or holders of such senior debt.

**Rights of L Bond Holders**

As an L Bond holder, you have limited rights to vote on our actions as they are limited by the indenture. In general, you will have the right to vote on whether or not to approve some amendments to the indenture. For a description of these rights, see "—Amendment, Supplement and Waiver" above. You will also have the right to direct some actions that the trustee takes if there is an event of default with respect to the L Bonds. For a description of these rights, see above under the caption "—Events of Default." For a complete description of your rights as an L Bond holder, we encourage you to read a copy of the indenture, which is filed as an exhibit to the registration statement of which this prospectus is a part. We will also provide you with a copy of the indenture upon your request.

The trustee and the L Bond holders will have the right to direct the time, method and place of conducting any proceeding for some of the remedies available, except as otherwise provided in the indenture. The trustee may require reasonable indemnity, satisfactory to the trustee, from L Bond holders before acting at their direction. You will not have any right to pursue any remedy with respect to the indenture or the L Bonds unless you satisfy the conditions contained in the indenture.

**The Indenture Trustee**

*General*

Bank of Utah has agreed to be the trustee under the indenture. The indenture contains certain limitations on the rights of the trustee, should it become one of our creditors, to obtain payment of claims in certain cases, or to realize on certain property received in respect of any claim as security or otherwise. The trustee will be permitted to engage in other transactions with us.

Subject to certain exceptions, the holders of a majority in principal amount of the then-outstanding L Bonds will have the right to direct the time, method and place of conducting any proceeding for exercising any remedy available to the trustee. The indenture provides that if an event of default specified in the indenture shall occur and not be cured, the trustee will be required, in the exercise of its power, to use the degree of care of a reasonable person in the conduct of his own affairs. Subject to such provisions, the trustee will be under no obligation to exercise any of its rights or powers under the indenture at the request of any holder of L Bonds, unless the holder shall have offered to the trustee security and indemnity satisfactory to it against any loss, liability or expense.

*Resignation or Removal of the Trustee*

The trustee may resign at any time, or may be removed by the holders of a majority of the aggregate principal amount of the outstanding L Bonds. In addition, we may remove the trustee for certain failures in its duties, including the insolvency of the trustee or the trustee's ineligibility to serve as trustee under the Trust Indenture Act of 1939. However, no resignation or removal of the trustee may become effective until a successor trustee has accepted the appointment as provided in the indenture.

Table of Contents

*Reports to Trustee*

We will provide the trustee with (i) a calculation date report by the 15th day of each month containing a calculation of the debt coverage ratio that includes a summary of all cash, life insurance policy investments serving as collateral, as well as our total outstanding indebtedness including outstanding principal balances, interest credited and paid, transfers made, any redemption or repayment and interest rate paid; (ii) copies of our audited annual financials, no earlier than when the same become a matter of public record; and (iii) any additional information reasonably requested by the trustee.

**Certain Charges**

We and our servicing agents, if any, may assess service charges for changing the registration of any L Bond to reflect a change in name of the holder, multiple changes in interest payment dates or transfers (whether by operation of law or otherwise) of an L Bond by the holder to another person. The indenture permits us to set off, against amounts otherwise payable to you under the L Bonds, the amount of these charges.

**Variations in Terms and Conditions**

We may from time to time vary the terms and conditions of the L Bonds offered, including but not limited to minimum initial principal investment amount requirements, maximum aggregate principal amount limits, interest rates, minimum denominations, service and other fees and charges, and redemption provisions. Terms and conditions may be varied by state, locality, principal amount, type of investor (for example, new or current investor) or as otherwise permitted under the indenture governing the securities offered by this prospectus. No change in terms, however, will apply to any L Bonds already issued and outstanding at the time of such change.

**Satisfaction and Discharge of Indenture**

The indenture shall cease to be of further effect upon the payment in full of all of the outstanding L Bonds and the delivery of an officer's certificate to the trustee stating that we do not intend to issue additional L Bonds under the indenture or, with certain limitations, upon deposit with the trustee of funds sufficient for the payment in full of all of the outstanding L Bonds.

**Reports**

We will publish annual reports containing financial statements and quarterly reports containing financial information for the first three quarters of each fiscal year. We will send copies of these reports, at no charge, to any holder of L Bonds who sends us a written request.

Table of Contents

**PLAN OF DISTRIBUTION**

We are offering up to $1,000,000,000 in principal amount of L Bonds on a continuous basis. The L Bonds will be sold at their face value and in amounts of $25,000 or more in principal. There is no minimum amount of L Bonds that must be sold before we access and use the proceeds. The proceeds of new sales of L Bonds will be paid directly to us promptly following each sale and will not be placed in an escrow account. Even if we sell less than the entire $1,000,000,000 in L Bonds being offered, the L Bonds that we sell will be issued, and the proceeds of those L Bond sales will be invested, as described in this prospectus.

The L Bonds will be offered and sold on a best efforts basis by Emerson Equity LLC (our "dealer manager") and any participating broker-dealers it engages for this purpose (together the "selling group"). Emerson Equity LLC will be the placement agent for our L Bonds. The L Bonds will be offered to the public on the terms set forth in this prospectus and any prospectus supplements we may file from time to time. Both we and the selling group plan to market the L Bonds directly to the public primarily through presentations, the Internet, and personal contacts made by us and through the selling group. We may also sell L Bonds to registered investment advisors. Neither our dealer manager nor any other broker-dealer participating in our selling group will have any obligation to take or purchase any L Bonds. Our dealer manager and each broker-dealer member of our selling group is expected to assist in the offering by: (1) conducting informational meetings for subscribers and other qualified potential purchasers; (2) keeping records of all subscriptions; and (3) training and educating employees regarding the mechanics and regulatory requirements of the offering process.

Members of the selling group will receive sales commissions of up to 6.00% of the gross offering proceeds depending upon the maturity of the L Bond sold, of which up to 1.00% may be retained by the selling broker-dealer firm. In addition, members of our selling group may receive up to 3.00% of the gross offering proceeds as additional compensation consisting of (i) an accountable expense allowance, (ii) a dealer-manager fee (payable only to Emerson Equity LLC) for managing and coordinating the offering, and (iii) a wholesaling fee (payable only to wholesaling dealers). We have also agreed to reimburse Emerson Equity for certain pre-offering expenses that we expect will aggregate to no more than $30,000. In the event that the offering is terminated or abandoned such that the pre-offering monthly retainer paid to the dealer manager exceeds the amount of permitted accountable expenses, the dealer manager will reimburse us for such excess amount. We will not pay referral or similar fees to any accountants, attorneys or other persons in connection with the distribution of the L Bonds. Nevertheless, the aggregate selling commissions and additional compensation we pay to our placement agent and other FINRA members in the course of this offering will not exceed 8.00% of the aggregate gross offering proceeds we receive from the sale of L Bonds.

Our dealer manager will enter into participating dealer agreements with certain other broker-dealers that are members of FINRA, referred to as selling group members, to authorize such broker-dealers to sell our L Bonds. Upon the sale of L Bonds by such broker-dealers, the broker-dealer effecting the sale will receive selling commissions and additional compensation in connection therewith.

As part of the accountable expense allowance, the dealer manager and members of the selling group are expected to be reimbursed for accountable out-of-pocket expenses incurred by them during the course of the offering. Expenses eligible for reimbursement may include travel, lodging, meals and other reasonable out-of-pocket expenses incurred by participating broker-dealers and their personnel, and reimbursement of actual costs of third-party professionals retained to by them. In no event will the total selling commissions, additional compensation and accountable due diligence expenses (including reimbursements), together with non-transaction-based and non-cash selling compensation, if any, exceed 8.00% of the aggregate gross offering proceeds we receive from the sale of L Bonds.

Our L Bonds will also be distributed through registered investment advisors who are generally compensated on a fee-for-service basis by the investor. In the event of the sale of L Bonds in our primary offering through an investment advisor compensated on a fee-for-service basis by the investor, our selling group member will waive its right to a commission.

<center>109</center>

Table of Contents

In addition to the sales commissions, fees, allowances, reimbursements and expenses described above, we expect to pay approximately $1,500,500 in offering and related costs and expenses in connection with this offering. These kinds of expenses include all expenses to be paid by us in connection with the offering (other than sales commissions, additional compensation, and expense allowances and reimbursement to our selling group members), including but not limited to legal, accounting, printing and mailing expenses, registration, qualification and associated securities filing fees and other costs and expenses.

The table below sets forth the maximum amount of sales commissions and additional compensation (consisting of accountable expense allowances, a dealer-manager fee (payable only to Emerson Equity LLC), and a wholesaling fee (payable only to wholesaling dealers), and more fully described in fn. 2 to the table below) we may pay in connection with this offering.

| L Bond Term | Sales Commission (1) | Additional Compensation (2) | Total |
|---|---|---|---|
| 6 months | 0.75% | 3.00% | 3.75% |
| 1 year | 1.50% | 3.00% | 4.50% |
| 2 years | 4.00% | 3.00% | 7.00% |
| 3 years | 5.00% | 3.00% | 8.00% |
| 5 years | 5.90% | 2.10% | 8.00% |
| 7 years | 6.00% | 2.00% | 8.00% |

(1)     Up to 1.00% of the sales commission may be retained by the selling broker-dealer firm with which any registered representative is associated.

(2)     As described above, additional compensation includes: (i) a dealer-manager fee payable to Emerson Equity in an amount equal to 0.50% of the principal amount of all L Bonds sold; and (ii) an accountable expense allowance, wholesaling fee, any non-transaction-based selling compensation and non-cash

App. 0084

selling compensation that, when aggregated, will not exceed the lesser of 2.50% of the aggregate gross offering proceeds of all L Bonds sold or such lower amount that, when added to sales commissions and the dealer-manager fee, will not exceed 8.00% of the aggregate gross offering proceeds of all L Bonds sold. If all L Bonds sold have seven-year maturities resulting in sales commissions of 6.00%, then the maximum amounts of aggregates accountable expenses, wholesaling fees and non-transaction-based and non-cash selling compensation will not exceed 1.5%.

The line items reflected in the table below are our current estimates of average sales commissions and additional compensation (including accountable expenses) that we will pay. Specifically, we estimate that the average sales commission will be 5.00%, or $50,000,000 based on $1,000,000,000 in principal amount of L Bonds sold, and the average additional compensation will be 3.00%, or $30,000,000 based on $1,000,000,000 in principal amount of L Bonds sold. The components of "additional compensation" are detailed in fn. 1 to the table below. Actual costs may differ from the percentages and amounts shown in the table below, subject, however, to the limitations noted above.

| L Bonds Sold | Sales Commission | Additional Compensation (1) | Total |
|---|---|---|---|
| $300,000,000 | $ 15,000,000 | $ 9,000,000 | 8.00% |
| 500,000,000 | 25,000,000 | 15,000,000 | 8.00% |
| 1,000,000,000 | 50,000,000 | 30,000,000 | 8.00% |

(1)     Additional compensation consists of all selling compensation (other than sales commissions) paid in the form of an accountable expense allowance, a dealer-manager fee, wholesale commissions, plus any non-transaction-based and non-cash selling compensation. Additional compensation consists of all selling compensation paid to our placement agent (and other FINRA members) other than selling commissions. Such additional compensation will be paid in the form of a dealer-manager fee, wholesaling fee, if applicable, an accountable expense allowance, plus any non-transaction-based and non-cash selling compensation. For purposes of the table above, we have assumed our payment of the maximum amount of such additional compensation.

110

Table of Contents

Our dealer manager holds the FINRA licenses for wholesalers employed by us, who attend local, regional and national conferences of the participating broker-dealers and who contact participating broker-dealers and their registered representatives to make presentations concerning us and this offering and to encourage them to sell our L Bonds. The wholesalers will receive a portion of their base salaries as compensation for their selling efforts. We host training and education meetings for broker-dealers and their representatives. The costs of the training and education meetings will be borne by us.

In accordance with FINRA rules, in no event will our total compensation to FINRA members, including but not limited to sales commissions, the dealer-manager fee and accountable and non-accountable expense and other reimbursements to our dealer manager and selling group broker-dealers (including non-transaction-based and non-cash selling compensation), exceed 8.00% of our gross offering proceeds, in the aggregate.

We will indemnify the participating broker-dealers and our dealer manager against some civil liabilities, including certain liabilities under the Securities Act of 1933 and liabilities arising from breaches of our representations and warranties contained in the Managing Broker-Dealer Agreement. If we are unable to provide this indemnification, we may contribute to payments the indemnified parties may be required to make in respect of those liabilities.

The foregoing is a summary of the material terms relating to the plan of distribution of the L Bonds contained in the Managing Broker-Dealer Agreement. Any amendment to the Managing Broker-Dealer Agreement will be filed as an exhibit to an amendment to the registration statement of which this prospectus is a part.

**Settlement Procedures**

If you purchase L Bonds through a broker-dealer who is a DTC participant and offers "DTC settlement," then you can place an order for the purchase of L Bonds through your broker-dealer. A broker-dealer using this service will have an account with DTC in which your funds will be placed to facilitate the anticipated monthly closing cycle. Orders will be executed by your broker-dealer electronically and you must coordinate with your broker-dealer's registered representative to pay the full purchase price of the L Bonds by the final settlement date. Orders may be placed at any time, and the final settlement date will be the date on which your subscription agreement is accepted. You will be credited with ownership of an L Bond on the first business day following the month in which the subscription is made. However, interest will begin to accrue from the final settlement date. If you purchase your L Bonds in this manner, your purchase price will not be held in escrow.

You also have the option to elect to settle your purchase directly with us, the Company. If you elect to use direct settlement with us, you should complete and sign a Subscription Agreement similar to the one filed as an exhibit to the registration statement of which this prospectus is a part. A form of Subscription Agreement is available from your broker-dealer's registered representative. Once completed and signed, your Subscription Agreement should be provided to your broker-dealer who will deliver it to us to be held, together with your related subscription funds, until our acceptance of your subscription. In connection with a direct settlement subscription, you should pay the full purchase price of the L Bonds to us as set forth in the Subscription Agreement. Subscribers may not withdraw funds from the subscription account. Subscriptions will be effective upon our acceptance of your Subscription Agreement and related funds, and we reserve the right to reject any subscription in whole or in part.

**Covered Security**

Our L Bonds are a "covered security." The term "covered security" applies to securities exempt from state registration because of their oversight by federal authorities and national-level regulatory bodies pursuant to Section 18 of the Securities Act of 1933. Generally, securities listed on national exchanges are the most common type of covered security exempt from state registration. A non-traded security also can be a covered security if it has a seniority greater than or equal to other securities from the same issuer that are listed on a national exchange. Our L Bonds are a covered security because they are senior to our common stock, which was listed on The Nasdaq Capital Market on September 25, 2014, and therefore our offering of L Bonds will be exempt from state registration.

111

Table of Contents

   Although the status of our L Bonds as a "covered security" will facilitate their purchase and sale to a broader range of investors than would otherwise be available to us, and although the offer and sale of a "covered security" generally involves fewer issuance costs to the issuer of such securities, our L Bonds are not a suitable purchase for all investors. In this regard, please carefully review the "Risk Factors" contained in this prospectus, as well as the disclosures on page 3 under the heading "Covered Security."

112

Table of Contents

## MATERIAL FEDERAL INCOME TAX CONSIDERATIONS

   The following is a general discussion of the material United States ("U.S.") federal income tax considerations relating to the initial purchase, ownership and disposition of the L Bonds by U.S. and non-U.S. holders. This discussion is a summary only and is not a complete analysis of all the potential tax considerations relating to the purchase, ownership and disposition of the L Bonds. We have based this summary on current provisions of the Code of 1986, as amended (the "Code"), applicable U.S. Treasury Regulations promulgated thereunder, judicial opinions, and published rulings of the Internal Revenue Service (the "IRS"), all as in effect on the date of this prospectus. However, these laws and other guidance are subject to differing interpretations or change, possibly with retroactive effect. In addition, we have not sought, and will not seek, a ruling from the IRS or an opinion of counsel with respect to any tax consequences of purchasing, owning or disposing of L Bonds. Thus, the IRS could take a different position regarding one or more of the tax consequences or matters described in this prospectus; and there can be no assurance that any position taken by the IRS would not be sustained.

   This discussion is limited to purchasers of L Bonds who acquire the L Bonds from us in this offering and hold the L Bonds as capital assets for federal income tax purposes. This discussion does not address all possible tax consequences that may be applicable to you in light of your specific circumstances. For instance, this discussion does not address the alternative minimum tax provisions of the Code, or special rules applicable to some categories of investors such as financial institutions, insurance companies, tax-exempt organizations, dealers in securities, real estate investment trusts, regulated investment companies, or persons who hold L Bonds as part of a hedge, conversion or constructive sale transaction, straddle or other risk reduction transaction that may be subject to special rules. This discussion also does not address the tax consequences arising under the laws of any foreign, state or local jurisdiction; or any U.S. estate or gift tax laws.

   If you are considering the purchase of an L Bond, you should consult your own tax advisors as to the particular tax consequences to you of acquiring, holding or otherwise disposing of the L Bonds, including the effect and applicability of state, local or foreign tax laws, or any U.S. estate and gift tax laws.

   As used in this discussion, the term "U.S. holder" means a holder of an L Bond that is:

   (i)   for United States federal income tax purposes, a citizen or resident of the United States;

   (ii)  a corporation, partnership or other entity created or organized in or under the laws of the United States or of any political subdivision thereof or other entity characterized as a corporation or partnership for federal income tax purposes;

   (iii) an estate, the income of which is subject to United States federal income taxation regardless of its source; or

   (iv)  a trust, the administration of which is subject to the primary supervision of a court within the United States and which has one or more United States persons with authority to control all substantial decisions, or if the trust was in existence on August 20, 1996, and has elected to continue to be treated as a United States trust.

   For the purposes of this discussion, a "non-U.S. holder" means any holder of L Bonds other than a U.S. holder. Any L Bond purchaser who is not a U.S. citizen will be required to furnish documentation, on IRS Form W-8BEN, that clearly states whether it is subject to U.S. withholding taxes, in accordance with applicable requirements of the United States taxing authority.

**Characterization of the L Bonds**

   The federal income tax consequences of owning L Bonds depend on characterization of the L Bonds as debt for federal income tax purposes, rather than as equity interests or a partnership among the holders of the L Bonds. We believe that the L Bonds have been structured in a manner that will allow the L Bonds to be characterized as debt for federal income tax purposes. However, this is only our belief; and no ruling from the

113

Table of Contents

IRS or an opinion of counsel has been sought in this regard. Thus, the IRS could successfully challenge this characterization.

If the L Bonds were treated as equity interests, there could be adverse effects on some holders. For example, payments on the L Bonds could (1) if paid to non-U.S. holders, be subject to federal income tax withholding; (2) constitute unrelated business taxable income to some tax-exempt entities, including pension funds and some retirement accounts (if the relationship were characterized as a partnership for tax purposes); and (3) cause the timing and amount of income that accrues to holders of L Bonds to be different from that described below.

Because of these potential adverse effects, you are urged to consult your own tax advisors as to the tax consequences that may apply to your particular situation in the event the L Bonds are re-characterized as equity interests; and as to the likelihood that the L Bonds could be so re-characterized. The remainder of this discussion assumes that the L Bonds are characterized as debt.

**Taxation of U.S. Holders**

*Stated Interest*

Under general federal income tax principles, you must include stated interest in income in accordance with the method of accounting you use for federal income tax purposes. Accordingly, if you are using the accrual method of tax accounting, you must include stated interest in income as it accrues. If you are using the cash method of tax accounting, you must include stated interest in income as it is actually or constructively received. Payments of interest to taxable holders of L Bonds will constitute portfolio income, and not passive activity income, for the purposes of the passive loss limitations of the Code. Accordingly, income arising from payments on the L Bonds will not be subject to reduction by losses from passive activities of a holder.

Income attributable to interest payments on the L Bonds may be offset by investment expense deductions, subject to the limitation that individual investors may only deduct miscellaneous itemized deductions, including investment expenses other than interest, to the extent these deductions exceed 2% of the investor's adjusted gross income.

If a partnership (or other entity or arrangement treated as a partnership for U.S. federal income tax purposes) holds L Bonds, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership. If you are a partner in a partnership purchasing L Bonds, we urge you to consult your tax advisor.

*Disposition of L Bonds*

In general, a U.S. holder will recognize gain or loss upon the sale, exchange or other taxable disposition of an L Bond measured by the difference between (1) the sum of the cash and the fair market value of all other property received on such disposition, excluding any portion of the payment that is attributable to accrued interest on the L Bonds; and (2) your adjusted tax basis in the L Bond. A U.S. holder's adjusted tax basis in an L Bond generally will be equal to the price the U.S. holder paid for the L Bond. Any of this gain or loss generally will be long-term capital gain or loss if, at the time of any such taxable disposition, the L Bond was a capital asset in the hands of the holder and was held for more than one year. Net long-term capital gain recognized by individual U.S. holders is eligible for a reduced rate of taxation. The deductibility of capital losses is subject to annual limitations.

The terms of the L Bonds may be modified upon the consent of a specified percentage of holders and, in some cases, without consent of the holders. In addition, the L Bonds may be assumed upon the occurrence of specific transactions. The modification or assumption of an L Bond could, in some instances, give rise to a deemed exchange of an L Bond for a new debt instrument for federal income tax purposes. If an exchange is deemed to occur by reason of a modification or assumption, you could realize gain or loss without receiving any cash.

114

Table of Contents

*Additional Tax on Net Investment Income*

If you are a U.S. holder other than a corporation, you generally will be subject to a 3.8% additional tax on the lesser of (1) your "net investment income" for the taxable year, and (2) the excess of your modified adjusted gross income for the taxable year over a certain threshold. Your net investment income generally will include any income or gain recognized by you with respect to our L Bonds, unless such income or gain is derived in the ordinary course of the conduct of your trade or business (other than a trade or business that consists of certain passive or trading activities).

**Considerations for Tax-Exempt Holders of L Bonds**

Tax-exempt entities, including charitable corporations, pension plans, profit sharing or stock bonus plans, individual retirement accounts and some other employee benefit plans are subject to federal income tax on unrelated business taxable income. For example, net income derived from the conduct of a trade or business regularly carried on by a tax-exempt entity or by a partnership in which it is a partner is treated as unrelated business taxable income.

A $1,000 special deduction is allowed in determining the amount of unrelated business taxable income subject to tax. Tax-exempt entities taxed on their unrelated business taxable income are also subject to the alternative minimum tax for items of tax preference which enter into the computation of unrelated business taxable income.

In general, interest income does not constitute unrelated business taxable income. However, under the debt-financed property rules, if tax-exempt holders of L Bonds finance the acquisition or holding of L Bonds with debt, interest on the L Bonds will be taxable as unrelated business taxable income. The L Bonds will be treated as debt-financed property if the debt was incurred to acquire the L Bonds or was incurred after the acquisition of the L Bonds, so long as the debt would not have been incurred but for the acquisition and, at the time of the acquisition, the incurrence of the debt has already occurred or was foreseeable.

**Non-U.S. Holders**

The following discussion is a summary of the principal U.S. federal income consequences resulting from the ownership of the L Bonds by non-U.S. holders. However, application of the U.S. federal income tax rules associated with non-U.S. holders is complex and factually sensitive. Thus, if you could be considered to be a non-U.S. holder, you are urged to consult your own tax advisors with respect to the application of the federal income tax rules for your particular situation.

*Payments of Interest to Non-U.S. Holders*

Subject to the discussion below under "Backup Withholding and Information Reporting," payments of interest received by a non-U.S. holder generally will not be subject to U.S. federal withholding tax, provided (1) that (a) the non-U.S. holder does not own, actually or constructively, 10% or more of the total combined voting power of all classes of our stock entitled to vote; (b) the non-U.S. holder is not a controlled foreign corporation, actually or constructively, through stock ownership; and (c) the beneficial owner of the L Bond complies with the certification requirements, including delivery of a statement, signed by the holder under penalties of perjury, certifying that the holder is a foreign person and provides its name and address; or (2) that the non-U.S. holder is entitled to the benefits of an income tax treaty under which the interest is exempt from U.S. withholding tax and the non-U.S. holder complies with the reporting requirements. If an L Bond is held through a securities clearing organization or other specified financial institutions (an "Intermediary"), the Intermediary may provide the relevant signed statement and, unless the Intermediary is a "qualified" intermediary as defined under the Code, the signed statement provided by the Intermediary must be accompanied by a copy of a valid Form W-8BEN provided by the non-U.S. beneficial holder of the L Bond.

Payments of interest not exempt from United States federal withholding tax as described above will be subject to a withholding tax at the rate of 30%, subject to reduction under an applicable income tax treaty.

<div align="center">115</div>

Table of Contents

Payments of interest on an L Bond to a non-U.S. holder generally will not be subject to U.S. federal income tax, as opposed to withholding tax, unless the income is effectively connected with the conduct by the non-U.S. holder of a trade or business in the United States. To claim the benefit of a lower treaty withholding rate, a non-U.S. holder must provide a properly executed IRS Form W-8BEN to us or our paying agent before the payment of stated interest; and may be required to obtain a U.S. taxpayer identification number and provide documentary evidence issued by foreign governmental authorities to prove residence in the foreign country. You should consult your own tax advisor to determine the effects of the application of the U.S. federal withholding tax to your particular situation.

*Disposition of the L Bonds by Non-U.S. Holders*

Subject to the discussion below under "Backup Withholding and Information Reporting," a non-U.S. holder generally will not be subject to United States federal income tax, and generally no tax will be withheld with respect to gains realized on the disposition of an L Bond, unless (a) the gain is effectively connected with a United States trade or business conducted by the non-U.S. holder or (b) the non-U.S. holder is an individual who is present in the United States for 183 or more days during the taxable year of the disposition and other requirements are satisfied.

*Non-U.S. Holders Subject to U.S. Income Taxation*

If interest and other payments received by a non-U.S. holder with respect to the L Bonds, including proceeds from the disposition of the L Bonds, are effectively connected with the conduct by the non-U.S. holder of a trade or business within the United States, or the non-U.S. holder is otherwise subject to United States federal income taxation on a net basis with respect to the holder's ownership of the L Bonds, or are individuals that have by operation of law become residents in the United States for federal income tax purposes, the non-U.S. holder generally will be subject to the rules described above applicable to U.S. holders of L Bonds, subject to any modification provided under an applicable income tax treaty. If any of these non-U.S. holders is a corporation, it may also be subject to a U.S. "branch profits tax" at a 30% rate.

**Backup Withholding and Information Reporting**

Non-corporate U.S. holders may be subject to backup withholding at a rate of 28% on payments of principal, premium, and interest on, and the proceeds of the disposition of, the L Bonds. In general, backup withholding will be imposed only if the U.S. holder (1) fails to furnish its taxpayer identification number ("TIN"), which for an individual would be his or her Social Security number; (2) furnishes an incorrect TIN; (3) is notified by the IRS that it has failed to report payments of interest or dividends; or (4) under some circumstances, fails to certify under penalty of perjury that it has furnished a correct TIN and has been notified by the IRS that it is subject to backup withholding tax for failure to report interest or dividend payments. In addition, the payments of principal and interest to U.S. holders generally will be subject to information reporting. You should consult your tax advisors regarding your qualification for exemption from backup withholding and the procedure for obtaining an exemption, if applicable.

Backup withholding generally will not apply to payments made to a non-U.S. holder of an L Bond who provides the certification that it is a non-U.S. holder, and the payor does not have actual knowledge that a certificate is false, or otherwise establishes an exemption from backup withholding. Payments by United States office of a broker of the proceeds of a disposition of the L Bonds generally will be subject to backup withholding at a rate of 28% unless the non-U.S. holder certifies it is a non-U.S. holder under penalties of perjury or otherwise establishes an exemption. In addition, if a foreign office of a foreign custodian, foreign nominee or other foreign agent of the beneficial owner, or if a foreign office of a foreign "broker" pays the proceeds of the sale of an L Bond to the seller, backup withholding and information reporting will not apply; provided that the nominee, custodian, agent or broker is not a "United States related person," or a person

<div align="right">App. 0088</div>

which derives more than 50% of its gross income for some periods from the conduct of a trade or business in the United States or is a controlled foreign corporation. The payment by a foreign office of a broker that is a United States person or a United States related person of the proceeds of the sale of L Bonds will not be subject to backup withholding, but will be subject to information reporting unless the broker has documentary

116

Table of Contents

evidence in its records that the beneficial owner is not a United States person for purposes of the backup withholding and information reporting requirements and other conditions are met, or the beneficial owner otherwise establishes an exemption.

The amount of any backup withholding imposed on a payment to a holder of an L Bond will be allowed as a credit against the holder's United States federal income tax liability and may entitle the holder to a refund; provided that the required information is furnished to the IRS.

117

Table of Contents

## STATE, LOCAL AND FOREIGN TAXES

We make no representations regarding the tax consequences of the purchase, ownership or disposition of the L Bonds under the tax laws of any state, locality or foreign country. You should consult your own tax advisors regarding these state and foreign tax consequences.

## ERISA CONSIDERATIONS

### General

Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and Section 4975 of the Code impose restrictions on employee benefit plans that are subject to ERISA, or plans or arrangements that are subject to Code Section 4975, and on persons who are parties in interest or disqualified persons with respect to those plans or arrangements. Some employee benefit plans, like governmental plans and church plans (if no election has been made under Section 410(d) of the Code), are not subject to the restrictions of Title I of ERISA or Code Section 4975, and assets of these plans may be invested in the L Bonds without regard to the ERISA considerations described below, subject to the Code and other applicable federal and state laws affecting tax-exempt organizations generally. Any plan fiduciary that proposes to cause a plan to acquire any of the L Bonds should consult with its counsel with respect to the potential consequences under ERISA and the Code of the plan's acquisition and ownership of the L Bonds. Investments by plans are also subject to ERISA's and the Code's general fiduciary requirements, including the requirement of investment prudence and diversification and the requirement that a plan's investments be made in accordance with the documents governing the plan.

### Prohibited Transactions

#### General

Section 406 of ERISA and Section 4975 of the Code prohibits certain "parties in interest" and "disqualified persons" with respect to a plan from engaging in select transactions involving a plan and its assets unless a statutory, regulatory or administrative exemption applies to the transaction. Section 4975 of the Code imposes excise taxes on parties in interest that engage in non-exempt "prohibited transactions." Section 502(i) of ERISA requires the Secretary of the U.S. Department of Labor ("Labor") to assess a civil penalty against a fiduciary who breaches any fiduciary responsibility under, or commits any other violation of, part 4 of Title I of ERISA, or any other person who knowingly participates in a breach or violation.

#### Plan Asset Regulations

Labor has issued regulations concerning the definition of what constitutes the assets of a plan for purposes of ERISA and the prohibited transaction provisions of the Code. The plan asset regulations describe the circumstances where the assets of an entity in which a plan invests will be considered to be "plan assets," so that any person who exercises control over the assets would be subject to ERISA's fiduciary standards. Generally, under the plan asset regulation, when a plan invests in another entity, the plan's assets do not include, solely by reason of the investment, any of the underlying assets of the entity. However, the plan asset regulation provides that, if a plan acquires an "equity interest" in an entity that is neither a "publicly-offered security" nor a security issued by an investment company registered under the Investment Company Act of 1940 the assets of the entity will be treated as assets of the plan investor unless exceptions apply.

Under the plan asset regulations the term "equity interest" is defined as any interest in an entity other than an instrument that is treated as indebtedness under "applicable local law" and that has no "substantial equity features." Although the plan asset regulation is silent with respect to the question of which law constitutes "applicable local law" for this purpose, Labor has stated that these determinations should be made under the state law governing interpretation of the instrument in question. In the preamble to the plan asset regulation, Labor declined to provide a precise definition of what features are equity features or the circumstances under which the features would be considered "substantial," noting that the question of whether

118

Table of Contents

a plan's interest has substantial equity features is an inherently factual one, but that in making that determination it would be appropriate to take into account whether the equity features are such that a plan's investment would be a practical vehicle for the indirect provision of investment management services. We believe that the L Bonds will be classified as indebtedness without substantial equity features for ERISA purposes.

Under the plan asset regulations the term "publicly-offered security" is defined as a security that is (i) freely transferable, (ii) part of a class of securities that is widely held, and (iii) either (A) part of a class of securities registered under section 12(b) or 12(g) of the Securities Exchange Act of 1934 or (B) sold to the plan as part of an offering of securities to the public pursuant to an effective registration statement under the Securities Act of 1933 and the class of securities of which such security is a part is registered under the Securities Exchange Act of 1934 within 120 days after the end of the fiscal year of the issuer during which the offering of such securities to the public occurred. For purposes of the above, a class of securities is considered to be "widely held" if it is owned by 100 or more investors independent of the issuer and of one another. In the case of this offering, while the offer and sale of the L Bonds have been registered under the Securities Act of 1933, the L Bonds themselves have not been registered under the Securities Exchange Act of 1934. For this reason, we believe that the L Bonds will not likely meet the definition for "publicly-offered security" under the plan asset regulations.

In light of the foregoing, if the L Bonds were deemed to be equity interests for this purpose and no statutory, regulatory, or administrative exception applies, we could be considered to hold plan assets by reason of a plan's investment in the L Bonds. These plan assets would include an undivided interest in all of our assets. In this case, we may be considered a fiduciary with respect to the investing plans. We would be subject to the fiduciary responsibility provisions of Title I of ERISA, including the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code, and to Section 4975 of the Code with respect to transactions involving any of our assets. The ERISA fiduciary standards could affect the way we conduct the business, which would have consequences for all investors, not just those that are employee benefit plans.

Depending on the relevant facts and circumstances, prohibited transaction exemptions may apply to the purchase or holding of the L Bonds. See, for example, Prohibited Transaction Class Exemption ("PTE") 96-23, which exempts some transactions effected on behalf of a plan or by an "in-house asset manager;" PTE 95-60, which exempts some transactions between insurance company general accounts and parties in interest; PTE 91-38, which exempts some transactions between bank collective investment funds and parties in interest; PTE 90-1, which exempts some transactions between insurance company pooled separate accounts and parties in interest; or PTE 84-14, which exempts some transactions effected on behalf of a plan by a "qualified professional asset manager." However, there can be no assurance that any of these exemptions will apply with respect to any plan's investment in the L Bonds, or that the exemption, if it did apply, would apply to all prohibited transactions that may occur in connection with the investment.

Any plan fiduciary considering whether to purchase L Bonds on behalf of a plan should consult with its counsel regarding the applicability of the fiduciary responsibility and prohibited transaction provisions of ERISA and the Code. Before purchasing any L Bonds, a fiduciary of a plan should make its own determination as to (1) whether GWG Holdings, as issuer of and borrower under the L Bonds, is a "party in interest" under ERISA or a "disqualified person" under the Code with respect to the plan; (2) the availability of the relief provided in the plan asset regulation and (3) the availability of any other prohibited transaction exemptions. In addition, purchasers that are insurance companies should consult their own ERISA counsel with respect to their fiduciary responsibilities associated with their purchase and ownership of the L Bonds, including any responsibility under the Supreme Court case *John Hancock Mutual Life Insurance Co. v. Harris Trust and Savings Bank*.

119

Table of Contents

## LEGAL MATTERS

Certain legal matters in connection with the L Bonds will be passed upon for us by Maslon Edelman Borman & Brand, LLP, of Minneapolis, Minnesota.

## EXPERTS

The consolidated financial statements of GWG Holdings, Inc. and its subsidiaries as of and for the year ended December 31, 2013, included in this prospectus and in the registration statement of which this prospectus is a part, have been audited by Baker Tilly Virchow Krause, LLP, an independent registered public accounting firm. The consolidated financial statements of GWG Holdings, Inc. and its subsidiaries as of and for the year ended December 31, 2012, included in this prospectus and in the registration statement of which this prospectus is a part, have been audited by Mayer Hoffman McCann P.C., an independent registered public accounting firm. As indicated in their reports with respect thereto, these consolidated financial statements are included in this prospectus in reliance upon the authority of such firms as experts in auditing and accounting, with respect to each such respective report.

## WHERE YOU CAN FIND MORE INFORMATION

We have filed with the SEC a registration statement on Form S-1 under the Securities Act with respect to the L Bonds to be offered and sold pursuant to the prospectus which is a part of that registration statement. This prospectus does not contain all the information contained in the registration statement. For further information with respect to us and the L Bonds to be sold in this offering, we refer you to the registration statement, including the agreements, other documents and schedules filed as exhibits to the registration statement.

We file annual, quarterly and current reports, and other information with the SEC. We intend to make these filings available on our website at www.gwglife.com. Information on our website is not incorporated by reference in this prospectus. We maintain an office at 220 South Sixth Street, Suite 1200, Minneapolis, MN 55402 where all records concerning the L Bonds are to be retained. L Bond holders and their representatives can request information regarding the L Bonds by contacting our office by mail at our address or by telephone at (612) 746-1944 or by fax at (612) 746-0445. Upon request, we will provide copies of our filings with the SEC

free of charge to our investors. Our SEC filings, including the registration statement of which this prospectus is a part, will also be available on the SEC's Internet site at *http://www.sec.gov*. You may read and copy all or any portion of the registration statement or any reports, statements or other information we file at the SEC's public reference room at 100 F Street, N.E., Washington, D.C. 20549. In addition, you may call the SEC at 1-800-SEC-0330 for further information on the operation of the public reference room. You may receive copies of these documents upon payment of a duplicating fee by writing to the SEC.

120

Table of Contents

# GWG HOLDINGS, INC.

## Table of Contents

| | Page |
|---|---|
| Reports of Independent Registered Public Accounting Firms | F-2 |
| Consolidated Balance Sheets as of December 31, 2013 and December 31, 2012 | F-4 |
| Consolidated Statements of Operations for the years ended December 31, 2013 and December 31, 2012 | F-5 |
| Consolidated Statements of Changes in Stockholders' Equity (Deficit) for the years ended December 31, 2013 and December 31, 2012 | F-6 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2013 and December 31, 2012 | F-7 |
| Notes to Consolidated Financial Statements | F-9 |
| Condensed Consolidated Balance Sheets as of September 30, 2014 (unaudited) and December 31, 2013 | F-30 |
| Condensed Consolidated Statements of Operations for the three months ended September 30, 2014 and 2013 (unaudited) | F-31 |
| Condensed Consolidated Statements of Cash Flows for the three months ended September 30, 2014 and 2013 (unaudited) | F-32 |
| Condensed Consolidated Statement of Stockholders' Equity | F-34 |
| Notes to Condensed Consolidated Financial Statements | F-35 |

F-1

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Shareholders, Audit Committee and Board of Directors
GWG Holdings, Inc.
Minneapolis, MN

We have audited the accompanying consolidated balance sheet of GWG Holdings, Inc. as of December 31, 2013, and the related consolidated statements of operations, changes in stockholders' equity, and cash flows for the year then ended. These consolidated financial statements are the responsibility of the company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. The company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of its internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the company's internal control over financial reporting. Accordingly, we express no such opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management as well as evaluating the overall consolidated financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of GWG Holdings, Inc. as of December 31, 2013 and the results of their operations and their cash flows for the year then ended, in conformity with U.S. generally accepted accounting principles.

/s/ Baker Tilly Virchow Krause, LLP
Minneapolis, Minnesota
March 19, 2014, except for Note 18, as to which the date is June 24, 2014

F-2

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

**GWG HOLDINGS, INC. AND SUBSIDIARIES**

We have audited the accompanying consolidated balance sheet of GWG Holdings, Inc. and Subsidiaries (Company) as of December 31, 2012, and the related consolidated statements of operations, changes in stockholders' deficit, and cash flows for the year then ended. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall consolidated financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of GWG Holdings, Inc. and Subsidiaries as of December 31, 2012, and the results of their operations and their cash flows for the year then ended, in conformity with U.S. generally accepted accounting principles.

/s/ Mayer Hoffman McCann P.C.
Minneapolis, MN
March 30, 2013, except for Note 18 as to which the date is June 24, 2014

F-3

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**

| | December 31, 2013 | December 31, 2012 |
|---|---|---|
| **ASSETS** | | |
| Cash and cash equivalents | $ 33,449,793 | $ 27,497,044 |
| Restricted cash | 5,832,970 | 2,093,092 |
| Due from related parties | — | 8,613 |
| Investment in life settlements, at fair value | 234,672,794 | 164,317,183 |
| Deferred financing costs, net | 357,901 | 97,040 |
| Death benefits receivable | — | 2,850,000 |
| Other assets | 1,067,018 | 1,085,063 |
| TOTAL ASSETS | $275,380,476 | $197,948,035 |
| **LIABILITIES & STOCKHOLDERS' EQUITY (DEFICIT)** | | |
| **LIABILITIES** | | |
| Revolving credit facility | $ 79,000,000 | $ 71,000,000 |
| Series I Secured notes payable | 29,275,202 | 37,844,711 |
| Renewable Secured Debentures | 131,646,062 | 55,718,950 |
| Accounts payable | 839,869 | 470,059 |
| Interest payable | 7,209,408 | 3,477,320 |
| Other accrued expenses | 504,083 | 1,291,499 |
| Deferred taxes, net | 7,675,174 | 5,501,407 |
| TOTAL LIABILITIES | 256,149,798 | 175,303,946 |
| **COMMITMENTS AND CONTINGENCIES (NOTES 14 AND 15)** | | |
| CONVERTIBLE, REDEEMABLE PREFERRED STOCK | | |
| (par value $0.001; shares authorized 40,000,000; shares issued and outstanding 3,368,109 and 3,361,076; liquidation preference of $25,261,000 and $25,208,000 on December 31, 2013 and 2012, respectively) | 24,722,693 | 23,905,878 |
| STOCKHOLDERS' EQUITY (DEFICIT) | | |
| Common stock (par value $0.001: shares authorized 210,000,000; shares issued and outstanding 4,562,000 and 4,994,500 on December 31, 2013 and 2012) | 4,562 | 4,995 |
| Additional paid-in capital | 2,942,000 | 6,976,838 |

App. 0092

| Accumulated deficit | | (8,438,579) | (8,245,622) |
|---|---|---|---|
| TOTAL STOCKHOLDERS' EQUITY (DEFICIT) | | (5,492,015) | (1,261,789) |
| | | | |
| TOTAL LIABILITIES & EQUITY (DEFICIT) | | $275,380,476 | $197,948,035 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-4

---

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Year Ended | |
|---|---|---|
| | December 31, 2013 | December 31, 2012 |
| REVENUE | | |
| Gain on life settlements, net | $29,513,642 | $17,436,743 |
| Gain upon termination of agreement with Athena Securities Ltd. | $ 3,252,400 | — |
| Interest and other income | 298,732 | 89,055 |
| TOTAL REVENUE | 33,064,774 | 17,525,798 |
| | | |
| EXPENSES | | |
| Interest expense | 20,762,644 | 10,878,627 |
| Employee compensation and benefits | 5,043,848 | 2,903,373 |
| Legal and professional fees | 1,754,209 | 1,076,694 |
| Other expenses | 3,525,261 | 2,486,813 |
| TOTAL EXPENSES | 31,085,962 | 17,345,507 |
| | | |
| INCOME BEFORE INCOME TAXES | 1,978,812 | 180,291 |
| INCOME TAX EXPENSE | 2,173,767 | 1,193,190 |
| | | |
| NET LOSS | (194,955) | (1,012,899) |
| Accretion of preferred stock to liquidation value | (806,624) | (1,578,405) |
| LOSS ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ (1,001,579) | $ (2,591,304) |
| | | |
| NET LOSS PER COMMON SHARE (BASIC AND DILUTED) | | |
| Net loss | $ (0.04) | $ (0.20) |
| Accretion of preferred stock to liquidation value | $ (0.17) | $ (0.32) |
| Net loss per share attributable to common shareholders | $ (0.21) | $ (0.52) |
| | | |
| WEIGHTED AVERAGE SHARES OUTSTANDING | | |
| Basic and diluted | 4,758,699 | 4,994,500 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-5

---

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY (DEFICIT)**

| | Common Shares | Common Stock (par) | Additional Paid-in Capital | Accumulated Deficit | Total Equity |
|---|---|---|---|---|---|
| Balance, December 31, 2011 | 4,994,500 | $4,995 | $ 8,174,297 | $(7,230,723) | $ 948,569 |

App. 0093

| | | | | |
|---|---|---|---|---|
| Net loss | — | — | — | (1,012,899) | (1,012,899) |
| Issuance of warrants to purchase common stock | — | — | 380,946 | — | 380,946 |
| Accretion of preferred stock to liquidation value | — | — | (1,578,405) | — | (1,578,405) |
| **Balance, December 31, 2012** | **4,994,500** | **4,995** | **6,976,838** | **(8,243,622)** | **(1,261,789)** |
| Net loss | — | — | — | (194,955) | (194,955) |
| Repurchase of common stock | (432,500) | (433) | (3,251,967) | — | (3,252,400) |
| Stock-based compensation | — | — | 23,753 | — | 23,753 |
| Accretion of preferred stock to liquidation value | — | — | (806,624) | — | (806,624) |
| **Balance, December 31, 2013** | **4,562,000** | **$4,562** | **$ 2,942,000** | **$(8,438,577)** | **$(5,492,015)** |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-6

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Year Ended | |
|---|---|---|
| | December 31, 2013 | December 31, 2012 |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net loss | $ (194,955) | $ (1,012,899) |
| Adjustments to reconcile net loss to net cash flows used in operating activities: | | |
| Gain on life settlements | (39,337,542) | (27,856,374) |
| Amortization of deferred financing and issuance costs | 2,470,390 | 1,908,930 |
| Deferred income taxes | 2,173,767 | 1,193,190 |
| Convertible, redeemable preferred stock issued in lieu of cash dividends | 623,899 | 567,478 |
| Convertible, redeemable preferred stock dividends payable | 255 | 338,695 |
| Gain upon termination of agreement with Athena Securities Ltd. | (3,252,400) | — |
| (Increase) decrease in operating assets: | | |
| Due from related parties | 8,613 | (6,348) |
| Death benefits receivable | 2,850,000 | (2,850,000) |
| Other assets | (566,418) | (869,165) |
| Increase (decrease) in operating liabilities: | | |
| Accounts payable | 369,809 | (257,708) |
| Interest payable | 3,418,432 | 1,744,599 |
| Other accrued expenses | 50,642 | (69,292) |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (31,385,508) | (27,168,894) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Investment in life settlements | (34,997,500) | (15,067,495) |
| Proceeds from settlement of life settlements | 4,563,896 | 1,067,210 |
| NET CASH FLOWS USED IN INVESTING ACTIVITIES | (30,433,604) | (14,000,285) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Net proceeds from revolving credit facility | 8,000,000 | 11,000,000 |
| Payments for redemption of Series I Secured notes payable | (8,671,624) | (7,477,197) |
| Proceeds from issuance of Renewable Secured Debentures | 85,260,976 | 58,553,280 |
| Payment of deferred issuance costs for Renewable Secured Debentures | (4,320,542) | (3,024,545) |
| Payments for redemption of Renewable Secured Debentures | (8,143,363) | (112,500) |
| Proceeds from (uses of) restricted cash | (3,739,878) | 2,701,210 |
| Issuance (redemption) of convertible, redeemable preferred stock | (613,708) | 6,414,273 |
| Payments of issuance cost for convertible, redeemable preferred stock | — | (1,266,647) |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 67,771,861 | 66,787,874 |
| NET INCREASE IN CASH AND CASH EQUIVALENTS | 5,952,749 | 25,618,695 |

App. 0094

CASH AND CASH EQUIVALENTS

|  |  |  |
|---|---|---|
| BEGINNING OF PERIOD | 27,497,044 | 1,878,349 |
| END OF PERIOD | $ 33,449,793 | $ 27,497,044 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-7

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS — CONTINUED**

|  | Year Ended | |
|---|---|---|
|  | December 31, 2013 | December 31, 2012 |
| SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION |  |  |
| Interest and preferred dividends paid | $13,627,000 | $6,280,000 |
|  |  |  |
| NON-CASH INVESTING AND FINANCING ACTIVITIES |  |  |
| Non-cash conversion of Series I Secured notes | $ 912,000 | $4,220,000 |
| Non-cash conversion of accrued interest payable on Series I Secured notes | $ — | $ 6,000 |
| Warrants issued to purchase common stock | $ — | $ 381,000 |
| Options issued to purchase common stock | $ 24,000 | $ — |
| Accrued interest payable on Series I Secured notes added to principal | $ 185,000 | $ 142,000 |
| Accrued interest payable on Renewable Secured Debentures added to principal | $ 141,000 | $ 13,000 |
| Unsettled life settlements included in accounts payable | $ — | $ 292,000 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-8

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(1) Nature of business and summary of significant accounting policies**

   **Nature of business** — GWG Holdings, Inc. and subsidiaries, located in Minneapolis, Minnesota, facilitates the purchase of life insurance policies for its own investment portfolio through its wholly owned subsidiary, GWG Life Settlements, LLC (GWG Life), and its subsidiaries, GWG Trust (Trust), GWG DLP Funding II, LLC (DLP II) and its wholly owned subsidiary, GWG DLP Master Trust II (the Trust II). Our wholly owned subsidiary, GWG Broker Services, LLC (Broker Services), was formed to earn fees for brokering policy transactions between market participants. Our wholly owned subsidiary United Lending, LLC (United Lending) and its wholly owned subsidiary United Lending SPV, LLC (United Lending SPV) were formed to finance life settlement premiums and policy loans. All of these entities are legally organized in Delaware. Unless the context otherwise requires or we specifically so indicate, all references in this report to "we", "us", "our", "our Company", "GWG", or the "Company" refer to these entities collectively. GWG Member, LLC, a wholly owned subsidiary formed November 2010 to facilitate the acquisition of policies, has not commenced operations as of December 31, 2013. The entities were legally organized in Delaware and are collectively referred herein to as GWG, or the Company.

   **Use of estimates** — The preparation of consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. The Company regularly evaluates estimates and assumptions. The Company bases its estimates and assumptions on current facts, historical experience, and various other factors that it believes to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities and the accrual of costs and expenses that are not readily apparent from other sources. The actual results experienced by the Company may differ materially and adversely from the Company's estimates. To the extent there are material differences between the estimates and the actual results, future results of operations will be affected. The most significant estimates with regard to these consolidated financial statements relates to (1) the determination of the assumptions used in estimating the fair value of the investment in life insurance policies, and (2) the value of deferred tax assets and liabilities.

   **Cash and cash equivalents** — The Company considers cash in demand deposit accounts and temporary investments purchased with an original maturity of three months or less to be cash equivalents. The Company maintains its cash and cash equivalents with highly rated financial institutions. From time to time, the

App. 0095

Company's balances in its bank accounts exceed Federal Deposit Insurance Corporation limits. The Company periodically evaluates the risk of exceeding insured levels and may transfer funds as it deems appropriate. The Company has not experienced any losses with regards to balances in excess of insured limits or as a result of other concentrations of credit risk.

**Life settlements** — ASC 325-30, Investments in Insurance Contracts, allows a reporting entity the election to account for its investments in life settlements using either the investment method or the fair value method. The election shall be made on an instrument-by-instrument basis and is irrevocable. Under the investment method, an investor shall recognize the initial investment at the purchase price plus all initial direct costs. Continuing costs (policy premiums and direct external costs, if any) to keep the policy in force shall be capitalized. Under the fair value method, an investor shall recognize the initial investment at the purchase price. In subsequent periods, the investor shall re-measure the investment at fair value in its entirety at each reporting period and shall recognize the change in fair value in current period income net of premiums paid. The Company uses the fair value method to account for all life settlements.

The Company recognizes realized gains (revenue) from life settlement contracts upon one of the two following events:

1) Receipt of death notice or verified obituary of insured

2) Sale of policy and filing of change of ownership forms and receipt of payment

F-9

Table of Contents

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The Company recognizes the difference between the death benefits and carrying values of the policy when an insured event has occurred and the Company determines that settlement and ultimate collection of the death benefits is realizable and reasonably assured. Revenue from a transaction must meet both criteria in order to be recognized. In an event of a sale of a policy the Company recognizes gain or loss as the difference between the sale price and the carrying value of the policy on the date of the receipt of payment on such sale.

Deposits and initial direct costs advanced on unsettled policy acquisitions are recorded as other assets until policy ownership has been transferred to the Company. Such deposits and direct cost advances were $201,000 and $785,000 at December 31, 2013 and 2012 respectively.

**Deferred financing and issuance costs** — Costs incurred to obtain financing under the revolving credit facility, as described in note 6, have been capitalized and are amortized using the straight-line method over the term of the revolving credit facility. Amortization of deferred financing costs was $455,000 and $233,000 for the years ended December 31, 2013 and 2012, respectively. The future amortization is expected to be $358,000 for the year ending December 31, 2014. The Series I Secured notes payable, as described in note 7, are reported net of issuance costs, sales commissions and other direct expenses, which are amortized using the interest method over the term of each respective borrowing. The Renewable Secured debentures, as described in note 8, are reported net of issuance costs, sales commissions and other direct expenses, which are amortized using the interest method over the term of each respective borrowing. The Series A preferred stock, as described in note 9, is reported net of issuance costs, sales commissions, including the fair value of warrants issued, and other direct expenses, which are amortized using the interest method as interest expense over the three-year redemption period.

**Earnings (loss) per share** — Basic per share earnings (loss) attributable to non-redeemable interests is calculated using the weighted-average number of shares outstanding during the period. Diluted earnings per share is calculated based on the potential dilutive impact, if any, of the Company's convertible, redeemable preferred stock, and outstanding warrants, and stock options.

**Subsequent events** — Subsequent events are events or transactions that occur after the balance sheet date but before consolidated financial statements are issued. The Company recognizes in the consolidated financial statements the effects of all subsequent events that provide additional evidence about conditions that existed at the date of the balance sheet, including the estimates inherent in the process of preparing the consolidated financial statements. The Company's consolidated financial statements do not recognize subsequent events that provide evidence about conditions that did not exist at the date of the balance sheet but arose after the balance sheet date and before the consolidated financial statements are available to be issued. The Company evaluates subsequent events and transactions that occur after the balance sheet date up to the date that the consolidated financial statements are filed for potential recognition or disclosure.

**Recently adopted pronouncements** — Pronouncements issued by the FASB or other authoritative accounting standards groups with future effective dates are either not applicable or are not expected to be significant to the Company.

**(2) Restrictions on cash**

The Company is required by its lenders to maintain collection and escrow accounts. These accounts are used to fund the acquisition, pay annual premiums of insurance policies, pay interest and other charges under the revolving credit facility, and collect policy benefits. DZ Bank AG, as agent for Autobahn Funding Company, LLC, the lender for the revolving credit facility as described in note 6, authorizes the disbursements from these accounts. At December 31, 2013 and 2012 there was a balance of $5,833,000, and $2,093,000, respectively, maintained in these restricted cash accounts.

F-10

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(3) Investment in life insurance policies**

The life insurance policies (Level 3 fair value measurements) are valued based on unobservable inputs that are significant to the overall fair value measurement. Changes in the fair value of these instruments are recorded in gain or loss on life insurance policies in the consolidated statements of operations (net of the cash premiums paid on the policies). The fair value is determined on a discounted cash flow basis that incorporates life expectancy assumptions. Life expectancy reports have been obtained from widely accepted life expectancy providers. The discount rate incorporates current information about market interest rates, the credit exposure to the insurance company that issued the life insurance policy and our estimate of the risk premium an investor in the policy would require. As a result of management's analysis, discount rates of 11.69% and 12.08% were applied to the portfolio as of December 31, 2013 and 2012, respectively.

A summary of the Company's life insurance policies accounted for under the fair value method and their estimated maturity dates, based on remaining life expectancy is as follows:

| | As of December 31, 2013 | | | As of December 31, 2012 | | |
|---|---|---|---|---|---|---|
| Years Ending December 31, | Number of Contracts | Estimated Fair Value | Face Value | Number of Contracts | Estimated Fair Value | Face Value |
| 2014 | — | $ — | $ — | — | $ — | $ — |
| 2015 | 4 | 5,065,000 | 6,750,000 | — | — | — |
| 2016 | 8 | 8,174,000 | 13,750,000 | 2 | 1,163,000 | 2,000,000 |
| 2017 | 25 | 33,345,000 | 63,916,000 | 13 | 11,608,000 | 22,229,000 |
| 2018 | 33 | 37,243,000 | 80,318,000 | 17 | 21,155,000 | 53,439,000 |
| 2019 | 34 | 32,844,000 | 89,295,000 | 31 | 28,252,000 | 75,668,000 |
| 2020 | 34 | 27,741,000 | 75,644,000 | 35 | 26,947,000 | 84,579,000 |
| Thereafter | 125 | 90,261,000 | 410,975,000 | 113 | 75,192,000 | 334,331,000 |
| Totals | 263 | $234,673,000 | $740,648,000 | 211 | $164,317,000 | $572,246,000 |

The Company recognized death benefits of $16,600,000 and $7,350,000 during 2013 and 2012, respectively, related to policies with a carrying value of $4,564,000 and $1,067,000, respectively. The Company recorded realized gains of $12,036,000 and $6,283,000 on such policies.

Reconciliation of gain on life settlements:

| | 2013 | 2012 |
|---|---|---|
| Change in fair value | $ 39,338,000 | $ 27,856,000 |
| Premiums and other annual fees | (21,860,000) | (16,702,000) |
| Policy maturities | 12,036,000 | 6,283,000 |
| Gain on life settlements, net | $ 29,514,000 | $ 17,437,000 |

The estimated expected premium payments to maintain the above life insurance policies in force for the next five years, assuming no mortalities, are as follows:

| Years Ending December 31, | |
|---|---|
| 2014 | $ 22,739,000 |
| 2015 | 25,056,000 |
| 2016 | 27,508,000 |
| 2017 | 30,653,000 |
| 2018 | 33,509,000 |
| | $139,465,000 |

F-11

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Management anticipates funding the estimated premium payments as noted above with proceeds from the DZ Bank revolving credit facility and through additional debt and equity financing as well as from cash proceeds from maturities of life insurance policies. The proceeds of these capital sources are also intended to be used for the purchase, financing, and maintenance of additional life insurance policies.

App. 0097

**(4) Fair value definition and hierarchy**

ASC 820 establishes a hierarchical disclosure framework which prioritizes and ranks the level of market price observability used in measuring assets and liabilities at fair value. Market price observability is affected by a number of factors, including the type of investment, the characteristics specific to the investment and the state of the marketplace including the existence and transparency of transactions between market participants. Assets and liabilities with readily available active quoted prices or for which fair value can be measured from actively quoted prices in an orderly market generally will have a higher degree of market price observability and a lesser degree of judgment used in measuring fair value. ASC 820 establishes a three-level valuation hierarchy for inputs used in measuring fair value that maximizes the use of observable inputs and minimizes the use of unobservable inputs by requiring that the most observable inputs be used when available. Observable inputs are inputs that market participants would use in pricing the asset or liability developed based on market data obtained from sources independent of the Company. Unobservable inputs are inputs that reflect the Company's assumptions about the assumptions market participants would use in pricing the asset or liability developed based on the best information available in the circumstances. Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability (i.e., the "exit price") in an orderly transaction between market participants at the measurement date.

The hierarchy is broken down into three levels based on the observability of inputs as follows:

- Level 1 — Valuations based on quoted prices in active markets for identical assets or liabilities that the Company has the ability to access. Since valuations are based on quoted prices that are readily and regularly available in an active market, valuation of these products does not entail a significant degree of judgment.

- Level 2 — Valuations based on one or more quoted prices in markets that are not active or for which all significant inputs are observable, either directly or indirectly.

- Level 3 — Valuations based on inputs that are unobservable and significant to the overall fair value measurement.

The availability of observable inputs can vary by types of assets and liabilities and is affected by a wide variety of factors, including, for example, whether an instrument is established in the marketplace, the liquidity of markets and other characteristics particular to the transaction. To the extent that valuation is based on models or inputs that are less observable or unobservable in the market, the determination of fair value requires more judgment. Accordingly, the degree of judgment exercised by management in determining fair value is greatest for assets and liabilities categorized in Level 3.

Level 3 Valuation Process

The estimated fair value of the Company's portfolio of life settlements is determined on a quarterly basis by the Company's portfolio management committee, taking into consideration changes in discount rate assumptions, estimated premium payments and life expectancy estimate assumptions, as well as any changes in economic and other relevant conditions. These inputs are then used to estimate the discounted cash flows using the Model Actuarial Pricing System (MAPS), probabilistic portfolio pricing model, which estimates the cash flows using various probabilities and scenarios. The valuation process includes a review by senior management as of each valuation date. Management has also engaged a third party expert to independently test the accuracy of the valuations using the inputs provided by management on a quarterly basis.

F-12

---

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Life insurance policies, as well as the portfolio taken as a whole, represent financial instruments recorded at fair value on a recurring basis. The following table reconciles the beginning and ending fair value of the Company's Level 3 investments in its portfolio of life insurance policies for the years ending December 31, as follows:

| | 2013 | 2012 |
|---|---|---|
| Beginning balance | $164,317,000 | $122,169,000 |
| Purchases | 35,582,000 | 15,359,000 |
| Maturities (acquisition cost) | (4,564,000) | (1,067,000) |
| Gross unrealized gains | 39,338,000 | 28,055,000 |
| Gross unrealized losses | — | (199,000) |
| Ending balance | $234,673,000 | $164,317,000 |

The fair value of a portfolio of life insurance policies is based on information available to the Company at the reporting date. Fair value is based upon a discounted cash flow model that incorporates life expectancy estimate assumptions. Life expectancy estimates are obtained from independent, third-party widely accepted life expectancy estimate providers at policy acquisition. The life expectancy values of each insured, as determined at policy acquisition, are rolled down monthly for the passage of time by the MAPS actuarial software the Company uses for ongoing valuation of its portfolio of life insurance policies. The discount rate incorporates current information about discount rates applied by other reporting companies owning portfolios of life insurance policies, discount rates observed in the life insurance secondary market, market interest rates, the credit exposure to the insurance company that issued the life insurance policy and management's estimate of the risk premium a purchaser would require to receive the future cash flows derived from our portfolio of life insurance policies.

App. 0098

On January 22, 2013, one of the independent medical actuarial underwriting firms we utilize, 21st Services, announced advancements in its underwriting methodology, resulting in revised estimated life expectancy mortality tables for life settlement transactions. We have been advised by 21st Services that the changes are very granular and relate to both specific medical conditions and lifestyles of insureds. These changes are the result of the application of additional medical information that has been gathered by 21st Services over a period of time, and which has now been applied to the inputs and methodologies used to develop the actuarial life expectancies. While we do not believe these revised methodologies indicate the previous estimated life expectancies were inaccurate, we believe the revised methodologies provide additional information that should be considered in updating our estimate of the life expectancies of the insureds within our portfolio of life settlement contracts as of December 31, 2012. Based upon our evaluation and analysis of data made available by 21st Services, as well as information regarding the insureds within our portfolio, we have estimated the impact of the changes in 21st Services' methodologies for determining life expectancies on a policy-by-policy basis within our portfolio as of December 31, 2012 and applied such changes to the life expectancy inputs used to estimate fair value. We have adjusted the original life expectancies provided by 21st Services based on four factors, the impact of each analyzed individually for each insured in the GWG portfolio. The four factors are gender, anti-selection, age, and primary impairment. GWG applied this set of adjustments to all 21st Services LEs used in valuation of the portfolio as of December 31, 2012. At that time, the portfolio contained 211 policies on 194 insured lives. Of those 211 policies, 199 were valued using a 21st Services LE as part of the pricing LE calculation. While the analysis and adjustments were applied on an individual policy basis, the result was an average overall increase in the original life expectancy estimates of 8.67%. We have a standard practice of obtaining two third-party life expectancy estimates for each policy in our portfolio. As a result, the effective change in life expectancy on the portfolio was an average of approximately 4.33%, which resulted in an aggregate decrease in the fair value of our life settlements portfolio of $12.4 million. Life expectancy reports by their very nature are estimates.

F-13

Table of Contents

## GWG HOLDINGS, INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The fair value of life insurance policies is estimated using present value calculations of estimated cash flows based on the data specific to each individual life insurance policy. Estimated future policy premium payments are calculated based on the terms of the policy and the premium payment history. The following summarizes the unobservable inputs utilized in estimating the fair value of the portfolio of life insurance policies:

|  | As of December 31, 2013 | As of December 31, 2012 |
|---|---|---|
| Weighted average age of insured | 82.1 | 81.3 |
| Weighted average life expectancy, months* | 87.0 | 91.6 |
| Average face amount per policy | $2,816,000 | $2,712,064 |
| Discount rate | 11.69% | 12.08% |

*    Standard life expectancy as adjusted for insured's specific circumstances.

These assumptions are, by their nature, inherently uncertain and the effect of changes in estimates may be significant. The techniques used in estimating the present value of estimated cash flows are derived from valuation techniques generally used in the industry that include inputs for the asset that are not based on observable market data. The extent to which the fair value could reasonably vary in the near term has been quantified by evaluating the effect of changes in significant underlying assumptions used to estimate the fair value. If the life expectancy estimates were increased or decreased by four and eight months on each outstanding policy and the discount factors were increased or decreased by 1% and 2%, while all other variables are held constant, the fair value of the investment in life insurance policies would increase or (decrease) by the amounts summarized below:

|  | Change in life expectancy | | | |
|---|---|---|---|---|
|  | plus 8 months | minus 8 months | plus 4 months | minus 4 months |
| Investment in life policies |  |  |  |  |
| December 31, 2013 | $(34,382,000) | $36,152,000 | $(17,417,000) | $17,865,000 |
| December 31, 2012 | $(24,072,000) | $25,268,000 | $(12,185,000) | $12,484,000 |

|  | Change in discount rate | | | |
|---|---|---|---|---|
|  | plus 2% | minus 2% | plus 1% | minus 1% |
| Investment in life policies |  |  |  |  |
| December 31, 2013 | $(22,944,000) | $27,063,000 | $(11,933,000) | $12,959,000 |
| December 31, 2012 | $(16,811,000) | $19,978,000 | $ (8,759,000) | $ 9,547,000 |

Other Fair Value Considerations

Carrying value of receivables, prepaid expenses, accounts payable and accrued expenses approximate fair value due to their short-term maturities and low credit risk. The estimated fair value of the Company's Series I Secured notes payable is approximately $33,067,000 based on a weighted-average market interest rate of

7.51% based on our income approach. The Company began issuing Renewable Secured Debentures in the first quarter of 2012. The current interest rates on the Renewable Secured Debentures approximate market rates. The carrying value of the Renewable Secured Debentures approximates fair value. The carrying value of the revolving credit facility reflects interest charged at the commercial paper rate plus an applicable margin. The margin represents our credit risk, and the strength of the portfolio of life insurance policies collateralizing the debt. The overall rate reflects market, and the carrying value of the revolver approximates fair value. All of the financial instruments are level 3 fair value measurements.

The Company has issued warrants to purchase common stock in connection with the issuance of its convertible, redeemable preferred stock. Warrants were determined by the Company as permanent equity. The fair value measurements associated with the warrants, measured at issuance represent level 3 instruments.

F-14

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

As of December 31, 2013:

| Month issued | Warrants issued | Fair value per share | Risk free rate | Volatility | Term |
|---|---|---|---|---|---|
| December 2011 | 68,937 | $0.22 | 0.42% | 25.25% | 3 years |
| March 2012 | 38,130 | $0.52 | 0.38% | 36.20% | 3 years |
| June 2012 | 161,841 | $1.16 | 0.41% | 47.36% | 3 years |
| July 2012 | 144,547 | $1.16 | 0.41% | 47.36% | 3 years |
| September 2012 | 2,500 | $0.72 | 0.31% | 40.49% | 3 years |
| | 415,955 | | | | |

Volatility is based upon the weekly percentage change in the stock price of selected comparable insurance companies. In June 2012, we evaluated the comparable companies used, and made certain changes to those used. The percentage change is calculated on the average price of those selected stocks at the weekly close of business for the year preceding the balance sheet date. We compare annual volatility based on this weekly information.

**(5) Notes receivable from related parties**

As of December 31, 2013 and December 31, 2012, the Company had receivables totaling $5,000,000 due from an affiliate, Opportunity Finance, LLC, which were fully reserved. Opportunity Finance ceased operations in 2008.

**(6) Credit facilities**

**Revolving credit facility — Autobahn Funding Company LLC**

On July 15, 2008, DLP II and United Lending entered into a revolving credit facility pursuant to a Credit and Security Agreement (Agreement) with Autobahn Funding Company LLC (Autobahn), providing the Company with a maximum borrowing amount of $100,000,000. Autobahn is a commercial paper conduit that issues commercial paper to investors to provide funding to DLP II and United Lending. DZ Bank AG acts as the agent for Autobahn. The original Agreement was to expire on July 15, 2013. On January 29, 2013, Holdings, together with GWG Life and DLP II, entered into an Amended and Restated Credit and Security Agreement with Autobahn, extending the facility expiration date to December 31, 2014, and removing United Lending as a party to the amended and restated Agreement. The amount outstanding under this facility as of December 31, 2013 and 2012, was $79,000,000 and $71,000,000, respectively.

The Agreement requires DLP II to pay, on a monthly basis, interest at the commercial paper rate plus an applicable margin, as defined in the Agreement. The effective rate was 6.19% and 2.02% at December 31, 2013 and December 31, 2012, respectively. The weighted average effective interest rate (excluding the unused line fee) was 6.14% and 2.14% for the years ended December 31, 2013 and 2012, respectively. The Agreement also requires payment of an unused line fee of 0.30% on the unfunded amount under the revolving credit facility. The note is secured by substantially all of DLP II assets which consist primarily of life settlement policies.

The Agreement has certain financial and nonfinancial covenants. The Company was in compliance with these covenants at December 31, 2013 and 2012. The Agreement generally prohibits the Company from:

- changing its corporate name, offices, and jurisdiction of incorporation

- changing any deposit accounts or payment instructions to insurers;

- changing any operating policies and practices such that it would be reasonably likely to adversely affect the collectability of any asset in any material respect;

F-15

App. 0100

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

- merging or consolidating with, or selling all or substantially all of its assets to, any third party;

- selling any collateral or creating or permitting to exist any adverse claim upon any collateral;

- engaging in any other business or activity than that contemplated by the Agreement;

- incurring or guaranteeing any debt for borrowed money;

- amending the Company's certificate of incorporation or bylaws, making any loans or advances to, investments in, or paying any dividends to, any person unless both before and after any such loan, advance, investment or dividend there exists no actual event of default, potential event of default or termination event;

- removing an independent director on the board of directors except for cause or with the consent of the lender; or

- making payment on or issuing any subsidiary secured notes or debentures, or amending any agreements respecting such notes or debentures, if an event of default, potential event of default or termination event exists or would arise from any such action.

In addition, the Company has agreed to maintain (i) a positive consolidated net income (as defined and calculated under the Agreement) for each complete fiscal year and (ii) a tangible net worth (again, as defined and calculated under the Agreement) of not less than $15 million, and (iii) maintain a borrowing base surplus or cash cushion sufficient to pay three to twelve months (increasing throughout 2013) of premiums and facility fees.

Consolidated net income and tangible net worth as of and for the year ended December 31, 2013, as calculated under the agreement, was $20,916,000 and $54,286,000 respectively.

Advances under the Agreement are subject to a borrowing base formula, which limits the availability of advances on the borrowing base calculation based on attributes of policies pledged to the facility. Over-concentration of policies by insurance carrier, over-concentration of policies by insurance carriers with ratings below a AA- rating, and the premiums and facility fees reserve are the three primary factors with the potential of limiting availability of funds on the facility. Total funds available for additional borrowings under the borrowing base formula criteria at December 31, 2013 and 2012, were $3,937,000 and $15,043,000 respectively.

On July 15, 2008, Holdings delivered a performance guaranty in favor of Autobahn pursuant to which it guaranteed the obligations of GWG Life, in its capacity as the seller and master servicer, under the Credit and Security Agreement and related documents. On January 29, 2013 and in connection with the Amended and Restated Credit and Security Agreement, Holdings delivered a reaffirmation of its performance guaranty. The obligations of Holdings under the performance guaranty and subsequent reaffirmation do not extend to the principal and interest owed by DLP II as the borrower under the credit facility.

**(7) Series I Secured notes payable**

Series I Secured notes payable have been issued in conjunction with the GWG Series I Secured notes private placement memorandum dated August 25, 2009 (last revised November 15, 2010). On June 14, 2011 the Company closed the offering to additional investors, however, existing investors may elect to continue advancing amounts outstanding upon maturity subject to the Company's option. Series I Secured notes have maturity dates ranging from six months to seven years with fixed interest rates varying from 5.65% to 9.55% depending on the term of the note. Interest is payable monthly, quarterly, annually or at maturity depending on the terms of the note. At December 31, 2013 and 2012 the weighted average interest rates of Series I Secured notes were 8.35% and 8.22%, respectively. The notes are secured by assets of GWG Life. The principal amount outstanding under these Series I Secured notes was $29,744,000 and $38,570,000 at December 31, 2013, and December 31, 2012, respectively. The difference between the amount outstanding on the Series I

F-16

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Secured notes and the carrying amount on the consolidated balance sheet is due to netting of unamortized deferred issuance costs. Overall, interest expense includes amortization of deferred financing and issuance costs of $606,000 and $1,170,000 in 2013 and 2012, respectively. Future expected amortization of deferred financing costs is $468,000 over the next six years.

On November 15, 2010, Jon Sabes and Steve Sabes pledged their ownership interests in the Company to the Series I Trust as security for advances under the Series I Trust arrangement.

The use of proceeds from the issuances of Series I Secured notes was limited to the following: (1) payment of commissions of Series I Secured note sales, (2) purchase life insurance policies, (3) pay premiums of life insurance policies, (4) pay principal and interest to Senior Liquidity Provider (DZ Bank), (5) pay portfolio or note operating fees or costs, (6) pay trustee (Wells Fargo Bank, N.A.), (7) pay servicer and collateral fees, (8) pay principal and interest on Series I Secured notes, (9) make distributions to equity holders for tax liability related to portfolio, (10) purchase interest rate caps, swaps, or hedging instruments, (11) pay GWG Series I Trustee fees, and (12) pay offering expenses.

On November 1, 2011, GWG entered into a Third Amended and Restated Note Issuance and Security Agreement with Lord Securities Corporation after receiving majority approval from the holders of Series I Secured notes. Among other things, the amended and restated agreement modified the use of proceeds and certain provisions relating to the distribution of collections and subordination of cash flow. Under the amended and restated agreement, GWG is no longer restricted as to its use of proceeds or subject to restrictions on certain distributions of collections and subordination of cash flows. Under the amended and restated agreement, GWG may extend the maturity of Series I Secured notes of a six month term for up to two additional six month terms, and Series I Secured notes of a one year term for up to six months.

Future contractual maturities of Series I Secured notes payable at December 31, 2013 are as follows:

| Years Ending December 31, | |
|---|---|
| 2014 | $16,111,000 |
| 2015 | 6,700,000 |
| 2016 | 2,030,000 |
| 2017 | 4,085,000 |
| 2018 | 754,000 |
| Thereafter | 64,000 |
| | $29,744,000 |

## (8) Renewable Secured Debentures

The Company has registered with the Securities and Exchange Commission, effective January 2012, the offer and sale of $250,000,000 of secured debentures. Renewable Secured Debentures have maturity dates ranging from six months to seven years with fixed interest rates varying from 4.75% to 9.50% depending on the term of the note. Interest is payable monthly, annually or at maturity depending on the terms of the debenture. At December 31, 2013 and 2012, the weighted average interest rate of Renewable Secured Debentures was 7.53% and 7.65%, respectively. The debentures are secured by assets of GWG Life and GWG Holdings. The amount outstanding under these Renewable Secured Debentures was $134,891,000 and $57,609,000 at December 31, 2013 and 2012, respectively. The difference between the amount outstanding on the Renewable Secured Debentures and the carrying amount on the consolidated balance sheet is due to netting of unamortized deferred issuance costs and cash receipts for new issuances in process at December 31, 2013 and 2012. Amortization of deferred issuance costs was $1,843,000 and $506,000 in 2013 and 2012, respectively. Future expected amortization of deferred financing costs is $5,147,000. Subsequent to December 31, 2013, the Company has issued approximately an additional $17,715,000 in principal amount of these Renewable Secured Debentures.

F-17

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The use of proceeds from the issuances of Renewable Secured Debentures is limited to the following: (1) payment of commissions on sales of Renewable Secured Debentures, (2) payment of offering expenses, (3) purchase of life insurance policies, (4) Payment of premiums on life insurance policies, (5) payment of principal and interest on Renewable Secured Debentures, (6) payment of portfolio operations expenses, and (7) for general working capital.

Future contractual maturities of Renewable Secured Debentures at December 31, 2013 are as follows:

| Years Ending December 31, | |
|---|---|
| 2013 | $ 34,258,000 |
| 2014 | 41,509,000 |
| 2015 | 29,152,000 |
| 2016 | 7,667,000 |
| 2017 | 5,381,000 |
| Thereafter | 16,924,000 |
| | $134,891,000 |

The Company entered into an Indenture effective October 19, 2011 with Holdings as obligor, GWG Life as guarantor, and Bank of Utah as trustee for the benefit of the debenture holders. The Indenture has certain financial and nonfinancial covenants. The Company was in compliance with these covenants at December 31, 2013 and 2012.

## (9) Convertible, redeemable preferred stock

App. 0102

The Company began offering 3,333,333 shares of convertible redeemable preferred stock (Series A preferred stock) for sale to accredited investors in a private placement on July 31, 2011. The offering of Series A preferred stock concluded on September 2, 2012 and resulted in 3,278,000 shares being issued for gross consideration of $24,582,000. As of December 31, 2013, 166,000 shares have been issued as a result of conversion of $1,163,000 in dividends into shares of Series A preferred stock. The Series A preferred stock was sold at an offering price of $7.50 per share. Series A preferred stock has a preferred dividend yield of 10% per annum, and each share has the right to convert into 0.75 shares of the Company's common stock. The Company may elect to automatically convert the Series A preferred stock to common stock as described below. Series A preferred shareholders also received three-year warrants to purchase, at an exercise price per share of $12.50, one share of common stock for every 40 shares of Series A preferred stock purchased. The warrants are exercisable immediately. In the Certificate of Designations for the Series A preferred stock dated July 31, 2011, the Company agreed to permit preferred shareholders to sell their shares back to the Company for the stated value of $7.50 per share, plus accrued dividends, according to the following schedule:

- Up to 33% of the holder's unredeemed shares one year after issuance:

- Up to 66% of the holder's unredeemed shares two years after issuance; and

- Up to 100% of the holder's unredeemed shares three years after issuance.

The Company's obligation to redeem Series A preferred shares will terminate upon the Company completing a registration of its common stock with the SEC. The Company may redeem the Series A preferred shares at a price equal to 110% of their liquidation preference ($7.50 per share) at any time after December 15, 2012.

At the election of the Company, the Series A preferred shares may be automatically converted into the common stock of the Company in the event of either (1) a registered offering of the Company's common stock with the SEC aggregating gross proceeds of at least $5.0 million at a price equal to or greater than $11.00 per share of common stock, or (2) the consent of shareholders holding at least a majority of the then-outstanding shares of Series A preferred stock. As of December 31, 2013, the Company had issued 3,450,000

F-18

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

preferred shares resulting in gross consideration of $25,799,000 (including cash proceeds, conversion of Series I Secured notes and accrued interest on Series I notes, and conversion of preferred dividends payable). In 2013, the Company redeemed 82,000 shares valued at $614,000 resulting in 3,368,000 shares outstanding with the gross value of $25,176,000. The Company incurred Series A preferred stock issuance costs of $2,838,000, of which $2,385,000 was amortized to additional paid in capital as of December 31, 2013, resulting in a carrying amount of $24,723,000.

The Company determined that the grant date fair value of the outstanding warrants attached to the Series A preferred stock was $395,000 for warrants issued through December 31, 2013. The Company may redeem outstanding warrants prior to their expiration, at a price of $0.01 per share upon 30 days written notice to the investors at any time after (i) the Company has completed a registration of its common stock with the SEC and (ii) the weighted-average sale price per share of common stock equals or exceeds 14.00 per share for ten consecutive trading days ending on the third business day prior to proper notice of such redemption. Total warrants outstanding as of December 31, 2013, were 415,955 with a weighted-average remaining life of 1.34 years. Total warrants outstanding at December 31, 2012, were 415,955 with a weighted-average remaining life of 2.34 years.

Dividends on the Series A preferred stock may be paid in either cash or additional shares of Series A preferred stock at the election of the holder and approval of the Company. The dividends are reported as an expense and included in the caption interest expense in the consolidated statements of operations.

The Company declared and accrued dividends of $2,528,000 and $2,227,000 in 2013 and 2012, respectively, pursuant to a board resolution declaring the dividend. 89,000 and 81,000 shares of Series A preferred stock were issued in lieu of cash dividends in 2013 and 2012. The shares issued in lieu of cash dividends were issued at $7.00 per share. As of December 31, 2013, Holdings has $629,000 of accrued preferred dividends which were paid or converted to shares of Series A preferred stock on January 15, 2014.

**(10) Income taxes**

The Company did not have any current income taxes for the years ended December 31, 2013 or 2012. The components of deferred income tax expense for the years ended December 31, 2013 and 2012, respectively, consisted of the following:

| Income tax provision: | 2013 | 2012 |
|---|---|---|
| Deferred: | | |
| Federal | $1,826,000 | $1,002,000 |
| State | 348,000 | 191,000 |
| Total income tax expense | $2,174,000 | $1,193,000 |

The following table provides a reconciliation of our income tax expense at the statutory federal tax rate to our actual income tax expense:

App. 0103

| | 2013 | | 2012 | |
|---|---|---|---|---|
| Statutory federal income tax | $ 673,000 | 34.0% | $ 61,000 | 34.0% |
| State income taxes, net of federal benefit | 298,000 | 15.1% | 165,000 | 91.2% |
| Series A preferred stock dividends | 860,000 | 43.4% | 757,000 | 420.1% |
| Other permanent differences | 343,000 | 17.3% | 210,000 | 116.5% |
| Total income tax expense | $2,174,000 | 109.8% | $1,193,000 | 661.8% |

The most significant temporary differences between GAAP net income and taxable net income are the treatment of interest costs with respect to the acquisition of the life insurance policies and revenue recognition with respect to the mark-to-market of life insurance portfolio.

F-19

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The tax effects of temporary differences that give rise to deferred income taxes were as follows:

| | 2013 | 2012 |
|---|---|---|
| Deferred tax assets: | | |
| Athena Securities Group, LTD, advisory services | $ — | $ 1,455,000 |
| Note receivable from related party | 2,023,000 | 2,023,000 |
| Net operating loss carryforwards | 2,596,000 | 1,671,000 |
| Other assets | 164,000 | 20,000 |
| Subtotal | 4,783,000 | 5,169,000 |
| Valuation allowance | (2,164,000) | (2,023,000) |
| Net deferred tax asset | 2,619,000 | 3,146,000 |
| | | |
| Deferred tax liabilities: | | |
| Investment in life settlements | (10,294,000) | (8,647,000) |
| Net deferred tax liability | $ (7,675,000) | $(5,501,000) |

At December 31, 2013 and 2012, the Company had federal net operating loss (NOL) carryforwards of $4,182,000 and $4,129,000, respectively, which will begin to expire in 2031. Future utilization of NOL carryforwards is subject to limitation under Section 382 of the Internal Revenue Code. This section generally relates to a more than 50 percent change in ownership over a three-year period. We currently do not believe that any issuance of common stock has resulted in an ownership change under Section 382.

The Company provides for a valuation allowance when it is not considered more likely than not that our deferred tax assets will be realized. At December 31, 2013 and 2012, based upon all available evidence, the Company has provided a valuation allowance of $2,164,000, and 2,023,000, respectively, against deferred tax assets related to the likelihood of recovering the tax benefit of a capital loss on a note receivable from a related entity. The change was $141,000 and $0 for the years ended December 31, 2013 and 2012, respectively. Management believes all other deferred tax assets are recoverable.

ASC 740, Income Taxes, requires the reporting of certain tax positions which do not meet a threshold of "more-likely-than-not" to be recorded as uncertain tax benefits. It is management's responsibility to determine whether it is "more-likely-than-not" that a tax position will be sustained upon examination, including resolution of any related appeals or litigation, based upon the technical merits of the position. Management has reviewed all income tax positions taken or expected to be taken for all open years and determined that the income tax positions are appropriately stated and supported. The Company does not anticipate that the total unrecognized tax benefits will significantly change prior to December 31, 2014.

Under the Company's accounting policies, interest and penalties on unrecognized tax benefits, as well as interest received from favorable tax settlements are recognized as components of income tax expense. At December 31, 2013 and 2012, the Company has recorded no accrued interest or penalties related to uncertain tax positions.

The Company's income tax returns for tax years ended December, 31 2013, 2012 and 2011 remain open to examination by the Internal Revenue Service and various state taxing jurisdictions.

**(11) Common Stock**

On July 11, 2011, the Company entered into a Purchase and Sale Agreement with Athena Securities Group, LTD and Athena Structured Funds PLC. Under this agreement, Holdings issued to Athena Securities Group, LTD (Athena) 494,500 shares of common stock, which was equal to 9.9% of the outstanding shares in the Company, in exchange for shares equal to 9.9% of the outstanding shares in Athena Structured

F-20

App. 0104

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Funds, PLC (Athena Funds) and cash of $5,000. In accordance with Accounting Standards Codification (ASC) 505-50, the Company recorded the share-based payment transaction with Athena at the fair value of the Company's 494,500 shares of common stock issued as it was the most reliable measurable form of consideration in this exchange the total value ascribed to the common stock issued to Athena was $3.6 million. The $5,000 cash paid by Athena, which represents the fair value of the shares of Athena Funds, is included in financing activities of the Consolidated Statement of Cash Flows.

On June 28, 2013, GWG Holdings, Inc. entered into a new Purchase and Sale Agreement with Athena Securities Limited and Athena Securities Group Limited. The June 28, 2013 agreement terminated the parties' original Purchase and Sale Agreement dated July 11, 2011. Under the new agreement, Holdings appointed Athena Securities Group Limited (i) as Holdings' exclusive representative for the offer and sale of Holdings' Renewable Secured Debentures in Ireland, and (ii) as a distributor for the offer and sale of those debentures in Europe and the Middle East, in each case until May 8, 2014. Any compensation payable to Athena Securities Group Limited will be in accordance with the compensation disclosures set forth in Holdings' prospectus for the offering filed with the SEC on dated June 4, 2013, as the same may be supplemented or amended from time to time. In addition, the new agreement effected the sale by Athena Securities Limited to Holdings of 432,500 shares of Holdings' common stock, and Holdings' sale back to Athena Securities Group Limited of certain shares of GWG Securities International Public Limited Company (formerly known as Athena Structured Funds PLC) originally transacted under the original July 11, 2011 agreement. The Company recorded a non-cash gain on the transaction of $3,252,000.

**(12) Stock Incentive Plan**

The Company adopted the GWG Holdings, Inc. 2013 Stock Incentive Plan on March 27, 2013. The plan shall be administered by Compensation Committee of the Board of Directors of the Company. The Company's Chief Executive Officer may, on a discretionary basis and without committee review or approval, grant incentives to new employees of the Company who are not Officers of the Company. Incentives under the plan may be granted in one or a combination of the following forms: (a) incentive stock options and non-statutory stock options; (b) stock appreciation rights; (c) stock awards; (d) restricted stock; (e) restricted stock units; and (f) performance shares. Eligible participants include officers and employees of the company, members of the Board of Directors, and consultants or other independent contractors. 1,000,000 shares are issuable under the plan. No person shall receive grants of stock options and SARs under the plan that exceed, in the aggregate 200,000 shares of common stock in any one year. The term of each stock option shall be determined by the committee but shall not exceed ten years. Vested stock options may be exercised in whole or part by the holder giving notice to the Company. The holder of the option may provide payment for the exercise price or surrender shares equal to the exercise price.

The Company issued stock options for 433,250 shares of common stock to employees, officers, and directors of the Company in 2013. Options for 208,750 shares vested immediately, and the remaining options vested over three years. The shares were issued with an exercise price of $7.52, which is equal to the estimated market price of the shares on the date of grant valued using Black-Scholes Binomial option pricing model. The expected volatility used in the Black-Scholes model valuation of options issued during the year was 19.73% annualized. The annual volatility rate is based on the standard deviation of the average continuously compounded rate of return of five selected comparable companies over the previous 52 weeks. Forfeiture rate of 15% is based on historical company information and expected future trend. In 2013 stock options for 52,750 shares were forfeited.

F-21

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Stock options granted during the year ended December 31, 2013:

| Grant Date | Exercise Price | Shares | Vesting | Binomial Value | Forfeiture Factor | Compensation Expense |
|---|---|---|---|---|---|---|
| 9/5/2013 | $7.46 | 1,250.00 | Immediate | 0.36 | 0.87 | 391.50* |
| 9/5/2013 | $7.52 | 142,500.00 | Immediate | 0.36 | 0.87 | 44,631.00* |
| 9/5/2013 | $8.28 | 25,000.00 | Immediate | 0.36 | 0.87 | 7,830.00* |
| 9/5/2013 | $7.46 | 1,500.00 | 1 year | 0.36 | 0.85 | 459.00 |
| 9/5/2013 | $7.52 | 44,338.50 | 1 year | 0.36 | 0.85 | 13,567.58 |
| 9/5/2013 | $8.28 | 2,833.50 | 1 year | 0.36 | 0.85 | 867.05 |
| 9/5/2013 | $7.46 | 1,500.00 | 2 years | 0.6 | 0.7225 | 650.25 |
| 9/5/2013 | $7.52 | 44,333.00 | 2 years | 0.6 | 0.7225 | 19,218.36 |
| 9/5/2013 | $8.28 | 2,833.50 | 2 years | 0.6 | 0.7225 | 1,228.32 |
| 9/5/2013 | $7.46 | 1,500.00 | 3 years | 0.82 | 0.6141 | 755.34 |
| 9/5/2013 | $7.52 | 44,328.50 | 3 years | 0.82 | 0.6141 | 22,322.15 |
| 9/5/2013 | $8.28 | 2,833.00 | 3 years | 0.82 | 0.6141 | 1,426.59 |
| 9/30/2013 | $7.52 | 4,000.00 | Immediate | 0.66 | 0.87 | 2,296.80* |
| 10/28/2013 | $7.52 | 4,250.00 | Immediate | 0.66 | 0.87 | 2,440.35* |

| 10/28/2013 | $7.52 | 17,000.00 | 1 year | 0.66 | 0.85 | 9,537.00 |
| 10/28/2013 | $7.52 | 17,000.00 | 2 years | 0.92 | 0.7225 | 11,299.90 |
| 10/28/2013 | $7.52 | 12,750.00 | 3 years | 1.14 | 0.6141 | 8,925.94 |
| 11/11/2013 | $7.52 | 4,167.00 | 1 year | 0.66 | 0.85 | 2,337.69 |
| 11/11/2013 | $7.52 | 4,166.50 | 2 years | 0.92 | 0.7225 | 2,769.47 |
| 11/11/2013 | $7.52 | 4,166.50 | 3 years | 1.14 | 0.6141 | 2,916.86 |
| 11/12/2013 | $7.52 | 1,750.00 | Immediate | 0.66 | 0.87 | 1,004.85* |
| 11/12/2013 | $7.52 | 7,000.00 | 1 year | 0.66 | 0.85 | 3,927.00 |
| 11/12/2013 | $7.52 | 7,000.00 | 2 years | 0.92 | 0.7225 | 4,652.90 |
| 11/12/2013 | $7.52 | 5,250.00 | 3 years | 1.14 | 0.6141 | 3,675.39 |
| 12/12/2013 | $7.52 | 30,000.00 | Immediate | 0.66 | 0.87 | 17,226.00* |
| | | 433,250.00 | | | | |

\*   Amounts reflected in current period earnings.

Outstanding stock options:

| | Vested | Un-vested | Total |
|---|---|---|---|
| Balance as of December 31, 2012 | — | — | — |
| Granted during the year | 208,750 | 224,500 | 433,250 |
| Exercised during the year | — | — | — |
| Forfeited during the year | (13,750) | (14,250) | (28,000) |
| Expired during the year | — | — | — |
| Balance as of December 31, 2013 | 195,000 | 210,250 | 405,250 |

Compensation expense related to un-vested options not yet recognized is $104,851. We expect to recognize this compensation expense over the next 2.7 years.

**(13) Net loss per common share**

The Company began issuing Series A preferred stock September, 1, 2011, as described in note 9. The Series A preferred stock is anti-dilutive to the net loss per common share calculation at December 31, 2013 and 2012. The Company has also issued warrants to purchase common stock in conjunction with the sale of convertible preferred stock, as discussed in note 9. The warrants are anti-dilutive at December 31, 2013 and 2012 and have not been included in the fully diluted net loss per common share calculation.

F-22

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

| | December 31, 2013 | December 31, 2012 |
|---|---|---|
| NET LOSS | $  (194,955) | $(1,012,899) |
| Accretion of preferred stock to liquidation value | (806,624) | (1,578,405) |
| LOSS ATTRIBUTABE TO COMMON SHAREHOLDERS | $(1,001,579) | $(2,591,304) |
| | | |
| Basic and diluted weighted average shares outstanding | 4,758,699 | 4,999,500 |
| NET LOSS PER COMMON SHARE (BASIC AND DILUTED) | | |
| Net loss | $      (0.04) | $      (0.20) |
| Accretion of value to preferred stock | $      (0.17) | $      (0.32) |
| **Net loss attributable to common shareholders** | $      (0.21) | $      (0.52) |

**(14) Commitments**

The Company entered into an office lease with U.S. Bank National Association as the landlord. The lease was effective April 22, 2012 with a term through August 31, 2015. The lease is for 11,695 square feet of office space located at 220 South Sixth Street, Minneapolis, Minnesota. The Company is obligated to pay base rent plus common area maintenance and a share of the building operating costs. Rent expenses under this and previous agreements were $200,000 and $162,000 in years ended December 31, 2013 and 2012, respectively. Minimum lease payments under the lease agreement effective April 22, 2012 are as follows:

App. 0106

| | |
|---|---:|
| 2014 | 104,000 |
| 2015 | 70,000 |
| Total | $174,000 |

**(15) Contingencies**

Litigation — In the normal course of business, the Company is involved in various legal proceedings. In the opinion of management, any liability resulting from such proceedings would not have a material adverse effect on the Company's financial position, results of operations or cash flows.

Opportunity Finance, LLC, owned by Jon Sabes and Steven Sabes, is subject to litigation clawback claims by the bankruptcy trustee for third-party matters for payments that may have been deemed preference payments. In addition, Jon Sabes and Steven Sabes are subject to litigation clawback claims by the bankruptcy trustee for third-party matters for payments received from Opportunity Finance that may have been deemed preference payments. If the parties are unsuccessful in defending against these claims, their equity ownership in the Company may be sold or transferred to other parties to satisfy such claims. In addition, the Company loaned $1,000,000 to Opportunity Finance, LLC, and was repaid in full plus interest of $177,000. This investment amount may also be subject to clawback claims by the bankruptcy court.

**(16) Guarantees of secured debentures**

Holdings has registered with the SEC the offer and sale $250,000,000 of secured debentures as described in note 8. The secured debentures are secured by the assets of Holdings as described in note 8 and a pledge of all the common stock by the largest shareholders. Obligations under the debentures are guaranteed by GWG Life. This guarantee involves the grant of a security interest in all the assets of GWG Life. The payment of principal and interest on the secured debentures is fully and unconditionally guaranteed by GWG Life. Substantially all of the Company's life insurance policies are held by DLP II and the Trust. The policies held by DLP II are not collateral for the debenture obligations as such policies are collateral for the credit facility.

The consolidating financial statements are presented in lieu of separate financial statements and other related disclosures of the subsidiary guarantors and issuer because management does not believe that separate financial statements and related disclosures would be material to investors. There are currently no significant

F-23

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

restrictions on the ability of Holdings or GWG Life, the guarantor subsidiary, to obtain funds from its subsidiaries by dividend or loan, except as follows. DLP II is a borrower under a credit agreement with Autobahn, with DZ Bank AG as agent, as described in note 6. The significant majority of insurance policies owned by the Company are subject to a collateral arrangement with DZ Bank AG described in notes 3 and 6. Under this arrangement, collection and escrow accounts are used to fund premiums of the insurance policies and to pay interest and other charges under the revolving credit facility. DZ Bank AG and Autobahn must authorize all disbursements from these accounts, including any distributions to GWG Life. Distributions are limited to an amount that would result in the borrowers (DLP II, GWG Life and Holdings) realizing an annualized rate of return on the equity funded amount for such assets of not more than 18%, as determined by DZ Bank AG. After such amount is reached, the credit agreement requires that excess funds be used for repayments of borrowings before any additional distributions may be made.

The following represents consolidating financial information as of December 31, 2013 and 2012, with respect to the financial position, and for the years ended December 31, 2013 and 2012 with respect to results of operations and cash flows of Holdings and its subsidiaries. The parent column presents the financial information of Holdings, the primary obligor of the secured debentures. The guarantor subsidiary column presents the financial information of GWG Life, the guarantor subsidiary of the secured debentures, presenting its investment in DLP II and Trust under the equity method. The non-guarantor subsidiaries column presents the financial information of all non-guarantor subsidiaries including DLP II, United Lending, GWG Broker Services and the Trust.

Consolidating Balance Sheets

| December 31, 2013 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---:|---:|---:|---:|---:|
| **ASSETS** | | | | | |
| Cash and cash equivalents | $ 32,711,636 | $ 738,157 | $ — | $ — | $ 33,449,793 |
| Restricted cash | — | 1,420,000 | 4,412,970 | — | 5,832,970 |
| Investment in life settlements, at fair value | — | — | 234,672,794 | — | 234,672,794 |
| Deferred financing costs, net | — | — | 357,901 | — | 357,901 |
| Other assets | 381,883 | 484,510 | 200,625 | — | 1,067,018 |
| Investment in subsidiaries | 129,839,241 | 159,798,490 | — | (289,637,731) | — |
| TOTAL ASSETS | $162,932,760 | $162,441,157 | $239,644,290 | $(289,637,731) | $275,380,476 |

App. 0107

**LIABILITIES & STOCKHOLDERS' EQUITY (DEFICIT)**

| | | | | | |
|---|---|---|---|---|---|
| **LIABILITIES** | | | | | |
| Revolving credit facility | $ — | $ — | $ 79,000,000 | $ — | $ 79,000,000 |
| Series I Secured notes payable | — | 29,275,202 | — | — | 29,275,202 |
| Renewable Secured Debentures | 131,646,062 | — | — | — | 131,646,062 |
| Accounts payable | 233,214 | 106,655 | 500,000 | — | 839,869 |
| Interest payable | 3,806,820 | 3,065,465 | 337,123 | — | 7,209,408 |
| Other accrued expenses | 340,812 | 154,594 | 8,677 | — | 504,083 |
| Deferred taxes | 7,675,174 | — | — | — | 7,675,174 |
| TOTAL LIABILITIES | 143,702,082 | 32,601,916 | 79,845,800 | — | 256,149,798 |
| | | | | | |
| CONVERTIBLE, REDEEMABLE PREFERRED STOCK | 24,722,693 | — | — | — | 24,722,693 |

F-24

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Consolidating Balance Sheets (continued)

| December 31, 2013 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **STOCKHOLDERS' EQUITY (DEFICIT)** | | | | | |
| Member capital | — | 129,839,241 | 159,798,490 | (289,637,731) | — |
| Common stock | 4,562 | — | — | — | 4,562 |
| Additional paid-in capital | 2,942,000 | — | — | — | 2,942,000 |
| Accumulated deficit | (8,438,577) | — | — | — | (8,438,577) |
| TOTAL STOCKHOLDERS' EQUITY (DEFICIT) | (5,492,015) | 129,839,241 | 159,798,490 | (289,637,731) | (5,492,015) |
| | | | | | |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT) | $162,932,760 | $162,441,157 | $239,644,290 | $(289,637,731) | $275,380,476 |

| December 31, 2012 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash and cash equivalents | $25,035,579 | $ 2,461,465 | $ — | $ — | $ 27,497,044 |
| Restricted cash | — | 1,748,700 | 344,392 | — | 2,093,092 |
| Due from related parties | — | 8,613 | — | — | 8,613 |
| Investment in life settlements, at fair value | — | — | 164,317,183 | — | 164,317,183 |
| Deferred financing costs, net | — | — | 97,040 | — | 97,040 |
| Death benefits receivable | — | — | 2,850,000 | — | 2,850,000 |
| Other assets | 96,994 | 202,979 | 785,090 | — | 1,085,063 |
| Investment in subsidiaries | 60,608,585 | 96,914,613 | — | (157,523,198) | — |
| | | | | | |
| TOTAL ASSETS | $85,741,158 | $101,336,370 | $168,393,705 | $(157,523,198) | $197,948,035 |

**LIABILITIES & STOCKHOLDERS' EQUITY (DEFICIT)**

| | | | | | |
|---|---|---|---|---|---|
| **LIABILITIES** | | | | | |
| Revolving credit facility | $ — | $ — | $ 71,000,000 | $ — | $ 71,000,000 |
| Series I Secured notes payable | — | 37,844,711 | — | — | 37,844,711 |
| Renewable Secured Debentures | 55,718,950 | — | — | — | 55,718,950 |
| Accounts payable | 73,084 | 104,975 | 292,000 | — | 470,059 |

App. 0108

| | | | | |
|---|---|---|---|---|
| Interest payable | 905,817 | 2,444,097 | 128,206 | — | 3,477,320 |
| Other accrued expenses | 898,611 | 382,522 | 10,366 | — | 1,291,499 |
| Deferred taxes | 5,501,407 | — | — | — | 5,501,407 |
| TOTAL LIABILITIES | 63,097,069 | 40,776,305 | 71,430,572 | — | 175,303,946 |
| | | | | | |
| CONVERTIBLE, REDEEMABLE PREFERRED STOCK | 23,905,878 | — | — | — | 23,905,878 |
| | | | | | |
| STOCKHOLDERS' EQUITY (DEFICIT) | | | | | |
| Member capital | — | 60,560,065 | 96,963,133 | (157,523,198) | — |
| Common stock | 4,995 | — | — | — | 4,995 |
| Additional paid-in capital | 6,976,838 | — | — | — | 6,976,838 |
| Accumulated deficit | (8,243,622) | — | — | — | (8,243,622) |
| TOTAL STOCKHOLDERS' EQUITY (DEFICIT) | (1,261,789) | 60,560,065 | 96,963,133 | (157,523,198) | (1,261,789) |
| | | | | | |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT) | $85,741,158 | $101,336,370 | $168,393,705 | $(157,523,198) | $197,948,035 |

F-25

---

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Consolidating Statements of Operations

| For the year ended December 31, 2013 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUE | | | | | |
| Contract servicing fees | $ — | $ 3,710,737 | $ — | $ (3,710,737) | $ — |
| Gain on life settlements, net | — | — | 29,513,642 | — | 29,513,642 |
| Gain upon termination of agreement with Athena Securities Ltd. | $ 3,252,400 | — | — | — | $ 3,252,400 |
| Interest and other income | 81,931 | 2,612,420 | 79,767 | (2,475,386) | 298,732 |
| TOTAL REVENUE | 3,334,331 | 6,323,157 | 29,593,409 | (6,186,123) | 33,064,774 |
| | | | | | |
| EXPENSES | | | | | |
| Origination and servicing fees | — | — | 3,710,737 | (3,710,737) | — |
| Interest expense | 11,800,718 | 3,684,811 | 5,277,115 | — | 20,762,644 |
| Employee compensation and benefits | 3,424,383 | 1,619,465 | — | — | 5,043,848 |
| Legal and professional fees | 1,206,520 | 514,728 | 32,961 | — | 1,754,209 |
| Other expenses | 2,004,636 | 1,463,084 | 2,532,927 | (2,475,386) | 3,525,261 |
| TOTAL EXPENSES | 18,436,257 | 7,282,088 | 11,553,740 | (6,186,123) | 31,085,962 |
| | | | | | |
| INCOME (LOSS) BEFORE EQUITY IN INCOME OF SUBSIDIARIES | (15,101,926) | (958,931) | 18,039,669 | — | 1,978,812 |
| | | | | | |
| EQUITY IN INCOME OF SUBSIDIARIES | 17,080,738 | 18,088,189 | — | (35,168,927) | — |
| | | | | | |
| NET INCOME BEFORE INCOME TAXES | 1,978,812 | 17,129,258 | 18,039,669 | (35,168,927) | 1,978,812 |
| | | | | | |
| INCOME TAX EXPENSE | 2,173,767 | — | — | — | 2,173,767 |
| NET INCOME (LOSS) | (194,955) | 17,129,258 | 18,039,669 | (35,168,927) | (194,955) |
| Accretion of preferred stock to liquidation value | (806,624) | — | — | — | (806,624) |
| LOSS ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ (1,001,579) | $17,129,258 | $18,039,669 | $(35,168,927) | $ (1,001,579) |

| For the year ended December 31, 2012 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUE | | | | | |
| Contract servicing fees | $ — | $ 2,539,437 | $ — | $ (2,539,437) | $ — |
| Gain on life settlements, net | — | — | 17,436,743 | — | 17,436,743 |

App. 0109

| | | | | | |
|---|---|---|---|---|---|
| Interest and other income | 42,668 | 223,311 | 42,747 | (219,679) | 89,055 |
| TOTAL REVENUE | 42,668 | 2,762,748 | 17,479,490 | (2,759,108) | 17,525,798 |
| | | | | | |
| **EXPENSES** | | | | | |
| Origination and servicing fees | — | — | 2,539,437 | (2,539,437) | — |
| Interest expense | 4,311,719 | 4,833,058 | 1,953,521 | (219,671) | 10,878,627 |
| Employee compensation and benefits | — | 2,903,373 | — | — | 2,903,373 |
| Legal and professional fees | 899,588 | 162,323 | 14,783 | — | 1,076,694 |
| Other expenses | 937,562 | 1,496,752 | 52,499 | — | 2,486,813 |
| TOTAL EXPENSES | 6,148,869 | 9,395,506 | 4,560,240 | (2,759,108) | 17,345,507 |
| | | | | | |
| INCOME (LOSS) BEFORE EQUITY IN INCOME OF SUBSIDIARIES | (6,106,201) | (6,632,758) | 12,919,250 | — | 180,291 |
| | | | | | |
| EQUITY IN INCOME OF SUBSIDIARIES | 6,286,492 | 13,035,698 | — | (19,322,190) | — |
| | | | | | |
| NET INCOME BEFORE INCOME TAXES | 180,291 | 6,402,940 | 12,919,250 | (19,322,190) | 180,291 |
| | | | | | |
| INCOME TAX EXPENSE | 1,193,190 | — | — | — | 1,193,190 |
| NET INCOME (LOSS) | (1,012,899) | 6,402,940 | 12,919,250 | (19,322,190) | (1,012,899) |
| Accretion of preferred stock to liquidation value | (1,578,405) | — | — | — | (1,578,405) |
| LOSS ATTRIBUTABLE TO COMMON SHAREHOLDERS | $(2,591,304) | $ 6,402,940 | $12,919,250 | $(19,322,190) | $ (2,591,304) |

F-26

---

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Consolidating Statements of Cash Flows

| For the year ended December 31, 2013 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | |
| Net income (loss) | $ (194,955) | $ 17,129,258 | $ 18,039,669 | $(35,168,927) | $ (194,955) |
| Adjustments to reconcile net income (loss) to cash flows from operating activities: | | | | | |
| Equity of subsidiaries | (17,080,738) | (18,088,189) | — | 35,168,927 | — |
| Gain on life settlements | — | — | (39,337,542) | — | (39,337,542) |
| Amortization of deferred financing and issuance costs | 1,908,248 | 823,004 | (260,861) | — | 2,470,391 |
| Deferred income taxes | 2,173,767 | — | — | — | 2,173,767 |
| Preferred stock issued for dividends | 623,899 | — | — | — | 623,899 |
| Convertible, redeemable preferred stock dividends payable | 255 | — | — | — | 255 |
| Gain upon termination of agreement with Athena Securities Ltd. | (3,252,400) | — | — | — | (3,252,400) |
| (Increase) decrease in operating assets: | | | | | |
| Due from related parties | — | 8,613 | — | — | 8,613 |
| Death benefits receivable | — | — | 2,850,000 | — | 2,850,000 |
| Other assets | (51,522,808) | (45,077,218) | — | 96,033,606 | (566,420) |
| Increase (decrease) in operating liabilities: | | | | | |
| Accounts payable | 160,130 | 1,680 | 208,000 | — | 369,810 |
| Interest payable | 2,399,975 | 809,540 | 208,918 | — | 3,418,433 |
| Other accrued expenses | 277,321 | (224,990) | (1,690) | — | 50,641 |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (64,507,306) | (44,618,302) | (18,293,506) | 96,033,606 | (31,385,508) |
| | | | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | |
| Investment in life settlements | — | — | (34,997,500) | — | (34,997,500) |
| Proceeds from settlement of life settlements | — | — | 4,563,896 | — | 4,563,896 |

App. 0110

| | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| NET CASH FLOWS USED IN INVESTING ACTIVITIES | — | — | (30,433,604) | — | (30,433,604) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | | |
| Net proceeds from revolving credit facility | — | — | 8,000,000 | — | 8,000,000 |
| Payments for redemption of Series I Secured notes payable | — | (8,671,624) | — | — | (8,671,624) |
| Proceeds from issuance of debentures | 85,260,976 | — | — | — | 85,260,976 |
| Payments for issuance of debentures | (4,320,542) | — | — | — | (4,320,542) |
| Payments for redemption of debentures | (8,143,363) | — | — | — | (8,143,363) |
| Proceeds (payments) from restricted cash | — | 328,700 | (4,068,578) | — | (3,739,878) |
| Issuance of member capital | — | 51,237,918 | 44,795,688 | (96,033,606) | — |
| Payments for redemption of preferred stock | (613,708) | — | — | — | (613,708) |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 72,183,363 | 42,894,994 | 48,727,110 | (96,033,606) | 67,771,861 |
| NET INCREASE IN CASH AND CASH EQUIVALENTS | 7,676,057 | (1,723,308) | — | — | 5,952,749 |
| **CASH AND CASH EQUIVALENTS** | | | | | |
| BEGINNING OF THE YEAR | 25,035,579 | 2,461,465 | — | — | 27,497,044 |
| END OF THE YEAR | $ 32,711,636 | $ 738,157 | $ — | $ — | $ 33,449,793 |

F-27

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Consolidating Statements of Cash Flows (continued)

| For the year ended December 31, 2012 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | |
| Net income (loss) | $ (1,012,899) | $ 6,402,940 | $ 12,919,250 | $(19,322,190) | $ (1,012,899) |
| Adjustments to reconcile net income (loss) to cash flows from operating activities: | | | | | |
| Equity of subsidiaries | (6,286,492) | (13,035,698) | — | 19,322,190 | — |
| Gain on life settlements | — | — | (27,856,374) | — | (27,856,374) |
| Amortization of deferred financing and issuance costs | 506,279 | 1,169,755 | 232,896 | — | 1,908,930 |
| Deferred income taxes | 1,193,190 | — | — | — | 1,193,190 |
| Preferred stock issued for dividends | 567,478 | — | — | — | 567,478 |
| Convertible, redeemable preferred stock dividends payable | 338,695 | — | — | — | 338,695 |
| (Increase) decrease in operating assets: | | | | | |
| Due from related parties | — | (6,348) | — | — | (6,348) |
| Death benefits receivable | — | — | (2,850,000) | — | (2,850,000) |
| Other assets | (33,137,100) | (22,587,090) | (772,090) | 55,627,115 | (869,165) |
| Increase (decrease) in operating liabilities: | | | | | |
| Accounts payable | (306,373) | 48,665 | — | — | (257,708) |
| Interest payable | 918,374 | 806,058 | 20,167 | — | 1,744,599 |
| Other accrued expenses | (55,890) | (16,352) | 2,950 | — | (69,292) |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (37,274,738) | (27,218,070) | (18,303,201) | 55,627,115 | (27,168,894) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | |
| Investment in life settlements | — | — | (15,067,495) | — | (15,067,495) |
| Proceeds from settlement of life settlements | — | — | 1,067,210 | — | 1,067,210 |
| NET CASH FLOWS USED IN INVESTING ACTIVITIES | — | — | (14,000,285) | — | (14,000,285) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | | |

App. 0111

| | | | | | |
|---|---|---|---|---|---|
| Net proceeds from revolving credit facility | — | 11,000,000 | — | — | 11,000,000 |
| Payments for redemption of Series I Secured notes payable | — | (7,477,197) | — | — | (7,477,197) |
| Proceeds from issuance of debentures | 58,553,280 | — | — | — | 58,553,280 |
| Payments for issuance of debentures | (3,024,545) | — | — | — | (3,024,545) |
| Payments for redemption of debentures | (112,500) | — | — | — | (112,500) |
| Proceeds (payments) from restricted cash | — | (926,473) | 3,627,683 | — | 2,701,210 |
| Issuance of member capital | — | 37,951,312 | 17,675,803 | (55,627,115) | — |
| Issuance of preferred stock | 6,414,273 | — | — | — | 6,414,273 |
| Payments for issuance of preferred stock | (1,266,647) | — | — | — | (1,266,647) |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 60,563,861 | 29,547,642 | 32,303,486 | (55,627,115) | 66,787,874 |
| NET INCREASE IN CASH AND CASH EQUIVALENTS | 23,289,123 | 2,329,572 | — | — | 25,618,695 |
| **CASH AND CASH EQUIVALENTS** | | | | | |
| BEGINNING OF THE YEAR | 1,746,456 | 131,893 | — | — | 1,878,349 |
| END OF THE YEAR | $ 25,035,579 | $ 2,461,465 | $ — | $ — | $ 27,497,044 |

F-28

---

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(17) Concentration**

GWG purchases life insurance policies written by life insurance companies having investment grade ratings by independent rating agencies. As a result there may be certain concentrations of contracts with life insurance companies. The following summarizes the face value of insurance contracts with specific life insurance companies exceeding 10% of the total face value held by the Company.

| | December 31, 2013 | December 31, 2012 |
|---|---|---|
| | % | % |
| Life insurance company | | |
| Company A | 16.58 | 16.96 |
| Company B | 11.34 | 13.80 |
| Company C | * | 11.36 |

*    percentage does not exceed 10% of the total face value.

The following summarizes the number of insurance contracts held in specific states exceeding 10% of the total face value held by the Company:

| | December 31, 2013 | December 31, 2012 |
|---|---|---|
| | % | % |
| State of residence | | |
| California | 28.14 | 28.44 |
| Florida | 15.59 | 13.27 |
| New York | 10.65 | 11.85 |

**(18) Subsequent events**

**Stock split** — On June 24, 2014, the Company's Board of Directors and majority stockholders approved a joint resolution to effect an amendment to the Company's Certificate of Incorporation in the state of Delaware whereby the company shall enact a reverse split of the common stock such that for every two (2) shares of common stock issued and outstanding immediately prior to the effective date shall, automatically and without any action on the part of the respective holders thereof, be combined and converted into one (1) share of common stock. The effective date of the amendment and reverse stock split is June 24, 2014. In lieu of fractional shares, stockholders received cash payments in an amount equal to the fraction to which the stockholder would otherwise be entitled multiplied by the price of the common stock, as determined by the Board of Directors of the Corporation, but adjusted so as to give effect to the reverse stock split. The par value of the common stock remained at $0.001 per share.

App. 0112

All share and per-share information presented elsewhere in these financial statements and corresponding notes have been adjusted to reflect the stock split.

F-29

---

**Table of Contents**

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED BALANCE SHEETS**

| | September 30, 2014 | December 31, 2013 |
|---|---|---|
| | (unaudited) | |
| **ASSETS** | | |
| Cash and cash equivalents | $ 29,511,989 | $ 33,449,793 |
| Restricted cash | 2,144,734 | 5,832,970 |
| Investment in life settlements, at fair value | 276,381,979 | 234,672,794 |
| Other assets | 3,453,974 | 1,424,919 |
| TOTAL ASSETS | $311,492,676 | $275,380,476 |
| **LIABILITIES & STOCKHOLDERS' EQUITY (DEFICIT)** | | |
| LIABILITIES | | |
| Revolving credit facility | $ 79,000,000 | $ 79,000,000 |
| Series I Secured notes payable | 27,701,842 | 29,275,202 |
| Renewable Secured Debentures | 169,186,917 | 131,646,062 |
| Interest payable | 9,768,218 | 7,209,408 |
| Accounts payable and other accrued expenses | 2,069,386 | 1,343,952 |
| Deferred taxes, net | 3,545,504 | 7,675,174 |
| TOTAL LIABILITIES | 291,271,867 | 256,149,798 |
| CONVERTIBLE, REDEEMABLE PREFERRED STOCK | | |
| (par value $0.001; shares authorized 40,000,000; shares issued and outstanding 3,368,109; liquidation preference of $25,261,000 on December 31, 2013) | — | 24,722,693 |
| **STOCKHOLDERS' EQUITY (DEFICIT)** | | |
| CONVERTIBLE, REDEEMABLE PREFERRED STOCK | | |
| (par value $0.001; shares authorized 40,000,000; shares issued and outstanding 2,710,214; liquidation preference of $20,327,000 on September 30, 2014) | 20,217,836 | — |
| COMMON STOCK | | |
| (par value $0.001: shares authorized 210,000,000; 5,871,798 shares issued and 5,870,193 shares outstanding on September 30 , 2014 and 4,562,000 shares both issued and outstanding on December 31, 2013) | 5,870 | 4,562 |
| Additional paid-in capital | 16,323,738 | 2,942,000 |
| Accumulated deficit | (16,326,635) | (8,438,577) |
| TOTAL STOCKHOLDERS' EQUITY (DEFICIT) | 20,220,809 | (5,492,015) |
| TOTAL LIABILITIES & STOCKHOLDERS' EQUITY (DEFICIT) | $311,492,676 | $275,380,476 |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements

F-30

---

**Table of Contents**

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(unaudited)**

| | Three Months Ended | | Nine Months Ended | |
|---|---|---|---|---|
| | September 30, 2014 | September 30, 2013 | September 30, 2014 | September 30, 2013 |
| REVENUE | | | | |
| Gain on life settlements, net | $ 5,118,423 | $ 5,437,580 | $ 16,119,517 | $21,511,182 |
| Interest and other income | 10,229 | 89,927 | 23,975 | 3,531,922 |

App. 0113

| | | | | |
|---|---|---|---|---|
| TOTAL REVENUE | 5,128,652 | 5,527,507 | 16,143,492 | 25,043,404 |
| **EXPENSES** | | | | |
| Employee compensation and benefits | 1,376,710 | 1,100,159 | 3,524,274 | 4,101,502 |
| Legal and professional fees | 760,130 | 420,874 | 1,627,769 | 1,134,181 |
| Interest expense | 6,796,736 | 5,537,326 | 19,731,327 | 14,946,484 |
| Other expenses | 1,453,367 | 755,066 | 3,277,850 | 2,955,237 |
| TOTAL EXPENSES | 10,386,943 | 7,813,425 | 28,161,220 | 23,137,404 |
| | | | | |
| INCOME (LOSS) BEFORE INCOME TAXES | (5,258,291) | (2,285,918) | (12,017,728) | 1,905,700 |
| INCOME TAX (BENEFIT) EXPENSE | (1,858,100) | (656,968) | (4,129,670) | 1,710,826 |
| | | | | |
| NET INCOME (LOSS) | $ (3,400,191) | $(1,628,950) | $ (7,888,058) | $ 194,874 |
| | | | | |
| Accretion of preferred stock to liquidation value | (117,674) | (191,663) | (344,658) | (658,303) |
| LOSS ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ (3,517,865) | $(1,820,613) | $ (8,232,716) | $ (463,429) |
| | | | | |
| **NET LOSS PER SHARE** | | | | |
| Basic | $ (0.76) | $ (0.40) | $ (1.80) | $ (0.10) |
| Diluted | $ (0.76) | $ (0.24) | $ (1.80) | $ (0.06) |
| | | | | |
| **WEIGHTED AVERAGE SHARES OUTSTANDING** | | | | |
| Basic | 4,633,097 | 4,562,000 | 4,579,920 | 4,867,962 |
| Diluted | 4,633,097 | 7,489,000 | 4,579,920 | 7,803,947 |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements

F-31

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(unaudited)**

| | Three Months Ended | | Nine Months Ended | |
|---|---|---|---|---|
| | **September 30, 2014** | **September 30, 2013** | **September 30, 2014** | **September 30, 2013** |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | |
| Net income (loss) | $ (3,400,191) | $ (1,628,950) | $ (7,888,058) | $ 194,874 |
| Adjustments to reconcile net income (loss) to net cash flows from operating activities: | | | | |
| Life settlements — change in fair value | (8,761,912) | (6,960,335) | (30,973,250) | (25,904,240) |
| Amortization of deferred financing and issuance costs | 863,217 | 1,125,913 | 2,570,881 | 3,056,793 |
| Deferred income taxes | (1,858,100) | (655,968) | (4,129,670) | 1,710,826 |
| Convertible, redeemable preferred stock dividends payable | 186,182 | 185,231 | 575,513 | 443,486 |
| (Increase) decrease in operating assets: | | | | |
| Other assets | (847,221) | 432,671 | (2,096,140) | (3,181,461) |
| Increase in operating liabilities: | | | | |
| Accounts payable and accrued expenses | 490,496 | 470,395 | 3,658,659 | 2,168,874 |
| | | | | |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (13,327,529) | (7,031,043) | (38,282,065) | (21,510,848) |
| | | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | |
| Investment in life settlements | (680,000) | (14,030,797) | (11,559,435) | (26,916,790) |
| Proceeds from settlement of life settlements | 930,625 | 1,331,743 | 999,125 | 4,203,895 |
| NET CASH FLOWS PROVIDED BY (USED IN) INVESTING ACTIVITIES | 250,625 | (12,699,054) | (10,560,310) | (22,712,895) |
| | | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | |
| Net proceeds from revolving credit facility | — | — | — | 8,000,000 |
| Payments for redemption of Series I Secured notes payable | (509,004) | (2,311,710) | (2,047,928) | (6,242,586) |

App. 0114

| | | | | |
|---|---|---|---|
| Proceeds from issuance of Renewable Secured Debentures | 15,281,809 | 19,617,094 | 46,516,296 | 62,056,755 |
| Payments for issuance costs and redemption of Renewable Secured Debentures | (4,494,383) | (4,305,558) | (13,816,794) | (9,642,129) |
| Proceeds from (uses of) restricted cash | 665,699 | 954,217 | 3,688,236 | (1,416,558) |
| Issuance (repurchase) of common stock | 9,030,000 | — | 9,030,000 | (3,252,400) |
| Redemptions of convertible, redeemable preferred stock | (445,183) | (35,285) | (465,239) | (347,089) |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 19,528,938 | 13,918,758 | 44,904,571 | 49,155,993 |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | 6,452,034 | (5,811,339) | (3,937,804) | 4,932,250 |
| **CASH AND CASH EQUIVALENTS** | | | | |
| BEGINNING OF PERIOD | 23,059,955 | 38,240,633 | 33,449,793 | 27,497,044 |
| END OF PERIOD | $ 29,511,989 | $ 32,429,294 | $ 29,511,989 | $ 32,429,294 |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements

F-32

---

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS — CONTINUED**
**(unaudited)**

| | Three Months Ended | | Nine Months Ended | |
|---|---|---|---|---|
| | September 30, 2014 | September 30, 2013 | September 30, 2014 | September 30, 2013 |
| **SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION** | | | | |
| Interest paid | $5,095,000 | $3,605,000 | $12,877,000 | $10,117,000 |
| **NON-CASH INVESTING AND FINANCING ACTIVITIES** | | | | |
| Series I secured notes: | | | | |
| Non-cash conversion of Series I secured notes | $ — | $ 350,000 | $ — | $ 350,000 |
| Non-cash conversion of accrued interest and commissions payable to principal | $ 47,000 | $ 39,000 | $ 152,000 | $ 190,000 |
| Renewable secured debentures: | | | | |
| Non-cash conversion of accrued interest and commission payable to principal | $ 133,000 | $ 91,000 | $ 415,000 | $ 191,000 |
| Convertible, redeemable preferred stock | | | | |
| Non-cash conversion to common stock | $4,957,000 | $ — | $ 4,957,000 | $ — |
| Non-cash conversion of dividends payable | $ 192,000 | $ 182,000 | $ 573,000 | $ 443,000 |
| Non-cash accretion of convertible, redeemable preferred stock to redemption value | $ 118,000 | $ 192,000 | $ 345,000 | $ 658,000 |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements

F-33

---

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENT OF STOCKHOLDERS' EQUITY**

| | Preferred Stock Shares | Preferred Stock | Common Shares | Common Stock (par) | Additional Paid-in Capital | Accumulated Deficit | Total Equity |
|---|---|---|---|---|---|---|---|
| **Balance, December 31, 2012** | — | $ — | 4,994,500 | $4,995 | $ 6,976,838 | $ (8,243,622) | $(1,261,789) |
| Net loss | — | — | — | — | — | (194,955) | (194,955) |
| Repurchase of common stock | — | — | (432,500) | (433) | (3,251,967) | — | (3,252,400) |
| Issuance of stock options | — | — | — | — | 23,753 | — | 23,753 |
| Accretion of preferred stock to liquidation value | — | — | — | — | (806,624) | — | (806,624) |

App. 0115

| | | | | | | |
|---|---|---|---|---|---|---|
| **Balance, December 31, 2013** | — | $ — | 4,562,000 | $4,562 | 2,942,000 | $(8,438,593) | $(5,492,015) |
| Net loss | — | — | — | — | — | (7,888,058) | (7,888,058) |
| Issuance of common stock | — | — | 800,000 | 800 | 8,653,605 | — | 8,654,405 |
| Conversion of preferred stock | — | — | 508,193 | 508 | 4,956,591 | — | 4,957,099 |
| Reclassification of preferred stock from temporary equity to permanent equity due to initial public offering (*) | 2,710,214 | 20,217,836 | — | — | — | — | 20,217,836 |
| Issuance of stock options | — | — | — | — | 116,200 | — | 116,200 |
| Accretion of preferred stock to liquidation value | — | — | — | — | (344,658) | — | (344,658) |
| **Balance, September 30, 2014** | **2,710,214** | **$20,217,836** | **5,870,193** | **$5,870** | **$16,323,738** | **$(16,326,635)** | **$20,220,809** |

---

\* Subject to the terms of the Certificate of Designation for Series A Convertible Preferred Stock, the listing of our common stock on The Nasdaq Capital Market on September 25, 2014 resulted in the termination of a redemption right in favor of the holders of such preferred stock. Preferred stock that is not redeemable by a shareholder is treated as stockholders' equity as shown in the table above.

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements

F-34

---

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(unaudited)**

**(1) Nature of business and summary of significant accounting policies**

**Nature of business** — GWG Holdings, Inc. (GWG Holdings) and subsidiaries, located in Minneapolis, Minnesota, facilitates the purchase of life insurance policies for its own investment portfolio through its wholly owned subsidiary, GWG Life, LLC (GWG Life), and its subsidiaries, GWG Trust (Trust), GWG DLP Funding II, LLC (DLP II) and its wholly owned subsidiary, GWG DLP Master Trust II (the Trust II). Our wholly owned subsidiary, GWG Broker Services, LLC (Broker Services), was formed to earn fees for brokering policy transactions between market participants. Our wholly owned subsidiary United Lending, LLC (United Lending) and its wholly owned subsidiary United Lending SPV, LLC (United Lending SPV) were formed to finance life settlement premiums and policy loans. All of these entities are legally organized in Delaware. Unless the context otherwise requires or we specifically so indicate, all references in this report to "we", "us", "our", "our Company", "GWG", or the "Company" refer to these entities collectively. GWG Member, LLC, a wholly owned subsidiary formed November 2010 to facilitate the acquisition of policies, has not commenced operations as of September 30, 2014.

**Basis of presentation** — The condensed consolidated balance sheet as of September 30, 2014, the condensed consolidated statements of operations for the three and nine months ended September 30, 2014 and 2013, and the condensed consolidated statements of cash flows for the three and nine months ended September 30, 2014 and 2013, and the related information presented in these notes, have been prepared by management in accordance with U.S. generally accepted accounting principles ("GAAP") for interim financial information and with the instructions to Form 10-Q and Rule 10-01 of Regulation S-X, without audit. To the extent that information and notes required by U.S. generally accepted accounting principles for complete financial statements are contained in or are consistent with the consolidated audited financial statements in the Company's Form 10-K for the year ended December 31, 2013, such information and notes have not been duplicated herein. In the opinion of management, all adjustments considered necessary for a fair presentation of results have been included. The condensed consolidated balance sheet at December 31, 2013 was derived from the audited consolidated financial statements as of that date. Operating results for the three and nine months ended September 30, 2014 are not necessarily indicative of the results that may be expected for the year ending December 31, 2014. For further information, refer to the consolidated financial statements and notes thereto included in the Company's Annual Report on Form 10-K for the year ended December 31, 2013.

**Use of estimates** — The preparation of consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. The Company regularly evaluates estimates and assumptions. The Company bases its estimates and assumptions on current facts, historical experience, and various other factors that it believes to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities and the accrual of costs and expenses that are not readily apparent from other sources. The actual results experienced by the Company may differ materially and adversely from the Company's estimates. To the extent there are material differences between the estimates and the actual results, future results of operations will be affected. The most significant estimates with regard to these consolidated financial statements relates to (1) the determination of the assumptions used in estimating the fair value of the investment in life insurance policies, and (2) the value of deferred tax assets.

**Life settlements** — Financial Accounting Standards Codification ("ASC") 325-30, *Investments in Insurance Contracts*, allows a reporting entity the election to account for its investments in life settlements using either the investment method or the fair value method. The election shall be made on an instrument-by-instrument basis and is irrevocable. Under the investment method, an investor shall recognize the initial investment at the purchase price plus all initial direct costs. Continuing costs (policy premiums and direct external costs, if any) to keep the policy in force shall be capitalized. Under the fair value method, an investor

F-35

App. 0116

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(unaudited)**

shall recognize the initial investment at the purchase price. In subsequent periods, the investor shall remeasure the investment at fair value in its entirety at each reporting period and shall recognize the change in fair value in current period income net of premiums paid. The Company uses the fair value method to account for all life settlements.

The Company recognizes realized gains (revenue) from life settlement contracts upon one of the two following events:

1)  Receipt of death notice or verified obituary of insured

2)  Sale of policy and filing of change of ownership forms and receipt of payment

The Company recognizes the difference between the death benefits and carrying values of the policy when an insured event has occurred and the Company determines that settlement and ultimate collection of the death benefits is realizable and reasonably assured. Revenue from a transaction must meet both criteria in order to be recognized. In an event of a sale of a policy the Company recognizes gain or loss as the difference between the sale price and the carrying value of the policy on the date of the receipt of payment on such sale.

Deposits and initial direct costs advanced on unsettled policy acquisitions are recorded as other assets until policy ownership has been transferred to the Company. Such deposits and direct cost advances were $25,000 and $201,000 at September 30, 2014 and December 31, 2013, respectively.

**Deferred financing and issuance costs** — Costs incurred to obtain financing under the revolving credit facility, as described in note 6, have been capitalized and are amortized using the straight-line method over the term of the revolving credit facility. Amortization of deferred financing costs was $89,000 for both the three-month periods ended September 30, 2014 and 2013, and $268,000 and $365,000 for the nine-month periods ended September 30, 2014 and 2013, respectively. The future amortization is expected to be $89,000 for the three months ending December 31, 2014. The Series I Secured notes payable, as described in note 7, are reported net of issuance costs, sales commissions and other direct expenses, which are amortized using the interest method over the term of each respective borrowing. The Renewable Secured Debentures, as described in note 8, are reported net of issuance costs, sales commissions and other direct expenses, which are amortized using the interest method over the term of each respective borrowing. The Series A preferred stock, as described in note 9, is reported net of issuance costs, sales commissions, including the fair value of warrants issued, and other direct expenses, which are amortized using the interest method as interest expense over the three-year redemption period.

**Earnings (loss) per share** — Basic per share earnings (loss) attributable to non-redeemable interests is calculated using the weighted-average number of shares outstanding during the period. Diluted earnings per share is calculated based on the potential dilutive impact, if any, of the Company's convertible, redeemable preferred stock, and outstanding warrants, and stock options.

**Subsequent events** — Subsequent events are events or transactions that occur after the balance sheet date but before consolidated financial statements are issued. The Company recognizes in the consolidated financial statements the effects of all subsequent events that provide additional evidence about conditions that existed at the date of the balance sheet, including the estimates inherent in the process of preparing the consolidated financial statements. The Company's consolidated financial statements do not recognize subsequent events that provide evidence about conditions that did not exist at the date of the balance sheet but arose after the balance sheet date and before the consolidated financial statements are available to be issued. The Company evaluates subsequent events and transactions that occur after the balance sheet date up to the date that the consolidated financial statements are filed for potential recognition or disclosure.

F-36

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(unaudited)**

**Recently adopted pronouncements** — In May 2014, the FASB issued ASU No. 2014-09, Revenue from Contracts with Customers, which converges the FASB and the International Accounting Standards Board standard on revenue recognition. Areas of revenue recognition that will be affected include, but are not limited to, transfer of control, variable consideration, allocation of transfer pricing, licenses, time value of money, contract costs and disclosures. This is effective for the fiscal years and interim reporting periods beginning after December 15, 2016. We are currently evaluating the impact that the adoption of ASU 2014-09 will have on our consolidated financial statements or related disclosures.

**(2) Restrictions on cash**

The Company is required by its lenders to maintain collection and escrow accounts. These accounts are used to fund the acquisition, pay annual premiums of insurance policies, pay interest and other charges under the revolving credit facility, and collect policy benefits. DZ Bank AG, as agent for Autobahn Funding

App. 0117

Company, BCC, the lender for the revolving credit facility as described in note 6, authorizes the disbursements from these accounts. At September 30, 2014 and December 31, 2013 there was a balance of $2,145,000, and $5,833,000, respectively, maintained in these restricted cash accounts.

**(3) Investment in life insurance policies**

The life insurance policies (Level 3 fair value measurements) are valued based on unobservable inputs that are significant to the overall fair value measurement. Changes in the fair value of these instruments are recorded in gain or loss on life insurance policies in the consolidated statements of operations (net of the cash premiums paid on the policies). The fair value is determined on a discounted cash flow basis that incorporates life expectancy assumptions. Life expectancy reports have been obtained from widely accepted life expectancy providers. The discount rate incorporates current information about market interest rates, the credit exposure to the insurance company that issued the life insurance policy and our estimate of the risk premium an investor in the policy would require. As a result of management's analysis, discount rates of 11.56% and 11.69% were applied to the portfolio as of September 30, 2014 and December 31, 2013.

A summary of the Company's life insurance policies accounted for under the fair value method and their estimated maturity dates, based on remaining life expectancy, is as follows:

| Years Ending December 31, | As of September 30, 2014 | | | As of December 31, 2013 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Number of Contracts | Estimated Fair Value | Face Value | Number of Contracts | Estimated Fair Value | Face Value |
| 2014 | — | $ — | $ — | — | $ — | $ — |
| 2015 | 3 | 4,936,000 | 6,000,000 | 4 | 5,065,000 | 6,750,000 |
| 2016 | 10 | 10,198,000 | 14,700,000 | 8 | 8,174,000 | 13,750,000 |
| 2017 | 21 | 29,061,000 | 49,630,000 | 25 | 33,345,000 | 63,916,000 |
| 2018 | 30 | 36,645,000 | 71,167,000 | 33 | 37,243,000 | 80,318,000 |
| 2019 | 43 | 46,015,000 | 109,295,000 | 34 | 32,844,000 | 89,295,000 |
| 2020 | 40 | 39,560,000 | 96,224,000 | 34 | 27,741,000 | 75,644,000 |
| Thereafter | 142 | 109,967,000 | 440,948,000 | 125 | 90,261,000 | 410,975,000 |
| Totals | 289 | $276,382,000 | $787,964,000 | 263 | $234,673,000 | $740,648,000 |

The Company recognized policy benefits of $3,000,000 and $5,000,000 during the three-month periods ended September 30, 2014 and 2013, respectively, related to policies with a carrying value of $931,000 and $1,332,000, respectively. The Company recorded realized gains of $2,069,000 and $3,668,000 on such policies. During the nine-month periods ended September 30, 2014 and 2013, the Company recognized policy benefits of $3,300,000 and $15,600,000, respectively, related to policies with carrying value of $999,000 and

F-37

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(unaudited)**

$4,204,000, respectively. The Company recorded realized gains of $2,301,000 and $11,396,000 on such policies. Subsequent to September 30, 2014, four policies with combined insurance benefits of $13,000,000 have matured.

Reconciliation of gain on life settlements:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2014 | 2013 | 2014 | 2013 |
| Change in fair value | $ 8,762,000 | $ 6,960,000 | $ 30,973,000 | $ 25,904,000 |
| Premiums and other annual fees | (5,713,000) | (5,191,000) | (17,155,000) | (15,789,000) |
| Policy maturities | 2,069,000 | 3,668,000 | 2,301,000 | 11,396,000 |
| Gain on life settlements, net | $ 5,118,000 | $ 5,437,000 | $ 16,119,000 | $ 21,511,000 |

The estimated expected premium payments to maintain the above life insurance policies in force through 2018, assuming no mortalities, are as follows:

| Years Ending December 31, | |
| --- | --- |
| Three months ending December 31 ,2014 | $ 6,364,000 |
| 2015 | 26,728,000 |
| 2016 | 29,354,000 |
| 2017 | 32,829,000 |
| 2018 | 35,753,000 |
| | $131,028,000 |

App. 0118

Management anticipates funding the estimated premium payments as noted above with proceeds from the DZ Bank revolving credit facility and through additional debt and equity financing as well as from cash proceeds from maturities of life insurance policies. The proceeds of these capital sources are also intended to be used for the purchase, financing, and maintenance of additional life insurance policies.

**(4) Fair value definition and hierarchy**

ASC 820 establishes a hierarchal disclosure framework which prioritizes and ranks the level of market price observability used in measuring assets and liabilities at fair value. Market price observability is affected by a number of factors, including the type of investment, the characteristics specific to the investment and the state of the marketplace including the existence and transparency of transactions between market participants. Assets and liabilities with readily available active quoted prices or for which fair value can be measured from actively quoted prices in an orderly market generally will have a higher degree of market price observability and a lesser degree of judgment used in measuring fair value. ASC 820 establishes a three-level valuation hierarchy for inputs used in measuring fair value that maximizes the use of observable inputs and minimizes the use of unobservable inputs by requiring that the most observable inputs be used when available. Observable inputs are inputs that market participants would use in pricing the asset or liability developed based on market data obtained from sources independent of the Company. Unobservable inputs are inputs that reflect the Company's assumptions about the assumptions market participants would use in pricing the asset or liability developed based on the best information available in the circumstances. Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability (i.e., the "exit price") in an orderly transaction between market participants at the measurement date.

F-38

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(unaudited)**

The hierarchy is broken down into three levels based on the observability of inputs as follows:

- Level 1 — Valuations based on quoted prices in active markets for identical assets or liabilities that the Company has the ability to access. Since valuations are based on quoted prices that are readily and regularly available in an active market, valuation of these products does not entail a significant degree of judgment.

- Level 2 — Valuations based on one or more quoted prices in markets that are not active or for which all significant inputs are observable, either directly or indirectly.

- Level 3 — Valuations based on inputs that are unobservable and significant to the overall fair value measurement.

The availability of observable inputs can vary by types of assets and liabilities and is affected by a wide variety of factors, including, for example, whether instrument is established in the marketplace, the liquidity of markets and other characteristics particular to the transaction. To the extent that valuation is based on models or inputs that are less observable or unobservable in the market, the determination of fair value requires more judgment. Accordingly, the degree of judgment exercised by management in determining fair value is greatest for assets and liabilities categorized in Level 3.

Level 3 Valuation Process

The estimated fair value of the Company's life settlements are determined on a quarterly basis by the Company taking into consideration changes in discount rate assumptions, estimated premium payments and life expectancy assumptions, as well as any changes in economic and other relevant conditions. These inputs are then used to estimate the discounted cash flows using the Model Actuarial Pricing System (MAPS) probabilistic portfolio pricing model, which estimates the cash flows using various different probabilities and scenarios. The valuation process includes a review by senior management as of each valuation date. Management also engages a third party expert to independently test the accuracy of the valuations using the inputs provided by management.

Life insurance policies represent financial instruments recorded at fair value on a recurring basis. The following table reconciles the beginning and ending fair value of the Company's Level 3 investments in life insurance policies for the three and nine-month periods ending September 30, 2014 and 2013, as follows:

| | Three month ended September 30, | | Nine Months ended September 30, | |
|---|---|---|---|---|
| | **2014** | **2013** | **2014** | **2013** |
| Beginning balance | $267,896,000 | $193,892,000 | $234,673,000 | $164,317,000 |
| Purchases | 655,000 | 14,646,000 | 11,735,000 | 28,149,000 |
| Maturities (cash in excess of carrying value) | (931,000) | (1,332,000) | (999,000) | (4,204,000) |
| Net change in fair value | 8,762,000 | 6,960,000 | 30,973,000 | 25,904,000 |
| Ending balance | $276,382,000 | $214,166,000 | $276,382,000 | $214,166,000 |

The fair value of a portfolio of life insurance policies is based on information available to the Company at the reporting date. Fair value is based upon a discounted cash flow model that incorporates life expectancy estimate assumptions. Life expectancy estimates are obtained from independent, third-party, widely

App. 0119

accepted life expectancy estimate providers at policy acquisition. The life expectancy values of each insured is determined at policy acquisition, are rolled down monthly for the passage of time by the MAPS actuarial software the Company uses for ongoing valuation of its portfolio of life insurance policies. The discount rate incorporates current information about discount rates applied by other reporting companies owning portfolios of life insurance policies, discount rates observed in the life insurance secondary market, market interest rates, the credit exposure to the insurance company that issued the life insurance policy and management's estimate

F-39

Table of Contents

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

of the risk premium a purchaser would require to receive the future cash flows derived from our portfolio of life insurance policies.

On January 22, 2013, one of the independent medical actuarial underwriting firms we utilize, 21st Services, announced advancements in its underwriting methodology, resulting in revised estimated life expectancy mortality tables for life settlement transactions. We were advised by 21st Services that the changes are very granular and relate to both specific medical conditions and lifestyles of insureds. These changes were the result of the application of additional medical information gathered by 21st Services over a period of time, and which were applied to the inputs and methodologies used to develop the actuarial life expectancies. While we do not believe these revised methodologies indicate the previous estimated life expectancies were inaccurate, we believe the revised methodologies provide additional information that should be considered in updating our estimate of the life expectancies of the insureds within our portfolio. Based upon our evaluation and analysis of data made available by 21st Services, as well as information regarding the insureds within our portfolio, we have estimated the impact of the changes in 21st Services' methodologies for determining life expectancies on a policy-by-policy basis within our portfolio as of December 31, 2012 and applied such changes to the life expectancy inputs used to estimate fair value. We have adjusted the original life expectancies provided by 21st Services based on four factors, the impact of each analyzed individually for each insured in the GWG portfolio. The four factors are gender, anti-selection, age, and primary impairment. GWG applied this set of adjustments to all 21st Services life expectancy reports used in valuation of the portfolio as of December 31, 2012. At that time, the portfolio contained 211 policies on 194 insured lives. Of those 211 policies, 199 were valued using a 21st Services life expectancy report as part of the pricing life expectancy estimate calculation. While the analysis and adjustments were applied on an individual policy basis, the result was an average overall increase in the original life expectancy estimates of 8.67%. We have a standard practice of obtaining two third-party life expectancy estimates for each policy in our portfolio. As a result, the effective change in life expectancy on the portfolio as of December 31, 2012 was an average of approximately 4.33%, which resulted in an aggregate decrease in the fair value of our life settlements portfolio of $12.4 million as of December 31, 2012. Life expectancy reports by their very nature are estimates.

During 2013, we sought to update our life expectancy estimates from all four of the major independent third-party medical-actuarial underwriting firms (including 21st Services) with updated medical records on all of the 211 policies we originally used a life expectancy report from 21st Services. As of December 31, 2013, we had successfully procured new life expectancy reports on 176 of the 211 policies owned as of December 31, 2012. We experienced ten mortalities in 2013 for which no updated life expectancy reports were necessary. We also had two small face policies ($1 million face value or less) in our portfolio for which we did not update life expectancy reports. Accordingly, as of September 30, 2014 we had updated our life expectancy estimates based on updated life expectancy reports on all but 10 policies (covering 9 people) in our portfolio that we are still seeking to update.

In order to assess the reasonableness of our adjustments, made effective December 31, 2012, we compared the life expectancy estimates including any adjustments used on December 31, 2012 to the updated life expectancy estimates used on December 31, 2013. Because an additional year has elapsed since the December 31, 2012 date, the older set of adjusted life expectancy estimates were "rolled down" to shorter numbers based on an actuarial calculation to make them comparable to the updated life expectancy estimates used on December 31, 2013. The average amount of roll down to account for the 12-month passage of time was eight and one-half months.

We concluded that the adjustments we made effective December 31, 2012, were reasonable when we the compared the rolled down life expectancy estimates from December 31, 2012 to the updated life expectancy estimates on December 31, 2013. The average rolled down life expectancy estimate from December 31, 2012

F-40

Table of Contents

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

is 80.9 months. The average updated life expectancy estimate obtained from updated life expectancy reports as of December 31, 2013 is 79.4 months, shorter by one and one-half months.

On September 15, 2014, 21st Services announced changes to its mortality tables primarily for insureds age 90 and older, as well as updated adjustment factors designed to better underwrite seniors with multiple impairments. These changes represent small portions of 21st Services' historical underwritings. We expect medical-actuarial underwriting firms to continue improving and refining their underwriting methodology.

App. 0120

The fair value of life insurance policies is estimated using present-value calculations of estimated cash flows based on the data specific to each individual life insurance policy. Estimated future policy premium payments are calculated based on the terms of the policy and the premium payment history. The following summarizes the unobservable inputs utilized in estimating the fair value of the portfolio of life insurance policies:

|  | As of September 30, 2014 | As of December 31, 2013 |
|---|---|---|
| Weighted average age of insured | 82.6 | 82.1 |
| Weighted average life expectancy, months* | 80.3 | 87.0 |
| Average face amount per policy | $2,727,000 | $2,816,000 |
| Discount rate | 11.56% | 11.69% |

\* Standard life expectancy as adjusted for insured's specific circumstances.

These assumptions are, by their nature, inherently uncertain and the effect of changes in estimates may be significant. The techniques used in estimating the present value of estimated cash flows are derived from valuation techniques generally used in the life settlement industry that include inputs for the asset that are not based on observable market data. The extent to which the fair value could reasonably vary in the near term has been quantified by evaluating the effect of changes in significant underlying assumptions used to estimate the fair value. If the life expectancy estimates were increased or decreased by four and eight months on each outstanding policy and the discount rates were increased or decreased by 1% and 2%, while all other variables are held constant, the fair value of the investment in life insurance policies would increase or (decrease) by the amounts summarized below:

|  | Changes in fair value of life insurance policies | | | |
|---|---|---|---|---|
| Change in life expectancy estimates | plus 8 months | minus 8 months | plus 4 months | minus 4 months |
| September 30, 2014 | $(38,876,000) | $40,795,000 | $(19,680,000) | $20,166,000 |
| December 31, 2013 | $(34,382,000) | $36,152,000 | $(17,417,000) | $17,865,000 |

| Change in discount rate | plus 2% | minus 2% | plus 1% | minus 1% |
|---|---|---|---|---|
| September 30, 2014 | $(24,279,000) | $28,449,000 | $(12,608,000) | $13,646,000 |
| December 31, 2013 | $(22,944,000) | $27,063,000 | $(11,933,000) | $12,959,000 |

Other Fair Value Considerations

Carrying value of receivables, prepaid expenses, accounts payable and accrued expenses approximate fair value due to their short-term maturities and low credit risk. The estimated fair value of the Company's Series I Secured notes payable and Renewable Secured Debentures is approximately $203,920,000 based on a weighted-average market interest rate of 7.16% based on an income approach, the combined face value of these notes is $201,439,000 as of September 30, 2014. The carrying value of the revolving credit facility reflects interest charged at the commercial paper rate plus an applicable margin. The margin represents our

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(unaudited)**

credit risk, and the strength of the portfolio of life insurance policies collateralizing the debt. The overall rate reflects market, and the carrying value of the revolver approximates fair value. All of the financial instruments are level 3 fair value measurements.

The Company has issued warrants to purchase common stock in connection with the issuance of its convertible, redeemable preferred stock. Warrants are classified as permanent equity. The fair value measurements associated with the warrants, measured at issuance represent level 3 instruments.

As of September 30, 2014:

| Month issued | Warrants issued | Fair value per share | Risk free rate | Volatility | Term |
|---|---|---|---|---|---|
| December 2011 | 68,937 | $0.22 | 0.42% | 25.25% | 3 years |
| March 2012 | 38,130 | $0.52 | 0.38% | 36.20% | 3 years |
| June 2012 | 161,840 | $1.16 | 0.41% | 47.36% | 3 years |
| July 2012 | 144,547 | $1.16 | 0.41% | 47.36% | 3 years |

| September 2012 | 2,590 | $6.72 | 6.31% | 48.49% | 3 years |
|---|---|---|---|---|---|
| | 415,954 | | | | |

Volatility is based upon the weekly percentage change in the stock price of selected comparable insurance companies. In June 2012, we evaluated the comparable companies used, and made certain changes to those used. The percentage change is calculated on the average price of those selected stocks at the weekly close of business for the year preceding the balance sheet date. We compare annual volatility based on this weekly information.

In conjunction with the Company's recent initial public offering the Company issued a warrant for the purchase of up 16,000 shares of the Company's common stock to the underwriters of the initial public offering.

### (5) Notes receivable from related parties

As of September 30, 2014 and December 31, 2013, the Company had receivables totaling $5,000,000 due from an affiliate, Opportunity Finance, LLC, which were fully reserved. Opportunity Finance ceased operations in 2008.

### (6) Credit facilities

**Revolving credit facility — Autobahn Funding Company LLC**

On July 15, 2008, DLP II and United Lending entered into a revolving credit facility pursuant to a Credit and Security Agreement (Agreement) with Autobahn Funding Company LLC (Autobahn), providing the Company with a maximum borrowing amount of $100,000,000. Autobahn is a commercial paper conduit that issues commercial paper to investors in order to provide funding to DLP II and United Lending. DZ Bank AG Deutsche Zentral-Genossenschaftsbank (DZ Bank) acts as the agent for Autobahn. The original Agreement was to expire on July 15, 2013. On January 29, 2013, GWG Holdings, together with GWG Life and DLP II, entered into an Amended and Restated Credit and Security Agreement with Autobahn, extending the facility expiration date to December 31, 2014, and removing United Lending as a party to the amended and restated agreement. On May 29, 2014, GWG Holdings, together with GWG Life and DLP II, entered into an Amendment No. 1 to Amended and Restated Credit and Security Agreement with Autobahn and DZ Bank (as committed lender and Agent). The amendment was entered into for the purpose of extending the maturity date

F-42

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(unaudited)**

for borrowings under the agreement to December 31, 2016. The amount outstanding under this facility as of both September 30, 2014 and December 31, 2013 was $79,000,000.

The Agreement requires DLP II to pay, on a monthly basis, interest at the commercial paper rate plus an applicable margin, as defined in the Agreement. The effective rate was 6.22% at September 30, 2014 and 6.19% at December 31, 2013. The weighted average effective interest rate was 6.23% (excluding the unused line fee) for both three months ended September 30, 2014 and 2013. The Agreement also requires payment of an unused line fee on the unfunded amount under the revolving credit facility. The note is secured by substantially all of DLP II assets which consist primarily of life insurance policies.

The Agreement has certain financial and nonfinancial covenants. The Company was in compliance with these covenants at September 30, 2014 and December 31, 2013. The Agreement generally prohibits the Company from:

- changing its corporate name, offices, and jurisdiction of incorporation;

- changing any deposit accounts or payment instructions to insurers;

- changing any operating policies and practices such that it would be reasonably likely to adversely affect the collectability of any asset in any material respect;

- merging or consolidating with, or selling all or substantially all of its assets to, any third party;

- selling any collateral or creating or permitting to exist any adverse claim upon any collateral;

- engaging in any other business or activity than that contemplated by the Agreement;

- incurring or guaranteeing any debt for borrowed money;

- amending the Company's certificate of incorporation or bylaws, making any loans or advances to, investments in, or paying any dividends to, any person unless both before and after any such loan, advance, investment or dividend there exists no actual event of default, potential event of default or termination event;

App. 0122

- removing an independent director on the board of directors except for cause or with the consent of the lender; or

- making payment on or issuing any subsidiary secured notes or debentures, or amending any agreements respecting such notes or debentures, if an event of default, potential event of default or termination event exists or would arise from any such action.

In addition, the Company has agreed to maintain (i) a positive consolidated net income on a Non-GAAP basis (as defined and calculated under the Agreement) for each complete fiscal year and (ii) a tangible net worth on a Non-GAAP basis (as defined and calculated under the Agreement) of not less than $15 million, and (iii) maintain a borrowing base surplus or cash cushion sufficient to pay 12 months of premiums and facility fees.

Consolidated net income and tangible net worth as of and for the four quarters ended September 30, 2014, as calculated under the agreement, was $20,467,000 and $78,236,000 respectively.

Advances under the Agreement are subject to a borrowing base formula, which limits the availability of advances based on attributes of policies pledged to the facility. Over-concentration of policies by insurance carrier, over-concentration of policies by insurance carriers with ratings below a AA- rating, and the premiums and facility fees reserve are the three primary factors with the potential of limiting availability of funds on the

F-43

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(unaudited)**

facility. Total funds available for additional borrowings under the borrowing base formula criteria at September 30, 2014 and December 31, 2013, were $11,576,000 and $3,937,000 respectively.

On July 15, 2008, GWG Holdings delivered a performance guaranty in favor of Autobahn pursuant to which it guaranteed the obligations of GWG Life, in its capacity as the seller and master servicer, under the Credit and Security Agreement and related documents. On January 29, 2013 and in connection with the Amended and Restated Credit and Security Agreement, GWG Holdings delivered a reaffirmation of its performance guaranty. The obligations of GWG Holdings under the performance guaranty and subsequent reaffirmation do not extend to the principal and interest owed by DLP II as the borrower under the credit facility.

**(7) Series I Secured notes payable**

Series I Secured notes payable have been issued in conjunction with the GWG Series I Secured notes private placement memorandum dated August 25, 2009 (last revised November 15, 2010). On June 14, 2011, the Company closed the offering to additional investors; however, existing investors may elect to continue advancing amounts outstanding upon maturity subject to the Company's option. Series I Secured notes have maturity dates ranging from six months to seven years with fixed interest rates varying from 5.65% to 9.55% depending on the term of the note. Interest is payable monthly, quarterly, annually or at maturity depending on the terms of the note. At September 30, 2014 and December 31, 2013, the weighted-average interest rate of Series I Secured notes was 8.37% and 8.35%, respectively. The notes are secured by assets of GWG Life. The principal amount outstanding under these Series I Secured notes was $28,193,000 and $29,744,000 at September 30, 2014 and December 31, 2013, respectively. The difference between the amount outstanding on the Series I Secured notes and the carrying amount on the consolidated balance sheet is due to netting of unamortized deferred issuance costs. Overall, interest expense includes amortization of deferred financing and issuance costs of $126,000 and $427,000 for the three and nine months ended September 30, 2014, respectively, and $165,000 and $606,000 for the three and nine months ended September 30, 2013, respectively. Future expected amortization of deferred financing costs is $491,000 over the next six years.

Future contractual maturities of Series I Secured notes payable at September 30, 2014 are as follows:

| Years Ending December 31, | |
| --- | --- |
| Three months ending December 31 ,2014 | $ 1,925,000 |
| 2015 | 12,729,000 |
| 2016 | 8,217,000 |
| 2017 | 4,427,000 |
| 2018 | 754,000 |
| Thereafter | 141,000 |
| | $28,193,000 |

**(8) Renewable Secured Debentures**

The Company has registered with the Securities and Exchange Commission, effective January 2012, the offer and sale of $250,000,000 of secured debentures. Renewable Secured Debentures have maturity dates ranging from six months to seven years with fixed interest rates varying from 4.75% to 9.50% depending on the term of the note. Interest is payable monthly, annually or at maturity depending on the terms of the debenture. At September 30, 2014 and December 31, 2013, the weighted-average interest rate of Renewable Secured Debentures was 7.49% and 7.53%, respectively. The debentures are secured by assets of GWG Life and GWG Holdings. The amount outstanding under these Renewable Secured Debentures was $173,245,000 and $134,891,000 at September 30, 2014 and December 31, 2013, respectively. The difference between the amount outstanding on the Renewable Secured Debentures and the carrying amount on the consolidated

App. 0123

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(unaudited)**

balance sheets is due to netting of unamortized deferred issuance costs and cash receipts for new issuances in process. Amortization of deferred issuance costs was $829,000 and $2,584,000 for the three and nine months ended September 30, 2014, respectively, and $630,000 and $1,253,000 for the three and nine months ended September 30, 2013, respectively. Future expected amortization of deferred financing costs as of September 30, 2014 is $5,737,000. Subsequent to September 30, 2014, the Company has issued approximately an additional $7,300,000 in principal amount of these Renewable Secured Debentures.

The use of proceeds from the issuances of Renewable Secured Debentures is limited to the following: (1) payment of commissions on sales of Renewable Secured Debentures, (2) payment of offering expenses, (3) purchase of life insurance policies, (4) payment of premiums on life insurance policies, (5) payment of principal and interest on Renewable Secured Debentures, (6) payment of portfolio operations expenses, and (7) for general working capital.

Future contractual maturities of Renewable Secured Debentures at September 30, 2014 are as follows:

| Years Ending December 31, | |
|---|---:|
| Three months ending December 31, 2014 | $ 16,086,000 |
| 2015 | 55,676,000 |
| 2016 | 43,434,000 |
| 2017 | 21,950,000 |
| 2018 | 10,730,000 |
| Thereafter | 25,369,000 |
| | $173,245,000 |

The Company entered into an indenture effective October 19, 2011 with GWG Holdings as obligor, GWG Life as guarantor, and Bank of Utah as trustee for the benefit of the debenture holders. The Indenture has certain financial and nonfinancial covenants. The Company was in compliance with these covenants at September 30, 2014 and December 31, 2013.

**(9) Convertible, redeemable preferred stock**

The Company offered 3,333,333 shares of convertible redeemable preferred stock (Series A preferred stock) for sale to accredited investors in a private placement on July 31, 2011. The offering of Series A preferred stock concluded on September 2, 2012 and resulted in 3,278,000 shares being issued for gross consideration of $24,582,000. As of September 30, 2014, 248,000 shares have been issued as a result of conversion of $1,735,000 in dividends into shares of Series A preferred stock and 678,000 shares have been converted to 508,000 shares of the Company's common stock. The Series A preferred stock was sold at an offering price of $7.50 per share. Series A preferred stock has a preferred yield of 10% per annum, and each share has the right to convert into 0.75 shares of the Company's common stock. Series A preferred shareholders also received three-year warrants to purchase, at an exercise price per share of $12.50, one share of common stock for every 40 shares of Series A preferred stock purchased. The warrants are exercisable immediately. Upon their original issuance, these warrants had a three-year exercise period. Effective August 1, 2014, the Board of Directors authorized the extension of the warrant exercise period for an additional two years. In the Certificate of Designations for the Series A preferred stock dated July 31, 2011, the Company has agreed to permit preferred shareholders to sell their shares back to the Company for the stated value of $7.50 per share, plus accrued dividends, according to the following schedule:

• Up to 33% of the holder's unredeemed shares one year after issuance:

• Up to 66% of the holder's unredeemed shares two years after issuance; and

• Up to 100% of the holder's unredeemed shares three years after issuance.

F-45

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(unaudited)**

The Company's obligation to redeem Series A preferred shares terminated upon the Company completing a registration of its common stock with the SEC which occured on September 24, 2014 (See Note 11). As such, the convertible redeemable preferred stock was reclassified from temporary equity to permanent equity. The

Company may redeem the Series A preferred shares at a price equal to 110% of their liquidation preference ($3.50 per share) at any time after December 15, 2012. As of September 30, 2014, the Company had redeemed an aggregate of 145,000 shares of Series A preferred stock.

The Series A preferred shares (i) were convertible, at the election of the Company, into common stock of the Company in the event of either a registered offering of the Company's common stock with the SEC aggregating gross proceeds of at least $5.0 million and at a price equal to or greater than $11.00 per share; (ii) remain convertible at the option of each holder; and (iii) are required to be converted upon the consent of shareholders holding at least a majority of the then-outstanding Series A preferred stock. In connection with the Company's initial public offering, the Company elected to cause the conversion of 677,566 shares of preferred stock into 508,193 shares of common stock. As of September 30, 2014, the Company had 2,710,000 shares of Series A preferred stock outstanding with gross consideration of $20,327,000 (including cash proceeds, conversion of Series I Secured notes and accrued interest on Series I notes, and conversion of preferred dividends payable). The Company incurred Series A preferred stock issuance costs of $2,838,000, of which $2,729,000 was amortized to additional paid in capital through September 30, 2014, resulting in a carrying amount of $20,218,000.

The Company determined that the grant date fair value of the outstanding warrants attached to the Series A preferred stock was $395,000 for warrants outstanding as of September 30, 2014. The Company may redeem outstanding warrants prior to their expiration, at a price of $0.01 per share upon 30 days written notice to the investors at any time after (i) the Company has completed a registration of its common stock with the SEC and (ii) the volume of weighted-average sale price per share of common stock equals or exceeds $14.00 per share for ten consecutive trading days ending on the third business day prior to proper notice of such redemption. Total warrants outstanding as of September 30, 2014, were 415,955 with a weighted-average remaining life of 2.59 years. Total warrants outstanding at December 31, 2013, were 415,955 with a weighted-average remaining life of 1.34 years. As of September 30, 2014, none of these warrants have been exercised.

Dividends on the Series A preferred stock may be paid in either cash or additional shares of Series A preferred stock at the election of the holder and approval of the Company. The dividends are reported as an expense and included in the caption interest expense in the consolidated statements of operations. The Company declared and accrued dividends of $632,000 during both the three months ended September 30, 2014 and 2013, and $1,912,000 and $1,897,000 during the nine months ended September 30, 2014 and 2013, respectively, pursuant to a board resolution declaring the dividend. 27,000 and 26,000 shares of Series A preferred stock were issued in lieu of cash dividends in the three month periods ended September 30, 2014 and 2013, and 82,000 and 63,000 shares of Series A preferred stock were issued in lieu of cash dividends in the nine-month periods ended September 30, 2014 and 2013, respectively. The shares issued in lieu of cash dividends were issued at $7.00 per share. As of September 30, 2014, GWG Holdings has $632,000 of accrued preferred dividends which were paid or converted to shares of Series A preferred stock on October 15, 2014.

**(10) Income taxes**

For the three and nine months ended September 30, 2014, the Company recorded income tax benefit of $1,858,000 and $4,130,000, or 35.3% and 34.4%, respectively, of income before taxes, compared to the recognition of an income tax benefit of $657,000, or 28.7% of income before taxes for the three months ended September 30, 2013 and recording an income tax expense of $1,711,000, or 89.8% of income before taxes, for the nine months ended September 30, 2013. The primary differences between the Company's September 30,

<div align="center">F-46</div>

**Table of Contents**

<div align="center">

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(unaudited)**

</div>

2014 effective tax rate and the statutory federal rate are the accrual of nondeductible preferred stock dividend expense of $1,912,000, state taxes, and other non-deductible expenses.

The most significant temporary differences between GAAP net income and taxable net income are the treatment of interest costs with respect to the acquisition of the life insurance policies and revenue recognition with respect to the mark-to-market of life insurance portfolio.

**(11) Common Stock**

On September 24, 2014, GWG consummated an initial public offering of its common stock which resulted in the sale of 800,000 shares of common stock at $12.50 per share. The sale resulted in net proceeds of approximately $9.03 million after the deduction of underwriting commissions, discounts and expense reimbursements. In connection with this offering, the Company started listing its common stock on The NASDAQ Capital Market under the ticker symbol "GWGH" effective September 25, 2014. The Company intends to use the net proceeds from the offering to promote and advertise the opportunities for consumers owning life insurance and investors to profit from participating in the secondary market for life insurance policies, purchase additional life insurance policies in the secondary market, pay premiums on the Company's life insurance policy assets, fund its portfolio operations, and for working capital purposes.

On July 11, 2011, we entered into a Purchase and Sale Agreement with Athena Securities Group, Ltd. and Athena Structured Funds PLC. Under this agreement, we issued to Athena Securities Group, Ltd. (Athena) 494,500 shares of common stock, which was equal to 9.9% of our outstanding shares, in exchange for shares equal to 9.9% of the outstanding shares in Athena Structured Funds, PLC and cash of $5,000. This 2011 agreement had contemplated cooperative efforts by the parties aimed at developing a security and related offering in Europe or Ireland, the proceeds of which would be used to finance the acquisition of life-insurance related assets in the United States. In 2013, we sought to terminate the 2011 agreement due to a changing regulatory environment in Europe that negatively affected the likelihood of consummating the contemplated offering of securities, and our dissatisfaction with Athena's performance under the 2011 agreement. As a result, in June 2013 we entered into a second Purchase and Sale Agreement with Athena Securities Ltd. and Athena. This agreement effected the termination of the 2011 agreement. The June 2013 agreement contained mutual general releases of claims and substantially unwound certain capital stock transactions that had been effected under the 2011 agreement. In particular, Athena returned to us for redemption 432,500 shares of our common stock, and retained 62,000 common shares in

<div align="right">App. 0125</div>

recognition for their earlier efforts under the 2011 agreement. For our part, we sold back to Athena all of our ownership in Athena Structured Funds, PLC that we had originally acquired under the 2011 agreement. Presently, we have no ongoing business relationship with Athena.

**Stock split** — On June 24, 2014, the Company's Board of Directors and majority stockholders approved a joint resolution to effect an amendment to the Company's Certificate of Incorporation to effect a reverse split of the issued and outstanding common stock on a 2-for-1 basis. The effective date of the amendment and reverse stock split was June 24, 2014. In lieu of fractional shares, stockholders received cash payments in an amount equal to the fraction to which the stockholder would otherwise be entitled multiplied by the price of the common stock, as determined by the Board of Directors of the Corporation, but adjusted so as to give effect to the reverse stock split. The par value of the common stock remained at $0.001 per share.

**(12) Stock Incentive Plan**

The Company adopted the GWG Holdings, Inc. 2013 Stock Incentive Plan on March 27, 2013. The plan is administered by Compensation Committee of the Board of Directors of the Company. The Company's Chief Executive Officer may, on a discretionary basis and without committee review or approval, grant incentives to

F-47

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(unaudited)**

new employees of the Company who are not Officers of the Company. Incentives under the plan may be granted in one or a combination of the following forms: (a) incentive stock options and non-statutory stock options; (b) stock appreciation rights; (c) stock awards; (d) restricted stock; (e) restricted stock units; and (f) performance shares. Eligible participants include officers and employees of the company, members of the Board of Directors, and consultants or other independent contractors. 1,000,000 shares are issuable under the plan. No person shall receive grants of stock options and SARs under the plan that exceed, in the aggregate 200,000 shares of common stock in any one year. The term of each stock option shall be determined by the committee but shall not exceed ten years. Vested stock options may be exercised in whole or part by the holder giving notice to the Company. The holder of the option may provide payment for the exercise price or surrender shares equal to the exercise price.

The Company issued stock options for 632,351 shares of common stock to employees, officers, and directors of the Company through September 30, 2014. Options for 268,455 shares have vested, and the remaining options will have vested over three years. The options were issued with an exercise price between $8.20 and $8.71 for those owning more than 10% of the Company's stock and between $7.46 and $7.92 for others, which is equal to the estimated market price of the shares on the date of grant valued using Black-Scholes Binomial option pricing model. The expected volatility used in the Black-Scholes model valuation of options issued during the year was 17.03% annualized. The annual volatility rate is based on the standard deviation of the average continuously compounded rate of return of five selected comparable companies over the previous 52 weeks. Forfeiture rate of 15% is based on historical company information and expected future trend. As of September 30, 2014, stock options for 32,750 shares were forfeited.

In September 2014, we entered into a stock option agreement (the Agreement) with a new management employee (the Employee) granting the Employee the right to purchase up to 318,000 of the Company's common stock at an exercise price of $12.50. The grant of such rights to purchase the Company's common stock was treated as an inducement grant is not included The GWG Holdings Inc. 2013 Stock Incentive plan. The Agreement specifies that, among other things, options to purchase 159,000 shares of the Company's common stock will vest with the Employee ratably on the first, second and third anniversary of the date of the Agreement. The remaining 159,000 options will vest quarterly using a formula based upon the closing price of the Company's common stock on the last business day of such quarter. The maximum number of these remaining options that will vest with the Employee is 53,000 in each successive one year period beginning on the date of the Agreement.

Stock options granted through September 30, 2014:

| Date Granted | Exercise Price | Number of Shares | Vesting | Binomial Value | Forfeiture Factor | Compensation Expense |
|---|---|---|---|---|---|---|
| 9/5/2013 | $7.52 | 143,750 | Vested | 0.36 | 0.87 | $ 45,023 |
| 9/5/2013 | $8.28 | 25,000 | Vested | 0.36 | 0.87 | $ 7,830 |
| 9/5/2013 | $7.52 | 45,838 | 1 years | 0.36 | 0.85 | $ 14,027 |
| 9/5/2013 | $8.28 | 2,834 | 1 years | 0.36 | 0.85 | $ 867 |
| 9/5/2013 | $7.52 | 45,833 | 2 years | 0.6 | 0.72 | $ 19,869 |
| 9/5/2013 | $8.28 | 2,833 | 2 years | 0.6 | 0.72 | $ 1,228 |
| 9/5/2013 | $7.52 | 45,829 | 3 years | 0.82 | 0.61 | $ 23,078 |
| 9/5/2013 | $8.28 | 2,833 | 3 years | 0.82 | 0.61 | $ 1,427 |
| 9/30/2013 | $7.52 | 4,000 | Vested | 0.66 | 0.87 | $ 2,297 |
| 10/28/2013 | $7.52 | 6,000 | Vested | 0.66 | 0.87 | $ 3,445 |
| 10/28/2013 | $7.52 | 24,000 | 1 years | 0.66 | 0.85 | $ 13,464 |
| 10/28/2013 | $7.52 | 24,000 | 2 years | 0.92 | 0.72 | $ 15,953 |
| 10/28/2013 | $7.52 | 18,000 | 3 years | 1.14 | 0.61 | $ 12,602 |
| 11/11/2013 | $7.52 | 4,167 | 1 years | 0.66 | 0.85 | $ 2,338 |

F-48

App. 0126

**Table of Contents**

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(unaudited)**

| Date Granted | Exercise Price | Number of Shares | Vesting | Binomial Value | Forfeiture Factor | Compensation Expense |
|---|---|---|---|---|---|---|
| 11/11/2013 | $ 7.52 | 4,166 | 2 years | 0.92 | 0.72 | $ 2,769 |
| 11/11/2013 | $ 7.52 | 4,167 | 3 years | 1.14 | 0.61 | $ 2,917 |
| 12/12/2013 | $ 7.52 | 30,000 | Vested | 0.66 | 0.87 | $ 17,226 |
| 4/1/2014 | $ 7.46 | 1,935 | Vested | 0.468 | 0.87 | $ 788 |
| 4/1/2014 | $ 7.46 | 11,007 | 1 years | 1.028 | 0.85 | $ 9,618 |
| 4/1/2014 | $ 7.46 | 10,999 | 2 years | 1.24 | 0.72 | $ 9,854 |
| 4/1/2014 | $ 7.46 | 10,994 | 3 years | 1.292 | 0.61 | $ 8,723 |
| 4/7/2014 | $ 7.46 | 3,334 | 1 years | 1.028 | 0.85 | $ 2,913 |
| 4/7/2014 | $ 8.20 | 3,334 | 1 years | 1.028 | 0.85 | $ 2,913 |
| 4/7/2014 | $ 7.46 | 3,333 | 2 years | 1.24 | 0.72 | $ 2,986 |
| 4/7/2014 | $ 8.20 | 3,333 | 2 years | 1.24 | 0.72 | $ 2,986 |
| 4/7/2014 | $ 7.46 | 3,333 | 3 years | 1.292 | 0.61 | $ 2,645 |
| 4/7/2014 | $ 8.20 | 3,333 | 3 years | 1.292 | 0.61 | $ 2,645 |
| 4/28/2014 | $ 7.46 | 5,000 | Vested | 0.468 | 0.87 | $ 2,036 |
| 4/28/2014 | $ 7.46 | 2,500 | 1 years | 1.028 | 0.85 | $ 2,185 |
| 4/28/2014 | $ 7.46 | 2,500 | 2 years | 1.24 | 0.72 | $ 2,240 |
| 4/28/2014 | $ 7.46 | 2,500 | 3 years | 1.292 | 0.61 | $ 1,984 |
| 5/27/2014 | $ 7.46 | 2,500 | Vested | 0.468 | 0.87 | $ 1,018 |
| 5/27/2014 | $ 7.46 | 10,000 | 1 years | 1.028 | 0.85 | $ 8,738 |
| 5/27/2014 | $ 7.46 | 10,000 | 2 years | 1.24 | 0.72 | $ 8,959 |
| 5/27/2014 | $ 7.46 | 10,000 | 3 years | 1.292 | 0.61 | $ 7,934 |
| 6/20/2014 | $ 7.46 | 3,000 | Vested | 0.468 | 0.87 | $ 1,221 |
| 6/20/2014 | $ 7.46 | 6,000 | 1 years | 1.028 | 0.85 | $ 5,243 |
| 6/20/2014 | $ 7.46 | 6,000 | 2 years | 1.24 | 0.72 | $ 5,375 |
| 6/20/2014 | $ 7.46 | 3,000 | 3 years | 1.292 | 0.61 | $ 2,380 |
| 9/2/2014 | $ 7.92 | 15,000 | Vested | 2.33 | 0.85 | $ 29,708 |
| 9/2/2014 | $ 7.92 | 16,229 | 1 years | 2.383 | 0.85 | $ 32,873 |
| 9/2/2014 | $ 8.71 | 3,334 | 1 years | 1.694 | 0.85 | $ 4,801 |
| 9/2/2014 | $ 7.92 | 16,220 | 2 years | 2.564 | 0.72 | $ 30,068 |
| 9/2/2014 | $ 8.71 | 3,334 | 2 years | 1.95 | 0.72 | $ 4,700 |
| 9/2/2014 | $ 7.92 | 166 | 3 years | 2.232 | 0.61 | $ 227 |
| 9/2/2014 | $ 7.92 | 16,035 | 3 years | 2.804 | 0.61 | $ 27,607 |
| 9/2/2014 | $ 8.71 | 1,666 | 3 years | 2.232 | 0.61 | $ 2,283 |
| 9/2/2014 | $ 8.71 | 1,666 | 3 years | 2.804 | 0.61 | $ 2,868 |
| 9/3/2014 | $ 7.92 | 2,515 | Vested | 2.33 | 0.85 | $ 4,981 |
| 9/8/2014 | $ 7.92 | 1,667 | 1 years | 2.383 | 0.85 | $ 3,377 |
| 9/8/2014 | $ 7.92 | 1,667 | 2 years | 2.564 | 0.72 | $ 3,090 |
| 9/8/2014 | $ 7.92 | 1,667 | 3 years | 2.804 | 0.61 | $ 2,870 |
| 9/22/2014 | $12.50 | 13,250 | 0 years | –2.25 | 0.85 | $ (25,341) |
| 9/22/2014 | $12.50 | 13,250 | 1 years | 0.118 | 0.72 | $ 1,130 |
| 9/22/2014 | $12.50 | 39,750 | 1 years | 0.118 | 0.85 | $ 3,987 |
| 9/22/2014 | $12.50 | 53,000 | 1 years | 2.383 | 0.85 | $107,354 |
| 9/22/2014 | $12.50 | 13,250 | 2 years | 0.339 | 0.61 | $ 2,758 |
| 9/22/2014 | $12.50 | 39,750 | 2 years | 0.339 | 0.72 | $ 9,743 |
| 9/22/2014 | $12.50 | 53,000 | 2 years | 2.564 | 0.72 | $ 98,250 |
| 9/22/2014 | $12.50 | 39,750 | 3 years | 0.585 | 0.61 | $ 14,281 |
| 9/22/2014 | $12.50 | 53,000 | 3 years | 2.804 | 0.61 | $ 91,248 |
| | | 950,351 | | | | |

F-49

App. 0127

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(unaudited)**

Outstanding stock options:

|  | Vested | Un-vested | Total |
|---|---|---|---|
| Balance as of December 31, 2013 | 195,000 | 210,250 | 405,250 |
| Granted during the year | 29,950 | 487,151 | 517,101 |
| Vested during the year | 53,505 | (53,505) | — |
| Forfeited during the year | (10,000) | (22,750) | (32,750) |
| Balance as of September 30, 2014 | 268,455 | 621,146 | 889,601 |

Compensation expense related to un-vested options not yet recognized is $588,000. We expect to recognize this compensation expense over the next 3.50 years. Stock-based compensation cost for the three and nine months ended September 30, 2014 was $44,000 and $116,000, respectively.

**(13) Net loss per common share**

The Company began issuing Series A preferred stock September, 1, 2011, as described in note 9. The Series A preferred stock is anti-dilutive to the net loss per common share calculation at September 30, 2014 and dilutive at September 30, 2013. The Company has also issued warrants to purchase common stock in conjunction with the sale of convertible preferred stock, as discussed in note 9. The warrants are anti-dilutive at September 30, 2014 and 2013, and have not been included in the fully diluted net loss per common share calculation.

**(14) Commitments**

The Company entered into an office lease with U.S. Bank National Association as the landlord. The lease was effective April 22, 2012 with a term through August 31, 2015. The lease is for 11,695 square feet of office space located at 220 South Sixth Street, Minneapolis, Minnesota. The Company is obligated to pay base rent plus common area maintenance and a share of the building operating costs. Rent expenses under this agreement were $157,000 and $149,000 during the nine-month periods ended September 30, 2014 and 2013, respectively, and $56,000 and $51,000 during the three-month periods ended September 30, 2014 and 2013, respectively. Minimum lease payments under the lease agreement effective April 22, 2012 are as follows:

| | |
|---|---|
| Three months ending December 31, 2014 | $26,000 |
| 2015 | 70,000 |
| Total | $96,000 |

**(15) Contingencies**

Litigation — In the normal course of business, the Company is involved in various legal proceedings. In the opinion of management, any liability resulting from such proceedings would not have a material adverse effect on the Company's financial position, results of operations or cash flows.

Opportunity Finance, LLC, owned by Jon Sabes and Steven Sabes, is subject to litigation clawback claims by the bankruptcy trustee for third-party matters for payments that may have been deemed preference payments. In addition, Jon Sabes and Steven Sabes are subject to litigation clawback claims by the bankruptcy trustee for third-party matters for payments received from Opportunity Finance that may have been deemed preference payments. If the parties are unsuccessful in defending against these claims, their equity ownership in the Company may be sold or transferred to other parties to satisfy such claims. In addition, the Company loaned $1,000,000 to Opportunity Finance, LLC, and was repaid in full plus interest of $177,000. This investment amount may also be subject to clawback claims by the bankruptcy court.

F-50

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(unaudited)**

**(16) Guarantees of secured debentures**

GWG Holdings has registered with the SEC the offer and sale $250,000,000 of secured debentures as described in note 8. The secured debentures are secured by the assets of GWG Holdings as described in note 8 and a pledge of all the common stock by the largest shareholders. Obligations under the debentures are guaranteed by GWG Life. This guarantee involves the grant of a security interest in all the assets of GWG Life. The payment of principal and interest on the secured debentures is fully and unconditionally guaranteed by GWG Life. Substantially all of the Company's life insurance policies are held by DLP II and the Trust. The policies held by DLP II are not collateral for the debenture obligations as such policies are collateral for the credit facility.

App. 0128

The consolidating financial statements are presented in lieu of separate financial statements and other related disclosures of the subsidiary guarantors and issuer because management does not believe that separate financial statements and related disclosures would be material to investors. There are currently no significant restrictions on the ability of GWG Holdings or GWG Life, the guarantor subsidiary, to obtain funds from its subsidiaries by dividend or loan, except as follows. DLP II is a borrower under a credit agreement with Autobahn, with DZ Bank AG as agent, as described in note 6. The significant majority of insurance policies owned by the Company are subject to a collateral arrangement with DZ Bank AG described in note 6. Under this arrangement, collection and escrow accounts are used to fund premiums of the insurance policies and to pay interest and other charges under the revolving credit facility. DZ Bank AG and Autobahn must authorize all disbursements from these accounts, including any distributions to GWG Life. Distributions are limited to an amount that would result in the borrowers (DLP II, GWG Life and GWG Holdings) realizing an annualized rate of return on the equity funded amount for such assets of not more than 18%, as determined by DZ Bank AG. After such amount is reached, the credit agreement requires that excess funds be used for repayments of borrowings before any additional distributions may be made.

The following represents consolidating financial information as of September 30, 2014 and December 31, 2013, with respect to the financial position, and for the three and nine months ended September 30, 2014 and 2013 with respect to results of operations and cash flows of GWG Holdings and its subsidiaries. The parent column presents the financial information of GWG Holdings, the primary obligor of the secured debentures. The guarantor subsidiary column presents the financial information of GWG Life, the guarantor subsidiary of the secured debentures, presenting its investment in DLP II and Trust under the equity method. The non-guarantor subsidiaries column presents the financial information of all non-guarantor subsidiaries including DLP II and Trust.

F-51

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(unaudited)**

Condensed Consolidating Balance Sheets

| September 30, 2014 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash and cash equivalents | $ 27,051,595 | $ 2,460,394 | $ — | $ — | $ 29,511,989 |
| Restricted cash | — | — | 2,144,734 | — | 2,144,734 |
| Investment in life settlements, at fair value | — | — | 276,381,979 | — | 276,381,979 |
| Other assets | 1,336,301 | 1,753,198 | 364,475 | — | 3,453,974 |
| Investment in subsidiaries | 171,512,960 | 198,872,078 | — | (370,385,038) | — |
| TOTAL ASSETS | $199,900,856 | $203,085,670 | $278,891,188 | $(370,385,038) | $311,492,676 |
| **LIABILITIES & STOCKHOLDERS' EQUITY (DEFICIT)** | | | | | |
| **LIABILITIES** | | | | | |
| Revolving credit facility | $ — | $ — | $ 79,000,000 | $ — | $ 79,000,000 |
| Series I Secured notes payable | — | 27,701,842 | — | — | 27,701,842 |
| Renewable Secured Debentures | 169,186,917 | — | — | — | 169,186,917 |
| Interest payable | 5,903,351 | 3,354,424 | 510,443 | — | 9,768,218 |
| Accounts payable and other accrued expenses | 1,044,275 | 516,444 | 508,667 | — | 2,069,386 |
| Deferred taxes | 3,545,504 | — | — | — | 3,545,504 |
| TOTAL LIABILITIES | 179,680,047 | 31,572,710 | 80,019,110 | — | 291,271,867 |
| **STOCKHOLDERS' EQUITY (DEFICIT)** | | | | | |
| Member capital | — | 171,512,960 | 198,872,078 | (370,385,038) | — |
| Convertible, redeemable preferred stock | 20,217,836 | — | — | — | 20,217,836 |
| Common stock | 5,870 | — | — | — | 5,870 |
| Additional paid-in capital | 16,323,738 | — | — | — | 16,323,738 |
| Accumulated deficit | (16,326,635) | — | — | — | (16,326,635) |
| TOTAL STOCKHOLDERS' EQUITY (DEFICIT) | 20,220,809 | 171,512,960 | 198,872,078 | (370,385,038) | 20,220,809 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT) | $199,900,856 | $203,085,670 | $278,891,188 | $(370,385,038) | $311,492,676 |

F-52

App. 0129

**Table of Contents**

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(unaudited)**

Condensed Consolidating Balance Sheets (continued)

| December 31, 2013 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash and cash equivalents | $ 32,711,636 | $ 738,157 | $ — | $ — | $ 33,449,793 |
| Restricted cash | — | (1,420,000) | 4,412,970 | — | 5,832,970 |
| Investment in life settlements, at fair value | — | — | 234,672,794 | — | 234,672,794 |
| Other assets | 381,883 | 484,510 | 558,526 | — | 1,424,919 |
| Investment in subsidiaries | 129,839,241 | 159,798,490 | — | (289,637,731) | — |
| TOTAL ASSETS | $162,932,760 | $162,441,157 | $239,644,290 | $(289,637,731) | $275,380,476 |
| **LIABILITIES & STOCKHOLDERS' EQUITY (DEFICIT)** | | | | | |
| LIABILITIES | | | | | |
| Revolving credit facility | $ — | $ — | $ 79,000,000 | $ — | $ 79,000,000 |
| Series I Secured notes payable | — | 29,275,202 | — | — | 29,275,202 |
| Renewable Secured Debentures | 131,646,062 | — | — | — | 131,646,062 |
| Interest payable | 3,806,820 | 3,065,465 | 337,123 | — | 7,209,408 |
| Accounts payable and other accrued expenses | 574,026 | 261,249 | 508,677 | — | 1,343,952 |
| Deferred taxes, net | 7,675,174 | — | — | — | 7,675,174 |
| TOTAL LIABILITIES | 143,702,082 | 32,601,916 | 79,845,800 | — | 256,149,798 |
| CONVERTIBLE, REDEEMABLE PREFERRED STOCK | 24,722,693 | — | — | — | 24,722,693 |
| STOCKHOLDERS' EQUITY (DEFICIT) | | | | | |
| Member capital | — | 129,839,241 | 159,798,490 | (289,637,731) | — |
| Common stock | 9,124 | — | — | — | 9,124 |
| Additional paid-in capital | 2,937,438 | — | — | — | 2,937,438 |
| Accumulated deficit | (8,438,577) | — | — | — | (8,438,577) |
| TOTAL STOCKHOLDERS' EQUITY (DEFICIT) | (5,492,015) | 129,839,241 | 159,798,490 | (289,637,731) | (5,492,015) |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT) | $162,932,760 | $162,441,157 | $239,644,290 | $(289,637,731) | $275,380,476 |

F-53

**Table of Contents**

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(unaudited)**

Condensed Consolidating Statements of Operations

| For the nine months ended September 30, 2014 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUE | | | | | |
| Contract servicing fees | $ — | $ 1,462,376 | $ — | $ (1,462,376) | $ — |
| Gain on life settlements, net | — | — | 16,119,517 | — | 16,119,517 |
| Interest and other income | 17,501 | 229,348 | 5,218 | (228,092) | 23,975 |
| TOTAL REVENUE | 17,501 | 1,691,724 | 16,124,735 | (1,690,468) | 16,143,492 |

App. 0130

EXPENSES

| | | | | | |
|---|---|---|---|---|---|
| Origination and servicing fees | — | — | 1,462,376 | (1,462,376) | — |
| Employee compensation and benefits | 1,992,554 | 1,531,720 | — | — | 3,524,274 |
| Legal and professional fees | 1,476,213 | 141,470 | 10,086 | — | 1,627,769 |
| Interest expense | 13,371,300 | 2,334,097 | 4,025,930 | — | 19,731,327 |
| Other expenses | 1,937,674 | 1,299,666 | 268,602 | (228,092) | 3,277,850 |
| TOTAL EXPENSES | 18,777,741 | 5,306,953 | 5,766,994 | (1,690,468) | 28,161,220 |
| | | | | | |
| INCOME (LOSS) BEFORE EQUITY IN INCOME OF SUBSIDIARIES | (18,760,240) | (3,615,229) | 10,357,741 | — | (12,017,728) |
| EQUITY IN INCOME OF SUBSIDIARY | 6,742,512 | 10,357,741 | — | (17,100,253) | — |
| NET INCOME (LOSS) BEFORE INCOME TAXES | (12,017,728) | 6,742,512 | 10,357,741 | (17,100,253) | (12,017,728) |
| INCOME TAX BENEFIT | (4,129,670) | — | — | — | (4,129,670) |
| NET INCOME (LOSS) | $ (7,888,058) | $ 6,742,512 | $10,357,741 | $(17,100,253) | $ (7,888,058) |

| For the nine months ended September 30, 2013 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUE | | | | | |
| Contract servicing fees | $ — | $ 2,818,309 | $ — | $ (2,818,309) | $ — |
| Gain on life settlements, net | — | — | 21,511,182 | — | 21,511,182 |
| Interest and other income | 3,324,771 | 1,956,863 | 69,943 | (1,819,655) | 3,531,922 |
| TOTAL REVENUE | 3,324,771 | 4,775,172 | 21,581,125 | (4,637,964) | 25,043,104 |
| | | | | | |
| EXPENSES | | | | | |
| Origination and servicing fees | — | — | 2,818,309 | (2,818,309) | — |
| Employee compensation and benefits | 2,801,017 | 1,300,485 | — | — | 4,101,502 |
| Legal and professional fees | 766,785 | 367,396 | — | — | 1,134,181 |
| Interest expense | 8,249,849 | 2,763,918 | 3,932,717 | — | 14,946,484 |
| Other expenses | 1,752,769 | 1,164,968 | 1,857,155 | (1,819,655) | 2,955,237 |
| TOTAL EXPENSES | 13,570,420 | 5,596,767 | 8,608,181 | (4,637,964) | 23,137,404 |
| | | | | | |
| INCOME (LOSS) BEFORE EQUITY IN INCOME OF SUBSIDIARIES | (10,245,649) | (821,595) | 12,972,944 | — | 1,905,700 |
| EQUITY IN INCOME OF SUBSIDIARY | 12,151,349 | 13,021,463 | — | (25,172,812) | — |
| NET INCOME BEFORE INCOME TAXES | 1,905,700 | 12,199,868 | 12,972,944 | (25,172,812) | 1,905,700 |
| INCOME TAX EXPENSE | 1,710,826 | — | — | — | 1,710,826 |
| NET INCOME | $ 194,874 | $12,199,868 | $12,972,944 | $(25,172,812) | $ 194,874 |

F-54

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(unaudited)**

Condensed Consolidating Statements of Operations (continued)

| For the three months ended September 30, 2014 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUE | | | | | |
| Contract servicing fees | $ — | $ 153,470 | $ — | $ (153,470) | $ — |
| Gain on life settlements, net | — | — | 5,118,423 | — | 5,118,423 |
| Interest and other income | 4,572 | 59,372 | 5,156 | (58,871) | 10,229 |
| TOTAL REVENUE | 4,572 | 212,842 | 5,123,579 | (212,341) | 5,128,652 |
| | | | | | |
| EXPENSES | | | | | |
| Origination and servicing fees | — | — | 153,470 | (153,470) | — |
| Employee compensation and benefits | 737,475 | 639,235 | — | — | 1,376,710 |

App. 0131

| | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Legal and professional fees | 754,024 | 16,020 | 10,086 | — | 780,130 |
| Interest expense | 4,679,311 | 761,828 | 1,355,597 | — | 6,796,736 |
| Other expenses | 850,122 | 587,745 | 74,371 | (58,871) | 1,453,367 |
| TOTAL EXPENSES | 7,000,932 | 2,004,828 | 1,593,524 | (212,341) | 10,386,943 |
| | | | | | |
| INCOME (LOSS) BEFORE EQUITY IN INCOME OF SUBSIDIARIES | (6,996,360) | (1,791,986) | 3,530,055 | — | (5,258,291) |
| EQUITY IN INCOME OF SUBSIDIARY | 1,738,069 | 3,530,055 | — | (5,268,124) | — |
| NET INCOME (LOSS) BEFORE INCOME TAXES | (5,258,291) | 1,738,069 | 3,530,055 | (5,268,124) | (5,258,291) |
| INCOME TAX BENEFIT | (1,858,100) | — | — | — | (1,858,100) |
| NET INCOME (LOSS) | $(3,400,191) | $ 1,738,069 | $3,530,055 | $(5,268,124) | $ (3,400,191) |

| For the three months ended September 30, 2013 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUE | | | | | |
| Contract servicing fees | $ — | $1,004,107 | $ — | $(1,004,107) | $ — |
| Gain on life settlements, net | — | — | 5,437,580 | — | 5,437,580 |
| Interest and other income | 57,317 | 979,007 | 32,322 | (978,719) | 89,927 |
| TOTAL REVENUE | 57,317 | 1,983,114 | 5,469,902 | (1,982,826) | 5,527,507 |
| | | | | | |
| EXPENSES | | | | | |
| Origination and servicing fees | — | — | 1,004,107 | (1,004,107) | — |
| Employee compensation and benefits | 587,961 | 512,198 | — | — | 1,100,159 |
| Legal and professional fees | 164,334 | 256,540 | — | — | 420,874 |
| Interest expense | 3,273,250 | 914,056 | 1,350,020 | — | 5,537,326 |
| Other expenses | 399,634 | 342,932 | 991,219 | (978,719) | 755,066 |
| TOTAL EXPENSES | 4,425,179 | 2,025,726 | 3,345,346 | (1,982,826) | 7,813,425 |
| | | | | | |
| INCOME (LOSS) BEFORE EQUITY IN INCOME OF SUBSIDIARIES | (4,367,862) | (42,612) | 2,124,556 | — | (2,285,918) |
| EQUITY IN INCOME OF SUBSIDIARY | 2,081,944 | 2,124,556 | — | (4,206,500) | — |
| NET INCOME (LOSS) BEFORE INCOME TAXES | (2,285,918) | 2,081,944 | 2,124,556 | (4,206,500) | (2,285,918) |
| INCOME TAX EXPENSE (BENEFIT) | (656,968) | — | — | — | (656,968) |
| NET INCOME (LOSS) | $(1,628,950) | $2,081,944 | $2,124,556 | $(4,206,500) | $(1,628,950) |

F-55

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(unaudited)**

Condensed Consolidating Statements of Cash Flows

| For the nine months ended September 30, 2014 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | |
| Net income (loss) | $ (7,888,058) | $ 6,742,512 | $ 10,357,741 | $(17,100,253) | $ (7,888,058) |
| Adjustments to reconcile net income (loss) to cash flows from operating activities: | | | | | |
| (Equity) loss of subsidiaries | (6,742,512) | (10,357,741) | — | 17,100,253 | — |
| Life settlements — change in fair value | — | — | (30,973,250) | — | (30,973,250) |
| Amortization of deferred financing and issuance costs | 2,125,269 | 427,187 | 18,425 | — | 2,570,881 |
| Deferred income taxes | (4,129,670) | — | — | — | (4,129,670) |
| Preferred stock issued for dividends | 575,513 | — | — | — | 575,513 |
| (Increase) in operating assets: | | | | | |
| Other assets | (35,758,660) | (29,984,534) | — | 63,647,054 | (2,096,140) |
| Increase in operating liabilities: | | | | | |

App. 0132

| | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Accounts payable and other accrued expenses | 2,093,814 | 591,534 | 373,311 | — | 3,058,659 |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (48,924,304) | (32,581,042) | (20,423,773) | 63,647,054 | (38,282,065) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | |
| Investment in life settlements | — | — | (11,559,435) | — | (11,559,435) |
| Proceeds from settlement of life settlements | — | — | 999,125 | — | 999,125 |
| NET CASH FLOWS USED IN INVESTING ACTIVITIES | — | — | (10,560,310) | — | (10,560,310) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | | |
| Payments for redemption of Series I Secured notes payable | — | (2,047,928) | — | — | (2,047,928) |
| Proceeds from issuance of debentures | 48,516,296 | — | — | — | 48,516,296 |
| Payments for issuance costs and redemption of Renewable Secured Debentures | (13,816,794) | — | — | — | (13,816,794) |
| Proceeds from restricted cash | — | 1,420,000 | 2,268,236 | — | 3,688,236 |
| Proceeds from sale of common stock | 9,030,000 | — | — | — | 9,030,000 |
| Payments for redemption of preferred stock | (465,239) | — | — | — | (465,239) |
| Issuance of member capital | — | 34,931,207 | 28,715,847 | (63,647,054) | — |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 43,264,263 | 34,303,279 | 30,984,083 | (63,647,054) | 44,904,571 |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | (5,666,041) | 1,722,237 | — | — | (3,937,804) |
| **CASH AND CASH EQUIVALENTS** | | | | | |
| BEGINNING OF PERIOD | 32,711,636 | 738,157 | — | — | 33,449,793 |
| END OF PERIOD | $ 27,051,595 | $ 2,460,394 | $ — | $ — | $ 29,511,989 |

F-56

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(unaudited)**

Consolidating Statements of Cash Flows (continued)

| For the nine months ended September 30, 2013 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | |
| Net income | $ 194,874 | $ 12,199,868 | $ 12,972,944 | $(25,172,812) | $ 194,874 |
| Adjustments to reconcile net income to cash: | | | | | |
| Equity income of subsidiaries | 1,099,118 | 1,256,636 | — | (2,355,754) | — |
| (Gain) loss on life settlements | — | — | (25,904,240) | — | (25,904,240) |
| Amortization of deferred financing and issuance costs | 1,368,147 | 599,431 | 1,089,215 | — | 3,056,793 |
| Deferred income taxes | 1,710,826 | — | — | — | 1,710,826 |
| Preferred stock issued for dividends | 443,486 | — | — | — | 443,486 |
| (Increase) decrease in operating assets: | | | | | |
| Other assets | (49,033,785) | (46,664,803) | (2,830,802) | 95,347,929 | (3,181,461) |
| Increase (decrease) in operating liabilities: | | | | | |
| Accounts payable and other accrued expenses | 1,914,318 | 614,418 | (359,862) | — | 2,168,874 |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (42,303,016) | (31,994,450) | (15,032,745) | 67,819,363 | (21,510,848) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | |
| Investment in life settlements | — | — | (26,916,790) | — | (26,916,790) |
| Proceeds from settlement of life settlements | — | — | 4,203,895 | — | 4,203,895 |
| NET CASH FLOWS USED IN INVESTING ACTIVITIES | — | — | (22,712,895) | — | (22,712,895) |

App. 0133

| CASH FLOWS FROM FINANCING ACTIVITIES | | | | | |
|---|---|---|---|---|---|
| Net proceeds from revolving credit facility | — | — | 8,000,000 | — | 8,000,000 |
| Payments for redemption of Series I Secured notes payable | — | (6,242,586) | — | — | (6,242,586) |
| Proceeds from issuance of debentures | 62,056,755 | — | — | — | 62,056,755 |
| Payments from redemption and issuance of debentures | (9,642,129) | — | — | — | (9,642,129) |
| Proceeds (payments) from restricted cash | — | 1,094,415 | (2,510,973) | — | (1,416,558) |
| Issuance of member capital | — | 35,562,750 | 32,256,613 | (67,819,363) | — |
| Repurchase of common stock | — | (3,252,400) | — | — | (3,252,400) |
| Payments for redemption of preferred stock | (347,089) | — | — | — | (347,089) |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 48,815,137 | 30,414,579 | 37,745,640 | (67,819,363) | 49,155,993 |
| NET INCREASE IN CASH AND CASH EQUIVALENTS | 6,512,121 | (1,579,871) | — | — | 4,932,250 |
| **CASH AND CASH EQUIVALENTS** | | | | | |
| BEGINNING OF PERIOD | 25,035,579 | 2,461,465 | — | — | 27,497,044 |
| END OF PERIOD | $ 31,547,700 | $ 881,594 | $ — | $ — | $ 32,429,294 |

F-57

---

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(unaudited)**

Consolidating Statements of Cash Flows (continued)

| For the three months ended September 30, 2014 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | |
| Net income (loss) | $ (3,400,191) | $ 1,738,069 | $ 3,530,055 | $ (5,268,124) | $ (3,400,191) |
| Adjustments to reconcile net loss to cash: | | | | | |
| (Equity) loss of subsidiaries | (1,738,069) | (3,530,055) | — | 5,268,124 | — |
| Life settlements — change in fair value | — | — | (8,761,912) | — | (8,761,912) |
| Amortization of deferred financing and issuance costs | 397,659 | 126,083 | 339,475 | — | 863,217 |
| Deferred income taxes | (1,858,100) | — | — | — | (1,858,100) |
| Preferred stock issued for dividends | 186,182 | — | — | — | 186,182 |
| (Increase) in operating assets: | | | | | |
| Other assets | (9,136,310) | (5,329,716) | 300,000 | 13,318,805 | (847,221) |
| Increase in operating liabilities: | | | | | |
| Accounts payable and other accrued expenses | 922,271 | 289,132 | (720,907) | — | 490,496 |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (14,626,558) | (6,706,487) | (5,313,289) | 13,318,805 | (13,327,529) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | |
| Investment in life settlements | — | — | (680,000) | — | (680,000) |
| Proceeds from settlement of life settlements | — | — | 930,625 | — | 930,625 |
| NET CASH FLOWS USED IN INVESTING ACTIVITIES | — | — | 250,625 | — | 250,625 |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | | |
| Payments for redemption of Series I Secured notes payable | — | (509,004) | — | — | (509,004) |
| Proceeds from issuance of debentures | 15,281,809 | — | — | — | 15,281,809 |
| Payments for issuance costs and redemption of Renewable Secured Debentures | (4,494,383) | — | — | — | (4,494,383) |
| Proceeds from restricted cash | — | 565,000 | 100,699 | — | 665,699 |
| Proceeds from sale of common stock | 9,030,000 | — | — | — | 9,030,000 |
| Payments for redemption of preferred stock | (445,183) | — | — | — | (445,183) |
| Issuance of member capital | — | 8,356,840 | 4,961,965 | (13,318,805) | — |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 19,372,243 | 8,412,836 | 5,062,664 | (13,318,805) | 19,528,938 |

App. 0134

| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | 4,745,685 | 1,706,349 | — | — | 6,452,034 |
|---|---|---|---|---|---|
| **CASH AND CASH EQUIVALENTS** | | | | | |
| BEGINNING OF PERIOD | 22,305,910 | 754,045 | — | — | 23,059,955 |
| END OF PERIOD | $ 27,051,595 | $ 2,460,394 | $ — | $ — | $ 29,511,989 |

F-58

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(unaudited)**

Consolidating Statements of Cash Flows (continued)

| For the three months ended September 30, 2013 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | |
| Net income | $ (1,628,950) | $ 2,081,944 | $ 2,124,556 | $ (4,206,500) | $ (1,628,950) |
| Adjustments to reconcile net income to cash: | | | | | |
| Equity income of subsidiaries | 2,081,944 | 2,124,556 | — | (4,206,500) | — |
| (Gain) loss on life settlements | — | — | (6,960,335) | — | (6,960,335) |
| Amortization of deferred financing and issuance costs | 630,188 | 165,000 | 330,725 | — | 1,125,913 |
| Deferred income taxes | (655,968) | — | — | — | (655,968) |
| Preferred stock issued for dividends | 185,231 | — | — | — | 185,231 |
| (Increase) decrease in operating assets: | | | | | |
| Other assets | (21,755,694) | (22,309,588) | 500,000 | 43,997,953 | 432,671 |
| Increase (decrease) in operating liabilities: | | | | | |
| Accounts payable and other accrued expenses | 425,529 | 494,915 | (450,049) | — | 470,395 |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (20,717,720) | (17,443,173) | (4,455,103) | 35,584,953 | (7,031,043) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | |
| Investment in life settlements | — | — | (14,030,797) | — | (14,030,797) |
| Proceeds from settlement of life settlements | — | — | 1,331,743 | — | 1,331,743 |
| NET CASH FLOWS USED IN INVESTING ACTIVITIES | — | — | (12,699,054) | — | (12,699,054) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | | |
| Payments for redemption of Series I Secured notes payable | — | (2,311,710) | — | — | (2,311,710) |
| Proceeds from issuance of debentures | 19,617,094 | — | — | — | 19,617,094 |
| Payments from redemption and issuance of debentures | (4,305,558) | — | — | — | (4,305,558) |
| Proceeds (payments) from restricted cash | — | 1,847,215 | (892,998) | — | 954,217 |
| Issuance of member capital | — | 17,537,798 | 18,047,155 | (35,584,953) | — |
| Payments for redemption of preferred stock | (35,285) | — | — | — | (35,285) |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 15,276,251 | 17,073,303 | 17,154,157 | (35,584,953) | 13,918,758 |
| NET INCREASE IN CASH AND CASH EQUIVALENTS | (5,441,469) | (369,870) | — | — | (5,811,339) |
| **CASH AND CASH EQUIVALENTS** | | | | | |
| BEGINNING OF PERIOD | 36,989,169 | 1,251,464 | — | — | 38,240,633 |
| END OF PERIOD | $ 31,547,700 | $ 881,594 | $ — | $ — | $ 32,429,294 |

F-59

Table of Contents

App. 0135

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
**(unaudited)**

**(17) Concentrations**

GWG purchases life insurance policies written by life insurance companies having investment grade ratings by independent rating agencies. As a result there may be certain concentrations of contracts with life insurance companies. The following summarizes the face value of insurance contracts with specific life insurance companies exceeding 10% of the total face value held by the Company.

| | September 30, 2014 | December 31, 2013 |
|---|---|---|
| | % | % |
| Life insurance company | | |
| Company A | 15.66 | 16.58 |
| Company B | 11.35 | 11.34 |

The following summarizes the number of insurance contracts held in specific states exceeding 10% of the total face value held by the Company:

| | September 30, 2014 | December 31, 2013 |
|---|---|---|
| | % | % |
| State of residence | | |
| California | 28.72 | 28.14 |
| Florida | 17.65 | 15.59 |
| New York | 10.03 | 10.65 |

F-60

Table of Contents

[THIS PAGE INTENTIONALLY LEFT BLANK.]

Table of Contents

# $1,000,000,000

# GWG HOLDINGS, INC.

# L Bonds

App. 0136

# PROSPECTUS

, 2015

Table of Contents

## PART II

### INFORMATION NOT REQUIRED IN PROSPECTUS

### ITEM 13. OTHER EXPENSES OF ISSUANCE AND DISTRIBUTION

Set forth below are expenses (other than the selling agent's commissions, dealer-manager fees, allowance expenses and reimbursements) we expect to incur in connection with the issuance and distribution of the securities registered hereby. None of these expenses are reimbursements to or payments on behalf of our selling group. With the exception of the Securities and Exchange Commission registration fee and the FINRA filing fee, the amounts set forth below are estimates and actual expenses may vary considerably from these estimates depending upon how long the notes are offered and other factors:

| | |
|---|---|
| Securities and Exchange Commission registration fee | $ 128,800 |
| FINRA filing fee | $ 150,500 |
| Accounting fees and expenses | $ 200,000 |
| Legal fees and expenses | $ 551,200 |
| Blue sky fees and expenses | $ 20,000 |
| Printing expenses | $ 200,000 |
| Trustee fees and expenses | $ 150,000 |
| Miscellaneous | $ 100,000 |
| **Total** | $1,500,500 |

### ITEM 14. INDEMNIFICATION OF DIRECTORS AND OFFICERS

Section 145 of the Delaware General Corporation Law provides for, under certain circumstances, the indemnification of our officers, directors, employees and agents against liabilities that they may incur in such capacities. A summary of the circumstances in which such indemnification provided for is contained herein, but that description is qualified in its entirety by reference to the relevant Section of the Delaware General Corporation Law.

In general, the statute provides that any director, officer, employee or agent of a corporation may be indemnified against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement, actually and reasonably incurred in a proceeding (including any civil, criminal, administrative or investigative proceeding) to which the individual was a party by reason of such status. Such indemnity may be provided if the indemnified person's actions resulting in the liabilities: (i) were taken in good faith; (ii) were reasonably believed to have been in or not opposed to our best interest; and (iii) with respect to any criminal action, such person had no reasonable cause to believe the actions were unlawful. Unless ordered by a court, indemnification generally may be awarded only after a determination of independent members of the Board of Directors or a committee thereof, by independent legal counsel or by vote of the stockholders that the applicable standard of conduct was met by the individual to be indemnified.

The statutory provisions further provide that to the extent a director, officer, employee or agent is wholly successful on the merits or otherwise in defense of any proceeding to which he was a party, he is entitled to receive indemnification against expenses, including attorneys' fees, actually and reasonably incurred in connection with the proceeding.

Indemnification in connection with a proceeding by or in the right of GWG Holdings, Inc. (the "Company") in which the director, officer, employee or agent is successful is permitted only with respect to expenses, including attorneys' fees actually and reasonably incurred in connection with the defense. In such actions, the person to be indemnified must have acted in good faith, in a manner believed to have been in our best interest and must not have been adjudged liable to us unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability, in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expense which the Court of Chancery or such other court shall deem proper.

App. 0137

Table of Contents

Indemnification is otherwise prohibited in connection with a proceeding brought on behalf of the Company in which a director is adjudged liable to us, or in connection with any proceeding charging improper personal benefit to the director in which the director is adjudged liable for receipt of an improper personal benefit.

Delaware law authorizes us to reimburse or pay reasonable expenses incurred by a director, officer, employee or agent in connection with a proceeding in advance of a final disposition of the matter. Such advances of expenses are permitted if the person furnishes to us a written agreement to repay such advances if it is determined that he is not entitled to be indemnified by us.

The statutory section cited above further specifies that any provisions for indemnification of or advances for expenses does not exclude other rights under our certificate of incorporation, corporate bylaws, resolutions of our stockholders or disinterested directors, or otherwise. These indemnification provisions continue for a person who has ceased to be a director, officer, employee or agent of the corporation and inure to the benefit of the heirs, executors and administrators of such persons.

The statutory provision cited above also grants the power to the Company to purchase and maintain insurance policies that protect any director, officer, employee or agent against any liability asserted against or incurred by him in such capacity arising out of his status as such. Such policies may provide for indemnification whether or not the corporation would otherwise have the power to provide for it.

Article 6 of our corporate bylaws provides that we shall indemnify our directors, officers, employees and agents to the fullest extent permitted by the Delaware General Corporation Law. Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers or persons controlling the Company pursuant to the foregoing provisions, we understand that in the opinion of the SEC such indemnification is against public policy as expressed in that Act and is therefore unenforceable.

We have purchased directors' and officers' liability insurance in order to limit the exposure to liability for indemnification of directors and officers, including liabilities under the Securities Act of 1933.

## ITEM 15. RECENT SALES OF UNREGISTERED SECURITIES

In 2011, the Company's wholly owned subsidiary, GWG Life, LLC ("GWG Life"), sold $13,537,876 in principal amount of Series I Secured notes for cash. In addition, $61,782 in principal amount of such notes were sold in consideration of reinvested interest payable on account of issued notes. The Company is a guarantor of GWG Life's obligations under the Series I Secured notes. The notes were offered and sold solely to accredited investors in a private placement under Section 4(a)(2) of the Securities Act of 1933, and Regulation D/Rule 506 thereunder. Arque Capital Ltd. was the managing broker-dealer for the offering of the notes and received customary sales commissions aggregating $387,048.

In 2011, the Company sold a total of 1,858,891 shares of Series A Preferred Stock for aggregate cash consideration of $13,941,683. In addition, 2,387 preferred shares were issued as in-kind dividends payable on account of the preferred stock. In connection with the sales of preferred stock, the Company issued three-year warrants for the purchase of up to 137,874 shares of common stock at the per-share price of $6.25. The preferred stock and warrants were offered and sold solely to accredited investors in a private placement under Section 4(a)(2) of the Securities Act of 1933, and Regulation D/Rule 506 thereunder. Arque Capital Ltd. was the managing broker-dealer for the offering of the preferred stock and received customary sales commissions aggregating $1,447,127.

In 2012, the Company's wholly owned subsidiary, GWG Life, sold $50,000 in principal amount of Series I Secured notes for cash. In addition, $141,052 in principal amount of such notes were sold in consideration of reinvested interest payable on account of earlier issued notes. The Company is a guarantor of GWG Life's obligations under the Series I Secured notes. The notes were offered and sold solely to accredited investors in a private placement under Section 4(a)(2) of the Securities Act of 1933, and Regulation D/Rule 506 thereunder.

In 2012, the Company sold a total of 855,240 shares of Series A Preferred Stock for aggregate cash consideration of $6,414,300. In addition, 563,467 preferred shares were sold in consideration of converted

II-2

Table of Contents

principal and interest owing under Series I Secured notes, and 82,323 preferred shares were issued as in-kind dividends payable on account of the preferred stock. In connection with the sales of preferred stock, the Company issued three-year warrants for the purchase of up to 694,034 shares of common stock at the per-share price of $6.25. The preferred stock and warrants were offered and sold solely to accredited investors in a private placement under Section 4(a)(2) of the Securities Act of 1933, and Regulation D/Rule 506 thereunder. Arque Capital Ltd. was the managing broker-dealer for the offering of the preferred stock and received customary sales commissions aggregating $1,051,000.

In 2013, the Company's wholly owned subsidiary, GWG Life, sold $196,484 in principal amount of Series I Secured notes in consideration of reinvested interest payable on account of earlier issued notes. The Company is a guarantor of GWG Life's obligations under the Series I Secured notes. The notes were offered and sold solely to accredited investors in a private placement under Section 4(a)(2) of the Securities Act of 1933, and Regulation D/Rule 506 thereunder. Arque Capital Ltd. was the managing broker-dealer for the offering of the notes.

In 2013, the Company issued 82,606 shares of Series A Preferred Stock as in-kind dividends payable on account of the preferred stock. The preferred stock was issued sold solely to accredited investors in a private placement under Section 4(a)(2) of the Securities Act of 1933, and Regulation D/Rule 506 thereunder.

## ITEM 16. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES

**(a)** **Exhibits**. The exhibits listed below are filed as a part of this registration statement.

| Exhibit Number | Description |
|---|---|
| 1.1 | Form of Managing Broker-Dealer Agreement with Emerson Equity LLC (16) |
| 3.1 | Certificate of Incorporation (1) |
| 3.2 | Certificate of Amendment of Certificate of Incorporation, dated July 29, 2011 (2) |
| 3.3 | Certificate of Designations for Series A Convertible Preferred Stock (2) |
| 3.4 | Bylaws (1) |
| 3.5 | Certificate of Amendment of Certificate of Incorporation, dated June 24, 2014 (13) |
| 4.1 | Indenture with Bank of Utah, dated October 19, 2011 (3) |
| 4.2 | Pledge and Security Agreement by and among GWG Holdings, Inc., GWG Life Settlements, LLC, Jon R. Sabes, Steven F. Sabes, and Bank of Utah, dated October 19, 2011 (3) |
| 4.3 | Intercreditor Agreement by and between Bank of Utah and Lord Securities Corporation, dated October 19, 2011 (3) |
| 4.4 | Amendment No. 1 to Indenture with Bank of Utah, dated December 15, 2011 (6) |
| 4.5 | Amendment No. 1 to Pledge and Security Agreement, dated December 15, 2011 (6) |
| 4.6 | Form of Amendment No. 2 to Indenture with Bank of Utah for L Bonds (15) |
| 4.7 | Form of L Bond (14) |
| 4.8 | Form of Subscription Agreement for L Bonds (15) |
| 4.9 | Form of Amendment No. 2 to Pledge and Security Agreement by and among GWG Holdings, Inc., GWG Life, LLC, Jon R. Sabes, Steven F. Sabes, and Bank of Utah (filed herewith) |
| 4.10 | Form of Amendment No. 1 to Intercreditor Agreement by and between Bank of Utah and Lord Securities Corporation (filed herewith) |
| 5.1 | Opinion of Maslon Edelman Borman & Brand, LLP (14) |
| 10.1 | Amended and Restated Credit and Security Agreement with DZ Bank AG Deutsche Zentral-Genossenschaftsbank (as agent), and Autobahn Funding Company LLC (as lender), dated effective January 25, 2013 (7)* |
| 10.2 | Performance Guaranty of GWG Holdings, LLC dated July 15, 2008, delivered in favor of DZ Bank AG Deutsche Zentral-Genossenschaftsbank (as agent), and Autobahn Funding Company LLC (as lender) (2) |

II-3

Table of Contents

| Exhibit Number | Description |
|---|---|
| 10.3 | General Reaffirmation and Modification Agreement dated effective January 29, 2013 delivered in favor of DZ Bank AG Deutsche Zentral-Genossenschaftsbank (as agent), and Autobahn Funding Company LLC (as lender) (7)** |
| 10.4 | Third Amended and Restated Note Issuance and Security Agreement dated November 1, 2011, with Lord Securities Corporation (as trustee), GWG LifeNotes Trust (as secured party), and noteholders (11) |
| 10.5 | Pledge Agreement dated November 15, 2010, among Jon R. Sabes, Steven F. Sabes, Opportunity Finance, LLC, SFS Trust 1976, SFS Trust 1992 Esther, SFS Trust 1982, Mokeson, LLC (collectively as pledgors), and Lord Securities Corporation (as trustee and pledgee) (2) |
| 10.6 | Amended and Restated Investment Agreement with Insurance Strategies Fund, LLC, dated as of September 3, 2009 (2) |
| 10.7 | Addendum No. 1 to Sub-Sublease Agreement effective as of July 14, 2008 by Opportunity Finance, LLC and GWG Life, LLC (5) |
| 10.8 | Employment Agreement with Jon R. Sabes, dated June 14, 2011 (4) |
| 10.9 | Employment Agreement with Steven F. Sabes, dated June 14, 2011 (4) |
| 10.10 | Employment Agreement with Paul A. Siegert, dated June 14, 2011 (4) |
| 10.11 | Purchase and Sale Agreement with Athena Securities Group Ltd. and Athena Structured Funds PLC, dated July 11, 2011 (2) |
| 10.12 | Shareholders' Agreement with respect to Athena Structured Funds PLC, dated July 11, 2011 (2) (10) |
| 10.13 | Amendment to Third Amended and Restated Note Issuance and Security Agreement, dated as of November 18, 2013, with Lord Securities Corporation (as trustee for the GWG LifeNotes Trust) (11) |
| 10.14 | Purchase and Sale Agreement among GWG Holdings, Inc., Athena Securities Group Limited and GWG Securities International Public Limited Company, dated June 28, 2013 (9) |
| 10.15 | 2013 Stock Incentive Plan dated March 27, 2013 (8) |
| 10.16 | Form of Stock Option Agreement used under 2013 Stock Incentive Plan (revised June 2014) (12)**** |
| 10.17 | Employment Agreement with William Acheson, dated May 30, 2014 (12) |
| 10.18 | Amendment No. 1 to Amended and Restated Credit and Security Agreement with DZ Bank AG Deutsche Zentral-Genossenschaftsbank and Autobahn Funding Company LLC, dated May 29, 2014 (12) |
| 10.19 | Employment Agreement with Michael D. Freedman, dated September 22, 2014 (16) |
| 10.20 | Stock Option Agreement with Michael D. Freedman, dated September 22, 2014 (16) |
| 21 | List of Subsidiaries (8) |

23.1    Consent of Mayer Hoffman McCann P.C. (filed herewith)
23.2    Consent of Baker Tilly Virchow Krause, LLP (filed herewith)
23.3    Consent of Maslon Edelman Borman & Brand, LLP (contained within Exhibit 5.1 above)
25      Statement of Eligibility of Trustee (16)

(1)    Incorporated by reference to Form S-1 Registration Statement filed on June 14, 2011 (File No. 333-174887).
(2)    Incorporated by reference to Form S-1/A Registration Statement filed on August 23, 2011 (File No. 333-174887).
(3)    Incorporated by reference to Form S-1/A Registration Statement filed on October 20, 2011 (File No. 333-174887).
(4)    Incorporated by reference to Form S-1/A Registration Statement filed on September 20, 2011 (File No. 333-174887).
(5)    Incorporated by reference to Form S-1/A Registration Statement filed on July 26, 2011 (File No. 333-174887).

II-4

**Table of Contents**

(6)    Incorporated by reference to Post-Effective Amendment No. 1 to Form S-1/A filed on April 30, 2012 (File No. 333-174887).
(7)    Incorporated by reference to Current Report on Form 8-K filed on February 1, 2013.
(8)    Incorporated by reference to Annual Report on Form 10-K for the period ended December 31, 2013, filed on March 20, 2014.
(9)    Incorporated by reference to Current Report on Form 8-K filed on July 8, 2013.
(10)   Agreement was terminated effective June 28, 2013.
(11)   Incorporated by reference to Post-Effective Amendment No. 8 to Form S-1/A filed on November 12, 2013 (File No. 333-174887).
(12)   Incorporated by reference to Form S-1/A Registration Statement filed on June 6, 2014 (File No. 333-195505).
(13)   Incorporated by reference to Quarterly Report on Form 10-Q for the period ended June 30, 2014, filed on August 8, 2014.
(14)   Incorporated by reference to Form S-1/A Registration Statement filed on October 30, 2014 (File No. 333-197227).
(15)   Incorporated by reference to Form S-1/A Registration Statement filed on November 4, 2014 (File No. 333-197227) .
(16)   Incorporated by reference to Form S-1/A Registration Statement filed on December 18, 2014 (File No. 333-197227).
*      The registrant has earlier filed the original Credit and Security Agreement dated July 15, 2008, Consent and Amendment No. 1 to the Credit and Security Agreement dated December 14, 2010, and Consent and Amendment No. 2 to the Credit and Security Agreement dated June 10, 2011. These documents were filed as Exhibits 10.1, 10.2 and 10.3, respectively, to the Form S-1/A Registration Statement filed on August 23, 2011.
**     The registrant has earlier filed a Reaffirmation of Guaranty dated as of June 10, 2011, which was filed as Exhibit 10.7 to the Form S-1/A Registration Statement filed on August 23, 2011.
***    The registrant has earlier filed a Managing Broker-Dealer Agreement dated August 14, 2011, an amended Managing Broker-Dealer Agreement dated October 19, 2011, an Amended and Restated Managing Broker-Dealer Agreement dated November 16, 2011, and a Second Amended and Restated Managing Broker-Dealer Agreement dated effective as of November 16, 2011. These documents were filed as Exhibits 10.8 to the Form S-1/A Registration Statements filed on August 23, October 20, November 28 and December 15, 2011, respectively.
****   The registrant has earlier filed a Form of Stock Option Agreement for use under the 2013 Stock Incentive Plan, which was filed as Exhibit 10.17 to the registrant's Annual Report on Form 10-K filed on March 20, 2014.

II-5

**Table of Contents**

**ITEM 17. UNDERTAKINGS**

Insofar as indemnification for liabilities arising under the Securities Act of 1933 (the "Securities Act") may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act, and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

The undersigned registrant hereby undertakes:

(1) To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement:

(i)   to include any prospectus required by section 10(a)(3) of the Securities Act of 1933;

App. 0140

(ii) to reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, an increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than a 20% change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective registration statement;

(iii) to include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement.

(2) That, for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3) To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(4) [intentionally omitted]

(5) For the purpose of determining any liability under the Securities Act to any purchaser, each prospectus filed pursuant to Rule 424(b) as part of a registration statement relating to an offering, other than registration statements relying on Rule 430B or other than prospectuses filed in reliance on Rule 430A, shall be deemed to be part of and included in the registration statement as of the date it is first used after effectiveness. Provided, however, that no statement made in a registration statement or prospectus that is part of the registration statement or made in a document incorporated or deemed incorporated by reference into the registration statement or prospectus that is part of the registration statement will, as to a purchaser with a time of contract of sale prior to such first use, supersede or modify any statement that was made in the registration statement or prospectus that was part of the registration statement or made in any such document immediately prior to such date of first use.

II-6

Table of Contents

(6) That, for the purpose of determining liability of the registrant under the Securities Act of 1933 to any purchaser in the initial distribution of the securities: The undersigned registrant undertakes that in a primary offering of securities of the undersigned registrant pursuant to this registration statement, regardless of the underwriting method used to sell the securities to the purchaser, if the securities are offered or sold to such purchaser by means of any of the following communications, the undersigned registrant will be a seller to the purchaser and will be considered to offer or sell such securities to such purchaser:

(i) Any preliminary prospectus or prospectus of the undersigned registrant relating to the offering required to be filed pursuant to Rule 424;

(ii) Any free writing prospectus relating to the offering prepared by or on behalf of the undersigned registrant or used or referred to by the undersigned registrant;

(iii) The portion of any other free writing prospectus relating to the offering containing material information about the undersigned registrant or its securities provided by or on behalf of the undersigned registrant; and

(iv) Any other communication that is an offer in the offering made by the undersigned registrant to the purchaser.

II-7

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the Registrant has duly caused this Amendment No. 6 to Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Minneapolis, State of Minnesota, on January 7, 2015.

GWG HOLDINGS, INC.

By:     /s/ Jon R. Sabes

Chief Executive Officer

App. 0141

Pursuant to the requirements of the Securities Act of 1933, this Amendment No. 6 to Registration Statement has been signed, as of January 7, 2015, by the following persons in the capacities indicated below.

| Name | Title |
| --- | --- |
| /s/ Jon R. Sabes<br>Jon R. Sabes | Director, Chief Executive Officer<br>(Principal Executive Officer) |
| /s/ Paul A. Siegert*<br>Paul A. Siegert | Director, Executive Chairman |
| /s/ William Acheson<br>William Acheson | Chief Financial Officer<br>(Principal Financial and Accounting Officer) |
| /s/ Steven F. Sabes*<br>Steven F. Sabes | Director, President and Secretary |
| /s/ David H. Abramson*<br>David H. Abramson | Director |
| /s/ Shawn R. Gensch*<br>Shawn R. Gensch | Director |
| /s/ Charles H. Maguire III*<br>Charles H. Maguire III | Director |
| /s/ Jeffrey L. McGregor*<br>Jeffrey L. McGregor | Director |

\* Signed pursuant to power of attorney held by Jon R. Sabes.

II-8

Table of Contents

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, the Registrant has duly caused this Amendment No. 6 to Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Minneapolis, State of Minnesota, on January 7, 2015.

GWG LIFE, LLC

By:   /s/ Jon R. Sabes
Chief Executive Officer

Pursuant to the requirements of the Securities Act of 1933, this Amendment No. 6 to Registration Statement has been signed, as of January 7, 2015, by the following persons in the capacities indicated below.

| Name | Title |
| --- | --- |
| /s/ Jon R. Sabes<br>Jon R. Sabes | Chief Executive Officer<br>(Principal Executive Officer) |
| /s/ William Acheson<br>William Acheson | Chief Financial Officer<br>(Principal Financial and Accounting Officer) |
| /s/ Jon R. Sabes | Manager of GWG Life, LLC |

App. 0142

Jon R. Suder

II-9

POS AM 1 posam2015a5_gwglbonds.htm POST EFFECTIVE AMENDMENT

As filed with the Securities and Exchange Commission on April 8, 2016

<div align="right">Registration Nos. 333-197227 and<br>333-197227-01</div>

## SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

———————————————

## POST-EFFECTIVE AMENDMENT NO. 5 TO
## FORM S-1
## REGISTRATION STATEMENT
*Under the Securities Act of 1933*

———————————————

## GWG HOLDINGS, INC.
## GWG LIFE, LLC
(Exact name of Registrant as specified in its charter)

———————————————

| | |
|---|---|
| **Delaware** | **26-2222607** |
| **Delaware** | **20-4356955** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

220 South Sixth Street, Suite 1200
Minneapolis, Minnesota 55402
Tel: (612) 746-1944
Fax: (612) 746-0445
(Address, including zip code, and telephone number, including area code, of Registrant's principal executive offices)

———————————————

| | |
|---|---|
| Jon R. Sabes | *Copies to*: |
| Chief Executive Officer | Paul D. Chestovich, Esq. |
| 220 South Sixth Street, Suite 1200 | Maslon Edelman Borman & Brand, LLP |
| Minneapolis, Minnesota 55402 | 3300 Wells Fargo Center |
| Tel: (612) 746-1944 | 90 South Seventh Street |
| (Name, address, including zip code, and telephone | Minneapolis, Minnesota 55402 |
| number, including area code, of agent for service) | Tel: (612) 672-8200 |

———————————————

Approximate date of commencement of proposed sale to the public: from time to time after the effective date of this registration statement.

If the only securities being registered on this Form are being offered pursuant to dividend or interest reinvestment plans, please check the following box. ☐

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, other than securities offered only in connection with dividend or interest reinvestment plans, check the following box. ☒

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a registration statement pursuant to General Instruction I.D. or a post-effective amendment thereto that shall become effective upon filing with the SEC pursuant to Rule 462(e) under the Securities Act, check the following box. ☐

If this Form is a post-effective amendment to a registration statement filed pursuant to General Instruction I.D. filed to register additional securities or additional classes of securities pursuant to Rule 413(b) under the Securities Act, check the following box. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐        Accelerated filer ☐        Non-accelerated filer ☐        Smaller reporting company ☒

App. 0145

**CALCULATION OF REGISTRATION FEE**

| Title of Each Class of Securities to Be Registered | Amount to be Registered | Proposed Maximum Offering Price Per Unit | Proposed Maximum Aggregate Offering Price | Amount of Registration Fee |
|---|---|---|---|---|
| L Bonds – Units | 1,000,000 | $ 1,000(1) | $ 1,000,000,000 | $ 128,800.00(2) |

(1)    The L Bonds will be issued in "Units" of $1,000 in principal amount, in minimum amounts of 25 Units ($25,000 principal amount) and in any whole or fractional Unit amounts in excess of such minimum amount.

(2)    Registration fee previously paid.

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the registration statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

App. 0146

**The information in this prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission, of which this prospectus is a part, shall have been declared effective. This prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any state where the offer or sale is not permitted.**

**SUBJECT TO COMPLETION, DATED APRIL 8, 2016**

# GWG HOLDINGS, INC.



1,000,000 Units of L Bonds
($1,000,000,000)

GWG Holdings, Inc., through its subsidiaries, invests in life insurance assets in the secondary marketplace. Our objective is to earn returns from our investments in life insurance assets that are greater than the costs necessary to purchase, finance and service those policies to their maturity.

We are offering up to 1,000,000 Units of L Bonds (the "L Bonds") at $1,000 principal amount per whole Unit, representing $1,000,000,000 in aggregate principal amount of L Bonds. This is a continuous offering and there is no minimum amount of L Bonds that must be sold before we can use any of the proceeds. The proceeds from the sale of the L Bonds will be paid directly to us following each sale and will not be placed in an escrow account. We will use the net proceeds from the offering of the L Bonds primarily to purchase and finance additional life insurance assets, and to service and retire other outstanding debt obligations. The minimum investment in L Bonds is 25 Units, or $25,000. Investments in excess of such minimum amount may be made in any number of whole or fractional Units. The L Bonds will be sold with varying maturity terms, interest rates and frequency of interest payments, all as set forth in this prospectus and in supplements we publish from time to time. Depending on our capital needs and the amount of your investment, L Bonds with certain terms may not always be available. Although we will periodically establish and change interest rates on unsold L Bonds offered pursuant to this prospectus, once an L Bond is sold, its interest rate will not change during its term (subject, however, to the extension and renewal provisions contained in such L Bond). Upon maturity, subject to the terms and conditions described in this prospectus, the L Bonds will be automatically renewed for the same (or lesser) term at the interest rate we are offering at that time to other investors with similar aggregate L Bond portfolios for L Bonds of the same maturity, unless redeemed upon maturity at our or your election.

The L Bonds are secured by the assets of GWG Holdings, Inc. and a pledge of all of the common stock by our largest stockholders. Importantly, GWG Holdings' most significant assets are cash and its investment in subsidiaries. Obligations under the L Bonds will be guaranteed by our subsidiary GWG Life, LLC, which guarantee will involve the grant of a security interest in all of the assets of such subsidiary. The majority of our life insurance assets are held in our subsidiaries GWG DLP Funding II, LLC ("DLP II") and GWG DLP Funding III, LLC ("DLP III"), which are a direct subsidiaries of GWG Life. The life insurance assets held by GWG DLP Funding II will not be collateral for obligations under the L Bonds although the guarantee and collateral provided by GWG Life will include its ownership interest in DLP II and DLP III. These facts present the risk to investors that the collateral security we and our subsidiary have granted for our obligations under the L Bonds may be insufficient to repay the L Bonds upon an event of default. The security offered for the L Bonds will provide rights as to collateral that are pari passu with the holders of certain other secured debt previously issued by GWG Life and GWG Holdings. This generally means that claims for payment and entitlement to security among the holders of L Bonds and such other secured debt previously issued by GWG Life and GWG Holdings will be treated equally and without preference.

We may call and redeem the entire outstanding principal and accrued but unpaid interest of any or all of the L Bonds at any time without penalty or premium. L Bond holders will have no right to put (that is, require us to redeem) any L Bond prior to the due date unless in the case of death, bankruptcy or total disability. In the event we agree to redeem L Bond upon the request of an L Bond holder — other than after death, bankruptcy or total disability of such holder — we may impose a redemption fee of 6% against the outstanding principal balance of the redeemed L Bond. This redemption fee will be subtracted from the amount paid.

We do not intend to list our L Bonds on any securities exchange during the offering period, and we do not expect a secondary market in the L Bonds to develop. As a result, you should not expect to be able to resell your L Bonds regardless of how we perform. Accordingly, an investment in our L Bonds is not suitable for investors that require liquidity in advance of their L Bond's maturity date.

We maintain a senior borrowing arrangement that subordinates the right to payment on, and shared collateral securing, the L Bonds to our senior secured lender. From time to time we may add or replace senior lenders and the particular arrangements under which we borrow from them. In addition, these borrowing arrangements with senior lenders restrict, and are expected to continue to restrict, our cash flows and, subject to certain exceptions, distributions from our

operating subsidiaries. These provisions will restrict cash flows available for payment of principal and interest on the L Bonds.

We are an "emerging growth company" under applicable law and are subject to reduced public company reporting requirements. Please read the disclosures on page 11 of this prospectus for more information. Investing in our L Bonds may be considered speculative and involves a high degree of risk, including the risk of losing your entire investment. See "Risk Factors" beginning on page 19 to read about the risks you should consider before buying our L Bonds. You should carefully consider the risk factors set forth in this prospectus. The L Bonds are only suitable for persons with substantial financial resources and with no need for liquidity in this investment.

Please read this prospectus before investing and keep it for future reference. We file annual, quarterly and current reports with the SEC. This information will be available free of charge by contacting us at 220 South Sixth Street, Suite 1200, Minneapolis, Minnesota 55402 or by phone at (612) 746-1944 or on our website at *www.gwglife.com*. The SEC also maintains a website at *www.sec.gov* that contains such information.

**Neither the SEC nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

The date of this prospectus is                     , 2016

App. 0148

The L Bonds will be offered and sold on a best-efforts basis by Emerson Equity LLC, a registered broker-dealer and member of the Financial Industry Regulatory Authority ("FINRA"). Emerson Equity will be our placement agent for the L Bonds in this offering for purposes of the Securities Act of 1933. Emerson Equity may retain other dealers to act as an agent on its behalf in the course of offering and selling L Bonds in this offering. We will pay Emerson Equity a selling commission ranging from 0.75% to 6.00% of the principal amount of L Bonds sold, depending on the L Bonds' maturity date. We will also pay Emerson Equity additional compensation consisting of a dealer-manager fee, a wholesaling fee (payable only to wholesaling dealers), and an accountable expense allowance. Emerson Equity will share its commissions and accountable expense allowance with other dealers who may participate in the offering. We have also agreed to reimburse Emerson Equity for certain pre-offering expenses that we anticipate will aggregate to no more than $30,000. The total amount of the selling commissions and additional compensation (including reimbursements, non-transaction-based and non-cash selling compensation) paid to Emerson Equity and any other FINRA member in the course of offering and selling L Bonds will not exceed 8.00% of the aggregate L Bonds. See "Plan of Distribution" and "Use of Proceeds" for further information.

| | Units | Price to Investor | Aggregate Commissions, Fees, and Expense Allowances[1][2] | Net Proceeds to Company |
|---|---|---|---|---|
| **Minimum Investment** | 25 | $ 25,000 | $ 1,812 | $ 23,188[3] |
| **Offering** | 1,000,000 | $ 1,000,000,000 | $ 80,000,000 | $ 920,000,000[4] |

_____

(1)    Assumes an average sales commission of 5.00%, average dealer-manager fee of 0.50%, average wholesaling fees of 1.30%, and average accountable expense allowance of 1.20%. As explained above, actual commissions will vary based on the term of the L Bonds sold. Nevertheless, the total amount of selling commissions and additional compensation (consisting of dealer-manager fees, wholesaling fees and accountable expense allowance, together with non-transaction-based and non-cash selling compensation, if any) paid to the placement agent will not exceed 8.00% of the aggregate gross offering proceeds we receive from the sale of the L Bonds sold. Accordingly, and assuming our sale of all $1,000,000,000 in principal amount of bonds offered hereby, the maximum amount of selling commissions we can pay is 6.00% of the gross offering proceeds we receive from the sale of the L Bonds (or $60,000,000), the maximum dealer-manager fee we can pay is 0.50% of the gross offering proceeds we receive from the sale of the L Bonds (or $5,000,000), and the maximum amount of aggregated accountable expenses, wholesaling fees, non-transaction-based and non-cash selling compensation we can pay will not exceed 2.50% of the aggregate gross offering proceeds we receive from the sale of the L Bonds. If all L Bonds sold have seven-year maturities resulting in sales commissions of 6.00%, then the maximum amounts of aggregate accountable expenses, wholesaling fees, non-transaction-based and non-cash selling compensation will not exceed 1.5%.

(2)    Emerson Equity has agreed to offer the L Bonds on a "best efforts" basis.

(3)    Net Proceeds to Company based on the Minimum Investment are calculated after deducting (i) selling commissions and (ii) additional compensation (consisting of a dealer-manager fee, wholesaling fee, an accountable expense allowance and non-transaction-based and non-cash selling compensation). We expect that our own offering expenses, consisting of legal, accounting, printing, mailing, registration, qualification and associated securities offering filing costs and expenses, will through the course of the offering aggregate to approximately $1,500,500, but for purposes of illustrating the Net Proceeds to Company based on the Minimum Investment, those offering expenses of $1,500,500 are not reflected.

(4)    Net Proceeds to Company based on the offering of 1,000,000 L Bond Units (representing $1,000,000,000 in aggregate principal amount) are calculated as described in fn. 3 above, but also before deducting our own expected offering expenses of $1,500,500.

L Bonds will be sold as "Units," with each whole Unit representing $1,000 in principal amount of L Bonds. Throughout this prospectus, we refer to L Bond Units simply as "L Bonds." We will issue the L Bond Units in book-entry form, certificated form, or in the form of a global certificate deposited with a depositary. Depending on the manner in which you purchase L Bonds, you may not receive a physical certificate representing your L Bonds. In all cases, however, we will deliver written confirmation to purchasers of L Bonds. Bank of Utah will act as trustee for the L Bonds.

The initial interest rates for the L Bonds based on the applicable maturity thereof is set forth in the table below.

| Maturity Term | Interest Rate (%) |
|---|---|
| 6 months | 4.25 |
| 1 year | 5.00 |
| 2 years | 6.50 |
| 3 years | 7.50 |
| 5 years | 8.50 |
| 7 years | 9.00 |

We may change the interest rates applicable to unsold L Bonds from time to time during this offering, in which case the applicable interest rates will be set forth in an interest rate supplement to this prospectus. Once an L Bond is sold, the interest rate will not change during its term (subject, however, to the extension and renewal provisions contained in such L Bond).

**TABLE OF CONTENTS**

|  | **Page** |
|---|---|
| ABOUT THIS PROSPECTUS | 1 |
| INDUSTRY AND MARKET DATA | 2 |
| HOW TO PURCHASE L BONDS | 2 |
| PROSPECTUS SUMMARY | 9 |
| RISK RELATING TO FORWARD-LOOKING STATEMENTS | 18 |
| RISK FACTORS | 19 |
| USE OF PROCEEDS | 25 |
| BUSINESS | 27 |
| DESCRIPTION OF THE L BONDS | 46 |
| PLAN OF DISTRIBUTION | 61 |
| MATERIAL FEDERAL INCOME TAX CONSIDERATIONS | 64 |
| STATE, LOCAL AND FOREIGN TAXES | 68 |
| ERISA CONSIDERATIONS | 68 |
| LEGAL MATTERS | 70 |
| EXPERTS | 70 |
| WHERE YOU CAN FIND MORE INFORMATION | 70 |
| INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE | 71 |
| FINANCIAL STATEMENTS | F-1 |



GWG Holdings, Inc.
220 South Sixth Street, Suite 1200
Minneapolis, MN 55402
Tel: (612) 746-1944
Fax: (612) 746-0445

i

App. 0151

**ABOUT THIS PROSPECTUS**

We have prepared this prospectus as part of a registration statement that we filed with the SEC for our continuous offering of L Bonds. We will endeavor to avoid interruptions in the continuous offering of our L Bonds. Nonetheless, our continuous offering may be suspended while the SEC or FINRA reviews certain amendments to our registration statement, until ultimately declared effective by the SEC.

Any statement that we make in this prospectus will be modified or superseded by any inconsistent statement made by us in a subsequent prospectus supplement. The registration statement we filed with the SEC includes exhibits that provide more detailed descriptions of the matters discussed in this prospectus and certain information that is incorporated by reference. You should read this prospectus, the related exhibits filed with the SEC, and any prospectus supplement, together with additional information described below under "Where You Can Find More Information." In this prospectus, we use the term "day" to refer to a calendar day, and we use the term "business day" to refer to any day other than Saturday, Sunday, a legal holiday or a day on which banks in New York City are authorized or required to close.

You should rely only on the information contained in this prospectus. Neither we nor the dealer-manager have authorized any other person to provide you with any information different from that contained in this prospectus or information furnished by us upon request as described herein. The information contained in this prospectus is complete and accurate only as of the date of this prospectus, regardless of the time of delivery of this prospectus or sale of our L Bonds. This prospectus contains summaries of certain other documents, which summaries contain all material terms of the relevant documents and are believed to be accurate, but reference is hereby made to the full text of the actual documents for complete information concerning the rights and obligations of the parties thereto. Such information necessarily incorporates significant assumptions, as well as factual matters. All documents relating to this offering and related documents and agreements, if readily available to us, will be made available to a prospective investor or its representatives upon request. During the course of this offering and prior to sale, each prospective L Bond holder is invited to ask questions of and obtain additional information from us concerning the terms and conditions of this offering, our company, the L Bonds and any other relevant matters, including but not limited to additional information necessary or desirable to verify the accuracy of the information set forth in this prospectus. We will provide the information to the extent it possesses such information or can obtain it without unreasonable effort or expense. If there is a material change in the affairs of our company, we will supplement this prospectus or amend the registration statement of which this prospectus is a part.

No information contained herein, nor in any prior, contemporaneous or subsequent communication should be construed by a prospective investor as legal or tax advice. Each prospective investor should consult its, his or her own legal, tax and financial advisors to ascertain the merits and risks of the transactions described herein prior to purchasing the L Bonds. This written communication is not intended to be written advice as defined in Circular 230 published by the U.S. Treasury Department.

The L Bonds will be issued under an indenture, as amended or supplemented from time to time (referred to herein collectively as the "indenture"). This prospectus is qualified in its entirety by the terms of that indenture filed with SEC as an exhibit to the registration statement of which this prospectus is a part. All material terms of the indenture are summarized in this prospectus. You may obtain a copy of the indenture upon written request to us or online at *www.sec.gov*.

The indenture trustee did not participate in the preparation of this prospectus and makes no representations concerning the L Bonds, the collateral, or any other matter stated in this prospectus. The indenture trustee has no duty or obligation to pay the L Bonds from their funds, assets or capital or to make inquiry regarding, or investigate the use of, amounts disbursed from any account.

## INDUSTRY AND MARKET DATA

The industry and market data used throughout this prospectus have been obtained from our own research, surveys or studies conducted by third parties and industry or general publications. Industry publications and surveys generally state that they have obtained information from sources believed to be reliable, but do not guarantee the accuracy and completeness of such information. We believe that each of these studies and publications is reliable.

## HOW TO PURCHASE L BONDS

If, after carefully reading this entire prospectus, obtaining any other information requested and available, and being fully satisfied with the results of pre-investment due-diligence activities, you would like to purchase L Bonds, you will have two different ways in which to consummate a purchase: (1) DTC settlement, and (2) direct settlement with the Company.

1. *Depositary Trust Company Settlement (DTC settlement).*   If your broker-dealer is a participant in the DTC system and makes DTC settlement available to you, then you can place an order for the purchase of L Bonds through your broker-dealer. A broker-dealer using this service will have an account with DTC in which your funds will be placed to facilitate the monthly closing cycle. Orders will be executed by your broker-dealer electronically and you must coordinate with your broker-dealer's registered representative to pay the full purchase price for the L Bonds by the final settlement date. Orders may be placed at any time, and the final settlement date will be the date on which your subscription agreement is accepted. You will be credited with ownership of an L Bond on the first business day following the month in which the subscription is made. However, interest will begin to accrue from the final settlement date. Your purchase price for L Bonds purchased in this way will not be held in escrow.

2. *Direct Settlement with the Company.*   If you wish to purchase L Bonds through direct settlement with the Company, then you must complete, execute and return the Subscription Agreement to us together with a certified check or personal check payable to the order of "GWG Holdings, Inc. — Subscription Account" (or wire sent to the Subscription Account) equal to the principal amount of L Bonds you wish to purchase. If you are working with a broker-dealer, your subscription materials and the certified check or personal check should be delivered to your broker-dealer, who will deliver it to us at the following address:

**GWG Holdings, Inc.**
**220 South Sixth Street, Suite 1200**
**Minneapolis, MN 55402**

<u>**Wire Instructions**</u>
GWG Holdings, Inc. — Subscription Account
Account: 500023916
Routing: 091310521
Bank Name: Bell State Bank & Trust

Your purchase is subject to our acceptance. All information provided is confidential and will be disclosed only to our directors, officers and employees who need to know, affiliates, managing broker-dealer, legal counsel and, if required, to governmental authorities and self-regulatory organizations or as otherwise required by law. For your purchase to be effective as of the first business day of a calendar month, your completed and executed Subscription Agreement, together with your related funds, must be received by the final settlement date (i.e., the last business day of the prior calendar month).

Upon our receipt of the signed Subscription Agreement and acceptance of your purchase, we will notify you of such acceptance. We may, in our sole discretion, accept or reject any purchase, in whole or in part. In the event we do not accept your purchase of L Bonds for any reason, we will promptly return your payment. We may terminate or suspend this offering at any time, for any reason or no reason, in our sole discretion. You may obtain a copy of the Subscription Agreement from our website at *www.gwglife.com*, your broker-dealer (if you are working with one), or from us by contacting us at 1-877-494-2388.

App. 0153

**COVERED SECURITY**

Our L Bonds are a "covered security." The term "covered security" applies to securities exempt from state registration pursuant to Section 18 of the Securities Act of 1933. Generally, securities listed on national exchanges are the most common type of covered security exempt from state registration. A non-traded security also can be a covered security if it has a seniority greater than or equal to other securities from the same issuer that are listed on a national exchange. Our L Bonds are a covered security because they will be senior to our common stock, which is listed on The Nasdaq Capital Market.

**Although the status of our L Bonds as a "covered security" will facilitate their purchase and sale to a broader range of investors than would otherwise be available to us, and although the offer and sale of a "covered security" generally involves fewer issuance costs to the issuer of such securities, our L Bonds are not a suitable purchase for all investors. Investors are urged to read carefully the risk factors relating to our business and our Company contained in the Risk Factors section of this prospectus beginning on page 19. In addition, investors should understand that because our L Bonds are a "covered security" exempt from state securities regulations, neither our Company, the L Bonds, or any other aspects of this offering have been the subject of any merit-based review by state securities regulators.**

3

## QUESTIONS AND ANSWERS ABOUT THIS OFFERING

*The following questions and answers about this offering highlight material information regarding us and this offering that you may wish to review. Nevertheless, you should read this entire prospectus, including the section entitled "Risk Factors," before deciding to purchase our L Bonds.*

**Can you explain and clarify the interplay between GWG Holdings, Inc. and GWG Life, LLC and its subsidiaries in relation to the L Bonds and the registration statement?**

GWG Holdings, Inc. will be issuing the L Bonds, receiving all proceeds from the sale of L Bonds, and will be the only entity making regular payments on the L Bonds. Nevertheless, because a significant amount of the consolidated assets of the Company are held in GWG Life, LLC and its direct subsidiaries, GWG Life is a guarantor of the Company's obligations under the L Bonds. As guarantor of the L Bonds, SEC rules require that GWG Life be included as a co-registrant under this registration statement. GWG Life will not, however, be otherwise involved in the offering of L Bonds.

**It seems as though you are offering several bonds with different interest rates and maturities but calling them all L Bonds. Is this the case?**

All bonds we issue in this offering will have identical terms, excepting the interest rate and the maturity length. In this regard, we have essentially created multiple classes of L Bonds, similar to how companies may have different classes of stocks with slightly different economic rights. Currently, we are offering six classes of L Bonds, as follows:

- "Class .5-1" L Bonds will mature six months from their issuance and accrue interest at 4.25% per annum.

- "Class 1-1" L Bonds will mature one year from their issuance and accrue interest at 5.00% per annum.

- "Class 2-1" L Bonds will mature two years from their issuance and accrue interest at 6.50% per annum.

- "Class 3-1" L Bonds will mature three years from their issuance and accrue interest at 7.50% per annum.

- "Class 5-1" L Bonds will mature five years from their issuance and accrue interest at 8.50% per annum.

- "Class 7-1" L Bonds will mature seven years from their issuance and accrue interest at 9.00% per annum.

The economic terms for each L Bond in any particular class will be identical to all other L Bonds in the same class (other than the date of maturity). In the event we adjust the interest rate for any class of bonds we offer, we will create a new class of L Bonds. Upon the renewal of any L Bonds we have sold, any new interest rate applied to an L Bond will be applied to all L Bonds in the same class. We presently do not use the "class" designation in our prospectus, but intend to do so if and when DTC settlement of our L Bonds is permitted.

**Your prospectus states that the interest rate for the L Bonds may be adjusted from time to time during the course of the offering. Will any such adjustment apply retroactively to L Bonds already issued?**

No. Once you purchase an L Bond, the interest rate on that L Bond will not change during the entirety of its original term. The interest rate on an issued L Bond may, however, be adjusted upon renewal of that L Bond. In any such case, we will advise you of any different interest rate that may apply to your L Bond upon renewal. In sum, any new interest rates for the L Bonds will apply only to newly issued L Bonds sold or renewed after the date of any interest rate change. Our decision to change interest rates depends on numerous factors, including but not limited to things such as market interest rates, our capitalization, demand for our L Bonds, the life settlement market in general, our capital requirements, and many other factors. We have not changed interest rates since January 2014, which was the only time we have changed the interest rates on our publicly offered L Bonds. Please see "Description of the L Bonds — Interest Rate."

**How do I subscribe for L Bonds, and what is the settlement process?**

L Bonds may be purchased either directly from the Company or through a DTC participant once DTC settlement is permitted.

---

4

If you purchase directly from the Company, you will send your completed and executed Subscription Agreement, together with your subscription amount to us at the address listed in "How to Purchase L Bonds." Your subscription amount is principal amount of L Bonds you wish to purchase, and should be paid through a certified check or personal check payable to the order of "GWG Holdings, Inc. — Subscription Account." In lieu of paying by check, you may wire your subscription amount to the account referenced in "How to Purchase L Bonds." If you are working with a broker-dealer or other investment professional, your broker-dealer or professional will gather and send in the required information on your behalf, and may facilitate your payment of the subscription amount. Once we have received your subscription amount and required documentation, we will either reject or accept your subscription. Once accepted, we will have immediate access to your subscription amount and you will start to accrue interest on your investment at the rate applicable to the L Bond you have purchased. Nevertheless, we will formally issue your L Bond on the first day of the month following the month in which your subscription is accepted. This means that if your subscription is accepted July 3, 2015, then your L Bond will be issued August 1, 2015. As indicated above, interest will nonetheless accrue on your L Bond from July 3, 2015 to July 31, 2015, and will be paid on August 15, 2015. If you purchase directly from the Company, your L Bond will ordinarily be issued in book-entry (or certificated) form and payments will be made directly into the account you indicate in your Subscription Agreement.

Purchasing through a DTC participant is a slightly different process. In this case, you will provide your order for the purchase of L Bonds to your broker-dealer, together with such other information as your broker-dealer may require. Your broker-dealer will ensure your order is electronically placed with the Company and that the Company timely receives your subscription amount. There is no need to furnish the Company with a Subscription Agreement when you purchase through a DTC participant. Once we have received your subscription amount, we will either reject or accept your subscription. Once accepted, we will have immediate access to your subscription amount and you will start to accrue interest on your investment at the rate applicable to the L Bond you have purchased. Nevertheless, we will formally issue your L Bond on the first day of the month following the month in which your subscription is accepted. This means that if your subscription is accepted July 3, 2015, then your L Bond will be issued August 1, 2015. As indicated above, interest will nonetheless accrue on your L Bond from July 3, 2015 to July 31, 2015, and will be paid on August 15, 2015. If you purchase through a DTC participant, your L Bond will be issued to DTC in the name of Cede & Co, as its nominee. In this sense, DTC will be the legal owner of the L Bond and you will be the beneficial owner. Your ownership of the L Bond should then appear on the brokerage or other investment statements you receive from your broker-dealer. Settling through a DTC participant will only be permitted if and when approved by DTC (The Depository Trust Company).

If and when DTC settlement is approved, we intend to issue each class of L Bonds a unique identifying number (CUSIP) each month to facilitate the settlement of L Bonds. Thus, Class 1-1 L Bonds issued in August 2015 (and maturing August 2016) will all have the same CUSIP, which will be different from the CUSIP applicable to Class 1-1 L Bonds issued in September 2015 (and maturing September 2016). In this way, all L Bonds belonging to a single CUSIP will be completely fungible, meaning that they will all mature on the same date and have identical terms so that one L Bond with a particular CUSIP is interchangeable with any other L Bond having the same CUSIP. This process helps us track L Bond issuances and creates a tracking system for the L Bonds to be issued to and transferred through DTC.

**What is the role of the trustee?**

The Bank of Utah is the trustee for the L Bonds. The role of the trustee is essentially to enforce the terms of the L Bonds on behalf of bondholders, including direct and beneficial holders, and facilitate the relationship between our Company and the bondholders. We must notify the trustee of certain events as required under the indenture, and the trustee will in turn notify bondholders. The trustee has also been granted a security interest in all of the assets of GWG Holdings and GWG Life for the benefit of the bondholders. The trustee has no duty to pay any obligations under L Bonds or to make inquiry regarding, or investigate the use of, amounts disbursed from any account. Upon an event of default under the indenture, and subject to those limitations in the indenture designed to benefit our senior creditors, the trustee may take action against us to enforce the rights of holders of the L Bonds.

**What is the role of the paying agent?**

The paying agent is the term ascribed to whomever it is that is making the payment to the holders of L Bonds. Presently, the Company itself is the paying agent and therefore responsible for tracking investors' respective payment dates and ensuring timely payment of principal and interest under the L Bonds. Under the indenture, we may designate

App. 0157

a third party, such as a transfer agent registered with the SEC, or a banking institution, to serve as paying agent. The role of the paying agent is essentially mechanical, and does not ordinarily involve the exercise of discretion and judgment in the way that is typical for an indenture trustee.

**Do I need to sign any paperwork in connection with renewal of my L Bond?**

No. The terms of the L Bond allow for the automatic renewal into a new L Bond of an identical maturity, unless we receive notice from you. If we renew your L Bond, then we will notify you of our decision at least 30 days prior to the maturity date of your L Bond. After receiving such notice, you may yourself elect to be repaid. If you do not elect repayment at least 15 days prior to the maturity date of your L Bond, then your L Bond will be renewed. To effect a renewal, you are not required to sign or submit any new paperwork to us or your broker-dealer. Your L Bond will automatically renew in accordance with the terms of the indenture. Please see "Prospectus Summary—Renewal or Redemption at Maturity" and "Description of the L Bonds — Renewal or Redemption at Maturity."

**Can I resell or transfer my L Bond after it has been purchased?**

Yes. Since these L Bonds are being offered and sold pursuant to an effective registration statement, the L Bonds may be transferred so long as such transfer is documented in the form approved by us. We do not, however, expect a public trading market to develop for the L Bonds in the foreseeable future, if ever. If you wish to transfer your L Bond held in book-entry (or certificated) form, you should contact us. If you wish to transfer your L Bond held through DTC, you should contact your broker-dealer.

**Will I be able to sell my L Bonds in the secondary market?**

We do not intend to list the L Bonds on an exchange and do not expect a public trading market to develop for them in the foreseeable future. Because of the lack of a trading market for L Bonds, it is unlikely that holders will be able to sell their L Bonds easily. If you require liquidity from your L Bond investment, you should contact us about the possibility of an early redemption.

**How will I receive interest and principal payments on my L Bonds?**

This will depend on how you purchased your L Bond. If you purchased your L Bond directly from us, we will directly deposit our payments of interest and principal into the account indicated in your Subscription Agreement. If you purchased through DTC, all payments of principal and interest will be made to DTC, who will forward such payment to participating broker-dealers. Your participating broker-dealer will then forward such funds to you by crediting those funds to your account held with that broker-dealer. In this case, all accountings of what you have contributed and what you are owed will be the responsibility of your participating broker-dealer.

**How does a "best efforts" offering work?**

When securities, including the L Bonds, are offered to the public on a "best efforts" basis, the broker-dealers participating in the offering are only required to use their best efforts to sell the securities. These broker-dealers do not themselves have any obligation to purchase any of the L Bonds.

**What is GWG Holdings, Inc.?**

We are a specialty finance company and a leading purchaser of life insurance policies in the secondary market. We are a holding company, meaning that we hold interests in subsidiaries and the subsidiaries generate income through operations. Through our subsidiary GWG Life, we purchase and finance life insurance policies at a discount to the face value of the policy benefit. In addition, through our subsidiary GWG MCA Capital, we participate in the merchant cash advance business.

While our primary wholly owned operating subsidiary began operations in March 2006, we were formed and organized in Delaware in 2008. In September 2014, we consummated an initial public offering of our common stock. In connection with this offering, we started listing our common stock on The NASDAQ Capital Market under the ticker symbol "GWGH." We are based in Minneapolis, Minnesota.

6

App. 0159

**Do you currently own any assets?**

Our assets consist primarily of cash and equity interests in our subsidiaries. Nearly all of our life insurance assets are held through our subsidiaries. As of December 31, 2015, our consolidated assets totaled $398.2 million, of which approximately $34.4 million was cash and equivalents and approximately $356.6 million was the fair value of our life insurance assets. Those life insurance assets had an aggregate face value of policy benefits approximating $945 million.

**What is your business strategy?**

Our business strategy is to purchase a large and well-diversified portfolio of life insurance policy assets at discounts to their face value of the policy benefits sufficient enough to generate profitable returns. In addition, we seek to bring the value of the secondary market for life insurance to a broader senior consumer market. In order to meet our goals, we have spent and intend to continue to spend significant resources: (i) developing a robust operational platform and systems for originating and purchasing life insurance policies; (ii) obtaining requisite licensure to participate in the life insurance secondary market; (iii) developing financing resources, strategies, and capabilities for servicing a large portfolio of life insurance policies; (iv) recruiting and developing a professional management team; and (v) establishing strategic relationships for delivering its services. We are currently focused on investments in universal life insurance policies.

Operationally, we generally transact directly with the policy owner who originally purchased the life insurance in the primary market through a network of life insurance agents, life insurance brokers, and licensed providers who assist policy owners in accessing the secondary market. We have been expanding our origination practice by marketing to consumers through various marketing initiatives.

**Are there any risks involved in investing in this offering?**

Yes. Investing in L bonds involves a high degree of risk. You should carefully review the "Risk Factors" section of this prospectus, which contains a detailed discussion of the material risks that you should consider before investing in our L Bonds.

**What is the status of this offering and how many L Bonds do you currently have outstanding?**

We began this offering on January 9, 2015. As of December 31, 2015, we had sold $121.9 million in principal amount of L Bonds under this registration statement, and had renewed $98.4 million in principal amount of L Bonds that had been previously sold. In total, we have outstanding as of December 31, 2015, an aggregate of $282.2 million in principal amount of L Bonds. This figure includes L Bonds sold since our initial offering of L Bonds commenced in January 2012.

**How long will this offering last?**

The offering is a continuous offering. The offering under this registration statement expires under SEC rules after three years (i.e., January 9, 2018). We may, however, conduct similar or identical offerings of L Bonds or other securities during this same time or afterwards. We may also decide to terminate this offering at any time.

**Will I be notified of how my investment is doing?**

We will provide you with periodic updates on our performance through periodic filings we make with the SEC. Such filings will include: (i) three quarterly financial reports; (ii) one annual report; (iii) supplements and amendments to this offering, as appropriate; and (iv) such other reports as required under Sections 13 and 15(d) of the Securities Exchange Act of 1934. Such information is also available on our corporate website at *www.gwglife.com*.

**Will I receive annual tax information regarding interest payments from you?**

You will receive a Form 1099-INT, which will be mailed by March 31 of each year.

**Who can help answer my questions about the offering?**

If you have more questions about the offering, you should contact a registered representative of your broker-dealer or other investment professional, or else contact:

GWG Holdings, Inc.
220 South Sixth Street, Suite 1200
Minneapolis, MN 55402
(612) 746-1944

App. 0161

## PROSPECTUS SUMMARY

*This summary highlights some of the information in this prospectus. It is not complete and may not contain all of the information that you may want to consider. To understand this offering fully, you should carefully read the entire prospectus, including the section entitled "Risk Factors," and the documents which are incorporated, or deemed to be incorporated, by reference into this prospectus, before making a decision to invest in our L Bonds. Unless otherwise noted or unless the context otherwise requires, the terms "we," "us," "our," the "Company" and "GWG" refer to GWG Holdings, Inc. together with its wholly owned subsidiaries. In instances where we refer emphatically to "GWG Holdings" or "GWG Holdings, Inc.," or where we refer to a specific subsidiary of ours by name, we are referring only to that specific legal entity.*

**Our Company**

We are a specialty finance company and a leading financial purchaser of life insurance assets in the secondary market. We create opportunities for consumers owning life insurance to obtain significant value for their policies as compared to the traditional options offered by insurance companies. We also create opportunities for investors to participate in alternative asset classes, such as life insurance, not correlated to traditional financial markets. In so doing, we enable investors to take advantage of financial opportunities dominated by banks prior to the 2008 credit crisis.

The life insurance secondary market provides consumers with the opportunity to sell their life insurance policies to financial buyers for a market value, rather than the surrender value offered by insurance carriers. When a life insurance policy is sold, the purchase price will exceed the surrender value, but will be at a discount to the face value of the policy benefit. Since inception, we have purchased approximately $1.85 billion in face value of policy benefits from consumers for over $315.5 million, an amount that exceeded surrender value of those policies by over $294.7 million. Why do consumers choose to sell their life insurance in the secondary market? There are a number of reasons, such as no longer needing or wanting the coverage, no longer being able to afford the premiums, or just wanting to maximize their life insurance investment. We believe that, for consumers 65 years or older and owning life insurance, we provide a unique financial opportunity that is far more valuable than surrendering a policy for a fraction of its market value or allowing it to lapse as worthless.

The potential secondary market for life insurance is large. According to the American Council of Life Insurers Fact Book 2015 (ACLI), individuals owned over $11.0 trillion in face value of life insurance policies in the United States in 2014. This figure includes all types of policies, including term and permanent insurance known as whole life and universal life. The ACLI reports that the lapse and surrender rate of individual life insurance policies for 2014 was 5.3%, amounting to over $602 billion in face value of policy benefits lapsed and surrendered in 2014 alone. These figures do not include group-owned life insurance, such as employer-provided life insurance, the market for which totaled over $8.2 trillion of face value of life insurance policies in the United States in 2014. Group-owned life insurance exhibits similar lapse and surrender rates to consumer owned life insurance according to the ACLI.

Research by Conning Research & Consulting (Conning) reports that the annual net market potential for life insurance policy benefits sold in the secondary market exceeds $138 billion in 2015. Of that market potential, Conning estimates that investors purchased approximately $1.7 billion in face value of life insurance assets in 2014, indicating that the market is dramatically underserved. And with an aging demographic in the United States, Conning expects the net market potential to grow to an annual $166 billion in face value of life insurance benefits by 2024. We share the belief that the life insurance secondary market represents both a dramatically underserved market and significant long-term growth opportunity.

Our business model is to earn a net profit between the yield generated by the alternative assets we own and the costs we incur to originate and finance the assets. We believe that we are uniquely positioned to acquire life insurance assets directly from consumers needing our services, and to finance our portfolio's growth by providing investors with the opportunity to participate in the yield we generate from our assets. At the same time, we seek to fill the vacuum created by the widespread disappearance of bank-driven finance in a variety of other alternative asset classes. We further believe that GWG is well organized and positioned to address the market need.

9

To participate and compete in our growing market,we have spent and intend to continue spending significant resources: (i) developing a robust operational platform and systems for originating and purchasing life insurance policies and other alternative assets; (ii) creating opportunities for investors to participate in the yield generated by alternative assets we own; (iii) recruiting and developing a professional management team; and (iv) establishing strategic relationships for delivering the services we provide.

**Portfolio Information**

Our portfolio of life insurance policies, owned by our wholly-owned subsidiaries as of December 31, 2015, is summarized below:

| | | |
|---|---|---|
| Total portfolio face value of policy benefits | $ | 944,844,000 |
| Average face value per policy | $ | 2,386,000 |
| Average face value per insured life | $ | 2,639,000 |
| Average age of insured (yrs.) | | 82.6 |
| Average life expectancy estimate (yrs.) | | 6.6 |
| Total number of policies | | 396 |
| Number of unique lives | | 358 |
| Demographics | | 70% Males; 30% Females |
| Number of smokers | | 10 |
| Largest policy as % of total portfolio | | 1.06% |
| Average policy as % of total portfolio | | 0.25% |
| Average annual premium as % of face value | | 3.41% |

**Corporate Organization**

Our business was originally organized in February 2006, and we added our current parent holding company, GWG Holdings Inc., in March 2008. In September 2014, we consummated an initial public offering of our common stock on The Nasdaq Capital Market, where our stock trades under the ticker symbol "GWGH."

GWG Holdings, Inc. (GWG Holdings) conducts its life insurance related business through a wholly-owned subsidiary, GWG Life, LLC (GWG Life), and GWG Life's wholly-owned subsidiaries, GWG Trust (Trust), GWG DLP Funding II, LLC (DLP II) and GWG DLP Funding III, LLC (DLP III). All of these entities are legally organized in Delaware.

In February 2016, we launched a new operating division in the merchant cash industry through a subsidiary entity, GWG MCA Capital, Inc. ("GWG MCA Capital"). GWG MCA Capital provides secured loans to merchant cash advance funders, and also provides merchant cash advances directly to small businesses across the United States. To begin this operating division, we acquired a $4.3 million portfolio of loans and advances from a subsidiary of Walker Preston Capital. As part of the transaction, we retained the services of Patrick F. Preece as the President and Chief Executive Officer of GWG MCA Capital. Mr. Preece had been the Chief Executive Officer of Walker Preston Capital prior to our acquisition of its loan portfolio and, prior to his work with Walker Preston Capital, Mr. Preece was head of asset securitization for Autobahn Funding, a $6 billion commercial paper conduit for DZ Bank that specialized in financing alternative classes. To finance our GWG MCA Capital portfolio, we intend to offer investors the opportunity to participate in the yield potentially generated by these alternative assets through a variety of securities offerings.

10

Our principal executive offices are located at 220 South Sixth Street, Suite 1200, Minneapolis, Minnesota 55402 and our telephone number is (612) 746-1944. Our website address is www.gwglife.com. The information on or accessible through our website is not part of this prospectus. Our corporate structure, including our principal subsidiaries, is as follows:



**"Emerging Growth Company" Status**

As a public reporting company with less than $1 billion in revenue during our last fiscal year, we qualify as an "emerging growth company" under the Jumpstart our Business Startups Act of 2012, or the JOBS Act. An emerging growth company may take advantage of certain reduced reporting requirements and is relieved of certain other significant requirements that are otherwise generally applicable to public companies. In particular, as an emerging growth company we:

- are not required to obtain an attestation and report from our auditors on our management's assessment of our internal control over financial reporting pursuant to the Sarbanes-Oxley Act of 2002;

- are not required to provide a detailed narrative disclosure discussing our compensation principles, objectives and elements and analyzing how those elements fit with our principles and objectives (commonly referred to as "compensation discussion and analysis");

- are not required to obtain a non-binding advisory vote from our stockholders on executive compensation or golden parachute arrangements (commonly referred to as the "say-on-pay," "say-on-frequency" and "say-on-golden-parachute" votes);

- are exempt from certain executive compensation disclosure provisions requiring a pay-for-performance graph and CEO pay ratio disclosure;

- may present only two years of audited financial statements and only two years of related Management's Discussion & Analysis of Financial Condition and Results of Operations, or MD&A; and

- are eligible to claim longer phase-in periods for the adoption of new or revised financial accounting standards under §107 of the JOBS Act.

We intend to take advantage of all of these reduced reporting requirements and exemptions, including the longer phase-in periods for the adoption of new or revised financial accounting standards under §107 of the JOBS Act. Our election to use the phase-in periods is irrevocable and may make it difficult to compare our financial statements to those of non-emerging growth companies and other emerging growth companies that have opted out of the longer phase-in periods under §107 of the JOBS Act.

11

Certain of these reduced reporting requirements and exemptions were already available to us due to the fact that we also qualify as a "smaller reporting company" under SEC rules. For instance, smaller reporting companies are not required to obtain an auditor attestation and report regarding management's assessment of internal control over financial reporting; are not required to provide a compensation discussion and analysis; are not required to provide a pay-for-performance graph or CEO pay ratio disclosure; and may present only two years of audited financial statements and related MD&A disclosure.

Under the JOBS Act, we may take advantage of the above-described reduced reporting requirements and exemptions for up to five years after our initial sale of common equity pursuant to a registration statement declared effective under the Securities Act of 1933 (which occurred in September 2014), or such earlier time that we no longer meet the definition of an emerging growth company. In this regard, the JOBS Act provides that we would cease to be an "emerging growth company" if we have more than $1 billion in annual revenues, have more than $700 million in market value of our common stock held by non-affiliates, or issue more than $1 billion in principal amount of non-convertible debt over a three-year period. Furthermore, under current SEC rules we will continue to qualify as a "smaller reporting company" for so long as we have a public float (i.e., the market value of common equity held by non-affiliates) of less than $75 million as of the last business day of our most recently completed second fiscal quarter.

12

App. 0165

**The Offering**

| | |
|---|---|
| **Issuer** | GWG Holdings, Inc. |
| **Indenture Trustee** | Bank of Utah |
| **Paying Agent** | GWG Holdings, Inc. |
| **Securities Offered** | We are offering up to 1,000,000 Units of L Bonds ("L Bonds"), with each whole Unit representing $1,000 in principal amount of L Bonds. The L Bonds are being sold on a continuous basis. |
| **Method of Purchase** | We will sell L Bonds using two different closing or "settlement" services, whenever available. The first service is DTC settlement, and the second is direct settlement with the Company. For more information, see "Plan of Distribution." |
| **Denomination** | The minimum purchase amount is 25 L Bond Units, or $25,000 in principal amount. Additional L Bonds in excess of 25 Units may be purchased in any number of whole or fractional Units. |
| **Offering Price** | $1,000 per whole Unit, representing 100% of the principal amount of the L Bond represented by a whole Unit. Throughout this prospectus, we refer to L Bond Units simply as "L Bonds." |
| **Limited Rescission Right** | If you are purchasing L Bonds through direct settlement with the Company and your Subscription Agreement is accepted at a time when we have determined that a post-effective amendment to the registration statement of which this prospectus is a part must be filed with the SEC, but such post-effective amendment has not yet been declared effective, you will have a limited time within which to rescind your investment subject to the conditions set forth in this prospectus. See "Description of the L Bonds — Limited Rescission Right" for additional information. |
| **Maturity** | You may generally choose maturities for your L Bonds of six months or 1, 2, 3, 5, or 7 years. Nevertheless, depending on our capital requirements, we may not offer and sell L Bonds of all maturities at all times during this offering. |
| **Interest Rates** | The interest rate of the L Bonds will be established at the time of your purchase, or at the time of renewal, based upon the rates we are offering in this prospectus or our latest interest rate supplement to this prospectus (i.e., any prospectus supplement containing interest rate information for L Bonds of different maturities), and will remain fixed throughout the term of the L Bond. We may offer higher rates of interest to investors with larger aggregate L Bond portfolios, but only as set forth in the then-current interest rate supplement. |
| **Interest Payments** | We will pay interest on the L Bonds based on the terms you choose, which may be monthly or annually. Interest will accrue from the effective date of the L Bond. Interest payments will generally be made on the 15th day immediately following the last day of the month to the L Bond holder of record as of the last day of that interest-payment period. Interest will be paid without any compounding. |
| **Principal Payments** | The maturity date for the L Bonds will be the last day of the month during which the L Bond matures. We are obligated to pay the principal on the L Bond by the fifth day of the month next following its maturity (or the first business day following such date). |

13

| | |
|---|---|
| **Payment Method** | Principal and interest payments will be made by direct deposit to the account you designate in your Subscription Agreement if you purchase L Bonds through direct settlement with the Company. If you purchase L Bonds through DTC settlement, principal and interest payments will be made to your brokerage or custodial account through DTC. |
| **Renewal or Redemption at Maturity** | Upon maturity, the L Bonds will be automatically renewed for the same term at the interest rate we are offering at that time to other investors with similar aggregate L Bond portfolios for L Bonds of the same maturity, unless repaid upon maturity at our or your election. In this regard, we will notify you at least 30 days prior to the maturity date of your L Bonds. In the notice, we will advise you if we intend to repay the L Bonds or else remind you that your L Bonds will be automatically renewed unless you exercise your option, at least 15 days prior to the maturity date, to elect to have your L Bonds repaid. If applicable, a new certificate will be issued. |
| | If we determine that a post-effective amendment to the registration statement covering the offer and sale of L Bonds must be filed during your 15-day repayment election period, we will extend your election period until ten days following the postmark date of our notice to you that the amendment has become effective. |
| | For any L Bonds offered hereby that mature after the three-year anniversary of the commencement of this offering, we expect that the renewal of such L Bonds may require us to file a new registration statement. In such a case, the new registration statement must be declared effective before we will be able to renew your L Bond. In this event, if the new registration statement has not yet been filed or become effective, we will extend your election period until ten days following the date of our notice to you that the new registration statement has become effective, which notice will include a new prospectus. |
| | If L Bonds with similar terms are not being offered at the time of renewal, (i) the interest rate upon renewal will be (a) the rate specified by us in writing on or before the maturity date or (b) if no such rate is specified, the rate of your existing L Bonds, and (ii) the maturity will, if L Bonds of the same maturity are being offered at the time of renewal, be the same or, if not, the next earliest maturity. Accordingly, you should understand that the interest rate offered upon renewal may differ from the interest rate applicable to your L Bonds prior to maturity. See "Description of the L Bonds — Renewal or Redemption on Maturity." |
| **Call and Redemption Prior to Maturity** | We may call and redeem the entire outstanding principal balance and accrued but unpaid interest of any or all of the L Bonds at any time without penalty or premium. L Bond holders will have no right to require us to redeem any L Bond prior to maturity unless the request is due to death, bankruptcy or total disability. In our sole discretion, we may accommodate other requests to redeem any L Bond prior to maturity. If we agree to redeem an L Bond upon the request of an L Bond holder, we may impose a redemption fee of 6% against the outstanding principal balance of the L Bond redeemed, which fee will be subtracted from the amount paid. |
| **Ranking** | The L Bonds will constitute secured debt of GWG Holdings. The payment of principal and interest on the L Bonds will be: |
| | • pari passu with respect to payment on and collateral securing the approximately $24.0 million in outstanding principal amount of Series I Secured Notes previously issued by our subsidiary GWG Life, and the previously issued L Bonds, of which approximately $282.2 million in principal amount is outstanding as of December 31, 2015 (see the caption "— Collateral Security" below); |

14

- structurally junior to the present and future obligations owed by our subsidiaries DLP II and DLP III under our current senior revolving credit facility with Autobahn/DZ Bank (including the approximately $65 million presently outstanding under such facility), and structurally or contractually junior to any future obligations that DLP II and DLP III or other primary obligors or guarantors may have under future senior secured borrowing facilities; and

- structurally junior to the present and future claims of other creditors of DLP II and DLP III, including trade creditors.

The indenture will permit us to issue other forms of debt, including senior and secured debt, in the future. Any such secured senior debt will have priority over L Bonds with respect to claims for payment and claims for any collateral that is shared as between the holders of L Bonds and such senior secured debt.

To fully understand the foregoing summary, you should understand that "pari passu" means that claims for payment and entitlement to security among the holders of L Bonds, the holders of previously issued L Bonds, and the holders of Series I Secured Notes previously issued by GWG Life, together with the holders of any later-created class of "pari passu debt" of ours, will generally be treated equally and without preference. We expect to continue our offering of Series I Secured Notes and previously issued L Bonds for purposes of processing renewals only, and any such debt issued on a pari passu basis in the future would also be treated equally and without preference in respect of the L Bonds and any secured debt issued by GWG Life. Thus, in the event of any default on the L Bonds (or any other debt securities of ours that is pari passu with the L Bonds) resulting in claims for payment or claims on collateral security, the holders of the L Bonds and all such other debt securities that are pari passu with the L Bonds would share in payment or collateral in proportion to the amount of principal and interest owed on each such debt instrument. See "Description of the L Bonds — Ranking" for further information.

| | |
|---|---|
| **Guarantee** | The payment of principal and interest on the L Bonds is fully and unconditionally guaranteed by GWG Life. This guarantee, together with the accompanying grant of a security interest in all of the assets of GWG Life and the terms and conditions of an intercreditor agreement, makes the L Bonds pari passu, with respect to payment and collateral, with the Series I Secured Notes issued by GWG Life and the previously issued L Bonds issued by GWG Holdings. On December 31, 2015, there was approximately $24.0 million in outstanding principal amount owed on the Series I Secured Notes and approximately $282.2 million in outstanding principal amount of previously issued L Bonds. |
| **Collateral Security** | The L Bonds are secured by the assets of GWG Holdings, Inc. We have granted a security interest in all of our assets to the indenture trustee for the benefit of the L Bond holders. Our assets consist primarily of our investments in our subsidiaries and any cash proceeds we receive from life insurance assets of our subsidiaries, and all other cash and investments we hold in various accounts.<br><br>The majority of our life insurance assets are held in our subsidiaries DLP II and DLP III and the associated master trust. The L Bonds' security interest will be structurally subordinate to the security interest in favor of our senior secured lender under the senior revolving credit facility, together with any future senior secured lenders of ours. The assets of GWG Life, including proceeds it receives as distributions from DLP II and DLP III and derived from the insurance policies owned by DLP II and DLP III, are collateral for GWG Life's guarantee of the repayment of principal and interest on the L Bonds. As indicated above under "Collateral," this security interest will be pari passu to other issued and outstanding debt of GWG Life and GWG Holdings, including our Series I Secured Notes and previously issued L Bonds, respectively. The L Bonds are also secured by a pledge of a majority of our outstanding common stock from our largest stockholders, which pledge is pari passu with the pledge of such common stock to the holders of Series I Secured Notes issued by GWG Life and to the |

holders of previously issued L Bonds. For a description of the meaning of the term "pari passu," please refer to the caption "Ranking" above.

15

| | |
|---|---|
| **Indenture Covenants** | The indenture governing the L Bonds places restrictive covenants and affirmative obligations on us. For example, our debt coverage ratio may not exceed 90%. |
| | The indenture defines the debt coverage ratio as a percentage calculated by the ratio of (A) obligations owing by us and our subsidiaries on all outstanding debt for borrowed money (including the L Bonds), over (B) the net present asset value of all life insurance assets we own, directly or indirectly, plus any cash held in our accounts. For this purpose, the net present asset value of our life insurance assets is equal to the present value of the cash flows derived from the face value of policy benefit assets we own, discounted at a rate equal to the weighted-average cost of capital for all our indebtedness for the prior month. |
| | We are required to notify the indenture trustee in the event that we violate this restrictive covenant for a period of 30 consecutive days. An "event of default" will exist under the indenture if a violation of this covenant persists for a period of 60 calendar days after the trustee's notice to us of a breach, or such a notice received from the holders of at least 25% in principal amount of outstanding L Bonds. |
| | The indenture also places limitations on our ability to engage in a merger or sale of all of our assets. See "Description of the Indentures — Events of Default" and "— Consolidation Mergers or Sales" for more information. |
| **Use of Proceeds** | If all the L Bonds are sold, we would expect to receive up to approximately $918.5 million of net proceeds from this offering after paying estimated offering and related expenses and after paying our estimated average selling commissions, dealer-manager fees, accountable expense allowance, wholesale commissions and our offering expenses. There is no minimum amount of L Bonds that must be sold before we access investor funds. The exact amount of proceeds we receive may vary considerably depending on a variety of factors, including how long the L Bonds are offered. |
| | We intend to use the net proceeds from this offering to: service our life insurance assets; and for certain other expenditures we anticipate incurring in connection with this offering and in connection with our business. See "Use of Proceeds" for additional information. |
| **No Market for L Bonds Units; Transferability** | There is no existing market for the L Bonds and we do not anticipate that a secondary market for the L Bonds will develop. We do not intend to apply for listing of the L Bonds on any securities exchange or for quotation of the L Bonds in any automated dealer quotation system. Nevertheless, you will be able to freely transfer or pledge L Bonds. See "Description of the L Bonds — Transfers." |
| **Book Entry** | The L Bonds may be issued in book-entry form, certificated form, or in the form of a global certificate deposited with a depositary. See "Description of the L Bonds — Registration and Exchange." |
| **Covered Security** | Our L Bonds are a "covered security." The term "covered security" applies to securities exempt from state registration because of their oversight by federal authorities and national-level regulatory bodies pursuant to Section 18 of the Securities Act of 1933. Generally, securities listed on national exchanges are the most common type of covered security exempt from state registration. A non-traded security also can be a covered security if it has a seniority greater than or equal to other securities from the same issuer that are listed on a national exchange. Our L Bonds are a covered security because they are senior to our common stock, which is listed on The Nasdaq Capital Market, and therefore our offering of L Bonds is exempt from state registration. |

Although the status of our L Bonds as a "covered security" will facilitate their purchase and sale to a broader range of investors than would otherwise be available to us, and although the offer and sale of a "covered security" generally involves fewer issuance costs to the issuer of such securities, our L Bonds are not a suitable purchase for all investors. In this regard, please carefully review the "Risk Factors" contained in this prospectus, as well as the disclosures on page 3 under the heading "Covered Security."

App. 0171

| Risk Factors | An investment in the L Bonds involves significant risks, including the risk of losing your entire investment, and may be considered speculative. Importantly, we maintain a senior borrowing arrangement that subordinates the right to payment on, and shared collateral securing, the L Bonds to our senior secured lender. From time to time we may add or replace senior lenders and the particular arrangements under which we borrow from them. In addition, these borrowing arrangements with senior lenders restrict, and are expected to continue to restrict, our cash flows and, subject to certain exceptions, distributions from our operating subsidiaries. These provisions will restrict cash flows available for payment of principal and interest on the L Bonds. For a summary of risks relating to this offering and our Company and business, please see "Risk Factors," page 19. |
|---|---|

17

**RISK RELATING TO FORWARD-LOOKING STATEMENTS**

Certain matters discussed in this prospectus contain forward-looking statements. These forward-looking statements are subject to risks, uncertainties and assumptions about our operations and the investments we make, including, among other things, factors discussed under the heading "Risk Factors" in this prospectus and the following:

- changes in the secondary market for life insurance;

- our limited operating history;

- the valuation of assets reflected on our financial statements;

- the reliability of assumptions underlying our actuarial models, including our life expectancy estimates;

- our reliance on debt financing;

- risks relating to the validity and enforceability of the life insurance policies we purchase;

- our reliance on information provided and obtained by third parties;

- federal, state and FINRA regulatory matters;

- competition in the secondary market of life insurance;

- the relative illiquidity of life insurance policies;

- our ability to satisfy our debt obligations if we were to sell our entire portfolio of life insurance policies;

- life insurance company credit exposure;

- general economic outlook, including prevailing interest rates;

- performance of our investments in life insurance policies;

- financing requirements;

- litigation risks;

- restrictive covenants contained in borrowing agreements; and

- increases in the cost of premiums charged by insurers for the policies we own.

Forward-looking statements can be identified by the use of words like "believes," "could," "possibly," "probably," "anticipates," "estimates," "projects," "expects," "may," "will," "should," "seek," "intend," "plan," "expect," or "consider" or the negative of these expressions or other variations, or by discussions of strategy that involve risks and uncertainties. All forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause our actual transactions, results, performance or achievements to be materially different from any future transactions, results, performance or achievements expressed or implied by such forward-looking statements.

We base these forward-looking statements on current expectations and projections about future events and the information currently available to us. Although we believe that the assumptions for these forward-looking statements are reasonable, any of the assumptions could prove to be inaccurate. Consequently, no representation or warranty can be given that the estimates, opinions, or assumptions made in or referenced by this prospectus will prove to be accurate. Some of the risks, uncertainties and assumptions are identified in the discussion entitled "Risk Factors" in this prospectus. We undertake no obligation to update our forward-looking statements.

18

**RISK FACTORS**

*An investment in our securities involves a high degree of risk. Before purchasing the securities offered by this prospectus, you should carefully consider the risks, uncertainties and additional information (i) set forth in our most recent Annual Report on Form 10-K filed with the SEC on March 22, 2016, Currents Reports on Form 8-K filed with SEC on March 8, 2016 and February 26, 2016 and our preliminary proxy statement filed with the SEC on March 23, 2016, all which are incorporated by reference into this prospectus, and (ii) contained herein or in any applicable prospectus supplement. For a description of these reports and documents, and information about where you can find them, see "Where You Can Find More Information" and "Incorporation of Certain Documents By Reference." The risks and uncertainties in this prospectus and in the documents incorporated, or deemed to be incorporated, by reference in this prospectus are those that we currently believe may materially impact the Company. Additional risks not presently known or are currently deemed immaterial could also materially and adversely affect our financial condition, results of operations, business and prospects.*

***We may not be able to raise the capital that we are seeking, and may be unable to meet our overall business objectives of growing a larger, more statistically diverse portfolio of life insurance policies without the proceeds from our continuous offering of L Bonds.***

Our offering of L Bonds has been the principal means by which we have raised the funds needed to meet our goal of growing a larger and more statistically diverse portfolio that is more likely to meet our cash flow projections. While we plan to continue financing our business, if we are unable to continue to do so for any reason we may be unable to meet our goal. In addition, if holders of our Series I Secured Notes or L Bonds were to fail to renew those securities with the frequency we have historically experienced, and actual cash flows from our portfolio of life insurance policies do not occur as our actuarial projections have forecasted, we could be forced to sell our investments in life insurance policies in order to service or satisfy our debt-related obligations. If we are forced to sell investments in life insurance policies or our entire portfolio, we may be unable to sell them at prices we believe are appropriate, and may not be able to sell them at prices that approximate the discount rate we have applied to value our portfolio, particularly if our sale of policies occurs at a time when we are (or are perceived to be) in distress. In any such event, our business and the value of our securities, including our debt securities and common stock, may be materially and adversely impacted.

***We depend upon cash distributions from our subsidiaries, and contractual restrictions on distributions to us or adverse events at one of our operating subsidiaries could materially and adversely affect our ability to pay our debts and to continue to operate our business.***

GWG Holdings, Inc. is a holding company. As a holding company, we conduct our operations through our operating subsidiaries, and our only significant assets are the capital stock of our subsidiaries. Accordingly, our ability to meet our cash obligations, including our obligations under the L Bonds, depends in material part upon the ability of our subsidiaries to make cash distributions to us. In this regard, the ability of our subsidiaries to make distributions to us is, and will continue to be, restricted by certain negative covenants in the agreement governing our senior revolving credit facility. DLP Funding II is the borrower under our senior revolving credit facility (see note 5 to our consolidated financial statements). The significant majority of the insurance policies we own are subject to a collateral arrangement with the agent for our revolving credit lender, as described in note 2 to our consolidated financial statements. Under this arrangement, collection and escrow accounts are used to fund purchases of and premiums for our insurance policies and to pay interest and other charges under the senior revolving credit facility. The lender and its agent must authorize all disbursements from these accounts, including any distributions to GWG Life. Distributions are limited to an amount that would result in the borrowers (us) realizing an annualized rate of return on the equity funded amount for such assets of not more than 18%, as determined by the agent. After such amount is reached, the credit agreement requires that excess funds be used to fund repayments or a reserve account in a certain amount, before any additional distributions may be made.

If any of the above limitations were to materially impede the flow of cash to us, such fact would materially and adversely affect our ability to service and repay our debt, including obligations under the L Bonds and Series I Secured Notes. In addition, any adverse event at the subsidiary level, such as a declaration of bankruptcy, liquidation or reorganization or an event of default under our senior revolving credit facility, could materially and adversely affect

19

App. 0174

the ability of our subsidiaries to make cash distributions to us. Just as with a material contractual impediment to cash flow, any such subsidiary corporate event would materially and adversely affect our ability to service and repay our debt, including obligations under the L Bonds, and negatively impact our ability to continue operations.

***Subordination provisions contained in the indenture will restrict the ability of the trustee or the L Bond holders to enforce their rights against us under the indenture, including the right to payment on the L Bonds, if a default then exists under our senior revolving credit facility.***

The L Bonds will be subordinate in right of payment to any claims of the senior lender under our senior revolving credit facility. In this regard, subordination provisions limiting the right of L Bond holders to enforce their rights are contained in the indenture. These provisions include:

- a prohibition on challenging any enforcement action taken by a senior lender or interfering with any legal action or suits undertaken by a senior lender against us and our affiliates;

- a 180-day standstill period during which there may not be brought any action to enforce an event of default against us or our affiliates unless our senior revolving credit facility has been repaid in full, which period may be extended if the credit facility provider takes action during such standstill period; and

- a prohibition on filing a bankruptcy or insolvency case against us or our affiliates for at least one year plus one day after the senior revolving credit facility lender has been paid in full.

Furthermore, in the event of a default, we will be prohibited from making any payment, direct or indirect (whether for interest, principal, as a result of any redemption or repayment at maturity, on default, or otherwise), on the L Bonds and any other indebtedness, and neither the holders of the L Bonds nor the trustee will have the right, directly or indirectly, to sue to enforce the indenture or the L Bonds, if a default or event of default under any senior credit facility has occurred and is continuing, or if any default or event of default under any senior credit facility would result from such payment. This payment restriction will generally remain in effect unless and until: (i) the default and event of default respecting the senior credit facility has been cured or waived or has ceased to exist; and (ii) the end of the period commencing on the date the indenture trustee receives written notice of default from a holder of such credit facility and ending on the earlier of the indenture trustee's receipt of (1) a valid waiver of default from the holder of a credit facility, or (2) a written notice from the holder of a credit facility terminating the payment blockage period.

Other provisions of the indenture permit the trustee to take action to enforce the right of L Bond holders to payment after 179 days have passed since the trustee's receipt of notice of default from the senior lender, but in such case any funds paid as a result of any such suit or enforcement action shall be applied toward the senior credit facility until the facility is indefeasibly paid in full before being applied to the L Bonds. These subordination provisions present the risk that, upon any default by us on obligations owed under our senior debt, the holders of the L Bonds will be unable to enforce their right to payment.

If the 180-day standstill period noted above or any other limitation on the rights of the trustee or L Bond holders to assert their rights to payment of principal or interest under the indenture or L Bonds is ultimately determined to conflict with provisions of the Trust Indenture Act of 1939 (most notably sections 316(b) and 317(a) of that Act), then the trustee, as well as any holder who shall not have earlier consented to such subordination provisions, shall (notwithstanding such provision contained in the indenture) be authorized to institute a lawsuit for the enforcement of any payment of principal or interest after their respective due dates.

***The collateral granted as security for our obligations under the L Bonds and Series I Secured Notes may be insufficient to repay the indebtedness upon an event of default.***

Our L Bonds and Series I Secured Notes are structurally subordinate to all obligations of our wholly owned subsidiaries DLP II and DLP III. Importantly in this regard, DLP II and DLP III own most of our life insurance policies and are the borrowers under the credit facility. This means that holders of the L Bonds and Series I Secured Notes will have a junior position to the claims of our senior credit facility provider. Thus, L Bonds and Series I Secured Notes are subordinate to all senior secured debt we have or may incur, to the extent of the value of the assets securing that debt. Importantly, as the issuers of the L Bonds and Series I Secured Notes which have granted a general security interest in its assets as collateral security for those obligations, GWG Holdings' and GWG Life's most significant assets are

20

cash and their investments in subsidiaries. GWG Holdings' total assets at December 31, 2015 were approximately $304.5 million, of which approximately $269.9 million was its investment in subsidiaries. While the indenture agreements governing the L Bonds limits the amount of debt we and our subsidiaries can incur, the indenture permits us and our subsidiaries to incur secured debt (subject to the debt coverage ratio) that may be senior to the L Bonds.

As indicated above, as of December 31, 2015, we had approximately $65 million of outstanding secured indebtedness under our senior revolving credit facility that is senior to the L Bonds. For a description of the ranking of the L Bonds, see " *Description of the L Bonds — Ranking* " in this prospectus. In addition, the guarantee and associated grant of collateral security by GWG Life for our obligations under the L Bonds may offer security that is insufficient to fully satisfy obligations under the L Bonds. Like GWG Holdings, GWG Life's most significant asset is its investment in its subsidiaries (in this case, DLP II and DLP III). GWG Life's total assets at December 31, 2015 were approximately $297.1 million, of which approximately $291.3 million was its investment in subsidiaries.

Because of the foregoing, and because of the fact that a majority of our life insurance assets as of December 31, 2015 are held in our DLP II and DLP III subsidiary or its associated master trust (and all of those assets serve as collateral security for our obligations under the senior revolving credit facility), L Bond holders risk the possibility that the collateral security we have granted for our obligations under such securities may be insufficient to repay those securities upon an event of default.

*If a significant number of holders of our Series I Secured Notes and L Bonds demand repayment of those instruments upon maturity instead of renewing them, and at such time we do not have sufficient capital on hand to fund those repayments (and do not otherwise have access to sufficient capital), we may be forced to liquidate some of our life insurance policy assets, which could have a material and adverse impact on our results of operations and financial condition.*

As of December 31, 2015, GWG Holdings had approximately $282.2 million in principal amount of L Bonds outstanding, and GWG Life had approximately $24.0 million in principal amount of Series I Secured Notes outstanding. By virtue of GWG Life's full and unconditional guarantee of obligations under the L Bonds, and other agreements contained in or made in connection with the indenture, the L Bonds are pari passu in right of payment and collateral with the Series I Secured Notes. The indenture governing the L Bonds, and the note issuance and security agreement governing the Series I Secured Notes, each provide for cross defaults upon an event of default under the provisions of the other agreement (i.e., an event of default under the note issuance and security agreement will constitute an event of default under the indenture for the L Bonds, and vice versa).

The terms of the Series I Secured Notes have renewal features. Since we first issued our Series I Secured Notes, we have experienced $150.2 million in maturities, of which $116.1 million has renewed for an additional term, as of December 31, 2015. This has provided us with an historical renewal rate of approximately 77% for investments in our Series I Secured Notes. Since we first issued our L Bonds, we have experienced $155.8 million in maturities, of which $98.4 million has renewed for an additional term, as of December 31, 2015. This has provided us with an historical renewal rate of approximately 63% for investments in our L Bonds.

Future contractual maturities of Series I Secured Notes and L Bonds as of December 31, 2015 are:

| Years Ending December 31, | Series I Secured Notes | | L Bonds | | Total | |
|---|---|---|---|---|---|---|
| 2016 | $ | 13,819,000 | $ | 94,790,000 | $ | 108,609,000 |
| 2017 | | 6,179,000 | | 64,589,000 | | 70,768,000 |
| 2018 | | 1,427,000 | | 64,372,000 | | 65,799,000 |
| 2019 | | 347,000 | | 18,513,000 | | 18,860,000 |
| 2020 | | 1,765,000 | | 19,810,000 | | 21,575,000 |
| Thereafter | | 40,000 | | 20,096,000 | | 20,136,000 |
| | $ | 23,577,000 | $ | 282,170,000 | $ | 305,747,000 |

If investors holding existing indebtedness with short-term maturities do not elect to renew their investments and we do not at such time have or have access to sufficient capital, then we may need to liquidate some of our investments in life insurance policies earlier than anticipated. In such an event, we may be unable to sell those policies at prices we believe are fair or otherwise appropriate and such sales could have a material and adverse impact on our results of operations and financial condition.

App. 0177

*Because we intend to hold our life insurance policies to their maturity, we therefore measure our debt coverage ratio against our current cost of financing, which may not reflect the sale price of our life insurance policies if we were to liquidate them.*

We intend to hold our life insurance policy investments until they are paid out at the mortality of the insured. As a result, we measure our debt coverage ratio based on the portfolio's gross expected yield against the interest cost of our total debt obligations to finance the portfolio. The debt coverage ratio, expressed as a percentage, is defined as the ratio of (i) total amounts outstanding on any indebtedness for borrowed money, over (ii) the net present asset value of all life insurance assets we own, plus any cash held in our accounts. For this purpose, the net present asset value of our life insurance assets is calculated as the present value of the life insurance portfolio's expected future cash flows discounted at the weighted-average interest rate of the indebtedness for the previous month. Under the indenture, the maximum amount of such securities we may issue at any time is limited to an amount such that our debt coverage ratio does not exceed 90%. This limitation is designed to provide some comfort to holders of our debt that the value of our assets exceeds our obligations to those holders. Nevertheless, the debt coverage ratio (as calculated) is not based on the fair value of our life insurance assets, which may be different — greater or less — than the amount we would receive if we were forced to sell those assets in the marketplace. Furthermore, mere compliance with the debt coverage ratio does not contemplate or account for the significant transactional costs that could be associated with a sale of all or any significant portion of our portfolio.

*We have no obligation to redeem L Bonds prior to their maturity date except in narrowly limited circumstances.*

We will have no obligation, and L Bond holders will have no right to require us, to redeem any L Bonds prior to their maturity date. The only exceptions exist for situations in which an individual natural person investor suffers a total permanent disability or a bankruptcy, or dies. In any such event, we will be required to redeem the L Bonds of such person so long as certain procedural requirements are met. Outside these narrow exceptions, we may nonetheless agree, in our sole and absolute discretion, to accommodate requests to redeem L Bonds prior to their maturity in other cases. If we do agree to redeem any L Bonds, we will assess a 6% redemption fee for such transaction. For more information, see "Description of the L Bonds — Call and Redemption Prior to Stated Maturity." As a result, any investment in our L Bonds should be considered illiquid and unable to be redeemed until its stated maturity.

*Fraudulent transfer statutes may limit your rights under the guarantee of the L Bonds.*

Our obligations under the L Bonds will be fully and unconditionally guaranteed by our direct wholly owned subsidiary, GWG Life. The guarantee may be subject to review under various laws for the protection of creditors. It is possible that other creditors of GWG Life may challenge the guarantee as a fraudulent transfer under relevant federal and state laws. Under certain circumstances, including a finding that GWG Life was insolvent at the time its guarantee was issued, a court could hold that the obligations of GWG Life under the guarantee may be voided or are subordinate to other obligations of GWG Life, or that the amount for which GWG Life is liable under its guarantee of the L Bonds may be limited. Different jurisdictions define "insolvency" differently, and we cannot assure you as to what standard a court would apply to determine whether GWG Life was insolvent. If a court were to determine that GWG Life was insolvent on the date on which it guaranteed the L Bonds, or that the guarantee constituted a fraudulent transfer on other legal grounds, the claims of creditors of GWG Life would effectively have priority with respect to GWG Life's assets and earnings over the claims of the holders of the L Bonds.

*Our controlling stockholders and principal executives are involved in litigation "clawback" claims, and it is possible that adverse outcomes from these claims could negatively affect the Company.*

Our Chief Executive Officer, Jon R. Sabes, and our corporate secretary and Executive Vice President of Originations and Servicing, Steven F. Sabes, who together beneficially own or control approximately 74% of our common stock, are subject to litigation relating to claims by a bankruptcy trustee for loan payments made to an affiliate, Opportunity Finance, LLC. The litigation stems from the 2010 conviction of an individual operating a fraudulent business, which business filed for bankruptcy in 2008. The bankruptcy trustee alleges that loan repayments to Opportunity Finance were avoidable transfers under preference or other legal theories and seeks to recover amounts for other creditors of the bankruptcy estate. Case No. 08-45257 (U.S. Bankruptcy Court District of Minnesota). Such payments may ultimately be deemed to be avoidable transfers under preference or other legal theories. In addition, GWG Holdings invested $1.0 million in Opportunity Finance, LLC in 2006 and

was repaid and received $176,948 of interest income from that investment in 2007. To date no claim has been made against the Company.

22

While we believe there are numerous meritorious defenses to the claims made by the bankruptcy trustee and others, and we are advised that the defendants in that action will vigorously defend against the trustee's claims, such defendants may not prevail. If the bankruptcy trustee were to succeed in any effort to sell or transfer all or a significant portion of the equity interests of Jon R. Sabes or Steven F. Sabes in our company, there could be a change in control of the Company, and our company and business could be materially and adversely impacted. Such adverse results would likely arise from a breach of negative change-in-control covenants contained in our revolving senior credit facility agreements, giving the senior lender the right to declare a default under the revolving credit facility. In addition, such an event would adversely affect holders of our L Bonds by reducing the number of shares of common stock of GWG Holdings that have been pledged as collateral security for our obligations under the L Bonds. Finally, regardless of the outcome of this litigation, these matters may distract management and reduce the time and attention that they are able to devote to our business.

***The loss of the services of our current executives or other key employees, or the failure to attract additional key individuals, would materially adversely affect our business operations and prospects.***

Our financial success is significantly dependent upon the efforts of our current executive officers and other key employees. In addition, our revolving senior credit facility requires Messrs. Jon R. Sabes and Steven F. Sabes to generally remain active within the business. We have entered into employment agreements with Messrs. Jon R. Sabes, Steven F. Sabes, Paul A. Siegert, William B. Acheson, Michael D. Freedman and Jon L. Gangelhoff. Nevertheless, there can be no assurance that these individuals will continue to provide services to us. A voluntary or involuntary termination of employment could have a materially adverse effect on our business operations if we were not able to attract qualified replacements in a timely manner. At present, we do not maintain key-man life insurance policies for any of these individuals. In addition, our success and viability is also dependent to a significant extent upon our ability to attract and retain qualified personnel in all areas of our business, especially our sales, policy acquisition, and financial management team. If we were to lose the members of these service teams, we would need to replace them with qualified individuals in a timely manner or our business operations and prospects could be adversely impacted.

***We have no obligation to contribute to a sinking fund to retire the L Bonds, nor are the L Bonds guaranteed by any governmental agency.***

We have no obligation to contribute funds to a sinking fund to repay principal or interest on the L Bonds upon maturity or default. The L Bonds are not certificates of deposit or similar obligations of, or guaranteed by, any depository institution. Further, no governmental entity insures or guarantees payment on the L Bonds if we do not have enough funds to make principal or interest payments.

***We have the discretion to purchase assets, including life insurance policies, through different subsidiaries, and to transfer assets among our subsidiaries. Any decision to purchase or hold title to assets in one subsidiary, as opposed to a different subsidiary, may affect the value of collateral security for our obligation under the L Bonds.***

We may at our discretion direct the purchase of policies by, and the sale of policies and other assets amongst, different subsidiaries of GWG Holdings as a method of asset and liability management and to attempt to maintain diversification and certain ratios in our investment portfolio. Purchases of assets in, or movements of assets amongst, different subsidiaries could affect the value of the collateral security for obligations under the L Bonds. For example, purchases through, or transfers of life insurance policies to, DLP Funding II would cause the policies acquired by DLP Funding II to become collateral for our senior revolving credit facility, whereas purchases through, or transfers of life insurance policies to, GWG Life would cause the policies acquired by GWG Life to become collateral for the L Bonds. Accordingly, purchases of assets such as life insurance policies through, or transfers of such assets to, different subsidiaries may affect the value of collateral security for different classes of holders of our debt, including the L Bonds. In the case of a liquidation, any of these discretionary decisions may affect the value of and amount you may ultimately be entitled to receive with respect to your L Bonds.

23

*We are an "emerging growth company" that has elected to delay adoption of new or revised accounting standards and abide by certain reduced disclosure requirements, which may make our securities in general, and our common stock in particular, less attractive.*

As a public reporting company with less than $1.0 billion in revenue during our last fiscal year, we qualify as an "emerging growth company" under the Jumpstart Our Business Startups Act of 2012, or the JOBS Act.

An emerging growth company may take advantage of certain reduced reporting requirements and is relieved of certain other significant requirements that are otherwise generally applicable to public companies. We intend to take advantage of all of the reduced reporting requirements and exemptions available to us, including the longer phase-in periods for the adoption of new or revised financial accounting standards under §107 of the JOBS Act. Our election to use the phase-in periods may make it difficult to compare our financial statements to those of non-emerging growth companies and other emerging growth companies that have opted out of the phase-in periods under §107 of the JOBS Act.

Under the JOBS Act, we may take advantage of the above-described reduced reporting requirements and exemptions for up to five years after our initial sale of common equity pursuant to a registration statement declared effective under the Securities Act of 1933, or such earlier time that we no longer meet the definition of an emerging growth company. In this regard, the JOBS Act provides that we would cease to be an "emerging growth company" if we have more than $1.0 billion in annual revenues, have more than $700 million in market value of our common stock held by non-affiliates, or issue more than $1.0 billion in principal amount of non-convertible debt over a three-year period. Even after our cessation to be an emerging growth company, certain of the same reduced disclosure requirement will continue to apply to us for so long as we are a "smaller reporting company" under applicable securities rules. We cannot predict if investors will find our securities less attractive due to our reliance on these exemptions. If investors were to find our securities less attractive as a result of our election, we may have difficulty raising all of the proceeds we seek in our financing efforts, and the market price of our common stock may suffer.

*We do not expect a market to exist that will enable you to sell your L Bonds.*

Although we are a public reporting company that files information with the SEC, the L Bonds will not be readily resalable or transferable. No public market for the L Bonds exists and none is expected to develop. As a result, the transferability of the L Bonds will be limited. Accordingly, the purchase of L Bonds is not suitable for investors desiring liquidity at any time prior to the maturity of the L Bonds.

*We cannot know the tax implications of an investment in the L Bonds for the L Bond holder.*

The section of this prospectus entitled "Material Federal Income Tax Considerations" sets forth a summary of federal income tax consequences to the purchasers of the L Bonds. No information is provided concerning tax consequences under any other federal, state, local or foreign laws that may apply to the purchasers of the L Bonds. Prospective investors or their representatives should read that section very carefully in order to properly evaluate the federal income tax risks of an investment in the L Bonds. Each prospective investor should consult his personal counsel, accountant and other business advisors as to the federal, state, local and foreign tax consequences of an investment in the L Bonds. L Bond holders will receive an IRS Form 1099-INT in connection with their receipt of interest payments.

24

## USE OF PROCEEDS

If all of the L Bonds are sold, we expect to receive up to approximately $918.5 million of net proceeds from this offering after paying estimated offering and related expenses and after paying our estimated average selling and wholesale commissions, dealer-manager fees, and accountable expense allowance. The estimated commissions, dealer-manager fees, accountable expense allowance and wholesale commissions of our selling group members aggregate to approximately $80 million based on expected average selling commissions of $50 million (5.00%), dealer-manager fees of $5 million (0.50%), and accountable expenses, wholesale commissions, and any non-transaction-based and non-cash selling compensation aggregating to $25 million (2.50%), assuming the sale of all of the L Bonds. We have also agreed to reimburse Emerson Equity for certain pre-offering expenses that we expect will aggregate to no more than $180,500. In addition, we expect that our offering expenses, consisting of legal, accounting, printing, mailing, registration, qualification and associated securities offering filing costs and expenses, will aggregate to approximately $1,350,000 through the course of this offering.

As explained elsewhere in this prospectus, the maximum amount of commissions, fees and allowances (including non-transaction-based and non-cash selling compensation, if any) payable to FINRA selling members is 8.00% of the aggregate principal amount of L Bonds sold. Therefore, if all of the L Bonds were sold and the maximum commissions, fees and allowances and reimbursements were paid, we estimate that the net proceeds to us, after paying our own estimated offering and related expenses, would be approximately $918.5 million. Nevertheless, because we do not know the total number of Units and principal amount of L Bonds that will be ultimately sold, we are unable to accurately forecast the total net proceeds that will be generated by this offering. For more information about dealer-manager fees, selling commissions, and accountable expenses payable to our selling group in connection with the sale of L Bonds, as well as our own offering and related expenses, please see "Plan of Distribution."

There is no minimum amount of L Bonds that must be sold before we access investor funds. The exact amount of proceeds we receive may vary considerably depending on a variety of factors, including how long the L Bonds are offered.

Our goal is to use a majority of the net proceeds from the sale of L Bonds to purchase additional life insurance policy assets in the secondary market. The amount of proceeds we apply towards purchasing additional life insurance policy assets will depend, among other things, on how long the L Bonds are offered, the amount of net proceeds that we receive from the sale of L Bonds being offered, the existence and timing of opportunities to expand our portfolio of insurance policy assets, our cash needs for certain other expenditures (summarized below) we anticipate incurring in connection with this offering and in connection with our business, and the availability of other sources of cash (e.g., our senior revolving credit facility). These certain other expenditures, listed in order of priority, include:

- servicing of life insurance assets;

- paying principal at maturity, interest and fees to our lenders, including under our senior revolving credit facility, the Series I Secured Notes, the previously issued L Bonds and the L Bonds offered hereby; and paying fees and expenses of the trustees of certain trusts associated with our Series I Secured Notes, the previously issued L Bonds and the L Bonds offered hereby; and

- general working capital purposes.

Our use of funds for general working capital purposes is expected to include, but not be limited to, expenditures such as (i) obtaining life expectancy reports, (ii) mortality tracking and (iii) legal and collections expenses; and our use of funds for working capital purposes is expected to include, but not be limited to, (iv) sales and marketing expenses, (v) general and administrative expenses, as well as (vi) tax liabilities, and (vii) interest rate caps, swaps or hedging instruments for our life insurance policy portfolio or our indebtedness.

As indicated above, the extent to which we will use proceeds from this offering for these other purposes, and the amounts and timing of such expenditures will depend on, among other things, how long the L Bonds are offered, the amount of net proceeds that we receive from the sale of L Bonds being offered, the existence and timing of opportunities to expand our portfolio of insurance policy assets, the availability of funds from other sources, including borrowings from our senior revolving credit facility and cash generated from our operations, and certain other factors. We currently

25

expect to allocate net offering proceeds (assuming the maximum amount of commissions, fees, allowances and any other items of selling compensation equal to 8.00% of the aggregate principal amount of L Bonds sold) as follows, based upon various assumed amounts of gross proceeds that we receive from the sale of L Bonds:

| | Gross Offering Proceeds | | | | | |
| | $ 1,000,000,000 | | $ 500,000,000 | | $ 250,000,000 | |
|---|---|---|---|---|---|---|
| Net Offering Proceeds | 918,500,000 | 100% | 458,500,000 | 100% | 228,500,000 | 100% |
| Purchase Policies | 661,320,000 | 72% | 330,120,000 | 72% | 141,670,000 | 62% |
| Payment of Premiums | 91,850,000 | 10% | 45,850,000 | 10% | 34,275,000 | 15% |
| Payment of Principal and Interest | 119,405,000 | 13% | 59,605,000 | 13% | 41,130,000 | 18% |
| Other Expenditures | 45,925,000 | 5% | 22,925,000 | 5% | 11,425,000 | 5% |

Net offering proceeds not immediately applied to the uses summarized above will be invested in short-term investments such as money market funds, commercial paper, U.S. Treasury Bills and similar securities investments pending their use. We may also purchase interest rate hedges to lock in our cost of capital, or longevity hedges to lock in our expected return from our portfolio.

As indicated above, we may use some of the net proceeds from this offering to pay premiums on life insurance assets we own. Our aggregate premium obligations over the next five years for life insurance assets that we own as of December 31, 2015 are set forth in the table below. These premium obligations do not take into account the expectation of mortality over the periods presented.

| Year | Premiums | | Servicing | | Premiums and Servicing | |
|---|---|---|---|---|---|---|
| 2016 | $ | 32,227,000 | $ | 475,000 | $ | 32,702,000 |
| 2017 | | 35,181,000 | | 475,000 | | 35,656,000 |
| 2018 | | 38,204,000 | | 475,000 | | 38,679,000 |
| 2019 | | 42,817,000 | | 475,000 | | 43,292,000 |
| 2020 | | 47,637,000 | | 475,000 | | 48,112,000 |
| **Total** | **$** | **196,066,000** | **$** | **2,375,000** | **$** | **198,441,000** |

Also as indicated above, we may use some of the net proceeds from this offering to pay principal amounts owing under our Series I Secured Notes or previously issued L Bonds when such amounts become due and payable. The amount of such securities that we would repay with proceeds of this offering will depend on whether the holders of such notes elect repayment rather than renewal of such securities, as well as whether we elect to use other sources of repayment. We believe it is most likely that such payments, if any, would relate to securities that mature within the first three years after the initial effective date of the registration statement of which this prospectus is a part (i.e., the maximum period of time during which we may offer securities under the registration statement). At December 31, 2015 and December 31, 2014, the weighted-average interest rate of Series I Secured Notes was 8.47% and 8.37%, respectively. The notes are secured by assets of GWG Life. The principal amount outstanding under these Series I Secured Notes was $23,578,000 and $28,047,000 at December 31, 2015 and 2014, respectively. We do not intend to use any net proceeds from this offering to repurchase Series I Secured Notes or previously issued L Bonds prior to their maturity.

Some of the outstanding previously issued L Bonds due to mature within the next year may have been issued within the prior year (i.e., less than one year ago). In such a case, we used the proceeds of such debt to purchase life insurance policies or finance the servicing of such policies.

App. 0183

**BUSINESS**

### Overview

GWG Holdings, Inc. is a specialty finance company and a leading financial purchaser of life insurance assets in the secondary market. We create opportunities for consumers owning life insurance to obtain significant value for their policies as compared to the traditional options offered by insurance companies. We also create opportunities for investors to participate in alternative asset classes, such as life insurance, not correlated to traditional financial markets. In so doing, we enable investors to take advantage of financial opportunities dominated by banks prior to the 2008 credit crisis.

The life insurance secondary market provides consumers with the opportunity to sell their life insurance policies to financial buyers for a market value, rather than the surrender value offered by insurance carriers. When a life insurance policy is sold, the purchase price will exceed the surrender value, but will be at a discount to the face value of the policy benefit. Since inception, we have purchased approximately $1.85 billion in face value of policy benefits from consumers for over $315.5 million, an amount that exceeded their surrender value by over $294.7 million. Why do consumers choose to sell their life insurance in the secondary market? There are a number of reasons, such as no longer needing or wanting the coverage, no longer being able to afford the premiums, or just wanting to maximize their life insurance investment. We believe that, for consumers 65 years or older and owning life insurance, we provide a unique financial opportunity that is far more valuable than surrendering a policy for a fraction of its market value or allowing it to lapse as worthless.

Market researchers believe that the market opportunity in the life insurance secondary market is significant, with the annual net market potential of $138 billion in face value of policy benefits in 2015. To seize this opportunity, we have built a robust operational platform to offer consumers options based on the market value of their life insurance that include: (i) selling the entire policy benefit for cash, or (ii) selling a portion of the policy benefit and retaining a portion of the benefit with no future premium obligation. When we purchase a life insurance policy, we expect to continue paying the premiums for that policy until the policy benefit is paid upon the mortality of the insured. We believe we are well positioned to capitalize on the market opportunity to serve consumers in the life insurance secondary market.

The life insurance secondary market provides buyers of life insurance policies with the opportunity to purchase an alternative asset that potentially generates attractive investment returns not correlated to traditional financial markets. When a buyer acquires a life insurance asset in the secondary market, that buyer acquires a financial obligation of an insurance carrier to pay the face value of the insurance policy benefit. The potential yield generated from a portfolio of life insurance assets equals the difference between the purchase price of the life insurance assets, plus the premiums and financing costs to maintain those assets, and the face value of the policy benefits received. As of December 31, 2015, our total investment in our portfolio of life insurance assets, including the purchase price and attendant premiums and financing costs was $353 million, and the total face value of life insurance policy benefits of our portfolio was $945 million.

We seek to build a profitable and large portfolio of life insurance assets that are well diversified in terms of insurance companies and insureds. We believe that diversification is a key risk mitigation strategy to provide consistent cash flows and reliable investment returns from our portfolio of life insurance assets. To grow our portfolio and achieve the diversification we seek, we offer investors the opportunity to participate in the yield potentially generated by our portfolio of life insurance assets through a variety of financings and securities offerings. We chose to finance our business in this manner after the 2008 credit crisis, during which banks largely ceased financing alternative asset classes as a result of the regulatory response to the financial crisis. We believe we are well positioned to continue providing investors with yield participation opportunities from alternative asset classes once dominated by the banking sector.

Our business was originally organized in February 2006, and we added our current parent holding company, GWG Holdings Inc., in March 2008. In September 2014, we consummated an initial public offering of our common stock on The Nasdaq Capital Market, where our stock trades under the ticker symbol "GWGH."

In February 2016, we launched a new operating division in the merchant cash industry through a subsidiary entity, GWG MCA Capital, Inc. ("GWG MCA"). GWG MCA provides secured loans to merchant cash advance funders, and also provides merchant cash advances directly to small businesses across the United States. To begin this operating division, we acquired a $4.3 million portfolio of loans and advances from a subsidiary of Walker

Preston Capital. As part of the transaction, we retained the services of Patrick F. Preece as the President and Chief Executive Officer of GWG MCA. Mr. Preece had been the Chief Executive Officer of Walker Preston Capital prior to our acquisition of its loan portfolio and, prior to his work with Walker Preston Capital, Mr. Preece was head of asset securitization for Autobahn Funding, a $6 billion commercial paper conduit for DZ Bank that specialized in financing alternative classes. To finance our GWG MCA portfolio, we intend to offer investors the opportunity to participate in the yield potentially generated by these alternative assets through a variety of securities offerings.

GWG Holdings, Inc. (GWG Holdings) conducts its life insurance related business through a wholly-owned subsidiary, GWG Life, LLC (GWG Life), and GWG Life's wholly-owned subsidiaries, GWG Trust (Trust), GWG DLP Funding II, LLC (DLP II) and GWG DLP Funding III, LLC (DLP III). As indicated above, GWG Holdings conducts its merchant cash advance activities through GWG MCA. All of these entities are legally organized in Delaware. Unless the context otherwise requires or we specifically so indicate, all references in this prospectus to "we", "us", "our", "our Company", "GWG", or the "Company" refer to these entities collectively. Our headquarters are based in Minneapolis, Minnesota.

**Markets**

*Consumers Owning Life Insurance*

The potential secondary market for life insurance is large. According to the American Council of Life Insurers Fact Book 2015 (ACLI), individuals owned over $11.0 trillion in face value of life insurance policy benefits in the United States in 2014. This figure includes all types of policies, including term and permanent insurance known as whole life and universal life. The ACLI reports that the lapse and surrender rate of 5.3% for individual life insurance policies, amounting to over $602 billion in face value of policy benefits lapsed and surrendered in 2014 alone. These figures do not include group-owned life insurance, such as employer-provided life insurance, the market for which totaled over $8.2 trillion of face value of life insurance policy benefits in the United States in 2014. Group-owned life insurance exhibits similar lapse and surrender rates to consumer owned life insurance according to the ACLI. Owners of life insurance lapse or surrender their policies for a variety of reasons, including: (i) the insurance coverage is no longer needed; (ii) the internal cash value of the policy is substantially less than was projected due to unrealistic assumptions made about the insurance policy's earnings when the policy was originally purchased; (iii) the insurance premiums are no longer affordable for the policy owner for a variety of reasons; or (iv) there is a desire to maximize the insurance policy's investment value in the secondary market.

The life insurance secondary market has developed in response to the large volume of policy lapses and surrenders and inadequate value offered to consumers by the insurance carriers. According to research conducted by a leading actuarial firm, it is estimated that 88% of all universal life insurance policies do not result in the payment of a benefit claim. Rather than allowing a policy to lapse as worthless, or surrendering a life insurance policy at a fraction of its market value, the secondary market can be a source of significant value to consumers. Without the secondary market, insurance carriers maintain monopsony power over consumers who no longer desire to pay the premiums for their life insurance coverage. To illustrate the significance of this value, since our inception we have paid consumers $315.5 million for their life insurance policies as compared to the $20.8 million of cash surrender value offered by insurance carriers for these same policies. The development of a vibrant life insurance secondary market provides consumers with greater flexibility and options for the life insurance assets they own and maintain.

The life insurance secondary market is geared towards consumers, 65 years and older, who own life insurance and are addressing their post-retirement financial options. These consumers represent the fastest growing demographic segment in the United States according to the U.S. Census Bureau. And as these consumers age, they and their families will be faced with a variety of financial needs that can benefit from the value-added options our market offers.

Research by Conning Research & Consulting (Conning) reports that the annual net market potential for life insurance policy benefits sold in the secondary market exceeds $138 billion in 2015. Of that market potential, Conning estimates that investors purchased approximately $1.7 billion in face value of life insurance assets in 2014, indicating that the market is dramatically underserved. And with an aging demographic in the United States, Conning expects the net market potential to grow to an annual $166 billion in face value of life insurance benefits by 2024. We share the belief that the life insurance secondary market represents a both a dramatically underserved market and significant long-term growth opportunity. We further believe that GWG is well organized and positioned to address the market need.

App. 0185

App. 0186

*Investors Seeking Alternative Assets*

Since the credit crisis of 2008, the flow of capital to a variety of alternative asset classes has undergone a structural shift. Alternative assets, broadly defined, are any non-traditional asset with potential economic value that would not be found in a standard investment portfolio. An asset is generally considered "alternative" if it has some or all of the following characteristics: a limited investment history, not commonly found in portfolios, an illiquid market, different performance characteristics, and requires specialized skill to originate and service the asset. Definitions of traditional assets today extend well beyond stocks and bonds, and can include a variety of assets which may have been better classified as "alternative" a decade ago, i.e., real estate, commodities or natural resources. Thus what is an alternative asset today may largely be considered tomorrow's mainstream investment asset.

Once dominated by banks, alternative asset markets are in many cases no longer viable for banks to finance due to vast new regulation effected since the crisis, regulation that has in effect reshaped the way in which banks participate in many parts of the economy. At the same time, an increasing number of investors are now turning to alternative asset classes as a means to diversify their investment portfolio to manage risk and volatility, and to obtain greater returns in the low interest rate environment that has persisted since 2008. In fact, according to research published by Goldman Sachs, a significant shift by retail investors in their investments from an average of 4% allocation in alternative asset investments to the 20% allocation favored by institutional investors is expected over the next five to ten years.

The trend of investors seeking access and exposure to alternative investment products is expected to continue as traditional bank sources of capital for these assets continues to retreat and alternative investment product offering innovations occur within the regulated securities markets. Researchers at McKinsey report that U.S. individual investors are expected to be a primary driver of growth in alternative asset investments. McKinsey reports that high net-worth individuals and the mass affluent are increasingly looking to hedge downside risk, protect principal, manage volatility, and generate income — the same reasons institutional investors have favored larger allocations to alternative asset investment classes.

**Our Business Model**

Our business model is to earn a net profit between the yield generated by the alternative assets we own and the costs we incur to originate and finance the assets. We believe that we are uniquely positioned to acquire life insurance assets directly from consumers needing our services, and to finance our portfolio's growth by providing investors with the opportunity to participate in the yield we generate from our assets. At the same time, we seek to fill the vacuum created by the widespread disappearance of bank-driven finance in a variety of other alternative asset classes.

To participate and compete in these growing markets, we have spent and intend to continue spending significant resources: (i) developing a robust operational platform and systems for originating and purchasing life insurance policies and other alternative assets; (ii) creating opportunities for investors to participate in the yield generated by alternative assets we own; (iii) recruiting and developing a professional management team; and (iv) establishing strategic relationships for delivering the services we provide.

*Originating Life Insurance Assets*

We generally purchase life insurance assets directly from policy owners who purchased their life insurance in the primary market. Historically, we have purchased life insurance policies in the secondary market through a network of specialized brokers who assist consumers and financial professionals in accessing the secondary market. We maintain membership affiliations and representation within key industry groups, such as the Life Insurance Settlement Association, where our President, Michael Freedman, serves on the board. We typically attend and sponsor trade events where we maintain contacts and visibility among professionals who submit life insurance policies for our potential purchase.

---

1    Goldman Sachs, Retail Liquid Alternatives: The Next Frontier (2013).

29

A key strategic initiative of ours has been to expand our origination capabilities by marketing directly to consumers and financial professionals. Most recently, we focused these marketing efforts towards financial professionals, namely financial advisors and life insurance agents, through our "Appointed Agent Program." Our Appointed Agent Program is designed to empower financial professionals to bring the life insurance secondary market's value proposition to their respective markets. Our Appointed Agent Program emphasizes education, training, regulatory compliance, and marketing support. In the fourth quarter of 2015, we deployed a new marketing effort focused on recruiting life insurance professionals to source life insurance policies directly to us through our Appointed Agent Program. Additionally, we continue to train financial advisors who sell our investment products to become Appointed Agents and market our services within their respective markets. While these efforts are new and still in development, the initial results and early outcomes from our Appointed Agent Program marketing efforts are encouraging and, as a result, we intend to further focus and allocate resources to grow and develop that program.

*Underwriting and Purchasing Life Insurance Assets*

We focus on purchasing high quality life insurance assets through our origination practices and underwriting procedures. Our origination practices and underwriting procedures strive to meet published guidelines and methodologies for rated securitizations of life insurance portfolios. At the same time, we are looking for innovative value-added tools, services, and methodologies to improve both the accuracy and efficiency with which we acquire life insurance assets.

Our underwriting procedures consist of a careful review and analysis of available materials and information related to a life insurance policy and the insured. The goal of our underwriting procedures is to make an informed purchasing decision. We typically purchase life insurance policies from insureds who are 65 years or older and whose life expectancies are less than 120 months (10 years). The life expectancies we use are estimates, stated in months, which indicate the 50% probability of an individual's mortality (meaning actuarial analysis predicts half of the individuals with similar age, sex, and medical conditions will experience mortality before that number of months, and half will experience mortality after that number of months). Life expectancies are based on actuarial tables that predict statistical probability of individual mortality.

We obtain life expectancies from independent third-party medical-actuarial underwriting firms, unless the life insurance policy benefit has a face value of $1,000,000 or less (which we generally refer to as a "small face policy"). When we obtain life expectancies from independent third-party medical-actuarial firms, we receive a medical underwriter's report summarizing the health of the insured based on a review of the insured's historical medical records. For all life insurance policies we purchase, other than small face policies, we average two life expectancies from two independent medical-actuarial underwriting firms to form the life expectancy we use to price and value our life insurance assets. In some cases, we may obtain more than two life expectancy estimates. In those cases, we average the two life expectancy estimates that we believe are the most reliable of those we have received, based on our own analyses and conclusions. In this regard, the two life expectancy estimates we ultimately choose to average may not always be the most conservative. For small face policies, we use modified procedures to estimate a life expectancy that may, or may not, use life expectancies from independent third-party medical-actuarial underwriting firms. If in the future we believe our business model will benefit from changes in our underwriting process and if such revisions are permitted under our borrowing covenants, we may change our underwriting processes and policies.

We continually seek to improve the process by which we originate our life insurance assets. To this end, we have refined our underwriting procedures in order to more efficiently price small face policies. In 2015, we have reached several milestones, most notably, the time in which it takes to complete a preliminary underwriting. Historically, the preliminary underwriting process to evaluate and price a life insurance policy could take six weeks or more. This lengthy timeline, as well as additional timelines necessary for a complicated closing process, creates barriers for market development and growth. Through our efforts, however, we have been able to reduce the elapsed time to complete a preliminary underwriting from weeks to days and streamline our entire purchasing process, reducing timelines further, from months to weeks.

Finally, we continue to refine and improve our actuarial underwriting. We believe we can continue to improve our service offerings by adopting a multivariate analysis approach to our life expectancy underwriting — in particular for small face policies. Multivariate analysis refers to a technique used to analyze data that arises from more than one variable. The goal of our multivariate underwriting is to augment traditional life expectancy underwriting by either filling gaps, or including new information, shown to be relevant to life expectancy. An example of this approach would be to account for socio-economic factors, such as income levels, in the calculation of life expectancies, which as The Brookings Institute has recently published, has a bearing upon life expectancies. Another example of this approach would be to apply advanced medical testing technologies to our life expectancy calculations, such as genomic testing, that have shown to statistically predict mortality among individuals. These efforts are ongoing and take time to develop and implement. Nevertheless, over time, we believe they hold promise to improve the value of the services we offer.

*Value Proposition — Life Insurance as an Alternative Asset*

We realize profits from the life insurance assets we own by earning a spread between the investment cost of our life insurance assets and the face value of the policy benefits we receive. Accordingly, if we originate and purchase life insurance assets in the secondary market, and make all the attendant premium payments to maintain those assets in order to receive the policy benefits, the most significant risk factors (among others that we discuss in the "Risk Factors" section of this prospectus) in the performance of those assets are: (i) the predictability of mortality, or longevity risk; and (ii) the creditworthiness of the issuing life insurance company, or credit risk. We believe the value proposition of our investments in the alternative asset of life insurance is our ability to obtain superior risk-adjusted returns.

Longevity Risk.    We believe actuarial mortality is the single largest variable affecting the returns on our investments in life insurance assets and impacting the portfolio's performance over time. Accurately predicting a specific individual's mortality date is impossible, and the best an actuary can do is provide a set of probabilities of survival over time. Nevertheless, predicting mortality among a group of similarly situated individuals is less difficult — in fact, the larger the group, the more accurate actuarial prediction tends to become. The statistical mathematical concept stating that the results of random events tend to become very predictable as the number of events becomes large is the "Central Limit Theorem" (or more commonly known as the "Law of Large Numbers"). "Mean regression" is another statistical mathematical concept used to describe that, on average, observations (in this case actual mortality of insureds) tend to cluster around the mean observation (in this case our estimate of mortality of insureds as described further under "Value Proposition" below). These statistical mathematical concepts are the basis for many business models, ranging from all types of insurance to the lottery. Insurance carriers, for example, can be very certain of the number of insurance claims to expect when they have spread their risk over a large book of diversified policies. In this way, insurance carriers can price a large number of insurance policies of any type to collect premiums slightly above the level of expected claims, virtually guaranteeing a surplus or profit. Similarly, a lottery can depend on an expected amount of earnings equal to the small advantage built into the odds of the games.

The implications for our business model are two-fold: First, as we accumulate larger numbers of life insurance policies, we should expect our results to increasingly correlate with our expectations. Second, over the long run, we should expect that the actual cash flows will converge with the forecasted cash flows from our portfolio of life insurance assets, and the actual return on our portfolio of life insurance assets will converge with our expected return. In sum, the degree of certainty of this eventual convergence should increase as the portfolio size increases. Although medical advances and life expectancy changes may significantly impact the longevity risk we face and our understanding of that risk, these concepts nevertheless serve as guiding principles as we seek to build, manage, and forecast the performance of our portfolio of life insurance assets.

These expectations are affirmed in research published by A.M. Best and others, that illustrate that as the number of insured lives increase within a portfolio of life insurance policies, there is a corresponding decrease in the standard deviation of the mortality events within the portfolio — i.e., longevity risk decreases as the number of insureds increases. Standard & Poor's indicates that 1,000 insured lives is required to reach statistical significance (where the relationship, in this context, between mortality projections and actual mortality events is not random). A.M. Best concludes that a portfolio of at least 300 insured lives is statistically significant. Our current portfolio covers 358 insured

31

lives and we believe that both the predictability and actual performance will continue to improve with additional size and diversification. Accordingly, we continue to seek to grow the size and diversification of the portfolio in order to further mitigate risk and improve our profitability.

Credit Risk.   We rely on the payment of policy benefit claims by life insurance companies as our most significant source of revenue collection. The life insurance assets we own represent obligations of third-party life insurance companies to pay the benefit amount under the relevant policy upon the mortality of the insured. As a result, we manage this credit risk exposure by generally purchasing policies issued by insurance companies with investment-grade ratings from Standard & Poor's, and diversifying our portfolio among a number of insurance companies.

Approximately 97.3% of life insurance assets in our portfolio were issued by insurance companies with investment-grade credit ratings from Standard & Poor's, as of December 31, 2015. Our largest life insurance company credit exposures and their respective Standard & Poor's credit rating of their respective financial strength and claims paying ability is set forth below:

| Rank | Policy Benefits | Percentage of Policy Benefit Amount | Insurance Company | Ins. Co. S&P Rating |
|---|---|---|---|---|
| 1 | $ 132,325,000 | 14.0% | AXA Equitable Life Insurance Company | A+ |
| 2 | $ 120,305,000 | 12.7% | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 3 | $ 86,070,000 | 9.1% | Transamerica Life Insurance Company | AA- |
| 4 | $ 62,475,000 | 6.6% | Voya Retirement Insurance and Annuity Company | A |
| 5 | $ 60,569,000 | 6.4% | Jefferson-Pilot Life Insurance Company | AA- |
| 6 | $ 46,825,000 | 5.0% | American General Life Insurance Company | A+ |
| 7 | $ 44,846,000 | 4.7% | Metropolitan Life Insurance Company | AA- |
| 8 | $ 43,750,000 | 4.6% | Massachusetts Mutual Life Insurance Company | AA+ |
| 9 | $ 42,407,000 | 4.5% | Lincoln National Life Insurance Company | AA- |
| 10 | $ 36,500,000 | 3.9% | West Coast Life Insurance Company | AA- |
| | 676,072,000 | 71.5% | | |

The yield to maturity on bonds issued by life insurance carriers reflects, among other things, the credit risk (risk of default) of such insurance carrier. We follow the yields on certain publicly traded life insurance company bonds as this information is part of the data we consider when valuing our portfolio of life insurance policies for our financial statements according to GAAP.

| Name of Bond | Maturity | YTM | Duration (Years) | Bond S&P Rating |
|---|---|---|---|---|
| AXA 7.125% | 12/15/2020 | 3.29% | 5.0 | BBB |
| Manulife Finl 4.9% | 9/17/2020 | 2.54% | 4.7 | A |
| Lincoln National Corp Ind 4% | 9/1/2023 | 3.44% | 7.7 | A- |
| Amer Intl Grp 5% | 4/26/2023 | 3.23% | 7.3 | A- |
| Protective Life 7.375% | 10/15/2019 | 2.85% | 3.8 | A- |
| Metlife 3.048% | 12/15/2022 | 2.94% | 7.0 | A- |
| Prudential Finl Inc Mtns Book 4.5% | 11/16/2021 | 2.86% | 5.9 | A |
| Average yield on insurance bonds | | 3.02% | 5.9 | |

The table above indicates the current yields to maturity (YTM) for the senior bonds of selected life insurance carriers with durations, on average, that our similar to our life insurance portfolio. The average yield to maturity of these bonds was 3.02% which, we believe, reflects in part the financial market's judgement that credit risk is low with regard to these carriers' financial obligations. It should be noted that the obligations of life insurance carriers to pay life insurance policy benefits is senior in rank to any other obligation. This "super senior" priority is not reflected in the

yield to maturity in the table and, if considered, would result in a lower yield to maturity all else being equal. As such, as long as the respective premium payments have been made, it is highly likely that the owner of the insurance policy will collect the insurance policy benefit upon the mortality of the insured.

Value Proposition.   We define the value proposition presented by our portfolio of life insurance assets as our ability to earn superior risk-adjusted returns. At any given point in time, we calculate our returns from our life insurance assets based upon (i) our historical results; and (ii) the future cash flows we expect to realize from our statistical forecasts. To forecast our expected future cash flows we use the probabilistic method of analysis. The actuarial software we use produce our expected future cash flows and conduct to our probabilistic analysis was developed by the actuarial firm Milliman and is now owned by Modeling Actuarial Pricing Systems, Inc. ("MAPS"). The expected future cash flow forecasts derived from this probabilistic analysis, in relation to our investment cost basis, provides us with an expected internal rate of return on our portfolio of life insurance assets. As of December 31, 2015, the expected internal rate of return on our portfolio of life insurance assets was 11.11%.

We seek to further enhance our understanding of our expected future cash flow forecast by applying a stochastic analysis, sometimes referred to as a "Monte Carlo simulation," to provide us with a greater understanding of the variability of our future cash flow projections. The stochastic analysis we perform is built within the MAPS actuarial software and provides internal rate of return calculations for different statistical confidence intervals. The results of our stochastic analysis, in which we run 10,000 random mortality scenarios, demonstrates that the scenario ranking at the 50th percentile of all 10,000 results generates an internal rate of return of 11.08% which is basically equal to our expected internal rate of return of 11.11%. The stochastic analysis results also reveal that our portfolio is expected to generate an internal rate of return of 10.33% or better in 75% of all generated scenarios; and an internal rate of return of 9.70% or better in 90% of all generated scenarios. As the portfolio continues to grow, all else equal, the percentage of observations that result in an internal rate of return at or very near 11.08% (currently our mean, or 50th percentile, internal rate of return expectation) will increase, thereby lowering future cash flow volatility and potentially justifying our use of lower discount rates to value our portfolio.

In sum, we believe our statistical analyses show that, if we can continue to grow and maintain our investments in life insurance assets, then, in the absence of significantly disruptive events negatively affecting our most significant risks, including but not limited to longevity and credit risk, and interest rate and financing risk, those investments will prove to be dependably profitable for our company and provide us with the means to generate attractive returns for our investors.

## Portfolio Information

Our portfolio of life insurance policies, owned by our wholly-owned subsidiaries as of December 31, 2015, is summarized below:

| | | |
|---|---|---|
| Total portfolio face value of policy benefits | $ | 944,844,000 |
| Average face value per policy | $ | 2,386,000 |
| Average face value per insured life | $ | 2,639,000 |
| Average age of insured (yrs.) | | 82.6 |
| Average life expectancy estimate (yrs.) | | 6.6 |
| Total number of policies | | 396 |
| Number of unique lives | | 358 |
| Demographics | | 70% Males; 30% Females |
| Number of smokers | | 10 |
| Largest policy as % of total portfolio | | 1.06% |
| Average policy as % of total portfolio | | 0.25% |
| Average annual premium as % of face value | | 3.41% |

33

Our portfolio of life insurance policies, owned by our wholly-owned subsidiaries as of December 31, 2015, organized by the insured's current age and the associated policy benefits, is summarized below:

**Distribution of Policy Benefits by Current Age of Insured**

| Min Age | Max Age | Policy Benefits | Weighted Average Life Expectancy (yrs.) | Percentage of Total Policy Benefits |
|---|---|---|---|---|
| 90 | 95 | $ 72,020,000 | 2.7 | 7.6% |
| 85 | 89 | $ 251,692,000 | 4.9 | 26.6% |
| 80 | 84 | $ 352,176,000 | 6.7 | 37.3% |
| 75 | 79 | $ 179,876,000 | 8.8 | 19.0% |
| 70 | 74 | $ 57,407,000 | 9.5 | 6.1% |
| 65 | 69 | $ 31,673,000 | 10.5 | 3.4% |
| **Total** | | **$ 944,844,000** | **6.6** | **100.0%** |

Our portfolio of life insurance policies, owned by our wholly-owned subsidiaries as of December 31, 2015, organized by the insured's current age and number of policies owned, is summarized below:

**Distribution of Policies by Current Age of Insured**

| Min Age | Max Age | Policies | Weighted Average Life Expectancy (yrs.) | Percentage of Total Policies |
|---|---|---|---|---|
| 90 | 95 | 30 | 2.7 | 7.6% |
| 85 | 89 | 113 | 4.9 | 28.5% |
| 80 | 84 | 127 | 6.7 | 32.1% |
| 75 | 79 | 69 | 8.8 | 17.4% |
| 70 | 74 | 35 | 9.5 | 8.8% |
| 65 | 69 | 22 | 10.5 | 5.6% |
| **Total** | | **396** | **6.6** | **100.0%** |

Our portfolio of life insurance policies, owned by our wholly-owned subsidiaries as of December 31, 2015, organized by the insured's estimated life expectancy estimates and associated policy benefits, is summarized below:

**Distribution of Policies by Current Life Expectancies of Insured**

| Min LE (Months) | Max LE (Months) | Policies | Policy Benefits | Percentage of Total Policy Benefits |
|---|---|---|---|---|
| 5 | 47 | 93 | $ 180,813,000 | 19.1% |
| 48 | 71 | 108 | 258,697,000 | 27.4% |
| 72 | 95 | 84 | 223,506,000 | 23.7% |
| 96 | 119 | 68 | 166,295,000 | 17.6% |
| 120 | 143 | 27 | 66,015,000 | 7.0% |
| 144 | 197 | 16 | 49,518,000 | 5.2% |
| **Total** | | **396** | **$ 944,844,000** | **100.0%** |

We track concentrations of pre-existing medical conditions among insured individuals within our portfolio based on information contained in life expectancy reports. We track these medical conditions within the following ten primary disease categories: (1) cancer, (2) cardiovascular, (3) cerebrovascular, (4) dementia, (5) diabetes, (6) multiple, (7) neurological disorders, (8) no disease, (9) other, and (10) respiratory diseases. Our primary disease categories are summary generalizations based on the ICD-9 codes we track on each insured individuals within our portfolio. ICD-9 codes, published by the World Health Organization, are used worldwide for medical diagnoses and treatment systems, as well as morbidity and mortality statistics. Currently, the only primary disease category within our portfolio that represents a concentration of over 10% is cardiovascular, which constitutes 20.8% of the value of our portfolio.

34

The complete detail of our portfolio of life insurance policies, owned by our wholly owned subsidiaries as of December 31, 2015, organized by the current age of the insured and the associated policy benefits, sex, estimated life expectancy, issuing insurance carrier, and the credit rating of the issuing insurance carrier, is set forth below.

**Life Insurance Portfolio Detail**
**(as of December 31, 2015)**

| | Face Amount | Gender | Age (ALB) | LE (mo.) | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 1 | $ 4,000,000 | Male | 95 | 34 | MetLife Investors USA Insurance Company | AA- |
| 2 | $ 1,100,000 | Male | 95 | 29 | Voya Retirement Insurance and Annuity Company | A |
| 3 | $ 1,500,000 | Female | 95 | 32 | Aviva Life Insurance Company | A- |
| 4 | $ 3,200,000 | Male | 94 | 27 | West Coast Life Insurance Company | AA- |
| 5 | $ 1,000,000 | Female | 93 | 38 | Transamerica Life Insurance Company | AA- |
| 6 | $ 264,000 | Female | 93 | 25 | Lincoln Benefit Life Company | BBB+ |
| 7 | $ 3,500,000 | Male | 92 | 40 | Voya Retirement Insurance and Annuity Company | A |
| 8 | $ 3,000,000 | Male | 92 | 40 | West Coast Life Insurance Company | AA- |
| 9 | $ 500,000 | Male | 92 | 12 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 10 | $ 625,000 | Female | 92 | 22 | Prudential Life Insurance Company | AA- |
| 11 | $ 2,000,000 | Female | 92 | 10 | Pruco Life Insurance Company | AA- |
| 12 | $ 250,000 | Male | 92 | 22 | Transamerica Life Insurance Company | AA- |
| 13 | $ 1,682,773 | Female | 91 | 49 | Hartford Life and Annuity Insurance Company | BBB+ |
| 14 | $ 5,000,000 | Female | 91 | 51 | American General Life Insurance Company | A+ |
| 15 | $ 5,000,000 | Female | 91 | 29 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 16 | $ 300,000 | Female | 91 | 30 | West Coast Life Insurance Company | AA- |
| 17 | $ 3,845,000 | Female | 91 | 45 | Pacific Life Insurance Company | A+ |
| 18 | $ 5,000,000 | Male | 90 | 31 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 19 | $ 3,500,000 | Female | 90 | 54 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 20 | $ 3,100,000 | Female | 90 | 32 | Lincoln Benefit Life Company | BBB+ |
| 21 | $ 1,500,000 | Female | 90 | 67 | Jefferson-Pilot Life Insurance Company | AA- |
| 22 | $ 2,500,000 | Female | 90 | 5 | AXA Equitable Life Insurance Company | A+ |
| 23 | $ 2,500,000 | Female | 90 | 5 | AXA Equitable Life Insurance Company | A+ |
| 24 | $ 3,000,000 | Female | 90 | 32 | Jefferson-Pilot Life Insurance Company | AA- |
| 25 | $ 5,000,000 | Female | 90 | 38 | Voya Retirement Insurance and Annuity Company | A |
| 26 | $ 5,000,000 | Female | 90 | 16 | Lincoln National Life Insurance Company | AA- |
| 27 | $ 1,000,000 | Male | 90 | 8 | Voya Retirement Insurance and Annuity Company | A |
| 28 | $ 1,203,520 | Male | 90 | 42 | Columbus Life Insurance Company | AA |
| 29 | $ 1,350,000 | Female | 90 | 34 | Jefferson-Pilot Life Insurance Company | AA- |
| 30 | $ 600,000 | Female | 90 | 20 | Columbus Life Insurance Company | AA |
| 31 | $ 5,000,000 | Female | 89 | 48 | Massachusetts Mutual Life Insurance Company | AA+ |
| 32 | $ 2,500,000 | Female | 89 | 46 | American General Life Insurance Company | A+ |
| 33 | $ 2,500,000 | Male | 89 | 53 | Pacific Life Insurance Company | A+ |
| 34 | $ 1,000,000 | Female | 89 | 49 | United of Omaha Life Insurance Company | AA- |

| 35 | $ 5,000,000 | Male | 89 | 50 | AXA Equitable Life Insurance Company | A+ |
|----|----|----|----|----|----|----|
| 36 | $ 375,000 | Male | 89 | 40 | Lincoln National Life Insurance Company | AA- |
| 37 | $ 1,103,922 | Female | 89 | 57 | Sun Life Assurance Company of Canada (U.S.) | AA- |
| 38 | $ 1,500,000 | Male | 89 | 41 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 39 | $ 1,500,000 | Male | 89 | 41 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 40 | $ 1,000,000 | Female | 89 | 62 | Transamerica Life Insurance Company | AA- |
| 41 | $ 250,000 | Female | 89 | 62 | Transamerica Life Insurance Company | AA- |
| 42 | $ 500,000 | Male | 89 | 59 | Lincoln National Life Insurance Company | AA- |
| 43 | $ 800,000 | Male | 89 | 66 | Lincoln National Life Insurance Company | AA- |

35

| | Face Amount | Gender | Age (ALB) | LE (mo.) | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 44 | $ 715,000 | Female | 89 | 58 | Jefferson-Pilot Life Insurance Company | AA- |
| 45 | $ 2,225,000 | Female | 89 | 81 | Transamerica Life Insurance Company | AA- |
| 46 | $ 3,000,000 | Female | 89 | 79 | Massachusetts Mutual Life Insurance Company | AA+ |
| 47 | $ 1,500,000 | Male | 89 | 44 | Union Central Life Insurance Company | A+ |
| 48 | $ 3,500,000 | Female | 89 | 38 | Lincoln National Life Insurance Company | AA- |
| 49 | $ 1,500,000 | Male | 89 | 103 | Transamerica Life Insurance Company | AA- |
| 50 | $ 3,000,000 | Male | 89 | 29 | American General Life Insurance Company | A+ |
| 51 | $ 500,000 | Female | 88 | 64 | Sun Life Assurance Company of Canada (U.S.) | AA- |
| 52 | $ 3,000,000 | Male | 88 | 45 | Transamerica Life Insurance Company | AA- |
| 53 | $ 250,000 | Male | 88 | 69 | Metropolitan Life Insurance Company | AA- |
| 54 | $ 4,000,000 | Female | 88 | 69 | Transamerica Life Insurance Company | AA- |
| 55 | $ 1,050,000 | Male | 88 | 42 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 56 | $ 3,000,000 | Male | 88 | 97 | Transamerica Life Insurance Company | AA- |
| 57 | $ 1,000,000 | Male | 88 | 52 | AXA Equitable Life Insurance Company | A+ |
| 58 | $ 1,250,000 | Male | 88 | 34 | Columbus Life Insurance Company | AA |
| 59 | $ 300,000 | Male | 88 | 34 | Columbus Life Insurance Company | AA |
| 60 | $ 4,785,380 | Female | 88 | 43 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 61 | $ 2,500,000 | Male | 88 | 45 | Transamerica Life Insurance Company | AA- |
| 62 | $ 1,000,000 | Female | 88 | 47 | West Coast Life Insurance Company | AA- |
| 63 | $ 2,000,000 | Female | 88 | 47 | West Coast Life Insurance Company | AA- |
| 64 | $ 1,803,455 | Female | 88 | 47 | Metropolitan Life Insurance Company | AA- |
| 65 | $ 1,529,270 | Female | 88 | 47 | Metropolitan Life Insurance Company | AA- |
| 66 | $ 5,000,000 | Male | 88 | 49 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 67 | $ 800,000 | Male | 88 | 52 | National Western Life Insurance Company | A |
| 68 | $ 200,000 | Male | 88 | 46 | Lincoln Benefit Life Company | BBB+ |
| 69 | $ 4,445,467 | Male | 88 | 56 | Penn Mutual Life Insurance Company | A+ |
| 70 | $ 7,500,000 | Male | 88 | 46 | Jefferson-Pilot Life Insurance Company | AA- |
| 71 | $ 3,600,000 | Female | 88 | 55 | AXA Equitable Life Insurance Company | A+ |
| 72 | $ 1,000,000 | Female | 88 | 33 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 73 | $ 3,000,000 | Male | 88 | 40 | Jefferson-Pilot Life Insurance Company | AA- |
| 74 | $ 2,000,000 | Male | 88 | 44 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 75 | $ 100,000 | Female | 88 | 52 | American General Life Insurance Company | A+ |
| 76 | $ 100,000 | Female | 88 | 52 | American General Life Insurance Company | A+ |
| 77 | $ 2,000,000 | Female | 88 | 73 | U.S. Financial Life Insurance Company | A+ |
| 78 | $ 396,791 | Male | 88 | 33 | Lincoln National Life Insurance Company | AA- |
| 79 | $ 1,000,000 | Male | 87 | 58 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 80 | $ 2,000,000 | Male | 87 | 58 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 81 | $ 5,000,000 | Male | 87 | 49 | Jefferson-Pilot Life Insurance Company | AA- |
| 82 | $ 5,000,000 | Female | 87 | 32 | Transamerica Life Insurance Company | AA- |
| 83 | $ 1,200,000 | Male | 87 | 70 | Transamerica Life Insurance Company | AA- |
| 84 | $ 6,000,000 | Female | 87 | 53 | Sun Life Assurance Company of Canada (U.S.) | AA- |

| 85 | $ 1,000,000 | Female | 87 | 83 | Voya Retirement Insurance and Annuity Company | A |
| 86 | $ 3,000,000 | Male | 87 | 76 | AXA Equitable Life Insurance Company | A+ |
| 87 | $ 1,000,000 | Female | 87 | 21 | State Farm Life Insurance Company | AA- |
| 88 | $ 1,000,000 | Female | 87 | 37 | New York Life Insurance Company | AA+ |
| 89 | $ 10,000,000 | Female | 87 | 68 | West Coast Life Insurance Company | AA- |
| 90 | $ 8,500,000 | Male | 87 | 77 | Massachusetts Mutual Life Insurance Company | AA+ |
| 91 | $ 500,000 | Male | 87 | 78 | Metropolitan Life Insurance Company | AA- |

36

| | Face Amount | Gender | Age (ALB) | LE (mo.) | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 92 | $ 347,211 | Male | 87 | 38 | Prudential Life Insurance Company | AA- |
| 93 | $ 500,000 | Female | 87 | 51 | Beneficial Life Insurance Company | N/A |
| 94 | $ 5,000,000 | Male | 87 | 77 | Lincoln National Life Insurance Company | AA- |
| 95 | $ 4,513,823 | Female | 87 | 22 | Aviva Life Insurance Company | A- |
| 96 | $ 2,000,000 | Male | 87 | 91 | Voya Retirement Insurance and Annuity Company | A |
| 97 | $ 2,000,000 | Male | 87 | 91 | Voya Retirement Insurance and Annuity Company | A |
| 98 | $ 2,000,000 | Male | 87 | 91 | Voya Retirement Insurance and Annuity Company | A |
| 99 | $ 1,365,000 | Female | 86 | 90 | Transamerica Life Insurance Company | AA- |
| 100 | $ 200,000 | Female | 86 | 82 | Lincoln National Life Insurance Company | AA- |
| 101 | $ 1,000,000 | Male | 86 | 37 | Massachusetts Mutual Life Insurance Company | AA+ |
| 102 | $ 2,000,000 | Male | 86 | 93 | Transamerica Life Insurance Company | AA- |
| 103 | $ 1,000,000 | Male | 86 | 36 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 104 | $ 1,000,000 | Male | 86 | 52 | AXA Equitable Life Insurance Company | A+ |
| 105 | $ 2,328,547 | Male | 86 | 41 | Metropolitan Life Insurance Company | AA- |
| 106 | $ 2,000,000 | Male | 86 | 41 | Metropolitan Life Insurance Company | AA- |
| 107 | $ 1,000,000 | Male | 86 | 23 | Transamerica Life Insurance Company | AA- |
| 108 | $ 2,000,000 | Male | 86 | 58 | Jefferson-Pilot Life Insurance Company | AA- |
| 109 | $ 3,000,000 | Female | 86 | 67 | Transamerica Life Insurance Company | AA- |
| 110 | $ 5,000,000 | Male | 86 | 69 | Voya Retirement Insurance and Annuity Company | A |
| 111 | $ 1,800,000 | Male | 86 | 50 | John Hancock Variable Life Insurance Company | AA- |
| 112 | $ 2,000,000 | Male | 86 | 60 | AXA Equitable Life Insurance Company | A+ |
| 113 | $ 1,750,000 | Male | 86 | 60 | AXA Equitable Life Insurance Company | A+ |
| 114 | $ 4,000,000 | Male | 86 | 48 | Metropolitan Life Insurance Company | AA- |
| 115 | $ 2,000,000 | Male | 86 | 32 | Transamerica Life Insurance Company | AA- |
| 116 | $ 1,425,000 | Male | 86 | 75 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 117 | $ 1,000,000 | Female | 85 | 78 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 118 | $ 1,500,000 | Male | 85 | 35 | Transamerica Life Insurance Company | AA- |
| 119 | $ 1,500,000 | Female | 85 | 104 | Lincoln Benefit Life Company | BBB+ |
| 120 | $ 1,000,000 | Female | 85 | 40 | Metropolitan Life Insurance Company | AA- |
| 121 | $ 3,750,000 | Male | 85 | 72 | AXA Equitable Life Insurance Company | A+ |
| 122 | $ 2,000,000 | Male | 85 | 51 | Metropolitan Life Insurance Company | AA- |
| 123 | $ 3,000,000 | Male | 85 | 51 | Metropolitan Life Insurance Company | AA- |
| 124 | $ 4,000,000 | Male | 85 | 33 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 125 | $ 1,000,000 | Male | 85 | 73 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 126 | $ 2,000,000 | Female | 85 | 80 | AXA Equitable Life Insurance Company | A+ |
| 127 | $ 2,000,000 | Female | 85 | 93 | Lincoln Benefit Life Company | BBB+ |
| 128 | $ 1,000,000 | Male | 85 | 50 | Voya Retirement Insurance and Annuity Company | A |
| 129 | $ 3,000,000 | Female | 85 | 79 | Sun Life Assurance Company of Canada (U.S.) | AA- |
| 130 | $ 2,400,000 | Male | 85 | 34 | Genworth Life Insurance Company | BBB- |

App. 0197

| 131 | $ 829,022 | Female | 85 | 22 | Hartford Life and Annuity Insurance Company | BBB+ |
| 132 | $ 1,500,000 | Male | 85 | 75 | AXA Equitable Life Insurance Company | A+ |
| 133 | $ 5,000,000 | Male | 85 | 84 | Voya Retirement Insurance and Annuity Company | A |
| 134 | $ 1,500,000 | Male | 85 | 46 | Voya Retirement Insurance and Annuity Company | A |
| 135 | $ 1,500,000 | Male | 85 | 46 | Voya Retirement Insurance and Annuity Company | A |
| 136 | $ 2,500,000 | Female | 85 | 61 | American General Life Insurance Company | A+ |
| 137 | $ 500,000 | Male | 85 | 38 | Genworth Life Insurance Company | BBB- |
| 138 | $ 1,000,000 | Male | 85 | 43 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 139 | $ 4,000,000 | Female | 85 | 47 | Voya Retirement Insurance and Annuity Company | A |

37

App. 0198

| | Face Amount | Gender | Age (ALB) | LE (mo.) | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 140 | $ 5,000,000 | Female | 85 | 88 | American General Life Insurance Company | A+ |
| 141 | $ 1,703,959 | Male | 85 | 63 | Jefferson-Pilot Life Insurance Company | AA- |
| 142 | $ 1,000,000 | Male | 85 | 54 | Hartford Life and Annuity Insurance Company | BBB+ |
| 143 | $ 3,500,000 | Female | 85 | 102 | Lincoln Benefit Life Company | BBB+ |
| 144 | $ 5,000,000 | Female | 84 | 95 | AXA Equitable Life Insurance Company | A+ |
| 145 | $ 6,000,000 | Female | 84 | 105 | American General Life Insurance Company | A+ |
| 146 | $ 5,000,000 | Male | 84 | 61 | AXA Equitable Life Insurance Company | A+ |
| 147 | $ 1,433,572 | Male | 84 | 51 | Security Mutual Life Insurance Company of NY | N/A |
| 148 | $ 1,000,000 | Male | 84 | 59 | Texas Life Insurance Company | N/A |
| 149 | $ 500,000 | Male | 84 | 101 | Metropolitan Life Insurance Company | AA- |
| 150 | $ 2,000,000 | Male | 84 | 37 | National Life Insurance Company | A |
| 151 | $ 2,147,816 | Female | 84 | 115 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 152 | $ 4,200,000 | Female | 84 | 113 | Transamerica Life Insurance Company | AA- |
| 153 | $ 750,000 | Male | 84 | 83 | West Coast Life Insurance Company | AA- |
| 154 | $ 5,000,000 | Male | 84 | 69 | AXA Equitable Life Insurance Company | A+ |
| 155 | $ 2,000,000 | Female | 84 | 69 | New York Life Insurance Company | AA+ |
| 156 | $ 5,000,000 | Male | 84 | 70 | Jefferson-Pilot Life Insurance Company | AA- |
| 157 | $ 2,700,000 | Male | 84 | 57 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 158 | $ 1,500,000 | Male | 84 | 72 | Jefferson-Pilot Life Insurance Company | AA- |
| 159 | $ 3,500,000 | Female | 84 | 84 | AXA Equitable Life Insurance Company | A+ |
| 160 | $ 1,000,000 | Female | 84 | 97 | West Coast Life Insurance Company | AA- |
| 161 | $ 3,000,000 | Female | 84 | 89 | MetLife Investors USA Insurance Company | AA- |
| 162 | $ 7,600,000 | Female | 84 | 95 | Transamerica Life Insurance Company | AA- |
| 163 | $ 250,000 | Male | 84 | 48 | Transamerica Life Insurance Company | AA- |
| 164 | $ 2,275,000 | Male | 84 | 89 | Voya Retirement Insurance and Annuity Company | A |
| 165 | $ 2,500,000 | Male | 84 | 55 | AXA Equitable Life Insurance Company | A+ |
| 166 | $ 3,000,000 | Male | 84 | 55 | Lincoln National Life Insurance Company | AA- |
| 167 | $ 340,000 | Female | 84 | 82 | Jackson National Life Insurance Company | AA |
| 168 | $ 2,000,000 | Male | 84 | 81 | Pacific Life Insurance Company | A+ |
| 169 | $ 3,000,000 | Female | 84 | 40 | AXA Equitable Life Insurance Company | A+ |
| 170 | $ 1,800,000 | Female | 84 | 57 | Jefferson-Pilot Life Insurance Company | AA- |
| 171 | $ 3,000,000 | Male | 84 | 57 | Metropolitan Life Insurance Company | AA- |
| 172 | $ 500,000 | Male | 84 | 16 | Great Southern Life Insurance Company | N/A |
| 173 | $ 2,247,450 | Female | 84 | 56 | Transamerica Life Insurance Company | AA- |
| 174 | $ 400,000 | Male | 84 | 46 | Transamerica Life Insurance Company | AA- |
| 175 | $ 10,000,000 | Female | 84 | 56 | American National Insurance Company | A |
| 176 | $ 500,000 | Male | 84 | 23 | West Coast Life Insurance Company | AA- |
| 177 | $ 3,500,000 | Female | 83 | 86 | Jefferson-Pilot Life Insurance Company | AA- |
| 178 | $ 1,000,000 | Male | 83 | 65 | Lincoln National Life Insurance Company | AA- |
| 179 | $ 3,000,000 | Male | 83 | 38 | U.S. Financial Life Insurance Company | A+ |
| 180 | $ 5,000,000 | Male | 83 | 106 | American General Life Insurance Company | A+ |
| 181 | $ 1,900,000 | Male | 83 | 62 | American National Insurance Company | A |
| 182 | $ 500,000 | Male | 83 | 43 | New York Life Insurance Company | AA+ |
| 183 | $ 500,000 | Male | 83 | 43 | New York Life Insurance Company | AA+ |
| 184 | $ 385,000 | Male | 83 | 70 | Metropolitan Life Insurance Company | AA- |

| 185 | $ 500,000 | Male | 83 | 70 | Metropolitan Life Insurance Company | AA- |
| 186 | $ 75,000 | Male | 83 | 44 | Fidelity and Guaranty Insurance Company | AA |
| 187 | $ 10,000,000 | Male | 83 | 71 | Lincoln National Life Insurance Company | AA- |

38

App. 0200

| | Face Amount | Gender | Age (ALB) | LE (mo.) | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 188 | $ 250,000 | Male | 83 | 30 | Jackson National Life Insurance Company | AA |
| 189 | $ 5,000,000 | Female | 83 | 72 | Sun Life Assurance Company of Canada (U.S.) | AA- |
| 190 | $ 750,000 | Male | 83 | 78 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 191 | $ 4,500,000 | Male | 83 | 70 | AXA Equitable Life Insurance Company | A+ |
| 192 | $ 1,995,000 | Female | 83 | 76 | Transamerica Life Insurance Company | AA- |
| 193 | $ 4,000,000 | Male | 83 | 54 | Jefferson-Pilot Life Insurance Company | AA- |
| 194 | $ 1,250,000 | Female | 83 | 57 | Columbus Life Insurance Company | AA |
| 195 | $ 10,000,000 | Male | 83 | 80 | AXA Equitable Life Insurance Company | A+ |
| 196 | $ 1,000,000 | Male | 83 | 67 | Hartford Life and Annuity Insurance Company | BBB+ |
| 197 | $ 1,000,000 | Male | 83 | 67 | Jackson National Life Insurance Company | AA |
| 198 | $ 2,300,000 | Male | 83 | 20 | American General Life Insurance Company | A+ |
| 199 | $ 3,500,000 | Male | 83 | 69 | AXA Equitable Life Insurance Company | A+ |
| 200 | $ 6,217,200 | Female | 83 | 101 | Phoenix Life Insurance Company | B+ |
| 201 | $ 2,500,000 | Female | 83 | 68 | Voya Retirement Insurance and Annuity Company | A |
| 202 | $ 5,000,000 | Female | 83 | 53 | Massachusetts Mutual Life Insurance Company | AA+ |
| 203 | $ 5,000,000 | Male | 83 | 72 | Transamerica Life Insurance Company | AA- |
| 204 | $ 2,000,000 | Female | 83 | 93 | Jefferson-Pilot Life Insurance Company | AA- |
| 205 | $ 1,000,000 | Male | 83 | 49 | American General Life Insurance Company | A+ |
| 206 | $ 350,000 | Male | 83 | 34 | Reassure America Life Insurance Company | AA |
| 207 | $ 5,000,000 | Male | 83 | 80 | Jefferson-Pilot Life Insurance Company | AA- |
| 208 | $ 3,000,000 | Male | 82 | 65 | Protective Life Insurance Company | AA- |
| 209 | $ 1,500,000 | Male | 82 | 65 | American General Life Insurance Company | A+ |
| 210 | $ 2,000,000 | Female | 82 | 102 | Transamerica Life Insurance Company | AA- |
| 211 | $ 550,000 | Male | 82 | 101 | Genworth Life Insurance Company | BBB- |
| 212 | $ 500,000 | Male | 82 | 62 | West Coast Life Insurance Company | AA- |
| 213 | $ 1,500,000 | Male | 82 | 55 | Pacific Life Insurance Company | A+ |
| 214 | $ 1,000,000 | Female | 82 | 94 | Jefferson-Pilot Life Insurance Company | AA- |
| 215 | $ 2,000,000 | Male | 82 | 83 | New York Life Insurance Company | AA+ |
| 216 | $ 250,000 | Male | 82 | 144 | Voya Retirement Insurance and Annuity Company | A |
| 217 | $ 10,000,000 | Male | 82 | 78 | New York Life Insurance Company | AA+ |
| 218 | $ 417,300 | Male | 82 | 98 | Jackson National Life Insurance Company | AA |
| 219 | $ 5,000,000 | Male | 82 | 71 | AXA Equitable Life Insurance Company | A+ |
| 220 | $ 300,000 | Female | 82 | 71 | Hartford Life and Annuity Insurance Company | BBB+ |
| 221 | $ 10,000,000 | Male | 82 | 112 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 222 | $ 2,000,000 | Male | 82 | 68 | Ohio National Life Assurance Corporation | AA- |
| 223 | $ 1,000,000 | Male | 82 | 68 | Ohio National Life Assurance Corporation | AA- |
| 224 | $ 7,000,000 | Male | 82 | 85 | Genworth Life Insurance Company | BBB- |
| 225 | $ 5,000,000 | Male | 81 | 90 | AXA Equitable Life Insurance Company | A+ |
| 226 | $ 8,000,000 | Male | 81 | 83 | AXA Equitable Life Insurance Company | A+ |
| 227 | $ 1,680,000 | Female | 81 | 67 | AXA Equitable Life Insurance Company | A+ |
| 228 | $ 2,000,000 | Male | 81 | 28 | Metropolitan Life Insurance Company | AA- |
| 229 | $ 1,250,000 | Gender | 81 | 99 | Metropolitan Life Insurance Company | AA- |
| 230 | $ 1,000,000 | Male | 81 | 64 | AXA Equitable Life Insurance Company | A+ |

| | | | | | | |
|---|---|---|---|---|---|---|
| 231 | $ | 1,250,000 | Female | 81 | 73 | Principal Life Insurance Company | A+ |
| 232 | $ | 320,987 | Female | 81 | 104 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 233 | $ | 1,000,000 | Male | 81 | 55 | AXA Equitable Life Insurance Company | A+ |
| 234 | $ | 700,000 | Male | 81 | 100 | Banner Life Insurance Company | AA- |
| 235 | $ | 2,000,000 | Female | 81 | 88 | Pacific Life Insurance Company | A+ |
| 236 | $ | 3,000,000 | Male | 81 | 97 | John Hancock Life Insurance Company (U.S.A) | AA- |

39

| | Face Amount | Gender | Age (ALB) | LE (mo.) | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 237 | $ 2,000,000 | Male | 81 | 40 | Jefferson-Pilot Life Insurance Company | AA- |
| 238 | $ 10,000,000 | Male | 81 | 68 | Hartford Life and Annuity Insurance Company | BBB+ |
| 239 | $ 1,750,000 | Male | 81 | 81 | AXA Equitable Life Insurance Company | A+ |
| 240 | $ 250,000 | Male | 81 | 79 | American General Life Insurance Company | A+ |
| 241 | $ 3,500,000 | Male | 81 | 100 | Metropolitan Life Insurance Company | AA- |
| 242 | $ 2,502,000 | Male | 81 | 149 | Transamerica Life Insurance Company | AA- |
| 243 | $ 3,000,000 | Male | 81 | 111 | Principal Life Insurance Company | A+ |
| 244 | $ 1,210,000 | Male | 81 | 65 | Lincoln National Life Insurance Company | AA- |
| 245 | $ 3,000,000 | Female | 81 | 104 | West Coast Life Insurance Company | AA- |
| 246 | $ 3,000,000 | Male | 80 | 43 | Pacific Life Insurance Company | A+ |
| 247 | $ 3,000,000 | Male | 80 | 43 | Minnesota Life Insurance Company | A+ |
| 248 | $ 3,000,000 | Male | 80 | 43 | Prudential Life Insurance Company | AA- |
| 249 | $ 3,000,000 | Male | 80 | 90 | Voya Retirement Insurance and Annuity Company | A |
| 250 | $ 5,000,000 | Male | 80 | 98 | Pacific Life Insurance Company | A+ |
| 251 | $ 5,000,000 | Male | 80 | 98 | Pacific Life Insurance Company | A+ |
| 252 | $ 4,000,000 | Male | 80 | 81 | Jefferson-Pilot Life Insurance Company | AA- |
| 253 | $ 3,000,000 | Male | 80 | 148 | Metropolitan Life Insurance Company | AA- |
| 254 | $ 300,000 | Female | 80 | 98 | Metropolitan Life Insurance Company | AA- |
| 255 | $ 5,000,000 | Male | 80 | 129 | Principal Life Insurance Company | A+ |
| 256 | $ 5,000,000 | Male | 80 | 90 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 257 | $ 800,000 | Male | 80 | 78 | North American Company for Life And Health Insurance | A+ |
| 258 | $ 7,000,000 | Male | 80 | 86 | Lincoln Benefit Life Company | BBB+ |
| 259 | $ 1,000,000 | Female | 80 | 87 | Lincoln Benefit Life Company | BBB+ |
| 260 | $ 6,000,000 | Male | 80 | 122 | AXA Equitable Life Insurance Company | A+ |
| 261 | $ 130,000 | Male | 80 | 51 | Genworth Life Insurance Company | BBB- |
| 262 | $ 1,000,000 | Male | 80 | 123 | Empire General Life Assurance Corporation | AA- |
| 263 | $ 4,300,000 | Female | 80 | 109 | American National Insurance Company | A |
| 264 | $ 200,000 | Male | 80 | 67 | Kansas City Life Insurance Company | N/A |
| 265 | $ 200,000 | Male | 80 | 57 | Lincoln National Life Insurance Company | AA- |
| 266 | $ 6,000,000 | Male | 80 | 107 | AXA Equitable Life Insurance Company | A+ |
| 267 | $ 2,000,000 | Female | 80 | 87 | Transamerica Life Insurance Company | AA- |
| 268 | $ 1,000,000 | Male | 80 | 56 | Pacific Life Insurance Company | A+ |
| 269 | $ 200,000 | Male | 80 | 46 | Prudential Life Insurance Company | AA- |
| 270 | $ 500,000 | Male | 80 | 48 | Transamerica Life Insurance Company | AA- |
| 271 | $ 5,000,000 | Male | 79 | 79 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 272 | $ 3,601,500 | Male | 79 | 94 | Transamerica Life Insurance Company | AA- |
| 273 | $ 1,000,000 | Male | 79 | 96 | Sun Life Assurance Company of Canada (U.S.) | AA- |
| 274 | $ 5,000,000 | Male | 79 | 89 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 275 | $ 1,009,467 | Male | 79 | 59 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 276 | $ 4,000,000 | Male | 79 | 51 | MetLife Investors USA Insurance Company | AA- |
| 277 | $ 100,000 | Male | 79 | 64 | North American Company for Life And Health Insurance | A+ |

| 278 | $ 5,000,000 | Male | 79 | 57 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 279 | $ 476,574 | Male | 79 | 72 | Transamerica Life Insurance Company | AA- |
| 280 | $ 2,250,000 | Male | 79 | 94 | Massachusetts Mutual Life Insurance Company | AA+ |
| 281 | $ 775,000 | Male | 79 | 124 | Lincoln National Life Insurance Company | AA- |
| 282 | $ 1,000,000 | Female | 79 | 123 | John Hancock Life Insurance Company (U.S.A) | AA- |

40

| | Face Amount | Gender | Age (ALB) | LE (mo.) | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 283 | $ 1,445,000 | Female | 79 | 104 | AXA Equitable Life Insurance Company | A+ |
| 284 | $ 1,500,000 | Female | 79 | 104 | AXA Equitable Life Insurance Company | A+ |
| 285 | $ 1,000,000 | Male | 79 | 87 | Lincoln National Life Insurance Company | AA- |
| 286 | $ 325,000 | Male | 79 | 43 | American General Life Insurance Company | A+ |
| 287 | $ 3,750,000 | Male | 79 | 60 | AXA Equitable Life Insurance Company | A+ |
| 288 | $ 1,000,000 | Male | 79 | 111 | Metropolitan Life Insurance Company | AA- |
| 289 | $ 5,000,000 | Female | 79 | 117 | Voya Retirement Insurance and Annuity Company | A |
| 290 | $ 750,000 | Male | 79 | 70 | Lincoln National Life Insurance Company | AA- |
| 291 | $ 5,000,000 | Male | 79 | 182 | West Coast Life Insurance Company | AA- |
| 292 | $ 3,000,000 | Male | 79 | 96 | Principal Life Insurance Company | A+ |
| 293 | $ 5,000,000 | Male | 78 | 119 | Jefferson-Pilot Life Insurance Company | AA- |
| 294 | $ 3,000,000 | Male | 78 | 86 | American General Life Insurance Company | A+ |
| 295 | $ 500,000 | Male | 78 | 68 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 296 | $ 1,000,000 | Male | 78 | 115 | Metropolitan Life Insurance Company | AA- |
| 297 | $ 3,000,000 | Female | 78 | 88 | New York Life Insurance Company | AA+ |
| 298 | $ 2,500,000 | Male | 78 | 88 | Massachusetts Mutual Life Insurance Company | AA+ |
| 299 | $ 2,500,000 | Male | 78 | 88 | Massachusetts Mutual Life Insurance Company | AA+ |
| 300 | $ 500,000 | Female | 78 | 116 | Columbus Life Insurance Company | AA |
| 301 | $ 1,750,000 | Male | 78 | 64 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 302 | $ 5,000,000 | Male | 78 | 104 | Transamerica Life Insurance Company | AA- |
| 303 | $ 6,250,000 | Male | 78 | 197 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 304 | $ 2,000,000 | Female | 78 | 57 | Transamerica Life Insurance Company | AA- |
| 305 | $ 2,840,000 | Male | 77 | 99 | Transamerica Life Insurance Company | AA- |
| 306 | $ 4,000,000 | Male | 77 | 69 | Massachusetts Mutual Life Insurance Company | AA+ |
| 307 | $ 1,000,000 | Female | 77 | 76 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 308 | $ 7,000,000 | Female | 77 | 124 | Pacific Life Insurance Company | A+ |
| 309 | $ 2,000,000 | Male | 77 | 108 | Genworth Life Insurance Company | BBB- |
| 310 | $ 2,000,000 | Male | 77 | 121 | Transamerica Life Insurance Company | AA- |
| 311 | $ 490,620 | Male | 77 | 88 | Ameritas Life Insurance Corporation | A+ |
| 312 | $ 600,000 | Male | 77 | 86 | Protective Life Insurance Company | AA- |
| 313 | $ 5,000,000 | Male | 76 | 151 | Prudential Life Insurance Company | AA- |
| 314 | $ 250,000 | Male | 76 | 106 | Midland National Life Insurance Company | A+ |
| 315 | $ 3,000,000 | Male | 76 | 57 | Aviva Life Insurance Company | A- |
| 316 | $ 3,000,000 | Male | 76 | 99 | Prudential Life Insurance Company | AA- |
| 317 | $ 500,000 | Male | 76 | 105 | AXA Equitable Life Insurance Company | A+ |
| 318 | $ 5,000,000 | Male | 76 | 144 | Massachusetts Mutual Life Insurance Company | AA+ |
| 319 | $ 5,000,000 | Male | 76 | 144 | Massachusetts Mutual Life Insurance Company | AA+ |
| 320 | $ 3,000,000 | Male | 76 | 106 | Protective Life Insurance Company | AA- |
| 321 | $ 2,000,000 | Female | 76 | 122 | Aviva Life Insurance Company | A- |
| 322 | $ 1,000,000 | Male | 76 | 106 | Athene Life Insurance Company of New York | A- |

| 323 | $ | 5,000,000 | Male | 76 | 35 | Lincoln Benefit Life Company | BBB+ |
| 324 | $ | 850,000 | Male | 76 | 71 | New York Life Insurance Company | AA+ |
| 325 | $ | 1,000,000 | Male | 76 | 85 | Pacific Life Insurance Company | A+ |
| 326 | $ | 150,000 | Male | 76 | 108 | Genworth Life Insurance Company | BBB- |
| 327 | $ | 5,000,000 | Male | 76 | 61 | West Coast Life Insurance Company | AA- |
| 328 | $ | 200,000 | Male | 75 | 73 | Voya Retirement Insurance and Annuity Company | A |
| 329 | $ | 3,000,000 | Male | 75 | 116 | John Hancock Life Insurance Company (U.S.A) | AA- |

41

| | Face Amount | Gender | Age (ALB) | LE (mo.) | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 330 | $ 5,000,000 | Male | 75 | 116 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 331 | $ 8,000,000 | Male | 75 | 106 | Metropolitan Life Insurance Company | AA- |
| 332 | $ 500,000 | Male | 75 | 97 | AXA Equitable Life Insurance Company | A+ |
| 333 | $ 4,000,000 | Female | 75 | 146 | American General Life Insurance Company | A+ |
| 334 | $ 300,000 | Male | 75 | 19 | Lincoln National Life Insurance Company | AA- |
| 335 | $ 10,000,000 | Female | 75 | 142 | Voya Retirement Insurance and Annuity Company | A |
| 336 | $ 500,000 | Male | 75 | 79 | American General Life Insurance Company | A+ |
| 337 | $ 3,000,000 | Female | 75 | 119 | General American Life Insurance Company | AA- |
| 338 | $ 412,839 | Male | 75 | 73 | Pacific Life Insurance Company | A+ |
| 339 | $ 300,000 | Female | 75 | 141 | Minnesota Life Insurance Company | A+ |
| 340 | $ 500,000 | Male | 74 | 40 | Midland National Life Insurance Company | A+ |
| 341 | $ 1,000,000 | Male | 74 | 104 | Transamerica Life Insurance Company | AA- |
| 342 | $ 3,000,000 | Male | 74 | 78 | AXA Equitable Life Insurance Company | A+ |
| 343 | $ 500,000 | Male | 74 | 111 | United of Omaha Life Insurance Company | AA- |
| 344 | $ 2,000,000 | Male | 74 | 127 | Prudential Life Insurance Company | AA- |
| 345 | $ 2,000,000 | Male | 74 | 102 | American General Life Insurance Company | A+ |
| 346 | $ 400,000 | Male | 74 | 88 | Protective Life Insurance Company | AA- |
| 347 | $ 1,000,000 | Female | 73 | 128 | United of Omaha Life Insurance Company | AA- |
| 348 | $ 2,500,000 | Male | 73 | 111 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 349 | $ 500,000 | Male | 73 | 143 | Prudential Life Insurance Company | AA- |
| 350 | $ 2,500,000 | Male | 73 | 112 | American General Life Insurance Company | A+ |
| 351 | $ 1,500,000 | Male | 73 | 134 | Lincoln National Life Insurance Company | AA- |
| 352 | $ 1,500,000 | Male | 73 | 134 | Lincoln National Life Insurance Company | AA- |
| 353 | $ 1,500,000 | Male | 73 | 134 | Lincoln National Life Insurance Company | AA- |
| 354 | $ 500,000 | Male | 72 | 130 | Ameritas Life Insurance Corporation | A+ |
| 355 | $ 370,000 | Male | 72 | 130 | Ameritas Life Insurance Corporation | A+ |
| 356 | $ 5,000,000 | Male | 72 | 136 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 357 | $ 2,500,000 | Male | 72 | 122 | Lincoln National Life Insurance Company | AA- |
| 358 | $ 2,500,000 | Male | 72 | 122 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 359 | $ 500,000 | Male | 72 | 136 | Metropolitan Life Insurance Company | AA- |
| 360 | $ 250,000 | Male | 72 | 75 | American General Life Insurance Company | A+ |
| 361 | $ 300,000 | Male | 72 | 119 | New England Life Insurance Company | AA- |
| 362 | $ 1,167,000 | Male | 72 | 31 | Transamerica Life Insurance Company | AA- |
| 363 | $ 600,000 | Male | 72 | 90 | AXA Equitable Life Insurance Company | A+ |
| 364 | $ 1,500,000 | Male | 72 | 116 | Metropolitan Life Insurance Company | AA- |
| 365 | $ 420,000 | Male | 72 | 130 | RiverSource Life Insurance Company | A+ |
| 366 | $ 10,000,000 | Male | 72 | 126 | AXA Equitable Life Insurance Company | A+ |
| 367 | $ 650,000 | Female | 71 | 79 | Voya Retirement Insurance and Annuity Company | A |
| 368 | $ 3,000,000 | Male | 71 | 81 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 369 | $ 2,000,000 | Male | 71 | 107 | New York Life Insurance Company | AA+ |
| 370 | $ 2,000,000 | Male | 71 | 107 | New York Life Insurance Company | AA+ |
| 371 | $ 500,000 | Male | 71 | 98 | Transamerica Life Insurance Company | AA- |
| 372 | $ 500,000 | Male | 71 | 98 | North American Company for Life And Health Insurance | A+ |

| 373 | $ 1,250,000 | Male | 70 | 107 | West Coast Life Insurance Company | AA- |
| 374 | $ 1,500,000 | Female | 70 | 161 | Prudential Life Insurance Company | AA- |
| 375 | $ 750,000 | Male | 69 | 142 | North American Company for Life And Health Insurance | A+ |
| 376 | $ 250,000 | Female | 69 | 129 | Ohio National Life Assurance Corporation | AA- |

42

| | Face Amount | Gender | Age (ALB) | LE (mo.) | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 377 | $ 400,000 | Male | 69 | 169 | Lincoln National Life Insurance Company | AA- |
| 378 | $ 1,000,000 | Male | 69 | 67 | Protective Life Insurance Company | AA- |
| 379 | $ 2,500,000 | Male | 68 | 169 | Prudential Life Insurance Company | AA- |
| 380 | $ 2,500,000 | Male | 68 | 169 | Prudential Life Insurance Company | AA- |
| 381 | $ 1,000,000 | Male | 68 | 94 | Protective Life Insurance Company | AA- |
| 382 | $ 2,000,000 | Male | 68 | 119 | Transamerica Life Insurance Company | AA- |
| 383 | $ 1,000,000 | Male | 68 | 119 | Genworth Life Insurance Company | BBB- |
| 384 | $ 150,000 | Male | 68 | 125 | Protective Life Insurance Company | AA- |
| 385 | $ 156,538 | Female | 68 | 113 | New York Life Insurance Company | AA+ |
| 386 | $ 2,000,000 | Male | 68 | 55 | MetLife Investors USA Insurance Company | AA- |
| 387 | $ 2,000,000 | Male | 68 | 55 | MetLife Investors USA Insurance Company | AA- |
| 388 | $ 3,000,000 | Male | 67 | 108 | Voya Retirement Insurance and Annuity Company | A |
| 389 | $ 2,000,000 | Male | 67 | 108 | AXA Equitable Life Insurance Company | A+ |
| 390 | $ 2,000,000 | Male | 67 | 108 | AXA Equitable Life Insurance Company | A+ |
| 391 | $ 750,000 | Male | 67 | 169 | Northwestern Mutual Life Insurance Company | AA+ |
| 392 | $ 5,616,468 | Male | 67 | 188 | John Hancock Life Insurance Company (U.S.A) | AA- |
| 393 | $ 1,000,000 | Male | 66 | 52 | Lincoln National Life Insurance Company | AA- |
| 394 | $ 1,000,000 | Male | 66 | 84 | Transamerica Life Insurance Company | AA- |
| 395 | $ 350,000 | Female | 66 | 93 | Assurity Life Insurance Company | N/A |
| 396 | $ 250,000 | Male | 66 | 171 | Prudential Life Insurance Company | AA- |
| | $944,844,471 | | | | | |

(1) The insured's age is current as of the measurement date.

(2) The insured's life expectancy estimate, other than for a small face value insurance policy (i.e., a policy with $1 million in face value benefits or less), is the average of two life expectancy estimates provided by independent third-party medical-actuarial underwriting firms at the time of purchase, actuarially adjusted through the measurement date. Numbers in this column represent months.

## Competition

We encounter significant competition in the life insurance purchasing and financing business from numerous companies, including hedge funds, investment banks, secured lenders, specialty life insurance finance companies and life insurance companies themselves. Many of these competitors have greater financial and other resources than we do and may have significantly lower cost of funds because they have greater access to insured deposits or the capital markets. Moreover, some of these competitors have significant cash reserves and can better fund shortfalls in collections that might have a more pronounced impact on companies such as ours. They also have greater market share. In the event that certain better-financed life insurance companies make a significant effort to compete against our business or the secondary market in general, we would experience significant challenges with our business model.

Competition can take many forms, including the pricing of the financing, transaction structuring, timeliness and responsiveness in processing a seller's application and customer service. Some competitors may outperform us in these areas. Some competitors target the same type of life insurance clients as we do and generally have operated in the markets we service for a longer period of time. Increased competition may result in increased costs of purchasing policies or may affect the availability and quality of policies that are available for our purchase. These factors could adversely affect our profitability by reducing our return on investment or increasing our risk.

## Government Regulation

Our business is highly regulated at the state level with respect to the purchase of life insurance assets and federal laws and regulations with respect to the issuance of securities. In general, we believe that regulatory and legal environments with respect to the purchase of life insurance assets are well settled. A stable regulatory and

legal environment is necessary to give consumers, financial professionals, and investor's greater confidence and willingness to participate in the development of the life insurance secondary market.

43

At the state level, many states subject us to laws and regulations requiring us to obtain specific licenses or approvals to be able to purchase life insurance policies in those states. State statutes typically provide state regulatory agencies with significant powers to interpret, administer and enforce the laws relating to the purchase of life insurance policies. Under this authority, state regulators have broad discretionary power and may impose new licensing and other requirements, and interpret or enforce existing regulatory requirements in new and different ways. Any of these new requirements, interpretations or enforcement directives could be adverse to our industry, even in a material way. Furthermore, because the life insurance secondary market is relatively new and because of the history of certain abuses in the industry, we believe it is likely that state regulation will increase and grow more complex in the foreseeable future. We cannot, however, predict what any new regulation would specifically involve or how it might affect our industry or our business.

State regulation more generally affecting life insurance assets (and not necessarily directed at the life insurance secondary market itself) may also affect our industry and business in negative ways. For example, we are aware of recent legislative efforts in some states to mandate the sale or liquidation of life insurance policies as a precondition to eligibility for health care under the Patient Protection and Affordable Care Act. These kinds of laws, if passed, may adversely affect the number of life insurance policies available for purchase.

Although the federal laws and regulations do not directly affect the life insurance secondary market, the settlement (i.e., purchase) of life insurance contracts may in some cases constitute a transaction in "securities" that is governed by federal securities laws. Specifically, several federal court cases have held that the offer and sale of fractionalized life insurance contracts (i.e., selling direct and fractionalized investments in life insurance contracts to investors) is a transaction in securities under the Securities Act of 1933. These cases do not impact the way in which we finance our business since our financing efforts do not involve the fractionalization of any life insurance assets.

These same and other federal court cases, however, have also held that variable life insurance contracts are themselves "securities." While we presently hold few variable life insurance contracts, our holding of a significant amount of such contracts in the future could cause our company or one of its subsidiaries to be characterized as an "investment company" under the federal Investment Company Act of 1940. The application of that law to all or part of our business — whether due to our purchase of variable life insurance contracts or to the expansion of definition of "securities" under federal securities laws — could require us to comply with detailed and complex regulatory requirements, and cause us to fall out of compliance with certain covenants under our revolving senior credit facility. Such an outcome could negatively affect our liquidity and increase our cost of capital and operational expenses, all of which would adversely affect our operating results. It is possible that such an outcome could even threaten the viability of our business and our ability to satisfy our obligations as they come due.

**State Life Settlement License Requirements**

State laws differ as to the extent to which purchasers of life insurance policies are required to be licensed. We purchase life insurance policies only in those states in which we are licensed or where no licensure is required. In certain states in which we do not a hold a required license, we purchase life insurance policies through a licensed provider. Although licensing requirements differ from state to state, where they exist they typically require the payment of licensing fees, periodic reporting, and submission to audit by state regulators.

Almost every state has regulation that governs the sale of a life insurance policy, with the exception of eight states that remain unregulated. We hold licenses to purchase policies in 35 states and can also purchase in the eight unregulated states. At times, acting as a fund, we will utilize another licensed life settlement provider for the purchase of a policy in a state where we are not licensed. In the following states, because we are not currently licensed we do not conduct business and do not purchase policies through another licensed life settlement provider: Alaska, New Hampshire, North Dakota, Vermont, and West Virginia.

**Health Insurance Portability and Accountability Act (HIPAA)**

HIPAA requires that holders of medical records maintain such records and implement procedures in ways designed to assure the privacy of patient records. HIPAA has precipitated widespread changes in record keeping, including patient consent forms and access restrictions in data processing software. In order to carry out our business, we receive medical records and obtain a release to share such records with a defined group of persons. We are entitled to have access to patient information, take on the responsibility for preserving the privacy of that information, and use the information only for purposes related to the life insurance policies.

44

**Employees**

We employ approximately 50 employees.

**Properties**

Our principal executive offices are located at 220 South Sixth Street, Suite 1200, Minneapolis, Minnesota 55402. At that location, we lease 17,687 square feet of space for a lease term expiring in 2026. We believe that these facilities are adequate for our current needs and that suitable additional space will be available as needed.

**Company Website Access and SEC Filings**

Our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and amendments to reports filed pursuant to Sections 13(a) and 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), are filed with the SEC. We are subject to the informational requirements of the Exchange Act and file or furnish reports, proxy statements and other information with the SEC.

Our general website address is www.gwglife.com. Our website has a wealth of information about our company, its mission, and our specialty finance business. Our website also has tools that could be used by our potential clients, financial advisors and investors alike.

45

**DESCRIPTION OF THE L BONDS**

**General**

The L Bonds are secured obligations of GWG Holdings. The L Bonds will be issued under the indenture between us and Bank of Utah as the indenture trustee, dated October 19, 2011, as amended or supplemented from time to time, including by that certain Amendment No. 3 to Indenture to be entered into in connection with this offering of L Bonds (referred to collectively herein as the "indenture"). The terms and conditions of the L Bonds include those stated in the indenture and those made part of the indenture by reference to the Trust Indenture Act of 1939. The following is a summary of the material provisions of the indenture. For a complete understanding of the L Bonds, you should review the definitive terms and conditions contained in the indenture, which include definitions of certain terms used below. A copy of the indenture has been filed with the SEC as an exhibit to the registration statement of which this prospectus is a part, and is available from us at no charge upon request.

The following is a summary of the material terms associated with the L Bonds:

- The L Bonds are general secured obligations of GWG Holdings. The obligations are secured by a grant of a security interest in all of the assets of GWG Holdings, which assets will serve as collateral for our obligations under the L Bonds. This grant of a security interest is effected pursuant to a pledge and security agreement attached to the indenture.

- The L Bonds are fully and unconditionally guaranteed by our wholly owned direct subsidiary, GWG Life, but otherwise are not guaranteed by any other person or entity. The guarantee is backed by a grant of a security interest in all of the assets of GWG Life, which assets will serve as additional collateral for our obligations under the L Bonds. Chief among these assets is GWG Life's ownership interest in DLP II and DLP III. This guarantee is effected pursuant to provisions contained in the indenture.

- The L Bonds are also secured by a pledge of the equity ownership interests in GWG Holdings by its principal stockholders — Jon R. Sabes and Steven F. Sabes — which pledge is effected pursuant to a pledge and security agreement attached to the indenture.

- The collateral granted for our obligations under the L Bonds (i.e., the security interest in all of the assets of GWG Holdings, and the guarantee by GWG Life and corresponding security interest in all of its assets including a pledge of the equity ownership interests in DLP II and DLP III), together with (i) certain covenants contained in the documents relating to our earlier issued Series I Secured Notes (of which approximately $24.0 million was outstanding as of December 31, 2015), and (ii) an intercreditor agreement, as amended, between Bank of Utah (on behalf of the L Bond holders, and on behalf of the previously issued L Bonds) and Lord Securities Corporation (the collateral trustee for the Series I Secured Notes), make the L Bonds pari passu with the Series I Secured Notes and the previously issued L Bonds (of which approximately $282.2 million was outstanding as of December 31, 2015) with respect to payment, security and collateral. The intercreditor agreement is attached to the indenture.

- The L Bonds will be junior to the $105 million senior revolving credit facility of DLP II and DLP III with Autobahn/DZ Bank, which currently has an outstanding balance of approximately $65 million. The L Bonds will also be junior to any other senior lending facility we may later obtain.

- The L Bonds are not savings accounts, certificates of deposit (CDs) or other forms of "deposits," and are not insured by the FDIC or any other governmental agency.

- The L Bonds are not directly secured by any life insurance assets not owned by GWG Life. A significant amount of our life insurance assets (74.7% of our policies, representing approximately 85.7% of the face value of policy benefits as of December 31, 2015) are held by DLP II and DLP III. Although GWG Life's equity ownership interests in DLP II and DLP III is an asset in which GWG Life has pursuant to its guarantee granted a security interest to serve as collateral for obligations under the L Bonds, the payment on such equity interests will be subordinate to the interests of creditors of DLP II and DLP III, including our senior creditor Autobahn/DZ Bank.

- The L Bonds do not have the benefit of a "sinking fund" for the retirement of principal.

- The L Bonds are not convertible into our capital stock or other securities.

46

App. 0213

- We have the option to call and redeem the entire outstanding principal balance and accrued but unpaid interest of any L Bonds at any time and without premium or penalty. If we elect to call and redeem your L Bonds, those redeemed L Bonds will cease to accrue interest after the redemption date under the terms and subject to the conditions of the indenture.

- Except in limited circumstances (death, bankruptcy or total disability), L Bond holders will have no right to require us to redeem any L Bond prior to its maturity date. Any early redemption will be for the total outstanding principal balance and accrued but unpaid interest. If we in our sole discretion nonetheless elect to accommodate a redemption request, we will redeem the entire (but not less than the entire) outstanding principal balance and accrued but unpaid interest of the L Bonds and may impose a redemption fee of 6% against the outstanding principal balance of the L Bond redeemed. This fee will be subtracted from the amount paid to you.

The L Bonds will be represented by "Units," with each whole Unit representing $1,000 in principal amount (USD) of L Bonds. Accordingly, L Bond Units will be sold at 100% of their principal face amount. Throughout this prospectus, we refer to L Bond Units simply as "L Bonds." The minimum investment amount in the L Bonds will be 25 Units, or $25,000. Above that minimum amount, L Bonds may be purchased in whole or fractional Units of any amount. Subject to the minimum investment amount, you may select the principal amount and term of the L Bonds (ranging from six months to seven years) you would like to purchase when you subscribe. The interest rate of your L Bonds will remain fixed until maturity. Depending on our capital requirements, we may not, however, always offer L Bonds with the particular terms you seek. See "Description of the L Bonds — Interest Rate and Maturity" below.

Upon acceptance of your subscription, we will create an account in a book-entry registration and transfer system for you, and credit the principal amount of your subscription to your account. We will also send you a purchase confirmation that will indicate our acceptance of your subscription. If your subscription is rejected, all funds deposited will be promptly returned to you without any interest. See "— Registration and Exchange" below. Alternatively, you may subscribe for L Bonds as a direct participant with Depository Trust Company (DTC settlement). See "Plan of Distribution — Settlement Procedures" for more information.

Investors whose subscriptions for L Bonds have been accepted and anyone who subsequently acquires L Bonds in a qualified transfer are referred to as "holders" or "registered holders" in this prospectus. We may modify or supplement the terms of the L Bonds described in this prospectus from time to time in a supplement to the indenture and a supplement to this prospectus. Except as set forth under "— Amendment, Supplement and Waiver" below, any modification or amendment will not affect L Bonds outstanding at the time of such modification or amendment.

The L Bonds are transferable pursuant to the terms of the indenture. The L Bonds may be transferred or exchanged for other L Bonds of the same series and class of a like aggregate principal amount (i.e., the same number of Units) subject to limitations contained in the indenture. We will not charge a fee for any registration, transfer or exchange of L Bonds. However, we may require the holder to pay any tax, assessment fee, or other governmental charge required in connection with any registration, transfer or exchange of L Bonds. The registered holder of any L Bonds will be treated as the owner of such L Bond Units for all purposes.

**Denomination**

You may purchase L Bonds in the minimum amount of 25 Units, representing a minimum principal amount of $25,000, and in any whole or fractional amounts in excess thereof. You will determine the exact number of L Bond Units you purchase when you subscribe. You may not cumulate multiple purchases L Bond Units in amounts less than 25 Units to satisfy the 25 Unit minimum requirement. In our discretion, however, we may waive the 25 Unit minimum purchase requirement for any investor.

**Term**

We may offer L Bonds with the following terms to maturity:

- six months          - three years
- one year            - five years
- two years           - seven years

47

App. 0214

You will select the term of the L Bonds you purchase when you subscribe. You may purchase multiple L Bonds with different terms by filling in investment amounts for more than one term on your Subscription Agreement. Nevertheless, during this offering we may not always offer L Bonds with each of the maturity terms outlined above.

The actual maturity date will be on the last day of the month in which the L Bond matures (i.e., the month in which the L Bond's term ends). For example, if you select a one-year term and your L Bond becomes effective on January 1, 2015, the actual maturity date will be January 31, 2016. After actual maturity, we will pay all outstanding principal and accrued but unpaid interest on the L Bond no later than the fifth day of the calendar month next following its maturity (or the first business day following the fifth day of such month). So, in the case of an L Bond with a maturity date of January 31, 2016, actual payment will be made on or prior to February 5, 2016 (unless such date is not a business day, in which case actual payment will be made on the next business day). The L Bonds do not earn interest after the maturity date or any date set for prepayment.

Should the original L Bond holder (x) no longer be the holder of the L Bond or (y) be unavailable, or a change in payee be necessary, such as in the case of a surviving estate, we may require a copy of the executed assignment to any transferee, or an order from a court or probate commission, as the case may be, in order that we know the principal is returned to the rightful party.

**Interest Rate**

The rate of interest we will offer to pay on L Bonds at any particular time will vary based upon market conditions, and will be determined by the term to maturity of the L Bonds, our capital requirements and other factors described below. The interest rate on particular L Bonds will be determined at the time of subscription or renewal and then remain fixed for the original or renewal term of the L Bond. We will establish and may change the interest rates payable for L Bonds of various terms and at various investment levels in an interest rate supplement to this prospectus.

We may offer L Bonds that earn incrementally higher interest rates when, at the time they are purchased or renewed, the aggregate principal amount of the L Bond portfolio of the holder increases. If applicable, the interest rates payable at each level of investment will be set forth in an interest rate supplement to this prospectus. We may change the interest rate for any or all maturities to reflect market conditions at any time by supplementing this prospectus. If we change the interest rates, the interest rate on L Bonds issued before the date of the change will not be affected.

**Payments on the L Bonds; Paying Agent and Registrar**

Investors will have the opportunity to select whether interest on their L Bonds will be paid monthly or annually. For investors using direct settlement with the Company, this selection opportunity will be presented in the Subscription Agreement.

Interest will accrue on the L Bonds at the stated rate from and including the effective date of the L Bond until maturity. The effective date of an L Bond will be as follows:

- If you purchase an L Bond through DTC settlement, the first business day after the monthly closing cycle with DTC. In this regard, you should be aware that the final settlement date for participating in a closing cycle will generally require you to have paid your subscription no later than the last business day of the prior calendar month. So for example, to participate in a closing cycle on which L Bonds will be issued on May 1, your DTC settlement subscription must be effected and paid for no later than April 30 (if April 30 is a business day, and if not then the last business day prior to April 30).

- If you purchase an L Bond through direct settlement with the Company, the effective date of your L Bond purchase will be the following, as applicable: (i) in cases where you pay for your bond via wire transfer directly to us, the first business day of the next calendar month after which we receive the wire; (ii) in cases where you pay for your bond by bank draft directly to us, the first business day of the next calendar month after which we receive the draft; or (iii) in cases where you pay for your bond by personal check, the first business day of the calendar month that is at least five full business days after which we receive the check. In all cases involving direct settlement with the Company, we must also have received your completed and executed Subscription Agreement.

48

Interest payments on L Bonds will be paid on the 15th day immediately following the last day of the applicable interest payment period. Interest will be paid without any compounding. The first payment of interest will include interest for the partial period in which the purchase occurred. The indenture provides that all interest will be calculated based on a year with twelve 30-day months.

If you purchase your L Bond Units through direct settlement, we will pay the principal of, and interest on, L Bonds by direct deposit to the account you specify in your Subscription Agreement. We will not accept subscriptions from investors who are not willing to receive their interest payments via direct deposit. If the foregoing payment method is not available, principal and interest payments on the L Bonds will be payable at our principal executive office or at such other place as we may designate for payment purposes. If you purchase your L Bond Units through DTC settlement, our payments of principal and interest will be paid to the depositary (DTC) and then be credited to your brokerage or custodial account through the DTC procedures followed by your brokerage firm or custodian. For more information, please see "Registration and Exchange — Global Certificates Deposited with DTC" below.

We will withhold 28% of any interest payable to any investor who has not provided us with a social security number, employer identification number, or other satisfactory equivalent in the Subscription Agreement (or another document) or where the IRS has notified us that backup withholding is otherwise required. Please see "Material Federal Income Tax Considerations — Backup Withholding and Information Reporting."

**Registration and Exchange**

The L Bonds that we settle directly will generally be issued in book-entry form, which means that no physical L Bond is created, subject, however, to limited exceptions described in the indenture. The L Bonds settled through DTC settlement will be represented by global certificates deposited with the depositary as described below.

### *Book-Entry Registration*

Evidence of your ownership will be provided by written confirmation. As described below, holders may, under certain circumstance described below, opt to receive physical delivery of a certificated security that evidences their L Bonds. Otherwise, the issuance and transfer of L Bonds will be accomplished exclusively through the crediting and debiting of the appropriate accounts in our book-entry registration and transfer system.

The holders of the accounts established upon the purchase or transfer of L Bonds will be deemed to be the owners of the L Bonds under the indenture. The holder of the L Bonds must rely upon the procedures established by the trustee to exercise any rights of a holder of L Bonds under the indenture. We will regularly provide the trustee with information regarding the establishment of new accounts and the transfer of existing accounts.

On or prior to any interest payment date or upon redemption, we will also provide the trustee with information regarding the total amount of any principal and interest due to holders of L Bonds. On each interest payment date, we will credit interest due on each account and direct payments to the holders. We will determine the interest payments to be made to the book-entry accounts and maintain, supervise and review any records relating to book-entry accounts for the L Bonds.

Book-entry notations in the accounts evidencing ownership of the L Bonds are exchangeable for certificated L Bonds only: (i) at the request of the holder, at the end of the Company's next fiscal quarter; or (ii) after the occurrence of an event of default under the indenture, if holders of more than 50% of the aggregate outstanding principal amount of the L Bonds advise the trustee in writing that the continuation of a book-entry system is no longer in the best interests of the holders of L Bonds. In its discretion, the Company may elect to terminate the book-entry system and replace book-entry notations with physical certificates.

### *Global Certificates Deposited with DTC*

L Bonds may be issued in the form fully registered global certificates deposited with, or on behalf of, The Depository Trust Company ("DTC"), New York, NY, and registered in the name of Cede & Co., as nominee of DTC. Unless and until exchanged, in whole or in part, for L Bonds in definitive registered form, a global certificate may not be transferred except as a whole by the depositary to a nominee of such depositary, by a nominee of such depositary to such depositary or another nominee of such depositary, or by such depositary or any nominee of such depositary to a successor of such depositary or a nominee of such successor.

49

DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act. DTC was created to hold securities of its participants and to facilitate the clearance and settlement of securities transactions, such as transfers and pledges, among its participants in such securities through electronic computerized book-entry changes in accounts of the participants, thereby eliminating the need for physical movement of securities certificates. DTC's participants include securities brokers and dealers (including the managing broker-dealer), banks, trust companies, clearing corporations and certain other organizations, some of whom own DTC. Access to DTC's book-entry system is also available to others, such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a participant, either directly or indirectly. The rules applicable to DTC and its participants are on file with the SEC.

If available, purchases of L Bonds within the DTC system must be made by or through direct participants, which will receive a credit for the L Bonds on DTC's records. The ownership interest of each beneficial owner of the L Bonds will be recorded on the direct and indirect participants' records. Beneficial owners will not receive written confirmation from DTC of their purchases, but beneficial owners are expected to receive written confirmations providing details of the transactions, as well as periodic statements of their holdings, from the direct or indirect participants through which the beneficial owners entered into the transaction. Transfers of ownership interests in the L Bonds are to be accomplished by entries made on the books of participants acting on behalf of beneficial owners.

To facilitate subsequent transfers, all L Bonds deposited by participants with DTC will be registered in the name of DTC's nominee, Cede & Co. The deposit of L Bonds with DTC and their registration in the name of Cede & Co. will effect no change in beneficial ownership. DTC will have no knowledge of the actual beneficial owners of the L Bonds. DTC's records will reflect only the identity of the direct participants to whose accounts such notes are credited, which may or may not be the beneficial owners. The participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to direct participants, by direct participants to indirect participants and by direct and indirect participants to beneficial owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

We will make payments due on the notes to Cede & Co., as nominee of DTC, in immediately available funds. DTC's practice is to credit direct participants' accounts, upon DTC's receipt of funds and corresponding detailed information, on the relevant payment date in accordance with their respective holdings shown on DTC's records. Payments by participants to beneficial owners will be governed by standing instructions and customary practices, as is the case with securities held for the account of customers in bearer form or registered in "street name," and will be the responsibility of such participant and not our responsibility or that of DTC, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment to Cede & Co. is our responsibility. Disbursement of such payments to direct participants is the responsibility of Cede & Co. Thereafter, disbursement of such payments to the beneficial owners is the responsibility of direct and indirect participants (i.e., brokers, dealers and custodians).

Except as provided herein, a beneficial owner of an interest in a global certificate will not be entitled to receive physical delivery of the L Bonds. Accordingly, each beneficial owner must rely on the procedures of DTC to exercise any rights under the L Bonds. The laws of some jurisdictions require that certain purchasers of securities take physical delivery of securities in definitive form. Such laws may impair the ability to transfer beneficial interests in a global certificate.

As long as the depositary, or its nominee, is the registered holder of a global certificate, the depositary or such nominee will be considered the sole owner and holder of the L Bonds represented thereby for all purposes under the L bonds and the indenture. Except in the limited circumstances referred to below, owners of beneficial interests in a global certificate will not be entitled to have such global certificate or any L Bonds represented thereby registered in their names, will not receive or be entitled to receive physical delivery of certificated L Bonds in exchange for the global certificate and will not be considered to be the owners or holders of such global certificate or any certificates represented thereby for any purpose under the L Bonds or the indenture. Accordingly, each person owning a beneficial interest in such global certificate must rely on the procedures of the depositary and, if such person is not a participant, on the procedures of the participant through which such person owns its interest to exercise any rights of a holder under the indenture.

App. 0218

50

App. 0219

If the depositary for a global certificate representing L Bonds is at any time unwilling or unable to continue as depositary and a successor depositary is not appointed by us within 90 days, we will issue L Bonds in definitive form in exchange for such global certificate. In addition, we may at any time and in our sole discretion determine not to have the L Bonds represented by one or more global certificates and, in such event, we will issue the notes in definitive form in exchange for all of the global certificates representing the L Bonds. Finally, if an event of default, or an event which with the giving of notice or lapse of time or both would constitute an event of default, with respect to the L Bonds represented by a global certificate has occurred and is continuing, then we will issue L Bonds in definitive form in exchange for all of the global certificates representing the notes.

Although DTC has agreed to the procedures provided above in order to facilitate transfers, it is under no obligation to perform these procedures, and these procedures may be modified or discontinued at any time.

**Limited Rescission Right**

If you are purchasing L Bonds through direct settlement with the Company and your Subscription Agreement is accepted at a time when we have determined that a post-effective amendment to the registration statement of which this prospectus is a part must be filed with the SEC, but such post-effective amendment has not yet been declared effective, we will send to you at your registered address a notice and a copy of the related prospectus once it has been declared effective. You will thereupon have the right to rescind your investment upon written request within ten business days from the postmark date of the notice we send to you that the post-effective amendment has been declared effective (and containing the related prospectus). We will promptly return any funds sent with a Subscription Agreement that is properly rescinded without penalty, although any interest previously paid on a rescinded L Bond will be deducted from the funds returned to you upon rescission. A written request for rescission, except in the case of a mailed rescission, must be postmarked on or before the tenth business day after our notice to you (described above). If you notify us other than by mail, we must actually receive your rescission request on or before the tenth business day after our notice to you.

We will not accept purchases of L Bonds through DTC settlement if, as of the end of the monthly closing for DTC settlement, we have determined that a post-effective amendment to the registration statement of which this prospectus is a part must be filed with the SEC, but such post-effective amendment has not yet been declared effective. In any such case, settlement of your L Bond purchase must occur in the following month.

**Renewal or Repayment on Maturity**

At least 30 days prior to the maturity of your L Bond, we will provide you with a notice indicating that your L Bond is about to mature and whether we will allow automatic renewal of your L Bond. If we allow you to renew your L Bond, we will also provide to you the then-current form of prospectus, which may include an interest rate or prospectus supplement and any other updates to the information contained in this prospectus. The prospectus, or the interest rate or prospectus supplement, will set forth the interest rates then in effect. The notice will recommend that you review the then-current prospectus, including any interest rate or prospectus supplement, prior to exercising one of the below options. If we do not provide you a new prospectus because the prospectus has not changed since the delivery of this prospectus in connection with your original investment or any prior renewal, we will nonetheless send you a new copy of the prospectus upon your request. Unless the election period is extended as described below, you will have until 15 days prior to the maturity date to exercise one of the following options:

- You can do nothing, in which case (subject to applicable law) your L Bond will automatically renew for a new term equal to the original term but at the interest rate in effect at the time of renewal. Interest on renewed L Bonds will be paid on the same schedule (i.e., monthly or annually) as the original L Bond. If applicable, a new certificate will be issued.

- You can elect repayment of your L Bond, in which case the principal amount will be repaid in full along with any accrued but unpaid interest. If you choose this option, your L Bond will not earn interest on or after the maturity date.

- You can elect repayment of your L Bond and use all or part of the proceeds to purchase a new L Bond with a different term or principal amount. To exercise this option, you will need to complete a new Subscription Agreement for the new L Bond and mail it along with your request, or else work with your broker if you wish to purchase your new L Bond through DTC settlement. Any proceeds from the old L Bond that are not applied to the new L Bond will be sent to you.

App. 0220

App. 0221

The foregoing options will be available to holders unless and until terminated under the indenture. Interest will accrue from the first day of each renewed term. Each renewed L Bond will retain all its original provisions, including provisions relating to payment, except that the interest rate payable during any renewal term will be the interest rate that is being offered at that time to other holders with similar aggregate L Bond portfolios for L Bonds of the same term as set forth in the interest rate supplement delivered with the maturity notice. If similar L Bonds are not then being offered, the (i) interest rate upon renewal will be the rate specified by us on or before the maturity date, or the rate of the existing L Bond if no such rate is specified, and (ii) the maturity will, if L Bonds of the same maturity are being offered at the time of renewal, be the same or, if not, the next earliest maturity.

If we notify the holder of our intention to repay an L Bond at maturity, or if the holder timely requests repayment, we will pay the principal and all accrued but unpaid interest on the L Bond on or prior to the fifth day of the calendar month after the maturity date (or the first business day following the fifth day of such month). Thus, in the case of an L Bond with a maturity date of January 31, 2016, actual payment will be made on or prior to February 5, 2016 (unless such date is not a business day, in which case actual payment will be made on the next business day). No interest will accrue after the maturity date. You should be aware that because payment is made by ACH transfer, funds may not be received in the holder's account for two to three business days.

We will be required from time to time to file post-effective amendments to the registration statement of which this prospectus is a part to update the information it contains. If you would otherwise be entitled to renew your L Bonds upon their stated maturity at a time when we have determined that a post-effective amendment must be filed with the SEC, but such post-effective amendment has not yet been declared effective, then the period during which you can elect renewal (or repayment) will be automatically extended until ten days following the postmark date of our notice to you that the post-effective amendment has been declared effective, which notice shall contain a copy of the related prospectus. All other provisions relating to the renewal or redemption of L Bonds upon their stated maturity described above shall remain unchanged.

For any L Bonds offered hereby that mature on or after the three-year anniversary of the date on which the registration statement of which this prospectus is a part shall have been declared effective, we expect that the renewal of such L Bonds may require us to file a new registration statement. In such a case, the new registration statement must be declared effective before we can renew your L Bond. In this event, if the new registration statement has not yet been filed or become effective, we will extend your election period until ten days following the date of our notice to you that the new registration statement has become effective, which notice will include a new prospectus.

**Call and Redemption Prior to Stated Maturity**

We may call and redeem, in whole or in part, principal amount and accrued but unpaid interest on any L Bonds prior to their stated maturity only as set forth in the indenture and described below. The holder has no right to put or otherwise require us to redeem any L Bond prior to its maturity date (as originally stated or as it may be extended), except as indicated in the indenture and described below.

*Our Voluntary Redemption*

We have the right to redeem any L Bond, in whole or in part, at any time prior to its stated maturity upon at least 30 days written notice to the holder of the L Bond. The holder of the L Bond being redeemed will be paid a redemption price equal to the outstanding principal amount thereof plus accrued but unpaid interest up to but not including the date of redemption without any penalty or premium. We may use any criteria we choose to determine which L Bonds we will redeem if we choose to do so. We are not required to redeem L Bonds on a pro rata basis.

*Holder's Put Election Upon Death, Bankruptcy or Total Permanent Disability*

L Bonds may be redeemed prior to maturity at the election of a holder who is a natural person (including L Bonds held in an individual retirement account and the holders of a beneficial interest in a global certificate held by a depositary or its nominee), by giving us written notice within 45 days following the holder's total permanent disability or bankruptcy, as established to our satisfaction, or at the election of the holder's estate, by giving written notice within 45 days following the death of the holder. Subject to the limitations described below, we will redeem the L Bonds not later than the 15th day of the month next following the month in which we establish to our satisfaction the holder's death, bankruptcy or total permanent disability. In the event that the 15th day of the month

next following the month in which we so establish such facts is not a business day, we will redeem the L Bonds on the next business day. The redemption price, in the event of

52

such a death, bankruptcy or total permanent disability, will be the entire principal amount of the L Bonds, plus accrued but unpaid interest thereon up to and through the last day of the calendar month preceding the redemption date.

If spouses are joint registered holders of an L Bond, the right to elect to have us redeem L Bonds will apply when either registered holder dies, files bankruptcy or suffers a total permanent disability. If the L Bond is held jointly by two or more persons who are not legally married, none of these persons will have the right to request that we redeem the L Bonds unless all joint holders have died, filed bankruptcy or suffered a total permanent disability. If the L Bond is held by a trust, partnership, corporation or other similar entity, the right to request redemption upon death or total permanent disability does not apply.

### *Redemption at Request of Holder*

We have no obligation to redeem any L Bonds other than upon maturity, or upon the death, bankruptcy or total permanent disability of a natural person holder. Nevertheless, at our sole discretion we may agree from time to time, at the written request of a holder (including the holder of a beneficial interest in a global certificate held by a depositary or its nominee), to redeem an L Bond, subject, however, to a redemption fee of 6.0% of the principal amount of such L Bond. If we so redeem any L Bond prior to maturity, we will redeem the entire principal amount of such L Bond together with accrued but unpaid interest thereon, The redemption fee will be subtracted from the amount paid to you.

### Transfers

The L Bonds will be transferable in accordance with the indenture. For L Bonds that are issued solely in book-entry form, transfers will be effective only upon the delivery to us of an executed assignment or other conveyance instrument in customary form. For L Bonds that are represented by a global certificate held by a depositary or its nominee, transfers of beneficial interests in such certificate must be effected in accordance with the procedures and rules of the depositary.

Upon transfer of an L Bond, we will provide the new holder of the L Bond with a purchase confirmation that will evidence the transfer of the account on our records. If applicable (e.g., if transferred to a custodial account), a new certificate will be issued. No written confirmations will be provided with respect to transfers of beneficial interests in a global certificate held by a depositary or its nominee.

### Quarterly Statements

We will provide holders of the L Bonds with quarterly statements, which will indicate, among other things, the account balance at the end of the quarter, interest credited, redemptions made, if any, and the interest rate paid during the quarter. These statements will be sent electronically on or prior to the 10th business day after the end of each calendar quarter. If a holder is unwilling or unable to receive quarterly statements electronically, we will mail the statements to the address of record on or prior to the 10th business day after the end of each calendar quarter. In such a case, we may charge such holders a reasonable fee to cover our expenses incurred in mailing the statements.

### Ranking

The L Bonds will constitute secured debt of GWG Holdings. The payment of principal and interest on the L Bonds will be:

- pari passu with respect to payment and collateral securing the approximately $24.0 million in outstanding principal amount of Series I Secured Notes previously issued by our subsidiary GWG Life, and the L Bonds previously issued by GWG Holdings, Inc. (originally under the name Renewable Secured Debentures and later renamed "L Bonds" upon the effectiveness of the registration statement of which this prospectus is a part), of which approximately $282.2 million in principal amount is outstanding as of December 31, 2015 (see the caption "— Collateral Security" below);

- structurally junior to the present and future obligations owed by our subsidiaries DLP II and DLP III under the senior revolving credit facility with Autobahn/DZ Bank (including the approximately $65 million outstanding under such facility as of December 31, 2015), and structurally or contractually junior to any future obligations that DLP II and DLP III or other primary obligors or guarantors may have under future senior secured borrowing facilities; and

App. 0224

53

- structurally junior to the present and future claims of creditors of our subsidiaries, other than GWG Life, including trade creditors, including trade creditors.

The indenture will permit us to issue other forms of debt, including secured and senior debt, in the future.

"Pari passu" means that claims for payment and entitlement to security among the holders of L Bonds, the holders of previously issued L Bonds, and the holders of Series I Secured Notes previously issued by GWG Life, together with the holders of any later-created class of "pari passu debt," will be treated equally and without preference. Although we have no present intention of causing GWG Life to issue additional secured debt in the future, any such debt issued on a pari passu basis in the future would also be treated equally and without preference in respect of the L Bonds, the previously issued L Bonds and Series I Secured Notes. We may continue our offering of Series I Secured Notes and previously issued L Bonds for renewals only, and any such debt issued on a pari passu basis in the future would also be treated equally and without preference in respect of the L Bonds and any secured debt issued by GWG Life. Thus, in the event of any default on the L Bonds (or any other debt securities of ours that is pari passu with the L Bonds) resulting in claims for payment or claims on collateral security, the holders of the L Bonds and all such other debt securities pari passu with the L Bonds would share in payment or collateral in proportion to the amount of principal and interest owed on each such debt instrument.

**Guarantee by GWG Life Subsidiary**

The payment of principal and interest on the L Bonds is fully and unconditionally guaranteed by GWG Life. This guarantee, together with (i) the accompanying grant of a security interest in all of the assets of GWG Life, (ii) the pledge of ownership interests in GWG Holdings, Inc. by our principal stockholders, and (iii) an intercreditor agreement, as amended, between Bank of Utah (on behalf of the L Bond holders and on behalf of the holders of previously issued L Bonds) and Lord Securities Corporation (the collateral trustee for the Series I Secured Notes), make the L Bonds pari passu with the Series I Secured Notes and the previously issued L Bonds with respect to payment, security and collateral. For an explanation of the term "pari passu," see "— Ranking" above. There were approximately $24.0 million in principal amount of Series I Secured Notes and approximately $282.2 million in principal amount of previously issued L Bonds outstanding as of December 31, 2015.

**Collateral Security**

The L Bonds are secured by the assets of GWG Holdings, Inc. We will grant a security interest in all of the assets of GWG Holdings to the indenture trustee for the benefit of the L Bond holders. The assets of GWG Holdings consist, and are expected to consist, primarily of (i) any cash proceeds received from its subsidiaries as distributions derived from life insurance assets of subsidiaries, (ii) all other cash and investments held in various accounts, (iii) the equity ownership interests in subsidiaries of GWG Holdings, including the equity ownership interest in GWG Life, together with (iv) all proceeds from the foregoing. This collateral security granted by us is referred to as the "GWG Holdings Assets Collateral."

As indicated above, our direct and wholly owned subsidiary, GWG Life, will fully and unconditionally guarantee our obligations under the L Bonds. This guarantee will be supported by GWG Life's grant of a security interest in all of its assets. The assets of GWG Life consist, and are expected to consist, primarily of (i) certain life insurance assets, (ii) any cash proceeds received from life insurance assets owned by GWG Life or received from its direct subsidiaries DLP II and DLP III distributions derived from life insurance policies owned by that subsidiary, (iii) all other cash and investments held by GWG Life in its various accounts, (iv) GWG Life's equity ownership interest in its direct subsidiaries DLP II and DLP III, together with (v) all proceeds from the foregoing. The collateral security granted by GWG Life pursuant to its guarantee of our obligations under the L Bonds is referred to as the "GWG Life Assets Collateral."

In addition, Messrs. Jon R. Sabes and Steven F. Sabes, our principal stockholders beneficially holding approximately 74% of the outstanding shares of our common stock, have pledged all of the shares they own in GWG Holdings to further secure our obligations under the L Bonds. This collateral security granted by Messrs. Jon R. Sabes and Steven F. Sabes is referred to as the "GWG Holdings Equity Collateral."

Together, the GWG Holdings Assets Collateral, GWG Life Assets Collateral and GWG Holdings Equity Collateral comprise all of the collateral security for our obligations under the L Bonds. To the extent that we subsequently establish one or more wholly owned subsidiaries of GWG Holdings or GWG Life, the L Bonds will have a security interest in the equity ownership interests of those subsidiaries if and to the extent owned by GWG Holdings or GWG Life.

App. 0227

The guarantee by GWG Life is contained in the indenture, and the grant of security interests in the GWG Holdings Assets Collateral, GWG Life Assets Collateral and GWG Holdings Equity Collateral is effected through a "Pledge and Security Agreement" that is an exhibit to the indenture and has been amended in connection with this offering of L Bonds. The grant of collateral security comprising the GWG Life Assets Collateral and GWG Holdings Equity Collateral is designed to afford the holders of L Bonds with rights to the same payment and collateral as that granted to holders of our Series I Secured Notes and the holders of our previously issued L Bonds on a pari passu basis. To effect this arrangement, the trustee under the indenture, Bank of Utah (to whom the security grant for L Bonds and the previously issued L Bonds are made under the Pledge and Security Agreement, as amended), has entered into an "Intercreditor Agreement" with Lord Securities Corporation (the trustee for our Series I Secured Notes). This intercreditor agreement is an exhibit to the indenture and has been amended in connection with this offering of L Bonds. Neither the indenture nor the Pledge and Security Agreement contain any provision preventing a pledging party from disposing of any collateral in the ordinary course of business. In this regard, the Pledge and Security Agreement permits the disposition of GWG Holdings Equity Collateral to the extent the number of shares continuing to constitute such collateral represents at least 10% of the number of shares held by each individual grantor as of the date of the Pledge and Security Agreement.

A majority of our life insurance assets are held in our subsidiaries. The L Bonds will not be directly secured by any security interest in the assets of DLP II and DLP III. Instead, the L Bonds will be secured by a pledge of the equity ownership interests in DLP II and DLP III owned by GWG Life by virtue of the guarantee provisions in the indenture and the Pledge and Security Agreement referenced above. An equity ownership interest is, by its very nature, subordinate to the interests of creditors. **Therefore, although investors in the L Bonds will have a security interest in the ownership of DLP II and DLP III, any claim they may have to the assets owned by such entity will be subordinate to the interests of creditors of that entity, including (i) Autobahn/DZ Bank which is the lender to DLP II and DLP III under our senior revolving credit facility, and (ii) all other creditors of DLP II and DLP III, including trade creditors. In addition, there is the risk that the collateral security granted for our obligations under the L Bonds may be insufficient to repay the L Bonds upon an event of default. See "Risk Factors," pag**e **19** *("The collateral granted as security...").*

**Subordination; Other Indebtedness**

Our obligations under the L Bonds will be subordinate to all our senior debt. For this purpose, "our senior debt" presently includes all indebtedness of our subsidiaries with respect to which the L Bonds are not pari passu with respect to payment and collateral (i.e., other than our Series I Secured Notes and previously issued L Bonds). In this regard, our subsidiary DLP Funding II has, as of December 31, 2015, approximately $65 million of debt outstanding under our senior revolving credit facility. With respect to pari passu indebtedness, as of December 31, 2015 our subsidiary GWG Life has approximately $24.0 million of debt outstanding under our Series I Secured Notes, and we had approximately $282.2 million of debt outstanding under our previously issued L Bonds.

The maximum amount of debt, including the L Bonds, we may issue is limited by the indenture. In particular, the indenture prohibits us from issuing debt in an amount such that our "debt coverage ratio" would exceed 90%. The indenture defines the debt coverage ratio as a percentage calculated by the ratio of (A) obligations owing by us and our subsidiaries on all outstanding debt for borrowed money (including the L Bonds), over (B) the net present asset value of all life insurance assets we own, directly or indirectly, plus any cash held in our accounts. For this purpose, the net present asset value of our life insurance assets is equal to the present value of the cash flows derived from the face value of policy benefit assets we own, discounted at a rate equal to the weighted average cost of capital for all our indebtedness for the prior month.

We are required to notify the indenture trustee in the event that we violate this restrictive covenant. An "event of default" will exist under the indenture if a violation of this covenant persists for a period of 30 calendar days after our initial notice to the trustee. The L Bonds are guaranteed by GWG Life but otherwise are not guaranteed by any of our subsidiaries, affiliates or control persons. Neither indenture nor the Pledge and Security Agreement prevent holders of debt issued by our subsidiaries from disposing of, or exercising any other rights with respect to, any or all of the collateral securing that debt. Accordingly, in the event of a liquidation or dissolution of one of our subsidiaries (other than GWG Life), creditors of that subsidiary that are senior in rank will be paid in full, or provision for such payment will be made, from the assets of that subsidiary prior to distributing any remaining assets to us as an equity owner of that subsidiary.

The indenture also contains specific subordination provisions, benefitting lenders under senior credit facilities to our operating subsidiaries, restricting the right of L Bond holders to enforce certain of their rights in certain circumstances, including:

- a prohibition on challenging any enforcement action taken by a senior lender or interfering with any legal action or suits undertaken by the senior lender against us and our affiliates;

- a 180-day standstill period during which there may not be brought any action to enforce an event of default against us or our affiliates unless our senior revolving credit facility has been repaid in full, which period may be extended if the credit facility provider takes action during such standstill period; and

- a prohibition on filing a bankruptcy or insolvency case against us or our affiliates for at least one year plus one day after the senior revolving credit facility lender has been paid in full.

We will not make any payment, direct or indirect (whether for interest, principal, as a result of any redemption or repayment at maturity, on default, or otherwise), on the L Bonds and any other indebtedness, and neither the holders of the L Bonds nor the trustee will have the right, directly or indirectly, to sue to enforce the indenture or the L Bonds, if a default or event of default under any senior credit facility has occurred and is continuing, or if any default or event of default under any senior credit facility would result from such payment, in each case unless and until:

- the default and event of default has been cured or waived or has ceased to exist; and

- the end of the period commencing on the date the indenture trustee receives written notice of default from a holder of such credit facility and ending on the earlier of the indenture trustee's receipt of (i) a valid waiver of default from the holder of a credit facility, or (ii) a written notice from the holder of a credit facility terminating the payment blockage period.

Notwithstanding the foregoing, if any of the blockage events described above have occurred and 179 days have passed since the indenture trustee's receipt of the notice of default without the occurrence of the cure, waiver, termination, or extension of all blockage periods described above, the trustee may thereafter sue on and enforce the indenture and our obligations thereunder and under the L Bonds as long as any funds paid as a result of any such suit or enforcement action shall be paid toward the senior credit facility until it is indefeasibly paid in full before being applied to the L Bonds. The indenture contains provisions whereby each investor in the L Bonds consents to the subordination provisions contained in the indenture and related agreements governing collateral security.

If the 180-day standstill period noted above or any other limitation on the rights of the trustee or L Bond holders to assert their rights to payment of principal or interest under the indenture or L Bonds is ultimately determined to conflict with provisions of the Trust Indenture Act of 1939 (most notably sections 316(b) and 317(a) of that Act), then the trustee, as well as any holder who shall not have earlier consented to such subordination provisions, shall (notwithstanding such provision contained in the indenture) be authorized to institute a lawsuit for the enforcement of any payment of principal or interest after their respective due dates.

**No Sinking Fund**

The L Bonds are not associated with any sinking fund. A sinking fund is generally any account to which contributions will be made, from which payments of principal or interest owed on the L Bonds will be made. See "Risk Factors," page 19.

**Restrictive Covenants**

The indenture contains covenants that restrict us from certain actions as described below. In particular, the indenture provides that:

- we will not declare or pay any dividends or other payments of cash or other property solely in respect of our capital stock to our stockholders (other than a dividend paid in shares of our capital stock on a pro rata basis to all our stockholders) unless no default and no event of default with respect to the L Bonds exists or would exist immediately following the declaration or payment of the dividend or other payment;

- to the extent legally permissible, we will not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or the performance of the indenture;

App. 0229

56

App. 0230

- our Board of Directors will not adopt a plan of liquidation that provides for, contemplates or the effectuation of which is preceded by (a) the sale, lease, conveyance or other disposition of all or substantially all of our assets, otherwise than (i) substantially as an entirety, or (ii) in a qualified sales and financing transaction, and (b) the distribution of all or substantially all of the proceeds of such sale, lease, conveyance or other disposition and of our remaining assets to the holders of our capital stock, unless, prior to making any liquidating distribution pursuant to such plan, we make provision for the satisfaction of our obligations under the renewable unsecured subordinated notes; and

- our debt coverage ratio may not exceed 90%.

The indenture defines the debt coverage ratio as a percentage calculated by the ratio of (A) obligations owing on all outstanding debt for borrowed money (including the L Bonds), over (B) the net present asset value of all life insurance assets we own, plus any cash held in our accounts. For this purpose, the net present asset value of our life insurance assets is equal to the present value of the face value of policy benefit assets we own, discounted at a rate equal to the weighted-average cost of capital for all our indebtedness for the prior month.

Importantly, we are not restricted from entering into "qualified sale and financing transactions" as defined — in the indenture, or incurring additional indebtedness, including additional senior debt.

**Consolidation, Mergers or Sales**

The indenture generally permits a consolidation or merger between us and another entity. It also permits the sale or transfer by us of all or substantially all of our property and assets. These transactions are permitted if:

- the resulting or acquiring entity, if other than us, is a United States corporation, limited liability company or limited partnership and assumes all of our responsibilities and liabilities under the indenture, including the payment of all amounts due on the notes and performance of the covenants in the indenture; and

- immediately after the transaction, and after giving effect to the transaction, no event of default shall exist under the indenture.

If we consolidate or merge with or into any other entity or sell or lease all or substantially all of our assets, according to the terms and conditions of the indenture, the resulting or acquiring entity will be substituted for us in the indenture with the same effect as if it had been an original party to the indenture. As a result, the successor entity may exercise our rights and powers under the indenture in our name, and we (as an entity) will be released from all our liabilities and obligations under the indenture and under the L Bonds. Nevertheless, no such transaction will by itself eliminate or modify the collateral that we have provided as security for our obligations under the indenture.

**Events of Default and Remedies**

The indenture provides that each of the following constitutes an event of default:

- the failure to pay interest or principal on any L Bond for a period of 30 days after it becomes due and payable;

- a failure to observe or perform any material covenant, condition or agreement in the indenture, but only after notice of failure from the indenture trustee and such failure is not cured within 60 days;

- our debt coverage ratio exceeds 90% for a period of 30 consecutive calendar days, but only after notice of such breach from the indenture trustee and such breach is not cured within 60 days;

- certain events of bankruptcy, insolvency or reorganization with respect to us; or

- the cessation of our business.

In addition, the indenture provides that for so long as any Series I Secured Notes or L Bonds remain outstanding, an event of default under the borrowing agreements relating to the Series I Secured Notes or L Bonds (as the same may from time to time be amended) will constitute an event of default under the indenture. In this regard, a default under the Series I Secured Note or L Bond borrowing agreements includes a default under our senior revolving credit facility. As explained in other parts of this prospectus, our senior revolving credit facility is currently provided by

App. 0231

App. 0232

Autobahn Funding Company, LLC, as conduit lender, and DZ Bank AG Deutsche Zentral-Genossenschaftsbank, as commited lender and agent, pursuant to a Credit and Security Agreement dated July 15, 2008, which was amended and restated effective as of May 11, 2015. DLP II is the borrower under the line of credit, and GWG Holdings is a party to the facility as performance guarantor (primarily for the obligations of GWG Life, as the servicer of policy assets).

The maximum line of credit is $105 million subject to a borrowing base, which permits us to borrow up to 70% of the amount of eligible policies purchased and held in our portfolio. As of December 31, 2015, approximately $65 million was outstanding under the line of credit. Proceeds of the line of credit may be used to purchase policies and loans. The credit facility matures in June 30, 2018. Advances under the line of credit bear interest based either at the commercial paper rates available to the lender at the time of funding or at the lender's cost of borrowing plus an applicable margin.

The line of credit is secured by a pledge of substantially all of each borrower's assets and requires GWG Holdings to provide certain indemnities to the lender. The line of credit is subject to customary affirmative and negative covenants. In addition, we must maintain certain financial covenants, including a positive consolidated net income measured annually and, at all times, a tangible net worth of not less than $45 million (calculated on a prescribed non-GAAP basis). In addition, the line of credit requires us to maintain cash and eligible investments at $15 million or above.

Finally, the line of credit is subject to certain customary events of default (e.g., payment defaults, covenant defaults, cross-defaults, material adverse change, changes in control and changes in management) and certain events of default specifically relating to our business, including but not limited to (i) portfolio defaults in excess of 10% on an annualized basis, (ii) failure to obtain an unqualified opinion on our annual consolidated financial statements, (iii) failure to maintain certain hedge transactions or replace hedge counterparties under any certain hedging transactions required under the credit agreement, (iv) any governmental authority directs that the purchase and/or servicing of loans be terminated or any law, rule or regulation makes it unlawful to originate, purchase and/or service loans, (v) the performance guaranty of GWG Holdings shall cease to be in full force and effect (vi) a deficiency in the borrowing base, as calculated under the credit agreement, or (vii) any default in the payment when due of other indebtedness in excess of $100,000.

The indenture requires that we give immediate notice to the indenture trustee upon the occurrence of an event of default, unless it has been cured or waived. The indenture trustee may then provide notice to the L Bond holders or withhold the notice if the indenture trustee determines in good faith that withholding the notice is in your best interest, unless the default is a failure to pay principal or interest on any L Bond.

If an event of default occurs, the indenture trustee or the holders of at least 25% in principal amount of the outstanding L Bonds, may by written notice to us declare the unpaid principal and all accrued but unpaid interest on the L Bonds to be immediately due and payable. Notwithstanding the foregoing, the indenture limits the ability of the L Bond holders to enforce certain rights under the indenture in certain circumstances. These limitations are required subordination provisions under our senior revolving credit facility and are summarized above under "— Subordination; Other Indebtedness." The Pledge and Security Agreement permits the trustee to exercise on behalf of the holders of L Bonds all rights and remedies as are available to a secured creditor under applicable law, subject to any limitations in the indenture, that agreement or the intercreditor agreement. In this regard, the trustee is not authorized under the Pledge and Security Agreement to distribute in kind any collateral in its possession to the holders of L Bonds.

**Amendment, Supplement and Waiver**

Except as provided in this prospectus or the indenture, the terms of the indenture or the L Bonds then outstanding may be amended, supplemented or waived with the consent of the holders of at least a majority in principal amount of the L Bonds then outstanding (which consent will be presumed if a holder does not object within 30 days of a request for consent), and any existing default or compliance with any provision of the indenture or the L Bonds may be waived with the affirmative consent of the holders of a majority in principal amount of the then outstanding L Bonds.

Notwithstanding the foregoing, an amendment or waiver will not be effective with respect to the L Bonds held by a holder who him, her or itself has not consented if such amendment or waiver:

- reduces the principal of, or changes the fixed maturity of, any L Bond;

- reduces the rate of or changes the time for payment of interest, including default interest, on any L Bond;

App. 0234

- waives a default or event of default in the payment of principal or interest on the L Bonds, except for a rescission or withdrawal of acceleration of the L Bonds made by the holders of at least a majority in aggregate principal amount of the then-outstanding L Bonds and a waiver of the payment default that resulted from such acceleration;

- makes any change in the provisions of the indenture relating to waivers of past defaults or the rights of holders of L Bonds to receive payments of principal of or interest on the L Bonds; or

- makes any change to the subordination provisions of the indenture that has a material adverse effect on holders of L Bonds.

Notwithstanding the foregoing, the following kinds of amendments or supplements to the indenture may be effected by us and the trustee without any consent of any holder of the L Bonds:

- to cure any ambiguity, defect or inconsistency;

- to provide for assumption of our obligations to holders of the L Bonds in the case of a merger, consolidation or sale of all or substantially all of our assets;

- to provide for additional uncertificated or certificated L Bonds;

- to make any change that does not materially and adversely affect the legal rights under the indenture of any holder of L Bonds, including but not limited to an increase in the aggregate dollar amount of L Bonds which may be outstanding under the indenture and limited in amount thereunder;

- to modify or eliminate our policy regarding redemptions elected by a holder of L Bonds prior to maturity, including our obligation to redeem L Bonds upon the death, bankruptcy or total permanent disability of any holder of the L Bonds, but only so long as such modifications do not materially and adversely affect any then-existing obligations under pending repurchase commitments for L Bonds;

- to comply with requirements of the SEC in order to effect or maintain the qualification of the indenture under the Trust Indenture Act of 1939, or to comply with other applicable federal or state laws or regulations;

- to comply with the rules or policies of a depositary of the L Bonds; or

- in connection with an amendment, extension, replacement, renewal or substitution of any senior debt, to amend the subordination provisions of the indenture to conform to the reasonable requirements of the holder or holders of such senior debt.

**Rights of L Bond Holders**

As an L Bond holder, you have limited rights to vote on our actions as set forth in the indenture. In general, you will have the right to vote on whether or not to approve some amendments to the indenture. For a description of these rights, see "— Amendment, Supplement and Waiver" above. You will also have the right to direct some actions that the trustee takes if there is an event of default with respect to the L Bonds. For a description of these rights, see above under the caption "— Events of Default." For a complete description of your rights as an L Bond holder, we encourage you to read a copy of the indenture, which is filed as an exhibit to the registration statement of which this prospectus is a part. We will also provide you with a copy of the indenture upon your request.

The trustee and the L Bond holders will have the right to direct the time, method and place of conducting any proceeding for some of the remedies available, except as otherwise provided in the indenture. The trustee may require reasonable indemnity, satisfactory to the trustee, from L Bond holders before acting at their direction. You will not have any right to pursue any remedy with respect to the indenture or the L Bonds unless you satisfy the conditions contained in the indenture.

**The Indenture Trustee**

*General*

Bank of Utah has agreed to be the trustee under the indenture. The indenture contains certain limitations on the rights of the trustee, should it become one of our creditors, to obtain payment of claims in certain cases, or to realize

59

on certain property received in respect of any claim as security or otherwise. The trustee will be permitted to engage in other transactions with us.

Subject to certain exceptions, the holders of a majority in principal amount of the then-outstanding L Bonds will have the right to direct the time, method and place of conducting any proceeding for exercising any remedy available to the trustee. The indenture provides that if an event of default specified in the indenture shall occur and not be cured, the trustee will be required, in the exercise of its power, to use the degree of care of a reasonable person in the conduct of his own affairs. Subject to such provisions, the trustee will be under no obligation to exercise any of its rights or powers under the indenture at the request of any holder of L Bonds, unless the holder shall have offered to the trustee security and indemnity satisfactory to it against any loss, liability or expense.

### *Resignation or Removal of the Trustee*

The trustee may resign at any time, or may be removed by the holders of a majority of the aggregate principal amount of the outstanding L Bonds. In addition, we may remove the trustee for certain failures in its duties, including the insolvency of the trustee or the trustee's ineligibility to serve as trustee under the Trust Indenture Act of 1939. However, no resignation or removal of the trustee may become effective until a successor trustee has accepted the appointment as provided in the indenture.

### *Reports to Trustee*

We will provide the trustee with (i) a calculation date report by the 15th day of each month containing a calculation of the debt coverage ratio that includes a summary of all cash, life insurance policy investments serving as collateral, as well as our total outstanding indebtedness including outstanding principal balances, interest credited and paid, transfers made, any redemption or repayment and interest rate paid; (ii) copies of our audited annual financials, no earlier than when the same become a matter of public record; and (iii) any additional information reasonably requested by the trustee.

## Certain Charges

We and our servicing agents, if any, may assess service charges for changing the registration of any L Bond to reflect a change in name of the holder, multiple changes in interest payment dates or transfers (whether by operation of law or otherwise) of an L Bond by the holder to another person. The indenture permits us to set off, against amounts otherwise payable to you under the L Bonds, the amount of these charges.

## Variations in Terms and Conditions

We may from time to time vary the terms and conditions of the L Bonds offered, including but not limited to minimum initial principal investment amount requirements, maximum aggregate principal amount limits, interest rates, minimum denominations, service and other fees and charges, and redemption provisions. Terms and conditions may be varied by state, locality, principal amount, type of investor (for example, new or current investor) or as otherwise permitted under the indenture governing the securities offered by this prospectus. No change in terms, however, will apply to any L Bonds already issued and outstanding at the time of such change.

## Satisfaction and Discharge of Indenture

The indenture shall cease to be of further effect upon the payment in full of all of the outstanding L Bonds and the delivery of an officer's certificate to the trustee stating that we do not intend to issue additional L Bonds under the indenture or, with certain limitations, upon deposit with the trustee of funds sufficient for the payment in full of all of the outstanding L Bonds.

## Reports

We will publish annual reports containing financial statements and quarterly reports containing financial information for the first three quarters of each fiscal year. We will send copies of these reports, at no charge, to any holder of L Bonds who sends us a written request.

**PLAN OF DISTRIBUTION**

**General**

We are offering up to 1,000,000 Units, representing $1,000,000,000 in aggregate principal amount, of L Bonds (referred to throughout this prospectus simply as "L Bonds") on a continuous basis. The L Bonds will be sold at $1,000 per Unit, and in minimum amounts of 25 Units, or $25,000 or more in principal. There is no minimum amount of L Bonds that must be sold before we access and use the proceeds. The proceeds of new sales of L Bonds will be paid directly to us promptly following each sale and will not be placed in an escrow account. Even if we sell less than the entire $1,000,000,000 in aggregate principal amount of L Bonds Units being offered, the L Bonds that we sell will be issued, and the proceeds of those L Bond sales will be used by us, as described in this prospectus.

The L Bonds will be offered and sold on a best efforts basis by Emerson Equity LLC (our "dealer manager") and any participating broker-dealers it engages for this purpose (together the "selling group"). Emerson Equity LLC will be the placement agent for our L Bonds. The L Bonds will be offered to the public on the terms set forth in this prospectus and any prospectus supplements we may file from time to time. Both we and the selling group plan to market the L Bonds directly to the public primarily through presentations, the Internet, and personal contacts made by us and through the selling group. We may also sell L Bonds to registered investment advisors. Neither our dealer manager nor any other broker-dealer participating in our selling group will have any obligation to take or purchase any L Bonds. Our dealer manager and each broker-dealer member of our selling group is expected to assist in the offering by: (1) conducting informational meetings for subscribers and other qualified potential purchasers; (2) keeping records of all subscriptions; and (3) training and educating employees regarding the mechanics and regulatory requirements of the offering process.

Members of the selling group will receive sales commissions of up to 6.00% of the gross offering proceeds depending upon the maturity of the L Bonds sold, of which up to 1.00% may be retained by the selling broker-dealer firm. In addition, members of our selling group may receive up to 3.00% of the gross offering proceeds as additional compensation consisting of (i) an accountable expense allowance, (ii) a dealer-manager fee (payable only to Emerson Equity LLC) for managing and coordinating the offering, and (iii) a wholesaling fee (payable only to wholesaling dealers). We have also agreed to reimburse Emerson Equity for certain pre-offering expenses that we expect will aggregate to no more than $30,000. In the event that the offering is terminated or abandoned such that the pre-offering monthly retainer paid to the dealer manager exceeds the amount of permitted accountable expenses, the dealer manager will reimburse us for such excess amount. We will not pay referral or similar fees to any accountants, attorneys or other persons in connection with the distribution of the L Bonds. Nevertheless, the aggregate selling commissions and additional compensation we pay to our placement agent and other FINRA members in the course of this offering will not exceed 8.00% of the aggregate gross offering proceeds we receive from the sale of L Bonds.

Our dealer manager will enter into participating dealer agreements with certain other broker-dealers that are members of FINRA, referred to as selling group members, to authorize such broker-dealers to sell our L Bonds. Upon the sale of L Bonds by such broker-dealers, the broker-dealer effecting the sale will receive selling commissions and additional compensation in connection therewith.

As part of the accountable expense allowance, the dealer manager and members of the selling group are expected to be reimbursed for accountable out-of-pocket expenses incurred by them during the course of the offering. Expenses eligible for reimbursement may include travel, lodging, meals and other reasonable out-of-pocket expenses incurred by participating broker-dealers and their personnel, and reimbursement of actual costs of third-party professionals retained to by them. In no event will the total selling commissions, additional compensation and accountable due diligence expenses (including reimbursements), together with non-transaction-based and non-cash selling compensation, if any, exceed 8.00% of the aggregate gross offering proceeds we receive from the sale of L Bonds.

Our L Bonds will also be distributed through registered investment advisors who are generally compensated on a fee-for-service basis by the investor. In the event of the sale of L Bonds through an investment advisor compensated on a fee-for-service basis by the investor, our selling group member will waive its right to a commission.

App. 0237

In addition to the sales commissions, fees, allowances, reimbursements and expenses described above, we expect to pay approximately $1,500,500 in offering and related costs and expenses in connection with this offering. These kinds of expenses include all expenses to be paid by us in connection with the offering (other than sales commissions, additional compensation, and expense allowances and reimbursement to our selling group members), including but not limited to legal, accounting, printing and mailing expenses, registration, qualification and associated securities filing fees and other costs and expenses.

The table below sets forth the maximum amount of sales commissions and additional compensation (consisting of accountable expense allowances, a dealer-manager fee (payable only to Emerson Equity LLC), and a wholesaling fee (payable only to wholesaling dealers), and more fully described in fn. 2 to the table below) we may pay in connection with this offering.

| L Bond Term | Sales Commission[1] | Additional Compensation[2] | Total |
|---|---|---|---|
| 6 months | 0.75% | 3.00% | 3.75% |
| 1 year | 1.50% | 3.00% | 4.50% |
| 2 years | 4.00% | 3.00% | 7.00% |
| 3 years | 5.00% | 3.00% | 8.00% |
| 5 years | 5.90% | 2.10% | 8.00% |
| 7 years | 6.00% | 2.00% | 8.00% |

_____

(1)    Up to 1.00% of the sales commission may be retained by the selling broker-dealer firm with which any registered representative is associated.

(2)    As described above, additional compensation includes: (i) a dealer-manager fee payable to Emerson Equity in an amount equal to 0.50% of the principal amount of all L Bonds sold; and (ii) an accountable expense allowance, wholesaling fee, any non-transaction-based selling compensation and non-cash selling compensation that when aggregated will not exceed the lesser of 2.50% of the aggregate gross offering proceeds of all L Bonds sold or such lower amount that, when added to sales commissions and the dealer-manager fee, will not exceed 8.00% of the aggregate gross offering proceeds of all L Bonds sold. If all L Bonds sold have seven-year maturities resulting in sales commissions of 6.00%, then the maximum amounts of aggregates accountable expenses, wholesaling fees and non-transaction-based and non-cash selling compensation will not exceed 1.5%.

The line items reflected in the table below are our current estimates of average sales commissions and additional compensation (including accountable expenses) that we will pay. Specifically, we estimate that the average sales commission will be 5.00%, or $50,000,000 based on $1,000,000,000 in principal amount of L Bonds sold, and the average additional compensation will be 3.00%, or $30,000,000 based on $1,000,000,000 in principal amount of L Bonds sold. The components of "additional compensation" are detailed in fn. 1 to the table below. Actual costs may differ from the percentages and amounts shown in the table below, subject, however, to the limitations noted above.

| L Bonds Sold | Sales Commission | Additional Compensation[1] | Total |
|---|---|---|---|
| $300,000,000 | $15,000,000 | $9,000,000 | 8.00% |
| 500,000,000 | 25,000,000 | 15,000,000 | 8.00% |
| 1,000,000,000 | 50,000,000 | 30,000,000 | 8.00  % |

_____

(1)    Additional compensation consists of all selling compensation (other than sales commissions) paid in the form of an accountable expense allowance, a dealer-manager fee, wholesale commissions, plus any non-transaction-based and non-cash selling compensation. Additional compensation consists of all selling compensation paid to our placement agent (and other FINRA members) other than selling commissions. Such additional compensation will be paid in the form of a dealer-manager fee, wholesaling fee, if applicable, an accountable expense allowance, plus any non-transaction-based and non-cash selling compensation. For purposes of the table above, we have assumed our payment of the maximum amount of such additional compensation.

Our dealer manager holds the FINRA licenses for wholesalers employed by us, who attend local, regional and national conferences of the participating broker-dealers and who contact participating broker-dealers and their registered representatives to make presentations concerning us and this offering and to encourage them to sell our L Bonds. The wholesalers will receive a portion of their base salaries as compensation for their selling efforts. We host training and education meetings for broker-dealers and their representatives. The costs of the training and education meetings will be borne by us.

App. 0239

In accordance with FINRA rules, in no event will our total compensation to FINRA members, including but not limited to sales commissions, the dealer-manager fee and accountable and non-accountable expense and other reimbursements to our dealer manager and selling group broker-dealers (including non-transaction-based and non-cash selling compensation), exceed 8.00% of our gross offering proceeds, in the aggregate.

We will indemnify the participating broker-dealers and our dealer manager against some civil liabilities, including certain liabilities under the Securities Act of 1933 and liabilities arising from breaches of our representations and warranties contained in the Managing Broker-Dealer Agreement. If we are unable to provide this indemnification, we may contribute to payments the indemnified parties may be required to make in respect of those liabilities.

The foregoing is a summary of the material terms relating to the plan of distribution of the L Bonds contained in the Managing Broker-Dealer Agreement. Any amendment to the Managing Broker-Dealer Agreement will be filed as an exhibit to an amendment to the registration statement of which this prospectus is a part.

**Settlement Procedures**

If you purchase L Bonds through a broker-dealer who is a DTC participant and offers "DTC settlement," then you can place an order for the purchase of L Bonds through your broker-dealer. A broker-dealer using this service will have an account with DTC in which your funds will be placed to facilitate the anticipated monthly closing cycle. Orders will be executed by your broker-dealer electronically and you must coordinate with your broker-dealer's registered representative to pay the full purchase price of the L Bonds by the final settlement date. Orders may be placed at any time, and the final settlement date will be the date on which your subscription agreement is accepted. You will be credited with ownership of an L Bond on the first business day following the month in which the subscription is made. However, interest will begin to accrue from the final settlement date. If you purchase your L Bonds in this manner, your purchase price will not be held in escrow.

You also have the option to elect to settle your purchase directly with us, the Company. If you elect to use direct settlement with us, you should complete and sign a Subscription Agreement similar to the one filed as an exhibit to the registration statement of which this prospectus is a part. A form of Subscription Agreement is available from your broker-dealer's registered representative. Once completed and signed, your Subscription Agreement should be provided to your broker-dealer who will deliver it to us to be held, together with your related subscription funds, until our acceptance of your subscription. In connection with a direct settlement subscription, you should pay the full purchase price of the L Bonds to us as set forth in the Subscription Agreement. Subscribers may not withdraw funds from the subscription account. Subscriptions will be effective upon our acceptance of your Subscription Agreement and related funds, and we reserve the right to reject any subscription in whole or in part.

**Covered Security**

Our L Bonds are a "covered security." The term "covered security" applies to securities exempt from state registration because of their oversight by federal authorities and national-level regulatory bodies pursuant to Section 18 of the Securities Act of 1933. Generally, securities listed on national exchanges are the most common type of covered security exempt from state registration. A non-traded security also can be a covered security if it has a seniority greater than or equal to other securities from the same issuer that are listed on a national exchange. Our L Bonds are a covered security because they are senior to our common stock, which is listed on The Nasdaq Capital Market, and therefore our offering of L Bonds will be exempt from state registration.

**Although the status of our L Bonds as a "covered security" will facilitate their purchase and sale to a broader range of investors than would otherwise be available to us, and although the offer and sale of a "covered security" generally involves fewer issuance costs to the issuer of such securities, our L Bonds are not a suitable purchase for all investors. In this regard, please carefully review the "Risk Factors" contained in this prospectus, as well as the disclosures on page 3 under the heading "Covered Security."**

63

### MATERIAL FEDERAL INCOME TAX CONSIDERATIONS

The following is a general discussion of the material United States ("U.S.") federal income tax considerations relating to the initial purchase, ownership and disposition of the L Bonds by U.S. and non-U.S. holders. This discussion is a summary only and is not a complete analysis of all the potential tax considerations relating to the purchase, ownership and disposition of the L Bonds. We have based this summary on current provisions of the Code of 1986, as amended (the "Code"), applicable U.S. Treasury Regulations promulgated thereunder, judicial opinions, and published rulings of the Internal Revenue Service (the "IRS"), all as in effect on the date of this prospectus. However, these laws and other guidance are subject to differing interpretations or change, possibly with retroactive effect. In addition, we have not sought, and will not seek, a ruling from the IRS or an opinion of counsel with respect to any tax consequences of purchasing, owning or disposing of L Bonds. Thus, the IRS could take a different position regarding one or more of the tax consequences or matters described in this prospectus; and there can be no assurance that any position taken by the IRS would not be sustained.

This discussion is limited to purchasers of L Bonds who acquire the L Bonds from us in this offering and hold the L Bonds as capital assets for federal income tax purposes. This discussion does not address all possible tax consequences that may be applicable to you in light of your specific circumstances. For instance, this discussion does not address the alternative minimum tax provisions of the Code, or special rules applicable to some categories of investors such as financial institutions, insurance companies, tax-exempt organizations, dealers in securities, real estate investment trusts, regulated investment companies, or persons who hold L Bonds as part of a hedge, conversion or constructive sale transaction, straddle or other risk reduction transaction that may be subject to special rules. This discussion also does not address the tax consequences arising under the laws of any foreign, state or local jurisdiction; or any U.S. estate or gift tax laws.

If you are considering the purchase of an L Bond, you should consult your own tax advisors as to the particular tax consequences to you of acquiring, holding or otherwise disposing of the L Bonds, including the effect and applicability of state, local or foreign tax laws, or any U.S. estate and gift tax laws.

As used in this discussion, the term "U.S. holder" means a holder of an L Bond that is:

(i)     for United States federal income tax purposes, a citizen or resident of the United States;

(ii)     a corporation, partnership or other entity created or organized in or under the laws of the United States or of any political subdivision thereof or other entity characterized as a corporation or partnership for federal income tax purposes;

(iii)     an estate, the income of which is subject to United States federal income taxation regardless of its source; or

(iv)     a trust, the administration of which is subject to the primary supervision of a court within the United States and which has one or more United States persons with authority to control all substantial decisions, or if the trust was in existence on August 20, 1996, and has elected to continue to be treated as a United States trust.

For the purposes of this discussion, a "non-U.S. holder" means any holder of L Bonds other than a U.S. holder. Any L Bond purchaser who is not a U.S. citizen will be required to furnish documentation, on IRS Form W-8BEN, that clearly states whether it is subject to U.S. withholding taxes, in accordance with applicable requirements of the United States taxing authority.

**Characterization of the L Bonds**

The federal income tax consequences of owning L Bonds depend on characterization of the L Bonds as debt for federal income tax purposes, rather than as equity interests or a partnership among the holders of the L Bonds. We believe that the L Bonds have been structured in a manner that will allow the L Bonds to be characterized as debt for federal income tax purposes. However, this is only our belief; and no ruling from the IRS or an opinion of counsel has been sought in this regard. Thus, the IRS could successfully challenge this characterization.

If the L Bonds were treated as equity interests, there could be adverse effects on some holders. For example, payments on the L Bonds could (1) if paid to non-U.S. holders, be subject to federal income tax withholding; (2) constitute unrelated business taxable income to some tax-exempt entities, including pension funds and some retirement accounts (if the relationship were characterized as a partnership for tax purposes);

and (3) cause the timing and amount of income that accrues to holders of B Bonds to be different from that described below.

64

Because of these potential adverse effects, you are urged to consult your own tax advisors as to the tax consequences that may apply to your particular situation in the event the L Bonds are re-characterized as equity interests; and as to the likelihood that the L Bonds could be so re-characterized. The remainder of this discussion assumes that the L Bonds are characterized as debt.

**Taxation of U.S. Holders**

### Stated Interest

Under general federal income tax principles, you must include stated interest in income in accordance with the method of accounting you use for federal income tax purposes. Accordingly, if you are using the accrual method of tax accounting, you must include stated interest in income as it accrues. If you are using the cash method of tax accounting, you must include stated interest in income as it is actually or constructively received. Payments of interest to taxable holders of L Bonds will constitute portfolio income, and not passive activity income, for the purposes of the passive loss limitations of the Code. Accordingly, income arising from payments on the L Bonds will not be subject to reduction by losses from passive activities of a holder.

Income attributable to interest payments on the L Bonds may be offset by investment expense deductions, subject to the limitation that individual investors may only deduct miscellaneous itemized deductions, including investment expenses other than interest, to the extent these deductions exceed 2% of the investor's adjusted gross income.

If a partnership (or other entity or arrangement treated as a partnership for U.S. federal income tax purposes) holds L Bonds, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership. If you are a partner in a partnership purchasing L Bonds, we urge you to consult your tax advisor.

### Disposition of L Bonds

In general, a U.S. holder will recognize gain or loss upon the sale, exchange or other taxable disposition of an L Bond measured by the difference between (1) the sum of the cash and the fair market value of all other property received on such disposition, excluding any portion of the payment that is attributable to accrued interest on the L Bonds; and (2) your adjusted tax basis in the L Bond. A U.S. holder's adjusted tax basis in an L Bond generally will be equal to the price the U.S. holder paid for the L Bond. Any of this gain or loss generally will be long-term capital gain or loss if, at the time of any such taxable disposition, the L Bond was a capital asset in the hands of the holder and was held for more than one year. Net long-term capital gain recognized by individual U.S. holders is eligible for a reduced rate of taxation. The deductibility of capital losses is subject to annual limitations.

The terms of the L Bonds may be modified upon the consent of a specified percentage of holders and, in some cases, without consent of the holders. In addition, the L Bonds may be assumed upon the occurrence of specific transactions. The modification or assumption of an L Bond could, in some instances, give rise to a deemed exchange of an L Bond for a new debt instrument for federal income tax purposes. If an exchange is deemed to occur by reason of a modification or assumption, you could realize gain or loss without receiving any cash.

### Additional Tax on Net Investment Income

If you are a U.S. holder other than a corporation, you generally will be subject to a 3.8% additional tax on the lesser of (1) your "net investment income" for the taxable year, and (2) the excess of your modified adjusted gross income for the taxable year over a certain threshold. Your net investment income generally will include any income or gain recognized by you with respect to our L Bonds, unless such income or gain is derived in the ordinary course of the conduct of your trade or business (other than a trade or business that consists of certain passive or trading activities).

**Considerations for Tax-Exempt Holders of L Bonds**

Tax-exempt entities, including charitable corporations, pension plans, profit sharing or stock bonus plans, individual retirement accounts and some other employee benefit plans are subject to federal income tax on unrelated business taxable income. For example, net income derived from the conduct of a trade or business regularly carried on by a tax-exempt entity or by a partnership in which it is a partner is treated as unrelated business taxable income.

65

A $1,000 special deduction is allowed in determining the amount of unrelated business taxable income subject to tax. Tax-exempt entities taxed on their unrelated business taxable income are also subject to the alternative minimum tax for items of tax preference which enter into the computation of unrelated business taxable income.

In general, interest income does not constitute unrelated business taxable income. However, under the debt-financed property rules, if tax-exempt holders of L Bonds finance the acquisition or holding of L Bonds with debt, interest on the L Bonds will be taxable as unrelated business taxable income. The L Bonds will be treated as debt-financed property if the debt was incurred to acquire the L Bonds or was incurred after the acquisition of the L Bonds, so long as the debt would not have been incurred but for the acquisition and, at the time of the acquisition, the incurrence of the debt has already occurred or was foreseeable.

**Non-U.S. Holders**

The following discussion is a summary of the principal U.S. federal income consequences resulting from the ownership of the L Bonds by non-U.S. holders. However, application of the U.S. federal income tax rules associated with non-U.S. holders is complex and factually sensitive. Thus, if you could be considered to be a non-U.S. holder, you are urged to consult your own tax advisors with respect to the application of the federal income tax rules for your particular situation.

### *Payments of Interest to Non-U.S. Holders*

Subject to the discussion below under "Backup Withholding and Information Reporting," payments of interest received by a non-U.S. holder generally will not be subject to U.S. federal withholding tax, provided (1) that (a) the non-U.S. holder does not own, actually or constructively, 10% or more of the total combined voting power of all classes of our stock entitled to vote; (b) the non-U.S. holder is not a controlled foreign corporation, actually or constructively, through stock ownership; and (c) the beneficial owner of the L Bond complies with the certification requirements, including delivery of a statement, signed by the holder under penalties of perjury, certifying that the holder is a foreign person and provides its name and address; or (2) that the non-U.S. holder is entitled to the benefits of an income tax treaty under which the interest is exempt from U.S. withholding tax and the non-U.S. holder complies with the reporting requirements. If an L Bond is held through a securities clearing organization or other specified financial institutions (an "Intermediary"), the Intermediary may provide the relevant signed statement and, unless the Intermediary is a "qualified" intermediary as defined under the Code, the signed statement provided by the Intermediary must be accompanied by a copy of a valid Form W-8BEN provided by the non-U.S. beneficial holder of the L Bond.

Payments of interest not exempt from United States federal withholding tax as described above will be subject to a withholding tax at the rate of 30%, subject to reduction under an applicable income tax treaty.

Payments of interest on an L Bond to a non-U.S. holder generally will not be subject to U.S. federal income tax, as opposed to withholding tax, unless the income is effectively connected with the conduct by the non-U.S. holder of a trade or business in the United States. To claim the benefit of a lower treaty withholding rate, a non-U.S. holder must provide a properly executed IRS Form W-8BEN to us or our paying agent before the payment of stated interest; and may be required to obtain a U.S. taxpayer identification number and provide documentary evidence issued by foreign governmental authorities to prove residence in the foreign country. You should consult your own tax advisor to determine the effects of the application of the U.S. federal withholding tax to your particular situation.

### *Disposition of the L Bonds by Non-U.S. Holders*

Subject to the discussion below under "Backup Withholding and Information Reporting," a non-U.S. holder generally will not be subject to United States federal income tax, and generally no tax will be withheld with respect to gains realized on the disposition of an L Bond, unless (a) the gain is effectively connected with a United States trade or business conducted by the non-U.S. holder or (b) the non-U.S. holder is an individual who is present in the United States for 183 or more days during the taxable year of the disposition and other requirements are satisfied.

### *Non-U.S. Holders Subject to U.S. Income Taxation*

If interest and other payments received by a non-U.S. holder with respect to the L Bonds, including proceeds from the disposition of the L Bonds, are effectively connected with the conduct by the non-U.S. holder

App. 0245

of a trade or business within the United States, or the non-U.S. holder is otherwise subject to United States federal income taxation

66

App. 0246

on a net basis with respect to the holder's ownership of the L Bonds, or are individuals that have by operation of law become residents in the United States for federal income tax purposes, the non-U.S. holder generally will be subject to the rules described above applicable to U.S. holders of L Bonds, subject to any modification provided under an applicable income tax treaty. If any of these non-U.S. holders is a corporation, it may also be subject to a U.S. "branch profits tax" at a 30% rate.

**Backup Withholding and Information Reporting**

Non-corporate U.S. holders may be subject to backup withholding at a rate of 28% on payments of principal, premium, and interest on, and the proceeds of the disposition of, the L Bonds. In general, backup withholding will be imposed only if the U.S. holder (1) fails to furnish its taxpayer identification number ("TIN"), which for an individual would be his or her Social Security number; (2) furnishes an incorrect TIN; (3) is notified by the IRS that it has failed to report payments of interest or dividends; or (4) under some circumstances, fails to certify under penalty of perjury that it has furnished a correct TIN and has been notified by the IRS that it is subject to backup withholding tax for failure to report interest or dividend payments. In addition, the payments of principal and interest to U.S. holders generally will be subject to information reporting. You should consult your tax advisors regarding your qualification for exemption from backup withholding and the procedure for obtaining an exemption, if applicable.

Backup withholding generally will not apply to payments made to a non-U.S. holder of an L Bond who provides the certification that it is a non-U.S. holder, and the payor does not have actual knowledge that a certificate is false, or otherwise establishes an exemption from backup withholding. Payments by United States office of a broker of the proceeds of a disposition of the L Bonds generally will be subject to backup withholding at a rate of 28% unless the non-U.S. holder certifies it is a non-U.S. holder under penalties of perjury or otherwise establishes an exemption. In addition, if a foreign office of a foreign custodian, foreign nominee or other foreign agent of the beneficial owner, or if a foreign office of a foreign "broker" pays the proceeds of the sale of an L Bond to the seller, backup withholding and information reporting will not apply; provided that the nominee, custodian, agent or broker is not a "United States related person," or a person which derives more than 50% of its gross income for some periods from the conduct of a trade or business in the United States or is a controlled foreign corporation. The payment by a foreign office of a broker that is a United States person or a United States related person of the proceeds of the sale of L Bonds will not be subject to backup withholding, but will be subject to information reporting unless the broker has documentary evidence in its records that the beneficial owner is not a United States person for purposes of the backup withholding and information reporting requirements and other conditions are met, or the beneficial owner otherwise establishes an exemption.

The amount of any backup withholding imposed on a payment to a holder of an L Bond will be allowed as a credit against the holder's United States federal income tax liability and may entitle the holder to a refund; provided that the required information is furnished to the IRS.

67

**STATE, LOCAL AND FOREIGN TAXES**

We make no representations regarding the tax consequences of the purchase, ownership or disposition of the L Bonds under the tax laws of any state, locality or foreign country. You should consult your own tax advisors regarding these state and foreign tax consequences.

**ERISA CONSIDERATIONS**

**General**

Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and Section 4975 of the Code impose restrictions on employee benefit plans that are subject to ERISA, or plans or arrangements that are subject to Code Section 4975, and on persons who are parties in interest or disqualified persons with respect to those plans or arrangements. Some employee benefit plans, like governmental plans and church plans (if no election has been made under Section 410(d) of the Code), are not subject to the restrictions of Title I of ERISA or Code Section 4975, and assets of these plans may be invested in the L Bonds without regard to the ERISA considerations described below, subject to the Code and other applicable federal and state laws affecting tax-exempt organizations generally. Any plan fiduciary that proposes to cause a plan to acquire any of the L Bonds should consult with its counsel with respect to the potential consequences under ERISA and the Code of the plan's acquisition and ownership of the L Bonds. Investments by plans are also subject to ERISA's and the Code's general fiduciary requirements, including the requirement of investment prudence and diversification and the requirement that a plan's investments be made in accordance with the documents governing the plan.

**Prohibited Transactions**

*General*

Section 406 of ERISA and Section 4975 of the Code prohibits certain "parties in interest" and "disqualified persons" with respect to a plan from engaging in select transactions involving a plan and its assets unless a statutory, regulatory or administrative exemption applies to the transaction. Section 4975 of the Code imposes excise taxes on parties in interest that engage in non-exempt "prohibited transactions." Section 502(i) of ERISA requires the Secretary of the U.S. Department of Labor ("Labor") to assess a civil penalty against a fiduciary who breaches any fiduciary responsibility under, or commits any other violation of, part 4 of Title I of ERISA, or any other person who knowingly participates in a breach or violation.

*Plan Asset Regulations*

Labor has issued regulations concerning the definition of what constitutes the assets of a plan for purposes of ERISA and the prohibited transaction provisions of the Code. The plan asset regulations describe the circumstances where the assets of an entity in which a plan invests will be considered to be "plan assets," so that any person who exercises control over the assets would be subject to ERISA's fiduciary standards. Generally, under the plan asset regulation, when a plan invests in another entity, the plan's assets do not include, solely by reason of the investment, any of the underlying assets of the entity. However, the plan asset regulation provides that, if a plan acquires an "equity interest" in an entity that is neither a "publicly-offered security" nor a security issued by an investment company registered under the Investment Company Act of 1940 the assets of the entity will be treated as assets of the plan investor unless exceptions apply.

Under the plan asset regulations the term "equity interest" is defined as any interest in an entity other than an instrument that is treated as indebtedness under "applicable local law" and that has no "substantial equity features." Although the plan asset regulation is silent with respect to the question of which law constitutes "applicable local law" for this purpose, Labor has stated that these determinations should be made under the state law governing interpretation of the instrument in question. In the preamble to the plan asset regulation, Labor declined to provide a precise definition of what features are equity features or the circumstances under which the features would be considered "substantial," noting that the question of whether a plan's interest has substantial equity features is an inherently factual one, but that in making that determination it would be appropriate to take into account whether the equity features are such that a plan's investment would be a practical vehicle for the indirect provision of investment management services. We believe that the L Bonds will be classified as indebtedness without substantial equity features for ERISA purposes.

68

App. 0248

Under the plan asset regulations the term "publicly-offered security" is defined as a security that is (i) freely transferable, (ii) part of a class of securities that is widely held, and (iii) either (A) part of a class of securities registered under section 12(b) or 12(g) of the Securities Exchange Act of 1934 or (B) sold to the plan as part of an offering of securities to the public pursuant to an effective registration statement under the Securities Act of 1933 and the class of securities of which such security is a part is registered under the Securities Exchange Act of 1934 within 120 days after the end of the fiscal year of the issuer during which the offering of such securities to the public occurred. For purposes of the above, a class of securities is considered to be "widely held" if it is owned by 100 or more investors independent of the issuer and of one another. In the case of this offering, while the offer and sale of the L Bonds have been registered under the Securities Act of 1933, the L Bonds themselves have not been registered under the Securities Exchange Act of 1934. For this reason, we believe that the L Bonds will not likely meet the definition for "publicly-offered security" under the plan asset regulations.

In light of the foregoing, if the L Bonds were deemed to be equity interests for this purpose and no statutory, regulatory, or administrative exception applies, we could be considered to hold plan assets by reason of a plan's investment in the L Bonds. These plan assets would include an undivided interest in all of our assets. In this case, we may be considered a fiduciary with respect to the investing plans. We would be subject to the fiduciary responsibility provisions of Title I of ERISA, including the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code, and to Section 4975 of the Code with respect to transactions involving any of our assets. The ERISA fiduciary standards could affect the way we conduct the business, which would have consequences for all investors, not just those that are employee benefit plans.

Depending on the relevant facts and circumstances, prohibited transaction exemptions may apply to the purchase or holding of the L Bonds. See, for example, Prohibited Transaction Class Exemption ("PTE") 96-23, which exempts some transactions effected on behalf of a plan or by an "in-house asset manager;" PTE 95-60, which exempts some transactions between insurance company general accounts and parties in interest; PTE 91-38, which exempts some transactions between bank collective investment funds and parties in interest; PTE 90-1, which exempts some transactions between insurance company pooled separate accounts and parties in interest; or PTE 84-14, which exempts some transactions effected on behalf of a plan by a "qualified professional asset manager." However, there can be no assurance that any of these exemptions will apply with respect to any plan's investment in the L Bonds, or that the exemption, if it did apply, would apply to all prohibited transactions that may occur in connection with the investment.

Any plan fiduciary considering whether to purchase L Bonds on behalf of a plan should consult with its counsel regarding the applicability of the fiduciary responsibility and prohibited transaction provisions of ERISA and the Code. Before purchasing any L Bonds, a fiduciary of a plan should make its own determination as to (1) whether GWG Holdings, as issuer of and borrower under the L Bonds, is a "party in interest" under ERISA or a "disqualified person" under the Code with respect to the plan; (2) the availability of the relief provided in the plan asset regulation and (3) the availability of any other prohibited transaction exemptions. In addition, purchasers that are insurance companies should consult their own ERISA counsel with respect to their fiduciary responsibilities associated with their purchase and ownership of the L Bonds, including any responsibility under the Supreme Court case *John Hancock Mutual Life Insurance Co. v. Harris Trust and Savings Bank*.

69

## LEGAL MATTERS

Certain legal matters in connection with the L Bonds will be passed upon for us by Maslon LLP, of Minneapolis, Minnesota.

## EXPERTS

The consolidated financial statements of GWG Holdings, Inc. and its subsidiaries as of and for the years ended December 31, 2015 and December 31, 2014, included in this prospectus and in the registration statement of which this prospectus is a part, have been audited by Baker Tilly Virchow Krause, LLP, an independent registered public accounting firm. As indicated in their report with respect thereto, these consolidated financial statements are included in this prospectus in reliance upon the authority of such firm as experts in auditing and accounting.

## WHERE YOU CAN FIND MORE INFORMATION

We have filed with the SEC a registration statement on Form S-1 under the Securities Act with respect to the L Bonds to be offered and sold pursuant to the prospectus which is a part of that registration statement. This prospectus does not contain all the information contained in the registration statement. For further information with respect to us and the L Bonds to be sold in this offering, we refer you to the registration statement, including the agreements, other documents and schedules filed as exhibits to the registration statement.

We file annual, quarterly and current reports, and other information with the SEC. We intend to make these filings available on our website at www.gwglife.com. Information on our website is not incorporated by reference in this prospectus. We maintain an office at 220 South Sixth Street, Suite 1200, Minneapolis, MN 55402 where all records concerning the L Bonds are to be retained. L Bond holders and their representatives can request information regarding the L Bonds by contacting our office by mail at our address or by telephone at (612) 746-1944 or by fax at (612) 746-0445. Upon request, we will provide copies of our filings with the SEC free of charge to our investors. Our SEC filings, including the registration statement of which this prospectus is a part, will also be available on the SEC's Internet site at *http://www.sec.gov*. You may read and copy all or any portion of the registration statement or any reports, statements or other information we file at the SEC's public reference room at 100 F Street, N.E., Washington, D.C. 20549. In addition, you may call the SEC at 1-800-SEC-0330 for further information on the operation of the public reference room. You may receive copies of these documents upon payment of a duplicating fee by writing to the SEC.

70

**INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE**

We are incorporating certain information about us that we have filed with the SEC by reference in this prospectus, which means that we are disclosing important information to you by referring you to those documents. The information we incorporate by reference is an important part of this prospectus.

We incorporate by reference the documents listed below and any future filings we will make with the Commission under Section 13(a), 13(c), 14 or 15(d) of the Exchange Act (i) after the date of the initial filing of the registration statement of which this prospectus is a part and prior to effectiveness of such registration statement, and (ii) from the date of this prospectus but prior to the termination of the offering of the securities covered by this prospectus:

- Our Annual Report on Form 10-K for the period ended December 31, 2015, filed with the SEC on March 22, 2016 (including all exhibits thereto);

- Our Current Reports on Form 8-K filed with the SEC on March 8, 2016 and February 26, 2016 (including all exhibits thereto); and

- Our definitive proxy statement filed with the SEC on April 4, 2016 (including all exhibits thereto).

We are not, however, incorporating by reference any documents or portions thereof, whether specifically listed above or filed in the future, that are not deemed "filed" with the SEC or any information furnished pursuant to Items 2.02 or 7.01 of Form 8-K or certain exhibits furnished pursuant to Item 9.01 of Form 8-K.

The section entitled "Where You Can Find More Information" above describes how you can obtain or access any documents or information that we have incorporated by reference herein. The information relating to us contained in this prospectus does not purport to be comprehensive and should be read together with the information contained in the documents incorporated or deemed to be incorporated by reference in this prospectus.

Upon written or oral request, we will provide, free of charge, to each person, including any beneficial owner, to whom a prospectus is delivered, a copy of any or all of the reports or documents that are incorporated by reference into this prospectus. Such written or oral requests should be made to:

<div align="center">

Jon L. Gangelhoff, Chief Operating Officer
220 South Sixth Street, Suite 1200
Minneapolis, MN 55402
Telephone Number: (612) 746-1944

</div>

In addition, such reports and documents may be found on our website at www.gwglife.com.

<div align="center">

71

</div>

**GWG HOLDINGS, INC.**

**Table of Contents**

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Balance Sheets as of December 31, 2015 and December 31, 2014 | F-3 |
| Consolidated Statements of Operations for the years ended December 31, 2015 and December 31, 2014 | F-4 |
| Consolidated Statements of Changes in Stockholders' Equity (Deficit) for the years ended December 31, 2015 and December 31, 2014 | F-5 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2015 and December 31, 2014 | F-6 |
| Notes to Consolidated Financial Statements | F-8 |

F-1

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Shareholders, Audit Committee and Board of Directors
GWG Holdings, Inc. and Subsidiaries
Minneapolis, MN

We have audited the accompanying consolidated balance sheets of GWG Holdings, Inc. and Subsidiaries as of December 31, 2015 and 2014, and the related consolidated statements of operations, stockholders' equity and cash flows for the years then ended. We also have audited GWG Holdings, Inc. and Subsidiaries' internal control over financial reporting as of December 31, 2015, based on criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) (2013 framework). These consolidated financial statements are the responsibility of the company's management. Our responsibility is to express an opinion on these consolidated financial statements and an opinion on the company's internal control over financial reporting based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements include examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall consolidated financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of consolidated financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the consolidated financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of GWG Holdings, Inc. and Subsidiaries as of December 31, 2015 and 2014 and the results of their operations and cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, GWG Holdings, Inc. and Subsidiaries maintained, in all material respects, effective internal control over financial reporting as of December 31, 2015, based on criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) (2013 framework).

/s/ Baker Tilly Virchow Krause, LLP
Minneapolis, Minnesota
March 22, 2016

F-2

App. 0253

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**

| | December 31, 2015 | December 31, 2014 |
|---|---|---|
| **ASSETS** | | |
| Cash and cash equivalents | $ 34,425,105 | $ 30,662,704 |
| Restricted cash | 2,341,900 | 4,296,053 |
| Investment in life settlements, at fair value | 356,649,715 | 282,883,010 |
| Deferred financing costs, net | 2,530,481 | 1,569,400 |
| Policy benefits receivable | — | 1,750,000 |
| Other assets | 2,218,546 | 1,909,362 |
| TOTAL ASSETS | $ 398,165,747 | $ 323,070,529 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | |
| **LIABILITIES** | | |
| Revolving senior credit facility | $ 65,011,048 | $ 72,161,048 |
| Series I Secured Notes payable | 23,287,704 | 27,616,578 |
| L Bonds | 277,024,326 | 182,782,884 |
| Accounts payable | 1,517,440 | 1,203,575 |
| Interest payable | 12,340,061 | 11,128,519 |
| Other accrued expenses | 1,060,786 | 514,434 |
| Deferred taxes, net | 1,763,968 | 5,273,555 |
| TOTAL LIABILITIES | 382,005,333 | 300,680,593 |
| **STOCKHOLDERS' EQUITY** | | |
| **CONVERTIBLE PREFERRED STOCK** | | |
| (par value $0.001; shares authorized 40,000,000; shares outstanding 2,781,735 and 2,738,966; liquidation preference of $20,863,000 and $20,542,000 on December 31, 2015 and 2014, respectively) | 20,799,841 | 20,527,866 |
| **COMMON STOCK** | | |
| Common stock (par value $0.001: shares authorized 210,000,000; shares issued and outstanding 5,941,790 and 5,870,193 on December 31, 2015 and 2014) | 5,942 | 5,870 |
| Additional paid-in capital | 17,149,391 | 16,257,686 |
| Accumulated deficit | (21,794,760) | (14,401,486) |
| TOTAL STOCKHOLDERS' EQUITY | 16,160,414 | 22,389,936 |
| TOTAL LIABILITIES & EQUITY | $ 398,165,747 | $ 323,070,529 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-3

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Year Ended | |
| --- | --- | --- |
| | December 31, 2015 | December 31, 2014 |
| **REVENUE** | | |
| Gain on life settlements, net | $ 39,381,003 | $ 30,416,127 |
| Interest and other income | 251,249 | 60,448 |
| TOTAL REVENUE | 39,632,252 | 30,476,575 |
| | | |
| **EXPENSES** | | |
| Interest expense | 31,587,960 | 26,716,798 |
| Employee compensation and benefits | 8,010,020 | 4,969,636 |
| Legal and professional fees | 3,152,783 | 2,339,235 |
| Other expenses | 7,784,350 | 4,815,434 |
| TOTAL EXPENSES | 50,535,113 | 38,841,103 |
| | | |
| (LOSS) INCOME BEFORE INCOME TAXES | (10,902,861) | (8,364,528) |
| Income tax (benefit) expense | (3,509,587) | (2,401,619) |
| | | |
| NET LOSS | (7,393,274) | (5,962,909) |
| Income attributable to preferred shareholders | 1,386,110 | (138,374) |
| LOSS ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ (6,007,164) | $ (6,101,283) |
| | | |
| **NET LOSS PER COMMON SHARE** | | |
| Basic | $ (1.02) | $ (1.24) |
| Diluted | $ (1.02) | $ (1.24) |
| | | |
| **WEIGHTED AVERAGE SHARES OUTSTANDING** | | |
| Basic | 5,906,761 | 4,909,657 |
| Diluted | 5,906,761 | 4,909,657 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-4

App. 0255

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENT OF CHANGES IN STOCKHOLDERS' EQUITY**

| | Preferred Stock Shares | Preferred Stock | Common Shares | Common Stock (par) | Additional Paid-in Capital | Accumulated Deficit | Total Equity |
|---|---|---|---|---|---|---|---|
| **Balance, December 31, 2013** | — | $ — | 4,562,000 | $ 4,562 | $ 2,942,000 | $ (8,438,577) | $ (5,492,015) |
| Net loss | — | — | — | — | — | (5,962,909) | (5,962,909) |
| Issuance of common stock | — | — | 800,000 | 800 | 8,642,990 | — | 8,643,790 |
| Series A Preferred Stock conversion | — | — | 508,193 | 508 | 4,956,591 | — | 4,957,099 |
| Reclassification of preferred stock from temporary equity to permanent equity due to initial public offering (*) | 2,710,214 | 20,326,605 | — | — | — | — | 20,326,605 |
| Issuance of preferred stock | 28,752 | 201,261 | — | — | — | — | 201,261 |
| Issuance of stock options | — | — | — | — | 122,412 | — | 122,412 |
| Extension of warrants | — | — | — | — | 47,120 | — | 47,120 |
| Accretion of preferred stock to liquidation value | — | — | — | — | (453,427) | — | (453,427) |
| **Balance, December 31, 2014** | **2,738,966** | **$20,527,866** | **5,870,193** | **$ 5,870** | **$16,257,686** | **$(14,401,486)** | **$22,389,936** |
| Net loss | — | — | — | — | — | (7,393,274) | (7,393,274) |
| Issuance of common stock | — | — | 60,000 | 60 | 581,940 | — | 582,000 |
| Series A Preferred Stock conversion to common stock | (15,463) | (115,973) | 11,597 | 12 | 115,961 | — | — |
| Issuance of preferred stock | 58,232 | 387,948 | — | — | — | — | 387,948 |
| Issuance of stock options | — | — | — | — | 193,804 | — | 193,804 |
| **Balance, December 31, 2015** | **2,781,735** | **$20,799,841** | **5,941,790** | **$ 5,942** | **$17,149,391** | **$(21,794,760)** | **$16,160,414** |

_____

\* Subject to the terms of the Certificate of Designation for Series A Convertible Preferred Stock, the listing of our common stock on The Nasdaq Capital Market on September 25, 2014 resulted in the termination of a redemption

right in favor of the holders of such preferred stock. Preferred stock that is not redeemable by a stockholder is treated as stockholders' equity as shown in the table above.

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-5

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENT OF CASH FLOWS**

| | Year Ended | |
| --- | --- | --- |
| | December 31, 2015 | December 31, 2014 |
| CASH FLOWS FROM OPERATING ACTIVITIES | | |
| Net loss | $ (7,393,274) | $ (5,962,909) |
| Adjustments to reconcile net loss to net cash flows used in operating activities: | | |
| Gain on life settlements, gross | (39,371,059) | (39,928,003) |
| Amortization of deferred financing and issuance costs | 3,712,056 | 3,804,795 |
| Deferred income taxes | (3,509,587) | (2,401,619) |
| Preferred stock issued in lieu of cash dividends | 683,133 | 774,085 |
| Preferred stock dividends payable | 6,800 | (116,207) |
| (Increase) decrease in operating assets: | | |
| Due from related parties | (1,256) | (291) |
| Policy benefits receivable | 1,750,000 | (1,750,000) |
| Other assets | (304,526) | (2,347,050) |
| Increase in operating liabilities: | | |
| Accounts payable | 313,864 | 363,706 |
| Interest payable | 2,213,529 | 4,638,876 |
| Other accrued expenses | 2,183,393 | 70,366 |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (39,716,927) | (42,854,251) |
| | | |
| CASH FLOWS FROM INVESTING ACTIVITIES | | |
| Investment in life settlements | (38,906,934) | (12,292,401) |
| Proceeds from settlement of life settlements | 4,511,289 | 4,185,813 |
| NET CASH FLOWS USED IN INVESTING ACTIVITIES | (34,395,645) | (8,106,588) |
| | | |
| CASH FLOWS FROM FINANCING ACTIVITIES | | |
| Net repayment of revolving senior credit facility | (7,150,000) | (6,838,952) |
| Payments for redemption of Series I Secured Notes | (4,891,681) | (2,268,379) |
| Proceeds from issuance of L Bonds | 131,159,348 | 65,713,297 |
| Payment of deferred issuance costs for L Bonds | (7,499,601) | (4,104,876) |
| Payments for redemption of L Bonds | (35,984,061) | (14,429,017) |
| Issuance of common stock | 582,000 | 9,030,000 |
| Proceeds from restricted cash | 1,954,153 | 1,536,916 |
| Payments for redemption of preferred stock | (295,185) | (465,239) |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 77,874,973 | 48,173,750 |
| | | |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | 3,762,401 | (2,787,089) |
| | | |
| CASH AND CASH EQUIVALENTS | | |
| BEGINNING OF YEAR | 30,662,704 | 33,449,793 |
| END OF YEAR | $ 34,425,105 | $ 30,662,704 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-6

App. 0258

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENT OF CASH FLOWS — CONTINUED**

| | Year Ended | |
| --- | --- | --- |
| | December 31, 2015 | December 31, 2014 |
| **SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION** | | |
| Interest and preferred dividends paid | $ 24,027,000 | $ 16,931,000 |
| Premiums paid | $ 26,650,000 | $ 23,265,000 |
| Stock-based compensation | $ 194,000 | $ 122,000 |
| | | |
| **NON-CASH INVESTING AND FINANCING ACTIVITIES** | | |
| Warrants issued to purchase common stock | $ — | $ 47,000 |
| Options issued to purchase common stock | $ 353,000 | $ 122,000 |
| Series I Secured Notes: | | |
|    Conversion of accrued interest and commission payable to principal | $ 203,000 | $ 151,000 |
| L Bonds: | | |
|    Conversion of accrued interest and commission payable to principal | $ 806,000 | $ 452,000 |
| Series A Preferred Stock: | | |
|    Conversion to common stock | $ 116,000 | $ 4,957,000 |
|    Reclassification to permanent equity due to initial public offering | $ — | $ 20,327,000 |
|    Issuance of preferred stock in lieu of cash dividends | $ 683,000 | $ 774,000 |
|    Accretion of preferred stock to redemption value | $ — | $ 453,000 |
| Investment in life settlements included in accounts payable | $ 1,079,000 | $ 50,000 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-7

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**(1) Nature of business and summary of significant accounting policies**

Nature of business — GWG Holdings, Inc. (GWG Holdings), located in Minneapolis, Minnesota, facilitates the purchase of life insurance policies for its own investment portfolio through its wholly-owned subsidiaries, GWG Life, LLC (GWG Life), GWG Life USA, LLC (GWG Life USA) and Wirth Park Agency, LLC, and GWG Life's own subsidiaries, GWG Trust (Trust), GWG DLP Funding II, LLC (DLP II) and its wholly-owned subsidiary, GWG DLP Master Trust II (the Trust II), and GWG DLP Funding III, LLC (DLP III). GWG Holdings is also involved in the merchant cash advance business through its wholly-owned subsidiary GWG MCA Capital, Inc. (GWG MCA Capital). All of these entities are legally organized in Delaware. Unless the context otherwise requires or we specifically so indicate, all references in this report to "we," "us," "our," "our Company," "GWG," or the "Company" refer to these entities collectively. References to particular entities, such as "GWG Holdings" or "GWG Life" or "GWG MCA Capital," are meant to refer only to the particular entity referenced.

On September 30, 2015, GWG Holdings formed a wholly-owned subsidiary, Wirth Park Agency, LLC. Wirth Park Agency was formed to convert term life insurance policies into universal, or permanent life insurance. Wirth Park Agency produces commission revenue through this activity.

On December 7, 2015, GWG Holdings formed a wholly-owned subsidiary, GWG MCA, LLC. On January 13, 2016, GWG MCA, LLC was converted to a corporation and became GWG MCA Capital, Inc. GWG MCA Capital, Inc. was formed to engage in the merchant cash advance business.

Use of estimates — The preparation of consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. The Company regularly evaluates estimates and assumptions. The Company bases its estimates and assumptions on current facts, historical experience, and various other factors that it believes to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities and the accrual of costs and expenses that are not readily apparent from other sources. The actual results experienced by the Company may differ materially and adversely from the Company's estimates. To the extent there are material differences between the estimates and the actual results, future results of operations will be affected. The most significant estimates with regard to these consolidated financial statements relates to (1) the determination of the assumptions used in estimating the fair value of the investment in life insurance policies, and (2) the value of deferred tax assets and liabilities.

Cash and cash equivalents — The Company considers cash in demand deposit accounts and temporary investments purchased with an original maturity of three months or less to be cash equivalents. The Company maintains its cash and cash equivalents with highly rated financial institutions. From time to time, the Company's balances in its bank accounts exceed Federal Deposit Insurance Corporation limits. The Company periodically evaluates the risk of exceeding insured levels and may transfer funds as it deems appropriate. The Company has not experienced any losses with regards to balances in excess of insured limits or as a result of other concentrations of credit risk.

Life settlements — ASC 325-30, *Investments in Insurance Contracts*, allows a reporting entity the election to account for its investments in life settlements using either the investment method or the fair value method. The election shall be made on an instrument-by-instrument basis and is irrevocable. Under the investment method, an investor shall recognize the initial investment at the purchase price plus all initial direct costs. Continuing costs (policy premiums and direct external costs, if any) to keep the policy in force shall be capitalized. Under the fair value method, an investor shall recognize the initial investment at the purchase price. In subsequent periods, the investor shall re-measure the investment at fair value in its entirety at each reporting period and shall recognize the change in fair value in current period income net of premiums paid. The Company uses the fair value method to account for all life settlements.

The Company recognizes realized gains (revenue) from life settlement contracts upon one of the two following events:

1) Receipt of death notice or verified obituary of insured

2) Sale of policy and filing of change of ownership forms and receipt of payment

App. 0260

App. 0261

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(1) Nature of business and summary of significant accounting policies** (cont.)

The Company recognizes the difference between the death benefits and carrying values of the policy when an insured event has occurred and the Company determines that settlement and ultimate collection of the death benefits is realizable and reasonably assured. Revenue from a transaction must meet both criteria in order to be recognized. In an event of a sale of a policy, the Company recognizes gain or loss as the difference between the sale price and the carrying value of the policy on the date of the receipt of payment on such sale.

Deposits and initial direct costs advanced on unsettled policy acquisitions are recorded as other assets until policy ownership has been transferred to the Company. Such deposits and direct cost advances were $31,000 and $27,000 at December 31, 2015 and 2014, respectively.

Deferred financing and issuance costs — Costs incurred to obtain financing under the revolving senior credit facility, as described in note 5, have been capitalized and are amortized using the straight-line method over the term of the revolving senior credit facility. Amortization of deferred financing costs was $727,000 and $358,000 for the years ended December 31, 2015 and 2014, respectively. The future amortization is expected to be $626,000 for the next four months ending April 30, 2016. The Series I Secured Notes, as described in note 6, are reported net of issuance costs, sales commissions and other direct expenses, which are amortized using the interest method over the term of each respective borrowing. The L Bonds, as described in note 7, are reported net of issuance costs, sales commissions and other direct expenses, which are amortized using the interest method over the term of each respective borrowing. The Series A Preferred Stock, as described in note 8, was also reported net of issuance costs, sales commissions, including the fair value of warrants issued, and other direct expenses, which were amortized using the interest method as interest expense over the three-year redemption period. As of December 31, 2015, those costs were fully amortized.

Earnings (loss) per share — Basic per share earnings (loss) attributable to non-redeemable interests is calculated using the weighted-average number of shares outstanding during the period. Diluted earnings (loss) per share is calculated based on the potential dilutive impact, if any, of the Company's Series A Preferred Stock, and outstanding warrants, and stock options.

Subsequent events — Subsequent events are events or transactions that occur after the balance sheet date but before consolidated financial statements are issued. The Company recognizes in the consolidated financial statements the effects of all subsequent events that provide additional evidence about conditions that existed at the date of the balance sheet, including the estimates inherent in the process of preparing the consolidated financial statements. The Company's consolidated financial statements do not recognize subsequent events that provide evidence about conditions that did not exist at the date of the balance sheet but arose after the balance sheet date and before the consolidated financial statements are available to be issued. The Company evaluates subsequent events and transactions that occur after the balance sheet date up to the date that the consolidated financial statements are filed for potential recognition or disclosure.

Recently adopted pronouncements — On April 7, 2015 the FASB issued Accounting Standards Update (ASU) No. 2015-03, *Simplifying the Presentation of Debt Issuance Costs*, as part of its simplification initiative. The ASU changes the presentation of debt issuance costs in financial statements. Under the ASU, an entity presents such costs in the balance sheet as a direct deduction from the related debt liability rather than as an asset. Amortization of the costs is reported as interest expense. For public business entities, the guidance in the ASU is effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2015. Early adoption is allowed for all entities for financial statements that have not been previously issued. Entities would apply the new guidance retrospectively to all prior periods (i.e., the balance sheet for each period is adjusted). The Company will adopt *ASU No. 2015-03, Simplifying the Presentation of Debt Issuance Costs*, during the first quarter of 2016, as required by the standard. The impact of the new ASU on the Company's balance sheet would be a reduction of approximately $2,288,000 to assets and the corresponding reduction to liabilities. There would be no impact on the Company's statements of operations.

*Reclassification*

Certain 2014 amounts have been reclassified to conform to the 2015 presentation. The reclassifications have no effect on the reported amounts of consolidated net income or equity.

F-9

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(2) Restrictions on cash**

The Company is required by its lenders to maintain collection and escrow accounts. These accounts are used to fund the acquisition, pay annual premiums of insurance policies, pay interest and other charges under the revolving senior credit facility, and collect policy benefits. DZ Bank AG, as agent for Autobahn Funding Company, LLC, the lender for the revolving senior credit facility as described in note 5, authorizes the disbursements from these accounts. At December 31, 2015 and 2014, there was a balance of $2,342,000, and $4,296,000, respectively, maintained in these restricted cash accounts.

**(3) Investment in life insurance policies**

The life insurance policies (Level 3 fair value measurements) are valued based on unobservable inputs that are significant to the overall fair value measurement. Changes in the fair value of these instruments are recorded in gain or loss on life insurance policies in the consolidated statements of operations (net of the cash premiums paid on the policies). The fair value is determined on a discounted cash flow basis that incorporates life expectancy assumptions. Life expectancy reports have been obtained from widely accepted life expectancy providers. The discount rate incorporates current information about market interest rates, the credit exposure to the insurance company that issued the life insurance policy and our estimate of the risk premium an investor in the policy would require. As a result of management's analysis, discount rates of 11.09% and 11.43% were applied to the portfolio as of December 31, 2015 and 2014, respectively.

A summary of the Company's life insurance policies accounted for under the fair value method and their estimated maturity dates, based on remaining life expectancy is as follows:

| Years Ending December 31, | As of December 31, 2015 | | | As of December 31, 2014 | | |
|---|---|---|---|---|---|---|
| | Number of Contracts | Estimated Fair Value | Face Value | Number of Contracts | Estimated Fair Value | Face Value |
| 2015 | — | $ — | $ — | 3 | $ 5,063,000 | $ 6,000,000 |
| 2016 | 5 | 7,503,000 | 8,500,000 | 7 | 8,144,000 | 11,550,000 |
| 2017 | 12 | 12,875,000 | 17,418,000 | 17 | 21,916,000 | 35,542,000 |
| 2018 | 27 | 37,109,000 | 58,428,000 | 30 | 41,994,000 | 76,206,000 |
| 2019 | 51 | 54,242,000 | 100,967,000 | 45 | 47,303,000 | 106,973,000 |
| 2020 | 59 | 64,750,000 | 137,868,000 | 41 | 43,429,000 | 102,614,000 |
| 2021 | 48 | 45,724,000 | 116,805,000 | 36 | 29,789,000 | 90,921,000 |
| Thereafter | 194 | 134,447,000 | 504,858,000 | 112 | 85,245,000 | 349,293,000 |
| Totals | 396 | $ 356,650,000 | 944,844,000 | 291 | $ 282,883,000 | $ 779,099,000 |

The Company recognized insurance benefits of $31,232,000 and $18,050,000 during 2015 and 2014, respectively, related to policies with a carrying value of $4,511,000 and $4,186,000, respectively. The Company recorded realized gains of $26,721,000 and $13,864,000 on such policies.

Reconciliation of gain on life settlements:

| | Years Ended December 31, | |
|---|---|---|
| | 2015 | 2014 |
| Change in fair value | $ 39,371,000 | $ 39,928,000 |
| Premiums and other annual fees | (26,711,000) | (23,376,000) |
| Policy maturities | 26,721,000 | 13,864,000 |
| Gain on life settlements, net | $ 39,381,000 | $ 30,416,000 |

F-10

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(3) Investment in life insurance policies** (cont.)

The estimated expected premium payments and servicing fees to maintain the above life insurance policies in force for the next five years, *assuming no mortalities*, are as follows:

| Years Ending December 31, | Premiums | Servicing | Premiums and Servicing Fees |
|---|---|---|---|
| 2016 | $ 32,227,000 | $ 475,000 | $ 32,702,000 |
| 2017 | 35,181,000 | 475,000 | 35,656,000 |
| 2018 | 38,204,000 | 475,000 | 38,679,000 |
| 2019 | 42,817,000 | 475,000 | 43,292,000 |
| 2020 | 47,637,000 | 475,000 | 48,112,000 |
| | $ 196,066,000 | $ 2,375,000 | $ 198,441,000 |

Management anticipates funding the estimated premium payments as noted above with proceeds from the DZ Bank revolving senior credit facility and through additional debt and equity financing as well as from cash proceeds from maturities of life insurance policies. The proceeds of these capital sources are also intended to be used for the purchase, financing, and maintenance of additional life insurance policies.

**(4) Fair value definition and hierarchy**

ASC 820 establishes a hierarchical disclosure framework which prioritizes and ranks the level of market price observability used in measuring assets and liabilities at fair value. Market price observability is affected by a number of factors, including the type of investment, the characteristics specific to the investment and the state of the marketplace including the existence and transparency of transactions between market participants. Assets and liabilities with readily available active quoted prices or for which fair value can be measured from actively quoted prices in an orderly market generally will have a higher degree of market price observability and a lesser degree of judgment used in measuring fair value. ASC 820 establishes a three-level valuation hierarchy for inputs used in measuring fair value that maximizes the use of observable inputs and minimizes the use of unobservable inputs by requiring that the most observable inputs be used when available. Observable inputs are inputs that market participants would use in pricing the asset or liability developed based on market data obtained from sources independent of the Company. Unobservable inputs are inputs that reflect the Company's assumptions about the assumptions market participants would use in pricing the asset or liability developed based on the best information available in the circumstances. Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability (i.e., the "exit price") in an orderly transaction between market participants at the measurement date.

The hierarchy is broken down into three levels based on the observability of inputs as follows:

- Level 1 — Valuations based on quoted prices in active markets for identical assets or liabilities that the Company has the ability to access. Since valuations are based quoted prices that are readily and regularly available in an active market, valuation of these products does not entail a significant degree of judgment.

- Level 2 — Valuations based on one or more quoted prices in markets that are not active or for which all significant inputs are observable, either directly or indirectly.

- Level 3 — Valuations based on inputs that are unobservable and significant to the overall fair value measurement.

The availability of observable inputs can vary by types of assets and liabilities and is affected by a wide variety of factors, including, for example, whether an instrument is established in the marketplace, the liquidity of markets and other characteristics particular to the transaction. To the extent that valuation is based on models or inputs that are less observable or unobservable in the market, the determination of fair value requires more judgment. Accordingly, the degree of judgment exercised by management in determining fair value is greatest for assets and liabilities categorized in Level 3.

App. 0264

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(4) Fair value definition and hierarchy** (cont.)

Level 3 Valuation Process

The estimated fair value of the Company's portfolio of life settlements is determined on a quarterly basis by the Company's portfolio management committee, taking into consideration changes in discount rate assumptions, estimated premium payments and life expectancy estimate assumptions, as well as any changes in economic and other relevant conditions. These inputs are then used to estimate the discounted cash flows using the Model Actuarial Pricing System (MAPS), probabilistic portfolio price model, which estimates the cash flows using various probabilities and scenarios. The valuation process includes a review by senior management as of each valuation date. Management has also engaged a third-party expert to independently test the accuracy of the valuations using the inputs provided by management on a quarterly basis.

Life insurance policies, as well as the portfolio taken as a whole, represent financial instruments recorded at fair value on a recurring basis. The following table reconciles the beginning and ending fair value of the Company's Level 3 investments in its portfolio of life insurance policies for the years ending December 31, as follows:

|  | Years Ended December 31, | |
| --- | --- | --- |
|  | **2015** | **2014** |
| Beginning balance | $ 282,883,000 | $ 234,673,000 |
| Purchases | 38,907,000 | 12,468,000 |
| Maturities (cash in excess of carrying value) | (4,511,000) | (4,186,000) |
| Net change in fair value | 39,371,000 | 39,928,000 |
| Ending balance | $ 356,650,000 | $ 282,883,000 |

The fair value of a portfolio of life insurance policies is based on information available to the Company at the reporting date. Fair value is based upon a discounted cash flow model that incorporates life expectancy estimate assumptions. Life expectancy estimates are obtained from independent, third- party widely accepted life expectancy estimate providers at policy acquisition. The life expectancy values of each insured, as determined at policy acquisition, are rolled down monthly for the passage of time by the MAPS actuarial software the Company uses for ongoing valuation of its portfolio of life insurance policies.

During the 4th quarter of 2014, GWG adopted a plan to update the life expectancy reports on the insured lives in our portfolio. The plan covers all policies with the exception of those policies purchased with small face amount underwriting standards (under $1 million in face amount). The plan is for each set of life expectancy estimates and medical records to be updated on a continuous rotating three-year cycle. The records for approximately 1/12th of the portfolio are being updated each quarter.

The discount rate incorporates current information about discount rate applied by other reporting companies owning portfolios of life insurance policies, discount rates observed in the life insurance secondary market, market interest rates, the credit exposure to the insurance company that issued the life insurance policy and management's estimate of the risk premium a purchaser would require to receive the future cash flows derived from our portfolio of life insurance policies.

On September 15, 2014, 21st Services announced changes to its mortality tables primarily for insureds age 90 and older, as well as updated adjustment factors designed to better underwrite seniors with multiple impairments. These changes represent small portions of 21st Services' historical underwritings. We expect medical-actuarial underwriting firms to continue improving and refining their underwriting methodology.

F-12

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(4) Fair value definition and hierarchy** (cont.)

The fair value of life insurance policies is estimated using present value calculations of estimated cash flows based on the data specific to each individual life insurance policy. Estimated future policy premium payments are calculated based on the terms of the policy and the premium payment history. The following summarizes the unobservable inputs utilized in estimating the fair value of the portfolio of life insurance policies:

|  | As of December 31, 2015 | As of December 31, 2014 |
|---|---|---|
| Weighted-average age of insured, years | 82.6 | 82.8 |
| Weighted-average life expectancy, months | 79.3 | 78.4 |
| Average face amount per policy | $ 2,386,000 | $ 2,677,000 |
| Discount rate | 11.09% | 11.43% |

These assumptions are, by their nature, inherently uncertain and the effect of changes in estimates may be significant. The techniques used in estimating the present value of estimated cash flows are derived from valuation techniques generally used in the industry that include inputs for the asset that are not based on observable market data. The extent to which the fair value could reasonably vary in the near term has been quantified by evaluating the effect of changes in significant underlying assumptions used to estimate the fair value. If the life expectancy estimates were increased or decreased by four and eight months on each outstanding policy and the discount factors were increased or decreased by 1% and 2%, while all other variables are held constant, the fair value of the investment in life insurance policies would increase or (decrease) by the amounts summarized below:

|  | Change in life expectancy estimates | | | |
|---|---|---|---|---|
|  | minus 8 months | minus 4 months | plus 4 months | plus 8 months |
| December 31, 2015 | $ 48,339,000 | $ 24,076,000 | $ (23,501,000) | $ (46,482,000) |
| December 31, 2014 | $ 40,634,000 | $ 20,130,000 | $ (19,664,000) | $ (38,864,000) |

|  | Change in discount rate | | | |
|---|---|---|---|---|
|  | minus 2% | minus 1% | plus 1% | plus 2% |
| December 31, 2015 | $ 35,024,000 | $ 16,786,000 | $ (15,485,000) | $ (29,803,000) |
| December 31, 2014 | $ 28,179,000 | $ 13,522,000 | $ (12,502,000) | $ (24,085,000) |

Other Fair Value Considerations

Carrying value of receivables, prepaid expenses, accounts payable and accrued expenses approximate fair value due to their short-term maturities and low credit risk. The estimated fair value of the Company's Series I Secured Notes payable and L Bonds is approximately $307,640,000 based on a weighted-average market interest rate of 7.07% based on an income approach, the combined face value of these notes is $305,749,000 as of December 31, 2015. The carrying value of the revolving senior credit facility reflects interest charged at the commercial paper rate plus an applicable margin. The margin represents our credit risk, and the strength of the portfolio of life insurance policies collateralizing the debt. The overall rate reflects market, and the carrying value of the revolver approximates fair value. All of the financial instruments are Level 3 fair value measurements.

The Company has issued warrants to purchase common stock in connection with the issuance of its convertible preferred stock. Warrants were determined by the Company as permanent equity. The fair value measurements associated with the warrants, measured at issuance represent Level 3 instruments.

App. 0266

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(4) Fair value definition and hierarchy** (cont.)

As of December 31, 2015:

| Month issued | Warrants issued | Fair value per share | Risk free rate | Volatility | Term |
|---|---|---|---|---|---|
| December 2011 | 68,937 | $ 0.22 | 0.42% | 25.25% | 5 years |
| March 2012 | 38,130 | $ 0.52 | 0.38% | 36.20% | 5 years |
| June 2012 | 161,840 | $ 1.16 | 0.41% | 47.36% | 5 years |
| July 2012 | 144,547 | $ 1.16 | 0.41% | 47.36% | 5 years |
| September 2012 | 2,500 | $ 0.72 | 0.31% | 40.49% | 5 years |
| September 2014 | 16,000 | $ 1.26 | 1.85% | 17.03% | 5 years |
| | 431,954 | | | | |

Volatility is based upon the weekly percentage change in the stock price of selected comparable insurance companies. In June 2012, the Company evaluated the comparable companies used, and made certain changes to those used. The percentage change is calculated on the average price of those selected stocks at the weekly close of business for the year preceding the balance sheet date. The Company compares annual volatility based on this weekly information.

**(5) Credit facilities**

**Revolving senior credit facility — Autobahn Funding Company LLC**

On July 15, 2008, DLP II entered into a revolving senior credit facility pursuant to a Credit and Security Agreement (Agreement) with Autobahn Funding Company LLC (Autobahn), providing the Company with a maximum borrowing amount of $100,000,000. Autobahn is a commercial paper conduit that issues commercial paper to investors in order to provide funding to DLP II. DZ Bank AG Deutsche Zentral-Genossenschaftsbank (DZ Bank) acts as the agent for Autobahn. The original Agreement was to expire on July 15, 2013. On January 29, 2013, GWG Holdings, together with GWG Life and DLP II, entered into an Amended and Restated Credit and Security Agreement with Autobahn, extending the facility expiration date to December 31, 2014. On May 29, 2014, GWG Holdings, together with GWG Life and DLP II, entered into an Amendment No. 1 to Amended and Restated Credit and Security Agreement with Autobahn and DZ Bank (as committed lender and Agent). The amendment was entered into for the purpose of extending the maturity date for borrowings under the Agreement to December 31, 2016. Effective May 11, 2015, GWG Holdings, together with certain of its subsidiaries, entered into a Second Amended and Restated Credit and Security Agreement with Autobahn Funding Company LLC, as the conduit lender, and DZ Bank AG Deutsche Zentral-Genossenschaftsbank, as the committed lender and as the agent on behalf of secured parties under such agreement. The Second Amended and Restated Credit and Security Agreement extends the maturity date of borrowings made by DLP II and DLP III, to June 30, 2018. Advances under the senior credit facility made after May 11, 2015 will bear interest at the commercial paper rate of the lender at the time of the advance, or at the lender's cost of borrowing plus 4.25%, which is 1.75% less than under the previous Credit and Security Agreement executed on January 25, 2013. In addition to the extended term and decreased interest rate and borrowing cost, the Second Amended and Restated Credit and Security Agreement also removes the requirement that the Company maintain a reserve for certain projected expenditures (including anticipated premium payments required to service its life insurance portfolio), thereby allowing for the Company's full use of the senior credit facility up to its limit of $105,000,000.

In connection with the Second Amended and Restated Credit and Security Agreement, GWG Holdings and its subsidiaries entered into certain other agreements and amendments and restatements of earlier agreements entered into in connection with the original and renewal Credit and Security Agreements. Included among these other agreements was an Amended and Restated Performance Guaranty affirming the performance guaranty that GWG Holdings earlier provided in connection with the original and first Amended and Restated Credit and Security Agreements to DZ Bank AG Deutsche Zentral-Genossenschaftsbank, as agent. The amount outstanding under this facility was $65,011,000 and $72,161,000 at December 31, 2015 and December 31, 2014, respectively.

App. 0267

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(5) Credit facilities** (cont.)

The Agreement requires DLP II to pay, on a monthly basis, interest at the commercial paper rate plus an applicable margin, as defined in the Agreement. The effective rate was 5.58% at December 31, 2015 and 6.24% at December 31, 2014. The Agreement also requires payment of an unused line fee on the unfunded amount under the revolving senior credit facility. The weighted-average effective interest rate (excluding the unused line fee) was 5.74% and 6.22% for the twelve months ended December 31, 2015 and 2014, respectively. The note is secured by substantially all of DLP II's and DLP III's assets, which consist primarily of life insurance policies.

The Agreement has certain financial and nonfinancial covenants. The Company was in compliance with these covenants at December 31, 2015 and December 31, 2014. The Agreement generally prohibits the Company from:

- changing its corporate name, offices, and jurisdiction of incorporation;

- changing any deposit accounts or payment instructions to insurers;

- changing any operating policies and practices such that it would be reasonably likely to adversely affect the collectability of any asset in any material respect;

- merging or consolidating with, or selling all or substantially all of its assets to, any third party;

- selling any collateral or creating or permitting to exist any adverse claim upon any collateral;

- engaging in any other business or activity than that contemplated by the Agreement;

- incurring or guaranteeing any debt for borrowed money;

- amending the Company's certificate of incorporation or bylaws, making any loans or advances to, investments in, or paying any dividends to, any person unless both before and after any such loan, advance, investment or dividend there exists no actual event of default, potential event of default or termination event;

- removing an independent director on the board of directors except for cause or with the consent of the lender; or

- making payment on or issuing any Series I Secured Notes or L Bonds, or amending any agreements respecting such notes or bonds, if an event of default, potential event of default, or termination event exists or would arise from any such action.

In addition, the Company has agreed to maintain (i) a positive consolidated net income on a non-GAAP basis (as defined and calculated under the Agreement) for each complete fiscal year and (ii) a tangible net worth on a non-GAAP basis (again, as defined and calculated under the Agreement) of not less than $45 million, and (iii) maintain cash and eligible investments at $15 million or above.

Consolidated Non-GAAP net income and Non-GAAP tangible net worth as of and for the four quarters ended December 31, 2015, as calculated under the Agreement, was $36,871,000 and $112,555,000 respectively.

Advances under the Agreement are subject to a borrowing base formula, which limits the availability of advances based on attributes of policies pledged to the facility. Over-concentration of policies by insurance carrier, over-concentration of policies by insurance carriers with ratings below a AA- rating, and the premiums and facility fees reserve are the three primary factors which might limit availability of funds on the facility. Total funds available for additional borrowings under the borrowing base formula criteria at December 31, 2015 and December 31, 2014, were $39,989,000 and $20,585,000 respectively.

F-15

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(6) Series I Secured Notes payable**

Series I Secured Notes payable have been issued in conjunction with the GWG Series I Secured Notes private placement memorandum dated August 25, 2009 (last revised November 15, 2010). Series I Secured Notes are secured by assets of GWG Life and are subordinate to our revolving senior credit facility (see note 5). On June 14, 2011, the Company closed the offering to additional investors; however, existing investors may elect to continue advancing amounts outstanding upon maturity subject to the Company's option. Series I Secured Notes have maturity dates ranging from six months to seven years with fixed interest rates varying from 5.65% to 9.55% depending on the term of the note. Interest is payable monthly, quarterly, annually or at maturity depending on the terms of the note. At December 31, 2015 and December 31, 2014, the weighted-average interest rate of Series I Secured Notes was 8.47% and 8.37%, respectively. The notes are secured by assets of GWG Life. The principal amount outstanding under these Series I Secured Notes was $23,578,000 and $28,047,000 at December 31, 2015 and 2014, respectively. The difference between the amount outstanding on the Series I Secured Notes and the carrying amount on the consolidated balance sheet is due to netting of unamortized deferred issuance costs. Overall, interest expense includes amortization of deferred financing and issuance costs of $362,000 and $552,000 in 2015 and 2014, respectively. Future expected amortization of deferred financing costs is $290,000 in total over the next six years.

Future contractual maturities of Series I Secured Notes payable and future amortization of their deferred financing costs at December 31, 2015 are as follows:

| Years Ending December 31, | Contractual Maturities | | Amortization of Deferred Financing Costs | |
|---|---|---|---|---|
| 2016 | $ | 13,819,000 | $ | 67,000 |
| 2017 | | 6,180,000 | | 108,000 |
| 2018 | | 1,427,000 | | 41,000 |
| 2019 | | 347,000 | | 7,000 |
| 2020 | | 1,765,000 | | 66,000 |
| 2021 | | 40,000 | | 1,000 |
| | $ | 23,578,000 | $ | 290,000 |

**(7) L Bonds**

The Company registered with the SEC, effective January of 2012, the offer and sale of $250,000,000 of Renewable Secured Debentures (subsequently renamed "L Bonds"). The debt securities are secured by assets of GWG Holdings and GWG Life and are subordinate to our revolving senior credit facility (see note 5). L Bonds have maturity dates ranging from six months to seven years with fixed interest rates varying from 4.25% to 9.50% depending on the term of the note. Interest is payable monthly, annually or at maturity depending on the terms of the debenture.

Effective January 9, 2015, the Company launched a $1 billion follow-on offering of L Bonds. The Company is offering L Bonds on a continuous basis and there is no minimum amount of L Bonds that must be sold before the Company can use proceeds from the sale of L Bonds. Emerson Equity LLC is serving as the managing broker-dealer for the offering, which is being sold through a network of participating dealers and licensed financial advisors and representatives in minimum increments of $25,000. At December 31, 2015 and 2014, the weighted-average interest rate of L Bonds was 7.18% and 7.45%, respectively. The amount outstanding under these L Bonds was $282,171,000 and $186,377,000 at December 31, 2015 and 2014, respectively. The difference between the amount outstanding on the L Bonds and the carrying amount on the consolidated balance sheets is due to netting of unamortized deferred issuance costs and cash receipts for new issuances in process. Amortization of deferred issuance costs was $5,285,000 and $3,537,000 in 2015 and 2014, respectively. Future expected amortization of deferred financing costs as of December 31, 2015 is $8,158,000 in total over the next seven years.

F-16

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(7) L Bonds** (cont.)

Future contractual maturities of L Bonds and future amortization of their deferred financing costs at December 31, 2015 are as follows:

| Years Ending December 31, | | Contractual Maturities | | Amortization of Deferred Financing Costs |
|---|---|---|---|---|
| 2016 | $ | 94,790,000 | $ | 785,000 |
| 2017 | | 64,589,000 | | 1,834,000 |
| 2018 | | 64,372,000 | | 2,694,000 |
| 2019 | | 18,514,000 | | 742,000 |
| 2020 | | 19,810,000 | | 967,000 |
| Thereafter | | 20,096,000 | | 1,136,000 |
| | $ | 282,171,000 | $ | 8,158,000 |

The Company entered into an Indenture effective October 19, 2011 with Holdings as obligor, GWG Life as guarantor, and Bank of Utah as trustee for the benefit of the bond holders. The Indenture has certain financial and non-financial covenants. The Company was in compliance with these covenants at December 31, 2015 and 2014.

**(8) Convertible preferred stock**

The Company offered 3,333,333 shares of convertible redeemable preferred stock (Series A Preferred Stock) for sale to accredited investors in a private placement on July 31, 2011. The offering of Series A Preferred Stock concluded on September 2, 2012 and resulted in 3,278,000 shares being issued for gross consideration of $24,582,000. As of December 31, 2015, 277,000 shares of Series A Preferred Stock have been issued as a result of conversion of $1,936,681 in dividends, and 678,000 shares of Series A Preferred Stock have been converted to 508,000 shares of the Company's common stock. The Series A Preferred Stock was sold at an offering price of $7.50 per share. Series A Preferred Stock has a preferred yield of 10% per annum, and each share has the right to convert into 0.75 shares of the Company's common stock. Series A preferred shareholders also received three-year warrants to purchase, at an exercise price per share of $12.50, one share of common stock for every 40 shares of Series A Preferred Stock purchased. The warrants are exercisable immediately. Effective August 1, 2014, the Board of Directors authorized the extension of the warrant exercise period for an additional two years. In the Certificate of Designations for the Series A Preferred Stock, the Company agreed to permit preferred shareholders to sell their shares back to the Company for the stated value of $7.50 per share, plus accrued dividends, according to the following schedule:

- Up to 33% of the holder's unredeemed shares one year after issuance:

- Up to 66% of the holder's unredeemed shares two years after issuance; and

- Up to 100% of the holder's unredeemed shares three years after issuance.

The Company's obligation to redeem its Series A Preferred Stock terminated upon the Company completing a registration of its common stock with the SEC, which occurred on September 24, 2014 (see Note 11). As such, the convertible redeemable preferred stock was reclassified from temporary equity to permanent equity. The Company may redeem the Series A Preferred Stock at a price equal to 110% of its liquidation preference ($7.50 per share) at any time. As of December 31, 2015, the Company had redeemed an aggregate of 185,000 shares of Series A Preferred Stock. The Series A Preferred Stock shares (i) were convertible, at the election of the Company, into common stock of the Company in the event of either a registered offering of the Company's common stock with the SEC aggregating gross proceeds of at least $5.0 million and at a price equal to or greater than $11.00 per share; (ii) remain convertible at the option of each holder; and (iii) are required to be converted upon the consent of shareholders holding at least a majority of the then-outstanding Series A Preferred Stock. In connection with the Company's initial public offering, the Company elected to cause the conversion of 677,566 shares of preferred stock into 508,193 shares of common stock. As of December 31,

2015, the Company had 2,782,000 shares of Series A Preferred Stock outstanding with gross consideration of $20,800,000 (including cash proceeds, conversion of Series I Secured Notes and accrued

F-17

App. 0271

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(8) Convertible preferred stock** (cont.)

interest on Series I notes, and conversion of preferred dividends payable). The Company incurred Series A Preferred Stock issuance costs of $2,838,000, all of which was included as a component of additional paid in capital as of December 31, 2015.

The Company determined that the grant date fair value of the outstanding warrants attached to the Series A Preferred Stock was $428,000 for warrants outstanding as of December 31, 2015. The Company may redeem outstanding warrants prior to their expiration, at a price of $0.01 per share upon 30 days written notice to the investors at any time after (i) the Company has completed a registration of its common stock with the SEC and (ii) the volume of weighted-average sale price per share of common stock equals or exceeds $14.00 per share for ten consecutive trading days ending on the third business day prior to proper notice of such redemption.

Total warrants outstanding as of both December 31, 2015 and 2014, were 431,954 with a weighted-average remaining life of 1.43 and 2.43 years, respectively. As of December 31, 2015, none of these warrants have been exercised.

Dividends on the Series A Preferred Stock may be paid in either cash or additional shares of Series A Preferred Stock at the election of the holder and approval of the Company. The dividends are reported as an expense and included in the caption interest expense in the consolidated statements of operations. The Company declared and accrued dividends of $2,069,000 and $2,428,000 in 2015 and 2014, respectively, pursuant to a board resolution declaring the dividend. 98,000 and 111,000 shares of Series A Preferred Stock were issued in lieu of cash dividends in 2015 and 2014, respectively. The shares issued in lieu of cash dividends were issued at $7.00 per share. As of December 31, 2015, GWG Holdings has $520,000 of accrued preferred dividends which were paid or converted to shares of Series A Preferred Stock on January 15, 2016.

**(9) Redeemable Preferred Stock**

The Company began offering up to 100,000 shares of Redeemable Preferred Stock for sale via Form S-1 registration statement effective November 30, 2015. The proposed maximum offering price per share is $1,000 with a par value per share of $.001. We also registered an indeterminate number of shares of common stock that may be issuable upon the conversion of the Redeemable Preferred Stock. The shares of shares of common stock issuable upon conversion of the Redeemable Preferred Stock will be issued for no additional consideration.

The Redeemable Preferred Stock ranks senior to our common stock, pari passu to our Series A Preferred Stock and senior or pari passu with all other classes and series of our preferred stock with respect to payment of dividends and rights upon liquidation dissolution or winding up. Redeemable Preferred Stock has an annualized yield of 7%.

Subject to the limitations described below, holders of Redeemable Preferred Stock will have the option to convert the Redeemable Preferred Stock they purchase from us and hold into common stock at a conversion price equal to the volume-weighted average price of our common stock for the 20 trading days immediately prior to the date on which notice of conversion is delivered to us, subject to a minimum conversion price of $15.00, subject to equitable adjustment. The right of holders to convert their Redeemable Preferred Stock is limited to 15% of the stated value of Redeemable Preferred Stock originally purchased by such holder from us *and* still held by such holder.

Beginning one year from the date of original issuance of any shares of Redeemable Preferred Stock to be redeemed, a holder will have the opportunity to request once per calendar quarter that we redeem up to 25% of such holder's Redeemable Preferred Stock originally purchased from us (plus any preferred shares issued in satisfaction of dividends thereon) at a redemption price equal to the stated value of such redeemed shares, plus any accrued but unpaid dividends thereon, less the applicable redemption fee (if any). As a percentage of the aggregate redemption price of a holder's shares to be redeemed, the redemption fee shall be:

- 8% if the redemption is requested after the first anniversary and before the second anniversary of the original issuance of such shares.

- 5% if the redemption is requested after the second anniversary and before the third anniversary of the original issuance of such shares.

F-18

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(9) Redeemable Preferred Stock** (cont.)

Beginning three years from the date of original issuance of such shares, no redemption fee shall be subtracted from the redemption price. Subject to certain restrictions and conditions, we will also redeem shares of Redeemable Preferred Stock of a holder who is a natural person (including an individual beneficial holder who holds our preferred shares through a custodian or nominee, such as a broker-dealer) upon his or her death, total disability or bankruptcy, within 60 days of our receipt of a written request from the holder or the holder's estate at a redemption price equal to the stated value, plus accrued and unpaid dividends thereon.

After one year from the date of original issuance of shares of Redeemable Preferred Stock, we will have the right (but not the obligation) to call and redeem such shares of Redeemable Preferred Stock at 100% of their stated value, plus any accrued but unpaid dividends thereon.

We will not be obligated in all cases to redeem shares of Redeemable Preferred Stock, whether upon a redemption request by a holder, at the option of the Company, or upon the death, total disability or bankruptcy of a holder. In particular, we will not redeem or repurchase any preferred shares if we are restricted by applicable law or our Certificate of Incorporation, as amended, from making such redemption or to the extent any such redemption would cause or constitute a default under any borrowing agreements to which we or any of our subsidiaries are a party or otherwise bound. In addition, we will have no obligation to redeem preferred shares upon a redemption request made by a holder if we do not have sufficient funds available to fund that redemption. We have discretion under the Certificate of Designation for the Redeemable Preferred Stock to determine whether we are in possession of "sufficient funds" to fund a redemption request.

As of December 31, 2015 no shares of Redeemable Preferred Stock were issued.

**(10) Income taxes**

The Company did not have any current income taxes for the years ended December 31, 2015 or 2014. The components of deferred income tax benefit for 2015 and 2014 consisted of the following:

|  | 2015 | 2014 |
|---|---|---|
| **Income tax provision:** | | |
| Deferred: | | |
| Federal | $ (2,660,000) | $ (1,820,000) |
| State | (850,000) | (582,000) |
| Total income tax expense | $ (3,510,000) | $ (2,402,000) |

The following table provides a reconciliation of our income tax expense (benefit) at the statutory federal tax rate to our actual income tax expense (benefit):

|  | 2015 | | 2014 | |
|---|---|---|---|---|
| Statutory federal income tax | $ (3,707,000) | 34.0% | $ (2,844,000) | 34.0% |
| State income taxes, net of federal benefit | (561,000) | 5.1% | (374,000) | 4.5% |
| Series A Preferred Stock dividends | 703,000 | (6.4)% | 826,000 | (9.9)% |
| Other permanent differences | 55,000 | (0.5)% | (10,000) | 0.1% |
| Total income tax expense | $ (3,510,000) | 32.2% | $ (2,402,000) | 28.7% |

The primary differences between the Company's December 31, 2015 effective tax rate and the statutory federal rate are the accrual of nondeductible preferred stock dividend expense of $2,069,000, state taxes, and other non-deductible expenses. The most significant temporary differences between GAAP net income and taxable net income are the treatment of interest costs with respect to the acquisition of the life insurance policies and revenue recognition with respect to the mark-to-market of life insurance portfolio.

F-19

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(10) Income taxes** (cont.)

The tax effects of temporary differences that give rise to deferred income taxes were as follows:

|  | 2015 | 2014 |
|---|---|---|
| Deferred tax assets : | | |
| Note receivable from related party | $ 2,023,000 | $ 2,023,000 |
| Net operating loss carryforwards | 7,049,000 | 4,517,000 |
| Other assets | 375,000 | 272,000 |
| Subtotal | 9,447,000 | 6,812,000 |
| Valuation allowance | (2,164,000) | (2,164,000) |
| Net deferred tax asset | 7,283,000 | 4,648,000 |
| | | |
| Deferred tax liabilities: | | |
| Investment in life settlements | (9,046,000) | (9,922,000) |
| Other | (1,000) | — |
| Net deferred tax assets | $ (1,764,000) | $ (5,274,000) |

At December 31, 2015 and 2014, the Company had federal net operating loss (NOL) carryforwards of $17,451,000 and $11,163,000, respectively, and aggregate state NOL carryforwards of approximately $17,423,000 and $7,334,000, respectively. The NOL carryforwards will begin to expire in 2031. Future utilization of NOL carryforwards is subject to limitations under Section 382 of the Internal Revenue Code. This section generally relates to a more than 50 percent change in ownership over a three-year period. We currently do not believe that any issuance of common stock has resulted in an ownership change under Section 382.

The Company provides for a valuation allowance when it is not considered more likely than not that our deferred tax assets will be realized. At both December 31, 2015 and 2014 based upon all available evidence, the Company has provided a valuation allowance of $2,164,000, against deferred tax assets related to the likelihood of recovering the tax benefit of a capital loss on a note receivable from a related entity and other capital losses. Management believes all other deferred tax assets are recoverable.

ASC 740, *Income Taxes*, requires the reporting of certain tax positions which do not meet a threshold of "more-likely-than-not" to be recorded as uncertain tax benefits. It management's responsibility to determine whether it is "more-likely-than-not" that a tax position will be sustained upon examination, including resolution of any related appeals or litigation, based upon the technical merits of the position. Management has reviewed all income tax positions taken or expected to be taken for all open years and determined that the income tax positions are appropriately stated and supported. The Company does not anticipate that the total unrecognized tax benefits will significantly change prior to December 31, 2016.

Under the Company's accounting policies, interest and penalties on unrecognized tax benefits, as well as interest received from favorable tax settlements are recognized as components of income tax expense. At December 31, 2015 and 2014, the Company has recorded no accrued interest or penalties related to uncertain tax positions.

The Company's income tax returns for tax years ended December 31, 2013, 2014 and 2015, when filed, remain open to examination by the Internal Revenue Service and various state taxing jurisdictions. The Company's tax return for tax year 2012 has now been examined by the IRS (finalized April of 2015) but is open for examination by various state taxing jurisdictions.

**(11) Common Stock**

On September 24, 2014, GWG consummated an initial public offering of its common stock which resulted in the sale of 800,000 shares of common stock at $12.50 per share. The sale resulted in net proceeds of approximately $8.6 million after the deduction of underwriting commissions, discounts and expense reimbursements. In connection with this offering, the Company listed its common stock on The NASDAQ Capital Market under the ticker symbol "GWGH" effective September 25, 2014.

F-20

App. 0275

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(11) Common Stock** (cont.)

On June 24, 2015 GWG issued 60,000 restricted shares of common stock at $9.70 per share, determined by closing market price, to a vendor as a form of payment for the services the vendor will provide to the Company in the next three years. The cost of the issued shares is being amortized over a twelve-month period.

**(12) Stock Incentive Plan**

The Company adopted the GWG Holdings, Inc. 2013 Stock Incentive Plan on March 27, 2013. On April 23, 2015 the Board of Directors approved amendments to the plan which were subsequently approved by a majority of the Company's stockholders at the annual meeting of stockholders on June 1, 2015. The plan is administered by Compensation Committee of the Board of Directors of the Company. The Company's Chief Executive Officer may, on a discretionary basis and without committee review or approval, grant incentives to new employees of the Company who are not officers of the Company. Incentives under the plan may be granted in one or a combination of the following forms: (a) incentive stock options and non-statutory stock options; (b) stock appreciation rights; (c) stock awards; (d) restricted stock; (e) restricted stock units; and (f) performance shares. Eligible participants include officers and employees of the company, members of the Board of Directors, and consultants or other independent contractors. 2,000,000 shares are issuable under the plan. No person shall receive grants of stock options and SARs under the plan that exceed, in the aggregate 400,000 shares of common stock in any one year. The term of each stock option shall be determined by the committee but shall not exceed ten years. Vested stock options may be exercised in whole or part by the holder giving notice to the Company. The holder of the option may provide payment for the exercise price or surrender shares equal to the exercise price.

The Company issued stock options for 1,053,615 shares of common stock to employees, officers, and directors of the Company through December 31, 2015. Options for 483,703 shares have vested, and the remaining options will vest over three years. The options were issued with an exercise price between $6.60 and $10.18 for those owning more than 10% of the Company's stock and between $6.00 and $10.25 for others, which is equal to the estimated market price of the shares on the date of grant valued using Black-Scholes binomial option pricing model. The expected volatility used in the Black-Scholes model valuation of options issued during the year was 20.59% annualized. The annual volatility rate is based on the standard deviation of the average continuously compounded rate of return of five selected comparable companies over the previous 52 weeks. Forfeiture rate of 15% is based on historical Company information and expected future trend. As of December 31, 2015, stock options for 335,185 shares were forfeited and stock options for 28,001 shares were exercised.

In September 2014, we entered into a stock option agreement (the Agreement) with a new management employee (the Employee) granting the Employee the right to purchase up to 318,000 of the Company's common stock at an exercise price of $12.50. The grant of such rights to purchase the Company's common stock was treated as an inducement grant and was issued outside the GWG Holdings Inc. 2013 Stock Incentive Plan. The Agreement specifies that, among other things, options to purchase 159,000 shares of the Company's common stock will vest with the Employee ratably on the first, second and third anniversary of the date of the Agreement. The remaining 159,000 options will vest quarterly using a formula based upon the closing price of the Company's common stock on the last business day of such quarter. The maximum number of these remaining options that will vest with the Employee is 53,000 in each successive one-year period beginning on the date of the Agreement. As of December 31, 2015 53,000 of these options were forfeited and 53,000 have vested.

F-21

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(12) Stock Incentive Plan** (cont.)

Outstanding stock options:

| | Vested | Un-vested | Total |
|---|---|---|---|
| **Balance as of December 31, 2013** | 195,000 | 210,250 | 405,250 |
| Granted during the year | 64,450 | 565,901 | 630,351 |
| Vested during the year | 72,089 | (72,089) | — |
| Exercised during the year | (334) | — | (334) |
| Forfeited during the year | (16,917) | (18,249) | (35,166) |
| **Balance as of December 31, 2014** | 314,288 | 685,813 | 1,000,101 |
| Granted during the year | 79,500 | 273,700 | 353,200 |
| Vested during the year | 238,999 | (238,999) | — |
| Exercised during the year | (27,667) | — | (27,667) |
| Forfeited during the year | (121,417) | (150,602) | (272,019) |
| **Balance as of December 31, 2015** | 483,703 | 569,912 | 1,053,615 |

Compensation expense related to un-vested options not yet recognized is $460,000. We expect to recognize this compensation expense over the next three years ($223,000 in 2016, $187,000 in 2017, and 50,000 in 2018). The Company issues new common stock for options exercised.

**(13) Net loss per common share**

The Company began issuing Series A Preferred Stock September, 1, 2011, as described in note 8. The Series A Preferred Stock is anti-dilutive to the net loss per common share calculation at December 31, 2015 and 2014. The Company has also issued warrants to purchase common stock in conjunction with the sale of convertible preferred stock, discussed in note 8. The warrants and vested stock options are anti-dilutive at December 31, 2015 and 2014 and have not been included in the fully diluted net loss per common share calculation.

**(14) Commitments**

The Company entered into an office lease with U.S. Bank National Association as the landlord. The lease was effective April 22, 2012 with a term through August 31, 2015. The lease is for 11,695 square feet of office space located at 220 South Sixth Street, Minneapolis, Minnesota. The Company is obligated to pay base rent plus common area maintenance and a share of the building operating costs. Effective September 1, 2015, the Company entered into a Second Amendment to the office lease with US Bank National Association that extended the term of the lease to 120 months from the effective date and expanded to 17,687 square feet. The landlord provided $50 per square foot (a total of $884,350) for tenant improvements to the leased space. The Second Amendment provides the right for us to extend the term of the lease for one three-year term, and a right of first offer on space adjacent to our leased premises.

The Company is obligated to pay base rent plus common area maintenance and a share of the building operating costs. Rent expenses under this agreement were $283,000 and $211,000 during 2015 and 2014, respectively.

Minimum lease payments under the Second Amendment to Lease are as follows:

| | | |
|---|---|---|
| 2016 | $ | 173,000 |
| 2017 | | 178,000 |
| 2018 | | 185,000 |
| 2019 | | 191,000 |
| 2020 | | 198,000 |
| 2021 | | 204,000 |
| 2022 | | 210,000 |
| 2023 | | 217,000 |
| 2024 | | 223,000 |

| | |
|---|---|
| 2025 | 230,000 |
| 2026 | 38,000 |
| | $ 2,047,000 |

F-22

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(15) Contingencies**

Litigation — In the normal course of business, the Company is involved in various legal proceedings. In the opinion of management, any liability resulting from such proceedings would not have a material adverse effect on the Company's financial position, results of operations or cash flows.

**(16) Guarantees of L Bonds**

GWG Holdings has registered with the SEC the offer and sale $250,000,000 of L Bonds, and effective January 9, 2015, launched a $1 billion follow-on to its publicly registered L Bond offering as described in note 7. The L Bonds are secured by the assets of GWG Holdings as described in note 7 and a pledge of all the common stock held by the largest individual shareholders. Obligations under the L Bonds are guaranteed by GWG Life. This guarantee involves the grant of a security interest in all the assets of GWG Life. The payment of principal and interest on the L Bonds is fully and unconditional guaranteed by GWG Life. Substantially all of the Company's life insurance policies are held by DLP III and the Trust. The policies held by DLP III are not collateral for the L Bond obligations as such policies serve as collateral for the senior credit facility.

The consolidating financial statements are presented in lieu of separate financial statements and other related disclosures of the subsidiary guarantors and issuer because management does not believe that separate financial statements and related disclosures would be material to investors. There are currently no significant restrictions on the ability of GWG Holdings or GWG Life, the guarantor subsidiary, to obtain funds from its subsidiaries by dividend or loan, except as follows. DLP II and DLP III are borrowers under a credit agreement with Autobahn, with DZ Bank AG as agent, as described in note 5. The significant majority of insurance policies owned by the Company are subject to a collateral arrangement with DZ Bank AG described in notes 2 and 5. Under this arrangement, collection and escrow accounts are used to fund premiums of the insurance policies and to pay interest and other charges under the revolving senior credit facility. DZ Bank AG and Autobahn must authorize all disbursements from these accounts, including any distributions to GWG Life. Distributions are limited to an amount that would result in the borrowers (DLP II, DLP III, GWG Life and GWG Holdings) realizing an annualized rate of return on the equity funded amount for such assets of not more than 18%, as determined by DZ Bank AG. After such amount is reached, the credit agreement requires that excess funds be used for repayments of borrowings before any additional distributions may be made.

The following represents consolidating financial information as of December 31, 2015 and 2014, with respect to the financial position, and for the years ended December 31, 2015 and 2014 with respect to results of operations and cash flows of GWG Holdings and its subsidiaries. The parent column presents the financial information of GWG Holdings, the primary obligor of the L Bonds. The guarantor subsidiary column presents the financial information of GWG Life, the guarantor subsidiary of the L Bonds, presenting its investment in DLP II, DLP III and Trust under the equity method. The non-guarantor subsidiaries column presents the financial information of all non-guarantor subsidiaries including DLP II, DLP III and Trust.

F-23

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(16) Guarantees of L Bonds** (cont.)

Consolidating Balance Sheets

| December 31, 2015 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash and cash equivalents | $ 32,292,162 | $ 1,982,722 | $ 150,221 | $ — | $ 34,425,105 |
| Restricted cash | — | 2,102,257 | 239,643 | — | 2,341,900 |
| Investment in life settlements, at fair value | — | — | 356,649,715 | — | 356,649,715 |
| Deferred financing costs, net | 799,029 | 1,000,000 | 731,452 | — | 2,530,481 |
| Other assets | 1,499,575 | 688,071 | 30,900 | — | 2,218,546 |
| Investment in subsidiaries | 269,886,254 | 291,295,951 | — | (561,182,205) | — |
| TOTAL ASSETS | $ 304,477,020 | $ 297,069,001 | $ 357,801,931 | $(561,182,205) | $ 398,165,747 |

**LIABILITIES & STOCKHOLDERS' EQUITY (DEFICIT)**

| | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **LIABILITIES** | | | | | |
| Revolving senior credit facility | $ — | $ — | $ 65,011,048 | $ — | $ 65,011,048 |
| Series I Secured Notes payable | — | 23,287,704 | — | — | 23,287,704 |
| L Bonds | 277,024,326 | — | — | — | 277,024,326 |
| Accounts payable | 280,988 | 157,217 | 1,079,235 | — | 1,517,440 |
| Interest payable | 8,529,959 | 3,544,626 | 265,476 | — | 12,340,061 |
| Other accrued expenses | 717,365 | 343,421 | — | — | 1,060,786 |
| Deferred taxes | 1,763,968 | — | — | — | 1,763,968 |
| TOTAL LIABILITIES | 288,316,606 | 27,332,968 | 66,355,759 | — | 382,005,333 |
| **STOCKHOLDERS' EQUITY (DEFICIT)** | | | | | |
| Member capital | — | 269,736,033 | 291,446,172 | (561,182,205) | — |
| Convertible preferred stock | 20,799,841 | — | — | — | 20,799,841 |
| Common stock | 5,942 | — | — | — | 5,942 |
| Additional paid-in capital | 17,149,391 | — | — | — | 17,149,391 |
| Accumulated deficit | (21,794,760) | — | — | — | (21,794,760) |
| TOTAL STOCKHOLDERS' EQUITY (DEFICIT) | 16,160,414 | 269,736,033 | 291,446,172 | (561,182,205) | 16,160,414 |

TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT) $ 304,477,020    $ 297,069,001    $ 357,801,931    $(561,182,205)    $ 398,165,747

F-24

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(16) Guarantees of L Bonds** (cont.)

Consolidating Balance Sheets (continued)

| December 31, 2014 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash and cash equivalents | $ 30,446,473 | $ 216,231 | $ — | $ — | $ 30,662,704 |
| Restricted cash | — | 82,500 | 4,213,553 | — | 4,296,053 |
| Investment in life settlements, at fair value | — | — | 282,883,010 | — | 282,883,010 |
| Deferred financing costs, net | 569,400 | 1,000,000 | — | — | 1,569,400 |
| Policy benefits receivable | — | — | 1,750,000 | — | 1,750,000 |
| Other assets | 1,104,328 | 777,534 | 27,500 | — | 1,909,362 |
| Investment in subsidiaries | 185,636,417 | 215,124,779 | — | (400,761,196) | — |
| TOTAL ASSETS | $ 217,756,618 | $ 217,201,044 | $ 288,874,063 | $(400,761,196) | $ 323,070,529 |

**LIABILITIES & STOCKHOLDERS' EQUITY (DEFICIT)**

| | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **LIABILITIES** | | | | | |
| Revolving senior credit facility | $ — | $ — | $ 72,161,048 | $ — | $ 72,161,048 |
| Series I Secured Notes payable | — | 27,616,578 | — | — | 27,616,578 |
| L Bonds | 182,782,884 | — | — | — | 182,782,884 |
| Accounts payable | 410,895 | 242,680 | 550,000 | — | 1,203,575 |
| Interest payable | 6,598,250 | 3,513,615 | 1,016,654 | — | 11,128,519 |
| Other accrued expenses | 301,098 | 191,753 | 21,583 | — | 514,434 |
| Deferred taxes | 5,273,555 | — | — | — | 5,273,555 |
| TOTAL LIABILITIES | 195,366,682 | 31,564,626 | 73,749,285 | — | 300,680,593 |
| **STOCKHOLDERS' EQUITY (DEFICIT)** | | | | | |
| Member capital | — | 185,636,418 | 215,124,778 | (400,761,196) | — |
| Convertible preferred stock | 20,527,866 | — | — | — | 20,527,866 |
| Common stock | 5,870 | — | — | — | 5,870 |
| Additional paid-in capital | 16,257,686 | — | — | — | 16,257,686 |
| Accumulated deficit | (14,401,486) | — | — | — | (14,401,486) |

| | | | | | |
|---|---|---|---|---|---|
| TOTAL STOCKHOLDERS' EQUITY (DEFICIT) | 22,389,936 | 185,636,418 | 215,124,778 | (400,761,196) | 22,389,936 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT) | $ 217,756,618 | $ 217,201,044 | $ 288,874,063 | $(400,761,196) | $ 323,070,529 |

F-25

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(16) Guarantees of L Bonds** (cont.)

Consolidated Statements of Operations

| For the year ended December 31, 2015 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUE | | | | | |
| Contract servicing fees | $ — | $ 2,217,471 | $ — | $ (2,217,471) | $ — |
| Gain on life settlements, net | — | — | 39,381,003 | — | 39,381,003 |
| Interest and other income | 45,613 | 62,125 | 143,511 | | 251,249 |
| TOTAL REVENUE | 45,613 | 2,279,596 | 39,524,514 | (2,217,471) | 39,632,252 |
| | | | | | |
| EXPENSES | | | | | |
| Origination and servicing fees | — | — | 2,217,471 | (2,217,471) | — |
| Interest expense | 24,486,093 | 2,703,124 | 4,398,743 | — | 31,587,960 |
| Employee compensation and benefits | 6,007,347 | 2,002,673 | — | — | 8,010,020 |
| Legal and professional fees | 2,115,580 | 1,037,203 | — | — | 3,152,783 |
| Other expenses | 4,295,085 | 3,347,294 | 141,971 | — | 7,784,350 |
| TOTAL EXPENSES | 36,904,105 | 9,090,294 | 6,758,185 | (2,217,471) | 50,535,113 |
| | | | | | |
| INCOME (LOSS) BEFORE EQUITY IN INCOME OF SUBSIDIARIES | (36,858,492) | (6,810,698) | 32,766,329 | — | (10,902,861) |
| | | | | | |
| EQUITY IN INCOME OF SUBSIDIARIES | 25,955,631 | 32,766,108 | — | (58,721,739) | — |
| | | | | | |
| NET INCOME BEFORE INCOME TAXES | (10,902,861) | 25,955,410 | 32,766,329 | (58,721,739) | (10,902,861) |
| | | | | | |
| INCOME TAX BENEFIT | (3,509,587) | — | — | — | (3,509,587) |
| NET INCOME (LOSS) | (7,393,274) | 25,955,410 | 32,766,329 | (58,721,739) | (7,393,274) |
| (Income) attributable to preferred shareholders | (1,386,110) | — | — | — | (1,386,110) |
| LOSS ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ (6,007,164) | $ — | $ — | $ — | $ (6,007,164) |

F-26

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(16) Guarantees of L Bonds** (cont.)

Consolidated Statements of Operations (continued)

| For the year ended December 31, 2014 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUE | | | | | |
| Contract servicing fees | $ — | $ 1,615,674 | $ — | $ (1,615,674) | $ — |
| Gain on life settlements, net | — | — | 30,416,127 | — | 30,416,127 |
| Interest and other income | 24,037 | 231,034 | 33,469 | (228,092) | 60,448 |
| TOTAL REVENUE | 24,307 | 1,846,708 | 30,449,596 | (1,843,766) | 30,476,575 |
| | | | | | |
| EXPENSES | | | | | |
| Origination and servicing fees | — | — | 1,615,674 | (1,615,674) | — |
| Interest expense | 18,248,599 | 3,110,165 | 5,358,034 | — | 26,716,798 |
| Employee compensation and benefits | 3,018,570 | 1,951,066 | — | — | 4,969,636 |
| Legal and professional fees | 2,021,763 | 307,386 | 10,086 | — | 2,339,235 |
| Other expenses | 2,832,867 | 1,929,557 | 281,102 | (228,092) | 4,815,434 |
| TOTAL EXPENSES | 26,121,799 | 7,298,174 | 7,264,896 | (1,843,766) | 38,841,103 |
| | | | | | |
| INCOME (LOSS) BEFORE EQUITY IN INCOME OF SUBSIDIARIES | (26,097,762) | (5,451,466) | 23,184,700 | — | (8,364,528) |
| | | | | | |
| EQUITY IN INCOME OF SUBSIDIARIES | 17,733,234 | 23,184,700 | — | (40,917,934) | — |
| | | | | | |
| NET INCOME BEFORE INCOME TAXES | 8,364,528 | 17,733,234 | 23,184,700 | (40,917,934) | (8,364,528) |
| | | | | | |
| INCOME TAX BENEFIT | (2,401,619) | — | — | — | (2,401,619) |
| NET INCOME (LOSS) | (5,962,909) | 17,733,234 | 23,184,700 | (40,917,934) | (5,962,909) |
| (Income) attributable to preferred shareholders | (138,374) | — | — | — | (138,374) |
| LOSS ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ (6,101,283) | $ — | $ — | $ — | $ (6,101,283) |

F-27

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(16) Guarantees of L Bonds** (cont.)

Consolidated Statements of Cash Flows

| For the year ended December 31, 2015 | Parent | Guarantor Sub | Non-Guarantor Sub | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | |
| Net income (loss) | $ (7,393,274) | $ 25,955,410 | $ 32,766,329 | $ (58,721,739) | $ (7,393,274) |
| Adjustments to reconcile net income to net cash flows from operating activities: | | | | | |
| (Equity) of subsidiaries | (25,955,632) | (32,766,107) | — | 58,721,739 | — |
| Gain on life settlements, gross | — | — | (39,371,059) | — | (39,371,059) |
| Amortization of deferred financing and issuance costs | 4,081,051 | 362,457 | (731,452) | — | 3,712,056 |
| Deferred income taxes | (3,509,587) | — | — | — | (3,509,587) |
| Preferred stock issued in lieu of cash dividends | 683,133 | — | — | — | 683,133 |
| Preferred stock dividends payable | 6,800 | — | — | — | 6,800 |
| (Increase) decrease in operating assets: | | | | | |
| Due from related parties | — | (1,256) | — | — | (1,256) |
| Policy benefits receivable | — | — | 1,750,000 | — | 1,750,000 |
| Other assets | (58,689,451) | (43,314,345) | — | 101,699,270 | (304,526) |
| Increase (decrease) in operating liabilities: | | | | | |
| Accounts payable | (129,909) | (85,463) | 529,236 | — | 313,864 |
| Interest payable | 2,730,921 | 233,786 | (751,178) | — | 2,213,529 |
| Other accrued expenses | 2,059,136 | 149,242 | (24,985) | — | 2,183,393 |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (86,116,812) | (49,466,276) | (5,833,109) | 101,699,270 | (39,716,927) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | |
| Investment in life settlements | — | — | (38,906,934) | — | (38,906,934) |
| Proceeds from settlement of life settlements | — | — | 4,511,289 | — | 4,511,289 |
| NET CASH FLOWS USED IN INVESTING ACTIVITIES | — | — | (34,395,645) | — | (34,395,645) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | | |
| Net repayment of revolving senior credit facility | — | — | (7,150,000) | — | (7,150,000) |
| Payments for redemption of Series I Secured Notes | — | (4,891,681) | — | — | (4,891,681) |
| Proceeds from issuance of L Bonds | 131,159,348 | — | — | — | 131,159,348 |
| Payment of deferred issuance costs for L Bonds | (7,499,601) | — | — | — | (7,499,601) |
| Payments for redemption of L Bonds | (35,984,061) | — | — | — | (35,984,061) |
| Issuance of common stock | 582,000 | — | — | — | 582,000 |
| Proceeds (payments) from restricted cash | — | (2,019,757) | 3,973,910 | — | 1,954,153 |

| | | | | |
|---|---|---|---|---|
| Payments for redemption of preferred stock | (295,185) | — | — | — | (295,185) |
| Issuance of member capital | — | 58,144,205 | 43,555,065 | (101,699,270) | — |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 87,962,501 | 51,232,767 | 40,378,975 | (101,699,270) | 77,874,973 |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | 1,845,689 | 1,766,491 | 150,221 | — | 3,762,401 |
| **CASH AND CASH EQUIVALENTS** | | | | | |
| BEGINNING OF THE PERIOD | 30,446,473 | 216,231 | — | — | 30,662,704 |
| END OF THE PERIOD | $ 32,292,162 | $ 1,982,722 | $ 150,221 | $ — | $ 34,425,105 |

F-28

App. 0287

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

### (16) Guarantees of L Bonds (cont.)

Consolidated Statements of Cash Flows (continued)

| For the year ended December 31, 2014 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | |
| Net income (loss) | $ (5,962,909) | $ 17,733,234 | $ 23,184,700 | $(40,917,934) | $ (5,962,909) |
| Adjustments to reconcile net income (loss) to cash flows from operating activities: | | | | | |
| (Equity) of subsidiaries | (17,733,234) | (23,184,700) | — | 40,917,934 | — |
| Gain on life settlements | — | — | (39,928,003) | — | (39,928,003) |
| Amortization of deferred financing and issuance costs | 2,967,617 | 479,278 | 357,900 | — | 3,804,795 |
| Deferred income taxes | (2,401,619) | — | — | — | (2,401,619) |
| Preferred stock issued in lieu of cash dividends | 774,085 | — | — | — | 774,085 |
| Convertible, redeemable preferred stock dividends payable | (116,207) | — | — | — | (116,207) |
| (Increase) decrease in operating assets: | | | | | |
| Due from related parties | — | (291) | — | — | (291) |
| Policy benefits receivable | — | — | (1,750,000) | — | (1,750,000) |
| Other assets | (39,118,259) | (33,434,321) | — | 70,205,530 | (2,347,050) |
| Increase (decrease) in operating liabilities: | | | | | |
| Accounts payable | 177,681 | 136,025 | 50,000 | — | 363,706 |
| Interest payable | 3,359,926 | 599,419 | 679,531 | — | 4,638,876 |
| Other accrued expenses | 43,591 | 16,367 | 10,408 | — | 70,366 |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (58,009,328) | (37,654,989) | (17,395,464) | 70,205,530 | (42,854,251) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | |
| Investment in life settlements | — | — | (12,292,401) | — | (12,292,401) |
| Proceeds from settlement of life settlements | — | — | 4,185,813 | — | 4,185,813 |
| NET CASH FLOWS USED IN INVESTING ACTIVITIES | — | — | (8,106,588) | — | (8,106,588) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | | |
| Net repayment of revolving senior credit facility | — | — | (6,838,952) | — | (6,838,952) |
| Payments for redemption of Series I Secured Notes | — | (2,268,379) | — | — | (2,268,379) |
| Proceeds from issuance of L Bonds | 65,713,297 | — | — | — | 65,713,297 |
| Payment of deferred issuance costs for L Bonds | (4,104,876) | — | — | — | (4,104,876) |
| Payments for redemption of L Bonds | (14,429,017) | — | — | — | (14,429,017) |
| Issuance of common stock | 9,030,000 | — | — | — | 9,030,000 |
| Proceeds from restricted cash | — | 1,337,500 | 199,416 | — | 1,536,916 |

| | | | | | |
|---|---|---|---|---|---|
| Payments for redemption of preferred stock | (456,239) | — | — | — | (465,239) |
| Issuance of member capital | — | 38,063,942 | 32,141,588 | (70,205,530) | — |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 55,744,165 | 37,133,063 | 25,502,052 | (70,205,530) | 48,173,750 |
| NET INCREASE IN CASH AND CASH EQUIVALENTS | (2,265,163) | (521,926) | — | — | (2,787,089) |
| **CASH AND CASH EQUIVALENTS** | | | | | |
| BEGINNING OF THE YEAR | 32,711,636 | 738,157 | — | — | 33,449,793 |
| END OF THE YEAR | $ 30,446,473 | $ 216,231 | $ — | $ — | $ 30,662,704 |

F-29

App. 0289

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(17) Concentration**

GWG purchases life insurance policies written by life insurance companies having investment grade ratings by independent rating agencies. As a result there may be certain concentrations of contracts with life insurance companies. The following summarizes the face value of insurance contracts with specific life insurance companies exceeding 10% of the total face value held by the Company.

| | As of December 31, | |
| --- | --- | --- |
| **Life insurance company** | **2015** | **2014** |
| AXA Equitable | 14.00% | 14.55% |
| John Hancock | 12.73% | 11.48% |

The following summarizes the number of insurance contracts held in specific states exceeding 10% of the total face value held by the Company:

| | As of December 31, | |
| --- | --- | --- |
| **State of residence** | **2015** | **2014** |
| California | 25.25% | 28.87% |
| Florida | 19.95% | 18.56% |

**(18) Subsequent events**

Subsequent to December 31, 2015, five policies covering five individuals have matured. The combined insurance benefits of these policies were $9,238,000. The Company recorded realized gains of $6,162,000 on these five policies.

Subsequent to December 31, 2015, the Company has issued approximately an additional $30,341,000 in principal amount of L Bonds.

Subsequent to December 31, 2015 the Company has issued approximately $1,423,000 of Redeemable Preferred Stock.

On January 13, 2016, GWG MCA, LLC was converted to a corporation and became GWG MCA Capital, Inc. GWG MCA Capital, Inc. was formed to engage in the merchant cash advance business. Effective February 4, 2016, GWG MCA Capital began to offer for sale up to of 2,000,000 shares of Redeemable Preferred Stock at an offering price of $10 per share in a private placement. Subsequent to December 31, 2015, the Company hasn't issued any Redeemable Preferred Stock related to this offering. On February 15, 2016, GWG MCA Capital purchased revolving credit arrangements from Walker Preston Capital Holdings, LLC for the amount of $4,354,000. For this purchase, GWG MCA Capital obtained a $2,700,000 loan from GWG Holdings evidenced by a promissory note maturing December 31, 2016, and a $1,760,000 loan from Insurance Strategies Fund, a related party, evidenced by a promissory note maturing December 31, 2016. Both promissory notes accrue interest at a rate of 9% per annum.

F-30

**1,000,000 Units**
**($1,000,000,000)**

# GWG HOLDINGS, INC.
## L Bonds

**PROSPECTUS**

April               , 2016

App. 0291

**PART II**
**INFORMATION NOT REQUIRED IN PROSPECTUS**

### ITEM 13. OTHER EXPENSES OF ISSUANCE AND DISTRIBUTION

Set forth below are expenses (other than the selling agent's commissions, dealer-manager fees and allowance expenses) we expect to be incurred in connection with the issuance and distribution of the securities registered hereby. With the exception of the Securities and Exchange Commission registration fee, the amounts set forth below are estimates and actual expenses may vary considerably from these estimates depending upon how long the notes are offered and other factors:

| | | |
|---|---|---:|
| Securities and Exchange Commission registration fee | $ | 128,800 |
| Accounting fees and expenses | $ | 200,000 |
| Legal fees and expenses | $ | 701,200 |
| Blue sky fees and expenses | $ | 20,000 |
| Printing expenses | $ | 200,000 |
| Trustee fees and expenses | $ | 150,000 |
| Miscellaneous | $ | 100,000 |
| **Total** | $ | 1,500,000 |

### ITEM 14. INDEMNIFICATION OF DIRECTORS AND OFFICERS

Section 145 of the Delaware General Corporation Law provides for, under certain circumstances, the indemnification of our officers, directors, employees and agents against liabilities that they may incur in such capacities. A summary of the circumstances in which such indemnification provided for is contained herein, but that description is qualified in its entirety by reference to the relevant Section of the Delaware General Corporation Law.

In general, the statute provides that any director, officer, employee or agent of a corporation may be indemnified against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement, actually and reasonably incurred in a proceeding (including any civil, criminal, administrative or investigative proceeding) to which the individual was a party by reason of such status. Such indemnity may be provided if the indemnified person's actions resulting in the liabilities: (i) were taken in good faith; (ii) were reasonably believed to have been in or not opposed to our best interest; and (iii) with respect to any criminal action, such person had no reasonable cause to believe the actions were unlawful. Unless ordered by a court, indemnification generally may be awarded only after a determination of independent members of the Board of Directors or a committee thereof, by independent legal counsel or by vote of the stockholders that the applicable standard of conduct was met by the individual to be indemnified.

The statutory provisions further provide that to the extent a director, officer, employee or agent is wholly successful on the merits or otherwise in defense of any proceeding to which he was a party, he is entitled to receive indemnification against expenses, including attorneys' fees, actually and reasonably incurred in connection with the proceeding.

Indemnification in connection with a proceeding by or in the right of GWG Holdings, Inc. (the "*Company*") in which the director, officer, employee or agent is successful is permitted only with respect to expenses, including attorneys' fees actually and reasonably incurred in connection with the defense. In such actions, the person to be indemnified must have acted in good faith, in a manner believed to have been in our best interest and must not have been adjudged liable to us unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability, in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expense which the Court of Chancery or such other court shall deem proper. Indemnification is otherwise prohibited in connection with a proceeding brought on behalf of the Company in which a director is adjudged liable to us, or in connection with any proceeding charging improper personal benefit to the director in which the director is adjudged liable for receipt of an improper personal benefit.

Delaware law authorizes us to reimburse or pay reasonable expenses incurred by a director, officer, employee or agent in connection with a proceeding in advance of a final disposition of the matter. Such advances of expenses are permitted if the person furnishes to us a written agreement to repay such advances if it is determined that he is not entitled to be indemnified by us.

App. 0293

The statutory section cited above further specifies that any provisions for indemnification of or advances for expenses does not exclude other rights under our certificate of incorporation, corporate bylaws, resolutions of our stockholders or disinterested directors, or otherwise. These indemnification provisions continue for a person who has ceased to be a director, officer, employee or agent of the corporation and inure to the benefit of the heirs, executors and administrators of such persons.

The statutory provision cited above also grants the power to the Company to purchase and maintain insurance policies that protect any director, officer, employee or agent against any liability asserted against or incurred by him in such capacity arising out of his status as such. Such policies may provide for indemnification whether or not the corporation would otherwise have the power to provide for it.

Article 6 of our corporate bylaws provides that we shall indemnify our directors, officers, employees and agents to the fullest extent permitted by the Delaware General Corporation Law. Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers or persons controlling the Company pursuant to the foregoing provisions, we understand that in the opinion of the SEC such indemnification is against public policy as expressed in that Act and is therefore unenforceable.

We have purchased directors' and officers' liability insurance in order to limit the exposure to liability for indemnification of directors and officers, including liabilities under the Securities Act of 1933.

## ITEM 15. RECENT SALES OF UNREGISTERED SECURITIES

In 2012, the Company's wholly owned subsidiary, GWG Life, sold $50,000 in principal amount of Series I Secured notes for cash. In addition, $141,052 in principal amount of such notes were sold in consideration of reinvested interest payable on account of earlier issued notes. The Company is a guarantor of GWG Life's obligations under the Series I Secured notes. The notes were offered and sold solely to accredited investors in a private placement under Section 4(a)(2) of the Securities Act of 1933, and Regulation D/Rule 506 thereunder.

In 2012, the Company sold a total of 855,240 shares of Series A Preferred Stock for aggregate cash consideration of $6,414,300. In addition, 563,467 preferred shares were sold in consideration of converted principal and interest owing under Series I Secured notes, and 82,323 preferred shares were issued as in-kind dividends payable on account of the preferred stock. In connection with the sales of preferred stock, the Company issued three-year warrants for the purchase of up to 694,034 shares of common stock at the per-share price of $6.25. The preferred stock and warrants were offered and sold solely to accredited investors in a private placement under Section 4(a)(2) of the Securities Act of 1933, and Regulation D/Rule 506 thereunder. Arque Capital Ltd. was the managing broker-dealer for the offering of the preferred stock and received customary sales commissions aggregating $1,051,000.

In 2013, the Company's wholly owned subsidiary, GWG Life, sold $196,484 in principal amount of Series I Secured notes in consideration of reinvested interest payable on account of earlier issued notes. The Company is a guarantor of GWG Life's obligations under the Series I Secured notes. The notes were offered and sold solely to accredited investors in a private placement under Section 4(a)(2) of the Securities Act of 1933, and Regulation D/Rule 506 thereunder. Arque Capital Ltd. was the managing broker-dealer for the offering of the notes.

In 2013, the Company issued 82,606 shares of Series A Preferred Stock as in-kind dividends payable on account of the preferred stock. The preferred stock was issued sold solely to accredited investors in a private placement under Section 4(a)(2) of the Securities Act of 1933, and Regulation D/Rule 506 thereunder.

In 2014, the Company issued 110,584 shares of Series A Preferred Stock as in-kind dividends payable on account of the preferred stock. The preferred stock was sold solely to accredited investors in a private placement under Section 4(a)(2) of the Securities Act of 1933, and Regulation D/Rule 506 thereunder.

In 2015, the Company issued 60,000 shares of common stock to Brewer Consulting Group in exchange for certain advisory services including financial consulting and marketing support to be provided to the Company by Brewer Consulting Group. The common stock was issued to Brewer Consulting Group, as accredited investor, in a private placement under Section 4(a)(2) of the Securities Act of 1933, and Regulation D/Rule 506 thereunder.

**ITEM 16. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES**

**(a)**    **Exhibits**. The exhibits listed below are filed as a part of this registration statement.

| Exhibit | Description |
|---------|-------------|
| 1.1 | Form of Managing Broker-Dealer Agreement with Emerson Equity[16] |
| 3.1 | Certificate of Incorporation[1] |
| 3.2 | Bylaws[1] |
| 3.3 | Certificate of Amendment to Certificate of Incorporation[3] |
| 3.4 | Certificate of Designations for Series A Convertible Preferred Stock[3] |
| 3.5 | Certificate of Amendment to Certificate of Incorporation[8] |
| 3.5 | Amendment No. 1 to Bylaws[9] |
| 3.6 | Amendment No. 2 to Bylaws[10] |
| 4.1 | Indenture with Bank of Utah, dated October 19, 2011[5] |
| 4.2 | Pledge and Security Agreement by and among GWG Holdings, Inc., GWG Life, LLC, Jon R. Sabes, Steven F. Sabes, and Bank of Utah, dated October 19, 2011[5] |
| 4.3 | Intercreditor Agreement by and among Bank of Utah, and Lord Securities Corporation, dated October 19, 2011[5] |
| 4.4 | Amendment No. 1 to Indenture with Bank of Utah, dated December 15, 2011[6] |
| 4.5 | Amendment No. 1 to Pledge and Security Agreement, dated December 15, 2011[6] |
| 4.6 | Amendment No. 2 to Indenture with Bank of Utah, dated January 9, 2015[12] |
| 4.7 | Amendment No. 1 to Intercreditor Agreement, dated January 9, 2015[13] |
| 4.8 | Amendment No. 2 to Pledge and Security Agreement , dated January 9, 2015[13] |
| 4.9 | Amendment No. 3 to Indenture with Bank of Utah, dated June 12, 2015[14] |
| 4.10 | Amendment No. 2 to Intercreditor Agreement, dated June 12, 2015[14] |
| 4.11 | Amendment No. 3 to Pledge and Security Agreement, dated June 12, 2015[14] |
| 4.12 | Form of L Bond[21] |
| 4.13 | Form of Subscription Agreement for L Bonds[22] |
| 5.1 | Opinion of Maslon[21] |
| 10.1 | Second Amended and Restated Credit and Security Agreement with DZ Bank AG Deutsche Zentral-Genossenschaftsbank (as agent), and Autobahn Funding Company LLC (as lender), dated effective May 11, 2015[11] |
| 10.2 | Amended and Restated Performance Guaranty of GWG Holdings, LLC dated as of May 11, 2015, delivered in favor of DZ Bank AG Deutsche Zentral-Genossenschaftsbank (as agent) and Autobahn Funding Company LLC (as lender)[11] |
| 10.3 | Pledge Agreement dated November 15, 2010, among Jon R. Sabes, Steven F. Sabes, Opportunity Finance, LLC, SFS Trust 1976, SFS Trust 1992 Esther, SFS Trust 1982, Mokeson, LLC (collectively as pledgors), and Lord Securities Corporation (as trustee and pledgee)[3] |
| 10.4 | Third Amended and Restated Note Issuance and Security Agreement dated November 1, 2011, with Lord Securities Corporation (as trustee), GWG LifeNotes Trust (as secured party), and noteholders[2] |
| 10.5 | Amendment to Third Amended and Restated Note Issuance and Security Agreement, dated as of November 18, 2013, with Lord Securities Corporation (as trustee for the GWG LifeNotes Trust)[9] |
| 10.6 | Employment Agreement with Jon R. Sabes, dated June 14, 2011[4] |
| 10.7 | Employment Agreement with Steven F. Sabes, dated June 14, 2011[4] |
| 10.8 | Employment Agreement with Paul A. Siegert, dated June 14, 2011[4] |
| 10.9 | Employment Agreement with William B. Acheson, dated May 30, 2014[15] |
| 10.10 | Employment Agreement with Michael D. Freedman, dated September 22, 2014[16] |
| 10.11 | Stock Option Agreement with Michael D. Freedman, dated September 22, 2014[16] |
| 10.12 | 2013 Stock Incentive Plan[17] |
| 10.13 | Form of Stock Option Agreement used with 2013 Stock Incentive Plan[15] |
| 21.1 | List of Subsidiaries[18] |
| 23.1 | Consent of Baker Tilly Virchow Krause, LLP (filed herewith) |

II-3

| Exhibit | Description |
|---|---|
| 23.2 | Consent of Maslon LLP (contained within Exhibit 5.1 above) |
| 25.1 | Statement of Eligibility of Trustee[16] |
| 99.1 | Letter from Model Actuarial Pricing Systems, dated February 1, 2016[18] |

---

(1)    Incorporated by reference to Form S-1 Registration Statement filed on June 14, 2011 (File No. 333-174887).
(2)    Incorporated by reference to Post-Effective Amendment No. 8 to Form S-1/A filed on November 12, 2013 (File No. 333-174887).
(3)    Incorporated by reference to Form S-1/A Registration Statement filed on August 23, 2011 (File No. 333-174887).
(4)    Incorporated by reference to Form S-1/A Registration Statement filed on September 20, 2011 (File No. 333-174887).
(5)    Incorporated by reference to Form S-1/A Registration Statement filed on October 20, 2011 (File No. 333-174887).
(6)    Incorporated by reference to Post-Effective Amendment No. 1 to Form S-1/A filed on April 30, 2012 (File No. 333-174887).
(7)    Incorporated by reference to Current Report on Form 8-K filed on February 1, 2013.
(8)    Incorporated by reference to Quarterly Report on Form 10-Q filed on August 8, 2014.
(9)    Incorporated by reference to Quarterly Report on Form 10-Q filed on November 13, 2014.
(10)   Incorporated by reference to Current Report on Form 8-K filed on June 2, 2015.
(11)   Incorporated by reference to Post-Effective Amendment No. 3 to Form S-1/A filed on May 15, 2015 (File No. 333-197227).
(12)   Incorporated by reference to Form S-1/A Registration Statement filed on November 4, 2014 (File No. 333-197227).
(13)   Incorporated by reference to Form S-1/A Registration Statement filed on January 7, 2015 (File No. 333-197227).
(14)   Incorporated by reference to Form S-1/A Registration Statement filed on June 12, 2015 (File No. 333-197227).
(15)   Incorporated by reference to Form S-1/A Registration Statement filed on June 6, 2014 (File No. 333-195505).
(16)   Incorporated by reference to Form S-1/A Registration Statement filed on December 18, 2014 (File No. 333-197227).
(17)   Incorporated by reference to the registrant's Definitive Proxy Statement filed on April 30, 2015.
(18)   Incorporated by reference to the registrant's Annual Report on Form 10-K filed on March 22, 2016.
(19)   Incorporated by reference to the registrant's Preliminary Proxy Statement filed on March 23, 2016.
(20)   Incorporated by reference to the registrant's Form S-1/A Registration Statement filed on October 23, 2015 (File No. 33-206626).
(21)   Incorporated by reference to Form S-1/A Registration Statement filed on October 30, 2014 (File No. 333-197227)
(22)   Incorporated by reference to Post-Effective Amendment No. 1 to Form S-1 Registration Statement filed on January 20, 2015 (File No. 333-197227)

## ITEM 17. UNDERTAKINGS

Insofar as indemnification for liabilities arising under the Securities Act of 1933 (the "Securities Act") may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act, and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

(a)(2)    That, for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3)    To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(4)    [intentionally omitted]

(5)    For the purpose of determining any liability under the Securities Act to any purchaser, each prospectus filed pursuant to Rule 424(b) as part of a registration statement relating to an offering, other than registration statements relying on Rule 430B or other than prospectuses filed in reliance on Rule 430A, shall be deemed to be part of and included in the registration statement as of the date it is first used after effectiveness. Provided, however, that no statement made in a registration statement or prospectus that is part of the registration statement or made in a document incorporated or deemed incorporated by reference into the registration statement or prospectus that is part of the

registration statement will, as to a purchaser with a time of contract of sale prior to such first use, supersede or modify any statement that was made

<div align="center">II-4</div>

in the registration statement or prospectus that was part of the registration statement or made in any such document immediately prior to such date of first use.

(6)    That, for the purpose of determining liability of the registrant under the Securities Act of 1933 to any purchaser in the initial distribution of the securities: The undersigned registrant undertakes that in a primary offering of securities of the undersigned registrant pursuant to this registration statement, regardless of the underwriting method used to sell the securities to the purchaser, if the securities are offered or sold to such purchaser by means of any of the following communications, the undersigned registrant will be a seller to the purchaser and will be considered to offer or sell such securities to such purchaser:

(i)    Any preliminary prospectus or prospectus of the undersigned registrant relating to the offering required to be filed pursuant to Rule 424;

(ii)    Any free writing prospectus relating to the offering prepared by or on behalf of the undersigned registrant or used or referred to by the undersigned registrant;

(iii)    The portion of any other free writing prospectus relating to the offering containing material information about the undersigned registrant or its securities provided by or on behalf of the undersigned registrant; and

(iv)    Any other communication that is an offer in the offering made by the undersigned registrant to the purchaser.

(b)    That, for purposes of determining any liability under the Securities Act of 1933, each filing of the registrant's annual report pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (and, where applicable, each fi ling of an employee benefit plan's annual report pursuant to Section 15(d) of the Securities Exchange Act of 1934) that is incorporated by reference in the registration statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fi de offering thereof.

II-5

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Minneapolis, State of Minnesota, on April 8, 2016.

GWG HOLDINGS, INC.

By:    /s/ Jon R. Sabes
       Chief Executive Officer

Pursuant to the requirements of the Securities Act of 1933, this Registration Statement has been signed, as of April 8, 2016, by the following persons in the capacities indicated below.

| Name | Title |
| --- | --- |
| /s/ Jon R. Sabes<br>Jon R. Sabes | Director, Chief Executive Officer<br>(Principal Executive Officer) |
| /s/ Paul A. Siegert*<br>Paul A. Siegert | Director, Executive Chairman |
| /s/ William Acheson<br>William Acheson | Chief Financial Officer<br>(Principal Financial and Accounting Officer) |
| /s/ Steven F. Sabes*<br>Steven F. Sabes | Director, Executive Vice President and Secretary |
| /s/ David H. Abramson*<br>David H. Abramson | Director |
| /s/ Charles H. Maguire III*<br>Charles H. Maguire III | Director |
| /s/ Jeffrey L. McGregor*<br>Jeffrey L. McGregor | Director |
| /s/ Shawn R. Gensch*<br>Shawn R. Gensch | Director |

* By    Jon R. Sabes, Attorney-in-fact, April 8, 2016

II-6

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Minneapolis, State of Minnesota, on April 8, 2016.

GWG LIFE, LLC

By:    /s/ Jon R. Sabes
       _____
       Chief Executive Officer

Pursuant to the requirements of the Securities Act of 1933, this Registration Statement has been signed, as of April 8, 2016, by the following persons in the capacities indicated below.

| Name | Title |
|---|---|
| /s/ Jon R. Sabes<br>Jon R. Sabes | Chief Executive Officer<br>(Principal Executive Officer) |
| /s/ William Acheson<br>William Acheson | Chief Financial Officer<br>(Principal Financial and Accounting Officer) |
| /s/ Jon R. Sabes<br>Jon R. Sabes | Manager of GWG Life, LLC |

II-7

App. 0300

S-1/A 1 fs12017a2_gwgholdings.htm AMENDMENT NO. 2 TO FORM S-1

As filed with the Securities and Exchange Commission on November 28, 2017

Registration Nos. 333-220288 and
333-220288-01

**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

———————————

**Amendment No. 2 to**
**FORM S-1**
**REGISTRATION STATEMENT**
*Under the Securities Act of 1933*

———————————

# GWG HOLDINGS, INC.
# GWG LIFE, LLC

(Exact name of Registrant as specified in its charter)

———————————

| **Delaware** | **26-2222607** |
| **Delaware** | **20-4356955** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

220 South Sixth Street, Suite 1200
Minneapolis, Minnesota 55402
Tel: (612) 746-1944
Fax: (612) 746-0445

(Address, including zip code, and telephone number, including area code, of Registrant's principal executive offices)

———————————

*Copies to:*

| Paul D. Chestovich | GWG Holdings, Inc. | Dominic Baldini |
| Maslon LLP | Jon R. Sabes | Emerson Equity LLC |
| 3300 Wells Fargo Center | Chief Executive Officer | 155 Bovet Road, Suite 725 |
| 90 South Seventh Street | 220 South Sixth Street, Suite 1200 | San Mateo, CA 94402 |
| Minneapolis, MN 55402 | Minneapolis, MN 55402 | Tel: (650) 312-0200 |
| Tel: (612) 672-8200 | Tel: (612) 746-1944 | |
| | (Name, address, including zip code, and telephone number, including area code, of agent for service) | |

———————————

Approximate date of commencement of proposed sale to the public: As soon as practicable after the effective date of this registration statement.

If the only securities being registered on this Form are being offered pursuant to dividend or interest reinvestment plans, please check the following box. ☐

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, other than securities offered only in connection with dividend or interest reinvestment plans, check the following box. ☒

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

App. 0301

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a registration statement pursuant to General Instruction I.D. or a post-effective amendment thereto that shall become effective upon filing with the SEC pursuant to Rule 462(e) under the Securities Act, check the following box. ☐

If this Form is a post-effective amendment to a registration statement filed pursuant to General Instruction I.D. filed to register additional securities or additional classes of securities pursuant to Rule 413(b) under the Securities Act, check the following box. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☒ |
| (Do not check if a smaller reporting company) | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act . ☐

**CALCULATION OF REGISTRATION FEE**

| Title of Each Class of Securities to Be Registered | Amount to be Registered | Proposed Maximum Offering Price Per Unit | Proposed Maximum Aggregate Offering Price | Amount of Registration Fee |
|---|---|---|---|---|
| L Bonds | 1,000,000 | $ 1,000[(1)] | $ 1,000,000,000 | $ 115,900[(3)] |
| Guarantee by GWG Life, LLC of L Bonds[(2)] | N/A | N/A | N/A | N/A |

_____

(1)    The L Bonds will be issued in "Units" of $1,000 in principal amount, in minimum amounts of 25 Units ($25,000 principal amount) and in any number of whole Unit amounts in excess of such minimum amount.

(2)    No additional consideration is being received for the guarantee. Pursuant to Rule 457(n) under the Securities Act of 1933, no separate fee is required in respect of such guarantee.

(3)    Registration Fee previously paid.

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the registration statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

App. 0303

The information in this prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission, of which this prospectus is a part, shall have been declared effective. This prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any state where the offer or sale is not permitted.

**SUBJECT TO COMPLETION, DATED NOVEMBER 28, 2017**

_____

# GWG HOLDINGS, INC.

_____



1,000,000 Units of L Bonds
($1,000,000,000)

Through its subsidiaries, GWG Holdings, Inc. invests in life insurance assets. Our objective is to earn returns from our investments in life insurance assets that are greater than the costs necessary to purchase, finance and service those assets.

We are offering up to 1,000,000 Units of L Bonds (the "L Bonds") at $1,000 principal amount per whole Unit, representing $1,000,000,000 in aggregate principal amount of L Bonds. This is a continuous offering and there is no minimum amount of L Bonds that must be sold before we can use any of the proceeds. The proceeds from the sale of the L Bonds will be paid directly to us following each sale and will not be placed in an escrow account. We will use the net proceeds from the offering of the L Bonds primarily to purchase and finance life insurance assets, and to service and retire other outstanding obligations. The minimum investment in L Bonds is 25 Units, or $25,000. Investments in excess of the minimum amount may be made in any number of whole Units. The L Bonds will be sold with varying maturity terms, interest rates and frequency of interest payments, all as set forth in this prospectus and in supplements we publish from time to time. Depending on our capital needs and the amount of your investment, L Bonds with certain maturity terms may not always be available. Although we will periodically establish and change interest rates on unsold L Bonds offered under this prospectus, once an L Bond is sold, its interest rate will not change during its term (subject, however, to the extension and renewal provisions of the L Bond). Upon maturity, and subject to the terms and conditions described in this prospectus, the L Bonds will be automatically renewed for the same or lesser term at the interest rate we are offering at that time to other investors with similar aggregate L Bond portfolios for L Bonds of the same maturity, unless redeemed upon maturity at our or your election.

Obligations under the L Bonds are secured by substantially all the assets of GWG Holdings (the most significant components of which are cash and investments in subsidiaries), a pledge of all our common stock held individually by our largest stockholders, and by a guarantee and corresponding grant of a security interest in substantially all the assets of our subsidiary, GWG Life, LLC. As a guarantor, GWG Life has fully and unconditionally guaranteed the payment of principal and interest on the L Bonds. Substantially all of our life insurance assets are held by GWG DLP Funding IV, LLC (DLP IV), which is a wholly owned subsidiary of GWG Life. The policies held by DLP IV are not collateral for the L Bond obligations but serve instead as collateral for our senior credit facility. These facts present the risk to investors that the collateral security that we and GWG Life have granted for our obligations under the L Bonds may be insufficient to repay the L Bonds upon an event of default.

We may call and redeem the entire outstanding principal and accrued but unpaid interest of any or all of the L Bonds at any time, and from time to time, without penalty or premium. L Bond holders will have no right to put (that is, require us to redeem) any L Bond prior to its due date unless in the case of a holder's death, bankruptcy or total permanent disability. In the event we agree to redeem L Bond upon the request of an L Bond holder — other than after death, bankruptcy or total permanent disability of such holder — we will impose a redemption fee of 6% against the outstanding principal balance of the redeemed L Bond. This redemption fee will be subtracted from the amount paid.

We do not intend to list our L Bonds on any securities exchange during the offering period, and we do not expect a secondary market in the L Bonds to develop. As a result, you should not expect to be able to resell your L Bonds regardless of how we perform. Accordingly, an investment in our L Bonds is not suitable for investors that require liquidity in advance of their L Bond's maturity date.

We maintain senior borrowing arrangements that subordinate to our senior lenders the right to payment on, and the collateral securing, the L Bonds. In addition, these borrowing arrangements restrict our receipt of distributions from our operating subsidiaries, subject to certain exceptions. These provisions will restrict cash flows available for payment of

principal and interest on the L Bonds. From time to time we may add or replace senior lenders and the particular arrangements under which we borrow from them.

We are an "emerging growth company" and a "smaller reporting company" under applicable law and are subject to reduced public company reporting requirements. Please read the disclosures on page 1 of this prospectus for more information. Investing in our L Bonds may be considered speculative and involves a high degree of risk, including the risk of losing your entire investment. See "Risk Factors" beginning on page 12 to read about the risks you should consider before buying our L Bonds. The L Bonds are only suitable for persons with substantial financial resources and with no need for liquidity in this investment.

Please read this prospectus before investing and keep it for future reference. We file annual, quarterly and current reports with the SEC. This information will be available free of charge by contacting us at 220 South Sixth Street, Suite 1200, Minneapolis, MN 55402, or by phone at (612) 746-1944. This information may also be accessed on our website at *www.gwgh.com*, and the SEC maintains a website at *www.sec.gov* that contains this information.

**Neither the SEC nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

The date of this prospectus is         , 2017

The L Bonds will be offered and sold on a best-efforts basis by Emerson Equity LLC, a registered broker-dealer and member of the Financial Industry Regulatory Authority ("FINRA"). Emerson Equity will be our dealer manager for the L Bonds in this offering for purposes of the Securities Act of 1933. Our dealer manager will enter into participating dealer agreements with certain other broker-dealers that are members of FINRA, referred to as "selling group members," to authorize those broker-dealers to sell our L Bonds. We will pay Emerson Equity a selling commission ranging from 0.75% to 5.00% of the principal amount of L Bonds sold, depending on the L Bonds' maturity date. We will also pay Emerson Equity additional compensation consisting of those items set forth in footnote (1) to the table below. The dealer manager will share its commissions and additional compensation, other than its dealer manager fee, with selling group members pursuant to the terms of each participating dealer agreement. The total amount of the selling commissions and additional compensation (including reimbursements, non-transaction-based and non-cash compensation) paid to Emerson Equity and any other FINRA member in the course of offering and selling L Bonds will not exceed 8.00% of the aggregate gross offering proceeds we receive from the sale of L Bonds. We also may sell L Bonds at a discount from the public offering price through appropriate and designated distribution channels. See "Plan of Distribution" and "Use of Proceeds" for further information.

| | Units | Price to Investor | Aggregate Commissions, Fees, and Expense Allowances[1][2] | Net Proceeds to Company |
|---|---|---|---|---|
| **Minimum Investment** | 25 | $ 25,000 | $ 2,000 | $ 23,000[3] |
| **Maximum Offering** | 1,000,000 | $ 1,000,000,000 | $ 80,000,000 | $ 920,000,000[4] |

_____

(1)    Assumes an average sales commission of 5.00%. As explained above, actual commissions will vary based on the term of the L Bonds sold. Nevertheless, the total amount of selling commissions and additional compensation (consisting of (i) a dealer-manager fee payable to the dealer manager in an amount equal to 0.50% of the principal amount of all L Bonds sold; (ii) an accountable expense allowance payable to the selling group members as described in the "Plan of Distribution," which may include due-diligence expenses of the dealer manager and selling group members set forth in a detailed and itemized invoice; (iii) wholesaling fees, which may consist of commissions and non-transaction-based compensation of the wholesalers; (iv) non-cash compensation; and (v) up to a 1.00% reallowance to selling group members) will not exceed 8.00% of the aggregate gross offering proceeds we receive from the sale of L Bonds. Accordingly, and assuming the sale of all $1,000,000,000 in principal amount of bonds offered hereby, the maximum amount of selling commissions we can pay is 5.00% of the gross offering proceeds we receive from the sale of the L Bonds (or $50,000,000), and the maximum amount of additional compensation we can pay will not exceed 3.00% of the aggregate gross offering proceeds we receive from the sale of the L Bonds (or $30,000,000). See "Plan of Distribution" for further information.

(2)    Emerson Equity has agreed to offer the L Bonds on a "best efforts" basis.

(3)     Net Proceeds to Company based on the Minimum Investment are calculated after deducting (i) selling commissions and (ii) additional compensation (consisting of the dealer-manager fee, a wholesaling fee, an accountable expense allowance and non-transaction-based and non-cash selling compensation). We expect that our own offering expenses, consisting of legal, accounting, printing, mailing, registration, qualification and associated securities offering filing costs and expenses, will through the course of the offering aggregate to approximately $1,200,000, but for purposes of illustrating the Net Proceeds to Company based on the Minimum Investment, those offering expenses of $1,200,000 are not reflected.

(4)     Net Proceeds to Company based on the Maximum Offering of 1,000,000 L Bond Units (representing $1,000,000,000 in aggregate principal amount) are calculated as described in footnote (3) above, but also before deducting our estimated offering-related expenses of $1,200,000.

L Bonds will be sold as "Units," with each whole Unit representing $1,000 in principal amount of L Bonds. Throughout this prospectus, we refer to L Bond Units simply as "L Bonds." We will issue the L Bonds in book-entry form, certificated form, or in the form of a global certificate deposited with a depositary. Depending on the manner in which you purchase L Bonds, you may not receive a physical certificate representing your L Bonds. In all cases, however, we will deliver written confirmation to purchasers of L Bonds. Bank of Utah will act as trustee for the L Bonds.

The current interest rates for the L Bonds based on their applicable maturity is set forth in the table below.

| Maturity Term | Interest Rate (%) |
|---|---|
| 2 years | 5.50 |
| 3 years | 6.25 |
| 5 years | 7.50 |
| 7 years | 8.50 |

We may change the interest rates applicable to unsold L Bonds from time to time during this offering, in which case the applicable interest rates will be set forth in a supplement to this prospectus. Once an L Bond is sold, the interest rate will not change during its term (subject, however, to the extension and renewal provisions contained in that L Bond).

App. 0307

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| ABOUT THIS PROSPECTUS | ii |
| INDUSTRY AND MARKET DATA | ii |
| HOW TO PURCHASE L BONDS | iii |
| COVERED SECURITY | iv |
| QUESTIONS AND ANSWERS ABOUT THIS OFFERING | v |
| PROSPECTUS SUMMARY | 1 |
| RISK RELATING TO FORWARD-LOOKING STATEMENTS | 10 |
| RISK FACTORS | 12 |
| USE OF PROCEEDS | 20 |
| BUSINESS | 22 |
| DESCRIPTION OF THE L BONDS | 50 |
| PLAN OF DISTRIBUTION | 65 |
| MATERIAL FEDERAL INCOME TAX CONSIDERATIONS | 69 |
| STATE, LOCAL AND FOREIGN TAXES | 73 |
| ERISA CONSIDERATIONS | 73 |
| LEGAL MATTERS | 75 |
| EXPERTS | 75 |
| WHERE YOU CAN FIND MORE INFORMATION | 75 |
| INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE | 76 |
| FINANCIAL STATEMENTS | F-1 |



GWG Holdings, Inc.
220 South Sixth Street, Suite 1200
Minneapolis, MN 55402
Tel: (612) 746-1944
Fax: (612) 746-0445

i

## ABOUT THIS PROSPECTUS

We have prepared this prospectus as part of a registration statement that we filed with the SEC for our continuous offering of L Bonds.

The registration statement we filed with the SEC includes exhibits that provide more detailed descriptions of the matters discussed in this prospectus and certain information that is incorporated by reference. You should read this prospectus, the related exhibits filed with the SEC, and any prospectus supplement(s), together with additional information described below under "Where You Can Find More Information," and the documents that are incorporated, or deemed to be incorporated, by reference into this prospectus. Any statement that we make in this prospectus will be modified or superseded by any inconsistent statement made by us in a subsequent prospectus supplement (or other disclosure incorporated into this prospectus by reference). This prospectus contains summaries of certain other documents, which summaries contain all material terms of the relevant documents and are believed to be accurate, but reference is hereby made to the full text of the actual documents for full and complete information concerning those documents. All documents relating to this offering, if readily available to us, will be made available to a prospective investor or its representatives upon request.

The L Bonds will be issued under an amended and restated indenture, as may be amended or supplemented from time to time (referred to herein as the "indenture"). This prospectus is qualified in its entirety by the terms of that indenture filed with SEC as an exhibit to the registration statement of which this prospectus is a part. All material terms of the indenture are summarized in this prospectus. You may obtain a copy of the indenture upon written request to us or online at *www.sec.gov*.

The indenture trustee did not participate in the preparation of this prospectus and makes no representations concerning the L Bonds, the collateral, or any other matter stated in this prospectus. The indenture trustee has no duty or obligation to pay the L Bonds from their funds, assets or capital or to make inquiry regarding, or investigate the use of, amounts disbursed from any account.

You should rely only on the information contained in this prospectus, as the same may be supplemented by prospectus supplements or other public disclosure incorporated into this prospectus by reference. Neither we nor the dealer manager have authorized any other person to provide you with any information different from that contained in this prospectus, a supplement, information incorporated into this prospectus by reference, or information furnished by us upon request as described herein. The information contained in this prospectus is complete and accurate only as of the date of this prospectus, regardless of the time of delivery of this prospectus or sale of our securities.

No information contained herein, nor in any prior, contemporaneous or subsequent communication should be construed by a prospective investor as legal or tax advice. Each prospective investor should consult its, his or her own legal, tax and financial advisors to ascertain the merits and risks of the transactions described herein prior to purchasing the L Bonds. This written communication is not intended to be written advice as defined in Circular 230 published by the U.S. Treasury Department.

In this prospectus, we use the term "day" to refer to a calendar day, and we use the term "business day" to refer to any day other than Saturday, Sunday, a legal holiday or a day on which banks in New York City are authorized or required to close.

## INDUSTRY AND MARKET DATA

The industry and market data used throughout this prospectus have been obtained from our own research, surveys or studies conducted by third parties and industry or general publications. Industry publications and surveys generally state that they have obtained information from sources believed to be reliable, but do not guarantee the accuracy and completeness of such information. We believe that each of these studies and publications is reliable.

App. 0309

**HOW TO PURCHASE L BONDS**

If, after carefully reading this entire prospectus, obtaining any other information requested and available, and being fully satisfied with the results of pre-investment due-diligence activities, you would like to purchase L Bonds, you will have two different ways in which to consummate a purchase: (1) DTC settlement, or (2) direct settlement with the Company.

1. *Depositary Trust Company Settlement (DTC settlement)*.    You can place an order for the purchase of L Bonds using DTC Settlement through your selling group member (i.e., your broker-dealer). A selling group member using this service will have an account with a DTC participant in which your funds will be placed to facilitate a closing on our periodic DTC closing cycle (typically, closings will occur on a bi-monthly cycle). Orders may be placed until the cyclical order due date. Orders will be executed by your selling group member electronically and you must coordinate with your selling group member's registered representative to pay the full purchase price for the L Bonds by the trade date. You will be credited with ownership of an L Bond on the second business day following the periodic DTC closing cycle in which the purchase is made. Nevertheless, interest will accrue for a period of 15 or 30 days for the month in which your purchase is made, depending on when during the DTC closing cycle your purchase is made. Your purchase price for L Bonds purchased in this way will not be held in escrow. This process is different if you purchase L Bonds through direct settlement with the Company as described below.

2. *Direct Settlement with the Company*.    If you wish to purchase L Bonds through direct settlement with the Company, then you must complete, execute and return the Subscription Agreement to us together with a certified check or personal check payable to the order of "GWG Holdings, Inc. — Subscription Account" (or wire sent to the Subscription Account) equal to the principal amount of L Bonds you wish to purchase. You will be credited with ownership of an L Bond, and interest will begin to accrue, from the date on which your fully paid subscription is accepted. If you are working with a selling group member, your subscription materials and the wire transfer, certified check or personal check should be delivered to your selling group member, who will deliver it to us at the following address:

**GWG Holdings, Inc.**
**220 South Sixth Street, Suite 1200**
**Minneapolis, MN 55402**
**<u>Wire Instructions</u>**
GWG Holdings, Inc. — Subscription Account
Account: 500023916
Routing: 091310521
Bank Name: Bell State Bank & Trust

Your purchase is subject to our acceptance. All information provided is confidential and will be disclosed only to our directors, officers and employees who need to know, affiliates, the managing broker-dealer, legal counsel and, if required, to governmental authorities and self-regulatory organizations or as otherwise required by law. For your purchase to be effective as of the first business day of a calendar month, your completed and executed Subscription Agreement, together with your related funds, must be received and accepted by us on or prior to the final settlement date (settlement dates normally occur on a bi-monthly basis).

Upon our receipt of the signed Subscription Agreement and acceptance of your purchase, we will notify you of such acceptance. In our sole discretion, we may accept or reject any purchase, in whole or in part. In the event we do not accept your purchase of L Bonds for any reason, we will promptly return your payment. We may terminate or suspend this offering at any time, for any reason or no reason, in our sole discretion. You may obtain a copy of the Subscription Agreement from our website at *www.gwgh.com*, from your selling group member (if you are working with one), or by contacting us at 1-877-494-2388.

**COVERED SECURITY**

Our L Bonds are a "covered security." The term "covered security" applies to securities exempt from state registration pursuant to Section 18 of the Securities Act of 1933. Generally, securities listed on national exchanges are the most common type of covered security exempt from state registration. A non-traded security also can be a covered security if it has a seniority greater than or equal to other securities from the same issuer that are listed on a national exchange. Our L Bonds are a covered security because they will be senior to our common stock, which is listed on The Nasdaq Capital Market, and therefore our offering of L Bonds is exempt from state registration.

**Although the status of our L Bonds as a "covered security" will facilitate their purchase and sale to a broader range of investors than would otherwise be available to us, and although the offer and sale of a "covered security" generally involves fewer issuance costs to the issuer of such securities, our L Bonds are not a suitable purchase for all investors. Investors are urged to read carefully the risk factors relating to our business and our Company contained in the Risk Factors section of this prospectus beginning on page 12. In addition, investors should understand that because our L Bonds are a "covered security" exempt from state securities regulations, neither our Company, the L Bonds, or any other aspects of this offering have been the subject of any merit-based review by state securities regulators.**

iv

### QUESTIONS AND ANSWERS ABOUT THIS OFFERING

*The following questions and answers about this offering highlight material information regarding us and this offering that you may wish to review. Nevertheless, you should read this entire prospectus, including the section entitled "Risk Factors," before deciding to purchase our L Bonds.*

**Can you explain and clarify the interplay between GWG Holdings, Inc. and GWG Life, LLC and its subsidiaries in relation to the L Bonds and the registration statement?**

GWG Holdings, Inc. will be issuing the L Bonds, receiving all proceeds from the sale of L Bonds, and will be the only entity making regular payments on the L Bonds. Nevertheless, because a significant amount of our consolidated assets are held in our subsidiary GWG Life, LLC (and its own subsidiaries), GWG Life is a guarantor of our obligations under the L Bonds. As guarantor of the L Bonds, SEC rules require that GWG Life be included as a co-registrant under this registration statement. GWG Life will not, however, be otherwise involved in the offering of L Bonds.

**It seems as though you are offering several bonds with different interest rates and maturities but calling them all L Bonds. Is this the case?**

All bonds we issue in this offering will have identical terms, excepting only (1) the interest rate and (2) the maturity length or "term." In this regard, we have essentially created multiple classes of L Bonds, similar to how companies may have different classes of stocks with slightly different economic rights. Currently, we are offering four classes of L Bonds, as follows:

- "Class 2-2" L Bonds will mature two years from their issuance and accrue interest at 5.50% *per annum*.

- "Class 3-2" L Bonds will mature three years from their issuance and accrue interest at 6.25% *per annum*.

- "Class 5-2" L Bonds will mature five years from their issuance and accrue interest at 7.50% *per annum*.

- "Class 7-2" L Bonds will mature seven years from their issuance and accrue interest at 8.50% *per annum*.

The economic terms for each L Bond in any particular class will be identical to all other L Bonds in the same class (other than the date of maturity). In the event we adjust the interest rate for any class of bonds we offer, we will create a new class of L Bonds. Upon the renewal of any L Bonds we have sold, any new interest rate applied to an L Bond will be applied to all L Bonds in the same class.

**Your prospectus states that the interest rate for the L Bonds may be adjusted from time to time during the course of the offering. Will any such adjustment apply retroactively to L Bonds already issued?**

No. Once you purchase an L Bond, the interest rate on that L Bond will not change during the entirety of its original term. The interest rate on an issued L Bond may, however, be adjusted upon renewal of that L Bond. In any such case, we will advise you of any different interest rate that may apply to your L Bond upon renewal. In sum, any new interest rates for the L Bonds will apply only to newly issued L Bonds sold or renewed after the date of any interest rate change. Our decision to change interest rates depends on numerous factors, including but not limited to things such as market interest rates, our capitalization, the demand for our L Bonds, the life settlement market in general, our capital requirements, and other factors. Please see "Description of the L Bonds — Interest Rate."

**How do I subscribe for L Bonds, and what is the settlement process?**

L Bonds may be purchased either directly from the Company or through your broker-dealer (also referred to in this prospectus as a selling group member), who utilizes a participant in the DTC system and offers "DTC settlement."

If you purchase directly from the Company, you will send your completed and executed Subscription Agreement, together with your subscription amount to us at the address listed in "How to Purchase L Bonds." Your subscription amount is the principal amount of L Bonds you wish to purchase, and should be paid through a certified check or personal check payable to the order of "GWG Holdings, Inc. — Subscription Account." In

lieu of paying by check, you may wire your subscription amount to the account referenced in "How to Purchase L Bonds." If you are working with a broker-dealer or other investment professional, your broker-dealer or professional will gather and send in the required information on your behalf, and may facilitate your payment of the subscription amount.

v

Once we have received your subscription amount and required documentation, we will either reject or accept your subscription. If accepted, you will be credited with ownership of the L Bond, we will have immediate access to your subscription amount and you will start to accrue interest on your investment at the rate applicable to the L Bond you have purchased. If you purchase directly from the Company, your L Bond will ordinarily be issued in book-entry (or, if requested, certificated) form and payments will be made directly into the account you indicate in your Subscription Agreement.

Purchasing through a DTC participant is a slightly different process. In this case, you will provide your order for the purchase of L Bonds to your broker-dealer, together with such other information as your broker-dealer may require. Your broker-dealer will ensure your order is electronically placed with the Company and that the Company timely receives your subscription amount. There is no need to furnish the Company with a Subscription Agreement when you purchase through a broker-dealer that utilizes a participant in the DTC system and offers "DTC settlement," However, your broker-dealer may require additional documents.

Once we have received your subscription amount, we will either reject or accept your subscription. Once accepted based on our DTC closing cycle, we will have immediate access to your subscription amount and you will start to accrue interest on your investment at the rate applicable to the L Bond you have purchased. Nevertheless, you will be credited with ownership of an L Bond on the second business day after the end of the closing cycle in which your subscription is accepted. Interest will accrue for a period of 15 or 30 days for the month in which your purchase is made, depending on when during the DTC closing cycle your purchase is made. If you purchase through a broker-dealer who utilizes a participant in the DTC system and offers "DTC settlement," your L Bond will be issued to DTC in the name of Cede & Co, as its nominee. In this sense, DTC will be the legal owner of the L Bond and you will be the beneficial owner. Your ownership of the L Bond should then appear on the brokerage or other investment statements you receive from your broker-dealer or custodian.

For so long as DTC settlement is approved, we intend to issue each class of L Bonds a unique identifying number (CUSIP) each month to facilitate the settlement of L Bonds. Thus, Class 2-2 L Bonds issued in February 2018 (and maturing February 2020) will all have the same CUSIP, which will be different from the CUSIP applicable to Class 2-2 L Bonds issued in September 2018 (and maturing September 2020). In this way, all L Bonds belonging to a single CUSIP will be completely fungible, meaning that they will all mature on the same date and have identical terms so that one L Bond with a particular CUSIP is interchangeable with any other L Bond having the same CUSIP. This process creates a tracking system for the L Bonds to be issued to and transferred through DTC.

**What is the role of the trustee?**

The Bank of Utah is the trustee for the L Bonds. The role of the trustee is essentially to enforce the terms of the L Bonds on behalf of bondholders, including direct and beneficial holders, and facilitate the relationship between our Company and the bondholders. We must notify the trustee of certain events as required under the indenture, and the trustee will in turn notify bondholders. The trustee has also been granted a security interest in all of the assets of GWG Holdings and GWG Life for the benefit of the bondholders. The trustee has no duty to pay any obligations under L Bonds or to make inquiry regarding, or investigate the use of, amounts disbursed from any account. Upon an event of default under the indenture, and subject to those limitations in the indenture designed to benefit our senior creditors, the trustee may take action against us to enforce the rights of holders of the L Bonds.

**What is the role of the paying agent?**

The paying agent is the term ascribed to whomever it is that is making the payment to the holders of L Bonds. Presently, the Company itself is the paying agent and therefore responsible for tracking investors' respective payment dates and ensuring timely payment of principal and interest under the L Bonds. Under the indenture, we may designate a third party, such as a transfer agent registered with the SEC, or a banking institution, to serve as paying agent. The role of the paying agent is essentially mechanical, and does not ordinarily involve the exercise of discretion and judgment in the way that is typical for an indenture trustee.

**Do I need to sign any paperwork in connection with the renewal of my L Bond?**

No. The terms of the L Bond allow for the automatic renewal into a new L Bond of an identical (or lesser) maturity, unless we receive notice from you. Upon maturity, the L Bonds will be automatically renewed for the same term at the interest rate we are offering at that time to other investors with similar aggregate L Bond portfolios for L Bonds of the same maturity, unless repaid upon maturity at our or your election. In this regard, we will notify you at least 30 days prior to the maturity date of your L Bonds. In the notice, we will advise you if we intend to repay the L Bonds or else remind you that your L Bonds will be automatically renewed unless you exercise your option, at least 15 days prior to the maturity date, to elect to have your L Bonds repaid. If applicable, a new certificate will be issued. Please see "Prospectus Summary — Renewal or Redemption at Maturity" and "Description of the L Bonds — Renewal or Redemption at Maturity."

**Can I resell or transfer my L Bond after it has been purchased?**

Yes. Since these L Bonds are being offered and sold pursuant to an effective registration statement, the L Bonds may be transferred so long as the transfer is documented in a form approved by us. We do not, however, expect a public trading market to develop for the L Bonds in the foreseeable future, if ever. Because of the lack of a trading market for L Bonds, it is unlikely that holders will be able to sell their L Bonds easily. If you wish to transfer your L Bond held in book-entry (or certificated) form, you should contact us. If you wish to transfer your L Bond held through DTC, you should contact your broker-dealer (i.e., your selling group member).

**How will I receive interest and principal payments on my L Bonds?**

This will depend on how you purchased your L Bond. If you purchased your L Bond directly from us, we will directly deposit our payments of interest and principal into the account indicated in your Subscription Agreement. If you purchased through DTC, all payments of principal and interest will be made to DTC, who will forward such payment to your brokerage account. In this case, all accountings of what you have contributed and what you are owed will be the responsibility of your broker-dealer.

**What is GWG Holdings, Inc.?**

We are a financial services company committed to finding new ways of disrupting and transforming the life insurance and related industries. We built our business by creating opportunities for consumers to obtain significantly more value for their life insurance policies as compared to the traditional options offered by the insurance industry. We are enhancing and extending these activities through innovation in our products and services, business processes, financing strategies, and investments in advanced epigenetic technologies. At the same time, we are creating opportunities for investors to receive income and capital appreciation from our investment activities in the life insurance and related industries.

Through our principal subsidiary GWG Life, we purchase and finance life insurance policies at a discount to the face value of the policy benefit. While GWG Life began operations in March 2006, we were formed and organized in Delaware in 2008. In September 2014, we consummated an initial public offering of our common stock. In connection with that offering, our common stock was listed on The NASDAQ Capital Market under the ticker symbol "GWGH." We are based in Minneapolis, Minnesota.

**Do you currently own any assets?**

Our assets consist primarily of cash and equity interests in our subsidiaries. Nearly all of our life insurance assets are held through our subsidiaries. As of December 31, 2016, our consolidated assets totaled $643.2 million, of which approximately $78.5 million was cash and equivalents, approximately $37.8 million was restricted cash, and approximately $511.2 million was the fair value of our life insurance assets. Those life insurance assets had an aggregate face value of policy benefits approximating $1.36 billion. As of September 30, 2017, our consolidated assets totaled $766.7 million, of which approximately $115.3 million was cash and equivalents, approximately $5.8 million was restricted cash, and approximately $620.1 million was the fair value of our life insurance assets. Those life insurance assets had an aggregate face value of policy benefits approximating $1.62 billion.

**What is your business strategy?**

Our business strategy is to purchase a large and well-diversified portfolio of life insurance policy assets at discounts to the face value of the policy benefits sufficient enough to generate profitable returns. In addition, we seek to create value for consumers owning life insurance through the secondary market for life insurance. In order to meet our goals, we have spent and intend to continue to spend significant resources: (i) developing a robust operational platform and systems for originating and purchasing life insurance policies; (ii) developing financing resources, strategies, and capabilities for servicing a large portfolio of life insurance policies; and (iii) establishing strategic relationships for delivering our products and services. In addition, we are exploring various ways in which we can commercialize, and perhaps transform, certain aspects of the life insurance and related industries through the application of epigenetic technology.

**Are there any risks involved in investing in this offering?**

Yes. Investing in our L Bonds involves a high degree of risk. You should carefully review the "Risk Factors" section of this prospectus, which contains a detailed discussion of the material risks that you should consider before investing in our L Bonds.

**How long will this offering last?**

The offering is a continuous offering. The offering under this registration statement expires under SEC rules after three years (i.e.,          ,          ). We may, however, conduct similar or identical offerings of L Bonds or other securities during this same time or afterwards. We may also decide to terminate this offering at any time.

**Will I be notified of how my investment is doing?**

We will provide you with periodic updates on our performance through periodic filings we make with the SEC. Such filings will include: (i) three quarterly financial reports; (ii) one annual report; (iii) supplements to this prospectus, as appropriate; and (iv) such other reports as required under Section 13 of the Securities Exchange Act of 1934. Such information is also available on our website at *www.gwgh.com*.

**Will I receive annual tax information regarding interest payments from you?**

You will receive a Form 1099-INT, which will be mailed by January 31 of each year.

**Who can help answer my questions about the offering?**

If you have more questions about our offering, you should contact a registered representative of your broker-dealer (i.e., your selling group member) or other investment professional, or else contact:

GWG Holdings, Inc.
220 South Sixth Street, Suite 1200
Minneapolis, MN 55402
(612) 746-1944
Attention: Jacky Junek, Senior Counsel

App. 0316

**PROSPECTUS SUMMARY**

*This summary highlights some of the information in this prospectus. It is not complete and may not contain all of the information that you may want to consider. To understand this offering fully, you should carefully read the entire prospectus, including the section entitled "Risk Factors," and the documents that are incorporated, or deemed to be incorporated, by reference into this prospectus, before making a decision to invest in our L Bonds. Unless otherwise noted or unless the context otherwise requires, the terms "we," "us," "our," the "Company" and "GWG" refer to GWG Holdings, Inc. together with its wholly owned direct or indirect subsidiaries. In instances where we refer emphatically to "GWG Holdings" or "GWG Holdings, Inc.," or where we refer to a specific subsidiary of ours by name, we are referring only to that specific legal entity.*

**Our Company**

We are a financial services company committed to finding new ways of transforming the life insurance and related industries through innovative products and services, business processes, financing strategies, and advanced epigenetic technology. Historically, we have focused on creating opportunities for consumers to maximize the value of their life insurance as compared to the traditional options offered by the insurance industry. As part of our business, we create opportunities for investors to receive income and capital appreciation from our various activities in the life insurance industry. More recently, we have focused on applying new epigenetic technology to the global life insurance industry.

The life insurance industry provides us with the opportunity to bring value to consumers and earn non-correlated yield by purchasing life insurance policy assets at a discount to the face value of the policy benefits. Once we purchase a life insurance policy asset, we continue to pay the premium to collect the policy benefit. In sum, we seek to earn the difference between the costs we incur to purchase, service and finance the life insurance assets we own and the policy benefits we receive. This practice is disruptive to historical life insurance industry practices as insurance carriers have grown to rely on consumer lapse and surrender behavior resulting in the forfeiture of policy benefits. From inception through September 30, 2017, we have purchased approximately $2.6 billion in face value of policy benefits from consumers for over $457.8 million, as compared to the $33 million in surrender value offered by insurance carriers on those same policies. Our innovative business allows consumers to maximize their investment in life insurance for their retirement or other financial needs.

We believe the market potential to serve consumers owning life insurance with our innovative products and services is large. According to the American Council of Life Insurers Fact Book 2016 (ACLI), individual consumers owned over $10.3 trillion in face value of life insurance policy benefits in the United States in 2015. In that same year, the ACLI reports that individual consumers purchased an aggregate of $1.6 trillion of new life insurance policy benefits. This figure includes all types of policies, including term insurance and permanent insurance known as whole life and universal life. Our opportunity exists as a result of consumer lapse behaviors and grossly inadequate surrender values offered to consumers by insurance carriers. The ACLI reports that the annual lapse and surrender rate for individual life insurance policies in 2015 was 5.4%, amounting to over $638.5 billion in face value of policy benefits lapsed and surrendered. According to testimony by Gottlieb & Smetters, it is estimated that nearly 88% of all universal life insurance policies sold in the United States do not result in the payment of a benefit claim. Research by Conning Research & Consulting (Conning) reports that the annual net market potential for life insurance policy benefits that could be sold in the secondary market exceeded $141 billion face value of policy benefits in 2016. Of that market potential, Conning estimates that $1.7 billion in face value of life insurance benefits were purchased in 2015, indicating that the market is dramatically underserved. With an aging demographic in the United States, Conning expects the net market potential to grow to an annual $170 billion in face value of life insurance benefits by 2025.

The need for innovative insurance based products and services that address the needs of the aging demographic in the United States was further supported by a policy statement by the National Association of Insurance Commissioners ("NAIC") Long-Term Care Innovation (B) Subgroup in 2017. In that policy statement, the NAIC recognized that the life insurance secondary market can provide an important private market solution for financing seniors need for long-term care. We share the belief that consumers are dramatically underserved with products and services based off life insurance secondary market principles. Further, we believe the opportunity to serve the aging demographic represents a significant long-term growth opportunity that GWG is well positioned to address.

A critical factor for earning positive returns from our life insurance assets is our ability to accurately estimate human life expectancy. In an effort to improve our accuracy in estimating human life expectancy, we began working

1

with by Dr. Steve Horvath, a Professor of Human Genetics and Biostatistics at the University of California, Los Angeles (UCLA). In May 2017, our wholly owned subsidiary Life Epigenetics, Inc. exclusively licensed from UCLA Dr. Horvath's "DNA Methylation Based Predictor of Mortality" technology, or "M-Panel" technology, which tests for certain chemical bio-markers occurring at the molecular level that are referred to as "methylation." We believe M-Panel technology could improve our ability to more accurately predict human life expectancy.

Our M-Panel technology is based upon a revolutionary new field of science known as "epigenetics." Epigenetics is the study of chemical changes occurring along the epigenome at a molecular scale. The chemical change known as methylation has been proven to silence or emphasize gene expression. In addition, while genetics generally do not change over a human's lifespan, the amount of methylation change that occurs in a human has been shown to change dramatically as a result of lifestyle, environment, diet, and other factors typically associated with environmental exposures. While we believe our M-Panel and similar technology may improve our ability to estimate human lifespan for our life insurance secondary market business, we believe the technology has much greater promise for the global life insurance industry. As a result, we intend to use M-Panel and other technology to aggressively pursue additional lines of business in the life insurance industry. According to industry experts, advancements in technology have the potential to upend the ability of insurers to assess and select risks. Industry consultants KPMG, Accenture, and Ernst & Young all take the position that the insurance industry will undergo transformational change as advanced technologies affect their businesses. We believe our M-Panel technology is a transformational industry technology.

We believe that we are uniquely positioned to continue acquiring life insurance assets from consumers in the secondary market, while developing additional innovative business models in the life insurance industry through the use of M-Panel technology. We expect to continue to finance our growth by providing investors with the opportunity to participate in the yield from the life insurance assets we own and growth opportunities we create.

To participate, compete in, and expand our markets, we spend significant resources: (i) recruiting and developing a professional management team; (ii) developing a robust operational platform, systems and strategy for originating life insurance policies; (iii) establishing strategic relationships for delivering the services we provide; (iv) creating opportunities for investors to participate in the yield and capital appreciation generated by the life insurance assets we own; and (v) creating innovative growth opportunities to participate in the global life insurance industry through the use of epigenetic technology.

### Portfolio Information

Our portfolio of life insurance policies owned by our subsidiaries as of September 30, 2017 is summarized below:

| | |
|---|---|
| Total portfolio face value of policy benefits | $ 1,622,627,000 |
| Average face value per policy | $ 1,909,000 |
| Average face value per insured life | $ 2,135,000 |
| Average age of insured (yrs.)* | 81.7 |
| Average life expectancy estimate (yrs.)* | 6.9 |
| Total number of policies | 850 |
| Number of unique lives | 760 |
| Demographics | 74% Males; 26% Females |
| Number of smokers | 34 |
| Largest policy as % of total portfolio | 0.82% |
| Average policy as % of total portfolio | 0.12% |
| Average annual premium as % of face value | 3.51% |

_____

\* Averages presented in the table are weighted averages.

2

**Corporate Organization**

Our business was originally organized in February 2006. We added our current parent holding company, GWG Holdings Inc., in March 2008, and in September 2014 we consummated an initial public offering of our common stock on The NASDAQ Capital Market, where our stock trades under the ticker symbol "GWGH."

We conduct our life insurance related business through a wholly owned subsidiary, GWG Life, LLC (GWG Life), and GWG Life's principal wholly owned subsidiary GWG DLP Funding IV, LLC (DLP IV). Both GWG Life and DLP IV are legally organized in Delaware. Life Epigenetics Inc. is a wholly owned subsidiary of GWG Holdings formed to engage in the various life insurance related businesses and activities.

Our principal executive offices are located at 220 South Sixth Street, Suite 1200, Minneapolis, Minnesota 55402 and our telephone number at that address is (612) 746-1944. Our website address is *www.gwgh.com*. The information on or accessible through our website is not part of this prospectus. Our corporate structure, including our principal subsidiaries, is depicted below.



3

App. 0320

**"Emerging Growth Company" Status**

As a public reporting company with less than $1 billion in revenue during our last fiscal year, we qualify as an "emerging growth company" under the Jumpstart our Business Startups Act of 2012, or the JOBS Act. An emerging growth company may take advantage of certain reduced reporting requirements and is relieved of certain other requirements otherwise generally applicable to public companies. In particular, as an emerging growth company we:

- are not required to obtain an attestation and report from our auditors on our management's assessment of our internal control over financial reporting under the Sarbanes-Oxley Act of 2002;

- are not required to provide a detailed narrative disclosure discussing our compensation principles and objectives and analyzing how our compensation elements fit with our principles and objectives (commonly referred to as "compensation discussion and analysis");

- are not required to obtain a non-binding advisory vote from our stockholders on executive compensation or golden parachute arrangements (commonly referred to as the "say-on-pay," "say-on-frequency" and "say-on-golden-parachute" votes);

- are exempt from certain executive compensation disclosure provisions requiring a pay-for-performance graph and CEO pay ratio disclosure;

- may present only two years of audited financial statements and only two years of related Management's Discussion & Analysis of Financial Condition and Results of Operations, or MD&A; and

- are eligible to claim longer phase-in periods for the adoption of new or revised financial accounting standards under §107 of the JOBS Act.

We intend to take advantage of all of these reduced reporting requirements and exemptions, including the longer phase-in periods for the adoption of new or revised financial accounting standards. Our election to use the phase-in periods is irrevocable and may make it difficult to compare our financial statements to companies that are either ineligible for, or have opted out of, the longer phase-in periods.

Under the JOBS Act, we may take advantage of the above-described reduced reporting requirements and exemptions for up to five years after our initial sale of common equity pursuant to a registration statement declared effective under the Securities Act of 1933 (which occurred in September 2014), or such earlier time that we no longer meet the definition of an emerging growth company. In this regard, the JOBS Act provides that we would cease to be an "emerging growth company" if we have more than $1 billion in annual revenues, have more than $700 million in market value of our common stock held by non-affiliates, or issue more than $1 billion in principal amount of non-convertible debt over a three-year period.

It should be noted that certain reduced reporting requirements and exemptions were already available to us due to the fact that we also qualify as a "smaller reporting company" under SEC rules, and our claim to those reduced reporting requirements and exemptions will not be affected by the loss of our status as an "emerging growth company." In this regard, we will continue to qualify as a "smaller reporting company" for so long as we have a public float (i.e., the market value of common equity held by non-affiliates) of less than $75 million as of the last business day of our most recently completed second fiscal quarter.

4

**The Offering**

| | |
|---|---|
| **Issuer** | GWG Holdings, Inc. |
| **Indenture Trustee** | Bank of Utah |
| **Paying Agent** | GWG Holdings, Inc. |

**Securities Offered**  We are offering up to 1,000,000 Units of L Bonds, with each whole Unit representing $1,000 in principal amount of L Bonds. The L Bonds are being sold on a continuous basis.

**Method of Purchase**  We will sell L Bonds using two different closing or "settlement" services, whenever available. The first service is DTC settlement, and the second is direct settlement with the Company. For more information, see "Plan of Distribution." The registration statement of which this prospectus is a part also registers the renewal of L Bonds that are outstanding from time to time.

**Denomination**  The minimum purchase amount is 25 L Bond Units, or $25,000 in principal amount. Additional L Bonds in excess of 25 Units may be purchased in any number of whole Units.

**Offering Price**  $1,000 per whole Unit, representing 100% of the principal amount of the L Bond represented by a whole Unit. Throughout this prospectus, we refer to L Bond Units simply as "L Bonds."

**Limited Rescission Right**  If you are purchasing L Bonds through direct settlement with the Company and your Subscription Agreement is accepted at a time when we have determined that a post-effective amendment to the registration statement of which this prospectus is a part must be filed with the SEC, but such post-effective amendment has not yet been declared effective, you will have a limited time within which to rescind your investment subject to the conditions set forth in this prospectus. See "Description of the L Bonds — Limited Rescission Right" for additional information.

**Maturity**  You may generally choose maturities for your L Bonds of two, three, five or seven years. Nevertheless, depending on our capital requirements, we may not offer and sell L Bonds of all maturities at all times during this offering.

**Interest Rates**  The interest rate of the L Bonds will be established at the time of your purchase, or at the time of renewal, based upon the rates we are offering in this prospectus or our latest interest rate supplement to this prospectus (i.e., any prospectus supplement containing interest rate information for L Bonds of different maturities), and will remain fixed throughout the term of the L Bond. We may offer higher rates of interest to investors with larger aggregate L Bond portfolios, but only as set forth in the then-current interest rate supplement.

**Interest Payments**  We will pay interest on the L Bonds based on the terms you choose, which may be monthly or annually. Interest will accrue from the effective date of the L Bond's issuance. If you purchase your L Bond directly from the Company, the effective date of your L Bond will be the date on which we accept your fully paid subscription. If you purchase your L Bond through DTC settlement, interest will begin accruing on the trade date. Based on our anticipated bi-monthly closing cycle, this means

App. 0322

that interest will accrue for a period of 15 or 30 days for the month in which your purchase is made, depending on when during the DTC closing cycle your purchase is made. Interest payments will generally be made on the 15th day immediately following the last day of the month to the L Bond holder of record as of the last day of that interest-payment period. Interest will be paid without any compounding.

| | |
|---|---|
| **Principal Payments** | The maturity date for the L Bonds will be the last day of the month during which the L Bond matures. We are obligated to pay the principal on the L Bond by the fifth day of the month next following its maturity (or the first business day following such date). |

5

App. 0323

| Payment Method | Principal and interest payments will be made by direct deposit to the account you designate in your Subscription Agreement if you purchase L Bonds through direct settlement with the Company. If you purchase L Bonds through DTC settlement, principal and interest payments will be made to your brokerage or custodial account through DTC. |
| --- | --- |
| **Renewal or Redemption at Maturity** | Upon maturity, the L Bonds will be automatically renewed for the same term at the interest rate we are offering at that time to other investors with similar aggregate L Bond portfolios for L Bonds of the same maturity, unless repaid upon maturity at our or your election. In this regard, we will notify you at least 30 days prior to the maturity date of your L Bonds. In the notice, we will advise you if we intend to repay the L Bonds or else remind you that your L Bonds will be automatically renewed unless you exercise your option, at least 15 days prior to the maturity date, to elect to have your L Bonds repaid. If applicable, a new certificate will be issued.<br><br>If we determine that a post-effective amendment to the registration statement covering the offer and sale of L Bonds must be filed during your 15-day repayment election period, we will extend your election period until ten days following the postmark date of our notice to you that the amendment has become effective.<br><br>For any L Bonds offered hereby that mature after the three-year anniversary of the commencement of this offering, we expect that the renewal of such L Bonds may require us to file a new registration statement. In such a case, the new registration statement must be declared effective before we will be able to renew your L Bond. In this event, if the new registration statement has not yet been filed or become effective, we will extend your election period until ten days following the date of our notice to you that the new registration statement has become effective, which notice will include a new prospectus.<br><br>If L Bonds with similar terms are not being offered at the time of renewal, then (i) the interest rate upon renewal will be (a) the rate specified by us in writing on or before the maturity date or (b) if no such rate is specified, the rate of your existing L Bonds, and (ii) the maturity will the same if L Bonds of the same maturity are then being offered at the time of renewal. If L Bonds of the same maturity are not then being offered at the time of renewal, then the maturity will be the next earliest maturity. Accordingly, you should understand that the interest rate offered upon renewal may differ from the interest rate applicable to your L Bonds prior to maturity. See "Description of the L Bonds — Renewal or Redemption on Maturity." |
| **Call and Redemption Prior to Maturity** | We may call and redeem the entire outstanding principal balance and accrued but unpaid interest of any or all of the L Bonds at any time without penalty or premium. L Bond holders will have no right to require us to redeem any L Bond prior to maturity unless the request is due to death, bankruptcy or total permanent disability. The indenture defines "total permanent disability" as the determination by a physician, approved by us, that a holder of an L Bond who is a natural person, and who was gainfully employed at the time of issuance of the L Bond (or its renewal date), is unable to work on a full-time basis during a period of 24 consecutive months.<br><br>In our sole discretion, we may accommodate other requests to redeem any L Bond prior to maturity. If we agree to redeem an L Bond upon the request of an L Bond holder (other than in connection with death, |

App. 0324

bankruptcy or total permanent disability), we will impose a redemption fee of 6% against the outstanding principal balance of the L Bond redeemed, which fee will be subtracted from the amount paid.

6

| | |
|---|---|
| **Ranking** | The L Bonds will constitute secured debt of GWG Holdings. The payment of principal and interest on the L Bonds will be: |

- pari passu with respect to payment on and collateral securing all L Bonds (including previously issued L Bonds), of which approximately $424.8 million in principal amount is outstanding as of September 30, 2017 (see the caption "— Collateral Security" below);

- structurally and contractually junior to the present and future obligations owed by DLP IV under a senior secured term loan with LNV/CLMG, and structurally or contractually junior to any future obligations that DLP IV and other primary obligors or guarantors may have under future senior secured borrowing facilities; and

- structurally junior to the present and future claims of other creditors of DLP IV, including trade creditors.

The indenture permits us to issue other forms of debt, including senior and secured debt, in the future. Any such secured senior debt will have priority over L Bonds with respect to claims for payment and claims for any collateral that is shared as between the holders of L Bonds and such senior secured debt.

To fully understand the foregoing summary, you should understand that "pari passu" means that claims for payment and entitlement to security among the holders of L Bonds (including the holders of previously issued L Bonds) and the holders of any later-created class of "pari passu debt" of ours, will generally be treated equally and without preference. Debt issued on a pari passu basis in the future would be treated equally and without preference in respect of the L Bonds. Thus, in the event of any default on the L Bonds (or any other debt securities of ours that is pari passu with the L Bonds) resulting in claims for payment or claims on collateral security, the holders of the L Bonds and all such other debt securities that are pari passu with the L Bonds would share in payment or collateral in proportion to the amount of principal and interest owed on each such debt instrument. See "Description of the L Bonds — Ranking" for further information.

| | |
|---|---|
| **Guarantee** | The payment of principal and interest on the L Bonds, including all previously issued L Bonds, is fully and unconditionally guaranteed by GWG Life. On September 30, 2017, there was approximately $424.8 million in outstanding principal amount of L Bonds. |
| **Collateral Security** | The L Bonds are secured by the assets of GWG Holdings, Inc. We have granted a security interest in all of our assets to the indenture trustee for the benefit of the L Bond holders. Our assets consist primarily of our investments in our subsidiaries and any cash proceeds we receive from life insurance assets of our subsidiaries, and all other cash and investments we hold in various accounts. |

Substantially all of our life insurance assets are held in our subsidiary DLP IV. The L Bonds' security interest will be structurally subordinate to the security interest in favor of our senior secured lender, together with any future senior secured lenders of ours. The assets of GWG Life, including proceeds it receives as distributions from DLP IV and derived from the insurance policies owned by DLP IV, are collateral for GWG

Life's guarantee of the repayment of principal and interest on the L Bonds.

The L Bonds are also secured by a pledge of a majority of our outstanding common stock beneficially held by our largest stockholders. For more information please see "Description of the L Bonds — Collateral Security."

7

| | |
|---|---|
| **Indenture Covenants** | The indenture governing the L Bonds places restrictive covenants and affirmative obligations on us. For example, our debt coverage ratio may not exceed 90%. |
| | The indenture defines the debt coverage ratio as a percentage calculated by the ratio of (A) obligations owing by us and our subsidiaries on all outstanding debt for borrowed money (including the L Bonds), over (B) the net present asset value of all life insurance assets we own, directly or indirectly, plus any cash held in our accounts. For this purpose, the net present asset value of our life insurance assets is equal to the present value of the cash flows derived from the face value of policy benefit assets we own, discounted at a rate equal to the weighted-average interest rate on our indebtedness for the prior month. |
| | We are required to notify the indenture trustee in the event that we violate this restrictive covenant for a period of 30 consecutive days. An "event of default" will exist under the indenture if a violation of this covenant persists for a period of 60 calendar days after the trustee's notice to us of a breach, or such a notice received from the holders of at least 25% in principal amount of outstanding L Bonds. |
| | The indenture also places limitations on our ability to engage in a merger or sale of all of our assets. See "Description of the Indentures — Events of Default" and "— Consolidation Mergers or Sales" for more information. |
| **Use of Proceeds** | If all the L Bonds are sold, we would expect to receive up to approximately $918.8 million of net proceeds from this offering after paying our estimated average selling commissions, dealer-manager fees, accountable expense allowance, wholesaling fees, non-cash compensation, up to a 1.00% reallowance, and our own offering-related expenses. There is no minimum amount of L Bonds that must be sold before we access investor funds. The exact amount of proceeds we receive may vary considerably depending on a variety of factors, including how long the L Bonds are offered. |
| | We intend to use the majority of net proceeds from this offering to purchase and service life insurance policy assets. We will also use proceeds from this offering to pay fees, interest and principal (at maturity) to our lenders, including under our senior credit facility, previously issued L Bonds and the L Bonds offered hereby, and for general working capital purposes. See "Use of Proceeds" for additional information. |
| **No Market for L Bonds Units; Transferability** | There is no existing market for the L Bonds and we do not anticipate that a secondary market for the L Bonds will develop. We do not intend to apply for listing of the L Bonds on any securities exchange or for quotation of the L Bonds in any automated dealer quotation system. Nevertheless, you will be able to freely transfer or pledge L Bonds. See "Description of the L Bonds — Transfers." |
| **Book Entry** | The L Bonds may be issued in book-entry form, certificated form, or in the form of a global certificate deposited with a depositary. See "Description of the L Bonds — Registration and Exchange." |
| **Covered Security** | Our L Bonds are a "covered security." The term "covered security" applies to securities exempt from state registration because of their oversight by federal authorities and national-level regulatory bodies pursuant to Section 18 of the Securities Act of 1933. Generally, securities |

listed on national exchanges are the most common type of covered security exempt from state registration. A non-traded security also can be a covered security if it has a seniority greater than or equal to other securities from the same issuer that are listed on a national exchange. Our L Bonds are a covered security because they are senior to our common stock, which is listed on The Nasdaq Capital Market, and therefore our offering of L Bonds is exempt from state registration.

8

Although the status of our L Bonds as a "covered security" will facilitate their purchase and sale to a broader range of investors than would otherwise be available to us, and although the offer and sale of a "covered security" generally involves fewer issuance costs to the issuer of such securities, our L Bonds are not a suitable purchase for all investors. In this regard, please carefully review the "Risk Factors" contained in this prospectus, as well as the disclosures on page 12 under the heading "Covered Security."

|  |  |
|---|---|
| **Risk Factors** | An investment in the L Bonds involves significant risks, including the risk of losing your entire investment, and may be considered speculative.<br><br>Importantly, we maintain senior borrowing arrangements that subordinate the right to payment on, and shared collateral securing, the L Bonds to our senior secured lenders. From time to time we may add or replace senior lenders or modify the particular arrangements under which we borrow from them. In addition, these borrowing arrangements with senior lenders restrict, and are expected to continue to restrict, our cash flows and, subject to certain exceptions, distributions from our operating subsidiaries. These provisions will restrict cash flows available for payment of principal and interest on the L Bonds. For a summary of risks relating to this offering and our Company and business, please see "Risk Factors," page 12. |

9

**RISK RELATING TO FORWARD-LOOKING STATEMENTS**

Certain matters discussed in this prospectus contain forward-looking statements. These forward-looking statements are subject to risks, uncertainties and assumptions about our operations and the investments we make, including, among other things, factors discussed under the heading "Risk Factors" in this prospectus and the following:

- changes in the secondary market for life insurance;

- changes resulting from the evolution of our business model and strategy with respect to the life insurance industry;

- our limited operating history;

- the valuation of assets reflected on our financial statements;

- the reliability of assumptions underlying our actuarial models, including our life expectancy estimates;

- our reliance on debt financing;

- risks relating to the validity and enforceability of the life insurance policies we purchase;

- risks relating to our ability to license and effectively apply technologies to improve and expand the scope of our business;

- our reliance on information provided and obtained by third parties;

- federal, state and FINRA regulatory matters;

- competition in the secondary market of life insurance;

- the relative illiquidity of life insurance policies;

- our ability to satisfy our debt obligations if we were to sell our entire portfolio of life insurance policies;

- life insurance company credit exposure;

- cost-of-insurance (premium) increases on our life insurance contracts;

- general economic outlook, including prevailing interest rates;

- performance of our investments in life insurance policies;

- financing requirements;

- risks associated with our merchant cash business;

- the various risks associated with our attempts to commercialize our M-Panel technology;

- litigation risks;

- restrictive covenants contained in borrowing agreements; and

- our ability to make cash distributions in satisfaction of dividend obligations and redemption requests.

Forward-looking statements can be identified by the use of words like "believes," "could," "possibly," "probably," "anticipates," "estimates," "projects," "expects," "may," "will," "should," "seek," "intend," "plan," "expect," or "consider" or the negative of these expressions or other variations, or by discussions of strategy that involves risks and uncertainties. All forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause our actual transactions, results, performance or achievements to be materially different from any future transactions, results, performance or achievements expressed or implied by such forward-looking statements.

We base these forward-looking statements on current expectations and projections about future events and the information currently available to us. Although we believe that the assumptions for these forward-

looking statements are reasonable, any of the assumptions could prove to be inaccurate. Consequently, no representation or warranty

---

10

App. 0332

can be given that the estimates, opinions, or assumptions made in or referenced by this prospectus will prove to be accurate. Some of the risks, uncertainties and assumptions are identified in the discussion entitled "Risk Factors" in this prospectus. We undertake no obligation to update our forward-looking statements. We caution you that the forward-looking statements in (or incorporated by reference into) this prospectus are only estimates and predictions, or statements or current intent. Actual results or outcomes, or actions that we ultimately undertake, could differ materially from those anticipated in the forward-looking statements due to risks, uncertainties or actual events differing from the assumptions underlying these statements. These risks, uncertainties and assumptions include, but are not limited to, those discussed in this prospectus.

11

App. 0333

**RISK FACTORS**

*An investment in our securities involves a high degree of risk. Before purchasing the securities offered by this prospectus, you should carefully consider the risks, uncertainties and additional information (i) set forth in our most recent Annual Report on Form 10-K filed with the SEC on March 15, 2017, Quarterly Reports on Form 10-Q filed with the SEC on May 12, August 10, and November 9, 2017, Currents Reports on Form 8-K filed with SEC on February 9, February 22, March 8, April 3, May 10, June 30, August 10, 2017, September 27, 2017, October 26, 2017, and November 9, 2017, and our definitive proxy statement filed with the SEC on March 30, 2017, all which are incorporated by reference into this prospectus, and (ii) contained herein or in any supplement to this prospectus, including information in any documents subsequently incorporated by reference into this prospectus. The information incorporated by reference into this prospectus specifically includes the risk factors contained in our Annual Report on Form 10-K filed with the SEC on March 15, 2017.*

*For a description of the above-described reports and documents, and information about where you can find them, see "Where You Can Find More Information" and "Incorporation of Certain Documents By Reference." The risks and uncertainties in this prospectus and in the documents presently incorporated by reference in this prospectus are those that we currently believe may materially impact the Company. Additional risks not presently known or are currently deemed immaterial could also materially and adversely affect our financial condition, results of operations, business and prospects.*

**We may be unable to raise the capital we are seeking from our securities offerings, and may be unable to meet our overall business objective of growing a larger, actuarially diverse portfolio of life insurance assets.**

Our offer and sale of L Bonds and other securities are the principal means by which we intend to raise funds needed to meet our goal of growing a larger and more statistically diverse portfolio. While we plan to continue financing our business, if we are unable to do so for any reason we may be unable to meet our goal. In addition, if holders of our L Bonds were to fail to renew those securities with the frequency we have historically experienced, and if actual cash flows from our portfolio of life insurance policies do not occur as our actuarial projections have forecasted, we could be forced to sell some or all of our investments in life insurance policies in order to service or satisfy our debt-related obligations. If we are forced to sell some or all of our investments in life insurance policies, or our entire portfolio, we may be unable to sell them at prices we believe are optimal or that approximate the discount rate we have applied to value our portfolio, particularly if our sale of policies occurs at a time when we are (or are perceived to be) in distress. In any such event, our business and the value of our securities would likely be materially and adversely impacted.

**We depend upon cash distributions from our subsidiaries, and contractual restrictions on distributions to us or adverse events at one of our operating subsidiaries could materially and adversely affect our ability to pay our debts and continue operating our business.**

GWG Holdings, Inc. is a holding company. As a holding company, we conduct our operations through operating subsidiaries, and as such our most significant assets are cash and our ownership interests in our subsidiaries. Accordingly, our ability to meet our obligations, including our obligations under the L Bonds, materially depends upon the ability of our subsidiaries to distribute cash to us. In this regard, the ability of our subsidiaries to distribute cash to us is, and will continue to be, restricted by certain negative covenants in the agreement governing our senior credit facility. If any of these limitations were to materially impede the flow of cash to us, our ability to service and repay our debt, including obligations under the L Bonds, would be materially and adversely affected. In addition, any adverse corporate event at the subsidiary level, such as a declaration of bankruptcy, liquidation or reorganization or an event of default under our senior credit facility, could adversely affect the ability of our subsidiaries to distribute cash to us, and thereby materially and adversely affect our ability to service and repay our debt, including obligations under the L Bonds, and negatively impact our ability to continue operations.

**Cost-of-insurance (premium) increases could materially and adversely affect our profitably and financial condition.**

We are subject to the risk of increased cost-of-insurance ("COI") charges (i.e., premium charges) for the universal life insurance policies we own in our portfolio. As of September 30, 2017, approximately 17% of the policies in our portfolio have premium levels that are guaranteed under the terms of the policy to keep the policy's death benefit in force even in a situation where the policy's cash account has been wholly depleted. On the remaining 83% of our policies, we pay

12

"non-guaranteed COI charges" and are subject to the risk that the insurer could increase the COI charges for the policy. In all cases, the amount of increase is subject to any limits that may be set forth in the insurance policy. Because very few of the policies we own have significant cash account value balances, any COI increase will require us to use more cash to satisfy the minimum premium amount required to keep the related policy in force, and this could materially and adversely affect our profitability.

A COI increase can also be expected to impair the value of the affected policy since extra expense (i.e., additional premium amounts) will be required to keep the policy in force, and such extra expense will diminish the economic value, or return, of the policy upon the mortality of the insured. As a result, any widespread COI increases in policies we own would likely have a material and adverse effect on the value of our portfolio, which in turn would materially and adversely affect our financial condition.

***Subordination provisions contained in the indenture will restrict the ability of the trustee or the L Bond holders to enforce their rights against us under the indenture, including the right to payment on the L Bonds, if a default then exists under a senior credit facility.***

The L Bonds will be subordinate in right of payment to any claims of our senior lenders under a senior credit facility. In this regard, subordination provisions limiting the right of L Bond holders to enforce their rights are contained in the indenture. These provisions include:

- a prohibition on challenging any enforcement action taken by a senior lender, or interfering with any legal action or suits undertaken by a senior lender, against us and our affiliates;

- a 180-day standstill period during which there may not be brought any action against us or our affiliates to enforce rights respecting collateral unless our senior credit facilities have been repaid in full, which period may be extended if the senior lender takes action during such standstill period; and

- a prohibition on filing a bankruptcy or insolvency case against us or our affiliates for at least one year plus one day after any senior lender has been paid in full.

In the event of a default on a senior credit facility, the indenture prohibits us from making any payment, direct or indirect (whether for interest, principal, as a result of any redemption or repayment at maturity, on default, or otherwise), on the L Bonds and any other indebtedness unless and until: (i) the default respecting the senior credit facility has been cured or waived or has ceased to exist; or (ii) in the case of a non-payment default that permits a senior lender to declare as due and payable all amounts owing under a senior credit facility (but where that senior lender has not yet so declared amounts as being due and payable), the end of the period commencing on the date the trustee receives written notice of default from the senior lender and ending on the earliest of (1) our discharge of the default (or other cure), (2) the trustee's receipt of a valid waiver of default from the senior lender, or (3) a written notice from the senior lender terminating the payment prohibition.

During any payment prohibition period, neither the holders of the L Bonds nor the trustee will have the right, directly or indirectly, to sue to enforce the indenture or the L Bonds. Other provisions of the indenture do permit the trustee to take action to enforce the payment rights of L Bond holders after 179 days have passed since the trustee's receipt of notice of default from a senior lender, but in such case any funds paid as a result of any such suit or enforcement action shall be applied toward the senior credit facility until the facility is indefeasibly paid in full before being applied to the L Bonds.

These subordination provisions present the risk that, upon any default by us on obligations owed to our senior lenders, the holders of the L Bonds will be unable to enforce their rights to payment.

If the 180-day standstill period noted above, or any other limitation on the rights of the trustee or L Bond holders to assert their rights to payment of principal or interest under the indenture, is ultimately determined to conflict with provisions of the Trust Indenture Act of 1939 (most notably sections 316(b) and 317(a) of that Act), then the trustee, as well as any holder who shall not have earlier consented to such subordination provisions, will (notwithstanding such provision contained in the indenture) be authorized to institute a lawsuit for the enforcement of any payment of principal or interest after their respective due dates.

13

*The collateral granted as security for our obligations under the L Bonds may be insufficient to repay the indebtedness upon an event of default.*

GWG Holdings (the issuer of the L Bonds) and GWG Life (the guarantor of obligations under the L Bonds, and the wholly owned subsidiary of GWG Holdings) have each granted a security interest in substantially all of their respective assets to serve as collateral security for obligations under the L Bonds. Importantly, DLP IV owns substantially all of our life insurance policies and is the borrower under our senior credit facility with LNV/CLMG. As the borrower under that senior credit facility, all of its assets — including all of its life insurance policy assets — serve as collateral for our obligations under the facility.

The most significant assets of each of GWG Holdings and GWG Life are their cash and investments in their respective subsidiaries. At December 31, 2016, GWG Holdings' total assets were approximately $462.3 million, of which approximately $28.5 million was cash and approximately $430.0 million was its investment in subsidiaries. On that same date, GWG Life's total assets were approximately $447.1 million, of which approximately $49.4 million was cash and approximately $352.3 million was its investment in subsidiaries. Approximately $41.2 million in fair value of life insurance policies was directly owned by GWG Life at December 31, 2016.

Because of the fact that substantially all of our life insurance assets are held in our DLP IV subsidiary, and all of those assets serve as collateral security for our obligations under our senior credit facility, L Bond holders risk the possibility that the collateral security that has been granted for our obligations under the L Bonds may be insufficient to repay holders upon an event of default. Furthermore, while the indenture governing the L Bonds limits the amount of debt we and our subsidiaries can incur, the indenture permits us and our subsidiaries to incur additional secured debt (subject to the debt coverage ratio) that may be senior to the L Bonds.

*If a significant number of holders of our L Bonds demand repayment upon maturity instead of renewing the bonds, and at such time we do not have sufficient access to capital to fund those repayments (and do not otherwise have access to sufficient capital), we may be forced to liquidate some of our life insurance policies, which could have a material and adverse impact on our results of operations and financial condition.*

As of September 30, 2017, we had approximately $424.8 million in principal amount of L Bonds outstanding. Since we first issued our L Bonds through September 30, 2017, we have experienced $374.6 million in maturities, of which $223.7 million has renewed for an additional term. This has provided us with an historical renewal rate of approximately 60%, in principal amount, for L Bond maturities. Future maturities of L Bonds as of September 30, 2017 are as follows:

| Years Ending December 31, | Contractual Maturities | | Unamortized Deferred Financing Costs | |
|---|---|---|---|---|
| Three months ending December 31, 2017 | $ | 17,059,000 | $ | 104,000 |
| 2018 | | 108,717,000 | | 1,652,000 |
| 2019 | | 133,174,000 | | 4,294,000 |
| 2020 | | 63,523,000 | | 2,763,000 |
| 2021 | | 28,703,000 | | 1,350,000 |
| Thereafter | | 73,602,000 | | 4,299,000 |
| | $ | 424,778,000 | $ | 14,462,000 |

In August 2017, we exercised our contractual rights to call for the redemption of all our Series I Secured Notes, the aggregate outstanding principal of which was approximately $6.8 million as of June 30, 2017. In September 2017, we consummated the redemption of all of those debt obligations.

If investors holding existing and maturing indebtedness do not elect to renew their investments and we do not at such time have or have access to sufficient capital, then we may need to liquidate some or all of our investments in life insurance policies earlier than anticipated. In such an event, we may be unable to sell those policies at prices we believe are fair or otherwise appropriate and these sales could have a material and adverse impact on our results of operations and financial condition. See also "*We may be unable to raise the capital we are seeking . . . .*"

14

*The debt coverage ratio, designed to provide some assurance that the value of our assets exceeds our obligations to the holders of L Bonds, values our life insurance policy assets in manner that may not be representative of the amount we would actually receive upon a sale of those assets.*

Under the indenture governing the L Bonds, the maximum amount of L Bonds we may issue at any time is limited to an amount such that our debt coverage ratio does not exceed 90%. This limitation is designed to provide a basis to ensure that the net present value of policy benefits from our life insurance assets are able to cover the obligations to our L Bond holders. Conceptually, and because we intend to hold our life insurance policies until we receive the related policy benefits, the debt coverage ratio is based on the future receipt our portfolio's gross expected yield (i.e., our expected gains) as measured against the future interest cost of our total debt obligations to finance the portfolio to maturity. Expressed as a percentage, the debt coverage ratio is calculated as the ratio of (i) the total amounts outstanding on interest-bearing debt, over (ii) the net present asset value of all life insurance assets we own, plus any cash and cash equivalents held in our accounts and policy benefit receivables. For this purpose, the net present asset value of our life insurance assets is calculated as the present value of the life insurance portfolio's expected future cash flows discounted at the weighted-average interest rate of the interest-bearing indebtedness for the previous month.

Although the debt coverage ratio is designed to provide a basis to ensure that our assets will be sufficient to meet our obligations to the holders of L Bonds, the "net present value" of our life insurance assets used in the debt coverage ratio is not the same as the "fair value" of those assets on our balance sheet. Accordingly, the "net present value" and the "fair value" of our life insurance assets may be different — greater or less — and as a result the debt coverage ratio is not informative of the amount we and holders of L Bonds would actually receive if we were forced to sell or liquidated our life insurance assets. Furthermore, any sale or liquidation of all or a significant portion of our life insurance assets would incur significant transactional costs. As a result, our mere compliance with the debt coverage ratio in the indenture will not guarantee that the value of our life insurance assets, if sold or liquidated, would in all cases exceed the amount of our obligations to the holders of L Bonds.

*We have no obligation to redeem L Bonds prior to their maturity date except in very limited circumstances.*

We will have no obligation, and L Bond holders will have no right to require us, to redeem any L Bonds prior to their maturity date. The only exceptions will exist for situations in which an individual natural person who holds an L Bond suffers a total permanent disability or a bankruptcy, or dies. In such an event, we will be required to redeem the L Bonds of that person so long as certain procedural requirements are met. We may nonetheless agree, in our sole and absolute discretion, to accommodate requests to redeem L Bonds prior to their maturity in other cases. If, in our discretion, we voluntarily agree to redeem L Bonds that we are not obligated to redeem under the indenture, we will assess a 6% redemption fee for the transaction. For more information, see "Description of the L Bonds — Call and Redemption Prior to Stated Maturity." As a result, any investment in our L Bonds should be considered illiquid until its stated maturity date.

*Inaccuracies in the life expectancy estimates we use for small face policies could have a material and adverse effect on our results of operation and financial condition.*

As of September 30, 2017, we owned 462 "small face" life insurance policies (i.e., policies having $1 million in face value of benefits or less) having $253.9 million in aggregate face value of benefits. We expect that the proportion of our total portfolio of life insurance policies consisting of small face policies will increase in the future.

The underwriting processes we use to evaluate, price and purchase small face policies are different from, and may not be as reliable as, the processes we use for life insurance policies with larger face values of benefits. In particular, the processes we use to develop life expectancy estimates and the related mortality curves for small face policies are less extensive than traditional methods. Although we obtain professional actuarial guidance regarding these processes, they may not be as reliable as the processes we use for policies with larger (greater than $1 million) face value of benefits.

As the face value attributable to our small face policies increases relative to the total face value of our portfolio, the accuracy with which we have estimated life expectancies for these policies will become increasingly material to

15

our business. Any shortcomings in the processes we use to evaluate, price, purchase and value our small face policies, or significant inaccuracies in the life expectancy estimates relating to those policies, could have a material and adverse effect on our results of operation and financial condition. Any such outcomes could have a negative and possibly material effect on our ability to satisfy our debts, including obligations under our L Bonds.

***We may in the future rely, in part, on new and unproven technology as part of our underwriting processes. If mortality predictions we obtain through use of this technology prove inaccurate, then our results of operation and financial condition could be materially and adversely affected.***

We recently exercised our option to license, on an exclusive basis for use in the life insurance industry, new technology (which we call "M-Panel" technology) that we believe may be applied to assist us with mortality predictions in the course of underwriting and valuing life insurance policies. This M-Panel technology, however, has not yet been commercially applied in the manner we envision, and it is possible that we will be unable to obtain more accurate mortality predictions through its use. It is also possible that the mortality predictions we obtain through use of the M-Panel technology will prove inaccurate, and perhaps materially so. In any such a case, our failure to accurately forecast mortalities could have a material and adverse effect on our results of operation and financial condition, which could in turn materially and negatively affect our ability to satisfy our debts, including obligations under our L Bonds.

***Although we have entered into a written license agreement for the M-Panel technology, we may have difficulties preventing third parties from using that technology, and we may be required to obtain additional licenses from other parties prior to our commercial use of that technology. We may be forced to develop our own proprietary processes, the success of which would be uncertain. Difficulties we encounter in our efforts to use or develop, and protect, intellectual property may prove costly and affect our results of operations.***

The M-Panel technology rights we have licensed are the subject of a provisional patent application, but no patent protection will be afforded those rights unless and until a non-provisional patent application is filed with the U.S. Patent and Trademark Office, which filing is beyond our control. If the patent for the M-Panel technology ultimately were to issue, we would be legally entitled to prevent third parties from using any part of the technology that is both covered by the claims of the patent and licensed to us. If, on the other hand, no patent is ultimately granted with respect to the M-Panel technology (or the scope of claims is too narrow to afford us with meaningful protection), then we may be unable to prevent third parties from using the M-Panel technology. This outcome may severely diminish any competitive advantage we hope to obtain through our use of the M-Panel technology.

We are aware that other patent applications pending in the U.S. Patent and Trademark Office may have scopes of claims that overlap with the claims contained in the provisional patent application filed with respect to the M-Panel technology. If those other patents were to issue with scopes of claims that in fact overlap with the claims in any patent application for the M-Panel technology, we would likely be required to enter into a license agreement with other third parties before we could use processes that are covered by those overlapping claims. Nevertheless, we may be unable to procure such a license, and even if we are able to procure such a license it may prove too costly for us. Alternatively, we would ourselves be required to develop other processes that would not overlap with other patent claims. Our own development of these processes could be costly and time consuming and may ultimately prove unsuccessful.

In sum, any difficulties we encounter in our efforts to use (through a license), or develop, and ultimately protect, intellectual property from which we hope to gain a competitive advantage and enter into new insurance-related markets could prove costly and time-consuming enough to materially and adversely affect our results of operations.

***The technology we license may subject us to claims of infringement or invalidity from third parties, and the magnitude of this risk to our business generally rises if and as we become more successful in employing and relying on the technology. Any such claims would be complex and costly, and adverse outcomes could undermine the competitive advantages we seek.***

Our reliance on M-Panel technology (or any other technology we own or license) will subject us to the risk that other parties may assert, rightly or wrongly, that our intellectual property rights are invalid or violate the rights of those parties, as well as the risk that our intellectual property rights will be infringed upon by third parties. Any outcome invalidating our intellectual property rights or otherwise diminishing the competitive advantages obtained, at least in part, through the use of those rights could have a material and adverse effect on our competitive position and our prospects.

App. 0339

*Commercializing the M-Panel or other technology may require significant expenses, may cause us to incur losses, and may ultimately prove ineffective in developing value-added products and services for the life insurance and related industries. Our competitors, however, could succeed in commercializing applications of technology in a way that provides them with a competitive advantage, which could materially and adversely affect our prospects.*

We intend to pursue new business models and business strategies in the insurance industry with M-Panel or similar technology. The M-Panel technology, however, has not yet been commercially applied in the manner we envision, and it is possible that we will incur losses as a result of these efforts. It is also possible that we will be unable to effectively commercialize M-Panel or similar technology, or unsuccessful in disrupting the life insurance industry. One or more competitors, however, may ultimately succeed in applying technology to the life insurance industry in a manner that provides them with a significant competitive advantage or that disrupts the marketplace. Any such outcome could have a material and adverse effect on our prospects, which could in turn materially and negatively affect our ability to successfully finance our business and satisfy our debts, including obligations under our L Bonds.

*Fraudulent transfer statutes may limit your rights under GWG Life's guarantee of the L Bonds.*

Obligations under our L Bonds will be fully and unconditionally guaranteed by our direct wholly owned subsidiary, GWG Life. The guarantee may be subject to review under various laws for the protection of creditors. It is possible that other creditors of GWG Life may challenge the guarantee as a fraudulent transfer under relevant federal and state laws. Under certain circumstances, including a finding that GWG Life was insolvent at the time its guarantee was issued, a court could hold that the obligations of GWG Life under the guarantee may be voided or are subordinate to other obligations of GWG Life, or that the amount for which GWG Life is liable under its guarantee of the L Bonds may be limited. Different jurisdictions define "insolvency" differently, and we cannot assure you as to what standard a court would apply to determine whether GWG Life was insolvent at the time it guaranteed obligations under the L Bonds. If a court were to determine that GWG Life was insolvent on the date on which it guaranteed the L Bonds, or that the guarantee constituted a fraudulent transfer on other grounds, then the claims of creditors of GWG Life would effectively have priority (with respect to GWG Life's assets and earnings) over the claims of L Bond holders.

*Our controlling stockholders and principal executives are involved in litigation "clawback" claims, and it is possible that adverse outcomes from these claims could negatively affect us.*

Our Chief Executive Officer, Jon R. Sabes, and our corporate secretary and Executive Vice President, Steven F. Sabes, who together beneficially own or control approximately 75% of our common stock, are subject to clawback litigation relating to loan payments made to Opportunity Finance, LLC. The litigation stems from loan payments received by Opportunity Finance, LLC (owned by Jon R. Sabes and Steve F. Sabes) from a borrower who filed for bankruptcy in 2008. The bankruptcy trustee alleges that loan repayments to Opportunity Finance were voidable transfers under preference or other legal theories and seeks to recover amounts for other creditors of the bankruptcy estate. Case No. 08-45257 (U.S. Bankruptcy Court District of Minnesota). Such loan repayments may ultimately be deemed to be voidable transfers under preference or other legal theories. To date, no claim has been made against us.

While we believe there are numerous meritorious defenses to the claims made by the bankruptcy trustee, and we are advised that the defendants in that action will vigorously defend against the trustee's claims, the defendants may not prevail. If the bankruptcy trustee were to succeed in any effort to sell or transfer the equity interests of Jon R. Sabes or Steven F. Sabes in our company as a result of the litigation, there could be a change in control of our company. Such an event could adversely affect holders of our L Bonds by reducing the number of shares of common stock of GWG Holdings that have been pledged as collateral security for our obligations under those securities. Finally, regardless of the outcome of this litigation, these matters may distract management and reduce the time and attention that they are able to devote to our business.

17

*The loss of the services of our current executives or other key employees, or the failure to attract additional key individuals, would materially adversely affect our business operations and prospects.*

Our financial success is significantly dependent upon the efforts of our current executive officers and other key employees. We have entered into employment agreements with Messrs. Jon R. Sabes and William B. Acheson. Nevertheless, there can be no assurance that these individuals will continue to provide services to us. A voluntary or involuntary termination of employment could have a materially adverse effect on our business operations if we were not able to attract qualified replacements in a timely manner. At present, we do not maintain key-man life insurance policies for any of these individuals. In addition, our success and viability is also dependent to a significant extent upon our ability to attract and retain qualified personnel in all areas of our business, especially our sales, policy acquisition, and financial management team. If we were to lose the members of these service teams, we would need to replace them with qualified individuals in a timely manner or our business operations and prospects could be adversely impacted.

*We have no obligation to contribute to a sinking fund to retire the L Bonds, nor are the L Bonds guaranteed by any governmental agency.*

We have no obligation to contribute funds to a sinking fund to repay principal or pay interest on the L Bonds upon maturity or default. The L Bonds are not certificates of deposit or similar obligations of, or guaranteed by, any depository institution. Further, no governmental entity insures or guarantees payment on the L Bonds if we do not have sufficient funds to make principal or interest payments.

*We have the discretion to purchase assets, including life insurance assets, through different subsidiaries, and to transfer assets among our subsidiaries. Any decision to purchase or hold title to assets in one subsidiary, as opposed to a different subsidiary, may affect the value of collateral security for our obligation under the L Bonds.*

We may at our discretion direct the purchase of policies by, and the sale of policies and other assets amongst, different subsidiaries of GWG Holdings. Purchases of assets in, or movements of assets amongst, different subsidiaries could affect the value of the collateral security for obligations under the L Bonds. For example, purchases through, or transfers of life insurance policies to, DLP IV would cause the policies acquired or transferred to become collateral for our senior credit facility with LNV/CLMG, whereas purchases through, or transfers of life insurance policies to, GWG Life would cause the policies acquired by GWG Life to become collateral for the L Bonds. Accordingly, purchases of assets through, or transfers of assets to, different subsidiaries may affect the value of collateral security for different classes of holders of our debt, including the L Bonds. In the case of a liquidation, any of these discretionary decisions may affect the value of, and amount you may ultimately be entitled to receive with respect to, your L Bonds.

*We are an "emerging growth company" under federal securities laws, and the reduced reporting requirements applicable to emerging growth companies may make it more difficult to compare our financial statements to those of other issuers that are not emerging growth companies.*

We are an "emerging growth company," as defined in the Jumpstart Our Business Startups Act, or JOBS Act. For as long as we continue to be an emerging growth company, we may take advantage of exemptions from various reporting requirements normally applicable to public companies, including not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, exemptions from the requirements of holding a non-binding advisory vote on executive compensation, and delayed adoption of new or revised financial accounting standards. We could be an emerging growth company through 2019, although certain circumstances could cause us to lose that status earlier. It is possible that these reduced reporting requirements could make it more difficult for investors to compare our results of operations and financial condition with those of other companies that are not emerging growth companies.

*We do not expect a market to exist that will enable you to sell your L Bonds.*

Although we are a public reporting company that files information with the SEC, the L Bonds will not be readily resalable or transferable. No public market for the L Bonds exists and none is expected to develop. As a result, the transferability of the L Bonds will be limited. Accordingly, the purchase of L Bonds is not suitable for investors desiring liquidity at any time prior to the maturity of the L Bonds.

*We cannot know the tax implications of an investment in the L Bonds for the L Bond holder.*

The section of this prospectus entitled "Material Federal Income Tax Considerations" sets forth a summary of federal income tax consequences to the purchasers of the L Bonds. No information is provided concerning tax consequences under any other federal, state, local or foreign laws that may apply to the purchasers of the L Bonds. Prospective investors or their representatives should read that section very carefully in order to properly evaluate the federal income tax risks of an investment in the L Bonds. Each prospective investor should consult his personal counsel, accountant and other business advisors as to the federal, state, local and foreign tax consequences of an investment in the L Bonds. L Bond holders will receive an IRS Form 1099-INT in connection with their receipt of interest payments.

19

**USE OF PROCEEDS**

If all of the L Bonds are sold, we expect to receive up to approximately $918.8 million of net proceeds from this offering after paying our estimated offering and related expenses and the estimated selling commissions and additional compensation consisting of the following:

- a dealer-manager fee payable to the dealer manager in an amount equal to 0.50% of the principal amount of all L Bonds sold;

- an accountable expense allowance to be paid to the selling group members, which may include due diligence expenses of the dealer manager and selling group members set forth in a detailed and itemized invoice and as further described below;

- wholesaling fees, which may consist of commissions and non-transaction based compensation of the wholesalers;

- non-cash compensation, which may consist of an occasional meal, a ticket to a sporting event or the theater, or comparable entertainment that is neither so frequent nor so extensive as to raise any question of propriety and is not preconditioned on achievement of a sales target, the national and regional sales conferences of our selling group members, training and education meetings for registered representatives of our selling group members, and permissible forms of non-cash compensation to registered representatives of our selling group members, such as gifts that do not exceed an aggregate value of $100 per annum per registered representative and that are not pre-conditioned on achievement of a sales target, including but not limited to seasonal gifts; and

- up to a 1.00% reallowance to selling group members.

We expect the selling commissions and additional compensation to aggregate approximately $80.0 million based on expected average selling commissions of $60.0 million (5.00%), dealer-manager fees of $5.0 million (0.50%), and additional expenses aggregating to $25.0 million (2.50%), assuming the sale of all of the L Bonds.

Our dealer manager will enter into participating dealer agreements with certain other broker-dealers that are members of FINRA, referred to as "selling group members," to authorize those broker-dealers to sell our L Bonds. As explained elsewhere in this prospectus, the maximum amount of commissions, dealer manager fees and additional compensation payable to the dealer manager and selling group members is 8.00% of the aggregate principal amount of L Bonds sold. Therefore, if all of the L Bonds were sold and the maximum commissions, dealer manager fees and additional compensation were paid, we estimate that the net proceeds to us, after paying our own estimated offering and related expenses, would be approximately $918.8 million. Nevertheless, because we do not know the total principal amount of L Bonds that will be ultimately sold, we are unable to accurately forecast the total net proceeds that will be generated by this offering.

There is no minimum amount of L Bonds that must be sold before we access investor funds. The exact amount of proceeds we receive may vary considerably depending on a variety of factors, including how long the L Bonds are offered.

Our goal is to use a majority of the net proceeds from the sale of L Bonds to purchase additional life insurance policy assets. The amount of proceeds we apply towards purchasing additional life insurance policy assets will depend, among other things, on how long the L Bonds are offered, the amount of net proceeds that we receive from the sale of L Bonds being offered, the existence and timing of opportunities to expand our portfolio of insurance policy assets, our cash needs for certain other expenditures (summarized below) we anticipate incurring in connection with this offering and in connection with our business, and the availability of other sources of cash (e.g., a senior credit facility). These certain other expenditures, listed in order of priority, include:

- servicing of life insurance assets (i.e., paying attendant life insurance policy premiums);

- paying principal at maturity, interest and fees to our lenders, including under a senior credit facility, previously issued L Bonds and the L Bonds offered hereby; and

- general working capital purposes.

20

Our use of funds for general working capital purposes is expected to include, but not be limited to, expenditures such as (i) obtaining life expectancy reports, (ii) mortality tracking and (iii) legal and collections expenses, (iv) sales and marketing expenses, (v) general and administrative salary expenses, as well as (vi) tax liabilities, and (vii) interest rate caps, swaps or hedging instruments for our life insurance policy portfolio or our indebtedness.

As indicated above, the extent to which we will use proceeds from this offering for these other purposes, and the amounts and timing of such expenditures will depend on, among other things, how long the L Bonds are offered, the amount of net proceeds that we receive from the sale of L Bonds being offered, the existence and timing of opportunities to expand our portfolio of insurance policy assets, the availability of funds from other sources, including borrowings from a senior credit facility and cash generated from our life insurance assets, and certain other factors. We currently expect to allocate net offering proceeds (assuming the maximum amount of commissions, fees, allowances and any other items of selling compensation equal to 8.00% of the aggregate principal amount of L Bonds sold) as follows, based upon various assumed amounts of gross proceeds that we receive from the sale of L Bonds:

| | Gross Offering Proceeds | | | | | |
|---|---|---|---|---|---|---|
| | $ 1,000,000,000 | | $ 750,000,000 | | $ 500,000,000 | |
| Net Offering Proceeds | 918,800,000 | 100% | 688,800,000 | 100% | 458,800,000 | 100% |
| Purchase Policies | 661,536,000 | 72% | 495,936,000 | 72% | 330,336,000 | 72% |
| Payment of Premiums | 91,880,000 | 10% | 68,880,000 | 10% | 45,880,000 | 10% |
| Payment of Principal and Interest | 119,444,000 | 13% | 89,544,000 | 13% | 59,644,000 | 13% |
| Other Expenditures | 45,940,000 | 5% | 34,440,000 | 5% | 22,940,000 | 5% |

Net offering proceeds not immediately applied to the uses summarized above will be invested in short-term investments such as money market funds, commercial paper, U.S. Treasury Bills and similar securities investments pending their use. We may also purchase interest rate hedges to lock in our cost of capital, or longevity hedges to lock in our expected return from our portfolio.

As indicated above, we may use some of the net proceeds from this offering to pay premiums on life insurance assets we own. The amount of payments for anticipated premiums and servicing costs that we will be required to make over the next five years to maintain our current portfolio, assuming no mortalities, is set forth in the table below:

| Years Ending December 31, | Premiums | Servicing | Premiums and Servicing Fees |
|---|---|---|---|
| Three months ending December 31, 2017 | $ 16,915,000 | $ 1,587,000 | $ 18,502,000 |
| 2018 | 54,931,000 | 1,587,000 | 56,518,000 |
| 2019 | 60,916,000 | 1,587,000 | 62,503,000 |
| 2020 | 68,728,000 | 1,587,000 | 70,315,000 |
| 2021 | 77,522,000 | 1,587,000 | 79,109,000 |
| 2022 | 87,424,000 | 1,587,000 | 89,011,000 |
| | $ 366,436,000 | $ 9,522,000 | $ 375,958,000 |

Also as indicated above, we may use some of the net proceeds from this offering to pay principal amounts owing under previously issued L Bonds when such amounts become due and payable. The amount of such securities that we would repay with proceeds of this offering will depend on whether the holders of such notes elect repayment rather than renewal of such securities, as well as whether we elect to use other sources of repayment. We believe it is most likely that such payments, if any, would relate to securities that mature within the first three years after the initial effective date of the registration statement of which this prospectus is a part (i.e., the maximum period of time during which we may offer securities under the registration statement). We presently do not intend to use any net proceeds from this offering to repurchase outstanding L Bonds prior to their maturity.

App. 0344

**BUSINESS**

### Overview

We are a financial services company committed to finding new ways of transforming the life insurance through innovative products and services, business processes, financing strategies, and advanced epigenetic technology. Historically, we have focused on creating opportunities for consumers to maximize the value for their life insurance as compared to the traditional options offered by the insurance industry. As part of our business, we create opportunities for investors to receive income and capital appreciation from our various activities. More recently, we have focused on applying new epigenetic technology to the global life insurance industry.

The life insurance industry provides us with the opportunity to bring value to consumers and earn non-correlated yield by purchasing life insurance policy assets in the secondary market at a discount to the face value of the policy benefits. Once we purchase a life insurance policy asset, we continue to pay the premiums of the policy until we collect the policy benefit. This practice is disruptive to the life insurance industry since insurance carriers rely on consumer lapse and surrender behavior resulting in the forfeiture of policy benefits. From inception through September 30, 2017, we have purchased approximately $2.6 billion in face value of policy benefits from consumers for over $457.8 million, as compared to the $33 million in surrender value offered by insurance carriers on those same policies. As such, we provide unique and valuable services that help life-insurance-owning consumers 65 years or older maximize their investments in their life insurance and meet their retirement financial needs.

By purchasing life insurance policy assets at a discount to the face value of the policy benefits, we have the opportunity to generate attractive investment returns that are not correlated to traditional financial markets. The potential to earn positive non-correlated yield from a portfolio of life insurance assets results from the positive difference between the (i) the face value of the policy benefits received; less (ii) the purchase price of the life insurance assets, plus the premiums and financing costs to maintain those assets. As of September 30, 2017, we owned a total of $1.6 billion in face value of our life insurance policy benefits; and our total investment in our portfolio of life insurance assets, including the purchase price, attendant premiums and financing costs was $610.1 million.

We seek to build a profitable and large portfolio of life insurance assets that is well diversified in terms of insurance companies and insureds. We believe that diversification is a key factor and risk mitigation strategy to provide consistent cash flows and reliable investment returns. Accordingly, we seek to grow our portfolio and achieve diversification through a variety of financings and securities products offered to investors. In addition, we have built a robust operational platform to work with financial advisors and insurance professionals to originate life insurance policy assets for purchase and assist consumers with the opportunity to maximize their investments in their life insurance.

More recently, we have made investments in technology to more accurately estimate human life expectancy. Our search for increased precision in estimating human life expectancy led us to a mortality predictive technology developed by Dr. Steve Horvath, a Professor of Human Genetics and Biostatistics at the University of California, Los Angeles (UCLA). In May 2017, we exclusively licensed from UCLA Dr. Horvath's "DNA Methylation Based Predictor of Mortality" technology or "M-Panel" technology. Our M-Panel technology is based upon a revolutionary new field of science known as "epigenetics." Our investments in M-Panel and related technologies are owned in our wholly owned subsidiary Life Epigenetics, Inc. This "insurtech" division is in the development process of commercializing epigenetic tests based upon the M-Panel Technology.

To grow our portfolio and achieve the diversification we seek, as well as to pursue additional opportunities in the life insurance industry through the use of technology, we offer investors the opportunity to potentially receive income and capital appreciation through a variety of financings and securities offerings.

We are dedicated to finding new ways of transforming the life insurance industry, both as it relates to our historical secondary life insurance business and now with the application of advanced epigenetic technology. Today, we provide consumers with the opportunity to maximize the value of their life insurance by disrupting the status quo of high policy lapse rates and low surrender values that life insurance carriers have enjoyed for years. In the future, we intend to disrupt the industry further by providing consumers with additional innovative products and services that benefit from the use of advanced epigenetic technologies, such as the M-Panel technology license. We believe this advanced epigenetic technology will permit us to reimagine the way in

which risk is assessed, selected and priced in the life insurance industry, and possibly also the long-term care and annuity industries.

<div align="center">22</div>

Our business was originally organized in February 2006. We added our current parent holding company, GWG Holdings Inc., in March 2008, and in September 2014 we consummated an initial public offering of our common stock on The NASDAQ Capital Market, where our stock trades under the ticker symbol "GWGH."

GWG Holdings, Inc. conducts its life insurance related business through a wholly owned subsidiary, GWG Life, LLC, and GWG Life's principal wholly owned subsidiary GWG DLP Funding IV, LLC (DLP IV). Both GWG Life and DLP IV are legally organized in Delaware. Life Epigenetics Inc. is a wholly owned subsidiary of GWG Holdings. Unless the context otherwise requires or we specifically so indicate, all references in this prospectus to "we," "us," "our," "our Company," "GWG," or the "Company" refer to these entities collectively. Our headquarters are based in Minneapolis, Minnesota.

**Markets**

*Consumers Owning Life Insurance and the Life Insurance Secondary Market*

The market for life insurance is large. According to the American Council of Life Insurers Fact Book 2016 (ACLI), individual consumers in the United States owned over $10.3 trillion in face value of life insurance policy benefits in 2015. In that same year, the ACLI reports individual consumers purchased an aggregate of $1.6 trillion of new life insurance policy benefits. This figure includes all types of life insurance, including term and permanent insurance known as whole life and universal life.

The secondary market for life insurance exists from consumer lapse behaviors and inadequate surrender values offered to consumers by the insurance carriers. The ACLI reports that the lapse and surrender rate for individual life insurance policies is 5.4%, amounting to over $638.5 billion in face value of policy benefits lapsed and surrendered in 2015 alone. According to testimony by Gottlieb & Smetters, it is estimated that nearly 88% of all permanent universal life insurance policies sold in the United States do not result in the payment of a benefit claim.

We offer products and services in the life insurance secondary market to consumers, 65 years and older, who seek to maximize the value of their investment in their life insurance for their retirement financial needs. These consumers represent the fastest growing demographic segment in the United States according to the U.S. Census Bureau. And as these consumers age, they and their families will be faced with a variety of financial needs that can benefit from the value-added products and services we offer. Our life insurance secondary market products and services address the convergence of three major trends: under-saving for retirement, longer life expectancies, and high and rising medical expenses.

In July 2017, the National Association of Insurance Commissioners ("NAIC") issued a policy bulletin in support of the type of products we seek to provide as "innovative private market solutions for financing Americans' long-term care needs." The NAIC, citing our Company, discussed how consumers could exchange the market value of their life insurance policies for products designed to fund long-term care expenses. The use of a life insurance policy to generate resources to fund long-term care was pioneered by our Executive Vice President, Chris Orestis. Today, we are the only company in the life insurance industry that provides this innovative product to pay for long-term care expenses.

Research by Conning Research & Consulting (Conning) reports that the annual net market potential for life insurance policy benefits sold in the secondary market exceeded $141 billion in face value of policy benefits in 2016. Of that market potential, Conning estimates that investors purchased approximately $1.7 billion in face value of life insurance benefits in 2015, indicating that the market is dramatically underserved. With an aging demographic in the United States, Conning expects the net market potential to grow to an annual $170 billion in face value of life insurance benefits by 2025. We share the belief that the life insurance secondary market represents both a dramatically underserved market and a significant long-term growth opportunity. We further believe that we are well positioned to address the market need.

*Technology and the Life Insurance Industry*

The opportunity to apply technology to transform the life insurance industry is significant. According to industry consultants at KPMG, Accenture, and Ernst & Young, there is a major movement afoot to transform the insurance industry through the use and application of advanced technologies. This movement, commonly referred to as "insurtech," suggests a new era of disruptive entrants into the traditional insurance marketplace that have the potential to upend the insurance industry's historical approach to assessing and selecting acceptable risks.

We intend to participate in the life insurance industry's insurtech movement through commercial applications using advanced epigenetic technology. Our initiative into the development and use of applications began in 2015 by working with Dr. Steve Horvath after he reported that human cells have an internal "biological age" and "biological clock" at the DNA molecular level that is indicative of the aging process. The study of chemical modifications of methylation levels to the DNA molecule or code (methylation-based bio-markers) that reveal aging, and upon which the M-Panel technology is based, is part of the epigenetics field. Epigenetics is the study of how the DNA molecule's instructions or code are modified as a result of environmental exposures and experiences. While the human DNA molecular code is essentially permanent throughout our lives, the expression of that code changes based upon numerous environmental factors. Epigenetics seeks to recognize conditions or patterns in methylation-based bio-markers that indicate the code has changed and what those changes mean to human biology. Dr. Horvath's epigenetic research has focused on looking at specific methylation-based bio-markers in order to study the determinants of aging and mortality.

In 2016, Dr. Horvath reported a discovery upon the completion of a statistical meta-analysis of over 13,000 individual DNA samples that was reported in the September 2016 issue of Aging. His research identified specific sets of DNA methylation-based bio-markers that was predictive of individual risk of all-cause mortality. We believe the implications of this discovery are simple and profound: individual lifespans can now be estimated with significantly greater precision across large groups of people. We have translated Dr. Horvath's technology into an actuarial underwriting methodology that we believe could prove revolutionary to traditional underwriting practices in the global life insurance industry. We are also seeking the discovery of additional methylation-based bio-markers that may be indicative of other changes in human biology and thereby be predictive of other environmental exposures and experiences. We are currently working to expand the application of predictive methylation-based bio-markers to influence and change traditional underwriting practices in the global life insurance industry.

*Investors Seeking Yield from Alternative Assets*

Since the credit crisis of 2008, the flow of capital to a variety of alternative asset classes has undergone a structural shift. Alternative assets, broadly defined, are any non-traditional asset with potential economic value that would not be found in a standard investment portfolio. An asset is generally considered "alternative" if it has some or all of the following characteristics: a limited investment history, not commonly found in portfolios, an illiquid market, different performance characteristics, and requires specialized skill to originate and service the asset. Definitions of traditional assets today extend well beyond stocks and bonds, and can include a variety of assets which may have been better classified as "alternative" a decade ago, i.e., real estate, commodities or natural resources. Thus, what is an alternative asset today may largely be considered tomorrow's mainstream investment asset.

Once dominated by banks, alternative asset markets are in many cases no longer viable for banks to finance due to vast new regulation effected since the crisis, regulation that has in effect reshaped the way in which banks participate in many parts of the economy. At the same time, an increasing number of investors are now turning to alternative asset classes as a means to diversify their investment portfolio and manage risk and volatility, and to obtain greater returns in the low interest rate environment that has persisted since 2008. According to research published by Goldman Sachs, retail investors are expected to shift a significant allocation of their investments towards alternative assess from a current average of 4% to the 20% allocation favored by institutional investors over the next five to ten years (see Goldman Sachs, Retail Liquid Alternatives: The Next Frontier (2013)).

The trend of investors seeking access and exposure to alternative investment products is expected to continue as traditional bank sources of capital for these assets continues to retreat and alternative investment product offering innovations occur within the regulated securities markets. Researchers at McKinsey report that U.S. individual investors are expected to be a primary driver of growth in alternative asset investments. McKinsey reports that high net-worth individuals and the mass affluent are increasingly looking to hedge downside risk, protect principal, manage volatility, and generate income — the same reason institutional investors have favored larger allocations to alternative asset investment classes.

**Our Business Model**

Our business model is to earn a net profit between the yield generated by the life insurance assets we own and the costs we incur to originate and finance those assets. We believe that we are uniquely positioned to acquire life insurance assets in the secondary market directly from consumers needing our services, and to finance our portfolio's growth by providing investors with the opportunity to participate in the yield we generate from those assets. In addition, upon our

implementation of M-Panel or other similar technology, we believe that we will be uniquely positioned to create even more opportunities for capital appreciation by obtaining a competitive edge in our current market space, and bringing innovative products and services to the global life insurance industry.

To participate and compete in, and expand, our markets, we spend significant resources: (i) recruiting and developing a professional management team; (ii) developing a robust operational platform, systems and strategy for originating life insurance policies; (iii) establishing strategic relationships for delivering the services we provide; (iv) creating opportunities for investors to participate in the yield and capital appreciation generated by the life insurance assets we own; (v) creating innovative growth opportunities to participate in the global life insurance industry through the use of epigenetic technology.

*Originating Life Insurance Assets*

We generally purchase life insurance assets in the secondary market directly from policy owners who purchased their life insurance in the primary market. Historically, we have purchased these life insurance policies through a network of specialized brokers who assist consumers and financial professionals in accessing the secondary market. We maintain membership affiliations and representation within key industry groups, such as the Life Insurance Settlement Association. We typically attend and sponsor trade events where we maintain contacts and visibility among professionals who submit life insurance policies for our potential purchase.

A key strategic initiative of ours has been to expand our origination capabilities by marketing our products and services directly to consumers through financial professionals. Most recently, we focused these efforts towards financial professionals, namely financial advisors and life insurance agents, through our "Appointed Agent Program." Our Appointed Agent Program is designed to empower financial professionals to bring the life insurance secondary market's value proposition to their respective markets. Our Appointed Agent Program emphasizes education, training, regulatory compliance, and marketing support. We have built an extensive team capable of marketing our products and services directly to life insurance professionals. We expect to continue allocating considerable resources towards the development and support of our direct origination team. We believe these resources will be of particular value as we seek to expand our business into other, more conventional, insurance-related industries.

*Underwriting and Purchasing Life Insurance Assets*

We focus on investing in high quality life insurance assets through our origination practices and underwriting procedures. These practices and procedures strive to meet guidelines and methodologies published by rating agency A.M. Best. At the same time, we seek innovative value-added tools, services, and methodologies to improve both the accuracy and efficiency with which we acquire life insurance assets.

Our secondary market underwriting procedures consist of a careful review and analysis of available materials and information related to a life insurance policy and the insured. The goal of our underwriting procedures is to make an informed purchasing decision. We typically purchase life insurance policies from insureds who are 65 years or older and whose life expectancies are less than 120 months (ten years). The life expectancies we use are estimates, stated in months, which indicate the 50% probability of an individual's mortality (meaning actuarial analysis predicts half of the individuals with similar age, sex, and medical conditions will experience mortality before that number of months, and half will experience mortality after that number of months). Life expectancies are based on actuarial tables that predict statistical probability of individual mortality.

We obtain life expectancies from independent third-party medical-actuarial underwriting firms, unless the life insurance policy benefit has a face value of $1,000,000 or less (which we generally refer to as a "small face policy"). When we obtain life expectancies from independent third-party medical-actuarial firms, we receive a medical underwriter's report summarizing the health of the insured based on a review of the insured's historical medical records. For all life insurance policies we purchase, other than small face policies, we average two life expectancies from two independent medical-actuarial underwriting firms to form the life expectancy we use to price and value our life insurance assets. In some cases, we may obtain more than two life expectancy estimates. In those cases, we average the two life expectancy estimates that we believe are the most reliable of those we have received, based on our own analyses and conclusions. In this regard, the two life expectancy estimates we ultimately choose to average may not always be the most conservative. For small face policies, we use modified procedures to estimate a life expectancy that may, or may not, use life expectancies from independent third-party medical-actuarial underwriting firms. As a result, our practices and procedures for small face policies may not meet the guidelines and methodologies published by the

App. 0351

rating agency A.M. Best. If in the future we believe our business model will benefit from changes in our underwriting process and if such revisions are permitted under our borrowing covenants, we may change our underwriting processes and policies.

Our success with our Appointed Agent Program, and in designing and implementing small face policy underwriting procedures, has presented us with the opportunity to purchase a greater number of small face life insurance policies. We believe this opportunity is meaningful since the majority of life insurance policies outstanding are small face policies, and policy diversification is critical in obtaining normalized actuarial performance. Historically, however, small face policies have not been available to purchasers of life insurance policies because secondary market industry participants have significantly relied on life insurance brokers who are paid a commission determined as a percentage of the face value benefit of the purchased policy, to present purchase opportunities. Not surprisingly, because larger commissions are associated with larger face value life insurance policies, brokers have focused on larger policies and the industry has developed origination practices and underwriting procedures to accommodate such practices. As a result, the industry's traditional approaches to underwriting and purchasing life insurance assets are ill suited for small face policies. For example, procuring complete medical records, two separate life expectancy reports, and engaging in related activities, can be time consuming and expensive, and these same costs cannot be justified when purchasing smaller life insurance assets. In sum, our method is focused on obtaining enough medical information to generate reliable life expectancy estimates, and thereby make informed purchase decisions. Our streamlined procedures have made it possible to complete a preliminary underwriting in a number of days (as opposed to weeks), and complete the entire purchasing process in a number of weeks (as opposed to months).

We expect to further refine our underwriting processes for large- and small-face policies over time and, to the extent possible, use new technologies to enhance this process and our overall business. In 2015 we began an initiative to re-examine the way in which we approached underwriting. Our initiative included a review of new advanced medical technologies capable of predicting aging and related mortality more accurately than traditional methods.

*Value Proposition — Life Insurance as an Alternative Asset*

We realize profits from the life insurance assets we own by earning a spread between the investment cost of our life insurance assets and the face value of the policy benefits we receive. Accordingly, if we purchase life insurance assets in the secondary market, and make all the attendant premium payments to maintain those assets in order to receive the policy benefits, the most significant risk factors (among others that we discuss in the "Risk Factors" section of this prospectus) in the performance of those assets are: (i) the predictability of mortality, or longevity risk; and (ii) the creditworthiness of the issuing life insurance company, or credit risk. We believe the value proposition of our investments in the alternative asset of life insurance is our ability to obtain superior risk-adjusted returns.

*Longevity Risk.*   We believe actuarial mortality is the single largest variable affecting the returns on our investments in life insurance assets and impacting our life insurance portfolio's performance over time. Accurately predicting an individual's mortality date is impossible, and the best an actuary can do is provide a set of probabilities of survival over time. Nevertheless, predicting mortality among a group of similarly situated individuals is less difficult — in fact, the larger the group, the more accurate actuarial predictions tend to become. The statistical mathematical concept stating that the results of random events tend to become very predictable as the number of events becomes large is the "Central Limit Theorem" (or more commonly known as the "Law of Large Numbers"). "Mean regression" is another statistical mathematical concept used to describe that, on average, observations (in this case, the actual mortality of insureds) tend to cluster around the mean observation (i.e., our estimate of mortality of insureds as described further under "Value Proposition" below). These statistical mathematical concepts are the basis for many business models, ranging from insurance to the lottery. Insurance carriers, for example, can be very certain of the number of insurance claims they can expect when they have spread their risk over a large book of diversified policies. In this way, insurance carriers can price a large number of insurance policies of any type to collect premiums slightly above the level of expected claims, and thereby expect to earn a surplus or profit. Similarly, a lottery can depend on an expected amount of earnings equal to the small advantage built into the odds of the games.

The implications for our business model are two-fold: first, as we accumulate larger numbers of life insurance policies, we should expect our results to increasingly correlate with our expectations; second, over the long run, we should expect that the actual cash flows will converge with the forecasted cash flows from our portfolio of life insurance assets, and the actual return on our portfolio of life insurance assets will converge with our expected return. Although medical advances and life expectancy changes may significantly impact the longevity risk we face and our

App. 0352

App. 0353

understanding of that risk, these concepts nevertheless serve as guiding principles as we seek to build, manage, and forecast the performance of our portfolio of life insurance assets.

These expectations are affirmed in research published by A.M. Best and others, illustrating that as the number of insured lives increase within a portfolio of life insurance policies, there is a corresponding decrease in the standard deviation of the mortality events within the portfolio — i.e., longevity risk decreases as the number of insureds increases. Standard & Poor's indicates that 1,000 insured lives are required to reach statistical "significance" (where the relationship, in this context, between mortality projections and actual mortality events is not random). A.M. Best concludes that a portfolio of at least 300 insured lives is statistically significant. Our current portfolio covers 622 insured lives and we believe that both the predictability and actual performance will continue to improve with additional size and diversification. Accordingly, we continue to seek to grow the size and diversification of the portfolio in order to mitigate risk and improve our profitability.

*Portfolio Credit Risk Management.*   We rely on the payment of policy benefit claims by life insurance companies as our most significant source of cash flows over time. The life insurance assets we own represent obligations of third-party life insurance companies to pay the benefit amount under the relevant policy upon the mortality of the insured. As a result, we manage this credit risk exposure by generally purchasing policies issued by insurance companies with investment-grade ratings from Standard & Poor's.

Approximately 96.5% of life insurance assets in our portfolio were issued by insurance companies with investment-grade credit ratings from Standard & Poor's, as of September 30, 2017. Our largest life insurance company credit exposures and the Standard & Poor's credit rating of their respective financial strength and claims-paying ability is set forth below:

| Rank | Policy Benefits | Percentage of Policy Benefit Amount | Insurance Company | Ins. Co. S&P Rating |
|---|---|---|---|---|
| 1 | $ 242,128,000 | 14.9% | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 2 | $ 198,657,000 | 12.2% | AXA Equitable Life Insurance Company | A+ |
| 3 | $ 182,827,000 | 11.3% | Lincoln National Life Insurance Company | AA- |
| 4 | $ 160,754,000 | 9.9% | Transamerica Life Insurance Company | AA- |
| 5 | $ 118,934,000 | 7.3% | Metropolitan Life Insurance Company | AA- |
| 6 | $ 61,025,000 | 3.8% | American General Life Insurance Company | A+ |
| 7 | $ 57,293,000 | 3.6% | Massachusetts Mutual Life Insurance Company | AA+ |
| 8 | $ 57,207,000 | 3.5% | Pacific Life Insurance Company | AA- |
| 9 | $ 53,106,000 | 3.3% | Security Life of Denver Insurance Company | A |
| 10 | $ 47,390,000 | 2.9% | West Coast Life Insurance Company | AA- |
| | 1,179,321,000 | 72.7% | | |

The yield to maturity on bonds issued by life insurance carriers reflects, among other things, the credit risk (risk of default) of such insurance carrier. We follow the yields on certain publicly traded life insurance company bonds since this information is part of the data we consider when valuing our portfolio of life insurance policies for our financial statements.

| Name of Bond | Maturity | YTM | Duration (Years) | Bond S&P Rating |
|---|---|---|---|---|
| AXA 1.125% | 5/15/2028 | 0.92% | 10.6 | A |
| Manulife Finl 4.15% | 3/4/2026 | 3.31% | 8.4 | A |
| Lincoln National Corp Ind 3.625% | 12/12/2026 | 3.42% | 9.2 | A- |
| Amer Intl Grp 4.125% | 2/15/2024 | 2.95% | 6.4 | BBB+ |
| Protective Life 7.375% | 10/15/2019 | 2.06% | 2.0 | A- |
| Metlife 3.048% | 12/15/2022 | 2.52% | 5.2 | A- |
| Prudential Finl Inc Mtns Book 3.5% | 5/15/2024 | 2.81% | 6.6 | A |
| **Average yield on insurance bonds** | | 2.57% | 6.9 | |

27

The table above indicates the current yields to maturity (YTM) for the senior bonds of selected life insurance carriers with durations, on average, that are similar to the weighted-average life expectancy estimates of our life insurance portfolio. As of September 30, 2017, the average yield to maturity of these bonds was 2.57%, which we believe reflects, in part, the financial market's judgment that credit risk is low with regard to these carriers' financial obligations. It should be noted that the obligations of life insurance carriers to pay life insurance policy benefits ranks senior to all of their other financial obligations, such as the bonds they issue. This "super senior" priority is not reflected in the yield to maturity in the table and, if considered, would result in a lower yield to maturity all else being equal. Thus, as long as the respective premium payments have been made, it is highly likely that the owner of the insurance policy will collect the insurance policy benefit upon the mortality of the insured.

*Value Proposition*.    We define the value proposition presented by our portfolio of life insurance assets as our ability to earn superior risk-adjusted returns. At any time, we calculate our returns from our life insurance assets based upon (i) our historical results; and (ii) the future cash flows we expect to realize from our statistical forecasts. To forecast our expected future cash flows, we use the probabilistic method of analysis. The actuarial software we use to produce our expected future cash flows and conduct our probabilistic analysis was developed by the actuarial firm Milliman and is now owned by Modeling Actuarial Pricing Systems, Inc. ("MAPS"). The expected internal rate of return of our portfolio is based upon future cash flow forecasts derived from a probabilistic analysis of our policy benefits received in relation to our investment cost basis. As of September 30, 2017, the expected internal rate of return on our portfolio of life insurance assets was 10.55% based on our portfolio benefits of $1.623 billion and our non-GAAP investment cost basis of $610.1 million (including purchase price, premiums paid, and financing costs incurred to date).

We seek to further enhance our understanding of our expected future cash flow forecast by applying a stochastic analysis, sometimes referred to as a "Monte Carlo simulation," to provide us with a greater understanding of the variability of our future cash flow projections. The stochastic analysis we perform is built within the MAPS actuarial software and provides internal rate of return calculations for different statistical confidence intervals. The results of our stochastic analysis, in which we run 10,000 random mortality scenarios, demonstrates that the scenario ranking at the 50th percentile of all 10,000 results generates an internal rate of return of 10.50%, which is near to our expected internal rate of return of 10.55%. The stochastic analysis results also reveal that our portfolio is expected to generate an internal rate of return of 10.02% or better in 75% of all generated scenarios; and an internal rate of return of 9.59% or better in 90% of all generated scenarios. As the portfolio continues to grow, all else equal, the percentage of observations that result in an internal rate of return at or very near 10.50% (currently our median, or 50th percentile, internal rate of return expectation) is expected to increase, thereby lowering future cash flow volatility and potentially justifying our use of lower discount rates to value our portfolio.

In sum, we believe our statistical analyses show that, if we can continue to grow and maintain our investments in life insurance assets, then, in the absence of significant negative events affecting our most significant risks, including but not limited to longevity and credit risk, and interest rate and financing risk, those investments will provide superior risk-adjusted returns for our company and provide us with the means to generate attractive returns for our investors.

**Portfolio Information**

Our portfolio of life insurance policies, owned by our subsidiaries as of September 30, 2017, is summarized below:

| | |
|---|---|
| Total portfolio face value of policy benefits | $ 1,622,627,000 |
| Average face value per policy | $ 1,909,000 |
| Average face value per insured life | $ 2,135,000 |
| Average age of insured (yrs.)* | 81.7 |
| Average life expectancy estimate (yrs.)* | 6.9 |
| Total number of policies | 850 |
| Number of unique lives | 760 |
| Demographics | 74% Males; 26% Females |
| Number of smokers | 34 |
| Largest policy as % of total portfolio | 0.82% |

App. 0355

| | |
|---|---|
| Average policy as % of total portfolio | 0.12% |
| Average annual premium as % of face value | 3.51% |

28

\* Averages presented in the table are weighted averages.

Our portfolio of life insurance policies, owned by our subsidiaries as of September 30, 2017, organized by the insured's current age and the associated policy benefits, is summarized below:

| Min Age | Max Age | Policies | Policy Benefits | Wtd. Avg. Life Expectancy (yrs.) | Percentage of Total Number of Policies | Percentage of Total Policy Benefits |
|---|---|---|---|---|---|---|
| 95 | 99 | 9 | $ 12,642,000 | 1.2 | 1.0% | 0.8% |
| 90 | 94 | 83 | $ 155,515,000 | 2.8 | 9.8% | 9.5% |
| 85 | 89 | 199 | $ 434,311,000 | 4.7 | 23.4% | 26.8% |
| 80 | 84 | 186 | $ 414,508,000 | 6.6 | 21.9% | 25.5% |
| 75 | 79 | 159 | $ 306,210,000 | 9.2 | 18.7% | 18.9% |
| 70 | 74 | 145 | $ 215,788,000 | 10.6 | 17.1% | 13.3% |
| 60 | 69 | 69 | $ 83,653,000 | 10.2 | 8.1% | 5.2% |
| **Total** | | **850** | **$1,622,627,000** | **6.9** | **100.0%** | **100.0%** |

Our portfolio of life insurance policies, owned by our subsidiaries as of September 30, 2017, organized by the insured's estimated life expectancy estimates and associated policy benefits, is summarized below:

| Min LE (Months) | Max LE (Months) | Policies | Policy Benefits | Percentage of Total Number of Policies | Percentage of Total Policy Benefits |
|---|---|---|---|---|---|
| 2 | 47 | 221 | $ 354,855,000 | 26.0% | 21.9% |
| 48 | 71 | 184 | 374,980,000 | 21.7% | 23.1% |
| 72 | 95 | 166 | 331,697,000 | 19.5% | 20.4% |
| 96 | 119 | 125 | 242,156,000 | 14.7% | 14.9% |
| 120 | 143 | 86 | 168,746,000 | 10.1% | 10.4% |
| 144 | 197 | 68 | 150,193,000 | 8.0% | 9.3% |
| **Total** | | **850** | **$ 1,622,627,000** | **100.0%** | **$100.0%** |

We track concentrations of pre-existing medical conditions among insured individuals within our portfolio based on information contained in life expectancy reports. We track these medical conditions within the following ten primary disease categories: (1) cancer, (2) cardiovascular, (3) cerebrovascular, (4) dementia, (5) diabetes, (6) multiple, (7) neurological disorders, (8) no disease, (9) other, and (10) respiratory diseases. Our primary disease categories are summary generalizations based on the ICD-9 codes we track on each insured individuals within our portfolio. ICD-9 codes, published by the World Health Organization, are used worldwide for medical diagnoses and treatment systems, as well as morbidity and mortality statistics. Currently, the primary disease categories within our portfolio that represent a concentration of over 10% are multiple, cardiovascular, and other which constitute 26.4%, 20.5%, and 12.9%, respectively, of the face amount of insured benefits of our portfolio as at September 30, 2017.

29

The complete detail of our portfolio of life insurance policies, owned by our subsidiaries as of September 30, 2017, organized by the current age of the insured and the associated policy benefits, sex, estimated life expectancy, issuing insurance carrier, and the credit rating of the issuing insurance carrier, is set forth below.

**Life Insurance Portfolio Detail**
**(as of September 30, 2017)**

| | Face Amount | Gender | Age (ALB)[1] | LE (mo.)[2] | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 1 | $ 8,000,000 | F | 99 | 13 | Massachusetts Mutual Life Insurance Company | AA+ |
| 2 | $ 1,100,000 | M | 97 | 15 | Reliastar Life Insurance Company | A |
| 3 | $ 184,000 | M | 96 | 32 | Reliastar Life Insurance Company | A |
| 4 | $ 219,000 | M | 96 | 32 | Reliastar Life Insurance Company | A |
| 5 | $ 1,500,000 | F | 96 | 18 | Accordia Life and Annuity Company | A- |
| 6 | $ 1,000,000 | F | 95 | 21 | Transamerica Life Insurance Company | AA- |
| 7 | $ 250,000 | M | 95 | 17 | North American Company for Life and Health Insurance | A+ |
| 8 | $ 264,000 | F | 95 | 10 | Lincoln Benefit Life Company | BBB+ |
| 9 | $ 125,000 | F | 95 | 2 | Lincoln National Life Insurance Company | AA- |
| 10 | $ 3,500,000 | M | 94 | 25 | Reliastar Life Insurance Company | A |
| 11 | $ 2,000,000 | F | 94 | 2 | Pruco Life Insurance Company | AA- |
| 12 | $ 500,000 | F | 94 | 34 | Sun Life Assurance Company of Canada (U.S.) | AA- |
| 13 | $ 250,000 | M | 94 | 5 | Transamerica Life Insurance Company | AA- |
| 14 | $ 1,682,773 | F | 93 | 34 | Hartford Life and Annuity Insurance Company | BBB+ |
| 15 | $ 572,429 | F | 93 | 19 | Reliastar Life Insurance Company | A |
| 16 | $ 3,000,000 | M | 93 | 24 | West Coast Life Insurance Company | AA- |
| 17 | $ 500,000 | F | 93 | 47 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 18 | $ 5,000,000 | F | 93 | 39 | American General Life Insurance Company | A+ |
| 19 | $ 400,000 | F | 93 | 50 | Principal Life Insurance Company | A+ |
| 20 | $ 5,000,000 | F | 93 | 19 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 21 | $ 1,000,000 | F | 93 | 18 | Lincoln National Life Insurance Company | AA- |
| 22 | $ 300,000 | F | 93 | 12 | West Coast Life Insurance Company | AA- |
| 23 | $ 500,000 | M | 92 | 32 | Massachusetts Mutual Life Insurance Company | AA+ |
| 24 | $ 5,000,000 | M | 92 | 18 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 25 | $ 3,500,000 | F | 92 | 53 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 26 | $ 3,100,000 | F | 92 | 19 | Lincoln Benefit Life Company | BBB+ |
| 27 | $ 1,500,000 | F | 92 | 48 | Lincoln National Life Insurance Company | AA- |
| 28 | $ 3,000,000 | F | 92 | 21 | Lincoln National Life Insurance Company | AA- |
| 29 | $ 5,000,000 | F | 92 | 36 | Reliastar Life Insurance Company | A |
| 30 | $ 144,000 | M | 92 | 42 | Lincoln National Life Insurance Company | AA- |
| 31 | $ 5,000,000 | F | 92 | 12 | Lincoln National Life Insurance Company | AA- |
| 32 | $ 500,000 | M | 92 | 32 | Reliastar Life Insurance Company | A |
| 33 | $ 1,000,000 | F | 92 | 54 | Lincoln National Life Insurance Company | AA- |
| 34 | $ 1,000,000 | M | 92 | 4 | Voya Retirement Insurance and Annuity Company | A |
| 35 | $ 1,203,520 | M | 92 | 43 | Columbus Life Insurance Company | AA |
| 36 | $ 1,350,000 | F | 92 | 23 | Lincoln National Life Insurance Company | AA- |
| 37 | $ 1,000,000 | F | 92 | 30 | Pan-American Assurance Company | N/A |
| 38 | $ 5,000,000 | F | 91 | 32 | Massachusetts Mutual Life Insurance Company | AA+ |
| 39 | $ 2,500,000 | F | 91 | 31 | American General Life Insurance Company | A+ |
| 40 | $ 2,500,000 | M | 91 | 36 | Pacific Life Insurance Company | AA- |

30

| | Face Amount | Gender | Age (ALB)[1] | LE (mo.)[2] | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 41 | $ 1,000,000 | F | 91 | 34 | United of Omaha Life Insurance Company | AA- |
| 42 | $ 500,000 | M | 91 | 31 | Allianz Life Insurance Company of North America | AA |
| 43 | $ 1,200,000 | F | 91 | 24 | Massachusetts Mutual Life Insurance Company | AA+ |
| 44 | $ 1,200,000 | F | 91 | 24 | Massachusetts Mutual Life Insurance Company | AA+ |
| 45 | $ 375,000 | M | 91 | 24 | Lincoln National Life Insurance Company | AA- |
| 46 | $ 1,103,922 | F | 91 | 43 | Sun Life Assurance Company of Canada (U.S.) | AA- |
| 47 | $ 1,000,000 | F | 91 | 46 | Transamerica Life Insurance Company | AA- |
| 48 | $ 250,000 | F | 91 | 46 | Transamerica Life Insurance Company | AA- |
| 49 | $ 500,000 | F | 91 | 25 | Transamerica Life Insurance Company | AA- |
| 50 | $ 5,000,000 | M | 91 | 26 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 51 | $ 500,000 | F | 91 | 20 | Lincoln National Life Insurance Company | AA- |
| 52 | $ 400,000 | M | 91 | 28 | Lincoln National Life Insurance Company | AA- |
| 53 | $ 2,000,000 | M | 91 | 23 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 54 | $ 500,000 | F | 91 | 18 | Nationwide Life and Annuity Insurance Company | A+ |
| 55 | $ 2,225,000 | F | 91 | 65 | Transamerica Life Insurance Company | AA- |
| 56 | $ 3,500,000 | F | 91 | 25 | Lincoln National Life Insurance Company | AA- |
| 57 | $ 1,000,000 | F | 90 | 36 | Metropolitan Life Insurance Company | AA- |
| 58 | $ 100,000 | M | 90 | 20 | American General Life Insurance Company | A+ |
| 59 | $ 248,859 | F | 90 | 18 | Lincoln National Life Insurance Company | AA- |
| 60 | $ 1,000,000 | F | 90 | 43 | General American Life Insurance Company | AA- |
| 61 | $ 500,000 | F | 90 | 49 | Sun Life Assurance Company of Canada (U.S.) | AA- |
| 62 | $ 250,000 | M | 90 | 60 | Metropolitan Life Insurance Company | AA- |
| 63 | $ 4,000,000 | F | 90 | 53 | Transamerica Life Insurance Company | AA- |
| 64 | $ 5,000,000 | M | 90 | 36 | AXA Equitable Life Insurance Company | A+ |
| 65 | $ 1,050,000 | M | 90 | 28 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 66 | $ 5,000,000 | M | 90 | 33 | AIG Life Insurance Company | A+ |
| 67 | $ 3,000,000 | M | 90 | 73 | Transamerica Life Insurance Company | AA- |
| 68 | $ 1,000,000 | M | 90 | 25 | AXA Equitable Life Insurance Company | A+ |
| 69 | $ 500,000 | M | 90 | 44 | Lincoln National Life Insurance Company | AA- |
| 70 | $ 649,026 | F | 90 | 51 | Midland National Life Insurance Company | A+ |
| 71 | $ 4,785,380 | F | 90 | 25 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 72 | $ 1,803,455 | F | 90 | 51 | Metropolitan Life Insurance Company | AA- |
| 73 | $ 1,529,270 | F | 90 | 51 | Metropolitan Life Insurance Company | AA- |
| 74 | $ 800,000 | M | 90 | 44 | Lincoln National Life Insurance Company | AA- |
| 75 | $ 5,000,000 | M | 90 | 35 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 76 | $ 500,000 | F | 90 | 32 | Transamerica Life Insurance Company | AA- |
| 77 | $ 400,000 | F | 90 | 32 | Lincoln Benefit Life Company | BBB+ |
| 78 | $ 3,000,000 | F | 90 | 69 | Massachusetts Mutual Life Insurance Company | AA+ |
| 79 | $ 200,000 | M | 90 | 31 | Lincoln Benefit Life Company | BBB+ |
| 80 | $ 4,445,467 | M | 90 | 40 | Penn Mutual Life Insurance Company | A+ |
| 81 | $ 1,500,000 | M | 90 | 29 | Union Central Life Insurance Company | N/A |
| 82 | $ 7,500,000 | M | 90 | 32 | Lincoln National Life Insurance Company | AA- |
| 83 | $ 3,600,000 | F | 90 | 48 | AXA Equitable Life Insurance Company | A+ |
| 84 | $ 300,000 | M | 90 | 30 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 85 | $ 3,000,000 | M | 90 | 27 | Lincoln National Life Insurance Company | AA- |
| 86 | $ 2,000,000 | M | 90 | 33 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 87 | $ 100,000 | F | 90 | 38 | American General Life Insurance Company | A+ |
| 88 | $ 100,000 | F | 90 | 38 | American General Life Insurance Company | A+ |
| 89 | $ 396,791 | M | 90 | 19 | Lincoln National Life Insurance Company | AA- |

App. 0359

App. 0360

| | Face Amount | Gender | Age (ALB)[1] | LE (mo.)[2] | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 90 | $ 1,000,000 | F | 90 | 43 | Metropolitan Life Insurance Company | AA- |
| 91 | $ 1,500,000 | M | 90 | 82 | Transamerica Life Insurance Company | AA- |
| 92 | $ 1,000,000 | F | 90 | 62 | Lincoln National Life Insurance Company | AA- |
| 93 | $ 1,000,000 | M | 89 | 31 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 94 | $ 2,000,000 | M | 89 | 31 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 95 | $ 5,000,000 | M | 89 | 32 | Lincoln National Life Insurance Company | AA- |
| 96 | $ 5,000,000 | F | 89 | 33 | Transamerica Life Insurance Company | AA- |
| 97 | $ 3,000,000 | M | 89 | 28 | Transamerica Life Insurance Company | AA- |
| 98 | $ 1,200,000 | M | 89 | 53 | Transamerica Life Insurance Company | AA- |
| 99 | $ 1,000,000 | M | 89 | 57 | AXA Equitable Life Insurance Company | A+ |
| 100 | $ 5,000,000 | F | 89 | 49 | Lincoln National Life Insurance Company | AA- |
| 101 | $ 6,000,000 | F | 89 | 39 | Sun Life Assurance Company of Canada (U.S.) | AA- |
| 102 | $ 250,000 | M | 89 | 29 | Wilton Reassurance Life Insurance Company | N/A |
| 103 | $ 330,000 | M | 89 | 50 | AXA Equitable Life Insurance Company | A+ |
| 104 | $ 175,000 | M | 89 | 50 | Metropolitan Life Insurance Company | AA- |
| 105 | $ 335,000 | M | 89 | 50 | Metropolitan Life Insurance Company | AA- |
| 106 | $ 3,000,000 | M | 89 | 55 | AXA Equitable Life Insurance Company | A+ |
| 107 | $ 2,000,000 | F | 89 | 31 | Beneficial Life Insurance Company | N/A |
| 108 | $ 250,000 | F | 89 | 31 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 109 | $ 1,000,000 | F | 89 | 22 | New York Life Insurance Company | AA+ |
| 110 | $ 1,250,000 | M | 89 | 19 | Columbus Life Insurance Company | AA |
| 111 | $ 300,000 | M | 89 | 19 | Columbus Life Insurance Company | AA |
| 112 | $ 10,000,000 | F | 89 | 69 | West Coast Life Insurance Company | AA- |
| 113 | $ 2,500,000 | M | 89 | 44 | Transamerica Life Insurance Company | AA- |
| 114 | $ 1,000,000 | F | 89 | 34 | West Coast Life Insurance Company | AA- |
| 115 | $ 2,000,000 | F | 89 | 34 | West Coast Life Insurance Company | AA- |
| 116 | $ 5,000,000 | M | 89 | 78 | West Coast Life Insurance Company | AA- |
| 117 | $ 200,000 | M | 89 | 52 | AIG Life Insurance Company | A+ |
| 118 | $ 500,000 | F | 89 | 38 | Beneficial Life Insurance Company | N/A |
| 119 | $ 800,000 | M | 89 | 37 | National Western Life Insurance Company | A |
| 120 | $ 1,269,017 | M | 89 | 17 | Hartford Life and Annuity Insurance Company | BBB+ |
| 121 | $ 2,000,000 | M | 89 | 61 | Lincoln National Life Insurance Company | AA- |
| 122 | $ 1,500,000 | F | 89 | 34 | Transamerica Life Insurance Company | AA- |
| 123 | $ 500,000 | F | 89 | 34 | Transamerica Life Insurance Company | AA- |
| 124 | $ 1,000,000 | M | 89 | 25 | Security Life of Denver Insurance Company | A |
| 125 | $ 5,000,000 | M | 89 | 60 | Lincoln National Life Insurance Company | AA- |
| 126 | $ 4,513,823 | F | 89 | 20 | Accordia Life and Annuity Company | A- |
| 127 | $ 2,000,000 | M | 89 | 67 | Security Life of Denver Insurance Company | A |
| 128 | $ 2,000,000 | M | 89 | 67 | Security Life of Denver Insurance Company | A |
| 129 | $ 2,000,000 | M | 89 | 67 | Security Life of Denver Insurance Company | A |
| 130 | $ 309,000 | M | 89 | 19 | Transamerica Life Insurance Company | AA- |
| 131 | $ 1,000,000 | M | 89 | 24 | Lincoln National Life Insurance Company | AA- |
| 132 | $ 1,365,000 | F | 88 | 73 | Transamerica Life Insurance Company | AA- |
| 133 | $ 1,000,000 | F | 88 | 67 | Security Life of Denver Insurance Company | A |
| 134 | $ 200,000 | F | 88 | 66 | Lincoln National Life Insurance Company | AA- |
| 135 | $ 1,000,000 | M | 88 | 29 | Sun Life Assurance Company of Canada (U.S.) | AA- |
| 136 | $ 1,000,000 | M | 88 | 24 | Massachusetts Mutual Life Insurance Company | AA+ |
| 137 | $ 1,000,000 | F | 88 | 14 | State Farm Life Insurance Company | AA |
| 138 | $ 2,000,000 | M | 88 | 75 | Transamerica Life Insurance Company | AA- |

App. 0362

| | Face Amount | Gender | Age (ALB)[1] | LE (mo.)[2] | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 139 | $ 209,176 | M | 88 | 71 | Lincoln National Life Insurance Company | AA- |
| 140 | $ 1,500,000 | M | 88 | 30 | Lincoln National Life Insurance Company | AA- |
| 141 | $ 1,000,000 | F | 88 | 59 | Transamerica Life Insurance Company | AA- |
| 142 | $ 8,500,000 | M | 88 | 67 | Massachusetts Mutual Life Insurance Company | AA+ |
| 143 | $ 2,328,547 | M | 88 | 31 | Metropolitan Life Insurance Company | AA- |
| 144 | $ 2,000,000 | M | 88 | 31 | Metropolitan Life Insurance Company | AA- |
| 145 | $ 1,000,000 | M | 88 | 19 | Transamerica Life Insurance Company | AA- |
| 146 | $ 500,000 | M | 88 | 61 | Metropolitan Life Insurance Company | AA- |
| 147 | $ 750,000 | F | 88 | 60 | Lincoln National Life Insurance Company | AA- |
| 148 | $ 1,500,000 | F | 88 | 60 | Lincoln National Life Insurance Company | AA- |
| 149 | $ 400,000 | F | 88 | 60 | Lincoln National Life Insurance Company | AA- |
| 150 | $ 1,250,000 | F | 88 | 60 | Lincoln National Life Insurance Company | AA- |
| 151 | $ 2,000,000 | M | 88 | 32 | Lincoln National Life Insurance Company | AA- |
| 152 | $ 3,000,000 | F | 88 | 44 | Transamerica Life Insurance Company | AA- |
| 153 | $ 347,211 | F | 88 | 21 | Pruco Life Insurance Company | AA- |
| 154 | $ 1,800,000 | M | 88 | 35 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 155 | $ 2,000,000 | M | 88 | 44 | AXA Equitable Life Insurance Company | A+ |
| 156 | $ 1,750,000 | M | 88 | 44 | AXA Equitable Life Insurance Company | A+ |
| 157 | $ 4,000,000 | M | 88 | 33 | Metropolitan Life Insurance Company | AA- |
| 158 | $ 2,000,000 | M | 88 | 24 | Transamerica Life Insurance Company | AA- |
| 159 | $ 1,425,000 | M | 88 | 38 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 160 | $ 1,500,000 | M | 88 | 39 | AXA Equitable Life Insurance Company | A+ |
| 161 | $ 694,487 | M | 87 | 56 | Lincoln National Life Insurance Company | AA- |
| 162 | $ 1,500,000 | M | 87 | 19 | Transamerica Life Insurance Company | AA- |
| 163 | $ 300,000 | F | 87 | 74 | Accordia Life and Annuity Company | A- |
| 164 | $ 1,500,000 | F | 87 | 106 | Lincoln Benefit Life Company | BBB+ |
| 165 | $ 1,000,000 | F | 87 | 53 | AXA Equitable Life Insurance Company | A+ |
| 166 | $ 2,000,000 | M | 87 | 34 | Metropolitan Life Insurance Company | AA- |
| 167 | $ 3,000,000 | M | 87 | 34 | Metropolitan Life Insurance Company | AA- |
| 168 | $ 1,000,000 | M | 87 | 21 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 169 | $ 2,000,000 | F | 87 | 64 | AXA Equitable Life Insurance Company | A+ |
| 170 | $ 1,000,000 | M | 87 | 36 | Security Life of Denver Insurance Company | A |
| 171 | $ 5,000,000 | F | 87 | 39 | Security Life of Denver Insurance Company | A |
| 172 | $ 3,000,000 | F | 87 | 63 | Sun Life Assurance Company of Canada (U.S.) | AA- |
| 173 | $ 125,000 | M | 87 | 45 | Jackson National Life Insurance Company | AA |
| 174 | $ 2,500,000 | M | 87 | 46 | Metropolitan Life Insurance Company | AA- |
| 175 | $ 1,500,000 | M | 87 | 65 | AXA Equitable Life Insurance Company | A+ |
| 176 | $ 1,000,000 | M | 87 | 36 | AXA Equitable Life Insurance Company | A+ |
| 177 | $ 500,000 | M | 87 | 38 | Lincoln National Life Insurance Company | AA- |
| 178 | $ 4,000,000 | F | 87 | 83 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 179 | $ 5,000,000 | M | 87 | 60 | Security Life of Denver Insurance Company | A |
| 180 | $ 5,000,000 | M | 87 | 67 | Security Life of Denver Insurance Company | A |
| 181 | $ 1,000,000 | M | 87 | 44 | Lincoln National Life Insurance Company | AA- |
| 182 | $ 450,000 | M | 87 | 44 | American General Life Insurance Company | A+ |
| 183 | $ 500,000 | M | 87 | 25 | Genworth Life Insurance Company | BB- |
| 184 | $ 1,980,000 | M | 87 | 31 | New York Life Insurance Company | AA+ |
| 185 | $ 1,000,000 | M | 87 | 30 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 186 | $ 500,000 | M | 87 | 30 | New England Life Insurance Company | A+ |
| 187 | $ 1,500,000 | M | 87 | 46 | Voya Retirement Insurance and Annuity Company | A |

App. 0364

| | Face Amount | Gender | Age (ALB)[1] | LE (mo.)[2] | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 188 | $ 4,000,000 | F | 87 | 48 | Reliastar Life Insurance Company | A |
| 189 | $ 284,924 | M | 87 | 41 | Transamerica Life Insurance Company | AA- |
| 190 | $ 5,000,000 | F | 87 | 71 | American General Life Insurance Company | A+ |
| 191 | $ 2,000,000 | F | 87 | 66 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 192 | $ 500,000 | F | 87 | 17 | Transamerica Life Insurance Company | AA- |
| 193 | $ 3,500,000 | F | 87 | 79 | Lincoln Benefit Life Company | BBB+ |
| 194 | $ 500,000 | M | 87 | 35 | Hartford Life and Annuity Insurance Company | BBB+ |
| 195 | $ 800,000 | M | 87 | 31 | Metropolitan Life Insurance Company | AA- |
| 196 | $ 5,000,000 | F | 86 | 79 | AXA Equitable Life Insurance Company | A+ |
| 197 | $ 1,000,000 | F | 86 | 63 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 198 | $ 6,000,000 | F | 86 | 100 | American General Life Insurance Company | A+ |
| 199 | $ 1,433,572 | M | 86 | 35 | Security Mutual Life Insurance Company of NY | N/A |
| 200 | $ 2,000,000 | M | 86 | 44 | National Life Insurance Company | A+ |
| 201 | $ 1,000,000 | F | 86 | 27 | Metropolitan Life Insurance Company | AA- |
| 202 | $ 1,000,000 | M | 86 | 40 | Columbus Life Insurance Company | AA |
| 203 | $ 2,147,816 | F | 86 | 97 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 204 | $ 4,200,000 | F | 86 | 96 | Transamerica Life Insurance Company | AA- |
| 205 | $ 750,000 | M | 86 | 65 | West Coast Life Insurance Company | AA- |
| 206 | $ 4,000,000 | M | 86 | 20 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 207 | $ 1,000,000 | M | 86 | 56 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 208 | $ 2,000,000 | F | 86 | 77 | Lincoln Benefit Life Company | BBB+ |
| 209 | $ 2,000,000 | F | 86 | 53 | New York Life Insurance Company | AA+ |
| 210 | $ 5,000,000 | M | 86 | 66 | Lincoln National Life Insurance Company | AA- |
| 211 | $ 2,400,000 | M | 86 | 20 | Genworth Life Insurance Company | BB- |
| 212 | $ 3,000,000 | M | 86 | 68 | Transamerica Life Insurance Company | AA- |
| 213 | $ 3,250,000 | F | 86 | 81 | Metropolitan Life Insurance Company | AA- |
| 214 | $ 3,075,000 | F | 86 | 81 | Metropolitan Life Insurance Company | AA- |
| 215 | $ 8,500,000 | M | 86 | 81 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 216 | $ 600,000 | M | 86 | 78 | AXA Equitable Life Insurance Company | A+ |
| 217 | $10,000,000 | M | 86 | 47 | Lincoln National Life Insurance Company | AA- |
| 218 | $ 7,600,000 | F | 86 | 77 | Transamerica Life Insurance Company | AA- |
| 219 | $ 250,000 | M | 86 | 11 | Midland National Life Insurance Company | A+ |
| 220 | $ 250,000 | M | 86 | 33 | Transamerica Life Insurance Company | AA- |
| 221 | $ 2,500,000 | F | 86 | 55 | American General Life Insurance Company | A+ |
| 222 | $ 2,500,000 | M | 86 | 40 | AXA Equitable Life Insurance Company | A+ |
| 223 | $ 3,000,000 | M | 86 | 40 | Lincoln National Life Insurance Company | AA- |
| 224 | $ 2,000,000 | M | 86 | 72 | Pacific Life Insurance Company | AA- |
| 225 | $ 7,600,000 | M | 86 | 79 | Transamerica Life Insurance Company | AA- |
| 226 | $ 3,000,000 | F | 86 | 29 | AXA Equitable Life Insurance Company | A+ |
| 227 | $ 2,000,000 | M | 86 | 55 | American National Insurance Company | A |
| 228 | $ 250,000 | M | 86 | 58 | Voya Retirement Insurance and Annuity Company | A |
| 229 | $ 1,800,000 | F | 86 | 41 | Lincoln National Life Insurance Company | AA- |
| 230 | $ 1,703,959 | M | 86 | 49 | Lincoln National Life Insurance Company | AA- |
| 231 | $ 3,000,000 | M | 86 | 42 | Metropolitan Life Insurance Company | AA- |
| 232 | $ 2,000,000 | M | 86 | 36 | Metropolitan Life Insurance Company | AA- |
| 233 | $ 500,000 | M | 86 | 7 | Great Southern Life Insurance Company | N/A |
| 234 | $ 2,247,450 | F | 86 | 41 | Transamerica Life Insurance Company | AA- |
| 235 | $ 1,000,000 | M | 86 | 39 | Hartford Life and Annuity Insurance Company | BBB+ |

34

| | Face Amount | Gender | Age (ALB)[1] | LE (mo.)[2] | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 236 | $ 400,000 | M | 86 | 30 | Transamerica Life Insurance Company | AA- |
| 237 | $ 1,000,000 | M | 86 | 69 | Lincoln National Life Insurance Company | AA- |
| 238 | $ 1,000,000 | M | 86 | 39 | Metropolitan Life Insurance Company | AA- |
| 239 | $ 300,000 | M | 86 | 41 | New England Life Insurance Company | A+ |
| 240 | $ 3,500,000 | M | 86 | 44 | Pacific Life Insurance Company | AA- |
| 241 | $ 2,500,000 | M | 86 | 44 | AXA Equitable Life Insurance Company | A+ |
| 242 | $ 200,000 | M | 85 | 55 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 243 | $ 402,500 | M | 85 | 63 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 244 | $10,000,000 | M | 85 | 104 | Pacific Life Insurance Company | AA- |
| 245 | $ 80,000 | F | 85 | 39 | Protective Life Insurance Company | AA- |
| 246 | $ 1,000,000 | M | 85 | 42 | Texas Life Insurance Company | N/A |
| 247 | $ 500,000 | M | 85 | 82 | Metropolitan Life Insurance Company | AA- |
| 248 | $ 1,000,000 | M | 85 | 50 | Lincoln National Life Insurance Company | AA- |
| 249 | $ 3,000,000 | M | 85 | 25 | U.S. Financial Life Insurance Company | N/A |
| 250 | $ 325,000 | M | 85 | 44 | Genworth Life and Annuity Insurance Company | BB- |
| 251 | $ 175,000 | M | 85 | 44 | Genworth Life and Annuity Insurance Company | BB- |
| 252 | $ 850,000 | M | 85 | 39 | American General Life Insurance Company | A+ |
| 253 | $ 600,000 | M | 85 | 51 | Massachusetts Mutual Life Insurance Company | AA+ |
| 254 | $ 1,900,000 | M | 85 | 46 | American National Insurance Company | A |
| 255 | $ 500,000 | M | 85 | 28 | New York Life Insurance Company | AA+ |
| 256 | $ 500,000 | M | 85 | 28 | New York Life Insurance Company | AA+ |
| 257 | $ 5,000,000 | M | 85 | 37 | AXA Equitable Life Insurance Company | A+ |
| 258 | $ 385,000 | M | 85 | 53 | Metropolitan Life Insurance Company | AA- |
| 259 | $ 500,000 | M | 85 | 53 | Metropolitan Life Insurance Company | AA- |
| 260 | $ 75,000 | M | 85 | 32 | Fidelity and Guaranty Insurance Company | BBB- |
| 261 | $10,000,000 | M | 85 | 53 | Lincoln National Life Insurance Company | AA- |
| 262 | $ 1,500,000 | M | 85 | 71 | Lincoln National Life Insurance Company | AA- |
| 263 | $ 5,000,000 | M | 85 | 81 | Banner Life Insurance Company | AA- |
| 264 | $ 3,500,000 | F | 85 | 74 | AXA Equitable Life Insurance Company | A+ |
| 265 | $ 1,000,000 | F | 85 | 79 | West Coast Life Insurance Company | AA- |
| 266 | $ 1,000,000 | F | 85 | 57 | American General Life Insurance Company | A+ |
| 267 | $ 3,000,000 | F | 85 | 48 | Metropolitan Life Insurance Company | AA- |
| 268 | $ 750,000 | M | 85 | 57 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 269 | $ 4,500,000 | M | 85 | 53 | AXA Equitable Life Insurance Company | A+ |
| 270 | $ 2,275,000 | M | 85 | 71 | Reliastar Life Insurance Company | A |
| 271 | $ 120,000 | F | 85 | 70 | Lincoln National Life Insurance Company | AA- |
| 272 | $ 77,000 | F | 85 | 70 | Lincoln National Life Insurance Company | AA- |
| 273 | $10,000,000 | M | 85 | 62 | AXA Equitable Life Insurance Company | A+ |
| 274 | $ 5,000,000 | M | 85 | 57 | Transamerica Life Insurance Company | AA- |
| 275 | $ 300,000 | F | 85 | 85 | AXA Equitable Life Insurance Company | A+ |
| 276 | $ 500,000 | F | 85 | 85 | AXA Equitable Life Insurance Company | A+ |
| 277 | $ 900,000 | M | 85 | 54 | Hartford Life and Annuity Insurance Company | BBB+ |
| 278 | $ 340,000 | F | 85 | 65 | Jackson National Life Insurance Company | AA |
| 279 | $ 2,300,000 | M | 85 | 17 | American General Life Insurance Company | A+ |
| 280 | $ 3,500,000 | M | 85 | 60 | AXA Equitable Life Insurance Company | A+ |
| 281 | $ 6,217,200 | F | 85 | 100 | Phoenix Life Insurance Company | BB |
| 282 | $ 2,500,000 | F | 85 | 53 | Reliastar Life Insurance Company | A |
| 283 | $ 1,275,000 | M | 85 | 35 | General American Life Insurance Company | AA- |
| 284 | $ 2,000,000 | F | 85 | 89 | Lincoln National Life Insurance Company | AA- |

App. 0367

| | Face Amount | Gender | Age (ALB)[1] | LE (mo.)[2] | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 285 | $ 1,000,000 | M | 85 | 33 | American General Life Insurance Company | A+ |
| 286 | $ 750,000 | M | 85 | 67 | AXA Equitable Life Insurance Company | A+ |
| 287 | $ 500,000 | F | 85 | 75 | Metropolitan Life Insurance Company | AA- |
| 288 | $ 2,400,000 | M | 85 | 52 | Phoenix Life Insurance Company | BB |
| 289 | $ 5,000,000 | M | 85 | 80 | Lincoln National Life Insurance Company | AA- |
| 290 | $10,000,310 | F | 85 | 82 | Security Life of Denver Insurance Company | A |
| 291 | $ 2,214,691 | F | 85 | 82 | Security Life of Denver Insurance Company | A |
| 292 | $ 1,500,000 | M | 84 | 75 | General American Life Insurance Company | AA- |
| 293 | $ 3,000,000 | M | 84 | 48 | Protective Life Insurance Company | AA- |
| 294 | $ 1,500,000 | M | 84 | 48 | American General Life Insurance Company | A+ |
| 295 | $ 2,000,000 | F | 84 | 84 | Transamerica Life Insurance Company | AA- |
| 296 | $ 1,500,000 | M | 84 | 53 | Pacific Life Insurance Company | AA- |
| 297 | $ 2,000,000 | M | 84 | 65 | New York Life Insurance Company | AA+ |
| 298 | $ 5,000,000 | M | 84 | 88 | American General Life Insurance Company | A+ |
| 299 | $ 250,000 | M | 84 | 120 | Reliastar Life Insurance Company | A |
| 300 | $ 1,000,000 | M | 84 | 131 | Reliastar Life Insurance Company | A |
| 301 | $ 1,000,000 | M | 84 | 39 | American General Life Insurance Company | A+ |
| 302 | $ 1,000,000 | M | 84 | 60 | Security Mutual Life Insurance Company of NY | N/A |
| 303 | $ 2,000,000 | F | 84 | 66 | Lincoln National Life Insurance Company | AA- |
| 304 | $ 1,995,000 | F | 84 | 89 | Transamerica Life Insurance Company | AA- |
| 305 | $ 838,529 | M | 84 | 100 | Transamerica Life Insurance Company | AA- |
| 306 | $10,000,000 | M | 84 | 60 | New York Life Insurance Company | AA+ |
| 307 | $ 700,000 | M | 84 | 80 | Hartford Life and Annuity Insurance Company | BBB+ |
| 308 | $ 1,000,000 | M | 84 | 49 | Hartford Life and Annuity Insurance Company | BBB+ |
| 309 | $ 1,000,000 | M | 84 | 49 | Jackson National Life Insurance Company | AA |
| 310 | $ 417,300 | M | 84 | 80 | Jackson National Life Insurance Company | AA |
| 311 | $ 5,000,000 | M | 84 | 58 | Transamerica Life Insurance Company | AA- |
| 312 | $ 2,000,000 | M | 84 | 51 | Ohio National Life Assurance Corporation | A+ |
| 313 | $ 1,000,000 | M | 84 | 51 | Ohio National Life Assurance Corporation | A+ |
| 314 | $ 500,000 | F | 84 | 82 | AXA Equitable Life Insurance Company | A+ |
| 315 | $ 350,000 | M | 84 | 21 | Jackson National Life Insurance Company | AA |
| 316 | $ 5,000,000 | F | 83 | 58 | Security Mutual Life Insurance Company of NY | N/A |
| 317 | $ 5,000,000 | M | 83 | 69 | AXA Equitable Life Insurance Company | A+ |
| 318 | $ 6,000,000 | M | 83 | 84 | Transamerica Life Insurance Company | AA- |
| 319 | $ 3,528,958 | F | 83 | 87 | Lincoln National Life Insurance Company | AA- |
| 320 | $ 8,000,000 | M | 83 | 66 | AXA Equitable Life Insurance Company | A+ |
| 321 | $ 850,000 | F | 83 | 79 | Zurich Life Insurance Company | A |
| 322 | $ 550,000 | M | 83 | 95 | Genworth Life Insurance Company | BB- |
| 323 | $ 500,000 | M | 83 | 45 | West Coast Life Insurance Company | AA- |
| 324 | $ 1,680,000 | F | 83 | 51 | AXA Equitable Life Insurance Company | A+ |
| 325 | $ 1,000,000 | F | 83 | 72 | Lincoln National Life Insurance Company | AA- |
| 326 | $ 1,250,000 | M | 83 | 80 | Metropolitan Life Insurance Company | AA- |
| 327 | $ 3,000,000 | F | 83 | 49 | AXA Equitable Life Insurance Company | A+ |
| 328 | $ 3,000,000 | F | 83 | 49 | AXA Equitable Life Insurance Company | A+ |
| 329 | $ 1,000,000 | M | 83 | 59 | AXA Equitable Life Insurance Company | A+ |
| 330 | $ 1,600,000 | M | 83 | 66 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 331 | $ 1,700,000 | M | 83 | 66 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 332 | $ 1,000,000 | M | 83 | 49 | AXA Equitable Life Insurance Company | A+ |
| 333 | $ 1,500,000 | M | 83 | 50 | Lincoln Benefit Life Company | BBB+ |

App. 0369

| | Face Amount | Gender | Age (ALB)[1] | LE (mo.)[2] | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 334 | $ 10,000,000 | F | 83 | 48 | Transamerica Life Insurance Company | AA- |
| 335 | $ 50,000 | M | 83 | 66 | Transamerica Life Insurance Company | AA- |
| 336 | $ 700,000 | M | 83 | 81 | Banner Life Insurance Company | AA- |
| 337 | $ 3,000,000 | M | 83 | 90 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 338 | $ 10,000,000 | M | 83 | 51 | Hartford Life and Annuity Insurance Company | BBB+ |
| 339 | $ 1,750,000 | M | 83 | 64 | AXA Equitable Life Insurance Company | A+ |
| 340 | $ 5,000,000 | M | 83 | 59 | AXA Equitable Life Insurance Company | A+ |
| 341 | $ 300,000 | F | 83 | 56 | Hartford Life and Annuity Insurance Company | BBB+ |
| 342 | $ 250,000 | M | 83 | 78 | American General Life Insurance Company | A+ |
| 343 | $ 3,500,000 | M | 83 | 66 | Metropolitan Life Insurance Company | AA- |
| 344 | $ 2,502,000 | M | 83 | 125 | Transamerica Life Insurance Company | AA- |
| 345 | $ 170,000 | F | 83 | 45 | Reliastar Life Insurance Company | A |
| 346 | $ 240,000 | M | 83 | 27 | Lincoln National Life Insurance Company | AA- |
| 347 | $ 10,000,000 | M | 83 | 93 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 348 | $ 10,000,000 | M | 83 | 85 | Pacific Life Insurance Company | AA- |
| 349 | $ 250,000 | F | 83 | 83 | Accordia Life and Annuity Company | A- |
| 350 | $ 3,000,000 | M | 83 | 104 | Principal Life Insurance Company | A+ |
| 351 | $ 1,700,000 | M | 83 | 45 | Lincoln National Life Insurance Company | AA- |
| 352 | $ 1,210,000 | M | 83 | 48 | Lincoln National Life Insurance Company | AA- |
| 353 | $ 3,000,000 | F | 83 | 87 | West Coast Life Insurance Company | AA- |
| 354 | $ 7,000,000 | M | 83 | 67 | Genworth Life Insurance Company | BB- |
| 355 | $ 8,000,000 | M | 82 | 107 | Metropolitan Life Insurance Company | AA- |
| 356 | $ 3,000,000 | M | 82 | 80 | Reliastar Life Insurance Company | A |
| 357 | $ 4,000,000 | M | 82 | 64 | Lincoln National Life Insurance Company | AA- |
| 358 | $ 500,000 | M | 82 | 37 | Genworth Life and Annuity Insurance Company | BB- |
| 359 | $ 3,000,000 | M | 82 | 124 | Metropolitan Life Insurance Company | AA- |
| 360 | $ 300,000 | F | 82 | 80 | Metropolitan Life Insurance Company | AA- |
| 361 | $ 200,000 | M | 82 | 55 | Protective Life Insurance Company | AA- |
| 362 | $ 150,000 | M | 82 | 55 | Protective Life Insurance Company | AA- |
| 363 | $ 150,000 | M | 82 | 55 | Protective Life Insurance Company | AA- |
| 364 | $ 350,000 | M | 82 | 55 | Lincoln National Life Insurance Company | AA- |
| 365 | $ 1,187,327 | M | 82 | 78 | Transamerica Life Insurance Company | AA- |
| 366 | $ 5,000,000 | M | 82 | 88 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 367 | $ 100,000 | M | 82 | 93 | Protective Life Insurance Company | AA- |
| 368 | $ 600,000 | M | 82 | 35 | Lincoln National Life Insurance Company | AA- |
| 369 | $ 800,000 | M | 82 | 61 | North American Company for Life And Health Insurance | A+ |
| 370 | $ 8,000,000 | F | 82 | 88 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 371 | $ 785,000 | M | 82 | 95 | Pacific Life Insurance Company | AA- |
| 372 | $ 2,000,000 | M | 82 | 17 | Metropolitan Life Insurance Company | AA- |
| 373 | $ 1,000,000 | F | 82 | 70 | Lincoln Benefit Life Company | BBB+ |
| 374 | $ 1,000,000 | M | 82 | 75 | Penn Mutual Life Insurance Company | A+ |
| 375 | $ 6,000,000 | M | 82 | 103 | AXA Equitable Life Insurance Company | A+ |
| 376 | $ 320,987 | F | 82 | 87 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 377 | $ 130,000 | M | 82 | 37 | Genworth Life Insurance Company | BB- |
| 378 | $ 5,500,000 | M | 82 | 102 | Metropolitan Life Insurance Company | AA- |
| 379 | $ 2,000,000 | M | 82 | 80 | Transamerica Life Insurance Company | AA- |
| 380 | $ 1,000,000 | M | 82 | 81 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 381 | $ 1,000,000 | M | 82 | 114 | Protective Life Insurance Company | AA- |
| 382 | $ 2,000,000 | F | 82 | 71 | Pacific Life Insurance Company | AA- |

App. 0371

| | Face Amount | Gender | Age (ALB)[1] | LE (mo.)[2] | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 383 | $ 4,000,000 | M | 82 | 77 | Lincoln National Life Insurance Company | AA- |
| 384 | $ 2,000,000 | M | 82 | 64 | Metropolitan Life Insurance Company | AA- |
| 385 | $ 2,000,000 | M | 82 | 64 | Metropolitan Life Insurance Company | AA- |
| 386 | $ 218,362 | M | 82 | 110 | Lincoln National Life Insurance Company | AA- |
| 387 | $ 4,300,000 | F | 82 | 92 | American National Insurance Company | A |
| 388 | $ 100,000 | M | 82 | 67 | Prudential Insurance Company of America | AA- |
| 389 | $ 200,000 | M | 82 | 50 | Kansas City Life Insurance Company | N/A |
| 390 | $ 1,029,871 | M | 82 | 121 | Principal Life Insurance Company | A+ |
| 391 | $ 2,000,000 | F | 82 | 58 | Transamerica Life Insurance Company | AA- |
| 392 | $ 1,500,000 | F | 82 | 59 | Protective Life Insurance Company | AA- |
| 393 | $ 687,006 | M | 82 | 64 | The State Life Insurance Company | AA- |
| 394 | $ 750,000 | M | 82 | 48 | Security Life of Denver Insurance Company | A |
| 395 | $ 2,500,000 | M | 82 | 101 | AXA Equitable Life Insurance Company | A+ |
| 396 | $ 2,500,000 | M | 82 | 101 | AXA Equitable Life Insurance Company | A+ |
| 397 | $ 200,000 | M | 82 | 34 | Pruco Life Insurance Company | AA- |
| 398 | $ 180,000 | F | 82 | 75 | Midland National Life Insurance Company | A+ |
| 399 | $ 500,000 | M | 82 | 33 | Transamerica Life Insurance Company | AA- |
| 400 | $ 3,000,000 | M | 81 | 41 | Pacific Life Insurance Company | AA- |
| 401 | $ 3,000,000 | M | 81 | 41 | Minnesota Life Insurance Company | A+ |
| 402 | $ 3,000,000 | M | 81 | 41 | Pruco Life Insurance Company | AA- |
| 403 | $ 5,000,000 | M | 81 | 79 | Pacific Life Insurance Company | AA- |
| 404 | $ 5,000,000 | M | 81 | 79 | Pacific Life Insurance Company | AA- |
| 405 | $ 800,000 | F | 81 | 83 | Prudential Insurance Company of America | AA- |
| 406 | $ 250,000 | M | 81 | 58 | United of Omaha Life Insurance Company | AA- |
| 407 | $ 3,601,500 | M | 81 | 78 | Transamerica Life Insurance Company | AA- |
| 408 | $ 1,000,000 | M | 81 | 78 | Sun Life Assurance Company of Canada (U.S.) | AA- |
| 409 | $ 5,000,000 | M | 81 | 72 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 410 | $ 5,000,000 | M | 81 | 110 | Principal Life Insurance Company | A+ |
| 411 | $ 150,000 | M | 81 | 74 | MetLife Insurance Company USA | A+ |
| 412 | $ 500,000 | M | 81 | 63 | American General Life Insurance Company | A+ |
| 413 | $ 1,000,000 | M | 81 | 104 | Transamerica Life Insurance Company | AA- |
| 414 | $ 800,000 | M | 81 | 104 | Columbus Life Insurance Company | AA |
| 415 | $ 1,009,467 | M | 81 | 43 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 416 | $ 7,000,000 | M | 81 | 69 | Lincoln Benefit Life Company | BBB+ |
| 417 | $ 100,000 | M | 81 | 50 | North American Company for Life And Health Insurance | A+ |
| 418 | $ 1,000,000 | M | 81 | 96 | Lincoln National Life Insurance Company | AA- |
| 419 | $ 1,000,000 | M | 81 | 124 | Metropolitan Life Insurance Company | AA- |
| 420 | $ 5,000,000 | M | 81 | 42 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 421 | $ 6,799,139 | M | 81 | 102 | AXA Equitable Life Insurance Company | A+ |
| 422 | $ 1,000,000 | M | 81 | 68 | Transamerica Life Insurance Company | AA- |
| 423 | $ 500,000 | M | 81 | 93 | Transamerica Life Insurance Company | AA- |
| 424 | $ 476,574 | M | 81 | 56 | Transamerica Life Insurance Company | AA- |
| 425 | $ 250,000 | M | 81 | 78 | AXA Equitable Life Insurance Company | A+ |
| 426 | $ 2,250,000 | M | 81 | 77 | Massachusetts Mutual Life Insurance Company | AA+ |
| 427 | $ 775,000 | M | 81 | 105 | Lincoln National Life Insurance Company | AA- |
| 428 | $ 1,000,000 | F | 81 | 105 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 429 | $ 6,000,000 | M | 81 | 100 | AXA Equitable Life Insurance Company | A+ |
| 430 | $ 1,445,000 | F | 81 | 86 | AXA Equitable Life Insurance Company | A+ |
| 431 | $ 1,500,000 | F | 81 | 86 | AXA Equitable Life Insurance Company | A+ |

58

| | Face Amount | Gender | Age (ALB)[1] | LE (mo.)[2] | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 432 | $ 500,000 | M | 81 | 126 | Transamerica Life Insurance Company | AA- |
| 433 | $ 200,000 | M | 81 | 41 | Lincoln National Life Insurance Company | AA- |
| 434 | $ 1,000,000 | M | 81 | 92 | Metropolitan Life Insurance Company | AA- |
| 435 | $ 6,000,000 | M | 81 | 89 | AXA Equitable Life Insurance Company | A+ |
| 436 | $ 5,000,000 | F | 81 | 98 | Reliastar Life Insurance Company | A |
| 437 | $ 300,000 | F | 81 | 67 | Columbus Life Insurance Company | AA |
| 438 | $ 750,000 | M | 81 | 53 | Lincoln National Life Insurance Company | AA- |
| 439 | $ 5,000,000 | M | 81 | 158 | West Coast Life Insurance Company | AA- |
| 440 | $ 3,000,000 | M | 81 | 78 | Principal Life Insurance Company | A+ |
| 441 | $ 5,000,000 | M | 80 | 118 | Lincoln National Life Insurance Company | AA- |
| 442 | $ 3,000,000 | M | 80 | 68 | American General Life Insurance Company | A+ |
| 443 | $ 70,000 | M | 80 | 35 | Pioneer Mutual Life Insurance Company | N/A |
| 444 | $ 5,000,000 | M | 80 | 63 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 445 | $ 500,000 | M | 80 | 52 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 446 | $ 100,000 | M | 80 | 46 | AXA Equitable Life Insurance Company | A+ |
| 447 | $ 1,000,000 | M | 80 | 96 | Metropolitan Life Insurance Company | AA- |
| 448 | $ 200,000 | M | 80 | 82 | Lincoln National Life Insurance Company | AA- |
| 449 | $ 1,250,000 | M | 80 | 81 | AXA Equitable Life Insurance Company | A+ |
| 450 | $ 3,000,000 | F | 80 | 71 | New York Life Insurance Company | AA+ |
| 451 | $ 4,000,000 | M | 80 | 53 | Metropolitan Life Insurance Company | AA- |
| 452 | $ 6,805,007 | M | 80 | 186 | Metropolitan Life Insurance Company | AA- |
| 453 | $ 2,500,000 | M | 80 | 84 | Massachusetts Mutual Life Insurance Company | AA+ |
| 454 | $ 2,500,000 | M | 80 | 84 | Massachusetts Mutual Life Insurance Company | AA+ |
| 455 | $ 500,000 | F | 80 | 106 | Columbus Life Insurance Company | AA |
| 456 | $ 4,000,000 | F | 80 | 76 | Transamerica Life Insurance Company | AA- |
| 457 | $ 4,000,000 | M | 80 | 129 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 458 | $ 323,027 | F | 80 | 142 | Lincoln National Life Insurance Company | AA- |
| 459 | $ 929,975 | M | 80 | 60 | Lincoln National Life Insurance Company | AA- |
| 460 | $ 1,000,000 | M | 80 | 69 | Lincoln National Life Insurance Company | AA- |
| 461 | $ 325,000 | M | 80 | 29 | American General Life Insurance Company | A+ |
| 462 | $ 1,750,000 | M | 80 | 49 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 463 | $ 5,000,000 | M | 80 | 77 | Transamerica Life Insurance Company | AA- |
| 464 | $ 3,750,000 | M | 80 | 34 | AXA Equitable Life Insurance Company | A+ |
| 465 | $ 500,000 | F | 80 | 123 | Ohio National Life Assurance Corporation | A+ |
| 466 | $ 550,000 | M | 80 | 63 | Pruco Life Insurance Company | AA- |
| 467 | $ 300,000 | M | 80 | 63 | Pruco Life Insurance Company | AA- |
| 468 | $ 800,000 | M | 80 | 82 | Minnesota Life Insurance Company | A+ |
| 469 | $ 1,000,000 | M | 80 | 85 | Massachusetts Mutual Life Insurance Company | AA+ |
| 470 | $ 1,200,000 | F | 80 | 94 | AXA Equitable Life Insurance Company | A+ |
| 471 | $ 300,000 | M | 80 | 60 | Lincoln National Life Insurance Company | AA- |
| 472 | $ 750,000 | M | 80 | 99 | General American Life Insurance Company | AA- |
| 473 | $ 2,000,000 | F | 80 | 43 | Transamerica Life Insurance Company | AA- |
| 474 | $ 1,220,000 | M | 80 | 89 | Reliastar Life Insurance Company of New York | A |
| 475 | $ 1,000,000 | M | 80 | 63 | Ameritas Life Insurance Corporation | A+ |
| 476 | $ 2,000,000 | M | 80 | 63 | Metropolitan Life Insurance Company | AA- |
| 477 | $ 1,358,500 | M | 80 | 63 | Metropolitan Life Insurance Company | AA- |
| 478 | $ 5,000,000 | F | 79 | 81 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 479 | $ 500,000 | M | 79 | 118 | Prudential Insurance Company of America | AA- |
| 480 | $ 1,200,000 | F | 79 | 116 | Athene Annuity & Life Assurance Company | A- |

App. 0375

| | Face Amount | Gender | Age (ALB)[1] | LE (mo.)[2] | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 481 | $ 1,000,000 | M | 79 | 88 | Accordia Life and Annuity Company | A- |
| 482 | $ 2,840,000 | M | 79 | 75 | Transamerica Life Insurance Company | AA- |
| 483 | $ 750,000 | M | 79 | 72 | North American Company for Life and Health Insurance | A+ |
| 484 | $ 1,000,000 | M | 79 | 72 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 485 | $ 500,000 | M | 79 | 72 | North American Company for Life and Health Insurance | A+ |
| 486 | $ 250,000 | M | 79 | 118 | Accordia Life and Annuity Company | A- |
| 487 | $ 50,000 | M | 79 | 31 | Lincoln National Life Insurance Company | AA- |
| 488 | $ 4,000,000 | M | 79 | 54 | Massachusetts Mutual Life Insurance Company | AA+ |
| 489 | $ 1,000,000 | F | 79 | 60 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 490 | $ 1,000,000 | F | 79 | 112 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 491 | $ 2,000,000 | M | 79 | 85 | Lincoln National Life Insurance Company | AA- |
| 492 | $ 2,000,000 | M | 79 | 85 | Lincoln National Life Insurance Company | AA- |
| 493 | $ 5,000,000 | M | 79 | 102 | Lincoln National Life Insurance Company | AA- |
| 494 | $ 300,000 | M | 79 | 65 | Lincoln National Life Insurance Company | AA- |
| 495 | $ 1,000,000 | M | 79 | 104 | Principal Life Insurance Company | A+ |
| 496 | $ 2,000,000 | M | 79 | 90 | Genworth Life Insurance Company | BB- |
| 497 | $ 6,250,000 | M | 79 | 173 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 498 | $ 490,620 | M | 79 | 72 | Ameritas Life Insurance Corporation | A+ |
| 499 | $ 600,000 | M | 79 | 69 | Protective Life Insurance Company | AA- |
| 500 | $ 400,000 | M | 79 | 102 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 501 | $ 730,000 | M | 78 | 86 | Transamerica Life Insurance Company | AA- |
| 502 | $ 5,000,000 | M | 78 | 132 | Pruco Life Insurance Company | AA- |
| 503 | $ 300,000 | M | 78 | 63 | Penn Mutual Life Insurance Company | A+ |
| 504 | $ 500,000 | F | 78 | 138 | Accordia Life and Annuity Company | A- |
| 505 | $ 5,000,000 | M | 78 | 120 | AXA Equitable Life Insurance Company | A+ |
| 506 | $ 1,000,000 | M | 78 | 132 | AXA Equitable Life Insurance Company | A+ |
| 507 | $ 3,000,000 | M | 78 | 81 | Pruco Life Insurance Company | AA- |
| 508 | $ 1,000,000 | M | 78 | 112 | Security Life of Denver Insurance Company | A |
| 509 | $ 3,000,000 | F | 78 | 91 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 510 | $ 5,000,000 | M | 78 | 125 | Massachusetts Mutual Life Insurance Company | AA+ |
| 511 | $ 5,000,000 | M | 78 | 125 | Massachusetts Mutual Life Insurance Company | AA+ |
| 512 | $ 200,000 | F | 78 | 128 | West Coast Life Insurance Company | AA- |
| 513 | $ 1,100,000 | M | 78 | 123 | Accordia Life and Annuity Company | A- |
| 514 | $ 3,000,000 | M | 78 | 88 | Protective Life Insurance Company | AA- |
| 515 | $ 2,000,000 | F | 78 | 103 | Accordia Life and Annuity Company | A- |
| 516 | $ 2,200,000 | F | 78 | 124 | Reliastar Life Insurance Company | A |
| 517 | $10,000,000 | M | 78 | 116 | AXA Equitable Life Insurance Company | A+ |
| 518 | $ 2,500,000 | M | 78 | 124 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 519 | $ 2,500,000 | M | 78 | 124 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 520 | $ 1,000,000 | M | 78 | 88 | Athene Annuity & Life Assurance Company of New York | A- |
| 521 | $ 162,000 | M | 78 | 65 | Metropolitan Life Insurance Company | AA- |
| 522 | $ 1,000,000 | F | 78 | 116 | American General Life Insurance Company | A+ |
| 523 | $ 7,000,000 | F | 78 | 106 | Pacific Life Insurance Company | AA- |
| 524 | $ 854,980 | M | 78 | 92 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 525 | $ 100,946 | F | 78 | 144 | Genworth Life and Annuity Insurance Company | BB- |
| 526 | $ 350,000 | M | 78 | 95 | AXA Equitable Life Insurance Company | A+ |
| 527 | $ 600,000 | M | 78 | 95 | AXA Equitable Life Insurance Company | A+ |

| 528 | $ 1,000,000 | M | 78 | 69 | Pacific Life Insurance Company | AA- |
| 529 | $ 2,000,000 | M | 78 | 103 | Transamerica Life Insurance Company | AA- |

40

| | Face Amount | Gender | Age (ALB)[1] | LE (mo.)[2] | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 530 | $ 200,000 | M | 78 | 101 | Prudential Insurance Company of America | AA- |
| 531 | $ 2,000,000 | F | 78 | 151 | Lincoln National Life Insurance Company | AA- |
| 532 | $ 150,000 | M | 78 | 90 | Genworth Life Insurance Company | BB- |
| 533 | $ 220,000 | M | 78 | 97 | Lincoln National Life Insurance Company | AA- |
| 534 | $ 260,000 | M | 78 | 97 | Lincoln National Life Insurance Company | AA- |
| 535 | $ 1,400,000 | F | 78 | 126 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 536 | $ 2,000,000 | M | 78 | 50 | Athene Annuity & Life Assurance Company | A- |
| 537 | $ 7,097,434 | M | 78 | 141 | Lincoln National Life Insurance Company | AA- |
| 538 | $ 5,000,000 | M | 78 | 47 | West Coast Life Insurance Company | AA- |
| 539 | $ 1,000,000 | M | 77 | 68 | Metropolitan Life Insurance Company | AA- |
| 540 | $ 250,000 | M | 77 | 85 | Lincoln Benefit Life Company | BBB+ |
| 541 | $ 1,000,000 | M | 77 | 111 | Transamerica Life Insurance Company | AA- |
| 542 | $ 750,000 | M | 77 | 98 | Protective Life Insurance Company | AA- |
| 543 | $ 250,000 | M | 77 | 88 | Midland National Life Insurance Company | A+ |
| 544 | $ 100,000 | M | 77 | 105 | Transamerica Life Insurance Company | AA- |
| 545 | $ 3,000,000 | M | 77 | 44 | Accordia Life and Annuity Company | A- |
| 546 | $ 200,000 | M | 77 | 58 | Reliastar Life Insurance Company | A |
| 547 | $ 3,000,000 | F | 77 | 140 | Security Life of Denver Insurance Company | A |
| 548 | $ 200,000 | M | 77 | 57 | Metropolitan Life Insurance Company | AA- |
| 549 | $ 100,000 | M | 77 | 57 | Metropolitan Life Insurance Company | AA- |
| 550 | $ 500,000 | M | 77 | 87 | AXA Equitable Life Insurance Company | A+ |
| 551 | $ 3,000,000 | M | 77 | 98 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 552 | $ 5,000,000 | M | 77 | 98 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 553 | $ 8,000,000 | M | 77 | 84 | Metropolitan Life Insurance Company | AA- |
| 554 | $ 100,000 | M | 77 | 45 | AXA Equitable Life Insurance Company | A+ |
| 555 | $ 1,000,000 | M | 77 | 80 | Transamerica Life Insurance Company | AA- |
| 556 | $ 4,000,000 | F | 77 | 127 | American General Life Insurance Company | A+ |
| 557 | $ 500,000 | M | 77 | 78 | AIG Life Insurance Company | A+ |
| 558 | $ 1,000,000 | M | 77 | 144 | Security Mutual Life Insurance Company of NY | N/A |
| 559 | $ 355,700 | M | 77 | 93 | Security Life of Denver Insurance Company | A |
| 560 | $ 6,500,000 | F | 77 | 61 | General American Life Insurance Company | AA- |
| 561 | $ 5,000,000 | M | 77 | 73 | Lincoln Benefit Life Company | BBB+ |
| 562 | $ 250,000 | M | 77 | 125 | West Coast Life Insurance Company | AA- |
| 563 | $ 750,000 | F | 77 | 69 | Delaware Life Insurance Company | BBB+ |
| 564 | $ 1,500,000 | M | 77 | 58 | Security Life of Denver Insurance Company | A |
| 565 | $ 1,000,000 | M | 77 | 89 | General American Life Insurance Company | AA- |
| 566 | $ 1,000,000 | M | 77 | 102 | Transamerica Life Insurance Company | AA- |
| 567 | $ 2,000,000 | M | 77 | 136 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 568 | $ 7,500,000 | F | 77 | 162 | Security Life of Denver Insurance Company | A |
| 569 | $ 3,000,000 | F | 77 | 97 | General American Life Insurance Company | AA- |
| 570 | $ 300,000 | F | 77 | 122 | Minnesota Life Insurance Company | A+ |
| 571 | $ 600,000 | M | 76 | 59 | United of Omaha Life Insurance Company | AA- |
| 572 | $ 500,000 | M | 76 | 77 | Protective Life Insurance Company | AA- |
| 573 | $ 1,000,000 | M | 76 | 83 | Security Life of Denver Insurance Company | A |
| 574 | $ 3,172,397 | M | 76 | 62 | Pacific Life Insurance Company | AA- |
| 575 | $ 2,000,000 | M | 76 | 96 | Protective Life Insurance Company | AA- |
| 576 | $ 1,500,000 | M | 76 | 96 | Protective Life Insurance Company | AA- |
| 577 | $ 1,000,000 | M | 76 | 88 | Transamerica Life Insurance Company | AA- |
| 578 | $ 1,000,000 | F | 76 | 132 | Companion Life Insurance Company | AA- |

App. 0379

| | Face Amount | Gender | Age (ALB)[1] | LE (mo.)[2] | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 579 | $ 500,000 | M | 76 | 80 | AXA Equitable Life Insurance Company | A+ |
| 580 | $ 500,000 | M | 76 | 94 | United of Omaha Life Insurance Company | AA- |
| 581 | $ 750,000 | M | 76 | 21 | North American Company for Life And Health Insurance | A+ |
| 582 | $ 300,000 | M | 76 | 69 | AIG Life Insurance Company | A+ |
| 583 | $ 8,000,000 | F | 76 | 120 | West Coast Life Insurance Company | AA- |
| 584 | $ 250,000 | F | 76 | 144 | AXA Equitable Life Insurance Company | A+ |
| 585 | $ 300,000 | M | 76 | 29 | Lincoln National Life Insurance Company | AA- |
| 586 | $ 172,245 | F | 76 | 46 | Symetra Life Insurance Company | A |
| 587 | $ 5,004,704 | M | 76 | 123 | American General Life Insurance Company | A+ |
| 588 | $ 2,000,000 | M | 76 | 109 | Pruco Life Insurance Company | AA- |
| 589 | $ 190,000 | M | 76 | 93 | Protective Life Insurance Company | AA- |
| 590 | $ 415,000 | M | 76 | 105 | AIG Life Insurance Company | A+ |
| 591 | $ 100,000 | M | 76 | 140 | Protective Life Insurance Company | AA- |
| 592 | $ 2,000,072 | M | 76 | 156 | American General Life Insurance Company | A+ |
| 593 | $ 5,000,000 | M | 76 | 118 | AIG Life Insurance Company | A+ |
| 594 | $ 4,000,000 | M | 76 | 98 | Security Mutual Life Insurance Company of NY | N/A |
| 595 | $ 89,626 | F | 76 | 107 | Union Central Life Insurance Company | N/A |
| 596 | $ 2,000,000 | M | 76 | 174 | American General Life Insurance Company | A+ |
| 597 | $ 10,000,000 | F | 76 | 123 | Reliastar Life Insurance Company | A |
| 598 | $ 1,000,000 | F | 76 | 139 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 599 | $ 500,000 | M | 76 | 63 | American General Life Insurance Company | A+ |
| 600 | $ 250,000 | M | 76 | 63 | Genworth Life and Annuity Insurance Company | BB- |
| 601 | $ 500,000 | M | 76 | 85 | Delaware Life Insurance Company | BBB+ |
| 602 | $ 667,738 | M | 76 | 74 | MONY Life Insurance Company of America | A+ |
| 603 | $ 100,000 | M | 76 | 132 | Genworth Life Insurance Company | BB- |
| 604 | $ 370,000 | F | 76 | 114 | Minnesota Life Insurance Company | A+ |
| 605 | $ 8,000,000 | M | 75 | 157 | Metropolitan Life Insurance Company | AA- |
| 606 | $ 4,547,770 | F | 75 | 164 | Principal Life Insurance Company | A+ |
| 607 | $ 2,000,000 | M | 75 | 99 | Phoenix Life Insurance Company | BB |
| 608 | $ 500,000 | M | 75 | 30 | Midland National Life Insurance Company | A+ |
| 609 | $ 1,000,000 | M | 75 | 140 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 610 | $ 750,000 | M | 75 | 139 | Lincoln Benefit Life Company | BBB+ |
| 611 | $ 150,000 | M | 75 | 93 | Genworth Life Insurance Company | BB- |
| 612 | $ 184,000 | M | 75 | 104 | Protective Life Insurance Company | AA- |
| 613 | $ 3,000,000 | M | 75 | 64 | AXA Equitable Life Insurance Company | A+ |
| 614 | $ 1,000,000 | M | 75 | 128 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 615 | $ 500,000 | M | 75 | 52 | William Penn Life Insurance Company of New York | AA- |
| 616 | $ 2,500,000 | M | 75 | 94 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 617 | $ 750,000 | M | 75 | 115 | Midland National Life Insurance Company | A+ |
| 618 | $ 500,000 | M | 75 | 124 | Pruco Life Insurance Company | AA- |
| 619 | $ 8,600,000 | M | 75 | 141 | AXA Equitable Life Insurance Company | A+ |
| 620 | $ 100,000 | M | 75 | 33 | Voya Retirement Insurance and Annuity Company | A |
| 621 | $ 3,000,000 | M | 75 | 101 | Transamerica Life Insurance Company | AA- |
| 622 | $ 500,000 | M | 75 | 101 | New York Life Insurance Company | AA+ |
| 623 | $ 500,000 | M | 75 | 101 | New York Life Insurance Company | AA+ |
| 624 | $ 800,000 | M | 75 | 111 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 625 | $ 1,000,000 | M | 75 | 111 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 626 | $ 1,500,000 | M | 75 | 111 | John Hancock Life Insurance Company (U.S.A.) | AA- |

627   $ 1,500,000   M   73   115   Lincoln National Life Insurance Company   XX

42

| | Face Amount | Gender | Age (ALB)[1] | LE (mo.)[2] | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 628 | $ 1,500,000 | M | 75 | 115 | Lincoln National Life Insurance Company | AA- |
| 629 | $ 1,500,000 | M | 75 | 115 | Lincoln National Life Insurance Company | AA- |
| 630 | $ 1,500,000 | M | 75 | 116 | American General Life Insurance Company | A+ |
| 631 | $ 1,500,000 | M | 75 | 116 | American General Life Insurance Company | A+ |
| 632 | $ 2,500,000 | M | 75 | 126 | Banner Life Insurance Company | AA- |
| 633 | $ 400,000 | M | 75 | 71 | Protective Life Insurance Company | AA- |
| 634 | $10,000,000 | M | 75 | 133 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 635 | $ 1,784,686 | M | 75 | 143 | Transamerica Life Insurance Company | AA- |
| 636 | $ 250,000 | F | 75 | 160 | Protective Life Insurance Company | AA- |
| 637 | $ 500,000 | M | 74 | 112 | Ameritas Life Insurance Corporation | A+ |
| 638 | $ 370,000 | M | 74 | 112 | Ameritas Life Insurance Corporation | A+ |
| 639 | $ 1,150,000 | M | 74 | 56 | Penn Mutual Life Insurance Company | A+ |
| 640 | $ 750,000 | M | 74 | 120 | Security Life of Denver Insurance Company | A |
| 641 | $ 1,000,000 | F | 74 | 109 | United of Omaha Life Insurance Company | AA- |
| 642 | $ 500,000 | M | 74 | 87 | Lincoln National Life Insurance Company | AA- |
| 643 | $ 1,841,877 | M | 74 | 110 | Metropolitan Life Insurance Company | AA- |
| 644 | $ 500,000 | M | 74 | 96 | William Penn Life Insurance Company of New York | AA- |
| 645 | $ 500,000 | M | 74 | 143 | Protective Life Insurance Company | AA- |
| 646 | $ 100,000 | M | 74 | 100 | Protective Life Insurance Company | AA- |
| 647 | $ 500,000 | M | 74 | 118 | Metropolitan Life Insurance Company | AA- |
| 648 | $ 2,000,000 | M | 74 | 110 | Voya Retirement Insurance and Annuity Company | A |
| 649 | $ 1,500,000 | M | 74 | 110 | Voya Retirement Insurance and Annuity Company | A |
| 650 | $ 1,000,000 | M | 74 | 96 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 651 | $ 500,000 | M | 74 | 70 | Phoenix Life Insurance Company | BB |
| 652 | $ 300,000 | M | 74 | 105 | Protective Life Insurance Company | AA- |
| 653 | $ 485,000 | M | 74 | 142 | Metropolitan Life Insurance Company | AA- |
| 654 | $ 250,000 | M | 74 | 59 | American General Life Insurance Company | A+ |
| 655 | $ 2,500,000 | M | 74 | 95 | American General Life Insurance Company | A+ |
| 656 | $ 100,000 | M | 74 | 93 | Transamerica Life Insurance Company | AA- |
| 657 | $ 2,000,000 | M | 74 | 121 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 658 | $ 800,000 | M | 74 | 75 | Commonwealth Annuity and Life Insurance Company | A- |
| 659 | $ 267,988 | M | 74 | 44 | Minnesota Life Insurance Company | A+ |
| 660 | $ 500,000 | M | 74 | 116 | Protective Life Insurance Company | AA- |
| 661 | $ 300,000 | M | 74 | 101 | New England Life Insurance Company | A+ |
| 662 | $ 1,167,000 | M | 74 | 42 | Transamerica Life Insurance Company | AA- |
| 663 | $ 3,042,627 | M | 74 | 100 | Massachusetts Mutual Life Insurance Company | AA+ |
| 664 | $ 450,000 | M | 74 | 107 | Jackson National Life Insurance Company | AA |
| 665 | $ 1,500,000 | M | 74 | 100 | Metropolitan Life Insurance Company | AA- |
| 666 | $ 1,000,000 | F | 74 | 133 | Reliastar Life Insurance Company | A |
| 667 | $10,000,000 | M | 74 | 108 | AXA Equitable Life Insurance Company | A+ |
| 668 | $ 1,000,000 | M | 73 | 119 | AIG Life Insurance Company | A+ |
| 669 | $ 2,500,000 | M | 73 | 43 | Transamerica Life Insurance Company | AA- |
| 670 | $10,000,000 | F | 73 | 197 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 671 | $ 400,000 | M | 73 | 184 | Protective Life Insurance Company | AA- |
| 672 | $ 1,000,000 | M | 73 | 93 | Accordia Life and Annuity Company | A- |
| 673 | $ 3,000,000 | M | 73 | 149 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 674 | $ 2,141,356 | M | 73 | 91 | New York Life Insurance Company | AA+ |
| 675 | $ 2,000,000 | M | 73 | 91 | New York Life Insurance Company | AA+ |

676   $ 5,000,000   M   73   119   John Hancock Life Insurance Company (U.S.A.)   SA

43

| | Face Amount | Gender | Age (ALB)[1] | LE (mo.)[2] | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 677 | $ 250,000 | F | 73 | 98 | Protective Life Insurance Company | AA- |
| 678 | $ 2,500,000 | M | 73 | 105 | Lincoln National Life Insurance Company | AA- |
| 679 | $ 2,500,000 | M | 73 | 105 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 680 | $ 390,025 | M | 73 | 135 | Genworth Life and Annuity Insurance Company | BB- |
| 681 | $ 1,350,000 | M | 73 | 90 | Lincoln National Life Insurance Company | AA- |
| 682 | $ 230,000 | M | 73 | 107 | Transamerica Life Insurance Company | AA- |
| 683 | $ 139,398 | F | 73 | 17 | Lincoln National Life Insurance Company | AA- |
| 684 | $ 500,000 | M | 73 | 27 | North American Company for Life and Health Insurance | A+ |
| 685 | $ 600,000 | M | 73 | 27 | West Coast Life Insurance Company | AA- |
| 686 | $ 2,400,000 | M | 73 | 82 | Transamerica Life Insurance Company | AA- |
| 687 | $ 190,000 | F | 73 | 180 | Protective Life Insurance Company | AA- |
| 688 | $ 420,000 | M | 73 | 121 | Protective Life Insurance Company | AA- |
| 689 | $ 250,000 | M | 73 | 73 | U.S. Financial Life Insurance Company | N/A |
| 690 | $ 160,000 | M | 73 | 83 | RiverSource Life Insurance Company | AA- |
| 691 | $ 75,000 | F | 73 | 92 | American General Life Insurance Company | A+ |
| 692 | $ 600,000 | M | 73 | 76 | AXA Equitable Life Insurance Company | A+ |
| 693 | $ 4,000,000 | M | 73 | 131 | MONY Life Insurance Company of America | A+ |
| 694 | $ 1,000,000 | F | 73 | 148 | American General Life Insurance Company | A+ |
| 695 | $ 3,500,000 | M | 73 | 148 | Ameritas Life Insurance Corporation | A+ |
| 696 | $ 1,500,000 | M | 73 | 148 | Ameritas Life Insurance Corporation | A+ |
| 697 | $ 420,000 | M | 73 | 112 | RiverSource Life Insurance Company | AA- |
| 698 | $ 100,000 | M | 73 | 126 | Protective Life Insurance Company | AA- |
| 699 | $ 4,000,000 | M | 73 | 136 | AXA Equitable Life Insurance Company | A+ |
| 700 | $ 250,000 | M | 72 | 43 | Protective Life Insurance Company | AA- |
| 701 | $ 650,000 | F | 72 | 63 | Security Life of Denver Insurance Company | A |
| 702 | $ 500,000 | M | 72 | 110 | Ohio National Life Assurance Corporation | A+ |
| 703 | $ 232,000 | M | 72 | 168 | Protective Life Insurance Company | AA- |
| 704 | $ 185,000 | M | 72 | 121 | Genworth Life and Annuity Insurance Company | BB- |
| 705 | $ 315,577 | F | 72 | 133 | Lincoln National Life Insurance Company | AA- |
| 706 | $ 750,000 | M | 72 | 115 | Transamerica Life Insurance Company | AA- |
| 707 | $ 6,000,000 | M | 72 | 183 | AXA Equitable Life Insurance Company | A+ |
| 708 | $ 1,250,000 | M | 72 | 90 | West Coast Life Insurance Company | AA- |
| 709 | $ 5,000,000 | M | 72 | 169 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 710 | $ 1,500,000 | F | 72 | 142 | Pruco Life Insurance Company | AA- |
| 711 | $ 1,000,000 | M | 72 | 147 | Nationwide Life and Annuity Insurance Company | A+ |
| 712 | $ 5,000,000 | M | 72 | 81 | Transamerica Life Insurance Company | AA- |
| 713 | $ 500,000 | M | 72 | 84 | Transamerica Life Insurance Company | AA- |
| 714 | $ 500,000 | M | 72 | 84 | North American Company for Life And Health Insurance | A+ |
| 715 | $10,000,000 | M | 72 | 157 | Principal Life Insurance Company | A+ |
| 716 | $ 300,000 | M | 72 | 184 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 717 | $ 250,000 | M | 72 | 90 | Massachusetts Mutual Life Insurance Company | AA+ |
| 718 | $ 314,000 | M | 72 | 128 | Genworth Life Insurance Company | BB- |
| 719 | $ 250,000 | M | 72 | 128 | Genworth Life Insurance Company | BB- |
| 720 | $ 150,000 | M | 72 | 27 | Protective Life Insurance Company | AA- |
| 721 | $ 150,000 | M | 72 | 27 | AXA Equitable Life Insurance Company | A+ |
| 722 | $ 1,000,000 | M | 72 | 46 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 723 | $ 5,000,000 | M | 72 | 104 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 724 | $ 5,000,000 | M | 72 | 104 | John Hancock Life Insurance Company (U.S.A.) | AA- |

725   $   202,700      M      72      107   Farmers New World Life Insurance Company      N/A

44

| | Face Amount | Gender | Age (ALB)[1] | LE (mo.)[2] | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 726 | $ 5,000,000 | M | 72 | 141 | Metropolitan Life Insurance Company | AA- |
| 727 | $ 385,741 | M | 71 | 90 | Security Life of Denver Insurance Company | A |
| 728 | $ 250,000 | F | 71 | 111 | Ohio National Life Assurance Corporation | A+ |
| 729 | $ 57,500 | M | 71 | 84 | Lincoln National Life Insurance Company | AA- |
| 730 | $ 650,000 | M | 71 | 125 | Protective Life Insurance Company | AA- |
| 731 | $ 1,000,000 | M | 71 | 159 | Protective Life Insurance Company | AA- |
| 732 | $ 2,000,000 | M | 71 | 161 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 733 | $ 1,000,000 | M | 71 | 146 | Transamerica Life Insurance Company | AA- |
| 734 | $ 400,000 | M | 71 | 150 | Lincoln National Life Insurance Company | AA- |
| 735 | $ 100,000 | M | 71 | 91 | Massachusetts Mutual Life Insurance Company | AA+ |
| 736 | $ 5,000,000 | M | 71 | 123 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 737 | $ 4,000,000 | M | 71 | 123 | AXA Equitable Life Insurance Company | A+ |
| 738 | $ 92,000 | F | 71 | 188 | Protective Life Insurance Company | AA- |
| 739 | $ 2,000,000 | M | 71 | 149 | Hartford Life and Annuity Insurance Company | BBB+ |
| 740 | $ 1,000,000 | M | 71 | 87 | Protective Life Insurance Company | AA- |
| 741 | $ 800,000 | M | 71 | 109 | National Life Insurance Company | A+ |
| 742 | $ 175,000 | F | 71 | 101 | Lincoln National Life Insurance Company | AA- |
| 743 | $ 1,500,000 | M | 71 | 63 | Lincoln National Life Insurance Company | AA- |
| 744 | $ 500,000 | M | 71 | 151 | Protective Life Insurance Company | AA- |
| 745 | $ 250,000 | M | 71 | 173 | Lincoln National Life Insurance Company | AA- |
| 746 | $ 1,500,000 | M | 71 | 96 | Midland National Life Insurance Company | A+ |
| 747 | $ 500,000 | M | 71 | 101 | Lincoln Benefit Life Company | BBB+ |
| 748 | $ 700,000 | M | 71 | 107 | Massachusetts Mutual Life Insurance Company | AA+ |
| 749 | $ 500,000 | M | 71 | 150 | Lincoln National Life Insurance Company | AA- |
| 750 | $ 750,000 | M | 71 | 140 | USAA Life Insurance Company | AA+ |
| 751 | $ 3,000,000 | M | 70 | 144 | Guardian Life Insurance Company of America | AA+ |
| 752 | $ 750,000 | M | 70 | 124 | North American Company for Life And Health Insurance | A+ |
| 753 | $ 100,000 | F | 70 | 154 | North American Company for Life and Health Insurance | A+ |
| 754 | $ 300,000 | M | 70 | 98 | Farmers New World Life Insurance Company | N/A |
| 755 | $ 1,532,043 | M | 70 | 142 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 756 | $ 1,000,000 | M | 70 | 176 | AXA Equitable Life Insurance Company | A+ |
| 757 | $ 1,200,000 | M | 70 | 116 | Massachusetts Mutual Life Insurance Company | AA+ |
| 758 | $ 2,500,000 | M | 70 | 150 | Pruco Life Insurance Company | AA- |
| 759 | $ 2,500,000 | M | 70 | 150 | Pruco Life Insurance Company | AA- |
| 760 | $ 1,000,000 | M | 70 | 78 | AXA Equitable Life Insurance Company | A+ |
| 761 | $ 4,000,000 | M | 70 | 123 | MetLife Insurance Company USA | A+ |
| 762 | $ 500,000 | M | 70 | 36 | Voya Retirement Insurance and Annuity Company | A |
| 763 | $ 1,000,000 | M | 70 | 78 | Protective Life Insurance Company | AA- |
| 764 | $ 200,000 | M | 70 | 169 | Protective Life Insurance Company | AA- |
| 765 | $ 2,000,000 | M | 70 | 104 | Transamerica Life Insurance Company | AA- |
| 766 | $ 1,000,000 | M | 70 | 104 | Genworth Life Insurance Company | BB- |
| 767 | $ 250,000 | F | 70 | 147 | Protective Life Insurance Company | AA- |
| 768 | $13,250,000 | M | 70 | 196 | TIAA-CREF Life Insurance Company | AA+ |
| 769 | $ 1,000,000 | M | 70 | 152 | Accordia Life and Annuity Company | A- |
| 770 | $ 500,000 | M | 70 | 110 | Lincoln National Life Insurance Company | AA- |
| 771 | $ 1,000,000 | M | 70 | 54 | Protective Life Insurance Company | AA- |
| 772 | $ 1,000,000 | M | 70 | 121 | Transamerica Life Insurance Company | AA- |
| 773 | $ 1,000,000 | M | 70 | 121 | Protective Life Insurance Company | AA- |

45

| | Face Amount | Gender | Age (ALB)[1] | LE (mo.)[2] | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 775 | $ 2,000,000 | M | 70 | 72 | Metropolitan Life Insurance Company | AA- |
| 776 | $ 2,000,000 | M | 70 | 72 | Metropolitan Life Insurance Company | AA- |
| 777 | $ 1,000,000 | M | 70 | 142 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 778 | $ 400,000 | F | 70 | 131 | AXA Equitable Life Insurance Company | A+ |
| 779 | $ 500,000 | M | 70 | 139 | United of Omaha Life Insurance Company | AA- |
| 780 | $ 1,000,000 | M | 70 | 139 | Lincoln Benefit Life Company | BBB+ |
| 781 | $ 300,000 | M | 70 | 84 | Protective Life Insurance Company | AA- |
| 782 | $ 1,000,000 | M | 69 | 37 | AXA Equitable Life Insurance Company | A+ |
| 783 | $ 250,000 | M | 69 | 139 | State Farm Life Insurance Company | AA |
| 784 | $ 200,000 | M | 69 | 139 | State Farm Life Insurance Company | AA |
| 785 | $ 1,000,000 | M | 69 | 128 | Transamerica Life Insurance Company | AA- |
| 786 | $ 1,000,000 | M | 69 | 150 | Lincoln National Life Insurance Company | AA- |
| 787 | $ 250,000 | F | 69 | 65 | Transamerica Life Insurance Company | AA- |
| 788 | $ 3,000,000 | M | 69 | 138 | Genworth Life Insurance Company | BB- |
| 789 | $ 1,200,000 | M | 69 | 138 | Genworth Life Insurance Company | BB- |
| 790 | $ 750,000 | M | 69 | 151 | Northwestern Mutual Life Insurance Company | AA+ |
| 791 | $ 300,000 | M | 69 | 93 | Lincoln National Life Insurance Company | AA- |
| 792 | $ 2,000,000 | M | 69 | 162 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 793 | $ 150,000 | M | 69 | 108 | Protective Life Insurance Company | AA- |
| 794 | $ 3,000,000 | M | 69 | 136 | Transamerica Life Insurance Company | AA- |
| 795 | $ 600,000 | M | 69 | 78 | William Penn Life Insurance Company of New York | AA- |
| 796 | $ 219,686 | M | 69 | 86 | Sunset Life Insurance Company of America | N/A |
| 797 | $ 100,000 | M | 69 | 113 | Phoenix Life Insurance Company | BB |
| 798 | $ 5,616,468 | M | 69 | 172 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 799 | $ 4,383,532 | M | 69 | 172 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 800 | $ 560,000 | M | 69 | 106 | AXA Equitable Life Insurance Company | A+ |
| 801 | $ 1,100,000 | M | 69 | 144 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 802 | $ 3,000,000 | M | 69 | 182 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 803 | $ 400,000 | M | 68 | 180 | Lincoln National Life Insurance Company | AA- |
| 804 | $ 3,000,000 | M | 68 | 92 | Reliastar Life Insurance Company | A |
| 805 | $ 2,000,000 | M | 68 | 92 | AXA Equitable Life Insurance Company | A+ |
| 806 | $ 2,000,000 | M | 68 | 92 | AXA Equitable Life Insurance Company | A+ |
| 807 | $ 1,000,000 | M | 68 | 42 | Lincoln National Life Insurance Company | AA- |
| 808 | $ 1,000,000 | M | 68 | 86 | Transamerica Life Insurance Company | AA- |
| 809 | $ 350,000 | F | 68 | 77 | Assurity Life Insurance Company | N/A |
| 810 | $ 5,000,000 | M | 68 | 95 | Athene Annuity & Life Assurance Company | A- |
| 811 | $ 1,000,000 | M | 68 | 138 | Sun Life Assurance Company of Canada (U.S.) | AA- |
| 812 | $ 900,000 | M | 68 | 170 | American General Life Insurance Company | A+ |
| 813 | $ 846,510 | M | 68 | 119 | Lincoln National Life Insurance Company | AA- |
| 814 | $ 846,210 | M | 68 | 119 | Lincoln National Life Insurance Company | AA- |
| 815 | $ 5,000,000 | M | 68 | 111 | Lincoln National Life Insurance Company | AA- |
| 816 | $ 229,725 | F | 68 | 97 | Hartford Life and Annuity Insurance Company | BBB+ |
| 817 | $ 492,547 | M | 68 | 88 | AXA Equitable Life Insurance Company | A+ |
| 818 | $ 105,798 | F | 68 | 124 | Lincoln Benefit Life Company | BBB+ |
| 819 | $ 67,602 | F | 68 | 124 | Allstate Life Insurance Company of New York | A+ |
| 820 | $ 320,581 | M | 68 | 19 | American General Life Insurance Company | A+ |
| 821 | $ 1,000,000 | M | 68 | 79 | The Savings Bank Life Insurance Company of Massachusetts | A- |
| 822 | $ 320,000 | M | 68 | 151 | Transamerica Life Insurance Company | AA- |

App. 0388

823   $   250,000   M   08   153   Pruco Life Insurance Company   SA

46

| | Face Amount | Gender | Age (ALB)[1] | LE (mo.)[2] | Insurance Company | S&P Rating |
|---|---|---|---|---|---|---|
| 824 | $ 250,000 | M | 68 | 188 | Zurich Life Insurance Company | A |
| 825 | $ 650,000 | M | 68 | 175 | Lincoln National Life Insurance Company | AA- |
| 826 | $ 750,000 | M | 67 | 76 | Massachusetts Mutual Life Insurance Company | AA+ |
| 827 | $ 1,000,000 | M | 67 | 105 | Prudential Insurance Company of America | AA- |
| 828 | $ 400,000 | M | 67 | 122 | Jackson National Life Insurance Company | AA |
| 829 | $ 1,500,000 | M | 67 | 144 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 830 | $ 500,000 | F | 67 | 161 | Banner Life Insurance Company | AA- |
| 831 | $ 350,000 | M | 67 | 89 | RiverSource Life Insurance Company | AA- |
| 832 | $ 250,000 | M | 67 | 152 | AIG Life Insurance Company | A+ |
| 833 | $ 989,361 | M | 67 | 140 | General American Life Insurance Company | AA- |
| 834 | $ 200,000 | M | 67 | 153 | Prudential Insurance Company of America | AA- |
| 835 | $ 200,000 | M | 67 | 153 | Prudential Insurance Company of America | AA- |
| 836 | $ 750,000 | M | 67 | 119 | Pacific Life Insurance Company | AA- |
| 837 | $ 500,000 | F | 67 | 122 | AIG Life Insurance Company | A+ |
| 838 | $ 500,000 | M | 66 | 140 | Protective Life Insurance Company | AA- |
| 839 | $ 250,000 | M | 66 | 138 | Conseco Life Insurance Company | N/A |
| 840 | $ 2,000,000 | F | 66 | 165 | Metropolitan Life Insurance Company | AA- |
| 841 | $ 250,000 | F | 66 | 168 | Principal Life Insurance Company | A+ |
| 842 | $ 500,000 | M | 66 | 67 | Transamerica Life Insurance Company | AA- |
| 843 | $ 265,000 | M | 66 | 149 | Protective Life Insurance Company | AA- |
| 844 | $ 350,000 | M | 66 | 113 | Hartford Life and Annuity Insurance Company | BBB+ |
| 845 | $ 3,500,000 | M | 66 | 189 | Prudential Insurance Company of America | AA- |
| 846 | $ 250,000 | M | 66 | 110 | Transamerica Life Insurance Company | AA- |
| 847 | $ 10,000,000 | M | 66 | 56 | Lincoln National Life Insurance Company | AA- |
| 848 | $ 540,000 | M | 66 | 162 | West Coast Life Insurance Company | AA- |
| 849 | $ 1,000,000 | M | 65 | 172 | John Hancock Life Insurance Company (U.S.A.) | AA- |
| 850 | $ 150,000 | M | 60 | 88 | Jackson National Life Insurance Company | AA |
| | **$ 1,622,627,412** | | | | | |

(1)   Age Last Birthday - the insured's age is current as of the measurement date.

(2)   The insured's life expectancy estimate, other than for a small face value insurance policy (i.e., a policy with $1 million in face value benefits or less), is the average of two life expectancy estimates provided by independent third-party medical-actuarial underwriting firms at the time of purchase, actuarially adjusted through the measurement date. Numbers in this column represent months.

## Competition

We encounter significant competition from numerous companies in the life insurance secondary market, including hedge funds, investment banks, secured lenders, specialty life insurance finance companies and life insurance companies. Many of these competitors have greater financial and other resources than we do and may have significantly lower cost of funds because they have greater access to insured deposits or the capital markets. Moreover, some of these competitors have significant cash reserves and can better fund shortfalls in collections that might have a more pronounced impact on companies such as ours. They may also have greater market share. In the event that better-financed life insurance companies make a significant effort to compete against our business or the secondary market in general, we would experience significant challenges with our business model.

Competition can take many forms, including the pricing of the financing, transaction structuring, timeliness and responsiveness in processing a seller's application, and customer service. Some competitors may outperform us in these areas. Some competitors target the same type of life insurance clients as we do and generally have operated in the markets we service for a longer period of time. Increased competition may result

in increased costs of purchasing policies or may affect the availability and quality of policies that are available for our purchase. These factors could adversely affect our profitability by reducing our return on investment or increasing our risk.

---

47

As we enter new markets, we expect to experience significant competition from incumbent market participants. Our ability to compete in these markets will be dependent upon our ability to deliver value-added products and services to the customers we serve. Even still, our competitors in these markets may have greater financial, market share and other resources than we do. These factors could adversely affect our profitability by reducing our return on investment or increasing our risk as we enter these markets.

**Government Regulation**

Our business is highly regulated at the state level with respect to life insurance assets, and at the federal level with respect to the issuance of securities. At the state level, states generally subject us to laws and regulations requiring us to obtain specific licenses or approvals to purchase or issue life insurance policies in those states. State statutes typically provide state regulatory agencies with significant powers to interpret, administer and enforce the laws relating to the life insurance industry. Under this authority, state regulators have broad discretionary power and may impose new licensing and other requirements, and interpret or enforce existing regulatory requirements in new and different ways. Any of these new requirements, interpretations or enforcement directives could be adverse to our industry, even in a material way. Furthermore, because the life insurance secondary market is relatively new and because of the history of certain abuses in the industry, we believe it is likely that state regulation will increase and grow more complex in the foreseeable future. We cannot, however, predict what any new regulation would specifically involve or how it might affect our industry or our business.

State regulation more generally affecting life insurance assets (and not necessarily directed at the life insurance secondary market itself) may also affect our industry and business in negative ways. For example, we are aware of recent legislative efforts in some states to mandate the sale or liquidation of life insurance policies as a precondition to eligibility for health care under the Patient Protection and Affordable Care Act. These kinds of laws, if passed, may adversely affect the number of life insurance policies available for purchase.

Although the federal laws and regulations do not directly affect life insurance, in some cases the purchase of a variable life insurance policy may constitute a transaction involving a "security" that is governed by federal securities laws. While we presently hold few variable life insurance policies, our holding of a significant amount of such policies in the future could cause our company or one of our subsidiaries to be characterized as an "investment company" under the federal Investment Company Act of 1940. The application of that law to all or part of our businesses — whether due to our purchase of life insurance policies or to the expansion of the definition of "securities" under federal securities laws — could require us to comply with detailed and complex regulatory requirements, and cause us to fall out of compliance with certain covenants under our senior credit facility. Such an outcome could negatively affect our liquidity and increase our cost of capital and operational expenses, all of which would adversely affect our operating results. It is possible that such an outcome could even threaten the viability of our business and our ability to satisfy our obligations as they come due.

We hold licenses to purchase life insurance policies in 37 states and can also purchase in the eight unregulated states. At times, we may work with licensed entities to purchase a policy in a state where we are not licensed.

**Health Insurance Portability and Accountability Act (HIPAA)**

HIPAA requires that holders of medical records maintain such records and implement procedures designed to assure the privacy of patient records. In order to carry out our business, we receive medical records and obtain a release to share such records with a defined group of persons, take on the responsibility for preserving the privacy of that information, and use the information only for purposes related to the life insurance policies we own.

**The Genetic Information Nondiscrimination Act of 2008 (GINA)**

GINA is a federal law that protects people from genetic discrimination in health insurance and employment. GINA prohibits health insurers from: (i) requesting, requiring, or using genetic information to make decisions about eligibility for health insurance; or (ii) making decisions on the health insurance premium, contribution amounts, or coverage terms they offer to consumers. This means it is against the law for health insurance companies to use a genetic test result or family health history to deny health insurance, or to decide how much to charge for health insurance. In addition, GINA makes it against the law for health insurers to consider family history or a genetic test result, a pre-existing condition, require a genetic test, or use any genetic information, to discriminate coverage, even if the health insurance company did not mean to collect such genetic information.

App. 0392

GINA does not apply to the life insurance, long-term care or annuity industries. The life insurance, long-term care or annuity industries are founded on medical-evidenced underwriting principles in which specific medical conditions are taken into account when assessing and pricing risk. The regulation of genomic data is relatively new, and we believe it is likely that regulation will increase and grow more complex in the foreseeable future. We cannot, however, predict what any new law or regulation would specifically involve or how it might affect our industry, our business, or our future plans.

**Employees**

We employ approximately 76 employees.

**Properties**

Our principal executive offices are located at 220 South Sixth Street, Suite 1200, Minneapolis, Minnesota 55402. At that location, we lease 17,687 square feet of space for a lease term expiring in 2025. We believe that these facilities are adequate for our current needs and that suitable additional space will be available as needed.

**Company Website Access and SEC Filings**

Our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and amendments to reports filed pursuant to Sections 13(a) and 15(d) of the Securities Exchange Act of 1934 are filed with the SEC. We are subject to the informational requirements of the Securities Exchange Act of 1934 and file or furnish reports, proxy statements and other information with the SEC.

Our general website address is *www.gwgh.com*. Our website has a wealth of information about our company, its mission, and our specialty finance business. Our website also has tools that could be used by our potential clients, financial advisors and investors alike.

App. 0394

**DESCRIPTION OF THE L BONDS**

**General**

The L Bonds are secured obligations of GWG Holdings. The L Bonds will be issued under the amended and restated indenture between us and Bank of Utah as the indenture trustee, dated October 23, 2017, which amends and restates the original indenture dated October 19, 2011 and as may be amended or supplemented from time to time (referred to herein as the "indenture"). The terms and conditions of the L Bonds include those stated in the indenture and those made part of the indenture by reference to the Trust Indenture Act of 1939. The following is a summary of the material provisions of the indenture. For a complete understanding of the L Bonds, you should review the definitive terms and conditions contained in the indenture, which include definitions of certain terms used below. A copy of the indenture has been filed with the SEC as an exhibit to the registration statement of which this prospectus is a part, and is available from us at no charge upon request.

The following is a summary of the material terms associated with the L Bonds:

- The L Bonds are general secured obligations of GWG Holdings. The obligations are secured by a grant of a security interest in all of the assets of GWG Holdings, which assets will serve as collateral for our obligations under the L Bonds. This grant of a security interest is effected pursuant to a pledge and security agreement attached to the indenture.

- The L Bonds are fully and unconditionally guaranteed by our wholly owned direct subsidiary, GWG Life, but otherwise are not guaranteed by any other person or entity. The guarantee is backed by a grant of a security interest in all of the assets of GWG Life, which assets will serve as additional collateral for our obligations under the L Bonds. Chief among these assets is GWG Life's ownership interest in DLP IV. This guarantee is effected pursuant to provisions contained in the indenture.

- The L Bonds are also secured by a pledge of the equity ownership interests in GWG Holdings beneficially owned by its principal stockholders — Jon R. Sabes and Steven F. Sabes — which pledge is effected pursuant to a pledge and security agreement attached to the indenture.

- Through DLP IV, we are party to a $172.3 million senior credit facility with LNV/CLMG. The amount outstanding under this facility was $212.5 million at September 30, 2017 and $162.7 million at December 31, 2016. The L Bonds will also be junior to any other senior lending facility we may later obtain.

- The L Bonds are not savings accounts, certificates of deposit (CDs) or other forms of "deposits," and are not insured by the FDIC or any other governmental agency.

- The L Bonds are not directly secured by any life insurance assets not owned by GWG Life. Substantially all of our life insurance assets are held by DLP IV. Although GWG Life's equity ownership interest in DLP IV is an asset in which GWG Life has, pursuant to its guarantee, granted a security interest to serve as collateral for obligations under the L Bonds, the payment on such equity interest will be subordinate to the interests of creditors of DLP IV, including our senior creditor LNV/CLMG.

- The L Bonds do not have the benefit of a "sinking fund" for the retirement of principal.

- The L Bonds are not convertible into our capital stock or other securities.

- We have the option to call and redeem the entire outstanding principal balance and accrued but unpaid interest of any L Bonds at any time and without premium or penalty. If we elect to call and redeem your L Bonds, those redeemed L Bonds will cease to accrue interest after the redemption date under the terms and subject to the conditions of the indenture.

- Except in limited circumstances (death, bankruptcy or total permanent disability), L Bond holders will have no right to require us to redeem any L Bond prior to its maturity date. Any early redemption will be for the total outstanding principal balance and accrued but unpaid interest. If we in our sole discretion nonetheless elect to accommodate a redemption request, we will redeem the entire (but not less than the entire) outstanding principal balance and accrued but unpaid interest of the L Bonds and may impose a redemption fee of 6% against the outstanding principal balance of the L Bond redeemed. This fee will be subtracted from the amount paid to you.

50

App. 0395

The L Bonds will be represented by "Units," with each whole Unit representing $1,000 in principal amount (USD) of L Bonds. Accordingly, L Bond Units will be sold at 100% of their principal face amount. Throughout this prospectus, we refer to L Bond Units simply as "L Bonds." The minimum investment amount in the L Bonds will be 25 Units, or $25,000. Above that minimum amount, L Bonds may be purchased in whole Units. Subject to the minimum investment amount, you may select the principal amount and term of the L Bonds (ranging from two to seven years) you would like to purchase when you subscribe. The interest rate of your L Bonds will remain fixed until maturity. Depending on our capital requirements, we may not, however, always offer L Bonds with the particular terms you seek. See "Description of the L Bonds — Interest Rate and Maturity" below.

Upon acceptance of your subscription, we will create an account in a book-entry registration and transfer system for you, and credit the principal amount of your subscription to your account. We will also send you a purchase confirmation that will indicate our acceptance of your subscription. If your subscription is rejected, all funds deposited will be promptly returned to you without any interest. See "— Registration and Exchange" below. Alternatively, you may subscribe for L Bonds as a direct participant with Depository Trust Company (DTC settlement). See "Plan of Distribution — Settlement Procedures" for more information.

Investors whose subscriptions for L Bonds have been accepted and anyone who subsequently acquires L Bonds in a qualified transfer are referred to as "holders" or "registered holders" in this prospectus. We may modify or supplement the terms of the L Bonds described in this prospectus from time to time in a supplement to the indenture and a supplement to this prospectus. Except as set forth under "— Amendment, Supplement and Waiver" below, any modification or amendment will not affect L Bonds outstanding at the time of such modification or amendment.

The L Bonds are transferable pursuant to the terms of the indenture. The L Bonds may be transferred or exchanged for other L Bonds of the same series and class of a like aggregate principal amount (i.e., the same number of Units) subject to limitations contained in the indenture. We will not charge a fee for any registration, transfer or exchange of L Bonds. However, we may require the holder to pay any tax, assessment fee, or other governmental charge required in connection with any registration, transfer or exchange of L Bonds. The registered holder of any L Bonds will be treated as the owner of such L Bond Units for all purposes.

**Denomination**

You may purchase L Bonds in the minimum amount of 25 Units, representing a minimum principal amount of $25,000, and in any whole Unit amounts in excess thereof. You will determine the exact number of L Bond Units you purchase when you subscribe. You may not cumulate multiple purchases L Bond Units in amounts less than 25 Units to satisfy the 25 Unit minimum requirement. In our discretion, however, we may waive the 25 Unit minimum purchase requirement for any investor.

**Term**

We may offer L Bonds with the following terms to maturity: two years, three years, five years, and seven years.

You will select the term of the L Bonds you purchase when you subscribe. You may purchase multiple L Bonds with different terms by filling in investment amounts for more than one term on your Subscription Agreement. Nevertheless, during this offering we may not always offer L Bonds with each of the maturity terms outlined above.

The actual maturity date will be on the last day of the month in which the L Bond matures (i.e., the month in which the L Bond's term ends). For example, if you select a two-year term and your L Bond becomes effective on January 1, 2018, then the actual maturity date will be January 31, 2020. After actual maturity, we will pay all outstanding principal and accrued but unpaid interest on the L Bond no later than the fifth day of the calendar month next following its maturity (or the first business day following the fifth day of such month). So, in the case of an L Bond with a maturity date of January 31, 2020, actual payment will be made on or prior to February 5, 2020 (unless such date is not a business day, in which case actual payment will be made on the next business day). The L Bonds do not earn interest after the maturity date or any date set for prepayment.

Should the original L Bond holder (x) no longer be the holder of the L Bond or (y) be unavailable, or a change in payee be necessary, such as in the case of a surviving estate, we may require a copy of the executed assignment to any transferee, or an order from a court or probate commission, as the case may be, in order that we know the principal is returned to the rightful party.

App. 0396

App. 0397

**Interest Rate**

The rate of interest we will offer to pay on L Bonds at any particular time will vary based upon market conditions, and will be determined by the term to maturity of the L Bonds, our capital requirements and other factors described below. The interest rate on particular L Bonds will be determined at the time of subscription or renewal and then remain fixed for the original or renewal term of the L Bond. We will establish and may change the interest rates payable for L Bonds of various terms and at various investment levels in an interest rate supplement to this prospectus.

We may offer L Bonds that earn incrementally higher interest rates when, at the time they are purchased or renewed, the aggregate principal amount of the L Bond portfolio of the holder increases. If applicable, the interest rates payable at each level of investment will be set forth in an interest rate supplement to this prospectus. We may change the interest rate for any or all maturities to reflect market conditions at any time by supplementing this prospectus. If we change the interest rates, the interest rate on L Bonds issued before the date of the change will not be affected.

**Payments on the L Bonds; Paying Agent and Registrar**

Investors will have the opportunity to select whether interest on their L Bonds will be paid monthly or annually. For investors using direct settlement with the Company, this selection opportunity will be presented in the Subscription Agreement.

Interest will accrue on the L Bonds at the stated rate from and including the effective date of the L Bond until maturity. The effective date of an L Bond will be as follows:

- If you purchase an L Bond through DTC settlement, the effective date of your L Bond purchase will be the date your subscription is accepted by the Company.

- If you purchase an L Bond through direct settlement with the Company, the effective date of your L Bond purchase will be the following, as applicable: (i) in cases where you pay for your bond via wire transfer directly to us, the first business day of the next calendar month after which we receive the wire; (ii) in cases where you pay for your bond by bank draft directly to us, the first business day of the next calendar month after which we receive the draft; or (iii) in cases where you pay for your bond by personal check, the first business day of the calendar month that is at least five full business days after which we receive the check. In all cases involving direct settlement with the Company, we must also have received and accepted your completed and executed Subscription Agreement.

Interest payments on L Bonds will be paid on the 15th day immediately following the last day of the applicable interest payment period. Interest will be paid without any compounding. The first payment of interest will include interest for the partial period in which the purchase occurred. The indenture provides that all interest will be calculated based on a year with twelve 30-day months.

If you purchase your L Bond Units through direct settlement, we will pay the principal of, and interest on, L Bonds by direct deposit to the account you specify in your Subscription Agreement. We will not accept subscriptions from investors who are not willing to receive their interest payments via direct deposit. If the foregoing payment method is not available, principal and interest payments on the L Bonds will be payable at our principal executive office or at such other place as we may designate for payment purposes. If you purchase your L Bond Units through DTC settlement, our payments of principal and interest will be paid to the depositary (DTC) and then be credited to your brokerage or custodial account through the DTC procedures followed by your brokerage firm or custodian. For more information, please see "Registration and Exchange — Global Certificates Deposited with DTC" below.

We will withhold 28% of any interest payable to any investor who has not provided us with a social security number, employer identification number, or other satisfactory equivalent in the Subscription Agreement (or another document) or where the IRS has notified us that backup withholding is otherwise required. Please see "Material Federal Income Tax Considerations — Backup Withholding and Information Reporting."

**Registration and Exchange**

The L Bonds that we settle directly will generally be issued in book-entry form, which means that no physical L Bond is created, subject, however, to limited exceptions described in the indenture. The L Bonds settled through DTC settlement will be represented by global certificates deposited with the depositary as described below.

### *Book-Entry Registration*

Evidence of your ownership will be provided by written confirmation. As described below, holders may, under certain circumstance described below, opt to receive physical delivery of a certificated security that evidences their L Bonds. Otherwise, the issuance and transfer of L Bonds will be accomplished exclusively through the crediting and debiting of the appropriate accounts in our book-entry registration and transfer system.

The holders of the accounts established upon the purchase or transfer of L Bonds will be deemed to be the owners of the L Bonds under the indenture. The holder of the L Bonds must rely upon the procedures established by the trustee to exercise any rights of a holder of L Bonds under the indenture. We will regularly provide the trustee with information regarding the establishment of new accounts and the transfer of existing accounts.

On or prior to any interest payment date or upon redemption, we will also provide the trustee with information regarding the total amount of any principal and interest due to holders of L Bonds. On each interest payment date, we will credit interest due on each account and direct payments to the holders. We will determine the interest payments to be made to the book-entry accounts and maintain, supervise and review any records relating to book-entry accounts for the L Bonds.

Book-entry notations in the accounts evidencing ownership of the L Bonds are exchangeable for certificated L Bonds only: (i) at the request of the holder, at the end of the Company's next fiscal quarter; or (ii) after the occurrence of an event of default under the indenture, if holders of more than 50% of the aggregate outstanding principal amount of the L Bonds advise the trustee in writing that the continuation of a book-entry system is no longer in the best interests of the holders of L Bonds. In its discretion, the Company may elect to terminate the book-entry system and replace book-entry notations with physical certificates.

### *Global Certificates Deposited with DTC*

L Bonds may be issued in the form fully registered global certificates deposited with, or on behalf of, The Depository Trust Company ("DTC"), New York, NY, and registered in the name of Cede & Co., as nominee of DTC. Unless and until exchanged, in whole or in part, for L Bonds in definitive registered form, a global certificate may not be transferred except as a whole by the depositary to a nominee of such depositary, by a nominee of such depositary to such depositary or another nominee of such depositary, or by such depositary or any nominee of such depositary to a successor of such depositary or a nominee of such successor.

DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act. DTC was created to hold securities of its participants and to facilitate the clearance and settlement of securities transactions, such as transfers and pledges, among its participants in such securities through electronic computerized book-entry changes in accounts of the participants, thereby eliminating the need for physical movement of securities certificates. DTC's participants include securities brokers and dealers (including the managing broker-dealer), banks, trust companies, clearing corporations and certain other organizations, some of whom own DTC. Access to DTC's book-entry system is also available to others, such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a participant, either directly or indirectly. The rules applicable to DTC and its participants are on file with the SEC.

If available, purchases of L Bonds within the DTC system must be made by or through direct participants, which will receive a credit for the L Bonds on DTC's records. The ownership interest of each beneficial owner of the L Bonds will be recorded on the direct and indirect participants' records. Beneficial owners will not receive written confirmation from DTC of their purchases, but beneficial owners are expected to receive written confirmations providing details of the transactions, as well as periodic statements of their holdings, from the direct or indirect participants through

App. 0400

which the beneficial owners entered into the transaction. Transfers of ownership interests in the L Bonds are to be accomplished by entries made on the books of participants acting on behalf of beneficial owners.

To facilitate subsequent transfers, all L Bonds deposited by participants with DTC will be registered in the name of DTC's nominee, Cede & Co. The deposit of L Bonds with DTC and their registration in the name of Cede & Co. will effect no change in beneficial ownership. DTC will have no knowledge of the actual beneficial owners of the L Bonds. DTC's records will reflect only the identity of the direct participants to whose accounts such notes are credited, which may or may not be the beneficial owners. The participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to direct participants, by direct participants to indirect participants and by direct and indirect participants to beneficial owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

We will make payments due on the notes to Cede & Co., as nominee of DTC, in immediately available funds. DTC's practice is to credit direct participants' accounts, upon DTC's receipt of funds and corresponding detailed information, on the relevant payment date in accordance with their respective holdings shown on DTC's records. Payments by participants to beneficial owners will be governed by standing instructions and customary practices, as is the case with securities held for the account of customers in bearer form or registered in "street name," and will be the responsibility of such participant and not our responsibility or that of DTC, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment to Cede & Co. is our responsibility. Disbursement of such payments to direct participants is the responsibility of Cede & Co. Thereafter, disbursement of such payments to the beneficial owners is the responsibility of direct and indirect participants (i.e., brokers, dealers and custodians).

Except as provided herein, a beneficial owner of an interest in a global certificate will not be entitled to receive physical delivery of the L Bonds. Accordingly, each beneficial owner must rely on the procedures of DTC to exercise any rights under the L Bonds. The laws of some jurisdictions require that certain purchasers of securities take physical delivery of securities in definitive form. Such laws may impair the ability to transfer beneficial interests in a global certificate.

As long as the depositary, or its nominee, is the registered holder of a global certificate, the depositary or such nominee will be considered the sole owner and holder of the L Bonds represented thereby for all purposes under the L bonds and the indenture. Except in the limited circumstances referred to below, owners of beneficial interests in a global certificate will not be entitled to have such global certificate or any L Bonds represented thereby registered in their names, will not receive or be entitled to receive physical delivery of certificated L Bonds in exchange for the global certificate and will not be considered to be the owners or holders of such global certificate or any certificates represented thereby for any purpose under the L Bonds or the indenture. Accordingly, each person owning a beneficial interest in such global certificate must rely on the procedures of the depositary and, if such person is not a participant, on the procedures of the participant through which such person owns its interest to exercise any rights of a holder under the indenture.

If the depositary for a global certificate representing L Bonds is at any time unwilling or unable to continue as depositary and a successor depositary is not appointed by us within 90 days, we will issue L Bonds in definitive form in exchange for such global certificate. In addition, we may at any time and in our sole discretion determine not to have the L Bonds represented by one or more global certificates and, in such event, we will issue the notes in definitive form in exchange for all of the global certificates representing the L Bonds. Finally, if an event of default, or an event which with the giving of notice or lapse of time or both would constitute an event of default, with respect to the L Bonds represented by a global certificate has occurred and is continuing, then we will issue L Bonds in definitive form in exchange for all of the global certificates representing the notes.

Although DTC has agreed to the procedures provided above in order to facilitate transfers, it is under no obligation to perform these procedures, and these procedures may be modified or discontinued at any time.

**Limited Rescission Right**

If you are purchasing L Bonds through direct settlement with the Company and your Subscription Agreement is accepted at a time when we have determined that a post-effective amendment to the registration statement of which this prospectus is a part must be filed with the SEC, but such post-effective amendment has not yet been declared

54

effective, we will send to you at your registered address a notice and a copy of the related prospectus once it has been declared effective. You will thereupon have the right to rescind your investment upon written request within ten business days from the postmark date of the notice we send to you that the post-effective amendment has been declared effective (and containing the related prospectus). We will promptly return any funds sent with a Subscription Agreement that is properly rescinded without penalty, although any interest previously paid on a rescinded L Bond will be deducted from the funds returned to you upon rescission. A written request for rescission, except in the case of a mailed rescission, must be postmarked on or before the tenth business day after our notice to you (described above). If you notify us other than by mail, we must actually receive your rescission request on or before the tenth business day after our notice to you.

We will not accept purchases of L Bonds through DTC settlement if, as of the end of the monthly closing for DTC settlement, we have determined that a post-effective amendment to the registration statement of which this prospectus is a part must be filed with the SEC, but such post-effective amendment has not yet been declared effective. In any such case, settlement of your L Bond purchase must occur in the following month.

**Renewal or Repayment on Maturity**

At least 30 days prior to the maturity of your L Bond, we will provide you with a notice indicating that your L Bond is about to mature and whether we will allow automatic renewal of your L Bond. If we allow you to renew your L Bond, we will also provide to you the then-current form of prospectus, which may include an interest rate or prospectus supplement and any other updates to the information contained in this prospectus. The prospectus, or the interest rate or prospectus supplement, will set forth the interest rates then in effect. The notice will recommend that you review the then-current prospectus, including any interest rate or prospectus supplement, prior to exercising one of the below options. If we do not provide you a new prospectus because the prospectus has not changed since the delivery of this prospectus in connection with your original investment or any prior renewal, we will nonetheless send you a new copy of the prospectus upon your request. Unless the election period is extended as described below, you will have until 15 days prior to the maturity date to exercise one of the following options:

- You can do nothing, in which case (subject to applicable law) your L Bond will automatically renew for a new term equal to the original term but at the interest rate in effect at the time of renewal. Interest on renewed L Bonds will be paid on the same schedule (i.e., monthly or annually) as the original L Bond. If applicable, a new certificate will be issued.

- You can elect repayment of your L Bond, in which case the principal amount will be repaid in full along with any accrued but unpaid interest. If you choose this option, your L Bond will not earn interest on or after the maturity date.

- You can elect repayment of your L Bond and use all or part of the proceeds to purchase a new L Bond with a different term or principal amount. To exercise this option, you will need to complete a new Subscription Agreement for the new L Bond and mail it along with your request, or else work with your broker if you wish to purchase your new L Bond through DTC settlement. Any proceeds from the old L Bond that are not applied to the new L Bond will be sent to you.

The foregoing options will be available to holders unless and until terminated under the indenture. Interest will accrue from the first day of each renewed term. Each renewed L Bond will retain all its original provisions, including provisions relating to payment, except that the interest rate payable during any renewal term will be the interest rate that is being offered at that time to other holders with similar aggregate L Bond portfolios for L Bonds of the same term as set forth in the interest rate supplement delivered with the maturity notice. If similar L Bonds are not then being offered, the (i) interest rate upon renewal will be the rate specified by us on or before the maturity date, or the rate of the existing L Bond if no such rate is specified, and (ii) the maturity will, if L Bonds of the same maturity are being offered at the time of renewal, be the same or, if not, the next earliest maturity.

If we notify the holder of our intention to repay an L Bond at maturity, or if the holder timely requests repayment, we will pay the principal and all accrued but unpaid interest on the L Bond on or prior to the fifth day of the calendar month after the maturity date (or the first business day following the fifth day of such month). Thus, in the case of an L Bond with a maturity date of January 31, 2020, actual payment will be made on or prior to February 5, 2020 (unless such date is not a business day, in which case actual payment will be made on the next business day). No interest will

55

accrue after the maturity date. You should be aware that because payment is made by ACH transfer, funds may not be received in the holder's account for two to three business days.

We will be required from time to time to file post-effective amendments to the registration statement of which this prospectus is a part to update the information it contains. If you would otherwise be entitled to renew your L Bonds upon their stated maturity at a time when we have determined that a post-effective amendment must be filed with the SEC, but such post-effective amendment has not yet been declared effective, then the period during which you can elect renewal (or repayment) will be automatically extended until ten days following the postmark date of our notice to you that the post-effective amendment has been declared effective, which notice shall contain a copy of the related prospectus. All other provisions relating to the renewal or redemption of L Bonds upon their stated maturity described above shall remain unchanged.

For any L Bonds offered hereby that mature on or after the three-year anniversary of the date on which the registration statement of which this prospectus is a part shall have been declared effective, we expect that the renewal of such L Bonds may require us to file a new registration statement. In such a case, the new registration statement must be declared effective before we can renew your L Bond. In this event, if the new registration statement has not yet been filed or become effective, we will extend your election period until ten days following the date of our notice to you that the new registration statement has become effective, which notice will include a new prospectus.

**Call and Redemption Prior to Stated Maturity**

We may call and redeem, in whole or in part, principal amount and accrued but unpaid interest on any L Bonds prior to their stated maturity only as set forth in the indenture and described below. The holder has no right to put or otherwise require us to redeem any L Bond prior to its maturity date (as originally stated or as it may be extended), except as indicated in the indenture and described below.

*Our Voluntary Redemption*

We have the right to redeem any L Bond, in whole or in part, at any time prior to its stated maturity upon at least 30 days written notice to the holder of the L Bond. The holder of the L Bond being redeemed will be paid a redemption price equal to the outstanding principal amount thereof plus accrued but unpaid interest up to but not including the date of redemption without any penalty or premium. We may use any criteria we choose to determine which L Bonds we will redeem if we choose to do so. We are not required to redeem L Bonds on a pro rata basis.

*Holder's Put Election Upon Death, Bankruptcy or Total Permanent Disability*

L Bonds may be redeemed prior to maturity at the election of a holder who is a natural person (including L Bonds held in an individual retirement account and the holders of a beneficial interest in a global certificate held by a depositary or its nominee), by giving us written notice within 45 days following the holder's total permanent disability or bankruptcy, as established to our satisfaction, or at the election of the holder's estate, by giving written notice within 45 days following the death of the holder. Subject to the limitations described below, we will redeem the L Bonds not later than the 15th day of the month next following the month in which we establish to our satisfaction the holder's death, bankruptcy or total permanent disability. In the event that the 15th day of the month next following the month in which we so establish such facts is not a business day, we will redeem the L Bonds on the next business day. The redemption price, in the event of such a death, bankruptcy or total permanent disability, will be the entire principal amount of the L Bonds, plus accrued but unpaid interest thereon up to and through the last day of the calendar month preceding the redemption date. The indenture defines "total permanent disability" as the determination by a physician, approved by us, that a holder of an L Bond who is a natural person, and who was gainfully employed at the time of issuance of the L Bond (or its renewal date), is unable to work on a full-time basis during a period of 24 consecutive months.

If spouses are joint registered holders of an L Bond, the right to elect to have us redeem L Bonds will apply when either registered holder dies, files bankruptcy or suffers a total permanent disability. If the L Bond is held jointly by two or more persons who are not legally married, none of these persons will have the right to request that we redeem the L Bonds unless all joint holders have died, filed bankruptcy or suffered a total permanent disability. If the L Bond is held by a trust, partnership, corporation or other similar entity, the right to request redemption upon death or total permanent disability does not apply.

56

*Redemption at Request of Holder*

We have no obligation to redeem any L Bonds other than upon maturity, or upon the death, bankruptcy or total permanent disability of a natural person holder. Nevertheless, at our sole discretion we may agree from time to time, at the written request of a holder (including the holder of a beneficial interest in a global certificate held by a depositary or its nominee), to redeem an L Bond, subject, however, to a redemption fee of 6.0% of the principal amount of such L Bond. If we so redeem any L Bond prior to maturity, we will redeem the entire principal amount of such L Bond together with accrued but unpaid interest thereon, The redemption fee will be subtracted from the amount paid to you.

**Transfers**

The L Bonds will be transferable in accordance with the indenture. For L Bonds that are issued solely in book-entry form, transfers will be effective only upon the delivery to us of an executed assignment or other conveyance instrument in customary form. For L Bonds that are represented by a global certificate held by a depositary or its nominee, transfers of beneficial interests in such certificate must be effected in accordance with the procedures and rules of the depositary.

Upon transfer of an L Bond, we will provide the new holder of the L Bond with a purchase confirmation that will evidence the transfer of the account on our records. If applicable (e.g., if transferred to a custodial account), a new certificate will be issued. No written confirmations will be provided with respect to transfers of beneficial interests in a global certificate held by a depositary or its nominee.

**Quarterly Statements**

We will provide holders of the L Bonds with quarterly statements, which will indicate, among other things, the account balance at the end of the quarter, interest credited, redemptions made, if any, and the interest rate paid during the quarter. These statements will be sent electronically on or prior to the 10th business day after the end of each calendar quarter. If a holder is unwilling or unable to receive quarterly statements electronically, we will mail the statements to the address of record on or prior to the 10th business day after the end of each calendar quarter. In such a case, we may charge such holders a reasonable fee to cover our expenses incurred in mailing the statements.

**Ranking**

The L Bonds will constitute secured debt of GWG Holdings. The payment of principal and interest on the L Bonds will be:

- pari passu with respect to payment and collateral securing all L Bonds previously issued by GWG Holdings, Inc., of which approximately $424.8 million in principal amount is outstanding as of September 30, 2017 (see the caption "— Collateral Security" below);

- structurally and contractually junior to the present and future obligations owed by our subsidiary DLP IV under our senior credit facility with LNV/CLMG, and structurally or contractually junior to any future obligations that DLP IV or other primary obligors or guarantors may have under future senior secured borrowing facilities; and

- structurally junior to the present and future claims of creditors of our subsidiaries, other than GWG Life, including trade creditors.

The indenture will permit us to issue other forms of debt, including secured and senior debt, in the future.

"Pari passu" means that claims for payment and entitlement to security among the holders of L Bonds, including the holders of previously issued L Bonds, and the holders of any later-created class of "pari passu debt," will be treated equally and without preference. Although we have no present intention of causing GWG Life to issue additional secured debt in the future, any such debt issued on a pari passu basis in the future (including renewals of outstanding L Bonds or other renewable pari passu debt) would also be treated equally and without preference in respect of all outstanding L Bonds. Thus, in the event of any default on the L Bonds (or any other debt securities of ours that are pari passu with the L Bonds) resulting in claims for payment or claims on collateral security, the holders of the L Bonds and all such other debt securities pari passu with the L Bonds would share in payment or collateral in proportion to the amount of principal and interest owed on each such debt instrument.

App. 0405

App. 0406

**Guarantee by GWG Life Subsidiary**

The payment of principal and interest on the L Bonds, including previously issued L Bonds, is fully and unconditionally guaranteed by GWG Life. There were approximately $424.8 million in principal amount of previously issued L Bonds outstanding as of September 30, 2017.

**Collateral Security**

The L Bonds are secured by the assets of GWG Holdings, Inc. We will grant a security interest in all of the assets of GWG Holdings to the indenture trustee for the benefit of the L Bond holders. The assets of GWG Holdings consist, and are expected to consist, primarily of (i) any cash proceeds received from its subsidiaries as distributions derived from life insurance assets of subsidiaries, (ii) all other cash and investments held in various accounts, (iii) the equity ownership interests in subsidiaries of GWG Holdings, including the equity ownership interest in GWG Life, together with (iv) all proceeds from the foregoing. This collateral security granted by us is referred to as the "GWG Holdings Assets Collateral."

As indicated above, our direct and wholly owned subsidiary, GWG Life, will fully and unconditionally guarantee our obligations under the L Bonds. This guarantee will be supported by GWG Life's grant of a security interest in all of its assets. The assets of GWG Life consist, and are expected to consist, primarily of (i) certain life insurance assets, (ii) any cash proceeds received from life insurance assets owned by GWG Life or received from DLP IV, as distributions derived from life insurance policies owned by that subsidiary, (iii) all other cash and investments held by GWG Life in its various accounts, (iv) GWG Life's equity ownership interest in its direct subsidiaries, including DLP IV, together with (v) all proceeds from the foregoing. The collateral security granted by GWG Life pursuant to its guarantee of our obligations under the L Bonds is referred to as the "GWG Life Assets Collateral."

In addition, Messrs. Jon R. Sabes and Steven F. Sabes, our principal stockholders beneficially holding approximately 75% of the outstanding shares of our common stock, have pledged all of the shares they beneficially own in GWG Holdings to further secure our obligations under the L Bonds. This collateral security granted by Messrs. Jon R. Sabes and Steven F. Sabes is referred to as the "GWG Holdings Equity Collateral."

Together, the GWG Holdings Assets Collateral, GWG Life Assets Collateral and GWG Holdings Equity Collateral comprise all of the collateral security for our obligations under the L Bonds. To the extent that we subsequently establish one or more wholly owned subsidiaries of GWG Holdings or GWG Life, the L Bonds will have a security interest in the equity ownership interests of those subsidiaries if and to the extent owned by GWG Holdings or GWG Life.

The guarantee by GWG Life is contained in the indenture, and the grant of security interests in the GWG Holdings Assets Collateral, GWG Life Assets Collateral and GWG Holdings Equity Collateral is effected through a "Pledge and Security Agreement" that is an exhibit to the indenture and has been amended in connection with this offering of L Bonds. Neither the indenture nor the Pledge and Security Agreement contain any provision preventing a pledging party from disposing of any collateral in the ordinary course of business. In this regard, the Pledge and Security Agreement permits the disposition of GWG Holdings Equity Collateral to the extent the number of shares continuing to constitute such collateral represents at least 10% of the number of shares beneficially held by each individual grantor as of the date of the Pledge and Security Agreement.

Substantially all of our life insurance assets are held in our subsidiaries. The L Bonds will not be directly secured by any security interest in the assets of those subsidiaries, including DLP IV. Instead, the L Bonds will be secured by a pledge of the equity ownership interests in those subsidiaries, including DLP IV, owned by GWG Life by virtue of the guarantee provisions in the indenture and the Pledge and Security Agreement referenced above. An equity ownership interest is, by its very nature, subordinate to the interests of creditors. **Therefore, although investors in the L Bonds will have a security interest in the ownership of DLP IV (and other direct subsidiaries of GWG Life) any claim they may have to the assets owned by such entity will be subordinate to the interests of creditors of that entity, including LNV/CLMG, which is the lender to DLP IV under our senior credit facility, and all other creditors of DLP IV, including trade creditors. In addition, there is the risk that the collateral security granted for our obligations under the L Bonds may be insufficient to repay the L Bonds upon an event of default. See "Risk Factors," page 12** *("The collateral granted as security...").*

58

**Subordination; Other Indebtedness**

Our obligations under the L Bonds will be subordinate to all our senior debt. For this purpose, "our senior debt" presently includes all indebtedness owed or that may in the future become owing under our senior credit facility with LNV/CLMG. As of September 30, 2017, DLP IV had approximately $212.5 million of debt outstanding under the credit facility with LNV/CLMG. In addition, as of September 30, 2017, we had approximately $424.8 million in principal amount of debt outstanding under previously issued L Bonds.

The maximum amount of debt, including the L Bonds, we may issue is limited by the indenture. In particular, the indenture prohibits us from issuing debt in an amount such that our "debt coverage ratio" would exceed 90%. The indenture defines the debt coverage ratio as a percentage calculated by the ratio of (A) obligations owing by us and our subsidiaries on all outstanding debt for borrowed money (including the L Bonds), over (B) the net present asset value of all life insurance assets we own, directly or indirectly, plus any cash held in our accounts. For this purpose, the net present asset value of our life insurance assets is equal to the present value of the cash flows derived from the face value of policy benefit assets we own, discounted at a rate equal to the weighted average cost of capital for all our indebtedness for the prior month.

We are required to notify the indenture trustee in the event that we violate this restrictive covenant. An "event of default" will exist under the indenture if a violation of this covenant persists for a period of 30 calendar days after our initial notice to the trustee. The L Bonds are guaranteed by GWG Life but otherwise are not guaranteed by any of our subsidiaries, affiliates or control persons. Neither indenture nor the Pledge and Security Agreement prevent holders of debt issued by our subsidiaries from disposing of, or exercising any other rights with respect to, any or all of the collateral securing that debt. Accordingly, in the event of a liquidation or dissolution of one of our subsidiaries (other than GWG Life), creditors of that subsidiary that are senior in rank will be paid in full, or provision for such payment will be made, from the assets of that subsidiary prior to distributing any remaining assets to us as an equity owner of that subsidiary.

The indenture also contains specific subordination provisions, benefitting lenders under any senior credit facility, restricting the right of L Bond holders to enforce certain of their rights in certain circumstances, including:

- a prohibition on challenging any enforcement action taken by a senior lender or interfering with any legal action or suits undertaken by our senior lenders against us and our affiliates;

- a 180-day standstill period during which there may not be brought any action against us or our affiliates to enforce rights respecting collateral unless our senior credit facilities have been repaid in full, which period may be extended if the senior lender takes action during such standstill period; and

- a prohibition on filing a bankruptcy or insolvency case against us or our affiliates for at least one year plus one day after the senior credit facility lenders have been paid in full.

We will not make any payment, direct or indirect (whether for interest, principal, as a result of any redemption or repayment at maturity, on default, or otherwise), on the L Bonds and any other indebtedness, and neither the holders of the L Bonds nor the trustee will have the right, directly or indirectly, to sue to enforce the indenture or the L Bonds, if a default or event of default under any senior credit facility has occurred and is continuing, or if any default or event of default under any senior credit facility would result from such payment, in each case unless and until:

- the default and event of default has been cured or waived or has ceased to exist; or

- in the case of a non-payment default that permits a senior lender to declare as due and payable all amounts owing under a senior credit facility (but where that senior lender has not yet so declared amounts as being due and payable), the end of the period commencing on the date the trustee receives written notice of default from the senior lender and ending on the earliest of (1) our discharge of the default (or other cure), (2) the trustee's receipt of a valid waiver of default from the senior lender, or (3) a written notice from the senior lender terminating the payment prohibition.

During any payment prohibition period, neither the holders of the L Bonds nor the trustee will have the right, directly or indirectly, to sue to enforce the indenture or the L Bonds. Other provisions of the indenture do permit the trustee to take action to enforce the payment rights of L Bond holders after 179 days have passed since the trustee's receipt of notice of default from a senior lender, but in such case any funds paid as a result of any such suit or enforcement action shall be applied toward the senior credit facility until the facility is indefeasibly paid in full before being applied to the L Bonds. The indenture contains provisions whereby each investor in the L Bonds consents to the subordination provisions contained in the indenture and related agreements governing collateral security.

If the 180-day standstill period noted above or any other limitation on the rights of the trustee or L Bond holders to assert their rights to payment of principal or interest under the indenture or L Bonds is ultimately determined to conflict with provisions of the Trust Indenture Act of 1939 (most notably sections 316(b) and 317(a) of that Act), then the trustee, as well as any holder who shall not have earlier consented to such subordination provisions, shall (notwithstanding such provision contained in the indenture) be authorized to institute a lawsuit for the enforcement of any payment of principal or interest after their respective due dates.

**No Sinking Fund**

The L Bonds are not associated with any sinking fund. A sinking fund is generally any account to which contributions will be made, from which payments of principal or interest owed on the L Bonds will be made. See "Risk Factors," page 12.

**Restrictive Covenants**

The indenture contains covenants that restrict us from certain actions as described below. In particular, the indenture provides that:

- we will not declare or pay any dividends or other payments of cash or other property solely in respect of our capital stock to our stockholders (other than a dividend paid in shares of our capital stock on a pro rata basis to all our stockholders) unless no default and no event of default with respect to the L Bonds exists or would exist immediately following the declaration or payment of the dividend or other payment;

- to the extent legally permissible, we will not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or the performance of the indenture;

- our Board of Directors will not adopt a plan of liquidation that provides for, contemplates or the effectuation of which is preceded by (a) the sale, lease, conveyance or other disposition of all or substantially all of our assets, otherwise than (i) substantially as an entirety, or (ii) in a qualified sales and financing transaction, and (b) the distribution of all or substantially all of the proceeds of such sale, lease, conveyance or other disposition and of our remaining assets to the holders of our capital stock, unless, prior to making any liquidating distribution pursuant to such plan, we make provision for the satisfaction of our obligations under the renewable unsecured subordinated notes; and

- our debt coverage ratio may not exceed 90%.

The indenture defines the debt coverage ratio as a percentage calculated by the ratio of (A) obligations owing on all outstanding debt for borrowed money (including the L Bonds), over (B) the net present asset value of all life insurance assets we own, plus any cash held in our accounts. For this purpose, the net present asset value of our life insurance assets is equal to the present value of the face value of policy benefit assets we own, discounted at a rate equal to the weighted-average cost of capital for all our indebtedness for the prior month.

Importantly, we are not restricted from entering into "qualified sale and financing transactions" as defined — in the indenture, or incurring additional indebtedness, including additional senior debt.

60

**Consolidation, Mergers or Sales**

The indenture generally permits a consolidation or merger between us and another entity. It also permits the sale or transfer by us of all or substantially all of our property and assets. These transactions are permitted if:

- the resulting or acquiring entity, if other than us, is a United States corporation, limited liability company or limited partnership and assumes all of our responsibilities and liabilities under the indenture, including the payment of all amounts due on the notes and performance of the covenants in the indenture; and

- immediately after the transaction, and after giving effect to the transaction, no event of default shall exist under the indenture.

If we consolidate or merge with or into any other entity or sell or lease all or substantially all of our assets, according to the terms and conditions of the indenture, the resulting or acquiring entity will be substituted for us in the indenture with the same effect as if it had been an original party to the indenture. As a result, the successor entity may exercise our rights and powers under the indenture in our name, and we (as an entity) will be released from all our liabilities and obligations under the indenture and under the L Bonds. Nevertheless, no such transaction will by itself eliminate or modify the collateral that we have provided as security for our obligations under the indenture.

**Events of Default and Remedies**

The indenture provides that each of the following constitutes an event of default:

- the failure to pay interest or principal on any L Bond for a period of 30 days after it becomes due and payable;

- a failure to observe or perform any material covenant, condition or agreement in the indenture, but only after notice of failure from the indenture trustee and such failure is not cured within 60 days;

- our debt coverage ratio exceeds 90% for a period of 30 consecutive calendar days, but only after notice of such breach from the indenture trustee and such breach is not cured within 60 days;

- certain events of bankruptcy, insolvency or reorganization with respect to us; or

- the cessation of our business.

In addition, a default under the indenture will create a default under our senior credit facility.

Through DLP IV, we are party to a senior credit facility with LNV Corporation (referred to in this prospectus as LNV), as the lender. The facility is governed by a Loan and Security Agreement, and CLMG Corp (referred to in this prospectus as CLMG) acts as the administrative agent for the lender under the Loan and Security Agreement.

On September 27, 2017, we entered into an amended and restated senior credit facility with LNV Corporation as lender through our subsidiary GWG DLP Funding IV, LLC. The Amended and Restated Loan Agreement governing the facility makes available a total of up to $300,000,000 in credit with a maturity date of September 27, 2029. Additional advances are available under the Amended and Restated Loan Agreement at the LIBOR rate as defined in the Amended and Restated Loan Agreement. Advances are available as the result of additional borrowing base capacity, created as the premiums and servicing costs of pledged life insurance policies become due. Interest will accrue on amounts borrowed under the Amended and Restated Loan Agreement at an annual interest rate, determined as of each date of borrowing or quarterly if there is no borrowing, equal to (A) the greater of 12-month LIBOR or the federal funds rate (as defined in the agreement) plus one-half of one percent per annum, plus (B) 7.50% per annum. The effective rate at September 30, 2017 was 7.52%. The interest rate effective October 1, 2017 was 9.31%. Interest payments are made on a quarterly basis. As of September 30, 2017, approximately $212.5 million was outstanding under the line of credit. We may use proceeds of the line of credit to repay short-term debt and acquire additional life insurance assets.

61

App. 0410

Under the Loan and Security Agreement, DLP IV has granted the administrative agent, for the benefit of the lenders under the agreement, a security interest in all of its assets. As with prior collateral arrangements relating to the senior secured debt of GWG Holdings and its subsidiaries (on a consolidated basis), GWG Holdings' equity ownership in DLP IV will serve as collateral for the obligations of GWG Holdings under its L Bonds (although the life insurance assets owned by DLP IV will not themselves serve directly as collateral for those obligations).

The Amended and Restated Loan Agreement does not require DLP IV to maintain a reserve account for future premiums.

In addition, the Loan and Security Agreement contains certain customary negative covenants restricting the ability of the borrower to directly or indirectly engage in a merger or exchange transaction, sell substantially all of its assets, or permit the amendment of the contracts governing the outstanding debt securities of GWG Holdings and its subsidiaries, without the prior consent of the lender.

The Loan and Security Agreement contains customary events of default (e.g., payment defaults, covenant defaults, cross-defaults, defaults arising by virtue of a change in control, and defaults arising from breaches of representations and warranties), as well as defaults for amendments to the organizational documents of the borrower, defaults from pledged policies falling out of good standing, the occurrence of an event that could terminate the arrangement by which GWG Life services the pledged life insurance policies, and the entry of a judgment against the borrower in an amount exceeding $50,000 without payment or discharge, or a stay of execution obtained, within 30 days thereafter.

The indenture requires that we give immediate notice to the indenture trustee upon the occurrence of an event of default under the indenture, unless it has been cured or waived. The indenture trustee may then provide notice to the L Bond holders or withhold the notice if the indenture trustee determines in good faith that withholding the notice is in your best interest, unless the default is a failure to pay principal or interest on any L Bond.

If an event of default occurs, the indenture trustee or the holders of at least 25% in principal amount of the outstanding L Bonds, may by written notice to us declare the unpaid principal and all accrued but unpaid interest on the L Bonds to be immediately due and payable. Notwithstanding the foregoing, the indenture limits the ability of the L Bond holders to enforce certain rights under the indenture in certain circumstances. These limitations are required subordination provisions under our senior credit facility and are summarized above under "— Subordination; Other Indebtedness." The Pledge and Security Agreement permits the trustee to exercise on behalf of the holders of L Bonds all rights and remedies as are available to a secured creditor under applicable law, subject to any limitations therein or in the indenture. In this regard, the trustee is not authorized under the Pledge and Security Agreement to distribute in kind any collateral in its possession to the holders of L Bonds.

**Amendment, Supplement and Waiver**

Except as provided in this prospectus or the indenture, the terms of the indenture or the L Bonds then outstanding may be amended, supplemented or waived with the consent of the holders of at least a majority in principal amount of the L Bonds then outstanding (which consent will be presumed if a holder does not object within 30 days of a request for consent), and any existing default or compliance with any provision of the indenture or the L Bonds may be waived with the affirmative consent of the holders of a majority in principal amount of the then outstanding L Bonds.

Notwithstanding the foregoing, an amendment or waiver will not be effective with respect to the L Bonds held by a holder who him, her or itself has not consented if such amendment or waiver:

- reduces the principal of, or changes the fixed maturity of, any L Bond;

- reduces the rate of or changes the time for payment of interest, including default interest, on any L Bond;

- waives a default or event of default in the payment of principal or interest on the L Bonds, except for a rescission or withdrawal of acceleration of the L Bonds made by the holders of at least a majority in aggregate principal amount of the then-outstanding L Bonds and a waiver of the payment default that resulted from such acceleration;

62

- makes any change in the provisions of the indenture relating to waivers of past defaults or the rights of holders of L Bonds to receive payments of principal of or interest on the L Bonds; or

- makes any change to the subordination provisions of the indenture that has a material adverse effect on holders of L Bonds.

Notwithstanding the foregoing, the following kinds of amendments or supplements to the indenture may be effected by us and the trustee without any consent of any holder of the L Bonds:

- to cure any ambiguity, defect or inconsistency;

- to provide for assumption of our obligations to holders of the L Bonds in the case of a merger, consolidation or sale of all or substantially all of our assets;

- to provide for additional uncertificated or certificated L Bonds;

- to make any change that does not materially and adversely affect the legal rights under the indenture of any holder of L Bonds, including but not limited to an increase in the aggregate dollar amount of L Bonds which may be outstanding under the indenture and limited in amount thereunder;

- to modify or eliminate our policy regarding redemptions elected by a holder of L Bonds prior to maturity, including our obligation to redeem L Bonds upon the death, bankruptcy or total permanent disability of any holder of the L Bonds, but only so long as such modifications do not materially and adversely affect any then-existing obligations under pending repurchase commitments for L Bonds;

- to comply with requirements of the SEC in order to effect or maintain the qualification of the indenture under the Trust Indenture Act of 1939, or to comply with other applicable federal or state laws or regulations;

- to comply with the rules or policies of a depositary of the L Bonds; or

- in connection with an amendment, extension, replacement, renewal or substitution of any senior debt, to amend the subordination provisions of the indenture to conform to the reasonable requirements of the holder or holders of such senior debt.

## Rights of L Bond Holders

As an L Bond holder, you have limited rights to vote on our actions as set forth in the indenture. In general, you will have the right to vote on whether or not to approve some amendments to the indenture. For a description of these rights, see "— Amendment, Supplement and Waiver" above. You will also have the right to direct some actions that the trustee takes if there is an event of default with respect to the L Bonds. For a description of these rights, see above under the caption "— Events of Default." For a complete description of your rights as an L Bond holder, we encourage you to read a copy of the indenture, which is filed as an exhibit to the registration statement of which this prospectus is a part. We will also provide you with a copy of the indenture upon your request.

The trustee and the L Bond holders will have the right to direct the time, method and place of conducting any proceeding for some of the remedies available, except as otherwise provided in the indenture. The trustee may require reasonable indemnity, satisfactory to the trustee, from L Bond holders before acting at their direction. You will not have any right to pursue any remedy with respect to the indenture or the L Bonds unless you satisfy the conditions contained in the indenture.

## The Indenture Trustee

### *General*

Bank of Utah has agreed to be the trustee under the indenture. The indenture contains certain limitations on the rights of the trustee, should it become one of our creditors, to obtain payment of claims in certain cases, or to realize on certain property received in respect of any claim as security or otherwise. The trustee will be permitted to engage in other transactions with us.

App. 0412

Subject to certain exceptions, the holders of a majority in principal amount of the then-outstanding L Bonds will have the right to direct the time, method and place of conducting any proceeding for exercising any remedy available to the trustee. The indenture provides that if an event of default specified in the indenture shall occur and not be cured, the trustee will be required, in the exercise of its power, to use the degree of care of a reasonable person in the conduct of his own affairs. Subject to such provisions, the trustee will be under no obligation to exercise any of its rights or powers under the indenture at the request of any holder of L Bonds, unless the holder shall have offered to the trustee security and indemnity satisfactory to it against any loss, liability or expense.

### *Resignation or Removal of the Trustee*

The trustee may resign at any time, or may be removed by the holders of a majority of the aggregate principal amount of the outstanding L Bonds. In addition, we may remove the trustee for certain failures in its duties, including the insolvency of the trustee or the trustee's ineligibility to serve as trustee under the Trust Indenture Act of 1939. However, no resignation or removal of the trustee may become effective until a successor trustee has accepted the appointment as provided in the indenture.

### *Reports to Trustee*

We will provide the trustee with (i) a calculation date report by the 15th day of each month containing a calculation of the debt coverage ratio that includes a summary of all cash, life insurance policy investments serving as collateral, as well as our total outstanding indebtedness including outstanding principal balances, interest credited and paid, transfers made, any redemption or repayment and interest rate paid; (ii) copies of our audited annual financials, no earlier than when the same become a matter of public record; and (iii) any additional information reasonably requested by the trustee.

## Certain Charges

We and our servicing agents, if any, may assess service charges for changing the registration of any L Bond to reflect a change in name of the holder, multiple changes in interest payment dates or transfers (whether by operation of law or otherwise) of an L Bond by the holder to another person. The indenture permits us to set off, against amounts otherwise payable to you under the L Bonds, the amount of these charges.

## Variations in Terms and Conditions

We may from time to time vary the terms and conditions of the L Bonds offered, including but not limited to minimum initial principal investment amount requirements, maximum aggregate principal amount limits, interest rates, minimum denominations, service and other fees and charges, and redemption provisions. Terms and conditions may be varied by state, locality, principal amount, type of investor (for example, new or current investor) or as otherwise permitted under the indenture governing the securities offered by this prospectus. No change in terms, however, will apply to any L Bonds already issued and outstanding at the time of such change.

## Satisfaction and Discharge of Indenture

The indenture shall cease to be of further effect upon the payment in full of all of the outstanding L Bonds and the delivery of an officer's certificate to the trustee stating that we do not intend to issue additional L Bonds under the indenture or, with certain limitations, upon deposit with the trustee of funds sufficient for the payment in full of all of the outstanding L Bonds.

## Reports

We will publish annual reports containing financial statements and quarterly reports containing financial information for the first three quarters of each fiscal year. We will send copies of these reports, at no charge, to any holder of L Bonds who sends us a written request.

**PLAN OF DISTRIBUTION**

**General**

We are offering up to 1,000,000 Units, representing $1,000,000,000 in aggregate principal amount, of L Bonds (referred to throughout this prospectus simply as "L Bonds") on a continuous basis. The L Bonds will be sold at $1,000 per Unit, and in minimum amounts of 25 Units, or $25,000 or more in principal. There is no minimum amount of L Bonds that must be sold before we access and use the proceeds. The proceeds of new sales of L Bonds will be paid directly to us promptly following each sale and will not be placed in an escrow account. Even if we sell less than the entire $1,000,000,000 in aggregate principal amount of L Bonds Units being offered, the L Bonds that we sell will be issued, and the proceeds of those L Bond sales will be used by us, as described in this prospectus.

The L Bonds will be offered and sold on a best efforts basis by Emerson Equity LLC (our "dealer manager"). Our dealer manager will enter into participating dealer agreements with certain other broker-dealers that are members of FINRA, referred to as "selling group members," to authorize those broker-dealers to sell our L Bonds. The L Bonds will be offered to the public on the terms set forth in this prospectus and any prospectus supplements we may file from time to time. Neither our dealer manager nor any selling group members will have any obligation to take or purchase any L Bonds. In addition to forming the selling group, our dealer manager provides services to us, which include conducting broker-dealer seminars, holding informational meetings and providing information and answering any questions investors or selling group members may have concerning this offering.

Members of the selling group will receive sales commissions of up to 5.00% of the gross offering proceeds depending upon the maturity of the L Bonds sold. In addition, our dealer manager and selling group members may receive up to 3.00% of the gross offering proceeds as additional compensation consisting of the following:

- a dealer-manager fee payable to the dealer manager in an amount equal to 0.50% of the principal amount of all L Bonds sold;

- an accountable expense allowance to be paid to the selling group members, which may include due diligence expenses of the dealer manager and selling group members set forth in a detailed and itemized invoice and as further described below;

- wholesaling fees, which may consist of commissions and non-transaction-based compensation of the wholesalers;

- non-cash compensation, which may consist of an occasional meal, a ticket to a sporting event or the theater, or comparable entertainment that is neither so frequent nor so extensive as to raise any question of propriety and is not preconditioned on achievement of a sales target, the national and regional sales conferences of our selling group members, training and education meetings for registered representatives of our selling group members, and permissible forms of non-cash compensation to registered representatives of our selling group members, such as gifts that do not exceed an aggregate value of $100 per annum per registered representative and that are not pre-conditioned on achievement of a sales target, including but not limited to seasonal gifts; and

- up to a 1.00% reallowance to selling group members.

As part of the accountable expense allowance, the dealer manager and selling group members are expected to be reimbursed for accountable out-of-pocket expenses incurred by them during the course of the offering. Expenses eligible for reimbursement may include:

- travel, lodging, and meals for the wholesalers who are our employees and associated with the dealer manager;

- reasonable out-of-pocket expenses incurred by selling group members and their associated persons, including reimbursement of actual costs of third-party professionals retained by them; and

- due diligence expenses of the dealer manager and selling group members set forth in a detailed and itemized invoice.

App. 0414

Upon the sale of L Bonds by a selling group member, the selling group member effecting the sale will receive selling commissions and additional compensation in connection therewith pursuant to the terms of the soliciting dealer agreement between the dealer manager and the selling group member.

In no event will the total selling commissions and additional compensation, including accountable due diligence expenses and reimbursements, exceed 8.00% of the aggregate gross offering proceeds we receive from the sale of L Bonds.

We may also sell our L Bonds at a discount through the following distribution channels in the event that the investor:

- purchases L Bonds through fee-based programs, also known as wrap accounts;

- purchases L Bonds through a selling group member that has an alternative fee arrangement with its clients;

- purchases L Bonds through certain registered investment advisers;

- purchases L Bonds through bank trust departments or any other organization or person authorized to act in a fiduciary capacity for its clients or customers; or

- is an endowment, foundation, pension fund or other institutional investor.

If an investor purchases shares through one of the above distribution channels in our offering, we will sell the L Bonds at a discount, reflecting that selling commissions are not being paid in connection with such purchase. The public offering price will be decreased by an amount equal to such reduction; however, the net proceeds to us will not be affected by any such reduction in selling commissions.

Our officers and directors and their family members may purchase the L Bonds offered hereby for investment and not for distribution at a discount from the public offering price. For purposes of this discount, we consider a family member to be a spouse, parent, child, sibling, mother- or father-in-law, son- or daughter-in-law or brother- or sister-in-law. In addition, if approved by our Board of Directors, certain of our joint venture partners, consultants and other service providers may purchase the L Bonds offered hereby at a discount from the public offering price. We will sell such L Bonds reflecting that selling commissions will not be paid in connection with such sales. The public offering price will be decreased by an amount equal to such reduction; however, the net proceeds to us from such sales made net of commissions will be the same as the net proceeds we receive from other sales of L Bonds.

Also, we may sell L Bonds to the dealer manager, selling group members, their retirement plans, their representatives and the family members as described above, IRAs and qualified plans of their representatives at a purchase price reflecting that selling commissions will not be payable in consideration of the services rendered by such dealer manager, selling group members, and their representatives in the offering. Such sales, however, may not be made for the period of time from the effective date through 90 days after the effective date. The public offering price will be decreased by an amount equal to such reduction; however, the net proceeds to us from the sales of these L Bonds will be the same as the net proceeds we receive from other sales of L Bonds.

Neither our dealer manager nor its affiliates will directly or indirectly compensate any person engaged as an investment advisor or a bank trust department by a potential investor as an inducement for such investment advisor or bank trust department to advise favorably for an investment in the L Bonds offered hereby. Also, we will not pay referral or similar fees to any accountants, attorneys or other persons in connection with the distribution of the L Bonds.

In addition to the sales commissions, fees, allowances, reimbursements and expenses described above, we expect to pay approximately $1,500,500 in offering and related costs and expenses in connection with this offering. These kinds of expenses include all expenses to be paid by us in connection with the offering (other than sales commissions, additional compensation, and expense allowances and reimbursement to our selling group members), including but not limited to legal, accounting, printing and mailing expenses, registration, qualification and associated securities filing fees and other costs and expenses.

The table below sets forth the maximum amount of sales commissions and additional compensation, as described in footnote (1) to the table below, we may pay in connection with this offering.

| L Bond Term | Sales Commission | Additional Compensation[1] | Total[2] |
|---|---|---|---|
| 2 years | 3.25% | 4.75% | 8.00% |
| 3 years | 4.25% | 3.75% | 8.00% |
| 5 years | 4.90% | 3.10% | 8.00% |
| 7 years | 5.00% | 3.00% | 8.00% |

_____

(1)    As described above, additional compensation includes: (i) a dealer-manager fee payable to the dealer manager in an amount equal to 0.50% of the principal amount of all L Bonds sold; (ii) an accountable expense allowance to the selling group members as described above, which may include due-diligence expenses of the dealer manager and selling group members set forth in a detailed and itemized invoice; (iii) wholesaling fees, which may consist of commissions and non-transaction-based compensation of the wholesalers; (iv) non-cash compensation, which may consist of an occasional meal, a ticket to a sporting event or the theater, or comparable entertainment that is neither so frequent nor so extensive as to raise any question of propriety and is not preconditioned on achievement of a sales target, the national and regional sales conferences of our selling group members, training and education meetings for registered representatives of our selling group members, and permissible forms of non-cash compensation to registered representatives of our selling group members, such as gifts that do not exceed an aggregate value of $100 per annum per registered representative and that are not pre-conditioned on achievement of a sales target, including but not limited to seasonal gifts; and (v) up to a 1.00% reallowance to selling group members.

(2)    The combined selling commissions and additional compensation for this offering will not exceed 8.00% of the aggregate gross proceeds of this offering.

The line items reflected in the table below are our current estimates of average sales commissions and additional compensation (including accountable expenses) that we will pay. Specifically, we estimate that the average sales commission will be 5.00%, or $50,000,000 based on $1,000,000,000 in principal amount of L Bonds sold, and the average additional compensation will be 3.00%, or $30,000,000 based on $1,000,000,000 in principal amount of L Bonds sold. The components of "additional compensation" are detailed in footnote (1) to the table above. Actual costs may differ from the percentages and amounts shown in the table below, subject, however, to the limitations noted above.

| L Bonds Sold | Sales Commission | Additional Compensation | Total |
|---|---|---|---|
| $500,000,000 | $ 25,000,000 | $ 15,000,000 | 8.00% |
| $750,000,000 | $ 37,500,000 | $ 22,500,000 | 8.00% |
| $1,000,000,000 | $ 50,000,000 | $ 30,000,000 | 8.00% |

The wholesalers employed by us are registered with and associated persons of our dealer manager. The wholesalers will:

- attend local, regional and national conferences of the selling group members; and

- contact selling group members and their registered representatives to make presentations concerning us and this offering.

The wholesalers will receive a portion of their non-transaction based compensation as compensation for their selling efforts. We host training and education meetings for selling group members and their representatives. The costs of the training and education meetings will be borne by us, but counted toward the 8.00% underwriting compensation limit.

Certain of our employees who are also registered representatives and supervisory principals of the dealer manager have been granted certain share appreciation rights ("SARs") as part of their compensation. The SARs give such individual the contractual right to receive from us additional cash compensation at any point before the SAR's expiration, but only if the price of our common stock has increased between the grant date and the date when we receive notice of such individual's intention to exercise the SAR. At the termination of this offering, the aggregate of the appreciation amount, as defined in the SAR agreement, will be calculated and added to the other items of value (e.g., selling commissions and additional forms of compensation) to ensure that aggregate compensation paid in connection with this offering does not exceed 8.00% of the gross offering proceeds.

In accordance with FINRA rules, in no event will our total compensation to FINRA members, including but not limited to sales commissions, the dealer-manager fee and accountable expense and other reimbursements to our dealer

App. 0417

manager and selling group members, including non-transaction-based compensation of the wholesalers and non-cash compensation, exceed 8.00% of our gross offering proceeds, in the aggregate.

We will indemnify the selling group members and our dealer manager against some civil liabilities, including certain liabilities under the Securities Act of 1933 and liabilities arising from breaches of our representations and warranties contained in the Dealer Manager Agreement.

The foregoing is a summary of the material terms relating to the plan of distribution of the L Bonds contained in the Dealer Manager Agreement. Any amendment to the Dealer Manager Agreement will be filed as an exhibit to an amendment to the registration statement of which this prospectus is a part.

**Settlement Procedures**

You can place an order for the purchase of L Bonds using DTC Settlement through your selling group member. A selling group member using DTC settlement will have an account with a DTC participant in which your funds will be placed to facilitate settlement. Orders may be placed until the cyclical order due date. Orders will be executed by such selling group member electronically and you must coordinate with your selling group member's registered representative to pay the full purchase price of the L Bonds by the trade date. If you purchase your L Bonds using DTC settlement, you will be credited with ownership of an L Bond on the second business day after the end of the DTC closing cycle in which the subscription is made (typically, closings will occur on a bi-monthly cycle). If you purchase your L Bonds in this manner, your purchase price will not be held in escrow.

You also have the option to elect to settle your purchase directly with us, the Company. If you elect to use direct settlement with us, you should complete and sign a Subscription Agreement similar to the one filed as an exhibit to the registration statement of which this prospectus is a part. A form of Subscription Agreement is available from your selling group member's registered representative. Once completed and signed, your Subscription Agreement should be provided to your selling group member who will deliver it to us to be held, together with your related subscription funds, until our acceptance of your subscription. In connection with a direct settlement subscription, you should pay the full purchase price of the L Bonds to us as set forth in the Subscription Agreement. Subscribers may not withdraw funds from the subscription account. Subscriptions will be effective upon our acceptance of your Subscription Agreement and related funds, and we reserve the right to reject any subscription in whole or in part.

**Covered Security**

Our L Bonds are a "covered security." The term "covered security" applies to securities exempt from state registration because of their oversight by federal authorities and national-level regulatory bodies pursuant to Section 18 of the Securities Act of 1933. Generally, securities listed on national exchanges are the most common type of covered security exempt from state registration. A non-traded security also can be a covered security if it has a seniority greater than or equal to other securities from the same issuer that are listed on a national exchange. Our L Bonds are a covered security because they are senior to our common stock, which is listed on The Nasdaq Capital Market, and therefore our offering of L Bonds will be exempt from state registration.

**Although the status of our L Bonds as a "covered security" will facilitate their purchase and sale to a broader range of investors than would otherwise be available to us, and although the offer and sale of a "covered security" generally involves fewer issuance costs to the issuer of such securities, our L Bonds are not a suitable purchase for all investors. In this regard, please carefully review the "Risk Factors" contained in this prospectus, as well as the disclosures on page 12 under the heading "Covered Security."**

68

### MATERIAL FEDERAL INCOME TAX CONSIDERATIONS

The following is a general discussion of the material United States ("U.S.") federal income tax considerations relating to the initial purchase, ownership and disposition of the L Bonds by U.S. and non-U.S. holders. This discussion is a summary only and is not a complete analysis of all the potential tax considerations relating to the purchase, ownership and disposition of the L Bonds. We have based this summary on current provisions of the Code of 1986, as amended (the "Code"), applicable U.S. Treasury Regulations promulgated thereunder, judicial opinions, and published rulings of the Internal Revenue Service (the "IRS"), all as in effect on the date of this prospectus. However, these laws and other guidance are subject to differing interpretations or change, possibly with retroactive effect. In addition, we have not sought, and will not seek, a ruling from the IRS or an opinion of counsel with respect to any tax consequences of purchasing, owning or disposing of L Bonds. Thus, the IRS could take a different position regarding one or more of the tax consequences or matters described in this prospectus; and there can be no assurance that any position taken by the IRS would not be sustained.

This discussion is limited to purchasers of L Bonds who acquire the L Bonds from us in this offering and hold the L Bonds as capital assets for federal income tax purposes. This discussion does not address all possible tax consequences that may be applicable to you in light of your specific circumstances. For instance, this discussion does not address the alternative minimum tax provisions of the Code, or special rules applicable to some categories of investors such as financial institutions, insurance companies, tax-exempt organizations, dealers in securities, real estate investment trusts, regulated investment companies, or persons who hold L Bonds as part of a hedge, conversion or constructive sale transaction, straddle or other risk reduction transaction that may be subject to special rules. This discussion also does not address the tax consequences arising under the laws of any foreign, state or local jurisdiction; or any U.S. estate or gift tax laws.

If you are considering the purchase of an L Bond, you should consult your own tax advisors as to the particular tax consequences to you of acquiring, holding or otherwise disposing of the L Bonds, including the effect and applicability of state, local or foreign tax laws, or any U.S. estate and gift tax laws.

As used in this discussion, the term "U.S. holder" means a holder of an L Bond that is:

(i)     for United States federal income tax purposes, a citizen or resident of the United States;

(ii)    a corporation, partnership or other entity created or organized in or under the laws of the United States or of any political subdivision thereof or other entity characterized as a corporation or partnership for federal income tax purposes;

(iii)   an estate, the income of which is subject to United States federal income taxation regardless of its source; or

(iv)    a trust, the administration of which is subject to the primary supervision of a court within the United States and which has one or more United States persons with authority to control all substantial decisions, or if the trust was in existence on August 20, 1996, and has elected to continue to be treated as a United States trust.

For the purposes of this discussion, a "non-U.S. holder" means any holder of L Bonds other than a U.S. holder. Any L Bond purchaser who is not a U.S. citizen will be required to furnish documentation, on IRS Form W-8BEN, that clearly states whether it is subject to U.S. withholding taxes, in accordance with applicable requirements of the United States taxing authority.

### Characterization of the L Bonds

The federal income tax consequences of owning L Bonds depend on characterization of the L Bonds as debt for federal income tax purposes, rather than as equity interests or a partnership among the holders of the L Bonds. We believe that the L Bonds have been structured in a manner that will allow the L Bonds to be characterized as debt for federal income tax purposes. However, this is only our belief; and no ruling from the IRS or an opinion of counsel has been sought in this regard. Thus, the IRS could successfully challenge this characterization.

If the L Bonds were treated as equity interests, there could be adverse effects on some holders. For example, payments on the L Bonds could (1) if paid to non-U.S. holders, be subject to federal income tax withholding; (2) constitute unrelated business taxable income to some tax-exempt entities, including pension funds and some retirement accounts (if the relationship were characterized as a partnership for tax purposes);

and (3) cause the timing and amount of income that accrues to holders of B Bonds to be different from that described below.

69

Because of these potential adverse effects, you are urged to consult your own tax advisors as to the tax consequences that may apply to your particular situation in the event the L Bonds are re-characterized as equity interests; and as to the likelihood that the L Bonds could be so re-characterized. The remainder of this discussion assumes that the L Bonds are characterized as debt.

**Taxation of U.S. Holders**

*Stated Interest*

Under general federal income tax principles, you must include stated interest in income in accordance with the method of accounting you use for federal income tax purposes. Accordingly, if you are using the accrual method of tax accounting, you must include stated interest in income as it accrues. If you are using the cash method of tax accounting, you must include stated interest in income as it is actually or constructively received. Payments of interest to taxable holders of L Bonds will constitute portfolio income, and not passive activity income, for the purposes of the passive loss limitations of the Code. Accordingly, income arising from payments on the L Bonds will not be subject to reduction by losses from passive activities of a holder.

Income attributable to interest payments on the L Bonds may be offset by investment expense deductions, subject to the limitation that individual investors may only deduct miscellaneous itemized deductions, including investment expenses other than interest, to the extent these deductions exceed 2% of the investor's adjusted gross income.

If a partnership (or other entity or arrangement treated as a partnership for U.S. federal income tax purposes) holds L Bonds, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership. If you are a partner in a partnership purchasing L Bonds, we urge you to consult your tax advisor.

*Disposition of L Bonds*

In general, a U.S. holder will recognize gain or loss upon the sale, exchange or other taxable disposition of an L Bond measured by the difference between (1) the sum of the cash and the fair market value of all other property received on such disposition, excluding any portion of the payment that is attributable to accrued interest on the L Bonds; and (2) your adjusted tax basis in the L Bond. A U.S. holder's adjusted tax basis in an L Bond generally will be equal to the price the U.S. holder paid for the L Bond. Any of this gain or loss generally will be long-term capital gain or loss if, at the time of any such taxable disposition, the L Bond was a capital asset in the hands of the holder and was held for more than one year. Net long-term capital gain recognized by individual U.S. holders is eligible for a reduced rate of taxation. The deductibility of capital losses is subject to annual limitations.

The terms of the L Bonds may be modified upon the consent of a specified percentage of holders and, in some cases, without consent of the holders. In addition, the L Bonds may be assumed upon the occurrence of specific transactions. The modification or assumption of an L Bond could, in some instances, give rise to a deemed exchange of an L Bond for a new debt instrument for federal income tax purposes. If an exchange is deemed to occur by reason of a modification or assumption, you could realize gain or loss without receiving any cash.

*Additional Tax on Net Investment Income*

If you are a U.S. holder other than a corporation, you generally will be subject to a 3.8% additional tax on the lesser of (1) your "net investment income" for the taxable year, and (2) the excess of your modified adjusted gross income for the taxable year over a certain threshold. Your net investment income generally will include any income or gain recognized by you with respect to our L Bonds, unless such income or gain is derived in the ordinary course of the conduct of your trade or business (other than a trade or business that consists of certain passive or trading activities).

**Considerations for Tax-Exempt Holders of L Bonds**

Tax-exempt entities, including charitable corporations, pension plans, profit sharing or stock bonus plans, individual retirement accounts and some other employee benefit plans are subject to federal income tax on unrelated business taxable income. For example, net income derived from the conduct of a trade or business regularly carried on by a tax-exempt entity or by a partnership in which it is a partner is treated as unrelated business taxable income.

App. 0422

A $1,000 special deduction is allowed in determining the amount of unrelated business taxable income subject to tax. Tax-exempt entities taxed on their unrelated business taxable income are also subject to the alternative minimum tax for items of tax preference which enter into the computation of unrelated business taxable income.

In general, interest income does not constitute unrelated business taxable income. However, under the debt-financed property rules, if tax-exempt holders of L Bonds finance the acquisition or holding of L Bonds with debt, interest on the L Bonds will be taxable as unrelated business taxable income. The L Bonds will be treated as debt-financed property if the debt was incurred to acquire the L Bonds or was incurred after the acquisition of the L Bonds, so long as the debt would not have been incurred but for the acquisition and, at the time of the acquisition, the incurrence of the debt has already occurred or was foreseeable.

**Non-U.S. Holders**

The following discussion is a summary of the principal U.S. federal income consequences resulting from the ownership of the L Bonds by non-U.S. holders. However, application of the U.S. federal income tax rules associated with non-U.S. holders is complex and factually sensitive. Thus, if you could be considered to be a non-U.S. holder, you are urged to consult your own tax advisors with respect to the application of the federal income tax rules for your particular situation.

*Payments of Interest to Non-U.S. Holders*

Subject to the discussion below under "Backup Withholding and Information Reporting," payments of interest received by a non-U.S. holder generally will not be subject to U.S. federal withholding tax, provided (1) that (a) the non-U.S. holder does not own, actually or constructively, 10% or more of the total combined voting power of all classes of our stock entitled to vote; (b) the non-U.S. holder is not a controlled foreign corporation, actually or constructively, through stock ownership; and (c) the beneficial owner of the L Bond complies with the certification requirements, including delivery of a statement, signed by the holder under penalties of perjury, certifying that the holder is a foreign person and provides its name and address; or (2) that the non-U.S. holder is entitled to the benefits of an income tax treaty under which the interest is exempt from U.S. withholding tax and the non-U.S. holder complies with the reporting requirements. If an L Bond is held through a securities clearing organization or other specified financial institutions (an "Intermediary"), the Intermediary may provide the relevant signed statement and, unless the Intermediary is a "qualified" intermediary as defined under the Code, the signed statement provided by the Intermediary must be accompanied by a copy of a valid Form W-8BEN provided by the non-U.S. beneficial holder of the L Bond.

Payments of interest not exempt from United States federal withholding tax as described above will be subject to a withholding tax at the rate of 30%, subject to reduction under an applicable income tax treaty.

Payments of interest on an L Bond to a non-U.S. holder generally will not be subject to U.S. federal income tax, as opposed to withholding tax, unless the income is effectively connected with the conduct by the non-U.S. holder of a trade or business in the United States. To claim the benefit of a lower treaty withholding rate, a non-U.S. holder must provide a properly executed IRS Form W-8BEN to us or our paying agent before the payment of stated interest; and may be required to obtain a U.S. taxpayer identification number and provide documentary evidence issued by foreign governmental authorities to prove residence in the foreign country. You should consult your own tax advisor to determine the effects of the application of the U.S. federal withholding tax to your particular situation.

*Disposition of the L Bonds by Non-U.S. Holders*

Subject to the discussion below under "Backup Withholding and Information Reporting," a non-U.S. holder generally will not be subject to United States federal income tax, and generally no tax will be withheld with respect to gains realized on the disposition of an L Bond, unless (a) the gain is effectively connected with a United States trade or business conducted by the non-U.S. holder or (b) the non-U.S. holder is an individual who is present in the United States for 183 or more days during the taxable year of the disposition and other requirements are satisfied.

*Non-U.S. Holders Subject to U.S. Income Taxation*

If interest and other payments received by a non-U.S. holder with respect to the L Bonds, including proceeds from the disposition of the L Bonds, are effectively connected with the conduct by the non-U.S. holder of a trade or business within the United States, or the non-U.S. holder is otherwise subject to United States federal income taxation on a net basis with respect to the holder's ownership of the L Bonds, or are individuals that have by operation of law become residents in the United States for federal income tax purposes, the non-U.S. holder generally will be subject to the rules described above applicable to U.S. holders of L Bonds, subject to any modification provided under an applicable income tax treaty. If any of these non-U.S. holders is a corporation, it may also be subject to a U.S. "branch profits tax" at a 30% rate.

**Backup Withholding and Information Reporting**

Non-corporate U.S. holders may be subject to backup withholding at a rate of 28% on payments of principal, premium, and interest on, and the proceeds of the disposition of, the L Bonds. In general, backup withholding will be imposed only if the U.S. holder (1) fails to furnish its taxpayer identification number ("TIN"), which for an individual would be his or her Social Security number; (2) furnishes an incorrect TIN; (3) is notified by the IRS that it has failed to report payments of interest or dividends; or (4) under some circumstances, fails to certify under penalty of perjury that it has furnished a correct TIN and has been notified by the IRS that it is subject to backup withholding tax for failure to report interest or dividend payments. In addition, the payments of principal and interest to U.S. holders generally will be subject to information reporting. You should consult your tax advisors regarding your qualification for exemption from backup withholding and the procedure for obtaining an exemption, if applicable.

Backup withholding generally will not apply to payments made to a non-U.S. holder of an L Bond who provides the certification that it is a non-U.S. holder, and the payor does not have actual knowledge that a certificate is false, or otherwise establishes an exemption from backup withholding. Payments by United States office of a broker of the proceeds of a disposition of the L Bonds generally will be subject to backup withholding at a rate of 28% unless the non-U.S. holder certifies it is a non-U.S. holder under penalties of perjury or otherwise establishes an exemption. In addition, if a foreign office of a foreign custodian, foreign nominee or other foreign agent of the beneficial owner, or if a foreign office of a foreign "broker" pays the proceeds of the sale of an L Bond to the seller, backup withholding and information reporting will not apply; provided that the nominee, custodian, agent or broker is not a "United States related person," or a person which derives more than 50% of its gross income for some periods from the conduct of a trade or business in the United States or is a controlled foreign corporation. The payment by a foreign office of a broker that is a United States person or a United States related person of the proceeds of the sale of L Bonds will not be subject to backup withholding, but will be subject to information reporting unless the broker has documentary evidence in its records that the beneficial owner is not a United States person for purposes of the backup withholding and information reporting requirements and other conditions are met, or the beneficial owner otherwise establishes an exemption.

The amount of any backup withholding imposed on a payment to a holder of an L Bond will be allowed as a credit against the holder's United States federal income tax liability and may entitle the holder to a refund; provided that the required information is furnished to the IRS.

72

**STATE, LOCAL AND FOREIGN TAXES**

We make no representations regarding the tax consequences of the purchase, ownership or disposition of the L Bonds under the tax laws of any state, locality or foreign country. You should consult your own tax advisors regarding these state and foreign tax consequences.

## ERISA CONSIDERATIONS

**General**

Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and Section 4975 of the Code impose restrictions on employee benefit plans that are subject to ERISA, or plans or arrangements that are subject to Code Section 4975, and on persons who are parties in interest or disqualified persons with respect to those plans or arrangements. Some employee benefit plans, like governmental plans and church plans (if no election has been made under Section 410(d) of the Code), are not subject to the restrictions of Title I of ERISA or Code Section 4975, and assets of these plans may be invested in the L Bonds without regard to the ERISA considerations described below, subject to the Code and other applicable federal and state laws affecting tax-exempt organizations generally. Any plan fiduciary that proposes to cause a plan to acquire any of the L Bonds should consult with its counsel with respect to the potential consequences under ERISA and the Code of the plan's acquisition and ownership of the L Bonds. Investments by plans are also subject to ERISA's and the Code's general fiduciary requirements, including the requirement of investment prudence and diversification and the requirement that a plan's investments be made in accordance with the documents governing the plan.

**Prohibited Transactions**

*General*

Section 406 of ERISA and Section 4975 of the Code prohibits certain "parties in interest" and "disqualified persons" with respect to a plan from engaging in select transactions involving a plan and its assets unless a statutory, regulatory or administrative exemption applies to the transaction. Section 4975 of the Code imposes excise taxes on parties in interest that engage in non-exempt "prohibited transactions." Section 502(i) of ERISA requires the Secretary of the U.S. Department of Labor ("Labor") to assess a civil penalty against a fiduciary who breaches any fiduciary responsibility under, or commits any other violation of, part 4 of Title I of ERISA, or any other person who knowingly participates in a breach or violation.

*Plan Asset Regulations*

Labor has issued regulations concerning the definition of what constitutes the assets of a plan for purposes of ERISA and the prohibited transaction provisions of the Code. The plan asset regulations describe the circumstances where the assets of an entity in which a plan invests will be considered to be "plan assets," so that any person who exercises control over the assets would be subject to ERISA's fiduciary standards. Generally, under the plan asset regulation, when a plan invests in another entity, the plan's assets do not include, solely by reason of the investment, any of the underlying assets of the entity. However, the plan asset regulation provides that, if a plan acquires an "equity interest" in an entity that is neither a "publicly-offered security" nor a security issued by an investment company registered under the Investment Company Act of 1940 the assets of the entity will be treated as assets of the plan investor unless exceptions apply.

Under the plan asset regulations the term "equity interest" is defined as any interest in an entity other than an instrument that is treated as indebtedness under "applicable local law" and that has no "substantial equity features." Although the plan asset regulation is silent with respect to the question of which law constitutes "applicable local law" for this purpose, Labor has stated that these determinations should be made under the state law governing interpretation of the instrument in question. In the preamble to the plan asset regulation, Labor declined to provide a precise definition of what features are equity features or the circumstances under which the features would be considered "substantial," noting that the question of whether a plan's interest has substantial equity features is an inherently factual one, but that in making that determination it would be appropriate to take into account whether the equity features are such that a plan's investment would be a practical vehicle for the indirect provision of investment management services. We believe that the L Bonds will be classified as indebtedness without substantial equity features for ERISA purposes.

App. 0425

Under the plan asset regulations the term "publicly-offered security" is defined as a security that is (i) freely transferable, (ii) part of a class of securities that is widely held, and (iii) either (A) part of a class of securities registered under section 12(b) or 12(g) of the Securities Exchange Act of 1934 or (B) sold to the plan as part of an offering of securities to the public pursuant to an effective registration statement under the Securities Act of 1933 and the class of securities of which such security is a part is registered under the Securities Exchange Act of 1934 within 120 days after the end of the fiscal year of the issuer during which the offering of such securities to the public occurred. For purposes of the above, a class of securities is considered to be "widely held" if it is owned by 100 or more investors independent of the issuer and of one another. In the case of this offering, while the offer and sale of the L Bonds have been registered under the Securities Act of 1933, the L Bonds themselves have not been registered under the Securities Exchange Act of 1934. For this reason, we believe that the L Bonds will not likely meet the definition for "publicly-offered security" under the plan asset regulations.

In light of the foregoing, if the L Bonds were deemed to be equity interests for this purpose and no statutory, regulatory, or administrative exception applies, we could be considered to hold plan assets by reason of a plan's investment in the L Bonds. These plan assets would include an undivided interest in all of our assets. In this case, we may be considered a fiduciary with respect to the investing plans. We would be subject to the fiduciary responsibility provisions of Title I of ERISA, including the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code, and to Section 4975 of the Code with respect to transactions involving any of our assets. The ERISA fiduciary standards could affect the way we conduct the business, which would have consequences for all investors, not just those that are employee benefit plans.

Depending on the relevant facts and circumstances, prohibited transaction exemptions may apply to the purchase or holding of the L Bonds. See, for example, Prohibited Transaction Class Exemption ("PTE") 96-23, which exempts some transactions effected on behalf of a plan or by an "in-house asset manager;" PTE 95-60, which exempts some transactions between insurance company general accounts and parties in interest; PTE 91-38, which exempts some transactions between bank collective investment funds and parties in interest; PTE 90-1, which exempts some transactions between insurance company pooled separate accounts and parties in interest; or PTE 84-14, which exempts some transactions effected on behalf of a plan by a "qualified professional asset manager." However, there can be no assurance that any of these exemptions will apply with respect to any plan's investment in the L Bonds, or that the exemption, if it did apply, would apply to all prohibited transactions that may occur in connection with the investment.

Any plan fiduciary considering whether to purchase L Bonds on behalf of a plan should consult with its counsel regarding the applicability of the fiduciary responsibility and prohibited transaction provisions of ERISA and the Code. Before purchasing any L Bonds, a fiduciary of a plan should make its own determination as to (1) whether GWG Holdings, as issuer of and borrower under the L Bonds, is a "party in interest" under ERISA or a "disqualified person" under the Code with respect to the plan; (2) the availability of the relief provided in the plan asset regulation and (3) the availability of any other prohibited transaction exemptions. In addition, purchasers that are insurance companies should consult their own ERISA counsel with respect to their fiduciary responsibilities associated with their purchase and ownership of the L Bonds, including any responsibility under the Supreme Court case *John Hancock Mutual Life Insurance Co. v. Harris Trust and Savings Bank*.

74

## LEGAL MATTERS

Certain legal matters in connection with the L Bonds will be passed upon for us by Maslon LLP, of Minneapolis, Minnesota.

## EXPERTS

The consolidated financial statements of GWG Holdings, Inc. and its subsidiaries as of and for the years ended December 31, 2016 and December 31, 2015, included in this prospectus and in the registration statement of which this prospectus is a part, have been audited by Baker Tilly Virchow Krause, LLP, an independent registered public accounting firm. As indicated in their report with respect thereto, these consolidated financial statements and management's assessment of the effectiveness of internal control over financial reporting are included in this prospectus in reliance upon the authority of such firm as experts in auditing and accounting.

## WHERE YOU CAN FIND MORE INFORMATION

We have filed with the SEC a registration statement on Form S-1 under the Securities Act with respect to the L Bonds to be offered and sold pursuant to the prospectus which is a part of that registration statement. This prospectus does not contain all the information contained in the registration statement. For further information with respect to us and the L Bonds to be sold in this offering, we refer you to the registration statement, including the agreements, other documents and schedules filed as exhibits to the registration statement.

We file annual, quarterly and current reports, and other information with the SEC. We intend to make these filings available on our website at *www.gwgh.com*. Information on our website is not incorporated by reference in this prospectus. We maintain an office at 220 South Sixth Street, Suite 1200, Minneapolis, MN 55402 where all records concerning the L Bonds are to be retained. L Bond holders and their representatives can request information regarding the L Bonds by contacting our office by mail at our address or by telephone at (612) 746-1944 or by fax at (612) 746-0445. Upon request, we will provide copies of our filings with the SEC free of charge to our investors. Our SEC filings, including the registration statement of which this prospectus is a part, will also be available on the SEC's Internet site at *http://www.sec.gov*. You may read and copy all or any portion of the registration statement or any reports, statements or other information we file at the SEC's public reference room at 100 F Street, N.E., Washington, D.C. 20549. In addition, you may call the SEC at 1-800-SEC-0330 for further information on the operation of the public reference room. You may receive copies of these documents upon payment of a duplicating fee by writing to the SEC.

75

**INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE**

We are incorporating certain information about us that we have filed with the SEC by reference in this prospectus, which means that we are disclosing important information to you by referring you to those documents. The information we incorporate by reference is an important part of this prospectus.

We incorporate by reference the documents listed below and any future filings we will make with the Commission under Section 13(a), 13(c), 14 or 15(d) of the Exchange Act (i) after the date of the initial filing of the registration statement of which this prospectus is a part and prior to effectiveness of such registration statement, and (ii) from the date of this prospectus but prior to the termination of the offering of the securities covered by this prospectus:

- Our Annual Report on Form 10-K for the period ended December 31, 2016, filed with the SEC on March 15, 2017 (including all exhibits thereto);

- Our Quarterly Reports on Form 10-Q for the periods ended March 31, 2017, June 30, 2017, and September 30, 2017 filed with the SEC on May 12, 2017, August 10, 2017, and November 9, 2017 respectively (including all exhibits thereto);

- Our Current Reports on Form 8-K filed with the SEC on February 9, February 22, March 8, April 3, April 19, May 10, June 30, August 10, 2017, September 27, 2017, October 26, 2017, and November 9, 2017 (including all exhibits thereto); and

- Our definitive proxy statement filed with the SEC on March 30, 2017 (including all exhibits thereto).

We are not, however, incorporating by reference any documents or portions thereof, whether specifically listed above or filed in the future, that are not deemed "filed" with the SEC or any information furnished pursuant to Items 2.02 or 7.01 of Form 8-K or certain exhibits furnished pursuant to Item 9.01 of Form 8-K.

The section entitled "Where You Can Find More Information" above describes how you can obtain or access any documents or information that we have incorporated by reference herein. The information relating to us contained in this prospectus does not purport to be comprehensive and should be read together with the information contained in the documents incorporated or deemed to be incorporated by reference in this prospectus.

Upon written or oral request, we will provide, free of charge, to each person, including any beneficial owner, to whom a prospectus is delivered, a copy of any or all of the reports or documents that are incorporated by reference into this prospectus. Such written or oral requests should be made to:

William Acheson, Chief Financial Officer
220 South Sixth Street, Suite 1200
Minneapolis, MN 55402
Telephone Number: (612) 746-1944

In addition, such reports and documents may be found on our website at *www.gwgh.com*.

**GWG HOLDINGS, INC.**

**FINANCIAL STATEMENTS**

**Table of Contents**

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Balance Sheets at December 31, 2016 and 2015 | F-3 |
| Consolidated Statements of Operations for the years ended December 31, 2016 and 2015 | F-4 |
| Consolidated Statements of Changes in Equity for the years ended December 31, 2016 and 2015 | F-5 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2016 and 2015 | F-6 |
| Notes to Consolidated Financial Statements | F-8 |
| Condensed Consolidated Balance Sheets as of September 30, 2017, and December 31, 2016 | F-29 |
| Condensed Consolidated Statements of Operations for the three and nine months ended September 30, 2017 and 2016 | F-30 |
| Condensed Consolidated Statements of Cash Flows for the three and nine months ended September 30, 2017 and 2016 | F-31 |
| Consolidated Statement of Changes in Stockholders' Equity | F-33 |
| Notes to Condensed Consolidated Financial Statements | F-34 |

F-1

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Shareholders, Audit Committee and Board of Directors
GWG Holdings, Inc. and Subsidiaries
Minneapolis, MN

We have audited the accompanying consolidated balance sheets of GWG Holdings, Inc. and Subsidiaries as of December 31, 2016 and 2015, and the related consolidated statements of operations, stockholders' equity and cash flows for the years then ended. We also have audited GWG Holdings, Inc. and Subsidiaries' internal control over financial reporting as of December 31, 2016, based on criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) (2013 framework). The company's management is responsible for these consolidated financial statements, for maintaining effective control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on these consolidated financial statements and an opinion on the company's internal control over financial reporting based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements include examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall consolidated financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of consolidated financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the consolidated financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of GWG Holdings, Inc. and Subsidiaries as of December 31, 2016 and 2015 and the results of their operations and cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, GWG Holdings, Inc. and Subsidiaries maintained, in all material respects, effective internal control over financial reporting as of December 31, 2016, based on criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) (2013 framework).

/s/ Baker Tilly Virchow Krause, LLP
Minneapolis, Minnesota
March 15, 2017

App. 0430

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**

|  | December 31, 2016 | December 31, 2015 |
|---|---|---|
| **ASSETS** | | |
| Cash and cash equivalents | $ 78,486,982 | $ 34,425,105 |
| Restricted cash | 37,826,596 | 2,341,900 |
| Investment in life insurance policies, at fair value | 511,192,354 | 356,649,715 |
| Secured MCA advances | 5,703,147 | — |
| Life insurance policy benefits receivable | 5,345,000 | — |
| Other assets | 4,688,103 | 2,461,045 |
| TOTAL ASSETS | $ 643,242,182 | $ 395,877,765 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | |
| **LIABILITIES** | | |
| Senior credit facilities | $ 156,064,818 | $ 63,279,596 |
| Series I Secured Notes | 16,404,836 | 23,287,704 |
| L Bonds | 381,312,587 | 276,482,796 |
| Accounts payable | 2,226,712 | 1,517,440 |
| Interest payable | 16,160,599 | 12,340,061 |
| Other accrued expenses | 1,676,761 | 1,060,786 |
| Deferred taxes, net | 2,097,371 | 1,763,968 |
| TOTAL LIABILITIES | $ 575,943,684 | $ 379,732,351 |
| **STOCKHOLDERS' EQUITY** | | |
| CONVERTIBLE PREFERRED STOCK – Series A | | |
| (par value $0.001; shares authorized 40,000,000; shares outstanding 2,640,521 and 2,781,735; liquidation preference of $19,804,000 and $20,863,000 as of December 31, 2016 and 2015, respectively) | 19,701,133 | 20,784,841 |
| REDEEMABLE PREFERRED STOCK – RPS | | |
| (par value $0.001; shares authorized 100,000; shares outstanding 59,183 as of December 31, 2016) | 59,025,164 | — |
| COMMON STOCK | | |
| (par value $0.001: shares authorized 210,000,000; shares issued and outstanding 5,980,190 and 5,941,790 as of December 31, 2016 and 2015, respectively) | 5,980 | 5,942 |
| Additional paid-in capital | 7,383,515 | 14,563,834 |
| Accumulated deficit | (18,817,294) | (19,209,203) |
| TOTAL STOCKHOLDERS' EQUITY | 67,298,498 | 16,145,414 |
| TOTAL LIABILITIES & STOCKHOLDERS' EQUITY | $ 643,242,182 | $ 395,877,765 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-3

App. 0431

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Year Ended | |
| --- | --- | --- |
| | December 31, 2016 | December 31, 2015 |
| REVENUE | | |
| Gain on life insurance policies, net | $ 67,801,565 | $ 39,381,003 |
| MCA income | 929,303 | — |
| Interest and other income | 746,466 | 251,249 |
| TOTAL REVENUE | 69,477,334 | 39,632,252 |
| | | |
| EXPENSES | | |
| Interest expense | 42,343,374 | 29,518,718 |
| Employee compensation and benefits | 11,784,296 | 8,010,020 |
| Legal and professional fees | 3,947,376 | 3,152,783 |
| Other expenses | 10,676,976 | 7,784,350 |
| TOTAL EXPENSES | 68,752,022 | 48,465,871 |
| | | |
| INCOME (LOSS) BEFORE INCOME TAXES | 725,312 | (8,833,619) |
| Income tax expense (benefit) | 333,403 | (3,509,587) |
| | | |
| NET INCOME (LOSS) | 391,909 | (5,324,032) |
| Preferred stock dividends | (3,537,287) | (2,069,242) |
| NET LOSS ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ (3,145,378) | $ (7,393,274) |
| | | |
| NET LOSS PER COMMON SHARE ATTRIBUTABLE TO COMMON SHAREHOLDERS | | |
| Basic | $ (0.53) | $ (1.25) |
| Diluted | $ (0.53) | $ (1.25) |
| | | |
| WEIGHTED AVERAGE SHARES OUTSTANDING | | |
| Basic | 5,967,274 | 5,906,761 |
| Diluted | 5,967,274 | 5,906,761 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-4

App. 0432

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENT OF CHANGES IN STOCKHOLDERS' EQUITY**

| | Preferred Stock Shares | Preferred Stock | Common Shares | Common Stock (par) | Additional Paid-in Capital | Accumulated Deficit | Total Equity |
|---|---|---|---|---|---|---|---|
| **Balance, December 31, 2014** | **2,738,966** | **$20,527,866** | **5,870,193** | **$ 5,870** | **$15,741,371** | **$(13,885,171)** | **$22,389,936** |
| Net loss | — | — | — | — | — | (5,324,032) | (5,324,032) |
| Issuance of common stock | — | — | 60,000 | 60 | 581,940 | — | 582,000 |
| Series A Preferred Stock conversion to common stock | (15,463) | (115,973) | 11,597 | 12 | 115,961 | — | — |
| Issuance of preferred stock | 58,232 | 372,948 | — | — | — | — | 372,948 |
| Preferred stock dividends | — | — | — | — | (2,069,242) | — | (2,069,242) |
| Stock-based compensation | — | — | — | — | 193,804 | — | 193,804 |
| **Balance, December 31, 2015** | **2,781,735** | **$20,784,841** | **5,941,790** | **$ 5,942** | **$14,563,834** | **$(19,209,203)** | **$16,145,414** |
| Net loss | — | — | — | — | — | 391,909 | 391,909 |
| Issuance of common stock | — | — | 36,450 | 36 | 244,149 | — | 244,185 |
| Redemption of Series A Preferred Stock | (239,749) | (1,788,451) | 1,950 | 2 | 19,498 | — | (1,768,951) |
| Issuance of Series A Preferred Stock | 98,535 | 704,743 | — | — | — | — | 704,743 |
| Issuance Redeemable Preferred Stock | 59,183 | 59,025,164 | — | — | (4,133,525) | — | 54,891,639 |
| Preferred stock dividends | — | — | — | — | (3,537,288) | — | (3,537,288) |
| Issuance of stock options | — | — | — | — | 226,847 | — | 226,847 |
| **Balance, December 31, 2016** | **2,699,704** | **$78,726,297** | **5,980,190** | **$ 5,980** | **$ 7,383,515** | **$(18,817,294)** | **$67,298,498** |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-5

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENT OF CASH FLOWS**

| | Year Ended | |
| --- | --- | --- |
| | December 31, 2016 | December 31, 2015 |
| CASH FLOWS FROM OPERATING ACTIVITIES | | |
| Net loss | $ 391,909 | $ (5,324,032) |
| Adjustments to reconcile net loss to net cash flows used in operating activities: | | |
| Gain on life insurance policies | (48,988,406) | (39,371,059) |
| Amortization of deferred financing and issuance costs | 8,445,252 | 3,712,056 |
| Deferred income taxes | 333,402 | (3,509,587) |
| Preferred stock issued in lieu of cash dividends | 689,742 | 683,133 |
| Preferred stock dividends payable | 302,972 | 6,800 |
| (Increase) decrease in operating assets: | | |
| Due from related parties | 1,169 | (1,256) |
| Life insurance policy benefits receivable | (5,345,000) | 1,750,000 |
| Other assets | (23,022,962) | (304,526) |
| Increase in operating liabilities: | | |
| Accounts payable | 709,272 | 313,864 |
| Interest payable | 4,868,196 | 2,213,529 |
| Other accrued expenses | (4,399,443) | 2,183,393 |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (66,013,897) | (37,647,685) |
| | | |
| CASH FLOWS FROM INVESTING ACTIVITIES | | |
| Investment in life insurance policies | (94,952,879) | (38,906,934) |
| Carrying value of matured life insurance policies | 10,992,624 | 4,511,289 |
| Investment in Secured MCA advances | (8,727,924) | — |
| Proceeds from Secured MCA advances | 2,553,466 | — |
| NET CASH FLOWS USED IN INVESTING ACTIVITIES | (90,134,713) | (34,395,645) |
| | | |
| CASH FLOWS FROM FINANCING ACTIVITIES | | |
| Net borrowings on (repayments of) Senior Credit Facilities | 97,713,952 | (7,150,000) |
| Payments for redemption of Series I Secured Notes | (7,469,462) | (4,891,681) |
| Proceeds from issuance of L Bonds | 153,874,402 | 131,159,348 |
| Payments for issuance and redemption of L Bonds | (10,149,316) | (7,499,601) |
| Payments for redemption of L Bonds | (45,754,691) | (35,984,061) |
| Proceeds from (increase in) restricted cash | (35,484,697) | 1,954,153 |
| Issuance of common stock | 244,185 | 582,000 |
| Proceeds from issuance of preferred stock | 57,112,501 | — |
| Payments for issuance costs of preferred stock | (4,140,866) | — |
| Payments for redemption of preferred stock | (2,198,233) | (295,185) |
| Payments of preferred stock dividends | (3,537,288) | (2,069,242) |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 200,210,487 | 75,805,731 |
| | | |
| NET INCREASE IN CASH AND CASH EQUIVALENTS | 44,061,877 | 3,762,401 |
| | | |
| CASH AND CASH EQUIVALENTS | | |
| BEGINNING OF YEAR | 34,425,105 | 30,662,704 |

App. 0434

END OF YEAR                                                    $  78,486,982   $   34,425,105

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-6

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENT OF CASH FLOWS — CONTINUED**

| | | Year Ended December 31, | | |
|---|---|---|---|---|
| | | 2016 | | 2015 |
| **SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION** | | | | |
| Interest paid | $ | 34,607,000 | $ | 22,648,000 |
| Premiums paid | $ | 40,240,000 | $ | 26,650,000 |
| Stock-based compensation | $ | 227,000 | $ | 194,000 |
| | | | | |
| **NON-CASH INVESTING AND FINANCING ACTIVITIES** | | | | |
| Options issued to purchase common stock | | 638,000 | | 353,000 |
| Series I Secured Notes: | | | | |
| Conversion of accrued interest and commission payable to principal | $ | 234,000 | $ | 203,000 |
| L Bonds: | | | | |
| Conversion of accrued interest and commission payable to principal | $ | 1,988,000 | $ | 806,000 |
| Series A Preferred Stock: | | | | |
| Conversion to common stock | $ | 39,000 | $ | 116,000 |
| Issuance of preferred stock in lieu of cash dividends | $ | 690,000 | $ | 683,000 |
| Investment in life insurance policies included in accounts payable | $ | 605,000 | $ | 1,079,000 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-7

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(1) Nature of Business and Summary of Significant Accounting Policies**

**Nature of Business** — We are a financial services company committed to finding new ways of disrupting and transforming the life insurance and related industries through innovative products and services, business processes, financing strategies, and advanced epigenetic technology. Historically, we have focused on creating opportunities for consumers to obtain significantly more value for their life insurance policies as compared to the traditional options offered by the insurance industry. As part of our business, we create opportunities for investors to receive income and capital appreciation from our various activities in the life insurance and related industries. Through its wholly owned subsidiaries, GWG Holdings, Inc. owns a portfolio of life insurance policies. As of the date of this report, our portfolio had an aggregate fair value of $511.2 million. We earn income from changes in the fair value of our portfolio and through the benefits we receive upon the mortality of insureds.

GWG Holdings, Inc. and all of its subsidiaries are incorporated and organized in Delaware. Unless the context otherwise requires or we specifically so indicate, all references in these footnotes to "we," "us," "our," "our Company," "GWG," or the "Company" refer to GWG Holdings, Inc. and its subsidiaries collectively and on a consolidated basis. References to the full names of particular entities, such as "GWG Holdings, Inc." or "GWG Holdings," are meant to refer only to the particular entity referenced.

On September 30, 2015, GWG Holdings formed a wholly owned subsidiary, Wirth Park Agency, LLC. Wirth Park Agency was formed to convert term life insurance policies into universal, or permanent life insurance. Wirth Park Agency produces commission revenue through this activity.

On December 7, 2015, GWG Holdings formed a wholly owned subsidiary, GWG MCA, LLC. On January 13, 2016, GWG MCA, LLC was converted to a corporation and became GWG MCA Capital, Inc. GWG MCA Capital, Inc. was formed to engage in the merchant cash advance business.

On August 25, 2016, GWG Holdings formed a wholly owned subsidiary, Actüa Life & Annuity Ltd. to engage in various life insurance related businesses and activities.

**Use of Estimates** — The preparation of our consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions affecting the reported amounts of assets and liabilities at the date of the consolidated financial statements, as well as the reported amounts of revenue during the reporting period. We regularly evaluate estimates and assumptions, which are based on current facts, historical experience, and various other factors that it believes to be reasonable under the circumstances. The actual results that we experience may differ materially and adversely from our estimates. The most significant estimates with regard to these consolidated financial statements relate to (1) the determination of the assumptions used in estimating the fair value of our investments in life insurance policies, and (2) the value of our deferred tax assets and liabilities.

**Cash and Cash Equivalents** — We consider cash in demand deposit accounts and temporary investments purchased with an original maturity of three months or less to be cash equivalents. We maintain our cash and cash equivalents with highly rated financial institutions. The balances in our bank accounts may exceed Federal Deposit Insurance Corporation limits. We periodically evaluate the risk of exceeding insured levels and may transfer funds as we deem appropriate.

**Life Insurance Policies** — ASC 325-30 permits a reporting entity to account for its investments in life insurance policies using either the investment method or the fair value method. We elected to use the fair value method to account for our life insurance policies. Under the fair value method we recognize our initial investment at the purchase price. At each subsequent reporting period, we re-measure the investment at fair value in its entirety and recognize the change in fair value as revenue in the current period net of premiums paid.

We also recognize realized gain (revenue) from a life insurance policy upon one of the two following events: (1) our receipt of notice or verified mortality of the insured; or (2) our sale of the policy, filing of change-of-ownership forms and receipt of payment. In the case of mortality, the gain (or loss) we recognize is the difference between the policy benefits and the carrying values of the policy once we determine that collection of the policy benefits is realizable and reasonably assured. In the case of a policy sale, the gain (or loss) we recognize is the difference between the sale price and the carrying value of the policy on the date of our receipt of sale proceeds.

App. 0437

App. 0438

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(1) Nature of Business and Summary of Significant Accounting Policies** (cont.)

In a case where our acquisition of a policy is not complete as of a reporting date, but we have nonetheless advanced direct costs and deposits for the acquisition, those costs and deposits are recorded as "other assets" on our balance sheet until the acquisition is complete and we have secured title to the policy. On December 31, 2016 and 2015, a total of $42,000 and $31,000, respectively, of our "other assets" comprised direct costs and deposits that we advanced for policy acquisitions.

**Other Assets** — Actüa Life & Annuity Ltd. ("Actüa") is a new wholly-owned subsidiary of GWG Holdings engaged in various life insurance businesses and activities. In August 2016, Actüa entered into an exclusive option agreement with the Regents of the University of California to explore the use of predictive mortality forecasting using an epigenetic mortality predictor invented by Dr. Steve Horvath. The cost of entering into this exclusive option agreement is listed as "other assets."

**Stock-Based Compensation**: We measure and recognize compensation expense for all stock-based payments at fair value over the requisite service period. We use the Black-Scholes option pricing model to determine the weighted average fair value of options. For restricted stock grants, fair value is determined as the average price of our common stock on the date of grant. Equity-based compensation expense is recorded in administrative expenses based on the classification of the employee or vendor. The determination of fair value of stock-based payment awards on the date of grant using an option-pricing model is affected by our stock price as well as by assumptions regarding a number of subjective variables. These variables include, but are not limited to, the expected stock price volatility over the term of the awards, and actual and projected employee stock option exercise behaviors.

The expected terms of the options are based on evaluations of historical and expected future employee exercise behavior. The risk-free interest rate is based on the U.S. Treasury rates at the date of grant with maturity dates approximately equal to the expected life at grant date. Volatility is based on historical and expected future volatility of our stock. To date, we have not paid any dividends on our common stock. Forfeitures for both option and restricted stock grants are estimated at the time of the grant and revised in subsequent periods if actual forfeitures differ from estimates.

**Deferred Financing and Issuance Costs** — Loans advanced to us under our senior credit facilities, as described in Notes 5 and 6, are reported net of financing costs, which include issuance costs, sales commissions and other direct expenses, which are amortized using the straight-line method over the term of the facility. The Series I Secured Notes and L Bonds, as respectively described in Notes 7 and 8, are reported net of financing costs, which are amortized using the interest method over the term of those borrowings. The Series A, as described in Note 9, is reported net of financing costs (including the fair value of warrants issued), all of which were fully amortized using the interest method as of December 31, 2016. Selling and issuance costs of RPS and Series 2 Redeemable Preferred Stock ("RPS 2"), described in Notes 10 and 11, are netted against additional paid-in-capital.

**Earnings (loss) per Share** — Basic earnings (loss) per share attributable to common shareholders are calculated using the weighted-average number of shares outstanding during the reported period. Diluted earnings (loss) per share are calculated based on the potential dilutive impact of our outstanding Series A, RPS, warrants and stock options. Due to our net loss for years ended December 31, 2016 and 2015, there are no dilutive securities.

**Recently Adopted Pronouncements** — On April 7, 2015, the FASB issued Accounting Standards Update No. 2015-03, *Simplifying the Presentation of Debt Issuance Costs* ("ASU 2015-03"), as part of its simplification initiative. ASU 2015-03 changes the presentation of debt issuance costs by presenting those costs in the balance sheet as a direct deduction from the related debt liability. Amortization of the costs is reported as interest expense. We adopted ASU 2015-03 effective January 1, 2016, as required for public reporting entities.

On February 25, 2016, the FASB issued ASU 2016-02 *Leases* ("ASU 2016-02"). The new guidance is effective for fiscal years beginning after December 15, 2018. ASU 2016-02 provides more transparency and comparability in the financial statements of lessees by recognizing all leases with a term greater than twelve months on the balance sheet. Leasees will also be required to disclose key information about their leases. Early adoption is permitted. We have not adopted ASU 2016-02 as of December 31, 2016.

F-9

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(2) Restrictions on Cash**

Under the terms of our senior credit facilities (discussed in Notes 5 and 6), we are required to maintain collection and escrow accounts that are used to fund the acquisition of policies, pay annual policy premiums, pay interest and other charges under the facility, and collect policy benefits. The agent for the lender authorizes the disbursements from these accounts. At December 31, 2016 and December 31, 2015, there was a balance of $37,827,000, and $2,342,000, respectively, in these restricted cash accounts.

**(3) Investment in Life Insurance Policies**

Life insurance policies are valued based on unobservable inputs that are significant to their overall fair value. Changes in the fair value of these policies are recorded as gain or loss on life insurance policies, net of cash premiums paid on those policies, in our consolidated statements of operations. Fair value is determined on a discounted cash flow basis that incorporates life expectancy assumptions generally derived from reports obtained from widely accepted life expectancy providers, assumptions relating to cost-of-insurance (premium) rates and other assumptions. The discount rate we apply incorporates current information about discount rate applied by other reporting companies owning portfolios of life insurance policies, the discount rates observed in the life insurance secondary market, market interest rates, the credit exposure to the insurance companies that issued the life insurance policies and management's estimate of the risk premium a purchaser would require to receive the future cash flows derived from our portfolio as a whole. As a result of management's analysis, discount rates of 10.96% and 11.09% were applied to our portfolio as of December 31, 2016 and December 31, 2015, respectively.

A summary of our policies, organized according to their estimated life expectancy dates as of the dates indicated, is as follows:

| Years Ending December 31, | As of December 31, 2016 | | | As of December 31, 2015 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Number of Policies | Estimated Fair Value | Face Value | Number of Policies | Estimated Fair Value | Face Value |
| 2016 | — | $ — | $ — | 5 | $ 7,503,000 | $ 8,500,000 |
| 2017 | 11 | 14,837,000 | 16,939,000 | 12 | 12,875,000 | 17,418,000 |
| 2018 | 23 | 30,830,000 | 42,564,000 | 27 | 37,109,000 | 58,428,000 |
| 2019 | 55 | 57,556,000 | 88,858,000 | 51 | 54,242,000 | 100,967,000 |
| 2020 | 93 | 85,414,000 | 159,814,000 | 59 | 64,750,000 | 137,868,000 |
| 2021 | 86 | 73,825,000 | 158,744,000 | 48 | 45,724,000 | 116,805,000 |
| 2022 | 66 | 56,909,000 | 147,222,000 | 44 | 38,394,000 | 116,998,000 |
| Thereafter | 356 | 191,821,000 | 747,534,000 | 150 | 96,053,000 | 387,860,000 |
| Totals | 690 | $ 511,192,000 | 1,361,675,000 | 396 | $ 356,650,000 | $ 944,844,000 |

We recognized life insurance benefits of $48,452,000 and $31,232,000 during 2016 and 2015, respectively, related to policies with a carrying value of $10,993,000 and $4,511,000, respectively, and as a result recorded realized gains of $37,459,000 and $26,721,000.

Reconciliation of gain on life insurance policies:

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2016 | 2015 |
| Change in fair value | $ 70,582,000 | $ 39,371,000 |
| Premiums and other annual fees | (40,240,000) | (26,711,000) |
| Policy maturities | 37,460,000 | 26,721,000 |
| Gain on life insurance policies, net | $ 67,802,000 | $ 39,381,000 |

F-10

App. 0440

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(3) Investment in Life Insurance Policies** (cont.)

We currently estimate that premium payments and servicing fees required to maintain our current portfolio of life insurance policies in force for the next five years, assuming no mortalities, are as follows:

| Years Ending December 31, | Premiums | Servicing | Premiums and Servicing Fees |
|---|---|---|---|
| 2017 | $ 44,787,000 | $ 534,000 | $ 45,321,000 |
| 2018 | 50,165,000 | 534,000 | 50,699,000 |
| 2019 | 55,685,000 | 534,000 | 56,219,000 |
| 2020 | 60,561,000 | 534,000 | 61,095,000 |
| 2021 | 67,824,000 | 534,000 | 68,358,000 |
| | $ 279,022,000 | $ 2,670,000 | $ 281,692,000 |

Management anticipates funding the premium payments estimated above with proceeds from our senior credit facilities, proceeds from additional debt and equity financing, and proceeds from maturities of life insurance policies. The proceeds of these capital sources may also be used for the purchase, financing, and maintenance of additional life insurance policies.

**(4) Fair Value Definition and Hierarchy**

ASC 820 establishes a hierarchical disclosure framework that prioritizes and ranks the level of market price observability used in measuring assets and liabilities at fair value. Market price observability is affected by a number of factors, including the type of investment, the characteristics specific to the investment and the state of the marketplace, including the existence and transparency of transactions between market participants. Assets and liabilities with readily available and actively quoted prices, or for which fair value can be measured from actively quoted prices in an orderly market, generally will have a higher degree of market price observability and a lesser degree of judgment used in measuring fair value. ASC 820 maximizes the use of observable inputs and minimizes the use of unobservable inputs by requiring the use of observable inputs whenever available. Observable inputs are inputs that market participants would use in pricing the asset or liability developed based on market data obtained from independent sources. Unobservable inputs are inputs that reflect assumptions about how market participants price an asset or liability developed based on the best available information. Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability (i.e., the "exit price") in an orderly transaction between market participants at the measurement date.

The hierarchy is broken down into three levels based on the observability of inputs as follows:

- Level 1 — Valuations based on quoted prices in active markets for identical assets or liabilities that we have the ability to access. Since valuations are based quoted prices that are readily and regularly available in an active market, valuation of these products does not entail a significant degree of judgment.

- Level 2 — Valuations based on one or more quoted prices in markets that are not active or for which all significant inputs are observable, either directly or indirectly.

- Level 3 — Valuations based on inputs that are unobservable and significant to the overall fair value measurement.

The availability of observable inputs can vary by types of assets and liabilities and is affected by a wide variety of factors, including, for example, whether an instrument is established in the marketplace, the liquidity of markets and other characteristics particular to the transaction. To the extent that valuation is based on models or inputs that are less observable or unobservable in the market, the determination of fair value requires more judgment. Accordingly, the degree of judgment exercised by management in determining fair value is greatest for assets and liabilities categorized in Level 3.

App. 0441

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(4) Fair Value Definition and Hierarchy** (cont.)

*Level 3 Valuation Process*

The estimated fair value of our portfolio of life insurance policies is determined on a quarterly basis by our portfolio management committee, taking into consideration changes in discount rate assumptions, estimated premium payments and life expectancy estimate assumptions, as well as any changes in economic and other relevant conditions. The discount rate incorporates current information about discount rate applied by other reporting companies owning portfolios of life insurance policies, the discount rates observed in the life insurance secondary market, market interest rates, the credit exposure to the insurance company that issued the life insurance policy and management's estimate of the risk premium a purchaser would require to receive the future cash flows derived from our portfolio as a whole.

These inputs are then used to estimate the discounted cash flows from the portfolio using the Model Actuarial Pricing System probabilistic portfolio price model, which estimates the cash flows using various mortality probabilities and scenarios. The valuation process includes a review by senior management as of each valuation date. We also engage a third-party expert to independently test the accuracy of the valuations using the inputs we provide on a quarterly basis.

The following table reconciles the beginning and ending fair value of our Level 3 investments in our portfolio of life insurance policies for the periods ended December 31, as follows:

|  | Years Ended December 31, | |
|---|---|---|
|  | 2016 | 2015 |
| Beginning balance | $ 356,650,000 | $ 282,883,000 |
| Purchases | 94,953,000 | 38,907,000 |
| Maturities (initial cost basis) | (10,993,000) | (4,511,000) |
| Net change in fair value | 70,582,000 | 39,371,000 |
| Ending balance | $ 511,192,000 | $ 356,650,000 |

In the past, we periodically updated the independent life expectancy estimates on the insured lives in our portfolio, other than insured lives covered under small face amount policies (i.e., $1 million in face value benefits or less), on a continuous rotating three-year cycle, and through that effort attempted to update life expectancies for approximately one-twelfth of our portfolio each quarter. Nevertheless, the terms of our senior credit facility with LNV Corporation currently requires us to attempt to update life expectancies on a rotating two-year cycle.

The following table summarizes the inputs utilized in estimating the fair value of our portfolio of life insurance policies:

|  | As of December 31, 2016 | As of December 31, 2015 |
|---|---|---|
| Weighted-average age of insured, years | 81.6 | 82.6 |
| Weighted-average life expectancy, months | 83.2 | 79.3 |
| Average face amount per policy | $ 1,973,000 | $ 2,386,000 |
| Discount rate | 10.96% | 11.09% |

These assumptions are, by their nature, inherently uncertain and the effect of changes in estimates may be significant. For example, if the life expectancy estimates were increased or decreased by four and eight months on each outstanding

F-12

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(4) Fair Value Definition and Hierarchy** (cont.)

policy, and the discount rates were increased or decreased by 1% and 2%, while all other variables were held constant, the fair value of our investment in life insurance policies would increase or (decrease) as summarized below:

Change in Fair Value of the Investment in Life Insurance Policies

| | Change in life expectancy estimates | | | |
|---|---|---|---|---|
| | minus 8 months | minus 4 months | plus 4 months | plus 8 months |
| December 31, 2016 | $  69,253,000 | $  34,601,000 | $  (33,846,000) | $  (67,028,000) |
| December 31, 2015 | $  48,339,000 | $  24,076,000 | $  (23,501,000) | $  (46,482,000) |

| | Change in discount rate | | | |
|---|---|---|---|---|
| | minus 2% | minus 1% | plus 1% | plus 2% |
| December 31, 2016 | $  53,764,000 | $  25,728,000 | $  (23,668,000) | $  (45,491,000) |
| December 31, 2015 | $  35,024,000 | $  16,786,000 | $  (15,485,000) | $  (29,803,000) |

*Other Fair Value Considerations*

The carrying value of receivables, prepaid expenses, accounts payable and accrued expenses approximate fair value due to their short-term maturities and low credit risk. Using the income-based valuation approach, the estimated fair value of our Series I Secured Notes and L Bonds, having a combined aggregate face value of $403,681,000 as of December 31, 2016, is approximately $414,419,000 based on a weighted-average market interest rate of 6.45%. The carrying value of the senior credit facilities reflects interest charged at the commercial paper rate or 12-month LIBOR, as applicable, plus an applicable margin. The margin represents our credit risk, and the strength of the portfolio of life insurance policies collateralizing the debt. The overall rate reflects market, and the carrying value of the facility approximates fair value.

GWG MCA participates in the merchant cash advance industry by directly advancing sums to merchants and lending money, on a secured basis, to companies that advance sums to merchants. Each quarter, we review the carrying value of these advances and loans, and determine if an impairment reserve is necessary. At December 31, 2016 one of our secured loans was potentially impaired. The secured loan to Nulook Capital LLC had an outstanding balance of $2,527,000 and a loan loss reserve of $600,000 at December 31, 2016. We deem fair value to be the estimated collectible value on each loan or advance made from GWG MCA. Where we estimate the collectible amount to be less than the outstanding balance, we record a reserve for the difference.

The following table summarizes outstanding warrants as of December 31, 2016:

| Month issued | Warrants issued | Fair value per share | Risk free rate | Volatility | Term |
|---|---|---|---|---|---|
| March 2012 | 38,130 | $  0.52 | 0.38% | 36.20% | 5 years |
| June 2012 | 161,840 | $  1.16 | 0.41% | 47.36% | 5 years |
| July 2012 | 144,547 | $  1.16 | 0.41% | 47.36% | 5 years |
| September 2012 | 2,500 | $  0.72 | 0.31% | 40.49% | 5 years |
| September 2014 | 16,000 | $  1.26 | 1.85% | 17.03% | 5 years |
| | 363,017 | | | | |

**(5) Credit Facility — Autobahn Funding Company LLC**

Through DLP III, we are party to a $105 million senior credit facility with Autobahn Funding Company LLC ("Autobahn"), with a maturity date of June 30, 2018. The facility is governed by a Credit and Security Agreement (the "Agreement"), and DZ Bank AG Deutsche Zentral-Genossenschaftsbank ("DZ Bank") acts as

the agent for Autobahn under the Agreement. On September 14, 2016, we paid off the senior credit facility in full with funds received from a new senior credit facility with LNV Corporation as described in Note 6.

---

F-13

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(5) Credit Facility — Autobahn Funding Company LLC** (cont.)

Advances under the facility bear interest at a commercial paper rate of the lender at the time of the advance, or at the lender's cost of borrowing plus 4.25%. We make interest payments on a monthly basis. The effective rate of interest was 5.42% at September 14, 2016 and 5.58% at December 31, 2015.

The amount outstanding under this facility was $0 and $65,011,000 at December 31, 2016 and December 31, 2015, respectively. GWG Holdings is a performance guarantor of the various obligations of GWG Life, as servicer, under the Agreement. Obligations under the facility are secured by our pledge of ownership in our life insurance policies to DZ Bank through an arrangement under which Wells Fargo serves as a securities intermediary.

The Agreement has certain financial (as described below) and nonfinancial covenants, and we were in compliance with these covenants at both December 31, 2016 and 2015.

We have agreed to maintain (i) a positive consolidated net income on a non-GAAP basis (as defined and calculated under the Agreement) for each complete fiscal year, (ii) a tangible net worth on a non-GAAP basis (again, as defined and calculated under the Agreement) of not less than $45 million, and (iii) maintain cash and eligible investments of $15 million or above.

Consolidated non-GAAP net income and non-GAAP tangible net worth as of and for the four quarters ended December 31, 2016, as calculated under the Agreement, was $38,642,000 and $182,514,000, respectively.

Total funds available for additional borrowings under the facility at December 31, 2016 and 2015, were $0 and $39,989,000, respectively.

**(6) Credit Facility — CSG Investments, Inc.**

On September 14, 2016, we entered into a senior credit facility with LNV Corporation as lender through our subsidiary GWG DLP Funding IV, LLC ("DLP IV"). The facility is governed by a Loan and Security Agreement (the "Loan Agreement"), with CLMG Corp. acting as administrative agent on behalf of the lenders under the Loan Agreement. The Loan Agreement makes available a total of up to $172,300,000 in credit with a maturity date of September 14, 2026. Additional quarterly advances are available under the Loan Agreement at the LIBOR rate as defined by the lender. Interest will accrue on amounts borrowed under the agreement at an annual interest rate, determined as of each date of borrowing or quarterly if there is no borrowing, equal to (A) the greater of 12-month LIBOR or the federal funds rate (as defined in the agreement) plus one-half of one percent per annum, plus (B) 5.75% per annum. Interest payments are made on a quarterly basis.

The amount outstanding under this facility was $162,725,000 at December 31, 2016. Obligations under the facility are secured by a security interest in DLP IV's assets, for the benefit of the lenders under the Loan Agreement, through an arrangement under which Wells Fargo serves as security intermediary. The life insurance policies owned by DLP IV do not serve as direct collateral for the obligations of GWG Holdings under its L Bonds or Series I Secured Notes. The difference between the outstanding balance as of December 31, 2016 and the carrying amount relates to unamortized debt issuance costs.

The Loan Agreement requires DLP IV to maintain a reserve account in an amount sufficient to pay 12 months of servicing, administrative and third party expenses identified under the Loan Agreement, and 12 months of debt service as calculated under the Loan Agreement. As of December 31, 2016, the amount set aside in the reserve account was $27,500,000.

The Agreement has certain financial and nonfinancial covenants, and we were in compliance with these covenants at December 31, 2016.

Total funds available for additional borrowings under the facility at December 31, 2016 was $0.

F-14

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(7) Series I Secured Notes**

Series I Secured Notes ("Series I") are legal obligations of GWG Life and were privately offered and sold from August 2009 through June 2011. The Series I are secured by the assets of GWG Life and are subordinate to obligations under our senior credit facilities (see Notes 5 and 6). We are party to a Third Amended and Restated Note Issuance and Security Agreement dated November 1, 2011, as amended, under which GWG Life is obligor, GWG Holdings is guarantor, and Lord Securities Corporation serves as trustee of the GWG Life Trust ("Trust"). This agreement contains certain financial and non-financial covenants, and we were in compliance with these covenants at both December 31, 2016 and 2015.

The Series I were sold with original maturity dates ranging from six months to seven years, and with fixed interest rates varying from 5.65% to 9.55% depending on the term of the note. The Series I have renewal features under which we may elect to permit their renewal, subject to the right of bondholders to elect to receive payment at maturity. Effective September 1, 2016, we no longer renew the Series I.

Interest on the Series I is payable monthly, quarterly, annually or at maturity depending on the election of the investor. At December 31, 2016 and 2015, the weighted-average interest rate of our Series I was 8.68% and 8.47%, respectively. The principal amount of Series I outstanding was $16,614,000 and $23,578,000 at December 31, 2016 and 2015, respectively. The difference between the amount outstanding on the Series I and the carrying amount on our balance sheet is due to netting of unamortized deferred issuance costs. Overall, interest expense includes amortization of deferred financing and issuance costs of $332,000 and $362,000 in 2016 and 2015, respectively. Future expected amortization of deferred financing costs is $209,000 in total over the next five years.

Future contractual maturities of Series I payable and future amortization of their deferred financing costs at December 31, 2016 are as follows:

| Years Ending December 31, | | Contractual Maturities | | Amortization of Deferred Financing Costs |
|---|---|---|---|---|
| 2017 | $ | 10,523,000 | $ | 41,000 |
| 2018 | | 2,401,000 | | 41,000 |
| 2019 | | 1,024,000 | | 20,000 |
| 2020 | | 1,725,000 | | 52,000 |
| 2021 | | 941,000 | | 55,000 |
| | $ | 16,614,000 | $ | 209,000 |

**(8) L Bonds**

Our L Bonds are legal obligations of GWG Holdings. Obligations under the L Bonds are secured by the assets of GWG Holdings and by GWG Life, as a guarantor, and are subordinate to the obligations under our senior credit facilities (see Notes 5 and 6). We began publicly offering and selling L Bonds in January 2012 under the name "Renewable Secured Debentures." These debt securities were re-named "L Bonds" in January 2015. L Bonds are publicly offered and sold on a continuous basis under a registration statement permitting us to sell up to $1.0 billion in principal amount of L Bonds. We are party to an indenture governing the L Bonds dated October 19, 2011, as amended ("Indenture"), under which GWG Holdings is obligor, GWG Life is guarantor, and Bank of Utah serves as indenture trustee. The Indenture contains certain financial and non-financial covenants, and we were in compliance with these covenants at December 31, 2016 and 2015.

Effective September 1, 2016, we ceased selling 6-month and 1-year L Bonds until further notice. In addition, effective September 1, 2016, the L Bond interest rates changed to 5.50%, 6.25%, 7.50% and 8.50% for the 2-, 3-, 5- and 7-year L Bonds, respectively. The bonds have renewal features under which we may elect to permit their renewal, subject to the right of bondholders to elect to receive payment at maturity. Interest is payable monthly or annually depending on the election of the investor.

F-15

App. 0446

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(8) L Bonds** (cont.)

At December 31, 2016 and 2015, the weighted-average interest rate of our L Bonds was 7.23% and 7.16%, respectively. The principal amount of L Bonds outstanding was $387,067,000 and $282,171,000 at December 31, 2016 and 2015, respectively. The difference between the amount of outstanding L Bonds and the carrying amount on our balance sheets is due to netting of unamortized deferred issuance costs and cash receipts for new issuances in process. Amortization of deferred issuance costs was $7,099,000 and $5,285,000 in 2016 and 2015, respectively. Future expected amortization of deferred financing costs as of December 31, 2016 is $11,636,000 in total over the next eight years.

Future contractual maturities of L Bonds, and future amortization of their deferred financing costs, at December 31, 2016 are as follows:

| Years Ending December 31, | Contractual Maturities | Amortization of Deferred Financing Costs |
|---|---|---|
| 2017 | $ 106,955,000 | $ 1,178,000 |
| 2018 | 109,407,000 | 3,000,000 |
| 2019 | 90,463,000 | 3,450,000 |
| 2020 | 20,679,000 | 809,000 |
| 2021 | 28,923,000 | 1,512,000 |
| Thereafter | 30,640,000 | 1,687,000 |
| | $ 387,067,000 | $ 11,636,000 |

**(9) Series A Convertible Preferred Stock**

From July 2011 until September 2012, we privately offered shares of Series A of GWG Holdings at $7.50 per share. In the offering, we sold an aggregate of 3,278,000 shares for gross consideration of $24,582,000. Holders of Series A are entitled to cumulative dividends at the rate of 10% per annum, paid quarterly. Dividends on the Series A are accumulating and are recorded as a reduction to additional paid-in capital. Under certain circumstances described in the Certificate of Designation for the Series A, additional Series A shares may be issued in lieu of cash dividends at the rate of $7.00 per share.

Holders of Series A are entitled to a liquidation preference equal to the stated value of their preferred shares (i.e., $7.50 per share) plus accrued but unpaid dividends. Holders of Series A may presently convert each share of their Series A into 0.75 shares of our common stock at a price of $10.00 per share.

As of December 31, 2016, we issued an aggregate of 473,000 shares of Series A in satisfaction of $3,310,000 in dividends on the Series A, and an aggregate of 696,000 shares of Series A were converted into 522,000 shares of our common stock. As of December 31, 2016, we had 2,640,000 Series A shares outstanding with respect to which we incurred aggregate issuance costs of $2,838,000, all of which is included as a component of additional paid-in capital.

Purchasers of Series A in our offering received warrants to purchase an aggregate of 431,954 shares of our common stock at an exercise price of $12.50 per share. The grant date fair value of these warrants was $428,000. As of December 31, 2016, none of these warrants were exercised, 69,000 warrants have expired. The weighted-average remaining life of these warrants was 0.56 and 1.43 years at December 31, 2016 and 2015, respectively.

In September 2014, we completed, at our discretion, a public offering of our common stock and, as a result, the Series A was reclassified from temporary equity to permanent equity. We may redeem Series A shares at a price equal to 110% of their liquidation preference ($7.50 per share) at any time. As of December 31, 2016, we have redeemed an aggregate of 277,000 shares of Series A.

F-16

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(10) Redeemable Preferred Stock**

Beginning November 30, 2015, we began publicly offering up to 100,000 shares of Redeemable Preferred Stock ("RPS") at $1,000 per share. Holders of RPS are entitled to cumulative dividends at the rate of 7% per annum, paid monthly. Dividends on the RPS are recorded as a reduction to additional paid-in capital. Under certain circumstances described in the Certificate of Designation for the RPS, additional shares of RPS may be issued in lieu of cash dividends.

The RPS ranks senior to our common stock and pari passu with our Series A, and entitles its holders to a liquidation preference equal to the stated value per share (i.e., $1,000) plus accrued but unpaid dividends. Holders of RPS may presently convert their RPS into our common stock at a conversion price equal to the volume-weighted average price of our common stock for the 20 trading days immediately prior to the date of conversion, subject to a minimum conversion price of $15.00 and in an aggregate amount limited to 15% of the stated value of RPS originally purchased by such holder from us and still held by such holder.

Holders of RPS may request that we redeem their RPS at a price equal to their stated value plus accrued but unpaid dividends, less an applicable redemption fee, if any. Nevertheless, the Certificate of Designation for RPS permits us complete discretion to grant redemption requests. Subject to certain restrictions and conditions, we may also redeem shares of RPS without a redemption fee upon a holder's death, total disability or bankruptcy. In addition, after one year from the date of original issuance, we may, at our option, call and redeem shares of RPS at a price equal to their liquidation preference.

As of December 31, 2016, we had sold 59,183 shares of RPS for aggregate gross consideration of $59,025,000, and incurred approximately $4,134,000 of selling costs related to the sale of those shares.

At the time of its issuance, we determined that the RPS contained two embedded features: (1) optional redemption by the holder at our discretion and (2) optional conversion by the holder. We determined that each of the embedded features met the definition of a derivative and that the RPS should be considered an equity host for the purposes of assessing the embedded derivatives for potential bifurcation. Based on our assessment under ASC 470 "Debt" we do not believe bifurcation of either the holder's redemption or conversion feature is appropriate.

**(11) Series 2 Redeemable Preferred Stock**

On February 14, 2017, our public offering up to 150,000 shares of Series 2 Redeemable Preferred Stock ("RPS 2") at $1,000 per share was declared effective. Holders of RPS 2 are entitled to cumulative dividends at the rate of 7% per annum, paid monthly. Dividends on the RPS 2, when payable, will be recorded as a reduction to additional paid-in capital. Under certain circumstances described in the Certificate of Designation for the RPS 2, additional shares of RPS 2 may be issued in lieu of cash dividends.

The RPS 2 ranks senior to our common stock and pari passu with our Series A and RPS, and entitles its holders to a liquidation preference equal to the stated value per share (i.e., $1,000) plus accrued but unpaid dividends. Holders of RPS 2 may, less an applicable conversion discount, if any, convert their RPS 2 into our common stock at a conversion price equal to the volume-weighted average price of our common stock for the 20 trading days immediately prior to the date of conversion, subject to a minimum conversion price of $12.75 and in an aggregate amount limited to 10% of the stated value of RPS 2 originally purchased from us.

Holders of RPS 2 may request that we redeem their RPS 2 at a price equal to their liquidation preference at a price equal to their stated value plus accrued but unpaid dividends, less an applicable redemption fee, if any. Nevertheless, the Certificate of Designation for RPS 2 permits us complete discretion to decline requests for redemption. Subject to certain restrictions and conditions, we may also redeem shares of RPS 2 without a redemption fee upon a holder's death, total disability or bankruptcy. In addition, we may, at our option, call and redeem shares of RPS 2 at a price equal to their liquidation preference (subject to a minimum redemption price, in the event of redemptions occurring less than one year after issuance, of 107% of the stated value of the shares being redeemed).

We have not sold any shares of RPS 2.

F-17

App. 0448

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(12) GWG MCA Capital, Inc — 9% Preferred Stock**

Beginning March 31, 2016, GWG MCA began privately offering up to 2,000,000 shares of GWG MCA 9% Preferred Stock ("MCA Preferred") at $10.00 per share. Holders of MCA Preferred are entitled to cumulative dividends at a rate of 9% per annum, paid monthly. Dividends on the MCA Preferred are included as interest expense in the statements of operations. As of December 31, 2016, a total of 7,155 shares of MCA Preferred had been sold for aggregate gross consideration of $72,000 and approximately $7,000 of selling costs related to the sale of these shares were incurred.

Holders of MCA Preferred were redeemed as of December 31, 2016 at the stated value of their shares plus accrued but unpaid dividends.

**(13) Income Taxes**

We had a current income tax liability of $0 as of both December 31, 2016 and 2015. The components of deferred income tax expense (benefit) for 2016 and 2015, respectfully, consisted of the following:

| | 2016 | 2015 |
|---|---|---|
| Income tax provision: | | |
| Deferred: | | |
| Federal | $ 252,000 | $ (2,660,000) |
| State | 81,000 | (850,000) |
| Total income tax expense (benefit) | $ 333,000 | $ (3,510,000) |

We provided a valuation allowance against the deferred tax asset related to a note receivable, which was charged-off for financial reporting purposes, because we believe that, when realized for tax purposes, it will result in a capital loss that will not be utilized because we have no expectation of generating a capital gain within the applicable carryforward period. Therefore, we do not believe that it is "more likely than not" that the deferred tax asset will be realized.

We also provided a valuation allowance against the deferred tax asset related to a tax basis capital loss generated with respect to our settlement and subsequent disposal of an earlier investment. As we have no expectation of generating capital gains with the applicable carryforward period, we do not believe that it is "more likely than not" that the deferred asset will be realized.

The primary differences between the December 31, 2016 effective tax rate and the statutory federal rate are state taxes, and other non-deductible expenses. The most significant temporary differences between GAAP net income and taxable net income are the treatment of interest costs with respect to the acquisition of the life insurance policies and revenue recognition with respect to the mark-to-market of our life insurance portfolio.

The following table provides a reconciliation of our income tax expense (benefit) at the statutory federal tax rate to our actual income tax expense (benefit):

| | 2016 | | 2015 | |
|---|---|---|---|---|
| Statutory federal income tax | $ 247,000 | 34.0% | $ (3,004,000) | 34.0% |
| State income taxes, net of federal benefit | 56,000 | 7.8% | (561,000) | 6.3% |
| Other permanent differences | 30,000 | 4.2% | 55,000 | (0.6)% |
| Total income tax expense | $ 333,000 | 46.0% | $ (3,510,000) | 39.7% |

F-18

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(13) Income Taxes** (cont.)

The tax effects of temporary differences that give rise to deferred income taxes were as follows:

|  | 2016 | 2015 |
|---|---|---|
| Deferred tax assets: | | |
| Note receivable from related party | $ 2,023,000 | $ 2,023,000 |
| Net operating loss carryforwards | 10,781,000 | 7,049,000 |
| Other assets | 1,130,000 | 375,000 |
| Subtotal | 13,934,000 | 9,447,000 |
| Valuation allowance | (2,164,000) | (2,164,000) |
| Deferred tax assets | 11,770,000 | 7,283,000 |
| | | |
| Deferred tax liabilities: | | |
| Investment in life insurance policies | (13,867,000) | (9,046,000) |
| Other | — | (1,000) |
| Net deferred tax liability | $ (2,097,000) | $ (1,764,000) |

At December 31, 2016 and 2015, we had federal net operating loss ("NOL") carryforwards of $26,642,000 and $17,451,000, respectively, and aggregate state NOL carryforwards of approximately $26,616,000 and $17,423,000, respectively. The NOL carryforwards will begin to expire in 2031. Future utilization of NOL carryforwards is subject to limitations under Section 382 of the Internal Revenue Code. This section generally relates to a more than 50 percent change in ownership over a three-year period. We currently do not believe that any issuance of common stock has resulted in an ownership change under Section 382.

We provide for a valuation allowance when it is not considered "more likely than not" that our deferred tax assets will be realized. At both December 31, 2016 and 2015 based upon all available evidence, we provided a valuation allowance of $2,164,000, against deferred tax assets related to the likelihood of recovering the tax benefit of a capital loss on a note receivable from a related entity and other capital losses. Management believes all other deferred tax assets are recoverable.

ASC 740 requires the reporting of certain tax positions that do not meet a threshold of "more-likely-than-not" to be recorded as uncertain tax benefits. It management's responsibility to determine whether it is "more-likely-than-not" that a tax position will be sustained upon examination, including resolution of any related appeals or litigation, based upon the technical merits of the position. Management has reviewed all income tax positions taken or expected to be taken for all open years and determined that the income tax positions are appropriately stated and supported. We do not anticipate that the total unrecognized tax benefits will significantly change prior to December 31, 2016.

Under our accounting policies, interest and penalties on unrecognized tax benefits, as well as interest received from favorable tax settlements are recognized as components of income tax expense. At December 31, 2016 and 2015, we recorded no accrued interest or penalties related to uncertain tax positions.

Our income tax returns for tax years ended December 31, 2013, 2014, 2015 and 2016, when filed, remain open to examination by the Internal Revenue Service and various state taxing jurisdictions. Our tax return for tax year 2012 has now been examined by the IRS (finalized April of 2015) but is open for examination by various state taxing jurisdictions.

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(14) Common Stock**

In September 2014, we consummated an initial public offering of our common stock resulting in the sale of 800,000 shares of common stock at $12.50 per share, and net proceeds of approximately $8.6 million after the payment of underwriting commissions, discounts and expense reimbursements. In connection with this offering, we listed our common stock on the Nasdaq Capital Market under the ticker symbol "GWGH."

On June 24, 2015 we issued 60,000 restricted common shares at $9.70 per share, determined by the closing market price on the date of grant, to a vendor as payment for services to be rendered over three years. The cost of these shares is amortized over a 12-month period. On March 17, 2016, we issued an additional 6,500 restricted common shares at an average price of $7.16 per share, determined by the closing market price on the date of grant, to this same vendor for additional services provided to us. On April 25, 2016, we issued 25,000 restricted shares of common stock at $6.25 per share, determined by the closing market price on the date of grant, to a vendor as a form of payment for services the vendor is providing to us, which is expensed in the current period.

**(15) Stock Incentive Plan**

We adopted our 2013 Stock Incentive Plan in March 2013. The Compensation Committee of our Board of Directors is responsible for the administration the plan. Incentives under the plan may be granted incentive stock options and non-statutory stock options; stock appreciation rights; stock awards; restricted stock; restricted stock units; and performance shares. Eligible participants include officers and employees of GWG Holdings and its subsidiaries, members of our Board of Directors, and consultants. 2,000,000 common shares are presently issuable under the plan.

In September 2014, we entered into a stock option agreement with a new management employee granting the employee the right to purchase up to 318,000 of our common stock at an exercise price of $12.50. The grant of such rights to purchase our common stock was treated as an inducement grant and was issued outside the GWG Holdings Inc. 2013 Stock Incentive Plan.

Through December 31, 2016, we had issued stock options for 2,048,000 shares of common stock to employees, officers, and directors under the plan. Options for 738,000 shares have vested, and the remaining options are scheduled to vest over three years. The options were issued with an exercise price between $6.35 and $10.18 for those beneficially owning more than 10% of our common stock, and between $6.00 and $10.25 for all others, which is equal to the estimated market price of the shares on the date of grant. The expected annualized volatility used in the Black-Scholes model valuation of options issued during the period was 25.9%. The annual volatility rate is based on the standard deviation of the average continuously compounded rate of return of five selected comparable companies over the previous 52 weeks. A forfeiture rate of 15% is based on historical information and expected future trend. As of December 31, 2016, stock options for 437,000 shares were forfeited and stock options for 28,000 shares were exercised.

Outstanding stock options:

|  | Vested | Un-vested | Total |
|---|---|---|---|
| **Balance as of December 31, 2014** | 314,288 | 685,813 | 1,000,101 |
| Granted during the year | 79,500 | 273,700 | 353,200 |
| Vested during the year | 238,999 | (238,999) | — |
| Exercised during the year | (27,667) | — | (27,667) |
| Forfeited during the year | (121,417) | (150,602) | (272,019) |
| **Balance as of December 31, 2015** | 483,703 | 569,912 | 1,053,615 |
| Granted during the year | 22,500 | 608,350 | 630,850 |
| Vested during the year | 251,788 | (251,788) | — |
| Forfeited during the year | (19,926) | (82,140) | (102,066) |
| **Balance as of December 31, 2016** | 738,065 | 844,334 | 1,582,399 |

Compensation expense related to un-vested options not yet recognized is $525,000. We expect to recognize this compensation expense over the next three years ($265,000 in 2017, $157,000 in 2018, and $103,000 in 2019).

App. 0451

F-20

App. 0452

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(15) Stock Incentive Plan** (cont.)

Stock Appreciation Rights (SARs) — On September 19, 2016 we issued SARs for 145,388 shares of the common stock to employees. The strike price of the SARs was $8.76, which was equal to the market price of the common stock at the close of business on September 19, 2016. 56,358 of the SARs were vested as of December 31, 2016, on which date the market price of the common stock was $8.82. A forfeiture rate of 15% was used in calculating our liability for the SARs.

Outstanding Stock Appreciation Rights:

|  | Vested | Un-vested | Total |
|---|---|---|---|
| Balance as of December 31, 2015 | — | — | — |
| Granted during the year | 106,608 | 133,127 | 239,735 |
| Forfeited during the year | — | — | — |
| Balance as of December 31, 2016 | 106,608 | 133,127 | 239,735 |

A liability for Stock Appreciation Rights — Compensation Expense was recorded on December 31, 2016 in the amount of $4,266 and Compensation Expense was charged for the same amount.

**(16) Net Loss per Common Share**

We have outstanding Series A and RPS, as described in Notes 9 and 10. The Series A and RPS are anti-dilutive to our net loss attributable to common shareholders calculation for the years ended December 31, 2016 and December 31, 2015. We also issued warrants to purchase common stock in conjunction with the sale of Series A (see Note 9). Both those warrants and our vested stock options are anti-dilutive at December 31, 2016 and 2015 and have not been included in the fully diluted net loss per common share calculation.

**(17) Commitments**

We are party to an office lease with U.S. Bank National Association as the landlord. On September 1, 2015, we entered into an amendment to our original lease that expanded the leased space to 17,687 square feet and extended the term through 2026. Under the amended lease we are obligated to pay base rent plus common area maintenance and a share of building operating costs. Rent expenses under this agreement were $415,000 and $283,000 during 2016 and 2015, respectively.

Minimum lease payments under the amended lease are as follows:

| | |
|---|---|
| 2017 | 178,000 |
| 2018 | 185,000 |
| 2019 | 191,000 |
| 2020 | 198,000 |
| 2021 | 204,000 |
| 2022 | 210,000 |
| 2023 | 217,000 |
| 2024 | 223,000 |
| 2025 | 230,000 |
| | $ 1,836,000 |

**(18) Contingencies**

Litigation — In the normal course of business, we are involved in various legal proceedings. In the opinion of management, any liability resulting from such proceedings would not have a material adverse effect on our financial position, results of operations or cash flows.

F-21

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(19) Guarantee of L Bonds**

We are publicly offering and selling L Bonds under a registration statement declared effective by the SEC, as described in Note 8. Our obligations under the L Bonds are secured by substantially all the assets of GWG Holdings, a pledge of all our common stock held individually by our largest stockholders, and by a guarantee and corresponding grant of a security interest in substantially all the assets of GWG Life. As a guarantor, GWG Life has fully and unconditionally guaranteed the payment of principal and interest on the L Bonds. Substantially all of our life insurance policies are held by DLP III, DLP IV and the Trust. The policies held by DLP III and DLP IV are not collateral for the L Bond obligations as such policies serve as direct collateral for the senior credit facilities.

The consolidating financial statements are presented in lieu of separate financial statements and other related disclosures of the subsidiary guarantor and issuer because management does not believe that separate financial statements and related disclosures would be material to investors. There are currently no significant restrictions on the ability of GWG Holdings or GWG Life, the guarantor subsidiary, to obtain funds from its subsidiaries by dividend or loan, except as described in these notes. A majority of insurance policies we own are subject to a collateral arrangement with LNV described in Note 6. Under this arrangement, collection and escrow accounts are used to fund premiums for the insurance policies and to pay interest and other charges under the senior credit facility.

The following represents consolidating financial information as of December 31, 2016 and December 31, 2015, with respect to the financial position, and as of December 31, 2016 and 2015, with respect to results of operations and cash flows of GWG Holdings and its subsidiaries. The parent column presents the financial information of GWG Holdings, the primary obligor for the L Bonds. The guarantor subsidiary column presents the financial information of GWG Life, the guarantor subsidiary of the L Bonds, presenting its investment in DLP III, DLP IV and the Trust under the equity method. The non-guarantor subsidiaries column presents the financial information of all non-guarantor subsidiaries, including DLP III, DLP IV and the Trust.

F-22

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(19) Guarantee of L Bonds** (cont.)

Consolidating Balance Sheets

| December 31, 2016 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash and cash equivalents | $ 28,481,047 | $ 49,360,952 | $ 644,983 | $ — | $ 78,486,982 |
| Restricted cash | — | 2,117,649 | 35,708,947 | — | 37,826,596 |
| Investment in life insurance policies, at fair value | — | 41,277,896 | 469,914,458 | — | 511,192,354 |
| Secured MCA advances | — | — | 5,703,147 | — | 5,703,147 |
| Life insurance policy benefits receivable | — | — | 5,345,000 | — | 5,345,000 |
| Other assets | 3,854,233 | 2,056,822 | 810,640 | (2,033,592) | 4,688,103 |
| Investment in subsidiaries | 429,971,148 | 352,337,037 | — | (782,308,185) | — |
| TOTAL ASSETS | $462,306,428 | $ 447,150,356 | $ 518,127,175 | $(784,341,777) | $643,242,182 |

**LIABILITIES & STOCKHOLDERS' EQUITY**

| | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| LIABILITIES | | | | | |
| Senior credit facilities | $ — | $ — | $ 156,064,818 | $ — | $156,064,818 |
| Series I Secured Notes | — | 16,404,836 | — | — | 16,404,836 |
| L Bonds | 381,312,587 | — | — | — | 381,312,587 |
| Accounts payable | 853,470 | 731,697 | 641,545 | — | 2,226,712 |
| Interest payable | 9,882,133 | 3,743,277 | 2,535,189 | — | 16,160,599 |
| Other accrued expenses | 862,369 | 544,032 | 2,303,952 | (2,033,592) | 1,676,761 |
| Deferred taxes, net | 2,097,371 | — | — | — | 2,097,371 |
| TOTAL LIABILITIES | 395,007,930 | 21,423,842 | 161,545,504 | (2,033,592) | 575,943,684 |
| STOCKHOLDERS' EQUITY (DEFICIT) | | | | | |
| Member capital | — | 425,726,514 | 356,581,671 | (782,308,185) | — |
| Convertible preferred stock | 19,701,133 | — | — | — | 19,701,133 |
| Redeemable preferred stock | 59,025,164 | — | — | — | 59,025,164 |
| Common stock | 5,980 | — | — | — | 5,980 |
| Additional paid-in capital | 7,383,515 | — | — | — | 7,383,515 |
| Accumulated deficit | (18,817,294) | — | — | — | (18,817,294) |
| TOTAL STOCKHOLDERS' EQUITY | 67,298,498 | 425,726,514 | 356,581,671 | (782,308,185) | 67,298,498 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $462,306,428 | $ 447,150,356 | $ 518,127,175 | $(784,341,777) | $643,242,182 |

F-23

App. 0455

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(19) Guarantee of L Bonds** (cont.)

Consolidating Balance Sheets (continued)

| December 31, 2015 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash and cash equivalents | $ 32,292,162 | $ 1,982,722 | $ 150,221 | $ — | $ 34,425,105 |
| Restricted cash | — | 2,102,257 | 239,643 | — | 2,341,900 |
| Investment in life insurance policies, at fair value | — | — | 356,649,715 | — | 356,649,715 |
| Other assets | 1,742,074 | 688,071 | 30,900 | — | 2,461,045 |
| Investment in subsidiaries | 269,886,254 | 291,295,951 | — | (561,182,205) | — |
| TOTAL ASSETS | $303,920,490 | $296,069,001 | $ 357,070,479 | $(561,182,205) | $395,877,765 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | | | | |
| **LIABILITIES** | | | | | |
| Senior credit facilities | $ — | $ (1,000,000) | $ 64,279,596 | $ — | $ 63,279,596 |
| Series I Secured Notes | — | 23,287,704 | — | — | 23,287,704 |
| L Bonds | 276,482,796 | — | — | — | 276,482,796 |
| Accounts payable | 280,988 | 157,217 | 1,079,235 | — | 1,517,440 |
| Interest payable | 8,529,959 | 3,544,626 | 265,476 | — | 12,340,061 |
| Other accrued expenses | 717,365 | 343,421 | — | — | 1,060,786 |
| Deferred taxes, net | 1,763,968 | — | — | — | 1,763,968 |
| TOTAL LIABILITIES | 287,775,076 | 26,332,968 | 65,624,307 | — | 379,732,351 |
| **STOCKHOLDERS' EQUITY (DEFICIT)** | | | | | |
| Member capital | — | 269,736,033 | 291,446,172 | (561,182,205) | — |
| Convertible preferred stock | 20,784,841 | — | — | — | 20,784,841 |
| Common stock | 5,942 | — | — | — | 5,942 |
| Additional paid-in capital | 14,563,834 | — | — | — | 17,149,391 |
| Accumulated deficit | (19,209,203) | — | — | — | (19,209,203) |
| TOTAL STOCKHOLDERS' EQUITY | 16,145,414 | 269,736,033 | 291,446,172 | (561,182,205) | 16,145,414 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $303,920,490 | $296,069,001 | $ 357,070,479 | $(561,182,205) | $395,877,765 |

F-24

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**(19) Guarantee of L Bonds** (cont.)

Consolidated Statements of Operations

| For the year ended December 31, 2016 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUE | | | | | |
| Policy servicing fees | $ — | $ 13,417 | $ — | $ (13,417) | $ — |
| Gain on life insurance policies, net | — | 379,405 | 67,422,160 | — | 67,801,565 |
| MCA income | — | — | 929,303 | — | 929,303 |
| Interest and other income | 260,087 | 59,340 | 639,414 | (212,375) | 746,466 |
| TOTAL REVENUE | 260,087 | 452,162 | 68,990,877 | (225,792) | 69,477,334 |
| | | | | | |
| EXPENSES | | | | | |
| Origination and servicing fees | — | — | 13,417 | (13,417) | — |
| Interest expense | 32,149,577 | 2,311,819 | 8,094,353 | (212,375) | 42,343,374 |
| Employee compensation and benefits | 6,874,368 | 4,358,406 | 551,522 | — | 11,784,296 |
| Legal and professional fees | 2,107,053 | 1,628,408 | 211,915 | — | 3,947,376 |
| Other expenses | 5,822,621 | 2,871,318 | 1,983,037 | — | 10,676,976 |
| TOTAL EXPENSES | 46,953,619 | 11,169,951 | 10,854,244 | (225,792) | 68,752,022 |
| | | | | | |
| INCOME (LOSS) BEFORE EQUITY IN INCOME OF SUBSIDIARIES | (46,693,532) | (10,717,789) | 58,136,633 | — | 725,312 |
| | | | | | |
| EQUITY IN INCOME OF SUBSIDIARIES | 47,418,844 | 58,822,543 | — | (106,241,387) | — |
| | | | | | |
| NET INCOME BEFORE INCOME TAXES | 725,312 | 48,104,754 | 58,136,633 | (106,241,387) | 725,312 |
| | | | | | |
| INCOME TAX EXPENSE | 333,403 | — | — | — | 333,403 |
| NET INCOME | 391,909 | 48,104,754 | 58,136,633 | (106,241,387) | 391,909 |
| Preferred stock dividends | (3,537,287) | — | — | — | (3,537,287) |
| NET LOSS ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ (3,145,378) | $ — | $ — | $ — | $ (3,145,378) |

| For the year ended December 31, 2015 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUE | | | | | |
| Policy servicing fees | $ — | $ 2,217,471 | $ — | $ (2,217,471) | $ — |
| Gain on life insurance policies, net | — | — | 39,381,003 | — | 39,381,003 |
| Interest and other income | 45,613 | 62,125 | 143,511 | | 251,249 |
| TOTAL REVENUE | 45,613 | 2,279,596 | 39,524,514 | (2,217,471) | 39,632,252 |
| | | | | | |
| EXPENSES | | | | | |
| Origination and servicing fees | — | — | 2,217,471 | (2,217,471) | — |
| Interest expense | 22,416,821 | 2,703,124 | 4,398,743 | — | 29,518,718 |
| Employee compensation and benefits | 6,007,347 | 2,002,673 | — | — | 8,010,020 |
| Legal and professional fees | 2,115,580 | 1,037,203 | — | — | 3,152,783 |
| Other expenses | 4,295,085 | 3,347,294 | 141,971 | — | 7,784,350 |
| TOTAL EXPENSES | 34,834,863 | 9,090,294 | 6,758,185 | (2,217,471) | 48,465,871 |
| | | | | | |
| INCOME (LOSS) BEFORE EQUITY IN INCOME OF SUBSIDIARIES | (34,789,250) | (6,810,698) | 32,766,329 | — | (8,833,619) |
| | | | | | |
| EQUITY IN INCOME OF SUBSIDIARIES | 25,955,631 | 32,766,108 | — | (58,721,739) | — |
| | | | | | |
| NET INCOME (LOSS) BEFORE INCOME TAXES | (8,833,619) | 25,955,410 | 32,766,329 | (58,721,739) | (8,833,619) |
| | | | | | |
| INCOME TAX BENEFIT | (3,509,587) | — | — | — | (3,509,587) |
| NET INCOME (LOSS) | (5,324,032) | 25,955,410 | 32,766,329 | (58,721,739) | (5,324,032) |
| Preferred stock dividends | (2,069,242) | — | — | — | (2,069,242) |
| NET LOSS ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ (7,393,274) | $ — | $ — | $ — | $ (7,393,274) |

App. 0457

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(19) Guarantee of L Bonds** (cont.)

Consolidated Statements of Cash Flows

| For the year ended December 31, 2016 | Parent | Guarantor Sub | Non-Guarantor Sub | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | |
| Net income (loss) | $ 391,909 | $ 48,104,754 | $ 58,136,633 | $(106,241,387) | $ 391,909 |
| Adjustments to reconcile net income to net cash flows from operating activities: | | | | | |
| (Equity) of subsidiaries | (47,418,845) | (58,822,542) | — | 106,241,387 | — |
| Gain on life insurance policies, gross | — | — | (48,988,406) | — | (48,988,406) |
| Amortization of deferred financing and issuance costs | 7,720,065 | (1,307,640) | 2,032,827 | — | 8,445,252 |
| Deferred income taxes | 333,402 | — | — | — | 333,402 |
| Preferred stock issued in lieu of cash dividends | 689,742 | — | — | — | 689,742 |
| Preferred stock dividends payable | 302,972 | — | — | — | 302,972 |
| (Increase) decrease in operating assets: | | | | | |
| Life insurance policy benefits receivable | — | — | (5,345,000) | — | (5,345,000) |
| Due from related parties | — | 1,169 | — | — | 1,169 |
| Other assets | (112,725,117) | (44,866,357) | 19,683,919 | 114,884,593 | (23,022,962) |
| Increase (decrease) in operating liabilities: | | | | | |
| Due to related party | (2,033,592) | — | 2,033,592 | — | — |
| Accounts payable | 572,483 | 574,481 | (437,692) | — | 709,272 |
| Interest payable | 2,191,113 | 420,259 | 2,256,824 | — | 4,868,196 |
| Other accrued expenses | 706,718 | 2,873,233 | (7,979,395) | — | (4,399,444) |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (149,269,149) | (53,022,643) | 21,393,302 | 114,884,593 | (66,013,897) |
| | | | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | |
| Investment in life insurance policies | — | — | (94,952,879) | — | (94,952,879) |
| Carrying value of matured life insurance policies | — | — | 10,992,624 | — | 10,992,624 |
| Investment in Secured MCA advances | — | — | (8,727,924) | — | (8,727,924) |
| Proceeds from Secured MCA advances | — | — | 2,553,466 | — | 2,553,466 |
| NET CASH FLOWS USED IN INVESTING ACTIVITIES | — | — | (90,134,713) | — | (90,134,713) |
| | | | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | | |
| Net borrowings on senior credit facilities | — | — | 97,713,952 | — | 97,713,952 |
| Payments for redemption of Series I Secured Notes | — | (7,469,462) | — | — | (7,469,462) |
| Proceeds from issuance of L Bonds | 153,874,402 | — | — | — | 153,874,402 |
| Payment of deferred issuance costs for L Bonds | (10,149,316) | — | — | — | (10,149,316) |
| Payments for redemption of L Bonds | (45,754,691) | — | — | — | (45,754,691) |
| Issuance of common stock | 244,185 | — | — | — | 244,185 |
| Proceeds (payments) from restricted cash | — | (15,392) | (35,469,305) | — | (35,484,697) |
| Proceeds from issuance of preferred stock | 57,040,946 | — | 71,555 | — | 57,112,501 |
| Payments for issuance costs of preferred stock | (4,133,526) | — | (7,340) | — | (4,140,866) |
| Payments for redemption of preferred stock | (2,126,678) | — | (71,555) | — | (2,198,233) |
| Payments of preferred stock dividends | (3,537,288) | — | — | — | (3,537,288) |
| Issuance of member capital | — | 107,885,727 | 6,998,866 | (114,884,593) | — |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 145,458,034 | 100,400,873 | 69,236,173 | (114,884,593) | 200,210,487 |
| | | | | | |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | (3,811,115) | 47,378,230 | 494,762 | — | 44,061,877 |
| | | | | | |
| **CASH AND CASH EQUIVALENTS** | | | | | |
| BEGINNING OF THE PERIOD | 32,292,162 | 1,982,722 | 150,221 | — | 34,425,105 |
| END OF THE PERIOD | $ 28,481,047 | $ 49,360,952 | $ 644,983 | $ — | $ 78,486,982 |

F-26

App. 0459

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(19) Guarantee of L Bonds** (cont.)

Consolidated Statements of Cash Flows (continued)

| For the year ended December 31, 2015 | Parent | Guarantor Sub | Non-Guarantor Sub | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | |
| Net income (loss) | $ (5,324,032) | $ 25,955,410 | $ 32,766,329 | $ (58,721,739) | $ (5,324,032) |
| Adjustments to reconcile net income to net cash flows from operating activities: | | | | | |
| (Equity) of subsidiaries | (25,955,632) | (32,766,107) | — | 58,721,739 | — |
| Gain on life insurance policies, gross | — | — | (39,371,059) | — | (39,371,059) |
| Amortization of deferred financing and issuance costs | 4,081,051 | 362,457 | (731,452) | — | 3,712,056 |
| Deferred income taxes | (3,509,587) | — | — | — | (3,509,587) |
| Preferred stock issued in lieu of cash dividends | 683,133 | — | — | — | 683,133 |
| Preferred stock dividends payable | 6,800 | — | — | — | 6,800 |
| (Increase) decrease in operating assets: | | | | | |
| Due from related parties | — | (1,256) | — | — | (1,256) |
| Life insurance policy benefits receivable | — | — | 1,750,000 | — | 1,750,000 |
| Other assets | (58,689,451) | (43,314,345) | — | 101,699,270 | (304,526) |
| Increase (decrease) in operating liabilities: | | | | | |
| Accounts payable | (129,909) | (85,463) | 529,236 | — | 313,864 |
| Interest payable | 2,730,921 | 233,786 | (751,178) | — | 2,213,529 |
| Other accrued expenses | 2,059,136 | 149,242 | (24,985) | — | 2,183,393 |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (84,047,570) | (49,466,276) | (5,833,109) | 101,699,270 | (37,647,685) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | |
| Investment in life insurance policies | — | — | (38,906,934) | — | (38,906,934) |
| Proceeds from settlement of life insurance policies | — | — | 4,511,289 | — | 4,511,289 |
| NET CASH FLOWS USED IN INVESTING ACTIVITIES | — | — | (34,395,645) | — | (34,395,645) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | | |
| Net repayment of senior credit facilities | — | — | (7,150,000) | — | (7,150,000) |
| Payments for redemption of Series I Secured Notes | — | (4,891,681) | — | — | (4,891,681) |
| Proceeds from issuance of L Bonds | 131,159,348 | — | — | — | 131,159,348 |
| Payment of deferred issuance costs for L Bonds | (7,499,601) | — | — | — | (7,499,601) |
| Payments for redemption of L Bonds | (35,984,061) | — | — | — | (35,984,061) |
| Proceeds (payments) from restricted cash | — | (2,019,757) | 3,973,910 | — | 1,954,153 |
| Issuance of common stock | 582,000 | — | — | — | 582,000 |
| Payments for redemption of preferred stock | (295,185) | — | — | — | (295,185) |
| Payments of preferred stock dividends | (2,069,242) | — | — | — | (2,069,242) |
| Issuance of member capital | — | 58,144,205 | 43,555,065 | (101,699,270) | — |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 85,893,259 | 51,232,767 | 40,378,975 | (101,699,270) | 75,805,731 |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | 1,845,689 | 1,766,491 | 150,221 | — | 3,762,401 |
| **CASH AND CASH EQUIVALENTS** | | | | | |
| BEGINNING OF THE PERIOD | 30,446,473 | 216,231 | — | — | 30,662,704 |
| END OF THE PERIOD | $ 32,292,162 | $ 1,982,722 | $ 150,221 | $ — | $ 34,425,105 |

F-27

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(20) Concentration**

We purchase life insurance policies written by life insurance companies having investment-grade ratings by independent rating agencies. As a result, there may be certain concentrations of policies with life insurance companies. The following summarizes the face value of insurance policies with specific life insurance companies exceeding 10% of the total face value held by us.

| Life insurance company | As of December 31, | |
|---|---|---|
| | 2016 | 2015 |
| John Hancock | 14.36% | 12.73% |
| AXA Equitable | 13.42% | 14.00% |
| Lincoln National | 11.22% | * |

_____

\*    percentage does not exceed 10% of the total face value.

The following summarizes the number of insurance policies held in specific states exceeding 10% of the total face value held by us:

| State of residence | As of December 31, | |
|---|---|---|
| | 2016 | 2015 |
| California | 20.72% | 25.25% |
| Florida | 19.42% | 19.95% |

**(21) Subsequent Events**

Subsequent to December 31, 2016, eight policies covering seven individuals have matured. The combined insurance benefits of these policies were $15,975,000. We recorded realized gains of $13,956,000 on these seven policies.

Subsequent to December 31, 2016, we have issued approximately an additional $15,318,000 in principal amount of L Bonds.

Subsequent to December 31, 2016 we have issued approximately $16,871,000 of RPS.

On February 9, 2017, we declared a special cash dividend in the amount of $2.50 per share, payable on or about April 14, 2017, to the holders of RPS of record as of the close of business on April 5, 2017.

On February 14, 2017, we began a public offering of up to 150,000 shares of RPS 2 at $1,000 per share. As of the date of this report, we have not sold any shares of RPS 2.

Effective February 16, 2017, Paul Siegert, Director and Executive Chairman, voluntarily resigned from the Board of Directors. As part of his resignation, we agreed to repurchase Mr. Siegert's 200,445 shares of GWG common stock for an aggregate of approximately $1.604 million. As a separation payment, Mr. Siegert will continue to receive his regular salary payments (annualized to approximately $201,000) through December 31, 2017 and he forfeited all options, both unvested and vested, to purchase shares of GWG common stock. Following his resignation, the Board of Directors appointed Mark Schwarzmann as a director of the Board and Jon Sabes was appointed Chairman of the Board.

**(22) Reclassification of Preferred Stock Dividends**

For the quarter ended December 31, 2016, we identified an error relating to prior periods in the classification of preferred stock dividends on the consolidated statement of operations and balance sheet. Preferred stock dividends have been classified as interest expense since the third quarter of 2014, when our initial public offering became effective. As a result, dividend cost resulted in an increase of the accumulated deficit on the balance sheet. The preferred stock dividends should have been charged directly to additional paid-in capital and are separately reflected as preferred stock dividends on the consolidated statement of operations. The reclassification of preferred stock dividends did not result in any changes to total equity in any of the periods effected. Additionally, the reclassification did not result in any changes to net loss attributable to common shareholders or net loss per common share for the year ended December 31, 2015.

App. 0461

GWG HOLDINGS, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED BALANCE SHEETS

| | September 30, 2017 | December 31, 2016 |
|---|---|---|
| | (unaudited) | |
| **ASSETS** | | |
| Cash and cash equivalents | $ 115,345,481 | $ 78,486,982 |
| Restricted cash | 5,819,230 | 37,826,596 |
| Investment in life insurance policies, at fair value | 620,097,938 | 511,192,354 |
| Secured MCA advances | 2,623,657 | 5,703,147 |
| Life insurance policy benefits receivable | 14,597,000 | 5,345,000 |
| Deferred taxes, net | 4,384,546 | — |
| Other assets | 3,824,200 | 4,688,103 |
| TOTAL ASSETS | $ 766,692,052 | $ 643,242,182 |
| | | |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | |
| **LIABILITIES** | | |
| Senior Credit Facilities | $ 201,978,580 | $ 156,064,818 |
| Series I Secured Notes | — | 16,404,836 |
| L Bonds | 413,060,517 | 381,312,587 |
| Accounts payable | 3,715,236 | 2,226,712 |
| Interest payable | 13,521,174 | 16,160,599 |
| Other accrued expenses | 2,792,521 | 1,676,761 |
| Deferred taxes, net | — | 2,097,371 |
| TOTAL LIABILITIES | 635,068,028 | 575,943,684 |
| | | |
| **STOCKHOLDERS' EQUITY** | | |
| | | |
| CONVERTIBLE PREFERRED STOCK | | |
| (par value $0.001; shares authorized 40,000,000; shares outstanding 2,694,725 and 2,640,521; liquidation preference of $20,210,000 and $19,804,000 as of September 30, 2017 and December 31, 2016, respectively) | 19,408,980 | 19,701,133 |
| | | |
| REDEEMABLE PREFERRED STOCK | | |
| (par value $0.001; shares authorized 100,000; shares outstanding 99,080 and 59,183; liquidation preference of $99,080,000 and $59,183,000 as of September 30, 2017 and December 31, 2016, respectively) | 96,106,633 | 59,025,164 |
| | | |
| SERIES 2 REDEEMABLE PREFERRED STOCK | | |
| (par value $0.001; shares authorized 150,000; shares outstanding 48,316 and 0; liquidation preference of $48,316,000 and $0 as of September 30, 2017 and December 31, 2016, respectively) | 44,721,747 | — |
| | | |
| COMMON STOCK | | |
| (par value $0.001: shares authorized 210,000,000; shares issued and outstanding 5,813,555 and 5,980,190 as of September 30, 2017 and December 31, 2016, respectively) | 5,814 | 5,980 |
| Additional paid-in capital | — | 7,383,515 |
| Accumulated deficit | (28,619,150) | (18,817,294) |
| TOTAL STOCKHOLDERS' EQUITY | 131,624,024 | 67,298,498 |

| TOTAL LIABILITIES & EQUITY | $ 766,092,052 | $ 643,242,182 |
|---|---|---|

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements.

F-29

GWG HOLDINGS, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(unaudited)

| | Three Months Ended | | Nine Months Ended | |
| --- | --- | --- | --- | --- |
| | September 30, 2017 | September 30, 2016 | September 30, 2017 | September 30, 2016 |
| REVENUE | | | | |
| Gain on life insurance policies, net | $ 14,421,353 | $ 13,509,755 | $ 45,117,438 | $ 51,606,815 |
| MCA income | 100,367 | 286,225 | 480,526 | 654,441 |
| Interest and other income | 175,323 | 124,998 | 855,009 | 341,098 |
| TOTAL REVENUE | 14,697,043 | 13,920,978 | 46,452,973 | 52,602,354 |
| | | | | |
| EXPENSES | | | | |
| Interest expense | 13,275,407 | 10,942,790 | 38,765,647 | 29,856,601 |
| Employee compensation and benefits | 3,792,096 | 2,912,463 | 10,696,455 | 8,450,168 |
| Legal and professional fees | 1,657,090 | 586,830 | 3,934,027 | 3,097,312 |
| Provision for MCA advances | 28,000 | — | 906,000 | 400,000 |
| Other expenses | 2,771,196 | 2,863,212 | 8,434,617 | 7,208,057 |
| TOTAL EXPENSES | 21,523,789 | 17,305,295 | 62,736,746 | 49,012,138 |
| | | | | |
| INCOME (LOSS) BEFORE INCOME TAXES | (6,826,746) | (3,384,317) | (16,283,773) | 3,590,216 |
| INCOME TAX EXPENSE (BENEFIT) | (2,764,243) | (1,428,130) | (6,481,917) | 1,478,617 |
| | | | | |
| NET INCOME (LOSS) | (4,062,503) | (1,956,187) | (9,801,856) | 2,111,599 |
| | | | | |
| Preferred stock dividends | 3,548,165 | 1,041,178 | 7,447,022 | 2,153,333 |
| NET INCOME (LOSS) ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ (7,610,668) | $ (2,997,365) | $(17,248,878) | $ (41,734) |
| NET INCOME (LOSS) PER SHARE | | | | |
| Basic | $ (1.31) | $ (0.50) | $ (2.96) | $ (0.01) |
| Diluted | $ (1.31) | $ (0.50) | $ (2.96) | $ (0.01) |
| | | | | |
| WEIGHTED AVERAGE SHARES OUTSTANDING | | | | |
| Basic | 5,797,800 | 5,978,322 | 5,829,808 | 5,962,938 |
| Diluted | 5,797,800 | 5,978,322 | 5,829,808 | 5,962,938 |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements.

F-30

App. 0465

GWG HOLDINGS, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENT OF CASH FLOWS
(unaudited)

| | Three Months Ended | | Nine Months Ended | |
| --- | --- | --- | --- | --- |
| | September 30, 2017 | September 30, 2016 | September 30, 2017 | September 30, 2016 |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | |
| Net income (loss) | $ (4,062,503) | $ (1,956,187) | $ (9,801,856) | $ 2,111,599 |
| Adjustments to reconcile net income (loss) to net cash flows from operating activities: | | | | |
| Change in fair value of life insurance policies | (20,181,732) | (21,073,226) | (49,301,067) | (53,846,155) |
| Amortization of deferred financing and issuance costs | 2,344,541 | 2,765,743 | 6,508,692 | 6,077,905 |
| Deferred income taxes | (2,764,243) | (1,428,130) | (6,481,917) | 1,478,617 |
| Preferred stock dividends payable | 333,391 | 333,565 | 1,034,139 | 663,614 |
| (Increase) decrease in operating assets: | | | | |
| Life insurance policy benefits receivable | (7,627,000) | 700,000 | (9,252,000) | (6,129,022) |
| Other assets | 102,437 | 419,836 | 970,767 | (617,630) |
| Increase (decrease) in operating liabilities: | | | | |
| Due to related party | (3,429) | (80,949) | (13,214) | (182,730) |
| Accounts payable and other accrued expenses | (415,471) | (3,216,990) | 1,840,616 | (2,024,234) |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (32,274,009) | (23,536,338) | (64,495,840) | (52,468,036) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | |
| Investment in life insurance policies | (25,199,692) | (25,770,326) | (67,321,363) | (74,470,362) |
| Carrying value of matured life insurance policies | 2,333,039 | 1,078,889 | 7,716,847 | 7,381,132 |
| Investment in Secured MCA advances | — | (1,965,896) | (39,671) | (7,613,310) |
| Proceeds from Secured MCA advances | 826,621 | 220,911 | 2,250,323 | 1,246,703 |
| NET CASH FLOWS USED IN INVESTING ACTIVITIES | (22,040,032) | (26,436,422) | (57,393,864) | (73,455,837) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | |
| Net borrowings on (repayments of) Senior Credit Facilities | 56,887,491 | (10,761,048) | 49,787,954 | 6,238,952 |
| Payments for issuance of senior debt | (3,937,907) | — | (5,128,319) | — |
| Payments for redemption of Series I Secured Notes | (6,815,406) | (541,275) | (16,613,667) | (6,264,018) |
| Proceeds from issuance of L Bonds | 30,271,873 | 64,350,430 | 87,016,343 | 135,477,090 |
| Payments for issuance and redemption of L Bonds | (19,752,717) | (14,373,447) | (58,949,880) | (37,036,922) |
| Transfer from (payments to) restricted cash | 40,340,401 | (4,527,232) | 32,007,366 | (13,346,126) |
| Issuance (repurchase) of common stock | 30 | 31,515 | (1,603,526) | 244,185 |
| Proceeds from issuance of preferred stock | 25,211,870 | 20,786,332 | 86,692,811 | 31,287,541 |
| Payment for issuance and redemption of preferred stock | (1,291,420) | (2,556,859) | (7,013,857) | (4,174,773) |

| | | | | |
|---|---|---|---|---|
| Payment of preferred stock dividends | (3,548,165) | (1,041,178) | (7,447,022) | (2,153,555) |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 117,366,050 | 51,367,238 | 158,748,203 | 110,272,596 |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | 63,052,009 | 1,394,478 | 36,858,499 | (15,651,277) |
| **CASH AND CASH EQUIVALENTS** | | | | |
| BEGINNING OF PERIOD | 52,293,472 | 17,379,350 | 78,486,982 | 34,425,105 |
| END OF PERIOD | $115,345,481 | $ 18,773,828 | $115,345,481 | $ 18,773,828 |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements.

F-31

GWG HOLDINGS, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENT OF CASH FLOWS – CONTINUED
(unaudited)

| | Three Months Ended | | Nine Months Ended | |
| --- | --- | --- | --- | --- |
| | September 30, 2017 | September 30, 2016 | September 30, 2017 | September 30, 2016 |
| **SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION** | | | | |
| Interest paid | $ 17,478,000 | $ 10,808,000 | $ 45,101,000 | $ 27,207,000 |
| Premiums paid | $ 12,927,000 | $ 11,785,000 | $ 35,533,000 | $ 29,225,000 |
| Stock-based compensation | $ 270,000 | $ 162,000 | $ 350,000 | $ 213,000 |
| Payments for exercised stock options | $ 164,000 | $ — | $ 264,000 | $ — |
| **NON-CASH INVESTING AND FINANCING ACTIVITIES** | | | | |
| Series I Secured Notes: | | | | |
| Conversion of accrued interest and commissions payable to principal | $ — | $ 47,000 | $ — | $ 234,000 |
| L Bonds: | | | | |
| Conversion of accrued interest and commissions payable to principal | $ 477,000 | $ 854,000 | $ 1,382,000 | $ 1,515,000 |
| Series A Preferred Stock: | | | | |
| Issuance of Series A Preferred Stock in lieu of cash dividends | $ 161,000 | $ 170,000 | $ 499,000 | $ 509,000 |
| Investment in life insurance policies included in accounts payable | $ 966,000 | $ 1,603,000 | $ 966,000 | $ 1,603,000 |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements.

F-32

App. 0468

GWG HOLDINGS, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENT OF CHANGES IN STOCKHOLDERS' EQUITY
(unaudited)

| | Preferred Stock Shares | Preferred Stock | Common Shares | Common Stock (par) | Additional Paid-in Capital | Accumulated Deficit | Total Equity |
|---|---|---|---|---|---|---|---|
| Balance, December 31, 2015 | 2,781,735 | $ 20,784,841 | 5,941,790 | $ 5,942 | $14,563,834 | $(19,209,203) | $ 16,145,414 |
| Net loss | — | — | — | — | — | 391,909 | 391,909 |
| Issuance of common stock | — | — | 36,450 | 36 | 244,149 | — | 244,185 |
| Redemption of Series A Preferred Stock | (239,749) | (1,788,451) | 1,950 | 2 | 19,498 | — | (1,768,951) |
| Issuance of Series A Preferred Stock | 98,535 | 704,743 | — | — | — | — | 704,743 |
| Issuance of Redeemable Preferred Stock | 59,183 | 59,025,164 | — | — | (4,133,525) | — | 54,891,639 |
| Preferred stock dividends | — | — | — | — | (3,537,288) | — | (3,537,288) |
| Issuance of stock options | — | — | — | — | 226,847 | — | 226,847 |
| Balance, December 31, 2016 | 2,699,704 | $ 78,726,297 | 5,980,190 | $ 5,980 | $ 7,383,515 | $(18,817,294) | $ 67,298,498 |
| Net income | — | — | — | — | — | (9,801,856) | (9,801,856) |
| Issuance of common stock | — | — | 33,810 | 34 | 320,970 | — | 321,004 |
| Redemption of common stock | — | — | (200,445) | (200) | (1,603,360) | — | (1,603,560) |
| Issuance of Series A Preferred Stock | 71,237 | 498,659 | — | — | — | — | 498,659 |
| Redemption of Series A Preferred Stock | (17,033) | (126,997) | — | — | — | — | (126,997) |
| Issuance of redeemable preferred stock | 88,822 | 85,082,425 | — | — | (2,338,457) | — | 82,743,968 |
| Redemption of redeemable preferred stock | (609) | (608,777) | — | — | — | — | (608,777) |
| Dividends paid | | (3,670,488) | — | — | (3,776,534) | — | (7,447,022) |
| Issuance of stock options | | 336,241 | — | — | 13,866 | — | 350,107 |
| Balance, September 30, 2017 | 2,842,121 | $160,237,360 | 5,813,555 | $ 5,814 | $ — | $(28,619,150) | $131,624,024 |

---

\*    Preferred stock dividends were paid from additional paid-in capital until the latter was exhausted in the second quarter of 2017. Subsequent dividends were charged against the carrying values of the respective series of the Company's preferred stock, resulting in a difference between the Company's preferred stock book balances and liquidation preference of the respective series of preferred stock.

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements.

F-33

App. 0469

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

**(1) Nature of Business and Summary of Significant Accounting Policies**

**Nature of Business** — We are a financial services company committed to disrupting and transforming the life insurance industry and related industries. We built our business by creating opportunities for consumers to obtain significantly more value for their life insurance policies in a secondary market as compared to the traditional options offered by the insurance industry. We are enhancing and extending these activities through innovation in our products and services, business processes, financing strategies, and advanced epigenetic technologies. At the same time, we are creating opportunities for investors to receive income and capital appreciation from our investment activities in the life insurance and related industries.

GWG Holdings, Inc. and all of its subsidiaries are incorporated and organized in Delaware. Unless the context otherwise requires or we specifically so indicate, all references in these footnotes to "we," "us," "our," "our Company," "GWG," or the "Company" refer to GWG Holdings, Inc. and its subsidiaries collectively and on a consolidated basis. References to the full names of particular entities, such as "GWG Holdings, Inc." or "GWG Holdings," are meant to refer only to the particular entity referenced.

On December 7, 2015, GWG Holdings formed a wholly owned subsidiary, GWG MCA, LLC. On January 13, 2016, GWG MCA, LLC was converted to a corporation and became GWG MCA Capital, Inc. GWG MCA Capital, Inc. was formed to provide cash advances to small businesses.

On August 25, 2016, GWG Holdings formed a wholly owned subsidiary, Actüa Life & Annuity Ltd., renamed to Life Epigenetics Inc. ("Life Epigenetics") in August 2017, to engage in various life insurance related businesses and activities related to its exclusive license for "DNA Methylation Based Predictor of Mortality" technology.

**Use of Estimates** — The preparation of our consolidated financial statements in conformity with GAAP requires management to make significant estimates and assumptions affecting the reported amounts of assets and liabilities at the date of the consolidated financial statements, as well as the reported amounts of revenue during the reporting period. We regularly evaluate estimates and assumptions, which are based on current facts, historical experience, management's judgment, and various other factors that we believe to be reasonable under the circumstances. Our actual results may differ materially and adversely from our estimates. The most significant estimates with regard to these consolidated financial statements relate to (1) the determination of the assumptions used in estimating the fair value of our investments in life insurance policies and (2) the value of our deferred tax assets and liabilities.

**Cash and Cash Equivalents** — We consider cash in demand deposit accounts and temporary investments purchased with an original maturity of three months or less to be cash equivalents. We maintain our cash and cash equivalents with highly rated financial institutions. The balances in our bank accounts may exceed Federal Deposit Insurance Corporation limits. We periodically evaluate the risk of exceeding insured levels and may transfer funds as we deem appropriate.

**Life Insurance Policies** — Accounting Standards Codification 325-30, *Investments in Insurance Contracts* permits a reporting entity to account for its investments in life insurance policies using either the investment method or the fair value method. We elected to use the fair value method to account for our life insurance policies. We initially record our purchase of life insurance policies at the transaction price, which is the amount paid for the policy, inclusive of all external fees and costs associated with the acquisition. At each subsequent reporting period, we re-measure the investment at fair value in its entirety and recognize the change in fair value as unrealized gain (revenue) in the current period, net of premiums paid.

In a case where our acquisition of a policy is not complete as of a reporting date, but we have nonetheless advanced direct costs and deposits for the acquisition, those costs and deposits are recorded as "other assets" on our balance sheet until the acquisition is complete and we have secured title to the policy. On September 30, 2017 and December 31, 2016, a total of $0 and $42,000, respectively, of our "other assets" comprised direct costs and deposits that we had advanced for life insurance policy acquisitions.

We also recognize realized gain (or loss) from a life insurance policy upon one of the two following events: (1) our receipt of notice or verified mortality of the insured; or (2) our sale of the policy (upon filing of change-of-ownership

App. 0470

App. 0471

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

**(1) Nature of Business and Summary of Significant Accounting Policies** (cont.)

forms and receipt of payment). In the case of mortality, the gain (or loss) we recognize is the difference between the policy benefits and the carrying values of the policy once we determine that collection of the policy benefits is realizable and reasonably assured. In the case of a policy sale, the gain (or loss) we recognize is the difference between the sale price and the carrying value of the policy on the date we receive sale proceeds.

**Other Assets** — Life Epigenetics is engaged in various life insurance related businesses and activities related to its exclusive license for the "DNA Methylation Based Predictor of Mortality" technology for the life insurance industry. The cost of entering into this license agreement is included in "other assets."

**Stock-Based Compensation** — We measure and recognize compensation expense for all stock-based payments at fair value over the requisite service period. We use the Black-Scholes option pricing model to determine the weighted-average fair value of options. For restricted stock grants, fair value is determined as of the closing price of our common stock on the date of grant. Stock-based compensation expense is recorded in general and administrative expenses based on the classification of the employee or vendor. The determination of fair value of stock-based payment awards on the date of grant using an option-pricing model is affected by our stock price as well as by assumptions regarding a number of subjective variables. These variables include, but are not limited to, the expected stock price volatility over the term of the awards.

The risk-free interest rate is based on the U.S. Treasury rates at the date of grant with maturity dates approximately equal to the expected life at grant date. Volatility is based on the standard deviation of the average continuously compounded rate of return of five selected comparable companies over the previous 52 weeks. We have not historically issued any common stock dividends and do not expect to do so in the foreseeable future.

**Deferred Financing and Issuance Costs** — Loans advanced to us under our senior credit facility with LNV Corporation, as described in Note 6, are reported net of financing costs, including issuance costs, sales commissions and other direct expenses, which are amortized using the straight-line method over the term of the facility. We had no loans advanced to us under our senior credit facility with Autobahn Funding Company during the nine months ended September 30, 2017, as described in Note 5. The Series I and L Bonds, as respectively described in Notes 7 and 8, are reported net of financing costs, which are amortized using the interest method over the term of those borrowings. The Series A Convertible Preferred Stock ("Series A"), as described in Note 9, is reported net of financing costs (including the fair value of warrants issued), all of which were fully amortized using the interest method as of September 30, 2017. Selling and issuance costs of Redeemable Preferred Stock ("RPS") and Series 2 Redeemable Preferred Stock ("RPS 2"), described in Notes 10 and 11, are netted against additional paid-in-capital, if any, and then against the outstanding balance of the preferred stock.

**Earnings (loss) per Share** — Basic earnings (loss) per share attributable to common shareholders are calculated using the weighted-average number of shares outstanding during the reported period. Diluted earnings (loss) per share are calculated based on the potential dilutive impact of our Series A, RPS, RPS 2, warrants and stock options. Due to our net loss for the three and nine months ended September 30, 2017 and 2016, there are no dilutive securities.

**Recently Issued Accounting Pronouncements** — On April 7, 2015, the FASB issued Accounting Standards Update No. 2015-03, *Simplifying the Presentation of Debt Issuance Costs* ("ASU 2015-03"), as part of its simplification initiative. ASU 2015-03 changes the presentation of debt issuance costs by presenting those costs in the balance sheet as a direct deduction from the related debt liability. Amortization of the costs is reported as interest expense. We adopted ASU 2015-03 effective January 1, 2016, as required for public reporting entities.

On February 25, 2016, the FASB issued Accounting Standards Update 2016-02 *Leases* ("ASU 2016-02"). The new guidance is effective for fiscal years beginning after December 15, 2018. ASU 2016-02 provides more transparency and comparability in the financial statements of lessees by recognizing all leases with a term greater than twelve months on the balance sheet. Lessees will also be required to disclose key information about their leases. Early adoption is permitted. We are currently evaluating the impact of the adoption of this pronouncement and have not yet adopted ASU 2016-02 as of September 30, 2017.

F-35

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

**(1) Nature of Business and Summary of Significant Accounting Policies** (cont.)

In March 2016, the FASB issued Accounting Standards Update 2016-09 ("ASU 2016-09") to simplify the accounting for stock compensation related to the following items: income tax accounting, award classification, estimation of forfeitures, and cash flow presentation. The new guidance is effective for fiscal years beginning after December 15, 2016. We adopted ASU 2016-09 effective January 1, 2017. The impact of the adoption was not material to the financial statements.

**(2) Restrictions on Cash**

Under the terms of our senior credit facility with LNV Corporation (discussed in Note 6), we are required to maintain a collection account that is used to collect policy benefits from pledged policies, pay interest and other charges under the facility, and distribute funds to pay down the facility. The agents for the lenders authorize disbursements from these accounts. At September 30, 2017 and December 31, 2016, there was a balance of $5,819,000, and $37,827,000, respectively, in these restricted cash accounts.

**(3) Investment in Life Insurance Policies**

Life insurance policies are valued based on unobservable inputs that are significant to their overall fair value. Changes in the fair value of these policies are recorded as gain or loss on life insurance policies, net of premiums paid on those policies, in our consolidated statements of operations. Fair value is determined on a discounted cash flow basis that incorporates life expectancy assumptions generally derived from reports obtained from widely accepted life expectancy providers, other than insured lives covered under small face amount policies (i.e., $1 million in face value benefits or less), assumptions relating to cost-of-insurance (premium) rates and other assumptions. The discount rate we apply incorporates current information about discount rates applied by other public reporting companies owning portfolios of life insurance policies, the discount rates observed in the life insurance secondary market, market interest rates, the estimated credit exposure to the insurance companies that issued the life insurance policies and management's estimate of the operational risk premium a purchaser would require to receive the future cash flows derived from our portfolio as a whole. Management has discretion regarding the combination of these and other factors when determining the discount rate. As a result of management's analysis, a discount rate of 10.54% was applied to our portfolio as of September 30, 2017 as compared to 10.96% as of December 31, 2016.

A summary of our policies, organized according to their estimated life expectancy dates as of the reporting date, is as follows:

| Years Ending December 31, | As of September 30, 2017 | | | As of December 31, 2016 | | |
|---|---|---|---|---|---|---|
| | Number of Policies | Estimated Fair Value | Face Value | Number of Policies | Estimated Fair Value | Face Value |
| 2017 | 2 | $ 2,016,000 | $ 2,125,000 | 11 | $ 14,837,000 | $ 16,939,000 |
| 2018 | 9 | 13,222,000 | 16,564,000 | 23 | 30,830,000 | 42,564,000 |
| 2019 | 57 | 63,926,000 | 88,967,000 | 55 | 57,556,000 | 88,858,000 |
| 2020 | 94 | 88,281,000 | 148,908,000 | 93 | 85,414,000 | 159,814,000 |
| 2021 | 88 | 87,710,000 | 162,525,000 | 86 | 73,825,000 | 158,744,000 |
| 2022 | 91 | 78,940,000 | 174,699,000 | 66 | 56,909,000 | 147,222,000 |
| 2023 | 84 | 63,439,000 | 168,821,000 | 64 | 44,953,000 | 128,581,000 |
| Thereafter | 425 | 222,564,000 | 860,018,000 | 292 | 146,868,000 | 618,953,000 |
| Totals | 850 | $ 620,098,000 | $1,622,627,000 | 690 | $ 511,192,000 | 1,361,675,000 |

We recognized life insurance benefits of $9,747,000 and $5,300,000 during the three months ended September 30, 2017 and 2016, respectively, related to policies with a carrying value of $2,333,000 and $1,078,000, respectively, and as a result recorded realized gains of $7,414,000 and $4,222,000, respectively. We recognized life insurance benefits of $39,657,000 and $34,367,000 during the nine months ended September 30, 2017 and 2016, respectively, related to policies with a carrying value of $7,716,000 and $7,381,000, respectively, and as a result recorded realized gains of $31,941,000 and $26,986,000.

App. 0474

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

**(3) Investment in Life Insurance Policies** (cont.)

Reconciliation of gain on life insurance policies:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2017 | 2016 | 2017 | 2016 |
| Change in estimated probabilistic cash flows | $ 12,568,000 | $ 12,955,000 | $ 40,033,000 | $ 34,078,000 |
| Unrealized gain on acquisitions | 7,217,000 | 11,668,000 | 25,863,000 | 29,509,000 |
| Premiums and other annual fees | (13,174,000) | (11,784,000) | (36,124,000) | (29,225,000) |
| Change in discount rates[1] | 7,987,000 | (378,000) | 12,130,000 | 460,000 |
| Change in life expectancy evaluation[2] | (5,370,000) | (2,285,000) | (13,974,000) | (3,199,000) |
| Face value of matured policies | 9,747,000 | 5,300,000 | 39,657,000 | 34,367,000 |
| Fair value of matured policies | (4,554,000) | (1,966,000) | (22,468,000) | (14,383,000) |
| Gain on life insurance policies, net | $ 14,421,000 | $ 13,510,000 | $ 45,117,000 | $ 51,607,000 |

(1)    The discount rate applied to estimate the fair value of the portfolio of life insurance policies we own was 10.54% as of September 30, 2017, compared to 10.96% as of December 31, 2016 and 11.07% as of September 30, 2016. The carrying value of policies acquired during each quarterly reporting period is adjusted to current fair value using the fair value discount rate applied to the entire portfolio as of that reporting date.

(2)     The change in fair value due to updating independent life expectancy estimates on certain life insurance policies in our portfolio.

We currently estimate that premium payments and servicing fees required to maintain our current portfolio of life insurance policies in force for the next five years, assuming no mortalities, are as follows:

| Years Ending December 31, | Premiums | Servicing | Premiums and Servicing Fees |
|---|---|---|---|
| Three months ending December 31, 2017 | $ 16,915,000 | $ 1,587,000 | $ 18,502,000 |
| 2018 | 54,931,000 | 1,587,000 | 56,518,000 |
| 2019 | 60,916,000 | 1,587,000 | 62,503,000 |
| 2020 | 68,728,000 | 1,587,000 | 70,315,000 |
| 2021 | 77,522,000 | 1,587,000 | 79,109,000 |
| 2022 | 87,424,000 | 1,587,000 | 89,011,000 |
| | $ 366,436,000 | $ 9,522,000 | $ 375,958,000 |

Management anticipates funding the majority of the premium payments estimated above with additional borrowing capacity, created as the premiums and servicing costs of pledged life insurance policies become due, under the amended and restated senior credit facility with LNV Corporation as described in Note 6. Management anticipates funding premiums and servicing costs of non-pledged life insurance policies from proceeds from the receipt of policy benefits from our portfolio of life insurance policies and net proceeds from our offering of L Bonds and RPS 2. The proceeds of these capital sources may also be used for the purchase, financing, and maintenance of additional life insurance policies.

**(4) Fair Value Definition and Hierarchy**

Accounting Standards Codification 820, *Fair Value Measurements and Disclosures* ("ASC 820") establishes a hierarchical disclosure framework that prioritizes and ranks the level of market price observability used in measuring assets and liabilities at fair value. Market price observability is affected by a number of factors, including the type of investment, the characteristics specific to the investment and the state of the marketplace, including the existence and transparency of transactions between market participants. Assets and liabilities with readily available and actively quoted prices, or for which fair value can be measured from actively quoted prices in an orderly market, generally will have a higher degree of market price observability and a lesser degree of judgment used in measuring fair value. ASC 820 maximizes the use of observable inputs and minimizes the use of unobservable inputs by requiring the use

App. 0475

App. 0476

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

**(4) Fair Value Definition and Hierarchy** (cont.)

of observable inputs whenever available. Observable inputs are inputs that market participants would use in pricing the asset or liability developed based on market data obtained from independent sources. Unobservable inputs are inputs that reflect assumptions about how market participants price an asset or liability based on the best available information. Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability (i.e., the "exit price") in an orderly transaction between market participants at the measurement date.

The hierarchy is broken down into three levels based on the observability of inputs as follows:

- Level 1 — Valuations based on quoted prices in active markets for identical assets or liabilities that the Company has the ability to access. Since valuations are based on quoted prices that are readily and regularly available in an active market, valuation of these products does not entail a significant degree of judgment.

- Level 2 — Valuations based on one or more quoted prices in markets that are not active or for which all significant inputs are observable, either directly or indirectly.

- Level 3 — Valuations based on inputs that are unobservable and significant to the overall fair value measurement.

The availability of observable inputs can vary by types of assets and liabilities and is affected by a wide variety of factors, including, for example, whether an instrument is established in the marketplace, the liquidity of markets and other characteristics particular to the transaction. To the extent that valuation is based on models or inputs that are less observable or unobservable in the market, the determination of fair value requires more judgment. Accordingly, the degree of judgment exercised by management in determining fair value is greatest for assets and liabilities categorized in Level 3.

*Level 3 Valuation Process*

The estimated fair value of our portfolio of life insurance policies is determined on a quarterly basis by our portfolio management committee, taking into consideration changes in discount rate assumptions, estimated premium payments and life expectancy estimate assumptions, as well as any changes in economic and other relevant conditions. The discount rate incorporates current information about discount rates applied by other reporting companies owning portfolios of life insurance policies, the discount rates observed in the life insurance secondary market, market interest rates, the estimated credit exposure to the insurance company that issued the life insurance policy and management's estimate of the operational risk premium a purchaser would require to receive the future cash flows derived from our portfolio as a whole. Management has discretion regarding the combination of these and other factors when determining the discount rate.

These inputs are then used to estimate the discounted cash flows from the portfolio using the Model Actuarial Pricing System probabilistic portfolio price model, which estimates the cash flows using various mortality probabilities and scenarios. The valuation process includes a review by senior management as of each valuation date. We also engage a third-party expert to independently test the accuracy of the valuations using the inputs we provide on a quarterly basis. See Exhibit 99.1 filed herewith.

F-38

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

**(4) Fair Value Definition and Hierarchy** (cont.)

The following table reconciles the beginning and ending fair value of our Level 3 investments in our portfolio of life insurance policies for the periods ended September 30, as follows:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2017 | 2016 | 2017 | 2016 |
| Beginning balance | $ 577,050,000 | $ 431,820,000 | $ 511,192,000 | $ 356,650,000 |
| Purchases | 25,199,000 | 25,770,000 | 67,321,000 | 74,470,000 |
| Maturities (initial cost basis) | (2,333,000) | (1,078,000) | (7,716,000) | (7,381,000) |
| Net change in fair value | 20,182,000 | 21,073,000 | 49,301,000 | 53,846,000 |
| Ending balance | $ 620,098,000 | $ 477,585,000 | $ 620,098,000 | $ 477,585,000 |

In the past, we periodically updated the independent life expectancy estimates on the insured lives in our portfolio, other than insured lives covered under small face amount policies (i.e., $1 million in face value benefits or less), on a continuous rotating three-year cycle, and through that effort attempted to update life expectancies for approximately one-twelfth of our portfolio each quarter. Currently, however, the terms of our senior credit facility with LNV Corporation require us to update the independent life expectancy estimates every two years beginning from the date of the amended facility.

The following table summarizes the inputs utilized in estimating the fair value of our portfolio of life insurance policies:

| | As of September 30, 2017 | As of December 31, 2016 |
|---|---|---|
| Weighted-average age of insured, years* | 81.7 | 81.6 |
| Weighted-average life expectancy, months* | 82.6 | 83.2 |
| Average face amount per policy | $ 1,909,000 | $ 1,973,000 |
| Discount rate | 10.54% | 10.96% |

_____

(*)    Weighted average by face amount of policy benefits

Life expectancy estimates and market discount rates for a portfolio of life insurance policies are inherently uncertain and the effect of changes in estimates may be significant. For example, if the life expectancy estimates were increased or decreased by four and eight months on each outstanding policy, and the discount rates were increased or decreased by 1% and 2%, while all other variables were held constant, the fair value of our investment in life insurance policies would increase or decrease as summarized below:

Change in Fair Value of the Investment in Life Insurance Policies

| | Change in life expectancy estimates | | | |
|---|---|---|---|---|
| | minus 8 months | minus 4 months | plus 4 months | plus 8 months |
| September 30, 2017 | $ 83,536,000 | $ 41,411,000 | $ (40,893,000) | $ (81,069,000) |
| December 31, 2016 | $ 69,253,000 | $ 34,601,000 | $ (33,846,000) | $ (67,028,000) |

| | Change in discount rate | | | |
|---|---|---|---|---|
| | minus 2% | minus 1% | plus 1% | plus 2% |
| September 30, 2017 | $ 65,263,000 | $ 31,222,000 | $ (28,708,000) | $ (55,167,000) |
| December 31, 2016 | $ 53,764,000 | $ 25,728,000 | $ (23,668,000) | $ (45,491,000) |

F-39

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

**(4) Fair Value Definition and Hierarchy** (cont.)

*Other Fair Value Considerations*

The carrying value of receivables, prepaid expenses, accounts payable and accrued expenses approximate fair value due to their short-term maturities and low credit risk. Using the income-based valuation approach, the estimated fair value of our L Bonds, having an aggregate face value of $424,778,000 as of September 30, 2017, is approximately $434,374,000 based on a weighted-average market interest rate of 6.68%. The carrying value of the senior credit facility reflects interest charged at the commercial paper rate or 12-month LIBOR, as applicable, plus an applicable margin. The margin represents our credit risk, and the strength of the portfolio of life insurance policies pledged against the debt. The overall rate reflects market, and the carrying value of the facility approximates fair value.

GWG MCA participated in the merchant cash advance industry by directly advancing sums to merchants and lending money, on a secured basis, to companies that advance sums to merchants. Each quarter, we review the carrying value of these advances and loans, and determine if an impairment reserve is necessary. At September 30, 2017 one of our secured loans was potentially impaired. Specifically, the secured loan to Nulook Capital LLC had an outstanding balance of $2,001,000 and a loan loss reserve of $1,506,000 at September 30, 2017. We deem fair value to be the estimated collectible value on each loan or advance made from GWG MCA. Where we estimate the collectible amount to be less than the outstanding balance, we record a reserve for the difference, referred to as an impairment charge. We recorded an impairment charge of $28,000 and $906,000 for the three and nine months ended September 30, 2017, respectively.

The following table summarizes outstanding warrants related to the Company's initial public offering as of September 30, 2017:

| Month issued | Warrants issued | Fair value per share | Risk free rate | Volatility | Term |
|---|---|---|---|---|---|
| September 2014 | 16,000 | $ 1.26 | 1.85% | 17.03% | 5 years |
| | 16,000 | | | | |

**(5) Credit Facility — Autobahn Funding Company LLC**

On September 12, 2017, we terminated our $105 million senior credit facility with Autobahn Funding Company LLC, the Credit and Security Agreement governing the facility as well as the related pledge agreement, pursuant to which our obligations under the facility were secured. We had paid off in full all obligations under the facility on September 14, 2016, and since that date, we have had no amounts outstanding under the facility.

The Credit and Security Agreement contained certain financial and non-financial covenants, and we were in compliance with these covenants during the nine months ended September 30, 2017 until the date of termination.

**(6) Credit Facility — LNV Corporation**

On September 27, 2017, we entered into an amended and restated senior credit facility with LNV Corporation as lender through our subsidiary GWG DLP Funding IV, LLC. The Amended and Restated Loan Agreement governing the facility makes available a total of up to $300,000,000 in credit with a maturity date of September 27, 2029. Additional advances are available under the Amended and Restated Loan Agreement at the LIBOR rate as defined in the Amended and Restated Loan Agreement. Advances are available as the result of additional borrowing base capacity, created as the premiums and servicing costs of pledged life insurance policies become due. Interest will accrue on amounts borrowed under the Amended and Restated Loan Agreement at an annual interest rate, determined as of each date of borrowing or quarterly if there is no borrowing, equal to (A) the greater of 12-month LIBOR or the federal funds rate (as defined in the agreement) plus one-half of one percent per annum, plus (B) 7.50% per annum. The effective rate at September 30, 2017 was 7.52%. The interest rate effective October 1, 2017 was 9.31%. Interest payments are made on a quarterly basis.

F-40

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

**(6) Credit Facility — LNV Corporation** (cont.)

As of September 30, 2017, approximately 86.6% of the total face value of our portfolio is pledged to LNV Corporation. The amount outstanding under this facility was $212,513,000 at September 30, 2017 and $162,725,000 at December 31, 2016. Obligations under the facility are secured by a security interest in DLP IV's assets, for the benefit of the lenders under the Amended and Restated Loan Agreement, through an arrangement under which Wells Fargo serves as securities intermediary. The life insurance policies owned by DLP IV do not serve as direct collateral for the obligations of GWG Holdings under the L Bonds. The difference between the outstanding balance as of September 30, 2017 and the carrying amount relates to unamortized debt issuance costs.

The Amended and Restated Loan Agreement does not require DLP IV to maintain a reserve account for future premiums.

The Amended and Restated Loan Agreement has certain financial and nonfinancial covenants, and we were in compliance with these covenants at September 30, 2017 and with the covenants in the original Loan Agreement at December 31, 2016.

**(7) Series I Secured Notes**

Series I Secured Notes were legal obligations of GWG Life and were privately offered and sold from August 2009 through June 2011. On September 8, 2017, we redeemed all outstanding Series I Secured Notes for an aggregate of $6,815,000.

The Series I Secured Notes were governed by an Intercreditor Agreement, a Third Amended and Restated Note Issuance and Security Agreement dated November 1, 2011, as amended, and a related Pledge Agreement. Upon the redemption of the Series I Secured Notes and the termination of all obligations outstanding thereunder, those agreements were terminated effective as of September 8, 2017.

**(8) L Bonds**

Our L Bonds are legal obligations of GWG Holdings. Obligations under the L Bonds are secured by the assets of GWG Holdings and by GWG Life, as a guarantor, and are subordinate to the obligations under our senior credit facilities (see Notes 5 and 6). We began publicly offering and selling L Bonds in January 2012 under the name "Renewable Secured Debentures." These debt securities were re-named "L Bonds" in January 2015. L Bonds are publicly offered and sold on a continuous basis under a registration statement permitting us to sell up to $1.0 billion in principal amount of L Bonds. We are party to an indenture governing the L Bonds dated October 19, 2011, as amended ("Indenture"), under which GWG Holdings is obligor, GWG Life is guarantor, and Bank of Utah serves as indenture trustee. The Indenture contains certain financial and non-financial covenants, and we were in compliance with these covenants at September 30, 2017 and December 31, 2016.

Effective September 1, 2016, we ceased selling 6-month and 1-year L Bonds until further notice. In addition, effective September 1, 2016, the L Bond interest rates that we offer changed to 5.50%, 6.25%, 7.50% and 8.50% for the 2-, 3-, 5- and 7-year L Bonds, respectively. The bonds have renewal features under which we may elect to permit their renewal, subject to the right of bondholders to elect to receive payment at maturity. Interest is payable monthly or annually depending on the election of the investor.

At September 30, 2017 and December 31, 2016, the weighted-average interest rate of our L Bonds was 7.35% and 7.23%, respectively. The principal amount of L Bonds outstanding was $424,778,000 and $387,067,000 at September 30, 2017 and December 31, 2016, respectively. The difference between the amount of outstanding L Bonds and the carrying amount on our balance sheets is due to netting of unamortized deferred issuance costs, cash receipts for new issuances and payments of redemptions in process. Amortization of deferred issuance costs was $2,076,000 and $4,931,000 for the three and nine months ended September 30, 2017 and $2,073,000 and $5,362,000 for the three and nine months ended September 30, 2016. Future expected amortization of deferred financing costs as of September 30, 2017 is $14,462,000 in total over the next seven years.

F-41

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

**(8) L Bonds** (cont.)

Future contractual maturities of L Bonds, and their related unamortized deferred financing costs, at September 30, 2017 are as follows:

| Years Ending December 31, | Contractual Maturities | Unamortized Deferred Financing Costs |
|---|---|---|
| Three months ending December 31, 2017 | $ 17,059,000 | $ 104,000 |
| 2018 | 108,717,000 | 1,652,000 |
| 2019 | 133,174,000 | 4,294,000 |
| 2020 | 63,523,000 | 2,763,000 |
| 2021 | 28,703,000 | 1,350,000 |
| Thereafter | 73,602,000 | 4,299,000 |
| | $ 424,778,000 | $ 14,462,000 |

### (9) Series A Convertible Preferred Stock

From July 2011 through September 2012, we privately offered shares of Series A of GWG Holdings at $7.50 per share. In the offering, we sold an aggregate of 3,278,000 shares for gross consideration of $24,582,000. Holders of Series A were entitled to cumulative dividends at the rate of 10% per annum, paid quarterly.

As of September 30, 2017, we issued an aggregate of 544,000 shares of Series A in satisfaction of $3,808,000 in dividends on the Series A, and an aggregate of 696,000 shares of Series A were converted into 522,000 shares of our common stock. As of September 30, 2017, we had 2,695,000 Series A shares outstanding with respect to which we incurred aggregate issuance costs of $2,838,000, all of which is included as a component of additional paid-in capital.

Purchasers of Series A in our offering received warrants to purchase an aggregate of 416,000 shares of our common stock at an exercise price of $12.50 per share. The grant date fair value of these warrants was $428,000. As of September 30, 2017, all of these warrants have expired and none of them had been exercised.

The terms of the Series A permit us to redeem Series A shares at a price equal to 110% of their liquidation preference ($7.50 per share) at any time.

On October 9, 2017 all shares of Series A were redeemed with a redemption payment equal to the sum of: (i) $8.25 per Series A share and (ii) all accrued but unpaid dividends.

### (10) Redeemable Preferred Stock

On November 30, 2015, our public offering of up to 100,000 shares of Redeemable Preferred Stock ("RPS") at $1,000 per share was declared effective. Holders of RPS are entitled to cumulative dividends at the rate of 7% per annum, paid monthly. Dividends on the RPS are recorded as a reduction to additional paid-in capital, if any, then to the outstanding balance of the preferred stock if additional paid-in-capital has been exhausted. Under certain circumstances described in the Certificate of Designation for the RPS, additional shares of RPS may be issued in lieu of cash dividends.

The RPS ranks senior to our common stock and pari passu with our Series A and RPS 2, and entitles its holders to a liquidation preference equal to the stated value per share (i.e., $1,000) plus accrued but unpaid dividends. Holders of RPS may presently convert their RPS into our common stock at a conversion price equal to the volume-weighted average price of our common stock for the 20 trading days immediately prior to the date of conversion, subject to a minimum conversion price of $15.00 and in an aggregate amount limited to 15% of the stated value of RPS originally purchased by such holder from us and still held by such holder.

App. 0481

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

**(10) Redeemable Preferred Stock** (cont.)

Holders of RPS may request that we redeem their RPS at a price equal to their stated value plus accrued but unpaid dividends, less an applicable redemption fee, if any. Nevertheless, the Certificate of Designation for RPS permits us complete discretion to grant or decline redemption requests. Subject to certain restrictions and conditions, we may also redeem shares of RPS without a redemption fee upon a holder's death, total disability or bankruptcy. In addition, after one year from the date of original issuance, we may, at our option, call and redeem shares of RPS at a price equal to their liquidation preference.

On March 31, 2017, we closed the RPS offering to investors having sold 99,127 shares of RPS for an aggregate gross consideration of $99,127,000 and incurred approximately $7,019,000 of related selling costs.

At the time of its issuance, we determined that the RPS contained two embedded features: (1) optional redemption by the holder; and (2) optional conversion by the holder. We determined that each of the embedded features met the definition of a derivative and that the RPS should be considered an equity host for the purposes of assessing the embedded derivatives for potential bifurcation. Based on our assessment under Accounting Standards Codification 470 *"Debt"* ("ASC 470") we do not believe bifurcation of either the holder's redemption or conversion feature is appropriate.

**(11) Series 2 Redeemable Preferred Stock**

On February 14, 2017, our public offering of up to 150,000 shares of Series 2 Redeemable Preferred Stock ("RPS 2") at $1,000 per share was declared effective. Holders of RPS 2 are entitled to cumulative dividends at the rate of 7% per annum, paid monthly. Dividends on the RPS 2, when payable, will be recorded as a reduction to additional paid-in capital, if any, then to the outstanding balance of the preferred stock if additional paid-in-capital has been exhausted. Under certain circumstances described in the Certificate of Designation for the RPS 2, additional shares of RPS 2 may be issued in lieu of cash dividends.

The RPS 2 ranks senior to our common stock and pari passu with our Series A and RPS, and entitles its holders to a liquidation preference equal to the stated value per share (i.e., $1,000) plus accrued but unpaid dividends. Holders of RPS 2 may, less an applicable conversion discount, if any, convert their RPS 2 into our common stock at a conversion price equal to the volume-weighted average price of our common stock for the 20 trading days immediately prior to the date of conversion, subject to a minimum conversion price of $12.75 and in an aggregate amount limited to 10% of the stated value of RPS 2 originally purchased by such holder from us and still held by such holder.

Holders of RPS 2 may request that we redeem their RPS 2 shares at a price equal to their liquidation preference, less an applicable redemption fee, if any. Nevertheless, the Certificate of Designation for RPS 2 permits us complete discretion to grant or decline requests for redemption. Subject to certain restrictions and conditions, we may also redeem shares of RPS 2 without a redemption fee upon a holder's death, total disability or bankruptcy. In addition, we may, at our option, call and redeem shares of RPS 2 at a price equal to their liquidation preference (subject to a minimum redemption price, in the event of redemptions occurring less than one year after issuance, of 107% of the stated value of the shares being redeemed).

As of September 30, 2017, we had sold 48,316 shares of RPS 2 for aggregate gross consideration of $48,316,000, and incurred approximately $2,322,000 of selling costs related to the sale of those shares.

At the time of its issuance, we determined that the RPS 2 contained two embedded features: (1) optional redemption by the holder; and (2) optional conversion by the holder. We determined that each of the embedded features met the definition of a derivative and that the RPS 2 should be considered an equity host for the purposes of assessing the embedded derivatives for potential bifurcation. Based on our assessment under ASC 470 we do not believe bifurcation of either the holder's redemption or conversion feature is appropriate.

F-43

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

**(12) Income Taxes**

We had a current income tax liability of $0 as of both September 30, 2017 and December 31, 2016. The components of deferred income tax expense (benefit) for the three and nine months ended September 30, 2017 and 2016, respectfully, consisted of the following:

| | Three Months Ended | | Nine Months Ended | |
| --- | --- | --- | --- | --- |
| | September 30, 2017 | September 30, 2016 | September 30, 2017 | September 30, 2016 |
| Deferred: | | | | |
| Federal | $ (2,095,000) | $ (1,082,000) | $ (4,912,000) | $ 1,121,000 |
| State | (669,000) | (346,000) | (1,570,000) | 358,000 |
| Total income tax expense (benefit) | $ (2,764,000) | $ (1,428,000) | $ (6,482,000) | $ 1,479,000 |

We provide for a valuation allowance when it is not considered "more likely than not" that our deferred tax assets will be realized. At both September 30, 2017 and December 31, 2016, based upon all available evidence, we provided a valuation allowance of $2,164,000 against deferred tax assets related to the likelihood of recovering the tax benefit of a capital loss on a note receivable from a related entity and other capital losses.

The Company is engaged in acquiring of life insurance policies and holding them to maturity. Due to the nature of holding policies and the aging of the underlying insureds, Management believes the Company likely will recognize taxable income as the policies in our portfolio start maturing at an accelerated rate in the near future. Management has evaluated and concluded on the material accuracy of our deferred tax carrying amounts.

Accounting Standards Codification 740, *Income Taxes* requires the reporting of certain tax positions that do not meet a threshold of "more likely than not" to be recorded as uncertain tax benefits. It is management's responsibility to determine whether it is "more likely than not" that a tax position will be sustained upon examination, including resolution of any related appeals or litigation, based upon the technical merits of the position. Management has reviewed all income tax positions taken or expected to be taken for all open years and determined that the income tax positions are appropriately stated and supported.

Under our accounting policies, interest and penalties on unrecognized tax benefits, as well as interest received from favorable tax settlements, are recognized as components of income tax expense. At September 30, 2017 and December 31, 2016, we recorded no accrued interest or penalties related to uncertain tax positions.

Our income tax returns for tax years ended December 31, 2013, 2014, 2015 and 2016 remain open to examination by the Internal Revenue Service and various state taxing jurisdictions. Our tax return for tax year 2012 has now been examined by the IRS (finalized April of 2015) but is open for examination by various state taxing jurisdictions.

**(13) Common Stock**

In September 2014, we consummated an initial public offering of our common stock resulting in the sale of 800,000 shares of common stock at $12.50 per share, and net proceeds of approximately $8.6 million after the payment of underwriting commissions, discounts and expense reimbursements. In connection with this offering, we listed our common stock on the Nasdaq Capital Market under the ticker symbol "GWGH."

In conjunction with the initial public offering our Company issued warrants to purchase 16,000 shares of our common stock at an exercise price of $15.63 per share. As of September 30, 2017 none of these warrants had been exercised. The weighted average remaining life of these warrants at September 30, 2017 was 2.0 years.

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

**(14) Stock Incentive Plan**

We adopted our 2013 Stock Incentive Plan in March 2013, as amended on June 1, 2015 and May 5, 2017. The Compensation Committee of our Board of Directors is responsible for the administration of the plan. Participants under the plan may be granted incentive stock options and non-statutory stock options; stock appreciation rights; stock awards; restricted stock; restricted stock units; and performance shares. Eligible participants include officers and employees of GWG Holdings and its subsidiaries, members of our Board of Directors, and consultants. As of September 30, 2017, 3,000,000 common stock options are issuable under the plan.

*Stock Options*

Through September 30, 2017, we had outstanding stock options for 1,514,000 shares of common stock to employees, officers, and directors under the plan. Options for 762,000 shares have vested, and the remaining options are scheduled to vest over three years. The options were issued with an exercise price between $6.35 and $10.38 for those beneficially owning more than 10% of our common stock, and between $4.83 and $10.76 for all others, which is equal to the estimated market price of the shares on the date of grant. The expected annualized volatility used in the Black-Scholes model valuation of options issued during the period was 34.9%. The annual volatility rate is based on the standard deviation of the average continuously compounded rate of return of five selected comparable companies over the previous 52 weeks. As of September 30, 2017, stock options for 682,000 shares had been forfeited and stock options for 120,000 shares had been exercised.

Outstanding stock options:

|  | Vested | Un-vested | Total |
|---|---|---|---|
| **Balance as of December 31, 2015** | 483,703 | 569,912 | 1,053,615 |
| Granted during the year | 22,500 | 608,350 | 630,850 |
| Vested during the year | 251,788 | (251,788) | — |
| Exercised during the year | | | |
| Forfeited during the year | (19,926) | (82,140) | (102,066) |
| **Balance as of December 31, 2016** | 738,065 | 844,334 | 1,582,399 |
| Granted year-to-date | 40,100 | 228,300 | 268,400 |
| Vested year-to-date | 218,218 | (218,218) | — |
| Exercised year-to-date | (92,000) | — | (92,000) |
| Forfeited year-to-date | (142,119) | (102,315) | (244,434) |
| **Balance as of September 30, 2017** | 762,264 | 752,101 | 1,514,365 |

Compensation expense related to unvested options not yet recognized is $488,000. We expect to recognize this compensation expense over the next three years ($103,000 in 2017, $267,000 in 2018, $103,000 in 2019, and $15,000 in 2020).

*Stock Appreciation Rights (SARs)*

As of September 30, 2017, we have issued SARs for 280,472 shares of common stock to employees. The strike price of the SARs was between $7.84 and $10.38, which was equal to the market price of the common stock at the date of issuance. As of September 30, 2017, 149,000 of the SARs were vested. On September 30, 2017 the market price of GWG's common stock was $10.07.

F-45

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

**(14) Stock Incentive Plan** (cont.)

Outstanding Stock Appreciation Rights:

|  | Vested | Un-vested | Total |
|---|---|---|---|
| **Balance as of December 31, 2015** | — | — | — |
| Granted during the year | 106,608 | 133,127 | 239,735 |
| Forfeited during the year | — | — | — |
| **Balance as of December 31, 2016** | 106,608 | 133,127 | 239,735 |
| Granted during the year | 4,063 | 36,674 | 40,737 |
| Vested during the year | 38,197 | (38,197) | — |
| Forfeited during the year | — | — | — |
| **Balance as of September 30, 2017** | 148,868 | 131,604 | 280,472 |

The liability for the SARs as of September 30, 2017, recorded within Other accrued expenses, was $307,000. Employee compensation and benefits expense for SARs of ($9,000) and $303,000 was recorded during the three and nine months ended September 30, 2017.

Upon the exercise of SARs, the Company is obligated to make cash payment equal to the positive difference between the fair market value of the Company's common stock on the date of exercise less the fair market value of the common stock on the date of grant.

**(15) Other Expenses**

The components of "Other expenses" on our Condensed Consolidated Statements of Operations for the three and nine months ended September 30, 2017 and 2016 are as follows:

|  | Three months ended September 30, | | Nine months ended September 30, | |
|---|---|---|---|---|
|  | 2017 | 2016 | 2017 | 2016 |
| Contract Labor | $ 130,041 | $ 218,884 | $ 311,314 | $ 717,111 |
| Marketing | 485,510 | 423,041 | 1,686,943 | 1,234,372 |
| Information Technology | 410,903 | 194,653 | 1,093,011 | 522,552 |
| Servicing and Facility Fees | 276,826 | 520,235 | 855,928 | 680,208 |
| Travel and Entertainment | 249,684 | 272,785 | 767,958 | 838,111 |
| Insurance and Regulatory | 415,817 | 452,814 | 1,239,670 | 1,107,088 |
| Charitable Contributions | 42,093 | 277,508 | 462,103 | 279,682 |
| General and Administrative | 760,322 | 503,292 | 2,017,690 | 1,828,933 |
|  | $ 2,771,196 | $ 2,863,212 | $ 8,434,617 | $ 7,208,057 |

**(16) Net Loss per Common Share**

We have outstanding Series A, RPS and RPS 2, as respectively described in Notes 9, 10 and 11. The Series A, RPS and RPS 2 are anti-dilutive to our net loss or income attributable to common shareholders calculation at both September 30, 2017 and 2016. We also issued warrants to purchase common stock in conjunction with the sale of Series A (see Note 9), which have expired as of September 30, 2017. Both those warrants and our vested stock options are anti-dilutive at both September 30, 2017 and 2016.

F-46

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

**(17) Commitments**

We are party to an office lease with U.S. Bank National Association as the landlord. On September 1, 2015, we entered into an amendment to our original lease that expanded the leased space to 17,687 square feet and extended the term through October 2025. Under the amended lease we are obligated to pay base rent plus common area maintenance and a share of building operating costs. Rent expenses under this agreement were $121,000 and $344,000 during the three and nine months ended September 30, 2017 and $102,000 and $306,000 for the three and nine months ended September 30, 2016.

Minimum lease payments under the amended lease are as follows:

| | | |
|---|---|---:|
| Three months ending December 31, 2017 | $ | 64,000 |
| 2018 | | 266,000 |
| 2019 | | 275,000 |
| 2020 | | 284,000 |
| 2021 | | 293,000 |
| 2022 | | 302,000 |
| Thereafter | | 904,000 |
| | $ | **2,388,000** |

**(18) Contingencies**

*Litigation* — In the normal course of business, we are involved in various legal proceedings. In the opinion of management, any liability resulting from such proceedings would not have a material adverse effect on our financial position, results of operations or cash flows.

**(19) Guarantee of L Bonds**

We are publicly offering and selling L Bonds under a registration statement declared effective by the SEC, as described in Note 8. Our obligations under the L Bonds are secured by substantially all the assets of GWG Holdings, a pledge of all our common stock held individually by our largest stockholders, and by a guarantee and corresponding grant of a security interest in substantially all the assets of GWG Life. As a guarantor, GWG Life has fully and unconditionally guaranteed the payment of principal and interest on the L Bonds. GWG Life's equity in DLP IV serve as collateral for our L Bond obligations. Substantially all of our life insurance policies are held by DLP IV and the Trust. The policies held by DLP IV are not collateral for the L Bond obligations as such policies are pledged to the senior credit facility with LNV Corporation.

The consolidating financial statements are presented in lieu of separate financial statements and other related disclosures of the subsidiary guarantor and issuer, because management does not believe that separate financial statements and related disclosures would be material to investors. There are currently no significant restrictions on the ability of GWG Holdings or GWG Life, the guarantor subsidiary, to obtain funds from its subsidiaries by dividend or loan, except as described in these notes. A substantial majority of insurance policies we currently own are subject to a collateral arrangement with LNV Corporation described in Note 6. Under this arrangement, we are required to maintain a collection account that is used to collect policy benefits from pledged policies, pay interest and other charges under the facility, and distribute funds to pay down the facility.

The following represents consolidating financial information as of September 30, 2017 and December 31, 2016, with respect to the financial position, and for the three and nine months ended September 30, 2017 and 2016, with respect to results of operations and cash flows of GWG Holdings and its subsidiaries. The parent column presents the financial information of GWG Holdings, the primary obligor for the L Bonds. The guarantor subsidiary column represents the financial information of GWG Life, the guarantor subsidiary of the L Bonds, presenting its investment in DLP IV and the Trust under the equity method. The non-guarantor subsidiaries column presents the financial information of all non-guarantor subsidiaries, including DLP IV and the Trust.

F-47

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

**(19) Guarantee of L Bonds** (cont.)

Condensed Consolidating Balance Sheets

| September 30, 2017 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash and cash equivalents | $ 31,382,104 | $ 82,587,231 | $ 1,376,146 | $ — | $115,345,481 |
| Restricted cash | — | 2,647,121 | 3,172,109 | — | 5,819,230 |
| Investment in life insurance policies, at fair value | — | 45,962,331 | 574,135,607 | — | 620,097,938 |
| Secured MCA advances | — | — | 2,623,657 | — | 2,623,657 |
| Life insurance policy benefits receivable | — | — | 14,597,000 | — | 14,597,000 |
| Deferred taxes, net | 4,384,546 | — | — | — | 4,384,546 |
| Other assets | 1,883,433 | 2,013,796 | 61,584 | (134,613) | 3,824,200 |
| Investment in subsidiaries | 519,803,823 | 385,753,794 | — | (905,557,617) | — |
| TOTAL ASSETS | $557,453,906 | $ 518,964,273 | $ 595,966,103 | $(905,692,230) | $766,692,052 |

**LIABILITIES & STOCKHOLDERS' EQUITY**

| | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| LIABILITIES | | | | | |
| Senior credit facility | $ — | $ — | $ 201,978,580 | $ — | $201,978,580 |
| L Bonds | 413,060,517 | — | — | — | 413,060,517 |
| Accounts payable | 1,062,708 | 1,259,708 | 1,392,820 | — | 3,715,236 |
| Interest and dividends payable | 10,541,613 | — | 2,980,582 | (1,021) | 13,521,174 |
| Other accrued expenses | 1,165,044 | 1,351,379 | 409,690 | (133,592) | 2,792,521 |
| TOTAL LIABILITIES | 425,829,882 | 2,611,087 | 206,761,672 | (134,613) | 635,068,028 |
| STOCKHOLDERS' EQUITY | | | | | |
| Member's capital | — | 516,353,186 | 389,204,431 | (905,557,617) | — |
| Convertible preferred stock | 19,408,980 | — | — | — | 19,408,980 |
| Redeemable preferred stock and Series 2 redeemable preferred stock | 140,828,380 | — | — | — | 140,828,380 |
| Common stock | 5,814 | — | — | — | 5,814 |
| Accumulated deficit | (28,619,150) | — | — | — | (28,619,150) |
| TOTAL STOCKHOLDERS' EQUITY | 131,624,024 | 516,353,186 | 389,204,431 | (905,557,617) | 131,624,024 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $557,453,906 | $ 518,964,273 | $ 595,966,103 | $(905,692,230) | $766,692,052 |

F-48

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

### (19) Guarantee of L Bonds (cont.)

Condensed Consolidating Balance Sheets (continued)

| December 31, 2016 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash and cash equivalents | $ 28,481,047 | $ 49,360,952 | $ 644,983 | $ — | $ 78,486,982 |
| Restricted cash | — | 2,117,649 | 35,708,947 | — | 37,826,596 |
| Investment in life insurance policies, at fair value | — | 41,277,896 | 469,914,458 | — | 511,192,354 |
| Secured MCA advances | — | — | 5,703,147 | — | 5,703,147 |
| Life insurance policy benefits receivable | — | — | 5,345,000 | — | 5,345,000 |
| Other assets | 3,854,233 | 2,056,822 | 810,640 | (2,033,592) | 4,688,103 |
| Investment in subsidiaries | 429,971,148 | 352,337,037 | — | (782,308,185) | — |
| TOTAL ASSETS | $ 462,306,428 | $ 447,150,356 | $ 518,127,175 | $ (784,341,777) | $ 643,242,182 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | | | | |
| LIABILITIES | | | | | |
| Senior credit facilities | $ — | $ — | $ 156,064,818 | $ — | $ 156,064,818 |
| Series I Secured Notes | — | 16,404,836 | — | — | 16,404,836 |
| L Bonds | 381,312,587 | — | — | — | 381,312,587 |
| Accounts payable | 853,470 | 731,697 | 641,545 | — | 2,226,712 |
| Interest and dividends payable | 9,882,133 | 3,743,277 | 2,535,189 | — | 16,160,599 |
| Other accrued expenses | 862,369 | 544,032 | 2,303,952 | (2,033,592) | 1,676,761 |
| Deferred taxes, net | 2,097,371 | — | — | — | 2,097,371 |
| TOTAL LIABILITIES | 395,007,930 | 21,423,842 | 161,545,504 | (2,033,592) | 575,943,684 |
| STOCKHOLDERS' EQUITY | | | | | |
| Member's capital | — | 425,726,514 | 356,581,671 | (782,308,185) | — |
| Convertible preferred stock | 19,701,133 | — | — | — | 19,701,133 |
| Redeemable preferred stock | 59,025,164 | — | — | — | 59,025,164 |
| Common stock | 5,980 | — | — | — | 5,980 |
| Additional paid-in capital | 7,383,515 | — | — | — | 7,383,515 |
| Accumulated deficit | (18,817,294) | — | — | — | (18,817,294) |
| TOTAL STOCKHOLDERS' EQUITY | 67,298,498 | 425,726,514 | 356,581,671 | (782,308,185) | 67,298,498 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ 462,306,428 | $ 447,150,356 | $ 518,127,175 | $ (784,341,777) | $ 643,242,182 |

F-49

App. 0488

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

**(19) Guarantee of L Bonds** (cont.)

Condensed Consolidating Statements of Operations

| For the three months ended September 30, 2017 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUE | | | | | |
| Policy servicing income | $ — | $ 125,525 | $ — | $ (105,525) | $ 20,000 |
| Gain on life insurance policies, net | — | 2,780,544 | 11,640,809 | — | 14,421,353 |
| MCA income | — | — | 100,367 | — | 100,367 |
| Interest and other income | 40,044 | (12,115) | 139,498 | (12,104) | 155,323 |
| TOTAL REVENUE | 40,044 | 2,893,954 | 11,880,674 | (117,629) | 14,697,043 |
| EXPENSES | | | | | |
| Policy servicing fees | — | — | 105,525 | (105,525) | — |
| Interest expense | 9,907,959 | 253,422 | 3,126,130 | (12,104) | 13,275,407 |
| Employee compensation and benefits | 2,140,675 | 1,413,103 | 238,318 | — | 3,792,096 |
| Legal and professional fees | 746,939 | 246,691 | 663,460 | — | 1,657,090 |
| Provision for MCA advances | — | — | 28,000 | — | 28,000 |
| Other expenses | 1,743,730 | 711,528 | 315,938 | — | 2,771,196 |
| TOTAL EXPENSES | 14,539,303 | 2,624,744 | 4,477,371 | (117,629) | 21,523,789 |
| INCOME (LOSS) BEFORE EQUITY IN INCOME OF SUBSIDIARIES | (14,499,259) | 269,210 | 7,403,303 | — | (6,826,746) |
| EQUITY IN INCOME OF SUBSIDIARIES | 7,672,513 | 8,263,120 | — | (15,935,633) | — |
| INCOME (LOSS) BEFORE INCOME TAXES | (6,826,746) | 8,532,330 | 7,403,303 | (15,935,633) | (6,826,746) |
| INCOME TAX BENEFIT | (2,764,243) | — | — | — | (2,764,243) |
| NET INCOME (LOSS) | (4,062,503) | 8,532,330 | 7,403,303 | (15,935,633) | (4,062,503) |
| Preferred stock dividends | 3,548,165 | — | — | — | 3,548,165 |
| NET LOSS ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ (7,610,668) | $ 8,532,330 | $ 7,403,303 | $ (15,935,633) | $ (7,610,668) |

| For the three months ended September 30, 2016 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUE | | | | | |
| Policy servicing income | $ — | $ — | $ — | $ — | $ — |
| Gain on life insurance policies, net | — | — | 13,509,755 | — | 13,509,755 |
| MCA income | — | — | 286,225 | — | 286,225 |
| Interest and other income | 75,808 | 30,126 | 83,313 | (64,249) | 124,998 |
| TOTAL REVENUE | 75,808 | 30,126 | 13,879,293 | (64,249) | 13,920,978 |
| EXPENSES | | | | | |
| Policy servicing fees | — | — | — | — | — |
| Interest expense | 8,705,950 | 554,938 | 1,746,151 | (64,249) | 10,942,790 |
| Employee compensation and benefits | 1,718,683 | 1,038,058 | 155,722 | — | 2,912,463 |
| Legal and professional fees | 263,917 | 297,804 | 25,109 | — | 586,830 |
| Other expenses | 1,464,498 | 803,106 | 595,608 | — | 2,863,212 |
| TOTAL EXPENSES | 12,153,048 | 2,693,906 | 2,522,590 | (64,249) | 17,305,295 |
| INCOME (LOSS) BEFORE EQUITY IN INCOME OF SUBSIDIARIES | (12,077,240) | (2,663,780) | 11,356,703 | — | (3,384,317) |
| EQUITY IN INCOME OF SUBSIDIARIES | 8,692,923 | 11,361,329 | — | (20,054,252) | — |
| INCOME BEFORE INCOME TAXES | (3,384,317) | 8,697,549 | 11,356,703 | (20,054,252) | (3,384,317) |
| INCOME TAX BENEFIT | (1,428,130) | — | — | — | (1,428,130) |
| NET INCOME | (1,956,187) | 8,697,549 | 11,356,703 | (20,054,252) | (1,956,187) |
| Preferred stock dividends | 1,041,178 | — | — | — | 1,041,178 |
| NET INCOME ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ (2,997,365) | $ 8,697,549 | $ 11,356,703 | $ (20,054,252) | $ (2,997,365) |

App. 0489

App. 0490

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

**(19) Guarantee of L Bonds** (cont.)

Condensed Consolidating Statements of Operations (continued)

| For the nine months ended September 30, 2017 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUE | | | | | |
| Policy servicing income | $ — | $ 311,800 | $ — | $ (291,800) | $ 20,000 |
| Gain on life insurance policies, net | — | 4,481,555 | 40,635,883 | — | 45,117,438 |
| MCA income | — | — | 480,526 | — | 480,526 |
| Interest and other income | 194,273 | 36,895 | 683,141 | (79,300) | 835,009 |
| TOTAL REVENUE | 194,273 | 4,830,250 | 41,799,550 | (371,100) | 46,452,973 |
| | | | | | |
| EXPENSES | | | | | |
| Policy servicing fees | — | — | 291,800 | (291,800) | — |
| Interest expense | 27,495,867 | 930,837 | 10,418,243 | (79,300) | 38,765,647 |
| Employee compensation and benefits | 6,179,032 | 4,163,873 | 353,550 | — | 10,696,455 |
| Legal and professional fees | 1,524,510 | 687,240 | 1,722,277 | — | 3,934,027 |
| Provision for MCA advances | — | — | 906,000 | — | 906,000 |
| Other expenses | 5,291,881 | 2,244,577 | 898,159 | — | 8,434,617 |
| TOTAL EXPENSES | 40,491,290 | 8,026,527 | 14,590,029 | (371,100) | 62,736,746 |
| | | | | | |
| INCOME (LOSS) BEFORE EQUITY IN INCOME OF SUBSIDIARIES | (40,297,017) | (3,196,277) | 27,209,521 | — | (16,283,773) |
| | | | | | |
| EQUITY IN INCOME OF SUBSIDIARIES | 24,013,244 | 29,569,105 | — | (53,582,349) | — |
| | | | | | |
| INCOME (LOSS) BEFORE INCOME TAXES | (16,283,773) | 26,372,828 | 27,209,521 | (53,582,349) | (16,283,773) |
| | | | | | |
| INCOME TAX BENEFIT | (6,481,917) | — | — | — | (6,481,917) |
| NET INCOME (LOSS) | (9,801,856) | 26,372,828 | 27,209,521 | (53,582,349) | (9,801,856) |
| Preferred stock dividends | 7,447,022 | — | — | — | 7,447,022 |
| NET LOSS ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ (17,248,878) | $ 26,372,828 | $ 27,209,521 | $ (53,582,349) | $ (17,248,878) |

| For the nine months ended September 30, 2016 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUE | | | | | |
| Policy servicing income | $ — | $ 13,417 | $ — | $ (13,417) | $ — |
| Gain on life insurance policies, net | — | — | 51,606,815 | — | 51,606,815 |
| MCA income | — | — | 654,441 | — | 654,441 |
| Interest and other income | 181,828 | 31,137 | 282,259 | (154,126) | 341,098 |
| TOTAL REVENUE | 181,828 | 44,554 | 52,543,515 | (167,543) | 52,602,354 |
| | | | | | |
| EXPENSES | | | | | |
| Policy servicing fees | — | — | 13,417 | (13,417) | — |
| Interest expense | 23,323,987 | 1,856,909 | 4,829,831 | (154,126) | 29,856,601 |
| Employee compensation and benefits | 4,894,006 | 3,151,107 | 405,055 | — | 8,450,168 |
| Legal and professional fees | 1,642,252 | 1,308,959 | 146,101 | — | 3,097,312 |
| Other expenses | 4,241,825 | 2,197,133 | 1,169,099 | — | 7,608,057 |
| TOTAL EXPENSES | 34,102,070 | 8,514,108 | 6,563,503 | (167,543) | 49,012,138 |
| | | | | | |
| INCOME (LOSS) BEFORE EQUITY IN INCOME OF SUBSIDIARIES | (33,920,242) | (8,469,554) | 45,980,012 | — | 3,590,216 |
| | | | | | |
| EQUITY IN INCOME OF SUBSIDIARIES | 37,510,458 | 46,497,731 | — | (84,008,189) | — |
| | | | | | |
| INCOME BEFORE INCOME TAXES | 3,590,216 | 38,028,177 | 45,980,012 | (84,008,189) | 3,590,216 |
| | | | | | |
| INCOME TAX EXPENSE | 1,478,617 | — | — | — | 1,478,617 |
| NET INCOME | 2,111,599 | 38,028,177 | 45,980,012 | (84,008,189) | 2,111,599 |
| Preferred stock dividends | 2,153,333 | — | — | — | 2,153,333 |
| NET INCOME ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ (41,734) | $ 38,028,177 | $ 45,980,012 | $ (84,008,189) | $ (41,734) |

App. 0492

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

### (19) Guarantee of L Bonds (cont.)

Condensed Consolidating Statements of Cash Flows

| For the three months ended September 30, 2017 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | |
| Net income (loss) | $ (4,062,503) | $ 8,532,330 | $ 7,403,303 | $ (15,935,633) | $ (4,062,503) |
| Adjustments to reconcile net income to net cash flows from operating activities: | | | | | |
| Equity of subsidiaries | (7,672,513) | (8,263,120) | — | 15,935,633 | — |
| Change in fair value of life insurance policies | — | (3,609,194) | (16,572,538) | — | (20,181,732) |
| Amortization of deferred financing and issuance costs | 2,075,632 | 134,445 | 134,464 | — | 2,344,541 |
| Deferred income taxes | (2,764,243) | — | — | — | (2,764,243) |
| Preferred stock dividends payable | 333,391 | — | — | — | 333,391 |
| (Increase) decrease in operating assets: | | | | | |
| Life insurance policy benefits receivable | — | — | (7,627,000) | — | (7,627,000) |
| Other assets | (38,552,777) | 51,740,361 | 330,547 | (13,415,694) | 102,437 |
| Increase (decrease) in operating liabilities: | | | | | |
| Due to related party | 807,511 | (10,940) | (800,000) | — | (3,429) |
| Accounts payable and accrued expenses | 693,285 | (844,072) | (264,684) | — | (415,471) |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (49,142,217) | 47,679,810 | (17,395,908) | (13,415,694) | (32,274,009) |
| | | | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | |
| Investment in life insurance policies | — | — | (25,199,692) | — | (25,199,692) |
| Carrying value of matured life insurance policies | — | 505,000 | 1,828,039 | — | 2,333,039 |
| Proceeds from Secured MCA advances | — | — | 826,621 | — | 826,621 |
| NET CASH FLOWS USED IN INVESTING ACTIVITIES | — | 505,000 | (22,545,032) | — | (22,040,032) |
| | | | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | | |
| Net borrowings on senior credit facilities | — | — | 56,887,491 | — | 56,887,491 |
| Payments for issuance of senior debt | — | — | (3,937,907) | — | (3,937,907) |
| Payments for redemption of Series I Secured Notes | — | (6,815,406) | — | — | (6,815,406) |
| Proceeds from issuance of L Bonds | 30,271,873 | — | — | — | 30,271,873 |
| Payments for issuance and redemption of L Bonds | (19,752,717) | — | — | — | (19,752,717) |
| Payments to restricted cash | — | 1,807,105 | 38,533,296 | — | 40,340,401 |
| Issuance of member capital | — | 37,959,462 | (51,375,156) | 13,415,694 | — |
| Issuance of common stock | 30 | — | — | — | 30 |
| Proceeds from issuance of preferred stock | 25,211,870 | — | — | — | 25,211,870 |
| Payments for issuance and redemption of preferred stock | (1,291,420) | — | — | — | (1,291,420) |
| Payments of preferred stock dividends | (3,548,165) | — | — | — | (3,548,165) |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 30,891,471 | 32,951,161 | 40,107,724 | 13,415,694 | 117,366,050 |
| | | | | | |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | (18,250,746) | 81,135,971 | 166,784 | | 63,052,009 |
| | | | | | |
| **CASH AND CASH EQUIVALENTS** | | | | | |
| BEGINNING OF THE PERIOD | 49,632,850 | 1,451,260 | 1,209,362 | — | 52,293,472 |
| | | | | | |
| END OF THE PERIOD | $ 31,382,104 | $ 82,587,231 | $ 1,376,146 | $ — | $ 115,345,481 |

F-52

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

**(19) Guarantee of L Bonds** (cont.)

Consolidating Statements of Cash Flows (continued)

| For the three months ended September 30, 2016 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | |
| Net income | $ (1,956,187) | $ 8,697,549 | $ 11,356,703 | $ (20,054,252) | $ (1,956,187) |
| Adjustments to reconcile net loss to net cash flows from operating activities: | | | | | |
| Equity of subsidiaries | (8,692,924) | (11,361,328) | — | 20,054,252 | — |
| Change in fair value of life insurance policies | — | — | (21,073,226) | — | (21,073,226) |
| Amortization of deferred financing and issuance costs | 2,072,879 | 81,849 | 611,015 | — | 2,765,743 |
| Deferred income taxes | (1,428,130) | — | — | — | (1,428,130) |
| Preferred stock dividends payable | 333,565 | — | — | — | 333,565 |
| (Increase) decrease in operating assets: | | | | | |
| Life insurance policy benefits receivable | — | — | 700,000 | — | 700,000 |
| Other assets | (54,428,152) | (54,272,589) | — | 109,120,577 | 419,836 |
| Increase (decrease) in operating liabilities: | | | | | |
| Due to related party | (64,249) | (16,700) | — | — | (80,949) |
| Accounts payable and other accrued expenses | 155,980 | 2,172,227 | (5,545,197) | — | (3,216,990) |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (64,007,218) | (54,698,992) | (13,950,705) | 109,120,577 | (23,536,338) |
| | | | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | |
| Investment in life insurance policies | — | — | (25,770,326) | — | (25,770,326) |
| Carrying value of matured life insurance policies | — | — | 1,078,889 | — | 1,078,889 |
| Investment in Secured MCA advances | — | — | (1,965,896) | | (1,965,896) |
| Proceeds from Secured MCA advances | — | — | 220,911 | — | 220,911 |
| NET CASH FLOWS USED IN INVESTING ACTIVITIES | — | — | (26,436,422) | — | (26,436,422) |
| | | | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | | |
| Net repayment of senior credit facilities | — | — | (10,761,048) | — | (10,761,048) |
| Payments for redemption of Series I Secured Notes | — | (541,275) | — | — | (541,275) |
| Proceeds from issuance of L Bonds | 64,350,430 | — | — | — | 64,350,430 |
| Payments for issuance and redemption of L Bonds | (14,373,447) | — | — | — | (14,373,447) |
| Payments to restricted cash | — | 486,283 | (5,013,515) | — | (4,527,232) |
| Issuance of member capital | — | 52,304,345 | 56,816,232 | (109,120,577) | — |
| Issuance of common stock | 31,515 | — | — | — | 31,515 |
| Proceeds from issuance of preferred stock | 20,786,332 | — | — | — | 20,786,332 |
| Payments for issuance and redemption of preferred stock | (2,485,304) | — | (71,555) | — | (2,556,859) |
| Payments of preferred stock dividends | (1,041,178) | — | — | — | (1,041,178) |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 67,268,348 | 52,249,353 | 40,970,114 | (109,120,577) | 51,367,238 |
| | | | | | |
| NET INCREASE IN CASH AND CASH EQUIVALENTS | 3,261,130 | (2,449,639) | 582,987 | — | 1,394,478 |
| **CASH AND CASH EQUIVALENTS** | | | | | |
| BEGINNING OF THE PERIOD | 10,051,621 | 6,822,484 | 505,245 | — | 17,379,350 |
| END OF THE PERIOD | $ 13,312,751 | $ 4,372,845 | $ 1,088,232 | $ — | $ 18,773,828 |

F-53

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

### (19) Guarantee of L Bonds (cont.)

Consolidating Statements of Cash Flows (continued)

| For the nine months ended September 30, 2017 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | |
| Net income (loss) | $ (9,801,856) | $ 26,372,828 | $ 27,209,521 | $ (53,582,349) | $ (9,801,856) |
| Adjustments to reconcile net loss to net cash flows from operating activities: | | | | | |
| Equity of subsidiaries | (24,013,243) | (29,569,106) | — | 53,582,349 | — |
| Change in fair value of life insurance policies | — | (4,803,015) | (44,498,052) | — | (49,301,067) |
| Amortization of deferred financing and issuance costs | 4,931,441 | 208,829 | 1,368,422 | — | 6,508,692 |
| Deferred income taxes | (6,481,917) | — | — | — | (6,481,917) |
| Preferred stock dividends payable | 1,034,139 | — | — | — | 1,034,139 |
| (Increase) decrease in operating assets: | | | | | |
| Life insurance policy benefits receivable | — | — | (9,252,000) | — | (9,252,000) |
| Other assets | (65,691,037) | (3,794,004) | 788,726 | 69,667,082 | 970,767 |
| Increase (decrease) in operating liabilities: | | | | | |
| Due to related party | 1,897,406 | (10,620) | (1,900,000) | — | (13,214) |
| Accounts payable and other accrued expenses | 2,331,255 | (2,407,918) | 1,917,279 | — | 1,840,616 |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (95,793,812) | (14,003,006) | (24,366,104) | 69,667,082 | (64,495,840) |
| | | | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | |
| Investment in life insurance policies | — | — | (67,321,363) | — | (67,321,363) |
| Carrying value of matured life insurance policies | — | 1,256,576 | 6,460,271 | — | 7,716,847 |
| Investment in Secured MCA advances | — | — | (39,671) | — | (39,671) |
| Proceeds from Secured MCA advances | — | — | 2,250,323 | — | 2,250,323 |
| NET CASH FLOWS USED IN INVESTING ACTIVITIES | — | 1,256,576 | (58,650,440) | — | (57,393,864) |
| | | | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | | |
| Net repayment of senior credit facilities | — | — | 49,787,954 | — | 49,787,954 |
| Payments for issuance of senior debt | | (1,076,118) | (4,052,201) | — | (5,128,319) |
| Payments for redemption of Series I Secured Notes | — | (16,613,667) | — | — | (16,613,667) |
| Proceeds from issuance of L Bonds | 87,016,343 | — | — | — | 87,016,343 |
| Payments for issuance and redemption of L Bonds | (58,949,880) | — | — | — | (58,949,880) |
| Payments to restricted cash | — | (529,472) | 32,536,838 | — | 32,007,366 |
| Issuance of member capital | — | 64,191,966 | 5,475,116 | (69,667,082) | — |
| Payments for issuance and redemption of common stock | (1,603,526) | — | — | — | (1,603,526) |
| Proceeds from issuance of preferred stock | 86,692,811 | — | — | — | 86,692,811 |
| Payments for issuance and redemption of preferred stock | (7,013,857) | — | — | — | (7,013,857) |
| Payments of preferred stock dividends | (7,447,022) | — | — | — | (7,447,022) |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 98,694,869 | 45,972,709 | 83,747,707 | (69,667,082) | 158,748,203 |
| | | | | | |
| NET INCREASE IN CASH AND CASH EQUIVALENTS | 2,901,057 | 33,226,279 | 731,163 | — | 36,858,499 |
| | | | | | |
| **CASH AND CASH EQUIVALENTS** | | | | | |
| BEGINNING OF THE PERIOD | 28,481,047 | 49,360,952 | 644,983 | — | 78,486,982 |
| | | | | | |
| END OF THE PERIOD | $ 31,382,104 | $ 82,587,231 | $ 1,376,146 | $ — | $ 115,345,481 |

F-54

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

**(19) Guarantee of L Bonds** (cont.)

Consolidating Statements of Cash Flows (continued)

| For the nine months ended September 30, 2016 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | |
| Net income | $ 2,111,599 | $ 38,028,177 | $ 45,980,012 | $ (84,008,189) | $ 2,111,599 |
| Adjustments to reconcile net income to net cash flows from operating activities: | | | | | |
| Equity of subsidiaries | (37,510,459) | (46,497,730) | — | 84,008,189 | — |
| Change in fair value of life insurance policies | — | — | (53,846,155) | — | (53,846,155) |
| Amortization of deferred financing and issuance costs | 5,982,802 | (1,364,614) | 1,459,717 | — | 6,077,905 |
| Deferred income taxes | 1,478,617 | — | — | — | 1,478,617 |
| Preferred stock dividends payable | 663,614 | — | — | — | 663,614 |
| (Increase) decrease in operating assets: | | | | | |
| Life insurance policy benefits receivable | — | — | (6,129,022) | | (6,129,022) |
| Other assets | (114,885,990) | (92,168,163) | — | 206,436,523 | (617,630) |
| Increase in operating liabilities: | | | | | |
| Due to related party | (2,867,225) | (15,505) | 2,700,000 | — | (182,730) |
| Accounts payable and accrued expenses | 2,396,503 | 2,889,525 | (7,310,262) | — | (2,024,234) |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (142,630,539) | (99,128,310) | (17,145,710) | 206,436,523 | (52,468,036) |
| | | | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | |
| Investment in life insurance policies | — | — | (74,470,362) | — | (74,470,362) |
| Carrying value of matured life insurance policies | — | — | 7,381,132 | — | 7,381,132 |
| Investment in Secured MCA advances | — | — | (7,613,310) | — | (7,613,310) |
| Proceeds from Secured MCA advances | — | — | 1,246,703 | — | 1,246,703 |
| NET CASH FLOWS USED IN INVESTING ACTIVITIES | — | — | (73,455,837) | — | (73,455,837) |
| | | | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | | |
| Net borrowings on senior credit facilities | — | — | 6,238,952 | — | 6,238,952 |
| Payments for redemption of Series I Secured Notes | — | (6,264,018) | — | — | (6,264,018) |
| Proceeds from issuance of L Bonds | 135,477,090 | — | — | — | 135,477,090 |
| Payments for issuance and redemption of L Bonds | (37,036,922) | — | — | — | (37,036,922) |
| Payments to restricted cash | — | (2,335,768) | (11,010,358) | — | (13,346,126) |
| Issuance of common stock | 244,185 | — | — | — | 244,185 |
| Proceeds from issuance of preferred stock | 31,215,986 | — | 71,555 | — | 31,287,541 |
| Payments for issuance and redemption of preferred stock | (4,095,878) | — | (78,895) | — | (4,174,773) |
| Payments of preferred stock dividends | (2,153,333) | — | — | — | (2,153,333) |
| Issuance of member capital | — | 110,118,219 | 96,318,304 | (206,436,523) | — |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 123,651,128 | 101,518,433 | 91,539,558 | (206,436,523) | 110,272,596 |
| | | | | | |
| NET INCREASE IN CASH AND CASH EQUIVALENTS | (18,979,411) | 2,390,123 | 938,011 | — | (15,651,277) |
| | | | | | |
| **CASH AND CASH EQUIVALENTS** | | | | | |
| BEGINNING OF THE PERIOD | 32,292,162 | 1,982,722 | 150,221 | — | 34,425,105 |
| END OF THE PERIOD | $ 13,312,751 | $ 4,372,845 | $ 1,088,232 | $ — | $ 18,773,828 |

F-55

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

**(20) Concentrations**

We mostly purchase life insurance policies written by life insurance companies having investment-grade ratings by independent rating agencies. As a result, there may be certain concentrations of policies with life insurance companies. The following summarizes the face value of insurance policies with specific life insurance companies exceeding 10% of the total face value of our portfolio.

| Life insurance company | September 30, 2017 | December 31, 2016 |
|---|---|---|
| John Hancock | 14.92% | 14.36% |
| AXA Equitable | 12.24% | 13.42% |
| Lincoln National | 11.27% | 11.22% |

The following summarizes the number of insurance policies held in specific states exceeding 10% of the total face value of our portfolio:

| State of Residence | September 30, 2017 | December 31, 2016 |
|---|---|---|
| Florida | 19.76% | 19.42% |
| California | 19.06% | 20.72% |

**(21) Subsequent Events**

Since September 30, 2017, eight policies covering seven individuals have matured. The combined life insurance benefits of these policies were $14,953,000.

Since September 30, 2017, we have issued approximately $18,277,000 of L Bonds.

Since September 30, 2017, we have issued approximately $13,037,000 of RPS 2.

On October 9, 2017, all shares of Series A were redeemed with a redemption payment equal to the sum of (i) $8.25 per share of Series A and (ii) all accrued but unpaid dividends calculated at an annual rate of $0.75 per share, for an aggregate of $22,252,000.

On October 23, 2017, we entered into an Amended and Restated Indenture with GWG Life, LLC, as guarantor, and Bank of Utah, as trustee, for the purposes of (i) eliminating references to the Series I Secured Notes that had been governed by the original indenture and were fully paid off as described in this report (and replacing those references, where appropriate, with general references to pari passu debt that may be incurred in the future), (ii) eliminating references to an intercreditor agreement that had been entered into for the benefit of the holders of the Series I Secured Notes, and (iii) updating and otherwise clarifying certain provisions of the original Indenture. Our L Bonds are presently the only securities that have been issued under the Amended and Restated Indenture.

Also on October 23, 2017, we entered into an Amended and Restated Pledge and Security Agreement with GWG Life, LLC, Jon R. Sabes and Steven F. Sabes, each as a grantor, and Bank of Utah, as the collateral trustee, for the purposes of (i) amending and restating the terms under which it and the other grantors have granted a security interest for the obligations owing in respect of the L Bonds issued under the Amended and Restated Indenture to be consistent with the Amended and Restated Indenture described above, and (ii) updating and otherwise clarifying certain provisions of the original Pledge and Security Agreement.

F-56

App. 0497

# 1,000,000 Units
## ($1,000,000,000)

# GWG HOLDINGS, INC.
# L Bonds

_____

**PROSPECTUS**
_____

, 2017

F-57

App. 0498

**PART II**
**INFORMATION NOT REQUIRED IN PROSPECTUS**

### ITEM 13. OTHER EXPENSES OF ISSUANCE AND DISTRIBUTION

Set forth below are expenses (other than the selling agent's commissions, dealer-manager fees and allowance expenses) we expect to be incurred in connection with the issuance and distribution of the securities registered hereby. With the exception of the Securities and Exchange Commission registration fee, the amounts set forth below are estimates and actual expenses may vary considerably from these estimates depending upon how long the notes are offered and other factors:

| | | |
|---|---|---:|
| Securities and Exchange Commission registration fee | $ | 115,900 |
| Accounting fees and expenses | $ | 200,000 |
| Legal fees and expenses | $ | 500,000 |
| Blue sky fees and expenses | $ | 20,000 |
| Printing expenses | $ | 200,000 |
| Trustee fees and expenses | $ | 0 |
| Miscellaneous | $ | 164,100 |
| **Total** | $ | 1,200,000 |

### ITEM 14. INDEMNIFICATION OF DIRECTORS AND OFFICERS

Section 145 of the Delaware General Corporation Law provides for, under certain circumstances, the indemnification of our officers, directors, employees and agents against liabilities that they may incur in such capacities. A summary of the circumstances in which such indemnification provided for is contained herein, but that description is qualified in its entirety by reference to the relevant Section of the Delaware General Corporation Law.

In general, the statute provides that any director, officer, employee or agent of a corporation may be indemnified against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement, actually and reasonably incurred in a proceeding (including any civil, criminal, administrative or investigative proceeding) to which the individual was a party by reason of such status. Such indemnity may be provided if the indemnified person's actions resulting in the liabilities: (i) were taken in good faith; (ii) were reasonably believed to have been in or not opposed to our best interest; and (iii) with respect to any criminal action, such person had no reasonable cause to believe the actions were unlawful. Unless ordered by a court, indemnification generally may be awarded only after a determination of independent members of the Board of Directors or a committee thereof, by independent legal counsel or by vote of the stockholders that the applicable standard of conduct was met by the individual to be indemnified.

The statutory provisions further provide that to the extent a director, officer, employee or agent is wholly successful on the merits or otherwise in defense of any proceeding to which he was a party, he is entitled to receive indemnification against expenses, including attorneys' fees, actually and reasonably incurred in connection with the proceeding.

Indemnification in connection with a proceeding by or in the right of GWG Holdings, Inc. (the "Company") in which the director, officer, employee or agent is successful is permitted only with respect to expenses, including attorneys' fees actually and reasonably incurred in connection with the defense. In such actions, the person to be indemnified must have acted in good faith, in a manner believed to have been in our best interest and must not have been adjudged liable to us unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability, in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expense which the Court of Chancery or such other court shall deem proper. Indemnification is otherwise prohibited in connection with a proceeding brought on behalf of the Company in which a director is adjudged liable to us, or in connection with any proceeding charging improper personal benefit to the director in which the director is adjudged liable for receipt of an improper personal benefit.

II-1

Delaware law authorizes us to reimburse or pay reasonable expenses incurred by a director, officer, employee or agent in connection with a proceeding in advance of a final disposition of the matter. Such advances of expenses are permitted if the person furnishes to us a written agreement to repay such advances if it is determined that he is not entitled to be indemnified by us.

The statutory section cited above further specifies that any provisions for indemnification of or advances for expenses does not exclude other rights under our certificate of incorporation, corporate bylaws, resolutions of our stockholders or disinterested directors, or otherwise. These indemnification provisions continue for a person who has ceased to be a director, officer, employee or agent of the corporation and inure to the benefit of the heirs, executors and administrators of such persons.

The statutory provision cited above also grants the power to the Company to purchase and maintain insurance policies that protect any director, officer, employee or agent against any liability asserted against or incurred by him in such capacity arising out of his status as such. Such policies may provide for indemnification whether or not the corporation would otherwise have the power to provide for it.

Article 6 of our corporate bylaws provides that we shall indemnify our directors, officers, employees and agents to the fullest extent permitted by the Delaware General Corporation Law. Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers or persons controlling the Company pursuant to the foregoing provisions, we understand that in the opinion of the SEC such indemnification is against public policy as expressed in that Act and is therefore unenforceable.

We have purchased directors' and officers' liability insurance in order to limit the exposure to liability for indemnification of directors and officers, including liabilities under the Securities Act of 1933.

## ITEM 15. RECENT SALES OF UNREGISTERED SECURITIES

In 2014, the Company issued 110,584 shares of Series A Preferred Stock as in-kind dividends payable on account of the preferred stock. The preferred stock was sold solely to accredited investors in a private placement under Section 4(a)(2) of the Securities Act of 1933, and Regulation D/Rule 506 thereunder.

In 2014, the Company issued 60,000 shares of common stock to Brewer Consulting Group in exchange for certain advisory services including financial consulting and marketing support to be provided to the Company by Brewer Consulting Group. The common stock was sold to Brewer Consulting Group, as accredited investor, in a private placement under Section 4(a)(2) of the Securities Act of 1933, and Regulation D/Rule 506 thereunder.

In 2015, the Company issued 97,590 shares of Series A Preferred Stock as in-kind dividends payable on account of the preferred stock. The preferred stock was sold solely to accredited investors in a private placement under Section 4(a)(2) of the Securities Act of 1933, and Regulation D/Rule 506 thereunder.

In 2016, the Company issued 99,000 shares of Series A Preferred Stock as in-kind dividends payable on account of the preferred stock. The preferred stock was sold solely to accredited investors in a private placement under Section 4(a)(2) of the Securities Act of 1933, and Regulation D/Rule 506 thereunder.

From January 1 through June 30, 2017, the Company issued 48,000 shares of Series A Preferred Stock as in-kind dividends payable on account of the preferred stock. The preferred stock was sold solely to accredited investors in a private placement under Section 4(a)(2) of the Securities Act of 1933, and Regulation D/Rule 506 thereunder.

**ITEM 16. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES**

**(a) Exhibits**. The exhibits listed below are filed as a part of this registration statement.

| Exhibit | Description |
|---|---|
| 1.1 | Form of Dealer Manager Agreement with Emerson Equity[14] |
| 1.2 | Form of Soliciting Dealer Agreement[14] |
| 3.1 | Certificate of Incorporation[1] |
| 3.2 | Bylaws (as amended to and including June 2, 2015)[11] |
| 3.3 | Certificate of Amendment to Certificate of Incorporation[2] |
| 3.4 | Certificate of Designations for Series A Convertible Preferred Stock[2] |
| 3.5 | Certificate of Amendment to Certificate of Incorporation[5] |
| 3.6 | Certificate of Designation for Redeemable Preferred Stock[7] |
| 3.7 | Certificate of Amendment to Certificate of Designation for Redeemable Preferred Stock[4] |
| 3.8 | Certificate of Amendment to Certificate of Designation for Redeemable Preferred Stock[7] |
| 3.9 | Certificate of Designation for Series 2 Redeemable Preferred Stock[10] |
| 4.1 | Amended and Restated Indenture with Bank of Utah[15] |
| 4.2 | Amended and Restated Pledge and Security Agreement by and among GWG Holdings, Inc., GWG Life, LLC, Jon R. Sabes, Steven F. Sabes, and Bank of Utah[15] |
| 4.3 | Form of L Bond[8] |
| 4.4 | Form of Subscription Agreement for L Bonds[14] |
| 5.1 | Opinion of Maslon[14] |
| 10.1 | Loan and Security Agreement with GWG DLP Funding IV, LLC (as borrower), CLMG Corp. (as agent) and LNV Corporation (as lender), dated September 14, 2016[9] |
| 10.2 | Employment Agreement with Jon R. Sabes, dated June 14, 2011[3] |
| 10.3 | Employment Agreement with Steven F. Sabes, dated June 14, 2011[3] |
| 10.4 | Employment Agreement with William B. Acheson, dated June 28, 2017[13] |
| 10.5 | 2013 Stock Incentive Plan (as amended)[12] |
| 10.6 | Form of Stock Option Agreement used with 2013 Stock Incentive Plan[6] |
| 21.1 | List of Subsidiaries[11] |
| 23.1 | Consent of Baker Tilly Virchow Krause, LLP (filed herewith) |
| 23.2 | Consent of Maslon LLP (contained within Exhibit 5.1 above) |
| 25.1 | Statement of Eligibility of Trustee (filed herewith) |

(1)    Incorporated by reference to Form S-1 Registration Statement filed on June 14, 2011 (File No. 333-174887).
(2)    Incorporated by reference to Form S-1/A Registration Statement filed on August 23, 2011 (File No. 333-174887).
(3)    Incorporated by reference to Form S-1/A Registration Statement filed on September 20, 2011 (File No. 333-174887).
(4)    Incorporated by reference to Current Report on Form 8-K filed on April 28, 2016.
(5)    Incorporated by reference to Quarterly Report on Form 10-Q filed on August 8, 2014.
(6)    Incorporated by reference to Form S-1/A Registration Statement filed on June 6, 2014 (File No. 333-195505).
(7)    Incorporated by reference to the registrant's Annual Report on Form 10-K filed on March 22, 2016.
(8)    Incorporated by reference to Form S-1/A Registration Statement filed on October 30, 2014 (File No. 333-197227).
(9)    Incorporated by reference to Current Report on Form 8-K filed on September 19, 2016.
(10)   Incorporated by reference to Current Report on Form 8-K filed on February 22, 2017.
(11)   Incorporated by reference to Annual Report on Form 10-K filed on March 15, 2017.
(12)   Incorporated by reference to the registrant's Definitive Proxy Statement filed on April 30, 2015.
(13)   Incorporated by reference to Current Report on Form 8-K filed on June 30, 2017.
(14)   Incorporated by reference to Form S-1/A Registration Statement filed on October 10, 2017 (File No. 333-220288).
(15)   Incorporated by reference to Current Report on Form 8-K filed on October 26, 2017.


**ITEM 17. UNDERTAKINGS**

Insofar as indemnification for liabilities arising under the Securities Act of 1933 (the "Securities Act") may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act, and is, therefore, unenforceable. In the

App. 0501

App. 0502

event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

(a)(2)  That, for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3)  To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(4)  [intentionally omitted]

(5)  For the purpose of determining any liability under the Securities Act to any purchaser, each prospectus filed pursuant to Rule 424(b) as part of a registration statement relating to an offering, other than registration statements relying on Rule 430B or other than prospectuses filed in reliance on Rule 430A, shall be deemed to be part of and included in the registration statement as of the date it is first used after effectiveness. Provided, however, that no statement made in a registration statement or prospectus that is part of the registration statement or made in a document incorporated or deemed incorporated by reference into the registration statement or prospectus that is part of the registration statement will, as to a purchaser with a time of contract of sale prior to such first use, supersede or modify any statement that was made in the registration statement or prospectus that was part of the registration statement or made in any such document immediately prior to such date of first use.

(6)  That, for the purpose of determining liability of the registrant under the Securities Act of 1933 to any purchaser in the initial distribution of the securities: The undersigned registrant undertakes that in a primary offering of securities of the undersigned registrant pursuant to this registration statement, regardless of the underwriting method used to sell the securities to the purchaser, if the securities are offered or sold to such purchaser by means of any of the following communications, the undersigned registrant will be a seller to the purchaser and will be considered to offer or sell such securities to such purchaser:

(i)  Any preliminary prospectus or prospectus of the undersigned registrant relating to the offering required to be filed pursuant to Rule 424;

(ii)  Any free writing prospectus relating to the offering prepared by or on behalf of the undersigned registrant or used or referred to by the undersigned registrant;

(iii)  The portion of any other free writing prospectus relating to the offering containing material information about the undersigned registrant or its securities provided by or on behalf of the undersigned registrant; and

(iv)  Any other communication that is an offer in the offering made by the undersigned registrant to the purchaser.

(b)  That, for purposes of determining any liability under the Securities Act of 1933, each filing of the registrant's annual report pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (and, where applicable, each filing of an employee benefit plan's annual report pursuant to Section 15(d) of the Securities Exchange Act of 1934) that is incorporated by reference in the registration statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof.

II-4

App. 0503

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Minneapolis, State of Minnesota, on November 28, 2017.

GWG HOLDINGS, INC.

By:    /s/ Jon R. Sabes
          Chief Executive Officer

Pursuant to the requirements of the Securities Act of 1933, this Registration Statement has been signed, as of November 28, 2017, by the following persons in the capacities indicated below.

| Name | Title |
|---|---|
| /s/ Jon R. Sabes<br>Jon R. Sabes | Director, Chief Executive Officer<br>(Principal Executive Officer) |
| /s/ William Acheson<br>William Acheson | Chief Financial Officer<br>(Principal Financial and Accounting Officer) |
| /s/ Steven F. Sabes<br>Steven F. Sabes | Director, Executive Vice President and Secretary |
| /s/ David H. Abramson<br>David H. Abramson | Director |
| /s/ Charles H. Maguire III<br>Charles H. Maguire III | Director |
| /s/ Jeffrey L. McGregor<br>Jeffrey L. McGregor | Director |
| /s/ Shawn R. Gensch<br>Shawn R. Gensch | Director |
| /s/ Mark E. Schwarzmann<br>Mark E. Schwarzmann | Director |

II-5

App. 0504

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Minneapolis, State of Minnesota, on November 28, 2017.

GWG LIFE, LLC

By:    /s/ Jon R. Sabes

        Chief Executive Officer

Pursuant to the requirements of the Securities Act of 1933, this Registration Statement has been signed, as of November 28, 2017, by the following persons in the capacities indicated below.

| Name | Title |
|---|---|
| /s/ Jon R. Sabes <br> Jon R. Sabes | Chief Executive Officer <br> (Principal Executive Officer) |
| /s/ William Acheson <br> William Acheson | Chief Financial Officer <br> (Principal Financial and Accounting Officer) |
| /s/ Jon R. Sabes <br> Jon R. Sabes | Manager of GWG Life, LLC |

II-6

App. 0505

10-K 1 f10k2019_gwgholdings.htm ANNUAL REPORT

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

# FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2019

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES ACT OF 1934**

For the transition period from _____ to _____

**Commission File Number: 001-36615**

# GWG HOLDINGS, INC.

(Exact name of registrant as specified in its charter)

| **Delaware** | **26-2222607** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**325 North St. Paul Street, Suite 2650**
**Dallas, TX 75201**
(Address of principal executive offices, including zip code)

**(612) 746-1944**
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock | GWGH | Nasdaq Capital Market |

**Securities registered pursuant to Section 12(g) of the Act**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐  No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐  No ☒

The aggregate market value of the registrant's common stock held by non-affiliates was $21,845,565 as of June 28, 2019 (the last business day of the registrant's most recently completed second fiscal quarter), based on a total of 2,878,352 shares of common stock held by non-affiliates and a closing price of $7.14 as reported on the Nasdaq Capital Market on June 28, 2019. For purposes of this computation, all officers, directors, and 10% beneficial owners of the registrant are deemed to be affiliates. Such determination should not be deemed to be an admission that such officers, directors or 10% beneficial owners, are or were, in fact, affiliates of the registrant.

As of March 24, 2020, GWG Holdings, Inc. had 33,035,249 shares of common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE:**

None.

**GWG HOLDINGS, INC.**

**Index to Form 10-K**
**for the Fiscal Year Ended December 31, 2019**

| | | |
|---|---|---|
| PART I | | 1 |
| | | |
| ITEM 1. | Business. | 1 |
| ITEM 1A. | Risk factors. | 13 |
| ITEM 1B. | Unresolved staff comments. | 42 |
| ITEM 2. | Properties. | 42 |
| ITEM 3. | Legal proceedings. | 42 |
| ITEM 4. | Mine safety disclosures. | 42 |
| | | |
| PART II | | 43 |
| | | |
| ITEM 5. | Market for the registrant's common equity, related shareholder matters and issuer purchases of equity securities. | 43 |
| ITEM 6. | Selected financial data. | 43 |
| ITEM 7. | Management's discussion and analysis of financial condition and results of operations. | 44 |
| ITEM 7A. | Quantitative and qualitative disclosures about market risk. | 70 |
| ITEM 8. | Consolidated financial statements and supplementary data. | F-1 |
| ITEM 9. | Changes in and disagreements with accountants on accounting and financial disclosure. | 71 |
| ITEM 9A. | Controls and procedures. | 71 |
| ITEM 9B. | Other Information. | 72 |
| | | |
| PART III | | 73 |
| | | |
| ITEM 10. | Directors, executive officers and corporate governance. | 73 |
| ITEM 11. | Executive compensation. | 80 |
| ITEM 12. | Security ownership of certain beneficial owners and management and related shareholder matters. | 86 |
| ITEM 13. | Certain relationships and related transactions, and director independence. | 88 |
| ITEM 14. | Principal accounting fees and services. | 92 |
| | | |
| PART IV | | 93 |
| | | |
| ITEM 15. | Exhibits, financial statement schedules. | 93 |
| ITEM 16. | FORM 10-K SUMMARY | 95 |
| | | |
| SIGNATURES | | 96 |

i

App. 0508

**PART I**

**ITEM 1. BUSINESS.**

**Organizational Structure**

Our business was originally organized in February 2006. We added our current parent holding company, GWG Holdings, Inc. ("GWG Holdings"), in March 2008, and in September 2014 we consummated an initial public offering of our common stock on The Nasdaq Capital Market where our stock trades under the ticker symbol "GWGH."

GWG Holdings conducts its life insurance secondary market business through a wholly owned subsidiary, GWG Life, LLC ("GWG Life"), and GWG Life's wholly owned subsidiaries, GWG Life Trust and GWG DLP Funding IV, LLC. GWG Holdings' indirect interests in loans collateralized by cash flows from alternative assets are held by The Beneficient Company Group, L.P. ("Ben LP," including all of the subsidiaries it may have from time to time — "Beneficient") and its general partner, Beneficient Management, L.L.C. ("Beneficient Management"). As a result of the Investment and Exchange Agreements described in the section below entitled "The Beneficient Transaction", GWG Holdings reported the results of Ben LP and its subsidiaries on a consolidated basis beginning on the transaction date of December 31, 2019. All of these entities are legally organized in the state of Delaware, other than GWG Life Trust, which is governed by the laws of the state of Utah. Unless the context otherwise requires or we specifically so indicate, all references in this report to "we," "us," "our," "our Company," "GWG," or the "Company" refer to these entities collectively. Our headquarters are located in Dallas, Texas.

On November 11, 2019, GWG Holdings contributed the common stock and membership interests of its previously-wholly owned subsidiaries Life Epigenetics Inc. ("Life Epigenetics") and youSurance General Agency, LLC ("youSurance") to a legal entity, InsurTech Holdings, LLC ("InsurTech Holdings") in exchange for a membership interest in InsurTech Holdings. On March 2, 2020, InsurTech Holdings changed its name to FOXO BioScience LLC. Although we currently own 100% of the equity of InsurTech Holdings, we do not have a controlling financial interest in InsurTech Holdings because the managing member has substantive participating rights. Therefore, we account for our ownership interest in InsurTech Holdings as an equity method investment. Life Epigenetics was formed to commercialize epigenetic technology for the longevity industry. youSurance seeks to offer life insurance directly to customers utilizing epigenetic technology.

Beneficient was formed in 2003 but began its alternative asset business in September 2017. Beneficient operates primarily through its subsidiaries, which provide Beneficient's products and services. These subsidiaries include: (i) Beneficient Capital Company, L.L.C. ("BCC"), through which Beneficient offers loans and liquidity products; (ii) Beneficient Administrative and Clearing Company, L.L.C. ("BACC"), through which Beneficient provides services for fund and trust administration and plans to provide custody services; (iii) Pen Indemnity Insurance Company, LTD ("Pen"), through which Beneficient plans to offer insurance services; and (iv) Ben Markets Management Holdings, L.P., formerly called ACE Portal, L.L.C. ("ACE"), through which Beneficient plans to provide an online portal for direct access to Beneficient's financial services and products.

**Our Company**

We are a financial services company committed to transforming the alternative asset industry with disruptive and innovative products and services. In 2018 and 2019 GWG consummated a series of transactions (as more fully described below) with Beneficient that has resulted in a significant reorientation of our business and capital allocation strategy towards an expansive and diverse exposure to alternative assets. As part of this reorientation, we also changed our Board of Directors and executive management team.

While we are continuing our work to maximize the value of our secondary life insurance business, we do not anticipate purchasing additional life insurance policies in the secondary market and have increased capital allocated toward providing liquidity to a broader range of alternative assets, primarily through investments in Beneficient. We believe Beneficient's operations will generally produce higher risk-adjusted returns than those we can achieve from life insurance policies acquired in the secondary market. Furthermore, although we believe that our portfolio of life insurance policies is a meaningful component of a growing diversified alternative asset portfolio, we continue to explore strategic alternatives for our life insurance portfolio aimed at maximizing its value, including a possible sale, refinancing or recapitalization of our life insurance portfolio.

App. 0509

We completed our transactions with Beneficient to provide us with a significant increase in assets and common shareholder equity. In addition, our transactions with Beneficient provide us with the opportunity for a diversified source of future earnings within the alternative asset industry. As GWG and Beneficient expand their strategic relationship, we believe the Beneficient transactions will transform GWG from a niche provider of liquidity to owners of life insurance to, as GWG and Beneficient expand their strategic relationship, a full-scale provider of trust and liquidity products and services to owners of a broad range of alternative assets.

Beneficient, through its subsidiaries, plans to operate three potentially high value, high margin lines of business:

- Private Trust Lending & Liquidity Products. Through BCC, Beneficient provides a unique suite of private trust, lending and liquidity products focused on bringing liquidity to owners of professionally managed alternative assets. Beneficient's innovative liquidity solutions are designed to serve mid-to-high net worth ("MHNW") individuals, small-to-mid sized ("STM") institutions, and asset managers who have historically possessed few attractive options to access early liquidity from their alternative assets. Beneficient targets MHNW clients with $5 million to $30 million in net worth and STM institutional clients typically holding less than $1 billion in assets.

- Trust and Custody Services. Through BACC and (subject to capitalization) through Pen, Beneficient plans, in the future, to market retirement funds, custody and clearing of alternative assets, and trustee and insurance services for covering risks attendant to owning or managing alternative assets.

- Financial Technology. Through ACE, Beneficient plans to provide online portals and financial technologies for the trading and financing of alternative assets.

Beneficient's existing and planned products and services are designed to support the tax and estate planning objectives of its MHNW clients, facilitate a diversification of assets or simply provide administrative management and reporting solutions tailored to the goals of the investor who owns alternative investments.

**The Beneficient Transactions**

*The Exchange Transaction*

On January 12, 2018, GWG Holdings and GWG Life entered into a Master Exchange Agreement (as amended, the "Master Exchange Agreement") with Beneficient, MHT Financial SPV, LLC, a Delaware limited liability company ("MHT SPV"), and various related trusts (the "Seller Trusts"). The material terms and conditions of the initial Master Exchange Agreement were described in GWG Holdings' Current Report on Form 8-K (the "January 2018 Form 8-K") filed with the Securities and Exchange Commission ("SEC") on January 18, 2018.

On August 10, 2018, GWG Holdings, GWG Life, Beneficient, MHT SPV, and the Seller Trusts entered into a Third Amendment to Master Exchange Agreement (the "Third Amendment"). Pursuant to the Third Amendment, the parties agreed to consummate the transactions contemplated by the Master Exchange Agreement in two closings. The Third Amendment also generally deleted MHT SPV as a party to the Master Exchange Agreement. The material terms and conditions of the Third Amendment to Master Exchange Agreement were described in GWG Holdings' Current Report on Form 8-K (the "August 2018 Form 8-K") filed with the SEC on August 14, 2018. The transactions contemplated by the Master Exchange Agreement, as amended, are referred to throughout this Report as the "Exchange Transaction."

On the first closing date, which took place on August 10, 2018 (the "Initial Transfer Date"):

- in consideration for GWG Holdings and GWG Life entering into the Master Exchange Agreement and consummating the transactions contemplated thereby, Ben LP, as borrower, entered into a commercial loan agreement (the "Commercial Loan Agreement") with GWG Life, as lender, providing for a loan in a principal amount of $200.0 million (the "Commercial Loan");

- Ben LP delivered to GWG a promissory note (the "Exchangeable Note") in the principal amount of $162.9 million;

- Ben LP purchased 5,000,000 shares of GWG's Series B Convertible Preferred Stock, par value $0.001 per share and having a stated value of $10 per share (the "Series B"), for cash consideration of $50.0 million, which shares were subsequently transferred to the Seller Trusts;

Page 2

- the Seller Trusts delivered to GWG 4,032,349 common units of Ben LP at an assumed value of $10 per common unit;

- GWG issued to the Seller Trusts Seller Trust L Bonds due 2023 (the "Seller Trust L Bonds") in an aggregate principal amount of $403.2 million, as more fully described below;

- GWG and the Seller Trusts entered into a registration rights agreement with respect to the Seller Trust L Bonds received by the Seller Trusts; and

- GWG and Beneficient entered into a registration rights agreement with respect to the Ben LP common units received and to be received by GWG.

Under the Master Exchange Agreement, at the final closing (the "Final Closing" and the date on which the final closing occurred, the "Final Closing Date"), which occurred on December 28, 2018:

- in accordance with the Master Exchange Agreement, and based on the net asset value of alternative asset financings as of the Final Closing Date, effective as of the Initial Transfer Date, (i) the principal amount of the Commercial Loan was reduced to $182.0 million, (ii) the principal amount of the Exchangeable Note was reduced to $148.2 million, and (iii) the principal amount of the Seller Trust L Bonds was reduced to $366.9 million;

- the Seller Trusts refunded to GWG $0.8 million in interest paid on the Seller Trust L Bonds related to the Seller Trust L Bonds that were issued as of the Initial Transfer Date but cancelled, effective as of the Initial Transfer Date, on the Final Closing Date;

- the accrued interest on the Commercial Loan and the Exchangeable Note was added to the principal amount of the Commercial Loan, as a result of which the principal amount of the Commercial Loan as of the Final Closing Date was $192.5 million;

- the Seller Trusts transferred to GWG an aggregate of 21,650,087 common units of Ben LP and GWG received 14,822,843 common units of Ben LP in exchange for the Exchangeable Note, upon completion of which GWG owned (including the 4,032,349 common units received by GWG on the Initial Transfer Date) 40,505,279 common units of Ben LP;

- Ben LP issued to GWG an option (the "Option Agreement") to acquire the number of common units of Ben LP, interests or other property that would be received by a holder of Preferred Series A Subclass 1 Unit Accounts of Beneficient Company Holdings, L.P. ("BCH"), an affiliate of Ben LP; and

- GWG issued to the Seller Trusts 27,013,516 shares of GWG common stock (including shares issued upon conversion of the Convertible Preferred Stock).

On the Final Closing Date, GWG and the Seller Trusts also entered into a registration rights agreement with respect to the shares of GWG common stock owned by the Seller Trusts, an orderly marketing agreement and a stockholders' agreement. The material terms of these agreements were described in our Information Statement on Schedule 14C filed with the SEC on December 6, 2018, and in our Current Report on Form 8-K filed with the SEC on January 4, 2019.

*The Expanded Strategic Relationship*

In the second quarter of 2019, we completed an expansion of the strategic relationship with Beneficient, which was a transformational event for both organizations that is expected to create a unified platform uniquely positioned to provide an expanded suite of products, services and resources for investors and the financial professionals who assist them. GWG and Beneficient intend to collaborate extensively and capitalize on one another's capabilities, relationships and services.

On April 15, 2019, Jon R. Sabes, the Company's former Chief Executive Officer and a former director, and Steven F. Sabes, the Company's former Executive Vice President and a former director, entered into a Purchase and Contribution Agreement (the "Purchase and Contribution Agreement") with, among others, Ben LP. The Purchase and Contribution Agreement was summarized in our Current Report on Form 8-K filed with the SEC on April 16, 2019.

The closing of the transactions contemplated by the Purchase and Contribution Agreement (the "Purchase and Contribution Transaction") occurred on April 26, 2019. Prior to or in connection with such closing:

- Messrs. Jon and Steven Sabes sold and transferred all of the shares of the Company's common stock held directly and indirectly by them and their immediate family members (approximately 12% of the Company's outstanding common stock in the aggregate); specifically, Messrs. Jon and Steven Sabes (i) sold an aggregate 2,500,000 shares of Company common stock to BCC for $25.0 million in cash and (ii) contributed the remaining 1,452,155 shares of Company common stock to AltiVerse Capital Markets, L.L.C., a Delaware limited liability company ("AltiVerse") (which is a limited liability company owned by an entity related to Beneficient's founders, including Brad K. Heppner (GWG's Chairman and Beneficient's Chief Executive Officer and Chairman) and an entity related to Thomas O. Hicks (one of Beneficient's current directors and a director of GWG)), in exchange for certain equity interests in AltiVerse.

- Our bylaws were amended to increase the maximum number of directors of the Company from nine to 13, and the actual number of directors comprising the Board was increased from seven to 11. The size of the Board has since been reduced and currently consists of nine directors.

- All seven members of the Company's Board of Directors prior to the closing resigned as directors of the Company, and 11 individuals designated by Beneficient were appointed as directors of the Company, leaving two board seats vacant after the closing.

- Jon R. Sabes resigned from all officer positions he held with the Company and all of its subsidiaries prior to the closing, other than his position as Chief Executive Officer of the Company's technology focused wholly owned subsidiaries, Life Epigenetics and youSurance.

- Steven F. Sabes resigned from all officer positions he held with the Company and all of its subsidiaries prior to the closing, except as Chief Operating Officer of Life Epigenetics.

- The resignations of Messrs. Jon and Steven Sabes included a full waiver and forfeit of (i) any severance that may be payable by the Company or any of its subsidiaries in connection with such resignations or the Purchase and Contribution Transaction and (ii) all equity awards of the Company currently held by either of them.

- Murray T. Holland, a trust advisor of the Seller Trusts, was appointed as Chief Executive Officer of the Company.

- The Company entered into performance share unit agreements with certain employees of the Company pursuant to which such employees would receive a bonus under certain terms and conditions, including, among others, that such employees remain employed by the Company or one of its subsidiaries (or, if no longer employed, such employment was terminated by the Company other than for cause, as such term is defined in the performance share unit agreement) for a period of 120 days following the closing.

- The stockholders' agreement that was entered into on the Final Closing Date was terminated by mutual consent of the parties thereto.

- BCC and AltiVerse executed and delivered a Consent and Joinder to the Amended and Restated Pledge and Security Agreement dated October 23, 2017 by and among the Company, GWG Life, LLC, Messrs. Jon and Steven Sabes and the Bank of Utah, which provides that the shares of the Company's common stock acquired by BCC and AltiVerse pursuant to the Purchase and Contribution Agreement will continue to be pledged as collateral security for the Company's obligations owing in respect of the L Bonds issued under our Amended and Restated Indenture, dated as of October 23, 2017, as amended and supplemented.

Among other things, the Purchase and Contribution Agreement contemplated that after the closing, the parties will seek to enter into an agreement pursuant to which the Company will, in certain circumstances, have the right to appoint a majority of the board of directors of the general partner of Beneficient, resulting in the Company and Beneficient being consolidated from a financial reporting perspective. The Company and Beneficient will also seek to enter into an agreement pursuant to which the Company will offer and distribute (through a FINRA registered managing broker-dealer) Beneficient's liquidity products and services. The Company intends to reduce capital allocated to life insurance assets while it works with Beneficient to build a larger diversified portfolio of alternative asset investment products.

A copy of the Purchase and Contribution Agreement is included in our Annual Report on Form 10-K filed with the SEC on July 9, 2019 as Exhibit 99.3.

Page 4

*The Investment and Exchange Agreements*

On December 31, 2019, the Company, Ben LP, BCH, and Beneficient Management entered into a Preferred Series A Unit Account and Common Unit Investment Agreement (the "Investment Agreement").

Pursuant to the Investment Agreement, the Company transferred $79.0 million to Ben LP in return for 666,667 common units of Ben LP and a Preferred Series A Subclass 1 Unit Account of BCH.

In connection with the Investment Agreement, the Company obtained the right to appoint a majority of the board of directors of Beneficient Management, the general partner of Ben LP. As a result, the Company obtained control of Ben LP and began reporting the results of Ben LP and its subsidiaries on a consolidated basis beginning on the transaction date of December 31, 2019. The Company's right to appoint a majority of the board of directors of Beneficient Management will terminate in the event (i) the Company's ownership of the fully diluted equity of Ben LP (excluding equity issued upon the conversion or exchange of Preferred Series A Unit Accounts of BCH held as of December 31, 2019 by parties other than the Company) is less than 25%, (ii) the Continuing Directors of the Company cease to constitute a majority of the board of directors of the Company, or (iii) certain bankruptcy events occur with respect to the Company. The term "Continuing Directors" means, as of any date of determination, any member of the board of directors of the Company who: (1) was a member of the board of directors on December 31, 2019; or (2) was nominated for election or elected to the board of directors with the approval of a majority of the Continuing Directors who were members of the board of directors at the time of such nomination or election.

Following the transaction, and as agreed upon in the Investment Agreement, the Company was issued an initial capital account balance for the Preferred Series A Subclass 1 Unit Account of $319.0 million. The other holders of the Preferred Series A Subclass 1 Unit Accounts are an entity related to the founders of Ben LP and an entity related to one of GWG's and Beneficient's directors (the "Related Entities"), and the aggregate capital accounts of all holders of the Preferred Series A Subclass 1 Unit Accounts after giving effect to the investment by the Company is $1.6 billion. The Company's Preferred Series A Subclass 1 Unit Account is the same class of preferred security as held by the Related Entities. In the event the Related Entities exchange their Preferred Series A Subclass 1 Unit Account for securities of the Company, the Company's Preferred Series A Subclass 1 Unit Account would be converted into common units of Ben LP (so neither the Company nor the founders would hold Preferred Series A Subclass 1 Unit Accounts).

Also, on December 31, 2019, in a transaction related to the Investment Agreement, GWG Holdings transferred its interest in the Preferred Series A Subclass 1 Unit Account to its wholly owned subsidiary, GWG Life.

In addition, on December 31, 2019, the Company, Ben LP and the holders of common units of Ben LP (the "Common Units") entered into an Exchange Agreement (the "Exchange Agreement") pursuant to which the holders of Common Units from time to time have the right, on a quarterly basis, to exchange their Common Units for common stock of the Company. The exchange ratio in the Exchange Agreement is based on the ratio of the capital account associated with the Common Units to be exchanged to the market price of the Company's common stock based on the volume weighted average price of the Company's common stock for the five consecutive trading days prior to the quarterly exchange date. The Exchange Agreement is intended to facilitate the marketing of Ben LP's products to holders of alternative assets.

The Exchange Transaction, the Purchase and Contribution Transaction, and the Investment and Exchange Agreements are referred to collectively as the "Beneficient Transactions."

**Segment Financial Information**

We have two reportable segments: 1) Investment in Beneficient and 2) Secondary Life Insurance.

GWG segment information is included in Note 20, Segment Reporting, to the consolidated financial statements included in Item 8 of Part II of this Form 10-K.

**Market Opportunity**

*Alternative Asset Liquidity Products and Services*

The market demand for liquidity from owners of alternative assets is attributable to the outstanding net asset value of illiquid alternative assets ("NAV") held by U.S. investors. Using data from various published industry reports from 2017 to 2019, certain widely accepted commercial private-equity databases, and applying its own proprietary assumptions and calculations ("Ben Estimates"), Beneficient estimates that total outstanding NAV held by U.S. investors exceeded $4.0 trillion in 2019 (up from an estimated $3.0 trillion in 2018).

According to at least one industry report from Preqin from 2018, total outstanding NAV in the hands of U.S. investors grew at a 12.1% compound annual growth rate (CAGR) for the ten years ended 2018 and was forecasted to grow at an 8% CAGR through 2023 as a result of continued increases in capital committed to the alternative asset class.

According to Ben Estimates, the large U.S. institutions representing approximately 54% of the NAV have consistently sought liquidity on approximately 1.85% to 2.25% of their outstanding NAV. Based on Ben Estimates, this has led to an annual demand for liquidity of nearly $50 billion in recent years.

A primary group not included in this demand is the MHNW investor who holds investments of $5 million to $30 million compared to a large institution's holdings in the hundreds of millions or billions of dollars. Intermediary brokers will often not represent the MHNW individuals (or STM institutional investors). According to Ben Estimates, MHNW investors hold over $700.0 billion in NAV, yet MHNW investors have only been able to access liquidity representing less than 0.5% of the NAV held by them each year, compared to the average 2% achieved by the large institutional owners, representing 54% of the market.

Based on these amounts, Beneficient estimates that MHNW investors would seek liquidity of 3% of their outstanding NAV each year if liquidity was made available to them, or a slightly greater percentage than that of large U.S. institutions. As a result, and according to Ben Estimates, the estimated market demand for liquidity by MHNW individuals would have exceeded $20.0 billion in 2019.

*Secondary Life Insurance Market*

The market for life insurance is large. According to the American Council of Life Insurers Fact Book 2018 (ACLI), consumers owned approximately $12.0 trillion in face value of individual life insurance policy benefits in the United States in 2017. In that same year, the ACLI reports that individual consumers purchased an aggregate of $3.1 trillion of new individual life insurance policy benefits. This figure includes all types of individual life policies, including term insurance and permanent insurance known as whole life and universal life.

The life insurance secondary market primarily serves consumers, 65 years and older, and their families who own life insurance.

The secondary market for life insurance exists as a result of consumer lapse behaviors and surrender values far below economic value offered to consumers for their life insurance by the issuing insurance carriers. The ACLI reports that the annual lapse and surrender rate for individual life insurance policies is 5.7% of the in-force face value of benefits, amounting to over $680 billion in face value of policy benefits lapsed and surrendered in 2017 alone.

In 2017, the National Association of Insurance Commissioners ("NAIC") issued a policy bulletin in support of products we provide. The bulletin described these products as "innovative private market solutions for financing Americans' long-term care needs." The NAIC, citing the Company's August 25, 2016 presentation, discussed how consumers could exchange the market value of their life insurance policies for products designed to fund long-term care expenses.

*Primary Life Insurance Market and Technology ("Insurtech")*

The opportunity to apply technology to transform the insurance industry is significant. The application of technology to the insurance industry, commonly referred to as "insurtech", provides opportunities for new entrants into the traditional insurance marketplace that have the potential to significantly disrupt the insurance industry's historical approach to assessing and selecting acceptable underwriting risks.

As discussed in the Organizational Structure section above, on November 11, 2019, GWG contributed the common stock and membership interests of its previously wholly-owned subsidiaries, Life Epigenetics and youSurance, to InsurTech Holdings. This transaction affected a reorganization such that InsurTech owns only two direct subsidiaries, Life Epigenetics and youSurance, which hold all insurtech assets, and one indirect subsidiary, Scientific Testing Partners, LLC, a wholly owned subsidiary of Life Epigenetics. In connection with the transaction, GWG Holdings contributed $2.1 million in cash to InsurTech Holdings during the fourth quarter of 2019 and is committed to contribute an additional $17.9 million to the entity over the next two years.

Page 6

**Business Strategies**

*1. Liquidity for Alternative Assets*

As a result of the Beneficient Transactions, we are now uniquely positioned to provide liquidity and related services to investors holding a full range of illiquid alternative assets. We will continue to work to create the most value for holders of alternative assets, the financial professionals who advise them and for our shareholders.

Beneficient provides private trust solutions, including a unique suite of lending and liquidity products focused on bringing liquidity to owners of alternative assets. Beneficient's innovative liquidity solutions are designed to serve MHNW individuals, STM institutions, and asset managers who have historically possessed few attractive options to access early liquidity from their alternative assets. Beneficient targets MHNW individual clients with $5 million to $30 million in investments and institutional clients typically holding less than $1 billion in assets.

Beneficient's products can also support tax and estate planning objectives, facilitate a diversification of assets or provide administrative management and reporting solutions tailored to the goals of the investor. In the future, Beneficient plans to offer insurance services covering risks associated with owning or managing alternative assets.

Our life insurance secondary market business is designed to serve consumers 65 years or older owning life insurance. We seek to earn non-correlated yield from life insurance policies that we purchased in the secondary market. Since inception, we have purchased over $3.2 billion in face value of policy benefits from consumers for over $620 million, as compared to the $52 million in surrender value offered by insurance carriers on those same policies. Our products provide unique and valuable services to the senior consumers that we serve.

The goal of our secondary life insurance business has been to build a profitable, large and well-diversified portfolio of life insurance assets. We believe that scale and diversification are key factors and risk mitigation strategies to provide consistent cash flows and reliable investment returns. We believe that we have reached the goal in terms of portfolio size and diversification. As described elsewhere, we do not anticipate making additional investments in the life settlements portfolio as we believe Beneficient's operations will generally produce higher risk-adjusted returns than those we can achieve from life insurance policies acquired in the secondary market.

*2. Developing a World Class Financial Services Distribution Platform*

GWG has developed a large and sophisticated financial services product distribution platform. Today, this platform consists of over one hundred independent broker-dealers and several thousand "independent" financial advisors ("Retail Distribution") who sell the Company's investment products. "Independent" in this context refers to broker-dealers that accommodate financial advisors who carry securities licenses and need back-office support for services, such as compliance and trade execution, but allow their advisors wide latitude in how they conduct business. Since inception, GWG has raised over $1.52 billion of debt and equity capital to support our secondary market of life insurance business and related expenditures.

We believe that we are well positioned to continue to grow our Retail Distribution for several reasons:

- There is a trend of financial professionals leaving large full-service broker-dealers to become "independent";

- Newly independent financial professionals and their clients demand a high level of customer service and access to innovative and value added products;

- The significant demand for liquidity from owners of alternative assets by US investors;

- Our expanded relationship with Beneficient will attract more and larger broker dealers to our platform due to our increased size and market capitalization as well as the increase in products offered; and

- By using capital to provide liquidity products to our current customers, and as they begin to realize the benefit of these products, we will able to raise more capital and attract additional broker dealers into our selling group.

*3. Commercializing Advanced Epigenetic Technology for Primary Life Insurance Markets*

We believe life insurance underwriting will be transformed due to advancements in science and technology. As part of that transformational change, we believe the science of epigenetics will serve as a foundational science to this advancement for the life insurance industry by achieving more accurate and automated underwriting.

Page 7

As discussed in the Organizational Structure section above, on November 11, 2019, GWG contributed the common stock and membership interests of its previously wholly-owned subsidiaries, Life Epigenetics and youSurance, to InsurTech Holdings. We believe that as a separate entity (rather than as a small subsidiary of a large financial services holding company), the InsurTech Holdings businesses can reach their maximum potential in terms of marketing and branding, attraction of talent, appropriate peer group comparisons and, ultimately, return to its owners. The Company will retain substantially all of the economics of InsurTech Holdings.

**Secondary Life Insurance Assets**

Our portfolio of life insurance policies, owned by our subsidiaries as of December 31, 2019, is summarized below:

<p align="center"><strong>Life Insurance Portfolio Summary</strong></p>

| | | |
|---|---|---|
| Total life insurance portfolio face value of policy benefits (in thousands) | $ | 2,020,973 |
| Average face value per policy (in thousands) | $ | 1,756 |
| Average face value per insured life (in thousands) | $ | 1,883 |
| Weighted average age of insured (years) | | 82.4 |
| Weighted average life expectancy (LE) estimate (years) | | 7.2 |
| Total number of policies | | 1,151 |
| Number of unique lives | | 1,073 |
| Demographics | | 74% Male; 26% Female |
| Number of smokers | | 48 |
| Largest policy as % of total portfolio face value | | 0.7% |
| Average policy as % of total portfolio | | 0.1% |
| Average annual premium as % of face value | | 3.3% |

Our portfolio of life insurance policies, owned by our subsidiaries as of December 31, 2019, organized by the insured's current age and the associated number of policies and policy benefits, is summarized below:

<p align="center"><strong>Distribution of Policies and Policy Benefits by Current Age of Insured</strong></p>

| | | | | Percentage of Total | | |
|---|---|---|---|---|---|---|
| Min Age | Max Age | Number of Policies | Policy Benefits (in thousands) | Number of Policies | Policy Benefits | Wtd. Avg. LE (years) |
| 95 | 101 | 17 | $ 34,402 | 1.5% | 1.7% | 2.2 |
| 90 | 94 | 145 | 283,442 | 12.6% | 14.0% | 3.3 |
| 85 | 89 | 238 | 556,090 | 20.7% | 27.5% | 5.0 |
| 80 | 84 | 251 | 463,047 | 21.8% | 22.9% | 7.7 |
| 75 | 79 | 224 | 347,952 | 19.4% | 17.2% | 9.8 |
| 70 | 74 | 205 | 264,496 | 17.8% | 13.1% | 11.0 |
| 60 | 69 | 71 | 71,544 | 6.2% | 3.6% | 11.4 |
| **Total** | | **1,151** | **$ 2,020,973** | **100.0%** | **100.0%** | **7.2** |

<p align="center">Page 8</p>

App. 0516

Our portfolio of life insurance policies, owned by our subsidiaries as of December 31, 2019, organized by the insured's estimated life expectancy estimates and associated policy benefits, is summarized below:

**Distribution of Policies by Current Life Expectancies of Insured**

| LE (Months) | Max LE (Months) | Number of Policies | Policy Benefits (in thousands) | Percentage of Total Number of Policies | Percentage of Total Policy Benefits |
|---|---|---|---|---|---|
| 0 | 47 | 281 | $ 447,313 | 24.4% | 22.1% |
| 48 | 71 | 223 | 389,264 | 19.4% | 19.3% |
| 72 | 95 | 214 | 408,932 | 18.6% | 20.2% |
| 96 | 119 | 191 | 334,356 | 16.6% | 16.6% |
| 120 | 143 | 121 | 187,760 | 10.5% | 9.3% |
| 144 | 179 | 97 | 180,742 | 8.4% | 8.9% |
| 180 | 240 | 24 | 72,606 | 2.1% | 3.6% |
| **Total** | | **1,151** | **$ 2,020,973** | **100.0%** | **100.0%** |

We rely on the payment of policy benefit claims by life insurance companies as a significant source of cash inflow. The life insurance assets we own represent obligations of third-party life insurance companies to pay the benefit amount under the policy upon the mortality of the insured. As a result, we manage this credit risk exposure by generally purchasing policies issued by insurance companies with investment-grade ratings from Standard & Poor's, and diversifying our life insurance portfolio among a number of insurance companies.

The yield to maturity on bonds issued by life insurance carriers reflects, among other things, the credit risk (risk of default) of such insurance carrier. We follow the yields on certain publicly traded life insurance company bonds because this information is part of the data we consider when valuing our portfolio of life insurance policies for our financial statements.

The average yield to maturity of publicly traded life insurance company bonds data we consider as inputs to our life insurance portfolio valuation process was 2.67% as of December 31, 2019. We believe that this average yield to maturity reflects, in part, the financial market's judgment that credit risk is low with regard to these carriers' financial obligations. The obligations of life insurance carriers to pay life insurance policy benefits ranks senior to all of their other financial obligations, including the senior bonds they issue. The portfolio is backed by over 80 high quality insurance carriers. As of December 31, 2019, 95.7% of the face value benefits of our life insurance policies were issued by insurers having an investment-grade rating (BBB or better) by Standard & Poor's.

As of December 31, 2019, our ten largest life insurance company credit exposures and the Standard & Poor's credit rating of their respective financial strength and claims-paying ability is set forth below:

**Distribution of Policy Benefits by Top 10 Insurance Companies**

| Rank | Policy Benefits (in thousands) | Percentage of Policy Benefit Amount | Insurance Company | Ins. Co. S&P Rating |
|---|---|---|---|---|
| 1 | $ 287,492 | 14.2% | John Hancock Life Insurance Company | AA- |
| 2 | 233,338 | 11.5% | Lincoln National Life Insurance Company | AA- |
| 3 | 214,799 | 10.6% | AXA Equitable Life Insurance Company | A+ |
| 4 | 196,164 | 9.7% | Transamerica Life Insurance Company | AA- |
| 5 | 112,503 | 5.6% | Metropolitan Life Insurance Company | AA- |
| 6 | 98,068 | 4.8% | American General Life Insurance Company | A+ |
| 7 | 85,998 | 4.3% | Pacific Life Insurance Company | AA- |
| 8 | 69,976 | 3.5% | ReliaStar Life Insurance Company | A |
| 9 | 64,095 | 3.2% | Massachusetts Mutual Life Insurance Company | AA+ |
| 10 | 60,953 | 3.0% | Protective Life Insurance Company | AA- |
| | **$ 1,423,386** | **70.4%** | | |

Page 9

App. 0517

**Beneficient Loans Receivable**

Beneficient's primary operations pertain to its liquidity products whereby Ben LP, through its subsidiaries, extends loans collateralized by cash flows from illiquid alternative assets and provides services to the trustees who administer the collateral. Beneficient's core business products are its Exchange Trust, LiquidTrust and the InterChange Trust (introduced in 2020). Beneficient's clients select one of these products and place their alternative assets into the custody trust that is a constituent member of a trust structure called the "ExAlt Plan$^{TM}$" (comprised of Exchange Trusts, LiquidTrusts, Custody Trusts, Collective Trusts, and Funding Trusts). The ExAlt Plan$^{TM}$ then delivers to Beneficient's clients the consideration required by the specific product selected by Beneficient's clients. At the same time, Beneficient, through a subsidiary, extends a loan to the ExAlt Plan$^{TM}$. The proceeds (cash or securities of Ben LP or its affiliates) of that loan to the ExAlt Plan$^{TM}$ are ultimately paid to the client. The cash flows from the client's alternative asset support the repayment of the loans plus any related interest and fees.

Beneficient held loans receivable of $232.3 million at December 31, 2019, representing the fair value of loans as a result of the purchase accounting applied in conjunction with the Investment and Exchange Agreements described above. Loans are carried at the principal amount outstanding, plus interest paid in kind. Loans are demand loans with a maturity date of 12 years. Loans bear contractual interest at the greater of 14% or 1-month LIBOR plus 10%, compounded daily. In the event an alternative reference rate is required, the secured overnight financing rate (SOFR) would replace LIBOR, as contemplated in our loan agreements. The primary source of repayment for the loans and related fees is cash flows from the alternative assets collateralizing the loans. Interest income on loans is accrued on the principal amount outstanding and interest compounds on a daily basis.

As of December 31, 2019, Beneficient's loan portfolio had exposure to 117 professionally managed alternative investment funds, comprised of 362 underlying investments, and approximately 96 percent of Beneficient's loan portfolio was backed by investments in private companies. Beneficient's loan portfolio diversification spans across these industry sectors, investment strategy types and geographic regions:



Assets in the collateral portfolio consist primarily of interests in alternative investment vehicles (also referred to as "funds") that are managed by a group of U.S. and non-U.S. based alternative asset management firms that invest in a variety of financial markets and utilize a variety of investment strategies. The vintages of the funds in the collateral portfolio as of December 31, 2019 ranged from 1998 to 2011.

As Beneficient grows its loan portfolio, Beneficient will monitor the diversity of its collateral portfolio through the use of concentration guidelines. These guidelines were established, and will be periodically updated, through a data driven approach based on asset type, fund manager, vintage of fund, industry segment and geography to manage portfolio risk. Beneficient will refer to these guidelines when making decisions about new financing opportunities; however, these guidelines will not restrict Beneficient from entering into financing opportunities that would result in Beneficient having exposure outside of its concentration guidelines. In addition, changes to Beneficient's collateral portfolio may lag changes to the concentration guidelines. As such, Beneficient's collateral portfolio may, at any given time, have exposures that are outside of its concentration guidelines to reflect, among other things, attractive financing opportunities, limited availability of assets, or other business reasons. Given Beneficient's limited operating history, the collateral portfolio, as of December 31, 2019, had exposure to certain alternative investment vehicles and investments in private companies that were outside of those guidelines.

Classifications by industry sector, investment strategy type and geography reflect classification of investments held in funds or companies held directly in the collateral portfolio. Investments reflect the assets listed by the general partner of a fund as held by the fund and have a positive or negative net asset value. Typical assets include portfolio companies, limited partnership interests in other funds, and net other assets, which are a fund's cash and other current assets minus liabilities.

Industry sector is based on Global Industry Classification Standard (GICS®) Level 2 classification (also known as "Industry Group") of companies held in the collateral portfolio by funds or directly, subject to certain adjustments by us. "Other" classification is not a GICS® classification. "Other" classification reflects companies in the GICS® classification categories of Automobiles & Components, Banks, Commercial & Professional Services, Consumer Durables & Apparel, Consumer Services, Energy, Food, Beverage & Tobacco, Household & Personal Products, Insurance, Materials, Media & Entertainment, Real Estate, Retailing, Semiconductors & Semiconductors Equipment, Tech Hardware & Equipment, and Transportation. N/A includes investments assets that we have determined do not have an applicable GICS Level 2 classification, such as Net Other Assets and investments that are not operating companies.

Investment strategy type reflects classifications based on each fund's current investment strategy stage as determined by us. "Other Strategy Types" include private debt strategies, natural resources strategies, and hedge funds.

App. 0518

Geography reflects classifications determined by us based on each underlying investment. "Other" geography classification includes Israel, Australia, Eastern Europe.

Page 10

**Competitive and Regulatory Framework**

*Competition*

We encounter significant competition from numerous companies in the products and services we provide and seek to develop in the alternative assets industry. Many of these competitors have greater financial and other resources than we do and may have significantly lower cost of funds than us because they have access to insured deposits or greater access to the capital markets, for example. They may also have greater market share in the markets in which we operate. These factors could adversely affect our business, results of operations and financial condition and our ability to implement our growth strategies.

In addition, as we enter new markets, we expect to experience significant competition from incumbent market participants. Our ability to compete in these markets will be dependent upon our ability to deliver value-added products and services to the customers we serve. These factors also could adversely affect our business, results of operations and financial condition and our ability to implement our growth strategies.

*Government Regulation*

Our life insurance secondary market business is highly regulated at the state level with respect to the life insurance industry, and at the federal level with respect to the issuance of our securities offerings. At the state level, states generally subject us to laws and regulations requiring us to obtain specific licenses or approvals to purchase life insurance policies in those states. State statutes typically provide state regulatory agencies with significant powers to interpret, administer and enforce the laws relating to the life insurance industry. Under this authority, state regulators have broad discretionary power and may impose new licensing and other requirements, and interpret or enforce existing regulatory requirements in new and different ways. Any of these new requirements, interpretations or enforcement directives could be materially adverse to our industry.

Beneficient has applied for trust charters from the Texas Department of Banking and intends to carry on much of its business through two subsidiary trust companies. Because Beneficient's current business plans are based in part on obtaining regulatory charters to operate as regulated trust companies, a failure to obtain such charters may materially and adversely impact its financial performance and prospects, which would likely diminish our ability to affect parts of our business plan and growth strategies. Furthermore, a failure to obtain the trust charters may trigger an impairment assessment related to the assets of Beneficient, including goodwill recognized in connection with the Investment and Exchange Agreements (see Note 5 to our consolidated financial statements for further details of the accounting for the change in control).

The state regulatory landscape for the use of genetic and epigenetic testing in life insurance underwriting is such that genetic and epigenetic testing is generally permitted. A few states require informed consent for use of genetic testing in life insurance underwriting. Epigenetic testing is distinguishable from genetic testing and we believe epigenetic testing does not raise the ethical issue found with genetic testing of denying insurance coverage to applicants based on immutable inherited characteristics. While well-informed policymakers and regulators should have little reason to consider expanding current definitions of genetic testing to include epigenetic testing, or to increase restrictions on life insurance underwriting using epigenetic test results, we can provide no such assurances.

Other changes to the current genetic and epigenetic regulatory framework, including the imposition of additional or new regulations, could arise at any time during the development or marketing of InsurTech Holdings' epigenetic based products. This may negatively affect the ability of InsurTech Holdings to obtain or maintain applicable regulatory clearance or approval of its products. In addition, regulatory authorities, such as the Food and Drug Administration (FDA), may introduce new requirements that may change the regulatory requirements for InsurTech Holdings or its customers, or both.

Although the federal securities laws and regulations do not directly affect life insurance, in some cases the purchase of a variable life insurance policy may constitute a transaction involving a "security" that is governed by federal securities laws. While we presently hold few variable life insurance policies, our holding of a significant amount of such policies in the future could cause our Company or one of our subsidiaries to be characterized as an "investment company" under the federal Investment Company Act of 1940. The application of that law to all or part of our businesses — whether due to our purchase of life insurance policies or to the expansion of the definition of "securities" under federal securities laws — could require us to comply with detailed and complex regulatory requirements, and cause us to fall out of compliance with certain covenants under our second amended and restated senior credit facility with LNV Corporation. Such an outcome could negatively affect our business, results of operations and financial condition and our ability to implement our growth strategies.

We hold licenses to purchase life insurance policies in 38 states and can also purchase in seven unregulated states. We have also historically purchased life insurance policies from other secondary market participants.

*Health Insurance Portability and Accountability Act (HIPAA)*

HIPAA requires that holders of medical records maintain such records and implement procedures designed to assure the privacy of patient records. In order to carry out our business, we receive medical records and obtain a release to share such records with a defined group of persons, take on the responsibility for preserving the privacy of that information, and use the information only for purposes related to the life insurance policies we own.

Page 11

*The Genetic Information Nondiscrimination Act of 2008 (GINA)*

GINA is a federal law that protects people from genetic discrimination in health insurance and employment. GINA prohibits health insurers from: (i) requesting, requiring, or using genetic information to make decisions about eligibility for health insurance; or (ii) making decisions on the health insurance premium, contribution amounts, or coverage terms they offer to consumers. In addition, GINA makes it against the law for health insurers to consider family history or a genetic test result, a preexisting condition, require a genetic test, or use any genetic information, to discriminate coverage, even if the health insurance company did not mean to collect such genetic information.

GINA does not apply to the life insurance, long-term care or annuity industries. The life insurance, long-term care or annuity industries operate on medical-evidenced underwriting principles in which specific medical conditions are taken into account when assessing and pricing risk. The regulation of genomic data is relatively new, and we believe it is likely that regulation will increase and grow more complex in the foreseeable future. We cannot, however, predict what any new law or regulation would specifically involve or how it might affect our industry, our business, or our future plans.

**Patents, trademarks, licenses**

On March 19, 2018, Life Epigenetics filed provisional patents for the application of the use of epigenetic technology against the identification of tobacco and alcohol usage. Life Epigenetics continues to advance its intellectual property protection of these alcohol and tobacco focused technologies.

On December 17, 2018, Life Epigenetics secured the exclusive evaluation and option agreement for patent pending "Phenotypic Age and DNA Methylation Based Biomarkers for Life Expectancy and Morbidity" technology from The Regents of the University of California to commercialize advanced epigenetic technology for the life insurance industry.

Life Epigenetics has filed additional patents for a machine learning model trained to classify risk using DNA epigenetic data, a machine learned epigenetic status estimator, and a machine learning model trained to determine biochemical stat and/or medical conditions using DNA epigenetic data.

We believe epigenetics will be commercialized to improve upon many traditional factors used in the life insurance underwriting process with greater accuracy, speed and convenience. To that end, Life Epigenetics is engaged in several research and development efforts to further validate, refine and expand its epigenetic testing capabilities. In particular, Life Epigenetics conducted a research study comprised of approximately 1,300 participants in which biological samples, as well as medical records and prescription transaction history records, detailed health history, and DNA methylation analysis were conducted. Life Epigenetics measured the results of each participant's diagnostic indicators against insurance risk classes, disease states, biomarker levels, and prescription medication statuses. The results demonstrate that epigenetics can be used to effectively estimate tobacco use, cardiovascular disease, hypertension, kidney disease, diabetes, obesity, and alcohol and drug abuse.

Beneficient has registered trademarks for its LiquidTrust product described in the "Beneficient Loans Receivable" section above and its ACE portal described in the "Organizational Structure" section above. Beneficient also has trademarks pending registration on a number of its other liquidity products and trust services, also described in the "Beneficient Loans Receivable" section above, including, its ExAlt Plan$^{TM}$, Exchange Trust and Interchange Trust.

**Employees**

We employed approximately 130 employees as of the date of the filing of this Form 10-K.

**Properties**

Our principal executive offices are currently located at 325 North St. Paul Street, Dallas, Texas 75201. GWG and Beneficient collectively lease 33,652 square feet of space for a lease term expiring on July 31, 2021. GWG also retains the lease of its legacy executive offices located at 220 South Sixth Street, Suite 1200, Minneapolis, Minnesota 55402. At that location, GWG leases 17,687 square feet of space for a lease term expiring in 2025. We believe these facilities are adequate for our current needs and that suitable additional space will be available as needed.

**Company Website Access and SEC Filings**

Our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and amendments to reports filed pursuant to Sections 13(a) and 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), are filed with the SEC. We are subject to the informational requirements of the Exchange Act and file or furnish reports, proxy statements and other information with the SEC.

Our general website address is *www.gwgh.com*. Our website has additional information about our Company, its mission and our business. Our website also has tools that could be used by our clients and potential clients, financial advisors and investors. Beneficient's website address is *www.trustben.com* and has additional information about Beneficient, its mission and its business. We maintain the website *www.gwglife.com* for consumers and life insurance professionals seeking our life insurance secondary market products and services. InsurTech Holdings also maintains the websites *www.lifeegx.com* and *www.yousurance.com* for its initiatives of commercializing epigenetic testing and underwriting personalized life insurance policies based on this testing. The information contained on or accessible through the foregoing websites is not part of this Annual Report on Form 10-K.

**ITEM 1A. RISK FACTORS.**

Our business involves a number of challenges and risks. In addition to the other information in this report, you should consider carefully the following risk factors in evaluating us and our business. The risks described below are not the only ones that we face. Additional risks not presently known to us or that we currently deem immaterial may also affect our business, financial condition, operating results, or prospects.

**Risks Related to Our Secondary Life Insurance Business and Industry**

***Material changes in the secondary life insurance market, a relatively new and evolving market, may adversely affect our operating results, business prospects, the value of our common stock and our ability to repay our debt obligations.***

The success of our business and our ability to satisfy our debt obligations depends in part on the continued development of the secondary market for life insurance, including the accuracy of actuarial forecasting, the solvency of life insurance companies to pay the face value of the life insurance benefits and the demand for life insurance investments, all of which will critically impact our performance. The life insurance secondary market may be impacted by a variety of factors such as the interpretation of existing laws and regulations (including laws relating to insurable interests), the passage of new legislation and regulations, mortality improvement rates, updated actuarial methodologies, and mortality tables. Importantly, all of the factors that we believe could most significantly affect the life insurance secondary market are beyond our control. Any material and adverse change in the life insurance secondary market could adversely affect our operating results, our access to capital, the value of our common stock, our ability to repay our various debt and other obligations, and our business prospects and viability. Because of this, an investment in our securities involves greater risk as compared to investments offered by companies with more diversified business operations in more established or predictable markets.

***The valuation of our life insurance policy assets on our balance sheet requires us to make material assumptions that may ultimately prove to be incorrect. If our assumptions prove incorrect, we could suffer significant losses that materially and adversely affect our results of operations.***

One of our principal assets is a portfolio of life insurance policies purchased in the secondary market, comprising approximately 62% and 50% of our total assets, excluding goodwill, as of December 31, 2019 and 2018, respectively. Those assets are considered "Level 3" fair value measurements under Accounting Standards Codification 820, *Fair Value Measurements and Disclosures* ("ASC 820"), as there is currently no active market where we are able to observe quoted prices for identical assets. As a result, our determination of "fair value" for those assets on our balance sheet incorporates significant inputs that are not observable. Fair value is defined as an exit price representing the amount that would be received if assets were sold or that would be paid to transfer a liability in an orderly transaction between market participants at the measurement date. As such, fair value is a market-based measurement determined based on the assumptions market participants would use in pricing an asset or liability. A sale of the portfolio or a portion of the portfolio in an other than orderly transaction would likely occur at less than the fair value of the respective life insurance policies.

A Level 3 fair value measurement is inherently uncertain and could create additional volatility in our financial statements that is not necessarily related to the performance of our underlying assets. As of both December 31, 2019 and 2018, we estimated the fair value discount rate for our life insurance portfolio to be 8.25%. Life expectancy estimates are also a significant component within our fair value measurement. If in the future we determine that a higher discount rate is required to ascribe fair value to a similarly situated portfolio of life insurance policies or that life expectancy estimates materially differ from actuarial estimates and/or our projections, we could experience significant losses materially affecting our results of operations. In addition, significant losses of this nature would likely at some point cause our common stock to decline in value and cause us to be out of compliance with borrowing covenants contained in our various borrowing agreements. This could in turn result in acceleration of our second amended and restated senior credit facility with LNV Corporation, L Bonds and Seller Trust L Bonds, which we may not be able to repay. As a result, we may be forced to seek additional debt or equity financing to repay such debt amounts, and additional financing may not be available on terms acceptable to us, if at all.

If we are unable to repay our debt when it comes due, then our senior lender or the holders of our L Bonds and Seller Trust L Bonds, or both, would have the right to foreclose on our assets. For further disclosure relating to the risks associated with the valuation of our assets, see the risk factors below "*If actuarial assumptions we obtain from third-party providers . . . .*" and "*Inaccuracies in the life expectancy estimates we use for small face policies . . . .*"

***Actual results from our life insurance portfolio may not match our projected results, which could adversely affect our ability to service our existing portfolio and meet our debt obligations.***

Our business partially relies on achieving actual results that are materially in line with the results we expect to attain from our investments in life insurance policy assets. In this regard, we believe that the larger the portfolio of life insurance we own, the greater the likelihood that we will achieve our expected results. To our knowledge, rating agencies generally suggest that portfolios of life insurance policies contain enough policies on individual lives to achieve actuarial stability in receiving expected cash flows. For instance, in a life insurance securitization methodology published in 2016, A.M. Best Company concluded that at least 300 lives are necessary to achieve actuarial stability, while Standard & Poor's has indicated that stability is unlikely to be achieved with less than 1,000 lives. As of December 31, 2019, we owned $2.0 billion in face value of life insurance policies covering 1,073 unique lives.

However, even if our life insurance portfolio is actuarially stable, we still may experience differences between the projection models we use and actual mortalities, which generally has been the case over the past several years. Differences between our expectations and actual mortality results could have a materially adverse effect on our operating results and cash flow. In such a case, we may face liquidity problems, including difficulties servicing our remaining portfolio of policies and servicing our outstanding debt obligations. Continued or material failures to meet our expected results could decrease the attractiveness of our securities in the eyes of potential investors, thereby making it even more difficult to obtain capital needed to service and grow the portfolio — to the extent we allocate capital to life insurance policy purchases, and service our existing debt.

***Our investments in life insurance policies have inherent risks, including fraud and legal challenges to the validity of the policies, which we will be unable to eliminate and which may adversely affect our results of operations.***

When we purchase a life insurance policy, we face certain risks associated with insurance fraud and other legal challenges to the validity of the policy. For example, to the extent the insured is not aware of the existence of the policy, the insured does not exist, or the insurance company does not recognize the policy, the insurance company may cancel or rescind the policy thereby causing the loss of an investment in that policy. In addition, if an insured's medical records have been altered in such a way as to shorten a life expectancy as reported, this may cause us to overpay for the related policy. Finally, we may experience legal challenges from insurance companies claiming that the insured failed to have an insurable interest at the time the policy was originally purchased or that the policy owner made fraudulent disclosures to the insurer at the time the policy was purchased (e.g., disclosures pertaining to the health status of the insured or the existence or sources of premium financing), or challenges from the beneficiaries of an insurance policy claiming that the sale of the policy to us was invalid.

To mitigate these risks, our origination practices and underwriting procedures include a current verification of coverage from the insurance company, a complete due-diligence investigation of the insured and accompanying medical records, a review of the life insurance policy application, and a requirement that the policy has been in force for at least two years. We also conduct a legal review of any premium financing associated with the policy to determine if an insurable interest existed at the time of its issuance. Nevertheless, these steps will not eliminate the risk of fraud or legal challenges to the life insurance policies we purchase. Furthermore, changes in laws or regulations or the interpretation of existing laws or regulations, may prove our due-diligence and risk-mitigation efforts inadequate. If a significant face amount of policies were invalidated for reasons of fraud or any other reason, our results of operations would be materially adversely affected.

***Our ownership of life insurance policies issued by insurers that are unable to pay claims presented to them could have a materially adverse effect on our results of operation, our financial condition, or even our overall prospects.***

We currently rely on the payment of policy claims by insurers as our most significant source of revenue collection. In essence, the life insurance assets we own represent the obligations of insurers to pay the benefit amount under the relevant policy upon the mortality of the insured. As a result, in our business, we face the "credit risk" that a particular insurer will be financially unable to pay claims when and as they become due. Depending on how many policies we own that are issued by insurers having financial difficulties at the time a claim is presented for payment, this risk could be significant enough to have a materially adverse effect on our results of operation, our financial condition, or even our overall prospects.

Page 14

To mitigate this credit risk, we generally purchase policies issued only by insurers with an investment-grade credit rating from one or more of Standard & Poor's, Moody's, or A.M. Best Company. As of December 31, 2019, 95.7% of the face value benefits of our life insurance policies were issued by insurers having an investment-grade rating (BBB or better) by Standard & Poor's. We also review our exposure to credit risk associated with our portfolio of life insurance policies when estimating its fair value. In evaluating the policies' credit risk, we consider items such as insurance company solvency, credit risk indicators, and general economic conditions. Notwithstanding our efforts to mitigate credit risk exposure and to reflect this risk in our portfolio valuation, we cannot predict with any certainty whether a particular insurer will be in a financial position to satisfy amounts that it owes under life insurance policies it has issued when a claim for payment is presented.

***We have relied materially on information provided or obtained by third parties in the acquisition of life insurance policies. Any misinformation or negligence in the course of obtaining information could materially and adversely affect the value of the policies we own, our results of operation and the value of our securities.***

Our acquisition of each life insurance policy is negotiated based on variables and particular facts that are unique to the policy itself and the health of the insured. The facts we obtain about the policies and the insured at the time when the policy was applied for and obtained are based on the insured's factual representations to the insurance company, and the facts the insurance company separately obtains in the course of its own due-diligence examination, such as facts concerning the health of the insured and whether or not there is an insurable interest present when the policy was issued. Any misinformation or negligence in the course of obtaining information relating to a policy or insured could materially and adversely impact the value of the policies we own and could in turn adversely affect our results of operations and the value of our securities.

***Although we do not anticipate purchasing additional life insurance policies, our life insurance business continues to be subject to state regulation and changes in those laws and regulations, or changes in their interpretation, could negatively affect our results of operation and financial condition.***

When we purchase a life insurance policy, we are subject to state insurance regulations. Over the past number of years, we have seen a dramatic increase in the number of states that have adopted legislation and regulations from model laws promulgated by either the National Association of Insurance Commissioners ("NAIC") or by the National Conference of Insurance Legislators (NCOIL). These laws are essentially consumer protection statutes responding to abuses that arose early in the development of our industry, some of which may persist. Today, almost every state has adopted some version of either the NAIC or NCOIL model laws, which generally require the licensing of purchasers of and brokers for life insurance policies, the filing and approval of purchase agreements, and the disclosure of transaction fees. These laws also require various periodic reporting requirements and prohibit certain business practices deemed to be abusive. State statutes typically provide state regulatory agencies with significant powers to interpret, administer, and enforce the laws relating to the purchase of life insurance policies. Under statutory authority, state regulators have broad discretionary power and may impose new licensing requirements, interpret or enforce existing regulatory requirements in different ways, or issue new administrative rules, any of which could be generally adverse to the industry and potentially the value of our life insurance policy assets.

***If federal regulators or courts conclude that the purchase of life insurance in the secondary market constitutes, in all cases, a transaction in securities, we could be in violation of existing covenants under our second amended and restated senior credit facility with LNV Corporation, which could result in significantly diminished access to capital. We could also face increased operational expenses. The materialization of this risk could adversely affect our operating results and financial condition, our ability to repay our debt, and possibly threaten the viability of our business.***

On occasion, the SEC has attempted to regulate the purchase of non-variable universal life insurance policies as transactions in securities under federal securities laws. In July 2010, the SEC issued a Staff Report of its Life Settlement Task Force. In that report, the Staff recommended that certain types of purchased insurance policies be classified as securities. The SEC has not taken any position on the Staff Report, and there is no indication if the SEC will take any action to implement the recommendations of the Staff Report. In addition, there have been several federal court cases in which transactions involving the purchase and fractionalization of life insurance policies have been held to be transactions in securities under the federal Securities Act of 1933.

We believe that the matters discussed in the Staff Report and existing case law do not impact our current business model because our purchases of life insurance policies are distinguishable from those cases that have been held by courts, and advocated by the Staff Report, to be transactions in securities. For example, neither we nor any of our affiliates are involved in the fractionalization of life insurance policies, and we presently do not purchase significant amounts of variable life insurance policies. As a practical matter, if all or a majority of our life insurance policies were deemed to be "securities" under federal securities laws, either through an expansion of the definition of what constitutes a "security," the expansion of the types of transactions in life insurance policies that would constitute transactions in "securities," or the elimination or limitation of available exemptions and exceptions (whether by statutory change, regulatory change, or administrative or court interpretation), then we or one or more of our affiliated entities could become subject to the federal Investment Company Act of 1940. This outcome would likely have a material and negative effect on our Company by imposing additional regulations and rules to our governance structure, operations, and our capital structure. In particular, this outcome would likely cause us to be in violation of existing covenants under our second amended and restated senior credit facility with LNV Corporation requiring us not to operate or be characterized as an "investment company" under the Investment Company Act of 1940. This breach would likely adversely affect our liquidity and increase our cost of capital and operational expenses, all of which would adversely affect our operating results. Such an outcome could also threaten our ability to satisfy our obligations as they come due and the viability of our business.

*If actuarial assumptions we obtain from third-party providers and rely on to calculate our expected returns on our investments in life insurance policies change, our operating results and cash flow could be adversely affected, as well as the value of our collateral and our ability to service our debt obligations.*

When we acquire a life insurance policy, the expected internal rate of return we calculate is based upon the probability of an insured's mortality over an actuarial life expectancy estimate. We presently obtain these estimates from third-party medical-actuarial underwriting companies. In addition to actuarial life expectancies, we rely on a pricing and premium forecasting software model developed by a third-party actuarial firm for the valuation of policies we purchase, future mortality revenues, and the calculation of anticipated internal rates of return. These pricing models forecast the estimated future premiums due as well the future mortalities of insureds.

All actuarial life expectancies (and related forecasting software) are subject to interpretation and change based on evolving medical technology, actuarial data, and analytical techniques. Additionally, we are required under our second amended and restated senior credit facility with LNV Corporation to update life expectancy estimates for pledged life insurance policies with face amounts greater than $750,000 by December 18, 2020, and obtain updated life expectancy updates no less frequently than once every five years. Previously, we were required to update life expectancy estimates for pledged life insurance policies with face amounts greater than $750,000 every two years beginning from the closing date of the first amended and restated senior credit facility with LNV Corporation (or approximately the end of 2019). Our prior experience in updating life expectancies has generally resulted in longer life expectancies for most, but not all, of the insureds within our portfolio. Adverse impacts on the value of our life insurance policy portfolio or our cash flow could in turn impair the value of the collateral we have pledged to our creditors and our ability to service our debt and obligations as they come due.

*Inaccuracies in the life expectancy estimates we use for small face policies could have a material and adverse effect on our results of operation and financial condition.*

As of December 31, 2019, we owned 697 "small face" life insurance policies (i.e., those policies with $1 million in face value of benefits or less) having $395.8 million in aggregate face value of benefits.

The underwriting processes we use to evaluate, price and purchase small face policies are different from, and may not be as reliable as, the processes we use for life insurance policies with larger face values of benefits. In particular, the processes we use to develop or obtain life expectancy estimates and the related mortality curves for small face policies are less extensive than traditional methods. These processes include obtaining either a single fully underwritten or simplified report as opposed to two fully underwritten reports. A simplified third-party underwriting report is based on a self-reported medical interview and may be supplemented with additional information obtained from a pharmacy benefit manager database that is provided to one or more medical-actuarial underwriting firms to obtain a simplified life expectancy report. Although we obtain professional actuarial guidance regarding these processes, our simplified underwriting methodology may not be as reliable as the processes we use for policies with larger (i.e., greater than $1 million) face value of benefits.

Any shortcomings in the process we use to evaluate, price, purchase and value our small face policies, or significant inaccuracies in the life expectancy estimates relating to those policies, could have a material and adverse effect on our results of operations and financial condition. Any such outcomes could have a negative and possibly material effect on our ability to satisfy our debts.

<div align="center">Page 16</div>

***We rely on estimated rates of mortality when valuing life insurance policies and forecasting the performance of our life insurance portfolio, and we also rely on other estimates derived from statistical methodologies for projecting our future cash flows. If any of our estimates prove to be incorrect, it could materially and adversely affect our financial condition and ability to satisfy our debt service and repayment obligations.***

If we project we will receive cash inflows from policies sooner than we actually do, we may not be able to make payment on our debt obligations in a timely manner, or at all. Moreover, a significant medical discovery or advance that results in mortality improvements among seniors could have a material adverse effect on the value of our life insurance investments.

We use a modeling practice for projecting cash flows known as the "probabilistic method." This is an actuarial method that uses the probability of an insured's mortality over time (a mortality curve) to project the flow of policy benefits to us and to project premiums that must be paid by us. This method requires the input of life expectancy assumptions. These inputs are then used to estimate the discounted cash flows from the life insurance portfolio using the ClariNet LS probabilistic and stochastic portfolio pricing model from ClearLife Limited, which estimates the expected cash flows using various mortality probabilities and scenarios.

Prior to December 2018, the life expectancy inputs were based on the arithmetic average of two separate life expectancy reports ("Average Life Expectancy method"). Under that methodology, we experienced fewer cash flows from policy benefits than projected. The lower-than-projected policy benefits received corresponded with higher-than-projected premium payments. Using the Average Life Expectancy method, policy benefits actually received were approximately 58% of expected results as of December 31, 2018. This resulted in a delay in policy benefit inflows from those anticipated and premium outflows being higher than anticipated due to the slower than anticipated maturities occurring within the life insurance portfolio.

As a result of the challenges we experienced using the Average Life Expectancy method, we revised our methodology using information that was derived from back-testing (the process of applying an analytical method to historical data to see how accurately the method would have predicted actual results) the mortality cash flow performance of our life insurance portfolio using the longest life expectancy report received from the Life Expectancy Providers used for pricing at the time the life insurance policies were acquired (the "Longest Life Expectancy"). This contrasts with our historical methodology of projecting mortality cash flows, used prior to the fourth quarter of 2018, which, as described above, typically used the average of two such life expectancy reports. Given the methodology change, we anticipate the receipt of policy benefits and the payment of premiums to more closely track cash flow estimates in the future; however, this cannot be guaranteed.

Our enhanced Longest Life Expectancy valuation methodology uses the Longest Life Expectancy report result at the time of purchase combined with a multiplier factor applied for variance in our portfolio of actual to expected experience using the Longest Life Expectancy results. Our revised methodology uses a static portfolio multiplier we must recalculate anytime the six-month moving average of the difference between actual portfolio performance and projected performance of cumulative face value maturities deviates by more than one standard deviation from the mean and such deviation persists for three consecutive months and continues as of the current quarter-end month. As of December 31, 2019, the six-month moving average of the difference between actual portfolio performance and projected performance of cumulative face value of maturities was within one standard deviation from the mean. As such, our valuation methodology did not require an update to our portfolio mortality multiplier (PMM) during the current quarter.

We use the current future cash flow projection to generate our expected internal rate of return on the life insurance policy portfolio we own. Any change to these projections, pricing models, methodology, premium forecasting assumptions, cash flow projections, or mortality assumptions accompanied therewith that increase the projected cost-of-insurance premiums or decrease the probability of mortality could have a material and adverse impact on our cash flows and financial condition. Ultimately, this could adversely affect our ability to meet our debt service and repayment obligations and our viability.

*Cost-of-insurance (premium) increases could materially and adversely affect our profitability and financial condition.*

We are subject to the risk of increased cost-of-insurance ("COI") charges (i.e., premium charges) for the universal life insurance policies we own in our portfolio. As of December 31, 2019, approximately 33% of the policies in our life insurance portfolio have premium levels that are guaranteed under the terms of the policy to keep the policy's death benefit in force even in a situation where the policy's cash account has been wholly depleted. On the remaining approximately 67% of our policies, we pay "non-guaranteed COI charges" and are subject to the risk that the insurer could increase the COI charges for the policy. In all cases, the amount of increase is subject to any limits that may be set forth in the insurance policy. Because very few of the policies we own have significant cash account value balances, any COI increase will require us to use more cash to satisfy the minimum premium amount required to keep the related policy in force, and this could materially and adversely affect our profitability.

A COI increase can also be expected to impair the value of the affected policy because extra expense (i.e., additional premium amounts) will be required to keep the policy in force, and such extra expense will diminish the economic value, or return, of the policy realized upon the mortality of the insured. As a result, any widespread COI increases in policies we own would likely have a material and adverse effect on the value of our portfolio, which in turn would materially and adversely affect our profitability and financial condition.

*Our business and prospects may be adversely affected by changes, lack of growth, or increased competition in the life insurance secondary market.*

The growth of the secondary life insurance policy market may be negatively affected by a variety of factors beyond our control, including: negative publicity about the life insurance secondary market based on actual or perceived abuses; and the adoption of additional governmental regulation.

The relatively new and evolving nature of the market in which we operate makes the related risks difficult to identify and quantify. Nevertheless, contractions in the secondary market for life insurance policies, whether resulting from general economic conditions, regulatory or legal pressures, or otherwise (including regulatory pressures exerted on us or others involved in the secondary market for life insurance), could make participation in the market generally less desirable. This could in turn depress the prices at which life insurance policies on the secondary market are bought and sold and have a negative impact on the estimated value of the policies we own. If the value of the policies we own decreases, our results of operation and financial condition could suffer.

**Risks Relating to Our Company**

*We have a relatively limited history of operations, a history of net losses, and our future earnings, if any, and cash flows may be volatile, resulting in uncertainty about our ability to service and repay our debt when it comes due, redeem preferred stock when requested and uncertainty about our prospects generally.*

We are a company with a relatively limited operating history, which makes it difficult to accurately forecast our earnings and cash flows. We had net income attributable to common shareholders of $91.1 million in the year ended 2019. Net income attributable to common shareholders in 2019 includes a gain on the consolidation of Beneficient of $249.7 million. We incurred a net loss attributable to common shareholders of $136.1 million in the year ended December 31, 2018. Our lack of a significant history and the evolving nature of the market in which we operate make it likely that there are risks inherent to our business that are yet to be recognized by us or others, or not fully appreciated, and that could result in us suffering further losses. As a result of the foregoing, an investment in our securities necessarily involves uncertainty about the stability of our operating results, cash flows and, ultimately, our ability to service and repay our debt and our prospects generally. In addition, any volatility in our operating results we experience may adversely affect the market price of our common stock.

*Our indebtedness could adversely affect our financial condition and may otherwise adversely impact our business operations. We and our subsidiaries may incur additional indebtedness, including secured indebtedness.*

As of December 31, 2019, we had $1.6 billion of debt including our second amended and restated senior credit facility with LNV Corporation, our L Bonds and Seller Trust L Bonds, and Beneficient's other borrowings, which are due in June 2020. Our indebtedness could have significant effects on our business and the holders of our debt. For example, it could:

- require us to use a substantial portion of our cash flow from operations to service our indebtedness, which would reduce the available cash flow to fund acquisitions of alternative investments, working capital and other general corporate purposes;

Page 18

- require payments of principal and interest that may be greater than our cash flow from operations;

- force us to dispose of life insurance policies or other investments, possibly on disadvantageous terms, to make payments on our debt;

- increase our vulnerability to general adverse economic and industry conditions;

- limit our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate;

- restrict us from exploiting other business opportunities;

- make it more difficult for us to satisfy our obligations; and

- place us at a competitive disadvantage compared to our competitors that have less debt.

In addition, as of December 31, 2019, we had approximately $184.6 million of borrowings outstanding under our second amended and restated credit facility with LNV Corporation, which bore interest at variable rates. If interest rates increase significantly, our ability to borrow additional funds may be reduced and the risk related to our indebtedness would intensify.

In addition, most of our current debt is, and we anticipate that much of our future debt will be, non-amortizing and payable in balloon payments. Therefore, we will likely need to refinance at least a portion of that debt as it matures. There is a risk that we may not be able to refinance debt maturing in future years or that the terms of any refinancing will not be as favorable as the terms of the then-existing debt. If principal payments due at maturity cannot be refinanced, extended or repaid with proceeds from other sources, such as new equity capital or sales of facilities, our cash flow may not be sufficient to repay all maturing debt in years when significant balloon payments come due. Additionally, we may incur significant penalties if we choose to prepay the debt.

***We critically rely on debt financing for our business. Any inability to borrow could adversely affect our business operations, our ability to satisfy our debt-payment obligations and, ultimately, our prospects and viability.***

To date, we have chosen to finance our business principally through the issuance of debt, including debt incurred by our subsidiary GWG DLP Funding IV, LLC ("DLP IV") under our second amended and restated senior credit facility with LNV Corporation (see Note 11 to our consolidated financial statements), our L Bonds and Seller Trust L Bonds. Our second amended and restated senior credit facility with LNV Corporation is secured by all of the assets of DLP IV, has a maximum amount of $300.0 million, and the outstanding balance at December 31, 2019 was $184.6 million.

Obligations under the second amended and restated senior credit facility with LNV Corporation have a maturity date of September 27, 2029. Our L Bonds and Seller Trust L Bonds have scheduled maturities as set forth below in the risk factor "*If a significant number of holders . . . .*" Our debt facilities and offerings are the most important sources of financing on which our business continues to critically rely to grow and maintain our exposure to alternative assets — which include our portfolio of life insurance policies and our investments in Beneficient — as well as service existing debt.

Our business model is based on the acquisition of alternative assets financed primarily through debt financing. These alternative assets are typically long-term and may not produce cash flow for an extended period of time. For example, we do not receive cash in respect of acquired life insurance policies until the insured individual dies. The resulting asset/liability mismatch can result in a liquidity shortage if we are unable to renew maturing short-term debt or secure suitable additional financing. In such a situation, we could be forced to sell assets at less than optimal (distressed) prices. We thus rely on continued access to financing to enable us to grow our exposure to alternative assets and to pay the attendant premiums and costs of maintaining the life insurance portfolio, all while satisfying our current interest and principal repayment obligations under our second amended and restated senior credit facility with LNV Corporation, L Bonds and Seller Trust L Bonds and our dividend obligations on our preferred stock. Proceeds from life insurance policies that have been pledged under our second amended and restated senior credit facility with LNV Corporation will first be applied to the repayment of our obligations under the credit facility according to a waterfall amortization formula that is largely controlled by LNV Corporation. Therefore, we may not receive all of the proceeds from matured life insurance policies. Accordingly, until we achieve sufficient cash flows derived from our portfolio of life insurance policies, we expect to rely on advances from our second amended and restated senior credit facility with LNV Corporation and proceeds from our L Bond offering to satisfy our ongoing financing and liquidity needs. Likewise, until interest and dividends from our investments in Beneficient reach a significant size to service our various debt obligations, we expect to rely on advances from our second amended and restated senior credit facility with LNV Corporation and proceeds from our L Bond offering for these amounts.

Page 19

Continued access to financing and liquidity under the second amended and restated senior credit facility with LNV Corporation (other than premium payments on existing policies pledged thereto), the offering of our L Bonds, or otherwise is not guaranteed. Due to our failure to deliver GWG Life audited financial statements for 2018 to LNV Corporation within 90 days after the end of the year and the failure to deliver GWG Life unaudited financial statements within 45 days after March 31, 2019, we were in violation of our debt covenants under our amended and restated senior credit facility with LNV Corporation. CLMG Corp., as administrative agent for LNV Corporation, issued a forbearance extending the delivery of these reports to July 22, 2019. Although the covenant violations were cured during the forbearance period, until we regained compliance with our debt covenants, we were prohibited from receiving advances under the amended and restated senior credit facility, and we were not entitled to any excess amounts received from policies pledged under the amended and restated senior credit facility. See "An inability to obtain accurate and timely financial information from Beneficient may prevent us from complying with reporting obligations under federal securities law …." In addition, general economic conditions could limit our access to financing, as could regulatory or legal pressures exerted on us, our financiers, or those involved in the procurement of financing such as brokers, dealers, and registered investment advisors. If we are unable to borrow under the second amended and restated senior credit facility with LNV Corporation or otherwise for any reason, or to renew or replace the second amended and restated senior credit facility with LNV Corporation when it comes due, or if we are forced to discontinue our L Bond offering for any significant length of time and for any reason, our business would be adversely impacted and our ability to service and repay our debt obligations would be compromised, thereby negatively affecting our business prospects, the value of our common stock and perhaps our viability.

As of March 24, 2020, we had remaining capacity of approximately $120 million under our current registered L Bond offering. We are in the process of preparing and filing a registration statement to offer additional L Bonds. If, for any reason, there is a delay in the filing or the effective date of this additional offering, our financial condition and ability to continue operations may be negatively affected.

***We may not be able to raise the capital that we are seeking from our securities offerings and may be unable to meet our overall business objective of growing and diversifying our alternative asset exposure.***

The offer and sale of our L Bonds is a principal means by which we intend to raise funds needed to meet our business and financial goals. However, if we are unable to continue to do so for any reason, we may be unable to meet our goals. If actual cash flows from our portfolio of life insurance policies do not occur as we have forecasted, which has thus far been the case, we could be forced to sell our investments in life insurance policies in order to service or satisfy our debt-related obligations. Likewise, if our investments in Beneficient do not perform as we have projected, we could be forced to sell such investments in order to service or satisfy such debt-related obligations. Presently, none of our material investments (life insurance policies and investments in Beneficient) are supported by liquid secondary markets and our investments in Beneficient contain transfer restrictions. If we are forced to sell any material amount of these investments, we may be unable to sell them at prices we believe are optimal or at or above the carrying value of such investments, particularly if our sale of assets occurs at a time when we are (or are perceived to be) in distress. In any such event, our business and the value of our securities would likely be materially and adversely impacted.

***We depend upon cash distributions from our subsidiaries, and contractual restrictions on distributions to us or adverse events at one of our operating subsidiaries could materially and adversely affect our ability to pay our debts, redeem preferred stock when requested and continue operating our business.***

GWG Holdings, Inc. is a holding company. As a holding company, we conduct our operations through operating subsidiaries, and as such our most significant assets are cash and our ownership interests in our subsidiaries, controlled affiliates and equity investees. Accordingly, our ability to meet our obligations, including our debt-related and dividend-payment obligations, materially depends upon the ability of our subsidiaries to distribute cash to us. In this regard, the ability of our subsidiaries to distribute cash to us is, and will continue to be, restricted by certain negative covenants in the agreement governing our second amended and restated senior credit facility with LNV Corporation. If any of these limitations were to materially impede the flow of cash to us, our ability to service and repay our debt, including obligations under the L Bonds and Seller Trust L Bonds, and make cash dividend payments to holders of our preferred stock would be materially and adversely affected. In addition, any adverse corporate event at the subsidiary level, such as a declaration of bankruptcy, liquidation or reorganization or an event of default under our second amended and restated senior credit facility with LNV Corporation, could adversely affect the ability of our subsidiaries to distribute cash to us, and thereby materially and adversely affect our ability to service and repay our debt and make cash dividend payments, and negatively impact our ability to continue operations.

***The collateral granted as security for our obligations under the L Bonds and Seller Trust L Bonds may be insufficient to repay the indebtedness upon an event of default.***

GWG Holdings (the issuer of the L Bonds and Seller Trust L Bonds) and GWG Life (the guarantor of obligations under the L Bonds and Seller Trust L Bonds, and a wholly owned subsidiary of GWG Holdings) have each granted a security interest in substantially all of their respective assets to serve as collateral security for obligations under the L Bonds and Seller Trust L Bonds. Importantly, DLP IV, a wholly owned subsidiary of GWG Life, owns a substantial number of our life insurance policies, 77.3% of the face value of our life insurance portfolio as of December 31, 2019, and is the borrower under our second amended and restated senior credit facility with LNV Corporation. As the borrower under that second amended and restated senior credit facility with LNV Corporation, all of its assets — including all of its life insurance policy assets — serve as collateral for our obligations under the facility.

Because of the fact that a substantial number of our life insurance assets are held in our DLP IV subsidiary, and all of those life insurance assets serve as collateral security for our obligations under our second amended and restated senior credit facility with LNV Corporation, holders of L Bonds and Seller Trust L Bonds risk the possibility that the collateral security to secure our obligations under the L Bonds and Seller Trust L Bonds may be insufficient to repay holders upon an event of default. Furthermore, while the indenture governing the L Bonds and the Seller Trust L Bonds limits the amount of debt relative to a measure of asset coverage we and our subsidiaries can incur, the indenture permits us and our subsidiaries to incur additional secured debt (subject to the debt coverage ratio) that may be senior to the L Bonds and Seller Trust L Bonds.

Furthermore, the assets that secure our obligations under the L Bonds and Seller Trust L Bonds are illiquid assets. As a result, the book value of those assets as reflected in our financial statements are based on numerous assumptions and may not necessarily reflect the current market price for those assets, especially in the event of a bulk or distressed sale. Furthermore, a substantial majority of the net assets of Beneficient are currently represented by goodwill as of December 31, 2019. Some or a substantial portion of the proceeds from L Bond sales may be used to make investments in Beneficient. Because these advances may be used by Beneficient for working capital purposes and to repay indebtedness, such investments may not increase the tangible assets securing the L Bonds. If the trustee for the L Bonds were forced to sell all or a portion of the collateral securing them, there can be no assurance that the trustee would be able to sell them for the prices at which we have recorded them, and the trustee might be forced to sell them at significantly lower prices.

***If a significant number of holders of our L Bonds and Seller Trust L Bonds demand repayment of those instruments upon maturity instead of renewing them, and at such time we do not have sufficient capital on hand to fund those repayments (and do not otherwise have access to sufficient capital), we may be forced to liquidate some of our life insurance policies, investments in Beneficient or other assets, which could have a material and adverse impact on our results of operation and financial condition.***

As of December 31, 2019, we had approximately $948.1 million in principal amount of L Bonds outstanding (excluding Seller Trust L Bonds). Since we first issued our L Bonds, we have experienced $646.3 million in maturities, of which $341.3 million has renewed for an additional term, as of December 31, 2019. This has provided us with a cumulative historical renewal rate of approximately 52.8% for investments in our L Bonds. Future contractual maturities of L Bonds (excluding Seller Trust L Bonds) as of December 31, 2019 are as follows:

| Years Ending December 31, | L Bonds (in thousands) |
|---|---|
| 2020 | $ 152,118 |
| 2021 | 201,419 |
| 2022 | 163,741 |
| 2023 | 76,969 |
| 2024 | 118,848 |
| 2025 | 85,151 |
| Thereafter | 149,882 |
| | $ 948,128 |

Page 21

As of December 31, 2019, we had approximately $366.9 million in principal amount of Seller Trust L Bonds outstanding. The Seller Trust L Bonds have a contractual maturity in August 2023; however, the holders have the ability to exercise a put to require redemption beginning in 2021. Under the Supplemental Indenture for the Seller Trust L Bonds due 2023, in the event of a redemption request, including maturity, by the holders of the Seller Trust L Bonds, GWG in its sole discretion has the ability to satisfy the principal in the form of cash, a pro rata portion of (i) the outstanding principal amount and accrued and unpaid interest under the Commercial Loan Agreement and (ii) Ben LP common units, or a combination of cash and such property.

If investors holding existing indebtedness that matures do not elect to renew their investments and we do not at such time have or have access to sufficient capital to repay the indebtedness, then we may need to liquidate some of our life insurance policies or other assets earlier than anticipated. In such an event, we may be unable to sell those policies or other assets at prices we believe are fair or otherwise appropriate and such sales could have a material and adverse impact on our results of operations and financial condition. See also "*We may not be able to raise the capital that we are seeking . . . .*"

***Subordination provisions contained in the indenture will restrict the ability of the trustee or the L Bond or Seller Trust L Bond holders to enforce their rights against us under the indenture, including the right to payment on the L Bonds, if a default then exists under a senior credit facility.***

The L Bonds and Seller Trust L Bonds will be subordinate in right of payment to any claims of our senior lender under the second amended and restated senior credit facility with LNV Corporation. In this regard, subordination provisions limiting the right of L Bond and Seller Trust L Bond holders to enforce their rights are contained in the indenture. These provisions include:

- a prohibition on challenging any enforcement action taken by a senior lender, or interfering with any legal action or suits undertaken by a senior lender, against us and our affiliates;

- a 180-day standstill period during which there may not be brought any action against us or our affiliates to enforce rights respecting collateral unless our second amended and restated senior credit facility with LNV Corporation has been repaid in full, which period may be extended if the senior lender takes action during such standstill period; and

- a prohibition on filing a bankruptcy or insolvency case against us or our affiliates for at least one year plus one day after any senior lender has been paid in full.

In the event of a default on a senior credit facility, the indenture prohibits us from making any payment, direct or indirect (whether for interest, principal, as a result of any redemption or repayment at maturity, on default, or otherwise), on the L Bonds, Seller Trust L Bonds and any other indebtedness unless and until: (i) the default respecting the senior credit facility has been cured or waived or has ceased to exist; or (ii) in the case of a non-payment default that permits a senior lender to declare as due and payable all amounts owing under a senior credit facility (but where that senior lender has not yet so declared amounts as being due and payable), the end of the period commencing on the date the trustee receives written notice of default from the senior lender and ending on the earliest of (1) our discharge of the default (or other cure), (2) the trustee's receipt of a valid waiver of default from the senior lender, or (3) a written notice from the senior lender terminating the payment prohibition.

During any payment prohibition period, neither the holders of the L Bonds, the Seller Trust L Bonds, nor the trustee will have the right, directly or indirectly, to sue to enforce the indenture or the L Bonds or Seller Trust L Bonds. Other provisions of the indenture do permit the trustee to take action to enforce the payment rights of L Bond and Seller Trust L Bond holders after 179 days have passed since the trustee's receipt of notice of default from a senior lender, but in such case any funds paid as a result of any such suit or enforcement action shall be applied toward the senior credit facility until the facility is indefeasibly paid in full before being applied to the L Bonds and Seller Trust L Bonds.

These subordination provisions present the risk that, upon any default by us on obligations owed to our senior lender, the holders of the L Bonds and Seller Trust L Bonds will be unable to enforce their rights to payment.

If the 180-day standstill period noted above, or any other limitation on the rights of the trustee or L Bond and Seller Trust L Bond holders to assert their rights to payment of principal or interest under the indenture, is ultimately determined to conflict with provisions of the Trust Indenture Act of 1939 (most notably sections 316(b) and 317(a) of that Act), then the trustee, as well as any holder who shall not have earlier consented to such subordination provisions, will (notwithstanding such provision contained in the indenture) be authorized to institute a lawsuit for the enforcement of any payment of principal or interest after their respective due dates.

***A failure to maintain compliance with the covenants under our second amended and restated senior credit facility with LNV Corporation and the indenture governing the L Bonds and Seller Trust L Bonds may have a material adverse effect on our ability to continue our business operations.***

We are subject to various covenants under our second amended and restated senior credit facility with LNV Corporation, including requirements to timely deliver financial statements to LNV Corporation (our senior lender). Due to our failure to deliver GWG Life audited financial statements for 2018 to LNV Corporation within 90 days after the end of 2018 and the failure to deliver GWG Life unaudited financial statements within 45 days after March 31, 2019, we were in violation of our debt covenants during 2019. Although we regained compliance with our debt covenants in July 2019, if we fail to remain in compliance with our debt covenants, we may not be permitted to request, nor will we be entitled to receive, advances under the second amended and restated senior credit facility with LNV Corporation, and we will not be entitled to any excess amounts received from policies pledged under the second amended and restated senior credit facility with LNV Corporation. A failure to deliver required financial statements to LNV Corporation in the future may result in termination of the credit facility absent an extension of such period. We may be unable to repay outstanding amounts under this credit facility unless we are able to replace it with another facility or otherwise obtain capital from other sources, in which case LNV Corporation could elect to foreclose on the life insurance assets held in our DLP IV subsidiary that serve as collateral security.

Under the indenture governing the L Bonds and Seller Trust L Bonds, as amended, we are subject to various financial and non-financial covenants, including a maximum debt coverage ratio. As of December 31, 2019, we were in compliance with all of our covenants; however, there can be no assurance that we will be able to comply with all of our financial and non-financial covenants in the future. A failure to comply with these covenants could cause us to be in default of the indenture governing the L Bonds and Seller Trust L Bonds and the indenture trustee, acting on behalf of the holders of our L Bonds and Seller Trust L Bonds, would be within its rights to accelerate the maturity dates of any amounts owed on our L Bonds and Seller Trust L Bonds. If we were unable to repay outstanding amounts, either using current cash reserves or another source of capital, the indenture trustee would have the right, subject to the subordination provisions in the indenture, to foreclose on our assets and the assets of GWG Life (including GWG Life's equity in DLP IV), which serve as collateral for our L Bonds and Seller Trust L Bonds. If we are required to seek other sources of financing in order to satisfy our obligations under our second amended and restated senior credit facility with LNV Corporation, our L Bonds or Seller Trust L Bonds, such other sources of capital may be unavailable to us on terms acceptable to us or at all. As a result, failure to comply with the covenants under our debt arrangements would have a material and adverse impact on our ability to continue our business operations.

***The debt coverage ratio, designed to provide some assurance to the holders of the L Bonds and Seller Trust L Bonds that the value of our total assets exceeds our total interest-bearing obligations, values our life insurance policy assets, which represent 62% of our total assets (excluding goodwill) as of December 31, 2019, in a manner that may not be representative of the amount we would actually receive upon a sale of those assets.***

Under the indenture governing the L Bonds and Seller Trust L Bonds, as amended, the maximum amount of L Bonds and Seller Trust L Bonds we may issue at any time is limited to an amount such that our debt coverage ratio does not exceed 90%. This limitation is designed to provide some basis to ensure that the net present value of policy benefits from our life insurance assets, plus the carrying value of our other assets (including our investments in Beneficient), will be sufficient to meet our obligations to our L Bond and Seller Trust L Bond holders. Expressed as a percentage, the debt coverage ratio was previously defined as the ratio of (i) the total amounts outstanding on interest-bearing debt over (ii) the net present asset value of all life insurance assets we own, plus any cash and cash equivalents held in our accounts, policy benefit receivables and, without duplication, the value of all other assets of the Company, primarily our investments in Beneficient, as reflected on our most recently available balance sheet prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP"). For this purpose, the net present asset value of our life insurance assets is calculated as the present value of the life insurance portfolio's expected future cash flows discounted at the weighted-average interest rate of the interest-bearing indebtedness for the previous month.

Page 23

However, effective December 31, 2019, we entered into an amendment to the indenture to define the debt coverage ratio as the ratio, expressed as percentage, of (A) the aggregate sum of all indebtedness (other than Excluded Indebtedness as described below) of GWG Holdings and its direct and indirect subsidiaries (including the securities issued under the indenture, but excluding any indebtedness of Ben LP and its direct and indirect subsidiaries) as reflected on GWG Holdings' most recent consolidated balance sheet prepared in accordance with GAAP over (B) the sum of (i) net present asset value of life insurance policies owned by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding life insurance policies held by Ben LP and its direct and indirect subsidiaries and controlled affiliates, plus (ii) all cash (and cash equivalents) held by GWG Holdings and its direct or indirect Subsidiaries or subsidiaries or affiliates, but excluding the cash (and cash equivalents) held by Ben LP and its direct and indirect subsidiaries, plus (iii) the original cost basis in GWG Holdings' investment in common units or other securities of Ben LP, plus (iv) the outstanding principal amount of any outstanding loans made under a commercial loan agreement with GWG Life, as lender, plus (v) the cost basis of assets contributed to GWG Holdings or any direct or indirect subsidiary of GWG Holdings in connection with a Repurchase Transaction, plus (vi) without duplication, the value of all other assets of GWG Holdings and its direct and indirect subsidiaries or affiliates (but excluding the value of assets of Ben LP and its direct and indirect subsidiaries) as reflected on its most recent consolidated balance sheet prepared in accordance with GAAP. For this purpose, "Excluded Indebtedness" is indebtedness that is payable at GWG Holdings' option in capital stock of GWG Holdings or securities mandatorily convertible into or exchangeable for such capital stock of the Company, or any indebtedness that is reasonably expected to be converted or exchanged, directly or indirectly, into such capital stock, provided that under the terms of such indebtedness in the event any such conversion or exchange does not occur in accordance with the terms of such transaction, such indebtedness would be cancelled and any assets received in exchange for such indebtedness would be returned.

Although the debt coverage ratio is designed to provide some basis to ensure that our assets will be sufficient to meet our obligations to the holders of L Bonds and Seller Trust L Bonds, the "net present value" of our life insurance assets used in the debt coverage ratio is not the same as the GAAP "fair value" of those assets on our balance sheet. Accordingly, the debt coverage ratio is not informative of the amount we and holders of L Bonds and Seller Trust L Bonds would actually receive if we were forced to sell or liquidate our life insurance related assets. Furthermore, any sale or liquidation of all or a significant portion of our life insurance policies or investments in Beneficient would include significant transactional costs. As a result, our mere compliance with the debt coverage ratio in the indenture will not guarantee that the value of our life insurance assets plus the value of our investments in Beneficient, if sold or liquidated, would in all cases exceed the amount of our obligations to the holders of L Bonds and Seller Trust L Bonds.

***We may not realize a return on our investment in InsurTech Holdings, LLC.***

Under the Operating Agreement of InsurTech Holdings, LLC, we are obligated to invest $20.0 million in InsurTech Holdings over a two year period ending in November 2021, of which $2.1 million was funded in the fourth quarter of 2019. After this two-year period, we will be entitled to receive 100% of operating and capital distributions up to the amount of our cash contributions, and, thereafter 80% of cash flows from operations and capital proceeds. The success of InsurTech Holdings is dependent, in part, on new and unproven technology as part of its life insurance policy underwriting process. If the mortality predictions InsurTech Holdings obtains through use of this technology proves inaccurate, InsurTech Holdings may not generate sufficient cash flows to satisfy the terms of the distributions as provided in the Operating Agreement. Furthermore, any failure by InsurTech Holdings to protect its intellectual property rights could impair its ability to protect its proprietary technology and the value of our investment. As such, we may not realize the return contemplated in the Operating Agreement, and our results of operations and financial condition could be materially and adversely affected.

***The loss of the services of our key employees, or the failure to attract additional key individuals, would materially adversely affect our business operations and prospects.***

Our success and viability are dependent to a significant extent upon our ability to attract and retain qualified personnel in all areas of our business, especially our sales, policy acquisition and financial management teams. If we were to lose the members of these service teams, we would need to replace them with qualified individuals in a timely manner or our business operations and prospects could be adversely impacted.

***We have the discretion to purchase assets through different subsidiaries, and to transfer assets among our subsidiaries. Any decision to purchase or hold title to assets in one subsidiary, as opposed to a different subsidiary, may affect the value of collateral security for our debts.***

We may at our discretion direct the purchase of life insurance policies, investments in Beneficient and other assets by, and the sale of life insurance policies and other assets amongst, different subsidiaries of GWG Holdings. Purchases of assets in, or movements of assets amongst, different subsidiaries could affect the value of the collateral security for obligations under the L Bonds and Seller Trust L Bonds. For example, purchases through, or transfers of life insurance policies to, DLP IV would cause the policies acquired or transferred to become collateral for our second amended and restated senior credit facility with LNV Corporation, whereas purchases through, or transfers of life insurance policies to, GWG Life would cause the policies acquired by GWG Life to become collateral for the L Bonds and Seller Trust L Bonds. Similarly, the pledge of life insurance policies owned by GWG Life Trust, or the transfer of such policies to a subsidiary of GWG Life Trust, with a subsequent pledge of such policies could cause those policies to become collateral for a new loan facility. Accordingly, purchases of assets through, or transfers of assets to, different subsidiaries may affect the value of collateral security for different classes of holders of our debt.

***Being a public company is expensive and could adversely affect our ability to attract and retain qualified officers and directors.***

We have been a public reporting company since January 31, 2012. As such, we are subject to the reporting requirements of the Securities Exchange Act of 1934. These requirements generate significant accounting, legal, and financial compliance costs, and make some activities more difficult, time consuming or costly than they would otherwise be, and may place significant strain on our personnel and resources. These rules and regulations applicable to public companies, and the risks involved in serving as an officer or director of a public company, may also make it more difficult and expensive for us to obtain director and officer liability insurance, and to recruit and retain qualified officers and directors.

*Changes in general economic conditions could adversely impact our business.*

Changes in general economic conditions, including, for example, interest rates, short term funding markets, investor sentiment, changes specifically affecting competition, technological developments, political and diplomatic events, tax laws, and other factors not known to us today, can substantially and adversely affect our business and prospects. For example, an increase in interest rates would increase our cost of capital and may limit our ability to raise capital and have a corresponding adverse impact on our operating results. While we may engage in certain hedging activities in the future to mitigate the impact of rising interest rates, none of these risks are or will be within our control.

*Business disruptions and interruptions and adverse economic conditions due to natural disasters and other external events beyond our control can adversely affect our business, financial condition and results of operations.*

Our operations can be subject to natural disasters and other external events beyond our control, such as the effects of earthquakes, fires, floods, severe weather, public health issues such as the recent outbreak of the coronavirus or other pandemic diseases, power failures, telecommunication loss, major accidents, terrorist attacks, acts of war, and other natural and man-made events, some of which may be intensified by the effects of a government response to the event or climate change and changing weather patterns. For example, our corporate headquarters and critical business offices are located in north Texas, which is geographically located in "tornado alley", an area known for high instances of tornadoes, and which recently experienced catastrophic tornadic activity and blackouts. A tornado or other disaster could cause severe destruction, disruption or interruption to our operations or property and significantly impact our employees.

More recently, the COVID-19 coronavirus outbreak has impacted several countries around the world, including the United States. There have been numerous reports of the virus outbreak disrupting or restricting supply chains, facility closures, voluntary and mandatory quarantines, and federal, state and local governments requiring business to temporarily close or severely curtail commercial activity. It is also possible that the spread of the coronavirus may have direct effects on our operations, such as high levels of employee sickness and absences, limiting employee travel or increasing telecommuting arrangements. In addition, recent developments and reports indicate the coronavirus has coincided with heightened volatility in financial markets in the U.S. and worldwide. If the coronavirus adversely affects our business operations or leads to a significant or prolonged impact on global markets or economic growth, our financial conditions and results of operations could be adversely affected. We and other financial institutions generally must resume operations promptly following any interruption. If we were to suffer a disruption or interruption and were not able to resume normal operations within a period consistent with industry standards, our business, financial condition or results of operations could be adversely affected in a material manner. In addition, depending on the nature and duration of the disruption or interruption, we might become vulnerable to fraud, additional expense or other losses, or to a loss of business and clients.

Although we have implemented a business continuity management program that we continue to enhance on an ongoing basis, there can be no assurance that the program will adequately mitigate the risks of such business disruptions and interruptions. Additionally, natural disasters and external events, including those occurring in and around Texas, could affect the business and operations of our clients, which could impair their ability to satisfy obligations to us, impair the value of underlying collateral or otherwise adversely affect their business dealings with us, any of which could have a material adverse effect on our business, financial condition or results of operations.

*The interest rates under our credit agreement and other agreements may be impacted by the phase-out of the London Interbank Offered Rate ("LIBOR").*

LIBOR is the basic rate of interest used in lending between banks on the London interbank market and is widely used as a reference for setting the interest rates on loans globally. LIBOR is used as a reference rate to calculate interest under certain of our borrowings and receivables. In 2017, the United Kingdom's Financial Conduct Authority, which regulates LIBOR, announced that it intends to phase out LIBOR by the end of 2021. The U.S. Federal Reserve, in conjunction with the Alternative Reference Rates Committee, a steering committee comprised of large U.S. financial institutions, identified the Secured Overnight Financing Rate ("SOFR") as the preferred alternative reference rate to U.S. dollar LIBOR and recommended a paced transition plan that involves the creation of a reference rate based on SOFR by the end of 2021. SOFR is a more generic measure than LIBOR and considers the cost of borrowing cash overnight, collateralized by U.S. Treasury securities. Given the inherent differences between LIBOR and SOFR or any other alternative benchmark rate that may be established, there are many uncertainties regarding a transition from LIBOR. Certain of our borrowing and receivable agreements contain fallback provisions providing for alternative rate calculations in the event LIBOR is unavailable, prior to any LIBOR rate transition. As a result, our level of interest payments we incur or receive may change and the new rates we incur may not be as favorable to us as those in effect prior to any LIBOR phase-out.

*We are dependent on our information systems for our financial reporting, policy-related databases, communications and other functions. If our information systems fail or experience major interruptions, including those relating to cybersecurity or arising from cyber-attacks, our business and our financial results could be adversely affected.*

We rely on our information systems to effectively manage our operational and financial functions. Our computer systems, Internet web sites, telecommunications, and data networks are also vulnerable to damage or interruption from power loss, natural disasters and attacks from viruses or hackers, including cybersecurity threats and incidents. Global cybersecurity threats and incidents can range from uncoordinated individual attempts to gain unauthorized access to information technology systems to targeted measures directed at us, our databases, policies, and/or the subjects of acquired policies. Although we utilize various procedures and controls to attempt to mitigate our exposure to these risks, attacks are evolving and unpredictable and we cannot guarantee that any risk prevention measures implemented will be successful. System failures or interruptions, including those relating to cybersecurity or arising from cyber-attacks, could breach the security of the personal information of the subjects of the acquired policies and could adversely affect our reputation, business, financial condition, and operating results.

**Risks Related to our Strategic Relationship with The Beneficient Company Group, L.P., including the Purchase and Contribution Transaction:**

On December 28, 2018, we held the Final Closing of the Exchange Transaction with Beneficient and the Seller Trusts. On April 15, 2019, Jon R. Sabes, the Company's former Chief Executive Officer and a former director, and Steven F. Sabes, the Company's former Executive Vice President and a former director, entered into the Purchase and Contribution with, among others, Ben LP. The closing of the Purchase and Contribution occurred on April 26, 2019. On December 31, 2019, we transferred approximately $79 million to Ben LP in return for 666,667 common units of Ben LP and a Preferred Series A Subclass 1 Unit Account of BCH and obtained the right to appoint a majority of the board of directors of Beneficient Management pursuant to the Investment Agreement and the Exchange Agreement. Also on December 31, 2019, in a transaction related to the Investment Agreement, GWG Holdings transferred its interest in the Preferred Series A Subclass 1 Unit Account to its wholly owned subsidiary, GWG Life. These transactions are collectively referred to as the "Beneficient Transactions." You should consider carefully the following risk factors related to the Beneficient Transactions in evaluating us and our business.

***Our loans to Beneficient are contractually and structurally subordinated to the debt and other liabilities of the Beneficient entities that are not obligors on such loans, which means that creditors of such entities will be paid from their assets before we would have any claims to those assets.***

As of December 31, 2019, GWG Life had loaned to Ben LP approximately $197.4 million, including accrued interest, pursuant to the Commercial Loan Agreement. The amounts owed to GWG Life under the Commercial Loan Agreement are contractually subordinated to Beneficient's obligations ("Senior Obligations") (i) to commercial banks pursuant to commercial term loan and/or revolving credit facilities, and (ii) to Beneficient's NPC-B limited partnership interest, if issued. As of December 31, 2019, Beneficient had outstanding approximately $153.1 million of Senior Obligations. Furthermore, because a substantial portion of Ben LP's assets are held by subsidiaries, the amounts owed to us under the Commercial Loan Agreement are structurally subordinated to all debt and other liabilities of those entities, which means that creditors of those entities will be paid from their assets before GWG Life would have any claims to those assets.

On May 31, 2019, GWG Life agreed to loan $65.0 million to six common law trusts established as part of alternative asset financings extended by a subsidiary of Beneficient. An initial advance in the principal amount of $50.0 million was funded on June 3, 2019 and the second advance of $15.0 million was made on November 22, 2019. These loans are contractually subordinated to the secured obligations of Beneficient and its affiliates outstanding to HCLP Nominees, L.L.C. and Beneficient Holdings, Inc.

***Beneficient may be unable to operate its business successfully, which would negatively impact its ability to generate distributable cash flow and increase the value of Ben LP's common units.***

Beneficient plans to provide mid-to-high net worth individuals (i.e., individuals having a net worth of between $5 million and $30 million) with trust services and related liquidity products (collectively, "trust services and liquidity products") for illiquid investment funds and other alternative assets those individuals may own, and a variety of other financial services, including custody and clearing of alternative assets, fund and trust administration, retirement funds and insurance services for covering risks attendant to owning or managing alternative assets. The success of the Beneficient Transactions from our perspective will depend largely on Beneficient's ability to operate its business successfully, generate distributable cash flow, and increase the value of Ben LP's common units (of which we are a significant owner) and our Preferred Series A Subclass 1 Unit Account of BCH. If Beneficient is unable to do so, such inability will negatively impact our operations and may result in an impairment of goodwill. Furthermore, to date, Ben LP's originations of liquidity products have been transacted with a limited number of family offices, fund-of-funds and institutions. These types of clients, specifically fund-of-funds and institutions, may not represent the target market of Ben's liquidity products in the future.

***We may be unable to capitalize on the anticipated benefits of the Beneficient Transactions.***

We entered into the Beneficient Transactions anticipating that such transactions would provide significant financial and strategic benefits, including, significantly increasing our common equity, significantly reducing our leverage ratio (as measured by total assets divided by total equity), the introduction of new opportunities to lower our cost of funds (an important driver of stockholder value), diversifying our revenue and cash flow sources resulting in more consistent earnings, and increasing our public float and the liquidity in our common stock, thereby increasing our common stockholder base and potentially attracting additional equity analyst coverage (both of which are important factors in maximizing share valuation). In addition, we believe that the Beneficient Transactions have created opportunities for us and Beneficient to pursue strategies that are mutually advantageous, including the opportunity to leverage our knowledge, experience and significant infrastructure in, and the marketing, sales and servicing of, the independent broker dealer market and the related market for illiquid alternative investments — a prime target market for the origination of Beneficient's suite of liquidity products. We believe that the expansion of our strategic relationship with Beneficient has created a unified platform uniquely positioned to provide an expanded suite of products, services and resources for investors and the financial professionals who assist them. We intend to collaborate extensively with Beneficient and capitalize on our respective capabilities, relationships and services. Specifically, the Purchase and Contribution Agreement contemplates that we will seek to enter into an agreement with Beneficient pursuant to which we would offer and distribute (through a FINRA registered managing broker-dealer) Beneficient's liquidity products and services. There is no assurance that we will realize the anticipated benefits from the Beneficient Transactions. Failure to realize these benefits will likely negatively impact the results of our operations, our business prospects, the ultimate success of our strategic relationship and the value of our common stock.

*We have and will continue to invest in Beneficient, and Beneficient's financial performance and results of operations will have a direct impact on our financial performance.*

As a result of the Investment Agreement and the Exchange Agreement (as described above), GWG was granted the authority to appoint a majority of the Board of Directors of the general partner of Beneficient. As a result, effective as of December 31, 2019, GWG controls Beneficient and consolidates Beneficient for financial statement reporting purposes. As such, our basis of accounting for and the presentation of our investment in Beneficient is materially different from that described in previous audited and unaudited financial statements. Because Beneficient will represent a significant percentage of our consolidated assets, the impact on our financial statements of Beneficient's financial performance may be material.

*Beneficient has experienced significant delays in obtaining trust company charters and may be ultimately unable to do so, which outcome would hinder Beneficient's ability to successfully pursue its current business plan and could adversely affect the value of Ben LP's common units.*

Beneficient has applied for trust charters from the Texas Department of Banking and intends to carry on much of its business through two trust company subsidiaries. While it anticipates receiving the trust charters in the near future, there have been significant delays and there can be no assurance that Beneficient will ultimately be successful in obtaining trust company charters. Because Beneficient's current business plans are based on obtaining regulatory approval to operate as regulated trust companies, a failure to do so may materially and adversely impact its financial performance and prospects, which would likely negatively impact our results of operations and may result in impairment of goodwill.

*Ben LP's partnership agreement eliminates fiduciary duties that might otherwise be owed to us under Delaware law.*

Ben LP's business and affairs are managed by Beneficient Management. Ben LP's partnership agreement eliminates the fiduciary duties that might otherwise be owed by Beneficient Management under Delaware law and replaces them with the duties expressly set forth in such agreement. Ben LP's partnership agreement provides that, when the general partner is permitted or required to make a decision in its "discretion" or pursuant to a provision not subject to an express standard of "good faith," in making such decision, the general partner has no duty to give any consideration to any interest of or factors affecting Beneficient or any other person. If a decision under Ben LP's partnership agreement is subject to an express standard of "good faith," such decision will not constitute a breach of the agreement if the decision is approved by (i) a majority of the members of the conflicts committee of the board of directors of the general partner of Beneficient, (ii) holders of a majority of the voting power of the Ben LP's common units entitled to vote (excluding voting common units owned by the general partner and its affiliates), or (iii) the general partner acting without a subjective belief that such decision was adverse to the interests of Ben LP. Potential conflicts of interest may arise among the general partner and its affiliates, on the one hand, and Beneficient, on the other hand, and the general partner may be able to favor its own interest to the detriment of Beneficient and the holders of the common units of Ben LP.

*Beneficient has significant debt obligations outstanding to us and has the ability to incur additional indebtedness.*

Subject to certain restrictions within our current Commercial Loan Agreement with Beneficient, Beneficient is permitted to incur additional indebtedness ranking senior to the Commercial Loan. If Beneficient is unable to execute its business plans, it may materially and adversely impact Beneficient's ability to repay its indebtedness, including indebtedness under the Commercial Loan Agreement in accordance with its terms. As a significant holder of Beneficient indebtedness, a payment default under any additional indebtedness Beneficient may incur, or under the Commercial Loan Agreement, would likely have a corresponding negative impact on the value of our assets (including the value of our Ben LP common units) and the price of our common stock.

Page 27

***Our percentage ownership in Ben LP may be diluted significantly.***

On December 31, 2019, GWG was granted the authority to appoint a majority of the board of directors of the general partner of Ben LP (as contemplated by the Investment and Exchange Agreements). As such, GWG controls Beneficient and consolidates Beneficient for financial statement reporting purposes. It is possible that GWG and Beneficient will redeem all outstanding common units of Ben LP not owned by GWG such that GWG becomes the sole owner of such common units. In this scenario, "dilution" refers to the potentially significant economic rights and privileges of the limited partner interests (described below) that are senior or preferred to our common interests that could result in substantial economic dilution to GWG.

Upon completion of the Beneficient Transactions, we owned approximately 95.5% of the issued and outstanding common units in Ben LP. This percentage ownership does not take into account (i) limited partner interests that may be issued upon the conversion of outstanding securities issued by Beneficient or its affiliates, or (ii) additional limited partner interests that may be issued after the closing of the Beneficient Transactions. Taking these issuances into account, our ownership interest in common units of Ben LP could be reduced significantly below 50%. In addition, and importantly, Beneficient Management has discretion to cause Ben LP to issue additional limited partner interests from time to time, and Ben LP's partnership agreement contains no meaningful restrictions on this authority. Moreover, the Beneficient organizational structure permits the future issuance of additional securities that can, upon certain circumstances or at the discretion of their holders, be converted into additional limited partner interests in Ben LP. Should any of these actions be taken, our percentage ownership in Ben LP will be diluted.

***The resale of our common stock issued in the Exchange Transaction could put downward pressure on the market price of our common stock and result in a destabilized trading market for our common stock.***

Upon the Final Closing, we issued 27,013,516 shares of our common stock, which in the aggregate represented approximately 82% of our outstanding common stock as of December 31, 2019. The shares issued in the Exchange Transaction are subject to resale restrictions applicable to "restricted securities" under applicable federal securities laws. The Master Exchange Agreement and related ancillary agreements require that we register the resale of the shares of common stock issued in the Final Closing to the Seller Trusts to the extent permitted by applicable SEC rules and regulations. Upon the effectiveness of any such registration, or the lapse of applicable resale restrictions under applicable securities laws, the shares of our common stock issued in the Exchange Transaction will be available for resale in the public equity markets. We cannot predict the effect, if any, that future sales of these shares or the availability of these shares for future sale could have on the market price of our common stock.

***The Seller Trusts, collectively, own a substantial majority of our outstanding common stock, enabling them to exert significant influence over our operations, which may affect the trading price of our common stock.***

According to their most recent Schedule 13D/A filing, the Seller Trusts own approximately 78.4% of our outstanding common stock. The Seller Trusts are a group of individual common law trusts that received shares of our common stock in the Exchange Transaction. The trustee of each of the Seller Trusts is Delaware Trust Company. The trust advisors of each trust are two individuals unrelated to each other, Murray T. Holland (our President and Chief Executive Officer) and James E. Turvey, who have sole decision-making authority with respect to each Seller Trust. The beneficiary of each of the Seller Trusts is MHT Financial, LLC. The current members of MHT Financial, LLC include Murray T. Holland (our President and Chief Executive Officer) and an entity owned by Shawn T. Terry and Mike McGill. The Seller Trusts are entitled to full voting rights with respect to the shares of Common Stock they own. Because the Seller Trusts, collectively, own a substantial majority of our outstanding voting securities, the Seller Trusts are entitled to cast a majority of the votes on all matters requiring stockholder votes, including: the election of directors; mergers, consolidations, acquisitions and other strategic transactions; the sale of all or substantially all of our assets and other decisions affecting our capital structure; amendments to our Certificate of Incorporation or our bylaws; and our winding up and dissolution. This effectively transferred voting control over the Company to the Seller Trusts from Messrs. Jon and Steven Sabes, who held a majority of our outstanding common stock not held by the Seller Trusts prior to the closing of the Purchase and Contribution Transaction. This concentrated ownership enables the Seller Trusts to exert significant influence over all of our corporate activities, including the election of directors to our Board of Directors, and may delay, deter or prevent acts that would be favored by our other stockholders. The interests of the Seller Trusts may not always coincide with our interests or the interests of our other stockholders. This concentration of ownership may also have the effect of delaying, preventing or deterring a change in control of the Company. Also, the Seller Trusts may seek to cause us to take courses of action that, in their judgments, could enhance their investments in us, but which might involve risks to our other stockholders or adversely affect us or our other stockholders. As a result, the market price of our shares could decline or stockholders might not receive a premium over the then-current market price of our shares upon a change in control. In addition, this continued concentration of share ownership, albeit in new hands, may adversely affect the trading price of our shares because prospective investors may perceive disadvantages in owning shares in a company with such significant stockholders.

*We are currently relying on the "controlled company" exemption under Nasdaq Stock Market Listing Rules, pursuant to which "controlled companies" are exempt from certain corporate governance requirements otherwise applicable under Nasdaq Stock Market Listing Rules.*

The Nasdaq Stock Market Listing Rules exempt "controlled companies," or companies of which more than 50% of the voting power is held by an individual, a group or another company, from certain corporate governance requirements, including those requirements that:

- A majority of the Board of Directors consist of independent directors;

- Compensation of officers be determined or recommended to the Board of Directors by a majority of its independent directors or by a compensation committee comprised solely of independent directors; and

- Director nominees be selected or recommended to the Board of Directors by a majority of its independent directors or by a nominating committee that is composed entirely of independent directors.

The Seller Trusts that acquired our shares in the Beneficient Transactions own approximately 78.4% of our common stock and are considered a group for purposes of the Nasdaq controlled company listing rule, based on the most recent Schedule 13D/A filed by the Seller Trusts and the trust advisors with the SEC. As a result, we are currently a "controlled company" and are relying on the controlled company exemption for certain of the above requirements, including those related to the determination or recommendation of officer compensation. Accordingly, should the interests of the Seller Trusts differ from those of other stockholders, the other stockholders do not have the same protections generally as stockholders of other Nasdaq-listed companies with respect to corporate governance for so long as we rely on the controlled company exemption from the specified corporate governance requirements. Our status as a controlled company could make our common stock less attractive to some investors or otherwise harm our stock price.

*An inability to obtain accurate and timely financial information from Beneficient may prevent us from complying with reporting obligations under federal securities law and compromise our ability to finance our operations through the public equity or debt markets.*

On December 31, 2019, Beneficient became a consolidated subsidiary of GWG Holdings. Until we can fully integrate our accounting and financial reporting systems with Beneficient, we will continue to be heavily reliant on Beneficient to provide us with accurate and timely financial reporting that will allow us to timely prepare and file our consolidated financial statements in accordance with GAAP and in compliance with SEC regulations and Nasdaq listing rules. Although we plan to integrate our accounting and financial reporting systems with Beneficient, this integration is not expected to be complete until the second half of 2020.

Beneficient's management and auditors identified several material weaknesses in Beneficient's internal controls as of December 31, 2018 relating to various Committee of Sponsoring Organizations of the Treadway Commission components including control environment, risk assessment, monitoring activities and control activities. More specifically, material weaknesses were identified relating to, among other matters, insufficient accounting resources to properly capture and accurately record all material transactions; insufficient controls surrounding certain key valuation models and surrounding data inputs into such key valuation models; and ineffective controls over the period end financial reporting process. Beneficient has implemented remedial measures and will perform testing over the operating effectiveness of these controls in mid-2020. While there can be no assurance that the operating effectiveness efforts will be completed without further remedial efforts, Beneficient believes that the remedial efforts put in place address the material weaknesses noted in the 2018 internal control findings. Until the integration of our accounting and financial reporting systems with Beneficient is complete, if Beneficient is unable to maintain its effective internal control over financial reporting, the financial information we receive from Beneficient necessary to produce our consolidated financial statements may not be prepared in sufficient time to allow for us to produce our consolidated financial statements within required time periods.

If we are unable to obtain accurate and timely financial information from Beneficient and are unable to timely prepare and file our financial statements as a result, we may fail to comply with reporting obligations under federal securities law, become subject to delisting from the Nasdaq Stock Market, and may be unable to utilize the public debt or equity markets to finance our operations. Because we have been heavily reliant on the public offer and sale of L Bonds, discontinuing our L Bond offers would have a material adverse impact on our ability to expand our alternative asset portfolio, service our existing portfolio of life insurance policies, satisfy payment requirements under our debt obligations, including our L Bonds and Seller Trust L Bonds, and otherwise fund our operations. In addition, our failure to deliver financial information and comply with disclosure requirements under applicable SEC regulations may result in covenant violations under our second amended and restated senior credit facility with LNV Corporation and hurt our reputation and credibility with our stockholders and our debt holders.

We were unable, without unreasonable effort and expense, to complete our financial statements as of and for the year ended December 31, 2018 within the time period required for us to timely file our Annual Report on Form 10-K for the year ended December 31, 2018, which was due on or prior to April 1, 2019. Likewise, we were unable to timely file our Quarterly Reports on Form 10-Q for the quarters ended March 31, 2019 and June 30, 2019.

Our inability to timely file these Reports was due, in part, to a delay in our obtaining financial information from Beneficient. In each of these instances, and in accordance with standard procedures related to the delayed filing of periodic reports with the SEC, we received a letter from Nasdaq stating that we were not in compliance with our filing requirements for continued listing under Nasdaq Listing Rule 5250(c)(1). We ultimately regained compliance with Nasdaq's filing requirements within the grace periods provided by Nasdaq under its Marketplace Rules and delisting procedures. However, if we fail to maintain compliance in the future, we may be delisted, in which case our business and the value of our securities would likely be materially and adversely impacted. Our inability to timely file these reports also resulted in a temporary suspension of the offering of our L Bonds.

***A failure to establish and maintain effective internal controls over financial reporting could adversely affect our financial results.***

Both GWG Holdings and Beneficient reported material weaknesses as part of their respective 2018 annual audits. GWG Holdings' material weaknesses included ineffective information and communication controls with external parties due to delays in the financial statement close and reporting process as evidenced by the untimely filing of the Annual Report on Form 10-K for the year ended December 31, 2018, and of the Quarterly Report on Form 10-Q for the quarter ended March 31, 2019. Also, management of GWG Holdings did not have sufficient accounting resources and personnel to effectively design and execute process level controls around certain complex or non-recurring transactions to ensure proper application of U.S. GAAP. Beneficient's material weaknesses included, among other matters, insufficient accounting resources to properly capture and accurately record all material transactions; insufficient controls surrounding certain key valuation models and surrounding data inputs into such key valuation models; and ineffective controls over the period end financial reporting process.

GWG is a smaller reporting company for SEC reporting purposes and has historically had limited accounting and financial reporting resources. Prior to the December 31, 2019 consolidation with GWG, Beneficient was not subject to the reporting obligations required under the Sarbanes-Oxley ("SOX") Act of 2002. The consolidation of Beneficient and GWG will result in increased accounting, reporting and internal controls complexity as the companies integrate systems and processes. Furthermore, Beneficient, as a consolidated subsidiary of GWG, is required to be SOX compliant as of December 31, 2020. While both GWG and Beneficient have implemented remedial measures to address their respective 2018 internal control findings, and the companies have plans to fully integrate information systems and processes and to share accounting and financial reporting resources, there is no certainty that GWG and Beneficient will be able to maintain effective internal controls over financial reporting.

Effective internal controls are necessary for GWG and Beneficient to provide reliable financial reports, prevent fraud and operate successfully. If either GWG or Beneficient, or both, cannot provide reliable financial reports or prevent fraud, the Company's ability to accurately report its financial results could be adversely affected and its reputation and operating results would be harmed. GWG and Beneficient cannot be certain that their efforts to further establish and maintain internal controls over financial reporting will be successful. Any failure to further develop, as necessary, or to maintain effective internal controls could harm the Company's operating results or cause the Company to fail to meet its reporting obligations. See the risk factor above *"An inability to obtain accurate and timely financial information from Beneficient may prevent us from complying with reporting obligations under federal securities law . . . ."* Ineffective internal controls could also cause investors to lose confidence in the Company's reported financial information.

***Our remedies for an "Event of Default" under our Commercial Loan Agreement with Ben LP are limited.***

As part of the Exchange Transaction, GWG Life, as lender, and Ben LP, as borrower, entered into the Commercial Loan Agreement under which $197.4 million in principal and interest was outstanding at December 31, 2019. The principal amount under the Commercial Loan Agreement is due on August 9, 2023; provided that (a) in the event Ben LP completes at least one public offering of its common units raising at least $50 million, which on its own or together with any other public offering of Ben LP's common units results in Ben LP raising at least $100 million, then the maturity date will be extended to August 9, 2028; and (b) in the event that Ben LP (i) completes at least one public offering of its common units raising at least $50 million which on its own or together with any other public offering of Ben LP's common units results in Ben LP raising at least $100 million and (ii) at least 75% of Beneficient Holding's total outstanding NPC-B limited partnership interests have been converted to shares of Ben LP's common units, then the maturity date will be extended to August 9, 2033.

Ben LP's obligations under the Commercial Loan Agreement are unsecured, and repayment of the balance under the Commercial Loan Agreement is subordinated in right of payment to any of Beneficient's senior debt and to obligations that may arise in connection with its NPC-B Unit limited partnership interests. As a result, our remedies upon a default by Ben LP under the Commercial Loan Agreement that constitutes an "Event of Default" (as defined in the Commercial Loan Agreement) are limited to accelerating the loan and commencing a lawsuit for collection. We would not have the right to force Ben LP into bankruptcy or, since the Commercial Loan is unsecured, foreclose on any collateral until a judgment is secured. In addition, under the subordination provisions of the Commercial Loan Agreement, we would have the right to receive proceeds of any sale of Ben LP assets or any liquidation proceeding only after Beneficient's senior lender is paid in full.

***Our evolving operating priorities, allocation of capital and overall strategic direction may prove to be unsuccessful.***

The consummation of the Purchase and Contribution Transaction resulted in the reconstitution of our board of directors and management team. Such reconstitution has altered and will likely continue to alter our operating priorities, allocation of capital and overall strategic direction from those in place prior to the consummation of the Purchase and Contribution Transaction. There is no assurance that our operating priorities, allocation of capital and overall strategic direction will ultimately prove to be successful.

***The Purchase and Contribution Agreement provides that GWG and Beneficient will use commercially reasonable efforts to enter into a joint venture agreement, which may significantly alter the existing strategic relationship between GWG and Beneficient.***

The Purchase and Contribution Agreement provides that GWG and Beneficient will use commercially reasonable efforts to enter into a joint venture agreement. The terms of that agreement have not been determined and they may significantly alter the existing strategic relationship between GWG and Beneficient, including providing for further integration of our respective businesses and establishing additional or alternative financing arrangements. The terms of the joint venture agreement are subject to approval of the Board of Directors of GWG and the Board of Directors of Beneficient Management and subject to the exercise of their respective fiduciary duties. The Board of Directors of GWG has established a special committee of independent and disinterested directors to review and, if deemed appropriate, approve proposed transactions with or involving Beneficient.

**Risks Related to Beneficient's operations:**

In addition to the risks set forth above related to our controlling financial interest in Beneficient generally, the risk factors set forth below relate specifically to Beneficient's business operations. Because Ben LP is now our consolidated subsidiary as of December 31, 2019, the impact on our financial results of Beneficient's current business operations will be material to the overall results of our business operations. Therefore, you should also consider carefully the following risk factors in evaluating us and our business.

***Beneficient does not have any operating history for its new business.***

Beneficient's management has a long track record of successfully organizing and operating businesses, including Beneficient's founder who organized Beneficient's predecessor in 2003, but Beneficient's business plan represents a new phase in its development and Beneficient does not have significant operating history under its current business plan. Additionally, Beneficient's proposed trust company subsidiaries have little operating history. In general, companies that seek to implement these kinds of business plans present substantial business and financial risks and uncertainties.

***Beneficient's success depends on certain key executives and the ability to attract, retain, and develop new professionals.***

Beneficient's success depends in large part upon the skills, experience, personal reputations and network of business contacts of certain key executives. These individuals' reputations, business relationships and expertise are critical elements in the successful implementation of Beneficient's business strategy. Accordingly, the loss of any of the key executives could materially harm Beneficient's business and the value of Beneficient.

Beneficient's key executives are directly responsible for setting Beneficient's strategic direction, operating Beneficient's business, maintaining and expanding business and other critical relationships, clients and business partners and identifying expansion opportunities. Should Beneficient lose one of these key executives, it may have to search externally for a qualified replacement, which search may be prolonged, and Beneficient cannot provide assurance that it will be able to hire such a replacement on a timely basis or at all.

Competition for qualified personnel in the financial services industry is intense. Thus, the loss of any of these key personnel, by resignation, termination, death or disability, or Beneficient's inability to recruit and retain qualified replacements, could cause disruption in Beneficient's business and could prevent Beneficient from fully implementing Beneficient's business strategy, which could materially and adversely affect Beneficient's business, growth and profitability.

***Beneficient may not be able to grow, effectively manage its growth, or achieve profitability.***

A principal focus of Beneficient's strategy is to expand the number of Beneficient's product offerings and grow Beneficient's trust administration products and services. Beneficient's future growth depends upon a number of factors, many of which are beyond Beneficient's ability to control. These factors include Beneficient's ability to:

- accurately assess the demand for and sell the products and offerings that Beneficient expects to develop to meet demand;

- compete against other client solutions and other vendors;

- maintain the quality of Beneficient's trust administration products and services;

- effectively manage Beneficient's financing underwriting criteria and manage Ben Collateral, including with effective risk management discipline;

- update Beneficient's products and offerings and develop new products and offerings needed by clients; and

- hire, train and retain qualified personnel to manage and operate Beneficient's business as it is expected to grow.

A deficiency in any of these factors could adversely affect Beneficient's ability to achieve or manage growth or profitability.

***Beneficient's current business plan may be significantly compromised if it is unable to obtain its trust company charters.***

Beneficient's proposed trust company subsidiaries may not commence trust company operations until those subsidiaries receive the necessary trust charters from the Texas Department of Banking. Beneficient filed limited trust association charter applications for its proposed trust company subsidiaries with the Texas Department of Banking in September of 2018 and submitted revised charter applications on March 6, 2020. Approval of those applications is not assured. Even if the charter applications are approved, Beneficient expects that the approvals will be subject to certain conditions including, among others, that the proposed trust company subsidiaries satisfy certain minimum restricted capital requirements. There is no assurance that Beneficient will be able to satisfy all the conditions imposed by the Texas Department of Banking in connection with its approvals. In addition, such conditions could delay the anticipated time for commencement of trust operations.

If Beneficient is ultimately unable to obtain satisfactory limited trust association charters, Beneficient's ability to implement its current business plan may be significantly compromised. Without the trust company charters, federal regulations would significantly limit the amount of alternative asset liquidity financings ("Liquidity Transactions") Beneficient could undertake.

***Beneficient's business faces substantial competition from a variety of financial solution companies and other liquidity providers.***

Beneficient faces substantial competition in all areas of its operations from a variety of competitors, many of which are larger, have an established track record and reputation, and may have more financial resources. Beneficient's business competes with other providers of financial and trust administration such as bank holding companies, commercial and savings banks, savings and loan associations, credit unions, asset managers and their private equity affiliates, insurance companies and a growing list of other local, regional and national institutions which offer financial and trust administration services. Beneficient's business also competes with other providers of liquidity for alternative assets, which may hinder Beneficient's ability to offer Liquidity Transactions to the market. If Beneficient is unable to compete effectively, Beneficient will lose market share and income generated from trust administration services and other financial products will decline.

***Beneficient's liquidity, profitability and business may be adversely affected by an inability to access, or ability to access only on unfavorable terms, the capital markets.***

Liquidity is essential to Beneficient's business and Beneficient must continue to grow its capital to maintain liquidity. Future cash flows from Beneficient's financing arrangements and proceeds from borrowings may not be sufficient for Beneficient to satisfy Beneficient's working capital and liquidity needs. To the extent that working capital is insufficient to fund future operating costs, Beneficient may need to raise additional funds through equity or debt financings, including investments in the form of equity investments and debt advances from GWG, reduce expenses, or curtail its growth. Many factors will affect Beneficient's capital needs and their amount and timing, including Beneficient's growth and profitability, as well as market disruptions and other unforeseeable developments.

Page 32

App. 0541

Beneficient's liquidity may be impaired by an inability to access, or ability to access only on unfavorable terms, secured and/or unsecured debt markets or equity markets, including access to capital markets indirectly through GWG, an inability to access funds from its subsidiaries or otherwise allocate liquidity optimally, an inability to sell assets or redeem its interests in the Ben Collateral, or unforeseen outflows of cash or collateral. This situation may arise due to circumstances that Beneficient may be unable to control, such as a general market disruption or an operational problem that affects third parties or Beneficient, a disruption of the financial markets or negative views about the financial services industry generally, including concerns regarding fiscal matters in the U.S. and other geographic areas.

In addition, Beneficient's ability to raise funding could be impaired if investors or lenders develop a negative perception of Beneficient's long-term or short-term financial prospects. An increase in debt of Beneficient and/or its subsidiaries may increase Beneficient's leverage and reduce its interest coverage. To the extent that Beneficient or its subsidiaries raise additional capital through the future sale of equity or debt, the ownership interest of our equity holders may be diluted.

If Beneficient is unable to raise funding using the methods described above, Beneficient would likely need to consider financing or liquidating assets to meet maturing liabilities. Beneficient may be unable to sell some of its assets or Beneficient may have to sell assets at a discount to market value, either of which could adversely affect Beneficient's results of operations, cash flows and financial condition.

If Beneficient is unable to repay or refinance its existing credit facilities, then Beneficient will be required to either liquidate assets to repay these loans or to raise additional capital through the sale of equity.

***Beneficient is subject to repayment risk in connection with its Liquidity Transactions.***

Beneficient's Liquidity Transactions are structured as loans from Beneficient's subsidiary to unaffiliated trusts that acquire ownership interests in the alternative assets comprising the collateral supporting Beneficient's Liquidity Transactions (the "Ben Collateral"). Loans extended by Beneficient do not require repayment prior to maturity and are subject to a risk of default. Unaffiliated trusts may default on a loan from Beneficient even if the cash flow from alternative assets in the Ben Collateral supporting such a loan is sufficient to otherwise repay interest and principal on the loan.

***A determination that Beneficient is an unregistered investment company would have serious adverse consequences.***

A determination that Beneficient or any of the proposed trust company subsidiaries is an unregistered investment company under the Investment Company Act of 1940 (the "1940 Act") would have serious adverse consequences. Beneficient does not believe it could operate its business effectively as a registered investment company. As a result, Beneficient would have to change its operations so as not to be an investment company. Changes could include refraining from raising capital, changing the types of products and services that Beneficient provides, and changing the nature of the Ben Collateral. Furthermore, if at any time it were established that Beneficient or any of the proposed trust company subsidiaries had been operating as an investment company in violation of the registration requirements of the 1940 Act, there would be a risk, among other material adverse consequences, that such company: (i) could become subject to SEC enforcement and investigation, monetary penalties or injunctive relief, or both, (ii) would be unable to enforce contracts with third parties or that third parties could seek to obtain rescission of transactions with such company undertaken during the period in which it was established that such company was an unregistered investment company, and (iii) would face adverse action from the Texas Department of Banking, either in relation to its pending application for trust company charters, or if such charters are granted, in connection with such charters. Such developments would be likely to have material and adverse consequences for Beneficient. In addition, if Beneficient were treated as an investment company, it would not be eligible to be taxed as a partnership and instead would be taxable as a corporation for U.S. federal income tax purposes, which could result in a material and adverse impact on the returns of holders of Ben LP common units. Upon completion of the Beneficient Transactions, GWG Holdings owned approximately 95.5% of Ben LP common units.

***Beneficient's results of operations may fluctuate from period to period.***

Beneficient expects that the results of its operations may vary significantly from period to period for a variety of reasons, many of which are outside of Beneficient's control and difficult to predict, including demand for Beneficient's liquidity products and trust administration services, performance of the loans against alternative assets comprising the Ben Collateral and concentration of risk in the loan portfolios. Because Beneficient's results of operations may vary significantly from quarter to quarter, the results of any one period should not be relied upon as an indication of future performance. Many but not all of the factors that may cause Beneficient's results of operations to fluctuate are presented in these risk factors.

***Beneficient may incur significant losses as a result of ineffective risk management processes and strategies.***

Beneficient seeks to monitor and control its risk exposure by developing an effective risk and control framework, which encompasses a variety of separate but complementary financial, credit, operational, compliance, and legal reporting systems; internal controls; management review processes; and other mechanisms. While Beneficient employs and will continue to develop and deploy a broad and diversified set of risk monitoring and risk mitigation techniques, those techniques and the judgments that accompany their application may not be effective and may not anticipate every risk event in all market environments or the specific nature of the impact and timing of such outcomes.

***Beneficient's operations, products and services may be negatively impacted by changes in economic and market conditions.***

Beneficient's operations, products and services may be negatively impacted by changes in general economic and market conditions because the performance of Beneficient's liquidity products and trust administration services is directly affected by conditions in the financial and securities markets. The financial markets and businesses operating in the securities industry are highly volatile (meaning that performance results can vary greatly from period to period) and are directly affected by, among other factors, domestic and foreign economic conditions, geopolitics and general trends in business and finance, all of which are beyond Beneficient's control. Declines in the financial markets or a lack of sustained growth may result in a corresponding decline in Beneficient's performance and may adversely affect the assets comprising the Ben Collateral and the loans against the assets comprising the Ben Collateral.

***Fluctuations in interest rates and foreign exchange rates may negatively impact the business of Beneficient.***

Fluctuations in interest rates and foreign exchange rates may negatively impact the business of Beneficient. These rates are highly sensitive to many factors beyond Beneficient's control, including general economic conditions, both domestic and foreign, and the monetary and fiscal policies of various governmental and regulatory authorities. Beneficient's assets and liabilities can be affected significantly by changes in market interest rates. As a result, Beneficient may adopt asset and liability management policies to minimize the potential adverse effects of changes in interest rates and foreign exchange rates, primarily by altering the mix and maturity of Liquidity Transactions, interests in the Ben Collateral, funding sources, and derivatives. However, even with these policies in place, a change in interest rates and foreign exchange rates can impact Beneficient's financial condition. Beneficient's ability to successfully manage its interest rate and foreign exchange rate risks is subject to factors beyond its control.

***Beneficient relies on other companies to provide key components of Beneficient's business infrastructure.***

Third-party vendors provide and are expected to continue to provide key components of Beneficient's business infrastructure. Any problems caused by these third parties, including as a result of their not providing Beneficient their services for any reason or their performing their services poorly, could adversely affect Beneficient's ability to deliver products and services to Beneficient's clients, impair Beneficient's ability to conduct its business efficiently and effectively, and/or result in regulatory action, financial loss, litigation, and loss of reputation. Replacing these third-party vendors could also entail significant delay and expense.

***Beneficient may only be able to offer a limited number of products and solutions.***

Beneficient may only be able to offer a limited number of products and solutions due to regulatory, capital or other restrictions. Accordingly, the prospects for Beneficient's success may be solely dependent upon the performance of a single product or solution, or dependent upon the development or market acceptance of a single or limited number of products or solutions. A lack of diversification in its offerings may make Beneficient susceptible to numerous economic, competitive and regulatory conditions, any or all of which may have a substantial adverse impact upon Beneficient's ability to operate its business and/or grow its business in the future. Further, Beneficient would not be able to diversify its operations or benefit from the possible spreading of risks or offsetting of losses that offering a comprehensive suite of solutions could provide.

***Beneficient depends on the accuracy and completeness of information from and about clients.***

In deciding whether to enter into Liquidity Transactions with clients, Beneficient may rely on information furnished to it by or on behalf of clients, including financial statements and other financial information. Beneficient also may rely on representations of clients as to the accuracy and completeness of that information and, with respect to financial statements, on reports of independent auditors. For example, in connection with Liquidity Transactions, Beneficient may rely on information provided by a client such as net asset value of an underlying alternative asset. Beneficient also relies, and will continue to rely, on client representations and certifications, or other audit or accountants' reports, with respect to the business and financial condition of the assets underlying the Liquidity Transaction. Reliance on clients may not reveal or highlight all relevant facts (including bribery, fraud or other illegal activities) or risks that are necessary or helpful in evaluating such transaction opportunity. Instances of bribery, fraud, accounting irregularities and other improper, illegal or corrupt practices can be difficult to detect and may be more widespread in certain jurisdictions. Beneficient's financial condition, results of operations, financial reporting and reputation could be negatively affected if Beneficient relies on materially misleading, false, inaccurate or fraudulent information.

***Beneficient will be subject to comprehensive governmental regulation and supervision.***

Beneficient and its subsidiaries operate in a highly regulated environment and will be subject to supervision and regulation by several governmental agencies. Beneficient and its subsidiaries are subject to changes in federal and state laws, regulations, governmental policies, tax laws and accounting principles. As Beneficient's business grows, Beneficient and its subsidiaries expect to become subject to additional regulatory agencies' regulation. Changes in regulations or the regulatory environment could adversely affect Beneficient's business.

***Beneficient may incur fines, penalties and other negative consequences from regulatory violations.***

Beneficient may fail to comply with applicable laws and regulations and be held accountable for such violations, even if such violations are inadvertent. Some legal/regulatory frameworks provide for the imposition of fines or penalties for noncompliance even though the noncompliance was inadvertent or unintentional and even though there were systems and procedures designed to ensure compliance in place at the time. For example, Beneficient is subject to regulations issued by the Office of Foreign Assets Control, or "OFAC," that prohibit financial institutions from participating in the transfer of property belonging to the governments of certain foreign countries and designated nationals of those countries. OFAC may impose penalties for inadvertent or unintentional violations even if reasonable processes are in place to prevent the violations. There may be other negative consequences resulting from a finding of noncompliance, including restrictions on certain activities.

***Beneficient faces a risk of noncompliance with and enforcement actions under the Bank Secrecy Act and other anti-money laundering statutes and regulations.***

The Bank Secrecy Act, the USA PATRIOT Act of 2001, and other laws and regulations require financial institutions, among other duties, to institute and maintain an effective anti-money laundering program and file suspicious activity and currency transaction reports as appropriate. The federal Financial Crimes Enforcement Network is authorized to impose significant civil money penalties for violations of those requirements and has recently engaged in coordinated enforcement efforts with the individual federal banking regulators, as well as the U.S. Department of Justice, Drug Enforcement Administration, and Internal Revenue Service (the "IRS"). Beneficient is also subject to increased scrutiny of compliance with the rules enforced by the OFAC and compliance with the Foreign Corrupt Practices Act. If Beneficient's policies, procedures and systems are deemed deficient, Beneficient will be subject to liability, including fines and regulatory actions, which may include restrictions on Beneficient's ability to make distributions to its unitholders and the necessity to obtain regulatory approvals to proceed with certain aspects of Beneficient's business plan. Failure to maintain and implement adequate programs to combat money laundering and terrorist financing could also have serious reputational consequences for Beneficient. Any of these results could materially and adversely affect Beneficient's business, financial condition and results of operations.

***Difficult market conditions can cause investors to reduce or suspend their investments in alternative assets or their desire to liquidate alternative assets they hold, which could adversely affect Beneficient's business.***

During economic downturns, alternative asset owners may suffer from decreasing returns (including negative returns and loss of principal investment), liquidity pressure, increased volatility and difficulty maintaining targeted asset allocations, and investors may decrease or suspend making new fund investments during and after such periods. As the economy begins to recover from these periods, investors may elect to reduce their exposure to alternative investments, resulting in a smaller overall pool of potential clients in the industry and clients for Beneficient's services and products in the future. In the event all or part of this analysis proves true, when trying to find new clients Beneficient will be competing for fewer available alternative assets to administer in an increasingly competitive environment, which could lead to terms less favorable to Beneficient as well as difficulty in reaching new clients. Such changes would adversely affect Beneficient's revenues and profitability.

***Beneficient is dependent on the continued success of the alternative asset industry.***

Beneficient's success depends, in part, on the continued success of alternative asset managers and the alternative asset industry that has enjoyed a prolonged period of expansion and profitability. Such expansion and profitability is subject to market conditions and other factors outside of Beneficient's control (and the control of managers of alternative assets). There is no assurance that such expansion and profitability will continue. Beyond business and financial success, the alternative asset industry may also become subject to greater governmental regulation and investigation, which could have a negative effect on Beneficient.

***A failure of Beneficient to appropriately identify and address potential conflicts of interest could adversely affect Beneficient's business.***

Beneficient has developed robust procedures and controls designed to identify and address conflicts of interest relevant to its business operations. However, appropriately identifying and dealing with conflicts of interest is complex and difficult, and Beneficient's reputation could be damaged, and the willingness of clients to enter into transactions with Beneficient may be affected, if Beneficient fails, or appears to fail, to identify, disclose and deal appropriately with conflicts of interest. In addition, potential or perceived conflicts could give rise to litigation or regulatory enforcement actions.

***A failure in Beneficient's operational systems as well as human error or malfeasance, could impair Beneficient's liquidity, disrupt Beneficient's business, result in the disclosure of confidential information, damage Beneficient's reputation, and cause losses.***

Beneficient faces a variety of risks that are substantial and inherent in its business, including market, liquidity, credit, operational, legal, regulatory and reputational risks. The following are some of the more important factors that could affect Beneficient's business.

Beneficient's financial, accounting, data processing or other operational systems and facilities may fail to operate properly or become disabled as a result of events that are wholly or partially beyond Beneficient's control. Beneficient must continuously update systems to support its operations and growth and to respond to changes in regulations and markets, and invest heavily in systemic controls and training to ensure that such transactions do not violate applicable rules and regulations or, due to errors in processing such transactions, adversely affect markets, Beneficient's clients or Beneficient. Enhancements and updates to systems, as well as the requisite training, including in connection with the integration of new businesses, entail significant costs and create risks associated with implementing new systems and integrating them with existing ones.

The use of computing devices and phones is critical to the work done by Beneficient's employees and the operation of Beneficient's systems and business and those of Beneficient's clients and its third-party service providers and vendors. Additionally, computing devices may be vulnerable to cyber-attacks or have other inherent weaknesses.

Notwithstanding the proliferation of technology and technology-based risk and control systems, Beneficient's business ultimately relies on people as its greatest resource, and, from time-to-time, they may make mistakes or engage in violations of applicable policies, laws, rules or procedures that are not always identified immediately by Beneficient's technological processes or by Beneficient's controls and other procedures, which are intended to prevent and detect such errors or violations. These errors or violations can include calculation errors, mistakes in addressing emails, errors in software or model development or implementation, or simple errors in judgment, as well as intentional efforts to ignore or circumvent applicable policies, laws, rules or procedures. Human errors and malfeasance, even if promptly discovered and remediated, can result in material losses and liabilities for Beneficient.

***Any cybersecurity-attack or other security breach of Beneficient's technology systems, or those of third-party vendors Beneficient relies on, could subject Beneficient to significant liability and harm Beneficient's business operations and reputation.***

Cybersecurity attacks and security breaches of Beneficient's technology systems, including those of Beneficient's clients and third-party vendors, may subject Beneficient to liability and harm Beneficient's business operations and overall reputation. Beneficient's operations rely on the secure processing, storage and transmission of confidential and other information in its computer systems and networks. Threats to information technology systems associated with cybersecurity risks and cyber incidents continue to grow, and there have been a number of highly publicized cases involving financial services companies, consumer-based companies and other organizations reporting the unauthorized disclosure of client, customer or other confidential information in recent years. Beneficient is regularly the target of attempted cyber-attacks. Cybersecurity risks could disrupt Beneficient's operations, negatively impact Beneficient's ability to compete and result in injury to Beneficient's reputation, downtime, loss of revenue, and increased costs to prevent, respond to or mitigate cybersecurity events. Although Beneficient has developed, and continues to invest in, systems and processes that are designed to detect and prevent security breaches and cyber-attacks, and while Beneficient expects to periodically test this security, Beneficient's security measures, information technology and infrastructure may be vulnerable to attacks by hackers or breached due to employee error, malfeasance or other disruptions that could result in unauthorized disclosure or loss of sensitive information; damage to Beneficient's reputation; the incurrence of additional expenses; additional regulatory scrutiny or penalties; or Beneficient's exposure to civil or criminal litigation and possible financial liability, any of which could have a material adverse effect on Ben's business, financial condition and results of operations.

Third parties upon whom Beneficient relies face similar threats, which could directly or indirectly impact Beneficient's business and operations. The occurrence of a cybersecurity-incident or attack on Beneficient's third-party vendors could have a material adverse effect on Beneficient's reputation and on Beneficient's business, financial condition and results of operations.

***Transfer restrictions applicable to alternative assets may prevent Beneficient from being able to attract a sufficient number of clients to achieve Beneficient's business goals.***

Many alternative assets contain stringent transfer restrictions imposed by the issuing entity, which may prevent Beneficient from entering into Liquidity Transactions or providing trust administration services with respect to such assets. Such restrictions may result in Beneficient not being able to attract a sufficient number of clients or Liquidity Transactions and, as a result, its revenues and profitability could be adversely affected.

***Beneficient's failure to correctly identify mergers, acquisitions, divestitures or other strategic transactions could have a material adverse effect on its business, financial condition and results of operations.***

Beneficient may seek to facilitate its growth through mergers, acquisitions or other strategic transactions. Mergers, acquisitions, and other strategic transactions involve inherent risks that could compromise the success of the combined business and dilute the holdings of Beneficient's unitholders. If Beneficient is incorrect when assessing the value, strengths, weaknesses, liabilities and potential profitability of such transactions, or if Beneficient fails to adequately integrate the acquired businesses or individuals, the success of the combined business could be compromised. Business acquisitions are subject to the risks commonly associated with such transactions including, among others, potential exposure to unknown liabilities of acquired companies and to acquisition costs and expenses, the difficulty and expense of integrating the operations and personnel of the acquired companies, potential disruptions to the business of the combined company and potential diversion of management's time and attention, the impairment of relationships with and the possible loss of key employees and clients as a result of changes in management, potential litigation or other legal risks, potential write-downs related to goodwill impairments in connection with acquisitions and dilution to the unitholders of the combined company if the acquisition is made for equity of the combined company. In addition, investment strategies, technologies or businesses of acquired companies may not be effectively assimilated into Beneficient's business or may have a negative effect on the combined company's revenues or earnings. The combined company may also incur significant expenses to complete acquisitions and support acquired investment strategies and businesses. Further, any such acquisitions may be funded with cash, debt or equity, which could dilute the holdings or limit the rights of Beneficient's unitholders. Finally, Beneficient may not be successful in identifying attractive acquisition candidates or completing acquisitions on favorable terms.

Page 37

Divestitures involve inherent risks that could compromise the success of Beneficient's business. Risks related to divestitures can include difficulties in the separation of the divested business, loss of clients, retention or obligation to indemnify certain liabilities, the failure of counterparties to satisfy payment obligations, unfavorable market conditions that may impact any earnout or contingency payment due to Beneficient and unexpected difficulties in losing employees of the divested business.

There is no assurance that Beneficient will be successful in overcoming these or other risks encountered with mergers, acquisitions, divestitures and other strategic transactions. These risks may prevent Beneficient from realizing the expected benefits from mergers, acquisitions, divestitures and other strategic transactions and could result in the failure to realize the full economic value of a strategic transaction.

***Beneficient faces risks associated with the ability of its information technology systems and its people and processes to support its operations and future growth effectively.***

In order to serve Beneficient's market effectively, Beneficient has developed, and is continually developing, a comprehensive array of products and services. In order to support these products and services and for Beneficient to operate effectively, Beneficient has developed, purchased and licensed information technology and other systems and processes. As Beneficient's business grows, Beneficient expects to continue to invest in and enhance these systems, and its people and processes.

These investments and enhancements may affect Beneficient's future profitability and overall effectiveness. From time to time, Beneficient may change, consolidate, replace, add or upgrade existing systems or processes, which if not implemented properly to allow for an effective transition, may have an adverse effect on Beneficient's operations, including business interruptions, which may result in inefficiencies, revenue losses, client losses, exposure to fraudulent activities, regulatory enforcement actions, or damage to Beneficient's reputation. Beneficient also outsources certain operational and other functions to consultants or other third parties. If Beneficient does not implement its systems effectively or if its outsourcing business partners do not perform their functions properly, there could be an adverse effect on Beneficient. There can be no assurance that Beneficient will be able to effectively maintain or improve its systems and processes, or utilize outsourced talent, to meet its business needs efficiently. Any failure of such could adversely affect Beneficient's operations, financial condition, results of operations, future growth and reputation.

*Beneficient faces risks from regulatory investigations and proceedings and from private actions brought against it.*

From time to time, Beneficient may be named as a defendant or otherwise become involved in various legal proceedings, including class actions and other litigation or disputes with third parties. Future actions against Beneficient may result in judgments, settlements, fines, penalties or other results adverse to Beneficient, which could materially adversely affect Beneficient's business, financial condition or results of operations, or cause serious reputational harm to Beneficient.

Beneficient's businesses and operations are also subject to increasing regulatory oversight and scrutiny, which may lead to additional regulatory investigations or enforcement actions. These and other initiatives from federal and state officials may subject Beneficient to judgments, settlements, fines or penalties, or cause Beneficient to be required to restructure its operations and activities, all of which could lead to reputational issues, or higher operational costs, thereby reducing Beneficient's profitability.

While Beneficient seeks to insure against potential risks, Beneficient may not be able to obtain insurance to cover certain risks, or obtain coverage on favorable terms, and the insurance that Beneficient has may be inadequate to cover certain civil or criminal proceedings or regulatory investigations and associated costs.

*Beneficient may be impacted adversely by claims or litigation, including claims or litigation relating to its fiduciary responsibilities.*

Beneficient's business involves the risk that clients or others may sue Beneficient, claiming that Beneficient has failed to perform under a contract or otherwise failed to carry out a duty perceived to be owed to them. This risk would be heightened when Beneficient's trust company subsidiaries begin serving as fiduciaries for their clients following the issuance of state trust company charters. Specifically, Beneficient's trust company subsidiaries would be required to (i) adhere to the fiduciary standard of care required under the terms of the governing documents or applicable law, and (ii) properly discharge their fiduciary duties. If Beneficient fails to comply with these fiduciary obligations, it could incur significant costs and possibly liability, which could materially and adversely affect Beneficient's business, financial condition or results of operations. Liability for breach of fiduciary duty may be difficult to assess or quantify and its existence and magnitude may remain unknown for a substantial period of time. Additionally, an alleged breach of fiduciary duty, regardless of the merits of such alleged breach, could significantly damage Beneficient's reputation and cause it to incur legal and other costs. Claims made or actions brought against Beneficient, whether founded or unfounded, may result in injunctions, settlements, damages, fines or penalties, which could have a material adverse effect on Beneficient's financial condition and results of operations, could adversely affect Beneficient's ability to raise additional funding or attract new clients, and could require changes to Beneficient's business. Even if Beneficient defends itself successfully, the cost of litigation is often substantial, and public reports regarding claims made against Beneficient may cause damage to its reputation among existing and prospective clients or negatively impact the confidence of counterparties, rating agencies, and equityholders, consequently affecting Beneficient's earnings negatively.

*A change in Beneficient's tax treatment could adversely affect Beneficient.*

Beneficient is subject to a variety of tax laws and tax regulations by national, regional and local governments. Beneficient, and most of its subsidiaries, are pass through entities that are generally not subject to taxation. Rather, Beneficient passes on the distributive share of income to its investors who bear the burden of any tax liability that may be generated by such income. These tax laws and regulations (including the applicable tax rates), and their interpretation and application, may change from time to time and those changes could have a material adverse effect on the results of operations or Beneficient's financial position.

Page 39

In addition, without the consent of Beneficient's unitholders, Beneficient's general partner may elect to convert Beneficient into a corporation or be taxed as a corporation for U.S. federal income tax purposes if certain conditions have been met. Such a conversion could be a taxable event to Beneficient's unitholders where gain or loss is recognized. In addition, a conversion would subject all of Beneficient's future net income to a level of corporate tax, which may reduce the amount of cash available for distribution or reinvestment.

***Beneficient's business, profitability and liquidity may be adversely affected by deterioration in the credit quality of, or defaults by, third parties who owe Beneficient money, securities or other assets or whose securities or obligations Beneficient holds.***

Beneficient is exposed to the risk that third parties that owe Beneficient money, securities or other assets will not perform their obligations. These parties may default on their obligations to Beneficient due to bankruptcy, lack of liquidity, operational failure or other reasons. A failure of a significant market participant, or even concerns about a default by such an institution, could lead to significant liquidity problems, losses or defaults by other institutions, which in turn could adversely affect Beneficient.

***In the event Beneficient uses hedging transactions to manage certain market risks, Beneficient's business, profitability and liquidity may be adversely affected by unanticipated market conditions including interest rates, currency exchange rates, equity market behavior, and other relevant asset classes.***

When managing its exposure to market risks, Beneficient may make use of forward contracts, options, swaps, caps, collars and floors or pursue other strategies or use other forms of derivative instruments to limit its exposure to changes in the relative values of investments that may result from market developments, including changes in prevailing interest rates and currency exchange rates.

The use of hedging transactions and other derivative instruments to reduce the effects of changes in the value of a position does not eliminate the possibility of fluctuations in the value of the position or prevent losses if the value of the position declines. However, such activities can establish other positions designed to gain from those same developments, thereby offsetting the decline in the value of the position. Such transactions may also limit the opportunity for gain if the value of a position increases. Moreover, it may not be possible to limit the exposure to a market development that is so generally anticipated that a hedging or other derivative transaction cannot be entered into at an acceptable price. Although Beneficient may enter into hedging transactions in order to reduce its exposure to market risks, unanticipated market changes may result in poorer overall investment performance than if the transaction had not been executed. In addition, the degree of correlation between price movements of the instruments used in connection with hedging activities and price movements in a position being hedged may vary. Moreover, for a variety of reasons, Beneficient may not be successful in establishing a sufficient correlation or a sufficient matching of cash flows between the instruments used in a hedging or other derivative transaction and the position being hedged. An insufficient correlation could prevent Beneficient from achieving the intended result and create new risks of loss. In addition, Beneficient will not be able to fully limit exposure against all changes in the values of the alternative assets underlying its Liquidity Transactions, because the values of such assets are likely to fluctuate as a result of a number of factors, some of which will be beyond Beneficient's control, and it may not be able to respond to such fluctuations in a timely manner or at all.

***The interest rates under Beneficient's loan, credit and other agreements may be impacted by the phase-out of the London Interbank Offered Rate ("LIBOR").***

LIBOR is the basic rate of interest used in lending between banks on the London interbank market and is widely used as a reference for setting the interest rates on loans globally. LIBOR is used as a reference rate to calculate interest under certain of our borrowings and receivables. In 2017, the United Kingdom's Financial Conduct Authority, which regulates LIBOR, announced that it intends to phase out LIBOR by the end of 2021. The U.S. Federal Reserve, in conjunction with the Alternative Reference Rates Committee, a steering committee comprised of large U.S. financial institutions, identified the Secured Overnight Financing Rate ("SOFR") as the preferred alternative reference rate to U.S. dollar LIBOR and recommended a paced transition plan that involves the creation of a reference rate based on SOFR by the end of 2021. SOFR is a more generic measure than LIBOR and considers the cost of borrowing cash overnight, collateralized by U.S. Treasury securities. Given the inherent differences between LIBOR and SOFR or any other alternative benchmark rate that may be established, there are many uncertainties regarding a transition from LIBOR. Certain of Beneficient's borrowing and receivable agreements contain fallback provisions providing for alternative rate calculations in the event LIBOR is unavailable, prior to any LIBOR rate transition. As a result, our level of interest payments we incur or receive may change and the new rates we incur may not be as favorable to us as those in effect prior to any LIBOR phase-out.

***Beneficient's fair value estimates of illiquid assets may not accurately estimate prices obtained at the time of sale and Beneficient cannot provide assurance that the values of the alternative assets underlying the Liquidity Transactions that it reports from time to time will be realized.***

Asset valuations for which there is no readily available market, such as the illiquid assets comprising the Ben Collateral, require estimates and assumptions about matters that are inherently uncertain. Given this uncertainty, the fair values of such assets as reflected in estimated net asset value may not reflect the prices that would actually be obtained if and when such assets would be sold.

Under Beneficient's valuation policy, Beneficient bases its estimates of the fair value of the alternative assets in the Ben Collateral on the fund reported net asset value reported to it by the underlying fund managers. Because alternative asset managers generally hold a high proportion of their investments in assets for which market prices are not readily available, fund reported net asset value will necessarily incorporate estimates of fair value made by the fund managers. As there is no single method for determining fair value, there may be significant variations in the valuation policies used by different fund managers in the Ben Collateral.

In addition, due to time lags in receiving valuation information from fund managers, Beneficient typically does not and will not have up-to-date information from all underlying funds at the time it calculates the fair value of the alternative assets underlying the Liquidity Transactions. Beneficient typically is not and will not be aware of all material developments at a fund or its underlying portfolio companies that could adversely affect the value of the funds in the Ben Collateral.

Even if market quotations are available for the alternative assets underlying the Liquidity Transactions, such quotations may not reflect the value that could actually be realized because of various factors, including the possible illiquidity associated with a large ownership position, subsequent illiquidity in the market for a company's securities, future market price volatility or the potential for a future loss in market value. Realizations at values significantly lower than the fair values recorded in Beneficient's financial statements could have a material adverse effect on the net asset value of the alternative asset, and therefore the value of the beneficial interests and the corresponding Liquidity Transactions.

Furthermore, a substantial majority of the net assets of Beneficient are currently represented by intangible assets and goodwill. Beneficient's management performs goodwill and intangible asset impairment testing annually, during the fourth quarter, or when events occur, or circumstances change that would more likely than not indicate impairment has occurred. Goodwill impairment exists when the carrying value of goodwill exceeds its implied fair value. If Beneficient's management concludes that a portion of its goodwill is impaired, and writes down the value of such goodwill, the value of our investment in Beneficient may also have to be written down.

***Beneficient's liquidity, profitability and business may be adversely affected by concentrations of assets comprising the Ben Collateral.***

The Ben Collateral may be concentrated in certain issuers, funds, sectors, geographic regions, countries, or asset types, which could negatively affect performance as well as Beneficient's financial results, including Beneficient's capital position, earnings, cash flows, and growth.

Similarly, Beneficient's balance sheet may have significant exposures to certain issuers, industries, or asset classes. As a result, Beneficient's net cash flows and asset valuations (e.g., net asset value) may exhibit greater volatility due to idiosyncratic factors specific to companies, industries, regions, and asset classes. Moreover, because of such concentrations, Beneficient may suffer losses even when economic and market conditions are generally favorable for Beneficient's competitors.

In the case of Beneficient's exposure to investments in publicly traded companies, its operating results would be impacted by volatility in the public markets generally and in the stock prices of such companies.

***The due diligence process that Beneficient undertakes in connection with Liquidity Transactions may or may not reveal all facts that may be relevant in connection with such Liquidity Transaction, and even if Beneficient receives complete and accurate information it may not translate to identifying the appropriate underwriting criteria.***

Before offering liquidity solutions to clients, Beneficient conducts due diligence that it deems reasonable and appropriate based on the facts and circumstances applicable to each transaction. When conducting due diligence, Beneficient may be required to evaluate important and complex business, financial, tax, accounting, technological, environmental, social, governance and legal and regulatory issues. In addition to Beneficient's own employees, outside consultants, legal advisors and accountants may be involved in the due diligence process in varying degrees depending on the type of investment and the parties involved. Nevertheless, when conducting due diligence and making an assessment regarding the alternative assets behind a potential Liquidity Transaction, Beneficient relies on the resources available to it, including information provided by the potential client of the Liquidity Transaction, the general partners and managers of the alternative assets the client holds, and, in some circumstances, third-party investigations, and such an investigation will not necessarily result in the investment ultimately being successful. Moreover, even in the event that Beneficient receives complete and accurate information in the due diligence process, it may not translate to identifying the appropriate underwriting criteria, which could result in negative reputational effects, and/or otherwise materially and adversely affect Beneficient's business, financial condition and results of operations.

*Restrictions on Beneficient's ability to collect and analyze data regarding its clients' alternative assets investments could adversely affect its business.*

The Ben Collateral includes interests in alternative assets. Beneficient depends on the continuation of its relationships with the general partners and sponsors of the underlying funds and investments in order to maintain current data on these alternative assets. The termination of such relationships or the imposition of restrictions on its ability to use the data it obtains for its reporting and monitoring services could adversely affect its business, financial condition and results of operations. Beneficient's monitoring is also dependent on the statements and conduct of personnel at investment managers of the general partners of these alternative asset firms. To the extent that the beliefs and expectations of these managers turn out to be inaccurate, Beneficient's expectations as part of its monitoring process may be materially impacted.

**ITEM 1B. UNRESOLVED STAFF COMMENTS.**

Not applicable.

**ITEM 2. PROPERTIES.**

Our principal executive offices are currently located at 325 North St. Paul Street, Dallas, Texas 75201. GWG and Beneficient collectively lease 33,652 square feet of space for a lease term expiring on July 31, 2021. GWG also retains the lease of its legacy executive offices located at 220 South Sixth Street, Suite 1200, Minneapolis, Minnesota 55402. At that location, GWG leases 17,687 square feet of space for a lease term expiring in 2025. We believe these facilities are adequate for our current needs and that suitable additional space will be available as needed.

**ITEM 3. LEGAL PROCEEDINGS.**

We are a party from time to time to what we believe are routine litigation and proceedings considered part of the ordinary course of our business. We believe that the outcome of such existing proceedings would not have a material adverse effect on our financial position, results of operations or cash flows.

**ITEM 4. MINE SAFETY DISCLOSURES.**

Not applicable.

**PART II**

**ITEM 5. MARKET FOR THE REGISTRANT'S COMMON EQUITY, RELATED SHAREHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES.**

Our common stock is listed on The Nasdaq Capital Market under the ticker symbol "GWGH."

As of December 31, 2019, there were 111 record holders of our common stock, one of which was Cede & Co., a nominee for Depository Trust Company, or DTC. Shares of common stock that are held by financial institutions as nominees for beneficial owners are deposited into participant accounts at DTC, and are considered to be held of record by Cede & Co. as one stockholder.

*Purchases of Equity Securities by the Registrant*

On November 15, 2018, the Company's Board of Directors approved a stock repurchase program pursuant to which the Company was permitted, from time to time, to purchase shares of its common stock for an aggregate purchase price not to exceed $1.5 million. Stock repurchases were able to be executed through various means, including, without limitation, open market transactions, privately negotiated transactions or otherwise. The stock repurchase program did not obligate the Company to purchase any shares, and expired on April 30, 2019. As such, there were no repurchases of common stock under this stock repurchase program during the fourth quarter of 2019.

**ITEM 6. SELECTED FINANCIAL DATA.**

Not applicable.

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

You should read the following discussion in conjunction with the consolidated financial statements and accompanying notes and the information contained in other sections of this report. This discussion and analysis is based on the beliefs of our management, as well as assumptions made by, and information currently available to, our management.

*Risk Relating to Forward-Looking Statements*

This report contains forward-looking statements that reflect our current expectations and projections about future events. Actual results could differ materially from those described in these forward-looking statements.

The words "believe," "could," "possibly," "probably," "anticipate," "estimate," "project," "expect," "may," "will," "should," "seek," "intend," "plan," "expect," or "consider" and similar expressions are intended to identify forward-looking statements but are not the exclusive means of identifying such statements. Forward-looking statements are subject to risks and uncertainties, which could cause actual results to differ materially from such statements. Many of the forward-looking statements contained in this report can be found in Item 1A — "Risk Factors" and in the following discussion and analysis.

Such risks and uncertainties include, but are not limited to:

- the valuation of assets reflected on our financial statements, including the fair value of Beneficient's assets, liabilities and equity, including noncontrolling interests, which were consolidated as a result of the Investment and Exchange Agreements on December 31, 2019 (as more fully described in the sections that follow);

- the illiquidity of our life insurance investments and receivables from affiliates;

- our ability to realize the anticipated benefits from our consolidation of Beneficient;

- Beneficient's financial performance and ability to execute on its business plan;

- Beneficient's ability to obtain the trust charters from the Texas Department of Banking necessary to implement its business plan;

- our ability to obtain accurate and timely financial information from Beneficient;

- our ability to effectively transition the management and oversight roles served by our former executives and members of our Board of Directors;

- changes resulting from the evolution of our business model and strategy with respect to Beneficient and the life insurance secondary market;

- our reliance on debt financing and continued access to the capital markets;

- our significant and on-going financing requirements;

- our predominant use of short term debt to fund a portfolio of long term assets could result in a liquidity shortage;

- our ability to make cash distributions in satisfaction of dividend obligations and redemption requests;

- our ability to satisfy our debt obligations if we were to sell our assets;

- our history of operating losses;

- general economic outlook, including prevailing interest rates;

- federal, state and FINRA regulatory matters;

- litigation risks;

Page 44

App. 0553

- our ability to comply with financial and non-financial covenants contained in borrowing agreements;

- the reliability of assumptions underlying our actuarial models, including life expectancy estimates and our projections of mortality events and the realization of policy benefits;

- risks relating to the validity and enforceability of the life insurance policies we purchase;

- our reliance on information provided and obtained by third parties, including changes in underwriting tables and underwriting methodology;

- life insurance company credit exposure;

- cost-of-insurance (premium) increases on our life insurance policies;

- performance of our investments in life insurance policies; and

- risks associated with causing Life Epigenetics and youSurance to become independent of GWG.

We caution you that the foregoing list of factors is not exhaustive. Forward-looking statements are only estimates and predictions, or statements of current intent. Actual results, outcomes or actions that we ultimately undertake could differ materially from those anticipated in the forward-looking statements due to risks, uncertainties or actual events differing from the assumptions underlying these statements.

*JOBS Act*

On April 5, 2012, the Jumpstart Our Business Startups Act of 2012, or JOBS Act, was enacted. Section 107 of the JOBS Act provides that an "emerging growth company" can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act of 1933 for complying with new or revised accounting standards. This means that an "emerging growth company" can make an election to delay the adoption of certain accounting standards until those standards would apply to private companies. We historically qualified as an emerging growth company and elected to delay our adoption of new or revised accounting standards and, as a result, we may not have complied with new or revised accounting standards at the same time as other public reporting companies that are not "emerging growth companies." As discussed in our Annual Report on Form 10-K for the year ended December 31, 2018, we no longer qualify as an emerging growth company as a result of the aggregate amount of non-convertible debt that we have issued during the prior three year period.

**Overview**

In 2018 and 2019, we consummated a series of transactions (as more fully described below) with The Beneficient Company Group, L.P. ("Ben LP," including all of the subsidiaries it may have from time to time — "Beneficient"). Beneficient is a financial services firm, based in Dallas, Texas, that provides liquidity solutions for professionally managed alternative assets for mid-to-high net worth ("MHNW") individuals and small-to-mid ("STM") size institutions, which previously had few options to obtain early liquidity for their alternative asset holdings. Beneficient has closed a limited number of these transactions to date, and intends to significantly expand its operations going forward. As part of GWG's reorientation, we also changed our Board of Directors and executive management team. Beneficient, through its subsidiaries, plans to operate three potentially high value, high margin lines of business:

- Private Trust Lending & Liquidity Products. Through Beneficient Capital Company, L.L.C. ("BCC"), Beneficient provides a unique suite of private trust, lending and liquidity products focused on bringing liquidity to owners of professionally managed alternative assets. Beneficient's innovative liquidity solutions are designed to serve mid-to-high net worth ("MHNW") individuals, small-to-mid sized ("STM") institutions, and asset managers who have historically possessed few attractive options to access early liquidity from their alternative assets. Beneficient targets MHNW clients with $5 million to $30 million in net worth and STM institutional clients typically holding less than $1 billion in assets.

Page 45

- Trust and Custody Services. Through Beneficient Administrative and Clearing Company, L.L.C. ("BACC"), and (subject to capitalization) through Pen Indemnity Insurance Company, LTD ("Pen"), Beneficient plans, in the future, to market retirement funds, custody and clearing of alternative assets, and trustee and insurance services for covering risks attendant to owning or managing alternative assets.

- Financial Technology. Through Ben Markets Management Holdings, L.P., formerly called ACE Portal, L.L.C. ("ACE"), Beneficient plans to provide online portals and financial technologies for the trading and financing of alternative assets. Beneficient's existing and planned products and services are designed to support the tax and estate planning objectives of its MHNW clients, facilitate a diversification of assets or simply provide administrative management and reporting solutions tailored to the goals of the investor who owns alternative investments.

While we are continuing our work to maximize the value of our secondary life insurance business, we do not anticipate purchasing additional life insurance policies in the secondary market and have increased capital allocated toward providing liquidity to a broader range of alternative assets, primarily through Beneficient. We believe Beneficient's operations will generally produce higher risk-adjusted returns than those we can generally achieve from life insurance policies acquired in the secondary market. Furthermore, although we believe that our portfolio of life insurance policies is a meaningful component of a diversified alternative asset portfolio, we continue to explore strategic alternatives for our life insurance portfolio aimed at maximizing its value, including a possible sale, refinancing or recapitalization of our life insurance portfolio.

We completed our transactions with Beneficient to provide us with a significant increase in assets and common shareholders' equity. In addition, our transactions with Beneficient may provide us with the opportunity for a diversified source of future earnings within the alternative asset industry. As GWG and Beneficient expand their strategic relationship, we believe the Beneficient transactions will transform GWG from a niche provider of liquidity to owners of life insurance to a full-scale provider of trust and liquidity products and trust services to owners of a broad range of alternative assets.

**The Beneficient Transactions**

*The Exchange Transaction*

On January 12, 2018, GWG Holdings and GWG Life entered into a Master Exchange Agreement (as amended, the "Master Exchange Agreement") with Beneficient, MHT Financial SPV, LLC, a Delaware limited liability company ("MHT SPV"), and various related trusts (the "Seller Trusts"). The material terms and conditions of the initial Master Exchange Agreement were described in GWG Holdings' Current Report on Form 8-K (the "January 2018 Form 8-K") filed with the Securities and Exchange Commission ("SEC") on January 18, 2018.

On August 10, 2018, GWG Holdings, GWG Life, Beneficient, MHT SPV, and the Seller Trusts entered into a Third Amendment to Master Exchange Agreement (the "Third Amendment"). Pursuant to the Third Amendment, the parties agreed to consummate the transactions contemplated by the Master Exchange Agreement in two closings. The Third Amendment also generally deleted MHT SPV as a party to the Master Exchange Agreement. The material terms and conditions of the Third Amendment to Master Exchange Agreement were described in GWG Holdings' Current Report on Form 8-K (the "August 2018 Form 8-K") filed with the SEC on August 14, 2018. The transactions contemplated by the Master Exchange Agreement, as amended, are referred to throughout this Report as the "Exchange Transaction."

On the first closing date, which took place on August 10, 2018 (the "Initial Transfer Date"):

- in consideration for GWG and GWG Life entering into the Master Exchange Agreement and consummating the transactions contemplated thereby, Ben LP, as borrower, entered into a commercial loan agreement (the "Commercial Loan Agreement") with GWG Life, as lender, providing for a loan in a principal amount of $200.0 million (the "Commercial Loan");

- Ben LP delivered to GWG a promissory note (the "Exchangeable Note") in the principal amount of $162.9 million;

- Ben LP purchased 5,000,000 shares of GWG's Series B Convertible Preferred Stock, par value $0.001 per share and having a stated value of $10 per share (the "Series B"), for cash consideration of $50.0 million, which shares were subsequently transferred to the Seller Trusts;

- the Seller Trusts delivered to GWG 4,032,349 common units of Ben LP at an assumed value of $10 per common unit;

- GWG issued to the Seller Trusts Seller Trust L Bonds due 2023 (the "Seller Trust L Bonds") in an aggregate principal amount of $403.2 million;

- GWG and the Seller Trusts entered into a registration rights agreement with respect to the Seller Trust L Bonds received by the Seller Trusts; and

- GWG and Beneficient entered into a registration rights agreement with respect to the Ben LP common units received and to be received by GWG.

Under the Master Exchange Agreement, at the final closing (the "Final Closing" and the date on which the final closing occurred, the "Final Closing Date"), which occurred on December 28, 2018:

- in accordance with the Master Exchange Agreement, and based on the net asset value of alternative asset financings as of the Final Closing Date, effective as of the Initial Transfer Date, (i) the principal amount of the Commercial Loan was reduced to $182.0 million, (ii) the principal amount of the Exchangeable Note was reduced to $148.2 million, and (iii) the principal amount of the Seller Trust L Bonds was reduced to $366,.9 million;

- the Seller Trusts refunded to GWG $0.8 million in interest paid on the Seller Trust L Bonds related to the Seller Trust L Bonds that were issued as of the Initial Transfer Date, but cancelled, effective as of the Initial Transfer Date, on the Final Closing Date;

- Ben LP issued to GWG an option (the "Option Agreement") to acquire the number of common units of Ben LP, interests or other property that would be received by a holder of Preferred Series A Subclass 1 Unit Accounts of Beneficient Company Holdings, L.P. ("BCH"), an affiliate of Ben LP; and

- GWG issued to the Seller Trusts 27,013,516 shares of GWG common stock (including shares issued upon conversion of the Series B).

On the Final Closing Date, GWG and the Seller Trusts also entered into a registration rights agreement with respect to the shares of GWG common stock owned by the Seller Trusts, an orderly marketing agreement and a stockholders' agreement. The material terms of these agreements are described in our Information Statement on Schedule 14C filed with the SEC on December 6, 2018 and in our Current Report on Form 8-K filed with the SEC on January 4, 2019.

*The Expanded Strategic Relationship*

In the second quarter of 2019, we completed an expansion of the strategic relationship with Beneficient, which was a transformational event for both organizations that is expected to create a unified platform uniquely positioned to provide an expanded suite of products, services and resources for investors and the financial professionals who assist them. GWG and Beneficient intend to collaborate extensively and capitalize on one another's capabilities, relationships and services. On April 15, 2019, Jon R. Sabes, the Company's former Chief Executive Officer and a former director, and Steven F. Sabes, the Company's former Executive Vice President and a former director, entered into a Purchase and Contribution Agreement (the "Purchase and Contribution Agreement") with, among others, Ben LP. The Purchase and Contribution Agreement was summarized in our Current Report on Form 8-K filed with the SEC on April 16, 2019.

Page 47

The closing of the transactions contemplated by the Purchase and Contribution Agreement (the "Purchase and Contribution Transaction") occurred on April 26, 2019. Prior to or in connection with such closing:

- Messrs. Jon and Steven Sabes sold and transferred all of the shares of the Company's common stock held directly and indirectly by them and their immediate family members (approximately 12% of the Company's outstanding common stock in the aggregate); specifically, Messrs. Jon and Steven Sabes (i) sold an aggregate 2,500,000 shares of Company common stock to BCC for $25.0 million in cash and (ii) contributed the remaining 1,452,155 shares of Company common stock to AltiVerse Capital Markets, L.L.C., a Delaware limited liability company ("AltiVerse") (which is a limited liability company owned by an entity related to Beneficient's founders, including Brad K. Heppner (GWG's Chairman and Beneficient's Chief Executive Officer and Chairman) and an entity related to Thomas O. Hicks (one of Beneficient's current directors and a director of GWG)), in exchange for certain equity interests in AltiVerse.

- Our bylaws were amended to increase the maximum number of directors of the Company from nine to 13, and the actual number of directors comprising the Board was increased from seven to 11. The size of the Board has since been reduced and currently consists of nine directors.

- All seven members of the Company's Board of Directors prior to the closing resigned as directors of the Company, and 11 individuals designated by Beneficient were appointed as directors of the Company, leaving two board seats vacant after the closing.

- Jon R. Sabes resigned from all officer positions he held with the Company or any of its subsidiaries prior to the closing, other than his position as Chief Executive Officer of the Company's technology focused wholly owned subsidiaries, Life Epigenetics and youSurance.

- Steven F. Sabes resigned from all officer positions he held with the Company or any of its subsidiaries prior to the closing, except as Chief Operating Officer of Life Epigenetics.

- The resignations of Messrs. Jon and Steven Sabes included a full waiver and forfeit of (i) any severance that may be payable by the Company or any of its subsidiaries in connection with such resignations or the Purchase and Contribution Transaction and (ii) all equity awards of the Company currently held by either of them.

- Murray T. Holland, a trust advisor of the Seller Trusts, which in the aggregate own approximately 79 percent of GWG's outstanding common stock, was named Chief Executive Officer of the Company.

- The Company entered into performance share unit agreements with certain employees of the Company pursuant to which such employees would receive up to $4.5 million in bonuses under certain terms and conditions, including, among others, that such employees remain employed by the Company or one of its subsidiaries (or, if no longer employed, such employment was terminated by the Company other than for cause, as such term is defined in the performance share unit agreement) for a period of 120 days following the closing.

- The stockholders' agreement that was entered into on the Final Closing Date was terminated by mutual consent of the parties thereto.

- BCC and AltiVerse executed and delivered a Consent and Joinder to the Amended and Restated Pledge and Security Agreement dated October 23, 2017 by and among the Company, GWG Life, LLC, Messrs. Jon and Steven Sabes and the Bank of Utah, which provides that the shares of the Company's common stock acquired by BCC and AltiVerse pursuant to the Purchase and Contribution Agreement will continue to be pledged as collateral security for the Company's obligations owing in respect of the L Bonds issued under our Amended and Restated Indenture, dated as of October 23, 2017, as amended and supplemented.

Among other things, the Purchase and Contribution Agreement contemplated that after the closing, the parties will seek to enter into an agreement pursuant to which the Company in certain circumstances will have the right to appoint a majority of the board of directors of the general partner of Beneficient, resulting in the Company and Beneficient being consolidated from a financial reporting perspective. The Company and Beneficient will also seek to enter into an agreement pursuant to which the Company will offer and distribute (through a FINRA registered managing broker-dealer) Beneficient's liquidity products and services. The Company has reduced capital allocated to life insurance assets while it works with Beneficient to build a larger diversified portfolio of alternative asset investment products.

A copy of the Purchase and Contribution Agreement is included in our Annual Report on Form 10-K filed with the SEC on July 9, 2019 as Exhibit 99.3.

Page 48

*The Investment and Exchange Agreements*

On December 31, 2019, the Company, Ben LP, BCH, and Beneficient Management entered into a Preferred Series A Unit Account and Common Unit Investment Agreement (the "Investment Agreement").

Pursuant to the Investment Agreement, the Company transferred $79.0 million to Ben LP in return for 666,667 common units of Ben LP and a Preferred Series A Subclass 1 Unit Account of BCH.

In connection with the Investment Agreement, the Company obtained the right to appoint a majority of the board of directors of Beneficient Management, the general partner of Ben LP. As a result of this change-of-control event, we reported the results of Ben LP and its subsidiaries on a consolidated basis beginning on the transaction date of December 31, 2019. The Company's right to appoint a majority of the board of directors of Beneficient Management will terminate in the event (i) the Company's ownership of the fully diluted equity of Ben LP (excluding equity issued upon the conversion or exchange of Preferred Series A Unit Accounts of BCH held as of December 31, 2019 by parties other than the Company) is less than 25%, (ii) the Continuing Directors of the Company cease to constitute a majority of the board of directors of the Company, or (iii) certain bankruptcy events occur with respect to the Company. The term "Continuing Directors" means, as of any date of determination, any member of the board of directors of the Company who: (1) was a member of the board of directors on December 31, 2019; or (2) was nominated for election or elected to the board of directors with the approval of a majority of the Continuing Directors who were members of the board of directors at the time of such nomination or election.

Following the transaction, and as agreed upon in the Investment Agreement, the Company was issued an initial capital account balance for the Preferred Series A Subclass 1 Unit Account of $319.0 million. The other holders of the Preferred Series A Subclass 1 Unit Accounts are an entity related to the founders of Ben LP and an entity related to one of GWG's and Beneficient's directors (the "Related Unitholders"), and the aggregate capital accounts of all holders of the Preferred Series A Subclass 1 Unit Accounts after giving effect to the investment by the Company is $1.6 billion. The Company's Preferred Series A Subclass 1 Unit Account is the same class of preferred security as held by the Related Entities. If the Related Unitholders exchange their Preferred Series A Subclass 1 Unit Account for securities of the Company, the Company's Preferred Series A Subclass 1 Unit Account would be converted into common units of Ben LP (so neither the Company nor the founders would hold Preferred Series A Subclass 1 Unit Accounts).

Also on December 31, 2019, in a transaction related to the Investment Agreement, GWG Holdings transferred its interest in the Preferred Series A Subclass 1 Unit Account to its wholly owned subsidiary, GWG Life.

In addition, on December 31, 2019, the Company, Ben LP and the holders of common units of Ben LP (the "Common Units") entered into an Exchange Agreement (the "Exchange Agreement") pursuant to which the holders of Common Units from time to time have the right, on a quarterly basis, to exchange their Common Units for common stock of the Company. The exchange ratio in the Exchange Agreement is based on the ratio of the capital account associated with the Common Units to be exchanged to the market price of the Company's common stock based on the volume weighted average price of the Company's common stock for the five consecutive trading days prior to the quarterly exchange date. The Exchange Agreement is intended to facilitate the marketing of Ben LP's products to holders of alternative assets.

The Exchange Transaction, the Purchase and Contribution Transaction and the Investment and Exchange Agreements are referred to collectively as the "Beneficient Transactions."

**Critical Accounting Policies**

*Critical Accounting Estimates*

The preparation of our consolidated financial statements in accordance with the accounting principles generally accepted in the United States of America ("GAAP") requires us to make significant judgments, estimates, and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. We base our judgments, estimates, and assumptions on historical experience and on various other factors believed to be reasonable under the circumstances. Actual results could differ materially from these estimates. We evaluate our judgments, estimates, and assumptions on a regular basis and make changes accordingly. We believe that the judgments, estimates, and assumptions involved in accounting for business combinations, valuing our investments in life insurance policies, assessing potential impairment of equity method investments and equity security investments, assessing the need for allowance for credit losses on financing receivables and evaluating deferred taxes have the greatest potential impact on our consolidated financial statements and accordingly believe these to be our critical accounting estimates. Below we discuss the critical accounting policies associated with these estimates as well as certain other critical accounting policies.

*Business Combinations*

We include the results of operations of acquired businesses from the acquisition date. In allocating the purchase price of a business combination, we record all assets acquired and liabilities assumed at fair value, with the excess of the purchase price over the aggregate fair values recorded as goodwill. Accounting Standards Codification ("ASC") Topic 820, *Fair Value Measurements*, defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. The purchase price of an acquisition is allocated to the underlying assets acquired and liabilities assumed based upon their estimated fair values as of the date of acquisition. To the extent the purchase price exceeds the fair value of the net identifiable tangible and intangible assets acquired and liabilities assumed, such excess is allocated to goodwill. The Company determines the estimated fair values after review and consideration of relevant information, including discounted cash flows, quoted market prices and estimates made by management. The fair value assigned to identifiable intangible assets acquired is based on estimates and assumptions made by management at the time of the acquisition. The Company adjusts the preliminary purchase price allocation, as necessary, during the measurement period of up to one year after the acquisition closing date as it obtains more information as to facts and circumstances existing as of the acquisition date. Acquisition-related costs are recognized separately from the business combination and are expensed as incurred.

As a result of the Investment and Exchange Agreements, we reported the results of Ben LP and its subsidiaries on a consolidated basis beginning on the transaction date of December 31, 2019. The business combination resulted in a gain of $249.7 million related to the remeasurement of our preexisting equity method investment and preliminary goodwill of $2.4 billion. The valuation of goodwill will be a critical accounting estimate beginning January 1, 2020. Refer to Note 5 to the consolidated financial statements for details on the accounting for the transaction.

*Ownership of Life Insurance Policies — Fair Value Option*

We account for the purchase of life insurance policies in accordance with ASC 325-30, *Investments in Insurance Contracts*, which requires us to use either the investment method or the fair value method. We have elected to account for all of our life insurance policies using the fair value method.

The fair value of our life insurance policies is determined as the net present value of the life insurance portfolio's future expected cash flows (policy benefits received and required premium payments) that incorporates current life expectancy estimates and discount rate assumptions.

We initially record our purchase of life insurance policies at the transaction price, which is the amount paid for the policy, inclusive of all external fees and costs associated with the acquisition. At each subsequent reporting period, we re-measure the investment at fair value in its entirety and recognize the change in fair value as unrealized gain (loss) in the current period, net of premiums paid. Changes in the fair value of our life insurance portfolio are based on periodic evaluations and are recorded in our consolidated statements of operations as changes in fair value of life insurance policies.

*Fair Value Components — Life Expectancies*

Unobservable inputs, as discussed below, are a critical component of our estimate for the fair value of our investments in life insurance policies. We currently use a probabilistic method of estimating and valuing the projected cash flows of our portfolio, which we believe to be the preferred and most prevalent valuation method in the industry. In this regard, the most significant assumptions we make are the life expectancy estimates of the insureds and the discount rate applied to the expected future cash flows to be derived from our life insurance portfolio.

The fair value of our portfolio of life insurance policies is determined as the net present value of the life insurance portfolio's future expected cash flows (the net of policy benefits received and required premium payments). The net present value of the future expected cash flows incorporate life expectancy estimates and current discount rate assumptions. The life expectancy estimates we use for acquiring and valuing life insurance policies has in the past been typically based upon the average of two life expectancy reports received from third-party medical actuarial underwriting firms ("Life Expectancy Providers"). After the acquisition of a life insurance policy, we historically have sought to update these life expectancy reports on a periodic basis.

Page 50

In October and November 2018, two of the primary Life Expectancy Providers used by the Company — ITM TwentyFirst, LLC ("TwentyFirst") and AVS, LLC ("AVS") — released updates to their respective mortality tables and medical underwriting methodologies. As disclosed in our Quarterly Report on Form 10-Q for the quarter ended September 30, 2018 filed with the SEC on November 19, 2018, and our amended Quarterly Report on Form 10-Q/A filed on April 22, 2019, the majority of our life insurance policies were valued using life expectancy reports provided by TwentyFirst and/or AVS. The updates from TwentyFirst and AVS suggest a lengthening of prior life expectancy estimates and relate to revised estimates of the originally issued life expectancy reports. These updates do not encompass any change to the insured's age and health condition since the report was originally issued.

We, along with other major secondary market participants, have noted the frequent changes in methodologies made by the Life Expectancy Providers over the years that, short of purchasing revised life expectancy reports at a substantial cost, have lacked detailed information about the impact of these changes on individual policy values. Moreover, our experience is these methodology changes have not resulted in a narrowing of consensus in the life expectancy estimates issued for individual insureds. In other words, the successive changes in the medical underwriting methodologies and mortality tables made by the Life Expectancy Providers have not, in retrospect, proven to be sufficiently accurate with respect to our life insurance portfolio as measured by the ratio of mortality cash flows realized to mortality cash flows predicted (or "expected). We believe, as further described below, that the method we have adopted is a more accurate way of projecting mortality cash flows. Finally, as our life insurance portfolio has grown in size and diversity, our ability to model with greater certainty and predictability through the incorporation of historical portfolio experience in conjunction with the use of life expectancy reports has improved significantly.

*Performance Based Forecasting and Valuation Methodology ("Actual-to-Expected" or "A2E")*

As a result, we undertook a comprehensive study to determine a more accurate, transparent and cost-effective method of pricing, valuing, and modeling the performance of our portfolio of life insurance policies. Our goal was to incorporate life expectancy estimates from Life Expectancy Providers, the historical experience of our portfolio, the diversification and mortality factors of our portfolio, and relevant market-based observations and inputs.

The revised methodology we have adopted was derived from back-testing (the process of applying an analytical method to historical data to see how accurately the method would have predicted actual results) the mortality cash flow performance of our life insurance portfolio using the *longest* life expectancy report received from the Life Expectancy Providers used for pricing at the time the life insurance policies were acquired (the "Longest Life Expectancy"). This contrasts with our historical methodology of projecting mortality cash flows, used prior to the fourth quarter of 2018, which typically used the *average* of two such life expectancy reports.

Our Longest Life Expectancy methodology is built from the following pillars:

- The utilization of life expectancy reports from Life Expectancy Providers for the pricing of all life insurance policies;

- The application of a stable valuation methodology driven by the experience of our life insurance portfolio, which is re-evaluated if experience deviates by a specified margin; and

- The use of relevant market-based observations that can be validated and mapped to the discount rate used to value the life insurance portfolio. See "*Fair Value Components — Discount Rate*" below for a further discussion.

Each of the aforementioned pillars of the Longest Life Expectancy methodology, and the associated assumptions, modeling and outcomes, was reviewed by a leading actuarial consulting firm whose longevity services are used worldwide.

Our life insurance portfolio modeling and predicted future cash flows are based upon the central limit theorem, which establishes that, in certain situations, random events become normalized and predictable around the mean as the number of observations grow in size. We believe our portfolio of life insurance policies has grown sufficiently large in size and diversity to establish that while individual mortality experience is inherently unpredictable, the actual mortality experience of the portfolio should be expected to approach the mean modeled prediction. In other words, we believe that we have sufficient actual mortality experience from our life insurance portfolio to use as the basis for the Longest Life Expectancy methodology.

As of December 31, 2019, our life insurance portfolio, stratified by age of insured in the table below, stood at $2.0 billion in face value of policy benefits and 1,151 policies:

| | | | | Percentage of Total | | |
| Min Age | Max Age | Number of Policies | Policy Benefits (in thousands) | Number of Policies | Policy Benefits | Wtd. Avg. LE (yrs.) |
|---|---|---|---|---|---|---|
| 95 | 101 | 17 | $ 34,402 | 1.5% | 1.7% | 2.2 |
| 90 | 94 | 145 | 283,442 | 12.6% | 14.0% | 3.3 |
| 85 | 89 | 238 | 556,090 | 20.7% | 27.5% | 5.0 |
| 80 | 84 | 251 | 463,047 | 21.8% | 22.9% | 7.7 |
| 75 | 79 | 224 | 347,952 | 19.4% | 17.2% | 9.8 |
| 70 | 74 | 205 | 264,496 | 17.8% | 13.1% | 11.0 |
| 60 | 69 | 71 | 71,544 | 6.2% | 3.6% | 11.4 |
| **Total** | | **1,151** | **$ 2,020,973** | **100.0%** | **100.0%** | **7.2** |

As depicted in the graphs below and after extensive research and modeling, we determined that the Longest Life Expectancy methodology was highly predictive of the actual experience of our portfolio of life insurance policies as compared to our historical methodology using the Average Life Expectancy method.

We used the Least Squares statistical method, which can be used to determine a line of best fit by minimizing the sum of squares of the errors (actual vs. expected) and can be used with either linear or non-linear data. In this case, we are fitting non-linear data to a non-linear curve. The Least Squares method was determined to be an efficient means of calculating the required portfolio mortality multiplier (PMM) to maintain the overall shape of the projected curve while maximizing fit to the observed data.

Page 52

The table below compares the actual to expected mortality cash flow experience of our life insurance portfolio using Longest Life Expectancy. We have increased our actual to expected mortality cash flow experience accuracy from 78% under the Average Life Expectancy through December 2018 to 98% using the Longest Life Expectancy through December 2019. The net effect on the life insurance portfolio of achieving a higher actual to expected ratio is a significant lengthening of its overall life expectancy.



We believe that a Longest Life Expectancy methodology, which incorporates the actual mortality experience of our portfolio and the use of third-party estimates, is superior to our historical methodology. We believe this methodology should minimize future fluctuations of valuation, decrease our reliance on Life Expectancy Providers for updated reports, and improve our ability to finance and forecast future revenues and cash flows.

The implementation of the Longest Life Expectancy methodology required us to take a non-cash charge (net of the impact of a change in discount rate) to revenue of $87.1 million in the fourth quarter of 2018, reflecting a decrease in the fair value of our portfolio of life insurance policies at December 31, 2018. This non-cash charge represented approximately 10% of fair value of the portfolio prior to adjustment.

*Updates to the Analysis*

Proper maintenance of an A2E based valuation methodology includes the continual tracking of actual results as well as comparisons to projections. An A2E based valuation methodology rests on the actuarial premise that mortality results for sufficiently large populations follow predictable mortality curves (see discussion above regarding the Central Limit Theorem). As such, through the A2E analysis and the use of the PMM, we are able to "fit" projections to actual results, which provides a basis to forecast future performance more accurately.

Should performance sufficiently deviate in the future from these projections, the A2E analysis will be re-examined to determine if the resultant PMM still results in the most accurate fitting of the projections to actual results. Adjustments to the PMM would then be made based on that analysis if warranted.

The analysis would utilize the same basic methodology as the initial analysis to ensure consistency in the process:

- Calculation of a static Portfolio PMM;

- A cohort analysis of our life insurance portfolio combined with a durational analysis to determine if either static or vector cohort PMM's are warranted; and

- Following this updated analysis, any necessary changes to the PMM would then be incorporated into the valuation methodology.

Page 53

The basis for a re-examination of the A2E analysis could be based on either the passage of time or a pre-determined performance trigger. Following further analysis, we determined that a performance-based trigger approach that allows the portfolio to perform within statistical norms (+/- 1 standard deviation) without constant updates is most appropriate. We intend to re-examine the A2E analysis and recalculate the resultant PMM anytime the six-month moving average of the difference between actual portfolio performance and projected performance deviates by more than one standard deviation from the mean and such deviation continues as of the end of any calendar quarter after persisting for three consecutive months. This methodology allows for natural periods of slow or excess maturities to occur without the necessity of changes to the PMM. At present, a one standard deviation move in the six-month moving average of the difference between actual portfolio performance and projected performance would equate to a valuation change of approximately $8 million. The decision to update our valuation methodology in the fourth quarter of 2018 was based in part on an analysis performed by a third-party actuarial consulting firm, which indicated a very strong tendency toward mean reversion within the dataset.

The analysis above utilizes the Society of Actuaries 2015 Valuation Basic Table ("2015 VBT"). The 2015 VBT is the standard in the secondary market for life insurance and is based on a much larger dataset of insured lives, face amount of policies and more current information compared to the dataset underlying the 2008 Valuation Basic Table. The 2015 VBT dataset includes 266 million policies compared to the 2008 VBT dataset of 75 million. The experience data in the 2015 VBT dataset includes 2.6 million claims on policies from 51 insurance carriers. Life expectancies implied by the 2015 VBT are generally slightly longer for both male and female non-smokers between the ages of 65 and 80. However, insureds of both genders over the age of 80 have significantly longer life expectancies, approximately 8% to 42% longer, as compared to the 2008 VBT. We adopted the 2015 VBT in our valuation process in 2016.

*Periodic Updates to Life Expectancy (LE) Reports*

Our senior lender requires, and other lenders we engage may require, regular updates to LE Reports. Additionally, should we choose to sell life insurance policies in the secondary market, investors may require updated LE Reports. These lenders and investors may utilize an average LE for valuation, similar to our historical methodology, which may result in significantly different valuations.

We intend to continue obtaining LE Reports beyond our policy purchase process to the extent they are needed to comply with existing and future covenants within credit facilities. To the extent such LE Reports are available, we do not expect to immediately incorporate these LE Reports into our revised valuation methodology, but will track this data to determine over time if there exists any additive predictive value in relation to the basis of its mortality projections. As such, our policies and procedures surrounding the updating of LE Reports reflect that LE Reports will only be updated when required by third parties.

*Current A2E Analysis and PMM Implications*

Our A2E based methodology and use of a static Portfolio PMM requires that we recalculate the PMM used in our valuation anytime the six-month moving average of the difference between actual portfolio performance and projected performance of cumulative face value maturities deviates by more than one standard deviation from the mean and such deviation persists for three consecutive months and continues as of the current quarter-end month. As of December 31, 2019, the six-month moving average of the difference between actual portfolio performance and projected performance of cumulative face value of maturities was within one standard deviation from the mean. As such, our valuation methodology did not require an update to our PMM during the current quarter.

*Portfolio Return Implications*

At any time, we calculate our returns from our life insurance assets based upon (i) our historical results, and (ii) the future cash flows we expect to realize from our statistical forecasts. To forecast our expected future cash flows and returns, we use the probabilistic method of analysis. The expected internal rate of return ("IRR") of our portfolio is based upon future cash flow forecasts derived from a probabilistic analysis of policy benefits received and policy premiums paid in relation to our non-GAAP investment cost basis, which includes purchase price, total premiums paid, and total financing costs incurred to date. As of December 31, 2019, the expected internal rate of return on our portfolio of life insurance assets was 5.17% based on our portfolio benefits of $2.0 billion and our non-GAAP investment cost basis of $941.7 million. This calculation excludes returns realized from our matured policy benefits, which are substantial.

Page 54

We seek to further enhance our understanding of our expected future cash flow and returns by using a stochastic analysis, sometimes referred to as a "Monte Carlo simulation," to provide us with a greater understanding of the variability of our projections. The stochastic analysis we perform, which excludes financing costs to isolate only those cash flows associated with the life insurance policies, provides IRR calculations for different statistical confidence intervals. The results of our stochastic analysis, in which we run 10,000 random mortality scenarios, demonstrates that the scenario ranking at the 50th percentile of all 10,000 results generates an IRR of 8.22%, which is very near to the discount rate of 8.25% that we used to calculate the fair value of our portfolio. Our expected IRR is based upon future policy related cash flow forecasts derived from a probabilistic analysis of our policy benefits received and policy premiums paid. The stochastic analysis results also reveal that our portfolio is expected to generate an IRR of 7.75% or better in 75% of all generated scenarios, and an IRR of 7.35% or better in 90% of all generated scenarios. We believe the Company's portfolio of life insurance policies has grown sufficiently large in size and diversity to establish that, while individual mortality experience is inherently unpredictable, the actual mortality experience of the portfolio should be expected to approach the mean modeled prediction.

*Fair Value Components — Required Premium Payments*

We must pay the premiums on the life insurance policies within our portfolio in order to collect the policy benefit. The same probabilistic model and methodologies used to generate expected cash inflows from the life insurance policy benefits over the expected life of the insured are used to estimate cash outflows due to required premium payments. Premiums paid are offset against revenue in the applicable reporting period.

*Fair Value Components — Discount Rate*

A discount rate is used to calculate the net present value of the expected cash flows. The discount rate used to calculate fair value of our portfolio incorporates the guidance provided by ASC 820, *Fair Value Measurements and Disclosures*.

We utilized an 8.25% discount rate to estimate the fair value of our portfolio of life insurance policies at both December 31, 2019 and 2018.

In adopting the Longest Life Expectancy methodology as described above, we preserved the general methodology historically used to calculate the fair value discount rate and have made important enhancements. We also improved the reliability and relevancy of the competitive sales estimates we use to measure the discount rates (on a Longest Life Expectancy basis) observed in the life insurance secondary market. We continue to use fixed income market interest rates, credit exposure to the issuing insurance companies, and our estimate of the operational risk yield premium a purchaser would apply to the future cash flows derived from our portfolio of life insurance policies in our methodology. To the extent we limit or cease acquiring insurance policies, we may not have reliable access to the market-based factors described above and will be required to find suitable alternative proxies.

Management has significant discretion regarding the combination of these and other factors when determining the discount rate. The discount rate we choose assumes an orderly and arms-length transaction (i.e., a non-distressed transaction in which neither seller nor buyer is compelled to engage in the transaction), which is consistent with related GAAP guidance. The carrying value of policies acquired during each quarterly reporting period are adjusted to their current fair value using the fair value discount rate applied to the entire portfolio as of that reporting date.

We engaged ClearLife Limited, owner of the ClariNet LS actuarial portfolio pricing software we use, to prepare a net present value calculation of our life insurance portfolio. ClearLife Limited processed policy data, future premium data, life expectancy estimate data, and other actuarial information to calculate a net present value for our portfolio using the specified discount rate of 8.25%. ClearLife Limited independently calculated the net present value of our portfolio of 1,151 policies to be $796.0 million and furnished us with a letter documenting its calculation. A copy of such letter is filed as Exhibit 99.1 to this report.

See Note 7 to the consolidated financial statements for additional discussion of the sensitivity of the valuation to different discount rates.

*Equity Method Investments, Equity Security Investment and Financing Receivable from Affiliate*

On November 11, 2019, GWG contributed the common stock and membership interests of its previously-wholly owned subsidiaries Life Epigenetics Inc. ("Life Epigenetics") and youSurance General Agency, LLC ("youSurance") to a legal entity, InsurTech Holdings, LLC ("InsurTech Holdings"), in exchange for a membership interest in InsurTech Holdings. Although we currently own 100% of the equity of InsurTech Holdings, we do not have a controlling financial interest in InsurTech Holdings because the managing member has substantive participating rights. Therefore, we account for our ownership interest in InsurTech Holdings as an equity method investment. Life Epigenetics was formed to commercialize epigenetic technology for the longevity industry. youSurance seeks to offer life insurance directly to customers utilizing epigenetic technology.

Prior to December 31, 2019, GWG's investment in Ben LP was accounted for using the equity method. As a result of the Investment and Exchange Agreements on December 31, 2019, GWG consolidated Beneficient and accounted for the consolidation under the Business Combinations Critical Accounting Policy described above.

GWG also has an equity security investment in Beneficient and financing receivables for loans it provided to Beneficient and the LiquidTrust Borrowers (see Notes 8 and 9 to the consolidated financial statements).

When circumstances indicate that the carrying value of the equity method investments or equity security may not be recoverable, the fair value of the investment is evaluated by management. The fair values of these investments are not readily determinable as they are not currently publicly traded on a stock exchange. As a result, management uses other accepted valuation methods to determine fair value such as discounting estimated future cash flows for the business. If the fair value of the investment is determined to be less than its carrying value and the decline in value is considered to be other than temporary, an appropriate write down is recorded to net earnings based on the excess of the carrying value over the best estimate of fair value of the investment. In addition, if based on current information and events it is probable that GWG will be unable to collect all amounts due according to the contractual terms of the financing receivables from affiliates and an amount can be reasonably estimated, GWG will write down the amounts to estimated realizable value. Information and events creating uncertainty about the realization of recorded amounts for financing receivables from affiliates include, but are not limited to, the estimated cash flows generated by the affiliate's business, the sufficiency of collateral securing the amounts, and the creditworthiness of the counterparties involved. Changes in facts, circumstances and management's estimates and judgment could result in a material charge to earnings. At December 31, 2019, we determined that no indication of an impairment of the aforementioned equity method investments or equity security investments existed, and no allowance for credit losses was recorded on the financing receivables from affiliates.

*Deferred Income Taxes*

Under ASC 740, *Income Taxes*, deferred tax assets and liabilities are recognized for the future tax consequences attributable to temporary differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. A valuation allowance is established for deferred tax assets that are not considered "more likely than not" to be realized. Realization of deferred tax assets depends upon having sufficient past or future taxable income in periods to which the deductible temporary differences are expected to be recovered or within any applicable carryback or carryforward periods or sufficient tax planning strategies. After assessing the realization of the net deferred tax assets, we believe that there is substantial uncertainty that our net deferred tax asset will be realized during the applicable carryforward period. As such, valuation allowances have been recorded against the applicable federal and state deferred tax assets of GWG Holdings as of December 31, 2019 and 2018. In 2019, valuation allowances were recorded against the total amount of non-permanent deferred tax assets. Permanent deferred tax assets of $10.8 million in 2019 were comprised of interest expense limitation under Section 163(j) and the tax-effected net operating loss ("NOL") created subsequent to 2018.

At December 31, 2019 and December 31, 2018, we had NOL carryforwards of $28.6 million and $36.5 million, respectively, for both federal and state taxes. The NOL carryforwards subject to expiration (i.e., those generated prior to 2018) will begin to expire in 2033. Future utilization of NOL carryforwards is subject to limitations under Section 382 of the Internal Revenue Code. This section generally relates to a more than 50 percent change in ownership over a three-year period. As a result of the Exchange Transaction, a change in ownership for tax purposes only has occurred as of December 28, 2018. As such, the annual utilization of our net operating losses generated prior to the ownership change is limited. However, net unrealized built-in gains on our life insurance policies result in an increase in the Section 382 limit over the five-year recognition period, which resulted in a nominal amount of current tax liability in 2019.

Page 56

**Principal Revenue and Expense Items**

During the years ended December 31, 2019 and 2018, we earned revenues from the following primary sources:

- *Life Insurance Policy Benefits Realized*. We recognize the difference between the face value of the policy benefits and carrying value when an insured event has occurred and determine that collection of the policy benefits is realizable and reasonably assured. Revenue from a transaction must meet both criteria in order to be recognized. We generally collect the face value of the life insurance policy from the insurance company within 45 days of our notification of the insured's mortality.

- *Change in Fair Value of Life Insurance Policies*. We value our life insurance portfolio investments for each reporting period in accordance with the fair value principles discussed herein, which reflects the expected receipt of policy benefits in future periods, net of premium costs, as shown in our consolidated financial statements.

- *Interest on Financing Receivables from Affiliates.* We recognize and record interest income on outstanding principal as earned.

- *Sale of a Life Insurance Policy*. In the event of a sale of a policy, we recognize gain or loss as the difference between the sale price and the carrying value of the policy on the date of the receipt of payment on such sale.

During the years ended December 31, 2019 and 2018, our main components of expense are summarized below:

- *Interest Expense.* We recognize, and record interest expenses associated with the costs of financing our life insurance portfolio and our investment in Beneficient. These expenses include interest paid to our senior lenders under our second amended and restated senior credit facility with LNV Corporation, as well as interest paid on our L Bonds, Seller Trust L Bonds and other outstanding indebtedness. When we issue debt, we amortize the financing costs (commissions and other fees) associated with such indebtedness over the outstanding term of the financing and classify it as interest expense.

- *Selling, General and Administrative Expenses*. We recognize and record expenses incurred in our business operations, including operations related to the purchasing and servicing of life insurance policies. These expenses include salaries and benefits, sales, marketing, occupancy and other expenditures.

Additional components of our net earnings include:

- *Earnings (Loss) from Equity Method Investment*. Prior to the Investment and Exchange Agreements on December 31, 2019, we accounted for our investment in the common units of Ben LP using the equity method. Under this method, we recorded our share of the net earnings or losses attributable to Ben LP common unitholders, on a one quarter lag, as a separate line on our consolidated statements of operations. We also account for our investment in InsurTech as an equity method investment, which is also included in earnings (loss) from equity method investment in our consolidated statements of operations. We had a loss of $4.1 million from equity method investments during 2019, compared to nominal earnings in 2018.

- *Gain on Consolidation of Equity Method Investment:* In conjunction with the consolidation of Beneficient on December 31, 2019, we remeasured our preexisting equity method investment to fair value, resulting in a gain due to the increase in the estimated fair value compared to our existing book value. The gain on consolidation of Beneficient on December 31, 2019 was $249.7 million.

  In connection with the Investment Agreement, the Company obtained the right to appoint a majority of the board of directors of Beneficient Management, the general partner of Ben LP. As a result, the Company obtained control of Ben LP and consolidated Ben LP as of December 31, 2019, under the guidance in ASC 805, *Business Combinations*.

  As a result of the change-of-control, the Company was required to remeasure its existing equity investment at fair value prior to consolidation. At December 31, 2019, the Company's equity investment in the common units of Ben LP had a carrying value of $368.6 million, prior to the additional investment noted above. The Company estimated the fair value of its investment in Ben LP to be approximately $622.5 million, resulting in the recognition of a gain of $253.9 million during the fourth quarter of 2019. This gain is included in gain on consolidation of equity method investment on the Company's consolidated statement of operations for the year ended December 31, 2019. This gain was partially offset by the remeasurement to fair value of the Commercial Loan Agreement between GWG Life and Ben LP and the Option Agreement between GWG Holdings and Ben LP which resulted in a net loss of $4.2 million. The net gain on consolidation of equity method investment after remeasurement of these preexisting balances was $249.7 million. The Company's proportionate share of the earnings or losses from Ben LP was recognized in earnings (loss) from equity method investment in our consolidated statement of operations from August 10, 2018 until September 30, 2019 (see Note 9 to the consolidated financial statements for further information) and was previously recorded on a one-quarter lag basis. In connection with the consolidation of Beneficient, the Company was required to discontinue the one-quarter lag.

**Results of Operations — 2019 Compared to 2018**

The following is our analysis of the results of operations for the periods indicated below. This analysis should be read in conjunction with our consolidated financial statements and related notes (dollar values in thousands).

| | Years Ended December 31, | |
| --- | --- | --- |
| | **2019** | **2018** |
| Revenue realized from maturities of life insurance policies | $ 91,882 | $ 50,326 |
| Revenue recognized from change in fair value of life insurance policies[1] | 49,015 | (10,344) |
| Premiums and other annual fees | (65,577) | (54,087) |
| Gain (loss) on life insurance policies, net | 75,320 | (14,105) |
| Interest and other income | 16,956 | 13,715 |
| Total revenue | $ 92,276 | $ (390) |
| | | |
| Attribution of gain (loss) on life insurance policies, net: | | |
| Change in estimated probabilistic cash flows, net of premium and other annual fees paid | $ 1,609 | $ 21,357 |
| Net revenue recognized at maturity | 69,122 | 28,511 |
| Unrealized gain on acquisitions | 6,921 | 28,017 |
| Change in life expectancy evaluation | (2,332) | (4,890) |
| Change in life expectancy valuation methodology[1] | - | (87,100) |
| Gain (loss) on life insurance policies, net | $ 75,320 | $ (14,105) |
| | | |
| Number of policies acquired | 83 | 318 |
| Face value of purchases | $ 97,316 | $ 440,445 |
| Purchases (initial cost basis) | $ 32,356 | $ 128,503 |
| Unrealized gain on acquisition (% of face value) | 7.1% | 6.4% |
| | | |
| Number of policies matured | 78 | 62 |
| Face value of matured policies | $ 125,148 | $ 71,090 |
| Net revenue recognized at maturity event (% of face value matured) | 55.2% | 40.1% |

(1) In 2018, revenue recognized from change in fair value of life insurance policies includes a net pre-tax charge of $87.1 million related to the adoption of the Longest Life Expectancy methodology. The $87.1 million represented the net impact of the lengthening of overall life expectancies as a result of the adoption of the Longest Life Expectancy methodology partially offset by the impact of a decrease in the discount rate associated thereto.

Revenue from changes in estimated probabilistic cash flows, net of premiums paid was $1.6 million and $21.4 million in 2019 and 2018, respectively. The increase of $89.4 million in gain (loss) on life insurance policies for the year ended December 31, 2019 over the comparable prior year period was driven by a significant increase in maturities of life insurance policies and an $87.1 million charge resulting from the adoption of the Longest Life Expectancy methodology in 2018, offset by higher premiums paid in 2019.

The face value of policies purchased was $97.3 million and $440.4 million in 2019 and 2018, respectively, reflecting a decrease of face value purchased of $343.1 million. The resulting unrealized gain on acquisition was $6.9 million and $28.0 million in 2019 and 2018, respectively, reflecting a decrease of $21.1 million. Decreased unrealized gain on acquisition in the current period is the result of a strategic decision to significantly reduce capital allocated to purchasing additional life insurance policies in the secondary market and to increase capital allocated toward providing liquidity to a broader range of alternative assets, primarily through additional investments in Beneficient. On December 31, 2019, we obtained the right to appoint a majority of the board of directors of the general partner of Ben LP. As a result of this change-of-control event, we reported the results of Ben LP and its subsidiaries on a consolidated basis beginning on the transaction date of December 31, 2019. We believe Beneficient can finance investments in alternative assets that will generally produce higher risk-adjusted returns than those we can generally achieve from life insurance policies acquired in the secondary market. Furthermore, although we believe that our portfolio of life insurance policies is a meaningful component of a growing diversified alternative asset portfolio, we continue to explore strategic alternatives for our life insurance portfolio aimed at maximizing its value, including a possible sale, refinancing or recapitalization of our life insurance portfolio.

The face value of matured policies was $125.1 million and $71.1 million in 2019 and 2018, respectively, reflecting an increase of face value of matured policies of $54.0 million. The resulting net revenue recognized at maturity was $69.1 million and $28.5 million, respectively. Revenue changes from maturity events of $40.6 million primarily resulted from the changes of face value of policies matured during those same periods.

Net revenue charges from change in life expectancy evaluation were ($2.3) million and ($4.9) million in 2019 and 2018, respectively. The resulting net revenue increase of $2.6 million primarily resulted from a lower number of life expectancy updates received during 2019 over 2018.

Interest and other income is comprised of interest from financing receivables, bank interest and other miscellaneous items. Increased interest and other income of $3.2 million in 2019 compared to 2018 was primarily driven by the interest income earned on the financing receivables from Beneficient, and to a lesser extent, interest income from higher bank account balances and the implementation of a sweep process to move balances to higher interest earning bank accounts.

*Interest and Operating Expenses (in thousands)*

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | **2019** | **2018** | **Increase/ (Decrease)** |
| Interest expense (including amortization of deferred financing costs) | $ 114,844 | $ 80,136 | $ 34,708 |
| Employee compensation and benefits | 28,309 | 17,407 | 10,902 |
| Legal and professional fees | 12,824 | 5,541 | 7,283 |
| Other expenses | 15,896 | 15,995 | (99) |
| Total expenses | $ 171,873 | $ 119,079 | $ 52,794 |

The increase in interest expense was primarily due to the increase in the average outstanding L Bonds from $548.6 million in 2018 to $815.3 million in 2019, contributing $22.7 million of increased interest expense, including amortization of deferred financing costs. Seller Trust L Bonds of $366.9 million were issued in the third quarter of 2018 resulting in an additional $16.7 million of interest expense in 2019 compared to 2018. These increases were partially offset by $4.7 million of lower interest expense on the second amended and restated senior credit facility with LNV Corporation due to net paydowns of $19.8 million during the first ten months of 2019, prior to the amendment of the facility on November 1, 2019. A description of the agreement governing our second amended and restated senior credit facility is set forth below under the caption "Amendment of Credit Facility with LNV Corporation."

The increase in employee compensation and benefits in 2019 compared to 2018 was primarily related to management changes discussed under the caption "The Expanded Strategic Relationship" above, as well as incentive and severance costs associated with moving our principal executive offices from Minneapolis to Dallas during 2019. We also experienced higher costs in 2019 compared to 2018 resulting from certain stock-based compensation arrangements in the third and fourth quarters of 2019.

The increase in legal and professional fees in 2019 compared to 2018 is the result of higher non-capitalizable professional service fees, primarily legal and consulting fees, associated with the Investment and Exchange Agreements and the investment in InsurTech Holdings, in addition to legal, consulting and fees related to our move from Minneapolis to Dallas in 2019.

*Insurtech Initiatives*

During 2019 and 2018, we incurred $5.5 million and $4.2 million of expenses, respectively, in furtherance of our insurtech initiatives. These expenses are primarily related to the development of intellectual property surrounding advanced epigenetic testing technology.

As previously discussed, on November 11, 2019, GWG contributed the common stock and membership interests of its previously wholly-owned subsidiaries Life Epigenetics and youSurance to InsurTech Holdings in exchange for a membership interest in InsurTech Holdings. We believe that as a separate entity (rather than as a small subsidiary of a large financial services holding company), the InsurTech Holdings businesses can reach their maximum potential in terms of marketing and branding, attraction of talent, appropriate peer group comparisons and, ultimately, return to its owners. We expect InsurTech Holdings' costs to increase in the future, which will affect our consolidated earnings through our earnings (loss) from equity method investment. Under the Operating Agreement of InsurTech Holdings, we are obligated to invest approximately $20.0 million in InsurTech Holdings over a two year period ending in November 2021, of which $2.1 million was funded during the fourth quarter of 2019.

*Income Tax Expense*

We realized $57.9 million in income tax expense in 2019, which resulted in an effective tax rate of 34.8%, compared to the statutory federal income tax rate of 21%. We realized no income tax expense in 2018.

The following table provides a reconciliation of our income tax expense (benefit) at the statutory federal income tax rate to our actual income tax expense (in thousands):

| | Years Ended December 31, | | | | |
| | 2019 | | | 2018 | |
| --- | ---: | ---: | --- | ---: | ---: |
| Statutory federal income tax (benefit) | $ 34,869 | 21.0% | $ | (25,085) | 21.0% |
| State income taxes (benefit), net of federal benefit | 13,486 | 8.1% | | (9,243) | 7.7% |
| Change in valuation allowance | 9,671 | 5.8% | | 33,999 | (28.4)% |
| Other permanent differences | (93) | (0.1)% | | 329 | (0.3)% |
| **Total income tax expense (benefit)** | **$ 57,933** | **34.8%** | **$** | **—** | **0.0%** |

The most significant temporary differences between GAAP net income (loss) and taxable net income (loss) are the treatment of interest costs, policy premiums and servicing costs with respect to the acquisition and maintenance of the life insurance policies and revenue recognition with respect to the fair value of the life insurance portfolio.

**Revenue and Earnings before Tax by Reportable Segment — 2019 Compared to 2018**

We have two reportable segments: 1) Investment in Beneficient and 2) Secondary Life Insurance. Corporate & Other includes certain activities not allocated to specific business segments. These activities include holding company financing and investing activities, and management and administrative services to support the overall operations of the Company.

Page 60

App. 0569

Comparison of revenue by reportable segment for the periods indicated (in thousands):

| Revenue: | | Years Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2019 | | 2018 | | Increase/ (Decrease) | |
| Secondary Life Insurance | $ | 78,002 | $ | (11,633) | $ | 89,635 | |
| Investment in Beneficient | | 13,738 | | 10,655 | | 3,083 | |
| Corporate & Other | | 536 | | 588 | | (52) | |
| Total | $ | 92,276 | $ | (390) | $ | 92,666 | |

The primary drivers of the changes from 2018 to 2019 were as follows:

- Secondary Life Insurance revenue increased by $89.6 million for the year ended December 31, 2019 over the comparable period in 2018 primarily as a result of an $89.4 million higher net gain on life insurance policies. We recognized a loss on life insurance policies in 2018 of $14.1 million due primarily an $87.1 million charge resulting from a change in our life expectancy evaluation methodology. The current year also benefited from $40.6 million higher revenue from life insurance policy maturities and $2.6 million lower charges on life expectancy evaluation updates, partially offset by $11.5 million increased premium costs, $21.1 million lower unrealized gain on acquisition and an $8.3 million lower change in estimated probabilistic cash flows.

- Investment in Beneficient revenue for the year ended December 31, 2019 represents a full year of interest income on approximately $192 million of financing receivables resulting from the Exchange Transaction with Beneficient in the third and fourth quarters of 2018. Also included is interest income from the loan executed with the LiquidTrust Borrowers in June 2019. The interest income from the Beneficient note will be eliminated beginning in January 2020 as a result of the consolidation of Beneficient on December 31, 2019. See Note 8 to the consolidated financial statements regarding our financing receivables with affiliates.

Comparison of earnings before tax by reportable segment for the periods indicated (in thousands):

| Segment Earnings Before Tax[1] | | Years Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2019 | | 2018 | | Increase/ (Decrease) | |
| Secondary Life Insurance | $ | (27,694) | $ | (96,578) | $ | 68,884 | |
| Investment in Beneficient | | 229,206 | | (106) | | 229,312 | |
| Corporate & Other | | (35,470) | | (22,767) | | (12,703) | |
| Total | $ | 166,042 | $ | (119,451) | $ | 285,493 | |

(1) Includes earnings (loss) from equity method investments and gain on consolidation of equity method investments as presented in our consolidated statements of operations.

Page 61

The primary drivers of the changes from 2018 to 2019 were as follows:

- Secondary Life Insurance increased by $68.9 million as a result of the following:

  - $89.4 million increase in the gain on life insurance policies, net as described above in the revenue discussion.

  - $13.7 million increase in interest expense as a result of higher average debt outstanding; and

  - An increase in operating expenses of $6.8 million, primarily resulting from higher employee compensation and benefits, professional fees and insurance costs, offset by $4.3 million lower bad debt expense.

- Investment in Beneficient segment earnings before tax increased by $229.3 in 2019 compared to 2018 primarily due to a fair value adjustment related to our preexisting investment as a result of obtaining control of Beneficient on December 31, 2019, resulting in a gain of $249.7 million. In addition, interest income was $3.1 million higher from financing receivables, offset by $21.0 million higher interest expense on the debt issued to finance the investments in Beneficient, and a $2.5 million loss from equity method earnings of Beneficient recognized during 2019 before the change-of-control.

- Corporate and Other operating loss increased primarily due to a $2.4 million increase in expenses related to insurtech initiatives, and a $10.3 million increase in other corporate costs, primarily employee compensation and benefits expenses associated with moving our principal executive offices from Minneapolis to Dallas and legal and professional fees associated with the Investment and Exchange Agreements.

**Liquidity and Capital Resources**

We finance our businesses through a combination of life insurance policy benefit receipts, dividends and interest on investments, equity offerings, debt offerings and our second amended and restated senior credit facility with LNV Corporation. We have traditionally used proceeds from these sources for policy acquisition, policy premiums and servicing costs, working capital and financing expenditures including paying principal, interest and dividends. We have also used proceeds to make additional investments in Beneficient. As of December 31, 2019 and 2018, we had approximately $151.5 million and $141.9 million, respectively, in combined available cash, cash equivalents, restricted cash, policy benefits receivable and fees receivable.

We currently fund our business primarily with debt that generally has a shorter duration than the duration of our long-term assets. The resulting asset/liability mismatch can result in a liquidity shortfall if we are unable to renew maturing short term debt or secure suitable additional financing. In such a situation, we could be forced to sell assets at less than optimal (distressed) prices. We were unable to offer our L Bonds, our primary source of debt capital, for the approximately three month period commencing May 1, 2019 due to delays in filing certain periodic reports with the SEC. We drew down our cash balances during that period as L Bonds matured but were unable to be renewed, and we were unable to offer new L Bonds. We recommenced our L Bond offering on August 8, 2019.

Additional future borrowing base capacity for premiums and servicing costs, created as the premiums and servicing costs of pledged life insurance policies become due and by additional policy pledges to the facility, if any, exists under our second amended and restated senior credit facility with LNV Corporation. The second amended and restated senior credit facility with LNV Corporation has certain financial and nonfinancial covenants. We were in compliance with the debt covenants as of December 31, 2019 and are in compliance as of the filing date of this report.

On August 10, 2018, we issued $50 million of Series B in connection with the Initial Transfer of the Exchange Transaction. Approximately half of the proceeds from this sale were distributed to common shareholders pursuant to a special dividend paid on September 5, 2018 to shareholders of record on August 27, 2018. The remaining amount was expected to be utilized primarily for our insurtech initiatives. As noted in the "Results of Operations" section above, on November 11, 2019, GWG contributed the common stock and membership interests of its wholly owned Life Epigenetics and youSurance subsidiaries to a legal entity, InsurTech Holdings, in exchange for a membership interest in the entity. In connection with the transaction, GWG contributed $2.1 million in cash to InsurTech Holdings during the fourth quarter of 2019 and is committed to contribute an additional $17.9 million to the entity over the next two years. We do not expect to issue any additional Series B.

We heavily rely on our L Bond offering to fund our business operations. As described elsewhere in this report, we suspended our offering on May 1, 2019 due to our delinquency in filing certain periodic reports with the SEC. After regaining compliance with our SEC reporting obligations, we recommenced our offering of L Bonds on August 8, 2019. If we are forced to suspend our L Bond offering in the future for any significant additional length of time and we are unable to obtain replacement financing, our business would be adversely impacted and our ability to service and repay our debt obligations, much of which is short term, would be compromised, thereby negatively affecting our business prospects and viability.

*Financings Summary*

We had the following outstanding debt balances as of December 31, 2019 and 2018:

| | As of December 31, 2019 | | As of December 31, 2018 | |
|---|---|---|---|---|
| **Issuer/Borrower** | **Principal Amount Outstanding** (in thousands) | **Weighted Average Interest Rate** | **Principal Amount Outstanding** (in thousands) | **Weighted Average Interest Rate** |
| GWG DLP Funding IV, LLC – LNV senior credit facility (see Note 11) | $ 184,586 | 9.57% | $ 158,209 | 10.45% |
| GWG Holdings, Inc. – L Bonds | 948,128 | 7.15% | 662,152 | 7.10% |
| GWG Holdings, Inc. – Seller Trust L Bonds | 366,892 | 7.50% | 366,892 | 7.50% |
| Beneficient – Other borrowings | 152,199 | 4.59% | — | —% |
| **Total** | $ 1,651,805 | 7.26% | $ 1,187,253 | 7.67% |

The table below reconciles the face amount of our outstanding debt to the carrying value shown on our balance sheets:

| | As of December 31, 2019 (in thousands) | As of December 31, 2018 (in thousands) |
|---|---|---|
| Senior credit facility with LNV Corporation | | |
| Face amount outstanding | $ 184,586 | $ 158,209 |
| Unamortized selling costs | (10,196) | (9,231) |
| Carrying amount | $ 174,390 | $ 148,978 |
| | | |
| L Bonds and Seller Trust L Bonds: | | |
| Face amount outstanding | $ 1,315,020 | $ 1,029,044 |
| Subscriptions in process | 15,839 | 13,467 |
| Unamortized selling costs | (37,329) | (24,216) |
| Carrying amount | $ 1,293,530 | $ 1,018,295 |

In January 2012, we began publicly offering up to $250.0 million in debt securities (initially named "Renewable Secured Debentures" and subsequently renamed "L Bonds") that was completed in January 2015.

On September 24, 2014, we consummated an initial public offering of our common stock resulting in the sale of 800,000 shares of common stock at $12.50 per share and net proceeds of approximately $8.6 million after the deduction of underwriting commissions, discounts and expense reimbursements.

In January 2015, we began publicly offering up to $1.0 billion of L Bonds as a follow-on to our earlier $250.0 million public debt offering. In January 2018, we began publicly offering up to $1.0 billion L Bonds as a follow-on to our earlier L Bond offering. Through December 31, 2019, the total amount of L Bonds sold under these two L Bond offerings, including renewals, was $1.5 billion. As of December 31, 2019 and 2018, respectively, we had approximately $948.1 million and $662.1 million in principal amount of L Bonds outstanding (exclusive of Seller Trust L Bonds).

In February 2017, we began publicly offering up to 150,000 shares of our Series 2 Redeemable Preferred Stock ("RPS 2") at a per-share price of $1,000. As of December 31, 2018, we had issued approximately $150 million stated value of RPS 2 and terminated that offering.

On August 10, 2018, GWG Holdings, GWG Life and the Bank of Utah, as trustee, entered into the Supplemental Indenture to the Amended and Restated Indenture. The Amended and Restated Indenture was subsequently amended on December 31, 2019, primarily to modify the calculation of the Debt Coverage Ratio in the Indenture to provide the Company with the ability to incur indebtedness (directly or through a subsidiary of the Company) that is payable in capital stock of the Company or mandatorily convertible into or exchangeable for capital stock of the Company that would be excluded from the calculation of the Debt Coverage Ratio. GWG Holdings entered into the Supplemental Indenture to add and modify certain provisions of the Amended and Restated Indenture necessary to provide for the issuance of the Seller Trust L Bonds. We issued Seller Trust L Bonds in the amount of $366.9 million to the Seller Trusts in connection with the Exchange Transaction. The maturity date of the Seller Trust L Bonds is August 9, 2023. The Seller Trust L Bonds bear interest at 7.5% per annum. Interest is payable monthly in cash (see Note 13 to the consolidated financial statements).

In August 2018, we offered and sold 5,000,000 shares of our Series B Convertible Preferred Stock in reliance upon the exemption from registration provided by Section 4(a)(2) under the Securities Act of 1933. The Series B shares were issued at $10 per share for cash consideration of $50 million.

On December 28, 2018, the Series B converted into 5,000,000 shares of our common stock at a conversion price of $10.00 per share immediately following the Final Closing of the Exchange Transaction.

The weighted-average interest rate of our outstanding L Bonds (excluding the Seller Trust L Bonds) as of December 31, 2019 and 2018 was 7.15% and 7.10%, respectively, and the weighted-average maturity at those dates was 3.21 and 2.83 years, respectively. Our L Bonds have renewal features. Since we first issued our L Bonds, we have experienced $646.3 million in maturities, of which $341.3 million has renewed through December 31, 2019 for an additional term. This has provided us with an aggregate renewal rate of approximately 52.8% for investments in these securities.

Future contractual maturities of L Bonds and Seller Trust L Bonds at December 31, 2019 are as follows (in thousands):

| Years Ending December 31, | | |
|---|---|---:|
| 2020 | $ | 152,118 |
| 2021[1] | | 568,311 |
| 2022 | | 163,741 |
| 2023 | | 76,969 |
| 2024 | | 118,848 |
| Thereafter | | 235,033 |
| | $ | 1,315,020 |

(1)  After the second anniversary of the Final Closing, the holders of the Seller Trust L Bonds will have the right to cause GWG to repurchase, in whole but not in part, the Seller Trust L Bonds held by such holder within 45 days. As such, while the maturity date of the $366.9 million of Seller Trust L Bonds is in August 2023, their contractual maturity is reflected in 2021, as that is the first period in which they could become payable. The repurchase may be paid, at GWG's option, in the form of cash, and/or a pro rata portion of (i) the outstanding principal amount and accrued and unpaid interest under the Commercial Loan Agreement, and (ii) Ben LP common units, or a combination of cash and such property.

The L Bonds and the Seller Trust L Bonds are secured by all of our assets and are subordinate to our second amended and restated senior credit facility with LNV Corporation.

On September 27, 2017, we entered into a $300 million amended and restated senior credit facility with LNV Corporation in which DLP IV is the borrower. As of December 31, 2019, we had approximately $184.6 million outstanding under the senior credit facility. On November 1, 2019, we entered into a second amended and restated senior credit facility, which replaced the prior agreement governing the facility. A description of the agreement governing our second amended and restated senior credit facility is set forth below under the caption "Amendment of Credit Facility with LNV Corporation." We intend to use the proceeds from this facility to maintain our portfolio of life insurance policies, for liquidity and for general corporate purposes.

Beneficient had borrowings with an aggregate principal balance outstanding, including accrued interest, of $152.2 million as of December 31, 2019. This aggregate balance includes a senior credit agreement and a second lien credit agreement with respective balances, including accrued interest, of $77.5 million and $72.2 million at December 31, 2019. Both loans accrue interest at a rate of 1-month LIBOR plus 3.95%, compounded daily, with interest due by the 15th of each month. Ben LP intends to repay with cash or refinance with other third-party lenders the senior credit agreement and the second lien credit agreement prior to their maturities, both of which are on June 30, 2020. Ben LP may not be able to refinance or obtain additional financing on favorable terms, or at all. If Ben LP is unable to refinance the senior credit agreement or the second lien credit agreement, or defaults on either loan, then Ben LP will be required to either (i) sell assets to repay these loans or (ii) to raise additional capital through the sale of equity and the ownership interest of Ben LP's equity holders may be diluted. These loans are not guaranteed by GWG. Beneficient has additional borrowings maturing in 2023 and 2024 with an aggregate principal balance outstanding, including accrued interest, of $2.5 million as of December 31, 2019. Future contractual maturities of these borrowings are as follows (in thousands):

**Years Ending December 31,**

| | | |
|---|---|---:|
| 2020 | $ | 149,661 |
| 2021 | | — |
| 2022 | | — |
| 2023 | | 750 |
| 2024 | | 1,579 |
| Thereafter | | — |
| | $ | 151,990 |

We expect to meet our ongoing operational capital needs for alternative asset investments, policy premiums and servicing costs, working capital and financing expenditures including paying principal, interest and dividends through a combination of the receipt of policy benefits from our portfolio of life insurance policies, net proceeds from our L Bond offering, dividends and interest from investments, including Beneficient's loans receivable, and funding available from our second amended and restated senior credit facility with LNV Corporation. We estimate that our liquidity and capital resources are sufficient for our current and projected financial needs for at least the next twelve months given current assumptions. However, if we are unable to continue our L Bond offering for any reason, and we are unable to obtain capital from other sources, our business will be materially and adversely affected. In addition, our business will be materially and adversely affected if we do not receive the policy benefits we forecast and if holders of our L Bonds fail to renew with the frequency we have historically experienced. In such a case, we could be forced to sell our investments in life insurance policies to service or satisfy our debt-related and other obligations. A sale under such circumstances may result in significant impairment of the recognized value of our portfolio.

Capital expenditures have historically not been material and we do not anticipate making material capital expenditures in 2020.

*Alternative Assets and Secured Indebtedness*

At December 31, 2019, the fair value of our investments in life insurance policies of $796.0 million plus our cash balance of $79.1 million, restricted cash balance of $20.3 million, life insurance policy benefits receivable of $23.0 million, loan receivables of $232.3 million, fees receivable of $29.2 million, and other assets of $99.2 million (which are mostly related to our financing receivables from affiliates) totaled $1.4 billion, representing an excess of portfolio assets over secured indebtedness of $155.0 million. At December 31, 2018, the fair value of our investments in life insurance policies of $747.9 million plus our cash balance of $114.6 million, restricted cash balance of $10.8 million, life insurance policy benefits receivable of $16.5 million, and other assets of $591.0 million totaled $1.5 billion, representing an excess of portfolio assets over secured indebtedness of $293.6 million.

The following forward-looking table seeks to illustrate the impact that a hypothetical sale of our portfolio of life insurance assets (at various discount rates), and the realization of the financing receivables from affiliates, investment in common units of Ben LP (a substantial majority of the net assets of which are currently represented by intangible assets and goodwill), investment in Preferred Series A Subclass 1 Unit Account of BCH, and equity security investment in the Option Agreement (in each case, at their respective carrying amounts and assuming no discount for lack of marketability or transaction costs, which could be substantial) would have on our ability to satisfy our debt obligations as of December 31, 2019. The amounts in the table below do not include the consolidation of the assets and liabilities of Beneficient and related eliminations as of December 31, 2019. In all cases, the sale of the life insurance assets owned by DLP IV will be used first to satisfy all amounts owing under our second amended and restated senior credit facility with LNV Corporation. The net sale proceeds remaining after satisfying all obligations under our second amended and restated senior credit facility with LNV Corporation would be applied to the L Bonds and Seller Trust L Bonds on a pari passu basis.

**Life Insurance**

| Portfolio Discount Rate | | 10% | 15% | 20% | 25% | 28% |
|---|---|---|---|---|---|---|
| Value of life insurance portfolio (in thousands) | $ | 728,702 | 583,888 | 485,256 | 414,614 | 381,300 |
| Investment in common units of Ben LP | | 632,473 | 632,473 | 632,473 | 632,473 | 632,473 |
| Cash, cash equivalents and policy benefits receivable | | 104,811 | 104,811 | 104,811 | 104,811 | 104,811 |
| Other assets | | 374,869 | 374,869 | 374,869 | 374,869 | 374,869 |
| Total assets | | 1,840,855 | 1,696,041 | 1,597,409 | 1,526,767 | 1,493,453 |
| Senior credit facility | | 184,587 | 184,587 | 184,587 | 184,587 | 184,587 |
| Net after senior credit facility | | 1,656,268 | 1,511,454 | 1,412,822 | 1,342,180 | 1,308,866 |
| L Bonds[1] | | 1,315,020 | 1,315,020 | 1,315,020 | 1,315,020 | 1,315,020 |
| Net remaining (in thousands) | $ | 341,248 | 196,434 | 97,802 | 27,160 | (6,154) |
| Impairment to L Bonds | | No impairment | No impairment | No impairment | No Impairment | Impairment |

(1)  Amount represents L Bonds and Seller Trust L Bonds

The above table illustrates that our ability to fully satisfy amounts owing under the L Bonds and Seller Trust L Bonds would likely be impaired upon the sale or the realization of the financing receivables from affiliates, investment in common units of Ben LP, investment in Preferred Series A Subclass 1 Unit Account of BCH, and equity security investment in the Option Agreement at their respective carrying amounts, plus all our life insurance assets at a price equivalent to a discount rate of approximately 27.41% or higher at December 31, 2019. At December 31, 2018, the likely impairment occurred at a discount rate of approximately 18.70% or higher. The discount rate used to calculate the fair value of our life insurance portfolio was 8.25% as of both December 31, 2019 and December 31, 2018.

The table does not include any allowance for transactional fees and expenses (which expenses and fees could be substantial) nor any discount for lack of marketability associated with a portfolio sale or the realization of the financing receivables with affiliates, investment in common units of Ben LP, investment in Preferred Series A Subclass 1 Unit Account of BCH, and equity security investment in the Option Agreement, respectively, and is provided to demonstrate how various discount rates used to value our portfolio of life insurance assets could affect our ability to satisfy amounts owing under our debt obligations in light of our senior secured lender's right to priority payments under our senior credit facility with LNV Corporation.

The table assumes we will realize the full amounts of financing receivables from affiliates, investment in common units of Ben LP, investment in Preferred Series A Subclass 1 Unit Account of BCH, and equity security investment in the Option Agreement. There is currently no market for the aforementioned assets, and a market may not develop. Our Commercial Loan receivable and a portion of our investment in the common units of Ben LP may be used as consideration for retiring the Seller Trust L Bonds upon a redemption event or at the maturity of the Seller Trust L Bonds (see Notes 12 and 13 to the consolidated financial statements). This table also does not include the yield maintenance fee we are required to pay in certain circumstances under our second amended and restated senior credit facility with LNV Corporation, which could be substantial. The above table should be read in conjunction with the information contained in other sections of this report, including Critical Accounting Policies — Fair Value Components — Discount Rate and the notes to the consolidated financial statements.

*Amendment of Credit Facility with LNV Corporation*

Effective November 1, 2019, DLP IV entered into a second amended and restated senior credit facility with LNV Corporation. The second amended and restated senior credit facility makes available a total of up to $300.0 million in credit to DLP IV with a maturity date of September 27, 2029. Subject to available borrowing base capacity, additional advances are available under the second amended and restated senior credit facility at the LIBOR rate described below. Such advances are available to pay premiums and servicing costs of pledged life insurance policies as such amounts become due. Interest will accrue on amounts borrowed under the second amended and restated senior credit facility at an annual interest rate, determined as of each date of borrowing or quarterly if there is no borrowing, equal to (a) 12-month LIBOR, plus (b) 7.50% per annum. The effective rate at December 31, 2019 was 9.54%. Interest payments are made on a quarterly basis.

Under the second amended and restated senior credit facility, DLP IV has granted the administrative agent, for the benefit of the lenders under the facility, a security interest in all of DLP IV's assets. As with prior collateral arrangements relating to the senior secured debt of GWG Holdings and its subsidiaries (on a consolidated basis), GWG Life's excess equity value of DLP IV after satisfying all amounts owing under our second amended and restated credit facility is available as collateral for the obligations of GWG Holdings under the L Bonds and Seller Trust L Bonds (although the life insurance assets owned by DLP IV do not themselves serve as direct collateral for those obligations).

We are subject to various financial and non-financial covenants under the second amended and restated senior credit facility with LNV Corporation, including, but not limited to, compliance with laws, preservation of existence, financial reporting, keeping of proper books of record and account, payment of taxes, and ensuring that neither DLP IV nor GWG Life become an investment company. As of December 31, 2019, we were in compliance with all financial and non-financial covenants.

**Cash Flows**

*Interest and Dividend Payments*

We finance our businesses through a combination of: life insurance policy benefit receipts; principal, dividends and interest receipts from investments, including Ben LP loan receivables; debt and equity offerings; and our senior credit facility with LNV Corporation. We have historically relied on debt (L Bonds and our senior credit facility with LNV Corporation) and equity (preferred stock) financing for the majority of our cash expenditures (for policy acquisition, policy premiums and servicing costs, working capital and financing expenditures including paying principal and interest on existing debt, and for making investments in Beneficient) as the amount of cash flows from the realization of life insurance policy benefits and cash flows from our other investments has been insufficient to meet all of our needs. This has resulted in the Company incurring substantial indebtedness (much of it being of a short term nature) and, to a lesser extent, obligations to make dividend payments on our classes of preferred stock.

Our total interest expense of $114.8 million and $80.1 million for years ended December 31, 2019 and 2018, respectively, represent the largest single line item of expense in each period. Preferred stock cash dividends were $16.9 and $16.7 million for the years ended December 31, 2019 and 2018, respectively. While reducing our cost of funds and increasing our common equity base (at valuations accretive to our book value) are primary goals of the Company, until we do so we will continue to expend significant amounts of cash for interest and dividend payments and will thus continue to rely heavily on our ability to raise cash from our L Bond offering, senior credit facility with LNV Corporation and other means as they are developed and available.

*Life Insurance Policy Premium Payments*

The payment of premiums and servicing costs to maintain life insurance policies represents one of our most significant requirements for cash disbursement. When a policy is purchased, we are able to calculate the minimum premium payments required to maintain the policy in-force. Over time as the insured ages, premium payments will increase. Nevertheless, the probability we will be required to pay the premiums decreases as mortality becomes more likely. These scheduled premiums and associated probabilities are factored into our expected internal rate of return and cash-flow modeling. Beyond premiums, we incur policy servicing costs, including annual trustee, policy administration and tracking costs. Additionally, we incur significant financing costs, including principal, interest and dividends. Both policy servicing costs and financing costs are excluded from our internal rate of return calculations. We finance our businesses through a combination of life insurance policy benefit receipts, dividends and interest on other investments, equity offerings, debt offerings, and advances under our senior credit facility with LNV Corporation.

The amount of payments for anticipated premiums, including the requirement under our second amended and restated senior credit facility with LNV Corporation to maintain a two month cost-of-insurance threshold within each policy cash value account, and servicing costs that we will be required to make over the next five years to maintain our current portfolio, assuming no mortalities, is set forth in the table below (in thousands).

| Years Ending December 31, | Premiums | Servicing | Premiums and Servicing Fees |
|---|---|---|---|
| 2020 | $ 67,455 | $ 1,674 | $ 69,129 |
| 2021 | 84,712 | 1,674 | 86,386 |
| 2022 | 97,757 | 1,674 | 99,431 |
| 2023 | 110,156 | 1,674 | 111,830 |
| 2024 | 120,077 | 1,674 | 121,751 |
| | $ 480,157 | $ 8,370 | $ 488,527 |

Our anticipated premium expenses are subject to the risk of increased cost-of-insurance charges (i.e., "COI" or premium charges) for the life insurance policies we own. During 2018, we received notice of, or support for, COI rate changes on 30 policies with combined face value of $84.6 million in our portfolio. These increased charges resulted in a $5.1 million reduction in the fair value of our life insurance portfolio in 2018. We did not receive any notices of COI rate changes in 2019.

We have no known pending cost-of-insurance increases on any policies in our portfolio, but we are aware that cost-of-insurance increases have become more prevalent in the industry. Thus, we may see additional insurers implementing cost-of-insurance increases in the future.

*Life Insurance Policy Benefit Receipts*

For the quarter-end dates set forth below, the following table illustrates the total amount of face value of policy benefits owned, and the trailing 12 months of life insurance policy benefits realized and premiums paid on our portfolio. The trailing 12-month benefits/premium coverage ratio indicates the ratio of policy benefits realized to premiums paid over the trailing 12-month period from our portfolio of life insurance policies.

| Quarter End Date | Portfolio Face Amount (in thousands) | 12-Month Trailing Benefits Realized (in thousands) | 12-Month Trailing Premiums Paid (in thousands) | 12-Month Trailing Benefits/Premium Coverage Ratio |
|---|---|---|---|---|
| March 31, 2015 | $ 754,942 | $ 46,675 | $ 23,786 | 196.2% |
| June 30, 2015 | 806,274 | 47,125 | 24,348 | 193.5% |
| September 30, 2015 | 878,882 | 44,482 | 25,313 | 175.7% |
| December 31, 2015 | 944,844 | 31,232 | 26,650 | 117.2% |
| March 31, 2016 | 1,027,821 | 21,845 | 28,771 | 75.9% |
| June 30, 2016 | 1,154,798 | 30,924 | 31,891 | 97.0% |
| September 30, 2016 | 1,272,078 | 35,867 | 37,055 | 96.8% |
| December 31, 2016 | 1,361,675 | 48,452 | 40,239 | 120.4% |
| March 31, 2017 | 1,447,558 | 48,189 | 42,753 | 112.7% |
| June 30, 2017 | 1,525,363 | 49,295 | 45,414 | 108.5% |
| September 30, 2017 | 1,622,627 | 53,742 | 46,559 | 115.4% |
| December 31, 2017 | 1,676,148 | 64,719 | 52,263 | 123.8% |
| March 31, 2018 | 1,758,066 | 60,248 | 53,169 | 113.3% |
| June 30, 2018 | 1,849,079 | 76,936 | 53,886 | 142.8% |
| September 30, 2018 | 1,961,598 | 75,161 | 55,365 | 135.8% |
| December 31, 2018 | 2,047,992 | 71,090 | 52,675 | 135.0% |
| March 31, 2019 | 2,098,428 | 87,045 | 56,227 | 154.8% |
| June 30, 2019 | 2,088,445 | 82,421 | 59,454 | 138.6% |
| September 30, 2019 | 2,064,156 | 101,918 | 61,805 | 164.9% |
| December 31, 2019 | 2,020,973 | 125,148 | 63,851 | 196.0% |

We believe that the portfolio cash flow results set forth above are consistent with our general investment thesis that the life insurance policy benefits we receive will continue to increase over time in relation to the premiums we are required to pay on the remaining polices in the portfolio. Nevertheless, we expect that our portfolio cash flow on a period-to-period basis will remain inconsistent as we continue to allocate substantially more capital to Beneficient and have reduced capital allocated to acquiring a larger, more diversified portfolio of life insurance policies.

**Inflation**

Changes in inflation do not necessarily correlate with changes in interest rates. We presently do not foresee any material impact of inflation on our results of operations in the periods presented in our consolidated financial statements.

**Off-Balance Sheet Arrangements**

*Unfunded Capital Commitments*

Beneficient had $73.8 million of gross potential capital commitments as of December 31, 2019 representing potential limited partner capital funding commitments on the alternative asset funds that serve as collateral to its loans. This is the amount above any existing cash reserves for such capital funding commitments. The trust holding the interest in the limited partnership for the alternative asset fund is required to fund these limited partner capital commitments per the terms of the limited partnership agreement. Capital funding commitment reserves are maintained by the associated trusts created at the origination of each trust for up to $0.1 million. To the extent that the associated trust cannot pay the capital funding commitment, Beneficient is obligated to lend sufficient funds to meet the commitment. Any amounts advanced by Beneficient for these limited partner capital funding commitments above the associated capital funding commitment reserves held by the associated trusts are added to the loan balance and are expected to be recouped through the cash distributions from the alternative asset fund collateral.

Capital commitments generally originate from limited partner agreements having fixed or expiring expiration dates. The total limited partner capital funding commitment amounts may not necessarily represent future cash requirements. Beneficient considers the creditworthiness on a case-by-case basis. At December 31, 2019, Beneficient had no reserves for losses on unused commitments to fund potential limited partner capital funding commitments.

**Credit Risk and Interest Rate Risk**

We review the credit risk associated with our portfolio of life insurance policies when estimating its fair value. In evaluating the policies' credit risk, we consider insurance company solvency, credit risk indicators, economic conditions, ongoing credit evaluations, and company positions. We attempt to manage our credit risk related to life insurance policies typically by purchasing policies issued only from companies with an investment-grade credit rating by either Standard & Poor's, Moody's, or A.M. Best Company. As of December 31, 2019, 95.7% of our life insurance policies, by face value benefits, were issued by companies that maintained an investment-grade rating (BBB or better) by Standard & Poor's.

The assets and liabilities exchanged in the Initial Transfer of the Exchange Transaction are excluded from this analysis.

Our second amended and restated senior credit facility with LNV Corporation and Beneficient's other borrowings are floating-rate financings. In addition, our ability to offer interest and dividend rates that attract capital (including in our continuous offering of L Bonds) is generally impacted by prevailing interest rates. Furthermore, while our L Bond offering provides us with fixed-rate debt financing, our Debt Coverage Ratio is calculated in relation to the interest rate on all of our debt financing, exclusive of our Seller Trust L Bonds. Therefore, increases in interest rates impact our business by increasing our borrowing costs and reducing availability under our debt financing arrangements. Earnings from our life insurance portfolio are based upon the spread, if any, generated between the return on the portfolio and the total cost of our financing (excluding cost of financing for the Seller Trust L Bonds). As a result, increases in interest rates will reduce the earnings we expect to achieve from our investments in life insurance policies.

Page 69

Beneficient is subject to risks related to markets, credit, currency, and interest rates. Beneficient issues loans that are subject to credit risk, repayment risk and interest rate risk. Beneficient has underwriting procedures and utilizes market rates. As of December 31, 2019, all of Beneficient's loans are collateralized by the cash flows originating from alternative assets without recourse to the client. Currently, all of these alternative assets consist of private equity limited partnership interests which are primarily denominated in the U.S. dollar, Euro, and Canadian dollar. The underlying portfolio companies primarily operate in the United States, with the largest percentage, based on NAV, operating in healthcare technology, bio-technology, and diversified telecommunications services industries. The Company mitigates credit risk through the ExAlt Plan[TM] whereby excess cash flows from a collective pool of alternative assets can be utilized to repay the loans when cash flows from the client's original alternative assets are not sufficient to repay the outstanding principal, interest, and fees.

**Debt Coverage Ratio**

Our L Bond borrowing covenants require us to maintain a Debt Coverage Ratio of less than 90%. The Debt Coverage Ratio is calculated by dividing the sum of our total interest-bearing indebtedness (other than Excluded Indebtedness described in Note 2 to the table below) by the sum of our cash, cash equivalents, restricted cash, life insurance policy benefits receivable, the net present value of the life insurance portfolio, and, without duplication, the value of all of our other assets as reflected on our most recently available balance sheet prepared in accordance with GAAP. The discount rate we use for the net present value of our life insurance portfolio for this calculation may not be the same discount rate we use for our GAAP valuation and is not necessarily reflective of the amount we could realize upon a sale of the portfolio.

| | December 31, 2019 | December 31, 2018 |
|---|---|---|
| | (in thousands) | (in thousands) |
| Life insurance portfolio policy benefits | $ 2,020,973 | $ 2,047,992 |
| Discount rate of future cash flows[(1)] | 7.55% | 7.75% |
| Net present value of life insurance portfolio policy benefits | $ 826,196 | $ 770,074 |
| All cash and cash equivalents (including restricted cash) | 81,780 | 125,436 |
| Life insurance policy benefits receivable (net of allowance) | 23,031 | 16,461 |
| Other assets | 945,240 | 591,048 |
| Total Coverage[(2)] | $ 1,876,247 | $ 1,503,019 |
| | | |
| Senior credit facility with LNV Corporation | $ 184,586 | $ 158,209 |
| L Bonds | 948,128 | 1,029,044 |
| Total Indebtedness[(2)] | $ 1,132,714 | $ 1,187,253 |
| | | |
| Debt Coverage Ratio | 60.40% | 78.99% |

(1) Weighted-average interest rate paid on indebtedness, excluding that of Seller Trust L-Bonds.
(2) Total Coverage excludes the assets of Beneficient. Total Indebtedness is equal to the total liabilities balance of GWG Holdings (excluding the liabilities of Beneficient) as of December 31, 2019, other than Excluded Indebtedness. Excluded Indebtedness is Indebtedness that is payable at the Company's option in Capital Stock of the Company or securities mandatorily convertible into or exchangeable for Capital Stock of the Company, or any Indebtedness that is reasonably expected to be converted or exchanged, directly or indirectly, into Capital Stock of the Company. This change in the definition of the Debt Coverage Ratio was defined in Amendment No. 2 to the Amended and Restated Indenture entered into as of December 31, 2019 (see Note 12 to the consolidated financial statements).

As of December 31, 2019 and 2018, we were in compliance with the Debt Coverage Ratio.

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.**

Not applicable.

Page 70

**ITEM 8. CONSOLIDATED FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Stockholders of
GWG Holdings, Inc. and Subsidiaries

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheet of GWG Holdings, Inc. and Subsidiaries (the "Company") as of December 31, 2019, and the related consolidated statements of operations, changes in stockholders' equity, and cash flows for the year ended December 31, 2019, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2019, and the results of their operations and their cash flows for the year ended December 31, 2019, in conformity with accounting principles generally accepted in the United States of America.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of December 31, 2019, based on criteria established in *2013 Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated March 26, 2020, expressed an unqualified opinion.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. Our audit included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audit provides a reasonable basis for our opinion.

We have served as the Company's auditor since 2019.

/s/ WHITLEY PENN LLP

Dallas, Texas

March 27, 2020

F-1

App. 0580

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Stockholders of
GWG Holdings, Inc. and Subsidiaries

**Opinion on Internal Control Over Financial Reporting**

We have audited GWG Holdings, Inc. and Subsidiaries (the "Company") internal control over financial reporting as of December 31, 2019, based on criteria established in *2013 Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2019, based on criteria established in *2013 Internal Control—Integrated Framework* issued by COSO.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the consolidated balance sheet of the Company, as of December 31, 2019, and the related consolidated statements of operations, changes in stockholders' equity, and cash flows for the year ended December 31, 2019, and our report dated March 26, 2020 expressed an unqualified opinion on those consolidated financial statements.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying *Management's Report on Internal Control Over Financial Reporting.* Our responsibility is to express an opinion on the entity's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

An entity's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America. An entity's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the entity; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the entity are being made only in accordance with authorizations of management and directors of the entity; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the entity's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ WHITLEY PENN LLP

Dallas, Texas

March 27, 2020

F-2

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Shareholders and the Board of Directors of GWG Holdings, Inc. and Subsidiaries:

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheet of GWG Holdings, Inc. and Subsidiaries (the "Company") as of December 31, 2018, the related consolidated statements of operations, changes in stockholders' equity, and cash flows, for the year ended December 31, 2018, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2018, and the results of its operations and its cash flows for the year ended December 31, 2018, in conformity with accounting principles generally accepted in the United States of America.

**Emphasis of Matter**

As described in Note 6 to the consolidated financial statements, for the year ended December 31, 2018, the Company incurred a loss within its gain (loss) on life insurance policies, net, of $87.1 million, resulting from a change in accounting estimate related to the changes made to the life expectancy estimation methodology on life insurance policies in the Company's portfolio. Our opinion is not modified with respect to this matter.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. Our audit included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audit provides a reasonable basis for our opinion.

/s/ Baker Tilly Virchow Krause, LLP

We served as the Company's auditor from 2013 to 2019.

Minneapolis, Minnesota

July 9, 2019

F-3

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
(in thousands, except per share data)

| | December 31, | |
| --- | --- | --- |
| | 2019 | 2018 |
| ASSETS | | |
| Cash and cash equivalents | $ 79,073 | $ 114,587 |
| Restricted cash | 20,258 | 10,849 |
| Investment in life insurance policies, at fair value | 796,039 | 747,922 |
| Life insurance policy benefits receivable, net | 23,031 | 16,461 |
| Loan receivables | 232,344 | — |
| Fees receivable | 29,168 | — |
| Financing receivables from affiliates | 67,153 | 184,769 |
| Equity method investments | 1,761 | 360,842 |
| Other assets | 28,374 | 45,437 |
| Goodwill | 2,358,005 | — |
| TOTAL ASSETS | $ 3,635,206 | $ 1,480,867 |
| | | |
| LIABILITIES & STOCKHOLDERS' EQUITY | | |
| LIABILITIES | | |
| Senior credit facility with LNV Corporation | $ 174,390 | $ 148,978 |
| L Bonds | 926,638 | 651,403 |
| Seller Trust L Bonds | 366,892 | 366,892 |
| Other borrowings | 153,086 | — |
| Interest and dividends payable | 16,516 | 18,555 |
| Deferred revenue | 41,444 | — |
| Accounts payable and accrued expenses | 27,836 | 13,981 |
| Deferred tax liability | 57,923 | — |
| TOTAL LIABILITIES | 1,764,725 | 1,199,809 |
| | | |
| Redeemable noncontrolling interests | 1,269,654 | — |
| | | |
| STOCKHOLDERS' EQUITY | | |
| | | |
| REDEEMABLE PREFERRED STOCK | | |
| (par value $0.001; shares authorized 100,000; shares outstanding 84,636 and 97,524; liquidation preference of $85,130 and $98,093 as of December 31, 2019 and 2018, respectively) | 74,023 | 86,910 |
| SERIES 2 REDEEMABLE PREFERRED STOCK | | |
| (par value $0.001; shares authorized 150,000; shares outstanding 147,164 and 148,359; liquidation preference of $148,023 and $149,225 as of December 31, 2019 and 2018, respectively) | 127,868 | 129,063 |
| COMMON STOCK | | |
| (par value $0.001; shares authorized 210,000,000; shares issued and outstanding 30,533,793 and 33,018,161 as of December 31, 2019 and 2018, respectively) | 33 | 33 |
| Common stock in treasury, at cost, 2,500,000 shares as of December 31, 2019 | (24,550) | — |
| Additional paid-in capital | 233,106 | 249,662 |
| Accumulated deficit | (76,501) | (184,610) |
| TOTAL GWG HOLDINGS STOCKHOLDERS' EQUITY | 333,979 | 281,058 |
| Noncontrolling interests | 266,848 | — |
| TOTAL STOCKHOLDERS' EQUITY | 600,827 | 281,058 |
| TOTAL LIABILITIES & STOCKHOLDERS' EQUITY | $ 3,635,206 | $ 1,480,867 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-4

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
(in thousands, except per share data)

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2019 | 2018 |
| REVENUE | | |
| Gain (loss) on life insurance policies, net | $ 75,320 | $ (14,105) |
| Interest and other income | 16,956 | 13,715 |
| TOTAL REVENUE | 92,276 | (390) |
| | | |
| EXPENSES | | |
| Interest expense | 114,844 | 80,136 |
| Employee compensation and benefits | 28,309 | 17,407 |
| Legal and professional fees | 12,824 | 5,541 |
| Other expenses | 15,896 | 15,995 |
| TOTAL EXPENSES | 171,873 | 119,079 |
| | | |
| LOSS BEFORE INCOME TAXES | (79,597) | (119,469) |
| INCOME TAX EXPENSE (BENEFIT) | 57,933 | — |
| | | |
| LOSS BEFORE EARNINGS FROM EQUITY METHOD INVESTMENTS | (137,530) | (119,469) |
| | | |
| Earnings (loss) from equity method investments | (4,077) | 18 |
| Gain on consolidation of equity method investment (see Note 5) | 249,716 | — |
| NET INCOME (LOSS) | 108,109 | (119,451) |
| | | |
| Preferred stock dividends | 16,943 | 16,663 |
| NET INCOME (LOSS) ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ 91,166 | $ (136,114) |
| | | |
| NET INCOME (LOSS) PER COMMON SHARE | | |
| Basic | $ 2.76 | $ (22.32) |
| Diluted | $ 2.65 | $ (22.32) |
| | | |
| WEIGHTED AVERAGE COMMON SHARES OUTSTANDING | | |
| Basic | 33,016,007 | 6,098,208 |
| Diluted | 35,219,442 | 6,098,208 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-5

App. 0584

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
(in thousands)

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2019 | 2018 |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net income (loss) | $ 108,109 | $ (119,451) |
| Adjustments to reconcile net income (loss) to net cash flows used in operating activities: | | |
| Change in fair value of investment in life insurance policies | (49,015) | 10,344 |
| Amortization of deferred financing and issuance costs | 13,804 | 10,037 |
| Amortization of premium and accretion of discount on financing receivables | (1,720) | (14) |
| Provision for uncollectible policy benefit receivable | 153 | 4,300 |
| Loss (earnings) from equity method investments | 4,077 | (18) |
| Stock-based compensation | 1,732 | 2,182 |
| Gain on consolidation of equity method investment | (249,716) | — |
| Deferred income taxes | 57,923 | — |
| (Increase) decrease in operating assets: | | |
| Life insurance policy benefits receivable | (6,683) | (4,102) |
| Interest receivable added to commercial loan principal | — | (10,534) |
| Accrued interest on financing receivables | (6,913) | — |
| Other assets | (5,056) | 4,406 |
| Increase (decrease) in operating liabilities: | | |
| Accounts payable and other accrued expenses | (8,297) | 4,102 |
| Interest and dividends payable | (1,228) | 3,269 |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (142,830) | (95,479) |
| | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Investment in life insurance policies | (32,367) | (128,503) |
| Carrying value of matured life insurance policies | 33,265 | 20,764 |
| Equity method investments | (12,388) | (3,204) |
| Business combination consideration, net of cash acquired | (61,479) | — |
| Financing receivables from affiliate issued | (65,000) | (3,037) |
| NET CASH FLOWS USED IN INVESTING ACTIVITIES | (137,969) | (113,980) |
| | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Borrowings on senior debt | 50,133 | 12,903 |
| Repayments of senior debt | (23,756) | (77,219) |
| Payments for senior debt issuance costs | (2,042) | — |
| Proceeds from issuance of L Bonds | 403,397 | 263,965 |
| Payments for L Bonds issuance costs | (25,284) | (17,379) |
| Payments for redemption of L Bonds | (116,809) | (48,027) |
| Issuance of common stock | 59 | 614 |
| Proceeds from issuance of convertible preferred stock | — | 50,000 |
| Proceeds from issuance of redeemable preferred stock | — | 56,238 |
| Payments for redeemable preferred stock issuance costs | — | (4,142) |
| Payments for redemption of redeemable preferred stock | (14,061) | (2,457) |
| Common stock dividends | — | (25,709) |
| Preferred stock dividends | (16,943) | (16,663) |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 254,694 | 192,124 |
| | | |
| NET DECREASE IN CASH, CASH EQUIVALENTS AND RESTRICTED CASH | (26,105) | (17,335) |
| | | |
| **CASH, CASH EQUIVALENTS AND RESTRICTED CASH** | | |
| BEGINNING OF PERIOD | 125,436 | 142,771 |
| END OF PERIOD | $ 99,331 | $ 125,436 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-6

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS — CONTINUED**
(in thousands, except per share data)

| | Years Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2019 | | 2018 | |
| **SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION** | | | | |
| Interest paid | $ | 102,202 | $ | 67,058 |
| Premiums paid, including prepaid | $ | 68,467 | $ | 49,467 |
| **NON-CASH INVESTING AND FINANCING ACTIVITIES** | | | | |
| Financing receivable from affiliate: | | | | |
| Financing receivable from affiliate acquired | $ | — | $ | 173,485 |
| Conversion of interest receivable to commercial loan principal | $ | — | $ | 10,534 |
| Exchangeable note acquired and converted to equity method investment | $ | — | $ | 156,422 |
| Equity method investment acquired | $ | — | $ | 201,828 |
| Equity security acquired | $ | — | $ | 38,562 |
| Seller Trust L Bonds issued | $ | — | $ | 366,892 |
| Common stock issued | $ | — | $ | 203,405 |
| L Bonds: | | | | |
| Conversion of accrued interest and commissions payable to principal | $ | 1,760 | $ | 1,240 |
| Conversion of L Bonds to redeemable preferred stock | $ | — | $ | 4,546 |
| Preferred Stock: | | | | |
| Conversion of Series B convertible preferred stock to common stock | $ | — | $ | 50,000 |
| Options and stock appreciation rights issued | $ | 399 | $ | 614 |
| Investment in life insurance policies included in accounts payable | $ | — | $ | 6,377 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-7

App. 0586

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY**
(in thousands, except per share data)

| | Preferred Stock Shares | Preferred Stock | Common Shares | Common Stock (par) | Additional Paid-in Capital | Accumulated Deficit | Treasury Stock | Total GWG Holdings Stockholders' Equity | Noncontrolling Interests | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|---|
| **Balance, December 31, 2017** | **187,319** | **$ 173,116** | **5,813,555** | **$ 6** | **$ —** | **$ (39,450)** | **$ —** | **$ 133,672** | **$ —** | **$ 133,672** |
| Net loss | — | — | — | — | — | (119,451) | — | (119,451) | — | (119,451) |
| Issuance of common stock | — | — | 22,214,641 | 22 | 204,771 | — | — | 204,793 | — | 204,793 |
| Repurchase of common stock | — | — | (10,035) | — | (69) | — | — | (69) | — | (69) |
| Issuance of redeemable preferred stock | 61,021 | 56,878 | — | — | — | — | — | 56,878 | — | 56,878 |
| Redemption of redeemable preferred stock | (2,457) | (2,458) | — | — | — | — | — | (2,458) | — | (2,458) |
| Common stock dividends | — | — | — | — | — | (25,709) | — | (25,709) | — | (25,709) |
| Issuance of Series B convertible preferred stock | 5,000,000 | 50,000 | — | — | — | — | — | 50,000 | — | 50,000 |
| Conversion of Series B convertible preferred stock to common stock | (5,000,000) | (50,000) | 5,000,000 | 5 | 49,995 | — | — | — | — | — |
| Preferred stock dividends | — | (11,563) | — | — | (5,100) | — | — | (16,663) | — | (16,663) |
| Stock-based compensation | — | — | — | — | 65 | — | — | 65 | — | 65 |
| **Balance, December 31, 2018** | **245,883** | **$ 215,973** | **33,018,161** | **$ 33** | **$ 249,662** | **$ (184,610)** | **$ —** | **$ 281,058** | **$ —** | **$ 281,058** |
| Net income | — | — | — | — | — | 108,109 | — | 108,109 | — | 108,109 |
| Issuance of common stock | — | — | 58,382 | — | 439 | — | — | 439 | — | 439 |
| Repurchase of common stock | — | — | (42,750) | — | (362) | — | — | (362) | — | (362) |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Common stock in treasury | — | — | (2,500,000) | — | — | — | (24,550) | (24,550) | — | (24,550) |
| Redemption of redeemable preferred stock | (14,083) | (14,082) | — | — | (1) | — | — | (14,083) | — | (14,083) |
| Preferred stock dividends | — | — | — | — | (16,943) | — | — | (16,943) | — | (16,943) |
| Stock-based compensation | — | — | — | — | 311 | — | — | 311 | — | 311 |
| Recognition of noncontrolling interests | — | — | — | — | — | — | — | — | 266,848 | 266,848 |
| **Balance, December 31, 2019** | **231,800** | **$ 201,891** | **30,533,793** | **$  33** | **$ 233,106** | **$  (76,501)** | **$ (24,550)** | **$ 333,979** | **$ 266,848** | **$ 600,827** |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-8

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**(1) Nature of Business**

**Organizational Structure**

GWG Holdings, Inc. ("GWG Holdings") conducts its life insurance secondary market business through a wholly owned subsidiary, GWG Life, LLC ("GWG Life"), and GWG Life's wholly owned subsidiaries, GWG Life Trust and GWG DLP Funding IV, LLC. GWG Holdings' previously wholly-owned subsidiary, Life Epigenetics Inc. ("Life Epigenetics") was formed to engage in various life insurance related businesses and activities related to its development of epigenetic technology. Through its previously wholly-owned subsidiary, youSurance General Agency, LLC ("youSurance"), GWG Holdings offered life insurance directly to customers from a variety of life insurance carriers. On November 11, 2019, GWG contributed the common stock of Life Epigenetics and membership interests in youSurance to a legal entity, InsurTech Holdings, LLC in exchange for a membership interest in the entity (see Note 9).

GWG Holdings' indirect interests in loans collateralized by cash flows from other alternative assets are held by The Beneficient Company Group, L.P. ("Ben LP," including all of the subsidiaries it may have from time to time — "Beneficient") and its general partner, Beneficient Management, L.L.C. ("Beneficient Management"). Prior to December 31, 2019, GWG Holdings' investment in Beneficient was accounted for as an equity method investment. On December 31, 2019, as more fully described below, Beneficient became a consolidated subsidiary of GWG Holdings.

Ben LP is the general partner to Beneficient Company Holdings, L.P. ("BCH") and owns 100% of the Class A Subclass A-1 and A-2 Units of BCH. BCH is the holding company that directly or indirectly receives all active and passive income of Beneficient and allocates that income among the units issued by BCH. As of December 31, 2019, BCH has issued general partnership Class A Units (Subclass A-1 and A-2), Class S Ordinary Units, Class S Preferred Units, FLP Units (Subclass 1 and Subclass 2), Preferred Series A Subclass 1 Unit Accounts, and Preferred Series A Subclass 2 Units. BCH issued to Ben LP Preferred Series A Subclass 2 Units as part of the transaction with GWG Holdings discussed below. Preferred Series A Subclass 2 Units hold the same rights and privileges as the Preferred Series A Subclass 1 Unit Accounts.

All of the aforementioned legal entities are organized in Delaware, other than GWG Life Trust, which is governed by the laws of the state of Utah. Unless the context otherwise requires or we specifically so indicate, all references in this report to "we," "us," "our," "our Company," "GWG," or the "Company" refer to these entities collectively. Our headquarters are located in Dallas, Texas.

**Nature of Business**

GWG Holdings, through its wholly-owned subsidiary GWG Life, has historically purchased life insurance policies in the secondary market and has built a large, actuarially diverse portfolio of life insurance policies backed by highly rated life insurance companies. These policy purchases were funded primarily through sales of L Bonds, as discussed in Note 12. In 2018 and 2019, GWG Holdings made strategic decisions to increase capital allocated toward providing liquidity products to a broader range of alternative assets, primarily through investments in Beneficient.

Beneficient is a financial services firm based in Dallas, Texas that provides liquidity solutions for mid-to-high net worth ("MHNW") individuals and small-to-mid ("STM") size institutions, which previously had few options to obtain early liquidity for their alternative assets holdings. On September 25, 2018, Beneficient's capital companies applied for trust charters from the Texas Department of Banking to merge into to-be organized limited trust associations. Beneficient's capital companies submitted revised charter applications on March 6, 2020. As of March 25, 2020, the trust charters had not been issued to Beneficient. As such, Beneficient has closed a limited number of transactions to date, but intends to significantly expand its operations if and when the trust charters are issued.

Beneficient was formed in 2003 but began its alternative asset business in September 2017. Beneficient operates primarily through its subsidiaries, which provide Beneficient's products and services. These subsidiaries include: (i) Beneficient Capital Company, L.L.C. ("BCC"), through which Beneficient offers loans and liquidity products; (ii) Beneficient Administrative and Clearing Company, L.L.C. ("BACC"), through which Beneficient provides services for fund and trust administration and plans to provide custody services; (iii) Pen Indemnity Insurance Company, LTD ("Pen"), through which Beneficient plans to offer insurance services; and (iv) Ben Markets Management Holdings, L.P., formerly called ACE Portal, L.L.C. ("ACE"), through which Beneficient plans to provide an online portal for direct access to Beneficient's financial services and products.

Beneficient's primary operations pertain to its liquidity products whereby Ben LP, through its subsidiaries, extends loans collateralized by cash flows from illiquid alternative assets and provides services to the trustees who administer the collateral. Beneficient's core business products are its Exchange Trust, LiquidTrust and the InterChange Trust (introduced in 2020). Beneficient's clients select one of these products and place their alternative assets into the custody trust that is a constituent member of a trust structure called the "ExAlt Plan™" (comprised of the Exchange Trusts, LiquidTrusts, Custody Trusts, Collective Trusts, and Funding Trusts). The ExAlt Plan™ then delivers to Beneficient's clients the consideration required by the specific product selected by Beneficient's clients. At the same time, Beneficient, through a subsidiary, extends a loan to the ExAlt Plan™. The proceeds (cash or common units in Ben LP) of that loan to the ExAlt Plan™ are ultimately paid to the client. The cash flows from the client's alternative asset support the repayment of the loans plus any related interest and fees.

In 2018 and 2019, GWG Holdings and GWG Life consummated a series of transactions (as more fully described below) with Beneficient that has resulted in a significant reorientation of our business and capital allocation strategy in addition to changes in our Board of Directors and executive management team.

**Liquidity**

As of December 31, 2019, we had cash and cash equivalents of approximately $79.1 million. We generated net losses from operations for the years ended December 31, 2019 and 2018 totaling $137.5 million and $119.5 million. As of February 29, 2020, we had cash and cash equivalents of $104.5 million, not including cash and cash equivalents of Beneficient. Besides funding operating expenditures and having sufficient cash to fund anticipated additional investments in Beneficient primarily for its lending products and working capital needs, we are obligated to pay other items such as interest payments and debt redemptions, and preferred stock dividends and redemptions. We expect to satisfy these obligations and fund our operations through anticipated

operating cash flows, receipt of proceeds from our insurance policies, sales of additional L-Bonds, and, potentially, additional borrowings under existing debt facilities or new borrowings with other third-party lenders.

GWG has a history of selling L-Bonds dating back to January 2012. GWG may not be able sell additional L-Bonds on terms as favorable to the Company as past transactions or in quantities sufficient to fund all of the Company's operating requirements. Additionally, the Company may not be able to obtain additional borrowing under existing debt facilities or new borrowings with other third-party lenders. To the extent that GWG or its subsidiaries raise additional capital through the future issuance of debt, the terms of those debt securities may include terms that adversely affect the rights of our existing debt and/or equity holders or involve negative covenants that restrict GWG's ability to take specific actions, such as incurring additional debt or making additional investments in growing the operations of the Company. If GWG is unable to fund its operations and other obligations, or defaults on its debt, then the Company will be required to either i) sell assets to provide sufficient funding or ii) to raise additional capital through the sale of equity and the ownership interest of our equity holders may be diluted.

Based on projections of anticipated operating cash flows, receipt of proceeds from our insurance policies, sales of additional L-Bonds, and, potentially, additional borrowings under existing debt facilities or new borrowings with other third-party lenders, we believe that we will have sufficient cash resources to finance our operations, satisfy our other obligations, and to fund anticipated additional investments in Beneficient through March 31, 2021.

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**The Exchange Transaction**

On August 10, 2018 (the "Initial Transfer Date"), we completed the first of two closings (the "Initial Transfer") contemplated by a Master Exchange Agreement with Ben LP and certain other parties (the "Seller Trusts"), which governs the strategic exchange of assets among the parties (the "Exchange Transaction"). On the Initial Transfer Date:

- GWG issued to the Seller Trusts Seller Trust L Bonds due 2023 (the "Seller Trust L Bonds") in an aggregate principal amount of $403.2 million, as more fully described below;

- Beneficient purchased 5,000,000 shares of GWG's Series B Convertible Preferred Stock, par value $0.001 per share and having a stated value of $10 per share ("Series B"), for cash consideration of $50.0 million, which shares were subsequently transferred to the Seller Trusts;

- in consideration for GWG and GWG Life entering into the Master Exchange Agreement and consummating the transactions contemplated thereby, Ben LP, as borrower, entered into a commercial loan agreement (the "Commercial Loan Agreement") with GWG Life, as lender, providing for a loan in a principal amount of $200.0 million (the "Commercial Loan");

- Ben LP delivered to GWG a promissory note (the "Exchangeable Note") in the principal amount of $162.9 million; and

- the Seller Trusts delivered to GWG 4,032,349 common units of Ben LP at an assumed value of $10 per common unit.

On December 28, 2018, the final closing of the transaction occurred and the following actions took place (the "Final Closing" and the date upon which the Final Closing occurred, the "Final Closing Date"):

- in accordance with the Master Exchange Agreement, and based on the net asset value of alternative asset financings as of the Final Closing Date, effective as of the Initial Transfer Date, (i) the principal amount of the Commercial Loan was reduced to $182.0 million, (ii) the principal amount of the Exchangeable Note was reduced to $148.2 million, and (iii) the principal amount of the Seller Trust L Bonds was reduced to $366.9 million;

- the Seller Trusts refunded to GWG $0.8 million in interest paid on the Seller Trust L Bonds related to the Seller Trust L Bonds that were issued as of the Initial Transfer Date but cancelled, effective as of the Initial Transfer Date, on the Final Closing Date;

- the accrued interest on the Commercial Loan and the Exchangeable Note was added to the principal amount of the Commercial Loan, as a result of which the principal amount of the Commercial Loan as of the Final Closing Date was $192.5 million;

- the Seller Trusts transferred to GWG an aggregate of 21,650,087 common units of Ben LP and GWG received 14,822,843 common units of Ben LP in exchange for the Exchangeable Note, upon completion of which GWG owned (including the 4,032,349 common units received by GWG on the Initial Transfer Date) 40,505,279 common units of Ben LP;

- Ben LP issued to GWG an option (the "Option Agreement") to acquire the number of common units of Ben LP, interests or other property that would be received by a holder of Preferred Series A Subclass 1 Unit Accounts of BCH; and

- GWG issued to the Seller Trusts 27,013,516 shares of GWG common stock (including 5,000,000 shares issued upon conversion of the Series B).

*Description of the Assets Exchanged*

*Seller Trust L Bonds*

On August 10, 2018, in connection with the Initial Transfer, GWG Holdings, GWG Life and Bank of Utah, as trustee, entered into a Supplemental Indenture (the "Supplemental Indenture") to the Amended and Restated Indenture dated as of October 23, 2017 (the "Amended and Restated Indenture"). GWG Holdings entered into the Supplemental Indenture to add and modify certain provisions of the Amended and Restated Indenture necessary to provide for the issuance of the Seller Trust L Bonds. The maturity date of the Seller Trust L Bonds is August 9, 2023. The Seller Trust L Bonds bear interest at 7.5% per year. Interest is payable monthly in cash.

After the second anniversary of the Final Closing Date, the holders of the Seller Trust L Bonds will have the right to cause GWG to repurchase, in whole but not in part, the Seller Trust L Bonds held by such holder. The repurchase may be paid, at GWG's option, in the form of cash, a pro rata portion of (i) the outstanding principal amount and accrued and unpaid interest under the Commercial Loan, and (ii) Ben LP common units, or a combination of cash and such property.

F-10

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The Seller Trust L Bonds (see Note 13) are senior secured obligations of GWG, ranking junior only to all senior debt of GWG (see Note 11), pari passu in right of payment and in respect of collateral with all "L Bonds" of GWG (see Note 12), and senior in right of payment to all subordinated indebtedness of GWG. Payments under the Seller Trust L Bonds are guaranteed by GWG Life (see Note 23).

*Series B Convertible Preferred Stock*

The Series B converted into 5,000,000 shares of our common stock at a conversion price of $10 per share upon the Final Closing.

*Commercial Loan*

The $192.5 million principal amount under the Commercial Loan is due on August 9, 2023; however, it is extendable for two five-year terms. See Note 8 for a full description of the terms of the Commercial Loan. Ben LP's obligations under the Commercial Loan are unsecured.

The principal amount of the Commercial Loan bears interest at 5.0% per year. From and after the Final Closing Date, one-half of the interest, or 2.5% per year, is due and payable monthly in cash, and one-half of the interest, or 2.5% per year, accrues and compounds annually on each anniversary date of the Final Closing Date and becomes due and payable in full in cash on the maturity date.

In accordance with the Supplemental Indenture governing the issuance of the Seller Trust L Bonds, upon a redemption event or at the maturity date of the Seller Trust L Bonds, the Company, at its option, may use the outstanding principal amount of the Commercial Loan, and accrued and unpaid interest thereon, as repayment consideration of the Seller Trust L Bonds.

*Exchangeable Note*

The Exchangeable Note accrued interest at a rate of 12.4% per year, compounded annually. Interest was payable in cash on the earlier to occur of the maturity date or the Final Closing Date; provided that Beneficient had the option to add to the outstanding principal balance under the Commercial Loan the accrued interest in lieu of payment in cash of such accrued interest thereon at the Final Closing Date. At the Final Closing date, the principal amount of the Exchangeable Note was exchanged for 14,822,843 common units of Ben LP, and the accrued interest on the Exchangeable Note was added to the principal balance of the Commercial Loan.

*Option Agreement*

In connection with the Final Closing, GWG Holdings entered into the Option Agreement with Ben LP. The Option Agreement gives GWG Holdings the option to acquire the number of common units in Ben LP that would be received by the holder of Preferred Series A Subclass 1 Unit Accounts of BCH, if such holder were converting on that date. There is no exercise price and the Company may exercise the option at any time until December 27, 2028, at which time the option will automatically settle.

*Common Units of Ben LP*

In connection with the Initial Transfer and Final Closing, the Seller Trusts and Beneficient delivered to GWG Holdings 40,505,279 common units of Ben LP. These units represented an approximate 89.9% interest in the common units of Ben LP as of the Final Closing Date (although, on a fully diluted basis, our ownership interest in common units of Ben LP would be reduced significantly below a majority of those issued and outstanding).

F-11

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Purchase and Contribution Agreement**

On April 15, 2019, Jon R. Sabes, GWG's former Chief Executive Officer and a former director, and Steven F. Sabes, GWG's former Executive Vice President and a former director, entered into a Purchase and Contribution Agreement (the "Purchase and Contribution Agreement") with, among others, Ben LP. Under the Purchase and Contribution Agreement, Jon and Steven Sabes agreed to transfer all 3,952,155 of the shares of GWG's outstanding common stock held directly or indirectly by them to BCC (a subsidiary of Ben LP) and AltiVerse Capital Markets, L.L.C. ("AltiVerse"). AltiVerse is a limited liability company owned by an entity related to Beneficient's founders, including Brad K. Heppner (GWG's Chairman and Beneficient's Chief Executive Officer and Chairman) and an entity related to Thomas O. Hicks (one of Beneficient's current directors and a director of GWG). GWG was not a party to the Purchase and Contribution Agreement; however, the closing of the transactions contemplated by the Purchase and Contribution Agreement (the "Purchase and Contribution Transaction") were subject to certain conditions that were dependent upon GWG taking, or refraining from taking, certain actions.

The closing of the Purchase and Contribution Transaction occurred on April 26, 2019. Prior to or in connection with such closing:

- GWG's bylaws were amended to increase the maximum number of directors of GWG from nine to 13, and the actual number of directors comprising the Board of Director was increased from seven to 11. The size of the Board has since been reduced and currently consists of nine directors.

- All seven members of GWG's Board of Directors prior to the closing resigned as directors of GWG, and 11 individuals designated by Beneficient were appointed as directors of GWG, leaving two board seats vacant after the closing.

- Jon R. Sabes resigned from all officer positions he held with GWG or any of its subsidiaries prior to the closing, other than his position as Chief Executive Officer of GWG's technology-focused then wholly-owned subsidiaries, Life Epigenetics and youSurance.

- Steven F. Sabes resigned from all officer positions he held with GWG or any of its subsidiaries prior to the closing, except as Chief Operating Officer of Life Epigenetics.

- The resignations of Messrs. Jon and Steven Sabes included a full waiver and forfeit of (i) any severance that may be payable by GWG or any of its subsidiaries in connection with such resignations or the Purchase and Contribution Transaction, and (ii) all equity awards of GWG held by either of them.

- Murray T. Holland was appointed as Chief Executive Officer of GWG.

- GWG entered into performance share unit agreements with certain employees of GWG pursuant to which such employees will collectively receive up to $4.5 million in cash compensation under certain terms and conditions, including, among others, that such employees remain employed by GWG or one of its subsidiaries (or, if no longer employed, such employment was terminated by GWG other than for cause, as such term is defined in the performance share unit agreement) for a period of 120 days following the closing.

- The stockholders agreement that was entered into on the Final Closing Date was terminated by mutual consent of the parties thereto.

- BCC and AltiVerse executed and delivered a Consent and Joinder to the Amended and Restated Pledge and Security Agreement dated October 23, 2017 by and among the Company, GWG Life, LLC, Messrs. Jon and Steven Sabes and the Bank of Utah, which provides that the shares of GWG's common stock acquired by BCC and AltiVerse pursuant to the Purchase and Contribution Agreement will continue to be pledged as collateral security for GWG's obligations owing in respect of the L Bonds and Seller Trust L Bonds.

*Indemnification Agreements*

On April 26, 2019, GWG entered into Indemnification Agreements (the "Indemnification Agreements") with each of its executive officers and the directors appointed to the Board of Directors on such date. On May 13, 2019, GWG entered into Indemnification Agreement with the three additional directors appointed to the Board of Directors on such date (collectively with the executive officers and directors appointed on April 26, 2019, the "Indemnitees"). The Indemnification Agreements clarify and supplement indemnification provisions already contained in GWG's bylaws and generally provide that GWG shall indemnify the indemnitees to the fullest extent permitted by applicable law, subject to certain exceptions, against expenses, judgments, fines and other amounts actually and reasonably incurred in connection with their service as a director or officer and also provide for rights to advancement of expenses and contribution.

F-12

App. 0593

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**The Investment and Exchange Agreements**

On December 31, 2019, the Company, Ben LP, BCH, and Beneficient Management entered into a Preferred Series A Unit Account and Common Unit Investment Agreement (the "Investment Agreement").

Pursuant to the Investment Agreement, the Company transferred $79.0 million to Ben LP in return for 666,667 common units of Ben LP and a Preferred Series A Subclass 1 Unit Account of BCH.

In connection with the Investment Agreement, the Company obtained the right to appoint a majority of the board of directors of Beneficient Management, the general partner of Ben LP. As a result, the Company obtained control of Ben LP and began reporting the results of Ben LP and its subsidiaries on a consolidated basis beginning on the transaction date of December 31, 2019. See Note 5 for more details on the accounting for the consolidation. The Company's right to appoint a majority of the board of directors of Beneficient Management will terminate in the event (i) the Company's ownership of the fully diluted equity of Ben LP (excluding equity issued upon the conversion or exchange of Preferred Series A Unit Accounts of BCH held as of December 31, 2019 by parties other than the Company) is less than 25%, (ii) the Continuing Directors of the Company cease to constitute a majority of the board of directors of the Company, or (iii) certain bankruptcy events occur with respect to the Company. The term "Continuing Directors" means, as of any date of determination, any member of the board of directors of the Company who: (1) was a member of the board of directors on December 31, 2019; or (2) was nominated for election or elected to the board of directors with the approval of a majority of the Continuing Directors who were members of the board of directors at the time of such nomination or election.

Following the transaction, and as agreed upon in the Investment Agreement, the Company was issued an initial capital account balance for the Preferred Series A Subclass 1 Unit Account of $319.0 million. The other holders of the Preferred Series A Subclass 1 Unit Accounts are an entity related to the founders of Ben LP and an entity related to one of GWG's and Beneficient's directors (the "Related Account Holders"), and the aggregate capital accounts of all holders of the Preferred Series A Subclass 1 Unit Accounts after giving effect to the investment by the Company is $1.6 billion. The Company's Preferred Series A Subclass 1 Unit Account is the same class of preferred security as held by the Related Account Holders. If the Related Account Holders exchange their Preferred Series A Subclass 1 Unit Accounts for securities of the Company, the Company's Preferred Series A Subclass 1 Unit Account would be converted into common units of Ben LP (so neither the Company nor the founders would hold Preferred Series A Subclass 1 Unit Accounts).

Also, on December 31, 2019, in a transaction related to the Investment Agreement, GWG Holdings transferred its interest in the Preferred Series A Subclass 1 Unit Account to its wholly owned subsidiary, GWG Life.

In addition, on December 31, 2019, the Company, Ben LP and the holders of common units of Ben LP (the "Common Units") entered into an Exchange Agreement (the "Exchange Agreement") pursuant to which the holders of Common Units from time to time have the right, on a quarterly basis, to exchange their Common Units for common stock of the Company. The exchange ratio in the Exchange Agreement is based on the ratio of the capital account associated with the Common Units to be exchanged to the market price of the Company's common stock based on the volume weighted average price of the Company's common stock for the five consecutive trading days prior to the quarterly exchange date. The Exchange Agreement is intended to facilitate the marketing of Ben LP's products to holders of alternative assets.

The Exchange Transaction, the Purchase and Contribution Transaction, and the Investment and Exchange Agreements are referred to collectively as the "Beneficient Transactions."

F-13

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(2) Summary of Significant Accounting Policies**

**Basis of Presentation** — The consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP").

**Principles of Consolidation** — The consolidated financial statements include the accounts of GWG Holdings, Inc. and its subsidiaries. All material intercompany balances and transactions have been eliminated upon consolidation. Noncontrolling interests have been recorded for minority ownership in entities that are not wholly owned and are presented in compliance with the provisions of the *Noncontrolling Interest in Subsidiary* subsections of the Accounting Standards Codification ("ASC").

The Company has interests in various entities including corporations and limited partnerships. For each such entity, the Company evaluates its ownership interest to determine whether the entity is a variable interest entity ("VIE") and, if so, whether it is the primary beneficiary of the VIE. The Company would consolidate any entity for which it was the primary beneficiary, regardless of its ownership or voting interests. Upon inception of a variable interest or the occurrence of a reconsideration event, the Company makes judgments in determining whether entities in which it invests are VIEs. If so, the Company makes judgments to determine whether it is the primary beneficiary and is thus required to consolidate the entity.

If it is concluded that an entity is not a VIE, then the Company considers its proportional voting interests in the entity. The Company consolidates majority-owned subsidiaries in which a controlling financial interest is maintained. A controlling financial interest is determined by majority ownership and the absence of significant third-party participating rights. Ownership interests in entities for which the Company has significant influence that are not consolidated under the Company's consolidation policy are accounted for as equity method investments. SEC Staff Announcement: Accounting for Limited Partnership Investments (codified in ASC 323-30-S99-1) guidance requires the use of the equity method unless the investor's interest "is so minor that the limited partner may have virtually no influence over partnership operating and financial policies." The SEC staff's position is that investments in limited partnerships of greater than 3% to 5% are considered more than minor and, therefore, should be accounted for using the equity method.

Related party transactions between the Company and its equity method investees have not been eliminated.

**Use of Estimates** — The preparation of our consolidated financial statements in conformity with GAAP requires management to make significant estimates and assumptions affecting the reported amounts of assets and liabilities at the date of the consolidated financial statements, as well as the reported amounts of revenue during the reporting period. We regularly evaluate estimates and assumptions, which are based on current facts, historical experience, management's judgment, and various other factors that we believe to be reasonable under the circumstances. Our actual results may differ materially and adversely from our estimates. The most significant estimates with regard to these consolidated financial statements relate to (1) the determination of the assumptions used in estimating the fair value of our investments in life insurance policies, (2) the assessment of potential impairment of our equity method investments and our equity security investments and determination of the allowance for credit losses on our financing receivables, and (3) the value of our deferred tax assets and liabilities. Periodically, we make significant estimates in assessing the fair value of assets acquired and consideration given in return for those assets, which are used to establish the initial recorded values of such assets in accordance with ASC 805, *Business Combinations*. Under ASC 805, the consideration paid in an asset acquisition is allocated among the assets acquired based on their relative fair values at acquisition date. In relation to the Investment and Exchange Agreements, relative fair values obtained from a third-party valuation firm were used to calculate the amounts recorded for the assets acquired and liabilities assumed at their acquisition dates as more fully described in Note 5.

**Cash and Cash Equivalents** — We consider cash in demand deposit accounts and temporary investments purchased with an original maturity of three months or less to be cash equivalents. We maintain our cash and cash equivalents with highly rated financial institutions. The balances in our bank accounts may exceed Federal Deposit Insurance Corporation limits. We periodically evaluate the risk of exceeding insured levels and may transfer funds as we deem appropriate.

Cash, cash equivalents and restricted cash on our consolidated statements of cash flows include cash and cash equivalents and restricted cash of $79.1 million and $20.3 million and $114.6 million and $10.8 million as of December 31, 2019 and 2018, respectively. See Note 4 for a discussion of restrictions on cash.

F-14

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Investment in Life Insurance Policies, at Fair Value** — ASC 325-30, *Investments in Insurance Contracts*, permits a reporting entity to account for its investments in life insurance policies using either the investment method or the fair value method. We elected to use the fair value method to account for our life insurance policies. We initially record our purchase of life insurance policies at the purchase price, which is the amount paid for the policy, inclusive of all direct external fees and costs associated with the purchase. At each subsequent reporting period, we re-measure the investment at fair value in its entirety and recognize the change in fair value as unrealized gain or loss in the current period, net of premiums paid, within gain (loss) on life insurance policies, net in our consolidated statements of operations.

In a case where our acquisition of a policy is not complete as of a reporting date, but we have nonetheless advanced direct costs and deposits for the acquisition, those costs and deposits are recorded as other assets in our consolidated balance sheets until the acquisition is complete and we have secured title to the policy. At December 31, 2019 and 2018, none of our other assets comprised direct costs and deposits that we had advanced for life insurance policy acquisitions.

We also recognize realized gain (or loss) from a life insurance policy upon one of the two following events: (1) our receipt of notice or verified mortality of the insured; or (2) our sale of the policy (upon filing of change-of-ownership forms and receipt of payment). In the case of mortality, the gain (or loss) we recognize is the difference between the policy benefits and the carrying value of the policy once we determine that collection of the policy benefits is reasonably assured. In the case of a policy sale, the gain (or loss) we recognize is the difference between the sale price and the carrying value of the policy on the date we receive sale proceeds.

**Life Insurance Policy Benefits Receivable, Net** — Our policy benefit receivables represent amounts due from insurance carriers for claims submitted on matured life insurance policies. Policy benefit receivables are recorded at the policy benefit amounts less reserves for estimated uncollectible amounts. Uncollectible policy benefits can result from challenges by the insurance carrier to the legal validity of the policy, typically related to the concept of insurable interest, or from liquidity or solvency problems at the insurance carrier (although policy benefits are senior to any other obligations of a carrier).

We reserve for policy benefits when it becomes probable that we will not collect the full amount of the policy benefit. The reserve requirements are based on the best facts available to us and are re-evaluated and adjusted as additional information becomes available. Uncollectible policy benefits are written off against the reserves when it is deemed that a policy amount is uncollectible. As of December 31, 2018, the balance of the allowance for uncollectible receivables was $4.3 million, relating to a single life insurance policy claim where collection was doubtful. In 2019 we received a settlement on that policy recovering the amount of premiums paid during the period it was held by GWG. As of December 31, 2019, there was no allowance for uncollectible life insurance policy benefits receivable.

**Other Assets** — Other assets consist of fixed assets, intangible assets, prepaid expenses, operating lease right-of-use assets, and other receivables. At December 31, 2019, other assets also includes the fair values of Beneficient's other assets, net of intercompany eliminations.

In December 2018, in connection with the Final Closing of the Exchange Transaction, GWG Holdings entered into an Option Agreement with Beneficient. The agreement gives GWG Holdings the option to acquire the number of common units in Ben LP that would be received by the holder of Preferred Series A Subclass 1 Unit Accounts of BCH. There is no exercise price and the Company may exercise the option at any time until December 27, 2028, at which time the option will automatically exercise and settle. The Option Agreement was eliminated upon consolidation of Beneficient on December 31, 2019, and the balance of $38.6 million was recorded in other assets at December 31, 2018. The Option Agreement is considered an equity security investment and earns a preferred return that we accrued to the investment balance and recorded in interest and other income in the consolidated statement of operations up until December 31, 2019. Any future gains or losses on this investment will be eliminated in consolidation.

**Financing Receivables** — ASC 310, *Receivables*, provides guidance for receivables and notes that arise from credit sales, loans or other transactions. Financing receivables includes loans and notes receivable. Originated loans we hold for which we have the intent and ability to hold for the foreseeable future or to maturity (or payoff) are classified as held for investment. Financing receivables held for investment are reported in our consolidated balance sheets at the outstanding principal balance adjusted for any write-offs, allowance for loan losses, deferred fees or costs, and any unamortized premiums or discounts. Interest income is accrued on outstanding principal as earned. Unamortized discounts and premiums are amortized using the effective interest method with the amortization recognized as part of interest income in the consolidated statements of operations.

F-15

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Losses on financing receivables are recognized when they are incurred, which requires us to make our best estimate of probable losses. Specific allowances are recorded for individually impaired loans to the extent we determine it is probable we will be unable to collect all amounts due according to original contractual terms of the loan agreement. Certain loans classified as impaired may not require an allowance for loan loss because we believe we will ultimately collect the unpaid balance (through collection or collateral repossession). The method for calculating the best estimate of losses depends on the type and risk characteristics of the related financing receivables. Such an estimate requires consideration of historical loss experience, adjusted for current conditions, and judgments about the probable effects of relevant observable data, including present economic conditions such as delinquency rates, financial health of market sectors, and the present and expected future levels of interest rates. The underlying assumptions, estimates and assessments we use to provide for losses are updated periodically to reflect our view of current conditions. Changes in such estimates can significantly affect the allowance and provision for losses. It is possible we will experience credit losses that are different from our current estimates. We have no allowance for losses at December 31, 2019 or December 31, 2018. Write-offs are deducted from the allowance for losses when we judge the principal to be uncollectible and subsequent recoveries are added to the allowance at the time cash is received on a written-off account.

**Equity Method Investments** — The Company accounts for investments in common stock or in-substance common stock in which we have the ability to exercise significant influence, but do not own a controlling financial interest, under the equity method of accounting. Investments within the scope of the equity method of accounting are initially measured at cost, including the cost of the investment itself and direct transaction costs incurred to acquire the investment. After the initial recognition of the investment at cost, we recognize income and losses from our investment by adjusting upward or downward the balance of our equity method investment on our consolidated balance sheet with such adjustments, if any, flowing through earnings (loss) from equity method investment on our consolidated statement of operations, in all cases adjusted to reflect amortization of basis differences, if any, and the elimination of intercompany gains and losses, if any. Cash distributions received from equity method investees are recorded as reductions to the investment balance and classified in the statement of cash flows using the cumulative earnings approach.

Equity method investments are reviewed for impairment whenever events or changes in circumstances indicate the carrying amount of the investment might not be recoverable. These circumstances can include, but are not limited to evidence that we do not have the ability to recover the carrying amount, the inability of the investee to sustain earnings, a current fair value of the investment that is less than the carrying amount, and other investors ceasing to provide support or reducing their financial commitment to the investee. If the fair value of the investment is less than the carrying amount, and the investment will not recover in the near term, an other-than-temporary impairment may exist. We recognize a loss in value of an investment deemed other-than-temporary in the period the conclusion is made.

When we do not expect financial information of our equity method partner companies to be consistently available on a timely basis, the Company reports its share of the income or loss of the equity method investment on a one-quarter lag.

For more information on equity method investments, see Note 9.

**Leases** — The Company adopted ASC 842, *Leases*, on January 1, 2019. The Company leases certain real estate for its office premises that are classified as operating leases. We assess whether an arrangement is a lease at inception. Leases with an initial term of twelve months or less are not recorded in the balance sheet. We have elected the practical expedient to not separate lease and non-lease components for all assets. Operating lease assets and operating lease liabilities are calculated based on the present value of the future minimum lease payments over the lease term at the lease start date. As our leases do not provide an implicit rate, we use our incremental borrowing rate based on the information available at the lease start date in determining the present value of future payments. The operating lease asset is increased by any lease payments made at or before the lease start date and reduced by lease incentives and initial direct costs incurred. The lease term includes options to renew or terminate the lease when it is reasonably certain that we will exercise that option. The exercise of lease renewal options is at our sole discretion. The depreciable life of lease assets and leasehold improvements are limited by the lease term, unless there is a transfer of title or purchase option reasonably certain of exercise. Lease expense for operating leases is recognized on a straight-line basis over the lease term.

F-16

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Stock-Based Compensation** — The Company measures and recognizes compensation expense for all stock-based payments at fair value on the grant date over the requisite service period. We use the Black-Scholes option pricing model to determine the fair value of stock options and stock appreciation rights. For restricted stock grants (including restricted stock units), fair value is determined as of the closing price of our common stock on the date of grant. Stock-based compensation expense is recorded in general and administrative expenses based on the classification of the employee or vendor. The determination of fair value of stock-based payment awards on the date of grant is affected by our stock price and a number of subjective variables. These variables include, but are not limited to, the expected stock price volatility over the term of the awards and the expected duration of the awards. We account for the effects of forfeitures as they occur.

The risk-free interest rate is based on the U.S. Treasury rates at the date of grant with maturity dates approximately equal to the expected life at grant date. Volatility is based on the standard deviation of the average continuously compounded rate of return of five selected companies.

**Deferred Financing and Issuance Costs** — Loans advanced to us under our second amended and restated senior credit facility with LNV Corporation, as described in Note 11, are reported net of financing costs, including issuance costs, sales commissions and other direct expenses, which are amortized using the straight-line method over the term of the facility. The L Bonds, as described in Note 12, are reported net of financing costs, which are amortized using the effective interest method over the term of those borrowings. Selling and issuance costs of Redeemable Preferred Stock ("RPS") and Series 2 Redeemable Preferred Stock ("RPS 2"), described in Note 15, are netted against additional paid-in capital, until depleted, and then against the outstanding balance of the preferred stock. The offerings of our RPS and RPS 2 closed in March 2017 and April 2018, respectively. There were no issuance costs associated with the August 2018 issuance of the Series B Convertible Preferred Stock, described in Note 15.

**Business Combinations** — The Company includes the results of operations of the businesses that it acquires from the acquisition date. In allocating the purchase price of a business combination, in accordance with ASC 805, *Business Combinations*, the Company records all assets acquired and liabilities assumed at fair value, and the fair value of any noncontrolling interests, with the excess of the purchase price over the aggregate fair values recorded as goodwill. ASC Topic 820, *Fair Value Measurements*, defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. The purchase price of an acquisition is allocated to the underlying assets acquired and liabilities assumed based upon their estimated fair values as of the date of acquisition. To the extent the purchase price exceeds the fair value of the net identifiable tangible and intangible assets acquired and liabilities assumed, such excess is allocated to goodwill. The Company determines the estimated fair values after review and consideration of relevant information, including discounted cash flows, quoted market prices and estimates made by management. The fair value assigned to identifiable intangible assets acquired is based on estimates and assumptions made by management at the time of the acquisition. The Company adjusts the preliminary purchase price allocation, as necessary, during the measurement period of up to one year after the acquisition closing date as it obtains more information as to facts and circumstances existing as of the acquisition date. Acquisition-related costs are recognized separately from the business combination and are expensed as incurred.

**Goodwill and Other Intangibles** — Preliminary goodwill of $2.4 billion and intangible assets of $3.4 million were recognized as a result of the business combination related to the Investment and Exchange Agreements on December 31, 2019 (see Note 5). Intangible assets are included in other assets in the Company's consolidated balance sheet. The Company accounts for goodwill and intangible assets in accordance with ASC Topic 350, *Intangibles – Goodwill and Other*. The amount of goodwill initially recorded is based on the fair value of the acquired entity at the time of acquisition. Management performs goodwill and intangible asset impairment testing annually, during the fourth quarter, or when events occur, or circumstances change that would more likely than not indicate impairment has occurred. Goodwill impairment exists when the carrying value of goodwill exceeds its implied fair value. Intangible assets include an insurance license and a non-compete agreement. Finite-lived intangibles are stated at cost less accumulated amortization. Amortization is recorded using the straight-line method, which approximates the expected pattern of economic benefit, over the estimated lives of the assets. The insurance license intangible has an indefinite life and is evaluated for impairment annually. The non-compete agreement is amortized over its estimated useful life of four years and is evaluated for impairment when indicators of impairment are present as outlined in the subsequent paragraph.

F-17

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The Company reviews the carrying value of its finite-lived intangible assets whenever events or changes in circumstances indicate that the carrying amount of the asset group may not be recoverable. Factors that would require an impairment assessment include, among other things, a significant change in the extent or manner in which an asset is used, a continual decline in the Company's operating performance, or as a result of fundamental changes in a subsidiary's business condition.

**Income Taxes** — The Company is a corporation for tax purposes. Certain of the Company's subsidiaries operate in the U.S. as partnerships for U.S. federal income tax purposes. In addition, certain of the wholly-owned subsidiaries of the Company will be subject to federal, state, and local corporate income taxes at the entity level and the related tax provision attributable to the Company's share of this income tax is reflected in the consolidated financial statements. Income taxes are accounted for using the asset and liability method of accounting. Under this method, deferred tax assets and liabilities are recognized for the expected future tax consequences of differences between the carrying amounts of assets and liabilities and their respective tax basis, using tax rates in effect for the year in which the differences are expected to reverse. The effect on deferred assets and liabilities of a change in tax rates is recognized in income in the period when the change is enacted. Deferred tax assets are reduced by a valuation allowance when it is more likely than not that some portion or all of the deferred tax assets will not be realized. Current and deferred tax liabilities, if any, are recorded within accounts payable and accrued expenses and other liabilities in the consolidated balance sheets. The Company analyzes its tax filing positions in all of the U.S. federal, state, local and foreign tax jurisdictions where it is required to file income tax returns, as well as for all open tax years in these jurisdictions. The Company records uncertain tax positions on the basis of a two-step process: (a) determination is made whether it is more likely than not that the tax positions will be sustained based on the technical merits of the position, and (b) those tax positions that meet the more likely than not threshold are recognized as the largest amount of tax benefit that is greater than 50 percent likely to be realized upon ultimate settlement with the related tax authority. The Company recognizes accrued interest and penalties related to uncertain tax positions in other expenses within the consolidated statements of operations.

**Earnings (Loss) per Common Share** — Basic earnings (loss) per share attributable to common shareholders are calculated using the weighted-average number of shares outstanding during the reported period. Diluted earnings (loss) per share are calculated based on the potential dilutive impact of our RPS, RPS 2, restricted stock units, warrants (if applicable) and stock options.

Net earnings, less any preferred dividends accumulated for the period (whether or not declared), is allocated to common stock. Basic earnings per common share is computed by dividing net earnings available to common stockholders by the weighted average number of common shares outstanding during the period.

Diluted earnings per common share is computed in a similar manner, except that first the denominator is increased to include the number of additional common shares that would have been outstanding if potentially dilutive common shares were issued using the treasury stock method in the case of restricted stock units, warrants and options, or the if-converted method in the case of RPS and RPS 2. During 2019 and 2018, RPS, RPS2, restricted stock units and stock options were the potentially dilutive non-participating instruments issued by the Company.

**Accounting Policies of Recently Consolidated Subsidiaries** — As discussed in Note 5, as a result of the Company acquiring the right to appoint a majority of the board of directors of Beneficient Management, the general partner of Ben LP, on December 31, 2019, Beneficient became a consolidated subsidiary of GWG Holdings. The Company reviewed the accounting policies of Beneficient and conformed those of Beneficient with those of the Company. For those accounting policies utilized by Beneficient that were not applicable to GWG prior to the consolidation of Beneficient, the Company adopted those accounting policies as of December 31, 2019. Additionally, Beneficient's balance sheet was remeasured to fair value on that date in accordance with our business combination accounting policy described above. A description of each of the most pertinent accounting policies applicable to Beneficient is included below. This list is not exhaustive.

*Loan Receivables*

Loan receivables are carried at the principal amount outstanding, plus interest paid-in-kind. The loans do not have scheduled principal or interest payments due prior to their maturity date, which is generally 12 years from the date of origination. Prepayment of the loans, in whole or in part, is permitted without premium or penalty. Loans bear contractual interest at the greater of 14% or 1-month LIBOR plus 10% compounded daily. The primary source of repayment for the loans and related fees is cash flows from the alternative assets collateralizing the loans. Interest income on loans is accrued on the principal amount outstanding and interest compounds on a daily basis.

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Allowances for Loan Losses*

The allowance for loan losses is a valuation allowance for probable incurred credit losses in the portfolio. Management's determination of the allowance is based upon an evaluation of the loan portfolio, impaired loans, economic conditions, volume, growth and composition of the collateral to the loan portfolio, and other risks inherent in the portfolio. Management applies risk factors to categories of loans and individually reviews all impaired loans above a de minimis threshold. Management relies heavily on statistical analysis, current net asset value ("NAV") and distribution performance of the underlying alternative asset collateral and industry trends related to alternative asset investments to estimate losses. Management evaluates the adequacy of the allowance by reviewing relevant internal and external factors that affect credit quality. As the collateral is the sole source of repayment of the loans and related interest, these loans are considered to be collateral dependent. Any charge-offs are recognized in the period in which they arise for the collateral dependent loans (i.e., impaired collateral dependent loans are written down to their estimated net realizable value based on disposition value).

*Fees Receivable*

Fees receivable represent balances arising from services provided to clients and are recorded on an accrual basis. Fees receivable are written off when they are determined to be uncollectible. Any allowance for doubtful accounts is estimated based on our estimate of the ability of the collateral to satisfy the amounts due. Most of the fees receivable consist of unpaid upfront fees and trust service fees that will be paid from the cash flows from the client's alternative asset based on an allocation of those cash flows as prescribed in the associated trust agreement. Upfront fees and trust service fees are required to be paid first from the cash flows from the client's alternative asset and thus, we believe that the amounts are fully collectible. Accordingly, our consolidated financial statements do not include an allowance for bad debt nor any bad debt expense.

*Noncontrolling interests – Redeemable and Non-redeemable*

Noncontrolling interests represent the portion of certain consolidated subsidiaries' limited partnership interests that are held by third parties. Amounts are adjusted by the noncontrolling interest holder's proportionate share of the subsidiaries' or VIEs' earnings or losses each period and for any distributions that are paid.

Noncontrolling interests are reported as a component of equity unless the noncontrolling interest is considered redeemable, in which case the noncontrolling interest is recorded between liabilities and equity (mezzanine or temporary equity) in the Company's consolidated balance sheets. The redeemable noncontrolling interest is adjusted at each balance sheet date to its maximum redemption value if the amount is greater than the carrying value. Changes in the Company's redeemable noncontrolling interests are presented in the consolidated statements of changes in stockholders' equity.

Noncontrolling interests include holders, which consist of "Related Entities", an entity affiliated with a related party, and third parties, of Class S Ordinary Units issued by BCH. "Related Entities" are defined as certain trusts and those entities held by such trusts that are controlled by Beneficient's founder and in which Beneficient's founder and his family members are also among classes of economic beneficiaries whether or not Beneficient's founder is entitled to economic distributions from such trusts. Beneficient's founder is also chairman of the board of directors of GWG Holdings.

Redeemable noncontrolling interests are held by holders, which consist of a Related Entity, an entity affiliated with a related party, and a third-party entity, of Preferred Series A Subclass 1 Unit Accounts issued by BCH.

*Upfront Fees*

Non-refundable upfront fees are earned for setting up and providing the client access to the EXAlt Plan$^{TM}$. These activities do not transfer a separate promised service and therefore, represent advanced payments for trust administration services. Upfront fees are billed at the origination of the liquidity transaction and are based on a percentage of NAV plus any unfunded capital commitments. Payment of the fees occurs in the first step of the waterfall distribution per the LiquidTrust agreement. Upfront fees are deferred upon receipt and recognized ratably over the period of benefit which is generally consistent with estimated expected life of LiquidTrusts (typically 7 to 10 years). Upfront fees are recorded on the consolidated balance sheets as fees receivable with a corresponding amount recorded to deferred revenue. Deferred revenue is subsequently recognized as trust services revenues on the consolidated statements of comprehensive income (loss), ratably over the expected life of the LiquidTrust.

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Trust Administration Revenues*

Trust administration fees are earned for providing administrative services to trustees for existing liquidity solution clients. The performance obligation under these agreements is satisfied over time as the administration and management services are provided. Fees are recognized monthly based upon the beginning of quarter (in advance) net asset value plus any remaining unfunded loan commitments and the applicable fee rate of the account as outlined in the agreement. Payment frequency is defined in the individual contracts, which primarily stipulate billings on a quarterly basis in advance. Trust administration fee receivables are recorded in the consolidated balance sheets in the fees receivable line item and in trust services revenues on the consolidated statements of comprehensive income (loss).

**Reclassification** — Certain prior year amounts have been reclassified for consistency with the current year presentation. These reclassifications had no effect on the reported results of operations. See Note 3 for an explanation of certain reclassifications we recorded in comparative periods on the guarantor financial statements.

**Newly Adopted Accounting Pronouncements** — On January 1, 2019, we adopted Accounting Standards Update ("ASU") No. 2016-02, *Leases* (Topic 842). ASU 2016-02 requires lessees to recognize right-of-use assets and lease liabilities on the balance sheet for all leases with a term greater than twelve months. We elected to adopt the standard using the modified retrospective method, without restatement of prior periods' financial information. The impact to the balance sheet on January 1, 2019, was the addition of approximately $0.9 million in right-of-use assets, a reduction to deferred rent of $0.7 million, and a net increase to lease liabilities of $1.6 million for our operating lease. The adoption of the new standard did not materially affect our consolidated statements of operations, consolidated statements of cash flows or consolidated statements of changes in stockholders' equity. We have entered into additional leases and have consolidated Beneficient's right-of-use assets and lease liabilities since the adoption of ASU 2016-02 as discussed in Note 21.

ASU 2017-04, *Goodwill,* (Topic 350) was issued in January 2017. This standard simplifies how an entity is required to test goodwill for impairment by eliminating Step 2 from the goodwill impairment test. Step 2 measures a goodwill impairment loss by comparing the implied fair value of a reporting unit's goodwill with the carrying amount of that goodwill. Under the new guidance, goodwill impairment loss will be measured on the basis of the fair value of the reporting unit relative to the reporting unit's carrying amount rather than on the basis of the implied amount of goodwill relative to the goodwill balance of the reporting unit. ASU 2017-04 is effective for annual periods beginning after December 15, 2019, including interim periods within those periods, for public business entities. Early adoption is permitted for interim or annual goodwill impairment tests performed on testing dates after January 1, 2017. The Company adopted this ASU on January 1, 2020, and it did not have a material impact on its consolidated financial statements and related disclosures.

**Recently Issued Accounting Pronouncements** — In June 2016, the Financial Accounting Standards Board ("FASB") issued ASU No. 2016-13, *Financial Instruments — Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments*, which changes the impairment model for most financial assets and certain other instruments, including trade and other receivables, held-to-maturity debt securities and loans. There have been numerous codification improvements and technical corrections issued through subsequent ASUs snice the issuance of ASU No. 2016-13. The standard requires entities to use a new, forward-looking "expected loss" model that is expected to generally result in the earlier recognition of allowances for losses. The guidance is effective for annual periods beginning after December 15, 2022, including interim periods within those years, for smaller reporting companies, as defined by the SEC, but early adoption is permitted. The Company is evaluating the potential impact of this guidance on our consolidated financial statements.

In August 2018, the FASB issued ASU No. 2018-13, *Fair Value Measurement (Topic 820): Disclosure Framework — Changes to the Disclosure Requirements for Fair Value Measurement*, which eliminates, adds and modifies certain disclosure requirements for fair value measurements. The guidance is effective for fiscal years and interim periods beginning after December 15, 2019. Certain of the amendments require prospective application, while the remainder require retrospective application. Early adoption is allowed either for the entire standard or only the provisions that eliminate or modify the requirements. The Company believes that we are currently compliant with this pronouncement but continues to evaluate potential impact of this guidance on our consolidated financial statements.

F-20

App. 0601

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(3) Correction of an Immaterial Error**

In the consolidated statement of cash flows for the year ended December 31, 2018, we have separated the gross borrowings and repayments on our senior credit facility with LNV Corporation that were previously erroneously reported on a net basis in cash flows from financing activities.

For the year ended December 31, 2018, we previously reported net repayments of senior debt of $64.3 million. We revised the comparative information for the year ended December 31, 2018, to report gross borrowings on senior debt of $12.9 million, and gross repayments of senior debt of $77.2 million, in the consolidated statements of cash flows. This revision had no effect on the total cash flows from financing activities.

**(4) Restrictions on Cash**

Under the terms of our second amended and restated senior credit facility with LNV Corporation (discussed in Note 11), we are required to maintain collection and payment accounts that are used to collect policy benefits from pledged policies, pay annual policy premiums, interest and other charges under the facility, distribute funds to pay down the facility, and distribute excess funds to the borrower (GWG DLP Funding IV, LLC).

The agents for the lender authorize the disbursements from these accounts. At December 31, 2019 and 2018, there was a balance of $20.3 million and $4.2 million, respectively, in these collection and payment accounts.

To fund the Company's acquisition of life insurance policies, we are required to maintain escrow accounts. Distributions from these accounts are made according to life insurance policy purchase contracts. At December 31, 2019 and 2018, there was a balance of $0 and $6.6 million, respectively, in the Company's escrow accounts.

**(5) Business Combination**

Prior to December 31, 2019, the Company owned 41,505,279 common units of Ben LP, for a total limited partnership interest in the common units of Ben LP of approximately 90.2%. This investment was historically accounted for using the equity method (see Note 9). On December 31, 2019, the Company entered into the Investment Agreement and Exchange Agreements described in Note 1.

Pursuant to the Investment Agreement, the Company transferred $79.0 million to Ben LP in return for 666,667 additional common units of Ben LP and a Preferred Series A Subclass 1 Unit Account of BCH, which increased the Company's ownership in Ben LP common units to approximately 95.5%. Also on December 31, 2019, in a transaction related to the Investment Agreement, GWG Holdings transferred its interest in the Preferred Series A Subclass 1 Unit Account to its wholly owned subsidiary, GWG Life. In connection with the Investment Agreement, the Company obtained the right to appoint a majority of the board of directors of Beneficient Management, the general partner of Ben LP. As a result, the Company obtained control of Ben LP and consolidated Ben LP as of December 31, 2019, under the guidance in ASC 805, *Business Combinations*.

As a result of the change-of-control, the Company was required to remeasure its existing equity investment at fair value prior to consolidation. At December 31, 2019, the Company's equity investment in the common units of Ben LP had a carrying value of $368.6 million, prior to the additional investment noted above. The Company estimated the fair value of its investment in Ben LP to be approximately $622.5 million, resulting in the recognition of a gain of $253.9 million during the fourth quarter of 2019. This gain is included in gain on consolidation of equity method investment in the Company's consolidated statement of operations for the year ended December 31, 2019. This gain was partially offset by the remeasurement to fair value of the Commercial Loan Agreement between GWG Life and Ben and the Option Agreement between GWG Holdings and Ben which resulted in a net loss of $4.2 million. The net gain on consolidation of equity method investment after remeasurement of these preexisting balances was $249.7 million. The Company's proportionate share of the earnings or losses from Ben LP was recognized in earnings (loss) from equity method investment in our consolidated statement of operations from August 10, 2018 until December 31, 2019 (see Note 9 for further information) and was previously recorded on a one-quarter lag basis. In connection with the consolidation of Beneficient, the Company was required to discontinue the one-quarter lag.

F-21

App. 0602

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The following table summarizes the fair value measurement of the assets acquired and liabilities assumed as of December 31, 2019 (in thousands):

**ASSETS**

| | | |
|---|---|---:|
| Loans receivable | $ | 232,344 |
| Fees receivable | | 29,168 |
| Investment in public equity securities | | 24,550 |
| Other assets | | 14,053 |
| Intangible assets | | 3,449 |
| Total identifiable assets acquired | | 303,564 |

**LIABILITIES**

| | |
|---|---:|
| Other borrowings | 153,086 |
| Commercial loan agreement from parent | 168,420 |
| Other liabilities and deferred revenue | 105,866 |
| Accounts payable and accrued expenses | 13,713 |
| Total liabilities assumed | 441,085 |
| Net liabilities assumed | (137,521) |

**NONCONTROLLING INTERESTS**

| | |
|---|---:|
| Common Units not owned by GWG Holdings[1] | 181,383 |
| Class S Ordinary Units | 85,448 |
| Class S Preferred Units | 17 |
| Preferred Series A Subclass 1 Unit Accounts | 1,269,654 |
| Total noncontrolling interests | 1,536,502 |

**ACQUISITION CONSIDERATION**

| | |
|---|---:|
| Cash, less cash acquired | 61,479 |
| Fair value of preexisting investment in Common Units[2] | 622,503 |
| Fair value of noncontrolling interest | 1,536,502 |
| Total estimated consideration | 2,220,484 |
| Less: Net liabilities assumed | (137,521) |
| Resulting preliminary goodwill | 2,358,005 |

(1)  Calculated as 1,974,677 Common Units not owned by GWG Holdings at December 31, 2019, multiplied by the $15.00 per unit derived from the enterprise valuation of Beneficient. Also includes $151.8 million of share-based payment awards that were granted by Beneficient prior to the change in control but were not replaced by awards of GWG Holdings upon the change in control. These awards were treated as noncontrolling interests in accordance with ASC 805, *Business Combinations*.

(2)  Calculated as 41,505,279 Common Units owned by GWG Holdings prior to the change in control multiplied by the $15.00 per unit derived from the enterprise valuation of Beneficient, with a nominal rounding adjustment.

*Methods Used to Determine Equity Value and to Fair Value Assets and Liabilities*

The following is a description of the valuation methodologies used to estimate the fair value of equity and the fair values of major categories of assets acquired and liabilities assumed. In many cases, determining the fair value of equity and the acquired assets and assumed liabilities required management to estimate cash flows expected from those assets and liabilities and to discount those cash flows at appropriate rates of interest. This required the utilization of significant estimates and management judgment in accounting for the 2019 change-of-control event.

**Loan receivables** — The loan portfolio was valued based on current guidance that defines fair value as the price that would be received to sell an asset or transfer a liability in an orderly transaction between market participants at the measurement date. Level 3 inputs were utilized to value the loan portfolio and included the use of present value techniques employing cash flow estimates and incorporated assumptions that marketplace participants would use in estimating fair values, specifically market interest rate and general credit fair value assumptions. In instances where reliable market information was not available, management used assumptions in an effort to determine reasonable fair value. There was no carryover related allowance for loan losses.

F-22

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Cash and cash equivalents and fees receivable** — Cash and cash equivalents and fees receivable were valued using their current carrying amounts which approximate fair value.

**Investment in public equity securities** — The fair value of the investments in public equity securities was determined using quoted market prices. As these were investments by Beneficient in the common stock of GWG, these amounts were eliminated in consolidation and treated as treasury stock as of December 31, 2019.

**Other assets** — Other assets include miscellaneous receivables that were valued using the current carrying amount as that amount approximates fair value due to the relatively short time between their origination date and the fair value date. Miscellaneous intercompany receivables were eliminated in consolidation.

**Intangible assets** — Intangible assets include an insurance license and a non-compete agreement. Both assets were valued using their current carrying amount which approximates fair value. The insurance license was valued at $3.1 million and the non-compete agreement was valued at $0.3 million.

**Other borrowings and commercial loan agreement from parent** — The measurement of the fair value of other borrowings and commercial loan agreement from parent was based on market prices that generally are observable for similar liabilities at commonly quoted intervals and is considered a Level 2 fair value measurement. The Commercial Loan Agreement between Beneficient and GWG Life was eliminated in consolidation as of December 31, 2019.

**Other liabilities and deferred revenue** — The carrying amounts of other liabilities and deferred revenue approximate their fair value. The Option Agreement between Beneficient and GWG was eliminated in consolidation as of December 31, 2019.

**Accounts payable and accrued expenses** — Due to their short-term nature, the carrying amounts of accounts payable and accrued expenses approximate the fair value. Miscellaneous intercompany payables were eliminated in consolidation as of December 31, 2019.

**Noncontrolling interests** — The values for each noncontrolling interest component were calculated after determination of an overall enterprise value for the Company. The enterprise value of the Company was determined using the Option Pricing Model ("OPM") Backsolve approach under the market method. The OPM Backsolve approach uses a Black-Scholes option pricing model to calculate the implied equity value of the firm. Once an overall equity value was determined, amounts were allocated to the various classes of equity based on the security class preferences. The inputs to the OPM Backsolve approach are the equity value for one component of the capital structure, expected time to exit, the risk-free interest rate and an assumed volatility based on the volatility of similar publicly traded companies. The OPM Backsolve inputs include Level 3 inputs.

The value of the noncontrolling interest includes an amount related to outstanding share-based payment awards that remain outstanding after the change-of-control. For these awards, the portion of the acquisition-date fair value of the share-based payment awards attributable to pre-combination service is recognized in noncontrolling interest as of December 31, 2019.

**Goodwill** — The resulting excess of the overall enterprise value after deducting the fair values of assets acquired and liabilities assumed is recognized as goodwill. The goodwill recognized is the result of the inherent value associated with the assembled business after all separately identifiable assets acquired and liabilities assumed are deducted from the enterprise value. None of the goodwill is expected to be deductible for income tax purposes. The goodwill is allocated to our Investment in Beneficient reporting unit.

As of December 31, 2019, the accounting for the estimates of equity values, which includes noncontrolling interests, the fair value of loan receivables, and any separately identifiable intangibles was based on the facts and circumstances that existed as of the acquisition date. Should management obtain new information about facts and circumstances that existed at the acquisition date, adjustments to the fair values assigned to these items could occur during the measurement period of one year from the acquisition date. Any such adjustment will result in corresponding adjustments to goodwill.

F-23

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The following unaudited pro forma financial information presents the combined results of operations of GWG Holdings as if the acquisition of Ben LP had occurred as of January 1, 2018:

| *(in thousands, except shares and per share data)* | | **Years ended December 31,** | | |
|---|---|---|---|---|
| | | **2019** | | **2018** |
| **Total Revenue** | | | | |
| Pro forma | $ | 104,989 | $ | 89,949 |
| As reported | $ | 92,276 | $ | (390) |
| | | | | |
| **Net Income (Loss) Attributable to Common Shareholders** | | | | |
| Pro forma | $ | (218,572) | $ | (87,808) |
| As reported | $ | 91,166 | $ | (136,114) |
| | | | | |
| **Net Earnings (Loss) per Diluted Common Share** | | | | |
| Pro forma | $ | (6.15) | $ | (2.67) |
| As reported | $ | 2.65 | $ | (22.32) |

The unaudited pro forma financial information is presented for informational purposes only. It is not necessarily indicative of what our consolidated results of operations actually would have been had the acquisition occurred at the beginning of each year, nor does it attempt to project the future results of operations of the combined company.

The unaudited pro forma financial information above gives effect to the following:

- Deconsolidation of certain Beneficient trusts included in the EXAlt Plan$^{TM}$
- Exclusion of the $249.7 million nonrecurring gain on consolidation of equity method investment
- Reduction of Beneficient interest expense related to acquisition-date debt principal payments
- Elimination of intercompany transactions, including the Commercial Loan Agreement and Option Agreement
- Exclusion of nonrecurring acquisition-related transaction costs

**(6) Investment in Life Insurance Policies**

Our investments in life insurance policies are valued based on unobservable inputs that are significant to their overall fair value. Changes in the fair value of these policies, net of premiums paid, are recorded in gain (loss) on life insurance policies, net in our consolidated statements of operations. Fair value is determined on a discounted cash flow basis that incorporates life expectancy assumptions generally derived from reports obtained from widely accepted life expectancy providers (other than insured lives covered under small face amount policies — those with $1 million in face value benefits or less — which utilize either a single fully underwritten, or simplified report based on self-reported medical interview), assumptions relating to cost-of-insurance (premium) rates and other assumptions. The discount rate we apply incorporates current information about the discount rates observed in the life insurance secondary market through competitive bidding observations (which have recently declined for us as a result of our decreased purchase activity) and other means, fixed income market interest rates, the estimated credit exposure to the insurance companies that issued the life insurance policies and management's estimate of the operational risk yield premium a purchaser would require to receive the future cash flows derived from our portfolio as a whole. Management has significant discretion regarding the combination of these and other factors when determining the discount rate. As a result of management's analysis, a discount rate of 8.25% was applied to our portfolio as of both December 31, 2019 and 2018.

**Portfolio Information**

Our portfolio of life insurance policies, owned by our subsidiaries as of December 31, 2019 is summarized below:

**Life Insurance Portfolio Summary**

| | | |
|---|---|---|
| Total life insurance portfolio face value of policy benefits (in thousands) | $ | 2,020,973 |
| Average face value per policy (in thousands) | $ | 1,756 |
| Average face value per insured life (in thousands) | $ | 1,883 |
| Average age of insured (years)* | | 82.4 |
| Average life expectancy estimate (years)* | | 7.2 |
| Total number of policies | | 1,151 |
| Number of unique lives | | 1,073 |
| Demographics | | 74% Male; 26% Female |
| Number of smokers | | 48 |
| Largest policy as % of total portfolio face value | | 0.7% |
| Average policy as % of total portfolio face value | | 0.1% |
| Average annual premium as % of face value | | 3.3% |

(*)  Averages presented in the table are weighted averages by face amount of policy benefits.

F-24

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

A summary of our policies organized according to their estimated life expectancy dates, grouped by year, as of the reporting date, is as follows:

| Years Ending December 31, | As of December 31, 2019 | | | As of December 31, 2018 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Number of Policies | Estimated Fair Value (in thousands) | Face Value (in thousands) | Number of Policies | Estimated Fair Value (in thousands) | Face Value (in thousands) |
| 2019 | — | $ — | $ — | 9 | $ 6,380 | $ 7,305 |
| 2020 | 8 | 5,869 | 6,342 | 41 | 46,338 | 59,939 |
| 2021 | 55 | 62,061 | 79,879 | 81 | 68,836 | 108,191 |
| 2022 | 90 | 89,074 | 138,723 | 104 | 97,231 | 177,980 |
| 2023 | 128 | 123,352 | 222,369 | 109 | 93,196 | 185,575 |
| 2024 | 109 | 103,111 | 217,053 | 107 | 84,150 | 211,241 |
| 2025 | 113 | 74,223 | 171,961 | 124 | 77,718 | 210,781 |
| Thereafter | 648 | 338,349 | 1,184,646 | 579 | 274,074 | 1,086,980 |
| **Totals** | **1,151** | **$ 796,039** | **$ 2,020,973** | **1,154** | **$ 747,923** | **$ 2,047,992** |

We recognized life insurance benefits of $125.1 million and $71.1 million during the years ended December 31, 2019 and 2018, respectively, related to policies with a carrying value of $33.2 million and $20.8 million, respectively, and as a result recorded realized gains of $91.9 million and $50.3 million.

A reconciliation of gain (loss) on life insurance policies is as follows (in thousands):

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2019 | 2018 |
| Change in estimated probabilistic cash flows[1] | $ 67,186 | $ 75,444 |
| Unrealized gain on acquisitions[2] | 6,921 | 28,017 |
| Premiums and other annual fees | (65,577) | (54,087) |
| Change in discount rates[3] | — | — |
| Change in life expectancy evaluation[4] | (2,332) | (4,890) |
| Change in life expectancy evaluation methodology[5] | — | (87,100) |
| Face value of matured policies | 125,148 | 71,090 |
| Fair value of matured policies | (56,026) | (42,579) |
| Gain (loss) on life insurance policies, net | $ 75,320 | $ (14,105) |

(1)  Change in fair value of expected future cash flows relating to our investment in life insurance policies that are not specifically attributable to changes in life expectancy, discount rate changes or policy maturity events.
(2)  Gain resulting from fair value in excess of the purchase price for life insurance policies acquired during the reporting period.
(3)  The discount rate applied to estimate the fair value of the portfolio of life insurance policies we own was 8.25% at December 31, 2019 and 2018.
(4)  The change in fair value due to updating life expectancy estimates on certain life insurance policies in our portfolio.
(5)  The change in fair value due to the adoption of the Longest Life Expectancy methodology on life policies in our portfolio, partially offset by the impact of a decrease in the discount rate associated thereto.

F-25

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Estimated premium payments and servicing fees required to maintain our current portfolio of life insurance policies in force for the next five years, assuming no mortalities (in thousands), are as follows:

| Years Ending December 31, | Premiums | Servicing | Total |
|---|---|---|---|
| 2020 | $ 67,455 | $ 1,674 | $ 69,129 |
| 2021 | 84,712 | 1,674 | 86,386 |
| 2022 | 97,757 | 1,674 | 99,431 |
| 2023 | 110,156 | 1,674 | 111,830 |
| 2024 | 120,077 | 1,674 | 121,751 |
| | $ 480,157 | $ 8,370 | $ 488,527 |

Management anticipates funding the majority of the premium payments and servicing fees estimated above from cash flows realized from life insurance policy benefits, and to the extent necessary, with additional borrowing capacity created as the premiums and servicing costs of pledged life insurance policies become due, under the second amended and restated senior credit facility with LNV Corporation as described in Note 11. Management anticipates funding premiums and servicing costs of non-pledged life insurance policies with cash flows realized from life insurance policy benefits from our portfolio of life insurance policies and net proceeds from our offering of L Bonds. The proceeds of these capital sources may also be used for; additional investments in Beneficient; the purchase, policy premiums and servicing costs of additional life insurance policies; working capital; and financing expenditures including paying principal, interest and dividends.

**(7) Fair Value Definition and Hierarchy**

ASC 820, *Fair Value Measurements and Disclosures*, establishes a hierarchical disclosure framework that prioritizes and ranks the level of market price observability used in measuring assets and liabilities at fair value. Market price observability is affected by a number of factors, including the type of investment, the characteristics specific to the investment and the state of the marketplace, including the existence and transparency of transactions between market participants. Assets and liabilities with readily available and actively quoted prices, or for which fair value can be measured from actively quoted prices in an orderly market, generally will have a higher degree of market price observability and a lesser degree of judgment used in measuring fair value.

ASC 820 maximizes the use of observable inputs and minimizes the use of unobservable inputs by requiring the use of observable inputs whenever available. Observable inputs are inputs that market participants would use in pricing the asset or liability developed based on market data obtained from third-party sources. Unobservable inputs are inputs that reflect assumptions about how market participants price an asset or liability based on the best available information. Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability (i.e., the "exit price") in an orderly transaction between market participants at the measurement date (a non-distressed transaction in which neither seller nor buyer is compelled to engage in the transaction). A sale of the portfolio or a portion of the portfolio in an other than orderly transaction would likely occur at less than the fair value of the respective life insurance policies.

The hierarchy is broken down into three levels based on the observability of inputs as follows:

Level 1 — Valuations based on quoted prices in active markets for identical assets or liabilities that the Company has the ability to access. Valuations are based on quoted prices that are readily and regularly available in an active market.

Level 2 — Valuations based on one or more quoted prices in markets that are not active or for which all significant inputs are observable, either directly or indirectly.

Level 3 — Valuations based on inputs that are unobservable and significant to the overall fair value measurement.

App. 0608

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The availability of observable inputs can vary by types of assets and liabilities and is affected by a wide variety of factors, including, for example, whether an instrument is established in the marketplace, the liquidity of markets and other characteristics particular to the transaction. To the extent that valuation is based on models or inputs that are less observable or unobservable in the market, the determination of fair value requires more judgment. Accordingly, the degree of judgment exercised by management in determining fair value is greatest for assets and liabilities categorized in Level 3.

*Level 3 Valuation Process*

The estimated fair value of our portfolio of life insurance policies is determined on a quarterly basis by management taking into consideration a number of factors, including changes in discount rate assumptions, estimated premium payments and life expectancy estimate assumptions, as well as any changes in economic and other relevant conditions. The discount rate incorporates current information about discount rates observed in the life insurance secondary market through competitive bidding observations (which have declined recently as a result of our decreased purchase activity) and other means, fixed income market interest rates, the estimated credit exposure to the insurance company that issued the life insurance policy and management's estimate of the operational risk yield premium a purchaser would require to receive the future cash flows derived from our portfolio as a whole. Management has significant discretion regarding the combination of these and other factors when determining the discount rate.

These inputs are then used to estimate the discounted cash flows from the portfolio using the ClariNet LS probabilistic and stochastic portfolio pricing model from ClearLife Limited, which estimates the expected cash flows using various mortality probabilities and scenarios. The valuation process includes a review by senior management as of each quarterly valuation date. We also engage ClearLife Limited to prepare a net present value calculation of our life insurance portfolio using the inputs we provide on a quarterly basis.

The following table reconciles the beginning and ending fair value of our Level 3 investments in our portfolio of life insurance policies (in thousands):

|  | Years Ended December 31, | |
| --- | --- | --- |
|  | 2019 | 2018 |
| Beginning balance | $ 747,922 | $ 650,527 |
| Purchases | 32,367 | 128,502 |
| Maturities (initial cost basis) | (33,265) | (20,763) |
| Net change in fair value | 49,015 | (10,344) |
| Ending balance | $ 796,039 | $ 747,922 |

Historically, for life insurance policies with face amounts greater than $1 million and that are not pledged as collateral under our second amended and restated senior credit facility with LNV Corporation (approximately 14.6% of our portfolio by face amount of policy benefits), we attempted to obtain updated life expectancy reports on a continuous rotating three year cycle. For life insurance policies that are pledged under our second amended and restated senior credit facility with LNV Corporation (approximately 77.3% of our portfolio by face amount of policy benefits as of December 31, 2019), prior to entering into the second amended and restated senior credit facility with LNV Corporation on November 1, 2019, we were required to update the life expectancy estimates every two years beginning from the closing date of the second amended and restated senior credit facility with LNV Corporation. Under the second amended and restated senior credit facility with LNV Corporation, we are required to update the life expectancy estimates for all life insurance policies that are pledged no later than December 18, 2020, and obtain updated life expectancy updates no less frequently than once every five years. For the remaining small face insurance policies (i.e., a policy with $1 million in face value benefits or less), we employ other methods and timeframes to update life expectancy estimates.

App. 0609

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

In the fourth quarter of 2018, we adopted the Longest Life Expectancy portfolio valuation methodology. Under our Longest Life Expectancy methodology, we: i) utilize life expectancy reports from third-party life expectancy providers for the pricing of all life insurance policies; ii) apply a stable valuation methodology driven by the experience of our life insurance portfolio, which is re-evaluated if experience deviates by a specified margin; and iii) use relevant market observations that can be validated and mapped to the discount rate used to value the life insurance portfolio.

With the adoption of the Longest Life Expectancy method, we discontinued the practice of obtaining updated life expectancy reports (or updating specific life expectancies in any manner) except as required by lenders to comply with existing and future covenants within credit facilities. This change was accounted for as a change in accounting estimate and affected the year ended December 31, 2019 and will affect all periods thereafter. To the extent such updated life expectancy reports are available, we do not expect to incorporate these life expectancy reports into our revised valuation methodology; however, we will monitor this data to determine over time if there exists any additive predictive value in relation to the basis of its mortality projections.

The following table summarizes the inputs utilized in estimating the fair value of our portfolio of life insurance policies:

| | As of December 31, 2019 | As of December 31, 2018 |
|---|---|---|
| Weighted-average age of insured, years* | 82.4 | 82.1 |
| Age of insured range, years | 62-101 | 61-100 |
| Weighted-average life expectancy, months* | 86.2 | 93.2 |
| Life expectancy range, months | 0-240 | 1-251 |
| Average face amount per policy (in thousands) | $ 1,756 | $ 1,775 |
| Discount rate | 8.25% | 8.25% |

(*)  Weighted-average by face amount of policy benefits

Life expectancy estimates and market discount rates for a portfolio of life insurance policies are inherently uncertain and the effect of changes in estimates may be significant. For example, if the life expectancy estimates were increased or decreased by four and eight months on each outstanding policy, and the discount rates were increased or decreased by 1% and 2%, with all other variables held constant, the fair value of our investment in life insurance policies would increase or decrease as summarized below:

Change in Fair Value of the Investment in Life Insurance Policies (in thousands)

| | Change in Life Expectancy Estimates | | | |
|---|---|---|---|---|
| | minus 8 months | minus 4 months | plus 4 months | plus 8 months |
| December 31, 2019 | $ 113,812 | $ 57,753 | $ (55,905) | $ (111,340) |
| December 31, 2018 | $ 113,410 | $ 57,611 | $ (55,470) | $ (110,473) |

| | Change in Discount Rate | | | |
|---|---|---|---|---|
| | minus 2% | minus 1% | plus 1% | plus 2% |
| December 31, 2019 | $ 91,890 | $ 43,713 | $ (39,790) | $ (76,118) |
| December 31, 2018 | $ 95,747 | $ 45,440 | $ (41,179) | $ (78,615) |

*Other Fair Value Considerations*

The carrying value of policy benefit receivables, prepaid expenses, accounts payable and accrued expenses approximate fair value due to their short-term maturities and low credit risk. Using the income-based valuation approach, the estimated fair value of our L Bonds and Seller Trust L Bonds, largely containing the same terms, was approximately $1.4 billion and $1.0 billion as of December 31, 2019 and 2018, respectively, based on a weighted-average market interest rate of 6.34% and 7.11%, respectively.

The Commercial Loan receivable from Ben LP has a below-market interest rate of 5.0% per year; provided that the accrued interest from the date of the Initial Transfer to the Final Closing Date of the Exchange Transaction was added to the principal balance of the Commercial Loan. From and after the Final Closing Date, one-half of the interest, or 2.5% per year, is due and payable monthly in cash, and (ii) one-half of the interest, or 2.5% per year, accrues and compounds annually on each anniversary date of the Final Closing Date and becomes due and payable in full in cash on the maturity date. Utilizing an implied yield of 6.75%, we estimated the fair value of the Commercial Loan to be approximately $183.1 million as of December 31, 2018 based on a market yield analysis for similar instruments with similar credit profiles. As previously discussed, the Commercial Loan was eliminated in consolidation on December 31, 2019.

The Promissory Note receivable from the LiquidTrusts (see Note 8) earns interest at 7.0% per year, payable upon maturity in 2023. Utilizing an implied yield of 10.0%, we estimate the fair value of the Promissory Note to be approximately $59.6 million as of December 31, 2019 based on a market yield analysis for similar instruments with similar credit profiles. The Promissory Note had a carrying value of $67.2 million as of December 31, 2019.

Beneficient also has assets and liabilities measured at fair value on a non-recurring basis including loan receivables, fees receivable and other borrowings. As of December 31, 2019, all of the Beneficient's assets and liabilities were recorded at fair value in the consolidated balance sheet due to the application of pushdown accounting as described in Note 5.

F-28

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The carrying value of the second amended and restated senior credit facility with LNV Corporation reflects interest charged at 12-month LIBOR plus an applicable margin. The margin represents our credit risk, and the strength of the portfolio of life insurance policies collateralizing the debt. The overall rate reflects the current interest rate market, and the carrying value of the facility approximates fair value.

GWG MCA Capital, Inc. ("GWG MCA") participated in the merchant cash advance industry by directly advancing sums to merchants and lending money, on a secured basis, to companies that advance sums to merchants. Each quarter, we review the carrying value of these cash advances, determine if an impairment exists and establish or adjust an allowance for loan loss as necessary. At December 31, 2019, one of our secured cash advances was impaired. Specifically, the secured loan to Nulook Capital LLC had an outstanding balance of $1.9 million and an allowance for loan loss of $1.9 million at December 31, 2019. We deem fair value to be the estimated collectible value on each loan or advance made from GWG MCA. Secured merchant cash advances, net of allowance for loan loss, of $0.3 and $0.5 million are included within other assets in our consolidated balance sheets as of December 31, 2019 and December 31, 2018, respectively. Where we estimate the collectible amount to be less than the outstanding balance, we record an allowance for the difference. Provision for merchant cash advances are recorded within other expenses on our consolidated statements of operations (see Note 17). GWG MCA no longer participates in the merchant cash advance industry.

Certain assets are subject to periodic impairment testing by comparing the respective carrying value of the asset to its estimated fair value. In the event we determine these assets to be impaired, we would recognize an impairment loss equal to the amount by which the carrying value of the impaired asset exceeds its estimated fair value. These periodic impairment tests utilize company-specific assumptions involving significant unobservable inputs, or Level 3, in the fair value hierarchy.

GWG Holdings previously had outstanding common stock warrants; however, the warrants expired in the quarter ended September 30, 2019.

**(8) Financing Receivables from Affiliates**

*Commercial Loan-Ben LP*

On August 10, 2018, in connection with the Initial Transfer of the Exchange Transaction, GWG Life, as lender, and Ben LP, as borrower, entered into the Commercial Loan Agreement. On December 28, 2018, the Final Closing Date of the Exchange Transaction, the agreement was amended to adjust the principal to $192.5 million. The principal amount under the Commercial Loan is due on August 9, 2023, but is extendable for two five-year terms under certain circumstances. Repayment of the Commercial Loan is subordinated in right of payment to other Beneficient obligations. Ben LP's obligations under the Commercial Loan Agreement are unsecured.

In accordance with the Supplemental Indenture governing the issuance of the Seller Trust L Bonds, upon a redemption event or at the maturity date of the Seller Trust L Bonds, the Company, at its option, may use the outstanding principal amount of the Commercial Loan, and accrued and unpaid interest thereon, as repayment consideration of the Seller Trust L Bonds (see Note 13).

On December 31, 2019, the Commercial Loan was eliminated as an intercompany balance as a result of the consolidation of Beneficient.

F-29

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Promissory Note-LiquidTrusts*

On May 31, 2019, GWG Life entered into a Promissory Note (the "Promissory Note"), made by Jeffrey S. Hinkle and Dr. John A. Stahl, not in their individual capacity but solely as trustees of The LT-1 LiquidTrust, The LT-2 LiquidTrust, The LT-5 LiquidTrust, The LT-7 LiquidTrust, The LT-8 LiquidTrust and The LT-9 LiquidTrust (collectively, the "LiquidTrust Borrowers") in the principal amount of $65.0 million. Pursuant to the terms of the Promissory Note, GWG Life funded a term loan to the LiquidTrust Borrowers in an aggregate principal amount of $65.0 million (the "Loan"), which Loan was funded in two installments as described below. The Loan was made pursuant to GWG's strategy to further diversify into alternative assets (beyond life insurance) and ancillary businesses and was intended to better position Beneficient's balance sheet, working capital and liquidity profile to satisfy anticipated Texas Department of Banking regulatory requirements.

The LiquidTrust Borrowers are common law trusts established as part of alternative asset financings extended by a subsidiary of Ben LP, of which the Company owns approximately 95% of the issued and outstanding common units of Ben LP (although, on a fully diluted basis, our ownership interest in common units of Ben LP would be reduced significantly below a majority of those issued and outstanding). Although each Borrower is allocated a portion of the Loan equal to approximately 16.7% of the aggregate outstanding principal of the Loan, the Loan constitutes the joint and several obligations of the LiquidTrust Borrowers.

An initial advance in the principal amount of $50.0 million was funded on June 3, 2019 and, subsequent to satisfaction of certain customary conditions, the second advance in the principal amount of $15.0 million was funded on November 22, 2019. The Loan bears interest at 7.0% per annum, with interest payable at maturity, and matures on June 30, 2023. Subject to the Intercreditor Agreements (as defined below), the Loan can be prepaid at the LiquidTrust Borrowers' election without premium or penalty.

The Loan is unsecured and is subject to certain covenants (including a restriction on the incurrence of any indebtedness senior to the Loan other than existing senior loan obligations to each of HCLP Nominees, L.L.C. ("HCLP") and Beneficient Holdings, Inc. ("BHI", and together with HCLP, the "Senior Lenders"), as lenders) and events of default. At the time Beneficient was consolidated, all existing senior loan obligations were held by HCLP. The Senior Lenders are directly or indirectly associated with one of Beneficient's founders, who is also Chairman of the Company's Board of Directors. HCLP is not considered a related party of GWG Holdings or Beneficient.

*Intercreditor Agreements*

In connection with the Promissory Note, the Company also entered into two intercreditor and subordination agreements: (1) an Intercreditor Agreement between GWG Life and HCLP and (2) an Intercreditor Agreement between GWG Life and BHI (the "Intercreditor Agreements"). Under the Intercreditor Agreements, GWG Life agrees to subordinate the Loan to the secured obligations of Beneficient and its affiliates outstanding to the Senior Lenders (the "Senior Loan Obligations"), agrees to not take any liens to secure the Loan (and to subordinate such liens, if any, to the liens of the Senior Lenders), and agrees not to take enforcement actions under the Promissory Note until such Senior Loan Obligations are paid in full. The Intercreditor Agreements establish various other inter-lender and subordination terms, including, without limitation, with respect to permitted actions by each party, permitted payments, waivers, voting arrangements in bankruptcy, application of certain proceeds and limitations on amendments of the respective loan obligations of the parties. The Senior Lenders have agreed not to extend the maturity of their respective loan obligations beyond June 30, 2023 or increase the outstanding principal of the loans made by the Senior Lenders without the written consent of GWG Life. GWG Life has agreed not to transfer, assign, pledge, grant a security interest in or otherwise dispose of (including, without limitation, pursuant to a foreclosure) the Promissory Note except with the written consent of the Senior Lenders (such consent not to be unreasonably withheld) or to the Company or direct or indirect wholly owned subsidiaries thereof.

F-30

App. 0613

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The following table summarizes outstanding principal, discount and accrued interest balances of the financing receivables from affiliates (in thousands)**:**

|  | December 31, | |
| --- | --- | --- |
|  | **2019** | **2018** |
| *Commercial Loan* | | |
| Commercial Loan receivable – principal | $           — | $     192,508 |
| Discount on Commercial Loan receivable | — | (7,846) |
| Accrued interest receivable on Commercial Loan | — | 107 |
| Balance outstanding on Commercial Loan [1] | — | 184,769 |
| *Promissory Note* | | |
| Promissory Note receivable – principal | 65,000 | — |
| Accrued interest receivable on Promissory Note | 2,153 | — |
| Balance outstanding on Promissory Note | $     67,153 | $           — |

[1]  The Commercial Loan was eliminated upon consolidation of Beneficient at December 31, 2019. The outstanding principal and accrued interest at December 31, 2019 was $197.4 million.

**(9) Equity Method Investments**

The balances of our equity method investments are as follows (in thousands):

|  | December 31, | |
| --- | --- | --- |
|  | **2019** | **2018** |
| Beneficient Company Group, L.P. [1] | $           — | $     360,842 |
| InsurTech Holdings, LLC [2] | 1,761 | — |
| Total | $       1,761 | $     360,842 |

[1]  The preexisting equity method investment in Ben was remeasured to fair value, and Ben and its subsidiaries were consolidated on December 31, 2019 (see Note 5).

[2]  On November 11, 2019, GWG Holdings contributed the common stock and membership interests of its previously-wholly owned subsidiaries Life Epigenetics and youSurance to InsurTech Holdings in exchange for a membership interest in InsurTech Holdings. Although GWG Holdings currently owns 100% of the equity of InsurTech Holdings, it does not have a controlling financial interest in InsurTech Holdings because the managing member has substantive participating rights. Therefore, GWG Holdings accounts for its ownership interest in InsurTech Holdings as an equity method investment.

*Beneficient Company Group, L.P.*

During 2018, we acquired 40.5 million common units of Ben LP for a total limited partnership interest in the common units of Ben LP of approximately 89.9% as of December 31, 2018. On June 12, 2019, we acquired an additional 1,000,000 common units of Ben LP from a third party for a cash investment of $10.0 million. On December 31, 2019, we acquired an additional 666,667 newly-issued common units of Ben LP for a cash investment of $10.0 million. The common units of Ben LP are not publicly traded on a stock exchange.

Prior to December 31, 2019, our investment in the common units of Ben LP was presented in equity method investment on our consolidated balance sheets. Our proportionate share of earnings or losses from our investee was recognized in earnings (loss) from equity method investments in our consolidated statements of operations. We recorded our share of the income or loss of Beneficient through September 30, 2019 on a one-quarter lag.

F-31

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

On December 31, 2019, we obtained control of Beneficient and consolidated Beneficient as of that date under the guidance in ASC 805, *Business Combinations*. See Note 5 for further information on the business combination. In connection with the consolidation, we discontinued the one-quarter reporting lag.

Financial information pertaining to Beneficient is summarized in the table below (in thousands):

| | Twelve months ended September 30, 2019 (unaudited) | | August 10 to September 30, 2018 (unaudited) |
|---|---|---|---|
| Total revenues | $ | 93,921 | $ 18,409 |
| Net income (loss) | | (32,133) | 8,291 |
| Net earnings (loss) attributable to Ben LP common unitholders | | (13,754) | 129 |
| GWG portion of net earnings (loss) [1] | | (2,460) | 18 |

[1]   Our portion of Beneficient's net earnings (loss) for the periods noted.

We eliminated the effects of any intercompany transactions in the summarized information presented above. Our historical ownership percentage of our investment in Ben LP common units is as follows:

| Date | Percentage of outstanding common units | Reason |
|---|---|---|
| August 10, 2018 | 13.9% | Purchase of units |
| December 28, 2018 | 89.9% | Purchase of units |
| March 31, 2019 | 88.1% | Change in investee outstanding units |
| June 12, 2019 | 90.2% | Purchase of units |
| December 31, 2019 | 95.5% | Purchase of units |

*Insurtech Holdings, LLC*

On November 11, 2019, GWG contributed the common stock and membership interests of its wholly owned Life Epigenetics and youSurance subsidiaries ("Insurtech Subsidiaries") to a legal entity, InsurTech Holdings, LLC ("InsurTech Holdings") in exchange for a membership interest in InsurTech Holdings. Although we currently own 100% of InsurTech Holdings' equity, we do not have a controlling financial interest in InsurTech Holdings because the managing member has substantive participating rights. Therefore, we account for our ownership interest in InsurTech Holdings as an equity method investment.

The transaction resulted in a loss of control of the Insurtech Subsidiaries and, as a result, we deconsolidated the subsidiaries and recorded an equity method investment balance during the fourth quarter of 2019. The loss of control required us to measure the equity investment at fair value. We determined the fair value of our investment in InsurTech approximated the carrying value of $3.4 million which was primarily comprised of cash and fixed assets contributed to the entity during the fourth quarter of 2019. We recognized a loss on equity method investment of $1.6 million during the fourth quarter of 2019, resulting in an ending balance of $1.8 million as of December 31, 2019.

In accordance with the operating agreement of InsurTech Holdings, GWG contributed $2.1 million in cash to InsurTech Holdings during the fourth quarter of 2019 and is committed to contribute an additional $17.9 million to the entity over the next two years.

Our investment in the membership interest of InsurTech Holdings is presented in equity method investment in our consolidated balance sheets. Our proportionate share of earnings or losses from our investee is recognized in earnings (loss) from equity method investments in our consolidated statements of operations.

F-32

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(10) Variable Interest Entities**

In accordance with ASC 810, *Consolidation*, the Company assesses whether it has a variable interest in legal entities in which it has a financial relationship and, if so, whether or not those entities are variable interest entities ("VIEs"). For those entities that qualify as VIEs, ASC 810 requires the Company to determine if the Company is the primary beneficiary of the VIE, and if so, to consolidate the VIE.

Prior to December 31, 2019, we determined that Beneficient is a VIE, but that we were not the primary beneficiary of the investment. GWG did not have the power to direct any activities of Beneficient, or any of its related parties, that most significantly impacted Beneficient's economic performance. GWG had no board representation at Ben LP or at its general partner. The general partner is exclusively assigned all management powers over the business and affairs of Beneficient, and the limited partners did not have the ability to remove the general partner. Therefore, we did not consolidate the results of Beneficient in our consolidated financial statements through September 30, 2019. The Company's exposure to risk of loss in Beneficient was generally limited to its investment in the common units of Ben LP, its financing receivable from Beneficient and its equity security investment in the Option Agreement to purchase additional common units of Ben LP. Effective December 31, 2019, GWG acquired the ability to appoint a majority of the board of directors of the general partner of Ben LP. As a result, we became the primary beneficiary of Ben LP on December 31, 2019 and consolidated the balance sheet of Beneficient on that date.

We determined that the LiquidTrust Borrowers are VIEs, but that we are not the primary beneficiary of the variable interests. We do not have the power to direct any activities of the LiquidTrust Borrowers that most significantly impact the Borrower's economic performance. The Company's exposure to risk of loss in the LiquidTrust Borrowers is limited to its financing receivable from the LiquidTrust Borrowers.

We determined that Insurtech is a VIE, but that we are not the primary beneficiary of the variable interests. We do not have the power to direct any activities of Insurtech that most significantly impact its economic performance. The Company's exposure to risk of loss in Insurtech is limited to its equity method investment in the limited partnership units of Insurtech Holdings, LLC and its remaining unfunded capital commitments.

The Company also determined that certain trusts included within the EXAlt^TM Plans used in connection with Beneficient's operations are VIEs but that neither GWG nor Beneficient are the primary beneficiary of the trusts. The Company does not have both the power to direct the trust's most significant activities and the obligation to absorb losses or right to receive benefits that could potentially be significant to the trusts. The Company's investments in the trusts are carried in loans receivable in the consolidated balance sheet. The Company's exposure to risk of loss was determined as the amortized cost of the loans to the trusts, any earned but unpaid fees or expenses plus any remaining potential contributions for unfunded capital commitments and cash reserve commitments.

The following table shows the classification, carrying value and maximum exposure to loss with respect to the Company's unconsolidated VIEs (in thousands):

| | December 31, 2019 | | December 31, 2018 | |
| | Carrying Value | Maximum Exposure to Loss | Carrying Value | Maximum Exposure to Loss |
|---|---|---|---|---|
| Loan receivables | $ 232,344 | $ 335,255 | $ — | $ — |
| Financing receivables from affiliates | 67,153 | 67,153 | 184,769 | 184,769 |
| Equity method investments | 1,761 | 19,661 | 360,842 | 360,842 |
| Other asset | — | — | 38,562 | 38,562 |
| Accounts payable and accrued expenses | (2,515) | — | — | — |
| Total | $ 298,743 | $ 422,069 | $ 584,173 | $ 584,173 |

**(11) Senior Credit Facility with LNV Corporation**

On September 27, 2017, we entered into an amended and restated senior credit facility with LNV Corporation as lender through our subsidiary GWG DLP Funding IV, LLC ("DLP IV"). The amended and restated senior credit facility makes available a total of up to $300.0 million in credit with a maturity date of September 27, 2029. Additional advances are available under the second amended and restated senior credit facility at the LIBOR rate as herein defined. Advances are available as the result of additional borrowing base capacity, created as the premiums and servicing costs of pledged life insurance policies become due. Interest will accrue on amounts borrowed under the second amended and restated senior credit facility at an annual interest rate, determined as of each date of borrowing or quarterly if there is no borrowing, equal to (a) 12-month LIBOR plus (b) 7.50% per annum.

F-33

App. 0616

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

On November 1, 2019, DLP IV entered into a second amended and restated senior credit facility with LNV Corporation, as lender, and CLMG Corp., as the administrative agent on behalf of the lenders under the agreement (the "Second Amended and Restated Agreement"), which replaced the amended and restated senior credit facility dated September 27, 2017 that previously governed the DLP IV's senior credit facility. The second amended and restated senior credit facility with LV Corporation makes available a total of up to $300.0 million in credit to DLP IV with a maturity date of September 27, 2029. Subject to available borrowing base capacity, additional advances are available under the second amended and restated senior credit facility at the LIBOR rate described below. Such advances are available to pay the premiums and servicing costs of pledged life insurance policies as such amounts become due. Interest will accrue on amounts borrowed under the second amended and restated senior credit facility at an annual interest rate, determined as of each date of borrowing or quarterly if there is no borrowing, equal to (a) 12-month LIBOR, plus (b) 7.50% per annum. The effective rate at December 31, 2019 was 9.54%. Interest payments are made on a quarterly basis.

Under the second amended and restated senior credit facility, DLP IV has granted the administrative agent, for the benefit of the lenders under the agreement, a security interest in all of DLP IV's assets.

In conjunction with entering into the second amended and restated senior credit facility, DLP IV pledged life insurance policies having an aggregate face value of approximately $298.3 million as additional collateral and received an advance of approximately $37.1 million (inclusive of certain fees and expenses incurred in connection with the negotiation and entry into the second amended and restated senior credit facility). The second amended and restated senior credit facility has certain financial and nonfinancial covenants, and we were in compliance with these covenants at December 31, 2019 and as of the date of this filing.

As of December 31, 2019, approximately 77.3% of the total face value of our life insurance policies portfolio is pledged to LNV Corporation. The amount outstanding under this facility was $184.6 million and $158.2 million at December 31, 2019 and 2018, respectively. Obligations under the second amended and restated senior credit facility are secured by a security interest in DLP IV's assets, for the benefit of the lenders, through an arrangement under which Wells Fargo Bank, N.A. serves as securities intermediary. The life insurance policies owned by DLP IV do not serve as direct collateral for the obligations of GWG Holdings under the L Bonds and Seller Trust L Bonds. The difference between the amount outstanding and the carrying amount on our consolidated balance sheets is due to netting of unamortized debt issuance costs.

**(12) L Bonds**

We began publicly offering and selling L Bonds in January 2012 under the name "Renewable Secured Debentures". These debt securities were re-named "L Bonds" in January 2015. L Bonds were publicly offered and sold on a continuous basis under a registration statement permitting us to sell up to $1.0 billion in principal amount of L Bonds through January 2018. On December 1, 2017, an additional public offering was declared effective permitting us to sell up to $1.0 billion in principal amount of L Bonds on a continuous basis until December 2020. This offering is a follow-on to the previous L Bond offering and contains the same terms and features. We are party to an indenture governing the L Bonds dated October 19, 2011, as amended ("Indenture"), under which GWG Holdings is obligor, GWG Life is guarantor, and Bank of Utah serves as indenture trustee.

Effective December 31, 2019, we entered into Amendment No. 2 to the indenture to define the debt coverage ratio as the ratio, expressed as percentage, of (A) the aggregate sum of all indebtedness (other than Excluded Indebtedness as described below) of GWG Holdings and its direct and indirect subsidiaries (including the securities issued under the indenture, but excluding any indebtedness of Ben LP and its direct and indirect subsidiaries) as reflected on GWG Holdings' most recent consolidated balance sheet prepared in accordance with GAAP over (B) the sum of (i) net present asset value of life insurance policies owned by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding life insurance policies held by Ben LP and its direct and indirect subsidiaries and controlled affiliates, plus (ii) all cash (and cash equivalents) held by GWG Holdings and its direct or indirect Subsidiaries or subsidiaries or affiliates, but excluding the cash (and cash equivalents) held by Ben LP and its direct and indirect subsidiaries, plus (iii) the original cost basis in GWG Holdings' investment in common units or other securities of Ben LP, plus (iv) the outstanding principal amount of any outstanding loans made under a commercial loan agreement with GWG Life, as lender, plus (v) the cost basis of assets contributed to GWG Holdings or any direct or indirect subsidiary of GWG Holdings in connection with a Repurchase Transaction, plus (vi) without duplication, the value of all other assets of GWG Holdings and its direct and indirect subsidiaries or affiliates (but excluding the value of assets of Ben LP and its direct and indirect subsidiaries) as reflected on its most recent consolidated balance sheet prepared in accordance with GAAP. For this purpose, "Excluded Indebtedness" is indebtedness that is payable at GWG Holdings' option in capital stock of GWG Holdings or securities mandatorily convertible into or exchangeable for such capital stock of the Company, or any indebtedness that is reasonably expected to be converted or exchanged, directly or indirectly, into such capital stock, provided that under the terms of such indebtedness in the event any such conversion or exchange does not occur in accordance with the terms of such transaction, such indebtedness would be cancelled and any assets received in exchange for such indebtedness would be returned.

We were in compliance with all material covenants of the indenture at December 31, 2019 and as of the date of this filing, and no Events of Default (as defined in the Amended and Restated Indenture) existed as of such dates.

F-34

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

We publicly offer and sell L Bonds under a registration statement declared effective by the SEC and have issued Seller Trust L Bonds under a Supplemental Indenture, as described in Note 13. We temporarily suspended the offering of our L Bonds on May 1, 2019 as a result of our delay in filing certain periodic reports with the SEC. We recommenced our L Bond offering on August 8, 2019.

The collateral and guarantee provisions of the L Bonds and Seller Trust L Bonds are described in Note 23.

The bonds have renewal features under which we may elect to permit their renewal, subject to the right of bondholders to elect to receive payment at maturity. Interest is payable monthly or annually depending on the election of the investor.

At December 31, 2019 and 2018, the weighted-average interest rate of our L Bonds was 7.15% and 7.10%, respectively. The principal amount of L Bonds outstanding was $948.1 million and $662.2 million at December 31, 2019 and 2018, respectively. The difference between the amount of outstanding L Bonds and the carrying amount on our consolidated balance sheets is due to netting of unamortized deferred issuance costs, cash receipts for new issuances and payments of redemptions in process. Amortization of deferred issuance costs was $12.7 million and $9.0 million for the years ended December 31, 2019 and 2018, respectively. Future expected amortization of deferred financing costs as of December 31, 2019 is $37.2 million in total over the next seven years.

Future contractual maturities of L Bonds (other than Seller Trust L Bonds), and future amortization of their deferred financing costs, at December 31, 2019 (in thousands) are as follows:

| Years Ending December 31, | Contractual Maturities | | Unamortized Deferred Financing Costs | |
|---|---|---|---|---|
| 2020 | $ | 152,118 | $ | 1,632 |
| 2021 | | 201,419 | | 5,774 |
| 2022 | | 163,741 | | 6,812 |
| 2023 | | 76,969 | | 3,342 |
| 2024 | | 118,848 | | 6,328 |
| Thereafter | | 235,033 | | 13,312 |
| | $ | 948,128 | $ | 37,200 |

**(13) Seller Trust L Bonds**

On August 10, 2018, in connection with the Initial Transfer of the Exchange Transaction, GWG Holdings, GWG Life and Bank of Utah, as trustee, entered into a Supplemental Indenture (the "Supplemental Indenture") to the Amended and Restated Indenture. GWG Holdings entered into the Supplemental Indenture to add and modify certain provisions of the Amended and Restated Indenture necessary to provide for the issuance of a new class of securities titled "Seller Trust L Bonds". GWG issued Seller Trust L Bonds in the amount of $366.9 million to the various related trusts (the "Seller Trusts") in connection with the Exchange Transaction on August 10, 2018.

The maturity date of the Seller Trust L Bonds is August 9, 2023. The Seller Trust L Bonds bear interest at 7.50% per year. Interest is payable monthly in cash.

After the second anniversary of the Final Closing, the holders of the Seller Trust L Bonds will have the right to cause GWG to repurchase, in whole but not in part, the Seller Trust L Bonds held by such holder. The repurchase may be paid, at GWG's option, in the form of cash, and/or a pro rata portion of (i) the outstanding principal amount and accrued and unpaid interest under the Commercial Loan Agreement and (ii) Ben LP common units, or a combination of cash and such property.

Our L Bonds are offered and sold under a registration statement declared effective by the SEC, as described in Note 12, and we have issued Seller Trust L Bonds under a Supplemental Indenture. We temporarily suspended the offering of our L Bonds on May 1, 2019 as a result of our delay in filing certain periodic reports with the SEC. We recommenced our L Bond offering on August 8, 2019.

The collateral and guarantee provisions of the L Bonds and Seller Trust L Bonds are described in Note 23.

The principal amount of Seller Trust L Bonds outstanding was $366.9 million at both December 31, 2019 and 2018.

F-35

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(14) Other Borrowings**

Beneficient had borrowings with an aggregate fair value of $153.1 million upon consolidation as of December 31, 2019. This aggregate balance includes a senior credit agreement and a second lien credit agreement with respective balances, including accrued interest, of $77.5 million and $72.2 million at December 31, 2019. Both the senior credit agreement and the second lien credit agreement were held by HCLP as of December 31, 2019. Both loans accrue interest at a rate of 1-month LIBOR plus 3.95%, compounded daily, with interest due by the 15th of each month. Ben LP intends to repay with cash or refinance with other third-party lenders the senior credit agreement and the second lien credit agreement prior to their maturities, both of which are on June 30, 2020. Ben LP may not be able to refinance or obtain additional financing on favorable terms, or at all. If Ben LP is unable to refinance the senior credit agreement or the second lien credit agreement, or defaults on either loan, then Ben LP will be required to either (i) sell assets to repay these loans or (ii) to raise additional capital through the sale of equity and the ownership interest of Ben LP's equity holders may be diluted. These loans are not guaranteed by GWG.

The loans contain customary covenants and events of default and termination, including cross-default provisions. As of December 31, 2019, Beneficient was in compliance with all covenants except for certain covenants related to providing financial statements and information related to the eligible underlying investments by a specified date. Subsequent to December 31, 2019, but before these consolidated financial statements were issued, the covenants were amended whereby the Company is in compliance with all such covenants.

Beneficient has additional borrowings maturing in 2023 and 2024 with an aggregate principal balance outstanding, including accrued interest, of $2.5 million.

Future contractual maturities of Beneficient's borrowings are as follows (in thousands):

| Years Ending December 31, | |
|---|---:|
| 2020 | $ 149,661 |
| 2021 | — |
| 2022 | — |
| 2023 | 750 |
| 2024 | 1,579 |
| Thereafter | — |
| | $ 151,990 |

**(15) Stockholders' Equity**

*Common Stock*

In September 2014, GWG Holdings consummated an initial public offering of its common stock resulting in the sale of 800,000 shares of common stock at $12.50 per share, and net proceeds of approximately $8.6 million after the payment of underwriting commissions, discounts and expense reimbursements. In connection with this offering, the common stock of GWG Holdings was listed on the Nasdaq Capital Market under the ticker symbol "GWGH."

In conjunction with the initial public offering, GWG Holdings issued warrants to purchase 16,000 shares of common stock at an exercise price of $15.63 per share. As of December 31, 2019, all of these warrants have expired and none of them had been exercised.

On August 10, 2018, the Company declared a special dividend of $4.30 per share of common stock payable to shareholders of record on August 27, 2018.

On December 28, 2018, the Series B converted into 5,000,000 shares of GWG Holdings common stock at a conversion price of $10.00 per share immediately following the Final Closing of the Exchange Transaction.

On December 28, 2018, in connection with the Exchange Transaction, GWG Holdings issued 22,013,516 shares of common stock to the Seller Trusts at a market value of approximately $203.4 million in exchange for Ben LP common units. The shares were offered and sold in reliance upon the exemption from registration provided by Section 4(a)(2) under the Securities Act of 1933, as amended.

The common shares issued to the Seller Trusts were initially subject to a Stockholders Agreement between GWG and the Seller Trusts, under which the Seller Trusts, as long as they own at least 10% of the voting shares of GWG, agree to vote their shares in proportion to the votes cast by all other voting securities of GWG. In addition, the Seller Trusts agree, for the period of one year after the Final Closing, not to seek or propose to influence or control the management, Board of Directors or policies of GWG. The Stockholders Agreement was terminated in connection with the closing of the Purchase and Contribution Transaction on April 26, 2019.

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

In addition, GWG and the Seller Trusts entered into a registration rights agreement and an orderly marketing agreement. Under these agreements, GWG and the Seller Trusts agreed to take steps to allow for the orderly marketing and resale of the common shares issued to Seller Trusts as part of the Exchange Transaction, and Seller Trusts agreed to sell their common shares of GWG only as permitted under these agreements.

On November 15, 2018, the Board of Directors of GWG Holdings approved a stock repurchase program pursuant to which the Company was permitted, from time to time, to purchase shares of its common stock for an aggregate purchase price not to exceed $1.5 million. Stock repurchases were able to be executed through various means, including, without limitation, open market transactions, privately negotiated transactions or otherwise. The stock repurchase program did not obligate the Company to purchase any shares, and expired on April 30, 2019.

The following table includes information about the stock repurchase program for the years ended December 31, 2019 and 2018:

| 2018 Monthly Period | Number of Shares Purchased | Average Price Paid per Share | | Total Number of Shares Purchased as Part of the Program | Maximum Dollar Value of Shares that May Yet Be Purchased Under the Program | |
|---|---|---|---|---|---|---|
| December 2018 | 10,035 | $ | 6.82 | 10,035 | $ | 1,432 |
| **2019 Monthly Period**[1] | | | | | | |
| January 2019 | 42,488 | $ | 8.47 | 52,523 | $ | 1,072 |
| February 2019 | 202 | | 8.88 | 52,725 | | 1,070 |

(1)  No stock was repurchased after February 2019, and the stock repurchase program expired on April 30, 2019.

The Exchange Agreement, discussed in Note 1, executed on December 31, 2019, allows holders of Ben LP common units to exchange their common units for common stock of the Company. The exchange ratio in the Exchange Agreement is based on the ratio of the capital account associated with the common units to be exchanged to the market price of the Company's common stock based on the volume weighted average price of the Company's common stock for the five consecutive trading days prior to the quarterly exchange date. No Ben LP common units have been exchanged for the Company's common stock through December 31, 2019.

*Redeemable Preferred Stock*

On November 30, 2015, our public offering of up to 100,000 shares of RPS at $1,000 per share was declared effective. Holders of RPS are entitled to cumulative dividends at the rate of 7% per annum, paid monthly. Dividends on the RPS are recorded as a reduction to additional paid-in capital, if any, then to the outstanding balance of the preferred stock if additional paid-in capital has been exhausted. Under certain circumstances described in the Certificate of Designation for the RPS, additional shares of RPS may be issued in lieu of cash dividends.

The RPS ranks senior to our common stock and pari passu with our RPS 2 and entitles its holders to a liquidation preference equal to the stated value per share (i.e., $1,000) plus accrued but unpaid dividends. Holders of RPS may presently convert their RPS into our common stock at a conversion price equal to the volume-weighted average price of our common stock for the 20 trading days immediately prior to the date of conversion, subject to a minimum conversion price of $15.00 and in an aggregate amount limited to 15% of the stated value of RPS originally purchased from us and still held by such purchaser.

Holders of RPS may request that we redeem their RPS at a price equal to their stated value plus accrued but unpaid dividends, less an applicable redemption fee, if any, as specified in the Certificate of Designation. Nevertheless, the Certificate of Designation for RPS permits us in our sole discretion to grant or decline redemption requests. Subject to certain restrictions and conditions, we may also redeem shares of RPS without a redemption fee upon a holder's death, total disability or bankruptcy. In addition, after one year from the date of original issuance, we may, at our option, call and redeem shares of RPS at a price equal to their liquidation preference.

F-37

App. 0620

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

In March 2017, we closed the RPS offering to additional investors having sold 99,127 shares of RPS for an aggregate gross consideration of $99.1 million and incurred approximately $7.0 million of related selling costs.

At the time of its issuance, we determined that the RPS contained two embedded features: (1) optional redemption by the holder, and (2) optional conversion by the holder. We determined that each of the embedded features met the definition of a derivative; however, based on our assessment under ASC 470, *Debt*, ("ASC 470") and ASC 815, *Derivatives and Hedging*, ("ASC 815"), we do not believe bifurcation of either the holder's redemption or conversion feature is appropriate.

*Series 2 Redeemable Preferred Stock*

On February 14, 2017, our public offering of up to 150,000 shares of RPS 2 at $1,000 per share was declared effective. Holders of RPS 2 are entitled to cumulative dividends at the rate of 7% per annum, paid monthly. Dividends on the RPS 2 are recorded as a reduction to additional paid-in capital, if any, then to the outstanding balance of the preferred stock if additional paid-in capital has been exhausted. Under certain circumstances described in the Certificate of Designation for the RPS 2, additional shares of RPS 2 may be issued in lieu of cash dividends.

The RPS 2 ranks senior to our common stock and pari passu with our RPS and entitles its holders to a liquidation preference equal to the stated value per share (i.e., $1,000) plus accrued but unpaid dividends. Holders of RPS 2 may, less an applicable conversion discount, if any, convert their RPS 2 into our common stock at a conversion price equal to the volume-weighted average price of our common stock for the 20 trading days immediately prior to the date of conversion, subject to a minimum conversion price of $12.75 and in an aggregate amount limited to 10% of the stated value of RPS 2 originally purchased from us and still held by such purchaser.

Holders of RPS 2 may request that we redeem their RPS 2 shares at a price equal to their liquidation preference, less an applicable redemption fee, if any, as specified in the Certificate of Designation. Nevertheless, the Certificate of Designation for RPS 2 permits us in our sole discretion to grant or decline requests for redemption. Subject to certain restrictions and conditions, we may also redeem shares of RPS 2 without a redemption fee upon a holder's death, total disability or bankruptcy. In addition, we may, at our option, call and redeem shares of RPS 2 at a price equal to their liquidation preference (subject to a minimum redemption price, in the event of redemptions occurring less than one year after issuance, of 107% of the stated value of the shares being redeemed).

In April 2018, we closed the RPS 2 offering to additional investors having sold 149,979 shares of RPS 2 for an aggregate gross consideration of $150.0 million and incurred approximately $10.3 million of related selling costs.

At the time of its issuance, we determined that the RPS 2 contained two embedded features: (1) optional redemption by the holder, and (2) optional conversion by the holder. We determined that each of the embedded features met the definition of a derivative; however, based on our assessment under ASC 470 and ASC 815, we do not believe bifurcation of either the holder's redemption or conversion feature is appropriate.

*Series B Convertible Preferred Stock*

On August 10, 2018, GWG Holdings issued 5,000,000 shares of Series B, par value $0.001 per share and having a stated value of $10.00 per share, to Ben LP for cash consideration of $50.0 million as part of the Initial Transfer.

On December 28, 2018, the Series B converted into 5,000,000 shares of our common stock at a conversion price of $10.00 per share immediately following the Final Closing of the Exchange Transaction.

F-38

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Preferred Series A Subclass 1 (Redeemable noncontrolling interest)*

BCH, a consolidated subsidiary of Ben LP, had non-unitized equity outstanding as of December 31, 2019. The Preferred Series A Subclass 1 Unit accounts are non-participating and convertible on a dollar basis. As of December 31, 2019, the 4th Amended and Restated Limited Partnership Agreement ("LPA") of BCH governs the terms of BCH's equity securities. Account holders are entitled to a compounded quarterly preferred return. The preferred return to be paid to Preferred Series A Unitholders is limited by a quarterly preferred return rate cap that is based on the annualized revenues of BCH. Annualized revenues are defined as four times the sum of total quarterly interest, fee and dividend income plus total noninterest revenues. This quarterly rate cap is defined as follows:

- 0.25% if annualized revenues are $80 million or less

- 0.50% if annualized revenues are greater than $80 million but equal to or less than $105 million

- 0.75% if annualized revenues are greater than $105 million but equal to or less than $125 million

- 1.00% if annualized revenues are greater than $125 million but equal to or less than $135 million

- 1.25% if annualized revenues are greater than $135 million but equal to or less than $140 million

- If over $140 million, the preferred return calculation is based on a fraction (i) the numerator of which is (A) the positive percentage rate change, if any, to the seasonally adjusted CPI-U covering the period from the date of the last allocation of profits to such holders, plus (B) (x) 2% prior to an Initial Public Offering (as defined in the BCH LPA) by Ben and (y) 3% thereafter, and (ii) the denominator of which is one minus the highest effective marginal combined U.S. federal, state and local income tax rate in effect as of the beginning of the fiscal quarter for which such determination is being made for an individual resident in New York City, New York, assuming (1) that the aggregate gross income allocable with respect to the quarterly preferred return for such fiscal year will consist of the same relative proportion of each type or character (e.g., long term or short term capital gain or ordinary or exempt income) of gross income item included in the aggregate gross income actually allocated in respect of the quarterly preferred return for the fiscal year reflected in the BCH's most recently filed Internal Revenue Service Form 1065 and (2) any state and local income taxes are not deductible against U.S. federal income tax.

The definition of Initial Public Offering includes an event, transaction or agreement pursuant to which Ben's Common Units are convertible or exchangeable into equity securities listed on a national securities exchange or quotation in an automated quotation system.

No amounts have been paid to the Preferred Series A Subclass 1 Unit Account holders related to the preferred return from issuance on September 1, 2017 through December 31, 2019. In connection with the issuance of Preferred Series A Subclass 2 Units as part of the Option Agreement, the preferred return of Preferred Series A Subclass 1 Unit Account holders is reduced by the preferred return allocated to the Preferred Series A Subclass 2 Units during the period the Option Agreement remains outstanding.

Upon election by a holder, the Preferred Series A Unit Accounts (other than Preferred Series A Subclass 2 Unit Accounts) are, at any time on or after January 1, 2021, convertible in an amount of Preferred Series A Unit Accounts (other than Preferred Series A Subclass 2 Unit Accounts), equal to 20% of their Sub-Capital Accounts into Class S Ordinary Units (with the right to convert any unconverted amount from previous years in any subsequent years). Upon an election, a holder of Preferred Series A Subclass 1 Unit Accounts will be issued Class S Ordinary Units necessary to provide the holder with a number of Class S Ordinary Units that, in the aggregate, equal (a) the balance of the holder's capital account associated with the Preferred Series A Subclass 1 Unit Accounts being converted divided by (b) either (x) prior to an initial public offering, the appraised per Class A Unit fair market value as determined by Beneficient or (y) following an initial public offering, the average price of a Common Unit for the thirty (30) day period ended immediately prior to the applicable conversion date. The holder of such newly issued Class S Ordinary Units may immediately convert them into Common Units. Additionally, effective December 31, 2030, if the Preferred Series A Subclass 1 Unit Accounts have not been converted, they will redeem for cash in an amount equal to the then outstanding capital account balance of the accounts. If available redeeming cash (as defined in the LPA) is insufficient to satisfy any such redemption requirements, BCH, on a quarterly basis, will redeem additional Preferred Series A Units until all such Preferred Series A Units have been redeemed. The Preferred Series A Subclass 1 Unit Accounts are subject to certain other conversion and redemption provisions.

F-39

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The current LPA of BCH also includes certain limitations of BCH, without the consent of a majority-in-interest of the Preferred Series A Unit Account holders, to (i) issue any new equity securities and (ii) except as otherwise provided, incur indebtedness that is senior to or pari passu with any right of distribution, redemption, repayment, repurchase or other payments relating to the Preferred Series A Unit accounts. Further, BCH cannot, prior to the conversion of all the Preferred Series A Unit accounts, incur any additional long-term debt unless (i) after giving effect to the incurrence of the new long-term debt on a pro forma basis, the sum of certain preferred stock, existing debt and any new long-term indebtedness would not exceed 55% of the BCH's NAV plus cash on hand, and (ii) at the time of incurrence of any new long-term indebtedness, the aggregate balance of the BCH's (including controlled subsidiaries) debt plus such new long-term debt does not exceed 40% of the sum of the NAV of the collateral underlying the loan portfolio of BCH and its subsidiaries plus cash on hand at Ben LP, BCH and its subsidiaries.

The Preferred Series A Subclass 1 Unit Accounts are recorded in the consolidated balance sheet in the redeemable noncontrolling interest line item.

*Class S Ordinary Units*

As of December 31, 2019, BCH, a subsidiary of Ben LP, had issued and outstanding 5.8 million Class S Ordinary Units, which were all outstanding on each of the respective dates. The Class S Ordinary Units participate on an as-converted basis pro-rata in the share of the profits or losses of BCH and subsidiaries following all other allocations made by BCH and its subsidiaries. As limited partner interests, these units have limited voting rights and do not entitle participation in the management of the Company's business and affairs. The Class S Ordinary Units are exchangeable for Common Units of Ben LP on a one-for-one basis, subject to customary conversion rate adjustments for splits, distributions and reclassifications, as well as compliance with any applicable vesting and transfer restrictions. Each conversion also results in the issuance to Ben LP of a Class A Unit of BCH for each Common Unit issued.

The Class S Ordinary Units are recorded in the consolidated balance sheet in the noncontrolling interests line item.

*Class S Preferred Units*

The limited partnership agreement of BCH allows it to issue Class S Preferred Units. The Class S Preferred Units are entitled to a quarterly preferred return that is limited by the quarterly preferred return rate cap described above for Preferred Series A Subclass 1 except for when annualized revenues exceed $140 million, the Class S Preferred return is based on a fraction (i) the numerator of which is (A) the positive percentage rate change, if any, to the seasonally adjusted CPI-U covering the period from the date of the last allocation of profits to such holders, plus (B) 0.75 percent, and (ii) the denominator of which is one minus the highest effective marginal combined U.S. federal, state and local income tax rate in effect as of the beginning of the fiscal quarter for which such determination is being made for an individual resident in New York City, New York, assuming (1) that the aggregate gross income allocable with respect to the quarterly preferred return for such fiscal year will consist of the same relative proportion of each type or character (e.g., long term or short term capital gain or ordinary or exempt income) of gross income item included in the aggregate gross income actually allocated in respect of the quarterly preferred return for the fiscal year reflected in the Ben Group Partnership's most recently filed IRS Form 1065 and (2) any state and local income taxes are not deductible against U.S. federal income tax. The Class S Preferred Units also participate on an as-converted basis pro-rata in the share of the profits or losses of BCH and subsidiaries following all other allocations made by BCH and its subsidiaries. As limited partner interests, these units are generally non-voting and do not entitle participation in the management of the Company's business and affairs. Generally, the Class S Preferred Units are exchangeable for Common Units in Ben LP on a 1.2-for-1 basis, subject to customary conversion rate adjustments for splits, distributions and reclassifications, as well as compliance with any applicable vesting and transfer restrictions. Each conversion also results in the issuance to Ben LP of a Class A Unit for each Common Unit issued. Holders of Class S Preferred Units may elect to convert into Class S Ordinary Units in connection with a sale or dissolution of BCH.

F-40

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

No amounts have been paid to the Class S Preferred Unit holders related to the preferred return from issuance through December 31, 2019. The Class S Preferred Units are recorded on the consolidated balance sheet in the noncontrolling interests line item.

**(16) Stock Incentive Plan**

We adopted our 2013 Stock Incentive Plan in March 2013, as amended on June 1, 2015, May 5, 2017 and May 8, 2018. The Stock Option Sub-Committee of our Compensation Committee of our Board of Directors is responsible for the administration of the plan. Participants under the plan may be granted incentive stock options and non-statutory stock options; stock appreciation rights; stock awards; restricted stock; restricted stock units; and performance shares. Eligible participants include officers and employees of GWG Holdings and its subsidiaries, members of our Board of Directors, and consultants. Option awards generally expire 10 years from the date of grant. As of December 31, 2019, 6,000,000 of our common stock options are authorized under the plan, of which 2,594,000 shares were reserved for issuance under outstanding incentive awards and 3,406,000 shares remain available for future grants.

*Stock Options*

As of December 31, 2019, we had outstanding stock options for 905,381 shares of common stock to employees, officers, and directors under the plan. Options for 673,341 shares have vested and the remaining options are scheduled to vest over three years. The options were issued with an exercise price between $4.83 and $11.56, which is equal to the market price of the shares on the date of grant. As of December 31, 2019, stock options for 1,195,705 shares had been forfeited and stock options for 777,364 shares had been exercised. The total intrinsic value of stock options exercised during 2019 was $0.3 million. The aggregate intrinsic value of stock options outstanding and exercisable at December 31, 2019 was $1.0 million and $0.8 million, respectively.

Outstanding stock options:

|  | Vested | Unvested | Total |
|---|---|---|---|
| **Balance as of December 31, 2017** | 857,192 | 779,756 | 1,636,948 |
| Granted during the year | 63,950 | 314,000 | 377,950 |
| Vested during the year | 503,503 | (503,503) | — |
| Exercised during the year | (569,864) | — | (569,864) |
| Forfeited during the year | (21,582) | (25,501) | (47,083) |
| **Balance as of December 31, 2018** | 833,199 | 564,752 | 1,397,951 |
| Granted during the year | — | 24,250 | 24,250 |
| Vested during the year | 197,859 | (197,859) | — |
| Exercised during the year | (53,001) | — | (53,001) |
| Forfeited during the year | (304,716) | (159,103) | (463,819) |
| **Balance as of December 31, 2019** | 673,341 | 232,040 | 905,381 |

F-41

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

We recognized $0.4 million and $1.3 million in expense related to stock options during 2019 and 2018, respectively. As of December 31, 2019, unrecognized compensation expense related to unvested options is $0.4 million. We expect to recognize this compensation expense over the next three years: $0.3 million in 2020, $0.1 million in 2021, and the remainder in 2022.

*Stock Appreciation Rights (SARs)*

As of December 31, 2019, we had outstanding SARs for 375,625 shares of common stock to employees. The strike price of the SARs was between $6.75 and $11.55, which was equal to the market price of the common stock at the date of issuance. SARs vest over varying terms of up to three years. As of December 31, 2019, 200,745 of the SARs were vested and 169,070 have been exercised. On December 31, 2019, the market price of GWG's common stock was $9.82.

Outstanding SARs:

|  | Vested | Unvested | Total |
|---|---|---|---|
| **Balance as of December 31, 2017** | 189,053 | 153,919 | 342,972 |
| Granted during the year | 2,625 | 111,025 | 113,650 |
| Vested during the year | 71,785 | (71,785) | — |
| Exercised during the year | (145,622) | — | (145,622) |
| Forfeited during the year | — | (39,235) | (39,235) |
| **Balance as of December 31, 2018** | 117,841 | 153,924 | 271,765 |
| Granted during the period | 4,250 | 130,650 | 134,900 |
| Vested during the period | 102,102 | (102,102) | — |
| Exercised during the period | (23,448) | — | (23,448) |
| Forfeited during the period | — | (7,592) | (7,592) |
| **Balance as of December 31, 2019** | 200,745 | 174,880 | 375,625 |

The liability for the SARs as of December 31, 2019 and 2018 was $0.6 million and $0.3 million, respectively, and was recorded within other accrued expenses in the consolidated balance sheets. Remaining compensation expense is expected to be recognized over the next three years. Employee compensation and benefits expense for SARs of $0.3 million was recorded for both years ended December 31, 2019 and 2018.

F-42

App. 0625

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Upon the exercise of SARs, the Company is obligated to make cash payment equal to the positive difference between the market value of the Company's common stock on the date of exercise less the market value of the common stock on the date of grant.

The following summarizes information concerning outstanding options and SARs issued under the 2013 Stock Incentive Plan:

| | December 31, 2019 | | | |
| | Outstanding | Weighted-Average Exercise Price | Weighted-Average Remaining Life (years) | Fair Value at Grant Date |
|---|---|---|---|---|
| **Vested** | | | | |
| Stock Options | 673,341 | $ 8.88 | 6.83 | $ 2.21 |
| SARs | 200,745 | $ 8.81 | 4.49 | $ 2.09 |
| Total Vested | 874,086 | $ 8.87 | 6.29 | $ 2.18 |
| | | | | |
| **Unvested** | | | | |
| Stock Options | 232,040 | $ 9.55 | 8.51 | $ 2.59 |
| SARs | 174,880 | $ 9.75 | 6.25 | $ 2.50 |
| Total Unvested | 406,920 | $ 9.64 | 7.54 | $ 2.55 |

| | December 31, 2018 | | | |
| | Outstanding | Weighted-Average Exercise Price | Weighted-Average Remaining Life (years) | Fair Value at Grant Date |
|---|---|---|---|---|
| **Vested** | | | | |
| Stock Options | 833,199 | $ 8.88 | 5.95 | $ 2.02 |
| SARs | 117,841 | $ 8.88 | 5.02 | $ 2.02 |
| Total Vested | 951,040 | $ 8.88 | 5.83 | $ 2.02 |
| | | | | |
| **Unvested** | | | | |
| Stock Options | 564,752 | $ 9.15 | 7.88 | $ 2.35 |
| SARs | 153,924 | $ 8.37 | 5.98 | $ 2.09 |
| Total Unvested | 718,676 | $ 8.98 | 7.47 | $ 2.30 |

*Restricted Stock Units*

A restricted stock unit ("RSU") entitles the holder thereof to receive one share of our common stock (or, in some circumstances, the cash value thereof) upon vesting. RSUs are subject to forfeiture until they vest. On June 18, 2019, we granted an aggregate of 114,366 RSUs to our directors, which RSUs are subject to time-based vesting and are scheduled to vest in their entirety on the one year anniversary of the grant date subject to the holder continuously remaining a director or employee of, or a consultant to, GWG or one of its subsidiaries through such date. On May 31, 2019, we granted RSUs to our Chief Executive Officer that are subject to performance-based vesting pursuant to a performance share unit agreement ("PSU Agreement"). The PSU Agreement provides for a target award grant of 129,717 RSUs, and up to a maximum of 259,434 RSUs, with each representing the right to receive one share of our common stock (or, following a Change-in-Control Transaction (as defined in the PSU Agreement), the cash value thereof) upon vesting, which is generally subject to the satisfaction of performance goals over a performance period commencing on April 26, 2019 and ending on December 31, 2021.

F-43

App. 0626

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

In the third quarter of 2019, a total of 375,000 RSUs held by employees vested entitling the holders thereof, collectively, to cash payments totaling $4.5 million, all of which were paid in the third and fourth quarters of 2019 and recognized in employee compensation and benefits in the consolidated statement of operations for the year ended December 31, 2019. Additionally during 2019, 53,403 RSUs vested and 26,701 shares of common stock were issued to employees, net of shares forfeited to satisfy tax withholding obligations.

Beneficient has various equity incentive plans. In 2019 and early 2020, Beneficient granted units to certain of its employees and directors under these plans. The Company expects the expense recognized related to these plans to be material. The holders of certain of these units, upon vesting, have the right to convert the units to shares GWG common stock per the Exchange Agreement discussed in Note 1. As such, units issued and vested under Beneficient's equity plans could result in dilution of GWG's common stock.

**(17) Other Expenses**

The components of other expenses in our consolidated statements of operations are as follows (in thousands):

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2019 | 2018 |
| Contract labor | $ 1,820 | $ 1,453 |
| Marketing | 1,612 | 1,856 |
| Information technology | 2,024 | 1,578 |
| Servicing and facility fees | 1,833 | 1,782 |
| Travel and entertainment | 1,218 | 892 |
| Insurance and regulatory | 5,032 | 1,562 |
| Bad debt expense | 153 | 4,300 |
| General and administrative | 2,204 | 2,572 |
| Total other expenses | $ 15,896 | $ 15,995 |

**(18) Income Taxes**

The components of our income tax expense (benefit) and the reconciliation at the statutory federal tax rate to our actual income tax expense (benefit) consisted of the following (in thousands):

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2019 | 2018 |
| Statutory federal income tax (benefit) | $ 34,869 | $ (25,085) |
| State income taxes (benefit), net of federal benefit | 13,486 | (9,243) |
| Change in valuation allowance | 9,671 | 33,999 |
| Other permanent differences | (93) | 329 |
| Total income tax expense (benefit) | $ 57,933 | $ — |

The current and deferred components of tax expense were as follows (in thousands):

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2019 | 2018 |
| Current income tax expense | $ 10 | $ — |
| Deferred income tax expense | 57,923 | — |
| Total income tax expense | $ 57,933 | $ — |

The Company's effective tax rate was 34.8% and 0.0% during 2019 and 2018, respectively. The 2019 effective tax rate was higher than the statutory rate primarily due to the deferred tax liability resulting from the gain on consolidation of equity method investment. The effective tax rate during 2018 was 0.0% as we did not generate taxable income.

F-44

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The effects of temporary differences that give rise to deferred income taxes were as follows (in thousands):

| | December 31, | |
| --- | --- | --- |
| | 2019 | 2018 |
| Deferred tax assets: | | |
| Investment in life insurance policies | $ 37,649 | $ 23,132 |
| Net operating loss and business interest carryforwards | 18,935 | 10,491 |
| Other assets | 4,286 | 6,864 |
| Subtotal | 60,870 | 40,487 |
| Valuation allowance | (50,056) | (40,385) |
| Deferred tax assets | 10,814 | 102 |
| | | |
| Deferred tax liabilities: | | |
| Investment in partnership | (68,737) | — |
| Other liabilities | — | (102) |
| Net deferred tax asset (liability) | $ (57,923) | $ — |

At December 31, 2019 and 2018, we had federal and aggregate state net operating loss ("NOL") carryforwards of $28.6 million and $36.5 million, respectively. The NOL carryforwards will begin to expire in 2033. Future utilization of NOL carryforwards is subject to limitations under Section 382 of the Internal Revenue Code. This section generally relates to a more than 50 percent change in ownership over a three-year period. As a result of the Exchange Transaction, a change in ownership for income tax purposes occurred as of December 28, 2018. As such, the annual utilization of our net operating losses generated prior to the ownership change was limited. However, net unrealized built-in gains on our life insurance policies result in an increase in the Section 382 limit over the five-year recognition period, which resulted a nominal amount of current tax liability in 2019. Included in the deferred tax liability noted in the table above are our investments in Ben LP and InsurTech Holdings, which are partnerships for federal income tax purposes.

We provide for a valuation allowance when it is not considered "more likely than not" that our deferred tax assets will be realized. As of December 31, 2019, based on all available evidence, we have provided a valuation allowance of $50.1 million against our deferred tax assets due to the uncertainty as to the realization of our deferred tax assets during the carryforward periods. In 2019, valuation allowances were recorded against the total amount of non-permanent deferred tax assets. Permanent deferred tax assets of $10.8 million in 2019 were comprised of interest expense limitations under Section 163(j) and the tax-effected net operation loss ("NOL") created subsequent to 2018.

ASC 740, *Income Taxes*, requires the reporting of certain tax positions that do not meet a threshold of "more-likely-than-not" to be recorded as uncertain tax benefits. It is management's responsibility to determine whether it is "more-likely-than-not" that a tax position will be sustained upon examination, including resolution of any related appeals or litigation, based upon the technical merits of the position. Management has reviewed all income tax positions taken or expected to be taken and has determined that the income tax positions are appropriately stated and supported. We do not anticipate that the total unrecognized tax benefits will significantly change prior to December 31, 2020.

Under our accounting policies, interest and penalties on unrecognized tax benefits, as well as interest received from favorable tax settlements are recognized as components of income tax expense. At December 31, 2019 and 2018, we recorded no accrued interest or penalties related to uncertain tax positions.

Our income tax returns for tax years ended December 31, 2016 through 2018, and 2019, when filed, remain open to examination by the Internal Revenue Service and various state taxing jurisdictions. Our income tax return for tax year ended December 31, 2015 also remains open to examination by various state taxing jurisdictions.

**(19) Earnings (Loss) per Common Share**

The computations of basic and diluted income (loss) attributable to common shareholders per share for 2019 and 2018 are as follows (in thousands, except share data and per share data):

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2019 | 2018 |
| **Numerator:** | | |
| Basic – Net income (loss) attributable to common shareholders | $ 91,166 | $ (136,114) |
| Add: Preferred dividends upon conversion | 2,020 | — |
| Diluted – Net income (loss) attributable to common shareholders | 93,186 | (136,114) |
| | | |
| **Denominator:** | | |
| Basic – weighted average common shares outstanding | 33,016,007 | 6,098,208 |
| Effect of dilutive securities | 2,203,435 | — |
| Diluted – weighted average common shares outstanding | 35,219,442 | 6,098,208 |
| | | |
| Basic earnings (loss) per common share | $ 2.76 | $ (22.32) |

App. 0628

Diluted earnings (loss) per common share                                                                           $  2.60   $  (22.32)

F-45

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

RPS and RPS 2 (as described in Note 15) and restricted stock units and stock options (as described in Note 16) were included in the calculation of diluted earnings per share for the year ended December 31, 2019. Options to purchase 437,266 shares of common stock were outstanding during 2019 but were excluded from the calculation of diluted earnings per share because their effects were anti-dilutive. RPS, RPS 2, restricted stock units and stock options were not included in the calculation of diluted earnings per share for the year ended December 31, 2018 because we recorded a net loss during that period and the effects were anti-dilutive.

**(20) Segment Reporting**

GWG has two reportable segments consisting of Secondary Life Insurance and Investment in Beneficient. Corporate & Other includes certain activities not allocated to specific business segments. These activities include holding company financing and investing activities, and management and administrative services to support the overall operations of the Company and from November 1, 2019, include our equity method investment in InsurTech Holdings.

The Secondary Life Insurance segment seeks to earn non-correlated yield from our portfolio of life insurance policies. Our Investment in Beneficient segment consists of our investment in the common units of Ben LP, which we accounted for using the equity method prior to December 31, 2019, and the Preferred Series A Subclass 1 Unit Account of BCH. Beneficient became a consolidated subsidiary of GWG as of December 31, 2019 as a result of the Investment and Exchange agreements described in Note 5. Ben LP provides a variety of trust services, liquidity products and loans for alternative assets and illiquid investment funds, and other financial services to mid-to-high net worth individuals. The Corporate & Other category consists of unallocated corporate overhead and administrative costs and the operations of operating segments that do not meet the quantitative criteria to be separately reported.

These segments are differentiated by the products and services they offer as well as by the information used by the Company's chief operating decision maker to determine allocation of resources and assess performance.

Earnings before taxes ("EBT") is the measure of profitability used by management to assess performance of its segments and allocate resources. Segment EBT represents net income (loss) excluding income taxes and includes earnings (loss) from equity method investments and gain on consolidation of equity method investment.

| Revenue: | Years Ended December 31, | |
| --- | --- | --- |
| | 2019 | 2018 |
| Secondary Life Insurance | $ 78,002 | $ (11,633) |
| Investment in Beneficient | 13,738 | 10,655 |
| Corporate & Other | 536 | 588 |
| Total | $ 92,276 | $ (390) |

| Interest Expense: | Years Ended December 31, | |
| --- | --- | --- |
| | 2019 | 2018 |
| Secondary Life Insurance | $ 83,055 | $ 69,357 |
| Investment in Beneficient | 31,789 | 10,778 |
| Corporate & Other | — | 1 |
| Total | $ 114,844 | $ 80,136 |

F-46

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

| | Years Ended December 31, | |
|---|---|---|
| **Segment EBT:** | **2019** | **2018** |
| Secondary Life Insurance | $ (27,694) | $ (96,578) |
| Investment in Beneficient | 229,206 | (106) |
| Corporate & Other | (35,470) | (22,767) |
| Total | 166,042 | (119,451) |
| Income tax expense | 57,933 | - |
| Net income (loss) | $ 108,109 | $ (119,451) |

| | December 31, | |
|---|---|---|
| **Total Assets:** | **2019** | **2018** |
| Secondary Life Insurance | $ 904,363 | $ 889,665 |
| Investment in Beneficient | 2,721,546 | 584,173 |
| Corporate & Other | 9,297 | 7,029 |
| Total | $ 3,635,206 | $ 1,480,867 |

The total assets of the Investment in Beneficient segment at December 31, 2019, includes goodwill of $2.4 billion which represents all of the goodwill on our consolidated balance sheet at December 31, 2019.

**(21) Leases**

The Company leases certain real estate for its office premises under operating lease agreements which expire in 2021 and 2025. Under these leases, we are obligated to pay base rent plus common area maintenance and a share of building operating costs. The lease agreements contain extension options which we have not included in our liability calculations. We lease various other facilities on a short-term basis.

The lease assets and liabilities are as follows (in thousands):

| Leases | Classification | December 31, 2019 |
|---|---|---|
| Operating lease right-of-use assets | Other assets | $ 1,912 |
| Operating lease liabilities | Other accrued expenses | $ 2,540 |

Total lease costs recognized for the years ended December 31, 2019 and 2018 were $0.5 million and $0.4 million, respectively. These amounts included operating lease costs of $0.2 million, variable lease costs of $0.2 million, and short term lease costs of $0.1 million for the year ended December 31, 2019. The weighted average remaining lease term at December 31, 2019 was 4.2 years and the weighted average discount rate was 6.6%. For the year ended December 31, 2019 and 2018, cash paid for amounts included in the measurement of operating lease liabilities and included in operating cash flows totaled $0.3 million.

Maturities of operating lease liabilities as of December 31, 2019 are as follows (in thousands):

| | |
|---|---|
| 2020 | $ 998 |
| 2021 | 715 |
| 2022 | 302 |
| 2023 | 311 |
| 2024 | 320 |
| Thereafter | 273 |
| Total lease payments | 2,919 |
| Less: imputed interest | (379) |
| Present value of lease liabilities | $ 2,540 |

F-47

App. 0631

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The minimum aggregate operating lease commitments as of December 31, 2018 as reported under previous lease accounting standards were as follows (in thousands):

| | | |
|---|---|---:|
| 2019 | $ | 275 |
| 2020 | | 284 |
| 2021 | | 293 |
| 2022 | | 302 |
| 2023 | | 311 |
| Thereafter | | 593 |
| | $ | 2,058 |

**(22) Commitments and Contingencies**

*Litigation* — In the normal course of business, we are involved in various legal proceedings. In the opinion of management, any liability resulting from such proceedings would not have a material adverse effect on our financial position, results of operations or cash flows.

*Commitments* — GWG Holdings is committed to contribute an additional $17.9 million to InsurTech Holdings over the next two years, with $13.8 million in 2020 and $4.1 million in 2021. Beneficient had $73.8 million and $75.2 million of gross potential capital commitments as of December 31, 2019 and December 31, 2018, respectively, representing potential limited partner capital funding commitments on the alternative asset funds that serve as collateral to its loans. This is the amount above any existing cash reserves for such capital funding commitments.

**(23) Guarantee and Collateral Provisions of L Bonds and Seller Trust L Bonds**

Our L Bonds are offered and sold under a registration statement declared effective by the SEC, as described in Note 12, and we have issued Seller Trust L Bonds under a Supplemental Indenture, as described in Note 13. The L Bonds and Seller Trust L Bonds are secured by substantially all the assets of GWG Holdings, a pledge of all our common stock held by BCC and AltiVerse (which together represent approximately 12% of our outstanding common stock), and by a guarantee and corresponding grant of a security interest in substantially all the assets of GWG Life[1]. As a guarantor, GWG Life has fully and unconditionally guaranteed the payment of principal and interest on the L Bonds and Seller Trust L Bonds. GWG Life's equity in DLP IV[2] serves as collateral for our L Bond and Seller Trust L Bond obligations. Substantially all of our life insurance policies are held by DLP IV or GWG Life Trust ("the Trust"). The policies held by DLP IV are not direct collateral for the L Bonds as such policies are pledged to the second amended and restated senior credit facility with LNV Corporation.

[1] The Seller Trust L Bonds are senior secured obligations of GWG, ranking junior to all senior debt of GWG (see Note 11), and pari passu in right of payment and in respect of collateral with all L Bonds of GWG (see Note 12). Payments under the Seller Trust L Bonds are guaranteed by GWG Life. The assets exchanged in the in connection with the Beneficent transaction are available as collateral for all holders of the L Bonds and Seller Trust L Bonds. Specifically, the common units of Ben LP are held by GWG Holdings and the Commercial Loan is held by GWG Life.

[2] The terms of our second amended and restated senior credit facility with LNV Corporation require that we maintain a significant excess of pledged collateral value over the amount outstanding on the second amended and restated senior credit facility at any given time. Any excess after satisfying all amounts owing under our second amended and restated senior credit facility with LNV Corporation is available as collateral for the L Bonds (including the Seller Trust L Bonds).

The following represents consolidating financial information as of December 31, 2019 and 2018, with respect to the financial position, and as of December 31, 2019 and 2018, with respect to results of operations and cash flows of GWG Holdings and its subsidiaries. The parent column presents the financial information of GWG Holdings, the primary obligor for the L Bonds and Seller Trust L Bonds. The guarantor subsidiary column presents the financial information of GWG Life, the guarantor subsidiary of the L Bonds and Seller Trust L Bonds, presenting its investment in DLP IV and the Trust under the equity method. The non-guarantor subsidiaries column presents the financial information of all non-guarantor subsidiaries, including DLP IV and the Trust.

F-48

App. 0632

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(23) Guarantee of L Bonds and Seller Trust L Bonds** (continued)

Consolidating Balance Sheets (in thousands)

| December 31, 2019 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash and cash equivalents | $ 57,721 | $ 2,644 | $ 18,708 | $ — | $ 79,073 |
| Restricted cash | — | — | 20,258 | — | 20,258 |
| Investment in life insurance policies, at fair value | — | 340 | 795,699 | — | 796,039 |
| Life insurance policy benefits receivable, net | — | 200 | 22,831 | — | 23,031 |
| Investment in GWG stock | — | — | 24,550 | (24,550) | — |
| Loan receivables | — | — | 232,344 | — | 232,344 |
| Fees receivable | — | — | 29,168 | — | 29,168 |
| Financing receivable from affiliates | — | 235,573 | — | (168,420) | 67,153 |
| Equity method investment | 384,264 | — | — | (382,503) | 1,761 |
| Other assets | 62,354 | 320,490 | 22,163 | (376,633) | 28,374 |
| Goodwill | — | — | 2,358,005 | — | 2,358,005 |
| Investment in subsidiaries | 1,221,227 | 664,723 | — | (1,885,950) | — |
| TOTAL ASSETS | $ 1,725,566 | $ 1,223,970 | $ 3,523,726 | $ (2,838,056) | $ 3,635,206 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | | | | |
| LIABILITIES | | | | | |
| Senior credit facility with LNV Corporation | $ — | $ — | $ 174,390 | $ — | $ 174,390 |
| L Bonds | 926,638 | — | — | — | 926,638 |
| Seller Trust L Bonds | 366,892 | — | — | — | 366,892 |
| Other borrowings | — | — | 153,086 | — | 153,086 |
| Intercompany debt – commercial loan | — | — | 168,420 | (168,420) | — |
| Interest and dividends payable | 12,491 | — | 4,025 | — | 16,516 |
| Deferred revenue | — | — | 41,444 | — | 41,444 |
| Account payable and accrued expenses | 3,093 | 3,891 | 78,455 | (57,603) | 27,836 |
| Deferred tax liability | 57,923 | — | — | — | 57,923 |
| TOTAL LIABILITIES | 1,367,037 | 3,891 | 619,820 | (226,023) | 1,764,725 |
| Redeemable noncontrolling interests | — | — | 1,588,604 | (318,950) | 1,269,654 |
| STOCKHOLDERS' EQUITY | | | | | |
| Member capital | — | 1,220,079 | 665,871 | (1,885,950) | — |
| Common units | — | — | 563,966 | (563,966) | — |
| Redeemable preferred stock and Series 2 redeemable preferred stock | 201,891 | — | — | — | 201,891 |
| Common stock | 33 | — | — | — | 33 |
| Treasury stock | — | — | — | (24,550) | (24,550) |
| Additional paid-in capital | 233,106 | — | — | — | 233,106 |
| Accumulated deficit | (76,501) | — | — | — | (76,501) |
| Noncontrolling interests | — | — | 85,465 | 181,383 | 266,848 |
| TOTAL STOCKHOLDERS' EQUITY | 358,529 | 1,220,079 | 1,315,302 | (2,293,083) | 600,827 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ 1,725,566 | $ 1,223,970 | $ 3,523,726 | $ (2,838,056) | $ 3,635,206 |

F-49

App. 0633

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(23) Guarantee of L Bonds and Seller Trust L Bonds** (continued)

Consolidating Balance Sheets (continued)

| December 31, 2018 | Parent | | Guarantor Subsidiary | | Non-Guarantor Subsidiaries | | Eliminations | | Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | |
| Cash and cash equivalents | $ | 113,294 | $ | 232 | $ | 1,061 | $ | — | $ | 114,587 |
| Restricted cash | | — | | 7,217 | | 3,632 | | — | | 10,849 |
| Investment in life insurance policies, at fair value | | — | | 92,336 | | 655,586 | | — | | 747,922 |
| Life insurance policy benefits receivable, net | | — | | 5,000 | | 11,461 | | — | | 16,461 |
| Financing receivables from affiliates | | — | | 184,769 | | — | | — | | 184,769 |
| Equity method investment | | 360,842 | | — | | — | | — | | 360,842 |
| Other assets | | 42,944 | | 1,731 | | 762 | | — | | 45,437 |
| Investment in subsidiaries | | 799,182 | | 510,865 | | — | | (1,310,047) | | — |
| TOTAL ASSETS | $ | 1,316,262 | $ | 802,150 | $ | 672,502 | $ | (1,310,047) | $ | 1,480,867 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | | | | | | | | | |
| LIABILITIES | | | | | | | | | | |
| Senior credit facility with LNV Corporation | $ | — | $ | — | $ | 148,978 | $ | — | $ | 148,978 |
| L Bonds | | 651,403 | | — | | — | | — | | 651,403 |
| Seller Trust L Bonds | | 366,892 | | — | | — | | — | | 366,892 |
| Interest and dividends payable | | 14,047 | | — | | 4,508 | | — | | 18,555 |
| Accounts payable and accrued expenses | | 2,862 | | 3,267 | | 7,852 | | — | | 13,981 |
| TOTAL LIABILITIES | | 1,035,204 | | 3,267 | | 161,338 | | — | | 1,199,809 |
| STOCKHOLDERS' EQUITY | | | | | | | | | | |
| Member capital | | — | | 798,883 | | 511,164 | | (1,310,047) | | — |
| Redeemable preferred stock and Series 2 redeemable preferred stock | | 215,973 | | — | | — | | — | | 215,973 |
| Common stock | | 33 | | — | | — | | — | | 33 |
| Additional paid-in capital | | 249,662 | | — | | — | | — | | 249,662 |
| Accumulated deficit | | (184,610) | | — | | — | | — | | (184,610) |
| TOTAL STOCKHOLDERS' EQUITY | | 281,058 | | 798,883 | | 511,164 | | (1,310,047) | | 281,058 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ | 1,316,262 | $ | 802,150 | $ | 672,502 | $ | (1,310,047) | $ | 1,480,867 |

F-50

App. 0634

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(23) Guarantee of L Bonds and Seller Trust L Bonds** (continued)

Consolidating Statements of Operations (in thousands)

| For the year ended December 31, 2019 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUE | | | | | |
| Gain on life insurance policies, net | $ — | $ 6,889 | $ 68,431 | $ — | $ 75,320 |
| Interest and other income | 2,090 | 13,738 | 1,128 | — | 16,956 |
| TOTAL REVENUE | 2,090 | 20,627 | 69,559 | — | 92,276 |
| | | | | | |
| EXPENSES | | | | | |
| Interest expense | 98,535 | — | 16,309 | — | 114,844 |
| Employee compensation and benefits | 17,699 | 9,103 | 1,507 | — | 28,309 |
| Legal and professional fees | 8,322 | 1,392 | 3,110 | — | 12,824 |
| Other expenses | 11,283 | 1,983 | 2,630 | — | 15,896 |
| TOTAL EXPENSES | 135,839 | 12,478 | 23,556 | — | 171,873 |
| | | | | | |
| INCOME (LOSS) BEFORE EQUITY IN INCOME OF SUBSIDIARIES | (133,749) | 8,149 | 46,003 | — | (79,597) |
| | | | | | |
| EQUITY IN INCOME OF SUBSIDIARIES | 31,322 | 51,362 | — | (82,684) | — |
| | | | | | |
| NET INCOME (LOSS) BEFORE INCOME TAXES | (102,427) | 59,511 | 46,003 | (82,684) | (79,597) |
| | | | | | |
| INCOME TAX EXPENSE | 57,933 | — | — | — | 57,933 |
| | | | | | |
| NET INCOME (LOSS) BEFORE EARNINGS FROM EQUITY METHOD INVESTMENT | (160,360) | 59,511 | 46,003 | (82,684) | (137,530) |
| | | | | | |
| Earnings (loss) from equity method investment | (4,077) | — | — | — | (4,077) |
| Gain on consolidation of equity method investment | 272,546 | (22,830) | — | — | 249,716 |
| NET INCOME (LOSS) | 108,109 | 36,681 | 46,003 | (82,684) | 108,109 |
| | | | | | |
| Preferred stock dividends | 16,943 | — | — | — | 16,943 |
| NET INCOME (LOSS) ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ 91,166 | $ 36,681 | $ 46,003 | $ (82,684) | $ 91,166 |

F-51

App. 0635

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(23) Guarantee of L Bonds and Seller Trust L Bonds** (continued)

Consolidating Statements of Operations (continued)

| For the year ended December 31, 2018 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUE | | | | | |
| Gain (loss) on life insurance policies, net | $ — | $ 8,340 | $ (22,445) | $ — | $ (14,105) |
| Interest and other income | 8,586 | 4,280 | 849 | — | 13,715 |
| TOTAL REVENUE | 8,586 | 12,620 | (21,596) | — | (390) |
| | | | | | |
| EXPENSES | | | | | |
| Interest expense | 59,112 | — | 21,024 | — | 80,136 |
| Employee compensation and benefits | 9,980 | 5,742 | 1,685 | — | 17,407 |
| Legal and professional fees | 1,795 | 864 | 2,882 | — | 5,541 |
| Other expenses | 6,908 | 1,995 | 7,092 | — | 15,995 |
| TOTAL EXPENSES | 77,795 | 8,601 | 32,683 | — | 119,079 |
| | | | | | |
| INCOME (LOSS) BEFORE EQUITY IN INCOME OF SUBSIDIARIES | (69,209) | 4,019 | (54,279) | — | (119,469) |
| | | | | | |
| EQUITY IN INCOME OF SUBSIDIARIES | (50,260) | (48,666) | — | 98,926 | — |
| | | | | | |
| NET INCOME (LOSS) BEFORE INCOME TAXES | (119,469) | (44,647) | (54,279) | 98,926 | (119,469) |
| | | | | | |
| INCOME TAX EXPENSE | — | — | — | — | — |
| | | | | | |
| NET INCOME (LOSS) BEFORE EARNINGS FROM EQUITY METHOD INVESTMENT | (119,469) | (44,647) | (54,279) | 98,926 | (119,469) |
| | | | | | |
| Earnings from equity method investment | 18 | — | — | — | 18 |
| NET INCOME (LOSS) | (119,451) | (44,647) | (54,279) | 98,926 | (119,451) |
| | | | | | |
| Preferred stock dividends | 16,663 | — | — | — | 16,663 |
| NET INCOME (LOSS) ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ (136,114) | $ (44,647) | $ (54,279) | $ 98,926 | $ (136,114) |

F-52

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(23) Guarantee of L Bonds and Seller Trust L Bonds** (continued)

Consolidating Statements of Cash Flows (in thousands)

| For the year ended December 31, 2019 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiary | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | |
| Net income (loss) | $ 108,109 | $ 36,681 | $ 46,003 | $ (82,684) | $ 108,109 |
| Adjustments to reconcile net income (loss) to net cash flows used in operating activities: | | | | | |
| Equity of subsidiaries | (31,322) | (51,362) | — | 82,684 | — |
| Change in fair value of investment in life insurance policies | — | (9,477) | (39,538) | — | (49,015) |
| Amortization of deferred financing and issuance costs | 12,727 | — | 1,077 | — | 13,804 |
| Amortization of discount or premium on financing receivables | — | (1,720) | — | — | (1,720) |
| Provision for uncollectible policy benefit receivable | — | — | 153 | — | 153 |
| Earnings from equity method investments | 4,077 | — | — | — | 4,077 |
| Stock-based compensation | 1,732 | — | — | — | 1,732 |
| Gain on consolidation of equity method investment | (272,546) | 22,830 | — | — | (249,716) |
| Deferred income taxes | 57,923 | — | — | — | 57,923 |
| (Increase) decrease in operating assets: | | | | | |
| Life insurance policy benefits receivable | — | 4,800 | (11,483) | — | (6,683) |
| Interest receivable added to commercial loan principal | — | (6,913) | — | — | (6,913) |
| Other assets | (1,079) | 194 | (4,171) | — | (5,056) |
| Increase (decrease) in operating liabilities: | | | | | |
| Accounts payable and other accrued expenses | (1,173) | (296) | (6,828) | — | (8,297) |
| Interest and dividends payable | (746) | — | (482) | — | (1,228) |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (122,298) | (5,263) | (15,269) | — | (142,830) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | |
| Investment in life insurance policies | — | (8,682) | (23,685) | — | (32,367) |
| Carrying value of matured life insurance policies | — | 3,403 | 29,862 | — | 33,265 |
| Equity investment acquired | (12,388) | — | — | — | (12,388) |
| Business combination consideration, net of cash acquired | (79,030) | — | 17,551 | — | (61,479) |
| Other investments acquired | — | (65,000) | — | — | (65,000) |
| Payment of capital contributions | (72,217) | 4,256 | — | 67,961 | — |
| NET CASH FLOWS PROVIDED BY (USED IN) INVESTING ACTIVITIES | (163,635) | (66,023) | 23,728 | 67,961 | (137,969) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | | |
| Borrowings on senior debt | — | — | 50,133 | — | 50,133 |
| Repayments of senior debt | — | — | (23,756) | — | (23,756) |
| Payments for senior debt issuance costs | — | — | (2,042) | — | (2,042) |
| Proceeds from issuance of L Bonds | 403,397 | — | — | — | 403,397 |
| Payments for L Bonds issuance costs | (25,284) | — | — | — | (25,284) |
| Payments for redemption of L Bonds | (116,809) | — | — | — | (116,809) |
| Issuance of common stock | 59 | — | — | — | 59 |
| Payments for redemption of redeemable preferred stock | (14,061) | — | — | — | (14,061) |
| Preferred stock dividends | (16,943) | — | — | — | (16,943) |
| Issuance of member capital | — | 66,481 | 1,480 | (67,961) | — |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 230,359 | 66,481 | 25,815 | (67,961) | 254,694 |
| NET INCREASE (DECREASE) IN CASH, CASH EQUIVALENTS AND RESTRICTED CASH | (55,574) | (4,805) | 34,274 | — | (26,105) |
| **CASH, CASH EQUIVALENTS AND RESTRICTED CASH** | | | | | |
| BEGINNING OF THE PERIOD | 113,294 | 7,449 | 4,693 | — | 125,436 |

END OF THE PERIOD    $    57,720    $    2,644    $    38,967    $    —    $    99,331

---

F-53

END OF THE PERIOD    $    57,720    $    2,644    $    38,967    $    —    $    99,331

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(23) Guarantee of L Bonds and Seller Trust L Bonds** (continued)

Consolidating Statements of Cash Flows (continued)

| For the year ended December 31, 2018 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiary | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | |
| Net income (loss) | $ (119,451) | $ (44,647) | $ (54,279) | $ 98,926 | $ (119,451) |
| Adjustments to reconcile net income (loss) to net cash flows used in operating activities: | | | | | |
| Equity of subsidiaries | 50,260 | 48,666 | — | (98,926) | — |
| Change in fair value of investment in life insurance policies | — | (4,263) | 14,607 | — | 10,344 |
| Amortization of deferred financing and issuance costs | 8,982 | — | 1,055 | — | 10,037 |
| Amortization of discount or premium on financing receivables | 628 | (642) | — | — | (14) |
| Provision for uncollectible policy benefit receivable | — | — | 4,300 | — | 4,300 |
| Earnings from equity method investment | (18) | — | — | — | (18) |
| Stock-based compensation | 2,182 | — | — | — | 2,182 |
| (Increase) decrease in operating assets: | | | | | |
| Life insurance policy benefits receivable | — | (3,500) | (602) | — | (4,102) |
| Interest receivable added to loan principal | (7,046) | (3,488) | — | — | (10,534) |
| Other assets | (188,365) | (144,147) | 4,372 | 332,546 | 4,406 |
| Increase (decrease) in operating liabilities: | | | | | |
| Accounts payable and other accrued expenses | (55) | 812 | 3,345 | — | 4,102 |
| Interest and dividends payable | 4,025 | — | (756) | | 3,269 |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (248,858) | (151,209) | (27,958) | 332,546 | (95,479) |
| | | | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | |
| Investment in life insurance policies | — | (41,404) | (87,099) | — | (128,503) |
| Carrying value of matured life insurance policies | — | 4,424 | 16,340 | — | 20,764 |
| Equity method investments | (3,204) | — | — | — | (3,204) |
| Other investments acquired | (3,037) | — | — | — | (3,037) |
| NET CASH FLOWS PROVIDED BY (USED IN) INVESTING ACTIVITIES | (6,241) | (36,980) | (70,759) | — | (113,980) |
| | | | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | | |
| Borrowings on senior debt | — | — | 12,903 | — | 12,903 |
| Repayments of senior debt | — | — | (77,219) | — | (77,219) |
| Proceeds from issuance of L Bonds | 263,965 | — | — | — | 263,965 |
| Payments for L Bonds issuance costs | (17,379) | — | — | — | (17,379) |
| Payments for redemption of L Bonds | (48,027) | — | — | — | (48,027) |
| Issuance of common stock | 614 | — | — | — | 614 |
| Proceeds from issuance of convertible preferred stock | 50,000 | — | — | — | 50,000 |
| Proceeds from issuance of redeemable preferred stock | 56,238 | — | — | — | 56,238 |
| Payments for redeemable preferred stock issuance costs | (4,142) | — | — | — | (4,142) |
| Payments for redemption of redeemable preferred stock | (2,457) | — | — | — | (2,457) |
| Common stock dividends | (25,709) | — | — | — | (25,709) |
| Preferred stock dividends | (16,663) | — | — | — | (16,663) |
| Issuance of member capital | — | 184,784 | 147,762 | (332,546) | — |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 256,440 | 184,784 | 83,446 | (332,546) | 192,124 |
| | | | | | |
| NET INCREASE (DECREASE) IN CASH, CASH EQUIVALENTS AND RESTRICTED CASH | 1,341 | (3,405) | (15,271) | — | (17,335) |
| | | | | | |
| **CASH, CASH EQUIVALENTS AND RESTRICTED CASH** | | | | | |
| BEGINNING OF THE PERIOD | 111,953 | 10,854 | 19,964 | — | 142,771 |
| | | | | | |
| END OF THE PERIOD | $ 113,294 | $ 7,449 | $ 4,693 | $ — | $ 125,436 |

F-54

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(24) Concentration**

We primarily purchase life insurance policies written by life insurance companies having investment-grade ratings by independent rating agencies. As a result, there may be certain concentrations of policies with life insurance companies. The following summarizes the face value of insurance policies with specific life insurance companies exceeding 10% of the total face value held by our portfolio.

| Life Insurance Company | December 31, 2019 | December 31, 2018 |
|---|---|---|
| John Hancock | 14.23% | 13.71% |
| Lincoln National | 11.55% | 11.33% |
| AXA Equitable | 10.63% | 10.83% |

The following summarizes the number of insurance policies held in specific states exceeding 10% of the total face value held by us:

| State of Residence | December 31, 2019 | December 31, 2018 |
|---|---|---|
| California | 17.46% | 18.02% |
| Florida | 14.86% | 15.34% |

Beneficient's underlying portfolio companies primarily operate in the United States, with the largest percentage, based on NAV, operating in healthcare technology, bio-technology, and diversified telecommunications services industries.

**(25) Related Parties**

*Relationship with Beneficient Management Counselors, L.L.C.*

Beneficient Management is the general partner of Ben LP and is governed by a board of directors. The governing document of BMLLC provides that Beneficient Management Counselors, L.L.C. ("BMC"), wholly owned by one of several Related Entities, determine the directors of Beneficient Management who fill 30% of the Board seats. BMC is also entitled to select (a) 50% of the membership of Beneficient Management's Nominating Committee and Executive Committee and appoint the chair of each of these committees, (b) 50% of the membership of the Community Reinvestment Committee (CRC), and (c) the CRC's chairperson, vice-chairperson, and lead committee member. Certain decisions with respect to Ben LP's charitable giving program are delegated to the CRC. Decisions regarding appointment and removal of Beneficient Management's directors, other than directors appointed by BMC, and GWG Holdings, are delegated, with certain exceptions, to the Nominating Committee of Beneficient Management, of which an executive of a Related Entity is a member and Chairman. In the event of a tie vote of the Nominating Committee on a vote for the removal of a director, the Chairman of the Nominating Committee may cast the tie-breaking vote.

F-55

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Services Agreement with Bradley Capital Company, L.L.C.*

Ben LP is the general partner of BCH and together they entered into an agreement with Bradley Capital Company, L.L.C. ("Bradley Capital") and BMC effective June 1, 2017 (the "Bradley Capital Agreement"). Bradley Capital is indirectly owned by a Related Entity. Under the Bradley Capital Agreement, Bradley Capital is entitled to a current base fee of $0.4 million per quarter for executive-level services provided by an executive of Bradley Capital, who is Beneficient's Chief Executive Officer and Chairman of GWG Holdings' and Beneficient Management's board of directors, together with a current supplemental fee of $0.2 million per quarter for administrative and financial analysis, subject to an annual inflation adjustment. The base fee may be increased up to two times the initial base fee per quarter if the scope of the services is expanded with the approval of the Executive Committee of the board of Beneficient Management, of which an executive of a Related Entity is a member and Chairman. An executive of a Related Entity receives an annual salary from the Company of $0.2 million and both an executive of a Related Entity and other employees of Bradley Capital can participate in equity incentive plans sponsored by the Company. The Bradley Capital Agreement also includes a payment from Ben LP of $0.2 million per year, paid quarterly, to cover ongoing employee costs for retired and/or departed employees of predecessor entities prior to September 1, 2017, which on-going costs were assumed by Bradley Capital, as well as a further payment to Bradley Capital in respect of the cost of health and retirement benefits for current employees of Bradley Capital all of which are reimbursed by Ben LP. Ben LP is also required to reimburse Bradley Capital for out-of-pocket expenses incurred by Bradley Capital employees, including reimbursement for private travel including the family members of a designated executive of a Related Entity for both business and personal use. The Bradley Capital Agreement requires Ben LP to reimburse Bradley Capital or its affiliates for taxes, fees, and expenses, including legal fees and related costs, relating to the contributions by affiliates of Bradley Capital of equity or debt interests in Ben LP to public charitable trusts in connection with the Exchange Trusts, as well as the contribution of beneficial interests in client trusts administered by Beneficient. Additionally, the Company provides office space and access to needed technology systems and telephony services. Payments by Ben LP to Bradley Capital and its affiliates are guaranteed and subject to enforcement by the state courts in Delaware in the event of default. The Bradley Capital Agreement extends through July 2021, with an annual one-year renewal provision thereafter. The Bradley Capital Agreement may be terminated by unanimous approval of the Executive Committee of the board of Beneficient Management of which an executive of a Related Entity is a member, or without such approval if the Related Entity no longer holds $10.0 million of Ben's securities.

*Relationship with Beneficient Holdings, Inc.*

The Beneficient Company Group (USA), L.L.C. ("Beneficient USA"), a subsidiary of BCH, entered into a Services Agreement with BHI effective July 1, 2017 (the "BHI Services Agreement"). BHI is indirectly owned by a Related Entity and is an affiliate of Beneficient. BHI pays an annual fee of $30 to Ben LP for the provision of trust administration services for a Related Entity and all trusts affiliated with its family trustee as that term is defined in the governing documents for a Related Entity. Beneficient USA also is required to provide any other services requested by BHI, subject to any restrictions in the operating agreement of BHI, at cost. The term of the BHI Services Agreement extends for the longer of (i) five years past the expiration or termination of the Bradley Capital Agreement, or (ii) seven years after the family trustee of the Related Entity is no longer a primary beneficiary of any trust affiliated with the family trustee.

BHI owns the majority of the Class S Ordinary Units, Preferred Series A Subclass 1 Unit Accounts, and FLP Subclass 1 Unit Accounts issued by BCH. Additionally, Ben LP, through its subsidiary, BCC, was the borrower of $72.0 million from BHI under the second lien credit agreement discussed in Note 14 that was subsequently assigned to HCLP.

*Administrative Services Agreement between Constitution Private Capital Company, L.L.C. ("Constitution") and Beneficient USA*

Constitution is an entity owned 50.5% by a Related Entity and 49.5% by an entity controlled by our board of directors. It was founded in 1986 and acquired by a Related Entity in 1996. Constitution currently manages three private equity fund-of-funds. Effective January 1, 2017, Constitution entered into an Administrative Services Agreement (the "ASA") with Beneficient USA, which is wholly owned by BACC and a subsidiary of BCH, whereby Beneficient USA provides personnel to administer the portfolio assets advised by Constitution. Under the ASA, Constitution pays to Beneficient USA a monthly fee equal to .01% of the month-end net assets of its portfolio. The ASA automatically renews on an annual basis and may be terminated at any time by Constitution. Beneficient USA may only terminate the ASA in the event of a breach by Constitution.

F-56

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Preferred Provider Liquidity Agreement with Constitution*

In May 2019, BCC entered into an agreement with Constitution (the "Preferred Liquidity Provider Agreement") under which at Constitution's option, BCC will provide liquidity to alternative asset funds sponsored by Constitution at an advance rate of not less than 82% of NAV, to the extent such funds meet certain specified qualifications. For a fund to qualify for the liquidity option, it must, among other things, hold investments that were approved or deemed approved by BCC at the time a fund makes such investments. BCC is required to provide liquidity in any combination, at its discretion, of cash, U.S. exchange traded funds registered under the Investment Company Act of 1940, or securities traded on a national securities exchange. BCC's obligation under the Preferred Liquidity Provider Agreement is guaranteed by Ben LP and BCH. The Preferred Provider Liquidity Agreement may be terminated solely by mutual consent of Ben and Constitution. Ben and Constitution have not contracted for any liquidity under this agreement through December 31, 2019.

*Relationship with The Heppner Endowment for Research Organizations, L.L.C. and Research Ranch Operating Company, L.L.C (collectively "HERO").*

HERO is owned indirectly by a Related Entity. Its purposes are (i) to serve as an advisor to National Philanthropic Trust ("NPT"), an unrelated third-party charitable organization, regarding the disbursement of research grants to qualifying organizations, (ii) to serve as an advisor to NPT regarding the administration of charitable contributions made for the benefit of multiple Texas universities and (iii) to provide funding and operational support for the research activities conducted by those Texas universities. Both HERO and the charitable organizations administered by NPT (the beneficiaries of which are multiple Texas universities) receive proceeds from trusts settled and funded by clients of Beneficient. The funding received by NPT is used to fund the research projects of the Texas universities. The funding received by HERO may be used, in HERO's discretion, to (i) provide appropriate facilities and properties for the Texas universities to utilize as part of their research endeavors (those properties and facilities being owned by a Related Entity), and (ii) provide fee revenue to HERO. HERO is granted such rights and authority pursuant to trust instruments entered into between a client and subsidiaries of Beneficient as well as an agreement between HERO and NPT. Beneficient's subsidiaries provide financing to the trusts established by the clients and Beneficient is paid as an agent of the trustees for administrative services it provides to the trusts.

*Relationship with Hicks Holdings L.L.C.*

Hicks Holdings L.L.C. ("Hicks Holdings"), an entity related to Thomas O. Hicks, who is a Beneficient Management and GWG Holdings director, owns a Preferred Series A Subclass 1 Unit Account and Class S Ordinary Units issued by BCH with a total initial balance of $60.4 million. Hicks Holdings was granted its Preferred Series A Subclass 1 Unit Account and Class S Ordinary Units as compensation for services provided under a previous advisory and consulting services agreement between Beneficient and Hicks Holdings which terminated on June 30, 2018.

*Services provided by representatives of Ben and the trusts associated with the loans*

An independent party currently serves as trustee for the LiquidTrusts and certain of the other trusts in the associated EXAlt Plan$^{TM}$ that are created at origination for each of our loans. Beneficient earns administration fees (for providing administrative serves to the trustee) and interest income from these trusts. Previously, an employee of Beneficient and another individual served as co-trustees for these trusts. The employee received no compensation for their services as co-trustee.

**(26) Subsequent Events**

In December 2019, a novel strain of coronavirus ("COVID-19") was first reported in Wuhan, China. Less than four months later, on March 11, 2020, the World Health Organization declared COVID-19 a pandemic. The extent of COVID-19's effect on the Company's operational and financial performance will depend on future developments, including the duration, spread and intensity of the pandemic, all of which are uncertain and difficult to predict considering the rapidly evolving landscape. As a result, it is not currently possible to ascertain the overall impact of COVID-19 on the Company's business. However, if the pandemic continues to evolve into a severe worldwide health crisis, the disease could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

Subsequent to December 31, 2019 through March 23, 2020, policy benefits on 18 policies covering 15 individuals have been realized. The face value of insurance benefits of these policies was $24.2 million.

Subsequent to December 31, 2019 through March 23, 2020, we have issued approximately $105.0 million of L Bonds.

F-57

**ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE.**

There have been no changes in or disagreements with accountants on accounting and financial disclosure.

**ITEM 9A. CONTROLS AND PROCEDURES.**

**Evaluation of Disclosure Controls and Procedures**

We maintain disclosure controls and procedures designed to provide reasonable assurance that information required to be disclosed in our reports filed pursuant to the Securities Exchange Act of 1934 is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance the objectives of the control system are met.

As of December 31, 2019, our Chief Executive Officer and Chief Financial Officer carried out an evaluation of the effectiveness of our disclosure controls and procedures as such term is defined in Rule 13a-15(e) under the Securities and Exchange Act of 1934, as of the end of the period covered by this report. Based on that evaluation, Our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective.

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting identified in connection with management's evaluation pursuant to Rules 13a-15(d) or 15d-15(d) of the Securities Exchange Act of 1934 during the fourth quarter of 2019 that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rule 13a-15(f) under the Securities and Exchange Act of 1934.

The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that:

(i) Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company;

(ii) Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are in accordance with authorizations of management and directors of the company; and

(iii) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with policies or procedures may deteriorate.

Under the supervision of the Audit Committee of the Board of Directors and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting using the criteria established in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on our assessment and those criteria, management concluded that our internal control over financial reporting as of December 31, 2019 was effective.

The Company's independent registered public accounting firm has audited the Company's internal control over financial reporting as of December 31, 2019, as stated in the Report of Independent Registered Public Accounting Firm, appearing under Item 8.

**ITEM 9B. OTHER INFORMATION.**

None.

App. 0645

## PART III

**ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE.**

The following paragraphs provide information as of the date of this report about each of our current directors and executive officers.

We currently have two "executive officers" as defined by the SEC. Our bylaws permit a maximum of fifteen directors, and our board of directors currently consists of nine members. The table below presents our executive officers and directors:

| Name | Age | Positions |
|---|---|---|
| Murray T. Holland | 66 | President and Chief Executive Officer |
| Timothy L. Evans | 40 | Chief Financial Officer |
| Brad K. Heppner[1] | 54 | Director, Chairman of the Board |
| Roy W. Bailey[2] | 66 | Director |
| Peter T. Cangany, Jr.[1] | 62 | Director |
| David F. Chavenson[3] | 67 | Director |
| Thomas O. Hicks[1] | 74 | Director |
| Dennis P. Lockhart[3] | 73 | Director |
| Bruce W. Schnitzer[1] | 75 | Director |
| Roger T. Staubach[1] | 78 | Director |
| David H. de Weese[1] | 77 | Director |

(1) Appointed to our Board of Directors upon the closing of the Purchase and Contribution Transaction, which occurred on April 26, 2019.

(2) Appointed to our Board of Directors on March 16, 2020

(3) Appointed to our Board of Directors on May 13, 2019.

The biographies of the above-identified individuals are set forth below:

***Murray T. Holland*** has served as our President and Chief Executive Officer since April 26, 2019. In 2001, Mr. Holland became an original investor and consultant for MHT Partners, a boutique investment banking firm based in Dallas, Texas with a number of offices in the United States.  From 2013 until recently, he was Managing Director of MHT Partners. Mr. Holland resigned from this position in connection with the Transaction. Prior to MHT, he was CEO and principal shareholder of Convergent Media Systems (Atlanta), a $100 million custom network outsourcing firm with approximately 300 employees, CEO and principal shareholder of Convergent Group Corporation (Denver), a $200 million geographic information systems software and integration firm with approximately 450 employees, and CEO and principal shareholder of BTI Americas (Chicago), a $2.7 billion business travel agency with approximately 4,400 employees. EDS was his principal business partner in these ventures. Prior to that, Mr. Holland was a partner at the law firm of Akin, Gump, Strauss, Hauer & Feld (Dallas) in corporate finance and securities, a Senior Vice President of Credit Suisse First Boston (New York and Dallas) in Mergers and Acquisitions and a Managing Director of Kidder, Peabody & Co. (New York) in Mergers and Acquisitions. He graduated from Washington and Lee University with a B.S. in 1975, University of Virginia Graduate School of Business Administration with an M.B.A. in 1978, and Washington and Lee University School of Law with a J.D. in 1980. Mr. Holland is the author of "*A Nation in the Red*" (McGraw Hill- 2014), a book about the U.S. national debt and its implications.

<div align="center">Page 73</div>

**Brad K. Heppner** is the Chief Executive Officer and Chairman of the Board of Directors of Beneficient. Mr. Heppner has acquired or founded ten operating companies principally in the financial services, investment and insurance sectors, each with a common business purpose of providing highly specialized solutions for alternative asset owners. Mr. Heppner founded Heritage Highland in 1996 as a family office to organize, acquire and own as controlling or sole shareholder these operating companies. In 2003, Mr. Heppner organized Highland Consolidated Business Holdings, L.P. which is the predecessor-in-interest to Beneficient and reorganized into Beneficient in September 2017. He has successfully completed realizations from seven of the ten Heritage Highland companies through mergers and transactions with Fortune 50 companies or institutionally backed management teams. In 2003, Mr. Heppner merged The Crossroads

Group, a multi-billion dollar alternative asset manager, with Lehman Brothers, now Neuberger Berman. Among the companies Mr. Heppner founded and sold is Capital Analytics, the third oldest alternative asset administration company in the United States, which is now owned by Mitsubishi Union Financial Group. Currently, Mr. Heppner serves as chief executive officer and chairman for all Heritage Highland companies, positions he has held since its organization in 1996. Previously, he was a senior consultant at Bain & Company where he focused on private equity financed companies between 1994 and 1996. Mr. Heppner served as director of investments for John D. and Catherine T. MacArthur Foundation in Chicago from 1989 to 1993 after beginning his career in New York City at Goldman, Sachs & Co. as an analyst. Through companies held by Heritage Highland, Mr. Heppner has been a fiduciary for over 250 institutions and served on numerous corporate boards and advisory committees. Mr. Heppner earned his M.B.A. from the J.L. Kellogg Graduate School of Management at Northwestern University. He is a magna cum laude graduate and Most Distinguished Alumnus of Southern Methodist University, where he received a B.S., a B.B.A. and a B.A.

**Timothy L. Evans** joined the Company as Chief Integration Officer on May 6, 2019, and was appointed Chief Financial Officer on August 15, 2019. Prior to joining GWG Holdings, Inc., Mr. Evans was Chief of Staff for Ben LP, where he had also served as Vice President and Deputy General Counsel since February 2018. Prior to joining Ben LP, Mr. Evans was an attorney for the United States Securities and Exchange Commission for six years, where he served as a trial attorney and a counsel to the Director of Enforcement. Mr. Evans was an associate in the Dallas office of Thompson & Knight LLP for four years before joining the Securities and Exchange Commission. He received his Juris Doctorate, summa cum laude, from the University of Arkansas School of Law in 2008. Prior to practicing as an attorney, Mr. Evans was an accountant for three years with SMG, a public facility management company. He previously held an Arkansas CPA license but is not currently licensed by the Arkansas State Board of Public Accountancy. He graduated from the University of Illinois at Urbana-Champaign with a Bachelor of Arts – Economics in 2001.

**Roy W. Bailey** has served as the CEO of Bailey Deason Capital Interests, LLC since 2012. Prior to serving as CEO of Bailey Deason Capital Interests, LLC, Mr. Bailey served in similar management roles with Giuliani Partners LLC and Hicks Holdings, LLC. He began his career in the insurance and the insurance finance industry. In addition to founding and owning Bailey Insurance Associates from 1983 – 1996, one of the largest single principal-owned agencies in Dallas at the time, he was also the co-founder and CEO of Premium Finance Holdings (PFH) from 1997 – 2001, which was later sold to Texas Capital Bank. Mr. Bailey received his BBA from Southern Methodist University in Dallas, Texas in 1976.

**Peter T. Cangany, Jr.** joined Ernst & Young, LLP ("EY") in 1980 upon graduating college and retired from the firm in 2017. Mr. Cangany became an EY partner in 1993 and, during his tenure, worked in EY's Indianapolis office 1980 – 1987, Seattle office 1987 – 2004, San Antonio office 2004 – 2011, and New York and Bermuda offices 2011 – 2017. At EY, Mr. Cangany specialized in working with insurance entities, primarily property, casualty and reinsurance, and has as a strong working knowledge of the life settlement industry. He also worked closely with Beneficient during its early formation on various accounting and consolidation matters. During his 37 years with EY, Mr. Cangany served as the engagement partner on several large public and non-public nationally recognized companies. He held numerous leadership positions at EY, including area insurance practice leader for the Pacific Northwest, Southwest, and BBC (Bermuda, Bahamas, Caymans) and Office Managing Partner for EY's Seattle and Bermuda offices. Mr. Cangany serves on the Board of Trustees – Franklin College of Indiana (2009–present) and is the Finance Committee Chair (and previously Audit Committee Chair). Mr. Cangany earned a B.A. in Accounting from Franklin College and an M.B.A. from Texas A&M University.

Page 74

***David F. Chavenson*** served as Treasurer of Alon USA Energy Company from 2007 until 2018. He served as Vice President and Treasurer of Flowserve Corp. from 2001 until 2005; Senior Vice President and Chief Financial Officer at Worldwide Flight Services, Inc. from 2000 to 2001; and Vice President of Finance, Chief Financial Officer and Corporate Secretary of Rutherford-Moran Oil Corporation since April 1996 to 1999. Previous to 1996, Mr. Chavenson spent 18 years at Oryx Energy Company, an oil and gas exploration and production company (previously Sun Exploration and Production Co.) ("Oryx"), and served as Treasurer there from 1993 to 1996. Prior to that, he served as Assistant Treasurer and Manager of Corporate Finance, Manager of Financial Analysis and Senior Financial Specialist at Oryx.

Mr. Chavenson has a B.A., magna cum laude, Phi Beta Kappa from Dickinson College and holds an M.B.A. in finance with honors from the Harvard Business School. He is also a Certified Public Accountant.

***Thomas O. Hicks*** is a pioneer in the private equity industry in the United States. From 1984 to 1988 he was Co-Founder and Co-Chairman of Hicks & Haas which compiled a highly successful track record of acquisitions, including Dr Pepper, Seven Up, A&W Root Beer, Sybron, and Thermadyne. He later founded numerous private equity funds for his firm, Hicks, Muse, Tate and Furst, which raised over $12 billion in funds. His funds have invested billions of dollars of equity in businesses in the United States, Europe, and Latin America. Mr. Hicks retired from Hicks Muse in 2004, and now manages his own family office private equity firm, Hicks Holdings, LLC. Mr. Hicks was a Director of Carpenter Technology Corporation until September 2014. Mr. Hicks has a B.B.A. from the University of Texas – Austin and an MBA from the University of Southern California. Mr. Hicks is also the manager and indirect, majority owner of HSG Sports Group Holdings LLC, which, through subsidiaries, including HSG Sports Group LLC and others, formerly owned interests in professional sports franchises, including the Texas Rangers major league professional baseball club and Dallas Stars professional ice hockey team. On May 24, 2010, the Texas Rangers filed a voluntary petition for Chapter 11 bankruptcy protection. On September 15, 2011, the Dallas Stars filed a voluntary petition for Chapter 11 bankruptcy protection. Additional proceedings were filed by or against other entities related to the Texas Rangers and the Dallas Stars, and Mr. Hicks in his individual capacity, in connection with the foregoing. Both the Texas Rangers and the Dallas Stars were sold to new owners in connection with their respective Chapter 11 bankruptcy cases.

Page 75

*Dennis P. Lockhart* is currently a distinguished professor-of-the-practice in the Nunn School of International Affairs at Georgia Tech. Early in 2017, Mr. Lockhart retired from his position as president and Chief Executive Officer of the Federal Reserve Bank of Atlanta, a position he held since 2007. Earlier, he was a professor at Georgetown University, School of Foreign Service, from 2003 to 2007. Prior to this, he held senior positions at Heller Financial Inc. and Citicorp (now Citigroup), and served as an officer in the U.S. Marine Corps Reserve. Mr. Lockhart holds a Master of Arts from Johns Hopkins University, Bachelor of Arts from Stanford University, and an honorary doctorate from Georgia State University. Mr. Lockhart currently serves on the Board of Directors of Pensare Acquisition Corp. (WRLS) and Invesco Mortgage Capital.

*Bruce W. Schnitzer* has been a successful private equity investor since 1985 and Chairman of Wand Partners, a private equity firm specialized in insurance and other specialty financial services, since 1987. Wand has sponsored and invested in eighteen platform businesses, thirteen of which span the insurance industry and fifteen of which are now fully realized. From 1977 to 1985, Mr. Schnitzer was a senior executive with Marsh & McLennan, where he served as President and CEO of Marsh, Inc. (the world-wide insurance broker) and as Chief Financial Officer of Marsh & McLennan Companies, Inc. (NYSE-MMC). Prior to joining Marsh & McLennan, Mr. Schnitzer was a Vice President and head of Mergers & Acquisitions at Morgan Guaranty Trust Company (J.P. Morgan) — 1967-76. Mr. Schnitzer has served in numerous non-profit roles, including Chairman of The Institute of Human Origins, Director of The Litchfield Land Trust, and Director & Treasurer of Scherr-Thoss Foundation. Mr. Schnitzer graduated from the University of Texas, Austin in 1966 (B.B.A.) and received an M.B.A. from the University of Texas, Austin in 1967.

*Roger T. Staubach* retired in July 2018 from the role of Executive Chairman of JLL Americas, a professional services firm specializing in real estate. Mr. Staubach's role focused on client relationships and new business development. With 2017 global revenue of $7.9 billion, JLL serves clients in 80 countries from more than 1,000 locations worldwide, including 300 corporate offices and a global workforce of 82,000. Prior to joining forces with JLL, Mr. Staubach was Executive Chairman of The Staubach Company, a market leading global real estate advisory firm that delivered cost-effective solutions for office, industrial and retail clients. In July 2008, The Staubach Company merged with JLL. Prior to his career in real estate, Mr. Staubach was a member of the Dallas Cowboys professional football team and won numerous football awards including the Heisman Trophy in 1963. Among the many other honors bestowed upon Mr. Staubach are the 2018 Presidential Medal of Freedom, Commercial Property News' "Corporate Services Executive of the Year" (four times), the 2006 Congressional Medal of Honor "Patriot Award," the NCAA "Teddy Roosevelt Award" for being one of the "100 Most Influential NCAA Student-Athletes," the American Jewish Congress "Torch of Conscience Award," and the United States Naval Academy "Distinguished Graduate." Mr. Staubach served as the Chairman of the Host Committee for Super Bowl XLV which was held in North Texas in 2011, and he continues to be involved with The Children's Cancer Fund, the United States Naval Academy Foundation and numerous other civic, charitable, and professional organizations. Mr. Staubach earned a B.S. from the United States Naval Academy and served four years as a Navy officer.

App. 0649

*David H. de Weese* is a Partner of Paul Capital Advisors, a private equity firm. He was instrumental in developing Paul Capital's deal origination strategy and transaction sourcing network. He joined Paul Capital in 1995 and led global secondary transaction sourcing activities and the due diligence of life science and health care investments. Mr. de Weese has 14 years of management experience in Europe. He has an extensive entrepreneurial experience and in-depth scientific and business knowledge. He also founded Medical Innovations. In 1993, he co-founded and served as the President and Chief Executive Officer of M6 Pharmaceuticals. Mr. de Weese served as the President and Chief Executive Officer of Cygnus Therapeutic Systems, SigA Pharmaceuticals and a Silicon Valley software company. Prior to Cygnus, he served as the President and Chief Executive Officer of Machine Intelligence Corporation. Mr. de Weese served as Director of OSE Immunotherapeutics SA (also known as OSE Pharma SA) from June 2014 to June 2017. Mr. de Weese holds an M.B.A. from the Harvard Business School, a B.A. from Stanford University and attended law school at Stanford University.

**Classification of Directors**

In early 2019, our Board of Directors and stockholders approved an amendment to our bylaws that established a classified Board of Directors in which directors are divided into three classes, to be designated as Class I, Class II and Class III. Each class will serve staggered, three year terms. The terms of office of Class II directors will expire at the annual meeting of stockholders to be held in 2020. The terms of office of the Class III directors will expire at the annual meeting of stockholders to be held in 2021. The terms of office of the Class I directors will expire at the annual meeting of stockholders to be held in 2022.

The following chart sets forth the three classes of directors.

| Director | Class | Expiration of Initial Term of Director |
|---|---|---|
| Brad K. Heppner | Class I | 2022 |
| Thomas O. Hicks | Class I | 2022 |
| Roy W. Bailey | Class I | 2022 |
| Bruce W. Schnitzer | Class II | 2020 |
| Roger T. Staubach | Class II | 2020 |
| Dennis P. Lockhart | Class II | 2020 |
| Peter T. Cangany, Jr. | Class III | 2021 |
| David H. de Weese | Class III | 2021 |
| David F. Chavenson | Class III | 2021 |

**Director Qualifications**

When considering whether directors have the experience, qualifications, attributes and skills to enable the Board of Directors to satisfy its oversight responsibilities effectively in light of our business and structure, our Board of Directors focuses primarily on the information discussed in each of the directors' individual biographies set forth above.

In addition, we believe that all of our directors have experience in developing and overseeing businesses and implementing near term and long-range strategic plans. We also believe that all of our directors have a reputation for integrity, honesty and adherence to high ethical standards. Collectively, they have demonstrated business acumen and an ability to exercise sound judgment, as well as a commitment of service to our Company and our Board of Directors.

**Board Committees**

Our Board of Directors has an Audit Committee, Compensation Committee and a Special Committee. The full board currently conducts the activities of the nominating committee. Each of the Audit Committee and the Compensation Committee has a written charter, a copy of each of which is available at our website at www.gwgh.com. Our Audit Committee and Compensation Committee each comply with the listing requirements of The NASDAQ Marketplace Rules taking into account our reliance on certain exceptions for "controlled companies" as described in Item 13 — Certain Relationships and Related Transactions, and Director Independence — Director Independence.

**Audit Committee**

The Audit Committee currently consists of three members: Peter T. Cangany, Jr. (Chair), David F. Chavenson and Roy W. Bailey. All members are financially literate and are independent directors under the NASDAQ Marketplace Rules, and SEC audit committee structure and membership requirements. Further, the Board has determined that Mr. Cangany is an "audit committee financial expert" as defined by applicable regulations of the SEC and is "independent" under the NASDAQ Marketplace Rules.

**Compensation Committee**

Our Compensation Committee consists of two members: Roy W. Bailey, Thomas O. Hicks and Dennis P. Lockhart. Our Compensation Committee is charged with oversight responsibility for the adequacy and effectiveness of our executive compensation and benefit plans and is primarily responsible for all matters relating to compensation of our executive officers and the directors, the adoption of all employee compensation and employee benefit plans and the administration of such plans including granting stock incentives or other benefits, and the review and approval of disclosures regarding executive compensation included in our SEC reports. Our Compensation Committee has the authority to obtain advice and assistance from external legal, accounting or other advisors, and has the authority to retain, terminate and approve the fees payable to any external compensation consultant to assist in the evaluation of director and senior executive compensation. However, any services to be rendered by our independent registered public accounting firm shall be pre-approved by the Audit Committee if required under our policy regarding pre-approval of such services.

**Special Committee**

Our Special Committee consists of three members: Roy W. Bailey, Peter T. Cangany, Jr. and David F. Chavenson. The Special Committee is a committee of the Board comprised solely of directors independent of Beneficient that was formed primarily for the purpose of considering and, if deemed appropriate, approving company transactions with or involving Beneficient.

Page 78

App. 0651

**Ability of Stockholders to Communicate with our Board of Directors**

Our Board of Directors has established several means for stockholders and others to communicate with our Board of Directors. If a stockholder has a concern regarding our financial statements, accounting practices or internal controls, the concern should be submitted in writing to the Chair of our Audit Committee in care of our Secretary at the address of our principal executive offices. If the concern relates to our governance practices, business ethics or corporate conduct, the concern should be submitted in writing in care of our Secretary at the address of our principal executive offices. If a stockholder wishes to provide input with respect to our executive compensation policies and programs, input should be submitted in writing to the Chair of our Compensation Committee in care of our Secretary at the address of our principal executive offices. If a stockholder is unsure as to which category the concern relates, the stockholder may communicate it to any one of the independent directors in care of our Secretary at the address of our principal executive offices. All stockholder communications sent in care of our Company Secretary will be forwarded promptly to the applicable director(s).

**Delinquent Section 16(a) Reports**

Section 16(a) of the Securities Exchange Act of 1934, as amended, requires our officers and directors, and persons who own more than ten percent of a registered class of our equity securities, to file electronically reports of ownership and changes in ownership of such securities with the SEC. Based on review of the copies of Forms 3 and 4 and amendments thereto filed electronically with the SEC during the year ended December 31, 2019 and Forms 5 and amendments thereto filed electronically with the SEC with respect to such year, or written representations that no Forms 5 were required, we believe all required forms have been filed by our officers, directors and greater than ten percent beneficial owners; however, Initial Statements of Beneficial Ownership on Form 3 required to be filed on or prior to May 6, 2019 were filed by on May 7, 2019 by Murray T. Holland; on May 8, 2019 by Michelle Caruso-Cabrera, David H. de Weese, David H. Glaser, Brad K. Heppner, Bruce W. Schnitzer, Roger T. Staubach, and Sheldon I. Stein; and on May 9, 2019 by Peter T. Cangany, Jr.

**Code of Ethics**

We have adopted a Code of Business Conduct and Ethics that applies to all of our employees and all of our officers (specifically including but not limited to the principal executive officer (CEO), principal financial officer (CFO) and other members of management). Our Code of Business Conduct and Ethics satisfies the requirements of Item 406(b) of Regulation S-K. Our Code of Business Conduct and Ethics is available on our Internet website at www.gwgh.com.

**ITEM 11. EXECUTIVE COMPENSATION.**

**Summary Compensation Table**

The following table sets forth the cash and non-cash compensation for the 2018 and 2019 years awarded to or earned by: (i) each individual who served as the principal executive officer of GWG Holdings during 2019; (ii) the two most highly compensated executive officers of GWG Holdings who were serving as executive officers at the end of 2019 and who received more than $100,000 in the form of salary and bonus during such year; and (iii) up to two additional individuals for whom disclosure would have been required under (ii) above but for the fact that the individual was not serving as an executive office of GWG Holdings at the end of 2019. These individuals are referred to as our "named executives."

| Name and Principal Position | Year | Salary | Bonus[5] | Stock Awards[1] | Option Awards[1] | Total |
|---|---|---|---|---|---|---|
| Murray T. Holland | 2019 | $ 440,000 | $ 637,500 | $ — | $ — | $ 1,077,500 |
| Chief Executive Officer[2] | 2018 | $ — | $ — | $ — | $ — | $ — |
| Jon R. Sabes | 2019 | $ 387,692 | $ 751,350 | $ — | $ — | $ 1,139,042 |
| Former Chief Executive Officer[2] | 2018 | $ 491,546 | $ 1,015,603 | $ — | $ — | $ 1,507,149 |
| Timothy L. Evans | 2019 | $ 261,539 | $ 326,750 | $ — | $ — | $ 588,289 |
| Chief Financial Officer[3] | 2018 | $ — | $ — | $ — | $ — | $ — |
| William B. Acheson | 2019 | $ 320,000 | $ 2,123,400 | $ — | $ — | $ 2,443,400 |
| Former Chief Financial Officer[3] | 2018 | $ 320,000 | $ 693,353 | $ 757,702 | $ — | $ 1,771,055 |
| Steven F. Sabes | 2019 | $ 140,966 | $ 35,241 | $ — | $ — | $ 176,207 |
| Former Chief Operating Officer – Life Epigenetics Inc. and Secretary[4] | 2018 | $ 208,246 | $ 54,343 | $ — | $ — | $ 262,589 |

(1) Amounts shown reflect the grant date fair value of stock awards and option awards granted for the respective year pursuant to the 2013 Stock Incentive Plan, computed in accordance with Financial Accounting Standards Board Accounting Standards Codification Topic 718. For a discussion of the assumptions used in calculating the grant date fair value of stock awards and option awards made in 2019, see Note 16 to our consolidated financial statements.

(2) On April 26, 2019, and in connection with the closing of the Purchase and Contribution Transaction, Jon R. Sabes resigned as the Company's Chief Executive Officer and from all officer positions he held with the Company or any of its subsidiaries prior to the Closing, other than his position as Chief Executive Officer of the Company's technology focused previously wholly-owned subsidiaries, Life Epigenetics Inc. ("Life Epigenetics") and youSurance General Agency, LLC ("youSurance"). Murray T. Holland was appointed as Chief Executive Officer on April 26, 2019 with an annual base salary of $650,000.

(3) Mr. Acheson ceased serving as Chief Financial Officer on August 15, 2019, and Mr. Evans was appointed Chief Financial Officer on the same date with an annual base salary of $400,000.

(4) On April 26, 2019, and in connection with the closing of the Purchase and Contribution Transaction, Steven F. Sabes resigned from all officer positions he held with the Company or any of its subsidiaries prior to the Closing, except as Chief Operating Officer of Life Epigenetics.

(5) The bonus amount for Mr. William B. Acheson includes $1,500,000 in incentives paid pursuant to the Purchase and Contribution Agreement described below under "Employment Agreements and Change-in-Control Provisions".

In general, in connection with its decisions about executive compensation, the Compensation Committee intends to consider the results of the most recent stockholder advisory vote on executive compensation as well as the advisory vote on the frequency of future advisory votes on executive compensation in determining how frequently to hold its Say-on-Pay vote in the future.

App. 0653

**Employment Agreements and Change-in-Control Provisions**

As of December 31, 2019, our named executives held the following positions: Mr. Murray T. Holland, Chief Executive Officer; and Mr. Timothy L. Evans, Chief Financial Officer. Mr. Jon R. Sabes, former Chief Executive Officer and Chairman of the Board of Directors, Mr. William B. Acheson, former Chief Financial Officer, and Mr. Steven F. Sabes, former Chief Operating Officer - Life Epigenetics Inc. Messrs. Jon R. Sabes, Steven F. Sabes and William B. Acheson were not serving as executive officers of the Company at December 31, 2019.

In June 2011, we entered into employment agreements with each of Messrs. Jon R. Sabes and Steven F. Sabes. Each of these agreements has an initial one year term and is automatically renewed for additional one year periods unless terminated prior to such renewal. On June 28, 2017, we entered into an employment agreement with Mr. Acheson to replace his prior employment agreement dated May 30, 2014, which amendment increased his annual base salary from $225,000 to $320,000. Mr. Acheson's current agreement has an initial three year term and is automatically renewed for additional one year periods unless either party gives notice of non-renewal at least 60 days prior to the expiration of the then current term. All of these employment agreements establish key employment terms (including reporting responsibilities, base salary, discretionary and bonus opportunity and other benefits), provide for severance benefits in certain situations (including change in control), and contain non-competition, non-solicitation and confidentiality covenants.

Under their respective employment agreements during 2019, Mr. Jon R. Sabes received an annual base salary of $480,000 and Mr. Steven F. Sabes received an annual base salary of $200,000. Mr. Acheson received an annual base salary of $320,000. The employment agreements contain customary provisions prohibiting the executives from soliciting our employees for a period of 12–18 months after any termination of employment, and from competing with our Company for either two years (if the executive is terminated for good cause or if he resigns without good reason) or one year (if we terminate the executive's employment without good cause or if he resigns with good reason which includes a change in control). If an executive's employment is terminated by us without "good cause" or if the executive voluntarily resigns with "good reason", then the executive will be entitled to (i) severance pay for a period of 12 months and (ii) reimbursement for health insurance premiums for his family if he elects continued coverage under COBRA.

The employment agreements for Messrs. Jon R. Sabes and Steve F. Sabes also provided that we will reimburse them for any legal costs they incur in enforcing their rights under the employment agreement and, to the fullest extent permitted by applicable law, indemnify them for claims, costs and expenses arising in connection with their employment, regardless of the outcome of any such legal contest, as well as interest at the prime rate on any payments under the employment agreements that are determined to be past due, unless prohibited by law.

All of the foregoing executive employment agreements include a provision allowing us to reduce their severance payments and any other payments to which the executive becomes entitled as a result of our change in control to the extent needed for the executive to avoid paying an excise tax under Code Section 280G, unless the named executive officer is better off, on an after-tax basis, receiving the full amount of such payments and paying the excise taxes due.

On November 28, 2018, the Company entered into restricted stock unit agreement with Mr. William B. Acheson pursuant to which Mr. Acheson received a grant of 73,348 restricted stock units. The grant was intended to be effective as of August 10, 2018. Each restricted stock unit entitled Mr. Acheson to receive one share of the Company's common stock upon vesting, subject to remaining continuously employed by the Company or one of its subsidiaries through the applicable vesting date. The number of restricted stock units was increased by 14,336 as a result of dividend equivalent rights associated with the shares underlying the grant. One half of the restricted stock units vested on the grant date, with the remainder scheduled to vest in equal quarterly installments on each three month anniversary of the intended effective date of the grant. The vesting of all remaining unvested restricted stock units accelerated upon the closing of the Purchase and Contribution Transaction.

On April 26, 2019, and in connection with the closing of the Purchase and Contribution Transaction, (i) Jon R. Sabes resigned as the Company's Chief Executive Officer and from all officer positions he held with the Company or any of its subsidiaries prior to the closing, other than his position as Chief Executive Officer of the Company's technology focused wholly owned subsidiaries, Life Epigenetics Inc. ("Life Epigenetics") and youSurance General Agency, LLC ("youSurance"), and (ii) Steven F. Sabes resigned as the Company's Executive Vice President of Originations and Servicing and from all officer positions he held with the Company or any of its subsidiaries prior to the closing, except as Chief Operating Officer of Life Epigenetics. The resignations of Messrs. Jon and Steven Sabes included a full waiver and forfeit of (i) any severance that may be payable by the Company or any of its subsidiaries in connection with such resignations or the Purchase and Contribution Transaction and (ii) all equity awards of the Company currently held by either of them.

Page 81

As contemplated by the Purchase and Contribution Agreement, the Company entered into performance share unit agreements (each a "PSU Agreement") with certain employees of the Company pursuant to which such employees will receive a bonus under certain terms and conditions, including, among others, that such employees remain employed by the Company or one of its subsidiaries (or, if no longer employed, such employment was terminated by the Company other than for cause, as such term is defined in the PSU Agreement) for a period of 120 days following the closing of the Purchase and Contribution Transaction. The Company's PSU Agreement with William B. Acheson, the Company's Chief Financial Officer, was entered into on April 22, 2019 and provides for a target award grant of 125,000 performance share units, which equates to a retention bonus amount of $1,500,000. The description of the form of PSU Agreement is not complete and is qualified in its entirety by reference to the full text of the form of PSU Agreement which filed as Exhibit 10.1 to our Current Report on Form 8-K filed on April 26, 2019 and incorporated by reference herein.

On April 26, 2019, and in connection with the closing of the Purchase and Contribution Transaction, Murray T. Holland was appointed as Chief Executive Officer of the Company. On May 31, 2019, we entered into an employment agreement with Mr. Holland pursuant to which he is currently serving as our President and Chief Executive Officer. The employment agreement has an initial three year term and is automatically renewed for additional one year periods unless either party gives notice of non-renewal at least 60 days prior to the expiration of the then current term.

Under the employment agreement, Mr. Holland is entitled to an annual base salary of $650,000, retroactive to April 26, 2019, and is eligible to receive an annual cash bonus the target amount of which will be 150% of his base salary (prorated for the partial first year of employment). Whether the bonus is granted for a particular year, and the amount thereof, will be determined by our Compensation Committee in its discretion based upon Mr. Holland's performance. Mr. Holland is also entitled to participate in all employee benefit plans and programs made available by the Company to the Company's executive employees generally.

If Mr. Holland's employment is terminated by us without "Cause" or if he voluntarily resigns with "Good Reason," in each case as defined in the employment agreement, then (i) he will be entitled to severance pay in an amount equal to his annual base salary, payable in a lump sum within 30 days after the date of the termination, (ii) he will receive a pro-rated portion of the target amount of his annual cash bonus for the year in which termination occurs, and (iii) any performance share units ("PSUs") or other equity incentives held by Mr. Holland will fully vest on the date of termination.

On May 31, 2019, and as contemplated by the employment agreement and discussed below, we entered into a PSU Agreement with Mr. Holland that provides for a target award grant of 129,717 PSUs (the "Target Award"), and up to a maximum of 259, 434 PSUs. Each PSU represents the right to receive one share of our common stock (or, following a Change-in-Control Transaction (as defined in the PSU Agreement, the cash value thereof), upon vesting, which is generally subject to (i) the satisfaction of performance goals over a three year performance period, as determined by our Compensation Committee in its sole discretion, and (ii) Mr. Holland remaining continuously employed by the Company or one of its subsidiaries ("Continuous Service") from the date of grant through the date that the PSUs are vested and paid in shares of common stock (or cash). Promptly following the Company's filing with the SEC of our Annual Report on Form 10-K for the year ended December 31, 2121 (the final year of the performance period), our Compensation Committee will review and certify in writing (a) whether, and to what extent, the performance goals have been achieved, and (b) the number of PSUs that vested, if any. At such time, PSUs that are not vested will be forfeited.

The PSUs are subject to forfeiture until they vest. If Mr. Holland's Continuous Service terminates for any reason at any time before all PSUs have vested, all unvested PSUs will be automatically forfeited upon such termination of Continuous Service. However, if Mr. Holland's Continuous Service terminates as a result of his death or disability, or as a result of a termination by the Company without Cause or by Mr. Holland for Good Reason, Mr. Holland will retain, and will not forfeit, a pro rata portion of the Target Award based on the number of days that he remained employed during the performance period. This retained portion of the Target Award will not be subject to accelerated vesting and, instead, will vest (and be paid in shares of common stock) based on extent to which the performance goals are achieved during the entire performance period.

If a "Sale Transaction," as defined in the Company's 2013 Stock Incentive Plan, occurs during the performance period, Mr. Holland remains in Continuous Service up until the date of such Sale Transaction, and the acquiring entity or successor to the Company does not assume the obligations of the Company under the PSU Agreement or replace the grant with a substantially equivalent incentive award, then all outstanding PSUs shall vest at Target Award levels on the date of such Sale Transaction.

If a Change-in-Control Transaction occurs during the performance period, then all outstanding PSUs will automatically vest at Target Award levels on the 120th day following the closing of the Change-in-Control Transaction (the "Retention Date"), contingent upon Mr. Holland remaining in Continuous Service through the Retention Date. However, if Mr. Holland's Continuous Service terminates following the occurrence of a Change-in-Control Transaction and prior to the Retention Date for any reason other than as a result of a termination by the Company for Cause, then all outstanding PSUs will automatically vest at Target Award levels upon such termination. PSUs vesting upon a Change-in-Control will be paid in cash (not shares of common stock). The amount of cash to be paid to Mr. Holland in respect of each vested PSU will be equal to the greater of (y) $12.00 or (z) the Fair Market Value (as defined in the Plan) of a share of common stock as of the trading date immediately prior to the closing date of the Change-in-Control Transaction. The PSU Agreement includes a provision allowing the Company to reduce the payment to which Mr. Holland would be entitled upon a Change-in-Control Transaction to the extent needed for him to avoid paying an excise tax under Internal Revenue Code Section 280G, unless Mr. Holland would be better off, on an after-tax basis, receiving the full amount of such payments and paying the excise taxes due.

The above descriptions of our employment agreement and PSU Agreement with Mr. Holland are not complete and are qualified in its entirety by reference to the full text of such agreements which are incorporated by reference as Exhibits 10.18 and 10.19, respectively, to this Report.

On August 15, 2019, Timothy L. Evans was appointed as our Chief Financial Officer and Treasurer, replacing William B. Acheson. Mr. Acheson remained employed by the Company on an interim basis as an Executive Vice President, to assist in the transition of his prior duties and responsibilities to Mr. Evans. Mr. Evans is employed pursuant to an unwritten employment arrangement under which he receives a base salary of $400,000 per year. We are in the process of finalizing a written employment agreement with Mr. Evans.

On November 19, 2019, we entered into a Transition and Separation Agreement (the "Transition Agreement") with William B. Acheson that governed Mr. Acheson's continued employment with the Company on an at-will basis as Executive Vice President and Advisor to the Chief Executive Officer. Under the Transition Agreement, which replaced his prior employment agreement dated June 28, 2017, Mr. Acheson was entitled to an annual base salary of $320,000. If Mr. Acheson remained employed with the Company through December 31, 2019, he was entitled to receive his target incentive cash bonus for the second half of 2019 in the amount of $160,000. Mr. Acheson was also entitled to participate in all employee benefit plans and programs made available by the Company to the Company's executive employees generally. Upon termination of Mr. Acheson's employment with the Company for any reason, he was entitled to severance pay in an amount equal to his annual base salary, and was entitled to receive a pro-rated portion of the target amount of his annual cash bonus for the year in which termination occurs. The Transition Agreement provided for the payment of such amounts in a lump sum within 30 days after the date of the termination. In addition, the Company agreed to pay the full cost of health, dental and vision insurance coverage for 12 months following termination or, if earlier, until he is eligible to obtain replacement coverage. Mr. Acheson's employment with the Company terminated on December 31, 2019.

The Transition Agreement also acknowledged that outstanding and currently-vested stock options held by Mr. Acheson will not terminate as a result of the termination of Mr. Acheson's employment and, instead, will remain outstanding and exercisable through the full original term thereof. The post-termination exercise period of such options was previously extended in conjunction with the Purchase and Contribution Transaction.

**2013 Stock Incentive Plan**

We maintain the GWG Holdings, Inc. 2013 Stock Incentive Plan, under which 6,000,000 shares of our common stock have previously been approved for issuance. The 2013 Stock Incentive Plan permits the grant of both incentive and non-statutory stock options. Through December 31, 2019, we had issued stock options, SARs and Restricted Stock Units (hereinafter, "options") for 2,593,919 shares of common stock to employees, officers, directors, and consultants under the plan. As of December 31, 2019, (i) 1,647,485 shares are reserved for issuance under outstanding options, of which 874,086 options have vested and the remaining outstanding are scheduled to vest over three years, (ii) 261,681 shares have been issued upon the exercise of options granted under the 2013 Stock Incentive Plan, and (iii) 3,406,081 shares remain available for issuance of future incentive grants. The Board of Directors adopted the 2013 Stock Incentive Plan to provide a means by which our employees, directors, officers and consultants may be granted an opportunity to purchase our common stock, to assist in retaining the services of such persons, to secure and retain the services of persons capable of filling such positions and to provide incentives for such persons to exert maximum efforts for our success.

**Outstanding Equity Awards at Year End**

As of December 31, 2019, our named executives had the following outstanding options to purchase common stock:

| | OPTION AWARDS | | | | STOCK AWARDS | |
| | | | | | | |
| Name | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Option Exercise Price ($) | Option Expiration Date | Number of shares or units of stock that have not vested (#) | Market value of shares or units of stock that have not vested ($) |
|------|------|------|------|------|------|------|
| William B. Acheson | 1,667 | — | $ 6.00 | 12/29/2025 | — | — |
| | 1,667 | — | $ 6.35 | 4/29/2026 | — | — |
| | 1,667 | — | $ 6.41 | 5/13/2026 | — | — |
| | 6,250 | — | $ 10.38 | 4/18/2027 | — | — |
| | 145,000 | — | $ 10.20 | 6/29/2027 | — | — |

Messrs. Jon and Steven Sabes forfeited all equity awards of the Company held by without compensation in connection with the closing of the Purchase and Contribution Transaction.

**Director Compensation**

The following table sets forth the cash and non-cash compensation awarded to or earned by each individual who served as a member of our Board of Directors during the year ended December 31, 2019.

| Director's Name | Fees Earned or Paid in Cash 2019 | Stock Awards[1] | Total |
|------|------|------|------|
| Murray T. Holland[2] | $ — | $ — | $ — |
| Brad K. Heppner[2] | 68,132 | 75,000 | 143,132 |
| Peter T. Cangany, Jr. [2] | 78,352 | 75,000 | 153,352 |
| David F. Chavenson [3] | 107,327 | 75,000 | 182,327 |
| Thomas O. Hicks [2] | 71,132 | 75,000 | 146,132 |
| Dennis P. Lockhart [3] | 64,805 | 75,000 | 139,805 |
| Bruce W. Schnitzer [2] | 68,132 | 75,000 | 143,132 |
| Roger T. Staubach [2] | 68,132 | 75,000 | 143,132 |
| Kathleen J. Mason [3][4] | 104,827 | 75,000 | 179,827 |
| Michelle Caruso-Cabrera [2][5] | 80,602 | 75,000 | 155,602 |
| Richard W. Fisher [2][6] | 47,021 | 75,000 | 122,021 |
| David H. Glaser [2][6] | 49,548 | 75,000 | 124,548 |
| Sheldon I. Stein [2][6] | 54,820 | 75,000 | 129,820 |
| Bruce E. Zimmerman [2][6] | 51,723 | 75,000 | 126,723 |
| David H. deWesse [2] | 75,000 | 75,000 | 150,000 |
| Jon R. Sabes [7] | — | — | — |
| Steven F. Sabes [7] | — | — | — |
| David H. Abramson [7] | 174,000 | — | 174,000 |
| Thomas J. Donohue, Jr. [7] | 181,800 | — | 181,800 |
| Shawn R. Gensch [7] | 166,800 | — | 166,800 |
| Jeffrey L. McGregor [7] | 169,200 | — | 169,200 |
| Mark E. Schwarzmann [7] | $ 166,800 | $ — | $ 166,800 |

(1) Amounts shown reflect the grant date fair value of restricted stock awards granted during 2019, computed in accordance with Financial Accounting Standards Board Accounting Standards Codification Topic 718. The $75,000 noted in the table above for those specific directors reflects 8,169 awards granted on June 18, 2019 with a grant date value of $9.18 per share.

(2) Such director commenced serving as a member of the Board of Directors at the April 16, 2019 closing of the Purchase and Contribution Transaction.

(3) Such director commenced serving as a member of the Board of Directors on May 13, 2019.

(4) Such director ceased serving as a member of the Board of Directors on March 2, 2020.

(5) Such director ceased serving as a member of the Board of Directors on February 21, 2020.

(6) Such director ceased serving as a member of the Board of Directors on October 15, 2019.

(7) Such director ceased serving as a member of the Board of Directors at the April 16, 2019 closing of the Purchase and Contribution Transaction.

During 2009, prior to April 27, 2009, each independent board member received base compensation of $6,000 per quarter. In addition, the chairman of the audit committee received an additional $4,800 per quarter. The chairmen of the Compensation Committee and the Corporate Governance Committee, prior to its dissolution, each received an additional $2,400 per quarter. Also, each non-chair member of committees received an additional $1,200 per quarter.

---

Page 84

On April 15, 2019, the Board approved changes to director compensation. In consideration for services provided and to be provided to the Company in their capacity as non-employee directors of the Company during the remainder of 2019, or until their earlier resignation in conjunction with the closing of the Purchase and Contribution Transaction, each individual serving as non-employee director of the Company prior to the closing of the Purchase and Contribution Transaction was entitled to receive cash compensation in the amount of $125,000. Such compensation was payable in three installments of $41,666, $41,666 and $41,667, respectively, on the last business day of June, September and December 2019, provided, however, that the entire unpaid portion of such compensation was accelerated and paid upon the closing of the Purchase and Contribution Transaction in accordance with the April 2019 changes to director compensation.

The Compensation Committee through consultation with its compensation advisors, approved a plan of compensation to be paid to the Company's non-employee directors for the period following the closing of the Purchase and Contribution Agreement. Under this plan, all non-employee directors receive annualized cash compensation of $100,000 paid in quarterly installments in arrears. The Chair and members of the Board's committees receive the additional annualized cash compensation set forth below:

| Committee | Position | Additional Fees | |
|---|---|---|---|
| Audit Committee | Chair | $ | 15,000 |
| | Member (other than Chair) | $ | 10,000 |
| Compensation Committee | Chair | $ | 12,000 |
| | Member (other than Chair) | $ | 5,375 |
| Special Committee | Member | $ | 25,000 |

Further, each member of the Special Committee receives $1,000 for attending each in-person Special Committee meeting or $500 for participating telephonically. The Special Committee is a committee of the Board comprised solely of directors independent of Beneficient that was formed primarily for the purpose of considering and, if deemed appropriate, approving company transactions with or involving Beneficient.

On June 18, 2019, the Company entered into restricted stock unit agreements with each non-employee director of the Company pursuant to which each received a grant of 8,169 restricted stock units. Each restricted stock unit entitles the holder thereof to receive one share of the Company's common stock upon vesting on the one year anniversary of the grant date, subject remaining a member of the Board and/or employed by or engaged as a consultant to the Company or one of its subsidiaries through such date, and subject to accelerated vesting in certain circumstances. Holders of restricted stock units are also entitled to dividend equivalent rights with respect to the shares underlying the grants.

The Company has entered into Indemnification Agreements (the "Indemnification Agreements") with each of its current directors and executive officers (collectively, the "Indemnitees"). The Indemnification Agreements clarify and supplement indemnification provisions already contained in the Company's bylaws and generally provide that the Company shall indemnify the Indemnitees to the fullest extent permitted by applicable law, subject to certain exceptions, against expenses, judgments, fines and other amounts actually and reasonably incurred in connection with their service as a director or officer and also provide for rights to advancement of expenses and contribution.

The description of the form of Indemnification Agreement and the restricted stock unit agreements set forth above are not complete and is qualified in its entirety by reference to the full text of the form of Indemnification Agreement and the form of restricted stock unit agreement which are filed as Exhibit 10.17 and Exhibit 10.24 to this Annual Report on Form 10-K, respectively, and are incorporated herein by reference.

**ITEM 12.  SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED SHAREHOLDER MATTERS.**

**Securities Authorized for Issuance under Equity Compensation Plans**

We maintain our 2013 Stock Incentive Plan. The purpose of the 2013 Stock Incentive Plan is to provide a means by which our employees, directors, officers and consultants may be granted an opportunity to purchase our common stock, to assist in retaining the services of such persons, to secure and retain the services of persons capable of filling such positions and to provide incentives for such persons to exert maximum efforts for our success. 6,000,000 shares of our common stock have been approved for issuance under the 2013 Stock Incentive Plan, of which 3,406,081 shares remained available for issuance pursuant to future grants at December 31, 2019.

The 2013 Stock Incentive Plan was approved by our stockholders. The following table sets forth certain information as of December 31, 2019 with respect to securities authorized for issuance under compensation arrangements.

| Plan Category | Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants and Rights (a) | Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights (b) ($) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a) (c) |
|---|---|---|---|
| Equity compensation plan approved by stockholders: | | | |
| Stock Options | 905,381 | $ 9.05 | N/A |
| Stock Appreciation Rights | 375,625 | $ 9.25 | N/A |
| Restricted Stock Units | 244,083 | N/A | N/A |
| 2013 Stock Incentive Plan Total | 1,525,089 | $ 9.11 | 3,406,081 |

**Beneficial Ownership**

The following table sets forth certain information regarding beneficial ownership of the our common stock as of March 23, 2020 for (i) each person known by us to be the beneficial owner of more than 5% of our common stock, (ii) each of our current directors and executive officers, (iii) all named executive officers and directors as a group, and (iv) each other named executive officer identified in the Summary Compensation Table. Unless otherwise indicated, the address of each of the following persons is 325 North St. Paul Street, Suite 2650, Dallas, TX 75201, and each such person has sole voting and investment power with respect to the shares of common stock set forth opposite such person's name. Percentage ownership in the table below is based on 33,035,249 shares of the Company's common stock outstanding as of March 24, 2020.

Page 86

Except as otherwise indicated in the table or its footnotes, the persons in the table below have sole voting and investment power with respect to all shares of common stock shown as beneficially owned by them, subject to community property laws where applicable.

| Name | Shares Beneficially Owned | Percentage of Shares Beneficially Owned |
|---|---|---|
| *Executive Officers:* | | |
| Murray T. Holland[1] | 25,913,516 | 78.4% |
| Timothy L. Evans | — | — |
| | | |
| *Non-Employee Directors:* | | |
| Brad K. Heppner[2] | 2,500,000 | 7.6% |
| Roy W. Bailey | — | — |
| Peter T. Cangany, Jr. | — | — |
| Michelle Caruso-Cabrera | — | — |
| David F. Chavenson | — | — |
| Thomas O. Hicks[3] | 1,452,155 | 4.4% |
| Dennis P. Lockhart | — | — |
| Kathleen J. Mason | — | — |
| Bruce W. Schnitzer | — | — |
| Roger T. Staubach | — | — |
| David H. de Weese | — | — |
| All current directors and officers as a group | 29,865,671 | 90.4% |
| | | |
| *Other Named Executive Officers:* | | |
| William B. Acheson[4] | 156,251 | * |
| Jon R. Sabes[5] | — | — |
| Steven F. Sabes[6] | — | — |
| | | |
| *Other 5% Beneficial Owners:* | | |
| Seller Trusts[7] | 25,913,516 | 78.4% |
| Beneficient Company Holdings, L.P.[8] | 2,500,000 | 7.6% |
| AltiVerse Capital Markets, L.L.C.[9] | 1,452,155 | 4.4% |

*       Less than one percent

(1)     Includes 25,913,516 shares of Common Stock held by the Seller Trusts. Murray T. Holland is one of the trust advisors to the Seller Trusts; the other trust advisor, James E. Turvey, is an individual unrelated to Mr. Holland. Mr. Holland and Mr. Turvey have shared decision-making authority with respect to each of the Seller Trusts, including shared voting power and shared dispositive power over the shares of Common Stock held by each of the Seller Trusts. Mr. Holland has an indirect pecuniary interest in the shares of Common Stock held by the Seller Trusts resulting from his ownership interest in 30% of the outstanding membership interests of MHT Financial, LLC ("MHT"), the sole beneficiary of each of the Seller Trusts. Consequently, to the extent that MHT, as beneficiary, receives proceeds from the sale of Common Stock and Seller Trust L Bonds, as contemplated by the Master Agreement, in excess of its contractual obligations, Mr. Holland would have a right to his pro rata share of any distribution of such proceeds if and when made by MHT to its members. There can be no assurance (i) that MHT will receive any proceeds in excess of its contractual obligations, (ii) as to the amount of any such excess, or (iii) that any distribution of such excess will be distributed to members of MHT, including Mr. Holland. Mr. Holland disclaims beneficial ownership of the shares of Common Stock held by the Seller Trusts except to the extent of the pecuniary interest therein described above.

(2)     Includes 2,500,000 shares of Common Stock held by Beneficient Capital Company, L.L.C., a Delaware limited liability company ("BCC"). BCC is a wholly-owned subsidiary of Beneficient Company Holdings, L.P., a Delaware limited partnership ("BEN Holdings"). BEN Holdings is also the managing member of BCC. BEN Holdings is controlled by its general partner, The Beneficient Company Group, L.P., a Delaware limited partnership ("BEN LP"). BEN LP is controlled by its general partner, Beneficient Management, L.L.C., a Delaware limited liability company ("BEN Management"). Brad K. Heppner serves as Director, Chairman and Chief Executive Officer of BEN Management. As a result, Mr. Heppner may be deemed to beneficially the shares of Common Stock owned by BCC. Mr. Heppner disclaims beneficial ownership of such shares except to the extent of his pecuniary interest therein.

(3)     Includes 1,452,155 shares of Common Stock held by AltiVerse Capital Markets, L.L.C. ("AltiVerse"). AltiVerse is a Delaware limited liability company for which Hicks Holdings Operating LLC, a Delaware limited liability company ("Hicks Holding"), serves as Manager. Thomas O. Hicks serves as sole manager of Hicks Holdings. As a result, Mr. Hicks may be deemed to beneficially own the shares of Common Stock owned by AltiVerse. Mr. Hicks disclaims beneficial ownership of such shares except to the extent of his pecuniary interest therein. All 1,452,155 shares held by AltiVerse have been pledged as collateral to secure our obligations under our L Bonds pursuant to the Amended and Restated Pledge and Security Agreement dated October 23, 2017.

(4)     Shares reflected in the table include 156,251 of vested stock options currently exercisable or vesting within 60 days granted pursuant to our 2013 Stock Incentive Plan.

(5)     On April 26, 2019, and in connection with the closing of the Purchase and Contribution Transaction, Jon R. Sabes resigned as the Company's Chief Executive Officer and from all officer positions he held with the Company or any of its subsidiaries prior to the Closing, other than his position as

Page 87

(6) On April 26, 2019, and in connection with the closing of the Purchase and Contribution Transaction, Steven F. Sabes resigned from all officer positions he held with the Company or any of its subsidiaries prior to the Closing, except as Chief Operating Officer of Life Epigenetics.

(7) The business address of the Seller Trusts is 325 North St. Paul Street, Suite 4850, Dallas, Texas 75201. On January 12, 2018, we entered into a Master Exchange Agreement (the "Master Exchange Agreement") pursuant to which we agreed to engage in a strategic transaction (the "Exchange Transaction") with Beneficient and certain other parties (the "Seller Trusts"), in which the parties agreed to an exchange of certain assets. The Seller Trusts are a group of individual common law trusts that received shares of Common Stock in the Exchange Transaction. The trustee of each of the Seller Trusts is Delaware Trust Company. The trust advisors of each trust are two individuals unrelated to each other, James E. Turvey and Murray T. Holland, who have sole decision-making authority with respect to each trust. The beneficiary of each of the Seller Trusts is MHT Financial, LLC. The current members of MHT Financial, LLC are Shawn T. Terry and Mike McGill. The names of the various trusts comprising the Seller Trusts are as follows: The LT-1 Exchange Trust, The LT-2 Exchange Trust, The LT-3 Exchange Trust, The LT-4 Exchange Trust, The LT-5 Exchange Trust, The LT-6 Exchange Trust, The LT-7 Exchange Trust, The LT-8 Exchange Trust, The LT-9 Exchange Trust, The LT-12 Exchange Trust, The LT-14 Exchange Trust, The LT-15 Exchange Trust, The LT-16 Exchange Trust, The LT-17 Exchange Trust, The LT-18 Exchange Trust, The LT-19 Exchange Trust, The LT-20 Exchange Trust, The LT-21 Exchange Trust, The LT-22 Exchange Trust, The LT-23 Exchange Trust, The LT-24 Exchange Trust, The LT-25 Exchange Trust and The LT-26 Exchange Trust.

In connection with the Exchange Transaction, the Company and the Seller Trusts entered into a Stockholders Agreement, which provides (among other standstill provisions) that until the Seller Trusts own, in the aggregate, voting securities representing less than 10% of the total voting power of all voting securities of the Company, all voting securities of the Company voted by the Seller Trusts will be voted solely in proportion with the votes cast by all other holders of voting securities of the Company on the matter. In connection with the Purchase and Contribution Transaction, the Stockholders Agreement was terminated and the Seller Trusts are now entitled to full voting rights with respect to the shares of Common Stock they own and are entitled to cast a majority of the votes on all matters requiring stockholder votes.

(8) As a limited partnership, BEN LP is controlled by its general partner, Beneficient Management, LLC, which is currently governed by an 11 member board of directors. The business address of BEN LP is 325 North St. Paul Street, Suite 4850, Dallas, Texas 75201.

(9) AltiVerse is managed by its sole manager, Hicks Holdings Operating LLC, of which Thomas O. Hicks is the sole member and exercises voting and investment power with respect to the shares of Common Stock held by AltiVerse. The business address of AltiVerse is c/o Hicks Holdings Operating LLC, 2200 Ross Avenue, 50th Floor, Dallas, Texas 75201. All 1,452,155 shares held by AltiVerse have been pledged as collateral to secure our obligations under our L Bonds pursuant to the Amended and Restated Pledge and Security Agreement dated October 23, 2017.

## ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE.

**Conflict-of-Interest and Related-Party Transaction Policy**

We have a Conflict-of-Interest and Related-Party Transaction Policy, pursuant to which our Board of Directors (or an authorized committee thereof) is responsible for reviewing policies and procedures with respect to related party transactions required to be disclosed pursuant to Item 404 of the SEC's Regulation S-K (including transactions between the Company and its officers and directors, or affiliates of such officers or directors), and approving the terms and conditions of such related party transactions. Our Conflict-of-Interest and Related-Party Transaction Policy sets forth the processes and procedure to be taken in such review and approval, which includes obtaining approval by a majority of the disinterested members of the Board (or an authorized committee thereof) and otherwise in accordance with state law governing conflicts of interest, or if the transaction involves compensation payable to an executive, the Compensation Committee. The related party transactions in which we engaged during year 2019 and the interim 2020 year-to-date period, which are described below, were approved in accordance with Conflict-of-Interest and Related-Party Transaction Policy.

**Transactions with Related Persons**

Related party transactions that we have entered into during year 2019 and the interim 2020 year-to-date period are described below:

*Purchase and Contribution Transaction*

On April 15, 2019, Jon R. Sabes, the Company's former Chief Executive Officer and a director, and Steven F. Sabes, the Company's former Executive Vice President and a director, entered into the Purchase and Contribution Agreement with, among others, Ben LP. The Company was not a party to the Purchase and Contribution Agreement. However, the closing of the transactions contemplated by the Purchase and Contribution Agreement (the "Purchase and Contribution Transaction") were subject to certain conditions that were dependent upon the Company taking, or refraining from taking, certain actions. The closing of the Purchase and Contribution Transaction occurred on April 26, 2019. See "Item 1 — Business — The Beneficient Transactions — The Expanded Strategic Relationship" for a description of the Purchase and Contribution Agreement and the Purchase and Contribution Transaction are described.

Among other actions taken in connection with the with the closing of the Purchase and Contribution Transaction, on April 26, 2019, Beneficient Capital Company, L.L.C., a Delaware limited liability company ("BCC"), and AltiVerse Capital Markets, L.L.C., a Delaware limited liability company ("AltiVerse"), executed and delivered a Consent and Joinder (the "Consent and Joinder") to the Amended and Restated Pledge and Security Agreement dated October 23, 2017 by and among the Company, GWG Life, LLC, Messrs. Jon and Steven Sabes and the Bank of Utah (the "Security Agreement"). Pursuant to the Consent and Joinder, Messrs. Jon and Steven Sabes assigned their rights and delegated their obligations under the Security Agreement to BCC and AltiVerse, and BCC and AltiVerse became substitute grantors under the Security Agreement such that the shares of the Company's common stock acquired by BCC and AltiVerse pursuant to the Purchase Agreement (as defined below) will continue to be pledged as collateral security for the Company's obligations owing in respect of the L Bonds issued under the Amended and Restated Indenture governing our L Bonds. The description of the Consent and Joinder set forth above is not complete and is qualified in its entirety by reference to the full text of the Consent and Joinder which is incorporated by reference as Exhibit 10.19 to this Report.

In connection with the Exchange Transaction, the Company and the Seller Trusts entered into a Stockholders Agreement that provided (among other standstill provisions) that until the Seller Trusts own, in the aggregate, voting securities representing less than 10% of the total voting power of all voting securities of the Company, all voting securities of the Company voted by the Seller Trusts will be voted solely in proportion with the votes cast by all other holders of voting securities of the Company on the matter. On April 26, and in connection with the closing of the Purchase and Contribution Transaction, the Stockholders Agreement was amended and terminated, and the Seller Trusts are now entitled to full voting rights with respect to the shares of Common Stock they own and are entitled to cast a majority of the votes on all matters requiring stockholder votes.

*Promissory Note with Certain LiquidTrusts*

On May 31, 2019, our wholly-owned subsidiary GWG Life entered into a Promissory Note (the "Promissory Note"), made by Jeffrey S. Hinkle and Dr. John A. Stahl, not in their individual capacity but solely as trustees of The LT-1 LiquidTrust, The LT-2 LiquidTrust, The LT-5 LiquidTrust, The LT-7 LiquidTrust, The LT-8 LiquidTrust and The LT-9 LiquidTrust (collectively, the "Borrowers") in the principal amount of $65.0 million and payable to the order of GWG Life. Pursuant to the terms of the Promissory Note, GWG Life funded a term loan to the Borrowers in an aggregate principal amount of $65.0 million (the "Loan"). The Loan was funded in two installments as described below.

The Borrowers are common law trusts established as part of alternative asset financings extended by a subsidiary of Ben LP, of which the Company owns approximately 90% of the issued and outstanding common units. Although each Borrower is allocated a portion of the Loan equal to approximately 16.7% of the aggregate outstanding principal of the Loan, the Loan constitutes the joint and several obligations of the Borrowers.

The Loan was made pursuant to GWG's strategy to further diversify into alternative assets (beyond life insurance) and ancillary businesses and was intended to better position Beneficient's balance sheet, working capital and liquidity profile to satisfy anticipated Texas Department of Banking regulatory requirements.

An initial advance in the principal amount of $50.0 million was funded on June 3, 2019 and, subject to satisfaction of certain customary conditions, it is anticipated that the second advance, in the principal amount of $15.0 million was funded on November 22, 2019. The Loan bears interest at 7.0% per annum, with interest payable at maturity, and matures on June 30, 2023. Subject to the Intercreditor Agreements (as described below), the Loan can be prepaid at the Borrowers' election without premium or penalty.

The Loan is unsecured and is subject to certain covenants (including a restriction on the incurrence of any indebtedness senior to the Loan other than existing senior loan obligations to each of HCLP Nominees, L.L.C. ("HCLP") and Beneficient Holdings, Inc. ("BHI", and together with HCLP, the "Senior Lenders"), as lenders) and events of default. At the time Beneficient was consolidated, all existing senior loan obligations were held by HCLP. The Senior Lenders are directly or indirectly associated with Brad K. Heppner, who is Chairman of the Company's Board of Directors. HCLP is not considered a related party of GWG or Beneficient.

A special committee of the Board of Directors of the Company (the "Special Committee") composed solely of independent and disinterested directors of the Company, together with the assistance of its independent legal advisors, reviewed, negotiated and approved the terms of the Loan. The foregoing description of the Promissory Note is qualified in its entirety by reference to the full and complete terms of the Promissory Note, which is incorporated by reference as Exhibit 10.24 to this Report.

*Intercreditor Agreements*

In connection with the Promissory Note, the Company also entered into two intercreditor and subordination agreements: (1) an Intercreditor Agreement between GWG Life and HCLP and (2) an Intercreditor Agreement between GWG Life and BHI (the "Intercreditor Agreements"). Under the Intercreditor Agreements, GWG Life agrees to subordinate the Loan to the secured obligations of Beneficient and its affiliates outstanding to the Senior Lenders (the "Senior Loan Obligations"), agrees to not take any liens to secure the Loan (and to subordinate such liens, if any, to the liens of the Senior Lenders), and agrees not to take enforcement actions under the Promissory Note until such Senior Loan Obligations are paid in full. The Intercreditor Agreements establish various other inter-lender and subordination terms, including, without limitation, with respect to permitted actions by each party, permitted payments, waivers, voting arrangements in bankruptcy, application of certain proceeds and limitations on amendments of the respective loan obligations of the parties. The Senior Lenders have agreed not to extend the maturity of their respective loan obligations beyond June 30, 2023 or increase the outstanding principal of the loans made by the Senior Lenders without the written consent of GWG Life. GWG Life has agreed not to transfer the Promissory Note except with the written consent of the Senior Lenders (such consent not to be unreasonably withheld) or to the Company or direct or indirect wholly owned subsidiaries thereof. The Special Committee, together with the assistance of its independent legal advisors, reviewed, negotiated and approved the terms of the Intercreditor Agreements. The foregoing description of the Intercreditor Agreements are qualified in their entirety by reference to the full and complete terms of the Intercreditor Agreements, which are incorporated by reference as Exhibit 10.25 and Exhibit 10.26 to this Report.

*Purchase of Additional Common Units of Ben LP*

On June 12, 2019, the Company acquired 1,000,000 Ben LP common units from unaffiliated holders of alternative assets that had sold the alternative assets to MHT Financial, LLC for contribution to various Exchange Trusts established by MHT Financial as part of the Ben LP liquidity products. The holders acquired the Ben LP common units from MHT Financial in satisfaction for a portion of the purchase price owed by MHT Financial for the alternative assets that MHT Financial contributed to the Exchange Trusts. Murray T. Holland, our Chief Executive Officer, was until recently a Managing Director of MHT Financial and continues to own a 30% interest in MHT Financial. Mr. Holland also serves as a trust advisor to the Exchange Trusts that hold the alternative assets. The purchase price for the Ben LP common units acquired by the Company was $10,000,000.

*Preferred Series A Unit Account and Common Unit Investment Agreement; Exchange Agreement*

On December 31, 2019, the Company, Ben LP, Beneficient Company Holdings, L.P., a Delaware limited partnership of which Ben LP owns all of the outstanding common units and serves as its general partner ("BCH"), and Beneficient Management, L.L.C., a Delaware limited liability company and the general partner of Ben LP ("Beneficient Management"), entered into a Preferred Series A Unit Account and Common Unit Investment Agreement (the "Investment Agreement").

Pursuant to the Investment Agreement, the Company transferred $79 million to Ben LP in return for 666,667 common units of Ben LP and a Preferred Series A Subclass 1 Unit Account of BCH.

In connection with the Investment Agreement, the Company obtained the right to appoint a majority of the board of directors of Beneficient Management, the general partner of Ben LP. As a result, the Company obtained control of Ben LP and began reporting the results of Ben LP and its subsidiaries on a consolidated basis beginning on the transaction date of December 31, 2019. The Company's right to appoint a majority of the board of directors of Beneficient Management will terminate in the event (i) the Company's ownership of the fully diluted equity of Ben LP (excluding equity issued upon the conversion or exchange of Preferred Series A Unit Accounts of BCH held as of December 31, 2019 by parties other than the Company) is less than 25%, (ii) the Continuing Directors of the Company cease to constitute a majority of the board of directors of the Company, or (iii) certain bankruptcy events occur with respect to the Company. The term "Continuing Directors" means, as of any date of determination, any member of the board of directors of the Company who: (1) was a member of the board of directors on December 31, 2019; or (2) was nominated for election or elected to the board of directors with the approval of a majority of the Continuing Directors who were members of the board of directors at the time of such nomination or election.

Page 90

Beneficient Management has an executive committee, a nominating committee and a community reinvestment committee. The board of directors of Beneficient Management has the right to appoint two members of these committees, and an entity related to Brad K. Heppner, the Company's Chairman, has the right to appoint the other two members of these committees. The entity related to Mr. Heppner also has the right to appoint the Chairman of the Board and of each of the committees. The Beneficient Management executive committee has the right to approve certain transactions on behalf of Beneficient Management and Ben LP and its subsidiaries, including: (i) the incurrence of debt; (ii) the issuance of equity interests of Ben LP or any subsidiary equal to 5% or more of the fully diluted equity of such entity or that have preferred terms to the common equity of Ben LP, except in connection with any trust instrument or product offered by Ben LP or its affiliates; (iii) the adoption of a shareholder or unitholder rights plan by Ben LP or any subsidiary thereof; (iv) the amendment, supplement, waiver, or modification of Ben LP's limited partnership agreement, the BCH limited partnership agreement or the organizational documents of any subsidiary of the foregoing other than any common law or statutory trusts created to facilitate the financing, acquisition, contribution, assignment or holding of alternative assets; (v) the exchange or disposition of a majority or more of the assets, taken as a whole, of Ben LP or any subsidiary thereof in a single transaction or a series of related transactions; (vi) the exchange or disposition of a majority or more of the assets, taken as a whole, of Beneficient Management or any subsidiary thereof in a single transaction or a series of related transactions; (vii) the execution by Ben LP, Beneficient Management or any subsidiary thereof of any contracts or of any amendment, supplement, waiver or modification of any existing contract, which would materially change the nature of the business of Beneficient Management and its affiliates; (viii) materially or commercially substantive changes to or creation of an employee incentive or benefit plan of Beneficient Management, Ben LP or any subsidiary thereof; (ix) the merger, sale or other combination of Ben LP, Beneficient Management or any subsidiary thereof with or into any other person or entity; (x) the transfer, mortgage, pledge, hypothecation or grant of a security interest in all or substantially all of the assets of Ben LP or any subsidiary thereof; (xi) the transfer, mortgage, pledge, hypothecation or grant of a security interest in all or substantially all of the assets of Beneficient Management or any subsidiary thereof; (xii) the removal without cause of a chief executive officer or any other executive officer of Beneficient Management, Ben LP or any operating subsidiary thereof; (xiii) the termination of employment of any other officer of Beneficient Management, Ben LP or any operating subsidiary thereof or the termination of the association of a partner, member, manager or director of any subsidiary of Ben LP, in each case, without cause; (xiv) the liquidation or dissolution of Beneficient Management, Ben LP or any operating subsidiary thereof; (xv) the withdrawal or removal of Beneficient Management as the general partner of Ben LP or the direct or indirect transfer of beneficial ownership of all or any part of a general partner interest in Ben LP; (xvi) any determination by Beneficient Management, acting as general partner of Ben LP, related to the removal or replacement of the general partner under Ben LP's limited partnership agreement; (xvii) the entry into any material or commercially substantive agreement with a related party; (xviii) the creation of any new and materially or commercially substantively different trust instrument or product, or any materially or commercially substantive change, amendment, supplement, waiver or modification to the terms or provision of any existing trust product, offered by Ben LP or any of its affiliates to the extent regulated by the Texas Finance Commission or other state, federal or non-U.S. regulator with direct or indirect jurisdiction over Ben LP or such affiliate or such product, other than any change or modification to any exhibit or schedule to any trust instrument or product; or (xix) the bankruptcy of Ben LP.

Following the transaction, and as agreed in the Investment Agreement, the Company was issued an initial capital account balance for the Preferred Series A Subclass 1 Unit Account of $319 million. The other holders of the Preferred Series A Subclass 1 Unit Accounts are entities related to certain founders of Ben LP and an entity related to one of GWG's and Beneficient's directors (the "Related Account Holders"), and the aggregate capital accounts of all holders of the Preferred Series A Subclass 1 Unit Accounts after giving effect to the investment by the Company is $1.6 billion. The Company's Preferred Series A Subclass 1 Unit Account is the same class of preferred security as held by the Related Account Holders. If the Related Account Holders exchange their Preferred Series A Subclass 1 Unit Accounts for securities of the Company, the Company's Preferred Series A Subclass 1 Unit Account would be converted into common units of Ben LP (so neither the Company nor the Related Account Holders would hold Preferred Series A Subclass 1 Unit Accounts).

In addition, on December 31, 2019, the Company, Ben LP and certain holders of common units of Ben LP (the "Common Units") entered into an Exchange Agreement (the "Exchange Agreement") pursuant to which certain holders of Common Units from time to time have the right, on a quarterly basis, to exchange their Common Units for common stock of the Company. The exchange ratio in the Exchange Agreement is based on the ratio of the capital account associated with the Common Units to be exchanged to the market price of the Company's common stock based on the volume weighted average price of the Company's common stock for the five consecutive trading days prior to the quarterly exchange date. The Exchange Agreement is intended to facilitate the marketing of Ben LP's products to holders of alternative assets.

**Director Independence**

Our Board of Directors periodically reviews relationships that directors have with our Company to determine whether our directors are "independent directors" as such term is defined in Rule 5605(a)(2) of the NASDAQ Marketplace Rules. Our Board of Directors has determined that the following directors are independent directors: Roy W. Bailey, Peter T. Cangany, Jr., David F. Chavenson, Dennis P. Lockhart, and Roger T. Staubach.

Because the Seller Trusts currently own a majority of our outstanding Common Stock, we are a "controlled company" as that term is set forth in Rule 5615(c) of the NASDAQ Marketplace Rules. Under the NASDAQ rules, a company of which more than 50% of the voting power for the election of directors is held by an individual, a group or another company is a "controlled company" and may elect not to comply with certain NASDAQ corporate governance requirements, including the requirements that:

- a majority of our board of directors consist of independent directors;

- our nominating and corporate governance committee be composed entirely of independent directors; and

- our compensation committee be composed entirely of independent directors.

We are currently relying on the controlled company exemption for certain of the above requirements, including those related to the composition of our compensation and nominating our corporate governance committees.

**ITEM 14. PRINCIPAL ACCOUNTING FEES AND SERVICES.**

|  | 2019[1] | | 2018 | |
|---|---|---|---|---|
| Audit Fees[2] | $ | 1,559,082 | $ | 577,317 |
| Audit-Related Fees[3] | | 50,908 | | 16,423 |
| Tax Fees[4] | | 126,710 | | 105,560 |
| All Other Fees[5] | | 6,430 | | 11,913 |
| Total Fees | $ | 1,743,130 | $ | 711,213 |

(1)  Amounts for 2019 include principal accounting fees and services incurred by Ben LP and its subsidiaries as these services were necessary to complete the audited consolidated financial statements of GWG Holdings.

(2)  Audit Fees consist of fees for professional services rendered for the audit of our consolidated annual financial statements and review of the interim consolidated financial statements included in quarterly reports and services that are normally provided in connection with statutory and regulatory filings or engagements.

(3)  Audit-Related Fees consist principally of assurance and related services that are reasonably related to the performance of the audit or review of the Company's financial statements but not reported under the caption *Audit Fees* above.

(4)  Tax Fees consist of fees for tax compliance, tax advice, and tax planning.

(5)  All Other Fees typically consist of fees for permitted non-audit products and services provided. All Other Fees included expenses related to our continuous offering of L Bonds and redeemable preferred stock.

The Audit Committee of our Board of Directors has reviewed the services provided by Whitley Penn LLP during year 2019 and the fees billed for such services. After consideration, the Audit Committee has determined that the receipt of these fees by Whitley Penn LLP is compatible with the provision of independent audit services. The Audit Committee discussed these services and fees with Whitley Penn LLP and our management to determine that they are permitted under the rules and regulations concerning auditor independence promulgated by the SEC to implement the Sarbanes-Oxley Act of 2002, as well as the American Institute of Certified Public Accountants.

**Pre-Approval Policy**

The written charter of the Audit Committee provides that all audit and non-audit accounting services permitted to be performed by the our independent registered public accounting firm under applicable rules and regulations must be pre-approved by the Audit Committee or by designated members of the Audit Committee, other than with respect to *de minimis* exceptions permitted under the Sarbanes-Oxley Act of 2002. All services performed by our independent registered public accounting firm during the years ended December 31, 2019 and 2018 were pre-approved in accordance with the written charter.

Prior to or as soon as practicable following the beginning of each year, a description of the audit, audit-related, tax, and other services expected to be performed by the independent registered public accounting firm in the following year will be presented to the Audit Committee for approval. Following such approval, any requests for audit, audit-related, tax, and other services not presented and pre-approved must be submitted to the Audit Committee for specific pre-approval and cannot commence until such approval has been granted. However, we have delegated the authority to grant specific pre-approval between meetings, as necessary, to the Chair of the Audit Committee. The Chair then updates the Audit Committee at the next regularly scheduled meeting of any services that were granted specific pre-approval.

**PART IV**

**ITEM 15. EXHIBITS, FINANCIAL STATEMENT SCHEDULES.**

**Documents filed as part of this Form 10-K:**

| | |
|---|---|
| Reports of Independent Registered Public Accounting Firms | F-1 |
| Consolidated Balance Sheets at December 31, 2019 and 2018 | F-4 |
| Consolidated Statements of Operations for the years ended December 31, 2019 and 2018 | F-5 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2019 and 2018 | F-6 |
| Consolidated Statements of Changes in Stockholders' Equity for the years ended December 31, 2019 and 2018 | F-8 |
| Notes to Consolidated Financial Statements | F-9 |

**Financial Statement Schedule:**

Not applicable.

**Exhibit Index**

| Exhibit | Description |
|---|---|
| 3.1 | Certificate of Incorporation[1] |
| 3.2 | Bylaws as amended[27] |
| 3.3 | Certificate of Amendment to Certificate of Incorporation[3] |
| 3.4 | Certificate of Amendment to Certificate of Incorporation[7] |
| 3.5 | Certificate of Designation for Redeemable Preferred Stock[8] |
| 3.6 | Certificate of Amendment to Certificate of Designation for Redeemable Preferred Stock[8] |
| 3.7 | Certificate of Designation for Series 2 Redeemable Preferred Stock[10] |
| 3.8 | Certificate Of Designations Of Series B Convertible Preferred Stock[18] |
| 4.1 | Amended and Restated Indenture with Bank of Utah, dated October 23, 2017[5] |
| 4.2 | Amended and Restated Pledge and Security Agreement by and among GWG Holdings, Inc., GWG Life, LLC, Jon R. Sabes, Steven F. Sabes, and Bank of Utah, dated October 23, 2017[5] |
| 4.3 | Form of Subscription Agreement for Redeemable Preferred Stock[11] |
| 4.4 | Form of Subscription Agreement for Series 2 Redeemable Preferred Stock[14] |
| 4.6 | Amendment No. 1 to Amended and Restated Indenture with Bank of Utah, dated March 27, 2018[23] |
| 4.7 | Supplemental Indenture dated as of August 10, 2018 To The Amended And Restated Indenture dated as of October 23, 2017, as amended[18] |
| 4.8 | Amendment No. 2 to Amended and Restated Indenture with Bank of Utah, dated December 31, 2019 [26] |
| 4.9 | Description of the Registrant's Securities Registered Pursuant to Section 12 of the Securities Exchange Act of 1934 (filed herewith) |
| 10.1 | Second Amended and Restated Loan and Security Agreement with GWG DLP Funding IV, LLC (as borrower), CLMG Corp. (as agent) and LNV Corporation (as lender), dated November 1, 2019[28] |
| 10.2* | Employment Agreement with William B. Acheson, dated June 30, 2017[9] |
| 10.3* | 2013 Stock Incentive Plan, as amended[16] |
| 10.4* | Form of Stock Option Agreement used with 2013 Stock Incentive Plan[13] |
| 10.5 | Master Exchange Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, MHT Financial SPV, LLC, a Delaware limited liability company, and various related trusts, as amended and restated on January 18, 2018 with effect from January 12, 2018[15] |
| 10.6 | First Amendment to Master Exchange Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, MHT Financial SPV, LLC, a Delaware limited liability company, and various related trusts, dated April 30, 2018[15] |
| 10.7 | Second Amendment to Master Exchange Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, MHT Financial SPV, LLC, a Delaware limited liability company, and various related trusts, dated June 29, 2018[17] |
| 10.8 | Third Amendment to Master Exchange Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, MHT Financial SPV, LLC, a Delaware limited liability company, and various related trusts, dated August 10, 2018[18] |

Page 93

| Exhibit | Description |
|---------|-------------|
| 10.9 | Commercial Loan Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, dated August 10, 2018[18] |
| 10.10 | Amendment No. 1 dated December 27, 2018 to Commercial Loan Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership[19] |
| 10.11 | Exchangeable Note from The Beneficient Company Group, L.P., a Delaware limited partnership, dated August 10, 2018[18] |
| 10.12 | Registration Rights Agreement with certain trusts related to The Beneficient Company Group, L.P., a Delaware limited partnership, and as set forth in the Agreement, dated August 10, 2018[18] |
| 10.13 | Registration Rights Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, dated August 10, 2018[18] |
| 10.14 | Registration Rights Agreement with each of the Exchange Trusts, dated December 27, 2018[19] |
| 10.15 | Participating Option Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, dated December 27, 2018[19] |
| 10.16 | Consent and Joinder to Amended and Restated Pledge and Security Agreement dated April 26, 2019[21] |
| 10.17* | Form of Indemnification Agreement with Directors and Officers[21] |
| 10.18* | Employment Agreement dated as of May 31, 2019 by and between GWG Holdings, Inc. and Murray T. Holland[24] |
| 10.19* | Performance Share Unit Agreement dated as of May 31, 2019 by and between GWG Holdings, Inc. and Murray T. Holland[24] |
| 10.20 | Promissory Note dated May 31, 2019 made by and on behalf of certain LiquidTrust Borrowers[25]† |
| 10.21 | Intercreditor Agreement dated May 31, 2019 between GWG Life and HCLP Nominees, L.L.C.[25] |
| 10.22 | Intercreditor Agreement dated May 31, 2019 between GWG Life and Beneficient Holdings, Inc.[25] |
| 10.23 | Forbearance Letter Agreement dated July 3, 2019 between GWG DLP Funding IV, LLC and CLMG Corp. (as agent)[27] |
| 10.24* | Form of Non-employee Director Restricted Stock Agreement[27] |
| 21 | List of Subsidiaries (filed herewith) |
| 23.1 | Consent of Whitley Penn (filed herewith) |
| 23.2 | Consent of Baker Tilly Virchow Krause, LLP (filed herewith) |
| 24.1 | Power of Attorney (incorporated by reference to the signature page of this Annual Report on Form 10-K) |
| 31.1 | Section 302 Certification of the Chief Executive Officer (filed herewith) |
| 31.2 | Section 302 Certification of the Chief Financial Officer (filed herewith) |

Page 94

| Exhibit | Description |
|---|---|
| 32.1 | Certification of Chief Executive Officer and Chief Financial Officer Pursuant to 18 U.S.C. §1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (filed herewith) |
| 99.1 | Letter from ClearLife Limited, dated February 24, 2020 (filed herewith) |
| 99.2 | Portfolio of Life Insurance Policies as of December 31, 2019 (filed herewith) |
| 99.3 | Purchase and Contribution Agreement dated as of April 15, 2018 by and among The Beneficient Company Group, L.P., Beneficient Company Holdings, L.P., AltiVerse Capital Markets, L.L.C., Sabes AV Holdings, LLC, Jon R. Sabes, Steven F. Sabes, Insurance Strategies Fund, LLC and SFS Holdings, LLC[20] |
| 99.4 | The Beneficient Company Group, L.P. and Subsidiaries Consolidated Financial Statements and Independent Auditor's Report (filed herewith) |
| 99.5 | Fourth Amended and Restated Limited Partnership Agreement of Beneficient Company Holdings, L.P., dated as of April 26, 2019[29] †. |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Schema Document |
| 101.CAL | XBRL Calculation Linkbase Document |
| 101.DEF | XBRL Definition Linkbase Document |
| 101.LAB | XBRL Label Linkbase Document |
| 101.PRE | XBRL Presentation Linkbase Document |

\*    Management contract or compensatory plan or arrangement.

(1)  Incorporated by reference to Form S-1 Registration Statement filed on June 14, 2011 (File No. 333-174887).

(2)  Intentionally omitted.

(3)  Incorporated by reference to Form S-1/A Registration Statement filed on August 23, 2011 (File No. 333-174887).

(4)  Intentionally omitted.

(5)  Incorporated by reference to Current Report on Form 8-K filed on October 26, 2017.

(6)  Intentionally omitted.

(7)  Incorporated by reference to Quarterly Report on Form 10-Q filed on August 8, 2014.

(8)  Incorporated by reference to Annual Report on Form 10-K filed on March 22, 2016.

(9)  Incorporated by reference to Current Report on Form 8-K filed on June 30, 2017.

(10) Incorporated by reference to Current Report on Form 8-K filed on February 22, 2017.

(11) Incorporated by reference to Form S-1/A Registration Statement filed on October 23, 2015 (File No. 333-206626).

(12) Intentionally omitted.

(13) Incorporated by reference to Form S-1/A Registration Statement filed on June 6, 2014 (File No. 333-195505).

(14) Incorporated by reference to Form S-1/A Registration Statement filed on February 7, 2017 (File No. 333-214896).

(15) Incorporated by reference to Quarterly Report on Form 10-Q filed on May 11, 2018.

(16) Incorporated by reference to Current Report on Form 8-K filed on May 9, 2018.

(17) Incorporated by reference to Quarterly Report on Form 10-Q filed on August 14, 2018.

(18) Incorporated by reference to Current Report on Form 8-K filed on August 14, 2018.

(19) Incorporated by reference to Current Report on Form 8-K filed on January 4, 2019.

(20) Incorporated by reference to Exhibit 10.1 to Amendment No. 1 to the Schedule 13D jointly filed on April 16, 2019 by Jon R. Sabes and Steven F. Sabes, among others.

(21) Incorporated by reference to Current Report on Form 8-K filed on April 30, 2019.

(22) Intentionally omitted.

(23) Incorporated by reference to Annual Report on Form 10-K filed on March 29, 2018.

(24) Incorporated by reference to Current Report on Form 8-K filed on June 6, 2019.

(25) Incorporated by reference to Current Report on Form 8-K filed on June 6, 2019.

(26) Incorporated by reference to Current Report on Form 8-K filed on January 7, 2020.

(27) Incorporated by reference to Annual Report on Form 10-K filed on July 9, 2019.

(28) Incorporated by reference to Current Report on Form 8-K filed on November 7, 2019.

(29) Incorporated by reference to Quarterly Report on Form 10-Q filed on September 3, 2019.

†    Certain information has been excluded from this exhibit because it both is not material and would likely cause competitive harm to the registrant if publicly disclosed.

**ITEM 16. FORM 10-K SUMMARY.**

Not applicable.

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities and Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**GWG HOLDINGS, INC.**

Date: March 27, 2020                                    By:    /s/ Murray T. Holland

                                                                *President and Chief Executive Officer*

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Murray T. Holland and Lennie Nicholson, jointly and severally, as his or her true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him or her, and in his or her name, place and stead, in any and all capacities, to sign any and all amendments to this report, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite or necessary to be done in and about the premises hereby ratifying and confirming all that said attorneys-in-fact and agents, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities and Exchange Act of 1934, this report has been signed below, as of March 27, 2020, by the following persons on behalf of the registrant and in the capacities indicated below.

| *Signature* | *Title* |
|---|---|
| /s/ Murray T. Holland<br>Murray T. Holland | President and Chief Executive Officer<br>(Principal Executive Officer) |
| /s/ Timothy L. Evans<br>Timothy L. Evans | Chief Financial Officer<br>(Principal Financial and Accounting Officer) |
| /s/ Brad K. Heppner<br>Brad K. Heppner | Director |
| /s/ Roy W. Bailey<br>Roy W. Bailey | Director |
| /s/ Peter T. Cangany, Jr.<br>Peter T. Cangany, Jr. | Director |
| /s/ David F. Chavenson<br>David F. Chavenson | Director |
| /s/ Thomas O. Hicks<br>Thomas O. Hicks | Director |
| /s/ Dennis P. Lockhart<br>Dennis P. Lockhart | Director |
| /s/ Bruce W. Schnitzer<br>Bruce W. Schnitzer | Director |
| /s/ Roger T. Staubach<br>Roger T. Staubach | Director |
| /s/ David H. de Weese<br>David H. de Weese | Director |

EX-99.4 11 f10k2019ex99-4_gwghold.htm THE BENEFICIENT COMPANY GROUP, L.P. AND SUBSIDIARIES

**Exhibit 99.4**

**THE BENEFICIENT COMPANY GROUP, L.P. AND SUBSIDIARIES**

**CONSOLIDATED FINANCIAL STATEMENTS AND**

**REPORT OF INDEPENDENT AUDITORS**

**As of December 31, 2019 (Second Successor) and December 31, 2018 and
for the year ended December 31, 2019, and for the
periods from June 1, 2018 to December 31, 2018 (Successor)
and January 1, 2018 to May 31, 2018 (Predecessor)**

**INDEX**

Report of Independent Auditors                                                                                                          2

Consolidated Statements of Financial Condition as of December 31, 2019 (Second Successor) and December 31, 2018
(Successor)                                                                                                                              3

Consolidated Statements of Comprehensive Income (Loss) for the year ended December 31, 2019 (Successor), the seven
months ended December 31, 2018 (Successor), and the five months ended May 31, 2018 (Predecessor)                                         4

Consolidated Statements of Changes in Equity (Deficit) for the year ended December 31, 2019 (Second Successor), the
seven months ended December 31, 2018 (Successor), and the five months ended May 31, 2018 (Predecessor)                                   5

Consolidated Statements of Cash Flows for the year ended December 31, 2019 (Successor), the seven months ended
December 31, 2018 (Successor), and the five months ended May 31, 2018 (Predecessor)                                                      6

Notes to Consolidated Financial Statements                                                                                              7

<div align="center">1</div>

**REPORT OF INDEPENDENT AUDITORS**

To the Board of Directors of
Beneficient Management, L.L.C.

We have audited the accompanying consolidated financial statements of The Beneficient Company Group, L.P. and Subsidiaries which comprise the consolidated statement of financial condition as of December 31, 2019 (Second Successor), and the related consolidated statements of comprehensive income (loss) (Successor), changes in equity (deficit) (Successor and Second Successor), and cash flows (Successor) for the year ended December 31, 2019, and the related notes to the consolidated financial statements.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on these consolidated financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of The Beneficient Company Group, L.P. and Subsidiaries as of December 31, 2019, and the results of their operations and their cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.

**Other Matter**

The consolidated financial statements of The Beneficient Company Group, L.P. and Subsidiaries as of December 31, 2018 (Successor), and for the seven months ended December 31, 2018 (Successor), and the five months ended May 31, 2018 (Predecessor), were audited by other auditors whose report dated June 14, 2019, expressed an unmodified opinion on those statements.

/s/ WHITLEY PENN LLP

Dallas, Texas
March 27, 2020

2

App. 0674

THE BENEFICIENT COMPANY GROUP, L.P.
CONSOLIDATED STATEMENTS OF FINANCIAL CONDITION

| (Dollars in thousands) | Second Successor As of December 31, 2019 | Successor As of December 31, 2018 |
|---|---:|---:|
| **ASSETS** | | |
| Cash and cash equivalents | $ 17,551 | $ 3,542 |
| Fees receivable | 29,168 | 23,778 |
| Investments in senior beneficial interests | — | 497,729 |
| Loan receivables | 232,344 | — |
| Due from unconsolidated affiliates and trusts | — | 13,783 |
| Other assets | 14,053 | 8,527 |
| Investment in public equity securities | 24,550 | — |
| Intangible assets, net | 3,449 | 4,825 |
| Goodwill | 2,358,005 | 1,530,961 |
| **Total assets** | $ 2,679,120 | $ 2,083,145 |
| | | |
| **LIABILITIES** | | |
| Accounts payable and accrued expenses | $ 13,713 | $ 24,215 |
| Due to unconsolidated affiliates and trusts | — | 291 |
| Other liabilities | 64,422 | 90,801 |
| Deferred revenue | 41,444 | 48,275 |
| Repurchase options | — | 149,155 |
| Other borrowings | 153,086 | 131,174 |
| Debt due to related parties | — | 72,039 |
| Commercial loan agreement from parent, net (a) | 168,420 | 174,911 |
| **Total liabilities** | 441,085 | 690,861 |
| | | |
| Redeemable noncontrolling interests | 1,588,604 | 1,013,694 |
| | | |
| **EQUITY** | | |
| Partners' capital: | | |
| Common units | 563,966 | 420,172 |
| Noncontrolling interests | 85,465 | 58,130 |
| Trusts deficit | — | (99,712) |
| **Total equity** | 649,431 | 378,590 |
| **Total liabilities and equity** | $ 2,679,120 | $ 2,083,145 |

(a) This line item was reported as commercial loan agreement from affiliate in the prior year. See Note 7 for more information.

See accompanying notes to consolidated financial statements.

3

App. 0675

THE BENEFICIENT COMPANY GROUP, L.P.
CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS)

| | Successor | | Predecessor |
|---|---|---|---|
| | **Year ended December 31, 2019** | **Seven Months Ended December 31, 2018** | **Five Months Ended May 31, 2018** |
| *(Dollars in thousands)* | | | |
| **Revenues:** | | | |
| Investment income | $ 38,409 | $ 35,576 | $ 17,818 |
| Loss on investment in public equity security | (450) | — | — |
| Interest income | 255 | — | — |
| Third-party administration revenues | 30 | 19 | 13 |
| Trust services revenues | 22,047 | 14,457 | 11,583 |
| **Total revenues** | 60,291 | 50,052 | 29,414 |
| | | | |
| **Operating expenses** | | | |
| Salaries and employee benefits | 17,438 | 8,087 | 3,839 |
| Professional services | 20,709 | 8,135 | 10,015 |
| Interest expense | 30,258 | 17,751 | 3,626 |
| Transaction expenses | 2,112 | 49,194 | 136,445 |
| Share-based compensation | 148,716 | — | — |
| Trust establishment costs | — | — | 3,665 |
| Other expenses | 8,207 | 3,316 | 968 |
| **Total operating expenses** | 227,440 | 86,483 | 158,558 |
| **Loss before income taxes** | (167,149) | (36,431) | (129,144) |
| Income tax expense (benefit) | 179 | (2,196) | (1,443) |
| **Net loss** | **(167,328)** | **(34,235)** | **(127,701)** |
| Less: Net loss attributable to noncontrolling interests | 83,287 | 29,220 | 132,521 |
| Less: Noncash deemed dividend to redeemable noncontrolling interest | (250,000) | — | — |
| **Net income (loss) attributable to The Beneficient Company Group, L.P. common unitholders** | $ (334,041) | $ 24,205 | $ 4,820 |
| | | | |
| Other comprehensive income (loss): | | | |
| Unrealized gain on investments | — | — | 1,239 |
| **Total comprehensive income (loss)** | $ (334,041) | $ 24,205 | $ 4,821 |

See accompanying notes to consolidated financial statements.

4

THE BENEFICIENT COMPANY GROUP, L.P.
CONSOLIDATED STATEMENTS OF CHANGES IN EQUITY (DEFICIT)

| (Dollars and units in thousands) | Common units | Common units ($) | Other comprehensive income (loss) | Noncontrolling interest (Trusts) | Noncontrolling interest (Class S Ordinary) | Noncontrolling interest (Class S Preferred) | Trusts deficit | Total equity (deficit) | Redeemable noncontrolling interests (Preferred Series A Subclass 1 Accounts) |
|---|---|---|---|---|---|---|---|---|---|
| **Balance, January 1, 2018 (Predecessor)** | 50,240 | $ 389,625 | $ 255 | $ — | $ 744 | $ — | $(26,911) | $ 363,713 | $ (139,717) |
| Net income (loss) | — | 4,820 | — | (84,405) | 2,253 | — | — | (77,332) | (50,369) |
| Other comprehensive gain | — | — | 1 | — | — | — | — | 1 | — |
| Trust origination activity | — | — | — | 13,457 | — | — | — | 13,457 | — |
| Noncash issuance of Common Units | 30,476 | 178,162 | — | — | — | — | — | 178,162 | — |
| Noncash issuance of Class S Units | — | — | — | — | 4,936 | — | — | 4,936 | — |
| Noncash issuance of Preferred Series A Subclass 1 Unit Accounts | — | — | — | — | — | — | — | — | 57,443 |
| Transfer of noncontrolling interest (trusts) to trusts' deficit | — | — | — | 70,948 | — | — | (70,948) | — | — |
| **Balance, May 31, 2018 (Predecessor)** | 80,716 | $ 572,607 | $ 256 | $ — | $ 7,933 | $ — | $(97,859) | $ 482,937 | $ (132,643) |
| Fair value adjustment (Note 8) | — | 234,555 | (256) | — | 131,803 | — | — | 366,101 | 1,163,078 |
| **Balance, June 1, 2018 (Successor)** | 80,716 | $ 807,162 | $ — | $ — | $ 139,736 | $ — | $(97,859) | $ 849,038 | $ 1,030,435 |
| Cash redemption of Common Units | (12,487) | (124,869) | — | — | — | — | — | (124,869) | — |
| Noncash redemption of Common Units | (38,020) | (380,203) | — | — | — | — | — | (380,203) | — |
| Net income (loss) | — | (5,015) | — | (1,853) | 2,174 | — | — | (4,694) | (29,541) |
| Transfer of noncontrolling interest (trusts) to trusts' deficit | — | — | — | 1,853 | — | — | (1,853) | — | — |
| Noncash issuance of Class S Units | — | — | — | — | 1,020 | — | — | 1,020 | — |
| Common Units reclassified to liability due to redemption obligation (Note 13) | — | (25,131) | — | — | — | — | — | (25,131) | — |
| Redemption of Preferred Stock Series A Subclass 1 Units for related party debt | — | — | — | — | — | — | — | — | (72,000) |
| Conversion of Class S Units to Preferred Stock Series A Subclass 1 Units | — | — | — | — | (84,800) | — | — | (84,800) | 84,800 |
| Conversion of Exchangeable Note to Common Units | 14,823 | 148,228 | — | — | — | — | — | 148,228 | — |
| **Balance, December 31, 2018 (Successor)** | 45,032 | $ 420,172 | $ — | $ — | $ 58,130 | $ — | $(99,712) | $ 378,590 | $ 1,013,694 |
| Net income (loss) | — | (84,041) | — | 51,675 | (10,469) | 46 | — | (42,789) | (124,539) |
| Recognition of share-based compensation cost | — | 148,716 | — | — | — | — | — | 148,716 | — |
| Trust origination activity | — | — | — | 1,876 | — | — | — | 1,876 | — |
| Recovery of noncontrolling interest (trusts) from trust deficit | — | — | — | (53,551) | — | — | 53,551 | — | — |
| Settlement of liability for Common Units | 1,100 | 11,605 | — | — | — | — | — | 11,605 | — |
| Redemption of Common Units | (2,652) | (1,322) | — | — | — | — | — | (1,322) | — |
| Noncash issuance of Class S Units | — | — | — | — | 1,250 | — | — | 1,250 | — |
| Issuance of Common Units | 667 | 10,000 | — | — | — | — | — | 10,000 | — |
| Issuance of Preferred Stock Series A Subclass 1 Units | — | — | — | — | — | — | — | — | 69,030 |
| **Balance, December 31, 2019 (Successor)** | 44,147 | $ 505,130 | $ — | $ — | $ 48,911 | $ 46 | $(46,161) | $ 507,926 | $ 958,185 |
| Fair value adjustment (Note 8) | — | 308,836 | — | — | 36,537 | (29) | 46,161 | 391,505 | 380,419 |
| Noncash deemed dividend to Preferred Stock Series A Subclass 1 Unit holder | — | (250,000) | — | — | — | — | — | (250,000) | 250,000 |
| **Balance, December 31, 2019 (Second Successor)** | $ 44,147 | $ 563,966 | $ — | $ — | $ 85,448 | $ 17 | $ — | $ 649,431 | $ 1,588,604 |

See accompanying notes to consolidated financial statements.

5

THE BENEFICIENT COMPANY GROUP, L.P.
CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Successor | | Predecessor |
|---|---|---|---|
| (Dollars in thousands) | Year ended December 31, 2019 | Seven Months Ended December 31, 2018 | Five Months Ended May 31, 2018 |
| **Cash flows from operating activities:** | | | |
| Net loss | $ (167,328) | $ (34,235) | $ (127,701) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | | |
| Depreciation and amortization | 465 | 267 | 48 |
| Amortization of upfront fees | (7,112) | (4,160) | (2,972) |
| Loss in investment in public equity security | 450 | — | — |
| Investment income | (38,664) | (35,576) | (17,818) |
| Noncash interest expense | 18,395 | 15,319 | 3,169 |
| Noncash transaction expenses | 2,112 | 39,481 | 127,117 |
| Noncash share-based compensation expense | 148,716 | — | — |
| Other | (488) | 673 | 4,121 |
| Changes in assets and liabilities: | | | |
| Changes in fees receivable | (5,084) | 13,121 | 25,490 |
| Changes in due from unconsolidated affiliates and trusts. | — | (245) | (167) |
| Changes in other assets | (1,574) | (149) | (508) |
| Changes in accounts payable and accrued expenses | 2,594 | 9,119 | 5,571 |
| Changes in other liabilities and deferred revenue | (3,670) | (28,396) | 27,496 |
| Change in due to unconsolidated affiliates and trusts | — | (3) | (1,248) |
| Net cash provided by (used in) operating activities | (51,188) | (24,784) | 42,598 |
| **Cash flows from investing activities:** | | | |
| Proceeds from sale of senior beneficial interests | 60,942 | — | — |
| Originations of senior beneficial interests | (1,917) | — | — |
| Contributions to investments in senior beneficial interests | — | (2,829) | — |
| Distributions received from investments in senior beneficial interests | 39,393 | 198,219 | — |
| Purchase of fixed assets | (2,981) | (268) | (106) |
| Investment in public equity security | (25,000) | — | — |
| Purchase of preferred stock | — | (50,000) | — |
| Loans to third parties | — | — | (3,480) |
| Net cash provided by (used in) investing activities | 70,437 | 145,122 | (3,586) |
| **Cash flows from financing activities:** | | | |
| Issuance of Common Units | 10,000 | — | — |
| Issuance of Preferred Stock Series A Subclass 1 Unit Accounts | 69,030 | — | — |
| Prepayment and extension fees | (960) | — | — |
| Payments to repurchase Common Units | (26,454) | (124,869) | — |
| Proceeds from other borrowings and debt due from related parties | — | 10,000 | — |
| Payments on other borrowings and related parties | (56,856) | (9,740) | (31,754) |
| Net cash used in financing activities | (5,240) | (124,609) | (31,754) |
| Net increase (decrease) in cash and cash equivalents | 14,009 | (4,271) | 7,258 |
| Cash and cash equivalents at beginning of period | 3,542 | 7,813 | 555 |
| Cash and cash equivalents at end of period | $ 17,551 | $ 3,542 | $ 7,813 |

See accompanying notes to consolidated financial statements.

6

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**1.      Overview of the Business**

The Beneficient Company Group, L.P. ("Ben," "our," "the Company," or "we"), a Delaware limited partnership, is a holding company of capital and financial services companies (collectively the "Company"). On September 25, 2018, Ben's capital companies applied for trust charters from the Texas Department of Banking to merge into to-be organized limited trust associations. Beneficient Management, L.L.C. ("BMLLC"), a Delaware limited liability company, is the general partner of Ben. BMLLC is governed by a board of directors. On March 6, 2020, Ben submitted updated trust charter applications to the Texas Department of Banking. Ben is controlled by, and the exclusive and complete authority to manage the operations and affairs of Ben is granted to BMLLC's board of directors. Ben, formerly known as Highland Consolidated Business Holdings, L.P., was formed on September 16, 2003. Ben is the general partner to Beneficient Company Holdings, L.P. ("BCH") and owns 100% of the Class A Subclass A-1 and A-2 Units of BCH.

BCH, formerly known as Beneficient Holdings, L.P., is a Delaware limited partnership formed on July 1, 2010. BCH is the holding company that directly or indirectly receives all active and passive income of the Company and allocates that income among the units issued by BCH. As of December 31, 2019, BCH has issued general partnership Class A Units (Subclass A-1 and A-2), Class S Ordinary Units, Class S Preferred Units, FLP Units (Subclass 1 and Subclass 2), Preferred Series A Subclass 1 Unit Accounts (formerly Non-Participating Convertible ("NPC") Series A Subclass Units), and Preferred Series A Subclass 2 Units (formerly NPC Series A Subclass 2 Units). BCH issued to Ben Preferred Series A Subclass 2 Units as part of the transaction with GWG Holdings, Inc. discussed in Note 4. Preferred Series A Subclass 2 Units hold the same rights and privileges as the Preferred Series A Subclass 1 Unit Accounts.

Ben markets to alternative asset investors an array of loan and liquidity products for mid-to-high net worth individuals having a net worth between $5 million and $30 million ("MHNW") and small-to-midsize institutional investors and family offices with less than $1 billion in investable assets ("STMIs"), and in addition to these product offerings, Ben offers a variety of services to its clients, including servicing of alternative assets and fund and trust administration (collectively, "Ben's Current Products and Services"). In the future, Ben plans to market retirement fund products, custody and clearing of alternative assets, and trustee and insurance services for covering risks attendant to owning or managing alternative assets as well as online portals for the trading of alternative assets (collectively, "Ben's Future Products and Services" and together with Ben's Current Products and Services, "Ben's Current and Future Products and Services"). Ben plans to offer these products and services through Ben's U.S.-based subsidiaries, including trust companies which Ben is in the process of applying to charter in Texas, and (subject to capitalization) through its Bermuda-regulated insurance companies, including Pen Indemnity Insurance Company, LTD and its subsidiaries (collectively, "Pen"). The two anticipated trust companies will exist to provide loan and liquidity products to clients, to serve as custodian and trustee to certain trusts required for loan and liquidity product transactions, and to provide trustee services to Ben's clients.

Ben operates primarily through its subsidiaries, which provide, or will provide, Ben's Current and Future Products and Services. These subsidiaries include (i) Beneficient Capital Company, L.L.C. ("BCC"), which offers loan and liquidity products; (ii) Beneficient Administrative and Clearing Company, L.L.C. ("BACC"), which provides services for fund and trust administration and plans to administer retirement funds; (iii) Pen, which will offer insurance services; and (iv) Ben Markets Management Holdings, L.P. formerly called ACE Portal, L.L.C. ("ACE Portal"), acquired in 2018, which intends to offer an online portal platform with related financial technologies; and (v) other non-operating entities.

Ben's primary operations, which commenced on September 1, 2017 with a transaction that established our first Exchange Trusts, pertain to its loan and liquidity products whereby Ben, through its subsidiaries, extends loans collateralized by cash flows from illiquid alternative assets and provides services to the trustees who administer the collateral. Ben's core business products are its ExchangeTrust, LiquidTrust, and the InterchangeTrust (subsequently introduced in 2020). Ben's clients select one of these products and place their alternative asset into the custody trust that is a constituent member of a trust structure called the ExAlt Plan$^{TM}$ (comprised of the Exchange Trusts, LiquidTrusts, Custody Trusts, Collective Trusts, and Funding Trusts) ("ExAlt Plan$^{TM}$"). The ExAlt Plan$^{TM}$ then delivers to Ben's clients the consideration required by the specific product selected by Ben's clients. At the same time, Ben, through a subsidiary, extends a loan to the ExAlt Plan$^{TM}$. The proceeds (cash or Common Units in Ben) of that loan to the ExAlt Plan$^{TM}$ are ultimately paid to the client. The cash flows from the client's alternative asset support the repayment of the loans plus any related interest and related fees.

Prior to the commencement of commercial operations on September 1, 2017, as discussed in Note 3, Ben's operations were primarily related to the establishment and capitalization of the business, development of Ben's Current and Future Products and Services and discontinued operations deemed unrelated to the Company's future business operations.

7

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Liquidity*

As of December 31, 2019, we had cash and cash equivalents of approximately $17.6 million. We generated net losses for the year ended December 31, 2019, the seven months ended December 31, 2018, and the five months ended May 31, 2018 totaling $167.3 million, $34.2 million, and $127.7 million, respectively. Each of these periods included substantial non-recurring and non-cash expenses involving share-based compensation costs and transactions expenses related to our initial capitalization and organizational transactions. Our net income (loss) excluding these non-recurring and non-cash items totaled $(16.5) million, $15.0 million, and $8.7 million for the year ended December 31, 2019, the seven months ended December 31, 2018, and the five months ended May 31, 2018, respectively. As of February 29, 2020, we had cash and cash equivalents of $18.1 million. Besides funding operating expenditures and having sufficient cash to fund our lending products, we are obligated to repay certain of our outstanding borrowings by June 30, 2020 totaling $149.7 million. We expect to satisfy these obligations and fund our operations through anticipated operating cash flows, proceeds from payments on outstanding loans receivable, additional investments into Ben by GWG Holdings and/or other parties, and, potentially, refinancing with other third-party lenders some or all of the existing borrowings due on June 30, 2020 prior to their maturity. As discussed in Note 7, Ben became a consolidated subsidiary for financial reporting purpose of GWG Holdings on December 31, 2019.

As a result of the current COVID-19 crisis discussed in Note 25, Ben may not be able to refinance or obtain additional financing on terms favorable to the Company, or at all. To the extent that Ben or its subsidiaries raise additional capital through the future sale of equity or debt, the ownership interest of our existing equity holders may be diluted. The terms of these future equity or debt securities may include liquidation or other preferences that adversely affect the rights of our existing equity unitholders or involve negative covenants that restrict Ben's ability to take specific actions, such as incurring additional debt or making additional investments in growing the operations of the Company. If Ben is unable to refinance the borrowings due on June 30, 2020, or defaults on these borrowings, then the Company will be required to either i) sell assets to repay these loans or ii) to raise additional capital through the sale of equity and the ownership interest of our equity holders may be diluted.

Based on projections of growth in revenue and net income in the coming quarters, the expected additional investments into Ben by GWG Holdings and/or other parties, and, potentially, refinancing certain existing borrowings with other third-party lenders, we believe that we will have sufficient cash resources to finance our operations, satisfy other obligations, and to fund expected lending transactions through March 31, 2021.

2.      **Summary of Significant Accounting Policies**

*Basis of Presentation and Principles of Consolidation*

The consolidated financial statements of Ben include the accounts of Ben, its wholly-owned and majority-owned subsidiaries and, for specific periods presented herein as described below, certain variable interest entities, or VIEs, in which the Company is the primary beneficiary. Prior to December 31, 2019, certain trusts included in the ExAlt Plan[TM] are considered VIEs for which Ben has a variable interest and is considered the primary beneficiary. Thus, Ben was required to consolidate certain of the trusts within the ExAlt Plan[TM]. The trusts included in the ExAlt Plan[TM] that were consolidated VIEs prior to December 31, 2019 are comprised of the Funding Trusts and Collective Trusts. Due to changes executed to the underlying agreements of certain trusts included in the ExAlt Plan[TM] along with the Company and the Funding Trusts entering into new loan agreements as of December 31, 2019, Ben no longer has the power to direct the activities that most significantly impact the economic performance for any of these trusts and thus is no longer required to consolidate any of the trusts included in the ExAlt Plan[TM] as of December 31, 2019.

All intercompany accounts and transactions have been eliminated in consolidation, and the portion of income allocated to owners other than the Company is included in "net income (loss) attributable to noncontrolling interests" in the consolidated statements of comprehensive income (loss).

8

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Reclassifications of amounts in prior year's consolidated financial statements are made whenever necessary to conform to the current year's presentation.

As discussed in Note 8, Ben applied push-down accounting due to change-of-control events occurring as of June 1, 2018 and again on December 31, 2019, resulting in a new basis of accounting as of each date. Accordingly, the consolidated statements of comprehensive income (loss), changes in equity (deficit), and cash flows for the period January 1, 2018 to May 31, 2018 are under one basis of accounting (referred to herein as "Predecessor"). The consolidated statement of financial condition as of December 31, 2018, and the consolidated statements of comprehensive income (loss), changes in equity (deficit), and cash flows for the period June 1, 2018 to December 31, 2018 and the year ended December 31, 2019, are under a new basis of accounting resulting from the June 1, 2018 change-of-control (referred to herein as "Successor"). The consolidated statement of financial condition as of December 31, 2019 is under another new basis of accounting due to the change-of-control event that occurred on December 31, 2019 (referred to herein as "Second Successor").

*Statement of Financial Condition Presentation*

As of December 31, 2019, the Company's consolidated statement of financial condition includes the Company's direct assets and liabilities. As of December 31, 2018, the Company's consolidated statement of financial condition includes both the Company's direct assets and liabilities and the assets and liabilities of certain of the trusts included in the ExAlt Plan$^{TM}$. Assets of each consolidated VIE can only be used to satisfy the obligations of that VIE, and the liabilities of consolidated VIEs are non-recourse to the Company. The Company was not obligated to provide, nor did it provide, any financial support to the consolidated trusts in the ExAlt Plan$^{TM}$, other than the payment of certain administrative fees that are reimbursable and certain capital commitments related to the alternative asset contributed by the client into ExAlt Plan$^{TM}$ as discussed in Note 22. Any creditor of the consolidated trusts in the ExAlt Plan$^{TM}$ had and has no recourse to the general credit of Ben. The notes to the consolidated financial statements describe the Company's assets and liabilities including, for the period(s) applicable, the assets and liabilities of the trusts in the ExAlt Plan$^{TM}$ that, prior to December 31, 2019, were consolidated trusts for financial reporting purposes. See Note 21 for additional information related to certain trusts in the ExAlt Plan$^{TM}$ that, prior to December 31, 2019, were required to be consolidated.

*Use of Estimates*

Our consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States ("U.S. GAAP"). This preparation requires management to make certain estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. These estimates and assumptions are based on information available as of the date of the consolidated financial statements and could differ from actual results. Material estimates that are particularly susceptible to change, in the near term, relate to the determination for assets, liabilities, and equity required to be fair valued under business combinations accounting guidance, determining grant date fair value for stock-based compensation awards, allowance for loan losses and evaluation of potential impairment of goodwill and other intangibles.

9

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Cash and Cash Equivalents*

Cash and cash equivalents represent cash held in banks or money market funds with original maturities of three months or less. Interest income from cash and cash equivalents is recorded in interest and fee income in the consolidated statements of comprehensive income (loss).

*Fees Receivable*

Fees receivable represent balances arising from services provided to trustees and are recorded on an accrual basis. Fees receivable are written off when they are determined to be uncollectible. Any allowance for doubtful accounts is estimated based on our estimate of the ability of the collateral to satisfy the amounts due. Most of the fees receivable consist of unpaid upfront fees and trust service fees that will be paid from the cash flows from the client's alternative asset based on an allocation of those cash flows as prescribed in the associated trust agreement. Upfront fees and trust service fees are required to be paid first from the cash flows from the client's alternative asset and thus, we believe that the amounts are fully collectible. Accordingly, our consolidated financial statements do not include an allowance for bad debt nor any bad debt expense.

*Investments in Senior Beneficial Interests*

Through the date of the deconsolidation on December 31, 2019, the Company held investments in senior beneficial interests representing interests in the LiquidTrusts established by our clients at the outset of a liquidity transaction. The investments in senior beneficial interests were accounted for as equity securities under Accounting Standards Codification ("ASC") Topic 321, *Investments – Equity Securities*. ASC Topic 321 requires all equity securities within its scope to be measured at fair value in the consolidated statements of financial condition with changes in fair value recognized in net income (loss) in the consolidated statements of comprehensive income (loss). Due to the deconsolidation of certain of the trusts included with the ExAlt Plan$^{TM}$ on December 31, 2019, Ben's consolidated statement of financial condition as of December 31, 2019 no longer includes investments in senior beneficial interests held by the Collective Trusts.

*Loans Receivable*

Loans receivable are carried at the principal amount outstanding, plus interest paid-in-kind. The loans do not have scheduled principal or interest payments due prior to their maturity date, which is generally 12 years from the date of origination. Prepayment of the loans, in whole or in part, is permitted without premium or penalty. Loans bear contractual interest at the greater of 14% or 1-month LIBOR plus 10% compounded daily. The primary source of repayment for the loans and related fees is cash flows from the alternative assets collateralizing the loans. Interest income on loans is accrued on the principal amount outstanding.

*Allowances for Loan Losses*

The allowance for loan losses is a valuation allowance for probable incurred credit losses in the portfolio. Management's determination of the allowance is based upon an evaluation of the loan portfolio, impaired loans, economic conditions, volume, growth and composition of the collateral to the loan portfolio, and other risks inherent in the portfolio. Management applies risk factors to categories of loans and individually reviews all impaired loans above a de minimis threshold. Management relies heavily on statistical analysis, current net asset value ("NAV") and distribution performance of the underlying alternative asset collateral and industry trends related to alternative asset investments to estimate losses. Management evaluates the adequacy of the allowance by reviewing relevant internal and external factors that affect credit quality. As the collateral is the sole source of repayment of the loans and related interest, these loans are considered to be collateral dependent. Ben recognizes the charge-off in the period in which it arises for its collateral dependent loans. Therefore, impaired collateral dependent loans are written down to their estimated net realizable value based on disposition value.

*Investment in Public Equity Security*

App. 0683

Investment in public equity securities represents our interest in GWG Holdings, and is carried at fair value. Fair value is determined using quoted market prices. Any realized gains and losses are recorded on a trade-date basis. Realized and unrealized gains and losses are recognized in gain (loss) on investment in public equity security in the consolidated statements of comprehensive income (loss). As of December 31, 2019, the fair value of investments in public equity securities was $24.6 million and the related unrealized loss recognized in the consolidated statement of comprehensive income (loss) for the year ended December 31, 2019 was $(0.5) million. Ben did not hold any investments in public equity securities prior to 2019. The investment in public equity securities has been in an unrealized loss position for less than 12 months.

10

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Other Assets*

Other assets consist of promissory notes receivables, deferred tax assets, fixed assets, prepaids, operating lease right-of-use assets, and other receivables.

There are amounts due under two promissory note agreements with third parties for funds advanced outside of our normal liquidity arrangements with a principal balance of $2.5 million and $0.9 million, respectively. The notes currently bear interest at 9.0% per annum for the $2.5 million note agreement and 2.5% per annum for the $0.9 million note agreement. The promissory note agreements mature in April 2020 for the $2.5 million note agreement and April 2023 for the $0.9 million note agreement and may be prepaid at any time without penalty. Mandatory prepayments are required if certain conditions are met.

The Company leases certain real estate for its office premises, under non-cancelable operating leases that expire during 2021. The right-of-use asset, which was established upon the adoption of ASU 2016-02 *Leases* (Topic 842), on January 1, 2019, represents the Company's right to use an underlying asset for the lease term. Related lease liabilities represent the Company's obligation to make lease payments arising from the lease. Right-of-use assets and lease liabilities are recognized at the lease commencement date based on the estimated present value of lease payments over the lease term, using the rate the Company would pay to borrow amounts equal to the lease payments over the lease term (the Company's incremental borrowing rate). Lease expense is recognized on a straight-line basis over the lease term in other expenses in the consolidated statements of comprehensive income (loss). Common area maintenance and other related costs are considered variable lease payments and are expensed as incurred. The Company has made an accounting policy election not to recognize short-term lease assets and liabilities (less than a 12-month term) or immaterial equipment leases in its balance sheets. The Company recognizes the lease expense for these leases on a straight-line basis over the life of the lease

Fixed assets, including leasehold improvements, are stated at cost, less accumulated depreciation and amortization. Expenditures related to leasehold improvements; furniture and fixtures; computer hardware and software; and most office equipment purchases are capitalized. Depreciation is computed using the straight-line method over the estimated useful lives of the assets (from 3 to 5 years). For leasehold improvements, amortization is computed based on the shorter of the useful life or the lease term. Software in process is composed of costs related to internally developed software projects in the application development phase. Gains or losses on disposition of fixed assets are reflected in net income (loss). Normal costs of maintenance and repairs are treated as current expenses in the consolidated statements of comprehensive income (loss).

The Company capitalizes certain costs related to the development of internal-use software. Costs incurred during the application development phase are capitalized. The types of costs capitalized during the application development phase primarily include consulting fees for third-party developers working on these projects. Costs related to the preliminary project stage and post-implementation activities are expensed as incurred. Internal-use software is amortized on a straight-line basis over the estimated useful life of the asset, which ranges from 1 to 3 years.

*Goodwill and Other Intangibles*

The Company accounts for goodwill and intangible assets in accordance with ASC Topic 350, *Intangibles – Goodwill and Other*. The amount of goodwill initially recorded is based on the fair value of the acquired entity at the time of acquisition. Management performs goodwill and intangible asset impairment testing annually, during the fourth quarter, or when events occur, or circumstances change that would more likely than not indicate impairment has occurred. Goodwill impairment exists when the carrying value of goodwill exceeds its implied fair value.

Intangible assets are recorded at fair value at the time of acquisition. Intangible assets include technology related intangibles, insurance licensing, and a non-compete agreement. Finite-lived intangibles are stated at cost less accumulated amortization. Amortization is recorded using the straight-line method, which approximates the expected pattern of economic benefit over the estimated lives of the assets.

The technology-related intangibles are projected to be amortized over the estimated useful lives of the assets of ten years and are assessed for impairment when indicators of impairment are present as outlined in the subsequent paragraph. The insurance license intangible has an indefinite life and is assessed for impairment annually. The non-compete agreement is amortized over its estimated useful life of four years and is assessed for impairment when indicators of impairment are present.

App. 0685

The Company reviews the carrying value of its finite-lived intangible assets whenever events or changes in circumstances indicate that the carrying amount of the asset group may not be recoverable. Factors that would require an impairment assessment include, among other things, a significant change in the extent or manner in which an asset is used, a continual decline in the Company's operating performance, or as a result of fundamental changes in a subsidiary's business condition.

11

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Repurchase Options*

The Company determined that a provision of each existing ExchangeTrust agreement whereby the holder of the beneficial interest can repurchase the senior beneficial interest in a LiquidTrust held by a Collective Trust at any time up to 3 years from the initial transaction date represents an equity contract liability that we have elected to account for utilizing the fair value option in accordance with accounting standards applicable to financial instruments. The repurchase options were provided to each ExchangeTrust for no consideration. As of the date of establishment of each LiquidTrust, the Company measured the fair value of the repurchase option and recorded the amount of repurchase options in the consolidated statements of financial condition with the recognition of transaction expense of a corresponding amount. As of December 31, 2018, the repurchase options are recorded at fair value with changes in fair value recorded in net loss in the consolidated statements of comprehensive income (loss). Adjustments to the fair value of the repurchase options are recognized within investment income in the consolidated statements of comprehensive income (loss). With the deconsolidation, as of December 31, 2019, of certain trusts included within the ExAlt Plan$^{TM}$, which includes the Collective Trusts, Ben's consolidated statement of financial condition no longer includes the repurchase options issued by the Collective Trusts as of December 31, 2019.

The primary reasons that management elected to record the repurchase options at fair value included reflecting the economic events in earnings on a timely basis and mitigating volatility in earnings from using different measurement attributes. Refer to Note 19 for additional information.

*Due from and Due to Unconsolidated Affiliates and Trusts*

Due from and due to unconsolidated affiliates and trusts include transactions with Related Entities, a Legacy Lender and certain non-consolidated trusts included within the ExAlt Plan$^{TM}$ that are not required to be included in the consolidated financial statements of Ben. Ben considers as affiliates certain trusts and those entities held by such trusts which are controlled by our founder and in which our founder and his family members are also among classes of economic beneficiaries whether or not our founder is entitled to economic distributions from such trusts ("Related Entities"). Ben does not consider as affiliates those entities held in trusts of which our founder is a member of a class of beneficiaries yet does not have an entitlement to economic distributions where such trusts may have previously been under the control of our founder but have subsequently come under the control of a third party who is independent and unrelated to our founder ("Legacy Lenders").

Amounts pertaining to non-consolidated trusts within the ExAlt Plan$^{TM}$ principally relate to cash due from LiquidTrusts representing balances owed to the various Collective Trusts, as holders of the senior beneficial interests of the LiquidTrusts, originating from cash distributions from the alternative assets held by the LiquidTrusts. The amounts owed to the senior beneficial interest holder are determined by the waterfall distribution provisions of the LiquidTrust agreements. As of December 31, 2018, cash due from LiquidTrusts to the Collective Trusts totaled $12.6 million. Ben is no longer required, as of December 31, 2019, to consolidate any of the trusts included within the ExAlt Plan$^{TM}$. There were no amounts due to Ben or its consolidated subsidiaries from any of the trusts included within the ExAlt Plan$^{TM}$ as of December 31, 2019.

*Other Liabilities*

Other liabilities consist principally of a liability related to an option agreement issued in connection with the transaction described in Note 4, a liability related to the purchase of common stock of GWG Holdings, Inc. described in Note 5, lease liabilities, and a liability related to an obligation to redeem Ben Common Units issued to certain counterparties in the transaction described in Note 3. Refer to Note 13 for more information on these other liabilities.

*Business Combinations*

The Company includes the results of operations of the businesses that it acquires from the acquisition date. In allocating the purchase price of a business combination, the Company records all assets acquired and liabilities assumed at fair value as of the date of acquisition, with the excess of the purchase price over the aggregate fair values recorded as goodwill. The Company determines the estimated fair values after review and consideration of relevant information, including discounted cash flows, quoted market prices and estimates made by management. The fair value assigned to identifiable intangible assets acquired is based on estimates and assumptions made by management at the time of the acquisition. The Company adjusts the

preliminary purchase price allocation, as necessary, during the measurement period of up to one year after the acquisition closing date as it obtains more information as to facts and circumstances existing as of the acquisition date. Acquisition-related costs are recognized separately from the business combination and are expensed as incurred.

12

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Income Taxes*

The Company and most of its subsidiaries operate in the U.S. as partnerships for U.S. federal income tax purposes. Certain of our entities are corporations for tax purposes. In addition, certain of the wholly-owned subsidiaries of the Company will be subject to federal, state, and local corporate income taxes at the entity level and the related tax provision attributable to the Company's share of this income tax is reflected in the consolidated financial statements.

Income taxes are accounted for using the asset and liability method of accounting. Under this method, deferred tax assets and liabilities are recognized for the expected future tax consequences of differences between the carrying amounts of assets and liabilities and their respective tax basis, using tax rates in effect for the year in which the differences are expected to reverse. The effect on deferred assets and liabilities of a change in tax rates is recognized in income in the period when the change is enacted. Deferred tax assets are reduced by a valuation allowance when it is more likely than not that some portion or all of the deferred tax assets will not be realized. Current and deferred tax liabilities, if any, are recorded within accounts payable and accrued expenses and other liabilities in the consolidated statements of financial condition.

The Company analyzes its tax filing positions in all of the U.S. federal, state, local and foreign tax jurisdictions where it is required to file income tax returns, as well as for all open tax years in these jurisdictions. The Company records uncertain tax positions on the basis of a two-step process: (a) determination is made whether it is more likely than not that the tax positions will be sustained based on the technical merits of the position and (b) those tax positions that meet the more likely than not threshold are recognized as the largest amount of tax benefit that is greater than 50 percent likely to be realized upon ultimate settlement with the related tax authority. The Company recognizes accrued interest and penalties related to uncertain tax positions in other expenses within the consolidated statements of comprehensive income (loss).

*Noncontrolling interests – Redeemable and Non-redeemable*

As of December 31, 2019, noncontrolling interests represent the portion of certain consolidated subsidiaries' limited partnership interests that are held by third parties. As of December 31, 2018, noncontrolling interests represent the portion of certain consolidated subsidiaries' limited partnership interests or interests in consolidated VIEs that are held by third parties. Amounts are adjusted by the noncontrolling interest holder's proportionate share of the subsidiaries' or VIEs' earnings or losses each period and for any distributions that are paid

Noncontrolling interests are reported as a component of equity unless the noncontrolling interest is considered redeemable, in which case the noncontrolling interest is recorded between liabilities and equity (mezzanine or temporary equity) in our consolidated statements of financial condition. The redeemable noncontrolling interest is adjusted at each balance sheet date to its maximum redemption value if the amount is greater than the carrying value. Changes in our redeemable noncontrolling interests are presented in the consolidated statements of changes in equity (deficit).

Noncontrolling interests include: (i) for both consolidated statements of financial condition presented, holders, which consist of Related Entities, an entity affiliated with a related party, and third parties, of Class S Ordinary Units issued by BCH, and (ii) for the consolidated statement of financial condition as of December 31, 2018, holders, which consists of unrelated charity organizations, of residual beneficial interests issued by certain trusts included in the ExAlt Plan$^{TM}$, that prior to December 31, 2019, were required to be presented in our consolidated statement of financial condition.

Redeemable noncontrolling interests are held by holders, which consist of a Related Entity, an entity affiliated with a related party, and a third-party entity, of Preferred Series A Subclass 1 Unit Accounts issued by BCH for both consolidated statements of financial condition presented.

See Note 17 for further information of the equity instruments of the Company, including those classified as redeemable noncontrolling interests and noncontrolling interests.

*Advertising Costs*

The Company expenses advertising costs as incurred, which are included in professional services in the consolidated statements of comprehensive income (loss). Advertising expenses were immaterial for all periods presented.

*Third-Party Administration Revenues*

Third-party administration fees are earned for the administration of third-party client accounts. The Company's performance obligation is satisfied over time and the resulting fees are recognized monthly, generally based upon the beginning of the quarter (in advance) net asset value under management and the applicable fee rate, depending on the terms of the contract. Third-party administration fee receivables are recorded on the consolidated statements of financial condition in the fees receivable line item and in third-party administration revenues on the consolidated statements of comprehensive income (loss).

13

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Trust services revenues include both of the following fees:

*Upfront Fees*

Non-refundable upfront fees are earned for setting up and providing the client access to the ExAlt Plan[TM]. These activities do not transfer a separate promised service and therefore, represent advanced payments for trust administration services. Upfront fees are billed at the origination of the liquidity transaction and are based on a percentage of NAV plus any unfunded capital commitments. Payment of the fees occurs in the first step of the waterfall distribution per the LiquidTrust agreement. Upfront fees are deferred upon receipt and recognized ratably over the period of benefit which is generally consistent with estimated expected life of LiquidTrusts (typically 7 to 10 years). Upfront fees are recorded on the consolidated statements of financial condition as fees receivable with a corresponding amount recorded to deferred revenue. Deferred revenue is subsequently recognized as trust services revenues on the consolidated statements of comprehensive income (loss), ratably over the expected life of the LiquidTrust.

*Trust Administration Revenues*

Trust administration fees are earned for providing administrative services to trustees for existing liquidity solution clients. The Company's performance obligation under these agreements is satisfied over time as the administration and management services are provided. Fees are recognized monthly based upon the beginning of quarter (in advance) net asset value plus any remaining unfunded capital commitments and the applicable fee rate of the account as outlined in the agreement. Payment frequency is defined in the individual contracts, which primarily stipulate billings on a quarterly basis in advance. Trust administration fee receivables are recorded on the consolidated statements of financial condition in the fees receivable line item and in trust services revenues on the consolidated statements of comprehensive income (loss).

The table below sets forth the third-party administration revenues and trust services revenues as a percent of total revenues, net:

| | Successor | | Predecessor |
|---|---|---|---|
| (Dollars in thousands) | Year Ended December 31, 2019 | Seven Months Ended December 31, 2018 | Five Months Ended May 31, 2018 |
| Third-party administration revenues | $ 30 | $ 19 | $ 13 |
| Trust services revenues | 22,047 | 14,457 | 11,583 |
| Total fee revenues | 22,077 | 14,476 | 11,596 |
| Total revenues | 60,291 | 50,052 | 29,414 |
| Percentage | 36.6% | 28.9% | 39.4% |

*Interest Income*

The consolidated financial statements reflect the assets, liabilities, revenues, expenses, investment income and cash flows of Ben, including, prior to their deconsolidation on December 31, 2019, the consolidated trusts in the ExAlt Plan[TM], on a gross basis, and a portion of the economic interests in the Collective Trusts, held by the residual beneficiaries, are attributed to noncontrolling interests in the accompanying consolidated financial statements. Interest income earned by us from those consolidated trusts in the ExAlt Plan[TM] is eliminated in consolidation. Interest income is computed principally as the stated interest due on the outstanding loan balances between BCC and the Funding Trusts adjusted for any estimated amounts that are probable of not being collected which was approximately $76.8 million for the year ended December 31, 2019. However, because the eliminated amounts are earned from, and funded by, noncontrolling interests, our attributable share of the net income from the consolidated trusts in the ExAlt Plan[TM] is increased by the amounts eliminated. Accordingly, the elimination in consolidation of interest income has no effect on net income (loss) attributable to Ben or Ben's Common Unitholders.

*Legal Fees*

App. 0691

Legal fees and other costs related to litigation and other legal proceedings are expensed as incurred and are included in professional services in the accompanying consolidated statements of comprehensive income (loss).

14

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Share-based Compensation*

Compensation expense for all equity-based compensation awards is determined using the grant date fair value. For all equity-based plans, we record the impact of forfeitures when they occur. Expense is recognized on a straight-line basis over the requisite service period of the award, which is generally equal to the vesting period. The details of our equity-based compensation programs are discussed in Note 16.

*Comprehensive Income (Loss)*

Comprehensive income (loss) consists of net income (loss) and other comprehensive income (loss). Other comprehensive income (loss) includes unrealized gains and losses on investments carried at fair value, which are reported as a separate component of equity.

*Fair Value of Financial Instruments*

ASC Topic 820, *Fair Value Measurement*, defines fair value as the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date. The guidance also specifies a hierarchy of valuation techniques based on whether the inputs to those valuation techniques are observable or unobservable. Observable inputs reflect market data obtained from independent sources, while unobservable inputs reflect our market assumptions. In accordance with ASC Topic 820, *Fair Value Measurement*, these two types of inputs have created the following fair value hierarchy:

Level 1: quoted prices in active markets for identical assets;

Level 2: inputs to the valuation methodology include quoted prices for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the instrument; and

Level 3: inputs to the valuation methodology are unobservable for the asset or liability.

15

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

This hierarchy requires the use of observable market data when available.

Fair values of financial instruments are estimated using relevant market information and other assumptions. Fair value estimates involve uncertainties and matters of significant judgment regarding interest rates, credit risk, and other factors, especially in the absence of broad markets for particular items. Changes in assumptions or market conditions could significantly affect these estimates.

*Accounting Standards Recently Adopted*

ASU 2016-02, *Leases* (Topic 842) was issued in February 2016, to increase the transparency and comparability of lease recognition and disclosure. The amendments in this standard require lessees to recognize lease contracts on the consolidated statement of financial condition, while recognizing expenses on the consolidated statement of comprehensive income (loss) in a manner similar to prior guidance. The Company adopted this ASU as of January 1, 2019, resulting in increases to total assets and total liabilities. The related increase to total assets was due to the recognition of a right-of-use asset recorded in other assets, while the increase in total liabilities was due to recognition of the lease payment liability recorded in other liabilities. Prior comparable periods are presented in accordance with previous guidance under ASC 840, "Leases."

ASU 2017-04, *Goodwill* (Topic 350) was issued in January 2017. This standard simplifies how an entity is required to test goodwill for impairment by eliminating Step 2 from the goodwill impairment test. Step 2 measures a goodwill impairment loss by comparing the implied fair value of a reporting unit's goodwill with the carrying amount of that goodwill. Under the new guidance, goodwill impairment loss will be measured on the basis of the fair value of the reporting unit relative to the reporting unit's carrying amount rather than on the basis of the implied amount of goodwill relative to the goodwill balance of the reporting unit. ASU 2017-04 is effective for annual periods beginning after December 15, 2019, including interim periods within those periods, for public business entities. Early adoption is permitted for interim or annual goodwill impairment tests performed on testing dates after January 1, 2017. Ben adopted this ASU on January 1, 2020, and it did not have a material impact on its consolidated financial statements and related disclosures.

ASU 2018-07, *Compensation, Stock Compensation* (Topic 718) was issued in June 2018. The amendments in this standard expand the scope of Topic 718 to include share-based payment transactions for acquiring goods and services from nonemployees. The Company adopted this ASU as of January 1, 2019. The adoption of this ASU did not have a material impact on Ben's consolidated financial statements and related disclosures.

16

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

ASU 2018-15, *Intangibles, Goodwill and Other, Internal Use Software* (Topic 350-40) was issued in August 2018. The amendments in this standard align the requirements for capitalizing implementation costs incurred in a hosting arrangement that is a service contract with the requirements for capitalizing implementation costs incurred to develop or obtain internal-use software (and hosting arrangements that include an internal-use software license). Accordingly, the amendments require an entity (customer) in a hosting arrangement that is a service contract to follow the guidance in Topic 350-40 to determine which implementation costs to capitalize as an asset related to the service contract and which costs to expense. The amendments also require the entity (customer) to expense the capitalized implementation costs of a hosting arrangement that is a service contract over the term of the hosting arrangement, which includes reasonably certain renewals. The Company prospectively adopted this ASU as of January 1, 2019. Related assets are reflected on the consolidated statements of financial condition in other assets and the related amortization expense is reflected in other expenses on the consolidated statements of comprehensive income (loss). The adoption of this ASU did not have a material impact on Ben's consolidated financial statements and related disclosures.

*Accounting Standards Not Yet Adopted*

ASU 2016-13, *Financial Instruments, Credit Losses* (Topic 326) was issued in June 2016. This standard broadens the information that an entity must consider in developing its expected credit loss estimate for loans and other financial assets measured either collectively or individually. Current U.S. GAAP delays recognition of credit losses until it is probable a loss has occurred, generally only considering past events and current conditions in measuring the incurred loss. Once implemented, this new standard will eliminate the probable initial recognition threshold and instead, will require the measurement of expected credit losses based on historical experience, current conditions, and reasonable and supportable forecasts covering the entire term of the instrument through contractual maturity. An entity must use judgment in determining the relevant information and estimation methods that are appropriate in its circumstances. This standard requires enhanced disclosures around significant estimates and judgments used in estimating credit losses, as well as the credit quality and underwriting standards of the portfolio. The effective date of this ASU has been extended for smaller reporting companies and private companies to fiscal years beginning after December 15, 2022, including interim periods within those fiscal years. Ben is evaluating the impact of this ASU on the consolidated financial statements and disclosures.

ASU 2018-13, *Fair Value Measurement* (Topic 820) was issued in August 2018. The amendments in this standard add or modify certain disclosure requirements for fair value measurements. The guidance is effective for fiscal years and interim periods beginning after December 15, 2019. Certain of the amendments require prospective application, while the remainder require retrospective application. Early adoption is permitted either for the entire standard or only the provisions that eliminate or modify the requirements. The Company believes that we are currently compliant with this pronouncement but continues to evaluate potential impact of this guidance on our consolidated financial statements and related disclosures.

ASU 2019-12, *Income Taxes: Simplifying the Accounting for Income Taxes* (Topic 740) was issued in December 2019. The amendments in ASU 2019-12 eliminate certain exceptions related to the approach for intraperiod tax allocation, the methodology for calculating income taxes in an interim period and the recognition of deferred tax liabilities for outside basis differences. ASU 2019-12 also clarifies and simplifies other aspects of the accounting for income taxes. ASU 2019-12 is effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2020, for public business entities. Early adoption is permitted, including adoption in any interim period. Ben is evaluating the impact of this ASU on the consolidated financial statements and disclosures.

3.     **Initial Capitalization and Organizational Transactions**

Ben commenced commercial operations on September 1, 2017, when Ben and MHT Financial, L.L.C. ("MHT Financial"), entered into agreements to provide liquidity in exchange for the economic rights to several portfolios of alternative assets (collectively, the "Initial Transactions"). In December 2017 and January 2018, Ben and MHT Financial entered into additional agreements to provide liquidity in exchange for the economic rights to additional portfolios of alternative assets (collectively, the "Second Transactions"). The primary closing condition of the Initial and Second Transactions consisted of MHT Financial entering into a Purchase and Sale Agreement with owners of alternative asset funds (family offices, fund-of-funds, and institutions, collectively the "Sellers") to acquire the portfolios of alternative assets (the "Initial Exchange Portfolio" for the Initial Transactions and the "Second Exchange Portfolio" for the Second Transactions) and the subsequent placement of the Initial and Second Exchange Portfolios by MHT Financial into the custody of certain constituent trusts of the ExAlt Plan[TM]

App. 0695

("Founding ExAlt Plan™") in exchange for Common Units of Ben of a like value issued to certain other constituent trusts of the Founding ExAlt Plan™ ("2017-18 Exchange Trusts").

The Initial Transactions, which were entered into on September 1, 2017, included:

(i) MHT Financial purchased the Initial Exchange Portfolio at purchase prices set out in schedules to the various Purchase and Sale Agreements (each such agreement, the "PSA"). The purchase price calculations in the PSAs used December 31, 2016, reported net asset value ("NAV") for the Initial Exchange Portfolio and adjusted for cash flows (capital calls and distributions) through the day before the signing of the PSAs. In addition, the PSAs included mark-to-market securities, which were valued at the end of business on the day prior to the PSA date. MHT Financial's aggregate purchase price for the Initial Exchange Portfolio was $489.2 million (the "Initial Exchange Portfolio Purchase Price");

17

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

(ii) MHT Financial placed the Initial Exchange Portfolio into the custody of constituent trusts of the Founding ExAlt Plan$^{TM}$;

(iii) Ben extended liquidity to the Founding ExAlt Plan$^{TM}$ equal to 77% of the Initial Exchange Portfolio Purchase Price with rights to the cash flows from the Initial Exchange Portfolio provided in return;

(iv) Transfers to the Founding ExAlt Plan$^{TM}$ of Common Units issued by Ben in return for liquidity proceeds equal to 77% of the Initial Exchange Portfolio Purchase Price;

(v) The contribution of substantially all the remaining tangible and intangible assets held by Ben to its subsidiaries;

(vi) An agreement for new notes/loans of approximately $141.0 million to (a) refinance existing loans from Legacy Lenders totaling approximately $120.8 million and to (b) purchase certain assets from Related Entities that were expensed by Ben totaling $20.2 million; and

(vii) The distribution by the Company to Related Entities of the assets of certain legacy business activities that would not be involved in the continuing Ben business.

The Second Transactions, which were entered into in December 2017 and January 2018, were carried out in a manner consistent with the Initial Transactions. MHT Financial's aggregate purchase price for the Second Exchange Portfolio was $244.6 million (the "Second Exchange Portfolio Purchase Price"). Ben extended loans to the Founding ExAlt Plan$^{TM}$ equal to 77% of the Second Exchange Portfolio Purchase Price in return for the right to the cash flows from the Second Exchange Portfolio. The loan proceeds were applied toward the purchase of Common Units of Ben.

Through December 31, 2019, Ben's originations of liquidity products have primarily been limited to the Initial and Second Transactions described above. The Initial and Second Transactions have been transacted with a limited number of family offices, fund-of-funds and institutions. These types of clients, specifically, fund-of-funds and institutions represent a smaller segment of the target market for Ben's financial products in the future.

**4.    Transaction with GWG Holdings, Inc. and GWG Life, LLC**

On January 12, 2018, Ben entered into a Master Exchange Agreement, as amended from time to time (the "MEA"), with GWG Holdings, Inc., a Delaware corporation ("GWG Holdings"), GWG Life, LLC, a Delaware limited liability company and wholly-owned subsidiary of GWG Holdings ("GWG Life" and, collectively with GWG Holdings, the "GWG Parties"), and the 2017-18 Exchange Trusts. The 2017-18 Exchange Trusts agreed to transfer the Common Units they held in Ben to the GWG Parties and receive assets, including GWG Holdings' common stock and GWG Life debt. On August 10, 2018 ("Initial Transfer Date"), Ben and the GWG Parties executed a third amended MEA and completed an initial transfer ("Initial Transfer") under which:

i. Ben, as a borrower, entered into a commercial loan agreement (the "Commercial Loan Agreement") with GWG Life, as a lender, in a principal amount of $200.0 million, with the loan proceeds used to redeem $200.0 million in Ben Common Units held by the 2017-18 Exchange Trusts;

ii. Ben delivered to GWG Holdings a promissory note (the "Exchangeable Note") in the principal amount of $162.9 million and applied the proceeds to redeem $162.9 million in Ben Common Units held by the 2017-18 Exchange Trusts;

iii. The 2017-18 Exchange Trusts used the loan proceeds from Ben to acquire $362.9 million of L Bonds due 2023 from GWG Holdings;

iv. The 2017-18 Exchange Trusts delivered to GWG Holdings 4,032,349 Common Units of Ben in exchange for L Bonds due 2023 in an aggregate principal amount of $40.3 million;

v. Ben purchased 5,000,000 shares of GWG Holdings' Series B Convertible Preferred Stock for cash consideration of $50.0 million. Ben transferred the GWG Holdings' Series B Convertible Preferred Stock to the 2017-18 Exchange Trusts on August 13, 2018, in exchange for $50.0 million in Ben Common Units held by the 2017-18 Exchange Trusts; and

vi. Ben and GWG entered into a registration rights agreement (the "Registration Rights Agreement") with respect to the Ben Common Units received and to be received by GWG Holdings.

Under the MEA, at the final closing (the "Final Closing"), which occurred on December 28, 2018 (the "Final Closing Date"):

App. 0697

i. In accordance with the MEA and based on the NAV of the Exchange Portfolio as of the Final Closing Date, effective as of the Initial Transfer Date, (i) the principal of the Commercial Loan Agreement was adjusted to $182.0 million, (ii) the principal amount of the Exchangeable Note was adjusted to $148.2 million and (iii) the principal amount of the L bonds held by the 2017-18 Exchange Trusts was adjusted to $366.9 million;

18

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

ii.   The accrued interest on the Commercial Loan Agreement and the Exchangeable Note was added to the principal amount of the Commercial Loan Agreement, as a result of which the principal amount of the Commercial Loan Agreement as of the Final Closing Date was $192.5 million;

iii.  The 2017-18 Exchange Trusts transferred to GWG Holdings an aggregate of $216.5 million in Ben Common Units and Ben transferred $148.2 million in Ben Common Units to GWG Holdings in exchange for the Exchangeable Note;

iv.   Ben issued to GWG an option ("Option Agreement") to acquire the number of Ben Common Units, interests, or other property that would be received by a holder of a Preferred Series A Subclass 2 Unit Account of BCH; and

v.    GWG issued to the 2017-18 Exchange Trusts 27,013,516 shares of GWG Holdings' common stock (including shares issued upon conversion of the GWG Holdings' Series B Convertible Preferred Stock).

In order to facilitate the closing of the transaction with the GWG Parties, the Company agreed to the redemption for debt of $72.0 million of Preferred Series A Subclass 1 Unit Accounts held by a Related Entity. Refer to Note 15 for further information on the debt issued in connection with this redemption.

*Registration Rights Agreement*

On the Initial Transfer Date, Ben and GWG Holdings entered into the Registration Rights Agreement related to Ben's Common Units providing GWG Holdings with certain customary registration rights with respect to the Ben Common Units received pursuant to the MEA. Pursuant to this Registration Rights Agreement, GWG Holdings is entitled to certain customary demand registration, shelf takedown and piggyback registration rights with respect to the Ben Common Units, subject to certain customary limitations (including with respect to minimum offering size and a maximum number of demands and underwritten shelf takedowns within certain periods). The agreement remains in effect until the earlier of the date GWG Holdings is permitted to sell all registrable securities under Rule 144 or until the registrable securities are sold.

**5.    Transaction with GWG Holdings, Inc. Controlling Shareholders**

On April 15, 2019, Ben, among others, entered into a Purchase and Contribution Agreement (the "Purchase Agreement") with Jon R. Sabes, GWG Holdings' Chief Executive Officer and a director, and Steven F. Sabes, GWG Holdings' Executive Vice President and a director. Pursuant to the Purchase Agreement, which closed on April 26, 2019 (the "Closing"), Messrs. Jon and Steven Sabes sold and transferred all of the shares of GWG Holdings' common stock held directly and indirectly by them and their immediate family members (approximately 12% of GWG Holdings' outstanding common stock in the aggregate). Specifically, Messrs. Jon and Steven Sabes (i) sold in aggregate 2,500,000 shares of GWG Holdings' common stock to BCC, a subsidiary of Ben, for $25.0 million in return for a payable ultimately settled in cash on December 31, 2019, and (ii) contributed their remaining 1,452,155 shares of GWG Holdings' common stock to a limited liability company ("SPV") owned by a Related Entity and an entity held by one of Ben's current directors, in exchange for certain equity interests in the SPV.

Certain other transactions occurred pursuant to the Purchase Agreement and in connection with the Closing (the "Transactions"), including:

●  GWG Holdings' bylaws were amended to increase the maximum number of directors of GWG Holdings from nine to thirteen, and the actual number of directors comprising GWG Holding's Board of Directors was increased from seven to eleven.

●  All seven members of GWG Holdings' Board of Directors prior to the Closing resigned as directors of GWG Holdings, and eleven individuals designated by Ben were appointed as directors of GWG Holdings, leaving two board seats vacant after the Closing. At the time, the eleven individuals designated by Ben were the members of the Board of Directors of BMLLC, the general partner of Ben.

●  BCC and the SPV executed and delivered a Consent and Joinder (as defined below) to the Security Agreement (as defined below).

GWG Holdings intends to reduce capital allocated to its traditional business while cooperating to build a larger diversified portfolio of loans against alternative assets investment portfolios through additional investment by GWG Holdings in Ben.

App. 0700

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

On April 26, 2019, and in connection with the Closing, BCC and the SPV executed and delivered a Consent and Joinder (the "Consent and Joinder") to the Amended and Restated Pledge and Security Agreement dated October 23, 2017 by and among the GWG Holdings, GWG Life, Messrs. Jon and Steven Sabes and the Bank of Utah (the "Security Agreement"). Pursuant to the Consent and Joinder, Messrs. Jon and Steven Sabes assigned their rights and delegated their obligations under the Security Agreement to BCC and the SPV, and BCC and the SPV became substitute grantors under the Security Agreement such that the shares of GWG Holdings' Common Stock acquired by BCC and the SPV pursuant to the Purchase Agreement will continue to be pledged as collateral security for GWG Holdings' obligations owing in respect of the L Bonds issued under that certain Amended and Restated Indenture, dated as of October 23, 2017, subsequently amended on March 27, 2018 and supplemented by a Supplemental Indenture dated as of August 10, 2018, as so amended and supplemented, and as it may be amended or supplemented from time to time hereafter.

6.    **Transaction with GWG Life, certain Trusts included in the ExAlt Plan$^{TM}$**

On May 31, 2019, certain LiquidTrusts for which Ben, through certain other trusts in the ExAlt Plan$^{TM}$ that were required to be consolidated in our financial statements prior to December 31, 2019, held investments in senior beneficial interests, executed a Promissory Note (the "Promissory Note") with GWG Life for a principal amount of $65.0 million that matures on June 30, 2023. An initial advance in the principal amount of $50.0 million was funded on June 3, 2019, and a second advance in the principal amount of $15.0 million was funded on November 27, 2019.

The proceeds from the Promissory Note are used by the LiquidTrusts to purchase senior beneficial interests held by these certain trusts of the ExAlt Plan$^{TM}$ that were required to be consolidated in our financial statements prior to December 31, 2019. The aforementioned trusts utilize the proceeds to repay loan amounts owed by certain of trusts included within the ExAlt Plan$^{TM}$ to BCC, a subsidiary of Ben. While Ben's primary tangible asset is its loan agreements collateralized by investments in senior beneficial interests held through the Collective Trusts in the various LiquidTrusts, none of the trusts included within the ExAlt Plan$^{TM}$ are affiliates of Ben. In accordance with the timeline of the Promissory Note, the LiquidTrusts purchased senior beneficial interests of $60.0 million prior to December 2019. The remaining purchase of senior beneficial interests will occur during January 2020. All proceeds from the Promissory Note have been or will be utilized by the ExAlt Plan$^{TM}$ to repay loan amounts owed to BCC. Ben utilized the proceeds from the loan repayments to BCC to provide working capital to the Company and to pay other liabilities.

The Promissory Note is unsecured and is subject to certain covenants (including a restriction on the incurrence of any indebtedness senior to the Promissory Note other than the existing senior loan obligations described in Note 15 to HCLP Nominees L.L.C. ("HCLP Nominees") and to Beneficient Holdings, Inc. ("BHI"), a Related Entity, (collectively, the "Senior Lenders")) and events of default. The Senior Lenders are Legacy Lenders as described in Notes 2, 15 and 20.

In connection with the Promissory Note, GWG Holdings entered into intercreditor and subordination agreements with each of the Senior Lenders.  The intercreditor and subordination agreements, among other things, subordinate the Promissory Note to the secured obligations of Ben outstanding to the Senior Lenders; stipulates that GWG Holdings agrees to not take any liens to secure the Promissory Note (and to subordinate such liens, if any, to the liens of the Senior Lenders), prohibits any voluntary prepayment of all or any portion of the Promissory Note until the Senior Lenders are paid in full unless such prepayment is agreed to by the Senior Lenders; and stipulates that GWG Holdings agrees not to take enforcement actions under the Promissory Note until existing obligations to the Senior Lenders are paid in full.  The Intercreditor Agreements establish various other inter-lender and subordination terms, including, without limitation, with respect to permitted actions by each party, permitted payments, waivers, voting arrangements in bankruptcy, application of certain proceeds and limitations on amendments of the respective loan obligations of the parties. The Senior Lenders have agreed to not extend the maturity of their respective loan obligations beyond June 30, 2023, or increase the outstanding principal of the loans made by the Senior Lenders without the written consent of GWG Life. GWG Life has agreed to not transfer the Promissory Note except with the written consent of the Senior Lenders (such consent not to be unreasonably withheld) or to GWG Holdings or direct or indirect wholly-owned subsidiaries thereof.

7.    **Strategic Transaction with GWG Holdings, Inc.**

App. 0701

On December 31, 2019, Ben, BCH, BMLLC, and GWG Holdings entered into a Preferred Series A Unit Account and Common Unit Investment Agreement (the "Investment Agreement"). Pursuant to the Investment Agreement, Ben and BCH received an aggregate amount of $79.0 million from GWG Holdings in return for 666,667 Common Units of Ben and a Preferred Series A Subclass 1 Unit Account of BCH.

20

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

In connection with the Investment Agreement, GWG Holdings acquired, on December 31, 2019, the right to appoint a majority of the board of directors of BMLLC, the general partner of Ben. Due to this change-of-control event, Ben became a consolidated subsidiary of GWG Holdings; therefore, the results of operations for Ben and its subsidiaries being reported in GWG Holdings' financial statements on a consolidated basis as of December 31, 2019. GWG Holdings' right to appoint a majority of the board of directors of BMLLC will terminate in the event (i) GWG Holdings' ownership of the fully diluted equity of Ben (excluding equity issued upon the conversion or exchange of Preferred Series A Unit Accounts of BCH held as of December 31, 2019 by parties other than GWG Holdings) is less than 25%, (ii) the Continuing Directors (as defined in the BMLLC LLC agreement) of GWG Holdings' cease to constitute a majority of the board of directors of the GWG Holdings, or (iii) certain bankruptcy events occur with respect to GWG Holdings.

As a result of the change-in-control, Ben elected to apply pushdown accounting in its separate consolidated financial statements as of December 31, 2019. Under the pushdown accounting guidance included in ASC Topic 805, *Business Combinations*, Ben recorded all of its assets and liabilities at fair value, with the excess of the purchase price over the aggregate fair values recorded in goodwill. As a result, Ben's consolidated statement of financial condition as of December 31, 2019 is not comparable to December 31, 2018. Loans receivable, other borrowings, commercial loan with parent and goodwill were the assets and liabilities impacted in any material respect by the purchase accounting adjustments. Refer to Note 8 for further discussion on the application of pushdown accounting and the resulting impact of recording our assets and liabilities at fair value, including a description of the methodologies used to determine the fair values.

Following the transaction, and as agreed in the Investment Agreement, GWG Holdings had an initial capital account balance for the Preferred Series A Subclass 1 Unit Account of $319.0 million. As a result, Ben recognized a deemed dividend of $250.0 million, which represents the difference between the redemption value and the carrying value, as of December 31, 2019. The other holders of the Preferred Series A Subclass 1 Unit Accounts include a Related Entity and an entity held by one of Ben's current directors, and the aggregate capital accounts of all holders of the Preferred Series A Subclass 1 Unit Accounts after giving effect to the investment by GWG Holdings, including the deemed dividend, is $1.6 billion. If a Related Entity exchanges their Preferred Series A Subclass 1 Unit Accounts for securities of GWG Holdings, the Preferred Series A Subclass 1 Unit Account held by GWG Holdings would be converted into Common Units of Ben, so neither Related Entities nor GWG Holdings would hold Preferred Series A Subclass 1 Unit Accounts.

In addition, on December 31, 2019, Ben, GWG Holdings and holders of Common Units of Ben Common Units entered into an Exchange Agreement (the "Exchange Agreement") pursuant to which holders of Ben's Common Units from time to time have the right, on a quarterly basis, to exchange their Common Units for common stock of GWG Holdings. The exchange ratio in the Exchange Agreement is based on the ratio of the capital account associated with Ben's Common Units to be exchanged to the market price of GWG Holdings' common stock based on the volume-weighted average price of the GWG Holdings' common stock for the five consecutive trading days prior to the quarterly exchange date. The Exchange Agreement is intended to facilitate the marketing of Ben's products to holders of alternative assets.

8.    **Acquisitions**

*(a) 2019 Change-of-Control Transaction*

On December 31, 2019, as described in Note 7, GWG Holdings obtained the right to appoint a majority of the board of directors of BMLLC, finalizing a change-of-control event. As a result, Ben applied pushdown accounting under ASC Topic 805-50-25-8 due to the 2019 change-of-control event of BMLLC.

21

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

In connection with the 2019 change-of-control event, the preliminary enterprise value and the preliminary estimated fair value of identifiable assets acquired and liabilities assumed as of the date of the 2019 change-of-control transaction are summarized in the following table:

*(Dollars in thousands)*

| | |
|---|---:|
| **Equity Value Allocated To:** | |
| Common Units | $    813,966 |
| Class S Ordinary Units | 85,448 |
| Class S Preferred Units | 17 |
| Preferred Series A Subclass 1 Unit Accounts | 1,338,604 |
| Total equity value | 2,238,035 |
| **Assets:** | |
| Loans receivable | 232,344 |
| Fees receivable | 29,168 |
| Cash and cash equivalents | 17,551 |
| Investment in public equity securities | 24,550 |
| Other assets | 14,053 |
| Intangible assets | 3,449 |
| Total assets | 321,115 |
| **Liabilities:** | |
| Other borrowings | 153,086 |
| Commercial loan agreement from parent | 168,420 |
| Other liabilities and deferred revenue | 105,866 |
| Accounts payable and accrued expenses | 13,713 |
| Total liabilities | 441,085 |
| **Net assets** | (119,970) |
| Goodwill resulting from the 2019 change-of-control | $  2,358,005 |

Methods Used to Determine Equity Value and to Fair Value Assets and Liabilities

The following is a description of the valuation methodologies used to estimate the fair value of equity and the fair values of major categories of assets acquired and liabilities assumed. In many cases, determining the fair value of equity and the acquired assets and assumed liabilities required management to estimate cash flows expected from those assets and liabilities and to discount those cash flows at appropriate rates of interest. This required the utilization of significant estimates and management judgment in accounting for the 2019 change-of-control event.

*Equity*: The values for each equity component were calculated after determination of an overall enterprise value for the Company. The enterprise value of the Company was determined using the Option Pricing Model ("OPM") Backsolve approach under the market method. The OPM Backsolve approach uses a Black-Scholes option pricing model to calculate the implied equity value of the firm. Once an overall equity value was determined, amounts were allocated to the various classes of equity based on the security class preferences. The inputs to the OPM Backsolve approach are the equity value for one component of the capital structure, expected time to exit, the risk-free interest rate and an assumed volatility based on the volatility of similar publicly traded companies. The OPM Backsolve inputs include Level 3 inputs.

The value for the common units includes an amount related to outstanding share-based payment awards that remain outstanding after the 2019 change-of-control. For these awards, the portion of the acquisition-date fair value of the share-based payment awards attributable to pre-combination service is recognized in the common unit value as of December 31, 2019.

*Loans receivable*: The loan portfolio was valued based on current guidance which defines fair value as the price that would be received to sell an asset or transfer a liability in an orderly transaction between market participants at the measurement date. Level 3 inputs were utilized to value the loan portfolio and included the use of present value techniques employing cash flow estimates and incorporated assumptions that marketplace participants would use in estimating fair values, specifically market interest rate and general credit fair value assumptions. In instances where reliable market information was not available,

management used assumptions in an effort to determine reasonable fair value. There was no carryover related allowance for loan losses.

*Fees receivable*: These fees receivable were valued using the current carrying amount which approximates fair value.

---

22

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Cash and cash equivalents*: The estimated fair values of cash and cash equivalents approximate their stated value.

*Other assets*: Other assets include miscellaneous receivables that were valued using the current carrying amount as that amount approximates fair value due to the relatively short time between their origination date and the fair value date. Other assets were valued using the current carrying amount which approximates fair value.

*Investment in public equity securities:* The fair value of the investments in public equity securities was determined using quoted market prices.

*Intangible assets:* Intangible assets include an insurance license and a non-compete agreement. Both assets were valued using the current carrying amount which approximates fair value. The insurance license was valued at $3.1 million and the non-compete agreement was valued at $0.3 million.

*Other borrowings and commercial loan agreement from parent*: The measurement of the fair value of other borrowings and commercial loan agreement from parent was based on market prices that generally are observable for similar liabilities at commonly quoted intervals and is considered a Level 2 fair value measurement.

*Other liabilities and deferred revenue*: The carrying amounts of other liabilities and deferred revenue approximate the fair value.

*Accounts payable and accrued expenses*: Due to their short-term nature, the carrying amounts of accounts payable and accrued expenses approximate the fair value.

*Goodwill*: The resulting excess of the overall enterprise value after deducting the fair values of assets acquired and liabilities assumed is recognized as goodwill. The goodwill recognized is the result of the inherent value associated with the assembled business after all separately identifiable assets acquired and liabilities assumed are deducted from the enterprise value.

The accounting for the estimates of equity values in the 2019 change-of-control event and the fair value of loans receivable and any separately identifiable intangibles was based on the facts and circumstances that existed as of the acquisition date. Should management obtain new information about facts and circumstances that existed at the acquisition date, adjustments to the fair values assigned to these items could occur during the measurement period of one year from the acquisition date. Any such adjustment will result in corresponding adjustments to goodwill.

### (b) 2018 Change-of-Control Transaction

Through the initial capitalization transactions described in Note 3, a third-party institutional investor held an indirect interest in all or substantially all of the outstanding Common Units of Ben through the 2017-18 Exchange Trusts. In a series of actions culminating on May 31, 2018, the limited liability company agreement of Ben's general partner, BMLLC, was amended and certain proxies were granted that reduced certain rights of Related Entities, including removing the aforementioned entities' right to appoint a majority of the board of directors of BMLLC, finalizing a change-of-control event. Ben applied pushdown accounting under ASC Topic 805-50-25-8 due to the 2018 change- of-control event of BMLLC.

23

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

In connection with the change-of-control event, the enterprise value and the estimated fair value of identifiable assets acquired, and liabilities assumed as of the date of the change-of-control transaction are summarized in the following table:

*(Dollars in thousands)*

| | |
|---|---:|
| **Equity Value Allocated To:** | |
| Common Units | $ 807,162 |
| Class S Ordinary Units | 139,736 |
| Preferred Series A Subclass 1 Unit Accounts | 1,030,435 |
| Non-controlling interests (trusts) | (97,859) |
| Total equity value | 1,879,474 |
| **Assets:** | |
| Investments in senior beneficial interests | 513,825 |
| Due from unconsolidated affiliates and trusts | 175,260 |
| Fees receivable | 36,899 |
| Cash and cash equivalents | 7,813 |
| Other receivables and other assets | 7,906 |
| Insurance license | 3,100 |
| Total assets | 744,803 |
| **Liabilities:** | |
| Other borrowings | 126,274 |
| Other liabilities and deferred revenue | 90,302 |
| Accounts payable and accrued expenses | 14,814 |
| Repurchase option | 164,605 |
| Due to unconsolidated affiliates and trusts | 295 |
| Total liabilities | 396,290 |
| **Net assets** | 348,513 |
| Goodwill resulting from the 2018 change-of-control | $ 1,530,961 |

<u>Methods Used to Determine Equity Value and to Fair Value Assets and Liabilities</u>

The following is a description of the valuation methodologies used to estimate the fair value of equity and the fair values of major categories of assets acquired and liabilities assumed. In many cases, determining the fair value of equity and the acquired assets and assumed liabilities required management to estimate cash flows expected from those assets and liabilities and to discount those cash flows at appropriate rates of interest. This required the utilization of significant estimates and management judgment in accounting for the change-of-control event.

*Equity*: The values for each equity component were calculated after determination of an overall enterprise value for the Company. The enterprise value of the Company was determined using the OPM Backsolve approach under the market method. The OPM Backsolve approach uses a Black-Scholes option pricing model to calculate the implied equity value of the firm. Once an overall equity value was determined, amounts were allocated to the various classes of equity based on the security class preferences. The inputs to the OPM Backsolve approach are the equity value for one component of the capital structure, expected time to exit, the risk-free interest rate and an assumed volatility based on the volatility of similar publicly traded companies. The OPM Backsolve inputs include Level 3 inputs.

*Investments in senior beneficial interests*: The investments in senior beneficial interests accounted for as equity securities were valued based on current guidance which defines fair value as the price that would be received to sell an asset or transfer a liability in an orderly transaction between market participants at the measurement date. Level 3 inputs were utilized to value the investments in senior beneficial interest portfolio and included the use of present value techniques employing cash flow estimates and incorporated assumptions that marketplace participants would use in estimating fair values. Specifically, the model includes assumptions related to i) equity market risk premiums, ii) alternative asset beta to public equities, iii) NAVs, iv) volatilities, v) distribution rates, and vi) market discount rates. In instances where reliable market information was not available, management used historical market data proxies and assumptions to determine a reasonable fair value.

*Due from unconsolidated affiliates and trusts and due to unconsolidated affiliates and trusts*: These assets and liabilities were valued at their current carrying amount which approximates fair value due to their short-term nature.

*Fees receivable*: These fees receivable were valued using the current carrying amount which approximates fair value.

---

24

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Cash and cash equivalents*: The estimated fair values of cash and cash equivalents approximate their stated value.

*Other receivables and other assets*: Other receivables were valued using the current carrying amount which approximates fair value due to the short time between their origination date and the fair value date. Other assets were valued using the current carrying amount which approximates fair value.

*Insurance license*: The insurance license asset was valued using the guideline transactions approach under the market method. The recent transactions approach indicates the value of an asset by deriving multiples from recent transactions involving similar assets. The recent transactions methodology utilizes Level 2 inputs.

*Other borrowings*: The fair value of the other borrowings approximates the carrying value of the debt based on the recent issuance of the debt, its variable interest rate, and the short remaining term. The fair value of other borrowings was determined using Level 2 inputs in the fair value hierarchy.

*Other liabilities and deferred revenue*: The carrying amounts of other liabilities and deferred revenue approximate the fair value.

*Accounts payable and accrued expenses*: Due to their short-term nature, the carrying amounts of accounts payable and accrued expenses approximate the fair value.

*Repurchase options*: Repurchase options were fair valued using a Black-Scholes option pricing model with a time-dependent strike for the repurchase price. Other model assumptions include i) a period of restricted exercise, ii) the dividend yield, iii) underlying NAVs, iv) alternative asset growth rates, v) volatilities and vi) market discount rate.

*Goodwill*: The resulting excess of the overall enterprise value after deducting the fair values of the assets acquired and liabilities assumed is recognized as goodwill. The goodwill recognized is the result of the inherent value associated with the assembled business after all separately identifiable assets acquired and liabilities assumed are deducted from the determined enterprise value.

As of December 31, 2018, the estimates of the equity value in the change-of-control event and the fair values of identifiable assets and liabilities assumed in the 2018 change-of-control event were final.

*(c) Acquisition of ACE Portal, Inc. Assets and Liabilities*

On February 12, 2018, BCH purchased the assets and certain liabilities of ACE Portal, Inc. in exchange for cash and 202,450 shares of Class S Ordinary Units. BCH formed a new limited liability company, Ace Portal, L.L.C. to operate the acquired online portal. In a separate and concurrent transaction, BCH also acquired the personal goodwill of a certain key executive from ACE Portal, Inc. for consideration including cash payments of up to $0.7 million, earnout payments of up to 200,063 Class S Ordinary Units based primarily on the achievement of certain revenue targets over the next five years; contingent payments of up to 803,185 Class S Ordinary Units based primarily on achievement of certain operational milestones; and conditional payments of up to 227,041 Class S Ordinary Units based primarily on the passage of time and achievement of certain milestones. As of December 31, 2019, $0.4 million of cash payments and 102,041 Class S Ordinary Units have been issued as part of the personal goodwill transaction. As of December 31, 2018, $0.2 million of cash payments and 102,041 Class S Ordinary Units were issued as part of the personal goodwill transaction. During the fourth quarter of 2019, an agreement was executed whereby all remaining earnout payments, contingent payments, and conditional payments were settled in return for a total of 100,000 Class S Ordinary Units. A net gain of $1.7 million was recorded in the other expenses line item on our consolidated statement of comprehensive income (loss) for the year ended December 31, 2019 related to this settlement.

25

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

In connection with the ACE Portal acquisition, the following table details the consideration paid, the initial estimated fair value of identifiable assets acquired, and liabilities assumed as of the date of acquisition and the resulting goodwill recorded:

*(Dollars in thousands)*

| | | |
|---|---|---:|
| **Consideration Paid:** | | |
| Cash consideration | $ | 20 |
| Equity consideration | | 2,025 |
| Contingent liability | | 4,011 |
| Total value of consideration | | 6,056 |
| **Assets Acquired:** | | |
| Developed technology | | 1,329 |
| Non-compete agreement | | 656 |
| Other assets | | 12 |
| Total assets | | 1,997 |
| **Liabilities Assumed:** | | |
| Accounts payable | | 132 |
| Other liabilities | | 691 |
| Total liabilities | | 823 |
| **Net Assets Acquired** | | 1,174 |
| Goodwill resulting from the acquisition of ACE Portal, Inc. assets | $ | 4,882 |

As of December 31, 2018, the fair values of the consideration paid and the identifiable assets and liabilities assumed in the change-of-control event and the ACE Portal, Inc. acquisition were final.

**9.      Loans receivable**

Due to the deconsolidation of the trusts included in the ExAlt Plan$^{TM}$ as of December 31, 2019, the loans receivable between BCC and certain trusts included in the ExAlt Plan$^{TM}$ became Ben's primary reported asset. The loans receivable held by the Company as of December 31, 2019 were originated primarily by the initial capitalization transactions discussed in Note 3. These loans are principally collateralized by the cash flows originating from the Exchange Portfolio.

As of December 31, 2019, the outstanding principal balance was $425.9 million, which includes $154.7 million of interest income paid in kind. As of December 31, 2019, the carrying value of the loans was $232.3 million, net of an unamortized discount of $(114.8) million. As a result of the push-down accounting described in Note 8, the carrying value is the estimated fair value of the loans and there is no allowance for loan losses recorded as of December 31, 2019.

In addition, the comparative period on the statement of financial condition of December 31, 2018, is not comparable as the loans were not presented on that statement due to the consolidation of certain trusts included within the ExAlt Plan$^{TM}$. As a result, Ben's statement of financial condition as of December 31, 2018 presented investments in senior beneficial interests instead of loans receivable. Refer to Note 10 for further discussion of the investments in senior beneficial interests.

**10.      Investments in senior beneficial interests**

Investments in senior beneficial interests held by the Company as of December 31, 2018 and up to the date of deconsolidation on December 31, 2019, of certain trusts included with the ExAlt Plan$^{TM}$, were primarily originated by the transactions discussed in Note 3. As of December 31, 2019, due to the deconsolidation of these trusts, Ben's consolidated financial statements no longer report the investments in senior beneficial interests held by the Collective Trusts. Prior to the deconsolidation, the Company held investments in senior beneficial interests in each LiquidTrust that has been established. Investments in senior beneficial interests are entitled to the repayment of the initial contribution and any additional contributions required to be made under the LiquidTrust agreement. The LiquidTrust agreements require additional contributions in limited situations to fund obligations of the LiquidTrusts such as capital commitment calls from alternative

asset funds above certain thresholds or the fulfillment of required cash reserves at the LiquidTrust to pay trustee fees and expenses after the passage of one year. The investments in senior beneficial interests are entitled to an annual return on its total net contributions based on the greater of a floor of 15% or average LIBOR for the period plus 14% ("Base Return"). Finally, the investments in senior beneficial interests participate in a portion of the returns above the Base Return up to the greater of 30% or the average LIBOR for the period plus 29% ("Enhanced Return").

26

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

As cash distributions for the alternative asset funds held by the LiquidTrusts are received, the allocation of such proceeds is determined based on a waterfall. Based on the allocation results of the waterfall, the proceeds applied against the investments in senior beneficial interests for the repayment of the total net contributions and the Base Return are utilized ultimately to repay BCC the amounts due under the loan agreement between BCC and a certain trust included within the ExAlt Plan$^{TM}$. The Enhanced Return earned from one LiquidTrust can be utilized to repay loans from BCC to a certain trust included in the ExAlt Plan$^{TM}$ related to another LiquidTrust when cash flows from the client's original alternative assets are not sufficient to repay the loan principal and contractual interest and fees due to BCC provided the LiquidTrusts are included in the same Collective Trust. Enhanced Return amounts earned and not utilized in the above manner are not available to BCC or other Ben entities and represent noncontrolling interests (trusts). The investments in senior beneficial interests are collateralized by cash flows generated by the Exchange Portfolio.

See Note 19, Fair Value Measurements, for additional required disclosures for financial instruments accounted for at fair value on a recurring basis.

## 11.    Fixed Assets

Fixed assets are included in other assets in the consolidated statements of financial condition and consist of the following:

| | Second Successor | Successor |
|---|---|---|
| | As of December 31, | |
| (Dollars in thousands) | 2019 | 2018 |
| Leasehold improvements | $ 104 | $ 16 |
| Furniture, fixtures, and equipment | 128 | 41 |
| Computer hardware and software | 442 | 291 |
| Other | 73 | 68 |
| Total fixed assets | 747 | 416 |
| Accumulated depreciation and amortization | — | (46) |
| Internal use software in process | 1,498 | — |
| Fixed assets, net | $ 2,245 | $ 370 |

Depreciation and amortization expense related to fixed assets was $0.2 million for the year ended December 31, 2019. Depreciation and amortization expense related to fixed assets was immaterial for the seven months ended December 31, 2018 and for the five months ended May 31, 2018.

## 12.    Goodwill and Other Intangibles

The following tables present activity in the Company's goodwill and finite-lived and indefinite-lived intangible assets from June 1, 2018 to December 31, 2019. Prior to June 1, 2018, Ben did not have any goodwill or intangible assets.

| (Dollars in thousands) | Successor As of December 31, 2018 | Amortization | Impairment | Successor As of December 31, 2019 | Purchase Price Allocation (a) | Second Successor As of December 31, 2019 | Amortization Period |
|---|---|---|---|---|---|---|---|
| Goodwill | $ 1,530,961 | $ — | $ — | $ 1,530,961 | $ 827,044 | $ 2,358,005 | Indefinite |
| Developed technology | 1,213 | (133) | (1,080) | — | — | — | 10 years |
| Non-compete agreement | 512 | (163) | — | 349 | — | 349 | 3 years |
| Insurance license | 3,100 | — | — | 3,100 | — | 3,100 | Indefinite |

| | | | | | |
|---|---|---|---|---|---|
| Total goodwill and intangible assets | $ 1,535,786 | $ (296) | $ (1,080) | $ 1,534,410 | $ 827,044 | $ 2,361,454 |

(a) Relates to the 2019 change-of-control event discussed in Note 8.

27

App. 0713

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

| (Dollars in thousands) | Successor As of June 1, 2018 | Additions | Amortization | Impairment | Successor As of December 31, 2018 | Amortization Period |
|---|---|---|---|---|---|---|
| Goodwill | $ 1,530,961 | $ — | $ — | $ — | $ 1,530,961 | Indefinite |
| Developed technology | 1,290 | — | (78) | — | 1,212 | 10 years |
| Non-compete agreement | 595 | — | (82) | — | 513 | 4 years |
| Insurance license | 3,100 | — | — | — | 3,100 | Indefinite |
| Total goodwill and intangible assets | $ 1,535,946 | $ — | $ (160) | $ — | $ 1,535,786 | |

We expect that amortization expense for our existing intangibles subject to amortization for the succeeding five years and thereafter will approximate the following:

*(Dollars in thousands)*

| Year | Amortization |
|---|---|
| 2020 | $ 164 |
| 2021 | 164 |
| 2022 | 21 |
| 2023 | — |
| 2024 | — |
| 2025 and thereafter | — |

Barring a triggering event that suggests possible impairment, the Company conducts impairment tests for goodwill and indefinite-lived assets during the fourth quarter each year, using generally accepted valuation methods. During the fourth quarter of 2019, the Company tested for impairment and determined there was no impairment of goodwill or indefinite-lived intangible assets during 2019.

During 2019, the Company determined that the developed technology, which related to the purchase of Ace Portal discussed in Note 8, was fully impaired. The $1.1 million impairment was triggered by a significant change in how Ben intends to use the long-term asset. The Company's requirements for the developed technology, which was purchased in February 2018, have changed significantly since the technology acquired with the Ace Portal acquisition was originally created. The impairment is recorded in the other expenses line item on the consolidated statements of comprehensive income (loss).

Finally, management has determined that none of the Company's goodwill is deductible for tax purposes.

## 13.    Other Liabilities

Other liabilities consist of the following:

| | Second Successor As of December 31, 2019 | Successor As of December 31, 2018 |
|---|---|---|
| *(Dollars in thousands)* | | |
| Option agreement liability | $ 57,456 | $ 57,219 |
| Liability to redeem common units | — | 25,131 |
| Interest commitments | 5,008 | 1,759 |
| Tax distribution payable | — | 2,520 |
| Other | 1,958 | 4,172 |
| Other liabilities | $ 64,422 | $ 90,801 |

*Option Agreement Liability*

As part of the Final Closing of the transaction with the GWG Parties discussed in Note 4, Ben issued the Option Agreement to GWG as additional consideration to consummate the transaction contemplated by the MEA. The Option Agreement provides GWG the ability to acquire Common Units of Ben with an initial settlement amount of $57.2 million for an exercise price of $0. The Option Agreement can be exercised at any time, in part with minimum exercises of $0.1 million or in full, and automatically exercises upon expiration, ten years from the issuance date of December 28, 2018. The settlement amount determined at the time of exercise is based on the number of Common Units in Ben that a holder of Preferred Series A Subclass 2 Units would receive if such holder were converting as of the settlement date.

28

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

In connection with the issuance of the Option Agreement, Preferred Stock Series A Subclass 2 Units were issued by BCH to Ben. The Preferred Stock Series A Subclass 2 Units had an initial value of $57.2 million and adjust in future periods based on allocations of gain and losses, tax distributions, and other amounts that would be allocated to a Preferred Stock Series A Subclass 1 Unitholder with a capital account balance of the same amount. The Preferred Stock Series A Subclass 2 Units hold the same rights and privileges as the Preferred Stock Series A Subclass 1 Units and possess a priority in the allocation of taxable income to eliminate any book-tax disparity that exists with respect to the Preferred Stock Series A Subclass 1 Unit accounts. The preferred return of the Preferred Stock Series A Subclass 1 Units is limited to the excess of the amount of the return determined as if the Preferred Stock Series A Subclass 2 Units had not been issued over the amount of the quarterly preferred Preferred Stock Series A Subclass 1 Units return provided to the Preferred Stock Series A Subclass 2 Units.

In conjunction with recording the liability of $57.2 million related to the Option Agreement, the Company expensed $39.5 million immediately in the seven months ended December 31, 2018 and a debt discount to the Commercial Loan Agreement of $17.7 million was recognized. The debt discount was being amortized to interest expense over the five years life of the Commercial Loan Agreement. The value of the Option Agreement was allocated between expense and debt discount using the relative values of the sources of proceeds utilized to redeem Ben Common Units from the 2017-18 Exchange Trusts as part of the transaction with the GWG Parties. Preferred Stock Series A Subclass 1 Units held by a Related Entity is allocated any expenses incurred by the Company, in the period recognized, as a result of the delivery of the Option Agreement to GWG to consummate the transactions contemplated by the MEA, including the amortization of the debt discount. In connection with the 2019 change-of-control event described in Note 8, the commercial loan agreement was recorded at fair value at December 31, 2019 and thus this debt discount is no longer reflected in the December 31, 2019 statement of financial condition.

The value of the Option Agreement adjusts each period until exercised by GWG based on the allocation of profit and losses, tax distributions, and other amounts allocated to the Preferred Stock Series A Subclass 2 Units. This adjustment results in income or expense being recognized by Ben each period until the option is exercised that will be directly allocated to all Preferred Stock Series A Subclass 1 Unitholders on a pro-rata basis. For the year ended December 31, 2019, the expense recognized related to the adjustment in the value of the Option Agreement was $0.2 million.

*Liability to Redeem Common Units*

The Company entered into an agreement effective August 10, 2018, with MHT Financial, certain 2017-18 Exchange Trusts and certain Sellers that are parties to the PSAs outlined in Note 3. Under this agreement, Ben agreed to pay to these 2017-18 Exchange Trusts and MHT Financial agreed to cause these 2017-18 Exchange Trusts to pay certain Sellers a total of $100.0 million in cash for the redemption of Ben Common Units held in these 2017-18 Exchange Trusts for the benefit of certain Sellers. In addition, the Company agreed to pay to these 2017-18 Exchange Trusts, and MHT Financial agreed to cause these 2017-18 Exchange Trusts to pay to certain Sellers a total of $50.0 million in cash for the redemption of Ben Common Units, sourced from 80 percent of the cash received by the Company following the date of August 10, 2018 from certain Funding Trusts and any cash received by the Company from a certain contemplated equity offering of BCH. A total of $114.9 million was paid by the Company under this agreement through December 14, 2018, including the $100.0 million payment made in August 2018.

On December 14, 2018, the Company entered into an amendment to the August 10, 2018 agreement. In the amended agreement, the Company agreed to pay to these 2017-18 Exchange Trusts and MHT Financial agreed to cause these 2017-18 Exchange Trusts to pay certain Sellers a total of $10.0 million by December 21, 2018, to redeem Ben Common Units held in these 2017-18 Exchange Trusts. The $10 million was paid on December 21, 2018. Also, the Company agreed to pay cash to these 2017-18 Exchange Trusts and MHT Financial agreed to cause these 2017-18 Exchange Trusts to pay certain Sellers an aggregate amount not to exceed $25.1 million in cash for the redemption of Ben Common Units from i) monthly payments received by the Company from all existing Funding Trusts over certain thresholds, ii) any cash proceeds received from a contemplated equity offering by BCH, and iii) any cash received from certain debt issuances contemplated with a certain third-party lender. The Company evaluated this obligation under ASC Topic 480, Distinguishing Liabilities from Equity, and recorded a liability related to the obligation to redeem the Ben Common Units by transferring assets with a corresponding reduction in Ben Common Units. The Company also agreed to pay interest on this outstanding liability on a semi-annual basis at a rate of 1-month LIBOR plus 3.95% beginning on December 14, 2018.

App. 0716

App. 0717

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Interest expense of $1.4 million and $0.1 million was recognized during the year ended December 31, 2019 and during the seven months ended December 31, 2018, respectively. No amount of this accrued interest was paid during the year ended December 31, 2018; however, the accrued interest and principal were paid in full during the year ended December 31, 2019. The liability to redeem Common Units was paid in full in November 2019 including all accrued interest.

*Interest Commitment*

The Company agreed with certain other sellers to MHT Financial to accrue interest beginning on August 10, 2018, at a rate of 1-month LIBOR plus 3.95% for thirty percent of the value of the Ben Common Units held by these 2017-18 Exchange Trusts until such time at these 2017-18 Exchange Trusts liquidate their holdings of Ben Common Units. The Company does not have an obligation to repurchase or redeem the Ben Common Units held by the 2017-18 Exchange Trusts. Interest expense of $3.3 million and $1.7 million was recognized during the year ended December 31, 2019 and the seven months ended December 31, 2018. Accrued interest on this commitment is reflected in other liabilities. No amount of accrued interest has been paid through December 31, 2019.

**14.    Commercial Loans from Parent**

*Commercial Loan Agreement*

As part of the Initial Transfer with the GWG Parties discussed in Note 4, on August 10, 2018, GWG Life, as lender, and Ben, as borrower, entered into the Commercial Loan Agreement. The initial principal amount of $200.0 million under the Commercial Loan Agreement is due on August 9, 2023; provided that (a) in the event Ben completes at least one public offering of its Common Units raising at least $50.0 million which on its own or together with any other public offering of Ben's Common Units results in Ben raising at least $100.0 million, then the maturity date will be extended to August 9, 2028; and (b) in the event that Ben (i) completes at least one public offering of its Common Units raising at least $50.0 million which on its own or together with any other public offering of Ben's Common Units results in Ben raising at least $100.0 million and (ii) at least 75% of BCH's total outstanding Preferred Series B Subclass 1 Units, if issued, have been converted to shares of Ben's Common Units, then the maturity date will be extended to August 9, 2033.

The Commercial Loan Agreement allows for prepayment, in whole or in part in minimum increments of $1.0 million and a minimum amount of $5.0 million, without premium or penalty, subject only to payment of interest accrued to the date of prepayment. Repayment of the balance under the Commercial Loan Agreement is subordinated in right of payment to any of Ben's other debt, and to Ben's obligations which may arise in connection with its Preferred Series B Subclass 1 Units, if issued. Ben's obligations under the Commercial Loan Agreement are unsecured.

The principal amount under the Commercial Loan Agreement bears interest at 5.00% per year, compounded annually, provided that the accrued interest from the Initial Transfer Date to the Final Closing Date was added to the principal balance under the Commercial Loan Agreement. From and after the Final Closing Date, one-half of the interest, or 2.50% per year, is due and payable monthly in cash, and (ii) one-half of the interest, or 2.50% per year, accrues and compounds annually on each anniversary date of the Final Closing Date (December 28, 2018) and becomes due and payable in full for cash on the maturity date.

In connection with the Final Closing, the principal balance of the Commercial Loan Agreement was adjusted from $200.0 million to $182.0 million based on the final NAV of the Exchange Portfolio and $10.5 million of accrued interest from the Commercial Loan Agreement and the Exchangeable Note was converted to principal on the Commercial Loan Agreement.

In connection with the 2019 change-of-control event described in Note 8, the commercial loan agreement was recorded at fair value as of December 31, 2019 which resulted in the debt being recorded at a discount to its previous carrying value of $14.4 million. As of December 31, 2019 and December 31, 2018, the outstanding principal, including interest paid-in-kind, was $197.3 million and $192.5 million, respectively, on the Commercial Loan Agreement. The balance reflected on the statements of financial condition as of December 31, 2019 and December 31, 2018, was $168.4 million and $174.9 million, net of an unamortized debt discount of $28.9 million and $17.7 million, respectively, that has a remaining amortization period of approximately 3.6 and 4.6 years, respectively. The effective interest rate for the year ended December 31, 2019 on the Commercial Loan Agreement from the Final Closing Date is approximately 7.26%.

The Commercial Loan Agreement contains covenants including limitations on the amount of additional indebtedness senior in right of payment, delivery of audited financial statements within 60 days of year-end, and unaudited quarterly financial statements within 25 days of each quarter-end other than the fourth quarter. As of December 31, 2019, the Company was in compliance with the covenants related to the Commercial Loan Agreement.

<div align="center">30</div>

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Exchangeable Note*

As part of the Initial Transfer with the GWG Parties discussed in Note 4, on August 10, 2018, Ben issued to GWG Holdings the Exchangeable Note in the principal amount of $162.9 million. The Exchangeable Note accrued interest at a rate of 12.40% per year, compounded annually, commencing on August 10, 2018, through the earlier to occur of the maturity date or the Final Closing Date. Interest was payable in cash on the earlier to occur of the maturity date or the Final Closing Date; provided that Ben could, at its option, add to the outstanding principal balance under the Commercial Loan Agreement, the accrued interest in lieu of payment in cash of such accrued interest thereon at the Final Closing Date (or, if earlier, the maturity date of the Exchangeable Note). The principal amount of the Exchangeable Note was payable in cash on August 10, 2023. In the event the Final Closing Date occurred on or prior to the maturity date, the principal amount of the Exchangeable Note was payable in Ben Common Units at a price equal to $10.00 per Common Unit. In the event the Final Closing Date occurred prior to the maturity date, Ben could, at its option, pay the accrued interest on the Exchangeable Note in the form of Ben Common Units or in the form of a promissory note providing for a term of up to two years and cash interest payable semi-annually at the rate of 5.00% per year.

In connection with the Final Closing, the principal balance of the Exchangeable Note was adjusted from $162.9 million to $148.2 million based on the final NAV of the Exchange Portfolio and all accrued interest was added to the principal balance on the Commercial Loan Agreement. Additionally, the principal balance of the Exchangeable Note was exchanged for 14,822,843 Ben Common Units and, in return, the Exchangeable Note was canceled by GWG Holdings.

Maturities of principal on the Commercial Loan Agreement and the other borrowings described in Note 15 for the next five years are as follows:

| (Dollars in thousands) | Commercial Loan Agreement | | Other Borrowings | |
|---|---|---|---|---|
| 2020 | $ | — | $ | 149,661 |
| 2021 | | — | | — |
| 2022 | | — | | — |
| 2023 | | 197,321 | | 750 |
| 2024 | | — | | 1,579 |

## 15.    Other Borrowings

*Senior Credit Agreement*

On September 1, 2017, the Company, through its BCC subsidiary, entered into a loan agreement ("Loan Agreement") with HCLP Nominees to refinance its prior existing loans and other payables with Legacy Lenders. HCLP Nominees is a Delaware limited liability company and is a Legacy Lender. Ben does not consider HCLP Nominees as a related party or affiliate. The aggregate principal amount refinanced by the Company, including $20.2 million related to the purchase of certain assets, totaled $141.0 million on a total advance commitment amount of $146.0 million. The advance commitment period expired on January 19, 2018 and no further borrowings were made by the Company or other related entities. The Loan Agreement required an upfront fee of 1% of the commitment amount that totaled $1.5 million and the loan accrues interest at a rate of 1-month LIBOR plus 3.95% and is compounded daily. Interest payments are due by the 15th of the month ("Interest Payment Date"). Through December 31, 2019, Ben has paid all interest due under the Loan Agreement.

The provisions of the Loan Agreement require partial mandatory prepayments if i) the ratio of the sum of total outstanding debt plus accrued interest divided by the market value of eligible underlying investments exceeds 50%, ii) total borrowings during the commitment period exceed the total advance commitment, or iii) $25.0 million is required to be repaid on the date that the first funds are received in trust related to the transactions described in Note 3 from any distribution or other amounts received from the collateral underlying the loans receivable balances. Voluntary prepayments of the outstanding principal are allowed subject to a prepayment premium equal to the product of (x) 3.95% per annum, (y) the principal amount of such prepayment and (z) the lesser of (i) 1.50 and (ii)(A) the number of days remaining until the scheduled maturity date divided by (B) 365. The aggregate prepayment premium is capped at an amount equal to 1.0% of the commitment amount of $146.0

million. A prepayment premium is not due on prepayments sourced from the proceeds of cash distributions from the eligible underlying investments.

31

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

In March 2019, the Loan Agreement was amended to include an additional mandatory prepayment clause. The new prepayment clause stipulates that beginning January 1, 2019 and calculated monthly; the Company shall prepay, unless waived by the lender, on the Interest Payment Date an amount not to exceed $30.0 million for any month equal to (A) the sum of (x) cash on hand excluding any required regulatory capital and certain proceeds from loans to the Funding Trust in an amount not to exceed $50.0 million plus (y) aggregate cash receipts of BCC and its affiliates excluding certain trusts included in the ExAlt Plan$^{TM}$, less (B) $25.0 million. Equity contributions made after January 1, 2019 up to $50.0 million in aggregate are not included in aggregate cash receipts of BCC or its affiliates for purposes of calculating any required prepayment under this additional mandatory prepayment clause.

The Loan Agreement is guaranteed by affiliates of BCC. The Loan Agreement contains standard provisions, including customary covenants and events of default and termination, including cross-default provisions. As of December 31, 2019, the Company was in compliance with all covenants in this agreement except for certain covenants related to providing financial statements and information related to the eligible underlying investments by a specified date. Subsequent to December 31, 2019 but before these consolidated financial statements were issued, the Loan Agreement covenants were amended whereby the Company is in compliance with all such covenants. The Loan Agreement had a scheduled maturity of December 31, 2018. On December 31, 2018, HCLP Nominees approved the extension of the maturity date to March 31, 2019, and then in March 2019, the maturity was extended to June 30, 2020 and allows for further extensions through March 31, 2022, at the request by Ben and the discretion of HCLP Nominees. Both extensions were made under substantially the same terms as the original agreements, other than the additional mandatory prepayment clause described above for the Loan Agreement.

A principal payment in the amount of $25.0 million was required under the mandatory prepayment clause (iii) and was paid under the initial provision of the Loan Agreement in the first quarter of 2018. An additional payment of $9.7 million and an additional borrowing of $10.0 million occurred in the fourth quarter of 2018 related to the Loan Agreement. During the fourth quarter of 2019, a payment of $49.8 million was made to HCLP Nominees related to the Loan Agreement. The payment reduced the outstanding principal by $48.7 million, paid a portion of outstanding interest totaling $0.1 million, and included a prepayment penalty of $1.0 million. This payment was required by HCLP Nominees as a condition to a waiver received from HCLP Nominees for their consent to the change-in-control of Ben as a result of the transaction described in Note 7. The outstanding balance, including interest paid-in-kind, of the Loan Agreement was $77.5 million and $126.4 million as of December 31, 2019 and December 31, 2018, respectively. The balance reflected within the other borrowings line item on the statements of financial condition as of December 31, 2019 and December 31, 2018, was $77.9 million and $126.4 million, net of an unamortized debt premium of $0.5 million and nil, respectively.

*Second Lien Credit Agreement*

In December 2018, in order to facilitate the closing of the transaction with the GWG Parties described in Note 4, BHI, a Related Entity, agreed to certain conditions related to its holding of Preferred Series A Subclass 1 Units of BCH in exchange for obtaining a right to receive early liquidity. Under the then existing governing documents, BHI had an early liquidity option to convert $72.0 million of Preferred Series A Subclass 1 Units of BCH into Common Units of Ben. Ben agreed instead to provide the early liquidity in the form of a note issued by BCC on terms no more favorable to BHI than the terms of the Loan Agreement described above.

On December 28, 2018, Ben and BHI entered into a promissory note for $72.0 million in return for the relinquishment by BHI of $72.0 million of Preferred Series A Subclass 1 Unit Accounts of BCH. The promissory note bears interest at one month adjusted LIBOR plus 3.95% and was due on March 31, 2019. The promissory note required that within 30 days of execution or such later date as BHI may agree that the parties enter into a credit agreement evidencing a secured credit facility consistent with the terms and provisions of the Loan Agreement. Such credit agreement was finalized in May 2019. Prior to the execution of the credit agreement, BHI approved the extension of the maturity date of this debt to June 30, 2020.

A credit agreement ("Second Lien Credit Agreement") between BCC and BHI in the amount of $72.0 million with an effective date of December 28, 2018 replaced the promissory note. The Second Lien Credit Agreement did not require any upfront fee and the loan accrues interest at a rate of 1-month LIBOR plus 3.95% and is compounded daily. Interest payments are due by the 15th of the month ("Second Lien Interest Payment Date"). Through December 31, 2019, Ben has paid all interest due under the Second Lien Credit Agreement.

App. 0723

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The provisions of the Second Lien Credit Agreement require partial mandatory prepayments if i) provided the Loan Agreement has been paid in full, the ratio of the sum of total outstanding debt plus accrued interest divided by the market value of eligible underlying investments exceeds 50%, ii) provided the Loan Agreement has been paid in full, total borrowings during the commitment period exceed the total advance commitment, or iii) $25.0 million is required to be repaid on the date that the first funds are received in trust related to the transactions described in Note 3 from any distribution or other amounts received from the collateral underlying the loans receivable balances. Additionally, the Second Lien Credit Agreement stipulates that beginning January 1, 2019 and calculated monthly, the Company shall prepay, unless waived by the lender, on the Second Lien Interest Payment Date an amount not to exceed $30 million for any month equal to (A) the sum of (x) cash on hand excluding any required regulatory capital and certain proceeds from loans to the Funding Trust in an amount not to exceed $50.0 million plus (y) aggregate cash receipts of BCC and its affiliates excluding certain trusts included in the ExAlt Plan$^{TM}$, less (B) $25.0 million. Equity contributions made after January 1, 2019 up to $50.0 million in aggregate are not included in aggregate cash receipts of BCC or its affiliates for purposes of calculating any required prepayment under this additional mandatory prepayment clause. Voluntary prepayments of the outstanding principal are allowed subject to a prepayment premium equal to the product of (x) 3.95% per annum, (y) the principal amount of such prepayment and (z) the lesser of (i) 1.50 and (ii)(A) the number of days remaining until the scheduled maturity date divided by (B) 365. The aggregate prepayment premium is capped at an amount equal to 1.0% of the commitment amount of $72.0 million. A prepayment premium is not due on prepayments sourced from the proceeds of cash distributions from the underlying collateral. Through December 31, 2019, no prepayments have been required or voluntarily made on the Second Lien Credit Agreement. The Second Lien Credit Agreement was assigned from BHI to HCLP Nominees as of April 1, 2019. Prior to the assignment to HCLP Nominees, the Second Lien Credit Agreement was classified as debt due to related parties on the consolidated statements of financial condition. Following the assignment to HCLP Nominees, the Second Lien Credit Agreement is now classified as other borrowings on the consolidated statements of financial condition.

The Second Lien Credit Agreement is guaranteed by affiliates of BCC and is subordinated to the Loan Agreement. The Second Lien Credit Agreement contains standard provisions, including customary covenants and events of default and termination, including cross-default provisions. As of December 31, 2019, the Company was in compliance with all covenants in this agreement except for certain covenants related to providing financial statements and information related to the eligible underlying investments by a specified date. Subsequent to December 31, 2019 but before these consolidated financial statements were issued, the Second Lien Credit Agreement covenants were amended whereby the Company is in compliance with all such covenants. Additionally, the lender relinquished its security position resulting in this debt becoming subordinated. The credit agreement executed in May 2019 provides for a June 30, 2020 maturity date but allows for further extensions at the discretion of the lender, if requested by Ben, through March 31, 2022. As of December 31, 2019, the Second Lien Credit Agreement's balance, including accrued interest, was $72.2 million and as of December 31, 2018, the promissory note's balance was $72.0 million. The balance reflected within the other borrowings line item on the statements of financial condition as of December 31, 2019 and December 31, 2018, was $72.6 million and $72.0 million, net of an unamortized debt premium of $0.4 million and nil, respectively. Interest payments under the Second Lien Credit Agreement during the year ended December 31, 2019 totaled $2.6 million. There were no interest payments made under the promissory note during 2018. During the fourth quarter of 2019, a waiver was received from the lender in order to obtain their consent to the change-in-control of Ben as a result of the transaction described in Note 7.

**16.    Share-based Compensation**

*BMP Equity Incentive Plan*

The board of directors of BMLLC, Ben's general partner, adopted the Beneficient Management Partners, L.P. ("BMP") Equity Incentive Plan in 2019. Under the BMP Equity Incentive Plan, certain directors and employees of Ben are eligible to receive equity units in BMP, an entity affiliated with the board of directors of BMLLC, in return for their services to Ben. The BMP equity units eligible to be awarded to employees is comprised of BMP's Class A Units and/or BMP's Class B Units (collectively, the "BMP Equity Units").

33

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

BMP's Class A Units indirectly participate in profits from certain revenue streams associated with BCH through the FLP Subclass 2 Unit Accounts of BCH as described in Note 17. The income allocation from the FLP Subclass 2 Units is reinvested equally into Class S Ordinary Units and Class S Preferred Units issued by BCH on a quarterly basis. For vested Class A Units, on a quarterly basis and subject to certain restrictions, the holder can direct that all or a portion of the Class S Ordinary Units and Class S Preferred Units attributable to such vested units be converted into Ben's Common Units and either i) distributed to the holder or ii) sold to another party with the proceeds less any transaction expenses distributed to the holder. Upon holder's termination of employment from Ben for reasons other than cause, BMP will redeem the vested Class A Units for consideration comprised of either i) Ben Common Units or ii) cash proceeds from Ben Common Units being sold to another party less any transaction expenses. The value at redemption is based on the continued participation in the income allocated to the holder's Class A Units for five years, with such continued participation reduced each year after termination by 20 percent.

The BMP Class B Units indirectly participate in 49.5 percent of the income of Constitution Private Capital Company, L.L.C. Upon a recipient's termination of employment from Ben for reasons other than cause, BMP will reacquire the outstanding vested Class B Units from the recipient for consideration valued at 8 times normalized earnings before interest, taxes, depreciation, and amortization as forecasted by the Partnership's General Partner in its sole discretion.

While providing services to Ben, if applicable, certain of these awards are subject to minimum retained ownership rules requiring the award recipient to continuously hold BMP Equity Units equivalents equal to at least 25% of their cumulatively granted awards that have the minimum retained ownership requirement. The awards are generally non-transferable. Awards under the BMP Equity Incentive Plan that vest ultimately dilute Ben's Common Unitholders.

In 2019, initial awards in the form of BMP's Equity Units were granted under the BMP Equity Incentive Plan. The awarded BMP Equity Units were primarily fully vested upon grant date, though some of the awards are subject to service-based vesting of a four-year period from the date of hire. Expense associated with the vesting of these awards is based on the fair value of the BMP Equity Units on the date of grant. As of December 31, 2019, compensation cost has been recognized for the granted awards using the straight-line method over the requisite service period. The remaining unrecognized compensation cost for granted awards will be recognized prospectively over the remaining requisite service period, on a straight-line basis using the graded vesting method and forfeitures will be accounted for at the time that such forfeitures occur.

As of December 31, 2019, a total of 14.3 million of each type of BMP Equity Unit have been granted or preliminarily approved for granting. Of this amount, 8.2 million of each type of BMP Equity Unit have been granted, of which 7.8 million of each type of BMP Equity Unit vested upon grant date and 0.4 million of each type of BMP Equity Unit vest over a 4-year service period beginning on the recipient's date of hire on a pro-rata basis. The weighted-average grant-date fair value as of the balance sheet date was $12.98 per unit. All awards are classified in equity upon issuance. The remaining 6.1 million of each type of BMP Equity Unit that were preliminarily approved for granting as of December 31, 2019 were granted during first quarter 2020.

During 2019, the Company recognized $125.2 million of compensation expense. Expense related to the BMP Equity Incentive Plan are specially allocated to certain noncontrolling interest holders. At December 31, 2019, there was $1.4 million of total unrecognized compensation cost related to granted, non-vested BMP Equity Unit awards. This cost is expected to be recognized over a weighted average period of 3.0 years.

In 2019, the fair value of the BMP Equity Units was determined on the grant-date using a probability-weighted discounted cash flow analysis. This fair value measurement is based on significant inputs not observable in the market and thus represents a Level 3 measurement within the fair value hierarchy. The resultant probability-weighted cash flows were then discounted using a rate that reflects the uncertainty surrounding the expected outcomes, which the Company believes is appropriate and representative of a market participant assumption.

*Ben Equity Incentive Plan*

The board of directors of BMLLC, Ben's general partner, adopted the Ben Equity Incentive Plan in September 2018. Under the Ben Equity Incentive Plan, Ben is permitted to grant equity awards in the form of restricted equity units ("REUs") representing ownership interests in Ben Common Units. Settled awards under the Ben Equity Incentive Plan dilute Ben's

Common Unitholders. The total number of Common Units that may be issued under the Ben Equity Incentive Plan is equivalent to 15% of the number of fully diluted Common Units outstanding, subject to annual adjustment.

In 2019, initial awards were granted under the Ben Equity Incentive Plan. All awards are subject to two performance conditions. The first performance condition pertains to entry into certain transactions with GWG Holdings prior to July 1, 2021. This performance condition was met on April 26, 2019 by the transaction described in Note 5. The second performance condition pertains to entry into an exchange agreement with GWG Holdings. This performance condition was met on December 31, 2019 by the transaction described in Note 7. Additionally, if a change-of-control event occurs prior to July 1, 2021, then all units, vested and unvested, will settle within 60 days. Any transaction where GWG Holdings obtains the right to appoint a majority of the members of BMLLCs board of directors is expressly excluded from the definition of change of control for the REUs.

<hr>

34

App. 0726

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Awards will generally be subject to service-based vesting over a multi-year period from the recipient's date of hire, though some awards are expected to be fully vested upon grant date, both subject to the completion of the performance condition described above. While providing services to Ben, if applicable, certain of these awards are subject to minimum retained ownership rules requiring the award recipient to continuously hold Common Unit equivalents equal to at least 15% of their cumulatively granted awards that have the minimum retained ownership requirement.

For the REUs awarded under the Ben Equity Incentive Plan, expense associated with the vesting of these awards will be based on the fair value of the Ben Common Units on the date of grant. Expense will be recognized when it is probable that the performance conditions will be met. A cumulative catch up of expense will be recognized for the portion of granted awards once the performance conditions are met. The remaining unrecognized compensation cost for granted awards will be recognized prospectively over the remaining requisite service period, on a straight-line basis using the graded vesting method and forfeitures will be accounted for at the time that such forfeitures occur.

As of December 31, 2019, a total of 6.5 million REUs have been preliminarily approved for granting. Of this amount, 2.4 million REUs have been awarded, of which 1.9 million REUs vested upon the grant date and 0.5 million REUs vest over a multi-year service period beginning on the recipient's hire date, both subject to the performance condition vesting described above. The estimated weighted-average grant date fair value as of the balance sheet date was $11.82 per share. All awards are classified in equity upon issuance. The remaining 4.1 million REUs that were preliminarily approved for granting as of December 31, 2019 were awarded during first quarter 2020.

During 2019, Ben recognized share-based compensation expense totaling $23.6 million for granted REUs once the performance condition was met. As of December 31, 2019, there was $1.8 million of total unrecognized compensation cost related to granted, non-vested equity awards. This cost is expected to be recognized over a weighted-average period of 1.9 years.

In 2019, the fair value of the Ben Common Units was estimated on the grant date using recent equity transactions involving third parties, which provided the Company with observable fair value information sufficient for estimating the grant date fair value.

*Preferred Equity*

On April 25, 2019, Preferred Series A Subclass 1 Unit Accounts in BCH, a subsidiary of Ben, were assigned to three board directors, with each having a capital account balance of $4.0 million in return for each of the board directors providing to BCH their knowledge and abilities in helping with the formation of and capital raising for the Company. BHI, a Related Entity, assigned the Preferred Series A Subclass 1 Unit Accounts it holds in BCH to the directors for those individuals providing services to BCH. Accounting for services provided to the Company but paid by a principal shareholder follows the substance of the transaction and is therefore accounted for similar to a share-based payment in exchange for services rendered. The awards vest upon grant, subject to a performance condition whereby each of the directors must be a board member at the time that a certain level of additional capital is raised. Expense will be recognized and allocated to certain non-controlling interest holders at the time the performance condition is considered probable, which will be when the necessary additional capital is obtained. This expense will be directly allocated to the Preferred Series A Subclass 1 Unit Account holders, on a pro-rata basis based on their capital account balance when it is recognized. The performance condition was not met as of December 31, 2019. The fair value of the awards at the grant date was estimated at $12.0 million in aggregate. During the fourth quarter of 2019, $4.0 million of the capital account balance was forfeited back to the Company and reverted to BHI upon the departure of a certain board director.

17.    **Equity**

Below is a description of the outstanding classes of the equity of the Company, including quasi-equity amounts that are required to be reported as temporary equity between the liabilities and equity sections on the consolidated statements of financial condition. The Company's governing documents authorize the issuance of additional classes of equity. All equity interests are limited partnership interests.

*Common Units*

As of December 31, 2019 and December 31, 2018, Ben had a total of 44,146,623 and 45,031,919 Common Units issued and outstanding, respectively. As limited partner interests, these units are generally non-voting and do not entitle the limited partner to participate in the management of the Company's business and affairs. For each Common Unit issued by Ben, Ben owns one unit of the Class A issued by BCH. The Class A Unit is entitled to share in the profits of BCH.

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Noncontrolling Interests:*

*Preferred Series A Subclass 1 Unit Accounts*

BCH, a consolidated subsidiary of Ben, had non-unitized equity outstanding as of December 31, 2019 and December 31, 2018. The Preferred Series A Subclass 1 Unit Accounts were issued with an initial nominal value of $318.4 million on the issue date of September 1, 2017. The Preferred Series A Subclass 1 Unit accounts are non-participating and convertible on a dollar basis. Account holders are entitled to a compounded quarterly preferred return prior to the date (April 26, 2019) of the 4th Amended and Restated LPA of BCH described below, based on a fraction (i) the numerator of which is (A) the positive percentage rate change, if any, to the seasonally adjusted CPI-U covering the period from the date of the last allocation of profits to such holders, plus (B) (x) 2% prior to an Initial Public Offering (as defined in the BCH LPA) by Ben and (y) 3% thereafter, and (ii) the denominator of which is 1 minus the highest effective marginal combined U.S. federal, state and local income tax rate in effect as of the beginning of the fiscal quarter for which such determination is being made for an individual resident in New York City, New York, assuming (1) that the aggregate gross income allocable with respect to the quarterly preferred return for such fiscal year will consist of the same relative proportion of each type or character (e.g., long term or short term capital gain or ordinary or exempt income) of gross income item included in the aggregate gross income actually allocated in respect of the quarterly preferred return for the fiscal year reflected in the BCH's most recently filed Internal Revenue Service Form 1065 and (2) any state and local income taxes are not deductible against U.S. federal income tax. The 4th Amended and Restated LPA of BCH broadened the definition of Initial Public Offering to include an event, transaction or agreement pursuant to which Ben's Common Units are convertible or exchangeable into equity securities listed on a national securities exchange or quotation in an automated quotation system. The 4th Amended and Restated LPA also instituted a quarterly preferred return rate cap, which is further described below.

Beginning June 1, 2018, the Preferred Series A Subclass 1 Unitholders agreed to temporarily reduce the preferred return rate. On March 31, 2019, Preferred Series A Subclass 1 Unit Account holders signed an agreement to forbear the right to receive an annualized preferred return in excess of a rate determined materially consistent with the methodology below until the earlier of December 31, 2019 or three months following the issuance of the limited trust association charters by the Texas Department of Banking. The charters from the Texas Department of Banking were not issued as of December 31, 2019. Therefore, the income allocation methodology for 2019 was as follows:

- First, Ben, as the sole holder of Class A Units issued by BCH is allocated income from BCH to cover the expenses incurred solely by Ben

- Second, the remaining income at BCH is allocated 50% to the aggregate of Class A Units and Class S Ordinary Units and 50% to Preferred Series A Subclass 1 Unit Accounts, until the Common Units issued by Ben receive a 1% annualized return on the Common Unit account balance

- Third, after the 1% annualized return to the Common Unit issued by Ben is achieved, additional income is allocated to the Preferred Series A until the Preferred Series A is allocated the amount required under the LPA, (as amended), and

- Finally, any remaining income is allocated under the terms of the current LPA (pro-rata between the Class A Units and Class S Ordinary Units).

Under the 4th Amended and Restated LPA of BCH, the preferred return to be paid to Preferred Series A Unitholders and the Class S Preferred Unitholders is limited by a quarterly preferred return rate cap that is based on the annualized revenues of BCH. Annualized revenues are defined as four times the sum of total quarterly interest, fee and dividend income plus total noninterest revenues. This quarterly rate cap is defined as follows:

0.25% if annualized revenues are $80 million or less
0.50% if annualized revenues are greater than $80 million but equal to or less than $105 million
0.75% if annualized revenues are greater than $105 million but equal to or less than $125 million
1.00% if annualized revenues are greater than $125 million but equal to or less than $135 million
1.25% if annualized revenues are greater than $135 million but equal to or less than $140 million

If over $140 million, there is no rate cap and the preferred return calculation follows the general calculation formula outlined above under the LPA (as amended)

The weighted average preferred return rate for the year ended December 31, 2019, the seven months ended December 31, 2018, and the five months ended May 31, 2018 was approximately 2.0%, 1.6%, and 7.4%, respectively. The preferred return amounts for the aforementioned periods were $3.8 million, $9.9 million, and $10.0 million, respectively. No amounts have been paid to the Preferred Series A Subclass 1 Unit Account holders related to the preferred return from inception through December 31, 2019, and any amounts earned have been accrued and are included in the balance of redeemable noncontrolling interests presented on the consolidated statements of financial condition. On December 31st, 2019, in connection with the Investment Agreement as discussed in Note 7, Ben recognized a deemed dividend of $250.0 million, which represents the difference in the redemption value and carrying value of the redeemable noncontrolling interest at the balance sheet date. In connection with the issuance of Preferred Series A Subclass 2 Units as part of the Option Agreement, the preferred return of Preferred Series A Subclass 1 Unit Account holders is reduced by the preferred return allocated to the Preferred Series A Subclass 2 Units during the period the Option Agreement remains outstanding.

36

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Prior to the 4th Amended and Restated LPA of BCH, following certain events (generally, the earlier of (i) 48 months after the initial transactions described above in Note 3 are complete and (ii) the later of (x) one year after an initial public offering, and (y) the day after the date on which the last "trade" price of the units is above $14.00) and subject to certain constraints, Preferred Series A Subclass 1 Unit Accounts, in whole or in part, may be converted into Class S Ordinary Units on a quarterly basis. Under the 4th Amended and Restated LPA of BCH, upon election by a holder, the Preferred Series A Unit Accounts (other than Preferred Series A Subclass 2 Unit Accounts) are, at any time on or after January 1, 2021, convertible in an amount of Preferred Series A Unit Accounts (other than Preferred Series A Subclass 2 Unit Accounts), equal to 20% of their Sub-Capital Accounts into Class S Ordinary Units (with the right to convert any unconverted amount from previous years in any subsequent years).

Under the 1st Amendment to the 4th Amended and Restated LPA of BCH, upon an election, a holder of Preferred Series A Subclass 1 Unit Accounts will be issued Class S Ordinary Units necessary to provide the holder with a number of Class S Ordinary Units that, in the aggregate, equal (a) the balance of the holder's capital account associated with the Preferred Series A Subclass 1 Unit Accounts being converted divided by (b) either (x) prior to an initial public offering, the appraised per Class A Unit fair market value as determined by Ben and (y) following an initial public offering, the average price of a Common Unit for the thirty (30) day period ended immediately prior to the applicable conversion date. The holder of such newly issued Class S Ordinary Units may immediately convert them into Common Units. Additionally, effective December 31, 2030, if the Preferred Series A Subclass 1 Unit Accounts have not been converted, they will redeem for cash in an amount equal to the then outstanding capital account balance of the accounts. If available redeeming cash (as defined in the LPA) is insufficient to satisfy any such redemption requirements, BCH, on a quarterly basis, will redeem additional Preferred Series A Units until all such Preferred Series A Units have been redeemed. The Preferred Series A Subclass 1 Unit Accounts are subject to certain other conversion and redemption provisions.

The 4th Amended and Restated LPA of BCH also included certain limitations of BCH, without the consent of a majority-in-interest of the Preferred Series A Unit Account holders, to i) issue any new equity securities and ii) except as otherwise provided, incur indebtedness that is senior to or pari passu with any right of distribution, redemption, repayment, repurchase or other payments relating to the Preferred Series A Unit accounts. Further, BCH cannot, prior to the conversion of all the Preferred Series A Unit accounts, incur any additional long-term debt unless i) after giving effect to the incurrence of the new long-term debt on a pro forma basis, the sum of certain preferred stock, existing debt and any new long-term indebtedness would not exceed 55% of the BCH's NAV plus cash on hand, and ii) at the time of incurrence of any new long-term indebtedness, the aggregate balance of the BCH's (including controlled subsidiaries) debt plus such new long-term debt does not exceed 40% of the sum of the NAV of the collateral underlying the loan portfolio of BCH and its subsidiaries plus cash on hand at Ben, BCH and its subsidiaries.

The Preferred Series A Subclass 1 Unit Accounts are recorded on the consolidated statements of financial condition in the redeemable noncontrolling interest line item.

*Class S Ordinary Units*

As of December 31, 2019 and December 31, 2018, BCH, a subsidiary of Ben, had issued 5.8 million and 5.6 million Class S Ordinary Units, which were all outstanding on each of the respective dates. The Class S Ordinary Units participate on an as-converted basis pro-rata in the share of the profits or losses of BCH and subsidiaries following all other allocations made by BCH and its subsidiaries. As limited partner interests, these units have limited voting rights and do not entitle participation in the management of the Company's business and affairs. The Class S Ordinary Units are exchangeable for Common Units in Ben on a one-for-one basis, subject to customary conversion rate adjustments for splits, distributions and reclassifications, as well as compliance with any applicable vesting and transfer restrictions. Each conversion also results in the issuance to Ben of a Class A Unit of BCH for each Common Unit issued.

The Class S Ordinary Units are recorded on the consolidated statements of financial condition in the noncontrolling interests line item.

37

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Class S Preferred Units*

The limited partnership agreement of BCH allows it to issue Class S Preferred Units. The Class S Preferred Units are entitled to a quarterly preferred return based on a fraction (i) the numerator of which is (A) the positive percentage rate change, if any, to the seasonally adjusted CPI-U covering the period from the date of the last allocation of profits to such holders, plus (B) 0.75 percent, and (ii) the denominator of which is one minus the highest effective marginal combined U.S. federal, state and local income tax rate in effect as of the beginning of the fiscal quarter for which such determination is being made for an individual resident in New York City, New York, assuming (1) that the aggregate gross income allocable with respect to the quarterly preferred return for such fiscal year will consist of the same relative proportion of each type or character (e.g., long term or short term capital gain or ordinary or exempt income) of gross income item included in the aggregate gross income actually allocated in respect of the quarterly preferred return for the fiscal year reflected in the Ben Group Partnership's most recently filed IRS Form 1065 and (2) any state and local income taxes are not deductible against U.S. federal income tax. The Class S Preferred Units also participate on an as-converted basis pro-rata in the share of the profits or losses of BCH and subsidiaries following all other allocations made by BCH and its subsidiaries. As limited partner interests, these units are generally non-voting and do not entitle participation in the management of the Company's business and affairs. Generally, the Class S Preferred Units are exchangeable for Common Units in Ben on a 1.2-for-1 basis, subject to customary conversion rate adjustments for splits, distributions and reclassifications, as well as compliance with any applicable vesting and transfer restrictions. Each conversion also results in the issuance to Ben of a Class A Unit for each Common Unit issued. Holders of Class S Preferred Units may elect to convert into Class S Ordinary Units in connection with a sale or dissolution of BCH.

The 4th Amended and Restated LPA instituted a quarterly preferred return rate cap on the Class S Preferred Units consistent with the quarterly preferred return rate cap described for the Preferred Series A Subclass 1 Units Accounts above.

As of December 31, 2019, 0.1 million shares of Class S Preferred Units have been issued. No Class S Preferred Units were issued on December 31, 2018. Preferred return earned by the Class S Preferred Units through December 31, 2019 is de minimus. No amounts have been paid to the Class S Preferred Unit holders related to the preferred return from inception through December 31, 2019 and any amounts earned have been accrued and are included in the balance of Class S Preferred Units presented on the consolidated statements of financial condition.

The Class S Preferred Units are recorded on the consolidated statements of financial condition in the noncontrolling interests line item.

*FLP Unit Accounts (Subclass 1 and Subclass 2)*

FLP Unit Accounts (Subclass 1 and Subclass 2) are non-unitized capital accounts. The FLP Subclass 1 Units were issued to a Related Entity as part of the initial commercial operations of Ben. The FLP Subclass 2 Units are related to an incentive plan. Both subclasses of the FLP Unit Accounts are entitled to (1) a 15% profits interest on the financing and other tax pass-through businesses of Ben (BCC and Pen) and (2) a net service fee revenue interest on Ben's fee-generating businesses (BACC and Pen Insurance Management Advisors, Ltd.), in each case calculated separately. The net service fee revenue interest for an entity is equal to the total revenues of the entity multiplied by the lower of (i)(x) the EBITDA of the entity divided by the total revenues of the entity (not less than zero) minus (y) 0.20 or (ii) 0.50. Amounts allocated to the FLP Unit Accounts are reinvested equally in additional Class S Ordinary Units and Class S Preferred Units on a quarterly basis at a price equal to the book value (if the units are not listed on a national securities exchange) or, if the units are listed on a national securities exchange, the closing price of the units on such exchange on the date of allocation, thereby creating additional Class S Ordinary Units and Class S Preferred Units. In the event BCH is sold or liquidated, following distribution of proceeds to any outstanding non-participating convertible unit accounts, Class S Preferred Units, Class S Ordinary Units and Class A Units to the extent of the balance of their capital accounts, remaining distributions will include distributions to the FLP Unit Accounts reflecting in substantial economic part the profits interests and net revenue interests otherwise applicable to the FLP Unit Accounts.

No income or loss was allocated to the FLP Unit Accounts through December 31, 2019.

*Residual Beneficiaries in the Collective Trusts*

App. 0732

Prior to the changes made to certain trust agreements that resulted in the deconsolidation of certain of the trusts included in the ExAlt Plan™ that previously were consolidated entities of Ben, each of the eight Collective Trusts included in the ExAlt Plan™ had one or more beneficiaries and a residual beneficiary. The other beneficiaries of the Collective Trusts were principally the Funding Trusts with each Funding Trust entitled to receive proceeds from its designated Collective Trust sufficient for the Funding Trust to satisfy any loan amounts due to Ben. The residual beneficiary of each Collective Trust was entitled to any remaining distributions from the Collective Trusts once all amounts owed to the other beneficiaries have been satisfied. Through the date of changes to the trust agreements that led to deconsolidation, the residual beneficiaries of the eight Collective Trusts were unrelated charity organizations. The residual beneficiaries account balances cannot be reduced to below zero. Any losses to the residual beneficiaries in excess of their account balances are reclassified to the trusts' deficit account at each period end.

38

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The residual beneficiaries in the Collective Trusts are recorded on the consolidated statements of financial condition in the noncontrolling interests line item as of December 31, 2018. The trusts related to the residual beneficiaries were deconsolidated on December 31, 2019, and thus there are no amounts reflected on our consolidated statement of financial condition as of December 31, 2019.

## 18. Income Taxes

The components of income tax expense (benefit) for the year ended December 31, 2019, the seven months ended December 31, 2018 and the five months ended May 31, 2018 are as follows:

| | Successor | | Predecessor |
|---|---|---|---|
| | | Seven Months | Five Months |
| | Year ended | Ended | Ended |
| | December 31, | December 31, | May 31, |
| (Dollars in thousands) | 2019 | 2018 | 2018 |
| Current provision: | | | |
| Federal | $ — | $ — | $ — |
| State | — | — | — |
| Deferred expense (benefit) | | | |
| Federal | 179 | (2,196) | (1,443) |
| State | — | — | — |
| Income tax expense (benefit) | $ 179 | $ (2,196) | $ (1,443) |

Income tax expense differs from the amounts computed by applying the Federal statutory rate to pre-tax income (loss). Reconciliations between the Federal statutory income tax rate of 21% to the effective income tax rate for the year ended December 31, 2019, the seven months ended December 31, 2018 and the five months ended May 31, 2018 are shown below:

| | Successor | | Predecessor |
|---|---|---|---|
| | | | Five Months |
| | Year Ended | Seven Months Ended | Ended |
| | December 31, | December 31, | May 31, |
| (Dollars in thousands) | 2019 | 2018 | 2018 |
| Expected statutory income tax benefit | $ (35,101) | $ (7,651) | $ (27,120) |
| Amounts attributable to non-taxable flow-through entities | 34,329 | 5,418 | 25,671 |
| Amounts not deductible for income tax | 951 | 37 | 6 |
| Income tax expense (benefit) | $ 179 | $ (2,196) | $ (1,443) |

The components of gross deferred tax assets and gross deferred tax liabilities as of December 31, 2019 and 2018 are as follows (included in other assets):

| | Second Successor | Successor |
|---|---|---|
| | As of December 31, | |
| (Dollars in thousands) | 2019 | 2018 |
| Deferred income tax assets: | | |
| Passthrough differences – temporary | $ 582 | $ 1,676 |
| Net operating loss | 2,878 | 1,963 |
| Non-current deferred income tax assets | 3,460 | 3,639 |
| | | |
| Deferred income tax liabilities: | | |

Other

Non-current deferred income tax liabilities | — | —
Total deferred income tax asset | $ 3,460 | $ 3,639

39

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

As of December 31, 2019 and December 31, 2018, our gross federal net operating loss carryforwards for income tax purposes were approximately $13.7 million and $9.3 million, respectively. There were no state net operating loss carryforwards as of December 31, 2019 and 2018. Under the Tax Act, federal net operating loss carryforwards can be carried forward indefinitely but limits the deduction for federal net operating losses to 80% of taxable income. The Company does not have any significant uncertain tax positions as of December 31, 2019 and 2018 and both tax years remain subject to examination by major tax jurisdictions.

## 19. Fair Value Measurements

Fair value is estimated based on a hierarchy that maximizes the use of observable inputs and minimizes the use of unobservable inputs. Observable inputs are inputs that reflect the assumptions that market participants would use in pricing the asset or liability developed based on market data obtained from sources independent of the reporting entity. Unobservable inputs are inputs that reflect the reporting entity's own assumptions about the assumptions market participants would use in pricing the asset or liability developed based on the best information available in the circumstances. The fair value hierarchy prioritizes the inputs to valuation techniques into three broad levels whereby the highest priority is given to Level 1 inputs and the lowest to Level 3 inputs.

- Level 1 - Quoted prices for identical instruments in active markets that the reporting entity has the ability to access as of the measurement date.

- Level 2 - Quoted prices for similar instruments in active markets; quoted prices for identical or similar instruments in markets that are not active; and model-derived valuations whose inputs are observable or whose significant value drivers are observable market data.

- Level 3 - Valuations for instruments with inputs that are unobservable, are derived from other valuation methodologies, including option pricing models, discounted cash flow models and similar techniques, and are not based on market exchange, dealer, or broker traded transactions. Level 3 valuations incorporate certain assumptions and projections in determining the fair value assigned to such instruments.

A financial instrument's categorization within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement.

*Financial instruments on a recurring basis*

The Company's financial assets and liabilities carried at fair value on a recurring basis, including the level in the fair value hierarchy, on December 31, 2019 and December 31, 2018 are presented below.

|  | **Fair Value Measurements as of December 31, 2019 (Second Successor)** | | | |
| --- | --- | --- | --- | --- |
| *(Dollars in thousands)* | **Level 1** | **Level 2** | **Level 3** | **Total** |
| Assets: | | | | |
| Investment in public equity security | $ 24,550 | $ — | $ — | $ 24,550 |

|  | **Fair Value Measurements as of December 31, 2018 (Successor)** | | | |
| --- | --- | --- | --- | --- |
| *(Dollars in thousands)* | **Level 1** | **Level 2** | **Level 3** | **Total** |
| Assets: | | | | |
| Investments in senior beneficial interests | $ — | $ — | $ 497,729 | $ 497,729 |
|  | | | | |
| Liabilities: | | | | |
| Repurchase options | — | — | 149,155 | 149,155 |
| Contingent consideration (included in other liabilities) | — | — | 3,447 | 3,447 |

App. 0736

The following is a description of the valuation methodologies used for financial instruments measured at fair value on a recurring basis:

*Investment in public equity security*

The fair value of the investments in public equity securities was determined using quoted market prices.

40

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Investments in senior beneficial interests*

The investments in senior beneficial interests accounted for as equity securities were fair valued using industry-standard valuation models. Level 3 inputs were utilized to value the investments in senior beneficial interest portfolio and included the use of present value techniques employing cash flow estimates and incorporated assumptions that marketplace participants would use in estimating fair values. Specifically, the model includes assumptions related to i) equity market risk premiums, ii) alternative asset beta to public equities, iii) NAVs, iv) volatilities, v) distribution rates, and vi) market discount rates. In instances where reliable market information was not available, management used historical market data proxies and assumptions to determine a reasonable fair value. The unrealized impact of this Level 3 measurement on earnings is reflected in investment income (loss).

*Repurchase options*

Repurchase options were fair valued using a Black-Scholes option pricing model with a time-dependent strike price for the repurchase price. The option pricing model has assumptions related to a period of restricted exercise price, dividend yield, underlying NAVs, alternative asset growth rates, volatilities, and market discount rate. The Company uses Level 3 inputs for its fair value estimates. The unrealized impact of this Level 3 measurement on earnings is reflected in investment income (loss).

*Contingent consideration*

The contingent consideration issued as part of the ACE Portal, Inc. acquisition described in Note 8 was fair valued using industry-standard valuation models. Level 3 inputs were utilized to value the contingent consideration and included the use of present value techniques employing cash flow estimates and incorporated assumptions that marketplace participants would use in estimating fair values, specifically projected ACE Portal revenues, Ben's projected stock price, and the number of projected clients utilizing the ACE Portal. In instances where reliable market information was not available, management used assumptions in an effort to determine a reasonable fair value. The impact of this Level 3 measurement on earnings is reflected in other expenses. The contingent consideration balance is recorded in other liabilities.

The following tables show the changes in Level 3 assets and liabilities measured at fair value on a recurring basis:

*(Dollars in thousands)*

| Year ended December 31, 2019 (Second Successor) | Investments in Senior Beneficial Interests | Repurchase Options | Contingent Consideration |
|---|---|---|---|
| Beginning balance | $   497,729 | $   (149,155) | $   (3,447) |
| Total gain or (loss) in earnings | (86,830) | 125,239 | 1,747 |
| Purchases | 3,794 | — | — |
| Issuances | — | (2,112) | — |
| Sales | (60,942) | — | — |
| Settlements | (28,930) | — | 1,400 |
| Transfers into Level 3 | — | — | — |
| Transfers out of Level 3 | — | — | — |
| Impact related to deconsolidation of certain trusts | (324,821) | 26,028 | — |
| Other | — | — | 300 |
| Ending balance December 31, 2019 | $           — | $           — | $           — |

*(Dollars in thousands)*

| January 1, 2018 to May 31, 2018 (Predecessor) | Investments in Senior Beneficial Interests | Repurchase Options | Contingent Consideration |
|---|---|---|---|

| | | | |
|---|---|---|---|
| Beginning balance | $ 429,544 | $ (101,543) | $ — |
| Total gain or (loss) in earnings | 14,117 | 3,701 | — |
| Purchases | 191,619 | — | — |
| Issuances | 46 | (66,763) | (4,011) |
| Settlements | (121,501) | — | — |
| Transfers into Level 3 | — | — | — |
| Transfers out of Level 3 | — | — | — |
| Ending balance May 31, 2018 | $ 513,825 | $ (164,605) | $ (4,011) |

41

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*(Dollars in thousands)*

| June 1, 2018 to December 31, 2018 (Successor) | Investments in Senior Beneficial Interests | Repurchase Options | Contingent Consideration |
|---|---|---|---|
| Beginning balance | $ 513,825 | $ (164,605) | $ (4,011) |
| Total gain or (loss) in earnings | 20,126 | 15,450 | — |
| Purchases | — | — | — |
| Issuances | 277 | — | — |
| Settlements | (36,499) | — | 564 |
| Transfers into Level 3 | — | — | — |
| Transfers out of Level 3 | — | — | — |
| Ending balance December 31, 2018 | $ 497,729 | $ (149,155) | $ (3,447) |

There have been no transfers between levels for any assets or liabilities recorded at fair value on a recurring basis or any changes in the valuation techniques used for measuring the fair value as of December 31, 2019 and 2018. The following table provides quantitative information about the significant unobservable inputs used in the fair value measurement of the Company's Level 3 fair value assets:

*(Dollars in thousands)*

| December 31, 2018 (Successor) | Fair Value | Unobservable Inputs | Valuation Methodology | Range of Targets |
|---|---|---|---|---|
| **Assets** | | | | |
| Investments in senior beneficial interests | $ 497,729 | Discounted cash flows | Alternative asset beta to equity markets | 1.25 - 1.72 |
| | | | Alternative asset market discount rate | .085 |
| | | | Distribution rate | .02 - .03 |
| | | | Equity market risk premiums | .03 - .06 |
| | | | Net asset value volatilities | 0.23 - 0.44 |
| **Liabilities** | | | | |
| Repurchase options | 149,155 | Option pricing model | Alternative asset market discount rate | 0.085 |
| | | | Dividend yield | .07 - .66 |
| | | | Net asset value growth rates | 0.085 |
| | | | Net asset value volatilities | 0.23 - 0.44 |
| | | | Restricted exercise period | 1 year |
| Contingent consideration | | | | |
| | 3,447 | Discounted cash flows | Projected revenues | $0M - $5.8M |
| | | | Projected Ben Common Unit value | $10.0 - $ 36.0 |
| | | | Total Number of ACE clients | 0 - 227 |

*Financial instruments on a non-recurring basis*

As of December 31, 2019, all of the Company's assets and liabilities were recorded at fair value in the consolidated statement of financial condition due to the application of pushdown accounting under ASC 805-50-25-8 as described in Note 8. There were no assets or liabilities measured at fair value on a non-recurring basis as of December 31, 2018.

*Carrying amounts and estimated fair values*

Ben is required to disclose the estimated fair value of financial instruments, whether or not recognized in the consolidated statements of financial condition, for which it is practicable to estimate those values. These fair value estimates are made based on relevant market information and information about the financial instruments. Fair value estimates are intended to represent the price at which an asset could be sold or the price at which a liability could be settled. However, given there is no active market or observable market transactions for many of Ben's financial instruments, Ben's estimates of many of these fair values are subjective in nature, involve uncertainties and matters of significant judgment and therefore cannot be determined

with precision. Changes in assumptions could significantly affect the estimated values. Nonfinancial instruments are excluded from disclosure requirements.

The Company's statement of financial condition as of December 31, 2019 is presented at fair value due to the change-of-control event described in Note 8. The carrying amounts and estimated fair values of the Company's financial instruments at December 31, 2019 and the carrying amounts and estimated fair values of the Company's financial instruments not recorded at fair value at December 31, 2018, were as noted in the table below.

42

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

|  | As of December 31, 2019 (Second Successor) | | |
| --- | :---: | :---: | :---: |
|  | Level in fair value hierarchy | Carrying amount | Estimated fair value |
| *(Dollars in thousands)* | | | |
| Financial assets: | | | |
| Cash and cash equivalents | 1 | $ 17,551 | $ 17,551 |
| Fees receivable | 1 | 29,168 | 29,168 |
| Loans receivable | 3 | 232,344 | 232,344 |
| | | | |
| Financial liabilities: | | | |
| Option agreement | 3 | 57,456 | 57,456 |
| Other borrowings | 2 | 153,086 | 153,086 |
| Commercial loan from parent | 2 | 168,420 | 168,420 |

|  | As of December 31, 2018 (Successor) | | |
| --- | :---: | :---: | :---: |
|  | Level in fair value hierarchy | Carrying amount | Estimated fair value |
| *(Dollars in thousands)* | | | |
| Financial assets: | | | |
| Cash and cash equivalents | 1 | $ 3,542 | $ 3,542 |
| Fees receivable | 1 | 23,778 | 23,778 |
| Due from unconsolidated affiliates and trusts | 1 | 13,783 | 13,783 |
| | | | |
| Financial liabilities: | | | |
| Option agreement | 3 | 57,219 | 57,219 |
| Other borrowings | 2 | 131,174 | 131,174 |
| Debt due to related parties | 2 | 72,039 | 72,039 |
| Commercial loan from parent | 2 | 192,508 | 192,508 |
| Due to unconsolidated affiliates and trusts | 1 | 291 | 291 |

The following methods and assumptions were used by Ben in estimating its fair value disclosures for each class of financial instruments:

*Cash and Cash Equivalents:* The carrying amounts reported in the consolidated statements of financial condition for cash and cash equivalents approximate those assets' fair values.

*Fees Receivable:* The carrying value of fees receivable generally approximates fair value.

*Loans Receivable*: The loan portfolio was valued based on current guidance which defines fair value as the price that would be received to sell an asset or transfer a liability in an orderly transaction between market participants at the measurement date. Level 3 inputs were utilized to value the loan portfolio and included the use of present value techniques employing cash flow estimates and incorporated assumptions that marketplace participants would use in estimating fair values, specifically market interest rate and general credit fair value assumptions. In instances where reliable market information was not available, management used assumptions in an effort to determine reasonable fair value. There was no carryover related allowance for loan losses.

*Due to and Due from Unconsolidated Affiliates and Trusts:* The carrying value of cash due from unconsolidated affiliates and trusts approximates fair value because of the relatively short period of time between their origination and realization.

*Option Agreement:* The carrying value of liability related to the participating option equity contract generally approximates fair value as the liability represents the dollar amount as of the balance sheet date of Common Units that will be issued when the holder exercises the option.

*Other Borrowings and Debt Due to Related Parties:* The measurement of the fair values of these debt instruments are based on market prices that generally are observable for similar liabilities at commonly quoted intervals and are considered a Level 2 fair value measurement. The carrying amount and estimates of the fair value of the Company's other borrowings and debt due to related parties outlined above do not include any related debt issuance costs associated with these debts.

43

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Commercial Loan from Parent:* The measurement of the fair value of this debt instrument is based on market prices that generally are observable for similar liabilities at commonly quoted intervals and is considered a Level 2 fair value measurement. The carrying amount and estimates of the fair value of the Company's commercial loan outlined above do not include any related debt discounts associated with the commercial loan.

## 20. Related Parties

*Relationship with Beneficient Management Counselors, L.L.C.*

BMLLC is the general partner of Ben and is governed by a board of directors. The governing document of BMLLC provides that Beneficient Management Counselors, L.L.C. ("BMC"), wholly owned by one of several Related Entities, determine the directors of BMLLC who fill 20% of the Board seats. With the closing of the transaction discussed in Note 7, this percentage was increased to 30%. BMC is also entitled to select (a) 50% of the membership of the BMLLC's Nominating Committee and Executive Committee and appoint the chair of each of these committees, (b) 50% of the membership of the Community Reinvestment Committee (CRC), and (c) the CRC's chairperson, vice-chairperson, and lead committee member. Certain decisions with respect to Ben's charitable giving program are delegated to the CRC. Decisions regarding appointment and removal of BMLLC's directors, other than directors appointed by BMC and, subsequent to the closing of the transaction described in Note 7, GWG Holdings, are delegated, with certain exceptions, to the Nominating Committee of BMLLC of which our Chief Executive Officer and Chairman is a member and Chairman appointed by BMC. In the event of a tie vote of the Nominating Committee on a vote for the removal of a director, the Chairman of the Nominating Committee may cast the tie-breaking vote. Prior to the closing of the transaction discussed in Note 7, provided that a "triggering event" (as defined in BMLLC's governing document) occurred, BMC could determine the directors who filled 30% of the Board seats to represent Related Entities.

*Services Agreement with Bradley Capital Company, L.L.C.*

Ben is the general partner of BCH and together they entered into an agreement with Bradley Capital Company, L.L.C. ("Bradley Capital") and BMC effective June 1, 2017 (the "Bradley Capital Agreement"). Bradley Capital is a Related Entity. Under the Bradley Capital Agreement, Bradley Capital is entitled to a current base fee of $0.4 million per quarter for executive-level services provided by an executive of Bradley Capital, who is currently designated to be our Chief Executive Officer and Chairman of BMLLC's board of directors, together with a current supplemental fee of $0.2 million per quarter for administrative and financial analysis, subject to an annual inflation adjustment. The base fee may be increased by the provider up to two times the initial base fee per quarter to cover increases in the cost of providing the services, or in the event of an expansion of the scope of the services with the approval of the Executive Committee of the board of BMLLC, of which our CEO & Chairman of BMLLC's board of directors is a member and Chairman. Our CEO & Chairman of BMLLC's board of directors receives an annual salary from the Company of $0.2 million and both he and other employees of Bradley Capital can participate in equity incentive plans sponsored by the Company. The Bradley Capital Agreement also includes a payment from Ben of $0.2 million per year, paid quarterly, to cover on-going employee costs for retired and/or departed employees of predecessor entities prior to September 1, 2017, which on-going costs were assumed by Bradley Capital, as well as a further payment to Bradley Capital in respect of the cost of health and retirement benefits for current employees of Bradley Capital all of which are reimbursed by Ben. Ben is also required to reimburse Bradley Capital for out-of-pocket expenses incurred by Bradley Capital employees, including reimbursement for private travel including the family members of designated executives of Bradley Capital for both business and personal use. The Bradley Capital Agreement requires Ben to reimburse Bradley Capital or its affiliates for taxes, fees, and expenses, including legal fees and related costs, relating to the contributions by affiliates of Bradley Capital of equity or debt interests in Ben to public charitable trusts in connection with the 2017-18 Exchange Trusts, as well as the contribution of beneficial interests in client trusts administered by Ben. Additionally, the Company provides office space and access to needed technology systems and telephony services. Payments by Ben to Bradley Capital and its affiliates are guaranteed and subject to enforcement by the state courts in Delaware in the event of default. The Bradley Capital Agreement extends through July 2021, with an annual one-year renewal provision thereafter. The Bradley Capital Agreement may be terminated by unanimous approval of the Executive Committee of the board of BMLLC of which an executive of a Related Entity is a member, or without such approval if the Related Entity no longer holds $10.0 million of Ben's securities. During the year ended December 31, 2019, the seven months ended December 31, 2018, and the five months ended May 31, 2018, the Company recognized expenses totaling $3.1 million, $1.5 million and $1.0 million related to this services agreement, respectively.

App. 0744

44

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Relationship with Beneficient Holdings, Inc.*

The Beneficient Company Group (USA), L.L.C. ("Beneficient USA"), a subsidiary of BCH, entered into with BHI, a Related Entity, a Services Agreement effective July 1, 2017 (the "BHI Services Agreement"). BHI pays an annual fee of $30,000 to Ben for the provision of trust administration services for Related Entities and all trusts affiliated with its family trustee as that term is defined in the governing documents for a Related Entity. Beneficient USA also is required to provide any other services requested by BHI, subject to any restrictions in the operating agreement of BHI, at cost. The term of the BHI Services Agreement extends for the longer of (i) five years past the expiration or termination of the Bradley Capital Agreement, or (ii) seven years after the family trustee of the Related Entity is no longer a primary beneficiary of any trust affiliated with the family trustee. During the year ended December 31, 2019, the seven months ended December 31, 2018, and the five months ended May 31, 2018, the income recognized by the Company related to this services agreement was immaterial.

BHI owns the majority of the Class S Ordinary Units, Preferred Series A Subclass 1 Unit Accounts, and FLP Subclass 1 Unit Accounts issued by BCH. Additionally, Ben, through its subsidiary, BCC, was the borrower of $72.0 million from BHI that was subsequently assigned to HCLP Nominees (a Legacy Lender) through the Second Lien Credit Agreement issued in December 2018 as discussed in Note 15. Interest payments made under the Second Lien Credit Agreement for the year ended December 31, 2019 was $4.4 million. There were no interest payments made for the seven months ended December 31, 2018 and the five months ended May 31, 2018.

*Administrative Services Agreement between Constitution Private Capital Company, L.L.C. ("Constitution") and Beneficient USA.*

Constitution is an entity owned 50.5% by a Related Entity and 49.5% by an entity controlled by our board of directors. It was founded in 1986 and acquired by a Related Entity in 1996. Constitution currently manages three private equity fund-of-funds. Effective January 1, 2017, Constitution entered into an Administrative Services Agreement (the "ASA") with Beneficient USA, which is wholly owned by BACC and a subsidiary of BCH, whereby Beneficient USA provides personnel to administer the portfolio assets advised by Constitution. Under the ASA, Constitution pays to Beneficient USA a monthly fee equal to .01% of the month-end net assets of its portfolio. The ASA automatically renews on an annual basis and may be terminated at any time by Constitution. Beneficient USA may only terminate the ASA in the event of a breach by Constitution. For the year ended December 31, 2019, the seven months ended December 31, 2018, and the five months ended May 31, 2018, the income recognized by the Company related to this services agreement was immaterial.

*Preferred Provider Liquidity Agreement with Constitution.*

Prior to December 31, 2018, the Company and Constitution had a mutual understanding to enter into an agreement that was formalized in May 2019 as outlined below. BCC entered into an agreement with Constitution (the "Preferred Liquidity Provider Agreement") under which at Constitution's option, BCC will provide liquidity to alternative asset funds sponsored by Constitution at an advance rate of not less than 82% of NAV, to the extent such funds meet certain specified qualifications. For a fund to qualify for the liquidity option, it must, among other things, hold investments that were approved or deemed approved by BCC at the time a fund makes such investments. BCC is required to provide liquidity in any combination, at its discretion, of cash, U.S. exchange traded funds registered under the Investment Company Act of 1940, or securities traded on a national securities exchange. BCC's obligation under the Preferred Liquidity Provider Agreement is guaranteed by Ben and BCH. The Preferred Provider Liquidity Agreement may be terminated solely by mutual consent of Ben and Constitution. Ben and Constitution have not contracted for any liquidity under this agreement through December 31, 2019.

*Relationship with The Heppner Endowment for Research Organizations, L.L.C. and Research Ranch Operating Company, L.L.C (collectively "HERO").*

HERO is a Related Entity. Its purposes are (i) to serve as an advisor to National Philanthropic Trust ("NPT"), an unrelated third-party charitable organization, regarding the disbursement of research grants to qualifying organizations, (ii) to serve as an advisor to NPT regarding the administration of charitable contributions made for the benefit of multiple Texas universities and (iii) to provide funding and operational support for the research activities conducted by those Texas universities. Both HERO and the charitable organizations administered by NPT (the beneficiaries of which are multiple Texas universities) receive proceeds from trusts settled and funded by clients of Ben. The funding received by NPT is used to fund the research

projects of the Texas universities. The funding received by HERO may be used, in HERO's discretion, to (i) provide appropriate facilities and properties for the Texas universities to utilize as part of their research endeavors (those properties and facilities being owned by a Related Entity), and (ii) provide fee revenue to HERO. HERO is granted such rights and authority pursuant to trust instruments entered into between a client and subsidiaries of Ben as well as an agreement between HERO and NPT. Ben's subsidiaries provide financing to the trusts established by the clients and Ben is paid as an agent of the trustees for administrative services it provides to the trusts. Ben has certain outstanding payables, including accrued interest, of approximately $2.5 million as of December 31, 2019 and $4.8 million as of December 31, 2018, to HERO and NPT (for the benefit of the Texas universities). Payments of $2.3 million and $6.6 million were made during the year ended December 31, 2019 and the five months ended May 31, 2018, respectively. There were no payments made during the seven months ended December 31, 2018.

<div align="center">45</div>

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Consulting Agreement between Ben and Hicks Holdings L.L.C.*

Ben entered into a 10-month consulting agreement effective September 1, 2017, with Hicks Holdings L.L.C. ("Hicks Holdings"), an affiliate of BMLLC's director Thomas O. Hicks. Under the agreement, Hicks Holdings received consulting fees of $416,667 for the first three months and $0.3 million per month thereafter through the termination on June 30, 2018. Hicks Holdings provided advisory and consulting services to Ben under the agreement in connection with, among other things, dispositions of investments, business and investment strategy, and portfolio performance. For the year ended December 31, 2019, no expense was recognized. For the seven months ended December 31, 2018 and the five months ended May 31, 2018, the Company recognized expense totaling $0.3 million and $1.5 million, respectively, related to this service agreement.

Hicks Holdings also owns a Preferred Series A Subclass 1 Unit Account and Class S Ordinary Units with a total initial balance of $60.4 million. Hicks Holdings was granted its Preferred Series A Subclass 1 Unit Account and Class S Ordinary Units as compensation for services provided. Compensation expense based on the estimated fair value of the equity award of $60.4 million was recognized as transaction expenses in the five months ended May 31, 2018.

Hicks Holdings is one of the owners and serves as the manager of the SPV described in Note 5.

*Services provided by representatives of Ben and the trusts associated with the loans*

An independent party currently serves as trustee for the LiquidTrusts and certain of the other trusts in the associated ExAlt Plan$^{TM}$ that are created at origination for each of our loans. Ben earns administration fees (for providing administrative services to the trustee) and interest income from these trusts. Previously, an employee of Ben and another individual served as co-trustees for these trusts. The employee received no compensation for their services as co-trustee.

## 21. Variable Interest Entities

In accordance with ASC 810, an enterprise is determined to be the primary beneficiary of a VIE if it holds a controlling financial interest. A controlling financial interest is defined as (a) the power to direct the activities of a VIE that most significantly impact the entity's economic performance and (b) the obligation to absorb losses of the entity or the right to receive benefits from the entity that could potentially be significant to the VIE. The consolidation guidance requires an analysis to determine (a) whether an entity in which Ben holds a variable interest is a VIE and (b) whether Ben's involvement, through holding interests directly or indirectly in the entity or contractually through other variable interests (for example, management and performance-related fees), would give it a controlling financial interest. The performance of that analysis requires the exercise of judgment.

*VIEs for Which the Company is the Primary Beneficiary*

On December 31, 2019, certain changes to the trust agreements and loan agreements resulted in Ben no longer being considered the primary beneficiary of certain trusts included in the ExAlt Plan$^{TM}$. Due to the reconsideration event, the Company deconsolidated certain trusts included in the ExAlt Plan$^{TM}$ as of December 31, 2019 that prior to these changes were included in the Company's consolidated financial statements No gains or losses were recognized as a result of the deconsolidation. The Company has a continuing involvement with the deconsolidated trusts in the form of its loans to certain of these trusts included within the ExAlt Plan$^{TM}$, that involve principally the receipt of future cash flows of principal and interest payments to satisfy amounts owed to the Company under the terms of the loan agreements, and the provisioning of administrative services to the trusts included in the ExAlt Plan$^{TM}$ as described in Note 20.

As of December 31, 2018, Ben's consolidated statement of financial condition includes assets of consolidated VIEs with a carrying value of $510.4 million, liabilities with a carrying value of $149.2 million and equity (deficit) with a carrying value of $(99.7) million. The table below reflects the assets, liabilities, and equity (deficit) recorded in the consolidated statements of financial condition related to the consolidated VIEs as of December 31, 2018.

46

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

| | Successor |
| | As of December 31, 2018 |
|---|---|
| (Dollars in thousands) | |
| **Assets:** | |
| Due from unconsolidated affiliates and trusts | $ 12,627 |
| Investments in senior beneficial interests | 497,729 |
| | |
| **Liabilities:** | |
| Repurchase option | $ 149,155 |
| | |
| **Equity:** | |
| Trusts deficit | $ (99,711) |

Income and expense amounts related to consolidated VIEs recorded in the consolidated statements of comprehensive income (loss) are presented in the tables below.

| | Successor | | Predecessor |
| | Year Ended December 31, 2019 | Seven Months Ended December 31, 2018 | Five Months Ended May 31, 2018 |
|---|---|---|---|
| (Dollars in thousands) | | | |
| Gain (loss) on investments in senior beneficial interests | $ (86,830) | $ 20,126 | $ 14,117 |
| Gain on repurchase option | 125,239 | 15,450 | 3,701 |
| Investment income | $ 38,409 | $ 35,576 | $ 17,818 |

Of the loss on investments in senior beneficial interests as of December 31, 2019, $7.8 million relates to equity securities no longer held by Ben. During the seven months ended December 31, 2018, and the five months ended May 31, 2018, all gains on investments in senior beneficial interests relate to equity securities still held by Ben as of each reporting date.

*VIEs for Which the Company is Not the Primary Beneficiary*

The Company is not required to consolidate VIEs in which it has concluded it does not have a controlling financial interest, and thus is not the primary beneficiary. In such cases, the Company does not have both the power to direct the entities' most significant activities and the obligation to absorb losses or right to receive benefits that could potentially be significant to the VIEs. The Company's investments in unconsolidated VIEs are carried in loans receivable on the consolidated statements of financial condition.

The following table presents information about our direct variable interests in nonconsolidated VIEs:

| | Trusts in the ExAlt Plan™ | |
| | Second Successor | Successor |
| | As of December 31, | |
| (Dollars in thousands) | 2019 | 2018 |
|---|---|---|
| Assets (carrying value) | $ 232,344 | $ 497,729 |
| Liabilities (carrying value) | 2,515 | — |
| Maximum Exposure to Loss | 335,255 | 520,000 |

As of December 31, 2019, the maximum exposure to loss was determined as the amortized cost of the loans to the unconsolidated VIEs, any earned but unpaid fees or expenses plus any remaining potential contributions for unfunded capital commitments and cash reserve commitments. As of December 31, 2018, the maximum exposure to loss was determined as the

amortized cost of the investment in senior beneficial interests of the unconsolidated VIEs, any earned but unpaid fees or expenses plus any remaining potential contributions for unfunded capital commitments and cash reserve commitments.

47

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## 22. Risk and Uncertainties

The Company is subject to risks related to markets, credit, currency, and interest rates. The Company issues loans that are subject to credit risk, repayment risk, and interest rate risk. The Company has underwriting procedures and utilizes market rates. As of December 31, 2019, all of the Company's loans are collateralized by the cash flows originating from alternative assets without recourse to the client. Currently, all of these alternative assets consist of private equity limited partnership interests which are primarily denominated in the U.S. dollar, Euro, and Canadian dollar. The underlying portfolio companies primarily operate in the United States with the largest percentage, based on NAV, operating in healthcare technology, bio-technology, and diversified telecommunications services industries. The Company mitigates credit risk through the ExAlt Plan$^{TM}$ whereby excess cash flows from a collective pool of alternative assets can be utilized to repay the loans when cash flows from the client's original alternative assets are not sufficient to repay the outstanding principal, interest, and fees.

As discussed in Note 1, Ben has applied for trust charters from the Texas Department of Banking. Should the Company not be able to obtain these trust charters, significant impacts to our future operations are expected to include: a) neither Ben nor its subsidiaries will be able to assume the role of trustee for the various trusts included in the ExAlt Plan$^{TM}$, including for those trusts already formed and for any new trusts that are formed in connection with new loan transactions; b) we will be limited in the number of ExchangeTrust originations involving the issuance of Ben Common Units that we could offer; and c) the marketability of our retail loan and liquidity products and certain current or future ancillary products, as currently contemplated, will be diminished. It is anticipated that as part of the requirements by the Texas Department of Banking to issue the trust charters, Ben will be required to maintain restricted capital of an amount to be determined by the Texas Department of Banking. This amount could be significant. While Ben may be able to continue certain current institutional operations, Ben will not be able to commence additional meaningful retail operations until we receive the trust charters. If we are unable to obtain the trust charters, we expect that our ability to affect parts of our business plan, as currently constituted, will be compromised.

## 23. Litigation and Contingencies

In the normal course of business, we have various outstanding commitments and contingent liabilities that are not reflected in the accompanying consolidated financial statements. Any significant commitments and contingencies are disclosed below.

*Lease Commitments*

The Company leases certain real estate for its office premises, under non-cancelable operating lease agreements that expire during 2021. Rental expense for our premises for the year ended December 31, 2019 and the seven months ended December 31, 2018 totaled $0.6 million and $0.3 million, respectively. Rental expense for the five months ended May 31, 2018 was immaterial. On December 31, 2019, the Company's right-of-use assets and operating lease liabilities were $0.9 million. As of December 31, 2019, the weighted average lease term for the lease liabilities was 1.6 years, and the weighted average discount rate of remaining payments was 5.71 percent. As of December 31, 2019, the contractual maturities of operating leases liabilities were as follows:

*(Dollars in thousands)*

| Years Ending December 31 | | |
|---|---|---:|
| 2020 | $ | 576 |
| 2021 | | 341 |
| Total contractual maturities | | 917 |
| Less imputed interest | | (43) |
| Total lease liabilities | $ | 874 |

*Unfunded Capital Commitments*

The Company had $73.8 million and $75.2 million of gross potential capital commitments as of December 31, 2019 and December 31, 2018, representing potential limited partner capital funding commitments on the alternative asset funds that serve as collateral to our loans above any cash reserves. The trust holding the interest in the limited partnership for the

alternative asset fund is required to fund these limited partner capital commitments per the terms of the limited partnership agreement. Capital funding commitment reserves are maintained by the associated trusts created at the origination of each trust for up to $0.1 million. To the extent that the associated trust cannot pay the capital funding commitment, the Company is obligated to lend sufficient funds to meet the commitment. Any amounts advanced by the Company for these limited partner capital funding commitments above the associated capital funding commitment reserves held by the associated trusts are added to the loan balance and are expected to be recouped through the cash distributions from the alternative asset fund collateral.

48

THE BENEFICIENT COMPANY GROUP, L.P.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Capital commitments generally originate from limited partner agreements having fixed or expiring expiration dates. The total limited partner capital funding commitment amounts may not necessarily represent future cash requirements. We consider the creditworthiness on a case-by-case basis. On December 31, 2019 and December 31, 2018, there were no reserves for losses on unused commitments to fund potential limited partner capital funding commitments.

## 24. Supplemental Cash Flow Information

Cash paid for taxes for the year ended December 31, 2019 was de minimus. Cash paid for interest for the year ended December 31, 2019 was $11.4 million. Cash paid for taxes and cash paid for interest were de minimus for the seven months ended December 31, 2018, and for the five months ended May 31, 2018.

Supplemental disclosure of noncash investing and financing activities include:

Year Ended December 31, 2019:

– $250.0 million in deemed dividend to Preferred Series A Subclass 1 Unit holders recognized in connection with the Investment Agreement discussed in Note 7
– $28.9 million of distributions from investments in senior beneficial interests were recorded with a corresponding amount recorded to due from unconsolidated affiliates and trusts.
– $3.8 million in SBI originations with $1.9 million paid in cash and $1.9 million being recognized in noncontrolling interest (trusts).
– $1.3 million partial settlement of a contingent consideration liability for the issuance of 100,000 Class S Ordinary Units.
– $11.6 million settlement of liability via issuance of 1.1 million of Ben Common Units.

Seven Months Ended December 31, 2018:

– $380.2 million of Common Units of Ben was redeemed in return for the issuance of $182.0 million under the Commercial Loan Agreement, $148.2 million under the Exchangeable Note and the contribution of $50.0 million of Convertible Preferred Stock of GWG Holdings, Inc. held by Ben.
– $148.2 million of Common Units of Ben was issued to cancel the Exchangeable Note.
– $1.0 million of Class S Ordinary Units was issued as part of the contingent consideration component of the acquisition of ACE Portal, Inc.
– $84.8 million of Class S Ordinary Units were converted to Preferred Series A Subclass 1 Units.
– $72.0 million of debt due to a related party was issued in return for the redemption of a corresponding amount of Preferred Series A Subclass 1 Units.
– $36.5 million of distributions from investments in senior beneficial interests were recorded with a corresponding amount recorded to due from unconsolidated affiliates and trusts.

Five Months Ended May 31, 2018:

– $178.2 million of Common Units of Ben were issued in return for investments in senior beneficial interests as described in Note 2 with a fair value of $191.6 million with the difference of $13.4 million recorded as non-controlling interests (trusts).
– $16.3 million of fees receivable were recorded with a corresponding amount recorded to deferred income.
– $121.5 million of distributions from investments in senior beneficial interests were recorded with a corresponding amount recorded to due from unconsolidated affiliates and trusts.
– $2.0 million of Class S Ordinary Units were issued in connection with the acquisition of ACE Portal.

## 25. Subsequent Events

In December 2019, a novel strain of coronavirus ("COVID-19") was first reported in Wuhan, China. In March 2020, the World Health Organization declared COVID-19 a pandemic. The extent of COVID-19's effect on the Company's operational and financial performance will depend on future developments, including the duration, spread and intensity of the pandemic,

all of which are uncertain and difficult to predict considering the rapidly evolving landscape. As a result, it is not currently possible to ascertain the overall impact of COVID-19 on the Company's business. However, if the pandemic continues to evolve into a severe worldwide health crisis, the disease could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

The Company has evaluated subsequent events through the date of this report and determined that there have been no other events that have occurred that would require adjustments to our disclosures in the consolidated financial statements.

<div align="center">49</div>

S-1 1 fs12019b_gwgholdingsinc.htm REGISTRATION STATEMENT

As filed with the Securities and Exchange Commission on March 30, 2020

Registration No. 333-

# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

**FORM S-1**
**REGISTRATION STATEMENT**
*Under the Securities Act of 1933*

# GWG HOLDINGS, INC.
# GWG LIFE, LLC

(Exact name of Registrant as specified in its charter)

| **Delaware** **Delaware** | **6282** | **26-2222607** **20-4356955** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

325 N. Saint Paul Street, Suite 2650
Dallas, Texas 75201
Tel: (612) 746-1944
Fax: (612) 746-0445

(Address, including zip code, and telephone number, including area code, of Registrant's principal executive offices)

GWG Holdings, Inc.
Murray T. Holland
President and Chief Executive Officer
325 N. Saint Paul Street, Suite 2650
Dallas, Texas 75201
Tel: (612) 746-1944

(Name, address, including zip code, and telephone number, including area code, of agent for service)

*Copies to:*

| | |
|---|---|
| Edward S. Best, Esq. | Dominic Baldini |
| Bruce F. Perce, Esq. | Emerson Equity LLC |
| Mayer Brown LLP | 155 Bovet Road, Suite 725 |
| 71 S. Wacker Drive | San Mateo, CA 94402 |
| Chicago, IL 60606 | Tel: (650) 312-020 |
| Tel: (312) 782-0600 | |

Approximate date of commencement of proposed sale to the public: As soon as practicable after the effective date of this registration statement.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933 check the following box. ☒

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

App. 0756

**CALCULATION OF REGISTRATION FEE**

| Title of Each Class of Securities to Be Registered | Amount to be Registered | Proposed Maximum Offering Price Per Unit | Proposed Maximum Aggregate Offering Price | Amount of Registration Fee |
|---|---|---|---|---|
| L Bonds | 2,000,000 | $ 1,000(1) | $2,000,000,000 | $ 259,600 |
| Guarantee by GWG Life, LLC of L Bonds(2) | N/A | N/A | N/A | N/A |

(1) The L Bonds will be issued in "Units" of $1,000 in principal amount, in minimum amounts of 25 Units ($25,000 principal amount) and in any number of whole Unit amounts in excess of such minimum amount.

(2) No additional consideration is being received for the guarantee. Pursuant to Rule 457(n) under the Securities Act of 1933, no separate fee is required in respect of such guarantee.

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the registration statement shall become effective on such date as the Securities and Exchange Commission acting pursuant to said Section 8(a) may determine.**

The information in this prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission, of which this prospectus is a part, shall have been declared effective. This prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.

**SUBJECT TO COMPLETION, DATED MARCH 30, 2020**

---

# GWG HOLDINGS, INC.

---



2,000,000 Units of L Bonds
($2,000,000,000)

We are a financial services company committed to transforming the alternative asset industry with disruptive and innovative products and services. In 2018 and 2019 we consummated a series of transactions (as more fully described in this prospectus) with Beneficient (as defined below) that has resulted in a significant reorientation of our business and capital allocation strategy towards an expansive and diverse exposure to alternative assets.

We are offering up to 2,000,000 Units of L Bonds (the "L Bonds") at $1,000 principal amount per whole Unit, representing $2,000,000,000 in aggregate principal amount of L Bonds. This is a continuous offering and there is no minimum amount of L Bonds that must be sold before we can use any of the proceeds. The proceeds from the sale of the L Bonds will be paid directly to us following each sale and will not be placed in an escrow account. We intend to use the net proceeds from the offering of the L Bonds to grow our alternative asset exposure, primarily through investments in Beneficient in the form of equity investments or loans, and to meet our other obligations, including debt obligations. The minimum investment in L Bonds is 25 Units, or $25,000. Investments in excess of the minimum amount may be made in any number of whole Units. The L Bonds will be sold with varying maturity terms, interest rates and frequency of interest payments, all as set forth in this prospectus and in further supplements we publish from time to time. Depending on our capital needs and the amount of your investment, L Bonds with certain maturity terms may not always be available. Although we will periodically establish and change interest rates on unsold L Bonds offered under this prospectus, once an L Bond is sold, its interest rate will not change during its term (subject, however, to the extension and renewal provisions of the L Bond). Upon maturity, and subject to the terms and conditions described in this prospectus, the L Bonds will be automatically renewed for the same or lesser term at the interest rate we are offering at that time to other investors with similar aggregate L Bond portfolios for L Bonds of the same maturity, unless redeemed upon maturity at our or your election.

Obligations under the L Bonds are secured by substantially all the assets of GWG Holdings (the most significant components of which are cash and investments in subsidiaries), and by a guarantee and corresponding grant of a security interest in substantially all the assets of our subsidiary, GWG Life, LLC ("GWG Life"). As a guarantor, GWG Life has fully and unconditionally guaranteed the payment of principal and interest on the L Bonds. A substantial majority of our life insurance assets are held by GWG DLP Funding IV, LLC ("DLP IV") and GWG Life Trust ("Life Trust"), which are wholly owned subsidiaries of GWG Life. Although GWG Life's assets, including its equity in DLP IV and its beneficial interest in Life Trust, serve as collateral for our L Bonds, the life insurance policies held by DLP IV and Life Trust, which comprise a substantial majority of our life insurance policies, do not serve as direct collateral for the L Bonds. Further, the life insurance policies held by DLP IV are pledged as direct collateral securing the obligations under our amended and restated senior credit facility. These facts present the risk to investors that the collateral security that we and GWG Life have granted for our obligations under the L Bonds may be insufficient to repay the L Bonds when they become due.

**Neither the SEC nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

*Cover continued on next page*

The date of this prospectus is      , 2020

App. 0758

We may call and redeem the entire outstanding principal and accrued but unpaid interest of any or all of the L Bonds at any time, and from time to time, without penalty or premium. L Bond holders will have no right to put (that is, require us to redeem) any L Bond prior to its due date unless in the case of a holder's death, bankruptcy or total permanent disability. In the event we agree to redeem L Bond upon the request of an L Bond holder — other than after death, bankruptcy or total permanent disability— we will impose a redemption fee of 6% against the outstanding principal balance of the redeemed L Bond. This redemption fee will be subtracted from the amount paid.

We do not intend to list our L Bonds on any securities exchange during the offering period, and we do not expect a secondary market in the L Bonds to develop. As a result, you should not expect to be able to resell your L Bonds regardless of how we perform. Accordingly, an investment in our L Bonds is not suitable for investors that require liquidity in advance of their L Bond's maturity date.

We maintain senior borrowing arrangements that subordinate to our senior lenders the right to payment on, and the collateral securing, the L Bonds. In addition, these borrowing arrangements restrict our receipt of distributions from certain of our operating subsidiaries, subject to certain exceptions. These provisions will restrict cash flows available for payment of principal and interest on the L Bonds. From time to time we may add or replace senior lenders and the particular arrangements under which we borrow from them.

**Investing in our L Bonds may be considered speculative and involves a high degree of risk, including the risk of losing your entire investment. See "Risk Factors" beginning on page 11 of this prospectus and the risks discussed in the documents we file with the SEC to read about the risks you should consider before buying our L Bonds. The L Bonds are only suitable for persons with substantial financial resources and with no need for liquidity in this investment.**

Please read this prospectus before investing and keep it for future reference. We file annual, quarterly and current reports with the SEC. This information will be available free of charge by contacting us at 325 N. Saint Paul Street, Suite 2650, Dallas, TX 75201, or by phone at (612) 746-1944. This information may also be accessed on our website at *www.gwgh.com*, and the SEC maintains a website at *www.sec.gov* that contains this information.

The L Bonds will be offered and sold on a best-efforts basis by Emerson Equity LLC, a registered broker-dealer and member of the Financial Industry Regulatory Authority ("FINRA"). Emerson Equity will be our dealer manager for the L Bonds in this offering for purposes of the Securities Act of 1933, as amended. Our dealer manager will enter into participating dealer agreements with certain other broker-dealers that are members of FINRA, referred to as "selling group members," to authorize those broker-dealers to sell our L Bonds. We will pay Emerson Equity a selling commission ranging from     % to     % of the principal amount of L Bonds sold, depending on the L Bonds' maturity date. We will also pay Emerson Equity additional compensation consisting of those items set forth in footnote (1) to the table below. The dealer manager will share its commissions and additional compensation, other than its dealer manager fee, with selling group members pursuant to the terms of each participating dealer agreement. The total amount of the selling commissions and additional compensation (including reimbursements, non-transaction-based and non-cash compensation) paid to Emerson Equity and any other FINRA member in the course of offering and selling L Bonds will not exceed     % of the aggregate gross offering proceeds we receive from the sale of L Bonds. We also may sell L Bonds at a discount from the public offering price through appropriate and designated distribution channels. See "Plan of Distribution" and "Use of Proceeds" for further information.

| | Units | Price to Investors | Aggregate Commission, Fees, and Expense Allowances[1][2] | Net Proceeds to Company |
|---|---|---|---|---|
| Minimum Investment | 25 | $ 25,000 | $ | $ (3) |
| Maximum Investment | 2,000,000 | $2,000,0000,000 | $ | $ (4) |

(1)  Assumes an average sales commission of     %. As explained above, actual commissions will vary based on the term of the L Bonds sold. Nevertheless, the total amount of selling commissions and additional compensation (consisting of (i) a dealer-manager fee payable to the dealer manager in an amount equal to     % of the principal amount of all L Bonds sold; (ii) an accountable expense allowance payable to the selling group members as described in the "Plan of Distribution," which may include due-diligence expenses of the dealer manager and selling group members set forth in a detailed and itemized invoice; (iii) wholesaling fees, which may consist of commissions and non-transaction-based compensation of the wholesalers; (iv) non-cash compensation; and (v) up to a     % reallowance to selling group members) will not exceed     % of the aggregate gross offering proceeds we receive from the sale of L Bonds. Accordingly, and assuming the sale of all $2,000,000,000 in principal amount of bonds offered hereby, the maximum amount of selling commissions we can pay is     % of the gross offering proceeds we receive from the sale of the L Bonds (or $100,000,000), and the maximum amount of additional compensation we can pay will not exceed     % of the

aggregate gross offering proceeds we receive from the sale of the L Bonds (or $        ). See "Plan of Distribution" for further information.

(2)  Emerson Equity has agreed to offer the L Bonds on a "best efforts" basis.

(3)  Net Proceeds to Company based on the minimum investment are calculated after deducting (i) selling commissions and (ii) additional compensation (consisting of the dealer-manager fee, a wholesaling fee, an accountable expense allowance and non-transaction-based and non-cash selling compensation). We expect that our own offering expenses, consisting of legal, accounting, printing, mailing, registration, qualification and associated securities offering filing costs and expenses, will, through the course of the offering, aggregate to approximately $2,400,000, but for purposes of illustrating the Net Proceeds to Company based on the minimum investment, those offering expenses of $2,400,000 are not reflected.

(4)  Net Proceeds to Company based on the Maximum Offering of 2,000,000 L Bond Units (representing $2,000,000,000 in aggregate principal amount) are calculated as described in footnote (3) above, but also before deducting our estimated offering-related expenses of $2,400,000.

L Bonds will be sold as "Units," with each whole Unit representing $1,000 in principal amount of L Bonds. We will issue the L Bonds in book-entry form, certificated form, or in the form of a global certificate deposited with a depositary. Depending on the manner in which you purchase L Bonds, you may not receive a physical certificate representing your L Bonds. In all cases, however, we will deliver written confirmation to purchasers of L Bonds. Bank of Utah will act as trustee for the L Bonds.

The current interest rates for the L Bonds based on their applicable maturity is set forth in the table below.

| Maturity Term | Interest Rate (%) |
|---|---|
| 2 years | |
| 3 years | |
| 5 years | |
| 7 years | |

We may change the interest rates applicable to unsold L Bonds from time to time during this offering, in which case the applicable interest rates will be set forth in a supplement to this prospectus. Once an L Bond is sold, the interest rate will not change during its term (subject, however, to the extension and renewal provisions contained in that L Bond).

App. 0762

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| ABOUT THIS PROSPECTUS | ii |
| INDUSTRY AND MARKET DATA | ii |
| HOW TO PURCHASE L BONDS | iii |
| PROSPECTUS SUMMARY | 1 |
| RISK RELATING TO FORWARD-LOOKING STATEMENTS | 10 |
| RISK FACTORS | 11 |
| USE OF PROCEEDS | 15 |
| DESCRIPTION OF THE L BONDS | 16 |
| PLAN OF DISTRIBUTION | 31 |
| MATERIAL FEDERAL INCOME TAX CONSIDERATIONS | 35 |
| STATE, LOCAL AND FOREIGN TAXES | 38 |
| ERISA CONSIDERATIONS | 39 |
| LEGAL MATTERS | 41 |
| EXPERTS | 41 |
| WHERE YOU CAN FIND MORE INFORMATION | 41 |
| INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE | 41 |



GWG Holdings, Inc.
325 N. Saint Paul Street, Suite 2650

Dallas, TX 75201
Tel: (612) 746-1944
Fax: (612) 746-0445

i

App. 0763

## ABOUT THIS PROSPECTUS

We have prepared this prospectus as part of a registration statement that we filed with the SEC for our continuous offering of L Bonds.

The registration statement we filed with the SEC includes exhibits that provide more detailed descriptions of the matters discussed in this prospectus and certain information that is incorporated by reference. You should read this prospectus, the related exhibits filed with the SEC, and any prospectus supplement(s), together with additional information described below under "Where You Can Find More Information," and the documents that are incorporated by reference into this prospectus. Any statement that we make in this prospectus will be modified or superseded by any inconsistent statement made by us in a prospectus supplement (or other disclosure incorporated into this prospectus by reference). This prospectus contains summaries of certain other documents, which summaries contain all material terms of the relevant documents and are believed to be accurate, but reference is hereby made to the full text of the actual documents for full and complete information concerning those documents. All documents relating to this offering, if readily available to us, will be made available to a prospective investor or its representatives upon request.

The L Bonds will be issued under an amended and restated indenture, as may be amended or supplemented from time to time (referred to herein as the "indenture"). This prospectus is qualified in its entirety by the terms of that indenture filed with SEC as an exhibit to the registration statement of which this prospectus is a part. All material terms of the indenture are summarized in this prospectus. You may obtain a copy of the indenture upon written request to us or online at *www.sec.gov*.

The indenture trustee did not participate in the preparation of this prospectus and makes no representations concerning the L Bonds, the collateral, or any other matter stated in this prospectus. The indenture trustee has no duty or obligation to pay the L Bonds from its funds, assets or capital or to make inquiry regarding, or investigate the use of, amounts disbursed from any account.

You should rely only on the information contained in this prospectus, as the same may be supplemented by prospectus supplements or other public disclosure incorporated into this prospectus by reference. Neither we nor the dealer manager have authorized any other person to provide you with any information different from that contained in this prospectus, a supplement, information incorporated into this prospectus by reference, or information furnished by us upon request as described herein. The information contained in this prospectus is complete and accurate only as of the date of this prospectus, regardless of the time of delivery of this prospectus or sale of our securities.

**No information contained herein, nor in any prior, contemporaneous or subsequent communication should be construed by a prospective investor as legal or tax advice. Each prospective investor should consult its, his or her own legal, tax and financial advisors to ascertain the merits and risks of the transactions described herein prior to purchasing the L Bonds. This written communication is not intended to be written advice as defined in Circular 230 published by the U.S. Treasury Department.**

In this prospectus, we use the term "day" to refer to a calendar day, and we use the term "business day" to refer to any day other than Saturday, Sunday, a legal holiday or a day on which banks in New York City are authorized or required to close.

## INDUSTRY AND MARKET DATA

The industry and market data used throughout this prospectus have been obtained from our own research, surveys or studies conducted by third parties and industry or general publications. Industry publications and surveys generally state that they have obtained information from sources believed to be reliable, but do not guarantee the accuracy and completeness of such information. We believe that each of these studies and publications is reliable.

ii

**HOW TO PURCHASE L BONDS**

If, after carefully reading this entire prospectus, obtaining any other information requested and available, and being fully satisfied with the results of pre-investment due-diligence activities, you would like to purchase L Bonds, you will have two different ways in which to consummate a purchase: (1) DTC settlement, or (2) direct settlement with the Company.

1. *Depositary Trust Company Settlement (DTC settlement).*    You can place an order for the purchase of L Bonds using DTC Settlement through your selling group member (i.e., your broker-dealer). A selling group member using this service will have an account with a DTC participant in which your funds will be placed to facilitate a closing on our periodic DTC closing cycle (typically, closings will occur on a bi-monthly cycle). Orders may be placed until the cyclical order due date. Orders will be executed by your selling group member electronically and you must coordinate with your selling group member's registered representative to pay the full purchase price for the L Bonds by the trade date. You will be credited with ownership of an L Bond on the second business day following the periodic DTC closing cycle in which the purchase is made. Nevertheless, interest will accrue for a period of 15 or 30 days for the month in which your purchase is made, depending on when during the DTC closing cycle your purchase is made. Your purchase price for L Bonds purchased in this way will not be held in escrow. This process is different if you purchase L Bonds through direct settlement with the Company as described below.

2. *Direct Settlement with the Company.*    If you wish to purchase L Bonds through direct settlement with the Company, then you must complete, execute and return the Subscription Agreement to us together with a certified check or personal check payable to the order of "GWG Holdings, Inc. — Subscription Account" (or wire sent to the Subscription Account) equal to the principal amount of L Bonds you wish to purchase. You will be credited with ownership of an L Bond, and interest will begin to accrue, from the date on which your fully paid subscription is accepted. If you are working with a selling group member, your subscription materials and the wire transfer, certified check or personal check should be delivered to your selling group member, who will deliver it to us at the following address:

<div align="center">

**GWG Holdings, Inc.**
**325 North St. Paul Street, Suite 2650**
**Dallas, TX, 75201**

<u>**Wire Instructions**</u>
GWG Holdings, Inc. — Subscription Account
Account: 500023916
Routing: 091310521
Bank Name: Bell Bank

</div>

Your purchase is subject to our acceptance. All information provided is confidential and will be disclosed only to our directors, officers and employees who need to know, affiliates, the managing broker-dealer, legal counsel and, if required, to governmental authorities and self-regulatory organizations or as otherwise required by law. For your purchase to be effective as of the first business day of a calendar month, your completed and executed Subscription Agreement, together with your related funds, must be received and accepted by us on or prior to the final settlement date (settlement dates normally occur on a bi-monthly basis).

Upon our receipt of the signed Subscription Agreement and acceptance of your purchase, we will notify you of such acceptance. In our sole discretion, we may accept or reject any purchase, in whole or in part. In the event we do not accept your purchase of L Bonds for any reason, we will promptly return your payment. We may terminate or suspend this offering at any time, for any reason or no reason, in our sole discretion. You may obtain a copy of the Subscription Agreement from our website at *www.gwgh.com*, from your selling group member (if you are working with one), or by contacting us at 1-877-494-2388.

<div align="center">

iii

</div>

**COVERED SECURITY**

Our L Bonds are a "covered security." The term "covered security" applies to securities exempt from state registration pursuant to Section 18 of the Securities Act of 1933. Generally, securities listed on national exchanges are the most common type of covered security exempt from state registration. A non-traded security also can be a covered security if it has a seniority greater than or equal to other securities from the same issuer that are listed on a national exchange. Our L Bonds are a covered security because they will be senior to our common stock, which is listed on The Nasdaq Capital Market, and therefore our offering of L Bonds is exempt from state registration.

**Although the status of our L Bonds as a "covered security" will facilitate their purchase and sale to a broader range of investors than would otherwise be available to us, and although the offer and sale of a "covered security" generally involves fewer issuance costs to the issuer of such securities, our L Bonds are not a suitable purchase for all investors. Investors are urged to read carefully the risk factors relating to our business and our Company contained in the Risk Factors section of this prospectus beginning on page 11 and under Item 1A, entitled "Risk Factors," of our Annual Report on Form 10-K for the year ended December 31, 2019, which is incorporated by reference herein. In addition, investors should understand that because our L Bonds are a "covered security" exempt from state securities regulations, neither our Company, the L Bonds, or any other aspects of this offering have been the subject of any merit-based review by state securities regulators.**

iv

**QUESTIONS AND ANSWERS ABOUT THIS OFFERING**

*The following questions and answers about this offering highlight material information regarding us and this offering that you may wish to review. Nevertheless, you should read this entire prospectus, including the section entitled "Risk Factors," and the documents incorporated by reference into this prospectus, before deciding to purchase our L Bonds.*

**Can you explain and clarify the interplay between GWG Holdings, Inc. and GWG Life, LLC and its subsidiaries in relation to the L Bonds and the registration statement?**

GWG Holdings, Inc. will be issuing the L Bonds, receiving all proceeds from the sale of L Bonds, and will be the only entity making regular payments on the L Bonds. Nevertheless, because a significant amount of our consolidated assets is held in our subsidiary GWG Life, LLC (and its own subsidiaries), GWG Life is a guarantor of our obligations under the L Bonds. As guarantor of the L Bonds, SEC rules require that GWG Life be included as a co-registrant under this registration statement. GWG Life will not, however, be otherwise involved in the offering of L Bonds.

**It seems as though you are offering several L Bonds with different interest rates and maturities but calling them all L Bonds. Is this the case?**

All bonds we issue in this offering will have identical terms, except (1) the interest rate and (2) the maturity length or "term." In this regard, we have essentially created multiple classes of L Bonds, similar to how companies may have different classes of stocks with slightly different economic rights. Currently, we are offering four classes of L Bonds, as follows:

- "Class 2-2" L Bonds will mature two years from their issuance and accrue interest at      % *per annum.*

- "Class 3-2" L Bonds will mature three years from their issuance and accrue interest at      % *per annum.*

- "Class 5-2" L Bonds will mature five years from their issuance and accrue interest at      % *per annum.*

- "Class 7-2" L Bonds will mature seven years from their issuance and accrue interest at      % *per annum.*

The economic terms for each L Bond in any particular class will be identical to all other L Bonds in the same class (other than the date of maturity). In the event we adjust the interest rate for any class of bonds we offer, we will create a new class of L Bonds. Upon the renewal of any L Bonds we have sold, any new interest rate applied to an L Bond will be applied to all L Bonds in the same class.

**Your prospectus states that the interest rate for the L Bonds may be adjusted from time to time during the course of the offering. Will any such adjustment apply retroactively to L Bonds already issued?**

No. Once you purchase an L Bond, the interest rate on that L Bond will not change during the entirety of its original term. The interest rate on an issued L Bond may, however, be adjusted upon renewal of that L Bond. In any such case, we will advise you of any different interest rate that may apply to your L Bond upon renewal. In sum, any new interest rates for the L Bonds will apply only to newly issued L Bonds sold or renewed after the date of any interest rate change. Our decision to change interest rates depends on numerous factors, including but not limited to things such as market interest rates, our capitalization, the demand for our L Bonds, the life settlement market in general, our capital requirements, and other factors. Please see "Description of the L Bonds — Interest Rate."

**How do I subscribe for L Bonds, and what is the settlement process?**

L Bonds may be purchased either directly from the Company or through your broker-dealer (also referred to in this prospectus as a selling group member), who utilizes a participant in the DTC system and offers "DTC settlement."

*Direct Settlement*

If you purchase directly from the Company, you will send your completed and executed Subscription Agreement, together with your subscription amount to us at the address listed in "How to Purchase L Bonds." Your subscription amount is the principal amount of L Bonds you wish to purchase, and should be paid through a certified check or personal check payable to the order of "GWG Holdings, Inc. — Subscription Account." In lieu of paying by check, you may wire your subscription amount to the account referenced in "How to Purchase L Bonds." If you are working with a broker-dealer or other investment professional, your broker-dealer or professional will gather and send in the required information on your behalf, and may facilitate your payment of the subscription amount.

v

Once we have received your subscription amount and required documentation, we will either reject or accept your subscription. If accepted, you will be credited with ownership of the L Bond, we will have immediate access to your subscription amount and you will start to accrue interest on your investment at the rate applicable to the L Bond you have purchased. If you purchase directly from the Company, your L Bond will ordinarily be issued in book-entry (or, if requested, certificated) form and payments will be made directly into the account you indicate in your Subscription Agreement.

*DTC Settlement*

Purchasing through a DTC participant is a slightly different process. In this case, you will provide your order for the purchase of L Bonds to your broker-dealer, together with such other information as your broker-dealer may require. Your broker-dealer will ensure your order is electronically placed with the Company and that the Company timely receives your subscription amount. There is no need to furnish the Company with a Subscription Agreement when you purchase through a broker-dealer that utilizes a participant in the DTC system and offers "DTC settlement." However, your broker-dealer may require additional documents.

Once we have received your subscription amount, we will either reject or accept your subscription. Once accepted based on our DTC closing cycle, we will have immediate access to your subscription amount and you will start to accrue interest on your investment at the rate applicable to the L Bond you have purchased. Nevertheless, you will be credited with ownership of an L Bond on the second business day after the end of the closing cycle in which your subscription is accepted. Interest will accrue for a period of 15 or 30 days for the month in which your purchase is made, depending on when during the DTC closing cycle your purchase is made. If you purchase through a broker-dealer who utilizes a participant in the DTC system and offers "DTC settlement," your L Bond will be issued to DTC in the name of Cede & Co., as its nominee. In this sense, DTC will be the legal owner of the L Bond and you will be the beneficial owner. Your ownership of the L Bond should then appear on the brokerage or other investment statements you receive from your broker-dealer or custodian.

For so long as DTC settlement is approved, we intend to issue each class of L Bonds a unique identifying number (CUSIP) each month to facilitate the settlement of L Bonds. Thus, Class 2-2 L Bonds issued in May 2020 (and maturing May 2022) will all have the same CUSIP, which will be different from the CUSIP applicable to Class 2-2 L Bonds issued in September 2020 (and maturing September 2022). In this way, all L Bonds belonging to a single CUSIP will be completely fungible, meaning that they will all mature on the same date and have identical terms so that one L Bond with a particular CUSIP is interchangeable with any other L Bond having the same CUSIP. This process creates a tracking system for the L Bonds to be issued to and transferred through DTC.

**What is the role of the trustee?**

The Bank of Utah is the trustee for the L Bonds. The role of the trustee is essentially to enforce the terms of the L Bonds on behalf of bondholders, including direct and beneficial holders, and facilitate the relationship between our Company and the bondholders. We must notify the trustee of certain events as required under the indenture, and the trustee will in turn notify bondholders. The trustee has also been granted a security interest in all of the assets of GWG Holdings and GWG Life for the benefit of the bondholders. The trustee has no duty to pay any obligations under L Bonds or to make inquiry regarding, or investigate the use of, amounts disbursed from any account. Upon an event of default under the indenture, and subject to those limitations in the indenture designed to benefit our senior creditors, the trustee may take action against us to enforce the rights of holders of the L Bonds.

**What is the role of the paying agent?**

The paying agent is the term ascribed to whomever it is that is making the payment to the holders of L Bonds. Presently, the Company has designated Computershare Trust Company, N.A. ("Computershare") to serve as the paying agent with respect to L Bonds settled through DTC, and the Company itself is the paying agent with respect to L Bonds settled directly with the Company. Please see "How to Purchase L Bonds," below. Computershare and the Company are therefore responsible for tracking investors' respective payment dates and ensuring timely payment of principal and interest under the L Bonds. The role of the paying agent is essentially mechanical, and does not ordinarily involve the exercise of discretion and judgment in the way that is typical for an indenture trustee.

vi

**Do I need to sign any paperwork in connection with the renewal of my L Bond?**

No. The terms of the L Bond allow for the automatic renewal into a new L Bond of an identical (or lesser) maturity, unless we receive notice from you. Upon maturity, the L Bonds will be automatically renewed for the same term at the interest rate we are offering at that time to other investors with similar aggregate L Bond portfolios for L Bonds.

**Can I resell or transfer my L Bond after it has been purchased?**

Yes. Since these L Bonds are being offered and sold pursuant to an effective registration statement, the L Bonds may be transferred so long as the transfer is documented in a form approved by us. We do not, however, expect a public trading market to develop for the L Bonds in the foreseeable future, if ever. Because of the lack of a trading market for L Bonds, it is unlikely that holders will be able to sell their L Bonds easily. If you wish to transfer your L Bond held in book-entry (or certificated) form, you should contact us. If you wish to transfer your L Bond held through DTC, you should contact your broker-dealer (i.e., your selling group member).

**How will I receive interest and principal payments on my L Bonds?**

This will depend on how you purchased your L Bond. If you purchased your L Bond directly from us, we will directly deposit our payments of interest and principal into the account indicated in your Subscription Agreement. If you purchased through DTC, all payments of principal and interest will be made to DTC, who will forward such payment to the DTC participant you hold your L Bonds through, which will then arrange to transfer the payment to your brokerage account. In this case, all accountings of what you have contributed and what you are owed will be the responsibility of your broker-dealer.

**What is GWG Holdings, Inc.?**

We are a financial services company committed to transforming the alternative asset industry with disruptive and innovative products and services. In 2018 and 2019, we consummated a series of transactions (as more fully described below) with Beneficient that has resulted in a significant reorientation of our business and capital allocation strategy towards an expansive and diverse exposure to alternative assets. Beneficient, through its subsidiaries, plans to operate three potentially high value, high margin lines of business: (i) private trust lending and liquidity products; (ii) trust and custody services; and (iii) financial technology.

While we are continuing our work to maximize the value of our secondary life insurance business, we do not anticipate purchasing additional life insurance policies in the secondary market and have increased capital allocated toward providing liquidity to a broader range of alternative assets, primarily through Beneficient. We believe Beneficient can finance investments in alternative assets that will generally produce higher risk-adjusted returns than those we generally can achieve from life insurance policies acquired in the secondary market. Furthermore, although we believe that our portfolio of life insurance policies is a meaningful component of a growing diversified alternative asset portfolio, we continue to explore various strategic alternatives for our life insurance portfolio aimed at maximizing its value, including a possible sale, refinancing or recapitalization of our life insurance portfolio.

Our common stock is listed on The NASDAQ Capital Market under the ticker symbol "GWGH." We are based in Dallas, Texas.

**What is your business strategy?**

We are a financial services company committed to transforming the alternative asset industry with disruptive and innovative products and services. In 2018 and 2019 we consummated a series of transactions with Beneficient that has resulted in a significant reorientation of our business and capital allocation strategy towards an expansive and diverse exposure to alternative assets.

vii

**Are there any risks involved in investing in this offering?**

Yes. Investing in our L Bonds involves a high degree of risk. You should carefully review the "Risk Factors" section of this prospectus and Item 1A, entitled "Risk Factors," of our Annual Report on Form 10-K for the year ended December 31, 2019, which is incorporated by reference herein, which contain a detailed discussion of the material risks that you should consider before investing in our L Bonds.

**How long will this offering last?**

The offering is a continuous offering. The offering expires under SEC rules after three years from the effective date of the registration statement of which this prospectus forms a part. We may, however, conduct similar or identical offerings of L Bonds or other securities during this same time or afterwards. We may also decide to terminate this offering at any time.

**Will I be notified of how my investment is doing?**

We will provide you with periodic updates on our performance through periodic filings we make with the SEC. Such filings will include: (i) three quarterly financial reports; (ii) one annual report; (iii) supplements to this prospectus, as appropriate; and (iv) such other reports as required under Section 13 of the Securities Exchange Act of 1934. Such information is also available on our website at *www.gwgh.com*.

**Will I receive annual tax information regarding interest payments from you?**

You will receive a Form 1099-INT, which will be mailed by January 31 of each year.

**Who can help answer my questions about the offering?**

If you have more questions about our offering, you should contact a registered representative of your broker-dealer (i.e., your selling group member) or other investment professional, or else contact:

GWG Holdings, Inc.
325 N. Saint Paul Street, Suite 2650
Dallas, TX 75201
(612) 746-1944
Attention: General Counsel

App. 0771

**PROSPECTUS SUMMARY**

*This summary highlights some of the information in this prospectus. It is not complete and may not contain all of the information that you may want to consider. To understand this offering fully, you should carefully read the entire prospectus, including the section entitled "Risk Factors," and the documents that are incorporated by reference into this prospectus, including Item 1A, entitled "Risk Factors," of our Annual Report on Form 10-K for the year ended December 31, 2019, before making a decision to invest in our L Bonds. Unless otherwise noted or unless the context otherwise requires, the terms "we," "us," "our," the "Company" and "GWG" refer to GWG Holdings, Inc. together with its wholly owned direct or indirect subsidiaries. In instances where we refer specifically to "GWG Holdings" or "GWG Holdings, Inc.," or where we refer to a specific subsidiary of ours by name, we are referring only to that specific legal entity.*

**Our Company**

We are a financial services company committed to transforming the alternative asset industry with disruptive and innovative products and services. In 2018 and 2019 we consummated a series of transactions with The Beneficient Company Group, L.P. ("Ben LP," and, including all of the subsidiaries it may have from time to time, "Beneficient") that has resulted in a significant reorientation of our business and capital allocation strategy towards an expansive and diverse exposure to alternative assets. As part of this reorientation, we also changed our Board of Directors and executive management team.

Beneficient, through its subsidiaries, plans to operate three potentially high value, high margin lines of business:

- <u>Private Trust Lending & Liquidity Products.</u> Through Beneficient Capital Company, L.L.C. ("BCC"), Beneficient provides a unique suite of private trust, lending and liquidity products focused on bringing liquidity to owners of professionally managed alternative assets. Beneficient's innovative liquidity solutions are designed to serve mid-to-high net worth ("MHNW") individuals, small-to-mid sized ("STM") institutions, and asset managers who have historically possessed few attractive options to access early liquidity from their alternative assets. Beneficient targets MHNW clients with $5 million to $30 million in net worth and STM institutional clients typically holding less than $1 billion in assets.

- <u>Trust and Custody Services.</u> Through Beneficient Administrative and Clearing Company, L.L.C. ("BACC") and (subject to capitalization) through PEN Indemnity Insurance Company, LTD ("PEN"), Beneficient plans, in the future, to market retirement funds, custody and clearing of alternative assets, and trustee and insurance services for covering risks attendant to owning or managing alternative assets.

- <u>Financial Technology.</u> Through Ben Markets Management Holdings, L.P., formerly called ACE Portal, L.L.C. ("ACE"), Beneficient plans in the future to provide online portals and financial technologies for the trading and financing of alternative assets.

Beneficient's existing and planned products and services are designed to support the tax and estate planning objectives of its MHNW clients, facilitate a diversification of assets or simply provide administrative management and reporting solutions tailored to the goals of the investor who owns alternative investments.

While we are continuing our work to maximize the value of our secondary life insurance business, we do not anticipate purchasing additional life insurance policies in the secondary market and have increased capital allocated toward providing liquidity to a broader range of alternative assets, primarily through investments in Beneficient. We believe Beneficient's operations will generally produce higher risk-adjusted returns than those we can achieve from life insurance policies acquired in the secondary market. Furthermore, although we believe that our portfolio of life insurance policies is a meaningful component of a growing diversified alternative asset portfolio, we continue to explore strategic alternatives for our life insurance portfolio aimed at maximizing its value, including a possible sale, refinancing or recapitalization of our life insurance portfolio.

We completed our transactions with Beneficient to provide us with a significant increase in assets and common shareholder equity. In addition, our transactions with Beneficient provide us with the opportunity for a diversified source of future earnings within the alternative asset industry. As GWG and Beneficient expand their strategic relationship, we believe the Beneficient transactions will transform GWG from a niche provider of liquidity to owners of life insurance to, as GWG and Beneficient expand their strategic relationship, a full-scale provider of trust and liquidity products and services to owners of a broad range of alternative assets.

**Organizational Structure**

GWG Holdings conducts its life insurance secondary market business through a wholly owned subsidiary, GWG Life, and GWG Life's wholly owned subsidiaries, Life Trust and DLP IV. GWG Holdings' indirect interests in loans collateralized by cash flows from other alternative assets are held by Ben LP and its general partner, Beneficient Management, L.L.C. ("Beneficient Management"). All of these entities are legally organized in the state of Delaware, other than GWG Life Trust, which is governed by the laws of the state of Utah. GWG Holdings' wholly owned subsidiary, Life Epigenetics Inc. (formerly named Actüa Life & Annuity Ltd.) ("Life Epigenetics"), was formed to commercialize epigenetic technology for the longevity industry. Through its wholly owned subsidiary, youSurance General Agency, LLC ("youSurance"), GWG Holdings sought to offer life insurance directly to customers utilizing epigenetic technology. On November 11, 2019, GWG Holdings contributed the common stock of Life Epigenetics and membership interests in youSurance to a legal entity, InsurTech Holdings, LLC ("InsurTech Holdings"), in exchange for 100% of the membership interest in InsurTech Holdings (on March 2, 2020, InsurTech Holdings changed its name to FOXO BioScience LLC). Although we currently own 100% of the equity of InsurTech Holdings, we do not have a controlling financial interest in InsurTech Holdings because InsurTech Holdings' managing member has substantive participating rights. Therefore, we account for our ownership interest in InsurTech Holdings as an equity method investment. Our headquarters are currently located in Dallas, Texas.

Beneficient was formed in 2003 but began its alternative asset business in September 2017. Beneficient operates primarily through its subsidiaries, which provide Beneficient's products and services. These subsidiaries include: (i) BCC, through which Beneficient offers loans and liquidity products; (ii) BACC, through which Beneficient provides services for fund and trust administration and plans to provide custody services; (iii) PEN, through which Beneficient plans to offer insurance services; and (iv) ACE, through which Beneficient plans to provide an online portal for direct access to Beneficient's financial services and products.

In the second quarter of 2019, in connection with the expansion of our strategic relationship with Beneficient, (i) our former chief executive officer resigned and was replaced with Murray T. Holland, a trust advisor of various related trusts (the "Seller Trusts"), which control a majority of our outstanding common stock, and (ii) all then current members of our Board of Directors resigned as directors of the Company, and 11 individuals designated by Beneficient were appointed as directors of the Company. Shortly thereafter, three additional directors were appointed to our Board of Directors. On October 11, 2019, four members of the Board of Directors resigned as directors of the Company, and the size of the Board of Directors was reduced from 14 to ten directors in order to facilitate the Board of Directors' ability to oversee the Company's operations in an efficient and effective manner. Under our current conflicts of interest policy, all transactions between the Company and its wholly owned subsidiaries, on the one hand, and related parties (including Beneficient and its controlled affiliates), on the other hand, must be approved by disinterested directors. On December 31, 2019, we entered into a Preferred Series A Unit Account and Common Unit Investment Agreement (the "Investment Agreement") with Ben LP, Beneficient Company Holdings, L.P. and Beneficient Management pursuant to which, among other things, we obtained the right to appoint a majority of the board of directors of Beneficient Management. As a result, the Company obtained control of Ben LP and began reporting the results of Ben LP and its subsidiaries on a consolidated basis beginning on the transaction date of December 31, 2019.

**Market Opportunity**

*Alternative Asset Liquidity Products and Services*

The market demand for liquidity from owners of alternative assets is attributable to the outstanding net asset value of illiquid alternative assets ("NAV") held by U.S. investors. Using data from various published industry reports from 2017 to 2019, certain widely accepted commercial private-equity databases, and applying its own proprietary assumptions and calculations ("Ben Estimates"), Beneficient estimates that total outstanding NAV held by U.S. investors exceeded $4.0 trillion in 2019 (up from an estimated $3.0 trillion in 2018).

According to at least one industry report from Prequin from 2018, total outstanding NAV in the hands of U.S. investors grew at a 12.1% compound annual growth rate ("CAGR") for the ten years ended 2018 and was forecasted to grow at an 8% CAGR through 2023 as a result of continued increases in capital committed to the alternative asset class.

According to Ben Estimates, the large U.S. institutions representing approximately 54% of the NAV have consistently sought liquidity on approximately 1.85% to 2.25% of their outstanding NAV. Based on Ben Estimates, this has led to an annual demand for liquidity of nearly $50 billion in recent years.

A primary group not included in this demand is the MHNW investor who holds investments of $5 million to $50 million compared to a large institution's holdings in the hundreds of millions or billions of dollars. Intermediary brokers will often not represent the MHNW individuals (or STM institutional investors). According to Ben Estimates, MHNW investors hold over $700.0 billion in NAV, yet MHNW investors have only been able to access liquidity representing less than 0.5% of the NAV held by them each year, compared to the average 2% achieved by the large institutional owners, representing 54% of the market.

Based on these amounts, Beneficient estimates that MHNW investors would seek liquidity of 3% of their outstanding NAV each year if liquidity was made available to them, or a slightly greater percentage than that of large U.S. institutions. As a result, and according to Ben Estimates, the estimated market demand for liquidity by MHNW individuals would have exceeded $20.0 billion in 2019.

2

*Secondary Life Insurance Market*

The market for life insurance is large. According to the American Council of Life Insurers Fact Book 2018 (ACLI), consumers owned approximately $12.0 trillion in face value of individual life insurance policy benefits in the United States in 2017. In that same year, the ACLI reports that individual consumers purchased an aggregate of $3.1 trillion of new individual life insurance policy benefits. This figure includes all types of individual life policies, including term insurance and permanent insurance known as whole life and universal life.

The life insurance secondary market primarily serves consumers, 65 years and older, and their families who own life insurance.

The secondary market for life insurance exists as a result of consumer lapse behaviors and surrender values far below economic value offered to consumers for their life insurance by the issuing insurance carriers. The ACLI reports that the annual lapse and surrender rate for individual life insurance policies is 5.7% of the in-force face value of benefits, amounting to over $680 billion in face value of policy benefits lapsed and surrendered in 2017 alone.

In 2017, the National Association of Insurance Commissioners ("NAIC") issued a policy bulletin in support of products we provide. The bulletin described these products as "innovative private market solutions for financing Americans' long-term care needs." The NAIC, citing the Company's August 25, 2016 presentation, discussed how consumers could exchange the market value of their life insurance policies for products designed to fund long-term care expenses.

*Primary Life Insurance Market and Technology ("Insurtech")*

The opportunity to apply technology to transform the insurance industry is significant. The application of technology to the insurance industry, commonly referred to as "insurtech", provides opportunities for new entrants into the traditional insurance marketplace that have the potential to significantly disrupt the insurance industry's historical approach to assessing and selecting acceptable underwriting risks.

As discussed in the Organizational Structure section above, on November 11, 2019, GWG contributed the common stock and membership interests of its previously-wholly owned subsidiaries, Life Epigenetics and youSurance, to InsurTech Holdings. This transaction affected a reorganization such that InsurTech owns only two direct subsidiaries, Life Epigenetics and youSurance, which hold all insurtech assets, and one indirect subsidiary, Scientific Testing Partners, LLC, a wholly owned subsidiary of Life Epigenetics. In connection with the transaction, GWG Holdings contributed $2.1 million in cash to InsurTech Holdings during the fourth quarter of 2019 and is committed to contribute an additional $17.9 million to the entity over the next two years.

**Business Strategies**

*1. Liquidity for Alternative Assets*

We believe we are now uniquely positioned to provide liquidity and related services to investors holding a full range of illiquid alternative assets. We will continue to work to create the most value for holders of alternative assets, the financial professionals who advise them and for our shareholders.

Beneficient provides private trust solutions, including a unique suite of lending and liquidity products focused on bringing liquidity to owners of alternative assets. Beneficient's innovative liquidity solutions are designed to serve MHNW individuals, STM institutions, and asset managers who have historically possessed few attractive options to access early liquidity from their alternative assets. Beneficient targets MHNW individual clients with $5 million to $30 million in investments and institutional clients typically holding less than $1 billion in assets.

Beneficient's products can also support tax and estate planning objectives, facilitate a diversification of assets or provide administrative management and reporting solutions tailored to the goals of the investor. In the future, Beneficient plans to offer insurance services covering risks associated with owning or managing alternative assets.

Our life insurance secondary market business is designed to serve consumers 65 years or older owning life insurance. We seek to earn non-correlated yield from life insurance policies that we purchased in the secondary market. Since inception, we have purchased over $3.2 billion in face value of policy benefits from consumers for over $620 million, as compared to the $52 million in surrender value offered by insurance carriers on those same policies. Our products provide unique and valuable services to the senior consumers that we serve.

3

The goal of our secondary life insurance business has been to build a profitable, large and well-diversified portfolio of life insurance assets. We believe that scale and diversification are key factors and risk mitigation strategies to provide consistent cash flows and reliable investment returns. We believe that we have reached the goal in terms of portfolio size and diversification. We do not anticipate making additional investments in the life settlements portfolio as we believe Beneficient's operations will generally produce higher risk-adjusted returns than those we can achieve from life insurance policies acquired in the secondary market.

*2. Developing a World Class Financial Services Distribution Platform*

GWG has developed a large and sophisticated financial services product distribution platform. Today, this platform consists of over one hundred independent broker dealers and several thousand "independent" financial advisors ("Retail Distribution") who sell the Company's investment products. "Independent" in this context refers to broker-dealers that accommodate financial advisors who carry securities licenses and need back-office support for services, such as compliance and trade execution, but allow their advisors wide latitude in how they conduct business. Since inception, GWG has raised over $1.52 billion of debt and equity capital to support our secondary market of life insurance business and related expenditures.

We believe that we are well positioned to continue to grow our Retail Distribution for several reasons:

- We believe there is a trend towards financial professionals leaving large full-service broker-dealers to become "independent";

- Newly independent financial professionals and their clients demand a high level of customer service and access to innovative and value added products;

- The significant demand for liquidity from owners of alternative assets by US investors;

- We believe that our expanded relationship with Beneficient will attract more and larger broker dealers to our platform due to our increased size and market capitalization as well as the increase in products offered; and

- We believe that by using capital to provide liquidity products to our current customers, and as they begin to realize the benefit of these products, we will able to raise more capital and attract additional broker dealers into our selling group.

*3. Commercializing Advanced Epigenetic Technology for Primary Life Insurance Markets*

We believe life insurance underwriting will be transformed due to advancements in science and technology. As part of that transformational change, we believe the science of epigenetics will serve as a foundational science to this advancement for the life insurance industry by achieving more accurate and automated underwriting.

As described above, on November 11, 2019, the Company contributed the common stock and membership interests of its previously wholly-owned subsidiaries, Life Epigenetics and youSurance to InsurTech Holdings. We believe that as a separate entity (rather than as a small subsidiary of a large financial services holding company), the InsurTech Holdings businesses can reach their maximum potential in terms of marketing and branding, attraction of talent, appropriate peer group comparisons and, ultimately, return to its owners. The Company will retain substantially all of the economics of InsurTech Holdings.

4

**The Offering**

| | |
|---|---|
| **Issuer** | GWG Holdings, Inc. |
| **Indenture Trustee** | Bank of Utah |
| **Paying Agent** | GWG Holdings, Inc. |

**Securities Offered**

We are offering up to 2,000,000 Units of L Bonds ("L Bonds"), with each whole Unit representing $1,000 in principal amount of L Bonds. The L Bonds are being sold on a continuous basis.

**Method of Purchase**

We will sell L Bonds using two different closing or "settlement" services, whenever available. The first service is DTC settlement, and the second is direct settlement with the Company. For more information, see "Plan of Distribution." The registration statement of which this prospectus is a part also registers the renewal of L Bonds that are outstanding from time to time.

**Denomination**

The minimum purchase amount is 25 L Bond Units, or $25,000 in principal amount. Additional L Bonds in excess of 25 Units may be purchased in any number of whole or fractional Units.

**Offering Price**

$1,000 per whole Unit, representing 100% of the principal amount of the L Bond represented by a whole Unit. Throughout this prospectus, we refer to L Bond Units simply as "L Bonds."

**Limited Rescission Right**

If you are purchasing L Bonds through direct settlement with the Company and your Subscription Agreement is accepted at a time when we have determined that a post-effective amendment to the registration statement of which this prospectus is a part must be filed with the SEC, but such post-effective amendment has not yet been declared effective, you will have a limited time within which to rescind your investment subject to the conditions set forth in this prospectus. See "Description of the L Bonds — Limited Rescission Right" for additional information.

**Maturity**

You may generally choose maturities for your L Bonds of two, three, five or seven years. Nevertheless, depending on our capital requirements, we may not offer and sell L Bonds of all maturities at all times during this offering.

**Interest Rates**

The interest rate of the L Bonds will be established at the time of your purchase, or at the time of renewal, based upon the rates we are offering in this prospectus or our latest interest rate supplement to this prospectus (i.e., any prospectus supplement containing interest rate information for L Bonds of different maturities), and will remain fixed throughout the term of the L Bond. We may offer higher rates of interest to investors with larger aggregate L Bond portfolios, but only as set forth in the then-current interest rate supplement.

**Interest Payments**

We will pay interest in cash on the L Bonds based on the terms you choose, which may be monthly or annually. Interest will accrue from the effective date of the L Bond's issuance. If you purchase your L Bond directly from the Company, the effective date of your L Bond will be the date on which we accept your fully paid subscription. If you purchase your L Bond through DTC settlement, interest will begin accruing on the trade date. Based on our anticipated bi-monthly closing cycle, this means that interest will accrue for a period of 15 or 30 days for the month in which your purchase is made, depending on when during the DTC closing cycle your purchase is made. Interest payments will generally be made on the 15th day immediately following the last day of the month to the L Bond holder of record as of the last day of that interest-payment period. Interest will be paid without any compounding.

App. 0779

App. 0780

| | |
|---|---|
| **Principal Payments** | The maturity date for the L Bonds will be the last day of the month during which the L Bond matures. We are obligated to pay the principal on the L Bond in cash by the fifth day of the month next following its maturity (or the first business day following such date). |
| **Payment Method** | Principal and interest payments will be made in cash by direct deposit to the account you designate in your Subscription Agreement if you purchase L Bonds through direct settlement with the Company. If you purchase L Bonds through DTC settlement, principal and interest payments will be made to your brokerage or custodial account through DTC. |
| **Renewal or Redemption at Maturity** | Upon maturity, the L Bonds will be automatically renewed for the same term at the interest rate we are offering at that time to other investors with similar aggregate L Bond portfolios for L Bonds of the same maturity, unless repaid upon maturity at our or your election. In this regard, we will notify you at least 30 days prior to the maturity date of your L Bonds. In the notice, we will advise you if we intend to repay the L Bonds or else remind you that your L Bonds will be automatically renewed unless you exercise your option, at least 15 days prior to the maturity date, to elect to have your L Bonds repaid. If applicable, a new certificate will be issued. |
| | If we determine that a post-effective amendment to the registration statement covering the offer and sale of L Bonds must be filed during your 15-day repayment election period, we will extend your election period until ten days following the postmark date of our notice to you that the amendment has become effective. |
| | For any L Bonds offered hereby that mature after the three-year anniversary of the commencement of this offering, we expect that the renewal of such L Bonds may require us to file a new registration statement. In such a case, the new registration statement must be declared effective before we will be able to renew your L Bond. In this event, if the new registration statement has not yet been filed or become effective, we will extend your election period until ten days following the date of our notice to you that the new registration statement has become effective, which notice will include a new prospectus. |
| | If L Bonds with similar terms are not being offered at the time of renewal, then (i) the interest rate upon renewal will be (a) the rate specified by us in writing on or before the maturity date or (b) if no such rate is specified, the rate of your existing L Bonds, and (ii) the maturity will the same if L Bonds of the same maturity are then being offered at the time of renewal. If L Bonds of the same maturity are not then being offered at the time of renewal, then the maturity will be the next earliest maturity. Accordingly, you should understand that the interest rate offered upon renewal may differ from the interest rate applicable to your L Bonds prior to maturity. See "Description of the L Bonds — Renewal or Redemption on Maturity." |
| **Call and Redemption Prior to Maturity** | We may call and redeem the entire outstanding principal balance and accrued but unpaid interest of any or all of the L Bonds at any time without penalty or premium. L Bond holders will have no right to require us to redeem any L Bond prior to maturity unless the request is due to death, bankruptcy or total permanent disability. The indenture defines "total permanent disability" as the determination by a physician, approved by us, that a holder of an L Bond who is a natural person, and who was gainfully employed at the time of issuance of the L Bond (or its renewal date), is unable to work on a full-time basis during a period of 24 consecutive months. |
| | In our sole discretion, we may accommodate other requests to redeem any L Bond prior to maturity. If we agree to redeem an L Bond upon the request of an L Bond holder (other than in connection with death, bankruptcy or total permanent disability of a holder), we will impose a redemption fee of 6% against the outstanding principal balance of the L Bond redeemed, which fee will be subtracted from the amount paid. |

App. 0782

| | |
|---|---|
| **Ranking** | The L Bonds will constitute secured debt of GWG Holdings. The payment of principal and interest on the L Bonds will be: |

- pari passu with respect to payment on and collateral securing all L Bonds (including those issued under our prior L Bond offering) and the previously issued Seller Trust L Bonds due 2023 (the "Seller Trust L Bonds"), of which approximately $948.1 million and $366.9 million in principal amount was outstanding, respectively, as of December 31, 2019 (see the caption "— Collateral Security" below);

- structurally junior to the present and future obligations owed by DLP IV under a second amended and restated senior credit facility with LNV Corporation, and structurally or contractually junior to any future obligations that DLP IV or other primary obligors or guarantors may have under future senior secured borrowing facilities; and

- structurally junior to the present and future claims of other creditors of DLP IV, including trade creditors.

The indenture will permit us to issue other forms of debt, including senior and secured debt, in the future. Any such secured senior debt will have priority over L Bonds with respect to claims for payment and claims for any collateral that is shared as between the holders of L Bonds and such senior secured debt.

To fully understand the foregoing summary, you should understand that "pari passu" means that claims for payment and entitlement to security among the holders of L Bonds (including the holders of previously issued L Bonds) and the holders of any later-created class of "pari passu debt" of ours, will generally be treated equally and without preference. Debt issued on a pari passu basis in the future would be treated equally and without preference in respect of the L Bonds. Thus, in the event of any default on the L Bonds (or any other debt securities of ours that is pari passu with the L Bonds) resulting in claims for payment or claims on collateral security, the holders of the L Bonds and all such other debt securities that are pari passu with the L Bonds would share in payment or collateral in proportion to the amount of principal and interest owed on each such debt instrument. See "Description of the L Bonds — Ranking" for further information.

| | |
|---|---|
| **Guarantee** | The payment of principal and interest on the L Bonds (including those issued under our prior L Bond offering) and Seller Trust L Bonds is fully and unconditionally guaranteed by GWG Life. On December 31, 2019, there was approximately $948.1 million and $366.9 million, respectively, in outstanding principal amount of previously issued L Bonds and Seller Trust L Bonds. |
| **Collateral Security** | The L Bonds are secured by the assets of GWG Holdings, Inc. and by a guarantee and corresponding grant of a security interest in substantially all the assets of GWG Life. Our assets consist primarily of our investments in Beneficient, investments in our subsidiaries (including financing receivables from affiliates) and any cash proceeds we receive from life insurance assets of our subsidiaries, and all other cash and investments we hold in various accounts. |

7

App. 0783

GWG Life's assets, including its equity in our subsidiary DLP IV and its beneficial interest in Life Trust, serve as collateral for our L Bonds. However the life insurance policies held by DLP IV and Life Trust, which comprise a substantial majority of our life insurance policies, do not serve as direct collateral for the L Bonds. Further, the life insurance policies held by DLP IV are pledged as direct collateral securing the obligations under DLP IV's second amended and restated senior credit facility with LNV Corporation. The L Bonds' security interest will be structurally subordinate to the security interest in favor of our senior secured lender, together with any future senior secured lenders of ours. The assets of GWG Life, including proceeds it receives as distributions from DLP IV and derived from the insurance policies owned by DLP IV, are collateral for GWG Life's guarantee of the repayment of principal and interest on the L Bonds.

The L Bonds are also secured by a pledge of 3,952,155 shares of our common stock. For more information please see "Description of the L Bonds — Collateral Security."

**Indenture Covenants**

The indenture governing the L Bonds places restrictive covenants and affirmative obligations on us. For example, our debt coverage ratio may not exceed 90%.

The indenture defines the debt coverage ratio as the ratio, expressed as percentage, of (A) the aggregate sum of all Indebtedness (as defined in the indenture, other than Excluded Indebtedness, as described below) of GWG Holdings and its direct and indirect subsidiaries (including the Securities issued under the indenture, but excluding any Indebtedness of Ben LP and its direct and indirect subsidiaries) as reflected on GWG Holdings' most recent consolidated balance sheet prepared in accordance with GAAP over (B) the sum of (i) Net Present Asset Value (as defined in the amended indenture) of Life Insurance Policies (as defined in the amended indenture) owned by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding Life Insurance Policies held by Ben LP and its direct and indirect subsidiaries and controlled affiliates, plus (ii) all cash (and cash equivalents) held by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding the cash (and cash equivalents) held by Ben LP and its direct and indirect subsidiaries, plus (iii) the original cost basis in GWG Holdings' investment in common units or other securities of Ben LP, plus (iv) the outstanding principal amount of any outstanding loans made under a commercial loan agreement with GWG Life, as lender, plus (v) the cost basis of assets contributed to GWG Holdings or any direct or indirect subsidiary of GWG Holdings in connection with a Repurchase Transaction (as defined below), plus (vi) without duplication, the value of all other assets of GWG Holdings and its direct and indirect subsidiaries or affiliates (but excluding the value of assets of Ben LP and its direct and indirect subsidiaries) as reflected on its most recent consolidated balance sheet prepared in accordance with GAAP.

The indenture defines "Excluded Indebtedness" as Indebtedness or any portion thereof (A) the principal and accrued but unpaid interest of which is payable at GWG Holdings' option, pursuant to the terms of such Indebtedness or otherwise, in Capital Stock (as defined in the amended indenture) of GWG Holdings or securities mandatorily convertible into or exchangeable for Capital Stock of GWG Holdings, or (B) any Indebtedness that is reasonably expected to be converted or exchanged, directly or indirectly, into Capital Stock of GWG Holdings, provided that under the terms of such Indebtedness in the event any such conversion or exchange does not occur in accordance with the terms of such transaction, such Indebtedness would be cancelled and any assets received in exchange for such Indebtedness would be returned (a "Repurchase Transaction").

For this purpose, the net present asset value of our life insurance assets is equal to the present value of the cash flows derived from the face value of policy benefit assets we own, discounted at a rate equal to the weighted-average interest rate paid on indebtedness, excluding that of Seller Trust L Bonds.

The net present asset value of our life insurance assets for purposes of this covenant is not necessarily the same as the fair value of our life insurance assets as reflected on our most recently available balance sheet prepared in accordance with U.S. generally accepted accounting principles ("GAAP") and does not necessarily reflect the saleable or market value of those assets.

We are required to notify the indenture trustee in the event we violate this restrictive covenant for a period of 30 consecutive days. An "event of default" will exist under the indenture if a violation of this covenant persists for a period of 60 calendar days after the trustee's notice to us of a breach, or such a notice received from the holders of at least 25% in principal amount of outstanding L Bonds.

The indenture also places limitations on our ability to engage in a merger or sale of all of our assets. See "Description of the Indentures — Events of Default" and "— Consolidation Mergers or Sales" for more information.

8

| | |
|---|---|
| **Use of Proceeds** | If all the L Bonds are sold, we would expect to receive up to approximately $    million of net proceeds from this offering after paying our estimated average selling commissions, dealer-manager fees, accountable expense allowance, wholesale commissions and our own offering-related expenses. There is no minimum amount of L Bonds that must be sold before we access investor funds. The exact amount of proceeds we receive may vary considerably depending on a variety of factors, including how long the L Bonds are offered. |
| | We intend to use the net proceeds from this offering to grow our alternative asset exposure, including through investments in Beneficient in the form of equity investments or loans, and to meet our other obligations, including debt obligations. Beneficient will have broad discretion to use the proceeds of any such investments and may use such proceeds to fund alternative asset financings, to repay indebtedness, including to related parties, and for general working capital purposes, including operating expenses. We may also use some of the proceeds from this offering to pay interest and principal amounts owing under previously issued L Bonds, Seller Trust L Bonds, and L Bonds offered hereby and for the payment of dividends on and redemption of our preferred stock. See "Use of Proceeds" for additional information. |
| **No Market for L Bonds Units; Transferability** | There is no existing market for the L Bonds and we do not anticipate that a secondary market for the L Bonds will develop. We do not intend to apply for listing of the L Bonds on any securities exchange or for quotation of the L Bonds in any automated dealer quotation system. Nevertheless, you will be able to freely transfer or pledge L Bonds. See "Description of the L Bonds — Transfers." |
| **Book Entry** | The L Bonds may be issued in book-entry form, certificated form, or in the form of a global certificate deposited with a depositary. See "Description of the L Bonds — Registration and Exchange." |
| **Covered Security** | Our L Bonds are a "covered security." The term "covered security" applies to securities exempt from state registration because of their oversight by federal authorities and national-level regulatory bodies pursuant to Section 18 of the Securities Act of 1933. Generally, securities listed on national exchanges are the most common type of covered security exempt from state registration. A non-traded security also can be a covered security if it has a seniority greater than or equal to other securities from the same issuer that are listed on a national exchange. Our L Bonds are a covered security because they are senior to our common stock, which is listed on The Nasdaq Capital Market, and therefore our offering of L Bonds is exempt from state registration. |
| | Although the status of our L Bonds as a "covered security" will facilitate their purchase and sale to a broader range of investors than would otherwise be available to us, and although the offer and sale of a "covered security" generally involves fewer issuance costs to the issuer of such securities, our L Bonds are not a suitable purchase for all investors. |
| **Risk Factors** | An investment in the L Bonds involves significant risks, including the risk of losing your entire investment, and may be considered speculative. Importantly, we maintain a senior borrowing arrangement that subordinates the right to payment on, and shared collateral securing, the L Bonds to our senior secured lender. From time to time we may add or replace senior lenders and the particular arrangements under which we borrow from them. In addition, these borrowing arrangements with senior lenders restrict, and are expected to continue to restrict, our cash flows and, subject to certain exceptions, distributions from our operating subsidiaries. These provisions will restrict cash flows available for payment of principal and interest on the L Bonds. For a summary of risks relating to this offering and our Company and business, please see "Risk Factors" beginning on page 11 of this prospectus and Item 1A, entitled "Risk Factors," of our Annual Report on Form 10-K for the year ended December 31, 2019, which is incorporated by reference herein. |

App. 0786

**RISK RELATING TO FORWARD-LOOKING STATEMENTS**

Certain matters discussed in this prospectus and the documents incorporated by reference contain forward-looking statements. These forward-looking statements reflect our current expectations and projections about future events and are subject to risks, uncertainties and assumptions about our operations and the investments we make, including, among other things, factors discussed under the heading "Risk Factors" below.

The words "believe," "could," "possibly," "probably," "anticipate," "estimate," "project," "expect," "may," "will," "should," "seek," "intend," "plan," "expect," or "consider" and similar expressions are intended to identify forward-looking statements but are not the exclusive means of identifying such statements. Forward-looking statements are subject to risks and uncertainties, which could cause actual results to differ materially from such statements. Such risks and uncertainties include, but are not limited to:

- the valuation of assets reflected on our financial statements, including the fair value of Beneficient's assets and liabilities, including noncontrolling interests, which were consolidated as a result of the transactions with Beneficient on December 31, 2019;

- the illiquidity of our life insurance and Beneficient-related investments and receivables from affiliates;

- our ability to realize the anticipated benefits from our consolidation of Beneficient;

- Beneficient's financial performance and ability to execute on its business plan;

- Beneficient's ability to obtain the trust charters from the Texas Department of Banking necessary to implement its business plan;

- our ability to obtain accurate and timely financial information from Beneficient;

- our ability to effectively transition the management and oversight roles served by our former executives and members of our Board of Directors;

- changes resulting from the evolution of our business model and strategy with respect to Beneficient and the life insurance secondary market;

- our reliance on debt financing and continued access to the capital markets;

- our significant and ongoing financing requirements;

- our predominant use of short term debt to fund a portfolio of long term assets could result in a liquidity shortage;

- our ability to make cash distributions in satisfaction of dividend obligations and redemption requests;

- our ability to satisfy our debt obligations if we were to sell our assets;

- our history of operating losses;

- general economic outlook, including prevailing interest rates and credit market conditions

- federal, state and FINRA regulatory matters;

- litigation risks;

- our ability to comply with financial and non-financial covenants contained in borrowing agreements;

- the reliability of assumptions underlying our actuarial models, including life expectancy estimates and our projections of mortality events and the realization of policy benefits;

- risks relating to the validity and enforceability of the life insurance policies we have purchased;

- our reliance on information provided and obtained by third parties, including changes in underwriting tables and underwriting methodology;

- life insurance company credit exposure;

- cost-of-insurance (premiums) increases on our life insurance policies;

App. 0788

- performance of our investments in life insurance policies; and

- risks associated with causing Life Epigenetics and youSurance to become independent of GWG.

We caution you that the foregoing list of factors is not exhaustive. Forward-looking statements are only estimates and predictions, or statements of current intent. Actual results, outcomes or actions that we ultimately undertake could differ materially from those anticipated in the forward-looking statements due to risks, uncertainties or actual events differing from the assumptions underlying these statements.

---

10

---

**RISK FACTORS**

*An investment in our securities involves a high degree of risk. Before purchasing the securities offered by this prospectus, you should carefully consider the risks, uncertainties and additional information (i) set forth in our most recent Annual Report on Form 10-K filed with the SEC which is incorporated by reference into this prospectus, and (ii) contained herein or in any applicable prospectus supplement. The information incorporated by reference into this prospectus specifically includes the risk factors contained in our Annual Report on Form 10-K filed with the SEC on March 27, 2020.*

*For a description of these reports and documents, and information about where you can find them, see "Where You Can Find More Information" and "Incorporation of Certain Documents by Reference." The risks and uncertainties in this prospectus and in the documents incorporated by reference in this prospectus are those that we currently believe may materially impact the Company and could result in the loss of all or a portion of your investment in the L Bonds. Additional risks not presently known or are currently deemed immaterial could also materially and adversely affect our financial condition, results of operations, business and prospects.*

**Risks Related to the Offering and the L Bonds**

***There is no established trading market for the L Bonds. If an actual trading market does not develop for the L Bonds, you may not be able to resell them quickly, for the price that you paid or at all.***

There is currently no existing market for the L Bonds and the L Bonds will not be listed for trading on any exchange. We cannot assure you as to the liquidity of any market that may develop for the L Bonds, the ability of holders of the L Bonds to sell them or the price at which the holders of the L Bonds may be able to sell them. The liquidity of any market for the L Bonds will depend on numerous factors, including prevailing interest rates, the market for similar securities and other factors, including general economic conditions and our own financial condition, performance and prospects. Historically, the market for debt securities, such as the L Bonds, has been subject to disruptions that have caused substantial price volatility. We cannot assure you that if a market for the L Bonds were to develop, such a market would not be subject to similar disruptions.

We also cannot assure you that you will be able to sell your L Bonds at a particular time or at all, or that the prices that you receive when you sell them will be favorable. If no active trading market develops, you may not be able to resell your L Bonds at their fair market value, or at all.

11

***The collateral granted as security for our obligations under the L Bonds and Seller Trust L Bonds may be insufficient to repay the indebtedness upon an event of default.***

GWG Holdings (the issuer of the L Bonds and Seller Trust L Bonds) and GWG Life (the guarantor of obligations under the L Bonds and Seller Trust L Bonds, and a wholly owned subsidiary of GWG Holdings) have each granted a security interest in substantially all of their respective assets to serve as collateral security for obligations under the L Bonds and Seller Trust L Bonds. Importantly, DLP IV, a wholly owned subsidiary of GWG Life, owns a substantial number of our life insurance policies, 77% of the face value of our life insurance portfolio as of December 31, 2019, and is the borrower under our second amended and restated senior credit facility with LNV Corporation. As the borrower under that second amended and restated senior credit facility with LNV Corporation, all of its assets — including all of its life insurance policy assets — serve as collateral for our obligations under the facility.

Because of the fact that a substantial number of our life insurance assets are held in our DLP IV subsidiary, and all of those life insurance assets serve as collateral security first for our obligations under our second amended and restated senior credit facility with LNV Corporation, holders of L Bonds and Seller Trust L Bonds risk the possibility that the collateral security granted in our life insurance policies and our investments in Beneficient to secure our obligations under the L Bonds and Seller Trust L Bonds may be insufficient to repay holders upon an event of default. Furthermore, while the indenture governing the L Bonds and the Seller Trust L Bonds limits the amount of debt relative to a measure of asset coverage we and our subsidiaries can incur, the indenture permits us and our subsidiaries to incur additional secured debt (subject to the debt coverage ratio) that may be senior to the L Bonds and Seller Trust L Bonds.

Furthermore, the life insurance policies and out investments in Beneficient that secure our obligations under the L Bonds and Seller Trust L Bonds are illiquid assets. As a result, the book value of those assets as reflected on our financial statements are based on numerous assumptions and may not necessarily reflect the current market price for those assets, especially in the event of a bulk or distressed sale. Furthermore, a substantial majority of the net assets of Beneficient are currently represented by goodwill as of December 31, 2019. Some or a substantial portion of the proceeds from L Bond sales may be used to make investments in Beneficient. Because these advances may be used by Beneficient for working capital purposes and to repay indebtedness, such investments may not increase the tangible assets securing the L Bonds. If the trustee for the L Bonds were forced to sell all or a portion of the collateral securing them, there can be no assurance that the trustee would be able to sell them for the prices at which we have recorded them, and the trustee might be forced to sell them at significantly lower prices.

***Subordination provisions contained in the indenture will restrict the ability of the trustee or the L Bond or Seller Trust L Bond holders to enforce their rights against us under the indenture, including the right to payment on the L Bonds, if a default then exists under a senior credit facility.***

The L Bonds and Seller Trust L Bonds will be subordinate in right of payment to any claims of our senior lender under the second amended and restated senior credit facility with LNV Corporation. In this regard, subordination provisions limiting the right of L Bond and Seller Trust L Bond holders to enforce their rights are contained in the indenture. These provisions include:

- a prohibition on challenging any enforcement action taken by a senior lender, or interfering with any legal action or suits undertaken by a senior lender, against us and our affiliates;

- a 180-day standstill period during which there may not be brought any action against us or our affiliates to enforce rights respecting collateral unless our second amended and restated senior credit facility with LNV Corporation has been repaid in full, which period may be extended if the senior lender takes action during such standstill period; and

- a prohibition on filing a bankruptcy or insolvency case against us or our affiliates for at least one year plus one day after any senior lender has been paid in full.

12

In the event of a default on a senior credit facility, the indenture prohibits us from making any payment, direct or indirect (whether for interest, principal, as a result of any redemption or repayment at maturity, on default, or otherwise), on the L Bonds, Seller Trust L Bonds and any other indebtedness unless and until: (i) the default respecting the senior credit facility has been cured or waived or has ceased to exist; or (ii) in the case of a non-payment default that permits a senior lender to declare as due and payable all amounts owing under a senior credit facility (but where that senior lender has not yet so declared amounts as being due and payable), the end of the period commencing on the date the trustee receives written notice of default from the senior lender and ending on the earliest of (1) our discharge of the default (or other cure), (2) the trustee's receipt of a valid waiver of default from the senior lender, or (3) a written notice from the senior lender terminating the payment prohibition.

During any payment prohibition period, neither the holders of the L Bonds, the Seller Trust L Bonds, nor the trustee will have the right, directly or indirectly, to sue to enforce the indenture or the L Bonds or Seller Trust L Bonds. Other provisions of the indenture do permit the trustee to take action to enforce the payment rights of L Bond and Seller Trust L Bond holders after 179 days have passed since the trustee's receipt of notice of default from a senior lender, but in such case any funds paid as a result of any such suit or enforcement action shall be applied toward the senior credit facility until the facility is indefeasibly paid in full before being applied to the L Bonds and Seller Trust L Bonds.

These subordination provisions present the risk that, upon any default by us on obligations owed to our senior lender, the holders of the L Bonds and Seller Trust L Bonds will be unable to enforce their rights to payment.

If the 180-day standstill period noted above, or any other limitation on the rights of the trustee or L Bond and Seller Trust L Bond holders to assert their rights to payment of principal or interest under the indenture, is ultimately determined to conflict with provisions of the Trust Indenture Act of 1939 (most notably sections 316(b) and 317(a) of that Act), then the trustee, as well as any holder who shall not have earlier consented to such subordination provisions, will (notwithstanding such provision contained in the indenture) be authorized to institute a lawsuit for the enforcement of any payment of principal or interest after their respective due dates.

***The debt coverage ratio, designed to provide some assurance to the holders of the L Bonds and Seller Trust L Bonds that the value of our total assets exceeds our total interest-bearing obligations, values our life insurance policy assets, which represent 56% of our total assets (excluding goodwill) as of December 31, 2019, in a manner that may not be representative of the amount we would actually receive upon a sale of those assets.***

Under the indenture governing the L Bonds and Seller Trust L Bonds, as amended, the maximum amount of L Bonds and Seller Trust L Bonds we may issue at any time is limited to an amount such that our debt coverage ratio does not exceed 90%. This limitation is designed to provide some basis to ensure that the net present value of policy benefits from our life insurance assets, plus the carrying value of our other assets (including out investments in Beneficient), will be sufficient to meet our obligations to our L Bond and Seller Trust L Bond holders. Expressed as a percentage, the debt coverage ratio is the ratio of (A) the aggregate sum of all Indebtedness (other than Excluded Indebtedness) of GWG Holdings and its direct and indirect subsidiaries (including the Securities issued under the indenture, but excluding any Indebtedness of Ben LP and its direct and indirect subsidiaries) as reflected on GWG Holdings' most recent consolidated balance sheet prepared in accordance with GAAP over (B) the sum of (i) Net Present Asset Value of Life Insurance Policies owned by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding Life Insurance Policies held by Ben LP and its direct and indirect subsidiaries and controlled affiliates, plus (ii) all cash (and cash equivalents) held by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding the cash (and cash equivalents) held by Ben LP and its direct and indirect subsidiaries, plus (iii) the original cost basis in GWG Holdings' investment in common units or other securities of Ben LP, plus (iv) the outstanding principal amount of any outstanding loans made under a commercial loan agreement with GWG Life, as lender, plus (v) the cost basis of assets contributed to GWG Holdings or any direct or indirect subsidiary of GWG Holdings in connection with a Repurchase Transaction, plus (vi) without duplication, the value of all other assets of GWG Holdings and its direct and indirect subsidiaries or affiliates (but excluding the value of assets of Ben LP and its direct and indirect subsidiaries) as reflected on its most recent consolidated balance sheet prepared in accordance with GAAP. For this purpose, Excluded Indebtedness" is Indebtedness which is payable at GWG Holdings' option in capital stock of GWG Holdings or securities mandatorily convertible into or exchangeable for such capital stock of GWG Holdings, or any Indebtedness that is reasonably expected to be converted or exchanged, directly or indirectly, into such capital stock, provided that under the terms of such Indebtedness in the event any such conversion or exchange does not occur in accordance with the terms of such transaction, such Indebtedness would be cancelled and any assets received in exchange for such Indebtedness would be returned.

Although the debt coverage ratio is designed to provide some basis to ensure that our assets will be sufficient to meet our obligations to the holders of L Bonds and Seller Trust L Bonds, the "net present value" of our life insurance assets used in the debt coverage ratio is not the same as the GAAP "fair value" of those assets on our balance sheet. Accordingly, the debt coverage ratio is not informative of the amount we and holders of L Bonds and Seller Trust L Bonds would actually receive if we were forced to sell or liquidate our life insurance related assets. Furthermore, any sale or liquidation of all or a significant portion of our life insurance policies or investments in Beneficient would include significant transactional costs. See "— The collateral granted as security for our obligations under the L Bonds and Seller Trust L Bonds may be insufficient to repay the indebtedness upon an event of default." As a result, our mere compliance with the debt coverage ratio in the indenture will not guarantee that the value of our life insurance assets plus the value of our investments in Beneficient, if sold or liquidated, would in all cases exceed the amount of our obligations to the holders of L Bonds and Seller Trust L Bonds.

14

**USE OF PROCEEDS**

If all of the L Bonds are sold, we expect to receive up to approximately $      million of net proceeds from this offering after paying our estimated offering and related expenses and the estimated selling commissions and additional compensation (consisting of (i) dealer-manager fees, (ii) wholesaling fees and non-transaction based compensation of the wholesalers, who are our employees and associated with the dealer manager, (iii) accountable expense allowance (iv) non-cash compensation, and (v) up to a 1.00% reallowance to selling group members). We expect the selling commissions and additional compensation to aggregate approximately $      million based on expected average selling commissions of $      million (    %), dealer-manager fees of $      million (    %), and additional expenses aggregating to $50.0 million (2.50%), assuming the sale of all of the L Bonds. We have also agreed to reimburse Emerson Equity for certain pre-offering expenses that we expect will aggregate to no more than $    . In addition, we expect that our offering expenses, consisting of legal, accounting, printing, mailing, registration, qualification and associated securities offering filing costs and expenses, will aggregate to approximately $2,400,000 through the course of this offering.

As explained elsewhere in this prospectus, the maximum amount of commissions, dealer manager fees and additional compensation payable to the dealer manager and selling group members is      % of the aggregate principal amount of L Bonds sold. Therefore, if all of the L Bonds were sold and the maximum commissions, dealer manager fees and additional compensation were paid, we estimate that the net proceeds to us, after paying our own estimated offering and related expenses, would be approximately $      million. Nevertheless, because we do not know the total principal amount of L Bonds that will be ultimately sold, we are unable to accurately forecast the total net proceeds that will be generated by this offering.

There is no minimum amount of L Bonds that must be sold before we access investor funds. The exact amount of proceeds we receive may vary considerably depending on a variety of factors, including how long the L Bonds are offered.

We intend to use the net proceeds from this offering to grow our alternative asset exposure, including through investments in Beneficient in the form of equity investments and/or loans to Beneficient or related entities, and to meet our other obligations, including:

- servicing our portfolio of life insurance assets (i.e., paying life insurance policy premiums);

- paying principal (at maturity or upon earlier prepayment or redemption), interest and fees to our lenders, including under DLP IV's second amended and restated senior credit facility, previously issued L Bonds, Seller Trust L Bonds and the L Bonds offered hereby;

- paying dividends on and, if applicable, redeeming our preferred stock;

- paying transaction expenses relating to interest rate hedging and similar derivative transactions (e.g., caps, collars, etc.); and

- general working capital purposes.

The extent to which we will use proceeds from this offering for any of these purposes, and the amounts and timing of such expenditures, will depend on, among other things, how long the L Bonds are offered, the amount of net proceeds that we receive from the sale of L Bonds being offered, our cash flows and needs for liquidity, the existence and timing of opportunities to strategically increase our investment in Beneficient, the availability of funds from other sources, including realizations from policy benefits, distributions from investments in Beneficient, the issuance of common or preferred equity, borrowings from senior credit facilities, and other factors deemed relevant by our Board of Directors and management.

Beneficient will have broad discretion to use the proceeds of any such investments and may use such proceeds to acquire alternative assets, to repay indebtedness, including to related parties, and for general working capital purposes, including operating expenses.

Net offering proceeds not immediately applied to the uses summarized above will be invested, at our sole discretion, in bank deposits or short-term investments such as money market funds, commercial paper, U.S. Treasury Bills and similar securities investments pending their use.

The maximum amount of L Bonds we may issue and have outstanding is limited by our debt coverage ratio discussed below.

15

## DESCRIPTION OF THE L BONDS

**General**

The L Bonds are secured obligations of GWG Holdings. The L Bonds will be issued under the amended and restated indenture between us and Bank of Utah as the indenture trustee, dated October 23, 2017, which amends and restates the original indenture dated October 19, 2011 and as may be amended or supplemented from time to time (referred to herein as the "indenture"). The terms and conditions of the L Bonds include those stated in the indenture and those made part of the indenture by reference to the Trust Indenture Act of 1939. The following is a summary of the material provisions of the indenture. For a complete understanding of the L Bonds, you should review the definitive terms and conditions contained in the indenture, which include definitions of certain terms used below. A copy of the indenture has been filed with the SEC as an exhibit to the registration statement of which this prospectus is a part, and is available from us at no charge upon request.

The following is a summary of the material terms of the L Bonds:

- The L Bonds are general secured obligations of GWG Holdings. The obligations are secured by a grant of a security interest in all of the assets of GWG Holdings, which assets will serve as collateral for our obligations under the L Bonds. This grant of a security interest is effected pursuant to an amended and restated pledge and security that has been filed as an exhibit to the registration statement of which this prospectus forms a part.

- The L Bonds are fully and unconditionally guaranteed by our wholly owned direct subsidiary, GWG Life, but otherwise are not guaranteed by any other person or entity. The guarantee is backed by a grant of a security interest in all of the assets of GWG Life, which assets will serve as additional collateral for our obligations under the L Bonds. Chief among these assets is GWG Life's ownership interest in DLP IV. This guarantee is effected pursuant to provisions contained in the indenture.

- The L Bonds are also secured by a pledge of the equity ownership interests in GWG Holdings beneficially owned by BCC and AltiVerse Capital Markets, L.L.C., a Delaware limited liability company ("AltiVerse") (which is a limited liability company owned by an entity related to Beneficient's founders)— which pledge is effected pursuant to an amended and restated pledge and security agreement that has been filed as an exhibit to the registration statement of which this prospectus forms a part.

- Through DLP IV, we are party to a $300.0 million second amended and restated senior credit facility with LNV Corporation. The amount outstanding under this facility was $184.6 million at December 31, 2019.

- The L Bonds are not savings accounts, certificates of deposit (CDs) or other forms of "deposits," and are not insured by the FDIC or any other governmental agency.

- The L Bonds are not directly secured by any life insurance assets not owned by GWG Life. A substantial majority of our life insurance assets are held by DLP IV. Although GWG Life's equity ownership interest in DLP IV is an asset in which GWG Life has, pursuant to its guarantee, granted a security interest to serve as collateral for obligations under the L Bonds, the payment on such equity interest will be subordinate to the interests of creditors of DLP IV, including our senior creditor LNV Corporation.

- The L Bonds do not have the benefit of a "sinking fund" for the retirement of principal.

- The L Bonds are not convertible into our capital stock or other securities.

- We have the option to call and redeem the entire outstanding principal balance and accrued but unpaid interest of any L Bonds at any time and without premium or penalty. If we elect to call and redeem your L Bonds, those redeemed L Bonds will cease to accrue interest after the redemption date under the terms and subject to the conditions of the indenture.

- Except in limited circumstances (death, bankruptcy or total permanent disability) L Bond holders will have no right to require us to redeem any L Bond prior to its maturity date. Any early redemption will be for the total outstanding principal balance and accrued but unpaid interest. If we in our sole discretion nonetheless elect to accommodate a redemption request, we will redeem the entire (but not less than the entire) outstanding principal balance and accrued but unpaid interest of the L Bonds and may impose a redemption fee of 6% against the outstanding principal balance of the L Bond redeemed. This fee will be subtracted from the amount paid to you.

App. 0795

App. 0796

The L Bonds will be represented by "Units," with each whole Unit representing $1,000 in principal amount (USD) of L Bonds. Accordingly, L Bond Units will be sold at 100% of their principal face amount. Throughout this prospectus, we refer to L Bond Units simply as "L Bonds." The minimum investment amount in the L Bonds will be 25 Units, or $25,000. Above that minimum amount, L Bonds may be purchased in whole Units. Subject to the minimum investment amount, you may select the principal amount and term of the L Bonds (ranging from two to seven years) you would like to purchase when you subscribe. The interest rate of your L Bonds will remain fixed until maturity. Depending on our capital requirements, we may not, however, always offer L Bonds with the particular terms you seek. See "Description of the L Bonds — Interest Rate and Maturity" below.

Upon acceptance of your subscription, we will create an account in a book-entry registration and transfer system for you, and credit the principal amount of your subscription to your account. We will also send you a purchase confirmation that will indicate our acceptance of your subscription. If your subscription is rejected, all funds deposited will be promptly returned to you without any interest. See "— Registration and Exchange" below. Alternatively, you may subscribe for L Bonds as a direct participant with Depository Trust Company (DTC settlement). See "Plan of Distribution — Settlement Procedures" for more information.

Investors whose subscriptions for L Bonds have been accepted and anyone who subsequently acquires L Bonds in a qualified transfer are referred to as "holders" or "registered holders" in this prospectus. We may modify or supplement the terms of the L Bonds described in this prospectus from time to time in a supplement to the indenture and a further supplement to this prospectus. Except as set forth under "— Amendment, Supplement and Waiver" below, any modification or amendment will not affect L Bonds outstanding at the time of such modification or amendment.

The L Bonds are transferable pursuant to the terms of the indenture. The L Bonds may be transferred or exchanged for other L Bonds of the same series and class of a like aggregate principal amount (i.e., the same number of Units) subject to limitations contained in the indenture. We will not charge a fee for any registration, transfer or exchange of L Bonds. However, we may require the holder to pay any tax, assessment fee, or other governmental charge required in connection with any registration, transfer or exchange of L Bonds. The registered holder of any L Bonds will be treated as the owner of such L Bond Units for all purposes.

**Denomination**

You may purchase L Bonds in the minimum amount of 25 Units, representing a minimum principal amount of $25,000, and in any whole Unit amounts in excess thereof. You will determine the exact number of L Bond Units you purchase when you subscribe. You may not cumulate multiple purchases L Bond Units in amounts less than 25 Units to satisfy the 25 Unit minimum requirement. In our discretion, however, we may waive the 25 Unit minimum purchase requirement for any investor.

**Term**

We may offer L Bonds with the following terms to maturity: two years, three years, five years, and seven years.

You will select the term of the L Bonds you purchase when you subscribe. You may purchase multiple L Bonds with different terms by filling in investment amounts for more than one term on your Subscription Agreement. Nevertheless, during this offering we may not always offer L Bonds with each of the maturity terms outlined above.

The actual maturity date will be on the last day of the month in which the L Bond matures (i.e., the month in which the L Bond's term ends). For example, if you select a two-year term and your L Bond becomes effective on June 1, 2020, then the actual maturity date will be June 30, 2022. After actual maturity, we will pay all outstanding principal and accrued but unpaid interest on the L Bond no later than the fifth day of the calendar month next following its maturity (or the first business day following the fifth day of such month). So, in the case of an L Bond with a maturity date of June 30, 2022, actual payment will be made on or prior to July 5, 2022 (unless such date is not a business day, in which case actual payment will be made on the next business day). The L Bonds do not earn interest after the maturity date or any date set for prepayment.

Should the original L Bond holder (x) no longer be the holder of the L Bond or (y) be unavailable, or a change in payee be necessary, such as in the case of a surviving estate, we may require a copy of the executed assignment to any transferee, or an order from a court or probate commission, as the case may be, in order that we know the principal is returned to the rightful party.

**Interest Rate**

The rate of interest we will offer to pay on L Bonds at any particular time will vary based upon market conditions, and will be determined by the term to maturity of the L Bonds, our capital requirements and other factors described below. The interest rate on particular L Bonds will be determined at the time of subscription or renewal and then remain fixed for the original or renewal term of the L Bond. We will establish and may change the interest rates payable for L Bonds of various terms and at various investment levels in an interest rate supplement to this prospectus.

We may offer L Bonds that earn incrementally higher interest rates when, at the time they are purchased or renewed, the aggregate principal amount of the L Bond portfolio of the holder increases. If applicable, the interest rates payable at each level of investment will be set forth in an interest rate supplement to this prospectus. We may change the interest rate for any or all maturities to reflect market conditions at any time by supplementing this prospectus. If we change the interest rates, the interest rate on L Bonds issued before the date of the change will not be affected.

**Payments on the L Bonds; Paying Agent and Registrar**

Investors will have the opportunity to select whether interest on their L Bonds will be paid monthly or annually. For investors using direct settlement with the Company, this selection opportunity will be presented in the Subscription Agreement.

Interest will accrue on the L Bonds at the stated rate from and including the effective date of the L Bond until maturity. The effective date of an L Bond will be as follows:

- If you purchase an L Bond through DTC settlement, the effective date of your L Bond purchase will be the date your subscription is accepted by the Company.

- If you purchase an L Bond through direct settlement with the Company, the effective date of your L Bond purchase will be the following, as applicable: (i) in cases where you pay for your bond via wire transfer directly to us, the first business day of the next calendar month after which we receive the wire; (ii) in cases where you pay for your bond by bank draft directly to us, the first business day of the next calendar month after which we receive the draft; or (iii) in cases where you pay for your bond by personal check, the first business day of the calendar month that is at least five full business days after which we receive the check. In all cases involving direct settlement with the Company, we must also have received and accepted your completed and executed Subscription Agreement.

Interest payments on L Bonds will be paid on the 15th day immediately following the last day of the applicable interest payment period. Interest will be paid without any compounding. The first payment of interest will include interest for the partial period in which the purchase occurred. The indenture provides that all interest will be calculated based on a year with twelve 30-day months.

If you purchase your L Bond Units through direct settlement, we will pay the principal of, and interest on, L Bonds by direct deposit to the account you specify in your Subscription Agreement. We will not accept subscriptions from investors who are not willing to receive their interest payments via direct deposit. If the foregoing payment method is not available, principal and interest payments on the L Bonds will be payable at our principal executive office or at such other place as we may designate for payment purposes. If you purchase your L Bond Units through DTC settlement, our payments of principal and interest will be paid to the depositary (DTC) and then be credited to your brokerage or custodial account through the DTC procedures followed by your brokerage firm or custodian. For more information, please see "Registration and Exchange — Global Certificates Deposited with DTC" below.

We will withhold 28% of any interest payable to any investor who has not provided us with a social security number, employer identification number, or other satisfactory equivalent in the Subscription Agreement (or another document) or where the IRS has notified us that backup withholding is otherwise required. Please see "Material Federal Income Tax Considerations — Backup Withholding and Information Reporting."

**Registration and Exchange**

The L Bonds that we settle directly will generally be issued in book-entry form, which means that no physical L Bond is created, subject, however, to limited exceptions described in the indenture. The L Bonds settled through DTC settlement will be represented by global certificates deposited with the depositary as described below.

*Book-Entry Registration*

Evidence of your ownership will be provided by written confirmation. As described below, holders may, under certain circumstance described below, opt to receive physical delivery of a certificated security that evidences their L Bonds. Otherwise, the issuance and transfer of L Bonds will be accomplished exclusively through the crediting and debiting of the appropriate accounts in our book-entry registration and transfer system.

The holders of the accounts established upon the purchase or transfer of L Bonds will be deemed to be the owners of the L Bonds under the indenture. The holder of the L Bonds must rely upon the procedures established by the trustee to exercise any rights of a holder of L Bonds under the indenture. We will regularly provide the trustee with information regarding the establishment of new accounts and the transfer of existing accounts.

On or prior to any interest payment date or upon redemption, we will also provide the trustee with information regarding the total amount of any principal and interest due to holders of L Bonds. On each interest payment date, we will credit interest due on each account and direct payments to the holders. We will determine the interest payments to be made to the book-entry accounts and maintain, supervise and review any records relating to book-entry accounts for the L Bonds.

Book-entry notations in the accounts evidencing ownership of the L Bonds are exchangeable for certificated L Bonds only: (i) at the request of the holder, at the end of the Company's next fiscal quarter; or (ii) after the occurrence of an event of default under the indenture, if holders of more than 50% of the aggregate outstanding principal amount of the L Bonds advise the trustee in writing that the continuation of a book-entry system is no longer in the best interests of the holders of L Bonds. In its discretion, the Company may elect to terminate the book-entry system and replace book-entry notations with physical certificates.

*Global Certificates Deposited with DTC*

L Bonds may be issued in the form fully registered global certificates deposited with, or on behalf of, The Depository Trust Company ("DTC"), New York, NY, and registered in the name of Cede & Co., as nominee of DTC. Unless and until exchanged, in whole or in part, for L Bonds in definitive registered form, a global certificate may not be transferred except as a whole by the depositary to a nominee of such depositary, by a nominee of such depositary to such depositary or another nominee of such depositary, or by such depositary or any nominee of such depositary to a successor of such depositary or a nominee of such successor.

DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act. DTC was created to hold securities of its participants and to facilitate the clearance and settlement of securities transactions, such as transfers and pledges, among its participants in such securities through electronic computerized book-entry changes in accounts of the participants, thereby eliminating the need for physical movement of securities certificates. DTC's participants include securities brokers and dealers (including the managing broker-dealer), banks, trust companies, clearing corporations and certain other organizations, some of whom own DTC. Access to DTC's book-entry system is also available to others, such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a participant, either directly or indirectly. The rules applicable to DTC and its participants are on file with the SEC.

If available, purchases of L Bonds within the DTC system must be made by or through direct participants, which will receive a credit for the L Bonds on DTC's records. The ownership interest of each beneficial owner of the L Bonds will be recorded on the direct and indirect participants' records. Beneficial owners will not receive written confirmation from DTC of their purchases, but beneficial owners are expected to receive written confirmations providing details of the transactions, as well as periodic statements of their holdings, from the direct or indirect participants through which the beneficial owners entered into the transaction. Transfers of ownership interests in the L Bonds are to be accomplished by entries made on the books of participants acting on behalf of beneficial owners.

To facilitate subsequent transfers, all L Bonds deposited by participants with DTC will be registered in the name of DTC's nominee, Cede & Co. The deposit of L Bonds with DTC and their registration in the name of Cede & Co. will effect no change in beneficial ownership. DTC will have no knowledge of the actual beneficial owners of the L Bonds. DTC's records will reflect only the identity of the direct participants to whose accounts such notes are credited, which may or may not be the beneficial owners. The participants will remain responsible for keeping account of their holdings on behalf of their customers.

App. 0801

Conveyance of notices and other communications by DTC to direct participants, by direct participants to indirect participants and by direct and indirect participants to beneficial owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

We will make payments due on the notes to Cede & Co., as nominee of DTC, in immediately available funds. DTC's practice is to credit direct participants' accounts, upon DTC's receipt of funds and corresponding detailed information, on the relevant payment date in accordance with their respective holdings shown on DTC's records. Payments by participants to beneficial owners will be governed by standing instructions and customary practices, as is the case with securities held for the account of customers in bearer form or registered in "street name," and will be the responsibility of such participant and not our responsibility or that of DTC, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment to Cede & Co. is our responsibility. Disbursement of such payments to direct participants is the responsibility of Cede & Co. Thereafter, disbursement of such payments to the beneficial owners is the responsibility of direct and indirect participants (i.e., brokers, dealers and custodians).

Except as provided herein, a beneficial owner of an interest in a global certificate will not be entitled to receive physical delivery of the L Bonds. Accordingly, each beneficial owner must rely on the procedures of DTC to exercise any rights under the L Bonds. The laws of some jurisdictions require that certain purchasers of securities take physical delivery of securities in definitive form. Such laws may impair the ability to transfer beneficial interests in a global certificate.

As long as the depositary, or its nominee, is the registered holder of a global certificate, the depositary or such nominee will be considered the sole owner and holder of the L Bonds represented thereby for all purposes under the L bonds and the indenture. Except in the limited circumstances referred to below, owners of beneficial interests in a global certificate will not be entitled to have such global certificate or any L Bonds represented thereby registered in their names, will not receive or be entitled to receive physical delivery of certificated L Bonds in exchange for the global certificate and will not be considered to be the owners or holders of such global certificate or any certificates represented thereby for any purpose under the L Bonds or the indenture. Accordingly, each person owning a beneficial interest in such global certificate must rely on the procedures of the depositary and, if such person is not a participant, on the procedures of the participant through which such person owns its interest to exercise any rights of a holder under the indenture.

If the depositary for a global certificate representing L Bonds is at any time unwilling or unable to continue as depositary and a successor depositary is not appointed by us within 90 days, we will issue L Bonds in definitive form in exchange for such global certificate. In addition, we may at any time and in our sole discretion determine not to have the L Bonds represented by one or more global certificates and, in such event, we will issue the notes in definitive form in exchange for all of the global certificates representing the L Bonds. Finally, if an event of default, or an event which with the giving of notice or lapse of time or both would constitute an event of default, with respect to the L Bonds represented by a global certificate has occurred and is continuing, then we will issue L Bonds in definitive form in exchange for all of the global certificates representing the notes.

Although DTC has agreed to the procedures provided above in order to facilitate transfers, it is under no obligation to perform these procedures, and these procedures may be modified or discontinued at any time.

**Limited Rescission Right**

If you are purchasing L Bonds through direct settlement with the Company and your Subscription Agreement is accepted at a time when we have determined that a post-effective amendment to the registration statement of which this prospectus is a part must be filed with the SEC, but such post-effective amendment has not yet been declared effective, we will send to you at your registered address a notice and a copy of the related prospectus once it has been declared effective. You will thereupon have the right to rescind your investment upon written request within ten business days from the postmark date of the notice we send to you that the post-effective amendment has been declared effective (and containing the related prospectus). We will promptly return any funds sent with a Subscription Agreement that is properly rescinded without penalty, although any interest previously paid on a rescinded L Bond will be deducted from the funds returned to you upon rescission. A written request for rescission, except in the case of a mailed rescission, must be postmarked on or before the tenth business day after our notice to you (described above). If you notify us other than by mail, we must actually receive your rescission request on or before the tenth business day after our notice to you.

We will not accept purchases of L Bonds through DTC settlement if, as of the end of the monthly closing for DTC settlement, we have determined that a post-effective amendment to the registration statement of which this prospectus is a part must be filed with the SEC, but such post-effective amendment has not yet been declared effective. In any such case, settlement of your L Bond purchase must occur in the following month.

20

App. 0803

**Renewal or Repayment on Maturity**

At least 30 days prior to the maturity of your L Bond, we will provide you with a notice indicating that your L Bond is about to mature and whether we will allow automatic renewal of your L Bond. If we allow you to renew your L Bond, we will also provide to you the then-current form of prospectus, which may include an interest rate or prospectus supplement and any other updates to the information contained in this prospectus. The prospectus, or the interest rate or prospectus supplement, will set forth the interest rates then in effect. The notice will recommend that you review the then-current prospectus, including any interest rate or prospectus supplement, prior to exercising one of the below options. If we do not provide you a new prospectus because the prospectus has not changed since the delivery of this prospectus in connection with your original investment or any prior renewal, we will nonetheless send you a new copy of the prospectus upon your request. Unless the election period is extended as described below, you will have until 15 days prior to the maturity date to exercise one of the following options:

- You can do nothing, in which case (subject to applicable law) your L Bond will automatically renew for a new term equal to the original term but at the interest rate in effect at the time of renewal. Interest on renewed L Bonds will be paid on the same schedule (i.e., monthly or annually) as the original L Bond. If applicable, a new certificate will be issued.

- You can elect repayment of your L Bond, in which case the principal amount will be repaid in full along with any accrued but unpaid interest. If you choose this option, your L Bond will not earn interest on or after the maturity date.

- You can elect repayment of your L Bond and use all or part of the proceeds to purchase a new L Bond with a different term or principal amount. To exercise this option, you will need to complete a new Subscription Agreement for the new L Bond and mail it along with your request, or else work with your broker if you wish to purchase your new L Bond through DTC settlement. Any proceeds from the old L Bond that are not applied to the new L Bond will be sent to you.

The foregoing options will be available to holders unless and until terminated under the indenture. Interest will accrue from the first day of each renewed term. Each renewed L Bond will retain all its original provisions, including provisions relating to payment, except that the interest rate payable during any renewal term will be the interest rate that is being offered at that time to other holders with similar aggregate L Bond portfolios for L Bonds of the same term as set forth in the interest rate supplement delivered with the maturity notice. If similar L Bonds are not then being offered, the (i) interest rate upon renewal will be the rate specified by us on or before the maturity date, or the rate of the existing L Bond if no such rate is specified, and (ii) the maturity will, if L Bonds of the same maturity are being offered at the time of renewal, be the same or, if not, the next earliest maturity.

If we notify the holder of our intention to repay an L Bond at maturity, or if the holder timely requests repayment, we will pay the principal and all accrued but unpaid interest on the L Bond on or prior to the fifth day of the calendar month after the maturity date (or the first business day following the fifth day of such month). Thus, in the case of an L Bond with a maturity date of January 31, 2020, actual payment will be made on or prior to February 5, 2020 (unless such date is not a business day, in which case actual payment will be made on the next business day). No interest will accrue after the maturity date. You should be aware that because payment is made by ACH transfer, funds may not be received in the holder's account for two to three business days.

We will be required from time to time to file post-effective amendments to the registration statement of which this prospectus is a part to update the information it contains. If you would otherwise be entitled to renew your L Bonds upon their stated maturity at a time when we have determined that a post-effective amendment must be filed with the SEC, but such post-effective amendment has not yet been declared effective, then the period during which you can elect renewal (or repayment) will be automatically extended until ten days following the postmark date of our notice to you that the post-effective amendment has been declared effective, which notice shall contain a copy of the related prospectus. All other provisions relating to the renewal or redemption of L Bonds upon their stated maturity described above shall remain unchanged.

For any L Bonds offered hereby that mature on or after the three-year anniversary of the date on which the registration statement of which this prospectus is a part shall have been declared effective, we expect that the renewal of such L Bonds may require us to file a new registration statement. In such a case, the new registration statement must be declared effective before we can renew your L Bond. In this event, if the new registration statement has not yet been filed or become effective, we will extend your election period until ten days following the date of our notice to you that the new registration statement has become effective, which notice will include a new prospectus.

**Call and Redemption Prior to Stated Maturity**

We may call and redeem, in whole or in part, principal amount and accrued but unpaid interest on any L Bonds prior to their stated maturity only as set forth in the indenture and described below. The holder has no right to put or otherwise require us to redeem any L Bond prior to its maturity date (as originally stated or as it may be extended), except as indicated in the indenture and described below.

*Our Voluntary Redemption*

We have the right to redeem any L Bond, in whole or in part, at any time prior to its stated maturity upon at least 30 days written notice to the holder of the L Bond. The holder of the L Bond being redeemed will be paid a redemption price equal to the outstanding principal amount thereof plus accrued but unpaid interest up to but not including the date of redemption without any penalty or premium. We may use any criteria we choose to determine which L Bonds we will redeem if we choose to do so. We are not required to redeem L Bonds on a pro rata basis.

*Holder's Put Election Upon Death*

L Bonds may be redeemed prior to maturity at the election of a holder who is a natural person (including L Bonds held in an individual retirement account and the holders of a beneficial interest in a global certificate held by a depositary or its nominee), by giving us written notice within 45 days following the holder's total permanent disability or bankruptcy, as established to our satisfaction, or at the election of the holder's estate, by giving written notice within 45 days following the death of the holder. Subject to the limitations described below, we will redeem the L Bonds not later than the 15th day of the month next following the month in which we establish to our satisfaction the holder's death, bankruptcy or total permanent disability. In the event that the 15th day of the month next following the month in which we so establish such facts is not a business day, we will redeem the L Bonds on the next business day. The redemption price, in the event of such a death, bankruptcy or total permanent disability, will be the entire principal amount of the L Bonds, plus accrued but unpaid interest thereon up to and through the last day of the calendar month preceding the redemption date. The indenture defines "total permanent disability" as the determination by a physician, approved by us, that a holder of an L Bond who is a natural person, and who was gainfully employed at the time of issuance of the L Bond (or its renewal date), is unable to work on a full-time basis during a period of 24 consecutive months.

If spouses are joint registered holders of an L Bond, the right to elect to have us redeem L Bonds will apply when either registered holder dies, files bankruptcy or suffers a total permanent disability. If the L Bond is held jointly by two or more persons who are not legally married, none of these persons will have the right to request that we redeem the L Bonds unless all joint holders have died, filed bankruptcy or suffered a total permanent disability. If the L Bond is held by a trust, partnership, corporation or other similar entity, the right to request redemption upon death or total permanent disability does not apply.

*Redemption at Request of Holder*

We have no obligation to redeem any L Bonds other than upon maturity, or upon the death, bankruptcy or total permanent disability of a natural person holder. Nevertheless, at our sole discretion we may agree from time to time, at the written request of a holder (including the holder of a beneficial interest in a global certificate held by a depositary or its nominee), to redeem an L Bond, subject, however, to a redemption fee of 6.0% of the principal amount of such L Bond. If we so redeem any L Bond prior to maturity, we will redeem the entire principal amount of such L Bond together with accrued but unpaid interest thereon, The redemption fee will be subtracted from the amount paid to you.

**Transfers**

The L Bonds will be transferable in accordance with the indenture. For L Bonds that are issued solely in book-entry form, transfers will be effective only upon the delivery to us of an executed assignment or other conveyance instrument in customary form. For L Bonds that are represented by a global certificate held by a depositary or its nominee, transfers of beneficial interests in such certificate must be effected in accordance with the procedures and rules of the depositary.

Upon transfer of an L Bond, we will provide the new holder of the L Bond with a purchase confirmation that will evidence the transfer of the account on our records. If applicable (e.g., if transferred to a custodial account), a new certificate will be issued. No written confirmations will be provided with respect to transfers of beneficial interests in a global certificate held by a depositary or its nominee.

**Quarterly Statements**

We will provide holders of the L Bonds with quarterly statements, which will indicate, among other things, the account balance at the end of the quarter, interest credited, redemptions made, if any, and the interest rate paid during the quarter. These statements will be sent electronically on or prior to the 10th business day after the end of each calendar quarter. If a holder is unwilling or unable to receive quarterly statements electronically, we will mail the statements to the address of record on or prior to the 10th business day after the end of each calendar quarter. In such a case, we may charge such holders a reasonable fee to cover our expenses incurred in mailing the statements.

**Ranking**

The L Bonds will constitute secured debt of GWG Holdings. The payment of principal and interest on the L Bonds will be:

- pari passu with respect to payment and collateral securing all L Bonds and Seller Trust L Bonds previously issued by GWG Holdings, Inc., of which approximately $1,315.0 million in principal amount is outstanding as of December 31, 2019 (see the caption "— Collateral Security" below);

- structurally and contractually junior to the present and future obligations owed by our subsidiary DLP IV under our second amended and restated senior credit facility with LNV Corporation, and structurally or contractually junior to any future obligations that DLP IV or other primary obligors or guarantors may have under future senior secured borrowing facilities; and

- structurally junior to the present and future claims of creditors of our subsidiaries, other than GWG Life, including trade creditors.

The indenture will permit us to issue other forms of debt, including secured and senior debt, in the future.

"Pari passu" means that claims for payment and entitlement to security among the holders of L Bonds, including the holders of previously issued L Bonds and Seller Trust L Bonds, and the holders of any later-created class of "pari passu debt," will be treated equally and without preference. Although we have no present intention of causing GWG Life to issue additional secured debt in the future, any such debt issued on a pari passu basis in the future (including renewals of outstanding L Bonds or other renewable pari passu debt) would also be treated equally and without preference in respect of all outstanding L Bonds and Seller Trust L Bonds. Thus, in the event of any default on the L Bonds (or any other debt securities of ours that are pari passu with the L Bonds) resulting in claims for payment or claims on collateral security, the holders of the L Bonds and all such other debt securities pari passu with the L Bonds (such as the Seller Trust L Bonds) would share in payment or collateral in proportion to the amount of principal and interest owed on each such debt instrument.

**Guarantee by GWG Life Subsidiary**

The payment of principal and interest on the L Bonds and Seller Trust L Bonds, including previously issued L Bonds, is fully and unconditionally guaranteed by GWG Life. There were approximately $1,315.0 million in principal amount of previously issued L Bonds and Seller Trust L Bonds outstanding as of December 31, 2019.

**Collateral Security**

The L Bonds are secured by the assets of GWG Holdings. We will grant a security interest in all of the assets of GWG Holdings to the indenture trustee for the benefit of the L Bond holders. The assets of GWG Holdings consist, and are expected to consist, primarily of (i) any cash proceeds received from its subsidiaries as distributions derived from life insurance assets of subsidiaries, (ii) all other cash and investments held in various accounts, (iii) the equity ownership interests in subsidiaries of GWG Holdings, including the equity ownership interest in GWG Life, together with (iv) all proceeds from the foregoing. This collateral security granted by us is referred to as the "GWG Holdings Assets Collateral."

As indicated above, our direct and wholly owned subsidiary, GWG Life, will fully and unconditionally guarantee our obligations under the L Bonds. This guarantee will be supported by GWG Life's grant of a security interest in all of its assets. The assets of GWG Life consist, and are expected to consist, primarily of (i) certain life insurance assets, (ii) any cash proceeds received from life insurance assets owned by GWG Life or received from DLP IV, as distributions derived from life insurance policies owned by that subsidiary, (iii) all other cash and investments held by GWG Life in its various accounts, (iv) GWG Life's equity ownership interest in its direct

App. 0806

subsidiaries, including DLP IV, together with (v) all proceeds from the foregoing. The collateral security granted by GWG Life pursuant to its guarantee of our obligations under the L Bonds is referred to as the "GWG Life Assets Collateral."

23

In addition, BCC and AltiVerse, collectively, have pledged 3,952,155 shares of our common stock to further secure our obligations under the L Bonds. This collateral security granted by BCC and Altiverse is referred to as the "GWG Holdings Equity Collateral."

Together, the GWG Holdings Assets Collateral, GWG Life Assets Collateral and GWG Holdings Equity Collateral comprise all of the collateral security for our obligations under the L Bonds. To the extent that we subsequently establish one or more wholly owned subsidiaries of GWG Holdings or GWG Life, the L Bonds will have a security interest in the equity ownership interests of those subsidiaries if and to the extent owned by GWG Holdings or GWG Life.

The guarantee by GWG Life is contained in the indenture, and the grant of security interests in the GWG Holdings Assets Collateral, GWG Life Assets Collateral and GWG Holdings Equity Collateral is effected through an "Amended and Restated Pledge and Security Agreement" that is an exhibit to the registration statement of which this prospectus forms a part. Neither the indenture nor the pledge and security agreement contain any provision preventing a pledging party from disposing of any collateral in the ordinary course of business. In this regard, the pledge and security agreement permits the disposition of GWG Holdings Equity Collateral to the extent the number of shares continuing to constitute such collateral represents at least 10% of the number of shares beneficially held by each individual grantor as of the date of the pledge and security agreement.

Substantially all of our life insurance assets are held in our subsidiaries. The L Bonds will not be directly secured by any security interest in the assets of those subsidiaries, including DLP IV. Instead, the L Bonds will be secured by a pledge of the equity ownership interests in those subsidiaries, including DLP IV, owned by GWG Life by virtue of the guarantee provisions in the indenture and the pledge and security agreement referenced above. An equity ownership interest is, by its very nature, subordinate to the interests of creditors. **Therefore, although investors in the L Bonds will have a security interest in the ownership of DLP IV (and other direct subsidiaries of GWG Life) any claim they may have to the assets owned by such entity will be subordinate to the interests of creditors of that entity, including LNV Corporation, which is the lender to DLP IV under our second amended and restated senior credit facility, and all other creditors of DLP IV, including trade creditors. In addition, there is the risk that the collateral security granted for our obligations under the L Bonds may be insufficient to repay the L Bonds upon an event of default. See "Risk Factors — The collateral granted as security for our obligations under the L Bonds and Seller Trust L Bonds may be insufficient to repay the indebtedness upon an event of default**."

**Subordination; Other Indebtedness**

Our obligations under the L Bonds will be subordinate to all our senior debt. For this purpose, "our senior debt" presently includes all indebtedness owed or that may in the future become owing under our second amended and restated senior credit facility with LNV Corporation. As of December 31, 2019, DLP IV had approximately $184.6 million of debt outstanding under the second amended and restated credit facility with LNV Corporation. In addition, as of December 31, 2019, we had approximately $1,315.0 million in principal amount of debt outstanding under previously issued L Bonds and Seller Trust L Bonds.

The maximum amount of debt, including the L Bonds, we may issue is limited by the indenture. In particular, the indenture prohibits us from issuing debt in an amount such that our "debt coverage ratio" would exceed 90%. The indenture defines the debt coverage ratio as the ratio, expressed as percentage, of (A) the aggregate sum of all Indebtedness (other than Excluded Indebtedness) of GWG Holdings and its direct and indirect subsidiaries (including the Securities issued under the indenture, but excluding any Indebtedness of Ben LP and its direct and indirect subsidiaries) as reflected on GWG Holdings' most recent consolidated balance sheet prepared in accordance with GAAP over (B) the sum of (i) Net Present Asset Value of Life Insurance Policies owned by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding Life Insurance Policies held by Ben LP and its direct and indirect subsidiaries and controlled affiliates, plus (ii) all cash (and cash equivalents) held by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding the cash (and cash equivalents) held by Ben LP and its direct and indirect subsidiaries, plus (iii) the original cost basis in GWG Holdings' investment in common units or other securities of Ben LP, plus (iv) the outstanding principal amount of any outstanding loans made under a commercial loan agreement with GWG Life, as lender, plus (v) the cost basis of assets contributed to GWG Holdings or any direct or indirect subsidiary of GWG Holdings in connection with a Repurchase Transaction, plus (vi) without duplication, the value of all other assets of GWG Holdings and its direct and indirect subsidiaries or affiliates (but excluding the value of assets of Ben LP and its direct and indirect subsidiaries) as reflected on its most recent consolidated balance sheet prepared in accordance with GAAP.

24

We are required to notify the indenture trustee in the event we violate this restrictive covenant. An "event of default" will exist under the indenture if a violation of this covenant persists for a period of 30 calendar days after our initial notice to the trustee. The L Bonds are guaranteed by GWG Life but otherwise are not guaranteed by any of our subsidiaries, affiliates or control persons. Neither indenture nor the pledge and security agreement prevent holders of debt issued by our subsidiaries from disposing of, or exercising any other rights with respect to, any or all of the collateral securing that debt. Accordingly, in the event of a liquidation or dissolution of one of our subsidiaries (other than GWG Life), creditors of that subsidiary that are senior in rank will be paid in full, or provision for such payment will be made, from the assets of that subsidiary prior to distributing any remaining assets to us as an equity owner of that subsidiary.

The indenture also contains specific subordination provisions, benefitting lenders under any senior credit facility, restricting the right of L Bond holders to enforce certain of their rights in certain circumstances, including:

- a prohibition on challenging any enforcement action taken by a senior lender or interfering with any legal action or suits undertaken by our senior lenders against us and our affiliates;

- a 180-day standstill period during which there may not be brought any action against us or our affiliates to enforce rights respecting collateral unless our senior credit facilities have been repaid in full, which period may be extended if the senior lender takes action during such standstill period; and

- a prohibition on filing a bankruptcy or insolvency case against us or our affiliates for at least one year plus one day after the senior credit facility lenders have been paid in full.

We will not make any payment, direct or indirect (whether for interest, principal, as a result of any redemption or repayment at maturity, on default, or otherwise), on the L Bonds and any other indebtedness, and neither the holders of the L Bonds nor the trustee will have the right, directly or indirectly, to sue to enforce the indenture or the L Bonds, if a default or event of default under any senior credit facility has occurred and is continuing, or if any default or event of default under any senior credit facility would result from such payment, in each case unless and until:

- the default and event of default has been cured or waived or has ceased to exist; or

- in the case of a non-payment default that permits a senior lender to declare as due and payable all amounts owing under a senior credit facility (but where that senior lender has not yet so declared amounts as being due and payable), the end of the period commencing on the date the trustee receives written notice of default from the senior lender and ending on the earliest of (1) our discharge of the default (or other cure), (2) the trustee's receipt of a valid waiver of default from the senior lender, or (3) a written notice from the senior lender terminating the payment prohibition.

During any payment prohibition period, neither the holders of the L Bonds nor the trustee will have the right, directly or indirectly, to sue to enforce the indenture or the L Bonds. Other provisions of the indenture do permit the trustee to take action to enforce the payment rights of L Bond holders after 179 days have passed since the trustee's receipt of notice of default from a senior lender, but in such case any funds paid as a result of any such suit or enforcement action shall be applied toward the senior credit facility until the facility is indefeasibly paid in full before being applied to the L Bonds. The indenture contains provisions whereby each investor in the L Bonds consents to the subordination provisions contained in the indenture and related agreements governing collateral security.

If the 180-day standstill period noted above or any other limitation on the rights of the trustee or L Bond holders to assert their rights to payment of principal or interest under the indenture or L Bonds is ultimately determined to conflict with provisions of the Trust Indenture Act of 1939 (most notably sections 316(b) and 317(a) of that Act), then the trustee, as well as any holder who shall not have earlier consented to such subordination provisions, shall (notwithstanding such provision contained in the indenture) be authorized to institute a lawsuit for the enforcement of any payment of principal or interest after their respective due dates.

**No Sinking Fund**

The L Bonds are not associated with any sinking fund. A sinking fund is generally any account to which contributions will be made, from which payments of principal or interest owed on the L Bonds will be made. See "Risk Factors," page 11.

**Restrictive Covenants**

The indenture contains covenants that restrict us from certain actions as described below. In particular, the indenture provides that:

- we will not declare or pay any dividends or other payments of cash or other property solely in respect of our capital stock to our stockholders (other than a dividend paid in shares of our capital stock on a pro rata basis to all our stockholders) unless no default and no event of default with respect to the L Bonds exists or would exist immediately following the declaration or payment of the dividend or other payment;

- to the extent legally permissible, we will not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or the performance of the indenture;

- our Board of Directors will not adopt a plan of liquidation that provides for, contemplates or the effectuation of which is preceded by (a) the sale, lease, conveyance or other disposition of all or substantially all of our assets, otherwise than (i) substantially as an entirety, or (ii) in a qualified sales and financing transaction, and (b) the distribution of all or substantially all of the proceeds of such sale, lease, conveyance or other disposition and of our remaining assets to the holders of our capital stock, unless, prior to making any liquidating distribution pursuant to such plan, we make provision for the satisfaction of our obligations under the renewable unsecured subordinated notes; and

- our debt coverage ratio may not exceed 90%.

The indenture defines the debt coverage ratio as the ratio, expressed as percentage, of (A) the aggregate sum of all Indebtedness (other than Excluded Indebtedness) of GWG Holdings and its direct and indirect subsidiaries (including the Securities issued under the indenture, but excluding any Indebtedness of Ben LP and its direct and indirect subsidiaries) as reflected on GWG Holdings' most recent consolidated balance sheet prepared in accordance with GAAP over (B) the sum of (i) Net Present Asset Value of Life Insurance Policies owned by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding Life Insurance Policies held by Ben LP and its direct and indirect subsidiaries and controlled affiliates, plus (ii) all cash (and cash equivalents) held by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding the cash (and cash equivalents) held by Ben LP and its direct and indirect subsidiaries, plus (iii) the original cost basis in GWG Holdings' investment in common units or other securities of Ben LP, plus (iv) the outstanding principal amount of any outstanding loans made under a commercial loan agreement with GWG Life, as lender, plus (v) the cost basis of assets contributed to GWG Holdings or any direct or indirect subsidiary of GWG Holdings in connection with a Repurchase Transaction, plus (vi) without duplication, the value of all other assets of GWG Holdings and its direct and indirect subsidiaries or affiliates (but excluding the value of assets of Ben LP and its direct and indirect subsidiaries) as reflected on its most recent consolidated balance sheet prepared in accordance with GAAP.

The indenture defines "Excluded Indebtedness" as Indebtedness or any portion thereof (A) the principal and accrued but unpaid interest of which is payable at GWG Holdings' option, pursuant to the terms of such Indebtedness or otherwise, in Capital Stock (as defined in the amended indenture) of GWG Holdings or securities mandatorily convertible into or exchangeable for Capital Stock of GWG Holdings, or (B) any Indebtedness that is reasonably expected to be converted or exchanged, directly or indirectly, into Capital Stock of GWG Holdings, provided that under the terms of such Indebtedness in the event any such conversion or exchange does not occur in accordance with the terms of such transaction, such Indebtedness would be cancelled and any assets received in exchange for such Indebtedness would be returned (a "Repurchase Transaction").

For this purpose, the net present asset value of our life insurance assets is equal to the present value of the face value of policy benefit assets we own, discounted at a rate equal to the weighted-average interest rate paid on indebtedness, excluding that of Seller Trust L Bonds. The net present asset value of our life insurance assets for purposes of this covenant is not necessarily the same as the net present asset value of our life insurance assets as reflected on our most recently available balance sheet prepared in accordance with GAAP and does not necessarily reflect the saleable or fair market value of those assets.

Importantly, we are not restricted from entering into "qualified sale and financing transactions" as defined in the indenture, or incurring additional indebtedness, including additional senior debt.

**Consolidation, Mergers or Sales**

The indenture generally permits a consolidation or merger between us and another entity. It also permits the sale or transfer by us of all or substantially all of our property and assets. These transactions are permitted if:

- the resulting or acquiring entity, if other than us, is a United States corporation, limited liability company or limited partnership and assumes all of our responsibilities and liabilities under the indenture, including the payment of all amounts due on the notes and performance of the covenants in the indenture; and

- immediately after the transaction, and after giving effect to the transaction, no event of default shall exist under the indenture.

If we consolidate or merge with or into any other entity or sell or lease all or substantially all of our assets, according to the terms and conditions of the indenture, the resulting or acquiring entity will be substituted for us in the indenture with the same effect as if it had been an original party to the indenture. As a result, the successor entity may exercise our rights and powers under the indenture in our name, and we (as an entity) will be released from all our liabilities and obligations under the indenture and under the L Bonds. Nevertheless, no such transaction will by itself eliminate or modify the collateral that we have provided as security for our obligations under the indenture.

**Events of Default and Remedies**

The indenture provides that each of the following constitutes an event of default:

- the failure to pay interest or principal on any L Bond for a period of 30 days after it becomes due and payable;

- a failure to observe or perform any material covenant, condition or agreement in the indenture, but only after notice of failure from the indenture trustee and such failure is not cured within 60 days;

- our debt coverage ratio exceeds 90% for a period of 30 consecutive calendar days, but only after notice of such breach from the indenture trustee and such breach is not cured within 60 days;

- certain events of bankruptcy, insolvency or reorganization with respect to us; or

- the cessation of our business.

In addition, a default under the indenture will create a default under our second amended and restated senior credit facility.

Through DLP IV, we are party to a second amended and restated senior credit facility with LNV Corporation, as the lender. CLMG Corp (referred to in this prospectus as CLMG) acts as the administrative agent for the lender under the second amended and restated senior credit facility.

Effective November 1, 2019, DLP IV entered into the second amended and restated senior credit facility with LNV Corporation, as lender, and CLMG Corp., as the administrative agent on behalf of the lenders under the agreement. The second amended and restated senior credit facility makes available a total of up to $300,000,000 in credit to DLP IV with a maturity date of September 27, 2029. Additional advances are available under the second amended and restated credit facility at the LIBOR rate as defined in the second amended and restated credit facility. Advances are available as the result of additional borrowing base capacity, created as the premiums and servicing costs of pledged life insurance policies become due. Interest will accrue on amounts borrowed under the second amended and restated credit facility at an annual interest rate, determined as of each date of borrowing or quarterly if there is no borrowing, equal to (A) the greater of 12-month LIBOR or the federal funds rate (as defined in the agreement) plus one-half of one percent per annum, plus (B) 7.50% per annum. The effective rate at December 31, 2019 was 9.54%. Interest payments are made on a quarterly basis. We may use proceeds of the line of credit to repay short-term debt, acquire additional life insurance assets and make additional investments in Beneficient.

Under the second amended and restated senior credit facility, DLP IV has granted the administrative agent, for the benefit of the lenders under the agreement, a security interest in all of its assets. As with prior collateral arrangements relating to the senior secured debt of

GWG Holdings and its subsidiaries (on a consolidated basis), GWG Holdings' equity ownership in DLP IV will serve as collateral for the obligations of GWG Holdings under its L Bonds (although the life insurance assets owned by DLP IV will not themselves serve directly as collateral for those obligations).

27

The second amended and restated senior credit facility does not require DLP IV to maintain a reserve account for future premiums.

In addition, the second amended and restated senior credit facility contains certain customary negative covenants restricting the ability of the borrower to directly or indirectly engage in a merger or exchange transaction, sell substantially all of its assets, or permit the amendment of the contracts governing the outstanding debt securities of GWG Holdings and its subsidiaries, without the prior consent of the lender.

The second amended and restated senior credit facility contains customary events of default (e.g., payment defaults, covenant defaults, cross-defaults, defaults arising by virtue of a change in control, and defaults arising from breaches of representations and warranties), as well as defaults for amendments to the organizational documents of the borrower, defaults from pledged policies falling out of good standing, the occurrence of an event that could terminate the arrangement by which GWG Life services the pledged life insurance policies, and the entry of a judgment against the borrower in an amount exceeding $50,000 without payment or discharge, or a stay of execution obtained, within 30 days thereafter.

The indenture requires that we give notice to the indenture trustee upon the occurrence of an event of default under the indenture, unless it has been cured or waived. The indenture trustee may then provide notice to the L Bond holders or withhold the notice if the indenture trustee determines in good faith that withholding the notice is in your best interest, unless the default is a failure to pay principal or interest on any L Bond.

If an event of default occurs, the indenture trustee or the holders of at least 25% in principal amount of the outstanding L Bonds, may by written notice to us declare the unpaid principal and all accrued but unpaid interest on the L Bonds to be immediately due and payable. Notwithstanding the foregoing, the indenture limits the ability of the L Bond holders to enforce certain rights under the indenture in certain circumstances. These limitations are required subordination provisions under our second amended and restated senior credit facility and are summarized above under "— Subordination; Other Indebtedness." The pledge and security agreement permits the trustee to exercise on behalf of the holders of L Bonds all rights and remedies as are available to a secured creditor under applicable law, subject to any limitations therein or in the indenture. In this regard, the trustee is not authorized under the pledge and security agreement to distribute in kind any collateral in its possession to the holders of L Bonds.

**Amendment, Supplement and Waiver**

Except as provided in this prospectus or the indenture, the terms of the indenture or the L Bonds then outstanding may be amended, supplemented or waived with the consent of the holders of at least a majority in principal amount of the L Bonds then outstanding (which consent will be presumed if a holder does not object within 30 days of a request for consent), and any existing default or compliance with any provision of the indenture or the L Bonds may be waived with the affirmative consent of the holders of a majority in principal amount of the then outstanding L Bonds.

Notwithstanding the foregoing, an amendment or waiver will not be effective with respect to the L Bonds held by a holder who him, her or itself has not consented if such amendment or waiver:

- reduces the principal of, or changes the fixed maturity of, any L Bond;

- reduces the rate of or changes the time for payment of interest, including default interest, on any L Bond;

- waives a default or event of default in the payment of principal or interest on the L Bonds, except for a rescission or withdrawal of acceleration of the L Bonds made by the holders of at least a majority in aggregate principal amount of the then-outstanding L Bonds and a waiver of the payment default that resulted from such acceleration;

- makes any change in the provisions of the indenture relating to waivers of past defaults or the rights of holders of L Bonds to receive payments of principal of or interest on the L Bonds; or

- makes any change to the subordination provisions of the indenture that has a material adverse effect on holders of L Bonds.

28

Notwithstanding the foregoing, the following kinds of amendments or supplements to the indenture may be effected by us and the trustee without any consent of any holder of the L Bonds:

- to cure any ambiguity, defect or inconsistency;

- to provide for assumption of our obligations to holders of the L Bonds in the case of a merger, consolidation or sale of all or substantially all of our assets;

- to provide for additional uncertificated or certificated L Bonds;

- to make any change that does not materially and adversely affect the legal rights under the indenture of any holder of L Bonds, including but not limited to an increase in the aggregate dollar amount of L Bonds which may be outstanding under the indenture and limited in amount thereunder;

- to modify or eliminate our policy regarding redemptions elected by a holder of L Bonds prior to maturity, including our obligation to redeem L Bonds upon the death, bankruptcy or total permanent disability of any holder of the L Bonds, but only so long as such modifications do not materially and adversely affect any then-existing obligations under pending repurchase commitments for L Bonds;

- to comply with requirements of the SEC in order to effect or maintain the qualification of the indenture under the Trust Indenture Act of 1939, or to comply with other applicable federal or state laws or regulations;

- to comply with the rules or policies of a depositary of the L Bonds; or

- in connection with an amendment, extension, replacement, renewal or substitution of any senior debt, to amend the subordination provisions of the indenture to conform to the reasonable requirements of the holder or holders of such senior debt.

**Rights of L Bond Holders**

As an L Bond holder, you have limited rights to vote on our actions as set forth in the indenture. In general, you will have the right to vote on whether or not to approve some amendments to the indenture. For a description of these rights, see "— Amendment, Supplement and Waiver" above. You will also have the right to direct some actions that the trustee takes if there is an event of default with respect to the L Bonds. For a description of these rights, see above under the caption "— Events of Default." For a complete description of your rights as an L Bond holder, we encourage you to read a copy of the indenture, which is filed as an exhibit to the registration statement of which this prospectus is a part. We will also provide you with a copy of the indenture upon your request.

The trustee and the L Bond holders will have the right to direct the time, method and place of conducting any proceeding for some of the remedies available, except as otherwise provided in the indenture. The trustee may require reasonable indemnity, satisfactory to the trustee, from L Bond holders before acting at their direction. You will not have any right to pursue any remedy with respect to the indenture or the L Bonds unless you satisfy the conditions contained in the indenture.

**The Indenture Trustee**

*General*

Bank of Utah has agreed to be the trustee under the indenture. The indenture contains certain limitations on the rights of the trustee, should it become one of our creditors, to obtain payment of claims in certain cases, or to realize on certain property received in respect of any claim as security or otherwise. The trustee will be permitted to engage in other transactions with us.

Subject to certain exceptions, the holders of a majority in principal amount of the then-outstanding L Bonds will have the right to direct the time, method and place of conducting any proceeding for exercising any remedy available to the trustee. The indenture provides that if an event of default specified in the indenture shall occur and not be cured, the trustee will be required, in the exercise of its power, to use the degree of care of a reasonable person in the conduct of his own affairs. Subject to such provisions, the trustee will be under no obligation to exercise any of its rights or powers under the indenture at the request of any holder of L Bonds, unless the holder shall have offered to the trustee security and indemnity satisfactory to it against any loss, liability or expense.

Case 3:22-cv-00410-B Document 101 Filed 02/21/24 Page 818 of 1549 PageID 3513

The trustee may resign at any time, or may be removed by the holders of a majority of the aggregate principal amount of the outstanding L Bonds. In addition, we may remove the trustee for certain failures in its duties, including the insolvency of the trustee or the trustee's ineligibility to serve as trustee under the Trust Indenture Act of 1939. However, no resignation or removal of the trustee may become effective until a successor trustee has accepted the appointment as provided in the indenture.

App. 0815

*Reports to Trustee*

We will provide the trustee with (i) a calculation date report within 45 days after the end of each fiscal quarter containing a calculation of the debt coverage ratio that includes a summary of all cash, life insurance policy investments serving as collateral, as well as our total outstanding indebtedness including outstanding principal balances, interest credited and paid, transfers made, any redemption or repayment and interest rate paid; (ii) copies of our audited annual financials, no earlier than when the same become a matter of public record; and (iii) any additional information reasonably requested by the trustee.

**Certain Charges**

We and our servicing agents, if any, may assess service charges for changing the registration of any L Bond to reflect a change in name of the holder, multiple changes in interest payment dates or transfers (whether by operation of law or otherwise) of an L Bond by the holder to another person. The indenture permits us to set off, against amounts otherwise payable to you under the L Bonds, the amount of these charges.

**Variations in Terms and Conditions**

We may from time to time vary the terms and conditions of the L Bonds offered, including but not limited to minimum initial principal investment amount requirements, maximum aggregate principal amount limits, interest rates, minimum denominations, service and other fees and charges, and redemption provisions. Terms and conditions may be varied by state, locality, principal amount, type of investor (for example, new or current investor) or as otherwise permitted under the indenture governing the securities offered by this prospectus. No change in terms, however, will apply to any L Bonds already issued and outstanding at the time of such change.

**Satisfaction and Discharge of Indenture**

The indenture shall cease to be of further effect upon the payment in full of all of the outstanding L Bonds and the delivery of an officer's certificate to the trustee stating that we do not intend to issue additional L Bonds under the indenture or, with certain limitations, upon deposit with the trustee of funds sufficient for the payment in full of all of the outstanding L Bonds.

**Reports**

We will publish annual reports containing financial statements and quarterly reports containing financial information for the first three quarters of each fiscal year. We will send copies of these reports, at no charge, to any holder of L Bonds who sends us a written request.

30

**PLAN OF DISTRIBUTION**

**General**

We are offering up to 2,000,000 Units, representing $2,000,000,000 in aggregate principal amount, of L Bonds (referred to throughout this prospectus simply as "L Bonds") on a continuous basis. The L Bonds will be sold at $1,000 per Unit, and in minimum amounts of 25 Units, or $25,000 or more in principal. There is no minimum amount of L Bonds that must be sold before we access and use the proceeds. The proceeds of new sales of L Bonds will be paid directly to us promptly following each sale and will not be placed in an escrow account. Even if we sell less than the entire $2,000,000,000 in aggregate principal amount of L Bonds Units being offered, the L Bonds that we sell will be issued, and the proceeds of those L Bond sales will be used by us, as described in this prospectus.

The L Bonds will be offered and sold on a best efforts basis by Emerson Equity LLC (our "dealer manager"). Our dealer manager will enter into participating dealer agreements with certain other broker-dealers that are members of FINRA, referred to as "selling group members," to authorize those broker-dealers to sell our L Bonds. The L Bonds will be offered to the public on the terms set forth in this prospectus and any prospectus supplements we may file from time to time. Neither our dealer manager nor any selling group members will have any obligation to take or purchase any L Bonds. In addition to forming the selling group, our dealer manager provides services to us, which include conducting broker-dealer seminars, holding informational meetings and providing information and answering any questions investors or selling group members may have concerning this offering.

Members of the selling group will receive sales commissions of up to        % of the gross offering proceeds depending upon the maturity of the L Bonds sold. In addition, our dealer manager and selling group members may receive up to % of the gross offering proceeds as additional compensation consisting of the following:

- a dealer-manager fee payable to the dealer manager in an amount equal to        % of the principal amount of all L Bonds sold;

- an accountable expense allowance to be paid to the selling group members, which may include due diligence expenses of the dealer manager and selling group members set forth in a detailed and itemized invoice and as further described below;

- wholesaling fees, which may consist of commissions and non-transaction-based compensation of the wholesalers;

- non-cash compensation, which may consist of an occasional meal, a ticket to a sporting event or the theater, or comparable entertainment that is neither so frequent nor so extensive as to raise any question of propriety and is not preconditioned on achievement of a sales target, the national and regional sales conferences of our selling group members, training and education meetings for registered representatives of our selling group members, and permissible forms of non-cash compensation to registered representatives of our selling group members, such as gifts that do not exceed an aggregate value of $100 per annum per registered representative and that are not pre-conditioned on achievement of a sales target, including but not limited to seasonal gifts; and

- up to a 1.00% reallowance to selling group members.

As part of the accountable expense allowance, the dealer manager and selling group members are expected to be reimbursed for accountable out-of-pocket expenses incurred by them during the course of the offering. Expenses eligible for reimbursement may include:

- travel, lodging, and meals for the wholesalers who are our employees and associated with the dealer manager;

- reasonable out-of-pocket expenses incurred by selling group members and their associated persons, including reimbursement of actual costs of third-party professionals retained by them; and

- due diligence expenses of the dealer manager and selling group members set forth in a detailed and itemized invoice.

Upon the sale of L Bonds by a selling group member, the selling group member effecting the sale will receive selling commissions and additional compensation in connection therewith pursuant to the terms of the soliciting dealer agreement between the dealer manager and the selling group member.

31

In no event will the total selling commissions and additional compensation, including accountable due diligence expenses and reimbursements, exceed      % of the aggregate gross offering proceeds we receive from the sale of L Bonds.

We may also sell our L Bonds at a discount through the following distribution channels in the event that the investor:

- purchases L Bonds through fee-based programs, also known as wrap accounts;

- purchases L Bonds through a selling group member that has an alternative fee arrangement with its clients;

- purchases L Bonds through certain registered investment advisers;

- purchases L Bonds through bank trust departments or any other organization or person authorized to act in a fiduciary capacity for its clients or customers; or

- is an endowment, foundation, pension fund or other institutional investor.

If an investor purchases shares through one of the above distribution channels in our offering, we will sell the L Bonds at a discount, reflecting that selling commissions are not being paid in connection with such purchase. The public offering price will be decreased by an amount equal to such reduction; however, the net proceeds to us will not be affected by any such reduction in selling commissions.

Our officers and directors and their family members may purchase the L Bonds offered hereby for investment and not for distribution at a discount from the public offering price. For purposes of this discount, we consider a family member to be a spouse, parent, child, sibling, mother- or father-in-law, son- or daughter-in-law or brother- or sister-in-law. In addition, if approved by our Board of Directors, certain of our joint venture partners, consultants and other service providers may purchase the L Bonds offered hereby at a discount from the public offering price. We will sell such L Bonds reflecting that selling commissions will not be paid in connection with such sales. The public offering price will be decreased by an amount equal to such reduction; however, the net proceeds to us from such sales made net of commissions will be the same as the net proceeds we receive from other sales of L Bonds.

Also, we may sell L Bonds to the dealer manager, selling group members, their retirement plans, their representatives and the family members as described above, IRAs and qualified plans of their representatives at a purchase price reflecting that selling commissions will not be payable in consideration of the services rendered by such dealer manager, selling group members, and their representatives in the offering. Such sales, however, may not be made for the period of time from the effective date through 90 days after the effective date. The public offering price will be decreased by an amount equal to such reduction; however, the net proceeds to us from the sales of these L Bonds will be the same as the net proceeds we receive from other sales of L Bonds.

Neither our dealer manager nor its affiliates will directly or indirectly compensate any person engaged as an investment advisor or a bank trust department by a potential investor as an inducement for such investment advisor or bank trust department to advise favorably for an investment in the L Bonds offered hereby. Also, we will not pay referral or similar fees to any accountants, attorneys or other persons in connection with the distribution of the L Bonds.

In addition to the sales commissions, fees, allowances, reimbursements and expenses described above, we expect to pay approximately $2,400,000 in offering and related costs and expenses in connection with this offering. These kinds of expenses include all expenses to be paid by us in connection with the offering (other than sales commissions, additional compensation, and expense allowances and reimbursement to our selling group members), including but not limited to legal, accounting, printing and mailing expenses, registration, qualification and associated securities filing fees and other costs and expenses.

The table below sets forth the maximum amount of sales commissions and additional compensation, as described in footnote (1) to the table below, we may pay in connection with this offering.

| L Bond Term | Sales Commission | Additional Compensation[1] | Total[2] |
|---|---|---|---|
| 2 years | % | % | % |
| 3 years | % | % | % |
| 5 years | % | % | % |
| 7 years | % | % | % |

(1) As described above, additional compensation includes: (i) a dealer-manager fee payable to the dealer manager in an amount equal to     % of the principal amount of all L Bonds sold; (ii) an accountable expense allowance to the selling group members as described above, which may include due-diligence expenses of the dealer manager and selling group members set forth in a detailed and itemized invoice; (iii) wholesaling fees, which may consist of commissions and non-transaction-based compensation of the wholesalers; (iv) non-cash compensation, which may consist of an occasional meal, a ticket to a sporting event or the theater, or comparable entertainment that is neither so frequent nor so extensive as to raise any question of propriety and is not preconditioned on achievement of a sales target, the national and regional sales conferences of our selling group members, training and education meetings for registered representatives of our selling group members, and permissible forms of non-cash compensation to registered representatives of our selling group members, such as gifts that do not exceed an aggregate value of $100 per annum per registered representative and that are not pre-conditioned on achievement of a sales target, including but not limited to seasonal gifts; and (v) up to a 1.00% reallowance to selling group members.

(2) The combined selling commissions and additional compensation for this offering will not exceed     % of the aggregate gross proceeds of this offering.

The line items reflected in the table below are our current estimates of average sales commissions and additional compensation (including accountable expenses) that we will pay. Specifically, we estimate that the average sales commission will be     %, or $     based on $2,000,000,000 in principal amount of L Bonds sold, and the average additional compensation will be     %, or $     based on $2,000,000,000 in principal amount of L Bonds sold. The components of "additional compensation" are detailed in footnote (1) to the table above. Actual costs may differ from the percentages and amounts shown in the table below, subject, however, to the limitations noted above.

| L Bonds Sold | Sales Commission | Additional Compensation | Total |
|---|---|---|---|
| $   500,000,000 | $ | $ | % |
| $   750,000,000 | $ | $ | % |
| $2,000,000,000 | $ | $ | % |

The wholesalers employed by us are registered with and associated persons of our dealer manager. The wholesalers will:

- attend local, regional and national conferences of the selling group members; and

- contact selling group members and their registered representatives to make presentations concerning us and this offering.

The wholesalers will receive a portion of their non-transaction based compensation as compensation for their selling efforts. We host training and education meetings for selling group members and their representatives. The costs of the training and education meetings will be borne by us, but counted toward the     % underwriting compensation limit.

Certain of our employees who are also registered representatives and supervisory principals of the dealer manager have been granted certain share appreciation rights ("SARs") as part of their compensation. The SARs give such individual the contractual right to receive from us additional cash compensation at any point before the SAR's expiration, but only if the price of our common stock has increased between the grant date and the date when we receive notice of such individual's intention to exercise the SAR. At the termination of this offering, the aggregate of the appreciation amount, as defined in the SAR agreement, will be calculated and added to the other items of value (e.g., selling commissions and additional forms of compensation) to ensure that aggregate compensation paid in connection with this offering does not exceed     % of the gross offering proceeds.

In accordance with FINRA rules, in no event will our total compensation to FINRA members, including but not limited to sales commissions, the dealer-manager fee and accountable expense and other reimbursements to our dealer manager and selling group members, including non-transaction-based compensation of the wholesalers and non-cash compensation, exceed     % of our gross offering proceeds, in the aggregate.

We will indemnify the selling group members and our dealer manager against some civil liabilities, including certain liabilities under the Securities Act of 1933, as amended, and liabilities arising from breaches of our representations and warranties contained in the Dealer Manager Agreement.

<div align="center">33</div>

The foregoing is a summary of the material terms relating to the plan of distribution of the L Bonds contained in the Dealer Manager Agreement. Any amendment to the Dealer Manager Agreement will be filed as an exhibit to an amendment to the registration statement of which this prospectus is a part.

**Settlement Procedures**

You can place an order for the purchase of L Bonds using DTC Settlement through your selling group member. A selling group member using DTC settlement will have an account with a DTC participant in which your funds will be placed to facilitate settlement. Orders may be placed until the cyclical order due date. Orders will be executed by such selling group member electronically and you must coordinate with your selling group member's registered representative to pay the full purchase price of the L Bonds by the trade date. If you purchase your L Bonds using DTC settlement, you will be credited with ownership of an L Bond on the second business day after the end of the DTC closing cycle in which the subscription is made (typically, closings will occur on a bi-monthly cycle). If you purchase your L Bonds in this manner, your purchase price will not be held in escrow.

You also have the option to elect to settle your purchase directly with us, the Company. If you elect to use direct settlement with us, you should complete and sign a Subscription Agreement similar to the one filed as an exhibit to the registration statement of which this prospectus is a part. A form of Subscription Agreement is available from your selling group member's registered representative. Once completed and signed, your Subscription Agreement should be provided to your selling group member who will deliver it to us to be held, together with your related subscription funds, until our acceptance of your subscription. In connection with a direct settlement subscription, you should pay the full purchase price of the L Bonds to us as set forth in the Subscription Agreement. Subscribers may not withdraw funds from the subscription account. Subscriptions will be effective upon our acceptance of your Subscription Agreement and related funds, and we reserve the right to reject any subscription in whole or in part.

**Covered Security**

Our L Bonds are a "covered security." The term "covered security" applies to securities exempt from state registration because of their oversight by federal authorities and national-level regulatory bodies pursuant to Section 18 of the Securities Act of 1933. Generally, securities listed on national exchanges are the most common type of covered security exempt from state registration. A non-traded security also can be a covered security if it has a seniority greater than or equal to other securities from the same issuer that are listed on a national exchange. Our L Bonds are a covered security because they are senior to our common stock, which is listed on The Nasdaq Capital Market, and therefore our offering of L Bonds will be exempt from state registration.

**Although the status of our L Bonds as a "covered security" will facilitate their purchase and sale to a broader range of investors than would otherwise be available to us, and although the offer and sale of a "covered security" generally involves fewer issuance costs to the issuer of such securities, our L Bonds are not a suitable purchase for all investors. Investors are urged to read carefully the risk factors relating to our business and our Company contained in the Risk Factors section of this prospectus beginning on page 11 and under Item 1A, entitled "Risk Factors," of our Annual Report on Form 10-K for the year ended December 31, 2019, which is incorporated by reference herein. In addition, investors should understand that because our L Bonds are a "covered security" exempt from state securities regulations, neither our Company, the L Bonds, or any other aspects of this offering have been the subject of any merit-based review by state securities regulators.**

34

**MATERIAL FEDERAL INCOME TAX CONSIDERATIONS**

The following is a general discussion of the material United States ("U.S.") federal income tax considerations relating to the initial purchase, ownership and disposition of the L Bonds by U.S. and non-U.S. holders. This discussion is a summary only and is not a complete analysis of all the potential tax considerations relating to the purchase, ownership and disposition of the L Bonds. We have based this summary on current provisions of the Code of 1986, as amended (the "Code"), applicable U.S. Treasury Regulations promulgated thereunder, judicial opinions, and published rulings of the Internal Revenue Service (the "IRS"), all as in effect on the date of this prospectus. However, these laws and other guidance are subject to differing interpretations or change, possibly with retroactive effect. In addition, we have not sought, and will not seek, a ruling from the IRS or an opinion of counsel with respect to any tax consequences of purchasing, owning or disposing of L Bonds. Thus, the IRS could take a different position regarding one or more of the tax consequences or matters described in this prospectus; and there can be no assurance that any position taken by the IRS would not be sustained.

This discussion is limited to purchasers of L Bonds who acquire the L Bonds from us in this offering and hold the L Bonds as capital assets for federal income tax purposes. This discussion does not address all possible tax consequences that may be applicable to you in light of your specific circumstances. For instance, this discussion does not address the alternative minimum tax provisions of the Code, or special rules applicable to some categories of investors such as financial institutions, insurance companies, tax-exempt organizations, dealers in securities, real estate investment trusts, regulated investment companies, or persons who hold L Bonds as part of a hedge, conversion or constructive sale transaction, straddle or other risk reduction transaction that may be subject to special rules. This discussion also does not address the tax consequences arising under the laws of any foreign, state or local jurisdiction; or any U.S. estate or gift tax laws.

If you are considering the purchase of an L Bond, you should consult your own tax advisors as to the particular tax consequences to you of acquiring, holding or otherwise disposing of the L Bonds, including the effect and applicability of state, local or foreign tax laws, or any U.S. estate and gift tax laws.

As used in this discussion, the term "U.S. holder" means a holder of an L Bond that is:

(i)    for United States federal income tax purposes, a citizen or resident of the United States;

(ii)   a corporation, partnership or other entity created or organized in or under the laws of the United States or of any political subdivision thereof or other entity characterized as a corporation or partnership for federal income tax purposes;

(iii)  an estate, the income of which is subject to United States federal income taxation regardless of its source; or

(iv)   a trust, the administration of which is subject to the primary supervision of a court within the United States and which has one or more United States persons with authority to control all substantial decisions, or if the trust was in existence on August 20, 1996, and has elected to continue to be treated as a United States trust.

For the purposes of this discussion, a "non-U.S. holder" means any holder of L Bonds other than a U.S. holder. Any L Bond purchaser who is not a U.S. citizen will be required to furnish documentation, on IRS Form W-8BEN, that clearly states whether it is subject to U.S. withholding taxes, in accordance with applicable requirements of the United States taxing authority.

**Characterization of the L Bonds**

The federal income tax consequences of owning L Bonds depend on characterization of the L Bonds as debt for federal income tax purposes, rather than as equity interests or a partnership among the holders of the L Bonds. We believe that the L Bonds have been structured in a manner that will allow the L Bonds to be characterized as debt for federal income tax purposes. However, this is only our belief; and no ruling from the IRS or an opinion of counsel has been sought in this regard. Thus, the IRS could successfully challenge this characterization.

If the L Bonds were treated as equity interests, there could be adverse effects on some holders. For example, payments on the L Bonds could (1) if paid to non-U.S. holders, be subject to federal income tax withholding; (2) constitute unrelated business taxable income to some tax-exempt entities, including pension funds and some retirement accounts (if the relationship were characterized as a partnership for tax purposes); and (3) cause the timing and amount of income that accrues to holders of L Bonds to be different from that described below.

App. 0823

Because of these potential adverse effects, you are urged to consult your own tax advisors as to the tax consequences that may apply to your particular situation in the event the L Bonds are re-characterized as equity interests; and as to the likelihood that the L Bonds could be so re-characterized. The remainder of this discussion assumes that the L Bonds are characterized as debt.

**Taxation of U.S. Holders**

*Stated Interest*

Under general federal income tax principles, you must include stated interest in income in accordance with the method of accounting you use for federal income tax purposes. Accordingly, if you are using the accrual method of tax accounting, you must include stated interest in income as it accrues. If you are using the cash method of tax accounting, you must include stated interest in income as it is actually or constructively received. Payments of interest to taxable holders of L Bonds will constitute portfolio income, and not passive activity income, for the purposes of the passive loss limitations of the Code. Accordingly, income arising from payments on the L Bonds will not be subject to reduction by losses from passive activities of a holder.

If a partnership (or other entity or arrangement treated as a partnership for U.S. federal income tax purposes) holds L Bonds, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership. If you are a partner in a partnership purchasing L Bonds, we urge you to consult your tax advisor.

*Disposition of L Bonds*

In general, a U.S. holder will recognize gain or loss upon the sale, exchange or other taxable disposition of an L Bond measured by the difference between (1) the sum of the cash and the fair market value of all other property received on such disposition, excluding any portion of the payment that is attributable to accrued interest on the L Bonds; and (2) your adjusted tax basis in the L Bond. A U.S. holder's adjusted tax basis in an L Bond generally will be equal to the price the U.S. holder paid for the L Bond. Any of this gain or loss generally will be long-term capital gain or loss if, at the time of any such taxable disposition, the L Bond was a capital asset in the hands of the holder and was held for more than one year. Net long-term capital gain recognized by individual U.S. holders is eligible for a reduced rate of taxation. The deductibility of capital losses is subject to annual limitations.

The terms of the L Bonds may be modified upon the consent of a specified percentage of holders and, in some cases, without consent of the holders. In addition, the L Bonds may be assumed upon the occurrence of specific transactions. The modification or assumption of an L Bond could, in some instances, give rise to a deemed exchange of an L Bond for a new debt instrument for federal income tax purposes. If an exchange is deemed to occur by reason of a modification or assumption, you could realize gain or loss without receiving any cash.

*Additional Tax on Net Investment Income*

If you are a U.S. holder other than a corporation, you generally will be subject to a 3.8% additional tax on the lesser of (1) your "net investment income" for the taxable year, and (2) the excess of your modified adjusted gross income for the taxable year over a certain threshold. Your net investment income generally will include any income or gain recognized by you with respect to our L Bonds, unless such income or gain is derived in the ordinary course of the conduct of your trade or business (other than a trade or business that consists of certain passive or trading activities).

**Considerations for Tax-Exempt Holders of L Bonds**

Tax-exempt entities, including charitable corporations, pension plans, profit sharing or stock bonus plans, individual retirement accounts and some other employee benefit plans are subject to federal income tax on unrelated business taxable income. For example, net income derived from the conduct of a trade or business regularly carried on by a tax-exempt entity or by a partnership in which it is a partner is treated as unrelated business taxable income.

A $1,000 special deduction is allowed in determining the amount of unrelated business taxable income subject to tax. Tax-exempt entities taxed on their unrelated business taxable income are also subject to the alternative minimum tax for items of tax preference which enter into the computation of unrelated business taxable income.

36

In general, interest income does not constitute unrelated business taxable income. However, under the debt-financed property rules, if tax-exempt holders of L Bonds finance the acquisition or holding of L Bonds with debt, interest on the L Bonds will be taxable as unrelated business taxable income. The L Bonds will be treated as debt-financed property if the debt was incurred to acquire the L Bonds or was incurred after the acquisition of the L Bonds, so long as the debt would not have been incurred but for the acquisition and, at the time of the acquisition, the incurrence of the debt has already occurred or was foreseeable.

**Non-U.S. Holders**

The following discussion is a summary of the principal U.S. federal income consequences resulting from the ownership of the L Bonds by non-U.S. holders. However, application of the U.S. federal income tax rules associated with non-U.S. holders is complex and factually sensitive. Thus, if you could be considered to be a non-U.S. holder, you are urged to consult your own tax advisors with respect to the application of the federal income tax rules for your particular situation.

*Payments of Interest to Non-U.S. Holders*

Subject to the discussion below under "Backup Withholding and Information Reporting," payments of interest received by a non-U.S. holder generally will not be subject to U.S. federal withholding tax, provided (1) that (a) the non-U.S. holder does not own, actually or constructively, 10% or more of the total combined voting power of all classes of our stock entitled to vote; (b) the non-U.S. holder is not a controlled foreign corporation, actually or constructively, through stock ownership; and (c) the beneficial owner of the L Bond complies with the certification requirements, including delivery of a statement, signed by the holder under penalties of perjury, certifying that the holder is a foreign person and provides its name and address; or (2) that the non-U.S. holder is entitled to the benefits of an income tax treaty under which the interest is exempt from U.S. withholding tax and the non-U.S. holder complies with the reporting requirements. If an L Bond is held through a securities clearing organization or other specified financial institutions (an "Intermediary"), the Intermediary may provide the relevant signed statement and, unless the Intermediary is a "qualified" intermediary as defined under the Code, the signed statement provided by the Intermediary must be accompanied by a copy of a valid Form W-8BEN provided by the non-U.S. beneficial holder of the L Bond.

Payments of interest not exempt from United States federal withholding tax as described above will be subject to a withholding tax at the rate of 30%, subject to reduction under an applicable income tax treaty.

Payments of interest on an L Bond to a non-U.S. holder generally will not be subject to U.S. federal income tax, as opposed to withholding tax, unless the income is effectively connected with the conduct by the non-U.S. holder of a trade or business in the United States. To claim the benefit of a lower treaty withholding rate, a non-U.S. holder must provide a properly executed IRS Form W-8BEN to us or our paying agent before the payment of stated interest; and may be required to obtain a U.S. taxpayer identification number and provide documentary evidence issued by foreign governmental authorities to prove residence in the foreign country. You should consult your own tax advisor to determine the effects of the application of the U.S. federal withholding tax to your particular situation.

*Disposition of the L Bonds by Non-U.S. Holders*

Subject to the discussion below under "Backup Withholding and Information Reporting," a non-U.S. holder generally will not be subject to United States federal income tax, and generally no tax will be withheld with respect to gains realized on the disposition of an L Bond, unless (a) the gain is effectively connected with a United States trade or business conducted by the non-U.S. holder or (b) the non-U.S. holder is an individual who is present in the United States for 183 or more days during the taxable year of the disposition and other requirements are satisfied.

*Non-U.S. Holders Subject to U.S. Income Taxation*

If interest and other payments received by a non-U.S. holder with respect to the L Bonds, including proceeds from the disposition of the L Bonds, are effectively connected with the conduct by the non-U.S. holder of a trade or business within the United States, or the non-U.S. holder is otherwise subject to United States federal income taxation on a net basis with respect to the holder's ownership of the L Bonds, or are individuals that have by operation of law become residents in the United States for federal income tax purposes, the non-U.S. holder generally will be subject to the rules described above applicable to U.S. holders of L Bonds, subject to any modification provided under an applicable income tax treaty. If any of these non-U.S. holders is a corporation, it may also be subject to a U.S. "branch profits tax" at a 30% rate.

**Backup Withholding and Information Reporting**

Non-corporate U.S. holders may be subject to backup withholding at a rate of 28% on payments of principal, premium, and interest on, and the proceeds of the disposition of, the L Bonds. In general, backup withholding will be imposed only if the U.S. holder (1) fails to furnish its taxpayer identification number ("TIN"), which for an individual would be his or her Social Security number; (2) furnishes an incorrect TIN; (3) is notified by the IRS that it has failed to report payments of interest or dividends; or (4) under some circumstances, fails to certify under penalty of perjury that it has furnished a correct TIN and has been notified by the IRS that it is subject to backup withholding tax for failure to report interest or dividend payments. In addition, the payments of principal and interest to U.S. holders generally will be subject to information reporting. You should consult your tax advisors regarding your qualification for exemption from backup withholding and the procedure for obtaining an exemption, if applicable.

Backup withholding generally will not apply to payments made to a non-U.S. holder of an L Bond who provides the certification that it is a non-U.S. holder, and the payor does not have actual knowledge that a certificate is false, or otherwise establishes an exemption from backup withholding. Payments by United States office of a broker of the proceeds of a disposition of the L Bonds generally will be subject to backup withholding at a rate of 28% unless the non-U.S. holder certifies it is a non-U.S. holder under penalties of perjury or otherwise establishes an exemption. In addition, if a foreign office of a foreign custodian, foreign nominee or other foreign agent of the beneficial owner, or if a foreign office of a foreign "broker" pays the proceeds of the sale of an L Bond to the seller, backup withholding and information reporting will not apply; provided that the nominee, custodian, agent or broker is not a "United States related person," or a person which derives more than 50% of its gross income for some periods from the conduct of a trade or business in the United States or is a controlled foreign corporation. The payment by a foreign office of a broker that is a United States person or a United States related person of the proceeds of the sale of L Bonds will not be subject to backup withholding, but will be subject to information reporting unless the broker has documentary evidence in its records that the beneficial owner is not a United States person for purposes of the backup withholding and information reporting requirements and other conditions are met, or the beneficial owner otherwise establishes an exemption.

The amount of any backup withholding imposed on a payment to a holder of an L Bond will be allowed as a credit against the holder's United States federal income tax liability and may entitle the holder to a refund; provided that the required information is furnished to the IRS.

<div align="center">

**STATE, LOCAL AND FOREIGN TAXES**

</div>

We make no representations regarding the tax consequences of the purchase, ownership or disposition of the L Bonds under the tax laws of any state, locality or foreign country. You should consult your own tax advisors regarding these state and foreign tax consequences.

<div align="center">38</div>

**ERISA CONSIDERATIONS**

**General**

Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and Section 4975 of the Code impose restrictions on employee benefit plans that are subject to ERISA, or plans or arrangements that are subject to Code Section 4975, and on persons who are parties in interest or disqualified persons with respect to those plans or arrangements. Some employee benefit plans, like governmental plans and church plans (if no election has been made under Section 410(d) of the Code), are not subject to the restrictions of Title I of ERISA or Code Section 4975, and assets of these plans may be invested in the L Bonds without regard to the ERISA considerations described below, subject to the Code and other applicable federal and state laws affecting tax-exempt organizations generally. Any plan fiduciary that proposes to cause a plan to acquire any of the L Bonds should consult with its counsel with respect to the potential consequences under ERISA and the Code of the plan's acquisition and ownership of the L Bonds. Investments by plans are also subject to ERISA's and the Code's general fiduciary requirements, including the requirement of investment prudence and diversification and the requirement that a plan's investments be made in accordance with the documents governing the plan.

**Prohibited Transactions**

*General*

Section 406 of ERISA and Section 4975 of the Code prohibits certain "parties in interest" and "disqualified persons" with respect to a plan from engaging in select transactions involving a plan and its assets unless a statutory, regulatory or administrative exemption applies to the transaction. Section 4975 of the Code imposes excise taxes on parties in interest that engage in non-exempt "prohibited transactions." Section 502(i) of ERISA requires the Secretary of the U.S. Department of Labor ("Labor") to assess a civil penalty against a fiduciary who breaches any fiduciary responsibility under, or commits any other violation of, part 4 of Title I of ERISA, or any other person who knowingly participates in a breach or violation.

*Plan Asset Regulations*

Labor has issued regulations concerning the definition of what constitutes the assets of a plan for purposes of ERISA and the prohibited transaction provisions of the Code. The plan asset regulations describe the circumstances where the assets of an entity in which a plan invests will be considered to be "plan assets," so that any person who exercises control over the assets would be subject to ERISA's fiduciary standards. Generally, under the plan asset regulation, when a plan invests in another entity, the plan's assets do not include, solely by reason of the investment, any of the underlying assets of the entity. However, the plan asset regulation provides that, if a plan acquires an "equity interest" in an entity that is neither a "publicly-offered security" nor a security issued by an investment company registered under the Investment Company Act of 1940 the assets of the entity will be treated as assets of the plan investor unless exceptions apply.

Under the plan asset regulations the term "equity interest" is defined as any interest in an entity other than an instrument that is treated as indebtedness under "applicable local law" and that has no "substantial equity features." Although the plan asset regulation is silent with respect to the question of which law constitutes "applicable local law" for this purpose, Labor has stated that these determinations should be made under the state law governing interpretation of the instrument in question. In the preamble to the plan asset regulation, Labor declined to provide a precise definition of what features are equity features or the circumstances under which the features would be considered "substantial," noting that the question of whether a plan's interest has substantial equity features is an inherently factual one, but that in making that determination it would be appropriate to take into account whether the equity features are such that a plan's investment would be a practical vehicle for the indirect provision of investment management services. We believe that the L Bonds will be classified as indebtedness without substantial equity features for ERISA purposes.

Under the plan asset regulations the term "publicly-offered security" is defined as a security that is (i) freely transferable, (ii) part of a class of securities that is widely held, and (iii) either (A) part of a class of securities registered under section 12(b) or 12(g) of the Securities Exchange Act of 1934 or (B) sold to the plan as part of an offering of securities to the public pursuant to an effective registration statement under the Securities Act of 1933 and the class of securities of which such security is a part is registered under the Securities Exchange Act of 1934 within 120 days after the end of the fiscal year of the issuer during which the offering of such securities to the public occurred. For purposes of the above, a class of securities is considered to be "widely held" if it is owned by 100 or more investors independent of the issuer and of one another. In the case of this offering, while the offer and sale of the L Bonds have been registered under the Securities Act of 1933, the L Bonds themselves have not been registered under the Securities Exchange Act

App. 0827

of 1934. For this reason, we believe that the L-Bonds will not likely meet the definition for "publicly-offered security" under the plan asset regulations.

---

39

---

In light of the foregoing, if the L Bonds were deemed to be equity interests for this purpose and no statutory, regulatory, or administrative exception applies, we could be considered to hold plan assets by reason of a plan's investment in the L Bonds. These plan assets would include an undivided interest in all of our assets. In this case, we may be considered a fiduciary with respect to the investing plans. We would be subject to the fiduciary responsibility provisions of Title I of ERISA, including the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code, and to Section 4975 of the Code with respect to transactions involving any of our assets. The ERISA fiduciary standards could affect the way we conduct the business, which would have consequences for all investors, not just those that are employee benefit plans.

Depending on the relevant facts and circumstances, prohibited transaction exemptions may apply to the purchase or holding of the L Bonds. See, for example, Prohibited Transaction Class Exemption ("PTE") 96-23, which exempts some transactions effected on behalf of a plan or by an "in-house asset manager;" PTE 95-60, which exempts some transactions between insurance company general accounts and parties in interest; PTE 91-38, which exempts some transactions between bank collective investment funds and parties in interest; PTE 90-1, which exempts some transactions between insurance company pooled separate accounts and parties in interest; or PTE 84-14, which exempts some transactions effected on behalf of a plan by a "qualified professional asset manager." However, there can be no assurance that any of these exemptions will apply with respect to any plan's investment in the L Bonds, or that the exemption, if it did apply, would apply to all prohibited transactions that may occur in connection with the investment.

Any plan fiduciary considering whether to purchase L Bonds on behalf of a plan should consult with its counsel regarding the applicability of the fiduciary responsibility and prohibited transaction provisions of ERISA and the Code. Before purchasing any L Bonds, a fiduciary of a plan should make its own determination as to (1) whether GWG Holdings, as issuer of and borrower under the L Bonds, is a "party in interest" under ERISA or a "disqualified person" under the Code with respect to the plan; (2) the availability of the relief provided in the plan asset regulation and (3) the availability of any other prohibited transaction exemptions. In addition, purchasers that are insurance companies should consult their own ERISA counsel with respect to their fiduciary responsibilities associated with their purchase and ownership of the L Bonds, including any responsibility under the Supreme Court case *John Hancock Mutual Life Insurance Co. v. Harris Trust and Savings Bank*.

40

## LEGAL MATTERS

Certain legal matters in connection with the L Bonds will be passed upon for us by Mayer Brown LLP, Chicago, Illinois.

## EXPERTS

The consolidated financial statements of GWG Holdings, Inc. and its subsidiaries for the year ended December 31, 2019 incorporated by reference in this prospectus from GWG Holdings, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2019 and the effectiveness of GWG Holdings, Inc.'s internal control over financial reporting as of December 31, 2019, have been audited by Whitley Penn LLP, independent registered public accounting firm, as set forth in their reports thereon, which are incorporated herein by reference. Such financial statements have been so incorporated in reliance upon the report of Whitley Penn LLP pertaining to such financial statements and the effectiveness of our internal control over financial reporting on the authority of such firm as experts in accounting and auditing.

The consolidated financial statements of GWG Holdings, Inc. and its subsidiaries for the year ended December 31, 2018 incorporated by reference in this prospectus from GWG Holdings, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2019 have been audited by Baker Tilly Virchow Krause, LLP, independent registered public accounting firm, as set forth in their report thereon. Such financial statements have been so incorporated in reliance upon the report of Baker Tilly Virchow Krause, LLP on the authority of such firm as experts in accounting and auditing.

The consolidated financial statements of The Beneficient Company Group, L.P. and its subsidiaries for the year ended December 31, 2019 incorporated by reference in this prospectus from GWG Holdings, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2019 have been audited by Whitley Penn LLP, independent registered public accounting firm, as set forth in their report thereon, which is incorporated herein by reference. Such financial statements have been so incorporated in reliance upon the report of Whitley Penn LLP pertaining to such financial statements on the authority of such firm as experts in accounting and auditing.

## WHERE YOU CAN FIND MORE INFORMATION

We have filed with the SEC a registration statement on Form S-1 under the Securities Act with respect to the L Bonds to be offered and sold pursuant to this prospectus which is a part of that registration statement. This prospectus does not contain all the information contained in the registration statement. For further information with respect to us and the L Bonds to be sold in this offering, we refer you to the registration statement, including the agreements, other documents and schedules filed as exhibits to the registration statement.

We file annual, quarterly and current reports, and other information with the SEC. We intend to make these filings available on our website at *www.gwgh.com*. Information on our website is not incorporated by reference in this prospectus. We maintain an office at 325 N. Saint Paul Street, Suite 2650, Dallas, TX 75201 where all records concerning the L Bonds are to be retained. L Bond holders and their representatives can request information regarding the L Bonds by contacting our office by mail at our address or by telephone at (612) 746-1944 or by fax at (612) 746-0445. Upon request, we will provide copies of our filings with the SEC free of charge to our investors. Our SEC filings, including the registration statement of which this prospectus is a part, will also be available on the SEC's Internet site at *http://www.sec.gov*.

## INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE

We are incorporating certain information about us that we have filed with the SEC by reference in this prospectus, which means that we are disclosing important information to you by referring you to those documents. The information we incorporate by reference is an important part of this prospectus.

We incorporate by reference the documents listed below:

- Our Annual Report on Form 10-K for the year ended December 31, 2019, filed with the SEC on March 27, 2020; and

- Our Current Reports on Form 8-K filed with the SEC on January 7, 2020, February 27, 2020, March 6, 2020, March 18, 2020 and March 20, 2020.

All documents filed by us pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, as amended, after the date of this prospectus and before the termination of the offering also are incorporated herein by reference. We are not, however,

App. 0830

incorporating by reference any documents or portions thereof that are not deemed "filed" with the SEC or any information furnished pursuant to Items 2.02 or 7.01 of Form 8-K or certain exhibits furnished pursuant to Item 9.01 of Form 8-K.

The section entitled "Where You Can Find More Information" above describes how you can obtain or access any documents or information that we have incorporated by reference herein. The information relating to us contained in this prospectus does not purport to be comprehensive and should be read together with the information contained in the documents incorporated by reference in this prospectus.

Upon written or oral request, we will provide, free of charge, to each person, including any beneficial owner, to whom a prospectus is delivered, a copy of any or all of the reports or documents that are incorporated by reference into this prospectus. Such written or oral requests should be made to:

<div align="center">

Timothy Evans, Chief Financial Officer
325 N. Saint Paul Street, Suite 2650
Dallas, TX 75201
Telephone Number: (612) 746-1935

</div>

In addition, such reports and documents may be found on our website at *www.gwgh.com*.

<div align="center">

41

</div>

2,000,000 Units

($2,000,000,000)

**GWG HOLDINGS, INC.**

**L Bonds**

**PROSPECTUS**

**, 2020**

App. 0832

PART II

INFORMATION NOT REQUIRED IN PROSPECTUS

ITEM 13. OTHER EXPENSES OF ISSUANCE AND DISTRIBUTION

Set forth below are expenses (other than the selling agent's commissions, dealer-manager fees and allowance expenses) we expect to be incurred in connection with the issuance and distribution of the securities registered hereby. With the exception of the Securities and Exchange Commission registration fee, the amounts set forth below are estimates and actual expenses may vary considerably from these estimates depending upon how long the notes are offered and other factors:

| | |
|---|---:|
| Securities and Exchange Commission registration fee | $ 259,600 |
| Accounting fees and expenses | 400,000 |
| Legal fees and expenses | 1,000,000 |
| Blue sky fees and expenses | 40,000 |
| Printing expenses | 400,000 |
| Trustee fees and expenses | 0 |
| Miscellaneous | 300,400 |
| Total | $ 2,400,000 |

ITEM 14. INDEMNIFICATION OF DIRECTORS AND OFFICERS

Section 145 of the Delaware General Corporation Law (the "DGCL") provides for, under certain circumstances, the indemnification of our officers, directors, employees and agents against liabilities that they may incur in such capacities. A summary of the circumstances in which such indemnification provided for is contained herein, but that description is qualified in its entirety by reference to the relevant Section of the DGCL.

In general, the statute provides that any director, officer, employee or agent of a corporation may be indemnified against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement, actually and reasonably incurred in a proceeding (including any civil, criminal, administrative or investigative proceeding) to which the individual was a party by reason of such status. Such indemnity may be provided if the indemnified person's actions resulting in the liabilities: (i) were taken in good faith; (ii) were reasonably believed to have been in or not opposed to our best interest; and (iii) with respect to any criminal action, such person had no reasonable cause to believe the actions were unlawful. Unless ordered by a court, indemnification generally may be awarded only after a determination of independent members of the board of directors or a committee thereof, by independent legal counsel or by vote of the stockholders that the applicable standard of conduct was met by the individual to be indemnified.

The statutory provisions further provide that to the extent a director, officer, employee or agent is wholly successful on the merits or otherwise in defense of any proceeding to which he or she was a party, he or she is entitled to receive indemnification against expenses, including attorneys' fees, actually and reasonably incurred in connection with the proceeding.

Indemnification in connection with a proceeding by or in the right of GWG Holdings in which the director, officer, employee or agent is successful is permitted only with respect to expenses, including attorneys' fees actually and reasonably incurred in connection with the defense. In such actions, the person to be indemnified must have acted in good faith, in a manner believed to have been in our best interest and must not have been adjudged liable to us unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability, in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expense which the Court of Chancery or such other court shall deem proper. Indemnification is otherwise prohibited in connection with a proceeding brought on behalf of the Company in which a director is adjudged liable to us, or in connection with any proceeding charging improper personal benefit to the director in which the director is adjudged liable for receipt of an improper personal benefit.

Delaware law authorizes us to reimburse or pay reasonable expenses incurred by a director, officer, employee or agent in connection with a proceeding in advance of a final disposition of the matter. Such advances of expenses are permitted if the person furnishes to us a written agreement to repay such advances if it is determined that he or she is not entitled to be indemnified by us.

The statutory section cited above further specifies that any provisions for indemnification of or advances for expenses does not exclude other rights under our certificate of incorporation, corporate bylaws, resolutions of our stockholders or disinterested directors, or otherwise. These indemnification provisions continue for a person who has ceased to be a director, officer, employee or agent of the corporation and inure to the benefit of the heirs, executors and administrators of such persons.

The statutory provision cited above also grants the power to the Company to purchase and maintain insurance policies that protect any director, officer, employee or agent against any liability asserted against or incurred by him in such capacity arising out of his status as such. Such policies may provide for indemnification whether or not the corporation would otherwise have the power to provide for it.

Article 6 of our corporate bylaws provides that we shall indemnify our directors, officers, employees and agents to the fullest extent permitted by the DGCL. Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers or persons controlling the Company pursuant to the foregoing provisions, we understand that in the opinion of the SEC such indemnification is against public policy as expressed in that Act and is therefore unenforceable.

We have purchased directors' and officers' liability insurance in order to limit the exposure to liability for indemnification of directors and officers, including liabilities under the Securities Act of 1933.

ITEM 15. RECENT SALES OF UNREGISTERED SECURITIES

On August 10, 2018, GWG issued and sold 5,000,000 shares of Convertible Preferred Stock to Beneficient for an aggregate purchase price of $50,000,000, or $10.00 per share of Convertible Preferred Stock. No underwriting discounts or commissions were paid in connection with such sale. The Convertible Preferred Stock will convert into 5,000,000 shares of GWG common stock at a conversion price of $10.00 per share immediately following the Final Closing.

The Convertible Preferred Stock were offered and sold in reliance upon the exemption from registration provided by Section 4(a)(2) under the Securities Act of 1933. The Master Exchange Agreement and the Third Amendment contains representations to support GWG's reasonable belief that Beneficient and the Seller Trusts had access to information concerning GWG's operations and financial condition, that each such recipient is acquiring the securities for its own account and not with a view to the distribution thereof, and that each such recipient is an "accredited investor" as defined by Rule 501 promulgated under the Securities Act of 1933.

On December 28, 2018, GWG issued and sold 27,013,516 shares of common stock (including shares issued upon conversion of the Convertible Preferred Stock) to the Seller Trusts. No underwriting discounts or commissions were paid in connection with such sale.

The shares were offered and sold in reliance upon the exemption from registration provided by Section 4(a)(2) under the Securities Act of 1933. The Master Exchange Agreement contains representations to support GWG's reasonable belief that Beneficient and the Seller Trusts had access to information concerning GWG's operations and financial condition, that each such recipient is acquiring the securities for its own account and not with a view to the distribution thereof (other than pursuant to a public offering registered under the Securities Act of 1933 or another applicable exemption), and that each such recipient is an "accredited investor" as defined by Rule 501 promulgated under the Securities Act of 1933.

ITEM 16. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES

**(a) Exhibits**. The exhibits listed below are filed as a part of this registration statement.

| Exhibit | Description |
|---|---|
| 1.1 | Form Managing Broker-Dealer Agreement with Emerson Equity[1] |
| 1.2 | Form of Soliciting Dealer Agreement[1] |
| 3.1 | Certificate of Incorporation[2] |
| 3.2 | Bylaws[3] |
| 3.3 | Amendment to Bylaws[19] |
| 3.4 | Certificate of Amendment to Certificate of Incorporation[5] |
| 3.5 | Certificate of Amendment to Certificate of Incorporation[8] |
| 3.6 | Certificate of Designation for Redeemable Preferred Stock[9] |
| 3.7 | Certificate of Amendment to Certificate of Designation for Redeemable Preferred Stock[9] |
| 3.8 | Certificate of Designation for Series 2 Redeemable Preferred Stock[11] |
| 3.9 | Certificate of Designations of Series B Convertible Preferred Stock[16] |
| 3.10 | Certificate of Correction of Certificate of Designation of Redeemable Preferred Stock[24] |
| 3.11 | Certificate of Correction of Certificate of Designation of Series 2 Redeemable Preferred Stock[24] |
| 4.1 | Amended and Restated Indenture with Bank of Utah, dated October 23, 2017[6] |
| 4.2 | Amended and Restated Pledge and Security Agreement by and among GWG Holdings, Inc., GWG Life, LLC, Jon R. Sabes, Steven F. Sabes, and Bank of Utah, dated October 23, 2017[6] |
| 4.3 | Form of L Bond (included as Exhibit A to Amended and Restated Indenture with Bank of Utah, dated October 23, 2017) |
| 4.4 | Form of Subscription Agreement for L Bonds[26] |
| 4.5 | Amendment No 1 to Amended and Restated Indenture with Bank of Utah, dated March 27, 2018[21] |
| 4.6 | Supplemental Indenture, dated as of August 10, 2018, to the Amended and Restated Indenture, dated as of October 23, 2017, as amended[16] |
| 4.7 | Amendment No 2 to Amended and Restated Indenture with Bank of Utah, dated December 31, 2019[28] |
| 5.1 | Opinion of Mayer Brown LLP[1] |
| 10.1 | Second Amended and Restated Loan and Security Agreement with GWG DLP Funding IV, LLC (as borrower), CLMG Corp. (as agent) and LNV Corporation (as lender), dated November 1, 2019[29] |
| 10.2 | Employment Agreement with William B. Acheson, dated June 30, 2017[10] |
| 10.3 | 2013 Stock Incentive Plan as amended[14] |
| 10.4 | Form of Stock Option Agreement used with 2013 Stock Incentive Plan[12] |
| 10.5 | Master Exchange Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, MHT Financial SPV, LLC, a Delaware limited liability company, and various related trusts, as amended and restated on January 18, 2018 with effect from January 12, 2018[13] |
| 10.6 | First Amendment to Master Exchange Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, MHT Financial SPV, LLC, a Delaware limited liability company, and various related trusts, dated April 30, 2018[13] |
| 10.7 | Second Amendment to Master Exchange Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, MHT Financial SPV, LLC, a Delaware limited liability company, and various related trusts, dated June 29, 2018[15] |
| 10.8 | Third Amendment to Master Exchange Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, MHT Financial SPV, LLC, a Delaware limited liability company, and various related trusts, dated August 10, 2018[16] |
| 10.9 | Commercial Loan Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, dated August 10, 2018[16] |
| 10.10 | Amendment No. 1 dated December 27, 2018 to Commercial Loan Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership[17] |
| 10.11 | Exchangeable Note from The Beneficient Company Group, L.P., a Delaware limited partnership, dated August 10, 2018[16] |

| | |
|---|---|
| 10.12 | Registration Rights Agreement with certain trusts related to The Beneficient Company Group, L.P., a Delaware limited partnership, and as set forth in the Agreement, dated August 10, 2018[16] |
| 10.13 | Registration Rights Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, dated August 10, 2018[16] |
| 10.14 | Registration Rights Agreement with each of the Exchange Trusts, dated December 27, 2018[17] |
| 10.15 | Participating Option Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, dated December 27, 2018[17] |

<div align="center">II-3</div>

| Exhibit | Description |
|---|---|
| 10.16 | Consent and Joinder to Amended and Restated Pledge and Security Agreement dated April 26, 2019[19] |
| 10.17 | Form of Indemnification Agreement with Directors and Officers[19] |
| 10.18 | Employment Agreement dated as of May 31, 2019 by and between GWG Holdings, Inc. and Murray T. Holland[22] |
| 10.19 | Performance Share Unit Agreement dated as of May 31, 2019 by and between GWG Holdings, Inc. and Murray T. Holland[22] |
| 10.20 | Promissory Note dated May 31, 2019 made by and on behalf of certain LiquidTrust Borrowers[23] |
| 10.21 | Intercreditor Agreement dated May 31, 2019 between GWG Life and HCLP Nominees, L.L.C.[23] |
| 10.22 | Intercreditor Agreement dated May 31, 2019 between GWG Life and Beneficient Holdings, Inc.[23] |
| 10.23 | Forbearance Letter Agreement dated July 3, 2019 between GWG DLP Funding IV, LLC and CLMG Corp. (as agent)[3] |
| 10.24 | Form of Non-employee Director Restricted Stock Agreement[3] |
| 21.1 | List of Subsidiaries[30] |
| 23.1 | Consent of Whitley Penn LLP (filed herewith) |
| 23.2 | Consent of Baker Tilly Virchow Krause, LLP (filed herewith) |
| 23.3 | Consent of Mayer Brown LLP[1] |
| 24.1 | Power of Attorney (incorporated by reference to the signature page of this Registration Statement on Form S-1) |
| 25.1 | Statement of Eligibility of Trustee (filed herewith) |
| 99.1 | Letter from ClearLife Limited, dated February 24, 2020[30] |
| 99.2 | Portfolio of Life Insurance Policies as of December 31, 2019[30] |
| 99.3 | Purchase and Contribution Agreement dated as of April 15, 2018 by and among The Beneficient Company Group, L.P., Beneficient Company Holdings, L.P., AltiVerse Capital Markets, L.L.C., Sabes AV Holdings, LLC, Jon R. Sabes, Steven F. Sabes, Insurance Strategies Fund, LLC and SFS Holdings, LLC[18] |
| 99.4 | The Beneficient Company Group, L.P. and Subsidiaries Consolidated Financial Statements and Independent Auditor's Report[30] |
| 99.5 | Fourth Amended and Restated Limited Partnership Agreement of Beneficient Company Holdings, L.P., dated as of April 26, 2019[25] † |

(1)   To be filed by amendment.
(2)   Incorporated by reference to Form S-1 Registration Statement filed on June 14, 2011 (File No. 333-174887).
(3)   Incorporated by reference to Annual Report on Form 10-K filed on July 9, 2019.
(4)   Intentionally omitted.
(5)   Incorporated by reference to Form S-1/A Registration Statement filed on August 23, 2011 (File No. 333-174887).
(6)   Incorporated by reference to Current Report on Form 8-K filed on October 26, 2017.
(7)   Intentionally omitted.
(8)   Incorporated by reference to Quarterly Report on Form 10-Q filed on August 8, 2014.
(9)   Incorporated by reference to Annual Report on Form 10-K filed on March 22, 2016.
(10)  Incorporated by reference to Current Report on Form 8-K filed on June 30, 2017.
(11)  Incorporated by reference to Current Report on Form 8-K filed on February 22, 2017.
(12)  Incorporated by reference to Form S-1/A Registration Statement filed on June 6, 2014 (File No. 333-195505).
(13)  Incorporated by reference to Quarterly Report on Form 10-Q filed on May 11, 2018.
(14)  Incorporated by reference to Current Report on Form 8-K filed on May 9, 2018.
(15)  Incorporated by reference to Quarterly Report on Form 10-Q filed on August 14, 2018.
(16)  Incorporated by reference to Current Report on Form 8-K filed on August 14, 2018.
(17)  Incorporated by reference to Current Report on Form 8-K filed on January 4, 2019.
(18)  Incorporated by reference to Exhibit 10.1 to Amendment No. 1 to the Schedule 13D jointly filed on April 16, 2019 by Jon R. Sabes and Steven F. Sabes, among others.
(19)  Incorporated by reference to Current Report on Form 8-K filed on April 30, 2019.
(20)  Intentionally omitted.
(21)  Incorporated by reference to Annual Report on Form 10-K filed on March 29, 2018.
(22)  Incorporated by reference to Current Report on Form 8-K filed on June 6, 2019.
(23)  Cacorporated by reference to Current Report on Form 8-K filed on June 6, 2019.
(24)  Incorporated by reference to Quarterly Report on Form 10-Q filed on November 14, 2019.
(25)  Incorporated by reference to Quarterly Report on Form 10-Q filed on September 3, 2019.
(26)  Incorporated by reference to Form S-1/A Registration Statement filed on October 10, 2017 (File No. 333-220288).

(27) Intentionally omitted

(28)  Incorporated by reference to Current Report on Form 8-K filed on January 7, 2020.

(29)  Incorporated by reference to Current Report on Form 8-K filed on November 7, 2019.

(30)  Incorporated by reference to Annual Report on Form 10-K filed on March 27, 2020.

†   Certain information has been excluded from this exhibit because it both is not material and would likely cause competitive harm to the registrant if publicly disclosed.

---

II-4

ITEM 17. UNDERTAKINGS

The undersigned registrant hereby undertakes:

(1) To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement:

(i) To include any prospectus required by Section 10(a)(3) of the Securities Act of 1933;

(ii) To reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than a 20% change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective registration statement; and

(iii) To include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement;

Provided, however, that:

Paragraphs (1)(i), (1)(ii) and (1)(iii) of this section do not apply if the information required to be included in a post-effective amendment by those paragraphs is contained in reports filed with or furnished to the Commission by the registrant pursuant to section 13 or section 15(d) of the Securities Exchange Act of 1934 that are incorporated by reference in the registration statement, or, as to a registration statement on Form S-3, Form SF-3 or Form F-3, is contained in a form of prospectus filed pursuant to Rule 424(b) that is part of the registration statement.

(2) That, for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3) To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(4) That, for the purpose of determining liability of the registrant under the Securities Act of 1933 to any purchaser in the initial distribution of the securities, the undersigned registrant undertakes that in a primary offering of securities of the undersigned registrant pursuant to this registration statement, regardless of the underwriting method used to sell the securities to the purchaser, if the securities are offered or sold to such purchaser by means of any of the following communications, the undersigned registrant will be a seller to the purchaser and will be considered to offer or sell such securities to such purchaser:

    (i) Any preliminary prospectus or prospectus of the undersigned registrant relating to the offering required to be filed pursuant to Rule 424;

    (ii) Any free writing prospectus relating to the offering prepared by or on behalf of the undersigned registrant or used or referred to by the undersigned registrant;

    (iii) The portion of any other free writing prospectus relating to the offering containing material information about the undersigned registrant or its securities provided by or on behalf of the undersigned registrant; and

    (iv) Any other communication that is an offer in the offering made by the undersigned registrant to the purchaser.

(5) That, for purposes of determining any liability under the Securities Act of 1933:

    (i) the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by the registrant pursuant to Rule 424(b)(l) or (4) or 497(h) under the Securities Act of 1933 shall be deemed to be a part of this registration statement as of the time it was declared effective; and

    (ii) each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

Insofar as indemnification for liabilities arising under the Securities Act of 1933 (the "Securities Act") may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act, and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

<div align="center">II-6</div>

SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Dallas, State of Texas, on March 30, 2020.

GWG HOLDINGS, INC.

By:  /s/ Murray T. Holland
President and Chief Executive Officer

KNOW ALL MEN BY THESE PRESENTS, that each of the undersigned constitutes and appoints Murray T. Holland and Timothy Evans his true and lawful attorney-in-fact and agent, with full power of substitution and resubstitution, for such person and in his or her name, place and stead, in any and all capacities, to sign this Registration Statement on Form S-1 (including all pre-effective and post-effective amendments and registration statements filed pursuant to Rule 462 under the Securities Act of 1933), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the U.S. Securities and Exchange Commission, granting unto said attorney-in-fact and agent full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he or she might or could do in person, hereby ratifying and confirming that any such attorney-in-fact and agent, or his or her substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this Registration Statement has been signed, as of March 30, 2020, by the following persons in the capacities indicated below.

| Name | Title |
| --- | --- |
| /s/ Murray T. Holland<br>Murray T. Holland | President and Chief Executive Officer<br>(Principal Executive Officer) |
| /s/ Timothy Evans<br>Timothy Evans | Chief Financial Officer<br>(Principal Financial and Accounting Officer) |
| /s/ Brad K. Heppner<br>Brad K. Heppner | Director, Chairman of the Board |
| /s/ Roy Bailey<br>Roy Bailey | Director |
| /s/ Peter T. Cangany, Jr.<br>Peter T. Cangany, Jr. | Director |
| /s/ David F. Chavenson<br>David F. Chavenson | Director |
| /s/ Thomas O. Hicks<br>Thomas O. Hicks | Director |
| /s/ Dennis P. Lockhart<br>Dennis P. Lockhart | Director |
| /s/ Bruce W. Schnitzer<br>Bruce W. Schnitzer | Director |
| /s/ Roger T. Staubach<br>Roger T. Staubach | Director |
| /s/ David H. de Weese | Director |

SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Dallas, State of Texas, on March 30, 2020.

GWG LIFE, LLC

By:    /s/ Murray T. Holland
        Chief Executive Officer

Pursuant to the requirements of the Securities Act of 1933, this Registration Statement has been signed, as of March 30, 2020, by the following persons in the capacities indicated below.

| Name | Title |
|------|-------|
| /s/ Murray T. Holland<br>Murray T. Holland | Chief Executive Officer<br>(Principal Executive Officer) |
| /s/ Timothy Evans<br>Timothy Evans | Chief Financial Officer<br>(Principal Financial and Accounting Officer) |
| /s/ Murray T. Holland<br>Murray T. Holland | Manager of GWG Life, LLC |

II-8

App. 0843

S-1/A 1 ea121445-s1a1_gwgholdingsinc.htm AMENDMENT NO. 1 TO FORM S-1

As filed with the Securities and Exchange Commission on May 15, 2020

Registration No. 333-237458

## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

**AMENDMENT NO. 1 TO**
**FORM S-1**
**REGISTRATION STATEMENT**
*Under the Securities Act of 1933*

# GWG HOLDINGS, INC.
# GWG LIFE, LLC

(Exact name of Registrant as specified in its charter)

| **Delaware** **Delaware** | **6282** | **26-2222607** **20-4356955** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

325 N. Saint Paul Street, Suite 2650
Dallas, Texas 75201
Tel: (612) 746-1944
Fax: (612) 746-0445

(Address, including zip code, and telephone number, including area code, of Registrant's principal executive offices)

GWG Holdings, Inc.
Murray T. Holland
President and Chief Executive Officer
325 N. Saint Paul Street, Suite 2650
Dallas, Texas 75201
Tel: (612) 746-1944

(Name, address, including zip code, and telephone number, including area code, of agent for service)

*Copies to:*

| | |
|---|---|
| Edward S. Best, Esq. | Dominic Baldini |
| Bruce F. Perce, Esq. | Emerson Equity LLC |
| Mayer Brown LLP | 155 Bovet Road, Suite 725 |
| 71 S. Wacker Drive | San Mateo, CA 94402 |
| Chicago, IL 60606 | Tel: (650) 312-020 |
| Tel: (312) 782-0600 | |

Approximate date of commencement of proposed sale to the public: As soon as practicable after the effective date of this registration statement.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933 check the following box. ☒

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

App. 0845

**CALCULATION OF REGISTRATION FEE**

| Title of Each Class of Securities to Be Registered | Amount to be Registered | Proposed Maximum Offering Price Per Unit | Proposed Maximum Aggregate Offering Price | Amount of Registration Fee |
|---|---|---|---|---|
| L Bonds | 2,000,000 | $ 1,000[1] | $2,000,000,000 | $ 259,600[2] |
| Guarantee by GWG Life, LLC of L Bonds[3] | N/A | N/A | N/A | N/A |

(1) The L Bonds will be issued in "Units" of $1,000 in principal amount, in minimum amounts of 25 Units ($25,000 principal amount) and in any number of whole Unit amounts in excess of such minimum amount.

(2) The registration fee of $259,600 was previously paid.

(3) No additional consideration is being received for the guarantee. Pursuant to Rule 457(n) under the Securities Act of 1933, no separate fee is required in respect of such guarantee.

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the registration statement shall become effective on such date as the Securities and Exchange Commission acting pursuant to said Section 8(a) may determine.**

App. 0846

The information in this prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission, of which this prospectus is a part, shall have been declared effective. This prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.

**SUBJECT TO COMPLETION, DATED MAY 15, 2020**

---

# GWG HOLDINGS, INC.

---



2,000,000 Units of L Bonds
($2,000,000,000)

We are a financial services company committed to transforming the alternative asset industry with disruptive and innovative products and services. In 2018 and 2019 we consummated a series of transactions (as more fully described in this prospectus) with Beneficient (as defined below) that has resulted in a significant reorientation of our business and capital allocation strategy towards an expansive and diverse exposure to alternative assets.

We are offering up to 2,000,000 Units of L Bonds (the "L Bonds") at $1,000 principal amount per whole Unit, representing $2,000,000,000 in aggregate principal amount of L Bonds. This is a continuous offering and there is no minimum amount of L Bonds that must be sold before we can use any of the proceeds. The proceeds from the sale of the L Bonds will be paid directly to us following each sale and will not be placed in an escrow account. We intend to use the net proceeds from the offering of the L Bonds to grow our alternative asset exposure, primarily through investments in Beneficient in the form of equity investments or loans, and to meet our other obligations, including debt obligations. The minimum investment in L Bonds is 25 Units, or $25,000. Investments in excess of the minimum amount may be made in any number of whole Units. The L Bonds will be sold with varying maturity terms, interest rates and frequency of interest payments, all as set forth in this prospectus and in further supplements we publish from time to time. Depending on our capital needs and the amount of your investment, L Bonds with certain maturity terms may not always be available. Although we will periodically establish and change interest rates on unsold L Bonds offered under this prospectus, once an L Bond is sold, its interest rate will not change during its term (subject, however, to the extension and renewal provisions of the L Bond). Upon maturity, and subject to the terms and conditions described in this prospectus, the L Bonds will be automatically renewed for the same or lesser term at the interest rate we are offering at that time to other investors with similar aggregate L Bond portfolios for L Bonds of the same maturity, unless redeemed upon maturity at our or your election.

Obligations under the L Bonds are secured by substantially all the assets of GWG Holdings (the most significant components of which are cash and investments in subsidiaries), and by a guarantee and corresponding grant of a security interest in substantially all the assets of our subsidiary, GWG Life, LLC ("GWG Life"). As a guarantor, GWG Life has fully and unconditionally guaranteed the payment of principal and interest on the L Bonds. A substantial majority of our life insurance assets are held by GWG DLP Funding IV, LLC ("DLP IV") and GWG Life Trust ("Life Trust"), which are wholly owned subsidiaries of GWG Life. Although GWG Life's assets, including its equity in DLP IV and its beneficial interest in Life Trust, serve as collateral for our L Bonds, the life insurance policies held by DLP IV and Life Trust, which comprise a substantial majority of our life insurance policies, do not serve as direct collateral for the L Bonds. Further, the life insurance policies held by DLP IV are pledged as direct collateral securing the obligations under our amended and restated senior credit facility. These facts present the risk to investors that the collateral security that we and GWG Life have granted for our obligations under the L Bonds may be insufficient to repay the L Bonds when they become due.

**Neither the SEC nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

*Cover continued on next page*

The date of this prospectus is      , 2020

App. 0847

We may call and redeem the entire outstanding principal and accrued but unpaid interest of any or all of the L Bonds at any time, and from time to time, without penalty or premium. L Bond holders will have no right to put (that is, require us to redeem) any L Bond prior to its due date unless in the case of a holder's death, bankruptcy or total permanent disability. In the event we agree to redeem L Bond upon the request of an L Bond holder — other than after death, bankruptcy or total permanent disability— we will impose a redemption fee of 6% against the outstanding principal balance of the redeemed L Bond. This redemption fee will be subtracted from the amount paid.

We do not intend to list our L Bonds on any securities exchange during the offering period, and we do not expect a secondary market in the L Bonds to develop. As a result, you should not expect to be able to resell your L Bonds regardless of how we perform. Accordingly, an investment in our L Bonds is not suitable for investors that require liquidity in advance of their L Bond's maturity date.

We maintain senior borrowing arrangements that subordinate to our senior lenders the right to payment on, and the collateral securing, the L Bonds. In addition, these borrowing arrangements restrict our receipt of distributions from certain of our operating subsidiaries, subject to certain exceptions. These provisions will restrict cash flows available for payment of principal and interest on the L Bonds. From time to time we may add or replace senior lenders and the particular arrangements under which we borrow from them.

**Investing in our L Bonds may be considered speculative and involves a high degree of risk, including the risk of losing your entire investment. See "Risk Factors" beginning on page 11 of this prospectus and the risks discussed in the documents we file with the SEC to read about the risks you should consider before buying our L Bonds. The L Bonds are only suitable for persons with substantial financial resources and with no need for liquidity in this investment.**

Please read this prospectus before investing and keep it for future reference. We file annual, quarterly and current reports with the SEC. This information will be available free of charge by contacting us at 325 N. Saint Paul Street, Suite 2650, Dallas, TX 75201, or by phone at (612) 746-1944. This information may also be accessed on our website at *www.gwgh.com*, and the SEC maintains a website at *www.sec.gov* that contains this information.

The L Bonds will be offered and sold on a best-efforts basis by Emerson Equity LLC, a registered broker-dealer and member of the Financial Industry Regulatory Authority ("FINRA"). Emerson Equity will be our dealer manager for the L Bonds in this offering for purposes of the Securities Act of 1933, as amended. Our dealer manager will enter into participating dealer agreements with certain other broker-dealers that are members of FINRA, referred to as "selling group members," to authorize those broker-dealers to sell our L Bonds. We will pay Emerson Equity a selling commission ranging from 0.75% to 5.00% of the principal amount of L Bonds sold, depending on the L Bonds' maturity date. We will also pay Emerson Equity additional compensation consisting of those items set forth in footnote (1) to the table below. The dealer manager will share its commissions and additional compensation, other than its dealer manager fee, with selling group members pursuant to the terms of each participating dealer agreement. The total amount of the selling commissions and additional compensation (including reimbursements, non-transaction-based and non-cash compensation) paid to Emerson Equity and any other FINRA member in the course of offering and selling L Bonds will not exceed 8.00% of the aggregate gross offering proceeds we receive from the sale of L Bonds. We also may sell L Bonds at a discount from the public offering price through appropriate and designated distribution channels. See "Plan of Distribution" and "Use of Proceeds" for further information.

| | Units | Price to Investors | Aggregate Commission, Fees, and Expense Allowances[1][2] | Net Proceeds to Company |
|---|---|---|---|---|
| Minimum Investment | 25 | $ 25,000 | $ 2,000 | $ 23,000[3] |
| Maximum Investment | 2,000,000 | $2,000,000,000 | $ 160,000,000 | $1,840,000,000[4] |

(1)  Assumes an average sales commission of 5.00%. As explained above, actual commissions will vary based on the term of the L Bonds sold. Nevertheless, the total amount of selling commissions and additional compensation (consisting of (i) a dealer-manager fee payable to the dealer manager in an amount equal to 0.40% of the principal amount of all L Bonds sold; (ii) an accountable expense allowance payable to the selling group members as described in the "Plan of Distribution," which may include due-diligence expenses of the dealer manager and selling group members set forth in a detailed and itemized invoice; (iii) wholesaling fees, which may consist of commissions and non-transaction-based compensation of the wholesalers; (iv) non-cash compensation; and (v) up to a 1.00% reallowance to selling group members) will not exceed 8.00% of the aggregate gross offering proceeds we receive from the sale of L Bonds. Accordingly, and assuming the sale of all $2,000,000,000 in principal amount of bonds offered hereby, the maximum amount of selling commissions we can pay is 5.00% of the gross offering proceeds we receive from the sale of the L Bonds (or $100,000,000), and the maximum amount of additional compensation we can pay will not

exceed 3.00% of the aggregate gross offering proceeds we receive from the sale of the L Bonds (or $60,000,000). See "Plan of Distribution" for further information.

(2) Emerson Equity has agreed to offer the L Bonds on a "best efforts" basis.

(3) Net Proceeds to Company based on the minimum investment are calculated after deducting (i) selling commissions and (ii) additional compensation (consisting of the dealer-manager fee, a wholesaling fee, an accountable expense allowance and non-transaction-based and non-cash selling compensation). We expect that our own offering expenses, consisting of legal, accounting, printing, mailing, registration, qualification and associated securities offering filing costs and expenses, will, through the course of the offering, aggregate to approximately $2,400,000, but for purposes of illustrating the Net Proceeds to Company based on the minimum investment, those offering expenses of $2,400,000 are not reflected.

(4) Net Proceeds to Company based on the Maximum Offering of 2,000,000 L Bond Units (representing $2,000,000,000 in aggregate principal amount) are calculated as described in footnote (3) above, but also before deducting our estimated offering-related expenses of $2,400,000.

L Bonds will be sold as "Units," with each whole Unit representing $1,000 in principal amount of L Bonds. We will issue the L Bonds in book-entry form, certificated form, or in the form of a global certificate deposited with a depositary. Depending on the manner in which you purchase L Bonds, you may not receive a physical certificate representing your L Bonds. In all cases, however, we will deliver written confirmation to purchasers of L Bonds. Bank of Utah will act as trustee for the L Bonds.

The current interest rates for the L Bonds based on their applicable maturity is set forth in the table below.

| Maturity Term | Interest Rate (%) |
|---|---|
| 2 years | 5.50 |
| 3 years | 6.25 |
| 5 years | 7.50 |
| 7 years | 8.50 |

We may change the interest rates applicable to unsold L Bonds from time to time during this offering, in which case the applicable interest rates will be set forth in a supplement to this prospectus. Once an L Bond is sold, the interest rate will not change during its term (subject, however, to the extension and renewal provisions contained in that L Bond).

**TABLE OF CONTENTS**

|  | Page |
| --- | --- |
| ABOUT THIS PROSPECTUS | ii |
| INDUSTRY AND MARKET DATA | ii |
| HOW TO PURCHASE L BONDS | iii |
| PROSPECTUS SUMMARY | 1 |
| RISK RELATING TO FORWARD-LOOKING STATEMENTS | 10 |
| RISK FACTORS | 11 |
| USE OF PROCEEDS | 14 |
| DESCRIPTION OF THE L BONDS | 15 |
| PLAN OF DISTRIBUTION | 30 |
| MATERIAL FEDERAL INCOME TAX CONSIDERATIONS | 34 |
| STATE, LOCAL AND FOREIGN TAXES | 37 |
| ERISA CONSIDERATIONS | 38 |
| LEGAL MATTERS | 40 |
| EXPERTS | 40 |
| WHERE YOU CAN FIND MORE INFORMATION | 40 |
| INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE | 40 |



GWG Holdings, Inc.
325 N. Saint Paul Street, Suite 2650
Dallas, TX 75201
Tel: (612) 746-1944
Fax: (612) 746-0445

i

## ABOUT THIS PROSPECTUS

We have prepared this prospectus as part of a registration statement that we filed with the SEC for our continuous offering of L Bonds.

The registration statement we filed with the SEC includes exhibits that provide more detailed descriptions of the matters discussed in this prospectus and certain information that is incorporated by reference. You should read this prospectus, the related exhibits filed with the SEC, and any prospectus supplement(s), together with additional information described below under "Where You Can Find More Information," and the documents that are incorporated by reference into this prospectus. Any statement that we make in this prospectus will be modified or superseded by any inconsistent statement made by us in a prospectus supplement (or other disclosure incorporated into this prospectus by reference). This prospectus contains summaries of certain other documents, which summaries contain all material terms of the relevant documents and are believed to be accurate, but reference is hereby made to the full text of the actual documents for full and complete information concerning those documents. All documents relating to this offering, if readily available to us, will be made available to a prospective investor or its representatives upon request.

The L Bonds will be issued under an amended and restated indenture, as may be amended or supplemented from time to time (referred to herein as the "indenture"). This prospectus is qualified in its entirety by the terms of that indenture filed with SEC as an exhibit to the registration statement of which this prospectus is a part. All material terms of the indenture are summarized in this prospectus. You may obtain a copy of the indenture upon written request to us or online at *www.sec.gov*.

The indenture trustee did not participate in the preparation of this prospectus and makes no representations concerning the L Bonds, the collateral, or any other matter stated in this prospectus. The indenture trustee has no duty or obligation to pay the L Bonds from its funds, assets or capital or to make inquiry regarding, or investigate the use of, amounts disbursed from any account.

You should rely only on the information contained in this prospectus, as the same may be supplemented by prospectus supplements or other public disclosure incorporated into this prospectus by reference. Neither we nor the dealer manager have authorized any other person to provide you with any information different from that contained in this prospectus, a supplement, information incorporated into this prospectus by reference, or information furnished by us upon request as described herein. The information contained in this prospectus is complete and accurate only as of the date of this prospectus, regardless of the time of delivery of this prospectus or sale of our securities.

**No information contained herein, nor in any prior, contemporaneous or subsequent communication should be construed by a prospective investor as legal or tax advice. Each prospective investor should consult its, his or her own legal, tax and financial advisors to ascertain the merits and risks of the transactions described herein prior to purchasing the L Bonds. This written communication is not intended to be written advice as defined in Circular 230 published by the U.S. Treasury Department.**

In this prospectus, we use the term "day" to refer to a calendar day, and we use the term "business day" to refer to any day other than Saturday, Sunday, a legal holiday or a day on which banks in New York City are authorized or required to close.

## INDUSTRY AND MARKET DATA

The industry and market data used throughout this prospectus have been obtained from our own research, surveys or studies conducted by third parties and industry or general publications. Industry publications and surveys generally state that they have obtained information from sources believed to be reliable, but do not guarantee the accuracy and completeness of such information. We believe that each of these studies and publications is reliable.

App. 0853

**HOW TO PURCHASE L BONDS**

If, after carefully reading this entire prospectus, obtaining any other information requested and available, and being fully satisfied with the results of pre-investment due-diligence activities, you would like to purchase L Bonds, you will have two different ways in which to consummate a purchase: (1) DTC settlement, or (2) direct settlement with the Company.

1. *Depositary Trust Company Settlement (DTC settlement).*    You can place an order for the purchase of L Bonds using DTC Settlement through your selling group member (i.e., your broker-dealer). A selling group member using this service will have an account with a DTC participant in which your funds will be placed to facilitate a closing on our periodic DTC closing cycle (typically, closings will occur on a bi-monthly cycle). Orders may be placed until the cyclical order due date. Orders will be executed by your selling group member electronically and you must coordinate with your selling group member's registered representative to pay the full purchase price for the L Bonds by the trade date. You will be credited with ownership of an L Bond on the second business day following the periodic DTC closing cycle in which the purchase is made. Nevertheless, interest will accrue for a period of 15 or 30 days for the month in which your purchase is made, depending on when during the DTC closing cycle your purchase is made. Your purchase price for L Bonds purchased in this way will not be held in escrow. This process is different if you purchase L Bonds through direct settlement with the Company as described below.

2. *Direct Settlement with the Company.*    If you wish to purchase L Bonds through direct settlement with the Company, then you must complete, execute and return the Subscription Agreement to us together with a certified check or personal check payable to the order of "GWG Holdings, Inc. — Subscription Account" (or wire sent to the Subscription Account) equal to the principal amount of L Bonds you wish to purchase. You will be credited with ownership of an L Bond, and interest will begin to accrue, from the date on which your fully paid subscription is accepted. If you are working with a selling group member, your subscription materials and the wire transfer, certified check or personal check should be delivered to your selling group member, who will deliver it to us at the following address:

**GWG Holdings, Inc.**
**325 North St. Paul Street, Suite 2650**
**Dallas, TX, 75201**

**Wire Instructions**
GWG Holdings, Inc. — Subscription Account
Account: 500023916
Routing: 091310521
Bank Name: Bell Bank

Your purchase is subject to our acceptance. All information provided is confidential and will be disclosed only to our directors, officers and employees who need to know, affiliates, the managing broker-dealer, legal counsel and, if required, to governmental authorities and self-regulatory organizations or as otherwise required by law. For your purchase to be effective as of the first business day of a calendar month, your completed and executed Subscription Agreement, together with your related funds, must be received and accepted by us on or prior to the final settlement date (settlement dates normally occur on a bi-monthly basis).

Upon our receipt of the signed Subscription Agreement and acceptance of your purchase, we will notify you of such acceptance. In our sole discretion, we may accept or reject any purchase, in whole or in part. In the event we do not accept your purchase of L Bonds for any reason, we will promptly return your payment. We may terminate or suspend this offering at any time, for any reason or no reason, in our sole discretion. You may obtain a copy of the Subscription Agreement from our website at *www.gwgh.com*, from your selling group member (if you are working with one), or by contacting us at 1-877-494-2388.

**COVERED SECURITY**

Our L Bonds are a "covered security." The term "covered security" applies to securities exempt from state registration pursuant to Section 18 of the Securities Act of 1933. Generally, securities listed on national exchanges are the most common type of covered security exempt from state registration. A non-traded security also can be a covered security if it has a seniority greater than or equal to other securities from the same issuer that are listed on a national exchange. Our L Bonds are a covered security because they will be senior to our common stock, which is listed on The Nasdaq Capital Market, and therefore our offering of L Bonds is exempt from state registration.

**Although the status of our L Bonds as a "covered security" will facilitate their purchase and sale to a broader range of investors than would otherwise be available to us, and although the offer and sale of a "covered security" generally involves fewer issuance costs to the issuer of such securities, our L Bonds are not a suitable purchase for all investors. Investors are urged to read carefully the risk factors relating to our business and our Company contained in the Risk Factors section of this prospectus beginning on page 11 and under Item 1A, entitled "Risk Factors," of our Annual Report on Form 10-K for the year ended December 31, 2019, which is incorporated by reference herein. In addition, investors should understand that because our L Bonds are a "covered security" exempt from state securities regulations, neither our Company, the L Bonds, or any other aspects of this offering have been the subject of any merit-based review by state securities regulators.**

iv

**QUESTIONS AND ANSWERS ABOUT THIS OFFERING**

*The following questions and answers about this offering highlight material information regarding us and this offering that you may wish to review. Nevertheless, you should read this entire prospectus, including the section entitled "Risk Factors," and the documents incorporated by reference into this prospectus, before deciding to purchase our L Bonds.*

**Can you explain and clarify the interplay between GWG Holdings, Inc. and GWG Life, LLC and its subsidiaries in relation to the L Bonds and the registration statement?**

GWG Holdings, Inc. will be issuing the L Bonds, receiving all proceeds from the sale of L Bonds, and will be the only entity making regular payments on the L Bonds. Nevertheless, because a significant amount of our consolidated assets is held in our subsidiary GWG Life, LLC (and its own subsidiaries), GWG Life is a guarantor of our obligations under the L Bonds. As guarantor of the L Bonds, SEC rules require that GWG Life be included as a co-registrant under this registration statement. GWG Life will not, however, be otherwise involved in the offering of L Bonds.

**It seems as though you are offering several L Bonds with different interest rates and maturities but calling them all L Bonds. Is this the case?**

All bonds we issue in this offering will have identical terms, except (1) the interest rate and (2) the maturity length or "term." In this regard, we have essentially created multiple classes of L Bonds, similar to how companies may have different classes of stocks with slightly different economic rights. Currently, we are offering four classes of L Bonds, as follows:

- "Class 2-2" L Bonds will mature two years from their issuance and accrue interest at 5.50% *per annum*.

- "Class 3-2" L Bonds will mature three years from their issuance and accrue interest at 6.25% *per annum*.

- "Class 5-2" L Bonds will mature five years from their issuance and accrue interest at 7.50% *per annum*.

- "Class 7-2" L Bonds will mature seven years from their issuance and accrue interest at 8.50% *per annum*.

The economic terms for each L Bond in any particular class will be identical to all other L Bonds in the same class (other than the date of maturity). In the event we adjust the interest rate for any class of bonds we offer, we will create a new class of L Bonds. Upon the renewal of any L Bonds we have sold, any new interest rate applied to an L Bond will be applied to all L Bonds in the same class.

**Your prospectus states that the interest rate for the L Bonds may be adjusted from time to time during the course of the offering. Will any such adjustment apply retroactively to L Bonds already issued?**

No. Once you purchase an L Bond, the interest rate on that L Bond will not change during the entirety of its original term. The interest rate on an issued L Bond may, however, be adjusted upon renewal of that L Bond. In any such case, we will advise you of any different interest rate that may apply to your L Bond upon renewal. In sum, any new interest rates for the L Bonds will apply only to newly issued L Bonds sold or renewed after the date of any interest rate change. Our decision to change interest rates depends on numerous factors, including but not limited to things such as market interest rates, our capitalization, the demand for our L Bonds, the life settlement market in general, our capital requirements, and other factors. Please see "Description of the L Bonds — Interest Rate."

**How do I subscribe for L Bonds, and what is the settlement process?**

L Bonds may be purchased either directly from the Company or through your broker-dealer (also referred to in this prospectus as a selling group member), who utilizes a participant in the DTC system and offers "DTC settlement."

*Direct Settlement*

If you purchase directly from the Company, you will send your completed and executed Subscription Agreement, together with your subscription amount to us at the address listed in "How to Purchase L Bonds." Your subscription amount is the principal amount of L Bonds you wish to purchase, and should be paid through a certified check or personal check payable to the order of "GWG Holdings, Inc. — Subscription Account." In lieu of paying by check, you may wire your subscription amount to the account referenced in "How to Purchase L Bonds." If you are working with a broker-dealer or other investment professional, your broker-dealer or professional will gather and send in the required information on your behalf, and may facilitate your payment of the subscription amount.

v

Once we have received your subscription amount and required documentation, we will either reject or accept your subscription. If accepted, you will be credited with ownership of the L Bond, we will have immediate access to your subscription amount and you will start to accrue interest on your investment at the rate applicable to the L Bond you have purchased. If you purchase directly from the Company, your L Bond will ordinarily be issued in book-entry (or, if requested, certificated) form and payments will be made directly into the account you indicate in your Subscription Agreement.

*DTC Settlement*

Purchasing through a DTC participant is a slightly different process. In this case, you will provide your order for the purchase of L Bonds to your broker-dealer, together with such other information as your broker-dealer may require. Your broker-dealer will ensure your order is electronically placed with the Company and that the Company timely receives your subscription amount. There is no need to furnish the Company with a Subscription Agreement when you purchase through a broker-dealer that utilizes a participant in the DTC system and offers "DTC settlement." However, your broker-dealer may require additional documents.

Once we have received your subscription amount, we will either reject or accept your subscription. Once accepted based on our DTC closing cycle, we will have immediate access to your subscription amount and you will start to accrue interest on your investment at the rate applicable to the L Bond you have purchased. Nevertheless, you will be credited with ownership of an L Bond on the second business day after the end of the closing cycle in which your subscription is accepted. Interest will accrue for a period of 15 or 30 days for the month in which your purchase is made, depending on when during the DTC closing cycle your purchase is made. If you purchase through a broker-dealer who utilizes a participant in the DTC system and offers "DTC settlement," your L Bond will be issued to DTC in the name of Cede & Co., as its nominee. In this sense, DTC will be the legal owner of the L Bond and you will be the beneficial owner. Your ownership of the L Bond should then appear on the brokerage or other investment statements you receive from your broker-dealer or custodian.

For so long as DTC settlement is approved, we intend to issue each class of L Bonds a unique identifying number (CUSIP) each month to facilitate the settlement of L Bonds. Thus, Class 2-2 L Bonds issued in May 2020 (and maturing May 2022) will all have the same CUSIP, which will be different from the CUSIP applicable to Class 2-2 L Bonds issued in September 2020 (and maturing September 2022). In this way, all L Bonds belonging to a single CUSIP will be completely fungible, meaning that they will all mature on the same date and have identical terms so that one L Bond with a particular CUSIP is interchangeable with any other L Bond having the same CUSIP. This process creates a tracking system for the L Bonds to be issued to and transferred through DTC.

**What is the role of the trustee?**

The Bank of Utah is the trustee for the L Bonds. The role of the trustee is essentially to enforce the terms of the L Bonds on behalf of bondholders, including direct and beneficial holders, and facilitate the relationship between our Company and the bondholders. We must notify the trustee of certain events as required under the indenture, and the trustee will in turn notify bondholders. The trustee has also been granted a security interest in all of the assets of GWG Holdings and GWG Life for the benefit of the bondholders. The trustee has no duty to pay any obligations under L Bonds or to make inquiry regarding, or investigate the use of, amounts disbursed from any account. Upon an event of default under the indenture, and subject to those limitations in the indenture designed to benefit our senior creditors, the trustee may take action against us to enforce the rights of holders of the L Bonds.

**What is the role of the paying agent?**

The paying agent is the term ascribed to whomever it is that is making the payment to the holders of L Bonds. Presently, the Company has designated Computershare Trust Company, N.A. ("Computershare") to serve as the paying agent with respect to L Bonds settled through DTC, and the Company itself is the paying agent with respect to L Bonds settled directly with the Company. Please see "How to Purchase L Bonds," below. Computershare and the Company are therefore responsible for tracking investors' respective payment dates and ensuring timely payment of principal and interest under the L Bonds. The role of the paying agent is essentially mechanical, and does not ordinarily involve the exercise of discretion and judgment in the way that is typical for an indenture trustee.

**Do I need to sign any paperwork in connection with the renewal of my L Bond?**

No. The terms of the L Bond allow for the automatic renewal into a new L Bond of an identical (or lesser) maturity, unless we receive notice from you. Upon maturity, the L Bonds will be automatically renewed for the same term at the interest rate we are offering at that time to other investors with similar aggregate L Bond portfolios for L Bonds.

**Can I resell or transfer my L Bond after it has been purchased?**

Yes. Since these L Bonds are being offered and sold pursuant to an effective registration statement, the L Bonds may be transferred so long as the transfer is documented in a form approved by us. We do not, however, expect a public trading market to develop for the L Bonds in the foreseeable future, if ever. Because of the lack of a trading market for L Bonds, it is unlikely that holders will be able to sell their L Bonds easily. If you wish to transfer your L Bond held in book-entry (or certificated) form, you should contact us. If you wish to transfer your L Bond held through DTC, you should contact your broker-dealer (i.e., your selling group member).

**How will I receive interest and principal payments on my L Bonds?**

This will depend on how you purchased your L Bond. If you purchased your L Bond directly from us, we will directly deposit our payments of interest and principal into the account indicated in your Subscription Agreement. If you purchased through DTC, all payments of principal and interest will be made to DTC, who will forward such payment to the DTC participant you hold your L Bonds through, which will then arrange to transfer the payment to your brokerage account. In this case, all accountings of what you have contributed and what you are owed will be the responsibility of your broker-dealer.

**What is GWG Holdings, Inc.?**

We are a financial services company committed to transforming the alternative asset industry with disruptive and innovative products and services. In 2018 and 2019, we consummated a series of transactions (as more fully described below) with Beneficient that has resulted in a significant reorientation of our business and capital allocation strategy towards an expansive and diverse exposure to alternative assets. Beneficient, through its subsidiaries, plans to operate three potentially high value, high margin lines of business: (i) private trust lending and liquidity products; (ii) trust and custody services; and (iii) financial technology.

While we are continuing our work to maximize the value of our secondary life insurance business, we do not anticipate purchasing additional life insurance policies in the secondary market and have increased capital allocated toward providing liquidity to a broader range of alternative assets, primarily through Beneficient. We believe Beneficient can finance investments in alternative assets that will generally produce higher risk-adjusted returns than those we generally can achieve from life insurance policies acquired in the secondary market. Furthermore, although we believe that our portfolio of life insurance policies is a meaningful component of a growing diversified alternative asset portfolio, we continue to explore various strategic alternatives for our life insurance portfolio aimed at maximizing its value, including a possible sale, refinancing or recapitalization of our life insurance portfolio.

Our common stock is listed on The NASDAQ Capital Market under the ticker symbol "GWGH." We are based in Dallas, Texas.

**What is your business strategy?**

We are a financial services company committed to transforming the alternative asset industry with disruptive and innovative products and services. In 2018 and 2019 we consummated a series of transactions with Beneficient that has resulted in a significant reorientation of our business and capital allocation strategy towards an expansive and diverse exposure to alternative assets.

---

vii

App. 0859

**Are there any risks involved in investing in this offering?**

Yes. Investing in our L Bonds involves a high degree of risk. You should carefully review the "Risk Factors" section of this prospectus and Item 1A, entitled "Risk Factors," of our Annual Report on Form 10-K for the year ended December 31, 2019, which is incorporated by reference herein, which contain a detailed discussion of the material risks that you should consider before investing in our L Bonds.

**How long will this offering last?**

The offering is a continuous offering. The offering expires under SEC rules after three years from the effective date of the registration statement of which this prospectus forms a part. We may, however, conduct similar or identical offerings of L Bonds or other securities during this same time or afterwards. We may also decide to terminate this offering at any time.

**Will I be notified of how my investment is doing?**

We will provide you with periodic updates on our performance through periodic filings we make with the SEC. Such filings will include: (i) three quarterly financial reports; (ii) one annual report; (iii) supplements to this prospectus, as appropriate; and (iv) such other reports as required under Section 13 of the Securities Exchange Act of 1934. Such information is also available on our website at *www.gwgh.com*.

**Will I receive annual tax information regarding interest payments from you?**

You will receive a Form 1099-INT, which will be mailed by January 31 of each year.

**Who can help answer my questions about the offering?**

If you have more questions about our offering, you should contact a registered representative of your broker-dealer (i.e., your selling group member) or other investment professional, or else contact:

GWG Holdings, Inc.
325 N. Saint Paul Street, Suite 2650
Dallas, TX 75201
(612) 746-1944
Attention: General Counsel

<center>viii</center>

**PROSPECTUS SUMMARY**

*This summary highlights some of the information in this prospectus. It is not complete and may not contain all of the information that you may want to consider. To understand this offering fully, you should carefully read the entire prospectus, including the section entitled "Risk Factors," and the documents that are incorporated by reference into this prospectus, including Item 1A, entitled "Risk Factors," of our Annual Report on Form 10-K for the year ended December 31, 2019, before making a decision to invest in our L Bonds. Unless otherwise noted or unless the context otherwise requires, the terms "we," "us," "our," the "Company" and "GWG" refer to GWG Holdings, Inc. together with its direct or indirect subsidiaries. In instances where we refer specifically to "GWG Holdings" or "GWG Holdings, Inc.," or where we refer to a specific subsidiary of ours by name, we are referring only to that specific legal entity.*

**Our Company**

We are a financial services company committed to transforming the alternative asset industry with disruptive and innovative products and services. In 2018 and 2019 we consummated a series of transactions with The Beneficient Company Group, L.P. ("Ben LP"), and, including all of the subsidiaries it may have from time to time, "Beneficient") that has resulted in a significant reorientation of our business and capital allocation strategy towards an expansive and diverse exposure to alternative assets. As part of this reorientation, we also changed our Board of Directors and executive management team.

Beneficient, through its subsidiaries, plans to operate three potentially high value, high margin lines of business:

- <u>Private Trust Lending & Liquidity Products.</u> Through Beneficient Capital Company, L.L.C. ("BCC"), Beneficient provides a unique suite of private trust, lending and liquidity products focused on bringing liquidity to owners of professionally managed alternative assets. Beneficient's innovative liquidity solutions are designed to serve mid-to-high net worth ("MHNW") individuals, small-to-mid sized ("STM") institutions, and asset managers who have historically possessed few attractive options to access early liquidity from their alternative assets. Beneficient targets MHNW clients with $5 million to $30 million in net worth and STM institutional clients typically holding less than $1 billion in assets.

- <u>Trust and Custody Services.</u> Through Beneficient Administrative and Clearing Company, L.L.C. ("BACC") and (subject to capitalization) through PEN Indemnity Insurance Company, LTD ("PEN"), Beneficient plans, in the future, to market retirement funds, custody and clearing of alternative assets, and trustee and insurance services for covering risks attendant to owning or managing alternative assets.

- <u>Financial Technology.</u> Through Ben Markets Management Holdings, L.P., formerly called ACE Portal, L.L.C. ("ACE"), Beneficient plans in the future to provide online portals and financial technologies for the trading and financing of alternative assets.

Beneficient's existing and planned products and services are designed to support the tax and estate planning objectives of its MHNW clients, facilitate a diversification of assets or simply provide administrative management and reporting solutions tailored to the goals of the investor who owns alternative investments.

While we are continuing our work to maximize the value of our secondary life insurance business, we do not anticipate purchasing additional life insurance policies in the secondary market and have increased capital allocated toward providing liquidity to a broader range of alternative assets, primarily through investments in Beneficient. We believe Beneficient's operations will generally produce higher risk-adjusted returns than those we can achieve from life insurance policies acquired in the secondary market. Furthermore, although we believe that our portfolio of life insurance policies is a meaningful component of a growing diversified alternative asset portfolio, we continue to explore strategic alternatives for our life insurance portfolio aimed at maximizing its value, including a possible sale, refinancing or recapitalization of our life insurance portfolio.

We completed our transactions with Beneficient to provide us with a significant increase in assets and common shareholder equity. In addition, our transactions with Beneficient provide us with the opportunity for a diversified source of future earnings within the alternative asset industry. As GWG and Beneficient expand their strategic relationship, we believe the Beneficient transactions will transform GWG from a niche provider of liquidity to owners of life insurance to, as GWG and Beneficient expand their strategic relationship, a full-scale provider of trust and liquidity products and services to owners of a broad range of alternative assets.

1

**Organizational Structure**

GWG Holdings conducts its life insurance secondary market business through a wholly owned subsidiary, GWG Life, and GWG Life's wholly owned subsidiaries, Life Trust and DLP IV. GWG Holdings' indirect interests in loans collateralized by cash flows from other alternative assets are held by Ben LP and its general partner, Beneficient Management, L.L.C. ("Beneficient Management"). All of these entities are legally organized in the state of Delaware, other than GWG Life Trust, which is governed by the laws of the state of Utah. GWG Holdings' wholly owned subsidiary, Life Epigenetics Inc. (formerly named Actüa Life & Annuity Ltd.) ("Life Epigenetics"), was formed to commercialize epigenetic technology for the longevity industry. Through its wholly owned subsidiary, youSurance General Agency, LLC ("youSurance"), GWG Holdings sought to offer life insurance directly to customers utilizing epigenetic technology. On November 11, 2019, GWG Holdings contributed the common stock of Life Epigenetics and membership interests in youSurance to a legal entity, InsurTech Holdings, LLC ("InsurTech Holdings"), in exchange for 100% of the membership interest in InsurTech Holdings (on March 2, 2020, InsurTech Holdings changed its name to FOXO BioScience LLC). Although we currently own 100% of the equity of InsurTech Holdings, we do not have a controlling financial interest in InsurTech Holdings because InsurTech Holdings' managing member has substantive participating rights. Therefore, we account for our ownership interest in InsurTech Holdings as an equity method investment. Our headquarters are currently located in Dallas, Texas.

Beneficient was formed in 2003 but began its alternative asset business in September 2017. Beneficient operates primarily through its subsidiaries, which provide Beneficient's products and services. These subsidiaries include: (i) BCC, through which Beneficient offers loans and liquidity products; (ii) BACC, through which Beneficient provides services for fund and trust administration and plans to provide custody services; (iii) PEN, through which Beneficient plans to offer insurance services; and (iv) ACE, through which Beneficient plans to provide an online portal for direct access to Beneficient's financial services and products.

In the second quarter of 2019, in connection with the expansion of our strategic relationship with Beneficient, (i) our former chief executive officer resigned and was replaced with Murray T. Holland, a trust advisor of various related trusts (the "Seller Trusts"), which control a majority of our outstanding common stock, and (ii) all then current members of our Board of Directors resigned as directors of the Company, and 11 individuals designated by Beneficient were appointed as directors of the Company. Shortly thereafter, three additional directors were appointed to our Board of Directors. On October 11, 2019, four members of the Board of Directors resigned as directors of the Company, and the size of the Board of Directors was reduced from 14 to ten directors in order to facilitate the Board of Directors' ability to oversee the Company's operations in an efficient and effective manner. Under our current conflicts of interest policy, all transactions between the Company and its wholly owned subsidiaries, on the one hand, and related parties (including Beneficient and its controlled affiliates), on the other hand, must be approved by disinterested directors. On December 31, 2019, we entered into a Preferred Series A Unit Account and Common Unit Investment Agreement (the "Investment Agreement") with Ben LP, Beneficient Company Holdings, L.P. and Beneficient Management pursuant to which, among other things, we obtained the right to appoint a majority of the board of directors of Beneficient Management. As a result, the Company obtained control of Ben LP and began reporting the results of Ben LP and its subsidiaries on a consolidated basis beginning on the transaction date of December 31, 2019.

**Market Opportunity**

*Alternative Asset Liquidity Products and Services*

The market demand for liquidity from owners of alternative assets is attributable to the outstanding net asset value of illiquid alternative assets ("NAV") held by U.S. investors. Using data from various published industry reports from 2017 to 2019, certain widely accepted commercial private-equity databases, and applying its own proprietary assumptions and calculations ("Ben Estimates"), Beneficient estimates that total outstanding NAV held by U.S. investors exceeded $4.0 trillion in 2019 (up from an estimated $3.0 trillion in 2018).

According to at least one industry report from Prequin from 2018, total outstanding NAV in the hands of U.S. investors grew at a 12.1% compound annual growth rate ("CAGR") for the ten years ended 2018 and was forecasted to grow at an 8% CAGR through 2023 as a result of continued increases in capital committed to the alternative asset class.

According to Ben Estimates, the large U.S. institutions representing approximately 54% of the NAV have consistently sought liquidity on approximately 1.85% to 2.25% of their outstanding NAV. Based on Ben Estimates, this has led to an annual demand for liquidity of nearly $50 billion in recent years.

A primary group not included in this demand is the MHNW investor who holds investments of $5 million to $30 billion compared to a large institution's holdings in the hundreds of millions or billions of dollars. Intermediary brokers will often not represent the MHNW individuals (or STM institutional investors). According to Ben Estimates, MHNW investors hold over $700.0 billion in NAV, yet MHNW investors have only been able to access liquidity representing less than 0.5% of the NAV held by them each year, compared to the average 2% achieved by the large institutional owners, representing 54% of the market.

Based on these amounts, Beneficient estimates that MHNW investors would seek liquidity of 3% of their outstanding NAV each year if liquidity was made available to them, or a slightly greater percentage than that of large U.S. institutions. As a result, and according to Ben Estimates, the estimated market demand for liquidity by MHNW individuals would have exceeded $20.0 billion in 2019.

2

*Secondary Life Insurance Market*

The market for life insurance is large. According to the American Council of Life Insurers Fact Book 2018 (ACLI), consumers owned approximately $12.0 trillion in face value of individual life insurance policy benefits in the United States in 2017. In that same year, the ACLI reports that individual consumers purchased an aggregate of $3.1 trillion of new individual life insurance policy benefits. This figure includes all types of individual life policies, including term insurance and permanent insurance known as whole life and universal life.

The life insurance secondary market primarily serves consumers, 65 years and older, and their families who own life insurance.

The secondary market for life insurance exists as a result of consumer lapse behaviors and surrender values far below economic value offered to consumers for their life insurance by the issuing insurance carriers. The ACLI reports that the annual lapse and surrender rate for individual life insurance policies is 5.7% of the in-force face value of benefits, amounting to over $680 billion in face value of policy benefits lapsed and surrendered in 2017 alone.

In 2017, the National Association of Insurance Commissioners ("NAIC") issued a policy bulletin in support of products we provide. The bulletin described these products as "innovative private market solutions for financing Americans' long-term care needs." The NAIC, citing the Company's August 25, 2016 presentation, discussed how consumers could exchange the market value of their life insurance policies for products designed to fund long-term care expenses.

*Primary Life Insurance Market and Technology ("Insurtech")*

The opportunity to apply technology to transform the insurance industry is significant. The application of technology to the insurance industry, commonly referred to as "insurtech", provides opportunities for new entrants into the traditional insurance marketplace that have the potential to significantly disrupt the insurance industry's historical approach to assessing and selecting acceptable underwriting risks.

As discussed in the Organizational Structure section above, on November 11, 2019, GWG contributed the common stock and membership interests of its previously-wholly owned subsidiaries, Life Epigenetics and youSurance, to InsurTech Holdings. This transaction affected a reorganization such that InsurTech owns only two direct subsidiaries, Life Epigenetics and youSurance, which hold all insurtech assets, and one indirect subsidiary, Scientific Testing Partners, LLC, a wholly owned subsidiary of Life Epigenetics. In connection with the transaction, GWG Holdings contributed $2.1 million in cash to InsurTech Holdings during the fourth quarter of 2019 and is committed to contribute an additional $17.9 million to the entity over the next two years.

**Business Strategies**

*1. Liquidity for Alternative Assets*

We believe we are now uniquely positioned to provide liquidity and related services to investors holding a full range of illiquid alternative assets. We will continue to work to create the most value for holders of alternative assets, the financial professionals who advise them and for our shareholders.

Beneficient provides private trust solutions, including a unique suite of lending and liquidity products focused on bringing liquidity to owners of alternative assets. Beneficient's innovative liquidity solutions are designed to serve MHNW individuals, STM institutions, and asset managers who have historically possessed few attractive options to access early liquidity from their alternative assets. Beneficient targets MHNW individual clients with $5 million to $30 million in investments and institutional clients typically holding less than $1 billion in assets.

Beneficient's products can also support tax and estate planning objectives, facilitate a diversification of assets or provide administrative management and reporting solutions tailored to the goals of the investor. In the future, Beneficient plans to offer insurance services covering risks associated with owning or managing alternative assets.

Our life insurance secondary market business is designed to serve consumers 65 years or older owning life insurance. We seek to earn non-correlated yield from life insurance policies that we purchased in the secondary market. Since inception, we have purchased over $3.2 billion in face value of policy benefits from consumers for over $620 million, as compared to the $52 million in surrender value offered by insurance carriers on those same policies. Our products provide unique and valuable services to the senior consumers that we serve.

3

The goal of our secondary life insurance business has been to build a profitable, large and well-diversified portfolio of life insurance assets. We believe that scale and diversification are key factors and risk mitigation strategies to provide consistent cash flows and reliable investment returns. We believe that we have reached the goal in terms of portfolio size and diversification. We do not anticipate making additional investments in the life settlements portfolio as we believe Beneficient's operations will generally produce higher risk-adjusted returns than those we can achieve from life insurance policies acquired in the secondary market.

*2. Developing a World Class Financial Services Distribution Platform*

GWG has developed a large and sophisticated financial services product distribution platform. Today, this platform consists of over one hundred independent broker dealers and several thousand "independent" financial advisors ("Retail Distribution") who sell the Company's investment products. "Independent" in this context refers to broker-dealers that accommodate financial advisors who carry securities licenses and need back-office support for services, such as compliance and trade execution, but allow their advisors wide latitude in how they conduct business. Since inception, GWG has raised over $1.52 billion of debt and equity capital to support our secondary market of life insurance business and related expenditures.

We believe that we are well positioned to continue to grow our Retail Distribution for several reasons:

- We believe there is a trend towards financial professionals leaving large full-service broker-dealers to become "independent";

- Newly independent financial professionals and their clients demand a high level of customer service and access to innovative and value added products;

- The significant demand for liquidity from owners of alternative assets by US investors;

- We believe that our expanded relationship with Beneficient will attract more and larger broker dealers to our platform due to our increased size and market capitalization as well as the increase in products offered; and

- We believe that by using capital to provide liquidity products to our current customers, and as they begin to realize the benefit of these products, we will able to raise more capital and attract additional broker dealers into our selling group.

*3. Commercializing Advanced Epigenetic Technology for Primary Life Insurance Markets*

We believe life insurance underwriting will be transformed due to advancements in science and technology. As part of that transformational change, we believe the science of epigenetics will serve as a foundational science to this advancement for the life insurance industry by achieving more accurate and automated underwriting.

As described above, on November 11, 2019, the Company contributed the common stock and membership interests of its previously wholly-owned subsidiaries, Life Epigenetics and youSurance to InsurTech Holdings. We believe that as a separate entity (rather than as a small subsidiary of a large financial services holding company), the InsurTech Holdings businesses can reach their maximum potential in terms of marketing and branding, attraction of talent, appropriate peer group comparisons and, ultimately, return to its owners. The Company will retain substantially all of the economics of InsurTech Holdings.

4

**The Offering**

| | |
|---|---|
| **Issuer** | GWG Holdings, Inc. |
| **Indenture Trustee** | Bank of Utah |
| **Paying Agent** | GWG Holdings, Inc. |
| **Securities Offered** | We are offering up to 2,000,000 Units of L Bonds ("L Bonds"), with each whole Unit representing $1,000 in principal amount of L Bonds. The L Bonds are being sold on a continuous basis. |
| **Method of Purchase** | We will sell L Bonds using two different closing or "settlement" services, whenever available. The first service is DTC settlement, and the second is direct settlement with the Company. For more information, see "Plan of Distribution." The registration statement of which this prospectus is a part also registers the renewal of L Bonds that are outstanding from time to time. |
| **Denomination** | The minimum purchase amount is 25 L Bond Units, or $25,000 in principal amount. Additional L Bonds in excess of 25 Units may be purchased in any number of whole or fractional Units. |
| **Offering Price** | $1,000 per whole Unit, representing 100% of the principal amount of the L Bond represented by a whole Unit. Throughout this prospectus, we refer to L Bond Units simply as "L Bonds." |
| **Limited Rescission Right** | If you are purchasing L Bonds through direct settlement with the Company and your Subscription Agreement is accepted at a time when we have determined that a post-effective amendment to the registration statement of which this prospectus is a part must be filed with the SEC, but such post-effective amendment has not yet been declared effective, you will have a limited time within which to rescind your investment subject to the conditions set forth in this prospectus. See "Description of the L Bonds — Limited Rescission Right" for additional information. |
| **Maturity** | You may generally choose maturities for your L Bonds of two, three, five or seven years. Nevertheless, depending on our capital requirements, we may not offer and sell L Bonds of all maturities at all times during this offering. |
| **Interest Rates** | The interest rate of the L Bonds will be established at the time of your purchase, or at the time of renewal, based upon the rates we are offering in this prospectus or our latest interest rate supplement to this prospectus (i.e., any prospectus supplement containing interest rate information for L Bonds of different maturities), and will remain fixed throughout the term of the L Bond. We may offer higher rates of interest to investors with larger aggregate L Bond portfolios, but only as set forth in the then-current interest rate supplement. |
| **Interest Payments** | We will pay interest in cash on the L Bonds based on the terms you choose, which may be monthly or annually. Interest will accrue from the effective date of the L Bond's issuance. If you purchase your L Bond directly from the Company, the effective date of your L Bond will be the date on which we accept your fully paid subscription. If you purchase your L Bond through DTC settlement, interest will begin accruing on the trade date. Based on our anticipated bi-monthly closing cycle, this means that interest will accrue for a period of 15 or 30 days for the month in which your purchase is made, depending on when during the DTC closing cycle your purchase is made. Interest payments will generally be made on the 15th day immediately following the last day of the month to the L Bond holder of record as of the last day of that interest-payment period. Interest will be paid without any compounding. |

5

| | |
|---|---|
| **Principal Payments** | The maturity date for the L Bonds will be the last day of the month during which the L Bond matures. We are obligated to pay the principal on the L Bond in cash by the fifth day of the month next following its maturity (or the first business day following such date). |
| **Payment Method** | Principal and interest payments will be made in cash by direct deposit to the account you designate in your Subscription Agreement if you purchase L Bonds through direct settlement with the Company. If you purchase L Bonds through DTC settlement, principal and interest payments will be made to your brokerage or custodial account through DTC. |
| **Renewal or Redemption at Maturity** | Upon maturity, the L Bonds will be automatically renewed for the same term at the interest rate we are offering at that time to other investors with similar aggregate L Bond portfolios for L Bonds of the same maturity, unless repaid upon maturity at our or your election. In this regard, we will notify you at least 30 days prior to the maturity date of your L Bonds. In the notice, we will advise you if we intend to repay the L Bonds or else remind you that your L Bonds will be automatically renewed unless you exercise your option, at least 15 days prior to the maturity date, to elect to have your L Bonds repaid. If applicable, a new certificate will be issued. |
| | If we determine that a post-effective amendment to the registration statement covering the offer and sale of L Bonds must be filed during your 15-day repayment election period, we will extend your election period until ten days following the postmark date of our notice to you that the amendment has become effective. |
| | For any L Bonds offered hereby that mature after the three-year anniversary of the commencement of this offering, we expect that the renewal of such L Bonds may require us to file a new registration statement. In such a case, the new registration statement must be declared effective before we will be able to renew your L Bond. In this event, if the new registration statement has not yet been filed or become effective, we will extend your election period until ten days following the date of our notice to you that the new registration statement has become effective, which notice will include a new prospectus. |
| | If L Bonds with similar terms are not being offered at the time of renewal, then (i) the interest rate upon renewal will be (a) the rate specified by us in writing on or before the maturity date or (b) if no such rate is specified, the rate of your existing L Bonds, and (ii) the maturity will the same if L Bonds of the same maturity are then being offered at the time of renewal. If L Bonds of the same maturity are not then being offered at the time of renewal, then the maturity will be the next earliest maturity. Accordingly, you should understand that the interest rate offered upon renewal may differ from the interest rate applicable to your L Bonds prior to maturity. See "Description of the L Bonds — Renewal or Redemption on Maturity." |
| **Call and Redemption Prior to Maturity** | We may call and redeem the entire outstanding principal balance and accrued but unpaid interest of any or all of the L Bonds at any time without penalty or premium. L Bond holders will have no right to require us to redeem any L Bond prior to maturity unless the request is due to death, bankruptcy or total permanent disability. The indenture defines "total permanent disability" as the determination by a physician, approved by us, that a holder of an L Bond who is a natural person, and who was gainfully employed at the time of issuance of the L Bond (or its renewal date), is unable to work on a full-time basis during a period of 24 consecutive months. |
| | In our sole discretion, we may accommodate other requests to redeem any L Bond prior to maturity. If we agree to redeem an L Bond upon the request of an L Bond holder (other than in connection with death, bankruptcy or total permanent disability of a holder), we will impose a redemption fee of 6% against the outstanding principal balance of the L Bond redeemed, which fee will be subtracted from the amount paid. |

App. 0869

| | |
|---|---|
| **Ranking** | The L Bonds will constitute secured debt of GWG Holdings. The payment of principal and interest on the L Bonds will be: |

- pari passu with respect to payment on and collateral securing all L Bonds (including those issued under our prior L Bond offering) and the previously issued Seller Trust L Bonds due 2023 (the "Seller Trust L Bonds"), of which approximately $948.1 million and $366.9 million in principal amount was outstanding, respectively, as of December 31, 2019 (see the caption "— Collateral Security" below);

- structurally junior to the present and future obligations owed by DLP IV under a second amended and restated senior credit facility with LNV Corporation, and structurally or contractually junior to any future obligations that DLP IV or other primary obligors or guarantors may have under future senior secured borrowing facilities; and

- structurally junior to the present and future claims of other creditors of our subsidiaries other than GWG Life, including Beneficient's senior credit agreement and second lien credit agreement with HCLP Nominees, L.L.C., of which approximately $152.2 million in principal amount was outstanding as of December 31, 2019, and trade creditors.

The indenture will permit us to issue other forms of debt, including senior and secured debt, in the future. Any such secured senior debt will have priority over L Bonds with respect to claims for payment and claims for any collateral that is shared as between the holders of L Bonds and such senior secured debt.

To fully understand the foregoing summary, you should understand that "pari passu" means that claims for payment and entitlement to security among the holders of L Bonds (including the holders of previously issued L Bonds) and the holders of any later-created class of "pari passu debt" of ours, will generally be treated equally and without preference. Debt issued on a pari passu basis in the future would be treated equally and without preference in respect of the L Bonds. Thus, in the event of any default on the L Bonds (or any other debt securities of ours that is pari passu with the L Bonds) resulting in claims for payment or claims on collateral security, the holders of the L Bonds and all such other debt securities that are pari passu with the L Bonds would share in payment or collateral in proportion to the amount of principal and interest owed on each such debt instrument. See "Description of the L Bonds — Ranking" for further information.

| | |
|---|---|
| **Guarantee** | The payment of principal and interest on the L Bonds (including those issued under our prior L Bond offering) and Seller Trust L Bonds is fully and unconditionally guaranteed by GWG Life. On December 31, 2019, there was approximately $948.1 million and $366.9 million, respectively, in outstanding principal amount of previously issued L Bonds and Seller Trust L Bonds. |
| **Collateral Security** | The L Bonds are secured by the assets of GWG Holdings, Inc. and by a guarantee and corresponding grant of a security interest in the assets of GWG Life. Our assets consist primarily of our investments in Beneficient, investments in our subsidiaries (including financing receivables from affiliates) and any cash proceeds we receive from life insurance assets of our subsidiaries, and all other cash and investments we hold in various accounts. |

7

GWG Life's assets, including its equity in our subsidiary DLP IV and its beneficial interest in Life Trust, serve as collateral for our L Bonds. However the life insurance policies held by DLP IV and Life Trust, which comprise a substantial majority of our life insurance policies, do not serve as collateral for the L Bonds. Further, the life insurance policies held by DLP IV are pledged as collateral securing the obligations under DLP IV's second amended and restated senior credit facility with LNV Corporation. The L Bonds' security interest will be structurally subordinate to the security interest in favor of our senior secured lender, together with any future senior secured lenders of ours. The assets of GWG Life, including proceeds it receives as distributions from DLP IV and derived from the insurance policies owned by DLP IV, are collateral for GWG Life's guarantee of the repayment of principal and interest on the L Bonds.

The L Bonds are also secured by a pledge of 3,952,155 shares of our common stock. For more information please see "Description of the L Bonds — Collateral Security."

**Indenture Covenants**

The indenture governing the L Bonds places restrictive covenants and affirmative obligations on us. For example, our debt coverage ratio may not exceed 90%.

The indenture defines the debt coverage ratio as the ratio, expressed as percentage, of (A) the aggregate sum of all Indebtedness (as defined in the indenture, other than Excluded Indebtedness, as described below) of GWG Holdings and its direct and indirect subsidiaries (including the Securities issued under the indenture, but excluding any Indebtedness of Ben LP and its direct and indirect subsidiaries) as reflected on GWG Holdings' most recent consolidated balance sheet prepared in accordance with GAAP over (B) the sum of (i) Net Present Asset Value (as defined in the amended indenture) of Life Insurance Policies (as defined in the amended indenture) owned by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding Life Insurance Policies held by Ben LP and its direct and indirect subsidiaries and controlled affiliates, plus (ii) all cash (and cash equivalents) held by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding the cash (and cash equivalents) held by Ben LP and its direct and indirect subsidiaries, plus (iii) the original cost basis in GWG Holdings' investment in common units or other securities of Ben LP, plus (iv) the outstanding principal amount of any outstanding loans made under a commercial loan agreement with GWG Life, as lender, plus (v) the cost basis of assets contributed to GWG Holdings or any direct or indirect subsidiary of GWG Holdings in connection with a Repurchase Transaction (as defined below), plus (vi) without duplication, the value of all other assets of GWG Holdings and its direct and indirect subsidiaries or affiliates (but excluding the value of assets of Ben LP and its direct and indirect subsidiaries) as reflected on its most recent consolidated balance sheet prepared in accordance with GAAP.

The indenture defines "Excluded Indebtedness" as Indebtedness or any portion thereof (A) the principal and accrued but unpaid interest of which is payable at GWG Holdings' option, pursuant to the terms of such Indebtedness or otherwise, in Capital Stock (as defined in the amended indenture) of GWG Holdings or securities mandatorily convertible into or exchangeable for Capital Stock of GWG Holdings, or (B) any Indebtedness that is reasonably expected to be converted or exchanged, directly or indirectly, into Capital Stock of GWG Holdings, provided that under the terms of such Indebtedness in the event any such conversion or exchange does not occur in accordance with the terms of such transaction, such Indebtedness would be cancelled and any assets received in exchange for such Indebtedness would be returned (a "Repurchase Transaction").

For this purpose, the net present asset value of our life insurance assets is equal to the present value of the cash flows derived from the face value of policy benefit assets we own, discounted at a rate equal to the weighted-average interest rate paid on indebtedness, excluding that of Seller Trust L Bonds.

The net present asset value of our life insurance assets for purposes of this covenant is not necessarily the same as the fair value of our life insurance assets as reflected on our most recently available balance sheet prepared in accordance with U.S. generally accepted accounting principles ("GAAP") and does not necessarily reflect the saleable or market value of those assets.

We are required to notify the indenture trustee in the event we violate this restrictive covenant for a period of 30 consecutive days. An "event of default" will exist under the indenture if a violation of this covenant persists for a period of 60 calendar days after the trustee's notice to us of a breach, or such a notice received from the holders of at least 25% in principal amount of outstanding L Bonds.

The indenture also places limitations on our ability to engage in a merger or sale of all of our assets. See "Description of the Indentures — Events of Default" and "— Consolidation Mergers or Sales" for more information.

8

| | |
|---|---|
| **Use of Proceeds** | If all the L Bonds are sold, we would expect to receive up to approximately $1,837.6 million of net proceeds from this offering after paying our estimated average selling commissions, dealer-manager fees, accountable expense allowance, wholesale commissions and our own offering-related expenses. There is no minimum amount of L Bonds that must be sold before we access investor funds. The exact amount of proceeds we receive may vary considerably depending on a variety of factors, including how long the L Bonds are offered. |
| | We intend to use the net proceeds from this offering to grow our alternative asset exposure, including through investments in Beneficient in the form of equity investments or loans, and to meet our other obligations, including debt obligations. Beneficient will have broad discretion to use the proceeds of any such investments and may use such proceeds to fund alternative asset financings, to repay indebtedness, including to related parties, and for general working capital purposes, including operating expenses. We may also use some of the proceeds from this offering to pay interest and principal amounts owing under previously issued L Bonds, Seller Trust L Bonds, and L Bonds offered hereby and for the payment of dividends on and redemption of our preferred stock. See "Use of Proceeds" for additional information. |
| **No Market for L Bonds Units; Transferability** | There is no existing market for the L Bonds and we do not anticipate that a secondary market for the L Bonds will develop. We do not intend to apply for listing of the L Bonds on any securities exchange or for quotation of the L Bonds in any automated dealer quotation system. Nevertheless, you will be able to freely transfer or pledge L Bonds. See "Description of the L Bonds — Transfers." |
| **Book Entry** | The L Bonds may be issued in book-entry form, certificated form, or in the form of a global certificate deposited with a depositary. See "Description of the L Bonds — Registration and Exchange." |
| **Covered Security** | Our L Bonds are a "covered security." The term "covered security" applies to securities exempt from state registration because of their oversight by federal authorities and national-level regulatory bodies pursuant to Section 18 of the Securities Act of 1933. Generally, securities listed on national exchanges are the most common type of covered security exempt from state registration. A non-traded security also can be a covered security if it has a seniority greater than or equal to other securities from the same issuer that are listed on a national exchange. Our L Bonds are a covered security because they are senior to our common stock, which is listed on The Nasdaq Capital Market, and therefore our offering of L Bonds is exempt from state registration. |
| | Although the status of our L Bonds as a "covered security" will facilitate their purchase and sale to a broader range of investors than would otherwise be available to us, and although the offer and sale of a "covered security" generally involves fewer issuance costs to the issuer of such securities, our L Bonds are not a suitable purchase for all investors. |
| **Risk Factors** | An investment in the L Bonds involves significant risks, including the risk of losing your entire investment, and may be considered speculative. Importantly, we maintain a senior borrowing arrangement that subordinates the right to payment on, and shared collateral securing, the L Bonds to our senior secured lender. From time to time we may add or replace senior lenders and the particular arrangements under which we borrow from them. In addition, these borrowing arrangements with senior lenders restrict, and are expected to continue to restrict, our cash flows and, subject to certain exceptions, distributions from our operating subsidiaries. These provisions will restrict cash flows available for payment of principal and interest on the L Bonds. For a summary of risks relating to this offering and our Company and business, please see "Risk Factors" beginning on page 11 of this prospectus and Item 1A, entitled "Risk Factors," of our Annual Report on Form 10-K for the year ended December 31, 2019, which is incorporated by reference herein. |

**RISK RELATING TO FORWARD-LOOKING STATEMENTS**

Certain matters discussed in this prospectus and the documents incorporated by reference contain forward-looking statements. These forward-looking statements reflect our current expectations and projections about future events and are subject to risks, uncertainties and assumptions about our operations and the investments we make, including, among other things, factors discussed under the heading "Risk Factors" below.

The words "believe," "could," "possibly," "probably," "anticipate," "estimate," "project," "expect," "may," "will," "should," "seek," "intend," "plan," "expect," or "consider" and similar expressions are intended to identify forward-looking statements but are not the exclusive means of identifying such statements. Forward-looking statements are subject to risks and uncertainties, which could cause actual results to differ materially from such statements. Such risks and uncertainties include, but are not limited to:

- the valuation of assets reflected on our financial statements, including the fair value of Beneficient's assets and liabilities, including noncontrolling interests, which were consolidated as a result of the transactions with Beneficient on December 31, 2019;

- the illiquidity of our life insurance and Beneficient-related investments and receivables from affiliates;

- our ability to realize the anticipated benefits from our consolidation of Beneficient;

- Beneficient's financial performance and ability to execute on its business plan;

- Beneficient's ability to obtain the trust charters from the Texas Department of Banking necessary to implement its business plan;

- our ability to obtain accurate and timely financial information from Beneficient;

- our ability to effectively transition the management and oversight roles served by our former executives and members of our Board of Directors;

- changes resulting from the evolution of our business model and strategy with respect to Beneficient and the life insurance secondary market;

- our reliance on debt financing and continued access to the capital markets;

- our significant and ongoing financing requirements;

- our predominant use of short term debt to fund a portfolio of long term assets could result in a liquidity shortage;

- our ability to make cash distributions in satisfaction of dividend obligations and redemption requests;

- our ability to satisfy our debt obligations if we were to sell our assets;

- our history of operating losses;

- general economic outlook, including prevailing interest rates and credit market conditions

- federal, state and FINRA regulatory matters;

- litigation risks;

- our ability to comply with financial and non-financial covenants contained in borrowing agreements;

- the reliability of assumptions underlying our actuarial models, including life expectancy estimates and our projections of mortality events and the realization of policy benefits;

- risks relating to the validity and enforceability of the life insurance policies we have purchased;

- our reliance on information provided and obtained by third parties, including changes in underwriting tables and underwriting methodology;

- life insurance company credit exposure;

- cost-of-insurance (premiums) increases on our life insurance policies;

- performance of our investments in life insurance policies; and

- risks associated with causing Life Epigenetics and youSurance to become independent of GWG.

We caution you that the foregoing list of factors is not exhaustive. Forward-looking statements are only estimates and predictions, or statements of current intent. Actual results, outcomes or actions that we ultimately undertake could differ materially from those anticipated in the forward-looking statements due to risks, uncertainties or actual events differing from the assumptions underlying these statements.

10

**RISK FACTORS**

*An investment in our securities involves a high degree of risk. Before purchasing the securities offered by this prospectus, you should carefully consider the risks, uncertainties and additional information (i) set forth in our most recent Annual Report on Form 10-K filed with the SEC which is incorporated by reference into this prospectus, and (ii) contained herein or in any applicable prospectus supplement. The information incorporated by reference into this prospectus specifically includes the risk factors contained in our Annual Report on Form 10-K filed with the SEC on March 27, 2020.*

*For a description of these reports and documents, and information about where you can find them, see "Where You Can Find More Information" and "Incorporation of Certain Documents by Reference." The risks and uncertainties in this prospectus and in the documents incorporated by reference in this prospectus are those that we currently believe may materially impact the Company and could result in the loss of all or a portion of your investment in the L Bonds. Additional risks not presently known or are currently deemed immaterial could also materially and adversely affect our financial condition, results of operations, business and prospects.*

**Risks Related to the Offering and the L Bonds**

***There is no established trading market for the L Bonds. If an actual trading market does not develop for the L Bonds, you may not be able to resell them quickly, for the price that you paid or at all.***

There is currently no existing market for the L Bonds and the L Bonds will not be listed for trading on any exchange. We cannot assure you as to the liquidity of any market that may develop for the L Bonds, the ability of holders of the L Bonds to sell them or the price at which the holders of the L Bonds may be able to sell them. The liquidity of any market for the L Bonds will depend on numerous factors, including prevailing interest rates, the market for similar securities and other factors, including general economic conditions and our own financial condition, performance and prospects. Historically, the market for debt securities, such as the L Bonds, has been subject to disruptions that have caused substantial price volatility. We cannot assure you that if a market for the L Bonds were to develop, such a market would not be subject to similar disruptions.

We also cannot assure you that you will be able to sell your L Bonds at a particular time or at all, or that the prices that you receive when you sell them will be favorable. If no active trading market develops, you may not be able to resell your L Bonds at their fair market value, or at all.

11

***The collateral granted as security for our obligations under the L Bonds and Seller Trust L Bonds may be insufficient to repay the indebtedness upon an event of default.***

GWG Holdings (the issuer of the L Bonds and Seller Trust L Bonds) and GWG Life (the guarantor of obligations under the L Bonds and Seller Trust L Bonds, and a wholly owned subsidiary of GWG Holdings) have each granted a security interest in substantially all of their respective assets to serve as collateral security for obligations under the L Bonds and Seller Trust L Bonds. Importantly, DLP IV, a wholly owned subsidiary of GWG Life, owns a substantial number of our life insurance policies, 77% of the face value of our life insurance portfolio as of December 31, 2019, and is the borrower under our second amended and restated senior credit facility with LNV Corporation. As the borrower under that second amended and restated senior credit facility with LNV Corporation, all of its assets — including all of its life insurance policy assets — serve as collateral for our obligations under the facility.

Because of the fact that a substantial number of our life insurance assets are held in our DLP IV subsidiary, and all of those life insurance assets serve as collateral security for our obligations under our second amended and restated senior credit facility with LNV Corporation, holders of L Bonds and Seller Trust L Bonds risk the possibility that the collateral security granted in our life insurance policies and our investments in Beneficient to secure our obligations under the L Bonds and Seller Trust L Bonds may be insufficient to repay holders upon an event of default. Furthermore, while the indenture governing the L Bonds and the Seller Trust L Bonds limits the amount of debt relative to a measure of asset coverage we and our subsidiaries can incur, the indenture permits us and our subsidiaries to incur additional secured debt (subject to the debt coverage ratio) that may be senior to the L Bonds and Seller Trust L Bonds.

Furthermore, the life insurance policies and our investments in Beneficient that secure our obligations under the L Bonds and Seller Trust L Bonds are illiquid assets. As a result, the book value of those assets as reflected on our financial statements are based on numerous assumptions and may not necessarily reflect the current market price for those assets, especially in the event of a bulk or distressed sale. Furthermore, a substantial majority of the net assets of Beneficient are currently represented by goodwill as of December 31, 2019. Some or a substantial portion of the proceeds from L Bond sales may be used to make investments in Beneficient. Because these advances may be used by Beneficient for working capital purposes and to repay indebtedness, such investments may not increase the tangible assets securing the L Bonds. If the trustee for the L Bonds were forced to sell all or a portion of the collateral securing them, there can be no assurance that the trustee would be able to sell them for the prices at which we have recorded them, and the trustee might be forced to sell them at significantly lower prices.

***Subordination provisions contained in the indenture will restrict the ability of the trustee or the L Bond or Seller Trust L Bond holders to enforce their rights against us under the indenture, including the right to payment on the L Bonds, if a default then exists under a senior credit facility.***

The L Bonds and Seller Trust L Bonds will be subordinate in right of payment to any claims of our senior lender under the second amended and restated senior credit facility with LNV Corporation. In this regard, subordination provisions limiting the right of L Bond and Seller Trust L Bond holders to enforce their rights are contained in the indenture. These provisions include:

- a prohibition on challenging any enforcement action taken by a senior lender, or interfering with any legal action or suits undertaken by a senior lender, against us and our affiliates;

- a 180-day standstill period during which there may not be brought any action against us or our affiliates to enforce rights respecting collateral unless our second amended and restated senior credit facility with LNV Corporation has been repaid in full, which period may be extended if the senior lender takes action during such standstill period; and

- a prohibition on filing a bankruptcy or insolvency case against us or our affiliates for at least one year plus one day after any senior lender has been paid in full.

In the event of a default on a senior credit facility, the indenture prohibits us from making any payment, direct or indirect (whether for interest, principal, as a result of any redemption or repayment at maturity, on default, or otherwise), on the L Bonds, Seller Trust L Bonds and any other indebtedness unless and until: (i) the default respecting the senior credit facility has been cured or waived or has ceased to exist; or (ii) in the case of a non-payment default that permits a senior lender to declare as due and payable all amounts owing under a senior credit facility (but where that senior lender has not yet so declared amounts as being due and payable), the end of the period commencing on the date the trustee receives written notice of default from the senior lender and ending on the earliest of (1) our discharge of the default (or other cure), (2) the trustee's receipt of a valid waiver of default from the senior lender, or (3) a written notice from the senior lender terminating the payment prohibition.

App. 0878

During any payment prohibition period, neither the holders of the L Bonds, the Seller Trust L Bonds, nor the trustee will have the right, directly or indirectly, to sue to enforce the indenture or the L Bonds or Seller Trust L Bonds. Other provisions of the indenture do permit the trustee to take action to enforce the payment rights of L Bond and Seller Trust L Bond holders after 179 days have passed since the trustee's receipt of notice of default from a senior lender, but in such case any funds paid as a result of any such suit or enforcement action shall be applied toward the senior credit facility until the facility is indefeasibly paid in full before being applied to the L Bonds and Seller Trust L Bonds.

These subordination provisions present the risk that, upon any default by us on obligations owed to our senior lender, the holders of the L Bonds and Seller Trust L Bonds will be unable to enforce their rights to payment.

If the 180-day standstill period noted above, or any other limitation on the rights of the trustee or L Bond and Seller Trust L Bond holders to assert their rights to payment of principal or interest under the indenture, is ultimately determined to conflict with provisions of the Trust Indenture Act of 1939 (most notably sections 316(b) and 317(a) of that Act), then the trustee, as well as any holder who shall not have earlier consented to such subordination provisions, will (notwithstanding such provision contained in the indenture) be authorized to institute a lawsuit for the enforcement of any payment of principal or interest after their respective due dates.

***The debt coverage ratio, designed to provide some assurance to the holders of the L Bonds and Seller Trust L Bonds that the value of our total assets exceeds our total interest-bearing obligations, values our life insurance policy assets, which represent 56% of our total assets (excluding goodwill) as of December 31, 2019, in a manner that may not be representative of the amount we would actually receive upon a sale of those assets.***

Under the indenture governing the L Bonds and Seller Trust L Bonds, as amended, the maximum amount of L Bonds and Seller Trust L Bonds we may issue at any time is limited to an amount such that our debt coverage ratio does not exceed 90%. This limitation is designed to provide some basis that the net present value of policy benefits from our life insurance assets, plus the carrying value of our other assets (including our investments in Beneficient), will be sufficient to meet our obligations to our L Bond and Seller Trust L Bond holders. Expressed as a percentage, the debt coverage ratio is the ratio of (A) the aggregate sum of all Indebtedness (other than Excluded Indebtedness) of GWG Holdings and its direct and indirect subsidiaries (including the Securities issued under the indenture, but excluding any Indebtedness of Ben LP and its direct and indirect subsidiaries) as reflected on GWG Holdings' most recent consolidated balance sheet prepared in accordance with GAAP over (B) the sum of (i) Net Present Asset Value of Life Insurance Policies owned by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding Life Insurance Policies held by Ben LP and its direct and indirect subsidiaries and controlled affiliates, plus (ii) all cash (and cash equivalents) held by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding the cash (and cash equivalents) held by Ben LP and its direct and indirect subsidiaries, plus (iii) the original cost basis in GWG Holdings' investment in common units or other securities of Ben LP, plus (iv) the outstanding principal amount of any outstanding loans made under a commercial loan agreement with GWG Life, as lender, plus (v) the cost basis of assets contributed to GWG Holdings or any direct or indirect subsidiary of GWG Holdings in connection with a Repurchase Transaction, plus (vi) without duplication, the value of all other assets of GWG Holdings and its direct and indirect subsidiaries or affiliates (but excluding the value of assets of Ben LP and its direct and indirect subsidiaries) as reflected on its most recent consolidated balance sheet prepared in accordance with GAAP. For this purpose, Excluded Indebtedness" is Indebtedness which is payable at GWG Holdings' option in capital stock of GWG Holdings or securities mandatorily convertible into or exchangeable for such capital stock of GWG Holdings, or any Indebtedness that is reasonably expected to be converted or exchanged, directly or indirectly, into such capital stock, provided that under the terms of such Indebtedness in the event any such conversion or exchange does not occur in accordance with the terms of such transaction, such Indebtedness would be cancelled and any assets received in exchange for such Indebtedness would be returned.

Although the debt coverage ratio is designed to provide some basis that our assets will be sufficient to meet our obligations to the holders of L Bonds and Seller Trust L Bonds, the "net present value" of our life insurance assets used in the debt coverage ratio is not the same as the GAAP "fair value" of those assets on our balance sheet. Accordingly, the debt coverage ratio is not informative of the amount we and holders of L Bonds and Seller Trust L Bonds would actually receive if we were forced to sell or liquidate our life insurance related assets. Furthermore, any sale or liquidation of all or a significant portion of our life insurance policies or investments in Beneficient would include significant transactional costs. See "— The collateral granted as security for our obligations under the L Bonds and Seller Trust L Bonds may be insufficient to repay the indebtedness upon an event of default." As a result, our compliance with the debt coverage ratio in the indenture will not guarantee that the value of our life insurance assets plus the value of our investments in Beneficient, if sold or liquidated, would in all cases exceed the amount of our obligations to the holders of L Bonds and Seller Trust L Bonds.

**USE OF PROCEEDS**

If all of the L Bonds are sold, we expect to receive up to approximately $1,837.6 million of net proceeds from this offering after paying our estimated offering and related expenses and the estimated selling commissions and additional compensation (consisting of (i) dealer-manager fees, (ii) wholesaling fees and non-transaction based compensation of the wholesalers, who are our employees and associated with the dealer manager, (iii) accountable expense allowance (iv) non-cash compensation, and (v) up to a 1.00% reallowance to selling group members). We expect the selling commissions and additional compensation to aggregate approximately $160.0 million based on expected average selling commissions of $100.0 million (5.00%), dealer-manager fees of $8.0 million (0.4%), and additional expenses aggregating to $52.0 million (2.60%), assuming the sale of all of the L Bonds. In addition, we expect that our offering expenses, consisting of legal, accounting, printing, mailing, registration, qualification and associated securities offering filing costs and expenses, will aggregate to approximately $2,400,000 through the course of this offering.

As explained elsewhere in this prospectus, the maximum amount of commissions, dealer manager fees and additional compensation payable to the dealer manager and selling group members is 8.0% of the aggregate principal amount of L Bonds sold. Therefore, if all of the L Bonds were sold and the maximum commissions, dealer manager fees and additional compensation were paid, we estimate that the net proceeds to us, after paying our own estimated offering and related expenses, would be approximately $1,837.6 million. Nevertheless, because we do not know the total principal amount of L Bonds that will be ultimately sold, we are unable to accurately forecast the total net proceeds that will be generated by this offering.

There is no minimum amount of L Bonds that must be sold before we access investor funds. The exact amount of proceeds we receive may vary considerably depending on a variety of factors, including how long the L Bonds are offered.

We intend to use the net proceeds from this offering to grow our alternative asset exposure, including through investments in Beneficient in the form of equity investments and/or loans to Beneficient or related entities, and to meet our other obligations, including:

- servicing our portfolio of life insurance assets (i.e., paying life insurance policy premiums);

- paying principal (at maturity or upon earlier prepayment or redemption), interest and fees to our lenders, including under DLP IV's second amended and restated senior credit facility, previously issued L Bonds, Seller Trust L Bonds and the L Bonds offered hereby;

- paying dividends on and, if applicable, redeeming our preferred stock;

- paying transaction expenses relating to interest rate hedging and similar derivative transactions (e.g., caps, collars, etc.); and

- general working capital purposes.

The extent to which we will use proceeds from this offering for any of these purposes, and the amounts and timing of such expenditures, will depend on, among other things, how long the L Bonds are offered, the amount of net proceeds that we receive from the sale of L Bonds being offered, our cash flows and needs for liquidity, the existence and timing of opportunities to strategically increase our investment in Beneficient, the availability of funds from other sources, including realizations from policy benefits, distributions from investments in Beneficient, the issuance of common or preferred equity, borrowings from senior credit facilities, and other factors deemed relevant by our Board of Directors and management.

Beneficient will have broad discretion to use the proceeds of any such investments and may use such proceeds to acquire alternative assets, to repay indebtedness, including to related parties, and for general working capital purposes, including operating expenses.

Net offering proceeds not immediately applied to the uses summarized above will be invested, at our sole discretion, in bank deposits or short-term investments such as money market funds, commercial paper, U.S. Treasury Bills and similar securities investments pending their use.

The maximum amount of L Bonds we may issue and have outstanding is limited by our debt coverage ratio discussed below.

14

## DESCRIPTION OF THE L BONDS

**General**

The L Bonds are secured obligations of GWG Holdings. The L Bonds will be issued under the amended and restated indenture between us and Bank of Utah as the indenture trustee, dated October 23, 2017, which amends and restates the original indenture dated October 19, 2011 and as may be amended or supplemented from time to time (referred to herein as the "indenture"). The terms and conditions of the L Bonds include those stated in the indenture and those made part of the indenture by reference to the Trust Indenture Act of 1939. The following is a summary of the material provisions of the indenture. For a complete understanding of the L Bonds, you should review the definitive terms and conditions contained in the indenture, which include definitions of certain terms used below. A copy of the indenture has been filed with the SEC as an exhibit to the registration statement of which this prospectus is a part, and is available from us at no charge upon request.

The following is a summary of the material terms of the L Bonds:

- The L Bonds are general secured obligations of GWG Holdings. The obligations are secured by a grant of a security interest in all of the assets of GWG Holdings, which assets will serve as collateral for our obligations under the L Bonds. This grant of a security interest is effected pursuant to an amended and restated pledge and security that has been filed as an exhibit to the registration statement of which this prospectus forms a part.

- The L Bonds are fully and unconditionally guaranteed by our wholly owned direct subsidiary, GWG Life, but otherwise are not guaranteed by any other person or entity. The guarantee is backed by a grant of a security interest in all of the assets of GWG Life, which assets will serve as additional collateral for our obligations under the L Bonds. Chief among these assets is GWG Life's ownership interest in DLP IV. This guarantee is effected pursuant to provisions contained in the indenture.

- The L Bonds are also secured by a pledge of the equity ownership interests in GWG Holdings beneficially owned by BCC and AltiVerse Capital Markets, L.L.C., a Delaware limited liability company ("AltiVerse") (which is a limited liability company owned by an entity related to Beneficient's founders)— which pledge is effected pursuant to an amended and restated pledge and security agreement that has been filed as an exhibit to the registration statement of which this prospectus forms a part.

- Through DLP IV, we are party to a $300.0 million second amended and restated senior credit facility with LNV Corporation. The amount outstanding under this facility was $184.6 million at December 31, 2019.

- The L Bonds are not savings accounts, certificates of deposit (CDs) or other forms of "deposits," and are not insured by the FDIC or any other governmental agency.

- The L Bonds are not directly secured by any life insurance assets not owned by GWG Life. A substantial majority of our life insurance assets are held by DLP IV. Although GWG Life's equity ownership interest in DLP IV is an asset in which GWG Life has, pursuant to its guarantee, granted a security interest to serve as collateral for obligations under the L Bonds, the payment on such equity interest will be subordinate to the interests of creditors of DLP IV, including our senior creditor LNV Corporation.

- The L Bonds do not have the benefit of a "sinking fund" for the retirement of principal.

- The L Bonds are not convertible into our capital stock or other securities.

- We have the option to call and redeem the entire outstanding principal balance and accrued but unpaid interest of any L Bonds at any time and without premium or penalty. If we elect to call and redeem your L Bonds, those redeemed L Bonds will cease to accrue interest after the redemption date under the terms and subject to the conditions of the indenture.

- Except in limited circumstances (death, bankruptcy or total permanent disability) L Bond holders will have no right to require us to redeem any L Bond prior to its maturity date. Any early redemption will be for the total outstanding principal balance and accrued but unpaid interest. If we in our sole discretion nonetheless elect to accommodate a redemption request, we will redeem the entire (but not less than the entire) outstanding principal balance and accrued but unpaid interest of the L Bonds and may impose a redemption fee of 6% against the outstanding principal balance of the L Bond redeemed. This fee will be subtracted from the amount paid to you.

App. 0881

The L Bonds will be represented by "Units," with each whole Unit representing $1,000 in principal amount (USD) of L Bonds. Accordingly, L Bond Units will be sold at 100% of their principal face amount. Throughout this prospectus, we refer to L Bond Units simply as "L Bonds." The minimum investment amount in the L Bonds will be 25 Units, or $25,000. Above that minimum amount, L Bonds may be purchased in whole Units. Subject to the minimum investment amount, you may select the principal amount and term of the L Bonds (ranging from two to seven years) you would like to purchase when you subscribe. The interest rate of your L Bonds will remain fixed until maturity. Depending on our capital requirements, we may not, however, always offer L Bonds with the particular terms you seek. See "Description of the L Bonds — Interest Rate and Maturity" below.

Upon acceptance of your subscription, we will create an account in a book-entry registration and transfer system for you, and credit the principal amount of your subscription to your account. We will also send you a purchase confirmation that will indicate our acceptance of your subscription. If your subscription is rejected, all funds deposited will be promptly returned to you without any interest. See "— Registration and Exchange" below. Alternatively, you may subscribe for L Bonds as a direct participant with Depository Trust Company (DTC settlement). See "Plan of Distribution — Settlement Procedures" for more information.

Investors whose subscriptions for L Bonds have been accepted and anyone who subsequently acquires L Bonds in a qualified transfer are referred to as "holders" or "registered holders" in this prospectus. We may modify or supplement the terms of the L Bonds described in this prospectus from time to time in a supplement to the indenture and a further supplement to this prospectus. Except as set forth under "— Amendment, Supplement and Waiver" below, any modification or amendment will not affect L Bonds outstanding at the time of such modification or amendment.

The L Bonds are transferable pursuant to the terms of the indenture. The L Bonds may be transferred or exchanged for other L Bonds of the same series and class of a like aggregate principal amount (i.e., the same number of Units) subject to limitations contained in the indenture. We will not charge a fee for any registration, transfer or exchange of L Bonds. However, we may require the holder to pay any tax, assessment fee, or other governmental charge required in connection with any registration, transfer or exchange of L Bonds. The registered holder of any L Bonds will be treated as the owner of such L Bond Units for all purposes.

**Denomination**

You may purchase L Bonds in the minimum amount of 25 Units, representing a minimum principal amount of $25,000, and in any whole Unit amounts in excess thereof. You will determine the exact number of L Bond Units you purchase when you subscribe. You may not cumulate multiple purchases L Bond Units in amounts less than 25 Units to satisfy the 25 Unit minimum requirement. In our discretion, however, we may waive the 25 Unit minimum purchase requirement for any investor.

**Term**

We may offer L Bonds with the following terms to maturity: two years, three years, five years, and seven years.

You will select the term of the L Bonds you purchase when you subscribe. You may purchase multiple L Bonds with different terms by filling in investment amounts for more than one term on your Subscription Agreement. Nevertheless, during this offering we may not always offer L Bonds with each of the maturity terms outlined above.

The actual maturity date will be on the last day of the month in which the L Bond matures (i.e., the month in which the L Bond's term ends). For example, if you select a two-year term and your L Bond becomes effective on June 1, 2020, then the actual maturity date will be June 30, 2022. After actual maturity, we will pay all outstanding principal and accrued but unpaid interest on the L Bond no later than the fifth day of the calendar month next following its maturity (or the first business day following the fifth day of such month). So, in the case of an L Bond with a maturity date of June 30, 2022, actual payment will be made on or prior to July 5, 2022 (unless such date is not a business day, in which case actual payment will be made on the next business day). The L Bonds do not earn interest after the maturity date or any date set for prepayment.

Should the original L Bond holder (x) no longer be the holder of the L Bond or (y) be unavailable, or a change in payee be necessary, such as in the case of a surviving estate, we may require a copy of the executed assignment to any transferee, or an order from a court or probate commission, as the case may be, in order that we know the principal is returned to the rightful party.

16

**Interest Rate**

The rate of interest we will offer to pay on L Bonds at any particular time will vary based upon market conditions, and will be determined by the term to maturity of the L Bonds, our capital requirements and other factors described below. The interest rate on particular L Bonds will be determined at the time of subscription or renewal and then remain fixed for the original or renewal term of the L Bond. We will establish and may change the interest rates payable for L Bonds of various terms and at various investment levels in an interest rate supplement to this prospectus.

We may offer L Bonds that earn incrementally higher interest rates when, at the time they are purchased or renewed, the aggregate principal amount of the L Bond portfolio of the holder increases. If applicable, the interest rates payable at each level of investment will be set forth in an interest rate supplement to this prospectus. We may change the interest rate for any or all maturities to reflect market conditions at any time by supplementing this prospectus. If we change the interest rates, the interest rate on L Bonds issued before the date of the change will not be affected.

**Payments on the L Bonds; Paying Agent and Registrar**

Investors will have the opportunity to select whether interest on their L Bonds will be paid monthly or annually. For investors using direct settlement with the Company, this selection opportunity will be presented in the Subscription Agreement.

Interest will accrue on the L Bonds at the stated rate from and including the effective date of the L Bond until maturity. The effective date of an L Bond will be as follows:

- If you purchase an L Bond through DTC settlement, the effective date of your L Bond purchase will be the date your subscription is accepted by the Company.

- If you purchase an L Bond through direct settlement with the Company, the effective date of your L Bond purchase will be the following, as applicable: (i) in cases where you pay for your bond via wire transfer directly to us, the first business day of the next calendar month after which we receive the wire; (ii) in cases where you pay for your bond by bank draft directly to us, the first business day of the next calendar month after which we receive the draft; or (iii) in cases where you pay for your bond by personal check, the first business day of the calendar month that is at least five full business days after which we receive the check. In all cases involving direct settlement with the Company, we must also have received and accepted your completed and executed Subscription Agreement.

Interest payments on L Bonds will be paid on the 15th day immediately following the last day of the applicable interest payment period. Interest will be paid without any compounding. The first payment of interest will include interest for the partial period in which the purchase occurred. The indenture provides that all interest will be calculated based on a year with twelve 30-day months.

If you purchase your L Bond Units through direct settlement, we will pay the principal of, and interest on, L Bonds by direct deposit to the account you specify in your Subscription Agreement. We will not accept subscriptions from investors who are not willing to receive their interest payments via direct deposit. If the foregoing payment method is not available, principal and interest payments on the L Bonds will be payable at our principal executive office or at such other place as we may designate for payment purposes. If you purchase your L Bond Units through DTC settlement, our payments of principal and interest will be paid to the depositary (DTC) and then be credited to your brokerage or custodial account through the DTC procedures followed by your brokerage firm or custodian. For more information, please see "Registration and Exchange — Global Certificates Deposited with DTC" below.

We will withhold 28% of any interest payable to any investor who has not provided us with a social security number, employer identification number, or other satisfactory equivalent in the Subscription Agreement (or another document) or where the IRS has notified us that backup withholding is otherwise required. Please see "Material Federal Income Tax Considerations — Backup Withholding and Information Reporting."

**Registration and Exchange**

The L Bonds that we settle directly will generally be issued in book-entry form, which means that no physical L Bond is created, subject, however, to limited exceptions described in the indenture. The L Bonds settled through DTC settlement will be represented by global certificates deposited with the depositary as described below.

*Book-Entry Registration*

Evidence of your ownership will be provided by written confirmation. As described below, holders may, under certain circumstance described below, opt to receive physical delivery of a certificated security that evidences their L Bonds. Otherwise, the issuance and transfer of L Bonds will be accomplished exclusively through the crediting and debiting of the appropriate accounts in our book-entry registration and transfer system.

The holders of the accounts established upon the purchase or transfer of L Bonds will be deemed to be the owners of the L Bonds under the indenture. The holder of the L Bonds must rely upon the procedures established by the trustee to exercise any rights of a holder of L Bonds under the indenture. We will regularly provide the trustee with information regarding the establishment of new accounts and the transfer of existing accounts.

On or prior to any interest payment date or upon redemption, we will also provide the trustee with information regarding the total amount of any principal and interest due to holders of L Bonds. On each interest payment date, we will credit interest due on each account and direct payments to the holders. We will determine the interest payments to be made to the book-entry accounts and maintain, supervise and review any records relating to book-entry accounts for the L Bonds.

Book-entry notations in the accounts evidencing ownership of the L Bonds are exchangeable for certificated L Bonds only: (i) at the request of the holder, at the end of the Company's next fiscal quarter; or (ii) after the occurrence of an event of default under the indenture, if holders of more than 50% of the aggregate outstanding principal amount of the L Bonds advise the trustee in writing that the continuation of a book-entry system is no longer in the best interests of the holders of L Bonds. In its discretion, the Company may elect to terminate the book-entry system and replace book-entry notations with physical certificates.

*Global Certificates Deposited with DTC*

L Bonds may be issued in the form fully registered global certificates deposited with, or on behalf of, The Depository Trust Company ("DTC"), New York, NY, and registered in the name of Cede & Co., as nominee of DTC. Unless and until exchanged, in whole or in part, for L Bonds in definitive registered form, a global certificate may not be transferred except as a whole by the depositary to a nominee of such depositary, by a nominee of such depositary to such depositary or another nominee of such depositary, or by such depositary or any nominee of such depositary to a successor of such depositary or a nominee of such successor.

DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act. DTC was created to hold securities of its participants and to facilitate the clearance and settlement of securities transactions, such as transfers and pledges, among its participants in such securities through electronic computerized book-entry changes in accounts of the participants, thereby eliminating the need for physical movement of securities certificates. DTC's participants include securities brokers and dealers (including the managing broker-dealer), banks, trust companies, clearing corporations and certain other organizations, some of whom own DTC. Access to DTC's book-entry system is also available to others, such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a participant, either directly or indirectly. The rules applicable to DTC and its participants are on file with the SEC.

If available, purchases of L Bonds within the DTC system must be made by or through direct participants, which will receive a credit for the L Bonds on DTC's records. The ownership interest of each beneficial owner of the L Bonds will be recorded on the direct and indirect participants' records. Beneficial owners will not receive written confirmation from DTC of their purchases, but beneficial owners are expected to receive written confirmations providing details of the transactions, as well as periodic statements of their holdings, from the direct or indirect participants through which the beneficial owners entered into the transaction. Transfers of ownership interests in the L Bonds are to be accomplished by entries made on the books of participants acting on behalf of beneficial owners.

To facilitate subsequent transfers, all L Bonds deposited by participants with DTC will be registered in the name of DTC's nominee, Cede & Co. The deposit of L Bonds with DTC and their registration in the name of Cede & Co. will effect no change in beneficial ownership. DTC will have no knowledge of the actual beneficial owners of the L Bonds. DTC's records will reflect only the identity of the direct participants to whose accounts such notes are credited, which may or may not be the beneficial owners. The participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to direct participants, by direct participants to indirect participants and by direct and indirect participants to beneficial owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

We will make payments due on the notes to Cede & Co., as nominee of DTC, in immediately available funds. DTC's practice is to credit direct participants' accounts, upon DTC's receipt of funds and corresponding detailed information, on the relevant payment date in accordance with their respective holdings shown on DTC's records. Payments by participants to beneficial owners will be governed by standing instructions and customary practices, as is the case with securities held for the account of customers in bearer form or registered in "street name," and will be the responsibility of such participant and not our responsibility or that of DTC, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment to Cede & Co. is our responsibility. Disbursement of such payments to direct participants is the responsibility of Cede & Co. Thereafter, disbursement of such payments to the beneficial owners is the responsibility of direct and indirect participants (i.e., brokers, dealers and custodians).

Except as provided herein, a beneficial owner of an interest in a global certificate will not be entitled to receive physical delivery of the L Bonds. Accordingly, each beneficial owner must rely on the procedures of DTC to exercise any rights under the L Bonds. The laws of some jurisdictions require that certain purchasers of securities take physical delivery of securities in definitive form. Such laws may impair the ability to transfer beneficial interests in a global certificate.

As long as the depositary, or its nominee, is the registered holder of a global certificate, the depositary or such nominee will be considered the sole owner and holder of the L Bonds represented thereby for all purposes under the L bonds and the indenture. Except in the limited circumstances referred to below, owners of beneficial interests in a global certificate will not be entitled to have such global certificate or any L Bonds represented thereby registered in their names, will not receive or be entitled to receive physical delivery of certificated L Bonds in exchange for the global certificate and will not be considered to be the owners or holders of such global certificate or any certificates represented thereby for any purpose under the L Bonds or the indenture. Accordingly, each person owning a beneficial interest in such global certificate must rely on the procedures of the depositary and, if such person is not a participant, on the procedures of the participant through which such person owns its interest to exercise any rights of a holder under the indenture.

If the depositary for a global certificate representing L Bonds is at any time unwilling or unable to continue as depositary and a successor depositary is not appointed by us within 90 days, we will issue L Bonds in definitive form in exchange for such global certificate. In addition, we may at any time and in our sole discretion determine not to have the L Bonds represented by one or more global certificates and, in such event, we will issue the notes in definitive form in exchange for all of the global certificates representing the L Bonds. Finally, if an event of default, or an event which with the giving of notice or lapse of time or both would constitute an event of default, with respect to the L Bonds represented by a global certificate has occurred and is continuing, then we will issue L Bonds in definitive form in exchange for all of the global certificates representing the notes.

Although DTC has agreed to the procedures provided above in order to facilitate transfers, it is under no obligation to perform these procedures, and these procedures may be modified or discontinued at any time.

**Limited Rescission Right**

If you are purchasing L Bonds through direct settlement with the Company and your Subscription Agreement is accepted at a time when we have determined that a post-effective amendment to the registration statement of which this prospectus is a part must be filed with the SEC, but such post-effective amendment has not yet been declared effective, we will send to you at your registered address a notice and a copy of the related prospectus once it has been declared effective. You will thereupon have the right to rescind your investment upon written request within ten business days from the postmark date of the notice we send to you that the post-effective amendment has been declared effective (and containing the related prospectus). We will promptly return any funds sent with a Subscription Agreement that is properly rescinded without penalty, although any interest previously paid on a rescinded L Bond will be deducted from the funds returned to you upon rescission. A written request for rescission, except in the case of a mailed rescission, must be postmarked on or before the tenth business day after our notice to you (described above). If you notify us other than by mail, we must actually receive your rescission request on or before the tenth business day after our notice to you.

We will not accept purchases of L Bonds through DTC settlement if, as of the end of the monthly closing for DTC settlement, we have determined that a post-effective amendment to the registration statement of which this prospectus is a part must be filed with the SEC, but such post-effective amendment has not yet been declared effective. In any such case, settlement of your L Bond purchase must occur in the following month.

App. 0886

App. 0887

**Renewal or Repayment on Maturity**

At least 30 days prior to the maturity of your L Bond, we will provide you with a notice indicating that your L Bond is about to mature and whether we will allow automatic renewal of your L Bond. If we allow you to renew your L Bond, we will also provide to you the then-current form of prospectus, which may include an interest rate or prospectus supplement and any other updates to the information contained in this prospectus. The prospectus, or the interest rate or prospectus supplement, will set forth the interest rates then in effect. The notice will recommend that you review the then-current prospectus, including any interest rate or prospectus supplement, prior to exercising one of the below options. If we do not provide you a new prospectus because the prospectus has not changed since the delivery of this prospectus in connection with your original investment or any prior renewal, we will nonetheless send you a new copy of the prospectus upon your request. Unless the election period is extended as described below, you will have until 15 days prior to the maturity date to exercise one of the following options:

- You can do nothing, in which case (subject to applicable law) your L Bond will automatically renew for a new term equal to the original term but at the interest rate in effect at the time of renewal. Interest on renewed L Bonds will be paid on the same schedule (i.e., monthly or annually) as the original L Bond. If applicable, a new certificate will be issued.

- You can elect repayment of your L Bond, in which case the principal amount will be repaid in full along with any accrued but unpaid interest. If you choose this option, your L Bond will not earn interest on or after the maturity date.

- You can elect repayment of your L Bond and use all or part of the proceeds to purchase a new L Bond with a different term or principal amount. To exercise this option, you will need to complete a new Subscription Agreement for the new L Bond and mail it along with your request, or else work with your broker if you wish to purchase your new L Bond through DTC settlement. Any proceeds from the old L Bond that are not applied to the new L Bond will be sent to you.

The foregoing options will be available to holders unless and until terminated under the indenture. Interest will accrue from the first day of each renewed term. Each renewed L Bond will retain all its original provisions, including provisions relating to payment, except that the interest rate payable during any renewal term will be the interest rate that is being offered at that time to other holders with similar aggregate L Bond portfolios for L Bonds of the same term as set forth in the interest rate supplement delivered with the maturity notice. If similar L Bonds are not then being offered, the (i) interest rate upon renewal will be the rate specified by us on or before the maturity date, or the rate of the existing L Bond if no such rate is specified, and (ii) the maturity will, if L Bonds of the same maturity are being offered at the time of renewal, be the same or, if not, the next earliest maturity.

If we notify the holder of our intention to repay an L Bond at maturity, or if the holder timely requests repayment, we will pay the principal and all accrued but unpaid interest on the L Bond on or prior to the fifth day of the calendar month after the maturity date (or the first business day following the fifth day of such month). Thus, in the case of an L Bond with a maturity date of January 31, 2020, actual payment will be made on or prior to February 5, 2020 (unless such date is not a business day, in which case actual payment will be made on the next business day). No interest will accrue after the maturity date. You should be aware that because payment is made by ACH transfer, funds may not be received in the holder's account for two to three business days.

We will be required from time to time to file post-effective amendments to the registration statement of which this prospectus is a part to update the information it contains. If you would otherwise be entitled to renew your L Bonds upon their stated maturity at a time when we have determined that a post-effective amendment must be filed with the SEC, but such post-effective amendment has not yet been declared effective, then the period during which you can elect renewal (or repayment) will be automatically extended until ten days following the postmark date of our notice to you that the post-effective amendment has been declared effective, which notice shall contain a copy of the related prospectus. All other provisions relating to the renewal or redemption of L Bonds upon their stated maturity described above shall remain unchanged.

For any L Bonds offered hereby that mature on or after the three-year anniversary of the date on which the registration statement of which this prospectus is a part shall have been declared effective, we expect that the renewal of such L Bonds may require us to file a new registration statement. In such a case, the new registration statement must be declared effective before we can renew your L Bond. In this event, if the new registration statement has not yet been filed or become effective, we will extend your election period until ten days following the date of our notice to you that the new registration statement has become effective, which notice will include a new prospectus.

**Call and Redemption Prior to Stated Maturity**

We may call and redeem, in whole or in part, principal amount and accrued but unpaid interest on any L Bonds prior to their stated maturity only as set forth in the indenture and described below. The holder has no right to put or otherwise require us to redeem any L Bond prior to its maturity date (as originally stated or as it may be extended), except as indicated in the indenture and described below.

*Our Voluntary Redemption*

We have the right to redeem any L Bond, in whole or in part, at any time prior to its stated maturity upon at least 30 days written notice to the holder of the L Bond. The holder of the L Bond being redeemed will be paid a redemption price equal to the outstanding principal amount thereof plus accrued but unpaid interest up to but not including the date of redemption without any penalty or premium. We may use any criteria we choose to determine which L Bonds we will redeem if we choose to do so. We are not required to redeem L Bonds on a pro rata basis.

*Holder's Put Election Upon Death*

L Bonds may be redeemed prior to maturity at the election of a holder who is a natural person (including L Bonds held in an individual retirement account and the holders of a beneficial interest in a global certificate held by a depositary or its nominee), by giving us written notice within 45 days following the holder's total permanent disability or bankruptcy, as established to our satisfaction, or at the election of the holder's estate, by giving written notice within 45 days following the death of the holder. Subject to the limitations described below, we will redeem the L Bonds not later than the 15th day of the month next following the month in which we establish to our satisfaction the holder's death, bankruptcy or total permanent disability. In the event that the 15th day of the month next following the month in which we so establish such facts is not a business day, we will redeem the L Bonds on the next business day. The redemption price, in the event of such a death, bankruptcy or total permanent disability, will be the entire principal amount of the L Bonds, plus accrued but unpaid interest thereon up to and through the last day of the calendar month preceding the redemption date. The indenture defines "total permanent disability" as the determination by a physician, approved by us, that a holder of an L Bond who is a natural person, and who was gainfully employed at the time of issuance of the L Bond (or its renewal date), is unable to work on a full-time basis during a period of 24 consecutive months.

If spouses are joint registered holders of an L Bond, the right to elect to have us redeem L Bonds will apply when either registered holder dies, files bankruptcy or suffers a total permanent disability. If the L Bond is held jointly by two or more persons who are not legally married, none of these persons will have the right to request that we redeem the L Bonds unless all joint holders have died, filed bankruptcy or suffered a total permanent disability. If the L Bond is held by a trust, partnership, corporation or other similar entity, the right to request redemption upon death or total permanent disability does not apply.

*Redemption at Request of Holder*

We have no obligation to redeem any L Bonds other than upon maturity, or upon the death, bankruptcy or total permanent disability of a natural person holder. Nevertheless, at our sole discretion we may agree from time to time, at the written request of a holder (including the holder of a beneficial interest in a global certificate held by a depositary or its nominee), to redeem an L Bond, subject, however, to a redemption fee of 6.0% of the principal amount of such L Bond. If we so redeem any L Bond prior to maturity, we will redeem the entire principal amount of such L Bond together with accrued but unpaid interest thereon, The redemption fee will be subtracted from the amount paid to you.

**Transfers**

The L Bonds will be transferable in accordance with the indenture. For L Bonds that are issued solely in book-entry form, transfers will be effective only upon the delivery to us of an executed assignment or other conveyance instrument in customary form. For L Bonds that are represented by a global certificate held by a depositary or its nominee, transfers of beneficial interests in such certificate must be effected in accordance with the procedures and rules of the depositary.

Upon transfer of an L Bond, we will provide the new holder of the L Bond with a purchase confirmation that will evidence the transfer of the account on our records. If applicable (e.g., if transferred to a custodial account), a new certificate will be issued. No written confirmations will be provided with respect to transfers of beneficial interests in a global certificate held by a depositary or its nominee.

21

**Quarterly Statements**

We will provide holders of the L Bonds with quarterly statements, which will indicate, among other things, the account balance at the end of the quarter, interest credited, redemptions made, if any, and the interest rate paid during the quarter. These statements will be sent electronically on or prior to the 10th business day after the end of each calendar quarter. If a holder is unwilling or unable to receive quarterly statements electronically, we will mail the statements to the address of record on or prior to the 10th business day after the end of each calendar quarter. In such a case, we may charge such holders a reasonable fee to cover our expenses incurred in mailing the statements.

**Ranking**

The L Bonds will constitute secured debt of GWG Holdings. The payment of principal and interest on the L Bonds will be:

- pari passu with respect to payment and collateral securing all L Bonds and Seller Trust L Bonds previously issued by GWG Holdings, Inc., of which approximately $1,315.0 million in principal amount is outstanding as of December 31, 2019 (see the caption "— Collateral Security" below);

- structurally and contractually junior to the present and future obligations owed by our subsidiary DLP IV under our second amended and restated senior credit facility with LNV Corporation, and structurally or contractually junior to any future obligations that DLP IV or other primary obligors or guarantors may have under future senior secured borrowing facilities; and

- structurally junior to the present and future claims of creditors of our subsidiaries, other than GWG Life, including Beneficient's senior credit agreement and second lien credit agreement with HCLP Nominees, L.L.C., of which approximately $152.2 million in principal amount was outstanding as of December 31, 2019, and trade creditors.

The indenture will permit us to issue other forms of debt, including secured and senior debt, in the future.

"Pari passu" means that claims for payment and entitlement to security among the holders of L Bonds, including the holders of previously issued L Bonds and Seller Trust L Bonds, and the holders of any later-created class of "pari passu debt," will be treated equally and without preference. Although we have no present intention of causing GWG Life to issue additional secured debt in the future, any such debt issued on a pari passu basis in the future (including renewals of outstanding L Bonds or other renewable pari passu debt) would also be treated equally and without preference in respect of all outstanding L Bonds and Seller Trust L Bonds. Thus, in the event of any default on the L Bonds (or any other debt securities of ours that are pari passu with the L Bonds) resulting in claims for payment or claims on collateral security, the holders of the L Bonds and all such other debt securities pari passu with the L Bonds (such as the Seller Trust L Bonds) would share in payment or collateral in proportion to the amount of principal and interest owed on each such debt instrument.

**Guarantee by GWG Life Subsidiary**

The payment of principal and interest on the L Bonds and Seller Trust L Bonds, including previously issued L Bonds, is fully and unconditionally guaranteed by GWG Life. There were approximately $1,315.0 million in principal amount of previously issued L Bonds and Seller Trust L Bonds outstanding as of December 31, 2019.

**Collateral Security**

The L Bonds are secured by the assets of GWG Holdings. We will grant a security interest in all of the assets of GWG Holdings to the indenture trustee for the benefit of the L Bond holders. The assets of GWG Holdings consist, and are expected to consist, primarily of (i) any cash proceeds received from its subsidiaries as distributions derived from life insurance assets of subsidiaries, (ii) all other cash and investments held in various accounts, (iii) the equity ownership interests in subsidiaries of GWG Holdings, including the equity ownership interest in GWG Life, together with (iv) all proceeds from the foregoing. This collateral security granted by us is referred to as the "GWG Holdings Assets Collateral."

As indicated above, our direct and wholly owned subsidiary, GWG Life, will fully and unconditionally guarantee our obligations under the L Bonds. This guarantee will be supported by GWG Life's grant of a security interest in all of its assets. The assets of GWG Life consist, and are expected to consist, primarily of (i) certain life insurance assets, (ii) any cash proceeds received from life insurance assets owned by GWG Life or received from DLP IV, as distributions derived from life insurance policies owned by that subsidiary,

(iii) all other cash and investments held by GWG Life in its various accounts, (iv) GWG Life's equity ownership interest in its direct subsidiaries, including DLP IV, together with (v) all proceeds from the foregoing. The collateral security granted by GWG Life pursuant to its guarantee of our obligations under the L Bonds is referred to as the "GWG Life Assets Collateral."

22

In addition, BCC and AltiVerse, collectively, have pledged 3,952,155 shares of our common stock to further secure our obligations under the L Bonds. This collateral security granted by BCC and Altiverse is referred to as the "GWG Holdings Equity Collateral."

Together, the GWG Holdings Assets Collateral, GWG Life Assets Collateral and GWG Holdings Equity Collateral comprise all of the collateral security for our obligations under the L Bonds. To the extent that we subsequently establish one or more wholly owned subsidiaries of GWG Holdings or GWG Life, the L Bonds will have a security interest in the equity ownership interests of those subsidiaries if and to the extent owned by GWG Holdings or GWG Life.

The guarantee by GWG Life is contained in the indenture, and the grant of security interests in the GWG Holdings Assets Collateral, GWG Life Assets Collateral and GWG Holdings Equity Collateral is effected through an "Amended and Restated Pledge and Security Agreement" that is an exhibit to the registration statement of which this prospectus forms a part. Neither the indenture nor the pledge and security agreement contain any provision preventing a pledging party from disposing of any collateral in the ordinary course of business. In this regard, the pledge and security agreement permits the disposition of GWG Holdings Equity Collateral to the extent the number of shares continuing to constitute such collateral represents at least 10% of the number of shares beneficially held by each individual grantor as of the date of the original pledge and security agreement.

Substantially all of our life insurance assets are held in our subsidiaries. The L Bonds will not be directly secured by any security interest in the assets of those subsidiaries, including DLP IV. Instead, the L Bonds will be secured by a pledge of the equity ownership interests in those subsidiaries, including DLP IV, owned by GWG Life by virtue of the guarantee provisions in the indenture and the pledge and security agreement referenced above. An equity ownership interest is, by its very nature, subordinate to the interests of creditors. **Therefore, although investors in the L Bonds will have a security interest in the ownership of DLP IV (and other direct subsidiaries of GWG Life) any claim they may have to the assets owned by such entity will be subordinate to the interests of creditors of that entity, including LNV Corporation, which is the lender to DLP IV under our second amended and restated senior credit facility, and all other creditors of DLP IV, including trade creditors. In addition, there is the risk that the collateral security granted for our obligations under the L Bonds may be insufficient to repay the L Bonds upon an event of default. See "Risk Factors — The collateral granted as security for our obligations under the L Bonds and Seller Trust L Bonds may be insufficient to repay the indebtedness upon an event of default**."

**Subordination; Other Indebtedness**

Our obligations under the L Bonds will be subordinate to all our senior debt. For this purpose, "our senior debt" presently includes all indebtedness owed or that may in the future become owing under our second amended and restated senior credit facility with LNV Corporation. As of December 31, 2019, DLP IV had approximately $184.6 million of debt outstanding under the second amended and restated credit facility with LNV Corporation. In addition, as of December 31, 2019, we had approximately $1,315.0 million in principal amount of debt outstanding under previously issued L Bonds and Seller Trust L Bonds.

The maximum amount of debt, including the L Bonds, we may issue is limited by the indenture. In particular, the indenture prohibits us from issuing debt in an amount such that our "debt coverage ratio" would exceed 90%. The indenture defines the debt coverage ratio as the ratio, expressed as percentage, of (A) the aggregate sum of all Indebtedness (other than Excluded Indebtedness) of GWG Holdings and its direct and indirect subsidiaries (including the Securities issued under the indenture, but excluding any Indebtedness of Ben LP and its direct and indirect subsidiaries) as reflected on GWG Holdings' most recent consolidated balance sheet prepared in accordance with GAAP over (B) the sum of (i) Net Present Asset Value of Life Insurance Policies owned by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding Life Insurance Policies held by Ben LP and its direct and indirect subsidiaries and controlled affiliates, plus (ii) all cash (and cash equivalents) held by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding the cash (and cash equivalents) held by Ben LP and its direct and indirect subsidiaries, plus (iii) the original cost basis in GWG Holdings' investment in common units or other securities of Ben LP, plus (iv) the outstanding principal amount of any outstanding loans made under a commercial loan agreement with GWG Life, as lender, plus (v) the cost basis of assets contributed to GWG Holdings or any direct or indirect subsidiary of GWG Holdings in connection with a Repurchase Transaction, plus (vi) without duplication, the value of all other assets of GWG Holdings and its direct and indirect subsidiaries or affiliates (but excluding the value of assets of Ben LP and its direct and indirect subsidiaries) as reflected on its most recent consolidated balance sheet prepared in accordance with GAAP.

We are required to notify the indenture trustee in the event we violate this restrictive covenant. An "event of default" will exist under the indenture if a violation of this covenant persists for a period of 30 calendar days after our initial notice to the trustee. The L Bonds are guaranteed by GWG Life but otherwise are not guaranteed by any of our subsidiaries, affiliates or control persons. Neither indenture nor the pledge and security agreement prevent holders of debt issued by our subsidiaries from disposing of, or exercising any other rights with respect to, any or all of the collateral securing that debt. Accordingly, in the event of a liquidation or dissolution of one of our subsidiaries (other than GWG Life), creditors of that subsidiary that are senior in rank will be paid in full, or provision for such payment will be made, from the assets of that subsidiary prior to distributing any remaining assets to us as an equity owner of that subsidiary.

The indenture also contains specific subordination provisions, benefitting lenders under any senior credit facility, restricting the right of L Bond holders to enforce certain of their rights in certain circumstances, including:

- a prohibition on challenging any enforcement action taken by a senior lender or interfering with any legal action or suits undertaken by our senior lenders against us and our affiliates;

- a 180-day standstill period during which there may not be brought any action against us or our affiliates to enforce rights respecting collateral unless our senior credit facilities have been repaid in full, which period may be extended if the senior lender takes action during such standstill period; and

- a prohibition on filing a bankruptcy or insolvency case against us or our affiliates for at least one year plus one day after the senior credit facility lenders have been paid in full.

We will not make any payment, direct or indirect (whether for interest, principal, as a result of any redemption or repayment at maturity, on default, or otherwise), on the L Bonds and any other indebtedness, and neither the holders of the L Bonds nor the trustee will have the right, directly or indirectly, to sue to enforce the indenture or the L Bonds, if a default or event of default under any senior credit facility has occurred and is continuing, or if any default or event of default under any senior credit facility would result from such payment, in each case unless and until:

- the default and event of default has been cured or waived or has ceased to exist; or

- in the case of a non-payment default that permits a senior lender to declare as due and payable all amounts owing under a senior credit facility (but where that senior lender has not yet so declared amounts as being due and payable), the end of the period commencing on the date the trustee receives written notice of default from the senior lender and ending on the earliest of (1) our discharge of the default (or other cure), (2) the trustee's receipt of a valid waiver of default from the senior lender, or (3) a written notice from the senior lender terminating the payment prohibition.

During any payment prohibition period, neither the holders of the L Bonds nor the trustee will have the right, directly or indirectly, to sue to enforce the indenture or the L Bonds. Other provisions of the indenture do permit the trustee to take action to enforce the payment rights of L Bond holders after 179 days have passed since the trustee's receipt of notice of default from a senior lender, but in such case any funds paid as a result of any such suit or enforcement action shall be applied toward the senior credit facility until the facility is indefeasibly paid in full before being applied to the L Bonds. The indenture contains provisions whereby each investor in the L Bonds consents to the subordination provisions contained in the indenture and related agreements governing collateral security.

If the 180-day standstill period noted above or any other limitation on the rights of the trustee or L Bond holders to assert their rights to payment of principal or interest under the indenture or L Bonds is ultimately determined to conflict with provisions of the Trust Indenture Act of 1939 (most notably sections 316(b) and 317(a) of that Act), then the trustee, as well as any holder who shall not have earlier consented to such subordination provisions, shall (notwithstanding such provision contained in the indenture) be authorized to institute a lawsuit for the enforcement of any payment of principal or interest after their respective due dates.

24

**No Sinking Fund**

The L Bonds are not associated with any sinking fund. A sinking fund is generally any account to which contributions will be made, from which payments of principal or interest owed on the L Bonds will be made. See "Risk Factors," page 11.

**Restrictive Covenants**

The indenture contains covenants that restrict us from certain actions as described below. In particular, the indenture provides that:

- we will not declare or pay any dividends or other payments of cash or other property solely in respect of our capital stock to our stockholders (other than a dividend paid in shares of our capital stock on a pro rata basis to all our stockholders) unless no default and no event of default with respect to the L Bonds exists or would exist immediately following the declaration or payment of the dividend or other payment;

- to the extent legally permissible, we will not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or the performance of the indenture;

- our Board of Directors will not adopt a plan of liquidation that provides for, contemplates or the effectuation of which is preceded by (a) the sale, lease, conveyance or other disposition of all or substantially all of our assets, otherwise than (i) substantially as an entirety, or (ii) in a qualified sales and financing transaction, and (b) the distribution of all or substantially all of the proceeds of such sale, lease, conveyance or other disposition and of our remaining assets to the holders of our capital stock, unless, prior to making any liquidating distribution pursuant to such plan, we make provision for the satisfaction of our obligations under the renewable unsecured subordinated notes; and

- our debt coverage ratio may not exceed 90%.

The indenture defines the debt coverage ratio as the ratio, expressed as percentage, of (A) the aggregate sum of all Indebtedness (other than Excluded Indebtedness) of GWG Holdings and its direct and indirect subsidiaries (including the Securities issued under the indenture, but excluding any Indebtedness of Ben LP and its direct and indirect subsidiaries) as reflected on GWG Holdings' most recent consolidated balance sheet prepared in accordance with GAAP over (B) the sum of (i) Net Present Asset Value of Life Insurance Policies owned by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding Life Insurance Policies held by Ben LP and its direct and indirect subsidiaries and controlled affiliates, plus (ii) all cash (and cash equivalents) held by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding the cash (and cash equivalents) held by Ben LP and its direct and indirect subsidiaries, plus (iii) the original cost basis in GWG Holdings' investment in common units or other securities of Ben LP, plus (iv) the outstanding principal amount of any outstanding loans made under a commercial loan agreement with GWG Life, as lender, plus (v) the cost basis of assets contributed to GWG Holdings or any direct or indirect subsidiary of GWG Holdings in connection with a Repurchase Transaction, plus (vi) without duplication, the value of all other assets of GWG Holdings and its direct and indirect subsidiaries or affiliates (but excluding the value of assets of Ben LP and its direct and indirect subsidiaries) as reflected on its most recent consolidated balance sheet prepared in accordance with GAAP.

The indenture defines "Excluded Indebtedness" as Indebtedness or any portion thereof (A) the principal and accrued but unpaid interest of which is payable at GWG Holdings' option, pursuant to the terms of such Indebtedness or otherwise, in Capital Stock (as defined in the amended indenture) of GWG Holdings or securities mandatorily convertible into or exchangeable for Capital Stock of GWG Holdings, or (B) any Indebtedness that is reasonably expected to be converted or exchanged, directly or indirectly, into Capital Stock of GWG Holdings, provided that under the terms of such Indebtedness in the event any such conversion or exchange does not occur in accordance with the terms of such transaction, such Indebtedness would be cancelled and any assets received in exchange for such Indebtedness would be returned (a "Repurchase Transaction").

For this purpose, the net present asset value of our life insurance assets is equal to the present value of the face value of policy benefit assets we own, discounted at a rate equal to the weighted-average interest rate paid on indebtedness, excluding that of Seller Trust L Bonds. The net present asset value of our life insurance assets for purposes of this covenant is not necessarily the same as the net present asset value of our life insurance assets as reflected on our most recently available balance sheet prepared in accordance with GAAP and does not necessarily reflect the saleable or fair market value of those assets.

Importantly, we are not restricted from entering into "qualified sale and financing transactions" as defined in the indenture, or incurring additional indebtedness, including additional senior debt.

**Consolidation, Mergers or Sales**

The indenture generally permits a consolidation or merger between us and another entity. It also permits the sale or transfer by us of all or substantially all of our property and assets. These transactions are permitted if:

- the resulting or acquiring entity, if other than us, is a United States corporation, limited liability company or limited partnership and assumes all of our responsibilities and liabilities under the indenture, including the payment of all amounts due on the notes and performance of the covenants in the indenture; and

- immediately after the transaction, and after giving effect to the transaction, no event of default shall exist under the indenture.

If we consolidate or merge with or into any other entity or sell or lease all or substantially all of our assets, according to the terms and conditions of the indenture, the resulting or acquiring entity will be substituted for us in the indenture with the same effect as if it had been an original party to the indenture. As a result, the successor entity may exercise our rights and powers under the indenture in our name, and we (as an entity) will be released from all our liabilities and obligations under the indenture and under the L Bonds. Nevertheless, no such transaction will by itself eliminate or modify the collateral that we have provided as security for our obligations under the indenture.

**Events of Default and Remedies**

The indenture provides that each of the following constitutes an event of default:

- the failure to pay interest or principal on any L Bond for a period of 30 days after it becomes due and payable;

- a failure to observe or perform any material covenant, condition or agreement in the indenture, but only after notice of failure from the indenture trustee and such failure is not cured within 60 days;

- our debt coverage ratio exceeds 90% for a period of 30 consecutive calendar days, but only after notice of such breach from the indenture trustee and such breach is not cured within 60 days;

- certain events of bankruptcy, insolvency or reorganization with respect to us; or

- the cessation of our business.

In addition, a default under the indenture will create a default under our second amended and restated senior credit facility.

Through DLP IV, we are party to a second amended and restated senior credit facility with LNV Corporation, as the lender. CLMG Corp (referred to in this prospectus as CLMG) acts as the administrative agent for the lender under the second amended and restated senior credit facility.

Effective November 1, 2019, DLP IV entered into the second amended and restated senior credit facility with LNV Corporation, as lender, and CLMG Corp., as the administrative agent on behalf of the lenders under the agreement. The second amended and restated senior credit facility makes available a total of up to $300,000,000 in credit to DLP IV with a maturity date of September 27, 2029. Additional advances are available under the second amended and restated credit facility at the LIBOR rate as defined in the second amended and restated credit facility. Advances are available as the result of additional borrowing base capacity, created as the premiums and servicing costs of pledged life insurance policies become due. Interest will accrue on amounts borrowed under the second amended and restated credit facility at an annual interest rate, determined as of each date of borrowing or quarterly if there is no borrowing, equal to (A) the greater of 12-month LIBOR or the federal funds rate (as defined in the agreement) plus one-half of one percent per annum, plus (B) 7.50% per annum. The effective rate at December 31, 2019 was 9.54%. Interest payments are made on a quarterly basis. We may use proceeds of the line of credit to repay short-term debt, acquire additional life insurance assets and make additional investments in Beneficient.

Under the second amended and restated senior credit facility, DLP IV has granted the administrative agent, for the benefit of the lenders under the agreement, a security interest in all of its assets. As with prior collateral arrangements relating to the senior secured debt of GWG Holdings and its subsidiaries (on a consolidated basis), GWG Holdings' equity ownership in DLP IV will serve as collateral for

the obligations of GWG Holdings under its L Bonds (although the life insurance assets owned by DLP IV will not themselves serve directly as collateral for those obligations).

26

The second amended and restated senior credit facility does not require DLP IV to maintain a reserve account for future premiums.

In addition, the second amended and restated senior credit facility contains certain customary negative covenants restricting the ability of the borrower to directly or indirectly engage in a merger or exchange transaction, sell substantially all of its assets, or permit the amendment of the contracts governing the outstanding debt securities of GWG Holdings and its subsidiaries, without the prior consent of the lender.

The second amended and restated senior credit facility contains customary events of default (e.g., payment defaults, covenant defaults, cross-defaults, defaults arising by virtue of a change in control, and defaults arising from breaches of representations and warranties), as well as defaults for amendments to the organizational documents of the borrower, defaults from pledged policies falling out of good standing, the occurrence of an event that could terminate the arrangement by which GWG Life services the pledged life insurance policies, and the entry of a judgment against the borrower in an amount exceeding $50,000 without payment or discharge, or a stay of execution obtained, within 30 days thereafter.

The indenture requires that we give notice to the indenture trustee upon the occurrence of an event of default under the indenture, unless it has been cured or waived. The indenture trustee may then provide notice to the L Bond holders or withhold the notice if the indenture trustee determines in good faith that withholding the notice is in your best interest, unless the default is a failure to pay principal or interest on any L Bond.

If an event of default occurs, the indenture trustee or the holders of at least 25% in principal amount of the outstanding L Bonds, may by written notice to us declare the unpaid principal and all accrued but unpaid interest on the L Bonds to be immediately due and payable. Notwithstanding the foregoing, the indenture limits the ability of the L Bond holders to enforce certain rights under the indenture in certain circumstances. These limitations are required subordination provisions under our second amended and restated senior credit facility and are summarized above under "— Subordination; Other Indebtedness." The pledge and security agreement permits the trustee to exercise on behalf of the holders of L Bonds all rights and remedies as are available to a secured creditor under applicable law, subject to any limitations therein or in the indenture. In this regard, the trustee is not authorized under the pledge and security agreement to distribute in kind any collateral in its possession to the holders of L Bonds.

**Amendment, Supplement and Waiver**

Except as provided in this prospectus or the indenture, the terms of the indenture or the L Bonds then outstanding may be amended, supplemented or waived with the consent of the holders of at least a majority in principal amount of the L Bonds then outstanding (which consent will be presumed if a holder does not object within 30 days of a request for consent), and any existing default or compliance with any provision of the indenture or the L Bonds may be waived with the affirmative consent of the holders of a majority in principal amount of the then outstanding L Bonds.

Notwithstanding the foregoing, an amendment or waiver will not be effective with respect to the L Bonds held by a holder who him, her or itself has not consented if such amendment or waiver:

- reduces the principal of, or changes the fixed maturity of, any L Bond;

- reduces the rate of or changes the time for payment of interest, including default interest, on any L Bond;

- waives a default or event of default in the payment of principal or interest on the L Bonds, except for a rescission or withdrawal of acceleration of the L Bonds made by the holders of at least a majority in aggregate principal amount of the then-outstanding L Bonds and a waiver of the payment default that resulted from such acceleration;

- makes any change in the provisions of the indenture relating to waivers of past defaults or the rights of holders of L Bonds to receive payments of principal of or interest on the L Bonds; or

- makes any change to the subordination provisions of the indenture that has a material adverse effect on holders of L Bonds.

Notwithstanding the foregoing, the following kinds of amendments or supplements to the indenture may be effected by us and the trustee without any consent of any holder of the L Bonds:

- to cure any ambiguity, defect or inconsistency;

- to provide for assumption of our obligations to holders of the L Bonds in the case of a merger, consolidation or sale of all or substantially all of our assets;

- to provide for additional uncertificated or certificated L Bonds;

- to make any change that does not materially and adversely affect the legal rights under the indenture of any holder of L Bonds, including but not limited to an increase in the aggregate dollar amount of L Bonds which may be outstanding under the indenture and limited in amount thereunder;

- to modify or eliminate our policy regarding redemptions elected by a holder of L Bonds prior to maturity, including our obligation to redeem L Bonds upon the death, bankruptcy or total permanent disability of any holder of the L Bonds, but only so long as such modifications do not materially and adversely affect any then-existing obligations under pending repurchase commitments for L Bonds;

- to comply with requirements of the SEC in order to effect or maintain the qualification of the indenture under the Trust Indenture Act of 1939, or to comply with other applicable federal or state laws or regulations;

- to comply with the rules or policies of a depositary of the L Bonds; or

- in connection with an amendment, extension, replacement, renewal or substitution of any senior debt, to amend the subordination provisions of the indenture to conform to the reasonable requirements of the holder or holders of such senior debt.

**Rights of L Bond Holders**

As an L Bond holder, you have limited rights to vote on our actions as set forth in the indenture. In general, you will have the right to vote on whether or not to approve some amendments to the indenture. For a description of these rights, see "— Amendment, Supplement and Waiver" above. You will also have the right to direct some actions that the trustee takes if there is an event of default with respect to the L Bonds. For a description of these rights, see above under the caption "— Events of Default." For a complete description of your rights as an L Bond holder, we encourage you to read a copy of the indenture, which is filed as an exhibit to the registration statement of which this prospectus is a part. We will also provide you with a copy of the indenture upon your request.

The trustee and the L Bond holders will have the right to direct the time, method and place of conducting any proceeding for some of the remedies available, except as otherwise provided in the indenture. The trustee may require reasonable indemnity, satisfactory to the trustee, from L Bond holders before acting at their direction. You will not have any right to pursue any remedy with respect to the indenture or the L Bonds unless you satisfy the conditions contained in the indenture.

**The Indenture Trustee**

*General*

Bank of Utah has agreed to be the trustee under the indenture. The indenture contains certain limitations on the rights of the trustee, should it become one of our creditors, to obtain payment of claims in certain cases, or to realize on certain property received in respect of any claim as security or otherwise. The trustee will be permitted to engage in other transactions with us.

Subject to certain exceptions, the holders of a majority in principal amount of the then-outstanding L Bonds will have the right to direct the time, method and place of conducting any proceeding for exercising any remedy available to the trustee. The indenture provides that if an event of default specified in the indenture shall occur and not be cured, the trustee will be required, in the exercise of its power, to use the degree of care of a reasonable person in the conduct of his own affairs. Subject to such provisions, the trustee will be under no obligation to exercise any of its rights or powers under the indenture at the request of any holder of L Bonds, unless the holder shall have offered to the trustee security and indemnity satisfactory to it against any loss, liability or expense.

*Resignation or Removal of the Trustee*

The trustee may resign at any time, or may be removed by the holders of a majority of the aggregate principal amount of the outstanding L Bonds. In addition, we may remove the trustee for certain failures in its duties, including the insolvency of the trustee or the trustee's ineligibility to serve as trustee under the Trust Indenture Act of 1939. However, no resignation or removal of the trustee may become effective until a successor trustee has accepted the appointment as provided in the indenture.

28

App. 0899

*Reports to Trustee*

We will provide the trustee with (i) a calculation date report within 45 days after the end of each fiscal quarter containing a calculation of the debt coverage ratio that includes a summary of all cash, life insurance policy investments serving as collateral, as well as our total outstanding indebtedness including outstanding principal balances, interest credited and paid, transfers made, any redemption or repayment and interest rate paid; (ii) copies of our audited annual financials, no earlier than when the same become a matter of public record; and (iii) any additional information reasonably requested by the trustee.

**Certain Charges**

We and our servicing agents, if any, may assess service charges for changing the registration of any L Bond to reflect a change in name of the holder, multiple changes in interest payment dates or transfers (whether by operation of law or otherwise) of an L Bond by the holder to another person. The indenture permits us to set off, against amounts otherwise payable to you under the L Bonds, the amount of these charges.

**Variations in Terms and Conditions**

We may from time to time vary the terms and conditions of the L Bonds offered, including but not limited to minimum initial principal investment amount requirements, maximum aggregate principal amount limits, interest rates, minimum denominations, service and other fees and charges, and redemption provisions. Terms and conditions may be varied by state, locality, principal amount, type of investor (for example, new or current investor) or as otherwise permitted under the indenture governing the securities offered by this prospectus. No change in terms, however, will apply to any L Bonds already issued and outstanding at the time of such change.

**Satisfaction and Discharge of Indenture**

The indenture shall cease to be of further effect upon the payment in full of all of the outstanding L Bonds and the delivery of an officer's certificate to the trustee stating that we do not intend to issue additional L Bonds under the indenture or, with certain limitations, upon deposit with the trustee of funds sufficient for the payment in full of all of the outstanding L Bonds.

**Reports**

We will publish annual reports containing financial statements and quarterly reports containing financial information for the first three quarters of each fiscal year. We will send copies of these reports, at no charge, to any holder of L Bonds who sends us a written request.

29

**PLAN OF DISTRIBUTION**

**General**

We are offering up to 2,000,000 Units, representing $2,000,000,000 in aggregate principal amount, of L Bonds (referred to throughout this prospectus simply as "L Bonds") on a continuous basis. The L Bonds will be sold at $1,000 per Unit, and in minimum amounts of 25 Units, or $25,000 or more in principal. There is no minimum amount of L Bonds that must be sold before we access and use the proceeds. The proceeds of new sales of L Bonds will be paid directly to us promptly following each sale and will not be placed in an escrow account. Even if we sell less than the entire $2,000,000,000 in aggregate principal amount of L Bonds Units being offered, the L Bonds that we sell will be issued, and the proceeds of those L Bond sales will be used by us, as described in this prospectus.

The L Bonds will be offered and sold on a best efforts basis by Emerson Equity LLC (our "dealer manager"). Our dealer manager will enter into participating dealer agreements with certain other broker-dealers that are members of FINRA, referred to as "selling group members," to authorize those broker-dealers to sell our L Bonds. The L Bonds will be offered to the public on the terms set forth in this prospectus and any prospectus supplements we may file from time to time. Neither our dealer manager nor any selling group members will have any obligation to take or purchase any L Bonds. In addition to forming the selling group, our dealer manager provides services to us, which include conducting broker-dealer seminars, holding informational meetings and providing information and answering any questions investors or selling group members may have concerning this offering.

Members of the selling group will receive sales commissions of up to 5.00% of the gross offering proceeds depending upon the maturity of the L Bonds sold. In addition, our dealer manager and selling group members may receive up to 3.00% of the gross offering proceeds as additional compensation consisting of the following:

- a dealer-manager fee payable to the dealer manager in an amount equal to 0.40% of the principal amount of all L Bonds sold;

- an accountable expense allowance to be paid to the selling group members, which may include due diligence expenses of the dealer manager and selling group members set forth in a detailed and itemized invoice and as further described below;

- wholesaling fees, which may consist of commissions and non-transaction-based compensation of the wholesalers;

- non-cash compensation, which may consist of an occasional meal, a ticket to a sporting event or the theater, or comparable entertainment that is neither so frequent nor so extensive as to raise any question of propriety and is not preconditioned on achievement of a sales target, the national and regional sales conferences of our selling group members, training and education meetings for registered representatives of our selling group members, and permissible forms of non-cash compensation to registered representatives of our selling group members, such as gifts that do not exceed an aggregate value of $100 per annum per registered representative and that are not pre-conditioned on achievement of a sales target, including but not limited to seasonal gifts; and

- up to a 1.00% reallowance to selling group members.

As part of the accountable expense allowance, the dealer manager and selling group members are expected to be reimbursed for accountable out-of-pocket expenses incurred by them during the course of the offering. Expenses eligible for reimbursement may include:

- travel, lodging, and meals for the wholesalers who are our employees and associated with the dealer manager;

- reasonable out-of-pocket expenses incurred by selling group members and their associated persons, including reimbursement of actual costs of third-party professionals retained by them; and

- due diligence expenses of the dealer manager and selling group members set forth in a detailed and itemized invoice.

Upon the sale of L Bonds by a selling group member, the selling group member effecting the sale will receive selling commissions and additional compensation in connection therewith pursuant to the terms of the soliciting dealer agreement between the dealer manager and the selling group member.

In no event will the total selling commissions and additional compensation, including accountable due diligence expenses and reimbursements, exceed 8.00% of the aggregate gross offering proceeds we receive from the sale of L Bonds.

We may also sell our L Bonds at a discount through the following distribution channels in the event that the investor:

- purchases L Bonds through fee-based programs, also known as wrap accounts;

- purchases L Bonds through a selling group member that has an alternative fee arrangement with its clients;

- purchases L Bonds through certain registered investment advisers;

- purchases L Bonds through bank trust departments or any other organization or person authorized to act in a fiduciary capacity for its clients or customers; or

- is an endowment, foundation, pension fund or other institutional investor.

If an investor purchases shares through one of the above distribution channels in our offering, we will sell the L Bonds at a discount, reflecting that selling commissions are not being paid in connection with such purchase. The public offering price will be decreased by an amount equal to such reduction; however, the net proceeds to us will not be affected by any such reduction in selling commissions.

Our officers and directors and their family members may purchase the L Bonds offered hereby for investment and not for distribution at a discount from the public offering price. For purposes of this discount, we consider a family member to be a spouse, parent, child, sibling, mother- or father-in-law, son- or daughter-in-law or brother- or sister-in-law. In addition, if approved by our Board of Directors, certain of our joint venture partners, consultants and other service providers may purchase the L Bonds offered hereby at a discount from the public offering price. We will sell such L Bonds reflecting that selling commissions will not be paid in connection with such sales. The public offering price will be decreased by an amount equal to such reduction; however, the net proceeds to us from such sales made net of commissions will be the same as the net proceeds we receive from other sales of L Bonds.

Also, we may sell L Bonds to the dealer manager, selling group members, their retirement plans, their representatives and the family members as described above, IRAs and qualified plans of their representatives at a purchase price reflecting that selling commissions will not be payable in consideration of the services rendered by such dealer manager, selling group members, and their representatives in the offering. Such sales, however, may not be made for the period of time from the effective date through 90 days after the effective date. The public offering price will be decreased by an amount equal to such reduction; however, the net proceeds to us from the sales of these L Bonds will be the same as the net proceeds we receive from other sales of L Bonds.

Neither our dealer manager nor its affiliates will directly or indirectly compensate any person engaged as an investment advisor or a bank trust department by a potential investor as an inducement for such investment advisor or bank trust department to advise favorably for an investment in the L Bonds offered hereby. Also, we will not pay referral or similar fees to any accountants, attorneys or other persons in connection with the distribution of the L Bonds.

In addition to the sales commissions, fees, allowances, reimbursements and expenses described above, we expect to pay approximately $2,400,000 in offering and related costs and expenses in connection with this offering. These kinds of expenses include all expenses to be paid by us in connection with the offering (other than sales commissions, additional compensation, and expense allowances and reimbursement to our selling group members), including but not limited to legal, accounting, printing and mailing expenses, registration, qualification and associated securities filing fees and other costs and expenses.

The table below sets forth the maximum amount of sales commissions and additional compensation, as described in footnote (1) to the table below, we may pay in connection with this offering.

| L Bond Term | Sales Commission | Additional Compensation[1] | Total[2] |
|---|---|---|---|
| 2 years | 3.25% | 4.75% | 8.00% |
| 3 years | 4.25% | 3.75% | 8.00% |
| 5 years | 4.90% | 3.10% | 8.00% |
| 7 years | 5.00% | 3.00% | 8.00% |

(1)  As described above, additional compensation includes: (i) a dealer-manager fee payable to the dealer manager in an amount equal to 0.40% of the principal amount of all L Bonds sold; (ii) an accountable expense allowance to the selling group members as described above, which may include due-diligence expenses of the dealer manager and selling group members set forth in a detailed and itemized invoice; (iii) wholesaling fees, which may consist of commissions and non-transaction-based compensation of the wholesalers; (iv) non-cash compensation, which may consist of an occasional meal, a ticket to a sporting event or the theater, or comparable entertainment that is neither so frequent nor so extensive as to raise any question of propriety and is not preconditioned on achievement of a sales target, the national and regional sales conferences of our selling group members, training and education meetings for registered representatives of our selling group members, and permissible forms of non-cash compensation to registered representatives of our selling group members, such as gifts that do not exceed an aggregate value of $100 per annum per registered representative and that are not pre-conditioned on achievement of a sales target, including but not limited to seasonal gifts; and (v) up to a 1.00% reallowance to selling group members.

(2)  The combined selling commissions and additional compensation for this offering will not exceed 8.00% of the aggregate gross proceeds of this offering.

The line items reflected in the table below are our current estimates of average sales commissions and additional compensation (including accountable expenses) that we will pay. Specifically, we estimate that the average sales commission will be 5.00%, or $100,000,000 based on $2,000,000,000 in principal amount of L Bonds sold, and the average additional compensation will be 3.00%, or $60,000,000 based on $2,000,000,000 in principal amount of L Bonds sold. The components of "additional compensation" are detailed in footnote (1) to the table above. Actual costs may differ from the percentages and amounts shown in the table below, subject, however, to the limitations noted above.

| L Bonds Sold | Sales Commission | Additional Compensation | Total |
|---|---|---|---|
| $  500,000,000 | $  25,000,000 | $  15,000,000 | 8.00% |
| $  750,000,000 | $  37,500,000 | $  22,500,000 | 8.00% |
| $2,000,000,000 | $100,000,000 | $  60,000,000 | 8.00% |

The wholesalers employed by us are registered with and associated persons of our dealer manager. The wholesalers will:

- attend local, regional and national conferences of the selling group members; and

- contact selling group members and their registered representatives to make presentations concerning us and this offering.

The wholesalers will receive a portion of their non-transaction based compensation as compensation for their selling efforts. We host training and education meetings for selling group members and their representatives. The costs of the training and education meetings will be borne by us, but counted toward the 8.00% underwriting compensation limit.

Certain of our employees who are also registered representatives and supervisory principals of the dealer manager have been granted certain share appreciation rights ("SARs") as part of their compensation. The SARs give such individual the contractual right to receive from us additional cash compensation at any point before the SAR's expiration, but only if the price of our common stock has increased between the grant date and the date when we receive notice of such individual's intention to exercise the SAR. At the termination of this offering, the aggregate of the appreciation amount, as defined in the SAR agreement, will be calculated and added to the other items of value (e.g., selling commissions and additional forms of compensation) to ensure that aggregate compensation paid in connection with this offering does not exceed 8.00% of the gross offering proceeds.

In accordance with FINRA rules, in no event will our total compensation to FINRA members, including but not limited to sales commissions, the dealer-manager fee and accountable expense and other reimbursements to our dealer manager and selling group members, including non-transaction-based compensation of the wholesalers and non-cash compensation, exceed 8.00% of our gross offering proceeds, in the aggregate.

We will indemnify the selling group members and our dealer manager against some civil liabilities, including certain liabilities under the Securities Act of 1933, as amended, and liabilities arising from breaches of our representations and warranties contained in the Dealer Manager Agreement.

32

The foregoing is a summary of the material terms relating to the plan of distribution of the L Bonds contained in the Dealer Manager Agreement. Any amendment to the Dealer Manager Agreement will be filed as an exhibit to an amendment to the registration statement of which this prospectus is a part.

**Settlement Procedures**

You can place an order for the purchase of L Bonds using DTC Settlement through your selling group member. A selling group member using DTC settlement will have an account with a DTC participant in which your funds will be placed to facilitate settlement. Orders may be placed until the cyclical order due date. Orders will be executed by such selling group member electronically and you must coordinate with your selling group member's registered representative to pay the full purchase price of the L Bonds by the trade date. If you purchase your L Bonds using DTC settlement, you will be credited with ownership of an L Bond on the second business day after the end of the DTC closing cycle in which the subscription is made (typically, closings will occur on a bi-monthly cycle). If you purchase your L Bonds in this manner, your purchase price will not be held in escrow.

You also have the option to elect to settle your purchase directly with us, the Company. If you elect to use direct settlement with us, you should complete and sign a Subscription Agreement similar to the one filed as an exhibit to the registration statement of which this prospectus is a part. A form of Subscription Agreement is available from your selling group member's registered representative. Once completed and signed, your Subscription Agreement should be provided to your selling group member who will deliver it to us to be held, together with your related subscription funds, until our acceptance of your subscription. In connection with a direct settlement subscription, you should pay the full purchase price of the L Bonds to us as set forth in the Subscription Agreement. Subscribers may not withdraw funds from the subscription account. Subscriptions will be effective upon our acceptance of your Subscription Agreement and related funds, and we reserve the right to reject any subscription in whole or in part.

**Covered Security**

Our L Bonds are a "covered security." The term "covered security" applies to securities exempt from state registration because of their oversight by federal authorities and national-level regulatory bodies pursuant to Section 18 of the Securities Act of 1933. Generally, securities listed on national exchanges are the most common type of covered security exempt from state registration. A non-traded security also can be a covered security if it has a seniority greater than or equal to other securities from the same issuer that are listed on a national exchange. Our L Bonds are a covered security because they are senior to our common stock, which is listed on The Nasdaq Capital Market, and therefore our offering of L Bonds will be exempt from state registration.

**Although the status of our L Bonds as a "covered security" will facilitate their purchase and sale to a broader range of investors than would otherwise be available to us, and although the offer and sale of a "covered security" generally involves fewer issuance costs to the issuer of such securities, our L Bonds are not a suitable purchase for all investors. Investors are urged to read carefully the risk factors relating to our business and our Company contained in the Risk Factors section of this prospectus beginning on page 11 and under Item 1A, entitled "Risk Factors," of our Annual Report on Form 10-K for the year ended December 31, 2019, which is incorporated by reference herein. In addition, investors should understand that because our L Bonds are a "covered security" exempt from state securities regulations, neither our Company, the L Bonds, or any other aspects of this offering have been the subject of any merit-based review by state securities regulators.**

## MATERIAL FEDERAL INCOME TAX CONSIDERATIONS

The following is a general discussion of the material United States ("U.S.") federal income tax considerations relating to the initial purchase, ownership and disposition of the L Bonds by U.S. and non-U.S. holders. This discussion is a summary only and is not a complete analysis of all the potential tax considerations relating to the purchase, ownership and disposition of the L Bonds. We have based this summary on current provisions of the Code of 1986, as amended (the "Code"), applicable U.S. Treasury Regulations promulgated thereunder, judicial opinions, and published rulings of the Internal Revenue Service (the "IRS"), all as in effect on the date of this prospectus. However, these laws and other guidance are subject to differing interpretations or change, possibly with retroactive effect. In addition, we have not sought, and will not seek, a ruling from the IRS or an opinion of counsel with respect to any tax consequences of purchasing, owning or disposing of L Bonds. Thus, the IRS could take a different position regarding one or more of the tax consequences or matters described in this prospectus; and there can be no assurance that any position taken by the IRS would not be sustained.

This discussion is limited to purchasers of L Bonds who acquire the L Bonds from us in this offering and hold the L Bonds as capital assets for federal income tax purposes. This discussion does not address all possible tax consequences that may be applicable to you in light of your specific circumstances. For instance, this discussion does not address the alternative minimum tax provisions of the Code, or special rules applicable to some categories of investors such as financial institutions, insurance companies, tax-exempt organizations, dealers in securities, real estate investment trusts, regulated investment companies, or persons who hold L Bonds as part of a hedge, conversion or constructive sale transaction, straddle or other risk reduction transaction that may be subject to special rules. This discussion also does not address the tax consequences arising under the laws of any foreign, state or local jurisdiction; or any U.S. estate or gift tax laws.

If you are considering the purchase of an L Bond, you should consult your own tax advisors as to the particular tax consequences to you of acquiring, holding or otherwise disposing of the L Bonds, including the effect and applicability of state, local or foreign tax laws, or any U.S. estate and gift tax laws.

As used in this discussion, the term "U.S. holder" means a holder of an L Bond that is:

(i) for United States federal income tax purposes, a citizen or resident of the United States;

(ii) a corporation, partnership or other entity created or organized in or under the laws of the United States or of any political subdivision thereof or other entity characterized as a corporation or partnership for federal income tax purposes;

(iii) an estate, the income of which is subject to United States federal income taxation regardless of its source; or

(iv) a trust, the administration of which is subject to the primary supervision of a court within the United States and which has one or more United States persons with authority to control all substantial decisions, or if the trust was in existence on August 20, 1996, and has elected to continue to be treated as a United States trust.

For the purposes of this discussion, a "non-U.S. holder" means any holder of L Bonds other than a U.S. holder. Any L Bond purchaser who is not a U.S. citizen will be required to furnish documentation, on IRS Form W-8BEN, that clearly states whether it is subject to U.S. withholding taxes, in accordance with applicable requirements of the United States taxing authority.

### Characterization of the L Bonds

The federal income tax consequences of owning L Bonds depend on characterization of the L Bonds as debt for federal income tax purposes, rather than as equity interests or a partnership among the holders of the L Bonds. We believe that the L Bonds have been structured in a manner that will allow the L Bonds to be characterized as debt for federal income tax purposes. However, this is only our belief; and no ruling from the IRS or an opinion of counsel has been sought in this regard. Thus, the IRS could successfully challenge this characterization.

If the L Bonds were treated as equity interests, there could be adverse effects on some holders. For example, payments on the L Bonds could (1) if paid to non-U.S. holders, be subject to federal income tax withholding; (2) constitute unrelated business taxable income to some tax-exempt entities, including pension funds and some retirement accounts (if the relationship were characterized as a partnership for tax purposes); and (3) cause the timing and amount of income that accrues to holders of L Bonds to be different from that described below.

App. 0906

Because of these potential adverse effects, you are urged to consult your own tax advisors as to the tax consequences that may apply to your particular situation in the event the L Bonds are re-characterized as equity interests; and as to the likelihood that the L Bonds could be so re-characterized. The remainder of this discussion assumes that the L Bonds are characterized as debt.

**Taxation of U.S. Holders**

*Stated Interest*

Under general federal income tax principles, you must include stated interest in income in accordance with the method of accounting you use for federal income tax purposes. Accordingly, if you are using the accrual method of tax accounting, you must include stated interest in income as it accrues. If you are using the cash method of tax accounting, you must include stated interest in income as it is actually or constructively received. Payments of interest to taxable holders of L Bonds will constitute portfolio income, and not passive activity income, for the purposes of the passive loss limitations of the Code. Accordingly, income arising from payments on the L Bonds will not be subject to reduction by losses from passive activities of a holder.

If a partnership (or other entity or arrangement treated as a partnership for U.S. federal income tax purposes) holds L Bonds, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership. If you are a partner in a partnership purchasing L Bonds, we urge you to consult your tax advisor.

*Disposition of L Bonds*

In general, a U.S. holder will recognize gain or loss upon the sale, exchange or other taxable disposition of an L Bond measured by the difference between (1) the sum of the cash and the fair market value of all other property received on such disposition, excluding any portion of the payment that is attributable to accrued interest on the L Bonds; and (2) your adjusted tax basis in the L Bond. A U.S. holder's adjusted tax basis in an L Bond generally will be equal to the price the U.S. holder paid for the L Bond. Any of this gain or loss generally will be long-term capital gain or loss if, at the time of any such taxable disposition, the L Bond was a capital asset in the hands of the holder and was held for more than one year. Net long-term capital gain recognized by individual U.S. holders is eligible for a reduced rate of taxation. The deductibility of capital losses is subject to annual limitations.

The terms of the L Bonds may be modified upon the consent of a specified percentage of holders and, in some cases, without consent of the holders. In addition, the L Bonds may be assumed upon the occurrence of specific transactions. The modification or assumption of an L Bond could, in some instances, give rise to a deemed exchange of an L Bond for a new debt instrument for federal income tax purposes. If an exchange is deemed to occur by reason of a modification or assumption, you could realize gain or loss without receiving any cash.

*Additional Tax on Net Investment Income*

If you are a U.S. holder other than a corporation, you generally will be subject to a 3.8% additional tax on the lesser of (1) your "net investment income" for the taxable year, and (2) the excess of your modified adjusted gross income for the taxable year over a certain threshold. Your net investment income generally will include any income or gain recognized by you with respect to our L Bonds, unless such income or gain is derived in the ordinary course of the conduct of your trade or business (other than a trade or business that consists of certain passive or trading activities).

**Considerations for Tax-Exempt Holders of L Bonds**

Tax-exempt entities, including charitable corporations, pension plans, profit sharing or stock bonus plans, individual retirement accounts and some other employee benefit plans are subject to federal income tax on unrelated business taxable income. For example, net income derived from the conduct of a trade or business regularly carried on by a tax-exempt entity or by a partnership in which it is a partner is treated as unrelated business taxable income.

A $1,000 special deduction is allowed in determining the amount of unrelated business taxable income subject to tax. Tax-exempt entities taxed on their unrelated business taxable income are also subject to the alternative minimum tax for items of tax preference which enter into the computation of unrelated business taxable income.

In general, interest income does not constitute unrelated business taxable income. However, under the debt-financed property rules, if tax-exempt holders of L Bonds finance the acquisition or holding of L Bonds with debt, interest on the L Bonds will be taxable as unrelated business taxable income. The L Bonds will be treated as debt-financed property if the debt was incurred to acquire the L Bonds or was incurred after the acquisition of the L Bonds, so long as the debt would not have been incurred but for the acquisition and, at the time of the acquisition, the incurrence of the debt has already occurred or was foreseeable.

**Non-U.S. Holders**

The following discussion is a summary of the principal U.S. federal income consequences resulting from the ownership of the L Bonds by non-U.S. holders. However, application of the U.S. federal income tax rules associated with non-U.S. holders is complex and factually sensitive. Thus, if you could be considered to be a non-U.S. holder, you are urged to consult your own tax advisors with respect to the application of the federal income tax rules for your particular situation.

*Payments of Interest to Non-U.S. Holders*

Subject to the discussion below under "Backup Withholding and Information Reporting," payments of interest received by a non-U.S. holder generally will not be subject to U.S. federal withholding tax, provided (1) that (a) the non-U.S. holder does not own, actually or constructively, 10% or more of the total combined voting power of all classes of our stock entitled to vote; (b) the non-U.S. holder is not a controlled foreign corporation, actually or constructively, through stock ownership; and (c) the beneficial owner of the L Bond complies with the certification requirements, including delivery of a statement, signed by the holder under penalties of perjury, certifying that the holder is a foreign person and provides its name and address; or (2) that the non-U.S. holder is entitled to the benefits of an income tax treaty under which the interest is exempt from U.S. withholding tax and the non-U.S. holder complies with the reporting requirements. If an L Bond is held through a securities clearing organization or other specified financial institutions (an "Intermediary"), the Intermediary may provide the relevant signed statement and, unless the Intermediary is a "qualified" intermediary as defined under the Code, the signed statement provided by the Intermediary must be accompanied by a copy of a valid Form W-8BEN provided by the non-U.S. beneficial holder of the L Bond.

Payments of interest not exempt from United States federal withholding tax as described above will be subject to a withholding tax at the rate of 30%, subject to reduction under an applicable income tax treaty.

Payments of interest on an L Bond to a non-U.S. holder generally will not be subject to U.S. federal income tax, as opposed to withholding tax, unless the income is effectively connected with the conduct by the non-U.S. holder of a trade or business in the United States. To claim the benefit of a lower treaty withholding rate, a non-U.S. holder must provide a properly executed IRS Form W-8BEN to us or our paying agent before the payment of stated interest; and may be required to obtain a U.S. taxpayer identification number and provide documentary evidence issued by foreign governmental authorities to prove residence in the foreign country. You should consult your own tax advisor to determine the effects of the application of the U.S. federal withholding tax to your particular situation.

*Disposition of the L Bonds by Non-U.S. Holders*

Subject to the discussion below under "Backup Withholding and Information Reporting," a non-U.S. holder generally will not be subject to United States federal income tax, and generally no tax will be withheld with respect to gains realized on the disposition of an L Bond, unless (a) the gain is effectively connected with a United States trade or business conducted by the non-U.S. holder or (b) the non-U.S. holder is an individual who is present in the United States for 183 or more days during the taxable year of the disposition and other requirements are satisfied.

*Non-U.S. Holders Subject to U.S. Income Taxation*

If interest and other payments received by a non-U.S. holder with respect to the L Bonds, including proceeds from the disposition of the L Bonds, are effectively connected with the conduct by the non-U.S. holder of a trade or business within the United States, or the non-U.S. holder is otherwise subject to United States federal income taxation on a net basis with respect to the holder's ownership of the L Bonds, or are individuals that have by operation of law become residents in the United States for federal income tax purposes, the non-U.S. holder generally will be subject to the rules described above applicable to U.S. holders of L Bonds, subject to any modification provided under an applicable income tax treaty. If any of these non-U.S. holders is a corporation, it may also be subject to a U.S. "branch profits tax" at a 30% rate.

36

**Backup Withholding and Information Reporting**

Non-corporate U.S. holders may be subject to backup withholding at a rate of 28% on payments of principal, premium, and interest on, and the proceeds of the disposition of, the L Bonds. In general, backup withholding will be imposed only if the U.S. holder (1) fails to furnish its taxpayer identification number ("TIN"), which for an individual would be his or her Social Security number; (2) furnishes an incorrect TIN; (3) is notified by the IRS that it has failed to report payments of interest or dividends; or (4) under some circumstances, fails to certify under penalty of perjury that it has furnished a correct TIN and has been notified by the IRS that it is subject to backup withholding tax for failure to report interest or dividend payments. In addition, the payments of principal and interest to U.S. holders generally will be subject to information reporting. You should consult your tax advisors regarding your qualification for exemption from backup withholding and the procedure for obtaining an exemption, if applicable.

Backup withholding generally will not apply to payments made to a non-U.S. holder of an L Bond who provides the certification that it is a non-U.S. holder, and the payor does not have actual knowledge that a certificate is false, or otherwise establishes an exemption from backup withholding. Payments by United States office of a broker of the proceeds of a disposition of the L Bonds generally will be subject to backup withholding at a rate of 28% unless the non-U.S. holder certifies it is a non-U.S. holder under penalties of perjury or otherwise establishes an exemption. In addition, if a foreign office of a foreign custodian, foreign nominee or other foreign agent of the beneficial owner, or if a foreign office of a foreign "broker" pays the proceeds of the sale of an L Bond to the seller, backup withholding and information reporting will not apply; provided that the nominee, custodian, agent or broker is not a "United States related person," or a person which derives more than 50% of its gross income for some periods from the conduct of a trade or business in the United States or is a controlled foreign corporation. The payment by a foreign office of a broker that is a United States person or a United States related person of the proceeds of the sale of L Bonds will not be subject to backup withholding, but will be subject to information reporting unless the broker has documentary evidence in its records that the beneficial owner is not a United States person for purposes of the backup withholding and information reporting requirements and other conditions are met, or the beneficial owner otherwise establishes an exemption.

The amount of any backup withholding imposed on a payment to a holder of an L Bond will be allowed as a credit against the holder's United States federal income tax liability and may entitle the holder to a refund; provided that the required information is furnished to the IRS.

<div align="center">

**STATE, LOCAL AND FOREIGN TAXES**

</div>

We make no representations regarding the tax consequences of the purchase, ownership or disposition of the L Bonds under the tax laws of any state, locality or foreign country. You should consult your own tax advisors regarding these state and foreign tax consequences.

<div align="center">37</div>

**ERISA CONSIDERATIONS**

**General**

Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and Section 4975 of the Code impose restrictions on employee benefit plans that are subject to ERISA, or plans or arrangements that are subject to Code Section 4975, and on persons who are parties in interest or disqualified persons with respect to those plans or arrangements. Some employee benefit plans, like governmental plans and church plans (if no election has been made under Section 410(d) of the Code), are not subject to the restrictions of Title I of ERISA or Code Section 4975, and assets of these plans may be invested in the L Bonds without regard to the ERISA considerations described below, subject to the Code and other applicable federal and state laws affecting tax-exempt organizations generally. Any plan fiduciary that proposes to cause a plan to acquire any of the L Bonds should consult with its counsel with respect to the potential consequences under ERISA and the Code of the plan's acquisition and ownership of the L Bonds. Investments by plans are also subject to ERISA's and the Code's general fiduciary requirements, including the requirement of investment prudence and diversification and the requirement that a plan's investments be made in accordance with the documents governing the plan.

**Prohibited Transactions**

*General*

Section 406 of ERISA and Section 4975 of the Code prohibits certain "parties in interest" and "disqualified persons" with respect to a plan from engaging in select transactions involving a plan and its assets unless a statutory, regulatory or administrative exemption applies to the transaction. Section 4975 of the Code imposes excise taxes on parties in interest that engage in non-exempt "prohibited transactions." Section 502(i) of ERISA requires the Secretary of the U.S. Department of Labor ("Labor") to assess a civil penalty against a fiduciary who breaches any fiduciary responsibility under, or commits any other violation of, part 4 of Title I of ERISA, or any other person who knowingly participates in a breach or violation.

*Plan Asset Regulations*

Labor has issued regulations concerning the definition of what constitutes the assets of a plan for purposes of ERISA and the prohibited transaction provisions of the Code. The plan asset regulations describe the circumstances where the assets of an entity in which a plan invests will be considered to be "plan assets," so that any person who exercises control over the assets would be subject to ERISA's fiduciary standards. Generally, under the plan asset regulation, when a plan invests in another entity, the plan's assets do not include, solely by reason of the investment, any of the underlying assets of the entity. However, the plan asset regulation provides that, if a plan acquires an "equity interest" in an entity that is neither a "publicly-offered security" nor a security issued by an investment company registered under the Investment Company Act of 1940 the assets of the entity will be treated as assets of the plan investor unless exceptions apply.

Under the plan asset regulations the term "equity interest" is defined as any interest in an entity other than an instrument that is treated as indebtedness under "applicable local law" and that has no "substantial equity features." Although the plan asset regulation is silent with respect to the question of which law constitutes "applicable local law" for this purpose, Labor has stated that these determinations should be made under the state law governing interpretation of the instrument in question. In the preamble to the plan asset regulation, Labor declined to provide a precise definition of what features are equity features or the circumstances under which the features would be considered "substantial," noting that the question of whether a plan's interest has substantial equity features is an inherently factual one, but that in making that determination it would be appropriate to take into account whether the equity features are such that a plan's investment would be a practical vehicle for the indirect provision of investment management services. We believe that the L Bonds will be classified as indebtedness without substantial equity features for ERISA purposes.

Under the plan asset regulations the term "publicly-offered security" is defined as a security that is (i) freely transferable, (ii) part of a class of securities that is widely held, and (iii) either (A) part of a class of securities registered under section 12(b) or 12(g) of the Securities Exchange Act of 1934 or (B) sold to the plan as part of an offering of securities to the public pursuant to an effective registration statement under the Securities Act of 1933 and the class of securities of which such security is a part is registered under the Securities Exchange Act of 1934 within 120 days after the end of the fiscal year of the issuer during which the offering of such securities to the public occurred. For purposes of the above, a class of securities is considered to be "widely held" if it is owned by 100 or more investors independent of the issuer and of one another. In the case of this offering, while the offer and sale of the L Bonds have been registered under the Securities Act of 1933, the L Bonds themselves have not been registered under the Securities Exchange Act of 1934. For this reason, we believe that the L Bonds will not likely meet the definition for "publicly-offered security" under the plan asset regulations.

App. 0911

38

In light of the foregoing, if the L Bonds were deemed to be equity interests for this purpose and no statutory, regulatory, or administrative exception applies, we could be considered to hold plan assets by reason of a plan's investment in the L Bonds. These plan assets would include an undivided interest in all of our assets. In this case, we may be considered a fiduciary with respect to the investing plans. We would be subject to the fiduciary responsibility provisions of Title I of ERISA, including the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code, and to Section 4975 of the Code with respect to transactions involving any of our assets. The ERISA fiduciary standards could affect the way we conduct the business, which would have consequences for all investors, not just those that are employee benefit plans.

Depending on the relevant facts and circumstances, prohibited transaction exemptions may apply to the purchase or holding of the L Bonds. See, for example, Prohibited Transaction Class Exemption ("PTE") 96-23, which exempts some transactions effected on behalf of a plan or by an "in-house asset manager;" PTE 95-60, which exempts some transactions between insurance company general accounts and parties in interest; PTE 91-38, which exempts some transactions between bank collective investment funds and parties in interest; PTE 90-1, which exempts some transactions between insurance company pooled separate accounts and parties in interest; or PTE 84-14, which exempts some transactions effected on behalf of a plan by a "qualified professional asset manager." However, there can be no assurance that any of these exemptions will apply with respect to any plan's investment in the L Bonds, or that the exemption, if it did apply, would apply to all prohibited transactions that may occur in connection with the investment.

Any plan fiduciary considering whether to purchase L Bonds on behalf of a plan should consult with its counsel regarding the applicability of the fiduciary responsibility and prohibited transaction provisions of ERISA and the Code. Before purchasing any L Bonds, a fiduciary of a plan should make its own determination as to (1) whether GWG Holdings, as issuer of and borrower under the L Bonds, is a "party in interest" under ERISA or a "disqualified person" under the Code with respect to the plan; (2) the availability of the relief provided in the plan asset regulation and (3) the availability of any other prohibited transaction exemptions. In addition, purchasers that are insurance companies should consult their own ERISA counsel with respect to their fiduciary responsibilities associated with their purchase and ownership of the L Bonds, including any responsibility under the Supreme Court case *John Hancock Mutual Life Insurance Co. v. Harris Trust and Savings Bank*.

<div align="center">39</div>

## LEGAL MATTERS

Certain legal matters in connection with the L Bonds will be passed upon for us by Mayer Brown LLP, Chicago, Illinois.

## EXPERTS

The consolidated financial statements of GWG Holdings, Inc. and its subsidiaries for the year ended December 31, 2019 incorporated by reference in this prospectus from GWG Holdings, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2019 and the effectiveness of GWG Holdings, Inc.'s internal control over financial reporting as of December 31, 2019, have been audited by Whitley Penn LLP, independent registered public accounting firm, as set forth in their reports thereon, which are incorporated herein by reference. Such financial statements have been so incorporated in reliance upon the report of Whitley Penn LLP pertaining to such financial statements and the effectiveness of our internal control over financial reporting on the authority of such firm as experts in accounting and auditing.

The consolidated financial statements of GWG Holdings, Inc. and its subsidiaries for the year ended December 31, 2018 incorporated by reference in this prospectus from GWG Holdings, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2019 have been audited by Baker Tilly Virchow Krause, LLP, independent registered public accounting firm, as set forth in their report thereon. Such financial statements have been so incorporated in reliance upon the report of Baker Tilly Virchow Krause, LLP on the authority of such firm as experts in accounting and auditing.

The consolidated financial statements of The Beneficient Company Group, L.P. and its subsidiaries for the year ended December 31, 2019 incorporated by reference in this prospectus from GWG Holdings, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2019 have been audited by Whitley Penn LLP, independent registered public accounting firm, as set forth in their report thereon, which is incorporated herein by reference. Such financial statements have been so incorporated in reliance upon the report of Whitley Penn LLP pertaining to such financial statements on the authority of such firm as experts in accounting and auditing.

## WHERE YOU CAN FIND MORE INFORMATION

We have filed with the SEC a registration statement on Form S-1 under the Securities Act with respect to the L Bonds to be offered and sold pursuant to this prospectus which is a part of that registration statement. This prospectus does not contain all the information contained in the registration statement. For further information with respect to us and the L Bonds to be sold in this offering, we refer you to the registration statement, including the agreements, other documents and schedules filed as exhibits to the registration statement.

We file annual, quarterly and current reports, and other information with the SEC. We intend to make these filings available on our website at *www.gwgh.com*. Information on our website is not incorporated by reference in this prospectus. We maintain an office at 325 N. Saint Paul Street, Suite 2650, Dallas, TX 75201 where all records concerning the L Bonds are to be retained. L Bond holders and their representatives can request information regarding the L Bonds by contacting our office by mail at our address or by telephone at (612) 746-1944 or by fax at (612) 746-0445. Upon request, we will provide copies of our filings with the SEC free of charge to our investors. Our SEC filings, including the registration statement of which this prospectus is a part, will also be available on the SEC's Internet site at *http://www.sec.gov*.

## INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE

We are incorporating certain information about us that we have filed with the SEC by reference in this prospectus, which means that we are disclosing important information to you by referring you to those documents. The information we incorporate by reference is an important part of this prospectus.

We incorporate by reference the documents listed below:

- Our Annual Report on Form 10-K for the year ended December 31, 2019, filed with the SEC on March 27, 2020;

- Our Quarterly Report on Form 10-Q for the quarter ended March 31, 2020, filed with the SEC on May 15, 2020; and

- Our Current Reports on Form 8-K filed with the SEC on January 7, 2020, February 27, 2020, March 6, 2020, March 18, 2020 and March 20, 2020.

App. 0914

All documents filed by us pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, as amended, after the date of this prospectus and before the termination of the offering also are incorporated herein by reference. We are not, however, incorporating by reference any documents or portions thereof that are not deemed "filed" with the SEC or any information furnished pursuant to Items 2.02 or 7.01 of Form 8-K or certain exhibits furnished pursuant to Item 9.01 of Form 8-K.

The section entitled "Where You Can Find More Information" above describes how you can obtain or access any documents or information that we have incorporated by reference herein. The information relating to us contained in this prospectus does not purport to be comprehensive and should be read together with the information contained in the documents incorporated by reference in this prospectus.

Upon written or oral request, we will provide, free of charge, to each person, including any beneficial owner, to whom a prospectus is delivered, a copy of any or all of the reports or documents that are incorporated by reference into this prospectus. Such written or oral requests should be made to:

<div align="center">

Timothy Evans, Chief Financial Officer
325 N. Saint Paul Street, Suite 2650
Dallas, TX 75201
Telephone Number: (612) 746-1935

</div>

In addition, such reports and documents may be found on our website at *www.gwgh.com*.

<div align="center">

40

</div>

2,000,000 Units

($2,000,000,000)

GWG HOLDINGS, INC.

L Bonds

PROSPECTUS

, 2020

PART II

INFORMATION NOT REQUIRED IN PROSPECTUS

ITEM 13. OTHER EXPENSES OF ISSUANCE AND DISTRIBUTION

Set forth below are expenses (other than the selling agent's commissions, dealer-manager fees and allowance expenses) we expect to be incurred in connection with the issuance and distribution of the securities registered hereby. With the exception of the Securities and Exchange Commission registration fee, the amounts set forth below are estimates and actual expenses may vary considerably from these estimates depending upon how long the notes are offered and other factors:

| | |
|---|---:|
| Securities and Exchange Commission registration fee | $ 259,600 |
| Accounting fees and expenses | 400,000 |
| Legal fees and expenses | 1,000,000 |
| Blue sky fees and expenses | 40,000 |
| Printing expenses | 400,000 |
| Trustee fees and expenses | 0 |
| Miscellaneous | 300,400 |
| Total | $ 2,400,000 |

ITEM 14. INDEMNIFICATION OF DIRECTORS AND OFFICERS

Section 145 of the Delaware General Corporation Law (the "DGCL") provides for, under certain circumstances, the indemnification of our officers, directors, employees and agents against liabilities that they may incur in such capacities. A summary of the circumstances in which such indemnification provided for is contained herein, but that description is qualified in its entirety by reference to the relevant Section of the DGCL.

In general, the statute provides that any director, officer, employee or agent of a corporation may be indemnified against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement, actually and reasonably incurred in a proceeding (including any civil, criminal, administrative or investigative proceeding) to which the individual was a party by reason of such status. Such indemnity may be provided if the indemnified person's actions resulting in the liabilities: (i) were taken in good faith; (ii) were reasonably believed to have been in or not opposed to our best interest; and (iii) with respect to any criminal action, such person had no reasonable cause to believe the actions were unlawful. Unless ordered by a court, indemnification generally may be awarded only after a determination of independent members of the board of directors or a committee thereof, by independent legal counsel or by vote of the stockholders that the applicable standard of conduct was met by the individual to be indemnified.

The statutory provisions further provide that to the extent a director, officer, employee or agent is wholly successful on the merits or otherwise in defense of any proceeding to which he or she was a party, he or she is entitled to receive indemnification against expenses, including attorneys' fees, actually and reasonably incurred in connection with the proceeding.

Indemnification in connection with a proceeding by or in the right of GWG Holdings in which the director, officer, employee or agent is successful is permitted only with respect to expenses, including attorneys' fees actually and reasonably incurred in connection with the defense. In such actions, the person to be indemnified must have acted in good faith, in a manner believed to have been in our best interest and must not have been adjudged liable to us unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability, in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expense which the Court of Chancery or such other court shall deem proper. Indemnification is otherwise prohibited in connection with a proceeding brought on behalf of the Company in which a director is adjudged liable to us, or in connection with any proceeding charging improper personal benefit to the director in which the director is adjudged liable for receipt of an improper personal benefit.

Delaware law authorizes us to reimburse or pay reasonable expenses incurred by a director, officer, employee or agent in connection with a proceeding in advance of a final disposition of the matter. Such advances of expenses are permitted if the person furnishes to us a written agreement to repay such advances if it is determined that he or she is not entitled to be indemnified by us.

The statutory section cited above further specifies that any provisions for indemnification of or advances for expenses does not exclude other rights under our certificate of incorporation, corporate bylaws, resolutions of our stockholders or disinterested directors, or otherwise. These indemnification provisions continue for a person who has ceased to be a director, officer, employee or agent of the corporation and inure to the benefit of the heirs, executors and administrators of such persons.

The statutory provision cited above also grants the power to the Company to purchase and maintain insurance policies that protect any director, officer, employee or agent against any liability asserted against or incurred by him in such capacity arising out of his status as such. Such policies may provide for indemnification whether or not the corporation would otherwise have the power to provide for it.

Article 6 of our corporate bylaws provides that we shall indemnify our directors, officers, employees and agents to the fullest extent permitted by the DGCL. Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers or persons controlling the Company pursuant to the foregoing provisions, we understand that in the opinion of the SEC such indemnification is against public policy as expressed in that Act and is therefore unenforceable.

We have purchased directors' and officers' liability insurance in order to limit the exposure to liability for indemnification of directors and officers, including liabilities under the Securities Act of 1933.

ITEM 15. RECENT SALES OF UNREGISTERED SECURITIES

On August 10, 2018, GWG issued and sold 5,000,000 shares of Convertible Preferred Stock to Beneficient for an aggregate purchase price of $50,000,000, or $10.00 per share of Convertible Preferred Stock. No underwriting discounts or commissions were paid in connection with such sale. The Convertible Preferred Stock will convert into 5,000,000 shares of GWG common stock at a conversion price of $10.00 per share immediately following the Final Closing.

The Convertible Preferred Stock were offered and sold in reliance upon the exemption from registration provided by Section 4(a)(2) under the Securities Act of 1933. The Master Exchange Agreement and the Third Amendment contains representations to support GWG's reasonable belief that Beneficient and the Seller Trusts had access to information concerning GWG's operations and financial condition, that each such recipient is acquiring the securities for its own account and not with a view to the distribution thereof, and that each such recipient is an "accredited investor" as defined by Rule 501 promulgated under the Securities Act of 1933.

On December 28, 2018, GWG issued and sold 27,013,516 shares of common stock (including shares issued upon conversion of the Convertible Preferred Stock) to the Seller Trusts. No underwriting discounts or commissions were paid in connection with such sale.

The shares were offered and sold in reliance upon the exemption from registration provided by Section 4(a)(2) under the Securities Act of 1933. The Master Exchange Agreement contains representations to support GWG's reasonable belief that Beneficient and the Seller Trusts had access to information concerning GWG's operations and financial condition, that each such recipient is acquiring the securities for its own account and not with a view to the distribution thereof (other than pursuant to a public offering registered under the Securities Act of 1933 or another applicable exemption), and that each such recipient is an "accredited investor" as defined by Rule 501 promulgated under the Securities Act of 1933.

ITEM 16. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES

**(a) Exhibits**. The exhibits listed below are filed as a part of this registration statement.

| Exhibit | Description |
| --- | --- |
| 1.1 | Form Managing Broker-Dealer Agreement with Emerson Equity[1] |
| 1.2 | Form of Soliciting Dealer Agreement[1] |
| 3.1 | Certificate of Incorporation[2] |
| 3.2 | Bylaws[3] |
| 3.3 | Amendment to Bylaws[19] |
| 3.4 | Certificate of Amendment to Certificate of Incorporation[5] |
| 3.5 | Certificate of Amendment to Certificate of Incorporation[8] |
| 3.6 | Certificate of Designation for Redeemable Preferred Stock[9] |
| 3.7 | Certificate of Amendment to Certificate of Designation for Redeemable Preferred Stock[9] |
| 3.8 | Certificate of Designation for Series 2 Redeemable Preferred Stock[11] |
| 3.9 | Certificate of Designations of Series B Convertible Preferred Stock[16] |
| 3.10 | Certificate of Correction of Certificate of Designation of Redeemable Preferred Stock[24] |
| 3.11 | Certificate of Correction of Certificate of Designation of Series 2 Redeemable Preferred Stock[24] |
| 4.1 | Amended and Restated Indenture with Bank of Utah, dated October 23, 2017[6] |
| 4.2 | Amended and Restated Pledge and Security Agreement by and among GWG Holdings, Inc., GWG Life, LLC, Jon R. Sabes, Steven F. Sabes, and Bank of Utah, dated October 23, 2017[6] |
| 4.3 | Form of L Bond (included as Exhibit A to Amended and Restated Indenture with Bank of Utah, dated October 23, 2017) |
| 4.4 | Form of Subscription Agreement for L Bonds[26] |
| 4.5 | Amendment No 1 to Amended and Restated Indenture with Bank of Utah, dated March 27, 2018[21] |
| 4.6 | Supplemental Indenture, dated as of August 10, 2018, to the Amended and Restated Indenture, dated as of October 23, 2017, as amended[16] |
| 4.7 | Amendment No 2 to Amended and Restated Indenture with Bank of Utah, dated December 31, 2019[28] |
| 5.1 | Opinion of Mayer Brown LLP[1] |
| 10.1 | Second Amended and Restated Loan and Security Agreement with GWG DLP Funding IV, LLC (as borrower), CLMG Corp. (as agent) and LNV Corporation (as lender), dated November 1, 2019[29] |
| 10.2 | Employment Agreement with William B. Acheson, dated June 30, 2017[10] |
| 10.3 | 2013 Stock Incentive Plan as amended[14] |
| 10.4 | Form of Stock Option Agreement used with 2013 Stock Incentive Plan[12] |
| 10.5 | Master Exchange Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, MHT Financial SPV, LLC, a Delaware limited liability company, and various related trusts, as amended and restated on January 18, 2018 with effect from January 12, 2018[13] |
| 10.6 | First Amendment to Master Exchange Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, MHT Financial SPV, LLC, a Delaware limited liability company, and various related trusts, dated April 30, 2018[13] |
| 10.7 | Second Amendment to Master Exchange Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, MHT Financial SPV, LLC, a Delaware limited liability company, and various related trusts, dated June 29, 2018[15] |
| 10.8 | Third Amendment to Master Exchange Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, MHT Financial SPV, LLC, a Delaware limited liability company, and various related trusts, dated August 10, 2018[16] |
| 10.9 | Commercial Loan Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, dated August 10, 2018[16] |
| 10.10 | Amendment No. 1 dated December 27, 2018 to Commercial Loan Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership[17] |
| 10.11 | Exchangeable Note from The Beneficient Company Group, L.P., a Delaware limited partnership, dated August 10, 2018[16] |

10.12    Registration Rights Agreement with certain trusts related to The Beneficient Company Group, L.P., a Delaware limited partnership, and as set forth in the Agreement, dated August 10, 2018[16]

10.13    Registration Rights Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, dated August 10, 2018[16]

10.14    Registration Rights Agreement with each of the Exchange Trusts, dated December 27, 2018[17]

10.15    Participating Option Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, dated December 27, 2018[17]

<div align="center">II-3</div>

| Exhibit | Description |
|---|---|
| 10.16 | Consent and Joinder to Amended and Restated Pledge and Security Agreement dated April 26, 2019[19] |
| 10.17 | Form of Indemnification Agreement with Directors and Officers[19] |
| 10.18 | Employment Agreement dated as of May 31, 2019 by and between GWG Holdings, Inc. and Murray T. Holland[22] |
| 10.19 | Performance Share Unit Agreement dated as of May 31, 2019 by and between GWG Holdings, Inc. and Murray T. Holland[22] |
| 10.20 | Promissory Note dated May 31, 2019 made by and on behalf of certain LiquidTrust Borrowers[23] |
| 10.21 | Intercreditor Agreement dated May 31, 2019 between GWG Life and HCLP Nominees, L.L.C.[23] |
| 10.22 | Intercreditor Agreement dated May 31, 2019 between GWG Life and Beneficient Holdings, Inc.[23] |
| 10.23 | Forbearance Letter Agreement dated July 3, 2019 between GWG DLP Funding IV, LLC and CLMG Corp. (as agent)[3] |
| 10.24 | Form of Non-employee Director Restricted Stock Agreement[3] |
| 21.1 | List of Subsidiaries[30] |
| 23.1 | Consent of Whitley Penn LLP[1] |
| 23.2 | Consent of Baker Tilly Virchow Krause, LLP[1] |
| 23.3 | Consent of Mayer Brown LLP (included in Exhibit 5.1) |
| 24.1 | Power of Attorney (previously filed) |
| 25.1 | Statement of Eligibility of Trustee (previously filed) |
| 99.1 | Letter from ClearLife Limited, dated February 24, 2020[30] |
| 99.2 | Portfolio of Life Insurance Policies as of December 31, 2019[30] |
| 99.3 | Purchase and Contribution Agreement dated as of April 15, 2018 by and among The Beneficient Company Group, L.P., Beneficient Company Holdings, L.P., AltiVerse Capital Markets, L.L.C., Sabes AV Holdings, LLC, Jon R. Sabes, Steven F. Sabes, Insurance Strategies Fund, LLC and SFS Holdings, LLC[18] |
| 99.4 | The Beneficient Company Group, L.P. and Subsidiaries Consolidated Financial Statements and Independent Auditor's Report[30] |
| 99.5 | Fourth Amended and Restated Limited Partnership Agreement of Beneficient Company Holdings, L.P., dated as of April 26, 2019[25] † |

(1)  Filed herewith.
(2)  Incorporated by reference to Form S-1 Registration Statement filed on June 14, 2011 (File No. 333-174887).
(3)  Incorporated by reference to Annual Report on Form 10-K filed on July 9, 2019.
(4)  Intentionally omitted.
(5)  Incorporated by reference to Form S-1/A Registration Statement filed on August 23, 2011 (File No. 333-174887).
(6)  Incorporated by reference to Current Report on Form 8-K filed on October 26, 2017.
(7)  Intentionally omitted.
(8)  Incorporated by reference to Quarterly Report on Form 10-Q filed on August 8, 2014.
(9)  Incorporated by reference to Annual Report on Form 10-K filed on March 22, 2016.
(10)  Incorporated by reference to Current Report on Form 8-K filed on June 30, 2017.
(11)  Incorporated by reference to Current Report on Form 8-K filed on February 22, 2017.
(12)  Incorporated by reference to Form S-1/A Registration Statement filed on June 6, 2014 (File No. 333-195505).
(13)  Incorporated by reference to Quarterly Report on Form 10-Q filed on May 11, 2018.
(14)  Incorporated by reference to Current Report on Form 8-K filed on May 9, 2018.
(15)  Incorporated by reference to Quarterly Report on Form 10-Q filed on August 14, 2018.
(16)  Incorporated by reference to Current Report on Form 8-K filed on August 14, 2018.
(17)  Incorporated by reference to Current Report on Form 8-K filed on January 4, 2019.
(18)  Incorporated by reference to Exhibit 10.1 to Amendment No. 1 to the Schedule 13D jointly filed on April 16, 2019 by Jon R. Sabes and Steven F. Sabes, among others.
(19)  Incorporated by reference to Current Report on Form 8-K filed on April 30, 2019.
(20)  Intentionally omitted.
(21)  Incorporated by reference to Annual Report on Form 10-K filed on March 29, 2018.
(22)  Incorporated by reference to Current Report on Form 8-K filed on June 6, 2019.
(23)  Incorporated by reference to Current Report on Form 8-K filed on June 6, 2019.
(24)  Incorporated by reference to Quarterly Report on Form 10-Q filed on November 14, 2019.
(25)  Incorporated by reference to Quarterly Report on Form 10-Q filed on September 3, 2019.

(26) Incorporated by reference to Form S-1/A Registration Statement filed on October 10, 2017 (File No. 333-220280).

(27) Intentionally omitted

(28) Incorporated by reference to Current Report on Form 8-K filed on January 7, 2020.

(29) Incorporated by reference to Current Report on Form 8-K filed on November 7, 2019.

(30) Incorporated by reference to Annual Report on Form 10-K filed on March 27, 2020.

† Certain information has been excluded from this exhibit because it both is not material and would likely cause competitive harm to the registrant if publicly disclosed.

---

II-4

ITEM 17. UNDERTAKINGS

The undersigned registrant hereby undertakes:

(1) To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement:

(i) To include any prospectus required by Section 10(a)(3) of the Securities Act of 1933;

(ii) To reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than a 20% change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective registration statement; and

(iii) To include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement;

Provided, however, that:

Paragraphs (1)(i), (1)(ii) and (1)(iii) of this section do not apply if the information required to be included in a post-effective amendment by those paragraphs is contained in reports filed with or furnished to the Commission by the registrant pursuant to section 13 or section 15(d) of the Securities Exchange Act of 1934 that are incorporated by reference in the registration statement, or, as to a registration statement on Form S-3, Form SF-3 or Form F-3, is contained in a form of prospectus filed pursuant to Rule 424(b) that is part of the registration statement.

(2) That, for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3) To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(4) That, for the purpose of determining liability of the registrant under the Securities Act of 1933 to any purchaser in the initial distribution of the securities, the undersigned registrant undertakes that in a primary offering of securities of the undersigned registrant pursuant to this registration statement, regardless of the underwriting method used to sell the securities to the purchaser, if the securities are offered or sold to such purchaser by means of any of the following communications, the undersigned registrant will be a seller to the purchaser and will be considered to offer or sell such securities to such purchaser:

(i) Any preliminary prospectus or prospectus of the undersigned registrant relating to the offering required to be filed pursuant to Rule 424;

(ii) Any free writing prospectus relating to the offering prepared by or on behalf of the undersigned registrant or used or referred to by the undersigned registrant;

(iii) The portion of any other free writing prospectus relating to the offering containing material information about the undersigned registrant or its securities provided by or on behalf of the undersigned registrant; and

(iv) Any other communication that is an offer in the offering made by the undersigned registrant to the purchaser.

(5) That, for purposes of determining any liability under the Securities Act of 1933:

(i) the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by the registrant pursuant to Rule 424(b)(l) or (4) or 497(h) under the Securities Act of 1933 shall be deemed to be a part of this registration statement as of the time it was declared effective; and

(ii) each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

Insofar as indemnification for liabilities arising under the Securities Act of 1933 (the "Securities Act") may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act, and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Dallas, State of Texas, on May 15, 2020.

GWG HOLDINGS, INC.

By:  /s/ Murray T. Holland
President and Chief Executive Officer

Pursuant to the requirements of the Securities Act of 1933, this Registration Statement has been signed, as of May 15, 2020, by the following persons in the capacities indicated below.

| Name | Title |
|---|---|
| /s/ Murray T. Holland<br>Murray T. Holland | President and Chief Executive Officer<br>(Principal Executive Officer) |
| /s/ Timothy Evans<br>Timothy Evans | Chief Financial Officer<br>(Principal Financial and Accounting Officer) |
| /s/ Brad K. Heppner<br>Brad K. Heppner | Director, Chairman of the Board |
| *<br>Roy Bailey | Director |
| *<br>Peter T. Cangany, Jr. | Director |
| *<br>David F. Chavenson | Director |
| *<br>Thomas O. Hicks | Director |
| *<br>Dennis P. Lockhart | Director |
| *<br>Bruce W. Schnitzer | Director |
| *<br>Roger T. Staubach | Director |
| *<br>David H. de Weese | Director |

* By:  /s/ Timothy Evans
Timothy Evans
Attorney-In-Fact

II-7

App. 0925

SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Dallas, State of Texas, on May 15, 2020.

GWG LIFE, LLC

By:    /s/ Murray T. Holland
      Chief Executive Officer

Pursuant to the requirements of the Securities Act of 1933, this Registration Statement has been signed, as of May 15, 2020, by the following persons in the capacities indicated below.

| Name | Title |
|---|---|
| /s/ Murray T. Holland | Chief Executive Officer |
| Murray T. Holland | (Principal Executive Officer) |
| /s/ Timothy Evans | Chief Financial Officer |
| Timothy Evans | (Principal Financial and Accounting Officer) |
| /s/ Murray T. Holland | Manager of GWG Life, LLC |
| Murray T. Holland | |

II-8

App. 0926

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

**FORM 10-Q**

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended March 31, 2020

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES ACT OF 1934**

For the transition period from _____ to _____

Commission File Number: 001-36615

# GWG HOLDINGS, INC.

(Exact name of registrant as specified in its charter)

| Delaware | 26-2222607 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**325 North St. Paul Street, Suite 2650**
**Dallas, TX 75201**
(Address of principal executive offices, including zip code)

**(612) 746-1944**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock | GWGH | NASDAQ Capital Market |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☒ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). ☒ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). ☐ Yes ☒ No

As of May 11, 2020 GWG Holdings, Inc. had 33,036,649 shares of common stock outstanding.

**GWG HOLDINGS, INC.**

**Index to Form 10-Q**
**for the Quarter Ended March 31, 2020**

| | | Page No. |
|---|---|---|
| PART I. FINANCIAL INFORMATION | | |
| Item 1. | Financial Statements | 1 |
| | Condensed Consolidated Balance Sheets as of March 31, 2020, and December 31, 2019 | 1 |
| | Condensed Consolidated Statements of Operations for the three months ended March 31, 2020 and 2019 | 2 |
| | Condensed Consolidated Statements of Cash Flows for the three months ended March 31, 2020 and 2019 | 3 |
| | Condensed Consolidated Statements of Changes in Stockholders' Equity for the three months ended March 31, 2020 and 2019 | 5 |
| | Notes to Condensed Consolidated Financial Statements | 7 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 51 |
| Item 4. | Controls and Procedures | 73 |
| | | |
| PART II. OTHER INFORMATION | | |
| Item 5. | Other Information | 74 |
| Item 6. | Exhibits | 74 |
| | | |
| SIGNATURES | | 75 |

i

App. 0928

**PART I — FINANCIAL INFORMATION**

**ITEM 1. FINANCIAL STATEMENTS**

GWG HOLDINGS, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED BALANCE SHEETS
(in thousands, except per share data)

| | March 31, 2020 (unaudited) | December 31, 2019 |
|---|---:|---:|
| **ASSETS** | | |
| Cash and cash equivalents | $ 116,432 | $ 79,073 |
| Restricted cash | 26,446 | 20,258 |
| Investment in life insurance policies, at fair value | 802,181 | 796,039 |
| Life insurance policy benefits receivable, net | 15,330 | 23,031 |
| Loans receivable, net of unearned income | 219,296 | 232,344 |
| Allowance for loan losses | (700) | — |
| Loans receivable, net | 218,596 | 232,344 |
| Fees receivable | 30,453 | 29,168 |
| Financing receivables from affiliates | 68,290 | 67,153 |
| Other assets | 33,906 | 30,135 |
| Goodwill | 2,372,595 | 2,358,005 |
| TOTAL ASSETS | $ 3,684,229 | $ 3,635,206 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | |
| **LIABILITIES** | | |
| Senior credit facility with LNV Corporation | $ 188,793 | $ 174,390 |
| L Bonds | 1,009,781 | 926,638 |
| Seller Trust L Bonds | 366,892 | 366,892 |
| Other borrowings | 152,597 | 153,086 |
| Interest and dividends payable | 22,403 | 16,516 |
| Deferred revenue | 39,651 | 41,444 |
| Accounts payable and accrued expenses | 21,139 | 27,836 |
| Deferred tax liability, net | 40,206 | 57,923 |
| TOTAL LIABILITIES | 1,841,462 | 1,764,725 |
| Redeemable noncontrolling interests | 1,241,641 | 1,269,654 |
| STOCKHOLDERS' EQUITY | | |
| REDEEMABLE PREFERRED STOCK | | |
| (par value $0.001; shares authorized 100,000; shares outstanding 69,756 and 84,636; liquidation preference of $70,163 and $85,130 as of March 31, 2020 and December 31, 2019, respectively) | 59,142 | 74,023 |
| SERIES 2 REDEEMABLE PREFERRED STOCK | | |
| (par value $0.001; shares authorized 150,000; shares outstanding 146,812 and 147,164; liquidation preference of $147,668 and $148,023 as of March 31, 2020 and December 31, 2019, respectively) | 127,516 | 127,868 |
| COMMON STOCK | | |
| (par value $0.001; shares authorized 210,000,000; shares issued and outstanding 30,535,249 and 30,533,793 as of March 31, 2020 and December 31, 2019, respectively) | 33 | 33 |
| Common stock in treasury, at cost (2,500,000 shares as of both March 31, 2020 and December 31, 2019) | (24,550) | (24,550) |
| Additional paid-in capital | 229,207 | 233,106 |
| Accumulated deficit | (121,933) | (76,501) |
| TOTAL GWG HOLDINGS STOCKHOLDERS' EQUITY | 269,415 | 333,979 |
| Noncontrolling interests | 331,711 | 266,848 |
| TOTAL STOCKHOLDERS' EQUITY | 601,126 | 600,827 |
| TOTAL LIABILITIES & STOCKHOLDERS' EQUITY | $ 3,684,229 | $ 3,635,206 |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements.

App. 0929

GWG HOLDINGS, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(in thousands, except per share data)
(unaudited)

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| REVENUE | | |
| Gain on life insurance policies, net | $ 14,445 | $ 21,496 |
| Interest and other income | 19,112 | 3,721 |
| TOTAL REVENUE | 33,557 | 25,217 |
| | | |
| EXPENSES | | |
| Interest expense | 35,871 | 26,975 |
| Employee compensation and benefits | 77,704 | 5,154 |
| Legal and professional fees | 6,163 | 2,947 |
| Provision for loan losses | 700 | — |
| Other expenses | 3,612 | 2,828 |
| TOTAL EXPENSES | 124,050 | 37,904 |
| | | |
| LOSS BEFORE INCOME TAXES | (90,493) | (12,687) |
| INCOME TAX BENEFIT | (14,507) | — |
| | | |
| NET LOSS BEFORE LOSS FROM EQUITY METHOD INVESTMENT | (75,986) | (12,687) |
| | | |
| Loss from equity method investment | (1,530) | (1,927) |
| | | |
| NET LOSS | (77,516) | (14,614) |
| | | |
| Net loss attributable to noncontrolling interests | 32,084 | — |
| | | |
| Less: Preferred stock dividends | 3,952 | 4,296 |
| NET LOSS ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ (49,384) | $ (18,910) |
| NET LOSS PER COMMON SHARE | | |
| Basic | $ (1.62) | $ (0.57) |
| Diluted | $ (1.62) | $ (0.57) |
| | | |
| WEIGHTED AVERAGE COMMON SHARES OUTSTANDING | | |
| Basic | 30,534,977 | 32,984,741 |
| Diluted | 30,534,977 | 32,984,741 |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements.

Page 2

App. 0930

GWG HOLDINGS, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
(in thousands, except per share data)
(unaudited)

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net loss | $ (77,516) | $ (14,614) |
| Adjustments to reconcile net loss to net cash flows from operating activities: | | |
| Change in fair value of life insurance policies | (12,177) | (15,571) |
| Amortization of deferred financing and issuance costs | 4,211 | 3,100 |
| Amortization of upfront fees | (1,793) | — |
| Amortization of debt premiums | (473) | — |
| Amortization and depreciation on long-lived assets | 172 | — |
| Accretion of discount on financing receivable from affiliate | — | (419) |
| Non-cash interest income | (13,374) | — |
| Non-cash interest expense | 676 | — |
| Loss from equity method investment | 1,530 | 1,927 |
| Provision for loan losses | 700 | — |
| Deferred income tax | (17,717) | — |
| Equity-based compensation | 69,448 | 834 |
| (Increase) decrease in operating assets: | | |
| Life insurance policy benefits receivable | 7,701 | 7,261 |
| Fees receivable | (1,285) | — |
| Accrued interest on financing receivable | — | (1,551) |
| Other assets | 368 | (3,942) |
| Decrease in operating liabilities: | | |
| Accounts payable and other accrued expenses | (1,103) | (3,328) |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (40,632) | (26,303) |
| | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Investment in life insurance policies | — | (27,392) |
| Carrying value of matured life insurance policies | 6,035 | 8,701 |
| Purchases of fixed assets | (481) | — |
| Equity method investments | (5,417) | — |
| Net change in loans receivable | 10,614 | — |
| NET CASH FLOWS PROVIDED BY (USED IN) INVESTING ACTIVITIES | 10,751 | (18,691) |
| | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Borrowings on senior debt | 14,074 | — |
| Repayments of senior debt | — | (2,373) |
| Proceeds from issuance of L Bonds | 109,053 | 125,985 |
| Payments for issuance and redemption of L Bonds | (30,532) | (23,974) |
| Issuance (repurchase) of common stock | 18 | (269) |
| Payments for redemption of preferred stock | (15,233) | (819) |
| Preferred stock dividends | (3,952) | (4,296) |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 73,428 | 94,254 |
| | | |
| NET INCREASE IN CASH, CASH EQUIVALENTS AND RESTRICTED CASH | 43,547 | 49,260 |
| | | |
| **CASH, CASH EQUIVALENTS AND RESTRICTED CASH** | | |
| BEGINNING OF PERIOD | 99,331 | 125,436 |
| END OF PERIOD | $ 142,878 | $ 174,696 |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements.

Page 3

App. 0931

GWG HOLDINGS, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS — CONTINUED
(in thousands, except per share data)
(unaudited)

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | 2020 | | 2019 | |
| **SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION** | | | | |
| Interest paid | $ | 32,532 | $ | 23,604 |
| Premiums paid, including prepaid | $ | 16,825 | $ | 19,113 |
| | | | | |
| **NON-CASH INVESTING AND FINANCING ACTIVITIES** | | | | |
| L Bonds: | | | | |
| Conversion of accrued interest and commissions payable to principal | $ | 660 | $ | 634 |
| Investment in life insurance policies included in accounts payable | $ | — | $ | 2,914 |
| Business combination measurement period adjustment: | | | | |
| Reduction in loans receivable (see Note 4) | $ | 14,590 | $ | — |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements.

Page 4

GWG HOLDINGS, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY
(in thousands, except per share data)
(unaudited)

| | Preferred Stock Shares | Preferred Stock | Common Shares | Common Stock (par) | Additional Paid-in Capital | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|
| **Balance, December 31, 2018 (audited)** | 245,883 | $ 215,973 | 33,018,161 | $ 33 | $ 249,662 | $ (184,610) | $ 281,058 |
| Net loss | — | — | — | — | — | (14,614) | (14,614) |
| Issuance of common stock | — | — | 17,135 | — | 93 | — | 93 |
| Repurchase of common stock | — | — | (42,690) | — | (361) | — | (361) |
| Redemption of redeemable preferred stock | (819) | (819) | — | — | — | — | (819) |
| Preferred stock dividends | — | — | — | — | (4,296) | — | (4,296) |
| Equity-based compensation | — | — | — | — | 198 | — | 198 |
| **Balance, March 31, 2019** | 245,064 | $ 215,154 | 32,992,606 | $ 33 | $ 245,296 | $ (199,224) | $ 261,259 |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements.

Page 5

| | Preferred Stock Shares | Preferred Stock | Common Shares | Common Stock (par) | Additional Paid-in Capital | Accumulated Deficit | Treasury Stock | Total GWG Holdings Stockholders' Equity | Noncontrolling Interests | Total Stockholders' Equity | Redeemable noncontrolling interests |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance, December 31, 2019 (audited) | 231,800 | $ 201,891 | 30,533,793 | $ 33 | $ 233,106 | $ (76,501) | $ (24,550) | $ 333,979 | $ 266,848 | $ 600,827 | $ 1,269,654 |
| Net loss | — | — | — | — | — | (45,432) | — | (45,432) | (4,071) | (49,503) | (28,013) |
| Issuance of common stock | — | — | 1,456 | — | 18 | — | — | 18 | — | 18 | — |
| Redemption of redeemable preferred stock | (15,233) | (15,233) | — | — | — | — | — | (15,233) | — | (15,233) | — |
| Preferred stock dividends | — | — | — | — | (3,952) | — | — | (3,952) | — | (3,952) | — |
| Equity-based compensation | — | — | — | — | 35 | — | — | 35 | 68,934 | 68,969 | — |
| Balance, March 31, 2020 | 216,567 | $ 186,658 | 30,535,249 | $ 33 | $ 229,207 | $ (121,933) | $ (24,550) | $ 269,415 | $ 331,711 | $ 601,126 | $ 1,241,641 |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements.

Page 6

App. 0934

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

**(1) Nature of Business**

**Organizational Structure**

GWG Holdings, Inc. ("GWG Holdings") conducts its life insurance secondary market business through a wholly-owned subsidiary, GWG Life, LLC ("GWG Life"), and GWG Life's wholly-owned subsidiaries, GWG Life Trust and GWG DLP Funding IV, LLC ("DLP IV").

GWG Holdings' indirect interests in loans collateralized by cash flows from other alternative assets are held by The Beneficient Company Group, L.P. ("Ben LP," including all of the subsidiaries it may have from time to time — "Beneficient") and its general partner, Beneficient Management, L.L.C. ("Beneficient Management"). Prior to December 31, 2019, GWG Holdings' investment in Beneficient was accounted for as an equity method investment. On December 31, 2019, as more fully described below, Beneficient became a consolidated subsidiary of GWG Holdings.

Ben LP is the general partner to Beneficient Company Holdings, L.P. ("BCH") and owns 100% of the Class A Subclass A-1 and A-2 Units of BCH. BCH is the holding company that directly or indirectly receives all active and passive income of Beneficient and allocates that income among the units issued by BCH. As of March 31, 2020, BCH has issued general partnership Class A Units (Subclass A-1 and A-2), Class S Ordinary Units, Class S Preferred Units, FLP Units (Subclass 1 and Subclass 2), Preferred Series A Subclass 1 Unit Accounts, and Preferred Series A Subclass 2 Units. BCH issued to Ben LP Preferred Series A Subclass 2 Units as part of the transaction with GWG Holdings discussed below. Preferred Series A Subclass 2 Units hold the same rights and privileges as the Preferred Series A Subclass 1 Unit Accounts.

GWG Holdings also has a controlling financial interest in FOXO BioScience LLC ("FOXO", formerly InsurTech Holdings, LLC), which, through its wholly-owned subsidiaries Life Epigenetics Inc. ("Life Epigenetics") and youSurance General Agency, LLC ("youSurance"), seeks to commercialize epigenetic technology for the longevity industry and offer life insurance directly to customers utilizing epigenetic technology.

All of the aforementioned legal entities are organized in Delaware, other than GWG Life Trust, which is governed by the laws of the state of Utah. Unless the context otherwise requires or we specifically so indicate, all references in this report to "we," "us," "our," "our Company," "GWG," or the "Company" refer to these entities collectively. Our headquarters are located in Dallas, Texas.

**Nature of Business**

GWG Holdings, through its wholly-owned subsidiary GWG Life, purchased life insurance policies in the secondary market and has built a large, actuarially diverse portfolio of life insurance policies backed by highly rated life insurance companies. These policies were purchased between April 2006 and November 2019 and were funded primarily through sales of L Bonds, as discussed in Note 10. Beginning in 2018, GWG Holdings made a strategic decision to reorient its business and increase capital allocated toward providing liquidity products to a broader range of alternative assets through investments in Beneficient. We believe that the investments in Beneficient will transform GWG Holdings from a niche provider of liquidity to owners of life insurance to a full-scale provider of trust and liquidity products and trust services to a broad range of alternative assets.

As a result of such strategic decision, GWG Holdings' business today is focused on raising capital from securities offerings and using the proceeds from such offerings to grow GWG Holdings' alternative asset exposure through investments in Beneficient in the form of equity investments and/or loans to Beneficient or related entities. GWG Holdings believes funding Beneficient's operations will generally produce higher risk-adjusted returns than those we can generally achieve from life insurance policies acquired in the secondary market.

Furthermore, although we believe that our portfolio of life insurance policies is a meaningful component of a diversified alternative asset portfolio, we do not anticipate purchasing additional life insurance policies in the secondary market, and we will continue to explore strategic alternatives for our life insurance portfolio aimed at maximizing its value, including a possible sale, refinancing or recapitalization of the portfolio.

Beneficient is a financial services firm based in Dallas, Texas that provides liquidity solutions for mid-to-high net worth ("MHNW") individuals and small-to-mid-("STM") sized institutions, which previously had few options to obtain early liquidity for their alternative assets holdings. On September 25, 2018, Beneficient's capital companies applied for trust charters from the Texas Department of Banking to merge into to-be organized limited trust associations. Beneficient submitted revised charter applications on March 6, 2020. As of May 15, 2020, the trust charters had not been issued to Beneficient. As such, Beneficient has closed a limited number of transactions to date, but intends to significantly expand its operations if and when the trust charters are issued.

Beneficient was formed in 2003 but began its current operations in September 2017. Beneficient operates primarily through its subsidiaries, which provide Beneficient's products and services. These subsidiaries include: (i) Beneficient Capital Company, L.L.C. ("BCC"), through which Beneficient offers loans and liquidity products; (ii) Beneficient Administrative and Clearing Company, L.L.C. ("BACC"), through which Beneficient provides services for fund and trust administration and plans to provide custody services; (iii) Pen Indemnity Insurance Company, LTD ("Pen"), through which Beneficient plans to offer insurance services; and (iv) Ben Markets Management Holdings, L.P., formerly called ACE Portal, L.L.C. ("Ben Markets"), through which Beneficient plans to provide an online portal for direct access to Beneficient's financial services and products.

Page 7

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

Beneficient's primary operations pertain to its liquidity products whereby Beneficient extends loans collateralized by cash flows from illiquid alternative assets and provides services to the trustees who administer the collateral. Beneficient's core business products are its Exchange Trust, LiquidTrust and the InterChange Trust (introduced in 2020). Beneficient's clients select one of these products and place their alternative assets into the custody trust that is a constituent member of a trust structure called the "ExAlt Plan$^{TM}$" (comprised of the Exchange Trusts, LiquidTrusts, Custody Trusts, Collective Trusts, and Funding Trusts). The ExAlt Plan$^{TM}$ then delivers to Beneficient's clients the consideration required by the specific product selected by Beneficient's clients. At the same time, Beneficient, extends a loan to the ExAlt Plan$^{TM}$. The proceeds (cash, securities of Ben LP or its affiliates, or other forms of consideration, as applicable) of that loan to the ExAlt Plan$^{TM}$ are ultimately paid to the client. The cash flows from the client's alternative asset support the repayment of the loans plus any related interest and fees.

In 2018 and 2019, GWG Holdings and GWG Life consummated a series of transactions (as more fully described below) with Beneficient that has resulted in a significant reorientation of the Company's business and capital allocation strategy in addition to changes in the Company's Board of Directors and executive management team.

**The Exchange Transaction**

On August 10, 2018 (the "Initial Transfer Date"), the first of two closings was completed (the "Initial Transfer") as contemplated by a Master Exchange Agreement between GWG Holdings, GWG Life, Ben LP and certain other parties (the "Seller Trusts"), which governs the strategic exchange of assets among the parties (the "Exchange Transaction"). On the Initial Transfer Date:

- GWG Holdings issued to the Seller Trusts Seller Trust L Bonds due 2023 (the "Seller Trust L Bonds") in an aggregate principal amount of $403.2 million, as more fully described below;

- Beneficient purchased 5,000,000 shares of GWG Holdings' Series B Convertible Preferred Stock, par value $0.001 per share and having a stated value of $10 per share ("Series B"), for cash consideration of $50.0 million, which shares were subsequently transferred to the Seller Trusts;

- in consideration for GWG Holdings and GWG Life entering into the Master Exchange Agreement and consummating the transactions contemplated thereby, Ben LP, as borrower, entered into a commercial loan agreement (the "Commercial Loan Agreement") with GWG Life, as lender, providing for a loan in a principal amount of $200.0 million (the "Commercial Loan");

- Ben LP delivered to GWG Life a promissory note (the "Exchangeable Note") in the principal amount of $162.9 million; and

- the Seller Trusts delivered to GWG Holdings 4,032,349 common units of Ben LP ("Common Units") at an assumed value of $10 per unit.

On December 28, 2018, the final closing of the above transaction occurred, and the following actions took place (the "Final Closing" and the date upon which the Final Closing occurred, the "Final Closing Date"):

- in accordance with the Master Exchange Agreement, and based on the net asset value of alternative asset financings as of the Final Closing Date, effective as of the Initial Transfer Date, (i) the principal amount of the Commercial Loan was reduced to $182.0 million, (ii) the principal amount of the Exchangeable Note was reduced to $148.2 million, and (iii) the principal amount of the Seller Trust L Bonds was reduced to $366.9 million;

- the Seller Trusts refunded to GWG Holdings $0.8 million in interest paid on the Seller Trust L Bonds related to the Seller Trust L Bonds that were issued as of the Initial Transfer Date but cancelled, effective as of the Initial Transfer Date, on the Final Closing Date;

Page 8

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

- the accrued interest on the Commercial Loan and the Exchangeable Note was added to the principal amount of the Commercial Loan, as a result of which the principal amount of the Commercial Loan as of the Final Closing Date was $192.5 million;

- the Seller Trusts transferred to GWG Holdings an aggregate of 21,650,087 Common Units and GWG Holdings received 14,822,843 Common Units in exchange for the Exchangeable Note, upon completion of which GWG Holdings owned (including the 4,032,349 Common Units received by GWG Holdings on the Initial Transfer Date) 40,505,279 common units of Ben LP;

- Ben LP issued to GWG Holdings an option (the "Option Agreement") to acquire the number of Common Units, interests or other property that would be received by a holder of Preferred Series A Subclass 1 Unit Accounts of BCH; and

- GWG Holdings issued to the Seller Trusts 27,013,516 shares of GWG Holdings common stock (including 5,000,000 shares issued upon conversion of the Series B).

***Description of the Assets Exchanged***

*Seller Trust L Bonds*

On August 10, 2018, in connection with the Initial Transfer, GWG Holdings, GWG Life and Bank of Utah, as trustee, entered into a Supplemental Indenture (the "Supplemental Indenture") to the Amended and Restated Indenture dated as of October 23, 2017 (the "Amended and Restated Indenture"). GWG Holdings entered into the Supplemental Indenture to add and modify certain provisions of the Amended and Restated Indenture necessary to provide for the issuance of the Seller Trust L Bonds. The maturity date of the Seller Trust L Bonds is August 9, 2023. The Seller Trust L Bonds bear interest at 7.5% per year. Interest is payable monthly in cash.

After the second anniversary of the Final Closing Date, the holders of the Seller Trust L Bonds will have the right to cause GWG Holdings to repurchase, in whole but not in part, the Seller Trust L Bonds held by such holder. The repurchase may be paid, at GWG Holdings' option, in the form of cash, a pro rata portion of (i) the outstanding principal amount and accrued and unpaid interest under the Commercial Loan, and (ii) Common Units, or a combination of cash and such property.

The Seller Trust L Bonds are senior secured obligations of GWG Holdings, ranking junior only to all senior debt of GWG Holdings, pari passu in right of payment and in respect of collateral with all "L Bonds" of GWG Holdings (see Note 10), and senior in right of payment to all subordinated indebtedness of GWG Holdings. Payments under the Seller Trust L Bonds are guaranteed by GWG Life (see Note 18).

*Series B Convertible Preferred Stock*

The Series B converted into 5,000,000 shares of GWG Holdings common stock at a conversion price of $10 per share upon the Final Closing.

*Commercial Loan*

The $192.5 million principal amount under the Commercial Loan is due on August 9, 2023; however, it is extendable for two five-year terms. Ben LP's obligations under the Commercial Loan are unsecured.

The principal amount of the Commercial Loan bears interest at 5.0% per year. From and after the Final Closing Date, one-half of the interest, or 2.5% per year, is due and payable monthly in cash, and one-half of the interest, or 2.5% per year, accrues and compounds annually on each anniversary date of the Final Closing Date and becomes due and payable in full in cash on the maturity date.

Page 9

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

In accordance with the Supplemental Indenture governing the issuance of the Seller Trust L Bonds, upon a redemption event or at the maturity date of the Seller Trust L Bonds, GWG Holdings, at its option, may use the outstanding principal amount of the Commercial Loan, and accrued and unpaid interest thereon, as repayment consideration of the Seller Trust L Bonds.

The Commercial Loan and its related interest are eliminated upon consolidation.

*Exchangeable Note*

At the Final Closing date, the principal amount of the Exchangeable Note was exchanged for 14,822,843 Common Units, and the accrued interest on the Exchangeable Note was added to the principal balance of the Commercial Loan.

*Option Agreement*

In connection with the Final Closing, GWG Holdings entered into the Option Agreement with Ben LP. The Option Agreement gives GWG Holdings the option to acquire the number of Common Units that would be received by the holder of Preferred Series A Subclass 1 Unit Accounts of BCH, if such holder were converting on that date. There is no exercise price and the Company may exercise the option at any time until December 27, 2028, at which time the option will automatically settle. The carrying value of the Option Agreement eliminates upon consolidation.

*Common Units of Ben LP*

In connection with the Initial Transfer and Final Closing, the Seller Trusts and Beneficient delivered to GWG Holdings 40,505,279 Common Units. These units represented an approximate 89.9% interest in the Common Units as of the Final Closing Date (although, on a fully diluted basis, GWG Holdings' ownership interest in Common Units would be reduced significantly below a majority of those issued and outstanding). These amounts eliminate upon consolidation.

**Purchase and Contribution Agreement**

On April 15, 2019, Jon R. Sabes, the former Chief Executive Officer and a former director of GWG Holdings, and Steven F. Sabes, the former Executive Vice President and a former director of GWG Holdings, entered into a Purchase and Contribution Agreement (the "Purchase and Contribution Agreement") with, among others, Ben LP. Under the Purchase and Contribution Agreement, Jon and Steven Sabes agreed to transfer all 3,952,155 of the shares of GWG Holdings' outstanding common stock held directly or indirectly by them to BCC (a subsidiary of Ben LP) and AltiVerse Capital Markets, L.L.C. ("AltiVerse"). AltiVerse is a limited liability company owned by an entity related to Beneficient's founders, including Brad K. Heppner (GWG Holdings' Chairman and Beneficient's Chief Executive Officer and Chairman) and an entity related to Thomas O. Hicks (one of Beneficient's current directors and a director of GWG Holdings). GWG Holdings was not a party to the Purchase Agreement; however, the closing of the transactions contemplated by the Purchase and Contribution Agreement (the "Purchase and Contribution Transaction") were subject to certain conditions that were dependent upon GWG Holdings taking, or refraining from taking, certain actions.

The closing of the Purchase and Contribution Transaction occurred on April 26, 2019. Prior to or in connection with such closing:

- GWG Holdings' bylaws were amended to increase the maximum number of directors of GWG Holdings from nine to 13, and the actual number of directors comprising the Board of Director was increased from seven to 11. The size of the Board has since been reduced and currently consists of nine directors.

- All seven members of GWG Holdings' Board of Directors prior to the closing resigned as directors of GWG, and 11 individuals designated by Beneficient were appointed as directors of GWG Holdings, leaving two board seats vacant after the closing.

Page 10

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

- Jon R. Sabes resigned from all officer positions he held with GWG Holdings or any of its subsidiaries prior to the closing, other than his position as Chief Executive Officer of Life Epigenetics and youSurance.

- Steven F. Sabes resigned from all officer positions he held with GWG Holdings or any of its subsidiaries prior to the closing, except as Chief Operating Officer of Life Epigenetics.

- The resignations of Messrs. Jon and Steven Sabes included a full waiver and forfeit of (i) any severance that may be payable by GWG Holdings or any of its subsidiaries in connection with such resignations or the Purchase and Contribution Transaction, and (ii) all equity awards of GWG Holdings held by either of them.

- Murray T. Holland was appointed as Chief Executive Officer of GWG Holdings.

- GWG Holdings entered into performance share unit agreements with certain of its employees pursuant to which such employees will collectively receive up to $4.5 million in cash compensation under certain terms and conditions, including, among others, that such employees remain employed by GWG Holdings or one of its subsidiaries (or, if no longer employed, such employment was terminated by GWG Holdings other than for cause, as such term is defined in the performance share unit agreement) for a period of 120 days following the closing.

- The stockholders agreement that was entered into on the Final Closing Date was terminated by mutual consent of the parties thereto.

- BCC and AltiVerse executed and delivered a Consent and Joinder to the Amended and Restated Pledge and Security Agreement dated October 23, 2017 by and among GWG Holdings, GWG Life, Messrs. Jon and Steven Sabes and the Bank of Utah, which provides that the shares of GWG Holdings' common stock acquired by BCC and AltiVerse pursuant to the Purchase and Contribution Agreement will continue to be pledged as collateral security for GWG Holdings' obligations owing in respect of the L Bonds and Seller Trust L Bonds.

*Indemnification Agreements*

On April 26, 2019, GWG Holdings entered into Indemnification Agreements (the "Indemnification Agreements") with each of its executive officers and the directors appointed to the Board of Directors on such date. On May 13, 2019, GWG Holdings entered into Indemnification Agreement with the three additional directors appointed to the Board of Directors on such date (collectively with the executive officers and directors appointed on April 26, 2019, the "Indemnitees"). The Indemnification Agreements clarify and supplement indemnification provisions already contained in GWG Holdings' bylaws and generally provide that GWG Holdings shall indemnify the indemnitees to the fullest extent permitted by applicable law, subject to certain exceptions, against expenses, judgments, fines and other amounts actually and reasonably incurred in connection with their service as a director or officer and also provide for rights to advancement of expenses and contribution.

**The Investment and Exchange Agreements**

On December 31, 2019, GWG Holdings, Ben LP, BCH, and Beneficient Management entered into a Preferred Series A Unit Account and Common Unit Investment Agreement (the "Investment Agreement").

Pursuant to the Investment Agreement, GWG Holdings transferred $79.0 million to Ben LP in return for 666,667 Common Units and a Preferred Series A Subclass 1 Unit Account of BCH.

Page 11

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

In connection with the Investment Agreement, GWG Holdings obtained the right to appoint a majority of the board of directors of Beneficient Management, the general partner of Ben LP. As a result, GWG Holdings obtained control of Ben LP and began reporting the results of Ben LP and its subsidiaries on a consolidated basis beginning on the transaction date of December 31, 2019. See Note 4 for more details on the accounting for the consolidation. GWG Holdings' right to appoint a majority of the board of directors of Beneficient Management will terminate in the event (i) GWG Holdings' ownership of the fully diluted equity of Ben LP (excluding equity issued upon the conversion or exchange of Preferred Series A Unit Accounts of BCH held as of December 31, 2019 by parties other than GWG Holdings) is less than 25%, (ii) the Continuing Directors of GWG Holdings cease to constitute a majority of the board of directors of GWG Holdings, or (iii) certain bankruptcy events occur with respect to GWG Holdings. The term "Continuing Directors" means, as of any date of determination, any member of the board of directors of GWG Holdings who: (1) was a member of the board of directors on December 31, 2019; or (2) was nominated for election or elected to the board of directors with the approval of a majority of the Continuing Directors who were members of the board of directors at the time of such nomination or election.

Following the transaction, and as agreed upon in the Investment Agreement, GWG Holdings was issued an initial capital account balance for the Preferred Series A Subclass 1 Unit Account of $319.0 million. The other holders of the Preferred Series A Subclass 1 Unit Accounts are principally an entity related to the founders of Ben LP and an entity related to one of the directors of both GWG Holdings and Beneficient (the "Related Account Holders"), and the aggregate capital accounts of all holders of the Preferred Series A Subclass 1 Unit Accounts after giving effect to the investment by GWG Holdings was $1.6 billion. GWG Holdings' Preferred Series A Subclass 1 Unit Account is the same class of preferred security as held by the Related Account Holders. If the Related Account Holders exchange their Preferred Series A Subclass 1 Unit Accounts for securities of GWG Holdings, the Preferred Series A Subclass 1 Unit Account of GWG Holdings will also convert into Common Units (so neither GWG Holdings nor the founders would hold Preferred Series A Subclass 1 Unit Accounts).

Also, on December 31, 2019, in a transaction related to the Investment Agreement, GWG Holdings transferred its interest in the Preferred Series A Subclass 1 Unit Account to its wholly-owned subsidiary, GWG Life.

In addition, on December 31, 2019, GWG Holdings, Ben LP and the holders of Common Units entered into an Exchange Agreement (the "Exchange Agreement") pursuant to which the holders of Common Units from time to time have the right, on a quarterly basis, to exchange their Common Units for common stock of GWG Holdings. The exchange ratio in the Exchange Agreement is based on the ratio of the capital account associated with the Common Units to be exchanged to the market price of GWG Holdings common stock based on the volume weighted average price of GWG Holdings common stock for the five consecutive trading days prior to the quarterly exchange date. The Exchange Agreement is intended to facilitate the marketing of Ben LP's products to holders of alternative assets.

The Exchange Transaction, the Purchase and Contribution Transaction, and the Investment and Exchange Agreements are referred to collectively as the "Beneficient Transactions."

**(2) Summary of Significant Accounting Policies**

**Basis of Presentation** — The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with the U.S. Securities and Exchange Commission ("SEC") requirements for interim reporting, which allows certain footnotes and other financial information normally required by Generally Accepted Accounting Principles in the United States of America ("GAAP") to be condensed or omitted. In our opinion, the condensed consolidated financial statements contain all adjustments (consisting of only normal recurring adjustments) necessary for the fair presentation of the Company's financial position and results of operations. These statements should be read in conjunction with the condensed consolidated financial statements and notes included in our Annual Report on Form 10-K for the year ended December 31, 2019, filed with the SEC on March 27, 2020 ("2019 Form 10-K"). The results of operations for interim periods are not necessarily indicative of the results to be expected for the full year.

Significant accounting policies are detailed in Note 2 to the condensed consolidated financial statements included in the Company's 2019 Form 10-K. Summarized below are those new or revised significant accounting policies, including those that resulted from the consolidation of Beneficient on December 31, 2019.

Page 12

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

**Use of Estimates** — The preparation of the Company's condensed consolidated financial statements in conformity with GAAP requires management to make significant estimates and assumptions affecting the reported amounts of assets and liabilities at the date of the condensed consolidated financial statements, as well as the reported amounts of revenue during the reporting period. Management regularly evaluates estimates and assumptions, which are based on current facts, historical experience, management's judgment, and various other factors that we believe to be reasonable under the circumstances. Actual results may differ materially and adversely from our estimates. Material estimates that are particularly susceptible to change, in the near term, relate to: the determination of the fair values of assets acquired, liabilities assumed and noncontrolling interests under business combinations accounting guidance; the determination of the assumptions used in estimating the fair value of our investments in life insurance policies; determining the grant date fair value for equity-based compensation awards; determining our allowance for loan losses; evaluation of potential impairment of goodwill and other intangibles; and the value of our deferred tax assets and liabilities.

**Loans Receivable** — Loans are recorded at their fair value at the acquisition date, change-of-control date, or other liquidation event. Credit discounts are included in the determination of fair value; therefore, an allowance for loan losses is not recorded as of the date of valuation. Purchased loans are evaluated upon acquisition and classified as either purchased credit impaired ("PCI") or non-purchased credit impaired ("non-PCI").

PCI loans reflect credit deterioration since origination such that it is probable as of the date of valuation that Beneficient will be unable to collect all contractually required payments. For PCI loans, expected cash flows as of the date of valuation in excess of the fair value of loans are recorded as interest income over the life of the loans using a level yield method if the timing and amount of the future cash flows is reasonably estimable. Subsequently, increases in cash flows over those expected at the acquisition date are recognized prospectively as interest income. Decreases in expected cash flows due to credit deterioration are recognized by recording an allowance for loan loss. Beneficient does not report PCI loans as nonperforming due to the accretion of interest income.

For non-PCI loans, the difference between the fair value and unpaid principal balance ("UPB") of the loan as of the date of valuation is amortized or accreted to interest income over the contractual life of the loans using the effective interest method. In the event of prepayment, the remaining unamortized amount is recognized in interest income.

**Equity-Based Compensation** — The Company measures and recognizes compensation expense for all equity-based payments at fair value on the grant date over the requisite service period. GWG Holdings uses the Black-Scholes option pricing model to determine the fair value of stock options and stock appreciation rights. For restricted stock grants (including restricted stock units), fair value is determined as of the closing price of GWG Holdings' common stock on the date of grant. As it is not publicly traded, Beneficient uses various methods to determine the grant date fair value of its equity-based compensation awards, as more fully described in Note 12.

Equity-based compensation expense is recorded in employee compensation and benefits in the condensed consolidated statements of operations. The determination of fair value of equity-based payment awards on the date of grant is affected by our stock price and a number of subjective variables. These variables include, but are not limited to, the expected stock price volatility over the term of the awards, the expected duration of the awards, the results of a probability-weighted discounted cash flow analysis and observable transactions. We account for the effects of forfeitures as they occur.

App. 0941

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

The risk-free interest rate is based on the U.S. Treasury rates at the date of grant with maturity dates approximately equal to the expected life at grant date. Volatility is based on the standard deviation of the average continuously compounded rate of return of five selected companies.

**Earnings (Loss) per Common Share** — Basic earnings (loss) per share attributable to common shareholders are calculated using the weighted-average number of shares outstanding during the reported period. Diluted earnings (loss) per share are calculated based on the potential dilutive impact of our redeemable preferred stock ("RPS"), Series 2 redeemable preferred stock ("RPS 2"), restricted stock units, warrants (if applicable) and stock options.

Net earnings, less any preferred dividends accumulated for the period (whether or not declared), is allocated to common stock. Basic earnings per common share is computed by dividing net earnings available to common stockholders by the weighted average number of common shares.

Diluted earnings per common share is computed in a similar manner, except that first the denominator is increased to include the number of additional common shares that would have been outstanding if potentially dilutive common shares were issued using the treasury stock method in the case of restricted stock units, warrants and options, or the if-converted method in the case of RPS and RPS 2. Our dilution calculation also takes into account the weighted average number of shares of a subsidiary that are exchangeable for shares of GWG Holdings common stock.

**Reclassification** — Certain prior year amounts have been reclassified for consistency with the current year presentation. Specifically, our equity method investment in FOXO as of December 31, 2019, was reclassified to other assets in the condensed consolidated balance sheets to maintain consistency with the current year presentation. This reclassification had no effect on the reported results of operations.

**Newly Adopted Accounting Pronouncements** — Accounting Standards Update ("ASU") No. 2017-04, *Goodwill, (Topic 350)* was issued in January 2017. This standard simplifies how an entity is required to test goodwill for impairment by eliminating Step 2 from the goodwill impairment test. Step 2 measures a goodwill impairment loss by comparing the implied fair value of a reporting unit's goodwill with the carrying amount of that goodwill. Under the new guidance, goodwill impairment loss will be measured on the basis of the fair value of the reporting unit relative to the reporting unit's carrying amount rather than on the basis of the implied amount of goodwill relative to the goodwill balance of the reporting unit. ASU 2017-04 is effective for annual periods beginning after December 15, 2019, including interim periods within those periods, for public business entities. The Company adopted this ASU on January 1, 2020, and it did not have a material impact on its condensed consolidated financial statements and related disclosures.

In August 2018, the Financial Accounting Standards Board ("FASB") issued ASU No. 2018-13, *Fair Value Measurement (Topic 820): Disclosure Framework — Changes to the Disclosure Requirements for Fair Value Measurement*, which eliminates, adds and modifies certain disclosure requirements for fair value measurements. The guidance is effective for fiscal years and interim periods beginning after December 15, 2019. Certain of the amendments require prospective application, while the remainder require retrospective application. The Company adopted this ASU on January 1, 2020, and it did not have a material impact on its condensed consolidated financial statements and related disclosures.

**Accounting Pronouncements Issued But Not Yet Adopted** — In June 2016, the FASB issued ASU No. 2016-13, *Financial Instruments — Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments*, which changes the impairment model for most financial assets and certain other instruments, including trade and other receivables, held-to-maturity debt securities and loans. There have been numerous codification improvements and technical corrections issued through subsequent ASUs since the issuance of ASU No. 2016-13. The standard requires entities to use a new, forward-looking "expected loss" model that is expected to generally result in the earlier recognition of allowances for losses. The guidance is effective for annual periods beginning after December 15, 2022, including interim periods within those years, for smaller reporting companies, as defined by the SEC, but early adoption is permitted. The Company is evaluating the potential impact of this guidance on our condensed consolidated financial statements.

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

ASU 2019-12, *Income Taxes: Simplifying the Accounting for Income Taxes (Topic 740),* was issued in December 2019. The amendments in ASU 2019-12 eliminate certain exceptions related to the approach for intraperiod tax allocation, the methodology for calculating income taxes in an interim period and the recognition of deferred tax liabilities for outside basis differences. ASU 2019-12 also clarifies and simplifies other aspects of the accounting for income taxes. ASU 2019-12 is effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2020, for public business entities. Early adoption is permitted, including adoption in any interim period. The Company is evaluating the impact of this ASU on the condensed consolidated financial statements and disclosures.

ASU 2020-04, *Reference Rate Reform* (Topic 848) was issued in March 2020. The amendments in ASU 2020-04 provide optional expedients and exceptions for applying GAAP to contracts, hedging relationships, and other transactions affected by reference rate reform if certain criteria are met. ASU 2020-04 can be applied by all entities as of the beginning of the interim period that includes March 12, 2020, or any date thereafter, and entities may elect to apply the amendments prospectively through December 31, 2022. The Company is evaluating the impact of this ASU on the condensed consolidated financial statements and disclosures.

**(3) Restrictions on Cash**

Under the terms of our second amended and restated senior credit facility with LNV Corporation (discussed in Note 10), we are required to maintain collection and payment accounts that are used to collect policy benefits from pledged policies, pay annual policy premiums, interest and other charges under the facility, distribute funds to pay down the facility, and distribute excess funds to the borrower (GWG DLP Funding IV, LLC).

The agents for the lender authorize the disbursements from these accounts. At March 31, 2020 and December 31, 2019, there was a balance of $26.4 million and $20.3 million, respectively, in these collection and payment accounts.

**(4) Business Combination**

Prior to December 31, 2019, GWG Holdings owned 41,505,279 Common Units, for a total limited partnership interest in the common units of Ben LP of approximately 90.2%. This investment was historically accounted for using the equity method (see Note 8). On December 31, 2019, GWG Holdings entered into the Investment Agreement and Exchange Agreement as described in Note 1.

Pursuant to the Investment Agreement, GWG Holdings transferred $79.0 million to Ben LP in return for 666,667 additional Common Units and a Preferred Series A Subclass 1 Unit Account of BCH, which increased GWG Holdings' ownership of Common Units to approximately 95.5%. Also, on December 31, 2019, in a transaction related to the Investment Agreement, GWG Holdings transferred its interest in the Preferred Series A Subclass 1 Unit Account to its wholly-owned subsidiary, GWG Life. In connection with the Investment Agreement, GWG Holdings obtained the right to appoint a majority of the board of directors of Beneficient Management, the general partner of Ben LP. As a result, GWG Holdings obtained control of Ben LP, resulting in the consolidation of Ben LP as of December 31, 2019, in accordance with ASC 805, *Business Combinations*.

As a result of the change-of-control, GWG Holdings was required to remeasure its existing equity investment at fair value prior to consolidation. At December 31, 2019, GWG Holdings' equity investment in Common Units had a carrying value of $368.6 million, prior to the additional investment noted above. GWG Holdings estimated the fair value of its preexisting investment in Ben LP to be approximately $622.5 million, resulting in the recognition of a gain of $253.9 million during the fourth quarter of 2019. This gain was included in gain on consolidation of equity method investment in the Company's consolidated statement of operations for the year ended December 31, 2019. This gain was partially offset by the remeasurement to fair value of the Commercial Loan Agreement between GWG Life and Ben LP and the Option Agreement between GWG Holdings and Ben LP, which resulted in a net loss of $4.2 million. The net gain on consolidation of equity method investment after remeasurement of these preexisting balances was $249.7 million. GWG Holdings' proportionate share of the earnings or losses from Ben LP was recognized in earnings (loss) from equity method investment in the consolidated statement of operations from August 10, 2018 until December 31, 2019 (see Note 8 for further information) and was previously recorded on a one-quarter lag basis. In connection with the consolidation of Beneficient, the one-quarter lag was required to be discontinued.

Page 15

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

The following table summarizes the fair value measurement of the assets acquired and liabilities assumed (in thousands):

| | Fair Value at Acquisition Date | Measurement Period Adjustment[1] | Adjusted Fair Value at Acquisition Date |
|---|---|---|---|
| **ASSETS** | | | |
| Loans receivable[1] | $ 232,344 | $ (14,590) | $ 217,754 |
| Fees receivable | 29,168 | — | 29,168 |
| Investment in public equity securities | 24,550 | — | 24,550 |
| Other assets | 14,053 | — | 14,053 |
| Intangible assets[2] | 3,449 | — | 3,449 |
| Total identifiable assets acquired | 303,564 | (14,590) | 288,974 |
| **LIABILITIES** | | | |
| Other borrowings | 153,086 | — | 153,086 |
| Commercial loan agreement from parent | 168,420 | — | 168,420 |
| Other liabilities and deferred revenue | 105,866 | — | 105,866 |
| Accounts payable and accrued expenses | 13,713 | — | 13,713 |
| Total liabilities assumed | 441,085 | — | 441,085 |
| Net liabilities assumed | (137,521) | (14,590) | (152,111) |
| **NONCONTROLLING INTERESTS** | | | |
| Common Units not owned by GWG Holdings[3] | 181,383 | — | 181,383 |
| Class S Ordinary Units | 85,448 | — | 85,448 |
| Class S Preferred Units | 17 | — | 17 |
| Preferred Series A Subclass 1 Unit Accounts | 1,269,654 | — | 1,269,654 |
| Total noncontrolling interests | 1,536,502 | — | 1,536,502 |
| **ACQUISITION CONSIDERATION** | | | |
| Cash, less cash acquired | 61,479 | — | 61,479 |
| Fair value of preexisting investment in Common Units[4] | 622,503 | — | 622,503 |
| Fair value of noncontrolling interest | 1,536,502 | — | 1,536,502 |
| Total estimated consideration | 2,220,484 | — | 2,220,484 |
| Less: Net liabilities assumed | (137,521) | (14,590) | (152,111) |
| Resulting preliminary goodwill | $ 2,358,005 | $ 14,590 | $ 2,372,595 |

(1) As a result of additional information obtained about the collateral value used in the valuation of the loan portfolio for certain collateral dependent loans, the Company recorded a measurement period adjustment during the first quarter of 2020, which resulted in a decrease to loans receivable of $14.6 million with a corresponding adjustment to goodwill.

(2) Includes an insurance license valued at $3.1 million and a non-compete agreement valued at $0.3 million.

(3) Calculated as 1,974,677 Common Units not owned by GWG Holdings at December 31, 2019, multiplied by the $15.00 per unit derived from the enterprise valuation of Beneficient. Also includes $151.8 million of equity-based payment awards that were granted by Beneficient prior to the change in control but were not replaced by awards of GWG Holdings upon the change in control. These awards were treated as noncontrolling interests in accordance with ASC 805, *Business Combinations*.

(4) Calculated as 41,505,279 Common Units owned by GWG Holdings prior to the change in control multiplied by the $15.00 per unit derived from the enterprise valuation of Beneficient.

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

*Methods Used to Determine Equity Value and to Fair Value Assets and Liabilities*

The following is a description of the valuation methodologies used to estimate the fair value of equity and the fair values of major categories of assets acquired and liabilities assumed. In many cases, determining the fair value of equity and the acquired assets and assumed liabilities required management to estimate cash flows expected from those assets and liabilities and to discount those cash flows at appropriate rates of interest. This determination required the utilization of significant estimates and management judgment in accounting for the 2019 change-of-control event.

**Loans receivable** — The loan portfolio was valued using current accounting guidance that defines fair value as the price that would be received to sell an asset or transfer a liability in an orderly transaction between market participants at the measurement date. Level 3 inputs were utilized to value the loan portfolio and included the use of present value techniques employing cash flow estimates and incorporated assumptions that marketplace participants would use in estimating fair values, specifically market interest rate and general credit fair value assumptions. In instances where reliable market information was not available, management used assumptions in an effort to determine reasonable fair value. There was no carryover related allowance for loan losses.

**Cash and cash equivalents and fees receivable** — Cash and cash equivalents and fees receivable were valued using their current carrying amounts which approximate fair value.

**Investment in public equity securities** — The fair value of the investments in public equity securities was determined using quoted market prices. As these were investments by Beneficient in the common stock of GWG Holdings, these amounts were eliminated in consolidation and treated as treasury stock.

**Other assets** — Other assets include miscellaneous receivables that were valued using the current carrying amount as that amount approximates fair value due to the relatively short time between their origination date and the fair value date. Miscellaneous intercompany receivables were eliminated in consolidation.

**Intangible assets** — Intangible assets include an insurance license and a non-compete agreement. Both assets were valued using their current carrying amount which approximates fair value.

**Other borrowings and commercial loan agreement from parent** — The measurement of the fair value of other borrowings and Commercial Loan Agreement from parent was based on market prices that generally are observable for similar liabilities at commonly quoted intervals and is considered a level 2 fair value measurement. The Commercial Loan Agreement between Beneficient and GWG Life was eliminated in consolidation.

**Other liabilities and deferred revenue** — The carrying amounts of other liabilities and deferred revenue approximate their fair value. The Option Agreement between Beneficient and GWG Holdings was eliminated in consolidation.

**Accounts payable and accrued expenses** — Due to their short-term nature, the carrying amounts of accounts payable and accrued expenses approximate the fair value. Miscellaneous intercompany payables were eliminated in consolidation.

**Noncontrolling interests** — The values for each noncontrolling interest component were calculated after determination of an overall enterprise value for the Company. The enterprise value of the Company was determined using the Option Pricing Model ("OPM") Backsolve approach under the market method. The OPM Backsolve approach uses a Black-Scholes option pricing model to calculate the implied equity value of the firm. Once an overall equity value was determined, amounts were allocated to the various classes of equity based on the security class preferences. The inputs to the OPM Backsolve approach are the equity value for one component of the capital structure, expected time to exit, the risk-free interest rate and an assumed volatility based on the volatility of similar publicly traded companies. The OPM Backsolve inputs include Level 3 inputs.

**Goodwill** — The resulting excess of the overall enterprise value after deducting the fair values of assets acquired and liabilities assumed is recognized as goodwill. The goodwill recognized is the result of the inherent value associated with the assembled business after all separately identifiable assets acquired and liabilities assumed are deducted from the enterprise value. The excess estimated enterprise value of Beneficient over the fair value of its net assets is primarily attributable to the potentially large and underserved market that Beneficient is seeking to address, including the estimated demand from MHNW individuals and STM size institutions seeking liquidity for their professionally managed alternative assets. None of the goodwill is expected to be deductible for income tax purposes. The goodwill is allocated to our Beneficient reporting unit.

Page 17

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

The initial accounting for the estimates of equity values, which includes noncontrolling interests, the fair value of loans receivable, and any separately identifiable intangibles was based on the facts and circumstances that existed as of the acquisition date. Should management obtain new information during the measurement period, in addition to that discussed above, about facts and circumstances that existed at the acquisition date, further adjustments to the fair values assigned to these items could occur during the measurement period of one year from the acquisition date. Any such adjustment will result in corresponding adjustments to goodwill.

The following unaudited pro forma financial information presents the combined results of operations of GWG Holdings for the three months ended March 31, 2019, as if the acquisition of Ben LP had occurred as of January 1, 2019 (in thousands, except per share data):

**Total Revenue**

| | | |
|---|---|---|
| Pro forma | $ | 43,935 |
| As reported | | 25,217 |

**Net Loss Attributable to Common Shareholders**

| | | |
|---|---|---|
| Pro forma | $ | (15,459) |
| As reported | | (18,910) |

**Net Loss per Diluted Common Share**

| | | |
|---|---|---|
| Pro forma | $ | (0.41) |
| As reported | | (0.57) |

The unaudited pro forma financial information is presented for informational purposes only. It is not necessarily indicative of what our consolidated results of operations actually would have been had the acquisition occurred at the beginning of each year, nor does it attempt to project the future results of operations of the combined company.

The unaudited pro forma financial information above gives effect to the following:

- Deconsolidation of certain Beneficient trusts included in the ExAlt Plan$^{TM}$;

- Reduction of Beneficient interest expense related to acquisition-date debt principal payments; and

- Elimination of intercompany transactions, including the Commercial Loan Agreement and Option Agreement.

**(5) Investment in Life Insurance Policies**

The Company's investments in life insurance policies include unobservable inputs that are significant to their overall fair value. Changes in the fair value of these policies, net of premiums paid, are recorded in gain (loss) on life insurance policies, net in our consolidated statements of operations. Fair value is determined on a discounted cash flow basis that incorporates life expectancy assumptions generally derived from reports obtained from widely accepted life expectancy providers (other than insured lives covered under small face amount policies — those with $1 million in face value benefits or less — which utilize either a single fully underwritten, or simplified report based on self-reported medical interview), assumptions relating to cost-of-insurance (premium) rates and other assumptions. The discount rate we apply incorporates current information about the discount rates observed in the life insurance secondary market through competitive bidding observations (which have recently declined for us as a result of our decreased purchase activity) and other means, fixed income market interest rates, the estimated credit exposure to the insurance companies that issued the life insurance policies and management's estimate of the operational risk yield premium a purchaser would require to receive the future cash flows derived from our portfolio as a whole. Management has significant discretion regarding the combination of these and other factors when determining the discount rate. As a result of management's analysis, a discount rate of 8.25% was applied to our portfolio as of both March 31, 2020 and December 31, 2019.

Page 18

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

**Portfolio Information**

Our portfolio of life insurance policies, owned by our subsidiaries as of March 31, 2020, is summarized below:

**Life Insurance Portfolio Summary**

| | |
|---|---|
| Total life insurance portfolio face value of policy benefits (in thousands) | $ 2,000,680 |
| Average face value per policy (in thousands) | $ 1,769 |
| Average face value per insured life (in thousands) | $ 1,900 |
| Weighted average age of insured (years) | 82.6 |
| Weighted average life expectancy estimate (years) | 7.2 |
| Total number of policies | 1,131 |
| Number of unique lives | 1,053 |
| Demographics | 74% Male; 26% Female |
| Number of smokers | 47 |
| Largest policy as % of total portfolio face value | 0.7% |
| Average policy as % of total portfolio face value | 0.1% |
| Average annual premium as % of face value | 3.5% |

A summary of our policies organized according to their estimated life expectancy dates, grouped by year, as of the reporting date, is as follows:

| | As of March 31, 2020 | | | As of December 31, 2019 | | |
|---|---|---|---|---|---|---|
| Years Ending December 31, | Number of Policies | Estimated Fair Value (in thousands) | Face Value (in thousands) | Number of Policies | Estimated Fair Value (in thousands) | Face Value (in thousands) |
| 2020 | 6 | 5,325 | 5,644 | 8 | 5,869 | 6,342 |
| 2021 | 41 | 49,578 | 61,040 | 55 | 62,061 | 79,879 |
| 2022 | 91 | 91,241 | 137,197 | 90 | 89,074 | 138,723 |
| 2023 | 123 | 120,539 | 212,493 | 128 | 123,352 | 222,369 |
| 2024 | 116 | 116,681 | 230,260 | 109 | 103,111 | 217,053 |
| 2025 | 112 | 77,648 | 179,796 | 113 | 74,223 | 171,961 |
| Thereafter | 642 | 341,169 | 1,174,250 | 648 | 338,349 | 1,184,646 |
| **Totals** | **1,131** | **$ 802,181** | **$ 2,000,680** | **1,151** | **$ 796,039** | **$ 2,020,973** |

We recognized life insurance benefits of $25.5 and $30.5 million during the three months ended March 31, 2020 and 2019, respectively, related to policies with a carrying value of $6.0 and $8.7 million, respectively, and as a result recorded realized gains of $19.5 and $21.8 million, respectively.

A reconciliation of gain (loss) on life insurance policies is as follows (in thousands):

| | Three Months Ended March 31, | |
|---|---|---|
| | 2020 | 2019 |
| Change in estimated probabilistic cash flows[1] | $ 17,851 | $ 17,131 |
| Unrealized gain on acquisitions[2] | — | 4,459 |
| Premiums and other annual fees | (17,199) | (15,832) |
| Face value of matured policies | 25,502 | 30,459 |
| Fair value of matured policies | (11,709) | (14,721) |
| Gain on life insurance policies, net | $ 14,445 | $ 21,496 |

---

[1] Change in fair value of expected future cash flows relating to our investment in life insurance policies that are not specifically attributable to changes in life expectancy, discount rate changes or policy maturity events.

[2] Gain resulting from fair value in excess of the purchase price for life insurance policies acquired during the reporting period. There were no policy acquisitions during the three months ended March 31, 2020.

Page 19

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

Estimated premium payments and servicing fees required to maintain our current portfolio of life insurance policies in force for the next five years, assuming no mortalities, are as follows (in thousands):

| Years Ending December 31, | | Premiums | | Servicing | | Total |
|---|---|---|---|---|---|---|
| Nine months ending December 31, 2020 | $ | 49,708 | $ | 1,222 | $ | 50,930 |
| 2021 | | 83,813 | | 1,630 | | 85,443 |
| 2022 | | 96,636 | | 1,630 | | 98,266 |
| 2023 | | 108,749 | | 1,630 | | 110,379 |
| 2024 | | 118,269 | | 1,630 | | 119,899 |
| 2025 | | 131,528 | | 1,630 | | 133,158 |
| | $ | 588,703 | $ | 9,372 | $ | 598,075 |

Management anticipates funding the majority of the premium payments and servicing fees estimated above from cash flows realized from life insurance policy benefits, and to the extent necessary, with additional borrowing capacity created as the premiums and servicing costs of pledged life insurance policies become due, under the second amended and restated senior credit facility with LNV Corporation and the net proceeds from our offering of L Bonds as described in Note 10. Management anticipates funding premiums and servicing costs of non-pledged life insurance policies with cash flows realized from life insurance policy benefits from our portfolio of life insurance policies and net proceeds from our offering of L Bonds. The proceeds of these capital sources may also be used for: additional allocations to Beneficient; the purchase, policy premiums and servicing costs of additional life insurance policies; working capital; and financing expenditures including paying principal, interest and dividends.

**(6) Loans Receivable**

*Beneficient Loans Receivable*

Loans receivable held by the Company as of March 31, 2020 and December 31, 2019, were originated primarily through the initial capitalization transactions of Beneficient in 2017 and 2018. These loans are collateralized by the portfolio of alternative assets held in the custody of certain trusts of the ExAlt Plan™. The outstanding principal balance was $430.1 million and $425.9 million as of March 31, 2020 and December 31, 2019, respectively, which included $169.5 million and $154.7 million of interest income paid-in-kind, respectively.

Components of the carrying value of loans receivable were as follows for the periods presented below (in thousands):

| | | As of March 31, 2020 | | As of December 31, 2019 |
|---|---|---|---|---|
| Loans receivable, net of unearned income | $ | 219,296 | $ | 232,344 |
| Allowance for loan losses | | (700) | | — |
| Loans receivable, net | $ | 218,596 | $ | 232,344 |

As described in Note 4, on December 31, 2019, a change-of-control event occurred that resulted in the application of push-down accounting, and all of Beneficient's assets and liabilities were recorded at fair value. Certain of the purchased loans were determined to be PCI loans under ASC 310-30, *Loans and Debt Securities Acquired with Deteriorated Credit Quality,* as defined in Note 2, with the remaining loans accounted for under ASC 310-20, *Nonrefundable Fees and Other Costs*. For loans accounted for under ASC 310-20, the discount arising due to the difference between each loan's carrying value and the estimated fair value at the time of acquisition will be accreted into interest income over its remaining contractual life. Should management obtain new information about facts and circumstances that existed at the acquisition date, additional adjustments to the fair values assigned to acquired loans could occur during the measurement period of one year from the acquisition date.

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

The following table reflects the fair value of non-PCI and PCI loans as of the date of the change-of control (in thousands):

**Fair value of non-PCI loans**                                                                           $           86,436

**Fair value of PCI loans**                                                                               $          145,908

The fair value of PCI loans above does not include the downward measurement period adjustment to PCI loans of $14.6 million discussed in Note 4.

The following table reflects the outstanding principal balance and carrying amounts of the non-PCI loans (in thousands):

|  | March 31, 2020 | | December 31, 2019 | |
| --- | --- | --- | --- | --- |
|  | **Carrying Value** | **Unpaid Balance** | **Carrying Value** | **Unpaid Balance** |
| Loans receivable | $ 89,135 | $ 131,925 | $ 86,436 | $ 129,304 |

The following table reflects the outstanding principal balance and carrying amounts of the PCI loans (in thousands):

|  | March 31, 2020 | | December 31, 2019 | |
| --- | --- | --- | --- | --- |
|  | **Carrying Value** | **Unpaid Balance** | **Carrying Value** | **Unpaid Balance** |
| Loans receivable | $ 129,461 | $ 298,127 | $ 145,908 | $ 296,627 |

Total contractually required payments receivable on PCI loans over the remaining contract period as of December 31, 2019 was $772.2 million. Cash flows expected to be collected at the acquisition date totaled $235.6 million. The difference between total cash flows expected to be collected and the fair value of the loans represents accretable yield.

The following table presents a rollforward of the accretable yield for the three months ended March 31, 2020 (in thousands):

| | |
| --- | --- |
| Balance, beginning of period | $ 89,647 |
| Accretion | (7,537) |
| Decrease in accretable yield[a] | (581) |
| Balance, end of period | $ 81,529 |

(a)  Includes changes in the accretable yield due to both transfers from the nonaccretable difference and the impact of changes in the expected timing of cash flows.

As of March 31, 2020, the allowance for loan losses related to PCI loans was $0.7 million. The loan loss provision expense related to PCI loans during the three months ended March 31, 2020 was $0.7 million.

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

The changes in the allowance for loan losses for the three months ended March 31, 2020 are as follows (in thousands):

| | | |
|---|---|---:|
| Beginning balance | $ | — |
| Provision | | 700 |
| Charge-offs and other, net | | — |
| Ending balance | $ | 700 |

As a result of the push-down accounting described in Note 4, the loans were recorded at fair value and there was no carryover allowance for loan losses recorded as of December 31, 2019.

Beneficient recognizes charge-offs in the period in which they arise for its collateral-dependent loans. Therefore, impaired collateral-dependent loans are written down to their estimated net realizable value, based on disposition value.

*Promissory Note-LiquidTrusts*

On May 31, 2019, GWG Life entered into a Promissory Note (the "Promissory Note"), made by Jeffrey S. Hinkle and Dr. John A. Stahl, not in their individual capacity but solely as trustees of The LT-1 LiquidTrust, The LT-2 LiquidTrust, The LT-5 LiquidTrust, The LT-7 LiquidTrust, The LT-8 LiquidTrust and The LT-9 LiquidTrust (collectively, the "LiquidTrust Borrowers") in the principal amount of $65.0 million. Pursuant to the terms of the Promissory Note, GWG Life funded a term loan to the LiquidTrust Borrowers in an aggregate principal amount of $65.0 million (the "Loan"), which Loan was funded in two installments as described below. The Loan was made pursuant to GWG Holdings' strategy to further diversify into alternative assets (beyond life insurance) and ancillary businesses and was intended to better position Beneficient's balance sheet, working capital and liquidity profile to satisfy anticipated Texas Department of Banking regulatory requirements.

The LiquidTrust Borrowers are common law trusts established as part of alternative asset financings extended by a subsidiary of Ben LP, of which the GWG Holdings owns approximately 95% of the issued and outstanding Common Units (although, on a fully diluted basis, GWG Holdings' ownership interest in Common Units would be reduced significantly below a majority of those issued and outstanding). Although each Borrower is allocated a portion of the Loan equal to approximately 16.7% of the aggregate outstanding principal of the Loan, the Loan constitutes the joint and several obligations of the LiquidTrust Borrowers.

An initial advance in the principal amount of $50.0 million was funded on June 3, 2019 and, subsequent to satisfaction of certain customary conditions, the second advance in the principal amount of $15.0 million was funded on November 22, 2019. The Loan bears interest at 7.0% per annum, with interest payable at maturity, and matures on June 30, 2023. The loan is reported in financing receivables from affiliates in the consolidated balance sheets and included accrued interest receivable of $3.3 million and $2.2 million as of March 31, 2020 and December 31, 2019, respectively. Subject to the Intercreditor Agreements (as defined below), the Loan can be prepaid at the LiquidTrust Borrowers' election without premium or penalty.

The Loan is unsecured and is subject to certain covenants (including a restriction on the incurrence of any indebtedness senior to the Loan other than existing senior loan obligations to HCLP Nominees, L.L.C. ("HCLP"), as Senior Lender) and events of default. HCLP is indirectly associated with one of Beneficient's founders, who is also Chairman of the Board of Directors of GWG Holdings.

Page 22

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

*Intercreditor Agreements*

In connection with the Promissory Note, GWG Life also entered into two intercreditor and subordination agreements: (1) an Intercreditor Agreement between GWG Life and HCLP and (2) an Intercreditor Agreement between GWG Life and Beneficient Holdings, Inc. ("BHI") (the "Intercreditor Agreements"). Under the Intercreditor Agreements, GWG Life agrees to subordinate the Loan to the secured obligations of Beneficient and its affiliates outstanding to the Senior Lender (the "Senior Loan Obligations"), agrees to not take any liens to secure the Loan (and to subordinate such liens, if any, to the liens of the Senior Lender), and agrees not to take enforcement actions under the Promissory Note until such Senior Loan Obligations are paid in full. The Intercreditor Agreements establish various other inter-lender and subordination terms, including, without limitation, with respect to permitted actions by each party, permitted payments, waivers, voting arrangements in bankruptcy, application of certain proceeds and limitations on amendments of the respective loan obligations of the parties. The Senior Lender has agreed not to extend the maturity of its loan obligations beyond June 30, 2023 or increase the outstanding principal of the loans made by the Senior Lender without the written consent of GWG Life. GWG Life has agreed not to transfer, assign, pledge, grant a security interest in or otherwise dispose of (including, without limitation, pursuant to a foreclosure) the Promissory Note except with the written consent of the Senior Lender (such consent not to be unreasonably withheld) or to the Company or direct or indirect wholly-owned subsidiaries thereof.

**(7) Fair Value Definition and Hierarchy**

ASC 820, *Fair Value Measurements and Disclosures* ("ASC 820"), establishes a hierarchical disclosure framework that prioritizes and ranks the level of market price observability used in measuring assets and liabilities at fair value. Market price observability is affected by a number of factors, including the type of investment, the characteristics specific to the investment and the state of the marketplace, including the existence and transparency of transactions between market participants. Assets and liabilities with readily available and actively quoted prices, or for which fair value can be measured from actively quoted prices in an orderly market, generally will have a higher degree of market price observability and a lesser degree of judgment used in measuring fair value.

ASC 820 maximizes the use of observable inputs and minimizes the use of unobservable inputs by requiring the use of observable inputs whenever available. Observable inputs are inputs that market participants would use in pricing the asset or liability developed based on market data obtained from third-party sources. Unobservable inputs are inputs that reflect assumptions about how market participants price an asset or liability based on the best available information. Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability (i.e., the "exit price") in an orderly transaction between market participants at the measurement date (a non-distressed transaction in which neither seller nor buyer is compelled to engage in the transaction). A sale of the portfolio or a portion of the portfolio in an other than orderly transaction would likely occur at less than the fair value of the respective life insurance policies.

The fair value hierarchy prioritizes the inputs into three levels based on the observability of inputs as follows:

Level 1 — Valuations based on quoted prices in active markets for identical assets or liabilities that the Company has the ability to access as of the measurement date. Valuations are based on quoted prices that are readily and regularly available in an active market.

Level 2 — Valuations based quoted prices for similar instruments in active markets; quoted prices for identical or similar instruments in in markets that are not active; and model-derived valuations whose inputs are observable or whose significant value drivers are observable market data.

Level 3 — Valuations based on inputs that are unobservable, are derived from other valuation methodologies, including option pricing models, discounted cash flow models and similar techniques, and are not based on market exchange, dealer, or broker traded transactions. Level 3 valuations incorporate certain assumptions and projections in determining the fair value assigned to such instruments.

A financial instrument's categorization within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement.

Page 23

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

The availability of observable inputs can vary by types of assets and liabilities and is affected by a wide variety of factors, including, for example, whether an instrument is established in the marketplace, the liquidity of markets and other characteristics particular to the transaction. To the extent that valuation is based on models or inputs that are less observable or unobservable in the market, the determination of fair value requires more judgment. Accordingly, the degree of judgment exercised by management in determining fair value is greatest for assets and liabilities categorized in Level 3.

*Financial instruments measured at fair value on a recurring basis*

The Company's financial assets and liabilities carried at fair value on a recurring basis, including the level in the fair value hierarchy, on March 31, 2020 and December 31, 2019 are presented below (in thousands).

| | As of March 31, 2020 | | | |
| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Assets: | | | | |
| Investments in life insurance policies | $ — | $ — | $ 802,181 | $ 802,181 |

| | As of December 31, 2019 | | | |
| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Assets: | | | | |
| Investments in life insurance policies | $ — | $ — | $ 796,039 | $ 796,039 |

The following is a description of the valuation methodologies used for financial instruments measured at fair value on a recurring basis:

**Investments in life insurance policies**

The estimated fair value of our portfolio of life insurance policies is determined on a quarterly basis by management taking into consideration a number of factors, including changes in discount rate assumptions, estimated premium payments and life expectancy estimate assumptions, as well as any changes in economic and other relevant conditions. The discount rate incorporates current information about discount rates observed in the life insurance secondary market through competitive bidding observations (which have declined recently as a result of our decreased purchase activity) and other means, fixed income market interest rates, the estimated credit exposure to the insurance company that issued the life insurance policy and management's estimate of the operational risk yield premium a purchaser would require to receive the future cash flows derived from our portfolio as a whole. Management has significant discretion regarding the combination of these and other factors when determining the discount rate.

Under our Longest Life Expectancy portfolio valuation methodology, we: i) utilize life expectancy reports from third-party life expectancy providers for the pricing of all life insurance policies; ii) apply a stable valuation methodology driven by the experience of our life insurance portfolio, which is re-evaluated if experience deviates by a specified margin; and iii) use relevant market observations that can be validated and mapped to the discount rate used to value the life insurance portfolio.

These inputs are then used to estimate the discounted cash flows from the portfolio using the ClariNet LS probabilistic and stochastic portfolio pricing model from ClearLife Limited, which estimates the expected cash flows using various mortality probabilities and scenarios. The valuation process includes a review by senior management as of each quarterly valuation date. We also engage ClearLife Limited to prepare a net present value calculation of our life insurance portfolio using the inputs we provide on a quarterly basis.

Page 24

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

The following table reconciles the beginning and ending fair value of our Level 3 investments in our portfolio of life insurance policies (in thousands):

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Beginning balance | $ 796,039 | $ 747,922 |
| Total gain in earnings[1] | 12,177 | 15,571 |
| Purchases | — | 27,393 |
| Settlements[2] | (6,035) | (8,701) |
| Transfers into Level 3 | — | — |
| Transfers out of Level 3 | — | — |
| Ending balance | $ 802,181 | $ 782,185 |

(1)  Net change in fair value
(2)  Policy maturities at initial cost basis

The net activity in the table above is reported in gain on life insurance policies, net, in the condensed consolidated statements of operations. There were no net unrealized gains/losses for Level 3 assets included in other comprehensive income as of March 31, 2020 and 2019.

There have been no transfers between levels for any assets or liabilities recorded at fair value on a recurring basis or any changes in the valuation techniques used for measuring the fair value as of March 31, 2020 and December 31, 2019. The following table provides quantitative information about the significant unobservable inputs used in the fair value measurement of the Company's Level 3 fair value assets:

| | As of March 31, 2020 | As of December 31, 2019 |
| --- | --- | --- |
| Weighted-average age of insured, years* | 82.6 | 82.4 |
| Age of insured range, years | 63-101 | 62-101 |
| Weighted-average life expectancy, months* | 86.6 | 86.2 |
| Life expectancy range, months | 0-240 | 0-240 |
| Average face amount per policy (in thousands) | $ 1,769 | $ 1,756 |
| Discount rate | 8.25% | 8.25% |

(*)  Weighted-average by face amount of policy benefits

Life expectancy estimates and market discount rates for a portfolio of life insurance policies are inherently uncertain and the effect of changes in estimates may be significant. For example, if the life expectancy estimates were increased or decreased by four and eight months on each outstanding policy, and the discount rates were increased or decreased by 1% and 2%, with all other variables held constant, the fair value of our investment in life insurance policies would increase or decrease as summarized below (in thousands):

| | Change in Life Expectancy Estimates | | | |
| --- | --- | --- | --- | --- |
| | minus 8 months | minus 4 months | plus 4 months | plus 8 months |
| March 31, 2020 | $ 112,668 | $ 57,263 | $ (55,449) | $ (110,453) |
| December 31, 2019 | $ 113,812 | $ 57,753 | $ (55,905) | $ (111,340) |

| | Change in Discount Rate | | | |
| --- | --- | --- | --- | --- |
| | minus 2% | minus 1% | plus 1% | plus 2% |
| March 31, 2020 | $ 89,558 | $ 42,637 | $ (38,865) | $ (74,399) |
| December 31, 2019 | $ 91,890 | $ 43,713 | $ (39,790) | $ (76,118) |

Page 25

App. 0953

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

*Financial instruments measured at fair value on a non-recurring basis*

There were no assets or liabilities measured at fair value on a non-recurring basis as of March 31, 2020. As of December 31, 2019, Beneficient's assets and liabilities were recorded at fair value in the consolidated balance sheet due to the application of purchase accounting in accordance with ASC 805 as described in Note 4**.**

*Carrying amounts and estimated fair values*

The Company is required to disclose the estimated fair value of financial instruments, whether or not recognized in the consolidated balance sheets, for which it is practicable to estimate those values. These fair value estimates are determined based on relevant market information and information about the financial instruments. Fair value estimates are intended to represent the price at which an asset could be sold or the price at which a liability could be settled. However, given there is no active market or observable market transactions for many of the Company's financial instruments, estimates of fair values are subjective in nature, involve uncertainties and matters of significant judgment and therefore cannot be determined with precision. Changes in assumptions could significantly affect the estimated values. Nonfinancial instruments are excluded from disclosure requirements.

The carrying amounts and estimated fair values of the Company's financial instruments not recorded at fair value, were as noted in the tables below (in thousands).

|  | Level in Fair Value Hierarchy | As of March 31, 2020 Carrying Amount | | Estimated Fair Value | |
|---|---|---|---|---|---|
| Financial assets: |  |  |  |  |  |
| Cash, cash equivalents and restricted cash | 1 | $ | 142,878 | $ | 142,878 |
| Life insurance policy benefits receivable, net | 1 |  | 15,330 |  | 15,330 |
| Fees receivable | 1 |  | 30,453 |  | 30,453 |
| Loans receivable, net of allowance for loan losses | 3 |  | 218,596 |  | 206,531 |
| Financing receivables from affiliates | 2 |  | 68,290 |  | 61,042 |
| Financial liabilities: |  |  |  |  |  |
| Senior credit facility | 2 | $ | 188,793 | $ | 198,661 |
| L Bonds and Seller Trust L bonds | 2 |  | 1,376,673 |  | 1,492,433 |
| Other borrowings | 2 |  | 152,597 |  | 152,597 |

Page 26

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

| | As of December 31, 2019 | | |
|---|---|---|---|
| | Level in Fair Value Hierarchy | Carrying Amount | Estimated Fair Value |
| Financial assets: | | | |
| Cash, cash equivalents and restricted cash | 1 | $ 99,331 | $ 99,331 |
| Life insurance policy benefits receivable, net | 1 | 23,031 | 23,031 |
| Fees receivable | 1 | 29,168 | 29,168 |
| Loans receivable, net of allowance for loan losses | 3 | 232,344 | 232,344 |
| Financing receivables from affiliates | 2 | 67,153 | 59,608 |
| | | | |
| Financial liabilities: | | | |
| Senior credit facility with LNV Corporation | 2 | $ 174,390 | $ 184,587 |
| L Bonds and Seller Trust L Bonds | 2 | 1,293,530 | 1,390,288 |
| Other borrowings | 2 | 153,086 | 153,086 |

The following methods and assumptions were used in estimating the fair values of each of the assets and liabilities in the tables above:

*Cash, Cash Equivalents and Restricted Cash*

The carrying amounts reported in the consolidated balance sheets for cash, cash equivalents and restricted cash approximate their fair values.

*Life Insurance Policy Benefits Receivable*

The carrying value of life insurance policy benefits receivable approximate fair value due to their short-term maturities and low credit risk.

*Fees Receivable*

The carrying value of fees receivable generally approximates fair value.

*Loans Receivable, Net of Allowance for Loan Losses*

The loan portfolio was valued using current accounting guidance that defines fair value as the price that would be received to sell an asset or transfer a liability in an orderly transaction between market participants at the measurement date. Level 3 inputs were utilized to value the loan portfolio and included the use of present value techniques employing cash flow estimates and incorporated assumptions that marketplace participants would use in estimating fair values, specifically market interest rate and general credit fair value assumptions. In instances where reliable market information was not available, management used assumptions in an effort to determine reasonable fair value.

As discussed in Note 4, Beneficient's assets and liabilities, including loans receivable, were recorded at fair value as a result of the change-of-control event on December 31, 2019. Accordingly, there was no carryover related allowance for loan losses.

*Financing Receivables from Affiliates*

The fair value of the Promissory Note receivable from the LiquidTrusts (see Note 6) was measured utilizing an implied yield of 10.0% based on a market yield analysis for similar instruments with similar credit profiles.

*Senior Credit Facility with LNV Corporation*

The carrying value of the LNV Credit Facility reflects interest charged at 12-month LIBOR plus an applicable margin, net of unamortized deferred financing costs. The margin represents our credit risk, and the strength of the portfolio of life insurance policies collateralizing the debt. The overall rate reflects the current interest rate market, and the outstanding principal balance of the facility approximates its fair value.

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

*L Bonds and Seller Trust L Bonds*

The measurement of the fair values of L Bonds and Seller Trust L Bonds, largely containing the same terms, were determined using weighted-average market interest rates of 6.21% and 6.34% as of March 31, 2020 and December 31, 2019, respectively.

*Other Borrowings*

The measurement of the fair values of these debt instruments is based on market prices that generally are observable for similar liabilities at commonly quoted intervals and are considered a Level 2 fair value measurement. The carrying value approximates fair value as of March 31, 2020.

As discussed in Note 4, Beneficient's assets and liabilities, including these other borrowings, were recorded at fair value as a result of the change-of-control event on December 31, 2019.

*Other Fair Value Considerations*

GWG MCA Capital, Inc. ("GWG MCA") participated in the merchant cash advance industry by directly advancing sums to merchants and lending money, on a secured basis, to companies that advance sums to merchants. Each quarter, we review the carrying value of these cash advances, determine if an impairment exists and establish or adjust an allowance for loan loss as necessary. At both March 31, 2020 and December 31, 2019, we fully reserved for the entire $2.2 million of GWG MCA's outstanding loans based on the low likelihood of collectibility on these loans. GWG MCA no longer participates in the merchant cash advance industry.

Certain assets are subject to periodic impairment testing by comparing the respective carrying value of the asset to its estimated fair value. In the event we determine these assets to be impaired, we would recognize an impairment loss equal to the amount by which the carrying value of the impaired asset exceeds its estimated fair value. These periodic impairment tests utilize company-specific assumptions involving significant unobservable inputs, or Level 3, in the fair value hierarchy.

**(8) Equity Method Investments**

*FOXO BioScience LLC (formerly, InsurTech Holdings, LLC)*

On November 11, 2019, GWG contributed the common stock and membership interests of its wholly-owned subsidiaries, Life Epigenetics and youSurance, ("Insurtech Subsidiaries") to a legal entity, FOXO, in exchange for a membership interest in FOXO. Although GWG Holdings currently owns 100% of FOXO's equity, we do not have a controlling financial interest in FOXO because the managing member has substantive participating rights. Therefore, we account for our ownership interest in FOXO as an equity method investment.

The transaction resulted in a loss of control of the Insurtech Subsidiaries and, as a result, we deconsolidated the subsidiaries and recorded an equity method investment balance during the fourth quarter of 2019. The loss of control required us to measure the equity investment at fair value. We determined the fair value of our investment in FOXO approximated the carrying value of $3.4 million, which was primarily comprised of cash and fixed assets contributed to the entity during the fourth quarter of 2019. We recognized a loss on equity method investment of $1.6 million during the fourth quarter of 2019, resulting in an ending balance of $1.8 million as of December 31, 2019. We made additional cash contributions of $5.4 million and recognized a loss on equity method investment of $1.5 million during the three months ended March 31, 2020, resulting in an ending balance of $5.6 million as of March 31, 2020.

In accordance with the operating agreement of FOXO, GWG Holdings is committed to contribute an additional $12.5 million to the entity through October 2021. Our investment in the membership interest of FOXO is presented in other assets in our consolidated balance sheets. Our proportionate share of earnings or losses from our investee is recognized in earnings (loss) from equity method investments in our consolidated statements of operations.

Page 28

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

*The Beneficient Company Group, L.P.*

During 2018, we acquired 40.5 million Common Units for a total limited partnership interest in the common units of Ben LP of approximately 89.9% as of December 31, 2018. On June 12, 2019, we acquired an additional 1,000,000 Common Units from a third party for a cash investment of $10.0 million. On December 31, 2019, we acquired an additional 666,667 newly-issued Common Units for a cash investment of $10.0 million. The Common Units are not publicly traded on a stock exchange.

Prior to December 31, 2019, our investment in Common Units was presented in equity method investment on our consolidated balance sheets. Our proportionate share of earnings or losses from our investee was recognized in earnings (loss) from equity method investments in our consolidated statements of operations. We recorded our share of the income or loss of Beneficient through September 30, 2019, on a one-quarter lag.

On December 31, 2019, we obtained control of Beneficient and consolidated Beneficient as of that date in accordance with ASC 805, *Business Combinations*. See Note 4 for further information on the business combination. In connection with the consolidation, we discontinued the one-quarter reporting lag.

Financial information pertaining to Beneficient is summarized in the table below (in thousands):

|  | October 1 to December 31, 2018 (unaudited) |
|---|---|
| Total revenues | $ 25,306 |
| Net loss | (41,644) |
| Net loss attributable to Ben LP common unitholders | (13,192) |
| GWG portion of net earnings (loss)[1] | (1,927) |

(1) Our portion of Beneficient's net earnings (loss) for the period noted. This amount was recognized during the three months ended March 31, 2019, in accordance with our one-quarter lag election.

We eliminated the effects of any intercompany transactions in the summarized information presented above. Our historical ownership percentage of our investment in Common Units is as follows:

| Date | Percentage of outstanding Common Units | Reason |
|---|---|---|
| August 10, 2018 | 13.9% | Purchase of units |
| December 28, 2018 | 89.9% | Purchase of units |
| March 31, 2019 | 88.1% | Change in investee outstanding units |
| June 12, 2019 | 90.2% | Purchase of units |
| December 31, 2019 | 95.5% | Purchase of units |

There was no change in GWG Holdings' percentage ownership in Beneficient during the three months ended March 31, 2020.

Page 29

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

**(9) Variable Interest Entities**

In accordance with ASC 810, *Consolidation*, the Company assesses whether it has a variable interest in legal entities in which it has a financial relationship and, if so, whether or not those entities are variable interest entities ("VIEs"). For those entities that qualify as VIEs, ASC 810 requires the Company to determine if the Company is the primary beneficiary of the VIE, and if so, to consolidate the VIE.

Prior to December 31, 2019, we determined that Beneficient was a VIE, but that we were not the primary beneficiary of the VIE. GWG Holdings did not have the power to direct any activities of Beneficient, or any of its related parties, that most significantly impacted Beneficient's economic performance. GWG Holdings had no board representation at Ben LP or at its general partner. The general partner was exclusively assigned all management powers over the business and affairs of Beneficient, and the limited partners did not have the ability to remove the general partner. Therefore, GWG Holdings did not consolidate the results of Beneficient in our condensed consolidated financial statements until the change-of-control occurred on December 31, 2019. Prior to the change-of-control, GWG Holdings' exposure to risk of loss in Beneficient was generally limited to its investment in Common Units, its financing receivable from Beneficient and its equity security investment in the Option Agreement to purchase additional common units of Ben LP. Effective December 31, 2019, GWG Holdings obtained the ability to appoint a majority of the board of directors of the general partner of Ben LP. As a result, GWG Holdings became the primary beneficiary of Ben LP on December 31, 2019, and consolidated Beneficient on that date.

We determined that the LiquidTrust Borrowers are VIEs, but that we are not the primary beneficiary of these VIEs. We do not have the power to direct any activities of the LiquidTrust Borrowers that most significantly impact the Borrower's economic performance. The Company's exposure to risk of loss in the LiquidTrust Borrowers is limited to its financing receivable from the LiquidTrust Borrowers.

The Company also determined that certain other trusts included within the ExAlt$^{TM}$ Plans used in connection with Beneficient's operations are VIEs but that we are not the primary beneficiary of these VIEs. The Company does not have both the power to direct the most significant activities of the trusts and the obligation to absorb losses or right to receive benefits that could potentially be significant to the trusts. The Company's investments in the trusts are carried in loans receivable in the consolidated balance sheets. The Company's exposure to risk of loss was determined as the amortized cost of the loans to the trusts, any earned but unpaid fees or expenses plus any remaining potential contributions for unfunded capital commitments and cash reserve commitments.

We determined that FOXO is a VIE, but that we are not the primary beneficiary of the VIE. We do not have the power to direct any activities of FOXO that most significantly impact its economic performance. The Company's exposure to risk of loss in FOXO is limited to its equity method investment in the membership interests of FOXO and its remaining unfunded capital commitments.

The following table shows the classification, carrying value and maximum exposure to loss with respect to the Company's unconsolidated VIEs (in thousands):

| | March 31, 2020 | | December 31, 2019 | |
| --- | --- | --- | --- | --- |
| | Carrying Value | Maximum Exposure to Loss | Carrying Value | Maximum Exposure to Loss |
| Loans receivable | $ 218,596 | $ 322,748 | $ 232,344 | $ 335,255 |
| Financing receivables from affiliates | 68,290 | 68,290 | 67,153 | 67,153 |
| Equity method investment | 5,648 | 18,148 | 1,761 | 19,661 |
| Accounts payable and accrued expenses | (2,538) | — | (2,515) | — |
| Total | $ 289,996 | $ 409,186 | $ 298,743 | $ 422,069 |

**(10) Debt**

*Senior Credit Facility with LNV Corporation*

On November 1, 2019, DLP IV entered into a second amended and restated senior credit facility with LNV Corporation, as lender, and CLMG Corp., as the administrative agent on behalf of the lenders under the agreement (the "LNV Credit Facility"), which replaced the amended and restated senior credit facility dated September 27, 2017 that previously governed DLP IV's senior credit facility. The LNV Credit Facility makes available a total of up to $300.0 million in credit to DLP IV with a maturity date of September 27, 2029. Subject to available borrowing base capacity, additional advances are available under the LNV Credit Facility at the LIBOR rate described below. Such advances are available to pay the premiums and servicing costs of pledged life insurance policies as such amounts become due. Interest will accrue on amounts borrowed under the LNV Credit Facility at an annual interest rate, determined as of each date of borrowing or quarterly if there is no borrowing, equal to (a) 12-month LIBOR, plus (b) 7.50% per annum. The effective rate at March 31, 2020 was 9.50%. Interest payments are made on a quarterly basis.

Page 30

App. 0958

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

Under the LNV Credit Facility, DLP IV has granted the administrative agent, for the benefit of the lenders under the agreement, a security interest in all of DLP IV's assets.

In conjunction with entering into the LNV Credit Facility, DLP IV pledged life insurance policies having an aggregate face value of approximately $298.3 million as additional collateral and received an advance of approximately $37.1 million (inclusive of certain fees and expenses incurred in connection with the negotiation and entry into the LNV Credit Facility). The LNV Credit Facility has certain financial and nonfinancial covenants, and we were in compliance with these covenants at March 31, 2020 and as of the date of this filing.

As of March 31, 2020, approximately 77.1% of the total face value of our life insurance policies portfolio is pledged to LNV Corporation. The principal amount outstanding under this facility was $198.7 million and $184.6 million at March 31, 2020 and December 31, 2019, respectively. Obligations under the LNV Credit Facility are secured by a security interest in DLP IV's assets, for the benefit of the lenders, through an arrangement under which Wells Fargo Bank, N.A. serves as securities intermediary. The life insurance policies owned by DLP IV do not serve as direct collateral for the obligations of GWG Holdings under the L Bonds and Seller Trust L Bonds. The difference between the amount outstanding and the carrying amount on our consolidated balance sheets is due to netting of unamortized debt issuance costs.

*L Bonds*

We began publicly offering and selling L Bonds in January 2012 under the name "Renewable Secured Debentures". These debt securities were re-named "L Bonds" in January 2015. L Bonds were publicly offered and sold on a continuous basis under a registration statement permitting us to sell up to $1.0 billion in principal amount of L Bonds through January 2018. On December 1, 2017, a registration statement relating to an additional public offering was declared effective permitting us to sell up to an additional $1.0 billion in principal amount of L Bonds on a continuous basis until December 2020. This offering contains the same terms and features as the previous offering. As of May 11, 2020, we had remaining capacity of approximately $70.0 million under our current registered L Bond offering.

On March 30, 2020, we filed a registration statement to offer up to $2.0 billion in principal amount of L Bonds on a continuous basis until the third anniversary of the effective date of the registration statement. These bonds contain the same terms and features as our previous offerings.

We are party to an indenture governing the L Bonds dated October 19, 2011, as amended ("Indenture"), under which GWG Holdings is obligor, GWG Life is guarantor, and Bank of Utah serves as indenture trustee. Effective December 31, 2019, we entered into Amendment No. 2 to the indenture which primarily modified the calculation of the debt coverage ratio to allow the Company greater flexibility to finance and to anticipate the potential impacts of GWG Holdings' expanding relationship with Beneficient.

We were in compliance with the covenants of the indenture at March 31, 2020, and as of the date of this filing, and no events of default (as defined in the Indenture) existed as of such dates.

We publicly offer and sell L Bonds under a registration statement declared effective by the SEC and have issued Seller Trust L Bonds under a Supplemental Indenture, as described below. We temporarily suspended the offering of our L Bonds on May 1, 2019 as a result of our delay in filing certain periodic reports with the SEC. We recommenced our L Bond offering on August 8, 2019.

The collateral and guarantee provisions of the L Bonds and Seller Trust L Bonds are described in Note 18.

The bonds have renewal features under which we may elect to permit their renewal, subject to the right of bondholders to elect to receive payment at maturity. Interest is payable monthly or annually depending on the election of the investor.

Page 31

App. 0959

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

At March 31, 2020 and December 31, 2019, the weighted-average interest rate of our L Bonds was 7.18% and 7.15%, respectively. The principal amount of L Bonds outstanding was $1.0 billion and $948.1 million at March 31, 2020 and December 31, 2019, respectively. The difference between the amount of outstanding L Bonds and the carrying amount on our consolidated balance sheets is due to netting of unamortized deferred issuance costs, cash receipts for new issuances and payments of redemptions in process. Amortization of deferred issuance costs was $3.9 million and $2.8 million for the three months ended March 31, 2020 and 2019, respectively. Future expected amortization of deferred financing costs as of March 31, 2020 is $41.2 million in total over the next seven years.

### *Seller Trust L Bonds*

On August 10, 2018, in connection with the Initial Transfer of the Exchange Transaction described in Note 1, GWG Holdings issued Seller Trust L Bonds in the amount of $366.9 million to the Seller Trusts. The maturity date of the Seller Trust L Bonds is August 9, 2023. The Seller Trust L Bonds bear interest at 7.50% per year. Interest is payable monthly in cash.

After December 28, 2020, the holders of the Seller Trust L Bonds will have the right to cause GWG Holdings to repurchase, in whole but not in part, the Seller Trust L Bonds held by such holder. The repurchase may be paid, at the option of GWG Holdings, in the form of cash, and/or a pro rata portion of (i) the outstanding principal amount and accrued and unpaid interest under the commercial loan between GWG Life and Ben LP entered into on August 10, 2018 and (ii) Common Units, or a combination of cash and such property.

The principal amount of Seller Trust L Bonds outstanding was $366.9 million at both March 31, 2020 and December 31, 2019.

### *Other Borrowings*

Beneficient had borrowings with an aggregate carrying value of $152.6 million and $153.1 million as of March 31, 2020 and December 31, 2019, respectively. This aggregate outstanding balance includes a senior credit agreement and a subordinate credit agreement with respective balances, including accrued interest, of $77.5 million and $72.2 million at both March 31, 2020 and December 31, 2019. These amounts exclude an aggregate unamortized premium of $0.4 million and $0.9 million as of March 31, 2020 and December 31, 2019, respectively. Both loans accrue interest at a rate of 1-month LIBOR plus 3.95%, compounded daily, with interest due by the 15th of each month. The senior credit agreement and the subordinate credit agreement both mature on June 30, 2020. These loans are not currently guaranteed by GWG. The loans contain customary covenants and events of default and termination, including cross-default provisions. As of March 31, 2020, Beneficient was in compliance with all covenants. As discussed in Note 20, on May 15, 2020, Beneficient and the lender signed a Binding Term Sheet to Amend the Credit Agreement ("Term Sheet") which would amend the terms of the loans.

Beneficient has additional borrowings maturing in 2023 and 2024 with an aggregate carrying value of $2.5 million as of both March 31, 2020 and December 31, 2019.

### (11) Stockholders' Equity

### *Common Stock*

In September 2014, GWG Holdings consummated an initial public offering of its common stock resulting in the sale of 800,000 shares of common stock at $12.50 per share, and net proceeds of approximately $8.6 million after the payment of underwriting commissions, discounts and expense reimbursements. In connection with this offering, the common stock of GWG Holdings was listed on the Nasdaq Capital Market under the ticker symbol "GWGH."

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

The 2018 transactions between GWG Holdings, GWG Life, Beneficient and the Seller Trusts described in Note 1 ultimately resulted in the issuance of 27,013,516 shares of GWG Holdings common stock to the Seller Trust in exchange for Common Units. The shares were offered and sold in reliance upon the exemption from registration provided by Section 4(a)(2) under the Securities Act of 1933, as amended. Also, the Purchase and Contribution Agreement described in Note 1 ultimately resulted in the sale of 2,500,000 shares of GWG Holdings common stock to BCC, and the contribution of 1,452,155 shares of GWG Holdings common stock to AltiVerse.

Pursuant to the Exchange Agreement described in Note 1, on December 31, 2019, holders of Ben LP common units have the right to exchange their common units for common stock of GWG Holdings. The exchange ratio in the Exchange Agreement is based on the ratio of the capital account associated with the common units to be exchanged to the market price of the common stock of GWG Holdings based on the volume weighted average price of GWG Holdings' common stock for the five consecutive trading days prior to the quarterly exchange date. No Ben LP common units have been exchanged for common stock of GWG Holdings through March 31, 2020.

On November 15, 2018, the Board of Directors of GWG Holdings approved a stock repurchase program pursuant to which the Company was permitted, from time to time, to purchase shares of its common stock for an aggregate purchase price not to exceed $1.5 million. Stock repurchases were able to be executed through various means, including, without limitation, open market transactions, privately negotiated transactions or otherwise. The stock repurchase program did not obligate the Company to purchase any shares, and expired on April 30, 2019.

The following table includes information about the stock repurchase program for the three months ended March 31, 2019 (dollar amounts in thousands, except per share data):

| 2019 Monthly Period | Number of Shares Purchased | Average Price Paid per Share | Total Number of Shares Purchased as Part of the Program | Maximum Dollar Value of Shares that Remained Under the Program |
|---|---|---|---|---|
| January 2019 | 42,488 | $ 8.47 | 52,523 | $ 1,072 |
| February 2019 | 202 | 8.88 | 52,725 | 1,070 |

(1)  No stock was repurchased after February 2019, and the stock repurchase program expired on April 30, 2019.

*Redeemable Preferred Stock*

On November 30, 2015, our public offering of up to 100,000 shares of RPS at $1,000 per share was declared effective. Holders of RPS are entitled to cumulative dividends at the rate of 7% per annum, paid monthly. Dividends on the RPS are recorded as a reduction to additional paid-in capital, if any, then to the outstanding balance of the preferred stock if additional paid-in capital has been exhausted. Under certain circumstances described in the Certificate of Designation for the RPS, additional shares of RPS may be issued in lieu of cash dividends.

The RPS ranks senior to our common stock and pari passu with our RPS 2 (see further details in the section below) and entitles its holders to a liquidation preference equal to the stated value per share (i.e., $1,000) plus accrued but unpaid dividends. Holders of RPS may convert their RPS into our common stock at a conversion price equal to the volume-weighted average price of our common stock for the 20 trading days immediately prior to the date of conversion, subject to a minimum conversion price of $15.00 and in an aggregate amount limited to 15% of the stated value of RPS originally purchased from us and still held by such purchaser.

Page 33

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

Holders of RPS may request that we redeem their RPS at a price equal to their stated value plus accrued but unpaid dividends, less an applicable redemption fee, if any, as specified in the Certificate of Designation. Nevertheless, the Certificate of Designation for RPS permits us in our sole discretion to grant or decline redemption requests. Subject to certain restrictions and conditions, we may also redeem shares of RPS without a redemption fee upon a holder's death, total disability or bankruptcy. In addition, after one year from the date of original issuance, we may, at our option, call and redeem shares of RPS at a price equal to their liquidation preference.

In March 2017, we closed the RPS offering to additional investors having sold 99,127 shares of RPS for an aggregate gross consideration of $99.1 million and incurred approximately $7.0 million of related selling costs.

At the time of its issuance, we determined that the RPS contained two embedded features: (1) optional redemption by the holder, and (2) optional conversion by the holder. We determined that each of the embedded features met the definition of a derivative; however, based on our assessment under ASC 470, *Debt*, ("ASC 470") and ASC 815, *Derivatives and Hedging*, ("ASC 815"), we do not believe bifurcation of either the holder's redemption or conversion feature is appropriate.

*Series 2 Redeemable Preferred Stock*

On February 14, 2017, our public offering of up to 150,000 shares of RPS 2 at $1,000 per share was declared effective. The terms of the RPS 2 are largely consistent with those of the RPS, other than the conversion and redemption features discussed below.

Holders of RPS 2 may, less an applicable conversion discount, if any, convert their RPS 2 into our common stock at a conversion price equal to the volume-weighted average price of our common stock for the 20 trading days immediately prior to the date of conversion, subject to a minimum conversion price of $12.75 and in an aggregate amount limited to 10% of the stated value of RPS 2 originally purchased from us and still held by such purchaser. We may, at our option, call and redeem shares of RPS 2 at a price equal to their liquidation preference (subject to a minimum redemption price, in the event of redemptions occurring less than one year after issuance, of 107% of the stated value of the shares being redeemed).

In April 2018, we closed the RPS 2 offering to additional investors having sold 149,979 shares of RPS 2 for an aggregate gross consideration of $150.0 million and incurred approximately $10.3 million of related selling costs.

The RPS 2 was determined to have the same two embedded features discussed in the RPS section above (optional redemption and optional conversion by the holder). We do not believe bifurcation of either the holder's redemption or conversion feature is appropriate.

*Preferred Series A Subclass 1 (Redeemable noncontrolling interest)*

BCH, a consolidated subsidiary of Ben LP, has non-unitized equity outstanding. The Preferred Series A Subclass 1 Unit accounts are non-participating and convertible on a dollar basis. The 4th Amended and Restated Limited Partnership Agreement ("LPA") of BCH governs the terms of BCH's equity securities.

Beginning June 1, 2018, the Preferred Series A Subclass 1 Unitholders agreed to temporarily reduce the preferred return rate. On March 31, 2019, Preferred Series A Subclass 1 Unit Account holders signed an agreement to forbear the right to receive an annualized preferred return in excess of a rate determined materially consistent with the methodology below until, initially, the earlier of December 31, 2019 or three months following the issuance of the limited trust association charters by the Texas Department of Banking. The charters from the Texas Department of Banking were not issued as of December 31, 2019. In 2020, this forbearance agreement was extended through March 31, 2020. The income allocation methodology under this forbearance agreement was as follows:

- First, Ben, as the sole holder of Class A Units issued by BCH is allocated income from BCH to cover the expenses incurred solely by Ben;

- Second, the remaining income at BCH is allocated 50% to the aggregate of Class A Units and Class S Ordinary Units and 50% to Preferred Series A Subclass 1 Unit Accounts, until the Common Units issued by Ben receive a 1% annualized return on the Common Unit account balance;

- Third, after the 1% annualized return to the Common Unit issued by Ben is achieved, additional income is allocated to the Preferred Series A until the Preferred Series A is allocated the amount required under the LPA, (as amended); and

- Finally, any remaining income is allocated under the terms of the current LPA (pro-rata between the Class A Units and Class S Ordinary Units).

If and when the forbearance agreement expires, account holders will be entitled to a compounded quarterly preferred return. The preferred return to be paid to Preferred Series A Unitholders is limited by a quarterly preferred return rate cap that is based on the annualized revenues of BCH. Annualized revenues are defined as four times the sum of total quarterly interest, fee and dividend income plus total noninterest revenues. This quarterly rate cap is defined as follows:

- 0.25% if annualized revenues are $80 million or less;

- 0.50% if annualized revenues are greater than $80 million but equal to or less than $105 million;

- 0.75% if annualized revenues are greater than $105 million but equal to or less than $125 million;

Page 34

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

- 1.00% if annualized revenues are greater than $125 million but equal to or less than $135 million;

- 1.25% if annualized revenues are greater than $135 million but equal to or less than $140 million; and

- If over $140 million, the preferred return calculation is based on a fraction (i) the numerator of which is (A) the positive percentage rate change, if any, to the seasonally adjusted CPI-U covering the period from the date of the last allocation of profits to such holders, plus (B) (x) 2% prior to an Initial Public Offering (as defined in the BCH LPA) by Ben and (y) 3% thereafter, and (ii) the denominator of which is one minus the highest effective marginal combined U.S. federal, state and local income tax rate in effect as of the beginning of the fiscal quarter for which such determination is being made for an individual resident in New York City, New York, assuming (1) that the aggregate gross income allocable with respect to the quarterly preferred return for such fiscal year will consist of the same relative proportion of each type or character (e.g., long term or short term capital gain or ordinary or exempt income) of gross income item included in the aggregate gross income actually allocated in respect of the quarterly preferred return for the fiscal year reflected in the BCH's most recently filed Internal Revenue Service Form 1065 and (2) any state and local income taxes are not deductible against U.S. federal income tax.

The definition of Initial Public Offering includes an event, transaction or agreement pursuant to which the Common Units are convertible or exchangeable into equity securities listed on a national securities exchange or quotation in an automated quotation system.

No amounts have been paid to the Preferred Series A Subclass 1 Unit Account holders related to the preferred return from inception through March 31, 2020. In connection with the issuance of Preferred Series A Subclass 2 Units as part of the Option Agreement, the preferred return of Preferred Series A Subclass 1 Unit Account holders is reduced by the preferred return allocated to the Preferred Series A Subclass 2 Units during the period the Option Agreement remains outstanding.

Upon election by a holder, the Preferred Series A Unit Accounts (other than Preferred Series A Subclass 2 Unit Accounts) are, at any time on or after January 1, 2021, convertible in an amount of Preferred Series A Unit Accounts (other than Preferred Series A Subclass 2 Unit Accounts), equal to 20% of their Sub-Capital Accounts into Class S Ordinary Units (with the right to convert any unconverted amount from previous years in any subsequent years). Upon an election, a holder of Preferred Series A Subclass 1 Unit Accounts will be issued Class S Ordinary Units necessary to provide the holder with a number of Class S Ordinary Units that, in the aggregate, equal (a) the balance of the holder's capital account associated with the Preferred Series A Subclass 1 Unit Accounts being converted divided by (b) either (x) prior to an initial public offering, the appraised per Class A Unit fair market value as determined by Beneficient or (y) following an initial public offering, the average price of a Common Unit for the thirty (30) day period ended immediately prior to the applicable conversion date. The holder of such newly issued Class S Ordinary Units may immediately convert them into Common Units. Additionally, effective December 31, 2030, if the Preferred Series A Subclass 1 Unit Accounts have not been converted, they will redeem for cash in an amount equal to the then outstanding capital account balance of the accounts. If available redeeming cash (as defined in the LPA) is insufficient to satisfy any such redemption requirements, BCH, on a quarterly basis, will redeem additional Preferred Series A Units until all such Preferred Series A Units have been redeemed. The Preferred Series A Subclass 1 Unit Accounts are subject to certain other conversion and redemption provisions.

The current LPA of BCH also includes certain limitations of BCH, without the consent of a majority-in-interest of the Preferred Series A Unit Account holders, to (i) issue any new equity securities and (ii) except as otherwise provided, incur indebtedness that is senior to or pari passu with any right of distribution, redemption, repayment, repurchase or other payments relating to the Preferred Series A Unit accounts. Further, BCH cannot, prior to the conversion of all the Preferred Series A Unit accounts, incur any additional long-term debt unless (i) after giving effect to the incurrence of the new long-term debt on a pro forma basis, the sum of certain preferred stock, existing debt and any new long-term indebtedness would not exceed 55% of BCH's net asset value ("NAV") plus cash on hand, and (ii) at the time of incurrence of any new long-term indebtedness, the aggregate balance of BCH's (including controlled subsidiaries) debt plus such new long-term debt does not exceed 40% of the sum of the NAV of the collateral underlying the loan portfolio of BCH and its subsidiaries plus cash on hand at Ben LP, BCH and its subsidiaries.

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

The Preferred Series A Subclass 1 Unit Accounts are recorded in the consolidated balance sheet in the redeemable noncontrolling interest line item.

*Class S Ordinary Units*

As of both March 31, 2020 and December 31, 2019, BCH had issued and outstanding 5.8 million Class S Ordinary Units. The Class S Ordinary Units participate on an as-converted basis pro-rata in the share of the profits or losses of BCH and subsidiaries following all other allocations made by BCH and its subsidiaries. As limited partner interests, these units have limited voting rights and do not entitle participation in the management of BCH's business and affairs. The Class S Ordinary Units are exchangeable for Common Units on a one-for-one basis, subject to customary conversion rate adjustments for splits, distributions and reclassifications, as well as compliance with any applicable vesting and transfer restrictions. Each conversion also results in the issuance to Ben LP of a Class A Unit of BCH for each common unit issued.

The Class S Ordinary Units are recorded in the consolidated balance sheet in the noncontrolling interests line item.

*Class S Preferred Units*

The limited partnership agreement of BCH allows it to issue Class S Preferred Units. The Class S Preferred Units are entitled to a quarterly preferred return that is limited by the quarterly preferred return rate cap described above for Preferred Series A Subclass 1 except for when annualized revenues exceed $140 million, the Class S Preferred return is based on a fraction (i) the numerator of which is (A) the positive percentage rate change, if any, to the seasonally adjusted CPI-U covering the period from the date of the last allocation of profits to such holders, plus (B) 0.75 percent, and (ii) the denominator of which is one minus the highest effective marginal combined U.S. federal, state and local income tax rate in effect as of the beginning of the fiscal quarter for which such determination is being made for an individual resident in New York City, New York, assuming (1) that the aggregate gross income allocable with respect to the quarterly preferred return for such fiscal year will consist of the same relative proportion of each type or character (e.g., long term or short term capital gain or ordinary or exempt income) of gross income item included in the aggregate gross income actually allocated in respect of the quarterly preferred return for the fiscal year reflected in the Ben Group Partnership's most recently filed IRS Form 1065 and (2) any state and local income taxes are not deductible against U.S. federal income tax. The Class S Preferred Units also participate on an as-converted basis pro-rata in the share of the profits or losses of BCH and subsidiaries following all other allocations made by BCH and its subsidiaries. As limited partner interests, these units are generally non-voting and do not entitle participation in the management of BCH's business and affairs. Generally, the Class S Preferred Units are exchangeable for Common Units in Ben LP on a 1.2-for-1 basis, subject to customary conversion rate adjustments for splits, distributions and reclassifications, as well as compliance with any applicable vesting and transfer restrictions. Each conversion also results in the issuance to Ben LP of a Class A Unit for each Common Unit issued. Holders of Class S Preferred Units may elect to convert into Class S Ordinary Units in connection with a sale or dissolution of BCH.

No amounts have been paid to the Class S Preferred Unit holders related to the preferred return from inception through March 31, 2020. The Class S Preferred Units are recorded in the consolidated balance sheet in the noncontrolling interests line item.

**(12) Equity-Based Compensation**

As of March 31, 2020, the Company has outstanding equity-based awards under the 2013 Stock Incentive Plan, the Beneficient Management Partners, L.P. ("BMP") Equity Incentive Plan, and the Ben Equity Incentive Plan, as more fully described in the sections below.

Page 36

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

*2013 Stock Incentive Plan*

GWG Holdings adopted the 2013 Stock Incentive Plan in March 2013, as amended on June 1, 2015, May 5, 2017 and May 8, 2018. Participants under the plan may be granted incentive stock options and non-statutory stock options; stock appreciation rights; stock awards; restricted stock; restricted stock units; and performance shares. Eligible participants include officers and employees of GWG Holdings and its subsidiaries, members of our Board of Directors, and consultants. Option awards generally expire 10 years from the date of grant. As of March 31, 2020, the Company has granted stock options, stock appreciation rights ("SAR"), and restricted stock units ("RSU") under this plan.

During the three months ended March 31, 2020, a total of 20,751 stock options held by employees vested. Additionally, as a result of stock option exercises, 1,456 shares of common stock were issued to employees, net of shares forfeited to satisfy tax withholding obligations.

Upon the exercise of SARs, the Company is obligated to make cash payment equal to the positive difference between the market value of the Company's common stock on the date of exercise less the market value of the common stock on the date of grant. The liability for the SARs as of March 31, 2020 and December 31, 2019 was $0.8 million and $0.6 million, respectively, and was recorded within accounts payable and accrued expenses in the condensed consolidated balance sheets.

During the three months ended March 31, 2020, none of the RSUs held by employees have vested.

*BMP Equity Incentive Plan*

The Board of Directors of Beneficial Management, Ben LP's general partner, adopted the BMP Equity Incentive Plan in 2019. Under the BMP Equity Incentive Plan, certain directors and employees of Ben are eligible to receive equity units in BMP, an entity affiliated with the board of directors of Beneficial Management, in return for their services to Ben. The BMP equity units eligible to be awarded to employees are comprised of BMP's Class A Units and/or BMP's Class B Units (collectively, the "BMP Equity Units"). The BMP Equity Units awarded in 2019 and during the three months ended March 31, 2020, included some awards that were fully vested upon grant date, and some awards that are subject to service-based vesting over a four-year period from the date of hire.

As BMP's equity is not publicly traded, the fair value of the BMP Equity Units is determined on each grant date using a probability-weighted discounted cash flow analysis. This fair value measurement is based on significant inputs not observable in the market and thus represents a Level 3 measurement within the fair value hierarchy. The resultant probability-weighted cash flows are then discounted using a rate that reflects the uncertainty surrounding the expected outcomes, which the Company believes is appropriate and representative of a market participant assumption.

*Ben Equity Incentive Plan*

The Board of Directors of Beneficial Management adopted the Ben Equity Incentive Plan in September 2018. Under the Ben Equity Incentive Plan, Ben is permitted to grant equity awards, in the form of restricted equity units ("REUs") representing ownership interests in Common Units. Settled awards under the Ben Equity Incentive Plan dilute Ben's Common Unitholders. The total number of Common Units that may be issued under the Ben Equity Incentive Plan is equivalent to 15% of the number of fully diluted Common Units outstanding, subject to annual adjustment.

All REUs are subject to two performance conditions which were met during 2019. Additionally, if a change-of-control event occurs prior to July 1, 2021, then all units, vested and unvested, will settle within 60 days. Any transaction where GWG Holdings obtains the right to appoint a majority of the members of Beneficial Management's Board of Directors is expressly excluded from the definition of change-of-control for the REUs. Awards will generally be subject to service-based vesting over a multi-year period from the recipient's date of hire, though some awards fully vest upon grant date. While providing services to Ben, if applicable, certain of these awards are subject to minimum retained ownership rules requiring the award recipient to continuously hold Common Unit equivalents equal to at least 15% of their cumulatively granted awards that have the minimum retained ownership requirement.

Page 37

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

As Ben LP's equity is not publicly traded, the fair value of the REUs is estimated on the grant date using recent equity transactions involving third parties, which provides the Company with observable fair value information sufficient for estimating the grant date fair value.

The following table summarizes the award activity, in number of units, for each plan during the three months ended March 31, 2020:

| | Balance at December 31, 2019 | Granted during the period | Vested during the period | Exercised during the period | Forfeited during the period | Balance at March 31, 2020 |
|---|---|---|---|---|---|---|
| **Vested** | | | | | | |
| Stock Options | 673,341 | — | 20,751 | (19,304) | (55,917) | **618,871** |
| SAR | 200,745 | — | — | (1,284) | (2,051) | **197,410** |
| RSU | — | — | — | — | — | **—** |
| BMP Equity Units | 7,980,037 | 3,451,017 | — | — | — | **11,431,054** |
| REU | 2,164,742 | 2,281,681 | 7,500 | — | — | **4,453,923** |
| | | | | | | |
| **Unvested** | | | | | | |
| Stock Options | 232,040 | — | (20,751) | — | (44,858) | **166,431** |
| SAR | 174,880 | — | — | — | (25,317) | **149,563** |
| RSU | 244,083 | — | — | — | — | **244,083** |
| BMP Equity Units | 180,000 | 2,649,200 | — | — | (70,000) | **2,759,200** |
| REU | 246,500 | 1,902,472 | (7,500) | — | (77,500) | **2,063,972** |
| | | | | | | |
| **Total** | | | | | | |
| Stock Options | 905,381 | — | — | (19,304) | (100,775) | **785,302** |
| SAR | 375,625 | — | — | (1,284) | (27,368) | **346,973** |
| RSU | 244,083 | — | — | — | — | **244,083** |
| BMP Equity Units | 8,160,037 | 6,100,217 | — | — | (70,000) | **14,190,254** |
| REU | 2,411,242 | 4,184,153 | — | — | (77,500) | **6,517,895** |

The holders of certain of the units issued under the BMP Equity Incentive Plan and the Ben Equity Incentive Plan, upon vesting, have the right to convert the units to shares of GWG Holdings common stock per the Exchange Agreement discussed in Note 1. As such, units vested and issued under Beneficient's equity incentive plans may result in dilution of the common stock of GWG Holdings.

The following table presents the components of equity-based compensation expense recognized in the consolidated statement of operations (in thousands):

| | Three Months Ended March 31, | |
|---|---|---|
| | **2020** | **2019** |
| Stock options | $ 48 | $ 262 |
| Stock appreciation rights | 206 | 413 |
| Restricted stock units | 260 | 159 |
| BMP equity units | 38,024 | — |
| REU | 30,910 | — |
| **Total equity-based compensation** | $ 69,448 | $ 834 |

Unrecognized equity-based compensation expense totaled approximately $45.2 million as of March 31, 2020. We currently expect to recognize equity-based compensation expense of $13.0 million during the remainder of 2020, and the remainder thereafter based on scheduled vesting of awards outstanding as of March 31, 2020. The following table presents the equity-based compensation expense expected to be recognized over the next five years based on scheduled vesting of awards outstanding as of March 31, 2020 (in thousands):

| | Stock Options | SAR | RSU | REU | BMP Equity Units | Total |
|---|---|---|---|---|---|---|
| Nine months ending 2020 | $ 202 | $ 81 | $ 226 | $ 6,169 | $ 6,301 | $ 12,979 |
| 2021 | 142 | 132 | — | 8,027 | 8,363 | 16,664 |
| 2022 | 20 | 81 | — | 5,306 | 5,705 | 11,112 |
| 2023 | — | 6 | — | 2,148 | 1,904 | 4,058 |
| 2024 | — | — | — | 262 | 139 | 401 |
| **Total** | $ 364 | $ 300 | $ 226 | $ 21,912 | $ 22,412 | $ 45,214 |

App. 0966

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

**(13) Income Taxes**

The Company applies an estimated annual effective rate to interim period pre-tax income to calculate the income tax provision for the quarter in accordance with the principal method prescribed by the accounting guidance established for computing income taxes in interim periods.

Income tax benefit was $14.5 million for the three months ended March 31, 2020, compared to $0.0 million for the three months ended March 31, 2019. The Company's effective tax rate was 16.03% and 0% for the same periods. Our tax benefit for the year primarily reflects the effect of a change in state taxing jurisdictions, the reduction of a naked credit (described below) and current tax expense.

In late 2019, the Company moved its headquarters from Minnesota to Texas. This move resulted in a change in the state deferred tax rate from 9.8% to 0%. The tax effects of this move has been recorded as a discrete item during the period.

The Company currently records a valuation allowance against its deferred tax assets to the extent there are indefinite lived intangibles related to investments, business interest expense and net operating losses. Due to the uncertain timing of the reversal of these temporary differences, they cannot be considered as a source of future taxable income for purposes of determining a valuation allowance; therefore the deferred tax liability cannot offset deferred tax assets. This is often referred to as a "naked credit." Due to a prior deemed ownership change, net operating loss carryforwards are subject to Section 382 of the Internal Revenue Code.

We continue to monitor and evaluate the rationale for recording a full valuation allowance for the net amount of the deferred tax assets which are in excess of the indefinite-lived deferred tax assets and liabilities. We intend to continue maintaining a full valuation allowance on these net deferred tax assets until there is sufficient evidence to support the reversal of all or some portion of these allowances. Release of the valuation allowance would result in the recognition of certain deferred tax assets and a decrease to income tax expense for the period the release is recorded. However, the exact timing and amount of the valuation allowance release are subject to change on the basis of the level of profitability that we are able to actually achieve.

On March 27, 2020, Congress passed and the President signed into law the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), which included significant changes to U.S. Federal income tax law. However, the only change that is expected to affect the Company is the modification to Section 163(j), which increased the allowable business interest deduction from 30% of adjusted taxable income to 50% of adjusted taxable income.

**(14) Loss per Common Share**

The computations of basic and diluted income (loss) attributable to common shareholders per share for the three months ended March 31, 2020 and 2019 are as follows (in thousands, except share data and per share data):

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| **Numerator:** | | |
| Net loss attributable to common shareholders | $ (49,384) | $ (18,910) |
| | | |
| **Denominator:** | | |
| Basic – weighted average common shares outstanding | 30,534,977 | 32,984,741 |
| Effect of dilutive securities | — | — |
| Diluted – weighted average common shares outstanding | 30,534,977 | 32,984,741 |
| Basic loss per common share | $ (1.62) | $ (0.57) |
| Diluted loss per common share | $ (1.62) | $ (0.57) |

For the three months ended March 31, 2020 and 2019, RPS, RPS 2, restricted stock units, and stock options for a potential 2,543,665 and 2,814,635 shares, respectively, were not included in the calculation of diluted earnings per share because we recorded a net loss during these periods and the effects were anti-dilutive. Potentially dilutive instruments issued by Ben LP that are ultimately exchangeable into GWG common stock were also excluded from the calculation of diluted earnings per share for the three months ended March 31, 2020 because we recorded a net loss during this period and the effects were anti-dilutive.

Page 39

App. 0967

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

**(15) Segment Reporting**

The Company has two reportable segments consisting of Secondary Life Insurance and Beneficient. Corporate & Other includes certain activities not allocated to specific business segments. These activities include holding company financing and investing activities, and management and administrative services to support the overall operations of the Company and from November 1, 2019, include our equity method investment in FOXO.

The Secondary Life Insurance segment seeks to earn non-correlated yield from our portfolio of life insurance policies. Our Beneficient segment consists of the assets and operations of Ben LP and its subsidiaries. Beneficient became a consolidated subsidiary of GWG Holdings as of December 31, 2019, as described in Note 4. Ben LP provides a variety of trust services, liquidity products and loans for alternative assets and illiquid investment funds, and other financial services to mid-to-high net worth individuals. Prior to December 31, 2019, we accounted for our investment in the common units of Beneficient under the equity method.

These segments are differentiated by the products and services they offer as well as by the information used by the Company's chief operating decision maker to determine allocation of resources and assess performance.

Earnings before taxes ("EBT") is the measure of profitability used by management to assess performance of its segments and allocate resources. Segment EBT represents net income (loss) excluding income taxes and includes earnings (loss) from equity method investments and gain on consolidation of equity method investment.

| | Three Months Ended March 31, | |
| --- | --- | --- |
| **Revenue:** | **2020** | **2019** |
| Secondary Life Insurance | $ 15,148 | $ 22,183 |
| Beneficient | 18,409 | 2,870 |
| Corporate & Other | — | 164 |
| Total | $ 33,557 | $ 25,217 |

| | Three Months Ended March 31, | |
| --- | --- | --- |
| **Interest Expense:** | **2020** | **2019** |
| Secondary Life Insurance | $ 22,693 | $ 20,096 |
| Beneficient | 13,178 | 6,879 |
| Corporate & Other | — | — |
| Total | $ 35,871 | $ 26,975 |

| | Three Months Ended March 31, | |
| --- | --- | --- |
| **Interest Income:** | **2020** | **2019** |
| Secondary Life Insurance | $ 615 | $ 631 |
| Beneficient | 13,374 | 2,825 |
| Corporate & Other | — | 4 |
| Total | $ 13,989 | $ 3,460 |

| | Three Months Ended March 31, | |
| --- | --- | --- |
| **Segment EBT:** | **2020** | **2019** |
| Secondary Life Insurance | $ (14,721) | $ (1,623) |
| Beneficient | (70,149) | (5,936) |
| Corporate & Other | (7,153) | (7,055) |
| Total | (92,023) | (14,614) |
| Income tax benefit | 14,507 | — |
| Net loss | $ (77,516) | $ (14,614) |

Page 40

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

| Total Assets: | March 31, 2020 | | December 31, 2019 | |
|---|---|---|---|---|
| Secondary Life Insurance | $ | 952,447 | $ | 904,363 |
| Beneficient | | 2,719,387 | | 2,721,546 |
| Corporate & Other | | 12,395 | | 9,297 |
| Total | $ | 3,684,229 | $ | 3,635,206 |

The total assets of the Beneficient segment at March 31, 2020 and December 31, 2019, includes goodwill of $2.4 billion and $2.4 billion, respectively, which represents all of the goodwill on our consolidated balance sheet as of the end of each reporting period.

**(16) Leases**

The Company leases certain real estate for its office premises under operating lease agreements which expire in 2021 and 2025. Under these leases, we are obligated to pay base rent plus common area maintenance and a share of building operating costs. The lease agreements contain extension options that we have not included in our liability calculations. We lease various other facilities on a short-term basis.

The lease assets and liabilities are as follows (in thousands):

| Leases | Classification | March 31, 2020 | |
|---|---|---|---|
| Operating lease right-of-use assets | Other assets | $ | 1,714 |
| Operating lease liabilities | Other accrued expenses | $ | 2,320 |

Total lease costs recognized for the three months ended March 31, 2020 and 2019 were $0.3 million and $0.1 million, respectively. These amounts included operating lease costs of $0.2 million and $50 thousand, variable lease costs of $53 thousand and $55 thousand, and short term lease costs of $49 thousand and $26 thousand for the three months ended March 31, 2020 and 2019, respectively. The weighted average remaining lease term at March 31, 2020 was 4.1 years and the weighted average discount rate was 6.6%. For the three months ended March 31, 2020 and 2019, cash paid for amounts included in the measurement of operating lease liabilities and included in operating cash flows totaled $0.3 million and $0.1 million, respectively.

Maturities of operating lease liabilities as of March 31, 2020 are as follows (in thousands):

| | | |
|---|---|---|
| 2020 | $ | 751 |
| 2021 | | 715 |
| 2022 | | 302 |
| 2023 | | 311 |
| 2024 | | 320 |
| Thereafter | | 273 |
| Total lease payments | | 2,672 |
| Less: imputed interest | | (352) |
| Present value of lease liabilities | $ | 2,320 |

**(17) Commitments and Contingencies**

*Litigation* — In the normal course of business, we are involved in various legal proceedings. In the opinion of management, any liability resulting from such proceedings would not have a material adverse effect on our financial position, results of operations or cash flows.

*Commitments* — GWG Holdings is committed to contribute an additional $12.5 million to FOXO through 2021, with an additional $8.4 million in the nine months ending December 31, 2020 and $4.1 million in 2021. Beneficient had $73.7 million and $73.8 million of gross potential capital commitments as of March 31, 2020 and December 31, 2019, respectively, representing potential limited partner capital funding commitments on the alternative asset fund collateral to its loans above any cash reserves. The trust holding the interest in the limited partnership for the alternative asset fund is required to fund these limited partner capital funding commitments per the terms of the limited partnership agreement. To the extent that the associated trust cannot pay the capital funding commitment, Beneficient is obligated to lend sufficient funds to meet the commitment. Capital commitments generally originate from limited partner agreements having fixed or expiring expiration dates. The total limited partner capital funding commitment amounts may not necessarily represent future cash requirements.

Page 41

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

**(18) Guarantee and Collateral Provisions of L Bonds and Seller Trust L Bonds**

Our L Bonds are offered and sold under a registration statement declared effective by the SEC, as described in Note 10, and we have issued Seller Trust L Bonds under a Supplemental Indenture, as described in Note 10. The L Bonds and Seller Trust L Bonds are secured by substantially all the assets of GWG Holdings, a pledge of all our common stock held by BCC and AltiVerse (which together represent approximately 12% of our outstanding common stock), and by a guarantee and corresponding grant of a security interest in substantially all the assets of GWG Life[1]. As a guarantor, GWG Life has fully and unconditionally guaranteed the payment of principal and interest on the L Bonds and Seller Trust L Bonds. GWG Life's equity in DLP IV[2] serves as collateral for our L Bond and Seller Trust L Bond obligations. Substantially all of our life insurance policies are held by DLP IV or GWG Life Trust. The policies held by DLP IV are not direct collateral for the L Bonds as such policies are pledged to the LNV Credit Facility.

[1] The Seller Trust L Bonds are senior secured obligations of GWG, ranking junior to all senior debt of GWG and pari passu in right of payment and in respect of collateral with all L Bonds of GWG (see Note 10). Payments under the Seller Trust L Bonds are guaranteed by GWG Life. The assets exchanged in the in connection with the Beneficent transaction are available as collateral for all holders of the L Bonds and Seller Trust L Bonds. Specifically, the Common Units of Ben LP are held by GWG Holdings and the Commercial Loan is held by GWG Life.

[2] The terms of our LNV Credit Facility require that we maintain a significant excess of pledged collateral value over the amount outstanding on the LNV Credit Facility at any given time. Any excess after satisfying all amounts owing under our LNV Credit Facility is available as collateral for the L Bonds (including the Seller Trust L Bonds).

The following represents consolidating financial information as of March 31, 2020 and December 31, 2019, with respect to the financial position, and for the three months ended March 31, 2020 and 2019, with respect to results of operations and cash flows of GWG Holdings and its subsidiaries. The parent column presents the financial information of GWG Holdings, the primary obligor for the L Bonds and Seller Trust L Bonds. The guarantor subsidiary column presents the financial information of GWG Life, the guarantor subsidiary of the L Bonds and Seller Trust L Bonds, presenting its investment in DLP IV and GWG Life Trust under the equity method. The non-guarantor subsidiaries column presents the financial information of all non-guarantor subsidiaries, including DLP IV, GWG Life Trust and Beneficent.

Page 42

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

Condensed Consolidating Balance Sheets (in thousands)

| March 31, 2020 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash and cash equivalents | $ 101,529 | $ 1,753 | $ 13,150 | $ — | $ 116,432 |
| Restricted cash | — | 512 | 25,934 | — | 26,446 |
| Investment in life insurance policies, at fair value | — | 344 | 801,837 | — | 802,181 |
| Life insurance policy benefits receivable, net | — | 200 | 15,130 | — | 15,330 |
| Loans receivable, net of unearned income | — | — | 219,296 | — | 219,296 |
| Allowance for loan losses | — | — | (700) | — | (700) |
| Loans receivable, net | — | — | 218,596 | — | 218,596 |
| Fees receivable | — | — | 30,453 | — | 30,453 |
| Financing receivable from affiliate | — | 239,564 | — | (171,274) | 68,290 |
| Investment in GWG stock | — | — | 25,400 | (25,400) | — |
| Other assets | 67,792 | 320,460 | 23,471 | (377,817) | 33,906 |
| Goodwill | — | — | 2,372,595 | — | 2,372,595 |
| Investment in subsidiaries | 1,569,254 | 653,926 | — | (2,223,180) | — |
| TOTAL ASSETS | $ 1,738,575 | $ 1,216,759 | $ 3,526,566 | $ (2,797,671) | $ 3,684,229 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | | | | |
| LIABILITIES | | | | | |
| Senior credit facility with LNV Corporation | $ — | $ — | $ 188,793 | $ — | $ 188,793 |
| L Bonds | 1,009,781 | — | — | — | 1,009,781 |
| Seller Trust L Bonds | 366,892 | — | — | — | 366,892 |
| Other borrowings | — | — | 152,597 | — | 152,597 |
| Intercompany debt – Commercial loan | — | — | 171,329 | (171,329) | — |
| Interest and dividends payable | 12,162 | — | 10,241 | — | 22,403 |
| Deferred revenue | — | — | 39,651 | — | 39,651 |
| Accounts payable and accrued expenses | 8,532 | 2,071 | 69,238 | (58,702) | 21,139 |
| Deferred tax liability, net | 40,206 | — | — | — | 40,206 |
| TOTAL LIABILITIES | 1,437,573 | 2,071 | 631,849 | (230,031) | 1,841,462 |
| Redeemable noncontrolling interests | — | — | 1,553,554 | (311,913) | 1,241,641 |
| STOCKHOLDERS' EQUITY | | | | | |
| Member capital | — | 1,214,688 | 655,073 | (1,869,761) | — |
| Common units | — | — | 603,417 | (603,417) | — |
| Redeemable preferred stock and Series 2 redeemable preferred stock | 186,658 | — | — | — | 186,658 |
| Common stock | 33 | — | — | — | 33 |
| Common stock in treasury | — | — | — | (24,550) | (24,550) |
| Additional paid-in-capital | 229,207 | — | — | — | 229,207 |
| Accumulated deficit | (114,896) | — | — | (7,037) | (121,933) |
| Noncontrolling interests | — | — | 82,673 | 249,038 | 331,711 |
| TOTAL STOCKHOLDERS' EQUITY | 301,002 | 1,214,688 | 1,341,163 | (2,255,727) | 601,126 |
| TOTAL LIABILITIES AND EQUITY | $ 1,738,575 | $ 1,216,759 | $ 3,526,566 | $ (2,797,671) | $ 3,684,229 |

Page 43

App. 0971

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

Condensed Consolidating Balance Sheets (in thousands) (continued)

| December 31, 2019 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash and cash equivalents | $ 57,721 | $ 2,644 | $ 18,708 | $ — | $ 79,073 |
| Restricted cash | — | — | 20,258 | — | 20,258 |
| Investment in life insurance policies, at fair value | — | 340 | 795,699 | — | 796,039 |
| Life insurance policy benefits receivable, net | — | 200 | 22,831 | — | 23,031 |
| Investment in GWG stock | — | — | 24,550 | (24,550) | — |
| Loans receivable, net of unearned income | — | — | 232,344 | — | 232,344 |
| Allowance for loan losses | — | — | — | — | — |
| Loans receivable, net | — | — | 232,344 | — | 232,344 |
| Fees receivable | — | — | 29,168 | — | 29,168 |
| Financing receivable from affiliates | — | 235,573 | — | (168,420) | 67,153 |
| Other assets | 446,618 | 320,490 | 22,163 | (759,136) | 30,135 |
| Goodwill | — | — | 2,358,005 | — | 2,358,005 |
| Investment in subsidiaries | 1,221,227 | 664,723 | — | (1,885,950) | — |
| TOTAL ASSETS | $ 1,725,566 | $ 1,223,970 | $ 3,523,726 | $ (2,838,056) | $ 3,635,206 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | | | | |
| LIABILITIES | | | | | |
| Senior credit facility with LNV Corporation | $ — | $ — | $ 174,390 | $ — | $ 174,390 |
| L Bonds | 926,638 | — | — | — | 926,638 |
| Seller Trust L Bonds | 366,892 | — | — | — | 366,892 |
| Other borrowings | — | — | 153,086 | — | 153,086 |
| Intercompany debt – commercial loan | — | — | 168,420 | (168,420) | — |
| Interest and dividends payable | 12,491 | — | 4,025 | — | 16,516 |
| Deferred revenue | — | — | 41,444 | — | 41,444 |
| Account payable and accrued expenses | 3,093 | 3,891 | 78,455 | (57,603) | 27,836 |
| Deferred tax liability | 57,923 | — | — | — | 57,923 |
| TOTAL LIABILITIES | 1,367,037 | 3,891 | 619,820 | (226,023) | 1,764,725 |
| Redeemable noncontrolling interests | — | — | 1,588,604 | (318,950) | 1,269,654 |
| STOCKHOLDERS' EQUITY | | | | | |
| Member capital | — | 1,220,079 | 665,871 | (1,885,950) | — |
| Common units | — | — | 563,966 | (563,966) | — |
| Redeemable preferred stock and Series 2 redeemable preferred stock | 201,891 | — | — | — | 201,891 |
| Common stock | 33 | — | — | — | 33 |
| Treasury stock | — | — | — | (24,550) | (24,550) |
| Additional paid-in capital | 233,106 | — | — | — | 233,106 |
| Accumulated deficit | (76,501) | — | — | — | (76,501) |
| Noncontrolling interests | — | — | 85,465 | 181,383 | 266,848 |
| TOTAL STOCKHOLDERS' EQUITY | 358,529 | 1,220,079 | 1,315,302 | (2,293,083) | 600,827 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ 1,725,566 | $ 1,223,970 | $ 3,523,726 | $ (2,838,056) | $ 3,635,206 |

Page 44

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

Condensed Consolidating Statements of Operations (in thousands)

| For the three months ended March 31, 2020 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUE | | | | | |
| Gain on life insurance policies, net | $ — | $ 3 | $ 14,442 | $ — | $ 14,445 |
| Interest and other income | 365 | 5,237 | 18,447 | (4,937) | 19,112 |
| TOTAL REVENUE | 365 | 5,240 | 32,889 | (4,937) | 33,557 |
| | | | | | |
| EXPENSES | | | | | |
| Interest expense | 28,737 | — | 11,221 | (4,087) | 35,871 |
| Employee compensation and benefits | 7,391 | 100 | 70,213 | — | 77,704 |
| Legal and professional fees | 1,947 | 134 | 4,082 | — | 6,163 |
| Provision for loan losses | — | — | 700 | — | 700 |
| Other expenses | 2,461 | 423 | 728 | — | 3,612 |
| TOTAL EXPENSES | 40,536 | 657 | 86,944 | (4,087) | 124,050 |
| | | | | | |
| INCOME (LOSS) BEFORE EQUITY IN INCOME (LOSS) OF SUBSIDIARIES | (40,171) | 4,583 | (54,055) | (850) | (90,493) |
| | | | | | |
| EQUITY IN INCOME (LOSS) OF SUBSIDIARIES | (11,128) | 9,561 | — | 1,567 | — |
| | | | | | |
| INCOME (LOSS) BEFORE INCOME TAXES | (51,299) | 14,144 | (54,055) | 717 | (90,493) |
| | | | | | |
| INCOME TAX BENEFIT | (14,434) | — | (73) | — | (14,507) |
| NET INCOME (LOSS) BEFORE EARNINGS (LOSS) FROM EQUITY METHOD INVESTMENT | (36,865) | 14,144 | (53,982) | 717 | (75,896) |
| | | | | | |
| Loss from equity method investment | (1,530) | — | — | — | (1,530) |
| | | | | | |
| NET INCOME (LOSS) | (38,395) | 14,144 | (53,982) | 717 | (77,516) |
| | | | | | |
| Net loss attributable to noncontrolling interests | — | — | 37,842 | (5,758) | 32,084 |
| | | | | | |
| Less: Preferred stock dividends | 3,952 | — | — | — | 3,952 |
| NET INCOME (LOSS) ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ (42,347) | $ 14,144 | $ (16,140) | $ (5,041) | $ (49,384) |

Page 45

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

Condensed Consolidating Statements of Operations (in thousands) (continued)

| For the three months ended March 31, 2019 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| REVENUE | | | | | |
| Gain (loss) on life insurance policies, net | $ — | $ 2,067 | $ 19,429 | $ — | $ 21,496 |
| Interest and other income | 614 | 2,833 | 274 | — | 3,721 |
| TOTAL REVENUE | 614 | 4,900 | 19,703 | — | 25,217 |
| | | | | | |
| EXPENSES | | | | | |
| Interest expense | 22,607 | — | 4,368 | — | 26,975 |
| Employee compensation and benefits | 3,224 | 1,855 | 75 | — | 5,154 |
| Legal and professional fees | 1,280 | 580 | 1,087 | — | 2,947 |
| Other expenses | 1,692 | 473 | 663 | — | 2,828 |
| TOTAL EXPENSES | 28,803 | 2,908 | 6,193 | — | 37,904 |
| | | | | | |
| INCOME (LOSS) BEFORE EQUITY IN INCOME OF SUBSIDIARIES | (28,189) | 1,992 | 13,510 | — | (12,687) |
| | | | | | |
| EQUITY IN INCOME OF SUBSIDIARIES | 15,502 | 14,885 | — | (30,387) | — |
| | | | | | |
| INCOME (LOSS) BEFORE INCOME TAXES | (12,687) | 16,877 | 13,510 | (30,387) | (12,687) |
| | | | | | |
| INCOME TAX EXPENSE (BENEFIT) | — | — | — | — | — |
| NET INCOME (LOSS) BEFORE LOSS FROM EQUITY METHOD INVESTMENT | (12,687) | 16,877 | 13,510 | (30,387) | (12,687) |
| | | | | | |
| Loss from equity method investment | (1,927) | — | — | — | (1,927) |
| | | | | | |
| NET INCOME (LOSS) | (14,614) | 16,877 | 13,510 | (30,387) | (14,614) |
| | | | | | |
| Preferred stock dividends | 4,296 | — | — | — | 4,296 |
| NET INCOME (LOSS) ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ (18,910) | $ 16,877 | $ 13,510 | $ (30,387) | $ (18,910) |

Page 46

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

Condensed Consolidating Statements of Cash Flows (in thousands)

| For the three months ended March 31, 2020 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiary | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | |
| Net income (loss) | $ (38,395) | $ 14,144 | $ (53,982) | $ 717 | $ (77,516) |
| Adjustments to reconcile net income (loss) to net cash flows from operating activities: | | | | | |
| Equity of subsidiaries | 11,128 | (9,561) | — | (1,567) | — |
| Change in fair value of life insurance policies | — | (4) | (12,173) | — | (12,177) |
| Amortization of deferred financing and issuance costs | 3,882 | — | 329 | — | 4,211 |
| Amortization of upfront fees | — | — | (1,793) | — | (1,793) |
| Amortization of debt premiums | — | — | (473) | — | (473) |
| Amortization and depreciation on long-lived assets | 31 | 1 | 140 | — | 172 |
| Accretion of discount on financing receivable from affiliate | — | (1,620) | 1,620 | — | — |
| Non-cash interest income | — | (1,138) | (12,236) | — | (13,374) |
| Non-cash interest expense | — | — | 676 | — | 676 |
| Loss from equity method investment | 1,530 | — | — | — | 1,530 |
| Provision for loan losses | — | — | 700 | — | 700 |
| Deferred income tax | (17,717) | — | — | — | (17,717) |
| Equity-based compensation | 4,303 | — | 65,145 | — | 69,448 |
| (Increase) decrease in operating assets: | | | | | |
| Life insurance policy benefits receivable | — | — | 7,701 | — | 7,701 |
| Fees receivable | — | — | (1,285) | — | (1,285) |
| Accrued interest on financing receivable | — | (1,234) | 1,234 | — | — |
| Other assets | 270 | 29 | (1,880) | 1,949 | 368 |
| Increase (decrease) in operating liabilities: | | | | | |
| Accounts payable and other accrued expenses | 5,372 | (1,821) | (3,555) | (1,099) | (1,103) |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (29,596) | (1,204) | (9,832) | — | (40,632) |
| | | | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | |
| Carrying value of matured life insurance policies | — | — | 6,035 | — | 6,035 |
| Purchases of fixed assets | (60) | — | (421) | — | (481) |
| Equity method investments | (5,417) | — | — | — | (5,417) |
| Net change of loans receivable | — | — | 10,614 | — | 10,614 |
| Payment of capital contributions | 19,528 | 20,359 | — | (39,887) | — |
| NET CASH FLOWS PROVIDED BY INVESTING ACTIVITIES | 14,051 | 20,359 | 16,228 | (39,887) | 10,751 |
| | | | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | | |
| Borrowings on senior debt | — | — | 14,074 | — | 14,074 |
| Proceeds from issuance of L Bonds | 109,053 | — | — | — | 109,053 |
| Payments for issuance and redemptions of L Bonds | (30,532) | — | — | — | (30,532) |
| Issuance of common stock | 18 | — | — | — | 18 |
| Payments for redemption of preferred stock | (15,233) | — | — | — | (15,233) |
| Preferred stock dividends | (3,952) | — | — | — | (3,952) |
| Issuance of member capital | — | (19,534) | (20,353) | 39,887 | — |
| NET CASH FLOWS PROVIDED BY (USED IN) FINANCING ACTIVITIES | 59,354 | (19,534) | (6,279) | 39,887 | 73,428 |
| | | | | | |
| NET INCREASE (DECREASE) IN CASH, CASH EQUIVALENTS AND RESTRICTED CASH | 43,809 | (379) | 117 | — | 43,547 |
| | | | | | |
| **CASH, CASH EQUIVALENTS AND RESTRICTED CASH** | | | | | |
| BEGINNING OF PERIOD | 57,720 | 2,644 | 38,967 | — | 99,331 |
| END OF PERIOD | $ 101,529 | $ 2,265 | $ 39,084 | $ — | $ 142,878 |

Page 47

App. 0975

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

Condensed Consolidating Statements of Cash Flows (in thousands) (continued)

| For the three months ended March 31, 2019 | Parent | Guarantor Subsidiary | Non-Guarantor Subsidiary | Eliminations | Consolidated |
|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | |
| Net income (loss) | $ (14,614) | $ 16,877 | $ 13,510 | $ (30,387) | $ (14,614) |
| Adjustments to reconcile net income (loss) to net cash flows from operating activities: | | | | | |
| Equity of subsidiaries | (15,502) | (14,885) | — | 30,387 | — |
| Change in fair value of life insurance policies | — | (3,620) | (11,951) | — | (15,571) |
| Amortization of deferred financing and issuance costs | 2,836 | — | 264 | — | 3,100 |
| Accretion of discount on financing receivable from affiliate | — | (419) | — | — | (419) |
| Loss from equity method investment | 1,927 | — | — | — | 1,927 |
| Equity-based compensation | 834 | — | — | — | 834 |
| (Increase) decrease in operating assets: | | | | | |
| Life insurance policy benefits receivable | — | 5,000 | 2,261 | — | 7,261 |
| Accrued interest on financing receivable | — | (1,551) | — | — | (1,551) |
| Other assets | (416) | 72 | (3,598) | — | (3,942) |
| Increase (decrease) in operating liabilities: | | | | | |
| Accounts payable and other accrued expenses | 1,404 | (481) | (4,251) | — | (3,328) |
| NET CASH FLOWS PROVIDED BY (USED IN) OPERATING ACTIVITIES | (23,531) | 993 | (3,765) | — | (26,303) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | |
| Investment in life insurance policies | — | (8,681) | (18,711) | — | (27,392) |
| Carrying value of matured life insurance policies | — | 169 | 8,532 | — | 8,701 |
| Payment of capital contributions | (33,724) | (28,498) | | 62,222 | — |
| NET CASH FLOWS USED IN INVESTING ACTIVITIES | (33,724) | (37,010) | (10,179) | 62,222 | (18,691) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | | |
| Repayments of senior debt | — | — | (2,373) | — | (2,373) |
| Proceeds from issuance of L Bonds | 125,985 | — | — | — | 125,985 |
| Payments for issuance and redemptions of L Bonds | (23,974) | — | — | — | (23,974) |
| Repurchase of common stock | (269) | — | — | — | (269) |
| Payments for redemption of preferred stock | (819) | — | — | — | (819) |
| Preferred stock dividends | (4,296) | — | — | — | (4,296) |
| Issuance of member capital | — | 31,713 | 30,509 | (62,222) | — |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 96,627 | 31,713 | 28,136 | (62,222) | 94,254 |
| NET INCREASE (DECREASE) IN CASH, CASH EQUIVALENTS AND RESTRICTED CASH | 39,372 | (4,304) | 14,192 | — | 49,260 |
| **CASH, CASH EQUIVALENTS AND RESTRICTED CASH** | | | | | |
| BEGINNING OF PERIOD | 113,294 | 7,449 | 4,693 | — | 125,436 |
| END OF PERIOD | $ 152,666 | $ 3,145 | $ 18,885 | $ — | $ 174,696 |

Page 48

App. 0976

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

**(19) Concentration**

*Life Insurance Carriers*

We primarily purchase life insurance policies written by life insurance companies rated investment-grade by third-party rating agencies, including A.M. Best, Standard & Poor's and Moody's. As a result, there may be concentrations of policies with certain life insurance companies. The following summarizes the face value of insurance policies with specific life insurance companies exceeding 10% of the total face value held by our portfolio.

| Life Insurance Company | March 31, 2020 | December 31, 2019 |
|---|---|---|
| John Hancock Life Insurance Company | 14.24% | 14.23% |
| The Lincoln National Life Insurance Company | 10.91% | 11.55% |
| AXA Equitable Life Insurance Company | 10.83% | 10.63% |

The following summarizes the number of insureds' state of residence exceeding 10% of the total face value held by us:

| State of Residence | March 31, 2020 | December 31, 2019 |
|---|---|---|
| California | 17.68% | 17.46% |
| Florida | 14.68% | 14.86% |

Beneficient's underlying portfolio companies primarily operate in the United States, with the largest percentage, based on NAV, operating in healthcare technology, bio-technology, and diversified telecommunications services industries.

**(20) Subsequent Events and Other Matters**

*COVID-19*

In December 2019, a novel strain of coronavirus ("COVID-19") was first reported in Wuhan, China. Less than four months later, on March 11, 2020, the World Health Organization declared COVID-19 a pandemic. The extent of COVID-19's effect on the Company's operational and financial performance will depend on future developments, including the duration, spread and intensity of the pandemic, all of which are uncertain and difficult to predict considering the rapidly evolving landscape. As a result, it is not currently possible to ascertain the overall impact of COVID-19 on the Company's business. The Company continues to raise capital, receive interest income and insurance policy benefits and meet its ongoing obligations. However, depending on the extent of the ensuing economic crisis resulting from the pandemic and its impact on the Company's business, the disease could have a material adverse effect on our results of operations, financial condition and cash flows.

As discussed in our 2019 Form 10-K, management performs goodwill and intangible asset impairment testing annually, during the fourth quarter, or when events occur, or circumstances change that would more likely than not indicate impairment has occurred. The Company recorded goodwill on December 31, 2019, as a result of the transactions with Beneficient discussed in Note 4 to the condensed consolidated financial statements. Due to the significance of the COVID-19 pandemic, management performed a qualitative assessment of the goodwill of the Beneficient reporting unit. Management concluded that the potentially large and underserved market that Beneficient is seeking to address, including the estimated demand from MHNW individuals and STM size institutions seeking liquidity for their professionally managed alternative assets, has not been negatively affected by the COVID-19 pandemic such that it is more likely than not that the fair value of the Beneficient reporting unit would exceed its carrying value as of March 31, 2020. Therefore, the impact of the COVID-19 pandemic through the end of the first quarter of 2020 was not a triggering event to perform a quantitative test. We will continue to monitor the impact of COVID-19 on the economy and our business and will perform an interim quantitative goodwill impairment test if necessary.

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

*Liquidity and Capital Resources*

As of March 31, 2020, we had cash, cash equivalents and restricted cash of $142.9 million. We generated net losses attributable to common shareholders of $49.4 million and $18.9 million for the three months ended March 31, 2020 and 2019, respectively. As of May 13, 2020, we had cash, cash equivalents and restricted cash of approximately $140 million. Besides funding operating expenditures and having sufficient cash to fund anticipated additional investments in Beneficient primarily for its lending products and working capital needs, we are obligated to pay other items such as interest payments and debt redemptions, and preferred stock dividends and redemptions. We expect to satisfy these obligations and fund our operations through anticipated operating cash flows, receipt of proceeds from our insurance policies, sales of additional L Bonds, and, potentially, additional borrowings under existing debt facilities or new borrowings with other third-party lenders.

GWG Holdings has a history of selling L Bonds dating back to January 2012. GWG Holdings may not be able sell additional L Bonds on terms as favorable to the Company as past transactions or in quantities sufficient to fund all of the Company's operating requirements. Additionally, the Company may not be able to obtain additional borrowing under existing debt facilities or new borrowings with other third-party lenders. To the extent that GWG Holdings or its subsidiaries raise additional capital through the future issuance of debt, the terms of those debt securities may include terms that adversely affect the rights of our existing debt and/or equity holders or involve negative covenants that restrict GWG Holdings' ability to take specific actions, such as incurring additional debt or making additional investments in growing the operations of the Company. If GWG Holdings is unable to fund its operations and other obligations, or defaults on its debt, then the Company will be required to either i) sell assets to provide sufficient funding or ii) to raise additional capital through the sale of equity and the ownership interest of our equity holders may be diluted.

Based on projections of anticipated operating cash flows, receipt of proceeds from our insurance policies, sales of additional L-Bonds, and, potentially, additional borrowings under existing debt facilities or new borrowings with other third-party lenders, we believe that we will have sufficient cash resources to finance our operations, satisfy our other obligations, and to fund anticipated additional investments in Beneficient through May 15, 2021.

*Amendment of Beneficient Credit Agreements*

On May 15, 2020, Beneficient signed the Term Sheet with its lender to amend its senior credit agreement and subordinated credit agreement (described in Note 10). The amendment would extend the maturity date of both loans to April 10, 2021, and includes an extension fee of 2.5% of the outstanding aggregate principal balance of the loans. The amendment would also increase the interest rate on each loan to 1-month LIBOR plus 8.0%, with a maximum interest rate of 9.5%. The loans would be payable in four installments of $25.0 million on each of June 1, 2020, September 10, 2020, December 10, 2020, and March 10, 2021, with the remaining balance payable on April 10, 2021.

The amendment also would provide for the assignment of the loans from Beneficient to GWG Life Trust, if permitted, or GWG Life upon issuance of Beneficient's trust company charters by the Texas Department of Banking. GWG Holdings or GWG Life will receive additional Common Units in exchange for assuming Beneficient's amended loans. Upon transfer of the loans, GWG Holdings or GWG Life will pay a fee of 2.0% of the then-remaining outstanding balance to the lender. Furthermore, upon transfer of the loans, the Commercial Loan Agreement between GWG Life and Beneficient will convert to Common Units in full satisfaction of the Commercial Loan Agreement.

In connection with the transfer of the loans from Beneficient, the lender would be granted a security interest in the Preferred Series A Subclass 1 Unit Accounts of BCH held by GWG Life and the life insurance policies held by GWG Life Trust. Furthermore, the lender will be permitted to purchase up to $152.0 million of Preferred Series A Subclass 1 units from BCH for cash for two years after the amendment of the loans. The Term Sheet also provides that, in connection with the transfer of the loans, (i) BHI, which owns a majority of the Class S Ordinary Units, Preferred Series A Subclass 1 Unit Accounts, and FLP Subclass 1 Unit Accounts issued by BCH, will grant certain tax-related concessions related to the transaction as may be mutually agreed upon between the parties, and (ii) in exchange for the tax-related concessions to be agreed between the parties, (a) 5% of BHI's Preferred Series A Sub Class 1 Unit Account will become senior in allocations, distributions, redemption rights, and liquidation (potentially as a different class) (the "Senior Preferred Series A Sub Class 1 Unit Accounts") to all other Preferred Series A Sub Class 1 Unit Accounts or any other securities issued by Beneficient or a subsidiary thereof, and (b) recipients of a grant of Preferred Series A Sub Class 1 Unit Accounts from BHI will have the right to put an amount of Preferred Series A Sub Class 1 Unit Accounts to Beneficient equal to any associated tax liability stemming from any such grant; provided that the aggregated associated tax liability shall not relate to more than $30 million of grants of Preferred Series A Sub Class 1 Unit Accounts from BHI; and provided, further, that such a put cannot be exercised prior to July 1, 2021. The agreed upon amended loan terms would contain covenants that would i) prevent Beneficient from issuing any securities senior to the Preferred Series A Subclass 1 Unit Accounts or the Senior Preferred Series A Sub Class 1 Unit Accounts, and ii) prevent Beneficient from incurring additional debt or borrowings, other than trade payables, while the loans are outstanding.

The amendments set forth in the Term Sheet are subject to, among other things, the negotiation and execution of definitive agreements governing the amendments and the satisfaction of closing conditions to be set forth therein, some of which may be outside of the parties' control. The parties have agreed to use their reasonable best efforts to enter into definitive agreements by June 1, 2020.

*Policy Benefits and L Bonds*

Subsequent to March 31, 2020 through May 6, 2020, policy benefits on 13 policies covering 12 individuals have been realized. The face value of insurance benefits of these policies was $14.8 million.

Subsequent to March 31, 2020 through May 12, 2020, we have issued approximately $41.6 million of L Bonds.

Page 50

App. 0978

**ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

*The following discussion should be read in conjunction with the condensed consolidated financial statements and accompanying notes and the information contained in other sections of this report. This discussion and analysis is based on the beliefs of our management, as well as assumptions made by, and information currently available to, our management.*

*Unless the context otherwise indicates, all references in this Management's Discussion and Analysis of Financial Condition and Results of Operations, or MD&A, to the "Company," "we," "us," "our" or "ours" or similar words are to GWG Holdings Inc. and its direct and indirect wholly-owned and consolidated subsidiaries, references to "GWG Holdings" refer solely to GWG Holdings Inc., references to "GWG Life" refer to GWG Life, LLC (a wholly-owned subsidiary of GWG Holdings), references to "Ben LP" refer to The Beneficient Company Group, L.P. (a consolidated subsidiary of GWG Holdings), references to "Beneficient" refer to Ben LP and all of its consolidated subsidiaries, references to "Beneficient Management" refer to Beneficient Management, L.L.C. (the general partner of Ben LP), references to "BCC" refer to Beneficient Capital Company, L.L.C. (a subsidiary of Ben LP) references to "BACC" refer to Beneficient Administrative and Clearing Company, L.L.C. (a subsidiary of Ben LP), references to "Pen" refer to Pen Indemnity Insurance Company, LTD (a subsidiary of Ben LP), references to "Ben Markets" refer to Ben Markets Management Holdings, L.P. (a subsidiary of Ben LP), and references to "FOXO" refer to FOXO BioScience LLC (formerly, InsurTech Holdings, LLC, an equity investee of GWG Holdings).*

### Risk Relating to Forward-Looking Statements

This report contains forward-looking statements that reflect our current expectations and projections about future events. Actual results could differ materially from those described in these forward-looking statements.

The words "believe," "could," "possibly," "probably," "anticipate," "estimate," "project," "expect," "may," "will," "should," "seek," "intend," "plan," "expect," or "consider" and similar expressions are intended to identify forward-looking statements but are not the exclusive means of identifying such statements. Forward-looking statements are subject to risks and uncertainties, which could cause actual results to differ materially from such statements. Many of the forward-looking statements contained in this report can be found in the following discussion and analysis.

Such risks and uncertainties include, but are not limited to:

- the valuation of assets reflected on our financial statements;

- the illiquidity of our life insurance investments and receivables from affiliates;

- the continued success of the alternative assets industry;

- our ability to realize the anticipated benefits from our consolidation of Beneficient;

- Beneficient's financial performance and ability to execute on its business plan;

- Beneficient's ability to obtain the trust charters from the Texas Department of Banking necessary to implement its business plan;

- changes resulting from the evolution of our business model and strategy with respect to Beneficient and the life insurance secondary market;

- our reliance on debt financing and continued access to the capital markets;

- our significant and ongoing financing requirements;

- our predominant use of short-term debt to fund a portfolio of long-term assets could result in a liquidity shortage;

- our ability to make cash distributions in satisfaction of dividend obligations and redemption requests;

Page 51

- our ability to satisfy our debt obligations if we were to sell our assets;

- our history of operating losses;

- general economic outlook, including prevailing interest rates;

- the novel coronavirus pandemic, the ensuing economic downturn and its impact on our business;

- federal, state, FINRA and other regulatory matters;

- litigation risks;

- our ability to comply with financial and non-financial covenants contained in borrowing agreements;

- the reliability of assumptions underlying our actuarial models, including life expectancy ("LE") estimates and our projections of mortality events and the realization of policy benefits;

- risks relating to the validity and enforceability of the life insurance policies we purchase;

- our reliance on information provided and obtained by third parties, including changes in underwriting tables and underwriting methodology;

- life insurance company credit exposure;

- cost-of-insurance (premium) increases on our life insurance policies;

- performance of our investments in life insurance policies; and

- risks associated with our investment in FOXO BioScience LLC (formerly InsurTech Holdings, LLC).

We caution you that the foregoing list of factors is not exhaustive. Forward-looking statements are only estimates and predictions, or statements of current intent. Actual results, outcomes or actions that we ultimately undertake could differ materially from those anticipated in the forward-looking statements due to risks, uncertainties or actual events differing from the assumptions underlying these statements.

**Overview**

In 2018 and 2019, GWG Holdings and GWG Life consummated a series of transactions with Beneficient, as more fully described in Note 1 to our condensed consolidated financial statements in this Form 10-Q. On December 31, 2019, GWG Holdings obtained the right to appoint a majority of the board of directors of Beneficient Management. As a result of this change-of-control event, GWG Holdings reported the results of Beneficient on a consolidated basis beginning on the transaction date of December 31, 2019.

Beneficient is a financial services firm, based in Dallas, Texas, that provides liquidity solutions for professionally managed alternative assets for mid-to-high net worth ("MHNW") individuals and small-to-mid ("STM") size institutions, which previously had few options to obtain early liquidity for their alternative asset holdings. Beneficient has closed a limited number of these transactions to date, but intends to significantly expand its operations going forward. As part of the Company's reorientation, we also changed our Board of Directors and executive management team. Beneficient plans to operate three potentially high value, high margin lines of business:

- Private Trust Lending & Liquidity Products. Through BCC, Beneficient provides a unique suite of private trust, lending and liquidity products focused on bringing liquidity to owners of professionally managed alternative assets. Beneficient's innovative liquidity solutions are designed to serve MHNW individuals, STM institutions, and asset managers who have historically possessed few attractive options to access early liquidity from their alternative assets. Beneficient targets MHNW clients with $5 million to $30 million in net worth and STM institutional clients typically holding less than $1 billion in assets.

App. 0980

- Trust and Custody Services. Through BACC, and (subject to capitalization) through Pen, Beneficient plans, in the future, to market retirement funds, custody and clearing of alternative assets, and trustee and insurance services for covering risks attendant to owning or managing alternative assets.

- Financial Technology. Through Ben Markets, Beneficient plans to provide online portals and financial technologies for the trading and financing of alternative assets. Beneficient's existing and planned products and services are designed to support the tax and estate planning objectives of its MHNW clients, facilitate a diversification of assets or simply provide administrative management and reporting solutions tailored to the goals of the investor who owns alternative investments.

While we are continuing our work to maximize the value of our secondary life insurance business, we do not anticipate purchasing additional life insurance policies in the secondary market and have increased capital allocated toward providing liquidity to a broader range of alternative assets through Beneficient. We believe Beneficient's operations will generally produce higher risk-adjusted returns than those we can generally achieve from life insurance policies acquired in the secondary market. Furthermore, although we believe that our portfolio of life insurance policies is a meaningful component of a diversified alternative asset portfolio, we will continue to explore strategic alternatives for our life insurance portfolio aimed at maximizing its value, including a possible sale, refinancing or recapitalization of our life insurance portfolio.

GWG Holdings completed the transactions with Beneficient to provide the Company with a significant increase in assets and common shareholders' equity. In addition, the transactions with Beneficient may provide the Company with the opportunity for a diversified source of future earnings within the alternative asset industry. As the combined organization expands, we believe the Beneficient transactions will transform GWG Holdings from a niche provider of liquidity to owners of life insurance to a full-scale provider of trust and liquidity products and trust services to owners of a broad range of alternative assets.

**Critical Accounting Policies and Estimates**

The preparation of our condensed consolidated financial statements in accordance with the accounting principles generally accepted in the United States of America ("GAAP") requires us to make significant judgments, estimates, and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. We base our judgments, estimates, and assumptions on historical experience and on various other factors believed to be reasonable under the circumstances. Actual results could differ materially from these estimates. We evaluate our judgments, estimates, and assumptions on a regular basis and make changes accordingly.

Material estimates that are particularly susceptible to change, in the near term, relate to: the determination of the fair values of assets acquired, liabilities assumed and noncontrolling interests under business combinations accounting guidance; the determination of the assumptions used in estimating the fair value of our investments in life insurance policies; determining the grant date fair value for equity-based compensation awards; determining our allowance for loan losses; evaluation of potential impairment of goodwill and other intangibles; and the value of our deferred tax assets and liabilities. We believe these estimates are likely to have the greatest potential impact on our condensed consolidated financial statements and accordingly believe these to be our critical accounting estimates.

Refer to our Annual Report on Form 10-K for the year ended December 31, 2019 filed with the SEC on March 27, 2020 ("2019 Form 10-K") for a discussion of our critical accounting policies and estimates. As discussed in Note 2 to our condensed consolidated financial statements in this Form 10-Q, we have revised and added accounting policies as necessary to incorporate those accounting policies of Beneficient. There have been no significant changes to our critical accounting policies during the quarter ended March 31, 2020, other than the additional policies noted below.

*Loans Receivable and Allowance for Loan Losses*

Loans receivable are carried at the principal amount outstanding, plus interest paid-in-kind. The loans do not have scheduled principal or interest payments due prior to their maturity date, which is generally 12 years from the date of origination. Prepayment of the loans, in whole or in part, is permitted without premium or penalty. Loans bear contractual interest at the greater of 14% or 1-month LIBOR plus 10% compounded daily. The primary source of repayment for the loans and related fees is cash flows from the alternative assets collateralizing the loans. Interest income on loans is accrued on the principal amount outstanding.

The allowance for loan losses is a valuation allowance for probable incurred credit losses in the portfolio. Management's determination of the allowance is based upon an evaluation of the loan portfolio, impaired loans, economic conditions, volume, growth and composition of the collateral to the loan portfolio, and other risks inherent in the portfolio. Management applies risk factors to categories of loans and individually reviews all impaired loans above a de minimis threshold. Management relies heavily on statistical analysis, current net asset value ("NAV") and distribution performance of the underlying alternative asset collateral and industry trends related to alternative asset investments to estimate losses. Management evaluates the adequacy of the allowance by reviewing relevant internal and external factors that affect credit quality. As the collateral is the sole source of repayment of the loans and related interest, these loans are considered to be collateral dependent. Beneficient recognizes the charge-off in the period in which it arises for its collateral dependent loans. Therefore, impaired collateral dependent loans are written down to their estimated net realizable value based on disposition value.

### Purchased Loans

Purchased loans are recorded at their fair value at the acquisition date. Credit discounts are included in the determination of fair value; therefore, an allowance for loan losses is not recorded at the acquisition date. Purchased loans are evaluated upon acquisition and classified as either purchased credit impaired ("PCI") or non-purchased credit impaired ("non-PCI").

PCI loans reflect credit deterioration since origination such that it is probable at acquisition that Beneficient will be unable to collect all contractually required payments. For PCI loans, expected cash flows at the acquisition date in excess of the fair value of loans are recorded as interest income over the life of the loans using a level yield method if the timing and amount of the future cash flows is reasonably estimable. Subsequent to the acquisition date, increases in cash flows over those expected at the acquisition date are recognized prospectively as interest income. Decreases in expected cash flows due to credit deterioration are recognized by recording an allowance for loan loss. Beneficient does not report PCI loans as nonperforming due to the accretion of interest income.

For non-PCI loans, the difference between the fair value and unpaid principal balance ("UPB") of the loan at the acquisition date is amortized or accreted to interest income over the contractual life of the loans using the effective interest method. In the event of prepayment, the remaining unamortized amount is recognized in interest income.

### Goodwill and Identifiable Intangible Assets

Goodwill and other identifiable intangible assets are initially recorded at their estimated fair values at the date of acquisition. Goodwill and other intangible assets having an indefinite useful life are not amortized for financial statement purposes. In the event that facts and circumstances indicate that the goodwill or other identifiable intangible assets may be impaired, an interim impairment test would be required. Intangible assets with finite lives are amortized over their useful lives. We perform required annual impairment tests of our goodwill and other intangible assets during the fourth quarter for our reporting units.

The goodwill impairment test requires us to make judgments and assumptions. The test consists of estimating the fair value of each reporting unit based on valuation techniques, including a discounted cash flow model using revenue and profit forecasts and recent industry transaction and trading multiples of our peers, and comparing those estimated fair values with the carrying values of the assets and liabilities of each reporting unit, which includes the allocated goodwill. If the estimated fair value is less than the carrying value, we will recognize an impairment charge for the amount by which the carrying amount exceeds the reporting unit's fair value; however, any loss recognized will not exceed the total amount of goodwill allocated to that reporting unit.

This evaluation includes multiple assumptions, including estimated discounted cash flows and other estimates that may change over time. If future discounted cash flows become less than those projected by us, future impairment charges may become necessary that could have a materially adverse impact on our results of operations and financial condition in the period in which the write-off occurs.

### Equity-Based Compensation

The Company measures and recognizes compensation expense for all equity-based payments at fair value on the grant date over the requisite service period. GWG Holdings uses the Black-Scholes option pricing model to determine the fair value of stock options and stock appreciation rights. For restricted stock grants (including restricted stock units), fair value is determined as of the closing price of GWG Holdings' common stock on the date of grant. As it is not publicly traded, Beneficient uses various methods to determine the grant date fair value of its equity-based compensation awards.

The fair value of the Beneficient Management Partners, L.P. ("BMP") Equity Units is determined on the grant date using a probability-weighted discounted cash flow analysis. This fair value measurement is based on significant inputs not observable in the market and thus represents a Level 3 measurement within the fair value hierarchy. The resultant probability-weighted cash flows are then discounted using a rate that reflects the uncertainty surrounding the expected outcomes, which the Company believes is appropriate and representative of a market participant assumption.

The fair value of Ben LP's restricted equity units ("REUs") is estimated on the grant date using recent equity transactions involving third parties, which provides the Company with observable fair value information sufficient for estimating the grant date fair value.

App. 0982

**Recent Developments**

*COVID-19 and the CARES Act*

In December 2019, a novel strain of coronavirus ("COVID-19") was first reported in Wuhan, China. Less than four months later, on March 11, 2020, the World Health Organization declared COVID-19 a pandemic. The extent of COVID-19's effect on the Company's operational and financial performance will depend on future developments, including the duration, spread and intensity of the pandemic, all of which are uncertain and difficult to predict considering the rapidly evolving landscape. As a result, it is not currently possible to ascertain the overall impact of COVID-19 on the Company's business. The Company continues to raise capital, receive interest income and insurance policy benefits and meet its ongoing obligations. However, depending on the extent of the ensuing economic crisis resulting from the pandemic and its impact on the Company's business, the disease could have a material adverse effect on our results of operations, financial condition and cash flows.

As discussed in our 2019 Form 10-K, management performs goodwill and intangible asset impairment testing annually, during the fourth quarter, or when events occur, or circumstances change that would more likely than not indicate impairment has occurred. The Company recorded goodwill on December 31, 2019, as a result of the transactions with Beneficient discussed in Note 4 to the condensed consolidated financial statements. Due to the significance of the COVID-19 pandemic, management performed a qualitative assessment of the goodwill of the Beneficient reporting unit. Management concluded that the potentially large and underserved market that Beneficient is seeking to address, including the estimated demand from MHNW individuals and STM size institutions seeking liquidity for their professionally managed alternative assets, has not been negatively affected by the COVID-19 pandemic such that it is more likely than not that the fair value of the Beneficient reporting unit would exceed its carrying value as of March 31, 2020. Therefore, the impact of the COVID-19 pandemic through the end of the first quarter of 2020 was not a triggering event to perform a quantitative test. We will continue to monitor the impact of COVID-19 on the economy and our business and will perform an interim quantitative goodwill impairment test if necessary.

*Trust Charter Applications*

On September 25, 2018, Beneficient's capital companies, BCC and BACC, applied for trust charters from the Texas Department of Banking to merge into to-be organized limited trust associations. Beneficient submitted revised charter applications on March 6, 2020. As of May 15, 2020, the trust charters had not been issued to Beneficient. As such, Beneficient has closed a limited number of transactions to date, but intends to significantly expand its operations if and when the trust charters are issued.

*Amendment of Beneficient Credit Agreements*

On May 15, 2020, Beneficient signed a Binding Term Sheet to Amend the Credit Agreement ("Term Sheet")with its lender to amend its senior credit agreement and subordinated credit agreement (described in Note 10). The amendment would extend the maturity date of both loans to April 10, 2021, and includes an extension fee of 2.5% of the outstanding aggregate principal balance of the loans. The amendment would also increase the interest rate on each loan to 1-month LIBOR plus 8.0%, with a maximum interest rate of 9.5%. The loans would be payable in four installments of $25.0 million on each of June 1, 2020, September 10, 2020, December 10, 2020, and March 10, 2021, with the remaining balance payable on April 10, 2021.

The amendment also would provide for the assignment of the loans from Beneficient to GWG Life Trust, if permitted, or GWG Life upon issuance of Beneficient's trust company charters by the Texas Department of Banking. GWG Holdings or GWG Life will receive additional Common Units in exchange for assuming Beneficient's amended loans. Upon transfer of the loans, GWG Holdings or GWG Life will pay a fee of 2.0% of the then-remaining outstanding balance to the lender. Furthermore, upon transfer of the loans, the Commercial Loan Agreement between GWG Life and Beneficient will convert to Common Units in full satisfaction of the Commercial Loan Agreement.

In connection with the transfer of the loans from Beneficient, the lender would be granted a security interest in the Preferred Series A Subclass 1 Unit Accounts of BCH held by GWG Life and the life insurance policies held by GWG Life Trust. Furthermore, the lender will be permitted to purchase up to $152.0 million of Preferred Series A Subclass 1 units from BCH for cash for two years after the amendment of the loans. The Term Sheet also provides that, in connection with the transfer of the loans, (i) BHI, which owns a majority of the Class S Ordinary Units, Preferred Series A Subclass 1 Unit Accounts, and FLP Subclass 1 Unit Accounts issued by BCH, will grant certain tax-related concessions related to the transaction as may be mutually agreed upon between the parties, and (ii) in exchange for the tax-related concessions to be agreed between the parties, (a) 5% of BHI's Preferred Series A Sub Class 1 Unit Account will become senior in allocations, distributions, redemption rights, and liquidation (potentially as a different class) (the "Senior Preferred Series A Sub Class 1 Unit Accounts") to all other Preferred Series A Sub Class 1 Unit Accounts or any other securities issued by Beneficient or a subsidiary thereof, and (b) recipients of a grant of Preferred Series A Sub Class 1 Unit Accounts from BHI will have the right to put an amount of Preferred Series A Sub Class 1 Unit Accounts to Beneficient equal to any associated tax liability stemming from any such grant; provided that the aggregated associated tax liability shall not relate to more than $30 million of grants of Preferred Series A Sub Class 1 Unit Accounts from BHI; and provided, further, that such a put cannot be exercised prior to July 1, 2021. The agreed upon amended loan terms would contain covenants that would i) prevent Beneficient from issuing any securities senior to the Preferred Series A Subclass 1 Unit Accounts or the Senior Preferred Series A Sub Class 1 Unit Accounts, and ii) prevent Beneficient from incurring additional debt or borrowings, other than trade payables, while the loans are outstanding.

The amendments set forth in the Term Sheet are subject to, among other things, the negotiation and execution of definitive agreements governing the amendments and the satisfaction of closing conditions to be set forth therein, some of which may be outside of the parties' control. The parties have agreed to use their reasonable best efforts to enter into definitive agreements by June 1, 2020.

Page 55

**Asset Diversification**

As of March 31, 2020, we held a combined portfolio of assets consisting of approximately 70% of secondary life insurance policies and 30% of loans collateralized by cash flows from alternative assets. The table presented below reflects classifications based on GWG Holdings' and Beneficient's current exposure types as of March 31, 2020 (dollar amounts in thousands).

| Exposure Type | | Value | Percent of Total |
|---|---|---|---|
| Intermediate-Duration Life Insurance Policies[1] | $ | 329,394 | 28.6% |
| Near-Duration Life Insurance Policies[1] | | 295,242 | 25.6% |
| Long-Duration Life Insurance Policies[1] | | 177,545 | 15.4% |
| Late Stage[2] | | 134,821 | 11.7% |
| Growth[2] | | 77,980 | 6.8% |
| Buyout[2] | | 65,663 | 5.7% |
| Other[2] | | 37,404 | 3.2% |
| Early Stage[2] | | 34,786 | 3.0% |
| **Total** | **$** | **1,152,835** | **100.00%** |

(1) Represents fair value of life insurance polices
(2) Represents the net asset value ("NAV") of the interests in alternative assets that provide cash flows that comprise the collateral of Beneficient's loan portfolio. NAV calculation reflects the most current report of NAV and other data received from firm/fund sponsors. If no such report has been received, Beneficient estimates NAV based upon the last NAV calculation reported by the investment manager and adjusts it for capital calls and distributions made in the intervening time frame.

The underlying exposure data represents GWG Holdings' exposure to life insurance policies included in its portfolio and its exposure to the underlying collateral of Beneficient's loan portfolio. Exposure type reflects classifications based on each company's portfolio as determined by management. Figures are based on third-party information and other relevant information as determined by management. "Other" includes private debt strategies, natural resources strategies, and hedge funds. "Near-Term", "Intermediate-Term", and "Long-Term" life insurance policies represent policies with life expectancies between 0 – 47 months, 48 – 95 months, and 96 – 240 months, respectively.

The following sections contain information on each of the secondary life insurance assets and Beneficient loans receivable separately.

*Secondary Life Insurance Assets*

Our portfolio of life insurance policies, owned by our subsidiaries as of March 31, 2020, is summarized below:

**Life Insurance Portfolio Summary**

| | | |
|---|---|---|
| Total life insurance portfolio face value of policy benefits (in thousands) | $ | 2,000,680 |
| Average face value per policy (in thousands) | $ | 1,769 |
| Average face value per insured life (in thousands) | $ | 1,900 |
| Average age of insured (years)* | | 82.6 |
| Average life expectancy estimate (years)* | | 7.2 |
| Total number of policies | | 1,131 |
| Number of unique lives | | 1,053 |
| Demographics | | 74% Males; 26% Females |
| Number of smokers | | 47 |
| Largest policy as % of total portfolio face value | | 0.7% |
| Average policy as % of total portfolio | | 0.1% |
| Average annual premium as % of face value | | 3.5% |

\*    Averages presented in the table are weighted averages.

Our portfolio of life insurance policies, owned by our subsidiaries as of March 31, 2020, organized by the insured's current age and the associated number of policies and policy benefits, is summarized below:

App. 0984

**Distribution of Policies and Policy Benefits by Current Age of Insured**

| | | | | Percentage of Total | | |
|---|---|---|---|---|---|---|
| Min Age | Max Age | Number of Policies | Policy Benefits | Number of Policies | Policy Benefits | Wtd. Avg. LE (yrs.) |
| 95 | 101 | 20 | $ 42,602 | 1.7% | 2.1% | 2.1 |
| 90 | 94 | 147 | 289,269 | 13.0% | 14.5% | 3.2 |
| 85 | 89 | 232 | 544,264 | 20.5% | 27.2% | 5.0 |
| 80 | 84 | 247 | 439,948 | 21.9% | 22.0% | 7.2 |
| 75 | 79 | 223 | 369,024 | 19.7% | 18.4% | 9.9 |
| 70 | 74 | 199 | 247,346 | 17.6% | 12.4% | 11.1 |
| 60 | 69 | 63 | 68,227 | 5.6% | 3.4% | 11.3 |
| **Total** | | **1,131** | **$ 2,000,680** | **100.0%** | **100.0%** | **7.2** |

Our portfolio of life insurance policies, owned by our subsidiaries as of March 31, 2020, organized by the insured's estimated life expectancy estimates and associated policy benefits, is summarized below:

**Distribution of Policies by Current Life Expectancies of Insured**

| | | | | Percentage of Total | |
|---|---|---|---|---|---|
| Min LE (Months) | Max LE (Months) | Number of Policies | Policy Benefits (in thousands) | Number of Policies | Policy Benefits |
| 0 | 47 | 285 | $ 470,414 | 25.2% | 23.5% |
| 48 | 71 | 238 | 406,698 | 21.0% | 20.3% |
| 72 | 95 | 208 | 389,939 | 18.4% | 19.5% |
| 96 | 119 | 171 | 299,116 | 15.1% | 15.0% |
| 120 | 143 | 117 | 184,886 | 10.4% | 9.2% |
| 144 | 179 | 93 | 180,871 | 8.2% | 9.0% |
| 180 | 240 | 19 | 68,756 | 1.7% | 3.5% |
| **Total** | | **1,131** | **$ 2,000,680** | **100.0%** | **100.0%** |

We rely on the payment of policy benefit claims by life insurance companies as a significant source of cash inflow. The life insurance assets we own represent obligations of third-party life insurance companies to pay the benefit amount under the policy upon the mortality of the insured. As a result, we manage this credit risk exposure by generally purchasing policies issued by insurance companies with investment-grade ratings from Standard & Poor's, and diversifying our life insurance portfolio among a number of insurance companies.

The yield to maturity on bonds issued by life insurance carriers reflects, among other things, the credit risk (risk of default) of such insurance carrier. We follow the yields on certain publicly traded life insurance company bonds because this information is part of the data we consider when valuing our portfolio of life insurance policies for our financial statements.

The average yield to maturity of publicly traded life insurance company bonds data we consider as inputs to our life insurance portfolio valuation process was 3.09% as of March 31, 2020. We believe that this reflects, in part, the financial market's judgment that credit risk is low with regard to these carriers' financial obligations. The obligations of life insurance carriers to pay life insurance policy benefits ranks senior to all of their other financial obligations, including the senior bonds they issue. As of March 31, 2020, approximately 95.6% of the face value of policy benefits in our life insurance portfolio were issued by insurance companies with investment-grade credit ratings from Standard & Poor's.

App. 0985

As of March 31, 2020, our ten largest life insurance company credit exposures and the Standard & Poor's credit rating of their respective financial strength and claims-paying ability is set forth below:

**Distribution of Policy Benefits by Top 10 Insurance Companies**

| Rank | Policy Benefits (in thousands) | Percentage of Policy Benefit Amount | Insurance Company | Ins. Co. S&P Rating |
|---|---|---|---|---|
| 1 | $ 285,092 | 14.2% | John Hancock Life Insurance Company | AA- |
| 2 | 218,386 | 10.9% | Lincoln National Life Insurance Company | AA- |
| 3 | 216,799 | 10.8% | AXA Equitable Life Insurance Company | A+ |
| 4 | 189,639 | 9.5% | Transamerica Life Insurance Company | AA- |
| 5 | 158,390 | 7.9% | Brighthouse Life Insurance Company | A+ |
| 6 | 90,339 | 4.5% | American General Life Insurance Company | A+ |
| 7 | 85,998 | 4.3% | Pacific Life Insurance Company | AA- |
| 8 | 70,376 | 3.5% | ReliaStar Life Insurance Company | A+ |
| 9 | 64,095 | 3.2% | Massachusetts Mutual Life Insurance Company | AA+ |
| 10 | 60,558 | 3.0% | Security Life of Denver Insurance Company | A+ |
| | $ 1,439,672 | 71.9% | | |

*Beneficient Loans Receivable*

Beneficient's primary operations pertain to its liquidity products whereby Ben LP, through its subsidiaries, extends loans collateralized by cash flows from illiquid alternative assets and provides services to the trustees who administer the collateral. Beneficient's core business products are its Exchange Trust, LiquidTrust and the InterChange Trust (introduced in 2020). Beneficient's clients select one of these products and place their alternative assets into the custody trust that is a constituent member of a trust structure called the "ExAlt Plan™" (comprised of Exchange Trusts, LiquidTrusts, Custody Trusts, Collective Trusts, and Funding Trusts). The ExAlt Plan™ then delivers to Beneficient's clients the consideration required by the specific product selected by Beneficient's clients. At the same time, Beneficient, through a subsidiary, extends a loan to the ExAlt Plan™. The proceeds (cash or securities of Ben LP or its affiliates) of that loan to the ExAlt Plan™ are ultimately paid to the client. The cash flows from the client's alternative asset support the repayment of the loans plus any related interest and fees.

Beneficient held loans receivable with a carrying value of $218.6 million and $232.3 million at March 31, 2020 and December 31, 2019. Loans are carried at the principal amount outstanding, plus interest paid in kind, less allowance for loan loss. Loans bear contractual interest at the greater of 14% or 1-month LIBOR plus 10%, compounded daily. In the event an alternative reference rate is required, the Secured Overnight Financing Rate ("SOFR") would replace LIBOR, as contemplated in our loan agreements. The primary source of repayment for the loans and related fees is cash flows from the alternative assets collateralizing the loans. Interest income on loans is accrued on the principal amount outstanding and interest compounds on a daily basis.

As of March 31, 2020, Beneficient's loan portfolio had exposure to 118 professionally managed alternative investment funds, comprised of 350 underlying investments, and approximately 92 percent of Beneficient's loan portfolio (based on NAV) was collateralized by investments in private companies. Beneficient's loan portfolio diversification spans across these industry sectors and geographic regions (dollar amounts in thousands):

| Industry Sector | Value | Percent of Total |
|---|---|---|
| Health Care Equipment and Services | $ 93,575 | 26.7% |
| Pharmaceuticals, Biotechnology and Life Sciences | 46,438 | 13.2% |
| Telecommunication Services | 39,567 | 11.3% |
| Other[1] | 38,131 | 10.9% |
| Diversified Financials | 28,033 | 8.0% |
| Not Applicable (e.g., Escrow, Earnouts) | 24,177 | 6.9% |
| Software and Services | 20,945 | 6.0% |
| Semiconductors and Semiconductor Equipment | 20,553 | 5.9% |
| Food and Staples Retailing | 20,507 | 5.8% |
| Utilities | 18,728 | 5.3% |
| **Total** | **$ 350,654** | **100.00%** |

| Geography | Value | Percent of Total |
|---|---|---|
| North America | $ 210,976 | 60.2% |
| Western Europe | 62,429 | 17.8% |
| Asia | 36,006 | 10.3% |
| Latin & South America | 22,263 | 6.3% |
| Other[2] | 18,980 | 5.4% |
| **Total** | **$ 350,654** | **100.00%** |

(1) Industries in this category each comprise less than 5 percent.

(2) Locations in this category each comprise less than 5 percent.

Values represent the NAV of the interests in alternative assets, the cash flows of which comprise the collateral of Beneficient's loan portfolio. Assets in the collateral portfolio consist primarily of interests in alternative investment vehicles (also referred to as "funds") that are managed by a group of U.S. and non-U.S. based alternative asset management firms that invest in a variety of financial markets and utilize a variety of investment strategies. The vintages of the funds in the collateral portfolio as of March 31, 2020 ranged from 1998 to 2011.

As Beneficient grows its loan portfolio, Beneficient will monitor the diversity of its collateral portfolio through the use of concentration guidelines. These guidelines were established, and will be periodically updated, through a data driven approach based on asset type, fund manager, vintage of fund, industry segment and geography to manage portfolio risk. Beneficient will refer to these guidelines when making decisions about new financing opportunities; however, these guidelines will not restrict Beneficient from entering into financing opportunities that would result in Beneficient having exposure outside of its concentration guidelines. In addition, changes to Beneficient's collateral portfolio may lag changes to the concentration guidelines. As such, Beneficient's collateral portfolio may, at any given time, have exposures that are outside of its concentration guidelines to reflect, among other things, attractive financing opportunities, limited availability of assets, or other business reasons. Given Beneficient's limited operating history, its collateral portfolio as of March 31, 2020 had exposure to certain alternative investment vehicles and investments in private companies that were outside of those guidelines.

Classifications by industry sector, exposure type and geography reflect classification of investments held in funds or companies held directly in the collateral portfolio. Investments reflect the assets listed by the general partner of a fund as held by the fund and have a positive or negative net asset value. Typical assets include portfolio companies, limited partnership interests in other funds, and net other assets, which are a fund's cash and other current assets minus liabilities. The alternative assets that serve as collateral for Beneficient's loan portfolio are primarily limited partnership interests, and the limited partnership agreements governing those interests generally include restrictions on disclosure of fund-level information, including fund names and company names in the funds.

Industry sector is based on Global Industry Classification Standard (GICS®) Level 2 classification (also known as "Industry Group") of companies held in the collateral portfolio by funds or directly, subject to certain adjustments by us. "Other" classification is not a GICS® classification. "Other" classification reflects companies in the GICS® classification categories of Automobiles & Components, Banks, Commercial & Professional Services, Consumer Durables & Apparel, Consumer Services, Energy, Food, Beverage & Tobacco, Household & Personal Products, Insurance, Materials, Media & Entertainment, Real Estate, Retailing, Semiconductors & Semiconductors Equipment, Tech Hardware & Equipment, and Transportation. N/A includes investments assets that we have determined do not have an applicable GICS Level 2 classification, such as Net Other Assets and investments that are not operating companies.

Investment exposure type reflects classifications based on each fund's current investment strategy stage as determined by us. "Other" includes private debt strategies, natural resources strategies and hedge funds.

Geography reflects classifications determined by us based on each underlying investment. "Other" geography classification includes Israel, Australia and Eastern Europe.

**Principal Revenue and Expense Items**

During the three months ended March 31, 2020 and 2019, we earned revenues from the following primary sources:

- *Revenue realized from maturities of life insurance policies*. We recognize the difference between the face value of the policy benefits and carrying value when an insured event has occurred and determine that collection of the policy benefits is realizable and reasonably assured. Revenue from a transaction must meet both criteria in order to be recognized. We generally collect the face value of the life insurance policy from the insurance company within 45 days of our notification of the insured's mortality.

- *Change in Fair Value of Life Insurance Policies*. We value our life insurance portfolio investments for each reporting period in accordance with the fair value principles discussed herein, which reflects the expected receipt of policy benefits in future periods, net of premium costs, as shown in our condensed consolidated financial statements.

- *Interest Income.* Includes interest income on Beneficient's loan portfolio and on the LiquidTrust promissory note, including discount amortization as applicable. See the discussion above under "Critical Accounting Policies and Estimates – Purchased Loans" for further information on our accounting for PCI and non-PCI loans.

- *Trust Services.* Trust administration fees are earned for providing administrative services to trustees for existing liquidity solution clients. The performance obligation under these agreements is satisfied over time as the administration and management services are provided. Fees are recognized monthly based upon the beginning of quarter (in advance) net asset value plus any remaining unfunded loan commitments and the applicable fee rate of the account as outlined in the agreement. Payment frequency is defined in the individual contracts, which primarily stipulate billings on a quarterly basis in advance. Fees that have been billed in advance are reflected as Deferred Income until earned.

During the three months ended March 31, 2020 and 2019, our main components of expense are summarized below:

- *Interest Expense.* We recognize and record interest expenses associated with the costs of financing our life insurance portfolio and our investment in Beneficient. These expenses include interest paid to our senior lenders under our second amended and restated senior credit facility with LNV Corporation ("LNV Credit Facility"), as well as interest paid on our L Bonds, Seller Trust L Bonds and other outstanding indebtedness, including Beneficient's other borrowings. When we issue debt, we amortize the financing costs (commissions and other fees) associated with such indebtedness over the outstanding term of the financing and classify it as interest expense.

- *Employee Compensation and Benefits.* Employee compensation and benefits includes salaries, bonuses and other incentives and costs of employee benefits. Also included are significant non-cash expenses related to Beneficient's equity incentive plans for the three months ended March 31, 2020.

- *Selling, General and Administrative Expenses.* We recognize and record expenses in our business operations as incurred, including operations related to the servicing of life insurance policies, the origination and servicing of loans and costs associated with trust administration. These expenses include legal and professional fees, sales, marketing, occupancy and other expenditures.

Additional components of our net earnings include:

- *Earnings (Loss) from Equity Method Investment.* Prior to the Investment and Exchange Agreements on December 31, 2019, we accounted for our investment in the common units of Ben LP ("Common Units") using the equity method. Under this method, we recorded our share of the net earnings or losses attributable to Ben LP common unitholders, on a one quarter lag, as a separate line on our consolidated statements of operations. We also account for our investment in FOXO as an equity method investment, which is also included in earnings (loss) from equity method investment in our consolidated statements of operations. We had losses of $1.5 million and $1.9 million from equity method investments during the three months ended March 31, 2020 and 2019, respectively.

**Results of Operations — Three Months Ended March 31, 2020 Compared to the Same Period in 2019**

The following is our analysis of the results of operations for the periods indicated below. This analysis should be read in conjunction with our condensed consolidated financial statements and related notes (dollar values in thousands).

*Revenue from Secondary Life Insurance*

| | Three Months Ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | **2020** | | **2019** | |
| Revenue realized from maturities of life insurance policies | $ | 19,467 | $ | 21,757 |
| Revenue recognized from change in fair value of life insurance policies | | 12,177 | | 15,571 |
| Premiums and other annual fees paid | | (17,199) | | (15,832) |
| Gain on life insurance policies, net | $ | 14,445 | $ | 21,496 |
| | | | | |
| Attribution of gain on life insurance policies, net: | | | | |
| Change in estimated probabilistic cash flows, net of premium and other annual fees paid | $ | 652 | $ | 1,299 |
| Net revenue recognized at maturity | | 13,793 | | 15,738 |
| Unrealized gain on acquisitions | | — | | 4,459 |
| Gain on life insurance policies, net | $ | 14,445 | $ | 21,496 |
| | | | | |
| Number of policies acquired | | — | | 60 |
| Face value of purchases | $ | — | $ | 80,211 |
| Purchases (initial cost basis) | $ | — | $ | 27,393 |
| Unrealized gain on acquisition (% of face value) | | n/a | | 5.6% |
| | | | | |
| Number of policies matured | | 20 | | 20 |
| Face value of matured policies | $ | 25,502 | $ | 30,459 |
| Net revenue recognized at maturity event (% of face value matured) | | 54.1% | | 51.7% |

Revenue from changes in estimated probabilistic cash flows, net of premiums paid was $0.7 million and $1.3 million in the three months ended March 31, 2020 and 2019, respectively. The decrease of $7.1 million in gain on life insurance policies for the three months ended March 31, 2020, over the comparable prior year period was driven by a decrease in the face value of matured life insurance policies and by higher premiums paid in the first quarter of 2020.

The Company did not purchase any life insurance policies in the first quarter of 2020. The face value of life insurance policies purchased in the first quarter of 2019 was $80.2 million. The resulting unrealized gain on acquisition was $0 and $4.5 million in the first quarter of 2020 and 2019, respectively. Decreased unrealized gain on acquisition in the current period is the result of a strategic decision to significantly reduce capital allocated to purchasing additional life insurance policies in the secondary market and to increase capital allocated toward providing liquidity to a broader range of alternative assets through additional investments in Beneficient. On December 31, 2019, we obtained the right to appoint a majority of the board of directors of the general partner of Ben LP. As a result of this change-of-control event, we reported the results of Ben LP and its subsidiaries on a consolidated basis beginning on the transaction date of December 31, 2019. We believe Beneficient can finance investments in alternative assets that will generally produce higher risk-adjusted returns than those we can generally achieve from life insurance policies acquired in the secondary market. Furthermore, although we believe that our portfolio of life insurance policies is a meaningful component of a growing diversified alternative asset portfolio, we continue to explore strategic alternatives for our life insurance portfolio aimed at maximizing its value, including a possible sale, refinancing or recapitalization of our life insurance portfolio.

The face value of matured policies was $25.5 million and $30.5 million in the three months ended March 31, 2020 and 2019, respectively, reflecting a decrease of face value of matured policies of $5.0 million. The resulting revenue recognized at maturity was $13.8 million and $15.7 million, respectively. Revenue changes from maturity events of ($1.9) million primarily resulted from the changes of face value of policies matured during those same periods.

*Interest Income, Trust Services Revenues and Other Income (in thousands)*

| | Three Months Ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | **2020** | | **2019** | |
| Interest income | $ | 13,989 | $ | 3,501 |
| Trust services revenues | | 5,027 | | — |
| Other income | | 96 | | 220 |
| Total | $ | 19,112 | $ | 3,721 |

Interest income increased $10.5 million during the three months ended March 31, 2020 compared to the same period in 2019, primarily due to the consolidation of Beneficient, which added $8.1 million to interest income. We also added $1.1 million of interest income from the promissory note between GWG Life and the LiquidTrusts entered into on May 31, 2019, as discussed in Note 6 to the condensed consolidated financial statements. These increases were partially offset by $2.8 million of interest on the commercial loan between GWG Life and Beneficient, which was reported in interest income during the three months ended March 31, 2019, prior to the consolidation of Beneficient on December 31, 2019. This intercompany interest was eliminated in consolidation beginning January 1, 2020.

Page 61

App. 0989

Trust services revenues related to Beneficient's trust administration services were added beginning January 1, 2020, as a result of the consolidation of Beneficient on December 31, 2019.

*Interest and Operating Expenses (in thousands)*

| | Three Months Ended March 31, | | |
|---|---|---|---|
| | 2020 | 2019 | Increase/ (Decrease) |
| Interest expense (including amortization of deferred financing costs) | $ 35,871 | $ 26,975 | $ 8,896 |
| Employee compensation and benefits | 77,704 | 5,154 | 72,550 |
| Legal and professional fees | 6,163 | 2,947 | 3,216 |
| Other expenses | 4,312 | 2,828 | 1,484 |
| Total expenses | $ 124,050 | $ 37,904 | $ 86,146 |

The increase in interest expense was primarily due to the increase in the average outstanding L Bonds from $729.3 million in three months ended March 31, 2019 to $1.0 billion in the same period of 2020, contributing $6.1 million of increased interest expense, including amortization of deferred financing costs. Also, the consolidation of Beneficient beginning December 31, 2019 increased interest expense by $2.3 million related to Beneficient's other borrowings. Additionally, $0.5 million of interest expense increase was attributed to interest paid on our LNV Credit Facility due to the higher principal balance outstanding.

The increase in employee compensation and benefits in the three months ended March 31, 2020, compared to the same period of 2019, was primarily related to the consolidation of Beneficient on December 31, 2019. Specifically, the Company recognized $68.9 million of equity-based compensation expense during the three months ended March 31, 2020, related to Beneficient's equity incentive plans. Beneficient's Board of Directors approved the granting of equity incentive awards during the first quarter of 2020 to certain employees and directors. Awards are generally subject to service-based vesting over a multi-year period from the recipient's date of hire, though some awards fully vested upon the grant date. As of March 31, 2020, over 77% of the awards granted under Beneficient's equity incentive plans had vested.

The Company expects to recognize an additional $12.5 million of equity-based compensation expense under Beneficient's plans in the nine months ended December 31, 2020, related to awards outstanding as of March 31, 2020. Expense associated with these awards is based on the fair value of the equity on the date of grant. As Ben LP's equity is not publicly traded, the fair value of the equity awards is estimated on the grant date using internal valuations or recent equity transactions involving third parties, which provides the Company with observable fair value information sufficient for estimating the grant date fair value.

In addition to Beneficient's equity-based compensation expense, we recognized additional retention, severance and other costs in the first quarter of 2020 related to the relocation of our principal offices from Minneapolis to Dallas in late 2019.

The increase in legal and professional fees in the three months ended March 31, 2020 compared to the same period of 2019 is primarily the result of the consolidation of Beneficient on December 31, 2019, which added $4.1 million during the first quarter of 2020. This increase is partially offset by $0.9 million of lower legal and consulting fees as the first quarter of 2019 included additional expenses related to the Beneficient transactions that closed in the second quarter of 2019.

*Income Taxes*

The Company applies an estimated annual effective rate to interim period pre-tax income to calculate the income tax provision for the quarter in accordance with the principal method prescribed by the accounting guidance established for computing income taxes in interim periods.

Income tax benefit was $14.5 million for the three months ended March 31, 2020, compared to $0.0 million for the three months ended March 31, 2019. The Company's effective tax rate was 16.03% and 0% for the same periods. Our tax benefit for the year primarily reflects the effect of a change in state taxing jurisdictions, the reduction of a naked credit (described below), and current tax expense.

In late 2019, the Company moved its headquarters from Minnesota to Texas. This move resulted in a change in the state deferred tax rate from 9.8% to 0%. The tax effects of this move has been recorded as a discrete item during the period.

The Company currently records a valuation allowance against its deferred tax assets to the extent there are indefinite lived intangibles related to investments, business interest expense and net operating losses. Due to the uncertain timing of the reversal of these temporary differences, they cannot be considered as a source of future taxable income for purposes of determining a valuation allowance; therefore the deferred tax liability cannot offset deferred tax assets. This is often referred to as a "naked credit." Due to a prior deemed ownership change, net operating loss carryforwards are subject to Section 382 of the Internal Revenue Code.

We continue to monitor and evaluate the rationale for recording a full valuation allowance for the net amount of the deferred tax assets which are in excess of the indefinite-lived deferred tax assets and liabilities. We intend to continue maintaining a full valuation allowance on these net deferred tax assets until there is sufficient evidence to support the reversal of all or some portion of these allowances. Release of the valuation allowance would result in the recognition of certain deferred tax assets and a decrease to income tax expense for the period the release is recorded. However, the exact timing and amount of the valuation allowance release are subject to change on the basis of the level of profitability that we are able to actually achieve.

On March 27, 2020, Congress passed and the President signed into law the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") which included significant changes to U.S. Federal income tax law. However, the only change that is expected to affect the Company is the modification to Section 163(j), which increased the allowable business interest deduction from 30% of adjusted taxable income to 50% of adjusted taxable income.

**Revenue and Earnings before Tax by Reportable Segment — Three Months Ended March 31, 2020 Compared to the Same Period of 2019**

We have two reportable segments: 1) Beneficient and 2) Secondary Life Insurance. Corporate & Other includes certain activities not allocated to specific business segments. These activities include holding company financing and investing activities, management and administrative services to support the overall operations of the Company and our equity method investment in FOXO.

Comparison of revenue by reportable segment for the periods indicated (in thousands):

| | | Three Months Ended March 31, | | | | |
| | | | | | | Increase/ |
| Revenue: | | 2020 | | 2019 | | (Decrease) |
|---|---|---|---|---|---|---|
| Secondary Life Insurance | $ | 15,148 | $ | 22,183 | $ | (7,035) |
| Beneficient | | 18,409 | | 2,870 | | 15,539 |
| Corporate & Other | | — | | 164 | | (164) |
| Total | $ | 33,557 | $ | 25,217 | $ | 8,340 |

The primary drivers of the changes in revenue during the first quarter of 2020 compared to the same period in 2019 were as follows:

- Secondary Life Insurance revenue decreased by $7.0 million during, the three months ended March 31, 2020, compared to the comparable period in 2019, primarily as a result of lower net gain on life insurance policies. During the three months ended March 31, 2020, compared to the same period in 2019, we experienced $2.3 million lower net revenue recognized at maturity due to few maturities at lower face values, and $4.8 million lower unrealized gain on policy acquisitions as we have not acquired any policies in 2020.

- Beneficient segment revenue for the three months ended March 31, 2020 represents the consolidated operations of Beneficient, compared to an equity method investment in Beneficient during the same period in 2019, and also includes interest income on the LiquidTrust promissory note entered into in May 2019. As such, the first quarter of 2020 includes $13.4 million of interest income and $5.0 million of trust services revenues, whereas the first quarter of 2019 primarily includes interest income on the Commercial Loan between GWG Life and Beneficient, which was eliminated in consolidation beginning December 31, 2019.

- Corporate & Other revenue during the first quarter of 2019 includes minimal revenue related to a legacy merchant cash advance subsidiary of GWG Holdings. GWG holdings no longer participates in the merchant cash advance industry.

Comparison of earnings before tax by reportable segment for the periods indicated (in thousands):

| | | Three Months Ended March 31, | | | | |
| Segment Loss Before Tax[1] | | 2020 | | 2019 | | Change |
|---|---|---|---|---|---|---|
| Secondary Life Insurance | $ | (14,721) | $ | (1,623) | $ | (13,098) |
| Beneficient | | (70,149) | | (5,936) | | (64,213) |
| Corporate & Other | | (7,153) | | (7,055) | | (98) |
| Total | $ | (92,023) | $ | (14,614) | $ | (77,409) |

(1)  Includes loss from equity method investments as presented in our consolidated statements of operations.

The primary drivers of the changes in loss before tax during the first quarter of 2020 compared to the same period in 2019 were as follows:

- Secondary Life Insurance loss before tax increased by $13.1 million as a result of the following:

  - $7.0 million decrease in the gain on life insurance policies, net as described above in the revenue discussion.

- $1.6 million increase in interest expense as a result of higher average debt outstanding; and

- An increase in operating expenses of $3.5 million, primarily resulting from higher employee compensation and benefits, professional fees and insurance costs.

- Beneficient segment loss before tax increased by $64.2 million during the first quarter of 2020 compared to the same period in 2019, primarily due to the consolidation of Beneficient on December 31, 2019. The earnings of Beneficient in the first quarter of 2020 were affected by a $65.1 million non-cash charge for equity incentive compensation.  In the first quarter of 2019, we accounted for Beneficient using the equity method on a one-quarter lag, and the amount reported represents our proportionate share of the losses of Beneficient for the period presented. The one-quarter lag was required to be discontinued with the consolidation of Beneficient on December 31, 2019.

- Corporate and Other operating loss was relatively unchanged during the first quarter of 2020 compared to the same period in 2019.

**Liquidity and Capital Resources**

We finance our businesses through a combination of life insurance policy benefit receipts; receipt of principal, interest and related fees on loans receivable; dividends and interest on investments; equity offerings; debt offerings; and our LNV Credit Facility and other borrowings. We have traditionally used proceeds from these sources for policy acquisition, policy premiums and servicing costs, working capital and financing expenditures including paying principal, interest and dividends. We have also used, and intend to continue to use, proceeds to allocate capital to Beneficient.

As of March 31, 2020 and December 31, 2019, we had approximately $188.7 million and $151.5, respectively, in combined available cash, cash equivalents, restricted cash, policy benefits receivable and fees receivable.

We currently fund our business primarily with debt that generally has a shorter duration than the duration of our longer-term assets. The resulting asset/liability mismatch can result in a liquidity shortfall if we are unable to renew maturing short term debt or secure suitable additional financing. In such a situation, we could be forced to sell assets at less than optimal (distressed) prices. We heavily rely on our L Bond offering to fund our business operations, including capital allocations to Beneficient. We were unable to offer our L Bonds, our primary source of debt capital, for the approximately three month period commencing May 1, 2019 due to delays in filing certain periodic reports with the SEC. We drew down our cash balances during that period as L Bonds matured but were unable to be renewed, and we were unable to offer new L Bonds. We recommenced our L Bond offering on August 8, 2019. If we are again forced to suspend our L Bond offering in the future for any significant length of time, and we are unable to obtain replacement financing, our business would be adversely impacted and our ability to service and repay our debt obligations, much of which is short term, would be compromised, thereby negatively affecting our business prospects and viability.

Additional future borrowing base capacity for premiums and servicing costs, created as the premiums and servicing costs of pledged life insurance policies become due and by additional policy pledges to the facility, if any, exists under the LNV Credit Facility. The LNV Credit Facility has certain financial and nonfinancial covenants. We were in compliance with the debt covenants as of March 31, 2020 and are in compliance as of the filing date of this report.

As noted in the "Results of Operations" section above, on November 11, 2019, GWG Holdings contributed the common stock and membership interests of its wholly-owned Life Epigenetics and youSurance subsidiaries to a legal entity, FOXO, in exchange for a membership interest in the entity. In connection with the transaction, GWG Holdings contributed $2.1 million in cash to FOXO during the fourth quarter of 2019 and is committed to contribute an additional $12.5 million to the entity through October 2021.

*Financings Summary*

We had the following outstanding debt balances as of March 31, 2020 and December 31, 2019:

| | As of March 31, 2020 | | As of December 31, 2019 | |
| --- | --- | --- | --- | --- |
| Issuer/Borrower | Principal Amount Outstanding (in thousands) | Weighted Average Interest Rate | Principal Amount Outstanding (in thousands) | Weighted Average Interest Rate |
| GWG DLP Funding IV, LLC – LNV senior credit facility (see Note 10) | $ 198,661 | 9.53% | $ 184,586 | 9.57% |
| GWG Holdings, Inc. – L Bonds | 1,035,827 | 7.18% | 948,128 | 7.15% |
| GWG Holdings, Inc. – Seller Trust L Bonds | 366,892 | 7.50% | 366,892 | 7.50% |
| Beneficient – Other borrowings | 152,183 | 5.35% | 152,199 | 4.59% |
| **Total** | $ 1,753,563 | 7.36% | $ 1,651,805 | 7.26% |

The table below reconciles the face amount of our outstanding debt to the carrying value shown on our balance sheets:

| | As of March 31, 2020 (in thousands) | | As of December 31, 2019 (in thousands) | |
|---|---:|---|---:|---|
| Senior credit facility with LNV Corporation | | | | |
| Face amount outstanding | $ | 198,661 | $ | 184,586 |
| Unamortized selling costs | | (9,868) | | (10,196) |
| Carrying amount | $ | 188,793 | $ | 174,390 |
| | | | | |
| L Bonds and Seller Trust L Bonds: | | | | |
| Face amount outstanding | $ | 1,402,719 | $ | 1,315,020 |
| Subscriptions in process | | 15,197 | | 15,839 |
| Unamortized selling costs | | (41,243) | | (37,329) |
| Carrying amount | $ | 1,376,673 | $ | 1,293,530 |
| | | | | |
| Other borrowings: | | | | |
| Face amount outstanding | $ | 152,183 | $ | 152,199 |
| Unamortized premium | | 414 | | 887 |
| Carrying amount | $ | 152,597 | $ | 153,086 |

In January 2015, we began publicly offering up to $1.0 billion of L Bonds as a follow-on to our earlier $250.0 million public debt offering. In January 2018, we began publicly offering up to $1.0 billion L Bonds under an additional offering. Through March 31, 2020, the total amount of L Bonds sold under these L Bond offerings, including renewals, was $1.7 billion. As of March 31, 2020 and December 31, 2019, respectively, we had approximately $1.0 billion and $948.1 million in principal amount of L Bonds outstanding (exclusive of Seller Trust L Bonds).

On March 30, 2020, we filed a registration statement to offer up to $2.0 billion in principal amount of L Bonds on a continuous basis the third anniversary of the effective date of the registration statement. These bonds contain the same terms and features as our previous offerings.

In February 2017, we began publicly offering up to 150,000 shares of our Series 2 Redeemable Preferred Stock ("RPS 2") at a per-share price of $1,000. As of December 31, 2018, we had issued approximately $150 million stated value of RPS 2 and terminated that offering.

On August 10, 2018, GWG Holdings, GWG Life and the Bank of Utah, as trustee, entered into the Supplemental Indenture to the Amended and Restated Indenture. GWG Holdings entered into the Supplemental Indenture to add and modify certain provisions of the Amended and Restated Indenture necessary to provide for the issuance of the Seller Trust L Bonds. We issued Seller Trust L Bonds in the amount of $366.9 million to the Seller Trusts in connection with the Exchange Transaction discussed in detail in Note 1 to the condensed consolidated financial statements. The maturity date of the Seller Trust L Bonds is August 9, 2023. The Seller Trust L Bonds bear interest at 7.5% per annum. Interest is payable monthly in cash (see Note 10 to the condensed consolidated financial statements).The Amended and Restated Indenture was subsequently amended on December 31, 2019, primarily to modify the calculation of the Debt Coverage Ratio in the Indenture to provide the Company with the ability to incur indebtedness (directly or through a subsidiary of the Company) that is payable in capital stock of the Company or mandatorily convertible into or exchangeable for capital stock of the Company that would be excluded from the calculation of the Debt Coverage Ratio.

The weighted-average interest rate of our outstanding L Bonds (excluding the Seller Trust L Bonds) as of March 31, 2020 and December 31, 2019 was 7.18% and 7.15%, respectively, and the weighted-average maturity at those dates was 3.24 and 3.21 years, respectively. Our L Bonds have renewal features. Since we first issued our L Bonds, we have experienced $677.3 million in maturities, of which $357.7 million has renewed through March 31, 2020 for an additional term. This has provided us with an aggregate renewal rate of approximately 52.8% for investments in these securities.

Future contractual maturities of L Bonds and Seller Trust L Bonds at March 31, 2020 are as follows (in thousands):

| Years Ending December 31, | | |
|---|---|---:|
| 2020 | $ | 117,173 |
| 2021[1] | | 566,939 |
| 2022 | | 192,133 |
| 2023 | | 107,884 |
| 2024 | | 118,042 |
| Thereafter | | 300,548 |
| | $ | 1,402,719 |

(1) After the second anniversary of the Final Closing, the holders of the Seller Trust L Bonds will have the right to cause GWG to repurchase, in whole but not in part, the Seller Trust L Bonds held by such holder within 45 days. As such, while the maturity date of the $366.9 million of Seller Trust L Bonds is in August 2023, their contractual maturity is reflected in 2021, as that is the first period in which they could become payable. The repurchase may be paid, at the option of GWG Holdings, in the form of cash, and/or a pro rata portion of (i) the outstanding principal amount and accrued and unpaid interest under the Commercial Loan Agreement, and (ii) Common Units, or a combination of cash and such property.

<div align="center">Page 66</div>

The L Bonds and the Seller Trust L Bonds are secured by all of our assets and are subordinate to our LNV Credit Facility.

On September 27, 2017, we entered into a $300 million amended and restated senior credit facility with LNV Corporation in which DLP IV is the borrower. As of March 31, 2020, we had approximately $198.7 million outstanding under the senior credit facility. On November 1, 2019, we entered into the LNV Credit Facility, which replaced the prior agreement governing the facility. A description of the agreement governing our LNV Credit Facility is set forth below under the caption "Amendment of Credit Facility with LNV Corporation." We intend to use the proceeds from this facility to maintain our portfolio of life insurance policies, for liquidity and for general corporate purposes.

Beneficient had borrowings with an aggregate carrying value of $152.6 million and $153.1 million as of March 31, 2020 and December 31, 2019, respectively. This aggregate outstanding balance includes a senior credit agreement and a subordinate credit agreement with respective balances, including accrued interest, of $77.5 million and $72.2 million as of March 31, 2020 and December 31, 2019, respectively. These amounts exclude an aggregate unamortized premium of $0.4 million and $0.9 million as of March 31, 2020 and December 31, 2019, respectively. Both loans accrue interest at a rate of 1-month LIBOR plus 3.95%, compounded daily, with interest due by the 15th of each month. The senior credit agreement and the subordinate credit agreement both mature on June 30, 2020. These loans are not currently guaranteed by GWG as of March 31, 2020. On May 15, 2020, Beneficient and the lender signed the Term Sheet which would amend the loan terms as discussed in detail in the "Recent Developments" section.

Beneficient has additional borrowings maturing in 2023 and 2024 with aggregate balances of $2.5 million as of both March 31, 2020 and December 31, 2019.

We expect to meet our ongoing operational capital needs for alternative asset investments, policy premiums and servicing costs, working capital and financing expenditures including paying principal, interest and dividends through a combination of the receipt of policy benefits from our portfolio of life insurance policies, net proceeds from our L Bond offering, dividends and interest from investments, including Beneficient's fee and loans receivable, and funding available from our LNV Credit Facility. We estimate that our liquidity and capital resources are sufficient for our current and projected financial needs for at least the next twelve months given current assumptions. However, if we are unable to continue our L Bond offering for any reason, and we are unable to obtain capital from other sources, our business will be materially and adversely affected. In addition, our business will be materially and adversely affected if we do not receive the policy benefits we forecast and if holders of our L Bonds fail to renew with the frequency we have historically experienced. In such a case, we could be forced to sell our investments in life insurance policies to service or satisfy our debt-related and other obligations. A sale under such circumstances may result in significant impairment of the recognized value of our portfolio.

Capital expenditures have historically not been material and we do not anticipate making material capital expenditures through the remainder of 2020.

*Alternative Assets and Secured Indebtedness*

The following information is specifically related to GWG Holdings, Inc. and its subsidiaries (not including the assets and liabilities held by Beneficient or any eliminations in consolidation).

The following table seeks to illustrate the impact that a hypothetical sale of our portfolio of life insurance assets (at various discount rates, including the discount rate used to value our portfolio at March 31, 2020), and the realization of the financing receivables from affiliates, investment in Common Units (a substantial majority of the net assets of which are currently represented by intangible assets and goodwill), investment in Preferred Series A Subclass 1 Unit Account of BCH, and equity security investment in the Option Agreement (in each case, at their respective carrying amounts and assuming no discount for lack of marketability or transaction costs, which could be substantial) would have on our ability to satisfy our debt obligations as of March 31, 2020. The financing receivables from affiliates, investment in Common Units, Preferred Series A Subclass 1 Unit Account of BCH, and Option Agreement are discussed in detail in Note 1 and other applicable notes to the consolidation financial statements. The amounts in the table below do not include the consolidation of the assets and liabilities of Beneficient and related eliminations as of March 31, 2020. In all cases, the sale of the life insurance assets owned by DLP IV will be used first to satisfy all amounts owing under our LNV Credit Facility. The net sale proceeds remaining after satisfying all obligations under our LNV Credit Facility would be applied to the L Bonds and Seller Trust L Bonds on a pari passu basis. All dollar amounts in the table below are in thousands.

Page 67

**Life Insurance**

| Portfolio Discount Rate | 8.25%[1] | 10.00% | 15.00% | 20.00% | 23.62% |
|---|---|---|---|---|---|
| Value of life insurance portfolio | $ 802,181 | $ 736,375 | $ 594,234 | $ 496,814 | $ 443,983 |
| Common Units of Ben LP and Preferred Series A Subclass 1 Unit Account of BCH | 697,714 | 697,714 | 697,714 | 697,714 | 697,714 |
| Financing receivables from affiliates | 239,564 | 239,564 | 239,564 | 239,564 | 239,564 |
| Cash, cash equivalents and policy benefits receivable | 146,225 | 146,225 | 146,225 | 146,225 | 146,225 |
| Option Agreement and other assets | 73,894 | 73,894 | 73,894 | 73,894 | 73,894 |
| Total assets | 1,959,578 | 1,893,772 | 1,751,631 | 1,654,211 | 1,601,380 |
| Senior credit facility | 198,661 | 198,661 | 198,661 | 198,661 | 198,661 |
| Net after senior credit facility | 1,760,917 | 1,695,111 | 1,552,970 | 1,455,550 | 1,402,719 |
| L Bonds[2] | 1,402,719 | 1,402,719 | 1,402,719 | 1,402,719 | 1,402,719 |
| Net remaining (in thousands) | $ 358,198 | $ 292,392 | $ 150,251 | $ 52,831 | $ (0) |
| Impairment to L Bonds | No impairment | No impairment | No impairment | No Impairment | Impairment |

(1)  The discount rate used to calculate the fair value of our life insurance portfolio as of March 31, 2020
(2)  Amount represents L Bonds and Seller Trust L Bonds

The above table illustrates that our ability to fully satisfy amounts owing under the L Bonds and Seller Trust L Bonds would likely be impaired upon the sale or the realization of the financing receivables from affiliates, investment in Common Units, investment in Preferred Series A Subclass 1 Unit Account of BCH, and equity security investment in the Option Agreement at their respective carrying amounts, plus all our life insurance assets at a price equivalent to a discount rate of approximately 23.62% or higher at March 31, 2020. At December 31, 2019, the likely impairment occurred at a discount rate of approximately 27.41% or higher.

The table does not include any allowance for transactional fees and expenses (which expenses and fees could be substantial) nor any discount for lack of marketability associated with a portfolio sale or the realization of the financing receivables from affiliates, investment in Common Units of Ben LP, investment in Preferred Series A Subclass 1 Unit Account of BCH, and equity security investment in the Option Agreement, respectively, and is provided to demonstrate how various discount rates used to value our portfolio of life insurance assets could affect our ability to satisfy amounts owing under our debt obligations in light of our senior secured lender's right to priority payments under our senior credit facility with LNV Corporation.

The table assumes we will realize the full amounts of financing receivables from affiliates, investment in Common Units, investment in Preferred Series A Subclass 1 Unit Account of BCH, and equity security investment in the Option Agreement. There is currently no market for the aforementioned assets, and a market may not develop. Our Commercial Loan receivable and a portion of our investment in the Common Units may be used as consideration for retiring the Seller Trust L Bonds upon a redemption event or at the maturity of the Seller Trust L Bonds (see Note 10 to the condensed consolidated financial statements). This table also does not include the yield maintenance fee we are required to pay in certain circumstances under our LNV Credit Facility, which could be substantial. The above table should be read in conjunction with the information contained in other sections of this report, including the notes to the condensed consolidated financial statements in this Form 10-Q and our 2019 Form 10-K.

*Amendment of Credit Facility with LNV Corporation*

Effective November 1, 2019, DLP IV entered into the LNV Credit Facility. The LNV Credit Facility makes available a total of up to $300.0 million in credit to DLP IV with a maturity date of September 27, 2029. Subject to available borrowing base capacity, additional advances are available under the LNV Credit Facility at the LIBOR rate described below. Such advances are available to pay premiums and servicing costs of pledged life insurance policies as such amounts become due. Interest will accrue on amounts borrowed under the LNV Credit Facility at an annual interest rate, determined as of each date of borrowing or quarterly if there is no borrowing, equal to (a) 12-month LIBOR, plus (b) 7.50% per annum. The effective rate at March 31, 2020 was 9.50%. Interest payments are made on a quarterly basis. As of March 31, 2020, we had future borrowing capacity of $101.3 million under the LNV Credit Facility.

Under the LNV Credit Facility, DLP IV has granted the administrative agent, for the benefit of the lenders under the facility, a security interest in all of DLP IV's assets. As with prior collateral arrangements relating to the senior secured debt of GWG Holdings and its subsidiaries (on a consolidated basis), GWG Life's excess equity value of DLP IV after satisfying all amounts owing under our LNV Credit Facility is available as collateral for the obligations of GWG Holdings under the L Bonds and Seller Trust L Bonds (although the life insurance assets owned by DLP IV do not themselves serve as direct collateral for those obligations).

We are subject to various financial and non-financial covenants under the LNV Credit Facility, including, but not limited to, compliance with laws, preservation of existence, financial reporting, keeping of proper books of record and account, payment of taxes, and ensuring that neither DLP IV nor GWG Life become an investment company. As of March 31, 2020, we were in compliance with all financial and non-financial covenants.

**Cash Flows**

*Interest and Dividend Payments*

We finance our businesses through a combination of: life insurance policy benefit receipts; principal, dividends and interest receipt on investments, including Ben LP fee and loans receivable; debt and equity offerings; and our senior credit facility with LNV Corporation. We have historically relied on debt (L Bonds and our senior credit facility with LNV Corporation) and equity (preferred stock) financing for the majority of our cash expenditures (for policy acquisition, policy premiums and servicing costs, working capital and financing expenditures including paying principal and interest on existing debt, and for making investments in Beneficient) as the amount of cash flows from the realization of life insurance policy benefits and cash flows from our other investments has been insufficient to meet all of our needs. This has resulted in the Company incurring substantial indebtedness (much of it being of a short term nature) and, to a lesser extent, obligations to make dividend payments on our classes of preferred stock.

Beneficient finances its business through payments on outstanding loans receivable and fees receivable, additional investments into Beneficient by GWG Holdings and/or other parties, and, potentially, refinancing with other third-party lenders some or all of the existing borrowings due on June 30, 2020 prior to their maturity. Beneficient uses proceeds from these sources to fund loan originations and potential unfunded capital commitments, working capital, debt service payments and costs associated with potential future products. Beneficient also anticipates the need to establish sufficient regulatory capital if and when its trust charters are issued.

Our total interest expense of $35.9 million and $27.0 million for the three months ended March 31, 2020 and 2019, respectively, represent the largest cash expense item in each period. Preferred stock cash dividends for the three months ended March 31, 2020 and 2019 were $4.0 million and $4.3 million, respectively. While reducing our cost of funds and increasing our common equity base (at valuations accretive to our book value) are primary goals of the Company, until we do so we will continue to expend significant amounts of cash for interest and dividend payments and will thus continue to rely heavily on our ability to raise cash from our L Bond offering, senior credit facility with LNV Corporation and other means as they are developed and available.

*Life Insurance Policy Premium Payments*

The payment of premiums and servicing costs to maintain life insurance policies represents one of our most significant requirements for cash disbursement. When a policy is purchased, we are able to calculate the minimum premium payments required to maintain the policy in-force. Over time as the insured ages, premium payments will increase. Nevertheless, the probability we will be required to pay the premiums decreases as mortality becomes more likely. These scheduled premiums and associated probabilities are factored into our expected internal rate of return and cash-flow modeling. Beyond premiums, we incur policy servicing costs, including annual trustee, policy administration and tracking costs. Additionally, we incur significant financing costs, including principal, interest and dividends. Both policy servicing costs and financing costs are excluded from our internal rate of return calculations. We finance our businesses through a combination of life insurance policy benefit receipts, dividends and interest on other investments, equity offerings, debt offerings, and advances under our senior credit facility with LNV Corporation.

The amount of payments for anticipated premiums, including the requirement under our LNV Credit Facility to maintain a two month cost-of-insurance threshold within each policy cash value account, and servicing costs that we will be required to make over the next five years to maintain our current portfolio, assuming no mortalities, is set forth in the table below (in thousands):

| Years Ending December 31, | Premiums | | Servicing | | Total | |
|---|---|---|---|---|---|---|
| Nine months ending December 31, 2020 | $ | 49,708 | $ | 1,222 | $ | 50,930 |
| 2021 | | 83,813 | | 1,630 | | 85,443 |
| 2022 | | 96,636 | | 1,630 | | 98,266 |
| 2023 | | 108,749 | | 1,630 | | 110,379 |
| 2024 | | 118,269 | | 1,630 | | 119,899 |
| 2025 | | 131,528 | | 1,630 | | 133,158 |
| | $ | 588,703 | $ | 9,372 | $ | 598,075 |

Our anticipated premium expenses are subject to the risk of increased cost-of-insurance charges (i.e., "COI" or premium charges) for the life insurance policies we own. We did not receive any notices of COI rate changes in 2019 or in the first quarter of 2020.

We have no known pending cost-of-insurance increases on any policies in our portfolio, but we are aware that cost-of-insurance increases have become more prevalent in the industry. Thus, we may see additional insurers implementing cost-of-insurance increases in the future.

*Life Insurance Policy Benefit Receipts*

For the quarter-end dates set forth below, the following table illustrates the total amount of face value of policy benefits owned, and the trailing 12 months of life insurance policy benefits realized and premiums paid on our portfolio. The trailing 12-month benefits/premium coverage ratio indicates the ratio of policy benefits realized to premiums paid over the trailing 12-month period from our portfolio of life insurance policies.

| Quarter End Date | Portfolio Face Amount (in thousands) | 12-Month Trailing Benefits Realized (in thousands) | 12-Month Trailing Premiums Paid (in thousands) | 12-Month Trailing Benefits/Premium Coverage Ratio |
|---|---|---|---|---|
| March 31, 2016 | 1,027,821 | 21,845 | 28,771 | 75.9% |
| June 30, 2016 | 1,154,798 | 30,924 | 31,891 | 97.0% |
| September 30, 2016 | 1,272,078 | 35,867 | 37,055 | 96.8% |
| December 31, 2016 | 1,361,675 | 48,452 | 40,239 | 120.4% |
| March 31, 2017 | 1,447,558 | 48,189 | 42,753 | 112.7% |
| June 30, 2017 | 1,525,363 | 49,295 | 45,414 | 108.5% |
| September 30, 2017 | 1,622,627 | 53,742 | 46,559 | 115.4% |
| December 31, 2017 | 1,676,148 | 64,719 | 52,263 | 123.8% |
| March 31, 2018 | 1,758,066 | 60,248 | 53,169 | 113.3% |
| June 30, 2018 | 1,849,079 | 76,936 | 53,886 | 142.8% |
| September 30, 2018 | 1,961,598 | 75,161 | 55,365 | 135.8% |
| December 31, 2018 | 2,047,992 | 71,090 | 52,675 | 135.0% |
| March 31, 2019 | 2,098,428 | 87,045 | 56,227 | 154.8% |
| June 30, 2019 | 2,088,445 | 82,421 | 59,454 | 138.6% |
| September 30, 2019 | 2,064,156 | 101,918 | 61,805 | 164.9% |
| December 31, 2019 | 2,020,973 | 125,148 | 63,851 | 196.0% |
| March 31, 2020 | 2,000,680 | 120,191 | 65,224 | 184.3% |

Page 70

We believe that the portfolio cash flow results set forth above are consistent with our general investment thesis that the life insurance policy benefits we receive will continue to increase over time in relation to the premiums we are required to pay on the remaining polices in the portfolio. Nevertheless, we expect that our portfolio cash flow on a period-to-period basis will remain inconsistent as we continue to allocate substantially more capital to Beneficient and have reduced capital allocated to acquiring a larger, more diversified portfolio of life insurance policies.

*Interest Income*

We earn interest income primarily on Beneficient's loans receivable and the promissory note receivable from the LiquidTrusts. Although Beneficient has originated a limited number of loans to date, we expect interest income to continue to increase as Beneficient expands its operations if and when the trust charters are issued.

**Inflation**

Changes in inflation do not necessarily correlate with changes in interest rates. We presently do not foresee any material impact of inflation on our results of operations in the periods presented in our condensed consolidated financial statements.

**Off-Balance Sheet Arrangements**

*Unfunded Capital Commitments*

Beneficient had $73.7 million and $73.8 million of gross potential capital commitments as of March 31, 2020 and December 31, 2019, respectively, representing potential limited partner capital funding commitments on the alternative asset fund collateral to its loans above any cash reserves. The trust holding the interest in the limited partnership for the alternative asset fund is required to fund these limited partner capital commitments per the terms of the limited partnership agreement. Capital funding commitment reserves are maintained by the associated trusts created at the origination of each trust for up to $0.1 million. To the extent that the associated trust cannot pay the capital funding commitment, Beneficient is obligated to lend sufficient funds to meet the commitment. Any amounts advanced by Beneficient for these limited partner capital funding commitments above the associated capital funding commitment reserves held by the associated trusts are added to the loan balance and are expected to be recouped through the cash distributions from the alternative asset fund collateral.

Capital commitments generally originate from limited partner agreements having fixed or expiring expiration dates. The total limited partner capital funding commitment amounts may not necessarily represent future cash requirements. Beneficient considers the creditworthiness on a case-by-case basis. At both March 31, 2020 and December 31, 2019, Beneficient had no reserves for losses on unused commitments to fund potential limited partner capital funding commitments.

**Credit Risk and Interest Rate Risk**

We review the credit risk associated with our portfolio of life insurance policies when estimating its fair value. In evaluating the policies' credit risk, we consider insurance company solvency, credit risk indicators, economic conditions, ongoing credit evaluations, and company positions. We attempt to manage our credit risk related to life insurance policies typically by purchasing policies issued only from companies with an investment-grade credit rating by either Standard & Poor's, Moody's, or A.M. Best Company. As of March 31, 2020, 95.6% of our life insurance policies, by face value benefits, were issued by companies that maintained an investment-grade rating (BBB or better) by Standard & Poor's.

The assets and liabilities exchanged in the Initial Transfer of the Exchange Transaction are excluded from this analysis.

Our LNV Credit Facility and Beneficient's other borrowings are floating-rate financings. In addition, our ability to offer interest and dividend rates that attract capital (including in our continuous offering of L Bonds) is generally impacted by prevailing interest rates. Furthermore, while our L Bond offering provides us with fixed-rate debt financing, our Debt Coverage Ratio is calculated in relation to the interest rate on all of our debt financing, exclusive of our Seller Trust L Bonds. Therefore, increases in interest rates impact our business by increasing our borrowing costs and reducing availability under our debt financing arrangements. Earnings from our life insurance portfolio are based upon the spread, if any, generated between the return on the portfolio and the total cost of our financing (excluding cost of financing for the Seller Trust L Bonds). As a result, increases in interest rates will reduce the earnings we expect to achieve from our investments in life insurance policies.

Page 71

Beneficient is subject to risks related to markets, credit, currency, and interest rates. Beneficient issues loans that are subject to credit risk, repayment risk and interest rate risk. Beneficient has underwriting procedures and utilizes market rates. As of March 31, 2020, all of Beneficient's loans are collateralized by the cash flows originating from alternative assets without recourse to the client. Currently, all of these alternative assets consist of private equity limited partnership interests which are primarily denominated in the U.S. dollar, Euro, and Canadian dollar. The underlying portfolio companies primarily operate in the United States, with the largest percentage, based on NAV, operating in healthcare technology, bio-technology, and diversified telecommunications services industries. The Company mitigates credit risk through the ExAlt Plan$^{TM}$ whereby excess cash flows from a collective pool of alternative assets can be utilized to repay the loans when cash flows from the client's original alternative assets are not sufficient to repay the outstanding principal, interest, and fees.

**Debt Coverage Ratio**

The L Bond borrowing covenants of GWG Holdings require it to maintain a Debt Coverage Ratio of less than 90%. The Debt Coverage Ratio is calculated by dividing the sum of our total interest-bearing indebtedness (other than Excluded Indebtedness described in note 2 to the table below) by the sum of our cash, cash equivalents, restricted cash, life insurance policy benefits receivable, the net present value of the life insurance portfolio, and, without duplication, the value of all of our other assets as reflected on our most recently available balance sheet prepared in accordance with GAAP. The discount rate we use for the net present value of our life insurance portfolio for this calculation may not be the same discount rate we use for our GAAP valuation and is not necessarily reflective of the amount we could realize upon a sale of the portfolio (dollar amounts in thousands):

| | March 31, 2020 | | December 31, 2019 |
|---|---|---|---|
| Life insurance portfolio policy benefits | $ 2,000,680 | $ | 2,020,973 |
| Discount rate of future cash flows[1] | 7.56% | | 7.55% |
| | | | |
| Net present value of life insurance portfolio policy benefits | $ 831,167 | $ | 826,196 |
| All cash and cash equivalents (including restricted cash) | 130,895 | | 81,780 |
| Life insurance policy benefits receivable, net | 15,330 | | 23,031 |
| Financing receivables from affiliates | 239,564 | | 258,402 |
| Investments in Common Units and Preferred Series A Subclass 1 Unit Account | 697,714 | | 632,473 |
| Option Agreement and other assets | 73,894 | | 54,365 |
| Total Coverage[2] | $ 1,988,564 | $ | 1,876,247 |
| | | | |
| Total Indebtedness[2] | $ 1,266,419 | $ | 1,132,714 |
| | | | |
| Debt Coverage Ratio | 63.69% | | 60.40% |

(1) Weighted-average interest rate paid on indebtedness, excluding that of Seller Trust L-Bonds.
(2) Total Coverage excludes the assets of Beneficient. Total Indebtedness is equal to the total liabilities balance of GWG Holdings (excluding the liabilities of Beneficient) as of March 31, 2020, other than Excluded Indebtedness. Excluded Indebtedness is Indebtedness that is payable at the Company's option in Capital Stock of the Company or securities mandatorily convertible into or exchangeable for Capital Stock of the Company, or any Indebtedness that is reasonably expected to be converted or exchanged, directly or indirectly, into Capital Stock of the Company. This change in the definition of the Debt Coverage Ratio was defined in Amendment No. 2 to the Amended and Restated Indenture entered into as of December 31, 2019 (see Note 10 to the condensed consolidated financial statements).

As of March 31, 2020 and December 31, 2019, we were in compliance with the Debt Coverage Ratio.

**ITEM 4. CONTROLS AND PROCEDURES.**

**Evaluation of Disclosure Controls and Procedures**

We maintain disclosure controls and procedures designed to provide reasonable assurance that information required to be disclosed in our reports filed pursuant to the Securities Exchange Act of 1934 is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance the objectives of the control system are met.

Our Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) under the Securities and Exchange Act of 1934) as of March 31, 2020 (the end of the period covered by this report). Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded our disclosure controls and procedures were effective.

**Changes in Internal Control over Financial Reporting**

As discussed elsewhere in this report, on December 31, 2019, GWG Holdings obtained the right to appoint a majority of the board of directors of Beneficient Management, the general partner of Ben LP. As a result of this change-of-control event, GWG Holdings reported the results of Ben LP and its subsidiaries on a consolidated basis beginning on the transaction date of December 31, 2019. As such, the scope of our assessment of the effectiveness of our disclosure controls and procedures did not include the internal control over financial reporting of Beneficient. These exclusions are consistent with the SEC Staff's guidance that an assessment of a recently acquired business may be omitted from the scope of our assessment of the effectiveness of disclosure controls and procedures that are also part of internal control over financial reporting in the 12 months following the acquisition.

As a result of the consolidation of Beneficient, we have commenced a project to evaluate the processes and procedures of Beneficient's internal control over financial reporting and incorporate Beneficient's internal control over financial reporting into our internal control over financial reporting framework. In addition, as a result of the consolidation of Beneficient, we are in the process of implementing new processes and controls over accounting for goodwill and other intangible assets, primarily related to assessing these assets for impairment.

Other than the aforementioned items, there were no changes in our internal control over financial reporting during the period covered by this report that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**PART II — OTHER INFORMATION**

**ITEM 5.    OTHER INFORMATION**

The information set for under the heading "Amendment of Beneficient Credit Agreements" in Note 20 to the consolidated financial statements included in this Form 10-Q is hereby incorporated herein by reference.

**ITEM 6.    EXHIBITS**

**Exhibit**

| | |
|---|---|
| 31.1 | Section 302 Certification of the Chief Executive Officer (*filed herewith*). |
| 31.2 | Section 302 Certification of the Chief Financial Officer (*filed herewith*). |
| 32.1 | Certification of Chief Executive Officer and Chief Financial Officer Pursuant to 18 U.S.C. §1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (*filed herewith*). |
| 99.1 | Letter from ClearLife Limited, dated April 15, 2020 (*filed herewith*). |
| 99.2 | Portfolio of Life Insurance Policies as of March 31, 2020 (*filed herewith*). |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document |

Page 74

**SIGNATURES**

Pursuant to the requirements of the Securities and Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

GWG HOLDINGS, INC.

Date: May 15, 2020                                                    By:    /s/ Murray T. Holland
                                                                             *President and Chief Executive Officer*

Date: May 15, 2020                                                    By:    /s/ Timothy L. Evans
                                                                             *Chief Financial Officer*

Page 75

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## Notice of Effectiveness

**Effectiveness Date:**    June 3, 2020 4:00 P.M.

**Form:**    S-1

**CIK:**    0001522690

**Company Name:**    GWG Holdings, Inc.

**File Number:**    333-237458

424B1 1 ea122727-424b1_gwgholdings.htm PROSPECTUS

**Filed pursuant to Rule 424(b)(1)**
**Registration No. 333-237458**

# GWG HOLDINGS, INC.



2,000,000 Units of L Bonds
($2,000,000,000)

We are a financial services company committed to transforming the alternative asset industry with disruptive and innovative products and services. In 2018 and 2019 we consummated a series of transactions (as more fully described in this prospectus) with Beneficient (as defined below) that has resulted in a significant reorientation of our business and capital allocation strategy towards an expansive and diverse exposure to alternative assets.

We are offering up to 2,000,000 Units of L Bonds (the "L Bonds") at $1,000 principal amount per whole Unit, representing $2,000,000,000 in aggregate principal amount of L Bonds. This is a continuous offering and there is no minimum amount of L Bonds that must be sold before we can use any of the proceeds. The proceeds from the sale of the L Bonds will be paid directly to us following each sale and will not be placed in an escrow account. We intend to use the net proceeds from the offering of the L Bonds to grow our alternative asset exposure, primarily through investments in Beneficient in the form of equity investments or loans, and to meet our other obligations, including debt obligations. The minimum investment in L Bonds is 25 Units, or $25,000. Investments in excess of the minimum amount may be made in any number of whole Units. The L Bonds will be sold with varying maturity terms, interest rates and frequency of interest payments, all as set forth in this prospectus and in further supplements we publish from time to time. Depending on our capital needs and the amount of your investment, L Bonds with certain maturity terms may not always be available. Although we will periodically establish and change interest rates on unsold L Bonds offered under this prospectus, once an L Bond is sold, its interest rate will not change during its term (subject, however, to the extension and renewal provisions of the L Bond). Upon maturity, and subject to the terms and conditions described in this prospectus, the L Bonds will be automatically renewed for the same or lesser term at the interest rate we are offering at that time to other investors with similar aggregate L Bond portfolios for L Bonds of the same maturity, unless redeemed upon maturity at our or your election.

Obligations under the L Bonds are secured by substantially all the assets of GWG Holdings (the most significant components of which are cash and investments in subsidiaries), and by a guarantee and corresponding grant of a security interest in substantially all the assets of our subsidiary, GWG Life, LLC ("GWG Life"). As a guarantor, GWG Life has fully and unconditionally guaranteed the payment of principal and interest on the L Bonds. A substantial majority of our life insurance assets are held by GWG DLP Funding IV, LLC ("DLP IV") and GWG Life Trust ("Life Trust"), which are wholly owned subsidiaries of GWG Life. Although GWG Life's assets, including its equity in DLP IV and its beneficial interest in Life Trust, serve as collateral for our L Bonds, the life insurance policies held by DLP IV and Life Trust, which comprise a substantial majority of our life insurance policies, do not serve as direct collateral for the L Bonds. Further, the life insurance policies held by DLP IV are pledged as direct collateral securing the obligations under our amended and restated senior credit facility. These facts present the risk to investors that the collateral security that we and GWG Life have granted for our obligations under the L Bonds may be insufficient to repay the L Bonds when they become due.

**Neither the SEC nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

*Cover continued on next page*

The date of this prospectus is June 3, 2020

We may call and redeem the entire outstanding principal and accrued but unpaid interest of any or all of the L Bonds at any time, and from time to time, without penalty or premium. L Bond holders will have no right to put (that is, require us to redeem) any L Bond prior to its due date unless in the case of a holder's death, bankruptcy or total permanent disability. In the event we agree to redeem L Bond upon the request of an L Bond holder — other than after death, bankruptcy or total permanent disability— we will impose a redemption fee of 6% against the outstanding principal balance of the redeemed L Bond. This redemption fee will be subtracted from the amount paid.

We do not intend to list our L Bonds on any securities exchange during the offering period, and we do not expect a secondary market in the L Bonds to develop. As a result, you should not expect to be able to resell your L Bonds regardless of how we perform. Accordingly, an investment in our L Bonds is not suitable for investors that require liquidity in advance of their L Bond's maturity date.

We maintain senior borrowing arrangements that subordinate to our senior lenders the right to payment on, and the collateral securing, the L Bonds. In addition, these borrowing arrangements restrict our receipt of distributions from certain of our operating subsidiaries, subject to certain exceptions. These provisions will restrict cash flows available for payment of principal and interest on the L Bonds. From time to time we may add or replace senior lenders and the particular arrangements under which we borrow from them.

**Investing in our L Bonds may be considered speculative and involves a high degree of risk, including the risk of losing your entire investment. See "Risk Factors" beginning on page 11 of this prospectus and the risks discussed in the documents we file with the SEC to read about the risks you should consider before buying our L Bonds. The L Bonds are only suitable for persons with substantial financial resources and with no need for liquidity in this investment.**

Please read this prospectus before investing and keep it for future reference. We file annual, quarterly and current reports with the SEC. This information will be available free of charge by contacting us at 325 N. Saint Paul Street, Suite 2650, Dallas, TX 75201, or by phone at (612) 746-1944. This information may also be accessed on our website at *www.gwgh.com*, and the SEC maintains a website at *www.sec.gov* that contains this information.

The L Bonds will be offered and sold on a best-efforts basis by Emerson Equity LLC, a registered broker-dealer and member of the Financial Industry Regulatory Authority ("FINRA"). Emerson Equity will be our dealer manager for the L Bonds in this offering for purposes of the Securities Act of 1933, as amended. Our dealer manager will enter into participating dealer agreements with certain other broker-dealers that are members of FINRA, referred to as "selling group members," to authorize those broker-dealers to sell our L Bonds. We will pay Emerson Equity a selling commission ranging from 0.75% to 5.00% of the principal amount of L Bonds sold, depending on the L Bonds' maturity date. We will also pay Emerson Equity additional compensation consisting of those items set forth in footnote (1) to the table below. The dealer manager will share its commissions and additional compensation, other than its dealer manager fee, with selling group members pursuant to the terms of each participating dealer agreement. The total amount of the selling commissions and additional compensation (including reimbursements, non-transaction-based and non-cash compensation) paid to Emerson Equity and any other FINRA member in the course of offering and selling L Bonds will not exceed 8.00% of the aggregate gross offering proceeds we receive from the sale of L Bonds. We also may sell L Bonds at a discount from the public offering price through appropriate and designated distribution channels. See "Plan of Distribution" and "Use of Proceeds" for further information.

| | Units | Price to Investors | Aggregate Commission, Fees, and Expense Allowances[1][2] | Net Proceeds to Company |
|---|---|---|---|---|
| Minimum Investment | 25 | $ 25,000 | $ 2,000 | $ 23,000[3] |
| Maximum Investment | 2,000,000 | $2,000,000,000 | $ 160,000,000 | $1,840,000,000[4] |

(1) Assumes an average sales commission of 5.00%. As explained above, actual commissions will vary based on the term of the L Bonds sold. Nevertheless, the total amount of selling commissions and additional compensation (consisting of (i) a dealer-manager fee payable to the dealer manager in an amount equal to 0.40% of the principal amount of all L Bonds sold; (ii) an accountable expense allowance payable to the selling group members as described in the "Plan of Distribution," which may include due-diligence expenses of the dealer manager and selling group members set forth in a detailed and itemized invoice; (iii) wholesaling fees, which may consist of commissions and non-transaction-based compensation of the wholesalers; (iv) non-cash compensation; and (v) up to a 1.00% reallowance to selling group members) will not exceed 8.00% of the aggregate gross offering proceeds we receive from the sale of L Bonds. Accordingly, and assuming the sale of all $2,000,000,000 in principal amount of bonds offered hereby, the maximum amount of selling commissions we can pay is 5.00% of the gross offering proceeds we receive from the sale of the L Bonds (or $100,000,000), and the maximum amount of additional compensation we can pay will not

exceed 3.00% of the aggregate gross offering proceeds we receive from the sale of the L Bonds (or $60,000,000). See "Plan of Distribution" for further information.

(2) Emerson Equity has agreed to offer the L Bonds on a "best efforts" basis.

(3) Net Proceeds to Company based on the minimum investment are calculated after deducting (i) selling commissions and (ii) additional compensation (consisting of the dealer-manager fee, a wholesaling fee, an accountable expense allowance and non-transaction-based and non-cash selling compensation). We expect that our own offering expenses, consisting of legal, accounting, printing, mailing, registration, qualification and associated securities offering filing costs and expenses, will, through the course of the offering, aggregate to approximately $2,400,000, but for purposes of illustrating the Net Proceeds to Company based on the minimum investment, those offering expenses of $2,400,000 are not reflected.

(4) Net Proceeds to Company based on the Maximum Offering of 2,000,000 L Bond Units (representing $2,000,000,000 in aggregate principal amount) are calculated as described in footnote (3) above, but also before deducting our estimated offering-related expenses of $2,400,000.

L Bonds will be sold as "Units," with each whole Unit representing $1,000 in principal amount of L Bonds. We will issue the L Bonds in book-entry form, certificated form, or in the form of a global certificate deposited with a depositary. Depending on the manner in which you purchase L Bonds, you may not receive a physical certificate representing your L Bonds. In all cases, however, we will deliver written confirmation to purchasers of L Bonds. Bank of Utah will act as trustee for the L Bonds.

The current interest rates for the L Bonds based on their applicable maturity is set forth in the table below.

| Maturity Term | Interest Rate (%) |
|---|---|
| 2 years | 5.50 |
| 3 years | 6.25 |
| 5 years | 7.50 |
| 7 years | 8.50 |

We may change the interest rates applicable to unsold L Bonds from time to time during this offering, in which case the applicable interest rates will be set forth in a supplement to this prospectus. Once an L Bond is sold, the interest rate will not change during its term (subject, however, to the extension and renewal provisions contained in that L Bond).

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| ABOUT THIS PROSPECTUS | ii |
| INDUSTRY AND MARKET DATA | ii |
| HOW TO PURCHASE L BONDS | iii |
| PROSPECTUS SUMMARY | 1 |
| RISK RELATING TO FORWARD-LOOKING STATEMENTS | 10 |
| RISK FACTORS | 11 |
| USE OF PROCEEDS | 14 |
| DESCRIPTION OF THE L BONDS | 15 |
| PLAN OF DISTRIBUTION | 30 |
| MATERIAL FEDERAL INCOME TAX CONSIDERATIONS | 34 |
| STATE, LOCAL AND FOREIGN TAXES | 37 |
| ERISA CONSIDERATIONS | 38 |
| LEGAL MATTERS | 40 |
| EXPERTS | 40 |
| WHERE YOU CAN FIND MORE INFORMATION | 40 |
| INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE | 40 |



GWG Holdings, Inc.
325 N. Saint Paul Street, Suite 2650
Dallas, TX 75201
Tel: (612) 746-1944
Fax: (612) 746-0445

i

## ABOUT THIS PROSPECTUS

We have prepared this prospectus as part of a registration statement that we filed with the SEC for our continuous offering of L Bonds.

The registration statement we filed with the SEC includes exhibits that provide more detailed descriptions of the matters discussed in this prospectus and certain information that is incorporated by reference. You should read this prospectus, the related exhibits filed with the SEC, and any prospectus supplement(s), together with additional information described below under "Where You Can Find More Information," and the documents that are incorporated by reference into this prospectus. Any statement that we make in this prospectus will be modified or superseded by any inconsistent statement made by us in a prospectus supplement (or other disclosure incorporated into this prospectus by reference). This prospectus contains summaries of certain other documents, which summaries contain all material terms of the relevant documents and are believed to be accurate, but reference is hereby made to the full text of the actual documents for full and complete information concerning those documents. All documents relating to this offering, if readily available to us, will be made available to a prospective investor or its representatives upon request.

The L Bonds will be issued under an amended and restated indenture, as may be amended or supplemented from time to time (referred to herein as the "indenture"). This prospectus is qualified in its entirety by the terms of that indenture filed with SEC as an exhibit to the registration statement of which this prospectus is a part. All material terms of the indenture are summarized in this prospectus. You may obtain a copy of the indenture upon written request to us or online at *www.sec.gov*.

The indenture trustee did not participate in the preparation of this prospectus and makes no representations concerning the L Bonds, the collateral, or any other matter stated in this prospectus. The indenture trustee has no duty or obligation to pay the L Bonds from its funds, assets or capital or to make inquiry regarding, or investigate the use of, amounts disbursed from any account.

You should rely only on the information contained in this prospectus, as the same may be supplemented by prospectus supplements or other public disclosure incorporated into this prospectus by reference. Neither we nor the dealer manager have authorized any other person to provide you with any information different from that contained in this prospectus, a supplement, information incorporated into this prospectus by reference, or information furnished by us upon request as described herein. The information contained in this prospectus is complete and accurate only as of the date of this prospectus, regardless of the time of delivery of this prospectus or sale of our securities.

**No information contained herein, nor in any prior, contemporaneous or subsequent communication should be construed by a prospective investor as legal or tax advice. Each prospective investor should consult its, his or her own legal, tax and financial advisors to ascertain the merits and risks of the transactions described herein prior to purchasing the L Bonds. This written communication is not intended to be written advice as defined in Circular 230 published by the U.S. Treasury Department.**

In this prospectus, we use the term "day" to refer to a calendar day, and we use the term "business day" to refer to any day other than Saturday, Sunday, a legal holiday or a day on which banks in New York City are authorized or required to close.

## INDUSTRY AND MARKET DATA

The industry and market data used throughout this prospectus have been obtained from our own research, surveys or studies conducted by third parties and industry or general publications. Industry publications and surveys generally state that they have obtained information from sources believed to be reliable, but do not guarantee the accuracy and completeness of such information. We believe that each of these studies and publications is reliable.

ii

**HOW TO PURCHASE L BONDS**

If, after carefully reading this entire prospectus, obtaining any other information requested and available, and being fully satisfied with the results of pre-investment due-diligence activities, you would like to purchase L Bonds, you will have two different ways in which to consummate a purchase: (1) DTC settlement, or (2) direct settlement with the Company.

1. *Depositary Trust Company Settlement (DTC settlement).*    You can place an order for the purchase of L Bonds using DTC Settlement through your selling group member (i.e., your broker-dealer). A selling group member using this service will have an account with a DTC participant in which your funds will be placed to facilitate a closing on our periodic DTC closing cycle (typically, closings will occur on a bi-monthly cycle). Orders may be placed until the cyclical order due date. Orders will be executed by your selling group member electronically and you must coordinate with your selling group member's registered representative to pay the full purchase price for the L Bonds by the trade date. You will be credited with ownership of an L Bond on the second business day following the periodic DTC closing cycle in which the purchase is made. Nevertheless, interest will accrue for a period of 15 or 30 days for the month in which your purchase is made, depending on when during the DTC closing cycle your purchase is made. Your purchase price for L Bonds purchased in this way will not be held in escrow. This process is different if you purchase L Bonds through direct settlement with the Company as described below.

2. *Direct Settlement with the Company.*    If you wish to purchase L Bonds through direct settlement with the Company, then you must complete, execute and return the Subscription Agreement to us together with a certified check or personal check payable to the order of "GWG Holdings, Inc. — Subscription Account" (or wire sent to the Subscription Account) equal to the principal amount of L Bonds you wish to purchase. You will be credited with ownership of an L Bond, and interest will begin to accrue, from the date on which your fully paid subscription is accepted. If you are working with a selling group member, your subscription materials and the wire transfer, certified check or personal check should be delivered to your selling group member, who will deliver it to us at the following address:

<div align="center">

**GWG Holdings, Inc.**
**325 North St. Paul Street, Suite 2650**
**Dallas, TX, 75201**

**<u>Wire Instructions</u>**
GWG Holdings, Inc. — Subscription Account
Account: 500023916
Routing: 091310521
Bank Name: Bell Bank

</div>

Your purchase is subject to our acceptance. All information provided is confidential and will be disclosed only to our directors, officers and employees who need to know, affiliates, the managing broker-dealer, legal counsel and, if required, to governmental authorities and self-regulatory organizations or as otherwise required by law. For your purchase to be effective as of the first business day of a calendar month, your completed and executed Subscription Agreement, together with your related funds, must be received and accepted by us on or prior to the final settlement date (settlement dates normally occur on a bi-monthly basis).

Upon our receipt of the signed Subscription Agreement and acceptance of your purchase, we will notify you of such acceptance. In our sole discretion, we may accept or reject any purchase, in whole or in part. In the event we do not accept your purchase of L Bonds for any reason, we will promptly return your payment. We may terminate or suspend this offering at any time, for any reason or no reason, in our sole discretion. You may obtain a copy of the Subscription Agreement from our website at *www.gwgh.com*, from your selling group member (if you are working with one), or by contacting us at 1-877-494-2388.

<div align="center">iii</div>

**COVERED SECURITY**

Our L Bonds are a "covered security." The term "covered security" applies to securities exempt from state registration pursuant to Section 18 of the Securities Act of 1933. Generally, securities listed on national exchanges are the most common type of covered security exempt from state registration. A non-traded security also can be a covered security if it has a seniority greater than or equal to other securities from the same issuer that are listed on a national exchange. Our L Bonds are a covered security because they will be senior to our common stock, which is listed on The Nasdaq Capital Market, and therefore our offering of L Bonds is exempt from state registration.

**Although the status of our L Bonds as a "covered security" will facilitate their purchase and sale to a broader range of investors than would otherwise be available to us, and although the offer and sale of a "covered security" generally involves fewer issuance costs to the issuer of such securities, our L Bonds are not a suitable purchase for all investors. Investors are urged to read carefully the risk factors relating to our business and our Company contained in the Risk Factors section of this prospectus beginning on page 11 and under Item 1A, entitled "Risk Factors," of our Annual Report on Form 10-K for the year ended December 31, 2019, which is incorporated by reference herein. In addition, investors should understand that because our L Bonds are a "covered security" exempt from state securities regulations, neither our Company, the L Bonds, or any other aspects of this offering have been the subject of any merit-based review by state securities regulators.**

iv

## QUESTIONS AND ANSWERS ABOUT THIS OFFERING

*The following questions and answers about this offering highlight material information regarding us and this offering that you may wish to review. Nevertheless, you should read this entire prospectus, including the section entitled "Risk Factors," and the documents incorporated by reference into this prospectus, before deciding to purchase our L Bonds.*

**Can you explain and clarify the interplay between GWG Holdings, Inc. and GWG Life, LLC and its subsidiaries in relation to the L Bonds and the registration statement?**

GWG Holdings, Inc. will be issuing the L Bonds, receiving all proceeds from the sale of L Bonds, and will be the only entity making regular payments on the L Bonds. Nevertheless, because a significant amount of our consolidated assets is held in our subsidiary GWG Life, LLC (and its own subsidiaries), GWG Life is a guarantor of our obligations under the L Bonds. As guarantor of the L Bonds, SEC rules require that GWG Life be included as a co-registrant under this registration statement. GWG Life will not, however, be otherwise involved in the offering of L Bonds.

**It seems as though you are offering several L Bonds with different interest rates and maturities but calling them all L Bonds. Is this the case?**

All bonds we issue in this offering will have identical terms, except (1) the interest rate and (2) the maturity length or "term." In this regard, we have essentially created multiple classes of L Bonds, similar to how companies may have different classes of stocks with slightly different economic rights. Currently, we are offering four classes of L Bonds, as follows:

- "Class 2-3" L Bonds will mature two years from their issuance and accrue interest at 5.50% *per annum*.

- "Class 3-3" L Bonds will mature three years from their issuance and accrue interest at 6.25% *per annum*.

- "Class 5-3" L Bonds will mature five years from their issuance and accrue interest at 7.50% *per annum*.

- "Class 7-3" L Bonds will mature seven years from their issuance and accrue interest at 8.50% *per annum*.

The economic terms for each L Bond in any particular class will be identical to all other L Bonds in the same class (other than the date of maturity). In the event we adjust the interest rate for any class of bonds we offer, we will create a new class of L Bonds. Upon the renewal of any L Bonds we have sold, any new interest rate applied to an L Bond will be applied to all L Bonds in the same class.

**Your prospectus states that the interest rate for the L Bonds may be adjusted from time to time during the course of the offering. Will any such adjustment apply retroactively to L Bonds already issued?**

No. Once you purchase an L Bond, the interest rate on that L Bond will not change during the entirety of its original term. The interest rate on an issued L Bond may, however, be adjusted upon renewal of that L Bond. In any such case, we will advise you of any different interest rate that may apply to your L Bond upon renewal. In sum, any new interest rates for the L Bonds will apply only to newly issued L Bonds sold or renewed after the date of any interest rate change. Our decision to change interest rates depends on numerous factors, including but not limited to things such as market interest rates, our capitalization, the demand for our L Bonds, the life settlement market in general, our capital requirements, and other factors. Please see "Description of the L Bonds — Interest Rate."

**How do I subscribe for L Bonds, and what is the settlement process?**

L Bonds may be purchased either directly from the Company or through your broker-dealer (also referred to in this prospectus as a selling group member), who utilizes a participant in the DTC system and offers "DTC settlement."

*Direct Settlement*

If you purchase directly from the Company, you will send your completed and executed Subscription Agreement, together with your subscription amount to us at the address listed in "How to Purchase L Bonds." Your subscription amount is the principal amount of L Bonds you wish to purchase, and should be paid through a certified check or personal check payable to the order of "GWG Holdings, Inc. — Subscription Account." In lieu of paying by check, you may wire your subscription amount to the account referenced in "How to Purchase L Bonds." If you are working with a broker-dealer or other investment professional, your broker-dealer or professional will gather and send in the required information on your behalf, and may facilitate your payment of the subscription amount.

App. 1013

v

Once we have received your subscription amount and required documentation, we will either reject or accept your subscription. If accepted, you will be credited with ownership of the L Bond, we will have immediate access to your subscription amount and you will start to accrue interest on your investment at the rate applicable to the L Bond you have purchased. If you purchase directly from the Company, your L Bond will ordinarily be issued in book-entry (or, if requested, certificated) form and payments will be made directly into the account you indicate in your Subscription Agreement.

*DTC Settlement*

Purchasing through a DTC participant is a slightly different process. In this case, you will provide your order for the purchase of L Bonds to your broker-dealer, together with such other information as your broker-dealer may require. Your broker-dealer will ensure your order is electronically placed with the Company and that the Company timely receives your subscription amount. There is no need to furnish the Company with a Subscription Agreement when you purchase through a broker-dealer that utilizes a participant in the DTC system and offers "DTC settlement." However, your broker-dealer may require additional documents.

Once we have received your subscription amount, we will either reject or accept your subscription. Once accepted based on our DTC closing cycle, we will have immediate access to your subscription amount and you will start to accrue interest on your investment at the rate applicable to the L Bond you have purchased. Nevertheless, you will be credited with ownership of an L Bond on the second business day after the end of the closing cycle in which your subscription is accepted. Interest will accrue for a period of 15 or 30 days for the month in which your purchase is made, depending on when during the DTC closing cycle your purchase is made. If you purchase through a broker-dealer who utilizes a participant in the DTC system and offers "DTC settlement," your L Bond will be issued to DTC in the name of Cede & Co., as its nominee. In this sense, DTC will be the legal owner of the L Bond and you will be the beneficial owner. Your ownership of the L Bond should then appear on the brokerage or other investment statements you receive from your broker-dealer or custodian.

For so long as DTC settlement is approved, we intend to issue each class of L Bonds a unique identifying number (CUSIP) each month to facilitate the settlement of L Bonds. Thus, Class 2-2 L Bonds issued in May 2020 (and maturing May 2022) will all have the same CUSIP, which will be different from the CUSIP applicable to Class 2-2 L Bonds issued in September 2020 (and maturing September 2022). In this way, all L Bonds belonging to a single CUSIP will be completely fungible, meaning that they will all mature on the same date and have identical terms so that one L Bond with a particular CUSIP is interchangeable with any other L Bond having the same CUSIP. This process creates a tracking system for the L Bonds to be issued to and transferred through DTC.

**What is the role of the trustee?**

The Bank of Utah is the trustee for the L Bonds. The role of the trustee is essentially to enforce the terms of the L Bonds on behalf of bondholders, including direct and beneficial holders, and facilitate the relationship between our Company and the bondholders. We must notify the trustee of certain events as required under the indenture, and the trustee will in turn notify bondholders. The trustee has also been granted a security interest in all of the assets of GWG Holdings and GWG Life for the benefit of the bondholders. The trustee has no duty to pay any obligations under L Bonds or to make inquiry regarding, or investigate the use of, amounts disbursed from any account. Upon an event of default under the indenture, and subject to those limitations in the indenture designed to benefit our senior creditors, the trustee may take action against us to enforce the rights of holders of the L Bonds.

**What is the role of the paying agent?**

The paying agent is the term ascribed to whomever it is that is making the payment to the holders of L Bonds. Presently, the Company has designated Computershare Trust Company, N.A. ("Computershare") to serve as the paying agent with respect to L Bonds settled through DTC, and the Company itself is the paying agent with respect to L Bonds settled directly with the Company. Please see "How to Purchase L Bonds," below. Computershare and the Company are therefore responsible for tracking investors' respective payment dates and ensuring timely payment of principal and interest under the L Bonds. The role of the paying agent is essentially mechanical, and does not ordinarily involve the exercise of discretion and judgment in the way that is typical for an indenture trustee.

vi

**Do I need to sign any paperwork in connection with the renewal of my L Bond?**

No. The terms of the L Bond allow for the automatic renewal into a new L Bond of an identical (or lesser) maturity, unless we receive notice from you. Upon maturity, the L Bonds will be automatically renewed for the same term at the interest rate we are offering at that time to other investors with similar aggregate L Bond portfolios for L Bonds.

**Can I resell or transfer my L Bond after it has been purchased?**

Yes. Since these L Bonds are being offered and sold pursuant to an effective registration statement, the L Bonds may be transferred so long as the transfer is documented in a form approved by us. We do not, however, expect a public trading market to develop for the L Bonds in the foreseeable future, if ever. Because of the lack of a trading market for L Bonds, it is unlikely that holders will be able to sell their L Bonds easily. If you wish to transfer your L Bond held in book-entry (or certificated) form, you should contact us. If you wish to transfer your L Bond held through DTC, you should contact your broker-dealer (i.e., your selling group member).

**How will I receive interest and principal payments on my L Bonds?**

This will depend on how you purchased your L Bond. If you purchased your L Bond directly from us, we will directly deposit our payments of interest and principal into the account indicated in your Subscription Agreement. If you purchased through DTC, all payments of principal and interest will be made to DTC, who will forward such payment to the DTC participant you hold your L Bonds through, which will then arrange to transfer the payment to your brokerage account. In this case, all accountings of what you have contributed and what you are owed will be the responsibility of your broker-dealer.

**What is GWG Holdings, Inc.?**

We are a financial services company committed to transforming the alternative asset industry with disruptive and innovative products and services. In 2018 and 2019, we consummated a series of transactions (as more fully described below) with Beneficient that has resulted in a significant reorientation of our business and capital allocation strategy towards an expansive and diverse exposure to alternative assets. Beneficient, through its subsidiaries, plans to operate three potentially high value, high margin lines of business: (i) private trust lending and liquidity products; (ii) trust and custody services; and (iii) financial technology.

While we are continuing our work to maximize the value of our secondary life insurance business, we do not anticipate purchasing additional life insurance policies in the secondary market and have increased capital allocated toward providing liquidity to a broader range of alternative assets, primarily through Beneficient. We believe Beneficient can finance investments in alternative assets that will generally produce higher risk-adjusted returns than those we generally can achieve from life insurance policies acquired in the secondary market. Furthermore, although we believe that our portfolio of life insurance policies is a meaningful component of a growing diversified alternative asset portfolio, we continue to explore various strategic alternatives for our life insurance portfolio aimed at maximizing its value, including a possible sale, refinancing or recapitalization of our life insurance portfolio.

Our common stock is listed on The NASDAQ Capital Market under the ticker symbol "GWGH." We are based in Dallas, Texas.

**What is your business strategy?**

We are a financial services company committed to transforming the alternative asset industry with disruptive and innovative products and services. In 2018 and 2019 we consummated a series of transactions with Beneficient that has resulted in a significant reorientation of our business and capital allocation strategy towards an expansive and diverse exposure to alternative assets.

vii

App. 1016

**Are there any risks involved in investing in this offering?**

Yes. Investing in our L Bonds involves a high degree of risk. You should carefully review the "Risk Factors" section of this prospectus and Item 1A, entitled "Risk Factors," of our Annual Report on Form 10-K for the year ended December 31, 2019, which is incorporated by reference herein, which contain a detailed discussion of the material risks that you should consider before investing in our L Bonds.

**How long will this offering last?**

The offering is a continuous offering. The offering expires under SEC rules after three years from the effective date of the registration statement of which this prospectus forms a part. We may, however, conduct similar or identical offerings of L Bonds or other securities during this same time or afterwards. We may also decide to terminate this offering at any time.

**Will I be notified of how my investment is doing?**

We will provide you with periodic updates on our performance through periodic filings we make with the SEC. Such filings will include: (i) three quarterly financial reports; (ii) one annual report; (iii) supplements to this prospectus, as appropriate; and (iv) such other reports as required under Section 13 of the Securities Exchange Act of 1934. Such information is also available on our website at *www.gwgh.com*.

**Will I receive annual tax information regarding interest payments from you?**

You will receive a Form 1099-INT, which will be mailed by January 31 of each year.

**Who can help answer my questions about the offering?**

If you have more questions about our offering, you should contact a registered representative of your broker-dealer (i.e., your selling group member) or other investment professional, or else contact:

GWG Holdings, Inc.
325 N. Saint Paul Street, Suite 2650
Dallas, TX 75201
(612) 746-1944
Attention: General Counsel

viii

App. 1017

**PROSPECTUS SUMMARY**

*This summary highlights some of the information in this prospectus. It is not complete and may not contain all of the information that you may want to consider. To understand this offering fully, you should carefully read the entire prospectus, including the section entitled "Risk Factors," and the documents that are incorporated by reference into this prospectus, including Item 1A, entitled "Risk Factors," of our Annual Report on Form 10-K for the year ended December 31, 2019, before making a decision to invest in our L Bonds. Unless otherwise noted or unless the context otherwise requires, the terms "we," "us," "our," the "Company" and "GWG" refer to GWG Holdings, Inc. together with its direct or indirect subsidiaries. In instances where we refer specifically to "GWG Holdings" or "GWG Holdings, Inc.," or where we refer to a specific subsidiary of ours by name, we are referring only to that specific legal entity.*

**Our Company**

We are a financial services company committed to transforming the alternative asset industry with disruptive and innovative products and services. In 2018 and 2019 we consummated a series of transactions with The Beneficient Company Group, L.P. ("Ben LP,") and, including all of the subsidiaries it may have from time to time, "Beneficient") that has resulted in a significant reorientation of our business and capital allocation strategy towards an expansive and diverse exposure to alternative assets. As part of this reorientation, we also changed our Board of Directors and executive management team.

Beneficient, through its subsidiaries, plans to operate three potentially high value, high margin lines of business:

- Private Trust Lending & Liquidity Products. Through Beneficient Capital Company, L.L.C. ("BCC"), Beneficient provides a unique suite of private trust, lending and liquidity products focused on bringing liquidity to owners of professionally managed alternative assets. Beneficient's innovative liquidity solutions are designed to serve mid-to-high net worth ("MHNW") individuals, small-to-mid sized ("STM") institutions, and asset managers who have historically possessed few attractive options to access early liquidity from their alternative assets. Beneficient targets MHNW clients with $5 million to $30 million in net worth and STM institutional clients typically holding less than $1 billion in assets.

- Trust and Custody Services. Through Beneficient Administrative and Clearing Company, L.L.C. ("BACC") and (subject to capitalization) through PEN Indemnity Insurance Company, LTD ("PEN"), Beneficient plans, in the future, to market retirement funds, custody and clearing of alternative assets, and trustee and insurance services for covering risks attendant to owning or managing alternative assets.

- Financial Technology. Through Ben Markets Management Holdings, L.P., formerly called ACE Portal, L.L.C. ("ACE"), Beneficient plans in the future to provide online portals and financial technologies for the trading and financing of alternative assets.

Beneficient's existing and planned products and services are designed to support the tax and estate planning objectives of its MHNW clients, facilitate a diversification of assets or simply provide administrative management and reporting solutions tailored to the goals of the investor who owns alternative investments.

While we are continuing our work to maximize the value of our secondary life insurance business, we do not anticipate purchasing additional life insurance policies in the secondary market and have increased capital allocated toward providing liquidity to a broader range of alternative assets, primarily through investments in Beneficient. We believe Beneficient's operations will generally produce higher risk-adjusted returns than those we can achieve from life insurance policies acquired in the secondary market. Furthermore, although we believe that our portfolio of life insurance policies is a meaningful component of a growing diversified alternative asset portfolio, we continue to explore strategic alternatives for our life insurance portfolio aimed at maximizing its value, including a possible sale, refinancing or recapitalization of our life insurance portfolio.

We completed our transactions with Beneficient to provide us with a significant increase in assets and common shareholder equity. In addition, our transactions with Beneficient provide us with the opportunity for a diversified source of future earnings within the alternative asset industry. As GWG and Beneficient expand their strategic relationship, we believe the Beneficient transactions will transform GWG from a niche provider of liquidity to owners of life insurance to, as GWG and Beneficient expand their strategic relationship, a full-scale provider of trust and liquidity products and services to owners of a broad range of alternative assets.

1

**Organizational Structure**

GWG Holdings conducts its life insurance secondary market business through a wholly owned subsidiary, GWG Life, and GWG Life's wholly owned subsidiaries, Life Trust and DLP IV. GWG Holdings' indirect interests in loans collateralized by cash flows from other alternative assets are held by Ben LP and its general partner, Beneficient Management, L.L.C. ("Beneficient Management"). All of these entities are legally organized in the state of Delaware, other than GWG Life Trust, which is governed by the laws of the state of Utah. GWG Holdings' wholly owned subsidiary, Life Epigenetics Inc. (formerly named Actüa Life & Annuity Ltd.) ("Life Epigenetics"), was formed to commercialize epigenetic technology for the longevity industry. Through its wholly owned subsidiary, youSurance General Agency, LLC ("youSurance"), GWG Holdings sought to offer life insurance directly to customers utilizing epigenetic technology. On November 11, 2019, GWG Holdings contributed the common stock of Life Epigenetics and membership interests in youSurance to a legal entity, InsurTech Holdings, LLC ("InsurTech Holdings"), in exchange for 100% of the membership interest in InsurTech Holdings (on March 2, 2020, InsurTech Holdings changed its name to FOXO BioScience LLC). Although we currently own 100% of the equity of InsurTech Holdings, we do not have a controlling financial interest in InsurTech Holdings because InsurTech Holdings' managing member has substantive participating rights. Therefore, we account for our ownership interest in InsurTech Holdings as an equity method investment. Our headquarters are currently located in Dallas, Texas.

Beneficient was formed in 2003 but began its alternative asset business in September 2017. Beneficient operates primarily through its subsidiaries, which provide Beneficient's products and services. These subsidiaries include: (i) BCC, through which Beneficient offers loans and liquidity products; (ii) BACC, through which Beneficient provides services for fund and trust administration and plans to provide custody services; (iii) PEN, through which Beneficient plans to offer insurance services; and (iv) ACE, through which Beneficient plans to provide an online portal for direct access to Beneficient's financial services and products.

In the second quarter of 2019, in connection with the expansion of our strategic relationship with Beneficient, (i) our former chief executive officer resigned and was replaced with Murray T. Holland, a trust advisor of various related trusts (the "Seller Trusts"), which control a majority of our outstanding common stock, and (ii) all then current members of our Board of Directors resigned as directors of the Company, and 11 individuals designated by Beneficient were appointed as directors of the Company. Shortly thereafter, three additional directors were appointed to our Board of Directors. On October 11, 2019, four members of the Board of Directors resigned as directors of the Company, and the size of the Board of Directors was reduced from 14 to ten directors in order to facilitate the Board of Directors' ability to oversee the Company's operations in an efficient and effective manner. Under our current conflicts of interest policy, all transactions between the Company and its wholly owned subsidiaries, on the one hand, and related parties (including Beneficient and its controlled affiliates), on the other hand, must be approved by disinterested directors. On December 31, 2019, we entered into a Preferred Series A Unit Account and Common Unit Investment Agreement (the "Investment Agreement") with Ben LP, Beneficient Company Holdings, L.P. and Beneficient Management pursuant to which, among other things, we obtained the right to appoint a majority of the board of directors of Beneficient Management. As a result, the Company obtained control of Ben LP and began reporting the results of Ben LP and its subsidiaries on a consolidated basis beginning on the transaction date of December 31, 2019.

**Market Opportunity**

*Alternative Asset Liquidity Products and Services*

The market demand for liquidity from owners of alternative assets is attributable to the outstanding net asset value of illiquid alternative assets ("NAV") held by U.S. investors. Using data from various published industry reports from 2017 to 2019, certain widely accepted commercial private-equity databases, and applying its own proprietary assumptions and calculations ("Ben Estimates"), Beneficient estimates that total outstanding NAV held by U.S. investors exceeded $4.0 trillion in 2019 (up from an estimated $3.0 trillion in 2018).

According to at least one industry report from Prequin from 2018, total outstanding NAV in the hands of U.S. investors grew at a 12.1% compound annual growth rate ("CAGR") for the ten years ended 2018 and was forecasted to grow at an 8% CAGR through 2023 as a result of continued increases in capital committed to the alternative asset class.

According to Ben Estimates, the large U.S. institutions representing approximately 54% of the NAV have consistently sought liquidity on approximately 1.85% to 2.25% of their outstanding NAV. Based on Ben Estimates, this has led to an annual demand for liquidity of nearly $50 billion in recent years.

A primary group not included in this demand is the MHNW investor who holds investments of $5 million to $30 million compared to a large institution's holdings in the hundreds of millions or billions of dollars. Intermediary brokers will often not represent the MHNW individuals (or STM institutional investors). According to Ben Estimates, MHNW investors hold over $700.0 billion in NAV, yet MHNW investors have only been able to access liquidity representing less than 0.5% of the NAV held by them each year, compared to the average 2% achieved by the large institutional owners, representing 54% of the market.

Based on these amounts, Beneficient estimates that MHNW investors would seek liquidity of 3% of their outstanding NAV each year if liquidity was made available to them, or a slightly greater percentage than that of large U.S. institutions. As a result, and according to Ben Estimates, the estimated market demand for liquidity by MHNW individuals would have exceeded $20.0 billion in 2019.

2

*Secondary Life Insurance Market*

The market for life insurance is large. According to the American Council of Life Insurers Fact Book 2018 (ACLI), consumers owned approximately $12.0 trillion in face value of individual life insurance policy benefits in the United States in 2017. In that same year, the ACLI reports that individual consumers purchased an aggregate of $3.1 trillion of new individual life insurance policy benefits. This figure includes all types of individual life policies, including term insurance and permanent insurance known as whole life and universal life.

The life insurance secondary market primarily serves consumers, 65 years and older, and their families who own life insurance.

The secondary market for life insurance exists as a result of consumer lapse behaviors and surrender values far below economic value offered to consumers for their life insurance by the issuing insurance carriers. The ACLI reports that the annual lapse and surrender rate for individual life insurance policies is 5.7% of the in-force face value of benefits, amounting to over $680 billion in face value of policy benefits lapsed and surrendered in 2017 alone.

In 2017, the National Association of Insurance Commissioners ("NAIC") issued a policy bulletin in support of products we provide. The bulletin described these products as "innovative private market solutions for financing Americans' long-term care needs." The NAIC, citing the Company's August 25, 2016 presentation, discussed how consumers could exchange the market value of their life insurance policies for products designed to fund long-term care expenses.

*Primary Life Insurance Market and Technology ("Insurtech")*

The opportunity to apply technology to transform the insurance industry is significant. The application of technology to the insurance industry, commonly referred to as "insurtech", provides opportunities for new entrants into the traditional insurance marketplace that have the potential to significantly disrupt the insurance industry's historical approach to assessing and selecting acceptable underwriting risks.

As discussed in the Organizational Structure section above, on November 11, 2019, GWG contributed the common stock and membership interests of its previously-wholly owned subsidiaries, Life Epigenetics and youSurance, to InsurTech Holdings. This transaction affected a reorganization such that InsurTech owns only two direct subsidiaries, Life Epigenetics and youSurance, which hold all insurtech assets, and one indirect subsidiary, Scientific Testing Partners, LLC, a wholly owned subsidiary of Life Epigenetics. In connection with the transaction, GWG Holdings contributed $2.1 million in cash to InsurTech Holdings during the fourth quarter of 2019 and is committed to contribute an additional $17.9 million to the entity over the next two years.

**Business Strategies**

*1. Liquidity for Alternative Assets*

We believe we are now uniquely positioned to provide liquidity and related services to investors holding a full range of illiquid alternative assets. We will continue to work to create the most value for holders of alternative assets, the financial professionals who advise them and for our shareholders.

Beneficient provides private trust solutions, including a unique suite of lending and liquidity products focused on bringing liquidity to owners of alternative assets. Beneficient's innovative liquidity solutions are designed to serve MHNW individuals, STM institutions, and asset managers who have historically possessed few attractive options to access early liquidity from their alternative assets. Beneficient targets MHNW individual clients with $5 million to $30 million in investments and institutional clients typically holding less than $1 billion in assets.

Beneficient's products can also support tax and estate planning objectives, facilitate a diversification of assets or provide administrative management and reporting solutions tailored to the goals of the investor. In the future, Beneficient plans to offer insurance services covering risks associated with owning or managing alternative assets.

Our life insurance secondary market business is designed to serve consumers 65 years or older owning life insurance. We seek to earn non-correlated yield from life insurance policies that we purchased in the secondary market. Since inception, we have purchased over $3.2 billion in face value of policy benefits from consumers for over $620 million, as compared to the $52 million in surrender value offered by insurance carriers on those same policies. Our products provide unique and valuable services to the senior consumers that we serve.

3

The goal of our secondary life insurance business has been to build a profitable, large and well-diversified portfolio of life insurance assets. We believe that scale and diversification are key factors and risk mitigation strategies to provide consistent cash flows and reliable investment returns. We believe that we have reached the goal in terms of portfolio size and diversification. We do not anticipate making additional investments in the life settlements portfolio as we believe Beneficient's operations will generally produce higher risk-adjusted returns than those we can achieve from life insurance policies acquired in the secondary market.

*2. Developing a World Class Financial Services Distribution Platform*

GWG has developed a large and sophisticated financial services product distribution platform. Today, this platform consists of over one hundred independent broker dealers and several thousand "independent" financial advisors ("Retail Distribution") who sell the Company's investment products. "Independent" in this context refers to broker-dealers that accommodate financial advisors who carry securities licenses and need back-office support for services, such as compliance and trade execution, but allow their advisors wide latitude in how they conduct business. Since inception, GWG has raised over $1.52 billion of debt and equity capital to support our secondary market of life insurance business and related expenditures.

We believe that we are well positioned to continue to grow our Retail Distribution for several reasons:

- We believe there is a trend towards financial professionals leaving large full-service broker-dealers to become "independent";

- Newly independent financial professionals and their clients demand a high level of customer service and access to innovative and value added products;

- The significant demand for liquidity from owners of alternative assets by US investors;

- We believe that our expanded relationship with Beneficient will attract more and larger broker dealers to our platform due to our increased size and market capitalization as well as the increase in products offered; and

- We believe that by using capital to provide liquidity products to our current customers, and as they begin to realize the benefit of these products, we will able to raise more capital and attract additional broker dealers into our selling group.

*3. Commercializing Advanced Epigenetic Technology for Primary Life Insurance Markets*

We believe life insurance underwriting will be transformed due to advancements in science and technology. As part of that transformational change, we believe the science of epigenetics will serve as a foundational science to this advancement for the life insurance industry by achieving more accurate and automated underwriting.

As described above, on November 11, 2019, the Company contributed the common stock and membership interests of its previously wholly-owned subsidiaries, Life Epigenetics and youSurance to InsurTech Holdings. We believe that as a separate entity (rather than as a small subsidiary of a large financial services holding company), the InsurTech Holdings businesses can reach their maximum potential in terms of marketing and branding, attraction of talent, appropriate peer group comparisons and, ultimately, return to its owners. The Company will retain substantially all of the economics of InsurTech Holdings.

4

**The Offering**

| | |
|---|---|
| **Issuer** | GWG Holdings, Inc. |
| **Indenture Trustee** | Bank of Utah |
| **Paying Agent** | GWG Holdings, Inc. |
| **Securities Offered** | We are offering up to 2,000,000 Units of L Bonds ("L Bonds"), with each whole Unit representing $1,000 in principal amount of L Bonds. The L Bonds are being sold on a continuous basis. |
| **Method of Purchase** | We will sell L Bonds using two different closing or "settlement" services, whenever available. The first service is DTC settlement, and the second is direct settlement with the Company. For more information, see "Plan of Distribution." The registration statement of which this prospectus is a part also registers the renewal of L Bonds that are outstanding from time to time. |
| **Denomination** | The minimum purchase amount is 25 L Bond Units, or $25,000 in principal amount. Additional L Bonds in excess of 25 Units may be purchased in any number of whole or fractional Units. |
| **Offering Price** | $1,000 per whole Unit, representing 100% of the principal amount of the L Bond represented by a whole Unit. Throughout this prospectus, we refer to L Bond Units simply as "L Bonds." |
| **Limited Rescission Right** | If you are purchasing L Bonds through direct settlement with the Company and your Subscription Agreement is accepted at a time when we have determined that a post-effective amendment to the registration statement of which this prospectus is a part must be filed with the SEC, but such post-effective amendment has not yet been declared effective, you will have a limited time within which to rescind your investment subject to the conditions set forth in this prospectus. See "Description of the L Bonds — Limited Rescission Right" for additional information. |
| **Maturity** | You may generally choose maturities for your L Bonds of two, three, five or seven years. Nevertheless, depending on our capital requirements, we may not offer and sell L Bonds of all maturities at all times during this offering. |
| **Interest Rates** | The interest rate of the L Bonds will be established at the time of your purchase, or at the time of renewal, based upon the rates we are offering in this prospectus or our latest interest rate supplement to this prospectus (i.e., any prospectus supplement containing interest rate information for L Bonds of different maturities), and will remain fixed throughout the term of the L Bond. We may offer higher rates of interest to investors with larger aggregate L Bond portfolios, but only as set forth in the then-current interest rate supplement. |
| **Interest Payments** | We will pay interest in cash on the L Bonds based on the terms you choose, which may be monthly or annually. Interest will accrue from the effective date of the L Bond's issuance. If you purchase your L Bond directly from the Company, the effective date of your L Bond will be the date on which we accept your fully paid subscription. If you purchase your L Bond through DTC settlement, interest will begin accruing on the trade date. Based on our anticipated bi-monthly closing cycle, this means that interest will accrue for a period of 15 or 30 days for the month in which your purchase is made, depending on when during the DTC closing cycle your purchase is made. Interest payments will generally be made on the 15th day immediately following the last day of the month to the L Bond holder of record as of the last day of that interest-payment period. Interest will be paid without any compounding. |

5

| | |
|---|---|
| **Principal Payments** | The maturity date for the L Bonds will be the last day of the month during which the L Bond matures. We are obligated to pay the principal on the L Bond in cash by the fifth day of the month next following its maturity (or the first business day following such date). |
| **Payment Method** | Principal and interest payments will be made in cash by direct deposit to the account you designate in your Subscription Agreement if you purchase L Bonds through direct settlement with the Company. If you purchase L Bonds through DTC settlement, principal and interest payments will be made to your brokerage or custodial account through DTC. |
| **Renewal or Redemption at Maturity** | Upon maturity, the L Bonds will be automatically renewed for the same term at the interest rate we are offering at that time to other investors with similar aggregate L Bond portfolios for L Bonds of the same maturity, unless repaid upon maturity at our or your election. In this regard, we will notify you at least 30 days prior to the maturity date of your L Bonds. In the notice, we will advise you if we intend to repay the L Bonds or else remind you that your L Bonds will be automatically renewed unless you exercise your option, at least 15 days prior to the maturity date, to elect to have your L Bonds repaid. If applicable, a new certificate will be issued. |
| | If we determine that a post-effective amendment to the registration statement covering the offer and sale of L Bonds must be filed during your 15-day repayment election period, we will extend your election period until ten days following the postmark date of our notice to you that the amendment has become effective. |
| | For any L Bonds offered hereby that mature after the three-year anniversary of the commencement of this offering, we expect that the renewal of such L Bonds may require us to file a new registration statement. In such a case, the new registration statement must be declared effective before we will be able to renew your L Bond. In this event, if the new registration statement has not yet been filed or become effective, we will extend your election period until ten days following the date of our notice to you that the new registration statement has become effective, which notice will include a new prospectus. |
| | If L Bonds with similar terms are not being offered at the time of renewal, then (i) the interest rate upon renewal will be (a) the rate specified by us in writing on or before the maturity date or (b) if no such rate is specified, the rate of your existing L Bonds, and (ii) the maturity will the same if L Bonds of the same maturity are then being offered at the time of renewal. If L Bonds of the same maturity are not then being offered at the time of renewal, then the maturity will be the next earliest maturity. Accordingly, you should understand that the interest rate offered upon renewal may differ from the interest rate applicable to your L Bonds prior to maturity. See "Description of the L Bonds — Renewal or Redemption on Maturity." |
| **Call and Redemption Prior to Maturity** | We may call and redeem the entire outstanding principal balance and accrued but unpaid interest of any or all of the L Bonds at any time without penalty or premium. L Bond holders will have no right to require us to redeem any L Bond prior to maturity unless the request is due to death, bankruptcy or total permanent disability. The indenture defines "total permanent disability" as the determination by a physician, approved by us, that a holder of an L Bond who is a natural person, and who was gainfully employed at the time of issuance of the L Bond (or its renewal date), is unable to work on a full-time basis during a period of 24 consecutive months. |
| | In our sole discretion, we may accommodate other requests to redeem any L Bond prior to maturity. If we agree to redeem an L Bond upon the request of an L Bond holder (other than in connection with death, bankruptcy or total permanent disability of a holder), we will impose a redemption fee of 6% against the outstanding principal balance of the L Bond redeemed, which fee will be subtracted from the amount paid. |

App. 1026

| | |
|---|---|
| **Ranking** | The L Bonds will constitute secured debt of GWG Holdings. The payment of principal and interest on the L Bonds will be: |

- pari passu with respect to payment on and collateral securing all L Bonds (including those issued under our prior L Bond offering) and the previously issued Seller Trust L Bonds due 2023 (the "Seller Trust L Bonds"), of which approximately $948.1 million and $366.9 million in principal amount was outstanding, respectively, as of December 31, 2019 (see the caption "— Collateral Security" below);

- structurally junior to the present and future obligations owed by DLP IV under a second amended and restated senior credit facility with LNV Corporation, and structurally or contractually junior to any future obligations that DLP IV or other primary obligors or guarantors may have under future senior secured borrowing facilities; and

- structurally junior to the present and future claims of other creditors of our subsidiaries other than GWG Life, including Beneficient's senior credit agreement and second lien credit agreement with HCLP Nominees, L.L.C., of which approximately $152.2 million in principal amount was outstanding as of December 31, 2019, and trade creditors.

The indenture will permit us to issue other forms of debt, including senior and secured debt, in the future. Any such secured senior debt will have priority over L Bonds with respect to claims for payment and claims for any collateral that is shared as between the holders of L Bonds and such senior secured debt.

To fully understand the foregoing summary, you should understand that "pari passu" means that claims for payment and entitlement to security among the holders of L Bonds (including the holders of previously issued L Bonds) and the holders of any later-created class of "pari passu debt" of ours, will generally be treated equally and without preference. Debt issued on a pari passu basis in the future would be treated equally and without preference in respect of the L Bonds. Thus, in the event of any default on the L Bonds (or any other debt securities of ours that is pari passu with the L Bonds) resulting in claims for payment or claims on collateral security, the holders of the L Bonds and all such other debt securities that are pari passu with the L Bonds would share in payment or collateral in proportion to the amount of principal and interest owed on each such debt instrument. See "Description of the L Bonds — Ranking" for further information.

| | |
|---|---|
| **Guarantee** | The payment of principal and interest on the L Bonds (including those issued under our prior L Bond offering) and Seller Trust L Bonds is fully and unconditionally guaranteed by GWG Life. On December 31, 2019, there was approximately $948.1 million and $366.9 million, respectively, in outstanding principal amount of previously issued L Bonds and Seller Trust L Bonds. |
| **Collateral Security** | The L Bonds are secured by the assets of GWG Holdings, Inc. and by a guarantee and corresponding grant of a security interest in the assets of GWG Life. Our assets consist primarily of our investments in Beneficient, investments in our subsidiaries (including financing receivables from affiliates) and any cash proceeds we receive from life insurance assets of our subsidiaries, and all other cash and investments we hold in various accounts. |

App. 1027

GWG Life's assets, including its equity in our subsidiary DLP IV and its beneficial interest in Life Trust, serve as collateral for our L Bonds. However the life insurance policies held by DLP IV and Life Trust, which comprise a substantial majority of our life insurance policies, do not serve as collateral for the L Bonds. Further, the life insurance policies held by DLP IV are pledged as collateral securing the obligations under DLP IV's second amended and restated senior credit facility with LNV Corporation. The L Bonds' security interest will be structurally subordinate to the security interest in favor of our senior secured lender, together with any future senior secured lenders of ours. The assets of GWG Life, including proceeds it receives as distributions from DLP IV and derived from the insurance policies owned by DLP IV, are collateral for GWG Life's guarantee of the repayment of principal and interest on the L Bonds.

The L Bonds are also secured by a pledge of 3,952,155 shares of our common stock. For more information please see "Description of the L Bonds — Collateral Security."

**Indenture Covenants**

The indenture governing the L Bonds places restrictive covenants and affirmative obligations on us. For example, our debt coverage ratio may not exceed 90%.

The indenture defines the debt coverage ratio as the ratio, expressed as percentage, of (A) the aggregate sum of all Indebtedness (as defined in the indenture, other than Excluded Indebtedness, as described below) of GWG Holdings and its direct and indirect subsidiaries (including the Securities issued under the indenture, but excluding any Indebtedness of Ben LP and its direct and indirect subsidiaries) as reflected on GWG Holdings' most recent consolidated balance sheet prepared in accordance with GAAP over (B) the sum of (i) Net Present Asset Value (as defined in the amended indenture) of Life Insurance Policies (as defined in the amended indenture) owned by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding Life Insurance Policies held by Ben LP and its direct and indirect subsidiaries and controlled affiliates, plus (ii) all cash (and cash equivalents) held by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding the cash (and cash equivalents) held by Ben LP and its direct and indirect subsidiaries, plus (iii) the original cost basis in GWG Holdings' investment in common units or other securities of Ben LP, plus (iv) the outstanding principal amount of any outstanding loans made under a commercial loan agreement with GWG Life, as lender, plus (v) the cost basis of assets contributed to GWG Holdings or any direct or indirect subsidiary of GWG Holdings in connection with a Repurchase Transaction (as defined below), plus (vi) without duplication, the value of all other assets of GWG Holdings and its direct and indirect subsidiaries or affiliates (but excluding the value of assets of Ben LP and its direct and indirect subsidiaries) as reflected on its most recent consolidated balance sheet prepared in accordance with GAAP.

The indenture defines "Excluded Indebtedness" as Indebtedness or any portion thereof (A) the principal and accrued but unpaid interest of which is payable at GWG Holdings' option, pursuant to the terms of such Indebtedness or otherwise, in Capital Stock (as defined in the amended indenture) of GWG Holdings or securities mandatorily convertible into or exchangeable for Capital Stock of GWG Holdings, or (B) any Indebtedness that is reasonably expected to be converted or exchanged, directly or indirectly, into Capital Stock of GWG Holdings, provided that under the terms of such Indebtedness in the event any such conversion or exchange does not occur in accordance with the terms of such transaction, such Indebtedness would be cancelled and any assets received in exchange for such Indebtedness would be returned (a "Repurchase Transaction").

For this purpose, the net present asset value of our life insurance assets is equal to the present value of the cash flows derived from the face value of policy benefit assets we own, discounted at a rate equal to the weighted-average interest rate paid on indebtedness, excluding that of Seller Trust L Bonds.

The net present asset value of our life insurance assets for purposes of this covenant is not necessarily the same as the fair value of our life insurance assets as reflected on our most recently available balance sheet prepared in accordance with U.S. generally accepted accounting principles ("GAAP") and does not necessarily reflect the saleable or market value of those assets.

We are required to notify the indenture trustee in the event we violate this restrictive covenant for a period of 30 consecutive days. An "event of default" will exist under the indenture if a violation of this covenant persists for a period of 60 calendar days after the trustee's notice to us of a breach, or such a notice received from the holders of at least 25% in principal amount of outstanding L Bonds.

The indenture also places limitations on our ability to engage in a merger or sale of all of our assets. See "Description of the Indentures — Events of Default" and "— Consolidation Mergers or Sales" for more information.

8

| | |
|---|---|
| **Use of Proceeds** | If all the L Bonds are sold, we would expect to receive up to approximately $1,837.6 million of net proceeds from this offering after paying our estimated average selling commissions, dealer-manager fees, accountable expense allowance, wholesale commissions and our own offering-related expenses. There is no minimum amount of L Bonds that must be sold before we access investor funds. The exact amount of proceeds we receive may vary considerably depending on a variety of factors, including how long the L Bonds are offered. |
| | We intend to use the net proceeds from this offering to grow our alternative asset exposure, including through investments in Beneficient in the form of equity investments or loans, and to meet our other obligations, including debt obligations. Beneficient will have broad discretion to use the proceeds of any such investments and may use such proceeds to fund alternative asset financings, to repay indebtedness, including to related parties, and for general working capital purposes, including operating expenses. We may also use some of the proceeds from this offering to pay interest and principal amounts owing under previously issued L Bonds, Seller Trust L Bonds, and L Bonds offered hereby and for the payment of dividends on and redemption of our preferred stock. See "Use of Proceeds" for additional information. |
| **No Market for L Bonds Units; Transferability** | There is no existing market for the L Bonds and we do not anticipate that a secondary market for the L Bonds will develop. We do not intend to apply for listing of the L Bonds on any securities exchange or for quotation of the L Bonds in any automated dealer quotation system. Nevertheless, you will be able to freely transfer or pledge L Bonds. See "Description of the L Bonds — Transfers." |
| **Book Entry** | The L Bonds may be issued in book-entry form, certificated form, or in the form of a global certificate deposited with a depositary. See "Description of the L Bonds — Registration and Exchange." |
| **Covered Security** | Our L Bonds are a "covered security." The term "covered security" applies to securities exempt from state registration because of their oversight by federal authorities and national-level regulatory bodies pursuant to Section 18 of the Securities Act of 1933. Generally, securities listed on national exchanges are the most common type of covered security exempt from state registration. A non-traded security also can be a covered security if it has a seniority greater than or equal to other securities from the same issuer that are listed on a national exchange. Our L Bonds are a covered security because they are senior to our common stock, which is listed on The Nasdaq Capital Market, and therefore our offering of L Bonds is exempt from state registration. |
| | Although the status of our L Bonds as a "covered security" will facilitate their purchase and sale to a broader range of investors than would otherwise be available to us, and although the offer and sale of a "covered security" generally involves fewer issuance costs to the issuer of such securities, our L Bonds are not a suitable purchase for all investors. |
| **Risk Factors** | An investment in the L Bonds involves significant risks, including the risk of losing your entire investment, and may be considered speculative. Importantly, we maintain a senior borrowing arrangement that subordinates the right to payment on, and shared collateral securing, the L Bonds to our senior secured lender. From time to time we may add or replace senior lenders and the particular arrangements under which we borrow from them. In addition, these borrowing arrangements with senior lenders restrict, and are expected to continue to restrict, our cash flows and, subject to certain exceptions, distributions from our operating subsidiaries. These provisions will restrict cash flows available for payment of principal and interest on the L Bonds. For a summary of risks relating to this offering and our Company and business, please see "Risk Factors" beginning on page 11 of this prospectus and Item 1A, entitled "Risk Factors," of our Annual Report on Form 10-K for the year ended December 31, 2019, which is incorporated by reference herein. |

## RISK RELATING TO FORWARD-LOOKING STATEMENTS

Certain matters discussed in this prospectus and the documents incorporated by reference contain forward-looking statements. These forward-looking statements reflect our current expectations and projections about future events and are subject to risks, uncertainties and assumptions about our operations and the investments we make, including, among other things, factors discussed under the heading "Risk Factors" below.

The words "believe," "could," "possibly," "probably," "anticipate," "estimate," "project," "expect," "may," "will," "should," "seek," "intend," "plan," "expect," or "consider" and similar expressions are intended to identify forward-looking statements but are not the exclusive means of identifying such statements. Forward-looking statements are subject to risks and uncertainties, which could cause actual results to differ materially from such statements. Such risks and uncertainties include, but are not limited to:

- the valuation of assets reflected on our financial statements, including the fair value of Beneficient's assets and liabilities, including noncontrolling interests, which were consolidated as a result of the transactions with Beneficient on December 31, 2019;

- the illiquidity of our life insurance and Beneficient-related investments and receivables from affiliates;

- our ability to realize the anticipated benefits from our consolidation of Beneficient;

- Beneficient's financial performance and ability to execute on its business plan;

- Beneficient's ability to obtain the trust charters from the Texas Department of Banking necessary to implement its business plan;

- our ability to obtain accurate and timely financial information from Beneficient;

- our ability to effectively transition the management and oversight roles served by our former executives and members of our Board of Directors;

- changes resulting from the evolution of our business model and strategy with respect to Beneficient and the life insurance secondary market;

- our reliance on debt financing and continued access to the capital markets;

- our significant and ongoing financing requirements;

- our predominant use of short term debt to fund a portfolio of long term assets could result in a liquidity shortage;

- our ability to make cash distributions in satisfaction of dividend obligations and redemption requests;

- our ability to satisfy our debt obligations if we were to sell our assets;

- our history of operating losses;

- general economic outlook, including prevailing interest rates and credit market conditions

- federal, state and FINRA regulatory matters;

- litigation risks;

- our ability to comply with financial and non-financial covenants contained in borrowing agreements;

- the reliability of assumptions underlying our actuarial models, including life expectancy estimates and our projections of mortality events and the realization of policy benefits;

- risks relating to the validity and enforceability of the life insurance policies we have purchased;

- our reliance on information provided and obtained by third parties, including changes in underwriting tables and underwriting methodology;

- life insurance company credit exposure;

- cost-of-insurance (premiums) increases on our life insurance policies;

- performance of our investments in life insurance policies; and

- risks associated with causing Life Epigenetics and youSurance to become independent of GWG.

We caution you that the foregoing list of factors is not exhaustive. Forward-looking statements are only estimates and predictions, or statements of current intent. Actual results, outcomes or actions that we ultimately undertake could differ materially from those anticipated in the forward-looking statements due to risks, uncertainties or actual events differing from the assumptions underlying these statements.

10

**RISK FACTORS**

*An investment in our securities involves a high degree of risk. Before purchasing the securities offered by this prospectus, you should carefully consider the risks, uncertainties and additional information (i) set forth in our most recent Annual Report on Form 10-K filed with the SEC which is incorporated by reference into this prospectus, and (ii) contained herein or in any applicable prospectus supplement. The information incorporated by reference into this prospectus specifically includes the risk factors contained in our Annual Report on Form 10-K filed with the SEC on March 27, 2020.*

*For a description of these reports and documents, and information about where you can find them, see "Where You Can Find More Information" and "Incorporation of Certain Documents by Reference." The risks and uncertainties in this prospectus and in the documents incorporated by reference in this prospectus are those that we currently believe may materially impact the Company and could result in the loss of all or a portion of your investment in the L Bonds. Additional risks not presently known or are currently deemed immaterial could also materially and adversely affect our financial condition, results of operations, business and prospects.*

**Risks Related to the Offering and the L Bonds**

***There is no established trading market for the L Bonds. If an actual trading market does not develop for the L Bonds, you may not be able to resell them quickly, for the price that you paid or at all.***

There is currently no existing market for the L Bonds and the L Bonds will not be listed for trading on any exchange. We cannot assure you as to the liquidity of any market that may develop for the L Bonds, the ability of holders of the L Bonds to sell them or the price at which the holders of the L Bonds may be able to sell them. The liquidity of any market for the L Bonds will depend on numerous factors, including prevailing interest rates, the market for similar securities and other factors, including general economic conditions and our own financial condition, performance and prospects. Historically, the market for debt securities, such as the L Bonds, has been subject to disruptions that have caused substantial price volatility. We cannot assure you that if a market for the L Bonds were to develop, such a market would not be subject to similar disruptions.

We also cannot assure you that you will be able to sell your L Bonds at a particular time or at all, or that the prices that you receive when you sell them will be favorable. If no active trading market develops, you may not be able to resell your L Bonds at their fair market value, or at all.

---

*The collateral granted as security for our obligations under the L Bonds and Seller Trust L Bonds may be insufficient to repay the indebtedness upon an event of default.*

GWG Holdings (the issuer of the L Bonds and Seller Trust L Bonds) and GWG Life (the guarantor of obligations under the L Bonds and Seller Trust L Bonds, and a wholly owned subsidiary of GWG Holdings) have each granted a security interest in substantially all of their respective assets to serve as collateral security for obligations under the L Bonds and Seller Trust L Bonds. Importantly, DLP IV, a wholly owned subsidiary of GWG Life, owns a substantial number of our life insurance policies, 77% of the face value of our life insurance portfolio as of December 31, 2019, and is the borrower under our second amended and restated senior credit facility with LNV Corporation. As the borrower under that second amended and restated senior credit facility with LNV Corporation, all of its assets — including all of its life insurance policy assets — serve as collateral for our obligations under the facility.

Because of the fact that a substantial number of our life insurance assets are held in our DLP IV subsidiary, and all of those life insurance assets serve as collateral security for our obligations under our second amended and restated senior credit facility with LNV Corporation, holders of L Bonds and Seller Trust L Bonds risk the possibility that the collateral security granted in our life insurance policies and our investments in Beneficient to secure our obligations under the L Bonds and Seller Trust L Bonds may be insufficient to repay holders upon an event of default. Furthermore, while the indenture governing the L Bonds and the Seller Trust L Bonds limits the amount of debt relative to a measure of asset coverage we and our subsidiaries can incur, the indenture permits us and our subsidiaries to incur additional secured debt (subject to the debt coverage ratio) that may be senior to the L Bonds and Seller Trust L Bonds.

Furthermore, the life insurance policies and our investments in Beneficient that secure our obligations under the L Bonds and Seller Trust L Bonds are illiquid assets. As a result, the book value of those assets as reflected on our financial statements are based on numerous assumptions and may not necessarily reflect the current market price for those assets, especially in the event of a bulk or distressed sale. Furthermore, a substantial majority of the net assets of Beneficient are currently represented by goodwill as of December 31, 2019. Some or a substantial portion of the proceeds from L Bond sales may be used to make investments in Beneficient. Because these advances may be used by Beneficient for working capital purposes and to repay indebtedness, such investments may not increase the tangible assets securing the L Bonds. If the trustee for the L Bonds were forced to sell all or a portion of the collateral securing them, there can be no assurance that the trustee would be able to sell them for the prices at which we have recorded them, and the trustee might be forced to sell them at significantly lower prices.

*Subordination provisions contained in the indenture will restrict the ability of the trustee or the L Bond or Seller Trust L Bond holders to enforce their rights against us under the indenture, including the right to payment on the L Bonds, if a default then exists under a senior credit facility.*

The L Bonds and Seller Trust L Bonds will be subordinate in right of payment to any claims of our senior lender under the second amended and restated senior credit facility with LNV Corporation. In this regard, subordination provisions limiting the right of L Bond and Seller Trust L Bond holders to enforce their rights are contained in the indenture. These provisions include:

- a prohibition on challenging any enforcement action taken by a senior lender, or interfering with any legal action or suits undertaken by a senior lender, against us and our affiliates;

- a 180-day standstill period during which there may not be brought any action against us or our affiliates to enforce rights respecting collateral unless our second amended and restated senior credit facility with LNV Corporation has been repaid in full, which period may be extended if the senior lender takes action during such standstill period; and

- a prohibition on filing a bankruptcy or insolvency case against us or our affiliates for at least one year plus one day after any senior lender has been paid in full.

In the event of a default on a senior credit facility, the indenture prohibits us from making any payment, direct or indirect (whether for interest, principal, as a result of any redemption or repayment at maturity, on default, or otherwise), on the L Bonds, Seller Trust L Bonds and any other indebtedness unless and until: (i) the default respecting the senior credit facility has been cured or waived or has ceased to exist; or (ii) in the case of a non-payment default that permits a senior lender to declare as due and payable all amounts owing under a senior credit facility (but where that senior lender has not yet so declared amounts as being due and payable), the end of the period commencing on the date the trustee receives written notice of default from the senior lender and ending on the earliest of (1) our discharge of the default (or other cure), (2) the trustee's receipt of a valid waiver of default from the senior lender, or (3) a written notice from the senior lender terminating the payment prohibition.

During any payment prohibition period, neither the holders of the L Bonds, the Seller Trust L Bonds, nor the trustee will have the right, directly or indirectly, to sue to enforce the indenture or the L Bonds or Seller Trust L Bonds. Other provisions of the indenture do permit the trustee to take action to enforce the payment rights of L Bond and Seller Trust L Bond holders after 179 days have passed since the trustee's receipt of notice of default from a senior lender, but in such case any funds paid as a result of any such suit or enforcement action shall be applied toward the senior credit facility until the facility is indefeasibly paid in full before being applied to the L Bonds and Seller Trust L Bonds.

These subordination provisions present the risk that, upon any default by us on obligations owed to our senior lender, the holders of the L Bonds and Seller Trust L Bonds will be unable to enforce their rights to payment.

If the 180-day standstill period noted above, or any other limitation on the rights of the trustee or L Bond and Seller Trust L Bond holders to assert their rights to payment of principal or interest under the indenture, is ultimately determined to conflict with provisions of the Trust Indenture Act of 1939 (most notably sections 316(b) and 317(a) of that Act), then the trustee, as well as any holder who shall not have earlier consented to such subordination provisions, will (notwithstanding such provision contained in the indenture) be authorized to institute a lawsuit for the enforcement of any payment of principal or interest after their respective due dates.

***The debt coverage ratio, designed to provide some assurance to the holders of the L Bonds and Seller Trust L Bonds that the value of our total assets exceeds our total interest-bearing obligations, values our life insurance policy assets, which represent 56% of our total assets (excluding goodwill) as of December 31, 2019, in a manner that may not be representative of the amount we would actually receive upon a sale of those assets.***

Under the indenture governing the L Bonds and Seller Trust L Bonds, as amended, the maximum amount of L Bonds and Seller Trust L Bonds we may issue at any time is limited to an amount such that our debt coverage ratio does not exceed 90%. This limitation is designed to provide some basis that the net present value of policy benefits from our life insurance assets, plus the carrying value of our other assets (including our investments in Beneficient), will be sufficient to meet our obligations to our L Bond and Seller Trust L Bond holders. Expressed as a percentage, the debt coverage ratio is the ratio of (A) the aggregate sum of all Indebtedness (other than Excluded Indebtedness) of GWG Holdings and its direct and indirect subsidiaries (including the Securities issued under the indenture, but excluding any Indebtedness of Ben LP and its direct and indirect subsidiaries) as reflected on GWG Holdings' most recent consolidated balance sheet prepared in accordance with GAAP over (B) the sum of (i) Net Present Asset Value of Life Insurance Policies owned by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding Life Insurance Policies held by Ben LP and its direct and indirect subsidiaries and controlled affiliates, plus (ii) all cash (and cash equivalents) held by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding the cash (and cash equivalents) held by Ben LP and its direct and indirect subsidiaries, plus (iii) the original cost basis in GWG Holdings' investment in common units or other securities of Ben LP, plus (iv) the outstanding principal amount of any outstanding loans made under a commercial loan agreement with GWG Life, as lender, plus (v) the cost basis of assets contributed to GWG Holdings or any direct or indirect subsidiary of GWG Holdings in connection with a Repurchase Transaction, plus (vi) without duplication, the value of all other assets of GWG Holdings and its direct and indirect subsidiaries or affiliates (but excluding the value of assets of Ben LP and its direct and indirect subsidiaries) as reflected on its most recent consolidated balance sheet prepared in accordance with GAAP. For this purpose, Excluded Indebtedness" is Indebtedness which is payable at GWG Holdings' option in capital stock of GWG Holdings or securities mandatorily convertible into or exchangeable for such capital stock of GWG Holdings, or any Indebtedness that is reasonably expected to be converted or exchanged, directly or indirectly, into such capital stock, provided that under the terms of such Indebtedness in the event any such conversion or exchange does not occur in accordance with the terms of such transaction, such Indebtedness would be cancelled and any assets received in exchange for such Indebtedness would be returned.

Although the debt coverage ratio is designed to provide some basis that our assets will be sufficient to meet our obligations to the holders of L Bonds and Seller Trust L Bonds, the "net present value" of our life insurance assets used in the debt coverage ratio is not the same as the GAAP "fair value" of those assets on our balance sheet. Accordingly, the debt coverage ratio is not informative of the amount we and holders of L Bonds and Seller Trust L Bonds would actually receive if we were forced to sell or liquidate our life insurance related assets. Furthermore, any sale or liquidation of all or a significant portion of our life insurance policies or investments in Beneficient would include significant transactional costs. See "— The collateral granted as security for our obligations under the L Bonds and Seller Trust L Bonds may be insufficient to repay the indebtedness upon an event of default." As a result, our compliance with the debt coverage ratio in the indenture will not guarantee that the value of our life insurance assets plus the value of our investments in Beneficient, if sold or liquidated, would in all cases exceed the amount of our obligations to the holders of L Bonds and Seller Trust L Bonds.

13

**USE OF PROCEEDS**

If all of the L Bonds are sold, we expect to receive up to approximately $1,837.6 million of net proceeds from this offering after paying our estimated offering and related expenses and the estimated selling commissions and additional compensation (consisting of (i) dealer-manager fees, (ii) wholesaling fees and non-transaction based compensation of the wholesalers, who are our employees and associated with the dealer manager, (iii) accountable expense allowance (iv) non-cash compensation, and (v) up to a 1.00% reallowance to selling group members). We expect the selling commissions and additional compensation to aggregate approximately $160.0 million based on expected average selling commissions of $100.0 million (5.00%), dealer-manager fees of $8.0 million (0.4%), and additional expenses aggregating to $52.0 million (2.60%), assuming the sale of all of the L Bonds. In addition, we expect that our offering expenses, consisting of legal, accounting, printing, mailing, registration, qualification and associated securities offering filing costs and expenses, will aggregate to approximately $2,400,000 through the course of this offering.

As explained elsewhere in this prospectus, the maximum amount of commissions, dealer manager fees and additional compensation payable to the dealer manager and selling group members is 8.0% of the aggregate principal amount of L Bonds sold. Therefore, if all of the L Bonds were sold and the maximum commissions, dealer manager fees and additional compensation were paid, we estimate that the net proceeds to us, after paying our own estimated offering and related expenses, would be approximately $1,837.6 million. Nevertheless, because we do not know the total principal amount of L Bonds that will be ultimately sold, we are unable to accurately forecast the total net proceeds that will be generated by this offering.

There is no minimum amount of L Bonds that must be sold before we access investor funds. The exact amount of proceeds we receive may vary considerably depending on a variety of factors, including how long the L Bonds are offered.

We intend to use the net proceeds from this offering to grow our alternative asset exposure, including through investments in Beneficient in the form of equity investments and/or loans to Beneficient or related entities, and to meet our other obligations, including:

- servicing our portfolio of life insurance assets (i.e., paying life insurance policy premiums);

- paying principal (at maturity or upon earlier prepayment or redemption), interest and fees to our lenders, including under DLP IV's second amended and restated senior credit facility, previously issued L Bonds, Seller Trust L Bonds and the L Bonds offered hereby;

- paying dividends on and, if applicable, redeeming our preferred stock;

- paying transaction expenses relating to interest rate hedging and similar derivative transactions (e.g., caps, collars, etc.); and

- general working capital purposes.

The extent to which we will use proceeds from this offering for any of these purposes, and the amounts and timing of such expenditures, will depend on, among other things, how long the L Bonds are offered, the amount of net proceeds that we receive from the sale of L Bonds being offered, our cash flows and needs for liquidity, the existence and timing of opportunities to strategically increase our investment in Beneficient, the availability of funds from other sources, including realizations from policy benefits, distributions from investments in Beneficient, the issuance of common or preferred equity, borrowings from senior credit facilities, and other factors deemed relevant by our Board of Directors and management.

Beneficient will have broad discretion to use the proceeds of any such investments and may use such proceeds to acquire alternative assets, to repay indebtedness, including to related parties, and for general working capital purposes, including operating expenses.

Net offering proceeds not immediately applied to the uses summarized above will be invested, at our sole discretion, in bank deposits or short-term investments such as money market funds, commercial paper, U.S. Treasury Bills and similar securities investments pending their use.

The maximum amount of L Bonds we may issue and have outstanding is limited by our debt coverage ratio discussed below.

14

**DESCRIPTION OF THE L BONDS**

**General**

The L Bonds are secured obligations of GWG Holdings. The L Bonds will be issued under the amended and restated indenture between us and Bank of Utah as the indenture trustee, dated October 23, 2017, which amends and restates the original indenture dated October 19, 2011 and as may be amended or supplemented from time to time (referred to herein as the "indenture"). The terms and conditions of the L Bonds include those stated in the indenture and those made part of the indenture by reference to the Trust Indenture Act of 1939. The following is a summary of the material provisions of the indenture. For a complete understanding of the L Bonds, you should review the definitive terms and conditions contained in the indenture, which include definitions of certain terms used below. A copy of the indenture has been filed with the SEC as an exhibit to the registration statement of which this prospectus is a part, and is available from us at no charge upon request.

The following is a summary of the material terms of the L Bonds:

- The L Bonds are general secured obligations of GWG Holdings. The obligations are secured by a grant of a security interest in all of the assets of GWG Holdings, which assets will serve as collateral for our obligations under the L Bonds. This grant of a security interest is effected pursuant to an amended and restated pledge and security that has been filed as an exhibit to the registration statement of which this prospectus forms a part.

- The L Bonds are fully and unconditionally guaranteed by our wholly owned direct subsidiary, GWG Life, but otherwise are not guaranteed by any other person or entity. The guarantee is backed by a grant of a security interest in all of the assets of GWG Life, which assets will serve as additional collateral for our obligations under the L Bonds. Chief among these assets is GWG Life's ownership interest in DLP IV. This guarantee is effected pursuant to provisions contained in the indenture.

- The L Bonds are also secured by a pledge of the equity ownership interests in GWG Holdings beneficially owned by BCC and AltiVerse Capital Markets, L.L.C., a Delaware limited liability company ("AltiVerse") (which is a limited liability company owned by an entity related to Beneficient's founders)— which pledge is effected pursuant to an amended and restated pledge and security agreement that has been filed as an exhibit to the registration statement of which this prospectus forms a part.

- Through DLP IV, we are party to a $300.0 million second amended and restated senior credit facility with LNV Corporation. The amount outstanding under this facility was $184.6 million at December 31, 2019.

- The L Bonds are not savings accounts, certificates of deposit (CDs) or other forms of "deposits," and are not insured by the FDIC or any other governmental agency.

- The L Bonds are not directly secured by any life insurance assets not owned by GWG Life. A substantial majority of our life insurance assets are held by DLP IV. Although GWG Life's equity ownership interest in DLP IV is an asset in which GWG Life has, pursuant to its guarantee, granted a security interest to serve as collateral for obligations under the L Bonds, the payment on such equity interest will be subordinate to the interests of creditors of DLP IV, including our senior creditor LNV Corporation.

- The L Bonds do not have the benefit of a "sinking fund" for the retirement of principal.

- The L Bonds are not convertible into our capital stock or other securities.

- We have the option to call and redeem the entire outstanding principal balance and accrued but unpaid interest of any L Bonds at any time and without premium or penalty. If we elect to call and redeem your L Bonds, those redeemed L Bonds will cease to accrue interest after the redemption date under the terms and subject to the conditions of the indenture.

- Except in limited circumstances (death, bankruptcy or total permanent disability) L Bond holders will have no right to require us to redeem any L Bond prior to its maturity date. Any early redemption will be for the total outstanding principal balance and accrued but unpaid interest. If we in our sole discretion nonetheless elect to accommodate a redemption request, we will redeem the entire (but not less than the entire) outstanding principal balance and accrued but unpaid interest of the L Bonds and may impose a redemption fee of 6% against the outstanding principal balance of the L Bond redeemed. This fee will be subtracted from the amount paid to you.

App. 1038

App. 1039

The L Bonds will be represented by "Units," with each whole Unit representing $1,000 in principal amount (USD) of L Bonds. Accordingly, L Bond Units will be sold at 100% of their principal face amount. Throughout this prospectus, we refer to L Bond Units simply as "L Bonds." The minimum investment amount in the L Bonds will be 25 Units, or $25,000. Above that minimum amount, L Bonds may be purchased in whole Units. Subject to the minimum investment amount, you may select the principal amount and term of the L Bonds (ranging from two to seven years) you would like to purchase when you subscribe. The interest rate of your L Bonds will remain fixed until maturity. Depending on our capital requirements, we may not, however, always offer L Bonds with the particular terms you seek. See "Description of the L Bonds — Interest Rate and Maturity" below.

Upon acceptance of your subscription, we will create an account in a book-entry registration and transfer system for you, and credit the principal amount of your subscription to your account. We will also send you a purchase confirmation that will indicate our acceptance of your subscription. If your subscription is rejected, all funds deposited will be promptly returned to you without any interest. See "— Registration and Exchange" below. Alternatively, you may subscribe for L Bonds as a direct participant with Depository Trust Company (DTC settlement). See "Plan of Distribution — Settlement Procedures" for more information.

Investors whose subscriptions for L Bonds have been accepted and anyone who subsequently acquires L Bonds in a qualified transfer are referred to as "holders" or "registered holders" in this prospectus. We may modify or supplement the terms of the L Bonds described in this prospectus from time to time in a supplement to the indenture and a further supplement to this prospectus. Except as set forth under "— Amendment, Supplement and Waiver" below, any modification or amendment will not affect L Bonds outstanding at the time of such modification or amendment.

The L Bonds are transferable pursuant to the terms of the indenture. The L Bonds may be transferred or exchanged for other L Bonds of the same series and class of a like aggregate principal amount (i.e., the same number of Units) subject to limitations contained in the indenture. We will not charge a fee for any registration, transfer or exchange of L Bonds. However, we may require the holder to pay any tax, assessment fee, or other governmental charge required in connection with any registration, transfer or exchange of L Bonds. The registered holder of any L Bonds will be treated as the owner of such L Bond Units for all purposes.

**Denomination**

You may purchase L Bonds in the minimum amount of 25 Units, representing a minimum principal amount of $25,000, and in any whole Unit amounts in excess thereof. You will determine the exact number of L Bond Units you purchase when you subscribe. You may not cumulate multiple purchases L Bond Units in amounts less than 25 Units to satisfy the 25 Unit minimum requirement. In our discretion, however, we may waive the 25 Unit minimum purchase requirement for any investor.

**Term**

We may offer L Bonds with the following terms to maturity: two years, three years, five years, and seven years.

You will select the term of the L Bonds you purchase when you subscribe. You may purchase multiple L Bonds with different terms by filling in investment amounts for more than one term on your Subscription Agreement. Nevertheless, during this offering we may not always offer L Bonds with each of the maturity terms outlined above.

The actual maturity date will be on the last day of the month in which the L Bond matures (i.e., the month in which the L Bond's term ends). For example, if you select a two-year term and your L Bond becomes effective on June 1, 2020, then the actual maturity date will be June 30, 2022. After actual maturity, we will pay all outstanding principal and accrued but unpaid interest on the L Bond no later than the fifth day of the calendar month next following its maturity (or the first business day following the fifth day of such month). So, in the case of an L Bond with a maturity date of June 30, 2022, actual payment will be made on or prior to July 5, 2022 (unless such date is not a business day, in which case actual payment will be made on the next business day). The L Bonds do not earn interest after the maturity date or any date set for prepayment.

Should the original L Bond holder (x) no longer be the holder of the L Bond or (y) be unavailable, or a change in payee be necessary, such as in the case of a surviving estate, we may require a copy of the executed assignment to any transferee, or an order from a court or probate commission, as the case may be, in order that we know the principal is returned to the rightful party.

16

**Interest Rate**

The rate of interest we will offer to pay on L Bonds at any particular time will vary based upon market conditions, and will be determined by the term to maturity of the L Bonds, our capital requirements and other factors described below. The interest rate on particular L Bonds will be determined at the time of subscription or renewal and then remain fixed for the original or renewal term of the L Bond. We will establish and may change the interest rates payable for L Bonds of various terms and at various investment levels in an interest rate supplement to this prospectus.

We may offer L Bonds that earn incrementally higher interest rates when, at the time they are purchased or renewed, the aggregate principal amount of the L Bond portfolio of the holder increases. If applicable, the interest rates payable at each level of investment will be set forth in an interest rate supplement to this prospectus. We may change the interest rate for any or all maturities to reflect market conditions at any time by supplementing this prospectus. If we change the interest rates, the interest rate on L Bonds issued before the date of the change will not be affected.

**Payments on the L Bonds; Paying Agent and Registrar**

Investors will have the opportunity to select whether interest on their L Bonds will be paid monthly or annually. For investors using direct settlement with the Company, this selection opportunity will be presented in the Subscription Agreement.

Interest will accrue on the L Bonds at the stated rate from and including the effective date of the L Bond until maturity. The effective date of an L Bond will be as follows:

- If you purchase an L Bond through DTC settlement, the effective date of your L Bond purchase will be the date your subscription is accepted by the Company.

- If you purchase an L Bond through direct settlement with the Company, the effective date of your L Bond purchase will be the following, as applicable: (i) in cases where you pay for your bond via wire transfer directly to us, the first business day of the next calendar month after which we receive the wire; (ii) in cases where you pay for your bond by bank draft directly to us, the first business day of the next calendar month after which we receive the draft; or (iii) in cases where you pay for your bond by personal check, the first business day of the calendar month that is at least five full business days after which we receive the check. In all cases involving direct settlement with the Company, we must also have received and accepted your completed and executed Subscription Agreement.

Interest payments on L Bonds will be paid on the 15th day immediately following the last day of the applicable interest payment period. Interest will be paid without any compounding. The first payment of interest will include interest for the partial period in which the purchase occurred. The indenture provides that all interest will be calculated based on a year with twelve 30-day months.

If you purchase your L Bond Units through direct settlement, we will pay the principal of, and interest on, L Bonds by direct deposit to the account you specify in your Subscription Agreement. We will not accept subscriptions from investors who are not willing to receive their interest payments via direct deposit. If the foregoing payment method is not available, principal and interest payments on the L Bonds will be payable at our principal executive office or at such other place as we may designate for payment purposes. If you purchase your L Bond Units through DTC settlement, our payments of principal and interest will be paid to the depositary (DTC) and then be credited to your brokerage or custodial account through the DTC procedures followed by your brokerage firm or custodian. For more information, please see "Registration and Exchange — Global Certificates Deposited with DTC" below.

We will withhold 28% of any interest payable to any investor who has not provided us with a social security number, employer identification number, or other satisfactory equivalent in the Subscription Agreement (or another document) or where the IRS has notified us that backup withholding is otherwise required. Please see "Material Federal Income Tax Considerations — Backup Withholding and Information Reporting."

**Registration and Exchange**

The L Bonds that we settle directly will generally be issued in book-entry form, which means that no physical L Bond is created, subject, however, to limited exceptions described in the indenture. The L Bonds settled through DTC settlement will be represented by global certificates deposited with the depositary as described below.

17

*Book-Entry Registration*

Evidence of your ownership will be provided by written confirmation. As described below, holders may, under certain circumstance described below, opt to receive physical delivery of a certificated security that evidences their L Bonds. Otherwise, the issuance and transfer of L Bonds will be accomplished exclusively through the crediting and debiting of the appropriate accounts in our book-entry registration and transfer system.

The holders of the accounts established upon the purchase or transfer of L Bonds will be deemed to be the owners of the L Bonds under the indenture. The holder of the L Bonds must rely upon the procedures established by the trustee to exercise any rights of a holder of L Bonds under the indenture. We will regularly provide the trustee with information regarding the establishment of new accounts and the transfer of existing accounts.

On or prior to any interest payment date or upon redemption, we will also provide the trustee with information regarding the total amount of any principal and interest due to holders of L Bonds. On each interest payment date, we will credit interest due on each account and direct payments to the holders. We will determine the interest payments to be made to the book-entry accounts and maintain, supervise and review any records relating to book-entry accounts for the L Bonds.

Book-entry notations in the accounts evidencing ownership of the L Bonds are exchangeable for certificated L Bonds only: (i) at the request of the holder, at the end of the Company's next fiscal quarter; or (ii) after the occurrence of an event of default under the indenture, if holders of more than 50% of the aggregate outstanding principal amount of the L Bonds advise the trustee in writing that the continuation of a book-entry system is no longer in the best interests of the holders of L Bonds. In its discretion, the Company may elect to terminate the book-entry system and replace book-entry notations with physical certificates.

*Global Certificates Deposited with DTC*

L Bonds may be issued in the form fully registered global certificates deposited with, or on behalf of, The Depository Trust Company ("DTC"), New York, NY, and registered in the name of Cede & Co., as nominee of DTC. Unless and until exchanged, in whole or in part, for L Bonds in definitive registered form, a global certificate may not be transferred except as a whole by the depositary to a nominee of such depositary, by a nominee of such depositary to such depositary or another nominee of such depositary, or by such depositary or any nominee of such depositary to a successor of such depositary or a nominee of such successor.

DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act. DTC was created to hold securities of its participants and to facilitate the clearance and settlement of securities transactions, such as transfers and pledges, among its participants in such securities through electronic computerized book-entry changes in accounts of the participants, thereby eliminating the need for physical movement of securities certificates. DTC's participants include securities brokers and dealers (including the managing broker-dealer), banks, trust companies, clearing corporations and certain other organizations, some of whom own DTC. Access to DTC's book-entry system is also available to others, such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a participant, either directly or indirectly. The rules applicable to DTC and its participants are on file with the SEC.

If available, purchases of L Bonds within the DTC system must be made by or through direct participants, which will receive a credit for the L Bonds on DTC's records. The ownership interest of each beneficial owner of the L Bonds will be recorded on the direct and indirect participants' records. Beneficial owners will not receive written confirmation from DTC of their purchases, but beneficial owners are expected to receive written confirmations providing details of the transactions, as well as periodic statements of their holdings, from the direct or indirect participants through which the beneficial owners entered into the transaction. Transfers of ownership interests in the L Bonds are to be accomplished by entries made on the books of participants acting on behalf of beneficial owners.

To facilitate subsequent transfers, all L Bonds deposited by participants with DTC will be registered in the name of DTC's nominee, Cede & Co. The deposit of L Bonds with DTC and their registration in the name of Cede & Co. will effect no change in beneficial ownership. DTC will have no knowledge of the actual beneficial owners of the L Bonds. DTC's records will reflect only the identity of the direct participants to whose accounts such notes are credited, which may or may not be the beneficial owners. The participants will remain responsible for keeping account of their holdings on behalf of their customers.

18

Conveyance of notices and other communications by DTC to direct participants, by direct participants to indirect participants and by direct and indirect participants to beneficial owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

We will make payments due on the notes to Cede & Co., as nominee of DTC, in immediately available funds. DTC's practice is to credit direct participants' accounts, upon DTC's receipt of funds and corresponding detailed information, on the relevant payment date in accordance with their respective holdings shown on DTC's records. Payments by participants to beneficial owners will be governed by standing instructions and customary practices, as is the case with securities held for the account of customers in bearer form or registered in "street name," and will be the responsibility of such participant and not our responsibility or that of DTC, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment to Cede & Co. is our responsibility. Disbursement of such payments to direct participants is the responsibility of Cede & Co. Thereafter, disbursement of such payments to the beneficial owners is the responsibility of direct and indirect participants (i.e., brokers, dealers and custodians).

Except as provided herein, a beneficial owner of an interest in a global certificate will not be entitled to receive physical delivery of the L Bonds. Accordingly, each beneficial owner must rely on the procedures of DTC to exercise any rights under the L Bonds. The laws of some jurisdictions require that certain purchasers of securities take physical delivery of securities in definitive form. Such laws may impair the ability to transfer beneficial interests in a global certificate.

As long as the depositary, or its nominee, is the registered holder of a global certificate, the depositary or such nominee will be considered the sole owner and holder of the L Bonds represented thereby for all purposes under the L bonds and the indenture. Except in the limited circumstances referred to below, owners of beneficial interests in a global certificate will not be entitled to have such global certificate or any L Bonds represented thereby registered in their names, will not receive or be entitled to receive physical delivery of certificated L Bonds in exchange for the global certificate and will not be considered to be the owners or holders of such global certificate or any certificates represented thereby for any purpose under the L Bonds or the indenture. Accordingly, each person owning a beneficial interest in such global certificate must rely on the procedures of the depositary and, if such person is not a participant, on the procedures of the participant through which such person owns its interest to exercise any rights of a holder under the indenture.

If the depositary for a global certificate representing L Bonds is at any time unwilling or unable to continue as depositary and a successor depositary is not appointed by us within 90 days, we will issue L Bonds in definitive form in exchange for such global certificate. In addition, we may at any time and in our sole discretion determine not to have the L Bonds represented by one or more global certificates and, in such event, we will issue the notes in definitive form in exchange for all of the global certificates representing the L Bonds. Finally, if an event of default, or an event which with the giving of notice or lapse of time or both would constitute an event of default, with respect to the L Bonds represented by a global certificate has occurred and is continuing, then we will issue L Bonds in definitive form in exchange for all of the global certificates representing the notes.

Although DTC has agreed to the procedures provided above in order to facilitate transfers, it is under no obligation to perform these procedures, and these procedures may be modified or discontinued at any time.

**Limited Rescission Right**

If you are purchasing L Bonds through direct settlement with the Company and your Subscription Agreement is accepted at a time when we have determined that a post-effective amendment to the registration statement of which this prospectus is a part must be filed with the SEC, but such post-effective amendment has not yet been declared effective, we will send to you at your registered address a notice and a copy of the related prospectus once it has been declared effective. You will thereupon have the right to rescind your investment upon written request within ten business days from the postmark date of the notice we send to you that the post-effective amendment has been declared effective (and containing the related prospectus). We will promptly return any funds sent with a Subscription Agreement that is properly rescinded without penalty, although any interest previously paid on a rescinded L Bond will be deducted from the funds returned to you upon rescission. A written request for rescission, except in the case of a mailed rescission, must be postmarked on or before the tenth business day after our notice to you (described above). If you notify us other than by mail, we must actually receive your rescission request on or before the tenth business day after our notice to you.

We will not accept purchases of L Bonds through DTC settlement if, as of the end of the monthly closing for DTC settlement, we have determined that a post-effective amendment to the registration statement of which this prospectus is a part must be filed with the SEC, but such post-effective amendment has not yet been declared effective. In any such case, settlement of your L Bond purchase must occur in the following month.

19

**Renewal or Repayment on Maturity**

At least 30 days prior to the maturity of your L Bond, we will provide you with a notice indicating that your L Bond is about to mature and whether we will allow automatic renewal of your L Bond. If we allow you to renew your L Bond, we will also provide to you the then-current form of prospectus, which may include an interest rate or prospectus supplement and any other updates to the information contained in this prospectus. The prospectus, or the interest rate or prospectus supplement, will set forth the interest rates then in effect. The notice will recommend that you review the then-current prospectus, including any interest rate or prospectus supplement, prior to exercising one of the below options. If we do not provide you a new prospectus because the prospectus has not changed since the delivery of this prospectus in connection with your original investment or any prior renewal, we will nonetheless send you a new copy of the prospectus upon your request. Unless the election period is extended as described below, you will have until 15 days prior to the maturity date to exercise one of the following options:

- You can do nothing, in which case (subject to applicable law) your L Bond will automatically renew for a new term equal to the original term but at the interest rate in effect at the time of renewal. Interest on renewed L Bonds will be paid on the same schedule (i.e., monthly or annually) as the original L Bond. If applicable, a new certificate will be issued.

- You can elect repayment of your L Bond, in which case the principal amount will be repaid in full along with any accrued but unpaid interest. If you choose this option, your L Bond will not earn interest on or after the maturity date.

- You can elect repayment of your L Bond and use all or part of the proceeds to purchase a new L Bond with a different term or principal amount. To exercise this option, you will need to complete a new Subscription Agreement for the new L Bond and mail it along with your request, or else work with your broker if you wish to purchase your new L Bond through DTC settlement. Any proceeds from the old L Bond that are not applied to the new L Bond will be sent to you.

The foregoing options will be available to holders unless and until terminated under the indenture. Interest will accrue from the first day of each renewed term. Each renewed L Bond will retain all its original provisions, including provisions relating to payment, except that the interest rate payable during any renewal term will be the interest rate that is being offered at that time to other holders with similar aggregate L Bond portfolios for L Bonds of the same term as set forth in the interest rate supplement delivered with the maturity notice. If similar L Bonds are not then being offered, the (i) interest rate upon renewal will be the rate specified by us on or before the maturity date, or the rate of the existing L Bond if no such rate is specified, and (ii) the maturity will, if L Bonds of the same maturity are being offered at the time of renewal, be the same or, if not, the next earliest maturity.

If we notify the holder of our intention to repay an L Bond at maturity, or if the holder timely requests repayment, we will pay the principal and all accrued but unpaid interest on the L Bond on or prior to the fifth day of the calendar month after the maturity date (or the first business day following the fifth day of such month). Thus, in the case of an L Bond with a maturity date of January 31, 2020, actual payment will be made on or prior to February 5, 2020 (unless such date is not a business day, in which case actual payment will be made on the next business day). No interest will accrue after the maturity date. You should be aware that because payment is made by ACH transfer, funds may not be received in the holder's account for two to three business days.

We will be required from time to time to file post-effective amendments to the registration statement of which this prospectus is a part to update the information it contains. If you would otherwise be entitled to renew your L Bonds upon their stated maturity at a time when we have determined that a post-effective amendment must be filed with the SEC, but such post-effective amendment has not yet been declared effective, then the period during which you can elect renewal (or repayment) will be automatically extended until ten days following the postmark date of our notice to you that the post-effective amendment has been declared effective, which notice shall contain a copy of the related prospectus. All other provisions relating to the renewal or redemption of L Bonds upon their stated maturity described above shall remain unchanged.

For any L Bonds offered hereby that mature on or after the three-year anniversary of the date on which the registration statement of which this prospectus is a part shall have been declared effective, we expect that the renewal of such L Bonds may require us to file a new registration statement. In such a case, the new registration statement must be declared effective before we can renew your L Bond. In this event, if the new registration statement has not yet been filed or become effective, we will extend your election period until ten days following the date of our notice to you that the new registration statement has become effective, which notice will include a new prospectus.

20

**Call and Redemption Prior to Stated Maturity**

We may call and redeem, in whole or in part, principal amount and accrued but unpaid interest on any L Bonds prior to their stated maturity only as set forth in the indenture and described below. The holder has no right to put or otherwise require us to redeem any L Bond prior to its maturity date (as originally stated or as it may be extended), except as indicated in the indenture and described below.

*Our Voluntary Redemption*

We have the right to redeem any L Bond, in whole or in part, at any time prior to its stated maturity upon at least 30 days written notice to the holder of the L Bond. The holder of the L Bond being redeemed will be paid a redemption price equal to the outstanding principal amount thereof plus accrued but unpaid interest up to but not including the date of redemption without any penalty or premium. We may use any criteria we choose to determine which L Bonds we will redeem if we choose to do so. We are not required to redeem L Bonds on a pro rata basis.

*Holder's Put Election Upon Death*

L Bonds may be redeemed prior to maturity at the election of a holder who is a natural person (including L Bonds held in an individual retirement account and the holders of a beneficial interest in a global certificate held by a depositary or its nominee), by giving us written notice within 45 days following the holder's total permanent disability or bankruptcy, as established to our satisfaction, or at the election of the holder's estate, by giving written notice within 45 days following the death of the holder. Subject to the limitations described below, we will redeem the L Bonds not later than the 15th day of the month next following the month in which we establish to our satisfaction the holder's death, bankruptcy or total permanent disability. In the event that the 15th day of the month next following the month in which we so establish such facts is not a business day, we will redeem the L Bonds on the next business day. The redemption price, in the event of such a death, bankruptcy or total permanent disability, will be the entire principal amount of the L Bonds, plus accrued but unpaid interest thereon up to and through the last day of the calendar month preceding the redemption date. The indenture defines "total permanent disability" as the determination by a physician, approved by us, that a holder of an L Bond who is a natural person, and who was gainfully employed at the time of issuance of the L Bond (or its renewal date), is unable to work on a full-time basis during a period of 24 consecutive months.

If spouses are joint registered holders of an L Bond, the right to elect to have us redeem L Bonds will apply when either registered holder dies, files bankruptcy or suffers a total permanent disability. If the L Bond is held jointly by two or more persons who are not legally married, none of these persons will have the right to request that we redeem the L Bonds unless all joint holders have died, filed bankruptcy or suffered a total permanent disability. If the L Bond is held by a trust, partnership, corporation or other similar entity, the right to request redemption upon death or total permanent disability does not apply.

*Redemption at Request of Holder*

We have no obligation to redeem any L Bonds other than upon maturity, or upon the death, bankruptcy or total permanent disability of a natural person holder. Nevertheless, at our sole discretion we may agree from time to time, at the written request of a holder (including the holder of a beneficial interest in a global certificate held by a depositary or its nominee), to redeem an L Bond, subject, however, to a redemption fee of 6.0% of the principal amount of such L Bond. If we so redeem any L Bond prior to maturity, we will redeem the entire principal amount of such L Bond together with accrued but unpaid interest thereon, The redemption fee will be subtracted from the amount paid to you.

**Transfers**

The L Bonds will be transferable in accordance with the indenture. For L Bonds that are issued solely in book-entry form, transfers will be effective only upon the delivery to us of an executed assignment or other conveyance instrument in customary form. For L Bonds that are represented by a global certificate held by a depositary or its nominee, transfers of beneficial interests in such certificate must be effected in accordance with the procedures and rules of the depositary.

Upon transfer of an L Bond, we will provide the new holder of the L Bond with a purchase confirmation that will evidence the transfer of the account on our records. If applicable (e.g., if transferred to a custodial account), a new certificate will be issued. No written confirmations will be provided with respect to transfers of beneficial interests in a global certificate held by a depositary or its nominee.

21

**Quarterly Statements**

We will provide holders of the L Bonds with quarterly statements, which will indicate, among other things, the account balance at the end of the quarter, interest credited, redemptions made, if any, and the interest rate paid during the quarter. These statements will be sent electronically on or prior to the 10th business day after the end of each calendar quarter. If a holder is unwilling or unable to receive quarterly statements electronically, we will mail the statements to the address of record on or prior to the 10th business day after the end of each calendar quarter. In such a case, we may charge such holders a reasonable fee to cover our expenses incurred in mailing the statements.

**Ranking**

The L Bonds will constitute secured debt of GWG Holdings. The payment of principal and interest on the L Bonds will be:

- pari passu with respect to payment and collateral securing all L Bonds and Seller Trust L Bonds previously issued by GWG Holdings, Inc., of which approximately $1,315.0 million in principal amount is outstanding as of December 31, 2019 (see the caption "— Collateral Security" below);

- structurally and contractually junior to the present and future obligations owed by our subsidiary DLP IV under our second amended and restated senior credit facility with LNV Corporation, and structurally or contractually junior to any future obligations that DLP IV or other primary obligors or guarantors may have under future senior secured borrowing facilities; and

- structurally junior to the present and future claims of creditors of our subsidiaries, other than GWG Life, including Beneficient's senior credit agreement and second lien credit agreement with HCLP Nominees, L.L.C., of which approximately $152.2 million in principal amount was outstanding as of December 31, 2019, and trade creditors.

The indenture will permit us to issue other forms of debt, including secured and senior debt, in the future.

"Pari passu" means that claims for payment and entitlement to security among the holders of L Bonds, including the holders of previously issued L Bonds and Seller Trust L Bonds, and the holders of any later-created class of "pari passu debt," will be treated equally and without preference. Although we have no present intention of causing GWG Life to issue additional secured debt in the future, any such debt issued on a pari passu basis in the future (including renewals of outstanding L Bonds or other renewable pari passu debt) would also be treated equally and without preference in respect of all outstanding L Bonds and Seller Trust L Bonds. Thus, in the event of any default on the L Bonds (or any other debt securities of ours that are pari passu with the L Bonds) resulting in claims for payment or claims on collateral security, the holders of the L Bonds and all such other debt securities pari passu with the L Bonds (such as the Seller Trust L Bonds) would share in payment or collateral in proportion to the amount of principal and interest owed on each such debt instrument.

**Guarantee by GWG Life Subsidiary**

The payment of principal and interest on the L Bonds and Seller Trust L Bonds, including previously issued L Bonds, is fully and unconditionally guaranteed by GWG Life. There were approximately $1,315.0 million in principal amount of previously issued L Bonds and Seller Trust L Bonds outstanding as of December 31, 2019.

**Collateral Security**

The L Bonds are secured by the assets of GWG Holdings. We will grant a security interest in all of the assets of GWG Holdings to the indenture trustee for the benefit of the L Bond holders. The assets of GWG Holdings consist, and are expected to consist, primarily of (i) any cash proceeds received from its subsidiaries as distributions derived from life insurance assets of subsidiaries, (ii) all other cash and investments held in various accounts, (iii) the equity ownership interests in subsidiaries of GWG Holdings, including the equity ownership interest in GWG Life, together with (iv) all proceeds from the foregoing. This collateral security granted by us is referred to as the "GWG Holdings Assets Collateral."

As indicated above, our direct and wholly owned subsidiary, GWG Life, will fully and unconditionally guarantee our obligations under the L Bonds. This guarantee will be supported by GWG Life's grant of a security interest in all of its assets. The assets of GWG Life consist, and are expected to consist, primarily of (i) certain life insurance assets, (ii) any cash proceeds received from life insurance assets owned by GWG Life or received from DLP IV, as distributions derived from life insurance policies owned by that subsidiary,

App. 1047

(iii) all other cash and investments held by GWG Life in its various accounts, (iv) GWG Life's equity ownership interest in its direct subsidiaries, including DLP IV, together with (v) all proceeds from the foregoing. The collateral security granted by GWG Life pursuant to its guarantee of our obligations under the L Bonds is referred to as the "GWG Life Assets Collateral."

22

In addition, BCC and AltiVerse, collectively, have pledged 3,952,155 shares of our common stock to further secure our obligations under the L Bonds. This collateral security granted by BCC and Altiverse is referred to as the "GWG Holdings Equity Collateral."

Together, the GWG Holdings Assets Collateral, GWG Life Assets Collateral and GWG Holdings Equity Collateral comprise all of the collateral security for our obligations under the L Bonds. To the extent that we subsequently establish one or more wholly owned subsidiaries of GWG Holdings or GWG Life, the L Bonds will have a security interest in the equity ownership interests of those subsidiaries if and to the extent owned by GWG Holdings or GWG Life.

The guarantee by GWG Life is contained in the indenture, and the grant of security interests in the GWG Holdings Assets Collateral, GWG Life Assets Collateral and GWG Holdings Equity Collateral is effected through an "Amended and Restated Pledge and Security Agreement" that is an exhibit to the registration statement of which this prospectus forms a part. Neither the indenture nor the pledge and security agreement contain any provision preventing a pledging party from disposing of any collateral in the ordinary course of business. In this regard, the pledge and security agreement permits the disposition of GWG Holdings Equity Collateral to the extent the number of shares continuing to constitute such collateral represents at least 10% of the number of shares beneficially held by each individual grantor as of the date of the original pledge and security agreement.

Substantially all of our life insurance assets are held in our subsidiaries. The L Bonds will not be directly secured by any security interest in the assets of those subsidiaries, including DLP IV. Instead, the L Bonds will be secured by a pledge of the equity ownership interests in those subsidiaries, including DLP IV, owned by GWG Life by virtue of the guarantee provisions in the indenture and the pledge and security agreement referenced above. An equity ownership interest is, by its very nature, subordinate to the interests of creditors. **Therefore, although investors in the L Bonds will have a security interest in the ownership of DLP IV (and other direct subsidiaries of GWG Life) any claim they may have to the assets owned by such entity will be subordinate to the interests of creditors of that entity, including LNV Corporation, which is the lender to DLP IV under our second amended and restated senior credit facility, and all other creditors of DLP IV, including trade creditors. In addition, there is the risk that the collateral security granted for our obligations under the L Bonds may be insufficient to repay the L Bonds upon an event of default. See "Risk Factors — The collateral granted as security for our obligations under the L Bonds and Seller Trust L Bonds may be insufficient to repay the indebtedness upon an event of default**."

**Subordination; Other Indebtedness**

Our obligations under the L Bonds will be subordinate to all our senior debt. For this purpose, "our senior debt" presently includes all indebtedness owed or that may in the future become owing under our second amended and restated senior credit facility with LNV Corporation. As of December 31, 2019, DLP IV had approximately $184.6 million of debt outstanding under the second amended and restated credit facility with LNV Corporation. In addition, as of December 31, 2019, we had approximately $1,315.0 million in principal amount of debt outstanding under previously issued L Bonds and Seller Trust L Bonds.

The maximum amount of debt, including the L Bonds, we may issue is limited by the indenture. In particular, the indenture prohibits us from issuing debt in an amount such that our "debt coverage ratio" would exceed 90%. The indenture defines the debt coverage ratio as the ratio, expressed as percentage, of (A) the aggregate sum of all Indebtedness (other than Excluded Indebtedness) of GWG Holdings and its direct and indirect subsidiaries (including the Securities issued under the indenture, but excluding any Indebtedness of Ben LP and its direct and indirect subsidiaries) as reflected on GWG Holdings' most recent consolidated balance sheet prepared in accordance with GAAP over (B) the sum of (i) Net Present Asset Value of Life Insurance Policies owned by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding Life Insurance Policies held by Ben LP and its direct and indirect subsidiaries and controlled affiliates, plus (ii) all cash (and cash equivalents) held by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding the cash (and cash equivalents) held by Ben LP and its direct and indirect subsidiaries, plus (iii) the original cost basis in GWG Holdings' investment in common units or other securities of Ben LP, plus (iv) the outstanding principal amount of any outstanding loans made under a commercial loan agreement with GWG Life, as lender, plus (v) the cost basis of assets contributed to GWG Holdings or any direct or indirect subsidiary of GWG Holdings in connection with a Repurchase Transaction, plus (vi) without duplication, the value of all other assets of GWG Holdings and its direct and indirect subsidiaries or affiliates (but excluding the value of assets of Ben LP and its direct and indirect subsidiaries) as reflected on its most recent consolidated balance sheet prepared in accordance with GAAP.

We are required to notify the indenture trustee in the event we violate this restrictive covenant. An "event of default" will exist under the indenture if a violation of this covenant persists for a period of 30 calendar days after our initial notice to the trustee. The L Bonds are guaranteed by GWG Life but otherwise are not guaranteed by any of our subsidiaries, affiliates or control persons. Neither indenture nor the pledge and security agreement prevent holders of debt issued by our subsidiaries from disposing of, or exercising any other rights with respect to, any or all of the collateral securing that debt. Accordingly, in the event of a liquidation or dissolution of one of our subsidiaries (other than GWG Life), creditors of that subsidiary that are senior in rank will be paid in full, or provision for such payment will be made, from the assets of that subsidiary prior to distributing any remaining assets to us as an equity owner of that subsidiary.

The indenture also contains specific subordination provisions, benefitting lenders under any senior credit facility, restricting the right of L Bond holders to enforce certain of their rights in certain circumstances, including:

- a prohibition on challenging any enforcement action taken by a senior lender or interfering with any legal action or suits undertaken by our senior lenders against us and our affiliates;

- a 180-day standstill period during which there may not be brought any action against us or our affiliates to enforce rights respecting collateral unless our senior credit facilities have been repaid in full, which period may be extended if the senior lender takes action during such standstill period; and

- a prohibition on filing a bankruptcy or insolvency case against us or our affiliates for at least one year plus one day after the senior credit facility lenders have been paid in full.

We will not make any payment, direct or indirect (whether for interest, principal, as a result of any redemption or repayment at maturity, on default, or otherwise), on the L Bonds and any other indebtedness, and neither the holders of the L Bonds nor the trustee will have the right, directly or indirectly, to sue to enforce the indenture or the L Bonds, if a default or event of default under any senior credit facility has occurred and is continuing, or if any default or event of default under any senior credit facility would result from such payment, in each case unless and until:

- the default and event of default has been cured or waived or has ceased to exist; or

- in the case of a non-payment default that permits a senior lender to declare as due and payable all amounts owing under a senior credit facility (but where that senior lender has not yet so declared amounts as being due and payable), the end of the period commencing on the date the trustee receives written notice of default from the senior lender and ending on the earliest of (1) our discharge of the default (or other cure), (2) the trustee's receipt of a valid waiver of default from the senior lender, or (3) a written notice from the senior lender terminating the payment prohibition.

During any payment prohibition period, neither the holders of the L Bonds nor the trustee will have the right, directly or indirectly, to sue to enforce the indenture or the L Bonds. Other provisions of the indenture do permit the trustee to take action to enforce the payment rights of L Bond holders after 179 days have passed since the trustee's receipt of notice of default from a senior lender, but in such case any funds paid as a result of any such suit or enforcement action shall be applied toward the senior credit facility until the facility is indefeasibly paid in full before being applied to the L Bonds. The indenture contains provisions whereby each investor in the L Bonds consents to the subordination provisions contained in the indenture and related agreements governing collateral security.

If the 180-day standstill period noted above or any other limitation on the rights of the trustee or L Bond holders to assert their rights to payment of principal or interest under the indenture or L Bonds is ultimately determined to conflict with provisions of the Trust Indenture Act of 1939 (most notably sections 316(b) and 317(a) of that Act), then the trustee, as well as any holder who shall not have earlier consented to such subordination provisions, shall (notwithstanding such provision contained in the indenture) be authorized to institute a lawsuit for the enforcement of any payment of principal or interest after their respective due dates.

24

**No Sinking Fund**

The L Bonds are not associated with any sinking fund. A sinking fund is generally any account to which contributions will be made, from which payments of principal or interest owed on the L Bonds will be made. See "Risk Factors," page 11.

**Restrictive Covenants**

The indenture contains covenants that restrict us from certain actions as described below. In particular, the indenture provides that:

- we will not declare or pay any dividends or other payments of cash or other property solely in respect of our capital stock to our stockholders (other than a dividend paid in shares of our capital stock on a pro rata basis to all our stockholders) unless no default and no event of default with respect to the L Bonds exists or would exist immediately following the declaration or payment of the dividend or other payment;

- to the extent legally permissible, we will not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or the performance of the indenture;

- our Board of Directors will not adopt a plan of liquidation that provides for, contemplates or the effectuation of which is preceded by (a) the sale, lease, conveyance or other disposition of all or substantially all of our assets, otherwise than (i) substantially as an entirety, or (ii) in a qualified sales and financing transaction, and (b) the distribution of all or substantially all of the proceeds of such sale, lease, conveyance or other disposition and of our remaining assets to the holders of our capital stock, unless, prior to making any liquidating distribution pursuant to such plan, we make provision for the satisfaction of our obligations under the renewable unsecured subordinated notes; and

- our debt coverage ratio may not exceed 90%.

The indenture defines the debt coverage ratio as the ratio, expressed as percentage, of (A) the aggregate sum of all Indebtedness (other than Excluded Indebtedness) of GWG Holdings and its direct and indirect subsidiaries (including the Securities issued under the indenture, but excluding any Indebtedness of Ben LP and its direct and indirect subsidiaries) as reflected on GWG Holdings' most recent consolidated balance sheet prepared in accordance with GAAP over (B) the sum of (i) Net Present Asset Value of Life Insurance Policies owned by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding Life Insurance Policies held by Ben LP and its direct and indirect subsidiaries and controlled affiliates, plus (ii) all cash (and cash equivalents) held by GWG Holdings and its direct or indirect subsidiaries or affiliates, but excluding the cash (and cash equivalents) held by Ben LP and its direct and indirect subsidiaries, plus (iii) the original cost basis in GWG Holdings' investment in common units or other securities of Ben LP, plus (iv) the outstanding principal amount of any outstanding loans made under a commercial loan agreement with GWG Life, as lender, plus (v) the cost basis of assets contributed to GWG Holdings or any direct or indirect subsidiary of GWG Holdings in connection with a Repurchase Transaction, plus (vi) without duplication, the value of all other assets of GWG Holdings and its direct and indirect subsidiaries or affiliates (but excluding the value of assets of Ben LP and its direct and indirect subsidiaries) as reflected on its most recent consolidated balance sheet prepared in accordance with GAAP.

The indenture defines "Excluded Indebtedness" as Indebtedness or any portion thereof (A) the principal and accrued but unpaid interest of which is payable at GWG Holdings' option, pursuant to the terms of such Indebtedness or otherwise, in Capital Stock (as defined in the amended indenture) of GWG Holdings or securities mandatorily convertible into or exchangeable for Capital Stock of GWG Holdings, or (B) any Indebtedness that is reasonably expected to be converted or exchanged, directly or indirectly, into Capital Stock of GWG Holdings, provided that under the terms of such Indebtedness in the event any such conversion or exchange does not occur in accordance with the terms of such transaction, such Indebtedness would be cancelled and any assets received in exchange for such Indebtedness would be returned (a "Repurchase Transaction").

For this purpose, the net present asset value of our life insurance assets is equal to the present value of the face value of policy benefit assets we own, discounted at a rate equal to the weighted-average interest rate paid on indebtedness, excluding that of Seller Trust L Bonds. The net present asset value of our life insurance assets for purposes of this covenant is not necessarily the same as the net present asset value of our life insurance assets as reflected on our most recently available balance sheet prepared in accordance with GAAP and does not necessarily reflect the saleable or fair market value of those assets.

25

Importantly, we are not restricted from entering into "qualified sale and financing transactions" as defined in the indenture, or incurring additional indebtedness, including additional senior debt.

**Consolidation, Mergers or Sales**

The indenture generally permits a consolidation or merger between us and another entity. It also permits the sale or transfer by us of all or substantially all of our property and assets. These transactions are permitted if:

- the resulting or acquiring entity, if other than us, is a United States corporation, limited liability company or limited partnership and assumes all of our responsibilities and liabilities under the indenture, including the payment of all amounts due on the notes and performance of the covenants in the indenture; and

- immediately after the transaction, and after giving effect to the transaction, no event of default shall exist under the indenture.

If we consolidate or merge with or into any other entity or sell or lease all or substantially all of our assets, according to the terms and conditions of the indenture, the resulting or acquiring entity will be substituted for us in the indenture with the same effect as if it had been an original party to the indenture. As a result, the successor entity may exercise our rights and powers under the indenture in our name, and we (as an entity) will be released from all our liabilities and obligations under the indenture and under the L Bonds. Nevertheless, no such transaction will by itself eliminate or modify the collateral that we have provided as security for our obligations under the indenture.

**Events of Default and Remedies**

The indenture provides that each of the following constitutes an event of default:

- the failure to pay interest or principal on any L Bond for a period of 30 days after it becomes due and payable;

- a failure to observe or perform any material covenant, condition or agreement in the indenture, but only after notice of failure from the indenture trustee and such failure is not cured within 60 days;

- our debt coverage ratio exceeds 90% for a period of 30 consecutive calendar days, but only after notice of such breach from the indenture trustee and such breach is not cured within 60 days;

- certain events of bankruptcy, insolvency or reorganization with respect to us; or

- the cessation of our business.

In addition, a default under the indenture will create a default under our second amended and restated senior credit facility.

Through DLP IV, we are party to a second amended and restated senior credit facility with LNV Corporation, as the lender. CLMG Corp (referred to in this prospectus as CLMG) acts as the administrative agent for the lender under the second amended and restated senior credit facility.

Effective November 1, 2019, DLP IV entered into the second amended and restated senior credit facility with LNV Corporation, as lender, and CLMG Corp., as the administrative agent on behalf of the lenders under the agreement. The second amended and restated senior credit facility makes available a total of up to $300,000,000 in credit to DLP IV with a maturity date of September 27, 2029. Additional advances are available under the second amended and restated credit facility at the LIBOR rate as defined in the second amended and restated credit facility. Advances are available as the result of additional borrowing base capacity, created as the premiums and servicing costs of pledged life insurance policies become due. Interest will accrue on amounts borrowed under the second amended and restated credit facility at an annual interest rate, determined as of each date of borrowing or quarterly if there is no borrowing, equal to (A) the greater of 12-month LIBOR or the federal funds rate (as defined in the agreement) plus one-half of one percent per annum, plus (B) 7.50% per annum. The effective rate at December 31, 2019 was 9.54%. Interest payments are made on a quarterly basis. We may use proceeds of the line of credit to repay short-term debt, acquire additional life insurance assets and make additional investments in Beneficient.

Under the second amended and restated senior credit facility, DLP IV has granted the administrative agent, for the benefit of the lenders under the agreement, a security interest in all of its assets. As with prior collateral arrangements relating to the senior secured debt of GWG Holdings and its subsidiaries (on a consolidated basis), GWG Holdings' equity ownership in DLP IV will serve as collateral for

the obligations of GWG Holdings under its L Bonds (although the life insurance assets owned by DLP IV will not themselves serve directly as collateral for those obligations).

26

The second amended and restated senior credit facility does not require DLP IV to maintain a reserve account for future premiums.

In addition, the second amended and restated senior credit facility contains certain customary negative covenants restricting the ability of the borrower to directly or indirectly engage in a merger or exchange transaction, sell substantially all of its assets, or permit the amendment of the contracts governing the outstanding debt securities of GWG Holdings and its subsidiaries, without the prior consent of the lender.

The second amended and restated senior credit facility contains customary events of default (e.g., payment defaults, covenant defaults, cross-defaults, defaults arising by virtue of a change in control, and defaults arising from breaches of representations and warranties), as well as defaults for amendments to the organizational documents of the borrower, defaults from pledged policies falling out of good standing, the occurrence of an event that could terminate the arrangement by which GWG Life services the pledged life insurance policies, and the entry of a judgment against the borrower in an amount exceeding $50,000 without payment or discharge, or a stay of execution obtained, within 30 days thereafter.

The indenture requires that we give notice to the indenture trustee upon the occurrence of an event of default under the indenture, unless it has been cured or waived. The indenture trustee may then provide notice to the L Bond holders or withhold the notice if the indenture trustee determines in good faith that withholding the notice is in your best interest, unless the default is a failure to pay principal or interest on any L Bond.

If an event of default occurs, the indenture trustee or the holders of at least 25% in principal amount of the outstanding L Bonds, may by written notice to us declare the unpaid principal and all accrued but unpaid interest on the L Bonds to be immediately due and payable. Notwithstanding the foregoing, the indenture limits the ability of the L Bond holders to enforce certain rights under the indenture in certain circumstances. These limitations are required subordination provisions under our second amended and restated senior credit facility and are summarized above under "— Subordination; Other Indebtedness." The pledge and security agreement permits the trustee to exercise on behalf of the holders of L Bonds all rights and remedies as are available to a secured creditor under applicable law, subject to any limitations therein or in the indenture. In this regard, the trustee is not authorized under the pledge and security agreement to distribute in kind any collateral in its possession to the holders of L Bonds.

**Amendment, Supplement and Waiver**

Except as provided in this prospectus or the indenture, the terms of the indenture or the L Bonds then outstanding may be amended, supplemented or waived with the consent of the holders of at least a majority in principal amount of the L Bonds then outstanding (which consent will be presumed if a holder does not object within 30 days of a request for consent), and any existing default or compliance with any provision of the indenture or the L Bonds may be waived with the affirmative consent of the holders of a majority in principal amount of the then outstanding L Bonds.

Notwithstanding the foregoing, an amendment or waiver will not be effective with respect to the L Bonds held by a holder who him, her or itself has not consented if such amendment or waiver:

- reduces the principal of, or changes the fixed maturity of, any L Bond;

- reduces the rate of or changes the time for payment of interest, including default interest, on any L Bond;

- waives a default or event of default in the payment of principal or interest on the L Bonds, except for a rescission or withdrawal of acceleration of the L Bonds made by the holders of at least a majority in aggregate principal amount of the then-outstanding L Bonds and a waiver of the payment default that resulted from such acceleration;

- makes any change in the provisions of the indenture relating to waivers of past defaults or the rights of holders of L Bonds to receive payments of principal of or interest on the L Bonds; or

- makes any change to the subordination provisions of the indenture that has a material adverse effect on holders of L Bonds.

27

Notwithstanding the foregoing, the following kinds of amendments or supplements to the indenture may be effected by us and the trustee without any consent of any holder of the L Bonds:

- to cure any ambiguity, defect or inconsistency;

- to provide for assumption of our obligations to holders of the L Bonds in the case of a merger, consolidation or sale of all or substantially all of our assets;

- to provide for additional uncertificated or certificated L Bonds;

- to make any change that does not materially and adversely affect the legal rights under the indenture of any holder of L Bonds, including but not limited to an increase in the aggregate dollar amount of L Bonds which may be outstanding under the indenture and limited in amount thereunder;

- to modify or eliminate our policy regarding redemptions elected by a holder of L Bonds prior to maturity, including our obligation to redeem L Bonds upon the death, bankruptcy or total permanent disability of any holder of the L Bonds, but only so long as such modifications do not materially and adversely affect any then-existing obligations under pending repurchase commitments for L Bonds;

- to comply with requirements of the SEC in order to effect or maintain the qualification of the indenture under the Trust Indenture Act of 1939, or to comply with other applicable federal or state laws or regulations;

- to comply with the rules or policies of a depositary of the L Bonds; or

- in connection with an amendment, extension, replacement, renewal or substitution of any senior debt, to amend the subordination provisions of the indenture to conform to the reasonable requirements of the holder or holders of such senior debt.

**Rights of L Bond Holders**

As an L Bond holder, you have limited rights to vote on our actions as set forth in the indenture. In general, you will have the right to vote on whether or not to approve some amendments to the indenture. For a description of these rights, see "— Amendment, Supplement and Waiver" above. You will also have the right to direct some actions that the trustee takes if there is an event of default with respect to the L Bonds. For a description of these rights, see above under the caption "— Events of Default." For a complete description of your rights as an L Bond holder, we encourage you to read a copy of the indenture, which is filed as an exhibit to the registration statement of which this prospectus is a part. We will also provide you with a copy of the indenture upon your request.

The trustee and the L Bond holders will have the right to direct the time, method and place of conducting any proceeding for some of the remedies available, except as otherwise provided in the indenture. The trustee may require reasonable indemnity, satisfactory to the trustee, from L Bond holders before acting at their direction. You will not have any right to pursue any remedy with respect to the indenture or the L Bonds unless you satisfy the conditions contained in the indenture.

**The Indenture Trustee**

*General*

Bank of Utah has agreed to be the trustee under the indenture. The indenture contains certain limitations on the rights of the trustee, should it become one of our creditors, to obtain payment of claims in certain cases, or to realize on certain property received in respect of any claim as security or otherwise. The trustee will be permitted to engage in other transactions with us.

Subject to certain exceptions, the holders of a majority in principal amount of the then-outstanding L Bonds will have the right to direct the time, method and place of conducting any proceeding for exercising any remedy available to the trustee. The indenture provides that if an event of default specified in the indenture shall occur and not be cured, the trustee will be required, in the exercise of its power, to use the degree of care of a reasonable person in the conduct of his own affairs. Subject to such provisions, the trustee will be under no obligation to exercise any of its rights or powers under the indenture at the request of any holder of L Bonds, unless the holder shall have offered to the trustee security and indemnity satisfactory to it against any loss, liability or expense.

*Resignation or Removal of the Trustee*

The trustee may resign at any time, or may be removed by the holders of a majority of the aggregate principal amount of the outstanding L Bonds. In addition, we may remove the trustee for certain failures in its duties, including the insolvency of the trustee or the trustee's ineligibility to serve as trustee under the Trust Indenture Act of 1939. However, no resignation or removal of the trustee may become effective until a successor trustee has accepted the appointment as provided in the indenture.

28

*Reports to Trustee*

We will provide the trustee with (i) a calculation date report within 45 days after the end of each fiscal quarter containing a calculation of the debt coverage ratio that includes a summary of all cash, life insurance policy investments serving as collateral, as well as our total outstanding indebtedness including outstanding principal balances, interest credited and paid, transfers made, any redemption or repayment and interest rate paid; (ii) copies of our audited annual financials, no earlier than when the same become a matter of public record; and (iii) any additional information reasonably requested by the trustee.

**Certain Charges**

We and our servicing agents, if any, may assess service charges for changing the registration of any L Bond to reflect a change in name of the holder, multiple changes in interest payment dates or transfers (whether by operation of law or otherwise) of an L Bond by the holder to another person. The indenture permits us to set off, against amounts otherwise payable to you under the L Bonds, the amount of these charges.

**Variations in Terms and Conditions**

We may from time to time vary the terms and conditions of the L Bonds offered, including but not limited to minimum initial principal investment amount requirements, maximum aggregate principal amount limits, interest rates, minimum denominations, service and other fees and charges, and redemption provisions. Terms and conditions may be varied by state, locality, principal amount, type of investor (for example, new or current investor) or as otherwise permitted under the indenture governing the securities offered by this prospectus. No change in terms, however, will apply to any L Bonds already issued and outstanding at the time of such change.

**Satisfaction and Discharge of Indenture**

The indenture shall cease to be of further effect upon the payment in full of all of the outstanding L Bonds and the delivery of an officer's certificate to the trustee stating that we do not intend to issue additional L Bonds under the indenture or, with certain limitations, upon deposit with the trustee of funds sufficient for the payment in full of all of the outstanding L Bonds.

**Reports**

We will publish annual reports containing financial statements and quarterly reports containing financial information for the first three quarters of each fiscal year. We will send copies of these reports, at no charge, to any holder of L Bonds who sends us a written request.

29

**PLAN OF DISTRIBUTION**

**General**

We are offering up to 2,000,000 Units, representing $2,000,000,000 in aggregate principal amount, of L Bonds (referred to throughout this prospectus simply as "L Bonds") on a continuous basis. The L Bonds will be sold at $1,000 per Unit, and in minimum amounts of 25 Units, or $25,000 or more in principal. There is no minimum amount of L Bonds that must be sold before we access and use the proceeds. The proceeds of new sales of L Bonds will be paid directly to us promptly following each sale and will not be placed in an escrow account. Even if we sell less than the entire $2,000,000,000 in aggregate principal amount of L Bonds Units being offered, the L Bonds that we sell will be issued, and the proceeds of those L Bond sales will be used by us, as described in this prospectus.

The L Bonds will be offered and sold on a best efforts basis by Emerson Equity LLC (our "dealer manager"). Our dealer manager will enter into participating dealer agreements with certain other broker-dealers that are members of FINRA, referred to as "selling group members," to authorize those broker-dealers to sell our L Bonds. The L Bonds will be offered to the public on the terms set forth in this prospectus and any prospectus supplements we may file from time to time. Neither our dealer manager nor any selling group members will have any obligation to take or purchase any L Bonds. In addition to forming the selling group, our dealer manager provides services to us, which include conducting broker-dealer seminars, holding informational meetings and providing information and answering any questions investors or selling group members may have concerning this offering.

Members of the selling group will receive sales commissions of up to 5.00% of the gross offering proceeds depending upon the maturity of the L Bonds sold. In addition, our dealer manager and selling group members may receive up to 3.00% of the gross offering proceeds as additional compensation consisting of the following:

- a dealer-manager fee payable to the dealer manager in an amount equal to 0.40% of the principal amount of all L Bonds sold;

- an accountable expense allowance to be paid to the selling group members, which may include due diligence expenses of the dealer manager and selling group members set forth in a detailed and itemized invoice and as further described below;

- wholesaling fees, which may consist of commissions and non-transaction-based compensation of the wholesalers;

- non-cash compensation, which may consist of an occasional meal, a ticket to a sporting event or the theater, or comparable entertainment that is neither so frequent nor so extensive as to raise any question of propriety and is not preconditioned on achievement of a sales target, the national and regional sales conferences of our selling group members, training and education meetings for registered representatives of our selling group members, and permissible forms of non-cash compensation to registered representatives of our selling group members, such as gifts that do not exceed an aggregate value of $100 per annum per registered representative and that are not pre-conditioned on achievement of a sales target, including but not limited to seasonal gifts; and

- up to a 1.00% reallowance to selling group members.

As part of the accountable expense allowance, the dealer manager and selling group members are expected to be reimbursed for accountable out-of-pocket expenses incurred by them during the course of the offering. Expenses eligible for reimbursement may include:

- travel, lodging, and meals for the wholesalers who are our employees and associated with the dealer manager;

- reasonable out-of-pocket expenses incurred by selling group members and their associated persons, including reimbursement of actual costs of third-party professionals retained by them; and

- due diligence expenses of the dealer manager and selling group members set forth in a detailed and itemized invoice.

Upon the sale of L Bonds by a selling group member, the selling group member effecting the sale will receive selling commissions and additional compensation in connection therewith pursuant to the terms of the soliciting dealer agreement between the dealer manager and the selling group member.

In no event will the total selling commissions and additional compensation, including accountable due diligence expenses and reimbursements, exceed 8.00% of the aggregate gross offering proceeds we receive from the sale of L Bonds.

We may also sell our L Bonds at a discount through the following distribution channels in the event that the investor:

- purchases L Bonds through fee-based programs, also known as wrap accounts;

- purchases L Bonds through a selling group member that has an alternative fee arrangement with its clients;

- purchases L Bonds through certain registered investment advisers;

- purchases L Bonds through bank trust departments or any other organization or person authorized to act in a fiduciary capacity for its clients or customers; or

- is an endowment, foundation, pension fund or other institutional investor.

If an investor purchases shares through one of the above distribution channels in our offering, we will sell the L Bonds at a discount, reflecting that selling commissions are not being paid in connection with such purchase. The public offering price will be decreased by an amount equal to such reduction; however, the net proceeds to us will not be affected by any such reduction in selling commissions.

Our officers and directors and their family members may purchase the L Bonds offered hereby for investment and not for distribution at a discount from the public offering price. For purposes of this discount, we consider a family member to be a spouse, parent, child, sibling, mother- or father-in-law, son- or daughter-in-law or brother- or sister-in-law. In addition, if approved by our Board of Directors, certain of our joint venture partners, consultants and other service providers may purchase the L Bonds offered hereby at a discount from the public offering price. We will sell such L Bonds reflecting that selling commissions will not be paid in connection with such sales. The public offering price will be decreased by an amount equal to such reduction; however, the net proceeds to us from such sales made net of commissions will be the same as the net proceeds we receive from other sales of L Bonds.

Also, we may sell L Bonds to the dealer manager, selling group members, their retirement plans, their representatives and the family members as described above, IRAs and qualified plans of their representatives at a purchase price reflecting that selling commissions will not be payable in consideration of the services rendered by such dealer manager, selling group members, and their representatives in the offering. Such sales, however, may not be made for the period of time from the effective date through 90 days after the effective date. The public offering price will be decreased by an amount equal to such reduction; however, the net proceeds to us from the sales of these L Bonds will be the same as the net proceeds we receive from other sales of L Bonds.

Neither our dealer manager nor its affiliates will directly or indirectly compensate any person engaged as an investment advisor or a bank trust department by a potential investor as an inducement for such investment advisor or bank trust department to advise favorably for an investment in the L Bonds offered hereby. Also, we will not pay referral or similar fees to any accountants, attorneys or other persons in connection with the distribution of the L Bonds.

In addition to the sales commissions, fees, allowances, reimbursements and expenses described above, we expect to pay approximately $2,400,000 in offering and related costs and expenses in connection with this offering. These kinds of expenses include all expenses to be paid by us in connection with the offering (other than sales commissions, additional compensation, and expense allowances and reimbursement to our selling group members), including but not limited to legal, accounting, printing and mailing expenses, registration, qualification and associated securities filing fees and other costs and expenses.

31

The table below sets forth the maximum amount of sales commissions and additional compensation, as described in footnote (1) to the table below, we may pay in connection with this offering.

| L Bond Term | Sales Commission | Additional Compensation[1] | Total[2] |
|---|---|---|---|
| 2 years | 3.25% | 4.75% | 8.00% |
| 3 years | 4.25% | 3.75% | 8.00% |
| 5 years | 4.90% | 3.10% | 8.00% |
| 7 years | 5.00% | 3.00% | 8.00% |

(1)  As described above, additional compensation includes: (i) a dealer-manager fee payable to the dealer manager in an amount equal to 0.40% of the principal amount of all L Bonds sold; (ii) an accountable expense allowance to the selling group members as described above, which may include due-diligence expenses of the dealer manager and selling group members set forth in a detailed and itemized invoice; (iii) wholesaling fees, which may consist of commissions and non-transaction-based compensation of the wholesalers; (iv) non-cash compensation, which may consist of an occasional meal, a ticket to a sporting event or the theater, or comparable entertainment that is neither so frequent nor so extensive as to raise any question of propriety and is not preconditioned on achievement of a sales target, the national and regional sales conferences of our selling group members, training and education meetings for registered representatives of our selling group members, and permissible forms of non-cash compensation to registered representatives of our selling group members, such as gifts that do not exceed an aggregate value of $100 per annum per registered representative and that are not pre-conditioned on achievement of a sales target, including but not limited to seasonal gifts; and (v) up to a 1.00% reallowance to selling group members.

(2)  The combined selling commissions and additional compensation for this offering will not exceed 8.00% of the aggregate gross proceeds of this offering.

The line items reflected in the table below are our current estimates of average sales commissions and additional compensation (including accountable expenses) that we will pay. Specifically, we estimate that the average sales commission will be 5.00%, or $100,000,000 based on $2,000,000,000 in principal amount of L Bonds sold, and the average additional compensation will be 3.00%, or $60,000,000 based on $2,000,000,000 in principal amount of L Bonds sold. The components of "additional compensation" are detailed in footnote (1) to the table above. Actual costs may differ from the percentages and amounts shown in the table below, subject, however, to the limitations noted above.

| L Bonds Sold | Sales Commission | Additional Compensation | Total |
|---|---|---|---|
| $  500,000,000 | $  25,000,000 | $  15,000,000 | 8.00% |
| $  750,000,000 | $  37,500,000 | $  22,500,000 | 8.00% |
| $2,000,000,000 | $100,000,000 | $  60,000,000 | 8.00% |

The wholesalers employed by us are registered with and associated persons of our dealer manager. The wholesalers will:

- attend local, regional and national conferences of the selling group members; and

- contact selling group members and their registered representatives to make presentations concerning us and this offering.

The wholesalers will receive a portion of their non-transaction based compensation as compensation for their selling efforts. We host training and education meetings for selling group members and their representatives. The costs of the training and education meetings will be borne by us, but counted toward the 8.00% underwriting compensation limit.

Certain of our employees who are also registered representatives and supervisory principals of the dealer manager have been granted certain share appreciation rights ("SARs") as part of their compensation. The SARs give such individual the contractual right to receive from us additional cash compensation at any point before the SAR's expiration, but only if the price of our common stock has increased between the grant date and the date when we receive notice of such individual's intention to exercise the SAR. At the termination of this offering, the aggregate of the appreciation amount, as defined in the SAR agreement, will be calculated and added to the other items of value (e.g., selling commissions and additional forms of compensation) to ensure that aggregate compensation paid in connection with this offering does not exceed 8.00% of the gross offering proceeds.

In accordance with FINRA rules, in no event will our total compensation to FINRA members, including but not limited to sales commissions, the dealer-manager fee and accountable expense and other reimbursements to our dealer manager and selling group members, including non-transaction-based compensation of the wholesalers and non-cash compensation, exceed 8.00% of our gross offering proceeds, in the aggregate.

We will indemnify the selling group members and our dealer manager against some civil liabilities, including certain liabilities under the Securities Act of 1933, as amended, and liabilities arising from breaches of our representations and warranties contained in the Dealer Manager Agreement.

<center>32</center>

The foregoing is a summary of the material terms relating to the plan of distribution of the L Bonds contained in the Dealer Manager Agreement. Any amendment to the Dealer Manager Agreement will be filed as an exhibit to an amendment to the registration statement of which this prospectus is a part.

**Settlement Procedures**

You can place an order for the purchase of L Bonds using DTC Settlement through your selling group member. A selling group member using DTC settlement will have an account with a DTC participant in which your funds will be placed to facilitate settlement. Orders may be placed until the cyclical order due date. Orders will be executed by such selling group member electronically and you must coordinate with your selling group member's registered representative to pay the full purchase price of the L Bonds by the trade date. If you purchase your L Bonds using DTC settlement, you will be credited with ownership of an L Bond on the second business day after the end of the DTC closing cycle in which the subscription is made (typically, closings will occur on a bi-monthly cycle). If you purchase your L Bonds in this manner, your purchase price will not be held in escrow.

You also have the option to elect to settle your purchase directly with us, the Company. If you elect to use direct settlement with us, you should complete and sign a Subscription Agreement similar to the one filed as an exhibit to the registration statement of which this prospectus is a part. A form of Subscription Agreement is available from your selling group member's registered representative. Once completed and signed, your Subscription Agreement should be provided to your selling group member who will deliver it to us to be held, together with your related subscription funds, until our acceptance of your subscription. In connection with a direct settlement subscription, you should pay the full purchase price of the L Bonds to us as set forth in the Subscription Agreement. Subscribers may not withdraw funds from the subscription account. Subscriptions will be effective upon our acceptance of your Subscription Agreement and related funds, and we reserve the right to reject any subscription in whole or in part.

**Covered Security**

Our L Bonds are a "covered security." The term "covered security" applies to securities exempt from state registration because of their oversight by federal authorities and national-level regulatory bodies pursuant to Section 18 of the Securities Act of 1933. Generally, securities listed on national exchanges are the most common type of covered security exempt from state registration. A non-traded security also can be a covered security if it has a seniority greater than or equal to other securities from the same issuer that are listed on a national exchange. Our L Bonds are a covered security because they are senior to our common stock, which is listed on The Nasdaq Capital Market, and therefore our offering of L Bonds will be exempt from state registration.

**Although the status of our L Bonds as a "covered security" will facilitate their purchase and sale to a broader range of investors than would otherwise be available to us, and although the offer and sale of a "covered security" generally involves fewer issuance costs to the issuer of such securities, our L Bonds are not a suitable purchase for all investors. Investors are urged to read carefully the risk factors relating to our business and our Company contained in the Risk Factors section of this prospectus beginning on page 11 and under Item 1A, entitled "Risk Factors," of our Annual Report on Form 10-K for the year ended December 31, 2019, which is incorporated by reference herein. In addition, investors should understand that because our L Bonds are a "covered security" exempt from state securities regulations, neither our Company, the L Bonds, or any other aspects of this offering have been the subject of any merit-based review by state securities regulators.**

## MATERIAL FEDERAL INCOME TAX CONSIDERATIONS

The following is a general discussion of the material United States ("U.S.") federal income tax considerations relating to the initial purchase, ownership and disposition of the L Bonds by U.S. and non-U.S. holders. This discussion is a summary only and is not a complete analysis of all the potential tax considerations relating to the purchase, ownership and disposition of the L Bonds. We have based this summary on current provisions of the Code of 1986, as amended (the "Code"), applicable U.S. Treasury Regulations promulgated thereunder, judicial opinions, and published rulings of the Internal Revenue Service (the "IRS"), all as in effect on the date of this prospectus. However, these laws and other guidance are subject to differing interpretations or change, possibly with retroactive effect. In addition, we have not sought, and will not seek, a ruling from the IRS or an opinion of counsel with respect to any tax consequences of purchasing, owning or disposing of L Bonds. Thus, the IRS could take a different position regarding one or more of the tax consequences or matters described in this prospectus; and there can be no assurance that any position taken by the IRS would not be sustained.

This discussion is limited to purchasers of L Bonds who acquire the L Bonds from us in this offering and hold the L Bonds as capital assets for federal income tax purposes. This discussion does not address all possible tax consequences that may be applicable to you in light of your specific circumstances. For instance, this discussion does not address the alternative minimum tax provisions of the Code, or special rules applicable to some categories of investors such as financial institutions, insurance companies, tax-exempt organizations, dealers in securities, real estate investment trusts, regulated investment companies, or persons who hold L Bonds as part of a hedge, conversion or constructive sale transaction, straddle or other risk reduction transaction that may be subject to special rules. This discussion also does not address the tax consequences arising under the laws of any foreign, state or local jurisdiction; or any U.S. estate or gift tax laws.

If you are considering the purchase of an L Bond, you should consult your own tax advisors as to the particular tax consequences to you of acquiring, holding or otherwise disposing of the L Bonds, including the effect and applicability of state, local or foreign tax laws, or any U.S. estate and gift tax laws.

As used in this discussion, the term "U.S. holder" means a holder of an L Bond that is:

(i)   for United States federal income tax purposes, a citizen or resident of the United States;

(ii)  a corporation, partnership or other entity created or organized in or under the laws of the United States or of any political subdivision thereof or other entity characterized as a corporation or partnership for federal income tax purposes;

(iii) an estate, the income of which is subject to United States federal income taxation regardless of its source; or

(iv)  a trust, the administration of which is subject to the primary supervision of a court within the United States and which has one or more United States persons with authority to control all substantial decisions, or if the trust was in existence on August 20, 1996, and has elected to continue to be treated as a United States trust.

For the purposes of this discussion, a "non-U.S. holder" means any holder of L Bonds other than a U.S. holder. Any L Bond purchaser who is not a U.S. citizen will be required to furnish documentation, on IRS Form W-8BEN, that clearly states whether it is subject to U.S. withholding taxes, in accordance with applicable requirements of the United States taxing authority.

**Characterization of the L Bonds**

The federal income tax consequences of owning L Bonds depend on characterization of the L Bonds as debt for federal income tax purposes, rather than as equity interests or a partnership among the holders of the L Bonds. We believe that the L Bonds have been structured in a manner that will allow the L Bonds to be characterized as debt for federal income tax purposes. However, this is only our belief; and no ruling from the IRS or an opinion of counsel has been sought in this regard. Thus, the IRS could successfully challenge this characterization.

If the L Bonds were treated as equity interests, there could be adverse effects on some holders. For example, payments on the L Bonds could (1) if paid to non-U.S. holders, be subject to federal income tax withholding; (2) constitute unrelated business taxable income to some tax-exempt entities, including pension funds and some retirement accounts (if the relationship were characterized as a partnership for tax purposes); and (3) cause the timing and amount of income that accrues to holders of L Bonds to be different from that described below.

App. 1063

Because of these potential adverse effects, you are urged to consult your own tax advisors as to the tax consequences that may apply to your particular situation in the event the L Bonds are re-characterized as equity interests; and as to the likelihood that the L Bonds could be so re-characterized. The remainder of this discussion assumes that the L Bonds are characterized as debt.

**Taxation of U.S. Holders**

*Stated Interest*

Under general federal income tax principles, you must include stated interest in income in accordance with the method of accounting you use for federal income tax purposes. Accordingly, if you are using the accrual method of tax accounting, you must include stated interest in income as it accrues. If you are using the cash method of tax accounting, you must include stated interest in income as it is actually or constructively received. Payments of interest to taxable holders of L Bonds will constitute portfolio income, and not passive activity income, for the purposes of the passive loss limitations of the Code. Accordingly, income arising from payments on the L Bonds will not be subject to reduction by losses from passive activities of a holder.

If a partnership (or other entity or arrangement treated as a partnership for U.S. federal income tax purposes) holds L Bonds, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership. If you are a partner in a partnership purchasing L Bonds, we urge you to consult your tax advisor.

*Disposition of L Bonds*

In general, a U.S. holder will recognize gain or loss upon the sale, exchange or other taxable disposition of an L Bond measured by the difference between (1) the sum of the cash and the fair market value of all other property received on such disposition, excluding any portion of the payment that is attributable to accrued interest on the L Bonds; and (2) your adjusted tax basis in the L Bond. A U.S. holder's adjusted tax basis in an L Bond generally will be equal to the price the U.S. holder paid for the L Bond. Any of this gain or loss generally will be long-term capital gain or loss if, at the time of any such taxable disposition, the L Bond was a capital asset in the hands of the holder and was held for more than one year. Net long-term capital gain recognized by individual U.S. holders is eligible for a reduced rate of taxation. The deductibility of capital losses is subject to annual limitations.

The terms of the L Bonds may be modified upon the consent of a specified percentage of holders and, in some cases, without consent of the holders. In addition, the L Bonds may be assumed upon the occurrence of specific transactions. The modification or assumption of an L Bond could, in some instances, give rise to a deemed exchange of an L Bond for a new debt instrument for federal income tax purposes. If an exchange is deemed to occur by reason of a modification or assumption, you could realize gain or loss without receiving any cash.

*Additional Tax on Net Investment Income*

If you are a U.S. holder other than a corporation, you generally will be subject to a 3.8% additional tax on the lesser of (1) your "net investment income" for the taxable year, and (2) the excess of your modified adjusted gross income for the taxable year over a certain threshold. Your net investment income generally will include any income or gain recognized by you with respect to our L Bonds, unless such income or gain is derived in the ordinary course of the conduct of your trade or business (other than a trade or business that consists of certain passive or trading activities).

**Considerations for Tax-Exempt Holders of L Bonds**

Tax-exempt entities, including charitable corporations, pension plans, profit sharing or stock bonus plans, individual retirement accounts and some other employee benefit plans are subject to federal income tax on unrelated business taxable income. For example, net income derived from the conduct of a trade or business regularly carried on by a tax-exempt entity or by a partnership in which it is a partner is treated as unrelated business taxable income.

A $1,000 special deduction is allowed in determining the amount of unrelated business taxable income subject to tax. Tax-exempt entities taxed on their unrelated business taxable income are also subject to the alternative minimum tax for items of tax preference which enter into the computation of unrelated business taxable income.

35

In general, interest income does not constitute unrelated business taxable income. However, under the debt-financed property rules, if tax-exempt holders of L Bonds finance the acquisition or holding of L Bonds with debt, interest on the L Bonds will be taxable as unrelated business taxable income. The L Bonds will be treated as debt-financed property if the debt was incurred to acquire the L Bonds or was incurred after the acquisition of the L Bonds, so long as the debt would not have been incurred but for the acquisition and, at the time of the acquisition, the incurrence of the debt has already occurred or was foreseeable.

**Non-U.S. Holders**

The following discussion is a summary of the principal U.S. federal income consequences resulting from the ownership of the L Bonds by non-U.S. holders. However, application of the U.S. federal income tax rules associated with non-U.S. holders is complex and factually sensitive. Thus, if you could be considered to be a non-U.S. holder, you are urged to consult your own tax advisors with respect to the application of the federal income tax rules for your particular situation.

*Payments of Interest to Non-U.S. Holders*

Subject to the discussion below under "Backup Withholding and Information Reporting," payments of interest received by a non-U.S. holder generally will not be subject to U.S. federal withholding tax, provided (1) that (a) the non-U.S. holder does not own, actually or constructively, 10% or more of the total combined voting power of all classes of our stock entitled to vote; (b) the non-U.S. holder is not a controlled foreign corporation, actually or constructively, through stock ownership; and (c) the beneficial owner of the L Bond complies with the certification requirements, including delivery of a statement, signed by the holder under penalties of perjury, certifying that the holder is a foreign person and provides its name and address; or (2) that the non-U.S. holder is entitled to the benefits of an income tax treaty under which the interest is exempt from U.S. withholding tax and the non-U.S. holder complies with the reporting requirements. If an L Bond is held through a securities clearing organization or other specified financial institutions (an "Intermediary"), the Intermediary may provide the relevant signed statement and, unless the Intermediary is a "qualified" intermediary as defined under the Code, the signed statement provided by the Intermediary must be accompanied by a copy of a valid Form W-8BEN provided by the non-U.S. beneficial holder of the L Bond.

Payments of interest not exempt from United States federal withholding tax as described above will be subject to a withholding tax at the rate of 30%, subject to reduction under an applicable income tax treaty.

Payments of interest on an L Bond to a non-U.S. holder generally will not be subject to U.S. federal income tax, as opposed to withholding tax, unless the income is effectively connected with the conduct by the non-U.S. holder of a trade or business in the United States. To claim the benefit of a lower treaty withholding rate, a non-U.S. holder must provide a properly executed IRS Form W-8BEN to us or our paying agent before the payment of stated interest; and may be required to obtain a U.S. taxpayer identification number and provide documentary evidence issued by foreign governmental authorities to prove residence in the foreign country. You should consult your own tax advisor to determine the effects of the application of the U.S. federal withholding tax to your particular situation.

*Disposition of the L Bonds by Non-U.S. Holders*

Subject to the discussion below under "Backup Withholding and Information Reporting," a non-U.S. holder generally will not be subject to United States federal income tax, and generally no tax will be withheld with respect to gains realized on the disposition of an L Bond, unless (a) the gain is effectively connected with a United States trade or business conducted by the non-U.S. holder or (b) the non-U.S. holder is an individual who is present in the United States for 183 or more days during the taxable year of the disposition and other requirements are satisfied.

*Non-U.S. Holders Subject to U.S. Income Taxation*

If interest and other payments received by a non-U.S. holder with respect to the L Bonds, including proceeds from the disposition of the L Bonds, are effectively connected with the conduct by the non-U.S. holder of a trade or business within the United States, or the non-U.S. holder is otherwise subject to United States federal income taxation on a net basis with respect to the holder's ownership of the L Bonds, or are individuals that have by operation of law become residents in the United States for federal income tax purposes, the non-U.S. holder generally will be subject to the rules described above applicable to U.S. holders of L Bonds, subject to any modification provided under an applicable income tax treaty. If any of these non-U.S. holders is a corporation, it may also be subject to a U.S. "branch profits tax" at a 30% rate.

**Backup Withholding and Information Reporting**

Non-corporate U.S. holders may be subject to backup withholding at a rate of 28% on payments of principal, premium, and interest on, and the proceeds of the disposition of, the L Bonds. In general, backup withholding will be imposed only if the U.S. holder (1) fails to furnish its taxpayer identification number ("TIN"), which for an individual would be his or her Social Security number; (2) furnishes an incorrect TIN; (3) is notified by the IRS that it has failed to report payments of interest or dividends; or (4) under some circumstances, fails to certify under penalty of perjury that it has furnished a correct TIN and has been notified by the IRS that it is subject to backup withholding tax for failure to report interest or dividend payments. In addition, the payments of principal and interest to U.S. holders generally will be subject to information reporting. You should consult your tax advisors regarding your qualification for exemption from backup withholding and the procedure for obtaining an exemption, if applicable.

Backup withholding generally will not apply to payments made to a non-U.S. holder of an L Bond who provides the certification that it is a non-U.S. holder, and the payor does not have actual knowledge that a certificate is false, or otherwise establishes an exemption from backup withholding. Payments by United States office of a broker of the proceeds of a disposition of the L Bonds generally will be subject to backup withholding at a rate of 28% unless the non-U.S. holder certifies it is a non-U.S. holder under penalties of perjury or otherwise establishes an exemption. In addition, if a foreign office of a foreign custodian, foreign nominee or other foreign agent of the beneficial owner, or if a foreign office of a foreign "broker" pays the proceeds of the sale of an L Bond to the seller, backup withholding and information reporting will not apply; provided that the nominee, custodian, agent or broker is not a "United States related person," or a person which derives more than 50% of its gross income for some periods from the conduct of a trade or business in the United States or is a controlled foreign corporation. The payment by a foreign office of a broker that is a United States person or a United States related person of the proceeds of the sale of L Bonds will not be subject to backup withholding, but will be subject to information reporting unless the broker has documentary evidence in its records that the beneficial owner is not a United States person for purposes of the backup withholding and information reporting requirements and other conditions are met, or the beneficial owner otherwise establishes an exemption.

The amount of any backup withholding imposed on a payment to a holder of an L Bond will be allowed as a credit against the holder's United States federal income tax liability and may entitle the holder to a refund; provided that the required information is furnished to the IRS.

<h2 style="text-align:center">STATE, LOCAL AND FOREIGN TAXES</h2>

We make no representations regarding the tax consequences of the purchase, ownership or disposition of the L Bonds under the tax laws of any state, locality or foreign country. You should consult your own tax advisors regarding these state and foreign tax consequences.

<div style="text-align:center">37</div>

**ERISA CONSIDERATIONS**

**General**

Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and Section 4975 of the Code impose restrictions on employee benefit plans that are subject to ERISA, or plans or arrangements that are subject to Code Section 4975, and on persons who are parties in interest or disqualified persons with respect to those plans or arrangements. Some employee benefit plans, like governmental plans and church plans (if no election has been made under Section 410(d) of the Code), are not subject to the restrictions of Title I of ERISA or Code Section 4975, and assets of these plans may be invested in the L Bonds without regard to the ERISA considerations described below, subject to the Code and other applicable federal and state laws affecting tax-exempt organizations generally. Any plan fiduciary that proposes to cause a plan to acquire any of the L Bonds should consult with its counsel with respect to the potential consequences under ERISA and the Code of the plan's acquisition and ownership of the L Bonds. Investments by plans are also subject to ERISA's and the Code's general fiduciary requirements, including the requirement of investment prudence and diversification and the requirement that a plan's investments be made in accordance with the documents governing the plan.

**Prohibited Transactions**

*General*

Section 406 of ERISA and Section 4975 of the Code prohibits certain "parties in interest" and "disqualified persons" with respect to a plan from engaging in select transactions involving a plan and its assets unless a statutory, regulatory or administrative exemption applies to the transaction. Section 4975 of the Code imposes excise taxes on parties in interest that engage in non-exempt "prohibited transactions." Section 502(i) of ERISA requires the Secretary of the U.S. Department of Labor ("Labor") to assess a civil penalty against a fiduciary who breaches any fiduciary responsibility under, or commits any other violation of, part 4 of Title I of ERISA, or any other person who knowingly participates in a breach or violation.

*Plan Asset Regulations*

Labor has issued regulations concerning the definition of what constitutes the assets of a plan for purposes of ERISA and the prohibited transaction provisions of the Code. The plan asset regulations describe the circumstances where the assets of an entity in which a plan invests will be considered to be "plan assets," so that any person who exercises control over the assets would be subject to ERISA's fiduciary standards. Generally, under the plan asset regulation, when a plan invests in another entity, the plan's assets do not include, solely by reason of the investment, any of the underlying assets of the entity. However, the plan asset regulation provides that, if a plan acquires an "equity interest" in an entity that is neither a "publicly-offered security" nor a security issued by an investment company registered under the Investment Company Act of 1940 the assets of the entity will be treated as assets of the plan investor unless exceptions apply.

Under the plan asset regulations the term "equity interest" is defined as any interest in an entity other than an instrument that is treated as indebtedness under "applicable local law" and that has no "substantial equity features." Although the plan asset regulation is silent with respect to the question of which law constitutes "applicable local law" for this purpose, Labor has stated that these determinations should be made under the state law governing interpretation of the instrument in question. In the preamble to the plan asset regulation, Labor declined to provide a precise definition of what features are equity features or the circumstances under which the features would be considered "substantial," noting that the question of whether a plan's interest has substantial equity features is an inherently factual one, but that in making that determination it would be appropriate to take into account whether the equity features are such that a plan's investment would be a practical vehicle for the indirect provision of investment management services. We believe that the L Bonds will be classified as indebtedness without substantial equity features for ERISA purposes.

Under the plan asset regulations the term "publicly-offered security" is defined as a security that is (i) freely transferable, (ii) part of a class of securities that is widely held, and (iii) either (A) part of a class of securities registered under section 12(b) or 12(g) of the Securities Exchange Act of 1934 or (B) sold to the plan as part of an offering of securities to the public pursuant to an effective registration statement under the Securities Act of 1933 and the class of securities of which such security is a part is registered under the Securities Exchange Act of 1934 within 120 days after the end of the fiscal year of the issuer during which the offering of such securities to the public occurred. For purposes of the above, a class of securities is considered to be "widely held" if it is owned by 100 or more investors independent of the issuer and of one another. In the case of this offering, while the offer and sale of the L Bonds have been registered under the Securities Act of 1933, the L Bonds themselves have not been registered under the Securities Exchange Act of 1934. For this reason, we believe that the L Bonds will not likely meet the definition for "publicly-offered security" under the plan asset regulations.

App. 1068

38

In light of the foregoing, if the L Bonds were deemed to be equity interests for this purpose and no statutory, regulatory, or administrative exception applies, we could be considered to hold plan assets by reason of a plan's investment in the L Bonds. These plan assets would include an undivided interest in all of our assets. In this case, we may be considered a fiduciary with respect to the investing plans. We would be subject to the fiduciary responsibility provisions of Title I of ERISA, including the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code, and to Section 4975 of the Code with respect to transactions involving any of our assets. The ERISA fiduciary standards could affect the way we conduct the business, which would have consequences for all investors, not just those that are employee benefit plans.

Depending on the relevant facts and circumstances, prohibited transaction exemptions may apply to the purchase or holding of the L Bonds. See, for example, Prohibited Transaction Class Exemption ("PTE") 96-23, which exempts some transactions effected on behalf of a plan or by an "in-house asset manager;" PTE 95-60, which exempts some transactions between insurance company general accounts and parties in interest; PTE 91-38, which exempts some transactions between bank collective investment funds and parties in interest; PTE 90-1, which exempts some transactions between insurance company pooled separate accounts and parties in interest; or PTE 84-14, which exempts some transactions effected on behalf of a plan by a "qualified professional asset manager." However, there can be no assurance that any of these exemptions will apply with respect to any plan's investment in the L Bonds, or that the exemption, if it did apply, would apply to all prohibited transactions that may occur in connection with the investment.

Any plan fiduciary considering whether to purchase L Bonds on behalf of a plan should consult with its counsel regarding the applicability of the fiduciary responsibility and prohibited transaction provisions of ERISA and the Code. Before purchasing any L Bonds, a fiduciary of a plan should make its own determination as to (1) whether GWG Holdings, as issuer of and borrower under the L Bonds, is a "party in interest" under ERISA or a "disqualified person" under the Code with respect to the plan; (2) the availability of the relief provided in the plan asset regulation and (3) the availability of any other prohibited transaction exemptions. In addition, purchasers that are insurance companies should consult their own ERISA counsel with respect to their fiduciary responsibilities associated with their purchase and ownership of the L Bonds, including any responsibility under the Supreme Court case *John Hancock Mutual Life Insurance Co. v. Harris Trust and Savings Bank*.

<div align="center">39</div>

## LEGAL MATTERS

Certain legal matters in connection with the L Bonds will be passed upon for us by Mayer Brown LLP, Chicago, Illinois.

## EXPERTS

The consolidated financial statements of GWG Holdings, Inc. and its subsidiaries for the year ended December 31, 2019 incorporated by reference in this prospectus from GWG Holdings, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2019 and the effectiveness of GWG Holdings, Inc.'s internal control over financial reporting as of December 31, 2019, have been audited by Whitley Penn LLP, independent registered public accounting firm, as set forth in their reports thereon, which are incorporated herein by reference. Such financial statements have been so incorporated in reliance upon the report of Whitley Penn LLP pertaining to such financial statements and the effectiveness of our internal control over financial reporting on the authority of such firm as experts in accounting and auditing.

The consolidated financial statements of GWG Holdings, Inc. and its subsidiaries for the year ended December 31, 2018 incorporated by reference in this prospectus from GWG Holdings, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2019 have been audited by Baker Tilly Virchow Krause, LLP, independent registered public accounting firm, as set forth in their report thereon. Such financial statements have been so incorporated in reliance upon the report of Baker Tilly Virchow Krause, LLP on the authority of such firm as experts in accounting and auditing.

The consolidated financial statements of The Beneficient Company Group, L.P. and its subsidiaries for the year ended December 31, 2019 incorporated by reference in this prospectus from GWG Holdings, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2019 have been audited by Whitley Penn LLP, independent registered public accounting firm, as set forth in their report thereon, which is incorporated herein by reference. Such financial statements have been so incorporated in reliance upon the report of Whitley Penn LLP pertaining to such financial statements on the authority of such firm as experts in accounting and auditing.

## WHERE YOU CAN FIND MORE INFORMATION

We have filed with the SEC a registration statement on Form S-1 under the Securities Act with respect to the L Bonds to be offered and sold pursuant to this prospectus which is a part of that registration statement. This prospectus does not contain all the information contained in the registration statement. For further information with respect to us and the L Bonds to be sold in this offering, we refer you to the registration statement, including the agreements, other documents and schedules filed as exhibits to the registration statement.

We file annual, quarterly and current reports, and other information with the SEC. We intend to make these filings available on our website at *www.gwgh.com*. Information on our website is not incorporated by reference in this prospectus. We maintain an office at 325 N. Saint Paul Street, Suite 2650, Dallas, TX 75201 where all records concerning the L Bonds are to be retained. L Bond holders and their representatives can request information regarding the L Bonds by contacting our office by mail at our address or by telephone at (612) 746-1944 or by fax at (612) 746-0445. Upon request, we will provide copies of our filings with the SEC free of charge to our investors. Our SEC filings, including the registration statement of which this prospectus is a part, will also be available on the SEC's Internet site at *http://www.sec.gov*.

## INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE

We are incorporating certain information about us that we have filed with the SEC by reference in this prospectus, which means that we are disclosing important information to you by referring you to those documents. The information we incorporate by reference is an important part of this prospectus.

We incorporate by reference the documents listed below:

- Our Annual Report on Form 10-K for the year ended December 31, 2019, filed with the SEC on March 27, 2020;

- Our Quarterly Report on Form 10-Q for the quarter ended March 31, 2020, filed with the SEC on May 15, 2020; and

- Our Current Reports on Form 8-K filed with the SEC on January 7, 2020, February 27, 2020, March 6, 2020, March 18, 2020 and March 20, 2020.

App. 1071

All documents filed by us pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, as amended, after the date of this prospectus and before the termination of the offering also are incorporated herein by reference. We are not, however, incorporating by reference any documents or portions thereof that are not deemed "filed" with the SEC or any information furnished pursuant to Items 2.02 or 7.01 of Form 8-K or certain exhibits furnished pursuant to Item 9.01 of Form 8-K.

The section entitled "Where You Can Find More Information" above describes how you can obtain or access any documents or information that we have incorporated by reference herein. The information relating to us contained in this prospectus does not purport to be comprehensive and should be read together with the information contained in the documents incorporated by reference in this prospectus.

Upon written or oral request, we will provide, free of charge, to each person, including any beneficial owner, to whom a prospectus is delivered, a copy of any or all of the reports or documents that are incorporated by reference into this prospectus. Such written or oral requests should be made to:

<div align="center">

Timothy Evans, Chief Financial Officer
325 N. Saint Paul Street, Suite 2650
Dallas, TX 75201
Telephone Number: (612) 746-1935

</div>

In addition, such reports and documents may be found on our website at *www.gwgh.com*.

<div align="center">40</div>

2,000,000 Units

($2,000,000,000)

**GWG HOLDINGS, INC.**

**L Bonds**

**PROSPECTUS**

**June 3, 2020**

8-K 1 ea145059-8k_gwgholdings.htm CURRENT REPORT

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

**FORM 8-K**

**CURRENT REPORT**

Pursuant to Section 13 or 15(d) of
the Securities Exchange Act of 1934

Date of Report (date of earliest event reported): **August 1, 2021**

**GWG Holdings, Inc.**
(Exact name of registrant as specified in its charter)

Commission File Number:  **001-36615**

| **Delaware** | **26-2222607** |
|---|---|
| (State or other jurisdiction of incorporation) | (IRS Employer Identification No.) |

**325 North St. Paul Street, Suite 2650, Dallas, TX 75201**
(Address of principal executive offices, including zip code)

**(612) 746-1944**
(Registrant's telephone number, including area code)

**Not Applicable**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Trading Symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| Common Shares | GWGH | Nasdaq Capital Markets |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review**

On August 1, 2021, the Board of Directors of the Company, in consultation with the Company's management, determined that the Company's audited financial statements for the year ended December 31, 2019, included in the Company's Annual Report on Form 10-K for the year ended December 31, 2019, filed with the Securities and Exchange Commission ("SEC") on March 27, 2020, and quarterly unaudited financial statements for the quarters ended March 31, 2020, June 30, 2020, and September 30, 2020, included in the Company's Quarterly Reports on Form 10-Q filed with the SEC on May 15, 2020, August 14, 2020, and November 19, 2020, respectively, should no longer be relied upon. The Board's determination was based upon the resolution of the consultation process with the SEC's Office of the Chief Accountant ("OCA") described below.

As previously reported, as part of the preparation of its Annual Report on Form 10-K for the year ended December 31, 2020, the Company voluntarily submitted two questions to OCA on February 15, 2021. OCA is responsible for accounting and auditing matters arising in the SEC's administration of the federal securities laws, particularly with respect to accounting policy determinations. In this role, OCA consults with registrants on the application of accounting standards and financial disclosure requirements. The questions submitted by the Company to OCA were (1) whether a December 31, 2019 transaction resulted in GWG obtaining control of The Beneficent Company Group, L.P. ("Ben") in a transaction that constituted a change-in-control of Ben by entities not under common control, and  (2) whether Ben was required to consolidate any of the trusts established in connection with its business of providing liquidity to holders of alternative assets (the "ExAlt Plan Trusts").

On July 26, 2021, the Company and OCA staff held a conference call in which OCA's staff notified the Company of its conclusions on the two accounting questions that were the subject of the consultation. During that call, OCA expressed that it would object to a conclusion that Ben not consolidate the ExAlt Plan Trusts. Consistent with the conclusions communicated by OCA on July 26, on August 1, 2021, the Board of Directors of the Company determined that it is necessary to restate prior period financial statements for the year ended December 31, 2019, and quarterly financial statements for the first three quarters of the year ended December 31, 2020, to consolidate the ExAlt Plan Trusts into Ben's financial statements and consequently into the Company's consolidated financial statements. Management is considering whether OCA's conclusion on question (1) will have any impact on the restated financial statements.

Based on the foregoing, the Company is working to complete a restatement of, and file amended financial statements with the SEC for, the year ended December 31, 2019, and the first three quarters of 2020. Given the resolution of the consultation with the OCA just occurred on July 26, 2021, the Company is unable at this point to estimate when those restatements will be complete. Management is also assessing the effect of the restatements on the Company's internal control over financial reporting and its disclosure controls and procedures.

These restatements do not arise from or cause any negative change in the Company's operations, the underlying economics attributable to the Company or its subsidiaries, the terms of the Company's existing assets, or its expected prospects for future business.

The Company suspended the sale of its L Bonds due to the fact that the Company did not timely file its 2020 Form 10-K. The Company continues to make all required payments under its L Bonds and preferred equity and is working on financing options to further supplement its cash position.

Members of Company management and/or the Audit Committee of the Company's Board of Directors have discussed these matters with the Company's current independent registered public accounting firm, Grant Thornton LLP, and its independent registered public accounting firm for the year ended December 31, 2019, Whitley Penn LLP.

**Cautionary Statement Regarding Forward-Looking Statements**

This report contains forward-looking statements that involve substantial risks and uncertainties. All statements, other than statements of historical facts, included in this report regarding the impact of the restatements on our historical financial statements, the timing for producing restated financial statements, the Company's financing options to supplement its cash position, the impact of the factors that resulted in the restatements on future operations, future financial position, future revenue, projected costs, prospects, plans and objectives of management are forward-looking statements. The words "anticipate," "believe," "estimate," "expect," "intend," "may," "plan," "would," "target" and similar expressions are intended to identify forward-looking statements, although not all forward-looking statements contain these identifying words. These forward-looking statements include, among other things, statements about our estimates regarding the impact of the consolidation of the ExAlt Plan Trusts on our past and future revenue, earnings, cash flows and financial position and financial performance. We may not actually achieve the expectations disclosed in our forward-looking statements, and you should not place undue reliance on our forward-looking statements. Actual results or events could differ materially

from the expectations disclosed in the forward-looking statements that we make. More information about potential factors that could affect our business and financial results is contained in our filings with the Securities and Exchange Commission, including our Quarterly Report on Form 10-Q filed with the SEC on November 19, 2020, and our Annual Report on Form 10-K filed with the SEC on March 27, 2020. Additional information will also be set forth in our future quarterly reports on Form 10-Q, annual reports on Form 10-K and other filings that we make with the SEC. We do not intend, and undertake no duty, to release publicly any updates or revisions to any forward-looking statements contained herein.

<div align="center">1</div>

**SIGNATURES**

      Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**GWG HOLDINGS, INC.**

Date: August 2, 2021

By:    /s/ Murray T. Holland

Name:   Murray T. Holland

Title:    Chairman, President and
Chief Executive Officer

2

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

_____

# FORM 10-K

_____

☒  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended **December 31, 2020**

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES ACT OF 1934**

For the transition period from _____ to _____

**Commission File Number: 001-36615**

_____

# GWG HOLDINGS, INC.

(Exact name of registrant as specified in its charter)

| **Delaware** | **26-2222607** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**325 North St. Paul Street, Suite 2650**
**Dallas, TX 75201**
(Address of principal executive offices, including zip code)

**(612) 746-1944**
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Trading Symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| Common Stock | GWGH | Nasdaq Capital Market |

**Securities registered pursuant to Section 12(g) of the Act**
**None**

_____

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐  No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐  No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐  No ☒

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☐ | Accelerated filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐  No ☒

The aggregate market value of the registrant's common stock held by non-affiliates was $24,297,105 as of June 30, 2020 (the last business day of the registrant's most recently completed second fiscal quarter), based on a total of 3,167,810 shares of common stock held by non-affiliates and a closing price of $7.67 as reported on the Nasdaq Capital Market on June 30, 2020. For purposes of this computation, all officers, directors, and 10% beneficial owners of the registrant are deemed to be affiliates. Such determination should not be deemed to be an admission that such officers, directors or 10% beneficial owners, are or were, in fact, affiliates of the registrant.

As of September 30, 2021, GWG Holdings, Inc. had 33,097,118 shares of common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE:**

None.

Table of Contents

**GWG HOLDINGS, INC.**

**Index to Form 10-K**
**for the Fiscal Year Ended December 31, 2020**

**Explanatory Note**

**Forward-Looking Information; Risk Factor Summary**    i

PART I    1

| | | |
|---|---|---|
| ITEM 1. | Business. | 1 |
| ITEM 1A. | Risk factors. | 12 |
| ITEM 1B. | Unresolved staff comments. | 41 |
| ITEM 2. | Properties. | 41 |
| ITEM 3. | Legal proceedings. | 41 |
| ITEM 4. | Mine safety disclosures. | 41 |

PART II    42

| | | |
|---|---|---|
| ITEM 5. | Market for the registrant's common equity, related shareholder matters and issuer purchases of equity securities. | 42 |
| ITEM 6. | Selected financial data. | 42 |
| ITEM 7. | Management's discussion and analysis of financial condition and results of operations. | 42 |
| ITEM 7A. | Quantitative and qualitative disclosures about market risk. | 74 |
| ITEM 8. | Consolidated financial statements and supplementary data. | F-1 |
| ITEM 9. | Changes in and disagreements with accountants on accounting and financial disclosure. | 73 |
| ITEM 9A. | Controls and procedures. | 73 |
| ITEM 9B. | Other Information. | 75 |

PART III    76

| | | |
|---|---|---|
| ITEM 10. | Directors, executive officers and corporate governance. | 76 |
| ITEM 11. | Executive compensation. | 80 |
| ITEM 12. | Security ownership of certain beneficial owners and management and related shareholder matters. | 85 |
| ITEM 13. | Certain relationships and related transactions, and director independence. | 88 |
| ITEM 14. | Principal accounting fees and services. | 92 |

PART IV    94

| | | |
|---|---|---|
| ITEM 15. | Exhibits, financial statement schedules. | 94 |
| ITEM 16. | FORM 10-K SUMMARY | 98 |

SIGNATURES    99

Table of Contents

<div align="center">**Explanatory Note**</div>

**Restatement Overview**

In this Annual Report on Form 10-K for the year ended December 31, 2020 (the "2020 Form 10-K"), GWG Holdings, Inc. is restating its previously issued (i) consolidated balance sheet as of December 31, 2019, (ii) the consolidated statement of operations, (iii) the consolidated statement of changes in stockholders' equity, and (iv) the consolidated statement of cash flows for the year ended December 31, 2019, included in its Annual Report on Form 10-K for the year ended December 31, 2019, (the "Restatement"). The Restatement also impacted each of the quarters for the periods beginning with GWG Holdings, Inc.'s consolidation with The Beneficient Company Group, L.P. ("Ben LP," including all of the subsidiaries it may have from time to time — "Beneficient") as of December 31, 2019 through the quarter ended September 30, 2020. We do not plan to file an amended version of any previously filed reports on Forms 10-K or 10-Q in connection with the Restatement, and, as such, the financial statements included in such previously filed periodic reports should not be relied upon.

In this 2020 Form 10-K, the annual and interim periods from GWG Holdings, Inc.'s consolidation with Beneficient as of December 31, 2019 through the quarter ended September 30, 2020 are collectively referred to as the "Restatement Period." References to the "Company," "we," "our" and "us" in this 2020 Form 10-K refer to GWG Holdings, Inc. together, in each case, with its subsidiaries unless the context suggests otherwise.

The impact of the Restatement is included in this 2020 Form 10-K, and is more specifically described below in this Explanatory Note and in Notes 21 and 22 of the notes to the accompanying audited consolidated financial statements and "Item 7 – Management's Discussion and Analysis of Financial Condition and Results of Operations". All references to prior periods included below in the Management's Discussion and Analysis of Financial Condition and Results of Operations have been revised to reflect the effects of the Restatement. Additionally, the impacts of the Restatement have been reflected throughout the financial statements, including the applicable footnotes.

As previously reported on Form 8-K filed with the Securities and Exchange Commission ("SEC") on July 7, 2021, and as discussed throughout this 2020 Form 10-K, as part of the preparation of its 2020 Form 10-K, the Company voluntarily submitted two questions to the SEC's Office of the Chief Accountant ("OCA") on February 15, 2021. The questions submitted by the Company to OCA were (1) whether a December 31, 2019 transaction resulted in GWG Holdings, Inc. obtaining control of Ben LP in a transaction that constituted a change-in-control of Beneficient by entities not under common control, and (2) whether Ben LP was required to consolidate any of the trusts created through Beneficient's ExAlt Plan™ (as defined in Item 1. Business) established in connection with its business of providing liquidity to holders of alternative assets. On July 26, 2021, the Company and OCA staff held a conference call in which OCA's staff notified the Company of its conclusions on the two accounting questions that were the subject of the consultation. During that call, OCA expressed that it would object to a conclusion that Ben LP not consolidate the Custody Trusts, Collective Trusts, LiquidTrusts and Funding Trusts, (collectively, the "ExAlt Trusts") as of December 31, 2019. Consistent with the conclusions communicated by OCA on July 26, 2021, the Company determined that it was necessary to restate the consolidated financial statements as of and for the year ended December 31, 2019 in response to the conclusion on question (2). Regarding question (1), OCA did not conclude on the common control aspect of the transaction in question. However, after further analysis, including, among other things, consulting with legal counsel to conclude that the common stock of GWG Holdings held by Beneficient were not voteable under Delaware law, the Company confirmed its original conclusion that the entities were not under common control.

Prior to December 31, 2019, only certain trusts created through Beneficient's ExAlt Plan™ were considered variable interest entities for which Ben LP had a variable interest and was considered the primary beneficiary. Thus, Ben LP was required to consolidate certain of such trusts. Due to changes to both the governance structure and the underlying economics of the trust and other agreements pertaining to certain of the ExAlt Trusts and the execution of new loan agreements between a subsidiary of Ben LP and certain of such trusts as of December 31, 2019, it was initially concluded that Ben LP no longer had the power to direct the activities that most significantly impact the economic performance of any of the ExAlt Trusts and therefore could no longer consolidate any of such trusts as of December 31, 2019, including those previously consolidated. However, we have since determined that such conclusion was incorrect, and that the proper application of generally accepted accounting principles is for Ben LP to consolidate the ExAlt Trusts. As a result of consolidating such trusts, Ben LP's primary tangible asset, which was acquired through loans a subsidiary of Ben LP made to certain of the ExAlt Trusts, was previously reported as a loan receivable as of December 31, 2019, but is now being reported as an investment in alternative assets held by certain of the ExAlt Trusts.

App. 1082

Table of Contents

**Impact of Restatement**

Notes 21 and 22 of the accompanying consolidated financial statements present the impact of the Restatement to our Consolidated Balance Sheets, Consolidated Statements of Operations, Consolidated Statements of Changes in Stockholders' Equity, and Consolidated Statements of Cash Flows for the annual and quarterly periods affected, each as compared with the amounts presented in the originally filed Annual Report on Form 10-K for the year ended December 31, 2019, and the original Quarterly Reports on Form 10-Q for the periods ended March 31, 2020, June 30, 2020, and September 30, 2020, previously filed with the SEC.

**Other Corrections**

In addition to the Restatement items, the Company has corrected other items, which had been previously identified and determined to be immaterial pursuant to Accounting Standards Codification ("ASC") Topic 250, *Accounting Changes and Error Corrections* and Staff Accounting Bulletin ("SAB") No. 99, *Materiality*. While these other adjustments are both quantitatively and qualitatively immaterial, individually and in the aggregate, because we are correcting for the Restatement items, we have decided to correct these other adjustments as well.

Specifically, the Company reassessed its valuation allowance against its deferred tax assets and determined it will no longer utilize the reversal of a temporary difference related to the Company's preferred equity ownership in Beneficient, until such time as the preferred equity is no longer constrained, as a source of income to realize existing deferred tax assets related to the net operating loss and Section 163(j) limitations. The net deferred tax liability presented in the Company's consolidated balance sheets is specifically related to GWG Life's investment in the Preferred Series A Subclass 1 Unit Accounts resulting from the Investment Agreement described in Note 1. The disposition of this investment is constrained by the Pledge and Security Agreement in favor of the holders of the L Bonds of GWG Holdings. As such, the timing of recognition of the necessary taxable income related to this investment and the future reversal of this temporary difference cannot be predicted. The changes in the valuation allowance are reflected in the restatement tables presented in Notes 21 and 22.

**Internal Control over Financial Reporting and Disclosure Controls and Procedures**

In connection with matters related to the Restatement, we have determined that a material weakness existed in our internal control over financial reporting for all periods from December 31, 2019 to December 31, 2020. As of December 31, 2020, the design and operating effectiveness of controls over the selection, application and review of the implementation of accounting policies were not sufficient to ensure amounts recorded and disclosed were fairly stated in accordance with GAAP. This material weakness resulted in the Restatement. In addition, not solely as a result of this material weakness, GWG Holdings, Inc.'s Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were not effective for the year ended December 31, 2020. Notwithstanding this material weakness and others identified, our management, based upon the substantial work performed during the Restatement process, has concluded that the Company's consolidated financial statements for the periods covered by and included in this 2020 Form 10-K are prepared in accordance with GAAP and fairly present, in all material respects, our financial position, results of operation and cash flows for each of the periods presented herein. For more information see "Part II – Item 9A – Controls and Procedures."

App. 1084

Table of Contents

**FORWARD-LOOKING INFORMATION; RISK FACTOR SUMMARY**

This 2020 Form 10-K contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, which involve certain known and unknown risks and uncertainties. Forward-looking statements predict or describe our future operations, business plans, business and investment strategies and portfolio management and the performance of our investments. These forward-looking statements are generally identified by their use of such terms and phrases as "intend," "goal," "estimate," "expect," "project," "projections," "plans," "seeks," "anticipates," "will," "should," "could," "may," "designed to," "foreseeable future," "believe," "scheduled" and similar expressions. Our actual results or outcomes may differ materially from those anticipated. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date the statement was made. We assume no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law.

Our actual results may differ significantly from any results expressed or implied by these forward-looking statements. A summary of the principal risk factors that make investing in our securities risky and might cause our actual results to differ is set forth below. The following is only a summary of the principal risks that may materially adversely affect our business, financial condition, results of operations and cash flows. This summary should be read in conjunction with the more complete discussion of the risk factors we face, which are set forth in the section entitled "Risk Factors" in this report. Defined terms used below are defined elsewhere in this 2020 Form 10-K.

**Risks Related to Our Operations and Organizational Structure**

- Our current inability to raise capital, recurring losses from operations, negative cash flows from operations, delays in executing our business plans, and potential negative implications of the ongoing SEC non-public, fact-finding investigation raise substantial doubt regarding our ability to continue as a going concern. The report from our independent registered public accounting firm for the year ended December 31, 2020, includes an explanatory paragraph stating that these factors raise substantial doubt about our ability to continue as a going concern.
- We have a relatively limited history of operations and a history of net losses.
- Our operations and financial results may be adversely affected by the ongoing COVID-19 pandemic.
- We may be unable to capitalize on the anticipated benefits of the Beneficient Transactions.
- GWG Holdings' ability to control the activities of Beneficient is subject to certain rights of others set forth in the limited liability company agreement for the general partner of Ben LP, and GWG Holdings has entered into a non-binding term sheet to relinquish certain rights with respect to Beneficient, including GWG Holdings' ability to appoint a majority of the board of directors of the general partner of Ben LP and control the activities of Beneficient.
- Ben LP's partnership agreement eliminates fiduciary duties that might otherwise be owed to GWG Holdings under Delaware law.
- If certain events occur, GWG Holdings will lose its right to appoint a majority of the board of directors of the general partner of Ben LP and therefore its ability to exercise control over Ben LP and consolidate its financial results.
- GWG Holdings' percentage ownership in Ben LP may be diluted significantly.
- A failure to establish and maintain effective internal controls over financial reporting, including our identified material weaknesses, could adversely affect our financial results.
- We may not realize a return on GWG Holdings' investment in FOXO Technologies Inc.
- The resale of GWG Holdings' common stock issued in the Exchange Transaction could result in a reduction to the market price of GWG Holdings' common stock and result in a destabilized trading market for GWG Holdings' common stock.
- The Seller Trusts, collectively, have the power to control the vote of a majority of GWG Holdings' outstanding common stock.
- We are currently relying on the "controlled company" exemption under Nasdaq Stock Market Listing Rules.

**Risks Related to Our Liquidity Products Business**

- Beneficient may be unable to operate its business successfully.
- Beneficient has experienced significant delays in obtaining, and may not obtain, its TEFFI trust company charter.
- Beneficient may not be able to grow, effectively manage its growth, or achieve profitability.
- Beneficient is subject to repayment risk in connection with its liquidity transactions.
- Beneficient may incur significant losses as a result of ineffective risk management processes and strategies.
- Difficult market conditions can cause investors to reduce or suspend their investments in alternative assets or their desire to liquidate alternative assets they hold, which could adversely affect Beneficient's business.

i

App. 1086

- Beneficient's business, profitability and liquidity may be adversely affected by deterioration in the credit quality of, or defaults by, the ExAlt Trusts that owe Beneficient money, securities or other assets or whose obligations collateralizes the loans made by certain of Beneficient's operating subsidiaries to certain of the ExAlt Trusts.
- Beneficient uses hedging transactions to manage certain market risks; Beneficient's business, profitability and liquidity may be adversely affected by unanticipated market conditions including interest rates, currency exchange rates, equity market behavior, and other relevant market factors that generate losses not covered or offset by a hedge.
- Beneficient's fair value estimates of illiquid assets may not accurately estimate prices obtained at the time of sale.
- Notwithstanding its diversification strategies, Beneficient's liquidity, profitability and business may be adversely affected by concentrations of assets.
- The due diligence process that Beneficient undertakes in connection with liquidity transactions may or may not reveal all facts that may be relevant in connection with such liquidity transaction.

**Risks Related to Our Secondary Life Insurance Business**

- The valuation of our life insurance policy assets requires us to make material assumptions that may ultimately prove to be incorrect.
- Actual results from our life insurance portfolio may not match our projected results.
- Our investments in life insurance policies have inherent risks, including fraud and legal challenges to the validity of the policies.
- If actuarial assumptions related to our investments in life insurance policies change, our operating results and cash flow could be adversely affected, as well as the value of our collateral and our ability to service our debt obligations.
- We rely on estimated rates of mortality when valuing life insurance policies and forecasting the performance of our life insurance portfolio.
- Cost-of-insurance (premium) increases could materially and adversely affect our profitability and financial condition.

**Risks Related to Our Proposed Insurance Business**

- We have no experience in operating an insurance business and our entry into the insurance market may not be successful.
- We may not be able to obtain or maintain approval of insurance regulators and other regulatory authorities.
- The operation of our proposed insurance business will subject us to additional costs and economic, political, currency, and other risks.

**Risks Related to Our Indebtedness and Financing Arrangements**

- Our indebtedness could adversely affect our financial condition and may otherwise adversely impact our business operations.
- We critically rely on debt financing for our business.
- We may not be able to raise the capital that we are seeking from our securities offerings.
- GWG Holdings depends upon cash distributions from its subsidiaries, and contractual restrictions on distributions to it or adverse events at one of its operating subsidiaries could materially and adversely affect its ability to pay its debts.
- The collateral granted as security for our obligations under our various debt obligations may be insufficient to repay all such debt obligations.
- If a significant number of holders of GWG Holdings' L Bonds demand repayment of those instruments upon maturity instead of renewing them, GWG Holdings may be forced to liquidate some of its life insurance policies, investments in Beneficient or other assets. Substantially all of our life insurance policies are pledged as collateral under the LNV Credit Facility and the NF Credit Facility and we would not be able to dispose of them without compliance with the terms of those credit facilities.
- Subordination provisions contained in the indenture governing the L Bonds, including any supplemental indentures, will place restrictions on the ability of the trustee or the L Bond holders to enforce certain rights against us under the indenture.
- A failure to maintain compliance with our debt covenants, including the indenture governing the L Bonds, may have a material adverse effect on our ability to continue our business operations.

**Legal and Regulatory Risks**

- A determination that we are an unregistered investment company would have material adverse consequences.
- We will be subject to comprehensive governmental regulation and supervision.
- Our life insurance business will be subject to state or foreign government regulation.

Table of Contents

- We are currently subject to a non-public, fact-finding investigation into the Company by the SEC, and we are unable to predict the outcome of this matter.

**General Risk Factors**

- Our success depends on certain key executives and the ability to attract, retain, and develop new professionals.
- Business disruptions and interruptions and adverse economic conditions due to natural disasters and other external events beyond our control can adversely affect our business, financial condition and results of operations.
- Changes in general economic conditions could adversely impact our business.
- A failure in our operational systems as well as human error or malfeasance could impair our liquidity, disrupt our business, result in the disclosure of confidential information, damage our reputation, and cause losses.
- We rely on other companies to provide key components of our business infrastructure.

iii

PART I

**ITEM 1. BUSINESS.**

**Organizational Structure**

Our business was originally organized in February 2006. We added our parent holding company, GWG Holdings, Inc. ("GWG Holdings"), in March 2008, and in September 2014 we consummated an initial public offering of GWG Holdings' common stock on The Nasdaq Capital Market where the stock trades under the ticker symbol "GWGH."

GWG Holdings conducts its life insurance secondary market business through a wholly-owned subsidiary, GWG Life, LLC ("GWG Life"), and GWG Life's wholly-owned subsidiaries, GWG Life Trust, GWG DLP Funding IV, LLC ("DLP IV"), GWG DLP Funding V Holdings, LLC ("DLP V Holdings"), and GWG DLP Funding Holdings VI, LLC ("DLP VI Holdings"). DLP V Holdings is the sole member of GWG DLP Funding V, LLC ("DLP V"). DLP VI Holdings is the sole member of GWG DLP Funding VI, LLC ("DLP VI").

In addition, GWG Holdings has exposure to indirect interests in loans collateralized by cash flows from alternative assets. Such loans are made and held by certain of the operating subsidiaries of Ben LP. These loans are made to certain of the ExAlt Trusts, which are consolidated subsidiaries of Ben LP and thus, such loans are eliminated upon consolidation for financial reporting purposes. Ben LP's general partner is Beneficient Management, L.L.C. ("Beneficient Management"). Prior to December 31, 2019, GWG Holdings' investment in Beneficient was accounted for as an equity method investment. On December 31, 2019, as more fully described below, Beneficient became a consolidated subsidiary of GWG Holdings. As also described below, on August 13, 2021, GWG Holdings entered into a non-binding term sheet with Ben LP and Beneficient Company Holdings, L.P. ("BCH"), that outlines a series of transactions which, if completed, will result in, among other things, (i) GWG Holdings receiving certain proposed enhancements to its investments in Beneficient; (ii) GWG Holdings no longer having the right to appoint directors of the Board of Directors of Beneficient Management; and (iii) Beneficient no longer being a consolidated subsidiary of GWG Holdings. The term sheet is part of ongoing efforts by management and the Board of Directors of the Company to maximize the value of GWG Holdings' and GWG Life's investment in Beneficient.

GWG Holdings also has a financial interest in FOXO Technologies Inc. ("FOXO", formerly FOXO BioScience LLC), which, through its wholly-owned subsidiaries FOXO Labs Inc. ("FOXO Labs", formerly, Life Epigenetics Inc.) and FOXO Life LLC ("FOXO Life", formerly, youSurance General Agency, LLC), seeks to commercialize epigenetic technology for the longevity industry and offer life insurance directly to customers utilizing epigenetic technology. Although we have a financial interest in FOXO, we do not have a controlling financial interest because another party is the majority shareholder of the voting class of securities. Therefore, we account for our ownership interest in FOXO as an equity method investment. FOXO Labs was formed to commercialize epigenetic technology for the longevity industry. FOXO Life seeks to offer life insurance directly to customers utilizing epigenetic technology.

All of the aforementioned entities are legally organized in the state of Delaware, other than GWG Life Trust, which was formed under the laws of the state of Utah, and certain of the ExAlt Trusts, which were formed under the laws of the State of Texas. Unless the context otherwise requires or we specifically so indicate, all references in this report to "we," "us," "our," "our Company," "GWG," or the "Company" refer to GWG Holdings together, in each case, with its subsidiaries. Our headquarters are located at 325 N. St. Paul Street, Suite 2560, Dallas, Texas 75201.

**Our Company**

We are an innovative financial services company that is a leader in providing unique liquidity solutions and services for the owners of illiquid investments. In 2018 and 2019, GWG Holdings consummated a series of transactions (as more fully described below) with Beneficient that has resulted in a significant reorientation of our business and capital allocation strategy towards an expansive and diverse exposure to alternative assets. As part of this reorientation, GWG Holdings also changed its Board of Directors and executive management team.

While we are continuing our work to maximize the value of our secondary life insurance business, based on recent developments in the capital markets, including the availability of financing on favorable terms, we have begun exploring the feasibility of purchasing additional life insurance policies through the secondary market and establishing a life insurance subsidiary to operate in the life insurance industry. These operations are in addition to allocating capital to provide liquidity to holders of a broader range of alternative assets, which GWG Holdings currently provides through investments in Beneficient.

Table of Contents

We completed the transactions with Beneficient to provide the Company with a significant increase in assets and common stockholders' equity as well as with the opportunity for a diversified source of future earnings from our exposure to the alternative asset industry. We believe the Beneficient transactions and the other strategies we are pursuing, including continuing to pursue opportunities in the life insurance industry, will transform GWG Holdings from a niche provider of liquidity to owners of life insurance to a diversified provider of financial products and services with exposure to a broad range of alternative assets.

Beneficient is a financial services company based in Dallas, Texas, that markets an array of liquidity and trust administration products to alternative asset investors primarily comprised of mid-to-high-net-worth individuals having a net worth between $5 million and $30 million ("MHNW") and small-to-midsize institutional investors and family offices with less than $1 billion in investable assets ("STMIs"). One of Beneficient's founders, Brad K. Heppner ("Ben Founder"), serves as Chairman and Chief Executive Officer of Beneficient and previously served as Chairman of GWG Holdings from April 26, 2019 to June 14, 2021. Ben LP plans to offer its products and services through its five operating subsidiaries, which include (i) Ben Liquidity, (ii) Ben Custody Admin, (iii) Ben Insurance, (iv) Ben Markets and (v) Beneficient USA (each operating subsidiary is further defined below). Ben Liquidity plans to operate a trust company that is a Kansas Technology Enabled Fiduciary Financial Institutions ("TEFFI") authorized to serve as an alternative asset custodian, trustee and lender with statutory powers granted for each of these activities and permitting Ben Liquidity to provide fiduciary financing for certain of its customer liquidity transactions. Ben Custody Admin plans to operate a Texas trust company that is being organized to provide its customers with certain administrative, custodial and trustee products and specialized services focused on alternative asset investors. Ben Insurance has been chartered as a Bermuda based insurance company that plans to offer certain customized insurance products and services covering risks relating to owning, managing and transferring alternative assets. Ben Markets is in the regulatory process for acquiring a captive registered broker-dealer that would conduct certain of its activities attendant to offering a suite of products and services from the Beneficient family of companies. Certain of Ben LP's operating subsidiary products and services involve or are offered to certain of the ExAlt Trusts (defined below), which are consolidated subsidiaries of Ben LP for financial reporting purposes (such trusts are and may individually be referred to as Custody Trusts, Collective Trusts, LiquidTrusts, and Funding Trusts). Beneficient USA employs a substantial majority of the executives and staff for Beneficient's operating subsidiaries to which Beneficient USA provides administrative and technical services.

Beneficient's primary operations, which commenced on September 1, 2017, consist of offering its liquidity and trust administration services to its customers, primarily through certain of Ben LP's operating subsidiaries, Ben Liquidity, L.L.C. ("Ben Liquidity") and Ben Custody, L.L.C. ("Ben Custody Admin"), respectively. Ben Liquidity offers simple, rapid and cost-effective liquidity products to its customers through the use of customized trust vehicles, (such trusts, the "ExAlt Trusts"), that facilitate the exchange of a customer's alternative assets for consideration using a unique financing structure (such structure and process, the "ExAlt Plan™"). The ExAlt Plan trademark was developed by Beneficient as a brand of liquidity and trust administration services designed for alternative asset investors, specifically MHNW and STMIs to "Ex"it "Alt"ernatives. A subsidiary of Ben Liquidity makes loans (each, an "ExAlt Loan") to certain of the ExAlt Trusts which employ the loan proceeds to acquire agreed upon consideration, which certain of the ExAlt Trusts deliver to customers in exchange for their alternative assets. Ben Liquidity generates interest and fee income earned in connection with the ExAlt Loans, which are collateralized by a portion of the cash flows from the exchanged alternative assets (the "Collateral"). Ben Custody Admin currently provides trust administration services to the trustees of certain of the ExAlt Trusts that own the exchanged alternative asset following liquidity transactions for fees payable quarterly. The Collateral supports the repayment of the ExAlt Loans plus any related interest and fees and trust administration service fees. Under the applicable trust and other agreements, certain charities are the ultimate beneficiaries of the ExAlt Trusts (the "Non-Controlling Interest Holders"). As ultimate beneficiaries of prior transactions, for every $0.95 paid to the lender (e.g., subsidiaries of Ben LP) on the ExAlt Loans, $0.05 is also paid to certain of the Non-Controlling Interest Holders. For periods following 2020, future Non-Controlling Interest Holders are structured to be paid $0.025 for every $0.975 paid to the fiduciary financial lender (e.g., subsidiaries of Ben LP) of the ExAlt Loans. Since Ben LP consolidates the ExAlt Trusts, Ben LP's operating subsidiary's ExAlt Loans and related interest and fee income are eliminated in the presentation of our consolidated financial statements.

Prior to January 1, 2021, Ben LP operated primarily through certain of its subsidiaries that included, (i) Beneficient Capital Company, L.L.C. ("BCC"), which offered liquidity products; (ii) Beneficient Administration and Clearing Company, L.L.C. ("BACC"), which provided services for private fund and trust administration; and (iii) other entities, including the ExAlt Trusts.

On December 31, 2020, a series of restructuring transactions occurred to better position certain of Ben LP's subsidiaries for ongoing operations and future products and services, to capitalize Pen and to meet certain requirements of the Texas

Department of Banking. In connection with these transactions, BCC transferred all of its assets, which included, among other assets, its ExAlt Loans receivable, liabilities, which included, among other liabilities, loans payable with respect to secured loans with HCLP Nominees, L.L.C., held as of December 31, 2020, to BCH. In order to capitalize Pen and enable it to offer insurance products and services to cover risks attendant to owning and managing alternative assets following approval from the Bermuda Monetary Authority (the "BMA"), BCH contributed to Pen certain of such ExAlt Loans receivable with an aggregate carrying value equal to $129.2 million. Likewise, BACC transferred all of its assets, which included its rights to perform fund trust administration services under certain trust and other agreements, and liabilities to BCH, which will perform such services until a Texas trust company charter is issued or the Kansas TEFFI trust company becomes operational.

Subsequent to December 31, 2020, Ben LP operates primarily through its business line operating subsidiaries, which provide, or will provide, Beneficient's existing and planned products and services. These subsidiaries include (i) Ben Liquidity, which offers liquidity products; (ii) Ben Custody Admin, which provides services for fund and trust administration; (iii) Ben Insurance L.L.C., including its subsidiaries ("Ben Insurance"), which intends to offer insurance products and services covering risks attendant to owning, managing and transferring alternative assets; (iv) Ben Markets, L.L.C., including its subsidiaries ("Ben Markets"), which intends to provide broker-dealer services in connection with offering Beneficient's liquidity products and services; and (vi) other entities, including the ExAlt Trusts, which operate for the benefit of the Non-Controlling Interest Holder. Beneficient's financial products and services are presently offered through Ben Liquidity and Ben Custody Admin, and Beneficient plans to expand its capabilities under Ben Custody Admin and provide products and services through Ben Insurance and Ben Markets in the future.

Beneficient's existing and planned products and services are designed to provide liquidity and trust solutions, support the tax and estate planning objectives of its MHNW customers, facilitate asset diversification or provide administrative management and reporting solutions tailored to the goals of investors of alternative investments.

Following several enhancements to its business practices, on March 6, 2020, Beneficient submitted updated trust company charter applications for two trust companies (one for liquidity products and the other for custodian and trustee services) to the Texas Department of Banking. On November 25, 2020, Beneficient withdrew one of its Texas charter applications.

In April 2021, the Kansas Legislature adopted, and the governor of Kansas signed into law, a bill that would allow for the chartering and creation of Kansas trust companies, known as TEFFIs, that provide fiduciary financing (e.g., lending to the Exalt Trusts), custodian and trustee services in all capacities pursuant to statutory fiduciary powers, to investors and other participants in the alternative assets market, as well as the establishment of alternative asset trusts. The legislation became effective on July 1, 2021, and designates an operating subsidiary of Ben LP, Beneficient Fiduciary Financial, L.L.C. ("BFF"), as the pilot trust company under the TEFFI legislation. A conditional trust charter was issued by the Kansas Bank Commissioner to BFF on July 1, 2021. Under the pilot program, Beneficient will not be authorized to exercise its fiduciary powers as a TEFFI until the earlier of the date the Kansas Bank Commissioner promulgates applicable rules and regulations or December 31, 2021. The bill also permits the Kansas Bank Commissioner to request a six-month extension of the pilot program period, which could delay Beneficient's permission to exercise fiduciary powers under the charter until July 1, 2022. In order to devote their time to serving as directors of the Beneficient TEFFI trust company, the directors of GWG Holdings who serve on the new TEFFI trust company Board of Directors resigned their membership, effective June 14, 2021, on GWG Holdings' Board of Directors, which the Company believes is the highest and best use of their available time and skills and will support the development of the Beneficient TEFFI trust company and the successful execution of Beneficient's business plan.

Additionally, Beneficient's charter application for custodian and trustee services remains in process at the Texas Department of Banking. If the charter is issued, the trust company would serve as custodian and trustee to one or more of the ExAlt Trusts. Similar or the same services may also be provided by Beneficient's Kansas trust company TEFFI. Also, a subsidiary of Ben Insurance, PEN Indemnity Insurance Company, Ltd. ("Pen"), has applied for regulatory approval from the BMA to write fiduciary liability policies for managers and investors in alternative asset funds to cover losses from contractual indemnification and exculpation provisions arising under the governing documents of such funds. Further, on March 26, 2021, a Ben LP subsidiary, Beneficient Capital Markets, L.L.C ("Beneficient Capital Markets") filed a Form BD with the Securities and Exchange Commission ("SEC") to commence its application for broker-dealer registration. Upon registration and admittance as a Financial Industry Regulatory Authority ("FINRA") member, Beneficient Capital Markets will conduct its activities attendant to offering Beneficient's products and services.

When the Kansas TEFFI trust company is authorized to exercise its fiduciary powers, Beneficient expects to be able to expand its operations and close an increased number of liquidity transactions. Additionally, once BMA regulatory approval is

Table of Contents

obtained and Beneficient Capital Markets is admitted as a FINRA member, Beneficient anticipates being able to offer its full suite of Beneficient's Current and Future Products and Services.

**The Beneficient Transactions**

*The Exchange Transaction*

On December 28, 2018 (the "Final Closing Date"), we completed a series of strategic exchanges of assets among GWG Holdings, GWG Life, Ben LP and certain trusts, each identified as an Exchange Trust formed during 2017 and 2018 (such trusts collectively, the "Seller Trusts", which are a related party but not among Ben LP's consolidated trusts), pursuant to a Master Exchange Agreement among the parties (the "Exchange Transaction"). As a result of the Exchange Transaction, a number of securities were exchanged between the parties, including the following securities as of the Final Closing Date: the Seller Trusts acquired GWG L Bonds due 2023 (the "Seller Trust L Bonds") in the aggregate principal amount of $366.9 million; the Seller Trusts acquired 27,013,516 shares of GWG Holdings' common stock; GWG Holdings acquired 40,505,279 common units of Ben LP (the "Common Units"); and GWG Holdings acquired the right to obtain additional Common Units or other property that would be received by a holder of Preferred Series A Subclass 1 Unit Accounts of BCH pursuant to an option issued by Ben LP (the "Option Agreement"). In addition, in connection with the Exchange Transaction, Ben LP, as borrower, entered into a commercial loan agreement (the "Commercial Loan Agreement") with GWG Life, as lender, providing for a loan in a principal amount of $192.5 million as of the Final Closing Date (the "Commercial Loan").

*The Investment and Exchange Agreements*

On December 31, 2019, GWG Holdings obtained control over Ben LP pursuant to a Preferred Series A Unit Account and Common Unit Investment Agreement by and among GWG Holdings, Ben LP, BCH, and Beneficient Management (the "Investment Agreement"), which resulted in the consolidation of GWG Holdings and Ben LP for accounting and financial reporting purposes.

Pursuant to the Investment Agreement, GWG Holdings transferred $79.0 million to Ben LP in return for 666,667 Common Units and a Preferred Series A Subclass 1 Unit Account of BCH.

In connection with the Investment Agreement, GWG Holdings obtained the right to appoint a majority of the board of directors of Beneficient Management, the general partner of Ben LP. As a result, GWG Holdings obtained control of Ben LP and began reporting the results of Ben LP and its subsidiaries on a consolidated basis beginning on the transaction date of December 31, 2019. GWG Holdings' right to appoint a majority of the Board of Directors of Beneficient Management will terminate in the event (i) GWG Holdings' ownership of the fully diluted equity of Ben LP (excluding equity issued upon the conversion or exchange of Preferred Series A Unit Accounts of BCH held as of December 31, 2019 by parties other than GWG Holdings) is less than 25%, (ii) the Continuing Directors of GWG Holdings cease to constitute a majority of the Board of Directors of GWG Holdings, or (iii) certain bankruptcy events occur with respect to GWG Holdings. The term "Continuing Directors" means, as of any date of determination, any member of the Board of Directors of GWG Holdings who: (1) was a member of the Board of Directors of GWG Holdings on December 31, 2019; or (2) was nominated for election or elected to the Board of Directors of GWG Holdings with the approval of a majority of the Continuing Directors who were members of the Board of Directors of GWG Holdings at the time of such nomination or election.

Following the transaction, and as agreed upon in the Investment Agreement, GWG Holdings was issued an initial capital account balance for the Preferred Series A Subclass 1 Unit Account of $319.0 million. The other holders of the Preferred Series A Subclass 1 Unit Accounts are an entity related to Beneficient's initial investors (the "Ben Initial Investors") and an entity related to one of Beneficient's directors who is also a former director of GWG Holdings (the "Related Account Holders"). The parties to the Investment Agreement agreed that the aggregate capital accounts of all holders of the Preferred Series A Subclass 1 Unit Accounts after giving effect to the investment by GWG Holdings is $1.6 billion. GWG Holdings' Preferred Series A Subclass 1 Unit Account is the same class of preferred security as held by the Related Account Holders. In the event the Related Account Holders exchange their Preferred Series A Subclass 1 Unit Account for securities of GWG Holdings, the Preferred Series A Subclass 1 Unit Account of GWG Holdings would be converted into Common Units (so neither GWG Holdings nor the founders would hold Preferred Series A Subclass 1 Unit Accounts).

Also, on December 31, 2019, in a transaction related to the Investment Agreement, GWG Holdings transferred its interest in the Preferred Series A Subclass 1 Unit Account to its wholly owned subsidiary, GWG Life.

App. 1095

In addition, on December 31, 2019, GWG Holdings, Ben LP and the holders of Common Units entered into an Exchange Agreement (the "Exchange Agreement") pursuant to which the holders of Common Units from time to time have the right, on a quarterly basis, to exchange their Common Units for common stock of GWG Holdings. The exchange ratio in the Exchange Agreement is based on the ratio of the capital account associated with the Common Units to be exchanged to the market price of GWG Holdings' common stock based on the volume weighted average price of GWG Holdings' common stock for the five consecutive trading days prior to the quarterly exchange date. The Exchange Agreement is intended to facilitate the marketing of Ben LP's products to holders of alternative assets.

*Preferred Series C Unit Purchase Agreement*

On July 15, 2020, GWG Holdings entered into a Preferred Series C Unit Purchase Agreement ("UPA") with Ben LP and BCH. The UPA was reviewed and approved by the then constituted Special Committee of the Board of Directors of GWG Holdings.

Pursuant to the UPA, and provided it has adequate liquidity, GWG Holdings has agreed to make capital contributions from time to time to BCH in exchange for Preferred Series C Unit Accounts of BCH during a purchasing period commencing on the date of the UPA and continuing until the earlier of (i) the occurrence of a Change of Control Event (as defined below) and (ii) the mutual agreement of the parties (the "Purchasing Period"). A "Change of Control Event" shall mean (A) the occurrence of an event that results in GWG Holdings' ownership of the fully diluted equity of Ben LP is less than 25%, the Continuing Directors (as defined below) of GWG Holdings cease to constitute a majority of the board of directors of GWG Holdings, or certain bankruptcy events occur with respect to GWG Holdings, and (B) the listing of Common Units on a national securities exchange (a "Public Listing"). The term "Continuing Directors" means, as of any date of determination, any member of the board of directors of GWG Holdings who: (1) was a member of the Board of Directors of GWG Holdings on December 31, 2019; or (2) was nominated for election or elected to the Board of Directors of GWG Holdings with the approval of a majority of the Continuing Directors who were members of the Board of Directors of GWG Holdings at the time of such nomination or election.

If, on or prior to the end of the Purchasing Period, a Public Listing occurs, the BCH Purchased Units shall be automatically exchanged for Common Units, or another unit of Ben LP, as the parties may mutually agree (the "Beneficient Units"), at the lower of (i) the volume-weighted average of the Beneficient Units for the 20 trading days following the Public Listing, and (ii) $12.75.

In addition, at any time following the Effective Date, all or some of the Preferred Series C Unit Accounts purchased under the UPA may be exchanged for Beneficient Units at the option of GWG Holdings (exercised by a special committee of the Board of Directors or, if such committee is no longer in place, the appropriate governing body of the Company); provided that, if GWG Holdings exchanges less than all of the Preferred Series C Unit Accounts purchased under the UPA, then, immediately after giving effect to such exchange, GWG Holdings shall be required to continue to hold Preferred Series C Unit Accounts with a capital account that is at least $10.0 million. The exchange price for such Beneficient Units shall be determined by third-party valuation agents selected by GWG Holdings and Beneficient.

*Contribution and Exchange Agreement*

On September 30, 2020, certain of the ExAlt Trusts (collectively, the "Participating ExAlt Trusts") at the sole direction of John A. Stahl, independent trustee of each such trust, with the intention of protecting the value of certain assets of the Participating ExAlt Trusts underlying part of the Collateral portfolio, the Participating ExAlt Trusts entered into that certain Contribution and Exchange Agreement with certain of the Seller Trusts, (collectively, the "Participating Exchange Trusts"), each of which entered into such agreement at the direction of its applicable trust advisor and by and through its applicable corporate trustee (the "Contribution and Exchange Agreement). Under the Contribution and Exchange Agreement, the Participating Exchange Trusts agreed to exchange 9,837,264 shares of GWG Holdings' common stock valued at $84.6 million, 543,874 shares of Common Units valued at $6.8 million, and GWG Holdings' L Bonds due 2023 in the aggregate principal amount of $94.8 million to the Participating ExAlt Trusts for $94.3 million in net asset value of the alternative asset investments held by the Participating ExAlt Trusts. This transaction (the "Collateral Swap") resulted in GWG Holdings, after the effects of eliminations upon consolidation, recognizing an additional $42.9 million of treasury stock, $3.4 million of additional noncontrolling interest, and $46.8 million of a deemed capital contribution from a related party.

The Exchange Transaction, the Investment and Exchange Agreements, the UPA, and the Collateral Swap are referred to collectively as the "Beneficient Transactions."

*Term Sheet*

On August 13, 2021, GWG Holdings entered into a non-binding term sheet (the "Term Sheet") with its non-wholly owned subsidiaries Ben LP and BCH that outlines a series of transactions which, if completed, will result in, among other things, (i) GWG Holdings receiving certain proposed enhancements to its investments in Beneficient; (ii) GWG Holdings no longer having the right to appoint directors of the Board of Directors of Beneficient Management; and (iii) Ben LP no longer being a consolidated subsidiary of GWG Holdings. The Term Sheet is a part of ongoing efforts by management and the Board of Directors of GWG Holdings to maximize the value of its investments in Beneficient.

GWG Holdings believes that returning control of Beneficient is a necessary step for Ben LP to establish one of its operating subsidiaries as a TEFFI under the Kansas Technology-Enabled Fiduciary Financial Institutions Act (the "TEFFI Act"), which is important to Beneficient's long-term business objective of providing liquidity and other services to holders of alternative assets.

Until the definitive documentation is finalized and executed, each of the provisions of the Term Sheet is non-binding and is subject to change in all respects, including as a result of additional diligence, the further discharge of fiduciary duties, and the negotiation of definitive documentation. GWG Holdings has begun working on definitive documentation to implement the Term Sheet with Ben LP and is working to complete such definitive documentation during the fourth quarter of 2021, although there can be no assurance definitive documentation will be completed by then, or at all.

If Ben LP becomes an independent company pursuant to the terms of the Term Sheet, GWG Holdings expects that Ben LP would reduce its reliance on GWG Holdings to fund its operations and would raise future capital from other sources. Beneficient's capital raising efforts may include the issuance of equity or debt of Ben LP or one of its subsidiaries, and the newly issued securities are expected to be dilutive to GWG Holdings' and GWG Life's percentage ownership in Ben LP and BCH and may include preferential terms relative to GWG Holdings' and GWG Life's investments in Ben LP and BCH, as applicable. GWG Holdings would still retain a substantial investment in Beneficient.

**Segment Financial Information**

We have two reportable segments: 1) Secondary Life Insurance and 2) Beneficient.

GWG Holdings' segment information is included in Note 16, Segment Reporting, to the consolidated financial statements included in Item 8 of Part II of this 2020 Form 10-K.

**Market Opportunity**

*Alternative Asset Liquidity Products and Services*

The market demand for liquidity from owners of alternative assets is generally correlated to the outstanding net asset value of illiquid alternative assets ("NAV") held by U.S. investors. Using data from various published industry reports from 2017 to 2020, certain widely accepted commercial private-equity databases, and applying its own proprietary assumptions and calculations ("Ben Estimates"), Beneficient estimates that total outstanding NAV held by U.S. investors exceeded $5.8 trillion in 2019 (up from an estimated $5.3 trillion in 2018).

According to at least one industry report from Preqin, the leading provider of data on alternative assets, from 2020, total outstanding NAV in the hands of U.S. investors grew at a 17.4% compound annual growth rate (CAGR) from 2017-2020, the highest CAGR of all investment classes.

According to Ben Estimates, the large U.S. institutions representing approximately 62% of the NAV have consistently sought liquidity on approximately 1.85% to 2.25% of their outstanding NAV on an annual basis. Based on Ben Estimates, this has led to an annual demand for liquidity of nearly $55.0 billion in recent years.

A primary group not included in this demand is the MHNW investor who holds investments of $5 million to $30 million compared to a large institution's holdings in the hundreds of millions or billions of dollars. Intermediary brokers will often not represent the MHNW individuals (or STM institutional investors). Of the $5.8 trillion of investments in alternative assets, approximately $785.0 billion were held by MHNW investors, and over $890.0 billion were held in the portfolios of STM investors, both segments of investors who we believe have little to no access to the highly competitive large institutional

Table of Contents

market for alternative asset liquidity, as reported by Preqin, Setter Capital and Ben Estimates. According to Ben Estimates, MHNW investors have only been able to access liquidity representing less than 0.5% of the NAV held by them each year, compared to the average 2% annually achieved by the large institutional owners, representing 62% of the market.

Based on these amounts, Beneficient estimates that MHNW investors would seek liquidity of at least 3% of their outstanding NAV each year if liquidity was made available to them, or a slightly greater percentage than that of large U.S. institutions. As a result, and according to Ben Estimates, the estimated market demand for liquidity by MHNW individuals would have exceeded $23.0 billion in 2020.

In addition to providing liquidity to owners of alternative assets, Beneficient, through Ben Custody Admin, seeks to address the administrative and regulatory burden of holding alternative assets by offering bespoke administrative support services to trustees and custodians. While Beneficient's conditional Kansas TEFFI charter, once operational, would allow Beneficient to provide custodial and trustee services, Beneficient has also submitted a trust company charter to the Texas Department of Banking to conduct custodial and trustee services in the future. Upon issuance of a trust company charter from Kansas or Texas, Beneficient intends to expand its services to provide its customers and others with comprehensive qualified custodial, trustee, accounting, tax, compliance, reporting and other back-office administrative services for their alternative assets. Ben Custody Admin's trust administrative support services to trustees and custodians are currently only offered to certain of the ExAlt Trusts, which are consolidated subsidiaries of Beneficient.

*Primary Life Insurance Market and Technology ("insurtech")*

The opportunity to apply technology to transform the insurance industry is significant. The application of technology to the insurance industry, commonly referred to as "insurtech", provides opportunities for new entrants into the traditional insurance marketplace that have the potential to significantly disrupt the insurance industry's historical approach to assessing and selecting acceptable underwriting risks. GWG Holdings' involvement in the insurtech space is limited to its investments in FOXO, as discussed in the Organizational Structure section above. GWG Holdings has contributed $16.2 million in cash to FOXO to date through December 31, 2020, and is committed to contribute an additional $3.8 million to the entity through October 2021, all of which was contributed by such date.

**Business Strategies**

*1. Liquidity for Alternative Assets*

As a result of the Beneficient Transactions, we are now uniquely positioned to provide liquidity and related services to investors holding a full range of illiquid alternative assets. We will continue to work to create the most value for holders of alternative assets, the financial professionals who advise them, and for our shareholders.

Beneficient provides private trust solutions, including a unique suite of lending and liquidity products focused on bringing liquidity to owners of alternative assets. Beneficient's innovative liquidity solutions are designed to serve MHNW individuals, STM institutions, and asset managers who have historically possessed few attractive options to access early liquidity from their alternative assets. Beneficient targets MHNW individual customers with $5 million to $30 million in investments and institutional customers typically holding less than $1 billion in assets.

Beneficient's products can also support tax and estate planning objectives, facilitate a diversification of assets or provide administrative management and reporting solutions tailored to the goals of the investor.

Our life insurance secondary market business is designed to serve consumers 65 years or older who own life insurance policies. We seek to earn non-correlated yield from life insurance policies that we purchased and may purchase in the secondary market. Since inception, we have purchased over $3.2 billion in face value of policy benefits from consumers for over $620 million, as compared to the $52 million in surrender value offered by insurance carriers on those same policies. Our products provide unique and valuable services to the senior consumers whom we serve.

The goal of our secondary life insurance business has been to build a profitable, large and well-diversified portfolio of life insurance assets. We have not made additional investments in the life settlements portfolio since 2018. However, because of the changes in the capital markets landscape, including the availability of favorable financing terms, we have begun exploring the feasibility of additional future investments in the life settlement portfolio as well as the form such investments might take.

Table of Contents

*2. Insurance Products and Services*

Through Ben Insurance, Beneficient intends to offer customized insurance services covering risks attendant to owning, managing, and transferring alternative assets. These services would provide tailored solutions to customers that enable them to mitigate many of the risks associated with alternative asset ownership, management and divestment. We are also exploring opportunities to provide life insurance products related to our life insurance business.

*3. Developing a World Class Financial Services Distribution Platform*

GWG Holdings has developed a large and sophisticated financial services product distribution platform. Today, this platform consists of approximately 145 independent broker-dealers and almost five thousand independent financial advisors ("Retail Distribution") who sell the Company's investment products. "Independent" in this context refers to broker-dealers that accommodate financial advisors who carry securities licenses and need back-office support for services, such as compliance and trade execution, but allow their advisors wide latitude in how they conduct business. Since inception, GWG Holdings has raised approximately $2.6 billion of debt and equity capital, including renewals but excluding Seller Trust L Bonds, to support our business activities.

We believe that we are well positioned to continue to grow our Retail Distribution for several reasons:

- Newly independent financial professionals and their clients demand a high level of customer service and access to innovative and value added products;

- The significant demand for liquidity from owners of alternative assets by US investors;

- GWG Holdings' relationship with Beneficient will attract more and larger broker dealers to our platform due to our increased size and market capitalization as well as the increase in products offered; and

- By using capital to provide liquidity products to our current customers, and as they begin to realize the benefit of these products, we will able to raise more capital and attract additional broker dealers into our selling group.

**Competitive and Regulatory Framework**

*Competition*

We encounter significant competition from numerous companies in the products and services we provide and seek to develop in the alternative assets industry. Many of these competitors may have greater resources and significantly lower cost of funds than we do because, for example, they have access to insured deposits or greater access to the capital markets. They may also have greater market share in the markets in which we operate. These factors could adversely affect our business, results of operations and financial condition and our ability to implement our growth strategies.

In addition, as we enter new markets, we expect to experience significant competition from incumbent market participants. Our ability to compete in these markets will depend on our ability to deliver value-added products and services to the customers we serve. These factors could also adversely affect our business, results of operations and financial condition and our ability to implement our growth strategies.

*Government Regulation*

Our life insurance secondary market business is highly regulated at the state level. We hold a license to purchase life insurance policies in one state and can also purchase in seven unregulated states. We have also historically purchased life insurance policies from other secondary market participants. States generally subject us to laws and regulations requiring us to obtain specific licenses or approvals to purchase life insurance policies in those states. State statutes typically provide state regulatory agencies with significant powers to interpret, administer and enforce the laws relating to the life insurance industry. Under this authority, state regulators have broad discretionary power and may impose new licensing and other requirements, and interpret or enforce existing regulatory requirements in new and different ways. Any of these new requirements, interpretations or enforcement directives could be materially adverse to our industry.

Although the federal securities laws and regulations do not directly affect life insurance, in some cases the purchase of a variable life insurance policy may constitute a transaction involving a "security" that is governed by federal securities laws. While we presently

hold few variable life insurance policies, our holding of a significant amount of such policies in the future could cause our Company or one of our subsidiaries to be characterized as an "investment company" under the federal

Page 8

Table of Contents

Investment Company Act of 1940. The application of that law to all or part of our businesses — whether due to our purchase of life insurance policies, GWG Holdings' and GWG Life's investments in Beneficient, or to the expansion of the definition of "securities" under federal securities laws — could require us to comply with detailed and complex regulatory requirements, and cause us to fall out of compliance with certain covenants under the second amended and restated senior credit facility with LNV Corporation (as amended from time to time, "LNV Credit Facility"), the credit facility (the "NF Credit Facility") with National Founders, L.P. ("National Founders"), the credit agreements governing Beneficient's secured loans from HCLP Nominees, L.L.C., and the Pledge and Security Agreement in favor of the holders of the L Bonds of GWG Holdings. Such an outcome could negatively affect our business, results of operations and financial condition and our ability to implement our growth strategies.

Beneficient has applied for a trust company charter from the Texas Department of Banking, received a conditional Kansas TEFFI charter from the Kansas Office of the State Bank Commissioner, and intends to carry on a significant portion its business through its subsidiary, BFF, as a Kansas TEFFI. Because Beneficient's current business plans are based in part on obtaining the unconditional Kansas TEFFI charter to operate as regulated Kansas TEFFI, a failure to obtain such unconditional Kansas TEFFI charter may materially and adversely impact its financial performance and prospects, which would likely diminish our ability to effect certain parts of our business plan and growth strategies. Furthermore, a failure to obtain the unconditional Kansas TEFFI charter may trigger an impairment assessment related to the assets of Beneficient, including goodwill recognized in connection with the Investment and Exchange Agreements (see Note 4 to our accompanying audited consolidated financial statements for further details of the accounting for the change in control). Additionally, in connection with the receipt of a Kansas TEFFI charter, BFF will become subject to further regulation by the Kansas Office of the State Bank Commissioner, including new rules and regulations that it will be expected to adopt as a part of and following the TEFFI pilot program. Such regulations could prove to be burdensome on Beneficient's business and could adversely impact its financial condition and results of operations.

In addition, Beneficient has applied for regulatory approval to commence offering insurance policies through its Ben Insurance subsidiary, Pen, in Bermuda as a Class 3 insurer. Bermuda insurance statutes and regulations, and the policies of the BMA, require that Pen, among other things, maintain a minimum level of capital and surplus, satisfy solvency standards, restrict dividends and distributions, obtain prior approval or provide notification to the BMA of certain transactions, maintain a head office in Bermuda, have a representative, secretary or a director resident in Bermuda, appoint and maintain a principal representative in Bermuda and provide for the performance of certain periodic examinations of itself and its financial conditions. A failure to meet these conditions may result in the failure to obtain the required regulatory approvals or, if obtained, a suspension or revocation of Pen's authority to do business as an insurance company in Bermuda, which would mean that Pen would not be able to provide the planned insurance products until the approvals are obtained or any suspension or revocation of the required approvals is resolved.

The state regulatory landscape for the use of genetic and epigenetic testing in life insurance underwriting is such that genetic and epigenetic testing is generally permitted. A few states require informed consent for use of genetic testing in life insurance underwriting. Epigenetic testing is distinguishable from genetic testing and we believe epigenetic testing does not raise the ethical issue found with genetic testing of denying insurance coverage to applicants based on immutable inherited characteristics. While well-informed policymakers and regulators should have little reason to consider expanding current definitions of genetic testing to include epigenetic testing, or to increase restrictions on life insurance underwriting using epigenetic test results, we can provide no such assurances.

Other changes to the current genetic and epigenetic regulatory framework, including the imposition of additional or new regulations, could arise at any time during the development or marketing of FOXO's epigenetic based products. This may negatively affect the ability of FOXO to obtain or maintain applicable regulatory clearance or approval of its products. In addition, regulatory authorities, such as the Food and Drug Administration ("FDA"), may introduce new requirements that may change the regulatory requirements for FOXO or its customers, or both.

On March 26, 2021, Beneficient Capital Markets filed a Form BD with the SEC to commence its application for broker-dealer registration. If and when Beneficient Capital Markets is registered and admitted as a FINRA member, it will become subject to the various rules and regulations governing broker-dealers.

Much of the regulation of broker-dealers has been delegated by the SEC to self-regulatory organizations such as FINRA. FINRA adopts rules (which are subject to approval by the SEC) for governing its members and the industry. Broker-dealers are also subject to federal securities laws and SEC rules, as well as the laws and rules of the states in which a broker-dealer conducts business. The laws and regulations to which broker-dealers are subject cover all aspects of its securities business, including, but not limited to, sales and trading practices, net capital requirements, record keeping and reporting procedures,

Table of Contents

relationships and conflicts with customers, restrictions on new business lines without regulatory approval, restrictions on cash withdrawals and distributions, investment banking activities, experience and training requirements for certain employees, and the conduct and supervision of registered persons, officers and employees. Broker-dealers are also subject to privacy, disaster recovery and anti-money laundering laws and regulations.

The principal purpose of regulation, oversight and discipline of broker-dealers is the protection of customers and the securities markets rather than protection of creditors and stockholders of broker-dealers. Additional legislation, changes in rules promulgated by the SEC, securities exchanges, self-regulatory organizations such as FINRA or states, or changes in the interpretation or enforcement of existing laws and rules, often directly affect the method of operation and profitability of broker-dealers. These governmental and self-regulatory organizations may conduct routine examinations, for-cause examinations, investigations and administrative and enforcement proceedings that can result in censure, fine, profit disgorgement, monetary penalties, suspension, revocation of registration or expulsion of broker-dealers, their registered persons, officers or employees.

*Health Insurance Portability and Accountability Act (HIPAA)*

HIPAA requires that holders of medical records maintain such records and implement procedures designed to assure the privacy of patient records. In order to carry out our secondary life insurance business, we receive medical records and obtain a release to share such records with a defined group of persons, take on the responsibility for preserving the privacy of that information, and use the information only for purposes related to the life insurance policies we own.

*The Genetic Information Nondiscrimination Act of 2008 (GINA)*

GINA is a federal law that protects people from genetic discrimination in health insurance and employment. GINA prohibits health insurers from: (i) requesting, requiring, or using genetic information to make decisions about eligibility for health insurance; or (ii) making decisions on the health insurance premiums, contribution amounts, or coverage terms they offer to consumers. In addition, GINA makes it against the law for health insurers to consider family history or a genetic test result, a preexisting condition, require a genetic test, or use any genetic information, to discriminate coverage, even if the health insurance company did not mean to collect such genetic information.

GINA does not apply to the life insurance, long-term care or annuity industries. The life insurance, long-term care or annuity industries operate on medical-evidenced underwriting principles in which specific medical conditions are taken into account when assessing and pricing risk. The regulation of genomic data is relatively new, and we believe it is likely that regulation will increase and grow more complex in the foreseeable future. We cannot, however, predict what any new law or regulation would specifically involve or how it might affect our industry, our business, or our future plans.

**Patents, trademarks, licenses**

Beneficient has registered trademarks for its liquidity products and its Ben Markets portal described in the "Our Company" section above. Beneficient also has trademarks pending registration on a number of its other liquidity products and trust services and other operating subsidiaries.

Beneficient filed provisional patent applications pending on certain of its systems and processes underlying its liquidity products and trust services. These patent applications cover the liquidity structure, underwriting, and risk assessment and reduction aspects of Beneficient's business.

**Employees**

We, primarily through Beneficient, employed approximately 160 employees as of the date of the filing of this Form 10-K. These employees are aligned to our vision and values – Trust, Trailblazing and Teamwork. The values inform our behaviors, how we pursue performance excellence and engage a thriving culture focused on collegiality. Our exceptional culture, career progression opportunities, and training and development have been instrumental in the retention of our talented employees. Our most important asset are the talented employees we are fortunate to have on our team. We will continue to grow our business leveraging their capabilities within an exceptional culture.

Our success depends upon the contributions of our employees, and our ability to provide employees with the resources they need to perform their roles and to develop and excel in their careers. Our senior management provides oversight for benefits and compensation of our workforce in a variety of ways, including periodic compensation benchmarking, implementation

Page 10

Table of Contents

and adaptation of various employee benefit programs, primarily health and other related benefits, review of certain employee post-retirement benefits and accessibility of employee assistance programs. Our human resources department oversees these programs to ensure our benefits and compensation are competitive.

**Company Website Access and SEC Filings**

Our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and amendments to reports filed pursuant to Sections 13(a) and 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), are filed with the SEC. We are subject to the informational requirements of the Exchange Act and file or furnish reports, proxy statements and other information with the SEC.

GWG Holdings general website address is *www.gwgh.com.* GWG Holdings website has additional information about our Company, its mission and our business. Our website also has tools that could be used by our customers and potential customers, financial advisors and investors. Beneficient's website address is *www.trustben.com* and has additional information about Beneficient, its mission and its business. We maintain the website *www.gwglife.com* for consumers and life insurance professionals seeking our life insurance secondary market products and services. The information contained on or accessible through the foregoing websites is not part of this 2020 Form 10-K.

<div align="center">Page 11</div>

**ITEM 1A. RISK FACTORS.**

Our business involves a number of challenges and risks. In addition to the other information in this report, you should consider carefully the following risk factors in evaluating us and our business. The risks described below are not the only ones that we face. Additional risks not presently known to us or that we currently deem immaterial may also affect our business, financial condition, operating results, or prospects.

**Risks Related to Our Operations and Organizational Structure**

***Our current inability to raise capital, recurring losses from operations, negative cash flows from operations, delays in executing our business plans, and potential negative implications of the ongoing SEC non-public, fact-finding investigation raise substantial doubt regarding our ability to continue as a going concern. The report from our independent registered public accounting firm for the year ended December 31, 2020, includes an explanatory paragraph stating that these factors raise substantial doubt about our ability to continue as a going concern.***

We heavily rely on debt financing through our L Bonds to raise sufficient capital to meet our obligations. We temporarily suspended the offering of GWG Holdings' L Bonds, commencing April 16, 2021, as a result of our delay in filing certain periodic reports with the SEC, including this 2020 Form 10-K. Our inability to meet the applicable NASDAQ listing requirements in a timely manner may result in the delisting of our common stock and our L Bonds no longer being "covered securities" for federal securities law purposes, which would subject the offer and sale of L Bonds to potentially extensive state "blue sky" securities law requirements.

The potential NASDAQ delisting, in combination with significant recurring losses from operations, negative cash flows from operations, delays in executing our business plans, and any potential negative outcome from the ongoing SEC investigation discussed elsewhere in this Form 10-K, raise substantial doubt about our ability to continue as a going concern. In that regard, the audit report issued by our independent registered public accounting firm for the audit of our 2020 consolidated financial statements includes an explanatory paragraph describing the existence of conditions that raise substantial doubt about our ability to continue as a going concern.

If we are unable to continue as a going concern, we may have to liquidate our assets and may receive less than the value at which those assets are carried on our audited financial statements, and it is likely that investors would lose part or all of their investment. Future reports from our independent registered public accounting firm may also contain statements expressing substantial doubt about our ability to continue as a going concern. If there remains substantial doubt about our ability to continue as a going concern, investors or other financing sources may be unwilling to provide additional funding to us on commercially reasonable terms, or at all, and our business may be harmed.

***We have a relatively limited history of operations, a history of net losses, and our future earnings, if any, and cash flows may be volatile, resulting in uncertainty about our ability to service and repay our debt when it comes due, redeem preferred stock when requested and uncertainty about our prospects generally.***

We are a company with a relatively limited operating history, which makes it difficult to accurately forecast our earnings and cash flows. We incurred a net loss attributable to common shareholders of $168.5 million in the year ended December 31, 2020. We had net income attributable to common shareholders of $70.5 million in the year ended December 31, 2019. Net income attributable to common shareholders in 2019 includes a gain on the consolidation of Beneficient of $243.0 million. We incurred a net loss attributable to common shareholders of $136.1 million in the year ended December 31, 2018. Our lack of a significant history and the evolving nature of the markets in which we operate make it likely that there are risks inherent to our business that are yet to be recognized by us or others, or not fully appreciated, and that could result in us suffering further losses. As a result of the foregoing, an investment in our securities necessarily involves uncertainty about the stability of our operating results, cash flows and, ultimately, our ability to service and repay our debt and our prospects generally. If we are unable to pay our debt when it becomes due, the trustee for the L Bonds or our other secured lenders may foreclose on the collateral securing such debt, which collateral may be worth less than the debt it secures, and investors in our securities could lose all or a portion of their investment. In addition, any volatility in our operating results we experience may adversely affect the market price of GWG Holdings' common stock.

***Our operations and financial results may be adversely affected by the ongoing COVID-19 pandemic.***

The COVID-19 coronavirus outbreak has impacted many countries around the world, including the United States. There have been numerous reports of the virus outbreak disrupting or restricting supply chains, facility closures, voluntary and mandatory quarantines, and federal, state and local governments and foreign governments requiring business to temporarily close or severely curtail commercial activity. It is also possible that the spread of the coronavirus may have direct effects on

Page 12

our operations, such as high levels of employee sickness and absences, limiting employee travel or increasing telecommuting arrangements. In addition, recent developments and reports indicate the coronavirus has coincided with heightened volatility in financial markets in the U.S. and worldwide. If the coronavirus adversely affects our business operations or leads to a significant or prolonged impact on global markets or economic growth, our financial conditions and results of operations could be adversely affected. We and other financial institutions generally must resume operations promptly following any interruption. If we were to suffer a disruption or interruption and were not able to resume normal operations within a period consistent with industry standards, our business, financial condition or results of operations could be adversely affected in a material manner. In addition, depending on the nature and duration of the disruption or interruption, we might become vulnerable to fraud, additional expense or other losses, or to a loss of business and customers.

***We may be unable to capitalize on the anticipated benefits of the Beneficient Transactions.***

We entered into the Beneficient Transactions anticipating that such transactions would provide significant financial and strategic benefits, including, significantly increasing our common equity, significantly reducing our leverage ratio, the introduction of new opportunities to lower our cost of funds (an important driver of stockholder value), diversifying our revenue and cash flow sources resulting in more consistent earnings, and increasing GWG Holdings' public float and the liquidity in its common stock, thereby increasing GWG Holdings' common stockholder base and potentially attracting additional equity analyst coverage (both of which are important factors in maximizing share valuation). In addition, certain terms of the Beneficient Transactions may be required to be revised to satisfy the requirements of the regulatory authorities from which Beneficient is seeking approvals or authorizations. There is no assurance that we will realize the anticipated benefits from the Beneficient Transactions. Failure to realize these benefits will likely have a material negative impact the results of our operations, our business prospects, the ultimate success of our strategic relationship and the value of GWG Holdings' common stock.

***GWG Holdings' ability to control the activities of Beneficient is subject to certain rights of others set forth in the limited liability company agreement for the general partner of Ben LP and GWG Holdings has entered into the Term Sheet that provides for it to relinquish certain rights with respect to Beneficient, including GWG Holdings' ability to appoint a majority of the board of directs of the general partner of Ben LP and control the activities of Beneficient.***

Beneficient Management, the general partner of Ben LP, has an executive committee, a nominating committee and a community reinvestment committee. The board of directors of Beneficient Management has the right to appoint two members of these committees, and an entity affiliated with Brad K. Heppner, former Chairman of GWG Holdings from April 26, 2019 to June 14, 2021, has the right to appoint the other two members of these committees. The entity affiliated with Mr. Heppner also has the right to appoint the chairman of the board of each of the committees. The Beneficient Management executive committee has the right to approve certain transactions on behalf of Beneficient Management and Ben LP and its subsidiaries, including the incurrence of debt, the issuance of equity interests of Ben LP or any subsidiary of Ben LP except in connection with any trust instrument or product offered by Ben LP or its affiliates, changes to or creation of employee incentive or benefit plans of Ben LP or its subsidiaries, certain changes to management of Beneficient Management or Ben LP or its subsidiaries, approval of mergers or acquisitions of Ben LP or liens on all or substantially all of its assets, and any change in the general partner of Ben LP. These rights may have the effect of limiting the power of GWG Holdings' board of directors to exercise control over certain business activities of Beneficient. In addition, GWG Holdings has entered into the Term Sheet which, if completed, will result in, among other things, (i) GWG Holdings receiving certain proposed enhancements to its investments in Beneficient; (ii) GWG Holdings no longer having the right to appoint directors of the board of directors of Beneficient Management; and (iii) Beneficient no longer being a consolidated subsidiary of GWG Holdings. Until the definitive documentation regarding the proposed transactions is finalized and executed, each of the provisions contemplated in the Term Sheet is non-binding and is subject to change in all respects, including as a result of additional diligence, the further discharge of fiduciary duties, and the negotiation of definitive documentation. The parties have begun working on definitive documentation to implement the Term Sheet and are working to complete such definitive documentation during the fourth quarter of 2021, but there can be no assurance definitive documentation will be completed by then, or at all.

***Ben LP's partnership agreement eliminates fiduciary duties that might otherwise be owed to GWG Holdings under Delaware law.***

Ben LP's partnership agreement eliminates the fiduciary duties that might otherwise be owed by Beneficient Management under Delaware law and replaces them with the duties expressly set forth in such agreement. Ben LP's partnership agreement provides that, when the general partner is permitted or required to make a decision in its "discretion" or pursuant to a provision not subject to an express standard of "good faith," in making such decision, the general partner has no duty to give any consideration to any interest of or factors affecting Beneficient or any other person. If a decision under Ben LP's partnership agreement is subject to an express standard of "good faith," such decision will not constitute a breach of the

agreement if the decision is approved by (i) a majority of the members of the conflicts committee of the board of directors of the general partner of Ben LP, (ii) holders of a majority of the voting power of the Ben LP's Common Units entitled to vote (excluding voting Common Units owned by the general partner and its affiliates), or (iii) the general partner acting without a subjective belief that such decision was adverse to the interests of Ben LP. Potential conflicts of interest may arise among the general partner and its affiliates, on the one hand, and Beneficient, on the other hand, and the general partner may be able to favor its own interest to the detriment of Beneficient and the holders of the Ben LP common units.

***If certain events occur, GWG Holdings will lose its right to appoint a majority of the board of directors of the general partner of Ben LP and therefore its ability to exercise control over Ben LP and consolidate its financial results. In addition, GWG Holdings has entered into the Term Sheet that provides for it to relinquish certain rights with respect to Beneficient, including GWG Holdings' ability to appoint a majority of the board of directors of the general partner of Ben LP and control the activities of Beneficient.***

In connection with the Investment Agreement, GWG Holdings acquired the right to appoint a majority of the board of directors of Beneficient Management. As a result, GWG Holdings reports the results of Ben LP and its subsidiaries on a consolidated basis beginning on the transaction date of December 31, 2019. GWG Holdings' right to appoint a majority of the board of directors of Beneficient Management will terminate in the event (i) GWG Holdings' ownership of the fully diluted equity of Ben LP (excluding equity issued upon the conversion or exchange of Preferred Series A Unit Accounts of BCH held as of December 31, 2019 by parties other than GWG Holdings) is less than 25%, (ii) the Continuing Directors of GWG Holdings cease to constitute a majority of the board of directors of GWG Holdings, or (iii) certain bankruptcy events occur with respect to GWG Holdings. The term "Continuing Directors" means, as of any date of determination, any member of the board of directors of GWG Holdings who: (1) was a member of the Board of Directors of GWG Holdings on December 31, 2019; or (2) was nominated for election or elected to the Board of Directors of GWG Holdings with the approval of a majority of the Continuing Directors who were members of the Board of Directors of GWG Holdings at the time of such nomination or election. In addition, GWG Holdings entered into the Term Sheet that provides for GWG Holdings no longer having the right to appoint directors of the board of directors of Beneficient Management and Beneficient no longer being a consolidated subsidiary of GWG Holdings. If any such events occur, GWG Holdings may no longer have the right to control Ben LP and consolidate its financial results, which could have a material negative effect on our financial condition.

***GWG Holdings' percentage ownership in Ben LP may be diluted significantly.***

GWG Holdings currently owns approximately 96% of the issued and outstanding common units in Ben LP. This percentage ownership does not take into account (i) limited partner interests that may be issued upon the conversion of outstanding securities issued by Ben LP or its affiliates, or (ii) additional limited partner interests that may be issued, and Ben LP is currently seeking to raise capital through the issuance of limited partner interests. Taking these issuances into account, as well as potential payments in Ben LP common units under the Seller Trust L Bonds, GWG Holdings' ownership interest in Ben LP common units could be reduced significantly below 25%. In addition, Beneficient Management has discretion to cause Ben LP to issue additional limited partner interests from time to time, and Ben LP's partnership agreement contains no meaningful restrictions on this authority. Moreover, the Beneficient organizational structure permits the future issuance of additional securities that can, upon certain circumstances or at the discretion of their holders, be converted into additional limited partner interests in Ben LP. Should any of these actions be taken, GWG Holdings' percentage ownership in Ben LP will be diluted.

***A failure to establish and maintain effective internal controls over financial reporting could adversely affect our financial results.***

A material weakness is defined as a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. GWG Holdings identified a material weakness in internal controls over financial reporting in the quarterly income tax provision process, which included the measurement of the valuation allowance against our deferred tax assets, which was reported in GWG Holdings' Quarterly Report on Form 10-Q for the quarter ended September 30, 2020. In addition, in connection with matters related to the Restatement, we have determined that a material weakness existed in our internal control over financial reporting for all periods from December 31, 2019 to December 31, 2020. As of December 31, 2020, the design and operating effectiveness of controls over the selection, application and review of the implementation of accounting policies were not sufficient to ensure amounts recorded and disclosed were fairly stated in accordance with GAAP. This material weakness resulted in the Restatement. As a result of these material weaknesses, GWG Holdings' Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were not effective for the year ended December 31, 2020.

Table of Contents

We continue to evaluate, design and implement controls and procedures under a remediation plan designed to address these material weaknesses. If our remedial measures are insufficient to address the material weaknesses, or if additional material weaknesses or significant deficiencies in our internal control are discovered or occur in the future, our financial results could be adversely affected.

GWG Holdings is a smaller reporting company for SEC reporting purposes and has historically had limited accounting and financial reporting resources. Prior to the December 31, 2019 consolidation with GWG Holdings, Beneficient was not subject to the reporting obligations required under the Sarbanes-Oxley ("SOX") Act of 2002. The consolidation of Beneficient and GWG Holdings resulted in increased accounting, reporting and internal controls complexity as the companies integrate systems and processes.

Effective internal controls are necessary for GWG Holdings and Beneficient to provide reliable financial reports, prevent fraud and operate successfully. If either GWG Holdings or Beneficient, or both, cannot provide reliable financial reports or prevent fraud, our ability to accurately report financial results could be adversely affected and our reputation and operating results would be harmed. While GWG Holdings and Beneficient believe they have increased their accounting and financial reporting resources, GWG Holdings and Beneficient cannot be certain that their efforts to further establish and maintain internal controls over financial reporting will be successful. Any failure to further develop, as necessary, or to maintain effective internal controls could harm our operating results or cause us to fail to meet our reporting obligations. Ineffective internal controls could also cause investors to lose confidence in our reported financial information. Refer to *Item 9A. Control and Procedures* for additional information regarding the material weaknesses identified.

### *We may not realize a return on GWG Holdings' investment in FOXO Technologies Inc.*

Under the FOXO subscription agreement, GWG Holdings is obligated to invest $20.0 million in FOXO over a two-year period ending in October 2021, of which $16.2 million was funded as of December 31, 2020. The success of FOXO is dependent, in part, on new and unproven technology as part of its life insurance policy underwriting process. If the mortality predictions FOXO obtains through use of this technology proves inaccurate, FOXO may not generate sufficient cash flows to satisfy the terms of the distributions to us as provided in its operating agreement. Furthermore, any failure by FOXO to protect its intellectual property rights could impair its ability to protect its proprietary technology and the value of GWG Holdings' investment. As such, GWG Holdings may not realize the return contemplated in the FOXO subscription agreement, and our results of operations and financial condition could be materially and adversely affected.

### *The resale of GWG Holdings' common stock issued in the Exchange Transaction could result in a reduction in the market price of GWG Holdings' common stock and result in a destabilized trading market for GWG Holdings' common stock.*

Upon the Final Closing Date, GWG Holdings issued 27,013,516 shares of its common stock to the Seller Trusts, which in the aggregate represented approximately 83% of the outstanding common stock on that date. On September 30, 2020, the ownership of 9,837,264 shares transferred to certain of the ExAlt Trusts in connection with the Collateral Swap, as discussed in *Item 1. Business*. The remaining shares issued in the Exchange Transaction are subject to resale restrictions applicable to "restricted securities" under applicable federal securities laws. The Master Exchange Agreement and related ancillary agreements require that GWG Holdings register the resale of the shares of common stock issued in the Exchange Transaction to the Seller Trusts to the extent permitted by applicable SEC rules and regulations. Upon the effectiveness of any such registration, or the lapse of applicable resale restrictions under applicable securities laws, the shares of GWG Holdings' common stock issued in the Exchange Transaction will be available for resale in the public equity markets. We cannot predict the effect, if any, that future sales of these shares or the availability of these shares for future sale could have on the market price of GWG Holdings' common stock.

### *The Seller Trusts, collectively, have the power to control the vote of a majority of GWG Holdings' outstanding common stock, enabling them to exert significant influence over our operations, which may affect the trading price of GWG Holdings' common stock.*

According to their most recent Schedule 13D/A filing, the Seller Trusts own approximately 48.6% of GWG Holdings' outstanding common stock. The Seller Trusts are a group of individual common law trusts that received shares of such common stock in the Exchange Transaction. The trustee of each of the Seller Trusts is Delaware Trust Company. The trust advisors of each trust are two individuals unrelated to each other, Murray T. Holland (GWG Holdings' President and Chief Executive Officer) and James E. Turvey, a Beneficient employee, who have sole decision-making authority with respect to each Seller Trust. The beneficiary of each of the Seller Trusts is MHT Financial, LLC. The current members of MHT Financial, LLC include Murray T. Holland and an entity owned by Shawn T. Terry and Mike McGill. The Seller Trusts are entitled to full voting rights with respect to the shares of Common Stock they own. Because the Seller Trusts, collectively,

App. 1117

own a substantial portion of GWG Holdings' outstanding voting securities and certain ExAlt Trusts, holding approximately 29.7% of GWG Holdings' outstanding common stock according to their latest Schedule 13D/A filing have agreed to vote their shares in proportion to the votes cast by all other holders of GWG Holdings' voting securities, the Seller Trusts are entitled to cast a majority of the votes on all matters requiring stockholder votes, including, if a stockholder vote is required: the election of directors; mergers, consolidations, acquisitions and other strategic transactions; the sale of all or substantially all of our assets and other decisions affecting our capital structure; amendments to GWG Holdings' Certificate of Incorporation or bylaws; and our winding up and dissolution. This concentrated ownership enables the Seller Trusts to exert significant influence over all of our corporate activities, including the election of directors to GWG Holdings' Board of Directors, and may delay, deter or prevent acts that would be favored by our other stockholders. The interests of the Seller Trusts may not always coincide with our interests or the interests of our other stockholders. This concentration of ownership may also have the effect of delaying, preventing or deterring a change in control of the Company. Also, the Seller Trusts may seek to cause us to take courses of action that, in their judgments, could enhance their investments in us, but which might involve risks to our other stockholders or adversely affect us or our other stockholders. As a result, the market price of GWG Holdings' shares could decline or stockholders might not receive a premium over the then-current market price of GWG Holdings' shares upon a change in control. In addition, this continued concentration of share ownership may adversely affect the trading price of GWG Holdings' shares because prospective investors may perceive disadvantages in owning shares in a company with such significant stockholders.

***We are currently relying on the "controlled company" exemption under Nasdaq Stock Market Listing Rules, pursuant to which "controlled companies" are exempt from certain corporate governance requirements otherwise applicable under Nasdaq Stock Market Listing Rules.***

The Nasdaq Stock Market Listing Rules exempt "controlled companies," or companies of which more than 50% of the voting power is held by an individual, a group or another company, from certain corporate governance requirements, including those requirements that:

- A majority of the board of directors consist of independent directors;
- Compensation of officers be determined or recommended to the board of directors by a majority of its independent directors or by a compensation committee comprised solely of independent directors; and
- Director nominees be selected or recommended to the board of directors by a majority of its independent directors or by a nominating committee that is composed entirely of independent directors.

The Seller Trusts that acquired GWG Holdings' shares in the Beneficient Transactions own approximately 48.6% of our common stock and are considered a group for purposes of the Nasdaq controlled company listing rule, based on the most recent Schedule 13D/A filed by the Seller Trusts and its trust advisors with the SEC, and certain of the ExAlt Trusts, holding approximately 29.7% of GWG Holdings' outstanding common stock according to their latest Schedule 13D/A filing have agreed to vote their shares in proportion to the votes cast by all other holders of GWG Holdings' voting securities. As a result, we are currently a "controlled company" and are relying on the controlled company exemption for certain of the above requirements, including those related to director nomination. Accordingly, should the interests of the Seller Trusts differ from those of other stockholders, the other stockholders do not have the same protections generally as stockholders of other Nasdaq-listed companies with respect to corporate governance for so long as we rely on the controlled company exemption from the specified corporate governance requirements. GWG Holdings' status as a controlled company could make GWG Holdings' common stock less attractive to some investors or otherwise harm GWG Holdings' stock price.

**Risks Related to Our Liquidity Products Business**

***Beneficient may be unable to operate its business successfully, which would negatively impact its ability to generate distributable cash flow and increase the value of GWG Holdings' and GWG Life's investments in Beneficient.***

We operate our liquidity products business through our consolidated subsidiary Ben LP and its subsidiaries. The success of our liquidity products business will depend primarily on Beneficient's ability to operate its business successfully, generate distributable cash flow, and increase the value of GWG Holdings' and GWG Life's investments in Beneficient. If Beneficient is unable to do so, such inability will negatively impact our operations and liquidity and may result in an impairment of goodwill. Beneficient does not have significant operating history under its current business plan. Additionally, Ben LP's proposed trust company subsidiary has no operating history. In general, companies that seek to implement these kinds of business plans present substantial business and financial risks and uncertainties. Furthermore, to date, Ben LP's originations of liquidity products have been transacted primarily with a limited number of family offices, fund-of-funds and institutions. These types of customers, specifically fund-of-funds and institutions, may not represent the target market of Beneficient's liquidity products in the future, and Beneficient has only recently begun transactions with individual investors.

Table of Contents

Because Beneficient represents a significant percentage of our consolidated assets, the impact on our consolidated financial statements of Beneficient's financial performance is likely to be material.

***Beneficient may not obtain an unconditional Kansas TEFFI charter and has experienced significant delays in obtaining a trust company charter, which outcome would hinder Beneficient's ability to successfully pursue its current business plan and could adversely affect the value of GWG Holdings' and GWG Life's investments in Beneficient.***

Beneficient's liquidity products are designed to facilitate the delivery, at a customer's election, of cash, equity securities or debt securities, or a combination of cash and equity or debt securities for their alternative assets. In order to further grow these businesses, BFF is seeking to obtain an unconditional TEFFI charter in Kansas and a non-depository trust company charter in Texas. Each of those proposed institutions may not commence operations until it receives its respective unconditional charter.

In April 2021, the Kansas Legislature adopted, and the governor of Kansas signed into law, a bill that would allow for the chartering and creation of Kansas TEFFI trust companies that provide fiduciary financing, custodian and trustee services to participants in the alternative assets market known as TEFFIs, as well as the establishment of alternative asset trusts. The legislation, which names BFF as the pilot TEFFI, became effective on July 1, 2021. As part of the pilot program, BFF received a conditional charter on July 1, 2021, and has applied for a final operational charter. Upon issuance of a final operational charter, Beneficient expects to conduct its liquidity business through BFF as a Kansas TEFFI. While Beneficient expects that it will establish an operational Kansas TEFFI trust company with a permanent unconditional charter, its ability to do so is not assured, in part because BFF's initial charter will be a part of a pilot program that could last until July 1, 2022 during which it will not be authorized to conduct operations. Until that time, BFF will not be authorized to conduct operations as a TEFFI. There can be no assurance that BFF will receive an unconditional TEFFI charter following the pilot program. Further, in connection with the expected receipt of a Kansas TEFFI charter, BFF is anticipated to become subject to regulation by the Kansas Office of the State Bank Commissioner and new rules and regulations that it would be expected to promulgate throughout and following the pilot program. Such regulations could prove to be burdensome on Beneficient's business and could adversely impact its financial condition and results of operations. Beneficient filed limited trust association charter applications for two proposed trust companies (one to offer liquidity products and the other to offer custodial and trustee services) with the Texas Department of Banking in September of 2018 and submitted revised charter applications on March 6, 2020. During the fourth quarter of 2020, the Texas Department of Banking delivered guidance to Beneficient that it does not require a trust company charter for Beneficient to offer its liquidity products to customers, and, as a result, on November 25, 2020, Beneficient withdrew its charter application with respect to the liquidity products. However, Beneficient is exploring whether it would be advantageous to continue pursuing a trust company charter to provide its liquidity products. Beneficient's charter application with respect to offering custodial and trustee services remains under review by Texas Department of Banking. Approval of this application is not assured.

Because Beneficient's current business plans are based in part on obtaining regulatory approval to operate a regulated trust company, a failure to do so may materially and adversely impact its financial performance and prospects, which would likely negatively impact our results of operations and may result in impairment of goodwill.

Even if the Kansas TEFFI is established or the Texas charter application is approved, Beneficient expects that the approval will be subject to certain conditions including, among others, that each proposed entity satisfies certain minimum restricted capital requirements. There is no assurance that Beneficient will be able to satisfy all the conditions imposed by the Kansas Office of the State Bank Commissioner or the Texas Department of Banking in connection with its approval. In addition, such conditions could delay the anticipated time for commencement of fiduciary operations.

***Beneficient may not be able to grow, effectively manage its growth, or achieve profitability.***

A principal focus of Beneficient's liquidity products strategy is to expand the number of Beneficient's product offerings and grow Beneficient's trust administration products and services. Beneficient's future growth depends upon a number of factors, many of which are beyond Beneficient's ability to control. These factors include Beneficient's ability to:

- accurately assess the demand for and sell the products and offerings that Beneficient has developed and expects to develop to meet demand;
- compete against other customer solutions and vendors;
- maintain the quality of Beneficient's trust administration products and services;
- effectively manage Beneficient's financing underwriting and risk criteria and manage diversification, including with effective risk management discipline;

- update Beneficient's products and offerings and develop new products and offerings for which its customers will be willing to exchange their alternative assets;
- properly scale its internal organization and infrastructure to accommodate the development and commercialization of its existing products and products in development; and
- hire, train and retain qualified personnel to manage and operate Beneficient's business as it is expected to grow.

A deficiency in any of these factors could adversely affect Beneficient's ability to achieve or manage growth or profitability.

### Beneficient is subject to repayment risk in connection with its liquidity transactions.

Beneficient's liquidity transactions include making ExAlt Loans, which are collateralized by the Collateral. ExAlt Loans do not require repayment prior to maturity and are subject to a risk of default. Because the trusts that borrow from the lending operating subsidiary of Ben Liquidity under such ExAlt Loans are controlled by an unaffiliated third-party trust advisor with investment discretion over the Collateral, any such borrower trusts may default on an ExAlt Loan even if the cash flow from alternative assets comprising the Collateral supporting any such ExAlt Loan is sufficient to otherwise repay interest and principal.

### Beneficient may incur significant losses as a result of ineffective risk management processes and strategies.

Beneficient seeks to monitor and control its risk exposure by developing an effective risk and control framework, which encompasses a variety of separate but complementary financial, credit, operational, compliance, and legal reporting systems; internal controls; management review processes; and other mechanisms. While Beneficient employs and will continue to develop and deploy risk monitoring and risk mitigation techniques, those techniques and the judgments that accompany their application may not be effective and may not anticipate every risk event in all market environments or the specific nature of the impact and timing of such outcomes. Beneficient's failure to manage risk effectively could have an adverse effect on its business and results of operations.

### Beneficient may be able to offer only a limited number of products and solutions.

Beneficient may be able to offer only a limited number of products and solutions due to regulatory, capital or other restrictions. Accordingly, the prospects for Beneficient's success may be solely dependent upon the performance of a single or limited products or solutions, or dependent upon the development or market acceptance of a single or limited number of products or solutions. A lack of diversification in its offerings may make Beneficient's results of operations susceptible to numerous economic, competitive and regulatory conditions, any or all of which may have a substantial adverse impact upon Beneficient's ability to operate its business and/or grow its business in the future. Further, Beneficient would not be able to diversify its operations or benefit from the possible spreading of risks or offsetting of losses that offering a comprehensive suite of solutions could provide.

### Beneficient depends on the accuracy and completeness of information from and about customers.

In making an assessment regarding the alternative assets underlying a potential liquidity transaction, Beneficient may rely on information furnished to it by or on behalf of customers, including financial statements and other financial information. Beneficient also may rely on representations of customers as to the accuracy and completeness of that information and, with respect to financial statements, on reports of independent auditors. For example, in connection with liquidity transactions, Beneficient may rely on information provided by a customer such as net asset value of an underlying alternative asset. Beneficient also relies, and will continue to rely, on customer representations and certifications, or other audit or accountants' reports, with respect to the business and financial condition of the assets underlying the liquidity transaction. While Beneficient believes that its underwriting process is thorough and robust, its necessary reliance on customers may not reveal or highlight all relevant facts (including bribery, fraud or other illegal activities) or risks that are necessary or helpful in evaluating such transaction opportunity. Instances of bribery, fraud, accounting irregularities and other improper, illegal or corrupt practices can be difficult to detect and may be more widespread in certain jurisdictions. Beneficient's financial condition, results of operations, financial reporting and reputation could be negatively affected if Beneficient relies on materially misleading, false, inaccurate or fraudulent information.

### Difficult market conditions can cause investors to reduce or suspend their investments in alternative assets or their desire to liquidate alternative assets they hold, which could adversely affect Beneficient's business.

Beneficient's business depends upon the health of the market for investments in alternative assets. During economic downturns, alternative asset owners may suffer from decreasing returns (including negative returns and loss of principal investment), liquidity pressure, increased volatility and difficulty maintaining targeted asset allocations, and investors may

Table of Contents

decrease or suspend making new fund investments during and after such periods. As the economy begins to recover from these periods, investors may elect to reduce their exposure to alternative investments, resulting in a smaller overall pool of potential customers in the industry and customers for Beneficient's products and services in the future. In the event all or part of this occurs, when trying to find new customers Beneficient will be competing for fewer available alternative assets to administer in an increasingly competitive environment, which could lead to terms less favorable to Beneficient as well as difficulty in reaching new customers. Such changes would adversely affect Beneficient's revenues and profitability.

***Beneficient is dependent on the continued success of the alternative asset industry.***

Beneficient's success depends, in part, on the continued success of alternative asset managers and the alternative asset industry that has enjoyed a prolonged period of expansion and profitability. Such expansion and profitability is subject to market conditions and other factors outside of Beneficient's control (and the control of managers of alternative assets). There is no assurance that such expansion and profitability will continue. Beyond business and financial success, the alternative asset industry may also become subject to greater governmental regulation and investigation, which could have a negative effect on Beneficient.

***A failure of Beneficient to appropriately identify and address potential conflicts of interest could adversely affect Beneficient's business.***

Beneficient has developed procedures and controls designed to identify and address conflicts of interest relevant to its business operations. However, appropriately identifying and dealing with conflicts of interest is complex and difficult, and Beneficient's reputation could be damaged, and the willingness of customers to enter into transactions with Beneficient may be affected, if Beneficient fails, or appears to fail, to identify, disclose and deal appropriately with conflicts of interest. In addition, potential or perceived conflicts could give rise to litigation or regulatory enforcement actions.

***Transfer restrictions applicable to alternative assets may prevent Beneficient from being able to attract a sufficient number of customers to achieve Beneficient's business goals.***

Many alternative assets contain stringent transfer restrictions imposed by the issuing entity, which may prevent Beneficient from entering into liquidity transactions or providing trust administration services with respect to such assets. Such restrictions may result in Beneficient not being able to attract a sufficient number of customers or liquidity transactions and, as a result, its revenues and profitability could be adversely affected.

***Beneficient's business, profitability and liquidity may be adversely affected by deterioration in the credit quality of, or defaults by, the ExAlt Trusts that owe Ben Liquidity money, securities or other assets or obligations collateralizing the ExAlt Loans held by Ben Liquidity.***

Beneficient is exposed to the risk that the ExAlt Trusts that owe Ben Liquidity money, securities or other assets will not perform their obligations. These parties may default on their obligations to Ben Liquidity due to bankruptcy, lack of liquidity, operational failure or other reasons. A failure of a significant market participant, or even concerns about a default by such an institution, could lead to significant liquidity problems, losses or defaults by other institutions, which in turn could adversely affect Ben Liquidity.

***Beneficient uses hedging transactions to manage certain market risks; Beneficient's business, profitability and liquidity may be adversely affected by unanticipated market conditions including interest rates, currency exchange rates, equity market behavior, and other relevant market factors that generate losses not covered or offset by a hedge.***

When managing its exposure to market risks, Beneficient may make use of forward contracts, options, swaps, caps, collars and floors and may pursue other strategies or use other forms of derivative instruments to limit its exposure to changes in the relative values of investments that may result from market developments, including changes in prevailing interest rates and currency exchange rates. On July 17, 2020, Ben LP, through its subsidiary CT Risk Management, L.L.C., made aggregate payments of $14.8 million to purchase put options against a decrease in the S&P 500 Index. The options have an aggregate notional amount of $300.0 million and are designed to protect the net asset value of the interests in alternative assets that generate the collateral to Beneficient's loan portfolio against market risk. One-half of the put options expire in July 2022 with the remaining put options expiring in July 2023.

The use of hedging transactions and other derivative instruments to reduce the effects of changes in the value of a position does not eliminate the possibility of fluctuations in the value of the position or prevent losses if the value of the position declines. However, such activities can establish other positions designed to gain from those same developments, thereby offsetting the decline in the value of the position. Such transactions may also limit the opportunity for gain if the value of a position increases. Moreover, it may not be possible to limit the exposure to a market development that is so generally

Table of Contents

anticipated that a hedging or other derivative transaction cannot be entered into at an acceptable price. Although Beneficient has entered into and may continue to enter into hedging transactions in order to reduce its exposure to market risks, unanticipated market changes may result in poorer overall investment performance than if the transaction had not been executed. In addition, the degree of correlation between price movements of the instruments used in connection with hedging activities and price movements in a position being hedged may vary. Moreover, for a variety of reasons, Beneficient may not be successful in establishing a sufficient correlation or a sufficient matching of cash flows between the instruments used in a hedging or other derivative transaction and the position being hedged. An insufficient correlation could prevent Beneficient from achieving the intended result and create new risks of loss. In addition, Beneficient will not be able to fully limit exposure against all changes in the values of the alternative assets underlying its liquidity transactions, because the values of such assets are likely to fluctuate as a result of a number of factors, some of which will be beyond Beneficient's control, and it may not be able to respond to such fluctuations in a timely manner or at all.

***Beneficient's fair value estimates of illiquid assets may not accurately estimate prices obtained at the time of sale and Beneficient cannot provide assurance that the values of the alternative assets underlying the liquidity transactions that it reports from time to time will be realized.***

Asset valuations for which there is no readily available market, such as the illiquid assets comprising the Collateral, require estimates and assumptions about matters that are inherently uncertain. Given this uncertainty, the fair values of such assets as reflected in estimated net asset value may not reflect the prices that would actually be obtained if and when such assets were sold.

Under Beneficient's valuation policy, Beneficient bases its estimates of the fair value of the alternative assets in the Collateral on the fund reported net asset value provided to it by the underlying fund managers. Because alternative asset managers generally hold a high proportion of their investments in assets for which market prices are not readily available, fund reported net asset value will necessarily incorporate estimates of fair value made by the fund managers. As there is no single method for determining fair value, there may be significant variations in the valuation policies used by different fund managers in the Collateral.

In addition, due to time lags in receiving valuation information from fund managers, Beneficient typically does not and will not have up-to-date information from all underlying funds at the time it calculates the fair value of the alternative assets underlying the liquidity transactions. Beneficient typically is not and will not be aware of all material developments at a fund or its underlying portfolio companies that could adversely affect the value of the funds in the Collateral.

Even if market quotations are available for the alternative assets underlying the liquidity transactions, such quotations may not reflect the value that could actually be realized because of various factors, including the possible illiquidity associated with a large ownership position, subsequent illiquidity in the market for a company's securities, future market price volatility or the potential for a future loss in market value. Realizations at values significantly lower than the fair values recorded in Beneficient's financial statements could have a material adverse effect on the net asset value of the alternative asset, and therefore the value of the beneficial interests and the corresponding liquidity transactions.

Furthermore, a substantial majority of the net assets of Beneficient, and a significant portion of the net assets of GWG Holdings on a consolidated basis, are currently represented by intangible assets and goodwill. Management performs goodwill and intangible asset impairment testing annually, during the fourth quarter, or when events occur, or circumstances change that would more likely than not indicate impairment has occurred. For 2020, the annual goodwill impairment analysis did not result in any impairment charges. Our evaluation utilized multiple assumptions, including estimated discounted cash flows and other estimates that may change over time. While our assumption reflects management's best estimates of future performance, the estimates assume Beneficient capturing a significant market share of liquidity transactions during the next five years leading to a substantial rate of growth of new service offerings and products, revenues and assets over the next five years ending December 31, 2025. These estimations are uncertain to occur, and to the extent the Company falls short of achieving our expected growth in revenues and assets over the next four years, material impairments of our goodwill may occur in the near term. Moreover, in light of Beneficient's significant recurring losses from operations, negative cash flows from operations, and delays in executing its business plans, there could be potential triggering events identified and resulting impairment of goodwill recorded during the annual impairment test during the fourth quarter of 2021. While management can and has implemented strategies to address these events, changes in operating plans or adverse changes in the future could reduce the underlying cash flows used to estimate fair values and could result in a decline in fair value that would trigger future impairment charges of the reporting unit's goodwill balance. Goodwill impairment exists when the carrying value of goodwill exceeds its implied fair value. If management concludes that a portion of goodwill is impaired, we would be required to write down the value of such goodwill, which may adversely affect our results of operations.

***Notwithstanding its diversification strategies, Beneficient's liquidity, profitability and business may be adversely affected by concentrations of assets comprising the Collateral.***

Although Beneficient monitors the diversity of its collateral portfolio through the use of concentration guidelines, the Collateral may be concentrated in certain issuers, funds, sectors, geographic regions, countries, or asset types, which could negatively affect performance as well as Beneficient's financial results, including Beneficient's capital position, earnings, cash flows, and growth.

Similarly, Beneficient may have significant exposures to certain issuers, industries, or asset classes. As a result, Beneficient's net cash flows and asset valuations (e.g., net asset value) may exhibit greater volatility due to idiosyncratic factors specific to companies, industries, regions, and asset classes. Moreover, because of such concentrations, Beneficient may suffer losses even when economic and market conditions are generally favorable for Beneficient's competitors.

In the case of Beneficient's exposure to investments in publicly traded companies, its operating results would be impacted by volatility in the public markets generally and in the stock prices of such companies.

***The due diligence process that Beneficient undertakes in connection with liquidity transactions may or may not reveal all facts that may be relevant in connection with such liquidity transaction, and even if Beneficient receives complete and accurate information it may not translate to identifying the appropriate underwriting criteria.***

Before offering liquidity solutions to customers, Beneficient conducts due diligence that it deems reasonable and appropriate based on the facts and circumstances applicable to each transaction. When conducting due diligence, Beneficient may be required to evaluate important and complex business, financial, tax, accounting, technological, environmental, social, governance and legal and regulatory issues. In addition to Beneficient's own employees, outside consultants, legal advisors and accountants may be involved in the due diligence process in varying degrees depending on the type of investment and the parties involved. Nevertheless, when conducting due diligence and making an assessment regarding the alternative assets behind a potential liquidity transaction, Beneficient relies on the resources available to it, including information provided by the potential customer of the liquidity transaction, the general partners and managers of the alternative assets the customer holds, and, in some circumstances, third-party investigations, and such an investigation will not necessarily result in the investment ultimately being successful. Moreover, even in the event that Beneficient receives complete and accurate information in the due diligence process, it may not translate to identifying the appropriate underwriting criteria, which could result in negative reputational effects, and/or otherwise materially and adversely affect our business, financial condition and results of operations.

***Restrictions on Beneficient's ability to collect and analyze data regarding its customers' alternative assets investments could adversely affect its business.***

The Collateral is generated by interests in alternative assets. Beneficient depends on the continuation of its relationships with the general partners and sponsors of the underlying funds and investments in order to maintain current data on these alternative assets. The termination of such relationships or the imposition of restrictions on its ability to use the data it obtains for its reporting and monitoring services could adversely affect our business, financial condition and results of operations. Beneficient's monitoring is also dependent on the statements and conduct of personnel at investment managers of the general partners of these alternative asset firms. To the extent that the beliefs and expectations of these managers turn out to be inaccurate, Beneficient's expectations as part of its monitoring process may be materially impacted.

**Risks Related to Our Secondary Life Insurance Business**

***The valuation of our life insurance policy assets on our balance sheet requires us to make material assumptions that may ultimately prove to be incorrect. If our assumptions prove incorrect, we could suffer significant losses that materially and adversely affect our results of operations.***

One of our principal assets is a portfolio of life insurance policies purchased in the secondary market, comprising approximately 64% and 62% of our total assets, excluding goodwill, as of December 31, 2020 and 2019, respectively. Those assets are considered "Level 3" fair value measurements under Accounting Standards Codification 820, *Fair Value Measurements and Disclosures* ("ASC 820"), as there is currently no active market where we are able to observe quoted prices for identical assets. As a result, our determination of fair value for those assets on our balance sheet incorporates significant inputs that are not observable. A sale of the portfolio or a portion of the portfolio in an other than orderly transaction would likely occur at less than the fair value of the respective life insurance policies.

A Level 3 fair value measurement is inherently uncertain and could create additional volatility in our financial statements that is not necessarily related to the performance of our underlying assets. As of both December 31, 2020 and 2019, we estimated

App. 1128

Table of Contents

the fair value discount rate for our life insurance portfolio to be 8.25%. Life expectancy estimates are also a significant component within our fair value measurement. If in the future we determine that a higher discount rate is required to ascribe fair value to a similarly situated portfolio of life insurance policies or that life expectancy estimates materially differ from actuarial estimates and/or our projections, we could experience significant losses materially affecting our results of operations. In addition, significant losses of this nature would likely at some point cause us to be out of compliance with borrowing covenants contained in our various borrowing agreements as well as cause our common stock to decline in value. This could in turn result in acceleration of the LNV Credit Facility, the NF Credit Facility, and GWG Holdings' L Bonds (including the Seller Trust L Bonds and Liquidity Bonds issued in connection with Beneficient liquidity transactions), which we may not be able to repay. As a result, we may be forced to seek additional debt or equity financing to repay such debt amounts, and additional financing may not be available on terms acceptable to us, if at all.

If we are unable to repay our debt when it comes due, then our senior lender or the holders of GWG Holdings' L Bonds, or both, would have the right to foreclose on our assets, and investors in our securities could lose all or a portion of their investment.

***Actual results from our life insurance portfolio may not match our projected results, which could adversely affect our ability to service our existing portfolio and meet our debt obligations.***

Our business partially relies on achieving actual results that are materially in line with the results we expect to attain from our investments in life insurance policy assets. In this regard, we believe that the larger the portfolio of life insurance we own, the greater the likelihood that we will achieve our expected results. To our knowledge, rating agencies generally suggest that portfolios of life insurance policies contain enough policies on individual lives to achieve actuarial stability in receiving expected cash flows. For instance, in a life insurance securitization methodology published in 2016, A.M. Best Company concluded that at least 300 lives are necessary to achieve actuarial stability, while Standard & Poor's has indicated that stability is unlikely to be achieved with less than 1,000 lives. As of December 31, 2020, we owned $1.9 billion in face value of life insurance policies covering 978 unique lives. Based on recent changes in the capital markets, specifically the availability of financing on favorable terms, we have begun exploring the feasibility of additional future purchases of life insurance policies through the secondary market. These operations are in addition to allocating capital to provide liquidity to a broader range of alternative assets, which GWG Holdings currently provides through investments in Beneficient. In the absence of purchasing additional life insurance policies, the number of life insurance policies that comprise our portfolio will decrease over time as policies mature, which may negatively impact the actuarial stability of our portfolio.

However, even if our life insurance portfolio is actuarially stable, we still may experience differences between the projection models we use and actual mortalities. Differences between our expectations and actual mortality results could have a materially adverse effect on our operating results and cash flows. In such a case, we may face liquidity problems, including difficulties servicing our remaining portfolio of policies and servicing our outstanding debt obligations. Continued or material failures to meet our expected results could decrease the attractiveness of our securities in the eyes of potential investors, thereby making it even more difficult to obtain capital needed meet our capital needs. Failure to meet our capital needs could materially and adversely affect the Company's financial position and may lead to our security holders losing all or a portion of their investment in the Company.

***Our investments in life insurance policies have inherent risks, including fraud and legal challenges to the validity of the policies, which we will be unable to eliminate and which may adversely affect our results of operations.***

We face certain risks associated with insurance fraud and other legal challenges to the validity of the policy. For example, to the extent the insured is not aware of the existence of the policy, the insured does not exist, or the insurance company does not recognize the policy, the insurance company may cancel or rescind the policy thereby causing the loss of an investment in that policy. In addition, if an insured's medical records have been altered in such a way as to shorten a life expectancy as reported, this may cause us to overpay for the related policy. Finally, we may experience legal challenges from insurance companies claiming that the insured failed to have an insurable interest at the time the policy was originally purchased or that the policy owner made fraudulent disclosures to the insurer at the time the policy was purchased (e.g., disclosures pertaining to the health status of the insured or the existence or sources of premium financing), or challenges from the beneficiaries of an insurance policy claiming that the sale of the policy to us was invalid.

To mitigate these risks, our origination practices and underwriting procedures, when we were purchasing policies, included a current verification of coverage from the insurance company, a complete due-diligence investigation of the insured and accompanying medical records, a review of the life insurance policy application, and a requirement that the policy has been in force for at least two years. We also conducted a legal review of any premium financing associated with the policy to determine if an insurable interest existed at the time of its issuance. Nevertheless, these steps will not eliminate the risk of fraud or legal challenges to the life insurance policies we own. Furthermore, changes in laws or regulations or the

interpretation of existing laws or regulations, may prove our due-diligence and risk-mitigation efforts inadequate. If a significant face amount of policies were invalidated for reasons of fraud or any other reason, our results of operations would be materially adversely affected.

***Our ownership of life insurance policies issued by insurers that are unable to pay claims presented to them could have a materially adverse effect on our results of operation and our financial condition.***

We currently rely on the payment of policy claims by insurers as our most significant source of revenue collection. In essence, the life insurance assets we own represent the obligations of insurers to pay the benefit amount under the relevant policy upon the mortality of the insured. As a result, in our business, we face the "credit risk" that a particular insurer will be financially unable to pay claims when and as they become due. Depending on how many policies we own that are issued by insurers having financial difficulties at the time a claim is presented for payment, this risk could be significant enough to have a materially adverse effect on our results of operation, our financial condition, or even our overall prospects.

To mitigate this credit risk, we generally purchased policies issued only by insurers with an investment-grade credit rating from one or more of Standard & Poor's, Moody's, or A.M. Best Company. As of December 31, 2020, 96.3% of the face value benefits of our life insurance policies were issued by insurers having an investment-grade credit rating (BBB or better) by Standard & Poor's. We also review our exposure to credit risk associated with our portfolio of life insurance policies when estimating its fair value. In evaluating the policies' credit risk, we consider items such as insurance company solvency, credit risk indicators, and general economic conditions. Notwithstanding our efforts to mitigate credit risk exposure and to reflect this risk in our portfolio valuation, we cannot predict with any certainty whether a particular insurer will be in a financial position to satisfy amounts that it owes under life insurance policies it has issued when a claim for payment is presented or whether a particular credit rating accurately reflects the risks associated with such life insurance policies.

***We have relied materially on information provided or obtained by third parties in the acquisition of life insurance policies. Any misinformation or negligence in the course of obtaining information could materially and adversely affect the value of the policies we own, our results of operation and the value of our securities.***

Our acquisition of each life insurance policy was negotiated based on variables and particular facts unique to the policy itself and the health of the insured. The facts we obtained about the policies and the insured at the time when the policy was applied for and obtained were based on the insured's factual representations to the insurance company, and the facts the insurance company separately obtained in the course of its own due-diligence examination, such as facts concerning the health of the insured and whether or not there is an insurable interest present when the policy was issued. Any misinformation or negligence in the course of obtaining information relating to a policy or insured could materially and adversely impact the value of the policies we own and could in turn adversely affect our results of operations and the value of our securities.

***If actuarial assumptions related to our investments in life insurance policies change, our operating results and cash flow could be adversely affected, as well as the value of our collateral and our ability to service our debt obligations.***

When we were acquiring life insurance policies, the expected internal rates of return we calculated were based upon the probability of an insured's mortality over an actuarial life expectancy estimate. We obtained these estimates from third-party medical-actuarial underwriting companies. In addition to actuarial life expectancies, we relied on a pricing and premium forecasting software model developed by a third-party actuarial firm for the valuation of policies we purchased, future mortality revenues, and the calculation of anticipated internal rates of return. These pricing models forecast the estimated future premiums due as well the future mortalities of insureds.

All actuarial life expectancies (and related forecasting software) are subject to interpretation and change based on evolving medical technology, actuarial data, and analytical techniques. Additionally, we were required under the LNV Credit Facility to update life expectancy estimates for pledged life insurance policies with face amounts greater than $750,000 by December 18, 2020, and obtain updated life expectancy updates no less frequently than once every five years. Additionally, we are required, under the NF Credit Facility, to use commercially reasonable efforts to update life expectancies on a biannual basis. Our prior experience in updating life expectancies has generally resulted in longer life expectancies for most, but not all, of the insureds within our portfolio. Adverse impacts on the value of our life insurance policy portfolio or our cash flow could in turn impair the value of the collateral we have pledged to our creditors and our ability to service our debt and obligations as they come due.

***Inaccuracies in the life expectancy estimates we used for small face policies at the time of purchase could have a material and adverse effect on our results of operation and financial condition.***

As of December 31, 2020, we owned 633 "small face" life insurance policies (i.e., those policies with $1 million in face value of benefits or less) having $364.6 million in aggregate face value of benefits.

Page 23

Table of Contents

The underwriting processes we used to evaluate, price and purchase small face policies were different from, and may not have been as reliable as, the processes we used for life insurance policies with larger face values of benefits. In particular, the processes we used to develop or obtain life expectancy estimates and the related mortality curves for small face policies were less extensive than traditional methods. These processes included obtaining either a single fully underwritten or simplified report as opposed to two fully underwritten reports. A simplified third-party underwriting report is based on a self-reported medical interview and may be supplemented with additional information obtained from a pharmacy benefit manager database that is provided to one or more medical-actuarial underwriting firms to obtain a simplified life expectancy report. Although we obtained professional actuarial guidance regarding these processes, our simplified underwriting methodology may not have been as reliable as the processes we use for policies with larger (i.e., greater than $1 million) face value of benefits.

Any shortcomings in the process we used to evaluate, price, purchase and value our small face policies, or significant inaccuracies in the life expectancy estimates relating to those policies, could have a material and adverse effect on our results of operations and financial condition. Any such outcomes could have a negative and possibly material effect on our ability to satisfy our debts.

***We rely on estimated rates of mortality when valuing life insurance policies and forecasting the performance of our life insurance portfolio, and we also rely on other estimates derived from statistical methodologies for projecting our future cash flows. If any of our estimates prove to be incorrect, it could materially and adversely affect our financial condition and ability to satisfy our capital needs including debt service and repayment obligations.***

If we project we will receive cash inflows from policies sooner than we actually do, we may not be able to make payment on our debt obligations in a timely manner, or at all. Moreover, a significant medical discovery or advance that results in mortality improvements among seniors could have a material adverse effect on the value of our life insurance investments.

We use a modeling practice for projecting cash flows known as the "probabilistic method". This is an actuarial method that uses the probability of an insured's mortality over time (a mortality curve) to project the flow of policy benefits to us and to project premiums that must be paid by us. This method requires the input of life expectancy assumptions. These inputs are then used to estimate the discounted cash flows from the life insurance portfolio using the ClariNet LS probabilistic and stochastic portfolio pricing model from ClearLife Limited, which estimates the expected cash flows using various mortality probabilities and scenarios.

Our Longest Life Expectancy valuation methodology uses the Longest Life Expectancy report result at the time of purchase combined with a multiplier factor applied for variance in our portfolio of actual to expected experience using the Longest Life Expectancy results. Our methodology uses a static portfolio multiplier we must recalculate anytime the six-month moving average of the difference between actual portfolio performance and projected performance of cumulative face value maturities deviates by more than one standard deviation from the mean and such deviation persists for three consecutive months and continues as of the current quarter-end month. As of December 31, 2020, the six-month moving average of the difference between actual portfolio performance and projected performance of cumulative face value of maturities was within one standard deviation from the mean. As such, our valuation methodology did not require an update to our portfolio mortality multiplier ("PMM").

We use the current future cash flow projection to generate our expected internal rate of return on the life insurance policy portfolio we own. Any change to these projections, pricing models, methodology, premium forecasting assumptions, cash flow projections, or mortality assumptions accompanied therewith that increase the projected cost-of-insurance premiums or decrease the probability of mortality could have a material and adverse impact on our cash flows and financial condition. Ultimately, this could adversely affect our ability to meet our debt service and repayment obligations and could materially and adversely affect our profitability.

***Cost-of-insurance (premium) increases could materially and adversely affect our profitability and financial condition.***

We are subject to the risk of increased cost-of-insurance ("COI") charges (i.e., premium charges) for the universal life insurance policies we own in our portfolio. As of December 31, 2020, approximately 31% of the policies in our life insurance portfolio have premium levels that are guaranteed under the terms of the policy to keep the policy's death benefit in force even in a situation where the policy's cash account has been wholly depleted. On the remaining approximately 69% of our policies, we pay "non-guaranteed COI charges" and are subject to the risk that the insurer could increase the COI charges for the policy. In all cases, the amount of increase is subject to any limits that may be set forth in the insurance policy and must be approved by the applicable state regulator. Because very few of the policies we own have significant cash account value balances, any COI increase will require us to use more cash to satisfy the minimum premium amount required to keep the related policy in force, and this could materially and adversely affect our profitability.

Table of Contents

A COI increase can also be expected to impair the value of the affected policy because extra expense (i.e., additional premium amounts) will be required to keep the policy in force, and such extra expense will diminish the economic value, or return, of the policy realized upon the mortality of the insured. As a result, any widespread COI increases in policies we own would likely have a material and adverse effect on the value of our life insurance portfolio, which in turn would materially and adversely affect our profitability and financial condition.

*Our business and prospects may be adversely affected by changes, lack of growth, or increased competition in the life insurance secondary market.*

The growth of the secondary life insurance policy market may be negatively affected by a variety of factors beyond our control, including: negative publicity about the life insurance secondary market based on actual or perceived abuses; and the adoption of additional governmental regulation.

The relatively new and evolving nature of the market in which we operate makes the related risks difficult to identify and quantify. Nevertheless, contractions in the secondary market for life insurance policies, whether resulting from general economic conditions, regulatory or legal pressures, or otherwise (including regulatory pressures exerted on us or others involved in the secondary market for life insurance), could make participation in the market generally less desirable. This could in turn depress the prices at which life insurance policies on the secondary market are bought and sold and have a negative impact on the estimated value of the policies we own. If the value of the policies we own decreases, our results of operation and financial condition could suffer.

**Risks Related to Our Proposed Insurance Business**

*We have no experience in operating an insurance business and our entry into the insurance market may not be successful.*

Beneficient's business plan involves, through Ben Insurance, entering into the business of providing insurance policies to managers of, and investors in, alternative asset funds, such as private equity funds, for specified losses arising from indemnification and related obligations to the funds. GWG Holdings is also exploring opportunities to provide life insurance products related to its life insurance business. Entering the insurance business will subject us to additional laws and regulations and involve additional risks, including risks relating to regulatory oversight and examinations, risks related to compliance with capital maintenance requirements, and increased risks of litigation. Although certain of our directors and management have experience operating insurance businesses, we have no experience in operating an insurance business, which will enhance these risks. Attempts to expand our business involve a number of risks, including the required investment of capital and other resources, increasing demands on operational and management systems and controls, the diversion of management's attention from our core business, and the ability to implement an effective marketing strategy to promote awareness of our insurance products. The insurance industry is highly competitive and there can be no assurance that our plans to enter the insurance market will be successful. If our proposed insurance business does not generate sufficient revenue or if we are unable to efficiently manage our expanded operations, our results of operations will be adversely affected.

*Beneficient's failure to obtain or maintain approval of insurance regulators and other regulatory authorities as required for the operations of an insurance subsidiary may have a material adverse effect on our future business, financial condition, results of operations and prospects.*

As a part of Beneficient's business plan, through Ben Insurance, Beneficient may seek to obtain a license to offer insurance products from the Kansas Insurance Department. If and when Beneficient receives the necessary regulatory approvals, Beneficient intends to offer certain insurance products, including, but not limited to, insurance policies to managers of, and investors in, alternative asset funds, such as private equity funds, for specified losses arising from indemnification and related obligations related to the funds and transfer and assignment policies to buyers and sellers of interests in funds to cover risks attendant transfers pursuant to transactions such as the liquidity transactions. Kansas insurance statutes and regulations and the policies of the Kansas Insurance Department may require Beneficient to, among other things, maintain a minimum level of capital and surplus, satisfy solvency standards, restrict dividends and distributions, obtain prior approval or provide notification of certain transactions, have at least one director or manager be a resident of Kansas, maintain a principal place of business in Kansas and hold at least one meeting in Kansas annually, and provide for the performance of certain periodic examinations of our insurance subsidiary and its financial conditions.

In addition, Beneficient has applied for regulatory approval to commence offering insurance policies through Pen, as a Bermuda Class 3 insurer. Subject to receiving the necessary regulatory approvals, Beneficient would intend to offer the same insurance policies noted above through Pen. Bermuda insurance statutes and regulations, and the policies of the BMA require that Pen, among other things, maintain a minimum level of capital and surplus, satisfy solvency standards, restrict dividends

App. 1136

Table of Contents

and distributions, obtain prior approval or provide notification to the BMA of certain transactions, maintain a head office in Bermuda, have a representative, secretary or director resident in Bermuda, appoint and maintain a principal representative in Bermuda and provide for the performance of certain periodic examinations of itself and its financial conditions.

A failure to meet these conditions may result in the failure to obtain the required regulatory approvals or, if obtained, a suspension or revocation of Ben Insurance's authority to do business as an insurance company, which would mean that Beneficient would not be able to provide the planned insurance products until the approvals are obtained or any suspension or revocation of the required approvals is resolved. If obtained, any suspension or revocation of regulatory approvals would negatively impact Beneficient's reputation in the marketplace and could have a material adverse effect on our ability to grow our exposure to alternative assets.

***The operation of Beneficient's proposed international insurance business, for which it has no prior experience, will subject Beneficient to additional costs and economic, political, currency and other risks that could adversely affect its revenues or financial position.***

Beneficient has no experience in operating its business internationally, which increases the risk that its proposed insurance business and any potential future expansion efforts that it may undertake may not be successful. Beneficient's operation of its proposed insurance business may face adverse financial consequences and operational problems due to political or economic changes, such as changes in political or economic conditions in Bermuda and the surrounding region, laws and regulations that restrict repatriation of earnings or other funds or that could subject repatriated earnings or other funds to additional taxes, or changes in foreign currency exchange rates. If Beneficient invests substantial time and resources to grow its proposed insurance business and is unable to manage these risks effectively, its business, results of operations and financial condition could be adversely affected. In addition, international expansion may increase its risks in complying with various laws and standards in Bermuda, including with respect to anti-corruption, anti-bribery, anti-money laundering, export controls, and trade and economic sanctions. Expansion into new markets abroad will require additional investments by Beneficient in both regulatory approvals and marketing. These incremental costs may include hiring additional personnel, as well as engaging third-party service providers and other research and development costs. If Beneficient fails to grow its international insurance business or if growth occurs at a slower rate than expected, its business, its results of operations and financial condition could be adversely affected.

**Risks Related to Beneficient's Proposed Broker-Dealer Business**

***Beneficient has no experience in operating a broker-dealer business, and its entry into this market may not be successful.***

Beneficient's proposed business plan involves offering broker-dealer services to its subsidiaries and affiliates through Ben Markets and its subsidiaries, including Beneficient Capital Markets and through Ben Market's acquisition of MHT Securities, L.P. ("MHT"). MHT is an SEC-registered broker dealer and FINRA member that is authorized to engage in private placements of securities. On July 14, 2021, an operating subsidiary of Ben LP, Ben Markets Management Holdings, L.P. ("Buyer") entered into a Transaction Agreement (the "Transaction Agreement") with MHT, MHT GP Securities, LLC, a Texas limited liability company (the "MHT GP"), and MHT Partners, L.P., a Texas limited partnership ("MHT LP" and, together with MHT GP, the "Sellers" and, together with Buyer, the "Transaction Parties"). Pursuant to the terms and conditions of the Transaction Agreement, the Buyer (i) purchased 20% of the limited partnership interests of MHT from MHT LP for an amount equal to $10,000, and (ii) agreed to (a) purchase the remaining 80% limited partnership interests of MHT from MHT LP, and (b) purchase 100% of the general partnership interests in MHT from MHT GP, in both cases for an aggregate amount equal to $40,000 (the "Subsequent Closing"). In addition to customary closing conditions applicable to transactions such as the ones contemplated by the Transaction Agreement, the Subsequent Closing is conditioned upon receipt from FINRA of approval of the Sellers' application for Continuing Membership Application under FINRA Rule 1017 for the remaining change in ownership (the "FINRA Application") (provided that such condition is waivable by the Transaction Parties if, on the date which is forty-five (45) days after the application was submitted, the Transaction Parties have not received a material objection from FINRA to the FINRA Application or in regard to FINRA approval which is disagreeable to the Transaction Parties). Until the Subsequent Closing, MHT is not controlled by or under common control with Beneficient and is not an affiliate of Beneficient.

Beneficient expects that operational efficiencies created by having an in-house broker-dealer will allow it to streamline its ExAlt Plan™ liquidity transactions, increase control of product distribution and reduce transaction costs. Entering into the broker-dealer business will subject Beneficient to additional laws and regulations and involve additional risks, including risks relating to regulatory oversight and examinations and increased risks of litigation. Although certain of Beneficient's directors and management have experience operating and advising broker-dealer businesses, Beneficient has no experience in operating a broker-dealer business, which will enhance these risks. Attempts to expand Beneficient's business involve a

number of risks, including the required investment of capital and other resources, increasing demands on its operational and management systems and controls, the diversion of management's attention from its core business, and our ability to implement an effective marketing strategy to promote awareness of our broker-dealer products. The broker-dealer industry is highly competitive and there can be no assurance that Beneficient's plans to enter the broker-dealer market will be successful. If Beneficient's proposed broker-dealer business does not generate sufficient revenue, provide expected efficiencies or if Beneficient is unable to efficiently manage its expanded operations, Beneficient's results of operations will be adversely affected.

***Beneficient's failure to obtain or maintain approval of regulatory authorities as required for the operations of its broker-dealer subsidiaries may have a material adverse effect on its future business, financial condition, results of operations and prospects.***

As a part of Beneficient's business plan, a subsidiary of Ben Markets, Beneficient Capital Markets, may seek to register as a broker-dealer with the SEC and in all 50 states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands, and become a member of FINRA, and on July 14, 2021, a subsidiary of Ben Markets acquired a 20% interest in MHT pursuant to the Transaction Agreement and, following FINRA approval, will acquire the remaining 80% upon the Subsequent Closing (and following, MHT shall be renamed "Ben Securities Company, L.L.C."). If and when Beneficient receives the necessary regulatory approvals, Beneficient Capital Markets and MHT will be subject to regulations that cover all aspects of its business, including sales methods, trade practices, use and safekeeping of customers' funds and securities, the capital structure of Beneficient Capital Markets and MHT, recordkeeping, the financing of customers' purchases and the conduct of directors, officers and employees. Beneficient Capital Markets and MHT will also be subject to routine periodic examination by the staff of FINRA. In addition, as a registered broker-dealer and member of a self-regulatory organization, Beneficient Capital Markets and MHT will be subject to the SEC's uniform net capital rule. Rule 15c3-1 of the Exchange Act specifies the minimum level of net capital a broker-dealer must maintain and also requires that a significant part of a broker-dealer's assets be kept in relatively liquid form. The SEC and FINRA impose rules that require notification when net capital falls below certain predefined criteria, limit the ratio of subordinated debt to equity in the regulatory capital composition of a broker-dealer and constrain the ability of a broker-dealer to expand its business under certain circumstances. Additionally, the SEC's uniform net capital rule imposes certain requirements that may have the effect of prohibiting a broker-dealer from distributing or withdrawing capital and requiring prior notice to the SEC for certain withdrawals of capital. MHT is already subject to such requirements. Any failure to meet these conditions may result in the failure to obtain the required regulatory approvals or, if obtained, a suspension or revocation of Beneficient Capital Markets' or MHT's broker-dealer license, which would mean that Beneficient would not be able to provide the planned broker-dealer products until the approvals are obtained or any suspension or revocation of the required approvals is resolved. If obtained, any suspension or revocation of regulatory approvals would negatively impact Beneficient's reputation in the marketplace and could have a material adverse effect on its ability to grow its exposure to alternative assets.

**Risks Related to Our Indebtedness and Financing Arrangements**

***Our indebtedness could adversely affect our financial condition and may otherwise adversely impact our business operations. We may incur additional indebtedness, including secured indebtedness.***

As of December 31, 2020, we had $1.8 billion of debt including the LNV Credit Facility, GWG Holdings' L Bonds (including its Seller Trust L Bonds and Liquidity Bonds issued in connection with Beneficient's liquidity transactions), and Beneficient's debt due to related parties. Beneficient's debt to HCLP Nominees, L.L.C. is due in 2022. In 2021, GWG Holdings also incurred indebtedness under the NF Credit Facility, which is due in 2031. Our indebtedness could have significant effects on our business and the holders of our debt.

For example, it could:

- require us to use a substantial portion of our cash flow from operations to service our indebtedness, which would reduce the available cash flow to fund acquisitions of alternative assets, working capital and other general corporate purposes;
- require payments of principal and interest that may be greater than our cash flow from operations;
- force us to dispose of life insurance policies or other investments, possibly on disadvantageous terms, to make payments on our debt;
- increase our vulnerability to general adverse economic and industry conditions;
- limit our flexibility in planning for, or reacting to, changes in our business and the industries in which we operate;
- restrict us from exploiting other business opportunities;

Table of Contents

- make it more difficult for us to satisfy our obligations; and
- place us at a competitive disadvantage compared to our competitors that have less debt.

In addition, the LNV Credit Facility, NF Credit Facility, and Beneficient's secured loans with HCLP Nominees L.L.C. bear interest at variable rates. If interest rates increase significantly, our ability to borrow additional funds may be reduced and the risk related to our indebtedness would intensify.

In addition, most of our current debt is, and we anticipate that much of our future debt will be, non-amortizing and payable in balloon payments. Therefore, we will likely need to refinance most of that debt as it matures. There is a risk that we may not be able to refinance debt as it matures or that the terms of any refinancing will not be as favorable as the terms of the then-existing debt. If principal payments due at maturity cannot be refinanced, extended or repaid with proceeds from other sources, such as new debt, equity capital or sales of assets, our cash flow may not be sufficient to repay all maturing debt in years when significant balloon payments come due. In the event we are unable to refinance debt as it becomes due, this could force us to liquidate and/or file for bankruptcy, and the collateral securing such debt may be worth less than the debt it secures, which would lead to material losses for our security holders as it relates to their investments in the Company. Additionally, we may incur significant penalties if we choose to prepay the debt.

***We critically rely on debt financing for our business. Any inability to borrow could adversely affect our business operations, our ability to satisfy our debt-payment obligations and, ultimately, our prospects and viability.***

To date, we have chosen to finance our business principally through the issuance of debt, including debt incurred by our subsidiary DLP IV under the LNV Credit Facility (see Note 10 to our accompanying audited consolidated financial statements), DLP VI under the NF Credit Facility, GWG Holdings' L Bonds and Beneficient's secured loans. The LNV Credit Facility is secured by all of the assets of DLP IV, has a maximum amount of $300.0 million, and the outstanding balance at December 31, 2020 was $193.7 million. The NF Credit Facility is secured by all assets of DLP VI and is fully drawn with $107.6 million outstanding as of August 31, 2021.

Obligations under the LNV Credit Facility and NF Credit Facility have maturity dates of September 27, 2029 and August 11, 2031, respectively. GWG Holdings' L Bonds have scheduled maturities as set forth below in the risk factor "*If a significant number of holders of GWG Holdings' L Bonds demand repayment of those instruments upon maturity instead of renewing them, and at such time we do not have sufficient capital on hand to fund those repayments (and do not otherwise have access to sufficient capital), we may be forced to liquidate some of our life insurance policies, investments in Beneficient or other assets, which could have a material and adverse impact on our results of operations and financial condition.*" Our debt facilities and offerings have been the most important sources of financing on which our business continues to critically rely to grow and maintain our exposure to alternative assets — which include our portfolio of life insurance policies and GWG Holdings' and GWG Life's investments in Beneficient — as well as service existing debt and preferred stock obligations, maintaining premium payments on our life settlements portfolio and paying for operations.

Our business model is based on increasing our exposure to alternative assets financed primarily through debt and preferred stock financing. These alternative assets are typically long-term and may not produce cash flows for an extended period of time. For example, we do not receive cash in respect of acquired life insurance policies until the insured individual dies, and Ben Liquidity may not receive payments on its ExAlt Loans until the assets underlying the Collateral have been sold by the asset manager and the unaffiliated third-party trust advisor that controls such borrower trusts elects to make a loan payment to Ben Liquidity prior to term, which is generally 12 years after the origination of any such ExAlt Loan. The resulting asset/liability mismatch can result in a liquidity shortage if we are unable to renew maturing short-term debt or secure suitable additional financing. In such a situation, we could be forced to sell assets at less than optimal (distressed) prices, or, in the event additional debt or other financings are not available, we could have to liquidate or file for bankruptcy, which would lead to material losses for our security holders as it relates to their investments in the Company. We thus rely on continued access to financing to enable us to grow our exposure to alternative assets and to pay the premiums and costs of maintaining our life insurance portfolio, all while satisfying our current interest, principal and dividend payment obligations under our debt and equity arrangements. Proceeds from life insurance policies that have been pledged under both the LNV Credit Facility and NF Credit Facility will first be applied to the repayment of our obligations under each respective credit facility according to a waterfall amortization formula that is largely controlled by each lender, respectively. Therefore, we may not receive all of the proceeds from matured life insurance policies. Accordingly, until we achieve sufficient cash flows derived from our portfolio of life insurance policies and investments in Beneficient, we expect to rely on proceeds from GWG Holdings' L Bond and preferred stock offerings to satisfy our ongoing financing and liquidity needs. Continued access to financing and liquidity under the LNV Credit Facility (other than premium payments on existing policies pledged pursuant thereto), from the offering of GWG Holdings' L Bonds, or otherwise is not guaranteed.

Table of Contents

As part of the preparation of its 2020 10-K, the Company voluntarily submitted two questions to the SEC's Office of the Chief Accountant ("OCA") on February 15, 2021. OCA is responsible for accounting and auditing matters arising in the SEC's administration of the federal securities laws, particularly with respect to accounting policy determinations. In this role, OCA consults with registrants on the application of accounting standards and financial disclosure requirements. Its website indicates that registrants can expect consultations to take approximately three weeks, although that time may vary depending on various factors. The questions submitted by the Company to OCA were (1) whether the December 31, 2019 transaction resulted in GWG Holdings obtaining control of Ben LP in a transaction by entities not under common control, and (2) whether Ben LP was required to consolidate any of the ExAlt Trusts. On July 26, 2021, the Company and OCA staff held a conference call in which OCA's staff notified the Company of its conclusions on the two accounting questions that were the subject of the consultation. During that call, OCA expressed that it would object to a conclusion that Beneficient not consolidate the ExAlt Trusts as of December 31, 2019. Consistent with the conclusions communicated by OCA, on August 1, 2021, the Board of Directors of GWG Holdings determined that it is necessary to restate prior period financial statements for the year ended December 31, 2019, and quarterly financial statements for the first three quarters of the year ended December 31, 2020, to consolidate all of the ExAlt Trusts into Beneficient's financial statements beginning on December 31, 2019, and consequently into the Company's consolidated financial statements on that same date.

We temporarily suspended the offering of GWG Holdings' L Bonds, commencing April 16, 2021, as a result of our delay in filing certain periodic reports with the SEC, including this 2020 Form 10-K. We anticipate recommencing the offering of GWG Holdings' L Bonds when we regain compliance with SEC filing requirements. Additionally, due to our failure to deliver GWG Life audited financial statements for 2020 to LNV Corporation within 90 days after the end of the year, we were in violation of our reporting obligations under the LNV Credit Facility. CLMG Corp., as administrative agent for LNV Corporation, issued a limited deferral extending the delivery of these reports to May 17, 2021. We regained compliance on May 17, 2021, when the audited annual financial statements of GWG Life were delivered to LNV Corporation.

During the time period between April 16, 2021 and when we re-commence GWG Holdings' L Bond offering, we have financed, and will continue to finance, our business using cash on hand and additional financings from creditors to meet our cash needs, including cash needs for premiums on our life settlements portfolio, interest expense on outstanding bonds, bond maturities, preferred stock redemptions, preferred stock dividends, operating costs, professional fees and miscellaneous expenses. In the event that L Bond sales and/or preferred stock sales do no recover to expected levels, we may have to sell assets or find additional financing options. In such event, the terms of such sale or financings may be on less favorable terms than we have sold assets or borrowed in the past

In addition, general economic conditions could limit our access to financing, as could regulatory or legal pressures exerted on us, our financiers, or those involved in the procurement of financing such as brokers, dealers, and registered investment advisors. If we are unable to borrow under either the LNV Credit Facility or the NF Credit Facility or otherwise for any reason, or to renew or replace the LNV Credit Facility or NF Credit Facility when it comes due, or if we are forced to discontinue GWG Holdings' L Bond offering for any significant length of time and for any reason, our business would be adversely impacted and our ability to service and repay our debt obligations would be compromised, thereby negatively affecting our business prospects, the value of our common stock and perhaps our viability. As such, investors in our securities could lose all or a portion of their investment.

***We may not be able to raise the capital that we are seeking from our securities offerings and may be unable to meet our overall business objective of growing and diversifying our alternative asset exposure.***

The offer and sale of GWG Holdings' L Bonds and preferred stock are a principal means by which we intend to raise funds needed to meet our business and financial goals. However, if we are unable to continue to do so for any reason, we may be unable to meet our goals. If actual cash flows from our portfolio of life insurance policies do not occur as we have forecasted we could be forced to sell our investments in life insurance policies in order to service or satisfy our debt-related obligations. Likewise, if GWG Holdings' and GWG Life's investments in Beneficient do not perform as we have projected, we could be forced to sell such investments in order to service or satisfy such debt-related obligations. Presently, none of GWG Holdings' material investments (life insurance policies and investments in Beneficient) are supported by liquid secondary markets and GWG Holdings' and GWG Life's investments in Beneficient contain transfer restrictions. If we are forced to sell any material amount of these investments, we may be unable to sell them at prices we believe are optimal or at or above the carrying value of such investments, particularly if our sale of assets occurs at a time when we are (or are perceived to be) in distress. In any such event, our business and the value of our securities would likely be materially and adversely impacted.

Page 29

Table of Contents

*GWG Holdings depends upon cash distributions from its subsidiaries, and contractual restrictions on distributions to GWG Holdings or adverse events at one of its operating subsidiaries could materially and adversely affect its ability to pay its debts, redeem preferred stock when requested and continue operating our business.*

GWG Holdings, Inc. is a holding company. As a holding company, GWG Holdings conducts its operations through operating subsidiaries, and as such its most significant assets are cash and its ownership interests in its subsidiaries, controlled affiliates and equity investees. Accordingly, GWG Holdings' ability to meet its obligations, including its debt-related and dividend-payment obligations, materially depends upon the ability of its subsidiaries to distribute cash to it. In this regard, the ability of GWG Holdings' subsidiaries to distribute cash to it is, and will continue to be, restricted by certain negative covenants in the agreement governing the LNV Credit Facility, the NF Credit Facility, and the credit agreements governing Beneficient's secured loans from HCLP Nominees, L.L.C. If any of these limitations were to materially impede the flow of cash to GWG Holdings, its ability to service and repay its debt, including obligations under the L Bonds, and make cash dividend payments to holders of GWG Holdings' preferred stock would be materially and adversely affected. In addition, any adverse corporate event at the subsidiary level, such as a declaration of bankruptcy, liquidation or reorganization or an event of default under the LNV Credit Facility, the NF Credit Facility, or the credit agreements governing Beneficient's secured loans from HCLP Nominees, L.L.C., could adversely affect the ability of GWG Holdings' subsidiaries to distribute cash to it, and thereby materially and adversely affect its ability to service and repay its debt and make cash dividend payments, and negatively impact GWG Holdings ability to continue operations.

*The collateral granted as security for our obligations under our various debt obligations may be insufficient to repay all such debt obligations upon an event of default.*

GWG Holdings and GWG Life have each granted a security interest in substantially all of their respective assets, which include GWG Holdings' and GWG Life's investments in Beneficient and GWG Life's investments in DLP IV Holdings and DLP VI Holdings, to serve as collateral security for obligations under the L Bonds. Importantly, DLP IV, a wholly owned subsidiary of GWG Life, owns approximately 78% of the face value of our life insurance portfolio as of December 31, 2020, and is the borrower under the LNV Credit Facility. As the borrower under the LNV Credit Facility, all of the assets of DLP IV — including all of its life insurance policy assets — serve as collateral for our obligations under the facility. DLP VI, a wholly owned subsidiary of DLP Holdings VI, which itself is a wholly owned subsidiary of GWG Life, owns the remainder of our life insurance portfolio, approximately 22% of the face value of our life insurance portfolio, as of August 31, 2021, and is the borrower under the NF Credit Facility. As the borrower under the NF Credit Facility, all of the assets of DLP VI — including all of its life insurance policy assets — serve as collateral for our obligations under the facility.

Because of the fact that substantially all of our life insurance policies are held in our DLP IV and DLP VI subsidiaries, and all of those life insurance assets serve as collateral security for our obligations under the LNV Credit Facility and NF Credit Facility, respectively, holders of L Bonds risk the possibility that the collateral security to secure our obligations under the L Bonds may be insufficient to repay holders upon an event of default. Furthermore, while the indenture governing the L Bonds limits the amount of debt relative to a measure of asset coverage we can incur, the indenture permits us to incur additional secured debt (subject to a debt coverage ratio) that may be senior to the L Bonds.

Furthermore, most of the assets that secure our obligations under the L Bonds, including GWG Holdings' and GWG Life's investments in Beneficient and GWG Life's ownership interests in the holding companies that own DLP IV and DLP VI, which own substantially all of the life insurance portfolio, are illiquid assets. Although GWG Holdings and GWG Life own debt and equity securities of Beneficient, a substantial majority of the net assets of Beneficient are currently represented by goodwill, an intangible asset. The calculation of Beneficient's goodwill required the utilization of significant estimates and management judgment, as discussed elsewhere in this 2020 Form 10-K. As a result, the carrying value of those assets as reflected in our consolidated financial statements may not necessarily reflect the current market price for those assets, especially in the event of a bulk or distressed sale. Proceeds from L Bond sales will be primarily used for the repayment of L Bond maturities, interest payments and other operating expenses of GWG Holdings, and as otherwise specified in the prospectus for the L Bonds. GWG Holdings may also continue to use a portion of proceeds from L Bond sales to make investments in Beneficient. Because advances from GWG Holdings to Beneficient may be used by Beneficient for working capital purposes, such investments may not increase the tangible assets securing the L Bonds. If the trustee for the L Bonds were forced to sell all or a portion of the collateral securing them, there can be no assurance that the trustee would be able to sell them for the prices at which we have recorded them in our consolidated financial statements, and the trustee might be forced to sell them at significantly lower prices.

*If a significant number of holders of GWG Holdings' L Bonds demand repayment of those instruments upon maturity instead of renewing them, and at such time we do not have sufficient capital on hand to fund those repayments (and do not otherwise have access to sufficient capital), we may be forced to liquidate some of GWG Holdings' life insurance*

Page 30

Table of Contents

*policies, GWG Holdings' or GWG Life's investments in Beneficient or other assets, which could have a material and adverse impact on our results of operations and financial condition. In addition, substantially all of our life insurance policies are pledged as collateral under the LNV Credit Facility and the NF Credit Facility and we would not be able to dispose of them without compliance with the terms of those credit facilities.*

As of December 31, 2020, we had approximately $1.3 billion in principal amount of L Bonds outstanding (including Liquidity Bonds issued in connection with Beneficient's liquidity transactions, but excluding Seller Trust L Bonds). Since we first issued GWG Holdings' L Bonds, we have experienced $768.7 million in maturities, of which $406.3 million has renewed for an additional term, as of December 31, 2020. This has provided us with a cumulative historical renewal rate of approximately 53% for investments in GWG Holdings' L Bonds.

Future contractual maturities of L Bonds (including Liquidity Bonds issued in connection with Beneficient's liquidity transactions, but excluding Seller Trust L Bonds) as of December 31, 2020 are as follows:

| Years Ending December 31, | | L Bonds (in thousands) |
| --- | --- | --- |
| 2021 | $ | 191,582 |
| 2022 | | 293,038 |
| 2023 | | 191,446 |
| 2024 | | 121,105 |
| 2025 | | 167,433 |
| Thereafter | | 313,277 |
| | $ | 1,277,881 |

As of December 31, 2020, we had approximately $366.9 million in principal amount of Seller Trust L Bonds outstanding, of which $94.8 million are held by the ExAlt Trusts and are eliminated in consolidation. The Seller Trust L Bonds have a contractual maturity in August 2023; however, the holders have the ability to exercise a put to require redemption beginning in 2021. This option has not been exercised as of the date of the filing of this 2020 Form 10-K. Under that certain Supplemental Indenture ("L Bond Supplemental Indenture") to the Amended and Restated Indenture dated as of October 23, 2017 (the "Amended and Restated Indenture"), by and among GWG Holdings, GWG Life and Bank of Utah, as trustee, in the event of a redemption request, including maturity, by the holders of the Seller Trust L Bonds, GWG Holdings in its sole discretion has the ability to satisfy the principal in the form of cash, a pro rata portion of (i) the outstanding principal amount and accrued and unpaid interest under the Commercial Loan Agreement and (ii) Common Units, or a combination of cash and such property.

The terms of the Liquidity Bonds issued in connection with Beneficient's liquidity transactions also require payment of principal and interest in cash subject to certain exceptions, and we expect to substantially increase the principal amount of Liquidity Bonds we issue as we seek to grow our exposure to alternative assets.

If investors holding existing indebtedness that matures do not elect to renew their investments and we do not at such time have or have access to sufficient capital to repay the indebtedness, then we may need to liquidate some of our life insurance policies or other assets earlier than anticipated. In such an event, we may be unable to sell those policies or other assets at prices we believe are fair or otherwise appropriate and such sales could have a material and adverse impact on our results of operations and financial condition. In addition, substantially all of our life insurance policies are pledged as collateral under the LNV Credit Facility and the NF Credit Facility and we would not be able to dispose of them without compliance with the terms of those credit facilities.

*Subordination provisions contained in the indenture governing the L Bonds, including any supplemental indentures, will restrict the ability of the trustee or the L Bond holders to enforce their rights against us under the indenture, including the right to payment on the L Bonds, if a default then exists under a senior credit facility.*

The L Bonds are subordinate in right of payment to any claims of our senior lender under the LNV Credit Facility and NF Credit Facility. In this regard, subordination provisions limiting the right of L Bond holders to enforce their rights are contained in the indenture. These provisions include:

- a prohibition on challenging any enforcement action taken by a senior lender, or interfering with any legal action or suits undertaken by a senior lender, against us and our affiliates;

Table of Contents

- a 180-day standstill period during which there may not be brought any action against us or our affiliates to enforce rights respecting collateral unless the LNV Credit Facility and the NF Credit Facility has been repaid in full, which period may be extended if the senior lender takes action during such standstill period; and

- a prohibition on filing a bankruptcy or insolvency case against us or our affiliates for at least one year plus one day after any senior lender has been paid in full.

In the event of a default on a senior credit facility, the indenture prohibits us from making any payment, direct or indirect (whether for interest, principal, as a result of any redemption or repayment at maturity, on default, or otherwise), on the L Bonds and any other indebtedness unless and until: (i) the default respecting the senior credit facility has been cured or waived or has ceased to exist; or (ii) in the case of a non-payment default that permits a senior lender to declare as due and payable all amounts owing under a senior credit facility (but where that senior lender has not yet so declared amounts as being due and payable), until the end of the period commencing on the date the trustee receives written notice of default from the senior lender and ending on the earliest of (1) our discharge of the default (or other cure), (2) the trustee's receipt of a valid waiver of default from the senior lender, or (3) a written notice from the senior lender terminating the payment prohibition.

During any payment prohibition period, neither the holders of the L Bonds nor the trustee will have the right, directly or indirectly, to sue to enforce the indenture or the L Bonds. Other provisions of the indenture do permit the trustee to take action to enforce the payment rights of L Bond holders after 179 days have passed since the trustee's receipt of notice of default from a senior lender, but in such case any funds paid as a result of any such suit or enforcement action shall be applied toward the senior credit facility until the facility is indefeasibly paid in full before being applied to the L Bonds.

These subordination provisions present the risk that, upon any default by us on obligations owed to our senior lender, the holders of the L Bonds will be unable to enforce their rights to payment.

If the 180-day standstill period noted above, or any other limitation on the rights of the trustee or L Bond holders to assert their rights to payment of principal or interest under the indenture, is ultimately determined to conflict with provisions of the Trust Indenture Act of 1939 (most notably sections 316(b) and 317(a) of that Act), then the trustee, as well as any holder who shall not have earlier consented to such subordination provisions, will (notwithstanding such provision contained in the indenture) be authorized to institute a lawsuit for the enforcement of any payment of principal or interest after their respective due dates.

***A failure to maintain compliance with the covenants under the LNV Credit Facility and the NF Credit Facility and the indenture governing the L Bonds may have a material adverse effect on our ability to continue our business operations.***

We are subject to various covenants under both the LNV Credit Facility and NF Credit Facility, including requirements to timely deliver financial statements to LNV Corporation (our senior lender under the LNV Credit Facility) and National Founders (the administrative agent under the NF Credit Facility). Due to our failure to deliver GWG Life audited financial statements for 2020 to LNV Corporation within 90 days after the end of the year, we were in violation of our reporting obligations. CLMG Corp., as administrative agent for LNV Corporation, issued a limited deferral extending the delivery of this report to May 17, 2021. We regained compliance on May 17, 2021, when the audited annual financial statements of GWG Life were delivered to LNV Corporation. If we fail to remain in compliance with our debt covenants, we may not be permitted to request, nor will we be entitled to receive, advances under the LNV Credit Facility, and we will not be entitled to any excess amounts received from policies pledged under the LNV Credit Facility. A failure to deliver required financial statements to LNV Corporation or National Founders in the future may result in termination of the applicable credit facility absent an extension of such period. We may be unable to repay outstanding amounts under our credit facilities unless we are able to replace it with another facility or otherwise obtain capital from other sources, in which case LNV Corporation or National Founders could elect to foreclose on the life insurance assets held in DLP IV or DLP VI, respectively, that serve as collateral security.

Under the indenture, including any supplemental indentures, governing the L Bonds, we are subject to various financial and non-financial covenants, including a maximum debt coverage ratio. As of December 31, 2020, we were in compliance with all of our covenants; however, there can be no assurance that we will be able to comply with all of our financial and non-financial covenants in the future. A failure to comply with these covenants could cause us to be in default of the indenture governing the L Bonds and the indenture trustee, acting on behalf of the holders of GWG Holdings' L Bonds, would be within its rights to accelerate the maturity dates of any amounts owed on GWG Holdings' L Bonds. If we were unable to repay outstanding amounts, either using current cash reserves or another source of capital, the indenture trustee would have the right, subject to the subordination provisions in the indenture, to foreclose on our assets and the assets of GWG Life (including GWG Life's equity in DLP IV and DLP Holdings VI), which serve as collateral for GWG Holdings' L Bonds. If

Table of Contents

we are required to seek other sources of financing in order to satisfy our obligations under the LNV Credit Facility, the NF Credit Facility or GWG Holdings' L Bonds, such other sources of capital may be unavailable to us on terms acceptable to us or at all. As a result, failure to comply with the covenants under our debt arrangements would have a material and adverse impact on our ability to continue our business operations and may result in our investors losing all or a portion of their investment.

***The debt coverage ratio in our indenture, designed to provide some assurance to the holders of the L Bonds that the value of our total assets exceeds our total interest-bearing obligations, values our life insurance policy assets, which represent 66% of our total assets (excluding goodwill) as of December 31, 2020, in a manner that may not be representative of the amount we would actually receive upon a sale of those assets.***

Under the indenture governing the L Bonds, the maximum amount of L Bonds we may issue at any time, and certain other debt, is limited to an amount such that our debt coverage ratio does not exceed 90%. This limitation is designed to provide a limit on the aggregate amount of certain debt of the Company. The "net present value" of our life insurance assets used in the debt coverage ratio is not the same as the GAAP "fair value" of those assets on our balance sheet. Accordingly, the debt coverage ratio is not necessarily indicative of the amount we and holders of L Bonds would actually receive if we were forced to sell or liquidate our life insurance related assets. Furthermore, any sale or liquidation of all or a significant portion of GWG Holdings' life insurance policies or investments in Beneficient would include significant transactional costs. As a result, our mere compliance with the debt coverage ratio in the indenture will not guarantee that the value of GWG Holdings' life insurance assets plus the value of GWG Holdings' and GWG Life's investments in Beneficient, if sold or liquidated, would in all cases exceed the amount of GWG Holdings' obligations to the holders of L Bonds and other creditors.

***The interest rates under our credit agreements and other agreements may be impacted by the phase-out of the London Interbank Offered Rate ("LIBOR").***

LIBOR is the basic rate of interest used in lending between banks on the London interbank market and is widely used as a reference for setting the interest rates on loans globally. LIBOR is used as a reference rate to calculate interest under certain of our borrowings and receivables. In 2017, the United Kingdom's Financial Conduct Authority, which regulates LIBOR, announced that it intends to phase out LIBOR by the end of 2021. The U.S. Federal Reserve, in conjunction with the Alternative Reference Rates Committee, a steering committee comprised of large U.S. financial institutions, identified the Secured Overnight Financing Rate ("SOFR") as the preferred alternative reference rate to U.S. dollar LIBOR and recommended a paced transition plan that involves the creation of a reference rate based on SOFR by the end of 2021. SOFR is a more generic measure than LIBOR and considers the cost of borrowing cash overnight, collateralized by U.S. Treasury securities. Given the inherent differences between LIBOR and SOFR or any other alternative benchmark rate that may be established, there are many uncertainties regarding a transition from LIBOR. Certain of our borrowing and receivable agreements contain fallback provisions providing for alternative rate calculations in the event LIBOR is unavailable, prior to any LIBOR rate transition. As a result, our level of interest payments we incur or receive may change and the new rates we incur may not be as favorable to us as those in effect prior to any LIBOR phase-out.

***We have the discretion to purchase assets through different subsidiaries, and to transfer assets among GWG Holdings' subsidiaries. Any decision to purchase or hold title to assets in one subsidiary, as opposed to a different subsidiary, may affect the value of collateral security for our debts.***

We may at our discretion direct GWG Holdings' and GWG Life's investments in Beneficient, purchases of additional life insurance policies, if any, and other assets by, and the sale of life insurance policies and other assets among, different subsidiaries of GWG Holdings. Purchases of assets in, or movements of assets amongst, different subsidiaries could affect the value of the collateral security for obligations under the L Bonds. For example, purchases through, or transfers of life insurance policies to, DLP IV would cause the policies acquired or transferred to become collateral for the LNV Credit Facility, and purchases through, or transfers of life insurance policies to, DLP VI would cause the policies acquired or transferred to become collateral for the NF Credit Facility, whereas purchases through, or transfers of life insurance policies to, GWG Life would cause the policies acquired by GWG Life to become collateral for the L Bonds. Accordingly, purchases of assets through, or transfers of assets to, different subsidiaries may affect the value of collateral security for different classes of holders of our debt.

**Legal and Regulatory Risks**

***A determination that we are an unregistered investment company would have material adverse consequences.***

A determination that we are an unregistered investment company under the Investment Company Act of 1940 (the "1940 Act") would have serious adverse consequences. We do not believe we could operate our business effectively as a registered

Table of Contents

investment company. As a result, we would have to change our operations so as not to be an investment company. Changes could include refraining from raising capital, changing the types of products and services that Beneficient provides, and changing the nature of the Collateral. Furthermore, if at any time it were established that we had been operating as an investment company in violation of the registration requirements of the 1940 Act, there would be a risk, among other material adverse consequences, that such company: (i) could become subject to SEC investigation and enforcement actions, including monetary penalties and injunctive relief, (ii) would be unable to enforce contracts with third parties or that third parties could seek to obtain rescission of transactions with such company undertaken during the period in which it was established that such company was an unregistered investment company, and (iii) would face adverse action from the Texas Department of Banking, either in relation to Beneficient's pending application for a trust company charter, or if such charter is granted, in connection with such charter, the Kansas Office of the State Bank Commissioner, in relation to the Kansas TEFFI trust company charter. Such developments would be likely to have material and adverse consequences for us and the value of GWG Holdings' and GWG Life's investments in Beneficient and result in a breach under our credit facilities and GWG Holdings' L Bonds, which would likely adversely affect our liquidity and increase our cost of capital and operational expenses. In addition, if Ben LP were treated as an investment company, it would not be eligible to be taxed as a partnership and instead would be taxable as a corporation for U.S. federal income tax purposes, which could result in a material and adverse impact on the value of GWG Holdings' and GWG Life's investments in Beneficient.

On occasion, the SEC has attempted to regulate the purchase of non-variable universal life insurance policies as transactions in securities under federal securities laws. In July 2010, the SEC issued a Staff Report of its Life Settlement Task Force. In that report, the Staff recommended that certain types of purchased insurance policies be classified as securities. The SEC has not taken any position on the Staff Report, and there is no indication if the SEC will take any action to implement the recommendations of the Staff Report. In addition, there have been several federal court cases in which transactions involving the purchase and fractionalization of life insurance policies have been held to be transactions in securities under the federal Securities Act of 1933.

We believe that the matters discussed in the Staff Report and existing case law do not impact our current business model because our life insurance policies are distinguishable from those cases that have been held by courts, and advocated by the Staff Report, to be transactions in securities. For example, neither we nor any of our affiliates are involved in the fractionalization of life insurance policies, and we presently do not purchase variable life insurance policies. As a practical matter, if all or a majority of our life insurance policies were deemed to be "securities" under federal securities laws, either through an expansion of the definition of what constitutes a "security," the expansion of the types of transactions in life insurance policies that would constitute transactions in "securities," or the elimination or limitation of available exemptions and exceptions (whether by statutory change, regulatory change, or administrative or court interpretation), then we or one or more of our affiliated entities could become subject to the 1940 Act.

***Beneficient will be subject to comprehensive governmental regulation and supervision.***

Ben LP and its subsidiaries operate in a highly regulated environment and will be subject to supervision and regulation by several governmental agencies. Ben LP and its subsidiaries are subject to changes in federal and state laws, regulations, governmental policies, tax laws and accounting principles. As Beneficient's business grows, Ben LP and its subsidiaries expect to become subject to additional regulatory agencies' regulation, including offshore insurance regulatory requirements in Bermuda and broker-dealer regulatory requirements in the United States. Changes in regulations or the regulatory environment could adversely affect Beneficient's business and the value of GWG Holdings' and GWG Life's investments in Beneficient.

***Beneficient faces a risk of noncompliance with and enforcement actions under the Bank Secrecy Act and other anti-money laundering statutes and regulations.***

The Bank Secrecy Act, the USA PATRIOT Act of 2001, and other laws and regulations require financial institutions, among other duties, to institute and maintain an effective anti-money laundering program and file suspicious activity and currency transaction reports as appropriate. The federal Financial Crimes Enforcement Network is authorized to impose significant civil money penalties for violations of those requirements and has recently engaged in coordinated enforcement efforts with the individual federal banking regulators, as well as the U.S. Department of Justice, Drug Enforcement Administration, and Internal Revenue Service (the "IRS"). Beneficient is also subject to increased scrutiny of compliance with the rules enforced by the OFAC and compliance with the Foreign Corrupt Practices Act. If Beneficient's policies, procedures and systems are deemed deficient, Beneficient will be subject to liability, including fines and regulatory actions, which may include restrictions on Beneficient's ability to make distributions to its unitholders, including GWG, and the necessity to obtain regulatory approvals to proceed with certain aspects of Beneficient's business plan. Failure to maintain and implement adequate programs to combat money laundering and terrorist financing could also have serious reputational consequences for

App. 1152

Table of Contents

Beneficient. Any of these results could materially and adversely affect Beneficient's business, financial condition and results of operations and the value of GWG Holdings' and GWG Life's investments in Beneficient.

***The failure of our trust subsidiaries to maintain certain minimum amounts of capital may result in regulatory sanctions or restrictions, limitations on their respective activities and operations, or require them to raise additional capital.***

As regulated entities, Beneficient's Kansas TEFFI and Texas trust company would be required to maintain minimum levels of capital under a framework determined by the Kansas State Banking Commissioner or Texas Banking Commissioner, as applicable. Except under certain specific and limited circumstances, in the event that Beneficient's Texas trust company failed to maintain at least such minimum capital amount, it would be unable to pay dividends to Beneficient or engage in capital repurchases, which could impair its ability to provide liquidity to Beneficient. In addition, the failure of Beneficient's trust companies to maintain minimum required levels of capital could subject them to administrative action, which could include restrictive constraints on operations, management, and activities, monetary sanctions, orders to raise additional capital, or, under certain limited circumstances, in the commencement of receivership or conservatorship proceedings. Any of these actions could have a material adverse effect on Beneficient's financial condition, results of operations or prospects, which could affect the value of GWG Holdings' and GWG Life's investments in Beneficient.

***If a subsidiary of Ben LP receives a trust company charter in Texas or an unconditional TEFFI charter in Kansas, the Texas Banking Commissioner or the Kansas State Banking Commissioner, as applicable, would have the authority to increase the minimum amount of capital required to be maintained by such subsidiaries under certain circumstances, which may result in lower returns on equity.***

The Texas Banking Commissioner has the authority to increase the minimum amount of capital required to be maintained by a Texas trust company, under a framework set forth in the Texas Finance Code, if the Commissioner finds that the condition and operations of the Company require additional capital to promote the safety and soundness of the trust company. Factors to be considered include the nature and type of business in which the trust company engages, the nature and decree of liquidity in trust company assets, the amount and type of fiduciary assets managed by the trust company, the complexity of the business, the adequacy of insurance held by the trust company and the extent and adequacy of its internal controls, among other things.

The Kansas State Banking Commissioner does not have the same discretionary authority under the TEFFI Act to increase a TEFFI's minimum capital so long as: (i) the TEFFI does not accept deposits, other than alternative asset custody accounts; (ii) the TEFFI maintains no third-party debt except debts owed to its members or its affiliates; and (iii) the TEFFI has secured an agreement from its members whereby such members agree to contribute additional capital to the TEFFI on if needed to ensure the safety and soundness of the fiduciary financial institution. However, if those requirements are not satisfied, the Kansas State Banking Commissioner may have the authority to require the TEFFI to maintain additional capital.

Any increase in the minimum amount of capital required for Beneficient's Kansas TEFFI or Texas trust company will further limit its ability to direct the allocation of those capital resources in the most optimal manner, including through cash distributions to Beneficient. In addition, a requirement to maintain higher minimum levels of capital at those entities may result in lower returns on equity, which could affect the value of GWG Holdings' and GWG Life's investments in Beneficient.

***Beneficient may be impacted adversely by claims or litigation, including claims or litigation relating to its fiduciary responsibilities.***

Beneficient's business involves the risk that customers or others may sue Beneficient, claiming that Beneficient has failed to perform under a contract or otherwise failed to carry out a duty perceived to be owed to them. This risk would be heightened when Beneficient's trust company begins serving as a fiduciary for its customers if the Texas state trust company charter is issued or when the Kansas TEFFI charter becomes unconditional. Specifically, Beneficient's trust company would be required to (i) adhere to the fiduciary standard of care required under the terms of the governing documents or applicable law, and (ii) properly discharge its fiduciary duties. If Beneficient fails to comply with these fiduciary obligations, it could incur significant costs and possibly liability, which could materially and adversely affect Beneficient's business, financial condition or results of operations. Liability for breach of fiduciary duty may be difficult to assess or quantify and its existence and magnitude may remain unknown for a substantial period of time. Additionally, an alleged breach of fiduciary duty, regardless of the merits of such alleged breach, could significantly damage Beneficient's reputation and cause it to incur legal and other costs. Claims made or actions brought against Beneficient, whether founded or unfounded, may result in injunctions, settlements, damages, fines or penalties, which could have a material adverse effect on Beneficient's financial condition and results of operations, could adversely affect Beneficient's ability to raise additional funding or attract new customers, and could require changes to Beneficient's business. Even if Beneficient defends itself successfully, the cost of litigation is often

substantial, and public reports regarding claims made against Beneficient may cause damage to its reputation among existing and prospective customers or negatively impact the confidence of counterparties, rating agencies, and equity holders, consequently affecting Beneficient's earnings negatively.

***A change in Beneficient's tax treatment could adversely affect Beneficient.***

Beneficient is subject to a variety of tax laws and tax regulations by national, regional and local governments and its Ben Insurance subsidiary, Pen, will be subject to foreign tax laws and tax regulations. Ben LP, and most of its subsidiaries, are pass through entities that are generally not subject to taxation. Rather, Beneficient passes on the distributive share of income to its investors who bear the burden of any tax liability that may be generated by such income. These tax laws and regulations (including the applicable tax rates), and their interpretation and application, may change from time to time and those changes could have a material adverse effect on the results of operations or Beneficient's financial position.

In addition, without the consent of Ben LP's unitholders, Ben LP's general partner may elect to convert Ben LP into a corporation or be taxed as a corporation for U.S. federal income tax purposes if certain conditions have been met. Such a conversion could be a taxable event to Ben LP's unitholders where gain or loss is recognized. In addition, a conversion would subject all of Ben LP's future net income to a level of corporate tax, which may reduce the amount of cash available for distribution or reinvestment.

***Our life insurance business is subject to state regulation and changes in those laws and regulations, or changes in their interpretation, could negatively affect our results of operation and financial condition.***

When we purchase a life insurance policy, we are subject to state insurance regulations. Over the past number of years, we have seen a dramatic increase in the number of states that have adopted legislation and regulations from model laws promulgated by either the National Association of Insurance Commissioners ("NAIC") or by the National Conference of Insurance Legislators (NCOIL). These laws are essentially consumer protection statutes responding to abuses that arose early in the development of the industry, some of which may persist. Today, almost every state has adopted some version of either the NAIC or NCOIL model laws, which generally require the licensing of purchasers of and brokers for life insurance policies, the filing and approval of purchase agreements, and the disclosure of transaction fees. These laws also require various periodic reporting requirements and prohibit certain business practices deemed to be abusive. State statutes typically provide state regulatory agencies with significant powers to interpret, administer, and enforce the laws relating to the purchase of life insurance policies. Under statutory authority, state regulators have broad discretionary power and may impose new licensing requirements, interpret or enforce existing regulatory requirements in different ways, or issue new administrative rules, any of which could be generally adverse to the industry and potentially the value of our life insurance policy assets.

***We may incur fines, penalties and other negative consequences from regulatory violations.***

We may fail to comply with applicable laws and regulations and be held accountable for such violations, even if such violations are inadvertent. Some legal/regulatory frameworks provide for the imposition of fines or penalties for noncompliance even though the noncompliance was inadvertent or unintentional and even though there were systems and procedures designed to ensure compliance in place at the time. For example, Beneficient is subject to regulations issued by the Office of Foreign Assets Control, or "OFAC," that prohibit financial institutions from participating in the transfer of property belonging to the governments of certain foreign countries and designated nationals of those countries. OFAC may impose penalties for inadvertent or unintentional violations even if reasonable processes are in place to prevent the violations. There may be other negative consequences resulting from a finding of noncompliance, including restrictions on certain activities.

On April 1, 2021, we filed with the SEC a Notification of Late Filing pursuant to Rule 12b-25 of the Securities Exchange Act of 1934 indicating that we were unable to complete our financial statements as of and for the year ended December 31, 2020 within the time period required to timely file this 2020 Form 10-K for the year ended December 31, 2020. We indicated at the time that we expected to file this Report no later than April 15, 2021, which is the fifteenth calendar day filing extension period afforded registrants under Rule 12b-25 of the Securities Exchange Act of 1934. As of April 15, 2020, however, we remained unable to file this Report. As such, we temporarily suspended the offering of GWG Holdings' L Bonds, commencing April 16, 2021, as a result of our delay in filing this annual report with the SEC. Additionally, we were unable to timely file our Quarterly Report on Form 10-Q for the quarter ended March 31, 2021, which was due on or before May 17, 2021, and our Quarterly Report on Form 10-Q for the quarter ended June 30, 2021, which was due on or before August 17, 2021.

Table of Contents

As part of the preparation of this 2020 Form 10-K, the Company voluntarily submitted two questions to the SEC's OCA on February 15, 2021. OCA is responsible for accounting and auditing matters arising in the SEC's administration of the federal securities laws, particularly with respect to accounting policy determinations. The questions submitted by the Company to OCA were (1) whether the December 31, 2019 transaction resulted in GWG Holdings obtaining control of Ben LP in a transaction by entities not under common control, and (2) whether Ben LP was required to consolidate any of the ExAlt Trusts. On July 26, 2021, the Company and OCA staff held a conference call in which OCA's staff notified the Company of its conclusions on the two accounting questions that were the subject of the consultation. During that call, OCA expressed that it would object to a conclusion that Ben LP not consolidate the ExAlt Trusts as of December 31, 2019. Consistent with the conclusions communicated by OCA, on August 1, 2021, the Board of Directors of GWG Holdings determined that it is necessary to restate prior period financial statements for the year ended December 31, 2019, and quarterly financial statements for the first three quarters of the year ended December 31, 2020, to consolidate the ExAlt Trusts into Beneficient's financial statements beginning on December 31, 2019, and consequently into the Company's consolidated financial statements on that same date.

We anticipate recommencing the offering of GWG Holdings' L Bonds when we regain compliance with SEC filing requirements. To regain compliance, we must (i) prepare and file all applicable late filings, including this 2020 Form 10-K and the Quarterly Reports on Form 10-Q for the first and second quarters of 2021, by October 31, 2021, and (ii) hold an annual shareholder meeting by December 31, 2021. If GWG Holdings is unable to regain compliance with Nasdaq's filing requirements for continued listing, we expect GWG Holdings to be delisted, in which case our business and the value of our securities would likely be materially and adversely impacted. While we have not filed the filings required by October 31, 2021, as of the date of this filings, we have communicated with Nasdaq regarding the status of the filings and have not yet received notice from Nasdaq regarding delisting.

***We face risks from regulatory investigations and proceedings and from private actions.***

From time to time, we may be named as a defendant or otherwise become involved in various legal proceedings, including class actions and other litigation or disputes with third parties. Future actions against us may result in judgments, settlements, fines, penalties or other results adverse to us, which could materially adversely affect our business, financial condition or results of operations, or cause serious reputational harm to us.

Beneficient's businesses and operations are also subject to increasing regulatory oversight and scrutiny, which may lead to additional regulatory investigations or enforcement actions. These and other initiatives from federal and state officials may subject Beneficient to judgments, settlements, fines or penalties, or cause Beneficient to be required to restructure its operations and activities, all of which could lead to reputational issues, or higher operational costs, thereby reducing Beneficient's profitability.

While we seek to insure against potential risks, we may not be able to obtain insurance to cover certain risks, or obtain coverage on favorable terms, and the insurance that we have may be inadequate to cover certain civil or criminal proceedings or regulatory investigations and associated costs.

***We are currently subject to a non-public, fact-finding investigation into GWG Holdings by the SEC, and we are unable to predict the outcome of this matter.***

On October 6, 2020, GWG Holdings received a subpoena to produce documents from the Chicago office of the SEC's Division of Enforcement, informing the Company of the existence of a non-public, fact-finding investigation into GWG Holdings. Since the initial subpoena, the Company has received subsequent subpoenas from the SEC for additional information. The requested information from the SEC has primarily related to GWG Holdings' investment products, including its L Bonds, as well as various accounting matters, among them, the consolidation for financial reporting purposes of Beneficient by GWG Holdings, goodwill valuation, and the accounting related to the ExAlt Trusts, related party transactions, life insurance policies, and the calculation of the debt-coverage ratio. We are cooperating fully with the SEC in connection with its investigation. Investigations of this nature are inherently uncertain, and their results cannot be predicted. Regardless of the outcome, the SEC investigation may have an adverse impact on us because of fines, legal costs, other expenses, diversion of management resources, and other factors. The investigation could also result in reputational harm to the Company and may have a material adverse effect on the Company's current and future business activities and its ability to

Page 37

Table of Contents

raise capital through the sale of L Bonds and equity securities. As a result, the failure to raise enough capital to meet our cash needs could have a material adverse effect on our operations and the value of our securities.

**General Risk Factors**

*Our success depends on certain key executives and the ability to attract, retain, and develop new professionals.*

Our success depends in large part upon the skills, experience, personal reputations and network of business contacts of certain key executives. These individuals' reputations, business relationships and expertise are critical elements in the successful implementation of our business strategy. Accordingly, the loss of any of the key executives could materially harm our business.

Our key executives are directly responsible for setting our strategic direction, operating our business, maintaining and expanding business and other critical relationships, clients and business partners and identifying expansion opportunities. Should we lose one of these key executives, we may have to search externally for a qualified replacement, which search may be prolonged, and we cannot provide assurance that we will be able to hire such a replacement on a timely basis or at all.

Most of our employees are employed by Beneficient, who provide services to GWG Holdings pursuant to the terms and conditions of an administrative shared services agreement, by and between GWG Holdings and Ben LP (the "Shared Services Agreement"). GWG Holdings and Ben LP have entered into a non-binding term sheet under which GWG Holdings would lose its ability to appoint a majority of the board of directors of the general partner of Ben LP and control the activities of Beneficient. If GWG Holdings is no longer able to control the activities of Beneficient, GWG Holdings will be relying on contractual obligations, including those under the Shared Services Agreement, to meet its human capital needs.

Additionally, competition for qualified personnel in the financial services industry is intense. Thus, the loss of any of these key personnel, by resignation, termination, death or disability, or our inability to recruit and retain qualified replacements, could cause disruption in our business and could prevent us from fully implementing our business strategy, which could materially and adversely affect our business, growth and profitability.

*Our business faces substantial competition from a variety of financial solution companies and other liquidity providers to owners of alternative assets.*

We face substantial competition in all areas of its operations from a variety of competitors, many of which are larger, have an established track record and reputation, and may have more financial resources. Our business competes with other providers of financial and trust administration such as bank holding companies, commercial and savings banks, savings and loan associations, credit unions, asset managers and their private equity affiliates, insurance companies and a growing list of other local, regional and national institutions that offer financial and trust administration services. Our business also competes with other providers of liquidity for alternative assets, which may hinder our ability to offer liquidity transactions to the market. If we are unable to compete effectively, we will not be able to grow our exposure to alternative assets and our operating results and financial condition will be adversely affected. While we believe regulatory approval to operate certain of our subsidiaries as a Texas trust company, Kansas TEFFI trust company and Bermuda Class 3 insurer will give us competitive advantages, any such advantages are not certain and we may never receive such approvals.

*Our results of operations likely will fluctuate from period to period, which may adversely affect the market price of our securities.*

We expect that the results of our operations will vary significantly from period to period for a variety of reasons, many of which are outside of our control and difficult to predict, including demand for Beneficient's liquidity products and trust administration services, changes in the fair value of the alternative assets held by certain of the ExAlt Trusts, performance of the ExAlt Loans against alternative assets interests underlying the Collateral and concentration of risk in the loan portfolios, and the performance of our life insurance portfolio. Because our results of operations may vary significantly from quarter to quarter, the results of any one period should not be relied upon as an indication of future performance and such fluctuations may make it harder for us to market and sell our securities or otherwise obtain necessary financing to maintain and grow our business.

*Business disruptions and interruptions and adverse economic conditions due to natural disasters and other external events beyond our control can adversely affect our business, financial condition and results of operations.*

Our operations can be subject to natural disasters and other external events beyond our control, such as the effects of earthquakes, fires, floods, severe weather, public health issues such as the outbreak of the coronavirus or other pandemic diseases, power failures, telecommunication loss, major accidents, terrorist attacks, acts of war, and other natural and man-made events, some of which may be intensified by the effects of a government response to the event or climate change and

Page 38

Table of Contents

changing weather patterns. For example, our corporate headquarters and critical business offices are located in north Texas, which is geographically located in "tornado alley", an area known for high instances of tornadoes, and which recently experienced catastrophic tornadic activity and blackouts. A tornado or other disaster could cause severe destruction, disruption or interruption to our operations or property and significantly impact our employees.

Although we have implemented a business continuity management program that we continue to enhance on an ongoing basis, there can be no assurance that the program will adequately mitigate the risks of such business disruptions and interruptions. Additionally, natural disasters and external events, including those occurring in and around Texas, could affect the business and operations of our clients, which could impair their ability to satisfy obligations to us, impair the value of underlying collateral or otherwise adversely affect their business dealings with us, any of which could have a material adverse effect on our business, financial condition or results of operations.

***Changes in general economic conditions could adversely impact our business.***

Changes in general economic conditions, including, for example, interest rates, foreign exchange rates, short term funding markets, investor sentiment, changes specifically affecting competition, technological developments, political and diplomatic events, tax laws, and other factors, can substantially and adversely affect our business and prospects. For example, an increase in interest rates would increase our cost of capital and may limit our ability to raise capital and have a corresponding adverse impact on our operating results. The financial markets and businesses operating in the securities industry are highly volatile and are affected by, among other factors, domestic and foreign economic conditions, geopolitics and general trends in business and finance, all of which are beyond our control. While we have engaged and may continue to engage in certain hedging activities to mitigate the impact of fluctuating interest rates and foreign exchange rates, none of these risks are or will be within our control. Declines in the financial markets or a lack of sustained growth may result in a corresponding decline in Beneficient's performance and may adversely affect the assets comprising the Collateral and the ExAlt Loans against the assets comprising the Collateral.

***A failure in our operational systems as well as human error or malfeasance, including cyber-attacks, could impair our liquidity, disrupt our business, result in the disclosure of confidential information, damage our reputation, and cause losses.***

Our financial, accounting, data processing or other operational systems and facilities may fail to operate properly or become disabled as a result of events that are wholly or partially beyond our control. We must continuously update systems to support our operations and growth and to respond to changes in regulations and markets, and invest in systemic controls and training to ensure that such transactions do not violate applicable rules and regulations or, due to errors in processing such transactions, adversely affect markets, our clients or us. Enhancements and updates to systems, as well as the requisite training, including in connection with the integration of new businesses, entail significant costs and create risks associated with implementing new systems and integrating them with existing ones.

The use of computing devices and phones is critical to the work done by our employees and the operation of our systems and business and those of our clients and its third-party service providers and vendors. Additionally, computing devices may be vulnerable to cyber-attacks or have other inherent weaknesses.

Cybersecurity attacks and security breaches of our technology systems, and those of our clients and third-party vendors, may subject us to liability and harm our business operations and overall reputation. Our operations rely on the secure processing, storage and transmission of confidential and other information in our computer systems and networks. Threats to information technology systems associated with cybersecurity risks and cyber incidents continue to grow, and there have been a number of highly publicized cases involving financial services companies, consumer-based companies and other organizations reporting the unauthorized disclosure of client, customer or other confidential information in recent years. Cybersecurity risks could disrupt our operations, negatively impact our ability to compete and result in injury to our reputation, result in system downtime and loss of revenue, and increase costs to prevent, respond to or mitigate cybersecurity events. Our security measures, information technology and infrastructure may be vulnerable to attacks by hackers or breached due to employee error, malfeasance or other disruptions that could result in unauthorized disclosure or loss of sensitive information; damage to our reputation; the incurrence of additional expenses; additional regulatory scrutiny or penalties; or our exposure to civil or criminal litigation and possible financial liability, any of which could have a material adverse effect on our business, financial condition and results of operations.

Third parties upon whom we rely face similar threats, which could directly or indirectly impact our business and operations. The occurrence of a cybersecurity-incident or attack on our third-party vendors could have a material adverse effect on our reputation and on our business, financial condition and results of operations.

Table of Contents

Notwithstanding the proliferation of technology and technology-based risk and control systems, our business relies on individuals that may make mistakes or engage in violations of applicable policies, laws, rules or procedures that are not always identified immediately by our technological processes or by our controls and other procedures. These errors or violations can include calculation errors, mistakes in addressing emails, errors in software or model development or implementation, or errors in judgment, as well as intentional efforts to ignore or circumvent applicable policies, laws, rules or procedures. Human errors and malfeasance, even if promptly discovered and remediated, can result in material losses and liabilities for us.

***We rely on other companies to provide key components of our business infrastructure.***

Third-party vendors provide and are expected to continue to provide key components of our business infrastructure. Any problems caused by these third parties, including as a result of their not providing us their services for any reason or their performing their services poorly, could adversely affect our ability to deliver products and services to our clients, impair our ability to conduct our business efficiently and effectively, and/or result in regulatory action, financial loss, litigation, and loss of reputation. Replacing these third-party vendors could also entail significant delay and expense.

Page 40

Table of Contents

**ITEM 1B. UNRESOLVED STAFF COMMENTS.**

Not applicable.

**ITEM 2. PROPERTIES.**

Our principal executive offices are currently located at 325 North St. Paul Street, Dallas, Texas 75201. GWG Holdings and Beneficient collectively lease 33,652 square feet of space for a lease term which expired on July 31, 2021. GWG Holdings also retains the lease of its legacy executive offices located at 220 South Sixth Street, Suite 1200, Minneapolis, Minnesota 55402. At that location, GWG Holdings is the primary lessee for 17,687 square feet of space for a lease term expiring in 2025. GWG Holdings no longer occupies the Minneapolis office space, but the lease of the space has been retained for use by FOXO. We believe these facilities are adequate for our current needs and that suitable additional space will be available as needed.

**ITEM 3. LEGAL PROCEEDINGS**

We are a party from time to time to what we believe are routine litigation and proceedings considered part of the ordinary course of our business. We believe that the outcome of such existing proceedings would not have a material adverse effect on our financial position, results of operations or cash flows.

*U.S. Securities and Exchange Commission Subpoena*

On October 6, 2020, GWG Holdings received a subpoena to produce documents from the Chicago office of the SEC's Division of Enforcement, informing the Company of the existence of a non-public, fact-finding investigation into GWG Holdings. Since the initial subpoena, the Company has received subsequent subpoenas from the SEC for additional information. The requested information from the SEC has primarily related to GWG Holdings' investment products, including its L Bonds, as well as various accounting matters, among them, the consolidation for financial reporting purposes of Beneficient by GWG Holdings, goodwill valuation, and the accounting related to the ExAlt Trusts, related party transactions, life insurance policies, and the calculation of the debt-coverage ratio.

Until receipt of the initial subpoena on October 6, 2020, the Company had no previous communication with the SEC related to these issues and was unaware of this investigation. The Company is fully cooperating with the SEC in this investigation. The Company is unable to predict when this matter will be resolved or what further action, if any, the SEC may take in connection with it.

**ITEM 4. MINE SAFETY DISCLOSURES.**

Not applicable.

Page 41

<div align="center">PART II</div>

**ITEM 5. MARKET FOR THE REGISTRANT'S COMMON EQUITY, RELATED SHAREHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES.**

GWG Holdings common stock is listed on The Nasdaq Capital Market under the ticker symbol "GWGH."

As of December 31, 2020, there were 112 record holders of GWG Holdings' common stock, one of which was Cede & Co., a nominee for The Depository Trust Company, or DTC. Shares of common stock that are held by financial institutions as nominees for beneficial owners are deposited into participant accounts at DTC, and are considered to be held of record by Cede & Co. as one stockholder.

**ITEM 6. SELECTED FINANCIAL DATA.**

Not applicable.

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

*The following discussion should be read in conjunction with the consolidated financial statements and accompanying notes and the information contained in other sections of this report. This discussion and analysis is based on the beliefs of our management, as well as assumptions made by, and information currently available to, our management.*

*Unless the context otherwise indicates, all references in this Management's Discussion and Analysis of Financial Condition and Results of Operations, or MD&A, to the "Company," "we," "us," "our" or "ours" or similar words are to GWG Holdings Inc. and its direct and indirect wholly-owned and consolidated subsidiaries, references to "GWG Holdings" refer to GWG Holdings Inc., references to "GWG Life" refer to GWG Life, LLC (a wholly-owned subsidiary of GWG Holdings), references to "DLP IV" refer to GWG DLP Funding IV, LLC (a wholly-owned subsidiary of GWG Life), references to "DLP V Holdings" refer to GWG DLP Funding V Holdings, LLC (a wholly-owned subsidiary of GWG Life), references to "DLP V" refer to GWG DLP Funding V, LLC (a wholly-owned subsidiary of DLP V Holdings), references to "DLP VI Holdings" refer to GWG DLP Funding Holdings VI, LLC (a wholly-owned subsidiary of GWG Life), references to "DLP VI" refer to GWG DLP Funding VI, LLC (a wholly-owned subsidiary of DLP VI Holdings), references to "Ben LP" refer to The Beneficient Company Group, L.P. (a consolidated subsidiary of GWG Holdings), references to "Beneficient" refer to Ben LP and all of its consolidated subsidiaries, references to "BCH" refer to Beneficient Company Holdings, L.P. (of which Ben LP is the general partner), references to "Beneficient Management" refer to Beneficient Management, L.L.C. (the general partner of Ben LP), references to "BCC" refer to Beneficient Capital Company, L.L.C. (a subsidiary of Ben LP), references to "BACC" refer to Beneficient Administrative and Clearing Company, L.L.C. (a subsidiary of Ben LP), references to "Pen" refer to Pen Indemnity Insurance Company, LTD (a subsidiary of Ben LP), references to "Ben Markets" refer to Ben Markets L.L.C. (a subsidiary of Ben LP), references to "FOXO" refer to FOXO Technologies Inc. (formerly, FOXO BioScience LLC, an equity investee of GWG Holdings), references to "FOXO Labs" refer to FOXO Labs Inc. (formerly, Life Epigenetics Inc., a wholly-owned subsidiary of FOXO), references to "FOXO Life" refer to FOXO Life LLC (formerly, youSurance General Agency, LLC, a wholly-owned subsidiary of FOXO); references to the "ExAlt Plan™ ", refer to a trust structure comprising customized trust vehicles (the "ExAlt Trusts", and each, an "ExAlt Trust").*

**Overview**

We are an innovative financial services firm based in Dallas, Texas, that is a leader in providing unique liquidity solutions and services for the owners of illiquid investments. In 2018 and 2019, GWG Holdings and GWG Life consummated a series of transactions (as more fully described in Item 1. *Business*) with The Beneficient Company Group, L.P. ("Ben LP," including all of the subsidiaries it may have from time to time — "Beneficient"). On December 31, 2019, GWG Holdings obtained the right to appoint a majority of the board of directors of Beneficient Management. As a result of this change-of-control event, GWG Holdings reported the results of Beneficient on a consolidated basis beginning on the transaction date of December 31, 2019. As further described in Note 23 to the consolidated financial statements, on August 13, 2021, GWG Holdings and Ben LP, and BCH (as defined below) entered into a non-binding term sheet (the "Term Sheet") which, if completed, is expected to result in, among other things, the deconsolidation of Beneficient from GWG Holdings.

Beneficient is a financial services company, based in Dallas, Texas, that markets an array of liquidity and trust administration products to alternative asset investors primarily comprised of mid-to-high-net-worth individuals having a net worth between

Page 42

Table of Contents

$5 million and $30 million ("MHNW") and small-to-midsize institutional investors and family offices with less than $1 billion in investable assets ("STMIs"). Ben LP plans to offer its products and services through its five operating subsidiaries, which include (i) Ben Liquidity, L.L.C. and its subsidiaries (collectively, "Ben Liquidity"), (ii) Ben Custody, L.L.C. and its subsidiaries (collectively, "Ben Custody Admin"), (iii) Ben Insurance, L.L.C. and its subsidiaries (collectively, "Ben Insurance"), (iv) Ben Markets, L.L.C., and its subsidiaries (collectively, "Ben Markets") and (v) The Beneficient Company Group (USA), L.L.C ("Beneficient USA"). Ben Liquidity plans to operate a trust company that is a Kansas Technology Enabled Fiduciary Financial Institutions ("TEFFI") authorized to serve as an alternative asset custodian, trustee and lender with statutory powers granted for each of these activities and permitting Ben Liquidity to provide fiduciary financing for certain of its customer liquidity transactions. Ben Custody Admin plans to operate a Texas trust company that is being organized to provide its customers with certain administrative, custodial and trustee products and specialized services focused on alternative asset investors. Ben Insurance has been chartered as a Bermuda based insurance company that plans to offer certain customized insurance products and services covering risks relating to owning, managing and transferring alternative assets. Ben Markets is in the regulatory process for acquiring a captive registered broker-dealer that would conduct certain of its activities attendant to offering a suite of products and services from the Beneficient family of companies. Certain of Ben LP's operating subsidiary products and services involve or are offered to certain of the ExAlt Trusts, which operate for the benefit of the Non-Controlling Interest Holders, and are consolidated subsidiaries of Ben LP for financial reporting purposes (such trusts are and may individually be referred to as Custody Trusts, Collective Trusts, LiquidTrusts, and Funding Trusts). Beneficient USA employs a substantial majority of the executives and staff for Beneficient's operating subsidiaries to which Beneficient USA provides administrative and technical services.

We believe that Beneficient's operations will generally produce higher risk-adjusted returns than those we can achieve from life insurance policies acquired in the secondary market; however, returns on equity in life settlements, especially with the current availability of financings on favorable terms, appear to be an attractive option to diversify our exposure to alternative assets, and we have begun exploring the feasibility of acquiring such policies. Furthermore, although we believe that our portfolio of life insurance policies is a meaningful component of a growing diversified alternative asset portfolio, we continue to explore strategic alternatives for our life insurance portfolio aimed at maximizing its value, including a possible sale, refinancing, recapitalization, partnership, reinsurance guarantees, life insurance operations or other transactions involving of our life insurance portfolio, as well as pursuing other alternatives to increase our exposure to alternative assets. These operations are in addition to allocating capital to provide liquidity to holders of a broader range of alternative assets, which we currently provide through GWG Holdings' and GWG Life's investments in Beneficient.

GWG Holdings completed the transactions with Beneficient, in part, to provide the Company with a significant increase in assets and common stockholders' equity. In addition, the transactions with Beneficient may provide us with the opportunity for a diversified source of future earnings within the alternative asset industry. We believe the Beneficient transactions and the other strategies we are pursuing will transform GWG Holdings from a niche provider of liquidity to owners of life insurance to a diversified provider of financial products and services with exposure to a broad range of alternative assets.

**Critical Accounting Policies**

*Critical Accounting Estimates*

The preparation of our consolidated financial statements in accordance with the accounting principles generally accepted in the United States of America ("GAAP") requires us to make significant judgments, estimates, and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. We base our judgments, estimates, and assumptions on historical experience and on various other factors believed to be reasonable under the circumstances. Actual results could differ materially from these estimates. We evaluate our judgments, estimates, and assumptions on a regular basis and make changes accordingly.

Material estimates that are particularly susceptible to change, in the near term, relate to: determining the assumptions used in estimating the fair value of our investments in life insurance policies; determining the grant date fair value for equity-based compensation awards; determining the allowance for loan losses as an input to the allocation of income (loss) to Beneficient's equity holders; and evaluation of potential impairment of goodwill and other intangibles. We believe these estimates are likely to have the greatest potential impact on our consolidated financial statements and accordingly believe these to be our critical accounting estimates. Below we discuss the critical accounting policies associated with these estimates.

App. 1166

Table of Contents

*Valuation of Life Insurance Policies*

We account for the purchase of life insurance policies in accordance with ASC 325-30, *Investments in Insurance Contracts*, which requires us to use either the investment method or the fair value method. We have elected to account for all of our life insurance policies using the fair value method.

We initially record our purchase of life insurance policies at the transaction price, which is the amount paid for the policy, inclusive of all external fees and costs associated with the acquisition. At each subsequent reporting period, we remeasure the investment at fair value in its entirety and recognize the change in fair value as unrealized gain (loss) in the current period, net of premiums paid. Changes in the fair value of our life insurance portfolio are based on periodic evaluations and are recorded in our consolidated statements of operations as changes in fair value of life insurance policies.

The fair value of our life insurance policies is determined as the net present value of the life insurance portfolio's future expected cash flows (policy benefits received and required premium payments) that incorporates life expectancy estimates obtained when the policy was purchased and current discount rate assumptions. We refer to our valuation methodology as the Longest Life Expectancy methodology. This methodology utilizes a portfolio mortality multiplier ("PMM") that allows us to "fit" projections to actual results, which provides a basis to forecast future performance more accurately. The table below compares the actual-to-expected ("A2E") mortality cash flow experience of our life insurance portfolio using this methodology. We have achieved expected mortality cash flow experience accuracy of 96% under the Longest Life Expectancy methodology through December 31, 2020.



Should performance sufficiently deviate in the future from these projections, the A2E analysis will be re-examined to determine if the resultant PMM still results in the most accurate fitting of the projections to actual results. Adjustments to the PMM would then be made based on that analysis if warranted.

A discount rate is used to calculate the net present value of the expected cash flows. The discount rate used to calculate fair value of our portfolio incorporates the guidance provided by ASC 820, *Fair Value Measurements and Disclosures*. We utilized an 8.25% discount rate to estimate the fair value of our portfolio of life insurance policies at both December 31, 2020 and 2019.

As we have ceased acquiring insurance policies, we no longer have direct access market-based factors that previously served as a key input to our discount rate. However, we engaged a third-party firm to provide recent market data on comparable assets to support our discount rate as of December 31, 2020. We also continue to use fixed income market interest rates, credit exposure to the issuing insurance companies and our estimate of the operational risk yield premium a purchaser would apply to the future cash flows derived from our portfolio of life insurance policies as inputs to our discount rate.

The determination of the discount rate used in the valuation of the Company's life insurance policies requires management judgment and incorporates information that is reasonably available to management as of the date of the valuation. The discount rate we utilize assumes an orderly and arms-length transaction (i.e., a non-distressed transaction in which neither seller nor buyer is compelled to engage in the transaction), which is consistent with related GAAP guidance. The carrying

Table of Contents

value of policies held at the end of each quarterly reporting period is adjusted to current fair value using the fair value discount rate applied to the entire portfolio as of that reporting date.

We engaged ClearLife Limited, owner of the ClariNet LS actuarial portfolio pricing software we use, to prepare a net present value calculation of our life insurance portfolio as of December 31, 2020. ClearLife Limited processed policy data, future premium data, life expectancy estimate data, and other actuarial information to calculate a net present value for our portfolio using the specified discount rate of 8.25%. ClearLife Limited independently calculated the net present value of our portfolio of 1,058 policies to be $791.9 million and furnished us with a letter documenting its calculation. A copy of such letter is filed as Exhibit 99.1 to this report.

Life expectancy estimates and market discount rates for a portfolio of life insurance policies are inherently uncertain and the effect of changes in estimates may be significant. For example, if the life expectancy estimates were increased or decreased by four and eight months on each outstanding policy, and the discount rates were increased or decreased by 1% and 2%, with all other variables held constant, the fair value of our investment in life insurance policies would increase or decrease as summarized below (in thousands):

| | Change in Life Expectancy Estimates | | | |
| | Minus 8 Months | Minus 4 Months | Plus 4 Months | Plus 8 Months |
|---|---|---|---|---|
| December 31, 2020 | $ 97,837 | $ 45,536 | $ (61,713) | $ (114,099) |
| December 31, 2019 | $ 113,812 | $ 57,753 | $ (55,905) | $ (111,340) |

| | Change in Discount Rate | | | |
| | Minus 2% | Minus 1% | Plus 1% | Plus 2% |
|---|---|---|---|---|
| December 31, 2020 | $ 82,983 | $ 39,560 | $ (36,151) | $ (69,284) |
| December 31, 2019 | $ 91,890 | $ 43,713 | $ (39,790) | $ (76,118) |

See Note 5 - Investment in Life Insurance Policies and Note 7 - Fair Value Measurements in the notes to the accompanying audited consolidated financial statements for additional information related to our valuation of life insurance policies.

### *Equity-Based Compensation*

The Company measures and recognizes compensation expense for all equity-based payments at fair value on the grant date over the requisite service period. GWG Holdings uses the Black-Scholes option pricing model to determine the fair value of stock options and stock appreciation rights. For restricted stock grants (including restricted stock units), if any, fair value is determined as of the closing price of GWG Holdings' common stock on the date of grant. As it is not publicly traded, Beneficient uses various methods to determine the grant date fair value of its equity-based compensation awards.

The fair value of the Beneficient Management Partners, L.P. ("BMP") Equity Units is determined on the grant date using a probability-weighted discounted cash flow analysis. This fair value measurement is based on significant inputs not observable in the market and thus represents a Level 3 measurement within the fair value hierarchy. The resultant probability-weighted cash flows are then discounted using a rate that reflects the uncertainty surrounding the expected outcomes, which the Company believes is appropriate and representative of a market participant assumption.

The fair value of Ben LP's restricted equity units ("REUs") was determined for substantially all of the awards granted in 2020, by using the valuation techniques consistent with those utilized to determine the acquisition date equity values arising from GWG Holdings obtaining a controlling financial interest in Beneficient. These valuation techniques relied upon the OPM Backsolve approach under the market method as more fully described in Note 4 to the consolidated financial statements. For the REUs granted in the latter portion of 2020, which is a *de minimis* amount of the total 2020 REUs, we utilized valuation techniques consisting of the income approach and market approach. For awards granted in 2019, the fair value of the REUs was estimated using recent equity transactions involving third parties, which provided the Company with observable fair value information sufficient for estimating the grant date fair value.

### *Beneficient's Income Allocation*

Net income (loss) attributable to noncontrolling interest holders is subject to Beneficient's income allocation in accordance with the governing limited partnership agreement of BCH as more fully described in Note 11.

Table of Contents

The consolidated financial statements of Beneficient reflect the assets, liabilities, revenues, expenses, investment income and cash flows of Beneficient, including, after December 31, 2019, all of the trusts in the ExAlt Plan™ on a gross basis, and a portion of the economic interests certain of the ExAlt Trusts, held by the residual beneficiaries, are attributed to noncontrolling interests in the accompanying consolidated financial statements. Interest income earned by Beneficient from the ExAlt Trusts is eliminated in its consolidation. However, because the eliminated amounts are earned from, and funded by, its noncontrolling interests, Beneficient's attributable share of the net income from the ExAlt Trusts is increased by the amounts eliminated. Accordingly, the elimination in consolidation of interest income and, for periods after December 31, 2019, certain fee revenue has no effect on net income (loss) attributable to Beneficient or holders of Common Units.

For purposes of income allocation to Beneficient's equity holders, interest income is generally comprised of contractual interest, which is computed at a variable rate compounding monthly, interest recognized on certain of the ExAlt Loans through the effective yield method, and an amortized discount that is recognized ratably over the life of the ExAlt Loan.

As a result of the change-of-control event discussed in Note 9 to the accompanying audited consolidated financial statements on December 31, 2019 and the resulting valuation performed under ASC 805, the existing loan portfolio between Ben and the ExAlt Trusts was evaluated as of December 31, 2019, for credit deterioration based on the intentions of all parties that the income allocations provisions of Ben operate under US GAAP as if the ExAlt Trusts were not consolidated for financial reporting purposes. Further, as required under ASC 805, each ExAlt Loans between Beneficient and the ExAlt Trusts was evaluated and classified as either purchased credit impaired ("PCI") or non purchased credit impaired ("non-PCI"). For PCI loans, expected cash flows as of the date of valuation in excess of the fair value of loans are recorded as interest income over the life of the loans using a level yield method if the timing and amount of the future cash flows is reasonably estimable. Subsequently, increases in cash flows over those expected at the acquisition date are recognized prospectively as interest income. Decreases in expected cash flows due to credit deterioration are recognized by recording an allowance for loan loss. For non-PCI loans, the difference between the fair value and unpaid principal balance of the loan as of the date of valuation is amortized or accreted to interest income over the contractual life of the loans using the effective interest method. In the event of prepayment, the remaining unamortized amount is recognized in interest income, which is eliminated upon the consolidation of the ExAlt Trusts for financial reporting purposes.

Allowance for Loan Losses

The allowance for loan losses, which is eliminated in consolidation, is an input to Beneficient's allocation of income to equity holders of Ben LP. The allowance for loan losses is a valuation allowance for probable incurred credit losses in the portfolio. Management's determination of the allowance is based upon an evaluation of the loan portfolio, impaired loans, economic conditions, volume, growth and composition of the collateral to the loan portfolio, and other risks inherent in the portfolio. Currently, management individually reviews all ExAlt Loans due to the low volume and non-homogenous nature of the current portfolio. Management relies heavily on statistical analysis, current NAV and distribution performance of the underlying alternative asset interests and industry trends related to alternative asset investments to estimate losses. Management evaluates the adequacy of the allowance by reviewing relevant internal and external factors that affect credit quality. The cash flows from the underlying alternative assets interests are the sole source of repayment for the ExAlt Loans and related interest. Beneficient recognizes any charge-off in the period in which it is confirmed. Therefore, impaired ExAlt Loans are written down to their estimated net present value.

Interest income, for purposes of determining income allocations to Beneficient's equity holders, is adjusted for any allowance for loan losses, which was approximately $5.4 million for the year ended December 31, 2020.

***Goodwill and Identifiable Intangible Assets***

Goodwill and other identifiable intangible assets are initially recorded at their estimated fair values at the date of acquisition. Goodwill and other intangible assets having an indefinite useful life are not amortized for financial statement purposes. In the event that facts and circumstances indicate that the goodwill or other identifiable intangible assets may be impaired, an interim impairment test would be required. Intangible assets with finite lives are amortized over their useful lives. We perform required annual impairment tests of our goodwill and other intangible assets as of October 1 for our reporting units.

The goodwill impairment test requires us to make judgments and assumptions. The test consists of estimating the fair value of each reporting unit based on valuation techniques, including a discounted cash flow model using revenue and profit forecasts and recent industry transaction and trading multiples of our peers. We then compare those estimated fair values with the carrying values of the assets and liabilities of each reporting unit, which includes the allocated goodwill. If the estimated fair value is less than the carrying value, we will recognize an impairment charge for the amount by which the carrying amount

Table of Contents

exceeds the reporting unit's fair value; however, any loss recognized will not exceed the total amount of goodwill allocated to that reporting unit.

For 2020, the annual goodwill impairment analysis did not result in any impairment charges. Our impairment evaluation included a qualitative assessment, which considered whether there were indicators of potential impairment following the recent completion of the business combination accounting. In addition, our evaluation included a quantitative analysis, which included multiple assumptions, including estimated discounted cash flows and other estimates that may change over time. For example, a key assumption in determining the fair value of our reporting units is forecasting free cash flow generated by our business over the next five years and includes assumptions regarding expected growth of new service offerings and products. While our assumption reflects management's best estimates of future performance, the estimates assume Beneficient capturing a significant market share of liquidity transactions during the next five years leading to a substantial rate of growth of new service offerings and products, revenues and assets over the next five years ending December 31, 2025. These estimations are uncertain to occur, and to the extent the Company falls short of achieving our expected growth in revenues and assets over the next four years, material impairments of our goodwill may occur in the near term. For example, a 15% decline in our annual projected volume of liquidity transactions reflected in the Company's forecasts would require impairments to begin to be recorded assuming all other assumptions on which the forecasts are built remain constant. Because the Company's forecasts are predicated on estimating future volume for new service offerings and products, the Company's actual future volume of liquidity transactions reflected in the Company's forecasts may fall short of management's forecasts by 15% or greater and may result in a partial or full write down of our goodwill balance, which totaled $2.4 billion at December 31, 2020. In light of Beneficient's significant recurring losses from operations, negative cash flows from operations, and delays in executing its business plans, there could be potential triggering events identified and resulting impairment of goodwill recorded during the annual impairment test during the fourth quarter of 2021. While management can and has implemented strategies to address these events, changes in operating plans or adverse changes in the future could reduce the underlying cash flows used to estimate fair values and could result in a decline in fair value that would trigger future impairment charges of the reporting unit's goodwill balance.

In addition, as reflected in Note 23 to the accompanying audited consolidated financial statements, the Company is evaluating potential strategic transactions that, if consummated, may result in the deconsolidation of Beneficient as GWG Holdings will no longer own a controlling financial interest in Beneficient. As we evaluate various strategic changes for the investment in Beneficient, we may make further changes to the Company's forecasted cash flows and such changes could result in losses upon deconsolidation of our subsidiary or may result in increased risk of future goodwill impairment charges. If future discounted cash flows become less than those projected by us, future impairment charges may become necessary that could have a materially adverse impact on our results of operations and financial condition in the period in which the write-off occurs.

**Recent Developments**

We define "recent developments" as material transactions or matters that occurred in the most recent fiscal quarter or in the period between the end of the fiscal quarter and the filing of the quarterly or annual financial statements with the SEC. The following recent developments are described in more detail in the notes to the accompanying audited consolidated financial statements. A reference to the corresponding note is included below:

- The amendment of Beneficient's Credit Agreements (Note 23).

- On December 31, 2020, GWG Holdings, GWG Life and Bank of Utah entered into a supplemental indenture (the "Liquidity Bond Supplemental Indenture") providing for the issuance of up to $1.0 billion in aggregate principal amount of two new series of L Bonds known as "Liquidity Bonds" (Note 10).

- During the fourth quarter of 2020, Beneficient executed 9 liquidity transactions pursuant to which customers sold interests in private equity funds with an aggregate net asset value of $15.1 million to certain of the ExAlt Trusts in exchange for agreed upon consideration. In connection with these transactions, GWG Life issued $0.5 million of principal in Liquidity Bonds on December 31, 2020.

- Subsequent to December 31, 2020 and through the date of this filing, Beneficient executed 10 liquidity transactions pursuant to which customers sold interests in private equity funds with an aggregate net asset value of $5.6 million to certain of the ExAlt Trusts in exchange for agreed upon consideration. In connection with certain of these transactions, GWG Life issued an aggregate of $0.3 million of principal in Liquidity Bonds on January 8, 2021 and January 15, 2021.

Table of Contents

- In addition, on March 25, 2021, Beneficient filed provisional patent applications pending on certain of its systems and processes underlying its liquidity products and trust services. These patent applications cover the following aspects of Beneficient's business:

  ◦ *Ben ExAlt Plan<sup>TM</sup> Patent Application.*

  - **ExAlt Plan**. System and process for providing liquidity to customers for their alternative assets.

  ◦ *Underwriting Systems Patent Applications.*

  - **AltScore**. Alternative asset quality scoring system.
  - **ValueAlt**. Method to value interests in alternative asset funds.
  - **AltRating**. Method to assign credit ratings to structured debt that is backed by alternative assets.

  ◦ *Risk Assessment and Risk Reduction Patent Applications.*

  - **AltC**. Tool to measure portfolio concentration relative to an established limit or target.
  - **OptimumAlt**. Portfolio optimization and allocation tool specifically designed for alternative asset funds.
  - **AlphaAlt**. Proprietary forecast of expected returns and cash flows for alternative asset fund types.
  - **AltQuote**. Real-time indicator of liquidity solutions for holders of alternative assets.

- In April 2021, the Kansas Legislature adopted, and the governor of Kansas signed into law, a bill that would allow for the chartering and creation of Kansas trust companies, known as Technology Enabled Fiduciary Financial Institutions ("TEFFIs"), that provide fiduciary financing (e.g., lending to ExAlt Trusts), custodian and trustee services in all capacities pursuant to statutory fiduciary powers, to investors and other participants in the alternative assets market, as well as the establishment of alternative asset trusts. The legislation became effective on July 1, 2021 and designates an operating subsidiary of Ben LP, Beneficient Fiduciary Financial, L.L.C. ("BFF") as the pilot trust company under the TEFFI legislation. A conditional trust charter was issued by the Kansas Bank Commissioner to a subsidiary of Ben LP on July 1, 2021. Under the pilot program, BFF will not be authorized to exercise its fiduciary powers as a TEFFI until the earlier of the date the Kansas Bank Commissioner promulgates applicable rules and regulations or December 31, 2021. The bill also permits the Kansas Bank Commissioner to request a six-month extension of the pilot program period, which could delay Beneficient's permission to exercise its fiduciary powers under the charter until July 1, 2022. As a result, the directors of GWG Holdings who serve on the new TEFFI trust company Board of Directors resigned their membership, effective June 14, 2021, on GWG Holdings' Board of Directors to devote their time to serving as directors of the Beneficient TEFFI trust company, which the Company believes is the highest and best use of their available time and skills and will support the development of the Beneficient TEFFI trust company and the successful execution of Beneficient's business plan (Note 23).

- On June 28, 2021, DLP IV entered into a Third Amended and Restated Loan and Security Agreement with LNV Corporation (the "Third Amended Facility") that resulted in a $52.5 million advance from LNV Corporation, or $51.2 million including certain fees and expenses incurred in connection with the entry into the Third Amended Facility (Note 23).

- On August 11, 2021, GWG DLP Funding VI, LLC, a Delaware limited liability company ("DLP VI"), entered into a Credit Agreement (the "NF Credit Agreement") with each lender from time to time party thereto and National Founders LP, a Delaware limited partnership, as the administrative agent (the credit facility evidenced by such NF Credit Agreement, the "NF Credit Facility") that resulted in a one-time $107.6 million advance with a scheduled maturity date of August 11, 2031 (Note 23). Approximately $56.7 million of such advanced amount was used to pay off the remaining amount due under the Third Amended Facility.

- On August 13, 2021, GWG Holdings, Ben LP, and BCH entered into a Term Sheet that contemplates a series of transactions which, if completed, will result in, among other things, (i) GWG Holdings receiving certain proposed enhancements to its investments in Beneficient; (ii) GWG Holdings no longer having the right to appoint directors of the board of directors of Beneficient Management; and (iii) Beneficient no longer being a consolidated subsidiary of GWG Holdings (Note 23).

Page 48

Table of Contents

- On September 7, 2021, DLP IV entered into a Fourth Amended and Restated Loan and Security Agreement with LNV Corporation, as lender, and CLMG Corp., as the administrative agent on behalf of the lenders under the agreement (the "Fourth Amended Facility") that resulted in a $30.3 million advance from LNV Corporation, with such advance including amounts to cover certain fees and expenses incurred in connection with the entry into the Fourth Amended Facility (Note 23).

- An update on the current state of the Company and potential impact of the COVID-19 pandemic (Note 23).

**Asset Diversification**

As of December 31, 2020, we held a combined portfolio of assets consisting of 78% of fair value secondary life insurance policies and 22% of indirect interests in alternative assets held by certain of the ExAlt Trusts. The table presented below reflects classifications based on GWG Holdings' and Beneficient's current exposure types as of December 31, 2020 (dollar amounts in thousands). Additional information regarding the Collateral portfolio is available on its website at *www.trustben.com*. The information on Beneficient's website is not part of, or incorporated by reference in, this report.

| Exposure Type | Value | Percent of Total |
|---|---|---|
| Near-Duration Life Insurance Policies [1] | $ 329,277 | 32.5 % |
| Intermediate-Duration Life Insurance Policies [1] | 299,812 | 29.6 % |
| Long-Duration Life Insurance Policies [1] | 162,823 | 16.1 % |
| Growth Stage Private [2] | 72,887 | 7.2 % |
| Late Stage Venture Backed [2] | 54,144 | 5.3 % |
| Corporate Buyouts [2] | 34,235 | 3.4 % |
| Early Stage Venture Backed [2] | 31,483 | 3.1 % |
| Other [2] | 29,145 | 2.8 % |
| **Total** | $ 1,013,806 | 100.0 % |

(1) Represents fair value of life insurance policies.
(2) Represents the net asset value ("NAV") of the interests in alternative assets that provide cash flows, which comprise the Collateral of the ExAlt Loans, excluding the collateral exchanged in the Collateral Swap, which is eliminated in consolidation. These ExAlt Loans eliminate upon consolidation in the presentation of our consolidated financial statements NAV calculation reflects the most current report of NAV and other data received from firm/fund sponsors. If no such report has been received, Beneficient estimates NAV based upon the last NAV calculation reported by the investment manager and adjusts it for capital calls and distributions made in the intervening time frame.

The underlying exposure data represents GWG Holdings' exposure to life insurance policies included in its portfolio and its exposure to the underlying Collateral of Beneficient's loan portfolio to the ExAlt Trusts. Exposure type reflects classifications based on each company's portfolio as determined by management. Figures are based on third-party information and other relevant information as determined by management. "Other" includes private debt strategies, natural resources strategies, and hedge funds. "Near-Term", "Intermediate-Term", and "Long-Term" life insurance policies represent policies with life expectancies between 0 – 47 months, 48 – 95 months, and 96 – 240 months, respectively.

The following sections contain information on each of the secondary life insurance assets and the interests in alternative assets held by certain of the ExAlt Trusts separately.

Page 49

Table of Contents

*Secondary Life Insurance Assets*

Our portfolio of life insurance policies, owned by GWG Holdings' subsidiaries as of December 31, 2020, is summarized below:

**Life Insurance Portfolio Summary**

| | | |
|---|---|---|
| Total life insurance portfolio face value of policy benefits (in thousands) | $ | 1,900,715 |
| Average face value per policy (in thousands) | $ | 1,797 |
| Average face value per insured life (in thousands) | $ | 1,943 |
| Weighted average age of insured (years) | | 83.1 |
| Weighted average life expectancy (LE) estimate (years) | | 6.9 |
| Total number of policies | | 1,058 |
| Number of unique lives | | 978 |
| Demographics | | 74% Male; 26% Female |
| Number of smokers | | 40 |
| Largest policy as % of total portfolio face value | | 0.7 % |
| Average policy as % of total portfolio | | 0.1 % |
| Average annual premium as % of face value | | 3.8 % |

Our portfolio of life insurance policies, owned by GWG Holdings' subsidiaries as of December 31, 2020, organized by the insured's current age and the associated number of policies and policy benefits, is summarized below:

**Distribution of Policies and Policy Benefits by Current Age of Insured**

| | | | | Percentage of Total | | |
|---|---|---|---|---|---|---|
| Min Age | Max Age | Number of Policies | Policy Benefits (in thousands) | Number of Policies | Policy Benefits | Weighted Average LE (Years) |
| 63 | 69 | 42 | $ 49,535 | 4.0 % | 2.6 % | 10.21 |
| 70 | 74 | 191 | 222,761 | 18.1 % | 11.7 % | 10.6 |
| 75 | 79 | 206 | 349,467 | 19.5 % | 18.4 % | 9.44 |
| 80 | 84 | 213 | 375,926 | 20.0 % | 19.7 % | 7.54 |
| 85 | 89 | 229 | 556,339 | 21.6 % | 29.3 % | 4.84 |
| 90 | 94 | 153 | 296,310 | 14.5 % | 15.6 % | 2.99 |
| 95 | 100 | 24 | 50,377 | 2.3 % | 2.7 % | 2.09 |
| **Total** | | 1,058 | $ 1,900,715 | 100.0 % | 100.0 % | 6.92 |

Page 50

App. 1177

Table of Contents

Our portfolio of life insurance policies, owned by GWG Holdings' subsidiaries as of December 31, 2020, organized by the insured's estimated life expectancy estimates and associated policy benefits, is summarized below:

**Distribution of Policies by Current Life Expectancies of Insured**

| Min LE (Months) | Max LE (Months) | Number of Policies | Policy Benefits (in thousands) | Percentage of Total | |
|---|---|---|---|---|---|
| | | | | Number of Policies | Policy Benefits |
| 0 | 47 | 300 | $ 518,044 | 28.4 % | 27.3 % |
| 48 | 71 | 225 | 421,774 | 21.3 % | 22.2 % |
| 72 | 95 | 192 | 318,497 | 18.1 % | 16.8 % |
| 96 | 119 | 150 | 283,899 | 14.2 % | 14.9 % |
| 120 | 143 | 109 | 167,195 | 10.3 % | 8.8 % |
| 144 | 179 | 71 | 145,581 | 6.7 % | 7.7 % |
| 180 | 240 | 11 | 45,725 | 1.0 % | 2.3 % |
| **Total** | | 1,058 | $ 1,900,715 | 100.0 % | 100.0 % |

We rely on the payment of policy benefit claims by life insurance companies as a significant source of cash inflow. The life insurance assets we own represent obligations of third-party life insurance companies to pay the benefit amount under the policy upon the mortality of the insured. As a result, we manage this credit risk exposure by generally purchasing policies issued by insurance companies with investment-grade credit ratings from Standard & Poor's, and diversifying our life insurance portfolio among a number of insurance companies.

The yield to maturity on bonds issued by life insurance carriers reflects, among other things, the credit risk (risk of default) of such insurance carrier. We follow the yields on certain publicly traded life insurance company bonds because this information is part of the data we consider when valuing our portfolio of life insurance policies for our financial statements.

The average yield to maturity of publicly traded life insurance company bonds data we consider as inputs to our life insurance portfolio valuation process was 1.15% as of December 31, 2020. We believe this average yield to maturity reflects, in part, the financial market's judgment that credit risk is low with regard to these carriers' financial obligations. The obligations of life insurance carriers to pay life insurance policy benefits ranks senior to all of their other financial obligations, including the senior bonds they issue. As of December 31, 2020, 96.3% of the face value benefits of our life insurance policies were issued by insurers having an investment-grade credit rating (BBB or better) by Standard & Poor's.

As of December 31, 2020, our ten largest life insurance company credit exposures and the Standard & Poor's credit rating of their respective financial strength and claims-paying ability is set forth below:

**Distribution of Policy Benefits by Top 10 Insurance Companies**

| Rank | Policy Benefits (in thousands) | Percentage of Policy Benefit Amount | Insurance Company | Ins. Co. S&P Rating |
|---|---|---|---|---|
| 1 | $ 279,792 | 14.7 % | John Hancock Life Insurance Company | AA- |
| 2 | 212,879 | 11.2 % | Lincoln National Life Insurance Company | AA- |
| 3 | 200,936 | 10.6 % | Equitable Life Insurance Company | A+ |
| 4 | 164,391 | 8.6 % | Transamerica Life Insurance Company | A+ |
| 5 | 157,755 | 8.3 % | Brighthouse Life Insurance Company | AA- |
| 6 | 87,339 | 4.6 % | American General Life Insurance Company | A+ |
| 7 | 84,998 | 4.5 % | Pacific Life Insurance Company | AA- |
| 8 | 67,376 | 3.5 % | ReliaStar Life Insurance Company | A+ |
| 9 | 59,808 | 3.1 % | Security Life of Denver Insurance Company | A+ |
| 10 | 57,153 | 3.0 % | Protective Life Insurance Company | AA- |
| | $ 1,372,427 | 72.1 % | | |

Page 51

*ExAlt Trusts' Investment in Alternative Assets*

Beneficient's primary operations, which commenced on September 1, 2017, consist of offering its liquidity and trust administration services to its customers, primarily through certain of Ben LP's operating subsidiaries, Ben Liquidity (as defined below) and Ben Custody Admin (as defined below), respectively. Ben Liquidity offers simple, rapid and cost-effective liquidity products to its customers through the use of customized trust vehicles, the ExAlt Trusts, that facilitate the exchange of a customer's alternative assets for consideration using a unique financing structure. A subsidiary of Ben Liquidity makes ExAlt Loans to certain of the ExAlt Trusts. Ben Liquidity generates interest and fee income earned in connection with such ExAlt Loans to certain of the ExAlt Trusts, which are collateralized by the cash flows from the exchanged alternative assets (the "Collateral"). Ben Custody Admin provides trust administration services to the trustees of certain of the ExAlt Trusts that own the exchanged alternative asset following a liquidity transaction for fees payable quarterly. The Collateral supports the repayment of the loans plus any related interest and fees. Since the ExAlt Trusts are consolidated, Ben LP's operating subsidiary ExAlt Loans and interest and fee income are eliminated in the presentation of our consolidated financial statements.

The ExAlt Trusts' investments in alternative assets are the source of the Collateral supporting the ExAlt Loans. These assets consist primarily of limited partnership interests in various alternative investments, including private equity funds. These alternative investments are valued using NAV as a practical expedient. Changes in the NAV of these investments are recorded in investment income, net in our consolidated statements of operations. The ExAlt Trusts' investments in alternative assets provide the economic value creating the Collateral to the ExAlt Loans made in connection with each liquidity transaction.

The ExAlt Trusts held interests in alternative assets with a net asset value of $221.9 million and $342.0 million at December 31, 2020 and December 31, 2019, respectively. As of December 31, 2020, the ExAlt Trusts' portfolio had exposure to 117 professionally managed alternative investment funds, comprised of 327 underlying investments, 91 percent of which are investments in private companies.

The portfolio of alternative assets, excluding the collateral exchanged in the Collateral Swap, which is eliminated in consolidation, covers the following industry sectors and geographic regions as of the dates shown below (dollar amounts in thousands):

| | | | (As Restated) | |
| Industry Sector | December 31, 2020 | | December 31, 2019 | |
| | Value | Percent of Total | Value | Percent of Total |
|---|---|---|---|---|
| Diversified Financials | $ 28,462 | 12.8 % | $ 27,418 | 8.0 % |
| Telecommunication Services | 27,401 | 12.3 % | 27,059 | 7.9 % |
| Food and Staples Retailing | 24,450 | 11.0 % | 20,507 | 6.0 % |
| Software and Services | 23,310 | 10.5 % | 22,573 | 6.6 % |
| Utilities | 21,740 | 9.8 % | 15,733 | 4.6 % |
| Semiconductors and Semiconductor Equipment | 21,271 | 9.6 % | 14,658 | 4.3 % |
| Not Applicable (e.g., Escrow, Earnouts) | 18,138 | 8.2 % | 26,569 | 7.7 % |
| Health Care Equipment and Services | 14,682 | 6.6 % | 92,418 | 27.0 % |
| Pharmaceuticals, Biotechnology and Life Sciences[1] | 3,415 | 1.5 % | 52,202 | 15.3 % |
| Other[1] | 39,025 | 17.7 % | 42,875 | 12.6 % |
| **Total** | $ 221,894 | 100.0 % | $ 342,012 | 100.0 % |

Page 52

Table of Contents

| Geography | December 31, 2020 | | *(As Restated)* December 31, 2019 | |
|---|---|---|---|---|
| | Value | Percent of Total | Value | Percent of Total |
| North America | $    95,569 | 43.1 % | $    211,722 | 61.9 % |
| Western Europe | 50,219 | 22.6 % | 46,719 | 13.7 % |
| Asia | 36,436 | 16.4 % | 29,144 | 8.5 % |
| Latin & South America | 25,255 | 11.4 % | 22,377 | 6.5 % |
| Other[2] | 14,415 | 6.5 % | 32,050 | 9.4 % |
| **Total** | $    221,894 | 100.0 % | $    342,012 | 100.0 % |

_____

[1]    Industries in this category each comprise less than 5 percent as of December 31, 2020. Pharmaceuticals, Biotechnology and Life Sciences is shown separately as it comprised greater than 5 percent as of December 31, 2019.

[2]    Locations in this category each comprise less than 5 percent.

Assets in the portfolio consist primarily of interests in alternative investment vehicles (also referred to as "funds") that are managed by a group of U.S. and non-U.S. based alternative asset management firms that invest in a variety of financial markets and utilize a variety of investment strategies. The vintages of the funds in the portfolio as of December 31, 2020 ranged from 1993 to 2018.

As the ExAlt Trusts grow its portfolio, it will monitor the diversity of the portfolio through the use of concentration guidelines. These guidelines were established, and will be periodically updated, through a data driven approach based on asset type, fund manager, vintage of fund, industry segment and geography to manage portfolio risk. Beneficient will refer to these guidelines when making decisions about new financing opportunities; however, these guidelines will not restrict Beneficient from entering into financing opportunities that would result in Beneficient having exposure outside of its concentration guidelines. In addition, changes to the ExAlt Trusts' portfolio may lag changes to the concentration guidelines. As such, the ExAlt Trusts' portfolio may, at any given time, have exposures that are outside of its concentration guidelines to reflect, among other things, attractive financing opportunities, limited availability of assets, or other business reasons. Given the ExAlt Trusts' limited operating history, the portfolio as of December 31, 2020 had exposure to certain alternative investment vehicles and investments in private companies that were outside of those guidelines.

Classifications by industry sector, exposure type and geography reflect classification of investments held in funds or companies held directly in the portfolio. Investments reflect the assets listed by the general partner of a fund as held by the fund and have a positive or negative net asset value. Typical assets include portfolio companies, limited partnership interests in other funds, and net other assets, which are a fund's cash and other current assets minus liabilities. The underlying interests in alternative assets are primarily limited partnership interests, and the limited partnership agreements governing those interests generally include restrictions on disclosure of fund-level information, including fund names and company names in the funds.

Industry sector is based on Global Industry Classification Standard (GICS®) Level 2 classification (also known as "Industry Group") of companies held in the portfolio by funds or directly, subject to certain adjustments by us. "Other" classification is not a GICS® classification. "Other" classification reflects companies in the GICS® classification categories of Automobiles & Components, Banks, Capital Goods, Commercial & Professional Services, Consumer Durables & Apparel, Consumer Services, Energy, Food, Beverage & Tobacco, Household & Personal Products, Insurance, Materials, Media & Entertainment, Real Estate, Retailing, Tech Hardware & Equipment, and Transportation. N/A includes investments assets that we have determined do not have an applicable GICS® Level 2 classification, such as Net Other Assets and investments that are not operating companies.

Investment exposure type reflects classifications based on each fund's current investment strategy stage as determined by us. "Other" includes private debt strategies, natural resources strategies and hedge funds.

Geography reflects classifications determined by us based on each underlying investment. "Other" geography classification includes Israel, Australia, Northern Europe, and Eastern Europe.

Table of Contents

**Principal Revenue and Expense Items**

During the years ended December 31, 2020 and 2019, we earned revenues from the following primary sources:

- *Revenue Realized from Maturities of Life Insurance Policies.* We recognize the difference between the face value of the policy benefits and carrying value when an insured event has occurred and determine that collection of the policy benefits is realizable and reasonably assured. Revenue from a transaction must meet both criteria in order to be recognized. We generally collect the face value of the life insurance policy from the insurance company within 45 days of our notification of the insured's mortality, but this collection time varies depending on the insurance company and individual policy.

- *Change in Fair Value of Life Insurance Policies.* We value our life insurance portfolio investments for each reporting period in accordance with the fair value principles discussed herein, which reflects the expected receipt of policy benefits in future periods, net of premium costs, as shown in our consolidated financial statements.

- *Investment Income.* Includes the change in net asset value of the alternative assets held by certain of the ExAlt Trusts as well as the change in fair value of repurchase options issued by certain of the ExAlt Trusts.

- *Interest Income.* During the year ended December 31, 2019, and thus prior to the consolidation of Beneficient. interest income primarily included interest income on the Promissory Note and Commercial Loan Agreement. Interest earned on the Promissory Note and the Commercial Loan Agreement was eliminated in consolidation with Beneficient beginning January 1, 2020. As such, interest income during the year ended December 31, 2020 only includes interest earned from policy benefits receivable and cash held in banks.

- *Other Income.* Includes changes in the fair value of Beneficient's investment in put options, L Bond redemption fees, and other miscellaneous income. Additionally, includes income totaling $36.3 million recognized during the second quarter of 2020 by Beneficient as a result of the forfeiture of vested equity-based compensation related to one former director of Beneficient.

During the years ended December 31, 2020 and 2019, our main components of expense are summarized below:

- *Interest Expense.* Includes interest incurred under the second amended and restated senior credit facility with LNV Corporation (as amended from time to time, "LNV Credit Facility"), as well as interest on GWG Holdings' L Bonds, Seller Trust L Bonds and other outstanding indebtedness, including Beneficient's debt due to related parties. When we issue debt, we amortize the financing costs (commissions and other fees) associated with such indebtedness over the outstanding term of the financing and classify it as interest expense.

- *Employee Compensation and Benefits.* Employee compensation and benefits includes salaries, bonuses and other incentives and costs of employee benefits. Also included are significant non-cash compensation expenses totaling $110.7 million related to Beneficient's equity incentive plans for the year ended December 31, 2020.

- *Selling, General and Administrative Expenses.* We recognize and record expenses incurred in our business operations, including operations related to the purchasing and servicing of life insurance policies, the origination and servicing of ExAlt Loans and costs associated with trust administration. These expenses include legal and professional fees, sales, marketing, occupancy and other expenditures.

Additional components of our net earnings include:

- *Earnings (Loss) from Equity Method Investment.* Prior to the Investment and Exchange Agreements on December 31, 2019, we accounted for GWG Holdings' investment in the common units of Ben LP ("Common Units") using the equity method. Under this method, we recorded our share of the net earnings or losses attributable to holders of Common Units, on a one quarter lag, as a separate line on our consolidated statements of operations. We also account for GWG Holdings' investment in FOXO as an equity method investment, which is also included in earnings (loss) from equity method investment in our consolidated statements of operations. We had losses of $7.3 million and $4.1 million from equity method investments during the years ended December 31, 2020 and 2019, respectively.

- *Gain on Consolidation of Equity Method Investment.* In conjunction with the consolidation of Beneficient on December 31, 2019, we remeasured our preexisting equity method investment to fair value, resulting in a gain due to

Page 54

Table of Contents

the increase in the estimated fair value compared to our existing book value. The gain on consolidation of Beneficient on December 31, 2019 was $243.0 million. Refer to Note 4 to the consolidated financial statements for further information.

**Results of Operations — 2020 Compared to 2019**

The following is our analysis of the results of operations for the periods indicated below. This analysis should be read in conjunction with our consolidated financial statements and related notes (dollar values in thousands).

*Net Income (Loss) Attributable to Common Shareholders*

Net loss attributable to common shareholders was $168.5 million for 2020 compared to net income attributable to common shareholders of $70.5 million for 2019. The results of operations for 2020 reflect the consolidation of Beneficient compared to an equity method investment in 2019. The year ended December 31, 2020 includes significant non-cash equity based compensation expense of $110.7 million related to Beneficient's equity incentive plans. The net income for 2019 was primarily driven by the net gain of $243.0 million realized upon consolidation of Beneficient. More details regarding revenue and expenses in 2020 compared to 2019 are included in the discussion below.

*Revenue from Secondary Life Insurance*

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | | **2020** | | **2019** |
| Revenue realized from maturities of life insurance policies | $ | 86,923 | $ | 91,882 |
| Revenue recognized from change in fair value of life insurance policies | | 34,114 | | 49,015 |
| Premiums and other annual fees | | (71,439) | | (65,577) |
| Gain on life insurance policies, net | $ | 49,598 | $ | 75,320 |
| | | | | |
| Attribution of gain on life insurance policies, net: | | | | |
| Change in estimated probabilistic cash flows, net of premium and other annual fees paid | $ | (7,976) | $ | 1,609 |
| Net revenue recognized at maturity | | 57,574 | | 69,122 |
| Unrealized gain on acquisitions | | — | | 6,921 |
| Change in life expectancy evaluation | | — | | (2,332) |
| Gain on life insurance policies, net | $ | 49,598 | $ | 75,320 |
| | | | | |
| Number of policies acquired | | — | | 83 |
| Face value of purchases | $ | — | $ | 97,316 |
| Purchases (initial cost basis) | $ | — | $ | 32,356 |
| Unrealized gain on acquisition (% of face value) | | — % | | 7.1 % |
| | | | | |
| Number of policies matured | | 92 | | 78 |
| Face value of matured policies | $ | 125,109 | $ | 125,148 |
| Net revenue recognized at maturity event (% of face value matured) | | 46.0 % | | 55.2 % |

Revenue from changes in estimated probabilistic cash flows, net of premiums paid, was a charge of $8.0 million in 2020 compared to a credit of $1.6 million in 2019. The decrease of $25.7 million in gain on life insurance policies for the year ended December 31, 2020, over the comparable prior year period, was driven by a combination of no gain on policy acquisitions, maturities of life insurance policies with a higher cumulative cost basis, and higher premiums paid.

The Company did not purchase any life insurance policies during 2020. The face value of policies purchased in 2019 was $97.3 million. The resulting unrealized gain on acquisition was $6.9 million in 2019. The absence of an unrealized gain on acquisition in the current period is the result of a strategic decision to significantly reduce capital allocated to purchasing additional life insurance policies through the secondary market and to increase capital allocated toward providing liquidity to a broader range of alternative assets, primarily through additional investments in Beneficient. On December 31, 2019, GWG

Page 55

Holdings obtained the right to appoint a majority of the board of directors of the general partner of Ben LP. As a result of this change-of-control event, we reported the results of Ben LP and its subsidiaries on a consolidated basis beginning on the transaction date of December 31, 2019. We believe that Beneficient's operations will generally produce higher risk-adjusted returns than those we can achieve from life insurance policies acquired in the secondary market; however, returns on equity in life settlements, especially with the current availability of financings on favorable terms, appear to be an attractive option to diversify our exposure to alternative assets, and we have begun exploring the feasibility of acquiring such policies. Furthermore, although we believe that our portfolio of life insurance policies is a meaningful component of a growing diversified alternative asset portfolio, we continue to explore strategic alternatives for our life insurance portfolio aimed at maximizing its value, including a possible sale, refinancing, recapitalization, partnership, reinsurance guarantees, life insurance operations or other transactions involving of our life insurance portfolio, as well as pursuing other alternatives to increase our exposure to alternative assets.

The face value of matured policies was $125.1 million for each period presented. The net revenue recognized at maturity was $57.6 million and $69.1 million, respectively, reflecting a decrease in revenue attributable to maturity events of $11.5 million primarily from maturities of policies with a higher cumulative cost basis in 2020 compared to 2019.

There were no net revenue charges from change in life expectancy evaluation in 2020 compared to a charge of $2.3 million in 2019. The resulting net revenue increase of $2.3 million primarily resulted from refinement of life expectancy data that occurred during 2019 that were nonrecurring in 2020.

*Investment Income, Interest Income and Other Income (in thousands)*

|  | Year Ended December 31, | | Increase/(Decrease) |
| --- | --- | --- | --- |
|  | **2020** | **2019** |  |
| Investment income | $ 44,106 | $ — | $ 44,106 |
| Interest income | 1,594 | 15,646 | (14,052) |
| Other income | 29,073 | 1,310 | 27,763 |
| Total | $ 74,773 | $ 16,956 | $ 57,817 |

Investment income was added as result of the consolidation of Beneficient on December 31, 2019. Investment income was $44.1 million during the year ended December 31, 2020, and is comprised of $17.6 million decrease in net asset value of the alternative assets held by certain of the ExAlt Trusts and $61.7 million increase in fair value of repurchase options issued by certain of the ExAlt Trusts.

Interest income decreased $14.1 million during the year ended December 31, 2020, compared to the same period in 2019, primarily due to the consolidation of Beneficient, which eliminated interest earned on the Promissory Note and Commercial Loan Agreement beginning January 1, 2020. Interest income on the Promissory Note entered into on May 31, 2019, was $2.2 million during 2019. Interest income earned on the commercial loan between GWG Life and Beneficient was $11.3 million during the year ended December 31, 2019. Interest income recognized during the year ended December 31, 2020 and 2019, also includes interest earned from policy benefits receivable and cash held in banks, which in the aggregate was $1.3 million and $2.1 million, respectively. The decrease was driven by lower average cash balances and slightly lower interest rates in 2020 compared to 2019.

Other income increased during the year ended December 31, 2020 compared to the same period in 2019. Other income for the year ended 2020 includes $36.3 million of income recognized during the second quarter of 2020 by Beneficient as a result of the forfeiture of vested equity-based compensation related to one former director of Beneficient. A substantial majority of the former director's equity-based compensation units were fully vested, and the related expense was recorded in prior periods. This income was offset by a $7.8 million decrease to the fair value of Beneficient's put options during 2020. Other income during the year ended December 31, 2019, includes L Bond early redemption fees and other miscellaneous income from legacy initiatives of GWG Holdings.

*Interest and Operating Expenses (in thousands)*

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | | 2020 | | 2019 | | Increase/(Decrease) |
| Interest expense (including amortization of deferred financing costs) | $ | 154,616 | $ | 114,844 | $ | 39,772 |
| Employee compensation and benefits | | 146,363 | | 28,309 | | 118,054 |
| Legal and professional fees | | 30,075 | | 12,824 | | 17,251 |
| Other expenses | | 18,227 | | 15,896 | | 2,331 |
| Total expenses | $ | 349,281 | $ | 171,873 | $ | 177,408 |

Interest expense, including amortization of deferred financing costs, increased $39.8 million during the year ended December 31, 2020 compared to the same period in 2019. The increase in interest expense was primarily due to the increase in the average outstanding L Bonds in 2020 compared to 2019, contributing $26.5 million of increased interest expense, including amortization of deferred financing costs. Also, the consolidation of Beneficient beginning December 31, 2019, increased interest expense by $11.3 million for the year ended December 31, 2020 compared to the same period in 2019, related to Beneficient's debt due to related parties. Additionally, $3.8 million of increased interest expense, including amortization of deferred financing costs, during the year ended December 31, 2020, compared to the same period in 2019, was due to increased interest paid on the LNV Credit Facility associated with a higher average principal balance outstanding. Finally, these increases were partially offset by a $1.8 million decrease in interest expense on Seller Trusts L Bonds related to the portion of Seller Trust L Bonds eliminated as of September 30, 2020 as a result of the Collateral Swap discussed in Note 1 to the consolidated financial statements.

The increase in employee compensation and benefits in 2020 compared to 2019 was primarily related to the consolidation of Beneficient on December 31, 2019. Specifically, the Company recognized $110.7 million of equity-based compensation expense during the year ended December 31, 2020, related to Beneficient's equity incentive plans. Beneficient's Board of Directors adopted the equity incentive plans in 2018 and 2019 and approved the granting of equity incentive awards during the second quarter of 2019 to certain directors and in the first quarter of 2020 to certain employees. Awards are generally subject to service-based vesting over a multi-year period from the recipient's date of hire, though some awards fully vested upon the grant date. As of December 31, 2020, over 78% of the awards granted under Beneficient's equity incentive plans had vested.

Expense associated with these awards is based on the fair value of the equity on the date of grant. As Ben LP's equity is not publicly traded, the fair value of the equity awards is estimated on the grant date using the most recent valuation received from a reputable third-party valuation firm, which provides the Company with observable fair value information sufficient for estimating the grant date fair value.

In addition to Beneficient's equity-based compensation expense, we recognized additional retention, severance and other costs in the first quarter of 2020 related to the relocation of GWG Holdings' principal offices from Minneapolis to Dallas in late 2019.

The increase in legal and professional fees in 2020 compared to 2019 is primarily the result of the consolidation of Beneficient on December 31, 2019, which added $19.0 million of legal and professional fees during the year ended December 31, 2020. The increase attributable to the consolidation of Beneficient was partially offset by lower consulting fees during 2020, compared to 2019.

The increase in other expenses during the year ended December 31, 2020 compared to the same period of 2019, is primarily the result of the consolidation of Beneficient on December 31, 2019, which added $7.6 million of other expenses during 2020. These increases were partially offset by lower business insurance, contract labor and other operating expenses of GWG Holdings and subsidiaries during the comparable periods.

*FOXO Initiatives*

During 2019, we incurred $5.5 million of expenses related to the development of intellectual property surrounding advanced epigenetic testing technology. These expenses were included in the loss from our equity method investment in FOXO during 2020.

Table of Contents

On November 13, 2020, FOXO BioScience LLC converted to a corporation and is now known as FOXO Technologies Inc. GWG's previous membership interest in the LLC converted to preferred equity in FOXO. We believe that as a separate entity (rather than as a small subsidiary of a large financial services holding company), the FOXO businesses can reach their maximum potential in terms of marketing and branding, attraction of talent, appropriate peer group comparisons and, ultimately, return to its owners. We expect FOXO's costs to increase in the future, which will affect our consolidated earnings through our earnings (loss) from equity method investment. Under GWG Holdings' subscription agreement with FOXO, we are obligated to invest approximately $20.0 million in FOXO over a two year period ending in October 2021, of which $16.2 million has been funded through December 31, 2020.

*Income Taxes*

We realized $16.4 million in income tax benefit and $71.9 million in income tax expense for the years ended December 31, 2020 and 2019, respectively, which resulted in effective tax rates of 7.9% and 34.8%, compared to the statutory federal income tax rate of 21.0% for both periods.

The following table provides a reconciliation of our income tax expense (benefit) at the statutory federal income tax rate to our actual income tax expense (in thousands):

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2020** | | | **2019** | |
| | | | | *(As Restated)* | |
| Statutory federal income tax (benefit) | $ | (43,339) | 21.0 % | $    33,449 | 21.0 % |
| State income taxes (benefit), net of federal benefit | | (2,995) | 1.5 % | 12,962 | 8.1 % |
| Change in valuation allowance | | 20,688 | (10.0) % | 25,547 | 5.8 % |
| Noncontrolling interest | | 7,718 | (3.7) % | — | — % |
| Other permanent differences, net | | 1,538 | (0.9) % | (93) | (0.1) % |
| **Total income tax expense (benefit)** | $ | **(16,390)** | **7.9 %** | $    **71,865** | **34.8 %** |

The most significant temporary differences between GAAP net income (loss) and taxable net income (loss) are the treatment of interest costs, policy premiums and servicing costs with respect to the acquisition and maintenance of the life insurance policies and revenue recognition with respect to the fair value of the life insurance portfolio.

As of both December 31, 2020 and 2019, valuation allowances were recorded against the total amount of non-permanent deferred tax assets. Indefinite-lived deferred tax assets of $2.8 million in 2020 were comprised of an interest expense limitation under Internal Revenue Code Section 163(j) and the tax-effected net operating loss ("NOL") created beginning in 2019.

At December 31, 2020, we had federal NOL carryforwards of $58.0 million resulting in related deferred tax assets of $12.2 million, and state NOL carryforwards of $24.3 million resulting in related deferred tax assets of $1.9 million. At December 31, 2019, we had federal NOL carryforwards of $29.7 million resulting in related deferred tax assets of $6.2 million, and state NOL carryforwards of $29.6 million resulting in related deferred tax assets of $2.3 million. The NOL carryforwards subject to expiration (i.e., those generated prior to 2018) will begin to expire in 2031. Future utilization of NOL carryforwards is subject to limitations under Section 382 of the Internal Revenue Code. This section generally relates to a more than 50 percent change in ownership over a three-year period. As a result of the Exchange Transaction, a change in ownership for tax purposes only has occurred as of December 28, 2018. As such, the annual utilization of our net operating losses generated prior to the ownership change is limited. However, net unrealized built-in gains on our life insurance policies result in an increase in the Section 382 limit over the five-year recognition period, which resulted in $0.5 million of current tax liability in 2020 and a nominal amount in 2019.

After the change-of-control transaction with Ben LP on December 31, 2019, GWG Holdings moved its headquarters from Minnesota to Texas. This move resulted in a change in the state deferred tax rate from 9.8% to 0%. In the third quarter 2020, GWG Holdings was allocated a gain from its investment in Ben LP. The tax effects of these items were recorded as discrete items.

The Company currently records a valuation allowance against its deferred tax assets that cannot be realized by the future reversal of existing temporary differences. Due to the uncertain timing of the reversal of certain of these temporary differences associated with the constraint described below, they cannot be considered as a source of future taxable income for

Table of Contents

purposes of determining a valuation allowance; therefore, the vast majority of the deferred tax liability cannot be utilized in determining the realizability of the deferred tax assets. Due to a prior deemed ownership change, net operating loss carryforwards are subject to Section 382 of the Internal Revenue Code.

The Company reassessed its valuation allowance during the third quarter of 2020 and determined it will no longer utilize the reversal of a temporary difference related to GWG Holdings' preferred equity ownership in Ben LP, until such time as the preferred equity is no longer constrained, as a source of income to realize existing deferred tax assets related to the net operating loss and Internal Revenue Code Section 163(j) limitations. As a result, we recorded a large net deferred tax liability as of December 31, 2020. The effects of the reassessment of the valuation allowance on the deferred tax liability as of December 31, 2019 are reflected in Note 21 to the consolidated financial statements. The net deferred tax liability as of December 31, 2020 is specifically related to GWG Life's investment in the Preferred Series A Subclass 1 Unit Accounts described in Note 1 to the consolidated financial statements. The disposition of this investment is constrained by the Pledge and Security Agreement in favor of the holders of the L Bonds of GWG Holdings. As such, the timing of recognition of the necessary taxable income related to this investment and the future reversal of this temporary difference cannot be predicted.

We continue to monitor and evaluate the rationale for recording a full valuation allowance for the net amount of the deferred tax assets in excess of the deferred tax liabilities that are not constrained. We intend to continue maintaining a full valuation allowance on these net deferred tax assets until there is sufficient evidence to support the reversal of all or some portion of these allowances. Release of the valuation allowance would result in the recognition of certain deferred tax assets and a decrease to income tax expense for the period the release is recorded. However, the exact timing and amount of the valuation allowance release are subject to change on the basis of the level of profitability that we are able to actually achieve.

On March 27, 2020, Congress passed and the President signed into law the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), which included significant changes to U.S. Federal income tax law. However, the only change that is expected to affect the Company is the modification to Section 163(j), which increased the allowable business interest deduction from 30% of adjusted taxable income to 50% of adjusted taxable income.

**Revenue and Earnings before Tax by Reportable Segment — 2020 Compared to 2019**

We have two reportable segments: 1) Beneficient and 2) Secondary Life Insurance. Corporate & Other includes certain activities not allocated to specific business segments. These activities include holding company financing and investing activities, and management and administrative services to support the overall operations of the Company and GWG Holdings' equity method investment in FOXO.

Comparison of revenue by reportable segment for the periods indicated (in thousands):

| | Year Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| **Revenue:** | | **2020** | | **2019** | **Increase/ (Decrease)** |
| Secondary Life Insurance | $ | 51,359 | $ | 78,002 | $ (26,643) |
| Beneficient | | 72,950 | | 13,738 | 59,212 |
| Corporate & Other | | 62 | | 536 | (474) |
| Total | $ | 124,371 | $ | 92,276 | $ 32,095 |

The primary drivers of the changes from 2019 to 2020 were as follows:

- Secondary Life Insurance revenue decreased by $26.6 million for the year ended December 31, 2020, over the comparable period in 2019 primarily as a result of a $25.7 million decrease in gain on life insurance policies driven by a combination of no gain on policy acquisitions, maturities of life insurance policies with a higher cumulative cost basis, and higher premiums paid. Also contributing to the decrease in the Secondary Life Insurance segment revenues was a decrease of $0.9 million in interest and other miscellaneous income during 2020 compared to 2019.

- Beneficient segment revenue for the year ended December 31, 2020, represents the consolidated operations of Beneficient, compared to an equity method investment in Beneficient during the same period in 2019. As such, the year ended 2020 includes $61.7 million of investment income recognized related to repurchase options issued by certain of the ExAlt Trusts and a $17.6 million downward adjustment to NAV of alternative assets held by certain of the ExAlt Trusts, which are consolidated subsidiaries of Ben LP, whereas the year ended 2019 primarily includes

App. 1191

Page 59

Table of Contents

$11.3 million of interest income on the Commercial Loan between GWG Life and Ben LP and $2.2 million of interest income on the Promissory Note between GWG Life and the ExAlt Trusts, both of which were eliminated in consolidation beginning December 31, 2019. Additionally, there was $36.3 million of income recognized during the second quarter by Beneficient as a result of the forfeiture of vested equity-based compensation related to one former director of Beneficient. A substantial majority of the former director's equity-based compensation units were fully vested, and the related expense was recorded in prior periods. Finally, this was offset by a $7.8 million decrease to the fair value of Beneficient's put options during 2020.

- Corporate & Other revenue was *de minimis* during the year ended December 31, 2020. The year ended 2019 includes minimal revenue related to a legacy merchant cash advance subsidiary of GWG Holdings. GWG Holdings no longer participates in the merchant cash advance industry.

Comparison of earnings (loss) before tax by reportable segment for the periods indicated (in thousands):

| | | Year Ended December 31, | | | |
| --- | --- | --- | --- | --- | --- |
| Segment Earnings (Loss) Before Tax[1] | | 2020 | | 2019 | Increase/ (Decrease) |
| | | | | *(As Restated)* | |
| Secondary Life Insurance | $ | (59,684) | $ | (27,694) $ | (31,990) |
| Beneficient[1] | | (139,575) | | 222,443 | (362,018) |
| Corporate & Other[2] | | (32,970) | | (35,470) | 2,500 |
| Total | $ | (232,229) | $ | 159,279 $ | (391,508) |

---

[1]  Includes earnings from equity method investments and gain on consolidation of equity method investments for the year ended December 31, 2019, as presented in our consolidated statements of operations, related to GWG Holdings' equity method investment in Beneficient prior to December 31, 2019.

[2]  Includes loss from equity method investments for the year ended December 31, 2020, as presented in our consolidated statements of operations, related to GWG Holdings' investment in FOXO.

The primary drivers of the changes in earnings (loss) before tax for the year ended December 31, 2020, compared to the same period of 2019 were as follows:

- Secondary Life Insurance loss before tax increased by $32.0 million as a result of the following:

  - $25.7 million decrease in the gain on life insurance policies, net as described above in the revenue discussion; and

  - $14.2 million increase in interest expense as a result of higher average debt outstanding; partially offset by

  - A decrease in operating expenses of $8.9 million, primarily resulting from lower employee compensation and benefits, lower business insurance costs, and lower legal fees.

- Beneficient segment experienced a net loss of $139.6 million in 2020 compared to earnings of $222.4 million in 2019, primarily due to the consolidation of Beneficient on December 31, 2019. During 2019, we accounted for Beneficient using the equity method on a one-quarter lag, and the amount reported represents our proportionate share of the losses of Beneficient for the period presented. The one-quarter lag was discontinued with the consolidation of Beneficient on December 31, 2019. The consolidation of Beneficient resulted in a net gain of $243.0 million related to the remeasurement to fair value of GWG Holdings' preexisting equity method investment in Beneficient. The loss of Beneficient for the year ended December 31, 2020, was primarily driven by $107.8 million of non-cash charges for equity incentive compensation. During the year ended December 31, 2020, Beneficient's losses were partially offset by $36.3 million of income recognized as a result of the forfeiture of vested equity-based compensation related to one former director of Beneficient as described in the revenue comparison discussion above.

- Corporate and Other operating loss was lower during December 31, 2020, compared to 2019, primarily due to lower legal and consulting fees as we incurred higher fees in 2019 as a result of the Beneficient transactions.

Table of Contents

**Liquidity and Capital Resources**

As of December 31, 2020 and 2019, we had approximately $124.2 million and $115.8 million, respectively, in combined available cash, cash equivalents, and restricted cash. We generated net losses from operations for the years ended December 31, 2020 and 2019 totaling $208.5 million and $151.5 million. As of October 15, 2021, we had approximately $54.3 million in combined available cash, cash equivalents, and restricted cash. Besides funding operating expenditures, we are obligated to pay other items such as interest payments and debt maturities, and preferred stock dividends and redemptions.

We have historically financed our businesses primarily through a combination of L Bond sales, preferred stock sales, the LNV Credit Facility, and the NF Credit Facility. We have also financed our business through proceeds from life insurance policy benefit receipts, cash distributions from the ExAlt Trusts' alternative asset portfolio, dividends and interest on investments, and Beneficient's debt due to related parties. We have traditionally used proceeds from these sources for policy acquisition, policy premiums and servicing costs, working capital and financing expenditures including paying principal, interest and dividends. We have also used proceeds to allocate capital to Beneficient; however, if Ben LP becomes an independent company per the Term Sheet discussed in the "Recent Developments" section above, the Company expects that Ben LP would reduce its reliance on GWG Holdings to fund its operations and would raise future capital from other sources. Ben LP's capital raising efforts and participation in liquidity transactions may include the issuance of equity or debt of Ben LP or one of its subsidiaries, and the newly issued securities may be dilutive to GWG Holdings' and GWG Life's investments in Ben LP and BCH and may include preferential terms relative to GWG Holdings' and GWG Life's investments in Ben LP and BCH, as applicable.

We currently fund our business primarily with debt that generally has a shorter duration than the duration of our long-term assets. The resulting asset/liability mismatch can result in a liquidity shortfall if we are unable to renew maturing short term debt or secure suitable additional financing. In such a situation, we could be forced to sell assets at less than optimal (distressed) prices. Substantially all of our life insurance policies are pledged as collateral under the LNV Credit Facility and the NF Credit Facility and we would not be able to dispose of them without compliance with the terms of those credit facilities. We heavily rely on GWG Holdings' L Bond offering to fund our business operations, including, among other things, interest and principal payments on the existing L Bonds and capital allocations to Beneficient. We temporarily suspended the offering of GWG Holdings' L Bonds, commencing April 16, 2021, as a result of our delay in filing certain periodic reports with the SEC, including this 2020 Form 10-K, and were required to seek alternative sources of capital.

As a result of the suspension of GWG Holdings' L Bond offering, on June 28, 2021 (as described in more detail above), we pledged additional life insurance policies as collateral and received an additional advance of $51.2 million under the Third Amended Facility. Subsequently, on August 11 2021, we entered into the NF Credit Agreement (as described in more detail above and in Note 23 to the accompanying audited consolidated financial statements) and received a one-time advance of $107.6 million. Approximately $56.7 million of such advanced amount was used to pay off the remaining amount due, including interest and penalties, under the Third Amended Facility and the additional pledged life insurance policies used as collateral for the Third Amended Facility were released and pledged under the NF Credit Facility. Further, on September 7, 2021, DLP IV entered into the Fourth Amended Facility, that replaced the aforementioned Third Amended Facility. The Fourth Amended Facility resulted in an additional advance of $30.3 million from LNV Corporation, with no additional pledged collateral.

Primarily due to the current suspension of GWG Holdings' L Bond offering, the Company may require additional capital to continue its operations over the next twelve months if our ability to sell L Bonds dissipates, or if we are forced to suspend the L Bond offering. However, the Company may not be able to obtain additional borrowings under existing debt facilities or new borrowings with other third-party lenders. To the extent that GWG Holdings or its subsidiaries raise additional capital through the future issuance of debt, the terms of those debt securities may include terms that adversely affect the rights of our existing debt and/or equity holders or involve negative covenants that restrict GWG Holdings' ability to take specific actions, such as incurring additional debt or making additional investments in growing the operations of the Company. If GWG Holdings is unable to fund its operations and other obligations, or defaults on its debt, then the Company will be required to either i) sell assets to provide sufficient funding, ii) exercise our right to decline requests for early L Bond redemptions or redemptions of preferred stock, or iii) to raise additional capital through the sale of equity and the ownership interest of our equity holders may be diluted. Substantially all of our life insurance policies are pledged as collateral under the LNV Credit Facility and the NF Credit Facility and we would not be able to dispose of them without compliance with the terms of those credit facilities.

App. 1196

We anticipate recommencing the offering of GWG Holdings' L Bonds once we become current with our filing obligations and satisfy applicable NASDAQ listing requirements. Once we become current with our filing obligations with respect to the L Bonds, we may be limited in the origination channels in which we sell our L Bonds in the event that we are unable to meet the applicable NASDAQ listing requirements in a timely manner, which could result in the L Bonds no longer being "covered securities" for federal securities law purposes which would subject the offer and sale of L Bonds to potentially extensive state "blue sky" securities law requirements. If for any reason we are forced to suspend GWG Holdings' L Bond offering, are limited in our origination channels in which we sell our L Bonds, or demand for GWG Holdings' L bonds dissipates, our business would be adversely impacted and our ability to service and repay our debt obligations, much of which is short term, would be compromised, thereby negatively affecting our business prospects and viability.

We had $97.4 million borrowing base capacity, excluding any potential capacity for premiums and servicing costs, under the LNV Credit Facility as of December 31, 2020. Additional future borrowing base capacity for premiums and servicing costs, created as the premiums and servicing costs of pledged life insurance policies become due and by additional policy pledges to the facility, if any, exists under the LNV Credit Facility at the sole discretion of the lender. The LNV Credit Facility has certain financial and nonfinancial covenants, and we were in compliance with these debt covenants as of December 31, 2020, and December 31, 2019, and continue to be so as of the filing date of this report. Subsequent to December 31, 2020, we received additional advances through amendments to the LNV Credit Facility and entered in to the NF Credit Facility (as described in more detail above and in Note 23 to the accompanying audited consolidated financial statements).

Beneficient is obligated to make debt payments totaling $74.5 million on certain outstanding borrowings through May 30, 2022 under the terms of the Amendment No. 1 to the Second Amended and Restated Credit Agreements as discussed further in Note 23 to the accompanying audited consolidated financial statements. Primarily due to both the forthcoming debt payments under the Credit Agreement and Second Lien Credit Agreement and the anticipated deconsolidation of Beneficient from GWG Holdings, as discussed previously and in Note 23 to the accompanying audited consolidated financial statements, which is expected to result in reduced reliance by Beneficient on GWG Holdings to fund its operations, Beneficient will require additional liquidity to continue its operations over the next twelve months. We expect Beneficient to satisfy these obligations and fund its operations through anticipated operating cash flows, proceeds from distributions on the alternative assets portfolio, additional investments into Beneficient by GWG Holdings and/or other parties and, potentially refinancing with other third-party lenders some or all of the existing borrowings due prior to their maturity. Beneficient is currently in the process of raising additional equity, which is anticipated to close during the fourth quarter of 2021 and/or the first quarter of 2022.

Beneficient may not be able to refinance or obtain additional financing on terms favorable to the Company, or at all. To the extent that Beneficient raises additional capital through the future sale of equity or debt, the ownership interest of its existing equity holders may be diluted. The terms of these future equity or debt securities may include liquidation or other preferences that adversely affect the rights of its existing equity unitholders or involve negative covenants that restrict Beneficient's ability to take specific actions, such as incurring additional debt or making additional investments in growing its operations. If Beneficient defaults on these borrowings, then it will be required to either i) sell assets to repay these loans or ii) to raise additional capital through the sale of equity and the ownership interest of our equity holders may be diluted. Moreover, if Beneficient were to sell assets to avoid a default of these borrowings, then the price at which Beneficient sold such assets may not reflect the carrying value of those assets as reflected in our consolidated financial statements, especially in the event of a bulk or distressed sale.

As noted in the "Results of Operations" section above, on November 11, 2019, GWG Holdings contributed the common stock and membership interests of its then wholly-owned FOXO Labs and FOXO Life subsidiaries to FOXO in exchange for a membership interest in the entity. On November 13, 2020, FOXO BioScience LLC converted to a corporation and is now known as FOXO Technologies Inc. With the corporate conversion, GWG Holdings' previous membership interest in the LLC converted to preferred equity. GWG Holdings has contributed $16.2 million in cash to FOXO through December 31, 2020, and is committed to contribute an additional $3.8 million to the entity through October 2021, all of which was contributed by such date.

The potential NASDAQ delisting and our current inability to sell L Bonds as discussed above, in combination with significant recurring losses from operations, negative cash flows from operations, delays in executing our business plans, and any potential negative outcome from the ongoing SEC investigation discussed elsewhere in this Form 10-K, raise substantial doubt about our ability to continue as a going concern for the next 12 months following the filing of this Form 10-K.

*Financings Summary*

We had the following outstanding debt balances as of December 31, 2020 and 2019, with the following weighted average interest rate as calculated for the years ended December 31, 2020 and 2019 (dollars in thousands):

| Issuer/Borrower | December 31, 2020 | | December 31, 2019 | |
| --- | --- | --- | --- | --- |
| | Principal Amount Outstanding | Weighted Average Interest Rate | Principal Amount Outstanding | Weighted Average Interest Rate |
| GWG DLP Funding IV, LLC – LNV senior credit facility | $ 202,611 | 9.12 % | $ 184,586 | 9.57 % |
| GWG Holdings, Inc. – L Bonds | 1,277,881 | 7.21 % | 948,128 | 7.15 % |
| GWG Holdings, Inc. – Seller Trust L Bonds | 272,104 | 7.50 % | 366,892 | 7.50 % |
| Beneficient – Debt due to related parties | 77,176 | 6.50 % | 152,199 | 4.59 % |
| **Total** | $ 1,829,772 | 7.43 % | $ 1,651,805 | 7.26 % |

The table below reconciles the face amount of our outstanding debt to the carrying value shown on our balance sheets (dollars in thousands):

| | December 31, 2020 | December 31, 2019 |
| --- | --- | --- |
| **Senior credit facility with LNV Corporation** | | |
| Face amount outstanding | $ 202,611 | $ 184,586 |
| Unamortized deferred financing costs | (8,881) | (10,196) |
| Carrying amount | $ 193,730 | $ 174,390 |
| | | |
| **L Bonds and Seller Trust L Bonds:** | | |
| Face amount outstanding | $ 1,549,985 | $ 1,315,020 |
| Subscriptions in process | 17,978 | 15,839 |
| Unamortized selling costs | (48,957) | (37,329) |
| Carrying amount | $ 1,519,006 | $ 1,293,530 |
| | | |
| **Debt due to related parties:** | | |
| Face amount outstanding | $ 77,176 | $ 152,199 |
| Unamortized premium (discount) | (916) | 887 |
| Carrying amount | $ 76,260 | $ 153,086 |

In January 2015, GWG Holdings began publicly offering up to $1.0 billion of L Bonds as a follow-on to our earlier $250.0 million public debt offering. In January 2018, GWG Holdings began publicly offering up to $1.0 billion L Bonds as a follow-on to GWG Holdings' earlier L Bond offering.

On June 3, 2020, a registration statement relating to an additional public offering was declared effective permitting us to sell up to $2.0 billion in principal amount of L Bonds on a continuous basis through June 2023. These bonds contain the same terms and features as our previous offerings. We have raised $231.2 million under this offering since it was declared effective.

Through December 31, 2020, the total amount of L Bonds sold under all offerings, including renewals, was $2.1 billion. As of December 31, 2020 and 2019, we had approximately $1.3 billion and $0.9 billion, respectively, in principal amount of L Bonds outstanding (exclusive of Seller Trust L Bonds).

On August 10, 2018, GWG Holdings, GWG Life and the Bank of Utah, as trustee, entered into the L Bond Supplemental Indenture to the Amended and Restated Indenture. GWG Holdings entered into the L Bond Supplemental Indenture to add and modify certain provisions of the Amended and Restated Indenture necessary to provide for the issuance of the Seller Trust L Bonds. GWG Holdings issued Seller Trust L Bonds in the amount of $366.9 million to the Seller Trusts in connection with the Exchange Transaction. As a result of the Collateral Swap discussed in Note 1 to the consolidated financial statements, $94.8 million of the Seller Trust L Bonds are eliminated upon consolidation. The maturity date of the Seller Trust

Table of Contents

L Bonds is August 9, 2023. The Seller Trust L Bonds bear interest at 7.5% per annum. Interest is payable monthly in cash (see Note 10 to the accompanying audited consolidated financial statements). The Amended and Restated Indenture was subsequently amended on December 31, 2019, primarily to modify the calculation of the Debt Coverage Ratio in the Indenture to provide GWG Holdings with the ability to incur indebtedness (directly or through a subsidiary of GWG Holdings) that is payable in capital stock of GWG Holdings or mandatorily convertible into or exchangeable for capital stock of GWG Holdings that would be excluded from the calculation of the Debt Coverage Ratio. On December 31, 2020, we entered into the Liquidity Bond Supplemental Indenture to add and modify certain provisions of the Amended and Restated Indenture necessary to provide for the issuance of the Liquidity Bonds in a principal amount of up to $1.0 billion.

The weighted-average interest rate of GWG Holdings' outstanding L Bonds (excluding the Seller Trust L Bonds) as of December 31, 2020 and 2019, was 7.21% and 7.15%, respectively, and the weighted-average maturity at those dates was 3.19 and 3.21 years, respectively. GWG Holdings' L Bonds (other than the Seller Trust L Bonds and the Liquidity Bonds) have renewal features. Since we first issued GWG Holdings' L Bonds, we have experienced $768.7 million in maturities, of which $406.3 million has renewed through December 31, 2020, for an additional term. This renewal activity has provided us with an aggregate renewal rate of approximately 52.9% for investments in these securities.

Future contractual maturities of L Bonds (including the Seller Trust L Bonds and Liquidity Bonds) at December 31, 2020 are as follows (in thousands):

| Years Ending December 31, | | |
|---|---|---:|
| 2021[1] | $ | 463,686 |
| 2022 | | 293,038 |
| 2023 | | 191,446 |
| 2024 | | 121,105 |
| 2025 | | 167,433 |
| Thereafter | | 313,277 |
| | $ | 1,549,985 |

_____

[1] As of December 31, 2020, we had approximately $366.9 million in principal amount of Seller Trust L Bonds outstanding, of which $94.8 million are held by the ExAlt Trusts and are eliminated in consolidation. Accordingly, the net of these amounts, $272.1 million, is presented in the table above. As the second anniversary of the Final Closing Date has passed, the holders of the Seller Trust L Bonds now have the right to cause GWG Holdings to repurchase, in whole but not in part, the Seller Trust L Bonds held by such holder within 45 days. As such, while the maturity date of the Seller Trust L Bonds is in August 2023, their contractual maturity is reflected in 2021, as that is the period in which they could become payable. The repurchase may be paid, at GWG Holdings' option, in the form of cash, and/or a pro rata portion of (i) the outstanding principal amount and accrued and unpaid interest under the Commercial Loan Agreement, and (ii) Common Units, or a combination of cash and such property.

The L Bonds (including the Seller Trust L Bonds and Liquidity Bonds) are secured by all of our assets and are subordinate to the LNV Credit Facility and the NF Credit Facility.

On September 27, 2017, we entered into a $300 million amended and restated senior credit facility with LNV Corporation in which DLP IV is the borrower. As of December 31, 2020, we had approximately $202.6 million outstanding under the senior credit facility. On November 1, 2019, we entered into the LNV Credit Facility, which replaced the prior agreement governing the facility. A description of the agreement governing the LNV Credit Facility is set forth below under the caption "Amendment of Credit Facility with LNV Corporation." We intend to use the proceeds from this facility to maintain our portfolio of life insurance policies, for liquidity and for general corporate purposes.

Beneficient had borrowings with an aggregate carrying value of $76.3 million and $153.1 million as of December 31, 2020, and December 31, 2019, respectively. This aggregate outstanding balance includes a first lien credit agreement and a second lien credit agreement with respective balances, including accrued interest, of $2.3 million and $72.3 million at December 31, 2020, and $77.5 million and $72.2 million as of December 31, 2019, respectively. These amounts exclude an unamortized discount of $0.9 million as of December 31, 2020, and an unamortized premium of $0.9 million as of December 31, 2019. Both credit agreements were amended and restated on August 13, 2020, which extended the maturity for both to April 10,

Table of Contents

2021, as discussed in detail in Note 10 to the consolidated financial statements. In accordance with the terms of the Second Amendments, both loans accrue interest at a rate of 1-month LIBOR plus 8.0%, with a maximum rate of 9.5%. Prior to the Second Amendments, both loans accrued interest at a rate of 1-month LIBOR plus 3.95%, compounded daily. On March 10, 2021, and again on June 28, 2021, Beneficient executed amendments to both credit agreements that, among other items, extended the maturity for both agreements to May 30, 2022, as discussed in more detail in Note 23 to the consolidated financial statements. These loans are not currently guaranteed by GWG Holdings or GWG Life.

Beneficient has additional borrowings maturing in 2023 and 2024 with an aggregate principal balance outstanding, including accrued interest, of $2.6 million and $2.5 million as of December 31, 2020 and December 31, 2019, respectively.

Future contractual maturities of Beneficient's debt due to related parties as of December 31, 2020 are as follows (in thousands):

| **Years Ending December 31,** | | |
|---|---|---:|
| 2021 | $ | 74,548 |
| 2022 | | — |
| 2023 | | 750 |
| 2024 | | 1,856 |
| 2025 | | — |
| Thereafter | | — |
| | $ | 77,154 |

We expect to meet our ongoing operational capital needs for, among other things, GWG Holdings' and GWG Life's investments in Beneficient, alternative asset investments, policy premiums and servicing costs, exploring opportunities to establish a life insurance company, working capital and financing expenditures including paying principal, interest and dividends through a combination of the receipt of policy benefits from our portfolio of life insurance policies, net proceeds from GWG Holdings' L Bond offering, dividends and interest from investments, distributions from the alternative assets held by certain of the ExAlt Trusts, future preferred and common equity offerings, and funding available from the LNV Credit Facility. We estimate that our liquidity and capital resources are sufficient for our current and projected financial needs for at least the next twelve months given current assumptions. However, if we are unable to continue GWG Holdings' L Bond offering for any reason, and we are unable to obtain capital from other sources, our business will be materially and adversely affected. In addition, our business will be materially and adversely affected if we do not receive the policy benefits we forecast and if holders of GWG Holdings' L Bonds fail to renew with the frequency we have historically experienced. In such a case, we could be forced to sell our investments in life insurance policies to service or satisfy our debt-related and other obligations. A sale under such circumstances may result in significant impairment of the recognized value of our portfolio.

Capital expenditures have historically not been material and we do not anticipate making material capital expenditures in 2021.

*Alternative Assets and Secured Indebtedness*

The following information is specifically related to GWG Holdings, Inc. and its subsidiaries (not including the assets and liabilities held by Beneficient or any eliminations in consolidation).

The following table seeks to illustrate the impact that a hypothetical sale of our portfolio of life insurance assets (at various discount rates, including the discount rate used to value our portfolio at December 31, 2020), and the realization of the investment in Common Units, investment in Preferred Series A Subclass 1 Unit Account of BCH, investment in Preferred Series C Unit Account of BCH (a substantial majority of the net assets of which are currently represented by intangible assets and goodwill), and the Commercial Loan Agreement (in each case, at their respective carrying amounts and assuming no discount for lack of marketability or transaction costs, which could be substantial) would have on our ability to satisfy our debt obligations as of December 31, 2020. The investment in Common Units, investment in Preferred Series A Subclass 1 Unit Account of BCH, investment in Preferred Series C Unit Account of BCH, and Commercial Loan Agreement are discussed in detail in Note 1 and other applicable notes to the accompanying audited consolidated financial statements. The amounts in the table below do not include the consolidation of the assets and liabilities of Beneficient and related eliminations as of December 31, 2020. In all cases, the sale of the life insurance assets owned by DLP IV will be used first to satisfy all amounts owing under the LNV Credit Facility. The net sale proceeds remaining after satisfying all obligations

Table of Contents

under the LNV Credit Facility would be applied to the L Bonds and Seller Trust L Bonds on a pari passu basis. All dollar amounts in the table below are in thousands.

| Life Insurance Portfolio Discount Rate | 8.25%[1] | 10.00% | 12.00% | 14.00% | 16.12% |
|---|---|---|---|---|---|
| Value of life insurance portfolio | $ 791,911 | $ 730,648 | $ 670,923 | $ 620,023 | $ 573,799 |
| Common Units | 438,194 | 438,194 | 438,194 | 438,194 | 438,194 |
| Preferred Series A Subclass 1 Unit Account of BCH | 319,030 | 319,030 | 319,030 | 319,030 | 319,030 |
| Preferred Series C Unit Account of BCH | 195,578 | 195,578 | 195,578 | 195,578 | 195,578 |
| Commercial Loan Agreement | 180,080 | 180,080 | 180,080 | 180,080 | 180,080 |
| Cash, cash equivalents and policy benefits receivable | 120,616 | 120,616 | 120,616 | 120,616 | 120,616 |
| Other assets | 20,082 | 20,082 | 20,082 | 20,082 | 20,082 |
| Total assets | 2,065,491 | 2,004,228 | 1,944,503 | 1,893,603 | 1,847,379 |
| Less: Senior credit facility[2] | 202,611 | 202,611 | 202,611 | 202,611 | 202,611 |
| Net after senior credit facility | 1,862,880 | 1,801,617 | 1,741,892 | 1,690,992 | 1,644,768 |
| Less: L Bonds[3] | 1,644,773 | 1,644,773 | 1,644,773 | 1,644,773 | 1,644,773 |
| Net remaining | $ 218,107 | $ 156,844 | $ 97,119 | $ 46,219 | $ (5) |
| Impairment to L Bonds | No impairment | No impairment | No impairment | No Impairment | Impairment |

(1)   The discount rate used to calculate the fair value of our life insurance portfolio as of December 31, 2020.

(2)   This amount excludes unamortized deferred financing costs.

(3)   Amount represents aggregate outstanding principal balance of L Bonds and Seller Trust L Bonds prior to eliminations as of December 31, 2020.

The above table illustrates that our ability to fully satisfy amounts owing under the L Bonds and Seller Trust L Bonds would likely be impaired upon the sale or the realization of the investment in Common Units, investment in Preferred Series A Subclass 1 Unit Account of BCH, investment in Preferred Series C Unit Account of BCH and Commercial Loan Agreement at their respective carrying amounts, plus all our life insurance assets at a price equivalent to a discount rate of approximately 16.12% or higher at December 31, 2020. At December 31, 2019, the likely impairment occurred at a discount rate of approximately 26.78% or higher. Based on a preliminary analysis, at September 30, 2021, management expects the likely impairment, as calculated in accordance with the table above, to occur at a discount rate of approximately 8.50% or higher. The above hypothetical analysis is included for informational purposes only, and the results of such analysis have no bearing on the current ability of GWG Holdings to market and sell L Bonds or to satisfy amounts owing under the L Bonds and Seller Trust L Bonds.

The table does not include any allowance for transactional fees and expenses (which expenses and fees could be substantial) nor any discount for lack of marketability associated with a portfolio sale or the realization of the investment in Common Units, investment in Preferred Series A Subclass 1 Unit Account of BCH, investment in Preferred Series C Unit Account of BCH and Commercial Loan Agreement, respectively, and is provided to demonstrate how various discount rates used to value our portfolio of life insurance assets could affect our ability to satisfy amounts owing under our debt obligations in light of our senior secured lender's right to priority payments under our senior credit facility with LNV Corporation.

The table also assumes GWG Holdings will realize the full amounts of the investment in Common Units, investment in Preferred Series A Subclass 1 Unit Account of BCH, investment in Preferred Series C Unit Account of BCH, and Commercial Loan Agreement. However, the ultimate value of GWG Holdings' and GWG Life's investments in Beneficient depends on multiple factors, including the expected growth of new service offerings and products. Since predicting the rate of growth attributable to newly launched products is inherently uncertain, there is no assurance that GWG Holdings will recover the full book basis of its investments in Beneficient. Additionally, there is currently no market for the aforementioned assets, and a market may not develop. Our Commercial Loan receivable and a portion of GWG Holdings' and GWG Life's investment in the Common Units may be used as consideration for retiring the Seller Trust L Bonds upon a redemption event or at the maturity of the Seller Trust L Bonds (see Note 10 to the accompanying audited consolidated financial statements). This table also does not include the yield maintenance fee we are required to pay in certain circumstances under the LNV Credit Facility, which could be substantial. The above table should be read in conjunction with the information contained in other sections of this report, including Critical Accounting Policies — Valuation of Life Insurance Policies and the notes to the accompanying audited consolidated financial statements.

*Amendment of Credit Facility with LNV Corporation*

Effective November 1, 2019, DLP IV entered into the LNV Credit Facility. The LNV Credit Facility makes available a total of up to $300.0 million in credit to DLP IV with a maturity date of September 27, 2029. Subject to available borrowing base capacity, additional advances are available under the LNV Credit Facility at the LIBOR rate described below. Such advances are available to pay premiums and servicing costs of pledged life insurance policies as such amounts become due. Interest will accrue on amounts borrowed under the LNV Credit Facility at an annual interest rate, determined as of each date of borrowing or quarterly if there is no borrowing, equal to (a) the greater of 1.50% or 12-month LIBOR, plus (b) 7.50% per annum. The effective rate at December 31, 2020 was 9.00%. Interest payments are made on a quarterly basis.

Under the LNV Credit Facility, DLP IV has granted the administrative agent, for the benefit of the lenders under the facility, a security interest in all of DLP IV's assets. As with prior collateral arrangements relating to the senior secured debt of GWG Holdings and its subsidiaries (on a consolidated basis), GWG Life's excess equity value of DLP IV after satisfying all amounts owing under the LNV Credit Facility is available as collateral for the obligations of GWG Holdings under the L Bonds and Seller Trust L Bonds (although the life insurance assets owned by DLP IV do not themselves serve as direct collateral for those obligations).

We are subject to various financial and non-financial covenants under the LNV Credit Facility, including, but not limited to, compliance with laws, preservation of existence, financial reporting, keeping of proper books of record and account, payment of taxes, and ensuring that neither DLP IV nor GWG Life become an investment company. As of December 31, 2020, we were in compliance with all financial and non-financial covenants.

In addition, the LNV Credit Facility has certain reporting obligations that require DLP IV to deliver audited annual financial statements no later than ninety days after the end of each fiscal year. Due to the failure to issue GWG Life, LLC audited financial statements for 2020 to LNV Corporation within 90 days after the end of the year, we were in violation of our financial reporting obligations under the LNV Credit Facility. CLMG Corp., as administrative agent for LNV Corporation, has issued a limited deferral extending the delivery of these reports to May 17, 2021. We regained compliance on May 17, 2021, when the audited annual financial statements of GWG Life were delivered to LNV Corporation.

On June 28, 2021, DLP IV entered into the Third Amended Facility with LNV Corporation, as lender, and CLMG Corp., as the administrative agent on behalf of the lenders under the agreement, that replaced the aforementioned LNV Credit Facility. The Third Amended Facility resulted in an additional advance of $52.5 million from LNV Corporation.

In conjunction with entering into the Third Amended Facility, DLP V transferred life insurance policies having an aggregate face value of approximately $440.6 million to DLP IV which were pledged as additional collateral to the Third Amended Facility, and DLP IV received proceeds of approximately $51.2 million (net of certain fees and expenses incurred in connection with the negotiation and entry into the Third Amended Facility). The Third Amended Facility sets forth interest and other terms and covenants similar those included in the previous LNV Credit Facility. The Third Amended Facility was paid off on August 11, 2021, with a portion of the proceeds from the NF Credit Facility described below.

On September 7, 2021, DLP IV entered into the Fourth Amended Facility with LNV Corporation, as lender, and CLMG Corp., as the administrative agent on behalf of the lenders under the agreement, that replaced the aforementioned Third Amended Facility. The Fourth Amended Facility resulted in an additional advance of $30.3 million from LNV Corporation. The Fourth Amended Facility sets forth interest and other terms and covenants similar those included in the previous LNV Credit Facility.

*Credit Facility with National Founders LP*

On August 11, 2021, DLP VI, entered into the NF Credit Agreement with each lender from time to time party thereto and National Founders LP, as the administrative agent. On August 11, 2021, a one-time advance of approximately $107.6 million was made to the DLP VI under the NF Credit Facility with a scheduled maturity date of August 11, 2031. Approximately $56.7 million of such advanced amount was used to pay off the remaining amount due, including interest and penalties, under the Third Amended Facility. Amounts borrowed under the NF Credit Facility bear interest on each day on the outstanding principal amount on such day at a per annum rate, determined on a daily basis, generally equal to 5.5% up to a 65% of the loan to value percent as calculated in accordance with the NF Credit Agreement, and 7.0% on anything above that loan to value percent.

Table of Contents

A portion of the proceeds from the funding under the NF Credit Facility was used to purchase life insurance policies that were owned by DLP IV, which used the funds to repay the most recent advance of $52.5 million plus interest and penalties under the LNV Credit Facility described above. At August 11, 2021, the aggregate face value of life insurance policies owned by DLP VI, was approximately $433.1 million. As of such date, the aggregate face value of life insurance policies owned by DLP IV was approximately $1.42 billion.

We are subject to various financial and non-financial covenants under the NF Credit Facility, including, but not limited to, compliance with laws, preservation of existence, financial reporting, keeping of proper books of record and account, payment of taxes, and ensuring that neither DLP VI nor GWG Life become an investment company. Additionally, we are required to maintain a Debt Coverage Ratio not to exceed 90%. As of August 31, 2021, we were in compliance with all financial and non-financial covenants in the NF Credit Facility.

**Cash Flows**

*Interest and Dividend Payments*

We finance our businesses through a combination of: life insurance policy benefit receipts; principal, dividends and interest receipts from investments; distributions from the alternative assets held by the ExAlt Trusts; debt and equity offerings; and the LNV Credit Facility and the NF Credit Facility. We have historically relied on debt (L Bonds and the LNV Credit Facility) and equity (preferred stock) financing for the majority of our cash expenditures (for policy acquisition, policy premiums and servicing costs, working capital and financing expenditures including paying principal and interest on existing debt, and for GWG Holdings and GWG Life making investments in Beneficient) as the amount of cash flows from the realization of life insurance policy benefits and cash flows from our other investments has been insufficient to meet all of our needs. This has resulted in the Company incurring substantial indebtedness and, to a lesser extent, obligations to make dividend payments on our classes of preferred stock.

Beneficient primarily finances its business through repayments on ExAlt Loans. Such repayments are funded from a portion of the cash distributions the ExAlt Trusts receive from their alternative assets and additional investments in Beneficient by GWG Holdings and/or other parties. See Note 10 to the accompanying audited consolidated financial statements for details on the amendments of Beneficient's credit agreements. Beneficient uses proceeds from these sources to fund liquidity transactions and potential unfunded capital commitments, working capital, debt service payments, and costs associated with potential future products. Beneficient also anticipates the need to establish sufficient regulatory capital if and when its Texas trust company charter is issued or the Kansas TEFFI trust company becomes operational. Additionally, Bermuda insurance statutes and regulations, and the policies of the BMA, require that Pen, among other things, maintain a minimum level of capital and surplus, satisfy solvency standards, and restrict dividends and distributions. Beneficient Capital Markets will also be subject to regulations of the SEC and FINRA that require, among other things, Beneficient Capital Markets to maintain a minimum level of capital.

Our total interest expense of $154.6 million and $114.8 million for the years ended December 31, 2020 and 2019, respectively, represent the largest cash expense in each period. Preferred stock cash dividends were $14.6 million and $16.9 million for the years ended December 31, 2020 and 2019, respectively. While reducing our cost of funds and increasing our common equity base are primary goals of the Company, until we do so we will continue to expend significant amounts of cash for interest and dividend payments and will thus continue to rely heavily on our ability to raise cash from GWG Holdings' L Bond offering, LNV Credit Facility and other means as they are developed and available.

*Life Insurance Policy Premium Payments*

The payment of premiums and servicing costs to maintain life insurance policies represents one of our most significant requirements for cash disbursement. When a policy is purchased, we are able to calculate the minimum premium payments required to maintain the policy in-force. Over time as the insured ages, premium payments will increase. Nevertheless, the probability we will be required to pay the premiums decreases as mortality becomes more likely. These scheduled premiums and associated probabilities are factored into our expected internal rate of return and cash-flow modeling. Beyond premiums, we incur policy servicing costs, including annual trustee, policy administration and tracking costs. Additionally, we incur significant financing costs, including principal, interest and dividends. Both policy servicing costs and financing costs are excluded from our internal rate of return calculations. We finance our businesses through a combination of life insurance policy benefit receipts, dividends and interest on other investments, equity offerings, debt offerings, and advances under the LNV Credit Facility and NF Credit Facility.

Table of Contents

The amount of payments for anticipated premiums, including the requirement under the LNV Credit Facility and NF Credit Facility to maintain a two month cost-of-insurance threshold within each policy cash value account, and servicing costs that we will be required to make over the next five years to maintain our current portfolio, assuming no mortalities, is set forth in the table below (in thousands):

| Years Ending December 31, | | Premiums | | Servicing | | Total |
|---|---|---|---|---|---|---|
| 2021 | $ | 72,445 | $ | 1,655 | $ | 74,100 |
| 2022 | | 89,436 | | 1,655 | | 91,091 |
| 2023 | | 100,953 | | 1,655 | | 102,608 |
| 2024 | | 110,044 | | 1,655 | | 111,699 |
| 2025 | | 122,438 | | 1,655 | | 124,093 |
| | $ | 495,316 | $ | 8,275 | $ | 503,591 |

Our anticipated premium expenses are subject to the risk of increased cost-of-insurance charges (i.e., "COI" or premium charges) for the life insurance policies we own. We did not receive any notices of COI rate changes in 2019. We have received COI increases on six policies during the year ended December 31, 2020.

We have no known pending cost-of-insurance increases on any policies in our portfolio, but we are aware that cost-of-insurance increases have become more prevalent in the industry. Thus, we may see additional insurers implementing cost-of-insurance increases in the future.

### *Life Insurance Policy Benefit Receipts*

For the quarter-end dates set forth below, the following table illustrates the total amount of face value of policy benefits owned, and the trailing 12 months of life insurance policy benefits realized and premiums paid on our portfolio. The trailing 12-month benefits/premium coverage ratio indicates the ratio of policy benefits realized to premiums paid over the trailing 12-month period from our portfolio of life insurance policies.

| Quarter End Date | | Portfolio Face Amount (in thousands) | | 12-Month Trailing Benefits Realized (in thousands) | | 12-Month Trailing Premiums Paid (in thousands) | 12-Month Trailing Benefits/Premiums Coverage Ratio |
|---|---|---|---|---|---|---|---|
| March 31, 2016 | $ | 1,027,821 | $ | 21,845 | $ | 28,771 | 75.9 % |
| June 30, 2016 | | 1,154,798 | | 30,924 | | 31,891 | 97.0 % |
| September 30, 2016 | | 1,272,078 | | 35,867 | | 37,055 | 96.8 % |
| December 31, 2016 | | 1,361,675 | | 48,452 | | 40,239 | 120.4 % |
| March 31, 2017 | | 1,447,558 | | 48,189 | | 42,753 | 112.7 % |
| June 30, 2017 | | 1,525,363 | | 49,295 | | 45,414 | 108.5 % |
| September 30, 2017 | | 1,622,627 | | 53,742 | | 46,559 | 115.4 % |
| December 31, 2017 | | 1,676,148 | | 64,719 | | 52,263 | 123.8 % |
| March 31, 2018 | | 1,758,066 | | 60,248 | | 53,169 | 113.3 % |
| June 30, 2018 | | 1,849,079 | | 76,936 | | 53,886 | 142.8 % |
| September 30, 2018 | | 1,961,598 | | 75,161 | | 55,365 | 135.8 % |
| December 31, 2018 | | 2,047,992 | | 71,090 | | 52,675 | 135.0 % |
| March 31, 2019 | | 2,098,428 | | 87,045 | | 56,227 | 154.8 % |
| June 30, 2019 | | 2,088,445 | | 82,421 | | 59,454 | 138.6 % |
| September 30, 2019 | | 2,064,156 | | 101,918 | | 61,805 | 164.9 % |
| December 31, 2019 | | 2,020,973 | | 125,148 | | 63,851 | 196.0 % |
| March 31, 2020 | | 2,000,680 | | 120,191 | | 65,224 | 184.3 % |
| June 30, 2020 | | 1,960,826 | | 137,082 | | 66,846 | 205.1 % |
| September 30, 2020 | | 1,921,067 | | 149,415 | | 67,931 | 220.0 % |
| December 31, 2020 | | 1,900,715 | | 125,109 | | 69,734 | 179.4 % |

Page 69

Table of Contents

We believe that the portfolio cash flow results set forth above are consistent with our general investment thesis that the life insurance policy benefits we receive will continue to increase over time in relation to the premiums we are required to pay on the remaining polices in the portfolio. Nevertheless, we expect that our portfolio cash flow on a period-to-period basis will remain inconsistent as we have reduced capital allocated to acquiring a larger, more diversified portfolio of life insurance policies.

**Inflation**

Changes in inflation do not necessarily correlate with changes in interest rates. We presently do not foresee any material impact of inflation on our results of operations in the periods presented in our consolidated financial statements.

**Off-Balance Sheet Arrangements**

*Unfunded Capital Commitments*

The ExAlt Trusts had $35.6 million and $34.9 million of potential gross capital commitments as of December 31, 2020 and December 31, 2019, respectively, representing potential limited partner capital funding commitments on the interests in alternative asset funds. The trust holding the interest in the limited partnership for the alternative asset fund is required to fund these limited partner capital commitments per the terms of the limited partnership agreement. Capital funding commitment reserves are maintained by the associated trusts within the ExAlt Plan$^{TM}$ created at the origination of each trust for up to $0.1 million. To the extent that the associated ExAlt Trust cannot pay the capital funding commitment, Beneficient is obligated to lend sufficient funds to meet the commitment. Any amounts advanced by Beneficient to the ExAlt Trusts for these limited partner capital funding commitments above the associated capital funding commitment reserves held by the associated ExAlt Trusts are added to the ExAlt Loan balance between Beneficient and the ExAlt Trusts and are expected to be recouped through the cash distributions from the interests in alternative asset fund that collateralizes such ExAlt Loan.

Capital commitments generally originate from limited partner agreements having fixed or expiring expiration dates. The total limited partner capital funding commitment amounts may not necessarily represent future cash requirements. Beneficient considers the creditworthiness of the investment on a case-by-case basis. At both December 31, 2020 and December 31, 2019, Beneficient had no reserves for losses on unused commitments to fund potential limited partner capital funding commitments.

*Unfunded Commitments*

Beneficient had $1.1 million of unfunded commitments on liquidity solution transactions as of December 31, 2020, related to liquidity transactions in process as of that date. There were no reserves for unfunded commitments as of December 31, 2020, and all amounts in process were fully funded in the first quarter of 2021.

*Equity Method Investee Commitments*

GWG Holdings has contributed $16.2 million in cash to FOXO to date through December 31, 2020, and is committed to contribute an additional $3.8 million to the entity through October 2021, all of which was contributed by such date.

**Credit Risk and Interest Rate Risk**

We review the credit risk associated with our portfolio of life insurance policies when estimating its fair value. In evaluating the policies' credit risk, we consider insurance company solvency, credit risk indicators, economic conditions, ongoing credit evaluations, and company positions. We attempt to manage our credit risk related to life insurance policies typically by purchasing policies issued only from companies with an investment-grade credit rating by either Standard & Poor's, Moody's, or A.M. Best Company. As of December 31, 2020, 96.3% of our life insurance policies, by face value benefits, were issued by companies that maintained an investment-grade credit rating (BBB or better) by Standard & Poor's.

The LNV Credit Facility, NF Credit Facility, and Beneficient's debt due to related parties are floating-rate financings. In addition, our ability to offer interest and dividend rates that attract capital (including in our continuous offering of L Bonds) is generally impacted by prevailing interest rates. Furthermore, while GWG Holdings' L Bond offering provides us with fixed-rate debt financing, our Debt Coverage Ratio is calculated in relation to the interest rate on all of our debt financing, exclusive of our Seller Trust L Bonds. Therefore, increases in interest rates impact our business by increasing our borrowing costs and reducing availability under our debt financing arrangements. Earnings from our life insurance portfolio are based upon the spread, if any, generated between the return on the portfolio and the total cost of our financing (excluding cost of

Page 70

Table of Contents

financing for the Seller Trust L Bonds). As a result, increases in interest rates will reduce the earnings we expect to achieve from our investments in life insurance policies.

The ExAlt Trusts hold investments in alternative assets, which are exposed to risks related to markets, credit, currency, and interest rates. Currently, all of these alternative assets consist of private equity limited partnership interests, which are primarily denominated in the U.S. dollar, Euro, and Canadian dollar. The underlying portfolio companies primarily operate in the United States and Western Europe, with the largest percentage, based on NAV, operating in diversified financials, telecommunications services, food and staples retailing, and software and services industries.

As of December 31, 2020, and 2019, all of the ExAlt Loans, which are eliminated upon consolidation, are collateralized by the cash flows originating from the ExAlt Trusts' investments in alternative assets. These ExAlt Loans are a key determinant in income (loss) allocable to Beneficient's equity holders, and thus GWG Holdings. Beneficient has underwriting procedures and utilizes market rates. Additionally, Beneficient has purchased put options to protect the net asset value of the interests in alternative assets held by certain of the ExAlt Trusts from impacts associated with a broad market downturn. Finally, the ExAlt Trusts applicable trust agreements allow for excess cash flows from a collective pool of alternative assets to be utilized to repay the ExAlt Loans they have with Beneficient when cash flows from the customer's originally alternative assets are not sufficient to repay the outstanding principal, interest, and fees.

**Guarantee and Collateral Provisions of L Bonds**

GWG Holdings' L Bonds are offered and sold under a registration statement declared effective by the SEC, and GWG Holdings has issued Seller Trust L Bonds under the L Bond Supplemental Indenture, as described in Note 10 to the consolidated financial statements. The L Bonds and Seller Trust L Bonds are secured by substantially all the assets of GWG Holdings and a pledge of all of GWG Holdings' common stock held by BCC and AltiVerse Capital Markets, L.L.C., a limited liability company owned by an entity related to the Ben Initial Investors, including Brad K. Heppner (GWG Holdings' former Chairman, who served in such capacity from April 26, 2019 to June 14, 2021, and Beneficient's current Chief Executive Officer and Chairman), and an entity related to Thomas O. Hicks (one of Beneficient's current directors and a former director of GWG Holdings) ("AltiVerse"). Together, BCC and AltiVerse represent approximately 12% of our outstanding common stock, and are guaranteed by GWG Life and a corresponding grant of a security interest in substantially all the assets of GWG Life. As a guarantor, GWG Life has fully and unconditionally guaranteed the payment of principal and interest on the L Bonds and Seller Trust L Bonds. GWG Life's equity in GWG Life Trust, DLP IV, and DLP V Holdings serves as collateral for GWG Holdings' L Bond and Seller Trust L Bond obligations. As of December 31, 2020, substantially all of our life insurance policies were held by DLP IV, DLP V, or GWG Life Trust. The policies held by DLP IV are not direct collateral for the L Bonds as such policies are pledged under the LNV Credit Facility.

On December 31, 2020, GWG Holdings, GWG Life and Bank of Utah, as trustee, entered into the Liquidity Bond Supplemental Indenture that provides for the issuance of two series of Liquidity Bonds, as described in Note 10 to the consolidated financial statements. The Liquidity Bonds are issued by GWG Life and guaranteed by GWG Holdings. The Liquidity Bonds are secured by the same collateral as the other L Bonds.

Furthermore, regarding the obligations of GWG Holdings and its subsidiaries as of December 31, 2020:

(1) The Seller Trust L Bonds are secured obligations of GWG Holdings, ranking junior to all senior debt of GWG Holdings and pari passu in right of payment and in respect of collateral with all L Bonds of GWG Holdings (see Note 10 to the accompanying audited consolidated financial statements). Payments under the Seller Trust L Bonds are guaranteed by GWG Life. The assets exchanged in connection with the Beneficent transaction are available as collateral for all holders of the L Bonds and Seller Trust L Bonds. Specifically, the Common Units are held by GWG Holdings and the Commercial Loan is held by GWG Life.

(2) The Liquidity Bonds are secured obligations of GWG Life, ranking junior to all senior debt of GWG Holdings or GWG Life and pari passu in right of payment and in respect of collateral with all L Bonds of GWG Holdings. Payments under the Liquidity Bonds are guaranteed by GWG Holdings.

(3) The terms of the LNV Credit Facility require that we maintain a significant excess of pledged collateral value over the amount outstanding on the LNV Credit Facility at any given time. Any excess after satisfying all amounts owing under the LNV Credit Facility is available as collateral for the L Bonds (including the Seller Trust L Bonds and Liquidity Bonds).

The following represents summarized financial information as of December 31, 2020 and December 31, 2019, with respect to the financial position, and for the year ended December 31, 2020, with respect to results of operations. The tables present summarized financial information of GWG Holdings and GWG Life on a combined basis after elimination of (i) intercompany transactions and balances among such entities, including GWG Holdings' interest in GWG Life, and (ii) equity in earnings from and investments in any subsidiary that is a non-guarantor (including DLP IV, DLP V, GWG Life Trust and Beneficient). The summarized financial information has been prepared in accordance with Rule 13-01 of Regulation S-X.

Summarized Balance Sheet Information (in thousands, not intended to balance):

| | | | | *(As Restated)* |
| | | December 31, 2020 | | December 31, 2019 |
|---|---|---|---|---|
| **Assets[1]** | | | | |
| Cash, cash equivalents and restricted cash | $ | 65,556 | $ | 60,365 |
| Financing receivables from affiliates | | — | | 67,153 |
| Other assets | | 6,366 | | 8,659 |
| Total assets | $ | 71,922 | $ | 136,177 |
| **Liabilities** | | | | |
| L Bonds | $ | 1,246,902 | $ | 926,638 |
| Seller Trust L Bonds | | 366,892 | | 366,892 |
| Interest and dividends payable | | 12,086 | | 12,491 |
| Accounts payable and accrued expenses | | 7,347 | | 3,093 |
| Deferred tax liabilities | | 51,469 | | 71,855 |
| Total liabilities | $ | 1,684,696 | $ | 1,380,969 |
| **Equity** | | | | |
| Redeemable preferred stock and Series 2 redeemable preferred stock | $ | 156,833 | $ | 201,891 |

[1] Assets exclude: i) GWG Holdings' investment in GWG Life of $1.2 billion as of both December 31, 2020 and December 31, 2019; ii) GWG Holdings' aggregate investments in non-obligor subsidiaries of $643.1 million and $439.4 million as of December 31, 2020 and December 31, 2019, respectively; and iii) GWG Life's aggregate investments in and loans to non-obligor subsidiaries of $1.2 billion as of both December 31, 2020 and December 31, 2019.

Summarized Statement of Operations Information (in thousands):

| | | Year Ended December 31, 2020 |
|---|---|---|
| **Total revenues** | $ | 100,518 |
| Interest expense | | 125,012 |
| Other expenses | | 38,155 |
| **Total expenses** | | 163,167 |
| **Loss before income taxes and preferred dividends** | | (62,649) |
| Income tax expense (benefit) | | (19,849) |
| Preferred dividends | | 14,630 |
| **Net loss** | $ | (57,430) |

Table of Contents

**Debt Coverage Ratio**

GWG Holdings' L Bond borrowing covenants require us to maintain a Debt Coverage Ratio not to exceed 90%. The Debt Coverage Ratio is calculated by dividing the sum of our total interest-bearing indebtedness (other than Excluded Indebtedness defined and described in note 5 to the table below) by the sum of our cash, cash equivalents, restricted cash, life insurance policy benefits receivable, the net present value of the life insurance portfolio, and, without duplication, the value of all of our other assets as reflected on our most recently available balance sheet prepared in accordance with GAAP.

GWG Holdings' and GWG Life's investments in Beneficient and GWG Life's ownership interests in the holding companies that own DLP IV and DLP VI, which own substantially all of the life insurance portfolio, secure our obligations under the L Bonds, and are illiquid assets. Although GWG Holdings and GWG Life own debt and equity securities of Beneficient, a substantial majority of the net assets of Beneficient are currently represented by goodwill, an intangible asset. The calculation of Beneficient's goodwill required the utilization of significant estimates and management judgment, as discussed elsewhere in this 2020 Form 10-K. As a result, the carrying value of those assets as reflected in our consolidated financial statements may not necessarily reflect the current market price for those assets, especially in the event of a bulk or distressed sale. Proceeds from L Bond sales will be primarily used for the repayment of L Bond maturities, interest payments and other operating expenses of GWG Holdings, and as otherwise specified in the prospectus for the L Bonds. GWG Holdings may also continue to use a portion of the proceeds from L Bond sales to make investments in Beneficient. Because advances may be used by Beneficient for working capital purposes, such investments may not increase the tangible assets securing the L Bonds. If the trustee for the L Bonds were forced to sell all or a portion of the collateral securing them, there can be no assurance that the trustee would be able to sell them for the prices at which we have recorded them in our consolidated financial statements, and the trustee might be forced to sell them at significantly lower prices.

The discount rate we use for the net present value of our life insurance portfolio for this calculation may not be the same discount rate we use for our GAAP valuation and is not necessarily reflective of the amount we could realize upon a sale of the portfolio (dollars in thousands):

| | December 31, 2020 | (As Restated) December 31, 2019 |
|---|---|---|
| Life insurance portfolio policy benefits | $ 1,900,715 | $ 2,020,973 |
| Discount rate of future cash flows[1] | 7.46 % | 7.55 % |
| Net present value of life insurance portfolio policy benefits | $ 822,859 | $ 826,196 |
| All cash and cash equivalents (including restricted cash) | 106,282 | 81,780 |
| Life insurance policy benefits receivable, net | 14,334 | 23,031 |
| Financing receivables from affiliates[2] | 180,080 | 258,402 |
| Investments in Common Units[2][3][4] | 438,194 | 313,443 |
| Investment in Preferred Series A Subclass 1 Unit Account[4] | 319,030 | 319,030 |
| Investment in Preferred Series C Unit Account[4] | 195,578 | — |
| Option Agreement and other assets [3] | 20,082 | 54,365 |
| Total Coverage [5] | $ 2,096,439 | $ 1,876,247 |
| Total Indebtedness [5] | $ 1,519,107 | $ 1,146,646 |
| Debt Coverage Ratio | 72.46 % | 61.10 % |

_____

(1) Weighted-average interest rate paid on indebtedness, excluding that of Seller Trust L-Bonds, as required under the indenture governing the L Bonds.

(2) The Promissory Note, previously included in financing receivables from affiliates, was converted to Preferred Series C on September 30, 2020.

(3) The Option Agreement was exercised and converted to Common Units effective August 11, 2020.

(4) Generally represents the value of the investment in Beneficient as of December 31, 2019 for investments that existed at the time of the change-in-control transaction, or the value at the time of purchase for investments that were made subsequent to December 31, 2019. As noted above, these are illiquid investments that are carried at book basis and not market value.

(5) Total Coverage excludes the assets of Beneficient. Total Indebtedness is equal to the total liabilities balance of GWG Holdings (excluding the liabilities of Beneficient) as of December 31, 2020, other than Excluded Indebtedness. "Excluded Indebtedness" means

Table of Contents

indebtedness that is payable at GWG Holdings' option in capital stock of GWG Holdings or securities mandatorily convertible into or exchangeable for capital stock of GWG Holdings, or any indebtedness that is reasonably expected to be converted or exchanged, directly or indirectly, into capital stock of GWG Holdings. This change in the definition of the Debt Coverage Ratio was defined in Amendment No. 2 to the Amended and Restated Indenture entered into as of December 31, 2019 (see Note 10 to the accompanying audited consolidated financial statements).

As of December 31, 2020 and 2019, we were in compliance with the Debt Coverage Ratio. Based on a preliminary analysis, the Company expects the Debt Coverage Ratio to be approximately 82% as of September 30, 2021.

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.**

Not applicable.

Page 74

App. 1220

Table of Contents

**ITEM 8. CONSOLIDATED FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

<div align="center">

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

</div>

To the Board of Directors and Stockholders
GWG Holdings, Inc. and Subsidiaries

**Opinion on the financial statements**

We have audited the accompanying consolidated balance sheet of GWG Holdings, Inc. (a Delaware corporation) and subsidiaries (the "Company") as of December 31, 2020 and the related consolidated statements of operations, cash flows and changes in stockholders' equity for the year ended December 31, 2020, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2020, and the results of its operations and its cash flows for the year ended December 31, 2020, in conformity with accounting principles generally accepted in the United States of America.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of December 31, 2020, based on criteria established in the 2013 *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), and our report dated November 5, 2021 expressed an adverse opinion.

**Going concern**

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the financial statements, the Company has incurred significant losses from operations, experienced negative cash flows from operations and experienced delays in executing its business plans. The Company expects to be dependent on raising equity or other financing to fund ongoing operations and to execute its business plans. These conditions, along with other matters as set forth in Note 1, raise substantial doubt about the Company's ability to continue as a going concern.

Management's plans in regard to these matters are also described in Note 1. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

**Basis for opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audit included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audit provides a reasonable basis for our opinion.

**Critical audit matters**

The critical audit matter communicated below arises from the current period audit of the financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which they relate.

*Fair value of investments in life insurance policies*

As described further in Note 5 and Note 7 to the financial statements, the fair value of the Company's investments in life insurance policies is determined as the net present value of the life insurance portfolio's future expected cash flows (policy

F-1

Table of Contents

benefits to be received and required future premium payments) that incorporates life expectancy estimates obtained when the policy was purchased and current discount rate assumptions. We identified fair value of investments in life insurance policies as a critical audit matter.

The principal considerations for our determination that fair value of investments in life insurance policies is a critical audit matter are that this asset is valued using unobservable inputs that require a high level of management judgment and fluctuations to such inputs could have a material impact on the financial statements. As a result, obtaining sufficient appropriate audit evidence related to the fair value measurement required significant auditor judgement to evaluate the reasonableness of unobservable inputs used in the valuation.

Our audit procedures related to the fair value of investments in life insurance policies included the following, among others:

- We tested the design and operating effectiveness of relevant controls over management's process relating to the fair value measurement of investments in life insurance policies.
- With the assistance of external valuation specialists, we considered results of the Company's actual-to-expected ("A2E") mortality cash flow experience, available third-party service provider reports for future premium streams, available market information, other available information to further corroborate overall valuation and sampled life insurance policy information in order to evaluate the following key fair value inputs:
  - Life expectancy, utilizing portfolio mortality multiplier methodology which is updated based on the A2E analysis
  - Estimated premium payments
  - Age of insured
  - Face amount of policies
  - Discount rate

/s/ GRANT THORNTON LLP

We have served as the Company's auditor since 2020.

Dallas, Texas
November 5, 2021

F-2

Table of Contents

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholders
GWG Holdings, Inc. and Subsidiaries

**Opinion on internal control over financial reporting**

We have audited the internal control over financial reporting of GWG Holdings, Inc. (a Delaware corporation) and subsidiaries (the "Company") as of December 31, 2020, based on criteria established in the 2013 *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). In our opinion, because of the effect of the material weaknesses described in the following paragraphs on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of December 31, 2020, based on criteria established in the 2013 *Internal Control— Integrated Framework* issued by COSO.

A material weakness is a deficiency, or combination of control deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. The following material weaknesses have been identified and included in management's assessment.

As of December 31, 2020, the design and operating effectiveness of controls over the selection, application and review of the implementation of accounting policies were not sufficient to ensure amounts recorded and disclosed were fairly stated in accordance with GAAP. This material weakness resulted in the Restatement.

During the year ended December 31, 2020, the Company identified a material weakness in internal controls over the quarterly income tax provision process, which included the measurement of the valuation allowance against the Company's deferred tax assets.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the consolidated financial statements of the Company as of and for the year ended December 31, 2020. The material weaknesses identified above were considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2020 consolidated financial statements, and this report does not affect our report dated November 5, 2021 which expressed a qualified opinion on those financial statements.

**Basis for opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and limitations of internal control over financial reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

F-3

Table of Contents

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ GRANT THORNTON LLP

Dallas, Texas
November 5, 2021

F-4

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Stockholders of
GWG Holdings, Inc. and Subsidiaries

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheet of GWG Holdings, Inc. and Subsidiaries (the "Company") as of December 31, 2019, and the related consolidated statements of operations, changes in stockholders' equity, and cash flows for the year ended December 31, 2019, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2019, and the results of their operations and their cash flows for the year ended December 31, 2019, in conformity with accounting principles generally accepted in the United States of America.

**Restatement and Other Corrections**

As discussed in Notes 2 and 21 to the consolidated financial statements, the 2019 consolidated financial statements have been restated to correct misstatements.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. Our audit included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audit provides a reasonable basis for our opinion.

/s/ WHITLEY PENN LLP

We served as the Company's auditor from 2019 to 2020.

Dallas, Texas

March 27, 2020, except for Notes 2, 6, and 21, as to which the date is November 5, 2021.

F-5

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
(in thousands, except share and per share data)

| | December 31, | |
| --- | --- | --- |
| | **2020** | **2019** |
| ASSETS | | *(As Restated)* |
| Cash and cash equivalents | $ 85,249 | $ 82,284 |
| Restricted cash | 38,911 | 33,506 |
| Investment in life insurance policies, at fair value | 791,911 | 796,039 |
| Life insurance policy benefits receivable, net | 14,334 | 23,031 |
| Investment in alternative assets, at fair value | 221,894 | 342,012 |
| Equity method investments | 8,582 | 1,761 |
| Other assets | 36,326 | 29,398 |
| Goodwill | 2,367,750 | 2,367,750 |
| TOTAL ASSETS | $ 3,564,957 | $ 3,675,781 |
| LIABILITIES & STOCKHOLDERS' EQUITY | | |
| LIABILITIES | | |
| Senior credit facility with LNV Corporation | $ 193,730 | $ 174,390 |
| L Bonds | 1,246,902 | 926,638 |
| Seller Trust L Bonds | 272,104 | 366,892 |
| Debt due to related parties | 76,260 | 153,086 |
| Interest and dividends payable | 24,080 | 16,516 |
| Repurchase option | — | 61,664 |
| Accounts payable and accrued expenses | 26,505 | 27,892 |
| Deferred tax liability, net | 51,469 | 71,855 |
| TOTAL LIABILITIES | 1,891,050 | 1,798,933 |
| Redeemable noncontrolling interests | 1,233,093 | 1,269,654 |
| STOCKHOLDERS' EQUITY | | |
| REDEEMABLE PREFERRED STOCK | | |
| (par value $0.001; shares authorized 100,000; shares outstanding 56,855 and 84,636; liquidation preference of $57,187 and $85,130 as of December 31, 2020 and 2019, respectively) | 46,241 | 74,023 |
| SERIES 2 REDEEMABLE PREFERRED STOCK | | |
| (par value $0.001; shares authorized 150,000; shares outstanding 129,887 and 147,164; liquidation preference of $130,645 and $148,023 as of December 31, 2020 and 2019, respectively) | 110,592 | 127,868 |
| COMMON STOCK | | |
| (par value $0.001; shares authorized 210,000,000; shares issued and outstanding, 33,094,664 and 33,033,793 as of December 31, 2020 and 2019, respectively) | 33 | 33 |
| Common stock in treasury, at cost, 12,337,264 shares as of December 31, 2020 and 2,500,000 shares as of December 31, 2019 | (67,406) | (24,550) |
| Additional paid-in capital | 274,023 | 233,106 |
| Accumulated deficit | (251,111) | (97,196) |
| TOTAL GWG HOLDINGS STOCKHOLDERS' EQUITY | 112,372 | 313,284 |
| Noncontrolling interests | 328,442 | 293,910 |
| TOTAL STOCKHOLDERS' EQUITY | 440,814 | 607,194 |
| TOTAL LIABILITIES & STOCKHOLDERS' EQUITY | $ 3,564,957 | $ 3,675,781 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
(in thousands, except per share data)

| | Year Ended December 31, | |
| --- | --- | --- |
| | **2020** | **2019** |
| REVENUE | | *(As Restated)* |
| Gain on life insurance policies, net | $        49,598 | $        75,320 |
| Investment income, net | 44,106 | — |
| Interest income | 1,594 | 15,646 |
| Other income | 29,073 | 1,310 |
| TOTAL REVENUE | 124,371 | 92,276 |
| EXPENSES | | |
| Interest expense | 154,616 | 114,844 |
| Employee compensation and benefits | 146,363 | 28,309 |
| Legal and professional fees | 30,075 | 12,824 |
| Other expenses | 18,227 | 15,896 |
| TOTAL EXPENSES | 349,281 | 171,873 |
| LOSS BEFORE INCOME TAXES | (224,910) | (79,597) |
| INCOME TAX EXPENSE (BENEFIT) | (16,390) | 71,865 |
| LOSS BEFORE LOSS FROM EQUITY METHOD INVESTMENTS | (208,520) | (151,462) |
| Loss from equity method investments | (7,319) | (4,077) |
| Gain on consolidation of equity method investment (see Note 4) | — | 242,953 |
| NET INCOME (LOSS) | (215,839) | 87,414 |
| Net loss attributable to noncontrolling interests | 61,924 | — |
| Less: Preferred stock dividends | 14,630 | 16,943 |
| NET INCOME (LOSS) ATTRIBUTABLE TO COMMON SHAREHOLDERS | $      (168,545) | $        70,471 |
| NET INCOME (LOSS) PER COMMON SHARE | | |
| Basic | $          (6.01) | $            2.13 |
| Diluted | $          (6.01) | $            2.06 |
| WEIGHTED AVERAGE COMMON SHARES OUTSTANDING | | |
| Basic | 28,063,268 | 33,016,007 |
| Diluted | 28,063,268 | 35,219,442 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-7

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS** (in thousands)

| | Year Ended December 31, | |
| --- | --- | --- |
| | **2020** | **2019** |
| | | *(As Restated)* |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net income (loss) | $ (215,839) | $ 87,414 |
| Adjustments to reconcile net income (loss) to net cash flows used in operating activities: | | |
| Change in fair value of investment in life insurance policies | (34,114) | (49,015) |
| Investment income, net | (44,106) | — |
| Amortization of deferred financing and issuance costs | 19,760 | 13,804 |
| Amortization and depreciation of long-lived assets | 1,171 | — |
| Accretion of discount on financing receivables from affiliate | — | (1,720) |
| Provision for uncollectible policy benefit receivable | — | 153 |
| Return on investments in alternative assets | 3,683 | — |
| Non-cash interest income, including interest paid-in-kind and accretion of purchase discount | (283) | — |
| Non-cash interest expense | 2,343 | — |
| Loss from equity method investments | 7,319 | 4,077 |
| Loss on fair value of put options | 7,757 | — |
| Equity-based compensation | 110,840 | 1,732 |
| Forfeiture of vested equity-based compensation | (36,267) | — |
| Gain on consolidation of equity method investment | — | (242,953) |
| Deferred income taxes | (16,927) | 71,855 |
| Change in operating assets and liabilities: | | |
| Life insurance policy benefits receivable | 8,697 | (6,683) |
| Accrued interest on financing receivables | — | (6,913) |
| Other assets | (599) | (5,056) |
| Accounts payable and accrued expenses | 3,123 | (8,297) |
| Interest and dividends payable | 1,042 | (1,228) |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (182,400) | (142,830) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Investment in life insurance policies | — | (32,367) |
| Return of investment for matured life insurance policies | 38,186 | 33,265 |
| Purchases of fixed assets | (3,281) | — |
| Contributions to equity method investments | (14,140) | (12,388) |
| Business combination consideration, net of cash and restricted cash acquired | — | (45,020) |
| Return of investments in alternative assets | 20,394 | — |
| Investments in alternative assets | (8,378) | — |
| Financing receivables from affiliate issued | — | (65,000) |
| Investment in put options | (14,775) | — |
| NET CASH FLOWS PROVIDED BY (USED IN) INVESTING ACTIVITIES | 18,006 | (121,510) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Borrowings on senior debt | 28,530 | 50,133 |
| Repayments of senior debt and debt due to related parties | (85,505) | (23,756) |
| Payments for deferred financing and issuance costs for senior debt and debt due to related parties | (3,207) | (2,042) |
| Proceeds from issuance of L Bonds | 440,195 | 403,397 |
| Payments for L Bonds issuance costs | (27,904) | (25,284) |
| Payments for redemption of L Bonds | (110,691) | (116,809) |
| Payment of employee taxes on stock awards | (1,554) | — |
| Purchase of noncontrolling interest | (1,195) | — |
| Issuance of common stock | 8 | 59 |
| Payments for redemption of redeemable preferred stock | (45,058) | (14,061) |
| Payments for equity issuance costs | (633) | — |
| Preferred stock dividends | (14,630) | (16,943) |
| Tax distribution to noncontrolling interest | (5,592) | — |
| NET CASH FLOWS PROVIDED BY FINANCING ACTIVITIES | 172,764 | 254,694 |
| NET INCREASE (DECREASE) IN CASH, CASH EQUIVALENTS AND RESTRICTED CASH | 8,370 | (9,646) |
| **CASH, CASH EQUIVALENTS AND RESTRICTED CASH** | | |
| BEGINNING OF PERIOD | 115,790 | 125,436 |
| END OF PERIOD | $ 124,160 | $ 115,790 |

F-8

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS — CONTINUED**
(in thousands)

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2020** | | **2019** |
| **SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION** | | | |
| Interest paid | $ | 131,516 | $ 102,202 |
| Premiums paid, including prepaid | $ | 70,243 | $ 68,467 |
| **NON-CASH INVESTING AND FINANCING ACTIVITIES** | | | |
| L Bonds: Conversion of accrued interest and commissions payable to principal | $ | 1,911 | $ 1,760 |
| Distribution payable to noncontrolling interest (see Note 12) | | 738 | — |
| Noncash issuance of noncontrolling interest (see Note 12) | | 5,978 | — |
| Liquidity Bonds, net of financing costs (see Note 10) | | 392 | — |
| Collateral Swap (See Note 1): | | | |
| Exchange of alternative assets for GWG Holdings' Seller Trust L Bonds | | 94,788 | — |
| Exchange of alternative assets for GWG Holdings' common stock | | 42,856 | — |
| Deemed capital contribution from related party | | 46,770 | — |
| Adjustment to noncontrolling interest | | 3,444 | — |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-9

Table of Contents

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY (As Restated)**
(in thousands, except per share data)

| | Redeemable Preferred Stock Shares | Redeemable Preferred Stock | Common Shares | Common Stock (par) | Additional Paid-in Capital | Accumulated Deficit | Treasury Stock | Total GWG Holdings Stockholders' Equity | Noncontrolling Interests | Total Stockholders' Equity | Redeemable Noncontrolling Interests |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance, December 31, 2018 | 245,883 | $ 215,973 | 33,018,161 | $ 33 | $ 249,662 | $ (184,610) | $ — | $ 281,058 | $ — | $ 281,058 | $ — |
| Net income (As Restated) | — | — | — | — | — | 87,414 | — | 87,414 | — | 87,414 | — |
| Issuance of common stock | — | — | 58,382 | — | 439 | — | — | 439 | — | 439 | — |
| Repurchase of common stock | — | — | (42,750) | — | (362) | — | — | (362) | — | (362) | — |
| Common stock in treasury | — | — | (2,500,000) | — | — | — | (24,550) | (24,550) | — | (24,550) | — |
| Redemption of redeemable preferred stock | (14,083) | (14,082) | — | — | (1) | — | — | (14,083) | — | (14,083) | — |
| Preferred stock dividends | — | — | — | — | (16,943) | — | — | (16,943) | — | (16,943) | — |
| Stock-based compensation | — | — | — | — | 311 | — | — | 311 | — | 311 | — |
| Recognition of noncontrolling interests (As Restated) | — | — | — | — | — | — | — | — | 293,910 | 293,910 | 1,269,654 |
| Balance, December 31, 2019 (As Restated) | 231,800 | $ 201,891 | 30,533,793 | $ 33 | $ 233,106 | $ (97,196) | $ (24,550) | $ 313,284 | $ 293,910 | $ 607,194 | $ 1,269,654 |
| Net loss | — | — | — | — | — | (153,915) | — | (153,915) | (30,955) | (184,870) | (30,969) |
| Issuance of common stock | — | — | 60,871 | — | 533 | — | — | 533 | — | 533 | — |
| Common stock in treasury (Note 1) | — | — | (9,837,264) | — | — | — | (42,856) | (42,856) | — | (42,856) | — |
| Redemption of redeemable preferred stock | (45,058) | (45,058) | — | — | — | — | — | (45,058) | — | (45,058) | — |
| Preferred stock dividends | — | — | — | — | (14,630) | — | — | (14,630) | — | (14,630) | — |
| Deemed capital contribution from related party (Note 1) | — | — | — | — | 46,770 | — | — | 46,770 | — | 46,770 | — |
| Tax distribution to noncontrolling interest | — | — | — | — | — | — | — | — | — | — | (5,592) |
| Equity-based compensation | — | — | — | — | 180 | — | — | 180 | 110,738 | 110,918 | — |
| Forfeiture of vested equity-based compensation | — | — | — | — | — | — | — | — | (36,267) | (36,267) | — |
| Tax withholding for employee restricted equity units | — | — | — | — | — | — | — | — | (1,521) | (1,521) | — |
| Distributions payable to noncontrolling interest | — | — | — | — | — | — | — | — | (738) | (738) | — |
| Noncash issuance of noncontrolling interest | — | — | — | — | — | — | — | — | 5,978 | 5,978 | — |
| Adjustment to noncontrolling interest for change in ownership of Common Units (Note 1) | — | — | — | — | 8,064 | — | — | 8,064 | (8,064) | — | — |
| Reduction to noncontrolling interest for Beneficient treasury (Note 1) | — | — | — | — | — | — | — | — | (3,444) | (3,444) | — |
| Purchase of noncontrolling interest | — | — | — | — | — | — | — | — | (1,195) | (1,195) | — |
| Balance, December 31, 2020 | 186,742 | $ 156,833 | 20,757,400 | $ 33 | $ 274,023 | $ (251,111) | $ (67,406) | $ 112,372 | $ 328,442 | $ 440,814 | $ 1,233,093 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-10

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(1) Nature of Business**

**Organizational Structure**

GWG Holdings, Inc. ("GWG Holdings") conducts its life insurance secondary market business through a wholly-owned subsidiary, GWG Life, LLC ("GWG Life"), and GWG Life's wholly-owned subsidiaries, GWG Life Trust, GWG DLP Funding IV, LLC ("DLP IV"), GWG DLP Funding V Holdings, LLC ("DLP V Holdings"), and GWG DLP Funding Holdings VI, LLC ("DLP VI Holdings"). DLP V Holdings is the sole member of GWG DLP Funding V, LLC ("DLP V"). DLP VI Holdings is the sole member of GWG DLP Funding VI, LLC ("DLP VI").

In addition, GWG Holdings has exposure to indirect interests in loans collateralized by cash flows from alternative assets. Such loans are made and held by certain of the operating subsidiaries of The Beneficient Company Group, L.P. ("Ben LP," including all of the subsidiaries it may have from time to time — "Beneficient"). These loans are made to certain of the ExAlt Trusts (defined below), which are consolidated subsidiaries of Ben LP and thus, such loans are eliminated in consolidation for financial reporting purposes. The ExAlt Trusts are comprised of the Custody Trusts, Collective Trusts, LiquidTrusts and Funding Trusts, (collectively, the "ExAlt Trusts"). Ben LP's general partner is Beneficient Management, L.L.C. ("Beneficient Management"). Prior to December 31, 2019, GWG Holdings' investment in Beneficient was accounted for as an equity method investment. On December 31, 2019, as more fully described below, Beneficient became a consolidated subsidiary of GWG Holdings. As also further described in Note 23, on August 13, 2021, GWG Holdings and Ben LP, and Beneficient Company Holdings, L.P. ("BCH") entered into a non-binding term sheet (the "Term Sheet") that outlines a series of transactions that, if completed, will result in, among other things, (i) GWG Holdings receiving certain proposed enhancements to its investments in Beneficient; (ii) GWG Holdings no longer having the right to appoint directors of the Board of Directors of Beneficient Management; and (iii) Beneficient no longer being a consolidated subsidiary of GWG Holdings. The Term Sheet is part of ongoing efforts by management and the Board of Directors of GWG Holdings to maximize the value of GWG Holdings' and GWG Life's investment in Beneficient.

Ben LP is the general partner of BCH and owns 100% of the Class A Subclass A-1 and A-2 Units of BCH. BCH is the holding company that directly or indirectly receives all active and passive income of Beneficient and allocates that income among the partnership interests issued by BCH. As of December 31, 2020, BCH has issued general partnership Class A Units (Subclass A-1 and A-2), Class S Ordinary Units, Class S Preferred Units, FLP Units (Subclass 1 and Subclass 2), Preferred Series A Subclass 1 Unit Accounts, and Preferred Series C Unit Accounts. On July 15, 2020, BCH amended its limited partnership agreement by executing that certain 5th Amended and Restated Limited Partnership Agreement ("LPA") of BCH to allow for the issuance of Preferred Series A Subclass 0 Unit Accounts ("Preferred A.0"), which are expected to be issued once certain conditions are met (as discussed in more detail below).

GWG Holdings also has a financial interest in FOXO Technologies Inc. ("FOXO", formerly FOXO BioScience LLC), which, through its wholly-owned subsidiaries FOXO Labs Inc. ("FOXO Labs", formerly, Life Epigenetics Inc.) and FOXO Life LLC ("FOXO Life", formerly, youSurance General Agency, LLC), seeks to commercialize epigenetic technology for the longevity industry and offer life insurance directly to customers utilizing epigenetic technology. Although we have a financial interest in FOXO, we do not have a controlling financial interest because another party is the majority shareholder of the voting class of securities. Therefore, we account for GWG Holdings' ownership interest in FOXO as an equity method investment.

All of the aforementioned entities are legally organized in the state of Delaware, other than GWG Life Trust, which was formed under the laws of the state of Utah, and certain of the ExAlt Trusts, which were formed under the laws of the state of Texas. Unless the context otherwise requires or we specifically so indicate, all references in this report to "we," "us," "our," "our Company," "GWG," or the "Company" refer to GWG Holdings together, in each case, with its subsidiaries. Our headquarters are located at 325 N. St. Paul Street, Suite 2650, Dallas, Texas 75201.

**Nature of Business**

GWG Holdings, through its wholly-owned subsidiary GWG Life, purchased life insurance policies in the secondary market and has built a large, actuarially diverse portfolio of life insurance policies backed by highly rated life insurance companies. These policies were purchased between April 2006 and November 2019 and were funded primarily through sales of L Bonds, as discussed in Note 10. Beginning in 2018, GWG Holdings consummated a series of transactions with Beneficient as part of

F-11

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

a strategic decision to reorient its business and increase capital allocated toward providing liquidity products to a broader range of alternative assets through investments in Beneficient. GWG Holdings completed the transactions with Beneficient to provide the Company with a significant increase in assets and common stockholders' equity as well as the opportunity for a diversified source of future earnings from our exposure to the alternative asset industry. We believe that GWG Holdings' and GWG Life's investments in Beneficient and the other strategies we are pursuing, including continuing to pursue opportunities in the life insurance industry, will transform GWG Holdings from a niche provider of liquidity to owners of life insurance policies to a diversified provider of financial products and services with exposure to a broad range of alternative assets.

We believe that Beneficient's operations will generally produce higher risk-adjusted returns than those we can achieve from life insurance policies acquired in the secondary market; however, returns on equity in life settlements, especially with the current availability of financings on favorable terms, appear to be an attractive option to diversify our exposure to alternative assets, and we have begun exploring the feasibility of acquiring such policies. Furthermore, although we believe that our portfolio of life insurance policies is a meaningful component of a growing diversified alternative asset portfolio, we continue to explore strategic alternatives for our life insurance portfolio aimed at maximizing its value, including a possible sale, refinancing, recapitalization, partnership, reinsurance guarantees, life insurance operations or other transactions involving of our life insurance portfolio, as well as pursuing other alternatives to increase our exposure to alternative assets. These operations are in addition to allocating capital to provide liquidity to holders of a broader range of alternative assets, which we currently provide through GWG Holdings' and GWG Life's investments in Beneficient.

Beneficient is a financial services company based in Dallas, Texas that markets an array of liquidity and trust administration products to alternative asset investors primarily comprised of mid-to-high-net-worth individuals having a net worth between $5 million and $30 million ("MHNW") and small-to-midsize institutional investors and family offices with less than $1 billion in investable assets ("STMIs"). One of Beneficient's founders, Brad K. Heppner ("Ben Founder") serves as Chairman and Chief Executive Officer of Beneficient and previously served from April 26, 2019 to June 14, 2021 as Chairman of GWG Holdings. Ben LP plans to offer its products and services through its five operating subsidiaries, which include (i) Ben Liquidity, (ii) Ben Custody Admin, (iii) Ben Insurance, (iv) Ben Markets and (v) Beneficient USA (each operating subsidiary is further defined below). Ben Liquidity plans to operate a trust company that is a Kansas Technology Enabled Fiduciary Financial Institutions ("TEFFI") authorized to serve as an alternative asset custodian, trustee and lender with statutory powers granted for each of these activities and permitting Ben Liquidity to provide fiduciary financing for certain of its customer liquidity transactions. Ben Custody Admin plans to operate a Texas trust company that is being organized to provide its customers with certain administrative, custodial and trustee products and specialized services focused on alternative asset investors. Ben Insurance has been chartered as a Bermuda based insurance company that plans to offer certain customized insurance products and services covering risks relating to owning, managing and transferring alternative assets. Ben Markets is in the regulatory process for acquiring a captive registered broker-dealer that would conduct certain of its activities attendant to offering a suite of products and services from the Beneficient family of companies. Certain of Ben LP's operating subsidiary products and services involve or are offered to certain of the ExAlt Trusts (defined below), which are consolidated subsidiaries of Ben LP for financial reporting purposes (such trusts are and may individually be referred to as Custody Trusts, Collective Trusts, LiquidTrusts, and Funding Trusts). Beneficient USA employs a substantial majority of the executives and staff for Beneficient's operating subsidiaries to which Beneficient USA provides administrative and technical services.

Beneficient's primary operations, which commenced on September 1, 2017, consist of offering its liquidity and trust administration services to its customers, primarily through certain of Ben LP's operating subsidiaries, Ben Liquidity, L.L.C and its subsidiaries (collectively, "Ben Liquidity") and Ben Custody Admin, L.L.C. and its subsidiaries (collectively, "Ben Custody Admin"), respectively. Ben Liquidity offers simple, rapid and cost-effective liquidity products to its customers through the use of customized trust vehicles, (such trusts, the ExAlt Trusts), that facilitate the exchange of a customer's alternative assets for consideration using a unique financing structure (such structure and process, the "ExAlt Plan™"). The ExAlt Plan trademark was developed by Beneficient as a brand of liquidity and trust administration services designed for alternative asset investors, specifically MHNW and STMIs to "Ex"it "Alt"ernatives. A subsidiary of Ben Liquidity makes loans (each, an "ExAlt Loan") to certain of the ExAlt Trusts, which employ the loan proceeds to acquire agreed upon consideration, which certain of the ExAlt Trusts deliver to customers in exchange for their alternative assets. Ben Liquidity generates interest and fee income earned in connection with the ExAlt Loans, which are collateralized by a portion of the cash flows from the exchanged alternative assets (the "Collateral"). Ben Custody Admin currently provides trust administration services to the trustees of certain of the ExAlt Trusts that own the exchanged alternative asset following liquidity transactions for fees payable quarterly. The Collateral supports the repayment of the ExAlt Loans plus any related interest and fees and trust administration service fees. Under the applicable trust and other agreements, certain charities are

F-12

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

the ultimate beneficiaries of the ExAlt Trusts (the "Non-Controlling Interest Holders"). As ultimate beneficiaries of prior transactions, for every $0.95 paid to the lender (e.g., subsidiaries of Ben LP) on the ExAlt Loans, $0.05 is also paid to certain of the Non-Controlling Interest Holders. For periods following 2020, future Non-Controlling Interest Holders are structured to be paid $0.025 for every $0.975 paid to the fiduciary financial lender (e.g., subsidiaries of Ben LP) of the ExAlt Loans. Since Ben LP consolidates the ExAlt Trusts, Ben LP's operating subsidiary's ExAlt Loans and related interest and fee income are eliminated in the presentation of our consolidated financial statements but are recognized for purposes of the allocation of income (loss) to Beneficient's equity holders.

Prior to January 1, 2021, Ben LP operated primarily through certain of its subsidiaries, that included (i) Beneficient Capital Company, L.L.C. ("BCC"), which offered liquidity products; (ii) Beneficient Administration and Clearing Company, L.L.C. ("BACC"), which provided services for private fund and trust administration; and (iii) other entities, including the ExAlt Trusts.

On December 31, 2020, a series of restructuring transactions occurred to better position certain of Ben LP's subsidiaries for ongoing operations and future products and services, to capitalize PEN Indemnity Insurance Company, Ltd. ("Pen") and to meet certain requirements of the Texas Department of Banking. These transactions had no impact to the consolidated financial statements. In connection with these transactions, BCC transferred all of its assets, which included, among other assets, its ExAlt Loans receivable, and liabilities, which included, among other liabilities, loans payable with respect to secured loans with HCLP Nominees, L.L.C., held as of December 31, 2020, to BCH. In order to capitalize Pen and enable it to offer insurance products and services to cover risks attendant to owning and managing alternative assets following approval from the Bermuda Monetary Authority (the "BMA"), BCH contributed to Pen certain of such ExAlt Loans receivable with an aggregate carrying value equal to $129.2 million. Likewise, BACC transferred all of its assets, which included its rights to perform fund trust administration services under certain trust and other agreements, and liabilities to BCH, which will perform such services until a Texas trust company charter is issued or the Kansas TEFFI trust company becomes operational.

Subsequent to December 31, 2020, Ben LP operates primarily through its business line operating subsidiaries, which provide, or will provide, Beneficient's existing and planned products and services. These subsidiaries include (i) Ben Liquidity, which offers liquidity products; (ii) Ben Custody Admin, which provides services for fund and trust administration; (iii) Ben Insurance L.L.C., including its subsidiaries (collectively, "Ben Insurance"), which intends to offer insurance products and services covering risks attendant to owning, managing and transferring alternative assets; (iv) Ben Markets, L.L.C., including its subsidiaries (collectively, "Ben Markets"), which intends to provide broker-dealer services in connection with offering Beneficient's liquidity products and services; and (vi) other entities, including the ExAlt Trusts, which operate for the benefit of the Non-Controlling Interest Holders. Beneficient's financial products and services are presently offered through Ben Liquidity and Ben Custody Admin, and Beneficient plans to expand its capabilities under Ben Custody Admin and provide products and services through Ben Insurance and Ben Markets in the future.

Beneficient's existing and planned products and services are designed to provide liquidity and trust solutions, support the tax and estate planning objectives of its MHNW customers, facilitate asset diversification or provide administrative management and reporting solutions tailored to the goals of investors of alternative investments.

*Beneficient's Regulatory Developments*

In April 2021, the Kansas Legislature adopted, and the governor of Kansas signed into law, a bill that would allow for the chartering and creation of Kansas trust companies, known as TEFFIs, that provide fiduciary financing (e.g., lending to ExAlt Trusts), custodian and trustee services in all capacities pursuant to statutory fiduciary powers, to investors and other participants in the alternative assets market, as well as the establishment of alternative asset trusts. The legislation became effective on July 1, 2021, and designates an operating subsidiary of Ben LP, Beneficient Fiduciary Financial ("BFF"), as the pilot trust company under the TEFFI legislation. A conditional trust charter was issued by the Kansas Bank Commissioner to Beneficient on July 1, 2021 as discussed further in Note 23. Under the pilot program, Beneficient will not be authorized to exercise its fiduciary powers as a TEFFI until the earlier of the date the Kansas Bank Commissioner promulgates applicable rules and regulations or December 31, 2021. The bill also permits the Kansas Bank Commissioner to request a six-month extension of the pilot program period, which could delay Beneficient's permission to exercise its fiduciary powers under the charter until July 1, 2022. In order to devote their time to serving as directors of the Beneficient TEFFI trust company, the directors of GWG Holdings who serve on the new TEFFI trust company Board of Directors resigned their membership, effective June 14, 2021, on GWG Holdings' Board of Directors, which the Company believes is the highest and best use of

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

their available time and skills and will support the development of the Beneficient TEFFI trust company and the successful execution of Beneficient's business plan.

Also, Beneficient's charter application for custodian and trustee services remains in process at the Texas Department of Banking. If the charter is issued, the trust company would serve as custodian and trustee to one or more ExAlt Trusts. Similar or the same services may also be provided by Beneficient's Kansas trust company TEFFI. Also, a subsidiary of Ben Insurance, Pen has applied for regulatory approval from the BMA to write fiduciary liability policies for managers and investors in alternative asset funds to cover losses from contractual indemnification and exculpation provisions arising under the governing documents of such funds. Further, on March 26, 2021, a Ben LP subsidiary, Beneficient Capital Markets, L.L.C ("Beneficient Capital Markets") filed a Form BD with the Securities and Exchange Commission ("SEC") to commence its application for broker-dealer registration. Upon registration and admittance as a Financial Industry Regulatory Authority ("FINRA") member, Beneficient Capital Markets will conduct activities attendant to offering Beneficient's products and services.

When the Kansas TEFFI trust company is authorized to exercise its fiduciary powers, Beneficient expects to be able to expand its operations and close an increased number of liquidity transactions. Additionally, once BMA regulatory approval is obtained and Beneficient Capital Markets is admitted as a FINRA member, Beneficient anticipates being able to offer its full suite of products and services.

**The Exchange Transaction**

On December 28, 2018 (the "Final Closing Date"), we completed a series of strategic exchanges of assets among GWG Holdings, GWG Life, Ben LP and certain trusts, each identified as an Exchange Trust formed during 2017 and 2018 (such trusts collectively, the "Seller Trusts", which are a related party but are not among Ben LP's consolidated trusts), pursuant to a Master Exchange Agreement among the parties (the "Exchange Transaction"). As a result of the Exchange Transaction, a number of securities were exchanged between the parties, including the following securities as of the Final Closing Date: the Seller Trusts acquired GWG Holdings' L Bonds due 2023 (the "Seller Trust L Bonds") in the aggregate principal amount of $366.9 million; the Seller Trusts acquired 27,013,516 shares of GWG Holdings' common stock; GWG Holdings acquired 40,505,279 common units of Ben LP (the "Common Units"); and GWG Holdings acquired the right to obtain additional Common Units or other property that would be received by a holder of Preferred Series A Subclass 1 Unit Accounts of BCH pursuant to an option issued by Ben LP (the "Option Agreement"). In addition, in connection with the Exchange Transaction, Ben LP, as borrower, entered into a commercial loan agreement (the "Commercial Loan Agreement") with GWG Life, as lender, providing for a loan in a principal amount of $192.5 million as of the Final Closing Date (the "Commercial Loan").

***Description of the Assets Exchanged***

*Seller Trust L Bonds*

On August 10, 2018, in connection with the initial transfer of the Exchange Transaction, GWG Holdings, GWG Life and Bank of Utah, as trustee, entered into a Supplemental Indenture (the "L Bond Supplemental Indenture") to the Amended and Restated Indenture dated as of October 23, 2017 (the "Amended and Restated Indenture"). GWG Holdings entered into the L Bond Supplemental Indenture to add and modify certain provisions of the Amended and Restated Indenture necessary to provide for the issuance of the Seller Trust L Bonds. The maturity date of the Seller Trust L Bonds is August 9, 2023. The Seller Trust L Bonds bear interest at 7.5% per year. Interest is payable monthly in cash.

As the second anniversary of the Final Closing Date has passed, the holders of the Seller Trust L Bonds now have the right to cause GWG Holdings to repurchase, in whole but not in part, the Seller Trust L Bonds held by such holder. The repurchase may be paid, at GWG Holdings' option, in the form of cash, a pro rata portion of (i) the outstanding principal amount and accrued and unpaid interest under the Commercial Loan, and (ii) Common Units, or a combination of cash and such property.

The Seller Trust L Bonds are senior secured obligations of GWG Holdings, ranking junior only to all senior debt of GWG Holdings, pari passu in right of payment and in respect of collateral with all "L Bonds" of GWG Holdings, and senior in right of payment to all subordinated indebtedness of GWG Holdings. See Note 10 for additional discussion of the outstanding debt of GWG Holdings. Payments under the Seller Trust L Bonds are guaranteed by GWG Life (see Item 7. *Management's Discussion and Analysis of Financial Condition and Results of Operations*).

F-14

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

As result of the Collateral Swap (discussed and defined below) on September 30, 2020, $94.8 million of Seller Trusts L Bonds are eliminated upon consolidation.

*Commercial Loan*

The $192.5 million principal amount under the Commercial Loan is due on August 9, 2023; however, it is extendable for two five-year terms. Ben LP's obligations under the Commercial Loan are unsecured.

The principal amount of the Commercial Loan bears interest at 5.0% per year. From and after the Final Closing Date, one-half of the interest, or 2.5% per year, is due and payable monthly in cash, and one-half of the interest, or 2.5% per year, accrues and compounds annually on each anniversary date of the Final Closing Date and becomes due and payable in full in cash on the maturity date.

In accordance with the L Bond Supplemental Indenture governing the issuance of the Seller Trust L Bonds, upon a redemption event or at the maturity date of the Seller Trust L Bonds, GWG Holdings, at its option, may use the outstanding principal amount of the Commercial Loan, and accrued and unpaid interest thereon, as repayment consideration of the Seller Trust L Bonds.

The Commercial Loan and its related interest are eliminated upon consolidation.

*Option Agreement*

In connection with the Exchange Transaction, GWG Holdings entered into the Option Agreement with Ben LP. The Option Agreement gave GWG Holdings the option to acquire the number of Common Units or other property that would be received by the holder of Preferred Series A Subclass 1 Unit Accounts of BCH pursuant to an option issued by Ben LP, if such holder were converting on that date. There was no exercise price and GWG Holdings could exercise the option at any time until December 27, 2028, at which time the option automatically settled.

Effective August 11, 2020, as a result of the Exchange Agreement entered into by the parties on December 31, 2019 (discussed below), and the mutual agreement of the parties, the Option Agreement was exercised under the provisions of the Option Agreement. As such, GWG Holdings received $57.5 million of Common Units at a price per unit equal to $12.50 per unit. The exercise of the Option Agreement had no impact on the Company's consolidated financial statements as it is eliminated in consolidation.

*Common Units of Ben LP*

In connection with the Exchange Transaction, the Seller Trusts and Beneficient delivered to GWG Holdings 40,505,279 Common Units. These units represented an approximate 89.9% interest in the Common Units as of the Final Closing Date (although, on a fully diluted basis, GWG Holdings' ownership interest in Common Units would be reduced significantly below a majority of those issued and outstanding). These amounts eliminate upon consolidation.

**Purchase and Contribution Agreement**

On April 15, 2019, Jon R. Sabes, the former Chief Executive Officer and a former director of GWG Holdings, and Steven F. Sabes, the former Executive Vice President and a former director of GWG Holdings, entered into a Purchase and Contribution Agreement (the "Purchase and Contribution Agreement") with, among others, Ben LP. Under the Purchase and Contribution Agreement, Jon and Steven Sabes agreed to transfer all 3,952,155 of the shares of GWG Holdings' outstanding common stock held directly or indirectly by them to BCC (a subsidiary of Ben LP) and AltiVerse Capital Markets, L.L.C. ("AltiVerse"). AltiVerse is a limited liability company owned by an entity related to Beneficient's initial investors (the "Ben Initial Investors"), including Brad K. Heppner (GWG Holdings' former Chairman, who served in such capacity from April 26, 2019 to June 14, 2021, and Beneficient's current Chief Executive Officer and Chairman), and an entity related to Thomas O. Hicks (one of Beneficient's current directors and a former director of GWG Holdings). GWG Holdings was not a party to the Purchase Agreement; however, the closing of the transactions contemplated by the Purchase and Contribution Agreement (the "Purchase and Contribution Transaction") were subject to certain conditions that were dependent upon GWG Holdings taking, or refraining from taking, certain actions. The closing of the Purchase and Contribution Transaction occurred on April 26, 2019.

App. 1243

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

In connection with such closing, BCC and AltiVerse executed and delivered a Consent and Joinder to the Amended and Restated Pledge and Security Agreement dated October 23, 2017 by and among GWG Holdings, GWG Life, Messrs. Jon and Steven Sabes and the Bank of Utah, which provides that the shares of GWG Holdings' common stock acquired by BCC and AltiVerse pursuant to the Purchase and Contribution Agreement will continue to be pledged as collateral security for GWG Holdings' obligations owing in respect of the L Bonds and Seller Trust L Bonds.

**Promissory Note - ExAlt Trusts**

On May 31, 2019, GWG Life entered into a Promissory Note (the "Promissory Note"), made by Jeffrey S. Hinkle and Dr. John A. Stahl, not in their individual capacity but solely as trustees of certain of The LT-1 LiquidTrust, The LT-2 LiquidTrust, The LT-5 LiquidTrust, The LT-7 LiquidTrust, The LT-8 LiquidTrust, and The LT-9 LiquidTrust, (collectively, the "Borrowers"). Pursuant to the terms of the Promissory Note, GWG Life funded a term loan to the Borrowers in an aggregate principal amount of $65.0 million (the "Loan"). The Loan was made pursuant to GWG's strategy to further diversify into alternative assets (beyond life insurance) and ancillary businesses and was intended to better position Beneficient's balance sheet, working capital and liquidity profile to satisfy anticipated Texas Department of Banking regulatory requirements. The Loan bears interest at 7.0% per annum, with interest payable at maturity, and matures on June 30, 2023. As of December 31, 2019, the Borrowers became consolidated subsidiaries of GWG Holdings as a result of the Investment Agreement (described below). Accordingly, the Promissory Note and related accrued interest, are eliminated upon consolidation as of that date.

On September 30, 2020, GWG Holdings, GWG Life, BCH, Ben LP, BCC, and the Borrowers entered into an agreement (the "Promissory Note Repayment") by which the parties agreed to repay the Promissory Note and any related accrued interest for a $75.0 million Preferred Series C Unit Account (the "Preferred C") of BCH that Ben LP issued to the Borrowers. The $75.0 million of Preferred C received by GWG Life was transferred to GWG Holdings upon execution of the Promissory Note conversion, which increased GWG Holdings' ownership percentage in Ben LP. As part of the agreement, if Beneficient has not received a trust company charter as of the one-year anniversary of the Promissory Note conversion, or if no trust company charter filing is still pending or in the process of being refiled, GWG Holdings would receive an additional $5.0 million of Preferred C. The carrying value of the Promissory Note on September 30, 2020, immediately prior to the transaction, net of a fair value adjustment and with accrued and unpaid interest thereon, was $65.1 million.

Other than the $8.1 million decrease to noncontrolling interest, which represents the required rebalancing of equity driven from the change in GWG Holdings' ownership percentage, any impacts of the Promissory Note conversion are eliminated upon consolidation.

**The Investment and Exchange Agreements**

On December 31, 2019, GWG Holdings obtained control over Ben LP pursuant to a Preferred Series A Unit Account and Common Unit Investment Agreement, by and among GWG Holdings, Ben LP, BCH, and Beneficient Management (the "Investment Agreement"), which resulted in the consolidation of GWG Holdings and Ben LP for accounting and financial reporting purposes.

Pursuant to the Investment Agreement, GWG Holdings transferred $79.0 million to Ben LP in return for 666,667 Common Units and a Preferred Series A Subclass 1 Unit Account of BCH.

In connection with the Investment Agreement, GWG Holdings obtained the right to appoint a majority of the board of directors of Beneficient Management, the general partner of Ben LP. As a result, GWG Holdings obtained control of Ben LP and began reporting the results of Ben LP and its subsidiaries on a consolidated basis beginning on the transaction date of December 31, 2019. See Note 4 for more details on the accounting for the consolidation. GWG Holdings' right to appoint a majority of the board of directors of Beneficient Management will terminate in the event (i) GWG Holdings' ownership of the fully diluted equity of Ben LP (excluding equity issued upon the conversion or exchange of Preferred Series A Unit Accounts of BCH held as of December 31, 2019 by parties other than GWG Holdings) is less than 25%, (ii) the Continuing Directors of GWG Holdings cease to constitute a majority of the board of directors of GWG Holdings, or (iii) certain bankruptcy events occur with respect to GWG Holdings. The term "Continuing Directors" means, as of any date of determination, any member of the board of directors of GWG Holdings who: (1) was a member of the board of directors of GWG Holdings on December 31, 2019; or (2) was nominated for election or elected to the board of directors of GWG

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Holdings with the approval of a majority of the Continuing Directors who were members of the board of directors of GWG Holdings at the time of such nomination or election.

Following the transaction, and as agreed upon in the Investment Agreement, GWG Holdings was issued an initial capital account balance for the Preferred Series A Subclass 1 Unit Account of $319.0 million. The other holders of the Preferred Series A Subclass 1 Unit Accounts are an entity related to the Ben Initial Investors and an entity related to one of Beneficient's directors who is also a former director of GWG Holdings (the "Related Account Holders"). The parties to the Investment Agreement agreed that the aggregate capital accounts of all holders of the Preferred Series A Subclass 1 Unit Accounts after giving effect to the investment by GWG Holdings was $1.6 billion. GWG Holdings' Preferred Series A Subclass 1 Unit Account is the same class of preferred security as held by the Related Account Holders. If the Related Account Holders exchange their Preferred Series A Subclass 1 Unit Accounts for securities of GWG Holdings, the Preferred Series A Subclass 1 Unit Account of GWG Holdings would be converted into Common Units (so neither GWG Holdings nor the founders would hold Preferred Series A Subclass 1 Unit Accounts).

Also, on December 31, 2019, in a transaction related to the Investment Agreement, GWG Holdings transferred its interest in the Preferred Series A Subclass 1 Unit Account to its wholly owned subsidiary, GWG Life.

In addition, on December 31, 2019, GWG Holdings, Ben LP and the holders of Common Units entered into an Exchange Agreement (the "Exchange Agreement") pursuant to which the holders of Common Units from time to time have the right, on a quarterly basis, to exchange their Common Units for common stock of GWG Holdings. The exchange ratio in the Exchange Agreement is based on the ratio of the capital account associated with the Common Units to be exchanged to the market price of GWG Holdings' common stock based on the volume weighted average price of GWG Holdings' common stock for the five consecutive trading days prior to the quarterly exchange date. The Exchange Agreement is intended to facilitate the marketing of Ben LP's products to holders of alternative assets.

**Preferred Series C Unit Purchase Agreement**

On July 15, 2020, GWG Holdings entered into a Preferred Series C Unit Purchase Agreement ("UPA") with Ben LP and BCH. The UPA was reviewed and approved by the then constituted independent Special Committee of the Board of Directors of GWG Holdings.

Pursuant to the UPA, and provided it has adequate liquidity, GWG Holdings has agreed to make capital contributions from time to time to BCH in exchange for Preferred Series C Unit Accounts of BCH during a purchasing period commencing on the date of the UPA and continuing until the earlier of (i) the occurrence of a Change of Control Event (as defined below) and (ii) the mutual agreement of the parties (the "Purchasing Period"). A "Change of Control Event" shall mean (A) the occurrence of an event that results in GWG Holdings' ownership of the fully diluted equity of Ben LP is less than 25%, the Continuing Directors (as defined below) of GWG Holdings cease to constitute a majority of the board of directors of GWG Holdings, or certain bankruptcy events occur with respect to GWG Holdings, and (B) the listing of Common Units on a national securities exchange (a "Public Listing"). The term "Continuing Directors" means, as of any date of determination, any member of the board of directors of GWG Holdings who: (1) was a member of the board of directors of GWG Holdings on December 31, 2019; or (2) was nominated for election or elected to the board of directors of GWG Holdings with the approval of a majority of the Continuing Directors who were members of the board of directors of GWG Holdings at the time of such nomination or election.

If, on or prior to the end of the Purchasing Period, a Public Listing occurs, the BCH Purchased Units shall be automatically exchanged for Common Units, or another unit of Ben LP, as the parties may mutually agree (the "Beneficient Units"), at the lower of (i) the volume-weighted average of the Beneficient Units for the 20 trading days following the Public Listing, and (ii) $12.75.

In addition, at any time following the Effective Date, all or some of the Preferred Series C Unit Accounts purchased under the UPA may be exchanged for Beneficient Units at the option of GWG Holdings (exercised by a special committee of the Board of Directors or, if such committee is no longer in place, the appropriate governing body of GWG Holdings); provided that, if GWG Holdings exchanges less than all of the Preferred Series C Unit Accounts purchased under the UPA, then, immediately after giving effect to such exchange, GWG Holdings shall be required to continue to hold Preferred Series C Unit Accounts with a capital account that is at least $10.0 million. The exchange price for such Beneficient Units shall be determined by third-party valuation agents selected by GWG Holdings and Beneficient.

10-17

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Contribution and Exchange Agreement**

On September 30, 2020, certain of the ExAlt Trusts (collectively, the "Participating ExAlt Trusts"), at the sole direction of John A. Stahl, independent trustee of each such trust, with the intention of protecting the value of certain assets of the Participating ExAlt Trusts underlying part of the Collateral portfolio, the Participating ExAlt Trusts entered into that certain Contribution and Exchange Agreement with certain of the Seller Trusts, (collectively, the Participating Exchange Trusts), each of which entered into such agreement at the direction of its applicable trust advisor and by and through its applicable corporate trustee (the "Contribution and Exchange Agreement). Under the Contribution and Exchange Agreement, the Participating Exchange Trusts agreed to exchange 9,837,264 shares of GWG Holdings' common stock valued at $84.6 million, 543,874 shares of Common Units valued at $6.8 million, and GWG Holdings' L Bonds due 2023 in the aggregate principal amount of $94.8 million to the Participating ExAlt Trusts for $94.3 million in net asset value of the alternative asset investments held by the Participating ExAlt Trusts. This transaction (the "Collateral Swap") resulted in GWG Holdings, after the effects of eliminations upon consolidation, recognizing an additional $42.9 million of treasury stock, $3.4 million of additional noncontrolling interest, and $46.8 million of a deemed capital contribution from a related party.

The Exchange Transaction, the Purchase and Contribution Transaction, the Promissory Note, the Investment and Exchange Agreements, the UPA, and the Collateral Swap, are referred to collectively as the "Beneficient Transactions."

**Going Concern**

To meet the Company's future capital needs, the Company may need to raise additional debt or equity financing. While the Company has historically been able to raise additional capital through issuance of debt and/or equity, the Company cannot guarantee that it will be able to secure additional financing or will otherwise be able to meet is ongoing obligations. These factors, in combination with the potential NASDAQ delisting and our current inability to sell L Bonds as discussed below under the heading "Liquidity and Capital Resources", our significant recurring losses from operations, negative cash flows from operations, delays in executing our business plans, and any potential negative outcome from the ongoing SEC investigation discussed elsewhere in this Form 10-K and in Note 18 to these consolidated financial statements, raise substantial doubt about the Company's ability to continue as a going concern within one year after these financial statements are issued.

The accompanying consolidated financial statements have been prepared on a going concern basis, which contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

**Liquidity and Capital Resources**

As of December 31, 2020, we had cash, cash equivalents, and restricted cash of $124.2 million. We generated net losses from operations for the years ended December 31, 2020 and 2019 totaling $208.5 million and $151.5 million. As of October 15, 2021, we had combined cash, cash equivalents, and restricted cash of $54.3 million. Besides funding operating expenditures, we are obligated to pay other items such as interest payments and debt maturities, and preferred stock dividends and redemptions.

We have historically financed our businesses primarily through a combination of L Bond sales, preferred stock sales, the LNV Credit Facility (as discussed further in Note 10) , and the NF Credit Facility (as discussed further in Note 23). We have also financed our business through proceeds from life insurance policy benefit receipts, cash distributions from the ExAlt Trusts' alternative asset portfolio, dividends and interest on investments, and Beneficient's debt due to related parties. We have traditionally used proceeds from these sources for policy acquisition, policy premiums and servicing costs, working capital and financing expenditures including paying principal, interest and dividends. We have also used proceeds to allocate capital to Beneficient; however, if Ben LP becomes an independent company pursuant to the terms of the Term Sheet discussed above and in Note 23, the Company expects that Ben LP would reduce its reliance on GWG Holdings to fund its operations and would raise future capital from other sources. Ben LP's capital raising efforts and participation in liquidity transactions may include the issuance of equity or debt of Ben LP or one of its subsidiaries, and the newly issued securities may be dilutive to GWG Holdings' and GWG Life's investments in Ben LP and BCH and may include preferential terms relative to GWG Holdings' and GWG Life's investments in Ben LP and BCH, as applicable.

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

We currently fund our business primarily with debt that generally has a shorter duration than the duration of our long-term assets. The resulting asset/liability mismatch can result in a liquidity shortfall if we are unable to renew maturing short term debt or secure suitable additional financing. In such a situation, we could be forced to sell assets at less than optimal (distressed) prices. Substantially all of our life insurance policies are pledged as collateral under the LNV Credit Facility and the NF Credit Facility and we would not be able to dispose of them without compliance with the terms of those credit facilities. We heavily rely on GWG Holdings' L Bond offering to fund our business operations, including, among other things, interest and principal payments on the existing L Bonds and capital allocations to Beneficient. We temporarily suspended the offering of GWG Holdings' L Bonds, commencing April 16, 2021, as a result of our delay in filing certain periodic reports with the SEC, including this 2020 Form 10-K, and were required to seek alternative sources of capital.

As a result of the suspension of GWG Holdings' L Bond offering, on June 28, 2021, we pledged additional life insurance policies as collateral and received an additional advance of $51.2 million under the Third Amended Facility. Subsequently, on August 11 2021, we entered into the NF Credit Agreement and received a one-time advance of $107.6 million. Approximately $56.7 million of such advanced amount was used to pay off the remaining amount due, including interest and penalties, under the Third Amended Facility and the additional pledged life insurance policies used as collateral for the Third Amended Facility were released and pledged under the NF Credit Facility. Further, on September 7, 2021, DLP IV entered into the Fourth Amended Facility, that replaced the aforementioned Third Amended Facility. The Fourth Amended Facility resulted in an additional advance of $30.3 million from LNV Corporation, with no additional pledged collateral. All of the aforementioned transactions that occurred subsequent to December 31, 2020, are described in more detail in Note 23.

Primarily due to the current suspension of GWG Holdings' L Bond offering, the Company may require additional capital to continue its operations over the next twelve months if our ability to sell L Bonds dissipates, or if we are forced to suspend the L Bond offering. However, the Company may not be able to obtain additional borrowings under existing debt facilities or new borrowings with other third-party lenders. To the extent that GWG Holdings or its subsidiaries raise additional capital through the future issuance of debt, the terms of those debt securities may include terms that adversely affect the rights of our existing debt and/or equity holders or involve negative covenants that restrict GWG Holdings' ability to take specific actions, such as incurring additional debt or making additional investments in growing the operations of the Company. If GWG Holdings is unable to fund its operations and other obligations, or defaults on its debt, then the Company will be required to either i) sell assets to provide sufficient funding, ii) exercise our right to decline requests for early L Bond redemptions or redemptions of preferred stock, or iii) to raise additional capital through the sale of equity and the ownership interest of our equity holders may be diluted. Substantially all of our life insurance policies are pledged as collateral under the LNV Credit Facility and the NF Credit Facility and we would not be able to dispose of them without compliance with the terms of those credit facilities.

We anticipate recommencing the offering of GWG Holdings' L Bonds once we become current with our filing obligations and satisfy applicable NASDAQ listing requirements. Once we become current with our filing obligations with respect to the L Bonds, we may be limited in the origination channels in which we sell our L Bonds in the event that we are unable to meet the applicable NASDAQ listing requirements in a timely manner, which could result in the L Bonds no longer being "covered securities" for federal securities law purposes which would subject the offer and sale of L Bonds to potentially extensive state "blue sky" securities law requirements. If for any reason we are forced to suspend GWG Holdings' L Bond offering, are limited in our origination channels in which we sell our L Bonds, or demand for GWG Holdings' L bonds dissipates, our business would be adversely impacted and our ability to service and repay our debt obligations, much of which is short term, would be compromised, thereby negatively affecting our business prospects and viability.

We had $97.4 million borrowing base capacity, excluding any potential capacity for premiums and servicing costs, under the LNV Credit Facility as of December 31, 2020. Additional future borrowing base capacity for premiums and servicing costs, created as the premiums and servicing costs of pledged life insurance policies become due and by additional policy pledges to the facility, if any, exists under the LNV Credit Facility at the sole discretion of the lender. The LNV Credit Facility has certain financial and nonfinancial covenants, and we were in compliance with these debt covenants as of December 31, 2020, and December 31, 2019, and continue to be so as of the filing date of this report. Subsequent to December 31, 2020, we received additional advances through amendments to the LNV Credit Facility and entered in to the NF Credit Facility (as described in more detail above and in Note 23).

Beneficient is obligated to make debt payments totaling $74.5 million on certain outstanding borrowings through May 30, 2022 under the terms of the Amendment No. 1 to the Second Amended and Restated Credit Agreements as discussed further in Note 23. Primarily due to both the forthcoming debt payments under the Credit Agreement and Second Lien Credit

F-19

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Agreement and the anticipated deconsolidation of Beneficient from GWG Holdings, as discussed in Note 23, which is expected to result in reduced reliance by Beneficient on GWG Holdings to fund its operations, Beneficient will require additional liquidity to continue its operations over the next twelve months. We expect Beneficient to satisfy these obligations and fund its operations through anticipated operating cash flows, proceeds from distributions on the alternative assets portfolio, additional investments into Beneficient by GWG Holdings and/or other parties and, potentially refinancing with other third-party lenders some or all of the existing borrowings due prior to their maturity. Beneficient is currently in the process of raising additional equity, which is anticipated to close during the fourth quarter of 2021 and/or the first quarter of 2022.

Beneficient may not be able to refinance or obtain additional financing on terms favorable to the Company, or at all. To the extent that Beneficient raises additional capital through the future sale of equity or debt, the ownership interest of its existing equity holders may be diluted. The terms of these future equity or debt securities may include liquidation or other preferences that adversely affect the rights of its existing equity unitholders or involve negative covenants that restrict Beneficient's ability to take specific actions, such as incurring additional debt or making additional investments in growing its operations. If Beneficient defaults on these borrowings, then it will be required to either i) sell assets to repay these loans or ii) to raise additional capital through the sale of equity and the ownership interest of our equity holders may be diluted. Moreover, if Beneficient were to sell assets to avoid a default of these borrowings, then the price at which Beneficient sold such assets may not reflect the carrying value of those assets as reflected in our consolidated financial statements, especially in the event of a bulk or distressed sale.

On November 11, 2019, GWG Holdings contributed the common stock and membership interests of its then wholly-owned FOXO Labs and FOXO Life subsidiaries to FOXO in exchange for a membership interest in the entity. On November 13, 2020, FOXO BioScience LLC converted to a corporation and is now known as FOXO Technologies Inc. With the corporate conversion, GWG Holdings' previous membership interest in the LLC converted to preferred equity. GWG Holdings has contributed $16.2 million in cash to FOXO through December 31, 2020, and is committed to contribute an additional $3.8 million to the entity through October 2021, all of which was contributed by such date.

**(2) Summary of Significant Accounting Policies**

**Restatement** — The Company is restating its previously issued (i) consolidated balance sheet as of December 31, 2019, (ii) the consolidated statement of operations, (iii) the consolidated statement of changes in stockholders' equity, and (iv) the consolidated statement of cash flows for the year ended December 31, 2019, included in its Annual Report on Form 10-K for the year ended December 31, 2019, (the "Restatement"). The Restatement also impacted each of the quarters for the periods beginning with GWG Holdings, Inc.'s consolidation with The Beneficient Company Group, L.P. ("Ben LP," including all of the subsidiaries it may have from time to time — "Beneficient") as of December 31, 2019 through the quarter ended September 30, 2020.

The impact of the Restatement is included in this 2020 Form 10-K, and is more specifically described in Notes 21 and 22. Additionally, the impacts of the Restatement have been reflected throughout the financial statements, including the applicable footnotes.

**Other Corrections** — In addition to the Restatement items, the Company has corrected other items, which had been previously identified and determined to be immaterial pursuant to Accounting Standards Codification ("ASC") Topic 250, *Accounting Changes and Error Corrections* and Staff Accounting Bulletin ("SAB") No. 99, *Materiality*. While these other adjustments are both quantitatively and qualitatively immaterial, individually and in the aggregate, because we are correcting for the Restatement items, we have decided to correct these other adjustments as well.

Specifically, the Company reassessed its valuation allowance against its deferred tax assets and determined it will no longer utilize the reversal of a temporary difference related to the Company's preferred equity ownership in Beneficient, until such time as the preferred equity is no longer constrained, as a source of income to realize existing deferred tax assets related to the net operating loss and Section 163(j) limitations. The net deferred tax liability presented in the Company's consolidated balance sheets is specifically related to GWG Life's investment in the Preferred Series A Subclass 1 Unit Accounts resulting from the Investment Agreement described in Note 1. The disposition of this investment is constrained by the Pledge and Security Agreement in favor of the holders of the L Bonds of GWG Holdings. As such, the timing of recognition of the necessary taxable income related to this investment and the future reversal of this temporary difference cannot be predicted. The changes in the valuation allowance are reflected in the restatement tables presented in Notes 21 and 22.

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Basis of Presentation** — The consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP").

**Principles of Consolidation** — The consolidated financial statements include the accounts of GWG Holdings, Inc. and its subsidiaries. All material intercompany balances and transactions have been eliminated upon consolidation. Noncontrolling interests have been recorded for minority ownership in entities that are not wholly owned and are presented in compliance with the provisions of the *Noncontrolling Interest in Subsidiary* subsections of the Accounting Standards Codification ("ASC").

The Company has interests in various entities including, but not limited to, corporations and limited partnerships. For each such entity, the Company evaluates its ownership interest to determine whether the entity is a variable interest entity ("VIE") and, if so, whether it is the primary beneficiary of the VIE. The Company would consolidate any entity for which it was the primary beneficiary, regardless of its ownership or voting interests. Upon inception of a variable interest or the occurrence of a reconsideration event, the Company makes judgments in determining whether entities in which it invests are VIEs. If so, the Company makes judgments to determine whether it is the primary beneficiary and is thus required to consolidate the entity. Ownership interests in entities for which the Company has significant influence that are not consolidated under the Company's consolidation policy are accounted for as equity method investments.

The entities for which the ExAlt Plan Trusts hold an ownership interest are investment companies (i.e., funds) under ASC 946. Thus, the investments in non-investment companies made by these funds are accounted for in accordance with ASC 946 and are not subject to consolidation or the disclosure requirements of ASC 810. Moreover, further consolidation provisions of ASC 946 are not applicable to Beneficient since these investment companies do not have an investment in an operating entity that provides services to the investment company or to Beneficient.

Related party transactions between the Company and its equity method investees have not been eliminated.

**Use of Estimates** — The preparation of our consolidated financial statements in conformity with GAAP requires management to make significant estimates and assumptions affecting the reported amounts of assets and liabilities at the date of the consolidated financial statements, as well as the reported amounts of revenue during the reporting period. Management regularly evaluates estimates and assumptions, which are based on current facts, historical experience, management's judgment, and various other factors that we believe to be reasonable under the circumstances. Our actual results may differ materially and adversely from our estimates. Material estimates that are particularly susceptible to change, in the near term, relate to: (1) determining the assumptions used in estimating the fair value of our investments in life insurance policies, (2) determining the grant date fair value for equity-based compensation awards, (3) determination of the allowance for loan losses as an input to the allocation of income (loss) to Beneficient's equity holders, and (4) evaluation of potential impairment of goodwill and other intangibles. Periodically, we make significant estimates in assessing the fair value of assets acquired and consideration given in return for those assets, which are used to establish the initial recorded values of such assets in accordance with ASC 805, *Business Combinations*. Under ASC 805, the consideration paid in an asset acquisition is allocated among the assets acquired based on their relative fair values at acquisition date. In relation to the Investment and Exchange Agreements, relative fair values obtained from a third-party valuation firm were used to calculate the amounts recorded for the assets acquired and liabilities assumed at their acquisition dates as more fully described in Note 4.

**Cash and Cash Equivalents** — We consider cash in demand deposit accounts and temporary investments purchased with an original maturity of three months or less to be cash equivalents. We maintain our cash and cash equivalents with highly rated financial institutions. The balances in our bank accounts may exceed Federal Deposit Insurance Corporation limits. We periodically evaluate the risk of exceeding insured levels and may transfer funds as we deem appropriate.

Cash, cash equivalents and restricted cash on our consolidated statements of cash flows include cash and cash equivalents and restricted cash of $85.2 million and $38.9 million and $82.3 million and $33.5 million as of December 31, 2020 and 2019, respectively. See Note 3 for a discussion of restrictions on cash.

**Investment in Life Insurance Policies, at Fair Value** — ASC 325-30, *Investments in Insurance Contracts*, permits a reporting entity to account for its investments in life insurance policies using either the investment method or the fair value method. We elected to use the fair value method to account for our life insurance policies. We initially record our purchase of life insurance policies at the purchase price, which is the amount paid for the policy, inclusive of all direct external fees and costs associated with the purchase. At each subsequent reporting period, we re-measure the investment at fair value in its

F-21

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

entirety and recognize the change in fair value as unrealized gain or loss in the current period, net of premiums paid, within gain (loss) on life insurance policies, net in our consolidated statements of operations.

We also recognize realized gain (or loss) from a life insurance policy upon one of the two following events: (1) our receipt of notice or verified mortality of the insured; or (2) our sale of the policy (upon filing of change-of-ownership forms and receipt of payment). In the case of mortality, the gain (or loss) we recognize is the difference between the policy benefits and the carrying value of the policy once we determine that collection of the policy benefits is reasonably assured. In the case of a policy sale, the gain (or loss) we recognize is the difference between the sale price and the carrying value of the policy on the date we receive sale proceeds.

Life insurance premium payments are considered operating cash flows and are included in the net income (loss) line item in the consolidated statements of cash flows. The portion of proceeds received from policy maturities that represents the carrying value of the policy is reported in return of investment for matured life insurance policies in the consolidated statements of cash flows.

**Life Insurance Policy Benefits Receivable, Net** — Our policy benefit receivables represent amounts due from insurance carriers for claims submitted on matured life insurance policies. Policy benefit receivables are recorded at the policy benefit amounts less reserves for estimated uncollectible amounts. Uncollectible policy benefits can result from challenges by the insurance carrier to the legal validity of the policy, typically related to the concept of insurable interest, or from liquidity or solvency problems at the insurance carrier (although policy benefits are senior to any other obligations of a carrier).

We reserve for policy benefits when it becomes probable that we will not collect the full amount of the policy benefit. The reserve requirements are based on the best facts available to us and are re-evaluated and adjusted as additional information becomes available. Uncollectible policy benefits are written off against the reserves when it is deemed that a policy amount is uncollectible. As of December 31, 2020 and 2019, there was no allowance for uncollectible life insurance policy benefits receivable.

**Other Assets** — Other assets consist of investment in put options, fixed assets, intangible assets, prepaid expenses, operating lease right-of-use assets, and other receivables.

**Investment in Alternative Assets, at Fair Value** — Investments in alternative assets represent the ownership interests in alternative assets, predominately private equity funds, held by certain of the ExAlt Trusts, either through direct ownership or a beneficial interest. ASC Topic 820, *Fair Value Measurement,* permits, as a practical expedient, to estimate the fair value of these types of investments based on the net asset value ("NAV") per share, or its equivalent, if the NAV of such investments is calculated in a manner consistent with the measurement principles of ASC 946, *Financial Services – Investment Companies*. The Company has elected to use NAV as a practical expedient to measure the fair value of these investments. These investments are valued based on the most recent available information, which typically has a delay due to the timing of financial information received from the individual investments. Accordingly, in determining the value of the investment, we may consider whether adjustments to the NAV are necessary in certain circumstances in which management is aware of material events that affect the value of the investments during the intervening period. Changes in NAV are recorded within investment income (loss) on our consolidated statements of operations.

**Equity Method Investments** — Other than the investments in alternative assets, which use NAV as a practical expedient, the Company accounts for investments in common stock or in-substance common stock in which we have the ability to exercise significant influence, but do not own a controlling financial interest, under the equity method of accounting. Investments within the scope of the equity method of accounting are initially measured at cost, including the cost of the investment itself and direct transaction costs incurred to acquire the investment. After the initial recognition of the investment at cost, we recognize income and losses from our investment by adjusting upward or downward the balance of our equity method investment on our consolidated balance sheet with such adjustments, if any, flowing through earnings (loss) from equity method investment on our consolidated statement of operations, in all cases adjusted to reflect amortization of basis differences, if any, and the elimination of intercompany gains and losses, if any. Cash distributions received from equity method investees are recorded as reductions to the investment balance and classified in the statement of cash flows using the cumulative earnings approach.

Equity method investments are reviewed for impairment whenever events or changes in circumstances indicate the carrying amount of the investment might not be recoverable. These circumstances can include, but are not limited to evidence that we

App. 1256

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

do not have the ability to recover the carrying amount, the inability of the investee to sustain earnings, a current fair value of the investment that is less than the carrying amount, and other investors ceasing to provide support or reducing their financial commitment to the investee. If the fair value of the investment is less than the carrying amount, and the investment will not recover in the near term, an other-than-temporary impairment may exist. We recognize a loss in value of an investment deemed other-than-temporary in the period the conclusion is made.

When we do not expect financial information of our equity method partner companies to be consistently available on a timely basis, the Company reports its share of the income or loss of the equity method investment on a one-quarter lag.

For more information on equity method investments, see Note 8.

**Leases** — The Company adopted ASC 842, *Leases*, on January 1, 2019. The Company leases certain real estate for its office premises that are classified as operating leases. We assess whether an arrangement is a lease at inception. Leases with an initial term of twelve months or less are not recorded in the balance sheet. We have elected the practical expedient to not separate lease and non-lease components for all assets. Operating lease assets and operating lease liabilities are calculated based on the present value of the future minimum lease payments over the lease term at the lease start date. As our leases do not provide an implicit rate, we use our incremental borrowing rate based on the information available at the lease start date in determining the present value of future payments. The operating lease asset is increased by any lease payments made at or before the lease start date and reduced by lease incentives and initial direct costs incurred. The lease term includes options to renew or terminate the lease when it is reasonably certain that we will exercise that option. The exercise of lease renewal options is at our sole discretion. The depreciable life of lease assets and leasehold improvements are limited by the lease term, unless there is a transfer of title or purchase option reasonably certain of exercise. Lease expense for operating leases is recognized on a straight-line basis over the lease term.

**Equity-based Compensation** — The Company measures and recognizes compensation expense for all equity-based payments at fair value on the grant date over the requisite service period. New shares of common are issued for stock option exercises. GWG Holdings uses the Black-Scholes option pricing model to determine the fair value of stock options and stock appreciation rights. For restricted stock grants (including restricted stock units), fair value is determined as of the closing price of GWG Holdings' common stock on the date of grant.

The determination of fair value of equity-based payment awards on the date of grant is affected by our stock price and a number of subjective variables. These variables include, but are not limited to, the expected stock price volatility over the term of the awards, the expected duration of the awards, the results of a probability-weighted discounted cash flow analysis and observable transactions. We account for the effects of forfeitures as they occur. The risk-free interest rate is based on the U.S. Treasury rates at the date of grant with maturity dates approximately equal to the expected life at grant date. Volatility is based on the standard deviation of the average continuously compounded rate of return of five selected companies.

As it is not publicly traded, Beneficient uses various methods to determine the grant date fair value of its equity-based compensation awards, as more fully described in Note 12.

Equity-based compensation expense is recorded in employee compensation and benefits in the consolidated statements of operations.

**Deferred Financing and Issuance Costs** — Loans advanced to us under the second amended and restated senior credit facility with LNV Corporation (as amended from time to time, "LNV Credit Facility"), as described in Note 10, are reported net of financing costs, including issuance costs, sales commissions and other direct expenses, which are amortized using the straight-line method over the term of the facility. The L Bonds, as described in Note 10, are reported net of financing costs, which are amortized using the effective interest method over the term of those borrowings. Beneficient's first and second lien credit agreements, as described in Note 10, are reported net of financing costs, which are amortized using the effective interest method over the term of those borrowings.

Selling and issuance costs of Redeemable Preferred Stock ("RPS") and Series 2 Redeemable Preferred Stock ("RPS 2"), described in Note 11, are netted against additional paid-in capital, until depleted, and then against the outstanding balance of the preferred stock. The offerings of GWG Holdings' RPS and RPS 2 closed in March 2017 and April 2018, respectively. There were no issuance costs associated with the August 2018 issuance of the Series B Convertible Preferred Stock.

App. 1259

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Business Combinations** — The Company includes the results of operations of the businesses that it acquires from the acquisition date. In allocating the purchase price of a business combination, in accordance with ASC 805, *Business Combinations*, the Company records all assets acquired and liabilities assumed at fair value, and the fair value of any noncontrolling interests, with the excess of the purchase price over the aggregate fair values recorded as goodwill. ASC Topic 820, *Fair Value Measurements*, defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. The Company determines the estimated fair values after review and consideration of relevant information, including discounted cash flows, quoted market prices and estimates made by management. The fair value assigned to identifiable intangible assets acquired is based on estimates and assumptions made by management at the time of the acquisition. The Company adjusts the preliminary purchase price allocation, as necessary, during the measurement period of up to one year after the acquisition closing date as it obtains more information as to facts and circumstances existing as of the acquisition date. Acquisition-related costs are recognized separately from the business combination and are expensed as incurred.

**Goodwill and Other Intangibles** — Goodwill of $2.4 billion and intangible assets of $3.4 million were recognized as a result of the business combination related to the Investment and Exchange Agreements on December 31, 2019 (see Note 4). Intangible assets are included in other assets in the Company's consolidated balance sheets. The Company accounts for goodwill and intangible assets in accordance with ASC Topic 350, *Intangibles – Goodwill and Other*. The amount of goodwill recorded is based on the fair value of the acquired entity at the time of acquisition. Management performs goodwill and intangible asset impairment testing annually, as of October 1, or when events occur, or circumstances change that would more likely than not indicate impairment has occurred. Goodwill impairment exists when the carrying value of goodwill exceeds its implied fair value.

For 2020, the annual goodwill impairment analysis did not result in any impairment charges. Our impairment evaluation included a qualitative assessment, which considered whether there were indicators of potential impairment following the recent completion of the business combination accounting. In addition, our evaluation included a quantitative analysis, which included multiple assumptions, including estimated discounted cash flows and other estimates that may change over time. For example, a key assumption in determining the fair value of our reporting units is forecasting free cash flow generated by our business over the next five years and includes assumptions regarding expected growth of new service offerings and products. While our assumption reflects management's best estimates of future performance, the estimates assume Beneficient capturing a significant market share of liquidity transactions during the next five years leading to a substantial rate of growth of new service offerings and products, revenues and assets over the next five years ending December 31, 2025. These estimations are uncertain to occur, and to the extent the Company falls short of achieving our expected growth in revenues and assets over the next four years, material impairments of our goodwill may occur in the near term. For example, a 15% decline in our annual projected volume of liquidity transactions reflected in the Company's forecasts would require impairments to begin to be recorded assuming all other assumptions on which the forecasts are built remain constant. Because the Company's forecasts are predicated on estimating future volume for new service offerings and products, the Company's actual future volume of liquidity transactions reflected in the Company's forecasts may fall short of management's forecasts by 15% or greater and may result in a partial or full write down of our goodwill balance, which totaled $2.4 billion at December 31, 2020. In light of Beneficient's significant recurring losses from operations, negative cash flows from operations, and delays in executing its business plans, there could be potential triggering events identified and resulting impairment of goodwill recorded during the annual impairment test during the fourth quarter of 2021. While management can and has implemented strategies to address these events, changes in operating plans or adverse changes in the future could reduce the underlying cash flows used to estimate fair values and could result in a decline in fair value that would trigger future impairment charges of the reporting unit's goodwill balance.

Intangible assets include an insurance license and a non-compete agreement. Finite-lived intangibles are stated at cost less accumulated amortization. Amortization is recorded using the straight-line method, which approximates the expected pattern of economic benefit, over the estimated lives of the assets. The insurance license intangible has an indefinite life and is evaluated for impairment annually. The non-compete agreement is amortized over its estimated useful life of two years and is evaluated for impairment when indicators of impairment are present as outlined in the subsequent paragraph.

The Company reviews the carrying value of its finite-lived intangible assets whenever events or changes in circumstances indicate that the carrying amount of the asset group may not be recoverable. Factors that would require an impairment assessment include, among other things, a significant change in the extent or manner in which an asset is used, a continual decline in the Company's operating performance, or as a result of fundamental changes in a subsidiary's business condition.

App. 1261

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Repurchase Option** — Beneficient determined that a provision of the Exchange Trust agreements, of which such trust is not among the consolidated trusts of Ben LP, executed as part of its initial capitalization whereby the holder of the beneficial interest can repurchase the senior beneficial interest in a certain ExAlt Trust from its holder, at any time up to 3 years from the initial transaction date, represents an equity contract liability that it has elected to account for utilizing the fair value option in accordance with accounting standards applicable to financial instruments. The repurchase options were provided to each Exchange Trust for no consideration. As of the date of establishment of these ExAlt Trusts in 2017 and 2018, Beneficient measured the fair value of the repurchase options and recorded the amount of repurchase options in the consolidated balance sheets with the recognition of transaction expense of a corresponding amount. The repurchase options are recorded at fair value with changes in fair value recorded in net income (loss) in the consolidated statements of operations. Adjustments to the fair value of the repurchase options are recognized within investment income in the consolidated statements of operations. ExAlt Plan™ transactions, other than those executed in the initial capitalization, do not include a repurchase provision.

The primary reasons that management elected to record the repurchase options at fair value included reflecting the economic events in earnings on a timely basis and mitigating volatility in earnings from using different measurement attributes. Refer to Note 7 for additional information.

**Income Taxes** — GWG Holdings is a corporation for tax purposes. Certain of GWG Holdings' subsidiaries operate in the U.S. as partnerships for U.S. federal income tax purposes. In addition, certain of the wholly-owned subsidiaries of GWG Holdings will be subject to federal, state, and local corporate income taxes at the entity level and the related tax provision attributable to the Company's share of this income tax is reflected in the consolidated financial statements. Income taxes are accounted for using the asset and liability method of accounting. Under this method, deferred tax assets and liabilities are recognized for the expected future tax consequences of differences between the carrying amounts of assets and liabilities and their respective tax basis, using tax rates in effect for the year in which the differences are expected to reverse. The effect on deferred assets and liabilities of a change in tax rates is recognized in income in the period when the change is enacted. Deferred tax assets are reduced by a valuation allowance when it is more likely than not that some portion or all of the deferred tax assets will not be realized. Current and deferred tax liabilities, if any, are recorded within accounts payable and accrued expenses and other liabilities in the consolidated balance sheets. The Company analyzes its tax filing positions in all of the U.S. federal, state, local and foreign tax jurisdictions where it is required to file income tax returns, as well as for all open tax years in these jurisdictions. The Company records uncertain tax positions on the basis of a two-step process: (a) determination is made whether it is more likely than not that the tax positions will be sustained based on the technical merits of the position, and (b) those tax positions that meet the more likely than not threshold are recognized as the largest amount of tax benefit that is greater than 50 percent likely to be realized upon ultimate settlement with the related tax authority. The Company recognizes accrued interest and penalties related to uncertain tax positions in income tax expense (benefit) within the consolidated statements of operations.

**Noncontrolling Interests – Redeemable and Non-redeemable** — Noncontrolling interests represent the portion of certain consolidated subsidiaries' limited partnership interests or the ExAlt Trusts that are held by third parties. Amounts are adjusted by the noncontrolling interest holder's proportionate share of the subsidiaries' or VIEs' earnings or losses each period and for any distributions that are paid.

Noncontrolling interests are reported as a component of equity unless the noncontrolling interest is considered redeemable, in which case the noncontrolling interest is recorded between liabilities and equity (mezzanine or temporary equity) in the Company's consolidated balance sheets. The redeemable noncontrolling interest is adjusted at each balance sheet date to its maximum redemption value if the amount is greater than the carrying value. Changes in the Company's redeemable noncontrolling interests are presented in the consolidated statements of changes in stockholders' equity.

Noncontrolling interests include (i) holders of Class S Ordinary Units issued by BCH, which consist of Ben Founder Affiliates (as defined below), an entity affiliated with a related party, and third parties, and (ii) holders, which consists of unrelated charity organizations, of residual beneficial interests issued by the ExAlt Trusts. "Ben Founder Affiliates" are defined as certain trusts and those entities held by such trusts that are controlled by Ben Founder or in which Ben Founder and his family members are also among classes of economic beneficiaries whether or not our founder is entitled to economic distributions from such trusts. Ben Founder is also the former Chairman of the board of directors of GWG Holdings, serving is such capacity from April 26, 2019 to June 14, 2021.

Redeemable noncontrolling interests are held by holders, which consist of a Ben Founder Affiliate, entities affiliated with a related party, and certain former directors, of Preferred Series A Subclass 1 Unit Accounts issued by BCH.

F-25

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Beneficient's Income Allocation*

Net income (loss) attributable to noncontrolling interest holders is subject to Beneficient's income allocation in accordance with the governing limited partnership agreement of BCH as more fully described in Note 11.

The consolidated financial statements of Beneficient reflect the assets, liabilities, revenues, expenses, investment income and cash flows of Beneficient, including, after December 31, 2019, all of the trusts in the ExAlt Plan™ on a gross basis, and a portion of the economic interests of certain of the ExAlt Trusts, held by the residual beneficiaries, are attributed to noncontrolling interests in the accompanying consolidated financial statements. Interest income earned by Beneficient from the ExAlt Trusts is eliminated in its consolidation. However, because the eliminated amounts are earned from, and funded by, its noncontrolling interests, Beneficient's attributable share of the net income from the ExAlt Trusts is increased by the amounts eliminated. Accordingly, the elimination in consolidation of interest income and, for periods after December 31, 2019, certain fee revenue has no effect on net income (loss) attributable to Beneficient or to holders of Common Units.

For purposes of income allocation to Beneficient's equity holders, interest income is generally comprised of contractual interest, which is computed at a variable rate compounding monthly, interest recognized on certain of the ExAlt Loans through the effective yield method, and an amortized discount that is recognized ratably over the life of the ExAlt Loan.

As a result of the change-of-control event discussed in Note 9 on December 31, 2019 and the resulting valuation performed under ASC 805, the existing loan portfolio between Ben and the ExAlt Trusts was evaluated as of December 31, 2019, for credit deterioration based on the intentions of all parties that the income allocations provisions of Ben operate under US GAAP as if the ExAlt Trusts were not consolidated for financial reporting purposes. Further, as required under ASC 805, each ExAlt Loan between Beneficient and the ExAlt Trusts was evaluated and classified as either purchased credit impaired ("PCI") or non purchased credit impaired ("non-PCI"). For PCI loans, expected cash flows as of the date of valuation in excess of the fair value of loans are recorded as interest income over the life of the loans using a level yield method if the timing and amount of the future cash flows is reasonably estimable. Subsequently, increases in cash flows over those expected at the acquisition date are recognized prospectively as interest income. Decreases in expected cash flows due to credit deterioration are recognized by recording an allowance for loan loss. For non-PCI loans, the difference between the fair value and unpaid principal balance of the loan as of the date of valuation is amortized or accreted to interest income over the contractual life of the loans using the effective interest method. In the event of prepayment, the remaining unamortized amount is recognized in interest income, which is eliminated upon the consolidation of the ExAlt Trusts for financial reporting purposes.

Allowance for Loan Losses

The allowance for loan losses is an input to Beneficient's allocation of income. The allowance for loan losses is a valuation allowance for probable incurred credit losses in the portfolio. Management's determination of the allowance is based upon an evaluation of the loan portfolio, impaired loans, economic conditions, volume, growth and composition of the collateral to the loan portfolio, and other risks inherent in the portfolio. Currently, management individually reviews all ExAlt Loans due to the low volume and non-homogenous nature of the current portfolio. Management relies heavily on statistical analysis, current NAV and distribution performance of the underlying alternative asset interests and industry trends related to alternative asset investments to estimate losses. Management evaluates the adequacy of the allowance by reviewing relevant internal and external factors that affect credit quality. The cash flows from the underlying alternative assets interests are the sole source of repayment for the loans and related interest. Beneficient recognizes any charge-off in the period in which it is confirmed. Therefore, impaired ExAlt Loans are written down to their estimated net present value.

Interest income, for purposes of determining income allocations to Beneficient's equity holders, is adjusted for any allowance for loan losses, which was approximately $5.4 million for the year ended December 31, 2020.

**Earnings (Loss) per Common Share** — Basic earnings (loss) per share is computed by dividing net income (loss) attributable to common shareholders by the weighted-average number of common shares outstanding during the reported period.

Diluted earnings (loss) per share in net income periods is calculated by dividing net income attributable to common shareholders by the weighted-average number of common shares outstanding adjusted to include the number of additional common shares that would have been outstanding if the potential dilutive common shares resulting from GWG Holdings' RPS, RPS 2, restricted stock units, warrants (if applicable) and stock options were issued. The Company uses the treasury stock method to calculate if potentially dilutive common shares were issued in the case of restricted stock units, warrants and

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

options, and the if-converted method in the case of RPS and RPS 2. During 2020 and 2019, RPS, RPS2, restricted stock units and stock options were the potentially dilutive non-participating instruments issued by GWG Holdings.

Additionally, pursuant to the Exchange Agreement, as discussed in Note 1, holders of Common Units have the right to exchange their Common Units for common stock of GWG. The Company uses the if-converted method for these potentially dilutive instruments issued by Ben LP that are ultimately exchangeable into GWG Holdings' common stock.

Diluted earnings (loss) per share does not reflect an adjustment for potentially dilutive shares in periods in which a net loss attributable to common shareholders exists.

**Newly Adopted Accounting Pronouncements** — On January 1, 2020, we adopted Accounting Standards Update ("ASU") 2017-04, *Goodwill*, (Topic 350). This standard simplifies how an entity is required to test goodwill for impairment by eliminating Step 2 from the goodwill impairment test. Step 2 measures a goodwill impairment loss by comparing the implied fair value of a reporting unit's goodwill with the carrying amount of that goodwill. Under the new guidance, goodwill impairment loss will be measured on the basis of the fair value of the reporting unit relative to the reporting unit's carrying amount rather than on the basis of the implied amount of goodwill relative to the goodwill balance of the reporting unit. The adoption of this standard did not have a material impact on the consolidated financial statements and related disclosures.

On January 1, 2020, we adopted ASU No. 2018-13, *Fair Value Measurement (Topic 820): Disclosure Framework — Changes to the Disclosure Requirements for Fair Value Measurement*, which eliminates, adds and modifies certain disclosure requirements for fair value measurements. The adoption did not have a material impact on the consolidated financial statements and related disclosures.

In March 2020, the SEC amended Regulation S-X to create Rules 13-01 and 13-02. These new rules reduce and simplify financial disclosure requirements for issuers and guarantors of registered debt offerings. Previously, with limited exceptions, a parent entity was required to provide detailed disclosures with regard to guarantors of registered debt offerings within the footnotes to the consolidated financial statements. Under the new regulations, disclosure exceptions have been expanded and required disclosures may be provided within Item 7. *Management's Discussion and Analysis of Financial Condition and Results of Operations* rather than in the notes to the financial statements. Further, summarized financial information covering guarantor balance sheets and income statements are permitted, replacing the previously required condensed consolidating financial statements. Summarized financial information only needs be disclosed for the current fiscal year rather than all years presented in the financial statements as was previously required. The amendments were subsequently included in the FASB codification through the issuance of ASU No. 2020-09, *Debt, (Topic 470)* in October 2020. The guidance will become effective for filings on or after January 4, 2021, with early adoption permitted. The Company elected to early adopt the new regulations during the second quarter of 2020. Our summarized guarantor financial information is now presented in Item 7. *Management's Discussion and Analysis of Financial Condition and Results of Operations.*

**Accounting Pronouncements Issued But Not Yet Adopted** — In June 2016, the Financial Accounting Standards Board ("FASB") issued ASU No. 2016-13, *Financial Instruments — Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments*, which changes the impairment model for most financial assets and certain other instruments, including trade and other receivables, held-to-maturity debt securities and loans. There have been numerous codification improvements and technical corrections issued through subsequent ASUs since the issuance of ASU No. 2016-13. The standard requires entities to use a new, forward-looking "expected loss" model that is expected to generally result in the earlier recognition of allowances for losses. The guidance is effective for annual periods beginning after December 15, 2022, including interim periods within those years, for smaller reporting companies, as defined by the SEC, but early adoption is permitted. The Company is evaluating the potential impact of this guidance on our consolidated financial statements.

ASU 2019-12, *Income Taxes: Simplifying the Accounting for Income Taxes, (Topic 740)* was issued in December 2019. The amendments in Topic 740 eliminate certain exceptions related to the approach for intraperiod tax allocation, the methodology for calculating income taxes in an interim period and the recognition of deferred tax liabilities for outside basis differences. Topic 740 also clarifies and simplifies other aspects of the accounting for income taxes. The standard is effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2020, for public business entities. Early adoption is permitted, including adoption in any interim period. The adoption of this standard is not expected to have a material impact on the consolidated financial statements and disclosures.

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

ASU 2020-04, *Reference Rate Reform, (Topic 848)* was issued in March 2020. The amendments in Topic 848 provide optional expedients and exceptions for applying GAAP to contracts, hedging relationships, and other transactions affected by reference rate reform if certain criteria are met. Topic 848 can be applied by all entities as of the beginning of the interim period that includes March 12, 2020, or any date thereafter, and entities may elect to apply the amendments prospectively through December 31, 2022. The Company did not utilize the optional expedients and exceptions provided by this standard during the year ended December 31, 2020. The Company is evaluating the impact of this standard on its consolidated financial statements and disclosures.

ASU 2020-06, *Debt—Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging—Contracts in Entity's Own Equity (Subtopic 815-40): Accounting for Convertible Instruments and Contracts in an Entity's Own Equity (ASU 2020-06)* was issued in August 2020. The amendments in ASU 2020-06 simplify the accounting for convertible instruments by removing major separation models and removing certain settlement condition qualifiers for the derivatives scope exception for contracts in an entity's own equity, and simplify the related diluted net income per share calculation for both Subtopics. ASU 2020-06 is effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2023, for smaller reporting companies, as defined by the SEC. Early adoption is permitted, but no earlier than fiscal years beginning after December 15, 2020, including interim periods within those fiscal years. The Company is evaluating the impact of this ASU on its consolidated financial statements and disclosures.

**(3) Restrictions on Cash**

Under the terms of the LNV Credit Facility, discussed further in Note 10, we are required to maintain collection and payment accounts that are used to collect policy benefits from pledged policies, pay annual policy premiums, interest and other charges under the facility, distribute funds to pay down the facility, and distribute excess funds to the borrower (GWG DLP Funding IV, LLC).

The agents for the lender authorize the disbursements from these accounts. At December 31, 2020 and 2019, there was a balance of $33.5 million and $20.3 million, respectively, in these collection and payment accounts.

Under the terms of the ExAlt Plan™ trust agreements, the trusts are required to maintain capital call reserves and administration reserves. These reserves are used to satisfy capital call obligations and pay fees and expenses for the trusts as required. The fees and expenses are primarily paid to Ben Custody Admin for serving as the administrative agent to the current trustees of the ExAlt Trusts. These reserves represent cash held in banks. At December 31, 2020 and 2019, there was a combined balance of $5.4 million and $13.2 million, respectively, in these reserves.

**(4) Business Combination**

Prior to December 31, 2019, GWG Holdings owned 41,505,279 Common Units, for a total limited partnership interest in the Common Units of approximately 90.2%. This investment was historically accounted for using the equity method (see Note 8). On December 31, 2019, GWG Holdings entered into the Investment Agreement and Exchange Agreements described in Note 1.

Pursuant to the Investment Agreement, GWG Holdings transferred $79.0 million to Ben LP in return for 666,667 additional Common Units and a Preferred Series A Subclass 1 Unit Account of BCH, which increased GWG Holdings' ownership of Common Units to approximately 95.5%. Also, on December 31, 2019, in a transaction related to the Investment Agreement, GWG Holdings transferred its interest in the Preferred Series A Subclass 1 Unit Account to its wholly-owned subsidiary, GWG Life. In connection with the Investment Agreement, GWG Holdings obtained the right to appoint a majority of the board of directors of Beneficient Management, the general partner of Ben LP. As a result, GWG Holdings obtained control of Ben LP and consolidated Ben LP as of December 31, 2019, under the guidance in ASC 805, *Business Combinations.*

As a result of the change-of-control, GWG Holdings was required to remeasure its existing equity investment at fair value prior to consolidation. At December 31, 2019, GWG Holdings' equity investment in Common Units had a carrying value of $368.6 million, prior to the additional investment noted above. GWG Holdings estimated the fair value of its investment in Ben LP to be approximately $622.5 million, resulting in the recognition of a gain of $253.9 million during the fourth quarter of 2019. This gain is included in gain on consolidation of equity method investment in the Company's consolidated statement of operations for the year ended December 31, 2019. This gain was partially offset by the remeasurement to fair value of the Commercial Loan Agreement between GWG Life and Ben LP, the Promissory Note between GWG Life and the Borrowers,

F-28

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

and the Option Agreement between GWG Holdings and Ben LP which resulted in a net loss of $10.9 million. The net gain on consolidation of equity method investment after remeasurement of these preexisting balances was $243.0 million. GWG Holdings' proportionate share of the earnings or losses from Ben LP was recognized in earnings (loss) from equity method investment in our consolidated statement of operations from August 10, 2018 until December 31, 2019 (see Note 8 for further information) and was previously recorded on a one-quarter lag basis. In connection with the consolidation of Beneficient, the one-quarter lag was discontinued.

The following table summarizes the fair value measurement of the assets acquired and liabilities assumed as of December 31, 2019 (in thousands):

| | As Restated Fair Value at Acquisition Date |
|---|---|
| **ASSETS** | |
| Investments in alternative assets, at net asset value | $ 342,012 |
| Investment in public equity securities | 24,550 |
| Other assets | 15,077 |
| Intangible assets[1] | 3,449 |
| Total identifiable assets acquired | 385,088 |
| **LIABILITIES** | |
| Debt due to related parties | 153,086 |
| Promissory note with related party | 60,390 |
| Commercial loan agreement from parent | 168,420 |
| Other liabilities and option agreement | 64,421 |
| Repurchase option | 61,664 |
| Accounts payable and accrued expenses | 13,770 |
| Total liabilities assumed | 521,751 |
| Net liabilities assumed | (136,663) |
| **NONCONTROLLING INTERESTS** | |
| Common Units not owned by GWG Holdings[2] | 181,383 |
| Class S Ordinary Units | 85,448 |
| Class S Preferred Units | 17 |
| Trusts' Deficit | 27,062 |
| Preferred Series A Subclass 1 Unit Accounts | 1,269,654 |
| Total noncontrolling interests | 1,563,564 |
| **ACQUISITION CONSIDERATION** | |
| Cash, less cash acquired | 45,020 |
| Fair value of preexisting investment in Common Units[3] | 622,503 |
| Fair value of noncontrolling interest | 1,563,564 |
| Total estimated consideration | 2,231,087 |
| Less: Net liabilities assumed | (136,663) |
| Resulting goodwill | $ 2,367,750 |

———————————————————

(1) Includes an insurance license valued at $3.1 million and a non-compete agreement valued at $0.3 million.
(2) Calculated as 1,974,677 Common Units not owned by GWG Holdings at December 31, 2019, multiplied by the $15 per unit derived from the enterprise valuation of Beneficient. Also includes $151.8 million of share-based payment awards that were granted by Beneficient prior to the change in control but were not replaced by awards of GWG Holdings upon the change in control. These awards were treated as noncontrolling interests in accordance with ASC 805, *Business Combinations*.

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

(3)  Calculated as 41,505,279 Common Units owned by GWG Holdings prior to the change in control multiplied by the $15 per unit derived from the enterprise valuation of Beneficient, with a nominal rounding adjustment.

*Methods Used to Determine Equity Value and to Fair Value Assets and Liabilities*

The following is a description of the valuation methodologies used to estimate the fair value of equity and the fair values of major categories of assets acquired and liabilities assumed. In many cases, determining the fair value of equity and the acquired assets and assumed liabilities required management to estimate cash flows expected from those assets and liabilities and to discount those cash flows at appropriate rates of interest. This required the utilization of significant estimates and management judgment in accounting for the change-of-control event.

**Investments in alternative assets** — The investment in alternative assets was valued at fair value using the net asset value of each underlying investment as a practical expedient.

**Cash and cash equivalents and restricted cash** — Cash and cash equivalents and restricted cash were valued using their current carrying amounts which approximate fair value.

**Investment in public equity securities** — The fair value of the investments in public equity securities was determined using quoted market prices. As these were investments by Beneficient in the common stock of GWG Holdings, these amounts were eliminated in consolidation and treated as treasury stock.

**Other assets** — Other assets include miscellaneous receivables that were valued using the current carrying amount as that amount approximates fair value due to the relatively short time between their origination date and the fair value date. Miscellaneous intercompany receivables were eliminated in consolidation.

**Intangible assets** — Intangible assets include an insurance license and a non-compete agreement. Both assets were valued using their current carrying amount which approximates fair value.

**Debt due to related parties, promissory note with related party, and commercial loan agreement from parent** — The measurement of the fair value of debt due to related parties, promissory note with related party, and commercial loan agreement from parent was based on market prices that generally are observable for similar liabilities at commonly quoted intervals and is considered a Level 2 fair value measurement. The Promissory Note between certain of the ExAlt Trusts and GWG Life and the Commercial Loan Agreement between Ben LP and GWG Life were eliminated in consolidation.

**Other liabilities** — The carrying amount of other liabilities approximates the fair value. The Option Agreement between Ben LP and GWG Holdings was eliminated in consolidation.

**Repurchase options:** Repurchase options were fair valued using a Black-Scholes option pricing model with a time-dependent strike for the repurchase price. Other model assumptions include i) a period of restricted exercise, ii) the dividend yield, iii) underlying NAVs, iv) alternative asset growth rates, v) volatilities, and vi) market discount rate.

**Accounts payable and accrued expenses** — Due to their short-term nature, the carrying amounts of accounts payable and accrued expenses approximate the fair value. Miscellaneous intercompany payables were eliminated in consolidation.

**Noncontrolling interests** — The values for each noncontrolling interest component were calculated after determination of an overall enterprise value for the Company. The enterprise value of the Company was determined using the Option Pricing Model ("OPM") Backsolve approach under the market method. The OPM Backsolve approach uses a Black-Scholes option pricing model to calculate the implied equity value of the firm. Once an overall equity value was determined, amounts were allocated to the various classes of equity based on the security class preferences. The inputs to the OPM Backsolve approach are the equity value for one component of the capital structure, expected time to exit, the risk-free interest rate and an assumed volatility based on the volatility of similar publicly traded companies. The OPM Backsolve inputs include Level 3 inputs.

**Goodwill** — The resulting excess of the overall enterprise value after deducting the fair values of assets acquired and liabilities assumed is recognized as goodwill. The goodwill recognized is the result of the inherent value associated with the assembled business after all separately identifiable assets acquired and liabilities assumed are deducted from the enterprise value. The excess estimated enterprise value of Beneficient over the fair value of its net assets is primarily attributable to

F-30

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

management's expectation of the potentially large and underserved market that Beneficient is seeking to address, including the estimated demand from MHNW individuals and STM size institutions seeking liquidity for their professionally managed alternative assets. None of the goodwill is expected to be deductible for income tax purposes. The goodwill is allocated to our Beneficient reporting unit.

The following unaudited pro forma financial information presents the combined results of operations of GWG Holdings as if the acquisition of Ben LP had occurred as of January 1, 2019:

| *(in thousands, except shares and per share data)* | *(As Restated)* |
| --- | --- |
| | **December 31, 2019** |
| **Total Revenue** | |
| Pro forma | $ 62,636 |
| As reported | $ 92,276 |
| | |
| **Net Income (Loss) Attributable to Common Shareholders** | |
| Pro forma | $ (220,726) |
| As reported | $ 70,471 |
| | |
| **Net Earnings (Loss) per Diluted Common Share** | |
| Pro forma | $ (6.21) |
| As reported | $ 2.06 |

The unaudited pro forma financial information is presented for informational purposes only. It is not necessarily indicative of what our consolidated results of operations actually would have been had the acquisition occurred at the beginning of the year, nor does it attempt to project the future results of operations of the combined company.

The unaudited pro forma financial information above gives effect to the following:

- Consolidation of all ExAlt Trusts (only certain of the trusts were consolidated until December 31, 2019)

- Exclusion of the $243.0 million nonrecurring gain on consolidation of equity method investment

- Reduction of Beneficient interest expense related to acquisition-date debt principal payments

- Elimination of intercompany transactions, including the Promissory Note, Commercial Loan Agreement and Option Agreement

- Exclusion of nonrecurring acquisition-related transaction costs

**(5) Investment in Life Insurance Policies**

The Company's investments in life insurance policies are valued based on unobservable inputs that are significant to their overall fair value. Changes in the fair value of these policies, net of premiums paid, are recorded in gain (loss) on life insurance policies, net in our consolidated statements of operations.

The fair value of our life insurance policies is determined as the net present value of the life insurance portfolio's future expected cash flows (policy benefits received and required premium payments) that incorporates life expectancy estimates obtained when the policy was purchased and current discount rate assumptions. We refer to our valuation methodology as the Longest Life Expectancy methodology. This methodology utilizes a portfolio mortality multiplier ("PMM") that allows us to "fit" projections to actual results, which provides a basis to forecast future performance more accurately.

The life expectancies used in our valuation were obtained at the time of policy purchase and are generally derived from reports obtained from widely accepted life expectancy providers (other than insured lives covered under small face amount policies — those with $1.0 million in face value benefits or less — which utilize either a single fully underwritten, or simplified report based on self-reported medical interview). Our valuation methodology also incorporates assumptions relating to cost-of-insurance (premium) rates and other assumptions, including a discount rate.

F-31

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The discount rate we apply is primarily based on information about the discount rates observed in recent portfolio purchase transactions in the life insurance tertiary market. The discount rate also incorporates fixed income market interest rates, the estimated credit exposure to the insurance companies that issued the life insurance policies and management's estimate of the operational risk yield premium a purchaser would require to receive the future cash flows derived from our portfolio as a whole. In prior periods, the discount rate also incorporated information about the discount rates observed in the life insurance secondary market through the Company's internal competitive bidding to purchase policies. However, the Company discontinued the use of this input as of December 31, 2020, as it is no longer actively purchasing policies in the life insurance secondary market. The determination of the discount rate used in the valuation of the Company's life insurance policies requires management judgment and incorporates information that is reasonably available to management as of the date of the valuation. As a result of management's analysis, a discount rate of 8.25% was applied to our portfolio as of both December 31, 2020 and 2019.

**Portfolio Information**

Our portfolio of life insurance policies, owned by GWG Holdings' subsidiaries as of December 31, 2020 is summarized below:

**Life Insurance Portfolio Summary**

| | |
|---|---|
| Total life insurance portfolio face value of policy benefits (in thousands) | $ 1,900,715 |
| Average face value per insured life (in thousands) | $ 1,943 |
| Average life expectancy estimate (years)* | 6.9 |
| Total number of policies | 1,058 |
| Number of unique lives | 978 |
| Demographics | 74% Male; 26% Female |
| Number of smokers | 40 |
| Largest policy as % of total portfolio face value | 0.7 % |
| Average policy as % of total portfolio face value | 0.1 % |
| Average annual premium as % of face value | 3.8 % |

(*) Averages presented in the table are weighted averages by face amount of policy benefits.

A summary of our policies organized according to their estimated life expectancy dates, grouped by year, as of the reporting date, is as follows (dollars in thousands):

| Years Ending December 31, | As of December 31, 2020 | | | As of December 31, 2019 | | |
|---|---|---|---|---|---|---|
| | Number of Policies | Estimated Fair Value | Face Value | Number of Policies | Estimated Fair Value | Face Value |
| 2020 | — | $ — | $ — | 8 | $ 5,869 | $ 6,342 |
| 2021 | 15 | 19,429 | 22,298 | 55 | 62,061 | 79,879 |
| 2022 | 62 | 66,657 | 88,698 | 90 | 89,074 | 138,723 |
| 2023 | 106 | 113,926 | 178,983 | 128 | 123,352 | 222,369 |
| 2024 | 119 | 130,280 | 229,815 | 109 | 103,111 | 217,053 |
| 2025 | 111 | 85,842 | 187,042 | 113 | 74,223 | 171,961 |
| 2026 | 115 | 100,280 | 237,632 | 123 | 92,337 | 250,239 |
| Thereafter | 530 | 275,497 | 956,247 | 525 | 246,012 | 934,407 |
| **Totals** | 1,058 | $ 791,911 | $ 1,900,715 | 1,151 | $ 796,039 | $ 2,020,973 |

We recognized life insurance benefits of $125.1 million for each of the years ended December 31, 2020 and 2019, respectively, related to policies with a carrying value of $38.2 million and $33.2 million, respectively, and as a result recorded realized gains of $86.9 million and $91.9 million. The aforementioned carrying value, which represents the aggregate cost basis in the policies that matured during the period, is considered a return of investment within the investing section of the consolidated statements of cash flows. Changes in fair value of policies and the other components of the net

F-32

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

gain on life insurance policies, as detailed below, are included in the operating section of the consolidated statements of cash flows.

A reconciliation of gain (loss) on life insurance policies is as follows (in thousands):

|  | Year Ended December 31, | |
|---|---|---|
|  | **2020** | **2019** |
| Change in estimated probabilistic cash flows[1] | $ 63,463 | $ 67,186 |
| Unrealized gain on acquisitions[2] | — | 6,921 |
| Premiums and other annual fees | (71,439) | (65,577) |
| Change in life expectancy evaluation[3] | — | (2,332) |
| Face value of matured policies | 125,109 | 125,148 |
| Fair value of matured policies | (67,535) | (56,026) |
| Gain on life insurance policies, net | $ 49,598 | $ 75,320 |

(1)  Change in fair value of expected future cash flows relating to our investment in life insurance policies that are not specifically attributable to changes in life expectancy, discount rate changes or policy maturity events.

(2)  Gain resulting from fair value in excess of the purchase price for life insurance policies acquired during the reporting period.

(3)  The change in fair value due to updating life expectancy estimates on certain life insurance policies in our portfolio.

Estimated premium payments and servicing fees required to maintain our current portfolio of life insurance policies in force for the next five years, assuming no mortalities, are as follows (in thousands):

| Years Ending December 31, | Premiums | Servicing | Total |
|---|---|---|---|
| 2021 | $ 72,445 | $ 1,655 | $ 74,100 |
| 2022 | 89,436 | 1,655 | 91,091 |
| 2023 | 100,953 | 1,655 | 102,608 |
| 2024 | 110,044 | 1,655 | 111,699 |
| 2025 | 122,438 | 1,655 | 124,093 |
|  | $ 495,316 | $ 8,275 | $ 503,591 |

Management anticipates funding the majority of the premium payments and servicing fees estimated above from cash flows realized from life insurance policy benefits, and to the extent necessary, with additional borrowing capacity created as the premiums and servicing costs of pledged life insurance policies become due, under the LNV Credit Facility and the net proceeds from our offering of L Bonds as described in Note 10. Management anticipates funding premiums and servicing costs of non-pledged life insurance policies with cash flows realized from life insurance policy benefits from our portfolio of life insurance policies and net proceeds from GWG Holdings' offering of L Bonds. The proceeds of these capital sources may also be used for; the purchase, policy premiums and servicing costs of additional life insurance policies; working capital; and financing expenditures including paying principal, interest and dividends.

**(6) Investments in Alternative Assets**

The investments held, either through direct ownership or through a beneficial interest, by certain of the ExAlt Trusts consist primarily of limited partnership interests in various alternative assets, including private equity funds. These alternative investments are valued using NAV as a practical expedient. Changes in the NAV of these investments are recorded in investment income, net in our consolidated statements of operations. The investments in alternative assets provide the economic value that ultimately collateralizes the loan that Beneficient originates with the ExAlt Trusts in a liquidity transaction.

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The NAV calculation reflects the most current report of NAV and other data received from firm/fund sponsors. If no such report has been received, Beneficient estimates NAV based upon the last NAV calculation reported by the investment manager and adjusts it for capital calls and distributions made in the intervening time frame. Beneficient also considers whether adjustments to the NAV are necessary in certain circumstances in which management is aware of specific material events, changes in market conditions, and other relevant factors that have affected the value of an investment during the period between the date of the most recent NAV calculation reported by the investment manager or sponsor and the measurement date. Public equity securities known to be owned within an alternative investment fund, based on the most recent information reported by the general partners, are marked to market using quoted market prices on the reporting date.

The underlying interests in alternative assets are primarily limited partnership interests, and the limited partnership agreements governing those interests generally include restrictions on disclosure of fund-level information, including fund names and company names in the funds. The transfer of the investments in private equity funds generally requires the consent of the corresponding private equity fund manager, and the transfer of certain fund investments is subject to rights of first refusal or other preemptive rights, potentially further limiting the ExAlt Plan™ from transferring an investment in a private equity fund. These investments can never be redeemed with the funds. Distributions from each fund will be received as the underlying investments are liquidated. Timing of liquidation is currently unknown.

**Portfolio Information**

Our portfolio of alternative investments, held by certain of the ExAlt Trust subsidiaries by asset class of each fund as of December 31, 2020 and 2019, is summarized below:

**Alternative Investments Portfolio Summary[1]**

| Asset Class | December 31, 2020 | | December 31, 2019 | |
|---|---|---|---|---|
| | Value | Unfunded Commitments | Value | Unfunded Commitments |
| Venture Capital | $ 123,021 | $ 1,659 | $ 267,662 | $ 8,915 |
| Private Equity | 92,316 | 33,387 | 34,614 | 22,187 |
| Private Real Estate | 2,118 | 269 | 27,151 | 3,584 |
| Other[2] | 4,439 | 294 | 12,585 | 260 |
| **Total** | $ 221,894 | $ 35,609 | $ 342,012 | $ 34,946 |

[1]   Amounts presented in the table exclude the collateral resulting from the Collateral Swap, including GWG Holdings' common stock valued at $84.6 million, 543,874 shares of Ben Common Units valued at $6.8 million, and GWG L Bonds due 2023 in the aggregate principal amount of $94.8 million, all of which are eliminated in consolidation

[2]   "Other" includes private debt strategies, natural resources strategies, and hedge funds.

As of December 31, 2020, ExAlt Trusts' portfolio had exposure to 117 professionally managed alternative investment funds, comprised of 327 underlying investments, 91 percent of which are investments in private companies.

**(7) Fair Value Measurements**

ASC 820, *Fair Value Measurements and Disclosures* ("ASC 820"), establishes a hierarchical disclosure framework that prioritizes and ranks the level of market price observability used in measuring assets and liabilities at fair value. Market price observability is affected by a number of factors, including the type of investment, the characteristics specific to the investment and the state of the marketplace, including the existence and transparency of transactions between market participants. Assets and liabilities with readily available and actively quoted prices, or for which fair value can be measured from actively quoted prices in an orderly market, generally will have a higher degree of market price observability and a lesser degree of judgment used in measuring fair value.

ASC 820 maximizes the use of observable inputs and minimizes the use of unobservable inputs by requiring the use of observable inputs whenever available. Observable inputs are inputs that market participants would use in pricing the asset or liability developed based on market data obtained from third-party sources. Unobservable inputs are inputs that reflect assumptions about how market participants price an asset or liability based on the best available information. Fair value is

F-34

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

defined as the price that would be received to sell an asset or paid to transfer a liability (i.e., the "exit price") in an orderly transaction between market participants at the measurement date (a non-distressed transaction in which neither seller nor buyer is compelled to engage in the transaction).

The fair value hierarchy is broken down into three levels based on the observability of inputs as follows:

Level 1 — Valuations based on quoted prices in active markets for identical assets or liabilities that the Company has the ability to access as of the measurement date. Valuations are based on quoted prices that are readily and regularly available in an active market.

Level 2 — Valuations based quoted prices for similar instruments in active markets; quoted prices for identical or similar instruments in markets that are not active; and model-derived valuations whose inputs are observable or whose significant value drivers are observable market data.

Level 3 — Valuations based on inputs that are unobservable, are derived from other valuation methodologies, including option pricing models, discounted cash flow models and similar techniques, and are not based on market exchange, dealer, or broker traded transactions. Level 3 valuations incorporate certain assumptions and projections in determining the fair value assigned to such instruments.

A financial instrument's categorization within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement. Investments valued using NAV as a practical expedient are excluded from this hierarchy. At December 31, 2020 and December 31, 2019, the fair value of these investments using the NAV per share practical expedient was $221.9 million and $342.0 million, respectively. During the year ended December 31, 2020, $17.6 million of loss was recognized from changes in NAV, which is recorded within investment income (loss) on our consolidated statements of operations.

The availability of observable inputs can vary by types of assets and liabilities and is affected by a wide variety of factors, including, for example, whether an instrument is established in the marketplace, the liquidity of markets and other characteristics particular to the transaction. To the extent that valuation is based on models or inputs that are less observable or unobservable in the market, the determination of fair value requires more judgment. Accordingly, the degree of judgment exercised by management in determining fair value is greatest for assets and liabilities categorized in Level 3.

F-35

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Financial instruments measured at fair value on a recurring basis*

The Company's financial assets and liabilities carried at fair value on a recurring basis, including the level in the fair value hierarchy, on December 31, 2020 and December 31, 2019 are presented below (in thousands).

| | As of December 31, 2020 | | | |
| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| **Assets:** | | | | |
| Investments in put options | $ 7,017 | $ — | $ — | $ 7,017 |
| Investments in life insurance policies | — | — | 791,911 | 791,911 |

| | As of December 31, 2019 (As Restated) | | | |
| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| **Assets:** | | | | |
| Investments in life insurance policies | $ — | $ — | $ 796,039 | $ 796,039 |
| | | | | |
| **Liabilities:** | | | | |
| Repurchase options | $ — | $ — | $ 61,664 | $ 61,664 |

The following is a description of the valuation methodologies used for financial instruments measured at fair value on a recurring basis:

*Investments in put options*

On July 17, 2020, Ben LP, through its subsidiary CT Risk Management, L.L.C., made aggregate payments of $14.8 million to purchase put options against a decrease in the S&P 500 Index. The options have an aggregate notional amount of $300.0 million and are designed to protect the net asset value of the interests in alternative assets that support the Collateral to Beneficient's loan portfolio against market risk. One-half of the put options expire in July 2022 with the remaining put options expiring in July 2023. Changes in the fair value of the options are recognized directly in earnings. The fair value of the options is recorded in the other assets line item of the consolidated balance sheets, and changes in the fair value of the options are recognized directly in earnings in the other income (loss) line item of the consolidated statements of operations.

*Repurchase options*

Repurchase options were fair valued using a Black-Scholes option pricing model with a time-dependent strike price for the repurchase price. The option pricing model has assumptions related to a period of restricted exercise price, dividend yield, underlying NAVs, alternative asset growth rates, volatilities, and market discount rate. The Company uses Level 3 inputs for its fair value estimates. The unrealized impact of this Level 3 measurement on earnings is reflected in investment income (loss).

The following table reconciles the beginning and ending fair value of our Level 3 repurchase options (in thousands). The year ended December 31, 2019, is not presented as the consolidation of Beneficient occurred on December 31, 2019.

| | Year Ended December 31, 2020 |
|---|---|
| Beginning balance | $ 61,664 |
| Total gain in earnings[1] | (61,664) |
| Purchases | — |
| Settlements | — |
| Other | — |
| Ending balance | $ — |

[1] Net change in fair value.

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The repurchase options, all of which were unexercised, expired during the third and fourth quarters of 2020, which is recognized in the investment income (loss) line item of the consolidated statements of operations. Additionally, during the year ended December 31, 2020, $17.6 million of loss on the investments in alternative assets was recognized from changes in NAV, which is recorded within investment income (loss) on our consolidated statements of operations.

The following table provides quantitative information about the significant unobservable inputs used in the fair value measurement of the Level 3 repurchase options as of December 31, 2019 (dollars in thousands):

| Valuation Date | Fair Value | Valuation Methodology | Unobservable Inputs | Range of Targets |
|---|---|---|---|---|
| December 31, 2019 | $    61,664 | Option Pricing Model | Alternative asset market discount rate | 0.085 |
| | | | Dividend yield | .22 - .56 |
| | | | Net asset value growth rates | 0.085 |
| | | | Net asset value volatilities | 0.24 - 0.45 |
| | | | Restricted exercise period | 1 year |

*Investments in life insurance policies*

The estimated fair value of our portfolio of life insurance policies is determined on a quarterly basis by management taking into consideration a number of factors, including changes in discount rate assumptions, estimated premium payments and life expectancy estimate assumptions, as well as any changes in economic and other relevant conditions. The discount rate incorporates information about discount rates observed in the life insurance secondary market through competitive bidding observations (which have declined recently as a result of our decreased purchase activity) and other means, fixed income market interest rates, the estimated credit exposure to the insurance companies that issued the life insurance policies and management's estimate of the operational risk yield premium a purchaser would require to receive the future cash flows derived from our portfolio as a whole. The determination of the discount rate used in the valuation of the Company's life insurance policies requires management judgment and incorporates information that is reasonably available to management as of the date of the valuation.

Under our Longest Life Expectancy portfolio valuation methodology, we: i) utilize life expectancy reports from third-party life expectancy providers for the pricing of all life insurance policies at the time of purchase; ii) apply a stable valuation methodology driven by the experience of our life insurance portfolio, which is re-evaluated if experience deviates by a specified margin; and iii) use relevant market observations that can be validated and mapped to the discount rate used to value the life insurance portfolio.

These inputs are then used to estimate the discounted cash flows from the portfolio using the ClariNet LS probabilistic and stochastic portfolio pricing model from ClearLife Limited, which estimates the expected cash flows using various mortality probabilities and scenarios. The valuation process includes a review by senior management as of each quarterly valuation date. We also engage ClearLife Limited to prepare a net present value calculation of our life insurance portfolio using the inputs we provide on a quarterly basis.

The following table reconciles the beginning and ending fair value of our Level 3 investments in our portfolio of life insurance policies (in thousands):

| | Year Ended December 31, | |
|---|---|---|
| | **2020** | **2019** |
| Beginning balance | $    796,039 | $    747,922 |
| Total gain in earnings[1] | 34,114 | 49,015 |
| Purchases | — | 32,367 |
| Settlements[2] | (38,185) | (33,265) |
| Lapsed policy[3] | (57) | — |
| Ending balance | $    791,911 | $    796,039 |

F-37

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

(1)   Net change in fair value
(2)   Policy maturities at initial cost basis
(3)   Represents the cost basis of one policy with a face value of $0.5 million.

The net activity in the table above is reported in gain on life insurance policies, net, in the consolidated statements of operations.

There have been no transfers between levels in the fair value hierarchy for any assets or liabilities recorded at fair value on a recurring basis or any changes in the valuation techniques used for measuring the fair value as of December 31, 2020 and December 31, 2019.

The following table summarizes the inputs utilized in estimating the fair value of our portfolio of life insurance policies:

|  | As of December 31, 2020 | As of December 31, 2019 |
|---|---|---|
| Weighted-average age of insured, years* | 83.1 | 82.4 |
| Age of insured range, years | 63-100 | 62-101 |
| Weighted-average life expectancy, months* | 83.0 | 86.2 |
| Life expectancy range, months | 0-240 | 0-240 |
| Average face amount per policy (in thousands) | $ 1,797 | $ 1,756 |
| Discount rate | 8.25 % | 8.25 % |

(*) Weighted-average by face amount of policy benefits

Life expectancy estimates and market discount rates for a portfolio of life insurance policies are inherently uncertain and the effect of changes in estimates may be significant. For example, if the life expectancy estimates were increased or decreased by four and eight months on each outstanding policy, and the discount rates were increased or decreased by 1% and 2%, with all other variables held constant, the fair value of our investment in life insurance policies would increase or decrease as summarized below (in thousands):

| | Change in Life Expectancy Estimates | | | |
|---|---|---|---|---|
| | Minus 8 Months | Minus 4 Months | Plus 4 Months | Plus 8 Months |
| December 31, 2020 | $ 97,837 | $ 45,536 | $ (61,713) | $ (114,099) |
| December 31, 2019 | $ 113,812 | $ 57,753 | $ (55,905) | $ (111,340) |

| | Change in Discount Rate | | | |
|---|---|---|---|---|
| | Minus 2% | Minus 1% | Plus 1% | Plus 2% |
| December 31, 2020 | $ 82,983 | $ 39,560 | $ (36,151) | $ (69,284) |
| December 31, 2019 | $ 91,890 | $ 43,713 | $ (39,790) | $ (76,118) |

*Financial instruments measured at fair value on a non-recurring basis*

There were no assets or liabilities measured at fair value on a non-recurring basis as of December 31, 2020. As of December 31, 2019, Beneficient's assets and liabilities were recorded at fair value in the consolidated balance sheet due to the application of purchase accounting in accordance with ASC 805 as described in Note 4.

*Carrying amounts and estimated fair values*

The Company is required to disclose the estimated fair value of financial instruments, whether or not recognized in the condensed consolidated balance sheets, for which it is practicable to estimate those values. These fair value estimates are determined based on relevant market information and information about the financial instruments. Fair value estimates are intended to represent the price at which an asset could be sold or the price at which a liability could be settled. However,

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

given there is no active market or observable market transactions for many of the Company's financial instruments, estimates of fair values are subjective in nature, involve uncertainties and matters of significant judgment and therefore cannot be determined with precision. Changes in assumptions could significantly affect the estimated values. Nonfinancial instruments are excluded from disclosure requirements.

The carrying amounts and estimated fair values of the Company's financial instruments not recorded at fair value were as noted in the tables below (in thousands).

| | As of December 31, 2020 | | |
| --- | --- | --- | --- |
| | Level in Fair Value Hierarchy | Carrying Amount | Estimated Fair Value |
| Financial assets: | | | |
| Cash, cash equivalents and restricted cash | 1 | $ 124,160 | $ 124,160 |
| Life insurance policy benefits receivable, net | 1 | 14,334 | 14,334 |
| Financial liabilities: | | | |
| Senior credit facility | 2 | $ 193,730 | $ 202,611 |
| L Bonds and Seller Trust L bonds | 1 | 1,519,006 | 1,519,006 |
| Debt due to related parties | 2 | 76,260 | 78,081 |
| Other liabilities | 1 | 50,585 | 50,585 |

| | As of December 31, 2019 (As Restated) | | |
| --- | --- | --- | --- |
| | Level in Fair Value Hierarchy | Carrying Amount | Estimated Fair Value |
| Financial assets: | | | |
| Cash, cash equivalents and restricted cash | 1 | $ 115,790 | $ 115,790 |
| Life insurance policy benefits receivable, net | 1 | 23,031 | 23,031 |
| Financial liabilities: | | | |
| Senior credit facility with LNV Corporation | 2 | $ 174,390 | $ 184,587 |
| L Bonds and Seller Trust L Bonds | 1 | 1,293,530 | 1,293,530 |
| Debt due to related parties | 2 | 153,086 | 153,086 |
| Other liabilities | 1 | 44,408 | 44,408 |

Other liabilities is comprised of the interest and dividends payable and accounts payable and accrued expenses line items on the consolidated balance sheets as of December 31, 2020 and December 31, 2019.

Certain assets are subject to periodic impairment testing by comparing the respective carrying value of the asset to its estimated fair value. In the event we determine these assets to be impaired, we would recognize an impairment loss equal to the amount by which the carrying value of the impaired asset exceeds its estimated fair value. These periodic impairment tests utilize company-specific assumptions involving significant unobservable inputs, or Level 3, in the fair value hierarchy.

**(8) Equity Method Investments**

*FOXO Technologies Inc. (formerly, FOXO BioScience LLC)*

On November 11, 2019, GWG Holdings contributed the common stock and membership interests of its wholly-owned subsidiaries, FOXO Labs and FOXO Life ("Insurtech Subsidiaries") to a legal entity, then known as FOXO BioScience LLC, in exchange for a membership interest in FOXO. On November 13, 2020, FOXO BioScience LLC converted to a corporation and is now known as FOXO Technologies Inc. With the conversion to a corporation, GWG Holdings' previous membership interest in the LLC converted to preferred equity in FOXO. Although GWG Holdings has a financial interest in FOXO, GWG

F-39

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Holdings does not have a controlling financial interest because another party is the majority shareholder of the voting class of securities. Therefore, we account for GWG Holdings' ownership interest in FOXO as an equity method investment.

The 2019 transaction resulted in a loss of control of the Insurtech Subsidiaries and, as a result, we deconsolidated the subsidiaries and recorded an equity method investment balance during the fourth quarter of 2019. The loss of control required us to measure the equity investment at fair value. We determined the fair value of our investment in FOXO approximated the carrying value of $3.4 million which was primarily comprised of cash and fixed assets contributed to the entity during the fourth quarter of 2019.

The following table includes a rollforward of the equity method investment in FOXO (in thousands):

|  | Year Ended December 31, 2020 | Year Ended December 31, 2019 |
|---|---|---|
| Beginning balance | $ 1,761 | $ — |
| Contributions | 14,436 | 3,378 |
| Loss on equity method investment | (7,319) | (1,617) |
| Other | (296) | — |
| Ending balance | $ 8,582 | $ 1,761 |

In accordance with the subscription agreement of FOXO, as of December 31, 2020, GWG Holdings was committed to contribute an additional $3.8 million to the entity through October 2021, all of which was contributed by such date. GWG Holdings' investment in FOXO is presented in other assets in our consolidated balance sheets. Our proportionate share of earnings or losses from our investee is recognized in earnings (loss) from equity method investments in our consolidated statements of operations.

*The Beneficient Company Group, L.P.*

During 2018, GWG Holdings acquired 40,505,279 Common Units for a total limited partnership interest in the Common Units of approximately 89.9% as of December 31, 2018. On June 12, 2019, GWG Holdings acquired an additional 1,000,000 Common Units from a third party for a cash investment of $10.0 million.

Prior to December 31, 2019, GWG Holdings' investment in Common Units was presented in equity method investment on our consolidated balance sheets. Our proportionate share of earnings or losses from our investee was recognized in earnings (loss) from equity method investments in our consolidated statements of operations. We recorded GWG Holdings' share of the income or loss of Beneficient through September 30, 2019 on a one-quarter lag.

On December 31, 2019, GWG Holdings obtained control of Beneficient and consolidated Beneficient as of that date under the guidance in ASC 805, *Business Combinations*. See Note 4 for further information on the business combination. In connection with the consolidation, we discontinued the one-quarter reporting lag.

Preconsolidation financial information after the elimination of any intercompany transactions pertaining to Beneficient is summarized in the table below (in thousands):

|  | Twelve months ended September 30, 2019 (unaudited) |
|---|---|
| Total revenues | $ 93,921 |
| Net loss | (32,133) |
| Net loss attributable to holders of Common Units | (13,754) |
| **GWG Holdings'** portion of net loss [1] | (2,460) |

---

[1]  GWG Holdings portion of Beneficient's net loss for October 1, 2018 to September 31, 2019. This amount was recognized during the year ended December 31, 2019, prior to the consolidation of Beneficient.

F-40

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(9) Variable Interest Entities**

In accordance with ASC 810, *Consolidation*, the Company assesses whether it has a variable interest in legal entities in which it has a financial relationship and, if so, whether or not those entities are variable interest entities ("VIEs"). For those entities that qualify as VIEs, ASC 810 requires the Company to determine if the Company is the primary beneficiary of the VIE, and if so, to consolidate the VIE.

*VIEs for Which the Company is the Primary Beneficiary*

ExAlt Trusts

The Company determined that the ExAlt Trusts used in connection with Beneficient's operations are VIEs of which Beneficient is the primary beneficiary. The Company concluded that Beneficient is the primary beneficiary of the trusts as it has the power to direct the most significant activities and has an obligation to absorb potential losses of the trusts. Accordingly, the results of the trusts are included in the Company's consolidated financial statements. The assets of the trusts may only be used to settle obligations of the trusts. Other than potentially funding capital calls above the related reserve (refer to Note 18), there is no recourse to the Company for the trusts' liabilities.

The cash flows generated by these VIEs subsequent to December 31, 2019 are included within the Company's consolidated statements of cash flows. The consolidated balance sheets include the following amounts from these consolidated VIEs as of the dates presented (in thousands):

| | December 31, 2020 | | December 31, 2019 | |
|---|---|---|---|---|
| **Assets:** | | | | |
| Cash and cash equivalents | $ | 5,965 | $ | 3,211 |
| Restricted cash | | 5,386 | | 13,248 |
| Investments in alternative assets, at NAV | | 221,894 | | 342,012 |
| Other assets | | 1,273 | | 1,335 |
| Total Assets of VIE | $ | 234,518 | $ | 359,806 |
| | | | | |
| **Liabilities:** | | | | |
| Repurchase obligation | $ | — | $ | 61,664 |
| Accounts payable and accrued expense | | 2,029 | | 17 |
| Total Liabilities of VIE | $ | 2,029 | $ | 61,681 |
| | | | | |
| **Equity:** | | | | |
| Noncontrolling interest | $ | 7,208 | $ | 27,062 |
| Total Equity of VIE | $ | 7,208 | $ | 27,062 |

The consolidated statement of operations for the year ended December 31, 2020 includes the following amounts from these consolidated VIEs (in thousands). The results of operations for year ended December 31, 2019 are not inclusive of these consolidated VIEs as Beneficient was not a consolidated subsidiary of GWG Holdings until December 31, 2019.

|  | Year Ended December 31, 2020 |
|---|---|
| REVENUE | |
| Investment income, net | $ 44,106 |
| Interest income | 21 |
| TOTAL REVENUE | 44,127 |
| EXPENSES | |
| Other expenses | 501 |
| TOTAL EXPENSES | 501 |
| NET INCOME | 43,626 |
| Net loss attributable to noncontrolling interests | 25,094 |
| NET INCOME ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ 68,720 |

F-41

App. 1294

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

CT Risk Management, L.L.C.

On March 20, 2020, CT Risk Management, L.L.C. ("CT") was created as a Delaware limited liability company to reduce the impact of a potential market downturn on the interests in alternative assets that support the Collateral for receivables held by Beneficient by distributing any potential profits to the certain of the ExAlt Trusts thereby offsetting any reduction in the value of the alternative assets. The LLC agreement was amended and restated on April 16, 2020. There was no activity of CT until July 2020 when Beneficient made a capital contribution of $14.8 million, which was used to purchase the put options reflected in the consolidated balance sheet as of December 31, 2020.

CT is considered a VIE as the at-risk equity holder, Ben LP, does not have all of the characteristics of a controlling financial interest due to Ben LP's receipt of returns being limited to its initial investment in CT. The Company concluded that Beneficient is the primary beneficiary of CT as it has the power to direct the most significant activities and has an obligation to absorb potential losses of CT. Accordingly, the results of CT are included in the Company's consolidated financial statements.

As of December 31, 2020, the consolidated balance sheets include assets of this consolidated VIE with a carrying value of $7.0 million, which is recorded in the other assets line item. Additionally, the Company recorded a $7.8 million loss on investment for the year ended December 31, 2020, which is reported in the other income (loss) line item of the consolidated statements of operations.

*VIEs for Which the Company is Not the Primary Beneficiary*

Prior to December 31, 2019, we determined that the Borrowers are VIEs, but that we are not the primary beneficiary of the variable interests. We do not have the power to direct any activities of the Borrowers that most significantly impact the Borrower's economic performance. The Company's exposure to risk of loss in the Borrowers is limited to its financing receivable from the Borrowers, which is eliminated upon consolidation with Beneficient on December 31, 2019.

We determined that FOXO is a VIE, but that we are not the primary beneficiary of the variable interests. We do not have the power to direct any activities of FOXO that most significantly impact its economic performance. The Company's exposure to risk of loss in FOXO is limited to its equity method investment in the preferred equity of FOXO and its remaining unfunded capital commitments.

The following table shows the classification, carrying value and maximum exposure to loss with respect to the Company's unconsolidated VIE (in thousands):

| | December 31, 2020 | | December 31, 2019 | |
| --- | --- | --- | --- | --- |
| | Carrying Value | Maximum Exposure to Loss | Carrying Value | Maximum Exposure to Loss |
| Total equity method investment | $ 8,582 | $ 12,332 | $ 1,761 | $ 19,661 |

**(10) Debt**

*Senior Credit Facility with LNV Corporation*

On November 1, 2019, DLP IV entered into a second amended and restated senior credit facility with LNV Corporation (as amended and restated by the Fourth Amended Facility (defined in Note 23) on September 7, 2021, the ("LNV Credit Facility")), as lender, and CLMG Corp., as the administrative agent on behalf of the lenders under the agreement, which replaced the amended and restated senior credit facility dated September 27, 2017 that previously governed DLP IV's senior credit facility. The LNV Credit Facility makes available a total of up to $300.0 million in credit to DLP IV with a maturity date of September 27, 2029. Subject to available borrowing base capacity, additional advances are available under the LNV Credit Facility at the LIBOR rate described below. Such advances are available to pay the premiums and servicing costs of pledged life insurance policies as such amounts become due. Interest will accrue on amounts borrowed under the LNV Credit Facility at an annual interest rate, determined as of each date of borrowing or quarterly if there is no borrowing, equal to (a) the greater of 1.5% or 12-month LIBOR, plus (b) 7.50% per annum. The effective rate at December 31, 2020 was 9.00%. Interest payments are made on a quarterly basis.

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Under the LNV Credit Facility, DLP IV has granted the administrative agent, for the benefit of the lenders under the agreement, a security interest in all of DLP IV's assets.

In conjunction with entering into the LNV Credit Facility, DLP IV pledged life insurance policies having an aggregate face value of approximately $298.3 million as additional collateral and received an advance of approximately $37.1 million (inclusive of certain fees and expenses incurred in connection with the negotiation and entry into the LNV Credit Facility). The LNV Credit Facility has certain financial and nonfinancial covenants, and we were in compliance with these covenants at December 31, 2020 and continue to be as of the date of this filing.

In addition, the LNV Credit Facility has certain reporting obligations that require DLP IV to deliver audited annual financial statements no later than ninety days after the end of each fiscal year. Due to the failure to issue GWG Life, LLC audited financial statements for 2020 to LNV Corporation within 90 days after the end of the year, we were in violation of our financial reporting obligations under the LNV Credit Facility. CLMG Corp., as administrative agent for LNV Corporation, issued a limited deferral extending the delivery of these reports to May 17, 2021. We regained compliance on May 17, 2021, when the audited annual financial statements of GWG Life were delivered to LNV Corporation.

As of December 31, 2020, approximately 77.1% of the total face value of our life insurance policies portfolio is pledged to LNV Corporation. The amount outstanding under this facility was $202.6 million and $184.6 million at December 31, 2020 and 2019, respectively. There were unamortized deferred financing costs of $8.9 million and $10.2 million as of December 31, 2020 and 2019, respectively. Obligations under the LNV Credit Facility are secured by a security interest in DLP IV's assets, for the benefit of the lenders, through an arrangement under which Wells Fargo Bank, N.A. serves as securities intermediary. The life insurance policies owned by DLP IV do not serve as direct collateral for the obligations of GWG Holdings under the L Bonds and Seller Trust L Bonds. The difference between the amount outstanding and the carrying amount on our consolidated balance sheets is due to netting of unamortized debt issuance costs.

*L Bonds*

GWG Holdings began publicly offering and selling L Bonds in January 2012, which have been sold under various registration statements since that time. On December 1, 2017, an additional public offering was declared effective permitting us to sell up to $1.0 billion in principal amount of L Bonds on a continuous basis until December 2020. We reached the maximum capacity on this offering during the third quarter of 2020.

On June 3, 2020, a registration statement relating to an additional public offering was declared effective permitting us to sell up to $2.0 billion in principal amount of L Bonds on a continuous basis through June 2023. These bonds contain the same terms and features as our previous offerings.

We are party to an indenture governing the L Bonds dated October 19, 2011, as amended ("Indenture"), under which GWG Holdings is obligor, GWG Life is guarantor, and Bank of Utah serves as indenture trustee. Effective December 31, 2019, we entered into Amendment No. 2 to the indenture, which primarily modified the calculation of the debt coverage ratio to allow the Company greater flexibility to finance and to anticipate the potential impacts of GWG Holdings' relationship with Beneficient.

We were in compliance with the covenants of the indenture at December 31, 2020 and as of the date of this filing, and no Events of Default (as defined in the Amended and Restated Indenture) existed as of such dates.

GWG Holdings publicly offers and sells L Bonds under a registration statement declared effective by the SEC and have issued Seller Trust L Bonds under the L Bond Supplemental Indenture, as described below. We temporarily suspended the offering of GWG Holdings' L Bonds, commencing April 16, 2021, as a result of our delay in filing certain periodic reports with the SEC, including this 2020 Form 10-K. We anticipate recommencing the offering of GWG Holdings' L Bonds when we regain compliance with SEC filing requirements.

The bonds have renewal features under which we may elect to permit their renewal, subject to the right of bondholders to elect to receive payment at maturity. Interest is payable monthly or annually depending on the election of the investor.

At December 31, 2020 and 2019, the weighted-average interest rate of GWG Holdings' L Bonds was 7.21% and 7.15%, respectively. The principal amount of L Bonds outstanding, including Liquidity Bonds discussed below, was $1.3 billion and

F-43

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

$0.9 billion at December 31, 2020 and 2019, respectively. The difference between the amount of outstanding L Bonds and the carrying amount on our consolidated balance sheets is due to netting of unamortized deferred issuance costs, cash receipts for new issuances, and payments of redemptions in process. There were $18.0 million and $15.8 million of subscriptions in process as of December 31, 2020 and 2019, respectively. Amortization of deferred issuance costs was $17.0 million and $12.7 million for the years ended December 31, 2020 and 2019, respectively. Future expected amortization of deferred financing costs as of December 31, 2020 is $49.0 million in total over the next seven years.

Future contractual maturities of L Bonds, including Liquidity Bonds discussed below, but excluding Seller Trust L Bonds, and future amortization of their deferred financing costs, at December 31, 2020 (in thousands) are as follows:

| Years Ending December 31, | Contractual Maturities | | Unamortized Deferred Financing Costs | |
|---|---|---|---|---|
| 2021 | $ | 191,582 | $ | 2,116 |
| 2022 | | 293,038 | | 8,522 |
| 2023 | | 191,446 | | 7,616 |
| 2024 | | 121,105 | | 5,220 |
| 2025 | | 167,433 | | 8,251 |
| Thereafter | | 313,277 | | 17,232 |
| | $ | 1,277,881 | $ | 48,957 |

### *Seller Trust L Bonds*

On August 10, 2018, in connection with the initial transfer of the Exchange Transaction described in Note 1, GWG Holdings, issued Seller Trust L Bonds in the amount of $366.9 million to the Seller Trusts. The maturity date of the Seller Trust L Bonds is August 9, 2023. The Seller Trust L Bonds bear interest at 7.50% per year. Interest is payable monthly in cash.

After December 28, 2020, the holders of the Seller Trust L Bonds have the right to cause GWG Holdings to repurchase, in whole but not in part, the Seller Trust L Bonds held by such holder. The repurchase may be paid, at GWG Holdings' option, in the form of cash, and/or a pro rata portion of (i) the outstanding principal amount and accrued and unpaid interest under the Commercial Loan Agreement and (ii) Common Units, or a combination of cash and such property.

GWG Holdings' L Bonds are offered and sold under a registration statement declared effective by the SEC, as described above, and GWG Holdings has issued Seller Trust L Bonds under the L Bond Supplemental Indenture.

As a result of the Collateral Swap on September 30, 2020, as discussed in Note 1, $94.8 million of Seller Trust L Bonds are now held by certain trusts within the ExAlt Trusts, and are eliminated in consolidation as of December 31, 2020.

The principal amount of Seller Trust L Bonds outstanding reflected on the consolidated balance sheets was $272.1 million and $366.9 million as of December 31, 2020 and 2019, respectively.

### *Liquidity Bonds*

On December 31, 2020, GWG Holdings, GWG Life, and Bank of Utah, as trustee (the "Trustee"), entered into a supplemental indenture, dated as of December 31, 2020 (the "Liquidity Bond Supplemental Indenture"), to that certain Amended and Restated Indenture, dated as of October 23, 2017 (as amended, the "Indenture"), among GWG Holdings, GWG Life and the Trustee, providing for the issuance from time to time of up to $1.0 billion in aggregate principal amount of two new series of L Bonds (the "Liquidity Bonds"). The Liquidity Bonds will be offered and sold to accredited investors in transactions that are exempt from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act"), pursuant to Regulation D under the Securities Act.

The Liquidity Bonds were issued as part of the Company's strategy to expand its exposure to a portfolio of loans collateralized by cash flows from illiquid alternative assets. Holders of alternative assets will be able to contribute their alternative assets to trusts that are part of the ExAlt Plan™ established by GWG Holdings' subsidiary, Ben LP, in exchange for Liquidity Bonds. The Liquidity Bonds will be

issued by GWG Life, as issuer, and guaranteed by GWG Holdings, will bear interest rates determined by the Company and the holders of the alternative assets being contributed and will generally

F-44

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

have a maturity of four years from issuance. The Liquidity Bonds will be issued under the Indenture, and will rank pari passu with respect to payment on and collateral securing all of the Company's other L Bonds issued under the Indenture.

The Liquidity Bond Supplemental Indenture provides for the issuance of two series of Liquidity Bonds: Series A Liquidity Bonds and Series B Liquidity Bonds. The Company expects an exchange of alternative assets for Series A Liquidity Bonds will be treated as a non-taxable exchange for U.S. federal and state income tax purposes, and that an exchange of alternative assets for Series B Liquidity Bonds will be treated as a taxable exchange for U.S. federal and state income tax purposes. In addition to interest payments, holders of Series A Liquidity Bonds will be entitled to an annual, cash participation payment of up to 1.5% of the principal amount of their Series A Liquidity Bonds subject to GWG Life having net taxable income in a given year, prorated for the portion of such year that the holder owned the Series A Liquidity Bond. To the extent that the net taxable income of GWG Life is insufficient to provide holders of Series A Liquidity Bonds with the full participation payment for any given year, such shortfall shall carry forward and be payable from net taxable income earned by GWG Life in subsequent years.

Six months after the issuance date of a Liquidity Bond, the holder may elect to exchange the Liquidity Bond, at the beginning of each month and upon 30 days' prior written notice to GWG Holdings, for that number of shares of GWG Holdings' common stock (the "GWG Common Stock") as determined by dividing the entire outstanding principal balance and accrued but unpaid interest of the Liquidity Bond by the Exchange Price (as defined below) or, at GWG Holdings' election, common securities of a subsidiary of GWG Holdings (the "Subsidiary Common Securities") if they are publicly traded on a national securities exchange, by dividing the entire outstanding principal balance and accrued but unpaid interest of the Liquidity Bond by the Subsidiary Common Securities Exchange Price (as defined below). For purposes of the Liquidity Bond Supplemental Indenture, (i) the Exchange Price will be set at a premium to the closing price of GWG Holdings' Common Stock on the Nasdaq Stock Market on the last trading day prior to the execution and delivery of the binding agreement for issuance of the Liquidity Bond, and (ii) the Subsidiary Common Securities Exchange Price will be based on the Exchange Price multiplied by the exchange ratio of GWG Common Stock to the Subsidiary Common Securities issued in connection with any transaction in which GWG Common Stock is converted into, or exchanged for, Subsidiary Common Securities, or if there is no conversion or exchange, the Subsidiary Common Securities Exchange Price will be determined by GWG Holdings' board of directors in good faith taking into account differences in capital structure and related matters between GWG Holdings and the issuer of such Subsidiary Common Securities.

The Liquidity Bonds are payable in cash at maturity; provided that the Liquidity Bonds may be paid at maturity (in GWG Life's sole discretion) in GWG Common Stock (at the Exchange Price) or Subsidiary Common Securities if they are publicly traded on a national securities exchange (at the Subsidiary Common Security Exchange Price), or a combination of cash and GWG Common Stock or Subsidiary Common Securities.

GWG Life may call and redeem the entire outstanding principal balance and accrued but unpaid interest of any or all of the Liquidity Bonds for cash at any time without penalty or premium. Liquidity Bond holders have no rights to require GWG Life to redeem any Liquidity Bond prior to maturity.

As of December 31, 2020, there was $0.5 million in principal and $0.2 million of unamortized financing costs of Liquidity Bonds. The net of these amounts, $0.3 million, is presented on the consolidated balance sheets in the L Bonds line item.

***Debt Due to Related Parties***

As of December 31, 2020 and December 31, 2019, Beneficient had borrowings that consisted of the following (in thousands):

|  | December 31, 2020 | December 31, 2019 |
|---|---|---|
| First Lien Credit Agreement | $ 2,288 | $ 77,477 |
| Second Lien Credit Agreement | 72,260 | 72,184 |
| Other borrowings | 2,628 | 2,538 |
| Unamortized debt premiums (discounts) | (916) | 887 |
| Total debt due to related parties | $ 76,260 | $ 153,086 |

App. 1300

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Beneficient First and Second Lien Credit Agreement*

On May 15, 2020, Beneficient executed a Term Sheet with HCLP Nominees, L.L.C ("HCLP" or the "lender") to amend its then senior credit agreement and subordinated credit agreement. The resulting Second Amended and Restated First Lien Credit Agreement and Second Amended and Restated Second Lien Credit Agreement (collectively, the "Second Amendments") was executed on August 13, 2020, with terms and conditions substantially consistent with the Term Sheet, as further described below. Prior to the execution of the Second Amendments, other amendments extended the June 30, 2020 maturity dates of both loans to August 13, 2020, while Beneficient and the lender finalized the amended and restated credit agreements. Additional agreements were entered into on June 10, 2020, and on June 19, 2020, consistent with the Term Sheet, whereby Beneficient agreed to repay $25.0 million of the then outstanding principal balance and pay an extension fee of 2.5% of the outstanding aggregate principal balance of the loans, calculated after the $25.0 million repayment, on July 15, 2020. A total of $28.6 million was paid on July 15, 2020, which included the $25.0 million principal payment, related accrued interest thereon, and the extension fee described above.

GWG Holdings, GWG Life, and a newly formed entity, DLP V, also entered into the credit agreements with respect to provisions related to the potential future assumption of the loans by DLP V as described below. The amendments extended the maturity date of both loans to April 10, 2021, and increased the interest rate on each loan to 1-month LIBOR plus 8.0%, with a maximum interest rate of 9.5%. The loans are payable in three installments of $25.0 million on each of September 10, 2020, December 10, 2020, and March 10, 2021, with the remaining balance payable on April 10, 2021. On March 10, 2021, and again on June 28, 2021, Beneficient executed subsequent amendments, among other items, to further extend the maturity date to May 30, 2022, as more fully described below and in Note 23. Through December 31, 2020, all principal and interest due under the Second Amendments have been paid.

The Second Amendments provided for the assumption of the loans by DLP V pursuant to a Third Amended and Restated First Lien Credit Agreement, upon satisfaction of certain conditions precedent, including the issuance of Beneficient's trust company charter by the Texas Department of Banking. The amendments provide that DLP V will receive Preferred C interests in exchange for assuming Beneficient's amended loans in an amount equal to 110% of the then outstanding loan balance. Upon assumption of the loans, the lender will receive a fee of 2.0% of the then outstanding balance of the loans. Furthermore, upon assumption of the loans, the Commercial Loan Agreement between GWG Life and Ben LP will be assumed by GWG Life USA, LLC, a wholly owned subsidiary of GWG Holdings, in exchange for Class A Subclass A-2 Units of BCH equivalent to the outstanding principal balance of the debt evidenced by the Commercial Loan Agreement. In connection with the assumption of the loans by DLP V, the lender will be granted a security interest in the Preferred Series A Subclass 1 Unit Accounts of BCH held by GWG Life and the life insurance policies held by DLP V, which are to be contributed to DLP V from GWG Life Trust. The assumption of the loans by DLP V has not occurred and, as described below, further amendments to the Second Amended and Restated Credit Agreement and the Second Amended and Restated Subordinate Credit Agreement removed the assumption of the loans by DLP V.

In connection with the Ben Credit Agreements (as defined in Note 23), (i) the lender will be permitted to make capital contributions of up to $152.0 million in exchange for a Preferred Series A Subclass 1 Unit Account of BCH for an equal amount of cash for two years after the assumption of the loans; should the lender elect to make such a capital contribution, GWG Holdings or one of its subsidiaries will be allowed to exchange an amount of Preferred C into Preferred Series A Subclass 1 Unit Accounts or contribute cash for Preferred Series A Subclass 1 Unit Accounts, in certain circumstances, in order to maintain its relative ownership percentage of the Preferred Series A Subclass 1 Unit Accounts; (ii) Beneficient Holdings, Inc. ("BHI"), which owns a majority of the Class S Ordinary Units, Preferred Series A Subclass 1 Unit Accounts, and FLP Subclass 1 Unit Accounts issued by BCH, will grant certain tax-related concessions related to the transaction to the lender as may be mutually agreed upon between the parties, and (iii) in exchange for the tax-related concessions to be agreed between the parties, (a) 5% of BHI's Preferred Series A Sub Class 1 Unit Account, which will be held by the lender, may convert, upon delivery of notice by BHI or its designee, to a Preferred A.0 Unit Account of BCH, and (b) recipients of a grant of Preferred Series A Subclass 1 Unit Accounts from BHI will have the right to put an amount of Preferred Series A Subclass 1 Unit Accounts to Ben LP equal to any associated tax liability stemming from any such grant; provided that the aggregated associated tax liability shall not relate to more than $30 million of grants of Preferred Series A Subclass 1 Unit Accounts from BHI; and provided, further, that such a put cannot be exercised prior to July 1, 2021. There has been no liability recorded for the put right as of December 31, 2020, as the transfer of Preferred Series A Subclass Unit Accounts has not occurred.

F-46

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The amended loan terms and ancillary documents contain covenants that (i) prevent Beneficient from issuing any securities senior to the Preferred Series A Subclass 1 or Preferred A.0 Unit Accounts; (ii) prevent Beneficient from incurring additional debt or borrowings greater than $10.0 million, other than trade payables, while the loans are outstanding; (iii) prevent, without the written consent of the lender, GWG Life Trust or DLP V from selling, transferring or otherwise disposing any of the life insurance policies held by GWG Life Trust as of May 15, 2020, except that life insurance policies may be sold, transferred, or otherwise disposed of, provided that concurrent with the assumption of the loans by DLP V, a prepayment of the loans would be required, if necessary, to maintain certain loan-to-value percentages, after giving effect to such sale, transfer or disposal; and (iv) prevent, without the written consent of the lender, GWG Holdings from selling, transferring, or otherwise disposing of any Preferred Series A Subclass 1 Unit Accounts held as of May 15, 2020, other than to DLP V. These covenants are materially similar to the terms under the Third Amended and Restated First Lien Credit Agreement once assumed by DLP V. As of December 31, 2020, Beneficient was in compliance with all covenants.

The assumption set forth in the amendments are subject to, among other things, the satisfaction of certain closing conditions, some of which may be outside of the parties' control. These loans are not currently guaranteed by GWG.

As more fully described in Note 23, on March 10, 2021, Beneficient executed the Amendment No.1 to the Second Amended and Restated Credit Agreement and Amendment No. 1 to the Second Amended and Restated Subordinate Credit Agreement with its lender. The amendments extend the maturity date of both loans to May 30, 2022. The loans are payable in three installments of $5.0 million on each of September 10, 2021 (subsequently deferred as discussed below), December 10, 2021, and March 10, 2022, with the remaining balance payable on May 30, 2022. The amendments also provide for an extension fee equal to 1.5% of the amount outstanding under the Credit Agreements, which was added to the outstanding amount under the Credit Agreements as provided for in the amendments. Further, as more fully described in Note 23, on June 28, 2021, Beneficient executed the Amendment No. 2 to the Second Amended and Restated Credit Agreement and Amendment No. 2 to the Second Amended and Restated Subordinate Credit Agreement with its lender. The amendments eliminate the obligation of DLP V to assume the Ben Credit Agreements as provided for in the Second Amendments and waive the daily fee payable upon the Trigger as provided for in the Amendment No. 1 to the Ben Credit Agreements. Finally, as also discussed in Note 23, effective July 15, 2021, Beneficient executed Consent and Amendment No. 3 to the Second Amended and Restated Credit Agreement and Amendment No. 2 to the Second Amended and Restated Subordinate Credit Agreement with its lender, which (i) deferred the payment of all accrued and unpaid interest until December 10, 2021, and (ii) deferred the installment payment of $5.0 million due on September 10, 2021, to December 10, 2021. Beneficient agreed to pay an amendment fee to the lender in an amount equal to 3% of the then outstanding principal and interest on December 10, 2021.

Beneficient's Second Lien Credit Agreement was originally issued to BHI, a Ben Founder Affiliate. During 2019, the Second Lien Credit Agreement was contributed to HCLP and thus, all existing senior loan obligations are held by HCLP as of December 31, 2020 and 2019. Future transactions between these parties are more fully described in Note 20.

HCLP is indirectly associated with Ben Founder. Further, an indirect parent entity of HCLP had loans outstanding to Ben Founder Affiliates as of December 31, 2020. Neither GWG Holdings nor Beneficient are a party to these loans, nor have they secured or guaranteed the loans. See Note 20 for further discussion of the relationship between HCLP and Ben Founder.

Beneficient's additional borrowings as detailed in the table below mature in 2023 and 2024.

Future contractual maturities of Beneficient's debt due to related parties as of December 31, 2020 are as follows (in thousands):

| **Years Ending December 31,** | | |
|---|---|---:|
| 2021 | $ | 74,548 |
| 2022 | | — |
| 2023 | | 750 |
| 2024 | | 1,856 |
| 2025 | | — |
| Thereafter | | — |
| | $ | 77,154 |

F-47

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## (11) Stockholders' Equity

### *GWG Holdings Equity*

*Common Stock*

In September 2014, GWG Holdings consummated an initial public offering of its common stock resulting in the sale of 800,000 shares of common stock at $12.50 per share, and net proceeds of approximately $8.6 million after the payment of underwriting commissions, discounts and expense reimbursements. In connection with this offering, the common stock of GWG Holdings was listed on the Nasdaq Capital Market under the ticker symbol "GWGH."

The 2018 transactions between GWG Holdings, GWG Life, Beneficial and the Seller Trusts described in Note 1 ultimately resulted in the issuance of 27,013,516 shares of GWG Holdings' common stock to the Seller Trusts in exchange for Common Units. The shares were offered and sold in reliance upon the exemption from registration provided by Section 4(a)(2) under the Securities Act of 1933, as amended. Also, the Purchase and Contribution Agreement described in Note 1 ultimately resulted in the sale of 2,500,000 shares of GWG Holdings common stock to BCC, and the contribution of 1,452,155 shares of GWG Holdings common stock to AltiVerse.

Pursuant to the Exchange Agreement described in Note 1, commencing on December 31, 2019, holders of Common Units have the right to exchange their Common Units for common stock of GWG Holdings. The exchange ratio in the Exchange Agreement is based on the ratio of the capital account associated with the Common Units to be exchanged to the market price of the common stock of GWG Holdings based on the volume weighted average price of GWG Holdings' common stock for the five consecutive trading days prior to the quarterly exchange date. No Common Units have been exchanged for common stock of GWG Holdings through December 31, 2020.

On November 15, 2018, the Board of Directors of GWG Holdings approved a stock repurchase program pursuant to which GWG Holdings was permitted, from time to time, to purchase shares of its common stock for an aggregate purchase price not to exceed $1.5 million. Stock repurchases were able to be executed through various means, including, without limitation, open market transactions, privately negotiated transactions or otherwise. The Company repurchased 42,750 shares under this program in the first quarter of 2019 at an average per share price of $8.43. The stock repurchase program did not obligate the Company to purchase any shares and expired on April 30, 2019.

*Redeemable Preferred Stock*

On November 30, 2015, GWG Holdings' public offering of up to 100,000 shares of RPS at $1,000 per share was declared effective. Holders of RPS are entitled to cumulative dividends at the rate of 7% per annum, paid monthly. Dividends on the RPS are recorded as a reduction to additional paid-in capital, if any, then to the outstanding balance of the preferred stock if additional paid-in capital has been exhausted. Under certain circumstances described in the Certificate of Designation for the RPS, additional shares of RPS may be issued in lieu of cash dividends.

The RPS ranks senior to GWG Holdings' common stock and pari passu with GWG Holdings' RPS 2 (see further details in the section below) and entitles its holders to a liquidation preference equal to the stated value per share (i.e., $1,000) plus accrued but unpaid dividends. Holders of RPS may presently convert their RPS into GWG Holdings' common stock at a conversion price equal to the volume-weighted average price of GWG Holdings' common stock for the 20 trading days immediately prior to the date of conversion, subject to a minimum conversion price of $15.00 and in an aggregate amount limited to 15% of the stated value of RPS originally purchased from us and still held by such purchaser.

Holders of RPS may request that we redeem their RPS at a price equal to their stated value plus accrued but unpaid dividends, less an applicable redemption fee, if any, as specified in the Certificate of Designation. Nevertheless, the Certificate of Designation for RPS permits us in our sole discretion to grant or decline redemption requests. Subject to certain restrictions and conditions, we may also redeem shares of RPS without a redemption fee upon a holder's death, total disability or bankruptcy. In addition, after one year from the date of original issuance, we may, at our option, call and redeem shares of RPS at a price equal to their liquidation preference.

In March 2017, we closed the RPS offering to additional investors having sold 99,127 shares of RPS for an aggregate gross consideration of $99.1 million and incurred approximately $7.0 million of related selling costs.

F-48

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

At the time of its issuance, we determined that the RPS contained two embedded features: (1) optional redemption by the holder, and (2) optional conversion by the holder. We determined that each of the embedded features met the definition of a derivative; however, based on our assessment under ASC 470, *Debt*, ("ASC 470") and ASC 815, *Derivatives and Hedging*, ("ASC 815"), we do not believe bifurcation of either the holder's redemption or conversion feature is appropriate.

*Series 2 Redeemable Preferred Stock*

On February 14, 2017, GWG Holdings' public offering of up to 150,000 shares of RPS 2 at $1,000 per share was declared effective. The terms of the RPS 2 are largely consistent with those of the RPS, other than the conversion and redemption features discussed below.

Holders of RPS 2 may, less an applicable conversion discount, if any, convert their RPS 2 into GWG Holdings' common stock at a conversion price equal to the volume-weighted average price of GWG Holdings' common stock for the 20 trading days immediately prior to the date of conversion, subject to a minimum conversion price of $12.75 and in an aggregate amount limited to 10% of the stated value of RPS 2 originally purchased from us and still held by such purchaser. We may, at our option, call and redeem shares of RPS 2 at a price equal to their liquidation preference (subject to a minimum redemption price, in the event of redemptions occurring less than one year after issuance, of 107% of the stated value of the shares being redeemed).

In April 2018, we closed the RPS 2 offering to additional investors having sold 149,979 shares of RPS 2 for an aggregate gross consideration of $150.0 million and incurred approximately $10.3 million of related selling costs.

The RPS 2 was determined to have the same two embedded features discussed in the RPS section above (optional redemption by the holder and optional conversion by the holder). We do not believe bifurcation of either the holder's redemption or conversion feature is appropriate.

**Beneficient Equity**

As of December 31, 2020, Ben LP has issued Common Units and BCH, a consolidated subsidiary of Ben LP, has issued general partnership Class A Units (Subclass A-1 and A-2), Class S Ordinary Units, Class S Preferred Units, FLP Units (Subclass 1 and Subclass 2), Preferred Series A Subclass 1 Unit Accounts, Preferred Series A Subclass 2 Unit Accounts, and Preferred Series C Unit Accounts. The Preferred Series A Subclass 0 Unit Accounts were created under the 5th Amended and Restated LPA; however, none have been issued as of December 31, 2020. The 5th Amended and Restated LPA of BCH governs the terms of these equity securities.

*Common Units*

As of December 31, 2020 and December 31, 2019, Ben LP has a total of 48,205,756 and 44,146,623 Common Units issued and outstanding, respectively. As of December 31, 2020 and December 31, 2019, GWG Holdings owns 46,887,915 and 42,171,946, Common Units, respectively, which are eliminated in consolidation. The remaining issued and outstanding Common Units are recorded in the consolidated balance sheets in the noncontrolling interests line item.

*Preferred Series A Subclass 0 (Noncontrolling Interests)*

On July 15, 2020, BCH amended its limited partnership agreement in a 5th Amended and Restated LPA, which created a new subclass of Preferred Series A Unit Accounts, the Preferred A.0.

As a subclass of the Preferred Series A Unit Accounts, the Preferred A.0 receives the same preferred return on a quarterly basis as the other Preferred Series A subclasses. However, the Preferred A.0 is senior to all other classes of preferred equity, including the other subclasses of Preferred Series A in terms of allocations of profits, distributions, and liquidation. The Preferred A.0 can be converted into Class S Units at the election of the holder, at a price equal to (x) prior to the initial public listing, the per Common Unit fair market value as determined by the general Partner and (y) following the initial public listing, the lesser of (i) $10 and (ii) if the Common Units are listed on a national securities exchange, the volume-weighted average closing price of a Common Unit as reported on the exchange on which the Common Units are traded for the twenty (20) days immediately prior to the applicable exchange date, or if the Common Units are not listed on a national securities exchange, then the volume-weighted average closing price of a security traded on a national securities exchange or quoted in

F-49

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

an automated quotation system into which the Common Units are convertible or exchangeable for the twenty (20) days immediately prior to the applicable exchange date.

The Preferred A.0 Unit Accounts have not been issued as of December 31, 2020.

*Preferred Series A Subclass 1 (Redeemable Noncontrolling Interest)*

BCH, a consolidated subsidiary of Ben LP, has non-unitized equity outstanding. The Preferred Series A Subclass 1 Unit Accounts are non-participating and convertible on a dollar basis.

In 2019, Preferred Series A Subclass 1 Unit Account holders signed an agreement to forbear the right to receive an annualized preferred return in excess of a rate determined materially consistent with the methodology below until, initially, the earlier of December 31, 2019 or three months following the issuance of the limited trust association charter by the Texas Department of Banking. The charter from the Texas Department of Banking was not issued as of December 31, 2019. In 2020, this forbearance agreement was extended through December 31, 2020.

The income allocation methodology under this forbearance agreement was as follows:

- First, Ben, as the sole holder of Class A Units issued by BCH is allocated income from BCH to cover the expenses incurred solely by Ben;

- Second, the remaining income at BCH is allocated 50% to the aggregate of Class A Units and Class S Ordinary Units and 50% to Preferred Series A Subclass 1 Unit Accounts, until the Common Units issued by Ben LP receive a 1% annualized return on the Common Unit account balance;

- Third, after the 1% annualized return to the Common Unit issued by Ben LP is achieved, additional income is allocated to the Preferred Series A until the Preferred Series A is allocated the amount required under the LPA, (as amended); and

- Finally, any remaining income is allocated under the terms of the current LPA (pro-rata between the Class A Units and Class S Ordinary Units).

If and when the forbearance agreement expires, account holders will be entitled to a compounded quarterly preferred return. The preferred return to be paid to Preferred Series A Unitholders is limited by a quarterly preferred return rate cap that is based on the annualized revenues of BCH. Annualized revenues are defined as four times the sum of total quarterly interest, fee and dividend income plus total noninterest revenues. This quarterly rate cap is defined as follows:

- 0.25% if annualized revenues are $80 million or less

- 0.50% if annualized revenues are greater than $80 million but equal to or less than $105 million

- 0.75% if annualized revenues are greater than $105 million but equal to or less than $125 million

- 1.00% if annualized revenues are greater than $125 million but equal to or less than $135 million

- 1.25% if annualized revenues are greater than $135 million but equal to or less than $140 million

- If over $140 million, the preferred return calculation is based on a fraction (i) the numerator of which is (A) the positive percentage rate change, if any, to the seasonally adjusted CPI-U covering the period from the date of the last allocation of profits to such holders, plus (B) (x) 2% prior to an Initial Public Offering (as defined in the BCH LPA) by Ben LP and (y) 3% thereafter, and (ii) the denominator of which is one minus the highest effective marginal combined U.S. federal, state and local income tax rate in effect as of the beginning of the fiscal quarter for which such determination is being made for an individual resident in New York City, New York, assuming (1)that the aggregate gross income allocable with respect to the quarterly preferred return for such fiscal year will consist of the same relative proportion of each type or character (e.g., long term or short term capital gain or ordinary or exempt income) of gross income item included in the aggregate gross income actually allocated in respect of the quarterly preferred return for the fiscal year reflected in the BCH's most recently filed Internal Revenue Service Form 1065 and (2) any state and local income taxes are not deductible against U.S. federal income tax.

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The definition of Initial Public Offering includes an event, transaction or agreement pursuant to which the Common Units are convertible or exchangeable into equity securities listed on a national securities exchange or quotation in an automated quotation system.

No amounts have been paid to the Preferred Series A Subclass 1 Unit Account holders related to the preferred return from inception through December 31, 2020, and any amounts earned have been accrued and are included in the balance of redeemable noncontrolling interests line item of the consolidated balance sheets. Certain Preferred Series A Subclass 1 Unit Account holders agreed to be specially allocated any income or losses associated with the Beneficient Management Partners, L.P. Equity Incentive Plan and certain other costs.

Upon election by a holder, the Preferred Series A Unit Accounts (other than Preferred Series A Subclass 2 Unit Accounts) are, at any time on or after January 1, 2021, convertible in an amount of Preferred Series A Unit Accounts (other than Preferred Series A Subclass 2 Unit Accounts), equal to 20% of their Sub-Capital Accounts into Class S Ordinary Units (with the right to convert any unconverted amount from previous years in any subsequent years). Upon an election, a holder of Preferred Series A Subclass 1 Unit Accounts will be issued Class S Ordinary Units necessary to provide the holder with a number of Class S Ordinary Units that, in the aggregate, equal (a) the balance of the holder's capital account associated with the Preferred Series A Subclass 1 Unit Accounts being converted divided by (b) either (x) prior to an initial public offering, the appraised per Class A Unit fair market value as determined by Beneficient or (y) following an initial public offering, the average price of a Common Unit for the thirty (30) day period ended immediately prior to the applicable conversion date. The holder of such newly issued Class S Ordinary Units may immediately convert them into Common Units. Additionally, effective December 31, 2030, if the Preferred Series A Subclass 1 Unit Accounts have not been converted, they will redeem for cash in an amount equal to the then outstanding capital account balance of the accounts. If available redeeming cash (as defined in the LPA) is insufficient to satisfy any such redemption requirements, BCH, on a quarterly basis, will redeem additional Preferred Series A Units until all such Preferred Series A Units have been redeemed. The Preferred Series A Subclass 1 Unit Accounts are subject to certain other conversion and redemption provisions.

The current LPA of BCH also includes certain limitations of BCH, without the consent of a majority-in-interest of the Preferred Series A Unit Account holders, to (i) issue any new equity securities and (ii) except as otherwise provided, incur indebtedness that is senior to or pari passu with any right of distribution, redemption, repayment, repurchase or other payments relating to the Preferred Series A Unit accounts. Further, BCH cannot, prior to the conversion of all the Preferred Series A Unit accounts, incur any additional long-term debt unless (i) after giving effect to the incurrence of the new long-term debt on a pro forma basis, the sum of certain preferred stock, existing debt and any new long-term indebtedness would not exceed 55% of BCH's net asset value ("NAV") plus cash on hand, and (ii) at the time of incurrence of any new long-term indebtedness, the aggregate balance of BCH's (including controlled subsidiaries) debt plus such new long-term debt does not exceed 40% of the sum of the NAV of the interests in alternative assets supporting the Collateral underlying the loan portfolio of BCH and its subsidiaries plus cash on hand at Ben LP, BCH and its subsidiaries.

The Preferred Series A Subclass 1 Unit Accounts are recorded in the consolidated balance sheet in the redeemable noncontrolling interest line item.

*Preferred Series C Unit Accounts*

The 5th Amended and Restated LPA also created a new class of preferred equity, the Preferred Series C Unit Accounts. The Preferred Series C Unit Accounts are non-participating and convertible on a basis consistent with the UPA discussed in Note 1. Account holders are entitled to a compounded quarterly preferred return based on a fraction, the numerator of which is (a) the sum of an inflation adjustment amount, plus (1) 0.5% prior to the initial public listing and (2) 0.75% following the initial public listing, and the denominator of which is (b) 1 minus the means of the highest effective marginal combined U.S. federal, state and local income tax rate (including the rate of taxes under Section 1411 of the Code) for a Fiscal Year prescribed for an individual resident in New York, New York (taking into account (a) the nondeductibility of expenses subject to the limitations described in Sections 67 and 68 of the Code and (b) the character (e.g., long-term or short-term capital gain or ordinary or exempt income) of the applicable income, but not taking into account the deductibility of state and local income taxes for U.S. federal income tax purposes), based on the Partnership's most recently filed IRS form 1065.

BCH calculates two Preferred Series C Unit Accounts capital accounts: the Liquidation Capital Account and the Conversion Capital Account. In calculating the Conversion Capital Account, the Preferred Series C Unit Accounts are allocated profits

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

and losses junior to the Preferred Series A Unit Accounts. In calculating the Liquidation Capital Account, the Preferred Series C Unit Accounts are allocated profits and losses pari passu with the Preferred Series A Unit Accounts.

Following the exchange of any Preferred Series C Unit Accounts into Common Units under the UPA described in Note 1, the excess of the profits and losses allocated to the Preferred Series C Unit Accounts under the Liquidation Capital Account will be deemed the "Excess Amount." This Excess Amount will be specially allocated at each tax period in accordance with the principals of Treasury Regulation Section 1.704-1(b)(4)(x), to the Preferred Series A Subclass 1 Units Accounts, prior to any amount of profit, income or gain being allocated to any other class of units (other than the Preferred A.0) or limited partners until such special allocations equal, in the aggregate, such Excess Amount.

The only conversion, redemption, or exchange rights available to the Preferred Series C Unit Accounts are those rights afforded in accordance with the UPA, described in Note 1, or such similar agreement.

While any amount of Preferred Series C Unit Accounts is outstanding, BCH cannot make any distributions, other than tax distributions and redemptions, distributions upon a liquidation of BCH, and distributions of net consideration received from a sale of BCH, without the prior consent of a majority in interest of the holders of the Preferred Series C Unit Accounts.

As of December 31, 2020, the carrying value of GWG Holdings' investments in Preferred Series C Unit Accounts was $195.6 million. The Preferred Series C Unit Accounts are eliminated upon consolidation.

*Class S Ordinary Units*

As of December 31, 2020 and 2019, BCH, a subsidiary of Ben LP, had issued and outstanding 5.8 million and 5.7 million Class S Ordinary Units, respectively. The Class S Ordinary Units participate on an as-converted basis pro-rata in the share of the profits or losses of BCH and subsidiaries following all other allocations made by BCH and its subsidiaries. As limited partner interests, these units have limited voting rights and do not entitle participation in the management of BCH's business and affairs. The Class S Ordinary Units are exchangeable for Common Units on a one-for-one basis, subject to customary conversion rate adjustments for splits, distributions and reclassifications, as well as compliance with any applicable vesting and transfer restrictions. Each conversion also results in the issuance to Ben LP of a Class A Unit of BCH for each Common Unit issued.

The Class S Ordinary Units are recorded in the consolidated balance sheet in the noncontrolling interests line item.

*Class S Preferred Units*

The limited partnership agreement of BCH allows it to issue Class S Preferred Units. The Class S Preferred Units are entitled to a quarterly preferred return that is limited by the quarterly preferred return rate cap described above for Preferred Series A Subclass 1 except for when annualized revenues exceed $140 million, the Class S Preferred return is based on a fraction (i) the numerator of which is (A) the positive percentage rate change, if any, to the seasonally adjusted CPI-U covering the period from the date of the last allocation of profits to such holders, plus (B) 0.75 percent, and (ii) the denominator of which is one minus the highest effective marginal combined U.S. federal, state and local income tax rate in effect as of the beginning of the fiscal quarter for which such determination is being made for an individual resident in New York City, New York, assuming (1) that the aggregate gross income allocable with respect to the quarterly preferred return for such fiscal year will consist of the same relative proportion of each type or character (e.g., long term or short term capital gain or ordinary or exempt income) of gross income item included in the aggregate gross income actually allocated in respect of the quarterly preferred return for the fiscal year reflected in the Ben Group Partnership's most recently filed IRS Form 1065 and (2) any state and local income taxes are not deductible against U.S. federal income tax. The Class S Preferred Units also participate on an as-converted basis pro-rata in the share of the profits or losses of BCH and subsidiaries following all other allocations made by BCH and its subsidiaries. As limited partner interests, these units are generally non-voting and do not entitle participation in the management of the BCH's business and affairs. Generally, the Class S Preferred Units are exchangeable for Common Units in Ben LP on a 1.2-for-1 basis, subject to customary conversion rate adjustments for splits, distributions and reclassifications, as well as compliance with any applicable vesting and transfer restrictions. Each conversion also results in the issuance to Ben LP of a Class A Unit for each Common Unit issued. Holders of Class S Preferred Units may elect to convert into Class S Ordinary Units in connection with a sale or dissolution of BCH.

App. 1313

F-52

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

As of December 31, 2020, a nominal number of shares of Class S Preferred Units have been issued. No amounts have been paid to the Class S Preferred Unit holders related to the preferred return from issuance through December 31, 2020, and any amounts earned have been accrued and are included in the balance of Class S Preferred Units presented on the consolidated balance sheet in the noncontrolling interests line item.

*Beneficiaries of the ExAlt Trusts*

The ultimate beneficiary of the ExAlt Trusts is an unrelated third party charity (the "Charitable Beneficiary") that is entitled to i) approximately 5% of any amounts paid to Beneficient as payment on amounts due under each ExAlt Loan, ii) approximately 10% of the amount of excess cash Collateral, if any, following the full repayment of an ExAlt Loan; and (iii) all amounts accrued and held at the ExAlt Trusts once all amounts due to Beneficient under the ExAlt Loans and any fees related to Beneficient's services to the ExAlt Trusts are repaid. The Charitable Beneficiary's account balances with respect to its interest in such ExAlt Trusts cannot be reduced to below zero. Any losses allocable to the Charitable Beneficiary in excess of its account balances are reclassified at each period end to the trusts deficit account which is included as part of noncontrolling interest. During 2020, additional ExAlt Trusts were created arising from new liquidity transactions with customers. These new ExAlt Trusts, which are consolidated by Beneficient, resulted in the recognition of additional noncontrolling interest of $6.0 million representing the interests in these new ExAlt Trusts held by the Charitable Beneficiary.

The interest of the Charitable Beneficiary, including the associated trust deficit (as applicable), in the ExAlt Trusts is recorded on the consolidated balance sheets in the noncontrolling interests line item.

**(12) Equity-Based Compensation**

As of December 31, 2020 and 2019, the Company has outstanding equity-based awards under the GWG Holdings 2013 Stock Incentive Plan, the Beneficient Management Partners, L.P. ("BMP") Equity Incentive Plan (the "BMP Equity Incentive Plan"), the Ben Equity Incentive Plan (as defined below), and Preferred Series A Subclass 1 Unit Accounts, as more fully described in the sections below.

*2013 Stock Incentive Plan*

GWG Holdings adopted the 2013 Stock Incentive Plan in March 2013, as amended on June 1, 2015, May 5, 2017 and May 8, 2018. Participants under the plan may be granted incentive stock options and non-statutory stock options; stock appreciation rights; stock awards; restricted stock; restricted stock units; and performance shares. Eligible participants include officers and employees of GWG Holdings and its subsidiaries, members of GWG Holdings' Board of Directors, and consultants. Option awards generally expire 10 years from the date of grant. As of December 31, 2020, the Company has granted stock options, stock appreciation rights ("SAR"), and restricted stock units ("RSU") under this plan. As of December 31, 2020, 6,000,000 awards are authorized under the plan, of which 2,507,924 shares were reserved for issuance under outstanding incentive awards and 3,492,076 shares remain available for future grants.

*Stock Options*

As of December 31, 2020, GWG Holdings had outstanding stock options for 695,117 shares of common stock to employees, officers, and directors under the plan. The options were issued with an exercise price between $4.83 and $11.56, which is equal to the market price of the shares on the date of grant. Options vest over varying terms of up to three years. There were no options granted during the year ended December 31, 2020. The weighted average grant date fair value of options granted during the year ended December 31, 2019, was $2.73. The total intrinsic value of stock options exercised during the year ended December 31, 2020 and 2019 was $31.6 thousand and $0.3 million, respectively. The aggregate intrinsic value of stock options outstanding and exercisable at December 31, 2020 was $41.7 thousand and $40.1 thousand, respectively. Additionally, as a result of stock option exercises, 3,688 shares of common stock were issued to employees, net of shares forfeited to satisfy tax withholding obligations. During the years ended December 31, 2020 and 2019, a total of 97,996 and 197,859 stock options held by employees vested for a total fair value of $0.3 million and $0.5 million, respectively.

F-53

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Stock Appreciation Rights (SARs)*

As of December 31, 2020, GWG Holdings had 535,657 SARs outstanding. The strike price of the SARs was between $6.75 and $11.55, which was equal to the market price of the common stock at the date of issuance. SARs vest over varying terms of up to three years. On December 31, 2020, the market price of GWG's common stock was $6.99. The weighted average grant date fair value of SARs granted during the years ended December 31, 2020 and 2019, was $2.51 and $2.66, respectively. During the years ended December 31, 2020 and 2019, a total of 98,536 and 102,102 SARs held by employees vested for a total fair value of $0.2 million and $0.2 million, respectively.

Upon the exercise of SARs, the Company is obligated to make cash payments equal to the positive difference between the market value of GWG Holdings' common stock on the date of exercise less the market value of the common stock on the date of grant. The liability for the SARs as of December 31, 2020 and 2019 was $0.5 million and $0.6 million, respectively, and was recorded within other accrued expenses in the consolidated balance sheets.

The following summarizes information concerning outstanding options and SARs issued under the 2013 Stock Incentive Plan:

|  | Outstanding | | Weighted Average Exercise Price | |
|---|---|---|---|---|
|  | Stock Options | SARs | Stock Options | SARs |
| December 31, 2019 | 905,381 | 375,625 $ | 9.05 $ | 9.25 |
| Granted | — | 192,925 | — | 7.82 |
| Exercised | (20,136) | (1,284) | 8.27 | 7.24 |
| Forfeited and expired | (190,128) | (31,609) | 9.23 | 9.05 |
| December 31, 2020 | 695,117 | 535,657 | 9.03 | 8.75 |

The following table provides information regarding outstanding stock options and SARs which were fully vested and exercisable:

|  | December 31, 2020 | | December 31, 2019 | |
|---|---|---|---|---|
|  | Stock Options | SARs | Stock Options | SARs |
| Number outstanding and exercisable | 629,530 | 293,455 | 673,341 | 200,745 |
| Weighted-Average Remaining Life (years) | 5.88 | 4.17 | 6.83 | 4.49 |
| Weighted Average Exercise Price | $ 8.91 $ | 8.93 $ | 8.88 $ | 8.81 |

*Restricted Stock Units*

A restricted stock unit ("RSU") entitles the holder thereof to receive one share of GWG Holdings' common stock (or, in some circumstances, the cash value thereof) upon vesting. RSUs are subject to forfeiture until they vest. On June 18, 2019, GWG Holdings granted an aggregate of 114,366 RSUs to its directors, which vested in their entirety on the one year anniversary of the grant date. On May 31, 2019, GWG Holdings granted RSUs to its Chief Executive Officer that are subject to performance-based vesting pursuant to a performance share unit agreement ("PSU Agreement"). The PSU Agreement provides for a target award grant of 129,717 RSUs, and up to a maximum of 259,434 RSUs, with each representing the right to receive one share of GWG Holdings' common stock (or, following a Change-in-Control Transaction (as defined in the PSU Agreement), the cash value thereof) upon vesting, which is generally subject to the satisfaction of performance goals over a performance period commencing on April 26, 2019 and ending on December 31, 2021. The weighted average grant date fair value of awards granted during 2019 was $10.15.

In the third quarter of 2019, a total of 375,000 RSUs held by employees vested entitling the holders thereof, collectively, to cash payments totaling $4.5 million, all of which were paid in the third and fourth quarters of 2019 and recognized in employee compensation and benefits in the consolidated statement of operations for the year ended December 31, 2019. Additionally during 2019, 53,403 RSUs vested and 26,701 shares of common stock were issued to employees, net of shares forfeited to satisfy tax withholding obligations.

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

During the year ended December 31, 2020, 57,183 of the RSUs held by directors vested for the same number of shares of common stock for a total fair value of $0.5 million. The weighted-average grant date fair value for the unvested activity presented in the table below was $9.18 for the year ended December 31, 2020.

*BMP Equity Incentive Plan*

The Board of Directors of Beneficient Management, Ben LP's general partner, adopted the BMP Equity Incentive Plan in 2019. Under the BMP Equity Incentive Plan, certain directors and employees of Beneficient are eligible to receive equity units in BMP, an entity affiliated with the board of directors of Beneficient Management, in return for their services to Ben. The BMP equity units eligible to be awarded to employees are comprised of BMP's Class A Units and/or BMP's Class B Units (collectively, the "BMP Equity Units"). As of December 31, 2020 and 2019, the Board of Directors of Beneficient Management has authorized the issuance of up to 19,000,000 units each of the BMP Equity Units. All awards are classified in equity upon issuance.

While providing services to Beneficient, if applicable, certain of these awards are subject to minimum retained ownership rules requiring the award recipient to continuously hold BMP Equity Units equivalents equal to at least 25% of their cumulatively granted awards that have the minimum retained ownership requirement. The awards are generally non-transferable. Awards under the BMP Equity Incentive Plan that vest ultimately dilute holders of Common Units.

The BMP Equity Units awarded beginning in second quarter 2019 and through December 31, 2020, included awards that were fully vested upon grant date, and some awards that are subject to service-based vesting over a four-year period from the date of hire. Expense associated with the vesting of these awards is based on the fair value of the BMP Equity Units on the date of grant. As of December 31, 2020 and 2019, compensation cost has been recognized for the granted awards using the straight-line method over the requisite service period. The remaining unrecognized compensation cost for granted awards will be recognized prospectively over the remaining requisite service period, on a straight-line basis using the graded vesting method and forfeitures will be accounted for at the time that such forfeitures occur. Expense recognized for these awards is specially allocated to certain holders of redeemable noncontrolling interests.

As BMP's equity is not publicly traded, the fair value of the BMP Equity Units is determined on each grant date using a probability-weighted discounted cash flow analysis. This fair value measurement is based on significant inputs not observable in the market and thus represents a Level 3 measurement within the fair value hierarchy. The resultant probability-weighted cash flows are then discounted using a rate that reflects the uncertainty surrounding the expected outcomes, which the Company believes is appropriate and representative of a market participant assumption.

During the second quarter of 2020, 1,963,969 vested units were forfeited and returned as a result of an agreement allowing Beneficient to recover the aforementioned units held by one former director of Beneficient (see further discussion below).

The weighted-average grant date fair value was $9.61 per unit as of December 31, 2020. The weighted-average grant date fair value for the unvested activity presented in the table below was $9.61 per unit for the year ended December 31, 2020. The total fair value of shares vested during the year ended December 31, 2020, was $49.6 million.

*Ben Equity Incentive Plan*

The Board of Directors of Beneficient Management adopted the Ben Equity Incentive Plan in September 2018 (the "Ben Equity Incentive Plan"). Under the Ben Equity Incentive Plan, Ben LP is permitted to grant equity awards, in the form of restricted equity units ("REUs") up to a maximum of 12,811,258, representing ownership interests in Common Units. Settled awards under the Ben Equity Incentive Plan dilute holders of Common Units. The total number of Common Units that may be issued under the Ben Equity Incentive Plan is equivalent to 15% of the number of fully diluted Common Units outstanding, subject to annual adjustment. All awards are classified in equity upon issuance.

All REUs are subject to two performance conditions, both of which were met during 2019. Additionally, if a change-of-control event occurs prior to July 1, 2021, then all units, vested and unvested, will settle within 60 days. Any transaction whereby GWG Holdings obtains the right to appoint a majority of the members of Beneficient Management's Board of Directors is expressly excluded from the definition of change-of-control for the REUs.

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Awards will generally be subject to service-based vesting over a multi-year period from the recipient's date of hire, though some awards fully vest upon grant date. While providing services to Beneficient, if applicable, certain of these awards are subject to minimum retained ownership rules requiring the award recipient to continuously hold Common Unit equivalents equal to at least 15% of their cumulatively granted awards that have the minimum retained ownership requirement.

The holders of certain of the units issued under the BMP Equity Incentive Plan and the Ben Equity Incentive Plan, upon vesting, have the right to convert the units to shares of GWG Holdings common stock per the Exchange Agreement discussed in Note 1. As such, units vested and issued under Beneficient's equity incentive plans may result in dilution of the common stock of GWG Holdings.

REUs were awarded under the Ben Equity Incentive Plan beginning in the second quarter of 2019. For the REUs awarded under the Ben Equity Incentive Plan, pre-combination expense associated with the vesting of these awards is based on the fair value of the Common Units on the date of grant while post-combination expense is based on the fair value of the Common Units on the change-in-control date. The remaining unrecognized compensation cost for granted awards will be recognized prospectively over the remaining requisite service period, on a straight-line basis using the graded vesting method and forfeitures will be accounted for at the time that such forfeitures occur.

As Ben LP's equity is not publicly traded, the fair value for substantially all of the REUs granted in 2020 was estimated by using the valuation techniques consistent with those utilized to determine the acquisition date equity values arising from GWG Holdings obtaining a controlling financial interest in Beneficient. These valuation techniques relied upon the OPM Backsolve approach under the market method as more fully described in Note 4. For the REUs granted in the latter portion of 2020, which is a *de minimis* amount of the total 2020 REUs, we utilized valuation techniques consisting of the income approach and market approach. For awards granted during 2019, the fair value of the REUs was estimated using recent equity transactions involving third parties, which provided the Company with observable fair value information sufficient for estimating the grant date fair value.

During the second quarter of 2020, 507,500 vested units were forfeited as a result of an agreement allowing Beneficient to recover the aforementioned units held by one former director of Beneficient. Beneficient recognized $36.3 million of other income as a result of this recovery of equity-based compensation, including both BMP Equity Units and REUs. A substantial majority of the former director's equity-based compensation units were fully vested, and the majority of the related expense was allocated to certain holders of noncontrolling interests and recorded in prior periods. The provisions of the award agreements related to the forfeiture of vested units resulted in the previous expense being recorded to other income in the year-to-date period, accordingly.

During the third quarter of 2020, 515,000 units were granted to a senior partner director subject to a performance condition. The performance condition has not been met as of December 31, 2020. As the performance condition of the grant is based on a liquidity event, recognition of the related compensation cost is deferred until the condition has been met. Total unrecognized compensation cost related to this award is approximately $6.4 million as of December 31, 2020.

The estimated weighted-average grant date fair value date was $12.50 as of December 31, 2020. The weighted-average grant date fair value for the unvested activity presented in the table below was $12.50 for the year ended December 31, 2020. The total fair value of shares vested during the year ended December 31, 2020, was $42.9 million.

*Preferred Equity*

On April 25, 2019, Preferred Series A Subclass 1 Unit Accounts in BCH, a subsidiary of Ben LP, were assigned to three directors, with each having a capital account balance of $4.0 million, subject to a performance condition, in return for each of the directors providing to BCH their knowledge and abilities in helping with the formation of and capital raising for the Company. BHI, a Ben Founder Affiliate, assigned the Preferred Series A Subclass 1 Unit Accounts it holds in BCH to the directors for those individuals providing services to BCH. Accounting for services provided to the Company but paid by a principal shareholder follows the substance of the transaction and is therefore accounted for similar to a share-based payment in exchange for services rendered. The awards vest upon grant, subject to a performance condition whereby each of the directors must be a board member at the time that a certain level of additional capital is raised. The fair value of the awards at the grant date was estimated at $12.0 million in aggregate.

During the fourth quarter of 2019, $4.0 million of the capital account balance was forfeited back to the Company and reverted to BHI upon the departure of a certain director. The performance condition was met during the fourth quarter of 2020 and

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

expense of $11.4 million was recognized and specially allocated to certain Preferred Series A Subclass 1 Unit Account holders on a pro-rata basis based on their capital account balance. The expense recognized upon vesting is reflective of the value calculated after the determination of overall enterprise value in connection with the change of control event discussed in Note 4.

The following table summarizes the award activity, in number of units, during the year ended December 31, 2020:

| | Balance at December 31, 2019 | Granted | Vested | Exercised | Forfeited | Recovery of Vested Awards | Balance at December 31, 2020 |
|---|---|---|---|---|---|---|---|
| **Vested** | | | | | | | |
| RSU | — | — | 57,183 | (57,183) | — | — | — |
| BMP Equity Units | 7,980,037 | 4,580,888 | 578,678 | — | (31,618) | (1,963,969) | **11,144,016** |
| REUs | 2,164,742 | 3,033,956 | 401,598 | — | (14,000) | (507,500) | **5,078,796** |
| **Unvested** | | | | | | | |
| RSU | 244,083 | — | (57,183) | — | (57,183) | — | **129,717** |
| BMP Equity Units | 180,000 | 3,008,800 | (578,678) | — | (380,025) | — | **2,230,097** |
| REUs | 246,500 | 2,727,072 | (401,598) | — | (303,400) | — | **2,268,574** |
| **Total** | | | | | | | |
| RSU | 244,083 | — | — | (57,183) | (57,183) | — | **129,717** |
| BMP Equity Units | 8,160,037 | 7,589,688 | — | — | (411,643) | (1,963,969) | **13,374,113** |
| REUs | 2,411,242 | 5,761,028 | — | — | (317,400) | (507,500) | **7,347,370** |

The following table presents the components of equity-based compensation expense recognized in the consolidated statement of operations (in thousands):

| | Year Ended December 31, | |
|---|---|---|
| | **2020** | **2019** |
| Stock options | $ 180 | $ 408 |
| Stock appreciation rights | (40) | 338 |
| Restricted stock units | (38) | 986 |
| BMP equity units | 53,523 | — |
| REUs | 45,772 | — |
| Preferred equity | 11,443 | — |
| **Total equity-based compensation** | $ 110,840 | $ 1,732 |

Unrecognized equity-based compensation expense, excluding the expense related to the performance award discussed above, totaled approximately $34.8 million as of December 31, 2020.

F-57

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The following table presents the equity-based compensation expense expected to be recognized over the next five years based on scheduled vesting of awards outstanding, excluding the award subject to the performance condition discussed above, as of December 31, 2020 (in thousands):

| | Stock Options | | SAR | | REU | | BMP Equity Units | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2021 | $ | 107 | $ | 287 | $ | 7,805 | $ | 7,965 | $ | 16,164 |
| 2022 | | 19 | | 192 | | 5,754 | | 5,834 | | 11,799 |
| 2023 | | — | | 91 | | 2,993 | | 2,555 | | 5,639 |
| 2024 | | — | | — | | 674 | | 518 | | 1,192 |
| 2025 | | — | | — | | — | | — | | — |
| **Total** | $ | 126 | $ | 570 | $ | 17,226 | $ | 16,872 | $ | 34,794 |
| **Weighted-average period over which to be recognized** | | 0.57 years | | 1.12 years | | 2.52 years | | 1.61 years | | |

**(13) Other Expenses**

The components of other expenses in our consolidated statements of operations are as follows (in thousands):

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | **2020** | | **2019** | |
| Insurance and regulatory | $ | 4,459 | $ | 5,032 |
| Information technology | | 3,596 | | 2,024 |
| Servicing and facility fees | | 2,423 | | 1,833 |
| Marketing | | 1,251 | | 1,612 |
| Premises and equipment | | 1,215 | | 692 |
| Depreciation and amortization | | 1,170 | | 436 |
| Contract labor | | 906 | | 1,820 |
| Travel and entertainment | | 2,004 | | 1,218 |
| General and administrative | | 1,203 | | 1,076 |
| Bad debt expense | | — | | 153 |
| Total other expenses | $ | 18,227 | $ | 15,896 |

**(14) Income Taxes**

The Company's income tax provision reflects the activity of GWG Holdings and its subsidiaries and Beneficient Corporate Holdings, LLC, currently the sole entity in the Beneficient consolidated group that is taxed as a corporation. GWG Holdings and its subsidiaries files a separate tax return from Beneficient Corporate Holdings, LLC, but the tax provision information below as of and for the year ended December 31, 2020 is presented on a consolidated basis for financial reporting purposes under applicable GAAP.

As the statements of operations of GWG Holdings and Ben LP were presented on a consolidated basis beginning on January 1, 2020, the information below as of and for the year ended December 31, 2019 does not include the tax provision information of Beneficient Corporate Holdings, LLC.

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The current and deferred components of our income tax expense (benefit) and the reconciliation at the statutory federal tax rate to our actual income tax expense (benefit) consisted of the following (in thousands):

|  | Year Ended December 31, | |
|  | **2020** | **2019** |
|  |  | *(As Restated)* |
| Current income tax expense | $        537 | $          10 |
| Deferred income tax expense (benefit) | (16,927) | 71,855 |
| Total income tax expense (benefit) | $   (16,390) | $   71,865 |

|  | Year Ended December 31, | |
|  | **2020** | **2019** |
|  |  | *(As Restated)* |
| Statutory federal income tax (benefit) | $   (43,339) | $   33,449 |
| State income taxes (benefit), net of federal benefit | (2,995) | 12,962 |
| Change in valuation allowance | 20,688 | 25,547 |
| Noncontrolling interest | 7,718 | — |
| Other permanent differences, net | 1,538 | (93) |
| Total income tax expense (benefit) | $   (16,390) | $   71,865 |

The Company's effective tax rate was 7.9% and 45.1% for the years ended December 31, 2020 and 2019, respectively. The effective tax rate for the year ended December 31, 2020 primarily reflects the effects of the remeasurement of deferred tax liabilities due to a change in state deferred tax rate, offset by current state taxes and an increase in valuation allowance. The effective tax rate for the year ended December 31, 2019 was higher than the statutory rate primarily due to the deferred tax liability resulting from the gain on consolidation of equity method investment.

After the change-of-control transaction with Ben LP on December 31, 2019, GWG Holdings moved its headquarters from Minnesota to Texas. This move resulted in a change in the state deferred tax rate from 9.8% to 0%.

The effects of temporary differences that give rise to deferred income taxes were as follows (in thousands):

|  | December 31 | |
|  | **2020** | **2019** |
|  |  | *(As Restated)* |
| Deferred tax assets: |  |  |
| Investment in life insurance policies | $   42,836 | $   37,649 |
| Net operating loss and business interest carryforwards | 43,188 | 18,935 |
| Other assets | 4,940 | 9,348 |
| Subtotal | 90,964 | 65,932 |
| Valuation allowance | (88,157) | (65,932) |
| Deferred tax assets | 2,807 | — |
|  |  |  |
| Deferred tax liabilities: |  |  |
| Investment in partnership | (54,077) | (71,855) |
| Other liabilities | (199) | — |
| Net deferred tax liability | $   (51,469) | $   (71,855) |

At December 31, 2020, we had federal net operating loss ("NOL") carryforwards of $58.0 million resulting in related deferred tax assets of $12.2 million, and state NOL carryforwards of $24.3 million resulting in related deferred tax assets of $1.9 million. At December 31, 2019, we had federal NOL carryforwards of $29.7 million resulting in related deferred tax

F-59

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

assets of $6.2 million, and state NOL carryforwards of $29.6 million resulting in related deferred tax assets of $2.3 million. The NOL carryforwards will begin to expire in 2031.

Future utilization of NOL carryforwards is subject to limitations under Section 382 of the Internal Revenue Code. This section generally relates to a more than 50 percent change in ownership over a three-year period. As a result of the Exchange Transaction, a change in ownership for income tax purposes occurred as of December 28, 2018. As such, the annual utilization of our net operating losses generated prior to the ownership change was limited. However, net unrealized built-in gains on our life insurance policies result in an increase in the Section 382 limit over the five-year recognition period, which resulted in $0.5 million of current tax liability in 2020 and a nominal amount in 2019. Included in the deferred tax liability noted in the table above are our investments in various classes of equity in Beneficient, which are partnerships for federal income tax purposes.

Also, as of December 31, 2020, we had a capital loss carryforward of $14.2 million that, if unused, will expire in 2025.

We provide for a valuation allowance when it is not considered "more likely than not" that our deferred tax assets will be realized. As of December 31, 2020, based on all available evidence, we have provided a valuation allowance of $88.2 million against our deferred tax assets due to the uncertainty as to the realization of our deferred tax assets during the carryforward periods. In 2020, valuation allowances were recorded against the total amount of non-permanent deferred tax assets.

The Company currently records a valuation allowance against its deferred tax assets that cannot be realized by the future reversal of existing temporary differences. Due to the uncertain timing of the reversal of certain of these temporary differences due to the constraint described below, they cannot be considered as a source of future taxable income for purposes of determining a valuation allowance; therefore, the vast majority of the deferred tax liability cannot be utilized in determining the realizability of the deferred tax assets. As previously discussed, due to a prior deemed ownership change, net operating loss carryforwards are subject to Section 382 of the Internal Revenue Code.

The Company reassessed its valuation allowance during the third quarter of 2020 and determined it would no longer utilize the reversal of a temporary difference related to GWG Holdings' preferred equity ownership in Beneficient, until such time as the preferred equity is no longer constrained, as a source of income to realize existing deferred tax assets related to the net operating loss and Section 163(j) limitations. As a result, the Company recorded a large net deferred tax liability as of December 31, 2020. The effects of the reassessment of the valuation allowance on the deferred tax liability as of December 31, 2019 are reflected in Note 21 to these consolidated financial statements. The net deferred tax liability as of December 31, 2020 is specifically related to GWG Life's investment in the Preferred Series A Subclass 1 Unit Accounts described in Note 1. The disposition of this investment is constrained by the Pledge and Security Agreement in favor of the holders of the L Bonds of GWG Holdings. As such, the timing of recognition of the necessary taxable income related to this investment and the future reversal of this temporary difference cannot be predicted.

ASC 740, *Income Taxes*, requires the reporting of certain tax positions that do not meet a threshold of "more-likely-than-not" to be recorded as uncertain tax benefits. It is management's responsibility to determine whether it is "more-likely-than-not" that a tax position will be sustained upon examination, including resolution of any related appeals or litigation, based upon the technical merits of the position. Management has reviewed all income tax positions taken or expected to be taken and has determined that the income tax positions are appropriately stated and supported. We do not anticipate that the total unrecognized tax benefits will significantly change prior to December 31, 2021.

Under our accounting policies, interest and penalties on unrecognized tax benefits, as well as interest received from favorable tax settlements are recognized as components of income tax expense. At December 31, 2020 and 2019, we recorded no accrued interest or penalties related to uncertain tax positions.

Our income tax returns for tax years ended December 31, 2017 through 2019, and 2020, when filed, remain open to examination by the Internal Revenue Service and various state taxing jurisdictions. Our income tax return for tax year ended December 31, 2016 also remains open to examination by various state taxing jurisdictions.

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(15) Earnings (Loss) per Common Share**

The computations of basic and diluted income (loss) attributable to common shareholders per share for 2020 and 2019 are as follows (in thousands, except share data and per share data):

| | **Year Ended December 31,** | |
| --- | --- | --- |
| | **2020** | **2019** |
| **Numerator:** | | *(As Restated)* |
| Basic – Net income (loss) attributable to common shareholders | $    (168,545) | $    70,471 |
| Add: Preferred dividends upon conversion | — | 2,020 |
| Diluted – Net income (loss) attributable to common shareholders | (168,545) | 72,491 |
| | | |
| **Denominator:** | | |
| Basic – weighted average common shares outstanding | 28,063,268 | 33,016,007 |
| Effect of dilutive securities | — | 2,203,435 |
| Diluted – weighted average common shares outstanding | 28,063,268 | 35,219,442 |
| Basic earnings (loss) per common share | $    (6.01) | $    2.13 |
| Diluted earnings (loss) per common share | $    (6.01) | $    2.06 |

For the year ended December 31, 2020, RPS, RPS 2, restricted stock units, and stock options for a potential 2,313,748 shares were not included in the calculation of diluted earnings per share because we recorded a net loss during this period and the effects were anti-dilutive. Potentially dilutive instruments issued by Ben LP that are ultimately exchangeable into GWG Holdings' common stock were also excluded from the calculation of diluted earnings per share for the year ended December 31, 2020 because we recorded a net loss during this period and the effects were anti-dilutive.

RPS and RPS 2 (as described in Note 11) and restricted stock units and stock options (as described in Note 12) were included in the calculation of diluted earnings per share for the year ended December 31, 2019. Options to purchase 437,266 shares of common stock were outstanding during 2019 but were excluded from the calculation of diluted earnings per share because their effects were anti-dilutive.

**(16) Segment Reporting**

The Company has two reportable segments consisting of Secondary Life Insurance and Beneficient. Corporate & Other includes certain activities not allocated to specific business segments. These activities include holding company financing and investing activities, and management and administrative services to support the overall operations of the Company, and from November 1, 2019, include GWG Holdings' equity method investment in FOXO.

The Secondary Life Insurance segment seeks to earn non-correlated yield from our portfolio of life insurance policies. Our Beneficient segment consists of the assets and operations of Ben LP and its subsidiaries. Beneficient became a consolidated subsidiary of GWG Holdings as of December 31, 2019 as described in Note 4. Ben LP provides a variety of trust services, liquidity products for owners of alternative assets and illiquid investment funds, and other financial services to MHNW individuals. The Corporate & Other category consists of unallocated corporate overhead and administrative costs and the operations of operating segments that do not meet the quantitative criteria to be separately reported.

These segments are differentiated by the products and services they offer as well as by the information used by the Company's chief operating decision maker to determine allocation of resources and assess performance.

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Earnings before taxes ("EBT") is the measure of profitability used by management to assess performance of its segments and allocate resources. Segment EBT represents net income (loss) excluding income taxes and includes earnings (loss) from equity method investments and for the year ended December 31, 2019, the gain on consolidation of equity method investment. Information on reportable segments is as follows (in thousands):

| Revenue: | Year Ended December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Secondary Life Insurance | $ 51,359 | $ 78,002 |
| Beneficient | 72,950 | 13,738 |
| Corporate & Other | 62 | 536 |
| Total | $ 124,371 | $ 92,276 |

| Interest Expense: | Year Ended December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Secondary Life Insurance | $ 97,279 | $ 83,055 |
| Beneficient | 57,337 | 31,789 |
| Corporate & Other | — | — |
| Total | $ 154,616 | $ 114,844 |

| Segment EBT: | Year Ended December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| | | *(As Restated)* |
| Secondary Life Insurance | $ (59,684) | $ (27,694) |
| Beneficient | (139,575) | 222,443 |
| Corporate & Other | (32,970) | (35,470) |
| Total Segment EBT | (232,229) | 159,279 |
| Income tax expense (benefit) | (16,390) | 71,865 |
| Net income (loss) | $ (215,839) | $ 87,414 |

| Total Assets: | December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| | | *(As Restated)* |
| Secondary Life Insurance | $ 886,739 | $ 904,363 |
| Beneficient | 2,662,630 | 2,762,121 |
| Corporate & Other | 15,588 | 9,297 |
| Total | $ 3,564,957 | $ 3,675,781 |

The total assets of the Beneficient segment at both December 31, 2020 and 2019, includes goodwill of $2.4 billion which represents all of the goodwill on our consolidated balance sheet as of the end of each reporting period.

**(17) Leases**

The Company leases certain real estate for its office premises under operating lease agreements, which expire in 2021 and 2025. Under these leases, we are obligated to pay base rent plus common area maintenance and a share of building operating costs. The lease

agreements contain extension options which we have not included in our liability calculations. We lease various other facilities on a short-term basis. The lease assets and liabilities are as follows (in thousands):

F-62

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

| Leases | Classification | December 31, 2020 |
|---|---|---|
| Operating lease right-of-use assets | Other assets | $ 1,126 |
| Operating lease liabilities | Accounts payable and accrued expenses | $ 1,672 |

Total lease costs recognized for the years ended December 31, 2020 and 2019 were as follows (in thousands):

| | Year Ended December 31, | |
|---|---|---|
| | 2020 | 2019 |
| Operating lease costs | $ 910 | $ 233 |
| Variable lease costs | 332 | 225 |
| Short-term lease costs | 87 | 60 |
| Total lease costs | $ 1,329 | $ 518 |

The weighted average remaining lease term at December 31, 2020 and 2019 was 3.9 years and 4.2 years, respectively, and the weighted average discount rate was 6.8% and 6.6%, respectively. For the years ended December 31, 2020 and 2019, cash paid for amounts included in the measurement of operating lease liabilities and included in operating cash flows totaled $1.0 million and $0.3 million respectively.

Maturities of operating lease liabilities as of December 31, 2020 are as follows (in thousands):

| | |
|---|---|
| 2021 | $ 716 |
| 2022 | 302 |
| 2023 | 311 |
| 2024 | 320 |
| 2025 | 273 |
| Thereafter | — |
| Total lease payments | 1,922 |
| Less: imputed interest | (250) |
| Present value of lease liabilities | $ 1,672 |

## (18) Commitments and Contingencies

*Litigation* — In the normal course of business, we are involved in various legal proceedings. In the opinion of management, any liability resulting from such proceedings would not have a material adverse effect on our financial position, results of operations or cash flows.

*Commitments* — GWG Holdings is committed to contribute an additional $3.8 million to FOXO through 2021. The ExAlt Trusts had $35.6 million and $34.9 million of potential gross capital commitments as of December 31, 2020 and December 31, 2019, respectively, representing potential limited partner capital funding commitments on the interests in alternative asset funds. This is the amount above any existing cash reserves for such capital funding commitments. The ExAlt Trusts holding the interest in the limited partnership for the alternative asset fund is required to fund these limited partner capital commitments per the terms of the limited partnership agreement. Capital funding commitment reserves are maintained by the associated trusts within the ExAlt Plan™ created at the origination of each trust for up to $0.1 million. To the extent that the associated ExAlt Trusts cannot pay the capital funding commitment, Beneficient is obligated to lend the associated ExAlt Trust sufficient funds to meet the commitment pursuant to the terms of the respective ExAlt Loan. Any amounts advanced by Beneficient to the ExAlt Trusts for these limited partner capital funding commitments pursuant to the terms of the respective ExAlt Loan above the associated capital funding commitment reserves held by the associated ExAlt Trusts are added to the ExAlt Loan balance between Beneficient and the ExAlt Trusts and are expected to be recouped through the cash distributions from the alternative asset fund that collateralizes such ExAlt Loan.

F-63

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Capital commitments generally originate from limited partner agreements having fixed or expiring expiration dates. The total limited partner capital funding commitment amounts may not necessarily represent future cash requirements. Beneficient considers the creditworthiness of the investments on a case-by-case basis. At both December 31, 2020 and December 31, 2019, Beneficient had no reserves for losses on unused commitments to fund potential limited partner capital funding commitments.

*Unfunded Commitments* — Beneficient had $1.1 million of unfunded commitments on liquidity solution transactions as of December 31, 2020 related to liquidity transactions in process as of that date. There were no reserves for unfunded commitments as of December 31, 2020, and all amount in process were fully funded in the first quarter of 2021.

*Investigation* — On October 6, 2020, GWG Holdings received a subpoena to produce documents from the Chicago office of the SEC's Division of Enforcement, informing the Company of the existence of a non-public, fact-finding investigation into GWG Holdings. Since the initial subpoena, GWG Holdings has received subsequent subpoenas from the SEC for additional information. The requested information from the SEC has primarily related to GWG Holdings' investment products, including its L Bonds, as well as various accounting matters, among them, the consolidation for financial reporting purposes of Beneficient by GWG Holdings, goodwill valuation, and the accounting related to the ExAlt Trusts, related party transactions, life insurance policies, and the calculation of the debt-coverage ratio.

Until receipt of the initial subpoena on October 6, 2020, GWG Holdings had no previous communication with the SEC related to these issues and was unaware of this investigation. The Company is fully cooperating with the SEC in this investigation. The Company is currently unable to predict when this matter will be resolved or what further action, if any, the SEC may take in connection with it. As such, the Company cannot predict with certainty the outcome or effect of any such investigation or whether it will lead to any claim or litigation.

**(19) Concentration**

*Life Insurance Carriers*

Our portfolio consists of purchased life insurance policies written by life insurance companies rated investment-grade by third-party rating agencies, including A.M. Best Company, Standard & Poor's, and Moody's. As a result, there may be concentrations of policies with certain life insurance companies. The following summarizes the face value of insurance policies with specific life insurance companies exceeding 10% of the total face value of our portfolio.

| Life Insurance Company | December 31, 2020 | December 31, 2019 |
|---|---|---|
| John Hancock | 14.72 % | 14.23 % |
| Lincoln National | 11.20 % | 11.55 % |
| Equitable Financial | 10.57 % | 10.63 % |

The following summarizes the number of insurance policies held in specific states exceeding 10% of the total face value held by us:

| State of Residence | December 31, 2020 | December 31, 2019 |
|---|---|---|
| California | 18.05 % | 17.46 % |
| Florida | 14.93 % | 14.86 % |

*Alternative Assets Industries*

Beneficient's underlying portfolio companies primarily operate in the United States and Western Europe, with the largest percentage, based on NAV, operating in diversified financials, telecommunications services, food and staples retailing, and software and services industries.

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(20) Related Parties**

*Relationship with Beneficient Management Counselors, L.L.C.*

Beneficient Management is the general partner of Ben LP and is governed by a board of directors. The governing document of Beneficient Management provides that Beneficient Management Counselors, L.L.C. ("BMC"), wholly owned by one of several Ben Founder Affiliates, determines the directors of Beneficient Management who fill 30% of the seats on the Board of Directors of Beneficient Management. BMC is also entitled to select (a) 50% of the membership of Beneficient Management's Nominating Committee and Executive Committee and appoint the chair of each of these committees, and (b) 50% of the membership of the Community Reinvestment Committee (CRC) and the CRC's chairperson, vice-chairperson, and lead committee member. Certain decisions with respect to Ben LP's charitable giving program are delegated to the CRC. Decisions regarding appointment and removal of Beneficient Management's directors, other than directors appointed by BMC, and GWG Holdings, are delegated, with certain exceptions, to the Nominating Committee of Beneficient Management, of which an executive of a Ben Founder Affiliate is a member and Chairman. In the event of a tie vote of the Nominating Committee on a vote for the removal of a director, the Chairman of the Nominating Committee may cast the tie-breaking vote.

*Services Agreement with Bradley Capital Company, L.L.C.*

Ben LP is the general partner of BCH and together they entered into an agreement with Bradley Capital Company, L.L.C. ("Bradley Capital") and BMC effective July 1, 2017 (the "Bradley Capital Agreement"). Bradley Capital is indirectly owned by a Ben Founder Affiliate. Under the Bradley Capital Agreement, Bradley Capital is entitled to a current base fee of $0.4 million per quarter for executive-level services provided by an executive of Bradley Capital, who is Beneficient's Chief Executive Officer, former Chairman of GWG Holdings' board of directors (serving from April 26, 2019 to June 14, 2021), and Chairman of Beneficient Management's board of directors, together with a current supplemental fee of $0.2 million per quarter for administrative and financial analysis, subject to an annual inflation adjustment. The base fee may be increased up to two times the initial base fee per quarter if the scope of the services is expanded with the approval of the Executive Committee of the board of Beneficient Management, of which an executive of a Ben Founder Affiliate is a member and Chairman. An executive of a Ben Founder Affiliate receives an annual salary from the Company of $0.2 million and both an executive of a Ben Founder Affiliate and other employees of Bradley Capital can participate in equity incentive plans sponsored by the Company. The Bradley Capital Agreement also includes a payment from Ben LP of $0.2 million per year, paid quarterly, to cover ongoing employee costs for retired and/or departed employees of predecessor entities prior to September 1, 2017, which on-going costs were assumed by Bradley Capital, as well as a further payment to Bradley Capital in respect of the cost of health and retirement benefits for current employees of Bradley Capital all of which are reimbursed by Ben LP. Ben LP is also required to reimburse Bradley Capital for out-of-pocket expenses incurred by Bradley Capital employees, including reimbursement for private travel including the family members of a designated executive of a Ben Founder Affiliate for both business and personal use. The Bradley Capital Agreement requires Ben LP to reimburse Bradley Capital or its affiliates for taxes, fees, and expenses, including legal fees and related costs, relating to the contributions by affiliates of Bradley Capital of equity or debt interests in Ben LP to public charitable trusts in connection with the Exchange Trusts, as well as the contribution of beneficial interests in customer trusts administered by Beneficient. Additionally, the Company provides office space and access to needed technology systems and telephony services. Payments by Ben LP to Bradley Capital and its affiliates are guaranteed and subject to enforcement by the state courts in Delaware in the event of default. The Bradley Capital Agreement extends through December 31, 2021, with an automatic annual one-year renewal provision thereafter. The Bradley Capital Agreement may be terminated by unanimous approval of the Executive Committee of the board of Beneficient Management of which an executive of a Ben Founder Affiliate is a member, or without such approval if the Ben Founder Affiliate no longer holds $10.0 million of Ben LP's securities. During the year ended December 31, 2020, the Company recognized expenses totaling $3.8 million related to this services agreement.

*Relationship with Beneficient Holdings, Inc.*

The Beneficient Company Group (USA), L.L.C. ("Beneficient USA"), a subsidiary of BCH, entered into a Services Agreement with BHI effective July 1, 2017 (the "BHI Services Agreement"). BHI is indirectly owned by a Ben Founder Affiliate and is an affiliate of Beneficient. BHI pays an annual fee of $30 thousand to Ben LP for the provision of trust administration services for a Ben Founder Affiliate and all trusts affiliated with its family trustee as that term is defined in the governing documents for a Ben Founder Affiliate. Beneficient USA also is required to provide any other services requested by BHI, subject to any restrictions in the operating agreement of BHI, at cost. The term of the BHI Services Agreement

F-65

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

extends for the longer of (i) five years past the expiration or termination of the Bradley Capital Agreement, or (ii) seven years after the family trustee of the Ben Founder Affiliate is no longer a primary beneficiary of any trust affiliated with the family trustee. During the year ended December 31, 2020, the Company recognized income in accordance with the agreement.

BHI owns the majority of the Class S Ordinary Units, Class S Preferred Units, Preferred Series A Subclass 1 Unit Accounts, and FLP Subclass 1 Unit Accounts issued by BCH.

BHI expects to receive tax distributions from HCLP arising from the repayment of the Second Lien Credit Agreement to cover any tax liability associated with the contribution of the Second Lien Credit Agreement to HCLP (Note 10). Additionally, if HCLP is liquidated while the Second Lien Credit Agreement is still outstanding, the Second Lien Credit Agreement will transfer back to BHI.

*HCLP Nominees, LLC*

During the years ended December 31, 2020 and 2019, GWG Holdings invested $130.2 million and $79.0 million, respectively, of cash into equity investments in Beneficient. During this same period, Beneficient made payments to HCLP, its Senior Lender, totaling $144.6 million in principal and interest on the First and Second Lien Credit Agreements. The First Credit Agreement was issued in 2017, while the Second Lien Credit Agreement was issued in 2018. HCLP is an indirect subsidiary of Highland Consolidated, L.L.C. ("Highland").

A long-standing lending and investment relationship of 25 years exists between Highland (and its affiliates or related parties), on the one hand, and certain trusts and entities held by such trusts that are controlled by Ben Founder ("Ben Founder Affiliates"), on the other. From time to time, Highland or its affiliates have advanced funds under various lending and investing arrangements to the Ben Founder Affiliates, and such Ben Founder Affiliates have made repayments to Highland or its affiliates, as applicable, both in cash and in kind.

Such loans to and investments with or in the Ben Founder Affiliates have been and may be made by Highland, or its affiliates, as applicable, using proceeds from loan repayments made by Beneficient to HCLP in its capacity as Senior Lender to Beneficient, with such loan repayments made potentially using cash from GWG Holdings' and GWG Life's investments in Beneficient. Such loans and investments have ranged between no outstanding balance and $104.0 million.

As of June 30, 2021, Highland and the applicable Ben Founder Affiliates mutually agreed to satisfy all obligations under all outstanding loans among Highland and the Ben Founder Affiliates via full payment and satisfaction of the existing loan balances (the "Loan Balances") by in-kind real property transfers (the "In-Kind Property Payment") from certain of the Ben Founder Affiliates to Highland. The terms of the In-Kind Property Payment grants Highland the right to transfer the real property that was transferred pursuant to the In-Kind Property Payment back to certain of the Ben Founder Affiliates, in exchange for a Preferred Series A Subclass 1 capital account balance in BCH in an amount equal to the Loan Balances, with such exchange to be satisfied from existing Preferred Series A Subclass 1 Unit Accounts that are held by such Ben Founder Affiliates. As of June 30, 2021, neither Highland nor any of its affiliates has any outstanding loans or investments with or in any Ben Founder Affiliates.

*Administrative Services Agreement between Constitution Private Capital Company, L.L.C. ("Constitution") and Beneficient USA*

Constitution is an entity owned 50.5% by a Ben Founder Affiliate and 49.5% by an entity controlled by the board of directors of Beneficient Management. It was founded in 1986 and acquired by a Ben Founder Affiliate in 1996. Constitution currently manages three private equity fund-of-funds. Effective January 1, 2017, Constitution entered into an Administrative Services Agreement (the "ASA") with Beneficient USA, which is wholly owned by BACC and a subsidiary of BCH, whereby Beneficient USA provides personnel to administer the portfolio assets advised by Constitution. Under the ASA, Constitution pays to Beneficient USA a monthly fee equal to .01% of the month-end net assets of its portfolio. The ASA automatically renews on an annual basis and may be terminated at any time by Constitution. Beneficient USA may only terminate the ASA in the event of a breach by Constitution. The income recognized by the Company related to this services agreement was immaterial for the years ended December 31, 2020.

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Preferred Liquidity Provider Agreement with Constitution*

In May 2019, BCC entered into an agreement with Constitution (the "Preferred Liquidity Provider Agreement") under which at Constitution's option, BCC will provide liquidity to alternative asset funds sponsored by Constitution at an advance rate of not less than 82% of NAV, to the extent such funds meet certain specified qualifications. For a fund to qualify for the liquidity option, it must, among other things, hold investments that were approved or deemed approved by BCC at the time a fund makes such investments. BCC is required to provide liquidity in any combination, at its discretion, of cash, U.S. exchange traded funds registered under the Investment Company Act of 1940, or securities traded on a national securities exchange. BCC's obligation under the Preferred Liquidity Provider Agreement is guaranteed by Ben LP and BCH. The Preferred Liquidity Provider Agreement may be terminated solely by mutual consent of Beneficient and Constitution. Beneficient and Constitution have not contracted for any liquidity under this agreement through December 31, 2020.

*Relationship with The Heppner Endowment for Research Organizations, L.L.C. ("HERO") and Research Ranch Operating Company, L.L.C ("RROC").*

HERO and RROC are owned indirectly by a Ben Founder Affiliate. HERO's purposes are (i) to serve as an advisor to National Philanthropic Trust ("NPT"), an unrelated third-party charitable organization, regarding the disbursement of research grants to qualifying organizations, and (ii) to serve as an advisor to NPT regarding the administration of charitable contributions made for the benefit of such qualifying organizations. Although HERO can advise on these matters, NPT has all final decision-making authority on the charitable contributions and complete control over the proceeds received by the charitable organizations. The charitable organizations administered by NPT (the beneficiaries of which have historically been multiple Texas universities) receive proceeds from trusts settled and funded by customers of Beneficient, in support of their charitable initiatives. HERO does not receive any proceeds from trusts settled and funded by customers of Beneficient.

RROC's purpose is to provide funding and operational support for the research activities conducted by the qualified charities. The funding received by RROC, from proceeds of trusts settled and funded by customers of Beneficient, may be used, in RROC's discretion, to (i) provide appropriate facilities and properties for the charitable organizations to utilize as part of their charitable initiatives (those properties and facilities being owned by a Ben Founder Affiliate), and (ii) provide fee revenue to RROC. RROC is granted such rights and authority pursuant to trust instruments entered into between a customer and subsidiaries of Ben LP as well as an agreement with NPT. Ben LP's subsidiaries provide financing to the ExAlt Trusts and Beneficient is paid as an agent of the trustees for administrative services it provides to the trusts. The Company has certain outstanding payables, including accrued interest, of approximately $2.6 million and $2.5 million as of December 31, 2020 and 2019, respectively, to RROC and NPT (for the benefit of the Texas universities). There were no payments made during the year ended December 31, 2020.

*Relationship with Hicks Holdings L.L.C.*

Hicks Holdings L.L.C. ("Hicks Holdings"), an entity related to Thomas O. Hicks, who is a Beneficient Management director and a former GWG Holdings director, owns a Preferred Series A Subclass 1 Unit Account and Class S Ordinary Units issued by BCH with a total initial balance of $60.4 million. Hicks Holdings was granted its Preferred Series A Subclass 1 Unit Account and Class S Ordinary Units as compensation for services provided under a previous advisory and consulting services agreement between Beneficient and Hicks Holdings, which terminated on June 30, 2018. The total balance as of December 31, 2020 was $78.2 million.

*Relationship with MHT Financial, L.L.C.*

MHT Financial, L.L.C ("MHT") is the sole beneficiary of each of the Seller Trusts. MHT is an entity affiliated with the Chairman, President and Chief Executive Officer of GWG Holdings (the "GWG Chairman") and became a related party to Beneficient as a result of the December 31, 2019 transactions between GWG Holdings and Ben LP. The GWG Chairman may be deemed to have an indirect interest in the assets held by the Seller Trusts as a result of his ownership of 30% of the outstanding membership interests of MHT. The assets of the Seller Trusts currently include shares of GWG Holdings' common stock and Seller Trust L Bonds. Consequently, to the extent that MHT, as sole beneficiary of each of the Seller Trusts, receives any proceeds from distributions on the GWG Holdings' common stock, interest and principal payments on the Seller Trust L Bonds or the sale or other disposition of GWG Holdings' common stock and Seller Trust L Bonds in excess of MHT's contractual obligations to the former owners of alternative assets that were contributed to the Seller Trusts, the GWG Chairman would have a right to receive his pro rata share of any distribution of such excess proceeds if made by

F-67

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

MHT to its members. The GWG Chairman does not have unilateral authority to effect the sale or other disposition of the assets of the Seller Trusts or cause MHT to make distributions to its members. Following the satisfaction of MHT's contractual obligations upon the sale or other disposition of the assets of the Seller Trusts, (i) there may not be excess proceeds to distribute to MHT or (ii) even if there are excess proceeds, MHT may not distribute such excess proceeds to its members.

Beneficient has amounts due under two promissory note agreements with MHT for funds advanced outside of its normal liquidity arrangements. Aggregate principal and interest due for both promissory notes as of December 31, 2020 and 2019, was $4.2 million and $3.9 million, respectively, which is recorded in other assets in the consolidated balance sheets.

MHT also owns a Preferred Series A Subclass 1 Unit Account with a total account balance of $23.9 million and $24.5 million as of December 31, 2020 and 2019, respectively.

*Promissory Note*

On May 31, 2019, the Borrowers executed the Promissory Note with GWG Life for a principal amount of $65.0 million that matures on June 30, 2023. An initial advance in the principal amount of $50.0 million was funded on June 3, 2019, and a second advance in the principal amount of $15.0 million was funded on November 27, 2019.

The proceeds from the Promissory Note were used by the Borrowers to purchase senior beneficial interests held by these certain other trusts of the ExAlt Plan™. The aforementioned trusts utilized the proceeds to repay loan amounts owed by certain of the trusts included within the ExAlt Plan™ to BCC, a subsidiary of Ben LP.

As of December 31, 2019, the Borrowers became consolidated subsidiaries of GWG Holdings as a result of the Investment Agreement (described in Note 1). Accordingly, the Promissory Note and related accrued interest, are eliminated upon consolidation as of that date. Prior to any purchase accounting adjustments, the outstanding principal balance was $65.0 million and accrued interest expense was $2.2 million as of December 31, 2019. The Promissory Note was settled on September 30, 2020, as discussed further in Note 1.

F-68

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(21) Restatement**

As previously reported on Form 8-K filed with the SEC on July 7, 2021, and as discussed throughout this 2020 Form 10-K, as part of the preparation of its 2020 Form 10-K, the Company voluntarily submitted two questions to the OCA on February 15, 2021. The questions submitted by the Company to OCA were (1) whether a December 31, 2019 transaction resulted in GWG Holdings, Inc. obtaining control of Ben LP in a transaction that constituted a change-in-control of Beneficient by entities not under common control, and (2) whether Ben LP was required to consolidate any of the trusts created through Beneficient's ExAlt Plan™ established in connection with its business of providing liquidity to holders of alternative assets. On July 26, 2021, the Company and OCA staff held a conference call in which OCA's staff notified the Company of its conclusions on the two accounting questions that were the subject of the consultation. During that call, OCA expressed that it would object to a conclusion that Ben LP not consolidate the ExAlt Trusts as of December 31, 2019. Regarding question (1), OCA did not conclude on the common control aspect of the transaction in question. However, after further analysis, including, among other things, consulting with legal counsel to conclude that the common stock of GWG Holdings held by Beneficient were not voteable under Delaware law, the Company confirmed its original conclusion that the entities were not under common control.

Prior to December 31, 2019, only certain trusts created through Beneficient's ExAlt Plan™ were considered variable interest entities for which Ben LP had a variable interest and was considered the primary beneficiary. Thus, Ben LP was required to consolidate certain of such trusts. Due to changes to both the governance structure and the underlying economics of the trust and other agreements pertaining to certain of the ExAlt Trusts and the execution of new loan agreements between a subsidiary of Ben LP and certain of such trusts as of December 31, 2019, it was initially concluded that Ben LP no longer had the power to direct the activities that most significantly impact the economic performance of any of the ExAlt Trusts and therefore could no longer consolidate any of such trusts as of December 31, 2019, including those previously consolidated. However, we have since determined that such conclusion was incorrect, and that the proper application of generally accepted accounting principles is for Ben LP to consolidate all of the ExAlt Trusts. As a result of consolidating such trusts, Ben LP's primary tangible asset, which was acquired through loans a subsidiary of Ben LP made to certain of the ExAlt Trusts, was previously reported as a loan receivable as of December 31, 2019, but is now being reported as an investment in alternative assets held by certain of the ExAlt Trusts.

The tables below illustrate the impact of the Restatement, as well as other corrections as discussed in Note 2, on our historical Consolidated Balance Sheet, Consolidated Statement of Operations, Consolidated Statement of Cash Flows, and Consolidated Statement of Changes in Stockholder's Equity as of December 31, 2019, each as compared with the amounts presented in the original Form 10-K previously filed with the SEC.

F-69

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Effects of the Restatement - Annual Results**

All adjustments presented in the tables below reflect the impact of the consolidation of the ExAlt Trusts, unless otherwise specifically indicated in the footnotes to each table.

The following table sets forth the effects of the Restatement on the affected line items within the Company's previously reported Consolidated Balance Sheet as of December 31, 2019 (dollars in thousands).

|  | December 31, 2019 | | |
|---|---|---|---|
|  | As Previously Reported | Adjustments | As Restated |
| ASSETS |  |  |  |
| Cash and cash equivalents | $ 79,073 | $ 3,211 | $ 82,284 |
| Restricted cash | 20,258 | 13,248 | 33,506 |
| Investment in alternative assets, at net asset value | — | 342,012 | 342,012 |
| Loan receivables, net of discount | 232,344 | (232,344) | — |
| Fees receivable | 29,168 | (29,168) | — |
| Financing receivables from affiliates | 67,153 | (67,153) | — |
| Other assets | 28,374 | 1,024 | 29,398 |
| Goodwill | 2,358,005 | 9,745 | 2,367,750 |
| TOTAL ASSETS | 3,635,206 | 40,575 | 3,675,781 |
| LIABILITIES & STOCKHOLDERS' EQUITY |  |  |  |
| LIABILITIES |  |  |  |
| Deferred revenue | 41,444 | (41,444) | — |
| Repurchase option | — | 61,664 | 61,664 |
| Accounts payable and accrued expenses | 27,836 | 56 | 27,892 |
| Deferred tax liability, net[1] | 57,923 | 13,932 | 71,855 |
| TOTAL LIABILITIES | 1,764,725 | 34,208 | 1,798,933 |
| STOCKHOLDERS' EQUITY |  |  |  |
| Accumulated deficit | (76,501) | (20,695) | (97,196) |
| TOTAL GWG HOLDINGS STOCKHOLDERS' EQUITY | 333,979 | (20,695) | 313,284 |
| Noncontrolling interests | 266,848 | 27,062 | 293,910 |
| TOTAL STOCKHOLDERS' EQUITY | 600,827 | 6,367 | 607,194 |
| TOTAL LIABILITIES & STOCKHOLDERS' EQUITY | $ 3,635,206 | $ 40,575 | $ 3,675,781 |

[1] Adjustment specifically reflects the impact of an immaterial out-of-period adjustment to correct the valuation allowance against the Company's deferred tax assets. See Note 2 to the consolidated financial statements for more details.

F-70

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The following table sets forth the effects of the Restatement on the affected line items within the Company's previously reported Consolidated Statement of Operations for the year ended December 31, 2019 (dollars in thousands).

| | As Previously Reported | Adjustments | As Restated |
|---|---|---|---|
| INCOME TAX EXPENSE[1] | $ 57,933 | $ 13,932 | $ 71,865 |
| LOSS BEFORE EARNINGS FROM EQUITY METHOD INVESTMENTS | (137,530) | (13,932) | (151,462) |
| Gain on consolidation of equity method investment (see Note 4) [2] | 249,716 | (6,763) | 242,953 |
| NET INCOME (LOSS) | 108,109 | (20,695) | 87,414 |
| NET INCOME (LOSS) ATTRIBUTABLE TO COMMON SHAREHOLDERS | 91,166 | (20,695) | 70,471 |
| NET INCOME (LOSS) PER COMMON SHARE | | | |
| Basic | $ 2.76 | $ (0.63) | 2.13 |
| Diluted | $ 2.65 | $ (0.59) | 2.06 |

[1] Adjustment reflects the impact of an immaterial out-of-period adjustment to correct the valuation allowance against the Company's deferred tax assets. See Note 2 to the consolidated financial statements for more details.
[2] Adjustment is due to the fair value adjustment of the Promissory Note, which was required as of December 31, 2019 upon consolidation of the ExAlt Trusts.

The following table sets forth the effects of the Restatement on the affected line items within the Company's previously reported Consolidated Statement of Cash Flows for the year ended December 31, 2019 (dollars in thousands).

| | As Previously Reported | Adjustments | As Restated |
|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | |
| Net income (loss) [1] [2] | $ 108,109 | $ (20,695) | $ 87,414 |
| Gain on consolidation of equity method investment | (249,716) | 6,763 | (242,953) |
| Deferred income taxes[1] | 57,923 | 13,932 | 71,855 |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (142,830) | — | (142,830) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | |
| Business combination consideration, net of cash and restricted cash acquired | (61,479) | 16,459 | (45,020) |
| NET CASH FLOWS PROVIDED BY (USED IN) INVESTING ACTIVITIES | (137,969) | 16,459 | (121,510) |
| NET INCREASE (DECREASE) IN CASH, CASH EQUIVALENTS AND RESTRICTED CASH | (26,105) | 16,459 | (9,646) |
| **CASH, CASH EQUIVALENTS AND RESTRICTED CASH** | | | |
| END OF PERIOD | 99,331 | 16,459 | 115,790 |

[1] Adjustment reflects the impact of an immaterial out-of-period adjustment to correct the valuation allowance against the Company's deferred tax assets. See Note 2 to the consolidated financial statements for more details.
[2] Adjustment is due to the fair value adjustment of the Promissory Note, which was required as of December 31, 2019 upon consolidation of the ExAlt Trusts.

The following table sets forth the effects of the Restatement on the affected line items and classes of stockholders' equity within the Company's previously reported Consolidated Statement of Changes in Stockholder's Equity as of December 31, 2019 (dollars in thousands).

| | Accumulated Deficit | Total GWG Holdings Stockholders' Equity | Noncontrolling Interests | Total Stockholders' Equity |
|---|---|---|---|---|
| **Balance, December 31, 2019 (As Previously Reported)** | $ (76,501) | $ 333,979 | $ 266,848 | $ 600,827 |
| Adjustment to recognition of noncontrolling interest | — | — | 27,062 | 27,062 |
| Adjustments to net income | (20,695) | (20,695) | — | (20,695) |
| **Balance, December 31, 2019 (As Restated)** | $ (97,196) | $ 313,284 | $ 293,910 | $ 607,194 |

F-71

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

### (22) Effects of the Restatement - Quarterly Results (Unaudited)

The tables below illustrate the impact of the Restatement, as well as other adjustments, on our historical Condensed Consolidated Balance Sheets, Condensed Consolidated Statements of Operations, Condensed Consolidated Statements of Cash Flows, and Condensed Consolidated Statements of Changes in Stockholder's Equity for the interim quarters impacted, each as compared with the amounts presented in the original Form 10-Q previously filed with the SEC. All adjustments presented in the tables below reflect the impact of the consolidation of the ExAlt Trusts, unless otherwise specifically indicated in the footnotes to each table.

The following table sets forth the effects of the Restatement on the affected line items within the Company's previously reported Condensed Consolidated Balance Sheets as of September 30, 2020, June 30, 2020, and March 31, 2020 (dollars in thousands).

| | September 30, 2020 | | | June 30, 2020 | | | March 31, 2020 | | |
|---|---|---|---|---|---|---|---|---|---|
| | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated |
| **ASSETS** | | | | | | | | | |
| Cash and cash equivalents | $ 93,766 | $ 588 | $ 94,354 | $ 149,233 | $ 454 | $ 149,687 | $ 116,432 | $ 776 | $ 117,208 |
| Restricted cash | 15,990 | 5,324 | 21,314 | 19,059 | 6,686 | 25,745 | 26,446 | 7,613 | 34,059 |
| Investment in alternative assets, at net asset value | — | 221,245 | 221,245 | — | 315,713 | 315,713 | — | 335,487 | 335,487 |
| Loan receivables, net of discount | 229,961 | (229,961) | — | 218,448 | (218,448) | — | 219,296 | (219,296) | — |
| Allowance for loan losses | (2,914) | 2,914 | — | (7,900) | 7,900 | — | (700) | 700 | — |
| Loans receivable, net | 227,047 | (227,047) | — | 210,548 | (210,548) | — | 218,596 | (218,596) | — |
| Fees receivable | 31,571 | (31,571) | — | 31,611 | (31,611) | — | 30,453 | (30,453) | — |
| Financing receivables from affiliates | — | — | — | 69,428 | (69,428) | — | 68,290 | (68,290) | — |
| Other assets | 53,501 | 838 | 54,339 | 40,142 | 1,399 | 41,541 | 33,906 | 1,035 | 34,941 |
| Goodwill | 2,384,121 | (16,371) | 2,367,750 | 2,384,121 | (16,371) | 2,367,750 | 2,372,595 | (4,845) | 2,367,750 |
| TOTAL ASSETS | 3,629,674 | (46,994) | 3,582,680 | 3,718,637 | (3,706) | 3,714,931 | 3,684,229 | 22,727 | 3,706,956 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | | | | | | | | |
| **LIABILITIES** | | | | | | | | | |
| Seller Trust L Bonds [1] | $ 366,892 | $ (94,788) | $ 272,104 | $ 366,892 | $ — | $ 366,892 | $ 366,892 | $ — | $ 366,892 |
| Deferred revenue | 35,848 | (35,848) | — | 37,858 | (37,858) | — | 39,651 | (39,651) | — |
| Repurchase option | — | 730 | 730 | — | 56,660 | 56,660 | — | 52,052 | 52,052 |
| Accounts payable and accrued expenses | 33,235 | 277 | 33,512 | 23,457 | 242 | 23,699 | 21,139 | 208 | 21,347 |
| Deferred tax liability, net [2] | 52,500 | — | 52,500 | 33,674 | 18,826 | 52,500 | 40,206 | 12,294 | 52,500 |
| TOTAL LIABILITIES | 1,970,900 | (129,629) | 1,841,271 | 1,913,834 | 37,870 | 1,951,704 | 1,841,462 | 24,903 | 1,866,365 |
| **STOCKHOLDERS' EQUITY** | | | | | | | | | |
| Common stock in treasury, at cost, 12,337,264 shares December 31, 2020 and 2,500,000 shares as of December 31, 2019 [1] | (24,550) | (42,856) | (67,406) | (24,550) | — | (24,550) | (24,550) | — | (24,550) |
| Additional paid-in capital [1] | 178,969 | 98,385 | 277,354 | 225,537 | — | 225,537 | 229,207 | — | 229,207 |
| Accumulated deficit [2] | (200,935) | (5,501) | (206,436) | (136,355) | (24,752) | (161,107) | (121,933) | (18,634) | (140,567) |
| TOTAL GWG HOLDINGS STOCKHOLDERS' EQUITY | 120,630 | 50,028 | 170,658 | 242,067 | (24,752) | 217,315 | 269,415 | (18,634) | 250,781 |
| Noncontrolling interests [1] | 291,391 | 32,607 | 323,998 | 298,705 | (16,824) | 281,881 | 331,711 | 16,458 | 348,169 |
| TOTAL STOCKHOLDERS' EQUITY | 412,021 | 82,635 | 494,656 | 540,772 | (41,576) | 499,196 | 601,126 | (2,176) | 598,950 |
| TOTAL LIABILITIES & STOCKHOLDERS' EQUITY | 3,629,674 | (46,994) | 3,582,680 | 3,718,637 | (3,706) | 3,714,931 | 3,684,229 | 22,727 | 3,706,956 |

[1] For September 30, 2020, adjustments reflect the impact of the Collateral Swap discussed in Note 1.

[2] Adjustments reflect the impact of an immaterial out-of-period adjustment to correct the valuation allowance against the Company's deferred tax assets. See Note 2 to the consolidated financial statements for more details.

F-72

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The following tables set forth the effects of the Restatement on the affected line items within the Company's previously reported Condensed Consolidated Statements of Operations for the quarterly periods ended September 30, 2020, June 30, 2020, and March 31, 2020 (dollars in thousands).

| | Three Months Ended September 30, 2020 | | | Three Months Ended June 30, 2020 | | | Three Months Ended March 31, 2020 | | |
|---|---|---|---|---|---|---|---|---|---|
| | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated |
| REVENUE | | | | | | | | | |
| Investment income (loss), net | $ — $ | 56,705 $ | 56,705 | $ — $ | (22,671) $ | (22,671) | $ — $ | 7,556 $ | 7,556 |
| Interest income | 12,928 | (12,650) | 278 | 12,671 | (12,371) | 300 | 13,989 | (13,274) | 715 |
| Trust services revenues | 4,556 | (4,556) | — | 4,829 | (4,829) | — | 5,027 | (5,027) | — |
| TOTAL REVENUE | 28,513 | 39,499 | 68,012 | 68,789 | (39,871) | 28,918 | 33,557 | (10,745) | 22,812 |
| EXPENSES | | | | | | | | | |
| Provision for loan losses | (4,986) | 4,986 | — | 7,200 | (7,200) | — | 700 | (700) | — |
| Other expenses | 4,550 | 162 | 4,712 | 4,895 | 168 | 5,063 | 3,612 | — | 3,612 |
| TOTAL EXPENSES | 81,963 | 5,148 | 87,111 | 68,720 | (7,032) | 61,688 | 124,050 | (700) | 123,350 |
| LOSS BEFORE INCOME TAXES | (53,450) | 34,351 | (19,099) | 69 | (32,839) | (32,770) | (90,493) | (10,045) | (100,538) |
| INCOME TAX EXPENSE (BENEFIT) [1] | 22,444 | (18,826) | 3,618 | (8,550) | 6,532 | (2,018) | (14,507) | (1,638) | (16,145) |
| LOSS BEFORE LOSS FROM EQUITY METHOD INVESTMENTS | (75,894) | 53,177 | (22,717) | 8,619 | (39,371) | (30,752) | (75,986) | (8,407) | (84,393) |
| NET INCOME (LOSS) | (77,325) | 53,177 | (24,148) | 7,301 | (39,371) | (32,070) | (77,516) | (8,407) | (85,923) |
| Net (income) loss attributable to noncontrolling interests | 12,745 | (33,926) | (21,181) | (21,723) | 33,253 | 11,530 | 32,084 | 10,468 | 42,552 |
| NET INCOME (LOSS) ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ (68,149) $ | 19,251 $ | (48,898) | $ (18,136) $ | (6,118) $ | (24,254) | $ (49,384) $ | 2,061 $ | (47,323) |
| NET INCOME (LOSS) PER COMMON SHARE | | | | | | | | | |
| Basic | $ (2.23) $ | 0.63 $ | (1.60) | $ (0.59) $ | (0.20) $ | (0.79) | $ (1.62) $ | 0.07 $ | (1.55) |
| Diluted | $ (2.23) $ | 0.63 $ | (1.60) | $ (0.59) $ | (0.20) $ | (0.79) | $ (1.62) $ | 0.07 $ | (1.55) |
| WEIGHTED AVERAGE COMMON SHARES OUTSTANDING [2] | | | | | | | | | |
| Basic | 30,584,719 | (106,927) | 30,477,792 | 30,536,830 | — | 30,536,830 | 30,534,977 | — | 30,534,977 |
| Diluted | 30,584,719 | (106,927) | 30,477,792 | 30,536,830 | — | 30,536,830 | 30,534,977 | — | 30,534,977 |

[1] Adjustments reflect the impact of an immaterial out-of-period adjustment to correct the valuation allowance against the Company's deferred tax assets. See Note 2 to the consolidated financial statements for more details.

[2] For September 30, 2020, adjustments reflect the impact of the Collateral Swap discussed in Note 1.

F-73

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The following tables set forth the effects of the Restatement on the affected line items within the Company's previously reported Condensed Consolidated Statements of Operations for the year-to-date periods ended September 30, 2020 and June 30, 2020 (dollars in thousands).

| | Nine Months Ended September 30, 2020 | | | Six Months Ended June 30, 2020 | | |
|---|---|---|---|---|---|---|
| | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated |
| REVENUE | | | | | | |
| Investment income (loss), net | $ — $ | 41,590 $ | 41,590 | $ — $ | (15,115) $ | (15,115) |
| Interest income | 39,588 | (38,295) | 1,293 | 26,660 | (25,645) | 1,015 |
| Trust services revenues | 14,412 | (14,412) | — | 9,856 | (9,856) | — |
| TOTAL REVENUE | 130,859 | (11,117) | 119,742 | 102,346 | (50,616) | 51,730 |
| EXPENSES | | | | | | |
| Provision for loan losses | 2,914 | (2,914) | — | 7,900 | (7,900) | — |
| Other expenses | 13,057 | 330 | 13,387 | 8,507 | 168 | 8,675 |
| TOTAL EXPENSES | 274,733 | (2,584) | 272,149 | 192,770 | (7,732) | 185,038 |
| LOSS BEFORE INCOME TAXES | (143,874) | (8,533) | (152,407) | (90,424) | (42,884) | (133,308) |
| INCOME TAX EXPENSE (BENEFIT)[1] | (613) | (13,932) | (14,545) | (23,057) | 4,894 | (18,163) |
| LOSS BEFORE LOSS FROM EQUITY METHOD INVESTMENTS | (143,261) | 5,399 | (137,862) | (67,367) | (47,778) | (115,145) |
| NET INCOME (LOSS) | (147,540) | 5,399 | (142,141) | (70,215) | (47,778) | (117,993) |
| Net loss attributable to noncontrolling interests | 23,106 | 9,795 | 32,901 | 10,361 | 43,721 | 54,082 |
| NET INCOME (LOSS) ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ (135,669) $ | 15,194 $ | (120,475) | $ (67,520) $ | (4,057) $ | (71,577) |
| NET INCOME (LOSS) PER COMMON SHARE | | | | | | |
| Basic | $ (4.44) $ | 0.49 $ | (3.95) | $ (2.21) $ | (0.13) $ | (2.34) |
| Diluted | $ (4.44) $ | 0.49 $ | (3.95) | $ (2.21) $ | (0.13) $ | (2.34) |
| WEIGHTED AVERAGE COMMON SHARES OUTSTANDING [2] | | | | | | |
| Basic | 30,552,233 | (35,902) | 30,516,331 | 30,535,811 | — | 30,535,811 |
| Diluted | 30,552,233 | (35,902) | 30,516,331 | 30,535,811 | — | 30,535,811 |

[1] Adjustments reflect the impact of an immaterial out-of-period adjustment to correct the valuation allowance against the Company's deferred tax assets. See Note 2 to the consolidated financial statements for more details.

[2] For September 30, 2020, adjustments reflect the impact of the Collateral Swap discussed in Note 1.

F-74

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The following tables set forth the effects of the Restatement on the affected line items within the Company's previously reported Condensed Consolidated Statements of Cash Flows for the year-to-date periods ended September 30, 2020, June 30, 2020, and March 31, 2020 (dollars in thousands).

| | Nine Months Ended September 30, 2020 | | | Six Months Ended June 30, 2020 | | | Three Months Ended March 31, 2020 | | |
|---|---|---|---|---|---|---|---|---|---|
| | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | | | | | |
| Net loss | $ (147,540) $ | 5,399 $ | (142,141) $ | (70,215) $ | (47,778) $ | (117,993) $ | (77,516) $ | (8,407) $ | (85,923) |
| Adjustments to reconcile net income (loss) to net cash flows used in operating activities: | | | | | | | | | |
| Investment income (loss), net | — | (41,590) | (41,590) | — | 15,115 | 15,115 | — | (7,556) | (7,556) |
| Amortization of upfront fees | (5,356) | 5,356 | — | (3,586) | 3,586 | — | (1,793) | 1,793 | — |
| Return on investments in alternative assets | — | 1,577 | 1,577 | — | 1,180 | 1,180 | — | 374 | 374 |
| Non-cash interest income, including interest paid-in-kind and accretion of purchase discount | (38,530) | 38,315 | (215) | (25,811) | 25,665 | (146) | (13,374) | 13,295 | (79) |
| Provision for loan losses | 2,914 | (2,914) | — | 7,900 | (7,900) | — | 700 | (700) | — |
| Deferred income taxes [1] | (4,621) | (13,932) | (18,553) | (24,250) | 4,894 | (19,356) | (17,717) | (1,638) | (19,355) |
| Change in operating assets and liabilities: | | | | | | | | | |
| Fees receivable | (2,643) | 2,643 | — | (2,443) | 2,443 | — | (1,285) | 1,285 | — |
| Other assets | (2,634) | 184 | (2,450) | (2,869) | (377) | (3,246) | 368 | (12) | 356 |
| Accounts payable and accrued expenses | 8,306 | 58 | 8,364 | 2,592 | 21 | 2,613 | (1,103) | 15 | (1,088) |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (142,905) | (4,904) | (147,809) | (83,669) | (3,151) | (86,820) | (40,632) | (1,551) | (42,183) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | | | | | |
| Net change in loans receivable | 11,169 | (11,169) | — | 11,169 | (11,169) | — | 10,614 | (10,614) | — |
| Investments in alternative assets | — | (226) | (226) | — | (169) | (169) | — | (78) | (78) |
| Return of investments in alternative assets | — | 5,752 | 5,752 | — | 5,169 | 5,169 | — | 4,173 | 4,173 |
| NET CASH FLOWS PROVIDED BY (USED IN) INVESTING ACTIVITIES | 16,007 | (5,643) | 10,364 | 19,049 | (6,169) | 12,880 | 10,751 | (6,519) | 4,232 |
| NET INCREASE (DECREASE) IN CASH, CASH EQUIVALENTS AND RESTRICTED CASH | 10,425 | (10,547) | (122) | 68,962 | (9,320) | 59,642 | 43,547 | (8,070) | 35,477 |
| **CASH, CASH EQUIVALENTS AND RESTRICTED CASH** | | | | | | | | | |
| BEGINNING OF PERIOD | 99,331 | 16,459 | 115,790 | 99,331 | 16,459 | 115,790 | 99,331 | 16,459 | 115,790 |
| END OF PERIOD | $ 109,756 $ | 5,912 $ | 115,668 $ | 168,293 $ | 7,139 $ | 175,432 $ | 142,878 $ | 8,389 $ | 151,267 |

[1] Adjustment reflects the impact of an immaterial out-of-period adjustment to correct the valuation allowance against the Company's deferred tax assets. See Note 2 to the consolidated financial statements for more details.

F-75

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

| | Nine Months Ended September 30, 2020 | | | Six Months Ended June 30, 2020 | | | Three Months Ended March 31, 2020 | | |
| | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated |
|---|---|---|---|---|---|---|---|---|---|
| **NON-CASH INVESTING AND FINANCING ACTIVITIES** | | | | | | | | | |
| Conversion of Promissory Note | 70,565 | (70,565) | — | — | — | — | — | — | — |
| Collateral Swap (see Note 1): | | | | | | | | | |
| Exchange of alternative assets for Seller Trust L Bonds [1] | — | 94,788 | 94,788 | — | — | — | — | — | — |
| Exchange of alternative assets for common stock [1] | — | 42,856 | 42,856 | — | — | — | — | — | — |
| Deemed capital contribution from related party [1] | — | 46,770 | 46,770 | — | — | — | — | — | — |
| Adjustment to noncontrolling interest as a result of Collateral Swap [1] | — | 3,444 | 3,444 | — | — | — | — | — | — |
| Distribution payable to noncontrolling interest | — | 165 | 165 | — | 165 | 165 | — | 136 | 136 |
| Business combination measurement period adjustments: | | | | | | | | | |
| Reduction in loans receivable | 26,116 | (26,116) | — | 26,116 | (26,116) | — | 14,590 | (14,590) | — |

[1] For September 30, 2020, adjustments reflect the impact of the Collateral Swap discussed in Note 1.

The following table sets forth the effects of the Restatement on the affected line items and classes of stockholders' equity within the Company's previously reported Condensed Consolidated Statements of Changes in Stockholder's Equity for the quarters ended March 31, 2020 through September 30, 2020 (dollars in thousands). There was no impact to the redeemable noncontrolling interest.

| | Common Shares | Additional Paid-in Capital | Accumulated Deficit | Treasury Stock | Total GWG Holdings Stockholders' Equity | Noncontrolling Interests | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|
| **Balance, December 31, 2019 (As Previously Reported)** | 30,533,793 $ | 233,106 $ | (76,501) $ | (24,550) $ | 333,979 $ | 266,848 $ | 600,827 |
| Adjustments to recognition of noncontrolling interest | — | — | — | — | — | 27,062 | 27,062 |
| Adjustments to net income | — | — | (20,695) | — | (20,695) | — | (20,695) |
| **Balance, December 31, 2019 (As Restated)** | 30,533,793 | 233,106 | (97,196) | (24,550) | 313,284 | 293,910 | 607,194 |
| Adjustments to noncontrolling interest | — | — | — | — | — | (10,604) | (10,604) |
| Adjustments to net loss | — | — | 2,061 | — | 2,061 | — | 2,061 |
| Total other activity as previously reported | 1,456 | (3,899) | (45,432) | — | (64,564) | 64,863 | 299 |
| **Balance, March 31, 2020 (As Restated)** | 30,535,249 | 229,207 | (140,567) | (24,550) | 250,781 | 348,169 | 598,950 |
| Adjustments to noncontrolling interest | — | — | — | — | — | (33,282) | (33,282) |
| Adjustments to net loss | — | — | (6,118) | — | (6,118) | — | (6,118) |
| Total other activity as previously reported | 2,232 | (3,670) | (14,422) | — | (27,348) | (33,006) | (60,354) |
| **Balance, June 30, 2020 (As Restated)** | 30,537,481 | 225,537 | (161,107) | (24,550) | 217,315 | 281,881 | 499,196 |
| Adjustments to noncontrolling interest | — | — | — | — | — | 33,926 | 33,926 |
| Adjustments to net loss | — | — | 19,251 | — | 19,251 | — | 19,251 |
| Deemed capital contribution from related party | — | 46,770 | — | — | 46,770 | — | 46,770 |
| Recognition of shares in treasury | (9,837,264) | — | — | (42,856) | (42,856) | — | (42,856) |
| Adjustment for change in ownership | — | 8,039 | — | — | 8,039 | (8,039) | — |
| Reduction to noncontrolling interest for Beneficient treasury | — | — | — | — | — | (3,444) | (3,444) |
| Total other activity as previously reported | 57,183 | (2,992) | (64,580) | — | (77,861) | 19,674 | (58,187) |
| **Balance, September 30, 2020 (As Restated)** | 20,757,400 $ | 277,354 $ | (206,436) $ | (67,406) $ | 170,658 $ | 323,998 $ | 494,656 |

F-76

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(23) Subsequent Events and Other Matters**

*Amendment of Beneficient Credit Agreements*

On March 10, 2021, Beneficient Capital Company II, L.L.C. (formerly known as Beneficient Capital Company, L.L.C.) and Beneficient Company Holdings, L.P. (the "New Borrower"), both of which are subsidiaries of Ben LP, entered into Amendment No. 1 to the Second Amended and Restated Credit Agreement (the "First Lien Amendment") and Amendment No. 1 to the Second Amended and Restated Second Lien Credit Agreement (the "Second Lien Amendment" and, together with the First Lien Amendment, the "Amendments") with HCLP Nominees, L.L.C. (the "Lender"). The Second Amended and Restated Credit Agreement is referred to herein as the "First Lien Credit Agreement" and the Second Amended and Restated Second Lien Credit Agreement is referred to herein as the "Second Lien Credit Agreement" and, together with the First Lien Credit Agreement, the "Ben Credit Agreements." As of March 10, 2021, the principal amount outstanding under the First Lien Credit Agreement was $2.3 million and the principal amount outstanding under the Second Lien Credit Agreement was $72.0 million.

The Amendments extend the scheduled maturity date under the Ben Credit Agreements from April 10, 2021 to May 30, 2022. The Amendments also provide that the New Borrower shall repay $5.0 million of the outstanding principal amount under the Ben Credit Agreements on each of September 10, 2021, December 10, 2021 and March 10, 2022. The Amendments also provide for the payment by the New Borrower to the Lender of an extension fee equal to 1.5% of the outstanding principal amounts under the Ben Credit Agreements, which was added to the outstanding amount under the Ben Credit Agreements as provided for in the amendments.

On June 28, 2021, the New Borrower and the Lender entered into Amendment No. 2 to the Ben Credit Agreements. The amendments eliminate the obligation of DLP V to assume the Ben Credit Agreements as provided for in the Second Amendments and waive the daily fee payable upon the Trigger as defined and provided for in the Amendment No. 1 to the Ben Credit Agreements. The eliminated provisions are discussed in further detail in Note 10.

Effective July 15, 2021, Beneficient executed Consent and Amendment No. 3 to the Second Amended and Restated Credit Agreement and Amendment No. 2 to the Second Amended and Restated Subordinate Credit Agreement with its lender, which (i) deferred the payment of all accrued and unpaid interest until December 10, 2021, and (ii) deferred the installment payment of $5.0 million due on September 10, 2021, to December 10, 2021. Beneficient agreed to pay an amendment fee to the lender in an amount equal to 3% of the then outstanding principal and interest on December 10, 2021.

*Third Amended and Restated Senior Credit Facility with LNV Corporation*

On June 28, 2021, DLP IV entered into the Third Amended and Restated Credit Facility with LNV Corporation, as lender, and CLMG Corp., as the administrative agent on behalf of the lenders under the agreement (the "Third Amended Facility"), which replaced the LNV Credit Facility described in Note 10 to the consolidated financial statements. The Third Amended Facility resulted in an additional advance of $52.5 million from LNV Corporation.

In conjunction with entering into the Third Amended Facility, DLP V transferred life insurance policies having an aggregate face value of approximately $440.6 million to DLP IV, which were pledged as additional collateral to the Third Amended Facility, and DLP IV received proceeds of approximately $51.2 million (net of certain fees and expenses incurred in connection with the negotiation and entry into the Third Amended Facility). The Third Amended Facility sets forth interest and other terms and covenants similar those included in the previous LNV Credit Facility.

*Beneficient's Conditional Kansas Charter*

In April 2021, the Kansas Legislature adopted, and the governor of Kansas signed into law, a bill that would allow for the chartering and creation of Kansas trust companies, known as TEFFIs, that provide fiduciary financing (e.g., lending to ExAlt Trusts), custodian and trustee services, in all capacities pursuant to statutory fiduciary powers, to investors and other participants in the alternative assets market, as well as the establishment of alternative asset trusts. The legislation became effective on July 1, 2021 and designates BFF as the pilot trust company under the TEFFI legislation. A conditional trust charter was issued by the Kansas Bank Commissioner to a subsidiary of Ben LP on July 1, 2021. Under the pilot program, BFF will not be authorized to exercise its fiduciary powers as a TEFFI until the earlier of the date the Kansas Bank Commissioner promulgates applicable rules and regulations or December 31, 2021 or. The bill also permits the Kansas Bank

F-77

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Commissioner to request a six-month extension of the pilot program period, which could delay Beneficient's permission to exercise of fiduciary powers under the charter until July 1, 2022.

*National Founders LP Credit Agreement*

On August 11, 2021, GWG DLP Funding VI, LLC, a Delaware limited liability company ("DLP VI"), entered into a Credit Agreement (the "NF Credit Agreement") with each lender from time to time party thereto and National Founders LP, a Delaware limited partnership, as the administrative agent (the credit facility evidenced by such NF Credit Agreement, the "NF Credit Facility"). DLP VI is a wholly owned subsidiary of GWG DLP Funding Holdings VI, LLC, a Delaware limited liability company (the "DLP Holdings VI"). DLP Holdings VI is a wholly owned subsidiary of GWG Life.

On August 11, 2021, a one-time advance of approximately $107.6 million was made to the DLP VI under the NF Credit Facility with a scheduled maturity date of August 11, 2031. Amounts borrowed under the NF Credit Facility bear interest on each day on the outstanding principal amount on such day at a per annum rate, determined on a daily basis, generally equal to 5.5% up to 65% of the loan to value percent as calculated in accordance with the NF Credit Agreement, and 7.0% on anything above that loan to value percent. In particular, amounts borrowed under the NF Credit Facility bear interest on each day on the outstanding principal amount on such day at a per annum rate equal to the Interest Rate as of such day, or the Default Rate as of such day if an event of default has occurred and is continuing. The "Interest Rate" as of such day is equal to the sum of: (a) the percentage equal to (i) the Non-Higher Rate Factor as of such date of determination multiplied by (ii) 5.50%; and (b) the percentage equal to (i) the Higher Rate Factor as of such date of determination multiplied by (ii) 7.00%. "Non-Higher Rate Factor" means, as of any date of determination, the percentage equal to (i) 100% minus (ii) the Higher Rate Factor as of such date of determination, and "Higher Rate Factor" means, as of any date of determination, the percentage equal to (i) the greater of (a) the amount equal to (1) the LTV Percentage (as defined in the NF Credit Agreement) as of such date of determination minus (2) 65% and (b) zero percent divided by (ii) the LTV Percentage as of such date of determination. The "Default Rate" as of such day is equal to the sum of: (a) the Interest Rate as of such day and (b) 2.00%. Interest payments are made on a monthly basis.

Under the NF Credit Facility, each of DLP VI and DLP Holdings VI has granted the administrative agent, for the benefit of the lenders under the agreement, a security interest in substantially all of GWG Holdings' remaining life insurance policy assets not pledged by DLP IV under its LNV Credit Facility. In addition, amounts owing under the NF Credit Facility have been guaranteed by GWG Holdings upon the occurrence of a Guarantee Trigger Event (as defined in the guarantee), including certain bankruptcy events related to the DLP VI or DLP Holdings VI or a Change in Control (as defined in the NF Credit Agreement).

A portion of the proceeds from the funding under the NF Credit Facility was used to purchase life insurance policies that were owned by DLP IV, which used the funds to repay the most recent advance of $52.5 million plus interest and penalties under the LNV Credit Facility described above. At August 11, 2021, the aggregate face value of life insurance policies owned by DLP VI, was approximately $433.1 million. As of such date, the aggregate face value of life insurance policies owned by DLP IV was approximately $1.42 billion.

With the exception of assets pledged by DLP IV under the LNV Credit Facility, and the assets pledged under the NF Credit Facility, GWG Holdings secures L Bonds with a pledge of collateral security in its ownership interests in GWG Life and GWG Holdings' other direct subsidiaries; GWG Life's ownership in its direct subsidiaries that own directly or indirectly a large actuarially diverse portfolio of life insurance policies of highly rated insurance companies; and investments in Beneficient. Furthermore, L Bonds are secured by a pledge of approximately 4.0 million shares of GWG Holdings' common stock. GWG Holdings' most significant assets are cash and its investments in subsidiaries. These assets were not pledged under the NF Credit Facility.

The NF Credit Facility has certain financial and nonfinancial covenants, and we were in compliance with these covenants as of the date of this filing. In addition, the NF Credit Facility has certain reporting obligations that require DLP VI to deliver audited annual consolidated financial statements of DLP Holdings VI no later than 150 days after the end of each fiscal year (beginning with the fiscal year ending December 31, 2021) and unaudited quarterly consolidated financial statements of DLP Holdings VI no later than 90 days after the end of each of DLP VI's first three fiscal quarters (beginning with the fiscal quarter ending September 30, 2021). The NF Credit Facility also has customary events of default for a facility of this type.

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

DLP VI may voluntarily prepay amounts owing under the NF Credit Facility upon payment of all accrued and unpaid interest on such prepaid amounts and payment of the applicable Prepayment Premium (as defined in the NF Credit Agreement).

The NF Credit Facility permits DLP VI to pay dividends and distributions from the proceeds of the one-time advance. As a result, the funding under the NF Credit Facility, less amounts used to purchase the life insurance policies from DLP IV, will be available to GWG Holdings and will improve GWG Holdings' cash position while it works to complete this 2020 Form 10-K, and its Current Reports on Form 10-Q for the quarters ended March 31, 2021 and June 30, 2021, which GWG Holdings expects will permit it to resume the issuance of its L Bonds.

*Non-Binding Term Sheet with Beneficient*

On August 13, 2021, GWG Holdings, Ben LP, and BCH entered into a non-binding term sheet (the "Term Sheet") that contemplates a series of transactions which, if completed, will result in, among other things, (i) GWG Holdings receiving certain proposed enhancements to its investments in Beneficient; (ii) GWG Holdings no longer having the right to appoint directors of the board of directors of Beneficient Management; and (iii) Beneficient no longer being a consolidated subsidiary of GWG Holdings. The Term Sheet and related negotiations are a part of ongoing efforts by management and the Board of Directors of GWG Holdings to maximize the value of GWG Holdings' and GWG Life's investment in Beneficient.

The Company believes that returning control of Beneficient is a necessary step for Ben LP to establish one of its operating subsidiaries as a TEFFI under the Kansas Technology-Enabled Fiduciary Financial Institutions Act (the "TEFFI Act"), which is important to Beneficient's long-term business objective of providing liquidity and other services to holders of alternative assets.

Until the definitive documentation is finalized and executed, each of these provisions is non-binding and is subject to change in all respects, including as a result of additional diligence, the further discharge of fiduciary duties, and the negotiation of definitive documentation. The Company has begun working on definitive documentation to implement the Term Sheet with Ben LP and is working to complete such definitive documentation within the fourth quarter of 2021, although there can be no assurance definitive documentation will be completed by then, or at all.

If Ben LP becomes an independent company pursuant to the terms of the Term Sheet, the Company expects that Ben LP would reduce its reliance on GWG Holdings to fund its operations and would raise future capital from other sources. Beneficient's capital raising efforts may include the issuance of equity or debt of Ben LP or one of its subsidiaries, and the newly issued securities may be dilutive to GWG Holdings' and GWG Life's investment in Ben LP and BCH and may include preferential terms relative to GWG Holdings' and GWG Life's investments in Ben LP and BCH. GWG Holdings and GWG Life would still retain a substantial investment in Beneficient.

*Fourth Amended and Restated Senior Credit Facility with LNV Corporation*

On September 7, 2021, DLP IV entered into a Fourth Amended and Restated Loan and Security Agreement with LNV Corporation, as lender, and CLMG Corp., as the administrative agent on behalf of the lenders under the agreement (the "Fourth Amended Facility"). The Fourth Amended Facility replaced the Third Amended Facility, that previously governed the Company's senior credit facility. The Fourth Amended Facility resulted in an additional advance of $30.3 million from LNV Corporation, paid on September 7, 2021.

Under the Fourth Amended Facility, all advances bear interest at a rate of the Benchmark Rate plus the Applicable Margin, or the Default Rate if an event of default has occurred and is continuing. For purposes of the Fourth Amended Facility, (i) the Benchmark Rate is the greater of (a) the sum of (i) the Federal Funds Rate plus (ii) one-half of one percent (0.50%) and (b) one and one half of one percent (1.50%); (ii) the Applicable Margin is seven and one half percent (7.50%); and (iii) the Default Rate is the Benchmark Rate plus nine and one half percent (9.50%).

F-79

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*COVID-19*

In December 2019, a novel strain of coronavirus and the associated respiratory disease ("COVID-19") was first reported in Wuhan, China. Less than four months later, on March 11, 2020, the World Health Organization declared COVID-19 a pandemic. The extent of COVID-19's effect on the Company's operational and financial performance will depend on continuing developments, including the duration, spread and intensity of the pandemic, all of which are uncertain and difficult to predict considering the rapidly evolving landscape. Although a substantial majority of our employees continue to work remotely, we have maintained our operations at or near normal levels. We have not experienced any significant disruptions due to operational issues, loss of communication capabilities, technology failure or cyber-attacks. The Company continues to raise capital, receive distributions from alternative assets and insurance policy benefits, pay interest and dividends and otherwise meet its ongoing obligations. However, depending on the extent of the ongoing economic crisis resulting from the pandemic and its impact on the Company's business, the pandemic could have a material adverse effect on our results of operations, financial condition and cash flows.

*Policy Benefits and L Bonds*

Subsequent to December 31, 2020 through October 15, 2021, policy benefits on 81 policies covering 74 individuals have been realized. The face value of insurance benefits of these policies was $106.2 million.

Subsequent to December 31, 2020 through April 16, 2021, the date we temporarily suspended GWG Holdings' L Bond offering, GWG Holdings issued approximately $191.6 million of L Bonds. No L Bonds have been sold since April 16, 2021.

*Beneficient's Liquidity Transactions*

Subsequent to December 31, 2020 through the date of this filing, we executed 10 transactions pursuant to which customers sold interests in private equity funds with an aggregate net asset value of $5.6 million to certain of the ExAlt Trusts in exchange for agreed upon consideration.

F-80

Table of Contents

**ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE.**

There have been no changes in or disagreements with accountants on accounting and financial disclosure.

**ITEM 9A. CONTROLS AND PROCEDURES.**

**Evaluation of Disclosure Controls and Procedures**

We maintain disclosure controls and procedures designed to provide reasonable assurance that information required to be disclosed in our reports filed pursuant to the Securities Exchange Act of 1934 is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including GWG Holdings' Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance the objectives of the control system are met.

GWG Holdings' Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of our disclosure controls and procedures as such term is defined in Rule 13a-15(e) and 15d-15(e) under the Securities and Exchange Act of 1934, as of December 31, 2020 (the end of the period covered by this report). Based on that evaluation, GWG Holdings' Chief Executive Officer and Chief Financial Officer concluded that due to the material weaknesses described below, our disclosure controls and procedures were ineffective.

*Material Weaknesses*

*Restatement*

In connection with matters related to the Restatement, we have determined that a material weakness existed in our internal control over financial reporting for all periods from December 31, 2019 to December 31, 2020. As of December 31, 2020, the design and operating effectiveness of controls over the selection, application and review of the implementation of accounting policies were not sufficient to ensure amounts recorded and disclosed were fairly stated in accordance with GAAP. This material weakness resulted in the Restatement.

In response to this material weakness, our management has expended, and will continue to expend, a substantial amount of effort and resources for the remediation and improvement of our internal control over financial reporting. While we have processes to identify and evaluate the appropriate accounting for technical pronouncements and other literature for all significant or unusual transactions, we are improving these processes to ensure that the nuances and complexities of such transactions are effectively evaluated in the context of the increasingly complex accounting standards. Our remediation plan at this time includes continuing to enhance our internal and external technical accounting resources by hiring additional personnel and increasing communication with third-party professionals with whom we consult regarding the application of complex accounting transactions.

Our remediation plan can only be accomplished over time and will be continually reviewed to determine that it is achieving its objectives. We can offer no assurance that these initiatives will ultimately have the intended effects.

*Quarterly Valuation Allowance*

In connection with the preparation and review of our quarterly condensed consolidated financial statements as of and for the period ended September 30, 2020, we also identified a material weakness in internal controls over the quarterly income tax provision process, which included the measurement of the valuation allowance against the Company's deferred tax assets.

We have implemented a suite of enhanced internal controls and have involved additional external resources in the quarterly income tax provision process, including the assessment of the valuation allowance. We believe these measures will enable us to remediate this material weakness in internal controls over the income tax provision process, including the valuation allowance against the Company's deferred tax assets.

We have completed certain of such remediation activities as of the date of this filing and believe that we have strengthened our internal controls to address the identified material weakness in internal controls over the quarter income tax provision process. However,

App. 1354

control weaknesses are not considered remediated until new internal controls have been operational for a

Page 73

period of time, are tested, and management concludes that these controls are operating effectively. We will continue to monitor the effectiveness of these remediation measures, and we will make any changes to the design of this plan and take such other actions that we deem appropriate given the circumstances.

Notwithstanding these material weaknesses, the Company has concluded that no material misstatements exist in the consolidated financial statements, and such financial statements present fairly, in all material respects, the financial position, results of operations and cash flows of the Company as of and for the years ended December 31, 2020 and December 31, 2019, in conformity with accounting principles generally accepted in the United States of America.

**Changes in Internal Control over Financial Reporting**

As a result of the consolidation of Beneficient on December 31, 2019, we have evaluated the processes and procedures of Beneficient's internal control over financial reporting, and have incorporated Beneficient's internal control over financial reporting into our internal control over financial reporting framework. In addition, as a result of the consolidation of Beneficient, we have implemented new processes and controls over accounting for goodwill and other intangible assets, primarily related to assessing these assets for impairment.

Additionally, we implemented a suite of enhanced internal controls in response to the identified material weakness in the quarterly income tax provision process. Specifically, we implemented a more robust process for evaluating the potential impact of significant and unusual transactions on the tax provision. We have also involved additional internal and external resources with a heightened understanding of ASC Topic 740, *Income Taxes*, in the quarterly income tax provision process.

Other than the aforementioned items, there were no changes in our internal control over financial reporting identified in connection with management's evaluation pursuant to Rules 13a-15(d) or 15d-15(d) of the Securities Exchange Act of 1934 during the fourth quarter of 2020 that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rule 13a-15(f) under the Securities and Exchange Act of 1934.

The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that:

(i)    Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company;

(ii)    Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are in accordance with authorizations of management and directors of the company; and

(iii)    Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with policies or procedures may deteriorate.

Under the supervision of the Audit Committee of the Board of Directors of GWG Holdings and with the participation of our management, including GWG Holdings' Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting using the criteria established in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on our assessment and those criteria, management concluded that due to the material weaknesses described above, our internal control over financial reporting as of December 31, 2020 was ineffective.

Table of Contents

The Company's independent registered public accounting firm has audited the Company's internal control over financial reporting as of December 31, 2020, as stated in the Report of Independent Registered Public Accounting Firm, appearing under Item 8.

**ITEM 9B. OTHER INFORMATION.**

None.

Page 75

PART III


**ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE.**

The following paragraphs provide information as of the date of this report about each of GWG Holdings' current directors and executive officers.

**Directors**

GWG Holdings' bylaws permit a maximum of fifteen directors. The board of directors of GWG Holdings currently consists of five members. GWG Holdings' Board of Directors is divided into three classes, designated as Class I, Class II and Class III. Each class serves staggered, three year terms except as described below. The terms of office of GWG Holdings' Class II directors will expire at the Combined 2020/2021 Annual Meeting, and their successors shall be elected for a term expiring at the 2023 annual meeting of stockholders. The terms of office of GWG Holdings' Class III directors will expire at the Combined 2020/2021 Annual Meeting, and their successors shall be elected for a three year term expiring at the 2024 annual meeting of stockholders. We expect that Peter T. Cangany, Jr. will become a Class I director and David F. Chavenson and David H. de Weese will become Class II directors following the Combined 2020/2021 Annual Meeting.

Each director serves until his or her successor is elected and shall have qualified, or until his or her earlier death, resignation, removal or disqualification.

The following chart sets forth the three classes of directors as of the date of this report.

| Director | Class | Expiration of Current Term of Director |
|---|---|---|
| Murray T. Holland | Class I | 2022 Annual Meeting |
| Peter T. Cangany, Jr. | Class III | 2020/2021 Annual Meeting |
| David F. Chavenson | Class III | 2020/2021 Annual Meeting |
| David H. de Weese | Class III | 2020/2021 Annual Meeting |
| Timothy L. Evans | Class III | 2020/2021 Annual Meeting |

| Name and Age of Director | Principal Occupation, Business Experience For the Past Five Years and Directorships of Public Companies | Director Since |
|---|---|---|
| | **CLASS I DIRECTORS** | |
| Murray T. Holland Age 67 | Murray T. Holland has served as GWG Holdings' President and Chief Executive Officer since April 26, 2019 and a director and Chairman of the Board of GWG Holdings since June 2021. In 2001, Mr. Holland became an original investor and consultant for MHT Partners, a boutique investment banking firm based in Dallas, Texas with a number of offices in the United States. From 2013 until recently, he was Managing Director of MHT Partners. Mr. Holland resigned from this position in connection with the transaction contemplated by the Purchase and Contribution Agreement, dated April 15, 2019, among Jon R. Sabes, Steven F. Sabes and Ben LP, among others. Prior to MHT Partners, he was CEO and principal shareholder of Convergent Media Systems (Atlanta), a $100 million custom network outsourcing firm with approximately 300 employees, CEO and principal shareholder of Convergent Group Corporation (Denver), a $200 million geographic information systems software and integration firm with approximately 450 employees, and CEO and principal shareholder of BTI Americas (Chicago), a $2.7 billion business travel agency with approximately 4,400 employees. EDS was his principal business partner in these ventures. Prior to that, Mr. Holland was a partner at the law firm of Akin, Gump, Strauss, Hauer & Feld (Dallas) in corporate finance and securities, a Senior Vice President of Credit Suisse First Boston (New York and Dallas) in Mergers and Acquisitions and a Managing Director of Kidder, Peabody & Co. (New York) in Mergers and Acquisitions. He graduated from Washington and Lee University with a B.S. in 1975, University of Virginia Graduate School of Business Administration with an M.B.A. in 1978, and Washington and Lee University School of Law with a J.D. in 1980. Mr. Holland is the author of "A Nation in the Red" (McGraw Hill - 2014), a book about the U.S. national debt and its implications. | 2021 |

Page 76

Table of Contents

## CLASS III DIRECTORS

| | | |
|---|---|---|
| Peter T. Cangany, Jr.<br>Age 64 | Peter T. Cangany, Jr. retired as a partner with Ernst & Young LLP ("EY") in 2017, having served in such capacity since 1993. Mr. Cangany specialized in the audits of companies involved in several sectors of the financial services industry, including insurance companies and investment management firms with a focus on public companies. He held senior positions with the leadership of EY throughout his years as a partner, including location and sector leadership responsibilities. Mr. Cangany also currently serves as Chair of the Board of Trustees of Franklin College of Indiana. Mr. Cangany brings extensive knowledge of financial reporting and accounting issues faced by companies in the financial services industry, as well as experience with early-stage growth businesses, strategic planning, and corporate governance from nearly 40 years of serving clients. Mr. Cangany earned a B.A. in Accounting from Franklin College and an M.B.A. from Texas A&M University. He is also a Certified Public Accountant. | 2019 |
| David F. Chavenson<br>Age 69 | David F. Chavenson served as Treasurer of Alon USA Energy Company from 2007 until 2018. He served as Vice President and Treasurer of Flowserve Corp. from 2001 until 2005; Senior Vice President and Chief Financial Officer at Worldwide Flight Services, Inc. from 2000 to 2001; and Vice President of Finance, Chief Financial Officer and Corporate Secretary of Rutherford-Moran Oil Corporation since April 1996 to 1999. Previous to 1996, Mr. Chavenson spent 18 years at Oryx Energy Company, an oil and gas exploration and production company (previously Sun Exploration and Production Co.) ("Oryx"), and served as Treasurer there from 1993 to 1996. Prior to that, he served as Assistant Treasurer and Manager of Corporate Finance, Manager of Financial Analysis and Senior Financial Specialist at Oryx. Mr. Chavenson has a B.A., magna cum laude, Phi Beta Kappa from Dickinson College and holds an M.B.A. in finance with honors from the Harvard Business School. He is also a Certified Public Accountant. | 2019 |
| David H. de Weese<br>Age 79 | David H. de Weese is a Partner of Paul Capital Advisors, a private equity firm. He was instrumental in developing Paul Capital's deal origination strategy and transaction sourcing network. He joined Paul Capital in 1995 and led global secondary transaction sourcing activities and the due diligence of life science and health care investments. Mr. de Weese has 14 years of management experience in Europe. He has an extensive entrepreneurial experience and in-depth scientific and business knowledge. He is the co-founder and a member of the board of directors of NISTA Diagnostics, Inc. He also founded Medical Innovations. In 1993, he co-founded and served as the President and Chief Executive Officer of M6 Pharmaceuticals. Mr. de Weese served as the President and Chief Executive Officer of Cygnus Therapeutic Systems, SIGA Technologies, Inc. and a Silicon Valley software company. Prior to Cygnus, he served as the President and Chief Executive Officer of Machine Intelligence Corporation. Mr. de Weese previously served as a member of the board of directors of OSE Immunotherapeutics SA (also known as OSE Pharma SA) and as the chairman of Capacitor Sciences, Inc. Mr. de Weese holds an M.B.A. from the Harvard Business School, a B.A. from Stanford University and attended law school at Stanford University. | 2019 |
| Timothy L. Evans<br>Age 42 | Timothy L. Evans joined GWG Holdings as Chief Integration Officer on May 6, 2019, and was appointed Chief Financial Officer on August 15, 2019 and a director in June 2021. Prior to joining GWG Holdings, Inc., Mr. Evans was Chief of Staff for Ben L.P. where he had also served as Vice President and Deputy General Counsel since February 2018. Prior to joining Ben LP, Mr. Evans was an attorney for the United States Securities and Exchange Commission for six years, where he served as a trial attorney and a counsel to the Director of Enforcement. Mr. Evans was an associate in the Dallas office of Thompson & Knight LLP for four years before joining the Securities and Exchange Commission. He received his Juris Doctorate, summa cum laude, from the University of Arkansas School of Law in 2008. Prior to practicing as an attorney, Mr. Evans was an accountant for three years with SMG, a public facility management company. He previously held an Arkansas CPA license but is not currently licensed by the Arkansas State Board of Public Accountancy. He graduated from the University of Illinois at Urbana-Champaign with a Bachelor of Arts in Economics in 2001. | 2021 |

**Executive Officers**

| Name and Title | Age | Principal Occupation, Business Experience for the Past Five Years and Directorships of Public Companies |
|---|---|---|
| Murray T. Holland<br>President and Chief Executive Officer | 67 | See description above. |
| Timothy L. Evans<br>Chief Financial Officer and Treasurer | 42 | See description above. |

**Board Leadership Structure and Risk Oversight**

Murray T. Holland serves as GWG Holdings' Chairman of our Board of Directors.

Management and our outside counsel discuss risks, both during Board meetings and in direct discussions with members of our Board of Directors. These discussions identify Company risks that are prioritized and assigned to the appropriate Board committee, as discussed below, or the full Board for oversight. Our risk management program as a whole is reviewed periodically as needed or as requested by GWG Holdings' Board or a Board committee.

**Board Committees and Board Meetings**

GWG Holdings' Board of Directors has an Audit Committee, a Compensation Committee and an Executive Committee. GWG Holdings' Board of Directors has also had a Nomination and Corporate Governance Committee; however, the activities conducted by such committee are currently being conducted by the full Board of Directors. Each of the foregoing Committees has a written charter, a copy of each of which is available at GWG Holdings' website at www.gwgh.com. GWG Holdings' Board committees comply with the listing requirements of The Nasdaq Marketplace Rules taking into account its reliance on exceptions for "controlled companies" as described under the caption "Director Independence" below.

**Audit Committee**

The Audit Committee consists of three members: Peter T. Cangany, Jr. (Chair), David F. Chavenson, and David H. de Weese. All of the members are financially literate and are independent directors under the Nasdaq Marketplace Rules, and SEC audit committee structure and membership requirements. Further, GWG Holdings' Board has determined that Mr. Cangany is an "audit committee financial expert" as defined by applicable regulations of the SEC and is "independent" under the Nasdaq Marketplace Rules.

The Audit Committee's job is one of oversight as set forth in its charter. It is not the duty of the Audit Committee to prepare our consolidated financial statements, to plan or conduct audits or investigations, or to determine that our financial statements are complete and accurate and are in accordance with generally accepted accounting principles. Our management is responsible for preparing our consolidated financial statements and for establishing and maintaining effective internal control over financial reporting. The independent registered public accountants are responsible for the audit of our consolidated financial statements and the review of the effectiveness of our internal control over financial reporting.

The Audit Committee is responsible primarily for assisting the Board in fulfilling its oversight and monitoring responsibility of reviewing the financial information that will be provided to stockholders and others, appointing the independent registered public accounting firm, reviewing the services performed by our independent registered public accounting firm, reviewing our accounting policies and the internal controls established by management and the Board, reviewing significant financial transactions, the integrity of the financial statements and our enterprise risk management framework. The Audit Committee also reviews the Anonymous Complaint Program, which allows for confidential, anonymous submissions by Company employees regarding questionable accounting or auditing matters, including reviewing if any such complaints were received and the disposition of those complaints.

In fulfilling its oversight over our independent registered public accounting firm, the Audit Committee carefully reviews the engagement of the independent registered public accounting firm, which includes among other things: the scope of the audit; fees; the assigned partner(s) and other personnel and their industry experience; auditor independence; peer and Public Company Accounting Oversight Board ("PCAOB") reviews; any significant legal proceedings; previous experience with the firm's performance; and any non-audit services performed. The Audit Committee engaged Grant Thornton LLP as our independent registered public accounting firm for the year ended December 31, 2020.

Table of Contents

We maintain an auditor independence policy that, among other things, prohibits our independent registered public accounting firm from performing non-financial consulting services, such as information technology consulting and internal audit services. This policy mandates that the Audit Committee approve in advance any non-audit services to be performed by the independent registered public accounting firm and the related costs associated therewith. Therefore, we may not enter into engagements with our independent registered public accounting firm for non-audit services without the express pre-approval of the Audit Committee.

**Compensation Committee**

GWG Holdings' Compensation Committee consists of one member: David H. de Weese. As described in our Current Report on Form 8-K filed with the SEC on June 17, 2021, Thomas O. Hicks, a former member of GWG Holdings' Compensation Committee, resigned from the Board and the Compensation Committee to join the board of directors of the Beneficient TEFFI trust company, and the Board has yet to appoint a successor to Mr. Hicks on the Compensation Committee. GWG Holdings' Compensation Committee is charged with oversight responsibility for the adequacy and effectiveness of our executive compensation and benefit plans and is primarily responsible for all matters relating to compensation of our executive officers and the directors, the adoption of all employee compensation and employee benefit plans and the administration of such plans including granting stock incentives or other benefits, and the review and approval of disclosures regarding executive compensation included in our SEC reports. GWG Holdings' Compensation Committee has the authority to obtain advice and assistance from external legal, accounting or other advisors, and has the authority to retain, terminate and approve the fees payable to any external compensation consultant to assist in the evaluation of director and senior executive compensation. However, any services to be rendered by our independent registered public accounting firm shall be pre-approved by the Audit Committee if required under our policy regarding pre-approval of such services.

**Executive Committee**

GWG Holdings' Executive Committee currently consists of one member: David H. de Weese. As described in our Current Report on Form 8-K filed with the SEC on June 17, 2021, Brad K. Heppner, Thomas O. Hicks, and Bruce W. Schnitzer, former members of the Executive Committee, resigned from the Board and the Executive Committee to join the board of directors of the Beneficient TEFFI trust company, and the Board has yet to appoint successors to Messrs. Heppner, Hicks, or Schnitzer on the Executive Committee. GWG Holdings' Executive Committee has authority to act on behalf of the full Board of Directors between regular meetings of the Board of Directors, consistent with the requirements of Delaware law.

**Corporate Governance and Nominating Committee**

GWG Holdings' Corporate Governance and Nominating Committee was dissolved in 2019. We are a controlled company and are currently relying on the Nasdaq controlled company exemption from the requirement to have nominations for director be selected, or recommended for selection, solely by independent directors. The activities conducted by GWG Holdings' Corporate Governance and Nominating Committee are currently being conducted by the full Board of Directors. The primary role of GWG Holdings' Corporate Governance and Nominating Committee was to consider and make recommendations to the full Board of Directors concerning the appropriate size, function and needs of the Board of Directors, including establishing criteria for Board membership and considering, recruiting and recommending candidates (including those recommended by stockholders) to fill new Board positions. The Corporate Governance and Nominating Committee also considered and advised the full Board of Directors on matters of corporate governance and monitored and recommended the functions of, and membership on, the various committees of the Board of Directors.

GWG Holdings' Corporate Governance and Nominating Committee (or a subcommittee thereof) recruited and considered director candidates and presented all qualified candidates to the full Board of Directors for consideration. In identifying and evaluating potential candidates to be nominees for directors, GWG Holdings' Corporate Governance and Nominating Committee had the flexibility to consider such factors as it deemed appropriate under relevant circumstances. These factors may include education, general business and industry experience, ability to act on behalf of stockholders and build long-term stockholder value, potential concerns regarding independence or conflicts of interest and other factors relevant in evaluating Board nominees. Qualified candidates will be considered without regard to race, color, religion, sex, ancestry, national origin, disability, marital or veteran status, or any other legally protected status. Although our Corporate Governance and Nominating Committee did not have a policy with regard to the consideration of diversity in identifying director candidates, the overall Board of Directors' diversity of industry background and experience is generally among the factors considered. GWG Holdings' Corporate Governance and Nominating Committee believed that a Board of Directors comprised of directors with diverse skills and experiences relevant to our industry will result in efficient and competent oversight of our various core competencies.

Table of Contents

GWG Holdings' Corporate Governance and Nominating Committee considered recommendations by stockholders of candidates for election to the Board of Directors. Any stockholder who wishes that the Board consider a candidate must follow the procedures set forth in our bylaws. Under our bylaws, if a stockholder plans to nominate a person as a director at a meeting, the stockholder is required to place a proposed director's name in nomination by written request delivered to or mailed and received at our principal executive offices not less than 90 nor more than 120 calendar days prior to the first anniversary of the date on which we first mailed proxy materials for the preceding year's annual meeting. However, in the event that the date of the annual meeting is more than 30 days before or more than 60 days after such anniversary date, notice by the stockholder must be so delivered not less than 90 nor more than 120 calendar days prior to the date of such annual meeting, or if the first public announcement of the date of such annual meeting is less than 100 days prior to the date of such annual meeting, the tenth day following the day on which public announcement is made.

**Ability of Stockholders to Communicate with GWG Holdings' Board of Directors**

GWG Holdings' Board of Directors has established several means for stockholders and others to communicate with the Board of Directors. If a stockholder has a concern regarding our financial statements, accounting practices or internal controls, the concern should be submitted in writing to the Chair of our Audit Committee in care of our Secretary at the address of our principal executive offices. If the concern relates to our governance practices, business ethics or corporate conduct, the concern should be submitted in writing to the Chairman of the Board of Directors in care of our Secretary at the address of our principal executive offices. If a stockholder wishes to provide input with respect to our executive compensation policies and programs, input should be submitted in writing to the Chair of our Compensation Committee in care of our Secretary at the address of our principal executive offices. If a stockholder is unsure as to which category the concern relates, the stockholder may communicate it to any one of the independent directors in care of our Secretary at the address of our principal executive offices. All stockholder communications sent in care of our Company Secretary will be forwarded promptly to the applicable director(s).

**Delinquent Section 16(a) Reports**

Section 16(a) of the Securities Exchange Act of 1934, as amended, requires our officers and directors, and persons who own more than ten percent of a registered class of our equity securities, to file electronically reports of ownership and changes in ownership of such securities with the SEC. Based on review of the copies of Forms 3 and 4 and amendments thereto filed electronically with the SEC during the year ended December 31, 2020 and Forms 5 and amendments thereto filed electronically with the SEC with respect to such year, or written representations that no Forms 5 were required, we believe all required forms have been filed by our officers, directors and greater than ten percent beneficial owners.

**Code of Ethics**

We have adopted a Code of Business Conduct and Ethics that applies to all of our employees and all of our officers (specifically including but not limited to the principal executive officer (CEO), principal financial officer (CFO) and other members of management). Our Code of Business Conduct and Ethics satisfies the requirements of Item 406(b) of Regulation S-K. Our Code of Business Conduct and Ethics is available on our Internet website at www.gwgh.com.

**ITEM 11. EXECUTIVE COMPENSATION AND RELATED-PARTY TRANSACTION DISCLOSURES.**

**Summary Compensation Table**

The following table sets forth the cash and non-cash compensation for the 2019 and 2020 fiscal years awarded to or earned by: (i) each individual who served as the principal executive officer of GWG Holdings during 2020; (ii) the two most highly compensated executive officers of GWG Holdings who were serving as executive officers at the end of 2020 and who received more than $100,000 in the form of salary and bonus during such year; and (iii) up to two additional individuals for whom disclosure would have been required under (ii) above but for the fact that the individual was not serving as an executive officer of GWG Holdings at the end of 2020. These individuals are referred to as GWG Holdings' "named executives."

Page 80

| Name and Principal Position | Year | Salary | Bonus | All Other Compensation | Total |
|---|---|---|---|---|---|
| Murray T. Holland President and Chief Executive Officer | 2020 | $ 650,000 | $ 975,000 | $ 17,819 | $ 1,642,819 |
| | 2019[1] | $ 440,000 | $ 637,500 | $ — | $ 1,077,500 |
| Timothy L. Evans Chief Financial Officer | 2020 | $ 400,000 | $ 500,000 | $3,427,411[2] | $ 4,327,411 |
| | 2019[3] | $ 261,539 | $ 326,750 | $ — | $ 588,289 |
| Lennie Nicholson Former General Counsel[4] | 2020 | $ 211,538 | $ 105,769 | $ — | $ 317,308 |

_____

(1)  Mr. Holland was appointed as Chief Executive Officer on April 26, 2019 with an annual base salary of $650,000.

(2)  Includes REUs (defined below) with an estimated grant date fair value of $1,562,500 issued by Ben LP and BMP Equity Units (defined below) with an estimated grant date fair value of $1,854,834 issued by Beneficient Management Partners, L.P. to Mr. Evans. Awards of REUs and BMP Equity Units are included because, beginning on December 31, 2019, GWG Holdings reports the results of Beneficient on a consolidated basis.

(3)  Mr. Evans was appointed Chief Financial Officer on August 15, 2019 with an annual base salary of $400,000.

(4)  Mr. Nicholson was appointed as General Counsel of GWG Holdings on March 3, 2020 and resigned on January 29, 2021.

In general, in connection with its decisions about executive compensation, the Compensation Committee intends to consider the results of the most recent stockholder advisory vote on executive compensation as well as the advisory vote on the frequency of future advisory votes on executive compensation in determining how frequently to hold its Say-on-Pay vote in the future. The Company currently seeks a stockholder advisory vote on executive compensation every three years and expects to hold the next stockholder advisory vote on executive compensation at the Company's 2022 annual meeting of stockholders.

**Employment Agreements and Change-in-Control Provisions**

As of the date of this filing, GWG Holdings' named executives held the following positions: Mr. Murray T. Holland, President and Chief Executive Officer; and Mr. Timothy L. Evans, Chief Financial Officer.

On April 26, 2019, and in connection with the closing of the Purchase and Contribution Transaction, Murray T. Holland was appointed as Chief Executive Officer of GWG Holdings. On May 31, 2019, GWG Holdings entered into an employment agreement with Mr. Holland pursuant to which he is currently serving as GWG Holdings' President and Chief Executive Officer. The employment agreement has an initial three-year term and is automatically renewed for additional one-year periods unless either party gives notice of non-renewal at least 60 days prior to the expiration of the then current term.

Under the employment agreement, Mr. Holland is entitled to an annual base salary of $650,000, retroactive to April 26, 2019, and is eligible to receive an annual cash bonus the target amount of which will be 150% of his base salary (prorated for the partial first year of employment). Whether the bonus is granted for a particular year, and the amount thereof, will be determined by GWG Holdings' Compensation Committee in its discretion based upon Mr. Holland's performance. Mr. Holland is also entitled to participate in all employee benefit plans and programs made available by GWG Holdings to the Company's executive employees generally.

If Mr. Holland's employment is terminated by us without "Cause" or if he voluntarily resigns with "Good Reason," in each case as defined in the employment agreement, then (i) he will be entitled to severance pay in an amount equal to his annual base salary, payable in a lump sum within 30 days after the date of the termination, (ii) he will receive a pro-rated portion of the target amount of his annual cash bonus for the year in which termination occurs, and (iii) any performance share units ("PSUs") or other equity incentives held by Mr. Holland will fully vest on the date of termination.

On May 31, 2019, and as contemplated by the employment agreement and discussed below, GWG Holdings entered into a Performance Share Unit Agreement (the "PSU Agreement") with Mr. Holland that provides for a target award grant of 129,717 PSUs (the "Target Award"), and up to a maximum of 259,434 PSUs. Each PSU represents the right to receive one share of GWG Holdings' common stock (or, following a Change-in-Control Transaction (as defined in the PSU Agreement, the cash value thereof), upon vesting, which is generally subject to (i) the satisfaction of performance goals over a three year

performance period, as determined by GWG Holdings' Compensation Committee in its sole discretion, and (ii) Mr. Holland remaining continuously employed by GWG Holdings or one of its subsidiaries ("Continuous Service") from the date of grant through the date that the PSUs are vested and paid in shares of common stock (or cash). Promptly following the Company's filing with the SEC of our Annual Report on Form 10-K for the fiscal year ended December 31, 2021 (the final year of the performance period), GWG Holdings' Compensation Committee will review and certify in writing (a) whether, and to what extent, the performance goals have been achieved, and (b) the number of PSUs that vested, if any. At such time, PSUs that are not vested will be forfeited.

The PSUs are subject to forfeiture until they vest. If Mr. Holland's Continuous Service terminates for any reason at any time before all PSUs have vested, all unvested PSUs will be automatically forfeited upon such termination of Continuous Service. However, if Mr. Holland's Continuous Service terminates as a result of his death or disability, or as a result of a termination by the Company without Cause or by Mr. Holland for Good Reason, Mr. Holland will retain, and will not forfeit, a pro rata portion of the Target Award based on the number of days that he remained employed during the performance period. This retained portion of the Target Award will not be subject to accelerated vesting and, instead, will vest (and be paid in shares of common stock) based on extent to which the performance goals are achieved during the entire performance period.

If a "Sale Transaction," as defined in GWG Holdings' 2013 Stock Incentive Plan, occurs during the performance period, Mr. Holland remains in Continuous Service up until the date of such Sale Transaction, and the acquiring entity or successor to GWG Holdings does not assume the obligations of GWG Holdings under the PSU Agreement or replace the grant with a substantially equivalent incentive award, then all outstanding PSUs shall vest at Target Award levels on the date of such Sale Transaction.

If a Change-in-Control Transaction occurs during the performance period, then all outstanding PSUs will automatically vest at Target Award levels on the 120th day following the closing of the Change-in-Control Transaction (the "Retention Date"), contingent upon Mr. Holland remaining in Continuous Service through the Retention Date. However, if Mr. Holland's Continuous Service terminates following the occurrence of a Change-in-Control Transaction and prior to the Retention Date for any reason other than as a result of a termination by GWG Holdings for Cause, then all outstanding PSUs will automatically vest at Target Award levels upon such termination. PSUs vesting upon a Change-in-Control will be paid in cash (not shares of common stock). The amount of cash to be paid to Mr. Holland in respect of each vested PSU will be equal to the greater of (y) $12.00 or (z) the Fair Market Value (as defined in the Plan) of a share of common stock as of the trading date immediately prior to the closing date of the Change-in-Control Transaction. The PSU Agreement includes a provision allowing GWG Holdings to reduce the payment to which Mr. Holland would be entitled upon a Change-in-Control Transaction to the extent needed for him to avoid paying an excise tax under Internal Revenue Code Section 280G, unless Mr. Holland would be better off, on an after-tax basis, receiving the full amount of such payments and paying the excise taxes due.

On August 15, 2019, Timothy L. Evans was appointed as GWG Holdings' Chief Financial Officer and Treasurer, replacing William B. Acheson. Mr. Acheson remained employed by GWG Holdings on an interim basis as an Executive Vice President, to assist in the transition of his prior duties and responsibilities to Mr. Evans, but is no longer in that capacity.

**2013 Stock Incentive Plan**

We maintain the GWG Holdings, Inc. 2013 Stock Incentive Plan, under which 6,000,000 shares of GWG Holdings' common stock have previously been approved for issuance. The 2013 Stock Incentive Plan permits the grant of both incentive and non-statutory stock options. Through December 31, 2020, we had issued stock options, SARs and Restricted Stock Units (hereinafter, "options") for 2,507,904 shares of common stock to employees, officers, directors, and consultants under the plan. As of December 31, 2020, (i) 1,360,491 shares are reserved for issuance under outstanding options, of which 922,985 options have vested and the remaining outstanding are scheduled to vest over three years, (ii) 322,552 shares have been issued upon the exercise of options granted under the 2013 Stock Incentive Plan, and (iii) 3,492,096 shares remain available for issuance of future incentive grants. The Board of Directors adopted the 2013 Stock Incentive Plan to provide a means by which our employees, directors, officers and consultants may be granted an opportunity to purchase GWG Holdings' common stock, to assist in retaining the services of such persons, to secure and retain the services of persons capable of filling such positions and to provide incentives for such persons to exert maximum efforts for our success.

**BMP Equity Incentive Plan**

The board of directors of Beneficient Management, Ben LP's general partner, maintains the BMP Equity Incentive Plan under which participants are eligible to receive equity units in Beneficient Management Partners, L.P. ("BMP"), an entity

affiliated with the board of directors of Beneficient Management. The BMP equity units eligible to be awarded to participants are comprised of BMP's Class A Units and/or BMP's Class B Units (collectively, the "BMP Equity Units"). The weighted-average grant date fair value of BMP Equity Units was $9.61 per unit as of December 31, 2020.

On January 1, 2020, Mr. Evans was awarded 193,011 BMP Equity Units for his prior service at Ben LP that vested 20% on the date of grant and vest 20% on each anniversary of Mr. Evan's hire date with Ben LP of February 15, 2018.

**Ben Equity Incentive Plan**

The Board of Directors of Beneficient Management maintains the Ben Equity Incentive Plan under which Ben LP is permitted to grant equity awards, in the form of restricted equity units ("REUs") up to a maximum of 12,811,258, representing ownership interests in common units of Ben LP. The holders of certain of the units issued under the BMP Equity Incentive Plan and the Ben Equity Incentive Plan, upon vesting, have the right to convert the units to shares of GWG Holdings common stock per the Exchange Agreement discussed below.

The estimated weighted-average grant date fair value date of REUs was $12.50 as of December 31, 2020.

On January 1, 2020, Mr. Evans was awarded 125,000 REUs for his prior service at Ben LP that vested 20% on the date of grant and vest 20% on each anniversary of Mr. Evan's hire date with Ben LP of February 15, 2018.

**Outstanding Equity Awards at Year End**

The following table sets forth the total outstanding equity awards as of December 31, 2020 for each named executive officer.

| | | Stock Awards | | | |
|---|---|---|---|---|---|
| Name | Grant Date | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
| Murray T. Holland[1] | 05/31/2019 | — | $ — | 129,717 | $ 906,721 |
| Timothy L. Evans[2] | 01/01/2020 | 50,000 | 625,000 | — | — |
| | 01/01/2020 | 77,204 | 741,931 | — | — |

(1) Represents the target award of PSUs awards that will vest on December 31, 2021, subject to the satisfaction of certain performance goals over a three-year performance period and Mr. Holland's Continuous Service (as defined in the PSU Agreement), through such vesting date, with a market value based on GWG Holdings' closing stock price of $6.99 on December 31, 2020.

(2) Includes 50,000 unvested REUs, of which 25,000 vested on February 15, 2021 and 25,000 vest February 15, 2022, and 77,204 unvested BMP Equity Units of which 38,602 vested on February 15, 2021 and 38,602 vest February 15, 2022.

**Director Compensation**

The following table sets forth the cash compensation awarded to or earned by each individual who served as a member of GWG Holdings' Board of Directors during the year ended December 31, 2020. There was no non-cash compensation paid to members of GWG Holdings' Board of Directors during 2020 except as noted below for Mr. Lockhart and Mr. Bailey.

Page 83

App. 1371

| Director's Name | Fees Earned or Paid in Cash 2020[1] | Stock Awards | Total |
|---|---|---|---|
| Peter T. Cangany, Jr.[2] | $ 371,225 | $ — | $ 371,225 |
| David F Chavenson | 156,255 | — | 156,255 |
| Brad K. Heppner | 100,000 | — | 100,000 |
| Thomas O. Hicks | 412,000 | — | 412,000 |
| Dennis P. Lockhart[3] | 295,375 | 1,105,500 | 1,400,875 |
| Bruce W. Schnitzer[4] | 400,000 | — | 400,000 |
| David H. de Weese | 100,000 | — | 100,000 |
| Roy W. Bailey[5] | 155,537 | 55,187 | 210,724 |
| Daniel P. Fine[6] | 62,413 | — | 62,413 |
| Michelle Caruso-Cabrera[7] | 43,625 | — | 43,625 |
| David S. Gruber[8] | 29,897 | — | 29,897 |
| Kathleen J. Mason[9] | 22,291 | — | 22,291 |
| Roger T. Staubach[10] | 133,379 | — | 133,379 |

_____

(1) Includes cash compensation for service as a director on the board of directors of Beneficient Management, L.L.C., a Delaware limited liability company ("Beneficient Management"), the general partner of Ben LP (the "Ben Board") of $300,000 for Mr. Schnitzer, $190,000 for Mr. Lockhart, $27,143 or Ms. Caruso-Cabrera, $210,000 for Mr. Cangany, $87,500 for Mr. Staubach, and $300,000 for Mr. Hicks.

(2) At fiscal year-end, Mr. Cangany had outstanding 25,000 REUs, of which 12,500 vested on April 1, 2021, and 12,500 vest on April 1, 2022, and 30,000 BMP Equity Units, of which 10,000 vested on April 1, 2021, 10,000 vest on April 1, 2022, and 10,000 vest on April 1, 2023.

(3) Stock awards include 50,000 REUs with an estimated grant date fair value of $625,000 and 50,000 BMP Equity Units with an estimated grant date fair value $480,500 that Mr. Lockhart was granted on May 1, 2020 for service as a director on the Ben Board. The REUs vest 25% on the date of grant and 25% on each anniversary of Mr. Lockhart's service start date with the Ben Board of May 10, 2019 and BMP Equity Units vest 20% on the date of grant and 20% on each anniversary of Mr. Lockhart's service start date with the Ben Board of May 10, 2019. At fiscal year-end, Mr. Lockhart had outstanding 25,000 REUs, of which 12,500 vest on May 10, 2021, and 12,500 vest on May 10, 2022, and 30,000 BMP Equity Units, of which 10,000 vest on May 10, 2021, 10,000 vest on May 10, 2022, and 10,000 vest on May 10, 2023.

(4) At fiscal year-end, Mr. Schnitzer held 3,750 REUs which vested on January 1, 2021.

(5) Mr. Bailey commenced serving as a member of GWG Holdings' Board of Directors on March 16, 2020 and ceased serving as a member of GWG Holdings' Board of Directors on March 6, 2021. The amount in the Stock Awards column represents the grant date fair value computed in accordance with FASB ASC Topic 718 for a grant of 7,895 restricted stock units. Such units did not vest due to Mr. Bailey's resignation from GWG Holdings' Board of Directors on March 6, 2021.

(6) Mr. Fine commenced serving as a member of GWG Holdings' Board of Directors on September 3, 2020 and ceased serving as a member of GWG Holdings' Board of Directors on March 6, 2021.

(7) Ms. Caruso-Cabrera ceased serving as a member of GWG Holdings' Board of Directors on February 21, 2020.

(8) Mr. Gruber commenced serving as a member of GWG Holdings' Board of Directors on September 3, 2020 and ceased serving as a member of GWG Holdings' Board of Directors on October 27, 2020.

(9) Ms. Mason ceased serving as a member of GWG Holdings' Board of Directors on March 2, 2020.

(10) Mr. Staubach ceased serving as a member of GWG Holdings' Board of Directors on June 15, 2020.

During 2020, all directors received annualized cash compensation of $100,000 paid in quarterly installments in arrears. The Chair and members of the Board's committees received the additional annualized cash compensation set forth below:

| Committee | Position | Additional Fees |
|---|---|---|
| Audit Committee | Chair | $ 15,000 |
| | Member (other than Chair) | $ 10,000 |
| Compensation Committee | Chair | $ 12,000 |
| | Member (other than Chair) | $ 5,375 |
| Special Committee | Chair | $ 30,000 |
| | Member (other than Chair) | $ 25,000 |

Table of Contents

Further, each member of the former Special Committee, which was dissolved in March 2021, received $1,000 for attending each Special Committee meeting, whether participating in-person or telephonically. The former Special Committee was a committee of the Board comprised solely of directors independent of Beneficient that was formed primarily for the purpose of considering and, if deemed appropriate, approving company transactions with or involving Beneficient.

In addition, upon approval by the board of directors of Beneficient Management ("Ben Board") following the recommendation of its compensation committee, members of the Board of Directors that serve as a member of the board of directors of Ben Management may receive board and committee retainers, meeting fees, equity-based compensation or other form of compensation for their service on the Ben Board.

On March 16, 2020, GWG Holdings entered into a restricted stock unit agreement with Mr. Bailey pursuant to which he received a grant of 7,895 restricted stock units. Each restricted stock unit entitled him to receive one share of GWG Holdings' common stock upon vesting on the one-year anniversary of the grant date, subject to remaining a member of the Board through such date, and subject to accelerated vesting in certain circumstances. Such units did not vest due to his resignation from the Board of Directors on March 6, 2021.

GWG Holdings has entered into Indemnification Agreements (the "Indemnification Agreements") with each of its current directors and executive officers (collectively, the "Indemnitees"). The Indemnification Agreements clarify and supplement indemnification provisions already contained in GWG Holdings' bylaws and generally provide that GWG Holdings shall indemnify the Indemnitees to the fullest extent permitted by applicable law, subject to certain exceptions, against expenses, judgments, fines and other amounts actually and reasonably incurred in connection with their service as a director or officer and also provide for rights to advancement of expenses and contribution.

The description of the Indemnification Agreements and the restricted stock unit agreement set forth above is not complete and is qualified in its entirety by reference to the full text of the form of Indemnification Agreement and the form of restricted stock unit agreement which are filed as Exhibit 10.17 and Exhibit 10.24, respectively, to this 2020 Form 10-K.

## ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED SHAREHOLDER MATTERS.

### In General

The tables below set forth information known to us regarding the beneficial ownership of GWG Holdings' common stock as of September 30, 2021 for:

- each person we believe beneficially holds more than 5% of GWG Holdings' outstanding common shares (based solely on our review of SEC filings), other than consolidated subsidiaries of the Company;
- each of GWG Holdings' named executive officers;
- each of GWG Holdings' directors; and
- all of GWG Holdings' directors and executive officers as a group.

The number of shares beneficially owned by a person includes shares issuable under options held by that person and that are currently exercisable or that become exercisable within 60 days of September 30, 2021. Percentage calculations assume, for each person and group, that all shares that may be acquired by such person or group pursuant to options currently exercisable or that become exercisable within 60 days of September 30, 2021 are outstanding for the purpose of computing the "Percentage of Common Stock Owned" by such person or group. Nevertheless, shares of common stock that are issuable upon exercise of presently unexercised options are not deemed to be outstanding for purposes of calculating the "Percentage of Common Stock Owned" by any other person or any other group.

Except as otherwise indicated in the table or its footnotes, the persons in the table below have sole voting and investment power with respect to all shares of common stock shown as beneficially owned by them, subject to community property laws where applicable.

As of the close of business on September 30, 2021, 33,097,118 shares of common stock, $0.001 par value, were issued and outstanding.

App. 1374

Table of Contents

**Beneficial Ownership**

| Name | Shares Beneficially Owned | Percentage of Shares Beneficially Owned |
|---|---|---|
| *5% Beneficial Owners:* | | |
| Seller Trusts[1] | 16,076,252 | 48.6 % |
| Custody Trusts[2] | 9,837,264 | 29.7 % |
| Beneficient Company Holdings, L.P. [3] | 2,500,000 | 7.6 % |
| *Named Executive Officers:* | | |
| Murray T. Holland (solely in his capacity as Trust Advisor to the Seller Trusts)[4] | 16,076,252 | 48.6 % |
| Timothy L. Evans | — | — % |
| Lennie Nicholson | 1,000 | * |
| *Non-Employee Directors:* | | |
| Peter T. Cangany, Jr. | 8,169 | * |
| David F. Chavenson | 8,169 | * |
| David H. de Weese | 8,169 | * |
| *All current directors and executive officers as a group* | 16,100,759 | 48.6 % |

_____

* less than one percent.

(1)  The business address of the Seller Trusts is 251 Little Falls Drive, Wilmington, DE 19808. On January 12, 2018, GWG Holdings entered into a Master Exchange Agreement (the "Master Exchange Agreement") pursuant to which we agreed to engage in a strategic transaction (the "Exchange Transaction") with Beneficient and the Seller Trusts, in which the parties agreed to an exchange of certain assets. The Seller Trusts are a group of individual common law trusts that received shares of common stock in the Exchange Transaction. The trustee of each of the Seller Trusts is Delaware Trust Company. The trust advisors of each trust are two individuals unrelated to each other, James E. Turvey, who is a Beneficient employee, and Murray T. Holland, who have sole decision-making authority with respect to each trust. The beneficiary of each of the Seller Trusts is MHT Financial, L.L.C. ("MHT"). The current members of MHT are Shawn T. Terry and Mike McGill. The names of the various trusts comprising the Seller Trusts that own the shares in the table above are as follows: The LT-1 Exchange Trust, The LT-2 Exchange Trust, The LT-3 Exchange Trust, The LT-4 Exchange Trust, The LT-5 Exchange Trust, The LT-6 Exchange Trust, The LT-7 Exchange Trust, The LT-8 Exchange Trust, The LT-9 Exchange Trust, The LT-12 Exchange Trust, The LT-14 Exchange Trust, The LT-15 Exchange Trust, The LT-16 Exchange Trust, The LT-17 Exchange Trust, The LT-18 Exchange Trust, The LT-19 Exchange Trust, and The LT-20 Exchange Trust.

(2)  The business address of the Custody Trusts is 251 Little Falls Drive, Wilmington, DE 19808. The Custody Trusts, which are variable interest entities, are a group of individual common law trusts that received shares of common stock from certain Seller Trusts that the Seller Trusts had received in connection with the Exchange Transaction. The names of the various trusts comprising the Custody Trusts and certain other custody trusts (collectively, the "Custody Trusts") are as follows: LT-21A Custody Trust, LT-22A Custody Trust, LT-23A Custody Trust, LT-24A Custody Trust, LT-25A Custody Trust, and LT-26A Custody Trust. The certificate holders of the Custody Trusts are as follows: The LT-21 LiquidTrust, The LT-22 LiquidTrust, The LT-23 LiquidTrust, The LT-24 LiquidTrust, The LT-25 LiquidTrust, and The LT-26 LiquidTrust (the "Liquid Trusts"). The trustee of each of the Liquid Trusts is John A. Stahl who has sole decision-making authority with respect to such Custody Trust, and therefore, may be deemed to have voting power and dispositive power with respect to the shares held by the Custody Trusts, subject to the provisions of the stockholders agreement described below.

In connection with the transfer of the shares to the Custody Trusts, on November 3, 2020, the Company and the LiquidTrusts entered into a Stockholders Agreement (the "Stockholders Agreement"), and concurrently, each of the Custody Trusts entered into a joinder to the Stockholders Agreement with respect to the shares held by the Custody Trusts (the LiquidTrusts and the Custody Trusts collectively, the "Subject Trusts"). The purpose of the Stockholders Agreement is to limit the voting power of the Subject Trusts and the control they would otherwise be entitled to exercise over the Company. The Stockholders Agreement contains, among others, the following provisions, all of which bind the Subject Trusts and their respective transferees:

- Until the Seller Trusts beneficially own less than 20% of the total voting power of GWG Holdings' common stock, the shares and any other voting securities of GWG Holdings over which the Subject Trusts have voting control, with respect to all matters including without limitation the election and removal of directors, regardless of whether voted at a regular or special meeting or pursuant to a written consent, will be voted solely in proportion with the votes cast by all other holders of voting securities of GWG Holdings on any matter put before them; and

- No Subject Trust nor its assignees and transferees (other than pursuant to a registered public offering) or their respective affiliates will, without the prior written consent of GWG Holdings' Board of Directors, directly or indirectly:

  ◦  acquire, offer to acquire, or agree to acquire, directly or indirectly, by purchase or otherwise, any securities or direct or indirect rights to acquire any voting securities of the Company or any of its subsidiaries;

- ◦ seek or propose to influence or control the management, Board of Directors, or policies of GWG Holdings, make or participate, directly or indirectly, in any "solicitation" of "proxies" (as such terms are used in applicable SEC rules) to vote any voting securities of GWG Holdings or any of its subsidiaries, or seek to advise or influence any other person with respect to the voting of any voting securities of GWG Holdings or any of its subsidiaries;

- ◦ submit a proposal for or offer of (with or without conditions) any merger, recapitalization, reorganization, business combination, or other extraordinary transaction involving GWG Holdings, any of its subsidiaries, or any of their respective securities or assets or, except as required by law, make any public announcement with respect to the foregoing;

- ◦ enter into any discussions, negotiations, arrangements, or understandings with any other person with respect to any of the foregoing, or otherwise form, join, engage in discussions relating to the formation of, or participate in a "group," within the meaning of Section 13(d)(3) of the Securities Exchange Act of 1934, as amended, in connection with any of the foregoing; or

- ◦ advise, assist, or encourage any other person in connection with any of the foregoing.

Each of the Subject Trusts has appointed as its proxy and attorney-in-fact an officer of GWG Holdings to be designated by GWG Holdings, with full power of substitution, to vote or execute written consents with respect to all of the shares owned by the Custody Trusts, provided that such proxy may only be exercised with respect to a Subject Trust if such Subject Trust fails to comply with its voting obligations under the Stockholders Agreement.

The Stockholders Agreement shall remain in effect until the Seller Trusts beneficially own less than 20% of GWG Holdings' common stock.

(3) Represents 2,500,000 shares of common stock held by Beneficient Company Holdings, L.P., a Delaware limited partnership ("BCH"). BCH is controlled by its general partner, Ben LP. Ben LP is controlled by its general partner, Beneficient Management. All 2,500,000 shares held by BCH have been pledged as collateral to secure our obligations under our debt securities pursuant to the Amended and Restated Pledge and Security Agreement dated October 23, 2017. While BCH has sole dispositive power with respect to the shares it holds, unless such shares are transferred to an unaffiliated third party, such shares are not entitled to vote nor to be counted for quorum purposes.

(4) Consists solely of 16,076,252 shares of common stock held by the Seller Trusts. Murray T. Holland, acting in a capacity other than as CEO of GWG, is one of the trust advisors to the Seller Trusts and James E Turvey, an individual unrelated to Mr. Holland and an employee of Ben LP, acting in a capacity other than as an employee of Ben LP, is the other trust advisor. Mr. Holland and Mr. Turvey have shared decision-making authority with respect to each of the Seller Trusts, including shared voting power and shared dispositive power over the shares of common stock held by each of the Seller Trusts. Mr. Holland has an indirect pecuniary interest in the shares of common stock held by the Seller Trusts resulting from his ownership interest in 30% of the outstanding membership interests of MHT, the sole beneficiary of each of the Seller Trusts. Consequently, to the extent that MHT, as beneficiary, receives proceeds from the sale of common stock and, GWG Holdings' Seller Trust L Bonds due 2023, as contemplated by the Master Exchange Agreement, in excess of MHT's contractual obligations, Mr. Holland would have a right to his pro rata share of any distribution of such proceeds if and when made by MHT to its members. There can be no assurance (i) that MHT will receive any proceeds in excess of its contractual obligations, (ii) as to the amount of any such excess, or (iii) that any distribution of such excess will be distributed to members of MHT, including Mr. Holland. Mr. Holland disclaims beneficial ownership of the shares of common stock held by the Seller Trusts except to the extent of the pecuniary interest therein described above.

## Securities Authorized for Issuance under Equity Compensation Plans

We maintain GWG Holdings' 2013 Stock Incentive Plan. The purpose of the 2013 Stock Incentive Plan is to provide a means by which our employees, directors, officers and consultants may be granted an opportunity to purchase GWG Holdings common stock, to assist in retaining the services of such persons, to secure and retain the services of persons capable of filling such positions and to provide incentives for such persons to exert maximum efforts for our success. At December 31, 2020, 6,000,000 shares of GWG Holdings' common stock have been approved for issuance under the 2013 Stock Incentive Plan, of which 3,492,096 shares remained available for issuance pursuant to future grants.

The 2013 Stock Incentive Plan was approved by GWG Holdings' stockholders. The following table sets forth certain information as of December 31, 2020 with respect to securities authorized for issuance under compensation arrangements.

Page 87

| Plan Category | Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants and Rights | Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights ($) |
|---|---|---|
| Equity compensation plan approved by stockholders: | | |
| Stock Options | 695,117 | $ 9.03 |
| Stock Appreciation Rights | 535,657 | $ 8.75 |
| Restricted Stock Units | 129,717 | N/A |
| 2013 Stock Incentive Plan Total | 1,360,491 | $ 8.91 |

Additional information in response to this Item is incorporated herein by reference to our definitive proxy statement to be filed pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this Form 10-K.

**ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE.**

**Conflict-of-Interest and Related-Party Transaction Policy**

We have a Conflict-of-Interest and Related-Party Transaction Policy, pursuant to which GWG Holdings' Board of Directors (or an authorized committee thereof) is responsible for reviewing policies and procedures with respect to related party transactions required to be disclosed pursuant to Item 404 of the SEC's Regulation S-K (including transactions between the Company and its officers and directors, or affiliates of such officers or directors), and approving the terms and conditions of such related party transactions. Our Conflict-of-Interest and Related-Party Transaction Policy sets forth the processes and procedure to be taken in such review and approval, which includes obtaining approval by a majority of the disinterested members of the Board (or an authorized committee thereof) and otherwise in accordance with state law governing conflicts of interest, or if the transaction involves compensation payable to an executive, the Compensation Committee. The related party transactions in which we engaged during 2020 and 2019, which are described below, were approved in accordance with Conflict-of-Interest and Related-Party Transaction Policy.

**Transactions with Related Persons**

*Purchase and Contribution Transaction*

On April 15, 2019, Jon R. Sabes, the former Chief Executive Officer and a former director of GWG Holdings, and Steven F. Sabes, the former Executive Vice President and a former director of GWG Holdings, entered into the Purchase and Contribution Agreement ("the Purchase and Contribution Agreement") with, among others, Ben LP. GWG Holdings was not a party to the Purchase and Contribution Agreement. However, the closing of the transactions contemplated by the Purchase and Contribution Agreement (the "Purchase and Contribution Transaction") were subject to certain conditions that were dependent upon the Company taking, or refraining from taking, certain actions. The closing of the Purchase and Contribution Transaction occurred on April 26, 2019.

Among other actions taken in connection with the closing of the Purchase and Contribution Transaction, on April 26, 2019, Beneficient Capital Company, L.L.C., a Delaware limited liability company ("BCC"), and AltiVerse Capital Markets, L.L.C., a Delaware limited liability company ("AltiVerse"), executed and delivered a Consent and Joinder (the "Consent and Joinder") to the Amended and Restated Pledge and Security Agreement dated October 23, 2017 by and among GWG Holdings, GWG Life, LLC, Messrs. Jon and Steven Sabes and the Bank of Utah (the "Security Agreement"). Pursuant to the Consent and Joinder, Messrs. Jon and Steven Sabes assigned their rights and delegated their obligations under the Security Agreement to BCC and AltiVerse, and BCC and AltiVerse became substitute grantors under the Security Agreement such that the shares of GWG Holdings' common stock acquired by BCC and AltiVerse pursuant to the Purchase Agreement (as defined below) will continue to be pledged as collateral security for the Company's obligations owing in respect of the debt securities issued under the Amended and Restated Indenture, dated as of October 23, 2017, as amended and supplemented.

In connection with the Exchange Transaction, GWG Holdings and the Seller Trusts entered into a stockholders agreement that provided (among other standstill provisions) that until the Seller Trusts own, in the aggregate, voting securities representing less than 10% of the total voting power of all voting securities of GWG Holdings, all voting securities of GWG Holdings voted by the Seller Trusts will be voted solely in proportion with the votes cast by all other holders of voting securities of GWG Holdings on the matter. On April 26, 2019, and in connection with the closing of the Purchase and

Contribution Transaction, the stockholders agreement was amended and terminated, and the Seller Trusts are now entitled to full voting rights with respect to the shares of common stock they own.

*Promissory Note with Certain ExAlt Trusts*

On May 31, 2019, GWG Holdings' wholly-owned subsidiary GWG Life entered into a Promissory Note (the "Promissory Note"), made by Jeffrey S. Hinkle and Dr. John A. Stahl, not in their individual capacity but solely as trustees of The LT-1 LiquidTrust, The LT-2 LiquidTrust, The LT-5 LiquidTrust, The LT-7 LiquidTrust, The LT-8 LiquidTrust and The LT-9 LiquidTrust (collectively, the "Borrowers"). Pursuant to the terms of the Promissory Note, GWG Life funded a term loan to the Borrowers in an aggregate principal amount of $65.0 million (the "Loan"). The Loan was funded in two installments as described below.

The Borrowers are common law trusts established as part of alternative asset financings extended by a subsidiary of Ben LP, of which GWG Holdings owns approximately 96.2% of the issued and outstanding common units. Although each Borrower is allocated a portion of the Loan equal to approximately 16.7% of the aggregate outstanding principal of the Loan, the Loan constituted the joint and several obligations of the Borrowers.

The Loan was made pursuant to GWG Holdings' strategy to further diversify into alternative assets (beyond life insurance) and ancillary businesses and was intended to better position Beneficient's balance sheet, working capital and liquidity profile to satisfy anticipated Texas Department of Banking regulatory requirements.

An initial advance in the principal amount of $50.0 million was funded on June 3, 2019 and the second advance, in the principal amount of $15.0 million, was funded on November 22, 2019. The Loan bore interest at 7.0% per annum, with interest payable at maturity, and matured on June 30, 2023. On September 30, 2020, the Promissory Note was repaid by the Borrowers utilizing Preferred Series C Unit Accounts of BCH, a Delaware limited partnership of which Ben LP owns all of the outstanding Class A units and serves as its general partner.

The Loan was unsecured and was subject to certain covenants (including a restriction on the incurrence of any indebtedness senior to the Loan other than existing senior loan obligations to each of HCLP Nominees, L.L.C. ("HCLP") and Beneficient Holdings, Inc. ("BHI", and together with HCLP, the "Senior Lenders"), as lenders) and events of default. At the time Beneficient was consolidated, all existing senior loan obligations were held by HCLP.

A then constituted special committee of the Board of Directors of GWG Holdings composed solely of independent and disinterested directors of GWG Holdings, together with the assistance of its independent legal advisors, reviewed, negotiated and approved the terms of the Loan as well as the terms of the repayment.

*HCLP Nominees, LLC*

During the years ended December 31, 2019 and 2020, GWG Holdings invested $79.0 million and $130.2 million, respectively, of cash into equity investments in Beneficient. During this same period, Beneficient made payments to HCLP, its Senior Lender, totaling $144.6 million in principal and interest on the First and Second Lien Credit Agreements. The First Credit Agreement was issued in 2017, while the Second Lien Credit Agreement was issued in 2018. HCLP is an indirect subsidiary of Highland Consolidated, L.L.C. ("Highland").

A long-standing lending and investment relationship of 25 years exists between Highland (and its affiliates or related parties), on the one hand, and certain trusts and entities held by such trusts that are controlled by Ben Founder ("Ben Founder Affiliates"), on the other. From time to time, Highland or its affiliates have advanced funds under various lending and investing arrangements to the Ben Founder Affiliates, and such Ben Founder Affiliates have made repayments to Highland or its affiliates, as applicable, both in cash and in kind.

Such loans to and investments with or in the Ben Founder Affiliates have been and may be made by Highland, or its affiliates, as applicable, using proceeds from loan repayments made by Beneficient to HCLP in its capacity as Senior Lender to Beneficient, with such loan repayments made potentially using cash from GWG Holdings' and GWG Life's investments in Beneficient. Such loans and investments have ranged between no outstanding balance and $104.0 million.

As of June 30, 2021, Highland and the applicable Ben Founder Affiliates mutually agreed to satisfy all obligations under all outstanding loans among Highland and the Ben Founder Affiliates via full payment and satisfaction of the existing loan balances (the "Loan Balances") by in-kind real property transfers (the "In-Kind Property Payment") from certain of the Ben Founder Affiliates to Highland. The terms of the In-Kind Property Payment grants Highland the right to transfer the real

Page 89

Table of Contents

property that was transferred pursuant to the In-Kind Property Payment back to certain of the Ben Founder Affiliates, in exchange for a Preferred Series A Subclass 1 capital account balance in BCH in an amount equal to the Loan Balances, with such exchange to be satisfied from existing Preferred Series A Subclass 1 Unit Accounts that are held by such Ben Founder Affiliates. As of June 30, 2021, neither Highland nor any of its affiliates has any outstanding loans or investments with or in any Ben Founder Affiliates.

*Intercreditor Agreements*

In connection with the Promissory Note, GWG Holdings also entered into two intercreditor and subordination agreements: (1) an Intercreditor Agreement between GWG Life and HCLP and (2) an Intercreditor Agreement between GWG Life and BHI (the "Intercreditor Agreements"). Under the Intercreditor Agreements, GWG Life agreed to subordinate the Loan to the secured obligations of Beneficient and its affiliates outstanding to the Senior Lenders (the "Senior Loan Obligations"), agreed to not take any liens to secure the Loan (and to subordinate such liens, if any, to the liens of the Senior Lenders), and agreed not to take enforcement actions under the Promissory Note until such Senior Loan Obligations were paid in full. The Intercreditor Agreements established various other inter-lender and subordination terms, including, without limitation, with respect to permitted actions by each party, permitted payments, waivers, voting arrangements in bankruptcy, application of certain proceeds and limitations on amendments of the respective loan obligations of the parties. The Senior Lenders agreed not to extend the maturity of their respective loan obligations beyond June 30, 2023 or increase the outstanding principal of the loans made by the Senior Lenders without the written consent of GWG Life. GWG Life agreed not to transfer the Promissory Note except with the written consent of the Senior Lenders (such consent not to be unreasonably withheld) or to the Company or direct or indirect wholly owned subsidiaries thereof. The special committee, together with the assistance of its independent legal advisors, reviewed, negotiated and approved the terms of the Intercreditor Agreements.

*Purchase of Additional Common Units of Ben LP*

On June 12, 2019, GWG Holdings acquired 1,000,000 Ben LP common units from unaffiliated holders of alternative assets that had sold the alternative assets to MHT for contribution to various Exchange Trusts established by MHT as part of the Ben LP liquidity products. The holders acquired the Ben LP common units from MHT in satisfaction for a portion of the purchase price owed by MHT for the alternative assets that MHT contributed to the Exchange Trusts. Murray T. Holland, GWG Holdings' Chairman and Chief Executive Officer, was a Managing Director of MHT and continues to own a 30% interest in MHT. Mr. Holland also serves as a trust advisor to the Exchange Trusts that hold the alternative assets. The purchase price for the Ben LP common units acquired by GWG Holdings was $10,000,000.

*Preferred Series A Unit Account and Common Unit Investment Agreement; Exchange Agreement*

On December 31, 2019, GWG Holdings, Ben LP, BCH and Beneficient Management, the general partner of Ben LP, entered into a Preferred Series A Unit Account and Common Unit Investment Agreement (the "Investment Agreement").

Pursuant to the Investment Agreement, GWG Holdings transferred $79 million to Ben LP in return for 666,667 common units of Ben LP and a Preferred Series A Subclass 1 Unit Account of BCH.

In connection with the Investment Agreement, GWG Holdings obtained the right to appoint a majority of the board of directors of Beneficient Management, the general partner of Ben LP. As a result, GWG Holdings obtained control of Ben LP and began reporting the results of Ben LP and its subsidiaries on a consolidated basis beginning on the transaction date of December 31, 2019. GWG Holdings' right to appoint a majority of the board of directors of Beneficient Management will terminate in the event (i) GWG Holdings' ownership of the fully diluted equity of Ben LP (excluding equity issued upon the conversion or exchange of Preferred Series A Unit Accounts of BCH held as of December 31, 2019 by parties other than the Company) is less than 25%, (ii) the Continuing Directors of GWG Holdings cease to constitute a majority of the board of directors of GWG Holdings, or (iii) certain bankruptcy events occur with respect to GWG Holdings. The term "Continuing Directors" means, as of any date of determination, any member of the board of directors of the Company who: (1) was a member of the board of directors of GWG Holdings on December 31, 2019; or (2) was nominated for election or elected to the board of directors of GWG Holdings with the approval of a majority of the Continuing Directors who were members of the board of directors of GWG Holdings at the time of such nomination or election.

Beneficient Management has an executive committee, a nominating committee and a community reinvestment committee. The board of directors of Beneficient Management has the right to appoint two members of these committees, and an entity related to Brad K. Heppner, GWG Holdings' former Chairman, who served in such capacity from April 26, 2019 to June 14, 2021, has the right to appoint the other two members of these committees. The entity related to Mr. Heppner also has the

Table of Contents

right to appoint the Chairman of the Board and of each of the committees. The Beneficient Management executive committee has the right to approve certain transactions on behalf of Beneficient Management and Ben LP and its subsidiaries, including: (i) the incurrence of debt; (ii) the issuance of equity interests of Ben LP or any subsidiary equal to 5% or more of the fully diluted equity of such entity or that have preferred terms to the common equity of Ben LP, except in connection with any trust instrument or product offered by Ben LP or its affiliates; (iii) the adoption of a shareholder or unitholder rights plan by Ben LP or any subsidiary thereof; (iv) the amendment, supplement, waiver, or modification of Ben LP's limited partnership agreement, the BCH limited partnership agreement or the organizational documents of any subsidiary of the foregoing other than any common law or statutory trusts created to facilitate the financing, acquisition, contribution, assignment or holding of alternative assets; (v) the exchange or disposition of a majority or more of the assets, taken as a whole, of Ben LP or any subsidiary thereof in a single transaction or a series of related transactions; (vi) the exchange or disposition of a majority or more of the assets, taken as a whole, of Beneficient Management or any subsidiary thereof in a single transaction or a series of related transactions; (vii) the execution by Ben LP, Beneficient Management or any subsidiary thereof of any contracts or of any amendment, supplement, waiver or modification of any existing contract, which would materially change the nature of the business of Beneficient Management and its affiliates; (viii) materially or commercially substantive changes to or creation of an employee incentive or benefit plan of Beneficient Management, Ben LP or any subsidiary thereof; (ix) the merger, sale or other combination of Ben LP, Beneficient Management or any subsidiary thereof with or into any other person or entity; (x) the transfer, mortgage, pledge, hypothecation or grant of a security interest in all or substantially all of the assets of Ben LP or any subsidiary thereof; (xi) the transfer, mortgage, pledge, hypothecation or grant of a security interest in all or substantially all of the assets of Beneficient Management or any subsidiary thereof; (xii) the removal without cause of a chief executive officer or any other executive officer of Beneficient Management, Ben LP or any operating subsidiary thereof; (xiii) the termination of employment of any other officer of Beneficient Management, Ben LP or any operating subsidiary thereof or the termination of the association of a partner, member, manager or director of any subsidiary of Ben LP, in each case, without cause; (xiv) the liquidation or dissolution of Beneficient Management, Ben LP or any operating subsidiary thereof; (xv) the withdrawal or removal of Beneficient Management as the general partner of Ben LP or the direct or indirect transfer of beneficial ownership of all or any part of a general partner interest in Ben LP; (xvi) any determination by Beneficient Management, acting as general partner of Ben LP, related to the removal or replacement of the general partner under Ben LP's limited partnership agreement; (xvii) the entry into any material or commercially substantive agreement with a related party; (xviii) the creation of any new and materially or commercially substantively different trust instrument or product, or any materially or commercially substantive change, amendment, supplement, waiver or modification to the terms or provision of any existing trust product, offered by Ben LP or any of its affiliates to the extent regulated by the Texas Finance Commission or other state, federal or non-U.S. regulator with direct or indirect jurisdiction over Ben LP or such affiliate or such product, other than any change or modification to any exhibit or schedule to any trust instrument or product; or (xix) the bankruptcy of Ben LP.

Following the transaction, and as agreed in the Investment Agreement, GWG Holdings was issued an initial capital account balance for the Preferred Series A Subclass 1 Unit Account of $319 million. The other holders of the Preferred Series A Subclass 1 Unit Accounts are entities related to certain Ben Initial Investors and an entity related to one of GWG Holdings' former directors and Beneficient's current directors (the "Related Account Holders"), and the aggregate capital accounts of all holders of the Preferred Series A Subclass 1 Unit Accounts after giving effect to the investment by GWG Holdings was $1.6 billion. GWG Holdings' Preferred Series A Subclass 1 Unit Account is the same class of preferred security as held by the Related Account Holders. If the Related Account Holders exchange their Preferred Series A Subclass 1 Unit Accounts for securities of GWG Holdings, GWG Holdings' Preferred Series A Subclass 1 Unit Account would be converted into Common Units (so neither GWG Holdings nor the Related Account Holders would hold Preferred Series A Subclass 1 Unit Accounts).

In addition, on December 31, 2019, GWG Holdings, Ben LP and certain holders of common units of Ben LP (the "Common Units") entered into an Exchange Agreement (the "Exchange Agreement") pursuant to which certain holders of Common Units from time to time have the right, on a quarterly basis, to exchange their Common Units for common stock of GWG Holdings. The exchange ratio in the Exchange Agreement is based on the ratio of the capital account associated with the Common Units to be exchanged to the market price of GWG Holdings' common stock based on the volume weighted average price of GWG Holdings' common stock for the five consecutive trading days prior to the quarterly exchange date. The Exchange Agreement is intended to facilitate the marketing of Ben LP's products to holders of alternative assets.

*Preferred Series C Unit Purchase Agreement*

On July 15, 2020, GWG Holdings entered into a Preferred Series C Unit Purchase Agreement ("UPA") with Ben LP and BCH. The UPA was reviewed and approved by the then constituted Special Committee of the Board of Directors of GWG Holdings.

Table of Contents

Pursuant to the UPA, and provided that GWG Holdings determines that it has excess liquidity, GWG Holdings has agreed to make capital contributions from time to time to BCH in exchange for Preferred Series C Unit accounts of BCH during a purchasing period commencing on the date of the UPA and continuing until the earlier of (i) the occurrence of a Change of Control Event (as defined below) and (ii) the mutual agreement of the parties (the "Purchasing Period"). A "Change of Control Event" shall mean (A) the occurrence of an event that results in GWG Holdings' ownership of the fully diluted equity of Beneficient is less than 25%, the Continuing Directors (as defined below) of GWG Holdings cease to constitute a majority of the board of directors of GWG Holdings, or certain bankruptcy events occur with respect to GWG Holdings, and (B) the listing of Common Units on a national securities exchange (a "Public Listing"). The term "Continuing Directors" means, as of any date of determination, any member of the board of directors of GWG Holdings who: (1) was a member of the board of directors of GWG Holdings on December 31, 2019; or (2) was nominated for election or elected to the board of directors of GWG Holdings with the approval of a majority of the Continuing Directors who were members of the board of directors of GWG Holdings at the time of such nomination or election.

If, on or prior to the end of the Purchasing Period, a Public Listing occurs, the BCH Purchased Units shall be automatically exchanged for Common Units, or another unit of Beneficient, as the parties may mutually agree (the "Beneficient Units"), at the lower of (i) the volume-weighted average of the Beneficient Units for the 20 trading days following the Public Listing, and (ii) $12.75.

In addition, at any time following the date of the UPA, all or some of the Preferred Series C Unit Accounts purchased under the UPA may be exchanged for Beneficient Units at the option of GWG Holdings (exercised by a special committee of the Board of Directors or, if such committee is not in place, the appropriate governing body of GWG Holdings); provided that, if GWG Holdings exchanges less than all of the Preferred Series C Unit Accounts purchased under the UPA, then, immediately after giving effect to such exchange, GWG Holdings shall be required to continue to hold Preferred Series C Unit Accounts with a capital account that is at least $10.0 million. The exchange price for such Beneficient Units shall be determined by third-party valuation agents selected by GWG Holdings and Beneficient.

**Director Independence**

GWG Holdings' Board of Directors periodically reviews relationships that directors have with our Company to determine whether our directors are "independent directors" as such term is defined in Rule 5605(a)(2) of the Nasdaq Marketplace Rules. GWG Holdings' Board of Directors has determined that the following directors are independent directors: Peter T. Cangany, Jr., David F. Chavenson and David H. de Weese.

Because various trusts (the "Seller Trusts"), collectively, own approximately 48.6% of GWG Holdings' outstanding voting securities and certain ExAlt Trusts holding approximately 29.7% of GWG Holdings' outstanding common stock (according to their latest Schedule 13D/A filing) have agreed to vote their shares in proportion to the votes cast by all other holders of GWG Holdings' voting securities, the Seller Trusts are entitled to cast a majority of the votes on all matters requiring stockholder votes, including, if a stockholder vote is required: the election of directors; mergers, consolidations, acquisitions and other strategic transactions; the sale of all or substantially all of our assets and other decisions affecting our capital structure; amendments to GWG Holdings' Certificate of Incorporation or bylaws; and our winding up and dissolution. As such, we are a "controlled company" as that term is set forth in Rule 5615(c) of the Nasdaq Marketplace Rules. Under the Nasdaq rules, a company of which more than 50% of the voting power for the election of directors is held by an individual, a group or another company is a "controlled company" and may elect not to comply with certain Nasdaq corporate governance requirements, including the requirements that:

- a majority of its board of directors consist of independent directors;
- nominations for director be selected, or recommended for selection, solely by independent directors; and
- its Compensation Committee be composed entirely of independent directors.

We are currently relying on the controlled company exemption for the above requirements related to director nominations.

**ITEM 14. PRINCIPAL ACCOUNTING FEES AND SERVICES.**

**Fees Billed to Company by Its Independent Registered Public Accounting Firm**

The following table presents fees for professional audit services and 401(k) audit services, tax services and other services rendered by Grant Thornton in 2020 and Whitley Penn in 2019:

|  | **2020** | | **2019** | |
|---|---|---|---|---|
| Audit Fees[1] | $ | 1,704,000 | $ | 1,559,082 |
| Audit-Related Fees[2] |  | — |  | 50,908 |
| Tax Fees[3] |  | — |  | 126,710 |
| All Other Fees[4] |  | 124,200 |  | 6,430 |
| Total Fees | $ | 1,828,200 | $ | 1,743,130 |

_____

(1)  Audit Fees consist of fees for professional services rendered for the audit of our consolidated annual financial statements and review of the interim consolidated financial statements included in quarterly reports and services that are normally provided in connection with statutory and regulatory filings or engagements.

(2)  Audit-Related Fees consist principally of assurance and related services that are reasonably related to the performance of the audit or review of the Company's financial statements but not reported under the caption Audit Fees above.

(3)  Tax Fees consist of fees for tax compliance, tax advice, and tax planning.

(4)  All Other Fees typically consist of fees for permitted non-audit products and services provided. All Other Fees included expenses related to employee compensation consulting services performed by Grant Thornton during 2020.

(5)  Due to the change in auditors noted above, fees for 2020 include only those fees paid to Grant Thornton, the accountant who rendered the audit opinion for the 2020 financial statements. Whitley Penn, the predecessor auditor, performed reviews of the Company's Forms 10-Q for the first and second quarters of 2020, as well as certain other services related to SEC filings during 2020. Whitley Penn was paid fees totaling $315,884 for these services in 2020 that are not included in the table above.

The Audit Committee of GWG Holdings' Board of Directors reviewed the services provided by Grant Thornton during the 2020 fiscal year and Whitley Penn during the 2019 fiscal year and the fees billed for such services. After consideration, the Audit Committee determined that the receipt of these fees by Whitley Penn and Grant Thornton, respectively, was compatible with the provision of independent audit services. The Audit Committee discussed these services and fees with the relevant auditor and our management to determine that they are permitted under the rules and regulations concerning auditor independence promulgated by the Securities and Exchange Commission ("SEC") to implement the Sarbanes-Oxley Act of 2002, as well as the American Institute of Certified Public Accountants.

**Pre-Approval Policy**

The written charter of the Audit Committee provides that all audit and non-audit accounting services permitted to be performed by our independent registered public accounting firm under applicable rules and regulations must be pre-approved by the Audit Committee or by designated members of the Audit Committee, other than with respect to *de minimis* exceptions permitted under the Sarbanes-Oxley Act of 2002. All services performed by our independent registered public accounting firms during the years ended December 31, 2020 and 2019 were pre-approved in accordance with the written charter.

Prior to or as soon as practicable following the beginning of each year, a description of the audit, audit-related, tax, and other services expected to be performed by the independent registered public accounting firm in the following year will be presented to the Audit Committee for approval. Following such approval, any requests for audit, audit-related, tax, and other services not presented and pre-approved must be submitted to the Audit Committee for specific pre-approval and cannot commence until such approval has been granted. However, we have delegated the authority to grant specific pre-approval between meetings, as necessary, to the Chair of the Audit Committee. The Chair then updates the Audit Committee at the next regularly scheduled meeting of any services that were granted specific pre-approval.

**PART IV**

**ITEM 15. EXHIBITS, FINANCIAL STATEMENT SCHEDULES.**

**Documents filed as part of this Form 10-K:**

| | |
|---|---|
| Reports of Independent Registered Public Accounting Firms | F-1 |
| Consolidated Balance Sheets at December 31, 2020 and 2019[1] | F-6 |
| Consolidated Statements of Operations for the years ended December 31, 2020 and 2019[1] | F-7 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2020 and 2019[1] | F-8 |
| Consolidated Statements of Changes in Stockholders' Equity for the years ended December 31, 2020 and 2019[1] | F-10 |
| Notes to Consolidated Financial Statements | F-9 |

[1] Financial statements as of and for the year ended December 31, 2019 reflect restatements as discussed in Notes 21 and 22.

**Financial Statement Schedule:**

Not applicable.

Page 94

Table of Contents

Exhibit Index

| Exhibit | Description |
|---|---|
| 3.1 | Certificate of Incorporation[1] |
| 3.2 | Bylaws as amended[2] |
| 3.3 | Certificate of Amendment to Certificate of Incorporation[3] |
| 3.4 | Certificate of Amendment to Certificate of Incorporation[7] |
| 3.5 | Certificate of Designation for Redeemable Preferred Stock[8] |
| 3.6 | Certificate of Amendment to Certificate of Designation for Redeemable Preferred Stock[8] |
| 3.7 | Certificate of Designation for Series 2 Redeemable Preferred Stock[10] |
| 3.8 | Certificate Of Designations Of Series B Convertible Preferred Stock[18] |
| 3.9 | Certificate of Correction for Redeemable Preferred Stock[30] |
| 3.10 | Certificate of Correction for Series 2 Redeemable Preferred Stock[30] |
| 4.1 | Amended and Restated Indenture with Bank of Utah, dated October 23, 2017[5] |
| 4.2 | Amended and Restated Pledge and Security Agreement by and among GWG Holdings, Inc., GWG Life, LLC, Jon R. Sabes, Steven F. Sabes, and Bank of Utah, dated October 23, 2017[5] |
| 4.3 | Form of Subscription Agreement for Redeemable Preferred Stock[11] |
| 4.4 | Form of Subscription Agreement for Series 2 Redeemable Preferred Stock[14] |
| 4.6 | Amendment No. 1 to Amended and Restated Indenture with Bank of Utah, dated March 27, 2018[23] |
| 4.7 | Supplemental Indenture dated as of August 10, 2018 to the Amended And Restated Indenture dated as of October 23, 2017, as amended[18] |
| 4.8 | Amendment No. 2 to Amended and Restated Indenture with Bank of Utah, dated December 31, 2019 [26] |
| 4.9 | Supplemental Indenture dated as of December 31, 2020 to the Amended and Restated Indenture dated as of October 23, 2017, as amended[31] |
| 4.10 | Description of the Registrant's Securities Registered Pursuant to Section 12 of the Securities Exchange Act of 1934 (filed herewith) |
| 10.1 | Third Amended and Restated Loan and Security Agreement with GWG DLP Funding IV, LLC (as borrower), CLMG Corp. (as agent) and LNV Corporation (as lender), dated June 28, 2021[34] |
| 10.2 | Fourth Amended and Restated Loan and Security Agreement with GWG DLP Funding IV, LLC (as borrower), CLMG Corp. (as agent) and LNV Corporation (as lender), dated September 7, 2021 (filed herewith)† |
| 10.3* | 2013 Stock Incentive Plan, as amended[16] |
| 10.4* | Form of Stock Option Agreement used with 2013 Stock Incentive Plan[13] |
| 10.5 | Master Exchange Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, MHT Financial SPV, LLC, a Delaware limited liability company, and various related trusts, as amended and restated on January 18, 2018 with effect from January 12, 2018[15] |
| 10.6 | First Amendment to Master Exchange Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, MHT Financial SPV, LLC, a Delaware limited liability company, and various related trusts, dated April 30, 2018[15] |
| 10.7 | Second Amendment to Master Exchange Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, MHT Financial SPV, LLC, a Delaware limited liability company, and various related trusts, dated June 29, 2018[17] |
| 10.8 | Third Amendment to Master Exchange Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, MHT Financial SPV, LLC, a Delaware limited liability company, and various related trusts, dated August 10, 2018[18] |
| 10.9 | Commercial Loan Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, dated August 10, 2018[18] |
| 10.10 | Amendment No. 1 dated December 27, 2018 to Commercial Loan Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership[19] |
| 10.12 | Registration Rights Agreement with certain trusts related to The Beneficient Company Group, L.P., a Delaware limited partnership, and as set forth in the Agreement, dated August 10, 2018[18] |
| 10.13 | Registration Rights Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, dated August 10, 2018[18] |
| 10.14 | Registration Rights Agreement with each of the Exchange Trusts, dated December 27, 2018[19] |

Table of Contents

| Exhibit | Description |
|---|---|
| 10.15 | Participating Option Agreement with The Beneficient Company Group, L.P., a Delaware limited partnership, dated December 27, 2018[19] |
| 10.16 | Consent and Joinder to Amended and Restated Pledge and Security Agreement dated April 26, 2019[21] |
| 10.17* | Form of Indemnification Agreement with Directors and Officers[21] |
| 10.18* | Employment Agreement dated as of May 31, 2019 by and between GWG Holdings, Inc. and Murray T. Holland[24] |
| 10.19* | Performance Share Unit Agreement dated as of May 31, 2019 by and between GWG Holdings, Inc. and Murray T. Holland[24] |
| 10.20 | Promissory Note dated May 31, 2019 made by and on behalf of certain Borrowers[25]† |
| 10.21 | Intercreditor Agreement dated May 31, 2019 between GWG Life and HCLP Nominees, L.L.C.[25] |
| 10.22 | Intercreditor Agreement dated May 31, 2019 between GWG Life and Beneficient Holdings, Inc.[25] |
| 10.23 | Forbearance Letter Agreement dated July 3, 2019 between GWG DLP Funding IV, LLC and CLMG Corp. (as agent)[27] |
| 10.24* | Form of Non-employee Director Restricted Stock Agreement[27] |
| 10.25 | Second Amended and Restated Credit Agreement among Beneficient Capital Company, L.LC., HCLP Nominees L.L.C., and other persons party thereto[32]† |
| 10.26 | Second Amended and Restated Second Lien Credit Agreement among Beneficient Capital Company, L.LC., HCLP Nominees L.L.C., and other persons party thereto[32]† |
| 10.27 | Amendment No. 1 to the Second Amended and Restated Credit Agreement among Beneficient Capital Company II, L.L,C., Beneficient Company Holdings, L.P. and HCLP Nominees, L.L.C. dated March 10, 2021[33] |
| 10.28 | Amendment No. 1 to the Second Amended and Restated Second Lien Credit Agreement among Beneficient Capital Company II, L.L,C., Beneficient Company Holdings, L.P. and HCLP Nominees, L.L.C. dated March 10, 2021[33] |
| 10.29 | Amendment No. 2 to the Second Amended and Restated Credit Agreement among Beneficient Capital Company II, L.L,C., Beneficient Company Holdings, L.P. and HCLP Nominees, L.L.C. dated June 28, 2021[34] |
| 10.30 | Amendment No. 2 to the Second Amended and Restated Second Lien Credit Agreement among Beneficient Capital Company II, L.L,C., Beneficient Company Holdings, L.P. and HCLP Nominees, L.L.C. dated June 28, 2021[34] |
| 10.31 | Credit Agreement, dated as of August 11, 2021, among GWG DLP Funding VI, LLC, as borrower, each lender from time to time party hereto and National Founders LP, as the administrative agent (filed herewith)† |
| 10.32 | Security Agreement, dated as of August 11, 2021, by GWG DLP Funding Holdings VI, LLC, as the pledgor, and National Founders LP, as administrative agent on behalf of the secured parties (filed herewith) |
| 10.33 | Security Agreement, dated as of August 11, 2021, by GWG DLP Funding VI, LLC, as the pledgor, and National Founders LP, as administrative agent on behalf of the secured parties (filed herewith) |
| 10.34 | Guarantee, dated as of August 11, 2021, by GWG Holdings, Inc., as guarantor, in favor of National Founders LP, as administrative agent for the benefit of the secured parties (filed herewith) |
| 21 | List of Subsidiaries (filed herewith) |
| 22 | List of Guarantor Subsidiaries (filed herewith) |
| 23.1 | Consent of Grant Thornton LLP (filed herewith) |
| 23.2 | Consent of Whitley Penn LLP (filed herewith) |
| 24.1 | Power of Attorney (incorporated by reference to the signature page of this 2020 Form 10-K) |
| 31.1 | Section 302 Certification of the Chief Executive Officer (filed herewith) |
| 31.2 | Section 302 Certification of the Chief Financial Officer (filed herewith) |
| 32.1 | Certification of Chief Executive Officer and Chief Financial Officer Pursuant to 18 U.S.C. §1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (filed herewith) |
| 99.1 | Letter from ClearLife Limited, dated January 25, 2021 (filed herewith) |
| 99.2 | Portfolio of Life Insurance Policies as of December 31, 2020 (filed herewith) |
| 99.3 | Purchase and Contribution Agreement dated as of April 15, 2018 by and among The Beneficient Company Group, L.P., Beneficient Company Holdings, L.P., AltiVerse Capital Markets, L.L.C., Sabes AV Holdings, LLC, Jon R. Sabes, Steven F. Sabes, Insurance Strategies Fund, LLC and SFS Holdings, LLC[20] |
| 99.5 | Fifth Amended and Restated Limited Partnership Agreement of Beneficient Company Holdings, L.P.[29] †. |

Page 96

Table of Contents

| Exhibit | Description |
|---------|-------------|
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Schema Document |
| 101.CAL | XBRL Calculation Linkbase Document |
| 101.DEF | XBRL Definition Linkbase Document |
| 101.LAB | XBRL Label Linkbase Document |
| 101.PRE | XBRL Presentation Linkbase Document |

———————————————————————

\*    Management contract or compensatory plan or arrangement.

(1)   Incorporated by reference to Form S-1 Registration Statement filed on June 14, 2011 (File No. 333-174887).

(2)   Incorporated by reference to Current Report on Form 8-K filed on March 31, 2021.

(3)   Incorporated by reference to Form S-1/A Registration Statement filed on August 23, 2011 (File No. 333-174887).

(4)   Intentionally omitted.

(5)   Incorporated by reference to Current Report on Form 8-K filed on October 26, 2017.

(6)   Intentionally omitted.

(7)   Incorporated by reference to Quarterly Report on Form 10-Q filed on August 8, 2014.

(8)   Incorporated by reference to Annual Report on Form 10-K filed on March 22, 2016.

(9)   Intentionally omitted

(10) Incorporated by reference to Current Report on Form 8-K filed on February 22, 2017.

(11) Incorporated by reference to Form S-1/A Registration Statement filed on October 23, 2015 (File No. 333-206626).

(12) Intentionally omitted.

(13) Incorporated by reference to Form S-1/A Registration Statement filed on June 6, 2014 (File No. 333-195505).

(14) Incorporated by reference to Form S-1/A Registration Statement filed on February 7, 2017 (File No. 333-214896).

(15) Incorporated by reference to Quarterly Report on Form 10-Q filed on May 11, 2018.

(16) Incorporated by reference to Current Report on Form 8-K filed on May 9, 2018.

(17) Incorporated by reference to Quarterly Report on Form 10-Q filed on August 14, 2018.

(18) Incorporated by reference to Current Report on Form 8-K filed on August 14, 2018.

(19) Incorporated by reference to Current Report on Form 8-K filed on January 4, 2019.

(20) Incorporated by reference to Exhibit 10.1 to Amendment No. 1 to the Schedule 13D jointly filed on April 16, 2019 by Jon R. Sabes and Steven F. Sabes, among others.

(21) Incorporated by reference to Current Report on Form 8-K filed on April 30, 2019.

(22) Intentionally omitted.

(23) Incorporated by reference to Annual Report on Form 10-K filed on March 29, 2018.

(24) Incorporated by reference to Current Report on Form 8-K filed on June 6, 2019.

(25) Incorporated by reference to Current Report on Form 8-K filed on June 6, 2019.

(26) Incorporated by reference to Current Report on Form 8-K filed on January 7, 2020.

(27) Incorporated by reference to Annual Report on Form 10-K filed on July 9, 2019.

(28) Intentionally omitted.

(29) Incorporated by reference to Quarterly Report on Form 10-Q filed on August 14, 2020.

(30) Incorporated by reference to Quarterly Report on Form 10-Q filed November 14, 2019.

(31) Incorporated by reference to Current Report on Form 8-K filed January 7, 2021.

(32) Incorporated by reference to Form 10-Q filed on November 19, 2020.

(33) Incorporated by reference to Current Report on Form 8-K filed on March 16, 2021.

(34) Incorporated by reference to Current Report on Form 8-K filed on July 2, 2021.

†    Certain confidential information has been excluded from this exhibit.

Page 97

Table of Contents

**ITEM 16. FORM 10-K SUMMARY.**

Not applicable.

Page 98

Table of Contents

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities and Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

GWG HOLDINGS, INC.

Date: November 5, 2021                                                                  By:   /s/ Murray T. Holland

*President and Chief Executive Officer*

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Murray T. Holland and Timothy L. Evans, jointly and severally, as his or her true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him or her, and in his or her name, place and stead, in any and all capacities, to sign any and all amendments to this report, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite or necessary to be done in and about the premises hereby ratifying and confirming all that said attorneys-in-fact and agents, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities and Exchange Act of 1934, this report has been signed below, as of November 5, 2021, by the following persons on behalf of the registrant and in the capacities indicated below.

| *Signature* | *Title* |
|---|---|
| /s/ Murray T. Holland | Chairman, President and Chief Executive Officer |
| Murray T. Holland | (Principal Executive Officer) |
| /s/ Timothy L. Evans | Director and Chief Financial Officer |
| Timothy L. Evans | (Principal Financial and Accounting Officer) |
| /s/ Peter T. Cangany, Jr. | Director |
| Peter T. Cangany, Jr. | |
| /s/ David F. Chavenson | Director |
| David F. Chavenson | |
| /s/ David H. de Weese | Director |
| David H. de Weese | |

Page 99

EFiled: May 13 2022 04:51PM EDT
Transaction ID 67619099
Case No. 2022-0167-SG

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| PAUL CAPITAL ADVISORS, L.L.C., a Delaware limited liability company, PAUL CAPITAL PARTNERS VIII-A, L.P., a Delaware limited partnership, PAUL CAPITAL PARTNERS VIII-B, L.P., a Delaware limited partnership, PAUL CAPITAL PARTNERS VIII-C, L.P., a Delaware limited partnership, PAUL CAPITAL PARTNERS VIII HOLDINGS, a California general partnership, PAUL CAPITAL PARTNERS IX, L.P., a Delaware limited partnership, and PAUL CAPITAL TOWN STREET PARTNERS, L.P., a Delaware limited partnership, <br><br> Plaintiffs, <br><br> v. <br><br> JOHN A. STAHL, as Trust Advisor of the LT-1 to LT-9 Exchange Trusts, MURRAY T. HOLLAND, as former Trust Advisor of the LT-1 to LT-9 Exchange Trusts, JAMES E. TURVEY, as former Trust Advisor of the LT-1 to LT-9 Exchange Trusts, DELAWARE TRUST COMPANY, as Trustee of the LT-1 to LT-9 Exchange Trusts, MHT FINANCIAL L.L.C., THE BENEFICIENT COMPANY GROUP, L.P., HIGHLAND CONSOLIDATED BUSINESS HOLDINGS GP, L.L.C., BENEFICIENT MANAGEMENT, L.L.C., BENEFICIENT COMPANY HOLDINGS, L.P., HIGHLAND CONSOLIDATED, L.P., BENEFICIENT HOLDINGS, INC., HIGHLAND REAL ASSETS, L.L.C., and BENEFICIENT MANAGEMENT COUNSELORS, L.L.C., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br><br> C.A. No. 2022-0167-SG <br><br> **PUBLIC VERSION FILED:** <br> May 13, 2022 |

## VERIFIED SECOND AMENDED COMPLAINT

Plaintiffs Paul Capital Advisors, L.L.C. ("PCA"), Paul Capital Partners VIII-A, L.P., Paul Capital Partners VIII-B, L.P., Paul Capital Partners VIII-C, L.P., Paul Capital Partners VIII Holdings, Paul Capital Partners IX, L.P., and Paul Capital Town Street Partners, L.P. (collectively, the "PCA Seller Funds" and, with PCA, the "PCA Parties"), by and through their attorneys, hereby allege upon knowledge as to themselves and their own acts, and on information and belief as to all other matters, as follows:

## NATURE OF THE COMPLAINT

1. This case arises out of a complex set of transactions that were entered into in 2017 but have never been completed due to Defendants' numerous fiduciary breaches, breaches of contract, and false promises. As a result, PCA, a private equity firm, and the PCA Seller Funds, which are several of PCA's affiliated private equity funds, have not received the full benefit of their bargain, and have been forced to file this action to enforce their legal rights and protect their economic interests, which are now in serious jeopardy.

2. Critically, the consideration still owed to the PCA Seller Funds from the transactions currently exists in the form of illiquid securities issued by GWG Holdings, Inc. ("GWGH"), which recently went bankrupt. These securities currently reside in PCA Seller Fund Exchange Trusts that were managed and controlled by Defendants Murray T. Holland and James E. Turvey, who were the Trust Advisors

to the Trusts, and are now managed and controlled by John A. Stahl, who succeeded Holland and Turvey as Trust Advisor. Under the parties' agreements, Holland and Turvey, along with GWGH, were supposed to monetize the securities in the trusts and distribute the resulting cash to the PCA Seller Funds, and Defendants MHT Financial, L.L.C. ("MHT") and Beneficient Company Group, L.P. ("BEN") were supposed to backstop the PCA Seller Funds if, for whatever reason, that monetization never occurred.

3.    Defendants never did so. Instead, Holland and Turvey put their own interests and the interests of other parties to the transactions, including GWGH, BEN, and MHT, ahead of the interests of the PCA Seller Fund Exchange Trusts, thereby breaching their contractual and fiduciary duties to the Trusts' beneficiaries, the PCA Seller Funds. And MHT and BEN failed completely to satisfy their contractual obligations to protect the PCA Seller Funds from Holland's, Turvey's, and GWGH's failure to monetize the GWGH securities in the Trusts.

4.    The reasons for this default are now clear. The securities in the Trusts that are supposed to be monetized for the PCA Seller Funds consist of GWGH "L-Bonds" with a face amount of $250 million, and thinly-traded GWGH common stock that was valued at $150 million when it was contributed to the trusts but is now worth only a fraction of that. Following the formation and funding of the trusts in 2017 and 2018, however, Holland, who already was a founder, owner, and principal

2

of MHT, became Chairman, President, and CEO of GWGH, which in turn became the majority owner of BEN, which is where Turvey is a senior executive. Thus, as Plaintiffs came to learn, Holland, despite his promises to the contrary, and Turvey were conflicted, and they abandoned their legal and contractual duties to the trusts in favor of the competing interests of GWGH, BEN and MHT, even as GWGH slid into bankruptcy.

5.    As a result of these events, instead of getting the cash to which they are entitled and for which they bargained, the PCA Seller Funds are now one of the largest creditors in GWGH's bankruptcy. Yet the PCA Seller Funds lack the ability to invoke or protect their rights as GWGH creditors since they lack control of the Trusts that still hold the GWGH L-Bonds and common stock.

6.    The PCA Parties commenced this lawsuit on February 18, 2022. In their initial one-count Verified Complaint, the PCA Parties sought to remove Holland and Turvey as managers of the PCA Seller Fund Exchange Trusts and to have them replaced with Plaintiffs' own designees. In their Verified Amended Complaint, filed on April 18, 2022, the PCA Parties asserted six additional causes of action against Holland, Turvey, MHT, and BEN, but did not materially change Count I—the cause of action for removal and replacement of Holland and Turvey as Trust Advisors.

3

7.    That same day, April 18, 2022, Holland and Turvey, without notice to Plaintiffs, resigned their positions as managers of the trusts in an attempt to "moot" Count I and delay the expedited discovery the Court had ordered on March 16, 2022. The next day, April 19, 2022, MHT, Holland's special purpose vehicle, appointed Stahl as the new Trust Advisor of the Trusts. Thereafter, MHT and Holland refused for six days to disclose Stahl's identity to Plaintiffs. In the meantime, Stahl immediately took steps to invisibly and indirectly—through an already-formed LLC that then hired a restructuring officer who then hired a law firm—advocate for GWGH's restructuring plans, and BEN's business plans, in GWGH's bankruptcy and in a GWGH-related bondholder lawsuit.

8.    Neither MHT nor Holland has explained *why* MHT selected Stahl to manage and protect trusts holding what was once hundreds of millions of dollars of securities for the benefit of the PCA Seller Funds, and to maximize the value of those securities in the context of GWGH's bankruptcy. To the PCA Parties' knowledge, Stahl is not a financial or restructuring professional; rather, he is a practicing radiologist who lives and works in Greensboro, North Carolina. His principal qualification to be an "independent" trustee for BEN-related trusts appears to be that he and Brad Heppner, BEN's CEO, were fraternity brothers at Southern Methodist University in the late 1980s. Whatever the reason, Stahl is apparently now the trustee or trust advisor to dozens of trusts that are part of BEN's business plan to

4

provide liquidity services to holders of alternative assets, including trusts that have borrowed $65 million from a GWGH subsidiary in order to improve BEN's balance sheet and then repaid the loan with BEN equity interests, and trusts that relate to BEN's plan to operate, through a subsidiary, as a Kansas-chartered "technology-enabled fiduciary financial institution," or "TEFFI," which requires it to set aside and distribute 2.5% of each transaction for rural development.

9.    In short, the process by which Stahl was appointed is tainted, his qualifications are more than suspect, and he is no more "independent" of BEN and GWGH and MHT, which still claims the power to remove and replace him, than Holland and Turvey were.    Accordingly, by this Verified Second Amended Complaint, the PCA Parties seek, among other things, an order from the Court promptly removing Stahl as the manager of the PCA Seller Fund Exchange Trusts and replacing him with a designee of the PCA Parties—a designee who will look out for the PCA Seller Funds' interests in the context of GWGH's bankruptcy, free of debilitating and potentially harmful conflicts.

## PARTIES

10.    Plaintiff Paul Capital Advisors, L.L.C. operates as a private equity firm. It is a Delaware limited liability company with its principal place of business located in San Francisco, California.

11. Plaintiff Paul Capital Partners VIII-A, L.P. is a private equity fund. It is a Delaware limited partnership with its principal place of business located in San Francisco, California.

12. Plaintiff Paul Capital Partners VIII-B, L.P. is a private equity fund. It is a Delaware limited partnership with its principal place of business located in San Francisco, California.

13. Plaintiff Paul Capital Partners VIII-C, L.P. is a private equity fund. It is a Delaware limited partnership with its principal place of business located in San Francisco, California.

14. Plaintiff Paul Capital Partners IX, L.P. is a private equity fund. It is a Delaware limited partnership with its principal place of business located in San Francisco, California.

15. Plaintiff Paul Capital Partners VIII Holdings is an investment holding company owned by Paul Capital Partners VIII-A, L.P., Paul Capital Partners VIII-B, L.P., and Paul Capital Partners VIII-C, L.P. It is a California general partnership with its principal place of business located in San Francisco, California.

16. Plaintiff Paul Capital Town Street Partners, L.P. is a private equity fund. It is a Delaware limited partnership with its principal place of business located in San Francisco, California.

17. Defendant John A. Stahl is a Trust Advisor to the LT-1 to LT-9 Exchange Trusts described herein and, on information and belief, a resident of North Carolina.

18. Defendant Murray T. Holland is a former Trust Advisor to the LT-1 to LT-9 Exchange Trusts described herein and, on information and belief, a resident of Texas. Holland is also the Chairman, President, and CEO of GWGH, and he is a principal and an owner of MHT.

19. Defendant James E. Turvey is a former Trust Advisor to the LT-1 to LT-9 Exchange Trusts described herein and, on information and belief, a resident of Texas. Turvey is also a senior executive of BEN, holding the position of Senior Vice President, Collateral Valuation.

20. Defendant Delaware Trust Company ("Delaware Trust") is the trustee of the LT-1 to LT-9 Exchange Trusts. Delaware Trust is a Delaware corporation.

21. Defendant MHT Financial, L.L.C. ("MHT") is a former affiliate of MHT Partners, an investment bank. MHT is a Delaware limited liability company with its principal place of business located in Dallas, Texas.

22. Defendant The Beneficient Company Group, L.P. ("BEN") is a holding company of capital and financial services companies. It is a Delaware limited partnership with its principal place of business located in Dallas, Texas.

23.    Defendant Highland Consolidated Business Holdings GP, L.L.C. ("BEN GP") is a Delaware limited liability company

24.    Defendant Beneficient Management, L.L.C. ("Successor BEN GP") is a Delaware limited liability company.

25.    Defendant Beneficient Company Holdings, L.P. ("BCH") is a Delaware limited partnership.

26.    Defendant Highland Consolidated, L.P. ("HCLP") is a Delaware limited partnership.

27.    Defendant Beneficient Holdings, Inc. ("Holdings") is a Delaware corporation. Holdings, together with BEN, BEN GP, Successor BEN GP, BCH, and HCLP, are collectively referred to as the "BEN CVR Parties."

28.    Defendant Highland Real Assets, L.L.C. ("Highland") is a Delaware limited liability company.

29.    Defendant Beneficient Management Counselors, L.L.C. ("Counselors") is a Delaware limited partnership. Counselors, together with BEN, BEN GP, Successor BEN GP, BCH, HCLP, Holdings, and Highland, are collectively referred to as the "BEN Transaction Agreement Parties."

8

## JURISDICTION

30. This Court has subject matter jurisdiction under 8 *Del. C.* § 111(a) and 10 *Del. C.* § 341, which provide this Court with jurisdiction "to hear and determine all matters and causes in equity."

31. This Court has personal jurisdiction over Defendants Stahl, Holland, and Turvey pursuant to 12 *Del. C.* § 3313(g) and based on the "Exchange Trust Agreements," described herein, that established the PCA Seller Fund Exchange Trusts, described herein, as well as the express terms of an "undertakings letter" that the Trust Advisors executed in favor of the PCA Parties on January 10, 2018. Holland was a Trust Advisor of the PCA Seller Fund Exchange Trusts from their creation until his resignation on April 18, 2022. Plaintiffs understand that Turvey became the other Trust Advisor on or about August 23, 2019 until his resignation on April 18, 2022.

32. This Court has personal jurisdiction over Defendants Delaware Trust, MHT, and the BEN Transaction Agreement Parties because each is a Delaware entity with a registered agent in Delaware.

33. The Exchange Trust Agreements, described herein, created Delaware common law trusts. The Exchange Trust Agreements provide that Delaware law shall govern all disputes at issue. Specifically, the Exchange Trust Agreements "shall be governed by and construed in accordance with the laws of the State of

9

Delaware, without reference to its conflict of law provisions, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws."

34.    A court of competent jurisdiction is entitled to hear disputes under the Exchange Trust Agreements. In the aforementioned undertakings letter, the Trust Advisors acknowledged that Delaware courts have jurisdiction over them with respect to matters arising out of or relating to their role as Trust Advisors:

> In furtherance thereof, each of us consents to the non-exclusive jurisdiction of the state and federal courts located in the State of Delaware (and the appellate courts thereof) in any action or proceeding against either of us arising out of or relating to this letter agreement and we agree that any such claims may be heard and determined in any such court.

35.    Further, the undertakings letter referenced above and described herein states that the undertakings set forth in the letter "shall be governed by and construed in accordance with the laws of the State of Delaware without regard to conflict of laws principles." It further states that the parties thereto, including the Trust Advisors, each "consents to the non-exclusive jurisdiction of the state and federal courts located in the State of Delaware (and the appellate courts thereof) in any action or proceeding against either of us arising out of or relating to this letter agreement and we agree that any such claims may be heard and determined in any such court."

10

36.    The other relevant agreements also include Delaware choice of law and venue selection clauses.  The Transaction Agreement is "governed by the Laws of the State of Delaware, without regard to the conflict of laws provisions thereof," and each of the parties thereto "irrevocably submits to the exclusive jurisdiction of the Chancery Court of the State of Delaware." Likewise, the CVR Contract is "governed by the Laws of the State of Delaware, without regard to the conflict of laws provisions thereof," and each party thereto "irrevocably and unconditionally agrees that it is and shall continue to be (i) subject to the jurisdiction of the courts of the State of Delaware."

## FACTUAL BACKGROUND

**Paul Capital Advisors**

37.    PCA is a private investment firm.  Founded in 1991, PCA raised capital from investors, pooled that capital into successive private equity ("PE") funds, and then invested the funds' capital with the goal of making a positive return on the investments. PCA's funds invested primarily in limited partnership ("LP") interests of other PE funds sponsored by other PE firms.  Such interests are often referred to as "secondary market" PE interests or just "secondaries." Generally, LP interests in PE funds are illiquid and cannot easily be monetized into cash.  PCA's strategy was to offer liquidity to institutional holders of illiquid PE interests who needed or

11

wanted cash for their PE fund LP interests and were willing to sell at a discount (and to forgo any future upside on the investments) in order to get it.

38.    By 2017, PCA had decided to exit the PE business and to sell the secondaries (the "PCA Fund Secondaries") held by certain of its remaining active PE funds (the "PCA Seller Funds"). These PCA Fund Secondaries had a net asset value, or "NAV," of approximately $500 million. PCA's plan was to sell the PCA Fund Secondaries for cash. PCA would then distribute that cash to the PCA Seller Funds' LPs before closing down the PCA Seller Funds.

**The Beneficient Company Group, L.P.**

39.    PCA found a buyer for the PCA Fund Secondaries in BEN.

40.    BEN was founded in Dallas in 2013 by Brad Heppner, its chairman and CEO, but its business plan was still only a concept in 2017. Heppner's plan was for BEN to invest in secondaries, but to do so as a non-depository bank rather than as a PE firm.

41.    To attract investors and, ultimately, to obtain a non-depository bank charter, BEN needed to demonstrate, among other things, that it had substantial assets under management and a strong track record. For these reasons, BEN was interested in purchasing the PCA Fund Secondaries from the PCA Seller Funds. By acquiring the PCA Fund Secondaries (and, potentially, other secondaries from other PE funds) in one large transaction, BEN could achieve immediate scale—$500

12

million in assets under management as measured by NAV—and begin building a track record.

42.    There were hurdles to reaching a deal, however. PCA wanted cash for the PCA Fund Secondaries so that it could distribute that cash to the PCA Seller Funds' investors, close the Funds, and then exit the PE business. PCA did *not* want to be a long-term, let alone permanent, creditor of, or source of capital funding for, BEN. The problem was that BEN did not have $500 million in available cash to buy the PCA Fund Secondaries.

**MHT Financial L.L.C.**

43.    At Heppner's suggestion, PCA and BEN ultimately agreed to complete a series of transactions with the assistance of MHT, an affiliate of a Dallas-based middle-market investment bank formed and led by Holland, who was a business acquaintance and friend of Heppner's. The parties agreed that MHT would serve as a middleman in a set of transactions designed to provide BEN with the PCA Fund Secondaries and the PCA Seller Funds with cash they could distribute to their investors before closing down.

**The Transactions**

44.    Pursuant to this plan, the PCA Parties, BEN, and MHT entered into the following set of transactions (the "Transactions") as of September 1, 2017:

13

45.    The PCA Seller Funds transferred to MHT the economic rights associated with the PCA Fund Secondaries.  (Certain other third-party seller funds (the "Co-Participants") also transferred their own additional secondaries to MHT in connection with the Transactions.)

46.    MHT contributed the rights associated with the PCA Fund Secondaries to nine newly formed Delaware exchange trusts (the "PCA Seller Fund Exchange Trusts"), for which Holland was one of two "Trust Advisors."   (MHT also contributed the Co-Participants' secondaries to other, separate exchange trusts.) Jeffrey Hinkle, then a BEN executive, was the other Trust Advisor. Turvey has since replaced Hinkle as the second Trust Advisor, and Stahl subsequently replaced both Holland and Turvey, becoming the sole Trust Advisor.

47.    At the direction of the Trust Advisors, the PCA Seller Fund Exchange Trusts exchanged the rights associated with the PCA Fund Secondaries for common equity units of BEN (the "BEN MLP Units") that BEN committed to list on a U.S. exchange. (The Co-Participants' seller exchange trusts also exchanged the rights to their secondaries for BEN MLP Units.)

48.    MHT and BEN, with the assistance of Credit Suisse, a major investment bank, agreed to conduct a "prelisting auction" of the BEN LP Units (the "Auction"), with the intention of selling them to one or more buyers in exchange for cash.

14

App. 1411

49. MHT and BEN agreed that, upon the completion and closing of the Auction, (1) MHT would pay up to $550 million in net Auction proceeds to the PCA Seller Funds, and (2) BEN would pay additional contingent consideration to the PCA Seller Funds—what the parties referred to as "contingent value rights" or "CVRs"— if the Auction failed to generate net cash proceeds of at least $500 million. (Similarly, MHT and BEN agreed that, upon completion of the Auction, MHT would pay appropriate Auction consideration and, if necessary, contingent consideration to the Co-Participants.)

50. The Transactions agreed to in September 2017 can be summarized as follows:

15



**The Transaction Documents**

51.    PCA, BEN, and MHT completed, or agreed to complete, these Transactions pursuant to the following set of agreements dated as of September 1, 2017.

16

*The Transaction Agreement*

52.    The overall set of Transactions was agreed to and summarized in a September 1, 2017 Transaction Agreement (the "Transaction Agreement") between PCA and the PCA Seller Funds,[1] BEN and several BEN affiliates,[2] and MHT.

53.    Thus, in the recitals of the Transaction Agreement, the parties stated that they were entering into "a series of transactions . . . pursuant to which certain assets [the PCA Fund Secondaries] owned by the Funds [the PCA Seller Funds] would be acquired by MHT in exchange for the right to the proceeds from the sale of common equity units of BEN [the BEN MLP Units] and the exercise of certain contingent rights as described herein [the CVRs]." The parties also stated that the BEN MLP Units and the CVRs "would be exchanged for *cash* through an Auction (as defined below)." (Emphasis added.)

54.    To that end, in Section 1.1 of the Transaction Agreement, the parties defined the term "Auction Consideration" to mean "the aggregate total *cash consideration* paid by the Auction Buyers for the Auction BEN Common Units [*i.e.,*

---

[1]    The PCA-managed seller funds that signed the Transaction Agreement on September 1, 2017, were Paul Capital Partners VIII-A, L.P., Paul Capital Partners VIII-B, L.P., Paul Capital Partners VIII-C, L.P., Paul Capital Partners VIII Holdings, and Paul Capital Partners IX, L.P. On December 21, 2017, the parties added Paul Capital Town Street Partners, L.P. as an additional PCA-managed seller fund pursuant to an addendum to the Transaction Agreement.

[2]    The BEN affiliates were BEN GP, Successor BEN GP, BCH, HCLP, Highland, Holdings, and Counselors.

17

the BEN MLP Units] pursuant to an Auction Purchase Agreement." (Emphasis added.)

55.    In Section 5.5.1 of the Transaction Agreement, MHT and the BEN Transaction Agreement Parties agreed to conduct the Auction of the BEN MLP Units for the benefit of the PCA Seller Funds, and to take "any reasonable actions reasonably necessary" to complete the Auction by April 30, 2018.

56.    Similarly, in Section 5.2 of the Transaction Agreement, MHT and the BEN Transaction Agreement Parties promised more broadly to "use commercially reasonable efforts" and to cooperate with each other "to do, or cause to be done, all things necessary, proper or advisable, consistent with applicable law to consummate and make effective the transactions contemplated by this Agreement."

*The Purchase and Sale Agreement*

57.    As noted above, in connection with the Transactions, the PCA Seller Funds transferred to MHT the economic rights associated with the PCA Fund Secondaries with an aggregate NAV of approximately $500 million.

58.    The PCA Seller Funds did so pursuant to a September 1, 2017 Purchase and Sale Agreement ("PSA") between and among PCA, the PCA Seller Funds, and MHT, as well as a September 1, 2017 Economic Direction Agreement ("EDA") between and among PCA, the PCA Seller Funds, the PCA Seller Fund Exchange Trusts, MHT, and BEN.

18

59.    In Section 2 of the PSA, PCA and the PCA Seller Funds agreed to sell the PCA Fund Secondaries to MHT in exchange for the right to receive up to $550 million of the net cash proceeds generated by MHT's and BEN's Auction of the BEN MLP Units.

60.    In Section 5(a) of the PSA, MHT agreed to commence the Auction of the BEN LP Units within 60 days, and to use "good faith efforts" to complete the Auction by April 30, 2018.

61.    In Section 5(d) of the PSA, MHT agreed to use its "best commercial efforts" to complete the Auction for net cash proceeds of at least $500 million, and to invoke and enforce the PCA Seller Funds' "contingent value rights" (CVRs) if the Auction failed to generate net cash proceeds of $500 million.

*The Economic Direction Agreement*

62.    As noted above, in the PSA, the PCA Seller Funds agreed ultimately to transfer the PCA Fund Secondaries themselves to MHT. To do that, the PCA Seller Funds required the consent of the underlying PE funds that had issued the PCA Fund Secondaries. The parties knew that it would take time for PCA to obtain those consents. Accordingly, PCA, the PCA Seller Funds, the PCA Seller Fund Exchange Trusts, MHT, and BEN, among others, entered into the EDA to make clear who had the right to the dividends, distributions, or other payments or proceeds generated by the PCA Fund Secondaries pending their actual transfer to MHT, the PCA Seller

19

Fund Exchange Trusts and, ultimately, BEN. In a nutshell, the EDA gave those rights to MHT and, in turn, BEN.

*The Exchange Trust Agreements*

63.    As noted above, as part of the Transactions, once it received them from the PCA Seller Funds pursuant to the PSA, MHT contributed the rights associated with the PCA Fund Secondaries to the PCA Seller Fund Exchange Trusts.

64.    MHT established the PCA Seller Fund Exchange Trusts pursuant to a series of "Exchange Trust Agreements" dated as of September 1, 2017, wherein MHT was the Settlor, the Delaware Trust Company functioned as a purely administrative trustee, and Defendant Holland and Jeffrey S. Hinkle, who was then a BEN executive, were designated as the "Trust Advisors." (Defendant Turvey, another BEN executive, later replaced Hinkle as a Trust Advisor, and Defendant Stahl later replaced both Holland and Turvey as a Trust Advisor.)

65.    Under the Exchange Trust Agreements, the Trust Advisors possess the authority and responsibility to manage and direct the activities of the PCA Seller Fund Exchange Trusts.

66.    In doing so, the Trust Advisors owe fiduciary duties to the PCA Seller Fund Exchange Trusts and their respective beneficiaries. Under Title 12, Section 3313 of the Delaware Code, trust advisors owe fiduciary duties to their trust and its beneficiaries unless the trust agreement specifically provides otherwise. The

20

Exchange Trust Agreements do not include a provision setting aside fiduciary duties. Accordingly, Defendants Stahl, Holland, and Turvey, as current and former Trust Advisors, each owed or still owe fiduciary duties to both the PCA Seller Fund Exchange Trusts and, as their beneficiaries, the PCA Seller Funds themselves.

67.    Once established, MHT contributed to the PCA Seller Fund Exchange Trusts the rights to the PCA Fund Secondaries that it purchased from the PCA Seller Funds. The economic rights associated with the PCA Fund Secondaries were then exchanged for the BEN MLP Units that MHT and BEN had agreed to sell for cash in the Auction.

68.    Notably, under the Exchange Trust Agreements, the Trust Advisors and the PCA Seller Fund Exchange Trusts themselves were required to "take all steps necessary and advisable to commence and consummate the Auction [of the BEN MLP Units] as contemplated by the Transaction Agreement including, without limitation fully exercising the Protection Rights," in other words, the CVRs.

69.    Further, under the Exchange Trust Agreements, the Trust Advisors were required "to take all steps necessary to distribute the Auction Consideration (including all proceeds received in connection with the Protection Rights)" to the PCA Seller Fund Exchange Trusts' "Beneficiaries" (plural) until each of them received their total allocated share of the sale proceeds. Notably, "Auction Consideration" was defined in the Exchange Trust Agreements to mean: "(i) the net

21

*cash* proceeds from the Auction plus (ii) the net *cash* proceeds realized from the exercise of the Protection Rights," or CVRs.

*The MHT-BEN Letter Agreement*

70. As noted above, as part of the Transactions, upon receipt, the PCA Seller Fund Exchange Trusts exchanged the rights to the PCA Fund Secondaries (after receiving them from MHT, which had received them from the PCA Seller Funds) for the BEN MLP Units, which BEN promised to list for public trading on a U.S. exchange.

71. On information and belief, the PCA Seller Fund Exchange Trusts, acting at the direction of the Trust Advisors, accomplished this exchange pursuant to a September 1, 2017 letter agreement between and among the PCA Seller Fund Exchange Trusts, MHT, and BEN (the "MHT-BEN Letter Agreement").

72. As a result of this exchange, BEN held the economic rights associated with the PCA Fund Secondaries (pending the actual transfers of the PCA Fund Secondaries themselves), while the PCA Seller Fund Exchange Trusts held the BEN MLP Units that BEN had committed to list on a U.S. exchange, and that MHT and BEN had agreed to sell for cash in the Auction.

*The CVR Contract*

73. As noted above, the parties agreed that, pursuant to the Transactions and following the completion of the Auction of the BEN MLP Units held by the

22

PCA Seller Fund Exchange Trusts, (1) MHT would pay up to $550 million in net Auction proceeds to the PCA Seller Funds (and keep any Auction proceeds in excess of $550 million, giving it potential upside in connection with the Transactions); and (2) BEN would pay additional contingent consideration to the PCA Seller Funds—what the parties referred to as "contingent value rights" or "CVRs"—if the Auction failed to generate net cash proceeds of at least $500 million.

74. Thus, in Section 5(d) of the PSA, MHT agreed to use its "best commercial efforts" to complete the Auction for net cash proceeds of at least $550 million, and to invoke and enforce the PCA Seller Funds' CVRs if the Auction failed to generate net cash proceeds of at least $500 million.

75. Those CVRs in favor of the PCA Seller Funds were embodied in a September 1, 2017 "CVR Contract" executed by MHT and the BEN CVR Parties for the express benefit of the PCA Seller Fund Exchange Trusts. Indeed, Section 4.9 of the CVR Contract states that the PCA Seller Fund Exchange Trusts are "an intended third party beneficiary of this Agreement."

76. The purpose of the CVR Contract was, and is, to protect the PCA Seller Funds if the Auction of the BEN MLP Units failed to occur or to generate at least $500 million in net cash proceeds. In either event, the BEN CVR Parties would be required to make up any shortfall in the consideration by contributing additional BEN MLP Units and/or cash to the PCA Seller Fund Exchange Trusts. In addition,

in certain circumstances, the BEN CVR Parties would be subject to reporting requirements and operating restrictions until any shortfall in the auction proceeds was eliminated.

77.    Defendant Holland signed the CVR Contract on behalf of MHT, which, under the PSA, has a duty to enforce the CVR Contract if the net cash proceeds of the Auction fall short of $500 million. Holland was also a Trust Advisor to the PCA Seller Fund Exchange Trusts, which are the express beneficiaries of the CVR Contract. As a Trust Advisor, it was likewise Holland's responsibility to protect the interests of the PCA Seller Fund Exchange Trusts and their beneficiaries in the event the Auction of the BEN MLP Units generated less than $500 million in cash for the PCA Seller Funds. As the second Trust Advisor, Hinkle and then Turvey had the same responsibilities. Now those responsibilities belong to Stahl.

**The Auction, And The Parties' Assurances That The PCA Seller Funds Would Receive Cash In The Near Term**

78.    On December 23, 2017, Holland, on behalf of MHT, informed PCA that the Auction of the BEN MLP Units had generated a winning bid.

79.    Although the winning bid was not an all-cash proposal, Holland represented to PCA that the bid would generate cash quickly pursuant to a "liquidity program" to be run by Credit Suisse.

80.    In a December 23, 2017 email to PCA, Holland stated that "[y]ou will quickly notice that [the PCA Seller Funds] will be receiving $110% of NAV [*i.e.*,

24

$550 million] on their assets [*i.e.*, the PCA Fund Secondaries], including 30% cash on the close and another 50% cash during 2018 under the liquidity program being run by Credit Suisse."

81. Holland attached to his December 23, 2017 email to PCA a formal "Winning Bid Notice," which MHT was required to provide under the PSA. The Winning Bid Notice included a Credit Suisse presentation (the "Credit Suisse Deck") describing both the terms of the winning bid and the so-called "liquidity program" to which Holland referred in his December 23, 2017 email.

82. Finally, Holland represented in his December 23, 2017 email that "[w]e expect to move to a close [on the Winning Bid] under the time frame set forth in the [PSA]," which contemplated the completion of the auction on or before April 30, 2018.

83. MHT's December 23, 2017 Winning Bid Notice stated that Credit Suisse, the "Auction Banker," had solicited bids from several potential buyers of the BEN MLP Units, and that MHT had determined the "Winning Bid."

84. The "Winning Bidder" was GWGH, which was then a Minneapolis-based financial services holding company whose common stock traded—thinly—on the NASDAQ exchange. (GWGH has since moved its headquarters to Dallas, Texas.)

85.    The Credit Suisse Deck attached to the Winning Bid Notice called GWGH a "leader in the emerging secondary life insurance market" and described GWGH's business model as follows:  GWGH bought life insurance policies from insureds who were 65 or older and whose life expectancies were less than 10 years. GWGH continued to pay the premiums on the life insurance policies until the insureds died and GWGH collected the death benefits.  GWGH earned a net profit when the death benefits generated by the life insurance policies exceeded the costs incurred to purchase them and to pay the remaining premiums.  As of December 2017, GWGH owned a portfolio of life insurance policies with an aggregate face value of $1.62 billion.

86.    According to MHT's Winning Bid Notice, the components of GWGH's Winning Bid were (1) an up-front cash payment of $150 million; (2) GWGH "L-Bonds"—i.e., GWGH-issued bonds secured by GWGH's assets, including its portfolio of life insurance policies—in the principal amount of $250 million; and (3) GWGH common stock worth $150 million. According to the Notice, the GWGH L-Bonds would pay 7.5% interest and would be redeemable in cash at the end of their five-year term.

87.    Thus, Holland and MHT represented in the Winning Bid Notice that GWGH had committed to pay $550 million in total consideration for the BEN MLP Units held by the PCA Seller Fund Exchange Trusts, which amounted to 110% of

26

App. 1423

the $500 million NAV of the PCA Fund Secondaries, the economic rights to which had already been promised to BEN pursuant to the MHT-BEN Letter Agreement.

88.    Because MHT knew that the PCA Parties were interested in receiving cash, not securities, in exchange for the PCA Fund Secondaries, MHT's Winning Bid Notice emphasized that the GWGH securities in the GWGH Winning Bid would be quickly refinanced and/or sold in exchange for cash.

89.    With respect to the L-Bonds, for example, MHT's Winning Bid Notice emphasized that "GWG[H] is *obligated* to seek to refinance its debt with a more favorable credit facility and/or institutional note within 12 months following issuance." (Emphasis added.)

90.    Similarly, with respect to the GWGH common stock, MHT's Winning Bid Notice assured the PCA Parties that "[a] nationally recognized bank, such as Credit Suisse, *will be engaged* to sell the stock in an orderly manner through one or a series of transactions in 2018, delivering cash proceeds for distribution to the Sellers." (Emphasis added.)

91.    The Credit Suisse Deck echoed and reinforced these representations made by MHT in the Winning Bid Notice. For example, the Credit Suisse Deck stated that GWGH had submitted a "*fully binding* and attractive bid to MHT" (emphasis added); that the bid was accompanied by a fully negotiated purchase agreement that either was, or would be, fully executed, depending on which slide

27

one was looking at; that the GWGH purchase price for the BEN MLP Units was $550 million, that is, 110% of the NAV of the PCA Seller Fund Secondaries, which was "estimated to be $500 million"; and that GWGH was expected to close on its purchase of the BEN MLP Units no later than April 30, 2018.

92.    The Credit Suisse Deck referred to the $250 million in GWGH L-Bonds as "near-term cash" and stated repeatedly that GWGH was obligated under the terms of its winning bid to refinance the L-Bonds within 12 months of the closing of its purchase of the BEN MLP Units.

93.    Similarly, the Credit Suisse Deck represented repeatedly that, after receiving the GWGH common stock from GWGH, the PCA Seller Fund Exchange Trusts, acting at the direction of the Trust Advisors, would engage Credit Suisse to liquidate the stock for cash proceeds that would then be distributed by the Trusts to the PCA Seller Funds.

**The Counterparties' Assurances That GWGH's Winning Bid Would Generate Near-Term Cash For The PCA Seller Funds**

94.    After receiving MHT's Winning Bid Notice, PCA sent MHT and BEN a set of due diligence questions regarding GWGH's winning bid. PCA made clear that it was interested in receiving cash, not GWGH securities, and it repeatedly sought assurances from both MHT and BEN that GWGH was obligated under the terms of its Winning Bid to promptly refinance or resell the GWGH L-Bonds, and

28

to market and sell the GWGH common stock, for cash that the PCA Seller Fund Exchange Trusts would then distribute to the PCA Seller Funds.

95.    On January 5, 2018, Heppner, on behalf of BEN, sent PCA a due diligence package of materials (the "BEN Due Diligence Package") that responded to PCA's questions.

96.    In the BEN Due Diligence Package, Heppner assured PCA that GWGH was *obligated* under the terms of its winning bid to refinance the GWGH L-Bonds within 12 months of the closing of GWGH's purchase of the BEN MLP Units, and that the refinancing was expected to occur no later than October 2018.

97.    Heppner also represented in the BEN Due Diligence Package that the PCA Seller Fund Exchange Trust Advisors (then Holland and Hinkle, later Holland and Turvey, and now just Stahl) were similarly obligated to reduce the L-Bonds to cash and to distribute the proceeds as soon as practicable.

98.    Finally, with respect to the GWGH common stock, Heppner represented in the BEN Due Diligence Package that "[t]he goal will be to create and maintain a market for the GWG[H] shares in a manner similar to that of an IPO," and that "[w]e anticipate executing the orderly resale [of the GWGH common stock] between 6-12 months following the Closing."

29

99.    Heppner stated further that "Attachment G" to the BEN Due Diligence Package set forth "the obligations" of the Trust Advisors, GWGH, the PCA Seller Fund Exchange Trusts, and BEN regarding the sale of the GWGH common shares.

100.    Attachment G, in turn, stated that the Trust Advisors and GWGH, for the benefit of the PCA Seller Fund Exchange Trusts, would agree to negotiate in good faith the terms of an "Orderly Marketing Agreement" with a major investment bank for the orderly marketing and resale of the GWGH common stock.

**GWGH's Comfort Letter Regarding The Cash Payment**

101.    On January 10, 2018, GWGH provided a letter to BEN, MHT, and the PCA Seller Fund Exchange Trusts (the "GWGH Comfort Letter") regarding the cash consideration component of what GWGH referred to as its "[i]rrevocable Bid, dated December 23, 2017," which would later be memorialized in a "Master Exchange Agreement" between GWGH, MHT, BEN, and the PCA Seller Fund Exchange Trusts (as managed by the Trust Advisors).

102.    MHT and BEN then forwarded a copy of the GWGH Comfort Letter to PCA to assure PCA that GWGH had the ability to pay the cash component of the GWGH Winning Bid.

103.    In the GWGH Comfort Letter forwarded to PCA by MHT and BEN, Jon Sabes, who was then GWGH's CEO, "confirmed," among other things, that GWGH had on hand the $150 million cash component of the GWGH Winning Bid,

30

App. 1427

and that the $150 million cash component was "financed via a fully committed and contractual purchase of GWG[H] securities."

**GWGH's Undertakings Letter Committing To Expeditiously Liquidate The L-Bonds**

104.   On January 10, 2018, GWGH also provided a letter to BEN, MHT, and the PCA Seller Fund Exchange Trusts (the "GWGH Undertakings Letter") regarding the L-Bond component of GWGH's "irrevocable bid."

105.   MHT and BEN then forwarded a copy of the GWGH Undertakings Letter to PCA to assure PCA that GWGH was committed to refinancing or reselling the L-Bond portion of GWGH's Winning Bid.

106.   In the GWGH Undertakings Letter, GWGH confirmed that it would use "commercially reasonable efforts to effect expeditiously, following the Closing" of a "Master Exchange Agreement" among the PCA Seller Fund Exchange Trusts, GWGH, MHT, and BEN, "the refinancing in full of the aggregate principal amount outstanding of the GWG[H] L-Bonds issued to each of the Seller Trusts," and/or to otherwise cooperate with a resale of those L-Bonds.

**The Trust Advisors' And MHT's Promises To Promptly Monetize The L-Bonds And GWGH Common Stock**

107.   To further induce PCA and the PCA Seller Funds to accept the GWGH Winning Bid, Defendant Holland, along with Hinkle, as Trust Advisors to the PCA Seller Fund Exchange Trusts, provided PCA and the PCA Seller Funds with an

31

"undertakings letter" regarding GWGH's winning bid that was also "acknowledged and agreed to" by MHT (the "Trust Advisors-MHT Undertakings Letter"). Indeed, Defendant Holland signed the Trust Advisors-MHT Undertakings Letter both as a Trust Advisor to the PCA Seller Fund Exchange Trusts *and* as the Managing Member of MHT. And although the Letter purported to be from the Trust Advisors to MHT, it was plainly written and meant to influence PCA and the PCA Seller Funds.

108. In the Trust Advisors-MHT Undertakings Letter, Holland and Hinkle acknowledged that, in its "irrevocable bid," GWGH had committed to use "commercially reasonable efforts to refinance outstanding debt with a more favorable credit facility and/or institutional note within 12 months following the Closing." They further acknowledged that the GWGH Winning Bid contemplated an orderly resale of the GWGH common stock pursuant to an Orderly Marketing Agreement with one or more investment banks.

109. After acknowledging these key components of the GWGH Winning Bid, the Trust Advisors acknowledged and agreed to "cooperate with MHT to the full extent of the authority granted to each of us" to facilitate a refinancing or resale of the L-Bonds "such that the debt securities are reduced to cash for distribution to the Sellers as [of] the earliest practicable date during 2018."

32

110. The Trust Advisors also promised to do the same with respect to the sale of the GWGH common stock "in order to reduce such securities to cash at the earliest practicable date following the consummation of the transactions contemplated by the GWG[H] Bid."

111. Finally, the Trust Advisors expressly acknowledged in the Trust Advisors-MHT Undertakings Letter that *each of the PCA Seller Funds was "a designated third party beneficiary of the agreements, covenants, and undertakings set forth herein and, accordingly, entitled to rely upon and enforce such agreements, covenants, and undertakings*." (Emphasis added.)

**The PCA Parties' Reliance On The Counterparties' Assurances Regarding Cash Consideration**

112. On January 11, 2018, PCA and the PCA Seller Funds agreed to go forward with, and not opt out of, the Transactions. The PCA Parties did so in reliance on the numerous promises to expeditiously refinance or resell the L-Bonds, and to quickly sell the GWGH common stock, that were made in the Trust Advisors-MHT Undertakings Letter, MHT's Winning Bid Notice, the BEN Due Diligence Package, the GWGH Comfort Letter, and the GWGH Undertakings Letter. PCA and the PCA Seller Funds were not interested in being long-term creditors or owners of GWGH. They were interested in receiving cash, and that is what they were promised.

33

113. The Transactions as of the time of the PCA Parties' agreement to proceed with the GWGH Winning Bid can be summarized as follows:



**The January 12, 2018 Master Exchange Agreement, Which Did Not Include The PCA Parties, And Which Was Inconsistent With The Terms Of The GWGH Winning Bid**

114. The next day, on January 12, 2018, the PCA Seller Fund Exchange Trusts (acting at the direction of the Trust Advisors), MHT, BEN, and GWGH entered into the Master Exchange Agreement (the "MEA") that was supposed to

34

capture the terms of the GWGH Winning Bid. (They did so without the participation of PCA and the PCA Seller Funds.)

115. Notably, Defendant Holland signed the MEA on behalf of both MHT and the PCA Seller Fund Exchange Trusts to which he owed fiduciary duties as Trust Advisor.

116. In the MEA, GWGH agreed, among other things, to buy the BEN MLP Units held by the PCA Seller Fund Exchange Trusts for $150 million in cash, $250 million in five-year GWGH L-Bonds redeemable in cash at maturity, and $150 million in GWGH common stock.

117. In Section 8.6 of the MEA, the PCA Seller Fund Exchange Trusts (again, acting at the direction of the Trust Advisors) and GWGH agreed to "negotiate in good faith" an Orderly Marketing Agreement with a major investment bank at the Closing in order to resell the GWGH common stock component of the GWGH winning bid. In addition, both GWGH and BEN agreed to use "commercially reasonable" efforts to support the resale of the stock by, for example, assisting in marketing efforts and participating in road shows.

118. In Section 8.1 of the MEA, the parties thereto agreed to use "commercially reasonable best efforts" to complete the transactions contemplated by the MEA.

35

119. Finally, in Exhibit A to the MEA, GWGH agreed to "undertake commercially reasonable efforts to refinance" or resell for cash the GWGH L-Bond component of the GWGH Winning Bid.

120. On January 18, 2018—a week *after* PCA and the PCA Seller Funds agreed to go forward on the basis of the GWGH Winning Bid—GWGH disclosed in a public filing that it would finance its obligations under the MEA to the PCA Seller Fund Exchange Trusts (as well as to the Co-Participant seller fund exchange trusts) with (1) the issuance of $400 million worth of GWGH common stock valued at $10 per share; (2) the issuance of $400 million worth of five-year GWGH L-Bonds; and (3) $150 million in cash from an "affiliated unitholder of BEN" that would purchase a portion of the total common stock and L-Bonds being issued in connection with the transaction.

121. On information and belief, this unidentified "affiliated unitholder of BEN" was MHT Financial SPV, LLC ("MHT SPV"), an affiliate of MHT that was also, apparently, a unitholder of BEN. In its January 12, 2018 SEC Form 8-K, GWGH stated that, "[u]nder the [MEA], MHT SPV has subscribed for GWG[H] common stock and L Bonds for an aggregate cash payment of $150 million, which subscription may be accepted by GWG Holdings solely at its option."

122. No one—not Defendant Holland (who owed a fiduciary obligation to the PCA Seller Fund Exchange Trusts and, in turn, the PCA Seller Funds who were

36

the intended and ultimate beneficiaries of those trusts), not MHT, not BEN, not GWGH, and not Heppner—had disclosed to PCA that MHT SPV, a special purpose vehicle formed by MHT, of which Holland was a principal and an owner, was the source of the $150 million cash component of GWGH's Winning Bid that PCA agreed to accept on January 11, 2018.

123. Had PCA known that MHT SPV was the source of the $150 million cash component of GWGH's Winning Bid, it would have demanded, at a minimum, assurances that MHT SPV had the resources to invest $150 million in GWGH L-Bonds and common stock. It also would have sought assurances that MHT SPV's participation in the MEA—which, in effect, was supposed to represent the GWGH Winning Bid in the form of a contract—would not conflict with Holland's and MHT's obligations under the various other Transaction Documents, including the CVR Contract and the Trust Advisors' obligations under the PCA Seller Fund Exchange Trusts. MHT SPV's participation in the transactions suggests that the GWGH Winning Bid was not really a GWGH bid at all. Rather, it was a GWGH-plus-MHT bid, with the all-important up-front cash component coming from MHT SPV. That was not the Winning Bid that was described to PCA and the PCA Seller Funds in MHT's Winning Bid Notice or in BEN's, GWGH's, MHT's, and the Trust Advisors' subsequent assurances regarding the GWGH Winning Bid.

37

App. 1434

124. Blind to this behind-the-scenes arrangement, PCA and the PCA Seller Funds began satisfying their obligations under the EDA, which became operative when the PCA Parties agreed to proceed with the overall deal on January 11, 2018.

125. Thus, on January 19 and 23, 2018, PCA and the PCA Seller Funds paid MHT (or, more precisely, the PCA Seller Fund Exchange Trust bank accounts controlled by Holland and MHT) and, in turn, BEN, $114 million in investment realizations on PCA Fund Secondaries that were still pending transfer to MHT because PCA was seeking consents from the underlying funds that had issued them.

126. Thereafter, PCA and the PCA Seller Funds continued to satisfy their obligations under the EDA. Indeed, by the time PCA and the PCA Seller Funds had obtained consents and transferred substantially all of the PCA Fund Secondaries to MHT in late 2018, PCA and the PCA Seller Funds had paid approximately $250 million to MHT and, in turn, BEN, pursuant to the EDA. To date, PCA and the PCA Seller Funds have paid MHT and, in turn, BEN approximately $281 million pursuant to the EDA.

**The Counterparties Default On The April 30, 2018 Deadline For Closing The Auction**

127. Under both the Transaction documents and MHT's Winning Bid Notice, GWGH's Winning Bid payment obligations—*i.e.*, GWGH's payment of the $150 million cash, $250 million L-Bonds, and $150 million stock components to the

38

PCA Seller Fund Exchange Trusts in exchange for the latter's BEN MLP Units—were supposed to be completed by April 30, 2018.

128. That did not happen. Instead, GWGH's Winning Bid failed to close because, until at least early April 2018, Heppner was still seeking to add Co-Participants to the overall transaction, and thereby increase the size of the overall deal. The GWGH Winning Bid also failed to close because BEN was having trouble completing an audited set of financial statements, which, according to BEN and GWGH, had to be completed before GWGH could acquire the BEN MLP Units (and, as a result, a majority and controlling interest in BEN).

**MHT And BEN Propose To Close The GWGH Bid In Two Stages**

129. By June 2018, the PCA Seller Fund Exchange Trusts, MHT, BEN, and GWGH still had not closed on the GWGH Winning Bid. Among other things, BEN was still having trouble generating a set of audited financial statements and, as a result, GWGH had received a de-listing notice, or the threat of such a notice, from NASDAQ.

130. Because of this delay, as well as the absence of any assurances from the Trust Advisors, BEN, MHT, and GWGH regarding when the GWGH Winning Bid would actually close, PCA determined to suspend, and suspended, the process of signing and providing MHT and BEN with the assignment and transfer agreements pursuant to which the PCA Seller Funds were transferring the PCA Fund

Secondaries to the PCA Seller Fund Exchange Trusts. As noted above, as of June 2018, the PCA Seller Funds had already transferred to MHT and, in turn, BEN, substantial economic benefits associated with the PCA Fund Secondaries, as well as many of the PCA Fund Secondaries themselves. In exchange, the PCA Seller Funds still had received nothing.

131. To salvage the overall set of transactions, Heppner proposed in late June 2018 that the parties agree to allow the GWGH Winning Bid to close in two stages. In an initial closing, the PCA Seller Fund Exchange Trusts would receive the $150 million cash and $250 million L-Bond components of the GWGH Winning Bid. Later, in a second closing, the PCA Seller Fund Exchange Trusts would receive the third component—the $150 million in GWGH common stock.

**Holland Emails PCA On August 8, 2018 Regarding Closing Delays**

132. On August 8, 2018, Defendant Holland sent PCA an email regarding the intention of the PCA Seller Fund Exchange Trusts (again, as directed by Holland and Hinkle as Trust Advisors), MHT, BEN, and GWGH to proceed with a two-stage closing of the GWGH Winning Bid.

133. In his August 8, 2018 email, Holland stated that GWGH would not be in a position to close on the $150 million GWGH common stock component of the GWGH Winning Bid until the last quarter of 2018. According to Holland, the SEC was insisting that GWGH include two years of audited financial statements for BEN

40

in GWGH's registration statement for the issuance of the common stock, but BEN still did not have such audited financial statements.

**Holland Emails PCA On August 9, 2018 With Additional Assurances**

134. On August 9, 2018, Holland sent PCA another email providing assurances regarding the L-Bond component of the GWGH Winning Bid. Holland assured PCA that, "[b]etween redemption, repurchase, repayment, refinancing and resale, the Seller Trusts will have at least five different ways to exit their position in the L-Bonds, which are now backed by two different balance sheets"—a reference to the balance sheets of both BEN and GWGH.

135. In his August 9, 2018 email, Holland also warned that, if PCA did not promptly agree to proceed with the two-stage closing, GWGH might walk away from the overall deal: "All the deal documents are now complete, and GWG[H] is pushing the parties to close. If we have to delay the closing another day, the deal will be in jeopardy."

136. Because the PCA Seller Funds still had not received any consideration for the PCA Fund Secondaries, PCA agreed to the bifurcated closings.

**The "Initial Closing" Of The GWGH Winning Bid In August 2018**

137. The initial closing of what was supposed to be the GWGH Winning Bid (the "Initial Closing") occurred on August 10, 2018, when the PCA Seller Fund Exchange Trusts, acting at the direction of the Trust Advisors, transferred

41

approximately 70% of their BEN MLP Units to GWGH. In exchange, the PCA Seller Fund Exchange Trusts received $100 million in cash and GWGH L-Bonds with an aggregate face amount of $250 million.

*The Cash Short Payment*

138. The PCA Seller Fund Exchange Trusts were supposed to receive $150 million in cash in the Initial Closing. They received only $100 million. To address this $50 million short payment, the parties executed an August 10, 2018 "Acknowledgment and Agreement Regarding Auction Consideration." In that acknowledgment, which was also signed by Holland on behalf of MHT and Heppner on behalf of BEN, PCA agreed to resume transferring PCA Fund Secondaries to the PCA Seller Fund Exchange Trusts. In exchange, BEN agreed to pay the remaining $50 million cash balance on or before December 14, 2018.

*The Altered GWGH L-Bond Payment Terms*

139. The payment terms of the GWGH L-Bonds that were distributed to the PCA Seller Fund Exchange Trusts in the Initial Closing differed in a material way from the terms that were promised in MHT's December 23, 2017 Winning Bid Notice.

140. MHT's Winning Bid Notice provided that the GWGH L-Bonds would be paid in cash at maturity. However, the GWGH L-Bonds that were distributed to

42

the PCA Seller Fund Exchange Trusts in the Initial Closing gave GWGH the option to redeem them with any combination of cash, BEN MLP Units, and/or BEN debt.

141.    PCA and the PCA Seller Funds nevertheless went forward with the Initial Closing for two primary reasons.  First, MHT and BEN represented that GWGH would not go forward with a cash-only redemption provision and that the altered L-Bond payment terms were "non-negotiable." Second, in theory, the altered redemption provision was beside the point, since GWGH was obligated under the terms of its Winning Bid to refinance or resell the L-Bonds for cash within 12 months of their issuance.  As Holland represented in one of his August 8, 2018 emails to PCA, "the ultimate effect to the [PCA] Parties" of the changed L-Bond payment terms "is that they receive cash payment on the L-Bonds."

**The Counterparties Make An Undisclosed, Unilateral Change To The GWGH Winning Bid**

142.    Unbeknownst to the PCA Parties, on August 10, 2018, the same day as the Initial Closing, the PCA Seller Fund Exchange Trusts (at the direction of the Trust Advisors), MHT, BEN, and GWGH amended their MEA (which, again, was supposed to embody the terms of the GWGH Winning Bid).

143.    In this August 10, 2018 amendment to the MEA, the PCA Seller Fund Exchange Trusts (again, at the direction of the Trust Advisors), MHT, BEN, and GWGH relieved MHT SPV (the affiliate of MHT) of its commitment to pay $150 million to GWGH in exchange for GWGH L-Bonds and GWGH common stock.

43

Indeed, the parties to the MEA, including the PCA Seller Fund Exchange Trusts, at the direction of the Trust Advisors, agreed to *delete* MHT SPV as a party to the MEA completely, thereby eliminating MHT SPV as the source of the $150 million cash payment component of the GWGH Winning Bid.

144.  The parties to the MEA did not stop there.  By this third amendment to their MEA, the Trust Advisors, MHT, BEN, and GWGH also agreed to relieve *GWGH* of its obligation to make the $150 million cash payment to the PCA Seller Fund Exchange Trusts, which was a core component of the GWGH Winning Bid, and a material alteration of its terms.

145.  On information and belief, the parties to the third amended MEA agreed that *BEN* would assume GWGH's obligation to make the $150 million cash payment.

146.  None of the parties to the MEA disclosed to PCA and the PCA Seller Funds the terms of this third amendment to the MEA before or at the Initial Closing—not the Trust Advisors (at the time, Holland and Hinkle, who owed fiduciary duties to the PCA Seller Fund Exchange Trusts and, in turn, the PCA Seller Fund), and not MHT, BEN, or GWGH.

147.  Had they known that the GWGH Winning Bid had been unilaterally altered to shift the $150 million cash payment obligation from GWGH to BEN, PCA and the PCA Seller Funds would have halted the transaction.

44

148.    On the one hand, the GWGH Winning Bid was no longer the GWGH Winning Bid at all, since that bid no longer had a cash component, just GWGH L-Bonds and GWGH stock.  If that cashless bid had been the "GWGH Winning Bid" back in December 2017, the PCA Parties never would have accepted it.  Again, the PCA Parties were interested in receiving cash, not securities, and they had no interest in being a long-term funding source for BEN, or a long-term owner or creditor of GWGH.

149.    On the other hand, there was also no assurance as of August 10, 2018 that *BEN* had the ability to make the remaining $50 million outstanding cash payment to the PCA Seller Fund Exchange Trusts in a timely fashion.  The Trust Advisors certainly knew as much.  At that point, BEN was still more of a business plan than a real business (it had yet to receive a non-depository bank charter) and, on information and belief, its principal source of capital funding was the money it was receiving from the PCA Seller Funds pursuant to the EDA.  Thus, the source of any payment made by BEN to the PCA Seller Fund Exchange Trusts was likely the economic benefits associated with the PCA Fund Secondaries themselves.  The PCA Parties would never have agreed to such a circular arrangement if that had been the "winning bid" proposal in the first instance.

**BEN Fails To Timely Pay The Outstanding $50 Million Cash Balance**

150.  As of December 4, 2018, BEN had paid the PCA Seller Fund Exchange Trusts only $15 million of the $50 million in cash they were still owed, leaving an unpaid balance of $35 million.

151.  That day, BEN informed PCA that BEN would not pay the remaining $35 million by December 15, 2018, as promised.

152.  Eight days later, on December 12, 2018, a senior secured lender to BEN told PCA that it would foreclose on its loan to BEN, thereby rendering BEN insolvent, unless PCA and the PCA Seller Funds agreed to accept just $10 million from BEN, with the remaining $25 million to be paid from "available cash" at some unspecified date in the future.

153.  On December 14, 2018, in order to prevent BEN's senior secured lender from foreclosing on BEN's assets (which included, of course, the PCA Fund Secondaries), PCA and the PCA Seller Funds agreed with the PCA Seller Fund Exchange Trusts (again, as directed by the Trust Advisors), MHT, and BEN to amend the August 10, 2018 "Acknowledgment and Agreement Regarding Auction Consideration" that was signed at the Initial Closing (the "Amended Acknowledgment").

154.  In this Amended Acknowledgment, BEN agreed to pay an additional $10 million in cash to the PCA Seller Fund Exchange Trusts by December 28, 2018,

46

and to pay the remaining $25 million (plus interest) from several potential sources, including (1) cash received from realizations on the PCA Fund Secondaries and GWGH preferred stock; (2) cash generated by any BEN offerings of equity interests; and (3) any cash received from GWGH.

155. The Amended Acknowledgment was signed by Holland on behalf of MHT, Holland and Hinkle as Trust Advisors on behalf of the PCA Seller Fund Exchange Trusts, and Heppner on behalf of BEN.

156. On December 21, 2018, BEN paid the PCA Seller Fund Exchange Trusts $10 million of the $35 million outstanding cash payment balance, leaving $25 million still to be paid.

**The Counterparties Effectuate The Second Closing In December 2018**

157. On December 31, 2018, GWGH finally transferred $150 million in GWGH common stock to the PCA Seller Fund Exchange Trusts in exchange for the latter's remaining BEN MLP Units (the "Second Closing").

158. As of the end of 2018, then, the PCA Seller Fund Exchange Trusts no longer held any BEN MLP Units—those had all been transferred to GWGH, which, as a result, now owned more than 80% of BEN. Instead, the PCA Seller Fund Exchange Trusts held, for the ultimate benefit of the PCA Seller Funds, GWGH L-Bonds with an aggregate face amount of $250 million, and GWGH common stock valued at $150 million.

47

159. None of these GWGH securities had been refinanced or sold for cash in 2018 consistent with MHT's December 23, 2017 Winning Bid Notice and the early January 2018 assurances of the Trust Advisors, BEN, and GWGH.

**GWGH And The Trust Advisors Execute An Empty Orderly Marketing Agreement**

160. Meanwhile, four days before the Second Closing, on December 31, 2018, the Trust Advisors, purportedly acting on behalf of the PCA Seller Fund Exchange Trusts, and GWGH entered into a so-called "Orderly Marketing Agreement."

161. This December 27, 2018 Orderly Marketing Agreement between the Trust Advisors and GWGH was *not* the Orderly Marketing Agreement that was promised in MHT's Winning Bid Notice, however.

162. As noted above, MHT and BEN promised in connection with the GWGH Winning Bid that the Trust Advisors and GWGH, for the benefit of the PCA Seller Fund Exchange Trusts, would enter into an Orderly Marketing Agreement *with a major investment bank* in order to sell the GWGH common stock component of the GWGH Winning Bid within 12 months of the Closing.

163. In addition, the Trust Advisors, MHT, BEN, and GWGH committed in their MEA to enter into an Orderly Marketing Agreement *with a major investment bank* in order to sell the GWGH common stock.

48

164. The December 27, 2018 Orderly Marketing Agreement between the Trust Advisors and GWGH did *not* engage a major investment bank to resell the GWGH common stock. Rather, in Section 1.4 of the December 27, 2018 Orderly Marketing Agreement, the Trust Advisors and GWGH agreed merely to "retain one or more nationally recognized bulge bracket investment banks (the 'Bank') for the orderly marketing and resale of [GWGH] Shares." Supposedly, that major investment bank would then "assist[] in the drafting and preparation of one or more prospectus supplements describing GWG[H], the Shares and the terms of the Offerings"; "advis[e] the Seller Trusts on a marketing and distribution strategy for each Tranche of [GWGH] Shares"; and "assist[] GWG[H] in preparing marketing materials and conducting one or more 'roadshows' and meetings with potential purchasers of the [GWGH] Shares."

165. Thus, in the December 27, 2018 Orderly Marketing Agreement, the Trust Advisors and GWGH simply agreed, again, to do what they were already required to do—namely, engage a major investment bank to sell the GWGH common stock.

166. The Orderly Marketing Agreement was thus an empty gesture, and the Trust Advisors, including Defendant Holland, certainly knew as much. Worse yet, on information and belief, the Trust Advisors and GWGH never actually retained an investment bank to resell the GWGH common stock held by the PCA Seller Fund

49

Exchange Trusts, and there were never any "'roadshows' [or] meetings with potential purchasers" of the GWGH shares. Instead, the Orderly Marketing Agreement simply expired by its own terms on December 27, 2019, one year after the Trust Advisors and GWGH signed it.

**BEN Assumes Control Of GWGH**

167. Meanwhile, in April 2019, BEN effectively took control of GWGH pursuant to an April 15, 2019 "Purchase and Contribution Agreement" with Jon and Steven Sabes, GWGH's CEO and Executive Vice President, respectively.

168. According to GWGH's public filings, the following transactions and events occurred in connection with the April 29, 2019 closing of that April 15, 2019 Purchase and Contribution Agreement:

- Jon and Steven Sabes cashed out of GWGH by selling 2,500,000 shares of their GWGH common stock to a BEN affiliate for $25 million and then contributed their remaining 1,452,155 shares to Altiverse Capital Markets LLC—an entity related to Heppner and another BEN principal—in exchange for equity in Altiverse.

- The Sabes brothers resigned from all of their officer positions at GWGH and all but two of its subsidiaries (Life Epigenetics and youSurance), and forfeited any and all additional severance and equity awards.

- GWGH's entire board resigned and was replaced by 11 individuals appointed by BEN.

- Heppner became Chairman of GWGH.

- Holland was named President and CEO of GWGH (while he still remained a Trust Advisor to the PCA Seller Fund Exchange Trusts and a principal and owner of MHT).

50

**BEN Fails To Timely Pay The $25 Million Cash Payment Balance**

169. On June 6, 2019, GWGH disclosed in an SEC filing that GWG Life, LLC ("GWG Life"), a wholly-owned subsidiary of GWGH, had entered into a Promissory Note with affiliates of BEN to fund a term loan in the aggregate principal amount of $65 million. GWGH stated further that, on June 3, 2019, GWG Life advanced $50 million to the affiliates of BEN pursuant to the Note.

170. Under the terms of the December 14, 2018 Amended Acknowledgment referenced above, BEN was supposed to pay the PCA Seller Funds the remaining $25 million cash payment balance within five days of receipt of this $50 million from GWG Life.

171. BEN failed to pay the $25 million as required. Accordingly, on July 31, 2019, counsel for the PCA Parties sent a letter to counsel for BEN demanding payment of the $25 million.

172. BEN finally made the $25 million cash payment several months later, on November 13, 2019. That day, the parties signed a "Mutual Confirmation of Payment." Notably, Holland signed this "Mutual Confirmation of Payment" in three different capacities: as a Trust Advisor to the PCA Seller Fund Exchange Trusts, as CEO of GWGH, and as an "Authorized Signatory of MHT."

173. Ultimately, the PCA Seller Funds *directly* received the $150 million cash component of the GWGH Winning Bid, consistent with the MHT's

51

commitment under the PSA that "*each applicable Exchange Trust shall distribute to Sellers* [*i.e.*, the applicable PCA Seller Fund] with respect to the Interests *all undistributed Realized Consideration*." (Emphasis added.) The Exchange Trusts (via Delaware Trust as trustee) directly wired almost all of the $150 million to the PCA Seller Funds, and BEN directly wired the remaining amount directly to the PCA Seller Funds, bypassing the Exchange Trusts altogether.

**The Distribution Trigger Event Under The CVR Contract**

174. As noted above, one of the Transaction Documents was the CVR Contract, the purpose of which is to protect the PCA Seller Funds if the Auction of the BEN MLP Units failed to occur or to generate at least $500 million in net cash proceeds. In essence, the parties agreed that, if the Auction generated less than $500 million in cash, the BEN CVR Parties would be required to make up the shortfall by contributing additional BEN MLP Units and/or cash to the PCA Seller Fund Exchange Trusts.

175. To date, the Auction of the BEN MLP Units has plainly failed to generate $500 million in net cash proceeds for the PCA Seller Funds. It has generated only $150 million in cash (and even that cash was received on a substantially delayed basis).

176. In the meantime, under the CVR Contract, the BEN CVR Parties were required, among other things, to file a Registration Statement for an initial public listing of the BEN MLP Units within 24 months of the "Auction Closing Date."

177. In connection with the Initial Closing, the parties to the Transaction Documents agreed in an August 10, 2018 "Acknowledgment Regarding Auction Closing Date and Consideration" (the "Auction Closing Date Acknowledgment") that the Auction Closing Date "shall for all purposes be as of December 23, 2017."

178. Accordingly, the BEN CVR Parties were required under the terms of the CVR Contract to file a Registration Statement for the initial listing of the BEN MLP Units by December 23, 2019.

179. The BEN CVR Parties failed to file a Registration Statement for the initial listing of the BEN MLP Units by December 23, 2019.

180. The BEN CVR Parties' failure to timely file its Registration Statement by December 23, 2019 was a "Distribution Trigger Event" under Section 2.3 of the CVR Contract.

181. Because there was a Distribution Trigger Event under Section 2.3 of the CVR Contract, certain of the BEN CVR Parties are required by that same provision to use "Available Cash" to, among other things, make quarterly distributions to the PCA Seller Fund Exchange Trusts until what the CVR Contract

53

refers to as the "Shortfall ET Amounts" are eliminated. Under the CVR Contract, this is called the "Mandatory Distribution Period."

182. Under the CVR Contract, the Shortfall ET Amount for each PCA Seller Fund Exchange Trust is the amount by which the "Net Auction Consideration" paid to that exchange trust is less than the "Adjusted Final NAV" for such exchange trust. Under the CVR Contract, "Net Auction Consideration" is further limited to "only include, as of any determination date, Auction Consideration received by MHT (or the Exchange Trusts) *in the form of cash and cash equivalents* on or prior to such determination date." (Emphasis added.) Thus, the aggregate Shortfall ET Amount for all the PCA Seller Fund Exchange Trusts is the amount by which the Net Auction Consideration paid "in the form of cash and cash equivalents" to all of the PCA Seller Fund Exchange Trusts is less than their Adjusted Final NAV of $500 million.

183. In the August 10, 2018 Auction Closing Date Acknowledgment, the parties to the Transaction Document "acknowledged and agreed" that "Net Auction Consideration" (as that term is used in the Transaction Agreement) shall for all purposes be deemed to include all "Auction Consideration" (as that term is used in the Transaction Agreement) received by the PCA Seller Fund Exchange Trusts.

184. The term "Auction Consideration" is not defined in the Auction Closing Date Acknowledgment. According to that Acknowledgment, capitalized terms not defined therein have the meaning prescribed to them in the Transaction Agreement,

54

which uses a different definition of "Auction Consideration" than the CVR Contract. The Transaction Agreement defines "Auction Consideration" as "the aggregate total *cash* consideration paid by the Auction Buyers for the Auction of BEN Common Units pursuant to an Auction Purchase Agreement." (Emphasis added.)

185. Accordingly, under the CVR Contract's *or* the Transaction Agreement's definitions of "Net Auction Consideration" or "Auction Consideration," the aggregate Shortfall ET Amount for all of the PCA Seller Fund Exchange Trusts is $350 million—the difference between the $150 million in cash that the PCA Seller Fund Exchange Trusts ultimately received from GWGH and BEN and their Adjusted Final NAV of $500 million.

186. In addition, because there has been a Distribution Trigger Event, BEN is obligated under the CVR Contract to promptly provide on a quarterly basis "a summary report setting out the calculation of Available Cash for such quarter to MHT, which shall promptly provide a copy of such report to all of the beneficiaries of the Exchange Trusts."

187. Notwithstanding their obligations under the CVR Contract, the requisite BEN CVR Parties have failed to make any Available Cash distributions to the PCA Seller Fund Exchange Trusts in order to reduce the aggregate Shortfall ET Amount. On information and belief, BEN also has failed to provide MHT with any quarterly Available Cash reports. As a result, MHT has failed to provide copies of

55

any such reports to the beneficiaries of the PCA Seller Fund Exchange Trusts—the PCA Seller Funds.

188. In addition to the requirements set forth above, the CVR Contract imposes business limitations on BEN during a Mandatory Distribution Period. Specifically, Section 2.2 provides that, during a Mandatory Distribution Period, BEN and its subsidiaries shall (1) cease to finance or otherwise acquire future private equity or other alternative asset loans unless such loan was agreed upon in writing prior to the commencement of the Mandatory Distribution Period; and (2) use all commercially reasonable efforts to satisfy Section 2.3's requirement that it use Available Cash to, among other things, eliminate the Shortfall ET amounts.

189. Finally, the last sentence of Section 2.1 of the CVR Contract provides that, until BEN has satisfied its obligations under Articles I, II, and III of the CVR Contract, BEN's general partner agrees not to authorize distributions by BEN to its partners except in certain limited circumstances.

190. On information and belief, the BEN CVR Parties have violated one or more of these CVR Contract Mandatory Distribution Period business restrictions, and continue to do so.

**MHT And The Trust Advisors Fail To Enforce The CVR Contract**

191. As noted above, in Section 5(d) of the PSA, MHT agreed to invoke and enforce the CVR Contract in favor of the PCA Seller Funds if the Auction failed to

56

generate net cash proceeds of $500 million. In addition, in the Exchange Trust Agreements, the Trust Advisors and the PCA Seller Fund Exchange Trusts themselves were required to "take all steps necessary or advisable to commence and consummate the Auction [of the BEN MLP Units] as contemplated by the Transaction Agreement including, *without limitation fully exercising the Protection Rights*," in other words, the CVRs. (Emphasis added.)

192.   Holland signed the CVR Contract on behalf of MHT. He also signed the Exchange Trust Agreements as a Trust Advisor.

193.   MHT has failed to enforce the CVR Contract against the BEN CVR Parties, or even to try to do so and, on information and belief, Holland has done nothing to cause MHT to do so, even though he remains a principal of MHT. Further, Holland and Turvey, as the then-Trust Advisors, failed to invoke and enforce the CVR Contract against the BEN CVR Parties, even though (i) they were required to do so by the Exchange Trust Agreements, (ii) the Exchange Trusts are explicit third-party beneficiaries of the CVR Contract, and (iii) the Trust Advisors owe fiduciary duties to the Exchange Trusts and their beneficiaries.

**BEN And MHT Attempt To Extinguish The PCA Parties' Rights Under The CVR Contract**

194.   Instead of MHT enforcing the PCA Parties' rights under the CVR Contract, MHT, BEN, and Holland, with help from Heppner and others at BEN, actively attempted to extinguish them through deception.

57

App. 1454

195. In early March 2020, the PCA Parties' representative on BEN's board discussed the CVR Contract with other BEN directors and a BEN lawyer, including the PCA Parties' position that a Distribution Trigger Event had occurred because BEN had failed to file a Registration Statement for the listing of the BEN MLP Units within two years of the parties' agreed upon Auction Closing Date.

196. On May 8, 2020, the PCA Parties' counsel sent letters regarding the CVR Contract to MHT (specifically, to the attention of Holland) and BEN (to the attention of Heppner). In addition, the PCA Parties' counsel sent a copy of the BEN letter to the BEN lawyer who had participated in the above-mentioned March 2020 discussions regarding the CVR contract. In each letter, the PCA Parties' counsel formally notified MHT (via Holland) and BEN (via Heppner) that a Distribution Trigger Event had occurred under the CVR Contract, since BEN had failed to file a Registration Statement for an initial public listing of the BEN MLP Units within 24 months of the Auction Closing Date. Further, the PCA Parties' counsel inquired of both MHT and BEN regarding whether, and to what extent, BEN was complying with its resulting obligations under the CVR Contract.

197. On May 12, 2020, another BEN lawyer sent a letter to counsel for the PCA Parties indicating that BEN was reviewing the PCA Parties' counsel's May 8, 2020 letter regarding the CVR Contract and that BEN would be in touch soon. Notably, the BEN lawyer who wrote this letter copied both Heppner and the BEN

58

lawyer who was involved in the March 2020 discussions regarding the CVR contract.

198. Just three days later, on May 15, 2020, the BEN lawyer who participated in the March 2020 discussions regarding the CVR contract, and who was copied on the legal correspondence regarding the CVR contract in early May 2020, asked the PCA Parties' BEN board representative to sign a purported "Second Amendment to the CVR Contract." The lawyer for BEN told the PCA Parties' representative that the August 10, 2018 Auction Closing Date Acknowledgment, which ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████ The lawyer for BEN said the purported amendment had already been █████████████████████████ and that he needed the PCA Parties' board representative to sign it too in his capacity as the ████████████████████ The BEN lawyer said the ████████████ ███████████████████████████████████████████████ ████████████████████ giving the PCA Parties' representative the impression that the representative's signature on the amendment was a ministerial act.

199. Notably, the BEN lawyer did not notify or copy the PCA Parties' counsel regarding his request that the PCA Parties' representative sign the purported amendment to the CVR Contract, even though he knew from the prior

59

correspondence that the PCA Parties were represented by counsel, who had just put MHT and BEN on formal notice of a default: that a Distribution Trigger Event had occurred under the terms of the CVR Contract.

200.  The Second Amendment to the CVR Contract that the lawyer for BEN sent to the PCA Parties' representative on May 15, 2020 was dated "effective as of December 28, 2019." It was already signed by both the BEN parties (by Heppner, among others) and by MHT (by Holland as an "Authorized Signatory"), although the document did not disclose *when* these parties signed it. The only missing signature was the PCA Parties representative's, who was being asked to sign ████

██████████████████████████████████████

201.  A Recital in this "Second Amendment to the CVR Contract" stated that MHT, BEN, Holland (as Trust Advisor to the PCA Seller Fund Exchange Trusts), and PCA (on behalf of itself and the PCA Parties) had each "entered into certain acknowledgments, each effective as of August 10, 2018 (collectively, the 'Acknowledgements'), that supplement[ed] and modif[ied] certain terms of the Transaction Agreement and related documents," but the Recital did not describe *how* the Acknowledgements had done so.

202.  Another Recital in this purported Second Amendment to the CVR Contract stated that MHT and BEN desired to amend the CVR Contract between them, purportedly to "reflect the supplements and modifications set forth in the

60

Acknowledgments and to conform the [CVR] Agreement to the terms in the Transaction Agreement as supplemented and modified by such Acknowledgements."

203. In fact, the Second Amendment to the CVR Contract did no such thing. To the contrary, it sought to substantially alter and effectively extinguish the PCA Parties' rights under the Transaction Documents, particularly the CVR Contract.

204. Specifically, the Second Amendment to the CVR Contract changed the CVR Contract's definition of "Net Auction Consideration" by, among other things, removing from the definition a clause stating that, "for purposes of the 'Shortfall ET Amount' under Article I and Article II, 'Net Auction Consideration' shall only include, as of any determination date, Auction Consideration received by MHT (or the Exchange Trusts) in the form of cash and cash equivalents on or prior to such determination date."

205. Before this change, the Shortfall ET Amount under the relevant agreements was at least $350 million, since the aggregate NAV of the PCA Seller Fund Exchange Trusts was $500 million and the Exchange Trusts still had only received $150 million in cash or cash equivalents. As noted above, in this scenario, BEN is required to use "Available Cash" to reduce and, ultimately, eliminate the shortfall, and is subject to reporting obligations and business activity restrictions until it does so. In addition, MHT is required, for the benefit of the PCA Seller Fund

61

Exchange Trusts and, in turn, the PCA Parties, to make sure BEN honors these obligations.

206. Based on MHT's and the BEN CVR Parties' unilateral change to the CVR Contract's definition of "Net Auction Consideration," however, they both now claim that the Shortfall ET Amount is zero on the ground that, because there is no longer a "cash or cash equivalent requirement," the Net Auction Consideration includes the $350 million worth of GWGH common stock and GWGH L-Bonds that remain in the PCA Seller Fund Exchange Trusts. In this scenario, MHT and BEN claim that BEN no longer has any obligations under the CVR Contract to reduce and ultimately eliminate the shortfall, and that MHT therefore has nothing to enforce.

207. Moreover, the August 10, 2018 Auction Closing Date Acknowledgment—one of the Acknowledgments referenced in the Recitals to the purported Second Amendment to the CVR Contract—did not, and could not, change the CVR Contract's definition of "Net Auction Consideration." That Acknowledgment never purported to amend the CVR Contract's definition, and it certainly did not broaden the definition of "Auction Consideration" to include non-cash consideration. Rather, the Acknowledgment said that "Net Auction Consideration shall for all purposes be deemed to include all Auction Consideration received by MHT or the Exchange Trusts," then excluded interest earned on the Exchange Trusts' holdings of GWGH L-Bonds from constituting "Net Auction

62

Consideration" or "Auction Consideration." The Acknowledgment is explicit that capitalized terms not defined therein, such as "Net Auction Consideration" and "Auction Consideration," shall "have the meaning prescribed in the Transaction Agreement." Under the Transaction Agreement's definition of Auction Consideration—which is different than the definition the CVR Contract ascribes to the same term, but consistent with the CVR Contract's definition of "Net Auction Consideration"—"Auction Consideration" is limited to cash consideration. It means: "the aggregate *total cash consideration* paid by the Auction Buyers for the Auction BEN Common Units pursuant to an Auction Purchase Agreement." (Emphasis added.)

208. Therefore, contrary to BEN's lawyer's email and the Recital in the Second Amendment to the CVR Contract, the Acknowledgement had nothing to do with amending the CVR Contract. It did not change the CVR Contract's definition of "Net Auction Consideration"—*an entirely different definition under an entirely different agreement*. Nor could the Acknowledgement have been understood as modifying the CVR Contract, when none of the contractual requirements for amending the CVR Contract were followed.

209. The Acknowledgement also supplied no basis for BEN to broaden the definition of "Net Auction Consideration" under the CVR Contract to include more than just cash consideration. Far from it, the Acknowledgment reinforced that "Net

63

Auction Consideration," *as used in the Transaction Agreement*, includes "*total cash consideration*" paid to MHT and the Exchange Trusts. (Emphasis added.)

210.  In short, BEN's lawyer and the purported amendment conflated the Transaction Agreement with the CVR Contract, leveraging to the BEN CVR Parties' advantage the fact that those two agreements shared common defined terms but not the same definitions.  By the so-called Second Amendment to the CVR Contract, the BEN CVR Parties and MHT sought to extinguish the PCA Parties' rights as express third-party beneficiaries of the CVR Contract.  MHT did this notwithstanding its own obligation to enforce the CVR Contract for the benefit of the PCA Seller Funds, and Holland signed the purported amendment for MHT even though, as Trust Advisor, he owes fiduciary duties to the PCA Seller Fund Exchange Trusts.

211.  At the request of the BEN lawyer, and based on his misleading description of the effect of the August 10, 2018 Auction Closing Date Acknowledgment, the PCA Parties' board representative signed the Second Amendment to the CVR Contract on May 15, 2020.  When he did so, he had no idea that the amendment effectively eliminated the PCA Parties' rights with respect to the CVR Contract.  Accordingly, to the extent MHT and the BEN CVR Parties claim that the PCA Parties' representative's signature on the document reflects the PCA Parties' "consent" to the amendment, that consent was fraudulently obtained, and

64

MHT and the BEN CVR Parties should not be able to benefit from their fraudulent misconduct.

**BEN And GWGH Have Now Received The Full Benefit Of The Bargain; PCA And The PCA Seller Funds Have Not**

212. More than four years have now passed since the parties signed the Transaction Documents on September 1, 2017.

213. Since then, BEN has received the full benefit of the bargain, namely, the PCA Fund Secondaries, and it has benefited immensely from the hundreds of millions in capital they have generated.

214. GWGH also received the full benefit of its bargain, namely, the BEN MLP Units and a controlling majority ownership stake in BEN. (And, along the way, the Trust Advisors, MHT, and BEN relieved GWGH of its obligation to make the $150 million cash payment component of its so-called "winning bid" in the Auction of the BEN MLP Units.)

215. On the other hand, the PCA Parties have not received the full benefit of their bargain. Far from it, after more than three years, they still have not received any cash for the GWGH L-Bond and GWGH common stock components of the GWGH Winning Bid, they have not received any contingent consideration under the CVR Contract from BEN, and they have received no discernible help at all from the Trust Advisors and MHT, notwithstanding the former's legal obligations to protect

65

the interests of the PCA Seller Funds under the Exchange Trust Agreements and the latter's obligation to enforce the CVR Contract.

216. Thus, the current status of the Transactions can be summarized as follows:



### GWGH's Bankruptcy

217. Meanwhile, recently, GWGH's financial condition has steadily deteriorated, and GWGH ultimately filed for bankruptcy on April 20, 2022.

App. 1463

218. In October 2020, GWGH learned that it was the subject of a SEC investigation. According to the company, the SEC's investigation is still ongoing.

219. Several months later, GWGH missed the March 31, 2021 deadline for filing its Annual Report on Form 10-K for the year ended December 31, 2020 (the "2020 10-K") because the company was working with its independent auditors and the SEC's Office of the Chief Accountant to resolve two accounting issues relating to its acquisition of a controlling interest in BEN.

220. GWGH's inability to timely file its 2020 10-K prompted a liquidity crunch that has grown more severe over time. GWGH relies heavily on L-Bond sales to generate the liquidity necessary to meet its financial obligations. Because of its inability to timely file its 2020 10-K, in April 2021, GWGH suspended sales of L-Bonds and, as a result, was forced to use liquidity reserves and to finance or refinance assets in order to meet its liquidity needs and satisfy its financial obligations.

221. GWGH did not file its 2020 10-K until November 5, 2021, and in that 10-K, the company disclosed both a "going concern" qualification and material weaknesses in its internal controls over financial reporting and in its disclosure controls. GWGH's going concern disclosure indicated that, in the view of the company's independent auditing firm, there is substantial doubt about the GWGH's ability to meet its financial obligations, due to the company's inability to raise capital

67

through L-Bond sales, recurring losses from operations, and potential negative implications from the ongoing SEC investigation. GWGH's internal controls disclosures indicated that, in management's view, GWGH's internal controls were insufficient to ensure that amounts recorded and disclosed were fairly stated in accordance with GAAP, and that its disclosure controls and procedures were ineffective for the year ended December 31, 2020.

222. On November 29, 2021, GWGH completed a series of transactions that resulted in BEN becoming an independent company and, in GWGH's view, no longer a subsidiary of GWGH. According to GWGH, this "return of control" to BEN was a necessary step for BEN to obtain a non-depository bank charter.

223. As part of this "decoupling," GWGH allowed BEN to pay off a $202 million commercial loan with illiquid common equity units of BEN. GWGH did so even though it was starved for cash and operating under a "going concern" qualification because of its liquidity crunch and the ongoing SEC investigation.

224. In addition to accepting additional illiquid BEN units in lieu of cash, GWGH gave up its right to appoint a majority of BEN's board of directors. As a result, GWGH now owns a majority equity interest in BEN, but no longer has a controlling interest.

225. Although GWGH has suggested that its deconsolidation of BEN will ultimately increase the value of its investments in BEN, there is no guarantee that

68

App. 1465

will happen. Moreover, GWGH expects that, as an independent company, BEN will reduce its reliance on GWGH to fund its operations and will seek to raise capital from other sources. In doing so, BEN could issue new equity that would be dilutive of GWGH's ownership interest in BEN.

226. With its SEC filings finally current, GWGH resumed L-Bond sales on December 1, 2021, but its sales were only a small fraction of what they had been previously, which only worsened the company's liquidity crunch.

227. On January 6, 2022, GWGH announced that, on December 31, 2021, its independent auditing firm notified the company that the firm would not stand for reappointment. GWGH has not yet retained a new independent auditing firm.

228. On January 15, 2022, GWGH made several announcements. First, the company announced that it had failed to pay approximately $13.6 million in L-Bond principal and interest payments that were due that day. Second, the company stated that, because its independent auditing firm had declined to stand for reappointment, it would likely miss its March 31, 2022 deadline for filing its Annual Report on Form 10-K for the year ended December 31, 2021 (the "2021 10-K"), and that its failure to meet this deadline for its 2021 10-K would likely require another suspension of its sale of L-Bonds. Third, GWGH disclosed that its board of directors had authorized management to hire financial and legal restructuring advisors to help evaluate the company's liquidity and capital structure alternatives. Finally, GWGH

69

App. 1466

announced that it had voluntarily suspended L-Bond sales effective as of January 10, 2022.

229.  In a January 24, 2022 communication to investors, Holland provided more information on GWGH's liquidity crisis. First, he stated that the company was working with its financial and legal restructuring advisors to evaluate its options, and that the company was unable to estimate when its L-Bond sales could return to a level that would allow the company to meet its financial obligations. Second, Holland stated that, while assets sales might provide near-term liquidity, such sales would likely be at a significant discount to the fair market value of those assets. Because of this, and because the company had no reliable expectation of when it could again raise capital through L-Bond sales, the company believed it was not in the best interests of GWGH's investors to pursue asset sales "at this time." Finally, Holland stated that GWGH had contacted potential replacement independent auditing firms who said generally that it was unlikely that they could complete an audit and issue an audit report on the company's 2021 year-end financial statements prior to the March 31, 2022 deadline for the filing of the company's 2021 10-K. According to Holland, GWGH likely will continue its suspension of L-Bond sales if that March 31, 2022 deadline is missed.

230.  On January 27, 2022, the Wall Street Journal reported that GWGH was seeking "rescue financing" in order to avoid a bankruptcy.

70

App. 1467

231. As noted above, under the indenture that governs GWGH's bonds, GWGH had a 30-day grace period to make the interest and principal payments that were due on January 15, 2022. On February 14, 2022, however, GWGH announced that its ongoing review of liquidity and restructuring alternatives would take at least three to four more weeks, and that it would not make interest or maturity payments on its L-Bonds pending the outcome of the review. As a result, under the indenture governing the L-Bonds, an event of default has occurred and either the indenture trustee or noteholders holding at least 25% of the outstanding principal amount of the L-Bonds may now elect to accelerate the L-Bonds, making them immediately due and payable subject to the GWGH's senior debt obligations. And if GWGH files for bankruptcy, under the indenture, that would automatically trigger an acceleration of the principal and interest due on the bonds.

232. At the same time, GWGH's stock price has fallen. As a result, the GWGH common stock that was supposed to have been monetized at $150 million for the benefit of the PCA Seller Funds is now valued at approximately $60 million based on current market trading prices.

233. According to the Wall Street Journal on April 4, 2022, GWGH has been "preparing to file for bankruptcy in the coming days after accounting issues and the resignation of its auditor prevented it from selling its product."

71

234. Ultimately, on April 20, 2022, GWGH filed for bankruptcy. *See In re GWG Holdings, Inc.*, Case No. 22-90032 (Bankr. S.D. Tex.) (MI).

**Holland And Turvey Resign In An Attempt To Moot Count I And Thwart Expedited Discovery**

235. On February 18, 2022, Plaintiffs filed their single-count initial Complaint and a Motion for Expedited Proceedings, seeking the expedited removal of Holland and Turvey, the two Trust Advisors, and their replacement with Plaintiffs' designees. In the Motion for Expedited Proceedings, Plaintiffs sought "a trial to be held in May 2022," given the Trust Advisors' "patent, uncurable conflicts of interest," including their "failure to act in the face of a recently announced potential restructuring" of GWGH.

236. Following briefing on Plaintiffs' Motion for Expedited Proceedings and two hearings, on March 16, 2022, the Court ordered that expedited discovery occur concurrently with briefing on Defendants' motion to dismiss.

237. Immediately thereafter, Plaintiffs contacted Defendants to set a written discovery schedule. On March 19, 2022, the parties agreed to an expedited schedule to serve and answer document requests and interrogatories.

238. In accordance with that schedule, on March 21, 2022, Plaintiffs served their document requests and interrogatories upon MHT, BEN, Holland, and Turvey. However, on March 28, 2022 (the agreed-upon deadline), MHT and BEN refused to participate in any document discovery or provide any substantive answers to

72

interrogatories, for the first time claiming exemption because, at the time, there was no claim against them. Further, Holland and Turvey unilaterally limited the scope of their participation in discovery, arguing that discovery was limited solely to the Trust Advisors' conflicts of interest—a position Defendants took at the March 16, 2022 conference, but which the Court did not adopt.

239. On April 11, 2022, while the parties were meeting and conferring regarding what was supposed to be expedited discovery, an entity called L Bond Management, L.L.C. ("L Bond Management") was formed in Delaware. Its Certificate of Formation was signed by Kelsie Knight as an "Authorized Person." On information and belief, Kelsie Knight is a corporate lawyer at Holland & Knight, BEN's long-time law firm.[3] At the time, no one notified Plaintiffs of the formation or purpose of L Bond Management.

240. One week later, on April 18, 2022—the same day Plaintiffs were to respond to Defendants' motion to dismiss or amend their Complaint—Holland and Turvey resigned their positions as Trust Advisors. Notably, MHT and BEN counter-signed Holland's and Turvey's "Resignation of Trust Advisors" in order to waive the 30-day notice requirement that otherwise would have applied. At the time, Defendants Holland and Turvey did not provide Plaintiffs with a copy or notice of their "Resignation of Trust Advisors." Neither did Defendants MHT or BEN.

---

[3]    *See* https://www.hklaw.com/en/professionals/k/knight-kelsie.

73

Plaintiffs had no role in Holland's and Turvey's resignations, nor were Plaintiffs consulted about them.

241.  That same evening, Plaintiffs filed their Amended Complaint. The Amended Complaint asserted six additional causes of action against Holland, Turvey, MHT, and BEN, but it did not materially change Count I, which sought to remove Holland and Turvey as Trust Advisors and have them replaced with Plaintiffs' designees. Plaintiffs promptly forwarded the Amended Complaint to Defendants, explaining that Count I continued to warrant expedited treatment and asking to discuss scheduling. Defendants never responded to this request.

**MHT Appoints John Stahl As A New Trust Advisor, But Withholds His Identity From PCA And The PCA Seller Funds**

242.  The next day, April 19, 2022, MHT, as Settlor of the Exchange Trusts, created and executed a document entitled, "Appointment of Successor Trust Advisor of the Exchange Trusts" (the "Appointment"). MHT, of course, was founded by Holland, is owned in part by Holland, and is effectively run by Holland. In the Appointment, MHT stated that Holland and Turvey had resigned as Trust Advisors; that, under the Exchange Trust Agreements, MHT had the power to appoint a successor; that MHT desired to appoint John A. Stahl as a successor Trust Advisor; and that John A. Stahl was willing to serve in that capacity. Following these Recitals, MHT appointed John A. Stahl as a successor Trust Advisor of the PCA

74

Seller Fund Exchange Trusts effective as of April 19, 2022. In a section entitled, "Acceptance of Appointment," John A. Stahl counter-signed the Appointment.

243. At the time, neither Holland, Turvey, MHT, BEN, nor Stahl notified Plaintiffs of Stahl's appointment. Plaintiffs had no role in selecting Stahl and were not consulted about it. Notably, the Appointment is silent as to the reasons why Stahl was selected as a successor Trust Advisor.

**The Very Busy Day Of April 19, 2022**

244. The same day as his appointment, April 19, 2022, Stahl signed and sent a "Direction Letter" to Delaware Trust, the administrative trustee of the Exchange Trusts. In the letter, Stahl directed Delaware Trust to execute, on behalf of the Exchange Trusts, an "Appointment of Agent" and a "Power of Attorney."

245. Stahl and Delaware Trust executed both documents that same day. The "Appointment of Agent" appointed L Bond Management "as the agent of the Trusts," including "with respect to claims and litigation pursuant to 12 *Del. C.* § 49A-212." The Power of Attorney, in turn, gave L Bond Management the authority to, among other things, "intervene or otherwise participate in litigation" on behalf of the PCA Seller Fund Exchange Trusts and nine other trusts.

246. Stahl signed both the Appointment of Agent and Power of Attorney in his capacity as "Manager" of L Bond Management. Both the Appointment of Agent and the Power of Attorney make clear that Stahl, in his capacity as the successor

75

Trust Advisor to the Exchange Trusts, can revoke them at any time upon written notice to L Bond Management. Notably, Stahl never informed Plaintiffs of the Direction Letter, the Appointment of Agent, or the Power of Attorney. Plaintiffs had no role in these events; they were not consulted.

247. L Bond Management wasted no time exercising its newfound authority to "intervene or otherwise participate in litigation" on behalf of the Exchange Trusts. That same day (still April 19, 2022), L Bond Management hired Richard Schmidt, a retired bankruptcy judge, as its "Restructuring Manager." It also hired the Dallas law firm of Lynn Pinker Hurst & Schwegmann ("Lynn Pinker") to represent it. L Bond Management then immediately—again, on that same day, April 19—moved to intervene in and gain control of a putative securities fraud class action in federal court in Dallas entitled, *Bayati v. GWG Holdings, Inc.*, Case No. 22-410 (N.D. Tex.).

248. In *Bayati*, purchasers of GWGH L-Bonds alleged that GWGH and certain of its current and former directors, including BEN's founder, Heppner, violated sections 11 and 12(a)(2) of the federal Securities Act of 1933 by misrepresenting in the June 2020 L-Bond offering documents how those L-Bond proceeds would be used. The *Bayati* plaintiffs alleged, in a nutshell, that, contrary to the offering documents, their L-Bond proceeds were largely funneled to BEN and BEN insiders, including Heppner.

76

**The Pro-BEN, Pro-GWGH Motion To Intervene**

249. In its Motion to Intervene in *Bayati*, L Bond Management identified itself as "the agent (the 'Agent') for twenty-four holders (collectively, the 'Intervenors') holding over 22% of the total outstanding L Bonds issued by GWG Holdings, Inc." According to the motion, the 24 Intervenors hold $366.9 million of GWGH L-Bonds. Notably, the Motion does not identify L Bond Management's Manager, Stahl, or any of its members, though it does state that "the Agent"— L Bond Management—had hired the Honorable Richard S. Schmidt "as a Restructuring Manager with full authority to act on behalf of the Intervenors in this lawsuit." Just as notably, the Motion does not identify any of the 24 Intervenors by name.

250. Although it does not say who they are, the Motion does say that "[c]*ertain of the Intervenors are a part of Ben's business plan to provide liquidity services to holders of alternative assets*." (Emphasis added.) According to the Motion, these Intervenors are owned by a series of entities to which BEN loans money, and they used the funds to acquire interests in alternative assets that support the repayment of the loans and, ultimately the payment of what the Motion calls the "Charitable Beneficiaries" of those entities. Somewhat incongruously, the Motion at another point states: "Intervenors are GWG's two largest holders of L Bonds."

77

App. 1474

The Motion does not identify either of these two largest holders of L-Bonds, but one of them is likely the PCA Seller Fund Exchange Trusts.

251.  The gist of L Bond Management's motion is that the *Bayati* plaintiffs' claims lack merit because neither GWGH nor its directors misled investors regarding the use of L-Bond proceeds, and that they are misguided, since the lawsuit is harming the reputations and business prospects of GWGH and, in turn, BEN, which is GWGH's most valuable asset.  The Motion argues that L Bond Management should therefore be allowed to participate in the *Bayati* litigation and to refute the plaintiffs' claims there.

252.  In making these arguments, L Bond Management repeatedly praises BEN and touts its future business prospects.  Among other things, the L Bond Management motion states:

- "Due to recent regulatory approvals of a trust charter and other events, Ben's value, and the value of GWG's interests in Ben, is poised to grow substantially in the near future."

- "GWG's interests in Ben are also positioned to become substantially more liquid in the near future as Ben is pursuing transactions to make its equity publicly tradeable."

- "This [the $340 million unrealized investment gain on GWG's investments in BEN] does not reflect the growth that Ben is likely to achieve now given other recent events, such as obtaining a trust charter in Kansas."

- "[T]he timing of this lawsuit could not be worse, as it comes during a critical juncture for Ben.  Mere months before Plaintiffs filed this putative class action, the Kansas Office of the State Bank Commissioner issued a Ben subsidiary an operating charter (the 'Charter') under the recently

78

enacted Kansas Technology-Enabled Fiduciary Financial Institutions ('TEFFI') Act. This Charter is a critical piece of Ben's business plan that allows Ben to substantially expand its operations and customer base."

- "Upon information and belief, Ben is currently in the process of securing approval of additional legislation and regulatory approvals and is seeking to finalize various other transactions to raise capital, obtain additional assets, and improve the liquidity of its equity, all to further support its business plans."

- "With these critical pieces of its business plan falling into place, Ben's value is poised to grow substantially, which will increase the value of the Ben common units."

**GWGH's April 20, 2022 Bankruptcy, And MHT's And Holland's Continued Refusal To Identify Stahl As The New Trust Advisor**

253. GWGH filed for bankruptcy early in the day on April 20, 2022. The bankruptcy court set GWGH's first-day hearing for the next day, April 21, 2022, at 2:30 P.M. Central Time.

254. During the afternoon of April 20, 2022, MHT's and Holland's counsel informed Plaintiffs' counsel that Holland and Turvey had resigned as Trust Advisors and that a new Trust Advisor had been appointed. MHT's and Holland's counsel argued that Holland's and Turvey's resignations mooted Count I of Plaintiffs' Amended Complaint, and stated that Defendants would therefore not participate in expedited discovery.

255. Within four hours of this call, Plaintiffs' counsel asked MHT's and Holland's counsel to identify the new Trust Advisor, and to produce documents

79

showing the resignations and replacement of Holland and Turvey as Trust Advisors. MHT's and Holland's counsel did not respond to this request.

256.   The next morning, on April 21, 2022, Plaintiffs' counsel again asked MHT's and Holland's counsel to provide the name of the new Trust Advisor, and to provide documents showing the resignations and replacement of Holland and Turvey as Trust Advisors. Plaintiffs' counsel asked that this basic information be provided in advance of the first-day hearing in GWGH's bankruptcy proceeding, which was set for that afternoon. MHT's and Holland's counsel did not respond to this request. Nor did MHT's and Holland's counsel respond to another phone call and another email from Plaintiffs' counsel that same day asking for the same basic information.

257.   Thus, as of the first-day hearing in the GWGH bankruptcy proceeding on the afternoon of April 21, Plaintiffs were still unaware that L Bond Management had been formed with the help of Holland & Knight, BEN's law firm, on April 11, 2022; that MHT—Holland's vehicle—had appointed Stahl to replace Holland and Turvey as Trust Advisor; that Stahl and the Delaware Trust had appointed L Bond Management as an "Agent" of the PCA Seller Fund Exchange Trusts and granted it a Power of Attorney to, among other things, intervene and participate in litigation on the Trusts' behalf; that L Bond Management had immediately hired Schmidt as its "Restructuring Advisor" and the Lynn Pinker firm as its litigation counsel; or that

80

L Bond Management had already filed a motion to intervene in the *Bayati* litigation that touted BEN's business plan and future prospects.

**The April 21, 2022 First-Day Hearing In GWGH's Bankruptcy Proceeding**

258. At the first-day hearing in GWGH's bankruptcy proceeding that afternoon, a lawyer from Holland & Knight appeared for BEN. He made a number of representations to the bankruptcy court, including the following:

- "My client [BEN] has a number of linkages with the debtors. We are -- among other things, we provide the operating services in the form of employees to service this debtors' business."

- "We were also a material shareholder, I think just under 20 percent of the GWG equity."

- "We also have an economic interest in the seller trust, something you're going to hear a whole lot more about. Counsel for Paul Capital alluded to those, but we have -- about $100 million of those bonds (indiscernible) in part, and we have an economic interest in that."

- "Judge Schmidt is now the CRO for an entity that holds the power of attorney on behalf of the trusts that own the L Bonds totaling about $350 million."

- "[W]e are not a debtor, but we are a -- the outcome for us is important to us, and it's important to this estate, and we intend to be a part of the solution here, hopefully putting a plan of reorganization that will facilitate our transactions and facilitate the monetization of the stock, public stock that will be generated by it, that will then have to be sold over time for the benefit of these constituents. The other alternative would be a litigation meltdown that's not going to generate anywhere close to the numbers that this transaction has the potential to generate."

259. Former Judge Schmidt also appeared at the first-day hearing. He, too, made a number of representations to the bankruptcy court, including the following:

81

- "I was the one who was hired to represent the entity that -- and to manage the entity that owns 22.5 percent of the L Bonds."

- "I've been involved for a couple of weeks. I had a chance to just look under the hood a bit, *but I've been actually employed as of a couple days ago*." (Emphasis added.)

- "[T]he value of Ben is a profound part of the likelihood that we will succeed in finding a substantial recovery for the L Bonds. As you've already heard about the transaction between Ben and the debtor, that Ben, as Mr. Bennett just spoke about, has an opportunity which it's trying to put to bed, which would go a long way to making this bankruptcy successful and protecting these bondholders, that it just seems to me that at this juncture it makes no sense other than to give that little bit of time to see if that does come to fruition . . . ."

- "I only was hired two days ago, I believe, and so I've not yet retained a lawyer. So I'm here --"

260. This last comment—that Schmidt had not yet retained a lawyer—is puzzling for two reasons. The first is that, two days earlier, on April 19, 2022, the Lynn Pinker firm had filed L Bond Management's motion to intervene in the *Bayati* litigation. Second, the same two Lynn Pinker lawyers who filed that motion to intervene filled out the bankruptcy court's on-line appearance form for the first-day hearing (though neither spoke at the hearing).

261. Notably, when the bankruptcy court asked Schmidt, "Who is your client?," Schmidt responded: "It's an entity -- I should know the name, of course, and of course, I don't have it right in front of me, but I think it's L Board [sic] Management, LLC." When the bankruptcy court asked Schmidt whether his client was "in any way an insider of the debtor or is it an independent owner," Schmidt

82

responded: "I don't believe that it's an insider of the debtor. I -- the client -- the individual that was running that entity before me is a doctor in Dallas, so I would have to get back to you (audio interference)." Finally, when asked by the bankruptcy court if he believed "your client is independent of management and independent of the other creditors in the case," Schmidt replied: "I believe I'm independent. There's no question that I am independent and I am running that management LLC."

262. Unlike Schmidt, Stahl did not appear at the GWGH first-day hearing. Stahl was not identified as the new successor Trust Advisor of the PCA Seller Fund Exchange Trusts (or any of the other Exchange Trusts for which he is now Trust Advisor). He was not identified as the Manager of L Bond Management. And no one explained to the bankruptcy court or anyone else who was listening that, ultimately, Schmidt serves at the pleasure of Stahl since, as noted above, Schmidt works for L Bond Management, and Stahl at any time and without notice can revoke L Bond Management's appointment as "Agent" of the PCA Seller Fund Exchange Trusts and its Power of Attorney. (Stahl, in turn, serves at the pleasure of MHT, Holland's vehicle, which still claims the power to remove and replace Stahl.)

**John Stahl And His Connections To Brad Heppner And BEN**

263. Meanwhile, on each of April 22, 23, and 24, 2022, Plaintiffs' counsel continued to request from MHT's and Holland's counsel the name of the new Trust

83

Advisor. MHT's and Holland's counsel finally disclosed Stahl's name on the night of April 25, 2022.

264. MHT's and Holland's reluctance to disclose Stahl as the successor Trust Advisor to Holland and Turvey is understandable, if not defensible. To put it mildly, Stahl's qualifications to manage and protect trusts holding what was once hundreds of millions of dollars of securities issued by a now-insolvent entity, and to maximize the value of those securities in the context of GWGH's bankruptcy, are not self-evident. On information and belief, Stahl is not a financial services or restructuring professional; rather, he is a practicing radiologist who lives and works in Greensboro, North Carolina. His principal qualification to manage BEN-related trusts appears to be that he and Brad Heppner were Lambda Chi Alpha fraternity brothers at Southern Methodist University back in the late 1980s, and they apparently have been friends ever since:

84



John Stahl,    Brad Heppner,

265. Recently, on April 19, 2022, Derek Fletcher, BEN's President and

Chief Fiduciary Officer, was quoted in a news article[4] as stating:

> "During 2019, BEN's customers were in need of an
> independent trustee to oversee their alternative asset trusts,
> and Dr. Stahl was identified as a qualified candidate
> during the recruitment process," Fletcher stated. "Prior to
> his appointment as an independent trustee, Dr. Stahl had

---

[4]    *See*    https://harveycountynow.com/all-news/beneficent-provides-more-information-about-teffi-fund-location.

85

no prior business dealings with Beneficient, its founders, affiliates or any of its employees."

266. Fletcher is also credited in the same article with stating that Stahl is independent of both BEN and GWGH, and owns no shares or interest in either company.

267. It is not clear what "recruitment process" was undertaken by BEN to identify appropriate independent trustees for its customers' alternative asset trusts, or *why* Stahl was chosen as a result of that process. What seems clear, however, is that BEN has *not* disclosed Stahl's *personal* connection to Heppner.

268. In this Court's April 28, 2022 telephonic status conference, counsel for MHT and Holland suggested that Plaintiffs' concerns about Stahl's appointment as the new Trust Advisor of the PCA Seller Fund Exchange Trusts were "overblown":

> So I think -- and perhaps this is also going to be useful for the plaintiff to the extent that they have questions about the new trust advisor's bio, his background, or how he was chosen -- they can refer to the discovery that they produced at PCA9046 which requests in 2019, Randall Schwed, the Paul Capital person who signed and verified their amended complaint, receiving that information and approving Mr. Stahl as a trust advisor for a different set of trusts.
>
> So I think, on the one hand, their claims that we're dumbfounded as to who this person is are kind of a little overblown.

269. This was misleading by omission. In late April 2019, Holland informed PCA that, though he would remain a Trust Advisor of the PCA Seller Fund Exchange

86

Trusts that held the GWGH L-Bonds and GWGH common stock that were supposed to be monetized for the benefit of the PCA Seller Funds, he could no longer serve as a Trust Advisor to certain BEN-related trusts *that did not hold any GWGH L-Bonds and GWGH stock for the ultimate benefit of Plaintiffs*. As to these latter trusts, Fletcher, then BEN's Chief Fiduciary Officer, identified Stahl as Holland's successor trustee, and he provided PCA with a brief, three-sentence description of Stahl, including that he is a radiologist. Fletcher did not disclose any personal connection between Stahl and Heppner and, because the trusts at issue *did not involve any trust property being held for the benefit of the PCA Seller Funds*, Plaintiffs consented to the change. Stahl's name never came up again. That is a far cry from "consenting" to Stahl as the successor Trust Advisor of the PCA Seller Fund Exchange Trusts, then or now.

270. On information and belief, Stahl is now the trustee or trust advisor to dozens of BEN-related trusts. These trusts are, as described in L Bond Management's Motion to Intervene in the *Bayati* litigation, "part of Ben's business plan to provide liquidity services to holders of alternative assets." On information and belief, several of these trusts borrowed $65 million from a GWGH subsidiary for the purpose of improving BEN's balance sheet, working capital, and liquidity profile, and thereby increase BEN's odds of obtaining a Texas or Kansas bank charter, which loan was then paid back with BEN equity interests. (On information

87

and belief, this was the same $65 million loan that, under the December 14, 2018 Amended Acknowledgment, triggered BEN's obligation to pay the remaining $25 million of the cash component of the GWGH Winning Bid, as described above in paragraphs 169-173.  As noted above, BEN did not make that payment until November 2019.)  Still others relate to BEN's plan to operate, though a subsidiary, as a Kansas-chartered "Technology-Enabled Fiduciary Financial Institution," or "TEFFI," which requires it to set aside 2.5% of each transaction for rural development.  Stahl is the trustee of the trusts responsible for distributing those proceeds to rural development funds.

271.  Since his appointment as successor Trust Advisor of the PCA Seller Fund Exchange Trusts, Stahl has not communicated, or attempted to communicate, with PCA.

## FIRST CAUSE OF ACTION

### (Removal and Replacement of Stahl as Trust Advisor, and Against BEN, MHT, and Delaware Trust as Necessary Parties)

272.  Plaintiffs repeat, re-allege, and incorporate by reference the above allegations as if fully set forth herein.

273.  Defendant Stahl is a Trust Advisor of the PCA Seller Fund Exchange Trusts, and thus an Exchange Trusts officeholder.

88

App. 1485

274.  Under 12 *Del. C.* § 3327, "the Court of Chancery may remove an officeholder *on the Court's own initiative or on petition of a* trustor, another officeholder, or *beneficiary*." (Emphasis added.)

275.  Though this Court does not need to ultimately determine whether Plaintiffs are beneficiaries to decide this First Cause of Auction, Plaintiffs are, in fact, beneficiaries of the PCA Seller Fund Exchange Trusts, and are accordingly authorized to seek the removal of the Trust Advisors under 12 *Del. C.* § 3327.

276.  The PCA Seller Funds have been, and remain, a direct recipient of Trust assets, including the cash component of the GWGH Winning Bid as well as interest payments on the GWGH L-Bonds held by the trusts.  From the outset of the Transactions, MHT committed in the September 1, 2017 Purchase and Sale Agreement to the PCA Seller Funds (referred to as the "Sellers") that "*each applicable Exchange Trust shall distribute to Sellers with respect to the Interests all undistributed Realized Consideration.*" (Emphasis added.)  Three months later, MHT reiterated this promise in the December 21, 2017 First Amendment to Purchase and Sale Agreement, clarifying that "*the Exchange Trusts shall only distribute cash*" *to the PCA Seller Funds*. (Emphasis added.)  Then, in their January 10, 2018 Trust Advisors-MHT Undertakings Letter, MHT, the Trust Advisors, and the Exchange Trusts each acknowledged the Exchange Trusts' obligation under the Purchase and Sale Agreement, as amended, that "*the Exchange Trusts shall only*

89

*distribute cash to the Sellers*, subject to certain limited exceptions in the event of a request from a Seller." (Emphasis added.)

277.  Moreover, in the Trust Advisors-MHT Undertakings Letter, the Trust Advisors expressly acknowledged that each of the PCA Seller Funds was "a designated third party beneficiary of the agreements, covenants and undertakings set forth herein and, accordingly, entitled to rely upon and enforce such agreements, covenants and undertakings." Finally, under the Transaction Documents, the PCA Seller Funds have a clear economic interest in, and right to, the monetization of the GWGH L-Bonds and common stock that still reside in the PCA Seller Fund Exchange Trusts.

278.  Whether this Court decides to act on its "own initiative" or based on Plaintiffs' petition, the result is the same: Multiple grounds exist for removing Stahl as Trust Advisor under 12 *Del. C.* § 3327.

279.  *First*, there has plainly been "[a] substantial change in circumstances" with respect to the PCA Seller Fund Exchange Trusts—over the last four years and within the last several weeks. *See* 12 *Del. C.* § 3327(3)(a).

280.  Over the last four years, the PCA Seller Fund Exchange Trusts that were originally intended to hold and promptly distribute cash shifted to holding mostly GWGH securities that were supposed to be promptly monetized. That prompt monetization never occurred and turned out to be utter stagnation, and that

90

utter stagnation has now been overtaken by GWGH's bankruptcy. The result of this sequence of events is that the PCA Seller Fund Exchange Trusts are now one of the largest creditors in GWGH's bankruptcy, yet the PCA Seller Fund Exchange Trusts are ultimately controlled by Holland who, in addition to being GWGH's Chairman, CEO, and President, also controls MHT, which still claims the power to appoint and remove the Trust Advisor(s) of the PCA Seller Fund Exchange Trusts.

281.    Just the last several weeks have seen equally seismic changes relating to the PCA Seller Fund Exchange Trusts. On April 18, 2019, after this lawsuit was commenced, Holland and Turvey resigned their positions as Trust Advisors—a tacit, albeit belated, admission that they were conflicted and unfit to do their jobs—in an attempt to moot Count I and avoid the expedited discovery that they were already resisting.    On April 19, 2022, MHT, Holland's vehicle, appointed Stahl as a successor Trust Advisor, yet inexplicably refused to identify him for the following six days. In the meantime, Stahl got to work setting up an opaque structure to stand behind. He became the Manager of L Bond Management, and entity formed as of April 11, 2022 with the assistance of Holland & Knight, which also happens to be BEN's law firm. L Bond Management, in turn, hired Richard Schmidt as Chief Restructuring officer, and Stahl and/or Schmidt then hired the Lynn Pinker firm to file L Bond Management's pro-GWGH, pro-BEN motion to intervene in the *Bayati* bondholder lawsuit, without identifying Stahl or the 24 intervenors themselves or

91

revealing that at least some of those intervenors—the PCA Seller Fund Exchange Trusts—are still indirectly controlled by Holland via MHT.

282.   *Second*, Stahl is plainly unfit and unable to properly administer the PCA Seller Fund Exchange Trusts, particularly now that GWGH is in bankruptcy. *See* 12 *Del. C.* § 3327(3)(b).

283.   The process by which Stahl was selected, and then his identity concealed, is tainted. MHT, Holland's vehicle, appointed Stahl, and both MHT and Holland are conflicted due to Holland's ties to GWGH and BEN. MHT and Holland then refused to identify him as he stood up an LLC, CRO, and law firm in front of himself, perhaps in recognition that he is both conflicted and unqualified.

284.   Not surprisingly, given that MHT and Holland are conflicted, Stahl is likewise conflicted. He is conflicted because he serves at the pleasure of MHT and Holland, since MHT still claims the power to remove him and appoint his replacement. He is conflicted because he has a longstanding personal connection to Heppner, his former fraternity brother who is now BEN's CEO, and because, apparently as a result of this connection to Heppner, he is already the trustee or a trust advisor to dozens of trusts that are integral to BEN's business plan. He is beholden to Heppner, BEN, and BEN's majority owner, GWGH. If there is any doubt about this, it was removed on April 19, 2022, when Stahl immediately became the Manager of a LLC that hired a CRO that hired a law firm that filed a pro-GWGH,

92

pro-BEN motion to intervene in a GWGH-related lawsuit—all on the same day. Stated bluntly, the well-orchestrated events of April 19, 2022, suggest that Stahl is just one ingredient in a fully-baked GWGH-and-BEN-driven plan to slow down this lawsuit, gain control of the *Bayati* litigation, and, most importantly, maintain control of GWGH's bankruptcy.

285. Stahl is unqualified because he does not appear to be a financial or securities professional or, more importantly in the context of GWGH's bankruptcy, a restructuring professional. Stahl is a practicing radiologist and, while that is a laudable profession, the PCA Seller Fund Exchange Trusts do not need a doctor, they need a financial and restructuring professional—an independent one who can analyze and execute the best path forward free of debilitating conflicts.

286. *Third*, although it is not a requirement for his removal, Stahl has already "committed a breach of trust." 12 *Del. C.* § 3327(1). Simply put, on the same day as his appointment, hiding behind his LLC, CRO, and law firm, he immediately cast his lot with BEN and GWGH, without consulting with the PCA Parties or even introducing himself. Doing so was flatly inconsistent with his duties of loyalty, care, and candor to the PCA Seller Fund Exchange Trusts.

287. For each of these reasons, Stahl is plainly unfit and unable to remain a Trust Advisor. He should be removed and replaced with a designee of PCA and the PCA Seller Funds.

93

288.  BEN and MHT are necessary parties to this First Cause Action, because each of them may assert a contractual right under the Exchange Trust Agreements to remove and/or appoint the Trust Advisors, and such interest may be affected by Plaintiffs' requested relief.  With respect to Delaware Trust, BEN, MHT, and the former Trust Advisors have asserted that Delaware Trust is a necessary party as the trustee of the PCA Seller Fund Exchange Trusts.

## SECOND CAUSE OF ACTION

### (Breach of Fiduciary Duties
### Against Holland and Turvey as Trust Advisors)

289.  Plaintiffs repeat, re-allege, and incorporate by reference the above allegations as if fully set forth herein.

290.  Defendants Holland and Turvey were Trust Advisors of the PCA Seller Fund Exchange Trusts.

291.  As Trust Advisors, Holland and Turvey owed fiduciary duties to the PCA Seller Fund Exchange Trusts and their beneficiaries, namely, the PCA Seller Funds.

292.  As stated above, Plaintiffs are beneficiaries of the PCA Seller Fund Exchange Trusts, and are accordingly authorized to seek damages against the former Trust Advisors under at least 12 *Del. C.* § 3582.

94

293. Under the Exchange Trust Agreements, the former Trust Advisors possessed the responsibility and authority to manage and direct the activities of the PCA Seller Fund Exchange Trusts.

294. Under Section III.B.7 of the Exchange Trust Agreements, the former Trust Advisors and the PCA Seller Fund Exchange Trusts were required to "take all steps necessary and advisable to commence and consummate the Auction [of the BEN MLP Units] as contemplated by the Transaction Agreement including, without limitation fully exercising the Protection Rights," or CVRs.

295. In the Trust Advisors-MHT Undertakings Letter, the former Trust Advisors promised Plaintiffs that they would "cooperate with MHT Financial to the full extent of the authority granted to each of us" to facilitate a refinancing or resale of the L-Bonds "such that the debt securities are reduced to cash for distribution to the Sellers as [of] the earliest practicable date during 2018." The former Trust Advisors also promised to do the same with respect to the sale of the GWGH common stock "in order to reduce such securities to cash at the earliest practicable date following the consummation of the transactions contemplated by the GWG[H] Bid."

296. Pursuant to their fiduciary duties, the former Trust Advisors were required to act in the best interests of the PCA Seller Fund Exchange Trusts and their

95

App. 1492

beneficiaries: the PCA Seller Funds (and not in the best interests of MHT, BEN, and/or GWGH).

297. Pursuant to their fiduciary duties, the Trust Advisors had among other things, an obligation to protect and enforce the rights of the PCA Seller Fund Exchange Trusts for the benefit of the PCA Seller Funds.

298. Finally, pursuant to their fiduciary duties, the Trust Advisors had a duty to inform the PCA Seller Funds of events that could, or did, harm the rights and interests of the PCA Seller Fund Exchange Trusts and, in turn, the PCA Parties.

299. Holland and/or Turvey breached their fiduciary duties to the PCA Seller Fund Exchange Trusts and, in turn, the PCA Seller Funds, by, among other things:

- failing to disclose MHT SPV's participation in the MEA, and that MHT SPV was the source of GWGH's irrevocable commitment to pay $150 million in cash, up front, to the PCA Seller Funds;

- agreeing, on behalf of the PCA Seller Fund Exchange Trusts, to delete MHT SPV as a party to the MEA and relieve GWGH from its obligation to make the $150 million up-front cash payment, without telling PCA or the PCA Seller Funds that they had done so;

- failing to enforce, or even attempt to enforce, the PCA Seller Fund Exchange Trusts' rights to the payment of $25 million when BEN received a $50 million advance from GWGH in June 2019;

- failing to enforce, or even attempt to enforce—against MHT, BEN, and/or GWGH—the PCA Seller Fund Exchange Trusts' rights under the MEA to a refinancing and/or resale of the L-Bonds and a resale of the GWGH common stock sitting dormant in the trusts;

- failing to protect the interests of the PCA Seller Fund Exchange Trusts when the GWGH winning bid failed to close by April 30, 2018, as

96

App. 1493

contemplated by the Transaction Documents and as promised by MHT, BEN, and GWGH;

- failing, along with GWGH, to enter into a proper Orderly Marketing Agreement with a major investment bank to sell the GWGH common stock, as required by the terms of the GWGH Winning Bid and the MEA;

- failing to enforce, or even attempting to enforce, the CVR Contract against BEN for the benefit of the PCA Seller Fund Exchange Trusts, which are express third-party beneficiaries of the CVR Contract; and

- in the case of Defendant Holland, signing the so-called Second Amendment to the CVR Contract on behalf of MHT (rather than seeking to enforce it) that purported to extinguish BEN's and MHT's obligations under and with respect to that Contract.

300.  Moreover, Holland did not fulfill his fiduciary duties to the PCA Seller Fund Exchange Trusts because he was hopelessly conflicted.  He failed to assert the PCA Seller Fund Exchange Trusts' rights against GWGH because he was also, and still is, the Chairman, President, and CEO of GWGH and, as such, owes duties to GWGH and its shareholders, who plainly have no interest in liquidating the L-Bonds and common stock in the PCA Seller Fund Exchange Trusts for the benefit of the PCA Seller Funds.

301.  Similarly, Holland failed to protect the PCA Seller Fund Exchange Trusts' interests against BEN—for example, by seeking to enforce the CVR Contract against BEN—because, among other things, BEN is now majority owned by GWGH.

97

302.  Finally, Holland failed to assert the PCA Seller Fund Exchange Trusts' rights with respect to MHT because he is still a principal of MHT, with a 30% membership interest in the company.

303.  Turvey was similarly conflicted.  On information and belief, he is a senior executive at BEN, so he could not protect the interests of the PCA Seller Fund Exchange Trusts or, in turn, the PCA Seller Funds, versus either BEN or its majority owner, GWGH.  Plainly, Turvey would not invoke the MEA against GWGH or BEN.  Just as plainly, he would not enforce the CVR Contract against BEN.

304.  Holland and Turvey should have acted in the best interests of the PCA Seller Fund Exchange Trusts, and maximized the value of the GWGH securities held by the PCA Seller Fund Exchange Trusts, and then liquidated those securities so that cash could be distributed to the PCA Seller Funds long before GWGH became financially distressed and ultimately filed for bankruptcy.

305.  As a direct and proximate result of the Trust Advisors' numerous breaches of their fiduciary duties, as well as their ongoing conflicts, the PCA Seller Fund Exchange Trusts and, in turn, the PCA Seller Funds, have suffered and will continue to suffer substantial damages for which they should be compensated.  Any and all conditions precedent to Plaintiffs seeking the relief requested herein have been performed or have occurred.

98

## THIRD CAUSE OF ACTION

### (Breach of the Trust Advisors-MHT Undertakings Letter
### Against Holland and Turvey as Trust Advisors)

306. Plaintiffs repeat, re-allege, and incorporate by reference the above allegations as if fully set forth herein.

307. Defendants Holland and Turvey, as former Trust Advisors, were parties to, and bound by, the Trust Advisors-MHT Undertakings Letter. Holland signed the Undertakings Letter as a Trust Advisor. Turvey became a party to, and bound by, the Trust Advisors-MHT Undertakings Letter when he replaced Jeffrey Hinkle as a Trust Advisor. MHT is also a signatory and party to the Letter.

308. In the Trust Advisors-MHT Undertakings Letter, the Trust Advisors and MHT expressly acknowledged that each of the PCA Seller Funds was "a designated third party beneficiary of the agreements, covenants and undertakings set forth herein and, accordingly, entitled to rely upon and enforce such agreements, covenants and undertakings."

309. In the Trust Advisors-MHT Undertakings Letter, the Trust Advisors and MHT also confirmed the Trust Advisors' obligations under Section III.B.7 of the PCA Seller Fund Exchange Agreements, which required the Trust Advisors "take all steps necessary and advisable to commence and consummate the Auction [of the BEN MLP Units] as contemplated by the Transaction Agreement including, without limitation fully exercising the Protection Rights," or CVRs.

99

310.  In the Trust Advisors-MHT Undertakings Letter, the Trust Advisors also promised, among other things, that, pursuant to Section III.B.7 of the Exchange Trust Agreements, they would "cooperate with MHT Financial to the full extent of the authority granted to each of us" to facilitate a refinancing or resale of the L-Bonds "such that the debt securities are reduced to cash for distribution to the Sellers as [of] the earliest practicable date during 2018." The Trust Advisors likewise promised to do the same with respect to the sale of the GWGH common stock "in order to reduce such securities to cash at the earliest practicable date following the consummation of the transactions contemplated by the GWG[H] Bid."

311.  Defendants Holland and Turvey have breached the Trust Advisors-MHT Undertakings Letter by, among other things:

- failing to "take all steps necessary and advisable to commence and consummate the Auction [of the BEN MLP Units] as contemplated by the Transaction Agreement including, without limitation fully exercising the Protection Rights," or CVRs;

- failing to "cooperate with MHT to the full extent of the authority granted to each of us" to facilitate a refinancing or resale of the L-Bonds "such that the debt securities are reduced to cash for distribution to the Sellers as [of] the earliest practicable date during 2018"; and

- failing to work with MHT to effectuate a sale of the GWGH common stock in the PCA Seller Fund Exchange Trusts "in order to reduce such securities to cash at the earliest practicable date following the consummation of the transactions contemplated by the GWG[H] Bid."

312.  As a direct and proximate result of these breaches of the Trust Advisors-MHT Undertakings Letter, the PCA Seller Funds have suffered and will

100

continue to suffer substantial damages. Any and all conditions precedent to Plaintiffs seeking the relief requested herein have been performed or have occurred.

## FOURTH CAUSE OF ACTION

### (Breach of the Exchange Trust Agreements
### Against Holland and Turvey as Trust Advisors, and
### Delaware Trust as a Necessary Party)

313. Plaintiffs repeat, re-allege, and incorporate by reference the above allegations as if fully set forth herein.

314. The Exchange Trust Agreements are valid and enforceable contracts.

315. Holland and Turvey are parties to the Exchange Trust Agreements and are the former Trust Advisors of the PCA Seller Fund Exchange Trusts.

316. The PCA Seller Funds are third-party beneficiaries of the Exchange Trust Agreements and have satisfied any and all of their obligations under the Exchange Trust Agreements. The parties to the Exchange Trust Agreement—MHT and the Trust Advisors—intended for the PCA Seller Funds to benefit from the Exchange Trust Agreements in satisfaction of their and other parties' obligations to the PCA Seller Funds under the Transaction Agreement and other Transaction Documents.

317. Thus, under the Exchange Trust Agreements, the Trust Advisors and the PCA Seller Fund Exchange Trusts themselves were required to "take all steps necessary and advisable to commence and consummate the Auction [of the BEN

101

MLP Units] as contemplated by the Transaction Agreement including, without limitation fully exercising the Protection Rights," in other words, the CVRs.

318.  In addition, under the Exchange Trust Agreements, the Trust Advisors and the Trusts were required "to take all steps necessary to distribute the Auction Consideration (including all proceeds received in connection with the Protection Rights)" to the Trusts' "Beneficiaries" (plural) until each received their total allocated share of the proceeds of the sale of the BEN MLP Units.  Consistent with this requirement, the Trusts have made cash and interest payments directly to the PCA Seller Funds.  Likewise, in the Trust Advisors-MHT Undertakings Letter, which post-dates the Exchange Trust Agreements, the Trust Advisors and the PCA Seller Fund Exchange Trusts (via the trustees) themselves acknowledged the PCA Seller Fund Exchange Trusts' obligation that *the Exchange Trusts shall only distribute cash to the Sellers*," in other words, the PCA Seller Funds.  (Emphasis added.)

319.  Holland and Turvey have breached the Exchange Trust Agreements by, among other things, failing to "take all steps necessary and advisable to commence and consummate the Auction [of the BEN MLP Units] as contemplated by the Transaction Agreement including, without limitation fully exercising the Protection Rights," or CVRs.

<div align="center">102</div>

320. As a direct and proximate result of these breaches of the Trust Advisors-MHT Undertakings Letter, the PCA Seller Funds have suffered and will continue to suffer substantial damages. Any and all conditions precedent to Plaintiffs seeking the relief requested herein have been performed or have occurred.

321. Additionally, Delaware Trust is named as a necessary party to this Third Cause of Action, BEN, MHT, and the former Trust Advisors have asserted that Delaware Trust is a necessary party as the trustee of the PCA Seller Fund Exchange Trusts.

## FIFTH CAUSE OF ACTION

### (Breach of the Transaction Agreement
### Against MHT and the BEN Transaction Agreement Parties)

322. Plaintiffs repeat, re-allege, and incorporate by reference the above allegations as if fully set forth herein.

323. The Transaction Agreement is a valid and enforceable contract.

324. PCA and the PCA Seller Funds, the BEN Transaction Agreement Parties, and MHT are all parties to the Transaction Agreement.

325. As noted above, the Transaction Agreement set forth that the PCA Fund Secondaries would be exchanged for the BEN MLP Units and the CVRs, and that the BEN MLP Units and CVRs "would be exchanged for *cash* through an Auction (as defined below)." (Emphasis added.) Consistent with this objective, in Section 1.1 of the Transaction Agreement, the parties defined the term "Auction

103

Consideration" to mean "the aggregate total *cash consideration* paid by the Auction Buyers for the Auction BEN Common Units [*i.e.,* the BEN MLP Units] pursuant to an Auction Purchase Agreement." (Emphasis added.)

326.  In Section 5.5.1 of the Transaction Agreement, MHT and the BEN Transaction Agreement Parties agreed to conduct the Auction of the BEN MLP Units for the benefit of the PCA Seller Funds, and to take "any reasonable actions reasonably necessary" to complete the Auction by April 30, 2018.

327.    In Section 5.2 of the Transaction Agreement, MHT and the BEN Transaction Agreement Parties promised more broadly to "use commercially reasonable efforts" and to cooperate with each other "to do, or cause to be done, all things necessary, proper or advisable, consistent with applicable law to consummate and make effective the transactions contemplated by this Agreement."

328.    Similarly, in Section 5.2 of the Transaction Agreement, MHT and the BEN Transaction Agreement Parties promised to "use commercially reasonable efforts" and to cooperate with each other "to do, or cause to be done, all things necessary, proper or advisable, consistent with applicable law to consummate and make effective the transactions contemplated by this Agreement, including the transactions contemplated under Exhibit A," which made clear that the PCA Seller Funds were "entitle[d] . . . to proceeds from the sale of the BEN Common Units held by the Exchange Trusts."

104

329.    MHT and the BEN Transaction Agreement Parties breached the Transaction Agreement by failing to take "any reasonable actions reasonably necessary" to complete the Auction by April 30, 2018. Almost four years later, the Auction is still not complete in that the PCA Seller Funds still have not received all of the cash Auction Consideration to which they are entitled.

330.    MHT and the BEN Transaction Agreement Parties have further breached the Transaction Agreement by failing to "use commercially reasonable efforts" to consummate and make effective the Transactions contemplated by the Transaction Agreement, in particular, to provide the PCA Seller Funds with the cash consideration for the PCA Secondaries to which the Funds are entitled and also to enforce the CVR Contract for the benefit of the PCA Seller Fund Exchange Trusts (and, ultimately, the PCA Seller Funds as the beneficiaries thereof) as a result of the occurrence of a Distribution Trigger Event.

331.    These breaches are material because they have deprived PCA and the PCA Seller Funds of the benefit of their bargain—namely, the receipt of hundreds of millions of dollars in cash consideration for the PCA Fund Secondaries that were transferred to BEN. By providing the PCA Fund Secondaries to MHT and, in turn, BEN, Plaintiffs have fully complied with their obligations under the Transaction Agreement. MHT and BEN have not.

105

App. 1502

332. As a direct and proximate result of these breaches of the Transaction Agreement, the PCA Seller Funds have suffered and will continue to suffer substantial damages. Any and all conditions precedent to Plaintiffs seeking the relief requested herein have been performed or have occurred.

## SIXTH CAUSE OF ACTION

### (Promissory Estoppel Against MHT, the BEN Transaction Agreement Parties, and Holland as Trust Advisor)

333. Plaintiffs repeat, re-allege, and incorporate by reference the above allegations as if fully set forth herein.

334. MHT, the BEN Transaction Agreement Parties, and Holland made numerous promises and representations to Plaintiffs in order to induce Plaintiffs to accept GWGH's Winning Bid, which only had a relatively small cash component.

335. Plaintiffs reasonably relied upon these promises and representations in deciding to accept GWGH's not-entirely-cash bid.

336. For example, on December 23, 2017, Holland emailed Plaintiffs, attaching the GWGH Winning Bid Notice. In that Notice, Holland, on behalf of MHT, made the following promises and representations to induce Plaintiffs to accept GWGH's bid:

- GWGH would make an up-front cash payment of $150 million;

- GWGH "is *obligated* to seek to refinance its debt with a more favorable credit facility and/or institutional note within 12 months following issuance" (emphasis added);

106

App. 1503

- "A nationally recognized bank, such as Credit Suisse, *will be engaged* to sell the stock in an orderly manner through one or a series of transactions in 2018, delivering cash proceeds for the sellers" (emphasis added); and

- "Closing is expected to be *on or prior to* April 30, 2018" (emphasis added).

337.    These promises and representations were "highlighted" as a "few of the key material terms of the Winning Bid."

338.    On information and belief, MHT has failed to fulfill any of these promises.

339.    Plaintiffs would not have accepted GWGH's bid in the absence of the promises and representations that MHT made in the Winning Bid Notice.

340.    MHT's failure to honor its representations and promises in the Winning Bid Notice has caused Plaintiffs harm.

341.    Similarly, in the January 5, 2018 BEN Due Diligence Package, the BEN Transaction Agreement Parties, in response to numerous questions and concerns from Plaintiffs, made promises and representations to Plaintiffs. The BEN Transaction Agreement Parties made those promises and representations in order to induce Plaintiffs to accept GWGH's bid, and reasonably expected that those promises and representations would induce Plaintiffs to accept GWGH's bid.

342.    Plaintiffs reasonably relied upon these promises and representations of the BEN Transaction Agreement Parties in deciding to accept GWGH's bid.

107

343.    The promises and representations in the BEN Due Diligence Package that Plaintiffs reasonably relied upon included:

- that GWGH had "obligations" to refinance the GWGH L-Bonds within 12 months of the closing of the Auction of the BEN MLP Units, and that "GWG[H]'s financial models reflect the refinancing occurring no later than October 2018";

- that the Trust Advisors of the PCA Seller Fund Exchange Trusts were similarly "*obligated* to reduce the L-Bonds to cash and distribute cash proceeds *as quickly as practicable*" (emphasis added);

- that GWGH and the Trust Advisors, for the benefit of the PCA Seller Fund Exchange Trusts, would agree to negotiate in good faith the terms of an Orderly Marketing Agreement with a major investment bank for the orderly marketing and resale of the GWGH common stock; and

- the GWGH "shares *will be sold* following the expiration of that [six-month] lock-up per the terms of an orderly marketing agreement" (emphasis added).

344.    On information and belief, the BEN Transaction Agreement Parties have failed to fulfill any of these promises and representations.

345.    Plaintiffs would not have accepted GWGH's bid in the absence of the promises and representations that the BEN Transaction Agreement Parties made in the BEN Due Diligence Package.

346.    The BEN Transaction Agreement Parties' failure to honor its representations and promises in the BEN Due Diligence Package has caused Plaintiffs harm.

347.    In addition, on January 10, 2018, GWGH provided the GWGH Comfort Letter to the BEN, MHT, and the PCA Seller Fund Exchange Trusts. MHT

108

App. 1505

and BEN then forwarded a copy of the GWGH Comfort Letter to Plaintiffs. They did so to further induce PCA and the PCA Seller Funds to accept the GWGH Winning Bid, and reasonably expected that those promises and representations would induce Plaintiffs to accept GWGH's bid.

348.    In the GWGH Comfort Letter, GWGH made the following promises and representations:

- GWGH represented that GWGH had on hand the $150 million cash component of the GWGH Winning Bid, and that it was "financed via a fully committed and contractual purchase of GWG[H] securities";

- GWGH represented that, "as of December 31, 2017 GWG[H] had $143 million of cash and cash equivalents on hand, with $223 million drawn on our $300 million senior credit facility, and the modeled cash flow from our portfolio of life insurance assets in 2018 is approximately $105 million"; and

- GWGH represented that "[w]e do not anticipate the Cash Consideration having a negative impact on our ability to make our contractual payments over the next 18 months."

349.    On information and belief, these representations and promises by GWGH—which Plaintiffs reasonably relied upon in accepting GWGH's bid—were never fulfilled.

350.    Plaintiffs would not have accepted GWGH's bid in the absence of the promises and representations that GWGH made in the GWGH Comfort Letter that was forwarded by MHT and BEN.

109

351.    Furthermore, on January 10, 2018, GWGH provided the GWGH Undertakings Letter to BEN, MHT, and the PCA Seller Fund Exchange Trusts. MHT and BEN then forwarded a copy of the GWGH Undertakings Letter to Plaintiffs. MHT and BEN did so to further induce PCA and the PCA Seller Funds to accept the GWGH Winning Bid, and reasonably expected that those promises and representations would induce Plaintiffs to accept GWGH's bid.

352.    In the GWGH Undertakings Letter, GWGH promised that it would use "commercially reasonable efforts to effect expeditiously following the Closing" of a "Master Exchange Agreement" between GWGH, MHT, BEN and the PCA Seller Fund Exchange Trusts—"the refinancing in full of the aggregate principal amount outstanding of the GWG[H] L Bonds issued to each of the Seller Trusts" and/or to otherwise cooperate with a resale of the L-Bonds. This promise was never fulfilled.

353.    Plaintiffs would not have accepted GWGH's bid in the absence of the promises and representations that GWGH made in the GWG Undertakings Letter, which was forwarded to them by MHT and BEN.

354.    As a direct and proximate result of these failed promises by MHT, the BEN Transaction Agreement Parties, and Holland, the PCA Seller Funds have suffered and will continue to suffer substantial damages. This injustice can only be

110

avoided by enforcing MHT's, the BEN Transaction Agreement Parties', and Holland's promises to Plaintiffs.

## SEVENTH CAUSE OF ACTION

### (Breach of the CVR Contract Against the BEN CVR Parties)

355.    Plaintiffs repeat, re-allege, and incorporate by reference the above allegations as if fully set forth herein.

356.    The CVR Contract is a valid and enforceable contract.

357.    The PCA Seller Funds are third-party beneficiaries of the CVR Contract and have satisfied any and all of their obligations under the CVR Contract. MHT and the BEN CVR Parties executed the CVR Contract for the benefit of the PCA Seller Funds. Section 4.9 of the CVR Contract states that the PCA Seller Fund Exchange Trusts are "an intended third party beneficiary of this Agreement." The PCA Seller Funds themselves, in turn, are beneficiaries of the PCA Seller Fund Exchange Trusts. Indeed, the whole purpose of the CVR Contract was to protect the PCA Seller Funds if the Auction of the BEN MLP Units failed to occur or failed to generate at least $500 million in net cash proceeds. In such an event (which is where the parties are now), the BEN CVR Parties would be required to make up any shortfall in the consideration by contributing additional BEN MLP Units and/or cash to the PCA Seller Fund Exchange Trusts.

111

358.    Under the CVR Contract, the BEN CVR Parties were required to file a Registration Statement for an initial public listing of the BEN MLP Units within 24 months of the "Auction Closing Date." Under the parties' agreements, the "Auction Closing Date" was deemed to be December 23, 2017. Thus, BEN was required to file a Registration Statement for the initial listing of the BEN MLP Units by December 23, 2019.

359.    The BEN CVR Parties failed to file a Registration Statement for the initial listing of the BEN MLP Units by December 23, 2019.

360.    The BEN CVR Parties' failure to file its Registration Statement by December 23, 2019 was a "Distribution Trigger Event" under Section 2.3 of the CVR Contract.

361.    Because there was a Distribution Trigger Event under Section 2.3 of the CVR Contract, certain of the BEN CVR Parties were required by that same provision to use "Available Cash" to, among other things, make quarterly distributions to the PCA Seller Fund Exchange Trusts.

362.    These quarterly distributions were required to be made until the "Shortfall ET Amounts" are eliminated. Under the CVR Contract, the time period in which the distributions are required is called the "Mandatory Distribution Period."

363.    Under the CVR Contract, the "Shortfall ET Amount" for each PCA Seller Fund Exchange Trust is the amount by which the "Net Auction Consideration"

112

paid to that exchange trust is less than the "Adjusted Final NAV" for such exchange trust. Thus, the aggregate Shortfall ET Amount for all the PCA Seller Fund Exchange Trusts is the amount by which the Net Auction Consideration paid to all of the PCA Seller Fund Exchange Trusts is less than their Adjusted Final NAV of $500 million.

364.    In the August 10, 2018 Auction Closing Date Acknowledgment, the parties to the Transaction Document "acknowledged and agreed" that "Net Auction Consideration shall for all purposes be deemed to include all Auction Consideration received by" the PCA Seller Fund Exchange Trusts.

365.    The term "Auction Consideration" is not defined in the Auction Closing Date Acknowledgment. According to that Acknowledgment, capitalized terms not defined therein have the meaning prescribed to them in the Transaction Agreement, which defines "Auction Consideration" as "the aggregate total *cash* consideration paid by the Auction Buyers for the Auction BEN Common Units pursuant to an Auction Purchase Agreement." (Emphasis added.)

366.    Accordingly, the aggregate Shortfall ET Amount for all of the PCA Seller Fund Exchange Trusts is $350 million—the difference between the $150 million in cash that the PCA Seller Fund Exchange Trusts ultimately received from the BEN CVR Parties and their Adjusted Final NAV of $500 million.

113

367.    In addition, because there has been a Distribution Trigger Event (*i.e.*, because of the BEN CVR Parties' failure to file its Registration Statement by December 23, 2019), BEN is obligated under the CVR Contract to "promptly provide on a quarterly basis a summary report setting out the calculation of Available Cash for such quarter to MHT, which shall promptly provide a copy of such report to all of the beneficiaries of the Exchange Trusts."

368.    The BEN CVR Parties have breached the CVR Contract by:

- failing to make any quarterly distributions of Available Cash to the PCA Seller Fund Exchange Trusts in order to reduce the aggregate Shortfall ET Amount; and

- failing to provide MHT with any quarterly Available Cash reports. As a result, MHT has failed to provide copies of any such reports to the beneficiaries of the PCA Seller Fund Exchange Trusts (*i.e.*, the PCA Seller Funds).

369.    In addition to the requirements set forth above, the CVR Contract imposes business limitations on the BEN CVR Parties during a Mandatory Distribution Period. Specifically, Section 2.2 provides that, during a Mandatory Distribution Period, BEN and its subsidiaries shall (1) cease to finance or otherwise acquire future private equity or other alternative asset loans unless such loan was agreed upon in writing prior to the commencement of the Mandatory Distribution Period; and (2) use all commercially reasonable efforts to satisfy Section 2.3's requirement that it use Available Cash to, among other things, eliminate the Shortfall ET Amounts.

114

370.    Finally, the last sentence of Section 2.1 of the CVR Contract provides that, until BEN has satisfied its obligations under Articles I, II, and III of the CVR Contract (which includes, among other things, quarterly payments of Available Cash to eliminate the Shortfall ET Amounts), BEN's general partner agrees not to authorize distributions by BEN to its partners except in certain limited circumstances.

371.    On information and belief, the BEN CVR Parties have violated one or more of these CVR Contract Mandatory Distribution Period business restrictions and continues to do so.

372.    The BEN CVR Parties' breach is material. Having a mechanism in place for PCA and the PCA Seller Funds to be compensated—in cash—for any shortfall with respect to at least $500 million in total cash consideration was a key part of the bargain the parties struck in the Transaction Documents and, in particular, the CVR Contract.

373.    By transferring the PCA Fund Secondaries to MHT and, in turn, BEN, PCA and the PCA Seller Funds have fully performed their end of the overall bargain.

374.    As a direct and proximate result of the BEN CVR Parties' breaches of the CVR Contract, PCA and the PCA Seller Funds have suffered and will continue

115

to suffer substantial damages. Any and all conditions precedent to Plaintiffs seeking the relief requested herein have been performed or have occurred.

## EIGHTH CAUSE OF ACTION

**(Fraud/Fraudulent Inducement/Equitable Fraud Regarding "Second Amendment to the CVR Contract" Against MHT and the BEN CVR Parties)**

375. Plaintiffs repeat, re-allege, and incorporate by reference the above allegations as if fully set forth herein.

376. As noted above, instead of honoring the PCA Parties' rights under the CVR Contract, MHT, the BEN CVR Parties, and Holland, with help from Heppner and others at BEN, attempted to extinguish those rights by knowingly and falsely inducing the PCA Parties' representative on BEN's board to sign the Second Amendment to the CVR Contract.

377. In early March 2020, the PCA Parties' representative on BEN's board discussed the CVR Contract with other BEN directors and a BEN lawyer. The discussion included the PCA Parties' position that a "Distribution Trigger Event" had occurred because BEN had failed to file a Registration Statement for the listing of the BEN MLP Units within two years of the parties' agreed upon Auction Closing Date.

378. On May 8, 2020, the PCA Parties' counsel sent letters regarding the CVR Contract to MHT (specifically, to the attention of Holland) and BEN (to the attention of Heppner). In addition, the PCA Parties' counsel sent a copy of the BEN

116

letter to the BEN lawyer who had participated in the above-mentioned March 2019 discussions regarding the CVR contract. In each letter, the PCA Parties' counsel formally notified MHT (via Holland) and BEN (via Heppner) that a Distribution Trigger Event had occurred under the CVR Contract, and inquired of both MHT and BEN regarding whether, and to what extent, BEN was complying with its resulting obligations under the CVR Contract.

379. On May 12, 2020, another BEN lawyer sent a letter to counsel for the PCA Parties indicating that BEN was reviewing the latter's May 8, 2020 letter regarding the CVR Contract and BEN would be in touch soon. The BEN lawyer who wrote this letter copied both Heppner and the BEN lawyer who was involved in the March 2019 discussions regarding the CVR Contract.

380. Just three days later, on May 15, 2020, the BEN lawyer who participated in the March 2019 discussions regarding the CVR Contract, and who was copied on the legal correspondence regarding the CVR Contract in early May 2020, asked the PCA Parties' BEN board representative to sign a purported "Second Amendment to the CVR Contract." The lawyer for BEN told the PCA Parties' representative that the purported amendment had already been ███████████ ████████████████████████████ and ███████████ ███████ ; that the purported amendment █████████████ ████████████████████████████████████████

███████ ; and that one of those Acknowledgements was ████████████

(Emphasis added.) The BEN lawyer gave the PCA Parties' representative the impression that the representative's signature on the amendment was simply a ministerial act and that all the relevant parties, including PCA itself, already had approved the terms of the amendment.

381. The BEN lawyer wrongly described the legal effect of the "Acknowledgments" on the CVR Contract, and did not notify or copy the PCA Parties' counsel regarding his request that the PCA Parties' representative sign the purported amendment to the CVR Contract, even though he knew from the prior correspondence that the PCA Parties were represented by counsel who had just put MHT and BEN on formal notice that a Distribution Trigger Event had occurred under the terms of the CVR Contract.

382. The Second Amendment to the CVR Contract that the lawyer for BEN sent to the PCA Parties' representative on May 15, 2020 was dated "effective as of December 28, 2019." It was already signed by both the BEN CVR Parties (by Heppner, among others) and by MHT (by Holland as an "Authorized Signatory"), although the document did not disclose *when* these parties signed it. ████████

████████████████████████

████████████████████████ The only missing signature was the PCA Parties' representative's, who was being asked

118

to sign ███████████████████████████████████████████

████████████

383. A Recital in this "Second Amendment to the CVR Contract" stated that MHT, BEN, Defendant Holland (as Trust Advisor to the PCA Seller Fund Exchange Trusts), and PCA (on behalf of itself and the PCA Parties) had each "entered into certain acknowledgments, each effective as of August 10, 2018 (collectively, the 'Acknowledgements'), that supplement[ed] and modif[ied] certain terms of the Transaction Agreement and related documents," but the Recital did not describe *how* the Acknowledgements had done so.

384. Another Recital in this purported Second Amendment to the CVR Contract stated that MHT and BEN desired to amend the CVR Contract between them, purportedly to "reflect the supplements and modifications set forth in the Acknowledgments and to conform the [CVR] Agreement to the terms in the Transaction Agreement as supplemented and modified by such Acknowledgements."

385. This was a knowingly false misrepresentation orchestrated by the BEN CVR Parties and designed to induce the PCA Parties' representative on BEN's board to sign the Second Amendment to the CVR Contract. In reality, the Second Amendment to the CVR Contract did no such thing. Contrary to MHT and BEN's contractual representations, the Second Amendment to the CVR Contract sought to

119

substantially alter and effectively extinguish the PCA Parties' rights under the Transaction Documents, particularly the CVR Contract.

386.   Specifically, the Second Amendment to the CVR Contract changed the CVR Contract's definition of "Net Auction Consideration" by, among other things, removing from the definition a clause stating that, "for purposes of the 'Shortfall ET Amount' under Article I and Article II, 'Net Auction Consideration' shall only include, as of any determination date, Auction Consideration received by MHT (or the Exchange Trusts) in the form of cash and cash equivalents on or prior to such determination date."

387.   Before this change, the Shortfall ET Amount under the relevant agreements was at least $350 million, since the aggregate NAV of the PCA Seller Fund Exchange Trusts was $500 million and the Exchange Trusts still had only received $150 million in cash or cash equivalents. As noted above, in this scenario, BEN is required to use "Available Cash" to reduce and, ultimately, eliminate the shortfall, and is subject to reporting obligations and business activity restrictions until it does so. In addition, MHT is required, for the benefit of the PCA Seller Fund Exchange Trusts and, in turn, the PCA Parties, to make sure that BEN honored these obligations. At bottom, BEN was obligated to ensure that the PCA Seller Funds would ultimately receive $500 million in *cash* from the PCA Seller Fund Exchange Trusts. That is the obligation BEN, and its cohorts, purported to eliminate.

120

388. MHT and the BEN CVR Parties knew that the Second Amendment to the CVR Contract did not "reflect the supplements and modifications set forth in the Acknowledgments and to conform the [CVR] Agreement to the terms in the Transaction Agreement as supplemented and modified by such Acknowledgements." Rather, as explained above, it was designed to extinguish the PCA Parties' rights under the CVR Contract by altering the CVR's Contract's definition of "Net Auction Consideration" such that the "cash or cash equivalent requirement" was removed.

389. MHT's and the BEN CVR Parties' false statement was intended to induce the PCA Parties' representative on BEN's board to sign the Second Amendment to the CVR Contract. By doing so, MHT and the BEN CVR Parties unilaterally, and self-servingly, changed the CVR Contract's definition of "Net Auction Consideration." Both now claim that, under the new definition, the Shortfall ET Amount is zero on the ground that, because there is no longer a "cash or cash equivalent requirement," the Net Auction Consideration includes the $350 million worth of GWGH common stock and GWGH L-Bonds that remain in the PCA Seller Fund Exchange Trusts. In this scenario, MHT and the BEN CVR Parties claim that BEN no longer has any obligations under the CVR Contract to reduce and ultimately eliminate the shortfall, and that MHT therefore has nothing to enforce.

121

390.   In short, by the so-called "Second Amendment to the CVR Contract," the BEN CVR Parties and MHT sought to extinguish the PCA Parties' rights as third-party beneficiaries of the CVR Contract and related agreements by providing false and misleading statements to induce the PCA Parties' BEN board representative to enter into a damaging agreement. MHT did this notwithstanding its own obligation to enforce the CVR Contract for the benefit of the PCA Seller Funds, and Defendant Holland signed the purported amendment for MHT even though, as Trust Advisor, he owes fiduciary duties to the PCA Seller Fund Exchange Trusts and, in turn, the PCA Seller Funds themselves.

391.   The PCA Parties' BEN board representative reasonably relied on MHT and BEN's representations regarding the Second Amendment to the CVR Contract. At the request of the BEN lawyer, and based on the representations he made, the PCA Parties' board representative, a BEN director, signed the Second Amendment to the CVR Contract on May 15, 2020. When he did so, because he had been misled by representatives of BEN, he had no idea that the amendment effectively eliminated the PCA Parties' rights with respect to the CVR Contract and related agreements. Accordingly, the PCA Parties' representative's "consent" to the amendment was fraudulently induced. Neither the PCA Parties nor their designated representative on the BEN board ever intend to waive their rights under the CVR

122

Contract and related agreements, and the so-called "Second Amendment to the CVR Contract" does not, and cannot, extinguish them.

392.    As a result of MHT's and the BEN CVR Parties' fraud, PCA and the PCA Seller Funds have suffered and will continue to suffer substantial damages and will be deprived of substantial benefits to which they otherwise would be entitled under the CVR Contract. Accordingly, PCA and the PCA Seller Funds seek monetary relief, rescission of the "Second Amendment to the CVR Contract," and/or a determination that the "Second Amendment to the CVR Contract" is invalid, inoperative, and unenforceable as a product of MHT and BEN's fraudulent conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgement in their favor and against Defendants and:

1.    Remove John A. Stahl as Trust Advisor;

2.    Enter an Order that, in view of the circumstances, equity requires that the Plaintiffs be authorized to remove and appoint, within their sole discretion, the successor trust advisors for each exchange trust, and any and all future trust advisors thereto;

3.    Award Plaintiffs damages in an amount to be proven at trial;

123

4.  Enter an order granting rescission of the "Second Amendment to the CVR Contract," or holding that the "Second Amendment to the CVR Contract" is otherwise invalid, inoperative, and/or unenforceable;

5.  Award costs and expenses incurred by Plaintiffs in connection with this action; and

6.  Award Plaintiffs such other relief as this Court deems just and equitable under the circumstances.

ROSS ARONSTAM & MORITZ LLP

*Of Counsel:*

John F. Hartmann, P.C.
Ravi Subramanian Shankar
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois 60654
(312) 862-2000

/s/ *David E. Ross*
David E. Ross (Bar No. 5228)
Eric D. Selden (Bar No. 4911)
A. Gage Whirley (Bar No. 6707)
Hercules Building
1313 North Market Street, Suite 1001
Wilmington, Delaware 19801
(302) 576-1600

*Attorneys for Plaintiffs Paul Capital Advisors, L.L.C., Paul Capital Partners VIII-A, L.P., Paul Capital Partners VIII-B, L.P., Paul Capital Partners VIII-C, L.P., Paul Capital Partners VIII Holdings, Paul Capital Partners IX, L.P., and Paul Capital Town Street Partners, L.P.*

May 6, 2022
**PUBLIC VERSION FILED:**
May 13, 2022

124

App. 1521

## CERTIFICATE OF SERVICE

I, David E. Ross, hereby certify that on May 13, 2022, I caused a true and correct copy of the *PUBLIC VERSION Verified Second Amended Complaint* to be served on the following counsel of record via File & Serve*Xpress*:

Norman M. Powell
Emily V. Burton
Lauren Dunkle Fortunato
Michael E. Neminski
YOUNG CONAWAY STARGATT
 & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801

Stephen C. Norman
Ellis H. Huff
POTTER ANDERSON
 & CORROON LLP
1313 North Market Street
Hercules Plaza, 6th Floor
Wilmington, Delaware 19801

*/s/ David E. Ross*
David E. Ross (Bar No. 5228)

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, DC 20549**

## FORM 8-K/A

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d)**
**of the Securities Exchange Act of 1934**

**Date of Report (date of earliest event reported): March 6, 2021**

# GWG Holdings, Inc.

**(Exact name of registrant as specified in its charter)**

**Commission File Number: 001-36615**

| **Delaware** | **26-2222607** |
|---|---|
| **(State or other jurisdiction of incorporation)** | **(IRS Employer Identification No.)** |

**325 North St. Paul Street, Suite 2650, Dallas, TX 75201**
**(Address of principal executive offices, including zip code)**

**(612) 746-1944**
**(Registrant's telephone number, including area code)**

**Not Applicable**
**(Former name or former address, if changed since last report)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock | GWGHQ | * |

\* On May 18, 2022, Nasdaq Stock Market LLC filed a Form 25 delisting and deregistering the shares of common stock, par value $0.001 per share, of GWG Holdings, Inc. from The Nasdaq Stock Market, which became effective ten days after the filing of the Form 25. GWG Holdings, Inc.'s common stock began trading exclusively on the over-the-counter market on April 29, 2022 under the symbol GWGHQ.

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

This Current Report on Form 8-K/A is filed to amend certain disclosures reported under Item 5.02 of the Current Report on Form 8-K, dated March 6, 2021 and filed with the SEC on March 11, 2021 (the "Original 8-K"), as set forth below and file exhibits which were incorrectly omitted from the Original 8-K.

**Item 5.02**          **Departure of Directors or Certain Officers; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers**

On March 11, 2021, GWG Holdings, Inc. (the "Company") filed the Original 8-K to report, among other matters, the resignations of Roy W. Bailey, Daniel P. Fine, and Jeffrey N. MacDowell as directors of the Company (the "Resigning Directors"). The Original 8-K incorrectly stated that the resignations were not due to any disagreement with the Company.

The Resigning Directors resigned from the Board of Directors (the "2021 Board") of the Company on March 6, 2021. The 2021 Board consisted of Brad Heppner, Peter T. Cangany, David F. Chavenson, David H. de Weese, Thomas O. Hicks, Dennis P. Lockhart, Bruce W. Schnitzer, and the Resigning Directors. Each of the Resigning Directors had been the members of a Special Committee of the Board (the "2021 Special Committee"), which was formed by the 2021 Board to review and approve or reject potential transactions with The Beneficient Company Group, L.P. and its subsidiaries and affiliates (collectively, "Ben"), a consolidated subsidiary of the Company as of March 31, 2021. Mr. Bailey resigned from the Audit Committee of the 2021 Board on March 2, 2021.

In recent days and subsequent to the filing of the Original 8-K, the Investigations Committee of the current Board of Directors (the "Investigations Committee"), which consists of Jeffrey S. Stein and Anthony R. Horton, informed the current Board of Directors (the "Current Board"), which consists of Murray Holland, Timothy Evans, Jeffrey S. Stein, Anthony R. Horton, David F. Chavenson, and David H. de Weese, of certain information, which after review and consideration has led the Current Board to determine and conclude that the resignations provided by the Resigning Directors resulted from disagreements with the Company relating to certain operations, policies and practices of the Company. Specifically, the Investigations Committee informed the Current Board that, at the time of the resignations, the Resigning Directors had objected to certain terms and parameters of a proposed investment the Company was considering in a Preferred Series C Unit Account of Ben (the "Ben Investment"), and certain other related matters, which had been submitted to the 2021 Special Committee for review and approval pursuant to the 2021 Board's Resolutions delegating the 2021 Board's authority with respect to proposed transactions with Ben to the 2021 Special Committee. Prior to their resignations, the Resigning Directors made their objection to the Ben Investment known to the Chief Executive Officer and the Chief Financial Officer of the Company through written and oral communication. The Investigations Committee further informed the Current Board that, after the objections of the Resigning Directors to the Ben Investment were made known to the Company, on March 3, 2021, the then-Chairman of the 2021 Board called for a Special Meeting of the 2021 Board to consider certain "urgent" matters concerning the Company's "funding of Ben." The Investigations Committee further informed the Current Board that, at a March 4, 2021 Special Meeting of the 2021 Board, while the disagreements concerning the Ben Investment remained unresolved (a fact that may not have been known to the full 2021 Board), the 2021 Board voted to dissolve the 2021 Special Committee and voted to confirm that the Ben Investment could be made without Special Committee approval. The Current Board has determined and concluded that these disagreements caused, in whole or in part, the Resigning Directors' resignations on March 6, 2021. At the time of the Resigning Directors' resignations, the disagreements remained outstanding, which was known to, at least, the Chief Executive Officer of the Company. Based on these recent determinations of the Current Board, the Company has decided to file this Form 8-K/A.

Exhibit 99.1 consists of the written resignation letters, delivered by the Resigning Directors on March 6, 2021, to the then-Chairman of the 2021 Board and the Chief Executive Officer of the Company. Exhibit 99.2 consists of (a) certain correspondence, dated March 9, 2021, from the Company's Chief Executive Officer and sent to the Resigning Directors via electronic mail, previewing certain language proposed to be included in the Original 8-K regarding the circumstances of the resignations of the Resigning Directors, and (b) subsequent correspondence from Mr. Fine, dated March 10, 2022 and sent via electronic mail to the Company's Chief Executive Officer on behalf of himself and the other Resigning Directors, whereby the Resigning Directors informed the Chief Executive Officer they declined to advise the Company on the proposed disclosure or any disclosure obligations with respect to the circumstances of their resignations.

App. 1524

Except as otherwise reported in this Current Report on Form 8-K/A, the other disclosures in the Original 8-K remain unchanged.

**Item 9.01**    **Financial Statements and Exhibits**

99.1    Director Resignation Letters

99.2    Subsequent Director Correspondence

104    Cover page Interactive data file (embedded with in the inline XBRL document)

**SIGNATURES**

   Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

<div align="center">

**GWG HOLDINGS, INC.**

</div>

Date: November 14, 2022

By:     /s/ *Jeffrey S. Stein*
Name:    Jeffrey S. Stein
Title:    Chief Restructuring Officer

EFiled: Aug 29 2023 01:02PM EDT
Transaction ID 70741833
Case No. 2022-0167-SG

**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

SAM GLASSCOCK III
VICE CHANCELLOR

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DELAWARE 19947

Date Submitted: May 8, 2023
Date Decided: August 29, 2023

David E. Ross, Esquire
Eric D. Selden, Esquire
A. Gage Whirley, Esquire
ROSS ARONSTAM & MORITZ LLP
Hercules Building
1313 N. Market Street, Suite 1001
Wilmington, Delaware 19801

Norman M. Powell, Esquire
Emily V. Burton, Esquire
Lauren Dunkle Fortunato, Esquire
Nehama L. Hanoch, Esquire
YOUNG CONAWAY SARGATT &
TAYLOR, LLP
Rodney Square
1000 N. King Street
Wilmington, Delaware 19801

Stephen Norma, Esquire
Ellis H. Huff, Esquire
POTTER ANDERSON & CORROON LLP
1313 N. Market Street
Hercules Plaza, 6th Floor
Wilmington, Delaware 19801

Re: *Paul Capital Advisors, L.L.C., et al. v. Holland, et al.*, C.A. No. 2022-0167-SG

Dear Counsel:

Alexander's cutting of the Gordian Knot with a single stroke is a metaphor for resolving complex litigation that has been worn smooth by overuse, yet it comes temptingly to mind as I labor to pick oakum from the tangle of contracts and undertakings by which, here, the Plaintiffs attempted to monetize certain illiquid assets; my job is made more difficult by the fact that it is unexplained, and not

App. 1527

intuitive, why the parties felt the complexity of the methods employed had merit. This Letter Opinion is my second opinion concerning that task. The Defendants offer me a blade to slice this monkey's fist of contract issues, via their Motions to Dismiss, addressed below; upon review, however, I must decline.

I will not repeat the statement of the facts set out, in painstaking if still abbreviated form, in *Paul Capital I*;[1] I adopt that statement of facts here, and address only briefly the facts necessary to my denial, via this Letter Opinion, of the bulk of the Defendants' Motions to Dismiss the remaining allegations of the Second Amended Complaint (the "SAC"). The liquidation scheme which the parties here employed involved the use of trusts (the "Exchange Trusts"), to hold the assets to be monetized, and the resulting sales' proceeds. In *Paul Capital I*, I found that the Plaintiffs were not fiduciary beneficiaries of those Exchange Trusts. They therefore lacked standing to remove the Trust Advisors to the Exchange Trusts or maintain breach of fiduciary duty claims.[2] That left the contract claims alleged in the SAC (together with tort claims alleging fraud and promissory estoppel). This Letter Opinion addresses the various Defendants' Motions to Dismiss those claims as well under Rule 12(b)(6).

---

[1] *Paul Cap. Advisors, L.L.C., et al. v. Stahl, et al.*, 2022 WL 3418769, at *4–7 (Del. Ch. Aug. 17, 2022) *as corrected* (Aug. 25, 2022) ("*Paul Capital I*").
[2] *Id.* at *12.

2

The following adumbration of the facts is sufficient, I think, to convey the complexity of the allegations in the SAC: The Plaintiffs are a Delaware LLC involved in private equity, and associated partnerships that function as private equity funds (jointly, "Paul Capital"). Paul Capital holds—or held—investments in other private equity funds. These investments are termed "Secondaries." They are generally illiquid. By 2017, Paul Capital intended to sell these Secondaries for cash.

Paul Capital found a buyer in Defendant Beneficent Company Group ("BEN"), a Delaware limited partnership. BEN, however, was cash-poor; it proposed to buy the Paul Capital Secondaries with another illiquid asset, BEN common units. To advance Paul Capital's goal of receiving cash, and presumably for other reasons the parties have not adequately revealed, BEN and Paul Capital concocted a scheme that is laid out below in simplified form.

The parties agreed that the transactions would be undertaken through a Delaware LLC, MHT, which is run by Defendant Murray Holland (together with MHT, the "MHT Defendants"). Paul Capital transferred the secondary assets to MHT. MHT formed nine trusts, the Exchange Trusts referred to above, and transferred the Secondaries to these trusts. The Exchange Trusts were controlled by two Trust Advisors, one of whom was Mr. Holland. The Exchange Trusts in turn transferred the Secondaries, or rights therein, to the buyer, BEN. In return, BEN transferred the BEN units to the Exchange Trusts. The parties contemplated an

3

auction of the BEN units for cash.  MHT was to receive the proceeds, then pay up to $550 million to Paul Capital, and retaining for itself any amount exceeding this sum.  If, on the other hand, the auction came in under $500 million, BEN was obligated to pay the difference to Paul Capital, in cash or additional BEN common units (the Contingent Value Rights (the "CVRs")).  Thus, the parties contemplated that, post auction, Paul Capital would have at least $500 million and at most $550 million in cash or a combination of cash and CVRs, BEN would have the Secondaries, and MHT would have an amount contingent on the auction achieving in excess of $550 million in cash.  But that is not what happened.

Instead, the auction resulted in a winning bid, from GWG Holdings, Inc. ("GWGH"), another company associated with Defendant Holland.  But this was not an all-cash bid.  It was composed of $150 million in cash, and GWGH common stock together with GWGH "L-Bonds."  The stock and bonds were supposedly worth $400 million, making the GWGH bid worth $550 million.  Neither the common stock nor the bonds were liquid assets, however, and thus could not satisfy Paul Capital's purpose, to receive cash for the Secondaries.

To address this purpose, MHT and the Exchange Trusts undertook to facilitate the refinancing of the L-Bonds and sale of the GWGH common stock promptly.  On those terms, and despite the fact that it was exchanging illiquid Paul Capital assets for illiquid BEN assets, and in turn exchanging those for illiquid GWGH assets, Paul

4

Capital accepted GWGH's offer as the winner of the auction. The Exchange Trusts transferred the BEN units to GWGH and received $150 million in cash and the illiquid GWGH assets in 2018. MHT and the Trusts paid the $150 million cash to Paul Capital, and retained the GWGH assets, which again, they had undertaken to convert to cash promptly. This did not happen. GWGH has since gone bankrupt.

This complex scheme, presented in simplified form above, was memorialized by numerous agreements among the parties. Paul Capital, which asserts that it is a party or third-party beneficiary to the pertinent contracts, points out that it has transferred its secondary assets, which it valued at $500 million, to BEN for a return of only $150 million in cash. It seeks damages for breach of the contracts against the various entities involved and the advisors of the Exchange Trusts. It also asserts claims of promissory estoppel and fraud. I address these causes of action, below.

### Counts III, IV, VI and VII—The Contract Claims

These counts address the breach of contract actions that the Plaintiffs have brought under the complex contractual scheme described above. In the SAC, the Plaintiffs describe the contracts at issue, that they were breached, and that they were parties or third-party beneficiaries of each. They allege resulting damages. This states a prima facie case under the notice pleading standard.[3] The Defendants counter with defenses individual to each contract, arguing that the contracts did not

---

[3] Ct. Ch. R. 8(a).

include Plaintiffs as intended beneficiaries or otherwise excluded them from seeking damages. It is true that contractual issues often present fertile ground for motions on the pleadings because unambiguous contract issues may be resolved as a matter of law from the face of the agreements.[4] Here, by contrast, I am unable to determine to what extent all the contracts are to be read together, and without an understanding of the motivation of the particular contractual scheme as it was known to the parties at the time of contracting, I am unwilling to determine rights under the various agreements at the pleadings stage.[5] While discovery may make these issues ripe for summary judgment, I decline to dismiss the contract counts.

Finally, the Defendants point out that, with respect to the Trust Agreements, I have already found that they excluded the Plaintiffs as trust beneficiaries.[6] They argue that it follows that the Plaintiffs cannot be third-party beneficiaries of the Trust Agreements.[7] But this is a non-sequitur. Whether a party is a third-party contractual beneficiary is dependent on the intent of the parties thereto,[8] and that intent is not necessarily foreclosed by a renunciation of *fiduciary* duties to the third parties.

---

[4] *Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006).

[5] *See Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 926–27 (Del. 2017) (explaining that an understanding of the business relationship among the parties informs analysis of the contractual scheme).

[6] *Paul Capital I*, 2022 WL 3418769, at *11.

[7] Opening Br. Defs. Supp. Mot. Dismiss 34–35, Dkt. No. 173 ("BEN OB"); Reply Br. Defs. Supp. Mot. Dismiss 2–7, Dkt. No. 187 ("BEN RB").

[8] *Madison Realty P'rs 7, LLC v. Ag ISA, LLC*, 2001 WL 406268, at *5 (Del. Ch. Apr. 17, 2001).

6

**Count VI and VIII—The Tort Claims**

*Promissory Estoppel*

To state a claim for promissory estoppel, a plaintiff must allege that (i) the defendant made a promise to the plaintiff; (ii) the defendant reasonably expected the plaintiff to take, or refrain from taking, action; (iii) the plaintiff acted to his detriment due to his reasonable reliance on the promise; and (iv) the plaintiff would suffer an injustice unless the promise is enforced.[9] The promise "must be a real promise, not just mere expressions of expectation, opinion, or assumption."[10] It must also be a "manifestation of an intention to act or refrain from acting in a specified manner, conveyed in such a way that another is justified in understanding that a commitment has been made; a person's assurance that the person will or will not do something."[11]

With respect to the MHT Defendants, Plaintiffs allege that, by emailing the GWGH Winning Bid Notice to Plaintiffs, the MHT Defendants "promised" Plaintiffs that (1) "GWGH would make an up-front cash payment of $150 million;" (2) "GWGH 'is *obligated* to seek to refinance its debt with a more favorable credit facility and/or institutional note within 12 months following issuance[;]'" (3) "'[a] nationally recognized bank, such as Credit Suisse, *will be engaged* to sell the stock in an orderly manner through one or a series of transactions in 2018, delivering cash

---

[9] *Lord v. Souder*, 748 A.2d 393, 399 (Del. 2000).
[10] *Territory of U.S. Virgin Islands v. Goldman, Sachs & Co.*, 937 A.2d 760, 805 (Del. Ch. 2007).
[11] *Promise*, BLACK'S LAW DICTIONARY (11th ed. 2019).

7

proceeds for the sellers[;]'" and (4) "'[c]losing is expected to be *on or prior to* April 30, 2018[.]'"[12]

Similarly, BEN is alleged to have made the following "promises" by sending Plaintiffs a "Due Diligence Package": (1) "that GWGH had 'obligations' to refinance the GWGH L-Bonds within 12 months of the closing of the Auction of the BEN [ ] Units, and that 'GWG[H]'s financial models reflect the refinancing occurring no later than October 2018';" (2) "that the Trust Advisors of the . . . Exchange Trusts were similarly '*obligated* to reduce the L-Bonds to cash and distribute cash proceeds *as quickly as practicable*[;]'" (3) "that GWGH and the Trust Advisors, for the benefit of the . . . Exchange Trusts, would agree to negotiate in good faith the terms of an Orderly Marketing Agreement with a major investment bank for the orderly marketing and resale of the GWGH common stock; and" (4) "the GWGH 'shares *will be sold* following the expiration of that [six-month] lock-up per the terms of an orderly marketing agreement[.]'"[13]

Plaintiffs further allege that the MHT Defendants and BEN both forwarded a comfort letter from GWGH (the "GWGH Comfort Letter")[14] and later forwarded an undertakings letter from GWGH (the "GWGH Undertakings Letter" and, together

---

[12] Verified Second Am. Compl. ¶ 336, Dkt. No. 66 (emphases in original) ("SAC").
[13] *Id.* ¶¶ 341, 343 (emphases in original).
[14] *Id.* ¶ 347.

with the GWGH Comfort Letter, the "GWGH Letters"),[15] both of which contained "promises" that Plaintiffs admit were made by GWGH.[16] By delivering the GWGH Winning Bid Notice, the Due Diligence Package, GWGH's Comfort Letter, and GWGH's Undertakings Letter, the Defendants allegedly intended to induce Plaintiffs to accept the bid made by GWGH.[17] Relying on these alleged promises from the Defendants, Plaintiffs accepted GWGH's bid even though it did not consist entirely of cash,[18] as Plaintiffs had intended when entering into this complex contractual scheme. As a result of accepting GWGH's bid, Plaintiffs allegedly "suffered and will continue to suffer substantial damages[,]" an "injustice [that] can only be avoided by enforcing [Defendants'] promises to Plaintiffs."[19]

The Defendants counter Plaintiffs' allegations by arguing the alleged promises that Plaintiffs attribute to Defendants were made instead by non-party GWGH.[20] Even if the mere act of delivering the documents, which contain GWGH's promises, to Plaintiffs was sufficient to allege that the promises contained within are also attributable to the Defendants, the Defendants argue that Plaintiffs did not adequately plead reasonable reliance because Plaintiffs were able to, and allegedly

---

[15] *Id.* ¶ 351.
[16] *Id.* ¶¶ 348, 352.
[17] *Id.* ¶¶ 334, 341, 347, 351.
[18] *Id.* ¶¶ 335, 342, 345, 350, 353.
[19] *Id.* ¶ 354.
[20] BEN OB 42–44; BEN RB 23–24; Opening Br. Defs. MHT and Holland Supp. Mot. Dismiss 22–29, Dkt. No. 174 ("MHT Defs.' OB"); Reply Br. Defs. MHT and Holland Supp. Mot. Dismiss 20–23, Dkt. No. 185 ("MHT Defs.' RB").

9

did, conduct their own due diligence of GWGH and the promises it made.[21]  Lastly, the Defendants assert Plaintiffs have suffered no injustice because Plaintiffs have received, and continue to be entitled to receive, the consideration Plaintiffs agreed to receive by accepting GWGH's bid.[22]

Drawing all reasonable inferences in favor of Plaintiffs, as I must do at the pleadings stage,[23] I conclude that Plaintiffs have sufficiently alleged that the Due Diligence Package contained promises—that the assets would be sold in a definite time, for instance—attributable to BEN and meant to encourage Plaintiffs to accept the GWGH bid, which Plaintiffs did to their detriment.

Plaintiffs, however, have failed to sufficiently allege that the MHT Defendants made any promises to Plaintiffs.  The alleged promises contained in the GWGH Winning Bid Notice are either attributable directly to GWGH, rather than the MHT Defendants, or are mere recitations of the material terms of GWGH's bid. Communicating the material terms of GWGH's bid to Plaintiffs is insufficient to support a claim that the MHT Defendants promised anything to Plaintiffs. Therefore, Plaintiffs have failed to state a claim for promissory estoppel against the MHT Defendants with respect to the GWGH Winning Bid Notice.

---

[21] BEN OB 44–45; BEN RB 24–25; MHT Defs.' OB 29–30; MHT Defs.' RB 23–25.
[22] BEN RB 44; MHT Defs.' OB 30; MHT Defs.' RB 25.
[23] *Orman v. Cullman*, 794 A.2d 5, 15 (Del. Ch. 2002).

10

With respect to the GWGH Letters, both of which were allegedly forwarded to Plaintiffs by BEN and the MHT Defendants, Plaintiffs failed to allege that the promises contained therein were made by either BEN or the MHT Defendants. In the SAC, Plaintiffs repeatedly acknowledge that the promises in the GWGH Letters were *made by GWGH*.[24] In an attempt to enforce GWGH's promises against BEN and the MHT Defendants, Plaintiffs consistently state that the GWGH Letters were forwarded to Plaintiffs by MHT and BEN to induce Plaintiffs into accepting GWGH's bid.[25] Plaintiffs have failed to allege how merely forwarding the GWGH Letters, without more, could constitute a "manifestation of an intention to act or refrain from acting in a specified manner, conveyed in such a way that another is justified in understanding that a commitment has been made[,]"[26] on behalf of BEN and the MHT Defendants. Therefore, Plaintiffs' promissory estoppel claim with respect to the GWGH Letters fails to state a cause of action and must be dismissed.

*The Fraud Claims*

Common Law Fraud

"To establish a claim for [common law] fraud, a plaintiff must prove (i) a false representation, (ii) a defendant's knowledge or belief of its falsity or his reckless

---

[24] *See, e.g.,* SAC ¶¶ 350, 353 ("Plaintiffs would not have accepted GWGH's bid in the absence of the ***promises and representations that GWGH made*** in the [GWGH Letters] that w[ere] forwarded by MHT and BEN.") (emphasis added).
[25] *See* SAC ¶¶ 347, 350–51, 353.
[26] *Promise*, Black's Law Dictionary (11th ed. 2019).

11

indifferent to its truth, (iii) a defendant's intention to induce action, (iv) reasonable reliance, and (v) causally related damages."[27]

Plaintiffs allege that the Defendants "attempted to extinguish [Plaintiffs' CVR Contract] rights by knowingly and falsely inducing [Plaintiffs'] representative on BEN's board to sign the Second Amendment to the CVR Contract."[28]  To accomplish this feat, a BEN lawyer, on behalf of BEN, convinced Plaintiffs' designated BEN board member, David de Weese, to sign the Second Amendment to the CVR Contract (the "Second Amendment") by claiming the signature "was simply a ministerial act" because Plaintiffs had already "approved the terms of the amendment."[29]  Plaintiffs allege, however, that the Second Amendment was designed "to substantially alter and effectively extinguish [Plaintiffs'] rights under the . . . CVR Contract[]"[30] by changing the contractual "definition of 'Net Auction Consideration'" to eliminate BEN's obligation to ensure Plaintiffs "receive[d] $500 million in *cash*[.]"[31]

The BEN defendants assert that Plaintiffs' fraud claim necessarily fails to state a claim because the BEN lawyer did not make a misrepresentation to Plaintiffs

---

[27] *In re Wayport, Inc. Litig.*, 76 A.3d 296, 323 (Del. Ch. 2013).
[28] SAC ¶ 376.
[29] *Id.* ¶ 380.
[30] *Id.* ¶ 385.
[31] *Id.* ¶¶ 386–87 (emphasis in original).

12

because (1) the statements were not misrepresentations and (2) the statements were not made *to Plaintiffs*.[32]  I consider each assertion in turn.

While BEN claims the statements the BEN lawyer made to de Weese were all accurate,[33] Plaintiffs contend that the BEN lawyer misrepresented (1) the legal effect of the Second Amendment; (2) that Plaintiffs had already approved the Second Amendment; and (3) that de Weese's signature was merely a "ministerial act."[34]  At this stage, I must accept the Plaintiffs' allegations as true.  The BEN defendants further assert that these statements, even if false, were not made *to Plaintiffs* because de Weese was acting solely in his capacity as director on BEN's board when he signed the Second Amendment.[35]  Viewing the facts in the light most favorable to Plaintiffs, I find that Plaintiffs have sufficiently alleged that, while BEN's LLC Agreement eliminated de Weese's fiduciary duties owed to BEN, de Weese still owed such duties to Plaintiffs.[36]  I can reasonably infer that in signing the Second Amendment, de Weese acted on behalf of his principal, the Plaintiffs, and that the allegedly false statements induced him to do so.

The MHT Defendants aptly point out that the allegedly false statements upon which Plaintiffs rest their fraud claim were made only by a *BEN* lawyer.[37]  Plaintiffs

---

[32] BEN OB 50–51, 55–57.
[33] BEN RB 27–29.
[34] SAC ¶¶ 380–84.
[35] BEN OB 50–51; BEN RB 25–27.
[36] *See* Pls.' Answering Br. 73–75; SAC ¶ 211.
[37] MHT Defs.' RB 25; *see* SAC ¶¶ 375–92.

<div align="center">13</div>

have failed to allege that the MHT Defendants made any false misrepresentations to Plaintiffs. Therefore, Plaintiffs' fraud claim with respect to the MHT Defendants fails on its face to state a claim and must be dismissed.

<u>Equitable Fraud</u>

"A claim for equitable fraud can lie only where the claimant sufficiently pleads the existence of: (1) a special relationship between the parties or other special equities, such as some form of fiduciary relationship; or (2) a justification for a remedy that only equity can afford."[38]

Plaintiffs fail to allege that a special relationship exists between them and BEN or the MHT Defendants. As contractual counterparties, absent unusual circumstances, Plaintiffs do not share a special relationship with either BEN or the MHT Defendants for the purposes of equitable fraud.[39]

**Conclusion**

With respect to the Contract Claims, Counts III, IV, V, and VII, Defendants' Motions to Dismiss are DENIED. BEN's Motion to Dismiss Count VI concerning the GWGH Letters and BEN's Motion to Dismiss Count VIII with respect to the equitable fraud claim are GRANTED. BEN's Motion to Dismiss Count VI with

---

[38] *Zebroski v. Progressive Direct Ins. Co.*, 2014 WL 2156984, at *7 (Del. Ch. Apr. 30, 2014) (citation omitted).
[39] *See Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 144 (Del. Ch. 2009) (explaining that there exists no special circumstances meriting application of the doctrine of equitable fraud where the parties "[a]re counterparties who negotiated at arms' length.").

14

respect to the Due Diligence Package and Count VIII with respect to the common law fraud claim are DENIED.  The MHT Defendants' Motion to Dismiss Counts VI and VIII are GRANTED.  The parties should submit an appropriate form of order.

Sincerely,

*/s/ Sam Glasscock III*
Vice Chancellor

15

# ASSET VALUES

## EFFECTIVE DATE ASSET VALUES (as of August 1, 2023)

The Good Faith Valuation of the assets transferred from GWG Holdings, Inc. and its affiliates of the bankruptcy estate, to the Wind Down Trust, effective as of August 1, 2023, has been completed. Please see the link provided to access the Good Faith Valuation of Trust Assets.

## INTERESTS

WDT Interest Holders who hold their interests directly as they had the former investments with GWG Holdings, Inc., you can access your account for the number of WDT Interests issued to you through Computershare. Computershare is the GWG Wind Down Trust's Transfer Agent and Distribution Agent. Below for your convenience is Computershare's contact information. You should have received a Certificate of Account showing the category and amount of WDT Interests issued by series. **Please contact Computershare as detailed below if you are unable to access your account or have not received your Certificate of Account as to the WDT Interests issued to you.**

INTEREST HOLDERS AGENT CONTACT INFORMATION:

Computershare

**Via Internet:** https://www-us.computershare.com/investor/#Home?cc=US&lang=en

**Via telephone:** *Toll Free:* 1-866-595-6048, option 1 (U.S.)  |

*International:* (781) 575-2798, option 1 (non-U.S.)

**Email inquiries:** web.queries@computershare.com

**Regular Mail:** PO Box 43007, Providence RI 02940-3006 USA

**Overnight Delivery:** 150 Royall Street, Suite 101, Canton MA 02021, USA

Click here to Access Your Computershare Account Instructions

WDT Interest Holders who hold their interests indirectly through their brokers/custodians must contact their respective brokers or custodians if they do not see the WDT interests reflected on their brokerage statements. Neither Computershare nor the Trustee has access to view these interests. These interests have been escrowed by CUSIP through the Depository Trust & Clearing Corporation ("DTC"). If your former investments were invested directly through GWG Holdings, Inc., the converted WDT Interests are now maintained through Computershare.

## WDT INTERESTS CLASSIFICATIONS SUMMARY

| WDT Interests Classifications: | Total Amount of WDT Interests: |
|---|---|
| Series A1 (formerly L Bonds) | 1,618,517,956 |
| Series A2 (formerly subrogated L Bonds) | 56,627,478 |
| Series B (General Unsecured Claims) | 1,209,631 |
| Series C (formerly Series 1 Preferred Stock) | 41,473,548 |
| Series D (formerly Series 2 Preferred Stock) | 85,827,332 |
| Series E (formerly Common Stock) | 33,102,275 |
| **TOTAL WDT Interests:** | **1,836,758,220** |

## ESTIMATING INTEREST HOLDER VALUE OF TRUST ASSETS

The GWG Wind Down Trust has presented its Effective Date Good Faith Valuation of Trust Assets, herein. In order for an interest holder to derive what they might deem their pro-rata portion of the effective date assets to be:

- Interest holder may obtain their interests in the GWG Wind Down Trust, see "Interests".
- Interest holder may divide their respective pro-rata interest in the GWG Wind Down Trust by the Total WDT Interests, see above "WDT Interests Classifications Summary".
- This pro-rata interest percent as calculated above, may be multiplied by the value presented in "Effective Date Good Faith Valuation of Trust Assets", as attached in the above link.

The GWG Wind Down Trust strongly encourages all interest holders to consult with their financial and tax advisors when interpreting their pro-rata share of the Effective Date Good Faith Valuation of Trust Assets.

App. 1542

# GWG Wind Down Trust
# Good Faith Valuation of Trust Assets

**As of August 1, 2023 (Effective Date)**

**The data contained herein is being presented in accordance with section 5.4 (b)
of the Wind Down Trust Agreement**

Section 5.4 (b) As soon as reasonably practicable after Wind Down Trust Assets are transferred to the Wind Down Trust, but in no event later than 180 days thereafter, the Wind Down Trust shall make a good faith valuation, as of the Effective Date, of Wind Down Trust Assets and the Wind Down Trustee shall apprise, in writing, the Wind Down Trust Beneficiaries of such valuation. In connection with the preparation of the valuation contemplated hereby and by the Plan, the Wind Down Trust shall be entitled to retain such professionals and advisors as the Wind Down Trust shall determine to be appropriate or necessary, and the Wind Down Trustee shall take such other actions in connection therewith as it determines to be appropriate or necessary. Such valuation shall be used consistently by all parties (including the Debtors, the Wind Down Trustee and the Wind Down Trust Beneficiaries) for all United States federal income tax purposes, including for determining tax basis and gain or loss. The Wind Down Trust shall bear all of the reasonable costs and expenses incurred in connection with determining such value, including the fees and expenses of any professionals retained by the Wind Down Trustee in connection therewith.

**GWG Wind Down Trust**
**Good Faith Valuation of Trust Assets**
**As of August 1, 2023 (Effective Date)**
**Unaudited**

| ASSETS - GWG Wind Down Trust | August 1, 2023 | | Pro-Forma Adjustments (a) | | | | August 1, 2023 (f) | |
|---|---|---|---|---|---|---|---|---|
| | | | (a) Debit | | (a) Credit | | | |
| Cash | $ | 17,600,000 (b) | 10,600,000 (b1), (d) | | 2,600,000 (b) | | 25,600,000 | |
| Restricted Cash | | 24,100,000 (b2) | - | | 24,100,000 (b2) | | - | |
| Marketable Securities Beneficient | | 214,900,000 (c) | - | | 40,000,000 (c) | | 174,900,000 | |
| Marketable Securities FOXO Technologies | | 600,000 (b1) | - | | 600,000 (b1) | | - | |
| All beneficial and reversionary interests in the Litigation Trust | | - (e) | - | | - (e) | | - | |
| **NET EQUITY INTEREST - Life Recovery Fund, LLC** | | | | | | | | |
| Exit Credit Facility - OBRA | | (600,300,000) (d) | 600,300,000 (d) | | - | | - | |
| Exit Credit Facility - OBRA - Interest Accrual | | (2,400,000) (d) | 2,400,000 (d) | | - | | - | |
| Cash Restricted | | 6,600,000 (d) | - | | 6,600,000 (d) | | - | |
| Policy Benefits Receivable | | 27,000,000 (d) | - | | 27,000,000 (d) | | - | |
| Life Insurance Portfolio at fair value | | 631,500,000 (d) | - | | 631,500,000 (d) | | - | |
| Net Equity Interests - Life Recovery Fund, LLC | | 62,400,000 | | | | | - | |
| Total Net Assets | $ | **319,900,000** | | | | $ | **200,500,000** (f) | |

App. 1547

**Footnotes**

**(a)** The unaudited information contained herein is being presented in accordance with Section 5.4(b) of the GWG Wind Down Trust ("WDT") Agreement as filed on June 8, 2023, Case 22-90032, ECF Docket #1887. All amounts reflected herein are unaudited, good faith estimates of the value of the assets transferred to the WDT and 100% of the net equity interests in its wholly owned subsidiary, Life Recovery Fund, LLC ("LRF") as of the effective date of August 1, 2023 ("Effective Date"). The WDT has presented the assets held by the WDT along with LRF as of the Effective Date and has presented Pro-Forma adjustments to the assets and the net equity interest in the LRF. The WDT believes that the presentation of the Pro-Forma adjustments result in a better indication of the value of the assets and net equity interest in LRF as of the Effective Date. Pro-Forma adjustments as described more fully below, represent the payment of previously accrued liabilities, reserve amounts pursuant to litigation matters and the sale of the WDT's interests in LRF, applying the benefit of hindsight. Variances between the GWG Wind Down Trust and Subsidiary Financial Statements (unaudited) as of September 30, 2023, previously published by the WDT and the Good Faith Estimate of value herein result from the GAAP presentation utilized for the September 30, 2023, financial statements and the utilization of fair market value basis as of August 1, 2023.

**(b)** Cash Transferred to the WDT as of the Effective Date was approximately $17.6 million, subsequent to the Effective Date the WDT paid approximately $2.6 pursuant to the negotiation and execution of a settlement of agreement, related to litigation which existed as of the Effective Date.

**(b1)** On October 13, 2023, the WDT sold its FOXO Technologies common shares for net proceeds of approximately $0.6 million.

**(b2)** Restricted cash transferred to the WDT as of the Effective Date was approximately $24.1 million, subsequent to the Effective Date, the WDT paid approximately $21.1 million in professional fees and approximately $3 million in accounts payable which was accrued prior to the Effective Date.

**(c)** The value ascribed to the WDT's equity interest in the Beneficient Company (BENF") as of the Effective Date, has been derived from a Fair Market Value Appraisal of the WDT's equity interest in BENF, prepared by an independent third party. The net asset value of the WDT's equity interest in BENF has been reduced to give effect to the Findings of Fact, Conclusions of Law, and Order Confirming Debtors' Further Modified Second Amended Joint Chapter 11 Plan (the "Confirmed Plan") (*Case 22-90032 Document 1952*). The Confirmed Plan outlines a restriction in the use of $40,000,000 of BENF common shares. The WDT's equity interests in BENF are subject to volatility in the BENF share price and the limited trading volume of BENF common stock. Therefore, the actual net realizable value of the WDT's interests in the common equity of BENF may be materially less.

**(d)** Subsequent to August 1, 2023, the WDT's 100% wholly owned subsidiary Life Recovery Company, LLC ("LRF") made payments pursuant to the maintenance of the life insurance portfolio accrued as of the Effective Date, collected policy benefits receivable related to maturities and beneficiary deaths, incurred additional accrued interest and increases in the credit facility associated with the portfolio of life insurance policies held as of the Effective Date. On October 13, 2023 the WDT sold 100% of it's equity interest in LRF. The purchaser acquired the portfolio of life insurance policies assumed the associated credit facility and accrued liabilities. As additional consideration, beyond the assumption of the credit facility and accrued portfolio liabilities, the WDT received $10 million in cash of which $3 million is required to be escrowed for a period of 3 years under the terms of an indemnification agreement required by Computershare.

**(e)** The WDT maintains a beneficial and reversionary interest in the GWG Litigation Trust. The WDT does not believe that it can ascribe an estimated value of the WDT's beneficial and reversionary interests in the Litigation Trust net of attorneys fees and collection costs, as of August 1, 2023, and for the period subsequent. These amounts, once quantified, could be expected to be available for remittance to the WDT for the benefit of the WDT's beneficiaries. The Litigation Trust's expectations about the amount of any distributions and when they may be paid are subject to risks and uncertainties and are based on certain estimates and assumptions, one or more of which may prove to be incorrect. As a result, the actual amount of any distributions may differ materially, perhaps in adverse ways, from the Trust estimates. Furthermore, it is not possible to predict the timing of any distributions.

**(f)** Each interest holder should consult with its personal tax advisor with respect to the income tax consequences of the formation, funding and creation of WDT. Each interest holder must determine its income tax consequences from the creation of WDT based on its share of the above valuation, such interest holder's tax basis in its interests immediately before the Effective Date and the interest holder's unique tax situation. Pursuant to Section 5.2 of the WDT Agreement, the WDT Beneficiaries are deemed grantors and owners of the WDT. No distributions were made to WDT Beneficiaries between the Effective Date and December 31, 2023. Thus, the WDT will not issue Forms 1099 to WDT Beneficiaries for calendar year 2023.