**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| | § | |
| IN RE GWG HOLDINGS, INC. | § | |
| SECURITIES LITIGATION | § | Case No. 3:22-cv-00410-B |
| | § | |
| | § | |
| | § | |

**DEFENDANTS BRAD K. HEPPNER, PETER T. CANGANY, JR, THOMAS O.
HICKS, DENNIS P. LOCKHART, BRUCE W. SCHNITZER, AND THE
BENEFICIENT COMPANY GROUP'S
REPLY IN SUPPORT OF THEIR MOTION TO DISMISS**

Defendants Brad K. Heppner, Peter T. Cangany, Jr., Thomas O. Hicks, Dennis P. Lockhart,

and Bruce W. Schnitzer (collectively, the "Individual Defendants") and Beneficient Company

Group, L.P. ("Ben" or "Beneficient", and together with the Individual Defendants, the "Ben De-

fendants"), submit this reply in support of their motion to dismiss (the "Motion") Plaintiffs' claims

for alleged violation of Section 11, Section 12, and Section 15 of the Securities Act of 1933 against

the Ben Defendants (Counts I, III, and IV) and in reply to Plaintiffs' response to the Motion (the

"Opposition").[1]

---

[1] Capitalized terms not herein defined shall have the meanings ascribed to them in the Motion.

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................ 1

   A.   Plaintiffs failed to adequately plead standing .................................................. 1

      i.    Plaintiffs cannot trace their L Bonds to the Registration Statement to establish standing under Section 11 ........................................................ 1

      ii.   Plaintiffs cannot show Ben Defendants passed title to Plaintiffs or solicited their purchases to establish standing under Section 12 ............................ 4

      iii.  Because Plaintiffs lack standing to assert a claim under Section 11 or 12, their Section 15 Claim also fails................................................................ 5

   B.   Plaintiffs' claims are subject to Rule 9's heightened pleadings standard ........................ 6

   C.   Plaintiffs fail to adequately plead any actionable false statement or omission................ 7

      i.    Plaintiffs fail to adequately plead an actionable misstatement or omission related to the Restatement. .................................................................. 7

      ii.   Statements regarding goodwill are non-actionable opinions ................................. 10

      iii.  GWG did not make material misrepresentations or omissions regarding accounting controls............................................................................. 12

      iv.   GWG properly disclosed the chairman's relationship with the senior lender........ 12

      v.    GWG did not make material misrepresentations or omissions regarding director resignations ............................................................................... 14

   D.   Plaintiffs' Section 11 claim cannot survive the negative causation defense.................. 15

   E.   Plaintiffs' Section 15 claim fails because they cannot plead a primary violation or control ............................................................................................. 15

   F.   Amendment is futile.............................................................................. 16

II.   CONCLUSION................................................................................................ 17

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alamosa Holdings, Inc. Sec. Litig.*,
382 F. Supp. 2d 832 (N.D. Tex. 2005) ...................................................................15

*In re Ariad Pharm., Inc. Sec. Litig.*,
842 F.3d 744 (1st Cir. 2016) ...................................................................................2

*Barnes v. Osofsky*,
373 F.2d 269 (2d Cir. 1967) (Friendly, J.) ..............................................................1

*In re Century Aluminum Co. Sec. Litig.*,
729 F.3d 1104 (9th Cir. 2013) .................................................................................2

*Crutchfield v. Match Grp., Inc.*,
529 F. Supp. 3d 570 (N.D. Tex. 2021) ...................................................................10

*Dartley v. ErgoBilt Inc.*,
No. 98- cv-1442-M, 2001 WL 313964 (N.D. Tex. Mar. 29, 2001) .........................16

*Dennis v. Gen. Imaging, Inc.*,
918 F.2d 496 (5th Cir. 1990) .................................................................................16

*ECA & Local 134 IBEW Joint Pension TR. of Chi. v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009) .....................................................................................8

*Edgar v. Anadarko Petroleum Corp.*,
No. 17-1372, 2018 WL 3032573 (S.D. Tex. June 19, 2018) ..................................11

*Einhorn v. Axogen, Inc.*,
42 F.4th 1218 (11th Cir. 2022) ..............................................................................11

*Financial Acquisition Partners LP v. Blackwell*,
440 F.3d 278 (5th Cir. 2006) .................................................................................17

*In re Franklin Bank Corp. Sec. Litig.*,
782 F. Supp. 2d 364 (S.D Tex. 2011) ..........................................................6, 10, 16

*Friou v. Phillips Petroleum Company*,
948 F.2d 972 (5th Cir. 1991) ...................................................................................4

*Gentilello v. Rege*,
627 F.3d 540 (5th Cir. 2010) ...................................................................................5

*Goldstein v. MCI WorldCom*,
  340 F.3d 238 (5th Cir. 2003) ...........................................................................................5

*James Jianhua Wu v. Weizhen Tang*,
  No. 3:10-CV-0218-O, 2011 WL 145259 (N.D. Tex. Jan. 14, 2011).........................................6

*Johnson v. CBD Energy, Ltd*.
  No. CV H-15-1668, 2016 WL 3654657, at *5–6 (S.D. Tex. July 6, 2016)...............................2

*Kapps v. Torch Offshore, Inc.*,
  379 F.3d 207 (5th Cir. 2004) .........................................................................................10

*Kovalchuk v. Wilmington Sav. Fund Soc'y*,
  No. 21-40281, 2021 WL 5119705 (5th Cir. Nov. 3, 2021) (per curiam) ...........................5, 17

*Krim v. PcOrder.com, Inc.*,
  402 F.3d 489 (5th Cir. 2005) ...........................................................................................1

*Lone Star Ladies Inv. Club v. Schlotzsky's*,
  238 F.3d 363 (5th Cir. 2001) ...........................................................................................6

*McKinney v. Irving ISD*,
  309 F.3d 308 (5th Cir. 2002) ...........................................................................................5

*Melder v. Morris*,
  27 F.3d 1097 (5th Cir 1994) ...........................................................................................6

*Mohamed v. Irving ISD*,
  300 F. Supp. 857 (N.D. Tex. 2018) ...................................................................................4

*Moran v. La. Dep't of Pub. Safety & Corr.*,
  No. 22-30787, 2023 WL 5983923 (5th Cir. Sept. 14, 2023) (per curiam) .....................4, 5, 17

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
  575 U.S. 175 (2015)..............................................................................................8, 10, 11

*Paul v. Sabban*,
  No. 22-51113, 2023 WL 4704117 (5th Cir. July 24, 2023) (per curiam).......................4, 5, 17

*Pinter v. Dahl*,
  486 U.S. 622 (1988)........................................................................................................4

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
  307 F. Supp. 3d 583 (S.D. Tex. 2018) ...............................................................................7

*Rosenzweig v. Azurix Corp.*,
   332 F.3d 854 (5th Cir. 2003) ..................................................................................4

*Schiller v. Physicians Resource Group Inc.*,
   342 F.3d 563 (5th Cir. 2003) ................................................................................17

*In re Segue Software, Inc.*,
   106 F. Supp. 2d 161 (D. Mass. 2000) ...................................................................12

*In re Venator Materials PLC Sec. Litig.*,
   547 F. Supp. 3d 624 (S.D. Tex. 2021) ...............................................................7, 10

**Statutes**
17 C.F.R. § 229.404(a)................................................................................................14

15 USC § 77l(a)(2) .......................................................................................................4

## I.    INTRODUCTION

Plaintiffs' Opposition does nothing to explain how the consolidated complaint [Dkt. No. 63] (the "Complaint") should survive numerous, independent grounds for dismissal. First, Plaintiffs lack standing to assert their Section 11 and 12 claims. The lack of standing alone defeats the claims asserted in the Complaint, and the Court need not address any other issues.[2] Second, Plaintiffs also fail to plead any actionable misstatement or omission. Plaintiffs' allegations that GWG Holdings, Inc. ("GWG") made material misstatements and omissions—much of which are in the nature of opinion—are conclusory, belied by express language in the disclosures, and/or are not pled with the requisite specificity given that their claims sound in fraud. Third, Plaintiffs' claims cannot on their face survive the negative causation doctrine.

Leave to amend should be denied because the Opposition does not suggest specific amendments that would cure the fatal deficiencies in their claims that have already been amended once after being originally asserted over 24 months ago. Accordingly, Ben Defendants' motion to dismiss should be granted, and the claims against them should be dismissed with prejudice.[3]

**A.    Plaintiffs failed to adequately plead standing**.

**i.  Plaintiffs cannot trace their L Bonds to the Registration Statement to establish standing under Section 11**.

To adequately plead standing under Section 11, the Complaint must plausibly show that Plaintiffs have performed the "often impossible" task of tracing the bonds ("L Bonds") issued by GWG to the registration statement effective June 2020 (the "Registration Statement"). *Barnes v. Osofsky*, 373 F.2d 269, 271–72 (2d Cir. 1967) (Friendly, J.); *see also Krim v. PcOrder.com, Inc.*,

---

[2] Plaintiffs' "control person" claim should be dismissed because the predicate section 11 and 12 claims fail as a matter of law, and because Plaintiffs' generic, conclusory allegations of control are not specific enough to survive dismissal.
[3] The claims against Ben Defendants should also be dismissed for the reasons set forth in co-defendants' motions to dismiss. *See* Dkt. ## 89, 90, 91, 94, and 95. Ben Defendants also join and incorporate the co-defendants' replies.

402 F.3d 489, 498 (5th Cir. 2005) (noting that in circumstances involving multiple offerings tracing is "virtually impossible"); *In re Century Aluminum Co. Sec. Litig*., 729 F.3d 1104, 1106 (9th Cir. 2013) (noting that tracing "is easier said than done"). As the Motion explained, Plaintiffs failed to satisfy this burden by failing to sufficiently plead that they purchased L Bonds traceable to the 2020 offering.[4] Prior to the June 3, 2020 Registration Statement (the "June 3, 2020 Offering"), GWG offered L Bonds pursuant to pursuant to a December 1, 2017 Registration Statement (the "2017 Offering").[5] Importantly, ***the 2017 Offering was still in effect and had not been exhausted through the third quarter of 2020***.[6]

Here, Plaintiffs rely only on the conclusory allegation that they "acquired" their L Bonds "pursuant to the Registration Statement."[7] But federal courts have consistently rejected allegations just like this as insufficient to meet the pleading standard. *In re Ariad Pharm., Inc. Sec. Litig.*, 842 F.3d 744, 755–56 (1st Cir. 2016); *Century Aluminum*, 729 F.3d at 1107–09. As the court explained in *Johnson v. CBD Energy, Ltd*., such "boilerplate language" does not "plausibly allege traceability," especially in cases "where the company offers shares in multiple registration statements." No. CV H-15-1668, 2016 WL 3654657, at *5–6 (S.D. Tex. July 6, 2016).[8]

Further, Plaintiffs' new allegation that there could be no secondary sales of L Bonds[9] fails

---

[4] Motion at 7–8.

[5] 12/12/2017 424B1.

[6] GWG Quarterly Report (Form 10-Q) (11/19/2020) at 31 ("On December 1, 2017, a registration statement relating to an additional public offering was declared effective permitting us to sell up to an additional $1.0 billion in principal amount of L Bonds on a continuous basis through December 2020. We reached the maximum capacity on this offering during the third quarter of 2020."), attached as Exhibit A.

[7] Opposition at 8–9; Complaint at ¶¶ 24–25.

[8] In *Johnson*, the plaintiffs alleged that they purchased shares "pursuant to or traceable to the Offering Documents" and argued this was "sufficient for purposes of pleading the traceability requirement." Id. at *3. The court disagreed and dismissed the plaintiffs' claims with prejudice stating such boilerplate allegations are not "sufficient to satisfy the plausibility standard because . . . the challenged offering was not the sole source of outstanding shares." *Id*. The court in *Johnson* looked to several cases including the Ninth Circuit's decision in *Century Aluminum*, which affirmed the dismissal of Section 11 claims premised on boilerplate tracing allegations and stated "[s]tanding alone, the conclusory allegation that plaintiffs 'purchased [the securities at issue] directly traceable to the Company's Secondary Offering' does not allow us to draw a reasonable inference about anything because it is devoid of factual content." 729 F.3d at 1108 Here too, Plaintiffs' tracing allegations are "devoid of factual content" and dismissal is required.

[9] Opposition at 10.

because it (1) was not included in the Complaint, (2) is conclusory, and (3) directly contradicts documents incorporated by reference into the Complaint, including the very document Plaintiffs cite in support of their allegation. The Prospectus[10] did not claim secondary sales were impossible or impermissible, nor did it claim that no private market would exist. Rather, it warned that that no **public** market was expected to develop and as a result, because the L Bonds were not listed on an exchange, such secondary sales would be more difficult to execute. The Prospectus states:

> ***Can I resell or transfer my L Bond after it has been purchased?***
> ***Yes*** . . . the ***L Bonds may be transferred*** so long as the transfer is documented in a form approved by us. We do not, however, expect a public trading market to develop for the L Bonds in the foreseeable future, if ever. Because of the lack of a trading market for L Bonds, ***it is unlikely that holders will be able to sell their L Bonds <u>easily</u>***.[11]

L Bonds issued pursuant to pursuant to the December 1, 2017 Registration Statement were also capable of being resold.[12]

Plaintiffs' argument that discovery may reveal records showing when L Bonds were issued and to whom[13] cannot satisfy the pleading standard because the Complaint does not describe such records or their contents, and even if it did, records only showing when L Bonds were issued and to whom will not permit Plaintiffs to trace their L Bonds to any particular offering. Plaintiffs offer no way to determine whether L Bonds issued from June 3, 2020 through the end of the third quarter of 2020 were issued pursuant to either the June 3, 2020 Offering or the 2017 Offering. Indeed, neither named Plaintiff even attempts in the Complaint to trace their own L Bonds to the June 3, 2020 Offering.[14] Horton's L Bonds from July 2020 and Moore's September 2020 L Bonds may

---

[10] The registration statement included a prospectus dated June 3, 2020, filed June 5, 2020, and supplemented August 17, 2020, and November 23, 2020 (as amended, the "Prospectus").

[11] Prospectus at vii.

[12] 12/12/2017 424B1 at vii.

[13] Opposition at 9, 10–11.

[14] *See* Certification of Thomas Horton and Certification of Frank Moore attached to the Complaint.

have either been (a) original issuances pursuant to either the 2017 or 2020 Offerings; or (b) secondary sales also pursuant to either Offering. Moore's January 2021 L Bonds may have been acquired through a secondary sale and could have originally been issued (a) before the June 3, 2020 Offering was initiated; (b) during the period when both the 2017 Offering and the June 3, 2020 Offering were effective; or (c) after the closing of the 2017 Offering.

### ii. Plaintiffs cannot show Ben Defendants passed title to Plaintiffs or solicited their purchases to establish standing under Section 12.

To adequately plead standing under Section § 12(a)(2), the Complaint must state facts supporting a plausible inference that Ben Defendants are a "statutory seller," meaning the Ben Defendants actually passed title to Plaintiffs or are brokers who solicited the purchase. 15 USC § 77l(a)(2); *Pinter v. Dahl*, 486 U.S. 622, 641–42 (1988); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003). Ben Defendants already demonstrated that the Complaint specifically pleads that these roles were filled by other parties.[15] In response, Plaintiffs effectively conceded that the Complaint is deficient,[16] but ask for leave to amend to assert a conclusory statement that "certain of the Individual Defendants 'passed title to Plaintiffs or solicited their purchases through direct communications.'"[17] The Court should deny this request for two principal reasons.

*First*, the conclusory allegation Plaintiffs seek to add does not fix the deficiency. Plaintiffs seeking to replead must show that repleading would not be futile by demonstrating how their proposed amendment would cure the deficiencies in their current pleadings. *See, e.g.*, *Moran v. La. Dep't of Pub. Safety & Corr.*, No. 22-30787, 2023 WL 5983923, at *1 (5th Cir. Sept. 14, 2023)

---

[15] Motion at 9.

[16] *See Mohamed v. Irving ISD*, 300 F. Supp. 857, 878 (N.D. Tex. 2018) (finding non-movant conceded arguments raised in the motion to dismiss where the arguments were not addressed in the response brief); *see also Friou v. Phillips Petroleum Company*, 948 F.2d 972, 974 (5th Cir. 1991) ("[The issue] is not discussed in their briefs. A party who inadequately briefs an issue is considered to have abandoned the claim.").

[17] Opposition at 50.

(per curiam); *Paul v. Sabban*, No. 22-51113, 2023 WL 4704117, at *2 (5th Cir. July 24, 2023) (per curiam); *Kovalchuk v. Wilmington Sav. Fund Soc'y*, No. 21-40281, 2021 WL 5119705, at *2 (5th Cir. Nov. 3, 2021) (per curiam); *Goldstein v. MCI WorldCom*, 340 F.3d 238, 254–55 (5th Cir. 2003); *McKinney v. Irving ISD*, 309 F.3d 308, 315 (5th Cir. 2002). Here, however, the proposed addition of an allegation "that certain of the Individual Defendants 'passed title to Plaintiffs or solicited their purchases through direct communications' " falls far short of satisfying the *Twombly*/*Iqbal* standard. It is conclusory, fails to distinguish between the Individual Defendants, and does not specify whether Plaintiffs are alleging that defendants passed title or were the brokers. The proposed conclusory allegation also contradicts their existing allegations that the Plaintiffs purchased their L Bonds "through a network of independent broker-dealers."[18]

*Second*, Plaintiffs have already had an adequate opportunity to amend their pleadings to make the necessary allegations. It has been 24 months since Plaintiffs filed the original complaint and 5 months since Plaintiffs filed the consolidated Complaint.[19] Moreover, these facts—how and from whom Plaintiffs purchased their L Bonds—are facts Plaintiffs are in the best position to know and should have known before filing even their original complaint. Plaintiffs should not be permitted to contradict themselves now that they discover their factual allegations defeat standing.

### iii. Because Plaintiffs lack standing to assert a claim under Section 11 or 12, their Section 15 Claim also fails.

Because Plaintiffs lack standing to assert a primary violation of either Section 11 or 12, Plaintiffs' control-person claims should be dismissed due to the lack of a predicate claim.[20]

---

[18] Opposition at 1.

[19] *See Moran*, 2023 WL 5983923, at *1; *Paul*, 2023 WL 4704117, at *2. Specifically, the Fifth Circuit has held that a request for leave to amend is insufficient where it fails "to apprise the district court of the facts that he would plead in an amended complaint, if necessary, to cure any deficiencies in his pleadings." *Kovalchuk*, 2021 WL 5119705, at *2 (citing *Gentilello v. Rege*, 627 F.3d 540, 546 (5th Cir. 2010).

[20] *See* Motion at 29–30.

5

### B.    Plaintiffs' claims are subject to Rule 9's heightened pleadings standard.

The Complaint is rife with allegations of fraud, including allegations that the Ben Defendants supposedly "knew or should have known" of "false and misleading" representations and omissions in the Registration Statement and "used it to directly induce investors, including Plaintiffs and other Class members, to purchase the L Bonds."[21] The Complaint also alleges that GWG's investments in Ben, negotiated by a special committee of *independent* directors, were not actually "*bona fide*" or "genuine arm's length transaction[s]."[22] Accordingly, the Complaint is subject to the heightened pleading standards of Rule 9(b) and the PSLRA.[23]

While the Complaint  alleges "strict liability,"[24] mere assertions of strict liability do not erase the extensive fraud allegations or negate the Complaint's allegations sounding in fraud.[25] Plaintiffs also cite *Franklin Bank Corp. Securities Litigation* for the proposition that "[a]llegations that the Defendants 'knew or should have known that the statements were untrue d[o] not transpose the Section 11 claim into one sounding in fraud.'" 782 F. Supp. 2d 364, 403 (S.D. Tex. 2011), *aff'd sub nom. Harold Roucher Tr. U/A DTD 9/21/72 v. Nocella*, 464 Fed. App'x 334 (5th Cir. 2012). But the *Franklin* opinion expressly relied on that complaint's express disclaimer, which is absent here, that the "Section 11 claim 'does not sound in fraud.'" *Id.*; *see also Schlotzsky's*, 238 F.3d at 369 (declining to apply Rule 9(b) where complaint expressly "disavow[s] and disclaim[s] any allegation of fraud"). The Complaint contains no such disclaimer, and multiple courts in this

---

[21] Motion at 6.

[22] Complaint ¶ 91; *see also* Opposition at 6, 28.

[23] *See Melder v. Morris*, 27 F.3d 1097, 1100 n.6 (5th Cir 1994) (holding that Rule 9(b) applies to 1933 Securities Act claims grounded in fraud). Plaintiffs' arguments otherwise are incorrect.

[24] Opposition at 13.

[25] *See, e.g.*, *James Jianhua Wu v. Weizhen Tang*, No. 3:10-CV-0218-O, 2011 WL 145259, at *6 (N.D. Tex. Jan. 14, 2011) (explaining in the context of Section 12 claims that "Rule 9(b) applies to 'averments' of fraud, and if such averment is inadequate, the court disregards it when determining if a claim is sufficiently stated). Moreover, "a district court is not required to sift through allegations of fraud in search of some 'lesser included' claim of strict liability." *Lone Star Ladies Inv. Club v. Schlotzsky's*, 238 F.3d 363, 368 (5th Cir. 2001).

circuit have held that a boilerplate disavowal of intent to allege fraud *in response to a motion to dismiss*, like Plaintiffs attempt here, is ineffective.[26] Although Rule 9(b) applies to all of the Complaint's averments of fraud, the Complaint fails even to satisfy the plausibility standard, as set forth more fully below.

### C.     Plaintiffs fail to adequately plead any actionable false statement or omission.

#### i. Plaintiffs fail to adequately plead an actionable misstatement or omission related to the Restatement.

While GWG restated its financials to address a novel and unique accounting question regarding the consolidation of certain trusts (the "ExAlt Trusts"), neither the Complaint nor Opposition plausibly alleged a Section 11 claim that GWG's Annual Report filed in November 2021 restating the financials (the "Restatement") revealed the "true" nature of Ben's business. Notwithstanding the restatement, GWG disclosed all facts regarding Ben's business necessary for any reasonable investor to understand Ben's "true" nature.[27] In particular, in advance of restating to consolidate the ExAlt Trusts, GWG disclosed the competing accounting possibilities, that Ben had previously adopted a different view regarding consolidation, and the effect of GWG's interpretation of the accounting rules relating to consolidation of the ExAlt Trusts.

Specifically, GWG's 2019 10-K (which is incorporated into the Registration Statement) expressly disclosed that the certain of the ExAlt Trusts had previously been consolidated in the 2018 financial statements, but would not be in the 2019 financial statements.[28]  GWG also expressly warned that this accounting treatment resulted in loans receivable becoming Ben's primary

---

[26] *See, e.g.*, *In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 669 (S.D. Tex. 2021) (noting that plaintiffs' "disavowal of an intent to plead fraudulent conduct is unpersuasive"); *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 619 (S.D. Tex. 2018), *aff'd on other grounds sub nom. Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 Fed. App'x. 726 (5th Cir. 2019) ("Boilerplate disavowals of an intent to allege fraud do not change the analysis.").

[27] Motion at 12.

[28] Notes to Ben's Consolidated Financial Statements (attached to GWG Annual Statement (Form 10-K) for the period ending December 31, 2019 (filed on March 27, 2020) ("2019 10-K")) at 26.

reported asset, whereas the 2018 financial statements "presented investments in senior beneficial interests instead of loans receivable."[29] Later, in 2021, after voluntary proactive consultation with the SEC's Office of Chief Accountant lasting many months, the SEC finally expressed its opinion that all of the ExAlt Trusts should be consolidated (as Ben had previously concluded for purposes of the 2018 financial statements) and GWG adopted this accounting judgment.[30]

Accounting interpretations are quintessential examples of statements of opinion under the securities laws. *See Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund,* 575 U.S. 175, 184 (2015) (for purposes of Section 11 claims, a statement of fact is a "determinate, verifiable statement," whereas a statement of opinion "expresse[s] a view, not a certainty" about a particular subject). As such, accounting interpretations are only actionable if they satisfy the requirements of *Omnicare,* namely pleading a material omission of a fact necessary to make the judgment not misleading. *See id.* at 188–94. Here, both the uncertainty of the accounting interpretation, as well as the impact of the alternate interpretation, were expressly disclosed. Plaintiffs' cited case *ECA & Local 134 IBEW Joint Pension TR. of Chi. v. JP Morgan Chase Co.,* 553 F.3d 187 (2d Cir. 2009), which stated in *dicta* that "misclassification does matter," is inapposite. *ECA* did not address an accounting judgment or opinion, was decided before *Omnicare*, and, in any event, ***dismissed*** claims based on allegedly improper misclassification. *Id.* at 205. Here, Plaintiffs do not identify any omission of material fact in connection with the accounting interpretation, and the supposed "truth" was disclosed.

The Opposition avoids the core issue of the relevant accounting interpretation and accom-

---

[29] Notes to Ben's Consolidated Financial Statements (attached to the 2019 10-K) at 26.

[30] GWG Annual Statement (Form 10-K) for the period ending December 31, 2020 (filed on November 5, 2021) ("2020 10-K"), Explanatory Note. Excerpt attached as Exhibit B.

panying disclosures and instead focuses on the downstream effects of GWG's change in accounting treatment, such as changes in revenue and other metrics that necessarily flow from the decision to consolidate the ExAlt Trusts. These arguments and the cases cited therein miss the point. The relationship between revenue and the accounting decision whether to consolidate was known to investors because GWG disclosed that, when it previously treated certain of the ExAlt Trusts as consolidated, the Company did not include receivables from the ExAlt Trusts.[31] The uncertainty was whether the ExAlt Trusts should be consolidated, not what downstream effects consolidation or deconsolidation would have.

Similarly, Plaintiffs claim that GWG's accounting judgment painted a misleading picture of Ben "gaining momentum." Setting aside that a reasonable investor would have understood the effects of consolidation due to GWG's disclosures, GWG's extensive risk factors belie the argument that GWG was gaining momentum, as GWG stated that Ben "does not have ***any*** operating history for its new business" and companies that seek to implement business plans like Ben "present substantial business and financial risks and uncertainties."[32] GWG also warned:

- Ben "experienced significant delays in obtaining trust company charters and may be ultimately unable to do so, which outcome would hinder [Ben's] ability to successfully pursue its current business plan[.]"[33]
- "We have a relatively limited history of operations, **a history of net losses**, and our future earnings, if any, and cash flows may be volatile, resulting in uncertainty about our ability to service and repay our debt when it comes due[.]"[34]
- "As a result of the foregoing, an investment in our securities necessarily involves uncertainty about the stability of our operating results, cash flows and, ultimately, our ability to service and repay our debt and our prospects generally."[35]

---

[31] Notes to Ben's Consolidated Financial Statements (attached to the 2019 10-K) at 26 ("In addition, the comparative period on the statement of financial condition of December 31, 2018, is not comparable as the loans were not presented on that statement due to the consolidation of certain trusts included within the ExAlt Plan[]. As a result, Ben's statement of financial condition as of December 31, 2018 presented investments in senior beneficial interests instead of loans receivable.").

[32] 2019 10-K at 31.

[33] 2019 10-K at 27.

[34] 2019 10-K at 18 (emphasis added).

[35] 2019 10-K at 18.

The risk factors and Registration Statement made clear that "Investing in [GWG's] L Bonds may be considered speculative and involves a high degree of risk, including the risk of losing your entire investment….The L Bonds are only suitable for persons with substantial financial resources and with no need for liquidity in this investment."[36] All of this must be considered in scrutinizing Plaintiffs' allegations concerning the later-restated consolidation: "The reasonable investor under-stands a statement of opinion in its full context, and § 11 creates liability only for the omission of material facts that cannot be squared with such a fair reading." *Omnicare*, 757 U.S. at 190-91. The Restatement did not reveal a material misstatement or omission.[37]

### ii. Statements regarding goodwill are non-actionable opinions.

Plaintiffs do not dispute that accounting estimates regarding the value of goodwill are opin-ions rather than statements of fact. Nor do Plaintiffs claim that any Defendants disbelieved the opinion at the relevant time.[38] While Plaintiffs point to two purported omissions allegedly making these opinions misleading, neither is actionable.[39]

*First*, Plaintiffs falsely allege that "GWG failed to identify the third-party transaction upon which the valuation of the Ben securities, used as an input in determining Ben's enterprise value under the OPM Backsolve Approach, was based."[40] This conclusory allegation cannot survive

---

[36] Registration Statement Cover Page.

[37] Plaintiffs do not allege any actionable misstatement or omission revealed by the restatement for an additional, in-dependent reason: the restatement did not reveal any misrepresentation that was material. The restatement's net effect of was to ***increase*** "GWG's non-controlling stockholder equity, cash, and assets." Courts can and do consider mate-riality at the motion to dismiss stage and the Court should do so here. The Fifth Circuit has acknowledged "many Section 11 cases have been properly dismissed on the pleadings for lack of materiality." *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 215 (5th Cir. 2004); *see also Crutchfield v. Match Grp., Inc.*, 529 F. Supp. 3d 570, 591 (N.D. Tex. 2021) (finding alleged misstatements were not material); *In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 669 (S.D. Tex. 2021; *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 408 (S.D Tex. 2011).

[38] Opposition at 28.

[39] *See* Opposition at 28-29.

[40] Complaint at ¶ 90. *See also* Opposition at 5–6.

dismissal because it ignores GWG's express disclosures that (1) described how goodwill was calculated in accordance with GAAP and was approved by independent auditors for inclusion in the financial statements; and (2) specifically identified the third-party transaction (the "Investment and Exchange Agreements") that valued the Ben securities and was the input for the OPM Backsolve calculations; and (3) described such transaction and the amount and prices of the securities exchanged in such transaction that were used as inputs to calculate Ben's goodwill value.[41]

*Second*, Plaintiffs make the conclusory and unsupported allegation that GWG failed to disclose that there was "no genuine arm's length transaction of any Ben securities underpinning the goodwill valuation."[42] This allegation ignores the fact that in December 2019, a Special Committee of independent GWG directors approved the Investment and Exchange Agreements. While the Special Committee utilized its own valuation and legal advisors and determined its own valuation of Ben, the valuation of Ben securities in such investment were inputs supporting management's audited goodwill calculation, which was performed in accordance with GAAP.[43] The Opposition is adamant that Plaintiffs are not alleging bad faith and fraud on the part of these directors.[44] But Plaintiffs cannot have it both ways. If they concede there was no such fraud or bad faith, then there can be no well-pled allegation that there was "no genuine arm's length transaction of any Ben securities underpinning the goodwill valuation." Because there are no well-pleaded allegations of omissions related to GWG's estimates of goodwill, the goodwill disclosures are non-actionable opinion statements.[45]

---

[41] Motion at 12–13.
[42] Opposition at 28.
[43] 2019 10-K at p. 78.
[44] Opposition at 13–14.
[45] *See Omnicare*, 75 U.S. at 186; *Einhorn v. Axogen, Inc.*, 42 F.4th 1218, 1224–25 (11th Cir. 2022) ("Aside from cursorily alleging that [Defendant] knew the statements were materially false or misleading, [Plaintiff] failed to allege any facts suggesting [Defendant's] actual knowledge of the statements' falsity."); *see also Edgar v. Anadarko Petroleum Corp.*, No. 17-1372, 2018 WL 3032573, at *13 (S.D. Tex. June 19, 2018).

### iii. GWG did not make material misrepresentations or omissions regarding accounting controls.

As briefed in the Motion, the alleged nondisclosures regarding internal controls is not actionable because: (a) Whitley Penn audited the effectiveness of GWG's internal controls over financial reporting as of December 31, 2019, and issued a clean opinion, as stated in their Report of Independent Registered Accounting Firm in Item 8 of the Form 10-K filed March 27, 2020; and (b) Plaintiffs do not allege any facts showing the Ben Defendants had reason to doubt such audit conclusions.[46] In response, Plaintiffs point to paragraph 19 of their Complaint, but that paragraph alleges only that Whitley Penn concluded that GWG's 2017 financial statements were fairly presented despite not consolidating the trusts. The mere fact that the Restatement changed this decision does not support an inference of inadequate financial controls, and it would violate securities law's policy favoring fulsome disclosures to "reflexively punish a company for correcting its earning statements when subsequent events disclose errors in the originals would create a perverse incentive for management to conceal mistakes[.]" *In re Segue Software, Inc.*, 106 F. Supp. 2d 161, 170 (D. Mass. 2000).

### iv. GWG properly disclosed the chairman's relationship with the senior lender.

Plaintiffs summarily allege that GWG restated its financials in 2020 to identify a $49.8 million loan payment made in 2019 to the senior lender as a "related party" payment despite the determination in 2019 that the senior lender was not a "related party" for accounting purposes, and falsely allege that the Restatement "concede[d] or "admit[ed]" that the senior lender was a related party in 2019.[47] In doing so, Plaintiffs have misrepresented what GWG restated and confused

---

[46] Motion at 19–21.
[47] Opposition at 35.

GWG's *later* determination that its senior lender had *become* a related party *due to changed circumstances that occurred after 2019* with an admission that the senior lender was a related party when it made the $49.8 million payment *in 2019*.

Specifically, the Restatement related to whether certain ExAlt Trusts were consolidated (with certain resulting changes and calculations relating to such consolidation), but such changes did *not* include a restatement of the determination of whether the senior lender was a "related party" for accounting purposes *in 2019*.[48] While the 2020 10-K accurately reflected that GWG determined that the senior lender was a "related party" for accounting purposes as of the end of 2020 **due to changed circumstances that occurred *after* 2019**, GWG did not amend or restate its original determination that the senior lender was not a "related party" for accounting purposes *in 2019*. Put differently, the disclosures that the senior lender was not a "related party" in 2019 were accurate when made and remain accurate, even though the senior lender later *became* a "related party" based on changed circumstances that were described in the 2020 10-K.[49] And, notably, the chairman's association with the senior lender,[50] the amounts previously transferred to the senior lender,[51] and the possibility that Ben would use future GWG investments to make payments to the senior lender in the future[52] were always disclosed even during periods when the senior lender was not a related party for accounting purposes.

---

[48] 2020 10-K at Explanatory Note and F-69 (describing what was restated); *see also* F-70 through F-76 (restated financial statements restated a number of categories of expenses and liabilities, which did not include a change in the treatment of debt owed to related parties); *see also* ASC 205-10-45-3 (requiring that "[p]rior-year figures shown for comparative purposes shall in fact be comparable with those shown for the most recent period").

[49] *See* 2020 10-K at F-66. Because, among other things, the amount of the loans and investments between the senior lender and Ben Founder Affiliates materially increased during certain periods after 2019 (as disclosed, *id.*), the senior lender was properly described as a 'related party' during certain periods (*e.g.* in the 2020 10-K) but not a 'related party' for accounting purposes during other periods (*e.g.* in the 2019 10-K).

[50] *See* 2019 10-K at 90, F-19, F-30.

[51] *See, e.g.*, 2019 10-K at 32 of the notes to Ben's consolidated financial statements (attached to the 2019 10-K).

[52] Prospectus, at Cover Page (emphasis added); *see also id.* at 9 (disclosing that Ben would "have broad discretion to use the proceeds of any [future GWG] investments and may use such proceeds to … repay indebtedness, ***including to related parties***.") (emphasis added).

Accordingly, Plaintiffs' allegation that GWG "concede[d] or "admit[ed]" a disclosure error in 2019 by correctly disclosing that the senior lender was a "related party" in its 2020 10-K cannot survive a motion to dismiss.[53] The Court should not infer that the senior lender was a related party *in 2019* merely because GWG later determined that the senior lender was a related party *in 2020* due to changed circumstances. Plaintiffs also misstate the law by suggesting that GWG was required to disclose how the senior lender used the funds *after* receiving them.[54] A company must only disclose payments to a related party.[55]

### v. GWG did not make material misrepresentations or omissions regarding director resignations.

GWG correctly disclosed that "four members of the Board of Directors resigned as directors of the Company, and the size of the Board of Directors was reduced from 14 to 10 directors in order to facilitate the Board of Directors' ability to oversee the Company's operations in an efficient and effective manner."[56]

Item 5.02 requires directors to furnish a letter "stating whether he or she agrees with the statements made by the registrant in response to this item 5.02, and, if not, stating the respects in which he or she does not agree." Item 5.02(a)(3)(ii). GWG would then have to file the letter from the director. Item 5.02(a)(3)(iii). None of the directors who resigned provided a letter disagreeing with the characterization of their resignations, and never clarified that their resignations were attributable to "disagreements with GWG management," as Plaintiffs allege. Plaintiffs' conclusory allegation is not plausible given the directors had every opportunity to disclose any disagreements, were required by law to do so, and yet did not come forward at the time or later to do so.

---

[53] Opposition at 33, 35.
[54] *See* Opposition at 33.
[55] 17 C.F.R. § 229.404(a).
[56] Motion at 22–23.

**D.      Plaintiffs' Section 11 claim cannot survive the negative causation defense**.

It is well-settled that the Court may consider the negative causation defense at the motion to dismiss stage and Plaintiffs admit as much. The Motion cited *In re Alamosa Holdings, Inc. Sec. Litig.,* 382 F. Supp. 2d 832, 865-66 (N.D. Tex. 2005) wherein Judge Cummings dismissed Section 11 claims and found that the negative causation defense barred the claims, even though negative causation is an affirmative defense. *Id.* ("Plaintiffs' own allegations demonstrate that any loss experienced by Plaintiffs could not be attributable to an alleged misrepresentation or omission from the Registration Statement and Plaintiffs' Section 11 claim is subject to the absolute negative causation defense.").

The Opposition does not even attempt to address *Alamosa* but admits that "dismissal on a 12(b)(6) motion is inappropriate unless the face of the complaint makes clear that the investor's loss is wholly unrelated to the alleged misrepresentation or omission."[57] Here, the Complaint itself plainly states that GWG's inability to raise capital (not reclassifications of the ExAlt Trusts or the other issues Plaintiffs invoke) was the cause of GWG's bankruptcy: "Without new L Bond sales to repay amounts owed on the earlier issued L Bonds, GWG was destined for bankruptcy."[58] As in *Alamosa*, Plaintiffs' claims are defeated by the negative causation defense because "Plaintiffs' own allegations demonstrate that any loss experienced by Plaintiffs could not be attributable to an alleged misrepresentation or omission from the Registration Statement."[59]

**E.      Plaintiffs' Section 15 claim fails because they cannot plead a primary violation or control**.

In their Opposition, Plaintiffs argue that "Ben's appointment of GWG's entire board of

---

[57] Opposition at 46.
[58] Complaint ¶ 20.
[59] *Id.*

15

directors makes Ben a controlling person subject to Section 15 liability."[60] This argument fails for the reasons addressed in the Motion: (1) the case law demonstrates that the alleged right to appoint board members is not sufficient to plead control-person liability, and (2) even if the right to appoint directors were sufficient to establish control, Plaintiff failed to plead control *during the relevant time*.[61] Plaintiffs' Opposition ignores these fatal defects. Instead, Plaintiffs reemphasize that the Individual Defendants "role as GWG directors and officers" gave them the power to control, without actually identifying whether and to what extent *each* Individual Defendant controlled certain transactions.[62] For example, the *only* allegation in the Complaint regarding Hicks, Lockhart, Schnitzer, and Cangany is that they were on the board, and the Opposition mentions them only in the glossary. Courts have consistently held that such generalized pleadings are not adequate.[63] Again, Plaintiffs simply have not, and cannot, state a Section 15 claim.

**F.    Amendment is futile**.

Plaintiffs seek to amend the Complaint to address deficiencies relating to the Section 12 claim, the director resignations, and to "reflect the results of their continuing investigation as to any claim the Court finds insufficiently pleaded."[64] As noted above, amendment of the Section 12 claims would be futile as the proposed amendment is vague, conclusory, and directly contradicted by Plaintiffs' admission in the second sentence of their brief that the bonds were sold "through a network of independent broker-dealers," not directly by the Individual Defendants.[65]

As for allowing amendment relating to director resignations and to fix "any" claim the

---

[60] Opposition at 48.
[61] Motion at 30–31.
[62] Opposition at 48.
[63] *Dennis v. Gen. Imaging, Inc*., 918 F.2d 496, 509 (5th Cir. 1990); *In re Franklin*, 782 F. Supp. 2d at 380; *In re Pilgrim's Pride Corp. Sec. Litig*., No. 2:08-CV-419-TJW, 2010 WL 3257369, at *33 (E.D. Tex. Aug. 17, 2010); *Dartley v. ErgoBilt Inc*., No. 98- cv-1442-M, 2001 WL 313964 at *1 (N.D. Tex. Mar. 29, 2001).
[64] Opposition at 50.
[65] *See supra* section I(A)(ii).

Court finds insufficiently pleaded, the Court should deny such a boilerplate request given that Plaintiffs have not filed a separate motion for leave, attached a proposed amended complaint, or proffered or outlined any specific proposed revisions. *See, e.g., Moran*, 2023 WL 5983923, at *1; *Paul*, 2023 WL 4704117, at *2. The Fifth Circuit has held insufficient a request for leave to amend that fails "to apprise the district court of the facts that he would plead in an amended complaint, if necessary, to cure any deficiencies in his pleadings." *Kovalchuk*, 2021 WL 5119705, at *2. By favoring a "wait and see" approach, Plaintiffs have deprived the defendants and the Court of any ability to assess whether Plaintiffs can cure the Complaint's deficiencies. *Financial Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 291–92 (5th Cir. 2006). Moreover, Plaintiffs have already amended their claims once when they filed the consolidated Complaint and have had over two years to investigate and plead accordingly, but simply chose not to do so. An amendment to a putative securities class action complaint should not be allowed where plaintiffs were "well aware of the pleading standards, but simply failed to meet them." *Schiller v. Physicians Resource Group Inc.*, 342 F.3d 563, 568, n.3 (5th Cir. 2003). Thus, the claims should be dismissed with prejudice.

## II.    CONCLUSION

Ben Defendants respectfully request the Court **GRANT** their Motion and **DISMISS** Plaintiffs' claims against them **with prejudice.**

DATED: March 21, 2024                Respectfully submitted,

  /s/ Michael W. Stockham

Michael W. Stockham
Michael.Stockham@hklaw.com
Texas State Bar No. 24038074
Steve J. Levitt
Steven.Levitt@hklaw.com
Texas State Bar No. 24092690
Sara Babineaux
Sara.Babineaux@hklaw.com
Texas Bar No. 24125102
**HOLLAND & KNIGHT LLP**
1722 Routh Street, Suite 1500
Dallas, Texas 75201-2533
Telephone: 214.969.1700
Facsimile: 214.969.1750

**ATTORNEYS FOR PETER T. CANGANY,
BRAD K. HEPPNER, THOMAS O. HICKS,
DENNIS P. LOCKHART, AND BRUCE
W. SCHNITZER**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing instrument was served on all participating parties this 21st day of March, 2024, via the Court's filing system.

*/s/ Michael W. Stockham*
Michael W. Stockham

18

# EXHIBIT A

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

**FORM 10-Q**

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended September 30, 2020

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES ACT OF 1934**

For the transition period from _____ to _____

Commission File Number: 001-36615

# GWG HOLDINGS, INC.

(Exact name of registrant as specified in its charter)

| **Delaware** | **26-2222607** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**325 North St. Paul Street, Suite 2650**
**Dallas, TX 75201**
(Address of principal executive offices, including zip code)

**(612) 746-1944**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Trading Symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| Common Stock | GWGH | NASDAQ Capital Market |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☒ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). ☒ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). ☐ Yes ☒ No

As of November 10, 2020, GWG Holdings, Inc. had 33,094,664 shares of common stock outstanding.

**GWG HOLDINGS, INC.**

**Index to Form 10-Q
for the Quarter Ended September 30, 2020**

|  |  | Page No. |
|---|---|---|
| PART I. FINANCIAL INFORMATION |  |  |
| Item 1. | Financial Statements | 1 |
|  | Condensed Consolidated Balance Sheets as of September 30, 2020, and December 31, 2019 | 1 |
|  | Condensed Consolidated Statements of Operations for the three and nine months ended September 30, 2020 and 2019 | 2 |
|  | Condensed Consolidated Statements of Cash Flows for the nine months ended September 30, 2020 and 2019 | 3 |
|  | Condensed Consolidated Statements of Changes in Stockholders' Equity for the three and nine months ended September 30, 2020 and 2019 | 5 |
|  | Notes to Condensed Consolidated Financial Statements | 7 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 48 |
| Item 4. | Controls and Procedures | 75 |
|  |  |  |
| PART II. OTHER INFORMATION |  | 76 |
| Item 1A. | Risk Factors | 74 |
| Item 5. | Other Information | 76 |
| Item 6. | Exhibits | 76 |
|  |  |  |
| SIGNATURES |  | 77 |

i

GWG HOLDINGS, INC. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

### *L Bonds*

We began publicly offering and selling L Bonds in January 2012 under the name "Renewable Secured Debentures". These debt securities were re-named "L Bonds" in January 2015. L Bonds were publicly offered and sold on a continuous basis under a registration statement permitting us to sell up to $1.0 billion in principal amount of L Bonds through January 2018. On December 1, 2017, a registration statement relating to an additional public offering was declared effective permitting us to sell up to an additional $1.0 billion in principal amount of L Bonds on a continuous basis through December 2020. We reached the maximum capacity on this offering during the third quarter of 2020.

On June 3, 2020, a registration statement relating to an additional public offering was declared effective permitting us to sell up to $2.0 billion in principal amount of L Bonds on a continuous basis through June 2023. These bonds contain the same terms and features as our previous offerings.

We are party to an indenture governing the L Bonds dated October 19, 2011, as amended ("Indenture"), under which GWG Holdings is obligor, GWG Life is guarantor, and Bank of Utah serves as indenture trustee. Effective December 31, 2019, we entered into Amendment No. 2 to the indenture, which primarily modified the calculation of the debt coverage ratio to allow the Company greater flexibility to finance and to anticipate the potential impacts of GWG Holdings' expanding relationship with Beneficient.

We were in compliance with the covenants of the indenture at September 30, 2020, and as of the date of this filing.

We publicly offer and sell L Bonds under a registration statement declared effective by the SEC and have issued Seller Trust L Bonds under a Supplemental Indenture, as described below. We temporarily suspended the offering of our L Bonds on May 1, 2019 as a result of our delay in filing certain periodic reports with the SEC. We recommenced our L Bond offering on August 8, 2019.

The bonds have renewal features under which we may elect to permit their renewal, subject to the right of bondholders to elect to receive payment at maturity. Interest is payable monthly or annually depending on the election of the investor.

At September 30, 2020 and December 31, 2019, the weighted-average interest rate of our outstanding L Bonds was 7.22% and 7.15%, respectively. The principal amount of L Bonds outstanding was $1.2 billion and $0.9 billion at September 30, 2020 and December 31, 2019, respectively. The difference between the amount of outstanding L Bonds and the carrying amount on our condensed consolidated balance sheets is due to netting of unamortized deferred issuance costs, cash receipts for new issuances and payments of redemptions in process. Amortization of deferred issuance costs was $4.3 million and $3.2 million for the three months ended September 30, 2020 and 2019, respectively. Amortization of deferred issuance costs was $12.4 million and $9.2 million for the nine months ended September 30, 2020 and 2019, respectively. Future expected amortization of deferred financing costs as of September 30, 2020 is $45.8 million in total over the next seven years.

### *Seller Trust L Bonds*

On August 10, 2018, in connection with the Initial Transfer of the Exchange Transaction described in Note 1, GWG Holdings issued Seller Trust L Bonds in the amount of $366.9 million to the Seller Trusts. The maturity date of the Seller Trust L Bonds is August 9, 2023. The Seller Trust L Bonds bear interest at 7.50% per year. Interest is payable monthly in cash.

After December 28, 2020, the holders of the Seller Trust L Bonds will have the right to cause GWG Holdings to repurchase, in whole but not in part, the Seller Trust L Bonds held by such holder. The repurchase may be paid, at the option of GWG Holdings, in the form of cash, and/or a pro rata portion of (i) the outstanding principal amount and accrued and unpaid interest under the commercial loan between GWG Life and Ben LP entered into on August 10, 2018 and (ii) Common Units, or a combination of cash and such property.

The principal amount of Seller Trust L Bonds outstanding was $366.9 million at both September 30, 2020 and December 31, 2019.

# EXHIBIT B

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

# FORM 10-K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended **December 31, 2020**

or

**TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES ACT OF 1934**

For the transition period from _____ to _____

**Commission File Number: 001-36615**

# GWG HOLDINGS, INC.
(Exact name of registrant as specified in its charter)

| **Delaware** | **26-2222607** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**325 North St. Paul Street, Suite 2650**
**Dallas, TX 75201**
(Address of principal executive offices, including zip code)
**(612) 746-1944**
(Registrant's telephone number, including area code)
**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock | GWGH | Nasdaq Capital Market |

**Securities registered pursuant to Section 12(g) of the Act**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes  No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes  No

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes  No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes  No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer

Accelerated filer

Non-accelerated filer

Smaller reporting company

Emerging growth company

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report.

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes  No

The aggregate market value of the registrant's common stock held by non-affiliates was $24,297,105 as of June 30, 2020 (the last business day of the registrant's most recently completed second fiscal quarter), based on a total of 3,167,810 shares of common stock held by non-affiliates and a closing price of $7.67 as reported on the Nasdaq Capital Market on June 30, 2020. For purposes of this computation, all officers, directors, and 10%

beneficial owners of the registrant are deemed to be affiliates. Such determination should not be deemed to be an admission that such officers, directors or 10% beneficial owners, are or were, in fact, affiliates of the registrant.

As of September 30, 2021, GWG Holdings, Inc. had 33,097,118 shares of common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE:**

None.

Table of Contents

**GWG HOLDINGS, INC.**

**Index to Form 10-K**
**for the Fiscal Year Ended December 31, 2020**

| | | |
|---|---|---|
| **Explanatory Note** | | |
| **Forward-Looking Information; Risk Factor Summary** | | i |
| PART I | | 1 |
| ITEM 1. | Business. | 1 |
| ITEM 1A. | Risk factors. | 12 |
| ITEM 1B. | Unresolved staff comments. | 41 |
| ITEM 2. | Properties. | 41 |
| ITEM 3. | Legal proceedings. | 41 |
| ITEM 4. | Mine safety disclosures. | 41 |
| PART II | | 42 |
| ITEM 5. | Market for the registrant's common equity, related shareholder matters and issuer purchases of equity securities. | 42 |
| ITEM 6. | Selected financial data. | 42 |
| ITEM 7. | Management's discussion and analysis of financial condition and results of operations. | 42 |
| ITEM 7A. | Quantitative and qualitative disclosures about market risk. | 74 |
| ITEM 8. | Consolidated financial statements and supplementary data. | F-1 |
| ITEM 9. | Changes in and disagreements with accountants on accounting and financial disclosure. | 73 |
| ITEM 9A. | Controls and procedures. | 73 |
| ITEM 9B. | Other Information. | 75 |
| PART III | | 76 |
| ITEM 10. | Directors, executive officers and corporate governance. | 76 |
| ITEM 11. | Executive compensation. | 80 |
| ITEM 12. | Security ownership of certain beneficial owners and management and related shareholder matters. | 85 |
| ITEM 13. | Certain relationships and related transactions, and director independence. | 88 |
| ITEM 14. | Principal accounting fees and services. | 92 |
| PART IV | | 94 |
| ITEM 15. | Exhibits, financial statement schedules. | 94 |
| ITEM 16. | FORM 10-K SUMMARY | 98 |
| SIGNATURES | | 99 |

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(21)**
**Restatement**

As previously reported on Form 8-K filed with the SEC on July 7, 2021, and as discussed throughout this 2020 Form 10-K, as part of the preparation of its 2020 Form 10-K, the Company voluntarily submitted two questions to the OCA on February 15, 2021. The questions submitted by the Company to OCA were (1) whether a December 31, 2019 transaction resulted in GWG Holdings, Inc. obtaining control of Ben LP in a transaction that constituted a change-in-control of Beneficient by entities not under common control, and (2) whether Ben LP was required to consolidate any of the trusts created through Beneficient's ExAlt Plan$^{TM}$ established in connection with its business of providing liquidity to holders of alternative assets. On July 26, 2021, the Company and OCA staff held a conference call in which OCA's staff notified the Company of its conclusions on the two accounting questions that were the subject of the consultation. During that call, OCA expressed that it would object to a conclusion that Ben LP not consolidate the ExAlt Trusts as of December 31, 2019. Regarding question (1), OCA did not conclude on the common control aspect of the transaction in question. However, after further analysis, including, among other things, consulting with legal counsel to conclude that the common stock of GWG Holdings held by Beneficient were not voteable under Delaware law, the Company confirmed its original conclusion that the entities were not under common control.

Prior to December 31, 2019, only certain trusts created through Beneficient's ExAlt Plan$^{TM}$ were considered variable interest entities for which Ben LP had a variable interest and was considered the primary beneficiary. Thus, Ben LP was required to consolidate certain of such trusts. Due to changes to both the governance structure and the underlying economics of the trust and other agreements pertaining to certain of the ExAlt Trusts and the execution of new loan agreements between a subsidiary of Ben LP and certain of such trusts as of December 31, 2019, it was initially concluded that Ben LP no longer had the power to direct the activities that most significantly impact the economic performance of any of the ExAlt Trusts and therefore could no longer consolidate any of such trusts as of December 31, 2019, including those previously consolidated. However, we have since determined that such conclusion was incorrect, and that the proper application of generally accepted accounting principles is for Ben LP to consolidate all of the ExAlt Trusts. As a result of consolidating such trusts, Ben LP's primary tangible asset, which was acquired through loans a subsidiary of Ben LP made to certain of the ExAlt Trusts, was previously reported as a loan receivable as of December 31, 2019, but is now being reported as an investment in alternative assets held by certain of the ExAlt Trusts.

The tables below illustrate the impact of the Restatement, as well as other corrections as discussed in Note 2, on our historical Consolidated Balance Sheet, Consolidated Statement of Operations, Consolidated Statement of Cash Flows, and Consolidated Statement of Changes in Stockholder's Equity as of December 31, 2019, each as compared with the amounts presented in the original Form 10-K previously filed with the SEC.

F-69

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Effects of the Restatement - Annual Results**

All adjustments presented in the tables below reflect the impact of the consolidation of the ExAlt Trusts, unless otherwise specifically indicated in the footnotes to each table.

The following table sets forth the effects of the Restatement on the affected line items within the Company's previously reported Consolidated Balance Sheet as of December 31, 2019 (dollars in thousands).

| | December 31, 2019 | | |
| --- | --- | --- | --- |
| | **As Previously Reported** | **Adjustments** | **As Restated** |
| ASSETS | | | |
| Cash and cash equivalents | $ 79,073 $ | 3,211 $ | 82,284 |
| Restricted cash | 20,258 | 13,248 | 33,506 |
| Investment in alternative assets, at net asset value | - | 342,012 | 342,012 |
| Loan receivables, net of discount | 232,344 | (232,344) | - |
| Fees receivable | 29,168 | (29,168) | - |
| Financing receivables from affiliates | 67,153 | (67,153) | - |
| Other assets | 28,374 | 1,024 | 29,398 |
| Goodwill | 2,358,005 | 9,745 | 2,367,750 |
| TOTAL ASSETS | 3,635,206 | 40,575 | 3,675,781 |
| LIABILITIES & STOCKHOLDERS' EQUITY | | | |
| LIABILITIES | | | |
| Deferred revenue | 41,444 | (41,444) | - |
| Repurchase option | - | 61,664 | 61,664 |
| Accounts payable and accrued expenses | 27,836 | 56 | 27,892 |
| Deferred tax liability, net[1] | 57,923 | 13,932 | 71,855 |
| TOTAL LIABILITIES | 1,764,725 | 34,208 | 1,798,933 |
| STOCKHOLDERS' EQUITY | | | |
| Accumulated deficit | (76,501) | (20,695) | (97,196) |
| TOTAL GWG HOLDINGS STOCKHOLDERS' EQUITY | 333,979 | (20,695) | 313,284 |
| Noncontrolling interests | 266,848 | 27,062 | 293,910 |
| TOTAL STOCKHOLDERS' EQUITY | 600,827 | 6,367 | 607,194 |
| TOTAL LIABILITIES & STOCKHOLDERS' EQUITY | $ 3,635,206 $ | 40,575 $ | 3,675,781 |

[1] Adjustment specifically reflects the impact of an immaterial out-of-period adjustment to correct the valuation allowance against the Company's deferred tax assets. See Note 2 to the consolidated financial statements for more details.

F-70

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The following table sets forth the effects of the Restatement on the affected line items within the Company's previously reported Consolidated Statement of Operations for the year ended December 31, 2019 (dollars in thousands).

| | As Previously Reported | Adjustments | As Restated |
|---|---|---|---|
| INCOME TAX EXPENSE[1] | $ 57,933 $ | 13,932 $ | 71,865 |
| LOSS BEFORE EARNINGS FROM EQUITY METHOD INVESTMENTS | (137,530) | (13,932) | (151,462) |
| Gain on consolidation of equity method investment (see Note 4) [2] | 249,716 | (6,763) | 242,953 |
| NET INCOME (LOSS) | 108,109 | (20,695) | 87,414 |
| NET INCOME (LOSS) ATTRIBUTABLE TO COMMON SHAREHOLDERS | 91,166 | (20,695) | 70,471 |
| NET INCOME (LOSS) PER COMMON SHARE | | | |
| Basic | $ 2.76 $ | (0.63) $ | 2.13 |
| Diluted | $ 2.65 $ | (0.59) $ | 2.06 |

[1] Adjustment reflects the impact of an immaterial out-of-period adjustment to correct the valuation allowance against the Company's deferred tax assets. See Note 2 to the consolidated financial statements for more details.
[2] Adjustment is due to the fair value adjustment of the Promissory Note, which was required as of December 31, 2019 upon consolidation of the ExAlt Trusts.

The following table sets forth the effects of the Restatement on the affected line items within the Company's previously reported Consolidated Statement of Cash Flows for the year ended December 31, 2019 (dollars in thousands).

| | As Previously Reported | Adjustments | As Restated |
|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | |
| Net income (loss) [1] [2] | $ 108,109 $ | (20,695) $ | 87,414 |
| Gain on consolidation of equity method investment | (249,716) | 6,763 | (242,953) |
| Deferred income taxes[1] | 57,923 | 13,932 | 71,855 |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (142,830) | - | (142,830) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | |
| Business combination consideration, net of cash and restricted cash acquired | (61,479) | 16,459 | (45,020) |
| NET CASH FLOWS PROVIDED BY (USED IN) INVESTING ACTIVITIES | (137,969) | 16,459 | (121,510) |
| NET INCREASE (DECREASE) IN CASH, CASH EQUIVALENTS AND RESTRICTED CASH | (26,105) | 16,459 | (9,646) |
| **CASH, CASH EQUIVALENTS AND RESTRICTED CASH** | | | |
| END OF PERIOD | 99,331 | 16,459 | 115,790 |

[1] Adjustment reflects the impact of an immaterial out-of-period adjustment to correct the valuation allowance against the Company's deferred tax assets. See Note 2 to the consolidated financial statements for more details.
[2] Adjustment is due to the fair value adjustment of the Promissory Note, which was required as of December 31, 2019 upon consolidation of the ExAlt Trusts.

The following table sets forth the effects of the Restatement on the affected line items and classes of stockholders' equity within the Company's previously reported Consolidated Statement of Changes in Stockholder's Equity as of December 31, 2019 (dollars in thousands).

| | Accumulated Deficit | Total GWG Holdings Stockholders' Equity | Noncontrolling Interests | Total Stockholders' Equity |
|---|---|---|---|---|
| **Balance, December 31, 2019 (As Previously Reported)** | $ (76,501) $ | 333,979 $ | 266,848 $ | 600,827 |
| Adjustment to recognition of noncontrolling interest | - | - | 27,062 | 27,062 |
| Adjustments to net income | (20,695) | (20,695) | - | (20,695) |
| **Balance, December 31, 2019 (As Restated)** | $ (97,196) $ | 313,284 $ | 293,910 $ | 607,194 |

F-71

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(22) Effects of the Restatement - Quarterly Results (Unaudited)**

The tables below illustrate the impact of the Restatement, as well as other adjustments, on our historical Condensed Consolidated Balance Sheets, Condensed Consolidated Statements of Operations, Condensed Consolidated Statements of Cash Flows, and Condensed Consolidated Statements of Changes in Stockholder's Equity for the interim quarters impacted, each as compared with the amounts presented in the original Form 10-Q previously filed with the SEC. All adjustments presented in the tables below reflect the impact of the consolidation of the ExAlt Trusts, unless otherwise specifically indicated in the footnotes to each table.

The following table sets forth the effects of the Restatement on the affected line items within the Company's previously reported Condensed Consolidated Balance Sheets as of September 30, 2020, June 30, 2020, and March 31, 2020 (dollars in thousands).

| | September 30, 2020 | | | June 30, 2020 | | | March 31, 2020 | | |
|---|---|---|---|---|---|---|---|---|---|
| | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated |
| **ASSETS** | | | | | | | | | |
| Cash and cash equivalents | $ 93,766 $ | 588 $ | 94,354 $ | 149,233 $ | 454 $ | 149,687 $ | 116,432 $ | 776 $ | 117,208 |
| Restricted cash | 15,990 | 5,324 | 21,314 | 19,059 | 6,686 | 25,745 | 26,446 | 7,613 | 34,059 |
| Investment in alternative assets, at net asset value | - | 221,245 | 221,245 | - | 315,713 | 315,713 | - | 335,487 | 335,487 |
| Loan receivables, net of discount | 229,961 | (229,961) | - | 218,448 | (218,448) | | 219,296 | (219,296) | - |
| Allowance for loan losses | (2,914) | 2,914 | - | (7,900) | 7,900 | | (700) | 700 | - |
| Loans receivable, net | 227,047 | (227,047) | | 210,548 | (210,548) | - | 218,596 | (218,596) | |
| Fees receivable | 31,571 | (31,571) | - | 31,611 | (31,611) | - | 30,453 | (30,453) | - |
| Financing receivables from affiliates | - | - | - | 69,428 | (69,428) | - | 68,290 | (68,290) | - |
| Other assets | 53,501 | 838 | 54,339 | 40,142 | 1,399 | 41,541 | 33,906 | 1,035 | 34,941 |
| Goodwill | 2,384,121 | (16,371) | 2,367,750 | 2,384,121 | (16,371) | 2,367,750 | 2,372,595 | (4,845) | 2,367,750 |
| TOTAL ASSETS | 3,629,674 | (46,994) | 3,582,680 | 3,718,637 | (3,706) | 3,714,931 | 3,684,229 | 22,727 | 3,706,956 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | | | | | | | | |
| **LIABILITIES** | | | | | | | | | |
| Seller Trust L Bonds [1] | $ 366,892 $ | (94,788) $ | 272,104 $ | 366,892 $ | - $ | 366,892 $ | 366,892 $ | - $ | 366,892 |
| Deferred revenue | 35,848 | (35,848) | - | 37,858 | (37,858) | - | 39,651 | (39,651) | - |
| Repurchase option | - | 730 | 730 | - | 56,660 | 56,660 | - | 52,052 | 52,052 |
| Accounts payable and accrued expenses | 33,235 | 277 | 33,512 | 23,457 | 242 | 23,699 | 21,139 | 208 | 21,347 |
| Deferred tax liability, net [2] | 52,500 | - | 52,500 | 33,674 | 18,826 | 52,500 | 40,206 | 12,294 | 52,500 |
| TOTAL LIABILITIES | 1,970,900 | (129,629) | 1,841,271 | 1,913,834 | 37,870 | 1,951,704 | 1,841,462 | 24,903 | 1,866,365 |
| **STOCKHOLDERS' EQUITY** | | | | | | | | | |
| Common stock in treasury, at cost, 12,337,264 shares December 31, 2020 and 2,500,000 shares as of December 31, 2019 | (24,550) | (42,856) | (67,406) | (24,550) | - | (24,550) | (24,550) | - | (24,550) |
| Additional paid-in capital [1] | 178,969 | 98,385 | 277,354 | 225,537 | - | 225,537 | 229,207 | - | 229,207 |
| Accumulated deficit [2] | (200,935) | (5,501) | (206,436) | (136,355) | (24,752) | (161,107) | (121,933) | (18,634) | (140,567) |
| TOTAL GWG HOLDINGS STOCKHOLDERS' EQUITY | 120,630 | 50,028 | 170,658 | 242,067 | (24,752) | 217,315 | 269,415 | (18,634) | 250,781 |
| Noncontrolling interests [1] | 291,391 | 32,607 | 323,998 | 298,705 | (16,824) | 281,881 | 331,711 | 16,458 | 348,169 |
| TOTAL STOCKHOLDERS' EQUITY | 412,021 | 82,635 | 494,656 | 540,772 | (41,576) | 499,196 | 601,126 | (2,176) | 598,950 |
| TOTAL LIABILITIES & STOCKHOLDERS' EQUITY | 3,629,674 | (46,994) | 3,582,680 | 3,718,637 | (3,706) | 3,714,931 | 3,684,229 | 22,727 | 3,706,956 |

[1] For September 30, 2020, adjustments reflect the impact of the Collateral Swap discussed in Note 1.

[2] Adjustments reflect the impact of an immaterial out-of-period adjustment to correct the valuation allowance against the Company's deferred tax assets. See Note 2 to the consolidated financial statements for more details.

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The following tables set forth the effects of the Restatement on the affected line items within the Company's previously reported Condensed Consolidated Statements of Operations for the quarterly periods ended September 30, 2020, June 30, 2020, and March 31, 2020 (dollars in thousands).

| | Three Months Ended September 30, 2020 | | | Three Months Ended June 30, 2020 | | | Three Months Ended March 31, 2020 | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated |
| REVENUE | | | | | | | | | |
| Investment income (loss), net | $ - | $ 56,705 | $ 56,705 | $ - | $ (22,671) | $ (22,671) | $ - | $ 7,556 | $ 7,556 |
| Interest income | 12,928 | (12,650) | 278 | 12,671 | (12,371) | 300 | 13,989 | (13,274) | 715 |
| Trust services revenues | 4,556 | (4,556) | - | 4,829 | (4,829) | - | 5,027 | (5,027) | - |
| TOTAL REVENUE | 28,513 | 39,499 | 68,012 | 68,789 | (39,871) | 28,918 | 33,557 | (10,745) | 22,812 |
| EXPENSES | | | | | | | | | |
| Provision for loan losses | (4,986) | 4,986 | - | 7,200 | (7,200) | - | 700 | (700) | - |
| Other expenses | 4,550 | 162 | 4,712 | 4,895 | 168 | 5,063 | 3,612 | - | 3,612 |
| TOTAL EXPENSES | 81,963 | 5,148 | 87,111 | 68,720 | (7,032) | 61,688 | 124,050 | (700) | 123,350 |
| LOSS BEFORE INCOME TAXES | (53,450) | 34,351 | (19,099) | 69 | (32,839) | (32,770) | (90,493) | (10,045) | (100,538) |
| INCOME TAX EXPENSE (BENEFIT) [1] | 22,444 | (18,826) | 3,618 | (8,550) | 6,532 | (2,018) | (14,507) | (1,638) | (16,145) |
| LOSS BEFORE LOSS FROM EQUITY METHOD INVESTMENTS | (75,894) | 53,177 | (22,717) | 8,619 | (39,371) | (30,752) | (75,986) | (8,407) | (84,393) |
| NET INCOME (LOSS) | (77,325) | 53,177 | (24,148) | 7,301 | (39,371) | (32,070) | (77,516) | (8,407) | (85,923) |
| Net (income) loss attributable to noncontrolling interests | 12,745 | (33,926) | (21,181) | (21,723) | 33,253 | 11,530 | 32,084 | 10,468 | 42,552 |
| NET INCOME (LOSS) ATTRIBUTABLE TO COMMON SHAREHOLDERS | $ (68,149) | $ 19,251 | $ (48,898) | $ (18,136) | $ (6,118) | $ (24,254) | $ (49,384) | $ 2,061 | $ (47,323) |
| NET INCOME (LOSS) PER COMMON SHARE | | | | | | | | | |
| Basic | $ (2.23) | $ 0.63 | $ (1.60) | $ (0.59) | $ (0.20) | $ (0.79) | $ (1.62) | $ 0.07 | $ (1.55) |
| Diluted | $ (2.23) | $ 0.63 | $ (1.60) | $ (0.59) | $ (0.20) | $ (0.79) | $ (1.62) | $ 0.07 | $ (1.55) |
| WEIGHTED AVERAGE COMMON SHARES OUTSTANDING [2] | | | | | | | | | |
| Basic | 30,584,719 | (106,927) | 30,477,792 | 30,536,830 | - | 30,536,830 | 30,534,977 | - | 30,534,977 |
| Diluted | 30,584,719 | (106,927) | 30,477,792 | 30,536,830 | - | 30,536,830 | 30,534,977 | - | 30,534,977 |

[1] Adjustments reflect the impact of an immaterial out-of-period adjustment to correct the valuation allowance against the Company's deferred tax assets. See Note 2 to the consolidated financial statements for more details.

[2] For September 30, 2020, adjustments reflect the impact of the Collateral Swap discussed in Note 1.

F-73

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The following tables set forth the effects of the Restatement on the affected line items within the Company's previously reported Condensed Consolidated Statements of Operations for the year-to-date periods ended September 30, 2020 and June 30, 2020 (dollars in thousands).

| | Nine Months Ended September 30, 2020 | | | Six Months Ended June 30, 2020 | | |
|---|---|---|---|---|---|---|
| | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated |
| REVENUE | | | | | | |
| Investment income (loss), net | $ - $ | 41,590 $ | 41,590 $ | - $ | (15,115) $ | (15,115) |
| Interest income | 39,588 | (38,295) | 1,293 | 26,660 | (25,645) | 1,015 |
| Trust services revenues | 14,412 | (14,412) | - | 9,856 | (9,856) | - |
| TOTAL REVENUE | 130,859 | (11,117) | 119,742 | 102,346 | (50,616) | 51,730 |
| EXPENSES | | | | | | |
| Provision for loan losses | 2,914 | (2,914) | - | 7,900 | (7,900) | - |
| Other expenses | 13,057 | 330 | 13,387 | 8,507 | 168 | 8,675 |
| TOTAL EXPENSES | 274,733 | (2,584) | 272,149 | 192,770 | (7,732) | 185,038 |
| LOSS BEFORE INCOME TAXES | (143,874) | (8,533) | (152,407) | (90,424) | (42,884) | (133,308) |
| INCOME TAX EXPENSE (BENEFIT)[1] | (613) | (13,932) | (14,545) | (23,057) | 4,894 | (18,163) |
| LOSS BEFORE LOSS FROM EQUITY METHOD INVESTMENTS | (143,261) | 5,399 | (137,862) | (67,367) | (47,778) | (115,145) |
| NET INCOME (LOSS) | (147,540) | 5,399 | (142,141) | (70,215) | (47,778) | (117,993) |
| Net loss attributable to noncontrolling interests | 23,106 | 9,795 | 32,901 | 10,361 | 43,721 | 54,082 |
| NET INCOME (LOSS) ATTRIBUTABLE TO COMMON SHAREHOLDERS | (135,669) $ | 15,194 $ | (120,475) $ | (67,520) $ | (4,057) $ | (71,577) |
| NET INCOME (LOSS) PER COMMON SHARE | | | | | | |
| Basic | $ (4.44) $ | 0.49 $ | (3.95) $ | (2.21) $ | (0.13) $ | (2.34) |
| Diluted | $ (4.44) $ | 0.49 $ | (3.95) $ | (2.21) $ | (0.13) $ | (2.34) |
| WEIGHTED AVERAGE COMMON SHARES OUTSTANDING [2] | | | | | | |
| Basic | 30,552,233 | (35,902) | 30,516,331 | 30,535,811 | - | 30,535,811 |
| Diluted | 30,552,233 | (35,902) | 30,516,331 | 30,535,811 | - | 30,535,811 |

[1] Adjustments reflect the impact of an immaterial out-of-period adjustment to correct the valuation allowance against the Company's deferred tax assets. See Note 2 to the consolidated financial statements for more details.
[2] For September 30, 2020, adjustments reflect the impact of the Collateral Swap discussed in Note 1.

F-74

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The following tables set forth the effects of the Restatement on the affected line items within the Company's previously reported Condensed Consolidated Statements of Cash Flows for the year-to-date periods ended September 30, 2020, June 30, 2020, and March 31, 2020 (dollars in thousands).

| | Nine Months Ended September 30, 2020 | | | Six Months Ended June 30, 2020 | | | Three Months Ended March 31, 2020 | | |
|---|---|---|---|---|---|---|---|---|---|
| | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | | | | | |
| Net loss | $ (147,540) $ | 5,399 $ | (142,141) $ | (70,215) $ | (47,778) $ | (117,993) $ | (77,516) $ | (8,407) $ | (85,923) |
| Adjustments to reconcile net income (loss) to net cash flows used in operating activities: | | | | | | | | | |
| Investment income (loss), net | - | (41,590) | (41,590) | - | 15,115 | 15,115 | - | (7,556) | (7,556) |
| Amortization of upfront fees | (5,356) | 5,356 | - | (3,586) | 3,586 | - | (1,793) | 1,793 | - |
| Return on investments in alternative assets | - | 1,577 | 1,577 | - | 1,180 | 1,180 | - | 374 | 374 |
| Non-cash interest income, including interest paid-in-kind and accretion of purchase discount | (38,530) | 38,315 | (215) | (25,811) | 25,665 | (146) | (13,374) | 13,295 | (79) |
| Provision for loan losses | 2,914 | (2,914) | - | 7,900 | (7,900) | - | 700 | (700) | - |
| Deferred income taxes [(1)] | (4,621) | (13,932) | (18,553) | (24,250) | 4,894 | (19,356) | (17,717) | (1,638) | (19,355) |
| Change in operating assets and liabilities: | | | | | | | | | |
| Fees receivable | (2,643) | 2,643 | - | (2,443) | 2,443 | - | (1,285) | 1,285 | - |
| Other assets | (2,634) | 184 | (2,450) | (2,869) | (377) | (3,246) | 368 | (12) | 356 |
| Accounts payable and accrued expenses | 8,306 | 58 | 8,364 | 2,592 | 21 | 2,613 | (1,103) | 15 | (1,088) |
| NET CASH FLOWS USED IN OPERATING ACTIVITIES | (142,905) | (4,904) | (147,809) | (83,669) | (3,151) | (86,820) | (40,632) | (1,551) | (42,183) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | | | | | |
| Net change in loans receivable | 11,169 | (11,169) | - | 11,169 | (11,169) | - | 10,614 | (10,614) | - |
| Investments in alternative assets | - | (226) | (226) | - | (169) | (169) | - | (78) | (78) |
| Return of investments in alternative assets | - | 5,752 | 5,752 | - | 5,169 | 5,169 | - | 4,173 | 4,173 |
| NET CASH FLOWS PROVIDED BY (USED IN) INVESTING ACTIVITIES | 16,007 | (5,643) | 10,364 | 19,049 | (6,169) | 12,880 | 10,751 | (6,519) | 4,232 |
| NET INCREASE (DECREASE) IN CASH, CASH EQUIVALENTS AND RESTRICTED CASH | 10,425 | (10,547) | (122) | 68,962 | (9,320) | 59,642 | 43,547 | (8,070) | 35,477 |
| **CASH, CASH EQUIVALENTS AND RESTRICTED CASH** | | | | | | | | | |
| BEGINNING OF PERIOD | 99,331 | 16,459 | 115,790 | 99,331 | 16,459 | 115,790 | 99,331 | 16,459 | 115,790 |
| END OF PERIOD | $ 109,756 $ | 5,912 $ | 115,668 $ | 168,293 $ | 7,139 $ | 175,432 $ | 142,878 $ | 8,389 $ | 151,267 |

[(1)] Adjustment reflects the impact of an immaterial out-of-period adjustment to correct the valuation allowance against the Company's deferred tax assets. See Note 2 to the consolidated financial statements for more details.

F-75

*Table of Contents*

**GWG HOLDINGS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

| | Nine Months Ended September 30, 2020 | | | Six Months Ended June 30, 2020 | | | Three Months Ended March 31, 2020 | | |
|---|---|---|---|---|---|---|---|---|---|
| | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated |
| **NON-CASH INVESTING AND FINANCING ACTIVITIES** | | | | | | | | | |
| Conversion of Promissory Note | 70,565 | (70,565) | - | - | - | - | - | - | - |
| Collateral Swap (see Note 1): | | | | | | | | | |
| Exchange of alternative assets for Seller Trust L Bonds [1] | - | 94,788 | 94,788 | - | - | - | - | - | - |
| Exchange of alternative assets for common stock [1] | - | 42,856 | 42,856 | - | - | - | - | - | - |
| Deemed capital contribution from related party [1] | - | 46,770 | 46,770 | - | - | - | - | - | - |
| Adjustment to noncontrolling interest as a result of Collateral Swap [1] | - | 3,444 | 3,444 | - | - | - | - | - | - |
| Distribution payable to noncontrolling interest | - | 165 | 165 | - | 165 | 165 | - | 136 | 136 |
| Business combination measurement period adjustments: | | | | | | | | | |
| Reduction in loans receivable | 26,116 | (26,116) | - | 26,116 | (26,116) | - | 14,590 | (14,590) | - |

[1] For September 30, 2020, adjustments reflect the impact of the Collateral Swap discussed in Note 1.

The following table sets forth the effects of the Restatement on the affected line items and classes of stockholders' equity within the Company's previously reported Condensed Consolidated Statements of Changes in Stockholder's Equity for the quarters ended March 31, 2020 through September 30, 2020 (dollars in thousands). There was no impact to the redeemable noncontrolling interest.

| | Common Shares | Additional Paid-in Capital | Accumulated Deficit | Treasury Stock | Total GWG Holdings Stockholders' Equity | Noncontrolling Interests | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|
| **Balance, December 31, 2019 (As Previously Reported)** | 30,533,793 $ | 233,106 $ | (76,501) $ | (24,550) $ | 333,979 $ | 266,848 $ | 600,827 |
| Adjustments to recognition of noncontrolling interest | - | - | - | - | - | 27,062 | 27,062 |
| Adjustments to net income | - | - | (20,695) | - | (20,695) | - | (20,695) |
| **Balance, December 31, 2019 (As Restated)** | 30,533,793 | 233,106 | (97,196) | (24,550) | 313,284 | 293,910 | 607,194 |
| Adjustments to noncontrolling interest | - | - | - | - | - | (10,604) | (10,604) |
| Adjustments to net loss | - | - | 2,061 | - | 2,061 | - | 2,061 |
| Total other activity as previously reported | 1,456 | (3,899) | (45,432) | - | (64,564) | 64,863 | 299 |
| **Balance, March 31, 2020 (As Restated)** | 30,535,249 | 229,207 | (140,567) | (24,550) | 250,781 | 348,169 | 598,950 |
| Adjustments to noncontrolling interest | - | - | - | - | - | (33,282) | (33,282) |
| Adjustments to net loss | - | - | (6,118) | - | (6,118) | - | (6,118) |
| Total other activity as previously reported | 2,232 | (3,670) | (14,422) | - | (27,348) | (33,006) | (60,354) |
| **Balance, June 30, 2020 (As Restated)** | 30,537,481 | 225,537 | (161,107) | (24,550) | 217,315 | 281,881 | 499,196 |
| Adjustments to noncontrolling interest | - | - | - | - | - | 33,926 | 33,926 |
| Adjustments to net loss | - | - | 19,251 | - | 19,251 | - | 19,251 |
| Deemed capital contribution from related party | - | 46,770 | - | - | 46,770 | - | 46,770 |
| Recognition of shares in treasury | (9,837,264) | - | - | (42,856) | (42,856) | - | (42,856) |
| Adjustment for change in ownership | - | 8,039 | - | - | 8,039 | (8,039) | - |
| Reduction to noncontrolling interest for Beneficient treasury | - | - | - | - | - | (3,444) | (3,444) |
| Total other activity as previously reported | 57,183 | (2,992) | (64,580) | - | (77,861) | 19,674 | (58,187) |
| **Balance, September 30, 2020 (As Restated)** | 20,757,400 $ | 277,354 $ | (206,436) $ | (67,406) $ | 170,658 $ | 323,998 $ | 494,656 |

F-76